**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17-cv-2393 |
| | ) | |
| COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities, | ) | Hon. Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO**
**DISQUALIFY COUNSEL FOR NAWARA**

**TABLE OF CONTENTS**


Introduction. 1

I. The Response Ignores the Substantial Evidence Provided in the Opening Brief as Well as Kurtz's Own Conduct – All of Which Supports Disqualification, and Which Plaintiff Utterly Fails to Rebut. 4

A. Defendants Have Documents Showing That Williams, as the Executive Director of Human Resources, was Not Merely a "Facilitator" Generally or With Respect to FFDs, Including Plaintiff's. 5

B. There is a Wealth of Evidence That Williams had Access to and Received Confidential and Privileged Communications About Plaintiff's FFD Process and this Lawsuit. 9

C. The Response Itself Shows That Williams Wrongfully Took Confidential Information with Her and Gave it to Kurtz, Who Refused Until the Day the Motion Was Filed to Return Some of it To The CCSO. 9

D. Kurtz Knew Williams Was Related to This Case From at Least April 2017, and Knew Williams was A High-Ranking Constituent of the CCSO in December 2017, When Kurtz Began Representing Williams. 11

E. Plaintiff's Own Discovery Responses in This Case Raise the Specter That Williams Has Given Kurtz Information That is Being Hidden Behind the Attorney-Client Relationship. 13

II. The Kurtz Firm Should be Disqualified Because They Created an Appearance of Impropriety and Have Failed to Meet Their Burden under *Schiessle* and its Progeny to "Clearly and Effectively" Show That No Confidential Information Was Shared by Williams. 14

A. The Appearance of Impropriety is Clear. 14

1. The apparent violations of Rules 4.2 and 4.4, along with the documented proof of a substantial relationship between Williams and the Nawara case are enough to create an appearance of impropriety. 15

2. The Response and Kurtz's misuse of FOIA requests since the Motion was filed also support the conclusion that she has violated Rule 4.4 by unfairly gaining access to CCSO documents protected by the Confidentiality Agreement and trying unfairly to gain access to privileged documents related to this case. 16

3. The presumption established by *Schiessle* cannot be overcome by the self-serving and evidence-free declarations provided by Plaintiff. 18

III. Kurtz's Disciplinary History is Relevant; and There Now is Even More Reason to Consider it. .......... 21

IV. Having Heidi Sleper Take Over the Case is No Remedy. .......... 25

CONCLUSION. .......... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Analytica, Inc. v. NPD Research, Inc.*,
708 F.2d 1263 (7th Cir. 1989) ....................21, 26

*Coburn v. DaimlerChrysler Servs. N. Am., L.L.C.*,
283 F. Supp. 2d 960 (N.D. Ill. 2003) ....................5, 14, 17, 18, 20, 21

*Crohan v. Village of Orland Park*,
2004 U.S. Dist. LEXIS 5006 (N.D. IL 2004) ....................17

*Cromley v. Bd. Of Educ. Of Lakeport Twp. High Sch. Dist. 205*,
17 F.3d 1059 (7th Cir. 1994), (Resp., Dkt. 108-1) ....................27

*Fuery v. City of Chicago*,
2018 U.S. App. LEXIS 22531 (7th Cir. 2018) ....................3, 15, 22, 23, 24

*Hill v. Shell Oil Co.*,
209 F. Supp. 2d 876 (N.D. Ill. 2002) ....................15

*Kapco Mfg. Co. v. C & O Enterprises, Inc.*,
637 F. Supp. 1231 (N.D. Ill. 1985), (Resp., Dkt. 108-1) ....................26

*Lanigan v. Resolution Trust Corp.*,
1992 U.S. Dist. LEXIS 17957 (N.D. Ill. 1992), (Resp., Dkt. 108-1) ....................20

*Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*,
2003 U.S. Dist. LEXIS 21754 (N.D. Ill. 2003) ....................3, 14

*Rojas v. Town of Cicero, Ill.*,
775 F.3d 906 (7th Cir. 2015) ....................22

*Sailsbery v. Vill. of Sauk Vill.*,
2017 U.S. Dist. LEXIS 194843 (N.D. Ill. 2017) ....................19

*Schiessle v. Stephens*,
717 F.2d 417 (7th Cir. 1983) ....................18, 19, 21, 26

*Tate v. Dart*,
No. 18 CH 02749 (Cr. Ct. Cook County, Feb 28, 2018) ....................10

*United States v. O'Malley*,
786 F.2d 786 (7th Cir. 1986) ....................3

*Williams v. Trans World Airlines, Inc.*,
588 F. Supp. 1037 (W.D. MO 1984) ....................5, 14

**Other Authorities**

ABA Rule 4.2....................................................................................................................15

Fed. R. Evid. 407 ...............................................................................................................7

Restatement (Third) of the Law Governing Lawyers ......................................................15

## *Introduction*

The central problem with Plaintiff's Response to Defendants' Motion to Disqualify is that it requires the Court to accept as true the blanket and conclusory claims of Ms. Kurtz, Ms. Williams, and Ms. Sleper. The reason this is a problem is three-fold. *First*, despite the mantra-like claim that Defendants have "no evidence" to back up their Motion, such evidence in fact was provided with the Opening Brief, and there now is even more evidence to present to this Court. That evidence directly contradicts the assertions made by the declarants, which is the sole evidence Plaintiff puts forth in opposition to the Motion. In particular, the evidence shows that Williams – despite her efforts to minimize her role as Executive Director of HR out of existence – was consulted about the Nawara matter both before and after his Fitness for Duty ("FFD") examination referral was made, fully consistent with her role as the head of the HR department.

Indeed, in November 2016, before the FFD determination was made, Defendant Reierson explicitly asked for Williams's help in assessing the Nawara referral to HR, along with eight other referrals. Later, in April 2017, Williams specifically directed Reierson to make changes to FFD procedures *in the direct wake* of Nawara filing his initial complaint in this case. Furthermore, the Court already has been provided with written privileged communications with Williams about this case, and it is undisputed both that Williams received these communications and that she sent to herself and took other materials with her that she should not have under the terms of her written Confidentiality Agreement. While Kurtz claims that "all" of those materials were returned on July 6, 2018 – the same day the present Motion was filed (a date that the Response gets wrong) – the Response tries to bury in a footnote the fact that not everything was returned. Notes Williams took about her work for the Cook County Sheriff's Office ("CCSO") have not been returned, under a purported claim of privilege – an apparently common tactic of the Kurtz firm. Moreover, the very

fact that Kurtz *had* these materials contradicts her claim that Williams shared none of the CCSO's confidential information with the firm.

It is now undisputed – and indeed confirmed – that Williams engaged the Kurtz firm as her counsel in December 2017, during the pendency of this lawsuit and others that Kurtz has against the CCSO. Indeed, it was in the context of a *different* lawsuit brought by the firm against the CCSO that Kurtz and Williams first spoke in December 2017 – when Kurtz, representing a different employee, communicated with Williams about that employee's job status as part of ongoing litigation in state court. Kurtz was on notice *at that time* not only that Williams was the head of HR but also that Williams was involved in the Nawara matter. Williams was *named* in TRO pleadings as the person in HR to whom Defendant Burke sent Nawara's FFD. The Response cannot avoid this plain fact by complaining that discovery disclosures responses did not later name Williams specifically as a witness, since those responses clearly referred Plaintiff back to the pleadings and documents in the case to identify people with knowledge of this case. Those pleadings and documents include direct references to Williams. In short, the claim that Defendants have "no evidence" to support their Motion is flat wrong; and saying it over and over again in the Response does not make it so.

*Second*, the law requires that once Defendants have established a relationship between Williams and this case (and they have), Plaintiff must provide evidence to "clearly and effectively" rebut the presumption in this case that by representing a high-ranking constituent of the CCSO, Kurtz and her firm have gained improper access to Defendants' confidential and privileged information and therefore must be disqualified. The only response provided by Plaintiff to rebut that presumption is the self-serving declarations of Williams, Kurtz, and Sleper denying knowledge or access. But courts repeatedly have held that mere denials of knowledge or of sharing

confidential and privileged information do not suffice to rebut the presumption, particularly where, as here, the declarations are so readily contradicted by contemporaneous records.

*Third*, the Response ignores entirely Williams's violation of the Confidentiality Agreement by which she was bound when she secretly engaged Kurtz; and Kurtz fails to come to terms with her firm's long, and growing, history of ethical and rules violations. Indeed, and remarkably, the Response nowhere even mentions the most recent example – the Seventh Circuit's decision in *Fuery v. City of Chicago*, 2018 U.S. App. LEXIS 22531 (7th Cir. 2018) – upholding sanctions against the Kurtz firm for a litany of dishonest and contumacious conduct and underscoring that the district court was "entitled to examine" and indeed "encouraged" to consider Kurtz's disciplinary history. *Id.* at 33-34. Likewise, this Court can and should consider the Kurtz firm's persistent gamesmanship in this case as a factor relevant to its decision – gamesmanship that includes abusive FOIA requests issued right after the Motion was presented seeking access to the very privileged documents presented to this Court with the Motion; hiding behind claims of "attorney-client privilege" in refusing to return Williams's notes about her work at the CCSO; and using the same excuse in refusing to identify a witness that Kurtz claims to have spoken to about a purported video of the altercation that spawned this case – a witness that could well be Williams herself.

This Court has the discretion to disqualify Kurtz from representing Nawara. *United States v. O'Malley*, 786 F.2d 786, 790-93 (7th Cir. 1986); *Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*, 2003 U.S. Dist. LEXIS 21754 at *23 (N.D. Ill. 2003). Defendants deserve a fair playing field and should not have to wonder whether and to what extent the former Executive Director of Human Resources has provided and may yet provide Nawara's counsel with confidential and privileged information. The only way to ensure that outcome is to disqualify the Kurtz firm.

## I. The Response Ignores the Substantial Evidence Provided in the Opening Brief as Well as Kurtz's Own Conduct – All of Which Supports Disqualification, and Which Plaintiff Utterly Fails to Rebut.

Plaintiff's Response Brief completely misses the point made in the Motion that Williams had access to and knowledge both of confidential and privileged information about this case *and* the FFD process in general. In so doing, Plaintiff simply fails to address the background and facts raised in pages 2-6 of Defendants Memorandum. (Resp. at 5, Dkt. 108-1.) Notably, these pages (supported by declarations and documents) expressly discuss (1) Williams's Confidentiality Agreement and the definition of Confidential Information therein (Br. at 2-3, Dkt. 88); (2) Williams's involvement with the FFD process at issue in this case (*Id.* at 3-4); (3) Kurtz's knowledge of Williams's involvement with this case and the responsibilities of the head of Human Resources (*Id.* at 5-6); (4) the confidential and privileged information Williams received regarding Plaintiff's FFD and this case (*Id.* at 6); and (5) Kurtz's apparent efforts to shield and obscure Williams's involvement by omitting her from discovery requests while naming her predecessor and nearly anyone else whose name appeared on a produced documents as custodians to be searched. (*Id.* at 6-7.)

Rather than address the actual facts presented to the Court, Plaintiff's Response repeats over and over again, like a mantra, three easily-rebuttable claims: (1) that Williams both knew and remembers nothing about the Nawara matter, was a mere "facilitator" between HR and other departments, and has not provided Kurtz with any confidential or privileged information about this or any other case (*see* Resp. at 1, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 17, Dkt. 108-1); (2) that Defendants have provided "no evidence" to support the proposition that Williams possesses and took confidential and privileged information about this case and others (Resp. at 1, 5, 8, 9, 11, 13, 17, Dkt. 108-1); and (3) that Kurtz and her firm have not received confidential and privileged information about this case or any other involving the CCSO. (Resp. at 2, 5, 8, 9, 11, 12, 13, 14, 16-17, 18, Dkt. 108-1). Every one of these propositions is belied either by documents already

before this Court, documents recently discovered in the ordinary course of searching for electronically stored information responsive to Plaintiff's discovery requests in this case[1], and by the arguments and documents raised in the Response itself.

### A. Defendants Have Documents Showing That Williams, as the Executive Director of Human Resources, was Not Merely a "Facilitator" Generally or With Respect to FFDs, Including Plaintiff's.

Plaintiff's Response argues that Williams was both too senior to know anything about day-to-day operations in HR and too junior to have any authority to direct how HR processes are performed. Ultimately, Plaintiff reaches the absurd conclusion that the highest-ranking person within HR merely "facilitated" communications between departments, rather like an elevated administrative assistant. (*See* Resp. at 3, Dkt. 108-1.) Not that there is anything wrong with being an administrative assistant – indeed, the Opening Brief cites at least two cases in which lawyers for employees in administrative roles were disqualified. *See Coburn v. DaimlerChrysler Servs. N. Am., L.L.C.*, 283 F. Supp. 2d 960, 967 (N.D. Ill. 2003) and *Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1041-43 (W.D. MO 1984). The point is that Williams's claims about her job being completely limited to this role are not true.

As discussed in Defendants' Opening Brief, Williams oversaw the FFD process, discussed HR policies and procedures with the CCSO's legal department, advised the CCSO on policies and procedures related to FFD processes, and worked with the CCSO's legal department on ongoing litigation and pre-litigation matters. (Br. at 2, Dkt. 88.) Despite this lawsuit's focus on Plaintiff's claims of disparate treatment and retaliation by members of the HR department, Plaintiff ignores

[1] The discovery process in this case has been rather unusually drawn out. The parties spent several months, starting in March 2018, trying to come up with an agreed set of custodians and search terms for the Defendants to use. After reaching an impasse, Defendants decided in June 2018 to proceed with those search terms it could agree to and gathered over a million documents from which to cull based on those terms. Over 16,000 documents were culled, and Defendants' counsel began reviewing them for responsiveness and privilege. Defendants discovered some of the documents cited herein in that process – after filing their Motion – and expects to produce the entire set in short order.

the fact that Williams was responsible for establishing HR policies and procedures relevant to this case and that her role required her to work closely with the Legal Department on matters similar to this case, and indeed, this case in particular.

Indeed, the description of the Executive Director of HR position that was in place when Williams originally applied for the role shows that Williams's responsibilities far exceeded those described in her declaration. (*See* Notice of Job Opportunity – Executive Director of Human Resources, Ex. 1.) Williams's "key" responsibilities and duties included (1) working "closely with the Compliance Officer to ensure Sheriff's Office compliance," (2) working "closely with the Legal Department on *all* Human Resources, labor, litigation and policy matters," (3) working "to develop systems and processes to enable Departments and employees to accomplish the goals set by the Sheriff, the Undersheriff, the Executive Staff, Bureau Chiefs and Department Heads on a timely basis," and (4) supervising "*all* subordinate personnel and ensur[ing] that supervisors administer discipline, when necessary." (Ex. 1 at 2 (emphasis added).) Importantly, Williams continued to be employed in this capacity while having secretly retained Kurtz (whom she knew was adverse to her employer) as her lawyer from December 2017 until April 16, 2018. (*See* Williams Decl. at ¶ 16, Dkt. 108-5.)

Plaintiff's assertion that Ms. Williams was merely a "facilitator" likewise ignores the declarations and documents attached to Defendants' Memorandum, which belie such a notion. (*See* Br. at 2-6, Dkt. 88; Christy Decl. at ¶¶ 5, 6, 8-18, Dkt. 88-1 at 18-21; Reierson Decl. at ¶¶ 17, 18, 37-39, Dkt. 88-1 at 81-87.) Each of these declarations make clear that members of the CCSO Legal and HR staffs regularly discussed confidential, privileged matters relating to specific employees (including Nawara) and FFD policies with Williams, despite Williams's self-serving denials and claims that she remembers nothing. (*Compare id.* to Williams Decl. at ¶¶ 5-14, Dkt. 108-5.)

Two telling documents recently discovered in this case (*see* footnote 1) directly contradict the claim that Williams "never spoke about specific employees" and had nothing to do with the Nawara FFD because her only job somehow was to coordinate with other departments. (Williams Decl. at ¶¶ 5-10, Dkt. 108-5). On November 11, 2016, for example – *before* the decision was made by HR to refer Nawara for an FFD examination, Defendant Reierson emailed her boss, Ms. Williams, regarding concerns she had about nine specific FFD referral requests – *including* the Nawara matter. (11/11/16 email to Ms. Williams, Ex. 2.) Attaching a chart listing specific employees by name and reasons for referral, Reierson said she was worried about what seemed to her to be an overuse of the FFD process, and asked Williams "can we talk about this when you are free?" *Id.*[2] This communication is entirely consistent not only with the Reierson declaration, but with the fact that Williams oversaw FFD referrals in the HR department.

More broadly, on April 19, 2017, Williams emailed Reierson to discuss changes to the FFD process, saying:

> when you have a moment let's discuss the changes within the FFD process. For example, we should no longer request employee sign off to allow the sheriff access to their medical records. Let's have corvel handle that process. We can talk further.

(4/19/17 email from Ms. Williams, Ex. 3.) This proposed process change *from* the Executive Director of Human Resources came *directly* in the wake of Nawara filing the initial complaint and TRO in this case. As detailed in the Opening Brief, the complaint was filed on March 29, 2017, and the TRO was filed shortly thereafter, on April 3, 2017. (Br. at 5-6). The TRO filing itself expressly complains that allowing the CCSO to obtain Nawara's medical records was "unlawful."[3] (Pl. TRO Mot. at 6 ¶ g, Dkt. 5.) Williams herself was included on numerous emails about the

---

[2] Identifying information about the 8 non-party employees has been redacted to protect their privacy. An unredacted version of the document will be provided to the Court *in camera*.

[3] As discussed in the pending Motion to Dismiss, there was nothing unlawful about the FFD procedures used with Nawara, and Defendants do not regard Williams's comments in this email as an admissible concession that there was. *See* Fed. R. Evid. 407.

filing and is named in the April 11, 2017 response to the TRO as the person to whom the referral was sent. (*See* Christy Decl. ¶¶ 7-17, Exs. A-K, Dkt. 88-1 at 19-79; Defs. TRO Resp. at 4, Dkt. 8). One week later, Williams sent her email to Reierson addressing the exact issue raised in the Nawara lawsuit and TRO, signaling a new procedure for the department of which she was the Executive Director. It thus defies reason to suggest, as Williams does, that she was paying no attention to Nawara, that she had nothing to do with this case, and that she just delegated everything about the FFD process to her subordinates.

Moreover, the existence of this document drives home the impropriety of Kurtz representing both Nawara and Williams at the same time. In the normal course, Defendants' counsel could have contacted Williams to ask her about her email, why she sent it, and what she meant by proposing the change. Now, because she is represented by Kurtz, any communication about the email would necessarily be made through the Kurtz firm. And because the Kurtz firm is counsel for Nawara, Williams and Kurtz would be able to discuss the document and its import under the umbrella of the attorney-client privilege, and Defendants could not inquire about such conversations. Even more concerning, Kurtz would have every incentive to prepare Williams to give as negative a connotation as possible to this and any other document involving her in this case.

Finally, Plaintiff's own exhibits to the Response show that Williams was not merely a "facilitator." For example, on December 19, 2017, Williams stated in an email that she was hired because "Sheriff Dart's desire was to hire a seasoned HR Leader… to create a strategic department to support his initiatives" and that her "role is to minimize employment risk on behalf of the [Sheriff's] Office." (Resp. Ex. 3, Dkt. 108-4 at 9.) On March 26, 2018, in an email to her supervisor, Joellen Bailey, Williams said that she "own[s] every error made by HR." (Resp. Ex. 3, Dkt. 108-4 at 31.) These statements do not comport with Plaintiff's and Williams's contentions

that she did not influence HR, or FFD policies and merely acted as a "facilitator." The effort to so minimize Williams's role cannot be credited as a matter of logic and of documented fact.

### B. There is a Wealth of Evidence That Williams had Access to and Received Confidential and Privileged Communications About Plaintiff's FFD Process and this Lawsuit.

The contention that Williams was so removed from her job that she either paid no attention to or cannot remember receiving privileged and confidential information about this case and about the FFD process likewise cannot be accepted as true. Once again, the documents tell a different tale. The April 19, 2017 email described above shows that Williams communicated process changes in handling FFD referrals as a result of this lawsuit having been filed in the first place. Exhibits B-G to the Christy Declaration – all of which are privileged communications about the *Nawara* suit and steps to be taken in response to it – confirm that Williams was privy to the legal department's thinking about this case and indeed *acted* on that thinking. (Dkt. 88-1 at 24-25.) Plaintiff's effort to minimize these communications because Williams's name sometimes appears on the "CC" rather than "To" lines is unavailing. The Court can see for itself that the information contained in the emails demonstrate an ongoing relationship between Williams and this litigation. (*See also id.* at Exs. H-K. Dkt. 88-1 at 46-79.)

### C. The Response Itself Shows That Williams Wrongfully Took Confidential Information with Her and Gave it to Kurtz, Who Refused Until the Day the Motion Was Filed to Return Some of it To The CCSO.

Plaintiff repeatedly claims that "Ms. Williams did not take, share, or email any confidential or privileged documents to Ms. Kurtz" (Resp. at 2, 5, 8, 9, 12, 16-17, Dkt. 108-1.) That assertion is belied, however, by the fact that the Response itself attaches confidential and deliberative information taken by Williams when she left her employment, retained for months in violation of Williams's Confidentiality Agreement, and only partially returned on July 6, 2018 – the very day

that the pending Motion in this case first was filed.[4] (*See* Resp. at 2, Dkt. 108-1; Resp. Ex. 3, Dkt. 108-4 at 1.)

Williams's Confidentiality Agreement (Br. Ex. 2, Dkt. 88-1) precludes her from disclosing confidential information, which includes personnel, propriety, and legal information. (*See* Br., Dkt. 88 at 2-3; Br. Ex. 2, Dkt. 88-1 at 16.) The Agreement requires that all documents related to Williams's employment or which may otherwise come into *immediately must be returned* to the CCSO upon the request of the Legal Affairs Department and/or *upon the termination* of employment. (*Id.*) The documents attached as Exhibit 3 to Plaintiff's Response all were confidential information that should have been returned in April 2018 and certainly after repeated demands from the CCSO. (*See* Scannell Decl. at ¶ 7, Dkt. 88-1 at 2.) For example, one of the attached email chains – sent while Kurtz was secretly representing Williams – expressly discusses CCSO proprietary information regarding benefit payments for specified former employees. (*See* Resp. Ex. 3, Dkt. 108-4 at 30-36.) Within this chain, one email was sent by Williams's supervisor to the CCSO's General Counsel "for counsel and assistance." (*See id.*at 31.)[5]

[4] Plaintiff contends that these documents were provided to the CCSO over a week before this Motion was filed. That is not the case. Defendants filed their Motion (Dkt. 76) and sought leave to file the supporting memorandum in excess of fifteen pages (Dkt. 82) on July 6, 2018 – the *same day* that Kurtz sent the documents that comprise Exhibit 3 to the Response to the States Attorney's Office and *after* Kurtz was informed Defendants would be moving to disqualify during the week in which it did. (*See* 6/29/18 Marmor Letter to Kurtz, Dkt. 88-1 at 144). After the presentment hearing on July 10, 2018, and with leave of the Court, Defendants filed their supporting memorandum on July 13, 2018. (*See* Dkt. 88.) Plaintiff simply has his dates wrong, and his argument that the Motion somehow is undermined by the partial production thus is rendered utterly pointless.

[5] Exhibit 9 to the Response, "12/19/17 Williams Email and [Inspector General] Complaint," also contains the CCSO's confidential information about ongoing litigation brought by the Kurtz firm after she began representing Williams. (Dkt. 108-10 at 1-3.) This exhibit does not include a complaint to the Inspector General. Instead, Plaintiff attaches an email memorandum sent to the Inspector General purporting to constitute "detailed information related to the complaint that was recently submitted via the online process." (*Id.* at 1.) The information provided by Williams to Kurtz regarding "Position Elimination" (*Id.* at 2) directly relates to an ongoing lawsuit filed by Kurtz against the CCSO on February 28, 2018 wherein the CCSO has filed a motion to disqualify Kurtz based on her representation of Williams. (*See* Br. at n.2, Dkt. 88; Mot. to Disqualify Kurtz in *Tate v. Dart*, Dkt. 88-1 at 119-29; Complaint, *Tate v. Dart*, No. 18 CH 02749 (Cir. Ct. Cook County, Feb. 28, 2018), Ex. 4 hereto.)

That Kurtz finally, and truculently, agreed on July 6, 2018 to return some of the documents that Williams took does not resolve anything. (Resp. Ex. 3, Dkt. 108-4 at 1.) It has been established that Williams should not have taken the documents – but she did. It also is clear that Kurtz should not have received or reviewed the documents – but she plainly did, since she is the one who returned them, and she feels free to opine as to whether they are confidential or not. Furthermore, the claim that Williams "produced all of the CCSO documents in her possession" is belied by very email trail by which Kurtz purported to return the documents Williams took. (*See* Resp. at 2, n. 1, Dkt. 108-1; Resp. Ex. 3, Dkt. 108-4 at 1.)

Significantly, Kurtz states both in that email and in the Response that "handwritten notes" taken by Williams were withheld on a claim of attorney-client privilege. *Id.* Since it was Williams's practice to take notes during meetings at the CCSO and about Plaintiff (*see* Reierson Decl. at ¶ 38, Dkt. 88-1 at 86), Defendants have good reason to doubt the claim of attorney-client privilege over them and to conclude they are the CCSO's confidential information. And the failure to return these notes begs the question of what else Williams may have taken that has not been returned – not to mention the question of what confidential information Williams may have told Kurtz that would not show up in any document. Again, we are asked to take Williams and Kurtz at their word. Again, there is reason not to.

**D. Kurtz Knew Williams Was Related to This Case From at Least April 2017, and Knew Williams was A High-Ranking Constituent of the CCSO in December 2017, When Kurtz Began Representing Williams.**

The notion that this Motion should be denied because prior counsel failed explicitly to include Karyn Williams's name in Rule 26 disclosures once again ignores the facts. Plaintiff's focus on discovery responses in this case is immaterial to whether Kurtz knew of Williams's role and her relationship to this lawsuit. (*See* Resp. at 3-4, Dkt. 108-1.) Defendants' opening brief discusses at length the early stage at which they informed Kurtz that Williams was involved with Plaintiff's FFD process. (Br. at 5-7, Dkt. 88.) Defendants discovery responses and Rule 26

disclosures refer Plaintiff to produced documents and additionally disclosed "any person with knowledge of the allegations raised in the pleadings at issue, who are *identified or referred to* in Plaintiff's Complaint…." (*See* Resp. Ex. 1, Dkt. 108-2 at 6; s*ee, e.g.*, Resp. Ex. 2, Dkt. 108-3 at 25, emphasis added.)

Williams is referenced not only in the TRO filings from Defendants – as noted in the Opening Brief – but she also is "identified or referred to" in Plaintiff's Complaint in this case. Both the First Amended Complaint ("FAC") and, with a conspicuous change, the Second Amended Complaint ("SAC") – filed just hours *after* the present Motion – each cites to the FFD referral as part of their allegations. (*Compare* FAC at at ¶ 50, Dkt. 22 and SAC at ¶ 51, Dkt. 89.) Referring to the FFD request sent to Williams alone, Plaintiff's FAC alleges "Defendant Burke stated that he requested *Human Resources* 'meet with Officer Nawara and determine whether a fitness for duty evaluation was appropriate.'" (FAC at ¶ 50, Dkt. 22 (emphasis added).) Shortly after Defendants filed their Motion to Disqualify, Plaintiff sought to amend the FAC and changed this allegation to "Defendant Burke stated that he requested *Shelby, and Reierson* 'meet with Officer Nawara and determine whether a fitness for duty evaluation was appropriate.'" (SAC at ¶ 51, Dkt. 89 (emphasis added).) This change to that paragraph is an obvious effort to distance Williams as the head of HR from this lawsuit. Indeed, the language quoted by Plaintiff is taken from the affidavit of Defendant Burke, which was filed during the TRO proceedings. Burke plainly refers, not to Shelby and Reierson, but to Williams in that affidavit, in which he averred that he sent the referral memorandum to "*the Executive Director of the Bureau of Human Resources, Karyn Williams*, requesting that Human Resources meet with Officer Nawara and determine whether a fitness for duty evaluation was appropriate." (Burke Decl. at ¶ 9, Dkt. 8-2 (emphasis added).) That Plaintiff tries to change the names used by Burke in his affidavit in his SAC likewise is a patent effort to excise Williams from the process.

Even if Kurtz and her firm are to be believed that they were unaware that Williams had confidential and privileged information related to this lawsuit, Kurtz's initial meeting and "conversation" with Williams were directly occasioned by Kurtz's representation of *another* client who had sued the CCSO. This alone demonstrates that Kurtz knew Williams was the head of HR at the CCSO and handled matters related to cases brought by Kurtz against her employer. (*See* Williams Decl. at ¶ 15, Dkt. 108-5.) And Williams could not have failed to grasp that Kurtz was adverse to the CCSO, since Kurtz publicly paraded the client into the Sheriff's offices with news cameras rolling, and attacked the Sheriff in a variety of published reports. (*See* Ex. 13, published media reports from December 4, 2017).

This is why it is especially remarkable that Kurtz omitted Karyn Williams from the list of custodians she asked Defendants to search for ESI in March of this year, while at the same time asked that the records of Williams's predecessor in the role – Rosemarie Nolan – be searched. Nolan had absolutely no involvement with this case and has never been identified as a person with knowledge of any aspect of this case – a point Kurtz declined to address in Plaintiff's Response. (Br. at 6-7, Dkt. 88.) Nevertheless, Kurtz began representing Williams without seeking approval in this Court or any other court despite the obvious risk Williams would have and disclose, intentionally or unintentionally, confidential and privileged information.[6]

### E. Plaintiff's Own Discovery Responses in This Case Raise the Specter That Williams Has Given Kurtz Information That is Being Hidden Behind the Attorney-Client Relationship.

That risk is not merely academic – it is borne out by Plaintiff's own conduct during discovery in this case. On May 18, 2018, as part of the protracted meet-and-confer process concerning various discovery requests in this case, Kurtz represented to counsel for Defendants

[6] Williams's claim that Kurtz instructed her to not to provide attorney-client privileged information is not supported by any written document and does not state when such an alleged instruction was made. (*See* Williams Decl. at ¶17, Dkt. 108-5.) Additionally, this instruction is limited only to attorney-client privileged information and does not address confidential or otherwise protected information. (*Id.*)

that she had a witness who saw a video of the incident alleged in the Complaint between Plaintiff and Defendant Jones-Hayes. This statement was surprising since Defendants and their counsel have diligently searched for any existing video recordings of this incident and could not find such a video. On May 22, 2018, Defendants served an interrogatory on Plaintiff expressly asking for the name of the alleged witness to whom Kurtz referred. (Certain Defs. Third Set of Interrogatories to Plaintiff, Ex. 5.) Plaintiff refused to provide the name, claiming that the identity of the person was protected by the attorney-client and attorney work product privileges – the same basis on which the handwritten notes taken by Williams have not been returned. (Pl.'s Ans. To Defs. Third Set of Interrogatories, Ex. 6.) Facts, of course, are not protected by these privileges. And Kurtz's insistence that she will not reveal the witness's name raises the obvious possibility that the witness was Ms. Williams herself. As discussed further below, this tactic of improperly claiming privilege was identified as a basis for the sanctions meted out, and upheld, in the *Fuery* decisions.

## II. The Kurtz Firm Should be Disqualified Because They Created an Appearance of Impropriety and Have Failed to Meet Their Burden under *Schiessle* and its Progeny to "Clearly and Effectively" Show That No Confidential Information Was Shared by Williams.

### A. The Appearance of Impropriety is Clear.

As detailed in the Opening Brief, courts focus on the appearance of impropriety in deciding disqualification cases. *See Coburn v. DaimlerChrysler Servs. N. Am., L.L.C.*, 283 F. Supp. 2d 960, 967 (N.D. Ill. 2003) ("While [the attorney] took the precautions he thought were necessary, he is covered in ethical white dust."); *Ridge Chrysler Jeep, L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*, 2003 U.S. Dist. LEXIS 21754 at *23 (N.D. Ill. 2003) (it is within a court's discretion to disqualify counsel for even the appearance of impropriety); *Williams v. Trans World Airlines, Inc.*, 588 F. Supp. 1037, 1041-43 (W.D. MO 1984) (a court may find an ethical violation where there is merely a "reasonable possibility that some specifically identifiable impropriety did in fact occur.") (cited with approval in *Coburn*). Here, quite frankly, there is more than a mere appearance

of impropriety in secretly representing a high ranking official like Williams – but the appearance is enough under the law.[7]

**1. The apparent violations of Rules 4.2 and 4.4, along with the documented proof of a substantial relationship between Williams and the Nawara case are enough to create an appearance of impropriety.**

As discussed at length in the opening brief (*see* Br. at 9-10, Dkt. 88), Kurtz appears to have violated Rule 4.2 by engaging in communications with Williams while she worked as the highest-ranking individual in the CCSO HR Department, supervised Defendants Shelby and Reierson, and had communicated with legal counsel for the CCSO about to this lawsuit and others. (*See, e.g.*, 12/18/17 Email, Dkt. 88-1 at 79; Christy Decl. ¶ 18, Dkt. 88-1 at 21.) *See also* ABA Rule 4.2 cmt. 7. Plaintiff completely ignores Defendants' Comment 7 to Rule 4.2 and instead focuses on an inapplicable statement from Comment (d) to the Restatement (Third) of the Law Governing Lawyers ("Restatement") and case law addressing "everyday business discussions.[8]" (*Compare* Br. at 10, Dkt. 88 and Resp. at 10, Dkt. 108-1.) The Response thus fails to rebut the contention that Williams was a constituent and therefore a represented party in this case when the engagement began. Moreover, Restatement § 99 cmt. n only adds to the conclusion that Kurtz should be disqualified: "a court may disqualify the offending lawyer when necessary to protect against a significant risk of future misuse of confidential information obtained through the contact . . . when disqualification is appropriate to deter flagrant or reckless violations."

---

[7] In effort to wriggle out of Defendants' authority, Plaintiff repeats a variation of the mantra noted in section I that things are unrebutted when they are not. (*See* Resp. at 16-17, Dkt. 108-1.) This kind of through-the-looking-glass creation of an alternative reality is confounding, but unfortunately also consistent with Kurtz's conduct in other cases. *See Fuery v. City of Chicago*, 2018 U.S. App. LEXIS 22531 at *29-32 (7th Cir. 2018). The Response also repeatedly argues that the access to confidential information is somehow speculative – it is not. At a minimum, this claim is belied by the very documents Kurtz returned to the State's Attorney on the day this Motion was filed.

[8] *Hill v. Shell Oil Co.*, 209 F. Supp. 2d 876, 880 (N.D. Ill. 2002) is wholly distinguishable because it involved communications with gas station attendants about whether a gas pump was "prepay or not" – which clearly is an everyday business discussion.

Defendants cannot now determine what Williams specifically may have told her lawyer during the months that Kurtz secretly was representing her (or indeed thereafter) because those communications are shielded by privilege. But given that the appearance of impropriety is enough for disqualification, and the risk of future misuse is high, Defendants are not required to do so for this Court to grant their Motion.

**2. The Response and Kurtz's misuse of FOIA requests since the Motion was filed also support the conclusion that she has violated Rule 4.4 by unfairly gaining access to CCSO documents protected by the Confidentiality Agreement and trying unfairly to gain access to privileged documents related to this case.**

The evidence about violation of Rule 4.4. has become even stronger since the Motion was filed. The Response confirms that Williams took confidential documents with her and gave them to her lawyer. (Resp. at 2, n.1, Dkt. 108-1; *see, e.g.*, Resp. Ex. 3, Dkt. 108-4.) The Response also confirms that Kurtz and her client refused to return the handwritten notes and are using the attorney-client relationship to do so. (Resp. at 2, n.1, Dkt. 108-1.) By using the attorney-client relationship to obtain confidential documents and to retain other documents, Kurtz plainly has adopted an improper means of violating the CCSO's legal rights under the Confidentiality Agreement and as to its legal privileges.

But the improper efforts do not stop there. On the very night following the presentment hearing for this Motion, and on the following day, Kurtz and her firm decided to use FOIA requests to obtain the same privileged documents presented to this Court *in camera* for the pending Motion.

On July 10, 2018, Kurtz sent a FOIA request to the CCSO for "[a]ll emails in which Karyn Williams was sent, received, or copied on any emails wherein Officer John Nawara's name was mentioned, using the search term "Nawara" in the subject line or body of the email or any attachment to the email, from September 1, 2016 to the present." (Ex. 7.) The next day, on July 11, 2018, a person who appears to be related to Kurtz lawyer Jacob Exline – Jessica Stencel Exline – sent the CCSO a FOIA request for "[a]ll emails between John Nawara" and *fourteen* CCSO

employees previously identified by Plaintiff as desired custodians for Defendants' review of electronically stored information. This hugely burdensome request came despite the fact that counsel for the CCSO previously objected to some of the custodians and that the parties had not concluded their Rule 37 discussions about those custodians. (Ex. 8.) Again on July 11, 2018, Dana Kurtz sent another FOIA request to the CCSO seeking "[a]ll emails from Karyn.Williams@cookcountyil.gov to karynklw@aol.com" from 2016 through 2018. (Ex. 9.) It is obvious that this request relates to the pending motion to disqualify and also appears to be an effort to gain access to the privileged and confidential documents Defendants submitted to this Court *in camera* or under seal. Even more concerning, when the CCSO's FOIA office objected to the burden of producing these materials, *Kurtz took the position that the privilege had been waived* on a technicality. (7/26/18 Email from Kurtz to Scannell, Ex. 10.) Setting aside the troubling gamesmanship this course of conduct represents, *see Crohan v. Village of Orland Park*, 2004 U.S. Dist. LEXIS 5006 (N.D. IL 2004) ("circumstances in this case indicate that [Kurtz] has engaged in gamesmanship" in discovery), there is sufficient evidence to show apparent violation of Rule 4.4.

Even beyond the relationship Williams has with this lawsuit and her sharing confidential information with Kurtz, the impropriety also is evident because Kurtz began secretly representing Williams whose job responsibilities included working with the CCSO's legal department on lawsuits brought by the Kurtz Firm. For those same months, Williams worked as the highest-ranking individual in the HR Department, participated in privileged communications with Legal, and created materials for Kurtz. (Williams Decl. at ¶ 16, Dkt. 108-5; Resp. Ex. 3, Dkt. 108-4 at 1.) Defendants' concerns could have been addressed before the Court had Kurtz not taken an aggressive approach to her representation of Williams. *See Coburn*, 283 F. Supp. 2d at 967 ("[i]nstead of aggressively seeking to secure a new client, [the attorney] should have acted

conservatively; he should have ceased all contacts and immediately sought guidance from this Court.") However, Kurtz decided to exacerbate the impropriety by keeping her representation of Williams secret for months while Williams was employed as the highest-ranking individual in HR for the CCSO.

Plaintiff's attempt to distinguish Kurtz's representation of Williams as somehow less aggressive than Vrdolyak's in *Coburn* is belied by the facts of that case. (Resp. at 15, Dkt. 108-1.) As soon as Vrdolyak learned of the plaintiff's employment, he immediate told her not to tell him "*anything* about her work." *Coburn*, 283 F. Supp. 2d at 962 (emphasis added). The *day after* retaining Vrdolyak, the employee informed her employer about the representation, thereby allowing the employer to transfer her to another department to limit her access to information related to Vrdolyak's litigation. *See id.* Kurtz took no such precautions to limit her access to information, recklessly and needlessly increasing the likelihood that Williams would provide her with confidential and privileged information related to this case and others against the CCSO.

**3. The presumption established by *Schiessle* cannot be overcome by the self-serving and evidence-free declarations provided by Plaintiff.**

A separate ground for disqualification is the presumption established under *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir. 1983) that Kurtz obtained confidential and privileged information by taking Williams on as a client. The presumption applies here because, as demonstrated above and in the Opening Brief, Williams's work at the CCSO was "substantially related" to the claims in this case. *See id.* at 420-21. Plaintiff simply fails to come to terms with this presumption, by overstating Defendants' burden, and by fully ignoring Plaintiff's own burden of establishing "clearly and effectively" that no confidences were shared between Williams and her lawyers. *See Coburn*, 283 F. Supp. 2d at 264 (the party rebutting these presumptions must meet a "very strict standard of proof" and must "submit objective and verifiable evidence that clearly rebuts *each* presumption.") (emphasis added).

Merely saying no confidences were shared does not make it so; but that is what the declarations from Williams and Kurtz boil down to.[9] Likewise, saying things are "unrebutted" – as the Response claims four times on page 8 – when they plainly are not, cannot change the facts. *Of course* it is disputed that Kurtz "was not privy to confidential information about Nawara." And *of course* it is disputed whether Williams has provided confidential information to Kurtz about the pending matter or about the Sheriff's Office. (Resp. at 8, Dkt. 108-1). Not only are these disputed matters, they are the very subject of the Motion, and amply supported by evidence. The presumption has been established, and Plaintiff must overcome it or be disqualified.

As set forth in *Schiessle*, where a lawyer working on a lawsuit transfers to an opposing camp, there is a presumption that confidences were shared with the opposing camp even where the lawyer did not then represent the opposing party. *See* 717 F.2d at 419-21 (disqualifying law firm for lack of "institutional mechanisms" to prevent disclosure where attorney joined the plaintiff's law firm prior to his former firm's representation of the defendants and where he disclaimed having any communications regarding the lawsuit at issue with his new firm). "The evidence presented to rebut this presumption must 'clearly and effectively' demonstrate that the [transferring] attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation." *Id.* (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 723 (7th Cir. 1982). It was not enough in *Schiessle* to rebut the presumption by providing a declaration – as Williams and Kurtz have done here – disclaiming conversations about the case with the new firm and claiming the lawyer would not recognize the parties. *Id.* at 419.

[9] *Guillen* is not really relevant to this Court's determination of the grounds for disqualification. (Rsp. At 13). The rule propounded in *Guillen* and advanced by Plaintiff is merely the precursor to *Scheissle* and *Coburn* tests, which expound upon it and articulate the test for disqualification based on the presumption of shared confidences. *See Sailsbery v. Vill. of Sauk Vill.*, 2017 U.S. Dist. LEXIS 194843 at *7-6 (N.D. Ill. 2017), (Resp. at 7, Dkt. 108-1), (favorably citing *Schiessle* and *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252 (7th Cir. 1983), (Br. at 14, Dkt. 88), for the test to determine whether to disqualify counsel).

Without limiting its application, the *Coburn* court rephrased the *Schiessle* test to apply to cases like this one, where it is the client who switches sides rather than the lawyer. *Coburn*, 283 F. Supp. 2d at 964. The *Schiessle* test, as articulated in *Coburn* for circumstances involving the representation of an employee who received confidential and privileged information during her employment, supports disqualification here. *See* 283 F. Supp. 2d at 962 ("if a court finds that there is a substantial relationship between [plaintiff's] work and claim, the court will presume that [plaintiff] obtained confidential information while working for Defendant and provided that confidential information to Plaintiff's counsel when she hired them to represent her.").

Indeed, Plaintiff's own case, *Lanigan v. Resolution Trust Corp.*, 1992 U.S. Dist. LEXIS 17957 (N.D. Ill. 1992), (Resp. at 7, 14, Dkt. 108-1), supports disqualification here. There, a lawyer represented a bank in bankruptcy matters and, with permission, the bank's Chairman regarding his employment agreement. The RTC later took over as receiver, and the Chairman sued RTC for repudiation of his employment agreement. Seeing the potential conflict, the lawyer informed RTC that she could no longer represent them in bankruptcy matters because of her representation of Lanigan in the employment dispute. RTC moved to disqualify the lawyer alleging a substantial relationship between the work she performed on bankruptcy matters and her representation of Lanigan. In denying the disqualification, the court made clear that if Hollis "*could have obtained* confidential information" in her bankruptcy work that would be relevant to Lanigan's repudiation claims, then the matters would have been substantially related, "regardless of whether such information was actually obtained." *Id.* at *6 (emphasis in original) (citing *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1989)).

Here, Defendants have provided this Court with documents and declarations demonstrating that Williams received confidential and privileged information regarding this case throughout her employment at the CCSO's HR Department. Williams also played a significant role in FFD

policies and procedures – the central issue in this case – throughout her tenure. The declarations, in comparison, are unreliable and hollow averments that do not come close to rebutting the presumption that confidences have been shared. As in *Coburn*, *Schiessle*, and *Analytica*, the declarations are insufficient to avoid disqualification. *See, e.g.*, *Coburn*, 283 F. Supp. 2d at 966-67 (attorney's affidavit deemed insufficient where he continued to have contact and failed to seek guidance from the court); *Schiessle*, 717 F.2d at 419 (attorney's affidavit deemed insufficient where he averred that his work was not related to the *Schiessle* case, he had not discussed any information he received from his former firm, he did not remember the merits of the case, and had no contact with the case); *Analytica*, 708 F.2d at 1269 (finding affidavits averring no improper communication were insufficient where the lawyers' interest in retaining a client and "denying a serious breach of professional ethics *might outweigh any felt obligation to come clean*.") (emphasis added).

## III. Kurtz's Disciplinary History is Relevant; and There Now is Even More Reason to Consider it.

Not surprisingly, Kurtz seeks to minimize her firm's disciplinary history as "irrelevant" and attacks Defendants for even raising it as some effort to "besmirch" her. (Resp. at 18, Dkt. 108-1.) That is not even remotely accurate. *First*, Kurtz has put her own credibility and that of her firm at issue by submitting declarations containing broad brush factual averments that do not withstand scrutiny. She likewise has sought to distinguish the *Coburn* case by suggesting that the lawyer there was "aggressive," implying that she and her firm are not. The question of whether those averments and arguments can be accepted cannot be considered in a vacuum, but instead open the door even wider to consideration of the Kurtz firm's disciplinary history.

*Second*, as the Seventh Circuit said just weeks ago on August 14, 2018 – in an appeal of a sanctions case about Kurtz herself – a district court is "entitled to examine, as one factor in its consideration, the modus operandi of the attorney as evidenced by her prior disciplinary history."

*Fuery*, 2018 U.S. App. LEXIS 22531 at *46. Citing the same cases noted by Defendants in the Opening Brief here, (Br. at 16, Dkt. 88), Judge Rovner continued, remarking that:

> Less than a year before the trial, this court, in an entirely separate matter, described a string of misconduct by Kurtz in a trial in the district court below and noted that she had a substantial disciplinary history. *Rojas v. Town of Cicero, Ill.*, 775 F.3d 906, 909-10 (7th Cir. 2015). The *Rojas* panel highlighted that history with a string cite of seven cases in which Kurtz had been disciplined. *Id.* It also noted that, "Kurtz's unwillingness to conform her conduct to requirements laid down by judicial orders or rules of procedure is unlikely to change unless courts respond firmly." *Id.* at 910. **And indeed we were right.**

*Fuery*, 2018 U.S. App. LEXIS 22531 at *46 (emphasis added). The basis for this rather extraordinary condemnation from Judge Rovner was the litany of contumacious behavior by Kurtz in a lengthy case and trial, despite the prior admonition from the *Rojas* court. Kurtz, somewhat surprisingly, makes no mention at all of this decision in the Response, despite the fact that it came down nearly two weeks before the Response was filed.

*Fuery* plainly approves of district courts considering Kurtz's disciplinary history in reaching decisions like the one facing this Court. "When an attorney repeatedly violates the standards and oaths of the profession, then a court may take notice of that attorney's disciplinary history when evaluating whether sanctions are appropriate." *Id.* at 47. But there are even more compelling reasons to consider the *Fuery* decision itself – because it identifies several types of misconduct by Kurtz that has direct relevance to this case.

For example, the decision describes numerous instances in which Kurtz appeared to have coached her clients to say things to the court to avoid sanctions in the case. Pages 10-23 of the decision detail how, one-by-one, the plaintiffs tried to explain away their violations of *in limine* rulings in the case by absolving their lawyer, Kurtz. Neither the trial court, nor the Seventh Circuit, accepted such conduct as proper or persuasive – finding instead that their statements "support[ed] the finding that Kurtz or her agent had instructed her clients to inform the judge that they had been prepared on the rulings *in limine*." *Id.* at *21. Remarkably, the appellants complained "that the

district court's inquiries about whether Kurtz properly prepared [her client] for trial violate the attorney-client privilege." *Id.* This of course is precisely the problem here. Defendants cannot test the bald assertions made in the declaration obtained by Kurtz from her client. There is no direct way to determine whether the statements Williams has made about her communications (or lack thereof) with Kurtz about this case are coached. This Reply brief does provide substantial evidence to suggest that many of the averments about Williams's job, lack of knowledge, and absence of memory are untrue – and that should be enough for disqualification. But Kurtz's documented history of coaching witnesses to tell a court untruths to avoid a sanction cannot be ignored.

Kurtz's own declaration also puts into question her reputation for truthfulness and once again justifies consideration of her disciplinary history. Here, too, the *Fuery* decision is instructive. On pages 23-28 of the decision, the Appellate Court details breaches by Kurtz of the district court's ruling concerning communications with the media. More to the point, the court concludes, as did the court below, that Kurtz's denials of having breached that ruling demonstrated a "lack of candor" that the district court was justified in considering. *Id.* at *28. Here, there seems to be a similar lack of candor in the Kurtz declaration – particularly as to the question of whether Kurtz had access to the CCSO's confidential information when the documents she herself returned (as well as the notes she said she refuses to return) on July 6th show otherwise.

A third and even more direct parallel between this case and the *Fuery* case is the dispute that arose in that case about handwritten notes. *Id.* at *29-32. As in this case, a question arose in *Fuery* over handwritten notes that were withheld by the Kurtz firm. During cross-examination at trial, plaintiff stated that she wrote a set of notes about the matter. *Id.* at *28-29. The plaintiff then stated that she gave the notes to Kurtz, which contradicted deposition testimony that she threw the notes away. *Id.* Kurtz came up with a series of explanations for why the missing notes were not

produced, including – as here – that she instructed the plaintiff to make them and thus they were privileged. *Id.* at *29-30. The district court ultimately concluded that "Kurtz's behavior when addressing this issue during trial was just another example of her staking out the most favorable position to herself and only backing down, incrementally, when presented with facts that contradicted her preferred narrative." *Id.* at *31. Both the act of shielding information from the defendants under suspect claims of privilege and the habit of staking out self-serving (and again suspect) positions despite evidence to the contrary are evident in this case. *Id.* at *29-31.

The *Fuery* court concluded that Kurtz's "misconduct was repeated, frequent, willful and intentional; wasted the court's time with sidebars and investigations; unfairly distracted the defendants' counsel from time it could have been preparing the merits of its defense; and prejudiced the defendants." *Id.* at *36. The Seventh Circuit agreed that the sanctions decision was well within the discretion of the court, noting that the court was exercising its "inherent authority to rectify abuses to the judicial system by an attorney whose job it is to aid the court in the administration of justice." *Id.* at *47.

The Seventh Circuit now twice has advised the district courts that "Kurtz's unwillingness to conform her conduct to requirements laid down by judicial orders or rules of procedure is unlikely to change unless courts respond firmly." *Id.* at *46 (quoting *Rojas v. Town of Cicero, Ill.*, 775 F.3d 906, 910 (7th Cir. 2015)). Kurtz's reckless agreement to represent Williams, in secret and at the same time that she was representing Nawara and other plaintiffs in employment cases against the CCSO, was the wrong thing to do. It not only created the appearance of impropriety, it *was* improper. The declarations from Kurtz and the firm's client, Williams, do not withstand scrutiny and cannot satisfy the legal requirements in this Circuit to avoid disqualification. The pugnacious and abusive tactics employed by Kurtz to hide information – *e.g.* the notes and the identity of her secret witness – behind the attorney client privilege and to chase privileged material

with FOIA requests demonstrate that this case already is on a path that could turn out like *Fuery*. Both Defendants, having met their legal burdens, and this Court should not have to wait to see if the same sorry result will play out here. To protect the integrity of the process, Defendants ask this Court to respond firmly, and exercise its discretion to disqualify Kurtz and her firm from representing Nawara in this case.

## IV. Having Heidi Sleper Take Over the Case is No Remedy.

Plaintiff's last-ditch argument is that even if Kurtz is disqualified, her partner Heidi Sleper should be permitted to represent Nawara. This suggestion cannot be countenanced. Sleper appeared for Plaintiff during the presentment of this Motion and made a series of statements regarding the firm's representation of Williams, including why and when the representation began, and the steps allegedly taken to ensure against disclosure of confidential information. (7/10/18 Hrg. Tr., Ex. 11, at 4-7). This directly contradicts the statement in Sleper's declaration that she knows nothing (a common refrain) about the Williams matter and has "no knowledge of any of the facts or circumstances surrounding Ms. Kurtz's representation of Ms. Williams." (Sleper Decl. at ¶¶ 3-4, Dkt. 108-11.) It likewise is difficult to square Sleper's representations to this Court with the averment that she has "not discussed, reviewed any documents or emails, or have any knowledge of any of the facts or details surrounding any claims Ms. Williams may have against the Cook County Sheriff's Office relating to her employment." (*Id.*)

If these averments are true, how could Ms. Sleper have represented to the Court on July 10, 2018 that Williams "came to us looking for representation regarding her own claims of retaliation relating to her termination. That's how we became involved in representing her." (Tr. at 4.) Setting aside the misleading nature of this claim – the suggestion that Williams didn't retain the Kurtz firm until after she was terminated, when even the Response admits it was months before – Sleper clearly wanted the Court to believe that she knew the facts about Ms. Williams's engagement of the Kurtz firm. Indeed, Sleper also told the Court that Williams "has been advised

under the rules not to disclose any information that she could have obtained through her position that could be considered attorney-client privileged." (Tr. at 4-5.) Again, if Sleper really knows nothing about the Williams retention, how could she make such a statement to the Court? The same pattern of changing stories to suit the Kurtz firm's purposes seems apparent here, again.

Moreover, Sleper does not meet the high bar to rebut the presumption that she received confidential or privileged documents or information from Williams, because the Response fails to establish that there is any screening mechanism at the Kurtz firm. To rebut the presumption, it is not enough to declare that Sleper did not discuss the Williams matter with her employer or the client – the absence of a mechanism is enough on its own to disqualify all lawyers at a firm. *See Scheissle*, 717 F.2d at 419-21 (disqualifying law firm for lack of "institutional mechanisms" to prevent disclosure even where the uncontroverted testimony showed the transferring attorney did not discuss the matter at issue with anyone); *Analytica*, 708 F.2d at 1267-68 (claim that no information about the matter was received does not show the existence of a "Chinese Wall" to rebut the presumption of shared confidences). Indeed, it is hard to imagine any effective screening mechanism could be employed at a firm as small as the Kurtz Firm. The firm's website lists only two lawyers – partners Kurtz and Sleper. (Kurtz Website "Team", Ex. 12).

Plaintiff's caselaw does not warrant lowering the standard for screening mechanisms to rebut the presumption of shared confidences and the appearance of impropriety that would result if Sleper, as an employee of the Kurtz Firm, were to now solely represent Plaintiff. In *Kapco Mfg. Co. v. C & O Enterprises, Inc.*, 637 F. Supp. 1231 (N.D. Ill. 1985), (Resp. at 19, Dkt. 108-1), the court based its decision not to require an institutionalized screen because there was evidence that it was brought to retaliate against opposing counsel and a former secretary. *Id.* at 1240-41. Additionally, other firm attorneys testified that they did not even work with the attorneys in question or know where the file was located. There is no reason to deviate here from the

longstanding requirement that a formal screening mechanism must be in place – and of course, it is too late now to create one. *Cromley v. Bd. Of Educ. Of Lakeport Twp. High Sch. Dist. 205*, 17 F.3d 1059, 1065 (7th Cir. 1994), (Resp. at 19, Dkt. 108-1), describes various institutional mechanisms that have been accepted for an attorney-transfer case – all of which "must be employed as soon as the disqualifying event occurred."

**CONCLUSION**

Defendants understand that they are seeking extraordinary relief from this Court and have done so advisedly. The record supporting the Motion is substantial, while Plaintiff's Response rests on conclusory and unreliable declarations that should not be countenanced. The case law establishes that the Motion should be granted. And the Kurtz firm's conduct both in this case and in many previous matters strongly counsels in favor of granting the Motion. For these and the foregoing reasons, Defendants ask that this Court exercise its discretion and disqualify the Kurtz Firm from representing Plaintiff in this case.

Respectfully submitted,

THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY,

/s/ Sarah R. Marmor
Stephanie A. Scharf
Sarah R. Marmor
Lynn Moffa
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
lmoffa@scharfbanks.com
mchurma@scharfbanks.com

**CERTIFICATE OF SERVICE**

TO:

Dana L. Kurtz
Heidi Karr Sleper
Jacob Exline
KURTZ LAW OFFICES, LTD.
32 Blaine
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
jexline@kurtzlaw.us
*Attorneys for John Nawara*

Nile N. Miller
Kathleen Cunniff Ori
Jay Rahman
COOK COUNTY STATE'S ATTORNEY'S OFFICE
500 Richard J. Daley Center
Chicago, IL 60602
nile.miller@cookcountyil.gov
kathleen.ori@cookcountyil.gov
jay.rahman@cookcountyil.gov
*Attorneys for County of Cook*

I certify that on September 26, 2018, I caused to be filed the foregoing **Defendants' Reply In Support of Their Motion to Disqualify Counsel for Nawara** using the Court's CM/ECF system, which will send e-mail notification of the filing to all counsel of record. These documents are available for viewing and downloading via the CM/ECF system.

/s/ Sarah R. Marmor