# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

---------------------------------------------------------

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

---------------------------------------------------------

Deposition of Rebecca Reierson

Confidential - Deposition of Rebecca Reierson (7, 9)

Friday

September 20th, 2019

-at-

Law Office of Peter V. Bustamante

17 North State Street

Suite 1550

Chicago, Illinois

APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Lyle Henretty
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendant County of Cook:

Megan Honingford

Cook County State's Attorney's Office

50 West Washington Street

Room 500

Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:

Sarah R. Marmor

Scharf Banks Marmor, LLC

333 West Wacker Drive

Suite 450

Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Friday, September 20th, 2019. The time is now 10:07 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Mrs. Rebecca Reierson. Mrs. Reierson, my name is Gregory Diaz. I am a notary public, and I am

recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MR. LINDEN: Richard Linden on behalf of the Plaintiff, John Nawara.

MR. BUSTAMANTE: Peter Bustamante for John Nawara.

MR. HENRETTY: Lyle Henretty on behalf of Defendant Karen Jones-Hayes.

MS. MARMOR: Sarah Marmor on behalf of the Sheriff, Ms. Reierson, Mr. Burke, and Ms. Shelby.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

MR. LINDEN: Let the record reflect this is the deposition of Rebecca Reierson taken pursuant to notice, and agreement of the parties, and the Federal Rules of Civil Procedure, and local rules.

EXAMINATION

BY MR. LINDEN:

Q. Good morning, Ms. Reierson.

A. Good morning. 0:01:29
Q. Am I pronouncing it right?
A. You are, yes.
Q. Can you please state and spell your name?
A. Sure, Rebecca Reierson, R-e-b-e-c-c-a, R-e-i-e-r-s-o-n.
Q. And have you ever had your deposition taken before?
A. Yes.
Q. And how many times have you been deposed?
A. Approximately four times, five perhaps.
Q. So I take it you're aware of the procedures and what's going to take place here?
A. Yes.
Q. I'm going to ask you a series of questions regarding the John Nawara case, and if at any -- any time you don't understand the question or if it's confusing, just let me know, but if you answer a question, it's going to be presumed that you understood the question. Fair enough?
A. Yes.
Q. And if at any time you want a break ,as long as there's not a question pending, just let us know, and you can take the break.
A. Okay.

Q. All right?

A. Yes. 0:02:22

Q. And it's real important that I don't interrupt you, and I'll try my best too, and you don't interrupt me because we have a court reporter and the transcript will get all messed up if we both talk over one another, all right?

A. Yes.

Q. And what is your date of birth?

A. [redacted]

Q. And where were you born?

A. [redacted]

Q. And what's your address?

(The following page 7 has been designated as confidential by agreement of the parties)

///

(Start of Confidential Portion)
A. [redacted]
Q. [redacted] --
A. [redacted]
(End of Confidential Portion)
///

*CONFIDENTIAL*

(Continuation of Regular, Non-Confidential Testimony)

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. And did you ever serve in the military?

A. I did not.

Q. And do you have any prior addresses?

A. I do. 0:03:16

Q. And what was the -- the one before this?

(The following page 9 has been designated as confidential by agreement of the parties)

///

(Start of Confidential Portion)

A. [redacted]

(End of Confidential Portion)

///

*CONFIDENTIAL*

(Continuation of Regular, Non-Confidential Testimony)
Q. And how long did you live on [redacted]?
A. For approximately nine years.
Q. And you moved to the [redacted] address when?
MS. MARMOR: Sorry, I just want -- just because I -- we have a protective order in the case, I'd just like to designate any addresses as confidential --
MR. LINDEN: Oh, that's --
MS. MARMOR: -- under the protective order.
MR. LINDEN: That's fine, yeah.
A. I'm sorry, what did you --
Q. I'm sorry.
A. -- ask?
Q. How long have you lived at the [redacted] address?
A. Since January of 2017.
Q. And nine years at the [redacted] address?
A. Yes, approximately.
Q. And can you -- did you live with anybody at -- at [redacted]?
A. [redacted]
Q. [redacted]?
A. [redacted]
Q. What -- what is your educational background?

A. I have a bachelor in science in criminology from --
Q. And from what college? 0:04:17
A. Eastern Michigan University.
Q. What year did you obtain that?
A. 1993.
Q. And where did you go to high school?
A. I went to Rich East High School.
Q. And is that in Chicago?
A. It's not, it's in Park Forest, Illinois.
Q. And what year did you graduate from there?
A. 1988.
Q. And if you could, up until the sheriff's department, start with your employment history, your first job, and you can be kind of brief in that, but what was your first job after college, let's start?
A. So I went to graduate school after undergrad, and I worked for a company called Research Pros, which is a marketing research firm.
Q. Okay. What graduate school?
A. University of Illinois at Chicago.
Q. And what did you study there?
A. Criminal justice. 0:05:13
Q. And did you get a graduate degree from there?
A. I did not.

Q. How many years did you spend there?
A. Two years, I just did not complete my thesis.
Q. Did you have any other school you had to do to get the degree, or you just had to do the thesis?
A. I just had to do the thesis.
Q. And what year did you leave University of Illinois, or stop going?
A. '96.
Q. '96. Okay. And your first job after -- during grad school was a marketing research firm?
A. Yes.
Q. What was the name of that?
A. Research Pros.
Q. And what years did you work there?
A. 1995 to 1999. 0:06:01
Q. And what was your title there?
A. I think I was a marketing research specialist, I have to check my resume.
Q. Okay. And -- and why did you leave there in '99?
A. So after graduate school, I attended law school, and so after I got my law degree, I left Research Pros once I found a regular full-time job.
Q. Okay. And what law school did you go to?
A. DePaul University in Chicago.

Q. And what years?
A. '96 to '99.
Q. And did you get a JD from DePaul?
A. Yes.
Q. And the JD is 1999?
A. Yes.
Q. Did you study for the bar exam?
A. I did.
Q. And did you take the bar exam?
A. Yes.
Q. And you passed it?
A. Yes.
Q. And are you a licensed lawyer in the State of Illinois?
A. Yes.
Q. How long have you been a licensed attorney?
A. Since 1999.
Q. Have you been current the whole time?
A. Yes. 0:07:02
Q. Has your license ever been suspended or revoked?
A. No.
Q. Have you ever been disciplined?
A. No.
Q. You ever been convicted of a felony?

A. No.
Q. And I take it you haven't been convicted of a misdemeanor or a crime involving dishonesty?
A. No.
Q. Okay. And after the marketing job, what was your first job --
A. I --
Q. -- after that?
A. I worked for the City of Chicago as a sexual harassment investigator.
Q. And were you a lawyer at the time?
A. I was.
Q. And what years did you work for the city?
A. 1999 until 2004.
Q. Were you part of their corporation counsel's office?
A. No, the sexual harassment office was a part of the department of personnel at the time.
Q. Was that part of their human resources --
A. Yes.
Q. -- at the city?
A. Yes. 0:07:56
Q. And what type of things did you do for the city?
A. So I investigated sexual harassment

complaints filed by city employees against other city employees, conducted training for all city employees on the sexual harassment policy, did other research projects related to sexual harassment in general.

Q. Were you essentially a fact finder, or was your job really, you know, to advocate for the city back then?

A. I was just a fact finder.

Q. And after 2004, what was your next position?

A. I was senior counsel with the Chicago Park District.

Q. And what year were you senior counsel?

A. 2004 until 2006. 0:08:44

Q. And what does a senior counsel for the park district do?

A. That senior counsel position was a laborer position, so union negotiations, grievances, discipline, some training, advising departments regarding labor issues, employee relation things.

Q. How many lawyers did the park district have in your department?

A. At that time, there were maybe nine attorneys.

Q. And entry level lawyer, would they be senior counsels? I take it they'd have a different title?

A. There is a counsel position and a senior counsel position.
Q. And who would be the next person up from a senior counsel?
A. Deputy general counsel.
Q. Would anybody be higher than the deputy general counsel?
A. There was also a general counsel. 0:09:46
Q. And you left the park district in 2004?
MR. BUSTAMANTE: '06.
A. Two thousand --
MR. BUSTAMANTE: Sorry.
A. I was --
MR. LINDEN: Swear -- swear the witness in.
A. I left in two thousand --
Q. It would be '06 I believe --
A. -- sorry, '16.
Q. '16? 2006 or 2016?
A. 2016.
Q. So you worked for 12 years for the park district?
A. I did.
Q. Oh, okay. And in 2016, did you go to the sheriff's office?
A. Yes.

Q. Okay. And that was the Cook County Sheriff's Office that you're employed with?
A. Yes.
Q. What was your first position in 2016 with them?
A. Leave and absence manager.
Q. What is a leave and absence manager?
A. You direct the employee services department, which is a department within the bureau of HR, and that department handles employee leaves, return to work issues, light duty, things like that.
Q. Do you recall when in 2016 you got hired? 0:11:04
A. I think I started August of 2016.
Q. So you had only been there a couple of months when the Nawara incident happened in September of '16 --
A. Yes.
Q. -- correct? Who was your immediate supervisor in 2016?
A. Karyn Williams.
Q. Was she an HR person, Karyn Williams?
A. Yes, she was the executive director of human resources.
Q. And how do you spell Karyn?
A. K-a-r-y-n.

Q. And how long was she your supervisor?
A. She was my supervisor until -- oh, gosh, maybe the spring of 2018. That's -- that's an approximation. I can't remember exactly when she left.
Q. So she was your supervisor up until the time Ms. Williams left the sheriff's office?
A. Yes. 0:12:15
Q. Was she your immediate supervisor?
A. Yes.
Q. Did you report to Ms. Williams?
A. I did.
Q. Did she work in the same office you did?
A. Yes.
Q. Where was your office?
A. My office is at the jail compound at 31st and California.
Q. Are there different buildings for the jail compound?
A. There are, I'm in building two.
Q. Is all of HR for the corrections in building two?
A. Yes.
Q. Is it HR just for corrections, or do you oversee other divisions or departments of the Cook County Sheriff's Office?

A. It's for all of the Cook County Sheriff's Office.
Q. So you also do HR for police officers?
A. Yes.
Q. Court personnel people?
A. Yes.
Q. They would all be in the jail complex, the HR?
A. Yes.
Q. And who would have been above Ms. Williams in 2016?
MS. MARMOR: Object to the form. 0:13:14
A. I believe Karyn reported to Dana.
Q. And Dana is -- what -- what was Dana's last name?
A. Dana Wright, sorry. I blanked for a second there.
Q. W-r-i-g-h-t?
A. Yes.
Q. What was her title in 2016?
A. I think she was a deputy chief or something similar.
Q. And did she work in the same building with you?
A. No.

Q. Was she part of HR?
A. No, she was not.
Q. So is it fair to say Karyn Williams would have been head of HR at the time?
A. Yes.
Q. And what were your job responsibilities in 2016?
A. Like I stated before, just kind of overseeing all of the human resource functions for current employees, so after hire. We didn't do any recruiting or anything like that in my department, but once an employee is hired, then any kind of leaves, benefit information, return to work, light duty, any kind of employee issues would be handled by employee services.
Q. And did you supervise anybody in 2016?
A. Yes. 0:14:29
Q. And who was underneath you? And I mean in the hierarchy, not literally, obviously, but.
A. I had five people in HR underneath me.
Q. Five people that reported directly to you?
A. Yes.
Q. And who were those five people, if you recall?
A. Wylola Shinnawi, I can spell that for you --
Q. Oh, please.

A. -- if you'd like. W-y-l-o-l-a, last name, Shinnawi, S-h-i-n-n-a-w-i.
Q. What was her position?
A. She was the FMLA manager.
Q. Did she have anything to do with John Nawara?
A. No, not that I believe -- no, not that I recall.
Q. Okay. But who were the other four people that -- if you recall?
A. Griselda Lobato.
Q. Can you spell that name too?
A. Sure, G-r-i-s-e-l-d-a, L-o-b-a-t-o. She was a -- maybe, like, a personnel analyst or something -- a title similar to that.
Q. Do you know if she had any -- anything to do or any involvement with John Nawara?
A. No. 0:15:41
Q. And who would be the third person that reported to you?
A. Jessica White.
Q. I -- I can even spell that name, but what -- what was her title?
A. Again, she was another personnel analyst or something of that nature.
Q. Do you know if she had anything to do with

the John Nawara incident or any involvement?
A. No.
Q. Okay. I think we've covered three of them, who is the fourth one?
A. Teresa Brown, T-e-r-e-s-a, Brown.
Q. What was her position?
A. Again, similar, personnel assistant or analyst.
Q. Did she have anything to do with John Nawara?
A. No.
Q. Was there a fifth person that reported to you?
A. Yes, Willette Lindsey, W-i-l-l-e-t-t-e.
Q. And what was Ms. Lindsey's position?
A. Again, she was a personnel analyst or HR analyst.
Q. Did she have anything to do with John Nawara?
A. No. I mean, the most they would -- involvement they would have had is issuing paperwork upon his return to work, I guess, but --
Q. How -- how about Karyn Williams, did she have anything to do with John Nawara?
MS. MARMOR: Object to the form. 0:16:58
A. Well as my supervisor, she -- we would meet about whatever current tasks I had ongoing.

Q. Was she directly involved at all in any of the issues regarding John Nawara, if you recall?
A. I did discuss the issues with him with Ms. Williams, yes.
Q. Okay. When did you have discussions with Ms. Williams regarding John Nawara?
A. I mean, just from the initial complaint from the Department of Corrections, I think, was sent to Karyn, and then she forwarded it to me, and so from that point on, she would ask for updates on the situation or I would, you know, talk to her about any issues I was having or anything that was happening.
Q. Do you recall any specific discussions you had with Ms. -- Ms. Williams regarding John Nawara?
A. You mean dates and exactly what we discussed or? 0:17:56
Q. Or not exact dates, but any specific conversations. I know it's hard to go back, that you're not a photographic memory to say, "On this date," but any specific conversations you had where the subject John Nawara was discussed.
A. I know that I would have raised with her, you know, the fact that he hadn't been -- that he wasn't participating in our process and he wasn't returning to work, so I mean she was -- she was -- is the one who

would give me advice or, you know, let me know what my next step should be, if any.

Q. Okay. As you sit here today, do you recall any specific conversations you had with Ms. Williams where you said anything to her or she said anything to you specifically regarding John Nawara?

A. No, I know we discussed it, but I can't recall specific conversations.

Q. As you sit here, you can't recall a single conversation with Ms. Williams in -- in which John Nawara's name came up. Is that fair?

MS. MARMOR: Object to the form.

A. Yeah, I mean, I -- I know we discussed it, but again, I can't -- I can't give you word for word what we discussed.

Q. Did she make any decisions regarding John Nawara?

MS. MARMOR: Object to the form. 0:19:08

Q. And "she" meaning Karyn Williams.

A. No, I think she would have advised me to go to the law department most likely, she wouldn't have made a decision.

Q. Okay. You said she would have advised you, do you recall her specifically advising you?

A. I don't recall the words coming out of her

mouth at this moment, but that was typically her advice.

Q. Okay. So you're talking in a general nature for matters that came up in H -- HR and not specifically related to John Nawara, is -- would that be a fair statement?

A. I'm sorry, can you repeat that?

Q. Are you talking generally what would have happened with an employee rather than specific -- specifically recalling Ms. Williams advising you to go to the law department?

A. Yes.

Q. How often would you go to the law department to seek advice regarding HR issues?

A. It would just depend on what was happening at the time. I don't have an estimate.

Q. Would it be on a daily basis?

A. No. 0:20:10

Q. Weekly basis?

A. Again, it would depend kind of, you know, what the issues were.

Q. Did HR have a law department?

A. No.

Q. Would you go -- who -- who would you go to in the law department if you had a question regarding an

HR issue?
A. Typically, Kate Christy or Nick Scouffas.
Q. What was Kate Christy's position back then?
A. I don't know what her title was.
Q. Was she in-house counsel for the sheriff's in 2016?
A. Yeah, she worked for the sheriff's office law department.
Q. And where was she located, at the jail?
A. No, at the Daley Center.
Q. Do you know if you talked to her at all regarding John Nawara?
A. Yes.
Q. And do you recall when any of these conversations took place?
A. Just during the ongoing issues. 0:21:05
Q. Did you talk to her about employment decisions?
MS. MARMOR: I -- I'm going to caution, I -- I don't really think you can ask that kind of question, the topic of the conversation. I -- I -- I -- I'm going to instruct the --
MR. LINDEN: Okay. But you --
MS. MARMOR: -- witness not to answer that.
MR. LINDEN: You can instruct her not to

answer, but I'm just going to tell you why, if it's an employment decision, I don't think it'd be covered. It's not litigation. There's -- I'm -- I'm just saying if you want to instruct her not to answer --

MS. MARMOR: I -- yeah, I -- I think that's -- I think you're getting into -- because you can -- it's not just litigation. It's not just -- it's not just litigation. It's also if you're seeking advice from counsel, that's also protected.

MR. LINDEN: I don't -- all due respect, for employment, I don't think it is, but if you're going --

MS. MARMOR: I -- I'm going --

MR. LINDEN: -- to object --

MS. MARMOR: Yeah, I am going to object.

Q. Did you seek advice from counsel when you talked to Ms. Christy?

A. Yes.

Q. Okay. Based on your counsel's instructions, are you refusing to answer questions regarding any discussions of any nature and any topics regarding Ms. Christy?

A. Yes. 0:22:06

Q. Anybody else in the legal department that you discussed John Nawara with, would it have been Nick Scouffas?

A. Yes.
Q. Right now, he's general counsel for the sheriff?
A. Yes.
Q. Back in '16, was he the general counsel?
A. I believe he was, yes.
Q. Did you seek any advice from Mr. Scouffas regarding labor decisions?
A. I would typically reach out to them together.
MR. LINDEN: Okay. And I take it you're going to instruct her not to answer regarding Mr. Scouffas, correct?
MS. MARMOR: Correct, any content of conversations with Mr. Scouffas, I'm instructing you not to answer.
MR. LINDEN: And also regarding topics?
MS. MARMOR: Yes.
Q. So based on advice of counsel, are you going to refuse to answer any questions regarding conversations you had with Mr. Scouffas?
A. Yes.
Q. And John Nawara?
MS. MARMOR: Regarding John Nawara.
Q. Regarding John Nawara?
A. Yes. 0:23:03

Q. Okay. Are you still employed at the sheriff's office?
A. Yes.
Q. And what's your current position with the sheriff's office?
A. Director of employee services.
Q. Was that the next position after your initial hire date in 2016?
A. Yes.
Q. And what does director of employer (sic) services do?
A. It's actually the exact same job duties, they just corrected the title because the job was essentially directing that department.
Q. And when did you get your title changed?
A. Maybe approximately four months ago.
Q. Is there any difference between your prior position in 2016 and the director of employee services?
A. There is not. 0:24:06
Q. Okay. Ms. Williams left, I believe you thought, somewhere around 2018?
A. Yes.
Q. And who replaced her?
A. Matt Burke.
Q. And what is Mr. Burke's title?

A. He is the interim executive director of human resources.

Q. How long has he been interim director, since 2018?

A. Yes, there was a little bit of a gap between when Karyn left and when he moved to HR, but it was still in 2018.

Q. And do you report -- report directly to Matt Burke?

A. I do not.

Q. How -- how come the reporting --

A. We --

Q. -- changed?

A. We also now have an assistant executive director of human resources, and I report to her.

Q. And who is that person?

A. Theresa Olson. 0:25:07

Q. And do you know when she became assistant director?

A. I believe it was early summer of 2019.

MS. MARMOR: How do you spell Olson?

WITNESS: O-l-s-o-n.

Q. So you -- you report directly to Theresa Olson?

A. Yes.

Q. And I take it Ms. Olson reports directly to Matt Burke?
A. Yes.
Q. And how many people are currently underneath you? Or report to you is probably a better question --
A. Eight people.
Q. Were any of those eight people involved in any manner in the John Nawara matter?
A. No. 0:25:59
Q. How about Matt Burke, did he have any involvement with John Nawara?
A. I believe the initial documents regarding the incident came from Matt.
Q. Was he formally the chief of staff, Matt Burke?
A. He worked for DOC, but I'm not certain of what his title was.
Q. When you say, "Initial documents," do you recall what the initial documents were?
A. It would have been a referral to HR that went to Karyn Williams, asking us to meet with an employee following an incident.
Q. Do you know of any other involvement that Matt Burke had with John Nawara?
A. I believe he followed up regarding the case

also at some point.

Q. And when you say, "Followed up," do you recall anything more you know?

A. No, I think he was just looking for the status of the case.

Q. Do you know if he talked to anybody or interviewed anybody about the case?

A. Oh, I don't -- not that I know of. 0:27:06

Q. How -- how about Theresa Olson, was she involved in any way with John Nawara?

A. Not from HR that I'm aware of.

Q. Do you know of any other involvement aside from HR that she may have had?

A. No, he came from DOC, but if she was involved in any way, I was not aware of it.

Q. You just have no knowledge either way --

A. Yes.

Q. -- is that fair? Okay. What did you do today to -- or to prepare for today's deposition?

A. Sorry. I met with counsel a couple days ago.

Q. And that was with Ms. Marmor?

A. Yes.

Q. And you met at her office?

A. Yes.

Q. And how long did that meeting occur?

A. We met for maybe two hours, three hours.
Q. And did you review any documents in preparation for today's deposition?
A. Yes. 0:28:03
Q. What documents did you review?
A. My -- the notice calling me as a witness for the deposition, correspondence that I've sent in this case. I -- I also answered questions, like, along the -- the way through the lawsuit, so I reviewed those also.
Q. You mean answers to interrogatories?
A. Yes, thank you.
Q. Okay. Anything else that you recall?
A. Not that I recall.
Q. Did you review any photographs?
A. No.
Q. Any videotapes?
A. No.
Q. No videos?
A. No. 0:28:59
Q. Any pleadings at all, aside from the answers to interrogatories?
A. Only my own.
Q. Okay. What is a fitness for duty exam?
A. The fitness for duty exam itself is when an

employee meets with an independent doctor to be evaluated for their fitness essentially to perform their job functions for the sheriff's office.

Q. Is it any employee within the sheriff's office that could be subject to a fitness for duty exam?

A. Yes. 0:29:50

Q. Do you know if there are any policies and procedures regarding fitness for duty exams in 2016 within the sheriff's office?

MS. MARMOR: Object to the form.

A. There were procedures that we followed.

Q. Do you know if there are written procedures regarding fitness for duty exams?

A. I don't know if -- if there were.

Q. Do you know either way if there were?

A. I -- I do not know if there were.

Q. Do you know what the procedures were in 2016?

A. Yes.

Q. And what were the procedures? 0:30:34

A. The department of HR would receive a referral, typically from an employee's department where they worked or from OPR regarding an incident involving an employee, could be an arrest, something like that, that, you know, would raise concern about whether or

not the employee would be able to continue working based on the incident that had occurred.

Q. Who had the authority to make a referral to HR for a fitness for duty?

A. It typically came from the department head, from DOC, or from one of the supervisors in OPR.

Q. Did each of those people have authority to -- to make a referral?

A. You know, I -- I don't know that there was -- it was specifically outlined who was allowed to make a referral. I mean, in general, you know, anyone who became aware of a potential issue should refer it to HR.

Q. Okay. And once HR got a referral, would it be automatic that it would be ordered or would somebody have to make a decision whether or not that employee is going to be ordered for a fitness for duty exam?

A. It -- it wouldn't be automatic. The employee would come to HR and meet with the occupational health nurse and -- and with me also, we'd meet with the employee together.

Q. Would it always be with the nurse and yourself for a fitness for duty exam? And I'm talking about 2016.

A. Yeah, I -- I believe there was one that might

have taken place in my absence, and I think it was the director of risk management who sat in with the nurse at that time.

Q. And do you know who that would have been?

A. Michele Morris, one L. 0:32:19

Q. Do you know if she had anything to do with John Nawara?

A. No, she did not.

Q. And did HR have the nurse working in HR?

A. Yes.

Q. And how many occupational nurses were there in HR?

A. One.

Q. And who is that person?

A. Winifred Shelby.

Q. Can you spell the first name?

A. W-i-n-i-f-r-e-d.

Q. Did Ms. Shelby report directly to you?

A. She did. She reported to me. I signed her timesheet, but she -- she reported to me and to the executive director of HR.

Q. Do you know what Ms. Shelby's title was within the sheriff's office?

A. Occupational health nurse.

Q. Is she there -- still there as an

occupational health nurse?
A. No, she's not.
Q. Do you know when she left the sheriff's office?
A. I believe she left in 2017.
Q. And she was involved with John Nawara, correct?
A. Yes. 0:33:24
Q. So the procedure was you'd call the -- I'm not talking about John Nawara specifically, but the procedure in 2016 is you'd call the person into HR, correct, the employee?
A. Yes.
Q. And then you and the nurse, Ms. Shelby, would meet with that person?
A. Yes.
Q. And what would be the purpose of that meeting?
A. We'd just try to get a sense from the employee about what occurred that led to the referral, and you know, it -- it would depend on what the exact situation was, but if, you know, someone was -- was struggling, we'd make sure they had, you know, resources if they needed them, a support system if that was necessary based on the situation, or you know,

relevant doctors' notes if someone were having a medical issue that appeared to make them unable to do their job, and at -- we would just meet with the employee, kind of gather information on the situation, and assess whether we thought the employee could actually return to work.

Q. Would you also meet with the person making the referral?

A. No. 0:34:37

Q. Would you talk to the person making the referral?

A. If we needed additional information, yes.

Q. So would you get the employee's side of the story if it's an incident that allegedly happened?

MS. MARMOR: Which --

A. Which --

MS. MARMOR: I'm sorry. Object to the form. I didn't -- we both had the same question.

MR. LINDEN: No, it wasn't the best question, but --

Q. Would -- would you -- like, in John Nawara's case, Jones-Hayes accused him of an incident in September of '16, correct?

A. Yes.

Q. In a case like that, not just with John

Nawara, but in a similar type of case, would you get the employee's side of the story of what happened before a fitness for duty exam would be ordered?

MS. MARMOR: And -- and I have the same objection because both people are employees, and so which employee are you talking about? You see the problem?

MR. LINDEN: A case like John Nawara, not John --

MS. MARMOR: Right.

MR. LINDEN: -- Nawara.

MS. MARMOR: But are you talking about would you get Mr. Nawara's or Ms. Jones-Hayes' side of the story? That's the --

MR. LINDEN: Okay. Let me --

MS. MARMOR: -- that's the --

MR. LINDEN: Let me -- let me -- I -- I can do this better.

Q. Okay. Who has the authority to order a fitness for duty exam?

A. You mean once the referral has come to HR?

Q. Yeah. 0:35:46

A. Who can then --

Q. Once you interview the employee and bring them in.

MR. BUSTAMANTE: Interrupt --
WITNESS: Oh.
A. The occupational health nurse would then send the referral to CorVel, which was our independent third party company.
Q. Okay. But who would make the decision that the employee has to undergo a fitness for duty exam?
A. The nurse and I would make it together.
Q. Would it be a joint decision?
A. Yes.
Q. Would you have to both agree on it, or can one of you say yes, another one say no, or how did that work?
A. I don't recall a time that we disagreed. If we initially had a disagreement, we would talk it through. In the end, I don't recall anyone ever being sent when one of us thought it was necessary and the other one didn't.
Q. Did you have the authority yourself to order a fitness for duty exam of an employee?
A. If -- if the nurse wasn't in agreement?
Q. Yeah, let's -- let's assume the nurse did not agree, did you have authority by yourself to order a fitness for duty exam?
A. It's not a situation that ever came up. 0:36:52

Q. Did you feel like you had the authority to order a fitness for duty exam?

MS. MARMOR: Objection. Calls for speculation.

A. I -- I would not do it on my own.

Q. Okay. In Mr. Nawara's case, he came in for an interview in November of 2016, correct?

A. Yes.

Q. And you met with Mr. Nawara, along with Ms. Shelby, correct?

A. Yes.

Q. And between the two of you, did you agree that Mr. Nawara would be ordered for a fitness for duty exam?

A. Yes.

Q. And you, along with Nurse Shelby, ordered a fitness for duty exam, correct?

A. We agreed that he should have one, yes.

Q. So between the two of you, you both had the authority to order Mr. Nawara to undergo a fitness for duty exam. Is that fair?

A. Yes. 0:37:45

Q. Okay. Would the referring person have the authority to order a fitness for duty exam?

A. Someone from outside of HR?

Q. Yes.
A. No.
Q. Like in this case, you said, I think, Matthew Burke made the referral for John Nawara, correct?
A. I believe so, yes.
Q. In 2016, could Matthew Burke order that fitness for duty exam be ordered for Mr. Nawara?
A. No, we would always have to meet with the employee in HR.
Q. Did Mr. Burke ever tell you that aside from a referral, that he should be ordered for a fitness for duty exam?
A. Aside -- no, no. 0:38:39
Q. Did you ever talk to Mr. Burke regarding John Nawara after you got the initial referral?
A. I don't believe so, other than he might have assisted me reaching the superintendent to get further information on the incident.
Q. And do you recall specifically going to Mr. Burke to get information from Jones-Hayes?
A. I -- I don't recall.
Q. Do you recall any involvement other than that you may have gone to him for assistance to get information with respect to John Nawara?
A. No, nothing other than putting us in touch.

Q. Do you recall any pertinent conversations you had regarding John Nawara other than just getting in touch with Superintendent Jones-Hayes?
A. With Matt Burke?
Q. Yes. 0:39:37
A. I don't.
Q. Do you know what criteria go into making decision whether or not the employee should be ordered for a fitness for duty exam?
A. It's essentially whether or not the employee presents in a way and the incident is such that Nurse Shelby and I believe that it would be best to have the employee evaluated before being returned to work.
Q. Do you recall any other criteria in 2016?
A. No. 0:40:27
Q. Do you recall any written criteria in place for fitness for duty exams?
A. If -- for us sending someone for a fitness for duty exam?
Q. Yes.
A. No.
Q. How specifically -- specifically did you go about making a decision whether or not to order the employee for a fitness for duty exam?
A. What do you mean?

Q. Mean you meet with the nurse, Ms. Shelby, and would you two meet and come -- try to come to a consensus whether or not that employee should be ordered to it?
A. So after we met with the employee, then we would talk amongst ourselves and try to come to a determination.
Q. Would it be typically that day that -- when you met with the employee that you would discuss it with Nurse Shelby?
A. Yes. 0:41:23
Q. And if you came to a determination where a fitness for duty exam should take place, what would be the next step?
A. We would inform the employee about what the procedures are, you know, the reason why we were recommending the employee go, and just kind of the procedural steps. Nurse Shelby would explain what the appointments are like, depending on whether it was a medical fitness for duty or a psychological fitness for duty, and she would assist, you know, and answer any questions the employees might have about the process.
Q. And would the employee receive written notice that he or she was required to do this?
A. They would -- the employee would receive

documentation regarding their medical records, but I don't believe the nurse gave a document to the employee.

Q. Would they be given the name of the person they should contact to have this exam?

MS. MARMOR: Object to the form. 0:42:36

A. I'm sorry, I'm -- I'm just -- I apologize, I'm just trying to remember if there was, like, a letter that the nurse would -- would give the employee, and I -- I can't recall at this time. But they would be informed either via letter or you know, also verbally from Nurse Shelby that, you know, CorVel was our third party administrator, that someone would be reaching out from CorVel to facilitate the process of, you know, gathering the medical records and setting an appointment.

Q. Okay. Who is CorVel, do they have a formal name company?

A. I believe that is their formal name.

Q. And what type -- is it a medical provider, CorVel?

A. We -- I don't know all of what they do, but we use them as a third party administrator to select an independent provider to conduct the fitness for duty exams.

Q. So in 2016, did you always use CorVel?
A. Yes. 0:43:29
Q. And would CorVel actually conduct the evaluation?
A. No, they would locate a provider and kind of coordinate getting the medical records to the provider, set up the appointment, notify the employee of when the appointment was scheduled. They would receive any documents that came from the independent medical provider also.
Q. Was there a list of medical providers that were approved to do these type of evaluations?
A. Not from the sheriff's office, no.
Q. That would be strictly done by CorVel?
A. Yes.
Q. Have you ever heard the name of a Dr. Kroll or Kroll, K-r-o, double L?
A. Not that I recall.
Q. Okay. I think you indicated that the procedures would depend on whether it's a medical or a psychological type referral?
A. Yes. 0:44:34
Q. Okay. What would be the difference between a medical referral versus a psychological referral?
A. Typically, a medical referral results in a

one day examination by a doctor, the psychological referrals are two day appointments, so the nurse would just kind of explain what their appointments would be regard -- you know, depending on what kind of referral they were being sent for.

Q. Okay. And what would be the criteria that you'd say, "This person is going to be subject to a medical referral versus psychological referral"?

A. It would be based on whatever the incident was that led them to be sent to human resources.

Q. Now as you sit here today, do you recall what the incident was regarding the referral for John Nawara?

A. Yes.

Q. And what was that?

A. It was an altercation that he had with a superintendent at work.

Q. And who is that superintendent?

A. Karen Hones-Hayes. 0:45:32

Q. When you say, "Altercation," what do you mean by "an altercation"?

A. There was -- according to the superintendent, when she asked Officer Nawara about something that was occurring at work, he, you know, reacted kind of in an agitated way toward her, and that's what led to the

referral that led him coming to human resources.

Q. Do you recall when that incident occurred?

A. It -- 2016, November, I believe.

Q. And John Nawara had a different version of what Ms. Hayes claimed happened, right?

MS. MARMOR: Object to the -- object. Assumes facts not in evidence. I don't think you've established that she knows what his version was.

Q. Did you ever talk to Ms. Hayes regarding what happened?

A. Yes. 0:46:29

Q. And do you recall what Ms. Hayes said to you what occurred?

A. Generally, yes.

Q. And when did you talk to Ms. Hayes?

A. It was just a day prior, I believe, to when we went with Officer Nawara, I don't recall the date.

Q. So it would have been November of 2016 --

A. Yes.

Q. -- fair?

A. Yes.

Q. And do you recall what Ms. Hayes told you what -- what happened?

A. Again, generally, yes. We have a -- she signed a statement kind of indicating all the details

of what occurred.
Q. Okay. Do you have any independent knowledge of what she said in this statement?
A. I do.
Q. And can you kind of tell us --
MS. MARMOR: I --
Q. -- what it is?
MS. MARMOR: I just want to make it clear. Independent recollection, she wasn't -- you're not suggesting she was there?
Q. Independent recollection of what --
MS. MARMOR: Yes.
Q. -- Ms. Hayes told you --
A. Yes. 0:47:12
Q. -- is what I'm asking.
A. So the superintendent spoke with the nurse and myself, and she indicated that in Cermak, she noticed inmates that were not handcuffed as they should have been, I guess, according to procedure, and when she went into the office to ask the officers who were there about why the inmates weren't handcuffed, Officer Nawara didn't respond to her question, and so she, I think, tapped his shoulder to get his attention, and kind of reacted in a violent way toward her, she felt, and was aggressive and disrespectful to the

superintendent.
Q. Okay. Do you recall specifically what -- when you say, "Violent way" that she claimed, do you recall how that was or what specifically the violent way was?
A. If I recall correct, I think he jumped out of his chair kind of angrily.
Q. Did she ever claim that Mr. Nawara struck her?
A. Not that I recall. 0:48:20
Q. Do you recall anything else specifically regarding what she claimed Mr. Nawara did that day?
A. So there was that incident in the office, and then I think she left the area because she was upset about what had happened, and then I believe that officer -- Officer Nawara approached her again in a way that she found to be disturbing.
Q. Okay. Everything you're testifying to is based upon what Ms. Jones-Hayes told you, correct?
A. Yes.
Q. Do you have any independent knowledge of the facts of what occurred that day?
A. I do not, only her statement.
Q. Do you know whether or not the incident occurred the way Jones-Hayes told you what happened?

A. I do not.
Q. Did you talk to Mr. Nawara regarding what happened that day?
A. I tried, yes. 0:49:14
Q. Okay. You said you tried, can you be more specific?
A. He wouldn't discuss -- I mean, he, at first, didn't acknowledge that there had even been any kind of an incident and wouldn't discuss the particulars of anything involving the superintendent.
Q. And do you recall was it an in person meeting you had with Mr. Nawara?
A. Yes, he met with the nurse and I in human resources --
Q. And --
A. -- the nurse and me.
Q. Do you recall the date you met?
A. I don't, November of 2016.
Q. Do you recall anything that Mr. Nawara said about anything that occurred that day back in September?
A. No, I recall that he said he didn't have -- you know, that he hadn't been experiencing any issues at work, that he didn't have an issue with the superintendent, and then he also stated later that he

tried to stay away from the superintendent.

Q. Did he ever indicate that Ms. Hayes -- and when I say, "Ms. Hayes," it's Jones-Hayes --

MS. MARMOR: Yes. 0:50:14

MR. LINDEN: Okay.

MS. MARMOR: And I think what --

MR. LINDEN: Making sure.

MS. MARMOR: Just so everybody understands the record, when she says, "The superintendent," we mean Jones-Hayes as well.

MR. LINDEN: Okay. Gotcha.

Q. Either "Superintendent" or "Ms. Hayes" might be easier.

A. Okay.

Q. Hyphens just becomes difficult for me. What was my -- I forgot -- let's see --

MS. MARMOR: You've lost -- he's lost -- actually, do you -- I -- I don't want to interrupt in the middle --

MR. LINDEN: No, that's fine.

MS. MARMOR: -- of a question, but --

MR. LINDEN: Yeah, now let's take a little break.

MS. MARMOR: Okay.

RECORDER: Okay. Okay.

MR. LINDEN: Off --
RECORDER: Off the --
MR. LINDEN: -- the record.
RECORDER: Off the record, 10:58 a.m.
MR. LINDEN: And let's --
(Off the record)
RECORDER: Back on the record, 11:06 a.m.
Q. Just want to just back up for a second. I think we talked a little bit about that you went to Karyn Williams for advice?
A. Yes.
Q. And do you recall specifically any advice that Ms. Williams gave you regarding John Nawara?
A. I do not. 0:51:03
Q. Do you know whether or not she gave you any advice regarding John Nawara?
A. I don't recall our specific conversations, but again, we did discuss it, so it wouldn't have just been me kind of talking. You know, she would have responded with direction.
Q. Do you recall any directions that she responded with as you sit here today?
A. Not specifically, no.
Q. Generally?
A. Generally, like I said before, she would have

directed me to go to the law department most likely --
Q. Okay.
A. -- with questions.
Q. Other than she would have directed you to the law department most likely, do you recall any other general advice that she may have gave you regarding John Nawara?
A. No.
Q. Do you know if she had any other involvement in John Nawara than generally that she may have said, "Go to the law department"?
A. No.
MS. MARMOR: Objection. Lack of foundation.
Q. I guess when you say, "No," you -- you agree with my statement. Would that be fair?
A. That she didn't have any other involvement that I'm aware of?
Q. Yes. 0:52:05
A. That's right.
Q. Okay. Okay. You talked about the referral depends on whether it be a medical referral or a psychological referral, correct?
A. Yes.
Q. And the medical would be one day, and you send him to a medical doctor -- or her, right?

A. Yes.
Q. And psychological, they'd be sent to either a psychologist or a psych -- a psychiatrist?
A. Yes.
Q. And you talked about medical authorization forms, would that be done for every employee that would be sent for a fitness for duty?
A. Yes.
Q. And did you have forms within HR for the employee to give his consent for a medical release?
A. Yes.
Q. What type of forms were they, were they general forms?
MS. MARMOR: Object to the form. 0:53:00
MR. LINDEN: No -- no -- no -- no -- no pun intended.
MS. MARMOR: No pun indeed.
Q. Do you understand the question?
A. I do. One form was for the employee to complete to go to their doctor, so that -- it was a release, essentially, for the doctor to -- to release their medical documentation or their medical file, and then another one was for the final fitness for duty report to be released to the sheriff's office.
Q. Would it be two separate releases the

employee would sign?
A. There were two forms, yes.
Q. And do you know who prepared those forms?
A. I do not.
Q. Did you have anything to do with the preparation of the forms?
A. No.
Q. Do you know if legal prepared those forms?
A. I don't know who prepared them.
Q. When you started in HR in 2016, were the forms already at HR?
A. Yes. 0:53:57
Q. Prior to ordering a fitness for duty exam for Mr. Nawara, did you or Ms. Shelby do any type of investigation to determine whether or not what Ms. Jones said actually happened?
A. We did not.
Q. Did you just accept what Ms. Jones said as true for purposes in determining whether or not he should be required to undergo an evaluation?
A. No, that was why we met with Officer Nawara, to try to figure out, you know, what had happened, if anything.
Q. Okay. Did you come to any conclusions at that time what -- what had happened?

A. You mean whether what she told us was accurate?
Q. Yes. 0:54:53
A. We did not.
Q. Did you ever assess whether or not Ms. Hayes should be ordered to undergo a fitness for duty evaluation?
A. We did not.
Q. How come?
A. We didn't have any information that alleged any kind of behavior from her that would make us suspect she wasn't able to perform her job duties.
Q. Did Mr. Nawara ever indicate to you that she treated him in an aggressive manner back in September of 2016?
A. No.
Q. Not at all?
A. No. 0:55:35
Q. When he went and saw you in November for the interview for the fitness for duty to determine whether or not he should be ordered, do you know what his status was as an employee?
A. He was a -- he was an active employee.
Q. Do you know what he was doing for the sheriff's office when he came in November of 2016?

A. He was a correctional officer.
Q. Did he have any limitations placed upon him prior to your meeting in November of 2016?
MS. MARMOR: Object to the form.
A. I -- what do you mean, "limitations"?
Q. Any work limitations, was he allowed, for instance, to carry a gun?
A. As far as I know, yes.
Q. Is it fair to say that he had been authorized to carry a gun from the time of the September incident up until the time that he came for the interview with you and Ms. Shelby?
A. Yes. 0:56:38
Q. Are there -- if somebody within the Department of Corrections considered a correctional officer to be of imminent danger, imminent threat, is there action that they could take to prevent that person from carrying a weapon?
A. It would depend on the circumstances, you know, where that information came from.
Q. Let's assume they had reason to believe that that employee was a danger, could they take immediate -- have immediate action taken to prevent that person from carrying a firearm?
A. I -- yeah. I -- I mean, I'm sure if a

supervisor had some kind of fear of an imminent situation happening, that they could go to OPR or something like that, or they would refer them to human resources.

Q. And I take it Ms. Jones could have communicated that to you back in November of '16 if that was a concern with Mr. Nawara, correct?

A. That she thought there was imminent danger with him?

Q. Yes. 0:57:45

A. Well she did write a memorandum following the incident, so I guess I don't know what you mean.

Q. Did she ever indicate to you that there was any imminent danger to either employees or the inmates with Mr. Nawara working as a correctional officer?

MS. MARMOR: Object to the form.

A. No, she passed on what her experience was with him.

Q. And that would have been in the statement that she gave you --

A. Yes.

Q. -- fair?

A. Yes.

MR. LINDEN: Okay. Do you have any Exhibit stickers?

RECORDER: Yeah.
MR. LINDEN: Okay.
RECORDER: Do you want me to write them out or you --
MR. LINDEN: Oh, gosh, you can write them out if you want. I don't care. I can't --
MS. MARMOR: I always make him do it. 0:58:45
MR. LINDEN: I can't -- why don't we get them all --
MS. MARMOR: I -- in fact, I have never filled out an Exhibit sticker in my life.
MR. LINDEN: No? Your -- either one --
MR. BUSTAMANTE: What are the numbers?
MR. LINDEN: Yeah, the numbers --
MR. HENRETTY: Probably did for trial. I don't know that I ever did it for deps.
MS. MARMOR: I've never done it for trial before.
MR. LINDEN: Oh, let's see.
MR. HENRETTY: Oh, you had better --
MS. MARMOR: I was --
WITNESS: Must be nice.
MS. MARMOR: -- Kirkland and Ellis.
MS. HONINGFORD: Yeah. Yeah.
MR. HENRETTY: Even -- even -- you had

support staff.
MS. MARMOR: Exactly. I was not working for the government.
MR. HENRETTY: At the firm, I don't think I ever did, but I did -- the government, you don't -- any --
MS. MARMOR: I was a paralegal before I went to law school, but I don't think I ever did a trial then.
MR. LINDEN: Just -- just for the record, I know we're getting a protective order entered. I think it's --
MS. MARMOR: Yes.
MR. LINDEN: -- pending.
MS. MARMOR: Oh, that's a different protective order. We have a protective order in the case already.
MR. LINDEN: Oh, do we already?
MS. MARMOR: We have a qualified HIPAA protective order.
MR. LINDEN: Oh, okay, that's it.
MS. MARMOR: That's a -- it's a different --
MR. LINDEN: Okay.
MS. MARMOR: -- issue, but we definitely have a protective order in the case.

MR. LINDEN: So the documents have already been marked confidential --
MS. MARMOR: Correct.
MR. LINDEN: -- we just can agree it's subject to the protective order?
MS. MARMOR: Exactly.
MR. LINDEN: All right.
MS. MARMOR: Yes.
MR. LINDEN: Great. Okay. I'd like to --
MS. MARMOR: We should probably -- he's -- he's -- he can't do both things, I don't think.
MR. LINDEN: Well the camera's on, right?
MS. MARMOR: Okay, but is that --
MR. LINDEN: Because --
MS. MARMOR: So is that -- is that -- I -- I've never done it where he wasn't typing while --
RECORDER: No --
MS. MARMOR: Is this off the record right now?
RECORDER: No, this is --
MS. MARMOR: This is on the record? Okay. All right. 0:59:57
MR. LINDEN: Do you want to -- can we just go off the record a second, if you'd like?
RECORDER: Off the record, 11:13 (sic) --

11:15 a.m.
MR. LINDEN: Yeah, what they do, they --
(Off the record)
Q. I have shown you what --
RECORDER: Back on --
MR. BUSTAMANTE: Wait.
RECORDER: Back on the record, 11:17 a.m.
MR. BUSTAMANTE: Okay.
Q. I -- I've shown you what's been marked as Reierson Number 1, do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is a document -- it's very blurry. This is a document that would be filled out and given to the employee's health care provider in order to release their medical information for a fitness for duty examination.
Q. Okay. You said this form would be filled out, who would fill this -- this form out?
A. It could be filled out by the employee or by Nurse Shelby.
Q. It's got a spot on top that says, "Patient's name"?
A. Yes. 1:00:57
Q. And it's got the date of birth for the

patient, correct --
A. Yes.
Q. -- spot? And Social Security?
A. Yes.
Q. And this is a form in use in 2016?
A. Yes.
Q. And this is actually the form given to Mr. Nawara to sign, correct?
A. Yes.
MS. MARMOR: Object to the form.
Q. Okay. The answer is yes?
A. Yes.
Q. So when this form was given to Mr. Nawara, the only part that was filled out was second box checked that reads "all health care information," correct?
A. I don't know what this specific -- what was checked on the specific form he got. It is checked on this form.
Q. Okay. If I represent to you that this is a form, I can show you other communications that came, but this box was checked, do you know who checked this box?
A. I do not. 1:01:59
Q. Do you know why none of this -- any of the

other information on this form was not filled out before it was given to Mr. Nawara?

A. So typically, it's kind of an interactive process when we meet with employees to determine if it would be necessary for them to undergo a fitness for duty, but Mr. Nawara was not cooperative, and so you know, normally, the nurse would talk to the employee and gather their providers' names and things like that and assist with completing the forms and explaining them, we just didn't have the opportunity with Mr. Nawara.

Q. Did you ask Mr. Nawara in November of '16 to complete this form in your presence?

A. I don't believe so. I don't believe we got to that point with him.

Q. Was there anything that prevented you or Ms. Shelby from putting the patient's name on this document?

A. No, not necessarily. 1:03:04

Q. And I take it being in HR, you either knew his date of birth or you had access to his date of birth?

A. Yes.

Q. So you or Ms. Shelby could have filled in the date of birth, correct?

A. Yes.
Q. And same thing when applied to the Social Security number?
A. Yes.
Q. And if there is a previous name, the sheriff's office would have known his previous name, correct?
A. Perhaps.
Q. Okay. It's got a spot here, it says, "I request and authorize," blank, "to release health care information of the patient named above," and who would -- this was blank what it was given to Mr. Nawara, correct?
A. Yes. 1:03:51
Q. Do you know why nothing was filled in when it says, "I request -- I request and authorize," blank, "to"?
A. Well again, this is a form that is kind of completed along with the employee while you are meeting and talking with the employee, so because we didn't get to that point with Mr. Nawara, the form wasn't completed with him like it would be in most circumstances.
Q. Would it typically be filled in -- who was the provider, Corell (sic)?

MR. BUSTAMANTE: CorVel.
MS. MARMOR: Object to the form. CorVel.
MR. LINDEN: CorVel.
Q. Would CorVel typically be the one authorized to receive the information when you were at HR in 2016?
MS. MARMOR: Object to the form and assumes facts not in evidence.
A. So this line that you're talking about would be where the provider's name would go, so you're authorizing the provider to release the information.
Q. Okay. And the provider in this case would have been CorVel, correct?
MS. MARMOR: Objection. Mischaracterizes her testimony. 1:04:52
Q. And -- and if I'm not stating it accurately, you know, please tell us.
A. So there's -- there's one form that authorizes a release to the sheriff's office, and there's one that allows the medical provider to release the records to CorVel. I would have to see the other one next to this, I guess, to differentiate.
Q. Who -- who would you typically put in this blank of this form, if you know --
A. I -- I didn't --
Q. -- in 2016?

A. Oh, I'm sorry. I didn't complete these forms, the nurse did.
Q. Okay. Do you know what the standard procedure would have been in 2016 on this specific form, if it would have been the sheriff's office to be filled in this blank or the provider?
A. Again, I'd have to see the other form to kind of have a frame --
Q. Okay.
A. -- of reference for this one.
Q. Okay. Let me show you what's been -- or is marked as Exhibit Number 2.
MS. MARMOR: Reierson Exhibit 2? 1:06:01
Q. And I just ask you, tell us what it is?
A. It says, "HIPAA authorization for disclosure of protected health information."
Q. And this is the other form that you're referring to?
A. Yes.
Q. Okay. By looking at this form and going back to my prior questions regarding Exhibit Number 1, can you tell on Exhibit 1 who the entity or -- should have been in the blank, that "I request and authorize," blank, "to release health care information"?
A. Yes, so this would be the employee

authorizing their physician to release information to the sheriff's office.

Q. So it'd be their personal physician? 1:06:54

A. Whatever physicians were -- right, that they were -- that they had seen.

Q. Okay. Then the next line says, "Release health care information of the patient named above to," and then it's got blanks, name, address, city, etcetera, correct? Do you see that?

A. Yes.

Q. And I'm referring to Exhibit Number 1.

MS. MARMOR: Oh, sorry. Yeah, I was completely confused.

WITNESS: Oh.

MR. LINDEN: Okay.

A. Excuse me. Yes, that's correct.

Q. Okay. And there's a stamp here, and can you read what the stamp is next to the name, and it's got an address?

A. Yes, it says, "Cook County Sheriff's Office, Winifred Shelby, RN, CO -- CCM, South Campus, Building 2, 3026 South California Avenue, Chicago, Illinois 60608."

Q. Do you know why, according to this firm (sic), the medical information be released to the

sheriff's office as opposed to the provider?
MS. MARMOR: Can -- can you read that back? 1:07:59
(Record replayed)
MS. MARMOR: I'm going to object to the form.
Q. Do you understand the question?
A. I do. So the employee's physician -- the employee's authorizing the physician to release the records to the sheriff's office, to the nurse. She will compile all of the medical documentation that was received and give it to CorVel to provide to the independent physician that was selected by CorVel.
Q. If that information would have been released to the sheriff's office, who within the sheriff's office would have had access to the medical records?
A. Just to the nurse, as indicated on here. 1:08:59
Q. Okay. What -- what protections were in place in 2016 that it would stay within the nurse's purview?
A. The nurse had her own locked office with locked filing cabinets.
Q. Is there anything on this document that says that that information would be limited to the nurse receiving it?
A. Well the authorization is for it to be released to her.
Q. Okay. On top, it says it'd be released to

the Cook County Sheriff's Office, correct?

MS. MARMOR: Object -- objection.

A. It says, "Cook County Sheriff's Office, Winifred Shelby," so they are authorizing the records to be released to her.

Q. Okay. Do you know why the authorization would be released to the Cook County Sheriff's Office, Winifred Shelby, as opposed to CorVel?

A. It was just because many times, employees had more than one provider, and so she would just kind of corral all of the documents together and present them in one packet to CorVel.

Q. Okay. Then if you go down after that, there is a paragraph that the document says, "This request and authorization applies to," colon, and there is three boxes that can be checked. See that?

A. Yes. 1:10:30

Q. And the first box would be if it would have been checked, "health care information relating to the following treatment condition or dates," colon?

A. Yes.

Q. And what was the purpose of that box on the form as an HR person?

A. If we had a specific referral for an employee -- regarding a particular medical situation, then we

might put details in that area.

Q. What about a specific psychological issue, would you limit and check that box?

A. That would -- that was -- wasn't done, as far as I was aware.

Q. So in Mr. Nawara's case, if you would have signed it, isn't it a fair statement that any records whatsoever relating to Mr. Nawara would have been released to the sheriff's office and Nurse Shelby?

MS. MARMOR: Objection. Mischaracterizes the testimony and puts facts not in evidence.

Q. Am I wrong? 1:11:33

A. No, so the information would be released to the nurse, and that would be provided to the independent medical doctor because that -- that would be the person who could decide what's relevant and what's not to whatever the current situation is.

Q. I -- I guess my question is this release, the way it's written, would call for the release of any and all medical information regarding that employee and it wouldn't be limited in scope. Is that a fair statement?

MS. MARMOR: Same objection.

A. Yeah, it's asking for all health care information.

Q. And you or Ms. Shelby could have checked the first box regarding Mr. Nawara and said it should be limited to X, Y, or Z, correct?

A. Yes, but I guess I don't -- if -- I don't know why you'd do that in a case like this because it wouldn't be -- I mean, there are a number of records that could be relevant, not just specifically a psychological record.

Q. Okay. What type of records were you seeking when you referred him to a fitness for duty exam?

MS. MARMOR: Objection. Calls for facts not in evidence. 1:12:42

A. I mean, I don't know specifically what the doctor considers relevant when they are reviewing the medical information and when they meet with the employee, but certainly, there could be physical issues that could lead to psychological issues, and there could be crossover, so limiting a request just to psychological records might not give a doctor the complete picture they need to evaluate an employee.

Q. How about limiting the release to a specific period of time, was that ever done when you were at HR?

A. Yeah, it was common for employees to ask about, you know, how long would these records need to go back, and then the nurse would have a conversation

with the employee about what seemed reasonable.
Q. And would that be a decision typically made by the nurse and not you, or would it be made by the two of you together?
A. It would be -- the nurse would discuss with the employee, and they would kind of come up with something that seemed reasonable under the circumstances.
Q. What type of scope limitations were typically --
A. I mean, it --
Q. -- put on these forms? 1:13:46
A. It could be a number of years. I mean, I -- the nurse would be more fit to discuss that. It wasn't a decision I made.
Q. With respect to Mr. Nawara, did you ever discuss with Ms. Shelby about any time limitations that should be placed upon the release?
A. No, again, that's a conversation she would have had with Mr. Nawara had he interacted with us in our meeting.
Q. Did anything prevent her from putting a time limitation on there?
A. Only that she hadn't been able to talk with Mr. Nawara.

Q. Do you know what efforts Ms. Shelby made trying to talk to Mr. Nawara about any limitations that should be placed on this form?
A. Well I know that she tried to have two conversations with him the day when he came to HR, and I know she reached out him at least once via telephone, maybe more than that.
Q. Isn't it true that when he came in, he expressed a problem with signing these forms, Exhibits 1 and 2?
MS. MARMOR: Objection. 1:14:51
A. No. Well I mean, he expressed a problem with just being there and discussing anything.
Q. Did he ever indicate to you that he didn't -- he wanted to talk to his lawyer before he signed the medical release forms?
A. No, not that I recall.
Q. Was there a reason why he didn't sign them on the day that he came in?
MS. MARMOR: Objection. Calls for speculation.
A. I don't even know if he knew what the forms were honestly, we weren't really able to discuss the process with him at all.
Q. Did you hand him the forms that day?

A. The nurse might have.
Q. Okay. When you say, "The nurse might have," do you -- do you recall whether or not she did or didn't on that day?
A. I -- I believe he -- he left with the forms.
Q. Did you have any information when Mr. Nawara came to you in 2016 that he had any psychological issues predating the alleged September 2016 incident?
A. No. 1:16:02
Q. Do you know of any reason why a psychological medical record should have been requested for a fitness for duty exam, medical records existing prior to 2016?
MS. MARMOR: Objection. Calls for -- it assumes facts not in evidence.
A. When the fitness for duty evaluations are conducted, like I said before, the doctor kind of looks at a full picture of the employee, which is why they request to have their medical history.
Q. Do you know what records a doctor in this case wanted?
A. I do not.
Q. Did you or Ms. Shelby ever call the doctor and say, "Should there be any limitations placed upon the release and what documents you, the doctor, needed to perform an evaluation on Mr. Nawara?"

A. No, we don't communicate with the doctor. 1:16:53
Q. Was there any reason for Mr. Nawara's fitness for duty examination that you needed the medical records as opposed to psychological records regarding Mr. Nawara?
MS. MARMOR: Objection to form and calls -- and assumes facts not in evidence.
A. I mean, just as I said before, that having the employee's full medical history, whether it's simply medical or psychological, assists -- assists with having a full evaluation done of the employee.
Q. Do you know of any medical issues with respect to Mr. Nawara when he came in for the interview in November 2016?
A. No.
Q. Do you know of any reason why a doctor, given that you didn't know of any medical issues, would have needed the medical records of Mr. Nawara as opposed to just psychological records, if he had any?
MS. MARMOR: Object to form and assumes facts not in evidence.
A. Oh, I -- just the same reason, they would need to know the medical history of the employee in order to make a complete assessment of the employee.
Q. But you're seeking a psychological assessment

regarding Mr. Nawara, I take it, correct?
A. Yes. 1:18:07
Q. Do you know why the doctor would have needed the medical records, as opposed to psychological records --
MS. MARMOR: Object --
Q. -- that psychological evaluation?
MS. MARMOR: Sorry. Objection. Asked and answered. I mean, I think she's answered several times now to that same question.
Q. I know you're not a doctor, I'm just asking do you know, as you sit here today, of any medical reason why that evaluator would have needed Mr. Nawara's medical records as opposed to psychologic records?
A. Yeah, again, only because, you know, someone's physical health can be intertwined with their psychological health.
Q. Okay. What physical health did that doctor need to perform the evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. I don't know. That's why they get the records and go through, you know, what they feel is relevant and use that in their assessment.

Q. Can you give us examples of any physical issues that would go to psychological issues for a fitness for duty examination?

MS. MARMOR: Objection. Assumes facts not in evidence.

A. Yeah, I cannot. 1:19:11

Q. You cannot, okay.

MS. MARMOR: I need to take a quick break.

MR. LINDEN: Sure.

MS. MARMOR: Okay.

RECORDER: Off the record, 11:36 a.m.

(Off the record)

RECORDER: Back on the record, 11:44 a.m.

Q. Just to clarify, did you meet one time with Mr. Nawara?

A. Yes. 1:19:31

Q. And that was the only time you met with Mr. Nawara, was one time in November?

A. It was one meeting date. He did come in and out of the office twice, but it was all within a short span of time.

Q. Okay. Do you know what kind of span we're talking about?

A. Oh, within probably 20 minutes, I would say.

Q. So was there a break where he left and then

came back?
A. He left and met with his union representative, yes.
Q. Do you know how long he was there before he met with the union rep?
A. A couple minutes maybe, tops. 1:20:02
Q. So one of the first things he said to you and Ms. Shelby was "I want to meet with the union rep," is that what happened?
A. No, he -- well we just explained why we wanted to meet with him.
Q. Did he ask to have a union rep present during that meeting?
A. I don't know if he had called the union in advance, the -- but -- and the union is not typically right there, so he -- he might have called them in advance. I don't remember him saying he wanted a union rep there, no.
Q. But initially, there was not a union rep, is that what happened?
A. Yes.
Q. Was anything -- did he say anything in that first session before the union rep got there?
A. Not much.
Q. When you say, "Not much," do you recall

anything what he said?
A. Well basically, what I told you before, that he wasn't experiencing any issues at work, he wasn't -- he hadn't been in any altercations, he didn't have an issue with the superintendent, and then that he stayed away from the superintendent, just very short, clipped answers. That was it.
Q. Okay. And where did this interview occur?
A. The meeting was in the nurse's office. 1:21:14
Q. And it was just you and Ms. Shelby?
A. Yes.
Q. Did Ms. Shelby have any other interviews that you know of with Mr. Nawara?
A. No, just I know she did try to reach him by phone, but I don't know that she ever connected with him again after we met with him that day.
Q. Do you know whether or not she met privately outside your presence at any time personally with Mr. Nawara?
A. Not that I'm aware of.
Q. Okay. And how long after the break was it when he came back in with the union rep?
A. Oh, I'm not certain, a few minutes maybe.
Q. And how long -- did he say anything more with the union rep, or what happened when he came back, if

you can separate the two time frames?
A. I don't recall. I -- I just -- I -- I recall that it ended abruptly with him just kind of -- with him just leaving, but I -- I don't recall the conversation once the union rep was there.
Q. Was this an office with a private door or more of a cubicle nature?
A. It's a private office. 1:22:22
Q. Can anybody else, other than you, and the nurse, and the union rep, when he was there, and Mr. Nawara hear what was going on?
A. No.
Q. Okay. I'd like to show you Exhibit Number 3.
MR. LINDEN: And there's two -- one --
MR. HENRETTY: I'll share.
MR. LINDEN: Yeah. You don't care?
MS. MARMOR: Thanks.
Q. And ask first of all, do you know what this document is?
A. Yes.
Q. What -- what is it?
A. This is the information that was given to Nurse Shelby and I by the superintendent regarding the incident with Mr. Nawara.
Q. And that would have been super --

Superintendent Hayes, correct? I think we already --
A. Yes.
Q. -- fixed that one.
MS. MARMOR: We -- we've now got Superintendent Jones, Superintendent Hayes, the record shows it's Superintendent Jones-Hayes. It's fine.
MR. LINDEN: Okay. 1:23:22
Q. And this is dated November 16th, 2016?
A. Yes.
Q. Do you know if that was the day that it was provided to you?
A. It was -- I -- it's the day the telephone conversation took place.
Q. And do you know who actually typed this Exhibit 3 up?
A. I believe I did.
Q. It was not given to you beforehand by Superintendent Hayes?
A. No, this was based on our conversation with Superintendent Hayes.
Q. Do you take handwritten notes of your conversation?
A. I don't know if I had -- was typing as we were talking or if there were other notes. I -- I think I probably typed as we spoke.

Q. Is that your normal practice, to type as you speak?
A. Yes, because I often can't read my handwriting when I go back, so.
Q. And is that a verbatim statement of what she gave or is it more of a nature of a summary?
A. It was a summary of what she said. 1:24:24
Q. By looking at this document, do you have a better idea of when you talked to Mr. Nawara?
A. It would have been after this statement, so maybe a day or two after, as soon as we could get him in the office.
Q. So it probably would have been either November 17th or 18th, 2016. Is that fair?
A. Yes.
Q. I notice one line here, and I don't want to go through the whole thing with you, it's -- this is Ms. Hayes' version of what occurred that day, correct?
A. Yes.
Q. As you sit here, you don't know if that's accurate or not accurate, correct?
A. Yes.
Q. You -- you don't know, correct? The question is bad. When you say, "Yes," you don't know if it's accurate or not, right?

A. No, I --
Q. It's solely --
A. This -- this is the statement that she gave to me and to Nurse Shelby -- or this is the information she gave to us --
Q. Okay.
A. -- I should say.
Q. So I notice one line says, "Officer Nawara displayed extreme rage towards her, his body trembled as he screamed at her with his fists clenched." You didn't come to a conclusion that that's what happened, I take it, correct?
A. No, this is what the superintendent reported --
Q. Okay. 1:25:37
A. -- occurred.
Q. So you don't know whether or not he did or did not display any type of rage towards her, correct?
A. I do not.
Q. Do you know what type of history Ms. Hayes had, did she have any other prior complaints of any employees?
MR. HENRETTY: Object to form.
MS. MARMOR: Same objection.
A. Did she complain about other employees?

Q. No, do you know whether or not, prior to meeting her or talking to her in November of 2016, whether or not she had any complaints against her by any fellow employees?

A. I do not know.

Q. Do you know --

A. I -- I do not know.

Q. Do you know if she had any disciplinary history within the sheriff's office?

A. I don't know.

Q. Did you or Ms. Shelby check to see whether or not she had ever been disciplined?

A. No.

Q. Did you check to see if she had any prior complaints against her by fellow employees?

A. No. 1:26:37

Q. Did you type any -- when you talked to Mr. Nawara, did you type any type of notes regarding your conversation with him?

A. No.

Q. Was there a reason that somehow you -- when you talked to Ms. Hayes, that you typed your notes up, but you did not when you talked to Mr. Nawara?

A. Well this was in order to get more detail on the incident she was reporting. There really was not

much of a conversation to -- to document with Mr. Nawara.
Q. Did you take any notes whatsoever when you talked to Mr. Nawara?
A. I don't believe so.
Q. Do you know whether or not Ms. Shelby took any notes regarding the interview with Mr. Nawara?
A. I don't know.
Q. Do you know of any written record of what Mr. Nawara might have said at that meeting with you and Ms. Shelby?
A. I don't. 1:27:37
Q. Do you know how many referrals for fitness of duty exams that you've been involved with during your time at the sheriff's office?
A. Oh, I would say approximately maybe 15 or so. It's -- it's a guess though.
Q. So it's somewhat rare to have a referral for a fitness for duty exam?
A. Yes.
Q. Of those 15 or so, did you always agree with the referral?
A. No. 1:28:30
Q. Of the 15, do you know how many you disagreed and said the employee should not have to be subjected

to it?
A. I would say maybe a third of the time, this is just an estimation, employees are actually sent through the fitness for duty process following their meeting in human resources.
Q. So is it fair to say that more often than not, you find that the employee should not have to undergo it?
A. Yes.
Q. Okay. When you said you have been involved in about 15, that would have been from 2016 until today, correct? About three year period?
A. Yes.
Q. Do you know if the --
A. That number might be a little low, I'm sorry.
Q. Okay. And I think when Mr. Nawara came in in November, you hadn't been there too long, right, same year --
A. Yes. 1:29:43
Q. -- under the sheriff's office? Prior to Mr. Nawara, do you know how many, approximately, fitness for duty evaluations you -- you had been involved in?
A. Maybe one or two before that.
Q. Yeah. Do you recall specifically what the one or two were?

A. I recall -- I recall one, but I feel like there was another one also, and I am not recollecting the details.

Q. How about Ms. Shelby, how long had she been working for HR as a nurse?

A. I believe she started in 2015 with the sheriff's office.

Q. Do you know how experienced she was in 2016 with referrals for fitness for duty exams?

A. I don't know.

MS. MARMOR: Objection. Lack of foundation.

Q. You don't know?

A. I -- I don't know. 1:30:40

MR. LINDEN: Okay. The Exhibits, we can just kind of keep over there so I don't lose them.

MS. MARMOR: Oh, okay.

MR. LINDEN: Okay.

MS. MARMOR: You're, like, the -- a partner --

MR. LINDEN: We're --

MS. MARMOR: -- at a big firm that cannot be trusted with them.

MR. LINDEN: No, no, no, no. Okay.

MS. MARMOR: We're on 4?

MR. LINDEN: Yes.

Q. I'd like to show you Exhibit Number 4 and ask you if you recognize Exhibit Number 4.
A. Yes. 1:31:38
Q. And what is Exhibit Number 4?
A. This was the referral that came from DOC requesting that we meet with Officer Nawara.
Q. Okay. And that was from Matthew Burke, comma, chief of staff?
A. Yes.
Q. And does that refresh your recollection what position Mr. Burke held on 9/29/16?
A. Yes, I guess he was chief of staff.
Q. Would that be chief of staff for the sheriff or just chief of staff within DOC?
A. DOC.
Q. So each department would have its own chief of staff?
A. I'm not certain.
Q. Do you know whether or not Mr. Burke had any communications with Ms. Hayes?
A. I don't.
Q. Do you where Ms. -- Mr. Burke got his information that a referral should be made to HR?
A. I do not. 1:32:39
Q. And this form says, "Pursuant to the attached

documentation, I am requesting that Officer John Nawara, employee number" -- goes on to say, "be evaluated for fitness for duty," do you know what the attached documentation was?

A. I believe the statement from the superintendent about the incident with Officer Nawara.

Q. Okay. And I see there is two people copied here, Nneka Jones Tapia --

MS. MARMOR: Nneka.

MR. LINDEN: Nneka? I'm sorry.

Q. Says, "Executive director," do you know was she executive director of DOC?

A. Yes, she was.

Q. And Tarry Williams, DOC chief of operations. Other than being cc'd on this referral, do you know of any involvement these two people had with John Nawara?

A. No. 1:33:43

Q. Is it common for the executive director and DOC chief of operation be copied on these type of letters, if you recall?

A. I don't know if they're typically copied or not. Probably.

Q. Does it mean anything to you that they are copied on this one?

A. No. I mean, only that Matt was just, you

know, keeping his supervisors in the loop.
Q. Okay. So would it typically go from -- in 2016, would Karyn Williams typically assign these to you?
A. Yes.
Q. Would Karyn Williams typically make the decisions for fitness for duty evaluations, or would she delegate that to you?
A. What do you mean, make the decisions for them?
Q. You indicated that you and Ms. Shelby made the decisions whether or not the employee should be required to undergo a fitness for duty exam, correct?
A. Yes. 1:34:46
Q. Would Ms. Williams have had the authority to make those determinations in 2016?
A. Oh, I don't know. She really wasn't involved in the process in that way. It would be more referring the cases to me and to the nurse.
Q. And that's what happened with Mr. Nawara, she basically referred it, stepped aside, and let you do the work with Ms. Shelby?
A. Yes.
Q. Okay. Do you know of any information if we talk to Ms. Williams that she'd have regarding

knowledge to this case?

MS. MARMOR: Objection. Calls for speculation.

A. I do not know.

Q. You don't know of any knowledge that she'd have, correct?

A. Yes. 1:35:33

Q. Do you know whether or not Ms. Hayes filed a complaint against Mr. Nawara?

A. I don't.

Q. Do you know whether or not Mr. Nawara was ever disciplined?

A. No, I don't know.

Q. You don't know either way? Do you have any information to indicate that Mr. Nawara was ever disciplined for the alleged incident that occurred in September?

A. I don't know if he was or not.

Q. Do you know whether or not OPR ever investigated what Ms. Hayes says occurred back in September of '16?

A. I don't know if they investigated. 1:36:38

Q. Do you know -- do you know of any conclusions by OPR regarding what happened that day?

A. I don't.

Q. Do you know whether or not John Nawara, prior to meeting with you in November, filed any type of complaint against Ms. Hayes?

MS. MARMOR: Objection. Asked and answered.

A. No, I don't know.

Q. Okay. I want to show you --

MR. LINDEN: Exhibit 5?

MS. MARMOR: Yeah.

Q. Going to hand you Exhibit 5.

MS. HONINGFORD: Thank you.

MR. LINDEN: I think a couple of these, we might have one less Exhibit.

MR. HENRETTY: Exhibit 5 --

MS. MARMOR: Oh, goodness.

MR. LINDEN: So far or not --

MR. HENRETTY: -- have --

MR. LINDEN: -- too bad.

Q. Do you recognize Exhibit Number 5?

A. No, I don't. 1:37:51

Q. Have you ever seen Exhibit 5 before today?

A. No, not that I recall.

Q. Have you ever seen this type of form before when you worked for the sheriff's office?

A. Yes.

Q. And what type of form is it?

A. It's --

MS. MARMOR: Objection. Lack of foundation.

A. So it -- it says, "Cook County Sheriff's Office discrimination, harassment, sexual harassment complaint form."

Q. Is this the type of form that's typically kept in the ordinary course of business based on your experience at the sheriff's office?

MS. MARMOR: Objection. Lack of foundation.

MR. HENRETTY: Join.

A. No, this isn't a form that I use, so I couldn't answer.

Q. How often -- how many times have you seen this form?

A. I -- I couldn't estimate. I don't know.

Q. More than ten?

A. This type of form?

Q. Yes.

A. Oh, maybe. I'm not certain.

Q. But according to this report, he filed a complaint on October 13th, 2016. See the date here?

A. Yes. 1:38:58

MS. MARMOR: Objection. Lack of foundation.

Q. At the time -- assuming he filed this complaint, would you have had access, if you wanted to,

to this document when you interviewed Mr. Nawara in November?

MS. MARMOR: Objection. Calls for speculation. Lack of foundation.

MR. HENRETTY: Join.

Q. If you know.

A. No, I don't know where he filed this complaint.

Q. Okay. You see on the top portion, it says, "This form must be submitted to either a member in your own chain of command," comma, "director of personnel, or the office of professional review." You see that up there?

A. Yes.

Q. Director of personnel at the time would have been within human resources, or would that be the DOC director of personnel?

MS. MARMOR: Objection. Lack of foundation. Calls for speculation.

A. Yeah, it --

Q. If you know. 1:39:56

A. Yeah, it's -- it's not clear on here.

Q. If you can just kind of read this, and I just wanted to ask you one question.

A. Okay. 1:41:26

Q. Would it have been useful in order for you and Ms. Shelby to make the decision whether or not to order a fitness for duty exam for you to have this information in November?

MS. MARMOR: Objection. Calls for speculation.

Q. And I know you didn't -- I know you didn't have it, so I'm not criticizing you, but would it have been helpful to you?

MS. MARMOR: Same objection.

WITNESS: Well --

MR. HENRETTY: Join.

WITNESS: -- can I answer?

MS. MARMOR: Yes, you can answer.

WITNESS: Okay.

A. I mean, that's why we meet with the employee, to kind of get a full picture of what's happening, but we didn't know about this. He didn't tell us about any of this.

Q. Okay. If you would have known, would that -- would you have considered that in determining whether or not he should be ordered for a fitness for duty exam?

MS. MARMOR: Same objection.

MR. HENRETTY: Join.

A. Yeah, it would have been considered, sure.
Q. So I take it in HR, you wouldn't automatically -- if you have a he said versus she said, you wouldn't automatically take the word of a supervisor, would you?
A. No. 1:42:28
Q. That they both should be given equal consideration, correct?
A. Yes.
Q. So based upon this, Mr. Nawara's version of events are quite different than what Ms. Hayes told you, correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
MR. HENRETTY: Join.
A. Yes.
Q. You would agree that if what Mr. Nawara says in this Exhibit Number 5 is true, that would be inappropriate conduct on the part of Ms. Hayes, wouldn't you?
MS. MARMOR: Objection. Lack of -- complete lack of foundation for --both for the document and for the question.
MR. HENRETTY: Join.
A. Can you repeat your question? I'm sorry.

Q. Yes. You would agree that based upon assuming what Mr. Nawara said is true in Number 5, I know you don't have independent knowledge, that that would be inappropriate conduct on the part of Ms. Hayes, correct?

MS. MARMOR: Same objection. She does not have a foundation to make that kind of a judgment.

MR. HENRETTY: Also form. 1:43:36

Q. You can --

WITNESS: Can --

Q. You can answer.

A. Okay.

Q. Unless they tell you not to answer, you can --

MS. MARMOR: Right.

Q. -- go ahead.

A. Yeah, I -- I mean, just reading this, if this were true, it -- it would be inappropriate behavior, yes.

Q. Okay. I'd like to show you Exhibit Number 6 and just ask you if you have ever seen this document before.

MR. HENRETTY: Sorry. 1:44:56

MR. LINDEN: All right.

A. I don't -- I don't recall seeing it, but he

-- it's -- I'm cc'd, so I must have received it.
Q. And what type of document is it, is it a normal document when you're in HR?
A. No, this is a document from DOC.
Q. And is this document -- what's the date of this document?
A. November 18th, 2016.
Q. Do you have any reason to dispute the date on this document?
A. No.
Q. It says here that Mr. -- be -- "Please be advised that director's office received notification on November 18th, 2016 that Officer Nawara is not permitted to work until he has been released by the bureau of human resources." You see that part?
A. Yes. 1:45:43
Q. Do you know who made that decision?
A. Well once someone is being referred out to undergo a fitness for duty, they are not allowed to work until the report is received --
Q. Is that automatic --
A. -- indicating --
Q. -- in all -- all cases?
A. If they're sent out for a fitness for duty, yes.

Q. Yes. And if they would not have been referred to fitness for duty, then they're allowed to work, I take it, the reverse would be true?

A. It -- it would depend on the situation with the employee, but typically, yes.

Q. Okay. It says he's not allowed to work until he has been released by the bureau of human resources, that would be your bureau, correct?

A. Yes.

Q. And what would it take for Mr. Nawara to be released?

A. So we would have to have the report back from CorVel, from the physician, indicating that he was fit for duty and was able to return to work with or without restrictions.

Q. Okay. So until you got the report back saying that he's fit for duty, he would not be allowed to work --

A. Yes. 1:46:55

Q. -- correct? And during this time on November 18th, 2016, was he still getting paid, or would he be not paid?

A. Employees who are out on fitness for duty at this time would be able to use whatever benefit time they had available, and so they would be paid in that

way.

Q. That's only if they have benefit time, correct?

A. Yes.

Q. So they'd have to use their own time to get paid?

A. Yes.

Q. So is it fair to say that effective on November 18th, 2016, that Mr. Nawara would have -- in order to get paid, would have had to use his own time?

MS. MARMOR: Objection. Lack of foundation.

A. Yes.

Q. And what type of time could Mr. Nawara use to get a paycheck?

A. Any benefit time he had accumulated, so vacation, sick, personal, compensatory, holiday.

Q. And are those days worth money, vacation days an employee --

A. Yes. 1:48:00

Q. And how so or how -- how would that work?

MS. MARMOR: Objection. Lack of foundation.

A. So if you don't work for a day and you use eight hours of vacation, you're still paid for that day as if you had worked.

Q. Okay. And that would be the same for a sick

day too?
A. Yes.
Q. Would sick days be day for day, or would you only get credit for, like, half a day for -- if you have ten sick days, can you use ten of those days to get paid for those ten days?
A. It's all based on hours, so you would use benefit time in lieu of working, and you'd be paid as if you had worked.
Q. As of November 18th, 2016, do you know what type -- what time Mr. Nawara had accumulated for vacation days, sick days, or other days?
A. No. 1:48:51
MS. MARMOR: I -- I need to ask my client a question because I just want to make sure --
MR. LINDEN: Sure.
MS. MARMOR: -- that she has a --
MR. LINDEN: Sure.
MS. MARMOR: -- nothing's misleading here.
RECORDER: Off the record, 12:14 p.m.
(Off the record)
RECORDER: Back on the record, 12:17 p.m.
MR. LINDEN: Let's see -- that.
MS. MARMOR: This is 7?
MR. LINDEN: Yeah, pretty sure that is.

Q. I can show you Exhibit Number 7, and have you ever seen Exhibit 7?
A. Yes.
Q. And what is Exhibit 7?
A. This is a letter that I sent to Officer Nawara.
Q. And this would have been a couple weeks approximately after you met with him?
A. Yes. 1:49:41
Q. Can you just read the first paragraph of this letter?
A. "Dear CO John Nawara, on 11/8/16, you were informed by the occupational health nurse for the sheriff's office, Winifred Shelby, that you were required to undergo a fitness for duty evaluation before returning to active duty. You took the forms in order to review them prior to signing and have failed to return them to Ms. Shelby. She called and left a voicemail message for you on 11/30/16 to which you did not respond. The time you have been off work since 11/18/16 is only authorized if you are participating in the -- in the FFD process. These signed documents must be returned to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you

are not participating in the process and your time off from work from 11/18/16 will be unauthorized. Further, you will -- you are not able to return to work until you have completed the FFD process."

Q. Okay. The forms that are being referred to in that paragraphs are Exhibit 1 and 2, correct? And you can go back and check if you want, but.

A. Yes. 1:51:05

Q. And -- and then Nurse Shelby is copied on your letter, correct?

A. Yes.

Q. And was this letter mailed to Mr. Nawara?

A. Yes.

Q. And it says here -- and it says, "Re," it says, "Via email, first class, and certified mail," do you know if it went out to Mr. Nawara in all three ways?

A. It should have gone out at each way that's listed.

Q. And when you send something certified, do you typically get a -- do a return receipt requested?

A. Yes.

Q. Do you know whether or not you got any -- you did it that way for this letter?

MS. MARMOR: Object to the form.

A. If it were sent certified mail, that's how it would have been.
Q. Yeah. Have you ever seen any signed certified receipt by Mr. Nawara acknowledging whether or not he got this letter?
A. Oh, I don't recall. 1:52:01
Q. Do you know what Mr. Nawara's -- Nawara's email address was in 2016?
A. I would have used -- used his sheriff's email address.
Q. Okay. Do you typically put it on the letter if you would have emailed it, or is it -- was it your practice just to do it this way?
A. Put what on the letter? I'm sorry.
Q. When you typically emailed something to an employee, would you put the email letter, you know, next to the address or somewhere on it?
A. Oh, the email address --
Q. Yes.
A. -- that I used? No.
Q. So your normal practice would be if you would have emailed it, that that address would not appear in the letter?
A. Right, because it would go through the sheriff's --

Q. Okay.
A. -- email system.
Q. Okay. When you say, "Ms. Shelby called and left a voice message for you on 11/30 to which you did not respond," how did you know that Ms. Shelby called and left a voicemail?
A. She told me. 1:53:11
Q. And she would have left the voicemail on the same day you wrote this letter, correct?
A. Yes.
Q. Do you know what time Ms. Shelby left the email -- or the voicemail? I'm sorry.
A. No.
Q. Do you know how long after she left the voicemail that you wrote this letter?
A. No.
Q. So could it have been half hour or ten minutes?
MS. MARMOR: Objection. Calls for speculation.
A. I mean, it -- it would have been a reasonable amount of time after leaving a message --
Q. Okay. When you say --
A. -- to expect a response, but I don't know for certain what -- what time she called or what time I

wrote the letter.

Q. Other than a guess, do you -- can you provide any approximation of how much time between the time she left the voicemail and your letter saying that you didn't respond to her voicemail?

A. No.

Q. Okay.

A. But he never did respond at any time.

Q. He never responded?

A. Not to her message, no. 1:54:12

Q. Okay. I'd like to show you Exhibit Number 8 and ask if you've ever seen this document before.

A. Yes.

Q. What is Number 8?

A. This is a letter I sent to Officer Nawara.

Q. What's the date of this letter?

A. February 28th, 2017.

Q. Okay. And that would have been sent, according to this letter, the same three ways, email, first class mail, and certified mail, yes?

A. Yes. 1:55:36

Q. Okay. Can you read the first paragraph of this letter?

A. "On November 18th, 2016, you were informed by the occupational health nurse for the sheriff's office,

Winifred Shelby, that you were required to undergo a fitness for duty, FFD, evaluation before returning to active duty. You were referred for fitness for duty based on an interaction you had with Superintendent Jones-Hayes, in which you were alleged to have acted in an overly aggressive and threatening manner. During the meeting on November 18th, 2016, you were given an authorization to release health care information and a HIPAA authorization for disclosure of protected health information form, which you took in order to review prior to signing. To date, you have not returned these forms to Ms. Shelby. Nurse Shelby also called you and left a message for you on November 30th, 2016. You never responded to her message. In addition, I sent you a letter on November 30th, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the fitness for duty process. To date, I have not heard back from you."

Q. Okay. The two authorization forms that were referred to in this paragraph, again, relate to Exhibits 1 and 2, correct?

A. Yes. 1:57:03

Q. And your letter indicates he never responded to her message, see that part?

A. Yes.
Q. Okay. But isn't it true that at the time you wrote this letter, Ms. Dana Kurtz was representing Mr. Nawara?
A. I don't know if that was when I -- I don't know what the timing was with that and me sending this letter.
Q. Okay. But if a lawyer for an employee responds to you, would that be the equivalent of the employee responding to you?
MS. MARMOR: Objection.
A. It would depend on what the situation was.
Q. But if you send a letter or a request to an employee and their lawyer responds, you wouldn't hold it against the employee for not responding personally, they're responding through a lawyer, would you?
MS. MARMOR: Object to the form.
MR. HENRETTY: Join. 1:57:56
A. I mean -- "hold it against them," I guess I'm not --
Q. Yeah, when you say the employee doesn't respond, if their lawyer would have responded on behalf of the employee, wouldn't that be essentially the same as the employee responding to you?
MS. MARMOR: Object to -- objection.

Argumentative.

A. It would depend on the circumstances.

Q. Okay. Prior to this letter of February 28th, 2017, do you know if you received any communications from Dana Kurtz?

A. I don't -- I don't know when -- she did send me an email. I don't recall when it was though.

Q. Okay. I'd like to hand you Exhibit Number 9 and ask you if you've ever seen this document?

A. Yes. 1:59:14

Q. And what -- what is it?

A. This is an email from Dana Kurtz to me, Nurse Shelby, and Peter Kramer.

Q. And what's the date of this?

A. December 21st, 2016.

Q. Okay. And it has -- on top, it says, "To," and then it's to you at cookcountyil.gov, correct?

A. Yes.

Q. Was that your correct email back on December 21st --

A. Yeah.

Q. -- 2016?

A. Yes.

Q. And Winifred Shelby is listed at cookcountyil.gov, would that have been her correct

email?
A. Yes.
Q. Do you recall receiving it on November (sic) 21st, 2016?
A. No, I know I -- I've seen it. I don't recall the date that I read it.
Q. Do you have any reason to doubt that that would have not been sent to you on November (sic) 21st?
A. That would have been sent to me on that day?
Q. Yes. 2:00:13
A. No, it says that's the date sent, I just don't know what day I saw it.
Q. Okay.
MS. MARMOR: And just -- I just want to make, for the record, clear because this is not a Bates stamped version of this document, that it looks like this is a document that was filed at the outset of this case. I do believe there are identical date -- Bates stamped versions of it --
MR. LINDEN: No, that's true.
MS. MARMOR: -- in the case.
MR. LINDEN: And if you want, it came from the motion for a temporary restraining order.
MS. MARMOR: I figured it was, but I just -- I wanted to make sure we weren't confused later on.

MR. LINDEN: Okay.
Q. Can you just read the first two paragraphs of this email?
A. "Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the sheriff's office and other possible individual defendants. I understand that you placed him on leave in order that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara and I," in parentheses, "believe that such an order is unlawful."
Q. Did you ever respond to this email, if you recall?
A. I -- I don't recall. 2:01:30
Q. Is it something you would recall if you would have responded to?
MS. MARMOR: Objection. Calls for speculation.
A. There would be a document if I did. I just -- I don't recall if I did or not.
Q. Would you consider that to be a response from Mr. Nawara to your request -- request regarding for him

-- or demand that he signs medical release forms?
A. Not necessarily.
Q. Okay. When you say, "Not necessarily," would that be a yes, or a no, or a maybe?
A. Well when I receive documentation from attorneys, I deal with our law department in how to respond or if to respond.
Q. Okay. Do you know whether or not you specifically dealt with your law department when you got this email on December 21st, 2016?
A. Yes, I did.
Q. Do you recall who you dealt with?
A. Kate Christy and probably Nick Scouffas as well.
Q. Did you seek advice to them regarding an employment matter within the sheriff's office when you contacted them?
MS. MARMOR: You mean "advice from them"? You said, "Advice to them."
MR. LINDEN: Advice from them.
A. I called them --
MR. LINDEN: Yeah. 2:02:36
A. -- with advice. Yeah, I -- I would have forwarded what I received and asked them what next steps should be.

Q. Do you recall -- and don't answer right away, because give your counsel a chance to object, do you recall what advice they gave you, if any, when you forwarded this to them?

MS. MARMOR: And I'm going to instruct you not to answer that question based on attorney-client communication and privilege.

WITNESS: Okay.

Q. And you're going to heed your attorney's advice --

A. Yes.

Q. -- and you understood the question, you're going to refuse to answer?

A. Yes, I am.

Q. Did that advice, if any, that was given to you relate to an employment decision, or did it relate to anticipation for litigation?

MS. MARMOR: Object to the form. 2:03:21

A. It related to this whole situation with Officer Nawara.

Q. Okay. Prior to your letter of November 30th, the prior Exhibit, was Mr. Nawara ever given any written notice that he had to complete the authorization forms, if you know?

A. I -- I'm not certain.

Q. Okay. The next paragraph, Ms. Kurtz says, "Officer Nawara has not been given any notification of any complaint or allegations against him," as of that date, do you know whether or not that's a true statement?
A. It's not a true statement.
Q. How so?
A. Well we met with Officer Nawara and told him why we wanted to meet with him. In the meeting, we discussed what led to the meeting, so he was aware that there were allegations against him.
Q. Okay. It also says, directed at you and Ms. Shelby, "You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form." Is that true or false?
A. That's false. 2:04:48
Q. Okay. What other information was given to him?
MS. MARMOR: Object to the form.
A. Well I -- I -- my -- essentially described the meeting before, you know, the nurse would explain why we had asked him to come to HR, you know, what the concerns were, and again, I don't know how far along we got in discussing the process -- or the nurse got in discussing the process with him because, you know, it

wasn't really an interactive type of meeting as they typically are, and it ended abruptly with him leaving. So I'm not certain exactly how much information he received, but he definitely was aware of why he was there. He wasn't just handed forms and pushed out the door.

Q. Based on Exhibit Number 9, is it true that he had not responded to you as of February of 2017?

MS. MARMOR: Mr. Nawara had not responded? 2:06:05

Q. Or -- or on behalf of his lawyer?

MS. MARMOR: Object to --

Q. At that time, his lawyer had responded on his behalf, correct?

MS. MARMOR: Object to the form.

A. I'm sorry, can you repeat the question?

Q. The prior Exhibit, Number 8, was dated 2/28/17, correct?

A. Yes.

Q. And when you wrote this letter, his lawyer, Dana Kurtz, had responded regarding the release forms on 12/21/16, correct?

MS. MARMOR: Object to the form.

A. Yes, her email is from December 2016.

Q. Okay. Do you know if you ever contacted Dana Kurtz from 12/21/16 up until February 28th, 2017?

MS. MARMOR: About Mr. Nawara?
MR. LINDEN: Yes. 2:07:03
A. I am not certain if I did. There would be a document if I had responded to her email.
Q. Have you seen any documents shown that you responded to the email?
A. I don't recall.
Q. Is there any reason why you apparently did not respond to this email?
A. I will --
MS. MARMOR: Objection.
Q. Would it have been based on conversations you had with the legal department?
A. Yes.
Q. So I take it they told you not to respond to her?
MS. MARMOR: Objection.
MR. LINDEN: I --
MS. MARMOR: I'm instructing you not to answer -- answer that --
MR. LINDEN: I think she kind --
MS. MARMOR: -- question.
MR. LINDEN: I think she kind of did. I'm sorry.
WITNESS: Not at all.

MR. LINDEN: I'm joke -- I'm being sarcastic.
Q. Had they told you to respond to it, I take it you would have responded?
MS. MARMOR: Objection. 2:07:47
Q. No, you don't have to answer that. Let's see, I'd like to show you Exhibit Number 10 and ask if you've ever seen this document before?
A. Yes.
Q. And this is an email from Dana Kurtz to you, correct?
A. Yes, to me, Nurse Shelby, and Peter Kramer.
Q. And it's dated January 31st, 2017 at 4:23 p.m.?
A. Yes. 2:08:53
Q. And I take it you have no doubt that you received it on that date and that time on January 31st, correct?
MS. MARMOR: Object to the form.
A. Yeah, it was sent that day. I don't know what day I actually read it, but it was sent that day, according to the email.
Q. Was it your practice to read your emails at or near the time that they would have been received?
A. As soon as I am able, yes.
Q. And Peter Kramer, who is Peter Kramer?

A. He is an attorney with the sheriff's office.
Q. Did he work with Ms. Christy?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. At this time, I'm not certain if he was working in the law department or not.
Q. Yeah. Were you dealing with Mr. -- Attorney Kramer at that time involving John Nawara?
A. Not specifically, no. 2:09:45
Q. And can you just read this email that was sent to you?
A. "We received no response to my email below. If Officer Nawara is not reinstated immediately before the end of this week, with his time and all benefits and salary -- salary reinstated as well, then we will file suit next week and request -- request -- request reimbursement of his time, salary, and attorney's fees. Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or place him on leave without pay. This is clear retaliation for his complaint against Superintendent Jones-Hayes for her harassment of him. I look forward to hearing from you."
Q. Was Ms. Kurtz correct in the first sentence saying that, "We received no response to my email

below," which refers to the December 21st, 2016 email?
A. Again, I don't recall if there was a response, but --
Q. Okay.
A. -- there would be a document if -- if there was a response --
Q. Okay. And again --
A. -- from me.
Q. -- you don't know of any document, correct?
A. I do not. 2:10:52
Q. Do you know if you ever responded to this January 31st email from Ms. Kurtz?
A. I don't recall.
Q. Would there be a document if you -- had you responded?
A. Yes.
Q. And do you know of any documents showing that you responded?
A. I do not.
Q. Do you know why there is no such document?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
Q. If you know.
A. I -- I'm sorry, what was the question?
Q. Do you know why there isn't a document

showing that you responded to the January 31st, 2017 email from Ms. Kurtz?

MS. MARMOR: Same objection and -- and assumes facts not in evidence.

A. No, I don't.

Q. Is there a document that you know of showing that you responded to this email?

A. I do not know.

Q. Do you know what you did when you got this email?

A. I would have referred to the law department.

Q. Okay. Do you recall specifically referring it to the law department?

A. Yes. 2:11:57

Q. Do you recall specifically who you referred it to?

A. To Kate Christy.

Q. And I take it you got advice from Ms. Christy?

A. Yes, any -- any correspondence from attorneys, I would refer to the law department.

Q. Do you know if Ms. Christy ever responded to Ms. Kurtz from this email?

A. I don't know.

Q. Do you know if Ms. Christy or anybody else in

the law department responded to her as a result of the December 2016 email that's marked Exhibit Number 9?

A. I'm not certain.

Q. Did you ever contact Ms. Kurtz and try and work something out regarding limiting the medical release?

A. No.

Q. Did anything prevent you from contacting Ms. Kurtz to try and get an agreement to limit the scope or the breadth of the medical releases?

A. I --

MS. MARMOR: Objection. Calls for speculation. 2:13:02

A. I wouldn't have worked personally with an employee's attorney.

Q. But I guess what I'm asking is did anything prevent you from doing it if you wanted to?

MS. MARMOR: Object to the form and argumentative.

A. I -- I -- like I said before, any correspondence from attorneys, I would handle -- hand to our law department for them to handle any kind of communications.

Q. Was there a written procedure or rule that required you to have the law department respond to

attorney communication rather than you responding?
A. That's the job of the law department, is to handle the other lawyers that --
Q. Okay. I'm not --
A. -- reach out to us.
Q. I'm not really questioning what your testimony is, I'm just saying is there a written rule or procedure -- procedure that would have prevented you from responding directly to Ms. Kurtz?
A. That's the procedure I follow.
Q. Okay. But do you know of any written procedure is my question?
A. I don't know.
Q. Do you know why it is nobody from legal responded to it?
MS. MARMOR: Objection. Lack of foundation.
A. I --
WITNESS: Oh, I'm sorry. 2:14:04
MS. MARMOR: It's -- go --
A. I don't know if they did, and if they did not, I don't know why.
Q. When you referred it, was it your understanding that somebody would respond to Ms. Kurtz from legal?
MS. MARMOR: Objection. I'm -- I'm going to

instruct you not to answer that question.

Q. Based on advice of counsel, are you refusing to answer the question?

A. Yes.

Q. I'd like to hand you Exhibit Number 11.

MR. LINDEN: I'm sorry --

Q. And if you can, identify this document.

A. It's an email from me to Dana Kurtz. 2:15:31

Q. So in this email, did you communicate directly to Ms. Kurtz, the lawyer for Mr. Nawara?

A. I did.

Q. What's the date of this email?

A. March 13th, 2017.

Q. And can you read the first paragraph?

A. "Ms. Kurtz, during the fitness for duty process, I intend to communicate directly with Mr. Nawara."

Q. And do you know why it is that you're telling her that you're going to communicate directly with her client and not with -- with her?

A. I do.

Q. And what is it?

MS. MARMOR: Is this something that would -- would -- would be based on advice of counsel?

WITNESS: Yes.

MS. MARMOR: So I'm going to instruct her not to answer.
Q. So I take it you understood the question, but based on advice of counsel, you're refusing to answer the question?
A. That's right. 2:16:31
Q. Okay. In this email, you write, "It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a fitness for duty prior to returning the employee to work," that's -- are those your words?
MS. MARMOR: Are you asking if she wrote that?
MR. LINDEN: Yes.
WITNESS: I'm unsure how to --
MS. MARMOR: You can -- you can --
WITNESS: -- answer.
MS. MARMOR: He's only asking if you actually wrote those words in the email, that's -- that's -- you can answer that.
WITNESS: I still have a --
MS. MARMOR: You need to --
WITNESS: -- question.
MS. MARMOR: Do you -- we -- can we take a --
MR. LINDEN: Yeah, sure.

MS. MARMOR: Yeah.
MR. LINDEN: Yeah.
RECORDER: Off the record, 12:46 p.m.
(Off the record)
RECORDER: Back on the record, 1:26 p.m. 2:17:33
Q. Ms. Reierson, on Exhibit Number 11, can you read the second paragraph? I don't think we did yet.
A. "Mr. Nawara has been ordered to complete an FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo an FFD prior to returning the employee to work."
Q. I'm sorry, I meant the third paragraph.
A. Okay.
MS. MARMOR: Oh.
A. "I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA" -- oh, my grammar. "I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible

discipline, including termination. Your indication that our practice is unlawful is not correct or supported by the law, therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further."

Q. Are these all your words in the third paragraph, or did some of those words come from legal?

A. All this language came from legal. 2:18:58

Q. Okay. This statement says, you know, in your email, "Your indication that our practice is unlawful and not correct or supported by the law," do you know of any law that would support requiring Mr. Nawara to sign Exhibit Number 2 with -- without basically any limitations on scope or time?

MS. MARMOR: Object to the form and the characterization of the document.

MR. HENRETTY: Join.

A. I'm sorry, can you repeat that question?

Q. Yeah, if you want -- if you want to look back in Exhibit Number 2, but do you know of any law offhand, and if you do or don't, that's fine, that indicates that you could require an employee to sign a waiver form in the form of Exhibit Number 2?

A. This is the form -- Exhibit 2 is the form that allows the sheriff's office to review his

evaluation.

Q. I'm sorry, I meant Exhibit Number 1, the one with the three blanks on -- three boxes. I think that's Exhibit 1, right?

MS. MARMOR: Oh. 2:20:13

MR. BUSTAMANTE: Yeah.

Q. Exhibit 1, I'm sorry, do you know of any law that would -- would require an employee to sign a document in the form of Exhibit Number 1 that's not limited to scope or time?

MS. MARMOR: Same objection as the last time.

A. I guess I don't know exactly what you're saying. I mean, the form hasn't been completed, because we didn't -- it wasn't -- it would be discussed with the employee.

Q. Okay. I'm not asking reasons why, but do you know of any case law or law that would require an employee to sign a form that's in the form of Exhibit Number 1?

MS. MARMOR: Same objection.

MR. HENRETTY: "In the form"?

A. I'm -- I think I'm -- I'm missing --

Q. Okay. And --

A. -- what you're trying to ask me here.

Q. -- I think we both agree that it's -- it's

not limited in time, right, the way it's written, Exhibit Number 1?

MS. MARMOR: Same objection. 2:21:10

Q. Correct?

A. Well because it is not completed, yes.

Q. Okay. And it's not limited regarding the type of medical records that would be released, correct?

MS. MARMOR: Same -- same objection.

A. Right -- well I mean, because it's only a blank form.

Q. Okay. But the way it's written, it's not limited to the type of medical records, correct?

A. You mean -- I'm sorry, the way the form is created?

Q. Yes.

A. Well I mean, it has lines to include what the limiting information would be, it's -- this is just a blank form.

Q. Okay. And -- and that's a form you're requiring him to sign in this email dated March 13th, 2017, correct?

MS. MARMOR: Objection. Assumes facts not in evidence. 2:21:53

A. So I -- like I said before, when we meet with

the employee is when the nurse completes this form to -- you know, so it's determined what's being requested or what might be needed for the situation, but it wasn't filled out with him.

Q. Okay. I understand it's not your words, but this email from you says, "If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered not to be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible discipline, including termination." This sentence is explicitly referring to Exhibit 1, correct?

MS. MARMOR: Objection. Lack of foundation.

A. It's referring to this form, you're -- you're asking?

Q. This specific document, is it not?

MS. MARMOR: Same objection. 2:22:50

A. I think it's referring to the document in Exhibit 2 --

Q. So Mr. --

A. -- the HIPAA form.

Q. Was Mr. Nawara required to sign Exhibit Number 1 in order for him not to be subject to discipline, according to this March 13th, 2017 email?

MS. MARMOR: Objection to the form and lack

of foundation.
A. No, I mean the email is referring to this document, the HIPAA form.
Q. So is it your testimony that had he signed Exhibit Number 2 and not Exhibit 1, that that would have been okay with the sheriff's office --
A. Well --
Q. -- or was he required to file -- sign both?
A. Well I think if he had signed this or done something for us to kind of engage in a conversation, we could have had gotten the process started.
Q. Okay. Ms. Kurtz did try and engage in a conversation, did she not, by her prior two emails that we went through?
MS. MARMOR: Objection. Argumentative. Lack of foundation. 2:24:02
A. I'm -- you --
Q. Isn't it true that Ms. Kurtz, by her prior two emails, the December one and the January one that you referred to legal, that she did attempt to engage in a process with the sheriff's office?
MS. MARMOR: Object to the form. Lack of foundation.
A. Sorry, I'm just looking for the document. Well she demanded he be reinstated. It doesn't look

like she was trying to engage in a conversation, I guess.

Q. But she also object to him signing a blank form, correct?

MS. MARMOR: Objection. Lack of foundation. It mischaracterizes the document.

A. She objected to him signing the -- the HIPAA authorization form, this Exhibit 2.

Q. Okay. 2:25:19

A. This.

Q. She also signed -- objected to signing Exhibit Number 1, correct?

MS. MARMOR: In what letter or what email?

Q. Which one are you looking at, the December 21st one?

A. Exhibit 9, December 21st.

Q. Okay. If you'd go back -- go back to Exhibit Number 8 for a second, I think that's still in front of you. You see Exhibit 8, which is your letter dated --

A. Oh. 2:26:07

Q. -- 2/28/17?

A. Yes.

Q. Okay. And you talk about the forms that Mr. Nawara needed to sign in order not to be subject to discipline, correct, in this letter?

MS. MARMOR: Objection. That's not what that letter says.

A. So I'm sorry, what did you want me to --

MS. MARMOR: So --

A. -- read?

WITNESS: Oh.

Q. Okay. Your -- let me strike that question. But your letter dated February 28th, 2017 complains that Mr. Nawara had not returned the forms in plural, correct? And if you -- if you want to read it, you can, that's fine.

MS. MARMOR: It's in the second full paragraph.

WITNESS: Oh. 2:26:57

A. Yes, it says, "Documents and forms," plural.

Q. So according to this letter, is it a fair statement that Mr. Nawara, in order not to be subject to discipline, at least as of February 28th, 2017, was required to sign Exhibits 1 and Exhibit 2?

MS. MARMOR: Objection. That is not what the letter says, it does not say, "Discipline" number one, and number two, that assumes facts not in evidence.

Q. You can answer if you understand the question.

A. So it -- it says that, "If the forms aren't

received, your time will be -- since -- your time off will be deemed unauthorized," which is not the same as discipline.

Q. Okay. Well what does it mean when your time is deemed unauthorized compared to what his status was before this?

A. So he was off, he -- there really was no official status for him. He wasn't on an approved leave, but he hadn't been deemed unauthorized, so it's just a way of characterizing the time, but it's not necessarily something that would be disciplinary.

Q. What happens when -- what are the consequences when somebody is deemed to be an unauthorized absence?

MS. MARMOR: Objection. Lack of foundation. 2:28:15

A. It's a process, it goes through employee discipline.

Q. Can the employee --

A. But --

Q. -- be disciplined if his absence is, quote, "unauthorized," unquote?

A. It's -- it's a possibility depending on the circumstances.

Q. Well one of your job functions in HR is to deal with authorized versus unauthorized absences,

correct?

MS. MARMOR: Objection. Lack of foundation.

A. Not as it relates to discipline, no.

Q. So is it fair to say that as of 2/28/2017, the sheriff's office was requiring Mr. Nawara to sign Exhibits 1 and Exhibit 2 in order to complete the fitness for duty process?

MS. MARMOR: Objection. Lack of -- lack of -- excuse me. Assumes facts not in evidence.

A. Right, or contact us if he wanted additional information --

Q. Am I -- if I --

A. -- or guidance. 2:29:10

Q. If I'm wrong, just correct me, but is it true that he was required to sign both forms and not just Exhibit 2 as of 2/28/17?

MS. MARMOR: Except -- objection. Asked and answered. She just clarified the answer.

A. So the -- the letter is asking him to complete the forms and return them or contact us.

Q. So --

A. So if -- if he had an issue with the forms, I mean, then he should have contacted us to discuss the forms. That's what the letter is saying.

Q. Okay. But it's true that Ms. Kurtz did

contact you --
MS. MARMOR: Object --
Q. -- and any -- anybody could have reached out to Ms. Kurtz. Isn't that correct?
MS. MARMOR: Objection. Argumentative.
A. The -- the question is I -- if -- could anyone have reached out to Ms. Kurtz?
Q. You had the ability to reach out to Ms. Kurtz, correct, if you wanted to?
MS. MARMOR: Same objection. 2:30:05
A. Yeah, I -- I would only reach out to the attorney if I was directed to do so.
Q. Okay. But there is no rule prohibiting you from contacting Ms. -- Ms. Kurtz directly and asked her, "Can we come to some type of an agreement with the forms?" was there?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. Yeah, I guess I don't know what kind of rule it would be.
Q. Okay.
A. But like I said before, any communication from an attorney will go to our law department.
Q. Do you know of any communication either to Mr. Nawara or to Ms. Kurtz, written communication,

saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?

MS. MARMOR: Objection. Assumes facts not in evidence. 2:30:54

A. Of the documents I have here, are you asking that, or?

Q. I -- I'm asking in your whole breadth of your knowledge, are you aware of any document that either went to Mr. Nawara or Ms. Kurtz saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?

MS. MARMOR: Same objection.

A. Yeah, I -- I can't recall a document that specifically says that, no.

Q. And if you would have written such a communication to either Mr. Nawara or Ms. Kurtz, there would be a written record of it, correct?

MS. MARMOR: Object to the form.

A. There should be, yes.

Q. And if somebody else within the legal department would have written such a letter, that should have been produced in this litigation --

MS. MARMOR: Objection --

Q. -- would you agree?

MS. MARMOR: Objection. That's --

A. I can't --
MS. MARMOR: She can't answer --
A. -- comment on that.
MS. MARMOR: -- that question.
Q. But you would expect that such a document would -- would exist if that was done, right?
MS. MARMOR: Object to the form and calls --
A. I can't --
MS. MARMOR: -- for speculation. 2:31:58
A. I'm -- I -- I -- so what is the question now? I apologize.
Q. If a letter was written by anybody else at the sheriff's office to either Ms. Kurtz or Mr. Nawara indicating, "You're not required to sign Exhibit Number 1, but all we need is Exhibit Number 2," you would expect that there would be a record of it within the sheriff's office, wouldn't you?
A. Most likely, yes.
Q. Okay. And when your, on Exhibit Number 11, March 13th, 2017 email refers to the FFD process, that's a process for the fitness for duty evaluation?
A. FFD returns -- I'm sorry, refers to fitness for duty.
Q. What do you mean by "process"? 2:33:02
A. To deal with the occupational health nurse to

determine what medical records or psychological records would be necessary for the exam, getting those documents to CorVel, scheduling an appointment through CorVel with the selected doctor, and meeting with the doctor and cooperating.

Q. I take it part of that process, in order for that to occur, would -- according to the sheriff's office, would require Mr. Nawara to sign both Exhibits 1 and 2, correct?

MS. MARMOR: Objection. Argumentative. Assumes facts not in evidence.

A. Yeah, I mean, without -- I mean, without having the particulars from Mr. Nawara, it's hard to say exactly what he would have been required to do in terms of what would have been required to be turned over.

Q. You would have needed the release -- at least a release signed by him in order for him to --

A. Because he -- he --

Q. -- get the fitness for duty evaluation. Is that fair?

MS. MARMOR: Object to the --

WITNESS: Sorry.

MS. MARMOR: -- form. Go ahead. 2:34:14

A. So when he signs -- when the employee signs a

release that's in -- this Exhibit 1 is the form that the employee would give to his or her physicians in order to --

Q. Okay.

A. -- receive the records.

Q. Okay. We talked a little bit a few minutes ago about Exhibit Number 8, which is your 2/28/17 letter, you see it there?

A. Yes. 2:35:05

Q. And -- and your letter, again, refers to the forms in plural, correct?

MS. MARMOR: Yeah, I -- objection. Asked and answered.

MR. LINDEN: It's -- it's just lead up and foundation coming for the next --

A. It does --

MR. LINDEN: -- question.

A. -- say, "Forms," in plural, yes.

Q. Okay. And you -- you actually attach the forms or include it with your 2/28/17 letter, correct?

A. It says, "I have enclosed another copy of the forms."

Q. Okay. And there is two forms attached --

A. Yes.

Q. -- to this letter, correct?

A. Yes.
Q. And they are Bates stamped Nawara 000059 and Nawara 000060, see it in the bottom right corner?
A. Yes.
Q. And those are the exact documents that are Exhibits 1 and 2, correct? And you can -- you can compare them if you want.
A. Yes. 2:36:17
Q. Okay. And I'm going to hand you two Exhibits, one time this time. Okay. Hand you Exhibit Number 12.
MR. LINDEN: Here's --
MS. MARMOR: Thank you.
Q. And -- and Exhibit Number 13, I'll just ask you some questions --
MS. MARMOR: Rick, do you know when -- I -- I've never been able to figure out when Mr. Nawara actually sent this email.
MR. LINDEN: I'm not positive. I think they correspond in the next -- I think it's right around the date of the emails that are attached, because it looks like page 1 of 5, see, wasn't it?
MS. MARMOR: So it's after March 17th? 2:38:29
MR. LINDEN: Must be or somewhere right in there. There's a date -- yeah, that's a good question.

I couldn't -- you tried too, Sarah, figuring out when it was?

MS. MARMOR: I just -- I don't want to assume anything. I -- I --

MR. HENRETTY: No --

MR. LINDEN: Yeah.

MR. HENRETTY: -- no, no, I'm just saying it could be either of those things, could be --

MR. LINDEN: Had to have been after March 8th.

MS. MARMOR: I mean, normally, the last one is the most recent one.

MR. LINDEN: Yeah.

MS. MARMOR: So it seems like it's after March 17th --

MR. LINDEN: Yeah, I think so --

MS. MARMOR: -- but.

MR. LINDEN: -- had to have been --

MS. MARMOR: It's just hard to tell.

MR. LINDEN: -- after March 8th, right?

MR. BUSTAMANTE: Yeah.

MS. MARMOR: Right, the -- since the evaluation was March 8th.

MR. LINDEN: Oh, Perry Mason.

Q. I -- have you ever seen Exhibit Number 12 to

start with?

A. Yes, the email looks familiar.

Q. And that's an email from John --

A. Excuse me. Sorry. 2:39:24

Q. You got a cold? I'm --

A. It's at the tail end, thank goodness.

Q. Okay. Like some water or anything, or?

A. No, I'm fine.

Q. Okay.

A. Thanks.

Q. Okay. But this is an email from John Nawara to you, and Dana Kurtz is on here, and it looks like Peter Kramer also?

A. Yeah --

Q. Or Peter?

A. Yes.

Q. And do you know whether or not you -- do you recall receiving this email?

A. I do recall this email.

Q. Okay. And it refers, "See attached report from Dr. Kroll," and if you look at Exhibit 13, it's a report from a Dr. Robin Kroll, K-r-o-l -- K-r-o-l-l, see that?

A. Yes.

Q. And do you recall receiving this report that

was -- should have been attached to Exhibit Number 12?
A. I do.
Q. And do you know when you would have received it?
A. No. 2:40:21
Q. By looking at the dates, does it appear to be sometime around March of 2017?
MS. MARMOR: Object to the form. Why don't you say, "After March 17th"?
A. Yeah, I mean, it looks like he emailed me following an email that was sent to him on March 17th, so sometime after that.
Q. And what -- what did you do when you received Exhibit Number 12 along with the Exhibit Number 13?
A. I consulted our law department.
Q. And who would that have been with?
A. Kate Christy.
Q. And were you seeking advice how to respond, if -- if at all, to the email and the report from Dr. Kroll?
A. Yes.
Q. Did you receive advice regarding it from Ms. Christy?
A. I did. 2:41:13
Q. And can you tell us what advice that was?

MS. MARMOR: And I'm going to object and instruct you not to answer, although I think there is a document that -- that responded to this.
Q. Okay. Based on advice from counsel, are you refusing to answer the question?
A. Yes.
Q. You -- I take it you understood the question and you know the answer to the question?
MS. MARMOR: I --
MR. LINDEN: Or I can -- I can start -- I was trying to go quick.
Q. First of all, you understood the question, correct?
A. The -- can you repeat what the question is?
Q. First of all, you under -- the question that your lawyer instructed you not to answer, you understood what the question was, correct?
MS. MARMOR: The question where he was --
A. That's -- that --
MS. MARMOR: -- asking what advice was given to you.
MR. LINDEN: Yeah.
A. Oh, that was the -- okay.
Q. Sorry, it's more --
A. Yes, I -- I did.

Q. -- formality we have to do.

A. I did understand that question, yes.

Q. And if you were permitted to answer, you could have answered the question, I take it, correct?

A. Yes. 2:41:59

Q. Okay. Did you review this report when you received it from Dr. Robin Kroll?

MS. MARMOR: You mean -- mean Exhibit 13?

MR. LINDEN: Yes.

A. I did.

Q. And are you aware that Dr. Kroll performed what he (sic) called a fitness for duty evaluation of Dr. (sic) Nawara?

A. Yes.

Q. And you're aware the date of the evaluation is March 8th, 2017?

A. Yes.

MS. MARMOR: And just for the --

A. As --

MS. MARMOR: -- record, do we know if Robin Kroll is a man or a woman? You said, "He," but I don't know.

MR. LINDEN: I think it might be a she with Robin. I don't know why --

MS. MARMOR: Okay.

MR. LINDEN: -- sex was thinking. Kroll sounds like a guy, but -- all due respect to the doctor. I don't mean to --
WITNESS: I know a male --
MR. LINDEN: -- offend him or her.
WITNESS: -- Robin too, so you know.
MR. LINDEN: Could be both, right? I have no -- no idea. Do you, Peter, know?
MR. BUSTAMANTE: No. 2:42:54
Q. Have you ever heard of a Dr. Robin Kroll before?
A. Not outside of this document.
Q. Have you ever since heard of Dr. Kroll in any other document?
A. Not that I recall.
Q. Do you know what it means to be a board certified police and public safety psychologist?
A. I assume just what it says there.
Q. Does that indicate to you that he's (sic) qualified to perform --
MR. HENRETTY: It's -- it's a she.
MS. MARMOR: A she.
Q. -- a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.

A. Yeah, no, just that she -- the doctor would be certified as this type of psychologist.
Q. Do you know what Dr. Kroll's findings were?
MS. MARMOR: I'm going to object to the lack of foundation. 2:43:46
A. The doctor wrote that she suggested that he was fit for duty.
Q. And can you just, on page 4, right underneath "recommendations," just read the paragraph of Exhibit 13?
MS. MARMOR: And I'm going to object to lack of foundation for any use of this document for this witness, but go ahead.
A. "Deputy John Nawara received a fitness for duty evaluation to determine any implications of cognitive, emotional, and or behavioral impairment related to his conduct at work. Clinical interview and evaluation all suggest that Deputy Nawara is fit for duty. It is recommended that he return to work with no restrictions."
Q. As you sit here today, do you disagree at all with that conclusion?
MS. MARMOR: Objection. Lack of foundation. 2:44:41
A. Yeah, I wouldn't have any basis to agree or disagree with what the doctor wrote.

Q. It's, in fact, consistent with the ultimate fitness for duty examination that Mr. Nawara had with the sheriff's office's doctor, correct?
MS. MARMOR: Objection. Lack of foundation, and that's actually not correct, that's a mischaracterization of the second examination.
MR. LINDEN: Okay.
A. The independent fitness for duty evaluation through the sheriff's office found Mr. Nawara to be fit for duty.
Q. Okay. Was Dr. Kroll's report sufficient for the sheriff's office in order to find him fit for duty?
A. No. 2:45:29
Q. Do you know why that is?
A. Because it wasn't conducted by an independent doctor as far as we were aware.
Q. Okay. What information do you have to show that Dr. Kroll was, in fact, not independent?
MS. MARMOR: Objection. That mischaracterizes her testimony.
A. Well the reason we use a third party administrator is because we know it's someone selected by the company and not related to either party.
Q. Okay.
A. So that -- that's how we know someone is

independent for certain.
Q. Okay. Do you know whether or not Dr. Kroll was related at all to -- to John Nawara, or is --
A. I don't.
Q. Do you know whether or not Dr. Kroll is related to his counsel?
A. No.
Q. When you send an employee to -- to your, quote, "independent doctor" or "psychologist," like to Correl (sic), is that doctor paid by the sheriff's office?
MS. MARMOR: Excuse me, I think did you mean CorVel?
MR. LINDEN: CorVel, I'm sorry. 2:46:38
MS. MARMOR: Okay. And I'm going to object to -- more generally to the form.
A. So we send the referral to CorVel, who then -- sorry.
Q. Okay.
A. He was distracting me.
Q. Let me -- let me -- that's --
WITNESS: Are you okay?
MR. BUSTAMANTE: I'm --
Q. That's a -- that's a terrible --
MR. BUSTAMANTE: I'm laughing because --

MR. LINDEN: Yeah.
MR. BUSTAMANTE: -- he always mispronounces words.
MR. LINDEN: Yeah.
WITNESS: Oh.
MR. LINDEN: That's fair. I'm -- I'm --
WITNESS: Okay.
MR. LINDEN: I'm bad.
MR. BUSTAMANTE: Sorry.
Q. Who -- who is CorVel --
A. Sorry.
Q. -- paid by when you send the employee to CorVel? 2:47:05
A. So we send the referral to CorVel, CorVel reaches out and obtains a doctor for the fitness for duty evaluation, and then later, we're billed for the evaluation and for CorVel's services from CorVel.
Q. So you're paying the doctor in -- indirectly through CorVel, correct, meaning the sheriff's office?
A. The sheriff's office is paying for the evaluation?
Q. Yes.
A. Yes, we don't make the employee pay for their own --
Q. Okay.

A. -- evaluation.
Q. Do you have any information as you sit here today that Dr. Kroll was in any way bias in favor of John Nawara when he (sic) did her (sic) fitness for duty evaluation?
MS. MARMOR: She did his? 2:47:48
MR. LINDEN: Yeah.
MS. MARMOR: And I'm going to object to lack of foundation.
A. No, I would have no way of knowing one way or the other.
Q. Who made the determination that Dr. Kroll's fitness for duty evaluation was not sufficient for John Nawara to go back to work, was it you?
A. No.
Q. Who was it?
A. When I received this, I reached out to the law department for guidance.
Q. Okay. But somebody made a determination that "we're not going to accept Dr. Kroll's fitness for duty evaluation," correct?
A. Yes.
Q. And who made that decision?
A. The law department.
Q. Who within the law department?

A. I don't know. I know who communicated to me, but I don't know who made the decision.
Q. Okay. Who communicated that to you?
A. Kate Christy.
Q. Do you know anybody else that were involved in the decision not to accept Dr. Kroll's report?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:48:48
Q. Okay. But Ms. Christy did communicate to you that this would not be sufficient for John Nawara, correct?
MS. MARMOR: I -- I'm going to tell her not to answer that question. I think there is a written document which you can get that same information from, and so I'm going to tell her not to answer that question, but I think you can get the same fundamental information from a written document that's -- that's produced in this case.
Q. Based on advice of counsel, are you refusing to answer that question?
A. Yes.
Q. And you understand the question?
A. Yes.
Q. And if you were permitted to answer the question, you could have answered it, correct?

A. Yes.
Q. Okay. What was John Nawara's status with the sheriff's office as of March of 2017?
MS. MARMOR: Object to the form. 2:49:48
A. He was just not reporting to work.
Q. Was he on what they call unpaid leave?
A. I mean, he wasn't --
MS. MARMOR: Object to the form.
WITNESS: Oh, I'm sorry.
MS. MARMOR: And I don't know who "they" is.
MR. LINDEN: Okay.
MR. BUSTAMANTE: Good point.
A. So when I think of leave, I think of you being off in an approved status, I guess, so I -- I don't know how you classify. He just -- he -- he wasn't following the -- the process in order to be able to return to work, so.
Q. So at that time, is it fair to say that he either wasn't being paid or he had to use his own days to get paid?
A. Yes. 2:50:26
MR. LINDEN: So -- emailed the documents pretty well.
MS. MARMOR: Uh-huh. 2:51:47
Q. I'd like to show you Exhibit Number 14, I

think that's what you're talking about here.
MS. MARMOR: Here to help.
MR. LINDEN: Okay. No, I don't think you are. All right.
MS. MARMOR: I object.
Q. Do you recognize page 1 of Exhibit Number 14, the first email?
A. Yes.
Q. And is that from you to Dana Kurtz?
A. To Dana Kurtz and John Nawara, and Peter Kramer is cc'd.
Q. So you're working weekends, right, Saturday, March 18th at 11:52, you sent it, right?
A. 24/7.
Q. Okay. And -- and can you read your email?
A. "Officer Nawara, thank you for your email. However, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure."
Q. Okay. And when you say, "The document attached," you're referring to Dr. Kroll's report in Exhibit Number 13, correct?
A. Yes. 2:53:01
MS. MARMOR: I stole your version, I'm sorry.

MS. HONINGFORD: Oh, it's okay.
Q. And when you indicate in this email, "Please return the signed release documents, as previously instructed, so we can begin the proper fitness for duty procedure," you're referring to Exhibits 1 and 2. Is that fair?
A. Yes.
Q. Okay. The day before, on Friday, March 17th, there is an email from John Nawara to you copied, with Peter Kramer copied. Do you see that?
A. Yes.
Q. And do you know whether or not you received this email from Mr. Nawara?
MS. MARMOR: That's -- that's the same email we just looked at.
MR. LINDEN: Was it? Yeah, no, you're right.
MS. MARMOR: Which answers the question --
MR. LINDEN: Okay.
MS. MARMOR: -- what date it was sent.
MR. LINDEN: Gotcha. Okay.
Q. Correct, that one --
A. Yes, it was in --
Q. Okay. 2:54:02
A. -- the previous Exhibit.
Q. Okay. Now Mr. Nawara informed you that Dr.

Kroll was an independent doctor and not his doctor. Isn't that a fair statement?

MS. MARMOR: Where does it say that? Oh, yeah.

Q. That right?

A. Yes, he wrote that.

Q. Okay. Did anybody within the sheriff's office disagree with that statement --

MS. MARMOR: Object to --

Q. -- that you know of?

MS. MARMOR: Objection. Lack of foundation.

A. I'm -- I don't know.

Q. That you know of? Did you disagree with the statement that Dr. Kroll was an independent doctor and not John Nawara's doctor?

MS. MARMOR: Objection. Lack of foundation.

A. I might -- I think it's a statement you don't take at face value. We -- we had -- no one had any idea if that was true or not.

Q. Okay. But you don't have any information to dispute that. Is that a fair statement?

A. I do not, no.

Q. Do you know of any information that exists within the sheriff's office that would dispute the statement that Dr. Kroll is an independent doctor?

A. I don't have any information, no. 2:55:04
Q. Okay. Okay. On this date, March 17th, the previous email sent to you by Mr. Nawara, isn't it correct that he informed you that, quote, "I feel the order for me to sign a blank HIPAA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the sheriff's office in which the jury found the sheriff violated my and other officers' first amendment rights and retaliated against us because of our political support for the opponent to Sheriff Dart and because of my complaints of harassment by the supervisor." He informed you of what he believed, correct, in this?
A. He did write that, yes. 2:55:53
Q. Okay. We might have talked a little about the third page of Exhibit 14, which was an email from Ms. Kurtz to you dated March 13th.
MS. MARMOR: I think this is the first time we're talking about it.
MR. LINDEN: Oh, is it? Okay.
MR. HENRETTY: You had to tell him?
MS. MARMOR: Sorry.
Q. Can you read the second full paragraph -- or first of all, did you receive this email?
A. Yes, I did.

Q. And that's an email dated Monday, March 13th, 2017 from Dana Kurtz to you?
A. Yes.
Q. That was a copy to Peter Kramer and John Nawara?
A. Yes. 2:57:05
Q. Okay. And can you read the paragraph where it starts "Second," comma?
A. "Second, Officer Nawara has been placed on an unpaid leave and is burning his sick and vacation time to his detriment, which he will run out of soon because he would not sign a HIPAA medical release form for his own medical records without limitation of time, scope, or any other limitations, setting aside that such a request is unlawful in the first place. He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the sheriff's office. All of this has caused Officer Nawara -- Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order seeking injunctive relief if this is not immediately remedied."

Q. What did you do, if anything, when you received this email on March 13th?
A. I forwarded it to the law department. 2:58:15
Q. And that would have been Ms. Christy again?
A. Yes.
Q. Did you -- did you forward it to her for advice in how, you know, this email should be responded to?
A. Yes.
Q. Did you receive advice from her?
A. Yes.
Q. Do you recall what that advice was?
MS. MARMOR: You can say if you recall what it was, you can't say what it was.
A. Yeah, I -- I don't recall what the advice was.
Q. Okay. Do you recall the gist of what she said in how to respond to her?
MS. MARMOR: Again, he's only asking if you recall the gist --
Q. And I don't want you to --
MS. MARMOR: -- not the actual --
Q. -- disclose it, but --
MS. MARMOR: Right.
Q. -- do you recall generally what the advice

was?

A. I do not.

Q. No, okay. Did you reach out to Ms. Kurtz at all after receiving this March 13th email to discuss with her limitations of time and scope on the forms?

A. I'm not certain. If I did, there would be a document.

Q. Okay. If you --

A. But I don't recall if I did or not. 2:59:20

Q. Would it be something you ordinarily would do if you received a letter like this from a lawyer, or would that be something you'd refer to legal to do?

MS. MARMOR: Objection. Calls for speculation.

A. I would refer it to legal, and then whatever the advice was, I would follow, whether that was --

Q. Okay.

A. -- me responding or the law department responding.

Q. Okay. If you turn to the next page, which is stamped Nawara page 84.

MS. MARMOR: Thank you for skipping the zeros. 3:00:07

MR. LINDEN: I hate when people say six zeros and --

Q. And if you could start with the paragraph that starts, "Fifth," comma?

A. "Fifth, in addition to the above, Officer Nawara has been provided no information as to who would be doing the fitness for duty exam -- the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPAA form so that the sheriff's office could obtain Officer Nawara's person -- own personal medical records, which is in violation of the ADA and violates his privacy rights."

Q. Okay. With respect to the first sentence of that paragraph, is there anything in that first sentence that is inaccurate?

MS. MARMOR: Object to the form.

A. No. 3:00:58

Q. Okay. Skipping the next sentence, and I'd like you to skip where the -- after the comma. I know you're not going to agree with that, "Which is in violation of the ADA and violates his privacy rights," the statement, "He was only ordered to complete a HIPAA form so the sheriff's office could obtain Officer Nawara's own personal medical records," do you disagree with that statement?

MS. MARMOR: Object to the form.

A. Yeah, it's -- it's an incomplete statement.

Q. Just in -- incompleteness, but not the accuracy, I take it, right?
A. Well I think they go together.
Q. Okay. What's inaccurate about it?
A. Well I -- to me, it reads as though we just wanted his medical records, not that they were going to be provided to, you know, a doctor to actually complete the fitness for duty examination.
Q. Okay. Can you read the next paragraph, starting with "sixth"?
A. "Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquiries. In fact, he did. He retained counsel," parentheses, "me, to respond for him which we did and received no response from the sheriff's office until your email below."
Q. Is there anything in that paragraph that you disagree with?
MS. MARMOR: Object to the -- number one, object to the -- the lack of foundation, she didn't write this, and to the form.
A. I -- I mean, she's writing about what required her to do something, I can't really speak to whether that's true or not.

Q. Do you disagree with her statement that, "Your letter suggests Officer Nawara did not respond to prior inquiries"?
A. My letter did suggest that, I would say, yes. 3:03:10
Q. And do you disagree with her statement that he retained counsel, Dana Kurtz, who responded for him, anything that you disagree with that statement?
MS. MARMOR: Objection. Lack of foundation.
A. I'm -- I knew she -- I know she sent an email. I'm not certain if she indicated that he had retained her as counsel.
Q. You can go back, if you want, to the -- I think your December 21st -- I think you have in front of you as Exhibit 5 or so. It's in front of me, let's see --
MS. MARMOR: And let me just be really clear because I -- I don't want to keep going around this.
MR. LINDEN: Yeah.
MS. MARMOR: My only objection is that you're asking her to accept her representation that she is responding for him as if that's sufficient. That -- that's really where the -- the -- the --
MR. LINDEN: Okay. Maybe we can --
MS. MARMOR: -- disagreement shows.
MR. LINDEN: -- shorten it.

Q. Back in December of 2016, you were informed by Ms. Kurtz that she was representing John Nawara with respect to these issues, correct?
MS. MARMOR: Object to the form. 3:04:07
A. I'm --
MS. MARMOR: "These issues." But you can answer.
A. I'm not certain --
Q. You -- you can go back --
A. -- what she stated.
Q. -- and look at the document, but --
A. What was the Exhibit?
Q. In -- what Exhibit was that, 5? The December --
A. Oh, okay.
Q. -- 21st email, was it from Dana Kurtz to you, didn't she inform you --
A. Oh, she --
Q. -- she has been retained to represent John Nawara?
A. She did write that, yes.
Q. And from this email, it's clear that she was representing him regarding the issues relating to the fitness for duty evaluation process, correct?
MS. MARMOR: Hang on, I -- I need to read.

Which -- which --
WITNESS: Exhibit 9.
MS. MARMOR: 9. Okay. I'm going to character -- characterization.
A. So I'm -- I'm sorry, what was the question?
Q. That in her December 21st email in front of you, correct, do you see that?
A. Yes. 3:05:00
Q. She informed you that she was representing Mr. Nawara related to matters in connection with his fitness for duty issues?
MS. MARMOR: Object -- object to the form.
A. She wrote, "With respect to potential claims he has against the sheriff's office."
Q. And those related to the release forms, yes?
MS. MARMOR: Objection. That's not what this says. You can answer it "yes" or "no" if you understand the question.
Q. And you could explain it, if you'd like, or --
A. I apologize, what was --
Q. What --
A. -- your question? 3:05:59
Q. What was -- what was your understanding from the December 21st email from Ms. Kurtz of what this --

what she was representing Mr. Nawara in?

A. My understanding was that he didn't want to go for a fitness for duty and she was representing him to argue that point for him.

Q. Okay. All right. Get that from you, just one second. I'm sorry. In Exhibit 9, isn't it true that she asked, "On what legal basis or policy provision do you and the sheriff's office have in order to -- to order him to complete this form for his personal medical records?" question mark. "Officer Nawara and I believe that such an order is unlawful." She communicated that to you, did she not, in the December 21st, 2016 email?

A. She did write that, yes. 3:06:57

MR. LINDEN: This will go faster.

MR. BUSTAMANTE: Promises, promises.

MR. LINDEN: Yeah.

MR. BUSTAMANTE: Come on, Rick, let's get moving.

MR. LINDEN: Oh, you could help me over there -- what are you -- what are you doing on your computer? No, I'm joking.

MS. MARMOR: Words with Friends is so much fun.

MR. LINDEN: Isn't it?. Bless you.

WITNESS: Sorry. 3:07:53
MR. LINDEN: 25 -- oh, it's okay. I'm doing it in some kind of order, date order. This one. This should be an easy one.
Q. Show you Exhibit Number 15 and ask you if you've ever seen this document before?
A. Well I -- I must have. It was -- it's an email addressed to me. I don't specifically recall it.
Q. Do you know who Sean Lynch is?
A. Yes.
Q. Who is Sean Lynch?
A. He works in our payroll department.
Q. Do you know what his title was?
A. No.
Q. Helen Cohn, do you know who she is?
A. Yes. 3:08:58
Q. Who is -- who is Helen?
A. Sorry. She's the manager of payroll for the sheriff's office.
Q. Melody Morley, does she also work with payroll?
A. Yes.
Q. Deborah Munizzi, is --
MS. MARMOR: Munizzi.
MR. LINDEN: Munizzi. Sorry. Thanks,

appreciate it.

MS. MARMOR: I speak Italian.

Q. Is she in payroll?

A. Yes, she is.

Q. John Harrington?

A. John Harrington is in attendance review.

Q. Is that within HR?

A. Now it is. At this time, I don't think it was.

Q. Who is Ann --

WITNESS: Excuse me.

Q. -- Dunlap?

A. I don't know who that is. 3:09:36

Q. Okay. And you're being asked to determine the status for John Nawara as he -- he is unauthorized effective 4/25/17 move -- moving forward, were you able to determine -- determine the status?

A. I -- I don't recall what -- what the situation was at this time.

Q. Do you know whether or not Mr. Nawara was unauthorized effective 4/25/17?

A. I am not certain. I don't know when he returned to work.

Q. Do you have any reason to dispute what Sean Lynch wrote in this memo?

MS. MARMOR: Objection. Lack of foundation.
A. Well -- I mean, it could -- he could have been marked unauthorized.
Q. Okay. "Unauthorized" means -- if he is unauthorized on May 11th, how is that different than his prior status before 4/25/17?
A. It's just the entry on a timesheet. 3:10:48
Q. That would possibly make him subject to discipline. Is that a fair statement --
MS. MARMOR: Objection.
Q. -- being unauthorized?
MS. MARMOR: Objection. Lack of foundation.
A. It -- it would -- it would go before attendance review to see what the situation was.
Q. Do you know who the people were in attendance review, was that a department?
A. It -- it was just John Harrington, I think, at the time.
Q. Is that within HR, attendance review?
MS. MARMOR: Objection. Asked and answered.
A. It -- it is -- now, it's in HR. At this time, I think it was just kind of on its own.
Q. Okay --
MS. MARMOR: Do you need something? 3:11:55
WITNESS: I thought I had a cough drop, I'm

just looking.
MR. LINDEN: Well we had some --
MS. MARMOR: I have --
MR. HENRETTY: Yeah, that's a --
MR. LINDEN: Could we go --
MS. MARMOR: Oh, you have cough drops?
MR. LINDEN: Could we go off --
WITNESS: Oh.
MR. LINDEN: Yeah, could we go off the record a second?
RECORDER: Off -- off the record, 2:21 p.m.
(Off the record)
RECORDER: Back on the record, 2:25 p.m.
Q. Do you recognize Exhibit Number 16?
A. I'm -- I -- I don't know that I've seen it before, but I mean, I see that he's -- that Officer Nawara signed the HIPAA authorization disclosure form.
Q. And can you -- is it dated?
A. Yes.
Q. And that's dated August 17th, 2017?
A. Yes.
Q. You indicated that your typical practice at the sheriff's office was to use CorVel, correct?
A. Yes. 3:12:52
Q. Have you ever seen this form of a HIPAA

authorization before from CorVel?

A. I don't know that I've seen this form before, but we've had medical workers go straight to CorVel rather than through the sheriff's office before.

Q. Do you know whose form was it, was it a form from the sheriff's office or was that a form from CorVel, if you know?

A. This -- in Exhibit 16?

Q. Yes.

A. I don't know.

Q. On paragraph one, can you read paragraph one of this authorization?

A. "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation."

Q. Okay. And that's different than Exhibit Number 1 which would have had the medical records go to Nurse Shelby, correct?

A. Yes. 3:14:02

Q. And this one instead goes to CorVel limited --

A. Yes.

Q. -- correct? And it's also limited to his fitness for duty exam for medical records, correct?

MS. MARMOR: That's what this says?
MR. LINDEN: Yes.
Q. Is that fair?
A. Yes, it does say that.
Q. And can you read paragraph three, please?
A. "This disclosure is made for the purpose of your fitness for duty examination as requested by your employer, Cook County. Your employer may (sic) receive a copy of the independent" --
MS. MARMOR: You said -- it says, "Will," not "May." "Your employer will."
WITNESS: Did I say, "May"?
MS. MARMOR: Yeah.
WITNESS: Oh, wow. Sorry about that.
A. "Your employer will receive a copy of the independent medical exam, IME," in parentheses. "You will also receive a copy of the IME."
Q. Okay. Based on paragraph three, is it your understanding that the sheriff's office would only receive a copy of the independent medical exam as opposed to all the medical records that CorVel was set to receive from the medical doctors of Mr. Nawara?
A. Yes. 3:15:16
Q. And that differs from Exhibit 1, correct? You -- you could go back and refer if you'd like.

MS. MARMOR: Yeah, that's Exhibit 1 right there.
WITNESS: Oh. This is --
MS. MARMOR: He's comparing it to --
WITNESS: -- a different form.
MS. MARMOR: -- this, not to that.
WITNESS: Oh.
A. You mean Exhibit 2?
Q. Yes, that provision differs from what's on Exhibit 1 is all --
MS. MARMOR: No, no, no.
Q. -- the question was --
MS. MARMOR: Now -- now there's confusion.
MR. LINDEN: Wait.
MS. MARMOR: She thinks you're comparing Exhibit 16 to Exhibit 2, are you actually --
MR. LINDEN: 16 --
MS. MARMOR: -- comparing --
MR. LINDEN: -- to 1 is what --
MS. MARMOR: 16 to 1?
MR. LINDEN: -- I'm comparing.
MS. MARMOR: So --
MR. LINDEN: Sorry about that.
WITNESS: Oh.
MR. LINDEN: Let -- let me -- could you read

back the question? I'm sorry. Let -- let me just ask
it, I think it will read better --
RECORDER: Oh. 3:16:15
MR. LINDEN: -- if you -- I remember.
Q. On paragraph three of Exhibit Number 16, it
states, "Your employer will receive a copy of
independent medical exam." On Exhibit Number 16, that
differs from Exhibit 1, where the employer, meaning the
sheriff's office, would have received all the medical
records in addition to, correct?
A. Well these are --
WITNESS: Oh, I'm sorry.
MS. MARMOR: Sorry to interrupt. Just "in
addition to," is that what you just said?
MR. LINDEN: Or -- that's -- that's a
terrible question. I'm tired.
Q. But on Exhibit Number 3, the sheriff's office
is only going to get a copy of the evaluation and not
the underlying medical records, correct?
MS. MARMOR: Sorry, you just said, "Exhibit
3," you're -- you're confusing everyone.
MR. LINDEN: Paragraph three of Exhibit 16,
I'm sorry.
MS. MARMOR: Okay.
Q. On paragraph three, the sheriff would only

get a copy of the evaluation report, correct?
MS. MARMOR: The IME. 3:17:13
A. Yes, which is the same as Exhibit 2.
Q. But I'm --
MS. MARMOR: But he's asking --
MR. LINDEN: Right.
MS. MARMOR: -- about Exhibit 1.
Q. About Exhibit 1, on Exhibit 1, the sheriff's office, through Nurse Shelby, would get a copy of all the medical records, correct?
A. To pass on to CorVel, yes.
Q. Right, yeah, but they receive the medical records to pass on, correct?
A. She could, yes, yes.
Q. Do you recognize -- do you recognize Exhibit Number 17?
A. Yes. 3:18:16
Q. And what is Exhibit 17?
A. This is the referral form that's sent from the sheriff's office to CorVel when we're referring an employee for a fitness for duty.
Q. Okay. And it's got Nurse Shelby's name at the bottom, correct?
A. Yes.
Q. And what -- were you still working in tandem

with Ms. -- Ms. Shelby at that time?
MS. MARMOR: Object --
A. What do you --
MS. MARMOR: -- to the form.
Q. That's a bad question. Were -- were you still in the loop when this was going on in August of 2017?
A. Regarding fitness for duty?
Q. Yes.
A. Yes.
Q. So this -- purpose of this document was to refer John Nawara and inform him that he's being referred for a fitness for duty exam, correct?
A. No, this actually goes to CorVel --
Q. Okay. 3:19:18
A. -- to explain to them why -- you know, who is being referred and why, because then CorVel reaches out to the employee to get the appointment scheduled and --
Q. Okay. It says, "Reason for referring," and it goes on to say, "The employee is aggressive, physically intimidating," etcetera, that information came solely from Superintendent Jones-Hayes, correct?
MS. MARMOR: Objection. That's not what the document says.
A. The first sentence is -- is relating to what

the superintendent related to us, yes.

Q. Okay. Can you read the first sentence?

A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to a routine directive," period.

Q. Okay. Do you have any information other than what was relayed to you by Ms. Jones to support that statement?

MS. MARMOR: Superintendent Jones-Hayes?

MR. LINDEN: Yes. 3:20:26

A. No.

Q. Okay. The last sentence here, can you read the last sentence --

MS. MARMOR: Of the first paragraph?

Q. -- of the first paragraph?

A. "In addition, weeks later, employee presented as aggressive and hostile in the human resources department."

Q. Was that talking about the interview with you?

A. That's the meeting with -- with me and the nurse, yes.

Q. Was he aggressive towards you at that meeting?

A. Yes.
Q. How was he aggressive?
A. His -- his demeanor and his -- the way of speaking.
Q. Can you be more specific about his demeanor, what did you find in his demeanor that was, you know, quote, "aggressive"?
A. Just kind of the way he responded to questions. Excuse me.
Q. Did he physically threaten either you or Ms. Shelby during that interview?
A. He did not. 3:21:23
Q. When you say, "Hostile," how was he hostile?
A. He just looked as though he was seething with anger the whole time he was sitting in the nurse's office with us.
Q. Did he say anything to you in an angry tone?
A. Oh, all of his responses were very clipped and angry.
Q. Did he raise his voice at you?
A. I think his -- his voice was raised a little bit. Not screaming, but loud, it was -- he was unnecessarily -- it -- it just kind of hostile, and it was a very uncomfortable feeling in the room with him.
Q. Have you ever been accused of something you

didn't do in your life?
A. Yes.
Q. Did that make you angry?
A. Oh, sure. 3:22:16
Q. Now if Mr. Nawara was accused by Hayes of doing something he didn't do, you'd expect him to be a little angry. Isn't that fair?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. He might be, sure.
Q. Would you find that unusual?
MS. MARMOR: Object to -- object to the form.
A. Being angry about something and being outwardly hostile are two different things, I think.
Q. Did Mr. Nawara, in fact, go to an independent fitness for duty evaluation as directed by the sheriff?
A. Through CorVel?
Q. Yes. 3:23:21
A. Yes.
Q. Okay. Okay. Do you -- do you recognize Exhibit Number 18?
A. I mean, I recognize this type of letter. I don't know if I've seen this one before.
Q. Okay. And this is a letter from CorVel to Mr. Nawara, correct?

A. Yes.
Q. What's the date of this letter?
A. September 8th, 2017.
Q. And can you read the first paragraph of this letter?
A. "Dear Mr. Nawara, this letter is to inform you that we have scheduled you for a two day fitness for duty exam with the Isaac Ray Forensic Group, LLC on Monday, September 11th, 2017 from 9:00 a.m. to 5:00 p.m. and Tuesday, September 12th, 2017 from 9:00 a.m. to 5:00 p.m."
Q. And is that consistent with your testimony before, that if it was a psychological evaluation, that would be for two days?
A. Yes. 3:24:33
Q. And have you ever heard of the Isaac Ray Forensic Group before?
A. Not that I recall, no.
Q. Do you recall any other employees being sent there by CorVel?
A. I don't recall this name, no.
Q. But it would have been approved by the sheriff's office if it came from CorVel, wouldn't that be a fair statement?
MS. MARMOR: Objection. No, that's not a

fair statement.

Q. You can correct me if you're -- I'm wrong.

A. CorVel chooses the providers. The sheriff's office doesn't -- doesn't choose the providers.

Q. Does the sheriff's office accept the conclusions of the provide -- the provider chosen by CorVel?

A. Yeah.

Q. Okay. And the Cook County Bureau of Human Resource Employee Services is copied on this letter of September 8th, 2017, correct?

A. Yes.

Q. And that would have been your department, correct?

A. Yes.

Q. Would that have been given to you, a copy of this?

A. Probably the nurse, not -- not to me.

Q. Was there any reason for the bureau of human -- human resources to object to Mr. Nawara going to the Isaac Ray Forensic Group?

A. No, not that I'm aware of. 3:25:49

MR. LINDEN: Okay.

WITNESS: Could I have just another minute break?

MR. LINDEN: Oh, sure.
WITNESS: Do you mind?
MR. LINDEN: No, any -- any time.
WITNESS: I just have to take some --
RECORDER: Off the record, 2:38 p.m.
(Off the record)
Q. Have you ever --
RECORDER: Back on the record, 2:44 p.m.
Q. Have you ever seen Exhibit 19 before?
A. Yes.
Q. What is Exhibit 19?
A. It's the fitness for duty report on Officer Nawara that was sent by CorVel.
Q. And was that received by your bureau?
A. Yes.
Q. And did you receive it, you know, shortly after 9/16/17 or that day?
A. I'm not certain what day I received it. 3:26:45
MS. MARMOR: Yeah, the bottom of the document says, "10/19/17 --
MR. LINDEN: Okay.
MS. MARMOR: -- 17."
MR. BUSTAMANTE: That computer --
MR. LINDEN: Thanks.
MR. BUSTAMANTE: If you look --

MR. LINDEN: Okay.
MR. BUSTAMANTE: Okay.
MR. LINDEN: Just off the --
MR. BUSTAMANTE: I'm ready.
MR. LINDEN: Return to work is, like, 9/27 --
MS. MARMOR: Okay. I'll -- I'll believe you. I actually think -- as you know, I know all the documents in the case. There is a document showing it being transmitted, but I just don't -- I don't know how --
MR. LINDEN: Oh, okay.
MS. MARMOR: -- to get that --
MR. LINDEN: Okay.
Q. It -- it indicates the date of the report September 16th, 2017, yes?
A. September 16th, 2017, is that what you said?
MS. MARMOR: Yeah, he's --
Q. Yes.
MS. MARMOR: -- pointing to right here.
Q. That's the date of the report --
A. Yes.
Q. -- correct?
A. Yes. 3:27:29
Q. If you could turn to page 2 of -- of 10, and the second to bottom paragraph, and just read the first

sentence, "According to"?

A. "According to Officer Nawara -- Nawara, during the interview here," in parentheses, "he was neither verbally counseled nor more formally disciplined for this incident, which he stated occurred on 9/28/16, not 9/29/16."

Q. Do you have any information that shows that that statement is inaccurate?

MS. MARMOR: I'm going to object for -- for a couple of reasons. First, she didn't write this, second, this is hearsay, and we can deal with that at a later date.

MR. LINDEN: Sure. 3:28:31

A. Is the incident -- I don't know what incident she was referring to.

Q. Right. I -- I -- my question is do you have anything -- do you know of anything that shows that that sentence is inaccurate in any way?

MS. MARMOR: Same objections.

A. So I don't know what she's referring to when she says, "This incident," so I guess I don't understand what you're asking.

Q. Okay. Assuming the incident refers back to the September 2016 incident with Jones-Hayes, would you agree that John Nawara was neither verbally counseled

or formally disciplined for the September 2016 incident?

MS. MARMOR: Okay. So in addition to my other objections, she's got absolutely no foundation to answer that question.

A. I don't know.

Q. You don't know of any discipline, correct?

A. I don't know if he was or not.

Q. Okay. And that goes to the counseling too, correct, that you don't know?

A. Yes, I -- I do not know. 3:29:33

Q. And on page 3 of 10 of this report, it summarizes John Nawara's version of what happened in September of '16, correct?

A. In the second paragraph here you're referring to?

Q. Second paragraph, and also the following third paragraph.

A. It looks like that's what it is, yes. 3:30:27

Q. And I take it you have no information to either support it or dispute what is contained here, correct?

MS. MARMOR: Okay. I mean, again, I don't really think you have a foundation to be asking her about hearsay from him. There's a lot of information

here. I don't think it's a fair question to ask her about two paragraphs that somebody else wrote, whether she has information to dispute it.

Q. You can read them, but I just want -- if there -- if you have any information to dispute anything what's in the second paragraph? Let's start with that.

MS. MARMOR: Same objection, and -- and I think even if she reads, it's kind of an unfair question.

Q. Let -- let me cut this one short, I don't want to spend ten minutes on the next two paragraphs.

A. Okay. 3:31:43

Q. Just to be clear, you don't have any independent information of what happened in September of 2016, correct?

MS. MARMOR: Meaning between Mr. --

MR. LINDEN: Nawara and --

MS. MARMOR: -- Nawara and Jones-Hayes?

MR. LINDEN: Correct.

A. Yeah, I was not a part of any investigation or anything.

Q. Anything you know -- anything you know would be based on what Ms. Jones-Hayes told you or what Mr. Nawara told you, correct?

A. Yes. Yes, sorry.

Q. Okay. Do you know whether or not Nurse Shelby and Superintendent Jones-Hayes are personal friends?

A. I don't know.

Q. You don't know either way?

A. No.

MS. MARMOR: He's on the next page, if you want to turn it.

WITNESS: Oh.

MR. BUSTAMANTE: Can I --

MR. LINDEN: All right.

MR. BUSTAMANTE: I'm sorry.

MR. LINDEN: No problem. 3:32:47

MS. MARMOR: So is that going to get transcribed?

Q. Okay. If you could turn to page 7 of 10 and read the first paragraph, starting with "notwithstanding."

MS. MARMOR: Just read it to herself?

MR. LINDEN: No.

Q. Read it out loud, please. 3:33:51

MS. MARMOR: Okay. I -- I'm -- again, I'm just going to have an objection. This is all hearsay, this is not her document, and I -- you know, I'll

object if this is tried to be read in on the record at -- at trial.

A. "Notwithstanding potentially problematic personality traits, I have been presented with no evidence from Officer Nawara's 18 plus year history with the county that he has experienced chronic, i.e. longstanding and pervasive, anger management difficulties on the job or any other particular difficulties for that matter. According to him, his last suspension was in 2006 pertaining to a situation involving a disagreement over a unit lockdown, and he ultimately prevailed in arbitration. Related, he deemed -- he denied that -- that other verbal and written discipline has -- he has received over the years related to anger management difficulties per se. I have similarly been presented with no evidence that the 9/29/16 incident was perceived as an anger management problem by administration at the time. Officer Nawara was not subjected to discipline, nor was he pulled from working or sent for a fitness for duty examination. It is reasonable to infer that he had concern -- that -- that" --

MS. MARMOR: "That had concerns."

A. Sorry.

Q. No problem.

MS. MARMOR: You were on, "It is reasonable --

Q. "It is reasonable."

MS. MARMOR: -- to infer."

A. I found it.

Q. Yeah, okay. 3:35:28

A. I knew where I was, I just couldn't find the line. "It's reasonable to infer that had concerns about Officer Nawara's emotional state been significant at that time, one or both would have occurred, yet Officer Nawara was returned to the very same assignment the next day and worked two other units before ultimately being sent to a fourth assignment where he would be interacting with both detainees and the general public and required to carry a firearm. It is my understanding, and I have been presented no evidence to the contrary, that Officer Nawara worked all assignments following the 9/29/16 incident without difficulty for another approximate six weeks before being pulled from the job and mandated to a fitness for duty examination on 11/18/16."

Q. Do you know of any facts which would refute anything in that paragraph you just read?

MS. MARMOR: I'm going to have all the same objections. This is a whole series of claims, it's

hearsay, it's based on things he told her and -- and this examiner's lack of information, and I don't even know how she can answer fairly a question like that.

Q. You -- you could read it, just tell me if you know of anything that would make that paragraph -- anything in there inaccurate.

A. I'm --

MS. MARMOR: Same objections.

A. I don't have information on his disciplinary history or his assignments.

Q. Okay. Is it fair to say that you don't have any information to either support it or dispute anything in this?

MS. MARMOR: Same objection. This is unbelievably compound.

A. Yeah, I don't have any information at all --

Q. And we can go through each sentence, but is there anything in here that you know of that would make anything in this paragraph untrue?

MS. MARMOR: As she sits here today?

MR. LINDEN: Yeah. 3:37:15

A. No, I don't -- I don't have any information --

Q. Okay.

A. -- one way or the other on this.

Q. Can you read the next paragraph, starting with "as a fitness examiner"?

A. "As a fitness examiner, this set of facts places me in a difficult position. The county's own actions suggest Officer Nawara was not deemed a threat to the safety of co-workers, detainees, or the general public. The only reasonable alternative explanation in -- if, in fact, the incident occurred as Superintendent Jones-Hayes described," in parentheses, "it is not my role to fact find and settle this apparent he said, she said, is that management failed to discipline or otherwise act appropriately at the time of the incident, and this was simply a missed opportunity for intervention. Finally, I would be remiss if I did not express my concerns about the timing of this examination being requested on 11/18/16, not only so remotely in time from the incident itself on 9/29/16, but following a formal complaint being filed by Officer Nawara in the interim."

Q. And this paragraph is written by Diana S. Goldstein, PhD, correct? If you want to turn to the following page, page 8 of 10.

A. She was the psychologist who wrote the report, yes. 3:39:10

Q. Is there anything in that paragraph that you

disagree with?

MS. MARMOR: Same set of objections and incredibly compound.

A. And this is just her opinion based on what he told her.

Q. It's her --

A. That doesn't seem to relate to the reason for a fitness for duty, I guess.

Q. Do you have any facts to dispute anything in that paragraph?

MS. MARMOR: Object to the form. Again, very compound, and I don't even know what "anything" is.

A. I mean, do I disagree with her opinion? I mean, it's just -- I don't understand exactly what facts I could have to --

Q. Yeah, do you have any facts to dispute what she says in the paragraph beginning with "as a fitness examiner" and ending --

A. Well I -- I do, because she's saying, "This set of facts," when she's just relaying what he told her.

Q. Okay. But do you have any facts to dispute what John -- what is contained here, other than what Superintendent Hayes told you?

MS. MARMOR: Objection. Object to the form. 3:40:36

A. I -- I guess I'm -- I'm not sure what you're asking me.

Q. Let -- let me -- let me move onto the next question, but can you just read the final full paragraph on page 7 of 10?

A. Mm-hmm. "It is my -- it is my opinion that there is presently no evidence that Officer Nawara's work conduct on 9/29/16, whatever that conduct may have been, arose directly from mental illness, cognitive impairment, or any medical condition or its treatment. It is similarly my opinion that he suffers from no mental illness, cognitive impairment, or medical condition that may impair his -- his capacity to do his job at the present time. As such, it is my opinion that Officer Nawara does not pose a safety risk to himself or others, co-workers, detainees, or the public," in parentheses, "and that he is fully capable of safely and effectively carrying out the essential functions of his job. I currently find Officer Nawara fit to return to duty without restriction."

Q. Based on Diana Goldstein's report, in hindsight, was the order for a fitness for duty examination of doctor -- for John Nawara proper?

MS. MARMOR: Objection. Lack of foundation and calls for speculation.

A. So based on her report --
Q. In hindsight, based --
A. -- should he have been sent for --
Q. Yeah. 3:42:34
A. -- fitness for duty?
Q. Based on her report, should he have ever had to have undergone a fitness -- fitness for duty evaluation?
A. Are -- are you asking my opinion or her opinion?
MS. MARMOR: Your opinion.
Q. Your opinion.
A. Oh. Well yeah, I mean, we wouldn't have known -- based on the situation and how he presented to us, we wouldn't have known that he was actually fit for duty until we received a report saying so.
Q. But again, the sheriff's office didn't do an investigation into the allegations made by Jones-Hayes -- Jones-Hayes before ordering Nawara to undergo a fitness for duty examination, correct?
MS. MARMOR: Objection. Argumentative and ignores other facts in the evidence.
A. He -- the investigation for discipline is separate from speaking to an employee about an alleged incident regarding a possible fitness for duty.

Q. Okay. What investigation is performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes actually were true before ordering John Nawara to submit to a fitness for duty evaluation?

MS. MARMOR: Objection. Asked and answered, and this is really not -- she doesn't do the -- the discipline side, she's established that. She has no foundation for answering those kinds of questions.

Q. If -- if you know of any, do you know of any investigation?

A. I -- I don't know what investigation was done. It's separate from meeting with an employee to discuss an allegation that may result in a fitness for duty exam.

Q. Was your order for John Nawara to submit to a physical -- fitness for duty evaluation based, in any part, on an investigation performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes were true or not true?

MS. MARMOR: Object to the form. 3:44:29

A. No, that's how we met with him --

Q. Okay.

A. -- to assess what the situation was.

Q. Okay. But there's no investigation that you

used from the sheriff's office before you and Nurse Shelby made the decision that he -- he was required to submit to a fitness for duty evaluation, correct?

A. No, we don't investigate in HR.

Q. Could you have referred the matter for an investigation in the sheriff's office of professional review?

MS. MARMOR: Objection. Lack of foundation.

A. So the -- if an allegation like this is raised, there is an investigative track that is handled by OPR. The fitness for duty referral would come to HR, we talk to the employee, try to figure out what had happened, what the situation was, if anything happened, and so that's what we were attempting to do when Mr. Nawara came to HR. And just based on his behavior and his failure to cooperate, we weren't able to -- to understand what had happened.

Q. Is there a mechanism in place at the sheriff's office where you could request an investigation be performed to determine whether or not allegations against an employee are true or not true?

MS. MARMOR: She personally?

MR. LINDEN: Or HR.

MS. MARMOR: Well no -- well no, no, no, there is no -- there is no foundation for HR. If

you're asking her personally, she can answer that question.

Q. Okay. You personally?

MR. LINDEN: That's fine. That's fair enough. 3:45:49

A. Me personally what? I'm sorry.

Q. Is there a mechanism in place that you could request an investigation into the complaints of Jones-Hayes before you ordered a fitness for duty evaluation?

A. So there is a mechanism to file a complaint for investigation, yes, and again, it's -- it's -- it's not really in line with meeting with someone for a fitness for duty. I just feel like you're confusing two separate issues.

Q. Okay. But the sheriff's office also has investigators, correct, within the sheriff's office?

A. Yes.

Q. Are you allowed to request an investigation be done separate and apart from a disciplinary investigation?

MS. MARMOR: Wait, what?

Q. You -- you have investigators that are not part of OPR that work for the sheriff's office, correct?

A. No. 3:46:43
Q. You have detectives within the sheriff's office?
A. Not for -- they -- all internal complaints are investigated by OPR.
Q. They can't be investigated outside of OPR?
A. I can't think of an instance where they're not handled by OPR.
Q. Okay. And -- and you -- you don't know whether or not OPR performed any investigation regarding this, correct?
A. I don't know.
Q. Okay. Let's see. I'm almost done. There you go. Do you recognize Exhibit Number 20?
A. Yes. 3:47:44
Q. And what is Exhibit 20?
A. This is the form indicating that Officer Nawara didn't have any restrictions and he could return to work full duty.
Q. And that came from Nurse Shelby?
A. Yes.
Q. And the date on this document is September 26th, 2017?
A. Yes.
Q. When was Mr. Nawara authorized to return to

work?
A. As of the issuance of this document.
Q. Well I think right above it, doesn't it say, "Return to work on 9/27/17"?
A. Right, so the day -- so she wrote this, he was able to return the next day.
Q. Okay. So what was his status on -- as of 9/27/17?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. If -- if he returned on that day, his status would have been working.
Q. Working, being paid, and benefits?
A. Mm-hmm.
Q. Okay.
A. Yes. 3:48:36
Q. Do you know whether or not he returned to work that day?
A. I don't know what day he returned
Q. Let's see. I'd like to show you Exhibit Number 21, if you could -- and might want to take a minute to review it.
MR. LINDEN: This is the latest one, right? 3:49:45
MS. MARMOR: Yeah, although I think we're going to supplement it with a new one.

MR. LINDEN: Okay.
A. Okay.
Q. Have you ever seen Exhibit Number 21 before?
A. No.
Q. And it states here to "identify the name, if known, the address, telephone number of each individual likely to have discoverable information that the disclosing party may use to support the claims or defenses as follows." Do you know what information Matthew Burke has, other than referring the referral for the fitness for duty?
A. No.
MS. MARMOR: Objection. Lack of foundation.
WITNESS: Sorry.
MS. MARMOR: It's okay.
Q. Do you know who Thomas Conley is?
A. Yes. 3:50:52
Q. Who is Mr. Conley?
A. He is a sergeant with the sheriff's office.
Q. Do you know what information he has related to this case?
A. I do not.
Q. Do you know whether or not he witnessed anything regarding the incident between Mr. Nawara and Ms. Jones-Hayes?

MS. MARMOR: Objection. Lack of foundation.
A. I'm not certain.
Q. Do you have any idea of what information he has?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't.
Q. Okay. How about Barbie Gannon, do you know who she is?
A. No.
Q. Do you know what information, if any, she might have?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. Do you know who Jeff Johnsen is on here, number eight?
A. Yes. 3:51:46
Q. Who is he?
A. He is -- he might be chief of staff now for DOC.
Q. So -- yeah, from this disclosure, Jeff Johnsen was Jones-Hayes' supervisor?
MS. MARMOR: That's what it says.
MR. LINDEN: It's her answers too, but.
Q. Do you -- do you know whether or not he was, in fact, Jones-Hayes' supervisor at the time of the

allegations --
MS. MARMOR: Objection. Lack of foundation.
A. Yeah, I mean, if he had a supervisory role over DOC, then the superintendents would have all reported up to him.
Q. Do you know what discoverable -- discoverable information Mr. Johnsen may have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. How about James Turrise?
MS. MARMOR: Turrise.
MR. LINDEN: Turrise. Thank you.
Q. Do you know who Mr. Turrise is?
A. I do not.
Q. Do you know what information he may or may not have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No. 3:52:53
Q. How about Johnice Brumfield-Greer, do you know what information she has?
A. No.
Q. Do you know who she is?
A. No.
Q. Do you know any other persons or individuals that may have information related to this case other

than the people listed on Exhibit Number 21?
A. No.
MR. BUSTAMANTE: Do you need, Rick, one more Exhibit sticker? No, you've got one.
MR. LINDEN: Okay. Maybe. Let's see.
WITNESS: Only one more.
MS. MARMOR: It's an indication.
MR. LINDEN: Maybe, let's see. Could be like Rizzo, "Any question I asked that I should have" -- no. That's Hinshaw's favorite question.
MS. MARMOR: Really? Oh, my God.
MR. HENRETTY: What is that? 3:53:58
MR. LINDEN: "Is there anything I should have asked you?"
MR. HENRETTY: Oh.
MS. HONINGFORD: That's --
MS. MARMOR: Off the record.
MR. LINDEN: Yes.
MR. HENRETTY: Do you want to --
MS. MARMOR: Off the record.
RECORDER: Oh, off the record, 3:12 p.m.
(Off the record)
RECORDER: Back on the -- back on the record, 3:13 p.m.
Q. Okay. I just want to show you Exhibit 22,

and it's kind of a Group Exhibit. If we can, I -- I can start with the first page and might short circuit it.

MS. MARMOR: And I'm actually going to interpose an object -- several objections. Number one, this is not produced in this case, number two, this is about a subject that the court has already said is not part of this case, so I am going to object to any line of inquiry on this.

MR. LINDEN: Are you going to allow her to answer or you're not?

MS. MARMOR: I'm going to listen to your question first.

MR. LINDEN: Okay. 3:54:55

Q. First off, have you ever seen the letter dated December 18th, 2018 from Brian White to John Nawara?

A. No.

Q. Do you have any knowledge or information regarding him being disqualified for the present cycle of merit rank promotional process for the position of police officer?

A. No.

Q. Did you ever discuss this with Brian White?

MS. MARMOR: I'm going to -- there is no

foundation for that.
MR. LINDEN: Right -- okay. But if she didn't, it's just no.
Q. And it sounds like that's what --
WITNESS: Can --
Q. -- your answer is going to be --
A. No.
Q. -- right? So this is the first you ever heard of this --
A. Yes.
Q. -- happening?
A. With Mr. Nawara, yes.
Q. Yes. Did you have any involvement or anything to do with Mr. Nawara being disqualified for the promotional process for a police officer?
MS. MARMOR: Object to the form, and again, no foundation.
A. Not that I'm aware of, no. 3:56:01
Q. Okay. Are -- are you related to any current or former politician, either through your -- any marriages or by blood?
A. No.
Q. Do you have any political clout?
MS. MARMOR: Object --
MR. HENRETTY: To the --

Q. "Clout" is a bad word. Let's see.
MR. BUSTAMANTE: The correct legal term is "Chinaman."
MS. MARMOR: What?
MR. BUSTAMANTE: Oh, you never heard of that?
MS. MARMOR: No.
MR. BUSTAMANTE: Oh, when you're --
MS. MARMOR: We should probably take this off the record.
MR. HENRETTY: Yeah, we might --
MS. MARMOR: Wait off the record.
MR. BUSTAMANTE: Yeah.
MR. LINDEN: That was -- that was Peter's -- his question, better than I phrased it. Anything else?
MR. BUSTAMANTE: No.
MR. LINDEN: Thank you very much. Appreciate your time, and I have no --
MR. BUSTAMANTE: And do you have --
MR. LINDEN: -- further questions.
MR. BUSTAMANTE: Do you have questions?
WITNESS: Thank you.
MS. MARMOR: I don't have any questions.
MR. BUSTAMANTE: Anybody? No?
MS. HONINGFORD: No, no.
MR. BUSTAMANTE: So we're done.

MS. MARMOR: And we'll reserve signature.

RECORDER: Off the record, 3:16 p.m.

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Gregory Diaz

September 30, 2019