# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-------------------------------------------------------

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

-------------------------------------------------------

Deposition of Winifred Shelby

Confidential - Deposition of Winifred Shelby (8)

Wednesday

September 25th, 2019

-at-

Law Office of Peter V. Bustamante

17 North State Street

Suite 1550

Chicago, Illinois

APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Joi Kamper
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendant County of Cook:

Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:

Sarah R. Marmor
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Wednesday, September 25th, 2019. The time is now 10:05 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, 1550 -- Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook -- v. County of Cook at el., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Ms. Winifred Shelby. Ms. --

MS. MARMOR: Winifred.

RECORDER: -- Winifred Shelby. My name is Katie Jasinski, and I'm a notary public, and I'm recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please --

MS. MARMOR: Whoops.

RECORDER: -- would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearance for the record?

MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.

MR. LINDEN: Richard Linden on behalf of John Nawara.

MS. MARMOR: Sarah Marmor on behalf of the witness, as we well as the sheriff, Matt -- Matthew Burke, and Beka Reierson.

MS. KAMPER: Joi Kamper on behalf of Karen Jones-Hayes.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

EXAMINATION

BY MR. BUSTAMANTE:

Q. All right. Please state your name and spell your last name for our record.

A. Sure. Winifred Shelby, S-h-e-l-b-y.

MR. BUSTAMANTE: All right. Let the record show that this is the deposition of Winifred Shelby, taken pursuant to notice and set to this date by agreement of the parties, and it will be taken in accordance with the applicable Rules of Federal Civil Procedure and local rules of the U.S. District Court for the Northern District of Illinois.

Q. Ms. Shelby, my name is Peter Bustamante. I'm going to be asking you a series of questions. If at any time you do not understand me, please let me know, so that every question that you answer should be an answer to a question that you understood. Do you understand that instruction?

A. Yes, I do. 0:02:17

Q. All right. Please keep all of your responses in spoken words so there's no mistake as to when you mean to say, "Yes" or you mean to say, "No." For example, in normal conversation, we may say, "Uh-huh" or "Uh-uh," but when that is transcribed in a -- in a record, that may be confusing, okay? So if you mean to say, "Yes," say, "Yes." If you mean to say, "No," say,

"No." Agree?

A. Agree.

Q. Also, please wait until I finish formulating a complete question before you answer, even though you know what that question is going to be. Again, in normal conversation, people usually interrupt each other because that's the way we, you know, human beings are, but when we're transcribing the proceedings, we want to have a complete question written out, instead of having half a question, an answer, and then the rest of the question after that. Okay?

A. Yes. 0:02:58

Q. All right. If at any time you feel I've interrupted you, let me know, and I'll stop whatever I'm doing and let you give a complete answer to your -- to any question, okay?

A. Okay.

Q. Finally, please do not guess, speculate on anything. If you don't know, it's perfectly okay to say, "I don't know." Okay?

A. Okay.

Q. Very good. Tell us a little bit about your background. How old are you?

A. [redacted]

Q. Okay. And your date of birth is?

A. [redacted]

Q. All right. Where do you live?

A. [redacted]

Q. And what is your address?

(The following page 8 has been designated as confidential by agreement of the parties)

///

(Start of Confidential Portion)

A. [redacted]

(End of Confidential Portion)

///

*CONFIDENTIAL*

(Continuation of Regular, Non-Confidential Testimony)

Q. All right. And is that a --

MS. MARMOR: And -- sorry. Let me just -- for the record, I'm designating her address as -- as confidential pursuant to the protective order.

MR. BUSTAMANTE: Agreed.

Q. Okay. Is that a house or an apartment?

A. [redacted]

Q. Okay. Who do you live there with?

A. [redacted] 0:03:55

Q. Okay. How long have you lived there?

A. [redacted]

Q. [redacted]

A. [redacted]

Q. Okay. Where were you born?

A. [redacted]

Q. Okay. Where did you go to high school?

A. [redacted]

Q. And after high school, what -- what year did you graduate high school?

A. I did not graduate high school.

Q. Okay. What did you do in terms of your formal education?

A. I went and got a GED.

Q. When did you get your GED?
A. I'm not sure of the year.
Q. Okay. Thereafter, after the GED, did you continue any type of formal education?
A. Yes, I did.
Q. And what was that?
A. I got my bachelor's degree in nursing.
Q. And what -- what institution did you get that from?
A. St. Xavier University.
Q. What year?
A. 1996.
Q. Did you thereafter take an examination to become a registered nurse with the State of Illinois?
A. Yes, I did. 0:05:23
Q. And were you licensed?
A. Yes.
Q. What year?
A. 1997.
Q. Did you have to take the exam more than once?
A. No.
Q. Since graduating from St. Xavier with a BSN, have you had any other formal education?
A. No.
Q. Tell us a little bit about your employment,

okay? What -- what year were you in when you left high school?

A. I don't remember.

Q. Okay. Well, tell us about the -- your first job.

A. At MacNeal Hospital, on a med surg unit, which is a general bedside nursing unit.

Q. What year was that?

A. '97, I started. I don't remember what year I left.

Q. So this is after you became an RN, you -- did you work before becoming an RN?

A. Yes, I did.

Q. What kind of jobs did you do? 0:06:36

A. Before -- when I was in nursing school, I started working at MacNeal as a patient care technician.

Q. What year was that?

A. I don't know the exact year. I -- I don't -- I don't remember.

Q. How many years did it take you to get your BSN?

A. Four years.

Q. Have you ever been married?

A. No.

Q. Do you have any children?
A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. Have you ever served in the military?
A. No.
Q. Have you ever taught nursing?
A. No.
Q. Did you obtain a specialty in nursing?
A. No.
Q. Have you ever studied any -- taken any courses on psychiatric nursing?
A. No.
Q. Have you ever taken any courses on mental health nursing?
A. None besides what was part of my curriculum in school.
Q. Other than your nursing license, do you hold any other professional license?
A. No. 0:08:25
Q. Has your license -- your nursing license ever been suspended?
A. No.

Q. All right. After your employment with MacNeal, what was your next employment, as an RN now?
A. Holy Cross Hospital.
Q. And what years were you there?
A. I don't remember.
Q. What -- what were your -- what was your title with them? Did you have a specialty with Holy Cross?
A. Staff -- staff RN.
Q. What does a staff RN do?
A. We're bedside, taking care of patients.
Q. And how long were you at Holy Cross?
A. I believe two year -- around two years, give or take, I believe.
Q. Yeah. Ms. -- Ms. Shelby, do you have a resume?
A. I do.
Q. All right. Does your resume have all of your employment history from the time you became an RN?
A. No, it does not. 0:09:27
Q. Okay. After Holy Cross, where did you go?
A. Rush.
Q. And what was your title at Rush?
A. Staff RN.
Q. How long were you there?
A. Give or take, six months. Around six months.

Q. And after Rush, where did you go?

A. I'm trying to -- I'm sorry, I'm trying to remember. After Rush, where did I go -- believe Little Company of Mary -- no, no, I'm sorry. I -- no. After Rush, I went to, I believe, the Board of Education.

Q. And what did you do for the Board of Education?

A. I worked as a school nurse. 0:10:29

Q. Were you assigned to a specific school?

A. Yes, I was.

Q. What school was that?

A. Dixon Elementary, Parkside Academy, and O'Keeffe Elementary.

Q. And how long did you work for the Board of Education?

A. Around three years.

Q. And this was the Chicago Board of Education?

A. Yes, it was.

Q. After the Board of Education, where did you go?

A. During -- while working for the Board of Education, I also was working at Grant Hospital, so when I left there, I just remained at Grant Hospital.

Q. As a staff nurse?

A. Yes. 0:11:09

Q. And for how long?
A. For about four years.
Q. What was your next employment after Grant Hospital?
A. Little Company of Mary.
Q. How long were you at Little Company?
A. For around 12 years.
Q. And during this period of time, your title still was staff nurse?
A. I was a weekend nurse there, yes.
Q. As a weekend nurse, is this full-time employment, or is it part-time?
A. It was part-time.
Q. Did you have any other employment besides that?
A. Yes.
Q. And what was the other employment?
A. Blue Cross Blue Shield of Illinois.
Q. What did you do for them?
A. My first position, I was a care coordinator.
Q. And thereafter?
A. A case manager, and then my last position was a supervisor of specialized services.
Q. All right. How long did you work for Blue Cross Blue Shield?

A. Seven years. 0:12:15

Q. And after Blue Cross Blue Shield, where did you go?

A. Health Plus Physician Organization.

Q. Goodness. Okay. How long were you with those folks?

A. I was with them for two years.

Q. Okay. And what was -- what were your duties there?

A. My position there was a coordinator of case management services.

Q. What does that mean, coordinating case management services?

A. It's working doing utilization review, which is -- well part of it is doing utilization review, which is looking at medical necessity, so if someone who is a member of this particular physician organization goes into the hospital or requiring services or testing, it has to be reviewed by a medical team. So I would be one of the people that would -- would look at it based on the guidelines that we were -- utilized, which was Milliman Guidelines, to see if it met medical necessity. If it didn't meet medical necessity based on the guidelines, then it would go over to one of our physician advisors for review to see

if they would approve the services. Also, with the case management portion, it was reaching out to the members, seeing how they were doing and seeing if there was anything besides their health care -- health plan that we can do to assist them to keep them out of the hospital, keep them where they were not missing their medications, if -- providing them with community resources, things like that.

Q. All right. And you did -- you did that for how long?

A. Two years. 0:14:12

Q. And from there, where did you go?

A. From there, I went to Palos -- wait, I -- from there, I went to UnitedHealthcare.

Q. And what were your duties with UnitedHealthcare?

A. Doing utilization review, but doing it on site for UnitedHealthcare patients at Northwestern Hospital.

Q. And how long did you do that?

A. I did that for a year.

Q. And thereafter?

A. And during that same time, I changed the weekend position to start working at Palos Hospital on the weekends, working as an ER case manager.

Q. I'm sorry, doing what? 0:15:00
A. Working as an emergency room case manager.
Q. All right. Thereafter, what did you do?
A. After that -- well I remained at Palos right now as a weekender, but full-time, that's when I went to the -- Cook County --
Q. Okay. What year --
A. -- Sheriff's Office.
Q. What year did you go to Cook County Sheriff's Office?
A. I believe it was 2014.
Q. And how was it that you found out about that employment opportunity with the Cook County Sheriff's Office?
A. Indeed.com.
Q. Did you apply online or did you go in person?
A. Online.
Q. And you were offered a job and you accepted it, of course --
A. Yes.
Q. -- correct? What was your job with the Cook County Sheriff's Office?
A. I was -- my job was working as an occupational health nurse.
Q. What does that mean?

A. For County, it meant I was doing -- when employees was off on leave or were off and needed a doctor's note to return to work, I was the person that they would come to me to bring in their doctor's note. If -- and I would transcribe it, taking out any HIPAA information, such as diagnosis, and give that to employee services, and that was the return to work note that I would give them to turn in to their management team. Also, if they were coming back with restrictions, I was transcribing that, putting that on paper, but once again, taking out any sort of HIPAA information, such as their diagnoses, so that it could go out to the employment -- employee services to see if they can honor these specific restrictions. I also would do screening on new hires. There was a health and physical sheet -- well it was a health form that they signed about their past medical history that they would give to me. Also, I would do their blood pressure screenings, initial heart rate. If it was abnormally high, I would send them back to their own medical doctor to give them -- to require them to get a release from their doctor, saying that they were medically fit to start employment with the Cook County Sheriff's Office. I was -- I would also do the initial, if there was concern with someone requiring

that they go for a fitness for duty, me and someone of the management team from HR would sit and just meet with the person to do an assessment.

Q. All right. How long were -- were you with the sheriff's office?

A. For roughly around three years. 0:18:17

Q. And so when is it that you left?

A. I believe December of 2017.

Q. Why did you leave?

A. Layoffs. Cook County layoffs. I was laid off from work.

Q. Was this because of the sugar tax?

A. Yes, it was.

Q. When you were laid off, were you told that you may be called back?

A. I don't recall.

Q. Has anyone called you back?

A. No.

Q. Were you a union member at the time?

A. No.

Q. When you first started working for the sheriff's office, who was your supervisor?

A. Nancy, and I can't remember her last name.

Q. And what was her title?

A. Bureau chief of HR, of human resources.

Q. So was your assignment as an occupational health nurse -- was your assignment to HR?
A. I'm not understanding your question. 0:19:31
Q. Well were you working under the HR division?
A. Yes.
Q. Were you provided with any training as to what was required to perform your duties?
A. I -- can you elaborate more so when you say, "Training"? Okay.
Q. Sorry. I'll -- I'll re-ask the question, but was this Nancy Nancy Donahue -- Donahue (phonetic)?
A. No.
Q. Okay. Yeah. When you came to work for the sheriff's office, did anybody put you through a period of training, "This is the way we do things in the HR department, these are going to be your duties, the -- these are the papers that you have to fill out, these are the forms that pertain to you, these are the rules and regulations and directives that apply to your job," that --
A. Yes.
Q. -- kind of thing?
A. Yes. 0:20:22
Q. Who gave you that training?
A. Nancy, which --

Q. Don't worry. Nancy.
A. Yes.
Q. Nancy in HR.
A. Yes.
Q. Okay. And how long did that training go for?
A. It was ongoing. I mean, it wasn't like a period of we have one week training. When I started, it was just ongoing as things arose, I would go to Nancy, and say, "How do we do this?" And that's where, you know, I would be told, "Okay, for -- these are what we use -- a paper that we use for this," and yeah, things of that nature. So it was ongoing.
Q. Okay. How long was Nancy your supervisor?
A. I don't recall.
Q. Did Nancy leave at one point, or what happened there?
A. Yes, she did.
Q. And after Nancy left, did someone else become your supervisor?
A. Yes.
Q. Who was that?
A. Let's see. For a short period of time, Shelitha Beach -- Beach -- Beacham, I believe it is, took over the HR department, so then I became under her.

Q. All right. And how -- how long was Ms. Beacham there?
A. She remained there, but they hired a new head of HR to take over.
Q. And who was that?
A. Oh. I'm trying to remember. Oh, that was -- I'm -- I'm trying to remember. It was so much a shift there of -- of personnel and who supervised me. After Shelitha, then I believe they hired Rebecca, and I believe that's when Rebecca came into place.
Q. And that would be Rebecca Reierson?
A. Yes. 0:22:33
Q. You said that Ms. Beacham remained there, what was her role when Ms. Reierson came on board?
A. I don't know exactly what her title was, but I believe she was much more a part of the hiring process over -- more so than overseeing the --
Q. But she was no longer -- Ms. Beacham was no longer your supervisor, correct?
A. Correct.
Q. And did Ms. Beacham report to Ms. Reierson or did Ms. Reierson report to Ms. Beacham?
MS. MARMOR: If you --
A. I don't believe --
MS. MARMOR: -- you know.

A. -- either --
WITNESS: Huh?
MS. MARMOR: If you know.
A. I -- I don't know. Yeah.
Q. In all the jobs that we've gone through from the time you became an RN, have you ever been fired from any of those jobs?
A. No. 0:23:38
Q. And what was your reason for leaving all -- all of these jobs? Was it better opportunities, more money, what was it?
A. Usually, better opportunities or more money.
Q. Have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Object to the form.
A. I'm sorry?
Q. Yes. Have -- have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Same objection.
A. I believe my first job.
Q. Tell us about that.
A. Due to tardiness.
Q. Due -- I'm sorry, due to?
A. Tardiness.
Q. Okay. Any -- any -- anything else?

A. No.
Q. Have you ever written any papers or publications regarding, you know, anything pertaining to your work as an RN?
A. No. 0:24:52
Q. Have you ever given any training to others in your field of work?
A. I've worked as a preceptor on the job.
Q. What is that, a preceptor?
A. Where a new hire comes onto the job, and I work to train them on the position.
Q. Have you worked as a preceptor with the Cook County Sheriff's Office?
A. No.
Q. Have you ever been convicted of any felony?
A. No.
Q. Have you ever been convicted of any crime involving dishonesty?
A. No.
Q. How did you prepare for your deposition today?
A. By speaking with my attorney.
Q. Did you look at any documents?
A. Yes. 0:25:48
Q. And what did you look at?

A. I looked at the forms that we had employees to sign at the -- that we were requiring them to go for a fitness for duty.
Q. Anything else?
A. I don't recall anything else.
Q. How many times did you meet with your -- your lawyer?
A. Twice.
Q. And when was that?
A. I believe last Wednesday and this morning.
Q. Okay. How long was the meeting last Wednesday?
A. Roughly around an hour, 45 minutes.
Q. And this morning?
A. About 20 minutes.
Q. Let's talk a little bit about HIPAA -- HIPAA.
A. Mm-hmm.
Q. You're familiar --
A. Yes.
Q. You're familiar with HIPAA?
A. Yes, I am.
Q. How did you become familiar with HIPAA? 0:26:54
A. From all of my jobs as nursing, that's one thing that nursing -- or health care is big on HIPAA, so throughout the years, it's constantly -- every job

is -- that's the one thing we always go over, HIPAA.
Q. All right. So tell us how -- tell us what HIPAA is first.
A. HIPAA is the laws that are in place that help to protect patients' rights, far as health care goes. It means that we -- it should not be disclosed to anyone that does not have a right to know, far as a patient goes. It also requires the patient give consent before we will disclose of their health care information, unless it's something pertaining to or -- like a legal matter or something where there's a harm to someone, but then in a case like that, usually, someone higher up would make that call on when to make a disclosure far as HIPAA goes. It also requires that health care people that are involved and have access to their records do not -- do not go in and look at patients' records if you don't have a right to be involved in their care or you're not involved in their care. So it also means if you -- in the hospital setting, if you have someone that's there and you're not involved in their care, you shouldn't be looking at their health care records.
Q. Okay. Did you receive training regarding HIPAA at nursing school?
A. I don't recall. 0:28:49

Q. If I remember correctly, HIPAA was introduced or signed into law around 1997, which would be around the time you became a nurse. Do you -- does that, you know, refresh your recollection as to having any training regarding HIPAA at nursing school?
A. It does not.
Q. And throughout your career in all these different locations that you worked, has HIPAA always been emphasized as something that is important?
A. Yes.
Q. And as a nurse, have you had occasion to protect a patient's rights under HIPAA?
MS. MARMOR: Object to the form.
A. Have I -- can you repeat that?
Q. Yeah, here's what I'm wondering, have -- has it ever been your experience that -- where you've had to explain to a patient, "These are your rights under HIPAA, you really don't have to give this information because you -- it's protected," that kind of thing?
MS. MARMOR: Same objection. 0:29:50
A. Yes.
Q. And give us an example with -- obviously, without mentioning any patients' names, of that type of interaction with a patient?
A. Well patients would -- would ask or -- or

I've had patients that would be concerned because they would see someone they knew that worked there and they would have questions about their medical records getting out in their neighborhood or people knowing about what was going on with them, and that's where when I would reassure them our rights under HIPAA was to protect their health care information, even though the person worked in the facility, they did not have a right to go into their medical records and view their medical records. And even if they were taking care of them, they didn't have a right to share that information.

Q. Okay. Did you receive any -- were you taught anything about the ADA, the Americans with Disabilities Act, in nursing school?

A. No. 0:31:01

Q. Did you become familiar with the ADA through your work as a nurse?

A. No.

Q. Today, are you familiar with any portion of the ADA?

A. Not enough to say yes.

Q. So you have just some general familiarity, in other words, you understand what ADA stands for, correct?

A. Yeah. Yes.
Q. So now let's -- let's talk a little bit about fitness for duty evaluations, okay?
A. Okay. 0:31:41
Q. Concerning the sheriff's office.
A. Okay.
Q. What is a fitness for duty evaluation?
A. It's one that -- for the sheriff's office, it's one that requires that an employee is sent to an independent contract -- or independent provider, usually -- a mental health provider, who evaluates the person to see if they're fit for duty, to see if they're mentally stable enough to perform their job duties.
Q. Okay. Let me ask first for the general fitness for duty. I know that there are two components -- I believe there are at least two components, one would be physical and one would be mental, okay?
A. Yes.
Q. Do you make such a distinction, or did the sheriff's office make such a distinction, physical versus mental?
A. I think they are -- were kind of intertwined because to send someone for a fitness for duty, the person that was going to perform that evaluation would

need their medical records to rule out that there was nothing physical --

Q. So --

A. -- that was -- that was -- that was causing whatever action or behavior that was going on.

Q. Okay. So maybe it's my confusion because I just imagine things differently, so is it your testimony that every fitness for duty evaluation performed at the request of the sheriff's office is performed by a psychologist or psychiatrist, a mental health professional?

A. If that -- it depends on the reason for the fitness for duty request.

Q. Well that's what I'm getting at.

A. Okay. 0:33:40

Q. So are there some requests that could be just physical components, the guy is, you know, passing out every three minutes, and therefore, we better send him to a doctor to find out if his blood pressure or whatever else, or the guy is acting a little weird, so we better send him to a mental health professional to find out if there's something else?

A. There were cases that we have sent people just for a medical component.

Q. Okay. Is there any difference in terms of

the assessment that is done, by whomever is responsible for assessing, as to whether or not a fitness for duty evaluation should take place when it's a physical component versus a mental component?

MS. MARMOR: Can -- I'm sorry.

MR. BUSTAMANTE: Long question?

MS. MARMOR: Are -- yeah, well I just --

MR. BUSTAMANTE: Okay.

MS. MARMOR: I'm trying to figure out whether you mean the -- the -- the provider or whether the persons making the decision in the first place.

MR. BUSTAMANTE: Okay. Let's -- let me restate. 0:34:32

Q. Before an individual is sent out for a fitness for duty evaluation, an assessment is made by the sheriff's office as to whether that fitness for duty evaluation should take place, is that correct?

A. Yes.

Q. That assessment is made by you as the nurse, correct?

A. No.

Q. Okay. That assessment is made by someone else then?

A. It was -- it was made -- a team decision.

Q. Okay. Well that was the second part of my

question, but you as a nurse and someone else?
A. Correct.
Q. How many others? How many people would make the decision?
A. Usually, it would be two people. 0:35:13
Q. And who would those people usually be?
A. Someone in management from HR and myself.
Q. So in making that assessment, okay, that's -- the question comes in, before the person is --
A. Yes.
Q. -- sent for an evaluation, is there a difference between a medical component or a mental component? Is there a difference in making that assessment?
A. Yes.
Q. And what is the difference?
A. For a medical component, it would be strictly based on the information, as well as the doctor's -- their provider's information.
Q. Okay. And for the mental component?
A. It would be based on the -- the person who made the referral, as well as our assessment or our interview with the person once we spoke with the person.
Q. Is this -- what you've just stated, okay, the

-- the different parts of the assessment, are those in writing anywhere?

A. I don't know. 0:36:31

Q. Have you ever seen anything in writing from the sheriff's office that says, "In order for you to assess whether or not a person should be sent for a fitness for duty evaluation, you must cover A, B, and C"?

A. No, I have never seen anything.

Q. How did you learn what should be evaluated or -- or looked into in order to make that determination?

A. Nursing judgment.

Q. One more time?

A. Judgment. My nursing judgment.

Q. Okay. How did the other person making the evaluation know what he or she should look to in order to make that determination?

MS. MARMOR: Objection. Lack of foundation. 0:37:18

A. For a medical decision, we were strictly going by the medical notes that was available and whatever the incident was. For the mental component, it was being made on -- I couldn't -- I couldn't explain to you what they made their judgment on.

Q. Okay. All right. In order for you to, I can't think of the word, come up with your nursing

judgment, what would you look at?
A. Behavior.
Q. What else?
A. Behavior was a key component. 0:38:35
Q. Okay. Anything else?
A. Our interview with the person.
Q. Okay. Anything else?
A. Their mannerisms.
Q. When you say, "Behavior," are you referring to the report that you receive as the basis for the assessment for the -- for making the assessment, or are you referring to observed behavior of the individual who may or may not be sent for a fitness for duty evaluation?
MS. MARMOR: Did you say, "Observed" or "Absurd"?
MR. BUSTAMANTE: O -- o-b.
MS. MARMOR: Okay.
MR. BUSTAMANTE: Observed.
MS. MARMOR: Okay. Okay. Good.
A. The observed behavior. 0:39:17
Q. Okay. And so that means that -- what you saw, correct?
A. Correct.
Q. All right. So behavior includes -- does that

include mannerism?
A. Yes.
Q. Okay. So -- okay. We talked about behavior, including mannerism. What else?
A. The interview with the person.
Q. Okay. What do you gather from the interview?
A. It's just a fact finding interview, so just asking them their version of whatever led to the issue why they were there, because a lot of times, their version would be different.
Q. Okay. Anything else that you looked at?
A. That -- no, those are the main two. 0:40:11
Q. And -- and what are you trying to get by making those observations of behavior and taking the interview? What is -- what are you trying to get?
A. I'm trying to get do I feel that the person is safe to go out and do their job or should they be further evaluated by a provider to make that determination.
Q. When a person is sent to your department for an assessment as to whether a fitness for duty evaluation should take place, what information are you provided with before the person is called into an interview with you?
MS. MARMOR: Object to the form.

A. Usually, I would be provided with whatever the reason that the referral is being made.

Q. Anything else? 0:41:26

A. Not that I recall.

Q. Being part of a HR, did you have access to employees' personnel files?

A. No.

Q. Did your supervisor or a person in management who could -- who would also participate in the assessment for fitness for duty, did that person have access to the employees' personnel files?

MS. MARMOR: Objection. Lack of foundation.

A. I don't know.

Q. Have you ever requested additional information about any employee before making your assessment as to fitness for duty?

MS. MARMOR: Object to the form.

A. I'm -- I'm sorry, repeat that.

Q. Sure. Have you ever requested additional information about any employee before making your assessment as to whether you would or would not recommend a fitness for duty evaluation?

MS. MARMOR: Same objection. 0:42:26

A. No.

Q. So what is the basic purpose of a fitness for

duty evaluation?

MS. MARMOR: Object to the form.

A. To determine if the -- to determine if the employee was fit to do their job and were not a harm to themselves or their -- or others.

Q. Have you talked to anyone, other than your counsel, about your deposition here today?

A. I have not. 0:43:41

Q. Have you talked to any of your co-Defendants about the fact that you were giving a deposition today?

A. I have not.

Q. Have you talked to any of your co-Defendants about the case after you were served with -- with the lawsuit?

A. I have not.

Q. Where was your office -- that's -- let me restate that. Did you have an office when you were working as a nurse for HR for the sheriff -- Cook County Sheriff?

A. I did.

Q. Where was your office located?

A. 3026 South California, in building number two.

Q. And your office, was it part of a bigger setup of HR, or was it a separate office somewhere

else?
A. My office was located directly in the office of HR.
Q. Did you have, you know, a -- a room with a door, or did you have a cubicle?
A. I had a room with a door. 0:44:47
Q. How many people were working at HR in September of 2016?
MS. MARMOR: Object --
A. I do not know.
Q. How many people that you normally see during the day as you worked at HR or in the HR office in September of 2016?
MS. MARMOR: Object to the form.
A. I don't know.
Q. Was there someone in -- when someone walked into the HR area, what do they first see if they -- do they have to go through a door to walk into HR?
A. To come into the building, there -- to come into the HR building, there was a door, and the first person you saw was an officer that was behind a desk.
Q. Okay. That's just coming into the building. Then did you have to take an elevator to -- to the HR office?
A. No. 0:45:48

Q. Where was the HR office?
A. On that main floor.
Q. And was there a separate reception for HR?
A. No.
Q. When you called a person in for an assessment for a fitness for duty evaluation, where did you meet that person?
A. In my office.
Q. In 2016 September --
A. And --
Q. Oh, go ahead.
A. Can I elaborate?
Q. Sure.
A. In my office usually. However, we have had meetings in other management staff office.
Q. In September of 2016, were there -- was there video surveillance of the HR area?
MS. MARMOR: Object --
A. I don't know. 0:46:51
Q. Other than this case, the John Nawara case, have you ever been sued?
A. Yes.
Q. How many times?
A. Once.
Q. And what was that about?

A. It was a death lawsuit.
Q. Where was that lawsuit?
A. In Illinois.
Q. In what part of Illinois?
A. Chicago.
Q. And when was that lawsuit? What year?
A. I believe in 2005 or 2007. I'm not quite sure.
Q. Did you have to give testimony?
A. Yes, I did.
Q. And you gave a deposition?
A. Yes.
Q. And did you testify at trial?
A. Yes.
Q. What was the result?
A. That the hospital was not liable.
Q. Were you sued personally, or was the hospital sued?
A. The hospital.
Q. And what hospital was that?
A. Little Company of Mary.
Q. And what was your involvement in the -- in that lawsuit? Why did you testify, in other words?
A. I was the nurse taking care of the patient. 0:48:19
Q. Were they blaming you for the patient's

death?

A. No.

Q. Any other lawsuits that you may have been involved in?

A. No, not that I know of.

Q. Now, what -- what was your practice while working for the sheriff's office regarding how to go about assessing an employee to determine whether or not you were going to recommend a fitness for duty evaluation?

MS. MARMOR: Objection. Asked and answered.

A. It was going to be -- it was the management person and myself that would sit down and meet with the employee and talk with the employee.

Q. Okay. Anything else? 0:49:25

A. No.

Q. Okay. And this is a -- a practice that you developed on your own, no one told you, "This is the way we do it"?

A. I didn't --

MS. MARMOR: Object to the form.

A. -- develop the practice. It was just decided on.

Q. Well what I'm asking is this, okay, so for example, someone may say, "I'm going to conduct fitness

for duty evaluations, and my practice is going to be I'm going to call in the person for an interview, I'm going to have them fill out a form that says their version of the events," or "I'm going to take a history, and I'm going to prepare a chart, you know, chart down exactly what this person tells me," was there anything such thing in your practice, or is -- it was simply talking to that individual?

MS. MARMOR: Object to the form.

A. Just talking to the individual. 0:50:11

Q. Did you make any notes of the times when you talked to individuals to determine their version of events?

MS. MARMOR: Object --

A. No.

MS. MARMOR: -- to the form.

Q. Why -- why didn't you make any notes?

A. I didn't see that there was a need for me to make any notes when I was just talking with the individual.

Q. The talking to the individual would lead to your nursing judgment of whether or not a -- an -- an evaluation was required, correct? Was part of -- part of what you use for your nursing judgment, correct?

A. Yes.

Q. And even though that was part of what you were going to use to make that determination, you did not think it was necessary to keep something in writing?

MS. MARMOR: Objection. Argumentative. 0:51:06

A. In -- no, I did not.

Q. Why not?

A. Because I didn't feel that keeping something with -- in writing was pertinent --

Q. By the way -- okay. I'm sorry.

A. Yeah.

Q. Go ahead.

A. I just felt like it -- it wasn't pertinent to me to keep something in writing on the event that was going on, yes.

Q. When a fitness for duty evaluation request is made, do you create a file for that request?

MS. MARMOR: Object to the form.

A. I don't remember. 0:51:51

Q. Does the sheriff's office keep a separate file, aside from a personnel file, when an employee is sent for a fitness for duty assessment?

MS. MARMOR: Objection. Lack of foundation.

A. They would keep a file of the medical records that was obtained for that employee and was sent over

to CorVel, as well as the -- the -- the fitness for duty report, once it came in.

Q. That -- aside from medical records, what else would that file contain?

MS. MARMOR: Objection. Asked and answered.

A. It would also contain the consent forms that the employee had signed and whatever had went over to CorVel.

Q. Would it contain anything with respect to the request for the assessment?

A. Yes. 0:53:03

Q. Would it contain any other information that the nurse and management use in order to determine whether or not a fitness for duty evaluation was -- was required?

MS. MARMOR: Object to the form.

A. I'm not understanding the question.

Q. Okay. I'll get -- I'll come back to that. I'm --

A. Okay.

Q. I'm sorry, I don't know how to --

A. Okay.

Q. I don't know how to express it, but maybe --

A. Okay.

Q. -- we'll come back to it. Okay. Regarding

that file that was kept for fitness for duty evaluations, who has that -- who had access to that file?

MS. MARMOR: Objection. Calls for speculation and to form.

A. When I was there, my understanding was that I was the only one that had a key.

Q. In nursing school, did you -- were you ever taught that if something is not charted, it didn't happen?

MS. MARMOR: Object to the form.

A. Yes. 0:54:29

Q. Why is that taught in nursing school?

A. Because the medical records that we are utilizing is -- are a legal document.

MR. BUSTAMANTE: I want to take just a short break.

MS. MARMOR: Okay.

MR. BUSTAMANTE: I need to stretch my legs --

RECORDER: Off --

MS. MARMOR: Okay.

RECORDER: Off record, 11:00 a.m.

(Off the record)

RECORDER: On record, 11:07 a.m.

Q. All right. Ms. Shelby, I'm going to be now

directing your attention to September of 2016.
A. Okay.
Q. And in particular, the events concerning John Nawara. When I talk -- when I say, "John," I mean John Nawara, okay? Because I -- I have difficulty pronouncing his name --
A. Okay.
Q. -- his last name, okay?
A. Okay.
Q. So if I -- if I don't say, "Nawara," that often is because it just doesn't roll off the tongue, okay?
A. Okay. Okay.
MS. MARMOR: Let the record show.
Q. So I'm going to show you first what we've marked as Shelby Deposition Exhibit Number 1.
MR. BUSTAMANTE: Of course I messed it up. There we go. Let's see here. I have three there.
MS. MARMOR: Thank you.
Q. Have you ever seen this document before?
A. I don't recall. 0:56:41
Q. Okay. Would you tell us -- for our record, would you tell us what this document is?
MS. MARMOR: Objection. Lack of foundation.
A. It appears to be a documentation -- a

document sent to Karyn Williams, the executive director of human resources, from Matt Burke, chief of staff.

Q. Okay. What is the purpose of this document?

MS. MARMOR: Objection. Lack of foundation.

A. The subject states, "Fitness for Duty."

Q. Okay. For Officer John Nawara, correct?

A. Correct.

Q. Right here in the first page of the document?

A. Yes. Correct.

Q. Okay. Do you know if this was the request that was -- the only request that was sent to HR to assess whether or not Officer Nawara should be evaluated for fitness for duty?

MS. MARMOR: Objection. Lack of foundation. 0:58:00

A. I don't know if anything else was sent to the HR department requesting that.

Q. If a request -- if this was the only request made to assess Officer Nawara for fitness for duty, would you have seen a copy of this document before interviewing Officer Nawara?

MS. MARMOR: Objection. Calls for speculation.

A. I'm sorry, can you repeat that?

Q. Yes. If this was the only document that was created requesting an assessment as to whether or not

Officer Nawara should be evaluated for fitness for duty, would you have seen a copy of this document?

MS. MARMOR: Same objection. Calls for speculation.

A. It would have been determined by someone in HR management because it didn't come to me, if it was sent to me or if they felt that they needed additional information.

Q. Okay. Did you have anything similar to this document before interviewing Officer Nawara?

MS. MARMOR: Objection to the form and foundation.

A. Did I have any document -- any documentation?

Q. Yes, did you have any documents?

A. I don't --

MS. MARMOR: That's a different question --

MR. BUSTAMANTE: Yeah, I --

MS. MARMOR: -- just to be clear. 0:59:36

A. I -- I don't recall.

Q. Do you have any recollection of conducting a -- an interview of Officer Nawara concerning a fitness for duty evaluation in 2016?

A. Do I recall interviewing Officer Nawara?

Q. Correct.

A. Yes, I do.

Q. What led you to interview Officer Nawara?
A. Rebecca and I had a discussion with his superintendent, I believe, and she gave a more detailed -- gave a more detailed report on why she was requesting the fitness for duty.
Q. Okay. Who has the right to request a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation and form.
A. I don't remember. 1:00:47
Q. Okay. Could anybody request a fitness for duty evaluation of an employee of the Cook County Sheriff's Office?
MS. MARMOR: Same objection.
A. I don't remember.
Q. Did you know, at any time, if there were limitations as to who could request a fitness for duty evaluation at the sheriff's office?
A. I don't remember.
Q. Did you know, at some time, who could request a fitness for duty evaluation at the sheriff's office?
MS. MARMOR: Objection to form. 1:01:16
A. I don't remember.
Q. Is there anything in writing as to who in the chain of command may request a fitness for duty

evaluation of a Cook County Sheriff's Office employee?
A. I don't remember.
Q. You said that this request for a fitness for duty was made by Superintendent Jones-Hayes, correct?
A. Correct.
Q. How did Superintendent Jones-Hayes make the request for a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
MS. KAMPER: Join.
A. And when you say, "How do," what do you mean?
Q. Well you tell me, how did you receive information from Superintendent Jones-Hayes or some -- something from Superintendent Jones-Hayes saying, "I want you to evaluate Officer John Nawara for fitness for duty"?
A. I --
MS. MARMOR: Object to the form.
A. I remember me and Rebecca spoke with her. 1:02:10
Q. Other than that?
A. That's all that I remember.
Q. And did you speak to her in person?
A. No, I believe it was via telephone.
Q. All right. And how did you know this was Superintendent Jones-Hayes talking to you?
A. I don't remember.

Q. Did you know the superintendent before the date of your conversation with her?
A. I did not.
Q. Where did that -- where were you physically located when that conversation took place?
A. I believe we were in Rebecca's office. I believe so. I don't remember it being in my office though.
Q. Did you take any notes of that conversation?
A. I don't remember.
Q. Did you see if Ms. Reierson was taking any notes of that conversation?
A. I don't remember.
Q. Have you seen, since that time, anything in writing that purport to be notes of that conversation?
A. I did from -- I believe from the superintendent.
Q. When did you see that? 1:03:35
A. I don't remember when I first saw it.
Q. And what makes you believe that it's from the superintendent?
A. Because it had her name on it.
Q. Now, where in the protocol that you have testified about that you followed regarding how you make an assessment for fitness for duty does it say

that management and the nurse are supposed to interview the person requesting the fitness for duty evaluation?

MS. MARMOR: Okay. I'm going to object both to form and completely mischaracterizes her testimony.

A. Repeat that. 1:04:25

Q. Yes. Initially, I asked you what were the things that you did in order to make an assessment for fitness for duty, and you gave me a detailed explanation of everything that you did. Nowhere in that explanation did you say, "Oh, and we interviewed the person who's requesting the fitness for duty evaluation." Where did that come from? Why did you decide to do it in this case?

MS. MARMOR: Objection. Argumentative.

A. Because I didn't have anything to base it on. You have to have a reason for the request, and I didn't have a reason for the request.

Q. Okay. So was it your decision to interview Superintendent Jones-Hayes?

A. I don't believe so.

Q. Whose decision was it?

A. I believe it -- it was a joint -- Rebecca saying that this is -- "Someone's requesting a fitness for duty, but we don't have enough information, I'm going to request that they give us more information if

-- before we call this person in."

Q. So Rebecca said that to you? 1:05:32

A. Give or take, you know, the word, I'm probably paraphrasing, yeah.

Q. Do you know what information Ms. Reierson had?

A. I don't recall if I knew what she had at that particular point.

Q. I'm -- wait.

A. Okay.

Q. If you take a look at Exhibit 1, please, and look at page 2, page 2 appears to be an email from Karen Jones-Hayes to Dawn Ertler. Do you see that?

A. Yes. 1:06:21

Q. And what is the date of this email?

A. September 29th, 2016.

Q. And then at page 1, the memorandum from Matthew Burke to Karyn Williams is September 29th, 2016, correct?

A. Correct.

Q. When was your interview with John Nawara?

A. I don't recall the date. 1:06:50

Q. If I tell you the interview took place on November 18th, 2016, can you tell me why it took from September 29th through November 16th to call Mr. Nawara

in for an interview?

A. I could not tell you why.

Q. Now, how long had Ms. Reierson been working in HR as of September 2016?

MS. MARMOR: Objection. Lack of foundation.

A. I don't know.

Q. If she says she started with the sheriff's office, I believe it was around August of 2016, would -- would you be kind of training her as to what to do?

MS. MARMOR: Object to the form.

A. No. 1:07:41

Q. She knew more than you did about the operations of HR at that time?

MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.

A. I was a nurse, and it wasn't my role to train Rebecca. When she came on, she came on and I was under the understanding that her superiors were to train her. It was not me.

Q. Was Ms. Reierson following your lead in concerns to fitness for duty evaluations?

MS. MARMOR: Object to the form.

A. No.

Q. Do all requests for fitness for duty evaluations take as long as a month and a half for --

to -- to call the employee in for an evaluation?
MS. MARMOR: Objection. Lack of foundation. 1:08:50
A. No.
Q. What is the longest that it's taken, in your experience, from the time the request is made until the time of the interview?
A. I don't know.
Q. Okay. Could it have been a year?
A. I don't know.
Q. Okay. Could it have been a month?
A. I don't know.
Q. Okay. What is the least amount of time that has taken?
MS. MARMOR: I'm sorry, what has taken?
MR. BUSTAMANTE: The least amount of time between the request for an assessment for fitness for duty evaluation and the time the interview is called.
MS. MARMOR: In her experience while she was working there?
MR. BUSTAMANTE: Of course. I mean, where else? Yeah.
A. I don't remember the least amount of time it took. It would play into factors, if the employee was there at work, it just -- if the employee was there at work that day, that was -- would -- would be much

swifter than someone who wasn't at --
Q. Okay. Do you know who Matthew Burke is?
A. I -- yes, I remember Matthew Burke. 1:10:05
Q. Okay. Do you know if he still works for the sheriff's office?
A. I don't know.
Q. What do you know about Matthew Burke?
MS. MARMOR: Object to the form.
A. That he worked for the sheriff department. I forgot what his title was, but I do remember that he was an attorney.
Q. Okay. Okay. Let me show you what has been marked -- what we're marking as Shelby Deposition Exhibit Number 2.
MS. MARMOR: Thank you.
Q. Have you seen this document before?
A. I have. 1:11:00
Q. What is it?
A. It is a note with the conversation that Superintendent Jones-Hayes had with me and Rebecca --
Q. This --
A. -- concerning the incident.
Q. This is a note regarding the telephone conversation you testified to?
A. Yes.

Q. Other than what is contained in this note, did you have any other conversations with Superintendent Jones-Hayes about the incident involving John?
A. Not that I recall.
Q. Who prepared this note?
A. I don't remember. 1:11:44
Q. Did you prepare it?
A. No.
Q. Do you know when this note was signed?
A. I do not.
Q. Do you recognize the signature?
A. I do not.
Q. Okay. Can you read the signature?
A. It says, "Supt. K. Jones-Hayes." And then it has number "271."
Q. Do you know when that signature came onto this document?
MS. MARMOR: Objection. Asked and answered.
A. I do not. 1:12:22
Q. Now, why is it that a written document is prepared concerning an interview with, as you stated, the person requesting the fitness for duty evaluation, but a written document is not prepared from the employee who is supposed to be assessed for fitness for

duty?

MS. MARMOR: Objection to the form. Calls for speculation. Lack of foundation.

A. I don't know.

Q. Do you know if any of the statements contained in this note, do you personally know if they're true?

A. I don't.

Q. When you are making an assessment of whether or not to request that an employee undertake a fitness for duty evaluation, do you rely on documents such as this, Exhibit Number 2?

MS. MARMOR: Object to the form. 1:13:37

A. I do not.

Q. What do you rely on?

A. I talk with the employee.

Q. Okay.

A. And --

Q. What do you rely on?

A. I rely on speaking with the -- the employee and the employee's response, as well as the employee's behavior.

Q. Let me show you Shelby Exhibit Number 3.

MR. BUSTAMANTE: Yours is going to have a different number. She has Shelby Number 3.

MS. MARMOR: Handwriting --
MR. BUSTAMANTE: So let's mark --
MS. MARMOR: -- takes precedence. Oh, I see. But this is just -- oh, so you're saying that the version we have is a copy of Reierson 5, but the version she has does -- is not?
MR. BUSTAMANTE: Doesn't have this.
MS. MARMOR: Doesn't have the Reierson 5 --
MR. BUSTAMANTE: Right.
MS. MARMOR: -- Exhibit sticker on it? Okay.
Q. Have you ever seen this document before?
A. I have not. 1:14:56
Q. Do you know what this is?
A. I do not.
Q. Okay. Have you ever seen a form from the sheriff's office for discrimination, harassment, sexual harassment complaint form?
A. Not that I recall.
Q. Do you know if this document would have been available to you if you had requested it?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
A. I don't know.
Q. I take it that even if you had this document in November of 2016, you would not have relied on it.

Is that correct?

MS. MARMOR: Object to the form. Lack of foundation. Complete speculation.

A. I would not. 1:15:45

Q. For the same reasons that you would not have relied on Exhibit 2, correct?

A. This would have no bearing on it. It wouldn't have had anything to do with my decision.

Q. Okay. So let's now talk a little bit about the interview with John, okay?

A. Okay.

Q. How was John informed that he was to have an interview with you and Ms. Reierson?

MS. MARMOR: Objection. Lack of foundation.

A. I don't remember.

Q. How would a person, an employee, typically be informed?

MS. MARMOR: Same objection.

A. He could have been informed through a -- through his superior. Usually, I think that was -- the -- the usual route of seeing, when the employee comes back to work, "Send them to us and we will talk to him," something like that, or "Send him here at this time and we can talk to him."

Q. How is the superior or supervisor informed of

that? Is that done by telephone call, by text message, by email, by interoffice memorandum? How is the superior informed that the employee is supposed to report to HR?

MS. MARMOR: Objection. Lack of foundation. 1:17:11

A. It could have been informed numerous ways. It could have been informed via email, via telephone conversation. There was no set way to inform.

Q. Would HR, your office, keep any documentation regarding "we informed this individual to come into the office today"?

MS. MARMOR: Object to the form, and it -- HR is not her entire office -- or she's not the office of HR.

A. No, I wouldn't have kept anything saying I -- are you asking would I have left -- let me ask you to just rephrase it to make sure I'm --

Q. Sure.

A. -- answering it correctly.

Q. So for -- for example, if -- if a phone call is made to whoever is in charge of roll call, when this individual shows up, make -- have him report to HR, is there some kind of documentation that is kept, "On this date, we called, asked that this individual show up," any kind of documentation?

A. No. 1:18:12

Q. How about any documentation regarding scheduling, you know, for example, did you keep a calendar saying, "These individuals are going to come to the office" or "have been requested to come to the office on this date" --

MS. MARMOR: Did she personally? Sorry.

Q. Let's start with you personally first.

A. No.

Q. Did the -- did the HR office keep any -- any such documentation, like a calendar, or diary, or any such form?

MS. MARMOR: Objection. Lack of foundation.

A. That I don't know.

Q. How did you know that you were expecting a certain individual to come up or to come to -- report to HR for an evaluation or an assessment for FFD?

A. I would have just known, whether it was a conversation that the person was coming at a certain time, but it wouldn't -- and maybe I would have put it on my -- I don't know, but I wouldn't have kept a documentation saying that, "I have these appointments here at this time," because my schedule wasn't like that.

Q. At what time did you report to work in

September of 2016?
A. 8:00. Usually around --
Q. 8:00?
A. -- yeah, 8:00. 1:19:34
Q. And at what time did you leave?
A. Usually around 4:00.
Q. At what time did John come for his appointment?
A. I don't know.
Q. Was it morning or was it afternoon?
A. I don't recall.
Q. Did John, in fact, report for his appointment?
A. Yes.
Q. Do you recall that it was November 18th, 2016?
A. I don't recall the date, no.
Q. Who did John report to when he came for his appointment?
A. He would have reported directly to the officer that's -- that sits in the main -- soon as you walk in the door.
Q. And --
A. And would have reported who he was there to see.

Q. Okay. When a person is requested to come up to HR for that type of assessment, for fitness for duty, is he told who he is going to see?

A. I believe so. I don't -- I -- I believe so.

Q. Okay. And would it have been, "You're going to see Ms. Reierson and Nurse Shelby," or "You're going to see Ms. Reierson," or "You're going to see Nurse Shelby"?

A. That I don't know. 1:20:52

Q. How does the man at the desk know that, you know, someone is reporting? Does -- does the man at the desk receive some kind of writing saying, "We're expecting these people to come in today"?

MS. MARMOR: Objection. Lack of foundation.

A. Not from me.

Q. All right. Do you know who John was supposed to report to, you, or Ms. Reierson, or both?

A. Both.

Q. Okay. Who greeted him? Aside -- you know, after he got past the guy in the front?

A. I don't remember.

Q. Did you see him first or did Ms. Reierson see him first?

A. I don't recall.

Q. In your office, do you have a desk?

A. Yes.
Q. Do you sit behind the desk to interview the employees?
A. I do.
Q. How many chairs are there on the other side of your desk?
MS. MARMOR: Were there. Since she's --
MR. BUSTAMANTE: Were there, right, right --
MS. MARMOR: -- no longer there.
MR. BUSTAMANTE: -- right, right.
MS. MARMOR: Yeah.
MR. BUSTAMANTE: Thank you. 1:21:49
A. Usually, there were two desk -- two chairs by my -- in front of my desk.
Q. When -- did Mr. Nawara come to your office, or did you go to Ms. Reierson's office first?
MS. MARMOR: Object to the form.
A. I believe it was in my office.
Q. Where was Ms. Reierson when Mr. Nawara came?
A. I don't recall.
Q. So it's possible she was not there when Mr. Nawara came in?
A. I don't recall.
Q. Did you have a conversation with Mr. Nawara while you and him were alone in your office?

A. No. 1:22:33
Q. Was all the conversations you had with -- with John were when both you and Ms. Reierson were present?
A. I believe so.
Q. Was there any other person present at any time that you had a conversation with John when he first reported to your office?
A. I don't recall.
Q. Who started the conversation when Mr. Nawara reported to your office?
A. I don't recall.
Q. Do you recall any part of that conversation?
A. Vaguely, yes. I -- yeah, vaguely.
Q. What do you recall of the conversation?
A. Trying to explain the purpose of why he was here in the office.
Q. Who -- who was speaking?
A. I believe myself. 1:23:36
Q. Okay. To the best that you can, I know it's not going to be word for word, would you tell us what you said?
A. That he was there --
Q. Pretend I'm John.
A. Okay.

Q. Just tell -- say what you said.

A. "Hi, John. You're here -- do you know why you're here?" And I don't remember if he knew why he was there or not at that particular point, but I would go on to just explain that, you know, there was some concerns of his behavior, we're calling him in just to do a fact finding, to get his view on exactly what transpired, because it's very concerning, you know, what was -- was said by his superior.

Q. Okay.

A. But I believe that it couldn't go on very long because he became very raged, very uncooperative, at that particular point. I remember that.

Q. Describe what you saw. 1:24:46

A. He was mad. He was mad. I believe his -- you know, I was trying to talk to him, that he was -- had became loud, and I believe, at one point, that he even stormed out of there. I -- I believe so, but I remember that he was just -- I had never had this happen. I've never seen anyone in that office behave like that before.

Q. When Mr. Nawara first reported to your office, did he sit down at -- at your desk?

A. I don't remember if he was sitting or not.

Q. And was Ms. Reierson on the same side of the

desk that you were on, or was she on the side that Mr. Nawara was on?

A. I believe she was on the side that he was on, because if -- yeah. I believe so.

Q. When you say that John got mad and I asked you what did you observe, okay, what did you observe?

A. Him being loud --

Q. Excuse me for interrupting you. For me, that's what did you hear. What did you observe is what --

MS. MARMOR: Well --

Q. -- did you see?

MS. MARMOR: -- I think she's allowed to answer the question --

MR. BUSTAMANTE: I know.

MS. MARMOR: -- the way she wants to.

MR. BUSTAMANTE: I understand that, but I --

MS. MARMOR: Okay.

MR. BUSTAMANTE: -- because we'd already -- she already testified to that.

A. Okay.

MS. MARMOR: Right. But that's how she defines mad.

A. Okay. I'm -- describe someone -- what I'm observing is someone who looks like they are looking at

me on -- like they're on ten and could attack at any given time.

Q. What gave you the feeling that he could attack at any given time?

A. By the look on his face. He just had a rage in him, and I can't -- it was rage.

Q. Okay.

A. I can't tell you what rage -- but you see it and you know it if it's looking at you. You see it.

Q. Okay. Can you describe John physically? What does he look like?

A. Physically, he has, I think, black hair, maybe olive colored skin. I believe he's kind of a medium or -- medium type of build. That's the most that I could, yeah, tell you.

Q. Did he make any physical gestures when -- when you say that you observed him being mad?

A. When you say, "Physical gestures," what are you speaking of?

Q. Anything that has to do with the body, any gestures.

A. I don't know exactly what do you mean with anything to do with the body. I'm --

Q. Okay. 1:27:48

A. -- not understanding that.

Q. What do you -- do you understand what -- what a gesture is?
A. I don't understand when you're -- no, maybe I don't. Explain to me --
Q. Okay.
A. -- what you mean.
Q. Okay. Did he make any moves that you would consider aggressive?
A. Not towards me.
Q. To -- towards anyone?
A. Not that I saw.
Q. Did you feel that your physical safety was threatened at that time?
A. I did not feel threatened because we were in the sheriff's office.
Q. Did you feel that Ms. Reierson's physical safety was threatened at that time?
A. I didn't think hers was threatened once -- because we were in the sheriff's office.
Q. How long did the interview with John last from the moment he came in until he stormed out?
A. I don't -- I don't -- I don't remember how long it lasted, but I -- I don't remember because I remember at one point, there was a union steward that came in, but I don't -- I -- I remember that there was

a union steward that came in, so I don't remember the time sequence of -- of everything that transpired.

Q. My understanding is that John was there at least twice that morning, okay, of November 18th. You say you -- you testified that he stormed out. He says differently. Doesn't really matter.

A. Okay. 1:29:45

Q. But I'm talking about the first time, before the union steward come -- comes, okay? He later returned with a union steward, okay?

A. Okay.

Q. That first time, how long was he there?

MS. MARMOR: Okay. I'm going to object to lack of foundation. I mean, she -- your -- your -- she's only basing her answers based on what your memory -- what your information is, not on her necessary --

MR. BUSTAMANTE: Correct.

MS. MARMOR: -- necessarily her memory.

A. I could not tell you how long.

Q. During that first part, before the union steward came, did you ask John to sign medical release forms?

A. I believe so. 1:30:22

Q. Tell us what you remember of that conversation.

A. Trying to explain the process for a fitness for duty, that he would be evaluated by an independent -- actually, at that point, let me go back, let me stop, because -- and -- and I -- and I just remembered, I don't know if he was asked to sign it at that point. I believe, at that point, he was not asked to sign it because I believe, at that point, we had not discussed it to decide if that's what -- what route we were going to go with him.

Q. Okay.

A. I believe it was after he stormed out, and then we had chance to talk, that that was the determination, but it was not decided immediately. It was -- it's never decided immediately that we're going to jump for a fitness for duty. There are cases that we didn't do fitness for duty.

Q. Okay. How -- how long -- by the way, put in your mind's eye, okay, what -- what is happening during the first time that John is in your office and you say he stormed out, do you see him, in your mind's eye, standing up from a chair and walking out of your office, or do you see him already standing, and he never sat down, and walking out of your office?

MS. MARMOR: If you remember. 1:31:46

A. I don't remember if he was standing the whole

time or not. I don't picture him sitting down. That I can say, I don't remember him ever sitting down. Okay.

Q. When he walked out of the office -- by the way, was the office door closed when the interview started?

A. Yes.

Q. And so who opened the door when he walked out?

A. He would have opened the door.

Q. Do you have a clear memory of that, or are you just guessing?

A. He stormed out, so he would have opened the door.

Q. Okay. How long was it before he returned?

A. That I don't remember.

Q. Was it a long time or a short time?

MS. MARMOR: Object to the form.

A. I don't remember.

Q. What -- he did return the same day?

A. Yes. 1:32:42

Q. And you say you remember a union rep coming back?

A. Yes.

Q. Okay. Between the time that John left your office and came back with a union rep, did you make a

decision, did you exercise your nursing judgment and determine whether or not he should be subject to a fitness for duty evaluation?

A. I believe Rebecca and I discussed it, and it was agreed upon by both of us that we felt that he should go for a fitness for duty.

Q. Okay. So tell us about that discussion. What did you say and what did Ms. Reierson say?

A. That what we had -- as we watched his behavior and his lack of self-control, and just talking with us from HR, that it's very concerning, him being safe to care for prisoners if he can't show self-control with us and we're not threatening whatsoever, so how would -- does he behave himself in that sort of environment, so he definitely should be evaluated by a provider to make sure that he didn't harm someone while on the job.

Q. All right. What I want to know is what was said by you and what was said by Ms. Reierson?

A. I couldn't tell you. I'm telling you, in gist, what the conversation went -- looked like. I couldn't tell you who said what in the conversation, but I just know that that was a concern.

Q. How did the conversation between you and Ms. Reierson start?

MS. MARMOR: Objection. Asked and answered. 1:34:32

A. I don't know.

Q. Well did you say, "Well can you believe that?" or "What do you think?" or something to that effect?

A. I couldn't tell you.

Q. How long did that conversation take place? How long -- I mean last, not take place. How long did that conversation last?

A. I don't recall.

Q. Did you make any notes of that conversation?

A. No.

Q. Why not?

A. There was no reason to make notes for it.

Q. Why is there no reason?

A. Because we were having a discussion.

Q. Did you make any -- any notes regarding the elements that went into your assessment, your nursing assessment, to recommend a fitness for duty evaluation?

MS. MARMOR: Objection. Asked and answered. 1:35:27

A. I did not.

Q. So when -- when John came back with the union rep, the determination had already been made that you were going to request that he submit to a fitness for duty evaluation?

A. Correct.
Q. At that point, was it at that point that you got the medical release forms, I'll call them, for John to sign?
MS. MARMOR: I'm sorry, can you -- I -- I didn't --
Q. Was it at that point, after you decided to -- that he was going to be requested to undergo a fitness for duty evaluation, that you obtained the forms for release of medical records?
MS. MARMOR: Object to the form. 1:36:15
A. I believe at that particular time, when he had the rep there, we explained the process and explained that these forms would need to be filled out, yes.
Q. Okay. But someone had to get the forms, correct? Or were the forms already there from the very -- from the very beginning?
A. The forms were probably there from the beginning.
Q. Where are those forms kept?
A. They are kept in a file cabinet in the back part of the office.
Q. They're not kept in your office? Or they were not kept in your office at that time?

A. Yes, they were kept in my office.
Q. So at the -- the file cabinet within your four walls of your office where the forms were --
A. Well my office had -- I had a front part of my office and then there was a back office right in my office, that's where the file cabinet was kept.
Q. Who prepared these forms? In other words, who -- who drafted them?
A. What do you --
MS. MARMOR: Originally? 1:37:24
MR. BUSTAMANTE: Originally, yes.
A. Oh, I don't know.
Q. These forms were already there when you started working for the sheriff's office?
A. I --
Q. The drafting of these forms?
A. Yes.
Q. And did you ever review these forms over the period of time that you had been working for the sheriff's office, did you ever review these forms to make sure that they complied with HIPAA?
A. I did not.
Q. Did you ever review these forms to make sure that they complied with the ADA?
A. I did --

MS. MARMOR: Objection. Lack of foundation.
A. I did not.
Q. So tell us what happened when John came back with the union rep.
A. I believe we spoke with both and explained to them what the next steps was going to be, that we were going to request that he go for a fitness for duty and the process of -- for the fitness of duty to, you know, transpire. CorVel is the third party company that handles it. They require that they receive his medical records, so they can give the provider, whoever is going to be doing the -- the evaluation, all of the medical records, and they need that to rule out anything that could be going on medically with the person.
Q. When John came back with the union rep, where did the meeting take place? Back in your office?
A. Yes. 1:39:12
Q. Besides John, the union rep, you, and Ms. Reierson, was there anybody else present?
A. No.
Q. What was the approximate time?
A. I don't know.
Q. Who spoke first when John came back with the union rep?

A. I don't know.
Q. Did you inform the union rep the reasons why it -- it was requested that John undergo a fitness for duty evaluation?
A. Yes.
Q. Did Ms. Reierson explain to the union rep the reasons why John was to -- requested to undergo a fitness for duty evaluation?
A. I don't recall.
Q. What did you say to the union rep?
A. I don't recall.
Q. What was John's demeanor when he came back with the union rep?
A. He was very upset.
Q. Okay. Explain what you observed or tell us what you observed when you say, "Upset."
A. He was upset, he was -- he was huffing and puffing. He was upset, he was -- I can't explain what an upset person looked like. They are just upset. They're -- they're mad.
Q. When you said he was upset, did you mean to say he was mad?
MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.
A. He was upset, and -- and that's how he was.

He was upset. Even while we were attempting to explain the situation, he was loud. I believe the union rep tried to diffuse it some, I believe -- yeah, I believe the union rep kind of tried to diffuse him some, but he was upset.

Q. All right. What was John saying when you say he was loud?

A. That he wasn't going for no fitness for duty.

Q. Anything else? 1:41:39

A. He made mention to -- that his superintendent, I believe, was lying on him or something to that effect. Yeah.

Q. Anything else that you recall?

A. Not that I recall.

Q. The -- did you --

MS. MARMOR: Oh, wait. She -- she -- looks like she has something more to say.

Q. Oh, go ahead.

A. And he -- I do recall that he was saying that he wasn't signing the papers, and -- and we, you know, informed him at that time if he didn't sign the paperwork or didn't want us to have his information, he could go directly through CorVel.

Q. Okay. Who said -- who said that to him, that he could go directly to CorVel?

A. I don't know if it was I that said it to him or Rebecca, but I do know he was informed that.

Q. And is that true, that an employee can go directly to CorVel if they don't want to sign the forms provided by the sheriff's office?

A. That is true. 1:42:56

Q. And have there been situations with employees other than John where they have gone directly to CorVel and signed the CorVel form?

A. Yes.

Q. Is this something that you tell all employees?

A. Absolutely.

Q. Okay. We'll go to Shelby Number 4. Ms. Shelby, have you seen a copy of this letter before?

A. I have.

Q. When you receive a copy of a letter such as this, what -- what do you do with it?

MS. MARMOR: Objection. Calls for speculation. 1:44:03

A. I -- I didn't have a process on what to do with a letter like this, so.

Q. Would it go into the employee's fitness for duty file that you keep in your office?

A. I might have put it in there and I might have

not. I didn't have a process on what to do with it.
Q. If you did not put it in any file, where would it go? The circular file?
MS. MARMOR: Objection -- objection. Argumentative.
MR. BUSTAMANTE: Sorry.
MS. MARMOR: And no -- and there is no -- there is no -- there's --
Q. I mean, would you just trash it or --
MS. MARMOR: Yeah -- yeah.
A. I probably wouldn't have received it as a hard copy for me to trash it. It would have probably came via an email form or something like that, so then it wouldn't have been a reason for me to trash it or anything. It just would have been part of the email.
Q. Do you know why you were copied on this letter?
A. I don't know why -- why I was copied on it, no. 1:45:06
Q. Okay. Would you please read that letter to yourself? Let me know when you're done.
A. Okay.
Q. Okay?
A. I am complete.
Q. All right. Is there anywhere in this letter

where John is told that if he doesn't want to sign the forms given to him by the sheriff's office, that he could go directly to CorVel and sign CorVel's form?

A. No. 1:46:22

Q. Why not?

MS. MARMOR: Object -- objection. She didn't write this letter. That's not an appropriate question for her.

A. And that's -- I did not write the letter.

Q. I understand that, but why -- why isn't that something that's put in -- in a letter to a -- an employee, copied to you so you saw it, okay? Do you know why that's missing?

MS. MARMOR: Okay. Slow down. I want to get my objection on the record. Number one, that's treating this as if it's a normal situation that was going on. And number two, she doesn't have the foundation to answer that question.

A. I don't know. I did not write the letter. 1:46:56

Q. Okay. Did you call and leave a voicemail for John on November 30, 2016?

A. I don't remember the date I did.

Q. But you did call, do you recall? Do you recall calling and leaving a voicemail?

A. Yes, I did.

Q. Were you asked to call, or did you call on your own?
A. I don't remember.
Q. What did you say when you left the voicemail?
A. Just who I -- I -- who I was, who I was calling for, and requested a call back.
Q. And what did you say when you said what you were calling for?
A. Who I was calling for, I was calling for --
Q. Oh, I'm --
A. -- John -- yeah.
Q. Okay. Got it. Did you discuss this letter with Ms. Reierson after you received your copy?
A. I don't recall. 1:47:50
MS. MARMOR: If you need to take a break, you can take a break.
WITNESS: Oh.
MS. MARMOR: Okay?
WITNESS: I'm fine. Thank you.
Q. If you need a break, let me know --
MS. MARMOR: No, she was just --
Q. -- okay?
MS. MARMOR: She was checking her watch. I just wanted to --
MR. BUSTAMANTE: Oh.

MS. MARMOR: -- make sure.
WITNESS: Oh, no. Thank you.
MS. MARMOR: Okay.
WITNESS: Sorry. You know, be vibrating these --
MR. BUSTAMANTE: What time is it?
MS. MARMOR: I see.
MR. LINDEN: 12:00, do you --
MR. BUSTAMANTE: Huh? 12 until --
MR. LINDEN: 12:00.
MR. BUSTAMANTE: Okay. I take a lot of breaks because I drink coffee, so.
WITNESS: Okay.
MR. BUSTAMANTE: Let's hope that we'll -- plow through.
Q. Let me show you Shelby Number 5.
MR. LINDEN: Thanks.
Q. Okay. Have you had a chance to read it? 1:49:28
A. Yes, I did.
Q. Okay. You have seen this letter before, correct?
A. Yes.
Q. And it's a letter dated February 28th, 2017?
A. Correct.
Q. To John Nawara from Ms. Reierson, correct?

A. Correct.
Q. Anywhere in this letter where Ms. Reierson says, "If you don't want to sign our forms, you can go to CorVel and sign the CorVel form"?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. No.
Q. This letter has attached two forms. Is that correct?
A. Correct. 1:50:06
Q. And are these the forms that were given to Mr. Nawara to sign when he came for the interview on November 18th, 2016?
A. Correct.
Q. If you'd take a look at the third page, which is Cook County Sheriff's Office 128 at the very bottom, you see where "all health care information" is checked?
A. Yes.
Q. Who put that checkmark there?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you -- were the forms that were kept in your office from the Cook County Sheriff's already all marked with "all health care information"?
A. Yes. 1:51:06

Q. When a -- when the sheriff's office is putting someone through a fitness for duty evaluation, do they always request all the medical records?

A. Yes.

Q. Why is that?

A. Because -- it should be all of the records because the provider -- we don't know what we're asking -- I -- for. We don't want just one office visit note. We want all of the medical records.

Q. Okay.

A. Because the provider requests that.

Q. So it -- it could happen that records that are not relevant to the issue at hand are therefore turned over?

MS. MARMOR: Objection. Argumentative and mischaracterizes her testimony.

A. I don't know. 1:52:20

Q. So you know, just for the sake of argument, if a -- argument. If a person had a hernia and he's being sent for a medical -- a mental health evaluation, the hernia would not be relevant to mental health, or would it?

MS. MARMOR: Objection. Calls for speculation and lack of foundation.

A. I don't know.

Q. Okay. Let me show you Shelby Number 6.
MR. BUSTAMANTE: Oh, shoot -- no, I don't have to worry about it. Got it on -- yeah. Put --
MS. MARMOR: This is why I ask the court reporter to do it for me.
MR. BUSTAMANTE: That's -- it's okay. No problem. We've got it -- got it on time.
Q. Have you ever seen this document before, in the computer, it doesn't have to be in a, you know, printed document, have you seen this type of log before?
MS. MARMOR: Object to the form. 1:53:42
A. I believe so.
Q. Okay. So the title of this document is "Fitness for Duty Log, January 2016 to April 2018," correct?
A. Correct.
Q. And the names of the employees have been redacted, okay, right?
A. Yes.
MS. MARMOR: And actually, can -- sorry, can we go off the record for --
MR. BUSTAMANTE: Sure.
MS. MARMOR: -- one second?
RECORDER: Off record, 12:06 p.m.

(Off the record)

RECORDER: On record, 12:06 p.m.

Q. Okay. Does -- did your office keep some kind of log or record of all the employees who came to your office for an assessment for fitness for duty, whether or not to be sent to a fitness for duty evaluation?

MS. MARMOR: Object to the form and lack of foundation. Do you mean she personally or the HR department in general?

MR. BUSTAMANTE: Her department in general.

MS. MARMOR: She --

MR. BUSTAMANTE: Her office.

MS. MARMOR: -- didn't have a department. She -- she had an -- she had an office, but she didn't -- she wasn't the head of a department.

MR. BUSTAMANTE: I -- I get it. I understand that. 1:54:52

A. There was a log that was kept, however, it was -- I couldn't say that it had all the fitness for duty people on here that we evaluated because the log was not into effect all the while while I worked there. The log went into effect, I don't remember when they started the log, but it was not in effect for the whole period that I worked for the sheriff's department.

Q. Okay. When the log was started, was it a

computerized record or was it a written record?
A. It was a computerized spreadsheet.
Q. The document that you have in front of you, do you know if this was prepared by the sheriff's office or it was prepared by counsel for purposes of this litigation?
A. I don't know. 1:55:46
Q. Does it look similar to what you would have had in terms of a computerized log while you were working at the sheriff's office?
A. I don't remember what was on -- exactly on that log. I remember that was some form of a log, but I couldn't tell you what was on it. That I don't know.
Q. Well this --
A. I don't remember.
Q. Okay. Let's look at some of the entries.
A. Okay.
Q. But first, we'll look at the -- the -- the descriptions on the top, okay? We have a "referral date," correct?
A. Correct.
Q. Slash "date of meeting." Then we have "last," "first," and "job title," which I assume refers to the employee, correct?
MS. MARMOR: Objection. Lack of foundation. 1:56:35

Q. It says, "Last," here, would that be --
A. Yes, I see that.
Q. -- last name?
A. Yes.
Q. First name?
A. Yes.
Q. Job title of the employee?
A. Correct.
Q. Okay. And then we have the "issue" and then "reason for referral," "referral received from," "decision," "comments," and "status," you saw all those?
A. Yes, I see that.
Q. Now from your memory of the log that is kept by the sheriff's office, would there have been any other entries, any other descriptions?
A. I don't recall. 1:57:07
MS. MARMOR: And I'm just going to note for the record that she's already testified she was gone by December, I believe, of 2017, and this log goes through April of 2018, so I'm just going to have a foundation objection to her talking about this.
MR. BUSTAMANTE: I don't think I'm going to go to April '18 -- 2018.
Q. Okay. So you know, I -- I -- I wanted to ask

you questions about specific entries, but we don't even know if this is a Cook County Sheriff's document.

A. Okay.

Q. So we may have to ask you to come back when we find out if -- if there's a different document. I'll ask you questions now, but you know, if -- if it's not a Cook County Sheriff's document, might have to ask you to come back, okay?

MS. MARMOR: Well I mean, let me be very clear, we've -- we've made productions in this case. We were clear about our productions in this case. There is, in fact, another log that was produced in this case that was contemporaneous, and I would object to her coming back --

MR. BUSTAMANTE: What was --

MS. MARMOR: -- you know, you should understand what the documents are in the case.

MR. BUSTAMANTE: We'll -- we'll -- during the break that we're going to take in a short while, we'll see if there's another log. Maybe you can help us share -- search it, if you -- you know, I mean, maybe. If not, I'm -- I'm going to just stand by what I'm saying.

Q. Okay. So let's look at some of these entries, okay? First, under "issue," when it says,

"Med," m-e-d, what does that refer to?
MS. MARMOR: Lack of foundation. 1:58:41
A. I don't know.
Q. Okay. When it says, "Eval," e-v-a-l, what does it stand for?
MS. MARMOR: Lack of foundation.
A. I don't know.
MR. BUSTAMANTE: Oh, shoot.
MR. LINDEN: That was lucky. Half hour -- sorry about that, I mean.
Q. Under "comments," okay, let's look at -- let's look at the entry for 9/9/2016, under "comments."
A. I'm sorry, what date was that?
Q. 9 --
MS. MARMOR: 9/9/2016.
Q. -- 9 --
A. Okay.
Q. -- 2016.
A. Okay.
Q. When -- under "comments," when it says, "FFD not appropriate, may be disciplinary issue," do you see that?
A. Yes. 1:59:29
Q. Who -- when would that entry be made?
MS. MARMOR: Objection. Lack of foundation.

A. I don't know.

Q. By the way, who would make the entries in the log that was kept by sheriff's office?

MS. MARMOR: If you know.

A. I don't remember.

Q. Would it be you?

A. I don't remember.

Q. Okay. Who -- if it was not you, who else could it have been?

A. Someone from the HR management team who was present during the fitness for duty.

Q. Okay. So in Mr. Nawara's case, it would have been either you or Ms. Reierson?

MS. MARMOR: Objection. Mischaracterizes her testimony.

A. Correct.

Q. And who would have access to the computerized log?

A. I don't remember.

Q. Well would it have been more than you or someone in HR management?

MS. MARMOR: Objection. Asked and answered. 2:00:23

A. No. I don't -- I don't remember.

Q. Would this type of information be protected by law from disclosure to people who have no business

putting their nose into it?
MS. MARMOR: Objection. Lack of foundation. Calls for a legal conclusion.
A. I don't know.
Q. Based on your experience as a nurse and based on your knowledge of HIPAA, would the information contained in this log be privileged?
MS. MARMOR: Privileged? Objection. Lack --
Q. Privileged from --
MS. MARMOR: -- complete lack of foundation.
Q. -- disclosure -- privileged from disclosure --
A. When you said, "Disclosure to others," what do you mean, "disclosure"?
Q. Well say that the cleaning lady is coming by and doing his or her job -- cleaning lady, her job, of cleaning your office, and this is on the screen, and she starts reading this information, would that be right?
A. Oh, no.
MS. MARMOR: Objection. Lack of --
Q. No?
MS. MARMOR: -- foundation.
A. No.
Q. Why not? 2:01:18

A. Because it has information pertaining to a fitness for duty, so that would not be something that would be shared with anyone that didn't have a reason -- a reason to be involved in that particular case.

Q. So not everybody could see or have access to this information, correct?

MS. MARMOR: Same objection. Lack of foundation.

A. I don't think -- believe so, no.

Q. Okay. The 9/29/16 referral date, is that the John Nawara event?

MS. MARMOR: Objection --

A. I don't know.

Q. By reading the reason for referral, does it appear to be the John Nawara event?

MS. MARMOR: Objection. Calls for speculation.

A. I don't know. 2:02:14

Q. Under "decision," when it says, "FFD," what does that mean?

A. Fitness for duty.

Q. And when it says above that, on 9/27/2016, when it says, "No FFD," what does that mean?

A. They were not sent for a fitness for duty.

Q. When a notation is made, says, "FFD not

appropriate, may be disciplinary issue," is that a nursing decision that is noted, or is it somebody else's decision that is noted?

MS. MARMOR: Objection. Lack of foundation. Calls for speculation.

A. It would have been a discussion held with the management from HR and myself.

Q. Okay. So the notation under "comments" is what management and the nurse, being yourself, decided. Is that correct?

MS. MARMOR: Objection. Lack of foundation. Calls for speculation.

A. Correct. 2:03:21

Q. Now, assuming -- and -- and I'm going to ask you to assume that the 9/29/2016 entry is John Nawara's entry, why is the "FFD not appropriate, may be disciplinary issue" written in -- in that spot?

MS. MARMOR: No, that's not -- that's the one above him.

MR. BUSTAMANTE: No, I'm asking why that notation is not in Nawara's entry.

MS. MARMOR: Okay. Well that completely calls for speculation, and there is no foundation for her to testify about documents she didn't create.

A. You said why wasn't it --

Q. Yeah.
A. -- written in that?
Q. Why didn't you write down -- or assuming -- why isn't it written down there "FFD not appropriate, may be disciplinary issue"?
A. I don't know.
MS. MARMOR: Same objections. 2:04:20
Q. If you look at the next page, 189, look under "12/9/2016," you see that?
A. 12/9/2016 --
Q. 12/9 --
A. -- right.
Q. -- third -- third from the top.
A. Okay.
Q. Here is an allegation of "work behavior, alleged outburst of anger," and "FFD" means that FFD was requested, correct, under --
MS. MARMOR: Objection.
Q. -- under the column "decision"?
MS. MARMOR: Objection. Lack of foundation.
A. Okay. What is your question?
Q. Well I'm -- I'm asking you, first of all, FFD was requested, correct?
A. Yes.
Q. And then under the comments, it says, "FFD

not appropriate, discussed options with employee's supervisors." And again, my -- my question is why is this here, this comment made, if an FFD was requested?

MS. MARMOR: Objection --

A. I don't --

MS. MARMOR: -- lack of foundation.

A. I don't know. 2:05:28

Q. Is it that the evaluator, the -- you know, the person who CorVel sends the employee to, decided that this was not appropriate for fitness for duty?

MS. MARMOR: Objection. Lack of foundation. Calls for speculation.

A. I don't know.

Q. Can you agree that at least it's not the HR manager and the nurse's decision because HR management and the nurse decided that FFD was -- was appropriate, correct?

MS. MARMOR: Objection. Lack of foundation. Calls for speculation.

A. Yeah, I don't see anywhere where it says that.

Q. Well it says, "FFD," and if some -- if it says, "FFD," means that you requested FFD, correct?

MS. MARMOR: Objection. Lack of -- lack of foundation. Calls for speculation.

A. I don't know if -- if it's saying that it was decided on an FFD, I don't know.
Q. All right. Well go back and look at all the columns up to --
A. Okay.
Q. -- the time that you left, okay?
A. Okay. 2:06:26
Q. If it says, "FFD," was it decided to FFD?
MS. MARMOR: She has no --
Q. And --
MS. MARMOR: Sorry.
Q. And if it says, "No FFD," was it decided no FFD?
MS. MARMOR: She has no foundation for answering these questions. She did not create this document.
A. I don't know.
Q. Show you Shelby Number 7. Would you tell us what this document is, please?
A. This is the referral form that we sent over to CorVel when we're requesting a fitness for duty for someone.
Q. Is this a document that you prepared?
A. I just put in the -- the -- the form -- the referral form was already prepared, I just plugged in

the individual employee's information into this -- to each referral form.

Q. Okay. When you say the referral form was already prepared, tell us what parts were already done and what parts you plugged in.

A. The date, the employee's name, date of birth, contact information, home address, job description, occupation, the reason referring, any specific questions to address.

Q. So the -- the -- the thing that was already prepared was the line where it says, "Cook County Referral Form"?

A. Yeah, "Cook County Referral Form," the date -- the -- the --

MS. MARMOR: Do you mean the headers right here? I think that's --

MR. BUSTAMANTE: The header.

MS. MARMOR: Yeah. Not just the headers, but the header -- like the header "date."

A. Yeah, the date.

Q. Got it.

A. The employee name, the date of birth, the employee contact, the home address, the job description, the reason for the referral, those were already on the form.

Q. Okay.
A. And I just would make it individualized for each employee by adding what their -- what the date is, what their name is, what their date of birth --
Q. Okay. What -- what is the date of this document?
A. 8/25/2017. 2:09:26
Q. Why was the document prepared at this time?
A. I don't know.
Q. By this time, had the issue regarding John signing the -- the HIPAA form been resolved?
A. I don't recall.
Q. Were you involved in any of the discussions regarding any changes to be made to the HIPAA forms?
A. I was not.
Q. Do you know if John signed the two forms that are referenced in Exhibit 5?
A. I don't recall.
Q. Did you have any other dealings with Mr. Nawara, any personal dealings with Mr. Nawara between the time of that interview in November of 2016 to present?
MS. MARMOR: Does that include the phone call or you mean one on one?
MR. BUSTAMANTE: One on one because I don't

think she -- the phone call, she says he never answered.

MS. MARMOR: Right. But she called -- she did leave a message.

MR. BUSTAMANTE: Personal.

A. I don't recall. 2:10:24

Q. Would Mr. Nawara have any reason to come back to see you at your office after the fitness for duty evaluation?

MS. MARMOR: Objection. Calls for speculation.

A. If he went for a fitness for duty evaluation, then more than likely, the Cook County Sheriff's Office would have received the results, and we would have called him to say we had the results for him to get the return to work paperwork, yes. I don't know if he would have gotten it, per se, from me, but he would have been called in to get the return to work paperwork because he would have had to be returned back to work.

Q. When you wrote this memorandum in August of 2017 -- or the referral form, I'm sorry, how many times had you seen John Nawara?

A. I don't recall. 2:11:28

Q. Had you seen him more than the one day that he came for the initial interview in -- in November of

2016?

A. I don't recall.

Q. Would you have had any other reason to see him between November 18th of 2016 and August 25 of 2017?

MS. MARMOR: Object to the form.

A. I don't -- I don't remember.

Q. When -- would you kindly read into our record the reason for referring?

A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed towards his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resource department."

Q. Did -- how did you come to the conclusion that the employee had been aggressive, physically intimidating, and had inappropriate behavior directed towards -- toward a superior officer?

MS. MARMOR: Object to the form. 2:12:47

A. Based on the discussion with his superior.

Q. Okay. What happened to the -- what you told us before, that those things are not facts that you consider, you don't consider them facts? Why did that change?

MS. MARMOR: Objection -- objection. Argumentative.

A. I was giving them all of the facts. That was not what went into play far as us deciding on the fitness for duty, his behavior was. I wanted to give CorVel all of the facts, so they can make an -- and -- and the provider all of the information, so they can make a decision. We -- it does us no good to send them for a fitness for duty and give them -- and don't give them all the information. I already had the information. I already knew. But that was not my decision in deciding on the fitness for duty. His behavior was our decision maker. But once again, we wanted them to have a clear understanding on why this referral was being made.

Q. Okay. When you say, "In addition," that, "weeks later, employee presented as aggressive and hostile in the human resources department," that's what you already described for us, correct?

A. Correct.

Q. Did you ever file a complaint against John with anyone for the behavior that he exhibited while you were interviewing him on November 18th, 2016?

MS. MARMOR: Objection. Lack of foundation.

A. No. 2:14:10

Q. Why not?
MS. MARMOR: Same objection.
A. I wouldn't have known what sort of complaint to try to file in a situation like this.
Q. Did you ask anyone as to whether or not you should file a complaint?
A. I did not.
Q. Did Ms. Reierson ever tell you that she was going to file a complaint?
A. She did not.
Q. Do you know what Mr. Nawara was doing between -- in terms of his employment, between September 16th, 2016 and the time of the interview at -- at HR in November 18th, 2016?
A. I don't recall.
Q. Did you know at one time?
A. I don't think I did. I --
Q. Would -- would his assignment --
MS. MARMOR: Wait, she --
Q. Oh, I'm sorry. I interrupted you.
A. I knew that he was a correction officer. That's what I knew. That was his position.
Q. Would part of your assessment for determining whether or not a fitness for duty evaluation was appropriate, was part of your assessment required to

determine his -- an individual, an employee's current assignment?

MS. MARMOR: I'm -- I'm -- I'm going to object to the form. There was a lot of words in there.

A. No. 2:15:43

Q. If the individual had, for months, a month and a half now, been assigned to outside services, where he is allowed to carry a weapon and escort inmates to and from different locations, would that have made any difference in your evaluation?

MS. MARMOR: Objection. Calls for speculation. Lack of foundation. And mischaracterizes the record.

A. No, it would not.

MR. BUSTAMANTE: Do you need a break?

MR. LINDEN: Mm-mm.

MR. BUSTAMANTE: Okay.

Q. Before John was called to human resources to meet with you and Ms. Reierson, was John provided with anything in writing regarding the reason why he was being called to HR?

MS. MARMOR: Objection. Lack of foundation.

A. Not -- not to my knowledge. 2:17:10

Q. Before coming to the interview at HR on November 18th, 2016, was John informed in writing of

what was considered the problematic behavior?
A. Not to my knowledge.
Q. When a Cook County Sheriff's Office employee is charged with improper work behavior by allegedly being aggressive, does that always result in a fitness for duty evaluation?
A. I don't know.
Q. Based on your experience in the time that you have been there and acting as the nurse that is part of the team that makes the decision for fitness for duty, when a CCSO employee is charged with improper behavior by allegedly being aggressive, that -- does that always result in a fitness for duty evaluation?
A. I don't know. 2:18:33
Q. When an employee is charged with aggressive behavior and you're making a determination as to whether or not to refer that person to -- for a fitness for duty evaluation, does it matter whether the person charged with making the charge of aggression is a supervisor or not?
MS. MARMOR: Objection. Lack of foundation.
A. No, it does not.
Q. Is it appropriate for a supervisor to have unwanted physical contact with -- with a subordinate?
MS. MARMOR: Object to the form. Lack of

foundation.

MS. KAMPER: Join.

A. I don't know what the policy is far as for the sheriff's department on that.

Q. Other than Shelby Number 7, have you prepared any other writing concerning John Nawara?

MS. MARMOR: Object to the form.

A. I don't recall. 2:20:16

MR. BUSTAMANTE: Okay. All right. I need to take a break. Is that okay?

MS. MARMOR: Yeah, of course.

MR. BUSTAMANTE: And you know what, I -- I think I only have about an hour or -- well less than an hour.

MS. MARMOR: Okay. Great.

MR. BUSTAMANTE: Like 40 minutes left. Can we just finish through without having a lunch break?

MS. MARMOR: Is that okay with you?

MR. LINDEN: That's fine.

WITNESS: Mm-hmm.

MR. BUSTAMANTE: Oh.

MS. MARMOR: Okay.

MR. BUSTAMANTE: That okay?

WITNESS: That's fine.

MS. MARMOR: The only caveat --

MR. LINDEN: Okay.
MS. MARMOR: -- is that I may get a phone call at --
MR. BUSTAMANTE: Okay.
MS. MARMOR: -- 1:00 --
MR. BUSTAMANTE: We can --
MS. MARMOR: -- that I have to take.
MR. BUSTAMANTE: -- break. That's fine.
MS. MARMOR: Yeah.
RECORDER: Off record, 12:33 p.m.
(Off the record)
RECORDER: On the record, 12:43 p.m.
Q. Okay. Let me show you Exhibit Number 8.
MR. BUSTAMANTE: And unfortunately, I only have one copy. It's the --
MS. KAMPER: That's --
MR. BUSTAMANTE: -- answers to interrogatories.
MS. KAMPER: No, that's all right.
MS. HONINGFORD: Okay.
MR. BUSTAMANTE: Apologize for that, but I didn't want to kill that many trees.
Q. Would you take -- take a look at the next to last page, page 21 of this document, please? Do you see that?

MS. MARMOR: No, I'm not there.
MR. BUSTAMANTE: Okay.
MS. MARMOR: Oh my goodness. Oh.
A. You said page 21?
Q. 21.
A. Yes.
Q. Okay. Is that your signature or a facsimile of your signature on that page?
A. Yes, it is.
Q. Would you please read the verification into our record?
A. "I, Winifred Shelby, declare under penalty of perjury, pursuant to USC --
MS. MARMOR: That's a section.
A. -- section" -- oh, "1746, that the foregoing Defendant Winifred Shelby answers to Plaintiff's first set of --
MS. MARMOR: "Interrogatories."
A. -- interrogatories directed to Defendant Winifred Shelby is true and correct. Executed on February 21st, 2018."
Q. So I'm going to ask you some questions about some of these interrogatories, okay?
A. Okay.
Q. Let's look at page 3, please. The last

paragraph of that page, would you read that to yourself and onto page 4? Let me know when you're ready.

A. The whole page 4 --

Q. No, just the -- through the --

A. Okay.

Q. -- through the top. 2:24:25

A. Okay. I'm --

Q. You're set?

A. -- finished. Yes.

Q. Okay. Go back to page 3, please. Do you see that last paragraph, under numeral three, would you please read that into our record, just numeral three?

A. "Defendant Shelby had in-person conversations with Defendant Rebecca Reierson regarding the appropriateness of a fitness for duty evaluation for Plaintiff."

Q. Other than the conversation that you described from the time that Mr. Nawara left your office and came back with a union representative, have you had any other conversations with Ms. Reierson regarding the appropriateness of fitness for duty evaluation for Plaintiff?

A. I don't recall. 2:25:17

Q. If you had any other conversation with Ms. Reierson, other than the one I've just described or the

time that I just described, would those be documented somewhere?

MS. MARMOR: Objection. Mischaracterizes exactly what the document says, which is that these were in person. I -- it says that they were in person, rather than documented, so it's a little bit --

MR. BUSTAMANTE: No, I understand that.

MS. MARMOR: Yeah.

MR. BUSTAMANTE: But my question is a little different. If she had, there were in-person conversations, but they -- would they be documented so she could later recall, "Oh, yeah, we had this in-person conversation."

MS. MARMOR: Right. I --

MR. BUSTAMANTE: Okay.

MS. MARMOR: -- my objection will stand.

A. Are -- are you asking would they have been documented -- not from me, no.

Q. Okay. You didn't keep any notes, any diary, any phone log, or anything like that --

A. No.

Q. -- saying, "Oh, I had a conversation on this date"?

A. No. 2:26:10

Q. Okay. How many -- look at number four. How

many times did you have in-person conversations with Ms. Reierson regarding contacting Plaintiff regarding his fitness for duty examination?

A. I don't know.

Q. Did you keep documentations of any of those conversations regarding contacting Plaintiff for his fitness for duty examination?

A. I did not.

Q. Look at page 14, if you would, please. And look at the first -- the first full paragraph on that page, starts with "notwithstanding," just read that to yourself, please.

MS. MARMOR: You guys, if you want to read this, it starts at the bottom of the page and goes on the next page.

A. Okay.

Q. Done?

A. Yes. 2:28:14

Q. Other than yourself and -- let me restate -- restate -- or start all over again. In September of 2016, other than yourself and Ms. Reierson, did anybody else conduct interviews to make decisions -- with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?

MS. MARMOR: Object to the form. You said,

"In September 2016."

MR. BUSTAMANTE: September 2016 is --

MS. MARMOR: Right.

MR. BUSTAMANTE: -- is what I said. Isn't that when -- the time of the -- oh -- let me -- let me restate. Thank you.

Q. Between September of 2016 and November of 2016, other than you and Ms. Reierson, was any other person conducting interviews with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?

A. I am unsure. 2:29:05

Q. Okay. Who else would -- would have been doing -- participating in that -- those interviews, besides you and Ms. Reierson?

MS. MARMOR: Object to the form.

A. If Ms. Reierson was not available, it would have been someone in HR management that would have did the interview with me.

Q. All right. And if you were not available, who replaced you?

A. Usually, I was always available to do them, I think, yes.

Q. Okay. Look at page 14, I want you to read, for yourself, interrogatory number 16 and the answer,

please, and let me know when you're done.
A. Okay.
Q. You're set?
A. Yes. 2:31:23
Q. Okay. At page 15, as part of your answer, would you read into the record the sentence that starts with "as reflected"? Third -- third line from the -- from the top.
A. "As reflected in document CCSO 000177, during the meeting, Plaintiff was uncooperative and appeared to be untruthful regarding an incident between himself and Defendant Jones-Hayes" --
Q. That's it.
A. Okay.
Q. Now in what way did John appear to be untruthful?
A. I don't recall now. 2:32:11
Q. Okay. Would you take a look at Exhibit Number 7, please, which is document CCSO 000177, and would you read into the record, please, where it says in that document that John was untruthful or appeared to be untruthful?
A. It does not say that.
Q. Look at page 15 and read to yourself interrogatory number 17 and your answer, please, then

I'll ask you a question about it.

MS. MARMOR: I'm sorry, what -- what are you asking about?

MR. BUSTAMANTE: I'm -- just to read first interrogatory number 17.

MS. MARMOR: 17, okay.

MR. BUSTAMANTE: And her answer.

Q. And then --

MS. MARMOR: Okay.

Q. -- when you're done, let me know, and I'll ask you a question.

A. Okay.

Q. Okay. Before April 2017, the forms needed -- that needed to be signed for a fitness for duty evaluation were provided by the sheriff's office?

MS. MARMOR: Object to the form and lack of foundation. 2:34:17

A. You said before --

Q. Well I'm asking you because -- okay, in this answer, it says -- when it says, "Notwithstanding," "Beginning April 2017, any forms that need to be signed are provided by CorVel."

A. Okay.

Q. Before that, were they provided by the sheriff's office?

MS. MARMOR: Object to -- objection. Lack of foundation.
A. In some cases. In most cases, they were, but they could go to CorVel also.
Q. Do you know when that change was made?
A. I do not.
Q. Was that your decision?
A. It was not.
Q. Did you participate or contribute to the decision to start using CorVel forms?
A. I did not.
Q. Okay. I'm done with that one. Here's Shelby Number 9.
MR. BUSTAMANTE: And again, I'm sorry, these are just answers to interrogatories --
MS. KAMPER: That's okay.
MR. BUSTAMANTE: -- I'm sorry I didn't make copies of all of them.
Q. If you would just read the interrogatory and answer to yourself, and then I'll ask you a couple of questions.
A. Okay. 2:36:39
Q. Ready?
A. Yes.
Q. Okay. Okay. Do you know Jeff Johnsen?

A. I do not.
Q. Do you know Johnice Brumfield-Greer?
A. I do not.
Q. Have you ever discussed John Nawara with either of those two people, Johnsen or Brumfield-Greer?
A. Not to my knowledge.
Q. Do you have personal -- do you have personal knowledge as to whether or not they know anything about John's case?
A. I don't know. 2:37:17
Q. Okay. This is Number 10, which is the Rule 26 disclosures.
MR. BUSTAMANTE: This one, I do have copies of. I don't know why you need them, but we have them.
MS. MARMOR: Sorry.
MR. BUSTAMANTE: They were short, I guess. 10, okay.
Q. We're going to go through these witnesses, I'm just going to simply ask you if you know these folks, okay?
A. Okay.
Q. Okay. So let's -- John Nawara, you do know?
A. Yes.
Q. Okay. Karen Jones-Hayes?
A. I --

Q. Have you ever met her?
A. No.
Q. Okay. Matthew Burke?
A. Yes.
Q. You do know him?
A. Yes.
Q. Have you ever discussed John Nawara's case with Matthew Burke?
A. No. 2:38:04
Q. Of course you know Rebecca Reierson, number four, right?
A. Yes. Yes.
Q. And you're number five. Who is Thomas Conley, do you know him?
A. I do not.
Q. Who is Barbie Gannon?
A. I don't know.
Q. We talked about Mr. Johnsen. Who is James Turrise?
A. I do not know.
Q. We talked about Johnice Brumfield-Greer. Other than these folks, do you know of any other Cook County Sheriff's employee that has knowledge about the facts concerning John's case?
A. I do not.

Q. Who is Karyn Williams?
A. She was the executive director of HR, human resources.
Q. Do you know when she left the sheriff's employ?
A. I do not. 2:38:53
Q. Did she leave before or after you left?
A. She was still there when I was there.
Q. Okay. Did you ever discuss John's case with Karyn Williams?
A. I don't recall.
Q. Did you ever discuss any requests for fitness for duty evaluations with Karyn Williams?
A. I don't recall.
Q. Did Karyn Williams have -- other than receiving the memo from Matthew Burke -- I think it's Matthew Burke, did Karyn Williams have any involvement in John Nawara's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you know if Ms. Williams made any decisions related to John's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:39:58
Q. Did you -- did I ask you this? Maybe not in

these words. I'm going to ask it again, I'm sorry. Did you have -- did you consult Ms. Williams regarding John's case?

A. I did not.

Q. Did you send any emails or memos to Ms. Williams regarding John's case?

MS. MARMOR: Objection. Lack of foundation, and the record will speak for itself.

A. I don't recall.

Q. Are you familiar with the concept of informed consent?

MS. MARMOR: Object to the form.

A. Yes.

Q. What is -- what is it?

A. That a person is giving consent based on the information that's provided to them.

Q. And when is -- in the practice of your profession, when does this come into play, informed consent?

MS. MARMOR: Same objection.

A. In -- when I think of an informed consent in -- in the practice of nursing, I usually think of it inform of treatment or procedures.

Q. By the way, just digressing just a little bit, have you ever heard of nursing diagnoses?

MS. MARMOR: Object to the form. 2:41:33
A. No.
Q. In the practice of nursing, do you know if informed consent is required for a psychiatric fitness for duty evaluation?
MS. MARMOR: Object to the form. Lack of foundation.
A. I don't know.
Q. Do you know if informed consent is required for a fitness for duty evaluation period?
MS. MARMOR: Same objection.
A. I don't know.
Q. Based on the information that you had at the time that you made the assessment that John should undergo a fitness for duty evaluation, what was it that you determined would make John need that evaluation?
MS. MARMOR: Objection. Asked and answered.
A. His behavior. 2:42:52
Q. What was --
A. His behavior.
Q. Other than that?
A. His behavior was 95 percent.
Q. What was the five percent?
A. Probably the write-up from his supervisor.
MR. BUSTAMANTE: Okay. I just need about two

minutes to consult with my co-counsel and --
MS. MARMOR: Sure.
MR. BUSTAMANTE: -- we're getting done. Okay?
RECORDER: Yep. Off record, 1:06 p.m.
(Off the record)
RECORDER: On record, 1:13 p.m.
Q. Ms. Shelby, have you ever seen Exhibit 11 before?
A. I'm sorry?
Q. Have you ever seen this document before?
A. I believe so.
Q. Okay. Was this sent to you on or about the date it bears?
MS. MARMOR: I don't think it actually bears a date. It just --
MR. BUSTAMANTE: It has --
MS. MARMOR: -- has the date of the exam.
MR. BUSTAMANTE: -- "date of report, 9/16/17."
MS. MARMOR: Oh, okay. Yeah.
A. I don't know. 2:44:01
Q. Okay. What was your reason for seeing this document?
A. Because I would have received it because it

would say if the person was fit to -- to return to work.

Q. You would have received it if it said he was fit to return to work or whether he -- they said he was not fit to return to work, you would have seen it as well, correct?

A. Correct.

Q. All right. So this is some -- a report that is then sent to you as the -- as the nurse for -- I forget what your title was?

A. Occupational health nurse.

Q. Occupational, yes, health --

A. Yes.

Q. -- services?

A. Health nurse.

Q. This was something that was sent to you because you were the nurse?

A. Yes. 2:44:40

Q. Okay. And I want to direct your attention to page CCSO 000113.

A. Okay.

Q. Would you please read into our record the response to number six?

A. "As described above, unfortunately, I cannot accept as fact what was summarized by human resources

seven weeks after the 9/26/2016 incident. Notwithstanding this issue, if indeed the incident transpired as Superintendent Jones-Hayes described, such transgressions of the code of conduct ought to be addressed through discipline, as it is not -- as it is my opinion that Officer Nawara was not suffering from any mental illness or other condition in need of treatment at the time of 9/26" -- I mean, "9/29/2016 incident that would account for such behavior. That is to say if he, in fact, conducted himself disrespectfully and threaten -- threateningly to Superintendent Hayes on 9/29/2016, treatment would not have been relevant in his particular case. Discipline is the best course of action going forward should such -- should any such behavior recur."

Q. And who signs this report? 2:46:32

A. The provider who's doing the assessment.

Q. And -- and the name is?

A. This one here is Diana S. Goldstein.

Q. A PhD, correct?

A. PhD, yes.

Q. And is she an independent evaluator?

A. Yes, she is.

MR. BUSTAMANTE: Okay -- she already said that.

MR. LINDEN: No, she -- okay.
MR. BUSTAMANTE: She already -- that's --
MR. LINDEN: Okay.
MR. BUSTAMANTE: -- the first thing she said.
MR. LINDEN: Okay. My bad. I don't remember.
MR. BUSTAMANTE: Okay. Anything else, Rick?
MR. LINDEN: No.
MR. BUSTAMANTE: Okay. You're done.
MS. MARMOR: Great. Thank you.
MR. BUSTAMANTE: Any questions?
MS. MARMOR: Oh. No, none. No. And we'll --
MR. BUSTAMANTE: Okay.
MS. MARMOR: And we'll reserve signature.
MR. BUSTAMANTE: Okay.
RECORDER: Off record, 1:16 p.m.
MR. BUSTAMANTE: So next one is Mr. Burke, I believe --
MR. LINDEN: Yeah, I told you --
MS. MARMOR: I think it's --

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Katie Jasinski

September 30, 2019