# EXHIBIT 3

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON and WINIFRED SHELBY in their individual capacities,<br><br>Defendants. | Case No. 1:17-cv-02393<br><br>Judge Rebecca R. Pallmeyer |

**DECLARATION OF JOHN NAWARA**

John Nawara declares under penalty of perjury the following:

1. I am the Plaintiff in this case.

2. This declaration is based on personal knowledge.

3. I was hired by the Cook County Sheriff's Office ("Sheriff's Office") on September 28, 1998 and am currently employed by the Sheriff's Office.

4. From September 28, 1998 until 2019, when I received a promotion to the position of Sheriff's Police Officer, I was a Correctional Officer for the Cook County Department of Corrections.

5. On September 28, 2016, I was assigned to guard detainees in the basement of Cermak Hospital at 2800 South California Avenue, Chicago, IL 60608. Cermak Hospital is part of Cook County Jail and it provides medical services to incarcerated detainees.

6. On September 28, 2016, at approximately 10:30 a.m., I was involved in an

incident involving Superintendent Karen Jones-Hayes in the basement area of Cermak Hospital, which resulted in me filing a complaint against Superintendent Jones-Hayes. I was never disciplined as a result of the September 28, 2016 incident.

7. On September 29, 2016, I was transferred to External Operations. I worked in External Operations until November 18, 2016. My duties in External Operations required me to carry a firearm.

8. On November 18, 2016, I was told by my supervisor to report to the Sheriff's Bureau of Human Resources.

9. On November 18, 2016, I met with Rebecca Reierson and Winifred Shelby at Human Resources. I was told I would have to undergo a fitness for duty evaluation and I was provided with two forms for the release of my medical records. A true and correct copy of these forms are attached as Exhibits 2 and 3 to Plaintiff's Statement of Uncontested Facts in Support of the Motion for Partial Summary Judgment.

10. I was told that I could not complete the fitness for duty process and would not be able to return to work unless I signed and returned both of these forms (Exhibits B and C) to Human Resources.

11. I refused to sign the forms because I believed the forms were unlawful and violated my privacy rights. I did not believe it was lawful for the Sheriff's Office to require me to sign forms that authorized the release of all my medical records to the Sheriff's Office and which had no limitations as to time or scope.

13. The Sheriff's Office did not allow me to return to work until September 27, 2017.

14. From November 2016 until September 27, 2017, I lost more than $50,000 in pay and benefits as a direct result of not being allowed to work.

15. From November 2016, until approximately April or May 2017, I was forced to use accrued benefit time in order to receive a paycheck.

16. In or about April or May 2017, my accrued benefit time ran out, and I received no pay from the Sheriff's Office from approximately April or May of 2017 until I was authorized to return to work on or about September 27, 2017.

17. I would have submitted to a fitness for duty exam with a provider chosen by CorVel in November 2016 had the Sheriff's Office not required me to sign the release forms.

Further affiant sayeth naught.

John a. Nawara
John Nawara

Dated: October 22, 2019

# Exhibit 2

Cook County SHERIFF

## AUTHORIZATION TO RELEASE HEALTHCARE INFORMATION

Patient's Name: ______________________ Date of Birth: ______________________

Previous Name: ______________________ Social Security #: ______________________

I request and authorize ______________________ ______________________ to release healthcare information of the patient named above to:

Name: ______________________ Cook County Sheriff's Office
Winifred Shelby, RN, COM, South Campus Bldg. 2
Address: ______________________ 3026 South California Avenue
Chicago, IL 60608

City: ______________________

This request and authorization applies to:

☐ Healthcare information relating to the following treatment, condition, or dates: ______________________

______________________

X All healthcare information

☐ Other: ______________________

**Definition:** Sexually Transmitted Disease (STD) as defined by law, RCW 70.24 et seq., includes herpes, herpes simplex, human papilloma virus, wart, genital wart, condyloma, Chlamydia, non-specific urethritis, syphilis, VDRL, chancroid, lymphogranuloma venereuem, HIV (Human Immunodeficiency Virus), AIDS (Acquired Immunodeficiency Syndrome), and gonorrhea.

☐ Yes ☐ No I authorize the release of my STD results, HIV/AIDS testing, whether negative or positive, to the person(s) listed above. I understand that the person(s) listed above will be notified that I must give specific written permission before disclosure of these test results to anyone.

☐ Yes ☐ No I authorize the release of any records regarding drug, alcohol, or mental health treatment to the person(s) listed above.

Patient Signature: ______________________ Date Signed: ______________________

THIS AUTHORIZATION EXPIRES NINETY DAYS AFTER IT IS SIGNED.

tabbies EXHIBIT Rejerson 1 9/20/19 GD

# Exhibit 3

## HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION

I, ____________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

____________________________ ____________________
Printed Name (of person giving authorization) Social Security Number

____________________________ ____________________
Signature of person giving authorization Date

EXHIBIT
tabbies
Reiferson 2
9/20/19 GD

Signed ____________________________
***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel.

# Exhibit 4

# SHERIFF'S OFFICE OF COOK COUNTY
## OFFICE OF PROFESSIONAL REVIEW
## COMPLAINT REGISTER

**Complainant Information**

| NAME (Last, First, M.I.): | AGE: | DATE OF BIRTH: | HOME #: |
|---|---|---|---|
| Jones-Hayes, Karen | N/A | N/A | [redacted] |

| HOME ADDRESS: | CITY: | WORK/OTHER #: |
|---|---|---|
| 2700 S. California | Chicago | 773-674-3813 |

| STATE: | ZIP CODE: | STATE I.D./D.L. #: | STATE OF ISSUANCE: |
|---|---|---|---|
| Illinois | 60608 | | |

**I HAVE BEEN NOTIFIED THAT, PURSUANT TO 50 ILCS 725/3.8(b), ANYONE FILING A COMPLAINT AGAINST A SWORN PEACE OFFICER MUST HAVE THE COMPLAINT SUPPORTED BY A SWORN AFFIDAVIT.**

**Complainant Information**

| DATE OF INCIDENT: | TIME OF INCIDENT: |
|---|---|
| 28 September 2016 | 1045 hrs. |

LOCATION OF INCIDENT:

Basement control and Staging area

PROVIDE NAMES, BADGE NUMBERS, SQUAD NUMBER or LICENSE PLATE, and/or PHYSICAL DESCRIPTION OF THE OFFICER AGAINST WHOM YOU WISH TO FILE A COMPLAINT:

Officer John Nawara JDE# 378032, Star no. 15012 , detailed to Cermak on the 7-.3 shift.

**Witnesses**

ARE THERE ANY WITNESSES YOU WISH TO BE CONTACTED DURING THE INVESTIGATION? ☐ YES ☐ NO
IF YES, PROVIDE CONTACT INFORMATION.

| NAME | ADDRESS/CITY/STATE/ZIP | HOME PHONE # |
|---|---|---|
| Officer B. Gannon | 2700 S. California Chicago, Il 60608 | [redacted] |
| Sgt. T. Conley | 2700 S. California Chicago, Il 60608 | [redacted] |
| | | |
| | | |
| | | |

**Narrative**

PROVIDE A FULL DETAILED ACCOUNT OF YOUR COMPLAINT AND THE NATURE OF THE INCIDENT.

At 1045 Hrs on September 28, 2016 R/Supt. Hayes #271 made rounds in the basement of Cermak Health Services. Upon my arrival to the basement I observed the basement control door ajar; this is a violation of the directive put in place by me for security reasons. R/Supt Hayes entered the area and observed 3 Officers, I was unable to initially identify who they were due to their backs being to the entrance. R/Supt Hayes then tapped officer Nawara on the back top of his shoulder to gain his attention. Officer Nawara turned to faced me at which time I knew he was an assigned Cermak officer. Officer Gannon then turned to face me and I asked her who was the officer on the computer. Officer Turrisse then turned as I tapped him on the shoulder to see who he was and explained that he was doing a report for an incident that had just occurred.

■ CONTINUED ON REVERSE

FOR OFFICE USE ONLY
DATE COMPLAINT RECEIVED: ____________ RECEIVED BY: ____________

IAD/IG #: ____________



CCSO_000003

**Complaint Narrative (Continued)**

I began to ask Officer Nawara why were all the detainees in the staging area not cuffed to the rear as per my directive for this area. He began saying, "I can only do what I can do with the resources I have." I asked Officer Gannon the same question she stated it was busy and they didn't get to it. I then turned to Officer Nawara who is assigned to staging as well as responsible for ensuring the cuffing policy is followed, why are the detainees not cuffed to the rear? As I was addressing both him and Officer Gannon my hand touched his left shoulder, Officer Nawara began screaming, "don't touch me, don't touch me lady, don't put your hands on me period." Officer Nawara was exuding such rage it startled me and I was really taken by surprise. I immediately stepped back and and said, "if I offended you by inadvertently touching your shoulder I apologize, I will not make any kind of contact with you again officer," to get him to calm down. I gave directive to officer Nawara to report to staging and make sure the detainees were properly cuffed. He exited the basement control area and I went into the ER.

Moments later, Officer Nawara entered the ER screaming at R/Supt Hayes, "this is what I am talking about this fucking inmate just jumped in my face because I told him he had to be shackled. I am not dealing with this crap." I exited the ER and Officer Nawara followed me out with his voice still elevated telling me he don't have time for this shit. I asked Sgt. Conley to assist me in the staging area to locate this detainee that officer Nawara was speaking about. I turned and asked officer Nawara, "where is the detainee?" He had no idea at the time, a few moments later he noticed the detainee in the rear of staging. I asked the detainee to come to where I was standing, he complied. I then informed the detainee that he would be shackled and to have a seat where I pointed and he complied. I then gave Officer Nawara an order to shackle the detainee and I walked away. As I walked away Officer Nawara continued to antagonize me stating, "yeah why don't you walk around with me all fucking day so I can do my job." I replied, "No Officer Nawara I will not walk with you all day, but you will do the job you are being paid for." I then exited the area and directed the shift commander to follow up with the officers in the staging area to make sure all detainees were secured properly. (DIV8.CERMAK.CAMERA0.002)

**PLEASE BE AWARE THAT IF YOU ALLEGE INJURIES AS A RESULT OF THIS INCIDENT, DUE TO FEDERAL PRIVACY LAWS ON THE RELEASE OF MEDICAL RECORDS, YOU MUST PROVIDE COPIES OF YOUR RELEVANT MEDICAL RECORDS REGARDING ANY EXAMINATION OR TREATMENT TO THE SHERIFF'S OFFICE INVESTIGATING UNIT TO BE MADE PART OF THE INVESTIGATION.**

**I have read this statement that I have voluntarily made, consisting of ____ pages, and I solemnly swear that the facts and allegations contained within are true and correct to the best of my knowledge.** Supt. Karen Jones Hayes
**(Print Name)**

**Complainant's Signature:** [signature] **Date:** 28 September 2016

**State of Illinois )**
**County of Cook )**

**Signed and sworn to before me on** 9/28/2016 **by** Karen Jones-Hayes
**(date)** **(name of person making statement)**

"OFFICIAL SEAL"
LOUISE RODRIGUEZ
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 07/22/2017

[signature]
**(signature of notary public)**

**A person commits PERJURY when, under oath or affirmation, in a proceeding or in any matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. PERJURY IS A CLASS 3 FELONY.**

Please mail your completed, **signed and notarized**, complaint form to:

**Cook County Sheriff's Office of Professional Review**
3026 S. California
Chicago, IL. 60608

CCSO_000004

CCSO_000004

# Exhibit 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-------------------------------------------------------

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

-------------------------------------------------------

Deposition of Rebecca Reierson

Confidential - Deposition of Rebecca Reierson (7, 9)

Friday

September 20th, 2019

-at-

Law Office of Peter V. Bustamante

17 North State Street

Suite 1550

Chicago, Illinois

A. There is a counsel position and a senior counsel position.
Q. And who would be the next person up from a senior counsel?
A. Deputy general counsel.
Q. Would anybody be higher than the deputy general counsel?
A. There was also a general counsel. 0:09:46
Q. And you left the park district in 2004?
MR. BUSTAMANTE: '06.
A. Two thousand --
MR. BUSTAMANTE: Sorry.
A. I was --
MR. LINDEN: Swear -- swear the witness in.
A. I left in two thousand --
Q. It would be '06 I believe --
A. -- sorry, '16.
Q. '16? 2006 or 2016?
A. 2016.
Q. So you worked for 12 years for the park district?
A. I did.
Q. Oh, okay. And in 2016, did you go to the sheriff's office?
A. Yes.

Q. Okay. And that was the Cook County Sheriff's Office that you're employed with?
A. Yes.
Q. What was your first position in 2016 with them?
A. Leave and absence manager.
Q. What is a leave and absence manager?
A. You direct the employee services department, which is a department within the bureau of HR, and that department handles employee leaves, return to work issues, light duty, things like that.
Q. Do you recall when in 2016 you got hired? 0:11:04
A. I think I started August of 2016.
Q. So you had only been there a couple of months when the Nawara incident happened in September of '16 --
A. Yes.
Q. -- correct? Who was your immediate supervisor in 2016?
A. Karyn Williams.
Q. Was she an HR person, Karyn Williams?
A. Yes, she was the executive director of human resources.
Q. And how do you spell Karyn?
A. K-a-r-y-n.

A. We met for maybe two hours, three hours.
Q. And did you review any documents in preparation for today's deposition?
A. Yes. 0:28:03
Q. What documents did you review?
A. My -- the notice calling me as a witness for the deposition, correspondence that I've sent in this case. I -- I also answered questions, like, along the -- the way through the lawsuit, so I reviewed those also.
Q. You mean answers to interrogatories?
A. Yes, thank you.
Q. Okay. Anything else that you recall?
A. Not that I recall.
Q. Did you review any photographs?
A. No.
Q. Any videotapes?
A. No.
Q. No videos?
A. No. 0:28:59
Q. Any pleadings at all, aside from the answers to interrogatories?
A. Only my own.
Q. Okay. What is a fitness for duty exam?
A. The fitness for duty exam itself is when an

employee meets with an independent doctor to be evaluated for their fitness essentially to perform their job functions for the sheriff's office.

Q. Is it any employee within the sheriff's office that could be subject to a fitness for duty exam?

A. Yes. 0:29:50

Q. Do you know if there are any policies and procedures regarding fitness for duty exams in 2016 within the sheriff's office?

MS. MARMOR: Object to the form.

A. There were procedures that we followed.

Q. Do you know if there are written procedures regarding fitness for duty exams?

A. I don't know if -- if there were.

Q. Do you know either way if there were?

A. I -- I do not know if there were.

Q. Do you know what the procedures were in 2016?

A. Yes.

Q. And what were the procedures? 0:30:34

A. The department of HR would receive a referral, typically from an employee's department where they worked or from OPR regarding an incident involving an employee, could be an arrest, something like that, that, you know, would raise concern about whether or

not the employee would be able to continue working based on the incident that had occurred.

Q. Who had the authority to make a referral to HR for a fitness for duty?

A. It typically came from the department head, from DOC, or from one of the supervisors in OPR.

Q. Did each of those people have authority to -- to make a referral?

A. You know, I -- I don't know that there was -- it was specifically outlined who was allowed to make a referral. I mean, in general, you know, anyone who became aware of a potential issue should refer it to HR.

Q. Okay. And once HR got a referral, would it be automatic that it would be ordered or would somebody have to make a decision whether or not that employee is going to be ordered for a fitness for duty exam?

A. It -- it wouldn't be automatic. The employee would come to HR and meet with the occupational health nurse and -- and with me also, we'd meet with the employee together.

Q. Would it always be with the nurse and yourself for a fitness for duty exam? And I'm talking about 2016.

A. Yeah, I -- I believe there was one that might

have taken place in my absence, and I think it was the director of risk management who sat in with the nurse at that time.

Q. And do you know who that would have been?

A. Michele Morris, one L. 0:32:19

Q. Do you know if she had anything to do with John Nawara?

A. No, she did not.

Q. And did HR have the nurse working in HR?

A. Yes.

Q. And how many occupational nurses were there in HR?

A. One.

Q. And who is that person?

A. Winifred Shelby.

Q. Can you spell the first name?

A. W-i-n-i-f-r-e-d.

Q. Did Ms. Shelby report directly to you?

A. She did. She reported to me. I signed her timesheet, but she -- she reported to me and to the executive director of HR.

Q. Do you know what Ms. Shelby's title was within the sheriff's office?

A. Occupational health nurse.

Q. Is she there -- still there as an

occupational health nurse?

A. No, she's not.

Q. Do you know when she left the sheriff's office?

A. I believe she left in 2017.

Q. And she was involved with John Nawara, correct?

A. Yes. 0:33:24

Q. So the procedure was you'd call the -- I'm not talking about John Nawara specifically, but the procedure in 2016 is you'd call the person into HR, correct, the employee?

A. Yes.

Q. And then you and the nurse, Ms. Shelby, would meet with that person?

A. Yes.

Q. And what would be the purpose of that meeting?

A. We'd just try to get a sense from the employee about what occurred that led to the referral, and you know, it -- it would depend on what the exact situation was, but if, you know, someone was -- was struggling, we'd make sure they had, you know, resources if they needed them, a support system if that was necessary based on the situation, or you know,

relevant doctors' notes if someone were having a medical issue that appeared to make them unable to do their job, and at -- we would just meet with the employee, kind of gather information on the situation, and assess whether we thought the employee could actually return to work.

Q. Would you also meet with the person making the referral?

A. No. 0:34:37

Q. Would you talk to the person making the referral?

A. If we needed additional information, yes.

Q. So would you get the employee's side of the story if it's an incident that allegedly happened?

MS. MARMOR: Which --

A. Which --

MS. MARMOR: I'm sorry. Object to the form. I didn't -- we both had the same question.

MR. LINDEN: No, it wasn't the best question, but --

Q. Would -- would you -- like, in John Nawara's case, Jones-Hayes accused him of an incident in September of '16, correct?

A. Yes.

Q. In a case like that, not just with John

Nawara, but in a similar type of case, would you get the employee's side of the story of what happened before a fitness for duty exam would be ordered?

MS. MARMOR: And -- and I have the same objection because both people are employees, and so which employee are you talking about? You see the problem?

MR. LINDEN: A case like John Nawara, not John --

MS. MARMOR: Right.

MR. LINDEN: -- Nawara.

MS. MARMOR: But are you talking about would you get Mr. Nawara's or Ms. Jones-Hayes' side of the story? That's the --

MR. LINDEN: Okay. Let me --

MS. MARMOR: -- that's the --

MR. LINDEN: Let me -- let me -- I -- I can do this better.

Q. Okay. Who has the authority to order a fitness for duty exam?

A. You mean once the referral has come to HR?

Q. Yeah. 0:35:46

A. Who can then --

Q. Once you interview the employee and bring them in.

MR. BUSTAMANTE: Interrupt --
WITNESS: Oh.
A. The occupational health nurse would then send the referral to CorVel, which was our independent third party company.
Q. Okay. But who would make the decision that the employee has to undergo a fitness for duty exam?
A. The nurse and I would make it together.
Q. Would it be a joint decision?
A. Yes.
Q. Would you have to both agree on it, or can one of you say yes, another one say no, or how did that work?
A. I don't recall a time that we disagreed. If we initially had a disagreement, we would talk it through. In the end, I don't recall anyone ever being sent when one of us thought it was necessary and the other one didn't.
Q. Did you have the authority yourself to order a fitness for duty exam of an employee?
A. If -- if the nurse wasn't in agreement?
Q. Yeah, let's -- let's assume the nurse did not agree, did you have authority by yourself to order a fitness for duty exam?
A. It's not a situation that ever came up. 0:36:52

Q. Did you feel like you had the authority to order a fitness for duty exam?
MS. MARMOR: Objection. Calls for speculation.
A. I -- I would not do it on my own.
Q. Okay. In Mr. Nawara's case, he came in for an interview in November of 2016, correct?
A. Yes.
Q. And you met with Mr. Nawara, along with Ms. Shelby, correct?
A. Yes.
Q. And between the two of you, did you agree that Mr. Nawara would be ordered for a fitness for duty exam?
A. Yes.
Q. And you, along with Nurse Shelby, ordered a fitness for duty exam, correct?
A. We agreed that he should have one, yes.
Q. So between the two of you, you both had the authority to order Mr. Nawara to undergo a fitness for duty exam. Is that fair?
A. Yes. 0:37:45
Q. Okay. Would the referring person have the authority to order a fitness for duty exam?
A. Someone from outside of HR?

Q. Yes.
A. No.
Q. Like in this case, you said, I think, Matthew Burke made the referral for John Nawara, correct?
A. I believe so, yes.
Q. In 2016, could Matthew Burke order that fitness for duty exam be ordered for Mr. Nawara?
A. No, we would always have to meet with the employee in HR.
Q. Did Mr. Burke ever tell you that aside from a referral, that he should be ordered for a fitness for duty exam?
A. Aside -- no, no. 0:38:39
Q. Did you ever talk to Mr. Burke regarding John Nawara after you got the initial referral?
A. I don't believe so, other than he might have assisted me reaching the superintendent to get further information on the incident.
Q. And do you recall specifically going to Mr. Burke to get information from Jones-Hayes?
A. I -- I don't recall.
Q. Do you recall any involvement other than that you may have gone to him for assistance to get information with respect to John Nawara?
A. No, nothing other than putting us in touch.

Q. Do you recall any pertinent conversations you had regarding John Nawara other than just getting in touch with Superintendent Jones-Hayes?
A. With Matt Burke?
Q. Yes. 0:39:37
A. I don't.
Q. Do you know what criteria go into making decision whether or not the employee should be ordered for a fitness for duty exam?
A. It's essentially whether or not the employee presents in a way and the incident is such that Nurse Shelby and I believe that it would be best to have the employee evaluated before being returned to work.
Q. Do you recall any other criteria in 2016?
A. No. 0:40:27
Q. Do you recall any written criteria in place for fitness for duty exams?
A. If -- for us sending someone for a fitness for duty exam?
Q. Yes.
A. No.
Q. How specifically -- specifically did you go about making a decision whether or not to order the employee for a fitness for duty exam?
A. What do you mean?

Q. Mean you meet with the nurse, Ms. Shelby, and would you two meet and come -- try to come to a consensus whether or not that employee should be ordered to it?

A. So after we met with the employee, then we would talk amongst ourselves and try to come to a determination.

Q. Would it be typically that day that -- when you met with the employee that you would discuss it with Nurse Shelby?

A. Yes. 0:41:23

Q. And if you came to a determination where a fitness for duty exam should take place, what would be the next step?

A. We would inform the employee about what the procedures are, you know, the reason why we were recommending the employee go, and just kind of the procedural steps. Nurse Shelby would explain what the appointments are like, depending on whether it was a medical fitness for duty or a psychological fitness for duty, and she would assist, you know, and answer any questions the employees might have about the process.

Q. And would the employee receive written notice that he or she was required to do this?

A. They would -- the employee would receive

documentation regarding their medical records, but I don't believe the nurse gave a document to the employee.

Q. Would they be given the name of the person they should contact to have this exam?

MS. MARMOR: Object to the form. 0:42:36

A. I'm sorry, I'm -- I'm just -- I apologize, I'm just trying to remember if there was, like, a letter that the nurse would -- would give the employee, and I -- I can't recall at this time. But they would be informed either via letter or you know, also verbally from Nurse Shelby that, you know, CorVel was our third party administrator, that someone would be reaching out from CorVel to facilitate the process of, you know, gathering the medical records and setting an appointment.

Q. Okay. Who is CorVel, do they have a formal name company?

A. I believe that is their formal name.

Q. And what type -- is it a medical provider, CorVel?

A. We -- I don't know all of what they do, but we use them as a third party administrator to select an independent provider to conduct the fitness for duty exams.

Q. So in 2016, did you always use CorVel?
A. Yes. 0:43:29
Q. And would CorVel actually conduct the evaluation?
A. No, they would locate a provider and kind of coordinate getting the medical records to the provider, set up the appointment, notify the employee of when the appointment was scheduled. They would receive any documents that came from the independent medical provider also.
Q. Was there a list of medical providers that were approved to do these type of evaluations?
A. Not from the sheriff's office, no.
Q. That would be strictly done by CorVel?
A. Yes.
Q. Have you ever heard the name of a Dr. Kroll or Kroll, K-r-o, double L?
A. Not that I recall.
Q. Okay. I think you indicated that the procedures would depend on whether it's a medical or a psychological type referral?
A. Yes. 0:44:34
Q. Okay. What would be the difference between a medical referral versus a psychological referral?
A. Typically, a medical referral results in a

A. Yes.
Q. And psychological, they'd be sent to either a psychologist or a psych -- a psychiatrist?
A. Yes.
Q. And you talked about medical authorization forms, would that be done for every employee that would be sent for a fitness for duty?
A. Yes.
Q. And did you have forms within HR for the employee to give his consent for a medical release?
A. Yes.
Q. What type of forms were they, were they general forms?
MS. MARMOR: Object to the form. 0:53:00
MR. LINDEN: No -- no -- no -- no -- no pun intended.
MS. MARMOR: No pun indeed.
Q. Do you understand the question?
A. I do. One form was for the employee to complete to go to their doctor, so that -- it was a release, essentially, for the doctor to -- to release their medical documentation or their medical file, and then another one was for the final fitness for duty report to be released to the sheriff's office.
Q. Would it be two separate releases the

11:15 a.m.

MR. LINDEN: Yeah, what they do, they --

(Off the record)

Q. I have shown you what --

RECORDER: Back on --

MR. BUSTAMANTE: Wait.

RECORDER: Back on the record, 11:17 a.m.

MR. BUSTAMANTE: Okay.

Q. I -- I've shown you what's been marked as Reierson Number 1, do you recognize this document?

A. Yes.

Q. And what is this document?

A. This is a document -- it's very blurry. This is a document that would be filled out and given to the employee's health care provider in order to release their medical information for a fitness for duty examination.

Q. Okay. You said this form would be filled out, who would fill this -- this form out?

A. It could be filled out by the employee or by Nurse Shelby.

Q. It's got a spot on top that says, "Patient's name"?

A. Yes. 1:00:57

Q. And it's got the date of birth for the

patient, correct --
A. Yes.
Q. -- spot? And Social Security?
A. Yes.
Q. And this is a form in use in 2016?
A. Yes.
Q. And this is actually the form given to Mr. Nawara to sign, correct?
A. Yes.
MS. MARMOR: Object to the form.
Q. Okay. The answer is yes?
A. Yes.
Q. So when this form was given to Mr. Nawara, the only part that was filled out was second box checked that reads "all health care information," correct?
A. I don't know what this specific -- what was checked on the specific form he got. It is checked on this form.
Q. Okay. If I represent to you that this is a form, I can show you other communications that came, but this box was checked, do you know who checked this box?
A. I do not. 1:01:59
Q. Do you know why none of this -- any of the

other information on this form was not filled out before it was given to Mr. Nawara?
A. So typically, it's kind of an interactive process when we meet with employees to determine if it would be necessary for them to undergo a fitness for duty, but Mr. Nawara was not cooperative, and so you know, normally, the nurse would talk to the employee and gather their providers' names and things like that and assist with completing the forms and explaining them, we just didn't have the opportunity with Mr. Nawara.
Q. Did you ask Mr. Nawara in November of '16 to complete this form in your presence?
A. I don't believe so. I don't believe we got to that point with him.
Q. Was there anything that prevented you or Ms. Shelby from putting the patient's name on this document?
A. No, not necessarily. 1:03:04
Q. And I take it being in HR, you either knew his date of birth or you had access to his date of birth?
A. Yes.
Q. So you or Ms. Shelby could have filled in the date of birth, correct?

A. Yes.
Q. And same thing when applied to the Social Security number?
A. Yes.
Q. And if there is a previous name, the sheriff's office would have known his previous name, correct?
A. Perhaps.
Q. Okay. It's got a spot here, it says, "I request and authorize," blank, "to release health care information of the patient named above," and who would -- this was blank what it was given to Mr. Nawara, correct?
A. Yes. 1:03:51
Q. Do you know why nothing was filled in when it says, "I request -- I request and authorize," blank, "to"?
A. Well again, this is a form that is kind of completed along with the employee while you are meeting and talking with the employee, so because we didn't get to that point with Mr. Nawara, the form wasn't completed with him like it would be in most circumstances.
Q. Would it typically be filled in -- who was the provider, Corell (sic)?

MR. BUSTAMANTE: CorVel.
MS. MARMOR: Object to the form. CorVel.
MR. LINDEN: CorVel.
Q. Would CorVel typically be the one authorized to receive the information when you were at HR in 2016?
MS. MARMOR: Object to the form and assumes facts not in evidence.
A. So this line that you're talking about would be where the provider's name would go, so you're authorizing the provider to release the information.
Q. Okay. And the provider in this case would have been CorVel, correct?
MS. MARMOR: Objection. Mischaracterizes her testimony. 1:04:52
Q. And -- and if I'm not stating it accurately, you know, please tell us.
A. So there's -- there's one form that authorizes a release to the sheriff's office, and there's one that allows the medical provider to release the records to CorVel. I would have to see the other one next to this, I guess, to differentiate.
Q. Who -- who would you typically put in this blank of this form, if you know --
A. I -- I didn't --
Q. -- in 2016?

A. Oh, I'm sorry. I didn't complete these forms, the nurse did.
Q. Okay. Do you know what the standard procedure would have been in 2016 on this specific form, if it would have been the sheriff's office to be filled in this blank or the provider?
A. Again, I'd have to see the other form to kind of have a frame --
Q. Okay.
A. -- of reference for this one.
Q. Okay. Let me show you what's been -- or is marked as Exhibit Number 2.
MS. MARMOR: Reierson Exhibit 2? 1:06:01
Q. And I just ask you, tell us what it is?
A. It says, "HIPAA authorization for disclosure of protected health information."
Q. And this is the other form that you're referring to?
A. Yes.
Q. Okay. By looking at this form and going back to my prior questions regarding Exhibit Number 1, can you tell on Exhibit 1 who the entity or -- should have been in the blank, that "I request and authorize," blank, "to release health care information"?
A. Yes, so this would be the employee

Q. I'd like to show you Exhibit Number 4 and ask you if you recognize Exhibit Number 4.
A. Yes. 1:31:38
Q. And what is Exhibit Number 4?
A. This was the referral that came from DOC requesting that we meet with Officer Nawara.
Q. Okay. And that was from Matthew Burke, comma, chief of staff?
A. Yes.
Q. And does that refresh your recollection what position Mr. Burke held on 9/29/16?
A. Yes, I guess he was chief of staff.
Q. Would that be chief of staff for the sheriff or just chief of staff within DOC?
A. DOC.
Q. So each department would have its own chief of staff?
A. I'm not certain.
Q. Do you know whether or not Mr. Burke had any communications with Ms. Hayes?
A. I don't.
Q. Do you where Ms. -- Mr. Burke got his information that a referral should be made to HR?
A. I do not. 1:32:39
Q. And this form says, "Pursuant to the attached

documentation, I am requesting that Officer John Nawara, employee number" -- goes on to say, "be evaluated for fitness for duty," do you know what the attached documentation was?
A. I believe the statement from the superintendent about the incident with Officer Nawara.
Q. Okay. And I see there is two people copied here, Nneka Jones Tapia --
MS. MARMOR: Nneka.
MR. LINDEN: Nneka? I'm sorry.
Q. Says, "Executive director," do you know was she executive director of DOC?
A. Yes, she was.
Q. And Tarry Williams, DOC chief of operations. Other than being cc'd on this referral, do you know of any involvement these two people had with John Nawara?
A. No. 1:33:43
Q. Is it common for the executive director and DOC chief of operation be copied on these type of letters, if you recall?
A. I don't know if they're typically copied or not. Probably.
Q. Does it mean anything to you that they are copied on this one?
A. No. I mean, only that Matt was just, you

know, keeping his supervisors in the loop.
Q. Okay. So would it typically go from -- in 2016, would Karyn Williams typically assign these to you?
A. Yes.
Q. Would Karyn Williams typically make the decisions for fitness for duty evaluations, or would she delegate that to you?
A. What do you mean, make the decisions for them?
Q. You indicated that you and Ms. Shelby made the decisions whether or not the employee should be required to undergo a fitness for duty exam, correct?
A. Yes. 1:34:46
Q. Would Ms. Williams have had the authority to make those determinations in 2016?
A. Oh, I don't know. She really wasn't involved in the process in that way. It would be more referring the cases to me and to the nurse.
Q. And that's what happened with Mr. Nawara, she basically referred it, stepped aside, and let you do the work with Ms. Shelby?
A. Yes.
Q. Okay. Do you know of any information if we talk to Ms. Williams that she'd have regarding

knowledge to this case?

MS. MARMOR: Objection. Calls for speculation.

A. I do not know.

Q. You don't know of any knowledge that she'd have, correct?

A. Yes. 1:35:33

Q. Do you know whether or not Ms. Hayes filed a complaint against Mr. Nawara?

A. I don't.

Q. Do you know whether or not Mr. Nawara was ever disciplined?

A. No, I don't know.

Q. You don't know either way? Do you have any information to indicate that Mr. Nawara was ever disciplined for the alleged incident that occurred in September?

A. I don't know if he was or not.

Q. Do you know whether or not OPR ever investigated what Ms. Hayes says occurred back in September of '16?

A. I don't know if they investigated. 1:36:38

Q. Do you know -- do you know of any conclusions by OPR regarding what happened that day?

A. I don't.

Q. Do you know whether or not John Nawara, prior to meeting with you in November, filed any type of complaint against Ms. Hayes?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't know.
Q. Okay. I want to show you --
MR. LINDEN: Exhibit 5?
MS. MARMOR: Yeah.
Q. Going to hand you Exhibit 5.
MS. HONINGFORD: Thank you.
MR. LINDEN: I think a couple of these, we might have one less Exhibit.
MR. HENRETTY: Exhibit 5 --
MS. MARMOR: Oh, goodness.
MR. LINDEN: So far or not --
MR. HENRETTY: -- have --
MR. LINDEN: -- too bad.
Q. Do you recognize Exhibit Number 5?
A. No, I don't. 1:37:51
Q. Have you ever seen Exhibit 5 before today?
A. No, not that I recall.
Q. Have you ever seen this type of form before when you worked for the sheriff's office?
A. Yes.
Q. And what type of form is it?

Q. Yes. You would agree that based upon assuming what Mr. Nawara said is true in Number 5, I know you don't have independent knowledge, that that would be inappropriate conduct on the part of Ms. Hayes, correct?

MS. MARMOR: Same objection. She does not have a foundation to make that kind of a judgment.

MR. HENRETTY: Also form. 1:43:36

Q. You can --

WITNESS: Can --

Q. You can answer.

A. Okay.

Q. Unless they tell you not to answer, you can --

MS. MARMOR: Right.

Q. -- go ahead.

A. Yeah, I -- I mean, just reading this, if this were true, it -- it would be inappropriate behavior, yes.

Q. Okay. I'd like to show you Exhibit Number 6 and just ask you if you have ever seen this document before.

MR. HENRETTY: Sorry. 1:44:56

MR. LINDEN: All right.

A. I don't -- I don't recall seeing it, but he

-- it's -- I'm cc'd, so I must have received it.
Q. And what type of document is it, is it a normal document when you're in HR?
A. No, this is a document from DOC.
Q. And is this document -- what's the date of this document?
A. November 18th, 2016.
Q. Do you have any reason to dispute the date on this document?
A. No.
Q. It says here that Mr. -- be -- "Please be advised that director's office received notification on November 18th, 2016 that Officer Nawara is not permitted to work until he has been released by the bureau of human resources." You see that part?
A. Yes. 1:45:43
Q. Do you know who made that decision?
A. Well once someone is being referred out to undergo a fitness for duty, they are not allowed to work until the report is received --
Q. Is that automatic --
A. -- indicating --
Q. -- in all -- all cases?
A. If they're sent out for a fitness for duty, yes.

Q. Yes. And if they would not have been referred to fitness for duty, then they're allowed to work, I take it, the reverse would be true?
A. It -- it would depend on the situation with the employee, but typically, yes.
Q. Okay. It says he's not allowed to work until he has been released by the bureau of human resources, that would be your bureau, correct?
A. Yes.
Q. And what would it take for Mr. Nawara to be released?
A. So we would have to have the report back from CorVel, from the physician, indicating that he was fit for duty and was able to return to work with or without restrictions.
Q. Okay. So until you got the report back saying that he's fit for duty, he would not be allowed to work --
A. Yes. 1:46:55
Q. -- correct? And during this time on November 18th, 2016, was he still getting paid, or would he be not paid?
A. Employees who are out on fitness for duty at this time would be able to use whatever benefit time they had available, and so they would be paid in that

way.

Q. That's only if they have benefit time, correct?

A. Yes.

Q. So they'd have to use their own time to get paid?

A. Yes.

Q. So is it fair to say that effective on November 18th, 2016, that Mr. Nawara would have -- in order to get paid, would have had to use his own time?

MS. MARMOR: Objection. Lack of foundation.

A. Yes.

Q. And what type of time could Mr. Nawara use to get a paycheck?

A. Any benefit time he had accumulated, so vacation, sick, personal, compensatory, holiday.

Q. And are those days worth money, vacation days an employee --

A. Yes. 1:48:00

Q. And how so or how -- how would that work?

MS. MARMOR: Objection. Lack of foundation.

A. So if you don't work for a day and you use eight hours of vacation, you're still paid for that day as if you had worked.

Q. Okay. And that would be the same for a sick

day too?
A. Yes.
Q. Would sick days be day for day, or would you only get credit for, like, half a day for -- if you have ten sick days, can you use ten of those days to get paid for those ten days?
A. It's all based on hours, so you would use benefit time in lieu of working, and you'd be paid as if you had worked.
Q. As of November 18th, 2016, do you know what type -- what time Mr. Nawara had accumulated for vacation days, sick days, or other days?
A. No. 1:48:51
MS. MARMOR: I -- I need to ask my client a question because I just want to make sure --
MR. LINDEN: Sure.
MS. MARMOR: -- that she has a --
MR. LINDEN: Sure.
MS. MARMOR: -- nothing's misleading here.
RECORDER: Off the record, 12:14 p.m.
(Off the record)
RECORDER: Back on the record, 12:17 p.m.
MR. LINDEN: Let's see -- that.
MS. MARMOR: This is 7?
MR. LINDEN: Yeah, pretty sure that is.

Q. I can show you Exhibit Number 7, and have you ever seen Exhibit 7?

A. Yes.

Q. And what is Exhibit 7?

A. This is a letter that I sent to Officer Nawara.

Q. And this would have been a couple weeks approximately after you met with him?

A. Yes. 1:49:41

Q. Can you just read the first paragraph of this letter?

A. "Dear CO John Nawara, on 11/8/16, you were informed by the occupational health nurse for the sheriff's office, Winifred Shelby, that you were required to undergo a fitness for duty evaluation before returning to active duty. You took the forms in order to review them prior to signing and have failed to return them to Ms. Shelby. She called and left a voicemail message for you on 11/30/16 to which you did not respond. The time you have been off work since 11/18/16 is only authorized if you are participating in the -- in the FFD process. These signed documents must be returned to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you

are not participating in the process and your time off from work from 11/18/16 will be unauthorized. Further, you will -- you are not able to return to work until you have completed the FFD process."

Q. Okay. The forms that are being referred to in that paragraphs are Exhibit 1 and 2, correct? And you can go back and check if you want, but.

A. Yes. 1:51:05

Q. And -- and then Nurse Shelby is copied on your letter, correct?

A. Yes.

Q. And was this letter mailed to Mr. Nawara?

A. Yes.

Q. And it says here -- and it says, "Re," it says, "Via email, first class, and certified mail," do you know if it went out to Mr. Nawara in all three ways?

A. It should have gone out at each way that's listed.

Q. And when you send something certified, do you typically get a -- do a return receipt requested?

A. Yes.

Q. Do you know whether or not you got any -- you did it that way for this letter?

MS. MARMOR: Object to the form.

A. If it were sent certified mail, that's how it would have been.

Q. Yeah. Have you ever seen any signed certified receipt by Mr. Nawara acknowledging whether or not he got this letter?

A. Oh, I don't recall. 1:52:01

Q. Do you know what Mr. Nawara's -- Nawara's email address was in 2016?

A. I would have used -- used his sheriff's email address.

Q. Okay. Do you typically put it on the letter if you would have emailed it, or is it -- was it your practice just to do it this way?

A. Put what on the letter? I'm sorry.

Q. When you typically emailed something to an employee, would you put the email letter, you know, next to the address or somewhere on it?

A. Oh, the email address --

Q. Yes.

A. -- that I used? No.

Q. So your normal practice would be if you would have emailed it, that that address would not appear in the letter?

A. Right, because it would go through the sheriff's --

Q. Okay.
A. -- email system.
Q. Okay. When you say, "Ms. Shelby called and left a voice message for you on 11/30 to which you did not respond," how did you know that Ms. Shelby called and left a voicemail?
A. She told me. 1:53:11
Q. And she would have left the voicemail on the same day you wrote this letter, correct?
A. Yes.
Q. Do you know what time Ms. Shelby left the email -- or the voicemail? I'm sorry.
A. No.
Q. Do you know how long after she left the voicemail that you wrote this letter?
A. No.
Q. So could it have been half hour or ten minutes?
MS. MARMOR: Objection. Calls for speculation.
A. I mean, it -- it would have been a reasonable amount of time after leaving a message --
Q. Okay. When you say --
A. -- to expect a response, but I don't know for certain what -- what time she called or what time I

wrote the letter.
Q. Other than a guess, do you -- can you provide any approximation of how much time between the time she left the voicemail and your letter saying that you didn't respond to her voicemail?
A. No.
Q. Okay.
A. But he never did respond at any time.
Q. He never responded?
A. Not to her message, no. 1:54:12
Q. Okay. I'd like to show you Exhibit Number 8 and ask if you've ever seen this document before.
A. Yes.
Q. What is Number 8?
A. This is a letter I sent to Officer Nawara.
Q. What's the date of this letter?
A. February 28th, 2017.
Q. Okay. And that would have been sent, according to this letter, the same three ways, email, first class mail, and certified mail, yes?
A. Yes. 1:55:36
Q. Okay. Can you read the first paragraph of this letter?
A. "On November 18th, 2016, you were informed by the occupational health nurse for the sheriff's office,

Winifred Shelby, that you were required to undergo a fitness for duty, FFD, evaluation before returning to active duty. You were referred for fitness for duty based on an interaction you had with Superintendent Jones-Hayes, in which you were alleged to have acted in an overly aggressive and threatening manner. During the meeting on November 18th, 2016, you were given an authorization to release health care information and a HIPAA authorization for disclosure of protected health information form, which you took in order to review prior to signing. To date, you have not returned these forms to Ms. Shelby. Nurse Shelby also called you and left a message for you on November 30th, 2016. You never responded to her message. In addition, I sent you a letter on November 30th, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the fitness for duty process. To date, I have not heard back from you."

Q. Okay. The two authorization forms that were referred to in this paragraph, again, relate to Exhibits 1 and 2, correct?

A. Yes. 1:57:03

Q. And your letter indicates he never responded to her message, see that part?

A. Yes.
Q. Okay. But isn't it true that at the time you wrote this letter, Ms. Dana Kurtz was representing Mr. Nawara?
A. I don't know if that was when I -- I don't know what the timing was with that and me sending this letter.
Q. Okay. But if a lawyer for an employee responds to you, would that be the equivalent of the employee responding to you?
MS. MARMOR: Objection.
A. It would depend on what the situation was.
Q. But if you send a letter or a request to an employee and their lawyer responds, you wouldn't hold it against the employee for not responding personally, they're responding through a lawyer, would you?
MS. MARMOR: Object to the form.
MR. HENRETTY: Join. 1:57:56
A. I mean -- "hold it against them," I guess I'm not --
Q. Yeah, when you say the employee doesn't respond, if their lawyer would have responded on behalf of the employee, wouldn't that be essentially the same as the employee responding to you?
MS. MARMOR: Object to -- objection.

Argumentative.
A. It would depend on the circumstances.
Q. Okay. Prior to this letter of February 28th, 2017, do you know if you received any communications from Dana Kurtz?
A. I don't -- I don't know when -- she did send me an email. I don't recall when it was though.
Q. Okay. I'd like to hand you Exhibit Number 9 and ask you if you've ever seen this document?
A. Yes. 1:59:14
Q. And what -- what is it?
A. This is an email from Dana Kurtz to me, Nurse Shelby, and Peter Kramer.
Q. And what's the date of this?
A. December 21st, 2016.
Q. Okay. And it has -- on top, it says, "To," and then it's to you at cookcountyil.gov, correct?
A. Yes.
Q. Was that your correct email back on December 21st --
A. Yeah.
Q. -- 2016?
A. Yes.
Q. And Winifred Shelby is listed at cookcountyil.gov, would that have been her correct

email?
A. Yes.
Q. Do you recall receiving it on November (sic) 21st, 2016?
A. No, I know I -- I've seen it. I don't recall the date that I read it.
Q. Do you have any reason to doubt that that would have not been sent to you on November (sic) 21st?
A. That would have been sent to me on that day?
Q. Yes. 2:00:13
A. No, it says that's the date sent, I just don't know what day I saw it.
Q. Okay.
MS. MARMOR: And just -- I just want to make, for the record, clear because this is not a Bates stamped version of this document, that it looks like this is a document that was filed at the outset of this case. I do believe there are identical date -- Bates stamped versions of it --
MR. LINDEN: No, that's true.
MS. MARMOR: -- in the case.
MR. LINDEN: And if you want, it came from the motion for a temporary restraining order.
MS. MARMOR: I figured it was, but I just -- I wanted to make sure we weren't confused later on.

MR. LINDEN: Okay.

Q. Can you just read the first two paragraphs of this email?

A. "Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the sheriff's office and other possible individual defendants. I understand that you placed him on leave in order that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara and I," in parentheses, "believe that such an order is unlawful."

Q. Did you ever respond to this email, if you recall?

A. I -- I don't recall. 2:01:30

Q. Is it something you would recall if you would have responded to?

MS. MARMOR: Objection. Calls for speculation.

A. There would be a document if I did. I just -- I don't recall if I did or not.

Q. Would you consider that to be a response from Mr. Nawara to your request -- request regarding for him

-- or demand that he signs medical release forms?

A. Not necessarily.

Q. Okay. When you say, "Not necessarily," would that be a yes, or a no, or a maybe?

A. Well when I receive documentation from attorneys, I deal with our law department in how to respond or if to respond.

Q. Okay. Do you know whether or not you specifically dealt with your law department when you got this email on December 21st, 2016?

A. Yes, I did.

Q. Do you recall who you dealt with?

A. Kate Christy and probably Nick Scouffas as well.

Q. Did you seek advice to them regarding an employment matter within the sheriff's office when you contacted them?

MS. MARMOR: You mean "advice from them"? You said, "Advice to them."

MR. LINDEN: Advice from them.

A. I called them --

MR. LINDEN: Yeah. 2:02:36

A. -- with advice. Yeah, I -- I would have forwarded what I received and asked them what next steps should be.

A. Yeah, no, just that she -- the doctor would be certified as this type of psychologist.
Q. Do you know what Dr. Kroll's findings were?
MS. MARMOR: I'm going to object to the lack of foundation. 2:43:46
A. The doctor wrote that she suggested that he was fit for duty.
Q. And can you just, on page 4, right underneath "recommendations," just read the paragraph of Exhibit 13?
MS. MARMOR: And I'm going to object to lack of foundation for any use of this document for this witness, but go ahead.
A. "Deputy John Nawara received a fitness for duty evaluation to determine any implications of cognitive, emotional, and or behavioral impairment related to his conduct at work. Clinical interview and evaluation all suggest that Deputy Nawara is fit for duty. It is recommended that he return to work with no restrictions."
Q. As you sit here today, do you disagree at all with that conclusion?
MS. MARMOR: Objection. Lack of foundation. 2:44:41
A. Yeah, I wouldn't have any basis to agree or disagree with what the doctor wrote.

Q. It's, in fact, consistent with the ultimate fitness for duty examination that Mr. Nawara had with the sheriff's office's doctor, correct?

MS. MARMOR: Objection. Lack of foundation, and that's actually not correct, that's a mischaracterization of the second examination.

MR. LINDEN: Okay.

A. The independent fitness for duty evaluation through the sheriff's office found Mr. Nawara to be fit for duty.

Q. Okay. Was Dr. Kroll's report sufficient for the sheriff's office in order to find him fit for duty?

A. No. 2:45:29

Q. Do you know why that is?

A. Because it wasn't conducted by an independent doctor as far as we were aware.

Q. Okay. What information do you have to show that Dr. Kroll was, in fact, not independent?

MS. MARMOR: Objection. That mischaracterizes her testimony.

A. Well the reason we use a third party administrator is because we know it's someone selected by the company and not related to either party.

Q. Okay.

A. So that -- that's how we know someone is

independent for certain.

Q. Okay. Do you know whether or not Dr. Kroll was related at all to -- to John Nawara, or is --

A. I don't.

Q. Do you know whether or not Dr. Kroll is related to his counsel?

A. No.

Q. When you send an employee to -- to your, quote, "independent doctor" or "psychologist," like to Correl (sic), is that doctor paid by the sheriff's office?

MS. MARMOR: Excuse me, I think did you mean CorVel?

MR. LINDEN: CorVel, I'm sorry. 2:46:38

MS. MARMOR: Okay. And I'm going to object to -- more generally to the form.

A. So we send the referral to CorVel, who then -- sorry.

Q. Okay.

A. He was distracting me.

Q. Let me -- let me -- that's --

WITNESS: Are you okay?

MR. BUSTAMANTE: I'm --

Q. That's a -- that's a terrible --

MR. BUSTAMANTE: I'm laughing because --

MR. LINDEN: Yeah.
MR. BUSTAMANTE: -- he always mispronounces words.
MR. LINDEN: Yeah.
WITNESS: Oh.
MR. LINDEN: That's fair. I'm -- I'm --
WITNESS: Okay.
MR. LINDEN: I'm bad.
MR. BUSTAMANTE: Sorry.
Q. Who -- who is CorVel --
A. Sorry.
Q. -- paid by when you send the employee to CorVel? 2:47:05
A. So we send the referral to CorVel, CorVel reaches out and obtains a doctor for the fitness for duty evaluation, and then later, we're billed for the evaluation and for CorVel's services from CorVel.
Q. So you're paying the doctor in -- indirectly through CorVel, correct, meaning the sheriff's office?
A. The sheriff's office is paying for the evaluation?
Q. Yes.
A. Yes, we don't make the employee pay for their own --
Q. Okay.

A. -- evaluation.

Q. Do you have any information as you sit here today that Dr. Kroll was in any way bias in favor of John Nawara when he (sic) did her (sic) fitness for duty evaluation?

MS. MARMOR: She did his? 2:47:48

MR. LINDEN: Yeah.

MS. MARMOR: And I'm going to object to lack of foundation.

A. No, I would have no way of knowing one way or the other.

Q. Who made the determination that Dr. Kroll's fitness for duty evaluation was not sufficient for John Nawara to go back to work, was it you?

A. No.

Q. Who was it?

A. When I received this, I reached out to the law department for guidance.

Q. Okay. But somebody made a determination that "we're not going to accept Dr. Kroll's fitness for duty evaluation," correct?

A. Yes.

Q. And who made that decision?

A. The law department.

Q. Who within the law department?

A. I don't know. I know who communicated to me, but I don't know who made the decision.
Q. Okay. Who communicated that to you?
A. Kate Christy.
Q. Do you know anybody else that were involved in the decision not to accept Dr. Kroll's report?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:48:48
Q. Okay. But Ms. Christy did communicate to you that this would not be sufficient for John Nawara, correct?
MS. MARMOR: I -- I'm going to tell her not to answer that question. I think there is a written document which you can get that same information from, and so I'm going to tell her not to answer that question, but I think you can get the same fundamental information from a written document that's -- that's produced in this case.
Q. Based on advice of counsel, are you refusing to answer that question?
A. Yes.
Q. And you understand the question?
A. Yes.
Q. And if you were permitted to answer the question, you could have answered it, correct?

A. Yes.

Q. Okay. What was John Nawara's status with the sheriff's office as of March of 2017?

MS. MARMOR: Object to the form. 2:49:48

A. He was just not reporting to work.

Q. Was he on what they call unpaid leave?

A. I mean, he wasn't --

MS. MARMOR: Object to the form.

WITNESS: Oh, I'm sorry.

MS. MARMOR: And I don't know who "they" is.

MR. LINDEN: Okay.

MR. BUSTAMANTE: Good point.

A. So when I think of leave, I think of you being off in an approved status, I guess, so I -- I don't know how you classify. He just -- he -- he wasn't following the -- the process in order to be able to return to work, so.

Q. So at that time, is it fair to say that he either wasn't being paid or he had to use his own days to get paid?

A. Yes. 2:50:26

MR. LINDEN: So -- emailed the documents pretty well.

MS. MARMOR: Uh-huh. 2:51:47

Q. I'd like to show you Exhibit Number 14, I

think that's what you're talking about here.

MS. MARMOR: Here to help.

MR. LINDEN: Okay. No, I don't think you are. All right.

MS. MARMOR: I object.

Q. Do you recognize page 1 of Exhibit Number 14, the first email?

A. Yes.

Q. And is that from you to Dana Kurtz?

A. To Dana Kurtz and John Nawara, and Peter Kramer is cc'd.

Q. So you're working weekends, right, Saturday, March 18th at 11:52, you sent it, right?

A. 24/7.

Q. Okay. And -- and can you read your email?

A. "Officer Nawara, thank you for your email. However, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure."

Q. Okay. And when you say, "The document attached," you're referring to Dr. Kroll's report in Exhibit Number 13, correct?

A. Yes. 2:53:01

MS. MARMOR: I stole your version, I'm sorry.

MS. HONINGFORD: Oh, it's okay.
Q. And when you indicate in this email, "Please return the signed release documents, as previously instructed, so we can begin the proper fitness for duty procedure," you're referring to Exhibits 1 and 2. Is that fair?
A. Yes.
Q. Okay. The day before, on Friday, March 17th, there is an email from John Nawara to you copied, with Peter Kramer copied. Do you see that?
A. Yes.
Q. And do you know whether or not you received this email from Mr. Nawara?
MS. MARMOR: That's -- that's the same email we just looked at.
MR. LINDEN: Was it? Yeah, no, you're right.
MS. MARMOR: Which answers the question --
MR. LINDEN: Okay.
MS. MARMOR: -- what date it was sent.
MR. LINDEN: Gotcha. Okay.
Q. Correct, that one --
A. Yes, it was in --
Q. Okay. 2:54:02
A. -- the previous Exhibit.
Q. Okay. Now Mr. Nawara informed you that Dr.

just looking.

MR. LINDEN: Well we had some --

MS. MARMOR: I have --

MR. HENRETTY: Yeah, that's a --

MR. LINDEN: Could we go --

MS. MARMOR: Oh, you have cough drops?

MR. LINDEN: Could we go off --

WITNESS: Oh.

MR. LINDEN: Yeah, could we go off the record a second?

RECORDER: Off -- off the record, 2:21 p.m.

(Off the record)

RECORDER: Back on the record, 2:25 p.m.

Q. Do you recognize Exhibit Number 16?

A. I'm -- I -- I don't know that I've seen it before, but I mean, I see that he's -- that Officer Nawara signed the HIPAA authorization disclosure form.

Q. And can you -- is it dated?

A. Yes.

Q. And that's dated August 17th, 2017?

A. Yes.

Q. You indicated that your typical practice at the sheriff's office was to use CorVel, correct?

A. Yes. 3:12:52

Q. Have you ever seen this form of a HIPAA

authorization before from CorVel?
A. I don't know that I've seen this form before, but we've had medical workers go straight to CorVel rather than through the sheriff's office before.
Q. Do you know whose form was it, was it a form from the sheriff's office or was that a form from CorVel, if you know?
A. This -- in Exhibit 16?
Q. Yes.
A. I don't know.
Q. On paragraph one, can you read paragraph one of this authorization?
A. "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation."
Q. Okay. And that's different than Exhibit Number 1 which would have had the medical records go to Nurse Shelby, correct?
A. Yes. 3:14:02
Q. And this one instead goes to CorVel limited --
A. Yes.
Q. -- correct? And it's also limited to his fitness for duty exam for medical records, correct?

MS. MARMOR: That's what this says?
MR. LINDEN: Yes.
Q. Is that fair?
A. Yes, it does say that.
Q. And can you read paragraph three, please?
A. "This disclosure is made for the purpose of your fitness for duty examination as requested by your employer, Cook County. Your employer may (sic) receive a copy of the independent" --
MS. MARMOR: You said -- it says, "Will," not "May." "Your employer will."
WITNESS: Did I say, "May"?
MS. MARMOR: Yeah.
WITNESS: Oh, wow. Sorry about that.
A. "Your employer will receive a copy of the independent medical exam, IME," in parentheses. "You will also receive a copy of the IME."
Q. Okay. Based on paragraph three, is it your understanding that the sheriff's office would only receive a copy of the independent medical exam as opposed to all the medical records that CorVel was set to receive from the medical doctors of Mr. Nawara?
A. Yes. 3:15:16
Q. And that differs from Exhibit 1, correct? You -- you could go back and refer if you'd like.

didn't do in your life?
A. Yes.
Q. Did that make you angry?
A. Oh, sure. 3:22:16
Q. Now if Mr. Nawara was accused by Hayes of doing something he didn't do, you'd expect him to be a little angry. Isn't that fair?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. He might be, sure.
Q. Would you find that unusual?
MS. MARMOR: Object to -- object to the form.
A. Being angry about something and being outwardly hostile are two different things, I think.
Q. Did Mr. Nawara, in fact, go to an independent fitness for duty evaluation as directed by the sheriff?
A. Through CorVel?
Q. Yes. 3:23:21
A. Yes.
Q. Okay. Okay. Do you -- do you recognize Exhibit Number 18?
A. I mean, I recognize this type of letter. I don't know if I've seen this one before.
Q. Okay. And this is a letter from CorVel to Mr. Nawara, correct?

A. Yes.
Q. What's the date of this letter?
A. September 8th, 2017.
Q. And can you read the first paragraph of this letter?
A. "Dear Mr. Nawara, this letter is to inform you that we have scheduled you for a two day fitness for duty exam with the Isaac Ray Forensic Group, LLC on Monday, September 11th, 2017 from 9:00 a.m. to 5:00 p.m. and Tuesday, September 12th, 2017 from 9:00 a.m. to 5:00 p.m."
Q. And is that consistent with your testimony before, that if it was a psychological evaluation, that would be for two days?
A. Yes. 3:24:33
Q. And have you ever heard of the Isaac Ray Forensic Group before?
A. Not that I recall, no.
Q. Do you recall any other employees being sent there by CorVel?
A. I don't recall this name, no.
Q. But it would have been approved by the sheriff's office if it came from CorVel, wouldn't that be a fair statement?
MS. MARMOR: Objection. No, that's not a

A. I -- I guess I'm -- I'm not sure what you're asking me.

Q. Let -- let me -- let me move onto the next question, but can you just read the final full paragraph on page 7 of 10?

A. Mm-hmm. "It is my -- it is my opinion that there is presently no evidence that Officer Nawara's work conduct on 9/29/16, whatever that conduct may have been, arose directly from mental illness, cognitive impairment, or any medical condition or its treatment. It is similarly my opinion that he suffers from no mental illness, cognitive impairment, or medical condition that may impair his -- his capacity to do his job at the present time. As such, it is my opinion that Officer Nawara does not pose a safety risk to himself or others, co-workers, detainees, or the public," in parentheses, "and that he is fully capable of safely and effectively carrying out the essential functions of his job. I currently find Officer Nawara fit to return to duty without restriction."

Q. Based on Diana Goldstein's report, in hindsight, was the order for a fitness for duty examination of doctor -- for John Nawara proper?

MS. MARMOR: Objection. Lack of foundation and calls for speculation.

A. No. 3:46:43

Q. You have detectives within the sheriff's office?

A. Not for -- they -- all internal complaints are investigated by OPR.

Q. They can't be investigated outside of OPR?

A. I can't think of an instance where they're not handled by OPR.

Q. Okay. And -- and you -- you don't know whether or not OPR performed any investigation regarding this, correct?

A. I don't know.

Q. Okay. Let's see. I'm almost done. There you go. Do you recognize Exhibit Number 20?

A. Yes. 3:47:44

Q. And what is Exhibit 20?

A. This is the form indicating that Officer Nawara didn't have any restrictions and he could return to work full duty.

Q. And that came from Nurse Shelby?

A. Yes.

Q. And the date on this document is September 26th, 2017?

A. Yes.

Q. When was Mr. Nawara authorized to return to

work?

A. As of the issuance of this document.

Q. Well I think right above it, doesn't it say, "Return to work on 9/27/17"?

A. Right, so the day -- so she wrote this, he was able to return the next day.

Q. Okay. So what was his status on -- as of 9/27/17?

MS. MARMOR: Objection. Lack of foundation.

Q. If you know.

A. If -- if he returned on that day, his status would have been working.

Q. Working, being paid, and benefits?

A. Mm-hmm.

Q. Okay.

A. Yes. 3:48:36

Q. Do you know whether or not he returned to work that day?

A. I don't know what day he returned

Q. Let's see. I'd like to show you Exhibit Number 21, if you could -- and might want to take a minute to review it.

MR. LINDEN: This is the latest one, right? 3:49:45

MS. MARMOR: Yeah, although I think we're going to supplement it with a new one.

# Exhibit 6

*COOK COUNTY DEPARTMENT OF CORRECTIONS*
*MEMORANDUM*

| | | |
|---|---|---|
| TO: | **Karyn Williams, Executive Director**<br>Bureau of Human Resources | DATE: 09/29/16 |
| FROM: | Matthew Burke, Chief of Staff | |
| SUBJECT: | **Fitness for Duty** | |

Pursuant to the attached documentation, I am requesting that Ofc. John Nawara, JDE#378032, Cermak, 7-3 Shift Detail 7, be evaluated for fitness for duty.

C: Nneka Jones Tapia, Executive Director
Tarry Williams, DOC Chief of Operations

I certify, that no political reasons or factors were considered in any decision I made or action I took relating to this employment action. Further, I do not know of, or have any reason to believe that, anyone else considered or took action based on political reasons or factors with respect to this employment action.

SIGNATURE

EXHIBIT
tabbies
Reirrson 4
9/20/19 GD

CCSO_000025

# Exhibit 7

***COOK COUNTY DEPARTMENT OF CORRECTIONS***
***MEMORANDUM***

| | | |
|---|---|---|
| **TO:** | **Richard Brogan, Superintendent**<br>External Operations | **DATE:** 11/18/16 |
| **FROM:** | Dr. Nneka Jones Tapia, Executive Director | |
| **SUBJECT:** | **Ofc. John Nawara, External Operations, 6-2 Shift Detail 5** | |

Be advised that the Director's Office received notification on November 18, 2016, that Ofc. John Nawara, External Operations, 6-2 Shift Detail 5, is not permitted to work until he has been released by the Bureau of Human Resources. Please ensure that your supervisory staff members are advised of this work restriction.

C: Rebecca Reierson, Bureau of Human Resources
File

**SIGNATURE**

EXHIBIT 6
Reierson
9/20/19

# Exhibit 8

SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
3026 South California Avenue, Chicago, IL 60608
**THOMAS J. DART**
SHERIFF

November 30, 2016

C/O John Nawara
100 Willow Lane
B207
Willow Springs, Il 60480

Re: Fitness for Duty / via: Email, First Class & Certified Mail

Dear C/O John Nawara:

On 11/18/16 you were informed by the Occupational Health Nurse for the Sheriff's Office, Winifred Shelby, that you were required to undergo a Fitness for Duty (FFD) evaluation before returning to active duty. You took the forms in order to review them prior to signing and have failed to return them to Ms. Shelby. She called and left a voicemail message for you on 11/30/16 to which you did not respond. The time you have been off of work since 11/18/16 is only authorized if you are participating in the FFD process. These signed documents must be returned to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you are not participating in the process and your time off of work from 11/18/16 will be unauthorized. Further, you are not able to return to work until you have completed the FFD process.

Your forms should be returned to Ms. Shelby in Building 2. Please contact her at 773-674-8535 if you have further questions regarding the FFD process.

Sincerely,

Rebecca Reierson
Director, HR Employee Services

Cc: Winifred Shelby

*I certify that no Political Reasons or Factors were considered in any decision I made or action I took related to this Employment Action. Further, I do not know of, or have any reason to believe that anyone else considered or took action based on Political Reasons or Factors with respect to this Employment Action.*

EXHIBIT 7
Reierson
9/20/19 GD

CCSO_000017

CCSO_000017

# Exhibit 9

**Dana Kurtz**

| | |
|---|---|
| **From:** | Dana Kurtz |
| **Sent:** | Wednesday, December 21, 2016 2:49 PM |
| **To:** | Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov |
| **Cc:** | Peter.Kramer@cookcounty.gov |
| **Subject:** | John Nawara |
| **Attachments:** | HIPAA Release form given to John to sign.pdf |
| **Importance:** | High |

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner.

As a result of the above actions taken against Officer Nawara and the unlawful order that he cannot return to work, he has been forced to use his vacation time. He has also lost out on advancement and training opportunities. We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from the harassment against him.

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

EXHIBIT 9
tabbies
Reierson
9/20/19 GD

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers

*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ______________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.
2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.
3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.
4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.
5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.
6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.
7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.
8. This Authorization shall expire one year from the date of my signature to this authorization, below.

______________________________ ______________________
Printed Name (of person giving authorization) Social Security Number

______________________________ ______________________
Signature of person giving authorization Date

Signed ______________________________
***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel.

# Exhibit 10

SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
3026 South California Avenue, Chicago, IL 60608
**THOMAS J. DART**
SHERIFF

February 28, 2017

C/O John Nawara
[redacted]

Re: Fitness for Duty / via: Email, First Class & Certified Mail

Dear C/O John Nawara:

On November 18, 2016 you were informed by the Occupational Health Nurse for the Sheriff's Office, Winifred Shelby, that you were required to undergo a Fitness for Duty (FFD) evaluation before returning to active duty. You were referred for a fitness for duty based on an interaction you had with Superintendent Jones-Hayes in which you were alleged to have acted in an overly aggressive and threatening manner. During the meeting on November 18, 2016, you were given an Authorization to Release Healthcare Information and a HIPAA Authorization for Disclosure of Protected Health Information form which you took in order to review prior to signing. To date, you have not returned these forms to Ms. Shelby. Nurse Shelby also called you and left a voicemail message for you on November 30, 2016 . You never responded to her message. In addition, I sent you a letter on November 30, 2016 informing you that the time you have been off of work since November 18, 2016 is only authorized if you are participating in the FFD process. To date, I have not heard back from you.

The signed waiver documents given to you on November 18, 2016 must be returned to Ms. Shelby by Wednesday, March 8, 2017 so the FFD evaluation process can proceed. This is the last notification you will receive. If the forms are not received by March 8, 2017, your time off work (November 18, 2016-present) will be deemed unauthorized. Further, you are not able to return to work until you have completed the FFD process.

I have enclosed another copy of the forms for your convenience. They should be returned to Ms. Shelby at 3026 S. California Ave., Building 2, Chicago, IL 60608. Please contact her at 773-674-8535 if you have further questions regarding the FFD process.

Sincerely,

Rebecca Reierson
Bureau of Human Resources, Employee Services

Cc: Winifred Shelby

EXHIBIT 8
Reierson
9/20/19 GG

*I certify that no Political Reasons or Factors were considered in any decision I made or action I took related to this Employment Action. Further, I do not know of, or have any reason to believe that anyone else considered or took action based on Political Reasons or Factors with respect to this Employment Action.*

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ____________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

____________________________________ ____________________

Printed Name (of person giving authorization) Social Security Number

____________________________________ ____________________

Signature of person giving authorization Date

Signed ____________________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel.

Cook County SHERIFF

# AUTHORIZATION TO RELEASE HEALTHCARE INFORMATION

Patient's Name: ______________________ Date of Birth: ______________________

Previous Name: ______________________ Social Security #: ______________________

I request and authorize ______________________________________________ to release healthcare information of the patient named above to:

Name: ______________ Cook County Sheriff's Office ______________
Address: ______________ Winifred Shelby, RN, CCM, South Campus Bldg. 2 ______________
3026 South California Avenue
City: ______________ Chicago, IL 60608 ______________

This request and authorization applies to:

☐ Healthcare information relating to the following treatment, condition, or dates: ______________

______________________________________________

X All healthcare information

☐ Other: ______________________________________________

**Definition:** Sexually Transmitted Disease (STD) as defined by law, RCW 70.24 et seq., includes herpes, herpes simplex, human papilloma virus, wart, genital wart, condyloma, Chlamydia, non-specific urethritis, syphilis, VDRL, chancroid, lymphogranuloma venereuem, HIV (Human Immunodeficiency Virus), AIDS (Acquired Immunodeficiency Syndrome), and gonorrhea.

☐ Yes ☐ No I authorize the release of my STD results, HIV/AIDS testing, whether negative or positive, to the person(s) listed above. I understand that the person(s) listed above will be notified that I must give specific written permission before disclosure of these test results to anyone.

☐ Yes ☐ No I authorize the release of any records regarding drug, alcohol, or mental health treatment to the person(s) listed above.

Patient Signature: ______________________ Date Signed: ______________

THIS AUTHORIZATION EXPIRES NINETY DAYS AFTER IT IS SIGNED.

# Exhibit 11

# Re: John Nawara

JN John Nawara (Sheriff) Reply all |

Today, 11:57 PM

Rebecca Reierson (Sheriff); Dana Kurtz <DKurtz@kurtzlaw.us>; Peter K

Sent Items

JNawara.FFD.pdf
993 KB

Download

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office, in which the jury found that the Sheriff violated my and other officer's First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, March 17, 2017 4:42 PM
**To:** Dana Kurtz
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara



EXHIBIT 12
Reierson
9/20/19

Ms. Kurtz,

We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara's absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

**From:** Dana Kurtz [mailto:DKurtz@kurtzlaw.us]
**Sent:** Monday, March 13, 2017 10:25 AM
**To:** Rebecca Reierson (Sheriff)
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara
**Importance:** High

Dear Ms. Reierson,

First, I appreciate you finally responding to my email and getting back to me. We are trying to avoid litigation which is why I reached out to you and copied Peter Kramer on the email as well.

However, the Sheriff's office lack of response and lack of engaging in any type of discussion is not helpful.

Second, Officer Nawara has been placed on an unpaid leave, and is burning his sick and vacation time to his detriment, which he will run out of soon, because he would not sign a HIPPA medical release form for his own medical records without limitation of time, scope, or any other limitations (setting aside that such a request is unlawful in the first place). He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the Sheriff's Office. All of this has caused Officer Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order, seeking injunctive release if this is not immediately remedied.

Third, the Sheriff's position to require Officer Nawara (or any other employee) to complete a medical release form so that the Sheriff's Office can obtain that individuals private medical records is unlawful and in violation of the ADA. An employer cannot order an employee to complete a HIPPA or medical release form so that the employer can obtain ***the employee's own medical records***, which is what you have ordered Officer Nawara to do. This is not the proper or legal way to go about ordering a "fitness for duty." In addition, the law requires that in order for an employee to be ordered to see the employer's selected doctor for a fitness for duty evaluation, ***there must be a business necessity***. *Wright v. Illinois Dept. of Children and Family Services*, 798 F.3d 513, 523 (C.A.7 (Ill.),2015). In *Wright*, the court reiterated:

An employer bears the burden of establishing that an examination is consistent with business necessity, *see Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir.2007), and that burden is "quite high," *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir.2003) (internal quotation marks omitted). An employer must "show that the asserted 'business necessity' is vital to the business," as opposed to a "mere expediency." *Id.; accord Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir.2014) (noting that an employer cannot rely on a "bare assertion that a medical examination was merely convenient or expedient"). In addition, the examination must "genuinely serve[ ] the asserted business necessity and ... must be a reasonably effective method of achieving the employer's goal." *Conroy*, 333 F.3d at 98. An employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the ... requirement contributes to the achievement of those business necessities." *Id.* at 101.
If the Sheriff's Office wants to order Officer Nawara to see a County doctor or its own selected doctor, then the Sheriff must show that it is "consistent with business necessity" and that "the asserted 'business necessity' is vital to the business,' as opposed to a 'mere expediency.'" We have been provided with ***no information*** to show that this burden has been met. Please provide me with this information, and I will consider it.

Fifth, in addition to the above, Officer Nawara has been provided ***no*** information as to who would be doing the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPPA form so that the Sheriff's Office could obtain Officer Nawara's own personal medical records, which is in violation of the ADA and violates his privacy rights.

Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquires. In fact, he did. He retained counsel (me) to respond for him, which we did, and received no response from the Sheriff's Office until your email below.

Finally, please let me know if a note from his doctor would suffice. Officer Nawara may be willing to provide this, but he is not going to and is not required to under the law sign a release so that his personal medical records are obtained by the Sheriff's office. Please let me know today, so that we can decide if we need to file a lawsuit and TRO, requesting injunctive relief.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY
Super Lawyers

*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

**From:** Rebecca Reierson (Sheriff) [mailto:Rebecca.Reierson@cookcountyil.gov]
**Sent:** Monday, March 13, 2017 8:33 AM
**To:** Dana Kurtz
**Subject:** John Nawara

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

# Exhibit 12

**Dr. Robin Kroll, Psy.D, ABPP**
Board Certified Police and Public Safety Psychologist
6323 N Avondale Ave #111
Chicago, IL, 60631
847-778-9322

# Fitness for Duty Evaluation

**Name:** John Nawara
**Race/Sex:** Caucasian/Hispanic Male
**Marital Status:** Engaged
**Birth Date:** [redacted]
**Employer:** Cook County Sheriffs Dept

**Date of Evaluation:** 03/08/2017

**Place of evaluation:**
FFDE Provider: Dr. Robin Kroll
6323 N. Avondale Ave. #111
Chicago, IL 60631
WK: 847-778-9322

---

## Confidentiality

This report should be kept confidential in its contents, restricted to those who have direct responsibility for decision-making. This Fitness-For-Duty Evaluation (FFDE) should not be shown or discussed with any individuals without first considering its findings, potential benefits, and the ways in which the enclosed data may be misinterpreted.

[redacted]

EXHIBIT 13
tabbies
Reierson
9/20/19 GD

[redacted]

[redacted]

## Recommendations:

Deputy John Nawara received a Fitness-For-Duty Evaluation to determine any implications of cognitive, emotional and/or behavioral impairment related to his conduct at work. Clinical interview and evaluation all suggest that Deputy Nawara is ***Fit-For-Duty.*** It is recommend that he return to work with no restrictions.

Respectfully,

FFDE Evaluator Robin Kroll, Psy.D, ABPP
Licensed Clinical Psychologist #070007698
Board Certified Police and Public Safety

*Confidentiality note: This report is intended for use only by the individual or entity to which it is addressed. It may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this report is not the intended recipient or the employee your agent responsible for delivering the report to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. Thank you.*

# Exhibit 13

**From:** Rebecca Reierson (Sheriff)
**To:** Dana Kurtz; John Nawara (Sheriff)
**Cc:** Peter Kramer (Sheriff)
**Subject:** Re: John Nawara
**Date:** Saturday, March 18, 2017 11:52:44 AM
**Attachments:** image001.jpg
image002.png

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** John Nawara (Sheriff)
**Sent:** Friday, March 17, 2017 11:57:09 PM
**To:** Rebecca Reierson (Sheriff); Dana Kurtz
**Cc:** Peter Kramer (Sheriff)
**Subject:** Re: John Nawara

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office, in which the jury found that the Sheriff violated my and other officer's First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

EXHIBIT 14
tabbies
Reierson
9/20/19 GD

Sincerely,
John A. Nawara

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, March 17, 2017 4:42 PM
**To:** Dana Kurtz
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara

Ms. Kurtz,
We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara's absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

# Exhibit 14

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**

## HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION

I, JOHN A. NAWARA authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your Fitness for Duty Examination as requested by your employer, Cook County. Your employer will receive a copy of the Independent Medical Exam (IME). You will also receive a copy of the IME.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

JOHN A. NAWARA
Printed Name (of person giving authorization)

[redacted]028
Social Security Number

[signature]
Signature of person giving authorization

08-17-2017
Date

Signed ______________________________
*(If applicable, Power of Attorney, Guardian, or Conservator. Attach a copy of document granting authority.)*

This document contains confidential information of a claimant and may not be disclosed or duplicated without prior written consent of CorVel

EXHIBIT 16
tabbies
Reierson
9/20/19 CP

# Exhibit 15

CORVEL

September 8, 2017

[redacted]

Dear Mr. Nawara:

This letter is to inform you that we have scheduled you for a two-day Fitness for Duty Exam with the Isaac Ray Forensic Group, LLC on Monday September 11, 2017 from 9:00 am to 5:00 pm and on Tuesday September 12, 2017 from 9 am to 5 pm.

Please report to:

Isaac Ray Forensic Group, LLC
Monday September 11, 2017 from 9 am to 5 pm with Jordan Fuller
Tuesday September 12, 2017 from 9 am to 5 pm with Dr. Diana Goldstein
65 E. Wacker Place, Suite 2240
Chicago, IL 60601
Ph: 312-621-9002

- Please note they are on Wacker Place not Wacker Drive. The other name of their street is South Water. The office is located next to Morton's Steakhouse. They are in between Michigan and Wabash Avenues. There is a parking structure right next door to them if you choose to drive.
- Please check in with security in the lobby, and go to the 22nd floor (suite 2240).
- You are welcome to bring a lunch, they have a refrigerator and microwave. There are other options available within a block of their office as well.

**If you are unable to attend this appointment, please contact me immediately at 630-874-7433.**

Copies of your medical records received will be sent to Isaac Ray Forensic Group, LLC for the evaluation along with the HIPAA signed release of information.

Thank you for your cooperation.

Sincerely,

*Michelle Sarocka, RN*

Michelle Sarocka, RN
Disability Nurse Case Manager
CorVel Corporation
T: 630-874-7433 | Fax: 866-450-5138

EXHIBIT 18
tabbies
Reierson
9/20/19 GD

cc: Cook County Bureau of Human Resources Employee Services

# Exhibit 16

Isaac Ray Forensic Group
65 E. Wacker Place, Suite 2210
Chicago, Illinois 60601
tel: 312.621.9002 fax: 312.621.9003

Michelle Sarocka, RN
Disability Nurse Case Manager
CorVel Corporation
3010 Highland Parkway, Suite 600
Downers Grove, IL 60515

**FITNESS FOR DUTY EXAMINATION**
*CONFIDENTIAL*

| | | | |
|---|---|---|---|
| **NAME:** | John Anthony Nawara | **EDUCATION:** | 12 years |
| **DATE OF BIRTH (AGE):** | [redacted] | **OCCUPATION:** | Correctional Officer |
| **DATE(S) OF EXAM:** | 9/11/17, 9/12/17 | **HANDEDNESS:** | Ambidextrous |
| **DATE OF REPORT:** | 9/16/17 | **REFERRAL:** | CorVel Corporation |

[redacted]

EXHIBIT 19
tabbies
Reierson
9/20/19 GD





CONFIDENTIAL

[redacted] I currently find Officer Nawara fit to return to duty, without restrictions.

[redacted]





CONFIDENTIAL

# Exhibit 17

SHERIFF'S OFFICE OF COOK COUNTY, ILLINOIS
South Campus – 3026 S. California - Building 2, 1ST Floor, CHICAGO, IL 60608
**THOMAS J. DART**
SHERIFF
**MEDICAL DIVISION**
Bureau of Human Resources

---

**JOHN NAWARA** — **Name**
**C.O.** — **Title**

**Address** ____________ **Phone**

**D.O.C/EX OPS**
**Department**

**NO**
**Injury on Duty Date**

**IT IS MY OPINION THAT THE CONDITION OF THE PERSON NAMED ABOVE IS SUCH THAT HE OR SHE CAN RETURN TO WORK ON 09/27/2017**
**THERFORE I HAVE ADVISED HIM/HER TO REPORT TO HIS/HER DEPARTMENT AT THIS TIME.**

**HOWEVER, ALL THE RESTRICTIONS (IF LISTED BELOW) ARE PER THE DISCRETION OF THE SHERIFF'S OFFICE, ONLY IF THEY CAN BE ACCOMMODATED FOR THE ABOVE JOB TITLE. (UPDATED MEDICAL DOCUMENTATION MUST BE PRESENTED WHEN THE EMPLOYEE RETURNS FOR RE-EVALUATION)**

---

*******PER FFD*******
FULL DUTY
NO RESTRICTIONS

Winifred Shelby, RN, CCM — 9/26/2017 **Date**

**RE-EVALUATION DATE** NA

---

**I HAVE REVIEWED THE ABOVE RESTRICTIONS AND WHILE UNDER THESE RESTRICTIONS, THIS EMPLOYEE:**

☐ **CAN** ☐ **CANNOT** **BE ALLOWED TO CARRY A WEAPON ON BEHALF OF THE CCSO**

**SIGNATURE & TITLE** ______________________ **DATE** ____________

EXHIBIT 20
Reierson
9/20/19 GD

NAWARA_000225