<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
     JOHN NAWARA,                    )
 4                                   )
                    Plaintiff,       )   Docket No. 17 C 2393
 5                                   )
              vs.                    )
 6                                   )
     COUNTY OF COOK, a unit of       )
 7   local government, et al.,       )   Chicago, Illinois
                                     )   December 12, 2019
 8                  Defendants.      )   9:15 a.m.

 9            TRANSCRIPT OF PROCEEDINGS - Status
       BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER
10
     APPEARANCES:
11
     For the Plaintiff:      LAW OFFICES OF RICHARD LINDEN
12                           BY:  MR. RICHARD F. LINDEN
                             17 North Wabash, Suite 400
13                           Chicago, Illinois  60602

14   For the Defendants:     SCHARF BANKS MARMOR LLC
                             BY:  MS. SARAH R. MARMOR
15                           333 West Wacker Drive, Suite 450
                             Chicago, Illinois  60606
16
                             HON. KIMBERLY M. FOXX
17                           STATE'S ATTORNEY OF COOK COUNTY
                             BY:  MS. JOI KAMPER
18                               MS. MEGAN M. HONINGFORD
                             500 Richard J. Daley Center
19                           Chicago, Illinois  60602

20   For Dana Kurtz:         FLAHERTY & YOUNGERMAN
                             BY:  MR. CHRISTOPHER L. GALLINARI
21                           321 S. Plymouth Ct., Suite 1400
                             Chicago, Illinois  60604
22
     Court Reporter:         FRANCES WARD, CSR, RPR, RMR, FCRR
23                           Official Court Reporter
                             219 S. Dearborn Street, Suite 2524A
24                           Chicago, Illinois  60604
                             (312) 435-5561
25                           frances_ward@ilnd.uscourts.gov
</pre>

1          THE CLERK:  17 C 2393, Nawara versus County of

2   Cook.

3          THE COURT:  Good morning.

4          MR. GALLINARI:  Good morning, your Honor.

5          MR. LINDEN:  Good morning, your Honor.

6          Richard Linden on behalf of the plaintiff.

7          MR. GALLINARI:  Christopher Gallinari on behalf of

8   Dana Kurtz.

9          MS. MARMOR:  Sarah Marmor on behalf of the Cook

10  County Sheriff's Office and all of the individual defendants

11  except for Jones-Hayes.

12         MS. KAMPER:  Good morning.

13         Joi Kamper on behalf of Jones-Hayes.

14         MS. HONINGFORD:  Good morning.

15         Megan Honingford on behalf of Cook County.

16         THE COURT:  Okay.  Good morning.

17         All right.  We are here for status, and also I had

18  suggested I would be hearing a short argument on the issue of

19  what sanctions are appropriate.

20         Are you prepared on that?

21         MS. MARMOR:  Yes, your Honor.

22         MR. GALLINARI:  Yes, your Honor.

23         THE COURT:  Let's start with the status.

24         What's our status?

25         MS. MARMOR:  Your Honor -- Rick, do you want to

1    explain?

2            MR. LINDEN:  No.  Go ahead.

3            MS. MARMOR:  We had one witness who has been a

4    little recalcitrant.  She is the fitness-for-duty examiner,

5    who is a fact witness, but absolutely insisted on getting

6    paid for her time.  We wrangled around that for some time and

7    finally did pay her, in advance, for some time.  And she has

8    made herself available this Monday at 2 p.m.  That will be

9    the last deposition in the case.  And I think all other

10    discovery is done.

11            THE COURT:  Great.

12            MS. MARMOR:  And we are going full steam ahead

13    getting ready for trial.

14            THE COURT:  Okay.  Good.

15            All right.  Now, with respect to the sanctions

16    issue, it was defendants' motion.  So I will allow you to

17    comment briefly on what you think is the appropriate

18    resolution, and I will hear from plaintiff as well.

19            MS. MARMOR:  Thank you, your Honor.

20            I just want to point out that it's almost two years

21    to the day that Dana Kurtz secretly agreed to represent Karyn

22    Williams, the then-executive director of HR for my client in

23    this employment case, the Cook County Sheriff's Office.

24            At that time we had just answered the first amended

25    complaint, initial disclosures had been made, and discovery

1    was about to begin.  And really, the course of conduct by

2    Ms. Kurtz after that time eventually led this case to stop in

3    its tracks for nearly a year and forced my client to expend

4    over $62,000 to demonstrate what should have been obvious

5    from the beginning, which was that that representation was

6    entirely inappropriate.

7              I believe the only thing that's up today is the

8    question of the amount of sanctions to be awarded to Ms. --

9    against Ms. Kurtz.

10             I note that the Court's standard is, the conflict

11   of interest presented here was one that a reasonably careful

12   attorney would have recognized after appropriate inquiry, and

13   her continued representation of Nawara under these

14   circumstances was an objective bad faith.

15             We seek all the fees incurred, which is $62,248.

16             We have also in our motion asked for Kurtz to be

17   barred from collecting on the lien that she filed shortly

18   before -- and I'm putting this in air quotes -- withdrawing

19   from this case at the eleventh hour.

20             Your order also says that Kurtz argues, without

21   authority, that an award of attorneys' fees should be limited

22   to expenses that Cook County incurred after she filed her

23   objection to the motion for disqualification.  And if that

24   were the standard, actually, that amount would be at least

25   $30,000.

1    But, in fact, Ms. Kurtz has argued for a paltry

2  5,000 or $6,125 in fees on the argument that had the -- had

3  it been so obvious that she should have withdrawn, the Court

4  would never have allowed her to file a surreply in the first

5  place.

6    I think that's an untenable standard, and it's not

7  accurate about why -- I'm not going to presume to know what

8  was in the Court's mind at the time that the Court allowed

9  the surreply.  But it seems to me that it would be more

10  reasonable to conclude that the reason the surreply was

11  allowed was simply to allow Ms. Kurtz the fullest opportunity

12  possible to try and defend her misconduct.

13    So the Court unquestionably has the authority and

14  discretion to order monetary sanctions in this case.  Today's

15  hearing is not and should not be about your authority to

16  order sanctions.

17    The extent of the monetary sanctions, the amount of

18  money that Ms. Kurtz should pay, should instead, we submit,

19  focus on satisfying three important values.

20    First, fairness to the Cook County Sheriff's

21  Office.

22    Second, honesty and ethical conduct before the

23  tribunal.

24    And third, sanctions that are calibrated to the bad

25  faith conduct that she engaged in and those that will deter,

1    hopefully, future misconduct by Ms. Kurtz, who has,

2    unfortunately, a long history of misconduct in this circuit.

3            As to fairness to the Cook County Sheriff's Office,

4    the sheriff's office reposed trust in their executive

5    director of HR and shared privileged and confidential

6    information with her, not only about this case but also about

7    fitness-for-duty policy in general.  They had a right to

8    expect that she would not secretly retain a lawyer who

9    regularly sues them and, indeed, when this case was pending

10   at the same time as the retention.

11           Ms. Kurtz should have known the moment the

12   retention started that she was engaging in unethical

13   behavior.  Any "reasonably careful" attorney -- that's the

14   standard -- would have some doubt about the propriety of

15   working in secret for the executive director of HR of the

16   defendant in their employment case.

17           The appropriate inquiry at the time should have

18   involved disclosing the representation so that the sheriff's

19   office and/or the Court could act before the sheriff's office

20   was prejudiced and had to spend all that money.

21           As Judge Lee observed in the *Harris* case, which we

22   cited at Page 14 of our opening brief, in there he granted

23   sanctions where lawyers met with a former employee of a party

24   and obtained confidential and privileged information.  He

25   wrote, "Obligations of decency, fundamental fairness, and,

1    frankly, the golden rule prompt a lawyer to notify the other

2    party of such contact."

3              It's more egregious here because she was actually a

4    current employee at the time.

5              This is why the entire amount we seek, in my view,

6    is justified.  Had the engagement properly been disclosed, we

7    would not be here today arguing about all this money.

8              The second value is honesty and ethical conduct

9    before the tribunal.  This is a self-evident consideration

10   that's underscored by the *Fuery* decision, one that,

11   incredibly, Ms. Kurtz has steadfastly ignored despite its

12   obvious relevance to her and her repeated misconduct in this

13   circuit.  We have been citing that case since -- I think it

14   was August of last year.

15             Here, the record is clear that Ms. Kurtz and

16   Ms. Williams filed false declarations and made dishonest

17   factual claims to this Court.  That dishonesty was just part

18   of a deny, deny, deny game that Ms. Kurtz played until she

19   was caught and she changed her tune and her tactics.

20             This was all a game to Ms. Kurtz, one that she

21   strung out for months.

22             If you don't mind, I have a little graphic that I

23   would like to show.

24             THE COURT:  Sure.

25             MS. MARMOR:  Can I switch places with you?  Sorry.

1          I just have to make sure I know which way to

2    position this.

3          THE COURT:  It should be on the screen.  There.

4    That's fine.

5          MR. GALLINARI:  Thank you.

6          Are either of these multiple pages?

7          MS. MARMOR:  No, it's not.  That's fine.  We can

8    hand it up.

9          THE COURT:  We will also pull it up, but yes, if

10   you wouldn't mind.

11        (Document tendered.)

12        MS. MARMOR:  Okay.  I'm going to grab my water.

13        Good practice for when we get ready for trial.

14        THE COURT:  Right.  Okay.

15        MS. MARMOR:  So first, this is the Kurtz game plan.

16        First, deny, deny, deny.  And, in fact, that

17   permeated this entire process.  It even permeated the

18   current -- the motion -- the response to our motion before

19   this Court.

20        Second, file false declarations.

21        Third, ask for a surreply when, as you may recall,

22   your Honor, she said she hadn't even read our brief a month

23   after it was filed.

24        THE COURT:  Right.

25        MS. MARMOR:  Move for extensions to delay the

1    inevitable.  While those extensions were under consideration,

2    file a lien to protect her monetary interest.

3            And then file a malicious surreply and purport to

4    withdraw at the 11th hour.

5            And never admit that she did anything wrong and

6    ignore her history, the history we know about because of the

7    *Rojas* and *Fuery* cases.

8            THE COURT:  Well, for a while it had us all on TV.

9            MS. MARMOR:  I just noticed that.  We all looked

10    very good.

11            THE COURT:  We do look good.  And, you know, the

12    courtroom looks better on TV than it looks in real life.

13        (Laughter.)

14            MR. LINDEN:  It looks pretty nice in real life to

15    me.

16            THE COURT:  I guess.

17            MS. MARMOR:  So that's the Kurtz game plan.

18            And I submit that litigants and the Court deserve

19    better than this.  We hold lawyers to higher standards of

20    ethical behavior than we do laypeople.  They are called

21    "officers of the court" for a reason.  When legitimate issues

22    of ethics and professional responsibility are treated as a

23    game, significant sanctions are warranted, which leads to the

24    third value.

25            And I have lost my page.  There we go.

1    Sanctions that are calibrated to the misconduct and
2    might actually deter repeat transgressions.
3    Remarkably, not once in any of the many briefs to
4    this Court has Ms. Kurtz conceded any wrongdoing at all.  And
5    not once has she tried to show that these two decisions,
6    *Rojas* and *Fuery* from the Seventh Circuit that are explicitly
7    about her and her sorry history of ethical and procedural
8    lapses, should not rule the day here.  Those cases cry out
9    for a significant monetary sanction and must be considered.
10    I want to just quickly run over those cases.
11    *Rojas*, a 2015 decision from the Seventh Circuit --
12    it's 775 F.3d 906 -- was an interesting case.  It started out
13    at the trial level before Judge Holderman.  And a series of
14    misconduct during the trial by Ms. Kurtz led Judge Holderman
15    to order a new trial.
16    Later Judge Durkin took over the case and convinced
17    the parties to settle.  And after the parties had settled,
18    they discovered that Ms. Kurtz knew that her client had filed
19    for bankruptcy and had failed to disclose that fact to
20    defendants when she should have, an interesting parallel to
21    what's happened here.
22    That decision also lays out -- the decision from
23    the Seventh Circuit really ordered Judge Durkin to consider
24    sanctions, which he hadn't imposed at that time, and said
25    Judge Durkin also should consider Kurtz's disciplinary

1  history, which is substantial.  And it ran through, in 2004,

2  a case that said, circumstances in this case suggest that

3  Kurtz has engaged in gamesmanship.

4  2005, there was expert testimony barred as a

5  sanction for delay.

6  2008, a $5,000 fine for a long delay in filing an

7  opening brief.  This was from the Seventh Circuit.

8  And also, at the trial court level, a $250 fine for

9  discovery abuses.

10  2010, striking a statement of fact for failure to

11  follow citation rules.

12  2011, sanctions for delaying production of

13  documents for years.

14  2013, a $100 fine for missing a courtesy copy

15  deadline.

16  In *Rojas*, Judge Durkin ultimately did not decide to

17  issue monetary sanctions.  That's a very interesting fact,

18  because here is what the *Rojas* court had said to Judge Durkin

19  at Page 910 of the *Rojas* decision:  "Kurtz's unwillingness to

20  conform her conduct to requirements laid down by judicial

21  orders or rules of procedure is unlikely to change unless

22  courts respond firmly."

23  And the reality is, it did not change.  Her course

24  of conduct did not change.  How do we know that?  We know

25  that because of the *Fuery* decision and, frankly, this case.

1    In *Fuery*, a series of misconduct, including lying

2  to the court, led Judge Ellis to issue sanctions --

3    (Brief interruption.)

4    MS. MARMOR:  Sorry.

5    THE COURT:  It's listening to you.

6    MS. MARMOR:  Big Brother definitely.

7    That led Judge Ellis to issue sanctions *sua sponte*,

8  reversing a many hundreds of thousands of dollars' jury

9  verdict for Kurtz's client.

10    The Seventh Circuit affirmed.  And there are just

11  three short comments that I want to read from that decision.

12    This is 900 F.3d 450 at 467 and 468.  "The district

13  court was entitled to examine, as one factor in its

14  consideration, the *modus operandi* of the attorney as

15  evidenced by her prior disciplinary history."

16    The next one I think is very important, your Honor.

17  "Courts must rely on attorneys -- officers of the court -- to

18  uphold rules and operate with integrity and honesty in the

19  courtroom."

20    And the final.  "When an attorney repeatedly

21  violates the standards and oaths of the profession, then a

22  court may take notice of the court's *{sic}* disciplinary

23  history."  And in that case, they upheld Judge Ellis'

24  sanction.

25    So this leads to the last part of this third value,

1    which is, calibrate the sanctions to the bad faith conduct

2    and make sure that they are sufficient to deter future

3    misconduct.

4            What's interesting here is that Ms. Kurtz certainly

5    does not challenge our rates.  There is no serious challenge

6    to the amount of hours that were expended on this very

7    serious matter.

8            Instead, Ms. Kurtz argues that the sanction amount

9    should be reduced by 90 percent.  That will not achieve any

10   of the values we have discussed, and it is not supported by

11   any law.

12           By contrast -- and the reality is, this case is

13   something of an aberration, as the *Terrebonne* decision talks

14   about.  It's not usual for lawyers to behave this way.  So

15   there aren't zillions of cases out there that give us

16   parameters for how much damages can be -- excuse me -- how

17   much sanctions can be.

18           But we do have the *Analytica v. NPD Research*

19   decision from the Seventh Circuit -- that's 708 F.2d 1263

20   from 1983 -- in which the Court granted 25,000 in

21   1983 dollars, I would say, as a sanction for lawyers

22   obdurately refusing to withdraw from a case when they should

23   have for the same types of conflict issues that we have

24   presented here.

25           The *Terrebonne* case, which is a California case --

1    that's *Terrebonne Ltd. v. Murray*, 1 F.Supp.2d 1050, Eastern

2    District of California, 1998 -- they issued as a partial --

3    they gave partial amounts back to the lawyers of $22,000,

4    again in 1998 dollars.

5         So this leads me -- and I just have one more

6    graphic, and I will hand up a copy for your Honor.

7         (Document tendered.)

8         MS. MARMOR:  This chart that I have handed up to

9    your Honor breaks down the amounts that we seek.  You will

10   see at the top the amount we seek versus the maximum amount

11   that Ms. Kurtz is grudgingly willing to concede might be

12   awarded.

13        The first -- what this does is, it breaks down our

14   dollars by the tasks that we engaged in, in sort of large

15   tranches.

16        The first amount is the amount of money that my

17   firm spent preparing the May 25th, 2018, letter to Ms. Kurtz,

18   where we were trying to avoid being here today, where we laid

19   out the facts as we understood them, gave her case law, and

20   asked her to please consider what we were saying and withdraw

21   so we didn't have to file a motion.

22        She embarked on her denial campaign in response.

23   We received that denial letter and did some research in

24   response to it.  And we sent her a second letter basically

25   saying, what you are saying is not right.  It's not right

1   under the law, and it's not right under the facts.  Please

2   withdraw or we will file a motion.  And she never responded

3   to that.

4           We then filed our motion to disqualify on July 6th,

5   2018.  This involved an enormous document search.  If you can

6   imagine, we had to go back and look at thousands and

7   thousands of communications between Ms. Williams and the

8   various constituents that she was involved with.  And we

9   wanted to do a careful and good job, because we understood

10  that what we were asking this Court to do was somewhat

11  extraordinary.

12          The next tranche was the money expended -- this is

13  the extension game.  Ms. Kurtz decided that she needed -- she

14  took more than 60 days to respond to our motion.  We have a

15  small amount of money for trying to stop that, because part

16  of the issue was that we were concerned about the prejudice

17  to my client.

18          We then got her brief that contained just

19  extraordinarily dishonest declarations.  So we had to go back

20  and look at more documents and law to rebut the false

21  declarations and legal arguments that she made.

22          Then there was the hearing on the motion that I

23  just mentioned on November 1st, 2018, where Ms. Kurtz swanned

24  in, basically, and confessed to have not read our brief but

25  asked for a surreply.

1        And then there were, after that, two more motions.

2    Even though the Court had granted the right to a surreply,

3    there were two more motions by Ms. Kurtz for extensions.  And

4    then we saw her surreply, and we had our November 14, 2018,

5    hearing where the Court granted our motion to disqualify

6    Ms. Kurtz.

7        Those last two amounts are the only amounts that

8    Ms. Kurtz is willing to concede might even be recoverable as

9    costs here.

10        So we submit that all of these amounts are properly

11    awardable as "but for" sanctions in this case.

12        Rejection of the lien is a fair response to the

13    final and really crowning acts of gamesmanship and

14    impropriety by Ms. Kurtz, using the extensions to basically

15    run in and get a lien when she saw the writing on the wall.

16        To award only the paltry sums that Ms. Kurtz

17    grudgingly suggests would not serve any of the values that I

18    have talked about today.  And we ask the Court to help us

19    vindicate those values and grant our sanctions amount in its

20    entirety.

21        Thank you.

22        THE COURT:  Thank you.

23        Response?

24        MR. GALLINARI:  On behalf of Ms. Kurtz, yes, your

25    Honor.  Thank you.

1    Counsel said something.  And, you know, I'm not
2    here to reargue the disqualification or even the order
3    directing that sanctions should be imposed.  But I feel
4    compelled to respond to a lot of what counsel said that does
5    go to the merits, I suppose, of the sanctions issue.

6         One of the things that counsel said at the outset
7    was that Ms. Kurtz secretly represented Ms. Williams in
8    connection with this case.  And that's just not true.  And if
9    I misheard or if I misunderstood --

10        THE COURT:  That's not the way I interpreted it.  I
11   understood what Ms. Marmor to be saying is that she -- that
12   Ms. Kurtz represented Ms. Williams, who is the HR director
13   directly involved in this case.

14        MR. GALLINARI:  Okay.  Because the representation
15   of Ms. Williams by Ms. Kurtz, beginning in December of 2017,
16   which they knew about certainly by April of 2018, when they
17   had their first meeting with Ms. Williams and her attorney to
18   discuss Ms. Williams' own employment issues with the County,
19   that representation -- Ms. Kurtz had no way to believe that
20   representation was substantially related to Ms. Kurtz's
21   representation of Mr. Nawara.

22        The issues with respect to Ms. Kurtz's
23   representation of Ms. Williams had to do with Ms. Williams'
24   objections to issues regarding a 2017 reduction in force or
25   layoff that didn't impact Mr. Nawara at all.

1    The representation of Ms. Williams had nothing to

2    do with any issues that Ms. Williams had with a referral for

3    fitness for duty or fitness-for-duty policies in any way.

4    Ms. Kurtz's representation of Mr. Nawara had to do

5    with issues that arose with respect to Mr. Nawara's referral

6    for a fitness-for-duty examination and had nothing to do with

7    the layoff and other issues that related to Ms. Williams'

8    issues with the County.

9    Ms. Williams' issues with the County are still

10   being litigated in the Circuit Court of Cook County in a case

11   before Judge Valderrama, I believe.  I believe that the same

12   attorney who represents the County here represents the County

13   in that pending dispute.  And the Kurtz law firm represents

14   Ms. Williams in that pending dispute.  That has nothing to do

15   with what your Honor is presiding over here with respect to

16   the separate dispute between Mr. Nawara and the County.

17   So then the question becomes, at what point did

18   Ms. Kurtz's opposition to the request for disqualification

19   become objectively frivolous so that under 28 USC 1927, if

20   she is unreasonably multiplying the proceedings, counsel

21   would be entitled to an award from that date onward?  It

22   isn't just, let's find something bad and then punish her.

23   It's a more compensatory scheme under 28 USC 1927, as I

24   understand it.

25   But at the outset, the attorneys in *Analytica*, a

1    case that is cited to by counsel -- at the outset in

2    *Analytica*, the attorneys there knew that their current and

3    former representations were substantially related and that

4    their current and former clients were adverse to one another,

5    the standards under 1.9 for disqualification.

6            They argued frivolously to the court that the

7    *Westinghouse* precedence of the Seventh Circuit had been

8    overruled by other cases by the Seventh Circuit, when that

9    wasn't true.  The attorneys knew that their current and

10   former clients were adverse to one another, and they knew

11   that their representations of those two different people were

12   substantially related to one another.

13           Ms. Kurtz has no way of knowing this here.

14           We have an affidavit from Karyn Williams, the first

15   one that was submitted to your Honor, where she says,

16   Ms. Reierson may have spoken to me about Mr. Nawara.  I don't

17   remember.

18           I think that tracks with Ms. Reierson's subsequent

19   deposition testimony in this case that I have read, where she

20   says, yeah, I reported to Ms. Williams about what I talked

21   about with Mr. Nawara.  I don't remember the specifics.

22           So not only do we not have any presumption of

23   shared confidences between Ms. Williams and Ms. Kurtz about

24   the Nawara case, because they are not substantially related

25   matters, we don't have any evidence of any actual confidences

1    that were disclosed.

2          THE COURT:  I need to interrupt you for just a

3    second here.

4          MR. GALLINARI:  Yes, your Honor.

5          THE COURT:  Because my memory is that Ms. Kurtz

6    identified -- I think it was in her 26(a)(1) disclosures --

7    people above and below Ms. Williams in the HR chain involved

8    in the decisions regarding Mr. Nawara, but somehow, for some

9    reason, never explained -- didn't include Ms. Williams on the

10   list.

11         Now, you will say, well, because she knew nothing

12   about it and had no relationship to it and wasn't involved in

13   the fitness-for-duty issues and therefore was not a 26(a)(1)

14   disclosed witness.

15         But then, why identify people above her in the food

16   chain?  That's question one.

17         Question two I have for you is, let's assume that

18   everything you just told me is true and that Ms. Williams'

19   omission from the list of 26(a)(1) disclosures can be fully

20   understood under the circumstances.

21         How do you respond to the suggestion that whatever

22   Ms. Kurtz knew or didn't know at the time she filed the

23   complaint in early 2018, she certainly knew by May 25th or,

24   at latest, by July 6th?

25         MR. GALLINARI:  I will address that, your Honor.

1    THE COURT:  That's great.

2    MR. GALLINARI:  With respect to the first point, if

3    she is not -- if she is unaware of any information that

4    Ms. Williams has with respect to the Nawara case, there is no

5    reason to list her as a person --

6    THE COURT:  Agreed.

7    Did she have information about people even more

8    senior than Ms. Williams in the food chain, that those people

9    did have information?

10    MR. GALLINARI:  I don't know.  I don't know.

11    THE COURT:  It cries out for explanation, sir.

12    MR. GALLINARI:  Well, counsel points out that there

13    was a first amended complaint that did not name Ms. Williams

14    as a defendant, when other people were named as defendants in

15    other matters.  But that was in June of 2017 that the first

16    amended complaint was filed.  And counsel has agreed that it

17    was December of 2017 that Ms. Kurtz began representing --

18    MS. MARMOR:  Actually, I know you're not on this --

19    there was actually a previous -- that was the second amended

20    complaint that was filed in July.  The first amended

21    complaint was filed before that time.

22    MR. GALLINARI:  December of 2017 is when Ms. Kurtz

23    and Ms. Williams first spoke with one another and when

24    Ms. Williams says she retained Ms. Kurtz.  And there is no

25    evidence of any prior representation or communications

1    between Ms. Kurtz and Ms. Williams.

2              THE COURT:  With respect, Ms. Kurtz sat down with

3    Ms. Williams, and Ms. Williams said, I have been RIFed out of

4    a job.  I need a lawyer.  The sheriff's department has

5    treated me unfairly.

6              Wouldn't you really expect Ms. Kurtz first to do

7    the conflict check and say, you know, I'm representing other

8    sheriff's department employees.  Let's make sure that you

9    wouldn't be a witness in any of those other cases that I

10   would need to depose.  Or, what was your role?

11             We are not talking about one line sheriff's deputy

12   and another line sheriff's deputy.  We are talking about an

13   HR official.  Just by definition, an HR official often will

14   be involved in some fashion in an employment case filed by an

15   employee.

16             The idea that she wouldn't at least check that out

17   strikes me as at least careless.  Let's say "careless."  But

18   then carelessness can be excused.  Lawyers are careless.  We

19   all make mistakes.

20             I'm still concerned about what happens after

21   May 25th or, at latest, July 6th.

22             MR. GALLINARI:  I will tell you.

23             THE COURT:  All right.  Good.

24             MR. GALLINARI:  Counsel files a motion for

25   disqualification.

23

1          THE COURT:  A month later.

2          MR. GALLINARI:  But the motion for disqualification

3    is supported by documents that are submitted *in camera* for

4    your Honor's review.  And then the issue becomes whether or

5    not Ms. Williams had any involvement in Mr. Nawara's

6    fitness-for-duty referral.

7          THE COURT:  And she diligently -- and Ms. Kurtz

8    diligently investigated that?  Hard for me to believe, and

9    let me explain why.

10          Hard for me to believe that she diligently

11    investigated those concerns because as of -- I can't recall

12    the date, but there was a date on which she told me -- oh,

13    yes.  When she asked leave to file a surreply, she did so in

14    November, a month after the reply had been filed.  When I

15    said, you know, why didn't you let us know sooner?  Well, she

16    just got around to reading it now.  If she was just getting

17    around to reading the briefs a month after --

18          MR. GALLINARI:  The reply.

19          THE COURT:  The reply.

20          MR. GALLINARI:  Yes.

21          THE COURT:  It's hard for me to -- she just gets

22    around to reading the reply.

23          MR. GALLINARI:  And not --

24          THE COURT:  Oh, you know what?  They made some

25    important points.  I better respond.

1    Given that kind of conduct, it's hard for me to

2    imagine that she was diligently investigating this concern

3    back when the whistle was blown earlier in the year,

4    especially because it didn't take me very long to see what I

5    think is an apparent conflict.

6    MR. GALLINARI:  Well, there is no conflict that I

7    can see between the representation of Ms. Williams in her own

8    employment dispute and the representation of Mr. Nawara here.

9    THE COURT:  So, in other words, you are saying that

10   I was wrong in disqualifying her.  That argument -- that ship

11   has sailed.

12   MR. GALLINARI:  I understand that, your Honor.

13   THE COURT:  I don't want to hear an argument about

14   that.

15   MR. GALLINARI:  But I can understand that the

16   Court, in the proper exercise of its discretion, orders

17   disqualification.  I am not going to argue with that.

18   THE COURT:  Actually, to be technical here, I

19   didn't get to it, because I was about to do it when she

20   withdrew.

21   In other words, she understood that she needed to

22   find Mr. Linden or somebody else to represent her client or

23   else get out of the Williams case.  Maybe both.  I don't

24   know.

25   MR. GALLINARI:  I don't know that she did.  And I

1    don't know that --

2            THE COURT:  I think she did, because I think she

3    was caught in some of the declarations that were submitted

4    being untrue.

5            MR. GALLINARI:  Well, your Honor had pointed --

6    well, I don't think that the declarations are untrue.

7            THE COURT:  There was documentary evidence that was

8    inconsistent with some of the statements that had been made

9    in declarations.

10           MR. GALLINARI:  To the extent that Ms. Williams

11   made a false declaration, that would be on Ms. Williams.

12           But if you are talking about what happened -- we

13   are skipping around.  Let's go back to --

14           THE COURT:  I apologize.

15           MR. GALLINARI:  You have no reason to apologize,

16   your Honor.  I'm trying to address your concerns.

17           Let's go back to April and May of 2018, when, at

18   that point, Ms. Williams is no longer an employee of the

19   Circuit Court of Cook County.  She has either been terminated

20   or fired, depending upon who you believe.

21           But in April of 2018, she is no longer an employee

22   of the Circuit Court of Cook County.  So between April and

23   July when the --

24           THE COURT:  When the motion gets filed.

25           MR. GALLINARI:  -- when the motion was filed, there

1    is no restriction on Ms. Kurtz communicating with

2    Ms. Williams about issues that are raised, so long as she

3    does not solicit any privileged information, which she did

4    not do and which she has not done, in connection with that

5    inquiry that she undertook then, because Ms. Williams said,

6    as she declared in August of 2018, she didn't recall

7    Mr. Nawara.

8         Now, she said Ms. Reierson may have spoken about

9    him with me.  There may be emails that have my name on them,

10   but I don't know what they are or recall them.  I don't

11   believe or understand that I have anything to offer.

12        Ms. Kurtz has no intention of calling Ms. Williams

13   as a witness on Nawara's behalf while she is representing

14   Mr. Nawara.  The County has no intention of calling

15   Ms. Williams as a witness on their behalf in response to

16   Mr. Linden, who they have argued that Ms. Williams should

17   have no involvement in this case whatsoever.

18        On November 1st, your Honor says, well, that's

19   okay, Ms. Kurtz.  You are saying you are not intending to

20   call him as a witness, but what if the County does?  How are

21   you going to cross-examine your own client in another matter

22   in this case?

23        That was something that gave Ms. Kurtz pause,

24   because up until that point, nobody would have thought that

25   the County would call Ms. Williams as a witness in support of

1    its positions because --

2         THE COURT:  You know what?  You have never had the

3    experience that I have in about 90 percent of my cases, where

4    I have got a discovery schedule in place, and two weeks

5    before the conclusion of discovery somebody takes a

6    deposition and says, we just found out about some documents

7    and some witnesses that we didn't know about that we are

8    going to have to -- that's never happened to you?  You have

9    lived a charmed life.

10        MR. GALLINARI:  Well --

11        THE COURT:  It happens all the time.  You don't

12   know until you have completed the discovery who out there has

13   information that's going to be useful.

14        The idea that the HR director wouldn't have

15   information that's useful in an employment case just does not

16   pass the test.  It just does not pass the test.

17        But again, I don't want to revisit the

18   disqualification issue.

19        The reason I thought we were having this hearing is

20   to determine which of this -- you know, Ms. Marmor's list

21   here --

22        MR. GALLINARI:  Yes.

23        THE COURT:  -- which of these are compensable and

24   which are not, and where do we draw that line?

25        My inclination is to draw the line right below --

1    right below the second bullet point in this list.

2         MR. GALLINARI:  Well, I believe that -- here is

3    what we propose, first of all.

4         Counsel has referred to Ms. Kurtz and the

5    possibility of Ms. Kurtz submitting a fee petition should

6    Mr. Nawara prevail in this matter.

7         THE COURT:  I do intend to ask Mr. Linden what's

8    his view on Ms. Kurtz's lien proposal, because when we sit

9    down to settle the case, if that ever happens, I can just

10   imagine, well, we can't, because there is this great big

11   lien.  I can just imagine that discussion.  I have been in

12   too many settlement conferences to know any better.

13        MR. GALLINARI:  That's why I think what we would

14   propose would be that Ms. Kurtz forfeit any right to

15   attorneys' fees for her representation of Mr. Nawara in this

16   case, whether it be pursuant to lien or the fee petition that

17   she would otherwise be submitting if Mr. Nawara were to be a

18   prevailing plaintiff.

19        And if Mr. Nawara were to be a prevailing plaintiff

20   and Ms. Kurtz were to submit a fee petition, that is money

21   that the County would be paying.  That is money that, if

22   Ms. Kurtz withdraws any right to her claim for attorneys'

23   fees, which is what we propose to do, the County would not

24   have to pay that money.  The amount of fee petition that she

25   would file would be in excess of $100,000, setting aside any

1    work that she did on the motion for disqualification, which I

2    agree is not collectible in any respect.  But that would more

3    than compensate the County.

4         If that is not an agreeable proposal for the Court,

5    then I would say, in the alternative, it's everything that

6    happens after November 1st onward with respect to the

7    disqualification motion, because your Honor reviewed the

8    disqualification motion in light of paper that Ms. Kurtz

9    never saw and has never seen.

10        The presumption of shared confidences doesn't kick

11   in because the representations of Williams and of Nawara were

12   not substantially related to one another, which means, even

13   if the disqualification is proper -- and I'm not arguing that

14   it wasn't -- there is no binding authority, the way there was

15   in *Analytica*, that gives an attorney the legal authority

16   saying, this is not a position where you can argue to the

17   Court's discretion there is binding legal authority telling

18   you to get out.  We don't have that here.  This is a novel

19   situation.

20        And given the fact that there was no presumption of

21   shared confidences and no actual shared confidences, because

22   Ms. Williams' declaration and the witness testimony in this

23   case is consistent to whatever extent there were

24   communications or involvement by Ms. Williams, it was at a

25   level where she doesn't have any recollection, because the

1    people who actually made the decisions were her subordinates
2    that she referred the FFD to.  And to the extent that they
3    reported back up to her, it was in connection with other
4    things, and she doesn't recall specifically.

5          So to the extent that your Honor is saying, you
6    know, I have looked at this, and I think that you are
7    treading on thin ice, Ms. Kurtz.  You better think long and
8    hard about what you are doing from November 1st, 2018
9    onward -- I think that, to the extent that the Court needs to
10   say, yes, there was an unreasonable multiplication of these
11   proceedings, our position, for the reasons that we set forth
12   in our response in opposition to the motion for sanctions --
13   we don't just discuss whether or not sanctions should be
14   awarded, as your Honor will recall.  We also state why, if
15   the Court orders that sanctions should be ordered under 1927,
16   it really should only be after the November 1st hearing,
17   because prior to that, we didn't even have any sense of what
18   this *in camera* submission to the Court consisted of.

19         When your Honor began discussing it with Ms. Kurtz,
20   then arguably there can be a finding of unreasonable
21   multiplication and fees incurred from after that date, but we
22   don't think it would be proper beforehand.

23         MS. MARMOR:  Your Honor, can I very briefly
24   respond?

25         THE COURT:  Sure.

1        MS. MARMOR:  So there are several fundamental

2   problems with this argument.

3        The first is that it flows almost entirely on

4   taking Ms. Kurtz and Ms. Williams at their words.  And I

5   think the record is pretty clear at this point that the

6   declarations that they have filed in this case cannot be

7   credited.

8        Further, this notion that there was no sort of

9   commonality of the representation, again, requires that we

10  rely solely on the statements of Ms. Kurtz and Ms. Williams.

11       One of the really fundamental problems, as you may

12  recall, is that Ms. Williams has these notebooks.  She

13  took -- and there were declarations in this case from my

14  client pointing out that in every single meeting which she

15  had, she would take incredibly detailed notes of what was

16  said.

17       We have asked for those notebooks, and Ms. Kurtz

18  has -- who now has them and admits that she has them, has

19  steadfastly refused to return them.  That is, in fact, what

20  the case in front of Judge Valderrama is about.  It's not

21  about Ms. Williams' employment issues.  That is a

22  counterclaim she was trying to make in that case, and there

23  is actually a motion to strike the counterclaim.

24       That lawsuit was filed contemporaneously with what

25  was going on in this case because of the violations of her

1    duties of loyalty to her employer.

2         This notion that the amount should be cut off at

3    November 1st, when counsel says that's when the Court was

4    saying, you should think long and hard from this point --

5    your Honor, Ms. Kurtz should have thought long and hard from

6    day one.  And she certainly should have thought long and hard

7    after we provided her with the authorities and the

8    information that we did in our letters.  That's the first two

9    bullet points.

10        I would have no problem with your Honor knocking

11   those amounts out of the sanctions and awarding the rest.

12        And the final comment I would just like to make is

13   that the idea that Ms. Kurtz should be allowed to simply

14   withdraw her lien, a lien that, frankly, was improperly filed

15   in the first place, that abused the court process by asking

16   for extensions -- not to file her surreply but to get her

17   ducks in a row so she could protect her monetary interest --

18   the major problem with that not only is that it rewards

19   unethical conduct and improper conduct, but it also does not

20   compensate the sheriff's office for the fees that it had to

21   pay.  It's based on kind of a theory about what might happen

22   in the future.

23        And that's why I talked about calibrating the

24   sanctions to the wrongdoing here.  I think the fairest

25   calibration of the sanctions is to allow all, or at least

1    most, of the amounts that we seek.

2              MR. LINDEN:  Can I just make a couple comments,

3    your Honor?

4              THE COURT:  Sure.

5              MR. LINDEN:  Richard Linden on behalf of the

6    plaintiff.

7              As I think the Court is aware, we didn't know --

8    learn anything about the case until me and my partner, Peter

9    Bustamante, took it over.

10             THE COURT:  Right.

11             MR. LINDEN:  But since we have completed our

12   discovery, we have taken, I think, six or eight depositions.

13   We filed the depositions of Rebecca Reierson, Nurse Shelby.

14   Took the deposition of Matthew Burke, who's the one, I

15   think -- I forget his title -- assistant director.  He made

16   the referral.  From all we could tell, sent a memo to

17   Ms. Williams.  And then Ms. Williams, I believe, handed off

18   the referral or request for a fitness-for-duty evaluation to

19   Rebecca Reierson, who worked underneath Ms. Williams.

20             We have asked every witness.  Your Honor has

21   transcripts for Rebecca Reierson, Ms. Shelby.  We took

22   Matthew Burke's deposition.  We took Jones-Hayes' deposition,

23   who's the one that sent a memo to Matthew Burke, who led the

24   referral for the fitness-for-duty exam.  We have deposed

25   Sergeant Connelly.  Everybody involved, as far as I can tell.

1  We have asked, I believe, every witness, did Karyn Williams,
2  to the best of your knowledge, have any involvement with
3  respect to Mr. Nawara in the fitness-for-duty exam?  And each
4  one of them says, no.

5        So our investigation has shown that she had nothing
6  to do with it.  I don't know what documents may have been
7  filed under seal, but we don't intend to call her as a
8  witness.  I don't see any reason or any information that I
9  know of that Ms. Williams would have to this case.

10        MS. MARMOR:  Your Honor?

11        MR. LINDEN:  That's all I could add.  I mean, I
12  don't see any connection that we have obtained in discovery
13  that she had anything to do with anything about Mr. Nawara.

14        MS. MARMOR:  Your Honor, this is exactly the same
15  argument we had in October.  There are, in fact, documents.
16  They are attached, and they are not *in camera* documents.

17        THE COURT:  They are not under seal.  Right.

18        MS. MARMOR:  This is just not an accurate
19  statement.

20        THE COURT:  In any event, we are not revisiting the
21  disqualification issue, which is what you are asking me to
22  do.  That's not happening.

23        I think a responsible lawyer would have known that
24  to represent Ms. Williams, to whom, by your own story just
25  now, the memo was sent regarding Mr. Nawara's situation, that

1    it was okay to represent her at the same time that she

2    represented Mr. Nawara made no sense.  But even if it did, as

3    of May 25th, there was a letter regarding this issue from

4    counsel and a response to her denial letter a month later --

5    a few days later.  Those were the whistles that needed to be

6    blown.

7              I think the costs after June 1 from this bullet

8    list all have got to be compensated.

9              I will also strike the lien.  Let me just point out

10   that to merely strike the lien and prohibit recovery of fees

11   would -- first of all, would have bite with respect to

12   Ms. Kurtz only if Mr. Nawara prevails.  We don't know that he

13   is going to prevail.

14             MR. GALLINARI:  I understand that, your Honor.

15             THE COURT:  That's one issue.

16             Another issue is that I think Ms. Marmor is correct

17   that it has no -- it provides no relief against the party

18   that's been victimized, which is the County; its taxpayers,

19   who had to pay now for months and months of litigation that

20   should not have been necessary; and, as an aside, the federal

21   taxpayers as well.  We lost six months of progress.  I

22   devoted substantial time to this.  None of this should have

23   been necessary.

24             Ms. Kurtz knew or should have known -- certainly

25   should have known in the exercise of good judgment, you don't

1    need a court opinion that specifically holds in a particular

2    direction in order for a lawyer to know what is not a good

3    idea to do.  And this was not a good idea.  And even if she

4    thought it was, she was told why it wasn't several times, and

5    she simply chose to press on until time marched on.

6         Other conduct confirms that Ms. Kurtz's

7    investigation was not as searching as it should have been.  I

8    don't want to beat this horse too dead, but to come and ask

9    me for leave to file a surreply because one hadn't read the

10   reply for a month just smacks of a lack of attention.

11        And the Court's decision is to grant a surreply

12   can't be used as some kind of an indication that I thought

13   that there was some merit to this.  It's the contrary.  It's

14   that I don't want to create some record of harshness to this

15   attorney.

16        You know, Ms. Kurtz is an extremely intelligent --

17   you might say almost brilliant lawyer.  She is very, very

18   effective.  Why she needs to engage in conduct like this

19   completely escapes me.

20        She tried a case before me involving Mr. Nawara and

21   many of his colleagues in which she won millions of dollars

22   on what I would tell you was, from what I could tell, not an

23   overwhelming case.  She is an extremely able lawyer.  She

24   does not need to do this kind of thing.

25        MR. GALLINARI:  Your Honor's reference to the

1  events of November 1st are part of the reason why we are

2  willing to agree that fees incurred after that date would be

3  an appropriate sanction under 1927.  We just disagree with

4  the imposition of fees for the date before that.

5          THE COURT:  Well, I'm afraid you are going to have

6  to tell your disagreement to the Court of Appeals.

7          I am awarding $54,341.  That's $62,248 requested

8  net of the -- or less the amounts prior to -- less the

9  amounts related to the May 25th letter and the June 1 letter.

10          MS. MARMOR:  Thank you, your Honor.

11          Could I ask one quick question looking forward to

12  trial?

13          THE COURT:  Sure.

14          MS. MARMOR:  We are trying to figure out exactly

15  what your Honor might like in terms of the date for motions

16  *in limine*, and I was sort of assuming that would be the same

17  day as the pretrial order.

18          THE COURT:  Yes, submitted with the final pretrial

19  order.  Once I look at those, I will make a decision about

20  how long I will need for a final pretrial conference to rule

21  on them.

22          MS. MARMOR:  Okay.  Thank you, your Honor.

23          MR. GALLINARI:  54,341?

24          MS. MARMOR:  Yes.

25          THE COURT:  I'm sorry?

1       MR. GALLINARI:  The net total, 54,341?

2       THE COURT:  54,341.

3       MR. LINDEN:  Just for the record, there is no

4   sanctions against the plaintiff individually.

5       THE COURT:  Correct.  There is no indication that

6   Mr. Nawara was implicit in this.

7       MR. GALLINARI:  Are you ordering a date by which

8   the --

9       THE COURT:  I should say "complicit."  I'm sorry.

10      MR. GALLINARI:  Are you ordering a date by which

11  the amount is to be paid, or is that to go with --

12      THE COURT:  I think it should be paid in 60 days.

13      All right.  Thank you.

14      MS. MARMOR:  Thank you, your Honor.

15      MS. KAMPER:  Thank you.

16              *    *    *    *    *

17  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

18

19  /s/ Frances Ward_____December 17, 2019.
    Official Court Reporter

20  F/j

21

22

23

24

25