**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**DEFENDANTS THOMAS DART, MATTHEW BURKE, REBECCA REIERSON, AND WINIFRED SHELBY'S MOTIONS *IN LIMINE***

Plaintiff John Nawara has three claims remaining in this case: for violation of the Americans with Disabilities Act ("ADA") (Count I) against the CCSO based on an allegedly wrongful inquiry into a disability in connection with Nawara being sent for a Fitness for Duty examination; for violation of the Illinois Whistleblower Act (Count IV) against all defendants based on the allegation that he was punished for raising arguments about the FFD forms he was asked to complete by Defendants Reierson and Shelby; and for violation of his due process rights in connection with the Cook County Sheriff's Merit Board Act (Count V) (apparently against all defendants) based on the theory that he should have been sent for a Merit Board determination before being placed on leave pending completion of the Fitness for Duty process.

In light of the claims in this case, the exhibits and arguments defendants anticipate will be proffered by Plaintiff, and pursuant to the Federal Rules of Evidence and related case law, Defendants Thomas Dart (in his official capacity as Sheriff of Cook County), Matthew Burke,

Rebecca Reierson, and Winfred Shelby ("Defendants") hereby submit the following Motions *in Limine*.

**1. DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO BAR BLANKET REFERENCE TO "DEFENDANTS."**

There are four individual defendants (Jones-Hayes, Burke, Reierson, and Shelby) and one entity defendant (Thomas Dart in his official capacity) in this case. As a matter of law, Nawara must prove his case and any claim for damages as to each defendant separately. *See* 745 ILCS 10/2-204 ("a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person."); *Miller v. DuPage County*, 2018 U.S. Dist. LEXIS 133083, *7 (N.D. Ill. Aug. 8, 2018) ("Individual-capacity liability under § 1983 requires a defendant's personal involvement in the alleged constitutional violation."). Referring to "defendants" as a monolithic group would prejudice all of them by leading the jury to believe that a particular defendant may be liable under an improper theory of collective responsibility – and not limited to their own conduct. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed."); *see also* FED. R. EVID. 403. Thus, this Court should bar Nawara and his counsel from referring collectively to "defendants" in opening statements, examinations, in jury instructions, and in argument rather than to them individually.

The undisputed facts in this case as to Defendant Burke illustrate the need for this motion *in limine* to be granted. As Burke has testified, his only involvement in this case is that he sent a referral to HR asking them to assess whether Nawara should undergo a fitness for duty exam. (10/10/19 Burke Dep. At 97:7-99:11, Ex. A). There are no facts in this case showing that Burke

had anything to do with the medical release forms provided to Nawara, the fitness for duty ("FFD") process after the initial referral to HR, or Nawara's employment status after he refused to participate in the FFD process – and indeed, in his deposition, Burke confirmed that "[o]utside of reading the complaint," he has no "knowledge about Nawara being required to sign any medical release." (*Id.* 99:8-11.) Burke testified that he believed his "only involvement [in the FFD process] would be the referral [to HR]" and that after the referral he did not have "more to do with the [FFD] process." (*Id.* 97:7-20.) Burke's only involvement in Nawara's FFD process after the referral to HR was to help facilitate communication between Jones-Hayes and HR. (*Id.* 97:21-98:2.) He did not "know anything about what forms were used by HR for fitness for duty examinations" nor did he "have anything to do with drawing up the forms." (*Id.* at 98:3-99:11.)[1] There simply are not facts in this case to the contrary. Accordingly, any blanket reference to "defendants" by plaintiff unfairly and improperly would lump Burke into activities with which he had absolutely no involvement. This same point also applies to Defendant Jones-Hayes who, other than providing a statement to HR, had nothing to do with Nawara's FFD process or his time off work.

Pursuant to FED. R. EVID. 401 and 403, the prejudice and resulting confusion that would ensue should preclude Nawara and his counsel from referring collectively to "defendants" in opening statements, arguments, and questioning before the jury.

**2. DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO BAR REFERENCE TO AND ANY EVIDENCE RELATED TO CLAIMS PREVIOUSLY DISMISSED FROM THIS CASE.**

---

[1] Indeed, on this basis alone, Burke should be dismissed from this case since there is no evidence that he participated in any of the actions that allegedly violated the ADA, the Whistleblower Act, or due process.

Plaintiff must not be permitted to reference, offer evidence of, or argument about any of the claims that previously have been dismissed or barred in this case. Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "**the fact is of consequence in determining the action**." FED. R. EVID. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (emphasis added). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907. Here, evidence about the *Burruss* lawsuit, Nawara's internal complaint against Jones-Hayes, his allegations of First Amendment and Whistleblower retaliation based on *Burruss*, and his claim of violation of Title VII all is irrelevant to this case and will not present facts of consequence in determining this action because the Court already has dismissed Nawara's First Amendment, Title VII, and Whistleblower claims (the latter in part). (Dkt. 187). Likewise, there should be no evidence of or argument about the allegation that Nawara's promotion to the Sheriff's Police was delayed, as the Court denied Plaintiff's Motion for Leave to Amend his complaint to add a claim regarding failure to promote. (Dkt. 208).

Specifically, the Court dismissed Count II as against all Defendants (for First Amendment retaliation pursuant to §§ 1983 and 1988 based on the *Burruss* suit); Count III (for Title VII retaliation based on an internal complaint Nawara filed against Jones-Hayes) and part of Count IV (for Whistleblower retaliation based on Nawara's participation in the *Buress* suit). And the Court ruled that the effort to add supplemental counts relating to an alleged delay in promoting Nawara after his return to duty was too late and unrelated to this case. (9/6/19 Hrg. Tr. at 3-4, Ex. B).

Defendants request an order *in limine* that there be no testimony or documents referring to those dismissed or barred claims. Any such evidence and arguments are irrelevant to the remaining

claims in this lawsuit and any probative value this evidence might have is substantially outweighed by the danger of prejudice and juror confusion, as such evidence of "retaliation" for the *Burruss* lawsuit and/or for filing an internal complaint against Jones-Hayes would likely lead the jury to decide the case on an improper basis or would serve to offer evidence of "bad acts" against the defendants. *See* FED. R. EVID. 403, 404(b); see also *Artunduaga v. Univ. of Chi. Med. Ctr.*, 2016 U.S. Dist. LEXIS 169460, *11 (N.D. Ill.) (excluding evidence of dismissed claims as prejudicial and confusing); see also Scott v. City of Chicago, 724 F.Supp.2d 917, 927 (N.D. Ill. 2010) (excluding evidence of bad conduct discharge because it would only serve the purpose of "dirtying up" plaintiff with unrelated bad acts evidence).

Plaintiff's proposed trial exhibits 28 and 49 include reference to dismissed theories of liability. (Attached hereto as Ex. C). Both relate to the EEOC charges Plaintiff brought in 2017 and refer to Title VII in the self-serving hearsay attachments to them. Because there is no Title VII claim in this case, these documents should be inadmissible as irrelevant, hearsay, and prejudicial. Plaintiff's Exhibit No. 3 (attached as Ex. D) is the Internal Complaint filed by Nawara against Jones-Hayes – a document no defendant in this case ever saw prior to taking any action complained about in this case, and there is no evidence to the contrary – and Plaintiff's Exhibit 100 is an email from non-party Jeff Johnsen to OPR attaching Nawara's complaint register. These documents should be inadmissible for the same reasons. Finally, Plaintiff's Exhibits 8, 9, 13, 14, 45, 46, 47, and 48 are emails from Nawara and/or his former attorney, Dana Kurtz, to Reierson in which they refer to Nawara's complaint against Jones-Hayes for retaliation and/or retaliation for the *Buress* lawsuit. To the extent these documents come into evidence at all, they should be redacted and Plaintiff should be barred from making any reference to these dismissed matters before the jury. (*Compare* Ex. E to Ex. F.)

**3. DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO BAR ANY REFERENCE TO PLAINTIFF'S INTERNAL COMPLAINT.**

For the same reasons provided above, Nawara should not be permitted to make any reference before the jury to his internal complaint against Jones-Hayes (PX 3, attached hereto as Ex. D), nor should that document – and any documents referencing it – be admitted into evidence at trial. And there is an additional reason not to permit use of or reference to the internal complaint – Nawara has adduced no evidence in this case that any of the Defendants were even aware that he had filed such a complaint. (See, e.g., 9/20/19 Reierson Dep. at 94:18-21, Ex. G; 10/10/19 Burke Dep. at 115:13-116:7-10, Ex. A; 11/4/19 Jones-Hayes Dep. at 110:3-8, Ex. H; 9/25/19 Shelby Dep. at 60:11-12, Ex. I.)

The only source of the allegation that Nawara's internal complaint somehow had a bearing in the issues in this case – his FFD referral and the forms that are at issue – is hearsay correspondence from Dana Kurtz to Rebecca Reierson that was sent *after* Nawara had been referred for an FFD exam and presented with medical information release forms. *See* PX 8, Ex. J; *see also* FED. R. EVID. 801. A causal connection cannot be created after-the-fact by self-serving and inadmissible lawyer argument. For this reason, if Kurtz's and Nawara's emails come into evidence in this case, any reference to the allegation that the FFD/release forms issue was related to the internal complaint (or, for that matter, to the *Burruss* suit) must be redacted from these documents. Defendants attach hereto the exhibits in both redacted and unredacted form to show what portions should not be presented to the jury. (See Exs. E and F.) Any probative value of these allegations is far outweighed by the prejudicial effect of introducing dismissed matter and rejected theories into this case. *See* FED. R. EVID. 403.

**4. DEFENDANTS' MOTION *IN LIMINE* NO. 4 TO BAR LEGAL ARGUMENTS MADE IN PRE-LITIGATION CORRESPONDENCE.**

For much the same reasons – hearsay and prejudice – Kurtz's references to specific case law in her correspondence with Defendant Rebecca Reierson should be dismissed. In an email dated March 13, 2017, Kurtz wrote that "the law requires that in order for an employee to be ordered to see the employer's selected doctor for a fitness for duty evaluation, there must be a business necessity," and cited to *Wright v. Illinois Dept. of Children and Family Services*, 798 F. 3d 513 (7th Cir. 2015), and again cited to *Wright* in an email to Reierson dated March 8, 2017. (PX 10, 47, 88, attached hereto as Ex. K). Plaintiff has listed these documents, without redaction, on his proposed exhibit list. These documents are, insofar as Plaintiff tries to offer them, hearsay in their entirety. They are Kurtz's out of court statements making self-serving allegations on behalf of her client. Moreover, they cannot be admitted through Plaintiff since he did not draft them and Kurtz has not even been named as a witness in this case and therefore cannot appear to lay a foundation for their admission by Plaintiff, if any.

To the extent these documents may come into evidence, they can only come in through Defendants as admissions by Nawara's agent. There is no exception to the hearsay rule that could apply to permit Nawara to enter them into evidence for the truth of the matter asserted – they are not business records, for example, since Nawara is not a business. *See* FED. R. EVID. 801, 802, 803. And there is no other exception to the hearsay rule that should apply. *See United States v. Harris*, 914 F.2d 927 (7th Cir. 1990) (statements of defendant's former attorney were admissions of defendant only because they were statements made by defendant's agent). But in whatever manner they may come into evidence, these documents must not include references to case law, pursuant to FED. R. EVID. 403. Dana Kurtz's interpretations of case law and what it means will invade the province of the jury instructions in this case and are likely to confuse the jury. The proposed redactions preserve the point that Kurtz believed there was something improper about

the FFD referral and, later, with the medical information release forms – a fair balance that protects the rights of all parties to this suit. Accordingly, Defendants ask that the redacted versions of these documents be the only ones permitted into evidence, if at all, and that Nawara be barred from referring in any way to legal authorities referenced in Kurtz's correspondence. *See Klaczak v. Consol. Med. Transp. Inc*., 2005 U.S. Dist. LEXIS 13607, *39-37 (N.D. Ill.) (excluding most of expert's report "under Rule 403 because [the expert's] assertions about the ultimate legality of various challenged practices contain various implicit legal determinations that invade the province of the Court").[2]

**5. DEFENDANTS' MOTION *IN LIMINE* NO. 5 TO BAR USE OR REFERENCE TO ANY CORRESPONDENCE BETWEEN UNION LAWYERS AND THE CCSO REGARDING NAWARA.**

Likewise, Plaintiff should be barred from using or referring to correspondence with a union lawyer concerning his FFD referral. Plaintiff's exhibits include correspondence from a lawyer from his union, Nicole Chaney, that is hearsay and makes claims (about a "Weingarten violation" and past debates with the union) that are not at issue in this lawsuit. (See PX 91, Ex. L). Ms. Chaney has not been identified by either party as a will call or may call witness in the Pretrial Order. Nonetheless, Plaintiff includes this email from her to Peter Kramer, Mark Robinson, and Dennis Andrews who likewise have not been named as witnesses in this case. As such, the statements made by Ms. Chaney are entirely hearsay under FED. R. EVID. 801 and should not be permitted in this case.

Ms. Chaney's email also contains information that could prejudice Defendants if provided to the jury. The email refers to a potential "Weingarten Violation" and states that the FFD referral

[2] To the extent the Plaintiff argues the documents should come in as notice, the redactions are a fail way to preserve the point without prejudicing the Defendants.

was "retaliatory and unfounded." (See PX 91, Ex. L). Pursuant to this Court's ruling on the motion to dismiss, Plaintiff's remaining claims regarding the FFD process relate only to whether the medical release forms themselves were a permissible inquiry – not whether the referral for an FFD examination itself was unlawful. (Dkt. 187 at 12-15.)

Without specifying her reasoning, Ms. Chaney then goes on to make her own factual conclusions that the requested medical records "have no relationship with the 'alleged incident' and that Plaintiff is being "divested [] of pay without due process." (*Id.*) These are central issues in this case and within the sole province of the jury. Allowing Plaintiff to introduce this email would prejudice Defendants because it replaces the jury's fact-finding inquiry with the conclusions of a union lawyer who has never been deposed and who will not be a witness at trial. Moreover, despite Ms. Chaney's assertions regarding Plaintiff's FFD process, the union in fact declined to pursue this matter, making these documents inadmissible hearsay for any purpose. (*See* 10/2/19 Nawara Dep. at 158:19-159:6 (testifying he engaged in conversations with the union "until the point where they told me they couldn't do anything about it.").)

For the reasons stated above and on similar grounds as Motion *in Limine* No. 4 to bar Ms. Kurtz's emails, this Court should bar the use or reference of correspondence by Plaintiff's union lawyers.

### 6. DEFENDANTS' MOTION *IN LIMINE* NO. 6 TO BAR DOCUMENTS AND REFERENCE TO CONCLUSIONS REACHED BY THE COOK COUNTY SHERIFF'S OFFICE OF PROFESSIONAL REVIEW.

Plaintiff has included on its proposed exhibit list numerous documents concerning an Office of Professional Review ("OPR") investigation into Jones-Hayes's complaint against Nawara for his behavior on September 28, 2016. Both Rebecca Reierson and Winifred Shelby – the defendants who made the decision to send Nawara for an FFD exam – testified that the reason

Nawara was sent for a fitness for duty evaluation was Nawara's demeanor and conduct in their meeting with him in HR on November 18, 2016 – and there is no testimony or evidence to the contrary in this case. (Ex. G, Reierson Dep., at 179:20-180:24; Ex. I, Shelby Dep. at 67:2-70:9). The jury thus could find the FFD referral and the process related thereto were appropriate without ever coming to a conclusion about what actually transpired on 9/28/16.

Nonetheless, Plaintiff seeks to admit Plaintiff's Exhibit numbers 68, 71-72, 79-81, 83, 86, 89-90, 111, and 117, which include questions from the OPR investigator, statements of those witnesses whom OPR chose to interview, statements from two of the parties in this case (Nawara and Jones-Hayes), various emails regarding the investigation, and a final determination by the OPR that it had "insufficient evidence" to conclude that Nawara had violated "CCSO rules, regulations and/or policies" in his altercation with Jones-Hayes on September 28, 2016. (PX 90 at CCSO_3039, Ex. M). The OPR did not consider the HR meeting at all in its proceedings, and that meeting is not part of their record.

The OPR investigation process has no probative value in this case, nor should the findings by OPR be presented to the jury. As a threshold matter, OPR investigations are different from FFD referrals – one seeks to determine if CCSO rules have been violated and if discipline should ensue; the other is non-disciplinary and seeks to determine if an employee can safely do his job in the specialized environment in which correctional officers work. Here, that distinction is even more pronounced – OPR was not tasked with examining whether Nawara's FFD referral was appropriate. Three of the four individual defendants were not interviewed at all, and many of the other witnesses in this case likewise were not interviewed. Not even all of the witnesses who were present in at the 9/28/16 altercation between Nawara and Jones-Hayes were interviewed, nor were those who spoke to Jones-Hayes immediately following the events of that day. To supplant the

jury's process of considering the evidence about the 9/28/16 altercation would be inappropriate and prejudicial to the defendants. It also could well confuse the jury, since the issue in this case is not whether in fact Nawara's or Jones-Hayes's version of the events on that day is true or not.

Courts regularly exclude OPR findings for this very reason – that evidence of OPR's findings would unfairly prejudice the defendants by allowing one or two OPR investigators to supplant the jury's role. *Lyles v. Gambino*, 2019 U.S. Dist. LEXIS 189295, *15 (N.D. Ill.) ("[T]he potential prejudice from testimony regarding the substantive findings of the OPR investigation would substantially outweigh the limited probative value of such findings for the jury."); *Delgado v. Mak*, 2008 U.S. Dist. LEXIS 27140, *5 (N.D. Ill.) (excluding internal affairs investigation because "the potential prejudice from testimony about the IAI substantially outweighs its questionable probative value").

To be clear, some aspects of the OPR files may be admissible. Specifically, the admissions of any party to the litigation, *i.e.*, Jones-Hayes and Nawara. *See Delgado*, 2008 U.S. Dist. LEXIS 27140, *5 (allowing OPR testimony for impeachment and admissions of a party opponent). All other statements and conclusions are hearsay and prejudicial and should be barred. To the extent that the Court allows the OPR process to be referenced, Defendants request an instruction that the OPR investigation had nothing to do with whether or not the Fitness for Duty evaluation and accompanying forms were appropriate and had only to do with discipline for the confrontation on September 28, 2016.

### 7. DEFENDANTS' MOTION *IN LIMINE* NO. 7 TO BAR ANY REFERENCE TO ANY DEFENDANT AS A "FINAL POLICY MAKER."

Nawara has not created any record that any of the individually named defendants in this case can be considered final policymakers for purposes of any due process liability. It is not clear

how Nawara intends to proceed with this claim, but to the extent that Plaintiff intends to impose liability on the CCSO for the actions of its employees, Nawara and his counsel should be precluded from referring to any of the Defendants as "final policymakers" for the purposes of establishing *Monell* liability.

To prove such a § 1983 claim against the CCSO, Nawara must show that a deprivation of his due process rights resulted from a custom or policy of the CCSO. *See Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978). A plaintiff may establish a "custom or policy" of the entity by showing that "the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). To be a final policy maker, the individual must have the "authority to make policy, laws, or rules for the conduct of government; a person who merely implements existing law—rather than creating it—does not act with policymaking authority." *Foggey v. City of Chicago*, 2018 U.S. Dist. LEXIS 18225, *22-23 (N.D. Ill. Feb. 5, 2018) (internal quotation marks omitted).

The Second Amended Complaint makes the purely conclusory, rote, and insufficient allegations that Defendants Jones-Hayes, Burke, Reierson, and Shelby are "final policy maker[s] for the Sheriff's Office with regard to [their] acts and conduct alleged herein." (SAC Dkt. 89 at ¶¶ 22, 25, 27, 30.); *See Foggey*, 2018 U.S. Dist. LEXIS 18225 at *22-23 (dismissing *Monell* claim). However, Nawara has not created any record in discovery that any Defendant made or had authority to make any policy, laws, or rules for the CCSO, much less any that would be relevant to Nawara's claims. Allowing him or his counsel to now refer to any Defendant as a "final policy maker" would prejudice Defendants and could lead the jury to believe this element of *Monell* liability has been satisfied without any evidence in the record.

**8. DEFENDANTS' MOTION *IN LIMINE* NO. 8 TO BAR ANY REFERENCE TO SPOLIATION OF EVIDENCE.**

Nawara has included many communications in his exhibit list relating only to efforts to locate an alleged video recordings of his September 28, 2016 altercation with Defendant Jones-Hayes. (See PXs 33-35, 37-39, 108-110, 113, Ex. N; Dkt. 237 (filed under seal).) These exhibits do not shed any light on Nawara's FFD process or his time away from work and appear to be listed in an effort to resurrect a long-abandoned theory that the CCSO spoliated a video recording that may have been related to this case. Nawara previously conceded that any such video – which never has been shown to have existed in the first place – is not relevant to this case and refused to provide discovery responses relating to this theory, cutting off this avenue of discovery. There is no evidence in this case that any recordings that previously existed later were deleted for the purpose of hiding adverse information or after anyone knew that litigation was imminent. Since Nawara has waived any potential spoliation claim and the undeveloped theory that there once was a video that now is gone, and because he would be unable to obtain a spoliation inference based on the record in this case, Nawara and his counsel should be barred from referencing or alluding to the destruction or spoliation of video evidence.

In written discovery in this case, Plaintiff asked for "all video recordings of the Cermak stating area and basement area on "September 28, 2016." In response, the CCSO produced all videos in their possession, custody, or control from the area near where the altercation between Nawara and Jones-Hayes took place. (See CCSO's Second Supplemental Responses and Objections to Plaintiff's Notice of Inspection and Request to Produce at 3, Ex. O.) In response, Plaintiff's counsel repeatedly asserted, without evidence, her belief that some video evidence must have existed previously and was destroyed. Defendants' discovery responses consistently explained that whatever relevant video footage that existed had been produced; that there was no other relevant footage available; that there were no video cameras located in the Cermak

emergency room or office (where the confrontations between Jones-Hayes and Nawara took place); and that in any event video footage from the holding area in Cermak where there are cameras is not retained beyond thirty days unless it involves an incident with a detainee or a special request was made. (*See* Defendants 11/14/17 Discovery Responses (Doc. Request # 21), 7/30/18 Interrogatory Answers (Interrogatories ## 1, 3, & 4), and 6/25/18 (Doc. Request # 43), Ex. P; 6/27/18 Moffa Ltr. To Kurtz, Ex. Q; and 7/19/18 Moffa Ltr. To Kurtz, Ex. R; Sheriff's Order re Video Surveillance System reflecting 30-day retention, CCSO-000453-464, Ex. S). No such request was made by Nawara, or by any CCSO employee, that might have preserved more than what the CCSO had to produce – and of course, no litigation was imminent within 30 days of the September 28, 2016 incident.

In one of many lengthy Rule 37(a) conference calls, Plaintiff's counsel claimed that she "knew of a witness who supposedly saw a video of the incident at issue between Plaintiff Nawara and Defendant Jones-Hayes" on "September 28, 2016." (6/27/18 Moffa Ltr. To Kurtz, Ex. Q). Defendants were skeptical of this claim, not the least because there are no cameras in the area where the alleged incident occurred. Accordingly, to try to get to the bottom of this allegation, Defendants served Plaintiff with an interrogatory on May 22, 2018 asking Plaintiff to:

> Identify the person or persons that Plaintiff's counsel alleged during a phone conversation with Defendants' counsel on May 18, 2018 had viewed a video recording showing any interaction between Plaintiff Nawara and Defendant Jones-Hayes on or about September 28, 2016. . . .

(Defendants' Third Set of Interrogatories, Ex. T). In response, Plaintiff flatly refused to disclose the identity of this supposed person, hiding behind a wholly spurious privilege objection and claiming that the identity of this supposed witness was not relevant to the litigation:

> Plaintiff objects to this request **as it calls for attorney client and attorney work product information, and is not relevant to any claims or defenses at this point in this**

> **litigation**, and poses a safety risk to an employee that could be subject to retaliation for such disclosure.

(Plaintiff's 6/25/18 Answers to Defendants' Third Set of Interrogatories, at 2, Ex. U). Defendants objected to this absurd position and made their position clear that there was no wrongly withheld or destroyed video relevant to this case. (Moffa 6/27/18 and 7/9/18 Ltrs., Exs. Q and R). Notably, no motion to compel ever was filed by Plaintiff and he never amended his written discovery responses or disclosures on this subject. Driving the point home, in the now sealed Surreply to the Motion to Disqualify Kurtz, Nawara expressly stated that this was not a matter that Plaintiff would seek to pursue. (Dkt. 140 at 14.) No discovery was sought thereafter on this topic in this case, and Defendants rightly considered the matter put to rest.

Defendants made this position and the relevant history clear to Nawara's new counsel by letter of June 20, 2019 after receiving a since-withdrawn 30(b)(6) notice for a deponent who could testify about video retention and destruction at the CCSO. (Notice, Ex. V). Counsel responded by describing all of the facts above, and concluded that given this record, "the effort to depose people about videos no one has ever seen, that no one has ever been able to establish existed, and which cannot be said to have had relevant information is a complete waste of time". (6/20/19 Marmor Ltr. To Linden, emphasis added, Ex. W). Plaintiff did not pursue any 30(b)(6) deposition thereafter, and never moved to compel anything on this topic – once again, Defendants considered the matter to be over. Given these facts, Nawara has waived any argument regarding any allegedly deleted video recordings and allowing him or his counsel to argue or suggest that there was any spoliation of video evidence would prejudice Defendants with no probative purpose.

Permitting Nawara and his counsel to reference the alleged destruction of video recordings obviously would be prejudicial and unfair to the defendants in this case under Federal Rule of Evidence 403 – Plaintiff abandoned this theory and refused to provide discovery responses to

substantiate his counsel's claims. Nor is there any basis under Federal Rule of Evidence 401 to admit such evidence because there is no basis on which to permit a spoliation claim or inference. Assuming there was a video, mere destruction of a video, standing alone, would not warrant an inference that it contained information adverse to Defendants. *See Norman-Nunnery v. Madison Area Tech. College*, 625 F.3d 422, 428 (7th Cir. 2010). Rather, the destruction must have been for the "purpose of hiding adverse information" favoring a plaintiff's claims after the destroying party "knew, or should have known, that litigation was imminent." *Id; see also also Miksis v. Howard*, 106 F.3d 754, 762-763 (7thCir. 1997) (party seeking adverse inference must prove that other party intentionally destroyed evidence in bad faith); *Spesco, Inc. v. General Elec. Co.*, 719 F.2d 233, 239 (7th Cir. 1983) (The Seventh Circuit "requires a showing of an intentional act by the party in possession of the allegedly lost or destroyed evidence" to support a missing or destroyed evidence instruction); *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.,* 2013 WL 5377164 (S.D. Ill. Sept. 25, 2013) (no violation of duty to preserve where litigation was not imminent and information was destroyed in accordance with defendant's standard retention policies).

There is no evidence in this case that any defendant, or anyone at the CCSO, intentionally destroyed any video footage or considered that a video of the incident contained information adverse to Defendants or which would favor Nawara's claims. Nonetheless, Nawara's proposed exhibits include internal CCSO communications concerning efforts to obtain video evidence over 6 weeks after the 9/28/16 incident. (*See, e.g.*, PX 35 (CCSO_966 (11/18/16 emails between Burke and Reierson confirming that video footage would only be stored for 30 days); PX 113 (CCSO_1117 (February 2017 emails between Reierson and Jones-Hayes showing that Reierson had been trying to locate videos and referencing the 30 day retention policy)). The 30-day period

for the September 28, 2016 incident elapsed well before Nawara's November 18, 2016 referral for an FFD – and thus before anyone could have suspected litigation over his FFD might ensue. Moreover, deposition testimony confirmed that there are no cameras that would have recorded the interactions between Jones-Hayes and Nawara in the office next to the Cermak waiting room. (11/4/19 Jones-Hayes Dep. at 94:1-6, Ex. H; 10/30/19 Turrise Dep. at 49:4-20, Ex. X). No one has testified that they saw any videos, favorable to Nawara or not, other than those produced in this litigation.

Any missing video footage would not be relevant to any of the claims in this lawsuit. Nawara's only remaining claims involve conduct after the September 28, 2016 incident – his referral for an FFD based on a subsequent outburst in HR and not being permitted to work until he completed the FFD process. Since Defendant Reierson was unable to locate any recordings of the September altercation and the referral was based on Nawara's subsequent behavior, any allegedly deleted recordings would have had no bearing on the issues in this case. Allowing Nawara and his counsel to reference non-existent video footage could mislead the jury into making an improper adverse inference which cannot be supported by the record.

Nawara and his former counsel abandoned the theory that there is some missing video in this case over a year ago. There is no evidence of wrongful or knowing destruction of relevant video evidence by any defendant. Nawara and his counsel should be barred from referring to any purported video recordings not produced in this case or implying that any defendant spoliated or in any other way destroyed video evidence in this case.

**9. DEFENDANTS' MOTION *IN LIMINE* NO. 9 TO EXCLUDE ANY REFERENCE TO PUNITIVE DAMAGES AND BAR RECOVERY OF SAME.**

Defendants move this Court for an order *in limine* to exclude punitive damages and bar any reference to punitive damages. Plaintiff has three claims remaining in this case: Violation of the Americans with Disabilities Act ("ADA") (Count I), Violation of the Illinois Whistleblower Act (Count IV), and Violation of due process related to the Merit Board Act (Count V). Plaintiff never included a request for punitive damages for his ADA or Merit Board Act claims in any of his three complaints. (See Dkts. 1, 22, 89.) Plaintiff did request "[p]unitive damages as allowed by law" under his Whistleblower Act claim – but the Whistleblower Act does not permit punitive damages where, as here, there is no claim of wrongful discharge. (See Dkts. 1, 22, 89.)[3]

In written discovery in this case, defendants Dart, Jones-Hayes, Burke, Reierson, and Shelby ("Certain Defendants") asked plaintiff to state with specificity the amount and category of damages he sought in this case, and for all documents in support thereof. (Plaintiff's Answers to Certain Defendants' Second Set of Interrogatories at 1-3, Ex. Y). Plaintiff's response nowhere identifies punitive damages as a category of damages – nor did he ever amend his answer to this interrogatory. Plaintiff's Rule 26 disclosures say he is seeking "[p]unitive damages against the individual Defendants" but does not explain under what theory – current or dismissed – he seeks such damages. (See 10/25/19 Supplemental Rule 26 Disclosures, Ex. Z). Plaintiff, by his own pleadings, thus confirmed that he cannot pursue punitive damages against the CCSO; and he should not be permitted to seek them against any individual defendant in this case because he failed to put them on notice of the theory under which he was doing so.

[3] Plaintiff sought punitive damages against Sheriff Dart, in his individual capacity, for his now dismissed § 1983 First Amendment claim (dismissed Count III). He did not seek punitive damages against any other individual or the CCSO in this dismissed count. (See Dkt. 89.) Sheriff Dart, in his individual capacity, was dismissed from this case on September 19, 2017. Despite his dismissal and the absence of any new alleged facts against the Sheriff, Plaintiff simply copied and pasted this request into his Second Amended Complaint. (See 3/28/19 Mem. Op. & Or. at 8, Dkt. 187.) Thus, the Second Amended Complaint does not specify a request for punitive damages against any individual Defendant.

To the extent Plaintiff may try to seek punitive damages in this case, as a matter of law, he cannot because punitive damages are not available against any defendant in this case.

*First*, the ADA bars punitive damages against a governmental entity defendant – and Count I is brought against the CCSO alone, *i.e.*, a governmental entity. (Dkt. #187 at 8). Specifically, 42 U.S.C. § 1981a(b)(1) provides that "A complaining party may recover punitive damages under this section against a respondent ***(other than a government, government agency or political subdivision)*** if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.") (emphasis added). *See also CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014) (recognizing that "compensatory damages are available in private causes of action under the ADA and Rehabilitation Act . . . [although] punitive damages are not") (*citing Barnes v. Gorman*, 536 U.S. 181 (2002)). Accordingly, no punitive damages can be sought under the ADA (Count I) against the CCSO, the only defendant named in that Count.

*Second*, the Illinois Whistleblower Act likewise does not provide for punitive damages as a remedy, except in cases of retaliatory discharge – and this case contains no such claim. *See* 740 ILCS 174/30 (damages limited to make whole relief and punitive damages not listed); *Brummel v. Grossman*, 2018 IL App (1st) 170516 ¶ 85 (the Whistleblower Act does not provide for punitive damages). Accordingly, plaintiff cannot as a matter of law seek punitive damages under Count IV against any defendant.

*Third*, the only count under which punitive damages is a legal possibility is Count V, the due process claim. As the Court is aware, this count originally was brought as a declaratory judgment claim only – which the Court rejected as a matter of law. (Dkt. # 185 at 26 ("The Court

will not enter a declaratory judgment here.") Instead, the Court construed this count as one for damages. *Id.* However, the Court did not propose that punitive damages could be awarded under Count V, and Plaintiff never sought to amend the complaint to add a punitive damages claim. Indeed, Plaintiff's response to the Motion to Dismiss confirms that he was seeking only declaratory and "make whole" relief under the Merit Board Act, and not punitive damages for a due process violation under § 1983. (See Resp. to Mot. To Dismiss at 25, Dkt. 154; Resp. to Mot. to Dismiss at 25, Dkt. 154 (Count V "asks for a declaratory judgment" and "that Plaintiff be *made whole* and his time, wages, and benefits be reinstated") (emphasis added)).

Moreover, Plaintiff asserted that Count V was brought under only "Illinois law, and as such, Illinois (not federal) law applies." Dkt. 154 at 25-27. He did not reference due process or § 1983 at all in this Count. On this record, this Court's ruling thus at most allowed Count V to proceed as a due process claim for damages to make Plaintiff whole – not for punitive damages that had never been alleged. As a result, no punitive damages may be sought under Count V.

In any event, Plaintiff has no evidence that would support a claim for punitive damages in this case. In § 1983 suits, a jury may consider an award of punitive damages only "when the defendant's conduct is show to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019). To obtain punitive damages, "conscious wrongdoing is always required." *Kolstad v. ADA*, 527 U.S. 526, 538 (1999). The Second Amended Complaint (the first time Plaintiff included Count V) comes nowhere close to alleging that any Defendant's behavior was malicious, reckless, or at all done with knowledge of its unlawfulness. No defendant was asked in deposition or written discovery if he or she even considered whether Nawara should be sent to the Merit Board for a hearing. Since Plaintiff has not established a record supporting a claim for

punitive damages, he should not be permitted to seek them or present the question to the jury in this case.

Defendants therefore request that Nawara be barred from pursuing punitive damages in this case.

**10. DEFENDANTS' MOTION *IN LIMINE* NO. 10 TO EXCLUDE ANY EVIDENCE OF DAMAGES FOR WHICH NO PROOF OF SUCH DAMAGES HAS EVER BEEN OFFERED.**

Defendants move this Court for an order *in limine* excluding any evidence of damages beyond Nawara's non-wage damages. Plaintiff never provided any estimate, let alone a method of calculation, for his non-wage damages as required by Fed. R. Civ. P. 26(1)(1)(A)(3). Plaintiff's Rule 26 Disclosures identified only the categories of damages Plaintiff seeks, but provided no method of calculation or amounts. (Ex. Z, Plaintiff's Supplemental Rule 26 Disclosures, at 9). Nor does Plaintiff identify any calculation method or amount in the damages section of the Pretrial Order, now, on the eve of trial, for any damages other than his lost wages. Because Plaintiff has no evidence to substantiate his non-age economic damages, to permit him to seek whatever amounts he may eventually assert would be premised on impermissible speculation, guess, and conjecture. *See Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 797-98 (7th Cir. 1989); *Saunders v. City of Chicago*, 320 F. Supp. 735, 739 (N.D. Ill. 2004).

Plaintiff seeks damages for lost pensions, health insurance, personal days, sick days, vacation days, seniority, and promotions, but he never identified a damages expert (or other witness) to testify about what these damages are, how they would be calculated, or what was "lost." Nor is there any witness in this case who could. Cook County, not the Sheriff, calculates pension and health insurance payments, and these are complicated calculations about which Plaintiff has never deposed a witness or identified any exhibits. Plaintiff likewise has offered no evidence

regarding his alleged lost seniority and promotions. There are no documents or testimony regarding what others in the "promoted" or "more senior" positions are paid, or even what such positions may have been available to Nawara. Nawara himself cannot testify to these matters since he lacks any foundation on which to do so. *Biondo v. City of Chicago*, 382 F.3d 680 (7th Cir. 2004) (compensatory damages for lost promotions are determined using the statistical "loss of chance" method, for example, "if a person would have had a 25% chance of promotion from lieutenant to captain, then preventing that person from becoming a lieutenant should lead to a remedy equal to 100% of the benefits of being a lieutenant plus 25% of the incremental benefits of being a captain"). Clearly, any such determination of a lost promotion must rely, not only on expert data, but must also take into account the salary and benefits of the promoted position.

Moreover, Plaintiff does not propose a method by which he would calculate Nawara's lost sick, vacation or personal days in the so-called itemized statement of damages in his proposed Pretrial Order, nor are there any documents or testimony identified that do so. It is Plaintiff's burden to prove his damages, and without any evidence to support these claims – or anyone qualified to provide opinions as to the amounts (and the reasoning behind) such figures – Plaintiff should not be permitted to argue that he has lost pensions, health insurance, personal days, sick days, vacation days, seniority, and promotions. To be clear, Plaintiff could have retained and disclosed an expert on damages; he could have taken a deposition of a CCSO or County witness to learn how these items are calculated; and he could have propounded interrogatories with such questions – he did none of these things. Because Plaintiff failed to disclose the above-named economic damages and has no witness, expert or otherwise, who can attest to whatever the amounts of these alleged damages may be, Plaintiff should be barred from recovering them because they are impermissibly speculative.

There is no evidence in this case to support damages for anything other than allegedly lost wages and Plaintiff should be barred from pursuing any compensatory damages beyond wages in this case.

**11. DEFENDANTS' MOTION *IN LIMINE* NO. 11 TO EXCLUDE REFERENCE TO INDEMNIFICATION BY COOK COUNTY AND REFERENCE TO DEFENSE COUNSEL AS "STATE'S ATTORNEYS"**

Defendants move this Court for an order *in limine* barring any references to whether Defendants may be indemnified by the County of Cook for any compensatory damages returned against them. Whether the County of Cook provides indemnity is irrelevant to determining whether any of the defendants are liable to Plaintiff. Accordingly, all such references must be barred.

Defendants further move this Court for an order *in limine* barring any references to the Defendants' attorneys as "Assistant State's Attorneys"; "County Lawyers"; "County"; "State"; or "Government." All such references must be barred.

The clear purpose of such references will be to place in the jury's mind the inference that the County will pay any judgment that may be entered. Such an inference would be highly prejudicial in that the jury may believe the County has "deep pockets," thereby allowing the jury to award money to Plaintiff regardless of the facts. *Townsend v. Benya*, 287 F. Supp. 2d 868, 874 (N.D. Ill. 2003) (granting Defendants' motion *in limine* barring mention of the indemnification of Defendants by the City because the information was too prejudicial to survive the Rule 403 balancing test); *see also Walker v. Saenz*, U.S. Dist. LEXIS 16454, at *3 (N.D. Ill. Oct. 27, 1992) (same); and FED. R. EVID. 411.

Finally, since there are no issues that need to be resolved relating to any indemnification claims, and the County does not dispute that it will be required to pay any compensatory damages

award, if any, the County should not be included on the caption, verdict form, jury instructions, or in argument before the jury. *See Martinez v. City of Chicago*, 2016 US Dist. LEXIS 84231 at *48 (N.D. Ill. 2016).

**12. DEFENDANTS' MOTION *IN LIMINE* NO. 12 TO BAR PLAINTIFF FROM CALLING SHERIFF DART AS A WITNESS.**

Defendants move to bar Plaintiff from calling Sheriff Dart as a witness at trial. As the Seventh Circuit has recognized in the deposition context, "depositions of public officials create unique concerns." *Cannon v. Burge,* No. 05-2192, 2007 WL 2410392, at *2 (N.D. Ill. Aug. 20, 2007) (citing *Stagman v. Ryan*, 176 F.3d 986, 994-95 (7th Cir.1999)); see also *Crawford-El v. Britton*, 523 U.S. 574, 597-98, (1998) (a court "must exercise its discretion so that officials are not subjected to unnecessary and burdensome *discovery or trial proceedings*."). (emphasis added). Public officials "should not have to spend their time giving depositions in cases arising out of the performance of their official duties unless there is some reason to believe that the deposition will produce or lead to admissible evidence." *Olivieri v. Rodriguez*, 122 F.3d 406, 409-10 (7th Cir. 1997); *Hobley v. Burge*, No 03-c-3678, 2007 WL 551569, at *2 (N.D. Ill. Feb. 22, 2007) ("the deposition of a high-ranking public official creates unique concerns; it should not be a routine part of civil litigation."). A party seeking to depose a high ranking official "must first demonstrate that there is some reason to believe that the deposition will produce or lead to admissible evidence." *Id*.

Here, the same considerations applicable to depositions should be applied to bar calling Sheriff Dart as a witness at trial. Sheriff Dart, named in his official capacity only, possesses no unique or firsthand knowledge about the facts of this case. Indeed, Sheriff Dart was never deposed in this case, and he was dismissed from the case in his individual capacity. (See 3/28/19 Mem.

Op. & Or., Dkt. 187). There are no allegations that Sheriff Dart has any personal knowledge about or involvement in any of the remaining claims, accordingly any testimony by him would be completely irrelevant and he should not be called as a witness for any purpose. FED. R. EVID. 402. There is zero record evidence he has any personal knowledge of or involvement in the FFD process, the only process at issue in this case.

### 13. DEFENDANT'S MOTION *IN LIMINE* NO. 13 TO BAR ANY ARGUMENT OR INFERENCE THAT DEFENDANT ALLEGEDLY FAILED TO CALL ANY WITNESSES.

Defendants move to bar Plaintiff from arguing or implying that Defendant failed to call any particular witness or a sufficient number of witnesses at trial in this case. Although this concern is addressed by Seventh Circuit Pattern Jury Instruction 1.18, Defendant seeks an order *in limine* to this effect.

Plaintiff bears the burden of proving his case by the preponderance of the evidence. Therefore, any suggestion, implication, or argument that heightens the obligations or seeks to impose an improper burden on Defendants should be barred. Defendants have no obligation to put forth any witnesses and can rely on the insufficiency of Plaintiff's case in sending the case to the jury. Any argument to the contrary would suggest a burden that is improper under the law and the Federal Rules.

However, Federal Rules 401 through 404 do not prohibit Defendants from referring to or commenting on Plaintiff's failure to call any witness, as Plaintiff bears the burden of proof in this case. These Rules do not shift the burden of proof in civil litigation from Plaintiff to Defendant, thus the Rules do not bar Defendants from pointing out that Plaintiff has failed to present relevant witness testimony. For this reason, Defendants seeks an order *in limine* to bar any attempt by Plaintiff to argue Defendants' failure to call witnesses during trial is relevant or at all.

**14. DEFENDANTS' MOTION *IN LIMINE* NO. 14 TO BAR ALL NON-PARTY WITNESSES FROM THE COURTROOM FOR OPENING STATEMENTS AND DURING TRIAL TESTIMONY.**

Defendants move this Court for an order *in limine* to exclude all witnesses (other than the parties) from the courtroom during the opening statements and testimony of any and all other witnesses. Once a witness has completed testimony and is off the stand, the witness may observe the remainder of the trial.

**15. DEFENDANTS' MOTION *IN LIMINE* NO. 15 TO LIMIT TESTIMONY AND TO BAR PORTIONS OF REPORT OF FFD EXAMINER DIANA GOLDSTEIN.**

In September 2017, nearly a year after Nawara originally was ordered to undergo a fitness for duty exam, Diana Goldstein, PhD was retained by CorVel, Cook County's outside vendor, to determine whether Nawara was fit for duty – *i.e.* safe to return to work (Goldstein Dep. 55:9-15, Ex. AA). Dr. Goldstein was not retained or disclosed as an expert by any party to this case and was deposed as a fact, not an expert, witness. (Goldstein Dep. 45:18-20, "Q. And you understand you're a fact witness in this case? A. I do.")

Goldstein found Plaintiff Nawara fit for duty (a fact to which the parties have stipulated) and issued a report. (Ex. BB under seal). The report lays out questions Goldstein was asked by non-party CorVel (*see* Corvel Ltr., Ex. CC (part of Ex. 5 to dep)), identifies the background information she was provided (including a referral form from the CCSO, a statement from Jones-Hayes, and medical records obtained from Nawara's primary physician) summarizes her interview of Nawara, provides an assessment of his mental state and some of the traits he displayed to her, and concludes that he was fit for duty. (Ex. BB under seal). Both in her report and in her testimony, however, Goldstein also offers opinions (a) about whether "administration" at the CCSO "perceived" the altercation between Nawara and Jones-Hayes "as an anger management problem" at the time; (b) about Jones-Hayes's state of mind; (c) that the CCSO should have disciplined

Nawara for the altercation; and (d) as to facts she was unaware of, "discounted," or finds "irrelevant" in reaching these unasked-for opinions. Goldstein testified that she had no contact with anyone at the CCSO, including the CCSO's HR department, that might have formed a foundation for these views. Pursuant to FED. R. EVID. 702, FED. R. EVID. 703, FRCP 26, and FED. R. EVID. 403, those portions of Goldstein's report should not be presented to the jury, nor should any testimony from her be elicited on these subjects.

In her deposition, Goldstein acknowledged that there were two reasons for the CCSO's FFD referral – the "intimidating and inappropriate behavior directed towards his superior officer in response to a routine directive" and "weeks later, employee presented as aggressive and hostile in the human resources department." (Goldstein Dep. 33:10-34:3, Ex. AA) Goldstein never had any direct communication with anyone at the Sheriff's office (*id.* 42:8-10) and noted that when "we don't have access. It limits us a little bit." (*Id.* 69:17-70:8). Goldstein also never spoke to Supt. Jones-Hayes (*id.* 70:14-71:15) or to the two HR professionals who made the decision to refer Nawara for an FFD – Defendants Reierson and Shelby – and who experienced the aggression and hostility that led to the FFD referral order (*id.* 15:15-16:10), nor does she have any knowledge of what the CCSO's procedures are for FFD referrals. (*Id.* 75:3-19). Goldstein concedes that how to do FFD referrals is "not my role." (*Id.* 59:1-60:24). Goldstein likewise has no certificates or training in disciplinary procedures at jails, explaining "I'm a psychologist, no." (*Id.* 74:17-20).

Goldstein also confirmed that her role is not to be a fact-finder: "I was very clear in this report that I have no way to confirm one way or another what he said versus what she said. It's not my role, either." (*Id.* 81:18-82:2). Furthermore, Goldstein was unaware that there was a lawsuit at the time she prepared her report: "I specifically stayed away from that because the

question before me was **simply a fitness for duty**." (*Id.* 84:22-85:5)[4]. And Goldstein understands that the factual questions are to be left to the jury: **"Q. You weren't there, and the jury will end up deciding that. A. Absolutely."** (*Id.* 91:2-8). Goldstein admits that she has no basis to know whether Supt. Jones-Hayes or anyone in HR even knew that Nawara had filed a complaint against Jones-Hayes (*id.* 99:19-22 ("Not at all.")) nor did she know that Nawara was told in November 2016 that he was being referred for the FFD based on his behavior in HR: "I cannot know one way or another." (*Id.* 103:5-11). Notably, Goldstein testified unequivocally that she regarded the FFD referral in this case as "a good referral":

> I will accept a fitness for duty examination if I think that the prompting question is relevant and appropriate, it is some kind of mental health or cognitive issue where there has been some disruption at the workplace and somebody's been pulled off work as a result of that, and there may be a question of whether there is a personality, mental health, substance use, or cognitive problem prompting the issue that may be treatable, and that there is a question of safety effectiveness, you know, within the workplace. **So in this particular case I felt it was a good referral, and I accepted it.**

(*Id.* 76:1-14).

Despite this clear testimony, Goldstein's report includes passages that cross the line into unsubstantiated speculation about what unnamed "administration" at the CCSO perceived about Nawara at the time of the 9/28/16 incident and raises "concerns" about the timing of the FFD referral being made six weeks after the 9/28/16 incident with Jones Hayes – despite having no knowledge of what accounted for the timing, and ignoring the intervening cause of the FFD referral: Nawara's hostile and aggressive behavior at HR on November 18, 2016. (Report, Ex. BB under seal, at 7). The report also raises a "concern" about the timing of the FFD coming after Nawara having filed a "formal complaint" against Jones-Hayes – something she only heard from Nawara. (*Id.*). And the report concludes that "[d]iscipline is the best course of action going

---

[4] All emphasis added in this motion *in limine*.

forward should such behavior [by Nawara] recur." (*Id.* at 8). The problematic and inadmissible passages are these:

> I have similarly **been presented with no evidence that the 9/29/16 *[sic]* incident was perceived as an anger management problem by administration *at the time*;** Officer Nawara was no subjected to discipline, nor was he pulled from working or sent for a fitness for duty examination; **it is reasonable to infer** that had concerns about Officer Nawara's emotional state been significant at the time, one or both would have occurred. Yet Officer Nawara was returned to the very same assignment the next day, and worked two other units before ultimately being sent to a fourth assignment, where he would be interacting with both detainees and the general public, and required to carry a firearm. It is my understanding (**and I have been presented no evidence to the contrary**) that Officer Nawara worked all assignments following the 9/29/16 *[sic]* incident, without difficulty, for another approximately six weeks before being mandated for a fitness for duty examination on 11/18/16.
>
> As a fitness examiner, this set of facts places me in a difficult position; the County's own actions suggest Officer Nawara was not deemed a threat to the safety of coworkers, detainees, or the general public. **The only reasonable alternative explanation—**if in fact the incident occurred as Supt. Jones-Hayes described (it is not my role to fact-find and settle this apparent *he said/she said*—**is that management failed to discipline or otherwise act appropriately at the time of the incident**, and this was simply a missed opportunity for intervention. **Finally, I would be remiss if I did not express my concerns about the timing of this examination being requested on 11/18/16, not only so remotely in time from the incident itself on 9/29/16 *[sic]*, but following a formal complaint being filed by Officer Nawara in the interim**. * * * *
>
> As described above, unfortunately **I cannot accept as fact what was summarized by Human Resources seven weeks after the 9/29/16** *[sic]* **incident**. Notwithstanding this issue, **if indeed the incident transpired as Supt. Jones-Hayes described, such transgressions of the code of conduct ought to be addressed through discipline**, as it is my opinion that Officer Nawara was not suffering from any mental illness or other condition in need of treatment at the time of the 9/29/16 *[sic]* incident that would account for such behavior. That is to say, if he in fact conducted himself disrespectfully and threateningly to Supt. Hayes on 9/29/16 *[sic]*, treatment would not have been relevant in his particular case. Discipline is the best course of action going forward should any such behavior recur.

(Ex. BB under seal at 7, 8).

Just because Goldstein wasn't presented evidence on these topics does not mean there is no evidence that those involved in the aftermath of the 9/28/16 altercation between Jones-Hayes and Nawara had sincere concerns about Nawara's behavior. (See emails between Jones-Hayes

and her superiors, DX 5-10, attached hereto as Ex. DD). It simply means that CorVel did not provide such evidence to Goldstein – nor did she ask for it. Under no circumstances should Goldstein's ill-informed conclusions be presented to the jury, whose role it is to make the factual determinations Goldstein chose to include in her report. *See Hall v. Hall*, 2018 U.S. Dist. LEXIS 70149 at *8 (N.D. Ill. 2018) ("no expert may testify regarding what [a party] (or anyone else) believed, understood, or intended, as these are inappropriate subjects for expert testimony.") Moreover, because Goldstein did no investigation of the facts about the circumstances of the Jones-Hayes incident or the FFD referral, she has no basis to offer any testimony on these topics at all. *Id.* 2018 U.S. Dist. LEXIS 70149 at *9-10 (witness had "no qualifications, let alone an adequate basis in what he has reviewed, to testify as a matter of fact or opinion" regarding the timing of a transfer "no expert may testify in a manner that suggests that these are matters of fact or that they [have] personal knowledge in this regard . . . . they have made no investigation or inquiry themselves, but are rather relying on what others have said.")

The Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. When considering Rule 403, courts use "a sliding scale approach: as the probative value increases, so does our tolerance of the risk of prejudice." *Whitehead v. Bond*, 680 F.3d 919, 930 (7th Cir. 2012). "Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior, and the risk is disproportionate to the probative value of the offered evidence." *Morgan v. City of Chicago*, 822 F.3d 317, 339 (7th Cir. 2016). Here, these considerations require exclusions of Goldstein's opinions about timing and state of mind.

Goldstein has no foundation for any of these arguments or opinions, as she herself admits. As detailed above, she did no investigation into why there was a delay between the request for an FFD referral meeting and the actual meeting; she never spoke to anyone at the CCSO, let alone anyone in the HR department; and she has no understanding at all about how the CCSO manages FFD referrals. Moreover, in reaching her unfounded conclusions, Goldstein made a judgment about what she deemed the reduced importance of the HR meeting – a judgment that steps squarely into the province of the jury and, again, for which she has utterly no foundation: "**I don't put a lot of stock into what happened in HR**. . . **that was not something I considered to have happened on the job**". (*Id.* 131:12-18). When pressed on her lack of any knowledge of who in "management" she believes didn't actually perceive Nawara as having an anger management problem – and when provided the facts that Defendants believe explain away her concerns – Goldstein stepped even further over the line, presuming to decide what is relevant and what is not and making wholly improper judgments about Jones-Hayes's state of mind in September of 2016:

> **Let me say none of that is relevant, frankly.** The bottom line is that he has an interaction that is concerning to a supervisor . . . to Jones-Hayes. Had she been so concerned about his conduct that day in the basement of Cermak, she would have made sure he got pulled [that day]. **The fact that she had trouble communicating with HR, I don't know what to say about that other than they better get their shit together. You know? That's crap. If he had been so unsafe, do you really think that she would have said, "Hmmm. You know, maybe it's just me."** If she had been so concerned about his ability to interact normally with everybody, not just her, . . . she had a responsibility I would say to pull him. **So I don't care whether she had trouble connecting with or whatever. . . .**[5]

(*Id.* 137:19-138:15); *see also Id.* 142:18-143:7 (**Q. Okay. I mean, you're applying basically your general experience, not anything you specifically know about this case, when you say**

[5] This is a remarkable statement since both the email from Jones-Hayes to her supervisor that led to the request that HR decide whether to send Nawara for a FFD exam and the statement from Jones-Hayes to HR explicitly stated that Jones-Hayes was unsure if Nawara's problem was specific to her or more general, and Goldstein testified there "[a]bsolutely" can be cases of workplace violence where people are not necessarily potentially violent to everybody, but they have specific targets that they're angry at." (*Id.* 67:10-21; see Ex. LL (referral form and email) and Ex. MM under seal (Jones-Hayes statement provided to Goldstein).)

**that [their own behavior can reasonably be inferred to show that they themselves did not have fitness concerns or he would have been pulled]. You didn't speak to any of the people who made the decisions. A. I can tell you it is irrelevant.**") Despite that diatribe, Goldstein returned to the conclusion that the referral for an FFD still was "appropriate" (*id.* 140:4-141:11) and eventually conceded that "**it's a perfectly fine referral based on what happened at HR, like what I said, or what happened in September**." (*Id.* 144:8-11).

Because Goldstein is not a disclosed expert by any party in this case, her report should not be admissible for any non-factual purpose – *e.g.* anything other than the admissions by Nawara reflected in the report and the findings Goldstein made about Nawara's mental condition and fitness for duty. *Mt. Funding, Inc. v. Frontier Ins. Co.*, 2004 U.S. Dist. LEXIS 6915, *11 (N.D. Ill.) ("Fact witnesses intended to give expert opinions also must be disclosed as experts, although they need not submit an expert report."); *see also Hall*, 2018 U.S. Dist. LEXIS 70149 at *8-10 (barring testimony as to defendant's state of mind and as to facts about which witness had no personal knowledge). Had Goldstein been named as an expert by Plaintiff, Defendants would have been entitled to bar her opinions under FED. R. EVID. 702 and 703; *see also* Daubert *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As it is, Goldstein herself admits that she was unaware that this litigation even was pending at the time she wrote her report. This, her gratuitous opinions and conclusions are inadmissible hearsay under FED. R. EVID. 801.

Even if Plaintiff could identify some means to admit Goldstein's gratuitous commentary, the prejudicial nature of these passages far outweighs their probative value. *See Williams v. Schwartz*, 2018 U.S. Dist. LEXIS 92754, *27-28 (N.D. Ill. 2018) (expert witnesses "must avoid unnecessary, conclusory and pejorative characterizations of the evidence and the credibility of witnesses . . . since the probative value of the testimony is substantially outweighed by the danger

of unfair prejudice and essentially transforms the expert into an advocate.") They invade the province of the jury by finding facts without any basis to do so, and if presented with a putative – albeit undisclosed – "expert," the jury could well defer to Goldstein's judgments rather than making their own, on a much more complete record that Goldstein had. *Id.* at *28 ("Thus type [of] testimony also invades the province of the jury which is charged with, and capable of making, its own determinations as to the credibility of witnesses and the weight of the evidence.") Unlike Goldstein, the jury will have an opportunity to hear the facts from the witnesses who were present both at the 9/28/16 incident and at the 11/18/16 HR meeting; the jury also will be provided with documentary evidence of the deliberations made by Jones-Hayes and her superiors; the reasons why there was a delay in calling Nawara into HR; and the reasons HR decided to send Nawara for an FFD. (See Ex. G, Reierson Dep., at 179:20-180:24; Ex. I, Shelby Dep. at 67:2-70:9; DX 5-10, attached hereto as Ex. DD).

This leads to a final reason not to permit the problematic passages from the report or testimony related thereto into evidence – waste of time and confusion under FED. R. EVID. 403. Having to show all of the reasons why the jury should disregard Goldstein's unfounded and improper views of the facts and what should have been done in this case will unnecessarily extend the trial. *See Smith v. Garcia*, 2018 U.S. Dist. LEXIS 7953, *22 (N.D. Ill.) (excluding evidence of "other misconduct because "[t]hese sideshows raise a risk of confusion and waste of juror time out of proportion to any probative value they might have").

Attached hereto is a redacted version of Goldstein's report, removing material that should not be presented to the jury in any form, either in the document or through testimony. (Ex. EE under seal). Defendants ask that this version of the report, if it is to be presented to the jury at all,

be the only version permitted in this case, and for an order instructing Goldstein and the parties not to elicit testimony relating to these passages and the opinions therein in any way.

**16. DEFENDANTS' MOTION *IN LIMINE* NO. 16 TO BAR EVIDENCE OF OFFERS OF COMPROMISE/SETTLEMENT IN THIS OR ANY OTHER LAWSUIT, OF FINAL DISPOSITIONS OF OTHER LAWSUITS, OR OF OTHER LAWSUITS BROUGHT AGAINST ANY OF THE DEFENDANTS.**

Defendants move this Court to bar Plaintiff from offering any witnesses, testimony, or evidence of settlement discussions in this matter, settlement of other CCSO cases, or final disposition of any other lawsuits involving the CCSO. Rule 408 plainly prohibits Plaintiff from offering evidence, asking for testimony about, or referencing any settlement discussions in this case or others to infer liability in the part of any defendant. It is a matter of public record that other lawsuits have been filed against the CCSO and its employees. Evidence about the fact that any defendant has been sued, as well as the disposition of such cases, whether by settlement or otherwise, is irrelevant and has no probative value in this case. FED. R. EVID. 401, 403.

The policy of encouraging settlement of disputed claims means that any efforts to settle disputes are inadmissible as a means of proving liability. *See In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1124 (7th Cir. 1979). Accordingly, neither efforts outside this case, nor efforts in this case, to compromise a legal dispute may be used against any defendant in this case. A signal example is the HIPAA form that Plaintiff ultimately agreed to sign so that his FFD exam could proceed. (PX 17). Plaintiff cannot argue that this document shows that any defendant conceded that the forms presented to Nawara in November 2016 were improper in any way. Likewise, no evidence of the mediation efforts in this case or of information provided therein should be permitted in this case for any purpose.

**17. DEFENDANTS' MOTION *IN LIMINE* NO. 17 TO BAR UNDISCLOSED WITNESSES.**

Defendants request that the Court bar any undisclosed witnesses from testifying at trial. Fed. R. Civ. P. 37(c)(1) excludes undisclosed witnesses unless the failure to disclose was justified or harmless. *Musser v. Gentiva Health Services*, 356 F.3d 751 (7th Cit. 2004). Here, Plaintiff has included OPR investigators on his witness list who he never adequately disclosed before. For this reason, and because the details and findings of the OPR investigation are irrelevant, Plaintiff should be barred from calling such witnesses to testify in this case.

**18. DEFENDANTS' MOTION *IN LIMINE* NO. 18 TO BAR EVIDENCE OF DISCIPLINE AGAINST ANY DEFENDANT IN THIS CASE.**

Defendants request an order *in limine* barring any reference to discipline against any individual defendant that is unrelated to this case. No discipline ever was issued against any defendant with respect to any aspect of this case, and any other discipline would be irrelevant and prejudicial under FED. R. EVID. 401 and 403. It also would constitute other "bad acts" evidence, barred by FED. R. EVID. 404(b). *See Huddleston v. U.S.* 485 U.S. 681, 685 (1988); *U.S. v. Shriver*, 842 F.2d 968, 974 (7th Cir. 1998).

**19. DEFENDANTS' MOTION *IN LIMINE* NO. 19 TO BAR REFERENCE TO THE ECONOMIC LAYOFF OF DEFENDANT SHELBY OR TO SUGGEST THAT SHE LEFT HER EMPLOYMENT FOR ANY PERFORMANCE-RELATED REASON.**

Defendant Winifred Shelby worked as an Occupational Health Nurse for the CCSO for three years, until December 2017. (Shelby Dep. 18:23-20:8, Ex. I). Through no fault of her own, Nurse Shelby was laid off due to budget cuts that followed revocation of the Cook County "sugar tax." (*Id.* 20:9-13). The "sugar tax" was and remains a hotly debated subject, and has no bearing on any facts in this case. And because Nurse Shelby's lay-off had nothing to do with her performance, the reasons for her departure likewise have no relevance to this case. Moreover, the risk of prejudice from reference to the sugar tax far outweighs the probative value of permitting

the Plaintiff to elicit such testimony. Pursuant to FED. R. EVID. 401 and 403, defendants ask that the Court bar any testimony or argument concerning her lay-off and the reasons therefor.

### 20. DEFENDANTS' MOTION *IN LIMINE* NO. 20 TO BAR SUBSEQUENT REMEDIAL MEASURE EVIDENCE, INCLUDING COMMUNICATIONS FROM KARYN WILLIAMS.

As this Court is aware, Karyn Williams, the former Executive Director of HR at the CCSO has been a source of significant controversy and legal arguments in this case. Dana Kurtz's decision to represent her while Williams still was an employee of the CCSO ultimately led to Kurtz's withdrawal as Plaintiff's counsel here, and to significant sanctions for her misconduct with respect to that representation and to the motion practice that ensued. (Of note, Kurtz has paid the entirety of the sanction and therefore the Court's judgment on these matters will not be the subject of any appeal by Kurtz).

In the course of the disqualification and sanctions motion practice, Kurtz, Williams, and later Plaintiff's new counsel repeatedly argued that Williams did not have any involvement with the Nawara lawsuit or with FFD policy at the CCSO. (See Resp. to Motion to Disqualify, Dkt. 108-1 and Williams Declaration thereto, Dkt. 108-5; Motion to Supplement the Record on Motion for Sanctions, Dkt. 216; Defendants' Response, Dkt. 218; and 10/9/19 Hrg. Tr. at 2-4, Ex. FF). Time and again, Defendants pointed out that this was not the case, hence the prejudice to them from the improper engagement with Kurtz. The most recent example was on October 4, 2019, when Plaintiff's new counsel sought to supplement the record on the sanctions motion, arguing that they should be permitted to meet with Williams because two of the defendants allegedly testified that they didn't consult with Williams regarding Nawara or FFDs. The Court granted the motion to supplement, but concluded based on Nawara's counsel's motion and statements that

they should not be permitted to confer with Williams. (10/9/19 Hrg. Tr. at 6-7, Ex. FF). Discovery now is closed and Williams has not been named by any party as a trial witness in the Pretrial Order.

Quite surprisingly given this record, Plaintiff has included several documents drafted by Karyn Williams on his Exhibit List in the Pretrial Order. These include an April 19, 2017 email from Williams to Rebecca Reierson proposing that they discuss changes to the FFD process, and saying "we should no longer request employee to sign off to allow the sheriff access to their medical records. Let's have corvel handle that process." (PX 51, Ex. GG under seal). Reierson responded the same day. (PX. 52, Ex. HH under seal). A similar email was sent by Williams to Shelby on April 21, 2017. (PX 53, Ex. II under seal). None of these documents should be permitted in evidence in this case as all are evidence of subsequent remedial measures and are barred under FED. R. EVID. 407. *See also Awalt v. Marketti*, 2015 U.S. Dist. LEXIS 91546, *41 (N.D. Ill. 2015) ("The point of Rule 407 is to allow parties to make changes in conditions for the better without worrying about it being used against them later at trial.") These documents obviously fall within Rule 407 and must be barred.

That conclusion only is underscored by the unfair prejudice of seeking to use documents drafted by Karyn Williams in light of the extensive effort by Nawara's counsel to convince this Court that Williams knows nothing related to this case. There is no basis now to change that tune, and Nawara should not be permitted to introduce evidence created by Ms. Williams at this late date.

Other exhibits on Plaintiff's list also should be barred under Rule 407 – specifically, new "Management Guidelines for Fitness for Duty Concerns" that were issued on May 17, 2017, long after Nawara was referred for an FFD and well after this lawsuit was filed on March 29, 2017. (PX 55, Ex. JJ). These guidelines also are irrelevant to this case, since they did not apply at the

time of Nawara's FFD referral. *See* FED. R. EVID. 401. Likewise, the HIPAA form that Nawara finally executed on August 17, 2017 (PX 17, Ex. KK under seal) cannot be deemed an admission of liability by any defendant in this case.

**21. DEFENDANTS' MOTION *IN LIMINE* NO. 21 TO BAR USE OF PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS.**

Plaintiff has included three proposed exhibits in his Pretrial Order exhibit list that inadvertently were produced in this case. All three reflect privileged attorney-client communications with Rebecca Reierson concerning matters that themselves are subject to motions *in limine* – communications with Nawara's union and videos of Cermak on the day of the 9/28/19 incident. Moreover, the communications themselves were prepared by counsel based on hearsay, and those counsel have not been named as witnesses in this case and therefore no foundation can be laid for admission of their communications. FED. R. EVID 401, 801. Upon discovering these documents inadvertently had been produced, Defendants' counsel asked Nawara's counsel to destroy them, in accordance with well-established law. To the extent that Plaintiff's counsel refuses to do so, Defendants seek an order *in limine* to bar these exhibits and any reference thereto: PX 108, 113 and 117.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motions *in Limine* be GRANTED.

Respectfully submitted,

THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, MATTHEW BURKE, REBECCA REIERSON, and WINIFED. R. EVID.D SHELBY,

/s/ Sarah R. Marmor

Sarah R. Marmor
Suzanne Milne Alexander
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
smarmor@scharfbanks.com
salexander@scharfbanks.com
mchurma@scharfbanks.com

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

-----------------------------------------------------

Deposition of Matthew Burke
Confidential - Deposition of Matthew Burke (9)
Thursday
October 10th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois

Page 2

APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Lyle Henretty
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

Page 3

For Defendant County of Cook:
Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Morgan G. Churma
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Thursday, October 10th, 2019. The time is now 10:06 a.m. We are located at The Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois, for a deposition in the matter of John Nawara v. County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Matthew Burke. Mr. Burke, my name is Abbey Douglas. I am a notary public, and I am recording this deposition

Page 4

on behalf of Exhibit 5, LLC. At this time, will you please raise your right hand for the oath?
(Witness sworn)
RECORDER: Thank you. Will the attorneys please state their appearances for the record?
MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.
MR. LINDEN: Richard Linden on behalf of John Nawara.
MR. CHURMA: Morgan Churma on behalf of the Sheriff, Matthew Burke, Rebecca Reierson, and Winifred Shelby.
MR. BUSTAMANTE: Okay. Record --
RECORDER: That --
MR. BUSTAMANTE: Excuse me. The record should also reflect that Lyle -- I can't think of his last name.
MR. LINDEN: Henretty.
MR. BUSTAMANTE: Henretty --
MR. LINDEN: Henretty.
MR. BUSTAMANTE: -- is --
MR. CHURMA: And Megan Honingford.
MR. BUSTAMANTE: -- is going to be late, and so he will be of record as soon as he walks in. Okay.
MR. LINDEN: And also Megan said to proceed



EXHIBIT
A
exhibitsticker.com

without her, right?
MR. CHURMA: Yes.
MR. BUSTAMANTE: Just -- so we -- we're all in agreement we can start?
MR. CHURMA: Yes.
RECORDER: That completes the required information. We can proceed.

EXAMINATION

BY MR. LINDEN:
Q. Mr. Burke, good morning. My name is, you know, Richard Linden, along with Peter Bustamante, represent the Plaintiff here. Can you just state and spell your name?
A. Matthew Burke, M-a-t-t-h-e-w, Burke, B-u-r-k-e.
Q. And you're a licensed attorney, yes?
A. Correct. 0:01:32
Q. So I assume you're aware of the procedures for a deposition?
A. Yes.
Q. But just, you know, one ground rule is just if you don't understand a question, just let me know. But if you answer, it's going to be assumed you understood the question. Fair enough?
A. Okay.



Q. And have you ever had your deposition taken before?
A. Yes.
Q. How many times?
A. Approximately ten to 20.
Q. Were they all regarding sheriff cases?
A. All but one. I was a witness to a car accident.
Q. And do you recall what cases you have given depositions in?
A. I -- I don't recall the specific cites, one of the cases was Hudson versus Cook County. There was -- was a series of American with Disabilities Act cases.
Q. Was that a case in federal court?
A. Yes. 0:02:40
Q. And do you recall who the lawyers for the plaintiffs were?
A. The Morrisseys. I don't recall the Hudson case, it was somebody from the Northwestern Bluhm Legal Clinic.
Q. Do you recall any other specific cases by name?
A. Believe -- no, I'm sorry.
Q. Okay. Was there one case regarding Tate?



A. Yes, yes.
Q. And that was Cass Casper is the lawyer on that one?
A. Yes, that's correct.
Q. Any other case besides that?
A. Sorry, it's been such a myriad of cases that I get them confused. One case involving, I believe, producing magazines or newspapers in the jail, and I can't remember who the opposing counsel was, maybe Cherry.
Q. Myron Cherry possibly?
A. Possibly.
Q. Do you recall any other cases involving fitness for duty exams or evaluations?
A. I don't believe so. 0:03:47
Q. Have you ever been involved in a lawsuit regarding any issues regarding fitness for duty?
A. I don't believe so.
Q. What is your age?
A. 41.
Q. Date of birth?
A. 2/18/78.
Q. And can you give us last four numbers of your Social Security?
MR. CHURMA: We can clarify that this is



going to be on the protective order.
MR. LINDEN: Yeah, that's fine.
(The following page 9 has been designated as confidential by agreement of the parties)
///

(Start of Confidential Portion)

[redacted]

(End of Confidential Portion)

///

*CONFIDENTIAL*



(Continuation of Regular, Non-Confidential Testimony)

Q. Can you describe your educational background?

A. I went to Catholic University of America for my undergrad. I received a major in English and a minor in philosophy.

Q. Where is Catholic University?

A. Washington, D.C.

Q. What year did you receive your degree in?

A. 2000.

Q. And after that?

A. In 2003, I believe, I went to Loyola University of Chicago for their urban studies master's program.

Q. Did you graduate from that program?

A. Yes.

Q. And what was your master's in?

A. Urban studies.

Q. What year?

A. I believe 2004.

Q. Any other education after that?

A. Law school.

Q. And what year?

A. I -- 2007 or '06 to 2009 -- or '08, I -- I passed the bar in 2009.



Q. What law school? 0:06:03

A. Loyola University Chicago.

Q. And you received a JD from Loyola?

A. Yes.

Q. And you took the bar exam right away or the next --

A. Yes.

Q. And --

A. The February bar.

Q. How long have you been licensed to practice law?

A. Ten years.

Q. Have you always been in good standing all ten years?

A. Yes.

Q. Any disciplinary complaints against you?

A. No, not that I'm aware of.

Q. After you -- could you just set forth briefly your work experience after your urban studies degree?

A. I was -- I ran a small power washing company for several years. We would clean decks, and houses, and parking garages. I was a bartender.

Q. Okay. What years was the power washing company?



A. 2001 to 2007 or so. 0:07:20

Q. Was that your own -- own company?

A. Yes, me and a partner.

Q. And bartending, what years?

A. Oh, 2003 to -- or maybe 2002 to 2007.

Q. And what bar did you bartend at?

A. Bernie's --

Q. What --

A. -- near Wrigley Field.

Q. And after that, what -- what was your work experience?

A. Started with the sheriff's office in April of 2007.

Q. And that was right out of law school?

A. I was in law school.

Q. Okay. How is it you were hired by the sheriff's office?

MR. CHURMA: Object to form. 0:08:10

A. I had known the sheriff and his chief of staff at the time.

Q. Was that Tom Dart at the time?

A. Yes.

Q. And how did you know Tom Dart before you got hired?

A. I worked on his campaign.

Page 13

Q. And what campaign?
A. His 2006 campaign.
Q. Was he running against Sylvester Baker in 2006, if you recall?
A. I -- I thought that may have been the election afterwards. It could have been an individual named Garza, but I could be mixing it up.
Q. Did you ever see a person by the name of Percy Taylor in connection with any of the campaigns against Thomas Dart?
A. That doesn't ring a bell. 0:09:14
Q. How is it that you became associated with the campaign, did you know Mr. Dart before, or volunteer, or how was it that caused you to campaign for him?
A. I had volunteered.
Q. Did you know Mr. Dart before you volunteered for the campaign in 2006?
A. Yes.
Q. And were you friends with Mr. Dart before you became employed by the sheriff's office?
A. No, other than having worked on the campaign.
Q. Do you ever socialize with Mr. Dart?
A. Not outside of any campaign activities.

Page 14

Q. And I think you indicated also that you knew the chief of staff before you were hired?
A. Yes.
Q. And who was the chief of staff back then?
A. Brian Towne.
Q. Is he still with the sheriff's office, Brian Towne?
A. No. 0:10:08
Q. Do you know when he left?
A. I -- 2014, I believe.
Q. And how did you know Mr. Towne before you got hired?
A. Mutual friends.
Q. And who was that mutual friend?
A. There was a few mutual friends. I -- I --
Q. Do you recall who they were?
A. Maybe an individual named Matt Canna.
Q. Can you spell that last name?
A. C-a-n-n-a.
Q. And how was he associated, if at all, with the sheriff's office?
A. He was not with the sheriff's office -- or associated with them.
Q. How well did you know Brian Towne before you got hired?

Page 15

A. Not very well. 0:11:01
Q. Did you submit an application, or was it pretty much --
A. It --
Q. -- a done deal?
MR. CHURMA: Object to form. Calls for speculation.
A. I had to come in for an interview and provide my resume.
Q. Do you recall who you interviewed with?
A. I believe Brian Towne, and I -- I can't remember if there was anybody else there.
Q. Okay. Did you talk to Tom Dart when you first interviewed?
A. I don't believe so.
Q. What was your first position at the sheriff's office?
A. Legal assistant.
Q. That would be kind of a law clerk type of job or --
A. Yes.
Q. What years were you legal assistant?
A. 2007 until 2009 when I passed the bar.
Q. And who did you report to when you were legal assistant?

Page 16

A. Peter Kramer.
Q. What was his title?
A. Acting general counsel or general counsel.
Q. Did you have any interaction with Thomas Dart from 2007 to '09?
A. Occasional. 0:12:10
Q. What type of occasions would you deal directly with Tom Dart during that time?
MR. CHURMA: I'm going to object to the extent that this calls for privileged information and --
Q. Yeah, I'm not asking anything that was said, and you were not a lawyer at that time, right?
A. No.
Q. What type of interactions did you have with Tom Dart during that time?
A. Possibly discussing lawsuits against the office or if there were certain initiatives that the legal department was embarking on, just sometimes day-to-day legal issues.
Q. And --
A. Labor relations.
Q. Have you ever discussed John Nawara with Thomas Dart?
A. No. 0:13:06

MR. CHURMA: I --
Q. Did you ever discuss John Nawara with the chief of staff?
MR. CHURMA: Again, I'm going -- I'm going to object to if this is going to lead to any privileged information and instruct him not to answer to the extent he's having conversations with -- for the legal department with members of the sheriff's office.
MR. LINDEN: I mean, right now, I haven't asked for any conversations whether or not --
MR. CHURMA: I know. I'm just --
MR. LINDEN: -- he talked to --
MR. CHURMA: -- advising my client not to reveal any privileged communications.
Q. Have you ever spoken to the chief of staff regarding John Nawara?
A. No. 0:13:39
Q. How is it that you got hired as a lawyer after law school?
A. Once I passed the bar, it was kind of a natural choice.
Q. Was the job offered to you before you passed the bar? Was it understood that once you passed the bar, you'd be a lawyer for the sheriff's office?



A. I don't recall ever having any conversations with anybody about it. It just seemed to be a natural decision.
Q. Do you recall whether or not you had to fill out a job application to be a lawyer with the sheriff's office?
A. I did not.
Q. What was your first position as a lawyer with the sheriff's office?
A. Assistant general counsel.
Q. And what does an assistant general counsel for the sheriff's do?
A. At the time, I was responsible for managing some of the litigation involving the sheriff's office and its employees, and I was pretty heavily involved with labor relations and contract negotiations during that period.
Q. And what years did you serve as an assistant general counsel?
A. 2009 until 2011 or '12. 0:15:17
Q. During that time, were you involved in any subjects related to fitness for duty evaluations or examinations?
A. As part of my labor relations portfolio, I may have dealt with a couple grievances involving



fitness for duties.
Q. Do you recall any specifically?
A. None specific.
Q. Do you recall generally at all about those couple grievances?
A. Just generally that employees were grieving the fact that they were sent for a fitness for duty and not paid while they were out.
Q. Did any of those result in a lawsuit that you're aware?
A. Not that I'm aware of. 0:16:17
Q. Do you know what the disposition of the grievances were?
A. Not specifically, no.
Q. Do you recall specifically -- specifically what the complaints were?
A. I have a vague recollection of people seeking some type of back pay or compensation for being out.
Q. Do you recall any of the individuals' names?
A. No. I should add that this was primarily court services department, not the department of corrections.
Q. As an assistant general counsel, you're assigned to a specific department of the Cook County



Sheriff's Office?
A. I was in the legal department. 0:17:10
Q. And they handled DOC, legal department?
A. There may have been, at the time, a couple in-house attorneys for the DOC who would have handled some matters. The legal department handled broader matters.
Q. When you say, "Broader matters," can you be more specific?
A. We would handle lawsuits, for instance, or the contract negotiations, not necessarily the day-to-day grievance disputes or union disputes.
Q. If there are lawsuits against individuals within the department of corrections, would that be handled by legal department?
A. We would essentially quarterback or manage the lawsuits. The state's attorney would actually be the attorneys of record on the cases.
Q. I guess what I'm trying to ask, was there different -- differentiation between lawsuits involving DOC and lawsuits, let's say court service or any other aspect, or were you responsible for any -- quarterbacking any type of lawsuits?
MR. CHURMA: Object to form. 0:18:30
A. I'm sorry, can you --

Page 21

Q. Yeah, was your overseeing lawsuits limited to any specific department within the sheriff's office?
A. No.
Q. No. And in 2012, you got promoted?
A. Yes, I believe it was 2012, I could be fudging the dates a little.
Q. Okay. What was your position in 2012 or thereabouts?
A. First assistant general counsel.
Q. And how is first assistant general counsel different than assistant general counsel?
A. At that --
MR. CHURMA: Object to form.
A. At that time, we built up our legal department a little bit, and so I was responsible for managing some of the attorneys in the legal department.
Q. And in 2012, do you recall how many lawyers were in the legal department?
A. I believe between five and nine.
Q. So the entry level lawyers or lowest level would be assistant general counsels?
A. Correct. 0:19:45
Q. And do you recall how many of those lawyers

Page 22

there were?
A. Between five and seven -- or five and ten, I believe.
Q. And how many first assistant general counsels were there, just you or --
A. I may have been the only one for a brief time, and then at some point, our current general counsel named Nick Scouffas, S-c-o-u-f-f-a-s, was also made first assistant general counsel.
Q. And do you recall when Mr. Scouffas took that -- was given that position?
MR. CHURMA: Object to form.
A. I don't.
Q. And how long did you work as first assistant general counsel?
A. Until June of 2014.
Q. And what were your duties as first assistant general counsel?
MR. BUSTAMANTE: Oh, sorry. Let the record show that -- slide by, yeah. Counsel for Jones-Hayes --
MR. HENRETTY: Jones-Hayes. 0:20:58
Q. Let me just ask the question again since we -- Lyle came in. What were your duties and responsibilities as a first assistant?

Page 23

A. My primary duties during the time were to oversee our litigation with the Department of Justice.
Q. And what -- what did that involve, was that the Shakman decree back then?
A. No, it was the what we termed agreed order between the Department of Justice, and the county, and the sheriff's office.
Q. And what was the subject matter of that agreed order?
MR. CHURMA: I'm going to object to the extent he doesn't have to really reveal confidential or -- any privileged information with respect to this. Advise him not to reveal any privileged information.
A. The lawsuit involved conditions of confinement at the department of corrections.
Q. Who did you report to? 0:22:18
A. At one point, I reported to Nancy Donahoe.
Q. What was her title?
A. General counsel.
Q. And do you recall what years you reported to Nancy Donahoe?
A. I believe 2012 and 2013, and then she was succeeded -- succeeded by Sean Heffernan as general counsel.
Q. Can you spell that name?

Page 24

A. H-e-f-f-e-r-n-a-n.
Q. Were there anybody in between first assistant general counsel and the general counsel?
A. No.
Q. So is it fair to say you and Mr. Scouffas are, like, number two in the legal department during that time?
A. Yes.
MR. CHURMA: Object to form.
WITNESS: Sorry.
Q. When you served as first assistant general counsel, did you have any involvement in fitness for duty issues?
MR. CHURMA: Object to form. 0:23:25
A. I don't recall specifically.
Q. Do you recall generally any involvement?
MR. CHURMA: Same objection.
A. Nothing comes to mind.
Q. What was your next position with the sheriff's office?
A. Chief of staff for the Cook County Department of Corrections.
Q. And what does chief of staff for corrections do?
A. I was essentially the chief of staff to the

Page 25

executive director of the jail, and so I was responsible for helping her at the time with day-to-day operations and the development and implementation of DOC policies, and I still retained my role as the primary liaison to the Department of Justice and the monitors for the agreed order.
Q. And when did you become chief of staff?
A. June of 2014.
Q. And who was the person you reported to, the executive director?
A. Cara Smith.
Q. And how long did you serve as chief of staff?
A. From June of 2014 until August of 2018. 0:24:44
Q. And what were your duties and responsibilities?
A. As mentioned, still quarterbacking our agreed order efforts, I was somewhat involved in labor relations, involved in the development and implementation of DOC related policies, I was responsible for some of our budget, and a whole host of other things.
Q. With respect for fitness for duty exams or evaluations, what role, if any, did you have from 2014 until 2018?

Page 26

A. On occasion, I would refer individuals to human resources for them to evaluate someone to determine if a fitness for duty was warranted.
Q. When -- when you say, "On occasion," how many occasions?
A. I really -- it -- I would say less than 25. 0:26:15
Q. Would it be more than ten?
A. I believe so.
Q. More than 15, if you can --
A. Probably around there.
Q. Were there any policies or procedures in place on referring an employee for a fitness for duty evaluation?
MR. CHURMA: Object to form.
A. I can't recall if there were any written policies throughout that period.
Q. Do you recall any at all during that period? 0:27:03
A. I believe that human resources had issued some type of guideline in 2017 or '18, but I -- I don't remember specifically.
Q. Were any in place in 2016 that you're aware of?
A. I don't recall any specific policies, but there may have been.
Q. What criteria did you use in deciding

Page 27

whether or not to refer a person for evaluation?
MR. CHURMA: Object to form. 0:27:42
A. There were, at the time I believe, a number of people who would get arrested on the weekends for say a DUI or a domestic incident, and they would go automatically, and then we would, on occasion, have an employee exhibit somewhat disturbing or problematic behavior, and at that point, we would have HR evaluate them.
Q. Is it fair to say there are, like, two types, one, if they get arrested, then the referral would be automatic?
A. For a period of time, that was the case, yes. 0:28:41
Q. Okay. Then you said, on occasion, an employee may exhibit aggressive behavior, and that may result in a referral?
MR. CHURMA: Object -- object to form. Mischaracterizes testimony.
Q. And correct me if I'm --
A. It -- it --
Q. -- mischaracterizing it.
A. Would exhibit some type of disturbing or problematic behavior, it wasn't always necessarily aggressive behavior.
Q. And what type of problematic, or disturbing,

Page 28

or aggressive behavior would be required in order to make a referral?
A. Sometimes I would receive reports of an employee who, for instance, had trouble walking or carrying anything, and so we would want them to be evaluated. I recall -- I vaguely recall there being times where employees complained about other employees not keeping up with their hygiene and exhibiting signs of deterioration like that, and so they would potentially be sent to HR.
Q. So the physical issues would be whether or not they could perform their duties within whatever department they are in, would that be fair?
A. Yes. 0:30:06
Q. And then were there occasions where an employee may display some kind of, you know, mental instability that could result in a referral?
MR. CHURMA: Object to form.
A. There were occasions where we would receive reports from an employee's colleagues or supervisors that the employee was potentially having mental health issues.
Q. Do you recall out of, you know, the 15 or so that you're involved in, how many cases there were where it wasn't one of the automatic referrals?

Page 29

A. I should --
MR. CHURMA: Object -- I'm going to object to
form here. 0:30:47
A. I'm sorry, I -- I should clarify a little bit. I'm thinking -- when I say the -- the between the ten and 15 or between ten and 25, it's more of those one-offs, not the more automatic referrals. The -- the more automatic referrals, I don't know the number of those.
Q. Do you recall any written criteria to be used in determining whether or not a referral would be made when it's not one of the automatic if somebody got arrested?
A. As I sit here right now, I can't remember if -- if I just was aware of what was written and just applied it or if there was not anything written.
Q. Do you recall --
A. I can't recall.
Q. I'm sorry to interrupt.
A. I'm sorry, I just -- I can't recall if there -- if there was anything actually in writing.
Q. Do you recall if you received any training with respect to when a referral should be made?
A. Not specifically, no. 0:31:48

Page 30

Q. Do you recall any training generally --
MR. CHURMA: I just want to object to form. We're talking about referral to HR here?
MR. LINDEN: I mean, I think --
A. Yes.
MR. LINDEN: -- he understood the question.
Q. Do you recall generally any training?
A. There were a few trainings on identifying mental health issues that detainees or potentially even staff were displaying, and so I would pick up on -- sorry. We were very focused on mental health issues because they're prevalent in the jail, particularly with the detainee population.
Q. How --
A. One of the primary -- I'm sorry.
Q. Oh, I'm sorry. You can finish. 0:32:42
A. One of the primary focuses of the agreed order was mental health care for detainees, and so I would have had lots of exposure to mental health issues in the development of -- of mental health related policies and trainings.
Q. How about mental health issues with respect to employees, any training there?
A. Nothing specific to employees, but mental health issues in general.

Page 31

Q. And do you -- do you recall specifically what the training was?
A. We had developed an advanced mental health training block, we had put together a few PowerPoints to send out to staff, but again, primarily for staff to be able to identify detainees exhibiting mental health problems.
Q. Was it a formal instruction program you had while you were employed?
MR. CHURMA: Object to form. 0:33:45
A. For sworn staff, yes, and some supervisory staff.
Q. Did somebody come in from the outside and provide instruction?
A. Yes, we had trained and experienced psychologists or mental health providers conduct the advanced mental health training blocks.
Q. And what year did you receive that type of training?
A. I did not actually go through the blocks, but was more responsible for reviewing the content. I would occasionally attend certain scenarios that were incorporated into the training.
Q. How many hours did you personally attend with respect to mental health formal training?

Page 32

A. I believe I took one or two of the PowerPoint trainings that were provided to staff.
Q. And do you recall about how long those trainings were?
A. May -- half an hour to an hour. 0:35:02
Q. I'm sorry, a half an hour or two?
A. To an hour.
Q. To an hour. So anywhere between an hour and two hours, would that be fair?
A. That seems fair.
Q. Who in 2016 within the sheriff's office had the authority to refer an employee for a fitness for duty?
MR. CHURMA: Object to form.
A. I believe only human resources.
Q. Okay. There is one -- I guess one step would be refer somebody to human resources to determine whether or not they should be required for an exam, correct?
A. Correct. 0:35:52
Q. I guess what I'm asking here is who had authority to make the referral to human resources for them to determine whether or not that employee should be subjected to an exam?
A. I don't recall whether it was clearly

established who could make those referrals, but primarily, it was through the executive director's office.
Q. In 2016, did you have such authority to make a referral to HR?
A. Yes.
Q. Do you recall where that authority came from, anything in writing?
A. I don't know if there's anything in writing.
Q. Anything specifically from the executive director?
A. I don't recall her specifically saying, "You have the authority to do this." It was --
Q. And that -- that --
A. -- just understood that I could. 0:36:57
Q. And that would have been Cara Smith at the time?
A. No, at the time, it would have been Nneka Jones.
Q. So I take it Nneka Jones had authority to make referrals, correct?
A. Yes.
Q. Do you know if she made referrals at that time?
A. I believe she did.



Q. Do you recall anybody else that had authority to make a referral, other than you and Nneka Jones, in 2016?
A. I -- I can't recall.
Q. Do you know if anybody else other than you, Nneka Jones ever made referrals in 2016?
A. I don't believe so, but I'm not sure.
Q. Were there any procedures -- did you have to witness an incident in order to make a referral?
A. No. 0:37:53
Q. So I take it department heads or supervisors would come to you and say, "We had this incident" or "made an observation," then request for you to make a referral, would that be how it generally took place?
MR. CHURMA: Object to form.
MR. HENRETTY: Join.
A. That would be one way, where a supervisor or another employee would make known a concern and then bring it to their supervisors, who would eventually bring it to me or the director's office.
Q. Do you know if there are anything in writing about, you know, the procedures and how that would take place in 2016?
A. I can't recall what specifically was in writing.



Q. Do you recall if there was anything in writing during that time?
A. I can't recall. 0:38:53
Q. Would it have to be a supervised level to make a request to you to make a referral at HR?
MR. CHURMA: Object to form.
A. I don't know.
Q. Let's say a sergeant within department of corrections, could they go directly to you and say, "I have this issue with an employee and I want you to refer this to the HR," or would it have to be somebody higher up?
MR. CHURMA: Object to form.
MR. HENRETTY: Join.
MR. CHURMA: Calls for speculation.
A. I don't know.
Q. So you don't know yes or no?
A. I -- I can't recall if that ever happened or if it didn't.
Q. How about lieutenant level, would they have the authority to request that you make a referral?
MR. CHURMA: Same objections.
MR. HENRETTY: Join.
A. I don't know.
Q. With respect to captains, would that be the



same answer?
MR. CHURMA: Same objections. 0:39:57
A. There were no captains.
Q. The captain position was abolished at some point in time, correct?
A. Correct.
Q. And that was before 2016?
A. Yes.
Q. And you had commanders after lieutenants would be the next position?
A. Correct.
Q. And did commanders have authority to ask you to make a referral?
MR. CHURMA: Object to form.
A. I -- I'm trying to recall how these issues would come to me, and I -- I can't recall specifically any sergeant, or lieutenant, or commander coming to me, but that's not to say it didn't happen.
Q. Do you know whether or not they had authority or not in 2016 to request you make a referral to HR?
MR. CHURMA: Object to form.
Q. And if you don't know, that's fine.
A. I don't know.
Q. After commander, the next position up would

be a superintendent?
A. Correct.
Q. And how many superintendents were there in department of corrections in 2016?
A. Approximately 12. 0:41:09
Q. Was there ever an occasion where a superintendent came to you and requested for you to make a referral to HR? When I say, "Referral," we're talking about fitness for duty.
MR. CHURMA: Object to form.
MR. HENRETTY: Join.
A. I would have superintendents bring issues to me, not necessarily so it would be referred to HR, but just bringing concerning issues to me. So I don't recall if a superintendent ever said, "I have this incident, please send him to HR." That may have happened, but I -- I don't recall the -- the nuances of how any decision to refer somebody to HR would be made, if that makes sense.
Q. Okay. If somebody complained that an employee displayed aggressiveness from a superintendent level, would you investigate the claim before you decided whether or not to make a referral?
MR. CHURMA: Just going object to -- object to form. 0:42:32



A. I would not launch a formal investigation, but I would want to hear about the incident.
Q. Okay. When you say you wouldn't launch a formal investigation, would it be more of an informal investigation?
MR. CHURMA: Object to form.
A. The way that it would work is that I would just get the information from whoever was concerned about an employee.
Q. Do you ever recall getting information from anybody other than a superintendent?
A. I don't recall, but that's not to say it didn't happen.
Q. So would you interview the effective employee before you made a referral?
MR. CHURMA: Object to form. 0:43:32
A. I don't recall doing that.
Q. Do you recall ever interviewing an employee and getting his or her side of the story before making a referral?
A. I don't recall doing that.
Q. Do you think it would be fair to the employee to get the employee's side of the story before you made a referral?
MR. CHURMA: Object to form.



MR. HENRETTY: Join.
A. No.
Q. Why not?
A. It's a referral to human resources.
Q. I guess my question is why would it not be required, in fairness to the employee, to get his or her side of the story before you decided to refer somebody to HR?
MR. CHURMA: Object to form again.
MR. HENRETTY: Join. 0:44:38
A. In those rare occasions where somebody's behavior rose to that level, it was more prudent to have them talk to somebody outside of the department of corrections, which in this case would be human resources.
Q. Okay. What did you -- I just want to go back a little bit, but did you prepare for this deposition?
A. Yes.
Q. And what did you do in preparation for the deposition?
A. I met with counsel and reviewed some documents.
Q. Okay. And what counsel did you meet with?
A. Morgan.



Q. And when did you meet with Mark (sic)? You could answer.
A. With Morgan? 0:45:41
Q. Or Morgan. I'm sorry, I thought you said, "Mark." Or Morgan, I'm sorry. You can -- you know, he hit me -- yeah, I apologize, but when -- when did you meet with Morgan?
A. A couple days ago.
Q. And do you recall how long the meeting was?
A. Two hours, two and a half hours.
Q. And you said you looked at documents, do you recall what documents you looked at?
A. The affidavit that I filled out in this case, the interrogatories, a few emails, Rebecca Reierson's deposition transcript.
Q. And when did you review Reierson's deposition transcript?
A. A couple days ago.
Q. Anything stand out that you could recall about Ms. Reierson, what she said in the deposition?
A. No, I just reviewed it very briefly.
Q. Any disagreements with what she said?
A. Nothing that stands out. 0:46:54
Q. Did you ever talk to Ms. Reierson about your deposition or her deposition?

Page 41

A. No.
Q. Ms. Shelby, did you review any transcripts with respect to her?
A. No.
Q. Do you know who Ms. Shelby is?
A. Yes.
Q. And what's her first name, Winifred?
A. Winifred, yes.
Q. How is it that you know Winifred?
A. Just by working with her.
Q. Are you aware of HIPAA?
MR. CHURMA: Object to form.
A. Yes.
Q. And what is HIPAA?
A. The Health Information (sic) Portability and Accountability Act.
Q. And did you ever receive any training with respect to HIPAA at the sheriff's office?
A. I can't recall. 0:48:09
Q. Do you recall if there are any written procedures or guidelines at the sheriff's office with respect to HIPAA?
A. I don't know if we have a specific policy on it or not.
Q. Do you know if HIPAA applies to employees'

Page 42

medical records?
MR. CHURMA: Object to form and calls for a legal conclusion.
A. That's my understanding.
Q. Did you ever receive any training or guidance with respect to HIPAA and an employee's medical records?
A. I can't recall specifically. 0:49:10
Q. Would you agree that it's important to keep confidential employees' medical records?
MR. CHURMA: Object to form.
MR. HENRETTY: Yeah, join that.
A. Somewhat. I -- I know there are exemptions and exceptions in HIPAA, and --
Q. And when would it not be prudent not to keep private an employee's --
MR. CHURMA: Object to form.
Q. -- medical records?
MR. CHURMA: Calls for a legal conclusion.
MR. HENRETTY: Also foundation.
MR. CHURMA: Foundation.
A. I can't think of any specific reasons as I sit here now.
Q. So as you sit here, you can't think of any legitimate reason not to keep an employee's medical

Page 43

records private?
MR. CHURMA: Same objections.
MR. HENRETTY: Yeah. 0:50:01
A. It depends what you mean by "private" and who the -- I don't -- I don't know how to answer that.
Q. You think it's proper for the sheriff's office to have access to an employee's personal medical records?
MR. CHURMA: Same objections.
MR. HENRETTY: Yep, join.
A. I -- I'm hesitant to put myself out there as saying one way or another, though I know there are circumstances where employers are entitled to certain records.
Q. Can you think of any circumstance sitting today that it would be proper for the Cook County Sheriff's Office to have access to -- direct access to employees' medical records?
MR. CHURMA: Same objections and calls for speculation.
MR. HENRETTY: Join. 0:50:58
A. I can't think of a reason right now.
Q. But you would agree that it's important to protect an employee's medical records in --
MR. CHURMA: Object --

Page 44

Q. -- for privacy, correct?
MR. CHURMA: Same objections.
MR. HENRETTY: Join.
A. It's important to protect private health information in accordance with the law.
Q. Okay. Are you familiar with the Americans with Disability Act or otherwise called the ADA?
A. Yes. 0:51:35
Q. And how are you familiar with the ADA?
A. Through my work experience and through law school and continuing legal education.
Q. Did you ever receive any training at the sheriff's office with respect to the ADA?
A. Yes.
Q. And can you describe what type of training you received?
A. In 2012 or '13 or so, we developed a training curriculum for staff, and I attended a few of those sessions.
Q. Were you responsible in any way for developing -- developing that curriculum?
A. I played a role in it, yes. 0:52:37
Q. And what role did you play?
A. In just helping develop the -- the slides for the PowerPoint or some of the material for it.

Q. Do you recall anything specific regarding medical records and the ADA?
A. I don't recall if we had anything specific to that in the training. We may have though.
Q. Do you know a person by the name of John Nawara?
A. Yes.
Q. How do you know Mr. Nawara?
A. Through this litigation.
Q. Prior to any issue arising in this litigation, had -- had you ever had any contacts or dealings with Mr. Nawara?
A. No. 0:53:41
MR. CHURMA: Object to form.
Q. I'm sorry, I think you might have talked over each other.
A. I'm sorry. I don't believe so.
Q. Do you recall any discussions with Mr. Nawara before or after this incident in this case?
A. On two occasions, he was working a security post that I was exiting.
Q. And do you recall when those two occasions were?
A. One occurred soon after he was transferred to external operations, and then the other was several



months later.
Q. Okay. Would the first occasion, would it have been in 2016?
A. Yes.
Q. And do you recall where you were during the first occasion?
A. I was exiting a security post in my car. 0:54:46
Q. Okay. Do you recall what security post it was?
A. Oh, God. I believe it's post four. I always get them confused.
Q. Okay. How many security posts are -- what is a security post? I'm kind of naive when it comes to that.
A. It's an area where you will have a correctional officer standing guard and he will allow people to come or go.
Q. Would each building have one security post, or would there be multiple security posts within a building?
A. For the external operations posts, there are several throughout the compound, and then a couple inside of the compound.
Q. When you refer to external operations, what is external operations?



A. It's the unit responsible for securing the outside of the buildings and of the jail compound, as well as securing and supervising detainees that are not within the custody of the jail, but for instance, at a hospital.
Q. Okay. When you say, "Outside," would that be the outside perimeter of a jail complex?
A. Yes. 0:56:14
Q. So it would be pretty much anything outside of the building itself, would that be a fair way to look at it?
A. Outside of the buildings, the Cook County Jail is comprised of several buildings in a large area.
Q. And within the building in the road, let's say on California, you'd have a fence and a guard tower, correct?
A. Correct.
Q. And would external operations be responsible for the area between the entrance of the jail building and that fence that would run along the street?
MR. CHURMA: Object to form and foundation.
A. They would be responsible for the entire perimeter.
Q. So were they responsible for patrolling it?



A. Some of the shift would be, yes.
Q. And what would their responsibilities involve? Or what would they be responsible for is probably a better question?
MR. CHURMA: Object to form and foundation. 0:57:12
A. Ensuring that nobody was up to anything or trying to break in or out of the jail or throw contraband over the walls.
Q. Would -- would they have vehicles to patrol the perimeters?
A. A few officers on the shift would.
Q. How about weapons, would external operations carry a weapon?
A. Yes.
Q. That would be different than inside the jail, correct?
A. Correct.
Q. Because inside of the jail, they have tasers, correct?
MR. CHURMA: Object to form.
A. There are tasers in the jail, but not every officer carries them.
Q. Would everybody in external operations and would be a correctional officer, would they have -- have to carry a firearm?

A. Yes. 0:58:07
Q. And what type of firearms would employees in external operations carry?
A. I don't know.
Q. Would it be a revolver?
A. Some type of handgun.
Q. Okay. Mr. Nawara, when the September incident took place before he was reassigned, he is assigned to the -- in Cermak, correct?
A. That's my understanding.
Q. And Cermak's what, a hospital within the jail?
A. It's the medical unit within the jail.
Q. And what building was Cermak in?
A. It's referred to as the Cermak building.
Q. And was there -- do you know where Mr. Nawara was assigned at the time when he first had the encounter with Jones-Hayes?
A. No. 0:58:59
Q. Do you whether -- whether or not, at that time, Mr. Nawara was authorized to carry a weapon in the -- at Cermak?
A. Nobody was allowed to carry a weapon inside Cermak.
Q. Okay. You said the -- we talked briefly



about the first occasion that you saw him, and you saw him in external operations by a post?
MR. CHURMA: Object to form.
Q. Correct? Post seven (sic) I think you indicated?
MR. BUSTAMANTE: Four.
A. Post four --
Q. Four?
A. -- I believe. I --
Q. Okay. And do you recall if you said anything to Mr. Nawara or if he said anything to you?
A. Just exchanged hellos.
Q. Was there anything confrontational about the hellos?
A. Not at all, no.
Q. Did he display any type of aggressive behavior when you saw him at that time?
A. No. 0:59:51
Q. Do you recall anything else about that contact with him?
A. No, just that that was -- it was not a memorable or noteworthy interaction.
Q. How is it that you knew that that was Mr. Nawara at the time, was -- did he have a name tag on?
A. That's exactly it. I -- when I came by, I



saw his name tag, and I said, "Oh, that's the individual who I received a call about."
Q. Sure. Do you know if he knew who you were at the time?
A. I don't know.
MR. CHURMA: Object to form.
WITNESS: I'm sorry.
A. I --
Q. Did he --
A. I don't --
Q. -- refer to you by name, if you recall?
A. I don't recall.
Q. And you said the second one occurred several months after this?
A. Yes.
Q. And where did the second contact occur?
A. Same location.
Q. And do you recall anything about it?
A. I do recall that it was not as pleasant as the one before. Well "pleasant" is a strong word, but it was not as -- it was a little bit different.
Q. Can you describe what happened? 1:01:06
A. During that interaction, I got the impression that he knew who I was and had a little bitterness towards me.



Q. What gave you that impression?
A. He had either put his hands on my car or window area or approached it pretty closely.
MR. HENRETTY: Sorry.
Q. Do you recall if he had his hands actually on your vehicle?
A. I believe he did, but I -- I don't recall exactly.
Q. Can you swear under oath that he was touching you vehicle, or is it just a hunch or a guess?
A. I definitely recall him invading the space. 1:02:07
Q. When you say, "Invading the space," what do you mean by that?
A. Meaning that I frequently would go through this post and so I would have an idea of, you know, how far somebody would need to be to check my ID or whatever it was, and he seemed to be closer than anybody I recall and he seemed to exude -- exude a bitterness.
Q. Did he check your ID at that time?
A. I believe he did.
Q. Is that a normal procedure, for them to check IDs -- IDs of people enter -- entering or exiting a post?

A. Yes.
Q. There's nothing improper about that act alone, correct?
A. No.
Q. Did he display any physical aggression during that second encounter?
MR. CHURMA: Object to form. 1:03:06
A. Other than, like I said, invading that space a little bit.
Q. Did you feel threatened at all?
A. I wouldn't say that I felt threatened, but I definitely could tell that he was, like I said, embittered and --
Q. Do you recall if you filled out any incident reports regarding that contact?
A. I didn't think that was necessary.
Q. And you obviously didn't file a complaint with OPR, correct?
A. No.
Q. Did you get the impression that he knew who you were before he checked your ID?
A. Yes. 1:03:55
Q. How did you get that impression?
A. In order to get to your car, you have to walk by the post, and so I believe he may have seen me



walking to my car, and then when I got to the post with my car, he -- he knew who was coming.
Q. Were you in your car at the time when you had contact with him?
A. Yes.
Q. Did you roll down the window?
A. Yes.
Q. So he's guarding the post where cars would enter or exit that area?
A. Cars or individuals walking from the outside --
Q. Okay.
A. -- or walking in the outside from court.
Q. Do you know a person by the name of Karen Jones-Hayes?
A. Yes. 1:05:02
Q. And who is Karen Jones-Hayes?
A. She is a superintendent with the Cook County Department of Corrections.
Q. Do you know if she's still employed by DOC?
A. Yes.
Q. Do you know how long she's been a superintendent?
A. Over three years.
Q. Was she a superintendent back in 2016?



A. Yes.
Q. Do you know where she was assigned in 2016?
A. Cermak and possibly another division.
Q. Did you know her before two -- on a personal level before 2016?
MR. CHURMA: Object to form. 1:05:50
A. I had interviewed her for the superintendent position, and that was the first time I had ever met her.
Q. Do you recall when that would have been?
A. 2015 or 2016, I don't recall specifically.
Q. Do you know what her position was before becoming the superintendent?
A. Lieutenant.
Q. She bypass a commander position?
MR. CHURMA: Object to form.
A. Yes.
Q. And how is it that somebody is able to go from a lieutenant directly to commander (sic), rather than the normal -- normal progression?
MR. BUSTAMANTE: Superintendent, not commander.
Q. To superintendent?
MR. CHURMA: Object to form.
Q. Let me -- let me redo that. How is it that



a person is able to go directly from a lieutenant to superintendent and not have to be a commander first?
MR. CHURMA: Object to form. 1:06:50
A. Our employment action processes allow for it to be an open application, and the minimum qualification for the superintendent position did not require that one be a commander first, in fact, it was open to the public as well.
Q. Was it a limited amount of positions that would be an open position rather than having to go directly, you know, from the commander position?
MR. CHURMA: Object to form and foundation.
A. There was no mechanism at that time just to make a commander a superintendent. We had decided to go with the open application process.
Q. Do you know if she submitted an application to become a superintendent back in 2015 or thereabouts?
A. Yes. 1:07:55
Q. Do you know how many other applicants there were for that position?
A. I don't recall specifically.
Q. Do you recall if there's more than five at that time?
A. Yes.

Q. Ten?
A. Yes.
Q. 15?
A. Yes.
Q. 20?
A. I believe so.
Q. 25?
A. I believe so.
Q. 30?
A. I believe so.
Q. Give me a --
A. I --
Q. -- I don't want to keep --
A. Because --
Q. -- doing --
A. Because it was an application -- it was an open application, we received -- or better said, HR would have received a few dozen applications, even people who were not even on paper qualified.
Q. As the chief of staff, was that part of your normal role, to interview people that were apply -- applying to be superintendents?
A. I believe that was the only time we interviewed people for superintendent during my tenure.



Q. Do you remember if she had any disciplinary history before when she was lieutenant?
A. I don't know. 1:09:08
Q. Do you recall looking at any, would that have been something you would have done?
A. I assume that HR would have screened any internal applicants for recent discipline, but I would not have done that independently.
Q. Did you make a recommendation whether or not she should be made superintendent back in '15?
A. I was part of the panel, and I recall recommending her.
Q. Do you recall why it is that she was recommended to be superintendent?
MR. CHURMA: Object to form. 1:09:46
A. She seemed to have a good understanding of mental health issues, I believe that she had even received a master's or some post-grad degree or certificate in psychology or mental health. She was confident and tough in the interview and interviewed well.
Q. Do you know if she had somebody higher up that was recommending her to get that position?
MR. CHURMA: Object to form.
A. I don't know what you mean.



Q. Did somebody ever give you a directive, somebody higher than you where the -- you know, "This person should be hired as a superintendent," either the sheriff or the undersheriff?
A. No. 1:10:53
Q. Okay. Do you know if she had any political clout to get that position?
MR. CHURMA: Object to form.
A. No.
Q. When you say, "No," she did not or you don't know?
A. I don't know, but I can tell you it did not -- if she did, it did not influence our decision.
Q. Okay. So at some point in 2016, did you become aware of John Nawara?
A. Yes.
Q. And can you describe how you became aware and what the circumstances were?
A. I can't remember what his title was at the time, but Jeff Johnsen and Superintendent Jones-Hayes, I believe, called me and said, "We just had an incident with a staff member" --
Q. Who --
A. -- and explained the -- the incident.
Q. Who is Jeff Johnsen? 1:12:05



A. I believe he, at the time, would have been an assistant executive director or a first assistant executive director, but he would have been Superintendent Jones-Hayes' supervisor.
Q. So she would have reported directly to Jeff Johnsen at the time?
A. Yes.
Q. And do you know who Mr. Johnsen's supervisor would have been? Would that have been the executive director?
A. He actually may have been reporting at that time to the chief of operations or he may have been the chief of operations, I -- I can't recall.
Q. And then would Cara Smith have been above him?
A. No. 1:13:07
MR. CHURMA: Object to form.
WITNESS: Oh, sorry.
A. Nneka Jones would have been the executive director at the time.
Q. And who would have been above Nneka Jones --
MR. CHURMA: Same objection.
Q. -- Undersheriff Whittler?
A. I can't remember what his title was, but it would have been Brad Curry.

Q. And above Brad Curry, would that have been Zelda Whittler?
MR. CHURMA: Object to form.
A. In the chain of command above Brad Curry would have been the undersheriff.
Q. Okay. And you said you were contacted by Jeff Johnsen and Ms. Jones-Hayes?
A. I believe they both had called me together, but I -- I'm --
Q. Was it a phone call --
A. I --
Q. -- when you first --
A. I believe so. 1:14:10
Q. So would it have been a conference call, or do you recall how that came to be?
A. I don't recall if it was a conference call or if Johnsen was with her.
Q. It -- it could have been in person and not a phone call when you say whether Johnsen was with her, or was it definitely by phone?
A. I'm -- I'm pretty sure it was by phone.
Q. Do you recall if they both were on the phone call at the time?
A. That's my recollection, but I'm not certain.
Q. And do you recall when that conversation



occurred?
A. The day of the incident.
Q. Do you recall what time of the day it was?
A. No. 1:14:58
Q. Do you recall where you were at the time?
A. I believe -- see, I'm trying to -- I'm almost positive it was a phone call because I remember Superintendent Jones-Hayes being pretty shaken up, and I believe I was in my office.
Q. So was it a phone call that you received, best you recall?
A. Yes.
Q. And did they both identify themselves, or was it Johnsen that identified himself when he called you?
A. I thought that it was both of them calling me together, but I may have had two conversations, one with each of them or maybe -- yeah, I'm -- I'm pretty sure that it was both of them that called me together.
Q. And do you recall what specifically Jeff Johnsen told you, if anything?
A. They both just explained what happened, I don't recall who said what exactly, but I remember Superintendent Jones-Hayes, like I said, being pretty shaken up by it.



Q. Okay. What did they tell you occurred? 1:16:16
A. That Officer Nawara had become extremely angry and had intimidated Superintendent Jones-Hayes when she had tried to either correct something he was doing or find out what was going on and that he snapped on her.
Q. Did you ask her specifically how he became extremely angry?
A. I don't recall specifically what I asked. 1:17:05
Q. Do you recall any details that she gave regarding how he became extremely angry?
A. Because she had questioned -- my recollection is that because she had questioned what he was doing and why certain inmates were either not handcuffed properly or why they were in a certain area and that she had tapped his shoulder and that he had had an outburst and snapped.
Q. Did she describe what that outburst was and what she meant by "snapped"?
A. Just that he was screaming and I believe swearing and that he was just extremely angry and that it was intimidating.
Q. When she said, "Screaming," was she any more specific than saying that he was screaming at her?
A. I don't recall specifically, but just



yelling very loudly.
Q. And she said he was swearing at her? 1:18:15
A. That's my recollection, that he was swearing.
Q. Do you recall any words that she said that Mr. Nawara used?
A. I don't recall what she had told me exactly, but I'm pretty sure she had indicated what words he had used in the complaint register that she later filed.
Q. Do you recall if she claimed that he called her the F word?
A. I don't -- I don't recall her telling that to me specifically, though she very well may have.
Q. How about the B word for a woman, did she indicate that to you?
A. I don't recall that.
Q. Do you recall any specific words that she claimed he used that were swear words?
A. Not that she told me. I don't recall, but that's not to say that she didn't.
Q. Okay. I think you indicated that you said she was intimidated by him?
A. Yes. 1:19:17
Q. And do you recall specifically what she said

to you regarding how she was intimidated by him?
A. I just recall being a little taken aback because she had explained that she doesn't get intimidated easily and that she had been working in corrections for a long time and that she knows how to handle herself, but this one -- this incident unnerved her because of the level of anger that he showed her.
Q. Did she say she has never seen that level of anger displayed by a DOC employee before?
A. I don't recall if she said she had never seen that level of anger, but like I said, it definitely unnerved her.
Q. As a superintendent, superintendents, I take, have power to discipline an employee, don't they?
A. Yes. 1:20:24
Q. What type of discipline can a superintendent make upon a correctional officer working underneath her or him?
A. He or she can give up to a 29 day suspension. Well I should correct that, they can recommend that an employee receive suspension, but the way the process works, and I believe it's the way it worked in 2016, would be that if you were going to go that route, then you would describe the infraction on



a disciplinary action form, you would submit that to the employee discipline unit, and then they would assign the level of discipline.
Q. Did superintendents have any authority to make lesser discipline without going through that process?
MR. CHURMA: Object to foundation. 1:21:28
A. You could have -- no, not -- not discipline, no.
Q. Does superintendent have authority to make any type of suspension, let's say a day suspension?
MR. CHURMA: Object to foundation.
A. Not unilaterally, so a superintendent could not just go up to an employee, for instance, and say, "You're suspended for one day effective tomorrow." There would have to be a process, meaning that the -- a form -- you know, the disciplinary action form would have to be filled out and it would have to be processed through the employee discipline unit to get a control number.
Q. Would that have to go through OPR?
MR. CHURMA: Object to -- object to form and object to foundation.
A. I -- I can't recall specifically in 2016 how the process worked.



Q. Do you know who -- who made the decision, if a superintendent recommended discipline through the process, how that would come to be, whether or not the employee would be disciplined or not disciplined?
MR. CHURMA: Object to form. 1:22:44
MR. BUSTAMANTE: You want to come in? Let's -- let's go off the record for a second, okay?
MR. LINDEN: Yeah -- yeah.
RECORDER: Off the record, 11:29 a.m.
(Off the record)
RECORDER: Back on the record, 11:36 a.m.
Q. Good morning, again, we're back on the record, but I think you indicated that either Ms. Jones-Hayes or Mr. Johnsen said that Nawara put his hand -- or she put her hand on his shoulder?
A. I believe that they told me that or I know that I had saw that fact in the complaint register.
Q. Do you recall Jones-Hayes specifically stating that to you the first time you talked to her over the phone?
A. I -- I think she may have, but I'm not positive.
Q. Is a supervisor allowed to touch an employee underneath him or her?
MR. CHURMA: Object to form and foundation. 1:23:49



A. It depends on the circumstance.
Q. Okay. What -- what would it depend upon?
MR. CHURMA: Object to form. Calls for speculation.
A. I mean, whether it's, you know, sexually inappropriate or what the motivation for the touching is.
Q. How about placing a hand on an employee's shoulder, would that be appropriate?
MR. CHURMA: Same objections.
A. It's -- I could only speculate.
Q. Can you think of any circumstance where it would be appropriate for a supervisor to place his or her hand on an employee?
MR. CHURMA: Same objections.
MR. HENRETTY: Join.
A. I -- I don't know.
Q. Can you think of any -- can you think of any instance where it would be appropriate?
MR. CHURMA: Same objections.
MR. HENRETTY: Join. 1:24:53
A. I -- not off the top of my head.
Q. Are there rules within the sheriff's office that prohibits a supervisor from touching an employee?
A. I believe there is a rule against

inappropriate touching, but not --
Q. Do you recall what the rule says specifically?
A. No.
Q. Do you recall if inappropriate, does it refer specifically to inappropriate touching or just touching?
A. For some reason, I believe it says, "Inappropriate touching."
Q. Do you know if "inappropriate" is defined anywhere?
A. I don't know.
Q. Do you know if there is any criteria between appropriate touching and let's say inappropriate touching?
A. I don't know. 1:25:56
Q. Do you know if there is any instances where there is any written guidelines saying any type of touching would be appropriate?
MR. CHURMA: Object to form.
A. I don't know.
Q. You'd agree that it would be against the rules for a superintendent to poke the chest of an employee underneath him or her, wouldn't you?
MR. CHURMA: Object to form.



Mischaracterizes testimony.
MR. HENRETTY: Join.
MR. CHURMA: Lack of foundation.
MR. HENRETTY: Join.
A. It would depend on the circumstances.
Q. Can you think of any circumstance where it would be appropriate for a superintendent to poke an employee in the chest?
MR. CHURMA: Same objections. 1:26:51
A. I can't think of any off the top of my head.
Q. Would it make a -- can you think of -- would -- I'm sorry, strike that. Is it against the rules for a supervisor to repeatedly poke an employee in the chest?
MR. CHURMA: Object to form. Lack of foundation. Calls for speculation.
MR. HENRETTY: Join.
A. It could be viewed as inappropriate touching if someone was repeatedly poking somebody in the chest.
Q. Can you think of any instance or circumstance where it would not be inappropriate for a supervisor to repeatedly poke an employee in the chest?
MR. CHURMA: Same objections. 1:27:49



A. I can't think of any off the top of my head.
Q. Would you agree that it would be inappropriate for a supervisor to yell at a subordinate?
MR. CHURMA: Object to form. Calls for speculation.
MR. HENRETTY: Join.
A. I don't know.
Q. I think you indicated that when you received the phone call, you did not launch a formal investigation?
MR. CHURMA: Object to form and to the extent it mischaracterizes testimony.
A. I myself didn't have the authority to investigate something like that, so I -- I did not do any investigation myself.
Q. What would be a formal investigation?
MR. CHURMA: Object to form. 1:28:47
A. At the sheriff's office, a formal investigation is conducted by the office of professional review.
Q. And that would get started by a complaint?
MR. CHURMA: Object to form.
A. They are generally initiated through a complaint register.



Q. I think right before the break, we were talking about what circumstances a superintendent can discipline an employee, is there any type of discipline, including a written reprimand, that a superintendent can do to an employee without going through the process you were talking about?
MR. CHURMA: Object to form. Foundation.
A. For officers, there is no formal discipline that a supervisor can give to a subordinate without going through the process.
Q. How about when you say, "Formal," is there a difference between formal and informal discipline?
A. I don't believe so. I -- I --
Q. Okay. If Jones-Hayes wanted to start a disciplinary complaint against Nawara, what would the steps be?
MR. CHURMA: Lack of foundation objection. 1:30:18
A. I'm sorry, what do you mean by "disciplinary"?
Q. In 2016, she complained, according to the phone call, that she was intimidated by him and that he acted angry towards her, he yelled and swore at her. If she wanted to start a disciplinary proceeding against him or a complaint, how would that take place?
MR. CHURMA: Object to form.

A. In that situation, she had completed and filed a complaint register, which was an appropriate method of getting the matter investigated.
Q. Do you know if that was ever filed, the complaint register?
A. Yes. 1:31:07
Q. And do you know who it was filed with?
A. The office of professional review.
Q. Do you know when it was filed?
A. Not specifically.
Q. Do you know if it was filed on the day of the incident?
A. I believe it was either the day of or the day after the incident.
Q. Do you know what became of the complaint register?
MR. CHURMA: Object to form.
A. It was processed by the office of professional review and investigated.
Q. Do you know what the extent of OPR's investigation was?
A. Not specifically.
Q. Do you know generally what -- what they did, if anything?
A. Generally, they will interview the accuser,



and the accused, and any witnesses and pull any other evidence that might be available.
Q. Do you know if that was done in this case?
A. I have no reason to believe it was not. 1:32:02
Q. Did you -- do you have any information showing it was other than what is usually done when a complaint register is made?
A. I do not believe I reviewed the investigation, but I may have.
Q. Do you know if Mr. Nawara was ever disciplined on account of this incident?
A. My understanding is that the investigation was not sustained.
Q. Do you know when OPR came to that finding that it was not sustained?
A. Not specifically.
Q. Do you -- do you know what factors it was that caused the complaint not to be sustained?
A. Not specifically, no.
Q. Generally?
A. Just that there was a lack of evidence to -- such that OPR could determine that -- by a preponderance of the evidence that he had engaged in misconduct.
Q. So it's true that OPR did not find



Jones-Hayes' version of the events that transpired to be credible, correct?
MR. CHURMA: Object to foundation. Mischaracterizes testimony.
MR. HENRETTY: Join. 1:33:20
A. No, I disagree with that.
Q. How do -- how do you disagree with that statement?
A. Because OPR's determination is, like I said, they -- or I'm sorry, OPR uses a preponderance of the evidence standard, it doesn't mean that they discredit or do not believe an accused's version of events, but there sometimes might not be enough supporting evidence or there isn't enough to sustain it.
Q. Do you know of any other alleged witnesses to what happened between Mr. Nawara and Jones-Hayes?
A. I know that she had indicated that there were witnesses on the complaint register, I believe Sergeant Conley may have been one of them, and I don't recall who else was.
Q. Was there an Officer Gannon, have you ever heard that name before?
A. No. 1:34:19
Q. Do you know if any witnesses corroborated Ms. Jones-Hayes' version of events?



A. I don't recall reading the final investigation, so I'm not -- I'm not sure exactly who said what.
Q. So you've seen OPR -- you've read OPR reports in the past, correct, for their investigations?
A. Yes.
Q. You would agree that oftentimes it's he said versus, you know, she said, so to speak?
A. Sometimes, yes.
Q. And you've seen cases where it's he said versus she said where OPR has sustained charges solely on that basis, have you not?
MR. CHURMA: Object to form and lack of foundation.
MR. HENRETTY: Join. 1:35:07
A. I can't recall a specific investigation where it was a situation like that.
Q. Do you know why it was that OPR failed -- or found insufficient evidence to sustain Jones-Hayes' allegations against Nawara?
MR. CHURMA: Object to form.
A. No.
Q. Do you know what part of her story, if any, did not check out according to OPR?

A. No.
Q. Do you know of any flaws in her statements or inconsistencies?
A. No.
Q. You don't -- and I -- I take it you have no personal knowledge of what transpired that day between John Nawara and Karen Jones-Hayes?
A. Other than what was relayed to me and what I saw in the complaint register, no.
Q. So the sole basis of any information or knowledge that you have is what Ms. Jones-Hayes told you of what happened that day, is that a fair statement?
MR. CHURMA: Object to form. Mischaracterizes testimony. 1:36:10
A. What was relayed to me soon after the incident and then what I saw in the complaint register or any other documentation.
Q. Okay. But it would have been based solely upon what Jones-Hayes either said to you or what she said in her report. Is that a fair statement?
MR. CHURMA: Object. Mischaracterizes testimony.
A. Yes, that was the -- the primary basis of my understanding of the incident.



Q. Okay. When you say, "Primary basis," any other secondary basis --
A. No.
Q. -- of any assessment? No?
A. No, no second --
Q. So you didn't witness the event, correct?
A. No. 1:37:03
Q. You didn't talk to any other persons or persons that claim to have witnessed the event other than Jones-Hayes, I take it, correct?
A. Correct.
Q. Do you know if Mr. Johnsen witnessed or claimed to have witnessed what happened?
A. I don't know. I don't -- I don't believe he was in the area or otherwise he would have been listed as a witness.
Q. Do you have -- do you know of any other witnesses, other than what we've talked about here, to that event?
A. No.
Q. At some point, you made a referral, correct, for Nawara?
MR. CHURMA: Object to form. 1:37:52
A. I made a referral for him to report to human resources.



Q. Was it based solely upon the phone call, or did you have any documents before you made the decision to refer him to HR?
A. I believe I had his -- received the complaint register and possibly an email.
Q. Do you recall who the email was from?
A. Either Karen or -- I -- I can't remember if she had sent an email describing the incident or it was -- if she just attached the complaint register which had the -- a narrative of the incident.
Q. Do you recall anything else that you might have reviewed before you before you made the referral?
A. I don't believe so.
Q. Did you ever call John Nawara to see what his version of events were?
A. No.
Q. Do you know whether or not at the time he denied that ever occurred?
A. I don't know. 1:39:11
Q. Are you aware that he claims that Jones-Hayes repeatedly poked him in the chest?
A. I don't believe I was aware of that.
Q. Did anything prevent you as chief of staff from calling John Nawara in and interviewing him before you made that referral to HR?



MR. CHURMA: Object to form.
A. Yes, I -- I would not have been qualified to interrogate him about the incident. I would have needed to get union representation, I would have needed to read him his Weingarten rights, and it would have been inappropriate for me to interrogate him and launch an investigation once I was aware that somebody else had already made a complaint against him.
Q. Were there rules against you contacting him and saying, you know, "Here are the allegations against you, can you tell me if you agree with it or what happened?"
MR. CHURMA: Object to form. Lack of foundation. 1:40:32
A. OPR is the only department within the sheriff's office that can initiate formal investigations or initiate interrogations.
Q. Could you have requested an investigation or interrogation from OPR based on what Karen Jones-Hayes told you what happened?
A. It would have been unnecessary because I knew that she was completing a complaint register.
Q. Did you make any type of request to OPR?
A. No.
Q. Did you --

A. Not that I'm aware of.
Q. Did you have the authority to make a request to OPR at the time?
A. I had the authority to file a complaint register just like any member of the sheriff's office or member of the public.
Q. And did you file a complaint register against Nawara?
A. No, because it had already been filed. 1:41:40
Q. Okay. Did you reassign John Nawara?
A. Yes.
Q. And you indicated before that he was assigned at Cermak, correct?
A. Correct.
Q. And the superintendent for Cermak at the time was Jones-Hayes, yes?
A. Yes.
Q. Who has the authority to reassign officers in John Nawara's position within the sheriff's office in 2016?
MR. CHURMA: Object to form. Lack of foundation.
A. At that time, I was primarily responsible for reassigning staff pending an investigation. I believe that OPR could also make a recommendation, but



I don't recall that happening frequently.
Q. With respect to your authority, would it be recommendation or would it be a direct order that the employee is reassigned?
MR. CHURMA: Object to form. 1:42:49
A. I don't recall ever being overruled when I made a decision --
Q. Okay.
A. -- to reassign.
Q. What type of reassignments were authorized by you at the time?
A. There were the reassignments pending an investigation, there could be a hardship reassignment for somebody who maybe needed to change their day off groups or shifts, there may have been reassignments for staffing or operational needs.
Q. Were you permitted to reassign correctional offers -- officers to desk duty at the time?
MR. CHURMA: Object to form. 1:43:53
A. I believe, at the time, we would just reassign someone pending an investigation to a different division or a unit such as ex ops or sometimes to external departments.
Q. If you made a determination that an employee was either dangerous to himself, staff, or inmates,



did you have the ability to remove -- remove him or her from active duty?
A. We would, at times, recommend that somebody be what we call de-deputized.
Q. How did that --
A. And that would work -- we would work with OPR on that.
Q. And how would that work? 1:45:03
A. The individual would be given a new ID card that made them unauthorized to carry a weapon.
Q. And what would have to be done to start that process with OPR?
A. It generally came in the wake of a complaint register or a serious incident.
Q. Do you know if that was ever done in John Nawara's case?
A. It was not.
Q. And why not?
MR. CHURMA: Object to form. Lack of foundation.
A. I -- I don't recall specifically why not.
Q. And I think you indicated before that external operations involves the employee carrying a gun?
A. Correct. 1:46:09



Q. There -- and there is many positions within the department of corrections that do not involve an employee to carry a weapon. Isn't that correct?
A. Correct.
Q. And you could have assigned Mr. Nawara to a position where he would not have been carrying a weapon. Isn't that a fair statement?
MR. CHURMA: Object to form. Mischaracterizes testimony.
A. Yes, we had -- we could reassign people to several different places.
Q. And when you reassigned Mr. Nawara to external operations, you knew at the time that he'd be carrying a weapon. Isn't that a fair statement?
A. Yes. 1:46:57
Q. And I take it if you felt that there was any imminent danger of that employee inflicting harm upon somebody, you would not have assigned -- assigned that person to a position where he carried a weapon. Is that --
A. Correct.
MR. CHURMA: Object --
Q. -- a fair statement?
MR. CHURMA: Object to form.
WITNESS: Sorry.

Q. I -- I'm sorry.
A. Sorry, can we repeat the question? Sorry.
MR. LINDEN: Can you -- can you read -- read that one back?
(Record replayed)
Q. I don't know, did he -- I -- I think you answered the question, but I think Counsel --
MR. CHURMA: Yes, for -- for the record --
Q. -- talked over you.
MR. CHURMA: -- I'd just like the object -- my objection to form to stand.
Q. Right, I think you talked at the same time is the problem, but was your answer to that question "yes"?
A. I was not concerned that Mr. Nawara was an imminent threat of physical harm to members of the public or other employees.
Q. Which is why you assigned him to a position where he is allowed to carry a weapon, correct?
A. Correct. 1:48:35
MR. CHURMA: Object to form.
WITNESS: Sorry.
Q. Do you recall your next involvement, if any, with Mr. Nawara after you made the referral?
A. No.



Q. Do you recall if you had any involvement once a referral is made by you with respect to John Nawara?
MR. CHURMA: Object to form. 1:49:02
A. I don't recall.
Q. You don't recall any off the top of your head?
A. Yes.
Q. Do you know Rebecca Reierson?
A. Yes.
Q. And how do you know Ms. Reierson?
A. She was working in human resources at the time.
Q. Do you know how long she had been in human resources when that incident arose in September of 2016?
A. No.
Q. Do you know if she had been there for months, years?
A. Not years, maybe a year or so.
Q. Were you social friends at all with Ms. Reierson?
A. No.
Q. How about Ms. Shelby?
A. No.



Q. Were you social friends at all with Jones-Hayes?
A. No.
Q. Have you ever socialized with any three of them, meaning Reierson, Shelby, or Jones-Hayes?
A. No. 1:50:03
Q. Do you know when HR interviewed Mr. Nawara?
A. A few weeks after the incident.
Q. Do you know when the incident occurred?
A. I believe September 28th, 2016.
Q. When you say that, is that because you reviewed documents the last couple days?
A. Yes.
Q. So I take it a month ago, you wouldn't have been able to --
A. No.
Q. -- that day? Nothing specific about that date, other than looking at documents now, that would tell you that's when it occurred?
A. Yes, nothing --
Q. Do you know when it was -- what date it was that he was interviewed by HR?
A. I believe early November. 1:50:58
Q. So I take it the entire time from September -- September 28th, 2018 until early November when they



interviewed him, he is working in external operations. Is that your understanding?
A. Yes.
Q. And he is carrying a gun that whole time?
A. Yes.
Q. Do you know why it took that long for him to be interviewed by HR?
A. No.
Q. Do you know what the normal procedure is when they get a referral from you until the time they interviewed the employee?
MR. CHURMA: Object to form. Objection. Lack of foundation.
A. My experience is that it would have been sooner than that.
Q. Okay. When you say, "Sooner," what would be the normal time frame, based on your experience?
A. Within a week or two. 1:51:59
Q. Do you know why it is that it wasn't done within a week or two in this case?
A. It seemed as though there was some miscommunication between Ms. Reierson and Superintendent Jones-Hayes.
Q. Okay. Well what basis or what causes you to say that?

Page 89

A. I received an email from, I believe, Ms. Reierson or Ms. Karyn Williams, who was the director of HR at the time, explaining that they had attempted to reach the superintendent and had been unable to contact her or get a call back.
Q. Do you know who tried to reach the superintendent?
A. I believe Rebecca, but I'm not sure. 1:52:57
Q. Do you know why it is that Rebecca couldn't get a call back from Ms. Hayes?
A. No.
Q. She ever explain to you why it was?
A. I don't believe so.
Q. Did you ever ask her why -- was it Jones-Hayes that was not cooperating with Rebecca?
MR. CHURMA: Object --
MR. HENRETTY: Object to --
MR. CHURMA: -- form.
MR. HENRETTY: -- form.
A. I wouldn't say that it wasn't cooperating. I don't know if she missed a message, I don't know.
Q. Do you know what efforts Ms. Reierson made trying to get a hold of Jones-Hayes?
A. I don't know specifically, no.
Q. Do you know generally what was done?

Page 90

A. I -- based on an email that she had sent me, she had indicated she attempted to contact her. I don't know whether it was email or phone.
Q. Did she seem frustrated by --
MR. CHURMA: Object -- object to form. 1:54:03
A. I don't know if she was frustrated or not or just sort of stating the fact that she had yet to connect with her.
Q. At some point in time, do you know whether or not she was able to connect with Jones-Hayes?
A. Yes, upon receiving the email from Rebecca, I emailed the superintendent and instructed her to contact Rebecca.
Q. Was that pretty much a direct order when the chief of staff makes it to a superintendent?
MR. CHURMA: Object to form.
A. I would have been frustrated had she not called --
Q. In --
A. -- Rebecca.
Q. In the hierarchy of DOC, chief of staff is above superintendents, correct?
A. Correct.
Q. So when you told her to contact Rebecca, would that have been a direct order?

Page 91

MR. CHURMA: Object to form. 1:55:02
A. For the most part, yes.
Q. Because DOC operates kind of like a paramilitary, is that kind of a fair statement?
MR. CHURMA: Object to form.
A. There is a chain of command.
Q. How would you describe -- is that close -- you know what a paramilitary -- the term refers to generally, right?
A. Generally, yeah.
Q. What is your understanding of paramilitary?
A. Like I said, just that there is a chain of command.
Q. And unless it's an unlawful order, essentially, subordinates have to obey direct orders from their superiors. Is that a fair statement?
MR. CHURMA: Object to form. Lack of foundation.
MR. HENRETTY: Join.
A. A subordinate can receive discipline for failure to follow direct orders.
Q. And the only way that they're allowed not to follow a direct order would be if it was unlawful. Isn't that a fair statement?
MR. CHURMA: Object to form. Lack of

Page 92

foundation.
MR. HENRETTY: Join. 1:56:06
A. I don't recall specifically what's in the general orders on that, but that would seem to make sense.
Q. Okay. If Jones-Hayes was so intimidated by Mr. Nawara, do you know why it is that she didn't follow up with Ms. Reierson sooner?
MR. HENRETTY: Object to form. Foundation. Calls for speculation.
A. I don't know.
Q. As chief of staff, if you're that agitated and intimidated by somebody, wouldn't you expect them to reach out to HR in a prompt matter?
MR. HENRETTY: Object to form.
MR. CHURMA: Object to form. 1:56:51
A. I believe that Superintendent Hayes' primary concern was just not having to be in a somewhat hostile work environment with somebody who had intimidated her, and since he had been removed from the work environment and they were no longer interacting with each other, she may not have known exactly what next -- next steps to take and been too concerned.
Q. Okay. Do you have any facts to indicate why

she didn't call HR back?
A. No. If she had even been called. I don't know.
Q. Okay. Do you know if Jones-Hayes was able to work that day, or did she have to go home because of what happened?
MR. CHURMA: Object to form. Lack of foundation. 1:58:13
A. I don't recall.
Q. Do you know if she took any time off because of the alleged incident with John Nawara?
A. I don't know.
Q. Do you know whether John Nawara ever had any other history of anger while working at DOC?
A. I don't know.
Q. Do you know of any?
A. Not that I can think of.
Q. So do you -- were you aware of any complaints regarding John Nawara from the time of the September incident up until the time he met with HR?
A. I'm not aware of any. 1:59:09
Q. You're aware, after his meeting with HR, that he was not allowed to work after that interview, correct?
MR. CHURMA: Object to form. Lack of



foundation. Assumes evidence not in -- on the record.
A. My understanding is that after the meeting, he was not in the workplace.
Q. They determined that he should have to submit for a fitness for duty examination. Isn't that a fair statement?
MR. CHURMA: Objection. Lack of foundation.
A. That's my understanding.
Q. And when that occurs, that employee is not allowed to work until that examination is complete and that employee has been cleared to go back to work. Is that fair?
MR. CHURMA: Object to form. Lack of foundation.
A. Generally, when someone is sent for fitness for duty, they are out of the workplace until they can complete the appointments and the provider can complete their assessment.
Q. And that's what happened in John Nawara's case, correct?
A. I don't know the ins and outs of what happened with him.
Q. Do you know whether or not, after they made the determination that he has to submit to a fitness for duty examination, do you know if he was allowed to



work after that?
MR. CHURMA: Object to form. 2:00:38
A. He was not allowed to work.
Q. Okay. I just want to take a step back. I think you indicated that you thought it was a -- when you talked about the first contact you had at post four with Mr. Nawara and the second contact, I think you said it was several months between them?
A. Yes.
Q. So is it fair to say the second one must have occurred some time between the incident and when Mr. -- and before Mr. Nawara got -- the interview with HR?
MR. CHURMA: Object to form. Mischaracterizes --
Q. If he's not allowed to work?
A. The first one occurred prior to him going to HR, and the second interaction occurred after he had been returned to work --
Q. If I were to tell you --
A. -- several -- several months later. 2:01:33
Q. Okay. If I were to tell you that he wasn't allowed to return to work until some time in that following September of 2017, would it have been after September of 2017, the second encounter?



MR. CHURMA: Object to form.
A. Yes.
Q. Okay. Do you know what's needed before an employee can be required to submit to a fitness for duty examination?
A. No, I don't -- I don't -- I'm sorry, I'm not following you.
Q. I guess do you know what criteria is used in determining whether or not an employee should be required to submit to an examination?
MR. CHURMA: Just going to object to form. 2:02:36
A. No, I'm not aware of the specific criteria that they -- they used.
Q. Are you aware of the general criteria they use?
MR. CHURMA: Object to form.
Q. My understanding is that if the individual presents as having physical or mental health issues to the degree that an outside expert should evaluate them, then that's when they will be referred.
Q. Do you know if there are any physical guideline or criteria in place in 2016 regarding that?
MR. CHURMA: Object to form.
A. I don't know what HR was using.
Q. You don't know either way?

A. I'm sorry, I don't -- I'm not following you. 2:03:43
Q. I'm sorry, do you know either way if there's any written criteria, policy, or procedures regarding that?
A. I don't know if there was written procedures that they were -- they used.
Q. Were you involved at all in the fitness for duty decisions for an examination?
MR. CHURMA: Object to form.
A. Other than referring somebody to HR for them to determine if somebody should be sent, no.
Q. So your only involvement would be the referral point in the process?
MR. CHURMA: Object to form.
A. I believe so.
Q. So after the referral process, did your duties or responsibilities have anything more to do with the process?
MR. CHURMA: Object to form.
A. I don't believe so. 2:04:40
Q. In Mr. Nawara's case, other than receiving that email I think you described where Reierson is having problems getting feedback from Jones-Hayes, do you recall if you had any other involvement with respect to John Nawara and the fitness for duty



examination?
A. I don't believe so.
Q. How about medical release forms, do you know anything about what forms were used by HR for fitness for duty examinations?
A. No --
MR. CHURMA: Object to form.
Q. I'm sorry, your answer was "no"?
A. No.
Q. Do you have anything to do with drawing up the forms?
MR. CHURMA: Objection. Lack of foundation.
A. I don't believe so.
Q. Do you know if employees were required to sign release forms as part of the process for a fitness for duty examination?
MR. CHURMA: Object to form.
A. I don't know.
Q. You don't know one way or the other -- other?
A. No. 2:05:45
Q. Do you know whether or not Mr. Nawara was required to sign medical release forms in order for him to take part in the process?
MR. CHURMA: Object to form. Lack of



foundation.
A. I know, based on reading the complaint, that that was an issue, but I was not familiar with the ins and outs of the process.
Q. On -- that's based on reading the complaint filed in this case?
A. Yes.
Q. Outside of reading the complaint, do you have any knowledge about Mr. Nawara being required to sign any medical releases?
A. I don't believe so.
Q. Okay. I'd like to hand you what -- what's been marked as Burke's Deposition Number 1 and ask -- ask you to identify this document.
A. This is an email chain between Jeff Johnsen and I.
Q. Okay. And the first email is from Jeff Johnsen to you?
A. Yes. 2:08:13
Q. And can you tell from this document what date that was sent to you on?
A. September 28th, 2016.
Q. Can you tell what time that was sent to you?
A. 6:43 p.m.
Q. Okay. And that was sent by Jeff Johnsen?



A. Correct.
Q. And Karen Jones-Hayes was copied on this email?
A. Correct.
Q. And do you recall receiving this email?
A. Vaguely, yes.
Q. Okay. Can you read the email, starting with, "Good evening"?
A. "Good evening, I wanted to let you know about an incident Karen had with an officer on her 7:00 to 3:00 shift, Nawara," comma, "John, today, where he became extremely disrespectful, began to yell at her. She was addressing him on the inmates in admissions who were not properly secured in handcuffs behind their backs, as is the policy for admissions. During her conversation with him, he became agitated and began to look away from her while she was explaining herself. At that time, she reached out to touch him on his arm to get his attention focused back on her when he made a large outburst at her about touching him and then calling her 'lady' and not addressing her by her rank. Karen addressed him regarding his outburst and apologized to him for touching his arm to get his attention focused back on her if that had offended him. She then stood her

ground and told him that he will do his job and follow the policy as it has been established. She has completed a complaint register form against the officer for his unprofessional conduct and threatening outburst, but has not submitted it yet. The question we both have is should she initiate discipline as well. She was also wondering if he can be reassigned from Cermak while the matter is being investigated. I have cc'd her in the event you had any follow-up questions regarding this manner."

Q. Is there anything in this initial email that was sent to you by Mr. Johnsen that indicated that Nawara swore at Ms. Hayes?

A. This email does not indicate that --

Q. This email --

A. -- he swore --

Q. -- also doesn't indicate that Mr. Nawara -- I know it's coming from Mr. Johnsen, but doesn't say that Nawara screamed at her either, correct?

A. It says that he began to yell at her. 2:10:43

Q. Yell, but doesn't say, "Scream," isn't that fair?

A. And that he had a large outburst.

Q. Okay. But is there anything in here that says that he screamed at her?



A. I do not see the word "scream."

Q. What did you do when you received this email at approximately 6:43 p.m. on September 28?

A. Looks like I just responded.

Q. Okay. Up on top is an email from you to Mr. Johnsen?

A. Yes.

Q. You also copied Karen Jones-Hayes?

A. Yes.

Q. What time did you send this email?

A. 8:14 that night.

Q. So would have been about an hour and a half after you received it?

A. Yes. 2:11:41

Q. And can you read what you said in this email?

A. "Thank you for letting me know. Is he working tomorrow?" question mark, "Thanks."

Q. And do you know if you received anything back after you sent this email?

A. I don't know.

Q. Okay. At that point in time, did you have a copy of the complaint register?

A. I don't know.

Q. What is a complaint register?



A. It's the form used to file a complaint against an employee.

Q. Okay. Did you ever receive by email a copy of the complaint register from Jones-Hayes?

A. I believe I received the complaint register. 2:13:07

Q. Do you know when you received it?

A. I don't recall if it was the day of the incident or the day after.

Q. If I could hand you Exhibit Number 2, Mr. Burke, and ask if you've ever seen this document before?

A. I believe so.

Q. And what is Exhibit Number 2?

A. It appears to be an email chain.

Q. From who to who?

A. Initially, from Karen Jones-Hayes to Jeff Johnsen, and then Jeff Johnsen forwarded me the email chain which contained an attachment.

Q. Can you tell when the first email from Jeff Johnsen to Karen Jones-Hayes took place?

MR. CHURMA: Just want to object to this document. I'm not familiar with this form of it and it's not Bates stamped, so lack of foundation on those emails were sent between two other individuals.

A. This document does not seem to indicate when



Karen had sent Jeff an email.

Q. Do you recall receiving the top email from Jeff Johnsen?

A. Vaguely. 2:15:20

Q. Okay. When you say, "Vaguely," is it just by looking at the document or do you have an independent recollection? I know you received a lot of emails as chief of staff.

A. It's by looking at the document.

Q. Okay. Do you have any independent knowledge when you received the complaint register, other than looking at this document marked as Exhibit 2?

A. No.

Q. And when does it indicate -- on top, it's from Jeff Johnsen to you and it says, "Here is the complaint register," on the email, correct?

A. Correct. Correct.

Q. Do you recall specifically if the complaint register was attached at that time?

A. Based on what I can see from this document, I assume that it was.

Q. Okay. Other than looking at this document, do you have any independent knowledge of the date and time that you received the complaint register?

A. No. 2:16:26

Q. You certainly received the complaint register before you decided and made the referral to HR?
A. I don't recall specifically when I made the referral.
Q. Okay. I guess what I'm asking, do you recall specifically receiving the complaint file, independent knowledge, before you made the referral?
MR. CHURMA: Object to form.
A. I don't know.
Q. Don't know?
A. I don't know the timing.
Q. Okay. Do you recognize Exhibit Number 3?
A. No.
MR. CHURMA: The same objection to the form of the document. It's not Bates numbered, appears to be --
MR. HENRETTY: Have these been produced in this case?
MR. CHURMA: I --
MR. LINDEN: Yeah.
MR. HENRETTY: They weren't Bates stamped though?
MR. LINDEN: I -- I think it was part of the --



MR. CHURMA: I mean --
MR. LINDEN: -- email --
MR. CHURMA: -- they look similar --
MR. LINDEN: -- production. 2:17:45
MR. CHURMA: -- some of it is similar to what -- what the sheriff's office produced, but ours were Bates labeled and the form is completely different.
Q. Have you ever seen a document of this type before?
A. No.
Q. Okay. This might be better. I'm done with that one, here's --
MR. BUSTAMANTE: Yeah.
Q. -- this one. I'd like to show you Number 4, maybe this will clear it up. Do you recognize Exhibit Number 4?
A. Yes. 2:18:37
Q. And is that what is commonly referred to as a complaint register?
A. Yes.
Q. And do you know if this is a complaint register that you received?
A. I'm pretty certain.
Q. When you say, "Pretty certain," are you



certain or how would -- describe your certainty level.
MR. CHURMA: Object to form.
A. I have no reason to believe this was not the complaint register that was sent to me that night or that was attached to that document or sent to me the next day.
Q. And I take it you have no personal knowledge of anything that's set forth in this complaint register?
A. No, I don't. I was not there. 2:20:39
Q. So as you sit here today, you don't know if any of what Ms. Jones-Hayes says in this complaint register is either true or not, isn't that a fair statement?
A. I know that Superintendent Hayes was involved in an incident with Mr. Nawara, was pretty upset about it, and made an immediate outcry.
Q. But you don't know if what she said is -- told you is true, do you?
A. I was not there. 2:21:21
Q. And again, other than what she told you, you have no other information to either prove or disprove what happened, right?
MR. CHURMA: Object to form to the extent it mischaracterizes the testimony.



MR. HENRETTY: Join.
MR. LINDEN: Okay. Good.
A. Yeah, she was the -- she and the documents provided were the primary source of --
Q. Okay.
A. -- my information regarding this incident.
Q. And you did ultimately make a referral to HR, correct?
A. Correct. 2:22:13
Q. Do you recall what date you actually made the referral?
A. Not the exact date, no.
Q. Do you know if it was that day, the next day, a week later?
A. I believe it was either that day or the next day.
Q. Okay -- if I could show you Exhibit 5 --
MR. CHURMA: Thanks.
Q. -- have you ever seen Exhibit 5 before?
A. Yes. 2:22:47
Q. What is Exhibit Number 5?
A. It is a department of corrections memorandum in which I'm requesting that Mr. Nawara be evaluated for a fitness for duty.
Q. And is that a standard form within the

Page 109

department of corrections, this referral form?
A. This memorandum form is.
Q. Is it like a template that you could use?
A. Yes.
Q. And do you know who drafted the form? Or created the form? That's a better word.
A. Created the form or the contents within the --
Q. The form itself, the template itself.
A. No. 2:23:34
Q. So I take it you basically took the template then filled in all the typewritten information here --
MR. CHURMA: Object --
Q. -- is how it worked?
MR. CHURMA: Object to form. Mischaracterizes testimony.
A. For this particular form, I believe that Mary McQuillan from the executive director's office filled in the information.
Q. Do you know, how did that occur, Mary McQuillan fill -- was she your assistant?
A. She was the executive assistant --
Q. Okay.
A. -- for the DOC.
Q. So was this written by you or would have

Page 110

been written by Mary McQuillan?
A. I believe it would have been written by her at my direction.
Q. So you would have directed her and said, "Here's the decision I made, please put a memorandum together"?
A. Yes. 2:24:32
Q. Do you know what date it was sent?
A. Generally, we would send memos on the same days that we date them, so I have no reason to believe it was not sent the 29th, but it could have -- if it was late in the day, maybe have been sent on the 30th.
Q. Did you review it before it went out?
A. I don't recall.
Q. Okay. It's got a place for signature under there and it looks like there's a signature about half an inch underneath the signature line here?
A. Yes.
Q. Is that your signature?
A. Yes, but it looks like my stamped signature.
Q. And did Mary McQuillan have access to your signature stamp?
A. Yes.
Q. Was she authorized to stamp your signature?
A. Yes.

Page 111

Q. Do you know whether or not you reviewed this document for -- before it went out?
A. I don't recall specifically if I did. 2:25:29
Q. Would it have been your normal procedure to review it before it got sent out, or was she authorized to stamp it and just send it out?
A. She would be authorized to stamp it at my direction.
Q. And can you read this document?
A. It was to Karyn Williams, the executive director of the bureau of human resources, dated 9/29/16, from me. The subject was "Fitness for Duty." And the contents of the memo state, "Pursuant to the attached documentation, I'm requesting that Officer John Nawara, JDE 378032, Cermak, 7:00 to 3:00 shift, detail seven, be evaluated for fitness for duty."
Q. Are those your words, starting with "pursuant" and ending with "fitness for duty" there?
MR. CHURMA: Object to form.
A. Yes, that was standard language used. 2:26:33
Q. Okay. And I see there's two people copied on this?
A. Yes.
Q. And the first one is who?
A. Nneka Jones Tapia, the executive director of

Page 112

the jail, and Tarry Williams, who was the DOC chief of operations.
Q. Is that normal procedure that those two get copied on referrals of these types?
A. I believe so, yes.
Q. Okay. It's sent to Karyn Williams, do you -- who is -- who is Karyn Williams?
A. She was the executive director of the bureau of human resources at the time.
Q. Did you have any dealings with her prior to this time?
MR. CHURMA: Object to form.
A. Yes, we would communicate occasionally.
Q. Other than this memo being sent to Karyn Williams, do you know of any involvement that Karyn Williams had with respect to John Nawara?
MR. CHURMA: Object to form.
MR. HENRETTY: Join.
A. No. 2:27:38
Q. Did you ever discuss John Nawara with Karyn Williams?
A. I don't recall.
Q. Is that something you'd recall?
A. Not necessarily.
Q. Did you have any reason, as you sit here

Page 113

today, that you would have discussed John Nawara with Karyn Williams?
MR. CHURMA: Object to form. Calls for speculation.
A. I don't know specifically.
Q. Can you recall any specific conversation or communication between you and Karyn Williams related in any way to John Nawara?
A. No, I can't recall a specific conversation.
Q. Do you know of any knowledge or information that Karyn Williams might have with respect to John Nawara?
MR. CHURMA: Object to form.
A. Other than receiving this memo and being aware that her department was responsible for evaluating him --
Q. Other than receiving this memo, assuming she did?
A. No, I have no independent knowledge. 2:28:57
Q. Do you know if she actually received -- physically received this memo, or would it have even gone to her desk, or would it have gone directly to Rebecca Reierson?
MR. CHURMA: Object to form. Lack of foundation.

Page 114

MR. HENRETTY: Join.
A. I assume it would have been emailed to her.
Q. Emailed to Ms. Williams?
A. Yes.
Q. Do you know if Ms. Williams conducted fitness for duty exams?
MR. CHURMA: Object to form. Lack of foundation.
A. I don't know.
Q. You don't know. But again, you have no knowledge of any involvement or contact that she had with Mr. Nawara or his case other than this memo, correct?
A. I don't know either way. 2:29:35
Q. Do you know what email address, if any, this form was sent to?
A. If it was emailed to her, it would have been -- I -- I don't know what her --
Q. That was bad -- I --
A. -- email address was.
Q. -- better question is can you tell by what means this form was sent to her by looking at this document?
A. No. 2:30:12
Q. Were there interoffice mail that could have

Page 115

been used?
A. Yes.
Q. If it was emailed, would there have been an email address on there showing that it was emailed?
A. Not on this document, no.
Q. Do you know what the normal procedure would have been for communicating this to Ms. Williams?
A. I would have thought, in 2016, that it would have been emailed, but I'm not certain. We -- we did use interoffice mail and it was in close proximity, so this may be the type of document that would have been sent interoffice.
Q. Okay. Do you know whether or not John Nawara ever filed a complaint against Karen Jones-Hayes?
A. Yes. 2:31:09
Q. How is it that you know that he did?
A. Because we're co-Defendants.
Q. Can you explain that a little bit more? You're aware -- not this complaint in this case, I'm talking --
A. Oh.
Q. -- about a complaint register.
MR. BUSTAMANTE: That's right.
Q. Is there --

Page 116

A. No, I'm not aware of that.
Q. I'd like to show you Exhibit 6, and this is previously Reierson 5, which is why you have the sticker on there.
MR. CHURMA: Call it Burke 6?
MR. LINDEN: Yes.
Q. Have you ever seen Exhibit 6?
MR. CHURMA: Just going to object to the foundation of this document.
A. I don't believe so. 2:32:56
Q. Would this information have been useful to you, if you had it available to you, in making the referral?
MR. CHURMA: Object to form.
A. It's hard to tell.
Q. Okay. If what Mr. Nawara says is true in this, could Jones-Hayes be subject to discipline from department of corrections?
MR. CHURMA: Object to form. Lack of foundation. Calls for speculation.
MR. HENRETTY: Join.
A. I don't know.
Q. Would it be a violation of the rules if, for instance, she pushes her finger in -- into his chest several times as she says to him, in the same

condescending tone of voice, "Who's the staging officer?"
MR. CHURMA: Object to form. Calls for speculation --
MR. HENRETTY: Foundation --
MR. LINDEN: -- lack of foundation. Mischaracterizes earlier testimony.
MR. HENRETTY: Asked and answered.
A. I don't know. 2:34:09
Q. Now correctional officers have a rather difficult job dealing with inmates, correct?
A. Correct.
MR. CHURMA: Object to form.
WITNESS: Sorry.
Q. I'm -- I'm -- I'm sorry, I think you might have talked at the same time.
A. Correct.
Q. And there's a lot of violent inmates at Cook County Jail, correct?
MR. CHURMA: Object to form.
A. Correct.
Q. And wouldn't you agree it's important that supervisors don't demean correctional officers in front of inmates, is that a fair statement?
MR. CHURMA: Object to form.



MR. HENRETTY: Join.
A. Generally. 2:34:58
Q. And why -- why is that?
MR. CHURMA: Object to form.
A. There are several reasons.
Q. And what are some of the reasons?
A. Off the top of my head, that detainees could take advantage of an incident like that to manipulate an officer later on, or use it to conjure up some type of other story and use it against the supervisor or even the other officer, and it demonstrates to the detainee that there might be a breaking down of the chain of command that can be manipulated.
Q. Now there's more detainees than there are guards at any given point in time, isn't that a fair statement?
MR. CHURMA: Object to form. Lack of foundation.
A. Depends on the situation. 2:36:02
Q. Well let's say it's Cermak on that day. Have you ever been to Cermak before?
A. Yes.
Q. And that's basically inmates going to receive medical care, correct?
A. Correct.



Q. And do you know how many --
A. Well -- I'm sorry.
Q. I -- I'm -- I'm sorry, is that correct?
A. Cermak's a multipurpose building.
Q. Okay. Where this occurred, was it the basement of Cermak?
MR. CHURMA: Object to foundation.
Q. And you can go back to Jones-Hayes' incident report if that would help you.
A. That's my understanding. 2:36:31
Q. Have you ever been in the basement of Cermak?
A. Yes.
Q. How would you describe what's in the basement?
A. You have a couple staging areas for detainees. You have a -- what we refer to as a bubble where the officer will sit and monitor the detainees. You have a large open space that has various exam rooms. You have a room for physical therapy. You have rooms with other large medical machines, either x-rays, maybe even MRI machine. You have smaller doctor's offices.
Q. Was there a large waiting room in the basement where inmates would be sent for their



appointment?
A. It's -- there is a what we call staging area or waiting area.
Q. And there are benches in that staging area, correct?
A. There were, yes. 2:37:45
Q. And at any given point in time, there could be over 50 detainees --
MR. CHURMA: Object --
Q. -- in that staging area, isn't that a fair --
MR. CHURMA: Objection. Lack of --
Q. -- statement?
MR. CHURMA: -- foundation.
A. I don't know the exact number of detainees.
Q. Do you have any estimation of how many detainees typically would be in that staging area?
MR. CHURMA: Object to form. Lack of foundation.
A. In my experience, it could be anywhere from one to a couple dozen.
Q. And do you know how many guards were assigned to that staging area at any given point in time?
MR. CHURMA: Object to form.

A. I don't recall the specific number of officers assigned.
Q. It would be less than ten, isn't that a fair statement?
MR. CHURMA: Object to form. Calls for speculation. Lack of foundation.
A. I believe that there would be less than ten Cermak officers assigned there, but you would have situations where officers from other divisions who had brought detainees to Cermak would wait to return the detainee, so sometimes the -- there were more officers than just the Cermak assigned officers.
Q. Isn't it true sometimes they just drop the detainee off and they'd come back and pick up the detainee and escort them back to his or her cell?
A. Yes.
MR. CHURMA: Object to form. Lack of foundation.
WITNESS: I'm sorry.
A. Yes.
Q. Correct -- there are instances where correctional officers get attacked by detainees, correct?
MR. CHURMA: Object to form.
A. Correct. 2:39:36



Q. And correctional officers don't have any weapons on them to protect themselves against detainees, correct?
MR. CHURMA: Object to form.
A. Officers have OC spray.
Q. What is -- like Mace?
A. Yes.
Q. Any other types of security devices?
A. Handcuffs.
Q. So wouldn't you agree it's important for officers and inmates -- skip that one -- or strike it. It's important for inmates to respect the officers --
MR. CHURMA: Object --
Q. -- for the safety of the officers, wouldn't you agree in that?
MR. CHURMA: Object to form.
A. Ideally, inmates would respect officers. 2:40:33
Q. And if inmates felt they could take advantage of an officer, that would place an officer's safety at risk, isn't that a fair characterization?
MR. CHURMA: Object to form. Calls for speculation.
A. It could jeopardize the safety of that officer, or other officers, or other inmates.
Q. I'd like to show you Exhibit Number 7 and --



and ask you if you've ever seen Exhibit Number 7?
A. Looks similar to Exhibit Number 2, except it contains another email.
Q. Except for the top part, right, it's similar to the other Exhibit?
A. Yes. 2:42:19
Q. And the other email is from who to who?
MR. CHURMA: Object to foundation.
A. Exhibit 2, which is a document I don't recognize, is -- I -- I see an email from Karen Jones-Hayes to Jeff Johnsen and then a subsequent email from Jeff to me, and then Exhibit 7 has a subsequent email that doesn't seem to include me that was sent from Jeff to Miriam Rentas.
Q. And who is Miriam Rentas?
A. She was an -- was and is an assistant director in the office of professional review.
Q. OPR?
A. Correct. 2:43:16
Q. Do you recall ever seeing the top email from Miriam Rentas to Jeff Johnsen?
A. No.
Q. Do you know what the attachment is that's referred to in this top email?
A. No.



Q. Do you know why it is that Jeff Johnsen was communicating on October 14th, 2016 with Miriam Rentas?
MR. CHURMA: Objection. Calls for speculation.
A. No.
MR. LINDEN: Can we just take a little bit of break? Off the record.
RECORDER: Off the record, 12:58 p.m.
(Off the record)
RECORDER: Back on the record, 1:09 p.m.
Q. Now if you could turn back to Exhibit Number 6, and that should be the complaint register that Mr. Nawara submitted?
MR. BUSTAMANTE: No, it's not a CR, Rick. It's --
Q. Or --
MR. BUSTAMANTE: -- a complaint.
Q. What would you describe that, a complaint?
MR. CHURMA: Object to foundation.
A. It -- it's the discrimination, harassment, sexual harassment complaint form.
Q. Have you ever seen that form before?
A. Yes. 2:45:08
Q. And what's that form used for or what's its

Page 125

purpose?
A. My understanding is for staff that want to make a complaint specific to any discrimination, harassment, or sexual harassment that they're receiving.
Q. And what would be the normal procedure, where would that -- they submit it to their supervisor?
MR. CHURMA: Object to form. Lack of foundation.
A. The form indicates that, "This form must be submitted to either a member in your chain of command, director of personnel, or the office of professional review."
Q. Okay. Upon receipt, is there procedures what that person's supposed to do with that?
MR. CHURMA: Same objections. 2:45:58
A. I don't recall specifically what someone would have had to have done with this form.
Q. Do you know if it goes to OPR customarily?
MR. CHURMA: Object to form. Lack of foundation.
A. My understanding is that generally, it goes to OPR.
Q. Do you know whether or not, in this case, it

Page 126

ever went to OPR?
MR. CHURMA: Objection. Lack of foundation.
A. I don't.
Q. Do you know if OPR ever opened up an investigation regarding the allegations that John Nawara made against Karen Jones-Hayes?
A. I don't.
Q. Do you know if Karen Jones-Hayes was ever disciplined on account of the complaints made by John Nawara?
MR. CHURMA: Object to form.
A. I'm not aware of that. 2:46:50
Q. You're not aware either way?
A. No.
Q. Do you know how many inmates are in the Cook County Department of Corrections on any given day in 2016?
MR. CHURMA: Object to form.
A. I believe approximately 8,500 or 9,000.
Q. Do you know how many guards would be there on any given day --
MR. CHURMA: Object --
Q. -- at the same time?
MR. CHURMA: Object to form.
A. I think upwards of 600 or 700.

Page 127

Q. So it's fair to say the inmates outnumber the guards working at any particular time, correct?
MR. CHURMA: Object to form.
A. Based on that ratio, yes.
Q. And that would be an accurate -- fairly accurate ratio, would it not?
MR. CHURMA: Object to form.
A. It's difficult to answer just because there are so many separate buildings on the DOC compound and each building has its different staffing levels and different number of inmates.
Q. Okay.
A. But based on the 9,000 versus 700 that you might have on a shift.
Q. So on average, there would be more than a ten to one ratio between inmates outnumbering guards, wouldn't that be a fair statement?
MR. CHURMA: Object to form, to the extent it mischaracterizes testimony.
A. Using that ratio. 2:48:37
Q. And do you have any reason to dispute that ratio?
A. Like I said, it's --
Q. Other than a specific building, I'm talking about overall an average at department of corrections?

Page 128

A. No, I don't dispute the ratio that we've discussed.
Q. I'd like to show you what is marked Exhibit Number 8, and the first page is the same as Exhibit Number --
MR. BUSTAMANTE: To 5. Same as --
Q. -- do you have the --
MR. CHURMA: 5.
MR. BUSTAMANTE: Same as 5.
Q. -- Exhibit Number 5, first page, is that the same as Exhibit Number 5?
A. Yes. 2:49:37
Q. And that's email from you to --
MR. BUSTAMANTE: No, it's a memo, not --
Q. -- or a memo from you to Karyn Williams dated 9/29/16?
A. Yes.
Q. And is that the referral that you testified a little while ago?
A. Yes.
Q. Okay. On this, it was written by your assistant, it says, "Pursuant to the attached documentation," this is a document that was produced in this case by the Defendant, but if you look at the second page, do you know if that's the attached

documentation that was sent to Karyn Williams at HR?
A. I believe so.
Q. Do you have any reason to dispute whether or not that was what was sent?
A. No.
Q. And the second page of this document, it appears to be an email from Karen Jones-Hayes to Dawn Ertler?
A. Correct. 2:50:44
Q. And Dawn Ertler is who, if you know?
A. I believe, at the time, she was an employee working for me. She may have been an employee of the office of professional review though.
Q. Okay. At one -- one point in time, did she work underneath you?
A. Yes, she worked for me after working for the office of professional review.
Q. Do you know if she was working for you on September 29th, 2016?
A. I believe so, but I'm not certain.
Q. Okay. Well that makes sense for her to get an email from Karen Jones-Hayes regarding this alleged incident and then for the referral to go out that same day?
MR. CHURMA: Object to form. 2:51:43



A. I -- I don't know. I don't think that this was standard practice where the attached documentation would be an email to Dawn.
Q. Okay --
A. But at -- it was, I believe, intended just to provide an overview of the incident and the basis for the referral.
Q. Do you know if you ever received the email which is page 2 of Exhibit Number --
MR. BUSTAMANTE: This would be 9.
MR. CHURMA: Okay. Where -- what number are we?
MR. BUSTAMANTE: 8.
MR. HENRETTY: 8.
MR. LINDEN: Exhibit 8.
A. I don't know.
Q. Do you recall, as you sit here, receiving this?
A. I don't know. 2:52:54
Q. Do you know why it appears that the second page of the email is attached to Karyn Williams and not the complaint register?
MR. CHURMA: Object to form -- sorry. Object to form. Do you mean Karen Jones-Hayes?
MR. LINDEN: Yes.



A. I'm sorry, can you repeat --
Q. No, do --
A. -- the question?
A. Do you know why it appears that the memorandum from you to Karyn Williams attached the email from Karen Jones-Hayes dated Thursday, September 29th, 2016 to Dawn Ertler, rather than the complaint register --
A. I don't --
Q. -- that you testified previously?
MR. CHURMA: Object to -- objection to form and mischaracterizes previous testimony.
A. I don't recall why we did it this way. 2:53:55
Q. Looking at these two documents, are you certain that you had a copy of the complaint register at the time the referral was sent to Karyn Williams on -- according to this memo, on 9/29/16?
MR. CHURMA: Object to form.
A. I believe, based on the documents that I've been given, that a copy was sent to me. I'm not certain, however, if I had opened it and was aware of it at the time that this got sent out. It was important just for HR to understand the general basis for the referral.
Q. I'd like to show you Exhibit Number 9, and



if you could just briefly review Exhibit 9, going to ask you if you know anything about these documents.
MR. LINDEN: Exhibit sticker -- two more Exhibits. Thanks.
A. I'm familiar with the first page of Exhibit --
Q. How is it that you're familiar with the first page of the Exhibit?
A. This is the standard email that gets sent to applicants for promotions, or transfers, or other employment actions involving the sheriff's police office.
Q. Are you aware of anything specifically in Exhibit Number 9?
MR. CHURMA: Object to form.
Q. Other than the standard document, are you aware that he was deemed disqualified for the promotional process for police officer?
A. Yes, I was aware of that. 2:57:13
Q. How were you made aware of that?
A. I was somewhat involved in the police promotion process in December of '18 and I remember seeing a list of individuals that were disqualified and recognized his name.
Q. Were you involved at all in the decision to

deem him disqualified on or about December 18th, 2018?
MR. CHURMA: Object to form.
A. No.
Q. And this letter is written by Brian White, correct?
MR. CHURMA: Objection. Lack of foundation.
Q. Or do you know who wrote this letter, Exhibit Number 9?
A. It indicates that Brian White wrote it.
Q. Do you have any reason to believe that Brian White did not write this letter?
MR. CHURMA: Object to form. 2:58:23
A. Chief White was responsible for sending out the status letters.
Q. And this is a document that would have came across your desk?
A. I don't know.
Q. Would you ordinarily -- you said you recognized this document in that I assume this -- Mr. Nawara, you knew who he was at the time, correct?
A. Yes, I recognize the form of this document -- or I recognize this document as being a notification of status for a police promotion process, and I knew at the time that Mr. Nawara was part of a group of officers or deputies that were being



disqualified.
Q. How is it that you came to know that he's a part of a group that was being disqualified? Is it because you received this letter or more of a summary of people that were disqualified?
A. I believe --
MR. CHURMA: Object --
A. -- more of the summary.
Q. Do you ever recall receiving this specific document at any time?
A. I do not, but that's not to say that I wasn't emailed or cc'd on it.
Q. Okay.
A. I -- I don't recall if I was cc'd on the batch of emails that went out.
Q. Looking at Exhibit Number 9, can you tell why John Nawara was deemed disqualified?
MR. CHURMA: Object to form. Calls for speculation. Lack of foundation.
A. The first page of the Exhibit states two reasons in the middle of the document, and one of them is "SEAM Article B, subsection B.6.3" and the second says, "Reason, OPR2012-0555, Brady violation, date of occurrence, 2/20/2012."
Q. Okay. Do you know what SEAM Article B,



subsection B.6.3 references?
A. Not specifically, but I believe the disciplinary requirements for a promotion.
Q. And that -- that would be connected with the next line, the Brady violation, correct?
A. I believe so. 3:01:04
Q. That the disciplinary violation that's referenced in SEAM Article B, subsection B.6.3 in this Exhibit was directly related to the alleged Brady violation, date of occurrence 2/20/2012, correct?
MR. CHURMA: Object to -- I'm sorry, object -- object to form, mischaracterizes testimony, and lack of foundation.
A. I don't know specifically what B.6.3 says and whether it references a Brady violation or not, but the second bullet point indicates that there was a Brady violation in his disciplinary check.
Q. Do you know how difficult it would be for somebody to pull OPR2012-0555 up and determine what the status was of that OPR complaint?
MR. CHURMA: Object to form. Lack of foundation. 3:02:07
A. If somebody was familiar with the OPR database or investigation system, it wouldn't be too difficult.



Q. How long would -- if you're familiar with it, how long would it take you to find out if that was a sustained violation or not sustained?
MR. CHURMA: Object to form. Calls for speculation.
A. A couple minutes.
Q. If you turn to page 2 of Exhibit Number 9, it's a document with the title "Expedited Arbitration Award," do you see that?
A. Yes.
Q. And it's got an OPR number, 2012-0555?
A. Yes.
Q. And is that the same OPR number that's referenced for the reason for Mr. Nawara's disqualification from promotional police process?
MR. CHURMA: Object to foundation. 3:03:15
A. It's the same number on both documents.
Q. And according to this arbitration award, the arbitrator found, "I sustain the grievance and find the employer has not sustained its burden of proof," and it's signed by Brian E. Reynolds, arbitrator, see that?
A. Yes.
Q. Wouldn't you agree that given that Mr. Nawara filed a grievance and it was ruled in his

favor, that the sheriff's office had no basis to disqualify him from the present cycle of the merit rank promotional process for the position of police officer?
MR. CHURMA: Object to form. Calls for speculation. Lack of foundation.
A. I really don't know the nuances of what the subject matter of the grievance was or what was, you know, ultimately determined in this.
Q. Okay. Assuming the arbitrator ruled in his favor, you see at the bottom of page 2 where it says, "This award is binding and non-precedential and only applies to the specific grievant," if it's binding, wouldn't you agree that it would be improper to use this OPR alleged violation against Mr. Nawara?
MR. CHURMA: Object to form. Lack of foundation. Calls for speculation. Also probably calls for a legal conclusion.
A. I -- I wish I knew more about what the specific grievance stated.
Q. I'm not saying he did it, but doesn't it seem unfair to you that they denied him a promotional process based on a grievance that he filed that was ruled in his favor?
MR. CHURMA: Same objections.



Q. Would you agree with that statement?
MR. CHURMA: Same objections.
A. I don't know all the ins and outs of --
Q. Okay.
A. -- what the grievance was about. 3:05:18
Q. Is it fair to say you just can't answer as you sit here?
A. Yes.
Q. Okay. Just one more thing or two more things, if you look at page 3 of Exhibit Number 9, it's a letter I wrote to Robert Egan. Do you know, who's Robert Egan?
A. He was the compliance officer for the Cook County Sheriff's Office.
Q. Is he still the compliance officer?
A. No.
Q. When did he leave?
A. Spring of '19.
Q. What is a compliance officer? What does he or she do?
A. He or she is responsible for ensuring that the Sheriff's Employment Action Manual or -- otherwise referred to as SEAM, is followed when there are employment actions taken, such as promotions, or transfers, or things of that nature.



Q. Do you know where Mr. Egan's office was in December 2018?
A. I believe on the seventh floor of the Daley Center.
Q. And how is SEAM -- does that apply to all sheriff's office employees, SEAM?
MR. CHURMA: Object to form. Lack of foundation. 3:06:54
A. Yes.
Q. And how do you describe -- what is SEAM?
A. It is a manual that contains a couple dozen articles, we call them, and each article lays out the policy and procedures for conducting certain employment actions.
Q. And those would be the policies and procedures to protect employees within the sheriff's office, that a fair statement?
MR. CHURMA: Object to form.
A. The -- SEAM is essentially designed to ensure consistency, and transparency, and fairness in employment actions.
Q. For the employees of the sheriff's office, correct?
A. Yes. 3:07:48
Q. So the sheriff's office is required to



follow the SEAMs with respect to its dealing with its employees, isn't that --
MR. CHURMA: Object to form.
Q. -- true?
MR. CHURMA: Lack of foundation.
A. As I said, it's just -- it -- it's the policy and procedure manual for that -- for the sheriff's office and its employees to follow for employment actions.
Q. I mean, they're required to follow it or you wouldn't need a compliance officer, wouldn't that be --
MR. CHURMA: Object to --
Q. -- a fair statement?
MR. CHURMA: Object to form. Lack of foundation. Calls for legal conclusions.
A. I'm afraid I don't understand what --
Q. I mean the sheriff's office is required to follow its SEAM in its treatment of employees, isn't that a fair statement?
MR. CHURMA: Object to form. Lack of foundation. Calls for legal conclusions.
A. The sheriff's office chooses to follow SEAM and --
Q. Can -- who has the power to remove or change

provisions in SEAM?
MR. CHURMA: Object to form. 3:09:11
A. Leadership of the sheriff's office.
Q. They could unilaterally remove or change a provision in SEAM without providing that employee with notice, is that --
MR. CHURMA: Object to form.
Q. -- what you're saying?
MR. CHURMA: Mischaracterizes testimony.
A. Not to one employee. For instance, if we wanted to change part of a process or even maybe part of a policy, then leadership of the sheriff's office could make the change, but again, it's all -- it would all be rooted in ensuring that processes were fair, and transparent, and efficient.
Q. So it's important to have transparency in any change of the SEAM so employees know what's being done, isn't that a fair statement?
MR. CHURMA: Object to form. Lack of foundation. 3:10:05
A. The SEAM is available online at the sheriff's website.
Q. Okay. Because at one point in time, didn't SEAM provide the, you know, procedures in the event of layoffs --



MR. CHURMA: Object --
Q. -- for instance?
MR. CHURMA: Object to form. Lack of foundation. Assumes evidence not in the record.
A. I don't recall the specific --
Q. Do you recall any SEAMs provision that provided that if you had merit ranks employees in exempt position and there's a layoff, that they'd be demoted to their prior current merit -- merit rank that was subject to a collective bargaining agreement?
MR. CHURMA: Object to form. Lack of foundation.
A. I don't know. 3:10:51
Q. You don't know?
A. No.
Q. Do you know whether or not that was changed?
MR. CHURMA: Same objections.
A. I -- there have been several changes to SEAM over the years, I'm not --
Q. Do you recall specifically if that type of provision was ever changed and removed?
MR. CHURMA: Objection. Asked and answered.
A. I don't recall.
MR. LINDEN: Okay. I'm almost done here.
MR. BUSTAMANTE: That was 15 minutes.



MR. LINDEN: It's been 12.
Q. Okay. Show you Exhibit Number 10 and ask if you've ever seen this document before?
A. I don't believe so. 3:12:10
Q. If you can look at this document and look at the witnesses who were disclosed in this document, I'm just going to ask you if you know of any other people that may have knowledge regarding John Nawara's complaint in this case?
MR. CHURMA: Just object to form.
A. In addition to the people listed here?
Q. Yes, any other people than those identified on this Exhibit.
A. Not off the top of my head.
MR. LINDEN: Okay -- our second --
MR. BUSTAMANTE: Which one?
MR. LINDEN: The last one, the 26.
Q. Okay. With respect to you, this document, we got it from counsel for the -- your counsel, it says, "Mr. Burke is a Defendant in this matter and may have discoverable information regarding" -- I'm sorry, "regarding the allegations in the complaint." Do you know what discoverable information is being referenced in this Exhibit?
MR. CHURMA: Object to form, to the extent



--
Q. Number ten?
MR. CHURMA: -- to the extent the answer seeks information protected by the attorney-client privilege.
A. I don't know. 3:13:55
Q. You have no idea what's being referred here? Do you know of any other information that you have that was not discussed in this deposition related to the allegations in Mr. Nawara's complaint?
MR. CHURMA: Object to form.
A. I can't think of anything off the top of my head.
MR. LINDEN: Anything more, Peter? Anything more?
MR. BUSTAMANTE: This is --
MR. LINDEN: Yeah --
MR. BUSTAMANTE: -- the memo doesn't say it's --
MR. LINDEN: Yeah.
MR. BUSTAMANTE: Just put --
MR. LINDEN: Yeah. Yeah. Yeah -- this, I only have one copy, but I'll show everybody. I'll let everybody see it first. Go ahead. I'm just -- we -- can we go off the record just one second?

MR. HENRETTY: What is it?
MR. LINDEN: Answers to interrogatories.
RECORDER: Off --
MR. LINDEN: Off if you don't --
RECORDER: Off the record, 1:40 p.m.
(Off the record)
RECORDER: Back on the record, 1:41 p.m.
Q. I'd like to show you Exhibit 11, just ask if you've ever seen this document?
A. Yes. 3:15:54
Q. And what is it?
A. My answers to Plaintiff's first set of interrogatories.
Q. And -- hold on one second. I'm sorry I just have one copy. On page 20, it contains a verification with your signature, correct?
A. Correct.
Q. And I take it you reviewed these answers before signing it?
A. Correct.
Q. So you attested under penalties of perjury they're true and correct, right?
A. Correct.
Q. And if you could just read your answer to number 16?



A. Read the highlighted section?
Q. No, the whole answer --
MR. BUSTAMANTE: No --
Q. -- above --
MR. BUSTAMANTE: Not the objection.
Q. Or not the objection, just the answer.
A. The second paragraph?
Q. Yes.
MR. CHURMA: I'm just going to object to form without reading the question first.
Q. I'm sorry, if you could read -- read the -- why don't you read the whole thing, the question, the objection, and the answer?
MR. BUSTAMANTE: Fine.
Q. Okay.
A. "Identify all reasons for which Plaintiff was required to undergo a fitness for duty evaluation." Answer, the second paragraph, "Notwithstanding and without waiving said objections, Defendant Burke states he forwarded via email to human resources a statement written by Defendant Karen Jones-Hayes. Human resources was to determine whether a fitness for duty evaluation was warranted under the circumstances. Defendant Burke was not responsible for deciding whether Plaintiff should undergo a



fitness for duty evaluation."
Q. And it references a statement from Karen Jones-Hayes that was forward to human resources, correct?
A. Correct. 3:17:37
Q. Do you know what statement that refers to?
A. I believe it was the email from her to Dawn Ertler.
Q. And that's the email attached, and you can go back and look, just be certain, email attached to Exhibit Number 8?
A. Yes, I believe so.
MR. LINDEN: Okay. Anything else?
MR. BUSTAMANTE: Is this via email? Did he send an email --
Q. I guess my question to you, it says here, "Via email," do you know if you actually sent an email?
A. I don't know if I personally sent it or if it was Mary McQuillan who sent it per my direction, or even if -- in looking at this now, whether it was, in fact, interofficed, and the only reason I'm concerned is because there was not the email, you know, from one of us to her, but it was communicated to them.
MR. LINDEN: Okay. I've got nothing



further, but thank you very much for --
MR. HENRETTY: I have one or two questions, if that's okay.
MR. CHURMA: That's fine.
MR. HENRETTY: Unless you guys want to go first.

EXAMINATION

BY MR. HENRETTY:
Q. Mr. Burke, we met before. My name is Lyle Henretty. I represent Jones-Hayes in this case. Just to follow up on what you were just reviewing, your answer to the interrogatory, it's my understanding that, ultimately, HR made the decision as to whether or not to proceed to a fitness for duty in this case?
A. Correct. 3:19:20
Q. Did -- to your knowledge, did Jones-Hayes have anything to do with the decision whether or not Mr. Nawara would have a fitness for duty evaluation?
A. No, she did not.
MR. HENRETTY: Nothing further. Thank you.
MS. HONINGFORD: Nothing.
MR. CHURMA: We'll reserve signature.
MR. LINDEN: Okay.
RECORDER: Off the record, 1:45 p.m.

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Abbey Douglas
October 15, 2019

## A


**aback** 65:2
**Abbey** 3:24 149:7
**ability** 83:1
**able** 31:6, 55:18 56:1, 87:15 90:10, 93:4
**abolished** 36:4
**above-entitled** 149:4
**access** 43:7 43:17, 43:17 110:21
**accident** 6:8
**account** 74:11 126:9
**Accountability** 41:16
**accurate** 127:5 127:6
**accused** 74:1
**accused's** 75:12
**accuser** 73:25
**act** 6:13, 41:16 44:7, 53:2
**acted** 72:22
**Acting** 16:3
**action** 56:4 66:1, 66:17 138:22
**actions** 132:11 138:24, 139:14 139:21, 140:9
**active** 83:2
**activities** 13:25
**ADA** 44:7, 44:9 44:13, 45:2
**add** 19:21
**addition** 143:11
**address** 9:13 114:15, 114:20 115:4
**addressed** 100:22
**addressing** 100:13, 100:22
**admissions** 100:14, 100:15
**advanced** 31:3 31:17
**advantage** 118:8, 122:19
**Advise** 23:13
**advising** 17:14
**affidavit** 40:13
**afraid** 140:17
**age** 7:19
**aggression** 53:5
**aggressive** 27:15, 27:24 28:1, 50:16
**aggressiveness** 37:21
**agitated** 92:12 100:16
**ago** 40:8, 40:18 87:14, 128:19
**agree** 42:9 43:23, 69:22 71:2, 76:8 80:11, 117:22 122:10, 122:15 136:24, 137:14 138:1
**agreed** 23:5 23:9, 25:6 25:18, 30:17
**agreement** 5:4 8:4, 142:10
**ahead** 144:24
**al** 1:11, 3:21
**allegations** 76:21, 80:10 126:5, 143:22 144:10
**alleged** 75:15 93:11, 129:22 135:9, 137:15
**allow** 46:16 56:4
**allowed** 49:23 67:23, 85:19 91:22, 93:23 94:10, 94:25 95:3, 95:16 95:23
**America** 10:4
**American** 6:13
**Americans** 44:6
**amount** 56:9
**anger** 65:7, 65:9 65:11, 93:14
**angry** 63:3, 63:8 63:11, 63:21 72:22
**answer** 5:23 17:6, 36:1, 40:2 43:5, 85:13 98:8, 127:8 138:6, 144:3 145:24, 146:2 146:6, 146:13 146:18, 148:12
**answered** 85:7 117:8, 142:22
**answers** 145:2 145:12, 145:18
**anybody** 15:12 18:2, 24:2, 34:1 34:5, 38:11 52:19
**apologize** 40:6
**apologized** 100:23
**appearances** 2:1 4:5
**appears** 103:14 105:16, 129:7 130:20, 131:4
**applicants** 56:20, 58:7 132:10
**application** 15:2 18:5, 56:5 56:15, 56:16 57:16, 57:17
**applications** 57:18
**applied** 29:17
**applies** 41:25 137:13
**apply** 57:21 139:5
**applying** 57:22
**appointment** 120:1
**appointments** 94:17
**approached** 52:3
**appropriate** 68:9, 68:13 68:19, 69:14 69:19, 70:7 73:2
**approximately** 6:5, 37:5, 102:3 126:19
**April** 12:12
**arbitration** 136:8, 136:18
**arbitrator** 136:19, 136:21 137:10
**area** 46:15 47:14, 47:20 52:3, 54:9 63:15, 78:15 120:2, 120:3 120:4, 120:10 120:17, 120:23
**areas** 119:16
**arising** 45:10
**arm** 100:19 100:24
**arose** 86:15
**arrested** 27:4 27:11, 29:14
**article** 134:22 134:25, 135:8 139:12
**articles** 139:12
**asked** 17:11 63:9, 117:8 142:22
**asking** 16:12 32:21, 105:6
**aspect** 20:22
**assessment** 78:4 94:18
**assign** 66:3
**assigned** 19:25 49:9, 49:17 55:2, 81:13 84:5, 84:18 84:18, 85:18 120:23, 121:2 121:8, 121:12
**assistant** 15:18 15:22, 15:25 18:10, 18:11 18:18, 19:24 21:10, 21:11 21:12, 21:23 22:4, 22:9 22:14, 22:17 22:25, 24:3 24:11, 60:2 60:2, 109:21 109:22, 123:16 128:22
**associated** 13:12 14:20, 14:23
**assume** 5:18 9:19, 58:6 104:21, 114:2 133:19
**assumed** 5:23
**Assumes** 94:1 142:4
**assuming** 113:17, 137:10
**attached** 79:9 104:19, 107:5 111:14, 128:22 128:25, 130:2 130:21, 131:5 147:9, 147:10

**attachment** 103:18, 123:23
**attacked** 121:22
**attempted** 89:3 90:2
**attend** 31:22 31:24
**attended** 44:18
**attention** 100:19 100:24
**attested** 145:21
**attorney** 5:16 20:17
**Attorney's** 2:21 3:3
**attorney-client** 144:4
**attorneys** 4:4 20:5, 20:18 21:17
**August** 25:14
**authority** 32:12 32:22, 33:4 33:7, 33:13 33:20, 34:2 35:21, 36:12 36:20, 66:4 66:10, 71:14 81:2, 81:4 81:18, 82:2
**authorized** 49:21, 82:10 110:24, 111:6 111:7
**automatic** 27:12 28:25, 29:8 29:9, 29:13
**automatically** 27:6
**available** 74:2 116:12, 141:21
**average** 127:15 127:25
**award** 136:9 136:18, 137:12
**aware** 5:18 11:17, 19:10 19:11, 26:21 29:16, 41:11 59:15, 59:17 79:20, 79:22 80:7, 81:1 93:18, 93:21 93:22, 96:12 96:14, 113:15 115:20, 116:1 126:12, 126:13 131:21, 132:13 132:17, 132:19 132:20

**B**

**B-u-r-k-e** 5:15
**B.6.3** 134:22 135:1, 135:8 135:14
**back** 14:4, 19:18 23:4, 39:17 54:25, 56:17 58:10, 67:11 67:12, 85:4 89:5, 89:10 93:1, 94:11 95:4, 100:19 100:24, 102:20 119:8, 121:14 121:15, 124:11 124:12, 145:7 147:10
**background** 10:3
**backs** 100:15
**bad** 114:19
**Baker** 13:3
**Banks** 3:11
**bar** 10:25, 11:5 11:9, 12:6 15:23, 17:21 17:24, 17:25
**bargaining** 142:10
**bartend** 12:6
**bartender** 11:23
**bartending** 12:4
**based** 77:19 79:1, 80:19 88:17, 90:1 99:2, 99:5 104:20, 127:4 127:13, 131:19 137:23
**basement** 119:6 119:11, 119:15 119:25
**basically** 109:11 118:23
**basis** 76:13 77:10, 77:24 78:1, 78:2 88:24, 130:6 131:23, 137:1
**batch** 134:15
**Bates** 103:23 105:16, 105:22 106:7
**becoming** 55:13
**began** 100:12 100:17, 101:20
**behalf** 4:1, 4:6 4:8, 4:10
**behavior** 27:8 27:15, 27:23 27:24, 28:1 39:12, 50:17
**believe** 6:24, 7:7 7:15, 7:18 10:12, 10:20 14:10, 15:11 15:15, 21:6 21:21, 22:3 23:22, 26:8 26:18, 27:3 32:1, 32:15 33:25, 34:7 45:17, 46:10 50:9, 52:7 52:22, 53:25 57:6, 57:8 57:10, 57:23 58:17, 59:21 60:1, 61:8 61:13, 62:6 62:9, 63:20 65:23, 67:16 68:25, 69:8 72:13, 73:13 74:4, 74:8 75:12, 75:18 78:14, 79:4 79:13, 79:22 81:25, 82:20 87:10, 87:23 89:1, 89:8 89:13, 92:17 97:15, 97:20 98:2, 98:13 99:11, 103:5 103:12, 107:3 108:15, 109:17 110:2, 110:10 112:5, 116:10 121:7, 126:19 129:2, 129:11 129:20, 130:5 131:19, 133:10 134:6, 135:2 135:6, 139:3 143:4, 147:7 147:12
**bell** 13:11
**benches** 120:4
**Bernie's** 12:7
**best** 62:11
**better** 48:4 57:17, 106:12 109:6, 114:21
**binding** 137:12 137:13
**birth** 7:21
**bit** 21:16, 29:6 39:17, 51:21 53:9, 115:19 124:7
**bitterness** 51:25 52:20
**block** 31:4
**blocks** 31:17 31:20
**Bluhm** 6:20
**born** 9:3
**bottom** 137:11
**Brad** 60:25 61:1, 61:4
**Brady** 134:23 135:5, 135:9 135:15, 135:17
**break** 48:7, 72:1 124:8
**breaking** 118:12
**Brendan** 9:12
**Brian** 14:5, 14:6 14:24, 15:11 133:4, 133:9 133:10, 136:21
**Bridget** 9:12
**brief** 22:6
**briefly** 11:19 40:21, 49:25 132:1
**bring** 34:19 34:20, 37:12
**bringing** 37:14
**broader** 20:6 20:8
**brought** 121:10
**bubble** 119:17
**budget** 25:21
**building** 46:18 46:20, 47:10 47:15, 47:20 49:14, 49:15 119:4, 127:10 127:24
**buildings** 47:2 47:12, 47:13 127:9
**built** 21:15
**bullet** 135:16
**burden** 136:20

**bureau** 111:11 112:8
**Burke** 1:15 1:16, 3:8, 3:24 3:24, 4:11, 5:10 5:14, 5:14 103:10, 116:5 143:20, 146:20 146:24, 148:9
**Burke's** 99:13
**Bustamante** 1:22, 2:4, 2:5 3:19, 4:6, 4:6 4:13, 4:15, 4:19 4:21, 4:23, 5:3 5:11, 22:19 50:6, 55:21 67:6, 106:14 115:24, 124:15 124:18, 128:6 128:9, 128:14 130:10, 130:13 142:25, 143:16 144:16, 144:18 144:21, 146:3 146:5, 146:14 147:14
**bypass** 55:15

**C**

**C-a-n-n-a** 14:19
**California** 47:16
**call** 51:2, 61:10 61:14, 61:16 61:19, 61:23 62:7, 62:10 71:10, 72:21 79:1, 79:14 83:4, 89:5 89:10, 93:1 116:5, 120:2 139:12
**called** 44:7 59:21, 61:8 62:14, 62:19 64:11, 90:18 93:2
**calling** 62:16 79:24, 100:21
**calls** 15:6, 16:10 35:15, 42:2 42:19, 43:19 68:3, 70:16 71:5, 92:10 113:3, 116:20 117:3, 121:5 122:21, 124:4 134:18, 136:4 137:5, 137:17 137:18, 140:16 140:22
**campaign** 12:25 13:1, 13:2 13:13, 13:14 13:18, 13:23 13:25
**campaigns** 13:9
**Canna** 14:17
**captain** 36:4
**captains** 35:25 36:3
**car** 6:7, 46:7 52:2, 53:24 54:1, 54:2, 54:3
**Cara** 25:11 33:16, 60:14
**card** 83:9
**care** 30:18 118:24
**carried** 84:19
**carries** 48:22
**carry** 48:13 48:25, 49:3 49:21, 49:23 83:10, 84:3 85:19
**carrying** 28:5 83:23, 84:6 84:14, 88:4
**cars** 54:8, 54:10
**case** 1:9, 3:21 6:15, 6:20, 6:25 7:5, 7:7, 27:13 39:14, 40:14 45:19, 74:3 83:16, 88:20 94:20, 97:21 99:6, 105:19 114:12, 115:20 125:25, 128:24 143:9, 148:10 148:14
**cases** 6:6, 6:9 6:12, 6:14, 6:22 7:6, 7:13, 20:18 28:24, 76:11
**Casper** 7:2
**Cass** 7:2
**Catholic** 10:4 10:7
**caused** 13:14 74:18
**causes** 88:24
**cc'd** 101:9 134:12, 134:14
**cell** 121:15
**Center** 139:4
**Cermak** 49:9 49:14, 49:15 49:22, 49:24 55:3, 81:13 81:15, 101:8 111:15, 118:20 118:21, 119:6 119:12, 121:8 121:10, 121:12
**Cermak's** 49:11 119:4
**certain** 16:18 31:22, 43:13 61:24, 63:14 63:15, 106:24 106:25, 107:1 115:9, 129:20 131:15, 131:21 139:13, 147:10
**certainly** 105:1
**certainty** 107:1
**certificate** 58:19
**CERTIFICAT...** 149:1
**certify** 149:2
**chain** 61:4, 91:6 91:12, 99:15 103:14, 103:18 118:13, 125:12
**change** 82:14 140:25, 141:4 141:11, 141:13 141:17
**changed** 142:16 142:21
**changes** 142:18
**characterization** 122:20
**charges** 76:12
**check** 52:17 52:21, 52:24 76:25, 135:17
**checked** 53:21
**Cherry** 7:10 7:11
**chest** 69:23 70:8, 70:14 70:20, 70:24 79:21, 116:24
**Chicago** 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 9:16, 10:13 11:2
**chief** 12:19, 14:2 14:4, 17:3 17:16, 24:21 24:23, 24:25 25:7, 25:12 57:20, 60:12 60:13, 79:23 90:15, 90:21 92:12, 104:8 112:1, 133:13
**children** 9:7 9:20
**children's** 9:11
**choice** 17:22
**chooses** 140:23
**Churma** 3:10 4:10, 4:10, 4:22 5:2, 5:5, 7:25 12:18, 15:6 16:9, 17:1, 17:4 17:12, 17:14 20:24, 21:14 22:12, 23:10 24:9, 24:14 24:17, 26:14 27:2, 27:17 28:18, 29:2 30:2, 31:10 32:14, 34:15 35:6, 35:13 35:15, 35:22 36:2, 36:14 36:22, 37:10 37:24, 38:6 38:16, 38:25 39:9, 41:12 42:2, 42:11 42:17, 42:19 42:21, 43:2 43:9, 43:19 43:25, 44:2 45:14, 47:22 48:5, 48:20 50:3, 51:6, 53:7 55:6, 55:16 55:24, 56:3 56:12, 58:15 58:24, 59:8 60:17, 60:22 61:3, 66:7 66:12, 66:22 67:5, 67:25 68:3, 68:10 68:15, 68:20 69:20, 69:25 70:3, 70:9 70:15, 70:25

71:5, 71:12
71:18, 71:23
72:7, 72:17
72:25, 73:17
75:3, 76:14
76:22, 77:14
77:22, 78:23
80:1, 80:13
81:21, 82:5
82:19, 83:19
84:8, 84:22
84:24, 85:8
85:10, 85:21
86:4, 88:12
89:16, 89:18
90:5, 90:16
91:1, 91:5
91:17, 91:25
92:16, 93:7
93:25, 94:7
94:13, 95:2
95:14, 96:1
96:11, 96:16
96:23, 97:9
97:14, 97:19
98:7, 98:12
98:17, 98:25
103:21, 105:9
105:15, 105:20
106:1, 106:3
106:5, 107:2
107:24, 108:18
109:13, 109:15
111:19, 112:12
112:17, 113:3
113:13, 113:24
114:7, 116:5
116:8, 116:14
116:19, 117:3
117:13, 117:20
117:25, 118:4
118:17, 119:7
120:9, 120:12
120:14, 120:18
120:25, 121:5
121:17, 121:24
122:4, 122:13
122:16, 122:21
123:8, 124:4
124:20, 125:9
125:17, 125:21
126:2, 126:11
126:18, 126:22
126:24, 127:3
127:7, 127:18
128:8, 129:25
130:11, 130:23
131:11, 131:18
132:15, 133:2
133:6, 133:12
134:7, 134:18
135:11, 135:21
136:4, 136:16
137:5, 137:16
137:25, 138:2
139:7, 139:18
140:3, 140:5
140:13, 140:15
140:21, 141:2
141:7, 141:9
141:19, 142:1
142:3, 142:11
142:17, 142:22
143:10, 143:25
144:3, 144:11
146:9, 148:4
148:22
**circumstance**
43:15, 68:1
68:12, 70:6
70:22
**circumstances**
43:13, 59:18
70:5, 72:2
146:24
**cites** 6:11
**claim** 37:22
78:9
**claimed** 64:11
64:19, 78:13
**claims** 79:20
**clarify** 7:25
29:5
**clean** 11:22
**clear** 106:16
**cleared** 94:11
**clearly** 32:25
**clerk** 15:19
**client** 17:14
**Clinic** 6:21
**close** 91:7
115:10
**closely** 52:3
**closer** 52:18
**clout** 59:7
**co-Defendants**
115:18
**colleagues** 28:20
**collective**
142:10
**Colorado** 9:4
**come** 15:8
31:13, 34:12
36:16, 46:17
67:3, 67:6
121:14
**comes** 24:18
46:13
**coming** 36:17
54:2, 101:18
**comma** 100:11
**command** 61:4
91:6, 91:13
118:13, 125:12
**commander**
36:17, 36:25
55:15, 55:19
55:22, 56:2
56:7, 56:11
56:14
**commanders**
36:9, 36:12
**commonly**
106:19
**communicate**
112:13
**communicated**
147:24
**communicating**
115:7, 124:2
**communication**
113:7
**communications**
17:15
**company** 11:21
11:25, 12:2
**compensation**
19:18
**complained**
28:7, 37:20
72:20
**complaint** 53:17
64:9, 67:17
71:22, 71:25
72:15, 72:24
73:2, 73:5
73:15, 74:7
74:18, 75:18
77:9, 77:17
79:5, 79:9, 80:8
80:22, 81:4
81:7, 83:13
99:2, 99:5, 99:8
101:3, 102:23
102:25, 103:1
103:4, 103:5
104:11, 104:16
104:18, 104:24
105:1, 105:7
106:20, 106:22
107:4, 107:8
107:12, 115:14
115:20, 115:23
124:13, 124:18
124:19, 124:22
125:3, 130:22
131:7, 131:15
135:20, 143:9
143:22, 144:10
**complaints**
11:16, 19:16
93:19, 126:9
**complete** 94:10
94:17, 94:18
**completed** 73:1
101:3
**completely**
106:7
**completes** 5:6
**completing**
80:22
**complex** 47:7
**compliance**
138:13, 138:15
138:19, 140:11
**compound**
46:22, 46:23
47:2, 127:9
**comprised**
47:13
**concern** 34:18
92:18
**concerned** 38:8
85:15, 92:24
147:22
**concerning**
37:14
**conclusion** 42:3
42:19, 137:18
**conclusions**
140:16, 140:22
**condescending**
117:1
**conditions**
23:14
**conduct** 31:16
101:4
**conducted**
71:20, 114:5
**conducting**
139:13
**conference**
61:14, 61:16
**confident** 58:20
**confidential**
1:16, 8:4, 9:1
9:22, 9:25
23:11, 42:10
**confinement**
23:15

**confrontational** 50:13
**confused** 7:7 46:11
**conjure** 118:9
**Conley** 75:19
**connect** 90:8 90:10
**connected** 135:4
**connection** 13:9
**consistency** 139:20
**contact** 50:20 51:16, 53:15 54:4, 89:5, 90:2 90:13, 90:24 95:6, 95:7 114:11
**contacted** 61:6
**contacting** 80:9
**contacts** 45:11
**contained** 103:18
**contains** 123:3 139:11, 145:15
**content** 31:21
**contents** 109:7 111:13
**Continuation** 10:1
**continuing** 44:11
**contraband** 48:8
**contract** 18:16 20:11
**control** 66:20
**conversation** 61:25, 100:16 113:6, 113:9
**conversations** 17:7, 17:11 18:1, 62:17
**Cook** 1:11, 2:21 3:1, 3:3, 3:21 6:12, 19:25 24:21, 43:16 47:12, 54:18 117:18, 126:15 138:13
**cooperating** 89:15, 89:20
**copied** 100:2 102:8, 111:21 112:4
**copy** 102:23 103:3, 131:15 131:20, 144:23 145:15
**correct** 5:17, 7:4 21:24, 27:19 32:19, 32:20 33:21, 36:5 36:6, 36:11 37:2, 44:1 47:17, 47:18 48:16, 48:17 48:19, 49:9 50:4, 53:3 53:18, 63:4 65:21, 75:2 76:5, 78:6 78:10, 78:11 78:21, 81:13 81:14, 83:25 84:3, 84:4 84:21, 85:19 85:20, 90:22 90:23, 93:24 94:20, 100:1 100:4, 101:19 104:16, 104:17 104:17, 108:8 108:9, 114:13 117:11, 117:12 117:17, 117:19 117:21, 118:24 118:25, 119:3 120:5, 121:21 121:23, 121:25 122:3, 123:19 127:2, 129:9 133:5, 133:20 135:5, 135:10 139:23, 145:16 145:17, 145:20 145:22, 145:23 147:4, 147:5 148:15, 149:2
**correctional** 46:16, 48:24 65:18, 82:17 117:10, 117:23 121:22, 122:1
**corrections** 19:23, 20:14 23:15, 24:22 24:23, 35:9 37:4, 39:14 54:19, 65:5 84:2, 108:22 109:1, 116:18 126:16, 127:25
**corroborated** 75:24
**counsel** 7:9 16:3, 16:3 18:10, 18:11 18:19, 19:24 21:10, 21:11 21:12, 22:8 22:9, 22:15 22:18, 22:20 23:19, 23:24 24:3, 24:3 24:12, 39:22 39:24, 85:7 143:19, 143:19
**counsels** 21:23 22:5
**county** 1:11 2:21, 3:1, 3:3 3:21, 6:12 19:25, 23:6 24:21, 43:16 47:12, 54:18 117:19, 126:16 138:14
**couple** 18:25 19:5, 20:4, 40:8 40:18, 46:22 87:12, 119:16 120:21, 136:6 139:11
**court** 1:1, 6:15 19:22, 20:21 54:13
**CR** 124:15
**created** 109:6 109:7
**credible** 75:2
**criteria** 26:25 29:11, 69:13 96:8, 96:12 96:14, 96:22 97:3
**current** 9:13 22:7, 142:9
**currently** 9:5
**curriculum** 44:18, 44:21
**Curry** 60:25 61:1, 61:4
**custody** 47:4
**customarily** 125:20
**cycle** 137:2

**D**

**D.C** 10:8
**Daley** 139:3
**danger** 84:17
**dangerous** 82:25
**Dart** 3:8, 12:21 12:23, 13:10 13:13, 13:17 13:20, 13:24 15:13, 16:5 16:8, 16:16 16:24
**database** 135:24
**date** 7:21, 87:18 87:21, 99:21 104:23, 108:10 108:12, 110:8 110:10, 134:23 135:10
**dated** 111:11 128:16, 131:6
**dates** 21:7
**Dawn** 129:7 129:10, 130:3 131:7, 147:7
**day** 62:2, 62:3 65:20, 66:11 66:15, 73:11 73:13, 73:14 77:6, 77:12 82:14, 87:17 93:5, 103:7 103:8, 107:6 108:13, 108:14 108:15, 108:16 110:12, 118:20 126:16, 126:21 129:24
**day-to-day** 16:20, 20:12 25:3
**days** 40:8, 40:18 87:12, 110:10
**de-deputized** 83:4
**deal** 15:5, 16:7
**dealing** 117:11 140:1
**dealings** 45:12 112:10
**dealt** 18:25
**December** 132:22, 133:1 139:2
**decided** 37:23 39:7, 56:14 105:2
**deciding** 26:25 146:25
**decision** 18:3

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 83 of 657 PageID #:4068



37:18, 59:13
67:1, 79:3, 82:7
110:5, 132:25
148:13, 148:17
**decisions** 97:8
**decks** 11:22
**decree** 23:4
**deem** 133:1
**deemed** 132:17
134:17
**Defendant** 2:19
3:1, 128:24
143:20, 146:20
146:21, 146:24
**Defendants** 1:13
3:8
**defined** 69:10
**definitely** 52:12
53:12, 61:20
65:12
**degree** 10:9
11:20, 58:18
96:19
**demean** 117:23
**demonstrates**
118:11
**demoted** 142:9
**denied** 79:18
137:22
**Denver** 9:4
**department**
16:19, 17:8
19:22, 19:22
19:25, 20:2
20:3, 20:6
20:14, 20:15
21:2, 21:16
21:18, 21:20
23:2, 23:6
23:15, 24:6
24:22, 25:5
28:13, 34:11
35:8, 37:4
39:13, 54:19
80:15, 84:2
108:22, 109:1
113:15, 116:18
126:16, 127:25
**departments**
82:23
**depend** 68:2
70:5
**depends** 43:4
68:1, 118:19
**deposition** 1:15
1:16, 3:20, 3:25
5:19, 6:1, 39:18
39:21, 40:15
40:17, 40:20
40:25, 40:25
99:13, 144:9
**depositions** 6:10
**deputies** 133:25
**describe** 10:2
44:15, 51:22
59:17, 63:18
65:25, 91:7
107:1, 119:14
124:19, 139:10
**described** 97:22
**describing** 79:8
**designated** 8:3
**designed** 139:19
**desk** 82:18
113:22, 133:16
**detail** 111:16
**details** 63:10
**detainee** 30:13
118:12, 121:11
121:14, 121:15
**detainees** 30:9
30:18, 31:6
47:3, 118:7
118:14, 119:17
119:18, 120:8
120:15, 120:17
121:10, 121:22
122:3
**deterioration**
28:9
**determination**
75:9, 82:24
94:24
**determine** 26:3
32:18, 32:23
74:22, 97:11
135:19, 146:22
**determined**
94:4, 137:9
**determining**
29:12, 96:9
**develop** 44:24
**developed** 31:3
44:17
**developing**
44:21, 44:21
**development**
25:3, 25:19
30:20
**devices** 122:8
**difference** 72:12
**different** 20:20
21:12, 48:15
51:21, 82:22
84:11, 106:8
127:10, 127:11
**differentiation**
20:20
**difficult** 117:11
127:8, 135:18
135:25
**direct** 43:17
82:3, 90:14
90:25, 91:15
91:21, 91:23
**directed** 110:4
**direction** 110:3
111:8, 147:20
**directive** 59:1
**directly** 16:8
35:9, 55:19
56:1, 56:11
60:5, 113:22
135:9
**director** 25:1
25:10, 33:11
60:2, 60:3
60:10, 60:20
89:2, 111:11
111:25, 112:8
123:17, 125:13
**director's** 33:2
34:20, 109:18
**Disabilities** 6:13
**Disability** 44:7
**disagree** 75:6
75:7
**disagreements**
40:22
**disciplinary**
11:16, 58:1
66:1, 66:17
72:15, 72:19
72:23, 135:3
135:7, 135:17
**discipline** 58:7
65:14, 65:17
66:2, 66:3, 66:5
66:8, 66:19
67:2, 72:3, 72:4
72:8, 72:12
91:20, 101:6
116:17
**disciplined** 67:4
67:4, 74:11
126:9
**disclosed** 143:6
**discoverable**
143:21, 143:23
**discredit** 75:11
**discrimination**
124:21, 125:3
**discuss** 17:2
112:20
**discussed** 16:23
113:1, 128:2
144:9
**discussing** 16:17
**discussions**
45:18
**display** 28:16
50:16, 53:5
**displayed** 37:21
65:9
**displaying**
30:10
**disposition**
19:12
**disprove** 107:22
**dispute** 127:21
128:1, 129:3
**disputes** 20:12
20:12
**disqualification**
136:15
**disqualified**
132:17, 132:23
133:1, 134:1
134:3, 134:5
134:17
**disqualify** 137:2
**disrespectful**
100:12
**District** 1:1, 1:2
3:22
**disturbing** 27:7
27:22, 27:25
**division** 1:3
3:23, 55:3
82:22
**divisions** 121:9
**DOC** 20:3, 20:5
20:21, 25:4
25:20, 54:20
65:9, 90:21
91:3, 93:14
109:24, 112:1
127:9
**doctor's** 119:23
**document** 99:14
99:20, 103:10
103:22, 103:25
104:6, 104:9
104:12, 104:20
104:22, 105:16
106:9, 107:5
111:2, 111:9
114:23, 115:5
115:11, 116:9
123:9, 128:23

129:6, 132:16
133:15, 133:19
133:21, 133:22
134:10, 134:21
136:8, 143:3
143:5, 143:6
143:18, 145:9
**documentation** 77:18, 111:14 128:23, 129:1 130:2
**documents** 39:23, 40:11 40:12, 79:2 87:12, 87:18 108:3, 131:14 131:19, 132:2 136:17
**doing** 38:17 38:21, 57:15 63:5, 63:14
**domestic** 27:5
**Donahoe** 23:17 23:21
**Douglas** 3:24 149:7
**dozen** 57:18 120:21, 139:11
**drafted** 109:5
**drawing** 98:10
**Drive** 3:12
**drop** 121:13
**DUI** 27:5
**duties** 19:1 22:17, 22:24 23:1, 25:15 28:12, 97:17
**duty** 7:14, 7:17 18:22, 19:7 24:13, 25:23 26:3, 26:12 32:13, 37:9 82:18, 83:2 94:5, 94:16 94:25, 96:5 97:8, 97:25 98:5, 98:16 108:24, 111:12 111:16, 111:18 114:6, 146:17 146:23, 147:1 148:14, 148:18

## E

**earlier** 117:7
**early** 87:23 87:25
**easily** 65:4
**Eastern** 1:3 3:23
**education** 10:21 44:11
**educational** 10:2
**effective** 38:14 66:15
**efficient** 141:15
**efforts** 25:18 89:22
**Egan** 138:11 138:12
**Egan's** 139:1
**either** 52:2, 59:3 63:4, 63:14 67:13, 73:13 77:20, 79:7 82:25, 96:25 97:2, 101:19 107:13, 107:22 108:15, 114:14 119:21, 125:12 126:13
**election** 13:6
**email** 79:5, 79:6 79:8, 89:1, 90:1 90:3, 90:11 97:22, 99:15 99:17, 100:3 100:5, 100:7 101:11, 101:14 101:15, 102:2 102:5, 102:10 102:16, 102:20 103:3, 103:14 103:17, 103:19 104:1, 104:2 104:16, 106:2 114:15, 114:20 115:4, 123:3 123:7, 123:10 123:12, 123:13 123:20, 123:24 128:13, 129:7 129:22, 130:3 130:8, 130:21 131:6, 132:9 146:20, 147:7 147:9, 147:10 147:14, 147:15 147:17, 147:18 147:23
**emailed** 90:12 114:2, 114:3 114:17, 115:3 115:4, 115:9 134:12
**emails** 40:14 103:24, 104:8 134:15
**embarking** 16:19
**embittered** 53:13
**employed** 13:21 31:9, 54:20
**employee** 26:12 27:7, 27:15 28:4, 28:16 28:21, 32:12 32:23, 34:18 35:10, 37:21 38:9, 38:15 38:18, 38:23 39:6, 65:9 65:14, 65:22 66:2, 66:14 66:19, 67:4 67:23, 68:14 68:24, 69:24 70:8, 70:13 70:23, 72:3 72:5, 82:4 82:24, 83:23 84:3, 84:17 88:11, 94:9 94:11, 96:4 96:9, 103:2 129:11, 129:12 141:5, 141:10
**employee's** 28:20, 38:23 42:6, 42:16 42:25, 43:7 43:24, 68:8
**employees** 18:15, 19:6 28:7, 28:7 30:23, 30:24 41:25, 42:10 43:18, 49:2 85:17, 98:14 139:6, 139:16 139:22, 140:2 140:8, 140:19 141:17, 142:7
**employer** 136:20
**employers** 43:13
**employment** 56:4, 132:11 138:22, 138:24 139:14, 139:21 140:9
**encounter** 49:18 53:6, 95:25
**engaged** 74:23
**English** 10:5
**ensure** 139:20
**ensuring** 48:6 138:21, 141:14
**enter** 52:24 54:9
**entering** 52:24
**entire** 47:23 87:24
**entitled** 43:13
**entrance** 47:20
**entry** 21:22
**environment** 92:19, 92:21
**Ertler** 129:8 129:10, 131:7 147:8
**escort** 121:15
**essentially** 20:16, 24:25 91:15, 139:19
**established** 33:1 101:2
**estimation** 120:16
**et** 1:11, 3:21
**evaluate** 26:2 27:8, 96:19
**evaluated** 28:6 108:23, 111:16
**evaluating** 113:16
**evaluation** 26:13, 27:1 146:18, 146:23 147:1, 148:18
**evaluations** 7:14 18:22, 25:24
**evening** 100:8 100:9
**event** 78:6, 78:9 78:19, 101:9 141:24
**events** 75:1 75:12, 75:25 79:15
**eventually** 34:19
**everybody** 48:23, 144:23 144:24
**evidence** 74:2

74:21, 74:23
75:11, 75:14
76:20, 94:1
142:4
**ex** 82:22
**exact** 108:12
120:15
**exactly** 50:25
52:8, 62:23
64:7, 76:2
92:23
**exam** 11:5
32:19, 32:24
119:19
**examination** 5:8
94:5, 94:10
94:25, 96:5
96:10, 97:8
98:1, 98:16
148:7
**examinations**
18:23, 98:5
**exams** 7:14
25:23, 114:6
**exceptions**
42:14
**exchanged**
50:12
**Excuse** 4:15
**executive** 25:1
25:10, 33:2
33:10, 60:2
60:3, 60:9
60:19, 109:18
109:22, 111:10
111:25, 112:8
**exempt** 142:8
**exemptions**
42:13
**exhibit** 4:1, 27:7
27:15, 27:22
103:9, 103:13
104:12, 105:13
106:16, 108:17
108:19, 108:21
116:2, 116:7
122:25, 123:1
123:2, 123:5
123:9, 123:12
124:12, 128:3
128:4, 128:10
128:11, 130:9
130:15, 131:25
132:1, 132:3
132:5, 132:8
132:14, 133:8
134:16, 134:20
135:9, 136:7
138:10, 143:2
143:13, 143:24
145:8, 147:11
**exhibiting** 28:8
31:6
**Exhibits** 132:4
**exit** 54:9
**exiting** 45:21
46:7, 52:25
**expect** 92:13
**Expedited** 136:8
**experience**
11:19, 12:11
44:10, 88:14
88:17, 120:20
**experienced**
31:15
**expert** 96:19
**explain** 89:12
115:19
**explained** 59:24
62:22, 65:3
**explaining** 89:3
100:18
**exposure** 30:19
**extent** 16:10
17:7, 23:11
71:13, 73:20
107:24, 127:18
143:25, 144:3
**external** 45:25
46:21, 46:24
46:25, 47:19
48:12, 48:23
49:3, 50:2
82:23, 83:23
84:13, 88:1
**extremely** 63:2
63:8, 63:11
63:21, 100:12
**exude** 52:19
52:19

**F**

**fact** 19:7, 56:7
67:17, 90:7
147:22
**factors** 74:17
**facts** 92:25
**failed** 76:19
**failure** 91:21
**fair** 5:24, 24:5
27:10, 28:13
32:9, 32:10
38:22, 47:10
77:12, 77:21
84:7, 84:14
84:23, 91:4
91:16, 91:24
94:6, 94:12
95:10, 101:22
107:13, 117:24
118:15, 120:10
121:3, 122:20
127:1, 127:17
138:6, 139:17
140:14, 140:20
141:14, 141:18
**fairly** 127:5
**fairness** 39:6
139:20
**familiar** 44:6
44:9, 99:3
103:22, 132:5
132:7, 135:23
136:1
**far** 52:17
**favor** 137:1
137:11, 137:24
**February** 11:9
**federal** 6:15
**feedback** 97:23
**feel** 53:10
**felt** 53:11, 84:16
122:18
**fence** 47:16
47:21
**Field** 12:9
**file** 53:17, 81:4
81:7, 103:1
105:7
**filed** 64:10, 73:2
73:4, 73:7, 73:9
73:11, 81:9
99:6, 115:14
136:25, 137:23
**fill** 18:4, 109:21
**filled** 40:13
53:14, 66:18
109:12, 109:19
**final** 76:1
**find** 63:5, 74:25
136:2, 136:19
**finding** 74:14
**fine** 8:2, 36:23
146:14, 148:4
**finger** 116:24
**finish** 30:16
**firearm** 48:25
**firearms** 49:2
**first** 15:14
15:16, 18:8
21:10, 21:11
22:4, 22:9
22:14, 22:17
22:25, 24:2
24:11, 41:7
46:2, 46:6
49:17, 50:1
55:8, 56:2, 56:7
60:2, 61:12
67:19, 95:6
95:17, 99:17
103:19, 111:24
128:4, 128:10
132:5, 132:8
134:20, 144:24
145:12, 146:10
148:6
**fitness** 7:14
7:17, 18:22
19:1, 19:7
24:12, 25:23
26:3, 26:12
32:12, 37:9
94:5, 94:15
94:24, 96:4
97:7, 97:25
98:4, 98:16
108:24, 111:12
111:16, 111:18
114:6, 146:17
146:23, 147:1
148:14, 148:18
**five** 21:21, 22:2
22:2, 56:23
**flaws** 77:2
**floor** 139:3
**focused** 30:11
100:19, 100:24
**focuses** 30:17
**follow** 91:21
91:23, 92:8
101:1, 140:1
140:8, 140:10
140:19, 140:23
148:11
**follow-up** 101:9
**followed** 138:23
**following** 8:3
95:24, 96:7
97:1
**foregoing** 149:2
**form** 12:18
15:6, 20:24
21:14, 22:12
24:9, 24:14
26:14, 27:2
27:17, 28:18
29:4, 30:2
31:10, 32:14

34:15, 35:6
35:13, 36:14
36:22, 37:10
37:25, 38:6
38:16, 38:25
39:9, 41:12
42:2, 42:11
42:17, 45:14
47:22, 48:5
48:20, 50:3
51:6, 53:7, 55:6
55:16, 55:24
56:3, 56:12
58:15, 58:24
59:8, 60:17
61:3, 66:1
66:17, 66:17
66:22, 67:5
67:25, 68:3
69:20, 69:25
70:15, 71:5
71:12, 71:18
71:23, 72:7
72:25, 73:17
76:14, 76:22
77:14, 78:23
80:1, 80:13
81:21, 82:5
82:19, 83:19
84:8, 84:24
85:11, 85:21
86:4, 88:12
89:18, 89:19
90:5, 90:16
91:1, 91:5
91:17, 91:25
92:9, 92:15
92:16, 93:7
93:25, 94:13
95:2, 95:14
96:1, 96:11
96:16, 96:23
97:9, 97:14
97:19, 98:7
98:17, 98:25
101:3, 103:1
103:22, 105:9
105:15, 106:7
107:2, 107:24
108:25, 109:1
109:2, 109:5
109:6, 109:7
109:9, 109:15
109:17, 111:19
112:12, 112:17
113:3, 113:13
113:24, 114:7
114:16, 114:22
116:14, 116:19
117:3, 117:13
117:20, 117:25
118:4, 118:17
120:18, 120:25
121:5, 121:17
121:24, 122:4
122:16, 122:21
124:22, 124:23
124:25, 125:9
125:11, 125:11
125:19, 125:21
126:11, 126:18
126:24, 127:3
127:7, 127:18
129:25, 130:23
130:24, 131:11
131:18, 132:15
133:2, 133:12
133:21, 134:18
135:12, 135:21
136:4, 137:5
137:16, 139:7
139:18, 140:3
140:15, 140:21
141:2, 141:7
141:19, 142:3
142:11, 143:10
143:25, 144:11
146:10
**formal** 31:8
31:25, 38:1
38:4, 71:10
71:17, 71:19
72:8, 72:11
72:12, 80:16
**forms** 98:3, 98:4
98:11, 98:15
98:23
**forth** 11:18
107:8
**forward** 147:3
**forwarded**
103:17, 146:20
**found** 76:20
136:19
**foundation**
42:20, 42:21
47:22, 48:5
56:12, 66:7
66:12, 66:23
67:25, 70:3
70:16, 72:7
72:17, 75:3
76:15, 80:14
81:22, 83:20
88:13, 91:18
92:1, 92:9, 93:8
94:1, 94:7
94:14, 98:12
99:1, 103:23
113:25, 114:8
116:9, 116:20
117:5, 117:6
118:18, 119:7
120:14, 120:19
121:6, 121:18
123:8, 124:20
125:10, 125:22
126:2, 133:6
134:19, 135:13
135:22, 136:16
137:6, 137:17
139:8, 140:5
140:16, 140:22
141:20, 142:4
142:12
**four** 7:23, 9:8
9:18, 9:20
46:10, 50:6
50:7, 50:8, 95:7
**frame** 88:17
**Frank** 9:12
**frequently**
52:15, 82:1
**friend** 14:14
**friends** 13:20
14:13, 14:15
86:21, 87:1
**front** 117:24
**frustrated** 90:4
90:6, 90:17
**fudging** 21:7
**further** 148:1
148:20

**G**

**Gannon** 75:21
**garages** 11:23
**Garza** 13:7
**general** 16:3
16:3, 18:10
18:11, 18:19
19:24, 21:10
21:11, 21:12
21:23, 22:4
22:7, 22:9
22:15, 22:18
23:19, 23:23
24:3, 24:3
24:11, 30:25
92:4, 96:14
131:23
**generally** 19:4
19:6, 24:16
30:1, 30:7
34:14, 71:24
73:23, 73:25
74:20, 83:13
89:25, 91:9
91:10, 94:15
110:9, 118:2
125:23
**getting** 38:10
38:19, 73:3
97:23
**give** 7:23, 57:11
59:1, 65:20
72:9
**given** 6:9, 22:11
83:9, 118:15
120:7, 120:23
126:16, 126:21
131:20, 136:24
**go** 27:5, 31:20
35:9, 39:16
46:17, 52:15
55:18, 56:1
56:10, 56:15
65:24, 66:14
66:21, 67:7
93:5, 94:11
119:8, 129:23
144:24, 144:25
147:10, 148:5
**God** 46:10
**goes** 125:20
125:23
**going** 4:23, 5:23
8:1, 16:9, 17:4
17:4, 17:5
23:10, 29:2
37:24, 63:5
65:24, 66:5
72:5, 72:10
95:17, 96:11
116:8, 118:23
132:1, 143:7
146:9
**good** 3:16, 5:10
11:13, 58:16
67:12, 100:8
100:9, 108:2
**graduate** 10:15
**grievance** 20:12
136:19, 136:25
137:8, 137:20
137:23, 138:5
**grievances**
18:25, 19:5
19:13

**grievant** 137:13
**grieving** 19:6
**ground** 5:21 101:1
**group** 133:25 134:3
**groups** 82:15
**guard** 46:16 47:16
**guarding** 54:8
**guards** 118:15 120:22, 126:20 127:2, 127:16
**guess** 20:19 32:16, 32:21 39:5, 52:11 96:8, 105:6 147:16
**guidance** 42:6
**guideline** 26:19 96:22
**guidelines** 41:21 69:18
**gun** 83:24, 88:4
**guys** 148:5

**H**

**H-e-f-f-e-r-n-a-n** 24:1
**half** 9:18, 32:5 32:6, 40:10 102:12, 110:16
**hand** 4:2, 67:15 67:15, 68:8 68:14, 99:12 103:9
**handcuffed** 63:15
**handcuffs** 100:14, 122:9
**handgun** 49:6
**handle** 20:10 65:6
**handled** 20:3 20:5, 20:6 20:15
**hands** 52:2, 52:5
**happen** 36:18 38:13
**happened** 35:18 37:17, 51:22 62:22, 75:16 77:12, 78:13 80:12, 80:20 93:6, 94:19 94:22, 107:23
**happening** 82:1
**harassment** 124:21, 124:22 125:4, 125:4
**hard** 116:15
**hardship** 82:13
**harm** 84:17 85:16
**Hayes** 89:10 92:17, 101:13 107:15
**head** 68:22 70:10, 71:1 86:7, 118:7 143:14, 144:13
**heads** 34:11
**health** 28:21 30:9, 30:11 30:18, 30:19 30:20, 30:22 30:25, 31:3 31:7, 31:16 31:17, 31:25 41:15, 44:4 58:17, 58:19 96:18
**hear** 38:2
**heard** 75:22
**heavily** 18:15
**Heffernan** 23:23
**hellos** 50:12 50:14
**help** 119:9
**helping** 25:2 44:24
**Henretty** 2:20 4:18, 4:19, 4:20 22:22, 34:16 35:14, 35:23 37:11, 39:1 39:10, 42:12 42:20, 43:3 43:10, 43:21 44:3, 52:4 68:16, 68:21 70:2, 70:4 70:17, 71:7 75:5, 76:16 89:17, 89:19 91:19, 92:2 92:9, 92:15 105:18, 105:22 108:1, 112:18 114:1, 116:21 117:5, 117:8 118:1, 130:14 145:1, 148:2 148:5, 148:8 148:10, 148:20
**hesitant** 43:11
**hierarchy** 90:21
**higher** 35:12 58:22, 59:2
**highlighted** 146:1
**HIPAA** 41:11 41:14, 41:18 41:22, 41:25 42:6, 42:14
**hired** 12:16 12:24, 14:2 14:12, 14:25 17:19, 59:3
**history** 58:2 93:14
**hit** 40:6
**hold** 89:23 145:14
**home** 93:5
**Honingford** 3:2 4:22, 148:21
**hospital** 47:5 49:11
**host** 25:21
**hostile** 92:19
**hour** 32:5, 32:5 32:6, 32:7, 32:8 32:8, 102:12
**hours** 31:24 32:9, 40:10 40:10
**houses** 11:22
**HR** 27:8, 28:10 30:3, 33:5, 35:5 35:11, 36:21 37:8, 37:13 37:16, 37:18 39:8, 57:17 58:6, 79:3 79:25, 87:7 87:22, 88:7 89:3, 92:14 93:1, 93:20 93:22, 95:13 95:18, 96:24 97:10, 98:4 105:3, 108:8 129:1, 131:23 148:13
**Hudson** 6:12 6:19
**human** 26:2 26:18, 32:15 32:17, 32:22 39:4, 39:14 78:24, 86:12 86:14, 111:11 112:9, 146:20 146:22, 147:3
**hunch** 52:10
**hygiene** 28:8

**I**

**idea** 52:16 144:7
**Ideally** 122:17
**identified** 62:14 143:12
**identify** 31:6 62:13, 99:14 146:16
**identifying** 30:8
**IDs** 52:24, 52:24
**Illinois** 1:2, 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 3:23
**immediate** 107:17
**imminent** 84:17 85:16
**implementation** 25:4, 25:20
**important** 42:9 43:23, 44:4 117:22, 122:10 122:12, 131:23 141:16
**impression** 51:24, 52:1 53:20, 53:23
**improper** 53:2 137:14
**in-house** 20:5
**inappropriate** 68:6, 69:1, 69:5 69:6, 69:9 69:10, 69:14 70:18, 70:22 71:3, 80:6
**inch** 110:17
**incident** 27:5 34:9, 34:12 37:16, 38:2 45:19, 49:8 53:14, 59:22 59:24, 62:2 65:6, 73:12 73:14, 74:11 77:17, 77:25 79:8, 79:10

80:3, 83:14
86:15, 87:8
87:9, 93:11
93:20, 95:11
100:10, 103:8
107:16, 108:6
118:8, 119:8
129:23, 130:6
**include** 123:13
**including** 72:4
**inconsistencies** 77:3
**incorporated** 31:23
**independent** 104:7, 104:10 104:23, 105:8 113:19
**independently** 58:8
**indicate** 64:16 92:25, 101:14 101:17, 103:25 104:14
**indicated** 14:1 50:5, 64:8 64:22, 67:13 71:9, 75:17 81:12, 83:22 90:2, 95:5 101:12
**indicates** 125:11 133:9, 135:16
**individual** 13:6 14:17, 51:2 83:9, 96:17
**individuals** 19:20, 20:13 26:1, 54:10 103:24, 132:23
**inflicting** 84:17
**influence** 59:13
**informal** 38:4 72:12
**information** 5:7 16:10, 17:6 23:12, 23:13 38:8, 38:10 41:15, 44:5 74:5, 77:10 107:22, 108:6 109:12, 109:19 113:10, 116:11 143:21, 143:23 144:4, 144:8
**infraction** 65:25
**initial** 101:11
**Initially** 103:16
**initiate** 80:16 80:17, 101:6
**initiated** 71:24
**initiatives** 16:18
**inmates** 63:14 82:25, 100:13 117:11, 117:18 117:24, 118:23 119:25, 122:11 122:12, 122:17 122:18, 122:24 126:15, 127:1 127:11, 127:16
**ins** 94:21, 99:3 138:3
**inside** 46:23 48:15, 48:18 49:23
**instability** 28:17
**instance** 20:10 28:4, 47:4 66:14, 68:19 70:21, 116:24 141:10, 142:2
**instances** 69:17 121:21
**instruct** 17:6
**instructed** 90:12
**instruction** 31:8 31:14
**insufficient** 76:20
**intended** 130:5
**interacting** 92:22
**interaction** 16:4 50:22, 51:23 95:18
**interactions** 16:15
**internal** 58:7
**interoffice** 114:25, 115:10 115:12
**interofficed** 147:22
**interrogate** 80:3 80:6
**interrogation** 80:19
**interrogations** 80:17
**interrogatories** 40:14, 145:2 145:13
**interrogatory** 148:12
**interrupt** 29:20
**interview** 15:8 38:14, 57:21 58:20, 73:25 93:23, 95:12
**interviewed** 15:10, 15:14 55:7, 57:24 58:20, 87:7 87:22, 88:1 88:7, 88:11
**interviewing** 38:18, 79:24
**intimidated** 63:3, 64:23 65:1, 65:4 72:21, 92:6 92:13, 92:20
**intimidating** 63:22
**invading** 52:12 52:13, 53:8
**investigate** 37:22, 71:15
**investigated** 73:3, 73:19 101:8
**investigation** 38:1, 38:4, 38:5 71:11, 71:16 71:17, 71:20 73:21, 74:9 74:12, 76:2 76:17, 80:7 80:18, 81:24 82:13, 82:21 126:5, 135:24
**investigations** 76:6, 80:17
**involve** 23:3 48:3, 84:2
**involved** 7:16 18:15, 18:21 23:14, 25:18 25:19, 28:24 97:7, 107:16 132:21, 132:25
**involvement** 24:12, 24:16 85:23, 86:1 97:12, 97:24 112:15, 114:11
**involves** 83:23
**involving** 7:7 7:13, 18:14 18:25, 20:21 132:11
**issue** 35:10 45:10, 99:3
**issued** 26:18
**issues** 7:17 16:20, 24:13 28:11, 28:22 30:9, 30:12 30:20, 30:22 30:25, 36:15 37:12, 37:14 58:17, 96:18

## J

**jail** 7:8, 25:1 30:12, 47:2 47:4, 47:7 47:13, 47:20 48:7, 48:16 48:18, 48:21 49:12, 49:13 112:1, 117:19
**JD** 11:3
**JDE** 111:15
**Jeff** 59:20 59:25, 60:5 61:7, 62:20 99:15, 99:17 99:25, 103:16 103:17, 103:19 104:1, 104:3 104:15, 123:11 123:12, 123:14 123:21, 124:1
**jeopardize** 122:23
**job** 15:20, 17:23 18:5, 101:1 117:11
**John** 1:5, 3:21 4:7, 4:8, 16:23 17:2, 17:17 45:5, 59:15 77:7, 79:14 79:24, 81:10 81:19, 83:15 86:2, 93:11 93:13, 93:19 94:19, 97:25 100:11, 111:15 112:16, 112:20 113:1, 113:8 113:11, 115:13 126:5, 126:9 134:17, 143:8
**Johnsen** 59:20 59:25, 60:6 61:7, 61:17

61:19, 62:14
62:21, 67:14
78:12, 99:15
99:18, 99:25
101:12, 101:18
102:6, 103:17
103:17, 103:20
104:3, 104:15
123:11, 123:21
124:1
**Johnsen's** 60:8
**join** 34:16
35:14, 35:23
37:11, 39:1
39:10, 42:12
43:10, 43:21
44:3, 68:16
68:21, 70:2
70:4, 70:17
71:7, 75:5
76:16, 91:19
92:2, 108:1
112:18, 114:1
116:21, 118:1
**Jones** 33:19
33:20, 34:3
34:6, 60:19
60:21, 111:25
**Jones-Hayes**
2:19, 22:20
22:22, 49:18
54:15, 54:17
59:20, 60:4
61:7, 62:8
62:24, 63:3
67:14, 67:18
72:14, 75:1
75:16, 75:25
76:20, 77:7
77:11, 77:20
78:10, 79:21
80:19, 81:16
87:2, 87:5
88:23, 89:15
89:23, 90:10
92:6, 93:4
97:23, 100:2
102:8, 103:4
103:16, 103:20
107:12, 115:15
116:17, 119:8
123:11, 126:6
126:8, 129:7
129:22, 130:24
131:6, 146:22
147:3, 148:10
148:16
**June** 22:16, 25:8
25:14
**Justice** 23:2
23:6, 25:6

## K

**Karen** 2:19
54:14, 54:17
77:7, 79:7
80:19, 100:2
100:10, 100:22
102:8, 103:16
103:20, 104:1
115:14, 123:10
126:6, 126:8
129:7, 129:22
130:24, 131:6
146:21, 147:2
**Karyn** 89:2
111:10, 112:6
112:7, 112:14
112:15, 112:20
113:2, 113:7
113:11, 128:15
129:1, 130:21
131:5, 131:16
**keep** 42:9, 42:15
42:25, 57:13
**keeping** 28:8
**kind** 15:19
17:21, 28:16
46:13, 91:3
91:4
**knew** 14:1
50:23, 51:3
51:24, 53:20
54:2, 80:22
84:13, 133:20
133:24, 137:19
**know** 5:11, 5:21
5:22, 12:23
13:13, 13:17
14:9, 14:11
14:24, 17:12
19:12, 28:16
28:23, 29:9
33:9, 33:23
34:5, 34:21
34:22, 35:7
35:16, 35:17
35:24, 36:19
36:23, 36:24
40:5, 41:5, 41:9
41:23, 41:25
42:13, 43:5
43:12, 45:5
45:8, 49:4
49:16, 51:3
51:5, 52:16
54:14, 54:20
54:22, 55:2
55:4, 55:12
56:11, 56:16
56:20, 58:3
58:22, 58:25
59:2, 59:6
59:11, 59:12
60:8, 66:17
67:1, 67:16
68:5, 68:17
69:10, 69:12
69:13, 69:16
69:17, 69:21
71:8, 73:4, 73:7
73:9, 73:11
73:15, 73:20
73:23, 74:3
74:10, 74:14
74:17, 75:15
75:17, 75:24
76:9, 76:19
76:24, 77:2
78:12, 78:14
78:17, 79:17
79:19, 80:10
83:15, 85:6
86:9, 86:11
86:14, 86:18
87:7, 87:9
87:21, 88:6
88:9, 88:19
89:6, 89:9
89:21, 89:21
89:22, 89:24
89:25, 90:3
90:6, 90:9, 91:8
92:7, 92:11
93:3, 93:4
93:10, 93:12
93:13, 93:15
93:16, 94:21
94:23, 94:25
96:3, 96:8
96:21, 96:24
96:25, 97:2
97:5, 98:3
98:14, 98:18
98:19, 98:22
99:2, 100:9
101:18, 102:17
102:19, 102:21
102:24, 103:6
104:7, 105:10
105:11, 105:12
106:22, 107:11
107:15, 107:18
108:13, 109:5
109:20, 110:8
111:1, 112:15
113:5, 113:10
113:20, 114:5
114:9, 114:10
114:14, 114:15
114:18, 115:6
115:13, 115:17
116:22, 117:9
119:1, 120:15
120:22, 123:23
124:1, 125:20
125:25, 126:4
126:8, 126:15
126:20, 128:25
129:10, 129:18
130:1, 130:8
130:16, 130:19
130:20, 131:4
132:2, 133:7
133:17, 134:2
134:25, 135:14
135:18, 137:7
137:9, 138:3
138:11, 139:1
141:17, 141:24
142:13, 142:14
142:16, 143:7
143:23, 144:6
144:8, 147:6
147:17, 147:19
147:23
**knowledge** 77:6
77:11, 99:9
104:10, 104:23
105:8, 107:7
113:10, 113:19
114:11, 143:8
148:16
**known** 12:19
34:18, 92:22
**knows** 65:5
**Kramer** 16:1

## L

**labeled** 106:7
**labor** 16:22
18:16, 18:24
25:18
**lack** 70:3, 70:15
72:17, 74:21
76:14, 80:13
81:21, 83:19
88:13, 91:17

91:25, 93:7
93:25, 94:7
94:13, 98:12
98:25, 103:23
113:24, 114:7
116:19, 117:6
118:17, 120:12
120:18, 121:6
121:17, 125:9
125:21, 126:2
133:6, 134:19
135:13, 135:21
137:6, 137:16
139:7, 140:5
140:15, 140:21
141:19, 142:3
142:11
**lady** 100:21
**language** 111:20
**large** 47:13
100:20, 101:23
119:19, 119:21
119:24
**late** 4:23, 110:12
**launch** 38:1
38:3, 71:10
80:7
**law** 1:22, 2:5
2:13, 3:18
10:22, 11:1
11:11, 12:14
12:15, 15:19
17:20, 44:5
44:10
**lawsuit** 7:16
19:9, 23:14
**lawsuits** 16:17
20:10, 20:13
20:17, 20:20
20:21, 20:23
21:1
**lawyer** 7:2
16:13, 17:19
17:25, 18:5
18:8
**lawyers** 6:17
21:19, 21:22
21:25
**layoff** 142:8
**layoffs** 141:25
**lays** 139:12
**lead** 17:5
**leadership**
141:3, 141:12
**leave** 138:17
**left** 14:9
**legal** 6:20, 15:18
15:22, 15:25
16:19, 16:20
17:8, 20:2, 20:3
20:6, 20:15
21:15, 21:17
21:20, 24:6
42:3, 42:19
44:11, 137:18
140:16, 140:22
**legitimate** 42:25
**lesser** 66:5
**letter** 133:4
133:7, 133:11
134:4, 138:11
**letters** 133:14
**letting** 102:17
**level** 21:22
21:22, 35:4
35:20, 37:22
39:12, 55:5
65:7, 65:8
65:11, 66:3
107:1
**levels** 127:10
**liaison** 25:5
**licensed** 5:16
11:10
**lieutenant** 35:20
36:17, 55:14
55:19, 56:1
58:2
**lieutenants** 36:9
**limited** 21:1
56:9
**Linden** 2:12
2:13, 4:8, 4:8
4:18, 4:20, 4:25
5:9, 5:11, 8:2
17:10, 17:13
30:4, 30:6, 67:8
85:3, 105:21
105:24, 106:2
106:4, 108:2
116:6, 117:6
124:7, 130:15
130:25, 132:3
142:24, 143:1
143:15, 143:17
144:14, 144:17
144:20, 144:22
145:2, 145:4
147:13, 147:25
148:23
**line** 110:17
135:5
**list** 132:23
**listed** 78:15
143:11
**litigation** 18:14
23:2, 45:9
45:11
**little** 21:7, 21:16
29:5, 39:17
51:21, 51:24
53:9, 65:2
115:19, 124:7
128:19
**live** 9:19
**lived** 9:17
**LLC** 3:11, 4:1
**located** 3:18
**location** 51:17
**long** 9:17, 11:10
22:14, 25:12
32:3, 40:9
54:22, 65:5
86:14, 88:6
136:1, 136:2
**longer** 92:21
**look** 47:11
100:17, 106:3
128:24, 138:10
143:5, 143:5
147:10
**looked** 40:11
40:12
**looking** 58:4
87:18, 104:6
104:9, 104:12
104:22, 114:22
131:14, 134:16
147:21
**looks** 102:4
110:16, 110:20
123:2
**lot** 104:7
117:18
**lots** 30:19
**loudly** 64:1
**lowest** 21:22
**Loyola** 10:12
11:2, 11:3
**Lyle** 2:20, 4:16
22:24, 148:9

**M**

**M-a-t-t-h-e-w**
5:14
**M-e-g-h-a-n**
9:10
**Mace** 122:6
**machine** 119:22
**machines**
119:21
**magazines** 7:8
**mail** 114:25
115:10
**major** 10:5
**making** 38:19
116:12
**manage** 20:16
**managing** 18:13
21:17
**manipulate**
118:8
**manipulated**
118:13
**manner** 101:10
**manual** 138:22
139:11, 140:7
**mark** 40:1, 40:5
102:18
**marked** 99:13
104:12, 128:3
**Marmor** 3:11
**married** 9:5
**Mary** 109:18
109:20, 110:1
110:21, 147:20
**master's** 10:13
10:17, 58:18
**material** 44:25
**Matt** 14:17
**matter** 3:21
23:8, 73:3
92:14, 101:8
137:8, 143:20
149:4
**matters** 20:6
20:7, 20:8
**Matthew** 1:15
1:16, 3:8, 3:24
4:11, 5:14
**McQuillan**
109:18, 109:21
110:1, 110:21
147:20
**mean** 17:10
30:4, 43:4
52:14, 58:25
68:5, 72:18
75:11, 106:1
130:24, 140:10
140:18
**meaning** 52:15
66:16, 87:5
**means** 114:22
**meant** 63:19
**mechanism**
56:13
**medical** 42:1
42:7, 42:10

42:18, 42:25
43:8, 43:18
43:24, 45:2
49:13, 98:3
98:23, 99:10
118:24, 119:21
**meet** 39:24, 40:1
40:7
**meeting** 40:9
93:22, 94:2
**Megan** 3:2, 4:22
4:25
**Meghan** 9:10
**member** 59:22
81:5, 81:6
125:12
**members** 17:8
85:16
**memo** 111:13
112:14, 113:14
113:17, 113:21
114:12, 128:14
128:15, 131:17
144:18
**memorable**
50:22
**memorandum**
108:22, 109:2
110:5, 131:5
**memos** 110:9
**mental** 28:16
28:21, 30:9
30:11, 30:18
30:19, 30:20
30:22, 30:24
31:3, 31:6
31:16, 31:17
31:25, 58:17
58:19, 96:18
**mentioned**
25:17
**merit** 137:2
142:7, 142:9
142:9
**message** 89:21
**met** 39:22, 55:8
93:20, 148:9
**method** 73:3
**middle** 134:21
**mind** 24:18
**minimum** 56:5
**minor** 10:6
**minutes** 136:6
142:25
**Miriam** 123:14
123:15, 123:21
124:2
**mischaracterizes**
27:18, 70:1
71:13, 75:4
77:15, 77:22
84:9, 95:15
107:25, 109:16
117:7, 127:19
131:12, 135:12
141:9
**mischaracterizi...**
27:21
**miscommunica...**
88:22
**misconduct**
74:24
**missed** 89:21
**mixing** 13:7
**monitor** 119:18
**monitors** 25:6
**month** 87:14
**months** 46:1
51:14, 86:19
95:8, 95:21
**Morgan** 3:10
4:10, 39:25
40:3, 40:4, 40:5
40:7
**morning** 3:16
5:10, 67:12
**Morrisseys** 6:19
**motivation** 68:6
**MRI** 119:22
**multiple** 46:19
**multipurpose**
119:4
**mutual** 14:13
14:14, 14:15
**myriad** 7:6
**Myron** 7:11

**N**

**naive** 46:13
**name** 3:24, 4:17
5:10, 5:13, 6:23
9:9, 13:8, 14:18
23:25, 41:7
45:5, 50:24
51:1, 51:11
54:14, 75:22
132:24, 148:9
**named** 13:7
14:17, 22:8
**names** 9:11
19:20
**Nancy** 23:17
23:21
**narrative** 79:10
**natural** 17:22
18:2
**nature** 138:25
**Nawara** 1:5
3:21, 4:7, 4:9
16:23, 17:2
17:17, 45:6
45:8, 45:12
45:19, 49:7
49:17, 49:21
50:11, 50:24
59:15, 63:2
64:6, 67:14
72:15, 74:10
75:16, 76:21
77:7, 78:22
79:14, 79:24
81:8, 81:10
84:5, 84:12
85:15, 85:24
86:3, 87:7, 92:7
93:11, 93:13
93:19, 95:7
95:12, 97:25
98:22, 99:9
100:11, 101:13
101:17, 101:19
107:16, 108:23
111:15, 112:16
112:20, 113:1
113:8, 113:12
114:12, 115:14
116:16, 124:14
126:6, 126:10
133:20, 133:24
134:17, 136:25
137:15, 148:18
**Nawara's** 81:19
83:16, 94:19
97:21, 136:14
143:8, 144:10
**near** 12:9
**necessarily**
20:11, 27:23
37:13, 112:24
**necessary** 53:16
**need** 52:17
140:11
**needed** 80:4
80:5, 82:14
96:3
**needs** 82:16
**negotiations**
18:16, 20:11
**never** 65:8
65:10
**new** 83:9
**newspapers** 7:8
**Nick** 22:8
**night** 102:11
107:4
**nine** 21:21
**Nneka** 33:18
33:20, 34:2
34:6, 60:19
60:21, 111:25
**Non-Confident...**
10:1
**non-precedential**
137:12
**normal** 52:23
55:20, 55:20
57:21, 88:9
88:17, 111:4
112:3, 115:6
125:6
**North** 1:23, 2:6
2:14, 3:19, 9:14
**Northern** 1:2
3:22
**Northwestern**
6:20
**notary** 3:25
**noteworthy**
50:22
**notice** 141:6
**notification**
133:23
**Notwithstanding**
146:19
**November**
87:23, 87:25
**nuances** 37:17
137:7
**number** 1:9
3:22, 24:6, 27:3
29:10, 66:20
99:13, 103:9
103:13, 105:13
106:15, 106:17
108:21, 120:15
121:1, 122:25
123:1, 123:2
124:12, 127:11
128:4, 128:5
128:10, 128:11
130:9, 130:11
131:25, 132:14
133:8, 134:16
136:7, 136:11
136:13, 136:17
138:10, 143:2
144:2, 145:25
147:11
**numbered**

105:16
**numbers** 7:23

## O

**oath** 4:2, 52:9
**obey** 91:15
**object** 12:18 15:6, 16:9, 17:5 20:24, 21:14 22:12, 23:10 24:9, 24:14 26:14, 27:2 27:17, 27:17 28:18, 29:2 29:2, 30:2 31:10, 32:14 34:15, 35:6 35:13, 36:14 36:22, 37:10 37:24, 37:24 38:6, 38:16 38:25, 39:9 41:12, 42:2 42:11, 42:17 43:25, 45:14 47:22, 48:5 48:20, 50:3 51:6, 53:7, 55:6 55:16, 55:24 56:3, 56:12 58:15, 58:24 59:8, 60:17 61:3, 66:7 66:12, 66:22 66:22, 66:23 67:5, 67:25 68:3, 69:20 69:25, 70:15 71:5, 71:12 71:18, 71:23 72:7, 72:25 73:17, 75:3 76:14, 76:22 77:14, 77:22 78:23, 80:1 80:13, 81:21 82:5, 82:19 83:19, 84:8 84:22, 84:24 85:10, 85:21 86:4, 88:12 89:16, 89:17 90:5, 90:5 90:16, 91:1 91:5, 91:17 91:25, 92:9 92:15, 92:16 93:7, 93:25 94:13, 95:2 95:14, 96:1 96:11, 96:16 96:23, 97:9 97:14, 97:19 98:7, 98:17 98:25, 103:21 105:9, 107:2 107:24, 109:13 109:15, 111:19 112:12, 112:17 113:3, 113:13 113:24, 114:7 116:8, 116:14 116:19, 117:3 117:13, 117:20 117:25, 118:4 118:17, 119:7 120:9, 120:18 120:25, 121:5 121:17, 121:24 122:4, 122:13 122:16, 122:21 123:8, 124:20 125:9, 125:21 126:11, 126:18 126:22, 126:24 127:3, 127:7 127:18, 129:25 130:23, 130:24 131:11, 131:18 132:15, 133:2 133:12, 134:7 134:18, 135:11 135:11, 135:12 135:21, 136:4 136:16, 137:5 137:16, 139:7 139:18, 140:3 140:13, 140:15 140:21, 141:2 141:7, 141:19 142:1, 142:3 142:11, 143:10 143:25, 144:11 146:9
**objection** 24:17 60:22, 72:17 85:11, 88:12 94:7, 98:12 105:15, 120:12 124:4, 126:2 131:11, 133:6 142:22, 146:5 146:6, 146:13
**objections** 35:22 36:2, 43:2, 43:9 43:19, 44:2 68:10, 68:15 68:20, 70:9 70:25, 125:17 137:25, 138:2 142:17, 146:19
**observation** 34:13
**obviously** 53:17
**OC** 122:5
**occasion** 26:1 26:4, 27:6 27:14, 37:6 46:2, 46:6, 50:1
**Occasional** 16:6
**occasionally** 31:22, 112:13
**occasions** 16:7 26:5, 28:15 28:19, 39:11 45:20, 45:22
**occur** 51:16 109:20
**occurred** 45:24 51:13, 62:1 63:1, 79:18 87:9, 87:19 95:11, 95:17 95:18, 119:5
**occurrence** 134:24, 135:10
**occurs** 94:9
**October** 1:18 3:17, 124:2 149:8
**offended** 100:25
**offered** 17:23
**offers** 82:18
**office** 1:22, 2:5 2:21, 3:3, 3:19 12:12, 12:17 13:21, 14:6 14:21, 14:22 15:17, 16:18 17:9, 17:25 18:6, 18:9 18:14, 20:1 21:3, 23:7 24:20, 32:11 33:3, 34:20 41:18, 41:21 43:7, 43:17 44:13, 62:9 68:23, 71:19 71:20, 73:8 73:18, 80:16 81:5, 81:19 106:6, 109:18 123:17, 125:13 129:13, 129:17 132:12, 137:1 138:14, 139:1 139:6, 139:17 139:22, 139:25 140:8, 140:18 140:23, 141:3 141:12
**officer** 46:16 48:22, 48:24 63:2, 65:18 75:21, 100:10 101:4, 111:14 117:2, 118:9 118:11, 119:18 122:19, 122:24 132:18, 137:4 138:13, 138:15 138:19, 140:11
**officer's** 122:19
**officers** 48:11 72:8, 81:18 82:18, 117:10 117:23, 121:2 121:8, 121:9 121:11, 121:12 121:22, 122:1 122:5, 122:11 122:12, 122:14 122:17, 122:24 133:25
**offices** 2:13 119:23
**oftentimes** 76:8
**Oh** 12:5, 22:19 30:16, 46:10 51:1, 60:18 115:22
**okay** 4:13, 4:24 5:25, 6:25 11:24, 12:16 15:13, 21:8 27:14, 32:16 37:20, 38:3 39:16, 39:24 44:6, 46:2, 46:8 46:12, 47:6 49:7, 49:25 50:10, 54:12 59:6, 59:14 61:6, 63:1 64:22, 67:7 68:2, 72:14 77:19, 78:1 81:10, 82:8

88:16, 88:24
92:6, 92:25
93:4, 95:4
95:22, 96:3
99:12, 99:17
99:25, 100:7
101:24, 102:5
102:22, 103:3
104:5, 104:10
104:22, 105:6
105:13, 106:12
108:2, 108:5
108:17, 109:23
110:15, 111:21
112:6, 115:13
116:16, 119:5
125:15, 127:12
128:21, 129:14
129:21, 130:4
130:11, 134:13
134:25, 137:10
138:4, 138:9
141:23, 142:24
143:2, 143:15
143:18, 146:15
147:13, 147:25
148:3, 148:23
**once** 17:21
17:24, 80:7
86:2
**one-offs** 29:8
**online** 141:21
**open** 56:5, 56:8
56:10, 56:15
57:17, 119:19
**opened** 126:4
131:21
**operates** 91:3
**operational**
82:16
**operations** 25:3
45:25, 46:21
46:24, 46:25
47:19, 48:12
48:23, 49:3
50:2, 60:12
60:13, 83:23
84:13, 88:1
112:2
**opposing** 7:9
**OPR** 53:18
66:21, 74:14
74:22, 74:25
75:10, 76:4
76:4, 76:12
76:19, 76:25
80:15, 80:19
80:23, 81:3
81:25, 83:7
83:12, 123:18
125:20, 125:24
126:1, 126:4
135:20, 135:23
136:11, 136:13
137:15
**OPR's** 73:20
75:9
**OPR2012-0555**
134:23, 135:19
**ops** 82:22
**order** 8:1, 23:5
23:9, 25:6
25:18, 28:1
30:18, 34:9
53:24, 82:3
90:14, 90:25
91:14, 91:23
98:23
**orders** 91:15
91:21, 92:4
**ordinarily**
133:18
**outburst** 63:17
63:18, 100:20
100:23, 101:5
101:23
**outcry** 107:17
**outnumber**
127:1
**outnumbering**
127:16
**outs** 94:21, 99:4
138:3
**outside** 13:25
31:13, 39:13
47:2, 47:6, 47:7
47:9, 47:12
54:10, 54:13
96:19, 99:8
**overall** 127:25
**overruled** 82:6
**oversee** 23:2
**overseeing** 21:1
**overview** 130:6

**P**

**p.m** 99:24
102:3, 124:9
124:11, 145:5
145:7, 148:24
**page** 8:3, 128:4
128:10, 128:25
129:6, 130:9
130:21, 132:5
132:8, 134:20
136:7, 137:11
138:10, 145:15
**paid** 19:8
**panel** 58:11
**paper** 57:19
**paragraph**
146:7, 146:18
**paramilitary**
91:4, 91:8
91:11
**parking** 11:23
**part** 18:24
57:20, 58:11
76:24, 91:2
98:15, 98:24
105:24, 123:4
133:24, 134:3
141:11, 141:11
**particular**
109:17, 127:2
**particularly**
30:13
**parties** 8:4
**partner** 12:3
**passed** 10:25
15:23, 17:21
17:23, 17:24
**patrol** 48:9
**patrolling** 47:25
**pay** 19:18
**penalties** 145:21
**pending** 81:24
82:12, 82:21
**people** 19:17
27:4, 46:17
52:24, 57:19
57:21, 57:24
84:10, 111:21
134:5, 143:7
143:11, 143:12
**Percy** 13:9
**perform** 28:12
**perimeter** 47:7
47:24
**perimeters**
48:10
**period** 18:17
26:16, 26:17
27:13
**perjury** 145:21
**permitted** 82:17
**person** 13:8
25:9, 27:1, 45:5
54:14, 56:1
59:3, 61:18
84:19
**person's** 125:16
**personal** 43:7
55:4, 77:6
107:7
**personally**
31:24, 147:19
**personnel**
125:13
**persons** 78:8
78:9
**Peter** 1:22, 2:4
2:5, 3:19, 4:6
5:11, 16:1
144:14
**philosophy** 10:6
**phone** 61:10
61:19, 61:20
61:21, 61:22
62:7, 62:10
67:20, 71:10
72:21, 79:1
90:3
**physical** 28:11
53:5, 85:16
96:18, 96:21
119:20
**physically**
113:21
**pick** 30:10
121:14
**place** 26:12
26:21, 34:14
34:23, 49:8
68:13, 72:24
96:22, 103:20
110:15, 122:19
**places** 84:11
**placing** 68:8
**Plaintiff** 1:7, 2:3
2:11, 5:12
146:16, 146:25
**Plaintiff's**
145:12
**plaintiffs** 6:18
**play** 44:23
**played** 44:22
**pleasant** 51:19
51:20
**please** 4:2, 4:5
37:16, 110:5
**point** 22:7
23:17, 27:8
36:5, 59:14
78:21, 90:9
97:13, 102:22
118:15, 120:7
120:23, 129:14
135:16, 141:23

**poke** 69:23, 70:7 70:13, 70:23
**poked** 79:21
**poking** 70:19
**police** 132:11 132:18, 132:21 133:23, 136:15 137:3
**policies** 25:4 25:20, 26:11 26:16, 26:23 30:21, 139:15
**policy** 41:23 97:3, 100:15 101:2, 139:13 140:7, 141:12
**political** 59:6
**population** 30:13
**Portability** 41:15
**portfolio** 18:24
**Portion** 9:1 9:22
**position** 15:16 18:8, 21:8 22:11, 24:19 36:4, 36:10 36:25, 55:8 55:12, 55:15 56:6, 56:10 56:11, 56:21 58:23, 59:7 81:19, 84:6 84:19, 85:18 137:3, 142:8
**positions** 56:9 84:1
**positive** 62:7 67:22
**possibly** 7:11 7:12, 16:17 55:3, 79:5
**post** 45:21, 46:7 46:8, 46:10 46:13, 46:18 50:2, 50:4, 50:7 52:16, 52:25 53:25, 54:1 54:8, 95:6
**post-grad** 58:18
**posts** 46:12 46:19, 46:21
**potentially** 28:10, 28:21 30:9
**power** 11:21 11:24, 65:14 140:25
**PowerPoint** 32:2, 44:25
**PowerPoints** 31:4
**practice** 11:10 130:2
**preparation** 39:20
**prepare** 39:17
**preponderance** 74:23, 75:10
**present** 137:2
**presents** 96:18
**pretty** 15:3 18:15, 47:9 52:3, 61:21 62:8, 62:18 62:24, 64:8 90:14, 106:24 106:25, 107:16
**prevalent** 30:12
**prevent** 79:23
**previous** 131:12
**previously** 116:3, 131:10
**primarily** 19:21 31:5, 33:2 81:23
**primary** 23:1 25:5, 30:15 30:17, 77:24 78:1, 92:17 108:4
**prior** 45:10 95:17, 112:10 142:9
**privacy** 44:1
**private** 42:16 43:1, 43:4, 44:4
**privilege** 144:5
**privileged** 16:10 17:6, 17:15 23:12, 23:13
**probably** 26:10 48:4, 137:17
**problem** 85:13
**problematic** 27:7, 27:23 27:25
**problems** 31:7 97:23
**procedure** 52:23, 88:9 111:4, 112:3 115:6, 125:6 140:7
**procedures** 5:18 26:11, 34:8 34:22, 41:21 97:3, 97:5 125:15, 139:13 139:16, 141:24
**proceed** 4:25 5:7, 148:14
**proceeding** 72:23
**proceedings** 149:3
**process** 56:15 65:23, 66:6 66:16, 66:25 67:3, 72:6 72:10, 83:12 97:13, 97:16 97:18, 98:15 98:24, 99:4 132:18, 132:22 133:23, 136:15 137:3, 137:23 141:11
**processed** 66:19 73:18
**processes** 56:4 141:14
**produced** 105:18, 106:6 128:23
**producing** 7:8
**production** 106:4
**professional** 71:21, 73:8 73:19, 123:17 125:13, 129:13 129:17
**program** 10:14 10:15, 31:8
**progression** 55:20
**prohibits** 68:24
**promoted** 21:5
**promotion** 132:22, 133:23 135:3
**promotional** 132:18, 136:15 137:3, 137:22
**promotions** 132:10, 138:24
**prompt** 92:14
**proof** 136:20
**proper** 43:6 43:16
**properly** 63:15 100:14
**protect** 43:24 44:4, 122:2 139:16
**protected** 144:4
**protective** 8:1
**prove** 107:22
**provide** 15:9 31:14, 130:6 141:24
**provided** 32:2 108:4, 142:7
**provider** 94:17
**providers** 31:16
**providing** 141:5
**provision** 141:5 142:6, 142:21
**provisions** 141:1
**proximity** 115:10
**prudent** 39:12 42:15
**psychologists** 31:16
**psychology** 58:19
**public** 3:25 56:8, 81:6 85:17
**pull** 74:1 135:19
**purpose** 125:1
**pursuant** 111:13, 111:18 128:22
**pushes** 116:24
**put** 31:4, 43:11 52:2, 67:14 67:15, 110:5 144:21

**Q**

**qualification** 56:6
**qualified** 57:19 80:2
**quarterback** 20:16
**quarterbacking** 20:23, 25:17
**question** 5:22 5:24, 22:23 30:6, 39:5, 48:4 85:2, 85:7 85:13, 101:5

102:18, 114:21
131:3, 146:10
146:12, 147:16
**questioned**
63:12, 63:13
**questions**
101:10, 148:2

## R

**raise** 4:2
**ran** 11:21
**rank** 100:22
137:3, 142:9
**ranks** 142:7
**rare** 39:11
**ratio** 127:4
127:6, 127:16
127:20, 127:22
128:1
**reach** 89:4, 89:6
92:14
**reached** 100:18
**read** 76:4, 80:5
85:3, 85:3
100:7, 102:15
111:9, 145:24
146:1, 146:11
146:11, 146:12
**reading** 76:1
99:2, 99:5, 99:8
146:10
**really** 23:11
26:6, 137:7
**reason** 42:25
43:22, 69:8
74:4, 107:3
110:10, 112:25
127:21, 129:3
133:10, 134:23
136:14, 147:22
**reasons** 42:22
118:5, 118:6
134:21, 146:16
**reassign** 81:10
81:18, 82:9
82:17, 82:21
84:10
**reassigned** 49:8
82:4, 84:12
101:7
**reassigning**
81:24
**reassignment**
82:13
**reassignments**
82:10, 82:12
82:15
**Rebecca** 3:8
4:11, 40:14
86:9, 89:8, 89:9
89:15, 90:11
90:13, 90:20
90:24, 113:23
**recall** 6:9, 6:11
6:17, 6:19, 6:22
7:13, 13:4
14:16, 15:10
18:1, 18:4, 19:2
19:4, 19:15
19:20, 21:19
21:25, 22:10
23:20, 24:15
24:16, 26:15
26:17, 26:23
28:6, 28:6
28:23, 29:11
29:18, 29:19
29:21, 29:23
30:1, 30:7, 31:1
32:3, 32:25
33:7, 33:12
34:1, 34:4
34:24, 35:1
35:3, 35:18
36:15, 36:16
37:15, 37:17
38:10, 38:12
38:17, 38:18
38:21, 40:9
40:12, 40:19
41:19, 41:20
42:8, 45:1, 45:3
45:18, 45:22
46:5, 46:8
50:10, 50:19
51:11, 51:12
51:18, 51:19
52:5, 52:7
52:12, 52:19
53:14, 55:10
55:11, 56:22
56:23, 58:4
58:11, 58:13
60:13, 61:15
61:16, 61:22
61:25, 62:3
62:5, 62:11
62:20, 62:23
63:9, 63:10
63:25, 64:5
64:7, 64:11
64:13, 64:17
64:18, 64:20
64:25, 65:2
65:10, 66:24
67:18, 69:2
69:5, 75:20
76:1, 76:17
79:6, 79:11
82:1, 82:6
83:21, 85:23
86:1, 86:5, 86:6
92:3, 93:9
97:24, 100:5
103:7, 104:2
104:18, 105:4
105:7, 108:10
110:14, 111:3
112:22, 112:23
113:6, 113:9
121:1, 123:20
125:18, 130:17
131:13, 134:9
134:14, 142:5
142:6, 142:20
142:23
**receipt** 125:15
**receive** 10:9
28:3, 28:19
31:18, 41:17
42:5, 44:12
65:22, 91:20
103:3, 118:24
**received** 10:5
11:3, 29:23
44:16, 51:2
57:17, 57:18
58:18, 62:10
71:9, 79:4, 89:1
102:2, 102:13
102:19, 103:5
103:6, 104:7
104:11, 104:24
105:1, 106:23
113:20, 113:21
130:8, 134:4
**receiving** 90:11
97:21, 100:5
104:2, 105:7
113:14, 113:17
125:5, 130:17
134:9
**recognize**
105:13, 106:16
123:10, 133:21
133:22
**recognized**
132:24, 133:19
**recollection**
19:17, 61:24
63:13, 64:3
104:7
**recommend**
65:22, 83:3
**recommendation**
58:9, 81:25
82:3
**recommended**
58:14, 67:2
**recommending**
58:12, 58:23
**record** 3:17, 4:5
4:13, 4:15, 4:24
20:18, 22:19
67:7, 67:9
67:10, 67:11
67:13, 85:5
85:8, 94:1
124:8, 124:9
124:10, 124:11
142:4, 144:25
145:5, 145:6
145:7, 148:24
149:3
**RECORDER**
3:16, 4:4, 4:14
5:6, 67:9, 67:11
124:9, 124:11
145:3, 145:5
145:7, 148:24
**recording** 3:25
**records** 42:1
42:7, 42:10
42:18, 43:1
43:8, 43:14
43:18, 43:24
45:2
**redo** 55:25
**refer** 26:1, 27:1
32:12, 32:17
35:11, 37:18
39:7, 46:24
51:11, 69:6
79:3, 119:17
**referenced**
135:8, 136:14
143:23
**references**
135:1, 135:15
147:2
**referral** 27:11
27:16, 28:2
28:17, 29:12
29:24, 30:3
32:22, 33:5
34:2, 34:9
34:14, 35:5
35:21, 36:13
36:21, 37:8

37:8, 37:23
38:15, 38:20
38:24, 39:4
78:21, 78:24
79:12, 79:25
85:24, 86:2
88:10, 97:13
97:16, 105:2
105:5, 105:8
108:7, 108:11
109:1, 116:13
128:18, 129:23
130:7, 131:16
131:24
**referrals** 28:25
29:8, 29:9, 33:1
33:21, 33:23
34:6, 112:4
**referred** 37:13
49:15, 96:20
106:19, 123:24
138:23, 144:7
**referring** 26:12
97:10
**refers** 91:8
147:6
**reflect** 4:16
**regarding** 6:6
6:25, 7:17, 7:17
17:17, 45:1
53:15, 63:11
65:1, 93:19
96:22, 97:3
100:23, 101:10
108:6, 126:5
129:22, 143:8
143:21, 143:22
**register** 64:9
67:17, 71:25
73:2, 73:5
73:16, 74:7
75:18, 77:9
77:17, 79:5
79:9, 80:22
81:5, 81:7
83:14, 101:3
102:23, 102:25
103:4, 103:5
104:11, 104:16
104:19, 104:24
105:2, 106:20
106:23, 107:4
107:9, 107:13
115:23, 124:13
130:22, 131:8
131:15
**Regular** 10:1
**Reierson** 3:9
4:11, 40:20
40:24, 86:9
86:11, 86:22
87:5, 88:22
89:2, 89:22
92:8, 97:22
113:23, 116:3
**Reierson's**
40:15, 40:16
**related** 18:22
25:20, 30:21
113:7, 135:9
144:9
**relations** 16:22
18:16, 18:24
25:19
**relayed** 77:8
77:16
**release** 98:3
98:15, 98:23
**releases** 99:10
**remember** 7:9
15:12, 26:20
29:15, 58:1
59:19, 60:24
62:7, 62:23
79:7, 132:22
**remove** 83:1
83:1, 140:25
141:4
**removed** 92:20
142:21
**Rentas** 123:14
123:15, 123:21
124:3
**repeat** 85:2
131:1
**repeatedly**
70:13, 70:19
70:23, 79:21
**replayed** 85:5
**report** 15:24
23:16, 77:21
78:24, 119:9
**reported** 23:17
23:20, 25:9
60:5
**reporting** 60:11
**reports** 28:3
28:20, 53:15
76:5
**represent** 5:12
148:10
**representation**
80:4
**reprimand** 72:4
**request** 34:13
35:5, 35:21
36:20, 80:23
81:2
**requested** 37:7
80:18
**requesting**
108:23, 111:14
**require** 56:7
**required** 5:6
28:1, 32:18
39:6, 96:4
96:10, 98:14
98:23, 99:9
139:25, 140:10
140:18, 146:17
**requirements**
135:3
**reserve** 148:22
**resources** 26:2
26:18, 32:15
32:17, 32:22
39:4, 39:15
78:25, 86:12
86:15, 111:11
112:9, 146:21
146:22, 147:3
**respect** 23:12
25:23, 29:24
30:22, 31:25
35:25, 41:3
41:18, 41:22
42:6, 44:13
82:2, 86:2
97:25, 112:16
113:11, 122:12
122:17, 140:1
143:18
**responded**
102:4
**responsibilities**
22:25, 25:16
48:2, 97:17
**responsible**
18:13, 20:22
21:16, 25:2
25:21, 31:21
44:20, 47:1
47:19, 47:23
47:25, 48:3
81:23, 113:15
133:13, 138:21
146:24
**result** 19:9
27:16, 28:17
**resume** 15:9
**retained** 25:4
**return** 95:23
121:10
**returned** 95:19
**reveal** 17:15
23:11, 23:13
**review** 40:16
41:2, 71:21
73:8, 73:19
110:13, 111:5
123:17, 125:14
129:13, 129:17
132:1
**reviewed** 39:22
40:21, 74:8
79:12, 87:12
111:1, 145:18
**reviewing** 31:21
148:11
**revolver** 49:5
**Reynolds**
136:21
**Richard** 2:12
2:13, 4:8, 5:11
**Rick** 124:15
**right** 4:2, 5:1
11:5, 12:14
16:13, 17:10
29:15, 43:22
72:1, 85:12
91:9, 107:23
115:24, 123:4
145:22
**rights** 80:5
**ring** 13:11
**risk** 122:20
**road** 47:15
**Robert** 138:11
138:12
**role** 25:5, 25:24
44:22, 44:23
57:21
**roll** 54:6
**room** 2:23, 3:5
119:20, 119:24
**rooms** 119:20
119:21
**rooted** 141:14
**rose** 9:12, 39:12
**route** 65:25
**rule** 5:21, 68:25
69:2
**ruled** 136:25
137:10, 137:24
**rules** 68:23
69:23, 70:12
80:9, 116:23
**run** 47:21
**running** 13:3

# S

**S-c-o-u-f-f-a-s** 22:8
**safety** 122:14 122:20, 122:23
**saw** 50:1, 50:1 50:17, 51:1 67:17, 77:9 77:17
**saying** 33:12 43:12, 63:24 69:18, 80:10 137:21, 141:8
**says** 69:2, 69:8 101:20, 101:25 104:15, 107:12 116:16, 116:25 128:22, 134:23 135:14, 137:11 143:20, 147:16
**scenarios** 31:22
**Scharf** 3:11
**school** 10:22 11:1, 12:14 12:15, 17:20 44:11
**Scouffas** 22:8 22:10, 24:5
**scream** 101:21 102:1
**screamed** 101:19, 101:25
**screaming** 63:20, 63:23 63:24
**screened** 58:6
**SEAM** 134:22 134:25, 135:8 138:23, 139:5 139:6, 139:10 139:19, 140:19 140:23, 141:1 141:5, 141:17 141:21, 141:24 142:18
**SEAMs** 140:1 142:6
**Sean** 23:23
**second** 51:13 51:16, 53:6 67:7, 78:5, 95:7 95:10, 95:18 95:25, 128:25 129:6, 130:20 134:22, 135:16 143:15, 144:25 145:14, 146:7 146:18
**secondary** 78:2
**section** 146:1
**secured** 100:14
**securing** 47:1 47:3
**security** 7:24 45:20, 46:7 46:8, 46:12 46:13, 46:18 46:19, 122:8
**see** 13:8, 62:6 79:14, 102:1 104:20, 111:21 123:10, 136:9 136:21, 137:11 144:24
**seeing** 123:20 132:23
**seeking** 19:18
**seeks** 144:4
**seen** 53:25, 65:8 65:11, 76:4 76:11, 103:10 106:9, 108:19 116:7, 123:1 124:23, 143:3 145:9
**send** 31:5, 37:16 102:10, 110:9 111:6, 147:15
**sending** 133:13
**sense** 37:19 92:5, 129:21
**sent** 19:7, 28:10 79:8, 90:1 94:15, 97:11 99:21, 99:23 99:25, 101:12 102:20, 103:24 104:1, 107:4 107:5, 110:8 110:11, 110:12 111:5, 112:6 112:14, 114:16 114:22, 115:12 119:25, 123:14 129:1, 129:4 131:16, 131:20 131:22, 132:9 147:17, 147:19 147:20
**separate** 127:9
**September** 49:7 86:15, 87:10 87:24, 87:25 93:20, 95:24 95:25, 99:22 102:3, 129:19 131:6
**sergeant** 35:8 36:17, 75:19
**series** 6:13
**serious** 83:14
**serve** 18:18 25:12
**served** 24:11
**service** 20:21
**services** 19:22
**sessions** 44:19
**set** 11:18, 107:8 145:12
**seven** 22:2, 50:4 111:16
**seventh** 139:3
**sexual** 124:22 125:4
**sexually** 68:5
**shaken** 62:8 62:25
**Shakman** 23:4
**Shelby** 3:9, 4:12 41:2, 41:5 86:24, 87:5
**sheriff** 4:11, 6:6 12:19, 59:4
**sheriff's** 12:12 12:17, 13:21 14:6, 14:21 14:22, 15:17 17:8, 17:25 18:6, 18:9 18:12, 18:14 20:1, 21:2, 23:7 24:20, 32:11 41:18, 41:21 43:6, 43:17 44:13, 68:23 71:19, 80:16 81:5, 81:19 106:6, 132:11 137:1, 138:14 138:22, 139:6 139:16, 139:22 139:25, 140:8 140:18, 140:23 141:3, 141:12 141:22
**shift** 48:1, 48:11 100:11, 111:15 127:14
**shifts** 82:15
**shoulder** 63:16 67:15, 68:9
**show** 22:20 106:15, 108:17 116:2, 122:25 128:3, 131:25 143:2, 144:23 145:8
**showed** 65:7
**showing** 74:6 115:4
**sic** 40:1, 41:15 50:4, 55:19
**side** 38:19 38:23, 39:7
**sign** 98:15 98:23, 99:10
**signature** 110:15, 110:16 110:17, 110:19 110:20, 110:22 110:24, 145:16 148:22
**signed** 136:21
**signing** 145:19
**signs** 28:8
**similar** 106:3 106:5, 123:2 123:4
**sit** 29:15, 42:23 42:24, 107:11 112:25, 119:18 130:17, 138:7
**sitting** 43:15
**situation** 73:1 76:18, 118:19
**situations** 121:9
**skip** 122:11
**slide** 22:20
**slides** 44:24
**small** 11:21
**smaller** 119:22
**Smith** 25:11 33:16, 60:14
**snapped** 63:6 63:17, 63:19
**social** 7:24 86:21, 87:1
**socialize** 13:24
**socialized** 87:4
**sole** 77:10
**solely** 76:12 77:19, 79:1
**somebody** 6:20 29:13, 31:13 32:17, 35:11 37:18, 37:20 39:8, 39:13 52:17, 55:18 58:22, 59:1

59:2, 70:19
80:7, 82:14
83:3, 84:18
92:13, 92:19
97:10, 97:11
135:19, 135:23
**somebody's**
39:11
**somewhat** 25:18
27:7, 42:13
92:18, 132:21
**soon** 4:24, 45:24
77:16
**sooner** 88:15
88:16, 92:8
**sorry** 6:24, 7:6
20:25, 22:19
24:10, 29:5
29:20, 29:21
30:11, 30:15
30:16, 32:6
40:4, 40:5
45:15, 45:17
51:7, 52:4
60:18, 70:12
72:18, 75:10
84:25, 85:1
85:2, 85:2
85:22, 96:6
97:1, 97:2, 98:8
117:14, 117:15
119:2, 119:3
121:19, 130:23
131:1, 135:11
143:21, 145:14
146:11
**sort** 90:7
**source** 108:4
**space** 52:12
52:13, 53:8
119:19
**speak** 76:9
**specific** 6:11
6:22, 19:3
19:25, 20:9
21:2, 26:23
30:24, 41:23
42:22, 45:1
45:3, 63:24
64:18, 76:17
87:17, 96:12
113:6, 113:9
121:1, 125:3
127:24, 134:9
137:13, 137:20
142:5
**specifically** 19:2
19:14, 19:15
19:15, 24:15
26:20, 29:25
31:1, 33:10
33:12, 34:24
36:16, 42:8
55:11, 56:22
62:20, 63:7
63:9, 63:25
64:14, 64:25
66:24, 67:18
69:3, 69:6
73:10, 73:22
74:16, 74:19
83:21, 89:24
92:3, 104:18
105:4, 105:7
111:3, 113:5
125:18, 132:13
135:2, 135:14
142:20
**speculate** 68:11
**speculation** 15:7
35:15, 43:20
68:4, 70:16
71:6, 92:10
113:4, 116:20
117:4, 121:6
122:22, 124:5
134:19, 136:5
137:6, 137:17
**spell** 5:13, 14:18
23:25
**spoken** 17:16
**spray** 122:5
**Spring** 138:18
**staff** 12:20, 14:2
14:4, 17:3
17:16, 24:21
24:23, 24:25
25:7, 25:13
30:10, 31:5
31:5, 31:11
31:12, 32:2
44:18, 57:20
59:22, 79:23
81:24, 82:25
90:15, 90:21
92:12, 104:8
125:2
**staffing** 82:16
127:10
**staging** 117:1
119:16, 120:2
120:4, 120:10
120:17, 120:23
**stamp** 110:22
110:24, 111:6
111:7
**stamped** 103:23
105:22, 110:20
**stand** 40:19
85:11
**standard** 75:11
108:25, 111:20
130:2, 132:9
132:16
**standing** 11:13
46:16
**stands** 40:23
**start** 5:4, 9:1
72:14, 72:23
83:11
**started** 12:12
71:22
**starting** 100:7
111:17
**state** 1:23, 2:6
2:14, 3:19, 4:5
5:12, 111:13
**state's** 2:21, 3:3
20:17
**stated** 137:20
**statement** 75:8
77:13, 77:21
84:7, 84:14
84:23, 91:4
91:16, 91:24
94:6, 107:14
117:24, 118:16
120:13, 121:4
127:17, 138:1
139:17, 140:14
140:20, 141:18
146:21, 147:2
147:6
**statements** 77:2
**states** 1:1
134:20, 146:20
**stating** 67:19
90:7
**status** 133:14
133:23, 135:20
**step** 32:16, 95:4
**steps** 72:16
92:23
**sticker** 116:4
132:3
**stood** 100:25
**story** 38:19
38:23, 39:7
76:24, 118:10
**street** 1:23, 2:6
2:14, 2:22, 3:4
3:19, 47:21
**strike** 70:12
122:11
**strong** 51:20
**studies** 10:13
10:18, 11:19
**subject** 23:8
111:12, 116:17
137:8, 142:10
**subjected** 32:24
**subjects** 18:22
**submit** 15:2
66:1, 94:5
94:24, 96:4
96:10, 125:7
**submitted** 56:16
101:5, 124:14
125:12
**subordinate**
71:4, 72:9
91:20
**subordinates**
91:15
**subsection**
134:22, 135:1
135:8
**subsequent**
123:11, 123:13
**succeeded** 23:23
23:23
**Suite** 1:24, 2:7
2:15, 3:13, 3:20
**summary** 134:4
134:8
**superintendent**
37:1, 37:7
37:15, 37:22
38:11, 54:18
54:23, 54:25
55:7, 55:13
55:21, 55:23
56:2, 56:6
56:14, 56:17
57:24, 58:10
58:14, 59:3
59:20, 60:4
62:8, 62:24
63:3, 65:13
65:17, 66:10
66:13, 67:2
69:23, 70:7
72:2, 72:5
81:15, 88:23
89:4, 89:7
90:12, 90:15
92:17, 107:15
**superintendents**
37:3, 37:12
57:22, 65:13

66:4, 90:22
**superiors** 91:16
**supervised** 35:4
**supervising** 47:3
**supervisor** 34:17, 60:4, 60:8, 67:23, 68:13, 68:24, 70:13, 70:23, 71:3, 72:9, 118:10, 125:8
**supervisors** 28:20, 34:11, 34:19, 117:23
**supervisory** 31:11
**supporting** 75:13
**supposed** 125:16
**sure** 34:7, 51:3, 61:21, 62:19, 64:8, 76:2, 89:8
**suspended** 66:15
**suspension** 65:21, 65:22, 66:11, 66:11
**sustain** 75:14, 76:20, 136:19
**sustained** 74:13, 74:15, 74:18, 76:12, 136:3, 136:3, 136:20
**swear** 52:9, 64:19
**swearing** 63:21, 64:2, 64:4
**swore** 72:22, 101:13, 101:16
**sworn** 4:3, 31:11
**Sylvester** 13:3
**system** 135:24

**T**

**tag** 50:24, 51:1
**take** 33:20, 34:11, 34:23, 65:14, 72:24, 77:5, 78:10, 84:16, 87:14, 87:24, 92:23, 95:4, 98:24, 107:7, 109:11, 118:8, 122:18, 124:7, 136:2, 145:18
**taken** 6:1, 65:2, 138:24
**talk** 15:13, 39:13, 40:24, 78:8
**talked** 17:13, 45:15, 49:25, 67:19, 78:18, 85:9, 85:12, 95:6, 117:16
**talking** 30:3, 37:9, 72:2, 72:6, 115:21, 127:24
**Tapia** 111:25
**tapped** 63:16
**Tarry** 112:1
**tasers** 48:19, 48:21
**Tate** 6:25
**Taylor** 13:9
**tell** 53:12, 59:12, 63:1, 80:11, 87:19, 95:20, 95:22, 99:20, 99:23, 103:19, 114:21, 116:15, 134:16
**telling** 64:13
**template** 109:3, 109:9, 109:11
**ten** 6:5, 11:12, 11:14, 22:2, 26:7, 29:7, 29:7, 57:1, 121:3, 121:7, 127:16, 144:2
**tenure** 57:25
**term** 91:8
**termed** 23:5
**testified** 128:18, 131:10
**testimony** 10:1, 27:18, 70:1, 71:13, 75:4, 77:15, 77:23, 84:9, 107:25, 109:16, 117:7, 127:19, 131:12, 135:12, 141:9
**thank** 4:4, 102:17, 148:1, 148:20
**Thanks** 102:18, 108:18, 132:4
**therapy** 119:20
**thereabouts** 21:9, 56:18
**thing** 138:9, 146:12
**things** 25:22, 138:10, 138:25
**think** 4:16, 14:1, 30:4, 38:22, 42:22, 42:24, 43:6, 43:15, 43:22, 45:15, 50:4, 53:16, 64:22, 67:13, 67:21, 68:12, 68:18, 68:18, 70:6, 70:10, 70:11, 70:21, 71:1, 71:9, 72:1, 83:22, 85:6, 85:7, 85:12, 93:17, 95:5, 95:7, 97:22, 105:24, 117:15, 126:25, 130:1, 144:12
**thinking** 29:6
**Thomas** 3:8, 13:10, 16:4, 16:24
**thought** 13:5, 40:4, 62:16, 95:5, 115:8
**threat** 85:16
**threatened** 53:10, 53:11
**threatening** 101:4
**three** 54:24, 87:4
**throw** 48:7
**Thursday** 1:17, 3:17, 131:6
**time** 3:18, 4:1, 12:20, 12:21, 16:8, 16:13, 16:16, 18:13, 18:21, 20:4, 21:15, 22:7, 23:1, 24:7, 25:2, 27:3, 27:13, 33:17, 33:18, 33:24, 35:2, 36:5, 49:17, 49:21, 50:17, 50:24, 51:4, 52:21, 54:3, 55:8, 56:13, 56:24, 57:23, 59:20, 60:1, 60:6, 60:12, 60:20, 61:23, 62:3, 62:5, 65:5, 67:19, 79:17, 81:3, 81:16, 81:23, 82:11, 82:18, 82:20, 84:13, 85:12, 86:13, 87:24, 88:4, 88:10, 88:17, 89:3, 90:9, 93:10, 93:19, 93:20, 95:11, 95:23, 99:23, 100:18, 102:10, 102:22, 104:19, 104:24, 112:9, 112:11, 117:16, 118:15, 120:7, 120:24, 126:23, 127:2, 129:11, 129:14, 131:16, 131:22, 133:20, 133:24, 134:10, 141:23
**times** 6:4, 28:7, 83:3, 116:25
**timing** 105:12
**title** 16:2, 23:18, 59:19, 60:24, 136:8
**today** 3:17, 3:23, 43:16, 100:11, 107:11, 113:1
**told** 62:21, 64:7, 64:20, 67:16, 77:11, 80:20, 90:24, 101:1, 107:19, 107:21
**Tom** 12:21, 12:23, 15:13, 16:8, 16:16
**tomorrow** 66:15, 102:18
**tone** 117:1
**top** 68:22, 70:10, 71:1, 86:6, 102:5, 104:2, 104:14, 118:7, 123:4, 123:20, 123:24, 143:14, 144:12
**touch** 67:23, 100:19
**touching** 52:10, 68:6, 68:24

69:1, 69:6, 69:7
69:9, 69:14
69:15, 69:19
70:18, 100:21
100:24
**tough** 58:20
**tower** 47:17
**town** 9:15
**Towne** 14:5
14:7, 14:11
14:24, 15:11
**trained** 31:15
**training** 29:23
30:1, 30:7
30:23, 31:2
31:4, 31:17
31:19, 31:23
31:25, 41:17
42:5, 44:12
44:15, 44:18
45:4
**trainings** 30:8
30:21, 32:2
32:4
**transcript** 40:15
40:17, 149:3
**transcripts** 41:2
**transferred**
45:24
**transfers** 132:10
138:25
**transparency**
139:20, 141:16
**transparent**
141:15
**transpired** 75:1
77:6
**treatment**
140:19
**tried** 63:4, 89:6
**trouble** 28:4
**true** 74:25
107:13, 107:19
116:16, 121:13
140:4, 145:22
**trying** 20:19
36:15, 48:7
62:6, 89:23
**turn** 124:12
136:7
**two** 24:6, 27:10
32:1, 32:6, 32:9
40:10, 40:10
45:20, 45:22
55:4, 62:17
88:18, 88:20
103:24, 111:21
112:3, 131:14
132:3, 134:20
138:9, 148:2
**type** 15:19, 16:7
16:15, 19:18
20:23, 26:19
27:22, 27:25
31:18, 44:15
49:2, 49:6
50:16, 65:17
66:11, 69:18
72:3, 80:23
82:10, 106:9
115:11, 118:9
142:20
**types** 27:11
112:4, 122:8
**typewritten**
109:12
**typically** 120:17

**U**

**ultimately** 108:7
137:9, 148:13
**unable** 89:4
**unauthorized**
83:10
**undergo** 146:17
146:25
**undergrad** 10:5
**underneath**
65:18, 67:24
69:24, 110:17
129:15
**undersheriff**
59:4, 60:23
61:5
**understand**
5:22, 131:23
140:17
**understanding**
42:4, 49:10
58:16, 74:12
77:25, 88:2
91:11, 94:2
94:8, 96:17
119:10, 125:2
125:23, 148:12
**understood** 5:24
17:24, 30:6
33:15
**unfair** 137:22
**unilaterally**
66:13, 141:4
**union** 20:12
80:4
**unit** 47:1, 49:13
66:2, 66:19
82:22
**UNITED** 1:1
**University** 10:4
10:7, 10:13
11:2
**unlawful** 91:14
91:23
**unnecessary**
80:21
**unnerved** 65:6
65:12
**unprofessional**
101:4
**upset** 107:17
**upwards** 126:25
**urban** 10:13
10:18, 11:19
**use** 26:25, 96:15
109:3, 115:10
118:9, 118:10
137:14
**useful** 116:11
**uses** 75:10
**usually** 74:6

**V**

**vague** 19:17
**vaguely** 28:6
100:6, 104:4
104:5
**various** 119:19
**vehicle** 52:6
52:10
**vehicles** 48:9
**venue** 3:22
**verification**
145:15
**version** 75:1
75:12, 75:25
79:15
**versus** 6:12
76:9, 76:12
127:13
**viewed** 70:18
**violation** 116:23
134:23, 135:5
135:7, 135:10
135:15, 135:17
136:3, 137:15
**violent** 117:18
**voice** 117:1
**volunteer** 13:14
**volunteered**
13:16, 13:17
**vs** 1:9

**W**

**Wacker** 3:12
**wait** 121:10
**waiting** 119:24
120:3
**waiving** 146:19
**wake** 83:13
**walk** 53:25
**walking** 28:4
54:1, 54:10
54:13
**walks** 4:24
**walls** 48:8
**want** 28:5, 30:2
35:10, 38:2
39:16, 57:13
67:6, 95:4
103:21, 125:2
148:5
**wanted** 72:14
72:23, 100:9
141:11
**warranted** 26:3
146:23
**washing** 11:21
11:24
**Washington**
2:22, 3:4, 10:8
**way** 34:17, 38:7
43:12, 44:20
47:10, 65:23
65:23, 91:22
96:25, 97:2
98:19, 113:8
114:14, 126:13
131:13
**we've** 78:18
128:1
**weapon** 48:13
49:21, 49:23
83:10, 84:3
84:7, 84:14
84:19, 85:19
**weapons** 48:12
122:2
**website** 141:22
**week** 88:18
88:20, 108:14
**weekends** 27:4
**weeks** 87:8
**Weingarten**
80:5
**went** 10:4, 10:12
110:13, 111:2
126:1, 134:15
**West** 2:22, 3:4

3:12
**White** 133:4 133:9, 133:11 133:13
**Whittler** 60:23 61:2
**wife** 9:19
**wife's** 9:9
**Wildwood** 9:14 9:17
**Williams** 89:2 111:10, 112:1 112:6, 112:7 112:15, 112:16 112:21, 113:2 113:7, 113:11 114:3, 114:5 115:7, 128:15 129:1, 130:21 131:5, 131:16
**window** 52:3 54:6
**Winifred** 3:9 4:11, 41:7, 41:8 41:9
**wish** 137:19
**witness** 3:23 4:3, 6:7, 24:10 34:9, 51:7 60:18, 78:6 78:16, 84:25 85:22, 117:14 121:19
**witnessed** 78:9 78:12, 78:13
**witnesses** 74:1 75:15, 75:18 75:24, 78:18 143:6
**woman** 64:15
**wondering** 101:7
**word** 51:20 64:12, 64:15 102:1, 109:6
**words** 64:5 64:8, 64:18 64:19, 111:17
**work** 11:19 12:10, 22:14 38:7, 44:10 83:6, 83:6, 83:8 92:19, 92:21 93:5, 93:23 94:10, 94:11 95:1, 95:3 95:16, 95:19 95:23, 129:15 129:16
**worked** 12:25 13:22, 65:24 66:25, 109:14 129:16
**working** 41:10 45:20, 65:4 65:18, 86:12 88:1, 93:14 102:18, 127:2 129:12, 129:16 129:18
**workplace** 94:3 94:16
**works** 65:23
**Wrigley** 12:9
**write** 133:11
**writing** 29:22 33:8, 33:9 34:21, 34:25 35:2
**written** 26:15 29:11, 29:16 29:17, 41:20 69:18, 72:4 97:3, 97:5 109:25, 110:1 110:2, 128:21 133:4, 146:21
**wrote** 133:7 133:9, 138:11

**X**

**x-rays** 119:22

**Y**

**yeah** 8:2, 16:12 21:1, 22:20 40:6, 42:12 43:3, 62:18 67:8, 67:8 91:10, 105:21 106:14, 108:3 144:17, 144:20 144:22, 144:22 144:22
**year** 10:9, 10:19 10:23, 31:18 86:20
**years** 9:18 11:12, 11:14 11:22, 11:24 12:4, 15:22 18:18, 23:20 54:24, 86:19 86:20, 142:19
**yell** 71:3, 100:12 101:20, 101:21
**yelled** 72:22
**yelling** 64:1
**Yep** 43:10

**Z**

**Zelda** 61:2

**0**

**0:01:32** 5:17
**0:02:40** 6:16
**0:03:47** 7:15
**0:04:53** 9:21
**0:06:03** 11:1
**0:07:20** 12:1
**0:08:10** 12:18
**0:09:14** 13:11
**0:10:08** 14:8
**0:11:01** 15:1
**0:12:10** 16:6
**0:13:06** 16:25
**0:13:39** 17:18
**0:15:17** 18:20
**0:16:17** 19:11
**0:17:10** 20:2
**0:18:30** 20:24
**0:19:45** 21:24
**0:20:58** 22:22
**0:22:18** 23:16
**0:23:25** 24:14
**0:24:44** 25:14
**0:26:15** 26:6
**0:27:03** 26:17
**0:27:42** 27:2
**0:28:41** 27:13
**0:30:06** 28:14
**0:30:47** 29:4
**0:31:48** 29:25
**0:32:42** 30:16
**0:33:45** 31:10
**0:35:02** 32:5
**0:35:52** 32:20
**0:36:57** 33:15
**0:37:53** 34:10
**0:38:53** 35:3
**0:39:57** 36:2
**0:41:09** 37:5
**0:42:32** 37:25
**0:43:32** 38:16
**0:44:38** 39:10
**0:45:41** 40:3
**0:46:54** 40:23
**0:48:09** 41:19
**0:49:10** 42:8
**0:50:01** 43:3
**0:50:58** 43:21
**0:51:35** 44:8
**0:52:37** 44:22
**0:53:41** 45:13
**0:54:46** 46:7
**0:56:14** 47:8
**0:57:12** 48:5
**0:58:07** 49:1
**0:58:59** 49:19
**0:59:51** 50:18
**06** 10:24
**08** 10:24
**09** 16:5

**1**

**1** 99:13
**1:01:06** 51:22
**1:02:07** 52:12
**1:03:06** 53:7
**1:03:55** 53:22
**1:05:02** 54:16
**1:05:50** 55:6
**1:06:50** 56:3
**1:07:55** 56:19
**1:09** 124:11
**1:09:08** 58:3
**1:09:46** 58:15
**1:10:53** 59:5
**1:12:05** 59:25
**1:13:07** 60:16
**1:14:10** 61:13
**1:14:58** 62:4
**1:16:16** 63:1
**1:17:05** 63:9
**1:18:15** 64:2
**1:19:17** 64:24
**1:20:24** 65:16
**1:2017cv02393** 1:9, 3:22
**1:21:28** 66:7
**1:22:44** 67:5
**1:23:49** 67:25
**1:24:53** 68:21
**1:25:56** 69:16
**1:26:51** 70:9
**1:27:49** 70:25
**1:28:47** 71:18
**1:30:18** 72:17
**1:31:07** 73:6
**1:32:02** 74:4
**1:33:20** 75:5
**1:34:19** 75:23
**1:35:07** 76:16
**1:36:10** 77:15
**1:37:03** 78:7
**1:37:52** 78:23
**1:39:11** 79:19

**1:40** 145:5
**1:40:32** 80:14
**1:41** 145:7
**1:41:40** 81:9
**1:42:49** 82:5
**1:43:53** 82:19
**1:45** 148:24
**1:45:03** 83:8
**1:46:09** 83:25
**1:46:57** 84:15
**1:48:35** 85:20
**1:49:02** 86:4
**1:50:03** 87:6
**1:50:58** 87:23
**1:51:59** 88:18
**1:52:57** 89:8
**1:54:03** 90:5
**1:55:02** 91:1
**1:56:06** 92:2
**1:56:51** 92:16
**1:58:13** 93:8
**1:59:09** 93:21
**10** 143:2
**10:06** 3:18
**10th** 1:18, 3:17
**11** 145:8
**11:29** 67:9
**11:36** 67:11
**12** 18:20, 37:5 143:1
**12:58** 124:9
**13** 44:17
**14th** 124:2
**15** 26:9, 28:23 29:7, 57:3 58:10, 142:25 149:8
**1550** 1:24, 2:7 2:15, 3:20
**16** 145:25
**17** 1:23, 2:6 2:14, 3:19
**18** 26:19, 132:22
**18th** 133:1
**19** 138:18

**2**

**2** 103:9, 103:13 104:12, 123:2 123:9, 130:9 136:7, 137:11
**2/18/78** 7:22
**2/20/2012** 134:24, 135:10
**2:00:38** 95:2
**2:01:33** 95:21
**2:02:36** 96:11
**2:03:43** 97:1
**2:04:40** 97:20
**2:05:45** 98:21
**2:08:13** 99:19
**2:10:43** 101:20
**2:11:41** 102:14
**2:13:07** 103:5
**2:15:20** 104:4
**2:16:26** 104:25
**2:17:45** 106:4
**2:18:37** 106:18
**2:20:39** 107:10
**2:21:21** 107:20
**2:22:13** 108:9
**2:22:47** 108:20
**2:23:34** 109:10
**2:24:32** 110:7
**2:25:29** 111:3
**2:26:33** 111:20
**2:27:38** 112:19
**2:28:57** 113:19
**2:29:35** 114:14
**2:30:12** 114:24
**2:31:09** 115:16
**2:32:56** 116:10
**2:34:09** 117:9
**2:34:58** 118:2
**2:36:02** 118:19
**2:36:31** 119:10
**2:37:45** 120:6
**2:39:36** 121:25
**2:40:33** 122:17
**2:42:19** 123:6
**2:43:16** 123:19
**2:45:08** 124:24
**2:45:58** 125:17
**2:46:50** 126:12
**2:48:37** 127:20
**2:49:37** 128:12
**2:50:44** 129:9
**2:51:43** 129:25
**2:52:54** 130:19
**2:53:55** 131:13
**2:57:13** 132:19
**2:58:23** 133:12
**20** 6:5, 57:5 145:15
**2000** 10:10
**2001** 12:1
**2002** 12:5
**2003** 10:12, 12:5
**2004** 10:20
**2006** 13:2, 13:4 13:18
**2007** 10:24, 12:1 12:5, 12:13 15:23, 16:5
**2009** 10:24 10:25, 15:23 18:20
**2011** 18:20
**2012** 21:5, 21:6 21:8, 21:19 23:22, 44:17
**2012-0555** 136:11
**2013** 23:22
**2014** 14:10 22:16, 25:8 25:14, 25:24
**2015** 55:11 56:17
**2016** 26:21 32:11, 33:4 34:3, 34:6 34:23, 36:7 36:20, 37:4 46:3, 54:25 55:2, 55:5 55:11, 59:14 65:24, 66:24 72:20, 81:20 86:16, 87:10 96:22, 99:22 115:8, 124:2 126:17, 129:19 131:7
**2017** 26:19 95:24, 95:25
**2018** 25:14 25:25, 87:25 133:1, 139:2
**2019** 1:18, 3:17 149:8
**25** 26:6, 29:7 57:7
**26** 143:17
**28** 102:3
**28th** 87:10 87:25, 99:22
**29** 65:20
**29th** 110:11 129:19, 131:7

**3**

**3** 105:13, 138:10
**3:00** 100:11 111:15
**3:01:04** 135:6
**3:02:07** 135:22
**3:03:15** 136:16
**3:05:18** 138:5
**3:06:54** 139:8
**3:07:48** 139:24
**3:09:11** 141:2
**3:10:05** 141:20
**3:10:51** 142:13
**3:12:10** 143:4
**3:13:55** 144:6
**3:15:54** 145:10
**3:17:37** 147:5
**3:19:20** 148:15
**30** 57:9
**30th** 110:12
**333** 3:12
**378032** 111:15

**4**

**4** 106:15, 106:17
**41** 7:20
**450** 3:13

**5**

**5** 4:1, 108:17 108:19, 108:21 116:3, 128:6 128:8, 128:9 128:10, 128:11
**50** 2:22, 3:4 120:8
**500** 2:23, 3:5

**6**

**6** 116:2, 116:5 116:7, 124:13
**6:43** 99:24 102:3
**600** 126:25
**60602** 2:8, 2:16 2:24, 3:6
**60606** 3:14
**6863** 9:14

**7**

**7** 122:25, 123:1 123:12
**7:00** 100:11 111:15
**700** 126:25 127:13

**8**

**8** 128:4, 130:13 130:14, 130:15 147:11
**8,500** 126:19

**8:14** 102:11
**8968** 9:2

**9**

**9** 1:16, 8:3
130:10, 131:25
132:1, 132:14
133:8, 134:16
136:7, 138:10
**9,000** 126:19
127:13
**9/29/16** 111:12
128:16, 131:17

**/**

/// 8:5, 9:23

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 17 C 2393 |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF COOK, a unit of | ) | |
| local government, et al., | ) | Chicago, Illinois |
| | ) | September 6, 2019 |
| Defendants. | ) | 9:10 a.m. |

TRANSCRIPT OF PROCEEDINGS - Motion
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff:
LAW OFFICES OF RICHARD LINDEN
BY: MR. RICHARD F. LINDEN
17 North Wabash, Suite 400
Chicago, Illinois 60602

LAW OFFICES OF PETER V. BUSTAMANTE
BY: MR. PETER V. BUSTAMANTE
17 North State Street, Suite 1550
Chicago, Illinois 60602

For the Defendants:
SCHARF BANKS MARMOR LLC
BY: MS. SARAH R. MARMOR
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606

HON. KIMBERLY M. FOXX
STATE'S ATTORNEY OF COOK COUNTY
BY: MS. KATHLEEN C. ORI
500 Richard J. Daley Center
Chicago, Illinois 60602

HON. KWAME RAOUL
ATTORNEY GENERAL OF ILLINOIS
BY: MR. LYLE K. HENRETTY
100 West Randolph Street
Chicago, Illinois 60601

EXHIBIT
B
exhibitsticker.com

Court Reporter:

FRANCES WARD, CSR, RPR, RMR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2524A
Chicago, Illinois 60604
(312) 435-5561
frances_ward@ilnd.uscourts.gov

THE CLERK: 17 C 2393, Nawara versus County of Cook.

MS. MARMOR: Good morning, your Honor.

Sarah Marmor on behalf of Sheriff Dart and three of the individual defendants.

THE COURT: Good morning.

MR. HENRETTY: Lyle Henretty for the remaining individual defendant.

MR. LINDEN: Good morning, your Honor.

Richard Linden on behalf of the plaintiff.

MR. BUSTAMANTE: Good morning, your Honor.

Peter Bustamante also on behalf of Mr. Nawara.

MS. ORI: And Kathleen Ori on behalf of Cook County.

THE COURT: Good morning.

This is a motion for leave to file certain supplemental counts to the second amended complaint. The defendants have objected essentially on timeliness grounds and also have argued that the new claims don't actually relate to the earlier ones or can be tried separately. I tend to agree with that.

Let me just point out that we know that this is not Mr. Nawara's first lawsuit against the sheriff and the county. He believes he has been part of a group of victims for some time now. I think he thinks that the whole episode

with his fitness-for-duty examination is more of the same. I would like to get that tried.

If he has got an additional new retaliation issue, I think that can be part of another lawsuit. He is welcome to file another one.

I would hope that he would, at some point, make peace with his employer, but that's not my business. That's the business of his lawyers. And I know you will counsel him on that.

So the motion for leave to amend is denied.

We have -- I know that we still have discovery going on with respect to experts. I'm not sure how far along we need to go down that road because I understood -- I thought I understood that there was expected -- that defendants were expecting to file a dispositive motion.

MR. LINDEN: I don't think we are there yet.

THE COURT: You are not there yet.

MR. LINDEN: We scheduled depositions.

THE COURT: Oh, okay.

MR. LINDEN: We essentially completed written discovery when we took the case over.

I believe we have -- what? -- four depositions scheduled next four to six weeks.

THE COURT: Well, your fact discovery close date is not until November, so I am not suggesting you are behind.

MS. MARMOR: That's right, your Honor.

THE COURT: Great. Well, why don't we set a status around then, middle of November. How is November 14th? That's a Thursday.

MS. MARMOR: I believe that's fine for me, your Honor.

MR. HENRETTY: That's fine.

THE COURT: All right.

MR. LINDEN: Yes.

THE COURT: Thank you.

MR. LINDEN: 9:00 o'clock?

THE COURT: 9:00 o'clock.

MR. LINDEN: Thank you, Judge.

MS. MARMOR: Thank you, your Honor.

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward__________________________September 9, 2019.
Official Court Reporter
F

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: **John Nawara**
**C/O Kurtz Law Offices, Ltd.**
**32 Blaine Street**
**Hinsdale, IL 60521**

From: **Chicago District Office**
**500 West Madison St**
**Suite 2000**
**Chicago, IL 60661**

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2017-02814** | **Alison Fisher, Investigator** | **(312) 869-8147** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

[signature]

**Julianne Bowman,**
**District Director**

10/11/2017
*(Date Mailed)*

Enclosures(s)

cc: **Cook County Sheriff's Office**
**c/o Thomas Nelligan**
**Assistant General Counsel**
**Richard J. Daley Center**
**50 West Washington, Room 704**
**Chicago, IL 60602**

EXHIBIT
C
exhibitsticker.com

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; see Privacy Statement on reverse before completing this form

ENTER CHARGE NUMBER
☐ IDHR
x EEOC 440-2017-02814

EEOC and ILLINOIS DEPARTMENT OF HUMAN RIGHTS
*(State or local Agency, if any)*

| NAME *(Indicated Mr., Ms., or Mrs.)* | | HOME TELEPHONE NO. *(Include Area Code)* |
|---|---|---|
| **JOHN NAWARA** | | **630-323-9444** |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
| **c/o Kurtz Law Offices, Ltd., 32 Blaine Street** | **Hinsdale Illinois 60521** | **DuPage** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below)*

| NAME | NO. EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| **COOK COUNTY SHERIFF'S OFFICE** | **Over 500** | **(312)603-6450** |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |
| **50 W. Washington, Chicago, IL 60602** | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*
☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ AGE **X** RETALIATION **X** DISABILITY ☐ OTHER *(Specify)*

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)*

THE PARTICULARS ARE *(If additional space is needed, attached extra sheet(s))*:

~~See attached particulars.~~

RECEIVED EEOC
MAR 24 2017
CHICAGO DISTRICT OFFICE

☐ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

I declare under penalty of perjury that the foregoing is true and correct.

March 22, 2017 — John A. Nawara
Date — Charging Party
*(Signature)*

SIGNATURE OF COMPLAINANT
John A. Nawara

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
3/22/17 Karen L. Moreno

Official Seal
Karen L Moreno
Notary Public State of Illinois
My Commission Expires 10/04/2017

THE PARTICULARS ARE:

1. Within the last 300 days, Respondent has discriminated against me in violation of the American with Disabilities Act, 42 U.S.C. § 12112(d)(4)(A).

2. I am male.

3. I was hired by Respondent on September 28, 1998. From approximately 2002 to 2007, I was a member of the Special Operations Response Team, which was a highly elite unit in the jail. For the last 5 years I have had an excellent attendance record and have not called in sick. I have satisfactorily performed my duties without incident. In fact, I have met and exceeded my direct supervisors' expectations.

4. On September 28, 2016, I was assigned to the basement of Cermak Hospital to monitor detainees. A fight broke out between two inmates. I and two other officers were able to break up the fight without incident. We contacted a supervisor per protocol and advised them of the situation. Superintendent Jones-Hayes (female), in a very insulting, provoking and demeaning manner, hit me in my chest with her finger several times. She also spoke to me in a condescending tone of voice. Nothing warranted her assault and battery of hitting me in the chest with her finger several times. She again hit me in the chest with her finger several times, at which time I took a step back, feeling trapped, and told her keep her hands off of me, and that it was very unprofessional. Superintendent Jones-Hayes acknowledged that she had offended me. Jones-Hayes also disparaged me in front of detainees. I complained about her conduct to the other employees, including the sergeant that was present.

5. The next day, I was transferred to external operations away from my regular assignment with no explanation.

6. On October 13, 2016, I filed a formal complaint with my supervisor regarding Jones-Hayes' harassment and assault and battery of me.

7. On November 18, 2016, Respondent ordered me to appear to Human Resources. Ms. Shelby and Ms. Reierson met with me. They asked me if I had threatened another employee; I responded: "no," as I had not threatened any employee. I was not provided with any complaint or any indication that anyone had complained about me. Moreover, I was told that this was not an O.P.R. (Office of Professional Review) review, which is the division that investigates officer misconduct.

8. Respondent, through the above HR representatives, directed me to sign blank HIPPA release forms for my medical records, which I refused because I reasonably believe that it is a violation of the ADA.

THE PARTICULARS ARE (continued):

9. Respondent told me that I could not return to work until I signed the HIPPA forms, which I believed was and is an unlawful request.

10. As a result, I have been forced to use my benefit time that is "on the books," *i.e.*, medical/sick, personal, compensation, holidays, and vacation. I have also been threatened with disciplinary action and that charges may be brought seeking my termination. I have been denied special assignments, transfers to more desirable units, and training, as well as promotional opportunities as a result of Respondent's unlawful order for me to sign blank HIPPA release forms for my medical records.

11. The Americans with Disabilities Act specifically prohibits employers from "require[ing] a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability". 42 U.S.C. § 12112(d)(4)(A).

12. Respondent cannot show that the medical inquiry at issue is vital to its business and is narrowly formulated to prevent unnecessary intrusion into my medical information. Respondent has not disclosed to me any asserted purpose, and cannot show that the medical inquiry serves any asserted purpose. The request is also in violation of my privacy rights and unlawful.

13. The respondent has violated the ADA.

14. The Respondent also retaliated against me in violation of Title VII for engaging in protected activity after I complained about harassment (assault and battery) by my supervisor (female).

# FILING SUIT IN COURT OF COMPETENT JURISDICTION

## PRIVATE SUIT RIGHTS

The issuance of this ***Notice of Right to Sue*** or ***Dismissal and Notice of Rights*** ends the EEOC process with respect to your Charge. You may file a lawsuit against the Respondent within 90 days from the date you receive this Notice. Therefore, you should keep a record of the date. Once the 90 day period is over, your right to sue is lost. If you intend to consult an attorney, you should do so as soon as possible. Furthermore, in order to avoid any question that you did not act in a timely manner, if you intend to sue on your own behalf; your suit should be filed well in advance of the expiration of the 90 day period.

You may file your lawsuit in a court of competent jurisdiction. Filing this Notice is not sufficient. A court complaint must contain a short Statement of the facts of your case which shows that you are entitled to relief. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the Respondent has its main office.

You may contact the EEOC if you have any questions about your rights, including advice on which court can hear your case, or if you need to inspect and copy information contained in the case file.

**IF THE FIRST THREE CHARACTERS OF YOUR EEOC CHARGE NUMBER ARE "21B" AND YOUR CHARGE WAS INVESTIGATED BY THE ILLINOIS DEPARTMENT OF HUMAN RIGHTS (IDHR), REQUEST FOR REVIEWING AND COPYING DOCUMENTS FROM YOUR FILE MUST BE DIRECTED TO IDHR.**

A lawsuit against a private employer is generally filed in the U.S. District Court.

A lawsuit under Title VII of the Civil Rights Act of 1964, as amended, against a State agency or a political subdivision of the State is also generally filed in the U.S. District Court.

However, a lawsuit under the Age Discrimination in Employment of the American with Disabilities Act or, probably, the Equal Pay Act against a State instrumentality (an agency directly funded and controlled by the State) can only be filed in a State court.

A lawsuit under the Age Discrimination in Employment Act or the American with Disabilities Act or the Equal Pay Act against a political subdivision of a State, such as municipalities and counties, may be filed in the U.S. District Court.

For a list of the U.S. District Courts, please see the reverse side.

## ATTORNEY REPRESENTATION

If you cannot afford an attorney, or have been unable to obtain an attorney to represent you, the court having jurisdiction in your case may assist you in obtaining a lawyer. If you plan to ask the court to help you obtain a lawyer, you must make this request of the court in the form and manner it requires. Your request to the court should be made well in advance of the 90 day period mentioned above. A request for representation does not relieve you of the obligation to file a lawsuit within the 90-day period.

## DESTRUCTION OF FILE

If you file suit, you or your attorney should forward a copy of your court complaint to this office. Your file will then be preserved. Unless you have notified us that you have filed suit, your Charge file could be destroyed as early as six months after the date of the Notice of Right to Sue.

**IF YOU FILE SUIT, YOU OR YOUR ATTORNEY SHOULD NOTIFY THIS OFFICE WHEN THE LAWSUIT IS RESOLVED.**

# INFORMATION ON WHERE TO FILE SUIT

You have been notified of your right to sue in Federal District Court. Suit is ordinarily filed in the District having jurisdiction of the county in which the employer, against whom you filed a Charge of employment discrimination, is located. The telephone number listed for each District is that of the Clerk of the Court.

| U.S. DISTRICT COURT<br>Northern District of Illinois<br>**Eastern Division at Chicago**<br>219 South Dearborn Street<br>Chicago, IL 60604<br>312-435-5670 | | U.S. DISTRICT COURT<br>Central District of Illinois<br>**Urbana Division**<br>201 South Vine<br>Urbana, IL 61801<br>217-373-5830 | |
|---|---|---|---|
| **Counties** | | **Counties** | |
| Cook | Kendall | Champaign | Kankakee |
| DuPage | Lake | Coles | Macon |
| Grundy | LaSalle | Douglas | Moultrie |
| Kane | Will | Edgar | Piatt |
| | | Ford | Vermillion |
| | | Iroquois | |
| U.S. DISTRICT COURT<br>Northern District of Illinois<br>**Western Division at Rockford**<br>211 South Court Street<br>Federal Building<br>Rockford, IL 61101<br>815-987-4355 | | **Peoria Division**<br><br>100 N.E. Monroe Street<br>135 Federal Building<br>Peoria, IL 61602<br>309-671-7117 | |
| **Counties** | | **Counties** | |
| Boone | McHenry | Bureau | McLean |
| Carroll | Ogle | Fulton | Peoria |
| DeKalb | Stephenson | Hancock | Putnam |
| JoDaviess | Whiteside | Knox | Stark |
| Lee | Winnebago | Livingston | Tazewell |
| | | Marshall | Woodford |
| | | McDonough | |
| U.S. DISTRICT COURT<br>**Southern District of Illinois**<br>750 Missouri Avenue<br>East St. Louis, IL 62201<br>618-482-0671<br>*and*<br>301 Main Street<br>Benton, IL 62812<br>618-438-0671 | | **Rock Island Division**<br>211 19th Street<br>Rock Island, IL 61201<br>309-793-5778 | |
| **Counties** | | **Counties** | |
| Alexander | Johnson | Henderson | Rock Island |
| Bond | Lawrence | Henry | Warren |
| Calhoun | Madison | Mercer | |
| Clark | Marion | **Springfield Division**<br>600 East Monroe Street<br>Springfield, IL 62701<br>217-492-4020 | |
| Clinton | Monroe | | |
| Crawford | Perry | | |
| Cumberland | Pope | | |
| Edwards | Pulaski | | |
| Effingham | Randolph | **Counties** | |
| Fayette | Richland | Adams | Logan |
| Franklin | St. Clair | Brown | Macoupin |
| Gallatin | Saline | Cass | Mason |
| Hamilton | Union | Christian | Menard |
| Hardin | Wabash | DeWitt | Montgomery |
| Jackson | Washington | Green | Morgan |
| Jasper | Wayne | Pike | Schuyler |
| Jefferson | White | Shelby | |
| Jersey | Williamson | | |

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison Street, Suite 2000
Chicago, IL 60661
PH: (312) 869-8000
TTY: (312) 869-8001
ENFORCEMENT FAX: (312) 869-8220
STATE & LOCAL FAX: (312) 869-8077
LEGAL FAX: (312) 869-8124

FILE REVIEWS FAX: (312) 869-8220
MEDIATION: (312) 869-8060
HEARINGS FAX: (312) 869-8125

# NOTICE OF DISCLOSURE RIGHTS

Parties to an EEOC charge are entitled to review and obtain copies of documents contained in their investigative file. Requests must be made in writing to **Sylvia Bustos** and either mailed to the address above, faxed to **(312) 869-8220** or sent via email to sylvia.bustos@eeoc.gov (please chose only one method, no duplicate requests). ***Be sure to include your name, address, phone number and EEOC charge number with your request***.

If you are the Charging Party and a RIGHT TO SUE has been issued, you may be granted access to your file:

* **Before filing a lawsuit, but within 90 days of your receipt of the Right to Sue, or**

* **After your lawsuit has been filed. If more than 90 days have elapsed since your receipt of the Right to Sue, include with your request a copy of the entire court complaint (with court stamped docket number) or enough pages to determine whether it was filed based on the EEOC charge.**

If you are the ***Respondent*** you may be granted access to the file ***only after*** a lawsuit has been filed. Include with your request a copy of the entire court complaint that includes an official court stamped docket number.

Pursuant to federal statutes, certain documents, such as those which reflect the agency's deliberative process, will not be disclosed to either party.

You must sign an Agreement of Nondisclosure **before** you are granted access to the file, which will be sent to you after receipt of your written request. (Statutes enforced by the EEOC prohibit the agency from making investigative information public.)

The process for access to the file will begin no later than ten (10) days following receipt of your request.

When the file becomes available for review, you will be contacted. You may review the file in our offices and/or request that a copy of the file be sent to you. Files may not be removed from the office.

Your file will be copied by **Aloha Print Group, 60 East Van Buren, Suite 1502, Chicago, IL 60605, (312) 542-1300.** You are responsible for the copying costs and must sign an agreement to pay these costs before the file will be sent to the copy service. Therefore, **it is recommended that you first review your file** to determine what documents, if any, you want copied. EEOC will not review your file or provide a count of the pages contained in it. If you choose not to review your file, it will be sent **in its entirety** to the copy service, **and you will be responsible for the cost.** Payment must be made directly to **Aloha Print Group,** which charges 15 cents per page.

(Revised 04/20/2016, previous copies obsolete)

U.S. GPO 1985 0-482-951

| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974; see Privacy Statement on reverse before completing this form | | ENTER CHARGE NUMBER<br>☐ IDHR<br>x EEOC |
|---|---|---|
| EEOC and ILLINOIS DEPARTMENT OF HUMAN RIGHTS<br>*(State or local Agency, if any)* | | |
| NAME *(Indicated Mr., Ms., or Mrs.)*<br>**JOHN NAWARA** | | HOME TELEPHONE NO. *(Include Area Code)*<br>**630-323-9444** |
| STREET ADDRESS<br>**c/o Kurtz Law Offices, Ltd., 32 Blaine Street** | CITY, STATE AND ZIP CODE<br>**Hinsdale Illinois 60521** | COUNTY<br>**DuPage** |
| NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)* | | |
| NAME<br>**COOK COUNTY SHERIFF'S OFFICE** | NO. EMPLOYEES/MEMBERS<br>**Over 500** | TELEPHONE NUMBER *(Include Area Code)*<br>**(312)603-6450** |
| STREET ADDRESS<br>**50 W. Washington, Chicago, IL 60602** | CITY, STATE AND ZIP CODE | |
| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*<br>☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN<br>☐ AGE **X** RETALIATION **X** DISABILITY ☐ OTHER *(Specify)* | | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)* |
| THE PARTICULARS ARE *(If additional space is needed, attached extra sheet(s))*:<br><br>See attached particulars. | | |
| : I also want this charge filed with the EEOC.<br>I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief | |
| I declare under penalty of perjury that the foregoing is true and correct.<br>March 22, 2017 [signature]<br>Date Charging Party<br>*(Signature)* | SIGNATURE OF COMPLAINANT<br>[signature]<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>3/22/17 [signature: Karen L. Moreno] | |

Official Seal
Karen L Moreno
Notary Public State of Illinois
My Commission Expires 10/04/2017

**THE PARTICULARS ARE:**

1. Within the last 300 days, Respondent has discriminated against me in violation of the American with Disabilities Act, 42 U.S.C. § 12112(d)(4)(A).

2. I am male.

3. I was hired by Respondent on September 28, 1998. From approximately 2002 to 2007, I was a member of the Special Operations Response Team, which was a highly elite unit in the jail. For the last 5 years I have had an excellent attendance record and have not called in sick. I have satisfactorily performed my duties without incident. In fact, I have met and exceeded my direct supervisors' expectations.

4. On September 28, 2016, I was assigned to the basement of Cermak Hospital to monitor detainees. A fight broke out between two inmates. I and two other officers were able to break up the fight without incident. We contacted a supervisor per protocol and advised them of the situation. Superintendent Jones-Hayes (female), in a very insulting, provoking and demeaning manner, hit me in my chest with her finger several times. She also spoke to me in a condescending tone of voice. Nothing warranted her assault and battery of hitting me in the chest with her finger several times. She again hit me in the chest with her finger several times, at which time I took a step back, feeling trapped, and told her keep her hands off of me, and that it was very unprofessional. Superintendent Jones-Hayes acknowledged that she had offended me. Jones-Hayes also disparaged me in front of detainees. I complained about her conduct to the other employees, including the sergeant that was present.

5. The next day, I was transferred to external operations away from my regular assignment with no explanation.

6. On October 13, 2016, I filed a formal complaint with my supervisor regarding Jones-Hayes' harassment and assault and battery of me.

7. On November 18, 2016, Respondent ordered me to appear to Human Resources. Ms. Shelby and Ms. Reierson met with me. They asked me if I had threatened another employee; I responded: "no," as I had not threatened any employee. I was not provided with any complaint or any indication that anyone had complained about me. Moreover, I was told that this was not an O.P.R. (Office of Professional Review) review, which is the division that investigates officer misconduct.

8. Respondent, through the above HR representatives, directed me to sign blank HIPPA release forms for my medical records, which I refused because I reasonably believe that it is a violation of the ADA.

**THE PARTICULARS ARE (continued):**

9. Respondent told me that I could not return to work until I signed the HIPPA forms, which I believed was and is an unlawful request.

10. As a result, I have been forced to use my benefit time that is "on the books," *i.e.*, medical/sick, personal, compensation, holidays, and vacation. I have also been threatened with disciplinary action and that charges may be brought seeking my termination. I have been denied special assignments, transfers to more desirable units, and training, as well as promotional opportunities as a result of Respondent's unlawful order for me to sign blank HIPPA release forms for my medical records.

11. The Americans with Disabilities Act specifically prohibits employers from "require[ing] a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability". 42 U.S.C. § 12112(d)(4)(A).

12. Respondent cannot show that the medical inquiry at issue is vital to its business and is narrowly formulated to prevent unnecessary intrusion into my medical information. Respondent has not disclosed to me any asserted purpose, and cannot show that the medical inquiry serves any asserted purpose. The request is also in violation of my privacy rights and unlawful.

13. The respondent has violated the ADA.

14. The Respondent also retaliated against me in violation of Title VII for engaging in protected activity after I complained about harassment (assault and battery) by my supervisor (female).

## COOK COUNTY SHERIFF'S OFFICE
### Discrimination/Harassment/Sexual Harassment Complaint Form

**THIS FORM MUST BE SUBMITTED TO EITHER A MEMBER IN YOUR CHAIN OF COMMAND, DIRECTOR OF PERSONNEL OR THE OFFICE OF PROFESSIONAL REVIEW**

☐ COMPLAINANT ☐ WITNESS ☐ SUPERVISOR

| COMPLAINANT NAME | STAR (if applicable) | JDE NUMBER | ASSIGNMENT | JOB TITLE |
|---|---|---|---|---|
| John A Nawara | 15012 | 378032 | Ex Ops | CO-1 |

| DEPARTMENT | LOCATION OF INCIDENT | DATE OF INCIDENT | TIME OF INCIDENT |
|---|---|---|---|
| CCDOC | Cermak Hospitals Basement Area | 28 SEP 16 | 1030 Hrs |

**WRITTEN SUMMARY**

**Provide a detailed summary of the alleged discrimination/harassment/sexual harassment incident. Include the name(s) of the person(s) committing the alleged discrimination/harassment/sexual harassment and name(s) of any witnesses, if known. Attach additional pages to continue summary if necessary. Attach additional written material related to the alleged complaint.**

On the above date and approximate time I was waiting on a response from a supervisor about an altercation that occurred between two detainees. Please see CCOMS Incident Report DIV11-2016-15666. I was assigned to Cermak Hospitals Basement Control Staging Area. This is the waiting area where detainees throughout the compound, from all divisions of the jail, wait to be seen by medical staff for medical issues. After what felt like quite a while, Sgt. Conley arrived with Supt. Jones-Hayes. In a very insulting, provoking and demeaning action, Supt. Jones-Hayes pushes her finger into my chest several times as she says, in a very condescending tone of voice, "Why isn't this inmate cuffed behind the back." She pointed to a detainee that was not either of the detainees that were involved in the altercation. In shock from what she just did to me, I responded the best I could by saying, "You would probably need to ask whomever escorted that detainee here." She then again pushes her finger into my chest several times as she says to me, in the same condescending tone of voice, "Who's the Staging Officer?" Amazed at her behavior, I take a step back and bump into the wall behind me, feeling trapped I say, "You need to keep your hands off of me. That is very unprofessional." As this happens Sgt. Conley is reaching into his pocket and pulls out today's roster and answers for me, "He is." Supt. Jones-Hayes, infront of Sgt. Conley and Ofc. Gannon says to me in the same bothersome tone, "Well, if I offended you by touching you,I apologize." (please see supplementary page)

**WHAT IS YOUR REQUESTED REMEDY TO THIS COMPLAINT?** (to be completed by the Complainant only)

I'm not sure. I'd like to speak with someone, if possible, about this incident.

| SIGNATURE UPON COMPLETION | STAR (if applicable) | DATE | TIME |
|---|---|---|---|
| [redacted] | 15012 | 13 OCT 16 | 2030 Hrs |

**SUPERVISORY REVIEW**

| SUPERVISOR (Print) | SIGNATURE | DATE |
|---|---|---|
| | | |

| DEPARTMENT HEAD (Print) | SIGNATURE | DATE |
|---|---|---|
| | | |

| REVIEWING OPR STAFF (Print) | SIGNATURE | ASSIGNED OPR NUMBER | DATE |
|---|---|---|---|
| | | | |

(FCN-19)(JUL 11)

EXHIBIT D

exhibitsticker.com

# COOK COUNTY SHERIFF'S OFFICE
## Discrimination/Harassment/Sexual Harassment Complaint Form

**THIS FORM MUST BE SUBMITTED TO EITHER A MEMBER IN YOUR CHAIN OF COMMAND, DIRECTOR OF PERSONNEL OR THE OFFICE OF PROFESSIONAL REVIEW**

☐ COMPLAINANT ☐ WITNESS ☐ SUPERVISOR

| COMPLAINANT NAME | STAR (If applicable) | JOE NUMBER | ASSIGNMENT | JOB TITLE |
|---|---|---|---|---|
| John A Nawara | 15012 | 378032 | Ex Ops | CO-1 |

| DEPARTMENT | LOCATION OF INCIDENT | DATE OF INCIDENT | TIME OF INCIDENT |
|---|---|---|---|
| CCDOC | Cermak Hospitals Basement Area | 28 SEP 16 | 1030 Hrs |

**WRITTEN SUMMARY**

**Provide a detailed summary of the alleged discrimination/harassment/sexual harassment incident. Include the name(s) of the person(s) committing the alleged discrimination/harassment/sexual harassment and name(s) of any witnesses, if known. Attach additional pages to continue summary if necessary. Attach additional written material related to the alleged complaint.**

(continued) She then turns toward Ofc. Gannon as she says, "Back in the day, when I used to be down here, I used to run this fuckin place!" Supt. Jones-Hayes, along with Sgt. Conley, walks out of the officers area and into the detainee staging area. Ofc. Gannon, appearing to be very disturbed by what just transpired said aloud, "Why is she yelling at me? What did I do?" The next day I was transferred out of Cermak Hospital, the building I work in everyday. I have waited over two weeks to receive an explanation as to why I was treated in this very discourteous way.

WHAT IS YOUR REQUESTED REMEDY TO THIS COMPLAINT? (to be completed by the Complainant only)

I'm not sure. I'd like to speak with someone, if possible, about this incident.

| SIGNATURE UPON COMPLETION | STAR (If applicable) | DATE | TIME |
|---|---|---|---|
| [redacted] | 15012 | 13 OCT 16 | 2030 Hrs |

**SUPERVISORY REVIEW**

| SUPERVISOR (Print) | SIGNATURE | DATE |
|---|---|---|
| | | |
| DEPARTMENT HEAD (Print) | SIGNATURE | DATE |
| | | |

| REVIEWING OPR STAFF (Print) | SIGNATURE | ASSIGNED OPR NUMBER | DATE |
|---|---|---|---|
| | | | |

(FCN-19)(JUL 11)

**From:** Dana Kurtz <DKurtz@kurtzlaw.us>
**To:** "Rebecca.Reierson@cookcountyil.gov" <Rebecca.Reierson@cookcountyil.gov>, "Winifred.Shelby@cookcountyil.gov" <Winifred.Shelby@cookcountyil.gov>
**CC:** "Peter.Kramer@cookcounty.gov" <Peter.Kramer@cookcounty.gov>
**Subject:** John Nawara
**Date:** 2016-12-21 15:49:18 -0500
**Importance:** high
**Attachments:** HIPAA_Release_form_given_to_John_to_sign.pdf
**Inline-Images:** image002.png; image001.jpg

---

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner.

As a result of the above actions taken against Officer Nawara and the unlawful order that he cannot return to work, he has been forced to use his vacation time. He has also lost out on advancement and training opportunities. We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from the harassment against him.

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT
E
exhibitsticker.com

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ____________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

____________________________ ____________________

Printed Name (of person giving authorization) Social Security Number

____________________________ ____________________

Signature of person giving authorization Date

Signed ____________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel

**From:** Dana Kurtz <DKurtz@kurtzlaw.us>
**To:** "'Rebecca.Reierson@cookcountyil.gov'" <Rebecca.Reierson@cookcountyil.gov>, "'Winifred.Shelby@cookcountyil.gov'" <Winifred.Shelby@cookcountyil.gov>
**CC:** "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov>
**Subject:** FW: John Nawara
**Date:** 2017-01-31 17:26:25 -0500
**Importance:** high
**Inline-Images:** image002.png; image001.jpg

---

Peter, I had the wrong email for you. See below.

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:23 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** 'Peter.Kramer@cookcounty.gov'
**Subject:** FW: John Nawara
**Importance:** High

We received no response to my email below. If Officer Nawara is not reinstated immediately, before the end of this week, with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees.

Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or to place him on leave without pay. This is clear retaliation for his complaints against Superintendent Jones-Hayes for her harassment of him.

I look forward to hearing from you.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Wednesday, December 21, 2016 2:49 PM
**To:** Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov
**Cc:** Peter.Kramer@cookcounty.gov
**Subject:** John Nawara
**Importance:** High

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner.

As a result of the above actions taken against Officer Nawara and the unlawful order that he cannot return to work, he has been forced to use his vacation time. He has also lost out on advancement and training opportunities. We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from the harassment against him.

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

This email has been scanned by the Symantec Email Security.cloud service.

**From:** <MAILER-DAEMON>
**To:** Rebecca Reierson (Sheriff)
**Subject:**
**Date:** 2017-03-18 00:42:56 -0400
**Attachments:** JNawara.FFD.pdf

---

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office, in which the jury found that the Sheriff violated my and other officer's First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

| | |
|---|---|
| **From:** | "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov> |
| **To:** | Dana Kurtz <dkurtz@kurtzlaw.us>, "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov> |
| **CC:** | "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov> |
| **Subject:** | Re: John Nawara |
| **Date:** | 2017-03-18 12:52:36 -0400 |
| **Inline-Images:** | image002.png; image001.jpg |

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** John Nawara (Sheriff)
**Sent:** Friday, March 17, 2017 11:57:09 PM
**To:** Rebecca Reierson (Sheriff); Dana Kurtz
**Cc:** Peter Kramer (Sheriff)
**Subject:** Re: John Nawara

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office, in which the jury found that the Sheriff violated my and other officer's First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, March 17, 2017 4:42 PM
**To:** Dana Kurtz
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara

Ms. Kurtz,
We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara's absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office

Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

**From:** Dana Kurtz [mailto:DKurtz@kurtzlaw.us]
**Sent:** Monday, March 13, 2017 10:25 AM
**To:** Rebecca Reierson (Sheriff)
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara
**Importance:** High

Dear Ms. Reierson,

First, I appreciate you finally responding to my email and getting back to me. We are trying to avoid litigation which is why I reached out to you and copied Peter Kramer on the email as well. However, the Sheriff's office lack of response and lack of engaging in any type of discussion is not helpful.

Second, Officer Nawara has been placed on an unpaid leave, and is burning his sick and vacation time to his detriment, which he will run out of soon, because he would not sign a HIPPA medical release form for his own medical records without limitation of time, scope, or any other limitations (setting aside that such a request is unlawful in the first place). He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the Sheriff's Office. All of this has caused Officer Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order, seeking injunctive release if this is not immediately remedied.

Third, the Sheriff's position to require Officer Nawara (or any other employee) to complete a medical release form so that the Sheriff's Office can obtain that individuals private medical records is unlawful and in violation of the ADA. An employer cannot order an employee to complete a HIPPA or medical release form so that the employer can obtain ***the employee's own medical records***, which is what you have ordered Officer Nawara to do. This is not the proper or legal way to go about ordering a "fitness for duty." In addition, the law requires that in order for an employee to be ordered to see the employer's selected doctor for a fitness for duty evaluation, ***there must be a business necessity***. *Wright v. Illinois Dept. of Children and Family Services*, 798 F.3d 513, 523 (C.A.7 (Ill.),2015). In *Wright*, the court reiterated:

An employer bears the burden of establishing that an examination is consistent with business necessity, *see Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir.2007), and that burden is "quite high," *Conroy v. New York State Dep't of Corr. Servs.,* 333 F.3d 88, 97 (2d Cir.2003) (internal quotation marks omitted). An employer must "show that the asserted 'business necessity' is vital to the business," as opposed to a "mere expediency." *Id.; accord Kroll v. White Lake Ambulance Auth.,* 763 F.3d 619, 623 (6th Cir.2014) (noting that an employer cannot rely on a "bare assertion that a medical examination was merely convenient or expedient"). In addition, the examination must "genuinely serve[ ] the asserted business necessity and ... must be a reasonably effective method of achieving the employer's goal." *Conroy,* 333 F.3d at 98. An employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the ... requirement contributes to the achievement of those business necessities." *Id.* at 101.
If the Sheriff's Office wants to order Officer Nawara to see a County doctor or its own selected doctor, then the Sheriff must show that it is "consistent with business necessity" and that "the asserted 'business necessity' is vital to the business,' as opposed to a 'mere expediency.'" We have been provided with ***no information*** to show that this burden has been met. Please provide me with this information, and I will consider it.

Fifth, in addition to the above, Officer Nawara has been provided ***no*** information as to who would be doing the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPPA form so that the Sheriff's Office could obtain Officer Nawara's own personal medical records, which is in violation of the ADA and violates his privacy rights.

Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquires. In fact, he did. He retained counsel (me) to respond for him, which we did, and received no response from the Sheriff's Office until your email below.

Finally, please let me know if a note from his doctor would suffice. Officer Nawara may be willing to provide this, but he is not going to and is not required to under the law sign a release so that his personal medical records are obtained by the Sheriff's office. Please let me know today, so that we can decide if we need to file a lawsuit and TRO, requesting injunctive relief.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Rebecca Reierson (Sheriff) [mailto:Rebecca.Reierson@cookcountyil.gov]
**Sent:** Monday, March 13, 2017 8:33 AM
**To:** Dana Kurtz
**Subject:** John Nawara

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

**From:** <MAILER-DAEMON>
**To:** Rebecca Reierson (Sheriff)
**Subject:**
**Date:** 2017-03-18 00:42:56 -0400
**Attachments:** JNawara.FFD.pdf

---

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office, in which the jury found that the Sheriff violated my and other officer's First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

| | |
|---|---|
| **From:** | "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov> |
| **To:** | Dana Kurtz <dkurtz@kurtzlaw.us>, "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov> |
| **CC:** | "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov> |
| **Subject:** | Re: John Nawara |
| **Date:** | 2017-03-18 12:52:36 -0400 |
| **Inline-Images:** | image002.png; image001.jpg |

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** John Nawara (Sheriff)
**Sent:** Friday, March 17, 2017 11:57:09 PM
**To:** Rebecca Reierson (Sheriff); Dana Kurtz
**Cc:** Peter Kramer (Sheriff)
**Subject:** Re: John Nawara

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the Sheriff’s Office, in which the jury found that the Sheriff violated my and other officer’s First Amendment rights, and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, March 17, 2017 4:42 PM
**To:** Dana Kurtz
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara

Ms. Kurtz,
We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara’s own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara’s behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara’s signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara’s absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office

Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

**From:** Dana Kurtz [mailto:DKurtz@kurtzlaw.us]
**Sent:** Monday, March 13, 2017 10:25 AM
**To:** Rebecca Reierson (Sheriff)
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara
**Importance:** High

Dear Ms. Reierson,

First, I appreciate you finally responding to my email and getting back to me. We are trying to avoid litigation which is why I reached out to you and copied Peter Kramer on the email as well. However, the Sheriff's office lack of response and lack of engaging in any type of discussion is not helpful.

Second, Officer Nawara has been placed on an unpaid leave, and is burning his sick and vacation time to his detriment, which he will run out of soon, because he would not sign a HIPPA medical release form for his own medical records without limitation of time, scope, or any other limitations (setting aside that such a request is unlawful in the first place). He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the Sheriff's Office. All of this has caused Officer Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order, seeking injunctive release if this is not immediately remedied.

Third, the Sheriff's position to require Officer Nawara (or any other employee) to complete a medical release form so that the Sheriff's Office can obtain that individuals private medical records is unlawful and in violation of the ADA. An employer cannot order an employee to complete a HIPPA or medical release form so that the employer can obtain ***the employee's own medical records***, which is what you have ordered Officer Nawara to do. This is not the proper or legal way to go about ordering a "fitness for duty." In addition, the law requires that in order for an employee to be ordered to see the employer's selected doctor for a fitness for duty evaluation, ***there must be a business necessity***. *Wright v. Illinois Dept. of Children and Family Services*, 798 F.3d 513, 523 (C.A.7 (Ill.),2015). In *Wright*, the court reiterated:

An employer bears the burden of establishing that an examination is consistent with business necessity, *see Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir.2007), and that burden is "quite high," *Conroy v. New York State Dep't of Corr. Servs.,* 333 F.3d 88, 97 (2d Cir.2003) (internal quotation marks omitted). An employer must "show that the asserted 'business necessity' is vital to the business," as opposed to a "mere expediency." *Id.; accord Kroll v. White Lake Ambulance Auth.,* 763 F.3d 619, 623 (6th Cir.2014) (noting that an employer cannot rely on a "bare assertion that a medical examination was merely convenient or expedient"). In addition, the examination must "genuinely serve[ ] the asserted business necessity and ... must be a reasonably effective method of achieving the employer's goal." *Conroy,* 333 F.3d at 98. An employer "cannot merely rely on reasons that have been found valid in other cases but must actually show that the ... requirement contributes to the achievement of those business necessities." *Id.* at 101.
If the Sheriff's Office wants to order Officer Nawara to see a County doctor or its own selected doctor, then the Sheriff must show that it is "consistent with business necessity" and that "the asserted 'business necessity' is vital to the business,' as opposed to a 'mere expediency.'" We have been provided with ***no information*** to show that this burden has been met. Please provide me with this information, and I will consider it.

Fifth, in addition to the above, Officer Nawara has been provided ***no*** information as to who would be doing the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPPA form so that the Sheriff's Office could obtain Officer Nawara's own personal medical records, which is in violation of the ADA and violates his privacy rights.

Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquires. In fact, he did. He retained counsel (me) to respond for him, which we did, and received no response from the Sheriff's Office until your email below.

Finally, please let me know if a note from his doctor would suffice. Officer Nawara may be willing to provide this, but he is not going to and is not required to under the law sign a release so that his personal medical records are obtained by the Sheriff's office. Please let me know today, so that we can decide if we need to file a lawsuit and TRO, requesting injunctive relief.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY
Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Rebecca Reierson (Sheriff) [mailto:Rebecca.Reierson@cookcountyil.gov]
**Sent:** Monday, March 13, 2017 8:33 AM
**To:** Dana Kurtz
**Subject:** John Nawara

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

| | |
|---|---|
| **From:** | "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov> |
| **To:** | "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov> |
| **CC:** | "dkurtz@kurtzlaw.us" <dkurtz@kurtzlaw.us> |
| **Subject:** | Re: John Nawara |
| **Date:** | 2017-03-18 13:22:00 -0400 |
| **Inline-Images:** | image002.png; image001.jpg |

---

Hello Ms. Reierson,

Please provide the general order or policy that requires me to sign a HIPPA release for my medical records. Thank you.

John A. Nawara

Get [Outlook for iOS](Outlook for iOS)

---

**From:** J ohonnNJ oaowr( S ei f ow)F
**Sent:** i Ndy w NM1 Nwmf 72c0: 75 779P09Rb s 1
**To:** ; NSN Dy wKut( f S z NmNwN ei f ow)F
**Cc:** . odbwDwNp owei f ow)F
**Subject:** J o9t( f S z NmNwN

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** t( f S z NmNwN ei f ow)F
**Sent:** l w NM1 Nwmf 75c0: 75 779P59 I . 1
**To:** J ohonnNJ oaowr( S ei f ow)Fu; NSN Dy wK
**Cc:** . odbwDwNp owei f ow)F
**Subject:** J o9t( f S z NmNwN

; oNw1 rqJ oaowr( Sc

i oo NdNnf o, wog( wd)w( p ; wDw( kkcmf ( ar NS aS, ogoS, oSd, ( nd( wNS, S( dp M, ( nd( wqvNp woHyordaSAd( ho gydhNn' d( m( w o))ondaOo ap p o, aNdbkMNS, Nkk( ) df o dap o vf NOo f N, d( hyw ho woaSrdNdb, qv)ookdf o ( w ow)( wp o d( raAS N hkNS' j v. . s wokoNro mNr ySkNm)ykNS, Oa( kNdbr df o s p owaNS madf ; aNhakadaor s ndNS, ar aS wodNkaNda( S )( wp Mgwa( wryadNANaSrddf o i f ow)4 E ))anocaS mf anf df o WwM)( yS, df Nddf o i f ow)) Oa( kNdb, p MNS, ( df ow( ))anow4 l awrds p oS, p oSdwaAf drcNS, wodNkaNdb, NANaSrdyr honNyro ( ) ( ywg( kadanNkrygg( wd)( wdf o ( gg( SoSdd( i f ow)) ; NwdcNS, honNyro ( ) p Mn( p gkNaSdr ( ) f NwNrrp oSdhMdf o rygowOar( wq. koNro n( S)awp df NdvnNS n( p o hNn' d( m( w NS, df NdNkk( ) p M dap o makkho woaSrdNdb, cNS, df Ndvmakk S( dho ryhWhdd( NSM)ywdf owf NwNrrp oSd( wwodNkaNda( Sq

vk( ( ' )( wmNw d( f oNwaSA)w( p M( y d( , NMr( df NdvnNS wodywaS d( m( w ( S 1 ( S, NMq

i aS nowokMd
t( f S s qz NmNwN

---

**From:** J ohonnNJ oaowr( S ei f ow)F
**Sent:** l w NM1 Nwmf 75c0: 75 x9x0 . 1
**To:** ; NSN Dy wK

| | |
|---|---|
| **From:** | Dana Kurtz <DKurtz@kurtzlaw.us> |
| **To:** | "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>, "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov>, "tom.dart@cookcountyil.gov" <tom.dart@cookcountyil.gov> |
| **CC:** | "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov> |
| **Subject:** | RE: John Nawara |
| **Date:** | 2017-03-23 15:31:03 -0400 |
| **Attachments:** | 20170323133448.pdf |
| **Inline-Images:** | image002.png; image001.jpg |

Attached please find the EEOC Charge that was filed on behalf of Officer Nawara today. We will also be filing a federal complaint an seeking a temporary restraining order and injunctive relief.

We are open to settlement discussions to try to resolve this matter and get Officer Nawara back to work and all of his time that he has had to use reinstated, as well as compensation for his damages and attorneys fees.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@ kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

| | |
|---|---|
| **From:** | Dana Kurtz <DKurtz@kurtzlaw.us> |
| **To:** | "Rebecca.Reierson@cookcountyil.gov" <Rebecca.Reierson@cookcountyil.gov>, "Winifred.Shelby@cookcountyil.gov" <Winifred.Shelby@cookcountyil.gov> |
| **CC:** | "Peter.Kramer@cookcounty.gov" <Peter.Kramer@cookcounty.gov> |
| **Subject:** | John Nawara |
| **Date:** | 2016-12-21 15:49:18 -0500 |
| **Importance:** | high |
| **Attachments:** | HIPAA_Release_form_given_to_John_to_sign.pdf |
| **Inline-Images:** | image002.png; image001.jpg |

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

[redacted]

As a result of the above actions taken against Officer Nawara and the [redacted] order that he cannot return to work, he has been forced to use his vacation time. [redacted] We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara [redacted]

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT
F
exhibitsticker.com

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ______________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

______________________________________ ____________________

Printed Name (of person giving authorization) Social Security Number

______________________________________ ____________________

Signature of person giving authorization Date

Signed ______________________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel

| | |
|---|---|
| **From:** | Dana Kurtz <DKurtz@kurtzlaw.us> |
| **To:** | "'Rebecca.Reierson@cookcountyil.gov'" <Rebecca.Reierson@cookcountyil.gov>, "'Winifred.Shelby@cookcountyil.gov'" <Winifred.Shelby@cookcountyil.gov> |
| **CC:** | "'Peter.Kramer@cookcounty.gov'" <Peter.Kramer@cookcounty.gov> |
| **Subject:** | FW: John Nawara |
| **Date:** | 2017-01-31 17:22:49 -0500 |
| **Importance:** | high |
| **Attachments:** | HIPAA_Release_form_given_to_John_to_sign.pdf |
| **Inline-Images:** | image002.png; image001.jpg |

P etre, e I ehtadtrewodawetrdtg nteg i ltf eldy u.Stb SS, ertWi y i ri t wtadrtre awri reht g g eh i relmtf eSdretnveteahtdStv wty eesdty nvtv wtng eti ahti lltf eaeSnvti ah wli rmtre awri rehti wty elldtnveaty ety lltSletwp rtaeOrty eesti ahtreNpewtre g f prveg eartdStv wtng edwi li rmti ahti mdraemwtSeewu

t

xlei wetlertg etsady tvdy tmdpty dplhtl setrdtord, eehu [redacted]

t

.tldds tSdry i rhtrdtvei r a' tSrdg tmdpu

t

T a, erelmc

t

*Dana*

t

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

t

**From:** Dana Kurtz
**Sent:** Wednesday, December 21, 2016 2:49 PM
**To:** Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov
**Cc:** Peter.Kramer@cookcounty.gov
**Subject:** John Nawara
**Importance:** High

MwtRe erwdati ahtMwtTvelf mc

t

.tvi I etf eeatreri aehtf mtJdvatWi y i ri trdtreorewearty g ty nvtrewoe, rtrdtodreani lt, li g wtvetvi wti ' i awtnvetTver SSkwtb SS, eti ahtdrvertodwf let ah I hpi l heSeahi anwu

t

.tpaherwi ahtnvi rtmdptoli , ehtv g tdatlei I eti ahtdrherehtnvi rtvet, i aadrtrerpratrdty drs tpanltvet, dg olerewtnveti mi , vehtH.xAAti pnvdr zi ndatSdrg tb aty vi n le' i ltf i wwtdrtodl , mtordI wdathdtmdpti ahtnvetTver SSkwtdSS, etvi I etrdtdrhertv g trdt, dg olenetnv wtSdrg tSdrtv wtoerwdai ltg eh , i ltre, drhw?tb SS, ertWi y i ri [redacted] f el eI etnvi rtwp, vti atdrhert wtpali y Splu

t

b SS, ertWi y i ri tvi wtadrtf eeat' I eati amtadnS, i ndatdSti amt, dg oli artdrti lle' i ndawti ' i awtv g tYdpti lwdtreSpvehtrdtordI hetv g ty nvti amt aSdrg i ndatdnver nvi atvety i wtf e a' tdrherehtrdtw' atnvetH.xAAtrelei wetSdrg u

t

[redacted]

t

Awti trewplrtdStnveti f dI eti , ndawtri seati ’ i awtb SS, ertWi y i ri ti ahtnvet[redacted] tdrhertnvi rtvet, i aadrtrerpratrdty drs dvetvi wtf eeatSdr, ehtrdtpwetv wtI i , i nda ng eu[redacted] utP eti retreNpewna’ tnvi rtvetf et g g eh i relmtre awri reg earti ahti lldy ehtrdtrerpratrdty drs c i wty ellti wtv wtI i , i ndati ahtng etnvi rtvetvi wtvi htrdtpwetf etre awri rehutP eti reti lwdtreNpewna’ tnvi rtvetTver SSt g g eh i relmtweahti tadnS, i ndatrdtTpoer areahean JdaewHi mewtrdtvi I etadtSprnvert, dari , rty nvtb SS, ertWi y i ri [redacted]

t

.tldds tSdry i rhtrdtvei r a’ tSrdg tmdptf eSdretnvet, ldwetdSf pwaewtFr hi mtDe, eg f ert24d2016u

t

T a, erelmc

t

*Dana*

t

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

[www.kurtzlaw.us](www.kurtzlaw.us)
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers

*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ______________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

______________________________ ______________________

Printed Name (of person giving authorization) Social Security Number

______________________________ ______________________

Signature of person giving authorization Date

Signed ______________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel

**From:** "Dana Kurtz" <DKurtz@kurtzlaw.us>
**To:** Rebecca Reierson (Sheriff);Winifred Shelby (Sheriff)
**CS:** Peter Kramer (Sheriff)
**ubj ecSt:** FW: John Nawara
**Datc:** 2017-01-31 17:26:23 -0500
**Inlinc-Imagcs:** image002.png; image001.jpg

---

Peter, I had the wrong email for you. See below.

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:23 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** 'Peter.Kramer@cookcounty.gov'
**Subject:** FW: John Nawara
**Importance:** High

We received no response to my email below. If Officer Nawara is not reinstated immediately, before the end of this week, with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees.

Please let me know how you would like to proceed. [redacted]

I look forward to hearing from you.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers

*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Wednesday, December 21, 2016 2:49 PM
**To:** Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov
**Cc:** Peter.Kramer@cookcounty.gov
**Subject:** John Nawara
**Importance:** High

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara [redacted] believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

[redacted]

As a result of the above actions taken against Officer Nawara and the [redacted] order that he cannot return to work, he has been forced to use his vacation time. [redacted] We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara [redacted]

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers

*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

**From:** Dana Kurtz <DKurtz@kurtzlaw.us>
**To:** "'Rebecca.Reierson@cookcountyil.gov'" <Rebecca.Reierson@cookcountyil.gov>, "'Winifred.Shelby@cookcountyil.gov'" <Winifred.Shelby@cookcountyil.gov>
**CC:** "'Peter Kramer (Sheriff)'" <Peter.Kramer@cookcountyil.gov>
**Subject:** RE: John Nawara
**Date:** 2017-03-08 15:23:02 -0500
**Attachments:** CO_NAWARA_2_28_17_LETTER.PDF
**Embedded:** unnamed; unnamed(1)
**Inline-Images:** image002.png; image001.jpg

---

I have received the attached correspondence from my client, Officer Nawara, from Ms. Reierson.

First, it is inaccurate to say that Officer Nawara did not respond to the letter or the voicemail. In fact, I contacted you on Officer Nawara's behalf and at his request on December 21, 2016 (email attached) and January 31, 2017 (email string attached).

Second, I never received a response to my emails.

Third, [redacted] If the order is not rescinded and Officer Nawara put back to work this week, we will have to file suit an seek injunctive release as well as all other remedies, including reinstated the time he has been forced to burn as a result of this unlawful order and unlawful suspension.

I look forward to hearing from you this week.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:26 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** Peter Kramer (Sheriff)
**Subject:** FW: John Nawara
**Importance:** High

Peter, I had the wrong email for you. See below.

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:23 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** 'Peter.Kramer@cookcounty.gov'
**Subject:** FW: John Nawara
**Importance:** High

We received no response to my email below. If Officer Nawara is not reinstated immediately, before the end of this week, with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees.

Please let me know how you would like to proceed. [redacted]

I look forward to hearing from you.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Wednesday, December 21, 2016 2:49 PM
**To:** Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov
**Cc:** Peter.Kramer@cookcounty.gov
**Subject:** John Nawara
**Importance:** High

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara [redacted] believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

[redacted]

As a result of the above actions taken against Officer Nawara and the [redacted] order that he cannot return to work, he has been forced to use his vacation time. [redacted] We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara [redacted]

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

**From:** "Rebecca Reierson (Sheriff)" <MAILER-DAEMON>
**To:** Dana Kurtz
**CS:** Peter Kramer (Sheriff);John Nawara (Sheriff)
**ubj ecSt:** RE: John Nawara
**Datc:** 2017-03-17 17:42:08 -0400
**Inlinc-Imagcs:** image002.png; image001.jpg

---

Ms. Kurtz,
We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara's absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

**From:** Dana Kurtz [mailto:DKurtz@kurtzlaw.us]
**Sent:** Monday, March 13, 2017 10:25 AM
**To:** Rebecca Reierson (Sheriff)
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara
**Importance:** High

Dear Ms. Reierson,

First, I appreciate you finally responding to my email and getting back to me. [redacted]

Second, Officer Nawara has been placed on an unpaid leave, and is burning his sick and vacation time [redacted] which he will run out of soon, because he would not sign a HIPPA medical release form for his own medical records without limitation of time, scope, or any other limitations [redacted] I have requested that his time be reinstated, also with no response from you or the Sheriff's Office. [redacted] As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order, seeking injunctive release if this is not immediately remedied.

Third, the Sheriff's position to require Officer Nawara (or any other employee) to complete a medical release form so that the Sheriff's Office can obtain that individuals private medical records is unlawful and in violation of the ADA. An employer cannot order an employee to complete a HIPPA or medical release form so that the employer can obtain ***the employee's own medical records***, which is what you have ordered Officer Nawara to do. This is not the proper [redacted] way to go about ordering a "fitness for duty." [redacted]

[redacted]

[redacted]

[redacted]

Fifth, in addition to the above, Officer Nawara has been provided ***no*** information as to who would be doing the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPPA form so that the Sheriff's Office could obtain Officer Nawara's own personal medical records, [redacted]

Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquires. In fact, he did. He retained counsel (me) to respond for him, which we did, and received no response from the Sheriff's Office until your email below.

Finally, please let me know if a note from his doctor would suffice. Officer Nawara may be willing to provide this, [redacted] Please let me know today, so that we can decide if we need to file a lawsuit and TRO, requesting injunctive relief.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Rebecca Reierson (Sheriff) [mailto:Rebecca.Reierson@cookcountyil.gov]
**Sent:** Monday, March 13, 2017 8:33 AM
**To:** Dana Kurtz
**Subject:** John Nawara

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

**From:** "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>
**To:** Dana Kurtz <dkurtz@kurtzlaw.us>, "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov>
**CC:** "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov>
**Subject:** Re: John Nawara
**Date:** 2017-03-18 12:52:36 -0400
**Inline-Images:** image002.png; image001.jpg

---

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** John Nawara (Sheriff)
**Sent:** Friday, March 17, 2017 11:57:09 PM
**To:** Rebecca Reierson (Sheriff); Dana Kurtz
**Cc:** Peter Kramer (Sheriff)
**Subject:** Re: John Nawara

Dear Ms. Reierson,

See attached report from Dr. Kroll, who is an independent doctor and not my doctor. I am requesting to be put back to work effective immediately and all of the time I have had to burn be reinstated. I feel the order for me to sign a blank HIPPA release was unlawful and violates the American with Disabilities Act [redacted] Please confirm that I can come back to work and that all of my time will be reinstated, and that I will not be subject to any further harassment or retaliation.

I look forward to hearing from you today, so that I can return to work on Monday.

Sincerely,
John A. Nawara

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, March 17, 2017 4:42 PM
**To:** Dana Kurtz
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara

Ms. Kurtz,
We have contacted our employee, Mr. Nawara, on several occasions about this issue as you are aware. A note from Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician, as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace, we believe there is a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time, as you suggest.

I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20, 2017 in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. If the signed paperwork is not received by that date, Mr. Nawara's absences from November 2016 will be re-coded as unauthorized.

Rebecca Reierson
Cook County Sheriff's Office

Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

**From:** Dana Kurtz [mailto:DKurtz@kurtzlaw.us]
**Sent:** Monday, March 13, 2017 10:25 AM
**To:** Rebecca Reierson (Sheriff)
**Cc:** Peter Kramer (Sheriff); John Nawara (Sheriff)
**Subject:** RE: John Nawara
**Importance:** High

Dear Ms. Reierson,

First, I appreciate you finally responding to my email and getting back to me. We are trying to avoid litigation which is why I reached out to you and copied Peter Kramer on the email as well. However, the Sheriff's office lack of response and lack of engaging in any type of discussion is not helpful.

Second, Officer Nawara has been placed on an unpaid leave, and is burning his sick and vacation time to his detriment, which he will run out of soon, because he would not sign a HIPPA medical release form for his own medical records without limitation of time, scope, or any other limitations (setting aside that such a request is unlawful in the first place). He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the Sheriff's Office. All of this has caused Officer Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order, seeking injunctive release if this is not immediately remedied.

Third, the Sheriff's position to require Officer Nawara (or any other employee) to complete a medical release form so that the Sheriff's Office can obtain that individuals private medical records is unlawful and in violation of the ADA. An employer cannot order an employee to complete a HIPPA or medical release form so that the employer can obtain ***the employee's own medical records***, which is what you have ordered Officer Nawara to do. This is not the proper or legal way to go about ordering a "fitness for duty." [redacted]

[redacted]

Fifth, in addition to the above, Officer Nawara has been provided***no*** information as to who would be doing the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPPA form so that the Sheriff's Office could obtain Officer Nawara's own personal medical records, which is in violation of the ADA and violates his privacy rights.

Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquires. In fact, he did. He retained counsel (me) to respond for him, which we did, and received no response from the Sheriff's Office until your email below.

Finally, please let me know if a note from his doctor would suffice. Officer Nawara may be willing to provide this, but he is not going to and is not required to under the law sign a release so that his personal medical records are obtained by the Sheriff's office. Please let me know today, so that we can decide if we need to file a lawsuit and TRO, requesting injunctive relief.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Rebecca Reierson (Sheriff) [ mailto:Rebecca.Reierson@cookcountyil.gov]
**Sent:** Monday, March 13, 2017 8:33 AM
**To:** Dana Kurtz
**Subject:** John Nawara

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

---

Deposition of Rebecca Reierson
Confidential - Deposition of Rebecca Reierson (7, 9)
Friday
September 20th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois



APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Lyle Henretty
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602



For Defendant County of Cook:
Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Sarah R. Marmor
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Friday, September 20th, 2019. The time is now 10:07 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Mrs. Rebecca Reierson. Mrs. Reierson, my name is Gregory Diaz. I am a notary public, and I am



recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MR. LINDEN: Richard Linden on behalf of the Plaintiff, John Nawara.

MR. BUSTAMANTE: Peter Bustamante for John Nawara.

MR. HENRETTY: Lyle Henretty on behalf of Defendant Karen Jones-Hayes.

MS. MARMOR: Sarah Marmor on behalf of the Sheriff, Ms. Reierson, Mr. Burke, and Ms. Shelby.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

MR. LINDEN: Let the record reflect this is the deposition of Rebecca Reierson taken pursuant to notice, and agreement of the parties, and the Federal Rules of Civil Procedure, and local rules.

EXAMINATION

BY MR. LINDEN:

Q. Good morning, Ms. Reierson.



EXHIBIT
G
exhibitsticker.com

Page 5

A. Good morning. 0:01:29
Q. Am I pronouncing it right?
A. You are, yes.
Q. Can you please state and spell your name?
A. Sure, Rebecca Reierson, R-e-b-e-c-c-a, R-e-i-e-r-s-o-n.
Q. And have you ever had your deposition taken before?
A. Yes.
Q. And how many times have you been deposed?
A. Approximately four times, five perhaps.
Q. So I take it you're aware of the procedures and what's going to take place here?
A. Yes.
Q. I'm going to ask you a series of questions regarding the John Nawara case, and if at any -- any time you don't understand the question or if it's confusing, just let me know, but if you answer a question, it's going to be presumed that you understood the question. Fair enough?
A. Yes.
Q. And if at any time you want a break ,as long as there's not a question pending, just let us know, and you can take the break.
A. Okay.

Page 6

Q. All right?
A. Yes. 0:02:22
Q. And it's real important that I don't interrupt you, and I'll try my best too, and you don't interrupt me because we have a court reporter and the transcript will get all messed up if we both talk over one another, all right?
A. Yes.
Q. And what is your date of birth?
A. 10/20/70.
Q. And where were you born?
A. Chicago.
Q. And what's your address?
(The following page 7 has been designated as confidential by agreement of the parties)
///

Page 7

[redacted]

*CONFIDENTIAL*

Page 8

(Continuation of Regular, Non-Confidential Testimony)
Q. Are you married?
A. No.
Q. Any children?
A. Yes.
Q. And how many children?
A. I have two children.
Q. And how -- what are their ages?
A. 17 and 15.
Q. And did you ever serve in the military?
A. I did not.
Q. And do you have any prior addresses?
A. I do. 0:03:16
Q. And what was the -- the one before this?
(The following page 9 has been designated as confidential by agreement of the parties)
///

[redacted]
///

*CONFIDENTIAL*



(Continuation of Regular, Non-Confidential Testimony)
Q. And how long did you live on [redacted]?
A. For approximately nine years.
Q. And you moved to the [redacted] when?
MS. MARMOR: Sorry, I just want -- just because I -- we have a protective order in the case, I'd just like to designate any addresses as confidential --
MR. LINDEN: Oh, that's --
MS. MARMOR: -- under the protective order.
MR. LINDEN: That's fine, yeah.
A. I'm sorry, what did you --
Q. I'm sorry.
A. -- ask?
Q. How long have you lived at the [redacted]
A. Since January of 2017.
Q. And nine years at the [redacted]?
A. Yes, approximately.
Q. And can you -- did you live with anybody at -- at Halsted?
A. My children.
Q. Okay. Anybody else?
A. No.
Q. What -- what is your educational background?



A. I have a bachelor in science in criminology from --
Q. And from what college? 0:04:17
A. Eastern Michigan University.
Q. What year did you obtain that?
A. 1993.
Q. And where did you go to high school?
A. I went to Rich East High School.
Q. And is that in Chicago?
A. It's not, it's in Park Forest, Illinois.
Q. And what year did you graduate from there?
A. 1988.
Q. And if you could, up until the sheriff's department, start with your employment history, your first job, and you can be kind of brief in that, but what was your first job after college, let's start?
A. So I went to graduate school after undergrad, and I worked for a company called Research Pros, which is a marketing research firm.
Q. Okay. What graduate school?
A. University of Illinois at Chicago.
Q. And what did you study there?
A. Criminal justice. 0:05:13
Q. And did you get a graduate degree from there?
A. I did not.



Q. How many years did you spend there?
A. Two years, I just did not complete my thesis.
Q. Did you have any other school you had to do to get the degree, or you just had to do the thesis?
A. I just had to do the thesis.
Q. And what year did you leave University of Illinois, or stop going?
A. '96.
Q. '96. Okay. And your first job after -- during grad school was a marketing research firm?
A. Yes.
Q. What was the name of that?
A. Research Pros.
Q. And what years did you work there?
A. 1995 to 1999. 0:06:01
Q. And what was your title there?
A. I think I was a marketing research specialist, I have to check my resume.
Q. Okay. And -- and why did you leave there in '99?
A. So after graduate school, I attended law school, and so after I got my law degree, I left Research Pros once I found a regular full-time job.
Q. Okay. And what law school did you go to?
A. DePaul University in Chicago.

Q. And what years?
A. '96 to '99.
Q. And did you get a JD from DePaul?
A. Yes.
Q. And the JD is 1999?
A. Yes.
Q. Did you study for the bar exam?
A. I did.
Q. And did you take the bar exam?
A. Yes.
Q. And you passed it?
A. Yes.
Q. And are you a licensed lawyer in the State of Illinois?
A. Yes.
Q. How long have you been a licensed attorney?
A. Since 1999.
Q. Have you been current the whole time?
A. Yes. 0:07:02
Q. Has your license ever been suspended or revoked?
A. No.
Q. Have you ever been disciplined?
A. No.
Q. You ever been convicted of a felony?



A. No.
Q. And I take it you haven't been convicted of a misdemeanor or a crime involving dishonesty?
A. No.
Q. Okay. And after the marketing job, what was your first job --
A. I --
Q. -- after that?
A. I worked for the City of Chicago as a sexual harassment investigator.
Q. And were you a lawyer at the time?
A. I was.
Q. And what years did you work for the city?
A. 1999 until 2004.
Q. Were you part of their corporation counsel's office?
A. No, the sexual harassment office was a part of the department of personnel at the time.
Q. Was that part of their human resources --
A. Yes.
Q. -- at the city?
A. Yes. 0:07:56
Q. And what type of things did you do for the city?
A. So I investigated sexual harassment complaints filed by city employees against other city employees, conducted training for all city employees on the sexual harassment policy, did other research projects related to sexual harassment in general.



Q. Were you essentially a fact finder, or was your job really, you know, to advocate for the city back then?
A. I was just a fact finder.
Q. And after 2004, what was your next position?
A. I was senior counsel with the Chicago Park District.
Q. And what year were you senior counsel?
A. 2004 until 2006. 0:08:44
Q. And what does a senior counsel for the park district do?
A. That senior counsel position was a laborer position, so union negotiations, grievances, discipline, some training, advising departments regarding labor issues, employee relation things.
Q. How many lawyers did the park district have in your department?
A. At that time, there were maybe nine attorneys.
Q. And entry level lawyer, would they be senior counsels? I take it they'd have a different title?



A. There is a counsel position and a senior counsel position.
Q. And who would be the next person up from a senior counsel?
A. Deputy general counsel.
Q. Would anybody be higher than the deputy general counsel?
A. There was also a general counsel. 0:09:46
Q. And you left the park district in 2004?
MR. BUSTAMANTE: '06.
A. Two thousand --
MR. BUSTAMANTE: Sorry.
A. I was --
MR. LINDEN: Swear -- swear the witness in.
A. I left in two thousand --
Q. It would be '06 I believe --
A. -- sorry, '16.
Q. '16? 2006 or 2016?
A. 2016.
Q. So you worked for 12 years for the park district?
A. I did.
Q. Oh, okay. And in 2016, did you go to the sheriff's office?
A. Yes.

Page 17

Q. Okay. And that was the Cook County Sheriff's Office that you're employed with?
A. Yes.
Q. What was your first position in 2016 with them?
A. Leave and absence manager.
Q. What is a leave and absence manager?
A. You direct the employee services department, which is a department within the bureau of HR, and that department handles employee leaves, return to work issues, light duty, things like that.
Q. Do you recall when in 2016 you got hired? 0:11:04
A. I think I started August of 2016.
Q. So you had only been there a couple of months when the Nawara incident happened in September of '16 --
A. Yes.
Q. -- correct? Who was your immediate supervisor in 2016?
A. Karyn Williams.
Q. Was she an HR person, Karyn Williams?
A. Yes, she was the executive director of human resources.
Q. And how do you spell Karyn?
A. K-a-r-y-n.

Page 18

Q. And how long was she your supervisor?
A. She was my supervisor until -- oh, gosh, maybe the spring of 2018. That's -- that's an approximation. I can't remember exactly when she left.
Q. So she was your supervisor up until the time Ms. Williams left the sheriff's office?
A. Yes. 0:12:15
Q. Was she your immediate supervisor?
A. Yes.
Q. Did you report to Ms. Williams?
A. I did.
Q. Did she work in the same office you did?
A. Yes.
Q. Where was your office?
A. My office is at the jail compound at 31st and California.
Q. Are there different buildings for the jail compound?
A. There are, I'm in building two.
Q. Is all of HR for the corrections in building two?
A. Yes.
Q. Is it HR just for corrections, or do you oversee other divisions or departments of the Cook County Sheriff's Office?

Page 19

A. It's for all of the Cook County Sheriff's Office.
Q. So you also do HR for police officers?
A. Yes.
Q. Court personnel people?
A. Yes.
Q. They would all be in the jail complex, the HR?
A. Yes.
Q. And who would have been above Ms. Williams in 2016?
MS. MARMOR: Object to the form. 0:13:14
A. I believe Karyn reported to Dana.
Q. And Dana is -- what -- what was Dana's last name?
A. Dana Wright, sorry. I blanked for a second there.
Q. W-r-i-g-h-t?
A. Yes.
Q. What was her title in 2016?
A. I think she was a deputy chief or something similar.
Q. And did she work in the same building with you?
A. No.

Page 20

Q. Was she part of HR?
A. No, she was not.
Q. So is it fair to say Karyn Williams would have been head of HR at the time?
A. Yes.
Q. And what were your job responsibilities in 2016?
A. Like I stated before, just kind of overseeing all of the human resource functions for current employees, so after hire. We didn't do any recruiting or anything like that in my department, but once an employee is hired, then any kind of leaves, benefit information, return to work, light duty, any kind of employee issues would be handled by employee services.
Q. And did you supervise anybody in 2016?
A. Yes. 0:14:29
Q. And who was underneath you? And I mean in the hierarchy, not literally, obviously, but.
A. I had five people in HR underneath me.
Q. Five people that reported directly to you?
A. Yes.
Q. And who were those five people, if you recall?
A. Wylola Shinnawi, I can spell that for you --
Q. Oh, please.

A. -- if you'd like. W-y-l-o-l-a, last name, Shinnawi, S-h-i-n-n-a-w-i.
Q. What was her position?
A. She was the FMLA manager.
Q. Did she have anything to do with John Nawara?
A. No, not that I believe -- no, not that I recall.
Q. Okay. But who were the other four people that -- if you recall?
A. Griselda Lobato.
Q. Can you spell that name too?
A. Sure, G-r-i-s-e-l-d-a, L-o-b-a-t-o. She was a -- maybe, like, a personnel analyst or something -- a title similar to that.
Q. Do you know if she had any -- anything to do or any involvement with John Nawara?
A. No. 0:15:41
Q. And who would be the third person that reported to you?
A. Jessica White.
Q. I -- I can even spell that name, but what -- what was her title?
A. Again, she was another personnel analyst or something of that nature.
Q. Do you know if she had anything to do with



the John Nawara incident or any involvement?
A. No.
Q. Okay. I think we've covered three of them, who is the fourth one?
A. Teresa Brown, T-e-r-e-s-a, Brown.
Q. What was her position?
A. Again, similar, personnel assistant or analyst.
Q. Did she have anything to do with John Nawara?
A. No.
Q. Was there a fifth person that reported to you?
A. Yes, Willette Lindsey, W-i-l-l-e-t-t-e.
Q. And what was Ms. Lindsey's position?
A. Again, she was a personnel analyst or HR analyst.
Q. Did she have anything to do with John Nawara?
A. No. I mean, the most they would -- involvement they would have had is issuing paperwork upon his return to work, I guess, but --
Q. How -- how about Karyn Williams, did she have anything to do with John Nawara?
MS. MARMOR: Object to the form. 0:16:58
A. Well as my supervisor, she -- we would meet about whatever current tasks I had ongoing.



Q. Was she directly involved at all in any of the issues regarding John Nawara, if you recall?
A. I did discuss the issues with him with Ms. Williams, yes.
Q. Okay. When did you have discussions with Ms. Williams regarding John Nawara?
A. I mean, just from the initial complaint from the Department of Corrections, I think, was sent to Karyn, and then she forwarded it to me, and so from that point on, she would ask for updates on the situation or I would, you know, talk to her about any issues I was having or anything that was happening.
Q. Do you recall any specific discussions you had with Ms. -- Ms. Williams regarding John Nawara?
A. You mean dates and exactly what we discussed or? 0:17:56
Q. Or not exact dates, but any specific conversations. I know it's hard to go back, that you're not a photographic memory to say, "On this date," but any specific conversations you had where the subject John Nawara was discussed.
A. I know that I would have raised with her, you know, the fact that he hadn't been -- that he wasn't participating in our process and he wasn't returning to work, so I mean she was -- she was -- is the one who



would give me advice or, you know, let me know what my next step should be, if any.
Q. Okay. As you sit here today, do you recall any specific conversations you had with Ms. Williams where you said anything to her or she said anything to you specifically regarding John Nawara?
A. No, I know we discussed it, but I can't recall specific conversations.
Q. As you sit here, you can't recall a single conversation with Ms. Williams in -- in which John Nawara's name came up. Is that fair?
MS. MARMOR: Object to the form.
A. Yeah, I mean, I -- I know we discussed it, but again, I can't -- I can't give you word for word what we discussed.
Q. Did she make any decisions regarding John Nawara?
MS. MARMOR: Object to the form. 0:19:08
Q. And "she" meaning Karyn Williams.
A. No, I think she would have advised me to go to the law department most likely, she wouldn't have made a decision.
Q. Okay. You said she would have advised you, do you recall her specifically advising you?
A. I don't recall the words coming out of her

mouth at this moment, but that was typically her advice.
Q. Okay. So you're talking in a general nature for matters that came up in H -- HR and not specifically related to John Nawara, is -- would that be a fair statement?
A. I'm sorry, can you repeat that?
Q. Are you talking generally what would have happened with an employee rather than specific -- specifically recalling Ms. Williams advising you to go to the law department?
A. Yes.
Q. How often would you go to the law department to seek advice regarding HR issues?
A. It would just depend on what was happening at the time. I don't have an estimate.
Q. Would it be on a daily basis?
A. No. 0:20:10
Q. Weekly basis?
A. Again, it would depend kind of, you know, what the issues were.
Q. Did HR have a law department?
A. No.
Q. Would you go -- who -- who would you go to in the law department if you had a question regarding an



HR issue?
A. Typically, Kate Christy or Nick Scouffas.
Q. What was Kate Christy's position back then?
A. I don't know what her title was.
Q. Was she in-house counsel for the sheriff's in 2016?
A. Yeah, she worked for the sheriff's office law department.
Q. And where was she located, at the jail?
A. No, at the Daley Center.
Q. Do you know if you talked to her at all regarding John Nawara?
A. Yes.
Q. And do you recall when any of these conversations took place?
A. Just during the ongoing issues. 0:21:05
Q. Did you talk to her about employment decisions?
MS. MARMOR: I -- I'm going to caution, I -- I don't really think you can ask that kind of question, the topic of the conversation. I -- I -- I -- I'm going to instruct the --
MR. LINDEN: Okay. But you --
MS. MARMOR: -- witness not to answer that.
MR. LINDEN: You can instruct her not to



answer, but I'm just going to tell you why, if it's an employment decision, I don't think it'd be covered. It's not litigation. There's -- I'm -- I'm just saying if you want to instruct her not to answer --
MS. MARMOR: I -- yeah, I -- I think that's -- I think you're getting into -- because you can -- it's not just litigation. It's not just -- it's not just litigation. It's also if you're seeking advice from counsel, that's also protected.
MR. LINDEN: I don't -- all due respect, for employment, I don't think it is, but if you're going --
MS. MARMOR: I -- I'm going --
MR. LINDEN: -- to object --
MS. MARMOR: Yeah, I am going to object.
Q. Did you seek advice from counsel when you talked to Ms. Christy?
A. Yes.
Q. Okay. Based on your counsel's instructions, are you refusing to answer questions regarding any discussions of any nature and any topics regarding Ms. Christy?
A. Yes. 0:22:06
Q. Anybody else in the legal department that you discussed John Nawara with, would it have been Nick Scouffas?



A. Yes.
Q. Right now, he's general counsel for the sheriff?
A. Yes.
Q. Back in '16, was he the general counsel?
A. I believe he was, yes.
Q. Did you seek any advice from Mr. Scouffas regarding labor decisions?
A. I would typically reach out to them together.
MR. LINDEN: Okay. And I take it you're going to instruct her not to answer regarding Mr. Scouffas, correct?
MS. MARMOR: Correct, any content of conversations with Mr. Scouffas, I'm instructing you not to answer.
MR. LINDEN: And also regarding topics?
MS. MARMOR: Yes.
Q. So based on advice of counsel, are you going to refuse to answer any questions regarding conversations you had with Mr. Scouffas?
A. Yes.
Q. And John Nawara?
MS. MARMOR: Regarding John Nawara.
Q. Regarding John Nawara?
A. Yes. 0:23:03

Page 29

Q. Okay. Are you still employed at the sheriff's office?
A. Yes.
Q. And what's your current position with the sheriff's office?
A. Director of employee services.
Q. Was that the next position after your initial hire date in 2016?
A. Yes.
Q. And what does director of employer (sic) services do?
A. It's actually the exact same job duties, they just corrected the title because the job was essentially directing that department.
Q. And when did you get your title changed?
A. Maybe approximately four months ago.
Q. Is there any difference between your prior position in 2016 and the director of employee services?
A. There is not. 0:24:06
Q. Okay. Ms. Williams left, I believe you thought, somewhere around 2018?
A. Yes.
Q. And who replaced her?
A. Matt Burke.
Q. And what is Mr. Burke's title?

Page 30

A. He is the interim executive director of human resources.
Q. How long has he been interim director, since 2018?
A. Yes, there was a little bit of a gap between when Karyn left and when he moved to HR, but it was still in 2018.
Q. And do you report -- report directly to Matt Burke?
A. I do not.
Q. How -- how come the reporting --
A. We --
Q. -- changed?
A. We also now have an assistant executive director of human resources, and I report to her.
Q. And who is that person?
A. Theresa Olson. 0:25:07
Q. And do you know when she became assistant director?
A. I believe it was early summer of 2019.
MS. MARMOR: How do you spell Olson?
WITNESS: O-l-s-o-n.
Q. So you -- you report directly to Theresa Olson?
A. Yes.

Page 31

Q. And I take it Ms. Olson reports directly to Matt Burke?
A. Yes.
Q. And how many people are currently underneath you? Or report to you is probably a better question --
A. Eight people.
Q. Were any of those eight people involved in any manner in the John Nawara matter?
A. No. 0:25:59
Q. How about Matt Burke, did he have any involvement with John Nawara?
A. I believe the initial documents regarding the incident came from Matt.
Q. Was he formally the chief of staff, Matt Burke?
A. He worked for DOC, but I'm not certain of what his title was.
Q. When you say, "Initial documents," do you recall what the initial documents were?
A. It would have been a referral to HR that went to Karyn Williams, asking us to meet with an employee following an incident.
Q. Do you know of any other involvement that Matt Burke had with John Nawara?
A. I believe he followed up regarding the case

Page 32

also at some point.
Q. And when you say, "Followed up," do you recall anything more you know?
A. No, I think he was just looking for the status of the case.
Q. Do you know if he talked to anybody or interviewed anybody about the case?
A. Oh, I don't -- not that I know of. 0:27:06
Q. How -- how about Theresa Olson, was she involved in any way with John Nawara?
A. Not from HR that I'm aware of.
Q. Do you know of any other involvement aside from HR that she may have had?
A. No, he came from DOC, but if she was involved in any way, I was not aware of it.
Q. You just have no knowledge either way --
A. Yes.
Q. -- is that fair? Okay. What did you do today to -- or to prepare for today's deposition?
A. Sorry. I met with counsel a couple days ago.
Q. And that was with Ms. Marmor?
A. Yes.
Q. And you met at her office?
A. Yes.
Q. And how long did that meeting occur?

Page 33

A. We met for maybe two hours, three hours.
Q. And did you review any documents in preparation for today's deposition?
A. Yes. 0:28:03
Q. What documents did you review?
A. My -- the notice calling me as a witness for the deposition, correspondence that I've sent in this case. I -- I also answered questions, like, along the -- the way through the lawsuit, so I reviewed those also.
Q. You mean answers to interrogatories?
A. Yes, thank you.
Q. Okay. Anything else that you recall?
A. Not that I recall.
Q. Did you review any photographs?
A. No.
Q. Any videotapes?
A. No.
Q. No videos?
A. No. 0:28:59
Q. Any pleadings at all, aside from the answers to interrogatories?
A. Only my own.
Q. Okay. What is a fitness for duty exam?
A. The fitness for duty exam itself is when an

Page 34

employee meets with an independent doctor to be evaluated for their fitness essentially to perform their job functions for the sheriff's office.
Q. Is it any employee within the sheriff's office that could be subject to a fitness for duty exam?
A. Yes. 0:29:50
Q. Do you know if there are any policies and procedures regarding fitness for duty exams in 2016 within the sheriff's office?
MS. MARMOR: Object to the form.
A. There were procedures that we followed.
Q. Do you know if there are written procedures regarding fitness for duty exams?
A. I don't know if -- if there were.
Q. Do you know either way if there were?
A. I -- I do not know if there were.
Q. Do you know what the procedures were in 2016?
A. Yes.
Q. And what were the procedures? 0:30:34
A. The department of HR would receive a referral, typically from an employee's department where they worked or from OPR regarding an incident involving an employee, could be an arrest, something like that, that, you know, would raise concern about whether or

Page 35

not the employee would be able to continue working based on the incident that had occurred.
Q. Who had the authority to make a referral to HR for a fitness for duty?
A. It typically came from the department head, from DOC, or from one of the supervisors in OPR.
Q. Did each of those people have authority to -- to make a referral?
A. You know, I -- I don't know that there was -- it was specifically outlined who was allowed to make a referral. I mean, in general, you know, anyone who became aware of a potential issue should refer it to HR.
Q. Okay. And once HR got a referral, would it be automatic that it would be ordered or would somebody have to make a decision whether or not that employee is going to be ordered for a fitness for duty exam?
A. It -- it wouldn't be automatic. The employee would come to HR and meet with the occupational health nurse and -- and with me also, we'd meet with the employee together.
Q. Would it always be with the nurse and yourself for a fitness for duty exam? And I'm talking about 2016.
A. Yeah, I -- I believe there was one that might

Page 36

have taken place in my absence, and I think it was the director of risk management who sat in with the nurse at that time.
Q. And do you know who that would have been?
A. Michele Morris, one L. 0:32:19
Q. Do you know if she had anything to do with John Nawara?
A. No, she did not.
Q. And did HR have the nurse working in HR?
A. Yes.
Q. And how many occupational nurses were there in HR?
A. One.
Q. And who is that person?
A. Winifred Shelby.
Q. Can you spell the first name?
A. W-i-n-i-f-r-e-d.
Q. Did Ms. Shelby report directly to you?
A. She did. She reported to me. I signed her timesheet, but she -- she reported to me and to the executive director of HR.
Q. Do you know what Ms. Shelby's title was within the sheriff's office?
A. Occupational health nurse.
Q. Is she there -- still there as an

occupational health nurse?
A. No, she's not.
Q. Do you know when she left the sheriff's office?
A. I believe she left in 2017.
Q. And she was involved with John Nawara, correct?
A. Yes. 0:33:24
Q. So the procedure was you'd call the -- I'm not talking about John Nawara specifically, but the procedure in 2016 is you'd call the person into HR, correct, the employee?
A. Yes.
Q. And then you and the nurse, Ms. Shelby, would meet with that person?
A. Yes.
Q. And what would be the purpose of that meeting?
A. We'd just try to get a sense from the employee about what occurred that led to the referral, and you know, it -- it would depend on what the exact situation was, but if, you know, someone was -- was struggling, we'd make sure they had, you know, resources if they needed them, a support system if that was necessary based on the situation, or you know,



relevant doctors' notes if someone were having a medical issue that appeared to make them unable to do their job, and at -- we would just meet with the employee, kind of gather information on the situation, and assess whether we thought the employee could actually return to work.
Q. Would you also meet with the person making the referral?
A. No. 0:34:37
Q. Would you talk to the person making the referral?
A. If we needed additional information, yes.
Q. So would you get the employee's side of the story if it's an incident that allegedly happened?
MS. MARMOR: Which --
A. Which --
MS. MARMOR: I'm sorry. Object to the form. I didn't -- we both had the same question.
MR. LINDEN: No, it wasn't the best question, but --
Q. Would -- would you -- like, in John Nawara's case, Jones-Hayes accused him of an incident in September of '16, correct?
A. Yes.
Q. In a case like that, not just with John



Nawara, but in a similar type of case, would you get the employee's side of the story of what happened before a fitness for duty exam would be ordered?
MS. MARMOR: And -- and I have the same objection because both people are employees, and so which employee are you talking about? You see the problem?
MR. LINDEN: A case like John Nawara, not John --
MS. MARMOR: Right.
MR. LINDEN: -- Nawara.
MS. MARMOR: But are you talking about would you get Mr. Nawara's or Ms. Jones-Hayes' side of the story? That's the --
MR. LINDEN: Okay. Let me --
MS. MARMOR: -- that's the --
MR. LINDEN: Let me -- let me -- I -- I can do this better.
Q. Okay. Who has the authority to order a fitness for duty exam?
A. You mean once the referral has come to HR?
Q. Yeah. 0:35:46
A. Who can then --
Q. Once you interview the employee and bring them in.



MR. BUSTAMANTE: Interrupt --
WITNESS: Oh.
A. The occupational health nurse would then send the referral to CorVel, which was our independent third party company.
Q. Okay. But who would make the decision that the employee has to undergo a fitness for duty exam?
A. The nurse and I would make it together.
Q. Would it be a joint decision?
A. Yes.
Q. Would you have to both agree on it, or can one of you say yes, another one say no, or how did that work?
A. I don't recall a time that we disagreed. If we initially had a disagreement, we would talk it through. In the end, I don't recall anyone ever being sent when one of us thought it was necessary and the other one didn't.
Q. Did you have the authority yourself to order a fitness for duty exam of an employee?
A. If -- if the nurse wasn't in agreement?
Q. Yeah, let's -- let's assume the nurse did not agree, did you have authority by yourself to order a fitness for duty exam?
A. It's not a situation that ever came up. 0:36:52

Q. Did you feel like you had the authority to order a fitness for duty exam?
MS. MARMOR: Objection. Calls for speculation.
A. I -- I would not do it on my own.
Q. Okay. In Mr. Nawara's case, he came in for an interview in November of 2016, correct?
A. Yes.
Q. And you met with Mr. Nawara, along with Ms. Shelby, correct?
A. Yes.
Q. And between the two of you, did you agree that Mr. Nawara would be ordered for a fitness for duty exam?
A. Yes.
Q. And you, along with Nurse Shelby, ordered a fitness for duty exam, correct?
A. We agreed that he should have one, yes.
Q. So between the two of you, you both had the authority to order Mr. Nawara to undergo a fitness for duty exam. Is that fair?
A. Yes. 0:37:45
Q. Okay. Would the referring person have the authority to order a fitness for duty exam?
A. Someone from outside of HR?



Q. Yes.
A. No.
Q. Like in this case, you said, I think, Matthew Burke made the referral for John Nawara, correct?
A. I believe so, yes.
Q. In 2016, could Matthew Burke order that fitness for duty exam be ordered for Mr. Nawara?
A. No, we would always have to meet with the employee in HR.
Q. Did Mr. Burke ever tell you that aside from a referral, that he should be ordered for a fitness for duty exam?
A. Aside -- no, no. 0:38:39
Q. Did you ever talk to Mr. Burke regarding John Nawara after you got the initial referral?
A. I don't believe so, other than he might have assisted me reaching the superintendent to get further information on the incident.
Q. And do you recall specifically going to Mr. Burke to get information from Jones-Hayes?
A. I -- I don't recall.
Q. Do you recall any involvement other than that you may have gone to him for assistance to get information with respect to John Nawara?
A. No, nothing other than putting us in touch.



Q. Do you recall any pertinent conversations you had regarding John Nawara other than just getting in touch with Superintendent Jones-Hayes?
A. With Matt Burke?
Q. Yes. 0:39:37
A. I don't.
Q. Do you know what criteria go into making decision whether or not the employee should be ordered for a fitness for duty exam?
A. It's essentially whether or not the employee presents in a way and the incident is such that Nurse Shelby and I believe that it would be best to have the employee evaluated before being returned to work.
Q. Do you recall any other criteria in 2016?
A. No. 0:40:27
Q. Do you recall any written criteria in place for fitness for duty exams?
A. If -- for us sending someone for a fitness for duty exam?
Q. Yes.
A. No.
Q. How specifically -- specifically did you go about making a decision whether or not to order the employee for a fitness for duty exam?
A. What do you mean?



Q. Mean you meet with the nurse, Ms. Shelby, and would you two meet and come -- try to come to a consensus whether or not that employee should be ordered to it?
A. So after we met with the employee, then we would talk amongst ourselves and try to come to a determination.
Q. Would it be typically that day that -- when you met with the employee that you would discuss it with Nurse Shelby?
A. Yes. 0:41:23
Q. And if you came to a determination where a fitness for duty exam should take place, what would be the next step?
A. We would inform the employee about what the procedures are, you know, the reason why we were recommending the employee go, and just kind of the procedural steps. Nurse Shelby would explain what the appointments are like, depending on whether it was a medical fitness for duty or a psychological fitness for duty, and she would assist, you know, and answer any questions the employees might have about the process.
Q. And would the employee receive written notice that he or she was required to do this?
A. They would -- the employee would receive

Page 45

documentation regarding their medical records, but I don't believe the nurse gave a document to the employee.
Q. Would they be given the name of the person they should contact to have this exam?
MS. MARMOR: Object to the form. 0:42:36
A. I'm sorry, I'm -- I'm just -- I apologize, I'm just trying to remember if there was, like, a letter that the nurse would -- would give the employee, and I -- I can't recall at this time. But they would be informed either via letter or you know, also verbally from Nurse Shelby that, you know, CorVel was our third party administrator, that someone would be reaching out from CorVel to facilitate the process of, you know, gathering the medical records and setting an appointment.
Q. Okay. Who is CorVel, do they have a formal name company?
A. I believe that is their formal name.
Q. And what type -- is it a medical provider, CorVel?
A. We -- I don't know all of what they do, but we use them as a third party administrator to select an independent provider to conduct the fitness for duty exams.

Page 46

Q. So in 2016, did you always use CorVel?
A. Yes. 0:43:29
Q. And would CorVel actually conduct the evaluation?
A. No, they would locate a provider and kind of coordinate getting the medical records to the provider, set up the appointment, notify the employee of when the appointment was scheduled. They would receive any documents that came from the independent medical provider also.
Q. Was there a list of medical providers that were approved to do these type of evaluations?
A. Not from the sheriff's office, no.
Q. That would be strictly done by CorVel?
A. Yes.
Q. Have you ever heard the name of a Dr. Kroll or Kroll, K-r-o, double L?
A. Not that I recall.
Q. Okay. I think you indicated that the procedures would depend on whether it's a medical or a psychological type referral?
A. Yes. 0:44:34
Q. Okay. What would be the difference between a medical referral versus a psychological referral?
A. Typically, a medical referral results in a

Page 47

one day examination by a doctor, the psychological referrals are two day appointments, so the nurse would just kind of explain what their appointments would be regard -- you know, depending on what kind of referral they were being sent for.
Q. Okay. And what would be the criteria that you'd say, "This person is going to be subject to a medical referral versus psychological referral"?
A. It would be based on whatever the incident was that led them to be sent to human resources.
Q. Now as you sit here today, do you recall what the incident was regarding the referral for John Nawara?
A. Yes.
Q. And what was that?
A. It was an altercation that he had with a superintendent at work.
Q. And who is that superintendent?
A. Karen Hones-Hayes. 0:45:32
Q. When you say, "Altercation," what do you mean by "an altercation"?
A. There was -- according to the superintendent, when she asked Officer Nawara about something that was occurring at work, he, you know, reacted kind of in an agitated way toward her, and that's what led to the

Page 48

referral that led him coming to human resources.
Q. Do you recall when that incident occurred?
A. It -- 2016, November, I believe.
Q. And John Nawara had a different version of what Ms. Hayes claimed happened, right?
MS. MARMOR: Object to the -- object. Assumes facts not in evidence. I don't think you've established that she knows what his version was.
Q. Did you ever talk to Ms. Hayes regarding what happened?
A. Yes. 0:46:29
Q. And do you recall what Ms. Hayes said to you what occurred?
A. Generally, yes.
Q. And when did you talk to Ms. Hayes?
A. It was just a day prior, I believe, to when we went with Officer Nawara, I don't recall the date.
Q. So it would have been November of 2016 --
A. Yes.
Q. -- fair?
A. Yes.
Q. And do you recall what Ms. Hayes told you what -- what happened?
A. Again, generally, yes. We have a -- she signed a statement kind of indicating all the details

of what occurred.
Q. Okay. Do you have any independent knowledge of what she said in this statement?
A. I do.
Q. And can you kind of tell us --
MS. MARMOR: I --
Q. -- what it is?
MS. MARMOR: I just want to make it clear. Independent recollection, she wasn't -- you're not suggesting she was there?
Q. Independent recollection of what --
MS. MARMOR: Yes.
Q. -- Ms. Hayes told you --
A. Yes. 0:47:12
Q. -- is what I'm asking.
A. So the superintendent spoke with the nurse and myself, and she indicated that in Cermak, she noticed inmates that were not handcuffed as they should have been, I guess, according to procedure, and when she went into the office to ask the officers who were there about why the inmates weren't handcuffed, Officer Nawara didn't respond to her question, and so she, I think, tapped his shoulder to get his attention, and kind of reacted in a violent way toward her, she felt, and was aggressive and disrespectful to the



superintendent.
Q. Okay. Do you recall specifically what -- when you say, "Violent way" that she claimed, do you recall how that was or what specifically the violent way was?
A. If I recall correct, I think he jumped out of his chair kind of angrily.
Q. Did she ever claim that Mr. Nawara struck her?
A. Not that I recall. 0:48:20
Q. Do you recall anything else specifically regarding what she claimed Mr. Nawara did that day?
A. So there was that incident in the office, and then I think she left the area because she was upset about what had happened, and then I believe that officer -- Officer Nawara approached her again in a way that she found to be disturbing.
Q. Okay. Everything you're testifying to is based upon what Ms. Jones-Hayes told you, correct?
A. Yes.
Q. Do you have any independent knowledge of the facts of what occurred that day?
A. I do not, only her statement.
Q. Do you know whether or not the incident occurred the way Jones-Hayes told you what happened?



A. I do not.
Q. Did you talk to Mr. Nawara regarding what happened that day?
A. I tried, yes. 0:49:14
Q. Okay. You said you tried, can you be more specific?
A. He wouldn't discuss -- I mean, he, at first, didn't acknowledge that there had even been any kind of an incident and wouldn't discuss the particulars of anything involving the superintendent.
Q. And do you recall was it an in person meeting you had with Mr. Nawara?
A. Yes, he met with the nurse and I in human resources --
Q. And --
A. -- the nurse and me.
Q. Do you recall the date you met?
A. I don't, November of 2016.
Q. Do you recall anything that Mr. Nawara said about anything that occurred that day back in September?
A. No, I recall that he said he didn't have -- you know, that he hadn't been experiencing any issues at work, that he didn't have an issue with the superintendent, and then he also stated later that he



tried to stay away from the superintendent.
Q. Did he ever indicate that Ms. Hayes -- and when I say, "Ms. Hayes," it's Jones-Hayes --
MS. MARMOR: Yes. 0:50:14
MR. LINDEN: Okay.
MS. MARMOR: And I think what --
MR. LINDEN: Making sure.
MS. MARMOR: Just so everybody understands the record, when she says, "The superintendent," we mean Jones-Hayes as well.
MR. LINDEN: Okay. Gotcha.
Q. Either "Superintendent" or "Ms. Hayes" might be easier.
A. Okay.
Q. Hyphens just becomes difficult for me. What was my -- I forgot -- let's see --
MS. MARMOR: You've lost -- he's lost -- actually, do you -- I -- I don't want to interrupt in the middle --
MR. LINDEN: No, that's fine.
MS. MARMOR: -- of a question, but --
MR. LINDEN: Yeah, now let's take a little break.
MS. MARMOR: Okay.
RECORDER: Okay. Okay.

Page 53

MR. LINDEN: Off --
RECORDER: Off the --
MR. LINDEN: -- the record.
RECORDER: Off the record, 10:58 a.m.
MR. LINDEN: And let's --
(Off the record)
RECORDER: Back on the record, 11:06 a.m.
Q. Just want to just back up for a second. I think we talked a little bit about that you went to Karyn Williams for advice?
A. Yes.
Q. And do you recall specifically any advice that Ms. Williams gave you regarding John Nawara?
A. I do not. 0:51:03
Q. Do you know whether or not she gave you any advice regarding John Nawara?
A. I don't recall our specific conversations, but again, we did discuss it, so it wouldn't have just been me kind of talking. You know, she would have responded with direction.
Q. Do you recall any directions that she responded with as you sit here today?
A. Not specifically, no.
Q. Generally?
A. Generally, like I said before, she would have

Page 54

directed me to go to the law department most likely --
Q. Okay.
A. -- with questions.
Q. Other than she would have directed you to the law department most likely, do you recall any other general advice that she may have gave you regarding John Nawara?
A. No.
Q. Do you know if she had any other involvement in John Nawara than generally that she may have said, "Go to the law department"?
A. No.
MS. MARMOR: Objection. Lack of foundation.
Q. I guess when you say, "No," you -- you agree with my statement. Would that be fair?
A. That she didn't have any other involvement that I'm aware of?
Q. Yes. 0:52:05
A. That's right.
Q. Okay. Okay. You talked about the referral depends on whether it be a medical referral or a psychological referral, correct?
A. Yes.
Q. And the medical would be one day, and you send him to a medical doctor -- or her, right?

Page 55

A. Yes.
Q. And psychological, they'd be sent to either a psychologist or a psych -- a psychiatrist?
A. Yes.
Q. And you talked about medical authorization forms, would that be done for every employee that would be sent for a fitness for duty?
A. Yes.
Q. And did you have forms within HR for the employee to give his consent for a medical release?
A. Yes.
Q. What type of forms were they, were they general forms?
MS. MARMOR: Object to the form. 0:53:00
MR. LINDEN: No -- no -- no -- no -- no pun intended.
MS. MARMOR: No pun indeed.
Q. Do you understand the question?
A. I do. One form was for the employee to complete to go to their doctor, so that -- it was a release, essentially, for the doctor to -- to release their medical documentation or their medical file, and then another one was for the final fitness for duty report to be released to the sheriff's office.
Q. Would it be two separate releases the

Page 56

employee would sign?
A. There were two forms, yes.
Q. And do you know who prepared those forms?
A. I do not.
Q. Did you have anything to do with the preparation of the forms?
A. No.
Q. Do you know if legal prepared those forms?
A. I don't know who prepared them.
Q. When you started in HR in 2016, were the forms already at HR?
A. Yes. 0:53:57
Q. Prior to ordering a fitness for duty exam for Mr. Nawara, did you or Ms. Shelby do any type of investigation to determine whether or not what Ms. Jones said actually happened?
A. We did not.
Q. Did you just accept what Ms. Jones said as true for purposes in determining whether or not he should be required to undergo an evaluation?
A. No, that was why we met with Officer Nawara, to try to figure out, you know, what had happened, if anything.
Q. Okay. Did you come to any conclusions at that time what -- what had happened?

A. You mean whether what she told us was accurate?
Q. Yes. 0:54:53
A. We did not.
Q. Did you ever assess whether or not Ms. Hayes should be ordered to undergo a fitness for duty evaluation?
A. We did not.
Q. How come?
A. We didn't have any information that alleged any kind of behavior from her that would make us suspect she wasn't able to perform her job duties.
Q. Did Mr. Nawara ever indicate to you that she treated him in an aggressive manner back in September of 2016?
A. No.
Q. Not at all?
A. No. 0:55:35
Q. When he went and saw you in November for the interview for the fitness for duty to determine whether or not he should be ordered, do you know what his status was as an employee?
A. He was a -- he was an active employee.
Q. Do you know what he was doing for the sheriff's office when he came in November of 2016?



A. He was a correctional officer.
Q. Did he have any limitations placed upon him prior to your meeting in November of 2016?
MS. MARMOR: Object to the form.
A. I -- what do you mean, "limitations"?
Q. Any work limitations, was he allowed, for instance, to carry a gun?
A. As far as I know, yes.
Q. Is it fair to say that he had been authorized to carry a gun from the time of the September incident up until the time that he came for the interview with you and Ms. Shelby?
A. Yes. 0:56:38
Q. Are there -- if somebody within the Department of Corrections considered a correctional officer to be of imminent danger, imminent threat, is there action that they could take to prevent that person from carrying a weapon?
A. It would depend on the circumstances, you know, where that information came from.
Q. Let's assume they had reason to believe that that employee was a danger, could they take immediate -- have immediate action taken to prevent that person from carrying a firearm?
A. I -- yeah. I -- I mean, I'm sure if a



supervisor had some kind of fear of an imminent situation happening, that they could go to OPR or something like that, or they would refer them to human resources.
Q. And I take it Ms. Jones could have communicated that to you back in November of '16 if that was a concern with Mr. Nawara, correct?
A. That she thought there was imminent danger with him?
Q. Yes. 0:57:45
A. Well she did write a memorandum following the incident, so I guess I don't know what you mean.
Q. Did she ever indicate to you that there was any imminent danger to either employees or the inmates with Mr. Nawara working as a correctional officer?
MS. MARMOR: Object to the form.
A. No, she passed on what her experience was with him.
Q. And that would have been in the statement that she gave you --
A. Yes.
Q. -- fair?
A. Yes.
MR. LINDEN: Okay. Do you have any Exhibit stickers?



RECORDER: Yeah.
MR. LINDEN: Okay.
RECORDER: Do you want me to write them out or you --
MR. LINDEN: Oh, gosh, you can write them out if you want. I don't care. I can't --
MS. MARMOR: I always make him do it. 0:58:45
MR. LINDEN: I can't -- why don't we get them all --
MS. MARMOR: I -- in fact, I have never filled out an Exhibit sticker in my life.
MR. LINDEN: No? Your -- either one --
MR. BUSTAMANTE: What are the numbers?
MR. LINDEN: Yeah, the numbers --
MR. HENRETTY: Probably did for trial. I don't know that I ever did it for deps.
MS. MARMOR: I've never done it for trial before.
MR. LINDEN: Oh, let's see.
MR. HENRETTY: Oh, you had better --
MS. MARMOR: I was --
WITNESS: Must be nice.
MS. MARMOR: -- Kirkland and Ellis.
MS. HONINGFORD: Yeah. Yeah.
MR. HENRETTY: Even -- even -- you had

support staff.
MS. MARMOR: Exactly. I was not working for the government.
MR. HENRETTY: At the firm, I don't think I ever did, but I did -- the government, you don't -- any --
MS. MARMOR: I was a paralegal before I went to law school, but I don't think I ever did a trial then.
MR. LINDEN: Just -- just for the record, I know we're getting a protective order entered. I think it's --
MS. MARMOR: Yes.
MR. LINDEN: -- pending.
MS. MARMOR: Oh, that's a different protective order. We have a protective order in the case already.
MR. LINDEN: Oh, do we already?
MS. MARMOR: We have a qualified HIPAA protective order.
MR. LINDEN: Oh, okay, that's it.
MS. MARMOR: That's a -- it's a different --
MR. LINDEN: Okay.
MS. MARMOR: -- issue, but we definitely have a protective order in the case.



MR. LINDEN: So the documents have already been marked confidential --
MS. MARMOR: Correct.
MR. LINDEN: -- we just can agree it's subject to the protective order?
MS. MARMOR: Exactly.
MR. LINDEN: All right.
MS. MARMOR: Yes.
MR. LINDEN: Great. Okay. I'd like to --
MS. MARMOR: We should probably -- he's -- he's -- he can't do both things, I don't think.
MR. LINDEN: Well the camera's on, right?
MS. MARMOR: Okay, but is that --
MR. LINDEN: Because --
MS. MARMOR: So is that -- is that -- I -- I've never done it where he wasn't typing while --
RECORDER: No --
MS. MARMOR: Is this off the record right now?
RECORDER: No, this is --
MS. MARMOR: This is on the record? Okay. All right. 0:59:57
MR. LINDEN: Do you want to -- can we just go off the record a second, if you'd like?
RECORDER: Off the record, 11:13 (sic) --



11:15 a.m.
MR. LINDEN: Yeah, what they do, they --
(Off the record)
Q. I have shown you what --
RECORDER: Back on --
MR. BUSTAMANTE: Wait.
RECORDER: Back on the record, 11:17 a.m.
MR. BUSTAMANTE: Okay.
Q. I -- I've shown you what's been marked as Reierson Number 1, do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is a document -- it's very blurry. This is a document that would be filled out and given to the employee's health care provider in order to release their medical information for a fitness for duty examination.
Q. Okay. You said this form would be filled out, who would fill this -- this form out?
A. It could be filled out by the employee or by Nurse Shelby.
Q. It's got a spot on top that says, "Patient's name"?
A. Yes. 1:00:57
Q. And it's got the date of birth for the



patient, correct --
A. Yes.
Q. -- spot? And Social Security?
A. Yes.
Q. And this is a form in use in 2016?
A. Yes.
Q. And this is actually the form given to Mr. Nawara to sign, correct?
A. Yes.
MS. MARMOR: Object to the form.
Q. Okay. The answer is yes?
A. Yes.
Q. So when this form was given to Mr. Nawara, the only part that was filled out was second box checked that reads "all health care information," correct?
A. I don't know what this specific -- what was checked on the specific form he got. It is checked on this form.
Q. Okay. If I represent to you that this is a form, I can show you other communications that came, but this box was checked, do you know who checked this box?
A. I do not. 1:01:59
Q. Do you know why none of this -- any of the

other information on this form was not filled out before it was given to Mr. Nawara?

A. So typically, it's kind of an interactive process when we meet with employees to determine if it would be necessary for them to undergo a fitness for duty, but Mr. Nawara was not cooperative, and so you know, normally, the nurse would talk to the employee and gather their providers' names and things like that and assist with completing the forms and explaining them, we just didn't have the opportunity with Mr. Nawara.

Q. Did you ask Mr. Nawara in November of '16 to complete this form in your presence?

A. I don't believe so. I don't believe we got to that point with him.

Q. Was there anything that prevented you or Ms. Shelby from putting the patient's name on this document?

A. No, not necessarily. 1:03:04

Q. And I take it being in HR, you either knew his date of birth or you had access to his date of birth?

A. Yes.

Q. So you or Ms. Shelby could have filled in the date of birth, correct?



A. Yes.

Q. And same thing when applied to the Social Security number?

A. Yes.

Q. And if there is a previous name, the sheriff's office would have known his previous name, correct?

A. Perhaps.

Q. Okay. It's got a spot here, it says, "I request and authorize," blank, "to release health care information of the patient named above," and who would -- this was blank what it was given to Mr. Nawara, correct?

A. Yes. 1:03:51

Q. Do you know why nothing was filled in when it says, "I request -- I request and authorize," blank, "to"?

A. Well again, this is a form that is kind of completed along with the employee while you are meeting and talking with the employee, so because we didn't get to that point with Mr. Nawara, the form wasn't completed with him like it would be in most circumstances.

Q. Would it typically be filled in -- who was the provider, Corell (sic)?



MR. BUSTAMANTE: CorVel.

MS. MARMOR: Object to the form. CorVel.

MR. LINDEN: CorVel.

Q. Would CorVel typically be the one authorized to receive the information when you were at HR in 2016?

MS. MARMOR: Object to the form and assumes facts not in evidence.

A. So this line that you're talking about would be where the provider's name would go, so you're authorizing the provider to release the information.

Q. Okay. And the provider in this case would have been CorVel, correct?

MS. MARMOR: Objection. Mischaracterizes her testimony. 1:04:52

Q. And -- and if I'm not stating it accurately, you know, please tell us.

A. So there's -- there's one form that authorizes a release to the sheriff's office, and there's one that allows the medical provider to release the records to CorVel. I would have to see the other one next to this, I guess, to differentiate.

Q. Who -- who would you typically put in this blank of this form, if you know --

A. I -- I didn't --

Q. -- in 2016?



A. Oh, I'm sorry. I didn't complete these forms, the nurse did.

Q. Okay. Do you know what the standard procedure would have been in 2016 on this specific form, if it would have been the sheriff's office to be filled in this blank or the provider?

A. Again, I'd have to see the other form to kind of have a frame --

Q. Okay.

A. -- of reference for this one.

Q. Okay. Let me show you what's been -- or is marked as Exhibit Number 2.

MS. MARMOR: Reierson Exhibit 2? 1:06:01

Q. And I just ask you, tell us what it is?

A. It says, "HIPAA authorization for disclosure of protected health information."

Q. And this is the other form that you're referring to?

A. Yes.

Q. Okay. By looking at this form and going back to my prior questions regarding Exhibit Number 1, can you tell on Exhibit 1 who the entity or -- should have been in the blank, that "I request and authorize," blank, "to release health care information"?

A. Yes, so this would be the employee

authorizing their physician to release information to the sheriff's office.
Q. So it'd be their personal physician? 1:06:54
A. Whatever physicians were -- right, that they were -- that they had seen.
Q. Okay. Then the next line says, "Release health care information of the patient named above to," and then it's got blanks, name, address, city, etcetera, correct? Do you see that?
A. Yes.
Q. And I'm referring to Exhibit Number 1.
MS. MARMOR: Oh, sorry. Yeah, I was completely confused.
WITNESS: Oh.
MR. LINDEN: Okay.
A. Excuse me. Yes, that's correct.
Q. Okay. And there's a stamp here, and can you read what the stamp is next to the name, and it's got an address?
A. Yes, it says, "Cook County Sheriff's Office, Winifred Shelby, RN, CO -- CCM, South Campus, Building 2, 3026 South California Avenue, Chicago, Illinois 60608."
Q. Do you know why, according to this firm (sic), the medical information be released to the



sheriff's office as opposed to the provider?
MS. MARMOR: Can -- can you read that back? 1:07:59
(Record replayed)
MS. MARMOR: I'm going to object to the form.
Q. Do you understand the question?
A. I do. So the employee's physician -- the employee's authorizing the physician to release the records to the sheriff's office, to the nurse. She will compile all of the medical documentation that was received and give it to CorVel to provide to the independent physician that was selected by CorVel.
Q. If that information would have been released to the sheriff's office, who within the sheriff's office would have had access to the medical records?
A. Just to the nurse, as indicated on here. 1:08:59
Q. Okay. What -- what protections were in place in 2016 that it would stay within the nurse's purview?
A. The nurse had her own locked office with locked filing cabinets.
Q. Is there anything on this document that says that that information would be limited to the nurse receiving it?
A. Well the authorization is for it to be released to her.
Q. Okay. On top, it says it'd be released to



the Cook County Sheriff's Office, correct?
MS. MARMOR: Object -- objection.
A. It says, "Cook County Sheriff's Office, Winifred Shelby," so they are authorizing the records to be released to her.
Q. Okay. Do you know why the authorization would be released to the Cook County Sheriff's Office, Winifred Shelby, as opposed to CorVel?
A. It was just because many times, employees had more than one provider, and so she would just kind of corral all of the documents together and present them in one packet to CorVel.
Q. Okay. Then if you go down after that, there is a paragraph that the document says, "This request and authorization applies to," colon, and there is three boxes that can be checked. See that?
A. Yes. 1:10:30
Q. And the first box would be if it would have been checked, "health care information relating to the following treatment condition or dates," colon?
A. Yes.
Q. And what was the purpose of that box on the form as an HR person?
A. If we had a specific referral for an employee -- regarding a particular medical situation, then we



might put details in that area.
Q. What about a specific psychological issue, would you limit and check that box?
A. That would -- that was -- wasn't done, as far as I was aware.
Q. So in Mr. Nawara's case, if you would have signed it, isn't it a fair statement that any records whatsoever relating to Mr. Nawara would have been released to the sheriff's office and Nurse Shelby?
MS. MARMOR: Objection. Mischaracterizes the testimony and puts facts not in evidence.
Q. Am I wrong? 1:11:33
A. No, so the information would be released to the nurse, and that would be provided to the independent medical doctor because that -- that would be the person who could decide what's relevant and what's not to whatever the current situation is.
Q. I -- I guess my question is this release, the way it's written, would call for the release of any and all medical information regarding that employee and it wouldn't be limited in scope. Is that a fair statement?
MS. MARMOR: Same objection.
A. Yeah, it's asking for all health care information.

Page 73

Q. And you or Ms. Shelby could have checked the first box regarding Mr. Nawara and said it should be limited to X, Y, or Z, correct?
A. Yes, but I guess I don't -- if -- I don't know why you'd do that in a case like this because it wouldn't be -- I mean, there are a number of records that could be relevant, not just specifically a psychological record.
Q. Okay. What type of records were you seeking when you referred him to a fitness for duty exam?
MS. MARMOR: Objection. Calls for facts not in evidence. 1:12:42
A. I mean, I don't know specifically what the doctor considers relevant when they are reviewing the medical information and when they meet with the employee, but certainly, there could be physical issues that could lead to psychological issues, and there could be crossover, so limiting a request just to psychological records might not give a doctor the complete picture they need to evaluate an employee.
Q. How about limiting the release to a specific period of time, was that ever done when you were at HR?
A. Yeah, it was common for employees to ask about, you know, how long would these records need to go back, and then the nurse would have a conversation

Page 74

with the employee about what seemed reasonable.
Q. And would that be a decision typically made by the nurse and not you, or would it be made by the two of you together?
A. It would be -- the nurse would discuss with the employee, and they would kind of come up with something that seemed reasonable under the circumstances.
Q. What type of scope limitations were typically --
A. I mean, it --
Q. -- put on these forms? 1:13:46
A. It could be a number of years. I mean, I -- the nurse would be more fit to discuss that. It wasn't a decision I made.
Q. With respect to Mr. Nawara, did you ever discuss with Ms. Shelby about any time limitations that should be placed upon the release?
A. No, again, that's a conversation she would have had with Mr. Nawara had he interacted with us in our meeting.
Q. Did anything prevent her from putting a time limitation on there?
A. Only that she hadn't been able to talk with Mr. Nawara.

Page 75

Q. Do you know what efforts Ms. Shelby made trying to talk to Mr. Nawara about any limitations that should be placed on this form?
A. Well I know that she tried to have two conversations with him the day when he came to HR, and I know she reached out him at least once via telephone, maybe more than that.
Q. Isn't it true that when he came in, he expressed a problem with signing these forms, Exhibits 1 and 2?
MS. MARMOR: Objection. 1:14:51
A. No. Well I mean, he expressed a problem with just being there and discussing anything.
Q. Did he ever indicate to you that he didn't -- he wanted to talk to his lawyer before he signed the medical release forms?
A. No, not that I recall.
Q. Was there a reason why he didn't sign them on the day that he came in?
MS. MARMOR: Objection. Calls for speculation.
A. I don't even know if he knew what the forms were honestly, we weren't really able to discuss the process with him at all.
Q. Did you hand him the forms that day?

Page 76

A. The nurse might have.
Q. Okay. When you say, "The nurse might have," do you -- do you recall whether or not she did or didn't on that day?
A. I -- I believe he -- he left with the forms.
Q. Did you have any information when Mr. Nawara came to you in 2016 that he had any psychological issues predating the alleged September 2016 incident?
A. No. 1:16:02
Q. Do you know of any reason why a psychological medical record should have been requested for a fitness for duty exam, medical records existing prior to 2016?
MS. MARMOR: Objection. Calls for -- it assumes facts not in evidence.
A. When the fitness for duty evaluations are conducted, like I said before, the doctor kind of looks at a full picture of the employee, which is why they request to have their medical history.
Q. Do you know what records a doctor in this case wanted?
A. I do not.
Q. Did you or Ms. Shelby ever call the doctor and say, "Should there be any limitations placed upon the release and what documents you, the doctor, needed to perform an evaluation on Mr. Nawara?"

A. No, we don't communicate with the doctor. 1:16:53
Q. Was there any reason for Mr. Nawara's fitness for duty examination that you needed the medical records as opposed to psychological records regarding Mr. Nawara?
MS. MARMOR: Objection to form and calls -- and assumes facts not in evidence.
A. I mean, just as I said before, that having the employee's full medical history, whether it's simply medical or psychological, assists -- assists with having a full evaluation done of the employee.
Q. Do you know of any medical issues with respect to Mr. Nawara when he came in for the interview in November 2016?
A. No.
Q. Do you know of any reason why a doctor, given that you didn't know of any medical issues, would have needed the medical records of Mr. Nawara as opposed to just psychological records, if he had any?
MS. MARMOR: Object to form and assumes facts not in evidence.
A. Oh, I -- just the same reason, they would need to know the medical history of the employee in order to make a complete assessment of the employee.
Q. But you're seeking a psychological assessment



regarding Mr. Nawara, I take it, correct?
A. Yes. 1:18:07
Q. Do you know why the doctor would have needed the medical records, as opposed to psychological records --
MS. MARMOR: Object --
Q. -- that psychological evaluation?
MS. MARMOR: Sorry. Objection. Asked and answered. I mean, I think she's answered several times now to that same question.
Q. I know you're not a doctor, I'm just asking do you know, as you sit here today, of any medical reason why that evaluator would have needed Mr. Nawara's medical records as opposed to psychologic records?
A. Yeah, again, only because, you know, someone's physical health can be intertwined with their psychological health.
Q. Okay. What physical health did that doctor need to perform the evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. I don't know. That's why they get the records and go through, you know, what they feel is relevant and use that in their assessment.



Q. Can you give us examples of any physical issues that would go to psychological issues for a fitness for duty examination?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. Yeah, I cannot. 1:19:11
Q. You cannot, okay.
MS. MARMOR: I need to take a quick break.
MR. LINDEN: Sure.
MS. MARMOR: Okay.
RECORDER: Off the record, 11:36 a.m.
(Off the record)
RECORDER: Back on the record, 11:44 a.m.
Q. Just to clarify, did you meet one time with Mr. Nawara?
A. Yes. 1:19:31
Q. And that was the only time you met with Mr. Nawara, was one time in November?
A. It was one meeting date. He did come in and out of the office twice, but it was all within a short span of time.
Q. Okay. Do you know what kind of span we're talking about?
A. Oh, within probably 20 minutes, I would say.
Q. So was there a break where he left and then



came back?
A. He left and met with his union representative, yes.
Q. Do you know how long he was there before he met with the union rep?
A. A couple minutes maybe, tops. 1:20:02
Q. So one of the first things he said to you and Ms. Shelby was "I want to meet with the union rep," is that what happened?
A. No, he -- well we just explained why we wanted to meet with him.
Q. Did he ask to have a union rep present during that meeting?
A. I don't know if he had called the union in advance, the -- but -- and the union is not typically right there, so he -- he might have called them in advance. I don't remember him saying he wanted a union rep there, no.
Q. But initially, there was not a union rep, is that what happened?
A. Yes.
Q. Was anything -- did he say anything in that first session before the union rep got there?
A. Not much.
Q. When you say, "Not much," do you recall

anything what he said?
A. Well basically, what I told you before, that he wasn't experiencing any issues at work, he wasn't -- he hadn't been in any altercations, he didn't have an issue with the superintendent, and then that he stayed away from the superintendent, just very short, clipped answers. That was it.
Q. Okay. And where did this interview occur?
A. The meeting was in the nurse's office. 1:21:14
Q. And it was just you and Ms. Shelby?
A. Yes.
Q. Did Ms. Shelby have any other interviews that you know of with Mr. Nawara?
A. No, just I know she did try to reach him by phone, but I don't know that she ever connected with him again after we met with him that day.
Q. Do you know whether or not she met privately outside your presence at any time personally with Mr. Nawara?
A. Not that I'm aware of.
Q. Okay. And how long after the break was it when he came back in with the union rep?
A. Oh, I'm not certain, a few minutes maybe.
Q. And how long -- did he say anything more with the union rep, or what happened when he came back, if



you can separate the two time frames?
A. I don't recall. I -- I just -- I -- I recall that it ended abruptly with him just kind of -- with him just leaving, but I -- I don't recall the conversation once the union rep was there.
Q. Was this an office with a private door or more of a cubicle nature?
A. It's a private office. 1:22:22
Q. Can anybody else, other than you, and the nurse, and the union rep, when he was there, and Mr. Nawara hear what was going on?
A. No.
Q. Okay. I'd like to show you Exhibit Number 3.
MR. LINDEN: And there's two -- one --
MR. HENRETTY: I'll share.
MR. LINDEN: Yeah. You don't care?
MS. MARMOR: Thanks.
Q. And ask first of all, do you know what this document is?
A. Yes.
Q. What -- what is it?
A. This is the information that was given to Nurse Shelby and I by the superintendent regarding the incident with Mr. Nawara.
Q. And that would have been super --



Superintendent Hayes, correct? I think we already --
A. Yes.
Q. -- fixed that one.
MS. MARMOR: We -- we've now got Superintendent Jones, Superintendent Hayes, the record shows it's Superintendent Jones-Hayes. It's fine.
MR. LINDEN: Okay. 1:23:22
Q. And this is dated November 16th, 2016?
A. Yes.
Q. Do you know if that was the day that it was provided to you?
A. It was -- I -- it's the day the telephone conversation took place.
Q. And do you know who actually typed this Exhibit 3 up?
A. I believe I did.
Q. It was not given to you beforehand by Superintendent Hayes?
A. No, this was based on our conversation with Superintendent Hayes.
Q. Do you take handwritten notes of your conversation?
A. I don't know if I had -- was typing as we were talking or if there were other notes. I -- I think I probably typed as we spoke.



Q. Is that your normal practice, to type as you speak?
A. Yes, because I often can't read my handwriting when I go back, so.
Q. And is that a verbatim statement of what she gave or is it more of a nature of a summary?
A. It was a summary of what she said. 1:24:24
Q. By looking at this document, do you have a better idea of when you talked to Mr. Nawara?
A. It would have been after this statement, so maybe a day or two after, as soon as we could get him in the office.
Q. So it probably would have been either November 17th or 18th, 2016. Is that fair?
A. Yes.
Q. I notice one line here, and I don't want to go through the whole thing with you, it's -- this is Ms. Hayes' version of what occurred that day, correct?
A. Yes.
Q. As you sit here, you don't know if that's accurate or not accurate, correct?
A. Yes.
Q. You -- you don't know, correct? The question is bad. When you say, "Yes," you don't know if it's accurate or not, right?

A. No, I --
Q. It's solely --
A. This -- this is the statement that she gave to me and to Nurse Shelby -- or this is the information she gave to us --
Q. Okay.
A. -- I should say.
Q. So I notice one line says, "Officer Nawara displayed extreme rage towards her, his body trembled as he screamed at her with his fists clenched." You didn't come to a conclusion that that's what happened, I take it, correct?
A. No, this is what the superintendent reported --
Q. Okay. 1:25:37
A. -- occurred.
Q. So you don't know whether or not he did or did not display any type of rage towards her, correct?
A. I do not.
Q. Do you know what type of history Ms. Hayes had, did she have any other prior complaints of any employees?
MR. HENRETTY: Object to form.
MS. MARMOR: Same objection.
A. Did she complain about other employees?



Q. No, do you know whether or not, prior to meeting her or talking to her in November of 2016, whether or not she had any complaints against her by any fellow employees?
A. I do not know.
Q. Do you know --
A. I -- I do not know.
Q. Do you know if she had any disciplinary history within the sheriff's office?
A. I don't know.
Q. Did you or Ms. Shelby check to see whether or not she had ever been disciplined?
A. No.
Q. Did you check to see if she had any prior complaints against her by fellow employees?
A. No. 1:26:37
Q. Did you type any -- when you talked to Mr. Nawara, did you type any type of notes regarding your conversation with him?
A. No.
Q. Was there a reason that somehow you -- when you talked to Ms. Hayes, that you typed your notes up, but you did not when you talked to Mr. Nawara?
A. Well this was in order to get more detail on the incident she was reporting. There really was not



much of a conversation to -- to document with Mr. Nawara.
Q. Did you take any notes whatsoever when you talked to Mr. Nawara?
A. I don't believe so.
Q. Do you know whether or not Ms. Shelby took any notes regarding the interview with Mr. Nawara?
A. I don't know.
Q. Do you know of any written record of what Mr. Nawara might have said at that meeting with you and Ms. Shelby?
A. I don't. 1:27:37
Q. Do you know how many referrals for fitness of duty exams that you've been involved with during your time at the sheriff's office?
A. Oh, I would say approximately maybe 15 or so. It's -- it's a guess though.
Q. So it's somewhat rare to have a referral for a fitness for duty exam?
A. Yes.
Q. Of those 15 or so, did you always agree with the referral?
A. No. 1:28:30
Q. Of the 15, do you know how many you disagreed and said the employee should not have to be subjected



to it?
A. I would say maybe a third of the time, this is just an estimation, employees are actually sent through the fitness for duty process following their meeting in human resources.
Q. So is it fair to say that more often than not, you find that the employee should not have to undergo it?
A. Yes.
Q. Okay. When you said you have been involved in about 15, that would have been from 2016 until today, correct? About three year period?
A. Yes.
Q. Do you know if the --
A. That number might be a little low, I'm sorry.
Q. Okay. And I think when Mr. Nawara came in in November, you hadn't been there too long, right, same year --
A. Yes. 1:29:43
Q. -- under the sheriff's office? Prior to Mr. Nawara, do you know how many, approximately, fitness for duty evaluations you -- you had been involved in?
A. Maybe one or two before that.
Q. Yeah. Do you recall specifically what the one or two were?

A. I recall -- I recall one, but I feel like there was another one also, and I am not recollecting the details.
Q. How about Ms. Shelby, how long had she been working for HR as a nurse?
A. I believe she started in 2015 with the sheriff's office.
Q. Do you know how experienced she was in 2016 with referrals for fitness for duty exams?
A. I don't know.
MS. MARMOR: Objection. Lack of foundation.
Q. You don't know?
A. I -- I don't know. 1:30:40
MR. LINDEN: Okay. The Exhibits, we can just kind of keep over there so I don't lose them.
MS. MARMOR: Oh, okay.
MR. LINDEN: Okay.
MS. MARMOR: You're, like, the -- a partner --
MR. LINDEN: We're --
MS. MARMOR: -- at a big firm that cannot be trusted with them.
MR. LINDEN: No, no, no, no. Okay.
MS. MARMOR: We're on 4?
MR. LINDEN: Yes.



Q. I'd like to show you Exhibit Number 4 and ask you if you recognize Exhibit Number 4.
A. Yes. 1:31:38
Q. And what is Exhibit Number 4?
A. This was the referral that came from DOC requesting that we meet with Officer Nawara.
Q. Okay. And that was from Matthew Burke, comma, chief of staff?
A. Yes.
Q. And does that refresh your recollection what position Mr. Burke held on 9/29/16?
A. Yes, I guess he was chief of staff.
Q. Would that be chief of staff for the sheriff or just chief of staff within DOC?
A. DOC.
Q. So each department would have its own chief of staff?
A. I'm not certain.
Q. Do you know whether or not Mr. Burke had any communications with Ms. Hayes?
A. I don't.
Q. Do you where Ms. -- Mr. Burke got his information that a referral should be made to HR?
A. I do not. 1:32:39
Q. And this form says, "Pursuant to the attached



documentation, I am requesting that Officer John Nawara, employee number" -- goes on to say, "be evaluated for fitness for duty," do you know what the attached documentation was?
A. I believe the statement from the superintendent about the incident with Officer Nawara.
Q. Okay. And I see there is two people copied here, Nneka Jones Tapia --
MS. MARMOR: Nneka.
MR. LINDEN: Nneka? I'm sorry.
Q. Says, "Executive director," do you know was she executive director of DOC?
A. Yes, she was.
Q. And Tarry Williams, DOC chief of operations. Other than being cc'd on this referral, do you know of any involvement these two people had with John Nawara?
A. No. 1:33:43
Q. Is it common for the executive director and DOC chief of operation be copied on these type of letters, if you recall?
A. I don't know if they're typically copied or not. Probably.
Q. Does it mean anything to you that they are copied on this one?
A. No. I mean, only that Matt was just, you



know, keeping his supervisors in the loop.
Q. Okay. So would it typically go from -- in 2016, would Karyn Williams typically assign these to you?
A. Yes.
Q. Would Karyn Williams typically make the decisions for fitness for duty evaluations, or would she delegate that to you?
A. What do you mean, make the decisions for them?
Q. You indicated that you and Ms. Shelby made the decisions whether or not the employee should be required to undergo a fitness for duty exam, correct?
A. Yes. 1:34:46
Q. Would Ms. Williams have had the authority to make those determinations in 2016?
A. Oh, I don't know. She really wasn't involved in the process in that way. It would be more referring the cases to me and to the nurse.
Q. And that's what happened with Mr. Nawara, she basically referred it, stepped aside, and let you do the work with Ms. Shelby?
A. Yes.
Q. Okay. Do you know of any information if we talk to Ms. Williams that she'd have regarding

knowledge to this case?
MS. MARMOR: Objection. Calls for speculation.
A. I do not know.
Q. You don't know of any knowledge that she'd have, correct?
A. Yes. 1:35:33
Q. Do you know whether or not Ms. Hayes filed a complaint against Mr. Nawara?
A. I don't.
Q. Do you know whether or not Mr. Nawara was ever disciplined?
A. No, I don't know.
Q. You don't know either way? Do you have any information to indicate that Mr. Nawara was ever disciplined for the alleged incident that occurred in September?
A. I don't know if he was or not.
Q. Do you know whether or not OPR ever investigated what Ms. Hayes says occurred back in September of '16?
A. I don't know if they investigated. 1:36:38
Q. Do you know -- do you know of any conclusions by OPR regarding what happened that day?
A. I don't.



Q. Do you know whether or not John Nawara, prior to meeting with you in November, filed any type of complaint against Ms. Hayes?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't know.
Q. Okay. I want to show you --
MR. LINDEN: Exhibit 5?
MS. MARMOR: Yeah.
Q. Going to hand you Exhibit 5.
MS. HONINGFORD: Thank you.
MR. LINDEN: I think a couple of these, we might have one less Exhibit.
MR. HENRETTY: Exhibit 5 --
MS. MARMOR: Oh, goodness.
MR. LINDEN: So far or not --
MR. HENRETTY: -- have --
MR. LINDEN: -- too bad.
Q. Do you recognize Exhibit Number 5?
A. No, I don't. 1:37:51
Q. Have you ever seen Exhibit 5 before today?
A. No, not that I recall.
Q. Have you ever seen this type of form before when you worked for the sheriff's office?
A. Yes.
Q. And what type of form is it?



A. It's --
MS. MARMOR: Objection. Lack of foundation.
A. So it -- it says, "Cook County Sheriff's Office discrimination, harassment, sexual harassment complaint form."
Q. Is this the type of form that's typically kept in the ordinary course of business based on your experience at the sheriff's office?
MS. MARMOR: Objection. Lack of foundation.
MR. HENRETTY: Join.
A. No, this isn't a form that I use, so I couldn't answer.
Q. How often -- how many times have you seen this form?
A. I -- I couldn't estimate. I don't know.
Q. More than ten?
A. This type of form?
Q. Yes.
A. Oh, maybe. I'm not certain.
Q. But according to this report, he filed a complaint on October 13th, 2016. See the date here?
A. Yes. 1:38:58
MS. MARMOR: Objection. Lack of foundation.
Q. At the time -- assuming he filed this complaint, would you have had access, if you wanted to,



to this document when you interviewed Mr. Nawara in November?
MS. MARMOR: Objection. Calls for speculation. Lack of foundation.
MR. HENRETTY: Join.
Q. If you know.
A. No, I don't know where he filed this complaint.
Q. Okay. You see on the top portion, it says, "This form must be submitted to either a member in your own chain of command," comma, "director of personnel, or the office of professional review." You see that up there?
A. Yes.
Q. Director of personnel at the time would have been within human resources, or would that be the DOC director of personnel?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Yeah, it --
Q. If you know. 1:39:56
A. Yeah, it's -- it's not clear on here.
Q. If you can just kind of read this, and I just wanted to ask you one question.
A. Okay. 1:41:26

Q. Would it have been useful in order for you and Ms. Shelby to make the decision whether or not to order a fitness for duty exam for you to have this information in November?
MS. MARMOR: Objection. Calls for speculation.
Q. And I know you didn't -- I know you didn't have it, so I'm not criticizing you, but would it have been helpful to you?
MS. MARMOR: Same objection.
WITNESS: Well --
MR. HENRETTY: Join.
WITNESS: -- can I answer?
MS. MARMOR: Yes, you can answer.
WITNESS: Okay.
A. I mean, that's why we meet with the employee, to kind of get a full picture of what's happening, but we didn't know about this. He didn't tell us about any of this.
Q. Okay. If you would have known, would that -- would you have considered that in determining whether or not he should be ordered for a fitness for duty exam?
MS. MARMOR: Same objection.
MR. HENRETTY: Join.



A. Yeah, it would have been considered, sure.
Q. So I take it in HR, you wouldn't automatically -- if you have a he said versus she said, you wouldn't automatically take the word of a supervisor, would you?
A. No. 1:42:28
Q. That they both should be given equal consideration, correct?
A. Yes.
Q. So based upon this, Mr. Nawara's version of events are quite different than what Ms. Hayes told you, correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
MR. HENRETTY: Join.
A. Yes.
Q. You would agree that if what Mr. Nawara says in this Exhibit Number 5 is true, that would be inappropriate conduct on the part of Ms. Hayes, wouldn't you?
MS. MARMOR: Objection. Lack of -- complete lack of foundation for --both for the document and for the question.
MR. HENRETTY: Join.
A. Can you repeat your question? I'm sorry.



Q. Yes. You would agree that based upon assuming what Mr. Nawara said is true in Number 5, I know you don't have independent knowledge, that that would be inappropriate conduct on the part of Ms. Hayes, correct?
MS. MARMOR: Same objection. She does not have a foundation to make that kind of a judgment.
MR. HENRETTY: Also form. 1:43:36
Q. You can --
WITNESS: Can --
Q. You can answer.
A. Okay.
Q. Unless they tell you not to answer, you can --
MS. MARMOR: Right.
Q. -- go ahead.
A. Yeah, I -- I mean, just reading this, if this were true, it -- it would be inappropriate behavior, yes.
Q. Okay. I'd like to show you Exhibit Number 6 and just ask you if you have ever seen this document before.
MR. HENRETTY: Sorry. 1:44:56
MR. LINDEN: All right.
A. I don't -- I don't recall seeing it, but he



-- it's -- I'm cc'd, so I must have received it.
Q. And what type of document is it, is it a normal document when you're in HR?
A. No, this is a document from DOC.
Q. And is this document -- what's the date of this document?
A. November 18th, 2016.
Q. Do you have any reason to dispute the date on this document?
A. No.
Q. It says here that Mr. -- be -- "Please be advised that director's office received notification on November 18th, 2016 that Officer Nawara is not permitted to work until he has been released by the bureau of human resources." You see that part?
A. Yes. 1:45:43
Q. Do you know who made that decision?
A. Well once someone is being referred out to undergo a fitness for duty, they are not allowed to work until the report is received --
Q. Is that automatic --
A. -- indicating --
Q. -- in all -- all cases?
A. If they're sent out for a fitness for duty, yes.

Q. Yes. And if they would not have been referred to fitness for duty, then they're allowed to work, I take it, the reverse would be true?
A. It -- it would depend on the situation with the employee, but typically, yes.
Q. Okay. It says he's not allowed to work until he has been released by the bureau of human resources, that would be your bureau, correct?
A. Yes.
Q. And what would it take for Mr. Nawara to be released?
A. So we would have to have the report back from CorVel, from the physician, indicating that he was fit for duty and was able to return to work with or without restrictions.
Q. Okay. So until you got the report back saying that he's fit for duty, he would not be allowed to work --
A. Yes. 1:46:55
Q. -- correct? And during this time on November 18th, 2016, was he still getting paid, or would he be not paid?
A. Employees who are out on fitness for duty at this time would be able to use whatever benefit time they had available, and so they would be paid in that



way.
Q. That's only if they have benefit time, correct?
A. Yes.
Q. So they'd have to use their own time to get paid?
A. Yes.
Q. So is it fair to say that effective on November 18th, 2016, that Mr. Nawara would have -- in order to get paid, would have had to use his own time?
MS. MARMOR: Objection. Lack of foundation.
A. Yes.
Q. And what type of time could Mr. Nawara use to get a paycheck?
A. Any benefit time he had accumulated, so vacation, sick, personal, compensatory, holiday.
Q. And are those days worth money, vacation days an employee --
A. Yes. 1:48:00
Q. And how so or how -- how would that work?
MS. MARMOR: Objection. Lack of foundation.
A. So if you don't work for a day and you use eight hours of vacation, you're still paid for that day as if you had worked.
Q. Okay. And that would be the same for a sick



day too?
A. Yes.
Q. Would sick days be day for day, or would you only get credit for, like, half a day for -- if you have ten sick days, can you use ten of those days to get paid for those ten days?
A. It's all based on hours, so you would use benefit time in lieu of working, and you'd be paid as if you had worked.
Q. As of November 18th, 2016, do you know what type -- what time Mr. Nawara had accumulated for vacation days, sick days, or other days?
A. No. 1:48:51
MS. MARMOR: I -- I need to ask my client a question because I just want to make sure --
MR. LINDEN: Sure.
MS. MARMOR: -- that she has a --
MR. LINDEN: Sure.
MS. MARMOR: -- nothing's misleading here.
RECORDER: Off the record, 12:14 p.m.
(Off the record)
RECORDER: Back on the record, 12:17 p.m.
MR. LINDEN: Let's see -- that.
MS. MARMOR: This is 7?
MR. LINDEN: Yeah, pretty sure that is.



Q. I can show you Exhibit Number 7, and have you ever seen Exhibit 7?
A. Yes.
Q. And what is Exhibit 7?
A. This is a letter that I sent to Officer Nawara.
Q. And this would have been a couple weeks approximately after you met with him?
A. Yes. 1:49:41
Q. Can you just read the first paragraph of this letter?
A. "Dear CO John Nawara, on 11/8/16, you were informed by the occupational health nurse for the sheriff's office, Winifred Shelby, that you were required to undergo a fitness for duty evaluation before returning to active duty. You took the forms in order to review them prior to signing and have failed to return them to Ms. Shelby. She called and left a voicemail message for you on 11/30/16 to which you did not respond. The time you have been off work since 11/18/16 is only authorized if you are participating in the -- in the FFD process. These signed documents must be returned to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you

are not participating in the process and your time off from work from 11/18/16 will be unauthorized. Further, you will -- you are not able to return to work until you have completed the FFD process."
Q. Okay. The forms that are being referred to in that paragraphs are Exhibit 1 and 2, correct? And you can go back and check if you want, but.
A. Yes. 1:51:05
Q. And -- and then Nurse Shelby is copied on your letter, correct?
A. Yes.
Q. And was this letter mailed to Mr. Nawara?
A. Yes.
Q. And it says here -- and it says, "Re," it says, "Via email, first class, and certified mail," do you know if it went out to Mr. Nawara in all three ways?
A. It should have gone out at each way that's listed.
Q. And when you send something certified, do you typically get a -- do a return receipt requested?
A. Yes.
Q. Do you know whether or not you got any -- you did it that way for this letter?
MS. MARMOR: Object to the form.



A. If it were sent certified mail, that's how it would have been.
Q. Yeah. Have you ever seen any signed certified receipt by Mr. Nawara acknowledging whether or not he got this letter?
A. Oh, I don't recall. 1:52:01
Q. Do you know what Mr. Nawara's -- Nawara's email address was in 2016?
A. I would have used -- used his sheriff's email address.
Q. Okay. Do you typically put it on the letter if you would have emailed it, or is it -- was it your practice just to do it this way?
A. Put what on the letter? I'm sorry.
Q. When you typically emailed something to an employee, would you put the email letter, you know, next to the address or somewhere on it?
A. Oh, the email address --
Q. Yes.
A. -- that I used? No.
Q. So your normal practice would be if you would have emailed it, that that address would not appear in the letter?
A. Right, because it would go through the sheriff's --



Q. Okay.
A. -- email system.
Q. Okay. When you say, "Ms. Shelby called and left a voice message for you on 11/30 to which you did not respond," how did you know that Ms. Shelby called and left a voicemail?
A. She told me. 1:53:11
Q. And she would have left the voicemail on the same day you wrote this letter, correct?
A. Yes.
Q. Do you know what time Ms. Shelby left the email -- or the voicemail? I'm sorry.
A. No.
Q. Do you know how long after she left the voicemail that you wrote this letter?
A. No.
Q. So could it have been half hour or ten minutes?
MS. MARMOR: Objection. Calls for speculation.
A. I mean, it -- it would have been a reasonable amount of time after leaving a message --
Q. Okay. When you say --
A. -- to expect a response, but I don't know for certain what -- what time she called or what time I



wrote the letter.
Q. Other than a guess, do you -- can you provide any approximation of how much time between the time she left the voicemail and your letter saying that you didn't respond to her voicemail?
A. No.
Q. Okay.
A. But he never did respond at any time.
Q. He never responded?
A. Not to her message, no. 1:54:12
Q. Okay. I'd like to show you Exhibit Number 8 and ask if you've ever seen this document before.
A. Yes.
Q. What is Number 8?
A. This is a letter I sent to Officer Nawara.
Q. What's the date of this letter?
A. February 28th, 2017.
Q. Okay. And that would have been sent, according to this letter, the same three ways, email, first class mail, and certified mail, yes?
A. Yes. 1:55:36
Q. Okay. Can you read the first paragraph of this letter?
A. "On November 18th, 2016, you were informed by the occupational health nurse for the sheriff's office,

Winifred Shelby, that you were required to undergo a fitness for duty, FFD, evaluation before returning to active duty. You were referred for fitness for duty based on an interaction you had with Superintendent Jones-Hayes, in which you were alleged to have acted in an overly aggressive and threatening manner. During the meeting on November 18th, 2016, you were given an authorization to release health care information and a HIPAA authorization for disclosure of protected health information form, which you took in order to review prior to signing. To date, you have not returned these forms to Ms. Shelby. Nurse Shelby also called you and left a message for you on November 30th, 2016. You never responded to her message. In addition, I sent you a letter on November 30th, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the fitness for duty process. To date, I have not heard back from you."

Q. Okay. The two authorization forms that were referred to in this paragraph, again, relate to Exhibits 1 and 2, correct?

A. Yes. 1:57:03

Q. And your letter indicates he never responded to her message, see that part?



A. Yes.

Q. Okay. But isn't it true that at the time you wrote this letter, Ms. Dana Kurtz was representing Mr. Nawara?

A. I don't know if that was when I -- I don't know what the timing was with that and me sending this letter.

Q. Okay. But if a lawyer for an employee responds to you, would that be the equivalent of the employee responding to you?

MS. MARMOR: Objection.

A. It would depend on what the situation was.

Q. But if you send a letter or a request to an employee and their lawyer responds, you wouldn't hold it against the employee for not responding personally, they're responding through a lawyer, would you?

MS. MARMOR: Object to the form.

MR. HENRETTY: Join. 1:57:56

A. I mean -- "hold it against them," I guess I'm not --

Q. Yeah, when you say the employee doesn't respond, if their lawyer would have responded on behalf of the employee, wouldn't that be essentially the same as the employee responding to you?

MS. MARMOR: Object to -- objection.



Argumentative.

A. It would depend on the circumstances.

Q. Okay. Prior to this letter of February 28th, 2017, do you know if you received any communications from Dana Kurtz?

A. I don't -- I don't know when -- she did send me an email. I don't recall when it was though.

Q. Okay. I'd like to hand you Exhibit Number 9 and ask you if you've ever seen this document?

A. Yes. 1:59:14

Q. And what -- what is it?

A. This is an email from Dana Kurtz to me, Nurse Shelby, and Peter Kramer.

Q. And what's the date of this?

A. December 21st, 2016.

Q. Okay. And it has -- on top, it says, "To," and then it's to you at cookcountyil.gov, correct?

A. Yes.

Q. Was that your correct email back on December 21st --

A. Yeah.

Q. -- 2016?

A. Yes.

Q. And Winifred Shelby is listed at cookcountyil.gov, would that have been her correct



email?

A. Yes.

Q. Do you recall receiving it on November (sic) 21st, 2016?

A. No, I know I -- I've seen it. I don't recall the date that I read it.

Q. Do you have any reason to doubt that that would have not been sent to you on November (sic) 21st?

A. That would have been sent to me on that day?

Q. Yes. 2:00:13

A. No, it says that's the date sent, I just don't know what day I saw it.

Q. Okay.

MS. MARMOR: And just -- I just want to make, for the record, clear because this is not a Bates stamped version of this document, that it looks like this is a document that was filed at the outset of this case. I do believe there are identical date -- Bates stamped versions of it --

MR. LINDEN: No, that's true.

MS. MARMOR: -- in the case.

MR. LINDEN: And if you want, it came from the motion for a temporary restraining order.

MS. MARMOR: I figured it was, but I just -- I wanted to make sure we weren't confused later on.

MR. LINDEN: Okay.
Q. Can you just read the first two paragraphs of this email?
A. "Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the sheriff's office and other possible individual defendants. I understand that you placed him on leave in order that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara and I," in parentheses, "believe that such an order is unlawful."
Q. Did you ever respond to this email, if you recall?
A. I -- I don't recall. 2:01:30
Q. Is it something you would recall if you would have responded to?
MS. MARMOR: Objection. Calls for speculation.
A. There would be a document if I did. I just -- I don't recall if I did or not.
Q. Would you consider that to be a response from Mr. Nawara to your request -- request regarding for him



-- or demand that he signs medical release forms?
A. Not necessarily.
Q. Okay. When you say, "Not necessarily," would that be a yes, or a no, or a maybe?
A. Well when I receive documentation from attorneys, I deal with our law department in how to respond or if to respond.
Q. Okay. Do you know whether or not you specifically dealt with your law department when you got this email on December 21st, 2016?
A. Yes, I did.
Q. Do you recall who you dealt with?
A. Kate Christy and probably Nick Scouffas as well.
Q. Did you seek advice to them regarding an employment matter within the sheriff's office when you contacted them?
MS. MARMOR: You mean "advice from them"? You said, "Advice to them."
MR. LINDEN: Advice from them.
A. I called them --
MR. LINDEN: Yeah. 2:02:36
A. -- with advice. Yeah, I -- I would have forwarded what I received and asked them what next steps should be.



Q. Do you recall -- and don't answer right away, because give your counsel a chance to object, do you recall what advice they gave you, if any, when you forwarded this to them?
MS. MARMOR: And I'm going to instruct you not to answer that question based on attorney-client communication and privilege.
WITNESS: Okay.
Q. And you're going to heed your attorney's advice --
A. Yes.
Q. -- and you understood the question, you're going to refuse to answer?
A. Yes, I am.
Q. Did that advice, if any, that was given to you relate to an employment decision, or did it relate to anticipation for litigation?
MS. MARMOR: Object to the form. 2:03:21
A. It related to this whole situation with Officer Nawara.
Q. Okay. Prior to your letter of November 30th, the prior Exhibit, was Mr. Nawara ever given any written notice that he had to complete the authorization forms, if you know?
A. I -- I'm not certain.



Q. Okay. The next paragraph, Ms. Kurtz says, "Officer Nawara has not been given any notification of any complaint or allegations against him," as of that date, do you know whether or not that's a true statement?
A. It's not a true statement.
Q. How so?
A. Well we met with Officer Nawara and told him why we wanted to meet with him. In the meeting, we discussed what led to the meeting, so he was aware that there were allegations against him.
Q. Okay. It also says, directed at you and Ms. Shelby, "You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form." Is that true or false?
A. That's false. 2:04:48
Q. Okay. What other information was given to him?
MS. MARMOR: Object to the form.
A. Well I -- I -- my -- essentially described the meeting before, you know, the nurse would explain why we had asked him to come to HR, you know, what the concerns were, and again, I don't know how far along we got in discussing the process -- or the nurse got in discussing the process with him because, you know, it

wasn't really an interactive type of meeting as they typically are, and it ended abruptly with him leaving. So I'm not certain exactly how much information he received, but he definitely was aware of why he was there. He wasn't just handed forms and pushed out the door.
Q. Based on Exhibit Number 9, is it true that he had not responded to you as of February of 2017?
MS. MARMOR: Mr. Nawara had not responded? 2:06:05
Q. Or -- or on behalf of his lawyer?
MS. MARMOR: Object to --
Q. At that time, his lawyer had responded on his behalf, correct?
MS. MARMOR: Object to the form.
A. I'm sorry, can you repeat the question?
Q. The prior Exhibit, Number 8, was dated 2/28/17, correct?
A. Yes.
Q. And when you wrote this letter, his lawyer, Dana Kurtz, had responded regarding the release forms on 12/21/16, correct?
MS. MARMOR: Object to the form.
A. Yes, her email is from December 2016.
Q. Okay. Do you know if you ever contacted Dana Kurtz from 12/21/16 up until February 28th, 2017?



MS. MARMOR: About Mr. Nawara?
MR. LINDEN: Yes. 2:07:03
A. I am not certain if I did. There would be a document if I had responded to her email.
Q. Have you seen any documents shown that you responded to the email?
A. I don't recall.
Q. Is there any reason why you apparently did not respond to this email?
A. I will --
MS. MARMOR: Objection.
Q. Would it have been based on conversations you had with the legal department?
A. Yes.
Q. So I take it they told you not to respond to her?
MS. MARMOR: Objection.
MR. LINDEN: I --
MS. MARMOR: I'm instructing you not to answer -- answer that --
MR. LINDEN: I think she kind --
MS. MARMOR: -- question.
MR. LINDEN: I think she kind of did. I'm sorry.
WITNESS: Not at all.



MR. LINDEN: I'm joke -- I'm being sarcastic.
Q. Had they told you to respond to it, I take it you would have responded?
MS. MARMOR: Objection. 2:07:47
Q. No, you don't have to answer that. Let's see, I'd like to show you Exhibit Number 10 and ask if you've ever seen this document before?
A. Yes.
Q. And this is an email from Dana Kurtz to you, correct?
A. Yes, to me, Nurse Shelby, and Peter Kramer.
Q. And it's dated January 31st, 2017 at 4:23 p.m.?
A. Yes. 2:08:53
Q. And I take it you have no doubt that you received it on that date and that time on January 31st, correct?
MS. MARMOR: Object to the form.
A. Yeah, it was sent that day. I don't know what day I actually read it, but it was sent that day, according to the email.
Q. Was it your practice to read your emails at or near the time that they would have been received?
A. As soon as I am able, yes.
Q. And Peter Kramer, who is Peter Kramer?



A. He is an attorney with the sheriff's office.
Q. Did he work with Ms. Christy?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. At this time, I'm not certain if he was working in the law department or not.
Q. Yeah. Were you dealing with Mr. -- Attorney Kramer at that time involving John Nawara?
A. Not specifically, no. 2:09:45
Q. And can you just read this email that was sent to you?
A. "We received no response to my email below. If Officer Nawara is not reinstated immediately before the end of this week, with his time and all benefits and salary -- salary reinstated as well, then we will file suit next week and request -- request -- request reimbursement of his time, salary, and attorney's fees. Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or place him on leave without pay. This is clear retaliation for his complaint against Superintendent Jones-Hayes for her harassment of him. I look forward to hearing from you."
Q. Was Ms. Kurtz correct in the first sentence saying that, "We received no response to my email

below," which refers to the December 21st, 2016 email?
A. Again, I don't recall if there was a response, but --
Q. Okay.
A. -- there would be a document if -- if there was a response --
Q. Okay. And again --
A. -- from me.
Q. -- you don't know of any document, correct?
A. I do not. 2:10:52
Q. Do you know if you ever responded to this January 31st email from Ms. Kurtz?
A. I don't recall.
Q. Would there be a document if you -- had you responded?
A. Yes.
Q. And do you know of any documents showing that you responded?
A. I do not.
Q. Do you know why there is no such document?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
Q. If you know.
A. I -- I'm sorry, what was the question?
Q. Do you know why there isn't a document



showing that you responded to the January 31st, 2017 email from Ms. Kurtz?
MS. MARMOR: Same objection and -- and assumes facts not in evidence.
A. No, I don't.
Q. Is there a document that you know of showing that you responded to this email?
A. I do not know.
Q. Do you know what you did when you got this email?
A. I would have referred to the law department.
Q. Okay. Do you recall specifically referring it to the law department?
A. Yes. 2:11:57
Q. Do you recall specifically who you referred it to?
A. To Kate Christy.
Q. And I take it you got advice from Ms. Christy?
A. Yes, any -- any correspondence from attorneys, I would refer to the law department.
Q. Do you know if Ms. Christy ever responded to Ms. Kurtz from this email?
A. I don't know.
Q. Do you know if Ms. Christy or anybody else in



the law department responded to her as a result of the December 2016 email that's marked Exhibit Number 9?
A. I'm not certain.
Q. Did you ever contact Ms. Kurtz and try and work something out regarding limiting the medical release?
A. No.
Q. Did anything prevent you from contacting Ms. Kurtz to try and get an agreement to limit the scope or the breadth of the medical releases?
A. I --
MS. MARMOR: Objection. Calls for speculation. 2:13:02
A. I wouldn't have worked personally with an employee's attorney.
Q. But I guess what I'm asking is did anything prevent you from doing it if you wanted to?
MS. MARMOR: Object to the form and argumentative.
A. I -- I -- like I said before, any correspondence from attorneys, I would handle -- hand to our law department for them to handle any kind of communications.
Q. Was there a written procedure or rule that required you to have the law department respond to



attorney communication rather than you responding?
A. That's the job of the law department, is to handle the other lawyers that --
Q. Okay. I'm not --
A. -- reach out to us.
Q. I'm not really questioning what your testimony is, I'm just saying is there a written rule or procedure -- procedure that would have prevented you from responding directly to Ms. Kurtz?
A. That's the procedure I follow.
Q. Okay. But do you know of any written procedure is my question?
A. I don't know.
Q. Do you know why it is nobody from legal responded to it?
MS. MARMOR: Objection. Lack of foundation.
A. I --
WITNESS: Oh, I'm sorry. 2:14:04
MS. MARMOR: It's -- go --
A. I don't know if they did, and if they did not, I don't know why.
Q. When you referred it, was it your understanding that somebody would respond to Ms. Kurtz from legal?
MS. MARMOR: Objection. I'm -- I'm going to

Page 125

instruct you not to answer that question.
Q. Based on advice of counsel, are you refusing to answer the question?
A. Yes.
Q. I'd like to hand you Exhibit Number 11.
MR. LINDEN: I'm sorry --
Q. And if you can, identify this document.
A. It's an email from me to Dana Kurtz. 2:15:31
Q. So in this email, did you communicate directly to Ms. Kurtz, the lawyer for Mr. Nawara?
A. I did.
Q. What's the date of this email?
A. March 13th, 2017.
Q. And can you read the first paragraph?
A. "Ms. Kurtz, during the fitness for duty process, I intend to communicate directly with Mr. Nawara."
Q. And do you know why it is that you're telling her that you're going to communicate directly with her client and not with -- with her?
A. I do.
Q. And what is it?
MS. MARMOR: Is this something that would -- would -- would be based on advice of counsel?
WITNESS: Yes.

Page 126

MS. MARMOR: So I'm going to instruct her not to answer.
Q. So I take it you understood the question, but based on advice of counsel, you're refusing to answer the question?
A. That's right. 2:16:31
Q. Okay. In this email, you write, "It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a fitness for duty prior to returning the employee to work," that's -- are those your words?
MS. MARMOR: Are you asking if she wrote that?
MR. LINDEN: Yes.
WITNESS: I'm unsure how to --
MS. MARMOR: You can -- you can --
WITNESS: -- answer.
MS. MARMOR: He's only asking if you actually wrote those words in the email, that's -- that's -- you can answer that.
WITNESS: I still have a --
MS. MARMOR: You need to --
WITNESS: -- question.
MS. MARMOR: Do you -- we -- can we take a --
MR. LINDEN: Yeah, sure.

Page 127

MS. MARMOR: Yeah.
MR. LINDEN: Yeah.
RECORDER: Off the record, 12:46 p.m.
(Off the record)
RECORDER: Back on the record, 1:26 p.m. 2:17:33
Q. Ms. Reierson, on Exhibit Number 11, can you read the second paragraph? I don't think we did yet.
A. "Mr. Nawara has been ordered to complete an FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo an FFD prior to returning the employee to work."
Q. I'm sorry, I meant the third paragraph.
A. Okay.
MS. MARMOR: Oh.
A. "I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA" -- oh, my grammar. "I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible

Page 128

discipline, including termination. Your indication that our practice is unlawful is not correct or supported by the law, therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further."
Q. Are these all your words in the third paragraph, or did some of those words come from legal?
A. All this language came from legal. 2:18:58
Q. Okay. This statement says, you know, in your email, "Your indication that our practice is unlawful and not correct or supported by the law," do you know of any law that would support requiring Mr. Nawara to sign Exhibit Number 2 with -- without basically any limitations on scope or time?
MS. MARMOR: Object to the form and the characterization of the document.
MR. HENRETTY: Join.
A. I'm sorry, can you repeat that question?
Q. Yeah, if you want -- if you want to look back in Exhibit Number 2, but do you know of any law offhand, and if you do or don't, that's fine, that indicates that you could require an employee to sign a waiver form in the form of Exhibit Number 2?
A. This is the form -- Exhibit 2 is the form that allows the sheriff's office to review his

evaluation.
Q. I'm sorry, I meant Exhibit Number 1, the one with the three blanks on -- three boxes. I think that's Exhibit 1, right?
MS. MARMOR: Oh. 2:20:13
MR. BUSTAMANTE: Yeah.
Q. Exhibit 1, I'm sorry, do you know of any law that would -- would require an employee to sign a document in the form of Exhibit Number 1 that's not limited to scope or time?
MS. MARMOR: Same objection as the last time.
A. I guess I don't know exactly what you're saying. I mean, the form hasn't been completed, because we didn't -- it wasn't -- it would be discussed with the employee.
Q. Okay. I'm not asking reasons why, but do you know of any case law or law that would require an employee to sign a form that's in the form of Exhibit Number 1?
MS. MARMOR: Same objection.
MR. HENRETTY: "In the form"?
A. I'm -- I think I'm -- I'm missing --
Q. Okay. And --
A. -- what you're trying to ask me here.
Q. -- I think we both agree that it's -- it's



not limited in time, right, the way it's written, Exhibit Number 1?
MS. MARMOR: Same objection. 2:21:10
Q. Correct?
A. Well because it is not completed, yes.
Q. Okay. And it's not limited regarding the type of medical records that would be released, correct?
MS. MARMOR: Same -- same objection.
A. Right -- well I mean, because it's only a blank form.
Q. Okay. But the way it's written, it's not limited to the type of medical records, correct?
A. You mean -- I'm sorry, the way the form is created?
Q. Yes.
A. Well I mean, it has lines to include what the limiting information would be, it's -- this is just a blank form.
Q. Okay. And -- and that's a form you're requiring him to sign in this email dated March 13th, 2017, correct?
MS. MARMOR: Objection. Assumes facts not in evidence. 2:21:53
A. So I -- like I said before, when we meet with



the employee is when the nurse completes this form to -- you know, so it's determined what's being requested or what might be needed for the situation, but it wasn't filled out with him.
Q. Okay. I understand it's not your words, but this email from you says, "If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered not to be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible discipline, including termination." This sentence is explicitly referring to Exhibit 1, correct?
MS. MARMOR: Objection. Lack of foundation.
A. It's referring to this form, you're -- you're asking?
Q. This specific document, is it not?
MS. MARMOR: Same objection. 2:22:50
A. I think it's referring to the document in Exhibit 2 --
Q. So Mr. --
A. -- the HIPAA form.
Q. Was Mr. Nawara required to sign Exhibit Number 1 in order for him not to be subject to discipline, according to this March 13th, 2017 email?
MS. MARMOR: Objection to the form and lack



of foundation.
A. No, I mean the email is referring to this document, the HIPAA form.
Q. So is it your testimony that had he signed Exhibit Number 2 and not Exhibit 1, that that would have been okay with the sheriff's office --
A. Well --
Q. -- or was he required to file -- sign both?
A. Well I think if he had signed this or done something for us to kind of engage in a conversation, we could have had gotten the process started.
Q. Okay. Ms. Kurtz did try and engage in a conversation, did she not, by her prior two emails that we went through?
MS. MARMOR: Objection. Argumentative. Lack of foundation. 2:24:02
A. I'm -- you --
Q. Isn't it true that Ms. Kurtz, by her prior two emails, the December one and the January one that you referred to legal, that she did attempt to engage in a process with the sheriff's office?
MS. MARMOR: Object to the form. Lack of foundation.
A. Sorry, I'm just looking for the document.
Well she demanded he be reinstated. It doesn't look

Page 133

like she was trying to engage in a conversation, I guess.
Q. But she also object to him signing a blank form, correct?
MS. MARMOR: Objection. Lack of foundation. It mischaracterizes the document.
A. She objected to him signing the -- the HIPAA authorization form, this Exhibit 2.
Q. Okay. 2:25:19
A. This.
Q. She also signed -- objected to signing Exhibit Number 1, correct?
MS. MARMOR: In what letter or what email?
Q. Which one are you looking at, the December 21st one?
A. Exhibit 9, December 21st.
Q. Okay. If you'd go back -- go back to Exhibit Number 8 for a second, I think that's still in front of you. You see Exhibit 8, which is your letter dated --
A. Oh. 2:26:07
Q. -- 2/28/17?
A. Yes.
Q. Okay. And you talk about the forms that Mr. Nawara needed to sign in order not to be subject to discipline, correct, in this letter?

Page 134

MS. MARMOR: Objection. That's not what that letter says.
A. So I'm sorry, what did you want me to --
MS. MARMOR: So --
A. -- read?
WITNESS: Oh.
Q. Okay. Your -- let me strike that question. But your letter dated February 28th, 2017 complains that Mr. Nawara had not returned the forms in plural, correct? And if you -- if you want to read it, you can, that's fine.
MS. MARMOR: It's in the second full paragraph.
WITNESS: Oh. 2:26:57
A. Yes, it says, "Documents and forms," plural.
Q. So according to this letter, is it a fair statement that Mr. Nawara, in order not to be subject to discipline, at least as of February 28th, 2017, was required to sign Exhibits 1 and Exhibit 2?
MS. MARMOR: Objection. That is not what the letter says, it does not say, "Discipline" number one, and number two, that assumes facts not in evidence.
Q. You can answer if you understand the question.
A. So it -- it says that, "If the forms aren't

Page 135

received, your time will be -- since -- your time off will be deemed unauthorized," which is not the same as discipline.
Q. Okay. Well what does it mean when your time is deemed unauthorized compared to what his status was before this?
A. So he was off, he -- there really was no official status for him. He wasn't on an approved leave, but he hadn't been deemed unauthorized, so it's just a way of characterizing the time, but it's not necessarily something that would be disciplinary.
Q. What happens when -- what are the consequences when somebody is deemed to be an unauthorized absence?
MS. MARMOR: Objection. Lack of foundation. 2:28:15
A. It's a process, it goes through employee discipline.
Q. Can the employee --
A. But --
Q. -- be disciplined if his absence is, quote, "unauthorized," unquote?
A. It's -- it's a possibility depending on the circumstances.
Q. Well one of your job functions in HR is to deal with authorized versus unauthorized absences,

Page 136

correct?
MS. MARMOR: Objection. Lack of foundation.
A. Not as it relates to discipline, no.
Q. So is it fair to say that as of 2/28/2017, the sheriff's office was requiring Mr. Nawara to sign Exhibits 1 and Exhibit 2 in order to complete the fitness for duty process?
MS. MARMOR: Objection. Lack of -- lack of -- excuse me. Assumes facts not in evidence.
A. Right, or contact us if he wanted additional information --
Q. Am I -- if I --
A. -- or guidance. 2:29:10
Q. If I'm wrong, just correct me, but is it true that he was required to sign both forms and not just Exhibit 2 as of 2/28/17?
MS. MARMOR: Except -- objection. Asked and answered. She just clarified the answer.
A. So the -- the letter is asking him to complete the forms and return them or contact us.
Q. So --
A. So if -- if he had an issue with the forms, I mean, then he should have contacted us to discuss the forms. That's what the letter is saying.
Q. Okay. But it's true that Ms. Kurtz did

contact you --
MS. MARMOR: Object --
Q. -- and any -- anybody could have reached out to Ms. Kurtz. Isn't that correct?
MS. MARMOR: Objection. Argumentative.
A. The -- the question is I -- if -- could anyone have reached out to Ms. Kurtz?
Q. You had the ability to reach out to Ms. Kurtz, correct, if you wanted to?
MS. MARMOR: Same objection. 2:30:05
A. Yeah, I -- I would only reach out to the attorney if I was directed to do so.
Q. Okay. But there is no rule prohibiting you from contacting Ms. -- Ms. Kurtz directly and asked her, "Can we come to some type of an agreement with the forms?" was there?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. Yeah, I guess I don't know what kind of rule it would be.
Q. Okay.
A. But like I said before, any communication from an attorney will go to our law department.
Q. Do you know of any communication either to Mr. Nawara or to Ms. Kurtz, written communication,



saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?
MS. MARMOR: Objection. Assumes facts not in evidence. 2:30:54
A. Of the documents I have here, are you asking that, or?
Q. I -- I'm asking in your whole breadth of your knowledge, are you aware of any document that either went to Mr. Nawara or Ms. Kurtz saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?
MS. MARMOR: Same objection.
A. Yeah, I -- I can't recall a document that specifically says that, no.
Q. And if you would have written such a communication to either Mr. Nawara or Ms. Kurtz, there would be a written record of it, correct?
MS. MARMOR: Object to the form.
A. There should be, yes.
Q. And if somebody else within the legal department would have written such a letter, that should have been produced in this litigation --
MS. MARMOR: Objection --
Q. -- would you agree?
MS. MARMOR: Objection. That's --



A. I can't --
MS. MARMOR: She can't answer --
A. -- comment on that.
MS. MARMOR: -- that question.
Q. But you would expect that such a document would -- would exist if that was done, right?
MS. MARMOR: Object to the form and calls --
A. I can't --
MS. MARMOR: -- for speculation. 2:31:58
A. I'm -- I -- I -- so what is the question now? I apologize.
Q. If a letter was written by anybody else at the sheriff's office to either Ms. Kurtz or Mr. Nawara indicating, "You're not required to sign Exhibit Number 1, but all we need is Exhibit Number 2," you would expect that there would be a record of it within the sheriff's office, wouldn't you?
A. Most likely, yes.
Q. Okay. And when your, on Exhibit Number 11, March 13th, 2017 email refers to the FFD process, that's a process for the fitness for duty evaluation?
A. FFD returns -- I'm sorry, refers to fitness for duty.
Q. What do you mean by "process"? 2:33:02
A. To deal with the occupational health nurse to



determine what medical records or psychological records would be necessary for the exam, getting those documents to CorVel, scheduling an appointment through CorVel with the selected doctor, and meeting with the doctor and cooperating.
Q. I take it part of that process, in order for that to occur, would -- according to the sheriff's office, would require Mr. Nawara to sign both Exhibits 1 and 2, correct?
MS. MARMOR: Objection. Argumentative. Assumes facts not in evidence.
A. Yeah, I mean, without -- I mean, without having the particulars from Mr. Nawara, it's hard to say exactly what he would have been required to do in terms of what would have been required to be turned over.
Q. You would have needed the release -- at least a release signed by him in order for him to --
A. Because he -- he --
Q. -- get the fitness for duty evaluation. Is that fair?
MS. MARMOR: Object to the --
WITNESS: Sorry.
MS. MARMOR: -- form. Go ahead. 2:34:14
A. So when he signs -- when the employee signs a

release that's in -- this Exhibit 1 is the form that the employee would give to his or her physicians in order to --
Q. Okay.
A. -- receive the records.
Q. Okay. We talked a little bit a few minutes ago about Exhibit Number 8, which is your 2/28/17 letter, you see it there?
A. Yes. 2:35:05
Q. And -- and your letter, again, refers to the forms in plural, correct?
MS. MARMOR: Yeah, I -- objection. Asked and answered.
MR. LINDEN: It's -- it's just lead up and foundation coming for the next --
A. It does --
MR. LINDEN: -- question.
A. -- say, "Forms," in plural, yes.
Q. Okay. And you -- you actually attach the forms or include it with your 2/28/17 letter, correct?
A. It says, "I have enclosed another copy of the forms."
Q. Okay. And there is two forms attached --
A. Yes.
Q. -- to this letter, correct?



A. Yes.
Q. And they are Bates stamped Nawara 000059 and Nawara 000060, see it in the bottom right corner?
A. Yes.
Q. And those are the exact documents that are Exhibits 1 and 2, correct? And you can -- you can compare them if you want.
A. Yes. 2:36:17
Q. Okay. And I'm going to hand you two Exhibits, one time this time. Okay. Hand you Exhibit Number 12.
MR. LINDEN: Here's --
MS. MARMOR: Thank you.
Q. And -- and Exhibit Number 13, I'll just ask you some questions --
MS. MARMOR: Rick, do you know when -- I -- I've never been able to figure out when Mr. Nawara actually sent this email.
MR. LINDEN: I'm not positive. I think they correspond in the next -- I think it's right around the date of the emails that are attached, because it looks like page 1 of 5, see, wasn't it?
MS. MARMOR: So it's after March 17th? 2:38:29
MR. LINDEN: Must be or somewhere right in there. There's a date -- yeah, that's a good question.



I couldn't -- you tried too, Sarah, figuring out when it was?
MS. MARMOR: I just -- I don't want to assume anything. I -- I --
MR. HENRETTY: No --
MR. LINDEN: Yeah.
MR. HENRETTY: -- no, no, I'm just saying it could be either of those things, could be --
MR. LINDEN: Had to have been after March 8th.
MS. MARMOR: I mean, normally, the last one is the most recent one.
MR. LINDEN: Yeah.
MS. MARMOR: So it seems like it's after March 17th --
MR. LINDEN: Yeah, I think so --
MS. MARMOR: -- but.
MR. LINDEN: -- had to have been --
MS. MARMOR: It's just hard to tell.
MR. LINDEN: -- after March 8th, right?
MR. BUSTAMANTE: Yeah.
MS. MARMOR: Right, the -- since the evaluation was March 8th.
MR. LINDEN: Oh, Perry Mason.
Q. I -- have you ever seen Exhibit Number 12 to



start with?
A. Yes, the email looks familiar.
Q. And that's an email from John --
A. Excuse me. Sorry. 2:39:24
Q. You got a cold? I'm --
A. It's at the tail end, thank goodness.
Q. Okay. Like some water or anything, or?
A. No, I'm fine.
Q. Okay.
A. Thanks.
Q. Okay. But this is an email from John Nawara to you, and Dana Kurtz is on here, and it looks like Peter Kramer also?
A. Yeah --
Q. Or Peter?
A. Yes.
Q. And do you know whether or not you -- do you recall receiving this email?
A. I do recall this email.
Q. Okay. And it refers, "See attached report from Dr. Kroll," and if you look at Exhibit 13, it's a report from a Dr. Robin Kroll, K-r-o-l -- K-r-o-l-l, see that?
A. Yes.
Q. And do you recall receiving this report that

was -- should have been attached to Exhibit Number 12?
A. I do.
Q. And do you know when you would have received it?
A. No. 2:40:21
Q. By looking at the dates, does it appear to be sometime around March of 2017?
MS. MARMOR: Object to the form. Why don't you say, "After March 17th"?
A. Yeah, I mean, it looks like he emailed me following an email that was sent to him on March 17th, so sometime after that.
Q. And what -- what did you do when you received Exhibit Number 12 along with the Exhibit Number 13?
A. I consulted our law department.
Q. And who would that have been with?
A. Kate Christy.
Q. And were you seeking advice how to respond, if -- if at all, to the email and the report from Dr. Kroll?
A. Yes.
Q. Did you receive advice regarding it from Ms. Christy?
A. I did. 2:41:13
Q. And can you tell us what advice that was?



MS. MARMOR: And I'm going to object and instruct you not to answer, although I think there is a document that -- that responded to this.
Q. Okay. Based on advice from counsel, are you refusing to answer the question?
A. Yes.
Q. You -- I take it you understood the question and you know the answer to the question?
MS. MARMOR: I --
MR. LINDEN: Or I can -- I can start -- I was trying to go quick.
Q. First of all, you understood the question, correct?
A. The -- can you repeat what the question is?
Q. First of all, you under -- the question that your lawyer instructed you not to answer, you understood what the question was, correct?
MS. MARMOR: The question where he was --
A. That's -- that --
MS. MARMOR: -- asking what advice was given to you.
MR. LINDEN: Yeah.
A. Oh, that was the -- okay.
Q. Sorry, it's more --
A. Yes, I -- I did.



Q. -- formality we have to do.
A. I did understand that question, yes.
Q. And if you were permitted to answer, you could have answered the question, I take it, correct?
A. Yes. 2:41:59
Q. Okay. Did you review this report when you received it from Dr. Robin Kroll?
MS. MARMOR: You mean -- mean Exhibit 13?
MR. LINDEN: Yes.
A. I did.
Q. And are you aware that Dr. Kroll performed what he (sic) called a fitness for duty evaluation of Dr. (sic) Nawara?
A. Yes.
Q. And you're aware the date of the evaluation is March 8th, 2017?
A. Yes.
MS. MARMOR: And just for the --
A. As --
MS. MARMOR: -- record, do we know if Robin Kroll is a man or a woman? You said, "He," but I don't know.
MR. LINDEN: I think it might be a she with Robin. I don't know why --
MS. MARMOR: Okay.



MR. LINDEN: -- sex was thinking. Kroll sounds like a guy, but -- all due respect to the doctor. I don't mean to --
WITNESS: I know a male --
MR. LINDEN: -- offend him or her.
WITNESS: -- Robin too, so you know.
MR. LINDEN: Could be both, right? I have no -- no idea. Do you, Peter, know?
MR. BUSTAMANTE: No. 2:42:54
Q. Have you ever heard of a Dr. Robin Kroll before?
A. Not outside of this document.
Q. Have you ever since heard of Dr. Kroll in any other document?
A. Not that I recall.
Q. Do you know what it means to be a board certified police and public safety psychologist?
A. I assume just what it says there.
Q. Does that indicate to you that he's (sic) qualified to perform --
MR. HENRETTY: It's -- it's a she.
MS. MARMOR: A she.
Q. -- a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.

Page 149

A. Yeah, no, just that she -- the doctor would be certified as this type of psychologist.
Q. Do you know what Dr. Kroll's findings were?
MS. MARMOR: I'm going to object to the lack of foundation. 2:43:46
A. The doctor wrote that she suggested that he was fit for duty.
Q. And can you just, on page 4, right underneath "recommendations," just read the paragraph of Exhibit 13?
MS. MARMOR: And I'm going to object to lack of foundation for any use of this document for this witness, but go ahead.
A. "Deputy John Nawara received a fitness for duty evaluation to determine any implications of cognitive, emotional, and or behavioral impairment related to his conduct at work. Clinical interview and evaluation all suggest that Deputy Nawara is fit for duty. It is recommended that he return to work with no restrictions."
Q. As you sit here today, do you disagree at all with that conclusion?
MS. MARMOR: Objection. Lack of foundation. 2:44:41
A. Yeah, I wouldn't have any basis to agree or disagree with what the doctor wrote.

Page 150

Q. It's, in fact, consistent with the ultimate fitness for duty examination that Mr. Nawara had with the sheriff's office's doctor, correct?
MS. MARMOR: Objection. Lack of foundation, and that's actually not correct, that's a mischaracterization of the second examination.
MR. LINDEN: Okay.
A. The independent fitness for duty evaluation through the sheriff's office found Mr. Nawara to be fit for duty.
Q. Okay. Was Dr. Kroll's report sufficient for the sheriff's office in order to find him fit for duty?
A. No. 2:45:29
Q. Do you know why that is?
A. Because it wasn't conducted by an independent doctor as far as we were aware.
Q. Okay. What information do you have to show that Dr. Kroll was, in fact, not independent?
MS. MARMOR: Objection. That mischaracterizes her testimony.
A. Well the reason we use a third party administrator is because we know it's someone selected by the company and not related to either party.
Q. Okay.
A. So that -- that's how we know someone is

Page 151

independent for certain.
Q. Okay. Do you know whether or not Dr. Kroll was related at all to -- to John Nawara, or is --
A. I don't.
Q. Do you know whether or not Dr. Kroll is related to his counsel?
A. No.
Q. When you send an employee to -- to your, quote, "independent doctor" or "psychologist," like to Correl (sic), is that doctor paid by the sheriff's office?
MS. MARMOR: Excuse me, I think did you mean CorVel?
MR. LINDEN: CorVel, I'm sorry. 2:46:38
MS. MARMOR: Okay. And I'm going to object to -- more generally to the form.
A. So we send the referral to CorVel, who then -- sorry.
Q. Okay.
A. He was distracting me.
Q. Let me -- let me -- that's --
WITNESS: Are you okay?
MR. BUSTAMANTE: I'm --
Q. That's a -- that's a terrible --
MR. BUSTAMANTE: I'm laughing because --

Page 152

MR. LINDEN: Yeah.
MR. BUSTAMANTE: -- he always mispronounces words.
MR. LINDEN: Yeah.
WITNESS: Oh.
MR. LINDEN: That's fair. I'm -- I'm --
WITNESS: Okay.
MR. LINDEN: I'm bad.
MR. BUSTAMANTE: Sorry.
Q. Who -- who is CorVel --
A. Sorry.
Q. -- paid by when you send the employee to CorVel? 2:47:05
A. So we send the referral to CorVel, CorVel reaches out and obtains a doctor for the fitness for duty evaluation, and then later, we're billed for the evaluation and for CorVel's services from CorVel.
Q. So you're paying the doctor in -- indirectly through CorVel, correct, meaning the sheriff's office?
A. The sheriff's office is paying for the evaluation?
Q. Yes.
A. Yes, we don't make the employee pay for their own --
Q. Okay.

A. -- evaluation.
Q. Do you have any information as you sit here today that Dr. Kroll was in any way bias in favor of John Nawara when he (sic) did her (sic) fitness for duty evaluation?
MS. MARMOR: She did his? 2:47:48
MR. LINDEN: Yeah.
MS. MARMOR: And I'm going to object to lack of foundation.
A. No, I would have no way of knowing one way or the other.
Q. Who made the determination that Dr. Kroll's fitness for duty evaluation was not sufficient for John Nawara to go back to work, was it you?
A. No.
Q. Who was it?
A. When I received this, I reached out to the law department for guidance.
Q. Okay. But somebody made a determination that "we're not going to accept Dr. Kroll's fitness for duty evaluation," correct?
A. Yes.
Q. And who made that decision?
A. The law department.
Q. Who within the law department?



A. I don't know. I know who communicated to me, but I don't know who made the decision.
Q. Okay. Who communicated that to you?
A. Kate Christy.
Q. Do you know anybody else that were involved in the decision not to accept Dr. Kroll's report?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:48:48
Q. Okay. But Ms. Christy did communicate to you that this would not be sufficient for John Nawara, correct?
MS. MARMOR: I -- I'm going to tell her not to answer that question. I think there is a written document which you can get that same information from, and so I'm going to tell her not to answer that question, but I think you can get the same fundamental information from a written document that's -- that's produced in this case.
Q. Based on advice of counsel, are you refusing to answer that question?
A. Yes.
Q. And you understand the question?
A. Yes.
Q. And if you were permitted to answer the question, you could have answered it, correct?



A. Yes.
Q. Okay. What was John Nawara's status with the sheriff's office as of March of 2017?
MS. MARMOR: Object to the form. 2:49:48
A. He was just not reporting to work.
Q. Was he on what they call unpaid leave?
A. I mean, he wasn't --
MS. MARMOR: Object to the form.
WITNESS: Oh, I'm sorry.
MS. MARMOR: And I don't know who "they" is.
MR. LINDEN: Okay.
MR. BUSTAMANTE: Good point.
A. So when I think of leave, I think of you being off in an approved status, I guess, so I -- I don't know how you classify. He just -- he -- he wasn't following the -- the process in order to be able to return to work, so.
Q. So at that time, is it fair to say that he either wasn't being paid or he had to use his own days to get paid?
A. Yes. 2:50:26
MR. LINDEN: So -- emailed the documents pretty well.
MS. MARMOR: Uh-huh. 2:51:47
Q. I'd like to show you Exhibit Number 14, I



think that's what you're talking about here.
MS. MARMOR: Here to help.
MR. LINDEN: Okay. No, I don't think you are. All right.
MS. MARMOR: I object.
Q. Do you recognize page 1 of Exhibit Number 14, the first email?
A. Yes.
Q. And is that from you to Dana Kurtz?
A. To Dana Kurtz and John Nawara, and Peter Kramer is cc'd.
Q. So you're working weekends, right, Saturday, March 18th at 11:52, you sent it, right?
A. 24/7.
Q. Okay. And -- and can you read your email?
A. "Officer Nawara, thank you for your email. However, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure."
Q. Okay. And when you say, "The document attached," you're referring to Dr. Kroll's report in Exhibit Number 13, correct?
A. Yes. 2:53:01
MS. MARMOR: I stole your version, I'm sorry.

MS. HONINGFORD: Oh, it's okay.
Q. And when you indicate in this email, "Please return the signed release documents, as previously instructed, so we can begin the proper fitness for duty procedure," you're referring to Exhibits 1 and 2. Is that fair?
A. Yes.
Q. Okay. The day before, on Friday, March 17th, there is an email from John Nawara to you copied, with Peter Kramer copied. Do you see that?
A. Yes.
Q. And do you know whether or not you received this email from Mr. Nawara?
MS. MARMOR: That's -- that's the same email we just looked at.
MR. LINDEN: Was it? Yeah, no, you're right.
MS. MARMOR: Which answers the question --
MR. LINDEN: Okay.
MS. MARMOR: -- what date it was sent.
MR. LINDEN: Gotcha. Okay.
Q. Correct, that one --
A. Yes, it was in --
Q. Okay. 2:54:02
A. -- the previous Exhibit.
Q. Okay. Now Mr. Nawara informed you that Dr.



Kroll was an independent doctor and not his doctor. Isn't that a fair statement?
MS. MARMOR: Where does it say that? Oh, yeah.
Q. That right?
A. Yes, he wrote that.
Q. Okay. Did anybody within the sheriff's office disagree with that statement --
MS. MARMOR: Object to --
Q. -- that you know of?
MS. MARMOR: Objection. Lack of foundation.
A. I'm -- I don't know.
Q. That you know of? Did you disagree with the statement that Dr. Kroll was an independent doctor and not John Nawara's doctor?
MS. MARMOR: Objection. Lack of foundation.
A. I might -- I think it's a statement you don't take at face value. We -- we had -- no one had any idea if that was true or not.
Q. Okay. But you don't have any information to dispute that. Is that a fair statement?
A. I do not, no.
Q. Do you know of any information that exists within the sheriff's office that would dispute the statement that Dr. Kroll is an independent doctor?



A. I don't have any information, no. 2:55:04
Q. Okay. Okay. On this date, March 17th, the previous email sent to you by Mr. Nawara, isn't it correct that he informed you that, quote, "I feel the order for me to sign a blank HIPAA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the sheriff's office in which the jury found the sheriff violated my and other officers' first amendment rights and retaliated against us because of our political support for the opponent to Sheriff Dart and because of my complaints of harassment by the supervisor." He informed you of what he believed, correct, in this?
A. He did write that, yes. 2:55:53
Q. Okay. We might have talked a little about the third page of Exhibit 14, which was an email from Ms. Kurtz to you dated March 13th.
MS. MARMOR: I think this is the first time we're talking about it.
MR. LINDEN: Oh, is it? Okay.
MR. HENRETTY: You had to tell him?
MS. MARMOR: Sorry.
Q. Can you read the second full paragraph -- or first of all, did you receive this email?
A. Yes, I did.



Q. And that's an email dated Monday, March 13th, 2017 from Dana Kurtz to you?
A. Yes.
Q. That was a copy to Peter Kramer and John Nawara?
A. Yes. 2:57:05
Q. Okay. And can you read the paragraph where it starts "Second," comma?
A. "Second, Officer Nawara has been placed on an unpaid leave and is burning his sick and vacation time to his detriment, which he will run out of soon because he would not sign a HIPAA medical release form for his own medical records without limitation of time, scope, or any other limitations, setting aside that such a request is unlawful in the first place. He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the sheriff's office. All of this has caused Officer Nawara -- Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order seeking injunctive relief if this is not immediately remedied."

Q. What did you do, if anything, when you received this email on March 13th?
A. I forwarded it to the law department. 2:58:15
Q. And that would have been Ms. Christy again?
A. Yes.
Q. Did you -- did you forward it to her for advice in how, you know, this email should be responded to?
A. Yes.
Q. Did you receive advice from her?
A. Yes.
Q. Do you recall what that advice was?
MS. MARMOR: You can say if you recall what it was, you can't say what it was.
A. Yeah, I -- I don't recall what the advice was.
Q. Okay. Do you recall the gist of what she said in how to respond to her?
MS. MARMOR: Again, he's only asking if you recall the gist --
Q. And I don't want you to --
MS. MARMOR: -- not the actual --
Q. -- disclose it, but --
MS. MARMOR: Right.
Q. -- do you recall generally what the advice



was?
A. I do not.
Q. No, okay. Did you reach out to Ms. Kurtz at all after receiving this March 13th email to discuss with her limitations of time and scope on the forms?
A. I'm not certain. If I did, there would be a document.
Q. Okay. If you --
A. But I don't recall if I did or not. 2:59:20
Q. Would it be something you ordinarily would do if you received a letter like this from a lawyer, or would that be something you'd refer to legal to do?
MS. MARMOR: Objection. Calls for speculation.
A. I would refer it to legal, and then whatever the advice was, I would follow, whether that was --
Q. Okay.
A. -- me responding or the law department responding.
Q. Okay. If you turn to the next page, which is stamped Nawara page 84.
MS. MARMOR: Thank you for skipping the zeros. 3:00:07
MR. LINDEN: I hate when people say six zeros and --



Q. And if you could start with the paragraph that starts, "Fifth," comma?
A. "Fifth, in addition to the above, Officer Nawara has been provided no information as to who would be doing the fitness for duty exam -- the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPAA form so that the sheriff's office could obtain Officer Nawara's person -- own personal medical records, which is in violation of the ADA and violates his privacy rights."
Q. Okay. With respect to the first sentence of that paragraph, is there anything in that first sentence that is inaccurate?
MS. MARMOR: Object to the form.
A. No. 3:00:58
Q. Okay. Skipping the next sentence, and I'd like you to skip where the -- after the comma. I know you're not going to agree with that, "Which is in violation of the ADA and violates his privacy rights," the statement, "He was only ordered to complete a HIPAA form so the sheriff's office could obtain Officer Nawara's own personal medical records," do you disagree with that statement?
MS. MARMOR: Object to the form.
A. Yeah, it's -- it's an incomplete statement.



Q. Just in -- incompleteness, but not the accuracy, I take it, right?
A. Well I think they go together.
Q. Okay. What's inaccurate about it?
A. Well I -- to me, it reads as though we just wanted his medical records, not that they were going to be provided to, you know, a doctor to actually complete the fitness for duty examination.
Q. Okay. Can you read the next paragraph, starting with "sixth"?
A. "Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquiries. In fact, he did. He retained counsel," parentheses, "me, to respond for him which we did and received no response from the sheriff's office until your email below."
Q. Is there anything in that paragraph that you disagree with?
MS. MARMOR: Object to the -- number one, object to the -- the lack of foundation, she didn't write this, and to the form.
A. I -- I mean, she's writing about what required her to do something, I can't really speak to whether that's true or not.

Q. Do you disagree with her statement that, "Your letter suggests Officer Nawara did not respond to prior inquiries"?
A. My letter did suggest that, I would say, yes. 3:03:10
Q. And do you disagree with her statement that he retained counsel, Dana Kurtz, who responded for him, anything that you disagree with that statement?
MS. MARMOR: Objection. Lack of foundation.
A. I'm -- I knew she -- I know she sent an email. I'm not certain if she indicated that he had retained her as counsel.
Q. You can go back, if you want, to the -- I think your December 21st -- I think you have in front of you as Exhibit 5 or so. It's in front of me, let's see --
MS. MARMOR: And let me just be really clear because I -- I don't want to keep going around this.
MR. LINDEN: Yeah.
MS. MARMOR: My only objection is that you're asking her to accept her representation that she is responding for him as if that's sufficient. That -- that's really where the -- the -- the --
MR. LINDEN: Okay. Maybe we can --
MS. MARMOR: -- disagreement shows.
MR. LINDEN: -- shorten it.



Q. Back in December of 2016, you were informed by Ms. Kurtz that she was representing John Nawara with respect to these issues, correct?
MS. MARMOR: Object to the form. 3:04:07
A. I'm --
MS. MARMOR: "These issues." But you can answer.
A. I'm not certain --
Q. You -- you can go back --
A. -- what she stated.
Q. -- and look at the document, but --
A. What was the Exhibit?
Q. In -- what Exhibit was that, 5? The December --
A. Oh, okay.
Q. -- 21st email, was it from Dana Kurtz to you, didn't she inform you --
A. Oh, she --
Q. -- she has been retained to represent John Nawara?
A. She did write that, yes.
Q. And from this email, it's clear that she was representing him regarding the issues relating to the fitness for duty evaluation process, correct?
MS. MARMOR: Hang on, I -- I need to read.



Which -- which --
WITNESS: Exhibit 9.
MS. MARMOR: 9. Okay. I'm going to character -- characterization.
A. So I'm -- I'm sorry, what was the question?
Q. That in her December 21st email in front of you, correct, do you see that?
A. Yes. 3:05:00
Q. She informed you that she was representing Mr. Nawara related to matters in connection with his fitness for duty issues?
MS. MARMOR: Object -- object to the form.
A. She wrote, "With respect to potential claims he has against the sheriff's office."
Q. And those related to the release forms, yes?
MS. MARMOR: Objection. That's not what this says. You can answer it "yes" or "no" if you understand the question.
Q. And you could explain it, if you'd like, or --
A. I apologize, what was --
Q. What --
A. -- your question? 3:05:59
Q. What was -- what was your understanding from the December 21st email from Ms. Kurtz of what this --



what she was representing Mr. Nawara in?
A. My understanding was that he didn't want to go for a fitness for duty and she was representing him to argue that point for him.
Q. Okay. All right. Get that from you, just one second. I'm sorry. In Exhibit 9, isn't it true that she asked, "On what legal basis or policy provision do you and the sheriff's office have in order to -- to order him to complete this form for his personal medical records?" question mark. "Officer Nawara and I believe that such an order is unlawful." She communicated that to you, did she not, in the December 21st, 2016 email?
A. She did write that, yes. 3:06:57
MR. LINDEN: This will go faster.
MR. BUSTAMANTE: Promises, promises.
MR. LINDEN: Yeah.
MR. BUSTAMANTE: Come on, Rick, let's get moving.
MR. LINDEN: Oh, you could help me over there -- what are you -- what are you doing on your computer? No, I'm joking.
MS. MARMOR: Words with Friends is so much fun.
MR. LINDEN: Isn't it?. Bless you.

Page 169

WITNESS: Sorry. 3:07:53
MR. LINDEN: 25 -- oh, it's okay. I'm doing it in some kind of order, date order. This one. This should be an easy one.
Q. Show you Exhibit Number 15 and ask you if you've ever seen this document before?
A. Well I -- I must have. It was -- it's an email addressed to me. I don't specifically recall it.
Q. Do you know who Sean Lynch is?
A. Yes.
Q. Who is Sean Lynch?
A. He works in our payroll department.
Q. Do you know what his title was?
A. No.
Q. Helen Cohn, do you know who she is?
A. Yes. 3:08:58
Q. Who is -- who is Helen?
A. Sorry. She's the manager of payroll for the sheriff's office.
Q. Melody Morley, does she also work with payroll?
A. Yes.
Q. Deborah Munizzi, is --
MS. MARMOR: Munizzi.
MR. LINDEN: Munizzi. Sorry. Thanks,

Page 170

appreciate it.
MS. MARMOR: I speak Italian.
Q. Is she in payroll?
A. Yes, she is.
Q. John Harrington?
A. John Harrington is in attendance review.
Q. Is that within HR?
A. Now it is. At this time, I don't think it was.
Q. Who is Ann --
WITNESS: Excuse me.
Q. -- Dunlap?
A. I don't know who that is. 3:09:36
Q. Okay. And you're being asked to determine the status for John Nawara as he -- he is unauthorized effective 4/25/17 move -- moving forward, were you able to determine -- determine the status?
A. I -- I don't recall what -- what the situation was at this time.
Q. Do you know whether or not Mr. Nawara was unauthorized effective 4/25/17?
A. I am not certain. I don't know when he returned to work.
Q. Do you have any reason to dispute what Sean Lynch wrote in this memo?

Page 171

MS. MARMOR: Objection. Lack of foundation.
A. Well -- I mean, it could -- he could have been marked unauthorized.
Q. Okay. "Unauthorized" means -- if he is unauthorized on May 11th, how is that different than his prior status before 4/25/17?
A. It's just the entry on a timesheet. 3:10:48
Q. That would possibly make him subject to discipline. Is that a fair statement --
MS. MARMOR: Objection.
Q. -- being unauthorized?
MS. MARMOR: Objection. Lack of foundation.
A. It -- it would -- it would go before attendance review to see what the situation was.
Q. Do you know who the people were in attendance review, was that a department?
A. It -- it was just John Harrington, I think, at the time.
Q. Is that within HR, attendance review?
MS. MARMOR: Objection. Asked and answered.
A. It -- it is -- now, it's in HR. At this time, I think it was just kind of on its own.
Q. Okay --
MS. MARMOR: Do you need something? 3:11:55
WITNESS: I thought I had a cough drop, I'm

Page 172

just looking.
MR. LINDEN: Well we had some --
MS. MARMOR: I have --
MR. HENRETTY: Yeah, that's a --
MR. LINDEN: Could we go --
MS. MARMOR: Oh, you have cough drops?
MR. LINDEN: Could we go off --
WITNESS: Oh.
MR. LINDEN: Yeah, could we go off the record a second?
RECORDER: Off -- off the record, 2:21 p.m.
(Off the record)
RECORDER: Back on the record, 2:25 p.m.
Q. Do you recognize Exhibit Number 16?
A. I'm -- I -- I don't know that I've seen it before, but I mean, I see that he's -- that Officer Nawara signed the HIPAA authorization disclosure form.
Q. And can you -- is it dated?
A. Yes.
Q. And that's dated August 17th, 2017?
A. Yes.
Q. You indicated that your typical practice at the sheriff's office was to use CorVel, correct?
A. Yes. 3:12:52
Q. Have you ever seen this form of a HIPAA

authorization before from CorVel?
A. I don't know that I've seen this form before, but we've had medical workers go straight to CorVel rather than through the sheriff's office before.
Q. Do you know whose form was it, was it a form from the sheriff's office or was that a form from CorVel, if you know?
A. This -- in Exhibit 16?
Q. Yes.
A. I don't know.
Q. On paragraph one, can you read paragraph one of this authorization?
A. "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation."
Q. Okay. And that's different than Exhibit Number 1 which would have had the medical records go to Nurse Shelby, correct?
A. Yes. 3:14:02
Q. And this one instead goes to CorVel limited --
A. Yes.
Q. -- correct? And it's also limited to his fitness for duty exam for medical records, correct?



MS. MARMOR: That's what this says?
MR. LINDEN: Yes.
Q. Is that fair?
A. Yes, it does say that.
Q. And can you read paragraph three, please?
A. "This disclosure is made for the purpose of your fitness for duty examination as requested by your employer, Cook County. Your employer may (sic) receive a copy of the independent" --
MS. MARMOR: You said -- it says, "Will," not "May." "Your employer will."
WITNESS: Did I say, "May"?
MS. MARMOR: Yeah.
WITNESS: Oh, wow. Sorry about that.
A. "Your employer will receive a copy of the independent medical exam, IME," in parentheses. "You will also receive a copy of the IME."
Q. Okay. Based on paragraph three, is it your understanding that the sheriff's office would only receive a copy of the independent medical exam as opposed to all the medical records that CorVel was set to receive from the medical doctors of Mr. Nawara?
A. Yes. 3:15:16
Q. And that differs from Exhibit 1, correct? You -- you could go back and refer if you'd like.



MS. MARMOR: Yeah, that's Exhibit 1 right there.
WITNESS: Oh. This is --
MS. MARMOR: He's comparing it to --
WITNESS: -- a different form.
MS. MARMOR: -- this, not to that.
WITNESS: Oh.
A. You mean Exhibit 2?
Q. Yes, that provision differs from what's on Exhibit 1 is all --
MS. MARMOR: No, no, no.
Q. -- the question was --
MS. MARMOR: Now -- now there's confusion.
MR. LINDEN: Wait.
MS. MARMOR: She thinks you're comparing Exhibit 16 to Exhibit 2, are you actually --
MR. LINDEN: 16 --
MS. MARMOR: -- comparing --
MR. LINDEN: -- to 1 is what --
MS. MARMOR: 16 to 1?
MR. LINDEN: -- I'm comparing.
MS. MARMOR: So --
MR. LINDEN: Sorry about that.
WITNESS: Oh.
MR. LINDEN: Let -- let me -- could you read



back the question? I'm sorry. Let -- let me just ask it, I think it will read better --
RECORDER: Oh. 3:16:15
MR. LINDEN: -- if you -- I remember.
Q. On paragraph three of Exhibit Number 16, it states, "Your employer will receive a copy of independent medical exam." On Exhibit Number 16, that differs from Exhibit 1, where the employer, meaning the sheriff's office, would have received all the medical records in addition to, correct?
A. Well these are --
WITNESS: Oh, I'm sorry.
MS. MARMOR: Sorry to interrupt. Just "in addition to," is that what you just said?
MR. LINDEN: Or -- that's -- that's a terrible question. I'm tired.
Q. But on Exhibit Number 3, the sheriff's office is only going to get a copy of the evaluation and not the underlying medical records, correct?
MS. MARMOR: Sorry, you just said, "Exhibit 3," you're -- you're confusing everyone.
MR. LINDEN: Paragraph three of Exhibit 16, I'm sorry.
MS. MARMOR: Okay.
Q. On paragraph three, the sheriff would only

Page 177

get a copy of the evaluation report, correct?
MS. MARMOR: The IME. 3:17:13
A. Yes, which is the same as Exhibit 2.
Q. But I'm --
MS. MARMOR: But he's asking --
MR. LINDEN: Right.
MS. MARMOR: -- about Exhibit 1.
Q. About Exhibit 1, on Exhibit 1, the sheriff's office, through Nurse Shelby, would get a copy of all the medical records, correct?
A. To pass on to CorVel, yes.
Q. Right, yeah, but they receive the medical records to pass on, correct?
A. She could, yes, yes.
Q. Do you recognize -- do you recognize Exhibit Number 17?
A. Yes. 3:18:16
Q. And what is Exhibit 17?
A. This is the referral form that's sent from the sheriff's office to CorVel when we're referring an employee for a fitness for duty.
Q. Okay. And it's got Nurse Shelby's name at the bottom, correct?
A. Yes.
Q. And what -- were you still working in tandem

Page 178

with Ms. -- Ms. Shelby at that time?
MS. MARMOR: Object --
A. What do you --
MS. MARMOR: -- to the form.
Q. That's a bad question. Were -- were you still in the loop when this was going on in August of 2017?
A. Regarding fitness for duty?
Q. Yes.
A. Yes.
Q. So this -- purpose of this document was to refer John Nawara and inform him that he's being referred for a fitness for duty exam, correct?
A. No, this actually goes to CorVel --
Q. Okay. 3:19:18
A. -- to explain to them why -- you know, who is being referred and why, because then CorVel reaches out to the employee to get the appointment scheduled and --
Q. Okay. It says, "Reason for referring," and it goes on to say, "The employee is aggressive, physically intimidating," etcetera, that information came solely from Superintendent Jones-Hayes, correct?
MS. MARMOR: Objection. That's not what the document says.
A. The first sentence is -- is relating to what

Page 179

the superintendent related to us, yes.
Q. Okay. Can you read the first sentence?
A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to a routine directive," period.
Q. Okay. Do you have any information other than what was relayed to you by Ms. Jones to support that statement?
MS. MARMOR: Superintendent Jones-Hayes?
MR. LINDEN: Yes. 3:20:26
A. No.
Q. Okay. The last sentence here, can you read the last sentence --
MS. MARMOR: Of the first paragraph?
Q. -- of the first paragraph?
A. "In addition, weeks later, employee presented as aggressive and hostile in the human resources department."
Q. Was that talking about the interview with you?
A. That's the meeting with -- with me and the nurse, yes.
Q. Was he aggressive towards you at that meeting?

Page 180

A. Yes.
Q. How was he aggressive?
A. His -- his demeanor and his -- the way of speaking.
Q. Can you be more specific about his demeanor, what did you find in his demeanor that was, you know, quote, "aggressive"?
A. Just kind of the way he responded to questions. Excuse me.
Q. Did he physically threaten either you or Ms. Shelby during that interview?
A. He did not. 3:21:23
Q. When you say, "Hostile," how was he hostile?
A. He just looked as though he was seething with anger the whole time he was sitting in the nurse's office with us.
Q. Did he say anything to you in an angry tone?
A. Oh, all of his responses were very clipped and angry.
Q. Did he raise his voice at you?
A. I think his -- his voice was raised a little bit. Not screaming, but loud, it was -- he was unnecessarily -- it -- it just kind of hostile, and it was a very uncomfortable feeling in the room with him.
Q. Have you ever been accused of something you

didn't do in your life?
A. Yes.
Q. Did that make you angry?
A. Oh, sure. 3:22:16
Q. Now if Mr. Nawara was accused by Hayes of doing something he didn't do, you'd expect him to be a little angry. Isn't that fair?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. He might be, sure.
Q. Would you find that unusual?
MS. MARMOR: Object to -- object to the form.
A. Being angry about something and being outwardly hostile are two different things, I think.
Q. Did Mr. Nawara, in fact, go to an independent fitness for duty evaluation as directed by the sheriff?
A. Through CorVel?
Q. Yes. 3:23:21
A. Yes.
Q. Okay. Okay. Do you -- do you recognize Exhibit Number 18?
A. I mean, I recognize this type of letter. I don't know if I've seen this one before.
Q. Okay. And this is a letter from CorVel to Mr. Nawara, correct?



A. Yes.
Q. What's the date of this letter?
A. September 8th, 2017.
Q. And can you read the first paragraph of this letter?
A. "Dear Mr. Nawara, this letter is to inform you that we have scheduled you for a two day fitness for duty exam with the Isaac Ray Forensic Group, LLC on Monday, September 11th, 2017 from 9:00 a.m. to 5:00 p.m. and Tuesday, September 12th, 2017 from 9:00 a.m. to 5:00 p.m."
Q. And is that consistent with your testimony before, that if it was a psychological evaluation, that would be for two days?
A. Yes. 3:24:33
Q. And have you ever heard of the Isaac Ray Forensic Group before?
A. Not that I recall, no.
Q. Do you recall any other employees being sent there by CorVel?
A. I don't recall this name, no.
Q. But it would have been approved by the sheriff's office if it came from CorVel, wouldn't that be a fair statement?
MS. MARMOR: Objection. No, that's not a



fair statement.
Q. You can correct me if you're -- I'm wrong.
A. CorVel chooses the providers. The sheriff's office doesn't -- doesn't choose the providers.
Q. Does the sheriff's office accept the conclusions of the provide -- the provider chosen by CorVel?
A. Yeah.
Q. Okay. And the Cook County Bureau of Human Resource Employee Services is copied on this letter of September 8th, 2017, correct?
A. Yes.
Q. And that would have been your department, correct?
A. Yes.
Q. Would that have been given to you, a copy of this?
A. Probably the nurse, not -- not to me.
Q. Was there any reason for the bureau of human -- human resources to object to Mr. Nawara going to the Isaac Ray Forensic Group?
A. No, not that I'm aware of. 3:25:49
MR. LINDEN: Okay.
WITNESS: Could I have just another minute break?



MR. LINDEN: Oh, sure.
WITNESS: Do you mind?
MR. LINDEN: No, any -- any time.
WITNESS: I just have to take some --
RECORDER: Off the record, 2:38 p.m.
(Off the record)
Q. Have you ever --
RECORDER: Back on the record, 2:44 p.m.
Q. Have you ever seen Exhibit 19 before?
A. Yes.
Q. What is Exhibit 19?
A. It's the fitness for duty report on Officer Nawara that was sent by CorVel.
Q. And was that received by your bureau?
A. Yes.
Q. And did you receive it, you know, shortly after 9/16/17 or that day?
A. I'm not certain what day I received it. 3:26:45
MS. MARMOR: Yeah, the bottom of the document says, "10/19/17 --
MR. LINDEN: Okay.
MS. MARMOR: -- 17."
MR. BUSTAMANTE: That computer --
MR. LINDEN: Thanks.
MR. BUSTAMANTE: If you look --

MR. LINDEN: Okay.
MR. BUSTAMANTE: Okay.
MR. LINDEN: Just off the --
MR. BUSTAMANTE: I'm ready.
MR. LINDEN: Return to work is, like, 9/27 --
MS. MARMOR: Okay. I'll -- I'll believe you. I actually think -- as you know, I know all the documents in the case. There is a document showing it being transmitted, but I just don't -- I don't know how --
MR. LINDEN: Oh, okay.
MS. MARMOR: -- to get that --
MR. LINDEN: Okay.
Q. It -- it indicates the date of the report September 16th, 2017, yes?
A. September 16th, 2017, is that what you said?
MS. MARMOR: Yeah, he's --
Q. Yes.
MS. MARMOR: -- pointing to right here.
Q. That's the date of the report --
A. Yes.
Q. -- correct?
A. Yes. 3:27:29
Q. If you could turn to page 2 of -- of 10, and the second to bottom paragraph, and just read the first



sentence, "According to"?
A. "According to Officer Nawara -- Nawara, during the interview here," in parentheses, "he was neither verbally counseled nor more formally disciplined for this incident, which he stated occurred on 9/28/16, not 9/29/16."
Q. Do you have any information that shows that that statement is inaccurate?
MS. MARMOR: I'm going to object for -- for a couple of reasons. First, she didn't write this, second, this is hearsay, and we can deal with that at a later date.
MR. LINDEN: Sure. 3:28:31
A. Is the incident -- I don't know what incident she was referring to.
Q. Right. I -- I -- my question is do you have anything -- do you know of anything that shows that that sentence is inaccurate in any way?
MS. MARMOR: Same objections.
A. So I don't know what she's referring to when she says, "This incident," so I guess I don't understand what you're asking.
Q. Okay. Assuming the incident refers back to the September 2016 incident with Jones-Hayes, would you agree that John Nawara was neither verbally counseled



or formally disciplined for the September 2016 incident?
MS. MARMOR: Okay. So in addition to my other objections, she's got absolutely no foundation to answer that question.
A. I don't know.
Q. You don't know of any discipline, correct?
A. I don't know if he was or not.
Q. Okay. And that goes to the counseling too, correct, that you don't know?
A. Yes, I -- I do not know. 3:29:33
Q. And on page 3 of 10 of this report, it summarizes John Nawara's version of what happened in September of '16, correct?
A. In the second paragraph here you're referring to?
Q. Second paragraph, and also the following third paragraph.
A. It looks like that's what it is, yes. 3:30:27
Q. And I take it you have no information to either support it or dispute what is contained here, correct?
MS. MARMOR: Okay. I mean, again, I don't really think you have a foundation to be asking her about hearsay from him. There's a lot of information



here. I don't think it's a fair question to ask her about two paragraphs that somebody else wrote, whether she has information to dispute it.
Q. You can read them, but I just want -- if there -- if you have any information to dispute anything what's in the second paragraph? Let's start with that.
MS. MARMOR: Same objection, and -- and I think even if she reads, it's kind of an unfair question.
Q. Let -- let me cut this one short, I don't want to spend ten minutes on the next two paragraphs.
A. Okay. 3:31:43
Q. Just to be clear, you don't have any independent information of what happened in September of 2016, correct?
MS. MARMOR: Meaning between Mr. --
MR. LINDEN: Nawara and --
MS. MARMOR: -- Nawara and Jones-Hayes?
MR. LINDEN: Correct.
A. Yeah, I was not a part of any investigation or anything.
Q. Anything you know -- anything you know would be based on what Ms. Jones-Hayes told you or what Mr. Nawara told you, correct?

Page 189

A. Yes. Yes, sorry.
Q. Okay. Do you know whether or not Nurse Shelby and Superintendent Jones-Hayes are personal friends?
A. I don't know.
Q. You don't know either way?
A. No.
MS. MARMOR: He's on the next page, if you want to turn it.
WITNESS: Oh.
MR. BUSTAMANTE: Can I --
MR. LINDEN: All right.
MR. BUSTAMANTE: I'm sorry.
MR. LINDEN: No problem. 3:32:47
MS. MARMOR: So is that going to get transcribed?
Q. Okay. If you could turn to page 7 of 10 and read the first paragraph, starting with "notwithstanding."
MS. MARMOR: Just read it to herself?
MR. LINDEN: No.
Q. Read it out loud, please. 3:33:51
MS. MARMOR: Okay. I -- I'm -- again, I'm just going to have an objection. This is all hearsay, this is not her document, and I -- you know, I'll

Page 190

object if this is tried to be read in on the record at -- at trial.
A. "Notwithstanding potentially problematic personality traits, I have been presented with no evidence from Officer Nawara's 18 plus year history with the county that he has experienced chronic, i.e. longstanding and pervasive, anger management difficulties on the job or any other particular difficulties for that matter. According to him, his last suspension was in 2006 pertaining to a situation involving a disagreement over a unit lockdown, and he ultimately prevailed in arbitration. Related, he deemed -- he denied that -- that other verbal and written discipline has -- he has received over the years related to anger management difficulties per se. I have similarly been presented with no evidence that the 9/29/16 incident was perceived as an anger management problem by administration at the time. Officer Nawara was not subjected to discipline, nor was he pulled from working or sent for a fitness for duty examination. It is reasonable to infer that he had concern -- that -- that" --
MS. MARMOR: "That had concerns."
A. Sorry.
Q. No problem.

Page 191

MS. MARMOR: You were on, "It is reasonable --
Q. "It is reasonable."
MS. MARMOR: -- to infer."
A. I found it.
Q. Yeah, okay. 3:35:28
A. I knew where I was, I just couldn't find the line. "It's reasonable to infer that had concerns about Officer Nawara's emotional state been significant at that time, one or both would have occurred, yet Officer Nawara was returned to the very same assignment the next day and worked two other units before ultimately being sent to a fourth assignment where he would be interacting with both detainees and the general public and required to carry a firearm. It is my understanding, and I have been presented no evidence to the contrary, that Officer Nawara worked all assignments following the 9/29/16 incident without difficulty for another approximate six weeks before being pulled from the job and mandated to a fitness for duty examination on 11/18/16."
Q. Do you know of any facts which would refute anything in that paragraph you just read?
MS. MARMOR: I'm going to have all the same objections. This is a whole series of claims, it's

Page 192

hearsay, it's based on things he told her and -- and this examiner's lack of information, and I don't even know how she can answer fairly a question like that.
Q. You -- you could read it, just tell me if you know of anything that would make that paragraph -- anything in there inaccurate.
A. I'm --
MS. MARMOR: Same objections.
A. I don't have information on his disciplinary history or his assignments.
Q. Okay. Is it fair to say that you don't have any information to either support it or dispute anything in this?
MS. MARMOR: Same objection. This is unbelievably compound.
A. Yeah, I don't have any information at all --
Q. And we can go through each sentence, but is there anything in here that you know of that would make anything in this paragraph untrue?
MS. MARMOR: As she sits here today?
MR. LINDEN: Yeah. 3:37:15
A. No, I don't -- I don't have any information --
Q. Okay.
A. -- one way or the other on this.

Q. Can you read the next paragraph, starting with "as a fitness examiner"?
A. "As a fitness examiner, this set of facts places me in a difficult position. The county's own actions suggest Officer Nawara was not deemed a threat to the safety of co-workers, detainees, or the general public. The only reasonable alternative explanation in -- if, in fact, the incident occurred as Superintendent Jones-Hayes described," in parentheses, "it is not my role to fact find and settle this apparent he said, she said, is that management failed to discipline or otherwise act appropriately at the time of the incident, and this was simply a missed opportunity for intervention. Finally, I would be remiss if I did not express my concerns about the timing of this examination being requested on 11/18/16, not only so remotely in time from the incident itself on 9/29/16, but following a formal complaint being filed by Officer Nawara in the interim."
Q. And this paragraph is written by Diana S. Goldstein, PhD, correct? If you want to turn to the following page, page 8 of 10.
A. She was the psychologist who wrote the report, yes. 3:39:10
Q. Is there anything in that paragraph that you



disagree with?
MS. MARMOR: Same set of objections and incredibly compound.
A. And this is just her opinion based on what he told her.
Q. It's her --
A. That doesn't seem to relate to the reason for a fitness for duty, I guess.
Q. Do you have any facts to dispute anything in that paragraph?
MS. MARMOR: Object to the form. Again, very compound, and I don't even know what "anything" is.
A. I mean, do I disagree with her opinion? I mean, it's just -- I don't understand exactly what facts I could have to --
Q. Yeah, do you have any facts to dispute what she says in the paragraph beginning with "as a fitness examiner" and ending --
A. Well I -- I do, because she's saying, "This set of facts," when she's just relaying what he told her.
Q. Okay. But do you have any facts to dispute what John -- what is contained here, other than what Superintendent Hayes told you?
MS. MARMOR: Objection. Object to the form. 3:40:36



A. I -- I guess I'm -- I'm not sure what you're asking me.
Q. Let -- let me -- let me move onto the next question, but can you just read the final full paragraph on page 7 of 10?
A. Mm-hmm. "It is my -- it is my opinion that there is presently no evidence that Officer Nawara's work conduct on 9/29/16, whatever that conduct may have been, arose directly from mental illness, cognitive impairment, or any medical condition or its treatment. It is similarly my opinion that he suffers from no mental illness, cognitive impairment, or medical condition that may impair his -- his capacity to do his job at the present time. As such, it is my opinion that Officer Nawara does not pose a safety risk to himself or others, co-workers, detainees, or the public," in parentheses, "and that he is fully capable of safely and effectively carrying out the essential functions of his job. I currently find Officer Nawara fit to return to duty without restriction."
Q. Based on Diana Goldstein's report, in hindsight, was the order for a fitness for duty examination of doctor -- for John Nawara proper?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.



A. So based on her report --
Q. In hindsight, based --
A. -- should he have been sent for --
Q. Yeah. 3:42:34
A. -- fitness for duty?
Q. Based on her report, should he have ever had to have undergone a fitness -- fitness for duty evaluation?
A. Are -- are you asking my opinion or her opinion?
MS. MARMOR: Your opinion.
Q. Your opinion.
A. Oh. Well yeah, I mean, we wouldn't have known -- based on the situation and how he presented to us, we wouldn't have known that he was actually fit for duty until we received a report saying so.
Q. But again, the sheriff's office didn't do an investigation into the allegations made by Jones-Hayes -- Jones-Hayes before ordering Nawara to undergo a fitness for duty examination, correct?
MS. MARMOR: Objection. Argumentative and ignores other facts in the evidence.
A. He -- the investigation for discipline is separate from speaking to an employee about an alleged incident regarding a possible fitness for duty.

Page 197

Q. Okay. What investigation is performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes actually were true before ordering John Nawara to submit to a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered, and this is really not -- she doesn't do the -- the discipline side, she's established that. She has no foundation for answering those kinds of questions.
Q. If -- if you know of any, do you know of any investigation?
A. I -- I don't know what investigation was done. It's separate from meeting with an employee to discuss an allegation that may result in a fitness for duty exam.
Q. Was your order for John Nawara to submit to a physical -- fitness for duty evaluation based, in any part, on an investigation performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes were true or not true?
MS. MARMOR: Object to the form. 3:44:29
A. No, that's how we met with him --
Q. Okay.
A. -- to assess what the situation was.
Q. Okay. But there's no investigation that you

Page 198

used from the sheriff's office before you and Nurse Shelby made the decision that he -- he was required to submit to a fitness for duty evaluation, correct?
A. No, we don't investigate in HR.
Q. Could you have referred the matter for an investigation in the sheriff's office of professional review?
MS. MARMOR: Objection. Lack of foundation.
A. So the -- if an allegation like this is raised, there is an investigative track that is handled by OPR. The fitness for duty referral would come to HR, we talk to the employee, try to figure out what had happened, what the situation was, if anything happened, and so that's what we were attempting to do when Mr. Nawara came to HR. And just based on his behavior and his failure to cooperate, we weren't able to -- to understand what had happened.
Q. Is there a mechanism in place at the sheriff's office where you could request an investigation be performed to determine whether or not allegations against an employee are true or not true?
MS. MARMOR: She personally?
MR. LINDEN: Or HR.
MS. MARMOR: Well no -- well no, no, no, there is no -- there is no foundation for HR. If

Page 199

you're asking her personally, she can answer that question.
Q. Okay. You personally?
MR. LINDEN: That's fine. That's fair enough. 3:45:49
A. Me personally what? I'm sorry.
Q. Is there a mechanism in place that you could request an investigation into the complaints of Jones-Hayes before you ordered a fitness for duty evaluation?
A. So there is a mechanism to file a complaint for investigation, yes, and again, it's -- it's -- it's not really in line with meeting with someone for a fitness for duty. I just feel like you're confusing two separate issues.
Q. Okay. But the sheriff's office also has investigators, correct, within the sheriff's office?
A. Yes.
Q. Are you allowed to request an investigation be done separate and apart from a disciplinary investigation?
MS. MARMOR: Wait, what?
Q. You -- you have investigators that are not part of OPR that work for the sheriff's office, correct?

Page 200

A. No. 3:46:43
Q. You have detectives within the sheriff's office?
A. Not for -- they -- all internal complaints are investigated by OPR.
Q. They can't be investigated outside of OPR?
A. I can't think of an instance where they're not handled by OPR.
Q. Okay. And -- and you -- you don't know whether or not OPR performed any investigation regarding this, correct?
A. I don't know.
Q. Okay. Let's see. I'm almost done. There you go. Do you recognize Exhibit Number 20?
A. Yes. 3:47:44
Q. And what is Exhibit 20?
A. This is the form indicating that Officer Nawara didn't have any restrictions and he could return to work full duty.
Q. And that came from Nurse Shelby?
A. Yes.
Q. And the date on this document is September 26th, 2017?
A. Yes.
Q. When was Mr. Nawara authorized to return to

work?
A. As of the issuance of this document.
Q. Well I think right above it, doesn't it say, "Return to work on 9/27/17"?
A. Right, so the day -- so she wrote this, he was able to return the next day.
Q. Okay. So what was his status on -- as of 9/27/17?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. If -- if he returned on that day, his status would have been working.
Q. Working, being paid, and benefits?
A. Mm-hmm.
Q. Okay.
A. Yes. 3:48:36
Q. Do you know whether or not he returned to work that day?
A. I don't know what day he returned
Q. Let's see. I'd like to show you Exhibit Number 21, if you could -- and might want to take a minute to review it.
MR. LINDEN: This is the latest one, right? 3:49:45
MS. MARMOR: Yeah, although I think we're going to supplement it with a new one.



MR. LINDEN: Okay.
A. Okay.
Q. Have you ever seen Exhibit Number 21 before?
A. No.
Q. And it states here to "identify the name, if known, the address, telephone number of each individual likely to have discoverable information that the disclosing party may use to support the claims or defenses as follows." Do you know what information Matthew Burke has, other than referring the referral for the fitness for duty?
A. No.
MS. MARMOR: Objection. Lack of foundation.
WITNESS: Sorry.
MS. MARMOR: It's okay.
Q. Do you know who Thomas Conley is?
A. Yes. 3:50:52
Q. Who is Mr. Conley?
A. He is a sergeant with the sheriff's office.
Q. Do you know what information he has related to this case?
A. I do not.
Q. Do you know whether or not he witnessed anything regarding the incident between Mr. Nawara and Ms. Jones-Hayes?



MS. MARMOR: Objection. Lack of foundation.
A. I'm not certain.
Q. Do you have any idea of what information he has?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't.
Q. Okay. How about Barbie Gannon, do you know who she is?
A. No.
Q. Do you know what information, if any, she might have?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. Do you know who Jeff Johnsen is on here, number eight?
A. Yes. 3:51:46
Q. Who is he?
A. He is -- he might be chief of staff now for DOC.
Q. So -- yeah, from this disclosure, Jeff Johnsen was Jones-Hayes' supervisor?
MS. MARMOR: That's what it says.
MR. LINDEN: It's her answers too, but.
Q. Do you -- do you know whether or not he was, in fact, Jones-Hayes' supervisor at the time of the



allegations --
MS. MARMOR: Objection. Lack of foundation.
A. Yeah, I mean, if he had a supervisory role over DOC, then the superintendents would have all reported up to him.
Q. Do you know what discoverable -- discoverable information Mr. Johnsen may have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. How about James Turrise?
MS. MARMOR: Turrise.
MR. LINDEN: Turrise. Thank you.
Q. Do you know who Mr. Turrise is?
A. I do not.
Q. Do you know what information he may or may not have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No. 3:52:53
Q. How about Johnice Brumfield-Greer, do you know what information she has?
A. No.
Q. Do you know who she is?
A. No.
Q. Do you know any other persons or individuals that may have information related to this case other

than the people listed on Exhibit Number 21?
A. No.
MR. BUSTAMANTE: Do you need, Rick, one more Exhibit sticker? No, you've got one.
MR. LINDEN: Okay. Maybe. Let's see.
WITNESS: Only one more.
MS. MARMOR: It's an indication.
MR. LINDEN: Maybe, let's see. Could be like Rizzo, "Any question I asked that I should have" -- no. That's Hinshaw's favorite question.
MS. MARMOR: Really? Oh, my God.
MR. HENRETTY: What is that? 3:53:58
MR. LINDEN: "Is there anything I should have asked you?"
MR. HENRETTY: Oh.
MS. HONINGFORD: That's --
MS. MARMOR: Off the record.
MR. LINDEN: Yes.
MR. HENRETTY: Do you want to --
MS. MARMOR: Off the record.
RECORDER: Oh, off the record, 3:12 p.m.
(Off the record)
RECORDER: Back on the -- back on the record, 3:13 p.m.
Q. Okay. I just want to show you Exhibit 22,



and it's kind of a Group Exhibit. If we can, I -- I can start with the first page and might short circuit it.
MS. MARMOR: And I'm actually going to interpose an object -- several objections. Number one, this is not produced in this case, number two, this is about a subject that the court has already said is not part of this case, so I am going to object to any line of inquiry on this.
MR. LINDEN: Are you going to allow her to answer or you're not?
MS. MARMOR: I'm going to listen to your question first.
MR. LINDEN: Okay. 3:54:55
Q. First off, have you ever seen the letter dated December 18th, 2018 from Brian White to John Nawara?
A. No.
Q. Do you have any knowledge or information regarding him being disqualified for the present cycle of merit rank promotional process for the position of police officer?
A. No.
Q. Did you ever discuss this with Brian White?
MS. MARMOR: I'm going to -- there is no



foundation for that.
MR. LINDEN: Right -- okay. But if she didn't, it's just no.
Q. And it sounds like that's what --
WITNESS: Can --
Q. -- your answer is going to be --
A. No.
Q. -- right? So this is the first you ever heard of this --
A. Yes.
Q. -- happening?
A. With Mr. Nawara, yes.
Q. Yes. Did you have any involvement or anything to do with Mr. Nawara being disqualified for the promotional process for a police officer?
MS. MARMOR: Object to the form, and again, no foundation.
A. Not that I'm aware of, no. 3:56:01
Q. Okay. Are -- are you related to any current or former politician, either through your -- any marriages or by blood?
A. No.
Q. Do you have any political clout?
MS. MARMOR: Object --
MR. HENRETTY: To the --



Q. "Clout" is a bad word. Let's see.
MR. BUSTAMANTE: The correct legal term is "Chinaman."
MS. MARMOR: What?
MR. BUSTAMANTE: Oh, you never heard of that?
MS. MARMOR: No.
MR. BUSTAMANTE: Oh, when you're --
MS. MARMOR: We should probably take this off the record.
MR. HENRETTY: Yeah, we might --
MS. MARMOR: Wait off the record.
MR. BUSTAMANTE: Yeah.
MR. LINDEN: That was -- that was Peter's -- his question, better than I phrased it. Anything else?
MR. BUSTAMANTE: No.
MR. LINDEN: Thank you very much. Appreciate your time, and I have no --
MR. BUSTAMANTE: And do you have --
MR. LINDEN: -- further questions.
MR. BUSTAMANTE: Do you have questions?
WITNESS: Thank you.
MS. MARMOR: I don't have any questions.
MR. BUSTAMANTE: Anybody? No?
MS. HONINGFORD: No, no.
MR. BUSTAMANTE: So we're done.

MS. MARMOR: And we'll reserve signature.
RECORDER: Off the record, 3:16 p.m.



CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Gregory Diaz
September 30, 2019

## A

**ability** 137:8
**able** 35:1, 57:12 74:24, 75:23 101:14, 101:24 105:3, 119:24 142:17, 155:16 170:16, 198:16 201:6
**above-entitled** 210:4
**abruptly** 82:3 117:2
**absence** 17:6 17:7, 36:1 127:24, 131:9 135:14, 135:20
**absences** 135:25
**absolutely** 187:4
**accept** 56:18 153:20, 154:6 165:20, 183:5
**access** 65:21 70:14, 95:25
**accumulated** 102:15, 103:11
**accuracy** 164:2
**accurate** 57:2 84:21, 84:21 84:25
**accurately** 67:15
**accused** 38:22 180:25, 181:5
**acknowledge** 51:8
**acknowledging** 106:4
**act** 159:6 193:12
**acted** 109:5
**action** 58:17 58:23
**actions** 193:5
**active** 57:23 104:16, 109:3
**actual** 161:22
**ADA** 163:10 163:19
**addition** 109:14 163:3, 176:10 176:14, 179:17 187:3
**additional** 38:12 136:10, 164:11
**address** 6:13 10:4, 10:16 10:18, 69:8 69:19, 106:8 106:10, 106:17 106:18, 106:22 202:6
**addressed** 169:8
**addresses** 8:12 10:7
**administration** 190:18
**administrator** 45:13, 45:23 150:22
**advance** 80:15 80:17
**advice** 24:1 25:2, 25:14 27:8, 27:15 28:7, 28:18 53:10, 53:12 53:16, 54:6 114:15, 114:18 114:19, 114:20 114:23, 115:3 115:10, 115:15 122:18, 125:2 125:24, 126:4 145:18, 145:22 145:25, 146:4 146:20, 154:19 161:7, 161:10 161:12, 161:15 161:25, 162:16
**advised** 24:20 24:23, 100:12
**advising** 15:18 24:24, 25:10
**advocate** 15:6
**agency** 126:8 127:11
**ages** 8:8
**aggressive** 49:25, 57:14 109:6, 178:20 179:3, 179:18 179:24, 180:2 180:7
**agitated** 47:25
**ago** 29:16, 32:20 141:7
**agree** 40:11 40:23, 41:12 54:14, 62:4 87:21, 98:17 99:1, 129:25 138:24, 149:24 163:18, 186:25
**agreed** 41:18
**agreement** 4:21 6:15, 8:16 40:21, 123:9 137:15
**ahead** 99:16 140:24, 149:13
**al** 1:11, 3:21
**allegation** 197:14, 198:9
**allegations** 116:3, 116:11 196:18, 197:3 197:19, 198:21 204:1
**alleged** 57:10 76:8, 93:16 109:5, 196:24
**allegedly** 38:14
**allow** 156:17 173:13, 206:10
**allowed** 35:10 58:6, 100:19 101:2, 101:6 101:17, 160:21 199:19
**allows** 67:19 128:25
**altercation** 47:16, 47:20 47:21
**altercations** 81:4
**alternative** 193:7
**amendment** 159:9
**American** 159:6
**amount** 107:22
**ample** 127:18
**analyst** 21:13 21:23, 22:8 22:15, 22:16
**anger** 180:15 190:7, 190:15 190:17
**angrily** 50:7
**angry** 180:17 180:19, 181:3 181:7, 181:13
**Ann** 170:10
**answer** 5:18 26:24, 27:1 27:4, 27:19 28:11, 28:15 28:19, 44:21 64:11, 95:12 97:13, 97:14 99:11, 99:13 115:1, 115:6 115:13, 118:20 118:20, 119:5 125:1, 125:3 126:2, 126:4 126:17, 126:20 134:23, 136:18 139:2, 146:2 146:5, 146:8 146:16, 147:3 154:13, 154:15 154:20, 154:24 166:7, 167:17 187:5, 192:3 199:1, 206:11 207:6
**answered** 33:8 78:9, 78:9, 94:4 136:18, 141:13 147:4, 154:25 171:20, 197:6 203:5
**answering** 197:9
**answers** 33:11 33:21, 81:7 157:17, 203:23
**anticipation** 115:17
**anybody** 10:20 10:23, 16:6 20:15, 27:23 32:6, 32:7, 82:9 122:25, 137:3 139:12, 154:5 158:7, 208:23
**apart** 199:20
**apologize** 45:7 139:11, 167:21
**apparent** 193:10
**apparently** 118:8
**appear** 106:22 145:6
**appearances** 2:1 4:6
**appeared** 38:2
**applied** 66:2
**applies** 71:15
**appointment** 45:16, 46:7 46:8, 140:3 178:18
**appointments** 44:19, 47:2

47:3
**appreciate** 170:1, 208:16
**approached** 50:16
**appropriately** 193:12
**approved** 46:12 135:8, 155:14 182:22
**approximate** 191:19
**approximately** 5:11, 10:3 10:19, 29:16 87:16, 88:21 104:8
**approximation** 18:4, 108:3
**arbitration** 190:12
**area** 50:14, 72:1
**argue** 168:4
**argumentative** 111:1, 123:19 132:15, 137:5 140:10, 196:21
**arose** 195:9
**arrest** 34:24
**aside** 32:12 33:21, 42:10 42:13, 92:21 160:14
**asked** 47:23 78:8, 94:4 114:24, 116:22 136:17, 137:14 141:12, 168:7 170:14, 171:20 197:6, 203:5 205:9, 205:14
**asking** 31:21 49:15, 72:24 78:11, 123:16 126:12, 126:18 129:16, 131:15 136:19, 138:5 138:7, 146:20 161:19, 165:20 177:5, 186:22 187:24, 195:2 196:9, 199:1
**assess** 38:5, 57:5 197:24
**assessment** 77:24, 77:25 78:25
**assign** 92:3
**assignment** 191:11, 191:13
**assignments** 160:16, 191:18 192:10
**assist** 44:21 65:9
**assistance** 42:23
**assistant** 22:7 30:14, 30:18
**assisted** 42:17
**assists** 77:10 77:10
**assume** 40:22 58:21, 143:3 148:18
**assumes** 48:7 67:6, 76:14 77:7, 77:20 79:4, 122:4 130:23, 134:22 136:9, 137:17 138:3, 140:11
**assuming** 95:24 99:2, 186:23
**attach** 141:19
**attached** 90:25 91:4, 113:9 141:23, 142:21 144:20, 145:1 156:17, 156:22
**attempt** 132:20
**attempting** 198:14
**attendance** 170:6, 171:14 171:15, 171:19
**attended** 12:21
**attention** 49:23
**attorney** 13:16 120:1, 120:7 123:15, 124:1 137:12, 137:23
**attorney's** 2:21 3:3, 115:9 120:17
**attorney-client** 115:6
**attorneys** 4:5 15:23, 114:6 122:21, 123:21
**August** 17:13 172:20, 178:6
**authority** 35:3 35:7, 39:19 40:19, 40:23 41:1, 41:20 41:24, 92:15
**authorization** 55:5, 68:15 70:23, 71:6 71:15, 109:8 109:9, 109:20 113:10, 115:24 133:8, 172:17 173:1, 173:12 173:13
**authorize** 66:10 66:16, 68:23
**authorized** 58:9 67:4, 104:21 109:17, 135:25 200:25
**authorizes** 67:18
**authorizing** 67:10, 69:1 70:7, 71:4
**automatic** 35:15 35:18, 100:21
**automatically** 98:3, 98:4
**available** 101:25
**Avenue** 69:22
**aware** 5:12 32:11, 32:15 35:12, 54:17 72:5, 81:20 116:10, 117:4 138:8, 147:11 147:15, 150:16 183:22, 207:18

**B**

**bachelor** 11:1
**back** 15:7, 23:18 26:3, 28:5 51:20, 53:7 53:8, 57:14 59:6, 63:5, 63:7 68:20, 70:2 73:25, 79:13 80:1, 81:22 81:25, 84:4 93:20, 101:12 101:16, 103:22 105:7, 109:19 111:19, 127:5 128:19, 133:17 133:17, 153:14 165:12, 166:1 166:9, 172:13 174:25, 176:1 184:8, 186:23 205:23, 205:23
**background** 10:25
**bad** 84:24 94:17, 152:8 178:5, 208:1
**Banks** 3:11
**bar** 13:7, 13:9
**Barbie** 203:7
**based** 27:18 28:18, 35:2 37:25, 47:9 50:19, 83:19 95:7, 98:10 99:1, 103:7 109:4, 115:6 117:7, 118:12 125:2, 125:24 126:4, 146:4 154:19, 174:18 188:24, 192:1 194:4, 195:21 196:1, 196:2 196:6, 196:14 197:17, 198:15
**basically** 81:2 92:21, 128:13
**basis** 25:17 25:19, 113:10 120:19, 149:24 168:7
**Bates** 112:15 112:18, 142:2
**beginning** 194:17
**behalf** 4:1, 4:7 4:11, 4:13, 4:15 110:22, 117:10 117:13
**behavior** 57:11 99:18, 179:4 198:15
**behavioral** 149:16
**believe** 16:16 19:13, 21:6 28:6, 29:20 30:20, 31:12 31:25, 35:25 37:5, 42:5 42:16, 43:12 45:2, 45:19 48:3, 48:16 50:15, 58:21 65:14, 65:14 76:5, 83:16 87:5, 89:6, 91:5

112:18, 113:14 168:11, 185:6
**believed** 159:13
**benefit** 20:12 101:24, 102:2 102:15, 103:8
**benefits** 120:14 201:13
**best** 6:4, 38:19 43:12
**better** 31:5 39:18, 60:20 84:9, 176:2 208:14
**bias** 153:3
**big** 89:21
**billed** 152:16
**birth** 6:9, 63:25 65:21, 65:22 65:25
**bit** 30:5, 53:9 141:6, 180:22
**blank** 66:10 66:12, 66:16 67:23, 68:6 68:23, 68:24 130:11, 130:19 133:3, 159:5
**blanked** 19:16
**blanks** 69:8 129:3
**Bless** 168:25
**blood** 207:21
**blurry** 63:13
**board** 148:16
**body** 85:9
**born** 6:11
**bottom** 142:3 177:23, 184:19 185:25
**box** 64:14, 64:22 64:23, 71:18 71:22, 72:3 73:2
**boxes** 71:16 129:3
**breadth** 123:10 138:7
**break** 5:22, 5:24 52:23, 79:8 79:25, 81:21 183:25
**Brian** 206:16 206:24
**brief** 11:15
**bring** 39:24
**Brown** 22:5 22:5
**Brumfield-Greer** 204:19
**building** 18:19 18:20, 19:23 69:21
**buildings** 18:17
**bureau** 17:9 100:15, 101:7 101:8, 183:9 183:19, 184:14
**Burke** 3:8, 4:14 29:24, 30:9 31:2, 31:10 31:15, 31:24 42:4, 42:6 42:10, 42:14 42:20, 43:4 90:7, 90:11 90:19, 90:22 202:10
**Burke's** 29:25
**Burling** 9:2 10:2, 10:18
**burning** 160:10
**business** 95:7
**Bustamante** 1:22, 2:4, 2:5 3:19, 4:9, 4:9 16:10, 16:12 40:1, 60:13 63:6, 63:8, 67:1 129:6, 143:21 148:9, 151:23 151:25, 152:2 152:9, 155:12 168:16, 168:18 184:23, 184:25 185:2, 185:4 189:11, 189:13 205:3, 208:2 208:5, 208:7 208:12, 208:15 208:18, 208:20 208:23, 208:25

**C**

**cabinets** 70:19
**California** 18:16, 69:22
**call** 37:9, 37:11 72:19, 76:22 155:6
**called** 11:18 80:14, 80:16 104:18, 107:3 107:5, 107:25 109:12, 114:21 147:12
**calling** 33:6
**calls** 41:3, 73:11 75:20, 76:13 77:6, 93:2, 96:3 96:19, 97:5 98:14, 107:19 113:20, 121:22 123:12, 139:7 162:13, 181:9 195:25
**camera's** 62:12
**Campus** 69:21
**capable** 195:17
**capacity** 195:13
**care** 60:6, 63:15 64:15, 66:10 68:24, 69:7 71:19, 72:24 82:16, 109:8
**carry** 58:7 58:10, 191:15
**carrying** 58:18 58:24, 195:18
**case** 1:9, 3:22 5:16, 10:6 31:25, 32:5 32:7, 33:8 38:22, 38:25 39:1, 39:8, 41:6 42:3, 61:17 61:25, 67:11 72:6, 73:5 76:20, 93:1 112:18, 112:21 129:17, 154:18 185:8, 202:21 204:7, 204:16 204:25, 206:6 206:8
**cases** 92:19 100:23
**caused** 160:19
**caution** 26:19
**cc'd** 91:15 100:1, 156:11
**CCM** 69:21
**Center** 26:10
**Cermak** 49:17
**certain** 31:16 81:23, 90:18 95:19, 107:25 115:25, 117:3 118:3, 120:5 123:3, 151:1 162:6, 165:10 166:8, 170:22 184:18, 203:2
**certainly** 73:16
**CERTIFICAT...** 210:1
**certified** 105:15 105:20, 106:1 106:4, 108:20 148:17, 149:2
**certify** 210:2
**chain** 96:11
**chair** 50:7
**chance** 115:2
**changed** 29:15 30:13
**character** 167:4
**characterization** 128:16, 167:4
**characterizing** 135:10
**check** 12:18 72:3, 86:11 86:14, 105:7
**checked** 64:15 64:18, 64:18 64:22, 64:22 71:16, 71:19 73:1
**Chicago** 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 6:12, 11:9 11:21, 12:25 14:9, 15:10 69:22
**chief** 19:21 31:14, 90:8 90:12, 90:13 90:14, 90:16 91:14, 91:19 203:18
**children** 8:4, 8:6 8:7, 10:22
**Chinaman** 208:3
**choose** 183:4
**chooses** 183:3
**chosen** 183:6
**Christy** 26:2 27:16, 27:21 114:13, 120:2 122:17, 122:19 122:22, 122:25 145:17, 145:23 154:4, 154:9 161:4
**Christy's** 26:3
**chronic** 190:6

**circuit** 206:2
**circumstances** 58:19, 66:23 74:8, 111:2 135:23
**city** 14:9, 14:13 14:21, 14:24 15:1, 15:1, 15:2 15:6, 69:8
**Civil** 4:22
**claim** 50:8
**claimed** 48:5 50:3, 50:12
**claims** 113:6 167:13, 191:25 202:8
**clarified** 136:18
**clarify** 79:14
**class** 105:15 108:20
**classify** 155:15
**clear** 49:8 96:22, 112:15 120:21, 165:16 166:22, 188:14
**clenched** 85:10
**client** 103:14 125:20
**Clinical** 149:17
**clipped** 81:6 180:18
**clout** 207:23 208:1
**co-workers** 193:6, 195:16
**cognitive** 149:16 195:9, 195:12
**Cohn** 169:15
**cold** 144:5
**college** 11:3 11:16
**colon** 71:15 71:20
**come** 30:11 35:19, 39:21 44:2, 44:2, 44:6 56:24, 57:9 74:6, 79:19 85:11, 116:22 128:7, 137:15 168:18, 198:11
**coming** 24:25 48:1, 141:15
**comma** 90:8 96:11, 160:8 163:2, 163:17
**command** 96:11
**comment** 139:3
**common** 73:23 91:18
**communicate** 77:1, 125:9 125:16, 125:19 154:9
**communicated** 59:6, 154:1 154:3, 168:12
**communication** 115:7, 124:1 137:22, 137:24 137:25, 138:16
**communications** 64:21, 90:20 111:4, 123:23
**company** 11:18 40:5, 45:18 150:23
**compare** 142:7
**compared** 135:5
**comparing** 175:4, 175:15 175:18, 175:21
**compensatory** 102:16
**compile** 70:9
**complain** 85:25
**complains** 134:8
**complaint** 23:7 93:9, 94:3, 95:5 95:21, 95:25 96:8, 116:3 120:21, 193:18 199:11
**complaints** 15:1 85:21, 86:3 86:15, 159:12 199:8, 200:4
**complete** 12:2 55:20, 65:13 68:1, 73:20 77:24, 98:21 113:12, 115:23 127:8, 127:10 127:19, 136:6 136:20, 163:7 163:20, 164:7 168:9
**completed** 66:19, 66:22 105:4, 129:13 130:5
**completely** 69:13
**completes** 4:17 113:9, 131:1
**completing** 65:9
**complex** 19:7
**compound** 18:15, 18:18 192:15, 194:3 194:12
**computer** 168:21, 184:23
**concern** 34:25 59:7, 128:4 190:22
**concerns** 116:23 126:9, 127:12 190:23, 191:8 193:15
**conclusion** 85:11, 149:22
**conclusions** 56:24, 93:23 183:6
**condition** 71:20 195:10, 195:13
**conduct** 45:24 46:3, 98:19 99:4, 149:17 195:8, 195:8
**conducted** 15:2 76:16, 150:15
**confidential** 1:16, 6:15, 7:1 7:5, 7:25, 8:16 9:1, 9:3, 9:25 10:8, 62:2
**confused** 69:13 112:25
**confusing** 5:18 176:21, 199:14
**confusion** 175:13
**Conley** 202:16 202:18
**connected** 81:15
**connection** 167:10
**consensus** 44:3
**consent** 55:10
**consequences** 135:13
**consider** 113:24
**consideration** 98:8
**considered** 58:15, 97:21 98:1, 127:23 131:8
**considers** 73:14
**consistent** 150:1 182:12
**consulted** 145:15
**contact** 45:5 123:4, 136:10 136:20, 137:1
**contacted** 114:17, 117:24 136:23
**contacting** 123:8, 137:14
**contained** 187:21, 194:23
**content** 28:13
**Continuation** 8:1, 10:1
**continue** 35:1 160:20
**contrary** 191:17
**conversation** 24:10, 26:21 73:25, 74:19 82:5, 83:13 83:19, 83:22 86:19, 87:1 132:10, 132:13 133:1
**conversations** 23:18, 23:20 24:4, 24:8 26:15, 28:14 28:20, 43:1 53:17, 75:5 118:12
**convicted** 13:25 14:2
**Cook** 1:11, 2:21 3:1, 3:3, 3:21 3:21, 4:16, 17:1 18:24, 19:1 69:20, 71:1 71:3, 71:7, 95:3 174:8, 183:9
**cookcountyil.gov** 111:17, 111:25
**cooperate** 198:16
**cooperating** 140:5
**cooperative** 65:6
**coordinate** 46:6
**copied** 91:7 91:19, 91:21 91:24, 105:9 157:9, 157:10 183:10
**copy** 141:21

160:4, 174:9
174:15, 174:17
174:20, 176:6
176:18, 177:1
177:9, 183:16
**Corell** 66:25
**corner** 142:3
**corporation**
14:15, 173:16
**corral** 71:11
**correct** 17:18
28:12, 28:13
37:7, 37:12
38:23, 41:7
41:10, 41:17
42:4, 50:6
50:19, 54:22
59:7, 62:3, 64:1
64:8, 64:16
65:25, 66:7
66:13, 67:12
69:9, 69:16
71:1, 73:3, 78:1
83:1, 84:18
84:21, 84:23
85:12, 85:18
88:12, 92:13
93:6, 98:8
98:12, 99:5
101:8, 101:20
102:3, 105:6
105:10, 107:9
109:22, 111:17
111:19, 111:25
117:13, 117:17
117:21, 119:10
119:17, 120:24
121:9, 128:2
128:11, 130:4
130:8, 130:13
130:22, 131:12
133:4, 133:12
133:25, 134:10
136:1, 136:14
137:4, 137:9
138:17, 140:9
141:11, 141:20
141:25, 142:6
146:13, 146:17
147:4, 150:3
150:5, 152:19
153:21, 154:11
154:25, 156:23
157:21, 159:4
159:13, 166:3
166:24, 167:7
172:23, 173:19
173:24, 173:25
174:24, 176:10
176:19, 177:1
177:10, 177:13
177:23, 178:13
178:22, 181:25
183:2, 183:11
183:14, 185:22
187:7, 187:10
187:14, 187:22
188:16, 188:20
188:25, 193:21
196:20, 198:3
199:17, 199:25
200:11, 208:2
210:2
**corrected** 29:13
**correctional**
58:1, 58:15
59:15
**corrections**
18:20, 18:23
23:8, 58:15
**Correl** 151:10
**correspond**
142:20
**correspondence**
33:7, 122:20
123:21
**CorVel** 40:4
45:12, 45:14
45:17, 45:21
46:1, 46:3
46:14, 67:1
67:2, 67:3, 67:4
67:12, 67:20
70:10, 70:11
71:8, 71:12
101:13, 140:3
140:4, 151:13
151:14, 151:17
152:10, 152:13
152:14, 152:14
152:17, 152:19
172:23, 173:1
173:3, 173:7
173:15, 173:21
174:21, 177:11
177:20, 178:14
178:17, 181:17
181:24, 182:20
182:23, 183:3
183:7, 184:13
**CorVel's** 152:17
**cough** 171:25
172:6
**counsel** 15:10
15:12, 15:14
15:16, 16:1
16:2, 16:4, 16:5
16:7, 16:8, 26:5
27:9, 27:15
28:2, 28:5
28:18, 32:20
115:2, 125:2
125:24, 126:4
146:4, 151:6
154:19, 164:15
165:6, 165:11
**counsel's** 14:15
27:18
**counseled** 186:4
186:25
**counseling**
187:9
**counsels** 15:25
**county** 1:11
2:21, 3:1, 3:3
3:21, 4:16, 17:1
18:25, 19:1
69:20, 71:1
71:3, 71:7, 95:3
174:8, 183:9
190:6
**county's** 193:4
**couple** 17:14
32:20, 80:6
94:11, 104:7
186:10
**course** 95:7
**court** 1:1, 6:5
19:5, 206:7
**covered** 22:3
27:2
**created** 130:15
**credit** 103:4
**crime** 14:3
**Criminal** 11:23
**criminology**
11:1
**criteria** 43:7
43:14, 43:16
47:6
**criticizing** 97:8
**crossover** 73:18
**cubicle** 82:7
**current** 13:18
20:9, 22:25
29:4, 72:17
207:19
**currently** 31:4
195:19
**cut** 188:11
**cycle** 206:20

**D**

**daily** 25:17
**Daley** 26:10
**Dana** 19:13
19:14, 19:16
110:3, 111:5
111:12, 117:20
117:24, 119:9
125:8, 144:12
156:9, 156:10
160:2, 165:6
166:16
**Dana's** 19:14
**danger** 58:16
58:22, 59:8
59:14
**Dart** 3:8, 159:11
**date** 6:9, 23:20
29:8, 48:17
51:17, 63:25
65:21, 65:21
65:25, 79:19
95:21, 100:5
100:8, 104:25
108:16, 109:11
109:18, 111:14
112:6, 112:11
112:18, 116:4
119:16, 125:12
142:21, 142:25
147:15, 157:19
159:2, 169:3
182:2, 185:14
185:20, 186:12
200:22
**dated** 83:8
117:16, 119:12
130:21, 133:19
134:8, 159:17
160:1, 172:18
172:20, 206:16
**dates** 23:15
23:17, 71:20
145:6
**day** 44:8, 47:1
47:2, 48:16
50:12, 50:22
51:3, 51:20
54:24, 75:5
75:19, 75:25
76:4, 81:16
83:10, 83:12
84:11, 84:18
93:24, 102:22
102:23, 103:1
103:3, 103:3
103:4, 107:9

112:9, 112:12 119:19, 119:20 119:20, 157:8 182:7, 184:17 184:18, 191:12 201:5, 201:6 201:11, 201:18 201:19
**days** 32:20 102:17, 102:17 103:3, 103:5 103:5, 103:6 103:12, 103:12 103:12, 127:23 131:7, 155:19 182:14
**deal** 114:6 135:25, 139:25 186:11
**dealing** 120:7
**dealt** 114:9 114:12
**Dear** 104:12 182:6
**Deborah** 169:23
**December** 111:15, 111:19 114:10, 117:23 121:1, 123:2 132:19, 133:14 133:16, 165:13 166:1, 166:13 167:6, 167:25 168:13, 206:16
**decide** 72:16
**decision** 24:22 27:2, 35:16 40:6, 40:9, 43:8 43:23, 74:2 74:15, 97:2 100:17, 115:16 153:23, 154:2 154:6, 198:2
**decisions** 24:16 26:18, 28:8 92:7, 92:9
92:12
**deemed** 127:25 131:9, 135:2 135:5, 135:9 135:13, 190:13 193:5
**Defendant** 2:19 3:1, 4:12
**defendants** 1:13 3:8, 113:7
**defenses** 202:9
**definitely** 61:24 117:4
**degree** 11:24 12:4, 12:22
**delegate** 92:8
**demand** 114:1
**demanded** 132:25
**demeanor** 180:3 180:5, 180:6
**denied** 160:16 190:13
**department** 11:14, 14:18 15:21, 17:8 17:9, 17:10 20:11, 23:8 24:21, 25:11 25:13, 25:22 25:25, 26:8 27:23, 29:14 34:21, 34:22 35:5, 54:1, 54:5 54:11, 58:15 90:16, 114:6 114:9, 118:13 120:6, 122:11 122:13, 122:21 123:1, 123:22 123:25, 124:2 137:23, 138:21 145:15, 153:18 153:24, 153:25 161:3, 162:18 169:12, 171:16
179:19, 183:13
**departments** 15:18, 18:24
**DePaul** 12:25 13:3
**depend** 25:15 25:20, 37:21 46:20, 58:19 101:4, 110:12 111:2
**depending** 44:19, 47:4 135:22
**depends** 54:21
**deposed** 5:10
**deposition** 1:15 1:16, 3:20, 4:1 4:20, 5:7, 32:19 33:3, 33:7
**deps** 60:16
**deputy** 16:5 16:6, 19:21 149:14, 149:18
**described** 116:20, 193:9
**designate** 10:7
**designated** 6:14 8:15
**detail** 86:24
**details** 48:25 72:1, 89:3
**detainees** 191:14, 193:6 195:16
**detectives** 200:2
**determination** 44:7, 44:12 153:12, 153:19
**determinations** 92:16
**determine** 56:15 57:20, 65:4 140:1, 149:15 170:14, 170:17 170:17, 197:2 197:19, 198:20
**determined** 104:25, 131:2
**determining** 56:19, 97:21
**detriment** 160:11
**Diana** 193:20 195:21
**Diaz** 3:25, 210:7
**difference** 29:17 46:23
**different** 15:25 18:17, 48:4 61:15, 61:22 98:11, 171:5 173:17, 175:5 181:14
**differentiate** 67:21
**differs** 174:24 175:9, 176:8
**difficult** 52:15 193:4
**difficulties** 190:8, 190:9 190:15
**difficulty** 191:19
**direct** 17:8
**directed** 54:1 54:4, 116:12 137:12, 179:4 181:16
**directing** 29:14
**direction** 53:20
**directions** 53:21
**directive** 179:6
**directly** 20:20 23:1, 30:8 30:23, 31:1 36:18, 124:9 125:10, 125:16 125:19, 137:14 195:9
**director** 17:22 29:6, 29:10
29:18, 30:1 30:3, 30:15 30:19, 36:2 36:21, 91:11 91:12, 91:18 96:11, 96:15 96:17
**director's** 100:12
**Disabilities** 159:6
**disagree** 149:21 149:25, 158:8 158:13, 163:22 164:19, 165:1 165:5, 165:7 194:1, 194:13
**disagreed** 40:14 87:24
**disagreement** 40:15, 165:24 190:11
**disciplinary** 86:8, 135:11 192:9, 199:20
**discipline** 15:18 128:1, 131:10 131:24, 133:25 134:18, 134:21 135:3, 135:17 136:3, 171:9 187:7, 190:14 190:19, 193:11 196:23, 197:8
**disciplined** 13:23, 86:12 93:12, 93:16 135:20, 186:5 187:1
**disclose** 161:23
**disclosing** 202:8
**disclosure** 68:15 109:9, 172:17 174:6, 203:20
**discoverable** 202:7, 204:6

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 219 of 657 PageID #:4204



204:6
**discrimination** 95:4
**discuss** 23:3 44:9, 51:7, 51:9 53:18, 74:5 74:14, 74:17 75:23, 136:23 162:4, 197:14 206:24
**discussed** 23:15 23:21, 24:7 24:13, 24:15 27:24, 116:10 129:14
**discussing** 75:13 116:24, 116:25
**discussions** 23:5 23:13, 27:20
**dishonesty** 14:3
**display** 85:18
**displayed** 85:9
**dispute** 100:8 158:21, 158:24 170:24, 187:21 188:3, 188:5 192:12, 194:9 194:16, 194:22
**disqualified** 206:20, 207:14
**disrespectful** 49:25
**distracting** 151:20
**district** 1:1, 1:2 3:23, 15:11 15:15, 15:20 16:9, 16:21
**disturbing** 50:17
**Division** 1:3 3:23
**divisions** 18:24
**DOC** 31:16 32:14, 35:6 90:5, 90:14 90:15, 91:12 91:14, 91:19 96:16, 100:4 203:19, 204:4
**doctor** 34:1 47:1, 54:25 55:20, 55:21 72:15, 73:14 73:19, 76:16 76:19, 76:22 76:24, 77:1 77:16, 78:3 78:11, 78:19 140:4, 140:5 148:3, 149:1 149:6, 149:25 150:3, 150:16 151:9, 151:10 152:15, 152:18 158:1, 158:1 158:14, 158:15 158:25, 163:6 164:7, 195:23
**doctors** 38:1 174:22
**document** 45:2 63:10, 63:12 63:13, 63:14 65:18, 70:20 71:14, 82:19 84:8, 87:1, 96:1 98:22, 99:21 100:2, 100:3 100:4, 100:5 100:6, 100:9 108:12, 111:9 112:16, 112:17 113:22, 118:4 119:7, 121:5 121:9, 121:14 121:20, 121:25 122:6, 125:7 128:16, 129:9 131:16, 131:18 132:3, 132:24 133:6, 138:8 138:13, 139:5 146:3, 148:12 148:14, 149:12 154:14, 154:17 156:17, 156:21 162:7, 166:11 169:6, 178:11 178:24, 184:19 185:8, 189:25 200:22, 201:2
**documentation** 45:1, 55:22 70:9, 91:1, 91:4 114:5
**documents** 31:12, 31:18 31:19, 33:2 33:5, 46:9, 62:1 71:11, 76:24 104:22, 118:5 121:17, 134:15 138:5, 140:3 142:5, 155:22 156:19, 157:3 185:8
**doing** 57:24 123:17, 163:5 168:21, 169:2 181:6
**door** 82:6, 117:6
**double** 46:17
**doubt** 112:7 119:15
**Dr** 46:16 144:21, 144:22 145:19, 147:7 147:11, 147:13 148:10, 148:13 149:3, 150:11 150:18, 151:2 151:5, 153:3 153:12, 153:20 154:6, 156:22 157:25, 158:14 158:25
**Drive** 3:12
**drop** 171:25
**drops** 172:6
**due** 27:10, 148:2
**Dunlap** 170:12
**duties** 29:12 57:12
**duty** 17:11 20:13, 33:24 33:25, 34:5 34:9, 34:14 35:4, 35:17 35:23, 39:3 39:20, 40:7 40:20, 40:24 41:2, 41:13 41:17, 41:21 41:24, 42:7 42:12, 43:9 43:17, 43:19 43:24, 44:13 44:20, 44:21 45:24, 55:7 55:23, 56:13 57:6, 57:20 63:16, 65:6 73:10, 76:12 76:15, 77:3 79:3, 87:14 87:19, 88:4 88:22, 89:9 91:3, 92:7 92:13, 97:3 97:22, 100:19 100:24, 101:2 101:14, 101:17 101:23, 104:15 104:16, 109:2 109:3, 109:3 109:18, 125:15 126:10, 136:7 139:21, 139:23 140:20, 147:12 148:23, 149:7 149:15, 149:19 150:2, 150:8 150:10, 150:12 152:16, 153:5 153:13, 153:20 156:20, 157:4 163:5, 164:8 166:24, 167:11 168:3, 173:15 173:25, 174:7 177:21, 178:8 178:13, 181:16 182:8, 184:12 190:20, 191:21 194:8, 195:20 195:22, 196:5 196:7, 196:16 196:20, 196:25 197:5, 197:15 197:17, 198:3 198:11, 199:9 199:14, 200:19 202:11

## E

**early** 30:20
**easier** 52:13
**East** 11:8
**Eastern** 1:3 3:23, 11:4
**easy** 169:4
**educational** 10:25
**effective** 102:8 170:16, 170:21
**effectively** 195:18
**efforts** 75:1
**eight** 31:6, 31:7 102:23, 203:15
**either** 32:16 34:16, 45:11 52:12, 55:2 59:14, 60:12 65:20, 84:13 93:14, 96:10 137:24, 138:8 138:16, 139:13

143:8, 150:23 155:19, 180:10 187:21, 189:6 192:12, 207:20
**Ellis** 60:23
**email** 105:15 106:8, 106:9 106:16, 106:18 107:2, 107:12 108:19, 111:7 111:12, 111:19 112:1, 113:3 113:15, 114:10 117:23, 118:4 118:6, 118:9 119:9, 119:21 120:10, 120:12 120:25, 121:1 121:12, 122:2 122:7, 122:10 122:23, 123:2 125:8, 125:9 125:12, 126:7 126:19, 128:10 130:21, 131:6 131:24, 132:2 133:13, 139:20 142:18, 144:2 144:3, 144:11 144:18, 144:19 145:11, 145:19 156:7, 156:15 156:16, 157:2 157:9, 157:13 157:14, 159:3 159:16, 159:24 160:1, 161:2 161:7, 162:4 164:11, 164:17 165:10, 166:16 166:22, 167:6 167:25, 168:13 169:8
**emailed** 106:12 106:15, 106:22 145:10, 155:22
**emails** 119:22 132:13, 132:19 142:21, 160:23
**emotional** 149:16, 191:9
**employed** 17:2 29:1
**employee** 15:19 17:8, 17:10 20:12, 20:14 20:14, 25:9 29:6, 29:18 31:21, 34:1 34:4, 34:24 35:1, 35:16 35:18, 35:21 37:12, 37:20 38:4, 38:5, 39:6 39:24, 40:7 40:20, 42:9 43:8, 43:10 43:13, 43:24 44:3, 44:5, 44:9 44:15, 44:17 44:23, 44:25 45:3, 45:9, 46:7 55:6, 55:10 55:19, 56:1 57:22, 57:23 58:22, 63:20 65:7, 66:19 66:20, 68:25 71:24, 72:20 73:16, 73:20 74:1, 74:6 76:17, 77:11 77:23, 77:24 87:25, 88:7 91:2, 92:12 97:16, 101:5 102:18, 106:16 110:8, 110:10 110:14, 110:15 110:21, 110:23 110:24, 126:9 126:11, 127:12 127:13, 128:22 129:8, 129:15 129:18, 131:1 135:16, 135:18 140:25, 141:2 151:8, 152:12 152:23, 177:21 178:18, 178:20 179:17, 183:10 196:24, 197:13 198:12, 198:21
**employee's** 34:22, 38:13 39:2, 63:15 70:6, 70:7, 77:9 123:15, 179:3
**employees** 15:1 15:2, 15:2 20:10, 39:5 44:22, 59:14 65:4, 71:9 73:23, 85:22 85:25, 86:4 86:15, 88:3 101:23, 182:19
**employer** 29:10 174:8, 174:8 174:11, 174:15 176:6, 176:8
**employment** 11:14, 26:17 27:2, 27:11 114:16, 115:16
**enclosed** 141:21
**ended** 82:3 117:2
**enforcement** 126:8, 127:11
**engage** 132:10 132:12, 132:20 133:1
**engaged** 127:24 131:8
**entered** 61:11
**entity** 68:22
**entry** 15:24 171:7
**equal** 98:7
**equivalent** 110:9
**essential** 195:18
**essentially** 15:5 29:14, 34:2 43:10, 55:21 110:23, 116:20
**established** 48:8 197:8
**estimate** 25:16 95:15
**estimation** 88:3
**et** 1:11, 3:21
**etcetera** 69:9 178:21
**evaluate** 73:20
**evaluated** 34:2 43:13, 91:3
**evaluation** 46:4 56:20, 57:7 76:25, 77:11 78:7, 78:20 104:15, 104:24 109:2, 127:9 129:1, 139:21 140:20, 143:23 147:12, 147:15 148:23, 149:15 149:18, 150:8 152:16, 152:17 152:21, 153:1 153:5, 153:13 153:21, 166:24 176:18, 177:1 181:16, 182:13 196:8, 197:5 197:17, 198:3 199:10
**evaluations** 46:12, 76:15 88:22, 92:7
**evaluator** 78:13
**events** 98:11
**everybody** 52:8
**evidence** 48:7 67:7, 72:11 73:12, 76:14 77:7, 77:21 79:5, 122:4 130:24, 134:22 136:9, 137:18 138:4, 140:11 190:5, 190:16 191:16, 195:7 196:22
**exact** 23:17 29:12, 37:21 142:5
**exactly** 18:4 23:15, 61:2 62:6, 117:3 129:12, 140:14 194:14
**exam** 13:7, 13:9 33:24, 33:25 34:6, 35:17 35:23, 39:3 39:20, 40:7 40:20, 40:24 41:2, 41:14 41:17, 41:21 41:24, 42:7 42:12, 43:9 43:19, 43:24 44:13, 45:5 56:13, 73:10 76:12, 87:19 92:13, 97:3 97:23, 140:2 163:5, 173:15 173:25, 174:16 174:20, 176:7 178:13, 182:8 197:15
**examination** 4:23, 47:1 63:17, 77:3 79:3, 150:2 150:6, 163:6 164:8, 174:7

190:21, 191:21 193:16, 195:23 196:20
**examiner** 193:2 193:3, 194:18
**examiner's** 192:2
**examples** 79:1
**exams** 34:9 34:14, 43:17 45:25, 87:14 89:9
**excuse** 69:16 136:9, 144:4 151:12, 170:11 180:9
**execute** 127:9
**executive** 17:22 30:1, 30:14 36:21, 91:11 91:12, 91:18
**Exhibit** 4:1 59:24, 60:11 68:12, 68:13 68:21, 68:22 69:11, 82:13 83:15, 90:1 90:2, 90:4, 94:7 94:9, 94:12 94:13, 94:18 94:20, 98:18 99:20, 104:1 104:2, 104:4 105:6, 108:11 111:8, 115:22 117:7, 117:16 119:6, 123:2 125:5, 127:6 128:13, 128:20 128:23, 128:24 129:2, 129:4 129:7, 129:9 129:18, 130:2 131:12, 131:19 131:22, 132:5 132:5, 133:8 133:12, 133:16 133:17, 133:19 134:19, 136:6 136:16, 138:2 138:2, 138:10 138:11, 139:14 139:15, 139:19 141:1, 141:7 142:10, 142:14 143:25, 144:21 145:1, 145:14 145:14, 147:8 149:9, 155:25 156:6, 156:23 157:24, 159:16 165:14, 166:12 166:13, 167:2 168:6, 169:5 172:14, 173:8 173:17, 174:24 175:1, 175:8 175:10, 175:16 175:16, 176:5 176:7, 176:8 176:17, 176:20 176:22, 177:3 177:7, 177:8 177:8, 177:15 177:18, 181:21 184:9, 184:11 200:14, 200:16 201:20, 202:3 205:1, 205:4 205:25, 206:1
**Exhibits** 75:9 89:14, 109:22 134:19, 136:6 140:8, 142:6 142:10, 157:5
**exist** 139:6
**existing** 76:12
**exists** 158:23
**expect** 107:24 139:5, 139:16 181:6
**experience** 59:17, 95:8
**experienced** 89:8, 190:6
**experiencing** 51:23, 81:3
**explain** 44:18 47:3, 116:21 167:19, 178:16
**explained** 80:10
**explaining** 65:9
**explanation** 193:7
**explicitly** 131:11
**express** 193:15
**expressed** 75:9 75:12
**extreme** 85:9

**F**

**face** 158:18
**facilitate** 45:14
**fact** 15:5, 15:8 23:23, 60:10 127:19, 150:1 150:18, 164:12 164:14, 181:15 193:8, 193:10 203:25
**facts** 48:7, 50:22 67:7, 72:11 73:11, 76:14 77:7, 77:20 79:4, 122:4 130:23, 134:22 136:9, 137:17 138:3, 140:11 191:22, 193:3 194:9, 194:15 194:16, 194:20 194:22, 196:22
**failed** 104:17 193:11
**failure** 198:16
**fair** 5:20, 20:3 24:11, 25:6 32:18, 41:21 48:20, 54:15 58:9, 59:22 72:7, 72:21 84:14, 88:6 102:8, 134:16 136:4, 140:21 152:6, 155:18 157:6, 158:2 158:21, 171:9 174:3, 181:7 182:24, 183:1 188:1, 192:11 199:4
**fairly** 192:3
**false** 116:15 116:16
**familiar** 144:2
**far** 58:8, 72:4 94:15, 116:23 150:16
**faster** 168:15
**favor** 153:3
**favorite** 205:10
**fear** 59:1
**February** 108:17, 111:3 117:8, 117:25 134:8, 134:18
**Federal** 4:21
**feel** 41:1, 78:24 89:1, 159:4 199:14
**feeling** 180:24
**fees** 120:17
**fellow** 86:4 86:15
**felony** 13:25
**felt** 49:24
**FFD** 104:22 104:24, 105:4 109:2, 127:9 127:10, 127:13 127:19, 127:24 128:5, 131:9 139:20, 139:22 163:5
**fifth** 22:11 163:2, 163:3
**figure** 56:22 142:17, 198:12
**figured** 112:24
**figuring** 143:1
**file** 55:22 120:16, 132:8 160:23, 199:11
**filed** 15:1, 93:8 94:2, 95:20 95:24, 96:7 112:17, 193:18
**filing** 70:19
**fill** 63:19
**filled** 60:11 63:14, 63:18 63:20, 64:14 65:1, 65:24 66:15, 66:24 68:6, 131:4
**final** 55:23 195:4
**finally** 164:12 193:14
**find** 88:7 150:12, 180:6 181:11, 191:7 193:10, 195:19
**finder** 15:5 15:8
**findings** 149:3
**fine** 10:11 52:20, 83:6 128:21, 134:11 144:8, 199:4
**firearm** 58:24 191:15
**firm** 11:19 12:10, 61:4 69:24, 89:21
**first** 11:15 11:16, 12:9 14:6, 17:4

36:16, 51:7
71:18, 73:2
80:7, 80:23
82:18, 104:10
105:15, 108:20
108:22, 113:2
120:24, 125:14
127:19, 127:20
146:12, 146:15
156:7, 159:9
159:18, 159:24
160:15, 163:11
163:12, 178:25
179:2, 179:15
179:16, 182:4
185:25, 186:10
189:18, 206:2
206:13, 206:15
207:8
**fists** 85:10
**fit** 74:14, 101:13
101:17, 149:7
149:18, 150:9
150:12, 195:20
196:15
**fitness** 33:24
33:25, 34:2
34:5, 34:9
34:14, 35:4
35:17, 35:23
39:3, 39:20
40:7, 40:20
40:24, 41:2
41:13, 41:17
41:20, 41:24
42:7, 42:11
43:9, 43:17
43:18, 43:24
44:13, 44:20
44:20, 45:24
55:7, 55:23
56:13, 57:6
57:20, 63:16
65:5, 73:10
76:11, 76:15
77:2, 79:3
87:13, 87:19
88:4, 88:21
89:9, 91:3, 92:7
92:13, 97:3
97:22, 100:19
100:24, 101:2
101:23, 104:15
109:2, 109:3
109:18, 125:15
126:9, 126:10
127:12, 136:7
139:21, 139:22
140:20, 147:12
148:23, 149:14
150:2, 150:8
152:15, 153:4
153:13, 153:20
156:20, 157:4
163:5, 164:8
166:24, 167:11
168:3, 173:15
173:25, 174:7
177:21, 178:8
178:13, 181:16
182:7, 184:12
190:20, 191:20
193:2, 193:3
194:8, 194:17
195:22, 196:5
196:7, 196:7
196:20, 196:25
197:4, 197:14
197:17, 198:3
198:11, 199:9
199:14, 202:11
**five** 5:11, 20:19
20:20, 20:22
**fixed** 83:3
**FMLA** 21:4
**follow** 124:10
162:16
**followed** 31:25
32:2, 34:12
**following** 6:14
8:15, 31:22
59:11, 71:20
88:4, 145:11
155:16, 187:17
191:18, 193:18
193:22
**follows** 202:9
**force** 120:19
**forced** 160:23
**foregoing** 210:2
**Forensic** 182:8
182:17, 183:21
**Forest** 11:10
**forgot** 52:16
**form** 19:12
22:23, 24:12
24:18, 34:11
38:17, 45:6
55:14, 55:19
58:4, 59:16
63:18, 63:19
64:5, 64:7
64:10, 64:13
64:18, 64:19
64:21, 65:1
65:13, 66:18
66:21, 67:2
67:6, 67:17
67:23, 68:5
68:7, 68:17
68:20, 70:4
71:23, 75:3
77:6, 77:20
85:23, 90:25
94:22, 94:25
95:5, 95:6
95:11, 95:14
95:17, 96:10
99:8, 105:25
109:10, 110:17
113:10, 113:12
115:18, 116:15
116:19, 117:14
117:22, 119:18
123:18, 127:22
128:15, 128:23
128:23, 128:24
128:24, 129:9
129:13, 129:18
129:18, 129:21
130:11, 130:14
130:19, 130:20
131:1, 131:7
131:14, 131:21
131:25, 132:3
132:22, 133:4
133:8, 138:18
139:7, 140:24
141:1, 145:8
151:16, 155:4
155:8, 160:12
163:7, 163:14
163:21, 163:24
164:22, 166:4
167:12, 168:9
172:17, 172:25
173:2, 173:5
173:5, 173:6
175:5, 177:19
178:4, 181:12
194:11, 194:25
197:21, 200:17
207:16
**formal** 45:17
45:19, 193:18
**formality** 147:1
**formally** 31:14
186:4, 187:1
**former** 207:20
**forms** 55:6, 55:9
55:12, 55:13
56:2, 56:3, 56:6
56:8, 56:11
65:9, 68:2
74:12, 75:9
75:16, 75:22
75:25, 76:5
104:16, 105:5
109:12, 109:20
114:1, 115:24
117:5, 117:20
127:9, 133:23
134:9, 134:15
134:25, 136:15
136:20, 136:22
136:24, 137:16
141:11, 141:18
141:20, 141:22
141:23, 162:5
167:15
**forward** 120:23
161:6, 170:16
**forwarded** 23:9
114:24, 115:4
161:3
**found** 12:23
50:17, 150:9
159:8, 191:5
**foundation**
54:13, 78:21
89:11, 95:2
95:9, 95:23
96:4, 96:18
98:13, 98:22
99:7, 102:11
102:21, 120:3
121:21, 124:16
131:13, 132:1
132:16, 132:23
133:5, 135:15
136:2, 141:15
148:24, 149:5
149:12, 149:23
150:4, 153:9
154:7, 158:11
158:16, 164:21
165:8, 171:1
171:12, 181:8
187:4, 187:24
195:24, 197:9
198:8, 198:25
201:9, 202:13
203:1, 203:12
204:2, 204:8
204:17, 207:1
207:17
**four** 5:11, 21:8
29:16
**fourth** 22:4
191:13

**frame** 68:8
**frames** 82:1
**Friday** 1:17 3:17, 157:8
**friends** 168:23 189:4
**front** 133:18 165:13, 165:14 167:6
**full** 76:17, 77:9 77:11, 97:17 134:12, 159:23 195:4, 200:19
**full-time** 12:23
**fully** 195:17
**fun** 168:24
**functions** 20:9 34:3, 135:24 195:19
**fundamental** 154:16
**further** 42:17 105:2, 128:5 208:19

**G**

**G-r-i-s-e-l-d-a** 21:12
**Gannon** 203:7
**gap** 30:5
**gather** 38:4 65:8
**gathering** 45:15
**general** 15:4 16:5, 16:7, 16:8 25:3, 28:2, 28:5 35:11, 54:6 55:13, 191:15 193:6
**generally** 25:8 48:14, 48:24 53:24, 53:25 54:10, 151:16 161:25
**getting** 27:6 43:2, 46:6 61:11, 101:21 140:2
**gist** 161:17 161:20
**give** 24:1, 24:14 45:9, 55:10 70:10, 73:19 79:1, 115:2 141:2
**given** 45:4 63:14, 64:7 64:13, 65:2 66:12, 77:16 82:22, 83:17 98:7, 109:7 115:15, 115:22 116:2, 116:17 146:20, 183:16
**go** 11:7, 12:24 16:23, 23:18 24:20, 25:10 25:13, 25:24 25:24, 43:7 43:22, 44:17 54:1, 54:11 55:20, 59:2 62:23, 67:9 71:13, 73:25 78:24, 79:2 84:4, 84:17 92:2, 99:16 105:7, 106:24 124:19, 133:17 133:17, 137:23 140:24, 146:11 149:13, 153:14 164:3, 165:12 166:9, 168:3 168:15, 171:13 172:5, 172:7 172:9, 173:3 173:18, 174:25 181:15, 192:17 200:14
**God** 205:11
**goes** 91:2 135:16, 173:21 178:14, 178:20 187:9
**going** 5:13, 5:15 5:19, 12:7 26:19, 26:22 27:1, 27:11 27:12, 27:14 28:11, 28:18 35:17, 42:19 47:7, 68:20 70:4, 82:11 94:9, 115:5 115:9, 115:13 124:25, 125:19 126:1, 142:9 146:1, 149:4 149:11, 151:15 153:8, 153:20 154:12, 154:15 163:18, 164:6 165:17, 167:3 176:18, 178:6 183:20, 186:9 189:15, 189:24 191:24, 201:25 206:4, 206:8 206:10, 206:12 206:25, 207:6
**Goldstein** 193:21
**Goldstein's** 195:21
**good** 3:16, 4:25 5:1, 142:25 155:12
**goodness** 94:14 144:6
**gosh** 18:2, 60:5
**Gotcha** 52:11 157:20
**gotten** 132:11
**government** 61:3, 61:5
**grad** 12:10
**graduate** 11:11 11:17, 11:20 11:24, 12:21
**grammar** 127:20
**Great** 62:9
**Gregory** 3:25 210:7
**grievances** 15:17
**Griselda** 21:10
**Group** 182:8 182:17, 183:21 206:1
**guess** 22:20 49:19, 54:14 59:12, 67:21 72:18, 73:4 87:17, 90:12 108:2, 110:19 123:16, 129:12 133:2, 137:19 155:14, 186:21 194:8, 195:1
**guidance** 136:13 153:18
**gun** 58:7, 58:10
**guy** 148:2

**H**

**half** 103:4 107:17
**Halsted** 7:2 10:4, 10:15 10:21
**hand** 4:2, 75:25 94:9, 111:8 123:21, 125:5 142:9, 142:10
**handcuffed** 49:18, 49:21
**handed** 117:5
**handle** 123:21 123:22, 124:3
**handled** 20:14 198:10, 200:8
**handles** 17:10
**handwriting** 84:4
**handwritten** 83:21
**Hang** 166:25
**happened** 17:15 25:9, 38:14 39:2, 48:5 48:10, 48:23 50:15, 50:25 51:3, 56:16 56:22, 56:25 80:9, 80:20 81:25, 85:11 92:20, 93:24 187:13, 188:15 198:13, 198:13 198:17
**happening** 23:12, 25:15 59:2, 97:17 207:11
**happens** 135:12
**harassment** 14:10, 14:17 14:25, 15:3 15:4, 95:4, 95:4 120:22, 159:12
**hard** 23:18 140:13, 143:19
**harm** 160:20
**Harrington** 170:5, 170:6 171:17
**hate** 162:24
**Hayes** 48:5 48:9, 48:12 48:15, 48:22 49:13, 52:2 52:3, 52:12 57:5, 83:1, 83:5 83:18, 83:20 84:18, 85:20 86:22, 90:20

93:8, 93:20
94:3, 98:11
98:19, 99:5
181:5, 194:24
**head** 20:4, 35:5
**health** 35:19
36:24, 37:1
40:3, 63:15
64:15, 66:10
68:16, 68:24
69:7, 71:19
72:24, 78:17
78:18, 78:19
104:13, 108:25
109:8, 109:9
139:25
**hear** 82:11
**heard** 46:16
109:18, 148:10
148:13, 182:16
207:9, 208:5
**hearing** 120:23
**hearsay** 186:11
187:25, 189:24
192:1
**heed** 115:9
**held** 90:11
**Helen** 169:15
169:17
**help** 156:2
168:20
**helpful** 97:9
**Henretty** 2:20
4:11, 4:11
60:15, 60:20
60:25, 61:4
82:15, 85:23
94:13, 94:16
95:10, 96:5
97:12, 97:25
98:15, 98:24
99:8, 99:23
110:18, 128:17
129:21, 143:5
143:7, 148:21
159:21, 172:4
205:12, 205:15
205:19, 207:25
208:10
**hierarchy** 20:18
**high** 11:7, 11:8
**higher** 16:6
**hindsight**
195:22, 196:2
**Hinshaw's**
205:10
**HIPAA** 61:19
68:15, 109:9
113:9, 116:15
127:9, 127:20
127:21, 131:21
132:3, 133:7
159:5, 160:12
163:7, 163:20
172:17, 172:25
**hire** 20:10, 29:8
**hired** 17:12
20:12
**history** 11:14
76:18, 77:9
77:23, 85:20
86:9, 190:5
192:10
**hold** 110:14
110:19, 128:4
**holiday** 102:16
**Hones-Hayes**
47:19
**honestly** 75:23
**Honingford** 3:2
4:15, 4:15
60:24, 94:10
157:1, 205:16
208:24
**hostile** 179:18
180:13, 180:13
180:23, 181:14
**hour** 107:17
**hours** 33:1, 33:1
102:23, 103:7
**HR** 17:9, 17:21
18:20, 18:23
19:3, 19:8, 20:1
20:4, 20:19
22:15, 25:4
25:14, 25:22
26:1, 30:6
31:20, 32:11
32:13, 34:21
35:4, 35:13
35:14, 35:19
36:9, 36:9
36:12, 36:21
37:11, 39:21
41:25, 42:9
55:9, 56:10
56:11, 65:20
67:5, 71:23
73:22, 75:5
89:5, 90:23
98:2, 100:3
116:22, 135:24
170:7, 171:19
171:21, 198:4
198:12, 198:15
198:23, 198:25
**human** 14:19
17:22, 20:9
30:1, 30:15
47:10, 48:1
51:13, 59:3
88:5, 96:16
100:15, 101:7
179:18, 183:9
183:19, 183:20
**Hyphens** 52:15

**I**

**idea** 84:9, 148:8
158:19, 203:3
**identical** 112:18
**identify** 125:7
202:5
**ignores** 196:22
**Illinois** 1:2, 1:25
2:8, 2:16, 2:24
3:6, 3:14, 3:20
3:23, 11:10
11:21, 12:7
13:14, 69:22
**illness** 195:9
195:12
**IME** 174:16
174:17, 177:2
**immediate**
17:18, 18:8
58:22, 58:23
**immediately**
120:13, 160:25
**imminent** 58:16
58:16, 59:1
59:8, 59:14
**impair** 195:13
**impairment**
149:16, 195:10
195:12
**implications**
149:15
**important** 6:3
**in-house** 26:5
**inaccurate**
163:13, 164:4
186:8, 186:18
192:6
**inappropriate**
98:19, 99:4
99:18, 179:4
**incident** 17:15
22:1, 31:13
31:22, 34:23
35:2, 38:14
38:22, 42:18
43:11, 47:9
47:12, 48:2
50:13, 50:24
51:9, 58:10
59:12, 76:8
82:24, 86:25
91:6, 93:16
186:5, 186:14
186:14, 186:21
186:23, 186:24
187:2, 190:17
191:18, 193:8
193:13, 193:17
196:25, 202:24
**include** 130:17
141:20
**including** 128:1
131:11
**incomplete**
163:25
**incompleteness**
164:1
**incredibly** 194:3
**independent**
34:1, 40:4
45:24, 46:9
49:2, 49:9
49:11, 50:21
70:11, 72:15
99:3, 150:8
150:15, 150:18
151:1, 151:9
158:1, 158:14
158:25, 174:9
174:16, 174:20
176:7, 181:15
188:15
**indicate** 52:2
57:13, 59:13
75:14, 93:15
148:19, 157:2
**indicated** 46:19
49:17, 70:15
92:11, 165:10
172:22
**indicates** 109:24
128:22, 185:14
**indicating** 48:25
100:22, 101:13
139:14, 200:17
**indication** 128:1
128:10, 205:7
**indirectly**
152:18
**individual** 113:7
202:6
**individuals**

204:24
**infer** 190:21 191:4, 191:8
**inform** 44:15 166:17, 178:12 182:6
**information** 4:18, 20:13 38:4, 38:12 42:18, 42:20 42:24, 57:10 58:20, 63:16 64:15, 65:1 66:11, 67:5 67:10, 68:16 68:24, 69:1 69:7, 69:25 70:12, 70:21 71:19, 72:13 72:20, 72:25 73:15, 76:6 82:22, 85:4 90:23, 92:24 93:15, 97:4 109:8, 109:10 116:14, 116:17 117:3, 130:18 136:11, 150:17 153:2, 154:14 154:17, 158:20 158:23, 159:1 163:4, 173:14 178:21, 179:7 186:7, 187:20 187:25, 188:3 188:5, 188:15 192:2, 192:9 192:12, 192:16 192:22, 202:7 202:9, 202:20 203:3, 203:10 204:7, 204:15 204:20, 204:25 206:19
**informed** 45:11 104:13, 108:24
157:25, 159:4 159:13, 166:1 167:9
**informing** 109:15
**initial** 23:7, 29:7 31:12, 31:18 31:19, 42:15
**initially** 40:15 80:19
**injunctive** 160:24
**inmates** 49:18 49:21, 59:14
**inquiries** 164:14 165:3
**inquiry** 206:9
**instance** 58:7 200:7
**instruct** 26:22 26:25, 27:4 28:11, 115:5 125:1, 126:1 146:2
**instructed** 146:16, 156:19 157:4
**instructing** 28:14, 118:19
**instructions** 27:18
**insufficient** 156:17
**intend** 125:16
**intended** 55:16
**interacted** 74:20
**interacting** 191:14
**interaction** 109:4
**interactive** 65:3 117:1
**interim** 30:1 30:3, 193:19
**internal** 200:4
**interpose** 206:5
**interrogatories** 33:11, 33:22
**interrupt** 6:4 6:5, 40:1, 52:18 176:13
**intertwined** 78:17
**intervention** 193:14
**interview** 39:24 41:7, 57:20 58:11, 77:13 81:8, 87:7 149:17, 179:20 180:11, 186:3
**interviewed** 32:7, 96:1
**interviews** 81:12
**intimidating** 178:21, 179:4
**investigate** 198:4
**investigated** 14:25, 93:20 93:22, 200:5 200:6
**investigation** 56:15, 188:21 196:18, 196:23 197:1, 197:11 197:12, 197:18 197:25, 198:6 198:20, 199:8 199:12, 199:19 199:21, 200:10
**investigative** 198:10
**investigator** 14:10
**investigators** 199:17, 199:23
**involved** 23:1 31:7, 32:10 32:14, 37:6 87:14, 88:10
88:22, 92:17 154:5
**involvement** 21:16, 22:1 22:19, 31:11 31:23, 32:12 42:22, 54:9 54:16, 91:16 207:13
**involving** 14:3 34:23, 51:10 120:8, 190:11
**irreparable** 160:20
**Isaac** 182:8 182:16, 183:21
**issuance** 201:2
**issue** 26:1, 35:12 38:2, 51:24 61:24, 72:2 81:5, 136:22
**issues** 15:19 17:11, 20:14 23:2, 23:3 23:12, 25:14 25:21, 26:16 51:23, 73:16 73:17, 76:8 77:12, 77:17 79:2, 79:2, 81:3 166:3, 166:6 166:23, 167:11 199:15
**issuing** 22:19
**it'd** 27:2, 69:3 70:25
**Italian** 170:2

**J**

**jail** 18:15, 18:17 19:7, 26:9
**James** 204:10
**January** 10:17 119:12, 119:16 121:12, 122:1
132:19
**JD** 13:3, 13:5
**Jeff** 203:14 203:20
**Jessica** 21:20
**job** 11:15, 11:16 12:9, 12:23 14:5, 14:6, 15:6 20:6, 29:12 29:13, 34:3 38:3, 57:12 124:2, 135:24 190:8, 191:20 195:14, 195:19
**John** 1:5, 3:21 4:8, 4:9, 5:16 21:5, 21:16 22:1, 22:9 22:17, 22:22 23:2, 23:6 23:14, 23:21 24:6, 24:10 24:16, 25:5 26:12, 27:24 28:22, 28:23 28:24, 31:8 31:11, 31:24 32:10, 36:7 37:6, 37:10 38:21, 38:25 39:8, 39:9, 42:4 42:14, 42:24 43:2, 47:12 48:4, 53:13 53:16, 54:7 54:10, 91:1 91:16, 94:1 104:12, 113:5 120:8, 144:3 144:11, 149:14 151:3, 153:4 153:13, 154:10 155:2, 156:10 157:9, 158:15 160:4, 166:2 166:19, 170:5

170:6, 170:15
171:17, 178:12
186:25, 187:13
194:23, 195:23
197:4, 197:16
206:16
**Johnice** 204:19
**Johnsen** 203:14
203:21, 204:7
**Join** 95:10, 96:5
97:12, 97:25
98:15, 98:24
110:18, 128:17
**joint** 40:9
**joke** 119:1
**joking** 168:22
**Jones** 56:16
56:18, 59:5
83:5, 91:8
179:8
**Jones-Hayes**
2:19, 4:12
38:22, 39:13
42:20, 43:3
50:19, 50:25
52:3, 52:10
83:6, 109:5
120:22, 178:22
179:10, 186:24
188:19, 188:24
189:3, 193:9
196:18, 196:19
197:3, 197:20
199:9, 202:25
203:21, 203:25
**judgment** 99:7
**jumped** 50:6
**jury** 159:8
**justice** 11:23

**K**

**K-a-r-y-n** 17:25
**K-r-o** 46:17
**K-r-o-l** 144:22
**K-r-o-l-l** 144:22
**Karen** 2:19
4:12, 47:19
**Karyn** 17:20
17:21, 17:24
19:13, 20:3
22:21, 23:9
24:19, 30:6
31:21, 53:10
92:3, 92:6
**Kate** 26:2, 26:3
114:13, 122:17
145:17, 154:4
**keep** 89:15
165:17
**keeping** 92:1
**kept** 95:7
**kind** 11:15, 20:8
20:12, 20:13
25:20, 26:20
38:4, 44:17
46:5, 47:3, 47:4
47:24, 48:25
49:5, 49:24
50:7, 51:8
53:19, 57:11
59:1, 65:3
66:18, 68:7
71:10, 74:6
76:16, 79:22
82:3, 89:15
96:23, 97:17
99:7, 118:21
118:23, 123:22
132:10, 137:19
169:3, 171:22
180:8, 180:23
188:9, 206:1
**kinds** 197:9
**Kirkland** 60:23
**knew** 65:20
75:22, 165:9
191:7
**know** 5:18, 5:23
15:6, 21:15
21:25, 23:11
23:18, 23:22
23:23, 24:1
24:1, 24:7
24:13, 25:20
26:4, 26:11
30:18, 31:23
32:3, 32:6, 32:8
32:12, 34:8
34:13, 34:15
34:16, 34:17
34:18, 34:25
35:9, 35:9
35:11, 36:4
36:6, 36:22
37:3, 37:21
37:22, 37:23
37:25, 43:7
44:16, 44:21
45:11, 45:12
45:15, 45:22
47:4, 47:24
50:24, 51:23
53:15, 53:19
54:9, 56:3, 56:8
56:9, 56:22
57:21, 57:24
58:8, 58:20
59:12, 60:16
61:11, 64:17
64:22, 64:25
65:7, 66:15
67:16, 67:23
68:3, 69:24
71:6, 73:5
73:13, 73:24
75:1, 75:4, 75:6
75:22, 76:10
76:19, 77:12
77:16, 77:17
77:23, 78:3
78:11, 78:12
78:16, 78:22
78:23, 78:24
79:22, 80:4
80:14, 81:13
81:14, 81:15
81:17, 82:18
83:10, 83:14
83:23, 84:20
84:23, 84:24
85:17, 85:20
86:1, 86:5, 86:6
86:7, 86:8
86:10, 87:6
87:8, 87:9
87:13, 87:24
88:14, 88:21
89:8, 89:10
89:12, 89:13
90:19, 91:3
91:11, 91:15
91:21, 92:1
92:17, 92:24
93:4, 93:5, 93:8
93:11, 93:13
93:14, 93:18
93:19, 93:22
93:23, 93:23
94:1, 94:5
95:15, 96:6
96:7, 96:21
97:7, 97:7
97:18, 99:3
100:17, 103:10
105:16, 105:23
106:7, 106:16
107:5, 107:11
107:14, 107:24
110:5, 110:6
111:4, 111:6
112:5, 112:12
114:8, 115:24
116:4, 116:21
116:22, 116:23
116:25, 117:24
119:19, 120:4
120:18, 121:9
121:11, 121:17
121:20, 121:23
121:25, 122:6
122:8, 122:9
122:22, 122:24
122:25, 124:11
124:13, 124:14
124:20, 124:21
125:18, 128:9
128:11, 128:20
129:7, 129:12
129:17, 131:2
137:19, 137:24
142:16, 144:17
145:3, 146:8
147:20, 147:22
147:24, 148:4
148:6, 148:8
148:16, 148:25
149:3, 150:14
150:22, 150:25
151:2, 151:5
154:1, 154:1
154:2, 154:5
154:8, 155:10
155:15, 157:12
158:10, 158:12
158:13, 158:23
161:7, 163:17
164:7, 165:9
169:9, 169:13
169:15, 170:13
170:20, 170:22
171:15, 172:15
173:2, 173:5
173:7, 173:10
178:16, 180:6
181:23, 184:16
185:7, 185:7
185:9, 186:14
186:17, 186:20
187:6, 187:7
187:8, 187:10
187:11, 188:23
188:23, 189:2
189:5, 189:6
189:25, 191:22
192:3, 192:5
192:18, 194:12
197:10, 197:10
197:12, 200:9
200:12, 201:10

201:17, 201:19
202:9, 202:16
202:20, 202:23
203:7, 203:10
203:14, 203:24
204:6, 204:13
204:15, 204:20
204:22, 204:24
**knowing** 153:10
**knowledge**
32:16, 49:2
50:21, 93:1
93:5, 99:3
138:8, 206:19
**known** 66:6
97:20, 196:14
196:15, 202:6
**knows** 48:8
**Kramer** 111:13
119:11, 119:25
119:25, 120:8
144:13, 156:11
157:10, 160:4
**Kroll** 46:16
46:17, 144:21
144:22, 145:20
147:7, 147:11
147:21, 148:1
148:10, 148:13
150:18, 151:2
151:5, 153:3
158:1, 158:14
158:25
**Kroll's** 149:3
150:11, 153:12
153:20, 154:6
156:22
**Kurtz** 110:3
111:5, 111:12
116:1, 117:20
117:25, 119:9
120:24, 121:12
122:2, 122:23
123:4, 123:9
124:9, 124:23
125:8, 125:10
125:15, 132:12
132:18, 136:25
137:4, 137:7
137:9, 137:14
137:25, 138:9
138:16, 139:13
144:12, 156:9
156:10, 159:17
160:2, 162:3
165:6, 166:2
166:16, 167:25

## L

**L-o-b-a-t-o**
21:12
**labor** 15:19
28:8
**laborer** 15:16
**lack** 54:13
78:21, 89:11
95:2, 95:9
95:23, 96:4
96:18, 98:13
98:21, 98:22
102:11, 102:21
120:3, 121:21
124:16, 131:13
131:25, 132:15
132:22, 133:5
135:15, 136:2
136:8, 136:8
148:24, 149:4
149:11, 149:23
150:4, 153:8
154:7, 158:11
158:16, 164:21
165:8, 171:1
171:12, 181:8
192:2, 195:24
198:8, 201:9
202:13, 203:1
203:12, 204:2
204:8, 204:17
**language** 128:8
**latest** 201:23
**laughing** 151:25
**law** 1:22, 2:5
2:13, 3:18
12:21, 12:22
12:24, 24:21
25:11, 25:13
25:22, 25:25
26:7, 54:1, 54:5
54:11, 61:8
114:6, 114:9
120:6, 122:11
122:13, 122:21
123:1, 123:22
123:25, 124:2
126:8, 127:11
128:3, 128:11
128:12, 128:20
129:7, 129:17
129:17, 137:23
145:15, 153:18
153:24, 153:25
161:3, 162:18
**lawsuit** 33:9
**lawyer** 13:13
14:11, 15:24
75:15, 110:8
110:14, 110:16
110:22, 117:10
117:12, 117:19
125:10, 146:16
162:11
**lawyers** 15:20
124:3
**lead** 73:17
141:14
**leave** 12:6
12:19, 17:6
17:7, 113:8
120:20, 135:9
155:6, 155:13
160:10
**leaves** 17:10
20:12
**leaving** 82:4
107:22, 117:2
**led** 37:20, 47:10
47:25, 48:1
116:10
**left** 12:22, 16:9
16:15, 18:4
18:6, 29:20
30:6, 37:3, 37:5
50:14, 76:5
79:25, 80:2
104:18, 107:4
107:6, 107:8
107:11, 107:14
108:4, 109:13
**legal** 27:23, 56:8
113:10, 118:13
120:19, 124:14
124:24, 128:7
128:8, 132:20
138:20, 162:12
162:15, 168:7
208:2
**letter** 45:9
45:11, 104:5
104:11, 105:10
105:12, 105:24
106:5, 106:11
106:14, 106:16
106:23, 107:9
107:15, 108:1
108:4, 108:15
108:16, 108:19
108:23, 109:15
109:24, 110:3
110:7, 110:13
111:3, 115:21
117:19, 133:13
133:19, 133:25
134:2, 134:8
134:16, 134:21
136:19, 136:24
138:21, 139:12
141:8, 141:10
141:20, 141:25
162:11, 164:13
165:2, 165:4
181:22, 181:24
182:2, 182:5
182:6, 183:10
206:15
**letters** 91:20
**level** 15:24
**license** 13:20
**licensed** 13:13
13:16
**lieu** 103:8
**life** 60:11, 181:1
**light** 17:11
20:13
**limit** 72:3, 123:9
**limitation** 74:23
160:13
**limitations** 58:2
58:5, 58:6, 74:9
74:17, 75:2
76:23, 128:14
160:14, 162:5
**limited** 70:21
72:21, 73:3
129:10, 130:1
130:6, 130:13
173:21, 173:24
**limiting** 73:18
73:21, 123:5
130:18
**Linden** 2:12
2:13, 4:7, 4:7
4:19, 4:24, 10:9
10:11, 16:14
26:23, 26:25
27:10, 27:13
28:10, 28:16
38:19, 39:8
39:11, 39:15
39:17, 52:5
52:7, 52:11
52:20, 52:22
53:1, 53:3, 53:5
55:15, 59:24
60:2, 60:5, 60:8
60:12, 60:14
60:19, 61:10
61:14, 61:18
61:21, 61:23

62:1, 62:4, 62:7 62:9, 62:12 62:14, 62:23 63:2, 67:3 69:15, 79:9 82:14, 82:16 83:7, 89:14 89:17, 89:20 89:23, 89:25 91:10, 94:7 94:11, 94:15 94:17, 99:24 103:16, 103:18 103:23, 103:25 112:20, 112:22 113:1, 114:20 114:22, 118:2 118:18, 118:21 118:23, 119:1 125:6, 126:14 126:25, 127:2 141:14, 141:17 142:12, 142:19 142:24, 143:6 143:9, 143:13 143:16, 143:18 143:20, 143:24 146:10, 146:22 147:9, 147:23 148:1, 148:5 148:7, 150:7 151:14, 152:1 152:4, 152:6 152:8, 153:7 155:11, 155:22 156:3, 157:16 157:18, 157:20 159:20, 162:24 165:18, 165:23 165:25, 168:15 168:17, 168:20 168:25, 169:2 169:25, 172:2 172:5, 172:7 172:9, 174:2 175:14, 175:17 175:19, 175:21 175:23, 175:25 176:4, 176:15 176:22, 177:6 179:11, 183:23 184:1, 184:3 184:21, 184:24 185:1, 185:3 185:5, 185:11 185:13, 186:13 188:18, 188:20 189:12, 189:14 189:21, 192:21 198:23, 199:4 201:23, 202:1 203:23, 204:12 205:5, 205:8 205:13, 205:18 206:10, 206:14 207:2, 208:13 208:16, 208:19

**Lindsey** 22:13

**Lindsey's** 22:14

**line** 67:8, 69:6 84:16, 85:8 191:8, 199:13 206:8

**lines** 130:17

**list** 46:11

**listed** 105:19 111:24, 205:1

**listen** 206:12

**literally** 20:18

**litigation** 27:3 27:7, 27:8 115:17, 138:22

**little** 30:5, 52:22 53:9, 88:15 141:6, 159:15 180:21, 181:7

**live** 10:2, 10:20

**lived** 10:15

**LLC** 3:11, 4:1 182:8

**Lobato** 21:10

**local** 4:22

**locate** 46:5

**located** 3:18 26:9

**lockdown** 190:11

**locked** 70:18 70:19

**long** 5:22, 10:2 10:15, 13:16 18:1, 30:3 32:25, 73:24 80:4, 81:21 81:24, 88:17 89:4, 107:14

**longstanding** 190:7

**look** 120:23 128:19, 132:25 144:21, 166:11 184:25

**looked** 157:15 180:14

**looking** 32:4 68:20, 84:8 132:24, 133:14 145:6, 172:1

**looks** 76:16 112:16, 142:21 144:2, 144:12 145:10, 187:19

**loop** 92:1, 178:6

**lose** 89:15

**lost** 52:17, 52:17

**lot** 187:25

**loud** 180:22 189:22

**low** 88:15

**Lyle** 2:20, 4:11

**Lynch** 169:9 169:11, 170:25

**M**

**mail** 105:15 106:1, 108:20 108:20

**mailed** 105:12

**making** 38:7 38:10, 43:7 43:23, 52:7

**male** 148:4

**man** 147:21

**management** 36:2, 190:7 190:15, 190:18 193:11

**manager** 17:6 17:7, 21:4 169:18

**mandated** 191:20

**manner** 31:8 57:14, 109:6

**March** 125:13 127:23, 130:21 131:7, 131:24 139:20, 142:23 143:9, 143:15 143:20, 143:23 145:7, 145:9 145:11, 147:16 155:3, 156:13 157:8, 159:2 159:17, 160:1 161:2, 162:4

**mark** 168:10

**marked** 62:2 63:9, 68:12 123:2, 171:3

**marketing** 11:19, 12:10 12:17, 14:5

**Marmor** 3:10 3:11, 4:13, 4:13 10:5, 10:10 19:12, 22:23 24:12, 24:18 26:19, 26:24 27:5, 27:12 27:14, 28:13 28:17, 28:23 30:21, 32:21 34:11, 38:15 38:17, 39:4 39:10, 39:12 39:16, 41:3 45:6, 48:6, 49:6 49:8, 49:12 52:4, 52:6, 52:8 52:17, 52:21 52:24, 54:13 55:14, 55:17 58:4, 59:16 60:7, 60:10 60:17, 60:21 60:23, 61:2 61:7, 61:13 61:15, 61:19 61:22, 61:24 62:3, 62:6, 62:8 62:10, 62:13 62:15, 62:18 62:21, 64:10 67:2, 67:6 67:13, 68:13 69:12, 70:2 70:4, 71:2 72:10, 72:23 73:11, 75:11 75:20, 76:13 77:6, 77:20 78:6, 78:8 78:21, 79:4 79:8, 79:10 82:17, 83:4 85:24, 89:11 89:16, 89:18 89:21, 89:24 91:9, 93:2, 94:4 94:8, 94:14 95:2, 95:9 95:23, 96:3 96:18, 97:5 97:10, 97:14 97:24, 98:13 98:21, 99:6 99:15, 102:11 102:21, 103:14

103:17, 103:19
103:24, 105:25
107:19, 110:11
110:17, 110:25
112:14, 112:21
112:24, 113:20
114:18, 115:5
115:18, 116:19
117:9, 117:11
117:14, 117:22
118:1, 118:11
118:17, 118:19
118:22, 119:4
119:18, 120:3
121:21, 122:3
123:12, 123:18
124:16, 124:19
124:25, 125:23
126:1, 126:12
126:16, 126:18
126:22, 126:24
127:1, 127:17
128:15, 129:5
129:11, 129:20
130:3, 130:9
130:23, 131:13
131:17, 131:25
132:15, 132:22
133:5, 133:13
134:1, 134:4
134:12, 134:20
135:15, 136:2
136:8, 136:17
137:2, 137:5
137:10, 137:17
138:3, 138:12
138:18, 138:23
138:25, 139:2
139:4, 139:7
139:9, 140:10
140:22, 140:24
141:12, 142:13
142:16, 142:23
143:3, 143:11
143:14, 143:17
143:19, 143:22
145:8, 146:1
146:9, 146:18
146:20, 147:8
147:18, 147:20
147:25, 148:22
148:24, 149:4
149:11, 149:23
150:4, 150:19
151:12, 151:15
153:6, 153:8
154:7, 154:12
155:4, 155:8
155:10, 155:24
156:2, 156:5
156:25, 157:14
157:17, 157:19
158:3, 158:9
158:11, 158:16
159:18, 159:22
161:13, 161:19
161:22, 161:24
162:13, 162:22
163:14, 163:24
164:20, 165:8
165:16, 165:19
165:24, 166:4
166:6, 166:25
167:3, 167:12
167:16, 168:23
169:24, 170:2
171:1, 171:10
171:12, 171:20
171:24, 172:3
172:6, 174:1
174:10, 174:13
175:1, 175:4
175:6, 175:11
175:13, 175:15
175:18, 175:20
175:22, 176:13
176:20, 176:24
177:2, 177:5
177:7, 178:2
178:4, 178:23
179:10, 179:15
181:8, 181:12
182:25, 184:19
184:22, 185:6
185:12, 185:17
185:19, 186:9
186:19, 187:3
187:23, 188:8
188:17, 188:19
189:8, 189:15
189:20, 189:23
190:23, 191:1
191:4, 191:24
192:8, 192:14
192:20, 194:2
194:11, 194:25
195:24, 196:11
196:21, 197:6
197:21, 198:8
198:22, 198:24
199:22, 201:9
201:24, 202:13
202:15, 203:1
203:5, 203:12
203:22, 204:2
204:8, 204:11
204:17, 205:7
205:11, 205:17
205:20, 206:4
206:12, 206:25
207:16, 207:24
208:4, 208:6
208:8, 208:11
208:22, 209:1
**marriages** 207:21
**married** 8:2
**Mason** 143:24
**Matt** 29:24 30:8, 31:2 31:10, 31:13 31:14, 31:24 43:4, 91:25
**matter** 3:20 31:8, 114:16 190:9, 198:5 210:4
**matters** 25:4 167:10
**Matthew** 3:8 42:3, 42:6, 90:7 202:10
**mean** 20:17 22:18, 23:7 23:15, 23:25 24:13, 33:11 35:11, 39:21 43:25, 44:1 47:20, 51:7 52:10, 57:1 58:5, 58:25 59:12, 73:6 73:13, 74:11 74:13, 75:12 77:8, 78:9 91:23, 91:25 92:9, 97:16 99:17, 107:21 110:19, 114:18 129:13, 130:10 130:14, 130:17 132:2, 135:4 136:23, 139:24 140:12, 140:12 143:11, 145:10 147:8, 147:8 148:3, 151:12 155:7, 164:23 171:2, 172:16 175:8, 181:22 187:23, 194:13 194:14, 196:13 204:3
**meaning** 24:19 152:19, 176:8 188:17
**means** 148:16 171:4
**meant** 127:15 129:2
**mechanism** 198:18, 199:7 199:11
**medical** 38:2 44:20, 45:1 45:15, 45:20 46:6, 46:9 46:11, 46:20 46:24, 46:25 47:8, 54:21 54:24, 54:25 55:5, 55:10 55:22, 55:22 63:16, 67:19 69:25, 70:9 70:14, 71:25 72:15, 72:20 73:15, 75:16 76:11, 76:12 76:18, 77:3 77:9, 77:10 77:12, 77:17 77:18, 77:23 78:4, 78:12 78:14, 113:12 114:1, 120:20 123:5, 123:10 130:7, 130:13 140:1, 160:12 160:13, 160:21 163:9, 163:22 164:6, 168:10 173:3, 173:13 173:18, 173:25 174:16, 174:20 174:21, 174:22 176:7, 176:9 176:19, 177:10 177:12, 195:10 195:12
**meet** 22:24 31:21, 35:19 35:20, 37:15 38:3, 38:7, 42:8 44:1, 44:2, 65:4 73:15, 79:14 80:8, 80:11 90:6, 97:16 116:9, 130:25
**meeting** 32:25

37:18, 51:11
58:3, 66:19
74:21, 79:19
80:13, 81:9
86:2, 87:10
88:5, 94:2
109:7, 116:9
116:10, 116:21
117:1, 140:4
179:22, 179:25
197:13, 199:13
**meets** 34:1
**Megan** 3:2, 4:15
**Melody** 169:20
**member** 96:10
**memo** 170:25
**memorandum**
59:11
**memory** 23:19
**mental** 195:9
195:12
**mentioned**
160:22
**merit** 206:21
**message** 104:19
107:4, 107:22
108:10, 109:13
109:14, 109:25
**messed** 6:6
**met** 32:20
32:23, 33:1
41:9, 44:5, 44:9
51:13, 51:17
56:21, 79:17
80:2, 80:5
81:16, 81:17
104:8, 116:8
197:22
**Michele** 36:5
**Michigan** 11:4
**middle** 52:19
**military** 8:10
**mind** 184:2
**minute** 183:24
201:22
**minutes** 79:24
80:6, 81:23
107:18, 141:6
188:12
**mischaracteriz...**
150:6
**mischaracterizes**
67:13, 72:10
133:6, 150:20
**misdemeanor**
14:3
**misleading**
103:19
**mispronounces**
152:2
**missed** 193:13
**missing** 129:22
**Mm-hmm** 195:6
201:14
**moment** 25:1
**Monday** 104:23
160:1, 182:9
**money** 102:17
**months** 17:14
29:16
**Morley** 169:20
**morning** 3:16
4:25, 5:1
**Morris** 36:5
**motion** 112:23
**mouth** 25:1
**move** 170:16
195:3
**moved** 10:4
30:6
**moving** 168:19
170:16
**Munizzi** 169:23
169:24, 169:25

**N**

**name** 3:24, 5:4
12:12, 19:15
21:1, 21:11
21:21, 24:11
36:16, 45:4
45:18, 45:19
46:16, 63:23
65:17, 66:5
66:6, 67:9, 69:8
69:18, 177:22
182:21, 202:5
**named** 66:11
69:7
**names** 65:8
**nature** 21:24
25:3, 27:20
82:7, 84:6
**Nawara** 1:5
3:21, 4:8, 4:10
5:16, 17:15
21:5, 21:16
22:1, 22:9
22:17, 22:22
23:2, 23:6
23:14, 23:21
24:6, 24:17
25:5, 26:12
27:24, 28:22
28:23, 28:24
31:8, 31:11
31:24, 32:10
36:7, 37:6
37:10, 39:1
39:8, 39:11
41:9, 41:13
41:20, 42:4
42:7, 42:15
42:24, 43:2
47:13, 47:23
48:4, 48:17
49:22, 50:8
50:12, 50:16
51:2, 51:12
51:19, 53:13
53:16, 54:7
54:10, 56:14
56:21, 57:13
59:7, 59:15
64:8, 64:13
65:2, 65:6
65:11, 65:12
66:12, 66:21
72:8, 73:2
74:16, 74:20
74:25, 75:2
76:6, 76:25
77:5, 77:13
77:18, 78:1
79:15, 79:18
81:13, 81:19
82:11, 82:24
84:9, 85:8
86:18, 86:23
87:2, 87:4, 87:7
87:10, 88:16
88:21, 90:6
91:2, 91:6
91:16, 92:20
93:9, 93:11
93:15, 94:1
96:1, 98:17
99:2, 100:13
101:10, 102:9
102:13, 103:11
104:6, 104:12
105:12, 105:16
106:4, 108:15
110:4, 113:5
113:13, 113:25
115:20, 115:22
116:2, 116:8
117:9, 118:1
120:8, 120:13
125:10, 125:17
127:8, 127:18
128:12, 131:22
133:24, 134:9
134:17, 136:5
137:25, 138:1
138:9, 138:9
138:16, 139:13
140:8, 140:13
142:2, 142:3
142:17, 144:11
147:13, 149:14
149:18, 150:2
150:9, 151:3
153:4, 153:14
154:10, 156:10
156:16, 157:9
157:13, 157:25
159:3, 160:5
160:9, 160:20
160:20, 162:21
163:4, 164:13
165:2, 166:2
166:20, 167:10
168:1, 168:11
170:15, 170:20
172:17, 174:22
178:12, 181:5
181:15, 181:25
182:6, 183:20
184:13, 186:2
186:2, 186:25
188:18, 188:19
188:25, 190:19
191:11, 191:17
193:5, 193:19
195:15, 195:19
195:23, 196:19
197:4, 197:16
198:15, 200:18
200:25, 202:24
206:17, 207:12
207:14
**Nawara's** 24:11
38:21, 39:13
41:6, 72:6, 77:2
78:14, 98:10
106:7, 106:7
155:2, 158:15
163:8, 163:22
187:13, 190:5
191:9, 195:7
**near** 119:23
**necessarily**
65:19, 114:2
114:3, 135:11
**necessary** 37:25
40:17, 65:5
140:2
**necessitated**

164:12
**need** 73:20 73:24, 77:23 78:20, 79:8 103:14, 126:22 139:15, 166:25 171:24, 205:3
**needed** 37:24 38:12, 76:24 77:3, 77:18 78:3, 78:13 131:3, 133:24 140:17
**negotiations** 15:17
**neither** 186:4 186:25
**never** 60:10 60:17, 62:16 108:8, 108:9 109:14, 109:24 142:17, 208:5
**new** 201:25
**nice** 60:22
**Nick** 26:2, 27:24 114:13
**nine** 10:3, 10:18 15:22
**Nneka** 91:8 91:9, 91:10
**Non-Confident...** 8:1, 10:1
**normal** 84:1 100:3, 106:21
**normally** 65:7 143:11
**North** 1:23, 2:6 2:14, 3:19, 7:2 9:2
**Northern** 1:2 3:22
**notary** 3:25
**notes** 38:1 83:21, 83:24 86:18, 86:22 87:3, 87:7
**nothing's** 103:19
**notice** 4:21, 33:6 44:23, 84:16 85:8, 115:23
**noticed** 49:18
**notification** 100:12, 116:2
**notify** 46:7
**notwithstanding** 189:19, 190:3
**November** 41:7 48:3, 48:18 51:18, 57:19 57:25, 58:3 59:6, 65:12 77:14, 79:18 83:8, 84:14 86:2, 88:17 94:2, 96:2, 97:4 100:7, 100:13 101:20, 102:9 103:10, 108:24 109:7, 109:13 109:15, 109:16 112:3, 112:8 115:21, 127:21
**number** 1:9 3:22, 63:10 66:3, 68:12 68:21, 69:11 73:6, 74:13 82:13, 88:15 90:1, 90:2, 90:4 91:2, 94:18 98:18, 99:2 99:20, 104:1 108:11, 108:14 111:8, 117:7 117:16, 119:6 123:2, 125:5 127:6, 128:13 128:20, 128:23 129:2, 129:9 129:19, 130:2 131:23, 132:5 133:12, 133:18 134:21, 134:22 138:2, 138:2 138:10, 138:11 139:14, 139:15 139:19, 141:7 142:11, 142:14 143:25, 145:1 145:14, 145:14 155:25, 156:6 156:23, 164:20 169:5, 172:14 173:18, 176:5 176:7, 176:17 177:16, 181:21 200:14, 201:21 202:3, 202:6 203:15, 205:1 206:5, 206:6
**numbers** 60:13 60:14
**nurse** 35:20 35:22, 36:2 36:9, 36:24 37:1, 37:14 40:3, 40:8 40:21, 40:22 41:16, 43:11 44:1, 44:10 44:18, 45:2 45:9, 45:12 47:2, 49:16 51:13, 51:16 63:21, 65:7 68:2, 70:8 70:15, 70:18 70:21, 72:9 72:14, 73:25 74:3, 74:5 74:14, 76:1 76:2, 82:10 82:23, 85:4 89:5, 92:19 104:13, 105:9 108:25, 109:12 111:12, 116:21 116:24, 119:11 131:1, 139:25 173:19, 177:9 177:22, 179:23 183:18, 189:2 198:1, 200:20
**nurse's** 70:17 81:9, 180:15
**nurses** 36:11

## O

**O-l-s-o-n** 30:22
**oath** 4:3
**object** 19:12 22:23, 24:12 24:18, 27:13 27:14, 34:11 38:17, 45:6 48:6, 48:6 55:14, 58:4 59:16, 64:10 67:2, 67:6, 70:4 71:2, 77:20 78:6, 85:23 105:25, 110:17 110:25, 115:2 115:18, 116:19 117:11, 117:14 117:22, 119:18 123:18, 128:15 132:22, 133:3 137:2, 138:18 139:7, 140:22 145:8, 146:1 149:4, 149:11 151:15, 153:8 155:4, 155:8 156:5, 158:9 163:14, 163:24 164:20, 164:21 166:4, 167:12 167:12, 178:2 181:12, 181:12 183:20, 186:9 190:1, 194:11 194:25, 197:21 206:5, 206:8 207:16, 207:24
**objected** 133:7 133:11
**objection** 39:5 41:3, 54:13 67:13, 71:2 72:10, 72:23 73:11, 75:11 75:20, 76:13 77:6, 78:8 78:21, 79:4 85:24, 89:11 93:2, 94:4, 95:2 95:9, 95:23 96:3, 96:18 97:5, 97:10 97:24, 98:13 98:21, 99:6 102:11, 102:21 107:19, 110:11 110:25, 113:20 118:11, 118:17 119:4, 120:3 121:21, 122:3 123:12, 124:16 124:25, 129:11 129:20, 130:3 130:9, 130:23 131:13, 131:17 131:25, 132:15 133:5, 134:1 134:20, 135:15 136:2, 136:8 136:17, 137:5 137:10, 137:17 138:3, 138:12 138:23, 138:25 140:10, 141:12 148:24, 149:23 150:4, 150:19 154:7, 158:11 158:16, 162:13 165:8, 165:19 167:16, 171:1

171:10, 171:12
171:20, 178:23
181:8, 182:25
188:8, 189:24
192:14, 194:25
195:24, 196:21
197:6, 198:8
201:9, 202:13
203:1, 203:5
203:12, 204:2
204:8, 204:17
**objections**
186:19, 187:4
191:25, 192:8
194:2, 206:5
**obtain** 11:5
163:8, 163:21
**obtains** 152:15
**obviously** 20:18
**occupational**
35:19, 36:11
36:24, 37:1
40:3, 104:13
108:25, 139:25
**occur** 32:25
81:8, 140:7
**occurred** 35:2
37:20, 48:2
48:13, 49:1
50:22, 50:25
51:20, 84:18
85:16, 93:16
93:20, 186:5
191:10, 193:8
**occurring** 47:24
**October** 95:21
**offend** 148:5
**offhand** 128:21
**office** 1:22, 2:5
2:21, 3:3, 3:18
14:16, 14:17
16:24, 17:2
18:6, 18:12
18:14, 18:15
18:25, 19:2
26:7, 29:2, 29:5
32:23, 34:3
34:5, 34:10
36:23, 37:4
46:13, 49:20
50:13, 55:24
57:25, 66:6
67:18, 68:5
69:2, 69:20
70:1, 70:8
70:13, 70:14
70:18, 71:1
71:3, 71:7, 72:9
79:20, 81:9
82:6, 82:8
84:12, 86:9
87:15, 88:20
89:7, 94:23
95:4, 95:8
96:12, 100:12
104:14, 108:25
113:6, 113:11
114:16, 120:1
128:25, 132:6
132:21, 136:5
139:13, 139:17
140:8, 150:9
150:12, 151:11
152:19, 152:20
155:3, 158:8
158:24, 159:8
160:19, 163:8
163:21, 164:17
167:14, 168:8
169:19, 172:23
173:4, 173:6
174:19, 176:9
176:17, 177:9
177:20, 180:16
182:23, 183:4
183:5, 196:17
197:2, 197:19
198:1, 198:6
198:19, 199:16
199:17, 199:24
200:3, 202:19
**office's** 150:3
**officer** 47:23
48:17, 49:21
50:16, 50:16
56:21, 58:1
58:16, 59:15
85:8, 90:6, 91:1
91:6, 100:13
104:5, 108:15
113:13, 115:20
116:2, 116:8
120:13, 156:16
160:9, 160:19
163:3, 163:8
163:21, 164:13
165:2, 168:10
172:16, 179:5
184:12, 186:2
190:5, 190:19
191:9, 191:11
191:17, 193:5
193:18, 195:7
195:15, 195:19
200:17, 206:22
207:15
**officers** 19:3
49:20, 159:9
**Offices** 2:13
**official** 135:8
**oh** 10:9, 16:23
18:2, 20:25
32:8, 40:2, 60:5
60:19, 60:20
61:15, 61:18
61:21, 68:1
69:12, 69:14
77:22, 79:24
81:23, 87:16
89:16, 92:17
94:14, 95:19
106:6, 106:18
124:18, 127:17
127:20, 129:5
133:20, 134:6
134:14, 143:24
146:23, 152:5
155:9, 157:1
158:3, 159:20
166:15, 166:18
168:20, 169:2
172:6, 172:8
174:14, 175:3
175:7, 175:24
176:3, 176:12
180:18, 181:4
184:1, 185:11
189:10, 196:13
205:11, 205:15
205:21, 208:5
208:7
**okay** 5:25, 10:23
11:20, 12:9
12:19, 12:24
14:5, 16:23
17:1, 21:8, 22:3
23:5, 24:3
24:23, 25:3
26:23, 27:18
28:10, 29:1
29:20, 32:18
33:13, 33:24
35:14, 39:15
39:19, 40:6
41:6, 41:23
45:17, 46:19
46:23, 47:6
49:2, 50:2
50:18, 51:5
52:5, 52:11
52:14, 52:24
52:25, 52:25
54:2, 54:20
54:20, 56:24
59:24, 60:2
61:21, 61:23
62:9, 62:13
62:21, 63:8
63:18, 64:11
64:20, 66:9
67:11, 68:3
68:9, 68:11
68:20, 69:6
69:15, 69:17
70:16, 70:25
71:6, 71:13
73:9, 76:2
78:19, 79:7
79:10, 79:22
81:8, 81:21
82:13, 83:7
85:6, 85:15
88:10, 88:16
89:14, 89:16
89:17, 89:23
90:7, 91:7, 92:2
92:24, 94:6
96:9, 96:25
97:15, 97:20
99:12, 99:20
101:6, 101:16
102:25, 105:5
106:11, 107:1
107:3, 107:23
108:7, 108:11
108:18, 108:22
109:20, 110:2
110:8, 111:3
111:8, 111:16
112:13, 113:1
114:3, 114:8
115:8, 115:21
116:1, 116:12
116:17, 117:24
121:4, 121:7
122:12, 124:4
124:11, 126:7
127:16, 128:9
129:16, 129:23
130:6, 130:12
130:20, 131:5
132:6, 132:12
133:9, 133:17
133:23, 134:7
135:4, 136:25
137:13, 137:21
139:19, 141:4
141:6, 141:19
141:23, 142:9
142:10, 144:7

144:9, 144:11
144:20, 146:4
146:23, 147:6
147:25, 150:7
150:11, 150:17
150:24, 151:2
151:15, 151:19
151:22, 152:7
152:25, 153:19
154:3, 154:9
155:2, 155:11
156:3, 156:15
156:21, 157:1
157:8, 157:18
157:20, 157:23
157:25, 158:7
158:20, 159:2
159:2, 159:15
159:20, 160:7
161:17, 162:3
162:8, 162:17
162:20, 163:11
163:16, 164:4
164:9, 165:23
166:15, 167:3
168:5, 169:2
170:14, 171:4
171:23, 173:17
174:18, 176:24
177:22, 178:15
178:19, 179:2
179:7, 179:13
181:20, 181:20
181:24, 183:9
183:23, 184:21
185:1, 185:2
185:6, 185:11
185:13, 186:23
187:3, 187:9
187:23, 188:13
189:2, 189:17
189:23, 191:6
192:11, 192:24
194:22, 197:1
197:23, 197:25
199:3, 199:16
200:9, 200:13
201:7, 201:15
202:1, 202:2
202:15, 203:7
205:5, 205:25
206:14, 207:2
207:19

**Olson** 30:17
30:21, 30:24
31:1, 32:9

**once** 12:23
20:11, 35:14
39:21, 39:24
75:6, 82:5
100:18

**ongoing** 22:25
26:16

**operation** 91:19

**operations**
91:14

**opinion** 194:4
194:13, 195:6
195:11, 195:14
196:9, 196:10
196:11, 196:12

**opponent**
159:11

**opportunity**
65:10, 193:13

**opposed** 70:1
71:8, 77:4
77:18, 78:4
78:14, 174:21

**OPR** 34:23
35:6, 59:2
93:19, 93:24
198:11, 199:24
200:5, 200:6
200:8, 200:10

**order** 10:6
10:10, 39:19
40:19, 40:23
41:2, 41:20
41:24, 42:6
43:23, 61:11
61:16, 61:16
61:20, 61:25
62:5, 63:15
77:24, 86:24
97:1, 97:3
102:10, 104:17
109:10, 112:23
113:8, 113:11
113:14, 126:8
127:10, 127:11
131:23, 133:24
134:17, 136:6
140:6, 140:18
141:3, 150:12
155:16, 159:5
160:24, 168:8
168:9, 168:11
169:3, 169:3
195:22, 197:16

**ordered** 35:15
35:17, 39:3
41:13, 41:16
42:7, 42:11
43:8, 44:4, 57:6
57:21, 97:22
116:14, 127:8
163:6, 163:7
163:20, 199:9

**ordering** 56:13
196:19, 197:4

**ordinarily**
162:10

**ordinary** 95:7

**outlined** 35:10

**outset** 112:17

**outside** 41:25
81:18, 148:12
200:6

**outwardly**
181:14

**overly** 109:6

**oversee** 18:24

**overseeing** 20:8

**P**

**p.m** 103:20
103:22, 119:13
127:3, 127:5
172:11, 172:13
182:10, 182:11
184:5, 184:8
205:21, 205:24
209:2

**packet** 71:12

**page** 6:14, 8:15
142:22, 149:8
156:6, 159:16
162:20, 162:21
185:24, 187:12
189:8, 189:17
193:22, 193:22
195:5, 206:2

**paid** 101:21
101:22, 101:25
102:6, 102:10
102:23, 103:6
103:8, 151:10
152:12, 155:19
155:20, 201:13

**paperwork**
22:19

**paragraph**
71:14, 104:10
108:22, 109:21
116:1, 125:14
127:7, 127:15
128:7, 134:13
149:9, 159:23
160:7, 163:1
163:12, 164:9
164:18, 173:11
173:11, 174:5
174:18, 176:5
176:22, 176:25
179:15, 179:16
182:4, 185:25
187:15, 187:17
187:18, 188:6
189:18, 191:23
192:5, 192:19
193:1, 193:20
193:25, 194:10
194:17, 195:5

**paragraphs**
105:6, 113:2
188:2, 188:12

**paralegal** 61:7

**parentheses**
113:13, 164:15
174:16, 186:3
193:9, 195:17

**park** 11:10
15:10, 15:14
15:20, 16:9
16:20

**part** 14:15
14:17, 14:19
20:1, 64:14
98:19, 99:4
100:15, 109:25
140:6, 188:21
197:18, 199:24
206:8

**participating**
23:24, 104:21
105:1, 109:17

**particular** 71:25
190:8

**particulars** 51:9
140:13

**parties** 4:21
6:15, 8:16

**partner** 89:18

**party** 40:5
45:13, 45:23
150:21, 150:23
202:8

**pass** 177:11
177:13

**passed** 13:11
59:17

**patient** 64:1
66:11, 69:7

**patient's** 63:22
65:17

**pay** 120:21
152:23

**paycheck**

102:14
**paying** 152:18 152:20
**payroll** 169:12 169:18, 169:21 170:3
**pending** 5:23 61:14
**people** 19:5 20:19, 20:20 20:22, 21:8 31:4, 31:6, 31:7 35:7, 39:5, 91:7 91:16, 162:24 171:15, 205:1
**perceived** 190:17
**perform** 34:2 57:12, 76:25 78:20, 148:20
**performed** 147:11, 197:1 197:18, 198:20 200:10
**period** 73:22 88:12, 179:6
**permitted** 100:14, 147:3 154:24
**Perry** 143:24
**person** 16:3 17:21, 21:18 22:11, 30:16 36:14, 37:11 37:15, 38:7 38:10, 41:23 45:4, 47:7 51:11, 58:18 58:23, 71:23 72:16, 163:9
**personal** 69:3 102:16, 113:12 120:20, 163:9 163:22, 168:10 189:3
**personality** 190:4
**personally** 81:18, 110:15 123:14, 198:22 199:1, 199:3 199:6
**personnel** 14:18 19:5, 21:13 21:23, 22:7 22:15, 96:11 96:15, 96:17
**persons** 204:24
**pertaining** 190:10
**pertinent** 43:1
**pervasive** 190:7
**Peter** 1:22, 2:4 2:5, 3:19, 4:9 111:13, 119:11 119:25, 119:25 144:13, 144:15 148:8, 156:10 157:10, 160:4
**Peter's** 208:13
**PhD** 193:21
**phone** 81:15
**photographic** 23:19
**photographs** 33:15
**phrased** 208:14
**physical** 73:16 78:17, 78:19 79:1, 197:17
**physically** 178:21, 179:3 180:10
**physician** 69:1 69:3, 70:6, 70:7 70:11, 101:13
**physicians** 69:4 141:2
**picture** 73:20 76:17, 97:17
**place** 5:13 26:15, 36:1 43:16, 44:13 70:16, 83:13 120:20, 160:15 198:18, 199:7
**placed** 58:2 74:18, 75:3 76:23, 113:8 160:9
**places** 193:4
**Plaintiff** 1:7, 2:3 2:11, 4:8
**pleadings** 33:21
**please** 4:2, 4:6 5:4, 20:25 67:16, 100:11 120:18, 156:18 157:2, 174:5 189:22
**plural** 134:9 134:15, 141:11 141:18
**plus** 190:5
**point** 23:10 32:1, 65:15 66:21, 155:12 168:4
**pointing** 185:19
**police** 19:3 148:17, 206:22 207:15
**policies** 34:8
**policy** 15:3 113:10, 168:7
**political** 159:10 207:23
**politician** 207:20
**portion** 7:1, 7:5 9:1, 9:3, 96:9
**pose** 195:15
**position** 15:9 15:16, 15:17 16:1, 16:2, 17:4 21:3, 22:6 22:14, 26:3 29:4, 29:7 29:18, 90:11 128:4, 193:4 206:21
**positive** 142:19
**possibility** 135:22
**possible** 113:7 127:25, 131:10 196:25
**possibly** 171:8
**potential** 35:12 113:6, 167:13
**potentially** 190:3
**practice** 84:1 106:13, 106:21 119:22, 128:2 128:10, 172:22
**predating** 76:8
**preparation** 33:3, 56:6
**prepare** 32:19
**prepared** 56:3 56:8, 56:9
**presence** 65:13 81:18
**present** 71:11 80:12, 195:14 206:20
**presented** 179:17, 190:4 190:16, 191:16 196:14
**presently** 195:7
**presents** 43:11
**presumed** 5:19
**pretty** 103:25 155:23
**prevailed** 190:12
**prevent** 58:17 58:23, 74:22 123:8, 123:17
**prevented** 65:16 124:8
**previous** 66:5 66:6, 157:24 159:3
**previously** 156:19, 157:3
**prior** 8:12 29:17, 48:16 56:13, 58:3 68:21, 76:12 85:21, 86:1 86:14, 88:20 94:1, 104:17 109:11, 111:3 115:21, 115:22 117:16, 126:10 127:13, 132:13 132:18, 159:7 160:23, 164:14 165:3, 171:6
**privacy** 163:10 163:19
**private** 82:6 82:8
**privately** 81:17
**privilege** 115:7
**probably** 31:5 60:15, 62:10 79:24, 83:25 84:13, 91:22 114:13, 183:18 208:8
**problem** 39:7 75:9, 75:12 189:14, 190:18 190:25
**problematic** 190:3
**procedural** 44:18
**procedure** 4:22 37:9, 37:11 49:19, 68:4 123:24, 124:8 124:8, 124:10 124:12, 156:20 157:5
**procedures** 5:12

34:9, 34:12
34:13, 34:18
34:20, 44:16
46:20
**proceed** 4:18
120:18
**proceedings**
210:3
**process** 23:24
44:22, 45:14
65:4, 75:24
88:4, 92:18
104:22, 104:24
105:1, 105:4
109:18, 116:24
116:25, 125:16
127:10, 127:24
128:5, 131:9
132:11, 132:21
135:16, 136:7
139:20, 139:21
139:24, 140:6
155:16, 166:24
206:21, 207:15
**produced**
138:22, 154:18
206:6
**professional**
96:12, 198:6
**prohibiting**
137:13
**projects** 15:4
**promises** 168:16
168:16
**promotional**
206:21, 207:15
**promotions**
160:16
**pronouncing**
5:2
**proper** 156:20
157:4, 195:23
**Pros** 11:18
12:13, 12:23
**protected** 27:9
68:16, 109:9
**protections**
70:16
**protective** 10:6
10:10, 61:11
61:16, 61:16
61:20, 61:25
62:5
**provide** 70:10
108:2, 116:13
183:6
**provided** 72:14
83:11, 127:18
163:4, 164:7
**provider** 45:20
45:24, 46:5
46:6, 46:10
63:15, 66:25
67:10, 67:11
67:19, 68:6
70:1, 71:10
183:6
**provider's** 67:9
**providers** 46:11
65:8, 183:3
183:4
**provision**
113:11, 168:8
175:9
**psych** 55:3
**psychiatrist**
55:3
**psychologic**
78:14
**psychological**
44:20, 46:21
46:24, 47:1
47:8, 54:22
55:2, 72:2, 73:8
73:17, 73:19
76:7, 76:10
77:4, 77:10
77:19, 77:25
78:4, 78:7
78:18, 79:2
140:1, 182:13
**psychologist**
55:3, 148:17
149:2, 151:9
193:23
**public** 3:25
148:17, 191:15
193:7, 195:17
**pulled** 190:20
191:20
**pun** 55:15
55:17
**purpose** 37:17
71:22, 174:6
178:11
**purposes** 56:19
**pursuant** 4:20
90:25
**purview** 70:17
**pushed** 117:5
**put** 67:22, 72:1
74:12, 106:11
106:14, 106:16
**puts** 72:11
**putting** 42:25
65:17, 74:22

**Q**

**qualified** 61:19
148:20
**question** 5:17
5:19, 5:20, 5:23
25:25, 26:20
31:5, 38:18
38:19, 49:22
52:21, 55:18
70:5, 72:18
78:10, 84:23
96:24, 98:23
98:25, 103:15
115:6, 115:12
117:15, 118:22
121:24, 124:12
125:1, 125:3
126:3, 126:5
126:23, 128:18
134:7, 134:24
137:6, 139:4
139:10, 141:17
142:25, 146:5
146:7, 146:8
146:12, 146:14
146:15, 146:17
146:18, 147:2
147:4, 154:13
154:16, 154:20
154:22, 154:25
157:17, 167:5
167:18, 167:23
168:10, 175:12
176:1, 176:16
178:5, 186:16
187:5, 188:1
188:10, 192:3
195:4, 199:2
205:9, 205:10
206:13, 208:14
**questioning**
124:6
**questions** 5:15
27:19, 28:19
33:8, 44:22
54:3, 68:21
142:15, 180:9
197:9, 208:19
208:20, 208:22
**quick** 79:8
146:11
**quite** 98:11
**quote** 135:20
151:9, 159:4
180:7

**R**

**R-e-b-e-c-c-a**
5:5
**R-e-i-e-r-s-o-n**
5:6
**rage** 85:9, 85:18
**raise** 4:2, 34:25
180:20
**raised** 23:22
180:21, 198:10
**rank** 206:21
**rare** 87:18
**Ray** 182:8
182:16, 183:21
**reach** 28:9
81:14, 124:5
137:8, 137:11
162:3
**reached** 75:6
137:3, 137:7
153:17
**reaches** 152:15
178:17
**reaching** 42:17
45:14
**reacted** 47:24
49:24
**read** 69:18, 70:2
84:3, 96:23
104:10, 108:22
112:6, 113:2
119:20, 119:22
120:10, 125:14
127:7, 134:5
134:10, 149:9
156:15, 159:23
160:7, 164:9
166:25, 173:11
174:5, 175:25
176:2, 179:2
179:13, 182:4
185:25, 188:4
189:18, 189:20
189:22, 190:1
191:23, 192:4
193:1, 195:4
**reading** 99:17
**reads** 64:15
164:5, 188:9
**ready** 185:4
**real** 6:3
**really** 15:6
26:20, 75:23
86:25, 92:17
117:1, 124:6

135:7, 164:24
165:16, 165:22
187:24, 197:7
199:13, 205:11
**reason** 44:16
58:21, 75:18
76:10, 77:2
77:16, 77:22
78:13, 86:21
100:8, 112:7
118:8, 128:4
150:21, 170:24
178:19, 183:19
194:7
**reasonable** 74:1
74:7, 107:21
190:21, 191:1
191:3, 191:8
193:7
**reasons** 129:16
186:10
**Rebecca** 1:15
1:16, 3:8, 3:24
4:20, 5:5
**recall** 17:12
20:23, 21:7
21:9, 23:2
23:13, 24:3
24:8, 24:9
24:24, 24:25
26:14, 31:19
32:3, 33:13
33:14, 40:14
40:16, 42:19
42:21, 42:22
43:1, 43:14
43:16, 45:10
46:18, 47:11
48:2, 48:12
48:17, 48:22
50:2, 50:4, 50:6
50:10, 50:11
51:11, 51:17
51:19, 51:22
53:12, 53:17
53:21, 54:5
75:17, 76:3
80:25, 82:2
82:2, 82:4
88:24, 89:1
89:1, 91:20
94:21, 99:25
106:6, 111:7
112:3, 112:5
113:16, 113:17
113:18, 113:23
114:12, 115:1
115:3, 118:7
121:2, 121:13
122:12, 122:15
138:13, 144:18
144:19, 144:25
148:15, 161:12
161:13, 161:15
161:17, 161:20
161:25, 162:9
169:8, 170:18
182:18, 182:19
182:21
**recalling** 25:10
**receipt** 105:21
106:4
**receive** 34:21
44:23, 44:25
46:8, 67:5
114:5, 141:5
145:22, 159:24
161:10, 174:8
174:15, 174:17
174:20, 174:22
176:6, 177:12
184:16
**received** 70:10
100:1, 100:12
100:20, 104:25
111:4, 114:24
117:4, 119:16
119:23, 120:12
120:25, 135:1
145:3, 145:13
147:7, 149:14
153:17, 157:12
161:2, 162:11
164:16, 176:9
184:14, 184:18
190:14, 196:16
**receiving** 70:22
112:3, 144:18
144:25, 162:4
**recognize** 63:10
90:2, 94:18
156:6, 172:14
177:15, 177:15
181:20, 181:22
200:14
**recollecting**
89:2
**recollection**
49:9, 49:11
90:10
**recommendati...**
149:9
**recommended**
149:19
**recommending**
44:17
**record** 3:17, 4:6
4:19, 52:9, 53:3
53:4, 53:6, 53:7
61:10, 62:18
62:21, 62:24
62:25, 63:3
63:7, 70:3, 73:8
76:11, 79:11
79:12, 79:13
83:5, 87:9
103:20, 103:21
103:22, 112:15
127:3, 127:4
127:5, 138:17
139:16, 147:20
172:9, 172:11
172:12, 172:13
184:5, 184:6
184:8, 190:1
205:17, 205:20
205:21, 205:22
205:23, 208:9
208:11, 209:2
210:3
**RECORDER**
3:16, 4:5, 4:17
52:25, 53:2
53:4, 53:7, 60:1
60:3, 62:17
62:20, 62:25
63:5, 63:7
79:11, 79:13
103:20, 103:22
127:3, 127:5
172:11, 172:13
176:3, 184:5
184:8, 205:21
205:23, 209:2
**recording** 4:1
**records** 45:1
45:15, 46:6
67:20, 70:8
70:14, 71:4
72:7, 73:6, 73:9
73:19, 73:24
76:12, 76:19
77:4, 77:4
77:18, 77:19
78:4, 78:5
78:14, 78:15
78:24, 113:13
120:20, 130:7
130:13, 140:1
140:1, 141:5
160:13, 163:9
163:22, 164:6
168:10, 173:14
173:18, 173:25
174:21, 176:10
176:19, 177:10
177:13
**recruiting** 20:10
**refer** 35:12
59:3, 122:21
162:12, 162:15
174:25, 178:12
**reference** 68:10
**referral** 31:20
34:22, 35:3
35:8, 35:11
35:14, 37:20
38:8, 38:11
39:21, 40:4
42:4, 42:11
42:15, 46:21
46:24, 46:24
46:25, 47:4
47:8, 47:8
47:12, 48:1
54:20, 54:21
54:22, 71:24
87:18, 87:22
90:5, 90:23
91:15, 151:17
152:14, 177:19
198:11, 202:10
**referrals** 47:2
87:13, 89:9
**referred** 73:10
92:21, 100:18
101:2, 105:5
109:3, 109:21
122:11, 122:15
124:22, 132:20
178:13, 178:17
198:5
**referring** 41:23
68:18, 69:11
92:18, 122:12
131:12, 131:14
131:18, 132:2
156:22, 157:5
177:20, 178:19
186:15, 186:20
187:15, 202:10
**refers** 121:1
139:20, 139:22
141:10, 144:20
186:23
**reflect** 4:19
**refresh** 90:10
**refuse** 28:19
115:13
**refused** 116:13

**refusing** 27:19 125:2, 126:4 146:5, 154:19
**refute** 191:22
**regard** 47:4
**regarding** 5:16 15:19, 23:2 23:6, 23:14 24:6, 24:16 25:14, 25:25 26:12, 27:19 27:20, 28:8 28:11, 28:16 28:19, 28:23 28:24, 31:12 31:25, 34:9 34:14, 34:23 42:14, 43:2 45:1, 47:12 48:9, 50:12 51:2, 53:13 53:16, 54:6 68:21, 71:25 72:20, 73:2 77:4, 78:1 82:23, 86:18 87:7, 92:25 93:24, 113:25 114:15, 117:20 123:5, 130:6 145:22, 166:23 178:8, 196:25 200:11, 202:24 204:7, 204:16 206:20
**regular** 8:1 10:1, 12:23
**Reierson** 1:15 1:16, 3:9, 3:24 3:24, 4:14, 4:20 4:25, 5:5, 63:10 68:13, 113:4 127:6
**reimbursement** 120:17
**reinstated** 120:13, 120:15 132:25, 160:18
**relate** 109:21 115:16, 115:16 194:7
**related** 15:4 25:5, 115:19 149:17, 150:23 151:3, 151:6 167:10, 167:15 179:1, 190:12 190:15, 202:20 204:25, 207:19
**relates** 136:3 173:15
**relating** 71:19 72:8, 166:23 178:25
**relation** 15:19
**relayed** 179:8
**relaying** 194:20
**release** 55:10 55:21, 55:21 63:15, 66:10 67:10, 67:18 67:19, 68:24 69:1, 69:6, 70:7 72:18, 72:19 73:21, 74:18 75:16, 76:24 109:8, 114:1 116:15, 117:20 120:19, 123:6 140:17, 140:18 141:1, 156:18 157:3, 159:5 160:12, 167:15
**released** 55:24 69:25, 70:12 70:24, 70:25 71:5, 71:7, 72:9 72:13, 100:14 101:7, 101:11 130:7, 173:14
**releases** 55:25 123:10
**relevant** 38:1 72:16, 73:7 73:14, 78:25
**reliance** 128:3
**relief** 160:24
**remedied** 160:25
**remember** 18:4 45:8, 80:17 176:4
**remiss** 193:14
**remotely** 193:17
**rep** 80:5, 80:8 80:12, 80:18 80:19, 80:23 81:22, 81:25 82:5, 82:10
**repeat** 25:7 98:25, 117:15 128:18, 146:14
**replaced** 29:23
**replayed** 70:3
**report** 18:10 30:8, 30:8 30:15, 30:23 31:5, 36:18 55:24, 95:20 100:20, 101:12 101:16, 144:20 144:22, 144:25 145:19, 147:6 150:11, 154:6 156:22, 177:1 184:12, 185:14 185:20, 187:12 193:24, 195:21 196:1, 196:6 196:16
**reported** 19:13 20:20, 21:19 22:11, 36:19 36:20, 85:13 204:5
**reporter** 6:5
**reporting** 30:11 86:25, 155:5
**reports** 31:1
**represent** 64:20 113:5, 166:19
**representation** 165:20
**representative** 80:3
**representing** 110:3, 166:2 166:23, 167:9 168:1, 168:3
**request** 66:10 66:16, 66:16 68:23, 71:14 73:18, 76:18 110:13, 113:25 113:25, 120:16 120:16, 120:16 160:15, 198:19 199:8, 199:19
**requested** 76:11 105:21, 127:19 127:21, 131:2 160:17, 174:7 193:16
**requesting** 90:6 91:1
**require** 128:22 129:8, 129:17 140:8
**required** 4:17 44:24, 56:20 92:13, 104:15 109:1, 123:25 131:22, 132:8 134:19, 136:15 138:1, 138:10 139:14, 140:14 140:15, 164:24 191:15, 198:2
**requiring** 128:12, 130:21 136:5
**research** 11:18 11:19, 12:10 12:13, 12:17 12:23, 15:3
**reserve** 209:1
**resource** 20:9 183:10
**resources** 14:19 17:23, 30:2 30:15, 37:24 47:10, 48:1 51:14, 59:4 88:5, 96:16 100:15, 101:7 179:18, 183:20
**respect** 27:10 42:24, 74:16 77:13, 113:5 148:2, 163:11 166:3, 167:13
**respond** 49:22 104:20, 107:5 108:5, 108:8 110:22, 113:15 114:7, 114:7 118:9, 118:15 119:2, 123:25 124:23, 145:18 161:18, 164:14 164:15, 165:2
**responded** 53:20, 53:22 108:9, 109:14 109:24, 110:22 113:19, 117:8 117:9, 117:12 117:20, 118:4 118:6, 119:3 121:11, 121:15 121:18, 122:1 122:7, 122:22 123:1, 124:15 146:3, 161:7 164:12, 165:6 180:8
**responding** 110:10, 110:15 110:16, 110:24 124:1, 124:9

162:18, 162:19 165:21
**responds** 110:9 110:14
**response** 107:24 113:24, 120:12 120:25, 121:3 121:6, 160:18 164:16, 179:5
**responses** 180:18
**responsibilities** 20:6
**restored** 160:22
**restraining** 112:23, 160:24
**restriction** 195:20
**restrictions** 101:15, 149:20 200:18
**result** 123:1 160:17, 197:14
**results** 46:25
**resume** 12:18
**retained** 113:5 164:15, 165:6 165:11, 166:19
**retaliated** 159:10
**retaliation** 120:21, 159:7
**return** 17:10 20:13, 22:20 38:6, 101:14 104:18, 105:3 105:21, 113:9 127:22, 131:7 136:20, 149:19 155:17, 156:18 156:18, 157:3 160:21, 185:5 195:20, 200:18 200:25, 201:4 201:6
**returned** 43:13 104:23, 109:11 134:9, 170:23 191:11, 201:11 201:17, 201:19
**returning** 23:24 104:16, 109:2 126:10, 127:13
**returns** 139:22
**reverse** 101:3
**review** 33:2 33:5, 33:15 96:12, 104:17 109:10, 128:25 147:6, 170:6 171:14, 171:16 171:19, 198:7 201:22
**reviewed** 33:9 173:14
**reviewing** 73:14
**revoked** 13:21
**Rich** 11:8
**Richard** 2:12 2:13, 4:7
**Rick** 142:16 168:18, 205:3
**right** 4:2, 5:2 6:1, 6:7, 28:2 39:10, 48:5 54:19, 54:25 62:7, 62:12 62:18, 62:22 69:4, 80:16 84:25, 88:17 99:15, 99:24 106:24, 115:1 126:6, 129:4 130:1, 130:10 136:10, 139:6 142:3, 142:20 142:24, 143:20 143:22, 148:7 149:8, 156:4 156:12, 156:13 157:16, 158:5 161:24, 164:2 168:5, 175:1 177:6, 177:12 185:19, 186:16 189:12, 201:3 201:5, 201:23 207:2, 207:8
**rights** 159:9 163:10, 163:19
**risk** 36:2 195:15
**Rizzo** 205:9
**RN** 69:21
**Robin** 144:22 147:7, 147:20 147:24, 148:6 148:10
**role** 193:10 204:3
**room** 2:23, 3:5 180:24
**routine** 179:5
**rule** 123:24 124:7, 137:13 137:19
**rules** 4:22, 4:22
**run** 160:11

**S**

**S-h-i-n-n-a-w-i** 21:2
**safely** 195:18
**safety** 148:17 193:6, 195:15
**salary** 120:15 120:15, 120:17
**Sarah** 3:10, 4:13 143:1
**sarcastic** 119:1
**sat** 36:2
**Saturday** 156:12
**saw** 57:19 112:12
**saying** 27:3 80:17, 101:17 108:4, 120:25 124:7, 129:13 136:24, 138:1 138:9, 143:7 194:19, 196:16
**says** 52:9, 63:22 66:9, 66:16 68:15, 69:6 69:20, 70:20 70:25, 71:3 71:14, 85:8 90:25, 91:11 93:20, 95:3 96:9, 98:17 100:11, 101:6 105:14, 105:14 105:15, 111:16 112:11, 116:1 116:12, 128:9 131:6, 134:2 134:15, 134:21 134:25, 138:14 141:21, 148:18 167:17, 174:1 174:10, 178:19 178:24, 184:20 186:21, 194:17 203:22
**Scharf** 3:11
**scheduled** 46:8 178:18, 182:7
**scheduling** 140:3
**school** 11:7 11:8, 11:17 11:20, 12:3 12:10, 12:21 12:22, 12:24 61:8
**science** 11:1
**scope** 72:21 74:9, 123:9 128:14, 129:10 160:13, 162:5
**Scouffas** 26:2 27:25, 28:7 28:12, 28:14 28:20, 114:13
**screamed** 85:10
**screaming** 180:22
**se** 190:15
**Sean** 169:9 169:11, 170:24
**second** 19:16 53:8, 62:24 64:14, 127:7 133:18, 134:12 150:6, 159:23 160:8, 160:9 168:6, 172:10 185:25, 186:11 187:15, 187:17 188:6
**Security** 64:3 66:3
**see** 39:6, 52:16 60:19, 67:20 68:7, 69:9 71:16, 86:11 86:14, 91:7 95:21, 96:9 96:12, 100:15 103:23, 109:25 119:6, 133:19 141:8, 142:3 142:22, 144:20 144:23, 157:10 163:6, 165:15 167:7, 171:14 172:16, 200:13 201:20, 205:5 205:8, 208:1
**seeing** 99:25
**seek** 25:14 27:15, 28:7 114:15
**seeking** 27:8 73:9, 77:25 145:18, 160:24
**seen** 69:5, 94:20 94:22, 95:13

99:21, 104:2
106:3, 108:12
111:9, 112:5
118:5, 119:7
143:25, 169:6
172:15, 172:25
173:2, 181:23
184:9, 202:3
206:15
**seething** 180:14
**select** 45:23
**selected** 70:11
140:4, 150:22
**send** 40:3, 54:25
105:20, 110:13
111:6, 151:8
151:17, 152:12
152:14
**sending** 43:18
110:6
**senior** 15:10
15:12, 15:14
15:16, 15:24
16:1, 16:4
**sense** 37:19
**sent** 23:8, 33:7
40:17, 47:5
47:10, 55:2
55:7, 88:3
100:24, 104:5
106:1, 108:15
108:18, 109:14
112:8, 112:9
112:11, 119:19
119:20, 120:11
142:18, 145:11
156:13, 157:19
159:3, 165:9
177:19, 182:19
184:13, 190:20
191:13, 196:3
**sentence** 120:24
131:11, 163:11
163:13, 163:16
178:25, 179:2
179:13, 179:14
186:1, 186:18
192:17
**separate** 55:25
82:1, 196:24
197:13, 199:15
199:20
**September** 1:18
3:17, 17:15
38:23, 51:21
57:14, 58:10
76:8, 93:17
93:21, 182:3
182:9, 182:10
183:11, 185:15
185:16, 186:24
187:1, 187:14
188:15, 200:22
210:8
**sergeant** 202:19
**series** 5:15
191:25
**serve** 8:10
**services** 17:8
20:14, 29:6
29:11, 29:18
152:17, 183:10
**session** 80:23
**set** 46:7, 174:21
193:3, 194:2
194:20
**setting** 45:15
160:14
**settle** 193:10
**settled** 126:8
127:11
**seven** 127:22
131:7
**sex** 148:1
**sexual** 14:9
14:17, 14:25
15:3, 15:4, 95:4
**share** 82:15
**she'd** 92:25
93:5
**Shelby** 3:9, 4:14
36:15, 36:18
37:14, 41:10
41:16, 43:12
44:1, 44:10
44:18, 45:12
56:14, 58:12
63:21, 65:17
65:24, 69:21
71:4, 71:8, 72:9
73:1, 74:17
75:1, 76:22
80:8, 81:10
81:12, 82:23
85:4, 86:11
87:6, 87:11
89:4, 92:11
92:22, 97:2
104:14, 104:18
104:23, 105:9
107:3, 107:5
107:11, 109:1
109:12, 109:12
111:13, 111:24
113:4, 116:13
119:11, 173:19
177:9, 178:1
180:11, 189:3
198:2, 200:20
**Shelby's** 36:22
177:22
**sheriff** 4:14
28:3, 90:13
159:8, 159:11
176:25, 181:16
**sheriff's** 11:13
16:24, 17:1
18:6, 18:25
19:1, 26:5, 26:7
29:2, 29:5, 34:3
34:4, 34:10
36:23, 37:3
46:13, 55:24
57:25, 66:6
67:18, 68:5
69:2, 69:20
70:1, 70:8
70:13, 70:13
71:1, 71:3, 71:7
72:9, 86:9
87:15, 88:20
89:7, 94:23
95:3, 95:8
104:14, 106:9
106:25, 108:25
113:6, 113:11
114:16, 120:1
128:25, 132:6
132:21, 136:5
139:13, 139:17
140:7, 150:3
150:9, 150:12
151:10, 152:19
152:20, 155:3
158:7, 158:24
159:7, 160:19
163:8, 163:21
164:17, 167:14
168:8, 169:19
172:23, 173:4
173:6, 174:19
176:9, 176:17
177:8, 177:20
182:23, 183:3
183:5, 196:17
197:2, 197:18
198:1, 198:6
198:19, 199:16
199:17, 199:24
200:2, 202:19
**Shinnawi** 20:24
21:2
**short** 79:20
81:6, 188:11
206:2
**shorten** 165:25
**shortly** 184:16
**shoulder** 49:23
**show** 64:21
68:11, 82:13
90:1, 94:6
99:20, 104:1
108:11, 119:6
150:17, 155:25
169:5, 201:20
205:25
**showing** 121:17
122:1, 122:6
185:8
**shown** 63:4
63:9, 118:5
**shows** 83:6
165:24, 186:7
186:17
**sic** 29:10, 62:25
66:25, 69:25
112:3, 112:8
147:12, 147:13
148:19, 151:10
153:4, 153:4
174:8
**sick** 102:16
102:25, 103:3
103:5, 103:12
160:10
**side** 38:13, 39:2
39:13, 197:8
**sign** 56:1, 64:8
75:18, 116:14
127:20, 127:21
127:22, 128:13
128:22, 129:8
129:18, 130:21
131:6, 131:22
132:8, 133:24
134:19, 136:5
136:15, 138:1
138:10, 139:14
140:8, 159:5
160:12
**signature** 209:1
**signed** 36:19
48:25, 72:7
75:15, 104:22
106:3, 132:4
132:9, 133:11
140:18, 156:18
157:3, 172:17
**significant**
191:9

**signing** 75:9 104:17, 109:11 133:3, 133:7 133:11
**signs** 114:1 140:25, 140:25
**similar** 19:22 21:14, 22:7 39:1
**similarly** 190:16 195:11
**simply** 77:10 193:13
**single** 24:9
**sit** 24:3, 24:9 47:11, 53:22 78:12, 84:20 149:21, 153:2
**sits** 192:20
**sitting** 180:15
**situation** 23:11 37:22, 37:25 38:4, 40:25 59:2, 71:25 72:17, 101:4 110:12, 115:19 131:3, 170:19 171:14, 190:10 196:14, 197:24 198:13
**six** 162:24 191:19
**sixth** 164:10 164:11
**skip** 163:17
**skipping** 162:22 163:16
**Social** 64:3, 66:2
**solely** 85:2 178:22
**somebody** 35:15 58:14, 124:23 135:13, 138:20 153:19, 188:2
**someone's** 78:17
**somewhat** 87:18
**soon** 84:11 119:24, 160:11
**sorry** 10:5 10:12, 10:13 16:12, 16:17 19:16, 25:7 32:20, 38:17 45:7, 68:1 69:12, 78:8 88:15, 91:10 98:25, 99:23 106:14, 107:12 117:15, 118:24 121:24, 124:18 125:6, 127:15 128:18, 129:2 129:7, 130:14 132:24, 134:3 139:22, 140:23 144:4, 146:24 151:14, 151:18 152:9, 152:11 155:9, 156:25 159:22, 167:5 168:6, 169:1 169:18, 169:25 174:14, 175:23 176:1, 176:12 176:13, 176:20 176:23, 189:1 189:13, 190:24 199:6, 202:14
**sounds** 148:2 207:4
**South** 69:21 69:22
**span** 79:21 79:22
**speak** 84:2 164:24, 170:2
**speaking** 180:4 196:24
**special** 160:16
**specialist** 12:18
**specific** 23:13 23:17, 23:20 24:4, 24:8, 25:9 51:6, 53:17 64:17, 64:18 68:4, 71:24 72:2, 73:21 131:16, 180:5
**specifically** 24:6 24:24, 25:5 25:10, 35:10 37:10, 42:19 43:22, 43:22 50:2, 50:4 50:11, 53:12 53:23, 73:7 73:13, 88:24 114:9, 120:9 122:12, 122:15 138:14, 169:8
**speculation** 41:4 75:21, 93:3 96:4, 96:19 97:6, 98:14 107:20, 113:21 121:22, 123:13 139:9, 162:14 181:9, 195:25
**spell** 5:4, 17:24 20:24, 21:11 21:21, 30:21 36:16
**spend** 12:1 188:12
**spoke** 49:16 83:25
**spot** 63:22, 64:3 66:9
**spring** 18:3
**staff** 31:14, 61:1 90:8, 90:12 90:13, 90:14 90:17, 203:18
**stamp** 69:17 69:18
**stamped** 112:16 112:19, 142:2 162:21
**standard** 68:3
**start** 7:1, 9:1 11:14, 11:16 144:1, 146:10 163:1, 188:6 206:2
**started** 17:13 56:10, 89:6 132:11
**starting** 164:10 189:18, 193:1
**starts** 160:8 163:2
**state** 1:23, 2:6 2:14, 3:19, 4:6 5:4, 13:13 191:9
**State's** 2:21, 3:3
**stated** 20:8 51:25, 166:10 186:5
**statement** 25:6 48:25, 49:3 50:23, 54:15 59:19, 72:7 72:22, 84:5 84:10, 85:3 91:5, 116:5 116:6, 128:9 134:17, 158:2 158:8, 158:14 158:17, 158:21 158:25, 163:20 163:23, 163:25 165:1, 165:5 165:7, 171:9 179:9, 182:24 183:1, 186:8
**states** 1:1, 176:6 202:5
**stating** 67:15
**status** 32:5 57:22, 135:5 135:8, 155:2 155:14, 170:15 170:17, 171:6 201:7, 201:11
**stay** 52:1, 70:17
**stayed** 81:5
**step** 24:2, 44:14
**stepped** 92:21
**steps** 44:18 114:25
**sticker** 60:11 205:4
**stickers** 59:25
**stole** 156:25
**stop** 12:7
**story** 38:14 39:2, 39:14
**straight** 173:3
**Street** 1:23, 2:6 2:14, 2:22, 3:4 3:19, 7:2, 10:2
**strictly** 46:14
**strike** 134:7
**struck** 50:8
**struggling** 37:23
**study** 11:22 13:7
**subject** 23:21 34:5, 47:7, 62:5 131:23, 133:24 134:17, 171:8 206:7
**subjected** 87:25 190:19
**subjecting** 127:25, 131:10
**submit** 197:4 197:16, 198:3
**submitted** 96:10
**suffers** 195:11
**sufficient** 150:11, 153:13 154:10, 165:21
**suggest** 149:18 165:4, 193:5
**suggested** 149:6
**suggesting** 49:10
**suggests** 164:13

165:2
**suit** 120:16 159:7, 160:23
**Suite** 1:24, 2:7 2:15, 3:13, 3:19
**summarizes** 187:13
**summary** 84:6 84:7
**summer** 30:20
**super** 82:25
**superintendent** 42:17, 43:3 47:17, 47:18 47:22, 49:16 50:1, 51:10 51:25, 52:1 52:9, 52:12 81:5, 81:6 82:23, 83:1 83:5, 83:5, 83:6 83:18, 83:20 85:13, 91:6 109:4, 120:22 178:22, 179:1 179:10, 189:3 193:8, 194:24
**superintendents** 204:4
**superior** 179:5
**supervise** 20:15
**supervisor** 17:19, 18:1 18:2, 18:5, 18:8 22:24, 59:1 98:5, 159:12 203:21, 203:25
**supervisors** 35:6, 92:1
**supervisory** 204:3
**supplement** 201:25
**support** 37:24 61:1, 128:12 159:10, 179:8 187:21, 192:12 202:8
**supported** 128:3 128:11
**sure** 5:5, 21:12 37:23, 52:7 58:25, 79:9 98:1, 103:15 103:16, 103:18 103:25, 112:25 126:25, 181:4 181:10, 184:1 186:13, 195:1
**suspect** 57:12
**suspended** 13:20
**suspension** 190:10
**swear** 16:14 16:14
**sworn** 4:4
**system** 37:24 107:2

**T**

**T-e-r-e-s-a** 22:5
**tail** 144:6
**take** 5:12, 5:13 5:24, 13:9, 14:2 15:25, 28:10 31:1, 44:13 52:22, 58:17 58:22, 59:5 65:20, 78:1 79:8, 83:21 85:12, 87:3 98:2, 98:4 101:3, 101:10 118:15, 119:2 119:15, 122:18 126:3, 126:24 140:6, 146:7 147:4, 158:18 164:2, 184:4 187:20, 201:21 208:8
**taken** 4:20, 5:7 36:1, 58:23
**talk** 6:6, 23:11 26:17, 38:10 40:15, 42:14 44:6, 48:9 48:15, 51:2 65:7, 74:24 75:2, 75:15 92:25, 133:23 198:12
**talked** 26:11 27:16, 32:6 53:9, 54:20 55:5, 84:9 86:17, 86:22 86:23, 87:4 141:6, 159:15
**talking** 25:3 25:8, 35:23 37:10, 39:6 39:12, 53:19 66:20, 67:8 79:23, 83:24 86:2, 156:1 159:19, 179:20
**tandem** 177:25
**Tapia** 91:8
**tapped** 49:23
**Tarry** 91:14
**tasks** 22:25
**telephone** 75:6 83:12, 202:6
**tell** 27:1, 42:10 49:5, 67:16 68:14, 68:22 97:18, 99:13 143:19, 145:25 154:12, 154:15 159:21, 192:4
**telling** 125:18
**temporary** 112:23, 160:24
**ten** 95:16, 103:5 103:5, 103:6 107:17, 188:12
**Teresa** 22:5
**term** 208:2
**termination** 128:1, 131:11
**terms** 140:15
**terrible** 151:24 176:16
**testifying** 50:18
**testimony** 8:1 10:1, 67:14 72:11, 124:7 132:4, 150:20 182:12
**thank** 4:5, 33:12 94:10, 142:13 144:6, 156:16 162:22, 204:12 208:16, 208:21
**Thanks** 82:17 144:10, 169:25 184:24
**Theresa** 30:17 30:23, 32:9
**thesis** 12:2, 12:4 12:5
**thing** 66:2 84:17
**things** 14:23 15:19, 17:11 62:11, 65:8 80:7, 143:8 181:14, 192:1
**think** 12:17 17:13, 19:21 22:3, 23:8 24:20, 26:20 27:2, 27:5, 27:6 27:11, 32:4 36:1, 42:3 46:19, 48:7 49:23, 50:6 50:14, 52:6 53:9, 61:4, 61:8 61:11, 62:11 78:9, 83:1 83:25, 88:16 94:11, 118:21 118:23, 127:7 129:3, 129:22 129:25, 131:18 132:9, 133:18 142:19, 142:20 143:16, 146:2 147:23, 151:12 154:13, 154:16 155:13, 155:13 156:1, 156:3 158:17, 159:18 164:3, 165:13 165:13, 170:8 171:17, 171:22 176:2, 180:21 181:14, 185:7 187:24, 188:1 188:9, 200:7 201:3, 201:24
**thinking** 148:1
**thinks** 175:15
**third** 21:18 40:4, 45:13 45:23, 88:2 127:15, 128:6 150:21, 159:16 187:18
**Thomas** 3:8 202:16
**thought** 29:21 38:5, 40:17 59:8, 171:25
**thousand** 16:11 16:15
**threat** 58:16 193:5
**threaten** 180:10
**threatening** 109:6
**three** 22:3, 33:1 71:16, 88:12 105:16, 108:19 129:3, 129:3 174:5, 174:18

176:5, 176:22
176:25
**time** 3:18, 4:2
5:17, 5:22
13:18, 14:11
14:18, 15:22
18:5, 20:4
25:16, 36:3
40:14, 45:10
56:25, 58:10
58:11, 73:22
74:17, 74:22
79:14, 79:17
79:18, 79:21
81:18, 82:1
87:15, 88:2
95:24, 96:15
101:20, 101:24
101:24, 102:2
102:5, 102:10
102:13, 102:15
103:8, 103:11
104:20, 105:1
107:11, 107:22
107:25, 107:25
108:3, 108:3
108:8, 109:16
110:2, 117:12
119:16, 119:23
120:5, 120:8
120:14, 120:17
127:19, 128:14
129:10, 129:11
130:1, 135:1
135:1, 135:4
135:10, 142:10
142:10, 155:18
159:18, 160:10
160:13, 160:17
160:22, 162:5
170:8, 170:19
171:18, 171:22
178:1, 180:15
184:3, 190:18
191:10, 193:12
193:17, 195:14
203:25, 208:17
**times** 5:10, 5:11
71:9, 78:9
95:13
**timesheet** 36:20
171:7
**timing** 110:6
193:15
**tired** 176:16
**title** 12:16
15:25, 19:20
21:14, 21:22
26:4, 29:13
29:15, 29:25
31:17, 36:22
169:13
**today** 3:17, 3:24
24:3, 32:19
47:11, 53:22
78:12, 88:12
94:20, 149:21
153:3, 192:20
**today's** 32:19
33:3
**told** 48:22
49:13, 50:19
50:25, 57:1
81:2, 98:11
107:7, 116:8
118:15, 119:2
188:24, 188:25
192:1, 194:5
194:20, 194:24
**tone** 180:17
**top** 63:22, 70:25
96:9, 111:16
**topic** 26:21
**topics** 27:20
28:16
**tops** 80:6
**touch** 42:25
43:3
**track** 198:10
**training** 15:2
15:18
**traits** 190:4
**transcribed**
189:16
**transcript** 6:6
210:3
**transmitted**
185:9
**treated** 57:14
**treatment** 71:20
195:10
**trembled** 85:9
**trial** 60:15
60:17, 61:8
190:2
**tried** 51:4, 51:5
52:1, 75:4
143:1, 190:1
**true** 56:19, 75:8
98:18, 99:2
99:18, 101:3
110:2, 112:20
116:4, 116:6
116:15, 117:7
132:18, 136:14
136:25, 158:19
164:25, 168:6
197:3, 197:20
197:20, 198:21
198:21
**trusted** 89:22
**try** 6:4, 37:19
44:2, 44:6
56:22, 81:14
123:4, 123:9
132:12, 198:12
**trying** 45:8
75:2, 129:24
133:1, 146:11
**Tuesday** 182:10
**turn** 162:20
185:24, 189:9
189:17, 193:21
**turned** 140:15
**Turrise** 204:10
204:11, 204:12
204:13
**twice** 79:20
**two** 8:7, 12:2
16:11, 16:15
18:19, 18:21
33:1, 41:12
41:19, 44:2
47:2, 55:25
56:2, 74:4, 75:4
82:1, 82:14
84:11, 88:23
88:25, 91:7
91:16, 109:20
113:2, 132:13
132:19, 134:22
141:23, 142:9
181:14, 182:7
182:14, 188:2
188:12, 191:12
199:15, 206:6
**type** 14:23, 39:1
45:20, 46:12
46:21, 55:12
56:14, 73:9
74:9, 84:1
85:18, 85:20
86:17, 86:18
86:18, 91:19
94:2, 94:22
94:25, 95:6
95:17, 100:2
102:13, 103:11
117:1, 130:7
130:13, 137:15
149:2, 181:22
**typed** 83:14
83:25, 86:22
**typical** 172:22
**typically** 25:1
26:2, 28:9
34:22, 35:5
44:8, 46:25
65:3, 66:24
67:4, 67:22
74:2, 74:9
80:15, 91:21
92:2, 92:3, 92:6
95:6, 101:5
105:21, 106:11
106:15, 117:2
**typing** 62:16
83:23

## U

**Uh-huh** 155:24
**ultimate** 150:1
**ultimately**
190:12, 191:13
**unable** 38:2
**unauthorized**
105:2, 127:25
131:10, 135:2
135:5, 135:9
135:14, 135:21
135:25, 170:15
170:21, 171:3
171:4, 171:5
171:11
**unbelievably**
192:15
**uncomfortable**
180:24
**undergo** 40:7
41:20, 56:20
57:6, 65:5, 88:8
92:13, 100:19
104:15, 109:1
126:10, 127:13
196:19
**undergone**
196:7
**undergrad**
11:17
**underlying**
176:19
**underneath**
20:17, 20:19
31:4, 149:8
**understand**
5:17, 55:18
70:5, 113:7
131:5, 134:23
147:2, 154:22

167:18, 186:22
194:14, 198:17
**understanding**
124:23, 167:24
168:2, 174:19
191:16
**understands**
52:8
**understood** 5:19
115:12, 126:3
146:7, 146:12
146:17
**unfair** 188:9
**union** 15:17
80:2, 80:5, 80:8
80:12, 80:14
80:15, 80:17
80:19, 80:23
81:22, 81:25
82:5, 82:10
**unit** 190:11
**UNITED** 1:1
**units** 191:12
**University** 11:4
11:21, 12:6
12:25
**unlawful** 113:14
128:2, 128:10
159:5, 160:15
168:11
**unnecessarily**
180:23
**unpaid** 155:6
160:10
**unquote** 135:21
**unsure** 126:15
**untrue** 192:19
**unusual** 181:11
**updates** 23:10
**upset** 50:14
**use** 45:23, 46:1
64:5, 78:25
95:11, 101:24
102:5, 102:10
102:13, 102:22
103:5, 103:7
149:12, 150:21
155:19, 172:23
202:8
**useful** 97:1

**V**

**vacation** 102:16
102:17, 102:23
103:12, 160:10
160:22
**value** 158:18
**venue** 3:22
**verbal** 190:13
**verbally** 45:12
186:4, 186:25
**verbatim** 84:5
**version** 48:4
48:8, 84:18
98:10, 112:16
156:25, 187:13
**versions** 112:19
**versus** 46:24
47:8, 98:3
135:25
**videos** 33:19
**videotapes**
33:17
**violated** 159:8
**violates** 159:6
163:10, 163:19
**violation** 163:10
163:19
**violent** 49:24
50:3, 50:4
**voice** 107:4
180:20, 180:21
**voicemail**
104:19, 107:6
107:8, 107:12
107:15, 108:4
108:5
**vs** 1:9

**W**

**W-i-l-l-e-t-t-e**
22:13
**W-i-n-i-f-r-e-d**
36:17
**W-r-i-g-h-t**
19:18
**W-y-l-o-l-a** 21:1
**Wacker** 3:12
**Wait** 63:6
175:14, 199:22
208:11
**waiver** 127:9
128:23
**want** 5:22, 10:5
27:4, 49:8
52:18, 53:8
60:3, 60:6
62:23, 80:8
84:16, 94:6
103:15, 105:7
112:14, 112:22
128:19, 128:19
134:3, 134:10
142:7, 143:3
161:21, 165:12
165:17, 168:2
188:4, 188:12
189:9, 193:21
201:21, 205:19
205:25
**wanted** 75:15
76:20, 80:11
80:17, 95:25
96:24, 112:25
116:9, 123:17
136:10, 137:9
164:6
**Washington**
2:22, 3:4
**water** 144:7
**way** 32:10
32:15, 32:16
33:9, 34:16
43:11, 47:25
49:24, 50:3
50:5, 50:16
50:25, 72:19
92:18, 93:14
102:1, 105:18
105:24, 106:13
130:1, 130:12
130:14, 135:10
153:3, 153:10
153:10, 180:3
180:8, 186:18
189:6, 192:25
**ways** 105:17
108:19
**we've** 22:3, 83:4
173:3
**weapon** 58:18
**week** 120:14
120:16
**weekends**
156:12
**Weekly** 25:19
**weeks** 104:7
179:17, 191:19
**went** 11:8, 11:17
31:20, 48:17
49:20, 53:9
57:19, 61:7
105:16, 132:14
138:9
**West** 2:22, 3:4
3:12
**whatsoever** 72:8
87:3
**White** 21:20
206:16, 206:24
**Willette** 22:13
**Williams** 17:20
17:21, 18:6
18:10, 19:10
20:3, 22:21
23:4, 23:6
23:14, 24:4
24:10, 24:19
25:10, 29:20
31:21, 53:10
53:13, 91:14
92:3, 92:6
92:15, 92:25
**Winifred** 3:9
36:15, 69:21
71:4, 71:8
104:14, 109:1
111:24
**witness** 3:23
4:4, 16:14
26:24, 30:22
33:6, 40:2
60:22, 69:14
97:11, 97:13
97:15, 99:10
115:8, 118:25
124:18, 125:25
126:15, 126:17
126:21, 126:23
134:6, 134:14
140:23, 148:4
148:6, 149:13
151:22, 152:5
152:7, 155:9
167:2, 169:1
170:11, 171:25
172:8, 174:12
174:14, 175:3
175:5, 175:7
175:24, 176:12
183:24, 184:2
184:4, 189:10
202:14, 205:6
207:5, 208:21
**witnessed**
202:23
**woman** 147:21
**word** 24:14
24:14, 98:4
208:1
**words** 24:25
126:11, 126:19
128:6, 128:7
131:5, 152:3
168:23
**work** 12:14

14:13, 17:10 18:12, 19:23 20:13, 22:20 23:25, 38:6 40:13, 43:13 47:17, 47:24 51:24, 58:6 81:3, 92:22 100:14, 100:20 101:3, 101:6 101:14, 101:18 102:20, 102:22 104:20, 105:2 105:3, 109:16 113:9, 120:2 123:5, 126:11 127:14, 149:17 149:19, 153:14 155:5, 155:17 156:18, 160:21 169:20, 170:23 185:5, 195:8 199:24, 200:19 201:1, 201:4 201:18
**worked** 11:18 14:9, 16:20 26:7, 31:16 34:23, 94:23 102:24, 103:9 123:14, 191:12 191:17
**workers** 173:3
**working** 35:1 36:9, 59:15 61:2, 89:5 103:8, 120:6 156:12, 177:25 190:20, 201:12 201:13
**works** 169:12
**worth** 102:17
**wow** 174:14
**Wright** 19:16
**write** 59:11 60:3, 60:5 126:7, 159:14 164:22, 166:21 168:14, 186:10
**writing** 164:23
**written** 34:13 43:16, 44:23 72:19, 87:9 115:23, 123:24 124:7, 124:11 130:1, 130:12 137:25, 138:15 138:17, 138:21 139:12, 154:13 154:17, 190:14 193:20
**wrong** 72:12 136:14, 183:2
**wrote** 107:9 107:15, 108:1 110:3, 117:19 126:12, 126:19 149:6, 149:25 158:6, 167:13 170:25, 188:2 193:23, 201:5
**Wylola** 20:24

**Y**

**yeah** 10:11 24:13, 26:7 27:5, 27:14 35:25, 39:22 40:22, 52:22 58:25, 60:1 60:14, 60:24 60:24, 63:2 69:12, 72:24 73:23, 78:16 79:6, 82:16 88:24, 94:8 96:20, 96:22 98:1, 99:17 103:25, 106:3 110:21, 111:21 114:22, 114:23 119:19, 120:7 126:25, 127:1 127:2, 128:19 129:6, 137:11 137:19, 138:13 140:12, 141:12 142:25, 143:6 143:13, 143:16 143:21, 144:14 145:10, 146:22 149:1, 149:24 152:1, 152:4 153:7, 157:16 158:4, 161:15 163:25, 165:18 168:17, 172:4 172:9, 174:13 175:1, 177:12 183:8, 184:19 185:17, 188:21 191:6, 192:16 192:21, 194:16 196:4, 196:13 201:24, 203:20 204:3, 208:10 208:12
**year** 11:5, 11:11 12:6, 15:12 88:12, 88:18 190:5
**years** 10:3 10:18, 12:1 12:2, 12:14 13:1, 14:13 16:20, 74:13 190:15

**Z**

**zeros** 162:23 162:24

**0**

**0:01:29** 5:1
**0:02:22** 6:2
**0:03:16** 8:13
**0:04:17** 11:3
**0:05:13** 11:23
**0:06:01** 12:15
**0:07:02** 13:19
**0:07:56** 14:22
**0:08:44** 15:13
**0:09:46** 16:8
**0:11:04** 17:12
**0:12:15** 18:7
**0:13:14** 19:12
**0:14:29** 20:16
**0:15:41** 21:17
**0:16:58** 22:23
**0:17:56** 23:16
**0:19:08** 24:18
**0:20:10** 25:18
**0:21:05** 26:16
**0:22:06** 27:22
**0:23:03** 28:25
**0:24:06** 29:19
**0:25:07** 30:17
**0:25:59** 31:9
**0:27:06** 32:8
**0:28:03** 33:4
**0:28:59** 33:20
**0:29:50** 34:7
**0:30:34** 34:20
**0:32:19** 36:5
**0:33:24** 37:8
**0:34:37** 38:9
**0:35:46** 39:22
**0:36:52** 40:25
**0:37:45** 41:22
**0:38:39** 42:13
**0:39:37** 43:5
**0:40:27** 43:15
**0:41:23** 44:11
**0:42:36** 45:6
**0:43:29** 46:2
**0:44:34** 46:22
**0:45:32** 47:19
**0:46:29** 48:11
**0:47:12** 49:14
**0:48:20** 50:10
**0:49:14** 51:4
**0:50:14** 52:4
**0:51:03** 53:14
**0:52:05** 54:18
**0:53:00** 55:14
**0:53:57** 56:12
**0:54:53** 57:3
**0:55:35** 57:18
**0:56:38** 58:13
**0:57:45** 59:10
**0:58:45** 60:7
**0:59:57** 62:22
**000059** 142:2
**000060** 142:3
**06** 16:10, 16:16

**1**

**1** 63:10, 68:21 68:22, 69:11 75:10, 105:6 109:22, 129:2 129:4, 129:7 129:9, 129:19 130:2, 131:12 131:23, 132:5 133:12, 134:19 136:6, 138:2 138:11, 139:15 140:9, 141:1 142:6, 142:22 156:6, 157:5 173:18, 174:24 175:1, 175:10 175:19, 175:20 176:8, 177:7 177:8, 177:8
**1:00:57** 63:24
**1:01:59** 64:24
**1:03:04** 65:19
**1:03:51** 66:14
**1:04:52** 67:14
**1:06:01** 68:13
**1:06:54** 69:3
**1:07:59** 70:2
**1:08:59** 70:15
**1:10:30** 71:17

**1:11:33** 72:12
**1:12:42** 73:12
**1:13:46** 74:12
**1:14:51** 75:11
**1:16:02** 76:9
**1:16:53** 77:1
**1:18:07** 78:2
**1:19:11** 79:6
**1:19:31** 79:16
**1:20:02** 80:6
**1:2017cv02393** 1:9, 3:22
**1:21:14** 81:9
**1:22:22** 82:8
**1:23:22** 83:7
**1:24:24** 84:7
**1:25:37** 85:15
**1:26** 127:5
**1:26:37** 86:16
**1:27:37** 87:12
**1:28:30** 87:23
**1:29:43** 88:19
**1:30:40** 89:13
**1:31:38** 90:3
**1:32:39** 90:24
**1:33:43** 91:17
**1:34:46** 92:14
**1:35:33** 93:7
**1:36:38** 93:22
**1:37:51** 94:19
**1:38:58** 95:22
**1:39:56** 96:21
**1:41:26** 96:25
**1:42:28** 98:6
**1:43:36** 99:8
**1:44:56** 99:23
**1:45:43** 100:16
**1:46:55** 101:19
**1:48:00** 102:19
**1:48:51** 103:13
**1:49:41** 104:9
**1:51:05** 105:8
**1:52:01** 106:6
**1:53:11** 107:7
**1:54:12** 108:10
**1:55:36** 108:21
**1:57:03** 109:23
**1:57:56** 110:18
**1:59:14** 111:10
**10** 119:6, 185:24 187:12, 189:17 193:22, 195:5
**10/19/17** 184:20
**10/20/70** 6:10
**10:07** 3:18
**10:58** 53:4
**11** 125:5, 127:6 139:19
**11/18/16** 104:21 105:2, 191:21 193:16
**11/30** 107:4
**11/30/16** 104:19
**11/8/16** 104:12
**11:06** 53:7
**11:13** 62:25
**11:15** 63:1
**11:17** 63:7
**11:36** 79:11
**11:44** 79:13
**11:52** 156:13
**11th** 171:5 182:9
**12** 16:20, 142:11 143:25, 145:1 145:14
**12/21/16** 117:21 117:25
**12/5/16** 104:23
**12:14** 103:20
**12:17** 103:22
**12:46** 127:3
**12th** 182:10
**13** 142:14 144:21, 145:14 147:8, 149:10 156:23
**13th** 95:21 125:13, 130:21 131:24, 139:20 159:17, 160:1 161:2, 162:4
**14** 7:4, 155:25 156:6, 159:16
**15** 8:9, 87:16 87:21, 87:24 88:11, 169:5
**1550** 1:24, 2:7 2:15, 3:19
**16** 16:17, 16:18 17:15, 28:5 38:23, 59:6 65:12, 93:21 172:14, 173:8 175:16, 175:17 175:20, 176:5 176:7, 176:22 187:14
**16th** 83:8 185:15, 185:16
**17** 1:23, 2:6 2:14, 3:19, 8:9 177:16, 177:18 184:22
**17th** 84:14 142:23, 143:15 145:9, 145:11 157:8, 159:2 172:20
**18** 109:16 181:21, 190:5
**18th** 84:14 100:7, 100:13 101:21, 102:9 103:10, 108:24 109:7, 156:13 206:16
**19** 184:9, 184:11
**1918** 7:2
**1988** 11:12
**1993** 11:6
**1995** 12:15
**1999** 12:15, 13:5 13:17, 14:14

**2**

**2** 68:12, 68:13 69:22, 75:10 105:6, 109:22 128:13, 128:20 128:23, 128:24 131:19, 132:5 133:8, 134:19 136:6, 136:16 138:2, 138:10 139:15, 140:9 142:6, 157:5 175:8, 175:16 177:3, 185:24
**2/28/17** 117:17 133:21, 136:16 141:7, 141:20
**2/28/2017** 136:4
**2:00:13** 112:10
**2:01:30** 113:17
**2:02:36** 114:22
**2:03:21** 115:18
**2:04:48** 116:16
**2:06:05** 117:9
**2:07:03** 118:2
**2:07:47** 119:4
**2:08:53** 119:14
**2:09:45** 120:9
**2:10:52** 121:10
**2:11:57** 122:14
**2:13:02** 123:13
**2:14:04** 124:18
**2:15:31** 125:8
**2:16:31** 126:6
**2:17:33** 127:5
**2:18:58** 128:8
**2:20:13** 129:5
**2:21** 172:11
**2:21:10** 130:3
**2:21:53** 130:24
**2:22:50** 131:17
**2:24:02** 132:16
**2:25** 172:13
**2:25:19** 133:9
**2:26:07** 133:20
**2:26:57** 134:14
**2:28:15** 135:15
**2:29:10** 136:13
**2:30:05** 137:10
**2:30:54** 138:4
**2:31:58** 139:9
**2:33:02** 139:24
**2:34:14** 140:24
**2:35:05** 141:9
**2:36:17** 142:8
**2:38** 184:5
**2:38:29** 142:23
**2:39:24** 144:4
**2:40:21** 145:5
**2:41:13** 145:24
**2:41:59** 147:5
**2:42:54** 148:9
**2:43:46** 149:5
**2:44** 184:8
**2:44:41** 149:23
**2:45:29** 150:13
**2:46:38** 151:14
**2:47:05** 152:13
**2:47:48** 153:6
**2:48:48** 154:8
**2:49:48** 155:4
**2:50:26** 155:21
**2:51:47** 155:24
**2:53:01** 156:24
**2:54:02** 157:23
**2:55:04** 159:1
**2:55:53** 159:14
**2:57:05** 160:6
**2:58:15** 161:3
**2:59:20** 162:9
**20** 79:24, 200:14 200:16
**2004** 14:14, 15:9 15:13, 16:9
**2006** 15:13 16:18, 190:10
**2015** 89:6
**2016** 16:18 16:19, 16:23 17:4, 17:12 17:13, 17:19 19:11, 19:20 20:7, 20:15 26:6, 29:8

29:18, 34:9
34:18, 35:24
37:11, 41:7
42:6, 43:14
46:1, 48:3
48:18, 51:18
56:10, 57:15
57:25, 58:3
64:5, 67:5
67:25, 68:4
70:17, 76:7
76:8, 76:12
77:14, 83:8
84:14, 86:2
88:11, 89:8
92:3, 92:16
95:21, 100:7
100:13, 101:21
102:9, 103:10
106:8, 108:24
109:7, 109:13
109:15, 109:16
111:15, 111:22
112:4, 114:10
117:23, 121:1
123:2, 127:21
166:1, 168:13
186:24, 187:1
188:16
**2017** 10:17, 37:5
108:17, 111:4
117:8, 117:25
119:12, 122:1
125:13, 127:23
130:22, 131:8
131:24, 134:8
134:18, 139:20
145:7, 147:16
155:3, 160:2
172:20, 178:7
182:3, 182:9
182:10, 183:11
185:15, 185:16
200:23
**2018** 18:3, 29:21
30:4, 30:7
206:16
**2019** 1:18, 3:17
30:20, 210:8
**20th** 1:18, 3:17
127:23, 131:8
**21** 201:21, 202:3
205:1
**21st** 111:15
111:20, 112:4
112:8, 114:10
121:1, 133:15
133:16, 165:13
166:16, 167:6
167:25, 168:13
**22** 205:25
**24/7** 156:14
**2453** 9:2
**25** 169:2
**26th** 200:23
**28th** 108:17
111:3, 117:25
134:8, 134:18

**3**

**3** 82:13, 83:15
176:17, 176:21
187:12
**3:00:07** 162:23
**3:00:58** 163:15
**3:03:10** 165:4
**3:04:07** 166:4
**3:05:00** 167:8
**3:05:59** 167:23
**3:06:57** 168:14
**3:07:53** 169:1
**3:08:58** 169:16
**3:09:36** 170:13
**3:10:48** 171:7
**3:11:55** 171:24
**3:12** 205:21
**3:12:52** 172:24
**3:13** 205:24
**3:14:02** 173:20
**3:15:16** 174:23
**3:16** 209:2
**3:16:15** 176:3
**3:17:13** 177:2
**3:18:16** 177:17
**3:19:18** 178:15
**3:20:26** 179:11
**3:21:23** 180:12
**3:22:16** 181:4
**3:23:21** 181:18
**3:24:33** 182:15
**3:25:49** 183:22
**3:26:45** 184:18
**3:27:29** 185:23
**3:28:31** 186:13
**3:29:33** 187:11
**3:30:27** 187:19
**3:31:43** 188:13
**3:32:47** 189:14
**3:33:51** 189:22
**3:35:28** 191:6
**3:37:15** 192:21
**3:39:10** 193:24
**3:40:36** 194:25
**3:42:34** 196:4
**3:44:29** 197:21
**3:45:49** 199:5
**3:46:43** 200:1
**3:47:44** 200:15
**3:48:36** 201:16
**3:49:45** 201:23
**3:50:52** 202:17
**3:51:46** 203:16
**3:52:53** 204:18
**3:53:58** 205:12
**3:54:55** 206:14
**3:56:01** 207:18
**30** 210:8
**3026** 69:22
**30th** 109:13
109:15, 115:21
**31st** 18:15
119:12, 119:16
121:12, 122:1
**333** 3:12

**4**

**4** 89:24, 90:1
90:2, 90:4
149:8
**4/25/17** 170:16
170:21, 171:6
**4:23** 119:12
**450** 3:13

**5**

**5** 4:1, 94:7, 94:9
94:13, 94:18
94:20, 98:18
99:2, 142:22
165:14, 166:13
**5:00** 182:9
182:11
**50** 2:22, 3:4
**500** 2:23, 3:5

**6**

**6** 99:20
**606** 7:3
**60602** 2:8, 2:16
2:24, 3:6, 3:20
**60606** 3:14
**60608** 69:23

**7**

**7** 1:16, 6:14
103:24, 104:1
104:2, 104:4
189:17, 195:5

**8**

**8** 108:11, 108:14
117:16, 133:18
133:19, 141:7
193:22
**84** 162:21
**8th** 143:10
143:20, 143:23
147:16, 182:3
183:11

**9**

**9** 1:16, 8:15
111:8, 117:7
123:2, 133:16
167:2, 167:3
168:6
**9/16/17** 184:17
**9/27** 185:5
**9/27/17** 201:4
201:8
**9/28/16** 186:6
**9/29/16** 90:11
186:6, 190:17
191:18, 193:17
195:8
**9:00** 182:9
182:10
**96** 12:8, 12:9
13:2
**99** 12:20, 13:2

**/**

**///** 6:16, 7:6
8:17, 9:4

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

Deposition of Karen Jones-Hayes
Confidential - Deposition of Karen Jones-Hayes (8-10)
Monday
November 4th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois

Page 2

APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Joi Kamper
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

Page 3

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Morgan G. Churma
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Monday, November 4th, 2019. The time is now 11:27 a.m. We are located at the Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois, for a deposition in the matter of John Nawara v. City of -- County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Superintendent Karen Jones-Hayes. Superintendent Jones-Hayes, my name is Erin Marshall. I'm a notary public, and I'm recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MR. BUSTAMANTE: Peter Bustamante on behalf

Page 4

of John Nawara.

MR. LINDEN: Richard Linden on behalf of John Nawara.

MR. CHURMA: Morgan Churma on behalf of Defendants Sheriff Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby.

MS. KAMPER: ASA Joi Kamper on behalf of Superintendent Karen Jones-Hayes.

RECORDER: Thank you. That completes the required information. We can proceed.

EXAMINATION

BY MR. BUSTAMANTE:

Q. All right. Please state your name for the record. 0:01:10

A. Superintendent Karen Jones-Hayes.

Q. All right. Let the record show that this is the deposition of Superintendent Karen Jones-Hayes, and it will be taken in accordance with the applicable rules of the United States District Court for the Northern District of Illinois, the Federal Rules of Civil Procedure, and -- I think that's all the rules we're going to take.

A. Okay.

Q. So Superintendent Jones-Hayes, I -- my name is Peter Bustamante.



EXHIBIT
H
exhibitsticker.com

Page 5

A. Okay.
Q. I'm going to be asking you a series of questions.
A. Okay.
Q. If at any time you do not understand me, please let me know so that all the answers that you give must be answers to questions that you understand. Do you understand that instruction?
A. Yes.
Q. Keep all of your responses in spoken words so that sometimes when speaking in normal conversation, we communicate with sounds such as "uh-huh" or "h-uh," and that can be confusing later on when we have a written record as to what you specifically mean to say, so do you agree to keep all your responses in spoken words?
A. Yes. 0:02:09
Q. All right. And also, a very important part of this process is not to guess or speculate, okay, so that if you're not sure about something, if you don't know something, it's quite -- it's a proper answer to say, "I don't know," okay?
A. Okay.
Q. So just make sure you're not guessing or could have been or might have been, but just what you know and what you remember, okay?

Page 6

A. Okay.
Q. Okay. Oh, one -- one final one. Please wait until I finish completely formulating a question before you answer, even though you know what the question is going to be, so that our record is clean. In other words, it will be half a question, an answer, and then the balance of the question, okay?
A. Okay.
Q. All right. So in the first place, I am going to ask you some personal questions, and I am going to instruct the court reporter that these should be, what do you call it, protected --
MR. BUSTAMANTE: What do -- what do you --
MR. LINDEN: Confidential. 0:03:06
MR. BUSTAMANTE: What is the word for that?
Q. -- confidential, okay?
MR. BUSTAMANTE: So could -- just mark this section confidential, please. Okay.
MS. KAMPER: And -- and as she's a party, the protective order in this case is --
MR. BUSTAMANTE: Right, pursuant to the protective order.
MS. KAMPER: -- pursuant to the protective order in the case.
MR. BUSTAMANTE: Correct. So --

Page 7

MS. KAMPER: Okay.
(The following pages 8 through 10 have been designated as confidential by agreement of the parties)
///

Page 8

(Start of Confidential Portion)
[redacted]

*CONFIDENTIAL*

Page 9

[redacted]

*CONFIDENTIAL*

Page 10

[redacted]

///

*CONFIDENTIAL*

Page 11

(Continuation of Regular, Non-Confidential Testimony)

Q. Thank you. So are -- are you a Chicago area native?

A. Do I live in Chicago?

Q. No, are you a Chicago area native, were you born in the Chicago area?

A. I was.

Q. Where did you go to high school?

A. Eisenhower.

Q. And what year did you graduate?

A. Nineteen eighty -- oh, Lord, wait. I've had a couple of schoolings here. 1985.

Q. Okay. And after Eisenhower High School, did you continue with your formal education?

A. I did.

Q. And where did you go?

A. Western Illinois University.

Q. And what years did you attend Western?

A. Right after high school, graduation 1989.

Q. And what was your degree in?

A. Broadcasting communications. 0:06:03

Q. Thereafter -- oh, thereafter, did you continue your formal education?

A. I did.

Q. And where did you go?

Page 12

A. Chicago State University.

Q. What years did you attend?

A. I'm not sure of the exact date.

Q. What was your degree?

A. Master's of psychology.

Q. What year?

A. Roughly '97 maybe. I'm not for certain.

Q. Okay. '95 to '97?

A. '95 to '97.

Q. Thereafter, did you continue your formal education?

A. I am currently in school now.

Q. Pardon?

A. I am presently in school now.

Q. Where are you going to school?

A. Walden University.

Q. W-a-l-d-e-n?

A. Correct.

Q. And what course -- what degree are you pursuing?

A. Adult education. 0:07:02

Q. And this will -- this degree, will --

A. Doctoral.

Q. -- will it be a PhD? A doc -- I'm sorry?

A. Doctoral level.

Q. I -- I'm --
A. I'm sorry --
Q. I should put my hearing aids --
A. -- you can't hear?
Q. I -- I'm sorry.
A. Okay.
Q. I heard "adult education."
A. Yes.
Q. So it's doctoral education?
A. Correct.
Q. What is your doctorate going to be in?
A. Adult education.
Q. Okay. So you're pursuing a PhD in adult education?
A. Correct, adult education.
Q. When do you expect to get your degree?
A. Hopefully within the next year and a half.
Q. Are you in the process of writing your thesis?
A. Yes.
Q. Tell us a little bit about your employment, okay? I understand presently, you are working for the Cook County Sheriff's Office, correct?
A. Correct.
Q. And you are -- your title is superintendent?



A. Correct.
Q. How long have you been a superintendent for the Cook County Sheriff's Office?
A. About three years now. 0:08:01
Q. When did you begin your employment with the Cook County Sheriff's Office?
A. December 1st, 1991.
Q. '91 or '81?
A. 9-1.
Q. 9-1. 1991. And what was your position or your title when you first began employment with the sheriff's office?
A. Correctional officer.
Q. How long were -- were you a correctional officer until you were promoted?
A. I'm not for certain of the dates. I couldn't even give you a ballpark at this moment.
Q. Give me a ballpark.
A. Maybe seven years later, I became a sergeant. Maybe -- I'm not certain.
Q. In those seven years as a correctional officer, I -- I take it that first, you went to the academy --
A. Initially --
Q. -- or the school that they have?



A. Initially, no. When I started, it was a little different, we worked first, and then we went to the academy later.
Q. How long did you work before you went to the academy?
A. I couldn't say for certain. 0:09:06
Q. Did you go to the academy?
A. We did -- I did.
Q. And the academy, where was that held?
A. I believe, at that time, it was in division six. It was on the compound itself.
Q. What is division six, how would you describe it?
A. A building.
Q. Did it house inmates?
A. I -- I want to say yes, but I'm not for certain.
Q. But part of the building was used for teaching?
A. Correct, the lower level.
Q. And how long was the -- the -- the course?
A. Whatever the requirement is now, I'm not sure how many weeks it is.
Q. Okay. Well like I said --
A. Perhaps 13 --



Q. -- if you don't remember --
A. -- weeks, 14 weeks.
Q. -- it's okay to say, "I don't remember."
A. I'm not for sure.
Q. Okay.
A. I don't remember.
Q. Nevertheless, you did take the course and you completed the course?
A. I did. 0:09:56
Q. And -- and then you worked for seven years as a correctional officer. Could you give me a rundown of your assignments as a correctional officer, what divisions you were assigned to?
A. Okay. I started off in division eight. It was the residential treatment unit. It housed mentally ill detainees and medical detainees. I worked there for quite some time. Division eight had four units actually, which was the mental health and the medical, which was RTU. It had a drug unit area for detainees who were fighting drug addiction and going through programming. There was the Cermak Hospital, where there were the ill detainees, and then we had division four, which was the female population.
Q. Okay. I'm just a little bit confused, is division four a unit of division eight?

Page 17

A. It was at that time, during my officer status, yes. 0:11:01
Q. What other units have you worked on besides division eight --
A. I've worked --
Q. -- as a correctional -- excuse me for --
A. As a --
Q. -- interrupting you, as a correctional officer?
A. I've worked division five, division -- let's see, as an officer, division eight, division five. Gosh, I don't know. I've had a long career, you know?
Q. Okay.
A. I'll just say five and eight as a correctional officer.
Q. Okay. What is division five?
A. Division five was medium classification, male population division.
Q. Is that like an intake division, when you say, "Classification"?
A. No, it's classified.
Q. Oh.
A. Medium classification.
Q. Medium? 0:11:59
A. Mm-hmm. So it was not an intake --

Page 18

Q. Okay.
A. -- unit, no.
Q. Just pointing out to you, you just said, "Mm-hmm."
A. Oh, sorry.
Q. It's all right. In that --
A. My apologies.
Q. Okay.
A. Yes.
Q. All right. So division five is a medium classification male population?
A. Correct.
Q. After your seven years as a correctional officer, what was your promotion to?
A. Sergeant.
Q. And '91, 1998, approximately, you'd be -- you were promoted to sergeant, did you have to take a test for that?
A. I did.
Q. And who gives the test?
A. The board, I presume.
Q. The merit board?
A. I want to say yes.
Q. Did you have to take a test in front of the merit board to become a correctional officer?

Page 19

A. I don't recall. 0:12:53
Q. Nevertheless, you -- did you have to apply for this job, or were you offered this job? How did -- did you -- excuse me, how did you get promoted to sergeant?
A. You have to apply. There is an application process.
Q. All right. And then there's a testing process?
A. Correct.
Q. And those people who pass the test, are they automatically made sergeant, or are you going on a waiting list? How does that happen?
A. There is a list generated, and it goes from there.
Q. And so you were a sergeant for how many years?
A. Oh, Lord, I should have remembered all this stuff. Maybe six, but I'm not for certain.
Q. Okay. Approximately six years --
A. Approximately.
Q. -- give or take?
A. Give or take.
Q. So it would bring us to 2004 or thereabouts. As sergeant, what were your assignments?

Page 20

A. I've worked division one, division two, receiving.
Q. One more time? 0:14:05
A. Receiving --
Q. 3CV (sic)?
A. Receiving.
Q. Receiving?
A. RCDC, receiving.
Q. Receiving. Sorry.
A. Oh, God, let me -- all together, one, two, receiving, division four, and that's it.
Q. What is division one?
A. Maximum security.
Q. Division two?
A. Minimum security.
Q. Division four, we talked about, is the female?
A. Females.
Q. Okay. Let me ask you a little bit about division two, are -- in this minimum facility, are inmates housed in individual cells, or is it a big, open room with bunk beds?
A. It's dormitory.
Q. It's a dormitory style. How many inmates at any one time in division two?

A. I couldn't say for certain at this time. I'm uncertain what the count would have been. I can't recall.
Q. How big is the area?
A. Pretty large. 0:15:02
Q. Would it be feasible to put 300 people in there?
A. I don't think it was that many.
Q. Half, 150?
A. Maybe.
Q. In any of these divisions, what is the noise level like at any given moment?
MS. KAMPER: Object to form. You may answer if you can.
A. In any of the divisions?
Q. Well let -- because that's too broad, I guess, let me start with one.
A. Okay.
Q. Let me start with division two.
A. Okay.
Q. Let's start after dark, what is the noise level at night?
A. After dark?
Q. Yeah.
A. Not very loud.



Q. Okay. During the day?
A. A little busy.
Q. Is it constant noise, are people talking, and yelling, and screaming, and things of that nature?
A. Not necessarily yelling and screaming, but talking, yes.
Q. Was -- would you say it's a constant noise? 0:16:02
A. Constant conversation. It depends on how you would define noise.
Q. Okay. Just want to get some background information, okay, that's -- all right. So let me -- division sergeant -- okay. So after sergeant, you were promoted -- promoted again?
A. Yes, sir.
Q. And your next promotion was?
A. Lieutenant.
Q. And when were you promoted to lieutenant approximately?
A. Oh, God.
Q. I mean, if we follow up what you told us, we're at 2004 approximately.
A. So we're -- right. I -- I -- gosh, I hate to speculate. Probably somewhere around 2004, I guess.
Q. Okay.
A. Yeah.



Q. For how long were you a lieutenant --
A. I don't think that that's --
Q. -- before you were --
A. -- accurate.
Q. -- promoted to superintendent?
A. I was lieutenant probably -- let me get my thoughts together. I made superintendent in 2016, so I couldn't say for sure.
Q. All right. How long have you been superintendent now --
A. Three years.
Q. Three?
A. Mm-hmm.
Q. And so from 2016 to 2019, and so from -- for whatever other period of time, correct me if I'm wrong, my understanding is you -- you were never made captain, correct?
A. Correct.
Q. So you -- from lieutenant, you went to superintendent?
A. Correct.
Q. And as lieutenant, have you served in any other divisions other than the ones we've talked about? And -- and let me tell you we've talked about division eight, division four, division one, and division two.



A. As lieutenant, I worked in women's justice. 0:18:02
Q. Is that different than division four?
A. It was.
Q. And what is women's justice?
A. It was a program designed for our female population who were either pregnant or had -- were on home monitoring.
Q. From -- excuse me. From the time you became a correctional officer to the time that you were promoted to superintendent, other than the academy that you attended as a correctional officer, have you had any other formal training provided to you by the Cook County Sheriff?
A. Yes.
Q. Tell me about that. 0:18:50
A. It is required that we have yearly trainings, so we do have what we call in-service. I have training in homeland security, I have training in hostage negotiations, and then we have other trainings that we do through our LMS system, so training is consistent, and that's pretty much it.
Q. All right. How -- how did you come about to get promoted to superintendent?
MS. KAMPER: Object to form. You may answer.
WITNESS: Thank you.

A. The job was posted on the sheriff's site, and I applied.
Q. Were you -- did you have to go through an interview process?
A. Yes. 0:19:47
Q. Who did you interview with?
A. There was a panel, I do believe it was Director -- Director Nneka Jones Tapia who was the executive director, and there were quite a few other people in the room.
Q. All right. Did you --
A. I couldn't tell you all of who was present though.
Q. All right. Did you have to submit anything in writing for part of that process?
A. The application process itself, your resume, any training or certificates that were obtained throughout my years of service, and that's all I can recall at the moment.
Q. Was there a test -- other than the interview, was there a test for this position?
A. I don't believe that there was. I don't recall having to do any written exam, no.
Q. Your merit rank of -- well let me withdraw that question. As a superintendent, do you have merit



protection?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join. You may answer. 0:21:05
A. Do I have --
Q. Merit protection.
A. I don't know.
Q. Okay. Do you know if you still retain your merit rank of lieutenant?
A. I'm uncertain.
MR. CHURMA: Same objections.
Q. Okay.
WITNESS: I'm sorry.
MS. KAMPER: Join.
Q. You -- yeah, unless they tell you not to answer, you can answer --
A. Okay.
Q. -- after their objections, okay?
A. Okay.
Q. You --
A. I -- you know, I'm not for sure.
MR. BUSTAMANTE: Oh, yeah, I know. I know.
Q. Do you hold any licenses particular to your profession?
A. No.
Q. Other than working at the -- for the Cook



County sheriff's, have you had other employment?
A. Throughout my life? 0:22:13
Q. How about since you finished college?
A. Yes.
Q. Okay. How many other jobs?
A. A few.
Q. Okay. Let -- let's go back to your first job before the sheriff's office.
A. I started off right out of high school -- or right out of college at an electronics store, it was called Silo.
Q. Okay.
A. It's not here anymore.
Q. Thereafter?
A. Thereafter, I began working with -- what was the name of the company? US Sprint. I also did some work with one of the airlines in reservations. That didn't work out too good, but -- and then I started working for the department.
Q. Okay. Have you ever been reprimanded with -- during your job at the Cook County Sheriff's Office?
A. Disciplined? 0:23:19
Q. Disciplined, yes.
A. I have.
Q. How many times?



A. Once.
Q. And what was that discipline for?
A. Medical.
Q. And what does that mean?
A. I was ill, I was off for an extended period of time. The captain at the time generated discipline for me being off, and eventually, it was thrown out -- or what do you call it, dismissed because I had the proper documentation upon returning to work, so it was dismissed.
Q. Okay. Now in order to prepare for your deposition, did you -- did you meet with your lawyers?
A. I did. 0:24:12
Q. When did you meet with your lawyers?
A. Today I met with her.
Q. And how long did you meet with your lawyer for?
A. Gosh, I guess I should have watched the clock. Maybe 40 minutes.
Q. Did you review any documents to prepare for your deposition?
A. I did.
Q. What did you review?
A. Video footage.
Q. What video footage did you review?

Page 29

A. Of the -- of an incident that happened in Cermak, a fight, and the staging area. That's it.
Q. Did you review any documents themselves --
A. No. Not today.
Q. -- any paperwork?
A. No.
Q. Okay. You only saw one video?
A. Two.
Q. Two. What -- and were the videos of the same incident?
A. Same day, the same area, two different views.
Q. At the same time or approximate times?
A. Separate. 0:25:11
Q. Separate?
A. Same -- around the same time of the day, the same area, just two different views, one from the rear and one from the other direction, so.
Q. Okay. Yeah, when you say, "Two different views," that's what -- I'm asking you if it's at the same time, it's the same time frames?
A. I think one was earlier than the other.
Q. Okay. At what time, if you noticed, did the films end?
A. Oh, Lord, I don't -- I don't know.
Q. Did the films show you at any time, were you

Page 30

-- did you see yourself --
A. Yes, sir.
Q. -- on the films? Did you see yourself in the film with Officer Nawara --
A. Officer --
Q. -- together -- you and he together?
A. There was a moment in the film when he walked past me, but never interacting together, no.
Q. This moment in the film, was it before or after your interaction with Officer Nawara that day that we're going to discuss later on in this depo?
MR. CHURMA: Object to --
MS. KAMPER: Object to --
MR. CHURMA: -- form. 0:26:15
MS. KAMPER: -- form. Foundation. You may answer.
A. Oh, God, let me see. After -- I think it was after.
Q. Do you know how long after?
A. No, sir.
Q. There were two -- I'm going to call -- call it two events that we're going to discuss.
A. Okay.
Q. One event is the touching of Officer Nawara, and the other event is the shackling of an inmate that

Page 31

did not want to be shackled. Do you recognize those two events that I'm talking about?
MS. KAMPER: Object to form and foundation.
MR. CHURMA: Join.
MS. KAMPER: I don't know how she can possibly answer that. If you can answer that question, you may answer.
A. I don't -- okay, what -- what's -- what's your question?
Q. I am going to be looking at two incidents, two events --
A. Okay. 0:27:10
Q. -- on -- on the day of the events that concern Officer Nawara, and I think that would be September 28, 2016. Do you agree that that's the date of the events that you were involved with Officer Nawara that resulted in this lawsuit?
A. I'm uncertain of the date.
Q. Okay.
WITNESS: Is that the right date?
A. I'm uncertain of the date.
Q. All right. Well I'm going to tell you it was September --
A. Okay.
Q. -- 28, 2016.

Page 32

A. Okay.
Q. And on that date, my understanding is that one of the events concerns your touching Officer Nawara. Do you remember that event?
MR. CHURMA: Object to form. Assumes evidence not in the record.
MS. KAMPER: Yeah -- join.
A. So it -- it depends on what you're asking me exactly.
Q. Well --
A. Because I'm --
Q. Well --
A. What do you mean --
Q. -- I'm just asking you --
A. -- "touching"?
Q. -- if you recall touch -- an event where you touched Officer Nawara?
A. Yes.
Q. Okay. That -- I'm going to call it event number one.
A. Okay. 0:28:03
Q. Event number two is going to be an event where there was some apparent difficulty in shackling an inmate, and you went out, I believe with a sergeant, and had the inmate shackled, I'm going to call that

Page 33

event number two.
A. Okay.
Q. That's all I was saying.
A. Okay, okay.
Q. All right. The video that you -- where you saw Officer Nawara pass by you, did it happen before the touching event or after the touching event, event number one?
MR. CHURMA: I'm going to object to the characterization of the event as it assumes evidence not in the record. Object to form.
MS. KAMPER: Join.
WITNESS: What does that mean exactly?
MS. KAMPER: So you -- you can answer.
Q. It means you can answer.
WITNESS: I'm like what does that mean?
MS. KAMPER: You -- you can answer.
WITNESS: Okay.
MS. KAMPER: I am objecting to the narrative Plaintiff's Counsel has put forward.
WITNESS: Okay.
MS. KAMPER: It's assuming facts not in evidence. You may answer to the best of your ability, you were the only one who was there.
WITNESS: Okay. 0:29:04

Page 34

MS. KAMPER: You may answer.
A. So you're asking me after the -- the interaction with Officer Nawara, in the film, did I see him walk by me?
Q. Well first of all, I am suggesting that there were at least two interactions with Officer Nawara.
A. Okay.
Q. One I've called event number one --
A. Yes.
Q. -- which is the touching event.
A. Okay.
Q. The other one I've called event number two, which is the shackling event.
A. Okay.
Q. So when you saw Officer Nawara in the film, you said it was after your interaction with him. Was it after both interactions, the touching and the shackling, or was it after one and not the other?
MS. KAMPER: Same objections.
MR. CHURMA: Join.
A. I believe it was after the incident when I touched his arm.
Q. Okay. As a superintendent -- I'm going to now direct you to September of 2016.
A. Okay. 0:30:07

Page 35

Q. As a superintendent, what were your working hours?
A. They varied.
Q. And tell me the -- well, they varied. Tell me what they were generally, and then tell me what the variances were.
A. During that time, my hours varied anywhere from 7:00 in the morning to 6:00 in the evening. Sometimes I would work earlier in the morning, and other times I would work later in the afternoon, so it varied.
Q. All right. But I take it that it was never less than eight hours?
A. Never less than?
Q. Correct.
A. Correct. 0:30:46
Q. And would you describe for us September of 2016 what your duties were during the day? You came to the office to do your job, what do you do?
A. Depending on what was on the agenda for the day, I would come in, check my emails, speak with the supervisors on duty to find out if there were any tasks that needed to be worked on or any follow-up that they needed to give me for the day, paperwork, making rounds in the building, meetings, trainings, whatever was

Page 36

scheduled for that particular day.
Q. You know, I -- I went ahead and assumed, because I know, that you were assigned to Cermak as the superintendent of Cermak, correct?
A. Correct. 0:31:52
Q. Had -- was that your first assignment as a superintendent?
A. Yes.
Q. Tell us what Cermak is.
A. Cermak is the hospital, if you will, on the compound for detainees. It house different populations, some mentally ill and some medical, some male and some female, and the lower area is more of a hospital, if you will, for -- that other detainees around the compound can come for medical services.
Q. As -- before you became superintendent, had you ever been assigned to Cermak?
A. Yes.
Q. How many times?
MS. KAMPER: Objection. Form. You may answer.
A. Quite a few.
Q. And what were your assignments in Cermak?
A. I was an officer there and a sergeant over that unit.

Q. As an officer at Cermak, was there any particular location at Cermak that you were assigned to, or were you all over the place?
A. I worked all of the areas pretty much. 0:33:01
Q. The area where the incidents with Nawara occurred, what is it called?
A. Basement control.
Q. Basement control?
A. Yes.
Q. And the area where the inmates are waiting to be seen by the doctor, what is that called?
A. Staging.
Q. In your career as a correctional officer, had you been assigned to that area of the basement, the control and staging?
A. I've worked the basement area. I'm uncertain as if I was just assigned to those particular areas, but I've worked in that area before, the ER, admissions, which is all kind of together, lab, so I've had exposure to the areas, yes, but I couldn't tell you if I was specifically assigned there throughout my career as an officer.
Q. Is an assignment to that area something that is bid by an officer?
A. No. 0:34:10



Q. Can an officer bid for that assignment?
A. No.
Q. How long had you been superintendent before September of 2016?
MS. KAMPER: Object to form. How long had she been superintendent before September of 2016, is that what you said?
MR. BUSTAMANTE: That's what I asked.
MS. KAMPER: All right. Go ahead, you can answer. I thought I heard something else.
MR. BUSTAMANTE: Sorry. I thought I was hard of hearing, that's --
A. July, I became supt, so three months.
Q. How many officers were assigned to Cermak when you became superintendent, approximately, okay? I don't have to be specific.
A. Maybe 300.
Q. And those 300 were in three different shifts?
A. Yes, sir. 0:35:03
Q. And so would it be -- well probably not fair. It wouldn't be divided 100 per shift, would it?
A. Yes, roughly.
Q. It would be 100 per shift?
A. Some -- some more, yeah.
Q. Well that's what I'm wondering.



A. Yes.
Q. Some -- you'd have probably less during the night and more during the day? Yes?
A. You can say that, yes.
Q. Okay. But -- but around 100 per shift?
A. Pretty much, yes.
Q. And I'm -- how many inmates were housed -- I don't know if that's the right word to say. How many inmates were there in Cermak when you first became superintendent or during that period of time?
A. I couldn't tell you at this moment.
Q. Can you give me an approximate amount?
A. I really couldn't say.
Q. Well don't -- don't guess, let me just work it another way around.
A. Okay. 0:36:03
Q. Is there some way to find out how many inmates had been assigned to Cermak in September of 2016? Is -- are there records, are there numbers kept, are there statistics kept?
A. Probably.
Q. Okay. And who would have those records?
A. I would guess IT can get you the information you need because of the census that's kept on the system, so.



Q. Nevertheless, would it be fair to say that the inmates always outnumber the correctional officers?
MS. KAMPER: Object to form. You may answer.
A. Well it depends on if you're going to put it in a building or if you're going to put it by sections.
Q. Okay. Well let's start with the building first.
A. Okay.
Q. Do the inmates outnumber the correctional officers in any given shift, okay? I'm not going to say all the folks that are assigned there, but in -- in a shift, 100 officers come in for one shift, are there more inmates than officers?
A. I would say that would be safe to say.
Q. Can you give me an idea of the ratio of officer to inmates in September of 2016?
A. I could not. 0:37:06
Q. Do you have an independent memory of the events with John Nawara on -- that occurred on September 28th, 2016?
A. Yes.
Q. Now you wrote a memorandum regarding these events. Is that right?
A. I wrote a complaint register.
Q. You wrote a complaint register. Did you

review that complaint register for your deposition today?
A. I did not.
Q. Why not?
A. I didn't think that it was necessary. I don't know. I mean --
Q. Okay. All right. Do -- you think this is an important proceeding?
A. Absolutely. 0:38:02
Q. All right. Do you think that it's important for you to have the best memory of what happened before you testify?
A. Yes.
MS. KAMPER: Object to form.
WITNESS: Oh.
Q. And --
MS. KAMPER: You may answer.
Q. And do you think that reviewing that record would refresh any memory that you might have?
A. Yes, I --
Q. But you did not review it?
A. I did not.
Q. Why not?
MS. KAMPER: Object to form. She's answered that.



Q. Go ahead.
A. I did not, with the understanding that if it was required that I have my memory refreshed, either you or my attorney would be able to provide the documents, I mean since this is something that's very serious for me to look over, if there was some question about it.
Q. All right. At what time did you start working on September 28th, 2016?
A. I'm uncertain.
Q. Did you go through your usual procedure when you come to work on that particular day?
MR. CHURMA: Object to form. 0:38:57
MS. KAMPER: Join. You may answer.
A. I couldn't say for certain. This was a long time ago.
Q. Okay. The -- did anything unusual happen before any interaction with John Nawara?
A. Not for me, no.
Q. What brought you to the basement area of Cermak on that day?
A. As I stated earlier, part of my responsibility is to make rounds in the building, and that includes the basement.
Q. Were you aware that there had been a fight



between inmates before coming to the basement area?
A. I was not.
Q. What is the protocol that officers are supposed to follow when there is a fight among inmates?
A. Regarding what? 0:39:47
Q. What are they supposed to do?
A. They are supposed to respond first off, secure the detainees, ensure that the area is safely contained, and transport the detainees to ensure that they're being cleared by medical, ensure the surrounding detainees are okay, and generate a report.
Q. Okay. Are they supposed to call a supervisor?
A. They should.
Q. And that's part of the protocol, right?
A. Yes, sir.
Q. That's part of what they're required to do?
A. Yes.
Q. How does an officer contact a supervisor when there has been a fight in that -- in the staging area of Cermak basement?
A. In any area, they can use their radios or telephone.
Q. Okay. In this particular occasion, there was a fight among inmates. Is that correct?



A. I found that out later, yes.
Q. Yes. And do you know who the supervisor that responded to that call for a supervisor, who that was?
A. No. 0:40:51
Q. Do you even know if a call was made?
A. I do not.
Q. If a call is made, would you be made aware of it?
A. No, not necessarily.
Q. Do you carry a radio with you?
A. Not usually.
Q. Okay. All right. Where -- when you -- so my -- my understanding is that you were simply making your daily rounds?
A. Yes, sir.
Q. Do you make your rounds alone, or do you make them with someone else?
A. Sometimes I do walk alone, other times I do ask for a supervisor to walk with me.
Q. All right. What do you consider a supervisor?
A. Sergeant and above.
Q. In this particular date, were you making your rounds alone, or were you accompanied?
A. I was accompanied by -- or with Sergeant

Conley.
Q. And where did you start from? In other words, in order to make these rounds, where were you before coming to the basement area?
A. I couldn't say for sure. 0:41:59
Q. Were you with Sergeant Conley -- let me -- withdraw that and restate. When you started making your rounds, where did you start?
A. I remember entering the elevator, and we went to the basement, so I believe we started in the basement.
Q. And so from the very beginning, you were with Sergeant Conley?
A. Yes.
Q. Where is Sergeant Conley's office with respect to your office?
A. I -- they -- the sergeants don't have an office, but there is an area where they tend to gather, which was on the main level.
Q. Is that where you got together with Sergeant Conley to begin your rounds, on the main level?
A. I can -- probably, but I couldn't say for certain.
Q. No guessing, remember?
A. Okay. Well --



Q. "I don't remember" is good.
A. I don't remember. Okay. 0:42:58
Q. Was there anybody else with you besides Sergeant Conley as you were making your rounds?
A. No, not that I can recall, no.
Q. When you go to the basement, you say you took the elevator there?
A. Yes.
Q. When you get off the elevator, what do we see?
A. When I got off the elevator, I -- well okay, I noticed that the doors to basement control were open.
Q. Stop -- let me stop you for just one second.
A. Okay.
Q. Getting off the elevator and I'm looking straight ahead, do I see the doors for basement control?
A. No, when you get off the elevator, you see the other set of elevators across from you. As you come to the left --
Q. To the right?
A. The left.
Q. To the left. Okay. 0:43:47
A. Left is where we enter Cermak -- the basement area of Cermak.



Q. Okay. Is there a hallway at that point, or is it an open area before coming to that door?
A. There is an open area to the right, and then it's an immediate walk in into the basement control area.
Q. Describe the door that you say was open.
A. It's just a regular --
Q. Is it a metal door?
A. Oh, gosh, I don't know what the material is --
Q. Okay. Is it -- is it a double door or a single door?
A. It's a single door.
Q. Does it open to the inside or to the outside?
A. Let me think. Let me just say I'm not sure.
Q. Okay. And when you say that you noticed that the door was open, how -- how wide was it open?
A. It was all the way open.
Q. Fully open?
A. Fully open. 0:44:49
Q. Were there people standing outside the door?
A. Not that I can recall.
Q. And of course inside the door is the staging area and -- I forget what you called the other areas where the officers sit, the control?



A. No, you have basement control, and then you go through the second door, and then you have the staging area.
Q. So the door to basement control was open?
A. Yes, sir.
Q. What is basement control?
A. That area is the location where the doors for the secured area or unsecured areas are controlled. The telephone, it controls the doors -- the secured doors to go out of the building, as well as the doors that are inside of the clinic area of Cermak.
Q. Okay.
A. So it controls -- it's like a hub, it controls the doors in that area.
Q. All right. I'm -- I'm trying to picture this in my mind, so I see a door on one end and a door on another end?
A. Yes. 0:45:54
Q. Yes, is that right? And the first door, the door that led to the elevators from where you came from, that was the one that was open wide?
A. Yes.
Q. Inside basement control -- is it a room, basement control?
A. It's an enclosed area.

Q. How big is it?
A. I couldn't tell you.
Q. Could -- you see this room here is about ten by eight, is it bigger than this room --
A. No.
Q. -- we're sitting in? Is it smaller than this room?
A. I couldn't say for certain, but it -- it's -- maybe. I don't know.
Q. It's approximate --
A. I couldn't tell you. Approximately, it's maybe about the same size, it's not -- this might be a little bigger.
Q. Okay. Inside this control -- basement control, you say there was a telephone, is there a desk in there?
A. It's a control panel, and it does have countertop.
Q. And is there chairs or are there chairs in there?
A. There is a chair assigned.
Q. Just one chair?
A. Yes. 0:46:53
Q. Is basement control manned -- I'm sorry to use the word "manned," is it manned by anyone?



A. It should be, yes, yes.
Q. How many people?
A. Two.
Q. Okay. And these people are standing or sitting?
A. They -- it's their choice if they want to stand or sit.
Q. But there is only one chair?
A. Should be two there.
Q. Okay. By the way, the -- the word "manned" in that case comes from "manus" which is the Latin for hand.
A. Oh, okay.
Q. I just corrected myself, so okay. So the panel, where is it with respect to the doors, are -- are the doors on the non-working part of the panel? And by "the working part," I mean where the officers would have control of the panel, are the doors in front of the officers having control of the panel or behind the officers having control of the panel?
A. Behind. 0:47:51
Q. Okay.
MR. BUSTAMANTE: Bless you.
WITNESS: Bless you.
Q. Are the doors controlled electronically? In



other words, can they be -- do people get buzzed in and out, or are they opened manually?
A. Both.
Q. So someone with a key can't open the door from the outside?
A. Correct.
Q. And are the -- are the doors -- are the officers inside the control area, can they see who or what is outside the doors?
A. Yes.
Q. How?
A. There is a window there where they can see, and you can hear.
Q. So once we come in through the first door, the one closest to the elevators, okay, we go into the control area and walk out the other door, what do we see on the other side of the second door?
A. The staging area. 0:48:55
Q. As we're sitting in the staging area facing -- inmates who are sitting in the staging area, where do they face? There's -- obviously, there's the back of the room and there is the front of the room, in the back of the room, is there a wall?
A. It is.
Q. All right. So away from the wall, towards



the front of the room, what -- what does -- what do we see?
A. Well you have rows of benches from the rear of the room to halfway to the front of the room, then you have the open section where the officers who have detainees in that area should be sitting.
Q. Okay. And further up, what do we see, on the opposite wall -- the wall opposite to the back?
A. You have benches on this side, this side, and up the middle.
Q. Right, I'm saying beyond the benches.
A. There is nothing beyond the benches --
Q. Okay.
A. -- but a wall.
Q. There -- okay. Isn't there a place where there has, like, three doors? As you're facing the front of the room, are -- are there not three doors in front of you?
A. In the front --
Q. At the very front. 0:50:06
A. -- bathrooms.
Q. Okay. And where do the inmates that have to be seen by doctors, where do they go?
A. Either to the ER or to the clinic.
Q. All right. And point me out, as I'm sitting

here -- I'm -- assume that I'm sitting in one of those benches and I'm facing the front of the room.
A. Yes.
Q. Where is the ER, is it to my right or to my left?
A. Your right.
Q. Okay. And is it to my right on the -- on the right wall, or is it to my right in front of me?
A. The right on the right wall.
Q. Okay. And there is a door, or is it an open area to the ER?
A. Door.
Q. What else is there in front of me as I'm facing the front of the room and I'm sitting on a bench?
A. The restrooms.
Q. How many bathrooms are there?
A. Two. 0:50:56
Q. So there is -- there is no other place to go, it's bathrooms, the ER to the right, and as I'm sitting on the bench --
A. And the clinic.
Q. Clinic further to the right as well?
A. Correct.
Q. Is there a door for the clinic?



A. It is.
Q. And as I'm sitting on the bench looking straight ahead, where is the control area?
A. To the left.
MS. KAMPER: Can we --
MR. BUSTAMANTE: Beg your pardon?
MS. KAMPER: Can we take a minute?
MR. BUSTAMANTE: Sure.
MS. KAMPER: I have to use the bathroom myself.
MR. BUSTAMANTE: Okay. No problem.
RECORDER: Off the record, 12:18 p.m.
(Off the record)
RECORDER: Back on the record, 12:24 p.m.
WITNESS: Okay.
Q. Inmates that are brought into the staging area, do they go through the control?
A. No, sir.
Q. Where do they come through?
A. The entrance door. 0:51:51
Q. All right. So again, where is the entrance door in relation to the doors that we've described so far?
A. In front of basement control, if we're looking at it from inside the staging area.



Q. Okay. I'm -- I'm -- can't picture it, so help me out. I'm sitting at the front bench in -- in the staging area, and to my left is the control area, if -- if I recall correctly you told me. From that position, where is the door through which the inmates are brought in, further to the left?
A. Correct.
Q. So to the left of the control room?
A. Correct.
Q. And how many doors --
A. Yes.
Q. How many doors are there for the inmates to come in?
A. One.
Q. And --
A. And the -- one.
Q. All right. And what kind of door is it, is it a double door or a single door?
A. Single. Single. 0:53:01
Q. And --
A. I'm so sorry.
Q. Okay. Do you know if it opens to the inside or the outside?
A. I couldn't tell you for sure.
Q. How many guards are assigned to the basement



during the 7:00 to 3:00 shift?
A. I'm not certain.
Q. Well we -- we know we have two guards in control, correct?
A. Should be, yes.
Q. Right. What other positions are there that must be guarded in the basement area?
A. It depends on the activities that's going on in the basement area, so.
Q. And give me an example of the activities that may be going on that require more or fewer guards.
A. We have several clinics that take place, the staging area itself, you have the ER, you have admissions, so it just depends on the level of activity that's scheduled for that day in that area.
Q. Okay. What -- what are the most number of guards that you had there during --
A. I -- I couldn't say for certain, sir. 0:54:13
Q. Well can you give me an approximation?
A. I could not.
Q. On the day of the occurrence in question, how many guards were assigned to the basement area?
A. I'm uncertain.
Q. Based on your review of the films, how many guards did you see on the film?

A. I did not count them.
Q. Okay. Based on your recollection of the events, how many guards were assigned to the staging area that day?
A. I have no idea.
Q. Okay. You recall that there was an Officer Turrise there?
A. On the computer, yes.
Q. Right. Do you recall there was an Officer Gannon there?
A. Yes.
Q. You recall there was an Officer Nawara there?
A. Right -- mm-hmm.
Q. Were there any --
A. Yes. 0:54:54
Q. -- other officers there that day?
A. I do recall there being some additional officers in the area of the basement control, but I couldn't say specifically who they were.
Q. All right. Could you say that they were assigned to that area, or were the officers simply bringing in inmates from other areas?
A. When I asked the question as to who they were, I was then advised that they were not assigned there, meaning they did not work for Cermak.



Q. So was Turrise assigned there, do you know?
A. No, not to my knowledge.
Q. So was Gannon assigned there?
A. Yes.
Q. Was Nawara assigned there?
A. He was assigned to the basement, yes. Which area in particular, I couldn't say for certain.
Q. How many inmates can the staging area hold?
A. I couldn't say for sure.
Q. Can you say approximately?
A. No. 0:55:55
Q. Could you -- would you say that there is more or less than 100 inmates could be put in that area?
A. I couldn't say for sure, sir.
Q. My understanding is that you gave a directive that inmates have to be shackled and handcuffed in the staging area. Is that correct?
A. Yes.
Q. How many handcuffs were available in the staging area?
A. I couldn't tell you for sure.
Q. Okay. How many shackles were available in the staging area?
A. I could not tell you.
Q. If there were not enough shackles to shackle



every inmate in the staging area, how could the guards comply with your directive?
MR. CHURMA: Object to form. 0:56:48
MS. KAMPER: Join. You may answer as best you can.
A. I had no information advised to me that there were not enough shackles to shackle the detainees in the area.
Q. Okay. But that's not the question. The question is if there were not enough shackles, how could the guards comply with your directive?
A. They should have --
MS. KAMPER: Same objections.
WITNESS: Oh, sorry.
MR. CHURMA: Join.
MS. KAMPER: You may answer. You're okay.
A. They should have advised a supervisor, and we would have resolved the issue.
Q. How would you have resolved the issue?
A. By getting more shackles.
Q. Where would you obtain more shackles?
A. Well the directive would have gone through the chain of command to get the shackles to replace the -- the ones that were not there or to replenish more shackles if it was required.



Q. When inmates are brought from other divisions, do you know if the other divisions provide shackles?
A. I can't say for certain, no.
Q. Do you know if the other divisions provide handcuffs?
A. Yes, they should. 0:57:52
Q. When inmates are moved from one division to the hospital, are they supposed to be handcuffed?
A. Yes.
Q. Who determines whether the handcuffs are supposed to be in the front or the back?
A. That's standard policy.
Q. I'm -- one more time?
A. That's standard policy --
Q. Okay. What is --
A. -- that detainees are --
Q. What is the standard policy?
A. That detainees should be cuffed to the rear unless there is some medical reason that they should not be --
Q. What kind --
A. -- or cannot be.
Q. Right. What kind of medical reasons would there be that would prevent an inmate from being

handcuffed in the rear?
MS. KAMPER: Object to form and foundation. You may answer.
MR. CHURMA: Join.
A. A cast on an arm, that would be a reason.
Q. Okay. Surgery on the shoulder could be a reason?
A. If it's confirmed.
Q. Inability to put your hands behind your back could be a reason?
A. If it's confirmed. 0:58:47
Q. Okay. Who would it have to be confirmed by?
A. Medical.
Q. And when would medical confirm that?
A. Once it was --
MS. KAMPER: Object to form and foundation. You may answer to the best of your ability.
MR. CHURMA: Join.
A. Once it was brought to staff attention that a detainee is complaining of not being able to be handcuffed to the rear, then we can check for the alerts and the detainee can be seen by medical to confirm that it would not be to the best interest of the detainee to be cuffed to the rear.
Q. Yeah. So it's before the detainee is brought



to Cermak, correct?
A. Not necessarily. 0:59:43
Q. Okay. All right. So based off what you reviewed in terms of the film, would you agree that only Gannon and Nawara were guards assigned to Cermak that day that you saw?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join. You may answer.
A. No.
Q. No. Who else was assigned that you saw?
A. I didn't see anyone.
Q. Well again, so my question is based on what you've seen in the film, the only two that you saw that were assigned to Cermak were Gannon and Nawara?
A. I can't say that that's accurate. 1:00:47
Q. So you saw more in the film. Is that what you're saying?
A. There were other officers present, yes.
Q. Okay. They were assigned to Cermak?
A. I don't know where they were assigned.
Q. Okay. So again, my question is the only one -- two that you can say that were assigned to Cermak that you saw in the film are Gannon and Nawara?
MS. KAMPER: Form. Foundation.
Q. Yeah --



MS. KAMPER: You may answer.
A. I --
Q. True?
A. I -- well I saw other officers that were assigned to Cermak in the area.
Q. Oh, you did. Who were they?
A. Just -- but I don't know if they were assigned there is what I'm saying.
Q. Well see, here you're confusing me. Either you -- either you saw officers that were assigned to Cermak, or you -- or you don't know if they were assigned to Cermak, so therefore, they're not assigned to Cermak?
A. So when I say, "Assigned to Cermak," that mean they work in the building of Cermak, which could be anywhere.
Q. Okay.
A. There were several officers in the area that I know that work Cermak but not necessarily assigned to that particular area --
Q. Okay.
A. -- is what I was saying.
Q. I got it.
A. Okay. 1:01:46
Q. Thank you.



A. Mm-hmm.
Q. All right. Let's go back to the date of the occurrence, which is September 28th, 2016.
A. Okay.
Q. You've gone -- gotten out of the elevator, you're with Sergeant Conley. Is Sergeant Conley to your right, to your left, to your front, to your rear, where is he?
A. I don't remember.
Q. Okay. Were you having a conversation with Sergeant Conley at that time?
A. I do recall having a conversation with Sergeant Conley as we approached the basement control --
Q. Okay.
A. -- area, yes.
Q. Well besides you and Sergeant Conley, was there anybody else present?
A. I can't recall. 1:02:36
Q. Okay. What did you say to Sergeant Conley, what did Sergeant Conley say to you?
A. I do recall sharing with Sergeant Conley that the door was not secured to basement control, and what his response was, I couldn't tell you at -- at this present moment, but I wanted him to be aware that the

Page 65

door was not secure.
Q. Okay. Did you suggest to Sergeant Conley that someone should be disciplined for not having the door secured?
A. I don't recall the specific conversation that I had in regards to discipline, but I do recall telling him that the door was not secure. I don't remember anything further with discussing about that -- discipline, I can't recall that.
Q. Would it have been appropriate to discipline whoever was responsible for having the door secure if the door was wide open?
A. Would it have been appropriate?
Q. Correct. 1:03:30
A. I can say that it wouldn't have been inappropriate if discipline was rendered because the directive was to keep the door secure.
Q. Who was responsible for keeping that door secure?
A. The officer that was assigned to the area.
Q. To the general area or assigned to the control?
A. To -- who is assigned to basement control because that's their workspace.
Q. And who was assigned to basement control?

Page 66

A. I couldn't tell you for certain.
Q. Did you go into the control room?
A. I did.
Q. And did Sergeant Conley go into the control room?
A. I couldn't tell you at this moment where he was positioned, but I know we were walking together, so I don't know where he was standing if that's what you're asking.
Q. No, I'm asking did he go through the threshold into the room?
A. I -- I can't confirm where he was at the moment.
Q. Okay. Would you -- were you the -- is it fair to say that you were the first to step into the control room?
A. I -- I want to say yes. 1:04:37
Q. When you stepped into the control room, what did you see?
A. I recall several officers being in the basement control area.
Q. Okay.
A. I couldn't tell you specifically how many, but I do know that there was someone sitting in the chair here, Officer Turrise was on the computer, the

Page 67

female officer, Gannon, was present, and Officer Nawara.
Q. Okay. So at least four officers were in the room?
A. At least.
Q. As you walked in the door, where was Officer Turrise?
A. Turrise was on the computer.
Q. Yeah, but that doesn't mean anything to me.
A. Oh, sorry.
Q. Right, left, in front, back?
A. So if I walked into the doorway here, the control panel is roughly in the area where you are.
Q. To your right? 1:05:45
A. To my right. Just inside of the doorway, Officer Nawara was here, Turrise was in the middle, Gannon was on the left, and then I remember someone sitting in the chair, but I couldn't tell you how many other people were in the room.
Q. Okay. Let's -- let's assume that the door of this conference room is the door that you walked through.
A. It would be easier if this was the door over here.
Q. Fine. The door is to your right --

Page 68

A. Okay.
Q. -- and on the wall.
A. Yes.
Q. So as you walk in and you're standing right there --
A. Yes.
Q. -- to your right --
A. Yes.
Q. -- where your lawyer is, who -- who would be there?
A. Nawara.
Q. Nawara. And next to Nawara, to his right or to his left, who -- would there be anybody?
A. To his left was Turrise --
Q. Turrise. And Turrise --
A. -- who was on the computer.
Q. -- was on the computer?
A. Yes.
Q. And --
A. And then Gannon was to the left of Turrise.
Q. Gannon was to the left of Turrise?
A. So it's like one, two, three. 1:06:46
Q. Okay. So middle of the table approximately?
A. Oh, I don't know how far we were.
Q. One, two, three?

A. Right, they -- that's how they were positioned, one, two, three.
Q. And where was the officer that was sitting?
A. Somewhere over here, behind me.
Q. Way to your left --
A. To my left.
Q. -- and as you're facing -- well that's -- okay.
A. Yeah.
Q. To your left of where you're sitting, but from the door straight --
A. Just about right here.
Q. -- straight from me? Okay. And so where was Nawara looking at when you walked in?
A. They were all looking at the computer.
Q. Okay. What happened as you walked in?
A. So when I walked in, I touched Nawara on his shoulder to lean forward to kind of get his attention, like, "Hi, guys" so I can read his name because I didn't know who he was, and I asked him, I said, "Do you work for Cermak?" and he said, "Yeah."
Q. Okay. 1:07:42
A. And I was like, "Okay," and then Officer Gannon, who is the female officer, she began to talk to me. I was like, "You know, you guys have people here



in this space, these doors should be secured, and no one should be in here but you all," and then Officer Gannon began to explain to me that Turrise was there because he was writing a report, and I said, "Oh, okay." You know, I don't recall how the subject came up about the staging area and the detainees being secured, but at some point, we had a conversation about "you know, you guys have to make sure -- you guys shackle these detainees and handcuff them to the rear, keep these doors secured because we have incidents down here that we need to make sure that we can contain everything," and at some point, I don't even know what happened, but I touched Nawara's -- how do you say his name?
Q. Nawara. 1:08:47
A. Nawara's arm, and I said, "Officer Nawara, are you hearing what I'm saying?" He went -- got angry, you know, and he began yelling, like really mad, "Don't touch me, don't touch me," and it -- it kind of threw me for a sec. I was like, oh my God, what happened? You know, and he was just screaming, "Don't touch me," he was very aggressive and got in my face. It -- it surprised me, one, because I didn't think that my, you know, touching his arm would make him that angry, and he was screaming, "Don't touch me, don't



touch me," and I was like, oh, my Lord. I said, "Okay, I'm -- I'm sorry if I -- if I -- I'm -- my apology if I -- me touching you offended you in any way, please forgive me, I'm sorry." You -- I -- he just got so angry, and I couldn't understand it, you know. I've never had anybody, like, explode like that on me and to be that aggressive just from me trying to give you a directive, you know, and he started yelling, "Don't touch me, keep -- keep your hands off me, lady," you know. I was like, oh. So after he began, you know, getting upset, I said, "You know, I'm sorry, my apologies." I -- my job wasn't to come down there and disrupt anybody or cause you to be angry, I'm just asking you to follow the directives that was put in place, you know, but it just -- it just threw me off, you know, it kind of shook me. In all my years of service, I just wasn't accustomed to that type of interaction from your staff, you know, and by me not really knowing him, I was like -- the best thing for me to do was just leave his workspace, that's what I'm going to do. So I stepped out of the basement control area and I kind of stood in the staging area, there is a desk there, and I kind of stood there to kind of try to get my bearings, not really understanding what caused the outburst, you know. So I was just trying to



pull my thoughts and everything together, and one of the detainees in the staging area was asking me some questions, and I asked him to just give me a minute, "Hold on a second, I'll -- I'll be right with you," and so I tried to get myself together, and then shortly thereafter, I approached the detainee to find out what -- what did he need. He asked me something, I couldn't tell you what it was, and then at some point, I exited the area completely and went into the ER.
Q. All right. Let's -- let's stop right there for one second.
A. Okay. 1:11:32
Q. I want to ask you some questions about --
A. Okay.
Q. -- what you just told us, okay? Had you worked with Officer Gannon before?
A. I don't believe so. The staff was -- I -- you know, being in a new position and going to a new building, it had been some time since I worked at Cermak, so I was getting to know all of the employees all over again. I don't remember if I have or have not worked with Gannon before.
Q. Okay.
A. I'm not sure.
Q. Okay. So you can't tell us today if you knew

Page 73

Gannon?
A. No, I didn't know her.
Q. Did not know her?
A. No.
Q. How about Nawara?
A. I did not know Nawara -- Nawara.
Q. Nawara. Yeah, it's a Polish name --
A. Okay.
Q. -- and the W is pronounced like a V.
A. Oh, I -- I -- because I've always -- okay. I keep saying, "Nawara." Nawara.
Q. Nawara, right. Did you know Turrise? 1:12:25
A. Not really. I think I've probably seen his face walking back and forth in the building in Cermak, but I didn't know him. That's why I asked, you know, "Who is -- who is assigned to Cermak, do you work in Cermak?" That's why I was asking the questions, because I was uncertain as to who actually were the staff in that area.
Q. When you saw the film in preparation for your deposition today, did you recognize Nawara?
A. No, I could not.
Q. Did you recognize Turrise?
A. I -- you know, Turrise -- once I -- I did recognize him, I'm sorry, later on when I looked at the

Page 74

video and I was able to see their faces clearly, yes.
Q. Did you see the officers that came to separate the inmates that were fighting?
A. Yes.
Q. Okay. Did you -- was one of those officers Officer Nawara?
A. Yes. 1:13:20
Q. Okay. And one of those officers was Officer Turrise?
A. Yes.
Q. All right. You did recognize them at that point?
A. Yes, sir.
Q. Did you see anything improper about the way that they handled that situation?
A. Not necessarily. I didn't really focus on it too much, but not to my recollection, no.
Q. Did you determine or were you able -- when you viewed the film, did you see if any one of them was aggressive towards the inmates?
A. I was not looking for that, sir, no.
Q. Say that again?
A. I -- no, I was not reviewing the film for that, no.
Q. No, but did you notice anything that jumped

Page 75

out at you, "Oh this guy is being aggressive --
A. No.
Q. -- towards the inmates"?
A. No.
Q. As a matter of fact, don't you think that they are -- the way that they handled the situation was a very slow, deliberate manner?
MS. KAMPER: Object to --
MR. CHURMA: Object to --
MS. KAMPER: -- form.
MR. CHURMA: -- form.
MS. KAMPER: You may answer. 1:14:12
A. I don't know if it was slow and deliberate. I couldn't say.
Q. Okay. One of the officers -- I'm sorry, I can't bear that noise. Okay. Let me see. You -- you -- did you observe any of the officers running towards the inmates that were involved in -- in a fight?
A. I did see officers respond, I don't know if they were running or not. I didn't pay that much attention to the video.
Q. So at this point in your several months of being -- two months approximately of being a superintendent, you didn't know all of the employees that were assigned to you?

Page 76

A. Correct. 1:15:05
Q. Going back to the control room, okay?
A. Mm-hmm.
Q. When you first entered the control room and touched Officer Nawara on the shoulder to see who he was, he did not react in any angry manner. Is that correct?
MS. KAMPER: Object to form. You may answer.
A. Initially, no.
Q. And -- and then did you have a further conversation with Officer Nawara, or was your conversation with Officer Gannon?
A. I -- the -- the conversation was more so for the staff that was in that area.
Q. With the group then?
A. Yeah. 1:15:58
Q. You were directing your --
A. That -- that -- well when I first addressed Nawara and I asked him did he work Cermak, he said, "Yes," and then Gannon began to speak, saying, "Oh, hi, Supt. I'm -- I'm Officer Gannon. Yes, we work down here. Turrise is on the computer because there was an incident." So now my conversation is geared towards Nawara and Gannon who have addressed me that yes, they work for Cermak.

Q. Okay. So now you're talking to both of them?
A. Correct.
Q. All right. And that's when you started talking about the directives --
A. Right.
Q. -- regarding having inmates handcuffed and shackled?
A. And the doors secured. 1:16:40
Q. And the doors secured. Okay. How long was it from the time that you first walked into the room and started having this conversation until you say that Nawara reacted angrily?
A. I couldn't give you a specific number of minutes, but the conversation was very brief, and I recall asking the questions, you know, "Are you guys aware of the policy, you know, having everyone shackled and handcuffed?" and he didn't respond, which is why I touched his arm to say, "Officer Nawara," and when I touched his arm, he just went crazy, just yelling, screaming. He was so angry, and I just didn't understand it.
Q. You know that Officer Nawara claims that you poked him in the chest with your finger?
A. No, why would I do that?
Q. No, but do you know that that's what he



claims?
A. Oh, no.
Q. Oh, you didn't know that?
A. No.
Q. Okay. Did you poke Officer Nawara --
A. I did not. 1:17:41
Q. Let me finish asking --
A. Oh, Lord.
Q. -- question.
A. I'm like what is happening?
Q. Let me ask a full question before you answer, okay?
A. Okay. I'm sorry.
Q. Okay. Did you poke Officer Nawara on the chest with your finger?
A. No.
Q. Okay. That would have been inappropriate for a supervisor, correct?
A. Yes.
Q. Is that correct?
A. Yes.
Q. Did you address Nawara in --
MR. BUSTAMANTE: Oh, okay. Excuse me one second.
Q. -- a condescending tone?



MS. KAMPER: Object to form.
MR. CHURMA: Join.
A. No, I did not.
Q. That would have been inappropriate for an officer to do. Is that correct?
A. Correct.
Q. Tell me exactly the words that Nawara used when he was angry towards you.
A. What I can recall is him saying, "Don't touch me, lady."
Q. How many times did he say that? 1:18:43
A. I couldn't tell you, but it was enough to scare me.
Q. Okay. What was your reaction physically first to his anger?
A. My thing was, "Officer Nawara, I'm sorry," you know. "If my touching your arm offended you in any way, I apologize, please forgive me." I do remember saying those specific words to him.
Q. Right. I want to know your physical reaction, in other words, were you scared?
A. Yes.
Q. Were you shaking?
A. I -- my -- I was very nervous, and it scared me. I just -- I didn't know what provoked it is what



bothered me.
Q. Okay. Did you maintain your composure even though you were scared?
A. Yes. 1:19:32
Q. Did Officer Nawara say anything else other than "don't touch me, lady" after you said, "Officer Nawara, I'm sorry" and all of the words that you said?
A. I don't remember what his response was. I kind of -- in my mind, I was just trying to process I need to get out of this space basically.
Q. Did Officer Nawara threaten you physically, in other words, raise his arm or pretend that he was going to hit you or something?
A. What I do remember is his hands were clenched closed, and he was approaching me as he was saying -- although we didn't have that much space in between us, but to -- to be that aggressive and get -- "Don't touch me, don't touch me, lady," you know it -- that's what frightened me. One, he's -- he's -- he's angry and I didn't know why, and it just -- I don't -- I don't know. It was just kind of bizarre, strange.
Q. Do you know how long Nawara had been assigned to Cermak before September 28th, 2016?
A. No, sir. 1:21:05
Q. Had you received any complaints about Nawara

before September 28th, 2016?
A. No, sir.
Q. Had you heard through the grapevine or heard in any way that Nawara had an anger problem?
A. I don't know much about anything prior to that incident with him and I, but --
WITNESS: With the thing with Commander Tylka?
MS. KAMPER: Well you can -- you can answer his --
WITNESS: Okay. 1:21:42
MS. KAMPER: -- question if you -- to the best of your ability, whatever you can recall.
A. So after the incident occurred, the commander then says, "Supt, you don't remember Officer Nawara?" and I was like, "No, why would I remember him?" There was an instance where he did not want to transport some detainees to another unit, so Commander Tylka and I came down to find out what the issue was, and I remember telling him -- Officer Nawara, "I'll take these guys since they're giving you problems and you just take them," and he's like, "No, no," you know, he was mad about the fact -- he didn't want me to transport the male detainees, although he was refusing to take the male detainees to division nine. So I



said, "It's okay, I'll -- I'll take -- leave this group here, I'll take these guys over, and you just take the ones that are not giving you an issue," and he just didn't want to hear it. So eventually, Commander Tylka intervened and said, "Supt, you don't have to walk them, I'll walk with Officer Nawara and then we'll just take the whole group," and I said, "Okay, that's fine." You know, I didn't remember that incident until Commander Tylka brought it to my attention, and he was just like, "You know, I think he has a problem taking orders from you, Supt," and I -- I just laughed about it. I'm like, "Just make sure we get the guys over there," and that was done. So other than that, I had nothing to even identify Nawara -- Nawara by, except the incident with me.
Q. So give me an approximate time when this first incident happened.
A. Oh, well I was a supt, so it had to be within that two month window.
Q. Okay. And where did it happen? 1:23:30
A. In the basement, in the core exiting out into the tunnel area.
Q. And super -- Commander Tylka, where was he assigned?
A. He was assigned to Cermak.



Q. And where did the incident take place?
A. In the --
Q. In the basement as well?
A. -- basement, yes, sir.
Q. At what time?
A. Oh, gosh, I couldn't tell you the specific time, to be honest.
Q. Or shift?
A. It had to be day shift because --
Q. Day shift?
A. -- they were assigned to the day shift.
Q. Okay. Who else besides Tylka, Nawara, and yourself were involved?
A. That's all I can recall being in the area.
Q. How were you brought into this event, were you just happened to be there, or --
A. They called --
Q. -- were you --
A. Someone called for Commander Tylka to -- to come because there were some problematic detainees in the staging area, and Officer Nawara, I'm assuming -- well, I can't -- shouldn't assume.
Q. No, don't assume. 1:24:37
A. But at some point, there was a disruption, so Commander Tylka was on his way down to the basement. I



do believe he told me that there was an issue, so I joined him.
Q. Okay. And how many detainees were involved in total?
A. I'm not for certain the exact number.
Q. Okay. How many did you offer to take yourself?
A. I want to say it was two or three of them.
Q. And where were they going?
A. To division nine.
Q. What is division nine?
A. Maximum security.
Q. Okay. And how many other detainees were there?
A. I couldn't tell you for sure.
Q. How -- eventually, you and Commander Tylka took those two or three detainees?
A. No, sir. Eventually, Commander Tylka and Officer Nawara took all of the detainees.
Q. Did you prepare any paperwork for this?
A. There was no need.
Q. Why was there no need?
A. It was not an incident, so it did not require paperwork.
Q. Okay. Wasn't Officer Nawara, according to

Page 85

what you're saying, refusing to obey orders?
A. He was. 1:25:43
Q. Okay. Isn't that an incident that should be reported?
A. That is an infraction, however, when you're dealing with this population, you can certainly understand some frustration, and it wasn't like, "Take these detainees, Officer Nawara, I'm giving you a direct order," it wasn't in that manner. It was more to assist in easing the conflict that he was having with himself and the detainees that he was transporting, so it wasn't received in that manner, if -- if you will.
Q. You just mentioned -- used an interesting word "frustrating." Do the conditions of employment for an officer in Cook County Jail, can they lead to frustration every once in a while?
A. Any position can lead to some frustration at some point, sir.
Q. And why is that? 1:26:45
A. Just daily duties, you know.
Q. You're dealing with people who are difficult?
A. We're human.
Q. Right. You're dealing with situations that may put you in danger as a guard, as an officer?

Page 86

A. Okay.
Q. Are you? I'm asking.
A. Well it -- it can be, but that's why we trained.
Q. Okay. You're dealing with a population of inmates that exceeds a population of guards. Is that correct?
A. On some occasions, I guess you can say that.
Q. Guards are not armed, true? 1:27:23
A. We do have tools that are given to us to perform our duties, but we do not have firearms inside of the facility, no.
Q. Correct. What tools are you given to perform your duties?
A. You have OC spray, you have de-escalation training, your voice, you have your presence, so there are other measures that you have to use that does require you to use a firearm, and then you have your physical training, so.
Q. The -- when an officer is assigned to supervise or guard a population in an open room, is that officer permitted to carry OCR (sic)?
A. I'm sorry, say it again now? 1:28:16
Q. If an officer is assigned to an area where the inmates are in an open room, is that officer

Page 87

permitted to carry pepper spray?
MS. KAMPER: Object to form. You may answer.
A. Yes.
Q. Isn't there a concern that the inmates, because of their number, could overpower the officers and take away their pepper spray?
MR. CHURMA: Object to form.
MS. KAMPER: Join. You may answer.
A. Not necessarily, because there are measures that you should take to -- you know, to prevent those issues from happening. When using OC spray, there is a training that requires -- that -- that is required to assist you in how to use your pepper spray, and that's just with like law enforcement on the streets, when they carry a firearm, there are methods that you use to protect your weapon, so it's the same inside.
Q. Why are weapons not permitted inside but pepper spray is?
MR. CHURMA: Object to form. Foundation. 1:29:17
MS. KAMPER: Join. You may answer.
A. I couldn't tell you why the department decided that.
Q. By the way, in order to become superintendent, did you receive additional training?
A. We did.

Page 88

Q. And what was that training?
A. Oh, I couldn't tell you all of the specifics, but they do give us additional training yearly --
Q. Okay. Was it like --
A. -- the job.
Q. -- an academy type setting, or was it more of a, what do you call it, on -- on the job type training?
A. Classroom setting.
Q. Okay. Who -- who ran the classes?
A. I couldn't tell you for sure.
Q. Was it inside or outside the facility?
A. Inside.
Q. So someone from the sheriff's office provided the training?
MS. KAMPER: Object to form. You may answer.
A. I do believe so, yes. 1:30:04
Q. Okay. As a super -- superintendent, did you eventually get to know all of the guards that worked with you -- under you?
A. Not all of them. I still had some people that I had to meet, some were off, some left and came back, so you don't really get to see the whole collective group all of the time, so no.
Q. Okay. What is a directive? As you use that term as a superintendent, what is a directive?

Page 89

A. It's an order.
Q. What is a policy?
A. It's an order. 1:30:57
Q. Do you use those terms interchangeably?
A. No, policies are something that is established by the department, and this is my perception. A directive is a verbal order that you give, so one is written and one is verbal.
Q. The requirement of having the inmates shackled behind the back at the basement of Cermak, was that a policy or a directive?
A. So first, the detainees are handcuffed to the rear and shackled, and that was a -- the handcuffing is policy.
Q. Okay.
A. And the directive was put forth to remind them of the policy, detainees entering this area should be handcuffed to the rear and they should be shackled when they are in this particular area.
Q. Okay. I wanted to break it down into two things, I started with the handcuffs, I didn't forget the shackles.
A. Okay. 1:32:04
Q. Handcuffs to the rear is a policy, you said, that is a department wide issue, correct?

Page 90

A. Detainees should be handcuffed to the rear.
Q. The shackling, was that also department wide -- was it a department policy?
A. I couldn't say for sure if it was put into policy or not --
Q. Did you --
A. -- but it was a directive.
Q. Was that your directive?
A. It was.
Q. And it's a directive that you implemented obviously after you became superintendent?
A. Correct.
Q. Who was the superintendent there before you at Cermak?
A. What is his name? Superintendent Jones.
Q. Pardon?
A. Jones.
Q. Jones. How many superintendents are there in the Cook County Department of Corrections?
A. I couldn't tell you for certain. 1:32:58
Q. Do you know Mr. Martinez or Martinez, Salomon Martinez?
A. Yes, I have --
Q. Is he --
A. -- with him.

Page 91

Q. Is he a superintendent?
A. Superintendent, yes, sir.
Q. Okay. Hugh Walsh, is he a superintendent?
A. Yes.
Q. Erica Queen, is she a superintendent?
A. Yes.
Q. Sean Julian, is he a superintendent?
A. No.
Q. Richard Brogan?
A. No.
Q. Martha Yoksoulian?
A. Yes.
Q. Is she a superintendent? Okay. John Guinta (phonetic) or Guinta?
A. Guinta -- John?
Q. G-u-i-n-t-a.
A. Guinta.
Q. Guinta. Guinta.
A. Guinta. He says, "Guinta."
Q. Okay.
A. Okay. Guinta, okay.
Q. Is he a super?
A. He is.
Q. Okay. How about Don Beachem?
A. He is.

Page 92

Q. And John Mueller?
A. Oh, I don't know what Mr. Mueller's --
Q. Okay. 1:33:48
A. -- position is.
Q. Okay. After you left the control room, you said you went out first to the staging area, discussed matters with an inmate, then you went to another location, was that the ER or was it somewhere else?
A. The ER.
Q. How long were you in the ER?
A. I'm not sure how long I was there.
Q. All right. And -- and by the way, did Sergeant Conley witness everything that you told us about about your interaction with Officer Nawara?
A. He did.
Q. Where was he, was he inside or outside the door as these events were happening?
A. I'm not sure specifically where he was standing.
Q. Sergeant Conley still work with you?
A. No. 1:34:55
Q. Where is he now?
A. I'm not sure.
Q. Okay. Is he working for the Cook County Sheriff's Office?

A. As far as I know.
Q. Okay. Did Sergeant Conley go with you to the ER?
A. At some point, he did come to the ER, but I don't recall if he walked with me in that moment that I went, but I do recall him coming to the ER where I was, yes.
Q. Was Sergeant Conley with you as you were speaking to the inmate at the staging area?
A. No.
Q. In the ER, where in particular in the ER were you?
A. I recall speaking with the admissions officer, so just beyond the door there and to the right, there is also an office area where the admission officer works, and then you have the ER area back that way.
Q. Okay. So you were by the admissions officer?
A. Yes. 1:35:55
Q. How many officers were there in that area?
A. I couldn't tell you how many total, but I know I was speaking directly to the admissions officer.
Q. What is that officer's name?
A. I couldn't -- I don't remember. It's been a long time.



Q. Okay. Are there cameras that film that portion of the hospital, the ER admissions area?
A. No, sir.
Q. There are no cameras in the control room as well. Is that correct?
A. No, sir.
Q. I'm sorry, are they or are there not?
A. There are not.
Q. Were you in the ER when you next had contact with Officer Nawara?
A. Yes.
Q. Did Officer Nawara come to the ER, or did you leave the ER?
A. He came into the ER.
Q. And when he came into the ER, the officer at the admissions desk was present, yes?
A. It's possible. 1:37:00
Q. Okay. Well let -- let me ask you the other way. Who was present when Officer Nawara --
A. I do know Sergeant Conley was present.
Q. Let me finish asking --
A. Oh, I'm sorry.
Q. -- question.
A. I thought you was asking me the same question. Forgive me, Lord. Okay. I'm sorry.



Q. Okay. We'll do it again.
A. Okay.
Q. Who was present when Officer Nawara came to the ER?
A. I did -- okay, you ready? Okay. I do know that Sergeant Conley and I were standing there. I couldn't say with 100 percent if the admissions officer was still present, I'm not sure, but I do know that Sergeant Conley was present.
Q. While you were in the ER and before Officer Nawara came in, did you use the telephone?
A. I don't remember.
Q. Are -- do you know if there are logs kept of telephone use in the Cook County Jail?
A. I couldn't say for sure, sir. 1:37:53
Q. When Officer Nawara came to the ER, what happened?
A. I remember him storming in. He was yelling that -- to me, saying, "See what you -- see what you made happen" or something, and I didn't know what he was speaking of, and my only thought was what are -- what are you talking about, Officer Nawara? He was just so aggravated with me and aggressive with me, and I said, "What are you talking about?" "You see what you made me" -- he was just beyond what a calm person



should be, and he shared with me that -- screaming, that the detainee -- "You all told me I had to shackle" -- something he was screaming, so I said, "Okay. Serg, come with me and let's find out what's going on." So he leaves out of the ER, and then --
Q. I'm sorry, "he" is Nawara? 1:38:58
A. Nawara -- Nawara.
Q. Nawara walks out before you do?
A. Walks -- we -- yeah.
Q. Or --
A. I let him go --
Q. -- two of you together?
A. Then we walked behind him.
Q. Okay.
A. And he -- he was really agitated, angry, I don't know, he was just having a moment, and --
Q. Was he walking fast, or was he walking slow as --
A. He was moving fast, because he -- he came in like a rushing storm when he bust in the ER, he was mad. And so when we got out to the staging area, I -- I asked Sergeant Conley, I said, "Please do not leave, stay right here with me." I think, at that point, I just didn't know how far this was going to go with Officer Nawara, you already had your explosive moment

Page 97

here, you -- you storming into the ER now screaming, saying -- you're blaming me for something that I'm not really understanding, so I asked the serg to "please stay right here, do not walk away from me," and he said, "Okay." So I says to him, I said, "Officer Nawara, can you please tell me what the problem is?" So he was screaming about the shackle.
Q. You're in the staging area now? 1:40:09
A. We're in the staging area now, he says something about the shackle. I said, "Well where is the detainee that you're trying to shackle?" and he's --
Q. And then what --
A. -- looking around.
Q. Okay.
A. He couldn't tell me which detainee --
Q. How many detainees were there approximately?
A. I -- I don't know. There were some there, but I couldn't tell you how many. I said, "Officer Nawara, can you just show me the detainee that's giving you the problems?" So he -- he couldn't find him. He was looking around, and he couldn't determine which detainee he was having this negative interaction with. So one of the detainees on the bench said, "Supt, you're looking for the guy back there on the back

Page 98

bench, that's him right there."
Q. Okay. And then what happened? 1:40:52
A. So I said, "Sir, can you come here? Can you come up here?" And he says, "No, I'm not coming up there." This is a detainee.
Q. Where -- where were you when you said that, how --
A. I was in the front of the seating area of staging, the detainee was in the back by the wall, in the last bench. He said he wasn't coming, so I continued to address him, and I said, "Sir, can you just come forward?" So he was like, "I'm not getting ready to" -- something "with that dude," referring to Officer Nawara. So I told him he doesn't have -- "Look, you don't have to be" -- he says, "I'm -- I don't want something to happen to me," or something to that effect, so I said, "Nothing's going to happen to you, just come up here, have a seat, we need to shackle you." And after coaxing him along and -- and communicating with him, at some point, he did come. I asked him to have a seat here, "Have a seat, sir," and I turned to Nawara, I said, "Now can you shackle him, please?"
Q. Okay.
A. So --

Page 99

Q. Go ahead.
A. -- as Nawara walks to shackle the guy when he kneeled down, I proceeded to exit stage left and get out of the basement area period because he scared me.
Q. Okay. In order to walk out of the basement area, you went through the control room?
A. No. 1:42:11
Q. Where -- how did you go?
A. I don't think I went through the control room. Let me think. I don't know which direction -- I don't know if I went through the door or not, I can't say for certain, but --
Q. Where was Sergeant Conley --
A. He was --
Q. -- when you walked out?
A. He -- he stayed in staging, but I remember, as I was leaving out, I -- I recall Officer Nawara saying something to me as I was leaving out, and I just continued to walk and exit the building. Sergeant Conley -- exited the basement. Sergeant Conley stayed in the basement area, I got on the elevator and left the basement altogether because it appeared that it was something about me that upset Officer Nawara.
Q. Okay. Now you stated that you were coaxing the inmate, tell us how you were coaxing the inmate.

Page 100

A. What I know about human -- what I've learned about working with -- just being around people in general, if they're elevated, the best thing for you to do is kind of bring your voice down and let them know, "You're safe, it's okay. I'm a superintendent, I'm asking you to come, so you'll be okay," you know? The detainee initially had some reservation, but after saying, you know, "Sir, listen, serg is here, I'm here, you're going to be fine, just come and sit here, we have to shackle you."
Q. Okay.
A. That was it.
Q. How many times did you have to do that?
A. I don't know, a few. More than one I'm sure. 1:43:47
Q. Okay. You said that as you were leaving, that Officer Nawara had a further conversation with you?
A. He -- he -- I'm --
Q. Let me ask you about that.
A. -- sorry.
Q. And -- and so here, did Officer Nawara proceed to shackle the inmate?
A. From what I can recall, yes.
Q. All right. How long does it take to shackle an inmate?

A. A couple of seconds maybe.
Q. Okay. Explain to us what the shackling does, what -- what does -- what does shackling mean? I can understand handcuffs, but what -- what is a shackle?
A. It's a larger handcuff that go around the ankle.
Q. Okay. And then where does that chain go?
A. It's linked to the bench where they're sitting.
Q. Okay. So is there only one -- one chain?
A. One shackle to the leg, one shackle to the bench.
Q. Okay. It's not both legs?
A. No, sir. 1:44:45
Q. Okay. And how long is that chain?
A. Long enough for they can stand up and move about, but it prevents them from walking the complete area.
Q. Now what did Nawara say to you after you told him to shackle the inmate and you saw he was shack -- shack -- had he already shackled the inmate when he said something else to you?
A. I don't know if he was completely done with the shackling process. I don't know. My goal was to get out of the area. Nawara frightened me --



Q. What did he say to you?
A. -- and I don't recall what the words were, but it -- he -- he got up so quickly to -- you know, the behavior was just -- it was -- it was a lot for me, so I just thought it was best to just do not engage and just leave the area --
Q. Okay. 1:45:46
A. -- which is what I did.
Q. About what time did this happen?
A. Oh, I don't remember the exact time. Do you have the report --
Q. I do.
A. -- my CR? Oh. I'm sorry. Can --
Q. I have the report --
A. -- you help me?
Q. -- but I want to test your memory first.
A. I -- I -- I'm not for certain to the exact minute.
Q. Approximately?
A. But I know it was fairly early, right around 10:45 or so.
Q. Okay. So between 10:00 and -- and 10:45 we're going to say?
A. Okay.
Q. Okay. In that area.



A. Okay. 1:46:29
Q. Okay. Again, during this second event with Nawara when you have him shackle the inmate and then he says something else to you and you walk out of there, did he threaten you physically during that period of time?
A. I don't know what he said.
Q. No, threaten you physically --
A. Oh.
Q. -- make any overt movements with his body, with his fists, or with his hands to -- like he was going to hit you or something?
A. Initially, yes, with his fists closed, yes, he was angry. Both fists --
Q. I'm talking about --
A. -- balled up. The second time?
Q. I'm talking about the second time. 1:47:25
A. I don't recall.
Q. And the first time, you said with his fists closed right next to his body, correct?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay.
A. Sorry.



Q. By the way, what -- what is the noise level at -- from -- on the inmate side of the staging area?
MS. KAMPER: Object to form.
MR. CHURMA: Join.
A. Standard.
Q. Standard?
A. Standard.
Q. Okay. Inmates talking?
A. Yes.
Q. Guards probably talking, sending -- giving directions or orders?
A. Officers talking, yes.
Q. Yeah. Okay. Okay. All right. We're going to look at some documents.
A. Okay. 1:48:23
Q. Let's see here, why don't we start with the CR, okay?
A. Okay.
MR. BUSTAMANTE: Thank you. We have Exhibit 1. Let's see here.
MS. KAMPER: Thank you.
MR. CHURMA: Thanks.
Q. So let me show you what we've marked as Jones-Hayes Exhibit Number 1, and this is a -- an investigation form and a complaint register, so that's

at -- at the -- at page number 3. Okay? You see the numbers at the bottom?
A. Okay. 1:49:12
Q. Okay. Would you look at pages number 3 and 4, please, read them to yourself, and let me know when you're done.
A. Okay. 1:52:01
Q. All right. You read it?
A. Yep.
Q. Okay. So now, first of all, did you prepare the -- what -- what is written on this complaint register, what is -- you know, the -- the narrative, provide a full detail, is that yours?
A. I believe so, yes.
Q. Right. Did you receive any assistance from anyone in preparing this narrative?
A. No, sir.
Q. You consulted with someone after you prepared this narrative?
A. I did.
Q. Who was that?
A. My superiors, I advised them.
Q. Say that again?
A. My boss, I advised him that this incident occurred.



Q. Okay. Who is your superior?
A. At the time, I believe it was Jeff Johnsen.
Q. Okay. And didn't you ask Mr. Johnsen to review this for you?
A. No.
Q. Okay. Take a look at page --
A. Not to my knowledge, no.
Q. -- 5, if you would please --
A. 5.
Q. -- and look --
A. Okay.
Q. -- at the email at the very bottom of the page.
A. Yes, sir.
Q. Would you please read that for us --
A. "Director, will you please" --
Q. -- from -- from Karen?
A. Yes. 1:53:00
Q. Read that.
A. "Director, will you please review it for me?"
Q. Okay. Did you -- no, please -- please read for our record, please read where it says, "From," "To," "Subject," and then the message.
A. "From Karen Jones-Hayes to Jeff Johnsen. Subject, Incident with Officer Nawara, John. Director,



will you please review it for me?"
Q. What were you asking him to review?
A. The -- the actual complaint register.
Q. Okay. So you did ask him to review it for you?
A. Not to review the contents, but to complete -- to review the complaint register itself.
Q. What is it in the complaint register that is important for him to review outside of the content?
A. To ensure that I --
MR. CHURMA: Object to form.
WITNESS: Oh.
MS. KAMPER: Join. You may answer.
A. To ensure that I completed it properly.
Q. Okay.
A. I didn't need him to assist me with the body, sir.
Q. Okay. Did Mr. Johnsen make any comments or offer you any suggestions regarding the complaint register?
A. Not to my knowledge, sir.
Q. Would you look at page 6, please? At the very bottom, it says, "From copiers@cookcountyil.gov to Karen Jones-Hayes."
A. Okay. 1:54:13



Q. What is that?
A. I don't know.
Q. What is -- was this -- was it someone emailing you, or were you emailing yourself?
A. I may have emailed myself. I'm not for sure.
Q. What was the content?
A. I couldn't tell you for certain, sir.
Q. What is "KM_364E"?
A. I have no idea.
Q. Who would know?
A. Maybe the --
MS. KAMPER: Object to form. You may answer if -- if you can.
A. I don't -- I don't know.
Q. Okay. At what time did you send your email to Jeff Johnsen asking him to please review this for you?
A. We're on page 5?
Q. Say that again? 1:55:05
A. You said from page 5?
Q. I'm looking at page 5, yes.
A. Oh, which one are you asking me about, the --
Q. I'm asking you about when you -- at what time did you send your email?
A. I don't know.

Page 109

Q. There is no timestamp on there. Is that correct?
A. Not that I can see, no, sir.
Q. All right. But if you look at the email above that from Jeff Johnsen to Matt Burke, it has a timestamp of 8:10 p.m. Do you see that?
A. Oh.
Q. Right here.
A. Okay. Mm-hmm, yes.
Q. Is that correct?
A. Yes, yes, yes.
Q. Okay. Do you know why your email has no timestamp?
A. No, I do not.
Q. Look at the top on page 5 again, I'm sorry, the top email from Jeff Johnsen to Miriam Rentas.
A. Okay. 1:55:59
Q. Do you see that? Who is Miriam Rentas?
A. She is director of OPR.
Q. Okay. Do you know what the attachment is here, "SKM_364E" and then a whole bunch of other numbers?
A. No.
Q. See -- see the date there, would you read it into our record, the email from Jeff Johnsen to Miriam

Page 110

Rentas is sent on what date?
A. Friday, October 14th, 2016, 11:31.
Q. Did John Nawara ever file a complaint against you?
A. I don't know, sir.
Q. So you are not aware that on October 13th, John Nawara filed a complaint against you?
A. No. 1:56:53
Q. Do you have any idea why Jeff Johnsen would have emailed Miriam Rentas on October 14th, a day after John Nawara filed a complaint against you?
A. No, sir --
MS. KAMPER: Object to form.
MR. CHURMA: Object to form.
MS. KAMPER: You may answer.
A. No, sir.
Q. Okay.
MS. KAMPER: Just a minute, I just want to check on my client. I know that you were hungry, you didn't get a chance to finish that. Do you need a minute?
WITNESS: Can I have two seconds? My stomach is rumbling.
MR. BUSTAMANTE: Oh, so sorry.
RECORDER: Off the record --

Page 111

WITNESS: Please.
RECORDER: -- 1:30 p.m.
MR. BUSTAMANTE: Do you want -- do you want to take --
WITNESS: Thank you.
(Off the record)
RECORDER: Back on the record, 1:39 p.m.
Q. All right. So we're looking at Exhibit Number 1, which is the complaint register, and I want to ask you a few questions about some of the statements in here, okay? Let's go --
A. Okay. 1:57:44
Q. -- to page 3, if you would, please. The second sentence, would you kindly read that into the record, please? It starts with "upon."
A. "Upon"? "Upon my arrival to the basement, I observed the basement control door ajar, this is a violation of the directive put in place for -- by me for security reasons."
Q. All right. Just to make sure I understand what we're talking about, this was an order that you had given as superintendent that the doors to the control room must be kept closed at all times?
A. Secure, yes, sir.
Q. All right. Is that what you mean by

Page 112

"secured"?
A. Yes.
Q. Closed?
A. Yes.
Q. Okay. And so this was not a policy of the jail, but it was a directive by the superintendent, correct?
A. I'm --
MR. CHURMA: Object to form. 1:58:35
A. I'm uncertain as to if it was made a policy or not, but because that is a secured area, the doors should be closed, secured.
Q. Okay. Well I'm just a little bit confused. This complaint register, does it contain truthful statements?
A. It does as far as --
Q. All right. And as --
A. -- yes.
Q. -- a matter of fact, on page 4, you signed this document and had it notarized. Is that correct?
A. Correct, sir.
Q. And -- and you swear that the facts and allegations are true and correct to the best of your knowledge, correct?
A. To the best of my knowledge, yes, sir.

Q. Right. So again, going back to page 3, this was an order by you, as superintendent, and not a jail policy. Is that correct?
MS. KAMPER: Object to --
MR. CHURMA: Object --
MS. KAMPER: -- form.
MR. CHURMA: -- form.
A. It is a directive by me, but I am uncertain is -- if it's actual policy, but it is a directive that was ordered by me, yes.
Q. If it were actual policy, there would be no need for you to issue a directive. Is that correct?
MS. KAMPER: Object to form. 1:59:45
MR. CHURMA: Join.
MS. KAMPER: You may answer.
A. So if it's what? I'm sorry, say it again.
Q. Yes, I'll repeat it. If it is a jail policy, there would be no need for you to issue a directive saying the same thing that the policy says?
A. I would not --
MS. KAMPER: Same objections.
A. I would --
MR. CHURMA: Object to foundation too.
A. I would say that staff sometimes need to be reminded of policy, yes, sir. They do need to be



reminded.
Q. Let's go to page 4, if you would, please.
A. Okay.
Q. Would you read the first sentence of page 4 into our record, please?
A. "I began to ask Officer Nawara why were all of the detainees in the staging area not cuffed to the rear as per my directive for this area."
Q. All right. Again, same questions regarding directive versus policy, it was your directive, your order, that detainees be cuffed in the rear, is that -- is that correct?
A. Yes.
MS. KAMPER: Object to form. If you want me to spell that out more, I'll be --
MR. BUSTAMANTE: No, no, no.
MS. KAMPER: -- happy to.
MR. BUSTAMANTE: I just want an answer.
A. Yes. 2:00:54
Q. Okay. Now when -- here's where I'm having a little bit of a mental block regarding what we see, so walk from the elevators to the door that was open that was supposed to be secured but is not, now you're in the -- in the control area. From the control area towards the staging area, is it open, or is it a -- or



is there a wall there?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. So just as this office has a door, if I was to put a hole in that wall, it would have a door, this would be a secured room, if we're looking in the mindset of basement control, right? So there's a door here, and there's a door here, and this is considered basement control.
Q. And -- and the control, does it have walls around it?
A. It does. 2:01:58
Q. And so you really cannot look into the staging area, correct?
MS. KAMPER: Object to form.
A. You can look into the staging area.
Q. Well through what, is there --
A. The window.
Q. -- a window?
A. I have to be for certain. However, there is a glass portion, if I'm not mistaken, in the door that leads out into the staging area.
Q. Okay. So you can see --
A. So you would still be able to see if the door was secured.



Q. Okay. You can see through the glass on the door that leads to the staging area?
A. As -- if I recall correctly.
Q. Okay. Is there other glass that would allow people in the control area to see to the staging area?
MS. KAMPER: Object to form.
A. I'm not for sure.
Q. Okay. So apparently, somehow you managed to look into the -- into the staging area when you walked into the control area?
A. Correct. Correct. 2:02:50
Q. And when you looked into the staging area, what did you see? I'm -- yes, if you look into the staging area, what did you see?
A. Apparently, if -- if I asked him to cuff -- handcuff that I didn't -- to cuff the hand -- the detainees, then I must have seen some detainees that were not handcuffed properly.
Q. How many did you see?
A. I couldn't tell you for sure, sir.
Q. Okay. Now where in this CR do you state that you went to the staging area and addressed some concerns an inmate had --
A. No --
Q. -- after you had -- after you had the first

Page 117

incident with Officer Nawara?
A. I don't believe that that's in this --
Q. Okay.
A. -- statement here, however, you asked me about the video I was reviewing.
Q. Yes. 2:04:10
A. That -- that's when I responded that I was addressing a detainee --
Q. Okay. You --
A. -- in --
Q. -- saw yourself on the video --
A. Yes, sir.
Q. -- addressing the detainee?
A. Yes, sir.
Q. Approximately what time was that?
A. I'm not for sure, sir.
Q. Okay. In this particular report, you talk about events occurring at 10:45.
A. Okay.
Q. All right. And at what time did the incident with the inmate happen?
MS. KAMPER: Form.
A. I'm not sure, sir, specifically what time it was.
MR. BUSTAMANTE: Can -- can I take a short

Page 118

break, please? I'm sorry.
RECORDER: Off the record, 1:47 p.m.
(Off the record)
RECORDER: Back on the record, 1:49 p.m. 2:04:55
Q. Now look at the second paragraph on page 4, please, that starts with, "Moments later," and would you kindly read into our record the sentence that starts with "I exited"?
A. "I" -- excuse me. "I exited the ER, and Officer Nawara followed me out with his voice still elevated, telling me he don't have time for this shit."
Q. Read the next sentence --
A. Okay. 2:05:50
Q. -- as well, please.
A. "I asked Sergeant Conley to assist me in the staging area to locate this detainee that Officer Nawara was speaking about."
Q. All right. Where in this complaint register do you state that you asked Sergeant Conley to assist you because you were concerned about Officer Nawara?
A. Well it's not in there.
Q. Okay.
A. When generating a report --
Q. That's fine, you -- you've answered my question. That --

Page 119

A. Oh, okay.
Q. That -- that's all I wanted to know.
A. Okay.
Q. If it's not in there, it's not in there.
A. Okay.
Q. All right. Where is it in this report that Sergeant -- no, that an inmate pointed out to you, "The detainee that you're looking for is back there"?
A. I don't recall reading that in the report.
Q. No, is it -- is it in this report, that an inmate informed you that the detainee was -- in the back?
A. One -- one second, let me read it.
Q. Oh, sure. 2:06:51
A. "'Where is the detainee?' He had no idea at the time. A few moments later, he noticed the detainee in the rear of staging." No, I did not state that the detainee told me he was in the rear.
Q. All right. As a matter of fact, you state it was Nawara that noticed the detainee. Is that correct?
A. I stated, "He had no idea at the time, and a few moments later, he noticed the detainee in the rear of staging," after I pointed it out to him -- after the detainee said, "This is the inmate that -- that he wanted."

Page 120

Q. I'm -- I'm sorry, let's just stay with what you stated.
A. Okay.
Q. Okay. Do you state here --
A. I did not.
Q. -- that it was Officer Nawara --
A. I --
Q. -- who noticed the detainee?
A. I did.
Q. Okay. So does this -- reading this report refresh your recollection as to the second statement that Officer Nawara made to you?
A. It does. 2:07:58
Q. Regarding as you were walking away --
A. Yes, sir.
Q. -- it does? Okay. Would you read that into our record, please?
A. "I then gave Officer Nawara an order to shackle the detainee, and I walked away. As I walked away, Officer Nawara continued -- continued to antagonize me, stating, 'Yeah, why don't you walk around with me all fucking day so I can do my job?' I replied, 'No, Officer Nawara, I will not walk with you all day, but you will do the job that you're being paid for.'"

Page 121

Q. All right. So at that time, you did what you as the supervisor, superintendent was supposed to do, right?
A. Correct.
Q. You did not back away from that officer, did you?
A. I did --
MR. CHURMA: Object to form.
WITNESS: Oh.
MS. KAMPER: Join.
A. I did --
Q. I'm sorry. 2:08:45
A. -- by exiting.
Q. In terms of your -- in terms of your authority, you told him he better do the job that he has to do, correct?
A. I instructed him that he should do what was required, yes.
Q. Right. At the very end of this block which has the narrative, it has "DV -- DIV8.CERMAK.CAMERA0.002," do you know what that is?
A. That is the camera view.
Q. What -- what does that mean?
A. The building has a camera system that logs different areas in the building, and that particular

Page 122

camera area was apparent -- a view that can be seen for the area that I was standing in.
Q. Did you put this in in this report, that --
A. It appears so, yes.
Q. Okay. How did you know that -- is this pointing to a particular camera? In other words, when I read this, I know, oh, this is this camera or that camera?
A. Not necessarily. 2:09:49
Q. It just says that --
A. Just pointing it --
Q. -- some camera --
A. It will say, "Staging" or -- or -- yeah.
Q. Okay. And -- and why did you put this in here?
A. Because that's the area where I was.
Q. And the purpose for that was, of reporting this here?
A. Documentation.
Q. Okay. Was another purpose to indicate that they should save the film for that area -- for that area?
MS. KAMPER: Object to --
MR. CHURMA: Object to --
MS. KAMPER: -- form.

Page 123

MR. CHURMA: -- form.
MS. KAMPER: You may answer.
A. I would think so, yes.
Q. Do you know if the film was saved?
A. I have no idea, sir.
Q. Did you see any film showing this event, the handcuffing or the shackling of the inmate, and your interaction with Officer Nawara in the staging area?
A. No, sir, I have not.
Q. Do you know why that film was not provided to you?
MS. KAMPER: Object to --
MR. CHURMA: Object to --
MS. KAMPER: -- form.
MR. CHURMA: -- form.
Q. If you know. I mean, do you know?
A. No, sir.
Q. If the film -- no, let me -- let me -- let me withdraw that question. The -- when you prepared this report, you prepared it on the same day of the occurrence, correct?
A. Yes. 2:10:57
Q. And you wanted it to be as complete and as thorough as possible. Is that correct?
A. As possible, yes, sir.

Page 124

Q. And you made sure that -- well let me show you. And the events were fresh in your mind as you were preparing this report. Is that correct?
A. I would say so, yes.
Q. So the statements that you attributed to Officer Nawara in this report are the best that you could remember, correct?
A. Correct.
Q. And you minced no words. Is that correct?
A. What do you mean?
Q. Well you -- you didn't say, "Well you know, I'm not going to put the F word in here because I -- I wanted to be -- you know, I -- I don't want to put the F word in here," you actually did put the F word in here. Is that correct?
A. Because that's what he said, yes.
Q. Okay. So everything that he said is what you put down?
MS. KAMPER: No. Object to form. You can answer though.
A. As much as I could recall.
MR. BUSTAMANTE: Okay. All right. This -- our lunch is here, why don't we take a break?
WITNESS: Oh, that was fast.
RECORDER: Off the record --

MR. BUSTAMANTE: And --
RECORDER: -- 1:56 p.m.
(Off the record)
MR. LINDEN: Number two --
RECORDER: Back on the record, 2:21 p.m. 2:11:53
MR. LINDEN: Yeah.
Q. Okay. Now after you filed the CR, what is the next thing that happened involving John Nawara?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. After I filed the CR, it's up to the executive staff and OPR to determine what happens after that.
Q. No, what happened involving you, what was your next event, what is the next thing that happened involving you and John Nawara or related to John Nawara?
MR. CHURMA: Object to form.
A. I'm not sure what --
Q. Okay. Were you interviewed by OPR?
A. I don't -- no. Was I interviewed by OPR? No.
Q. Okay. Were you interviewed by anybody else?
A. Not that I recall, unless there is something specific.



Q. Do you know whatever happened with the CR that you filed against John?
A. Once I filed the complaint register, it's up to OPR to investigate from there.
Q. That was not my question, is -- do you know what happened with the CR?
A. No. 2:13:11
Q. Okay. Do you know if John Nawara was ever disciplined for the events that you relate in the CR?
A. I do not.
Q. Did you ever -- other than the CR, did you start any other disciplinary process towards John Nawara as a result of the incidents of September 28th, 2016?
A. No, sir.
MS. KAMPER: Object to form on that. You may answer.
A. No, sir.
Q. Could you have taken other disciplinary measures?
A. No, sir.
Q. Why not?
A. Once a complaint register moves forward, there is no need for discipline from my stance.
Q. Okay. Other than filing a complaint



register, could you have done something else in terms of discipline towards John Nawara?
A. No, sir.
MR. CHURMA: Object to form.
A. No, sir.
Q. And why is that?
A. Because once you file a complaint register, you can't --
Q. If you had not filed a complaint register, could you have -- could you have implemented other discipline on Mr. Nawara?
MR. CHURMA: Object to form. 2:14:15
MS. KAMPER: Join. You may answer.
A. I'm sure there is a possibility I could have written discipline, but this was the route that I chose.
Q. I understand that. I want to find out what other routes were there available to you --
A. To generate --
Q. -- other --
A. -- discipline.
Q. -- other than the CR?
A. To generate discipline.
Q. And what would that have been?
A. I --



Q. What does that mean, to generate discipline?
A. Disciplinary reports that would then go through employee discipline. Because of the -- the interaction with Nawara, I felt that it warrant a complaint register instead.
Q. Then that's -- I understand that, okay? So let's just set that aside for the time being. What I want to find out is what other discipline or disciplinary measures were available to you other than a CR? I understand that you -- this is what you thought it merited at the time. I just want to find out what else was available.
A. An employee disciplinary report. 2:15:10
Q. And what would that have done?
A. It's just a different level of discipline. There is two forms, complaint register or an employee disciplinary form.
Q. And --
A. So it's -- it's two different measures of rendering discipline, I guess you can say.
Q. Okay. I want to --
A. I don't know what -- what --
Q. I want to find out more.
A. -- exactly -- okay.
Q. So in the other level -- can we agree that a

Page 129

CR is the highest level of discipline?
MR. CHURMA: Object to form.
MS. KAMPER: Join. You may answer.
A. Not necessarily.
Q. Okay. Okay. So where would the CR be in terms of levels of discipline?
A. I think it's equal level, one is handled and -- interdepartmental, and one is handled by office of professional review.
Q. Okay. The discipline that you could have handled interdepartmental, what was the maximum discipline that you could have sought for any infraction committed by Officer Nawara?
A. I wouldn't have determined the amount of time that was generated for Nawara.
Q. Who would have determined that? 2:16:22
A. Employee discipline.
Q. What is employee discipline?
A. It's a totally different department separate from me that will evaluate what was written and determine how much suspension time, if any, was given to Officer Nawara.
Q. So in terms of discipline -- interdisciplinary, not -- not the OPR, would the range of discipline go all the way from not founded all the

Page 130

way to a certain period of suspension?
MR. CHURMA: Object to form. Foundation.
A. That's possible.
Q. And the suspension could range from one to 30 days?
MR. CHURMA: Same objections.
A. That's possible.
Q. It could also be a reprimand?
A. That's possible. 2:17:09
Q. What -- what else is there besides reprimand? Is there censure, is there -- what other words are there that are used in terms of discipline?
A. You have counseling, you have a written reprimand, you have actual suspension days, and you have dismissed.
Q. Okay. Is -- dismissal always go through a complaint register?
MR. CHURMA: Object to form.
MS. KAMPER: The --
MR. CHURMA: Foundation.
MS. KAMPER: Yeah, and you may answer, but I do want to have an objection to foundation on this --
MR. BUSTAMANTE: Okay.
MS. KAMPER: -- this set of questions because it's not her area of expertise, but you may answer.

Page 131

A. No, ask me again, please.
Q. Yes. In order to dismiss an employee, is a complaint register always required?
A. Not --
MR. CHURMA: Same objection.
A. Not necessarily. 2:17:58
Q. In what types of situations is a complaint register not used to dismiss an employee?
A. I don't handle complaint registers. That's out of my realm.
Q. How do you know that a complaint register is not necessarily needed to dismiss an employee?
A. I -- I don't know how they process complaint registers in OPR because I don't work in that area.
Q. That's not what I'm asking. You just made a statement that a complaint register is not necessarily needed to dismiss an employee, and I want to find out how do you know that?
A. Dismiss an employee or dismiss discipline?
Q. No, dismiss an employee.
A. Okay. I don't know anything about dismissing employee because I can't fire an employee.
Q. Okay.
A. So if we're talking about -- when you asked me, "What are the levels of disciplinary if you

Page 132

generate an interdepartmental disciplinary report?" Right?
Q. Yes.
A. So you got the counseling, you have the written, you have the suspension days, and then you have a dismissal, meaning the report -- the discipline is thrown out.
Q. Got it. 2:18:58
A. Okay. Okay. Because I --
Q. Yeah. Dismissal --
A. -- I can't fire an employee.
Q. -- for me, was firing, and --
A. No, no, no.
Q. -- you're saying --
A. I can't fire anybody.
Q. Dismissal for me would be unfounded --
A. Oh.
Q. -- an unfounded --
A. Unfounded.
Q. Okay. It doesn't matter.
A. Okay.
Q. Now we get it. Okay. Let me see here, I got an outline somewhere. Now I was asking you if you had been interviewed by anybody else when I was asking you what was the next thing that happened from your

perspective regarding John Nawara, and I want to direct your attention to a conversation that you may have had with human resources.
A. Oh, okay.
Q. Okay. Did you have a conversation with human resources about John Nawara?
A. Yes.
Q. When --
A. Was -- yes.
Q. When did that happen?
A. I don't know the date.
Q. Okay. Did it happen shortly after the events with Mr. Nawara, or did it happen sometime later?
A. I can't recall the date, so --
Q. Okay. 2:20:01
A. -- I'm not sure how long --
Q. Was your conversation with HR in person, or by telephone, or by email?
A. Originally -- I can't say if I got the phone call first and then an email, but I do know that at one point, there was one and then the other. I just --
Q. Okay.
A. -- couldn't tell you which order.
Q. If HR -- someone in HR wanted to get a hold of you at work, what would they have to do?



A. You can either email or phone call.
Q. And when you are phoning someone from within the sheriff's office, do you just -- do you just have to dial a few numbers, like four or five numbers, or do you have to dial the whole number?
A. It depends on where you're calling within the department.
Q. Well, from HR to your office as superintendent of Cermak?
A. It's usually you dial four and then the four digit number, but if you're calling a different branch, then you have to dial the whole number.
Q. Okay. If -- for our purposes, would HR have to just dial four and four -- and four digits to get you?
A. I'm not sure. 2:21:12
MR. CHURMA: Object to form, yeah.
A. I'm not sure where they were calling from, so I couldn't tell you how many numbers it will take.
Q. Do -- do you know where HR is located?
A. Yes, I know it's -- now it's located on 31st Street in building two.
Q. Okay. Assume it was from that location, would they have to dial four and four numbers, or would they have to dial the full seven digits?



MS. KAMPER: Object to form.
A. I'm not sure.
Q. Okay. I --
A. I'm sorry. I'm unsure.
Q. That's -- that's okay. Now were you informed that HR had been trying to get a hold of you for some period of time?
A. No. 2:21:46
Q. Did anybody order you to call HR or to return HR's phone calls?
A. Not that I can recall, no.
Q. Do you know of any reason why if HR received information about the event with Mr. Nawara on the date after the event, it would take him almost a month and a half to have a conversation with you?
MR. CHURMA: Object --
MS. KAMPER: Object to form. Foundation.
A. I'm sorry, say it one more time. What --
Q. Yes. 2:22:17
A. -- now?
Q. Do you know of any reason why -- if HR received information about the incident between Mr. Nawara and you, why it would take almost a month and a half before HR had a conversation with you?
MS. KAMPER: Same objections. You may



answer.
A. No.
MR. CHURMA: Join.
Q. Was -- I -- again, I'm sorry, I -- I think I did ask you, do you recall having a conversation with HR?
A. I do.
Q. Okay. Who did you talk to?
A. I couldn't tell you which party called me. I just remember that one of them called. Someone --
Q. Okay. Some --
A. -- called me from HR.
Q. Someone called you --
A. Mm-hmm.
Q. -- is that correct?
A. Yes.
Q. You did not call them?
A. No, sir.
Q. And the -- did you speak to one or more people from HR?
A. I believe -- I'm not going to speculate. I'm not sure.
Q. Okay. No, no -- "I don't remember" is good. Okay. I'm going to show you our next exhibit.
A. Okay.

Page 137

MR. BUSTAMANTE: This will be Number 2. There's two there. Rick --
MS. KAMPER: Thank you. 2:23:38
Q. So if you'll take your time and take a look at that.
A. Okay. 2:25:35
Q. Okay. Now after reviewing this, do you recall that you spoke with one or two people?
A. I recall speaking to someone, yes.
Q. One or two?
A. I'm not for sure --
Q. Okay.
A. -- if it was two different people or not.
Q. And -- right. Okay. The -- do you recall when you spoke to those folks?
A. No, sir.
Q. Okay. Now if you take a look at page CCSO 1002, which is the second page --
A. I don't have a 2. That's 1004.
Q. Oh, my gosh. Oh, I'm sorry, I -- I picked the wrong one. 3 and 4.
A. Okay.
Q. My apologies.
A. Okay.
MR. BUSTAMANTE: Let me borrow that copy.

Page 138

MR. LINDEN: Which one?
MR. BUSTAMANTE: I got -- I got --
MR. LINDEN: Oh, I'm sorry.
MR. BUSTAMANTE: -- want to look at --
MR. LINDEN: Oh, okay. 2:26:26
MR. BUSTAMANTE: It's the same thing --
MR. LINDEN: Okay. I just wrote a note on there.
Q. So let's look at 1004.
A. Okay.
Q. There is a date of November 16th, 2016. Do you see that?
A. Yes, sir.
Q. Okay. Do you know if that was the date that you spoke with the people from HR?
A. No, sir.
Q. Now let's look at page 1003, the first page. Look at the email, and it's from Rebecca Reierson --
A. Yeah.
Q. -- one of the people from HR, to Karen Jones-Hayes --
A. Okay.
Q. -- to you, and the date is November 21st --
A. Okay.
Q. -- 2016. Do you know if the date that you

Page 139

spoke with HR was November 21st?
A. I'm not sure, sir.
Q. Okay. Do you know, if you had spoken to HR on November 16th, why they would have waited until November 21st to send you this draft?
A. I don't know, sir. 2:27:22
MR. CHURMA: Here, thanks.
MR. LINDEN: Thanks.
Q. Now once you got this draft, what did you do?
A. So is it safe to say that this is the draft that they sent me?
Q. Well that's what I'm assuming. This was produced by the Cook County Sheriff's Office, it has their Bates stamp and their numbers, so I'm assuming that they sent me what was sent to you.
A. Okay. Because it's not serving as an attachment, but okay.
Q. It -- you know, it -- it does mention on page 3, it has attachments, "Nawara, Jones-Hayes statement." See it on top?
A. Okay. So that's what this is.
Q. And -- and then --
A. Okay. 2:28:22
Q. -- it has this attachment.
A. Okay.

Page 140

Q. That's the way it was provided to us.
A. Okay.
Q. All right?
A. Gotcha.
Q. So one -- upon receiving this, what did you do?
A. Well she asked me to "review and edit, if necessary, sign, and return it to me as soon as possible."
Q. Okay. Did you do that?
A. I do recall sending --
Q. Okay.
A. -- a revised statement, yes.
Q. Okay. Now let's take a look at that statement, okay?
A. Okay.
Q. This is going to be the next exhibit. By the way, when you filed a complaint register against John Nawara, did you intend for him to be disciplined?
MR. CHURMA: Object to form.
MS. KAMPER: Join. You may answer.
A. I --
MR. BUSTAMANTE: This is -- did I pick the --
Q. Go ahead.
A. I did expect it to be looked into, yes.

Page 141

Q. And what -- what did you expect to accomplish by having that looked into?
MR. CHURMA: Object to form.
MS. KAMPER: Join. 2:29:25
A. To perhaps find out why was he so angry towards me, why so aggressive when all I did was give him a directive to perform his daily duties. He was extremely hostile, and I didn't understand that.
Q. Okay. So you had no intention of having him disciplined?
A. I don't know what OPR would have rendered, but I wanted it looked into.
Q. Okay. Did you find out if OPR looked into it?
A. No.
Q. Okay. What did you do to follow up on this concern that you had about finding out why John was so aggressive towards you?
A. I did not have any further contact with Officer Nawara --
Q. No?
A. -- after that.
Q. What about OPR?
A. That's not my duty to follow up, they have their own process that they deal with complaint

Page 142

registers and investigating. I don't involve myself in that.
Q. So what happened with your concern, did it just go -- go up into thin air?
A. I couldn't --
MS. KAMPER: Object to form.
A. -- tell you, sir.
Q. I'm sorry?
A. I couldn't tell you. I have no idea.
Q. Are you still concerned? 2:30:30
A. I'm concerned as to why he would have been as aggressive to me as he was, yes.
Q. All right.
A. And it would concern me if I was to be in the same space with him, yes.
MR. BUSTAMANTE: Okay. This is yours.
Q. So let's look at Number 3, please.
A. Okay.
Q. And page 1005 of this exhibit is an email from you to Rebecca Reierson. Is that correct?
A. Yes, sir.
Q. And it -- it is dated November 22nd, 2016?
A. Yes.
Q. And so this would be the day after you received the email from Reierson --

Page 143

A. Okay.
Q. -- with the statement, correct?
A. Yes.
Q. This -- look at page 1006, does this appear to be your edits, additions, and corrections to the statement that was sent to you by Reierson?
A. It appears to be so. 2:31:40
Q. Okay. Would you take your moment and just read the whole thing for yourself, please, and let me know --
A. Sure.
Q. -- when you're done?
A. Sure. Okay. 2:33:41
Q. One more page.
A. Oh. Oh. Okay.
Q. All right. Now did you inform HR that you had filed a complaint register against Nawara?
A. I don't believe I did, no, sir.
Q. Wouldn't have been easier to simply say, "Look at my statement in the complaint register that was signed under oath, you have all the information that you need there"?
MR. CHURMA: Object to form.
MS. KAMPER: Join --
MR. CHURMA: Go ahead.

Page 144

MS. KAMPER: Join. You may answer.
A. I can't decide what would be easier for them. I don't know what would be easier for them.
Q. But in effect, they -- they asked you to edit the statement that apparently Reierson had somehow prepared based on your conversation, correct?
A. Correct. 2:34:44
Q. Right. Now let's -- let's look at that statement.
A. Okay.
Q. The statement that Reierson -- let's put them together, okay?
A. Mm-hmm.
Q. Exhibit 2 and Exhibit 3, okay? I'm going to be talking about both of them.
A. Okay.
Q. So Reierson sends you a document that says, "A new directive had been issued," all right, and you say, "A new policy was generated."
A. Okay.
Q. What's the difference?
A. As I explained before, one is -- can be verbal and the other is -- is written.
Q. Okay. And in this case, which one was it?
A. It was generated by me, which was an order

Page 145

that I'd given, but it was also written.
Q. Okay. So you have a written order? 2:35:36
A. I did -- I did generate a memorandum --
Q. Okay. Do you have --
A. -- stating that this is what I require in this particular area that was posted downstairs in basement control.
Q. Can we get a copy of the memorandum, does it -- does it still exist?
A. It's possible.
Q. Okay.
A. I'm sure I can find a copy --
Q. All right.
A. -- for you somewhere.
Q. In the information provided by Reierson, it says, "On 9/29/16, Jones went down to the basement."
A. Okay.
Q. You know that in the email that Reierson said, it has, "I am forwarding notes from our telephone conversation regarding the incident with Officer Nawara on 9/28/16."
A. Okay.
Q. You did not correct her, why not?
A. It was probably an oversight. 2:36:35
Q. Okay. Okay. In Exhibit Number 3, you state

Page 146

that you instructed Sergeant Conley that officers were supposed to be disciplined for not following the directive established for the security of this area. Did you, in fact, instruct Sergeant Conley to discipline the officers?
A. I pointed the concern out to Sergeant Conley and instructed him that the officers were to be disciplined for not following the directive, so it's -- I'm assuming it's safe to say that I -- I advised him that that's what should be happening when these doors are not secured.
Q. I'm sorry, does it say you advised him, or does it say that you instructed him?
A. Advised and instruct is the same for me. 2:37:40
Q. Okay. Okay. So were officers disciplined?
A. I don't know.
Q. If they -- if the sergeant did not follow your instruction, is he to be disciplined?
A. That's to my discretion.
Q. Okay. How would you find out if the sergeant followed or did not follow your instruction to discipline these officers?
A. At this stage, you would have to confirm with employee discipline.
Q. How would you, as superintendent, follow up

Page 147

on that at this given period of September 2016?
A. Check the officers' files perhaps.
Q. Did you follow up on it?
A. I did not.
Q. Why not? 2:38:19
A. When I give supervisors a directive, I expect them to follow it, but it's possible that it didn't happen.
Q. Now -- okay. Correct me if I'm wrong, I thought that before you said that you did not know Officer Gannon before this incident, and as I read Exhibit 3, the corrected version, you state that Gannon said, "Yeah, Supt, I know you know me," "and I replied, 'Yes, I do.'" Did you or did you not know Gannon before this incident?
A. I recall the question being have I worked with Officer Gannon.
Q. Okay. 2:39:40
A. And I told you I was not aware of whether or not I did or I did not. Whether I was familiar with Gannon, that's possible, because that's the area where she was. I worked in the building, so I don't know -- it's relevant to me, do I know you. If I've seen you or do I know you, it just depends on how you look at it, I guess, so I don't -- I don't know what that --

Page 148

Q. Okay.
A. And as I stated, their backs were to me, so I didn't know initially who any of them were.
Q. Now if you look at the second paragraph, right around the fourth line, where you're ascribing what Nawara allegedly told you, would you read that into the record, please?
A. Excuse me one second. Where are you?
Q. Fourth line in the second paragraph.
A. Here? 2:40:53
Q. Where -- your quotes for Officer Nawara, what did he allegedly say?
A. Oh. "'Don't touch me, don't fucking touch me, lady' over and over again."
Q. All right. And if you would look at Exhibit 1 again, where you say what Officer Nawara said at page 4 of Exhibit 1?
A. Okay. Where are you?
Q. And first paragraph, towards --
A. Okay.
Q. -- the middle of the paragraph where -- where it says, "He began screaming."
A. Mm-hmm. "Don't touch me, don't touch me, lady."
Q. All right. 2:41:35

Page 149

A. "Don't put your hands on" --
Q. Now why did you add the expletive, "Don't fucking touch me" in the report to HR, but omitted it from your sworn statement to OPR made the day of the occurrence?
A. Perhaps it was something that I didn't recall when I generated the first incident, the CR, and I recalled it when I wrote the response here.
Q. All right. So a month and a half later, it's -- your recollection was fresher than it was on the day of the occurrence. Is that what your testimony is?
MS. KAMPER: Object to form. You may answer. 2:42:22
A. I wouldn't say that it was necessary fresher from the day that it happened to the day that I responded to this, just I was very upset when it first happened, and you know, time passes and sometimes things come to the forefront of your thought process, so it wasn't that I was purposely trying to omit it in one or add it in in the other.
Q. Do you think that perhaps you were trying to make the scene worse than it had really been?
MS. KAMPER: Object to form. You may answer.
A. No, sir.
Q. You were trying to embellish in order to make it worse for Officer Nawara?

Page 150

A. No, sir.
MS. KAMPER: Again --
MR. CHURMA: Object to form.
MS. KAMPER: -- object to form. You may answer.
A. No, sir. 2:43:06
Q. I'll show you -- excuse me, another exhibit --
A. Okay.
Q. -- or two. Excuse me. Here you go -- I will show you Exhibit Number 4.
A. Okay. 2:44:22
Q. And this simply is a signed version of exhibit -- of the statement contained in Exhibit Number 3, okay?
A. Okay.
Q. Why are there two versions, one signed and one not signed, do you know?
MS. KAMPER: Objection. Form and foundation. If you know.
A. I don't know.
Q. Reierson did ask you, "Please review, edit if necessary, sign, and return to me" --
A. Correct.
Q. -- correct? Is Exhibit Number 4 the signed

Page 151

document, the document that you returned to HR?
A. Perhaps.
Q. I'm sorry?
A. Perhaps that is the --
Q. You don't know for a fact?
A. I'm -- I'm not for certain, sir.
Q. Are you familiar with SEAM, S-E-A-M?
A. Somewhat. Yes, sir. 2:45:25
Q. What is SEAM?
A. It's part of our departmental -- I don't know if it's bylaws or policies, but I do know it exists.
Q. Okay. And does SEAM have a -- I don't know what you'd call it, a portion -- a section dealing with -- bear with me one second, transfer due to an investigation?
A. Okay.
MR. CHURMA: Object to foundation.
Q. Do you know?
A. No, sir.
Q. Do you know how it came about that Officer Nawara was transferred from Cermak the day after the incident with you?
A. No, sir.
Q. Did you request that Officer Nawara be transferred from Cermak?

Page 152

A. No, sir. 2:46:22
Q. Besides speaking with Jeff Johansson (sic), did you speak with anybody else regarding the incident with John Nawara?
A. Who is Jeff Johansson?
MR. LINDEN: Johnsen.
MR. CHURMA: Johnsen --
WITNESS: Oh. Okay. I'm sorry.
MR. BUSTAMANTE: Isn't that his name?
WITNESS: Johnsen.
MR. BUSTAMANTE: Johansson?
MS. KAMPER: No.
MR. BUSTAMANTE: No.
MR. LINDEN: Johnsen --
WITNESS: Johnsen.
MR. LINDEN: -- I think.
Q. Johnsen?
A. Johnsen, okay
Q. Okay. I'm sorry, did I say something different?
A. Yeah, you said, "Johansson."
Q. Okay.
A. I don't know who that is.
Q. Okay. So --
A. I'm like who in God's name --

Q. -- I'm not the --
A. -- is Johansson.
Q. Okay.
A. Okay.
Q. Yeah. Did you speak to anybody else besides Jeff -- I think that's his first name, right?
A. Yes.
Q. Okay.
A. Johnsen.
Q. Regarding --
A. Not --
Q. -- the incident with Nawara?
A. Not that I could recall, sir, no.
Q. Okay. Do you know who has the authority to transfer an employee from one position to another?
A. No, sir.
Q. Do you know who has the authority to transfer an employee from one position to another due to an investigation?
A. No, sir. 2:47:18
Q. Okay. I need to make a copy of this document and bring it to you to show it, okay?
A. Okay. 2:48:19
RECORDER: Off the record, 2:58 p.m.
(Off the record)



RECORDER: Back on the record, 2:59 p.m.
Q. Okay. I'm going to show you Exhibit Number 5.
A. Okay.
Q. And you see at the bottom, it's an email from Jeff Johnsen to Matt Burke?
A. Yes.
Q. Who is Matt Burke?
A. He is one of the -- he was one of the chiefs at the time.
Q. Okay. You've seen this before, correct?
A. I don't recall it.
Q. Well see it's -- it says, "cc Karen Jones-Hayes"?
A. Yes.
Q. If something is cc'd to you from Jeff Johnsen, would you normally look at it?
A. It depends on how busy I am.
Q. Say that again?
A. Don't tell him I said that.
Q. Okay.
A. Most times, yes.
Q. Most likely, you would --
A. But I don't --
Q. -- have seen --



A. -- recall this. Yeah, I don't recall this specifically.
Q. Why don't you read it for yourself, read the --
A. Okay. 2:49:20
Q. -- read the email, and then we'll ask you some questions.
MR. BUSTAMANTE: Put it on do not disturb, please.
MS. SAINSOT: Okay.
MS. KAMPER: Oh, sorry. I didn't mean to --
MR. LINDEN: Oh, that's okay --
A. Okay.
Q. All right. So after reading it, do you remember seeing it at time it was sent?
A. No, sir.
Q. After reading this, is this a true account of what you told Jeff Johnsen?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join. 2:50:35
A. I can say that I forwarded my complaint register for review to Jeff Johnsen, but this was not, per se, an open discussion that we had about it, if that's what you're asking. Is that what you're asking?
Q. No, I'm asking is if -- after you read the



whole --
A. Okay.
Q. -- email --
A. Okay.
Q. -- right?
A. Yes.
Q. Does it contain facts that you told Jeff Johnsen, or does it embellish, or does it -- you know, does it say something that is not -- that you didn't tell him?
A. It does contain some points from my complaint register, yes.
Q. Okay. Well is it true that as you were talking to Nawara in the --
A. Basement control? 2:51:43
Q. -- the control room, that he turned away from you?
A. That's -- yes, I believe so.
Q. Is that the reason why you touched him, that he -- because he turned away from you?
A. To get his attention, maybe, touched his shoulder --
Q. Well may --
A. -- to get his attention.
Q. -- maybe it was true or maybe it was not

true, so what was it?
MR. CHURMA: Objection. Mischaracterizes prior testimony.
MS. KAMPER: Join.
A. So ask me your question.
Q. Okay. Sure. This statement that was made here, "He became agitated, and he began to look away from her," is that true?
A. I can't say for sure.
Q. Okay. In -- in this particular email, there is no mention of the word "fucking touch me," right? There is no "don't fucking touch me" in this email, correct?
A. No. 2:52:43
Q. Okay. Here, it says that you apologized to him for touching his arm, is that true?
A. As I stated earlier, yes.
Q. Okay. Did you touch his arm, or did you touch his shoulder?
A. The shoulder is a part of --
MR. CHURMA: Object to form.
A. -- the arm right?
MR. CHURMA: Mischaracterizes --
WITNESS: I'm sorry.
MR. CHURMA: -- prior testimony.



Q. I -- I don't know. Sorry. I -- I don't -- I don't know that the shoulder is a --
A. Yeah.
Q. -- part of the arm.
A. Well it's -- it's a part of the arm --
Q. Okay.
A. -- in my mind.
Q. In your mind?
A. Yes.
Q. Okay. Did -- so you touched his upper arm is what you're saying?
A. His upper arm.
Q. Then you -- it says here you --
A. Sorry.
Q. Okay. It says you stood your ground. Is that true?
A. Those are not my words, sir.
Q. Is it -- is it true though, that you stood your ground?
MR. CHURMA: Object to form. 2:53:41
A. I would say that I gave Officer Nawara a directive to do his job. Standing your ground, that's -- those are not my words, so.
Q. You had not yet submitted the complaint register, why?



A. I --
MS. KAMPER: Object to form.
Q. Okay.
MS. KAMPER: You may answer.
Q. If you read the email, it says, "She completed a complaint register form against the officer --
A. Okay.
Q. -- but has not submitted it."
A. So complaint registers have to be notarized first before you submit them, so I don't -- I don't know what this has to do with my complaint register. I don't know why he said that.
Q. Well again, I'm asking you --
A. So I'm telling -- if I did not submit it, it has to be notarized first, so --
Q. Okay.
A. -- perhaps that's what the hold up was. I'm not for certain.
Q. Let's look at the complaint register, Exhibit Number 1, please.
A. Sure.
Q. Look at page 4.
A. Okay. Okay. 2:54:46
Q. It is notarized, is it not?



A. Yes, sir.
Q. What date is it notarized?
A. It is -- I don't know. September 28th.
Q. So you had a notarized complaint register on September 28th. Is that correct?
A. Correct.
Q. Then the -- the next sentence I don't quite understand, but you can explain this to me after -- could you read that into our record, where it says, "The question is"?
MR. BUSTAMANTE: Little button there says, "Do not disturb."
MS. SAINSOT: Okay. I'll do my best.
A. Where you have the yellow?
Q. No, where its says, "The" --
A. "The question we both"?
Q. Yeah, would you read that into --
A. "The question we both have is should she initiate discipline as well."
Q. Is it true that you both had that question?
A. No.
Q. Okay. Do you know what Jeff Johnsen means by "whether she should initiate discipline as well"?
MR. CHURMA: Object to form. 2:55:48
A. I have no idea.

Page 161

Q. Okay. Would you read the next sentence, please, into our record?
A. "She was wondering if he can be reassigned from Cermak while the matter is being investigated."
Q. Is that true?
A. I don't recall that.
Q. Okay. Did you ask or request that he be reassigned?
A. No, sir.
Q. Why not?
A. That's not my decision to make.
Q. Whether it's your decision or not, certainly you can ask?
A. But I would think that if administrative wanted -- warranted -- they've seen my complaint, and that would have been their decision to decide on whether or not he was to be moved or if I was to be moved for that matter.
Q. Who is Dawn Ertler?
A. I believe she worked, at that time, for Matt Burke. 2:56:55
MR. BUSTAMANTE: I'm going to mark one more, I gotta make a copy, so can we go off the record for just a minute?
RECORDER: Off the record, 3:08 p.m.

Page 162

(Off the record)
RECORDER: Back on the record, 3:09 p.m.
Q. Okay. I'm going to show you Exhibit Number 6.
MR. BUSTAMANTE: You want one, Rick?
MR. LINDEN: Okay.
Q. Okay. If you look at page 131, please, of Exhibit Number 6?
A. Mm-hmm.
Q. 131 right there. Okay. This is an email from you to Dawn Ertler. Is that correct?
A. I'm sorry, say it one more time? 2:58:13
Q. Is this an email from you to Dawn Ertler?
A. It appears that way. I don't remember this. Okay.
Q. Okay. Would you kindly read that into our record, starting from the "from" all the way to the body of the email?
A. This says from me --
Q. Well just say --
A. Oh, I'm --
Q. -- "Karen Jones-Hayes."
A. I'm so -- so sorry. "From Karen Jones -- Jones-Hayes, Thursday, September 29th, to Dawn Ertler. Incident with Officer John Nawara," and it says, "Hi

Page 163

Dawn, I just wanted to touch on the incident that occurred yesterday with myself and Officer John Nawara. On a daily basis, I walk this unit engaging and talking with detainees and staff alike, however, yesterday was an eye opening moment. Officer Nawara exuded such rage in his demeanor as I gave him a job related directive that I felt it was important I inform all of my superiors in the event of any future issues."
Q. The -- what is the time of this email?
A. 2:59. 2:59:28
Q. Okay. Now was Dawn Ertler your superior?
A. Dawn Ertler worked for my superior.
Q. Okay. When you -- why did you send an email to Dawn Ertler instead of to Matthew --
A. I don't recall sending this email. Oh, I'm so sorry.
Q. Why did you send an email to John -- Dawn Ertler instead of to Matthew Burke?
A. I don't --
MR. CHURMA: Object to form.
A. -- recall sending this email at all.
Q. I understand you may not recall, my question is why would you send it to Dawn instead of to Matt?
MR. CHURMA: Object to form.

Page 164

A. I would have sent it if it was a directive given to me, but I don't recall ever sending this email.
Q. After reading it, does the -- do these appear to be your words on the body of the email?
A. I don't recall sending it, so I don't know if I can say that these are my words, obviously.
Q. When you send an email, you see the -- the address box below the content?
A. Yes, sir. 3:00:31
Q. Does that always happen when you send an email from your email address?
A. I couldn't say if that was always something that always happens, no, I can't say that 100 percent, no.
Q. Could someone else have sent an email using your email address?
A. Someone could have certainly cut and paste.
Q. Yeah. And who -- who could do that?
A. I don't know.
Q. Who would have access to your email?
A. I don't know. Not having necessarily access to my email, but someone can type that in a body of a -- of an email letter, but I'm just saying I don't recall ever sending this, so it's not familiar to me.

Q. Okay. Did you ever see any film -- any video of your interaction with Nawara on September 28th, 2016?
MR. CHURMA: Object to form. 3:01:42
A. On the date of the incident itself?
Q. Anytime. At any time, have you seen video of --
A. I --
Q. -- your interaction with Nawara?
A. I have not seen anything, no.
Q. Did you -- when there's an incident such as the fight with -- between the inmates earlier that day, what is the protocol, the procedure for saving video?
MR. CHURMA: Object to form --
MS. KAMPER: Object --
MR. CHURMA: -- and foundation.
MS. KAMPER: And join.
A. So it would be -- it would have to be requested to save -- I'm sorry.
Q. No, that's okay.
A. Requested to save, and as far as I know or understand, now any time an incident is -- occurs, it's automatically saved into the archive, but I believe back then, it had to be requested.
Q. What was the method for requesting to save



video?
A. I couldn't say specifically who you have to contact, I'm uncertain.
Q. Okay. But would it be in writing, or would it be just a phone call, how would it be done?
MR. CHURMA: Object to form. 3:02:41
MS. KAMPER: I'm going to object to form.
MR. CHURMA: Foundation.
A. It can either be -- be a phone call or an email.
Q. Do you know -- I'm sorry. Did you request to have video saved of the date of the -- date and time of the incident between you and Nawara?
MR. CHURMA: Object to form.
A. I can't recall if I did or not.
Q. If you did, how would you have done it?
MR. CHURMA: Object to form.
A. Either email or phone call.
Q. Do you still have access to your emails from 2016?
A. I don't know. I haven't checked.
Q. Do you erase your emails, or is it part of the sheriff's office business and you don't touch it?
A. Some I do delete, some not, so I don't know if they're still there or not.



Q. Do you know if anybody else requested the film be saved of -- during the date and time of your interactions with Nawara?
A. I do not. 3:03:34
Q. As a supervisor, is it proper to criticize an officer in front of inmates?
MS. KAMPER: Object to form.
MR. CHURMA: Join.
A. I'm sorry, say it one more time?
Q. As a supervisor, is it proper to criticize an officer in front of inmates?
MS. KAMPER: Same objection.
MR. CHURMA: Join.
MS. KAMPER: You may answer.
A. No.
Q. Why not?
A. That's just not what you would do.
Q. Is there a reason for that is what I'm asking?
A. Not specifically. You don't want to embarrass your employees.
Q. Would it also diminish your employee's authority in front of the inmates if you criticize in front of inmates?
A. Yes, sir, that's possible.



Q. Is it important that the authority be kept?
A. It is. 3:04:29
MR. CHURMA: Object to --
Q. Why?
MR. CHURMA: Object to form.
A. To maintain control and order.
MR. BUSTAMANTE: Okay. I'm almost done -- have to talk it over with my counsel. Are you all going to have questions? Probably not, right?
MR. CHURMA: No.
MS. KAMPER: No.
MR. BUSTAMANTE: Okay.
RECORDER: Off the record, 3:17 p.m.
MR. BUSTAMANTE: Five --
(Off the record)
RECORDER: Back on the record, 3:21 p.m. 3:05:20
Q. All right. Superintendent Jones-Hayes, after the conversation with HR and submitting the edited and revised memorandum, did you have any other matter or any other dealing with anyone concerning John Nawara?
A. Not that I could --
MR. CHURMA: Object to form.
MS. KAMPER: Go ahead.
A. Not that I could recall.
Q. Did you have anything to do with requesting a

fitness for duty evaluation of John Nawara?
A. No, sir.
Q. Did you have anything to do with how HR went about in obtaining a fitness for duty evaluation of John Nawara?
A. No --
MR. CHURMA: Object to form.
MS. KAMPER: I would join, but you may answer.
A. No, sir.
Q. Okay. Did you -- sorry. Do you know any of the folks from HR that were involved in a fitness for duty evaluation of John Nawara?
A. No, sir. 3:06:25
MR. CHURMA: Object to form.
Q. Do you know Rebecca Reierson?
A. No, sir.
Q. Have you ever met her in person?
A. No, sir.
Q. Do you know, I can't think -- Nurse Shelby?
A. No, sir.
Q. Have you ever met her in person?
A. No, sir.
Q. Do you know Karyn Williams?
A. No, sir.



Q. Do you know who she is?
A. I do not.
Q. Have you ever poked an employee on the chest with your finger?
A. No, sir. 3:07:16
MR. BUSTAMANTE: Rick? I think I'm done.
MR. LINDEN: All right -- thank you.
WITNESS: Thank you.
MR. BUSTAMANTE: Any questions, Counsel?
MR. CHURMA: No, none from me.
MS. KAMPER: None from me.
MR. BUSTAMANTE: Okay. Signature?
MS. KAMPER: Do you want to review a transcript, see if any errors were made in terms of spellings or -- not for substance, just to say, you know --
WITNESS: That would be great.
MS. KAMPER: You want to review it?
WITNESS: Yes.
MS. KAMPER: Okay. So you can send it to -- to me and I'll send it to her then.
MR. BUSTAMANTE: That's fine --
RECORDER: Off the record --
MS. KAMPER: Okay.
RECORDER: -- 3:24 p.m.



CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Erin Marshall
November 19, 2019

## A

**ability** 33:23 61:17, 81:13
**able** 42:4, 61:20 74:1, 74:18 115:24
**above-entitled** 171:4
**Absolutely** 41:9
**academy** 14:23 15:3, 15:5, 15:7 15:9, 24:10 88:6
**access** 164:21 164:22, 166:19
**accompanied** 44:24, 44:25
**accomplish** 141:1
**account** 155:17
**accurate** 23:4 62:15
**accustomed** 71:17
**activities** 56:8 56:10
**activity** 56:14
**actual** 107:3 113:9, 113:11 130:14
**add** 149:2 149:19
**addiction** 16:20
**additional** 57:17 87:24, 88:3
**additions** 143:5
**address** 8:21 9:6, 9:7, 9:11 78:22, 98:11 164:9, 164:12 164:17
**addressed** 76:18 76:24, 116:22
**addressing** 117:8, 117:13
**administrative** 161:14
**admission** 93:15
**admissions** 37:19, 56:14 93:13, 93:18 93:22, 94:2 94:16, 95:7
**adult** 12:21 13:7, 13:12 13:13, 13:15
**advised** 57:24 59:6, 59:17 105:22, 105:24 146:9, 146:12 146:14
**afternoon** 35:10
**age** 8:17
**agenda** 35:20
**aggravated** 95:23
**aggressive** 70:22, 71:7 74:20, 75:1 80:17, 95:23 141:6, 141:18 142:12
**agitated** 96:15 157:7
**ago** 9:16, 42:16
**agree** 5:15 31:15, 62:4 128:25
**agreement** 7:3
**ahead** 36:2, 38:9 42:1, 46:16 54:3, 99:1 140:24, 143:25 168:23
**aids** 13:3
**air** 142:4
**airlines** 27:17
**ajar** 111:17
**al** 1:11, 3:14
**alerts** 61:22
**alike** 163:4
**allegations** 112:23
**allegedly** 148:6 148:12
**allow** 116:4
**altogether** 99:22
**amount** 39:12 129:14
**anger** 79:15 81:4
**angrily** 77:12
**angry** 70:18 70:25, 71:5 71:13, 76:6 77:20, 79:8 80:19, 96:15 103:14, 141:5
**ankle** 101:6
**answer** 5:20, 6:4 6:6, 21:13 24:24, 26:3 26:15, 26:15 30:16, 31:6 31:6, 31:7 33:14, 33:15 33:17, 33:23 34:1, 36:21 38:10, 40:3 41:17, 42:14 59:4, 59:16 61:3, 61:17 62:8, 63:1 75:12, 76:8 78:11, 81:9 87:2, 87:8 87:20, 88:15 107:13, 108:12 110:15, 113:15 114:18, 123:2 124:20, 126:17 127:13, 129:3 130:21, 130:25 136:1, 140:21 144:1, 149:12 149:22, 150:5 159:4, 167:14 169:9
**answered** 41:24 118:24
**answers** 5:6, 5:7
**antagonize** 120:21
**anybody** 46:3 64:18, 68:13 71:6, 71:13 125:23, 132:15 132:24, 135:9 152:3, 153:5 167:1
**anymore** 27:13
**Anytime** 165:6
**apologies** 18:7 71:12, 137:23
**apologize** 79:18
**apologized** 157:15
**apology** 71:2
**apparent** 32:23 122:1
**apparently** 116:8, 116:15 144:5
**appear** 143:4 164:4
**appearances** 2:1 3:24
**appeared** 99:22
**appears** 122:4 143:7, 162:14
**applicable** 4:18
**application** 19:6 25:16
**applied** 25:2
**apply** 19:2, 19:6
**approached** 64:13, 72:6
**approaching** 80:15
**appropriate** 65:10, 65:13
**approximate** 29:12, 39:12 49:10, 82:16
**approximately** 9:16, 9:17 18:16, 19:20 19:21, 22:18 22:21, 38:15 49:11, 58:10 68:23, 75:23 97:17, 102:19 117:15
**approximation** 56:19
**archive** 165:23
**area** 11:2, 11:5 11:6, 16:19 21:4, 29:2 29:11, 29:16 36:13, 37:5 37:10, 37:14 37:16, 37:18 37:23, 42:20 43:1, 43:8 43:20, 43:22 45:4, 45:18 46:25, 47:2 47:3, 47:5 47:24, 48:3 48:7, 48:8 48:11, 48:14 48:25, 51:8 51:16, 51:18 51:19, 51:20 52:6, 53:11 54:3, 54:17 54:25, 55:3 55:3, 56:7, 56:9 56:13, 56:15 56:22, 57:4 57:18, 57:21 58:7, 58:8 58:13, 58:17 58:20, 58:23 59:1, 59:8, 63:5 63:18, 63:20 64:16, 65:20 65:21, 66:21

67:13, 70:6
71:22, 71:22
72:2, 72:9
73:19, 76:14
82:22, 83:14
83:21, 86:24
89:17, 89:19
92:6, 93:9
93:15, 93:16
93:20, 94:2
96:21, 97:8
97:9, 98:8, 99:4
99:6, 99:21
101:18, 101:25
102:6, 102:25
104:2, 112:11
114:7, 114:8
114:24, 114:24
114:25, 115:14
115:16, 115:22
116:2, 116:5
116:5, 116:9
116:10, 116:12
116:14, 116:22
118:16, 122:1
122:2, 122:16
122:21, 122:22
123:8, 130:25
131:14, 145:6
146:3, 147:21
**areas** 37:4
37:17, 37:20
47:24, 48:8
57:22, 121:25
**arm** 34:22, 61:5
70:16, 70:24
77:18, 77:19
79:17, 80:12
157:16, 157:18
157:22, 158:4
158:5, 158:10
158:12
**armed** 86:9
**arrival** 111:16
**ASA** 4:7
**ascribing** 148:5
**aside** 128:7
**asked** 38:8
57:23, 69:20
72:3, 72:7
73:15, 76:19
96:22, 97:3
98:21, 116:15
117:4, 118:15
118:19, 131:24
140:7, 144:4
**asking** 5:2, 9:20
29:19, 32:8
32:14, 34:2
66:9, 66:10
71:14, 72:2
73:17, 77:15
78:7, 86:2
94:21, 94:24
100:6, 107:2
108:16, 108:22
108:23, 131:15
132:23, 132:24
155:24, 155:24
155:25, 159:14
167:19
**assigned** 16:13
36:3, 36:17
37:2, 37:14
37:17, 37:21
38:14, 39:18
40:11, 49:21
55:25, 56:22
57:3, 57:21
57:24, 58:1
58:3, 58:5, 58:6
62:5, 62:10
62:14, 62:19
62:20, 62:22
63:5, 63:8
63:10, 63:12
63:12, 63:14
63:19, 65:20
65:21, 65:23
65:25, 73:16
75:25, 80:22
82:24, 82:25
83:11, 86:20
86:24
**assignment** 36:6
37:23, 38:1
**assignments**
16:12, 19:25
36:23
**assist** 85:10
87:13, 107:16
118:15, 118:19
**assistance**
105:15
**assume** 53:1
67:20, 83:22
83:23, 134:23
**assumed** 36:2
**assumes** 32:5
33:10
**assuming** 33:22
83:21, 139:12
139:14, 146:9
**attachment**
109:20, 139:17
139:24
**attachments**
139:19
**attend** 11:18
12:2
**attended** 24:11
**attention** 61:19
69:18, 75:21
82:9, 133:2
156:21, 156:24
**attorney** 42:4
**Attorney's** 2:21
**attorneys** 3:23
**attributed** 124:5
**authority**
121:15, 153:14
153:17, 167:23
168:1
**automatically**
19:12, 165:23
**available** 58:19
58:22, 127:18
128:9, 128:12
**Avenue** 9:8
**aware** 42:25
44:7, 64:25
77:16, 110:6
147:19

**B**

**back** 8:25, 9:25
27:7, 51:21
51:23, 52:8
54:14, 60:12
61:9, 64:2
67:11, 73:14
76:2, 88:22
89:10, 93:16
97:25, 97:25
98:9, 111:7
113:1, 118:4
119:8, 119:12
121:5, 125:5
154:1, 162:2
165:24, 168:16
**background**
22:10
**backs** 148:2
**balance** 6:7
**balled** 103:16
**ballpark** 14:17
14:18
**Banks** 3:4
**based** 56:24
57:2, 62:3
62:12, 144:6
**basement** 37:7
37:8, 37:14
37:16, 42:20
42:24, 43:1
43:21, 45:4
45:10, 45:11
46:6, 46:12
46:16, 46:24
47:4, 48:1, 48:4
48:6, 48:23
48:24, 49:14
49:24, 54:24
55:25, 56:7
56:9, 56:22
57:18, 58:6
64:13, 64:23
65:23, 65:25
66:21, 71:21
82:21, 83:3
83:4, 83:25
89:10, 99:4
99:5, 99:20
99:21, 99:22
111:16, 111:17
115:7, 115:9
145:7, 145:16
156:15
**basically** 80:10
**basis** 163:3
**Bates** 139:14
**bathroom** 54:9
**bathrooms**
52:21, 53:17
53:20
**Beachem** 91:24
**bear** 75:16
151:14
**bearings** 71:24
**beds** 20:22
**Beg** 54:6
**began** 14:11
27:15, 69:24
70:3, 70:18
71:10, 76:20
114:6, 148:22
157:7
**beginning** 45:12
**behalf** 3:19
3:25, 4:2, 4:4
4:7
**behavior** 102:4
**believe** 15:10
25:7, 25:22
32:24, 34:21
45:10, 72:17
84:1, 88:16
105:14, 106:2
117:2, 136:21

143:18, 156:18 161:20, 165:23
**bench** 53:15 53:21, 54:2 55:2, 97:24 98:1, 98:10 101:8, 101:12
**benches** 52:3 52:9, 52:11 52:12, 53:2
**best** 33:23 41:11, 59:4 61:17, 61:23 71:19, 81:13 100:3, 102:5 112:23, 112:25 124:6, 160:13
**better** 121:15
**beyond** 52:11 52:12, 93:14 95:25
**bid** 37:24, 38:1
**big** 20:21, 21:4 49:1
**bigger** 49:4 49:13
**birth** 8:6
**bit** 13:21, 16:24 20:19, 112:13 114:21
**bizarre** 80:21
**blaming** 97:2
**Bless** 50:23 50:24
**block** 114:21 121:19
**board** 18:21 18:22, 18:25
**body** 103:10 103:20, 107:16 162:18, 164:5 164:23
**born** 11:6
**borrow** 137:25
**boss** 105:24
**bothered** 80:1
**bottom** 105:2 106:12, 107:23 154:5
**box** 164:9
**branch** 134:11
**break** 89:20 118:1, 124:23
**brief** 77:14
**bring** 19:24 100:4, 153:22
**bringing** 57:22
**broad** 21:16
**Broadcasting** 11:21
**Brogan** 91:9
**brought** 42:20 54:16, 55:6 60:1, 61:19 61:25, 82:9 83:15
**building** 15:14 15:18, 35:25 40:5, 40:6 42:23, 48:10 63:15, 72:19 73:14, 99:19 121:24, 121:25 134:22, 147:22
**bunch** 109:21
**bunk** 20:22
**Burke** 3:1, 4:5 109:5, 154:6 154:8, 161:21 163:18
**business** 166:23
**bust** 96:20
**Bustamante** 1:22, 2:4, 2:5 3:12, 3:25, 3:25 4:12, 4:25, 6:13 6:15, 6:17, 6:21 6:25, 26:21 38:8, 38:11 50:23, 54:6 54:8, 54:11 78:23, 104:19 110:24, 111:3 114:16, 114:18 117:25, 124:22 125:1, 130:23 137:1, 137:25 138:2, 138:4 138:6, 140:23 142:16, 152:9 152:11, 152:13 155:8, 160:11 161:22, 162:5 168:7, 168:12 168:14, 170:6 170:9, 170:12 170:22
**busy** 22:2 154:18
**button** 160:11
**buzzed** 51:1
**bylaws** 151:11

**C**

**call** 6:12, 24:17 28:8, 30:21 30:21, 32:19 32:25, 43:12 44:3, 44:5, 44:7 88:7, 133:20 134:1, 135:9 136:17, 151:13 166:5, 166:9 166:18
**called** 27:11 34:8, 34:12 37:6, 37:11 47:24, 83:17 83:19, 136:9 136:10, 136:12 136:13
**calling** 134:6 134:11, 134:18
**calls** 135:10
**calm** 95:25
**camera** 121:22 121:24, 122:1 122:6, 122:7 122:8, 122:12
**cameras** 94:1 94:4
**captain** 23:16 28:6
**career** 17:12 37:13, 37:22
**carry** 44:10 86:22, 87:1 87:15
**case** 1:9, 3:14 6:20, 6:24 50:11, 144:24
**cast** 61:5
**cause** 71:13
**caused** 71:25
**cc** 154:13
**cc'd** 154:16
**CCSO** 137:17
**cells** 20:21
**censure** 130:11
**census** 39:24
**Cermak** 16:21 29:2, 36:3, 36:4 36:9, 36:10 36:17, 36:23 37:1, 37:2 38:14, 39:9 39:18, 42:21 43:21, 46:24 46:25, 48:11 57:25, 62:1 62:5, 62:14 62:19, 62:22 63:5, 63:11 63:12, 63:13 63:14, 63:15 63:19, 69:21 72:20, 73:14 73:16, 73:17 76:19, 76:25 80:23, 82:25 89:10, 90:14 134:9, 151:21 151:25, 161:4
**certain** 12:7 14:16, 14:20 15:6, 15:17 19:19, 21:1 42:15, 45:23 49:8, 56:2 56:18, 58:7 60:4, 66:1, 84:5 90:20, 99:12 102:17, 108:7 115:20, 130:1 151:6, 159:19
**certainly** 85:6 161:12, 164:18
**certificates** 25:17
**CERTIFICAT...** 171:1
**certify** 171:2
**chain** 59:23 101:7, 101:10 101:15
**chair** 49:21 49:22, 50:8 66:25, 67:18
**chairs** 49:19 49:19
**chance** 110:20
**characterization** 33:10
**check** 35:21 61:21, 110:19 147:2
**checked** 166:21
**chest** 77:23 78:15, 170:3
**Chicago** 1:25 2:8, 2:16, 2:24 3:7, 3:13, 11:2 11:4, 11:5, 11:6 12:1
**chiefs** 154:9
**child's** 8:16
**children** 8:14
**choice** 50:6
**chose** 127:16

**Churma** 3:3 4:4, 4:4, 26:2 26:10, 30:12 30:14, 31:4 32:5, 33:9 34:20, 42:13 59:3, 59:15 61:4, 61:18 62:7, 75:9 75:11, 79:2 87:7, 87:19 104:4, 104:22 107:11, 110:14 112:9, 113:5 113:7, 113:14 113:23, 115:2 121:8, 122:24 123:1, 123:13 123:15, 125:9 125:18, 127:4 127:12, 129:2 130:2, 130:6 130:18, 130:20 131:5, 134:17 135:16, 136:3 139:7, 140:20 141:3, 143:23 143:25, 150:3 151:17, 152:7 155:19, 157:2 157:21, 157:23 157:25, 158:20 160:24, 163:20 163:25, 165:4 165:14, 165:16 166:6, 166:8 166:14, 166:17 167:8, 167:13 168:3, 168:5 168:10, 168:22 169:7, 169:15 170:10
**City** 3:14
**Civil** 4:21
**claims** 77:22 78:1
**classes** 88:9
**classification** 17:17, 17:20 17:23, 18:11
**classified** 17:21
**Classroom** 88:8
**clean** 6:5
**cleared** 43:10
**clearly** 74:1
**clenched** 80:14
**client** 110:19
**clinic** 48:11 52:24, 53:22 53:23, 53:25
**clinics** 56:12
**clock** 28:19
**closed** 80:15 103:13, 103:20 111:23, 112:3 112:12
**closest** 51:15
**coaxing** 98:19 99:24, 99:25
**collective** 88:23
**college** 27:3 27:10
**come** 24:22 35:21, 36:15 40:12, 42:12 46:20, 51:14 54:19, 55:13 71:12, 83:20 93:4, 94:12 96:4, 98:3, 98:4 98:12, 98:18 98:20, 100:6 100:9, 149:17
**comes** 50:11
**coming** 43:1 45:4, 47:2, 93:6 98:4, 98:10
**command** 59:23
**commander** 81:7, 81:14 81:18, 82:4 82:9, 82:23 83:19, 83:25 84:16, 84:18
**comments** 107:18
**committed** 129:13
**communicate** 5:12
**communicating** 98:20
**communications** 11:21
**company** 27:16
**complaining** 61:20
**complaint** 40:24 40:25, 41:1 104:25, 105:11 107:3, 107:7 107:8, 107:19 110:3, 110:7 110:11, 111:9 112:14, 118:18 126:3, 126:23 126:25, 127:7 127:9, 128:5 128:16, 130:17 131:3, 131:7 131:9, 131:11 131:13, 131:16 140:18, 141:25 143:17, 143:20 155:21, 156:11 158:24, 159:6 159:10, 159:12 159:20, 160:4 161:15
**complaints** 80:25
**complete** 101:17 107:6, 123:23
**completed** 16:8 107:14, 159:6
**completely** 6:3 72:9, 101:23
**completes** 4:9
**comply** 59:2 59:11
**composure** 80:2
**compound** 15:11, 36:11 36:15
**computer** 57:8 66:25, 67:8 68:16, 68:17 69:15, 76:22
**concern** 31:14 87:4, 141:17 142:3, 142:14 146:6
**concerned** 118:20, 142:10 142:11
**concerning** 168:20
**concerns** 32:3 116:23
**condescending** 78:25
**conditions** 85:15
**conference** 67:21
**confidential** 1:16, 6:14, 6:16 6:18, 7:3, 8:1 8:25, 9:24, 9:25 10:3, 10:25
**confirm** 61:14 61:23, 66:12 146:23
**confirmed** 61:8 61:11, 61:12
**conflict** 85:10
**confused** 16:24 112:13
**confusing** 5:13 63:9
**Conley** 45:1 45:6, 45:13 45:21, 46:4 64:6, 64:6 64:11, 64:13 64:17, 64:20 64:21, 64:22 65:2, 66:4 92:13, 92:20 93:2, 93:8 94:20, 95:6 95:9, 96:22 99:13, 99:20 99:20, 118:15 118:19, 146:1 146:4, 146:6
**Conley's** 45:15
**consider** 44:20
**considered** 115:8
**consistent** 24:20
**constant** 22:3 22:7, 22:8
**consulted** 105:18
**contact** 43:19 94:9, 141:19 166:3
**contain** 70:11 112:14, 156:7 156:11
**contained** 43:9 150:14
**content** 107:9 108:6, 164:9
**contents** 107:6
**Continuation** 11:1
**continue** 11:14 11:23, 12:10
**continued** 98:11 99:19, 120:20 120:20
**control** 37:7 37:8, 37:15 46:12, 46:17 47:4, 47:25 48:1, 48:4, 48:6 48:23, 48:24 49:14, 49:15

49:17, 49:24
50:18, 50:19
50:20, 51:8
51:16, 54:3
54:17, 54:24
55:3, 55:8, 56:4
57:18, 64:13
64:23, 65:22
65:23, 65:25
66:2, 66:4
66:16, 66:18
66:21, 67:13
71:21, 76:2
76:4, 92:5, 94:4
99:6, 99:9
111:17, 111:23
114:24, 114:24
115:7, 115:9
115:10, 116:5
116:10, 145:7
156:15, 156:16
168:6
**controlled** 48:8
50:25
**controls** 48:9
48:13, 48:14
**conversation**
5:11, 22:8
64:10, 64:12
65:5, 70:7
76:11, 76:12
76:13, 76:23
77:11, 77:14
100:16, 133:2
133:5, 133:17
135:15, 135:24
136:5, 144:6
145:20, 168:18
**Cook** 1:11, 2:21
3:14, 13:23
14:3, 14:6
24:12, 26:25
27:21, 85:16
90:19, 92:24
95:14, 139:13
**copiers@cookc...**
107:23
**copy** 137:25
145:8, 145:12
153:21, 161:23
**core** 82:21
**correct** 6:25
12:18, 13:10
13:15, 13:23
13:24, 14:1
15:20, 18:12
19:10, 23:15
23:17, 23:18
23:21, 35:15
35:16, 36:4
36:5, 43:25
51:6, 53:24
55:7, 55:9, 56:4
58:17, 62:1
65:14, 76:1
76:7, 77:2
78:18, 78:20
79:5, 79:6, 86:7
86:13, 89:25
90:12, 94:5
103:20, 109:2
109:10, 112:7
112:20, 112:21
112:23, 112:24
113:3, 113:12
114:12, 115:14
116:11, 116:11
119:20, 121:4
121:16, 123:21
123:24, 124:3
124:7, 124:8
124:9, 124:15
136:15, 142:20
143:2, 144:6
144:7, 145:23
147:9, 150:24
150:25, 154:11
157:13, 160:5
160:6, 162:11
171:2
**corrected** 50:14
147:12
**correctional**
14:13, 14:14
14:21, 16:11
16:12, 17:6
17:8, 17:15
18:13, 18:25
24:9, 24:11
37:13, 40:2
40:9
**corrections**
90:19, 143:5
**correctly** 55:4
116:3
**counsel** 33:20
168:8, 170:9
**counseling**
130:13, 132:4
**count** 21:2, 57:1
**countertop**
49:18
**County** 1:11
2:21, 3:14
13:23, 14:3
14:6, 24:13
27:1, 27:21
85:16, 90:19
92:24, 95:14
139:13
**couple** 11:12
101:1
**course** 12:19
15:21, 16:7
16:8, 47:23
**court** 1:1, 4:19
6:11
**CR** 102:13
104:17, 116:21
125:7, 125:11
126:1, 126:6
126:9, 126:11
127:22, 128:10
129:1, 129:5
149:7
**crazy** 77:19
**criticize** 167:5
167:10, 167:23
**cuff** 116:15
116:16
**cuffed** 60:19
61:24, 114:7
114:11
**currently** 12:12
**cut** 164:18

**D**

**daily** 44:14
85:21, 141:7
163:3
**danger** 85:25
**dark** 21:21
21:23
**Dart** 3:1, 4:5
**date** 8:6, 9:15
12:3, 31:15
31:18, 31:20
31:21, 32:2
44:23, 64:2
109:24, 110:1
133:11, 133:14
135:13, 138:11
138:14, 138:23
138:25, 160:2
165:5, 166:12
166:12, 167:2
**dated** 142:22
**dates** 14:16
**Dawn** 161:19
162:11, 162:13
162:24, 163:1
163:11, 163:12
163:14, 163:17
163:23
**day** 22:1, 29:11
29:15, 30:10
31:13, 35:18
35:21, 35:24
36:1, 39:3
42:12, 42:21
56:15, 56:21
57:4, 57:16
62:6, 83:9
83:10, 83:11
110:10, 120:22
120:24, 123:20
142:24, 149:4
149:10, 149:14
149:14, 151:21
165:12
**days** 130:5
130:14, 132:5
**de-escalation**
86:15
**deal** 141:25
**dealing** 85:6
85:22, 85:24
86:5, 151:13
168:20
**December** 14:7
**decide** 144:2
161:16
**decided** 87:22
**decision** 161:11
161:12, 161:16
**Defendant** 2:19
**Defendants** 1:13
3:1, 4:5
**define** 22:9
**degree** 11:20
12:4, 12:19
12:22, 13:16
**delete** 166:24
**deliberate** 75:7
75:13
**demeanor** 163:6
**department**
27:19, 87:21
89:6, 89:25
90:2, 90:3
90:19, 129:19
134:7
**departmental**
151:10
**Depending**
35:20
**depends** 22:8
32:8, 40:4, 56:8
56:14, 134:6

147:24, 154:18
**depo** 30:11
**deposition** 1:15 1:16, 3:13, 3:19 4:17, 28:12 28:21, 41:1 73:21
**describe** 15:12 35:17, 47:6
**described** 54:22
**designated** 7:3
**designed** 24:5
**desk** 49:15 71:23, 94:16
**detail** 105:13
**detainee** 61:20 61:22, 61:24 61:25, 72:6 96:2, 97:11 97:16, 97:20 97:23, 98:5 98:9, 100:7 117:8, 117:13 118:16, 119:8 119:11, 119:15 119:16, 119:18 119:20, 119:22 119:24, 120:8 120:19
**detainees** 16:16 16:16, 16:19 16:22, 36:11 36:14, 43:8 43:9, 43:11 52:6, 59:7 60:17, 60:19 70:6, 70:9, 72:2 81:18, 81:24 81:25, 83:20 84:3, 84:13 84:17, 84:19 85:8, 85:11 89:12, 89:17 90:1, 97:17 97:24, 114:7 114:11, 116:17 116:17, 163:4
**determine** 74:18 97:22, 125:12 129:21
**determined** 129:14, 129:16
**determines** 60:11
**dial** 134:4 134:5, 134:10 134:12, 134:14 134:24, 134:25
**difference** 144:21
**different** 15:2 24:2, 29:11 29:16, 29:18 36:11, 38:18 121:25, 128:15 128:19, 129:19 134:11, 137:13 152:20
**difficult** 85:22
**difficulty** 32:23
**digit** 134:11
**digits** 134:14 134:25
**diminish** 167:22
**direct** 34:24 85:9, 133:1
**directing** 76:17
**direction** 29:17 99:10
**directions** 104:11
**directive** 58:15 59:2, 59:11 59:22, 65:17 71:8, 88:24 88:25, 89:7 89:11, 89:16 90:7, 90:8 90:10, 111:18 112:6, 113:8 113:9, 113:12 113:18, 114:8 114:10, 114:10 141:7, 144:18 146:3, 146:8 147:6, 158:22 163:6, 164:1
**directives** 71:14 77:4
**directly** 93:22
**director** 25:8 25:8, 25:9 106:16, 106:20 106:25, 109:19
**disciplinary** 126:12, 126:19 128:2, 128:9 128:13, 128:17 131:25, 132:1
**discipline** 28:2 28:6, 65:6, 65:9 65:10, 65:16 126:24, 127:2 127:11, 127:15 127:21, 127:23 128:1, 128:3 128:8, 128:15 128:20, 129:1 129:6, 129:10 129:12, 129:17 129:18, 129:23 129:25, 130:12 131:19, 132:6 146:5, 146:22 146:24, 160:19 160:23
**disciplined** 27:22, 27:23 65:3, 126:9 140:19, 141:10 146:2, 146:8 146:15, 146:18
**discretion** 146:19
**discuss** 30:11 30:22
**discussed** 92:6
**discussing** 65:8
**discussion** 155:23
**dismiss** 131:2 131:8, 131:12 131:17, 131:19 131:19, 131:20
**dismissal** 130:16, 132:6 132:10, 132:16
**dismissed** 28:8 28:10, 130:15
**dismissing** 131:21
**disrupt** 71:13
**disruption** 83:24
**District** 1:1, 1:2 3:15, 4:19, 4:20
**disturb** 155:8 160:12
**DIV8.CERMA...** 121:21
**divided** 38:21
**division** 1:3 3:16, 15:10 15:12, 16:14 16:17, 16:22 16:25, 16:25 17:4, 17:10 17:10, 17:11 17:11, 17:16 17:17, 17:18 17:19, 18:10 20:1, 20:1 20:11, 20:12 20:14, 20:16 20:20, 20:25 21:19, 22:12 23:24, 23:25 23:25, 23:25 24:2, 60:8 81:25, 84:10 84:11
**divisions** 16:13 21:11, 21:15 23:23, 60:2 60:2, 60:5
**divorced** 8:11 9:13
**doc** 12:24
**doctor** 37:11
**doctoral** 12:23 12:25, 13:9
**doctorate** 13:11
**doctors** 52:23
**document** 112:20, 144:17 151:1, 151:1 153:21
**documentation** 28:9, 122:19
**documents** 28:20, 29:3 42:5, 104:14
**Don** 91:24
**door** 47:2, 47:6 47:8, 47:11 47:12, 47:13 47:17, 47:21 47:23, 48:2 48:4, 48:16 48:16, 48:19 48:20, 51:4 51:14, 51:16 51:17, 53:10 53:12, 53:25 54:20, 54:22 55:5, 55:17 55:18, 55:18 64:23, 65:1 65:4, 65:7 65:11, 65:12 65:17, 65:18 67:6, 67:20 67:21, 67:23 67:25, 69:11 92:17, 93:14 99:11, 111:17 114:22, 115:4 115:5, 115:7 115:8, 115:21 115:24, 116:2

**doors** 46:12 46:16, 48:7 48:9, 48:10 48:10, 48:14 50:15, 50:16 50:18, 50:25 51:7, 51:9 52:16, 52:17 54:22, 55:10 55:12, 70:1 70:10, 77:8 77:9, 111:22 112:11, 146:10
**doorway** 67:12 67:15
**dormitory** 20:23, 20:24
**double** 47:11 55:18
**downstairs** 145:6
**draft** 139:5 139:9, 139:10
**Drive** 3:5, 8:22 9:10
**drug** 16:19 16:20
**dude** 98:13
**due** 151:14 153:18
**duties** 35:18 85:21, 86:11 86:14, 141:7
**duty** 35:22 141:24, 169:1 169:4, 169:13
**DV** 121:20

**E**

**earlier** 29:21 35:9, 42:22 157:17, 165:12
**early** 102:20
**easier** 67:23 143:19, 144:2 144:3
**easing** 85:10
**Eastern** 1:3 3:16
**edit** 140:7 144:4, 150:22
**edited** 168:18
**edits** 143:5
**education** 11:14 11:23, 12:11 12:21, 13:7 13:9, 13:12 13:14, 13:15
**effect** 98:17 144:4
**eight** 16:14 16:17, 16:25 17:4, 17:11 17:14, 23:25 35:13, 49:4
**eighty** 11:11
**Eisenhower** 11:9, 11:13
**either** 24:6, 42:3 52:24, 63:9 63:10, 134:1 166:9, 166:18
**electronically** 50:25
**electronics** 27:10
**elevated** 100:3 118:11
**elevator** 45:9 46:7, 46:9 46:11, 46:15 46:18, 64:5 99:21
**elevators** 46:19 48:20, 51:15 114:22
**email** 106:12 108:15, 108:24 109:4, 109:12 109:16, 109:25 133:18, 133:20 134:1, 138:18 142:19, 142:25 145:18, 154:5 155:6, 156:3 157:10, 157:12 159:5, 162:10 162:13, 162:18 163:9, 163:13 163:15, 163:17 163:21, 164:3 164:5, 164:8 164:12, 164:12 164:16, 164:17 164:21, 164:23 164:24, 166:10 166:18
**emailed** 108:5 110:10
**emailing** 108:4 108:4
**emails** 35:21 166:19, 166:22
**embarrass** 167:21
**embellish** 149:24, 156:8
**employee** 128:3 128:13, 128:16 129:17, 129:18 131:2, 131:8 131:12, 131:17 131:19, 131:20 131:22, 131:22 132:11, 146:24 153:15, 153:18 170:3
**employee's** 167:22
**employees** 72:20, 75:24 167:21
**employment** 13:21, 14:5 14:11, 27:1 85:15
**enclosed** 48:25
**enforcement** 87:14
**engage** 102:5
**engaging** 163:3
**ensure** 43:8 43:9, 43:10 107:10, 107:14
**enter** 46:24
**entered** 76:4
**entering** 45:9 89:17
**entrance** 54:20 54:21
**equal** 129:7
**ER** 37:18, 52:24 53:4, 53:11 53:20, 56:13 72:9, 92:8, 92:9 92:10, 93:3 93:4, 93:6 93:11, 93:11 93:16, 94:2 94:9, 94:12 94:13, 94:14 94:15, 95:4 95:10, 95:16 96:5, 96:20 97:1, 118:9
**erase** 166:22
**Erica** 91:5
**Erin** 3:18, 171:7
**errors** 170:14
**Ertler** 161:19 162:11, 162:13 162:24, 163:11 163:12, 163:14 163:18
**established** 89:6 146:3
**et** 1:11, 3:14
**evaluate** 129:20
**evaluation** 169:1, 169:4 169:13
**evening** 35:8
**event** 30:24 30:25, 32:4 32:16, 32:19 32:22, 32:22 33:1, 33:7, 33:7 33:7, 33:10 34:8, 34:10 34:12, 34:13 83:15, 103:2 123:6, 125:15 135:13, 135:14 163:8
**events** 30:22 31:2, 31:11 31:13, 31:16 32:3, 40:19 40:23, 57:3 92:17, 117:18 124:2, 126:9 133:12
**eventually** 28:7 82:4, 84:16 84:18, 88:18
**evidence** 32:6 33:10, 33:23
**exact** 9:15, 12:3 84:5, 102:10 102:17
**exactly** 32:9 33:13, 79:7 128:24
**exam** 25:23
**EXAMINATI...** 4:11
**example** 56:10
**exceeds** 86:6
**excuse** 17:6 19:4, 24:8 78:23, 118:9 148:8, 150:7 150:10
**executive** 25:9 125:12
**exhibit** 3:20 104:19, 104:24 111:8, 136:24 140:17, 142:19

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 297 of 657 PageID #:4282




144:14, 144:14 145:25, 147:12 148:15, 148:17 150:7, 150:11 150:14, 150:14 150:25, 154:2 159:20, 162:3 162:8
**exist** 145:9
**exists** 151:11
**exit** 99:3, 99:19
**exited** 72:8 99:20, 118:8 118:9
**exiting** 82:21 121:13
**expect** 13:16 140:25, 141:1 147:6
**expertise** 130:25
**explain** 70:3 101:2, 160:8
**explained** 144:22
**expletive** 149:2
**explode** 71:6
**explosive** 96:25
**exposure** 37:20
**extended** 28:5
**extremely** 141:8
**exuded** 163:5
**eye** 163:5

**F**

**face** 51:21 70:22, 73:14
**faces** 74:1
**facility** 20:20 86:12, 88:11
**facing** 51:19 52:16, 53:2 53:14, 69:7
**fact** 75:5, 81:23 112:19, 119:19 146:4, 151:5
**facts** 33:22 112:22, 156:7
**fair** 38:20, 40:1 66:15
**fairly** 102:20
**familiar** 147:20 151:7, 164:25
**far** 54:23, 68:24 93:1, 96:24 112:16, 165:21
**fast** 96:17, 96:19 124:24
**feasible** 21:6
**Federal** 4:20
**felt** 128:4, 163:7
**female** 16:23 20:17, 24:5 36:13, 67:1 69:24
**Females** 20:18
**fewer** 56:11
**fight** 29:2, 42:25 43:4, 43:20 43:25, 75:18 165:12
**fighting** 16:20 74:3
**file** 110:3, 127:7
**filed** 110:7 110:11, 125:7 125:11, 126:2 126:3, 127:9 140:18, 143:17
**files** 147:2
**filing** 126:25
**film** 30:4, 30:7 30:9, 34:3 34:15, 56:25 62:4, 62:13 62:16, 62:23 73:20, 74:19 74:23, 94:1 122:21, 123:4 123:6, 123:10 123:18, 165:1 167:2
**films** 29:23 29:25, 30:3 56:24
**final** 6:2
**find** 35:22 39:17, 72:6 81:19, 96:4 97:21, 127:17 128:8, 128:11 128:23, 131:17 141:5, 141:13 145:12, 146:20
**finding** 141:17
**fine** 67:25, 82:7 100:9, 118:24 170:22
**finger** 77:23 78:15, 170:4
**finish** 6:3, 78:7 94:21, 110:20
**finished** 27:3
**fire** 131:22 132:11, 132:15
**firearm** 86:18 87:15
**firearms** 86:11
**firing** 132:12
**first** 6:9, 14:11 14:22, 15:2 27:7, 34:5, 36:6 39:9, 40:7, 43:7 48:19, 51:14 66:15, 76:4 76:18, 77:10 79:15, 82:17 89:12, 92:6 102:16, 103:19 105:10, 114:4 116:25, 133:20 138:17, 148:19 149:7, 149:15 153:6, 159:11 159:16
**fists** 103:11 103:13, 103:14 103:19
**fitness** 169:1 169:4, 169:12
**five** 9:1, 17:10 17:11, 17:14 17:16, 17:17 18:10, 134:4 168:14
**Flossmoor** 9:3 9:4, 9:6, 9:8, 9:9
**focus** 74:16
**folks** 40:11 137:15, 169:12
**follow** 22:20 43:4, 71:14 141:16, 141:24 146:17, 146:21 146:25, 147:3 147:7
**follow-up** 35:23
**followed** 118:10 146:21
**following** 7:2 146:2, 146:8
**footage** 28:24 28:25
**forefront** 149:17
**foregoing** 171:2
**forget** 47:24 89:21
**forgive** 9:20 71:4, 79:18 94:25
**form** 21:13 24:24, 26:2 30:14, 30:15 31:3, 32:5 33:11, 36:20 38:5, 40:3 41:14, 41:24 42:13, 59:3 61:2, 61:16 62:7, 62:24 75:10, 75:11 76:8, 79:1, 87:2 87:7, 87:19 88:15, 104:3 104:25, 107:11 108:12, 110:13 110:14, 112:9 113:6, 113:7 113:13, 114:14 115:2, 115:15 116:6, 117:22 121:8, 122:25 123:1, 123:14 123:15, 124:19 125:9, 125:18 126:16, 127:4 127:12, 128:17 129:2, 130:2 130:18, 134:17 135:1, 135:17 140:20, 141:3 142:6, 143:23 149:12, 149:22 150:3, 150:4 150:19, 155:19 157:21, 158:20 159:2, 159:6 160:24, 163:20 163:25, 165:4 165:14, 166:6 166:7, 166:14 166:17, 167:7 168:5, 168:22 169:7, 169:15
**formal** 11:14 11:23, 12:10 24:12
**forms** 128:16
**formulating** 6:3
**forth** 73:14 89:16
**forward** 33:20 69:18, 98:12 126:23
**forwarded** 155:21
**forwarding** 145:19
**found** 44:1

**foundation** 26:2 30:15, 31:3 61:2, 61:16 62:7, 62:24 87:19, 113:23 130:2, 130:20 130:22, 135:17 150:19, 151:17 155:19, 165:16 166:8
**founded** 129:25
**four** 9:5, 16:17 16:23, 16:25 20:11, 20:16 23:25, 24:2 67:3, 134:4 134:10, 134:10 134:14, 134:14 134:14, 134:24 134:24
**fourth** 148:5 148:9
**frames** 29:20
**fresh** 124:2
**fresher** 149:10 149:13
**Friday** 110:2
**frightened** 80:19, 101:25
**front** 18:24 50:18, 51:22 52:1, 52:4 52:17, 52:18 52:19, 52:20 53:2, 53:8 53:13, 53:14 54:24, 55:2 60:12, 64:7 67:11, 98:8 167:6, 167:11 167:23, 167:24
**frustrating** 85:15
**frustration** 85:7 85:17, 85:18
**fucking** 120:22 148:13, 149:3 157:11, 157:12
**full** 78:11 105:13, 134:25
**Fully** 47:19 47:20
**further** 52:7 53:23, 55:6 65:8, 76:10 100:16, 141:19
**future** 163:8

## G

**G-u-i-n-t-a** 91:16
**Gannon** 57:10 58:3, 62:5 62:14, 62:23 67:1, 67:17 68:20, 68:21 69:24, 70:3 72:16, 72:22 73:1, 76:12 76:20, 76:21 76:24, 147:11 147:12, 147:14 147:17, 147:21
**gather** 45:18
**geared** 76:23
**general** 65:21 100:3
**generally** 35:5
**generate** 43:11 127:19, 127:23 128:1, 132:1 145:3
**generated** 19:14 28:6, 129:15 144:19, 144:25 149:7
**generating** 118:23
**getting** 46:15 59:20, 71:11 72:20, 98:12
**give** 5:7, 8:21 14:17, 14:18 16:11, 19:22 19:23, 35:24 39:12, 40:15 56:10, 56:19 71:7, 72:3 77:13, 82:16 88:3, 89:8 141:6, 147:6
**given** 21:12 40:10, 86:10 86:13, 111:22 129:21, 145:1 147:1, 164:2
**gives** 18:20
**giving** 81:21 82:3, 85:8 97:20, 104:10
**glass** 115:21 116:1, 116:4
**go** 8:3, 9:25 11:8, 11:16 11:25, 15:7 25:3, 27:7, 38:9 42:1, 42:11 46:6, 48:2 48:10, 51:15 52:23, 53:19 54:17, 64:2 66:2, 66:4 66:10, 93:2 96:11, 96:24 99:1, 99:8 101:5, 101:7 111:11, 114:2 128:2, 129:25 130:16, 140:24 142:4, 142:4 143:25, 150:10 161:23, 168:23
**goal** 101:24
**God** 9:14, 20:10 22:19, 30:17 70:20
**God's** 152:25
**goes** 19:14
**going** 4:22, 5:2 6:5, 6:9, 6:10 12:15, 13:11 16:20, 19:12 30:11, 30:21 30:22, 31:10 31:22, 32:19 32:22, 32:25 33:9, 34:23 40:4, 40:5 40:10, 56:8 56:11, 71:21 72:18, 76:2 80:13, 84:9 96:4, 96:24 98:17, 100:9 102:23, 103:12 104:13, 113:1 124:12, 136:21 136:24, 140:17 144:14, 154:2 161:22, 162:3 166:7, 168:9
**good** 3:9, 27:18 46:1, 136:23
**gosh** 17:12 22:22, 28:18 47:9, 83:6 137:20
**Gotcha** 140:4
**gotta** 161:23
**gotten** 64:5
**graduate** 11:10
**graduation** 11:19
**grapevine** 81:3
**great** 170:17
**ground** 158:15 158:19, 158:22
**group** 76:15 82:1, 82:7 88:23
**guard** 85:25 86:21
**guarded** 56:7
**guards** 55:25 56:3, 56:11 56:17, 56:22 56:25, 57:3 59:1, 59:11 62:5, 86:6, 86:9 88:18, 104:10
**guess** 5:18 21:17, 22:23 28:18, 39:14 39:23, 86:8 128:20, 147:25
**guessing** 5:23 45:24
**Guinta** 91:13 91:14, 91:15 91:17, 91:18 91:18, 91:19 91:19, 91:21
**guy** 75:1, 97:25 99:2
**guys** 69:19 69:25, 70:8 70:8, 77:15 81:21, 82:2 82:12

## H

**h-uh** 5:12
**half** 6:6, 13:17 21:9, 135:15 135:24, 149:9
**halfway** 52:4
**hallway** 47:1
**hand** 3:21 50:12, 116:16
**handcuff** 70:9 101:5, 116:16
**handcuffed** 58:16, 60:9 61:1, 61:21 77:6, 77:17 89:12, 89:18 90:1, 116:18
**handcuffing**

89:13, 123:7
**handcuffs** 58:19 60:6, 60:11 89:21, 89:24 101:4
**handle** 131:9
**handled** 74:15 75:6, 129:7 129:8, 129:11
**hands** 61:9, 71:9 80:14, 103:11 149:1
**happen** 19:13 33:6, 42:17 82:20, 95:20 98:16, 98:17 102:9, 117:21 133:10, 133:12 133:13, 147:8 164:11
**happened** 29:1 41:11, 69:16 70:13, 70:21 82:17, 83:16 95:17, 98:2 125:8, 125:14 125:15, 126:1 126:6, 132:25 142:3, 149:14 149:16
**happening** 78:10, 87:11 92:17, 146:10
**happens** 125:12 164:14
**happy** 114:17
**hard** 38:11
**hate** 22:22
**Hayes** 8:18
**health** 16:18
**hear** 13:4, 51:13 82:4
**heard** 13:7 38:10, 81:3 81:3
**hearing** 13:3
38:12, 70:17
**height** 9:18
**held** 15:9
**help** 55:2 102:15
**hi** 69:19, 76:20 162:25
**high** 11:8, 11:13 11:19, 27:9
**highest** 129:1
**hit** 80:13 103:12
**hold** 26:22, 58:8 72:4, 133:24 135:6, 159:18
**hole** 115:5
**Holland** 8:20 8:22, 9:10
**home** 24:7
**homeland** 24:18
**honest** 83:7
**Hopefully** 13:17
**hospital** 16:21 36:10, 36:14 60:9, 94:2
**hostage** 24:18
**hostile** 141:8
**hours** 35:2, 35:7 35:13
**house** 15:15 36:11
**housed** 16:15 20:21, 39:7
**HR** 133:17 133:24, 133:24 134:8, 134:13 134:20, 135:6 135:9, 135:12 135:21, 135:24 136:6, 136:12 136:20, 138:15 138:20, 139:1 139:3, 143:16 149:3, 151:1 168:18, 169:3 169:12
**HR's** 135:10
**hub** 48:13
**Hugh** 91:3
**human** 85:23 100:1, 133:3 133:5
**hungry** 110:19

**I**

**idea** 40:15, 57:5 108:9, 110:9 119:15, 119:21 123:5, 142:9 160:25
**identify** 82:14
**Illinois** 1:2, 1:25 2:8, 2:16, 2:24 3:7, 3:13, 3:16 4:20, 8:23, 9:8 11:17
**immediate** 47:4
**implemented** 90:10, 127:10
**important** 5:17 41:8, 41:10 107:9, 163:7 168:1
**improper** 74:14
**in-service** 24:17
**Inability** 61:9
**inappropriate** 65:16, 78:17 79:4
**incident** 29:1 29:10, 34:21 76:23, 81:6 81:14, 82:8 82:15, 82:17 83:1, 84:23 85:3, 105:24 106:25, 117:1 117:20, 135:22 145:20, 147:11 147:15, 149:7 151:22, 152:3 153:12, 162:25 163:1, 165:5 165:11, 165:22 166:13
**incidents** 31:10 37:5, 70:10 126:13
**includes** 42:24
**independent** 40:18
**indicate** 122:20
**individual** 20:21
**inform** 143:16 163:7
**information** 4:10, 9:24 22:11, 39:23 59:6, 135:13 135:22, 143:21 145:15
**informed** 119:11, 135:5
**infraction** 85:5 129:13
**initially** 14:24 15:1, 76:9 100:7, 103:13 148:3
**initiate** 160:19 160:23
**inmate** 30:25 32:24, 32:25 59:1, 60:25 92:7, 93:9 99:25, 99:25 100:22, 100:25 101:20, 101:21 103:3, 104:2 116:23, 117:21 119:7, 119:11 119:24, 123:7
**inmates** 15:15 20:21, 20:24 37:10, 39:7 39:9, 39:18 40:2, 40:9 40:13, 40:16 43:1, 43:4 43:25, 51:20 52:22, 54:16 55:5, 55:12 57:22, 58:8 58:13, 58:16 60:1, 60:8, 74:3 74:20, 75:3 75:18, 77:6 86:6, 86:25 87:4, 89:9 104:8, 165:12 167:6, 167:11 167:23, 167:24
**inside** 47:14 47:23, 48:11 48:23, 49:14 51:8, 54:25 55:22, 67:15 86:11, 87:16 87:17, 88:11 88:12, 92:16
**instance** 81:17
**instruct** 6:11 146:4, 146:14
**instructed** 121:17, 146:1 146:7, 146:13
**instruction** 5:8 146:18, 146:21
**intake** 17:19 17:25
**intend** 140:19
**intention** 141:9
**interacting** 30:8
**interaction** 30:10, 34:3 34:16, 42:18 71:18, 92:14 97:23, 123:8 128:4, 165:2 165:9
**interactions** 34:6, 34:17 167:3

**interchangeably** 89:4
**interdepartme...** 129:8, 129:11 132:1
**interdisciplinary** 129:24
**interest** 61:23
**interesting** 85:14
**interrupting** 17:8
**intervened** 82:5
**interview** 25:4 25:6, 25:20
**interviewed** 125:20, 125:21 125:23, 132:24
**investigate** 126:4
**investigated** 161:4
**investigating** 142:1
**investigation** 104:25, 151:15 153:19
**involve** 142:1
**involved** 31:16 75:18, 83:13 84:3, 169:12
**involving** 125:8 125:14, 125:16
**issue** 59:18 59:19, 81:19 82:3, 84:1 89:25, 113:12 113:18
**issued** 144:18
**issues** 87:11 163:8

**J**

**jail** 85:16, 95:14 112:6, 113:2 113:17
**Jeff** 106:2 106:24, 108:16 109:5, 109:16 109:25, 110:9 152:2, 152:5 153:6, 154:6 154:16, 155:18 155:22, 156:7 160:22
**job** 19:3, 19:3 25:1, 27:7 27:21, 35:19 71:12, 88:5 88:7, 120:22 120:24, 121:15 158:22, 163:6
**jobs** 27:5
**Johansson** 152:2, 152:5 152:11, 152:21 153:2
**John** 1:5, 3:14 4:1, 4:2, 40:19 42:18, 91:13 91:15, 92:1 106:25, 110:3 110:7, 110:11 125:8, 125:16 125:16, 126:2 126:8, 126:12 127:2, 133:1 133:6, 140:18 141:17, 152:4 162:25, 163:2 163:17, 168:20 169:1, 169:5 169:13
**Johnsen** 106:2 106:3, 106:24 107:18, 108:16 109:5, 109:16 109:25, 110:9 152:6, 152:7 152:10, 152:14 152:15, 152:17 152:18, 153:9 154:6, 154:17 155:18, 155:22 156:8, 160:22
**Joi** 2:20, 4:7
**join** 26:3, 26:13 31:4, 32:7 33:12, 34:20 42:14, 59:4 59:15, 61:4 61:18, 62:8 79:2, 87:8 87:20, 104:4 107:13, 113:14 115:3, 121:10 125:10, 127:13 129:3, 136:3 140:21, 141:4 143:24, 144:1 155:20, 157:4 165:17, 167:8 167:13, 169:8
**joined** 84:2
**Jones** 25:8 90:15, 90:17 90:18, 145:16 162:23
**Jones-Hayes** 1:15, 1:16, 2:19 3:17, 3:18, 4:8 4:15, 4:17, 4:24 104:24, 106:24 107:24, 138:21 139:19, 154:14 162:22, 162:24 168:17
**Jordan** 8:18
**Julian** 91:7
**July** 38:13
**jumped** 74:25
**June** 9:1
**justice** 24:1 24:4

**K**

**Kamper** 2:20 4:7, 4:7, 6:19 6:23, 7:1, 21:13 24:24, 26:3 26:13, 30:13 30:15, 31:3 31:5, 32:7 33:12, 33:14 33:17, 33:19 33:22, 34:1 34:19, 36:20 38:5, 38:9, 40:3 41:14, 41:17 41:24, 42:14 54:5, 54:7, 54:9 59:4, 59:13 59:16, 61:2 61:16, 62:8 62:24, 63:1 75:8, 75:10 75:12, 76:8 79:1, 81:9 81:12, 87:2 87:8, 87:20 88:15, 104:3 104:21, 107:13 108:12, 110:13 110:15, 110:18 113:4, 113:6 113:13, 113:15 113:21, 114:14 114:17, 115:3 115:15, 116:6 117:22, 121:10 122:23, 122:25 123:2, 123:12 123:14, 124:19 125:10, 126:16 127:13, 129:3 130:19, 130:21 130:24, 135:1 135:17, 135:25 137:3, 140:21 141:4, 142:6 143:24, 144:1 149:12, 149:22 150:2, 150:4 150:19, 152:12 155:11, 155:20 157:4, 159:2 159:4, 165:15 165:17, 166:7 167:7, 167:12 167:14, 168:11 168:23, 169:8 170:11, 170:13 170:18, 170:20 170:24
**Karen** 1:15 1:16, 2:19, 3:17 4:8, 4:15, 4:17 106:17, 106:24 107:24, 138:20 154:13, 162:22 162:23
**Karyn** 169:24
**keep** 5:10, 5:15 65:17, 70:10 71:9, 71:9 73:11
**keeping** 65:18
**kept** 39:19 39:20, 39:24 95:13, 111:23 168:1
**key** 51:4
**kind** 37:19 55:17, 60:22 60:24, 69:18 70:19, 71:16 71:22, 71:23 71:23, 80:9 80:21, 100:4
**kindly** 111:14 118:7, 162:16
**KM_364E** 108:8
**kneeled** 99:3
**knew** 72:25
**know** 5:6, 5:20

5:21, 5:25, 6:4
9:15, 17:12
17:12, 26:6
26:7, 26:20
26:21, 26:21
29:24, 30:19
31:5, 36:2, 36:3
39:8, 41:6, 44:2
44:5, 47:9, 49:9
55:22, 56:3
58:1, 60:2, 60:5
62:20, 63:7
63:11, 63:19
66:7, 66:8
66:24, 68:24
69:20, 69:25
70:5, 70:8
70:12, 70:18
70:21, 70:24
71:5, 71:8
71:10, 71:10
71:11, 71:15
71:16, 71:18
71:25, 72:18
72:20, 73:2
73:3, 73:6
73:12, 73:15
73:15, 73:24
75:13, 75:19
75:24, 77:15
77:16, 77:22
77:25, 78:3
79:17, 79:20
79:25, 80:18
80:20, 80:21
80:22, 81:5
81:22, 82:8
82:10, 85:21
87:10, 88:18
90:21, 92:2
93:1, 93:22
94:20, 95:5
95:8, 95:13
95:20, 96:16
96:24, 97:18
99:10, 99:11
100:1, 100:4
100:6, 100:8
100:14, 101:23
101:24, 102:3
102:20, 103:7
105:5, 105:12
108:2, 108:10
108:14, 108:25
109:12, 109:20
110:5, 110:19
119:2, 121:21
122:5, 122:7
123:4, 123:10
123:16, 123:16
124:11, 124:13
126:1, 126:5
126:8, 128:22
131:11, 131:13
131:18, 131:21
133:11, 133:20
134:20, 134:21
135:12, 135:21
138:14, 138:25
139:3, 139:6
139:18, 141:11
143:10, 144:3
145:18, 146:16
147:10, 147:13
147:13, 147:14
147:22, 147:23
147:24, 147:25
148:3, 149:16
150:18, 150:20
150:21, 151:5
151:10, 151:11
151:12, 151:18
151:20, 152:23
153:14, 153:17
156:8, 158:1
158:2, 159:12
159:13, 160:3
160:22, 164:6
164:20, 164:22
165:21, 166:11
166:21, 166:24
167:1, 169:11
169:16, 169:20
169:24, 170:1
170:16
**knowing** 71:19
**knowledge** 58:2
106:7, 107:21
112:24, 112:25

**L**

**lab** 37:19
**lady** 71:9, 79:10
80:6, 80:18
148:14, 148:24
**large** 21:5
**larger** 101:5
**latest** 9:7
**Latin** 50:11
**laughed** 82:11
**law** 1:22, 2:5
2:13, 3:11
87:14
**lawsuit** 31:17
**lawyer** 28:16
68:9
**lawyers** 28:12
28:14
**lead** 85:16
85:18
**leads** 115:22
116:2
**lean** 69:18
**learned** 100:1
**leave** 71:20
82:1, 94:13
96:22, 102:6
**leaves** 96:5
**leaving** 99:17
99:18, 100:15
**led** 48:20
**left** 46:20, 46:22
46:23, 46:24
53:5, 54:4, 55:3
55:6, 55:8, 64:7
67:11, 67:17
68:13, 68:14
68:20, 68:21
69:5, 69:6
69:10, 88:21
92:5, 99:3
99:21
**leg** 101:11
**legs** 101:13
**letter** 164:24
**level** 12:25
15:20, 21:12
21:22, 45:19
45:21, 56:14
104:1, 128:15
128:25, 129:1
129:7
**levels** 129:6
131:25
**licenses** 26:22
**lieutenant** 22:16
22:17, 23:1
23:6, 23:19
23:22, 24:1
26:8
**life** 27:2
**Linden** 2:12
2:13, 4:2, 4:2
6:14, 125:4
125:6, 138:1
138:3, 138:5
138:7, 139:8
152:6, 152:14
152:16, 155:12
162:6, 170:7
**line** 148:5, 148:9
**linked** 101:8
**list** 19:13, 19:14
**listen** 100:8
**little** 13:21, 15:2
16:24, 20:19
22:2, 49:13
112:13, 114:21
160:11
**live** 8:19, 9:2
9:4, 9:9, 11:4
**lived** 8:24
**LLC** 3:4, 3:20
**LMS** 24:20
**locate** 118:16
**located** 3:11
134:20, 134:21
**location** 37:2
48:7, 92:8
134:23
**logs** 95:13
121:24
**long** 8:24, 9:4
14:2, 14:14
15:4, 15:21
17:12, 23:1
23:9, 28:16
30:19, 38:3
38:5, 42:15
77:9, 80:22
92:10, 92:11
93:25, 100:24
101:15, 101:16
133:16
**look** 42:6, 98:15
104:14, 105:4
106:6, 106:10
107:22, 109:4
109:15, 115:13
115:16, 116:9
116:13, 118:5
137:4, 137:17
138:4, 138:9
138:17, 138:18
140:14, 142:17
143:4, 143:20
144:8, 147:24
148:4, 148:15
154:17, 157:7
159:20, 159:23
162:7
**looked** 73:25
116:12, 140:25
141:2, 141:12
141:13
**looking** 31:10
46:15, 54:2
54:25, 69:14
69:15, 74:21

97:14, 97:22 97:25, 108:21 111:8, 115:6 119:8
**Lord** 9:22 11:11, 19:18 29:24, 71:1 78:8, 94:25
**lot** 102:4
**loud** 21:25
**lower** 15:20 36:13
**lunch** 124:23

M

**mad** 70:18 81:23, 96:21
**main** 45:19 45:21
**maintain** 80:2 168:6
**making** 35:24 44:13, 44:23 45:7, 46:4
**male** 8:18, 17:17 18:11, 36:13 81:24, 81:25
**managed** 116:8
**manned** 49:24 49:25, 49:25 50:10
**manner** 75:7 76:6, 85:9 85:12
**manually** 51:2
**manus** 50:11
**March** 8:7
**marital** 8:10
**mark** 6:17, 8:2 161:22
**marked** 104:23
**Marmor** 3:4
**married** 8:12
**Marshall** 3:18 171:7
**Martha** 91:11
**Martinez** 90:21 90:21, 90:22
**Master's** 12:5
**material** 47:9
**Matt** 109:5 154:6, 154:8 161:20, 163:24
**matter** 3:13 75:5, 112:19 119:19, 132:20 161:4, 161:18 168:19, 171:4
**matters** 92:7
**Matthew** 3:1 4:5, 163:14 163:18
**maximum** 20:13 84:12, 129:11
**mean** 5:14 22:20, 28:4 32:13, 33:13 33:16, 41:6 42:5, 50:17 63:15, 67:9 101:3, 111:25 121:23, 123:16 124:10, 128:1 155:11
**meaning** 57:25 132:6
**means** 33:15 160:22
**measures** 86:17 87:9, 126:20 128:9, 128:19
**medical** 16:16 16:18, 28:3 36:12, 36:15 43:10, 60:20 60:24, 61:13 61:14, 61:22
**medium** 17:17 17:23, 17:24 18:10
**meet** 28:12 28:14, 28:16 88:21
**meetings** 35:25
**memorandum** 40:22, 145:3 145:8, 168:19
**memory** 40:18 41:11, 41:19 42:3, 102:16
**mental** 16:18 114:21
**mentally** 16:15 36:12
**mention** 139:18 157:11
**mentioned** 85:14
**merit** 18:22 18:25, 25:24 25:25, 26:5 26:8
**merited** 128:11
**message** 106:23
**met** 28:15 169:18, 169:22
**metal** 47:8
**method** 165:25
**methods** 87:15
**middle** 52:10 67:16, 68:23 148:21
**minced** 124:9
**mind** 48:16 80:9, 124:2 158:7, 158:8
**mindset** 115:7
**minimum** 20:15 20:20
**minute** 54:7 72:3, 102:18 110:18, 110:21 161:24
**minutes** 28:19 77:14
**Miriam** 109:16 109:18, 109:25 110:10
**Mischaracterizes** 157:2, 157:23
**mistaken** 115:21
**mm-hmm** 17:25 18:4, 23:13 57:13, 64:1 76:3, 103:21 109:9, 136:14 144:13, 148:23 162:9
**moment** 14:17 21:12, 25:19 30:7, 30:9 39:11, 64:25 66:6, 66:13 93:5, 96:16 96:25, 143:8 163:5
**moments** 118:6 119:16, 119:22
**Monday** 1:17 3:10
**monitoring** 24:7
**month** 82:19 135:14, 135:23 149:9
**months** 9:1 38:13, 75:22 75:23
**Morgan** 3:3, 4:4
**morning** 3:9 35:8, 35:9
**move** 101:16
**moved** 8:25 60:8, 161:17 161:18
**movements** 103:10
**moves** 126:23
**moving** 96:19
**Mueller** 92:1
**Mueller's** 92:2

N

**name** 3:18, 4:13 4:24, 8:16 27:16, 69:19 70:14, 73:7 90:15, 93:23 152:9, 152:25 153:6
**narrative** 33:19 105:12, 105:16 105:19, 121:20
**native** 11:3 11:5
**nature** 22:4
**Naughton** 8:22 9:10
**Nawara** 1:5 3:14, 4:1, 4:3 30:4, 30:10 30:24, 31:14 31:17, 32:4 32:17, 33:6 34:3, 34:6 34:15, 37:5 40:19, 42:18 57:12, 58:5 62:5, 62:14 62:23, 67:2 67:16, 68:11 68:12, 68:12 69:14, 69:17 70:15, 70:16 73:5, 73:6, 73:6 73:7, 73:11 73:11, 73:12 73:21, 74:6 76:5, 76:11 76:19, 76:24 77:12, 77:18 77:22, 78:5 78:14, 78:22 79:7, 79:16 80:5, 80:7 80:11, 80:22 80:25, 81:4

81:15, 81:20
82:6, 82:14
82:14, 83:12
83:21, 84:19
84:25, 85:8
92:14, 94:10
94:12, 94:19
95:3, 95:11
95:16, 95:22
96:6, 96:7, 96:7
96:8, 96:25
97:6, 97:20
98:14, 98:22
99:2, 99:17
99:23, 100:16
100:21, 101:19
101:25, 103:3
106:25, 110:3
110:7, 110:11
114:6, 117:1
118:10, 118:17
118:20, 119:20
120:6, 120:12
120:18, 120:20
120:23, 123:8
124:6, 125:8
125:16, 125:17
126:8, 126:13
127:2, 127:11
128:4, 129:13
129:15, 129:22
133:1, 133:6
133:13, 135:13
135:23, 139:19
140:19, 141:20
143:17, 145:20
148:6, 148:11
148:16, 149:25
151:21, 151:24
152:4, 153:12
156:14, 158:21
162:25, 163:2
163:5, 165:2
165:9, 166:13
167:3, 168:20
169:1, 169:5
169:13

**Nawara's** 70:13 70:16

**necessarily** 22:5 44:9, 62:2 63:19, 74:16 87:9, 122:9 129:4, 131:6 131:12, 131:16 164:22

**necessary** 41:5 140:8, 149:13 150:23

**need** 39:24 70:11, 72:7 80:10, 84:21 84:22, 98:18 107:16, 110:20 113:12, 113:18 113:24, 113:25 126:24, 143:22 153:21

**needed** 35:23 35:24, 131:12 131:17

**negative** 97:23

**negotiations** 24:19

**nervous** 79:24

**never** 23:16 30:8, 35:12 35:14, 71:6

**Nevertheless** 16:7, 19:2, 40:1

**new** 72:18 72:18, 144:18 144:19

**night** 21:22 39:3

**nine** 81:25 84:10, 84:11

**Nineteen** 11:11

**Nneka** 25:8

**noise** 21:11 21:21, 22:3 22:7, 22:9 75:16, 104:1

**Non-Confident...** 11:1

**non-working** 50:16

**normal** 5:11

**normally** 154:17

**North** 1:23, 2:6 2:14, 3:12

**Northern** 1:2 3:15, 4:20

**notarized** 112:20, 159:10 159:16, 159:25 160:2, 160:4

**notary** 3:18

**note** 138:7

**notes** 145:19

**Nothing's** 98:17

**notice** 74:25

**noticed** 29:22 46:12, 47:16 119:16, 119:20 119:22, 120:8

**November** 1:18 3:10, 138:11 138:23, 139:1 139:4, 139:5 142:22, 171:8

**number** 1:9 3:15, 32:20 32:22, 33:1 33:8, 34:8 34:12, 56:16 77:13, 84:5 87:5, 104:24 105:1, 105:4 111:9, 125:4 134:5, 134:11 134:12, 137:1 142:17, 145:25 150:11, 150:14 150:25, 154:2 159:21, 162:3 162:8

**numbers** 39:19 105:2, 109:22 134:4, 134:4 134:19, 134:24 139:14

**Nurse** 169:20

**O**

**Oakmont** 9:7

**oath** 3:21 143:21

**obey** 85:1

**object** 21:13 24:24, 26:2 30:12, 30:13 31:3, 32:5, 33:9 33:11, 38:5 40:3, 41:14 41:24, 42:13 59:3, 61:2 61:16, 62:7 75:8, 75:9, 76:8 79:1, 87:2, 87:7 87:19, 88:15 104:3, 107:11 108:12, 110:13 110:14, 112:9 113:4, 113:5 113:13, 113:23 114:14, 115:2 115:15, 116:6 121:8, 122:23 122:24, 123:12 123:13, 124:19 125:9, 125:18 126:16, 127:4 127:12, 129:2 130:2, 130:18 134:17, 135:1 135:16, 135:17 140:20, 141:3 142:6, 143:23 149:12, 149:22 150:3, 150:4 151:17, 155:19 157:21, 158:20 159:2, 160:24 163:20, 163:25 165:4, 165:14 165:15, 166:6 166:7, 166:14 166:17, 167:7 168:3, 168:5 168:22, 169:7 169:15

**objecting** 33:19

**objection** 36:20 130:22, 131:5 150:19, 157:2 167:12

**objections** 26:10 26:17, 34:19 59:13, 113:21 130:6, 135:25

**observe** 75:17

**observed** 111:17

**obtain** 59:21

**obtained** 25:17

**obtaining** 169:4

**obviously** 51:21 90:11, 164:7

**OC** 86:15, 87:11

**occasion** 43:24

**occasions** 86:8

**occurred** 37:6 40:19, 81:14 105:25, 163:2

**occurrence** 56:21, 64:3 123:21, 149:5 149:11

**occurring** 117:18

**occurs** 165:22

**OCR** 86:22

**October** 110:2 110:6, 110:10

**offended** 71:3 79:17

**offer** 84:6 107:19

**offered** 19:3
**office** 1:22, 2:5
2:21, 3:11
13:23, 14:3
14:6, 14:12
27:8, 27:21
35:19, 45:15
45:16, 45:18
88:13, 92:25
93:15, 115:4
129:8, 134:3
134:8, 139:13
166:23
**officer** 14:13
14:15, 14:22
16:11, 16:12
17:1, 17:9
17:11, 17:15
18:14, 18:25
24:9, 24:11
30:4, 30:5
30:10, 30:24
31:14, 31:16
32:3, 32:17
33:6, 34:3, 34:6
34:15, 36:24
37:1, 37:13
37:22, 37:24
38:1, 40:16
43:19, 57:6
57:9, 57:12
65:20, 66:25
67:1, 67:1, 67:6
67:16, 69:3
69:23, 69:24
70:2, 70:16
72:16, 74:6
74:8, 76:5
76:11, 76:12
76:21, 77:18
77:22, 78:5
78:14, 79:5
79:16, 80:5
80:6, 80:11
81:15, 81:20
82:6, 83:21
84:19, 84:25
85:8, 85:16
85:25, 86:20
86:22, 86:24
86:25, 92:14
93:14, 93:16
93:18, 93:22
94:10, 94:12
94:15, 94:19
95:3, 95:7
95:10, 95:16
95:22, 96:25
97:5, 97:19
98:14, 99:17
99:23, 100:16
100:21, 106:25
114:6, 117:1
118:10, 118:16
118:20, 120:6
120:12, 120:18
120:20, 120:23
121:5, 123:8
124:6, 129:13
129:22, 141:20
145:20, 147:11
147:17, 148:11
148:16, 149:25
151:20, 151:24
158:21, 159:6
162:25, 163:2
163:5, 167:6
167:11
**officer's** 93:23
**officers** 38:14
40:2, 40:10
40:12, 40:13
43:3, 47:25
50:17, 50:19
50:20, 51:8
52:5, 57:16
57:18, 57:21
62:18, 63:4
63:10, 63:18
66:20, 67:3
74:2, 74:5, 74:8
75:15, 75:17
75:19, 87:5
93:20, 104:12
146:1, 146:5
146:7, 146:15
146:22, 147:2
**Offices** 2:13
**oh** 6:2, 9:14
9:22, 11:11
11:22, 17:22
18:5, 19:18
20:10, 22:19
26:21, 29:24
30:17, 41:15
47:9, 50:13
59:14, 63:6
67:10, 68:24
70:4, 70:20
71:1, 71:10
73:10, 75:1
76:20, 78:2
78:3, 78:8
78:23, 82:18
83:6, 88:2, 92:2
94:22, 102:10
102:13, 103:9
107:12, 108:22
109:7, 110:24
119:1, 119:14
121:9, 122:7
124:24, 132:17
133:4, 137:20
137:20, 138:3
138:5, 143:15
143:15, 148:13
152:8, 155:11
155:12, 162:21
163:15
**okay** 4:23, 5:1
5:4, 5:18, 5:21
5:22, 5:25, 6:1
6:2, 6:7, 6:8
6:16, 6:18, 7:1
8:4, 8:5, 8:10
8:12, 8:19, 9:2
9:13, 9:18, 9:23
10:1, 10:2
11:13, 12:8
13:6, 13:13
13:22, 15:24
16:3, 16:5
16:14, 16:24
17:13, 17:16
18:1, 18:8
19:20, 20:19
21:18, 21:20
22:1, 22:10
22:11, 22:12
22:24, 26:7
26:11, 26:16
26:17, 26:18
27:5, 27:7
27:12, 27:20
28:11, 29:7
29:18, 29:22
30:23, 31:8
31:12, 31:19
31:24, 32:1
32:19, 32:21
33:2, 33:4, 33:4
33:18, 33:21
33:25, 34:7
34:11, 34:14
34:23, 34:25
38:15, 39:5
39:16, 39:22
40:6, 40:8
40:10, 41:7
42:17, 43:11
43:12, 43:24
44:12, 45:25
46:2, 46:11
46:14, 46:23
47:1, 47:11
47:16, 48:12
49:14, 50:4
50:10, 50:13
50:14, 50:22
51:15, 52:7
52:13, 52:15
52:22, 53:7
53:10, 54:11
54:15, 55:1
55:22, 56:16
57:2, 57:6
58:22, 59:9
59:16, 60:16
61:6, 61:12
62:3, 62:19
62:21, 63:17
63:21, 63:24
64:4, 64:10
64:15, 64:20
65:2, 66:14
66:22, 67:3
67:20, 68:1
68:23, 69:8
69:13, 69:16
69:22, 69:23
70:5, 71:1
72:12, 72:14
72:15, 72:23
72:25, 73:8
73:10, 74:5
74:8, 75:15
75:16, 76:2
77:1, 77:9, 78:5
78:12, 78:13
78:14, 78:17
78:23, 79:14
80:2, 81:11
82:1, 82:7
82:20, 83:12
84:3, 84:6
84:13, 84:25
85:3, 86:1, 86:5
88:4, 88:9
88:17, 88:24
89:15, 89:20
89:23, 91:3
91:13, 91:20
91:21, 91:21
91:24, 92:3
92:5, 92:24
93:2, 93:18
94:1, 94:18
94:25, 95:1
95:2, 95:5, 95:5
96:3, 96:14

97:5, 97:15
98:2, 98:24
99:5, 99:24
100:5, 100:6
100:11, 100:15
101:2, 101:7
101:10, 101:13
101:15, 102:7
102:22, 102:24
102:25, 103:1
103:2, 103:24
104:8, 104:13
104:13, 104:15
104:17, 104:18
105:1, 105:3
105:4, 105:7
105:10, 106:1
106:3, 106:6
106:11, 106:21
107:4, 107:15
107:18, 107:25
108:15, 109:9
109:12, 109:17
109:20, 110:17
111:11, 111:12
112:5, 112:13
114:3, 114:20
115:23, 116:1
116:4, 116:8
116:21, 117:3
117:9, 117:17
117:19, 118:13
118:22, 119:1
119:3, 119:5
120:3, 120:4
120:10, 120:16
122:5, 122:14
122:20, 124:17
124:22, 125:7
125:20, 125:23
126:8, 126:25
128:6, 128:21
128:24, 129:5
129:5, 129:10
130:16, 130:23
131:21, 131:23
132:9, 132:9
132:20, 132:21
132:22, 133:4
133:5, 133:12
133:15, 133:22
134:13, 134:23
135:3, 135:5
136:8, 136:11
136:23, 136:24
136:25, 137:6
137:7, 137:12
137:14, 137:17
137:22, 137:24
138:5, 138:7
138:10, 138:14
138:22, 138:24
139:3, 139:16
139:17, 139:21
139:23, 139:25
140:2, 140:10
140:12, 140:14
140:15, 140:16
141:9, 141:13
141:16, 142:16
142:18, 143:1
143:8, 143:13
143:15, 144:10
144:12, 144:14
144:16, 144:20
144:24, 145:2
145:4, 145:11
145:17, 145:22
145:25, 145:25
146:15, 146:15
146:20, 147:9
147:18, 148:1
148:18, 148:20
150:9, 150:12
150:15, 150:16
151:12, 151:16
152:8, 152:18
152:19, 152:22
152:24, 153:3
153:4, 153:8
153:14, 153:21
153:22, 153:23
154:2, 154:4
154:11, 154:21
155:5, 155:10
155:12, 155:13
156:2, 156:4
156:13, 157:6
157:10, 157:15
157:18, 158:6
158:10, 158:15
159:3, 159:8
159:17, 159:24
159:24, 160:13
160:22, 161:1
161:7, 162:3
162:6, 162:7
162:10, 162:15
162:16, 163:11
163:13, 165:1
165:20, 166:4
168:7, 168:12
169:11, 170:12
170:20, 170:24
**old** 8:8
**omit** 149:18
**omitted** 149:3
**once** 28:1, 51:14
61:15, 61:19
73:24, 85:17
126:3, 126:23
127:7, 139:9
**ones** 23:23
59:24, 82:3
**open** 20:22
46:12, 47:2
47:3, 47:6
47:14, 47:17
47:17, 47:18
47:19, 47:20
48:4, 48:21
51:4, 52:5
53:10, 65:12
86:21, 86:25
114:22, 114:25
155:23
**opened** 51:2
**opening** 163:5
**opens** 55:22
**opposite** 52:8
52:8
**OPR** 109:19
125:12, 125:20
125:21, 126:4
129:24, 131:14
141:11, 141:13
141:23, 149:4
**order** 6:20, 6:22
6:24, 28:11
45:3, 85:9
87:23, 89:1
89:3, 89:7, 99:5
111:21, 113:2
114:11, 120:18
131:2, 133:23
135:9, 144:25
145:2, 149:24
168:6
**ordered** 113:10
**orders** 82:11
85:1, 104:11
**Originally**
133:19
**outburst** 71:25
**outline** 132:23
**outnumber** 40:2
40:9
**outside** 47:14
47:21, 51:5
51:9, 55:23
88:11, 92:16
107:9
**overpower** 87:5
**oversight**
145:24
**overt** 103:10

**P**

**p.m** 54:12
54:14, 109:6
111:2, 111:7
118:2, 118:4
125:2, 125:5
153:24, 154:1
161:25, 162:2
168:13, 168:16
170:25
**page** 105:1
106:6, 106:13
107:22, 108:18
108:20, 108:21
109:15, 111:13
112:19, 113:1
114:2, 114:4
118:5, 137:17
137:18, 138:17
138:17, 139:18
142:19, 143:4
143:14, 148:16
159:23, 162:7
**pages** 7:2, 105:4
**paid** 120:24
**panel** 25:7
49:17, 50:15
50:16, 50:18
50:19, 50:20
67:13
**paperwork** 29:5
35:24, 84:20
84:24
**paragraph**
118:5, 148:4
148:9, 148:19
148:21
**pardon** 12:13
54:6, 90:16
**part** 5:17, 15:18
25:15, 42:22
43:15, 43:17
50:16, 50:17
151:10, 157:20
158:4, 158:5
166:22
**particular** 26:22
36:1, 37:2
37:17, 42:12
43:24, 44:23
58:7, 63:20
89:19, 93:11

117:17, 121:25 122:6, 145:6 157:10
**parties** 7:4
**party** 6:19 136:9
**pass** 19:11, 33:6
**passes** 149:16
**paste** 164:18
**pay** 75:20
**people** 19:11 21:6, 22:3 25:10, 47:21 50:2, 50:4, 51:1 67:19, 69:25 85:22, 88:20 100:2, 116:5 136:20, 137:8 137:13, 138:15 138:20
**pepper** 87:1 87:6, 87:13 87:18
**percent** 95:7 164:14
**perception** 89:7
**perform** 86:11 86:13, 141:7
**period** 23:15 28:5, 39:10 99:4, 103:5 130:1, 135:7 147:1
**permitted** 86:22 87:1, 87:17
**person** 95:25 133:17, 169:18 169:22
**personal** 6:10
**perspective** 133:1
**Peter** 1:22, 2:4 2:5, 3:12, 3:25 4:25
**PhD** 12:24 13:13
**phone** 133:19 134:1, 135:10 166:5, 166:9 166:18
**phonetic** 91:14
**phoning** 134:2
**physical** 79:20 86:19
**physically** 79:14 80:11, 103:5 103:8
**pick** 140:23
**picked** 137:20
**picture** 48:15 55:1
**place** 6:9, 37:3 52:15, 53:19 56:12, 71:15 83:1, 111:18
**Plaintiff** 1:7, 2:3 2:11
**Plaintiff's** 33:20
**please** 3:20 3:24, 4:13, 5:6 6:2, 6:18, 8:21 71:3, 79:18 96:22, 97:3 97:6, 98:23 105:5, 106:8 106:15, 106:16 106:20, 106:21 106:21, 106:22 107:1, 107:22 108:16, 111:1 111:13, 111:15 114:2, 114:5 118:1, 118:6 118:14, 120:17 131:1, 142:17 143:9, 148:7 150:22, 155:9 159:21, 161:2 162:7
**point** 47:1 52:25, 70:7 70:12, 72:8 74:12, 75:22 83:24, 85:19 93:4, 96:23 98:20, 133:21
**pointed** 119:7 119:23, 146:6
**pointing** 18:3 122:6, 122:11
**points** 156:11
**poke** 78:5, 78:14
**poked** 77:23 170:3
**policies** 89:5 151:11
**policy** 60:13 60:15, 60:18 77:16, 89:2 89:11, 89:14 89:17, 89:24 90:3, 90:5 112:5, 112:10 113:3, 113:9 113:11, 113:17 113:19, 113:25 114:10, 144:19
**Polish** 73:7
**population** 16:23, 17:18 18:11, 24:6 85:6, 86:5, 86:6 86:21
**populations** 36:12
**portion** 8:1 10:3, 94:2 115:21, 151:13
**position** 14:10 25:21, 55:5 72:18, 85:18 92:4, 153:15 153:18
**positioned** 66:7 69:2
**positions** 56:6
**possibility** 127:14
**possible** 94:17 123:24, 123:25 130:3, 130:7 130:9, 140:9 145:10, 147:7 147:21, 167:25
**possibly** 31:6
**posted** 25:1 145:6
**pregnant** 24:6
**preparation** 73:20
**prepare** 28:11 28:20, 84:20 105:10
**prepared** 105:18, 123:19 123:20, 144:6
**preparing** 105:16, 124:3
**presence** 86:16
**present** 25:12 62:18, 64:18 64:25, 67:1 94:16, 94:19 94:20, 95:3 95:8, 95:9
**presently** 12:14 13:22
**presume** 18:21
**pretend** 80:12
**pretty** 21:5 24:21, 37:4 39:6
**prevent** 60:25 87:10
**prevents** 101:17
**prior** 81:5 157:3, 157:25
**probably** 22:23 23:6, 38:20 39:2, 39:21 45:22, 73:13 104:10, 145:24 168:9
**problem** 54:11 81:4, 82:10 97:6
**problematic** 83:20
**problems** 81:21 97:21
**procedure** 4:21 42:11, 165:13
**proceed** 4:10 100:22
**proceeded** 99:3
**proceeding** 41:8
**proceedings** 171:3
**process** 5:18 13:18, 19:7 19:9, 25:4 25:15, 25:16 80:9, 101:24 126:12, 131:13 141:25, 149:17
**produced** 139:13
**profession** 26:23
**professional** 129:9
**program** 24:5
**programming** 16:21
**promoted** 14:15 18:17, 19:4 22:13, 22:13 22:17, 23:5 24:10, 24:23
**promotion** 18:14, 22:15
**pronounced** 73:9
**proper** 5:20 28:9, 167:5 167:10
**properly** 107:14 116:18
**protect** 87:16
**protected** 6:12

**protection** 26:1 26:5
**protective** 6:20 6:22, 6:23
**protocol** 43:3 43:15, 165:13
**provide** 42:4 60:2, 60:5 105:13
**provided** 24:12 88:13, 123:10 140:1, 145:15
**provoked** 79:25
**psychology** 12:5
**public** 3:19, 8:3
**pull** 72:1
**purpose** 122:17 122:20
**purposely** 149:18
**purposes** 134:13
**pursuant** 6:21 6:23
**pursuing** 12:20 13:13
**put** 13:3, 21:6 33:20, 40:4 40:5, 58:13 61:9, 71:14 85:25, 89:16 90:4, 111:18 115:5, 122:3 122:14, 124:12 124:13, 124:14 124:18, 144:11 149:1, 155:8

**Q**

**Queen** 91:5
**question** 6:3 6:4, 6:6, 6:7 25:25, 31:6 31:9, 42:6 56:21, 57:23 59:9, 59:10 62:12, 62:21 78:9, 78:11 81:12, 94:23 94:25, 118:25 123:19, 126:5 147:16, 157:5 160:10, 160:16 160:18, 160:20 163:23
**questions** 5:3 5:7, 6:10, 72:3 72:13, 73:17 77:15, 111:10 114:9, 130:24 155:7, 168:9 170:9
**quickly** 102:3
**quite** 5:20 16:17, 25:9 36:22, 160:7
**quotes** 148:11

**R**

**radio** 44:10
**radios** 43:22
**rage** 163:5
**raise** 3:20, 80:12
**ran** 88:9
**range** 129:24 130:4
**rank** 25:24, 26:8
**ratio** 40:15
**RCDC** 20:8
**react** 76:6
**reacted** 77:12
**reaction** 79:14 79:21
**read** 69:19 105:5, 105:8 106:15, 106:19 106:21, 106:22 109:24, 111:14 114:4, 118:7 118:12, 119:13 120:16, 122:7 143:9, 147:11 148:6, 155:3 155:3, 155:6 155:25, 159:5 160:9, 160:17 161:1, 162:16
**reading** 119:9 120:10, 155:14 155:17, 164:4
**ready** 95:5 98:13
**really** 39:13 70:18, 71:19 71:24, 73:13 74:16, 88:22 96:15, 97:3 115:13, 149:21
**realm** 131:10
**rear** 29:16, 52:3 60:19, 61:1 61:21, 61:24 64:7, 70:9 89:13, 89:18 89:24, 90:1 114:8, 114:11 119:17, 119:18 119:22
**reason** 60:20 61:5, 61:7 61:10, 135:12 135:21, 156:19 167:18
**reasons** 60:24 111:19
**reassigned** 161:3, 161:8
**Rebecca** 3:1, 4:5 138:18, 142:20 169:16
**recall** 19:1, 21:3 25:19, 25:23 32:16, 46:5 47:22, 55:4 57:6, 57:9 57:12, 57:17 64:12, 64:19 64:22, 65:5 65:6, 65:9 66:20, 70:5 77:15, 79:9 81:13, 83:14 93:5, 93:6 93:13, 99:17 100:23, 102:2 103:18, 116:3 119:9, 124:21 125:24, 133:14 135:11, 136:5 137:8, 137:9 137:14, 140:11 147:16, 149:6 153:13, 154:12 155:1, 155:1 161:6, 163:15 163:21, 163:22 164:2, 164:6 164:25, 166:15 168:24
**recalled** 149:8
**receive** 87:24 105:15
**received** 80:25 85:12, 135:12 135:22, 142:25
**receiving** 20:2 20:4, 20:6, 20:7 20:8, 20:9 20:11, 140:5
**recognize** 31:1 73:21, 73:23 73:25, 74:11
**recollection** 57:2, 74:17 120:11, 149:10
**record** 3:10 3:24, 4:14, 4:16 5:14, 6:5, 8:3 9:25, 32:6 33:11, 41:18 54:12, 54:13 54:14, 106:22 109:25, 110:25 111:6, 111:7 111:15, 114:5 118:2, 118:3 118:4, 118:7 120:17, 124:25 125:3, 125:5 148:7, 153:24 153:25, 154:1 160:9, 161:2 161:23, 161:25 162:1, 162:2 162:17, 168:13 168:15, 168:16 170:23, 171:3
**RECORDER** 3:9, 3:23, 4:9 54:12, 54:14 110:25, 111:2 111:7, 118:2 118:4, 124:25 125:2, 125:5 153:24, 154:1 161:25, 162:2 168:13, 168:16 170:23, 170:25
**recording** 3:19
**records** 39:19 39:22
**referring** 98:13
**refresh** 41:19 120:11
**refreshed** 42:3
**refusing** 81:24 85:1
**regarding** 40:22 43:5, 77:6 107:19, 114:9 114:21, 120:14 133:1, 145:20 152:3, 153:10
**regards** 65:6
**register** 40:24 40:25, 41:1 104:25, 105:12 107:3, 107:7 107:8, 107:20

111:9, 112:14
118:18, 126:3
126:23, 127:1
127:7, 127:9
128:5, 128:16
130:17, 131:3
131:8, 131:11
131:16, 140:18
143:17, 143:20
155:22, 156:12
158:25, 159:6
159:12, 159:20
160:4
**registers** 131:9
131:14, 142:1
159:10
**regular** 9:25
11:1, 47:7
**Reierson** 3:2
4:6, 138:18
142:20, 142:25
143:6, 144:5
144:11, 144:17
145:15, 145:18
150:22, 169:16
**relate** 126:9
**related** 125:16
163:6
**relation** 54:22
**relevant** 147:23
**remember** 5:25
16:1, 16:3, 16:6
32:4, 45:9
45:24, 46:1
46:2, 64:9, 65:7
67:17, 72:21
79:18, 80:8
80:14, 81:15
81:16, 81:20
82:8, 93:24
95:12, 95:18
99:16, 102:10
124:7, 136:10
136:23, 155:15
162:14
**remembered**
19:18
**remind** 89:16
**reminded**
113:25, 114:1
**rendered** 65:16
141:11
**rendering**
128:20
**Rentas** 109:16
109:18, 110:1
110:10
**repeat** 113:17
**replace** 59:23
**replenish** 59:24
**replied** 120:23
147:13
**report** 43:11
70:4, 102:11
102:14, 117:17
118:23, 119:6
119:9, 119:10
120:10, 122:3
123:20, 124:3
124:6, 128:13
132:1, 132:6
149:3
**reported** 85:4
**reporter** 6:11
**reporting**
122:17
**reports** 128:2
**reprimand**
130:8, 130:10
130:14
**reprimanded**
27:20
**request** 151:24
161:7, 166:11
**requested**
165:19, 165:21
165:24, 167:1
**requesting**
165:25, 168:25
**require** 56:11
84:23, 86:18
145:5
**required** 4:10
24:16, 42:3
43:17, 59:25
87:12, 121:18
131:3
**requirement**
15:22, 89:9
**requires** 87:12
**reservation**
100:7
**reservations**
27:17
**residential**
16:15
**resolved** 59:18
59:19
**resources** 133:3
133:6
**respect** 45:16
50:15
**respond** 43:7
75:19, 77:17
**responded** 44:3
117:7, 149:15
**response** 64:24
80:8, 149:8
**responses** 5:10
5:15
**responsibility**
42:23
**responsible**
65:11, 65:18
**restate** 45:7
**restrooms** 53:16
**result** 126:13
**resulted** 31:17
**resume** 25:16
**retain** 26:7
**return** 135:9
140:8, 150:23
**returned** 151:1
**returning** 28:9
**review** 28:20
28:23, 28:25
29:3, 41:1
41:21, 56:24
106:4, 106:20
107:1, 107:2
107:4, 107:6
107:7, 107:9
108:16, 129:9
140:7, 150:22
155:22, 170:13
170:18
**reviewed** 62:4
**reviewing** 41:18
74:23, 117:5
137:7
**revised** 140:13
168:19
**Richard** 2:12
2:13, 4:2, 91:9
**Rick** 137:2
162:5, 170:6
**right** 3:21, 4:13
4:16, 5:17, 6:9
6:21, 9:23
11:19, 18:6
18:10, 19:8
22:11, 22:22
23:9, 24:22
25:11, 25:14
27:9, 27:10
31:20, 31:22
33:5, 35:12
38:9, 39:8
40:23, 41:7
41:10, 42:8
43:15, 44:12
44:20, 46:21
47:3, 48:15
48:19, 51:25
52:11, 52:25
53:4, 53:6, 53:7
53:8, 53:8, 53:9
53:9, 53:20
53:23, 54:21
55:17, 56:6
57:9, 57:13
57:20, 60:24
62:3, 64:2, 64:7
67:11, 67:14
67:15, 67:25
68:4, 68:7
68:12, 69:1
69:12, 72:4
72:10, 72:10
73:12, 74:11
77:3, 77:5
79:20, 85:24
92:12, 93:15
96:23, 97:4
98:1, 100:24
102:20, 103:20
104:13, 105:8
105:15, 109:4
109:8, 111:8
111:20, 111:25
112:17, 113:1
114:9, 115:7
117:20, 118:18
119:6, 119:19
121:1, 121:3
121:19, 124:22
132:2, 137:14
140:3, 142:13
143:16, 144:8
144:18, 145:13
148:5, 148:15
148:25, 149:9
153:6, 155:14
156:5, 157:11
157:22, 162:10
168:9, 168:17
170:7
**room** 2:23
20:22, 25:10
48:23, 49:3
49:4, 49:7
51:22, 51:22
51:23, 52:1
52:4, 52:4
52:17, 53:2
53:14, 55:8
66:2, 66:5
66:11, 66:16
66:18, 67:4
67:19, 67:21

76:2, 76:4 77:10, 86:21 86:25, 92:5 94:4, 99:6 99:10, 111:23 115:6, 156:16
**roughly** 12:7 38:22, 67:13
**rounds** 35:24 42:23, 44:14 44:16, 44:24 45:3, 45:8 45:21, 46:4
**route** 127:15
**routes** 127:18
**rows** 52:3
**RTU** 16:19
**rules** 4:19, 4:20 4:21
**rumbling** 110:23
**rundown** 16:11
**running** 75:17 75:20
**rushing** 96:20

**S**

**S-E-A-M** 151:7
**safe** 40:14 100:5, 139:10 146:9
**safely** 43:8
**SAINSOT** 155:10, 160:13
**Salomon** 90:21
**save** 122:21 165:19, 165:21 165:25
**saved** 123:4 165:23, 166:12 167:2
**saving** 165:13
**saw** 29:7, 33:6 34:15, 62:6 62:10, 62:13 62:16, 62:23 63:4, 63:10 73:20, 101:20 117:11
**saying** 33:3 52:11, 62:17 63:8, 63:22 70:17, 73:11 76:20, 79:9 79:19, 80:15 85:1, 95:19 97:2, 99:18 100:8, 113:19 132:14, 158:11 164:24
**says** 81:15 91:19, 97:5 97:9, 98:4 98:15, 103:4 106:22, 107:23 113:19, 122:10 144:17, 145:16 148:22, 154:13 157:15, 158:13 158:15, 159:5 160:9, 160:11 160:15, 162:19 162:25
**scare** 79:13
**scared** 79:21 79:24, 80:3 99:4
**scene** 149:21
**Scharf** 3:4
**scheduled** 36:1 56:15
**school** 11:8 11:13, 11:19 12:12, 12:14 12:15, 14:25 27:9
**schoolings** 11:12
**screaming** 22:4 22:5, 70:21 70:25, 77:20 96:1, 96:3, 97:1 97:7, 148:22
**se** 155:23
**SEAM** 151:7 151:9, 151:12
**Sean** 91:7
**seat** 98:18 98:21, 98:21
**seating** 98:8
**sec** 70:20
**second** 46:13 48:2, 51:17 72:4, 72:11 78:24, 103:2 103:16, 103:17 111:14, 118:5 119:13, 120:11 137:18, 148:4 148:8, 148:9 151:14
**seconds** 101:1 110:22
**section** 6:18 52:5, 151:13
**sections** 40:5
**secure** 43:8 65:1, 65:7 65:11, 65:17 65:19, 111:24
**secured** 48:8 48:9, 64:23 65:4, 70:1, 70:7 70:10, 77:8 77:9, 112:1 112:11, 112:12 114:23, 115:6 115:25, 146:11
**security** 20:13 20:15, 24:18 84:12, 111:19 146:3
**see** 17:11, 30:1 30:3, 30:17 34:3, 46:10 46:16, 46:18 48:16, 49:3 51:8, 51:12 51:17, 52:2 52:7, 56:25 62:11, 63:9 66:19, 74:1 74:2, 74:14 74:19, 75:16 75:19, 76:5 88:22, 95:19 95:19, 95:24 104:16, 104:20 105:1, 109:3 109:6, 109:18 109:24, 109:24 114:21, 115:23 115:24, 116:1 116:5, 116:13 116:14, 116:19 123:6, 132:22 138:12, 139:20 154:5, 154:13 164:8, 165:1 170:14
**seeing** 155:15
**seen** 37:11 52:23, 61:22 62:13, 73:13 116:17, 122:1 147:23, 154:11 154:25, 161:15 165:6, 165:10
**send** 108:15 108:24, 139:5 163:13, 163:17 163:23, 164:8 164:11, 170:20 170:21
**sending** 104:10 140:11, 163:15 163:21, 164:2 164:6, 164:25
**sends** 144:17
**sent** 110:1 139:11, 139:15 139:15, 143:6 155:15, 164:1 164:16
**sentence** 111:14 114:4, 118:7 118:12, 160:7 161:1
**separate** 29:13 29:14, 74:3 129:19
**September** 31:15, 31:23 34:24, 35:17 38:4, 38:6 39:18, 40:16 40:20, 42:9 64:3, 80:23 81:1, 126:13 147:1, 160:3 160:5, 162:24 165:2
**serg** 96:3, 97:3 100:8
**sergeant** 14:19 18:15, 18:17 19:5, 19:12 19:16, 19:25 22:12, 22:12 32:24, 36:24 44:22, 44:25 45:6, 45:13 45:15, 45:20 46:4, 64:6, 64:6 64:11, 64:13 64:17, 64:20 64:21, 64:22 65:2, 66:4 92:13, 92:20 93:2, 93:8 94:20, 95:6 95:9, 96:22 99:13, 99:19 99:20, 118:15 118:19, 119:7 146:1, 146:4 146:6, 146:17 146:20
**sergeants** 45:17

**series** 5:2
**serious** 42:6
**served** 23:22
**service** 25:18 71:17
**services** 36:15
**serving** 139:16
**set** 46:19, 128:7 130:24
**setting** 88:6 88:8
**seven** 14:19 14:21, 16:10 18:13, 134:25
**sex** 8:16
**shack** 101:20 101:21
**shackle** 58:25 59:7, 70:9, 96:2 97:7, 97:10 97:11, 98:18 98:22, 99:2 100:10, 100:22 100:24, 101:4 101:11, 101:11 101:20, 103:3 120:19
**shackled** 31:1 32:25, 58:16 77:7, 77:16 89:10, 89:13 89:18, 101:21
**shackles** 58:22 58:25, 59:7 59:10, 59:20 59:21, 59:23 59:25, 60:3 89:22
**shackling** 30:25 32:23, 34:13 34:18, 90:2 101:2, 101:3 101:24, 123:7
**shaking** 79:23
**shared** 96:1
**sharing** 64:22
**Shelby** 3:2, 4:6 169:20
**Sheriff** 4:5 24:13
**sheriff's** 13:23 14:3, 14:6 14:12, 25:1 27:1, 27:8 27:21, 88:13 92:25, 134:3 139:13, 166:23
**shift** 38:21 38:23, 39:5 40:10, 40:12 40:12, 56:1 83:8, 83:9 83:10, 83:11
**shifts** 38:18
**shit** 118:11
**shook** 71:16
**short** 117:25
**shortly** 72:5 133:12
**shoulder** 61:6 69:18, 76:5 156:22, 157:19 157:20, 158:2
**show** 4:16 29:25, 97:20 104:23, 124:1 136:24, 150:7 150:11, 153:22 154:2, 162:3
**showing** 123:6
**sic** 20:5, 86:22 152:2
**side** 51:17, 52:9 52:9, 104:2
**sign** 140:8 150:23
**Signature** 170:12
**signed** 112:19 143:21, 150:13 150:17, 150:18 150:25
**Silo** 27:11
**simply** 44:13 57:21, 143:19 150:13
**single** 47:12 47:13, 55:18 55:19, 55:19
**sir** 22:14, 30:2 30:20, 38:19 43:16, 44:15 48:5, 54:18 56:18, 58:14 74:13, 74:21 80:24, 81:2 83:4, 84:18 85:19, 91:2 94:3, 94:6 95:15, 98:3 98:11, 98:21 100:8, 101:14 105:17, 106:14 107:17, 107:21 108:7, 109:3 110:5, 110:12 110:16, 111:24 112:21, 112:25 113:25, 116:20 117:12, 117:14 117:16, 117:23 120:15, 123:5 123:9, 123:17 123:25, 126:15 126:18, 126:21 127:3, 127:5 136:18, 137:16 138:13, 138:16 139:2, 139:6 142:7, 142:21 143:18, 149:23 150:1, 150:6 151:6, 151:8 151:19, 151:23 152:1, 153:13 153:16, 153:20 155:16, 158:17 160:1, 161:9 164:10, 167:25 169:2, 169:10 169:14, 169:17 169:19, 169:21 169:23, 169:25 170:5
**sit** 47:25, 50:7 100:9
**site** 25:1
**sitting** 49:6 50:5, 51:19 51:20, 52:6 52:25, 53:1 53:14, 53:20 54:2, 55:2 66:24, 67:18 69:3, 69:10 101:9
**situation** 74:15 75:6
**situations** 85:24 131:7
**six** 15:11, 15:12 19:19, 19:20
**size** 49:12
**SKM_364E** 109:21
**slow** 75:7, 75:13 96:17
**smaller** 49:6
**Somewhat** 151:8
**soon** 140:8
**sorry** 12:24 13:2, 13:5, 18:5 20:9, 26:12 38:11, 49:24 55:21, 59:14 67:10, 71:2 71:4, 71:11 73:25, 75:15 78:13, 79:16 80:7, 86:23 94:7, 94:22 94:25, 96:6 100:20, 102:13 103:25, 109:15 110:24, 113:16 118:1, 120:1 121:12, 135:4 135:18, 136:4 137:20, 138:3 142:8, 146:12 151:3, 152:8 152:19, 155:11 157:24, 158:1 158:14, 162:12 162:23, 163:16 165:19, 166:11 167:9, 169:11
**sought** 129:12
**sounds** 5:12
**South** 8:20, 8:22 9:10
**space** 70:1 80:10, 80:16 142:15
**speak** 35:21 76:20, 136:19 152:3, 153:5
**speaking** 5:11 93:9, 93:13 93:22, 95:21 118:17, 137:9 152:2
**specific** 38:16 65:5, 77:13 79:19, 83:6 125:25
**specifically** 5:14 37:21, 57:19 66:23, 92:18 117:23, 155:2 166:2, 167:20
**specifics** 88:2
**speculate** 5:18 22:23, 136:21
**spell** 114:15
**spellings** 170:15
**spoke** 137:8 137:15, 138:15 139:1

**spoken** 5:10 5:15, 139:3
**spray** 86:15 87:1, 87:6 87:11, 87:13 87:18
**Sprint** 27:16
**staff** 61:19 71:18, 72:17 73:19, 76:14 113:24, 125:12 163:4
**stage** 99:3 146:23
**staging** 29:2 37:12, 37:15 43:20, 47:23 48:3, 51:18 51:19, 51:20 54:16, 54:25 55:3, 56:13 57:3, 58:8 58:17, 58:20 58:23, 59:1 70:6, 71:22 72:2, 83:21 92:6, 93:9 96:21, 97:8 97:9, 98:9 99:16, 104:2 114:7, 114:25 115:14, 115:16 115:22, 116:2 116:5, 116:9 116:12, 116:14 116:22, 118:16 119:17, 119:23 122:13, 123:8
**stamp** 139:14
**stance** 126:24
**stand** 50:7 101:16
**standard** 60:13 60:15, 60:18 104:5, 104:6 104:7
**standing** 47:21 50:4, 66:8, 68:4 92:19, 95:6 122:2, 158:22
**start** 8:1, 21:17 21:19, 21:21 40:6, 42:8, 45:2 45:8, 104:16 126:12
**started** 15:1 16:14, 27:9 27:18, 45:7 45:10, 71:8 77:3, 77:11 89:21
**starting** 162:17
**starts** 111:15 118:6, 118:8
**state** 1:23, 2:6 2:14, 3:12, 3:24 4:13, 12:1 116:21, 118:19 119:17, 119:19 120:4, 145:25 147:12
**State's** 2:21
**stated** 42:22 99:24, 119:21 120:2, 148:2 157:17
**statement** 117:4 120:11, 131:16 139:19, 140:13 140:15, 143:2 143:6, 143:20 144:5, 144:9 144:11, 149:4 150:14, 157:6
**statements** 111:10, 112:15 124:5
**States** 1:1, 4:19
**stating** 120:21 145:5
**statistics** 39:20
**status** 8:10, 17:2
**stay** 96:23, 97:4 120:1
**stayed** 99:16 99:20
**step** 66:15
**stepped** 66:18 71:21
**stomach** 110:22
**stood** 71:22 71:23, 158:15 158:18
**stop** 46:13 46:13, 72:10
**store** 27:10
**storm** 96:20
**storming** 95:18 97:1
**straight** 46:16 54:3, 69:11 69:13
**strange** 80:21
**Street** 1:23, 2:6 2:14, 2:22, 3:12 134:22
**streets** 87:14
**stuff** 19:19
**style** 20:24
**subject** 70:5 106:23, 106:25
**submit** 25:14 159:11, 159:15
**submitted** 158:24, 159:9
**submitting** 168:18
**substance** 170:15
**suggest** 65:2
**suggesting** 34:5
**suggestions** 107:19
**Suite** 1:24, 2:7 2:15, 3:6, 3:12
**super** 82:23 88:17, 91:22
**superintendent** 3:17, 3:17, 4:8 4:15, 4:17, 4:24 13:25, 14:2 23:5, 23:7 23:10, 23:20 24:10, 24:23 25:25, 34:23 35:1, 36:4, 36:7 36:16, 38:3 38:6, 38:15 39:10, 75:24 87:24, 88:17 88:25, 90:11 90:13, 90:15 91:1, 91:2, 91:3 91:5, 91:7 91:13, 100:5 111:22, 112:6 113:2, 121:2 134:9, 146:25 168:17
**superintendents** 90:18
**superior** 106:1 163:11, 163:12
**superiors** 105:22, 163:8
**supervise** 86:21
**supervisor** 43:13, 43:19 44:2, 44:3 44:19, 44:21 59:17, 78:18 121:2, 167:5 167:10
**supervisors** 35:22, 147:6
**supposed** 43:4 43:6, 43:7 43:12, 60:9 60:12, 114:23 121:2, 146:2
**supt** 38:13 76:21, 81:15 82:5, 82:11 82:18, 97:24 147:13
**sure** 5:19, 5:23 8:3, 12:3, 15:22 16:4, 23:8 26:20, 45:5 47:15, 54:8 55:24, 58:9 58:14, 58:21 70:8, 70:11 72:24, 82:12 84:15, 88:10 90:4, 92:11 92:18, 92:23 95:8, 95:15 100:14, 108:5 111:20, 116:7 116:20, 117:16 117:23, 119:14 124:1, 125:19 127:14, 133:16 134:16, 134:18 135:2, 136:22 137:11, 139:2 143:11, 143:13 145:12, 157:6 157:9, 159:22
**Surgery** 61:6
**surprised** 70:23
**surrounding** 43:11
**suspension** 129:21, 130:1 130:4, 130:14 132:5
**swear** 112:22
**sworn** 3:22 149:4
**system** 24:20 39:25, 121:24

## T

**table** 68:23
**take** 4:22, 14:22 16:7, 18:17 18:24, 19:22

19:23, 35:12
54:7, 56:12
81:20, 81:22
81:25, 82:1
82:2, 82:2, 82:7
83:1, 84:6, 85:7
87:6, 87:10
100:24, 106:6
111:4, 117:25
124:23, 134:19
135:14, 135:23
137:4, 137:4
137:17, 140:14
143:8
**taken** 4:18
126:19
**talk** 69:24
117:17, 136:8
168:8
**talked** 20:16
23:23, 23:24
**talking** 22:3
22:6, 31:2, 77:1
77:4, 95:22
95:24, 103:15
103:17, 104:8
104:10, 104:12
111:21, 131:24
144:15, 156:14
163:3
**Tapia** 25:8
**tasks** 35:22
**teaching** 15:19
**telephone** 43:23
48:9, 49:15
95:11, 95:14
133:18, 145:19
**tell** 13:21, 23:24
24:15, 25:12
26:14, 31:22
35:4, 35:4, 35:5
36:9, 37:20
39:11, 49:2
49:11, 55:24
58:21, 58:24
64:24, 66:1
66:6, 66:23
67:18, 72:8
72:25, 79:7
79:12, 83:6
84:15, 87:21
88:2, 88:10
90:20, 93:21
97:6, 97:16
97:19, 99:25
108:7, 116:20
133:23, 134:19
136:9, 142:7
142:9, 154:20
156:10
**telling** 65:6
81:20, 118:11
159:15
**ten** 9:17, 9:17
49:3
**tend** 45:18
**term** 88:25
**terms** 62:4, 89:4
121:14, 121:14
127:1, 129:6
129:23, 130:12
170:14
**test** 18:17, 18:20
18:24, 19:11
25:20, 25:21
102:16
**testify** 41:12
**testimony** 11:1
149:11, 157:3
157:25
**testing** 19:8
**thank** 3:23, 4:9
11:2, 24:25
63:25, 104:19
104:21, 111:5
137:3, 170:7
170:8
**thanks** 104:22
139:7, 139:8
**thereabouts**
19:24
**thesis** 13:19
**thin** 142:4
**thing** 71:19
79:16, 81:7
100:3, 113:19
125:8, 125:15
132:25, 138:6
143:9
**things** 22:4
89:21, 149:17
**think** 4:21, 9:23
21:8, 23:2
29:21, 30:17
31:14, 41:5
41:7, 41:10
41:18, 47:15
70:23, 73:13
75:5, 82:10
96:23, 99:9
99:10, 123:3
129:7, 136:4
149:20, 152:16
153:6, 161:14
169:20, 170:6
**Thomas** 3:1
**thorough**
123:24
**thought** 38:10
38:11, 94:24
95:21, 102:5
128:11, 147:10
149:17
**thoughts** 23:7
72:1
**threaten** 80:11
103:5, 103:8
**three** 14:4
23:11, 23:12
38:13, 38:18
52:16, 52:17
68:22, 68:25
69:2, 84:8
84:17
**threshold** 66:11
**threw** 70:20
71:15
**thrown** 28:7
132:7
**Thursday**
162:24
**time** 3:10, 3:20
5:5, 15:10
16:17, 17:1
20:3, 20:25
21:1, 23:15
24:8, 24:9, 28:6
28:6, 29:12
29:15, 29:20
29:20, 29:22
29:25, 35:7
39:10, 42:8
42:16, 60:14
64:11, 72:19
77:10, 82:16
83:5, 83:7
88:23, 93:25
102:9, 102:10
103:6, 103:16
103:17, 103:19
106:2, 108:15
108:23, 117:15
117:20, 117:23
118:11, 119:16
119:21, 121:1
128:7, 128:11
129:14, 129:21
135:7, 135:18
137:4, 149:16
154:10, 155:15
161:20, 162:12
163:9, 165:6
165:22, 166:12
167:2, 167:9
**times** 8:12
27:25, 29:12
35:10, 36:19
44:18, 79:11
100:13, 111:23
154:22
**timestamp**
109:1, 109:6
109:13
**title** 13:25
14:11
**today** 3:10, 3:16
28:15, 29:4
41:2, 72:25
73:21
**told** 22:20, 55:4
72:15, 84:1
92:13, 96:2
98:14, 101:19
119:18, 121:15
147:19, 148:6
155:18, 156:7
**tone** 78:25
**tools** 86:10
86:13
**top** 109:15
109:16, 139:20
**total** 84:4, 93:21
**totally** 129:19
**touch** 32:16
70:19, 70:19
70:22, 70:25
71:1, 71:9, 79:9
80:6, 80:17
80:18, 148:13
148:13, 148:23
148:23, 149:3
157:11, 157:12
157:18, 157:19
163:1, 166:23
**touched** 32:17
34:22, 69:17
70:13, 76:5
77:18, 77:19
156:19, 156:21
158:10
**touching** 30:24
32:3, 32:15
33:7, 33:7
34:10, 34:17
70:24, 71:3
79:17, 157:16
**trained** 86:4
**training** 24:12
24:17, 24:18
24:20, 25:17

86:16, 86:19
87:12, 87:24
88:1, 88:3, 88:7
88:14
**trainings** 24:16
24:19, 35:25
**transcript**
170:14, 171:3
**transfer** 151:14
153:15, 153:17
**transferred**
151:21, 151:25
**transport** 43:9
81:17, 81:24
**transporting**
85:12
**treatment** 16:15
**tried** 72:5
**true** 63:3, 86:9
112:23, 155:17
156:13, 156:25
157:1, 157:8
157:16, 158:16
158:18, 160:20
161:5
**truthful** 112:14
**try** 71:23
**trying** 48:15
71:7, 71:25
80:9, 97:11
135:6, 149:18
149:20, 149:24
**tunnel** 82:22
**turned** 98:22
156:16, 156:20
**Turrise** 57:7
58:1, 66:25
67:7, 67:8
67:16, 68:14
68:15, 68:15
68:20, 68:21
70:3, 73:12
73:23, 73:24
74:9, 76:22
**two** 9:7, 20:1
20:10, 20:14
20:20, 20:25
21:19, 23:25
29:8, 29:9
29:11, 29:16
29:18, 30:21
30:22, 31:2
31:10, 31:11
32:22, 33:1
34:6, 34:12
50:3, 50:9
53:18, 56:3
62:13, 62:22
68:22, 68:25
69:2, 75:23
82:19, 84:8
84:17, 89:20
96:12, 110:22
125:4, 128:16
128:19, 134:22
137:2, 137:8
137:10, 137:13
150:10, 150:17
**Tylka** 81:8
81:18, 82:4
82:9, 82:23
83:12, 83:19
83:25, 84:16
84:18
**type** 71:17, 88:6
88:7, 164:23
**types** 131:7

**U**

**uh-huh** 5:12
**uncertain** 21:2
26:9, 31:18
31:21, 37:16
42:10, 56:23
73:18, 112:10
113:8, 166:3
**understand** 5:5
5:7, 5:8, 13:22
71:5, 77:21
85:7, 101:4
111:20, 127:17
128:6, 128:10
141:8, 160:8
163:22, 165:22
**understanding**
23:16, 32:2
42:2, 44:13
58:15, 71:24
97:3
**unfounded**
132:16, 132:18
132:19
**unit** 16:15
16:19, 16:25
18:2, 36:25
81:18, 163:3
**United** 1:1, 4:19
**units** 16:17
17:3
**University**
11:17, 12:1
12:16
**unprotected**
9:25
**unsecured** 48:8
**unsure** 135:4
**unusual** 42:17
**upper** 158:10
158:12
**upset** 71:11
99:23, 149:15
**use** 43:22, 49:25
54:9, 86:17
86:18, 87:13
87:15, 88:24
89:4, 95:11
95:14
**usual** 42:11
**usually** 44:11
134:10

**V**

**variances** 35:6
**varied** 35:3
35:4, 35:7
35:11
**venue** 3:15
**verbal** 89:7
89:8, 144:23
**version** 147:12
150:13
**versions** 150:17
**versus** 114:10
**video** 28:24
28:25, 29:7
33:5, 74:1
75:21, 117:5
117:11, 165:1
165:6, 165:13
166:1, 166:12
**videos** 29:9
**view** 121:22
122:1
**viewed** 74:19
**views** 29:11
29:16, 29:19
**violation** 111:18
**voice** 86:16
100:4, 118:10
**vs** 1:9

**W**

**W-a-l-d-e-n**
12:17
**Wacker** 3:5
**wait** 6:2, 11:11
**waited** 139:4
**waiting** 19:13
37:10
**Walden** 12:16
**walk** 34:4, 44:18
44:19, 47:4
51:16, 68:4
82:5, 82:6, 97:4
99:5, 99:19
103:4, 114:22
120:21, 120:23
163:3
**walked** 30:7
67:6, 67:12
67:21, 69:14
69:16, 69:17
77:10, 93:5
96:13, 99:15
116:9, 120:19
120:19
**walking** 66:7
73:14, 96:17
96:17, 101:17
120:14
**walks** 96:8, 96:9
99:2
**wall** 51:23
51:25, 52:8
52:8, 52:14
53:8, 53:9, 68:2
98:9, 115:1
115:5
**walls** 115:10
**Walsh** 91:3
**want** 15:16
18:23, 22:10
31:1, 50:6
66:17, 72:13
79:20, 81:17
81:23, 82:4
84:8, 98:16
102:16, 110:18
111:3, 111:3
111:9, 114:14
114:18, 124:13
127:17, 128:8
128:11, 128:21
128:23, 130:22
131:17, 133:1
138:4, 162:5
167:20, 170:13
170:18
**wanted** 64:25
89:20, 119:2
119:25, 123:23
124:13, 133:24
141:12, 161:15
163:1
**warrant** 128:4
**warranted**
161:15

**Washington** 2:22
**watched** 28:18
**way** 39:15 39:17, 47:18 50:10, 69:5 71:3, 74:14 75:6, 79:18 81:4, 83:25 87:23, 92:12 93:17, 94:19 104:1, 129:25 130:1, 140:1 140:18, 162:14 162:17
**we've** 23:23 23:24, 54:22 104:23
**weapon** 87:16
**weapons** 87:17
**weeks** 15:23 16:2, 16:2
**weight** 9:21
**went** 14:22, 15:2 15:4, 23:19 32:24, 36:2 45:9, 70:17 72:9, 77:19 92:6, 92:7, 93:6 99:6, 99:9 99:11, 116:22 145:16, 169:3
**West** 2:22, 3:5
**Western** 11:17 11:18
**wide** 47:17 48:21, 65:12 89:25, 90:2
**Williams** 169:24
**window** 51:12 82:19, 115:18 115:19
**Winifred** 3:2 4:6
**withdraw** 25:24 45:7, 123:19
**witness** 3:16 3:22, 24:25 26:12, 31:20 33:13, 33:16 33:18, 33:21 33:25, 41:15 50:24, 54:15 59:14, 81:7 81:11, 92:13 107:12, 110:22 111:1, 111:5 121:9, 124:24 152:8, 152:10 152:15, 157:24 170:8, 170:17 170:19
**women's** 24:1 24:4
**wondering** 38:25, 161:3
**word** 6:15, 39:8 49:25, 50:10 85:15, 124:12 124:14, 124:14 157:11
**words** 5:10 5:15, 6:6, 45:3 51:1, 79:7 79:19, 79:21 80:7, 80:12 102:2, 122:6 124:9, 130:11 158:17, 158:23 164:5, 164:7
**work** 15:4 27:17, 27:18 28:9, 35:9 35:10, 39:14 42:12, 57:25 63:15, 63:19 69:21, 73:16 76:19, 76:21 76:25, 92:20 131:14, 133:25
**worked** 15:2 16:10, 16:16 17:3, 17:5 17:10, 20:1 24:1, 35:23 37:4, 37:16 37:18, 72:16 72:19, 72:22 88:18, 147:16 147:22, 161:20 163:12
**working** 13:22 26:25, 27:15 27:19, 35:1 42:9, 50:17 92:24, 100:2
**works** 93:16
**workspace** 65:24, 71:20
**worse** 149:21 149:25
**writing** 13:18 25:15, 70:4 166:4
**written** 5:13 25:23, 89:8 105:11, 127:15 129:20, 130:13 132:5, 144:23 145:1, 145:2
**wrong** 23:15 137:21, 147:9
**wrote** 40:22 40:24, 40:25 138:7, 149:8

**Y**

**yeah** 21:24 22:25, 26:14 26:21, 29:18 32:7, 38:24 61:25, 62:25 67:9, 69:9 69:21, 73:7 76:16, 96:9 104:13, 120:21 122:13, 125:6 130:21, 132:10 134:17, 138:19 147:13, 152:21 153:5, 155:1 158:3, 160:17 164:19
**year** 11:10, 12:6 13:17
**yearly** 24:16 88:3
**years** 9:5, 9:14 9:16, 11:18 12:2, 14:4 14:19, 14:21 16:10, 18:13 19:17, 19:20 23:11, 25:18 71:16
**yelling** 22:4 22:5, 70:18 71:8, 77:19 95:18
**yellow** 160:14
**Yep** 105:9
**yesterday** 163:2 163:4
**Yoksoulian** 91:11

**0**

**0:01:10** 4:14
**0:02:09** 5:16
**0:03:06** 6:14
**0:03:58** 8:24
**0:04:59** 9:22
**0:06:03** 11:21
**0:07:02** 12:21
**0:08:01** 14:4
**0:09:06** 15:6
**0:09:56** 16:9
**0:11:01** 17:2
**0:11:59** 17:24
**0:12:53** 19:1
**0:14:05** 20:3
**0:15:02** 21:5
**0:16:02** 22:7
**0:18:02** 24:1
**0:18:50** 24:15
**0:19:47** 25:5
**0:21:05** 26:3
**0:22:13** 27:2
**0:23:19** 27:22
**0:24:12** 28:13
**0:25:11** 29:13
**0:26:15** 30:14
**0:27:10** 31:12
**0:28:03** 32:21
**0:29:04** 33:25
**0:30:07** 34:25
**0:30:46** 35:16
**0:31:52** 36:5
**0:33:01** 37:4
**0:34:10** 37:25
**0:35:03** 38:19
**0:36:03** 39:16
**0:37:06** 40:17
**0:38:02** 41:9
**0:38:57** 42:13
**0:39:47** 43:5
**0:40:51** 44:4
**0:41:59** 45:5
**0:42:58** 46:2
**0:43:47** 46:23
**0:44:49** 47:20
**0:45:54** 48:18
**0:46:53** 49:23
**0:47:51** 50:21
**0:48:55** 51:18
**0:50:06** 52:20
**0:50:56** 53:18
**0:51:51** 54:20
**0:53:01** 55:19
**0:54:13** 56:18
**0:54:54** 57:15
**0:55:55** 58:11
**0:56:48** 59:3
**0:57:52** 60:7
**0:58:47** 61:11
**0:59:43** 62:2

## 1

**1** 104:20, 104:24 111:9, 148:16 148:17, 159:21
**1:00:47** 62:15
**1:01:46** 63:24
**1:02:36** 64:19
**1:03:30** 65:14
**1:04:37** 66:17
**1:05:45** 67:14
**1:06:46** 68:22
**1:07:42** 69:22
**1:08:47** 70:15
**1:11:32** 72:12
**1:12:25** 73:12
**1:13:20** 74:7
**1:14:12** 75:12
**1:15:05** 76:1
**1:15:58** 76:16
**1:16:40** 77:8
**1:17:41** 78:6
**1:18:43** 79:11
**1:19:32** 80:4
**1:2017cv02393** 1:9, 3:15
**1:21:05** 80:24
**1:21:42** 81:11
**1:23:30** 82:20
**1:24:37** 83:23
**1:25:43** 85:2
**1:26:45** 85:20
**1:27:23** 86:9
**1:28:16** 86:23
**1:29:17** 87:19
**1:30** 111:2
**1:30:04** 88:16
**1:30:57** 89:3
**1:32:04** 89:23
**1:32:58** 90:20
**1:33:48** 92:3
**1:34:55** 92:21
**1:35:55** 93:19
**1:37:00** 94:17
**1:37:53** 95:15
**1:38:58** 96:6
**1:39** 111:7
**1:40:09** 97:8
**1:40:52** 98:2
**1:42:11** 99:7
**1:43:47** 100:14
**1:44:45** 101:14
**1:45:46** 102:7
**1:46:29** 103:1
**1:47** 118:2
**1:47:25** 103:17
**1:48:23** 104:15
**1:49** 118:4
**1:49:12** 105:3
**1:52:01** 105:7
**1:53:00** 106:18
**1:54:13** 107:25
**1:55:05** 108:19
**1:55:59** 109:17
**1:56** 125:2
**1:56:53** 110:8
**1:57:44** 111:12
**1:58:35** 112:9
**1:59:45** 113:13
**10** 7:2
**10:00** 102:22
**10:45** 102:21 102:22, 117:18
**100** 38:21, 38:23 39:5, 40:12 58:13, 95:7 164:14
**1002** 137:18
**1003** 138:17
**1004** 137:19 138:9
**1005** 142:19
**1006** 143:4
**11:27** 3:11
**11:31** 110:2
**12:18** 54:12
**12:24** 54:14
**1218** 9:7
**13** 15:25
**131** 162:7 162:10
**13th** 110:6
**14** 16:2
**14th** 110:2 110:10
**150** 21:9
**15129** 8:22, 9:10
**1550** 1:24, 2:7 2:15, 3:12
**16th** 138:11 139:4
**17** 1:23, 2:6 2:14, 3:12
**173** 9:22
**18** 8:18
**19** 171:8
**1967** 8:7
**1985** 11:12
**1989** 11:19
**1991** 14:7, 14:10
**1998** 18:16
**19th** 8:7
**1st** 14:7

## 2

**2** 137:1, 137:19 144:14
**2:00:54** 114:19
**2:01:58** 115:12
**2:02:50** 116:11
**2:04:10** 117:6
**2:04:55** 118:4
**2:05:50** 118:13
**2:06:51** 119:14
**2:07:58** 120:13
**2:08:45** 121:12
**2:09:49** 122:9
**2:10:57** 123:22
**2:11:53** 125:5
**2:13:11** 126:7
**2:14:15** 127:12
**2:15:10** 128:13
**2:16:22** 129:16
**2:17:09** 130:9
**2:17:58** 131:6
**2:18:58** 132:8
**2:20:01** 133:15
**2:21** 125:5
**2:21:12** 134:16
**2:21:46** 135:8
**2:22:17** 135:19
**2:23:38** 137:3
**2:25:35** 137:6
**2:26:26** 138:5
**2:27:22** 139:6
**2:28:22** 139:23
**2:29:25** 141:4
**2:30:30** 142:10
**2:31:40** 143:7
**2:33:41** 143:13
**2:34:44** 144:7
**2:35:36** 145:2
**2:36:35** 145:24
**2:37:40** 146:14
**2:38:19** 147:5
**2:39:40** 147:18
**2:40:53** 148:10
**2:41:35** 148:25
**2:42:22** 149:12
**2:43:06** 150:6
**2:44:22** 150:12
**2:45:25** 151:8
**2:46:22** 152:1
**2:47:18** 153:20
**2:48:19** 153:23
**2:49:20** 155:5
**2:50:35** 155:20
**2:51:43** 156:15
**2:52:43** 157:14
**2:53:41** 158:20
**2:54:46** 159:24
**2:55:48** 160:24
**2:56:55** 161:21
**2:58** 153:24
**2:58:13** 162:12
**2:59** 154:1 163:10
**2:59:28** 163:10
**2004** 19:24 22:21, 22:23
**2016** 23:7, 23:14 31:15, 31:25 34:24, 35:18 38:4, 38:6 39:19, 40:16 40:20, 42:9 64:3, 80:23 81:1, 110:2 126:14, 138:11 138:25, 142:22 147:1, 165:3 166:20
**2019** 1:18, 3:10 23:14, 171:8
**21st** 138:23 139:1, 139:5
**22nd** 142:22
**28** 31:15, 31:25
**28th** 40:20, 42:9 64:3, 80:23 81:1, 126:13 160:3, 160:5 165:2
**29th** 162:24

## 3

**3** 105:1, 105:4 111:13, 113:1 137:21, 139:19 142:17, 144:14 145:25, 147:12 150:15
**3:00** 56:1
**3:00:31** 164:10
**3:01:42** 165:4
**3:02:41** 166:6
**3:03:34** 167:4
**3:04:29** 168:2
**3:05:20** 168:16
**3:06:25** 169:14
**3:07:16** 170:5
**3:08** 161:25
**3:09** 162:2
**3:17** 168:13
**3:21** 168:16
**3:24** 170:25
**30** 130:4
**300** 21:6, 38:17

38:18
**31st** 134:21
**333** 3:5
**3CV** 20:5

**4**

**4** 105:5, 112:19, 114:2, 114:4, 118:5, 137:21, 148:17, 150:11, 150:25, 159:23
**40** 28:19
**450** 3:6
**4th** 1:18, 3:10

**5**

**5** 3:20, 106:8, 106:9, 108:18, 108:20, 108:21, 109:15, 154:3
**50** 2:22
**500** 2:23
**52** 8:9
**5'5** 9:19

**6**

**6** 107:22, 162:4, 162:8
**6:00** 35:8
**60602** 2:8, 2:16, 2:24
**60606** 3:7

**7**

**7:00** 35:8, 56:1

**8**

**8** 7:2
**8:10** 109:6
**81** 14:8
**8-10** 1:16

**9**

**9/28/16** 145:21
**9/29/16** 145:16
**91** 14:8, 18:16
**9-1** 14:9, 14:10
**95** 12:8, 12:9
**97** 12:7, 12:8, 12:9

**/**

/// 7:5, 10:4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

-----------------------------------------------------

Deposition of Winifred Shelby
Confidential - Deposition of Winifred Shelby (8)
Wednesday
September 25th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois



APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Joi Kamper
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602



For Defendant County of Cook:
Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Sarah R. Marmor
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Wednesday, September 25th, 2019. The time is now 10:05 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, 1550 -- Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook -- v. County of Cook at el., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Ms. Winifred Shelby. Ms. --



MS. MARMOR: Winifred.

RECORDER: -- Winifred Shelby. My name is Katie Jasinski, and I'm a notary public, and I'm recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please --

MS. MARMOR: Whoops.

RECORDER: -- would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearance for the record?

MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.

MR. LINDEN: Richard Linden on behalf of John Nawara.

MS. MARMOR: Sarah Marmor on behalf of the witness, as we well as the sheriff, Matt -- Matthew Burke, and Beka Reierson.

MS. KAMPER: Joi Kamper on behalf of Karen Jones-Hayes.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

EXAMINATION



EXHIBIT
I
exhibitsticker.com

BY MR. BUSTAMANTE:
Q. All right. Please state your name and spell your last name for our record.
A. Sure. Winifred Shelby, S-h-e-l-b-y.
MR. BUSTAMANTE: All right. Let the record show that this is the deposition of Winifred Shelby, taken pursuant to notice and set to this date by agreement of the parties, and it will be taken in accordance with the applicable Rules of Federal Civil Procedure and local rules of the U.S. District Court for the Northern District of Illinois.
Q. Ms. Shelby, my name is Peter Bustamante. I'm going to be asking you a series of questions. If at any time you do not understand me, please let me know, so that every question that you answer should be an answer to a question that you understood. Do you understand that instruction?
A. Yes, I do. 0:02:17
Q. All right. Please keep all of your responses in spoken words so there's no mistake as to when you mean to say, "Yes" or you mean to say, "No." For example, in normal conversation, we may say, "Uh-huh" or "Uh-uh," but when that is transcribed in a -- in a record, that may be confusing, okay? So if you mean to say, "Yes," say, "Yes." If you mean to say, "No," say,



"No." Agree?
A. Agree.
Q. Also, please wait until I finish formulating a complete question before you answer, even though you know what that question is going to be. Again, in normal conversation, people usually interrupt each other because that's the way we, you know, human beings are, but when we're transcribing the proceedings, we want to have a complete question written out, instead of having half a question, an answer, and then the rest of the question after that. Okay?
A. Yes. 0:02:58
Q. All right. If at any time you feel I've interrupted you, let me know, and I'll stop whatever I'm doing and let you give a complete answer to your -- to any question, okay?
A. Okay.
Q. Finally, please do not guess, speculate on anything. If you don't know, it's perfectly okay to say, "I don't know." Okay?
A. Okay.
Q. Very good. Tell us a little bit about your background. How old are you?
A. I'm 53.
Q. Okay. And your date of birth is?



A. 1/4/66.
Q. All right. Where do you live?
A. I live in Country Club Hills, Illinois.
Q. And what is your address?
(The following page 8 has been designated as confidential by agreement of the parties)
///



[redacted]
///

*CONFIDENTIAL*

(Continuation of Regular, Non-Confidential Testimony)
Q. All right. And is that a --
MS. MARMOR: And -- sorry. Let me just -- for the record, I'm designating her address as -- as confidential pursuant to the protective order.
MR. BUSTAMANTE: Agreed.
Q. Okay. Is that a house or an apartment?
A. A house.
Q. Okay. Who do you live there with?
A. By myself. 0:03:55
Q. Okay. How long have you lived there?
A. I believe 12 years, 11, 12 years -- yeah.
Q. All right. Are you native to the Chicago area?
A. Yes, I am.
Q. Okay. Where were you born?
A. Chicago, Illinois.
Q. Okay. Where did you go to high school?
A. CVS in Calumet.
Q. And after high school, what -- what year did you graduate high school?
A. I did not graduate high school.
Q. Okay. What did you do in terms of your formal education?
A. I went and got a GED.



Q. When did you get your GED?
A. I'm not sure of the year.
Q. Okay. Thereafter, after the GED, did you continue any type of formal education?
A. Yes, I did.
Q. And what was that?
A. I got my bachelor's degree in nursing.
Q. And what -- what institution did you get that from?
A. St. Xavier University.
Q. What year?
A. 1996.
Q. Did you thereafter take an examination to become a registered nurse with the State of Illinois?
A. Yes, I did. 0:05:23
Q. And were you licensed?
A. Yes.
Q. What year?
A. 1997.
Q. Did you have to take the exam more than once?
A. No.
Q. Since graduating from St. Xavier with a BSN, have you had any other formal education?
A. No.
Q. Tell us a little bit about your employment,



okay? What -- what year were you in when you left high school?
A. I don't remember.
Q. Okay. Well, tell us about the -- your first job.
A. At MacNeal Hospital, on a med surg unit, which is a general bedside nursing unit.
Q. What year was that?
A. '97, I started. I don't remember what year I left.
Q. So this is after you became an RN, you -- did you work before becoming an RN?
A. Yes, I did.
Q. What kind of jobs did you do? 0:06:36
A. Before -- when I was in nursing school, I started working at MacNeal as a patient care technician.
Q. What year was that?
A. I don't know the exact year. I -- I don't -- I don't remember.
Q. How many years did it take you to get your BSN?
A. Four years.
Q. Have you ever been married?
A. No.



Q. Do you have any children?
A. Yes, I do.
Q. How many?
A. One.
Q. And the -- the age of the child?
A. 34.
Q. Have you ever served in the military?
A. No.
Q. Have you ever taught nursing?
A. No.
Q. Did you obtain a specialty in nursing?
A. No.
Q. Have you ever studied any -- taken any courses on psychiatric nursing?
A. No.
Q. Have you ever taken any courses on mental health nursing?
A. None besides what was part of my curriculum in school.
Q. Other than your nursing license, do you hold any other professional license?
A. No. 0:08:25
Q. Has your license -- your nursing license ever been suspended?
A. No.

Page 13

Q. All right. After your employment with MacNeal, what was your next employment, as an RN now?
A. Holy Cross Hospital.
Q. And what years were you there?
A. I don't remember.
Q. What -- what were your -- what was your title with them? Did you have a specialty with Holy Cross?
A. Staff -- staff RN.
Q. What does a staff RN do?
A. We're bedside, taking care of patients.
Q. And how long were you at Holy Cross?
A. I believe two year -- around two years, give or take, I believe.
Q. Yeah. Ms. -- Ms. Shelby, do you have a resume?
A. I do.
Q. All right. Does your resume have all of your employment history from the time you became an RN?
A. No, it does not. 0:09:27
Q. Okay. After Holy Cross, where did you go?
A. Rush.
Q. And what was your title at Rush?
A. Staff RN.
Q. How long were you there?
A. Give or take, six months. Around six months.

Page 14

Q. And after Rush, where did you go?
A. I'm trying to -- I'm sorry, I'm trying to remember. After Rush, where did I go -- believe Little Company of Mary -- no, no, I'm sorry. I -- no. After Rush, I went to, I believe, the Board of Education.
Q. And what did you do for the Board of Education?
A. I worked as a school nurse. 0:10:29
Q. Were you assigned to a specific school?
A. Yes, I was.
Q. What school was that?
A. Dixon Elementary, Parkside Academy, and O'Keeffe Elementary.
Q. And how long did you work for the Board of Education?
A. Around three years.
Q. And this was the Chicago Board of Education?
A. Yes, it was.
Q. After the Board of Education, where did you go?
A. During -- while working for the Board of Education, I also was working at Grant Hospital, so when I left there, I just remained at Grant Hospital.
Q. As a staff nurse?
A. Yes. 0:11:09

Page 15

Q. And for how long?
A. For about four years.
Q. What was your next employment after Grant Hospital?
A. Little Company of Mary.
Q. How long were you at Little Company?
A. For around 12 years.
Q. And during this period of time, your title still was staff nurse?
A. I was a weekend nurse there, yes.
Q. As a weekend nurse, is this full-time employment, or is it part-time?
A. It was part-time.
Q. Did you have any other employment besides that?
A. Yes.
Q. And what was the other employment?
A. Blue Cross Blue Shield of Illinois.
Q. What did you do for them?
A. My first position, I was a care coordinator.
Q. And thereafter?
A. A case manager, and then my last position was a supervisor of specialized services.
Q. All right. How long did you work for Blue Cross Blue Shield?

Page 16

A. Seven years. 0:12:15
Q. And after Blue Cross Blue Shield, where did you go?
A. Health Plus Physician Organization.
Q. Goodness. Okay. How long were you with those folks?
A. I was with them for two years.
Q. Okay. And what was -- what were your duties there?
A. My position there was a coordinator of case management services.
Q. What does that mean, coordinating case management services?
A. It's working doing utilization review, which is -- well part of it is doing utilization review, which is looking at medical necessity, so if someone who is a member of this particular physician organization goes into the hospital or requiring services or testing, it has to be reviewed by a medical team. So I would be one of the people that would -- would look at it based on the guidelines that we were -- utilized, which was Milliman Guidelines, to see if it met medical necessity. If it didn't meet medical necessity based on the guidelines, then it would go over to one of our physician advisors for review to see

Page 17

if they would approve the services. Also, with the case management portion, it was reaching out to the members, seeing how they were doing and seeing if there was anything besides their health care -- health plan that we can do to assist them to keep them out of the hospital, keep them where they were not missing their medications, if -- providing them with community resources, things like that.
Q. All right. And you did -- you did that for how long?
A. Two years. 0:14:12
Q. And from there, where did you go?
A. From there, I went to Palos -- wait, I -- from there, I went to UnitedHealthcare.
Q. And what were your duties with UnitedHealthcare?
A. Doing utilization review, but doing it on site for UnitedHealthcare patients at Northwestern Hospital.
Q. And how long did you do that?
A. I did that for a year.
Q. And thereafter?
A. And during that same time, I changed the weekend position to start working at Palos Hospital on the weekends, working as an ER case manager.

Page 18

Q. I'm sorry, doing what? 0:15:00
A. Working as an emergency room case manager.
Q. All right. Thereafter, what did you do?
A. After that -- well I remained at Palos right now as a weekender, but full-time, that's when I went to the -- Cook County --
Q. Okay. What year --
A. -- Sheriff's Office.
Q. What year did you go to Cook County Sheriff's Office?
A. I believe it was 2014.
Q. And how was it that you found out about that employment opportunity with the Cook County Sheriff's Office?
A. Indeed.com.
Q. Did you apply online or did you go in person?
A. Online.
Q. And you were offered a job and you accepted it, of course --
A. Yes.
Q. -- correct? What was your job with the Cook County Sheriff's Office?
A. I was -- my job was working as an occupational health nurse.
Q. What does that mean?

Page 19

A. For County, it meant I was doing -- when employees was off on leave or were off and needed a doctor's note to return to work, I was the person that they would come to me to bring in their doctor's note. If -- and I would transcribe it, taking out any HIPAA information, such as diagnosis, and give that to employee services, and that was the return to work note that I would give them to turn in to their management team. Also, if they were coming back with restrictions, I was transcribing that, putting that on paper, but once again, taking out any sort of HIPAA information, such as their diagnoses, so that it could go out to the employment -- employee services to see if they can honor these specific restrictions. I also would do screening on new hires. There was a health and physical sheet -- well it was a health form that they signed about their past medical history that they would give to me. Also, I would do their blood pressure screenings, initial heart rate. If it was abnormally high, I would send them back to their own medical doctor to give them -- to require them to get a release from their doctor, saying that they were medically fit to start employment with the Cook County Sheriff's Office. I was -- I would also do the initial, if there was concern with someone requiring

Page 20

that they go for a fitness for duty, me and someone of the management team from HR would sit and just meet with the person to do an assessment.
Q. All right. How long were -- were you with the sheriff's office?
A. For roughly around three years. 0:18:17
Q. And so when is it that you left?
A. I believe December of 2017.
Q. Why did you leave?
A. Layoffs. Cook County layoffs. I was laid off from work.
Q. Was this because of the sugar tax?
A. Yes, it was.
Q. When you were laid off, were you told that you may be called back?
A. I don't recall.
Q. Has anyone called you back?
A. No.
Q. Were you a union member at the time?
A. No.
Q. When you first started working for the sheriff's office, who was your supervisor?
A. Nancy, and I can't remember her last name.
Q. And what was her title?
A. Bureau chief of HR, of human resources.

Q. So was your assignment as an occupational health nurse -- was your assignment to HR?
A. I'm not understanding your question. 0:19:31
Q. Well were you working under the HR division?
A. Yes.
Q. Were you provided with any training as to what was required to perform your duties?
A. I -- can you elaborate more so when you say, "Training"? Okay.
Q. Sorry. I'll -- I'll re-ask the question, but was this Nancy Nancy Donahue -- Donahue (phonetic)?
A. No.
Q. Okay. Yeah. When you came to work for the sheriff's office, did anybody put you through a period of training, "This is the way we do things in the HR department, these are going to be your duties, the -- these are the papers that you have to fill out, these are the forms that pertain to you, these are the rules and regulations and directives that apply to your job," that --
A. Yes.
Q. -- kind of thing?
A. Yes. 0:20:22
Q. Who gave you that training?
A. Nancy, which --



Q. Don't worry. Nancy.
A. Yes.
Q. Nancy in HR.
A. Yes.
Q. Okay. And how long did that training go for?
A. It was ongoing. I mean, it wasn't like a period of we have one week training. When I started, it was just ongoing as things arose, I would go to Nancy, and say, "How do we do this?" And that's where, you know, I would be told, "Okay, for -- these are what we use -- a paper that we use for this," and yeah, things of that nature. So it was ongoing.
Q. Okay. How long was Nancy your supervisor?
A. I don't recall.
Q. Did Nancy leave at one point, or what happened there?
A. Yes, she did.
Q. And after Nancy left, did someone else become your supervisor?
A. Yes.
Q. Who was that?
A. Let's see. For a short period of time, Shelitha Beach -- Beach -- Beacham, I believe it is, took over the HR department, so then I became under her.



Q. All right. And how -- how long was Ms. Beacham there?
A. She remained there, but they hired a new head of HR to take over.
Q. And who was that?
A. Oh. I'm trying to remember. Oh, that was -- I'm -- I'm trying to remember. It was so much a shift there of -- of personnel and who supervised me. After Shelitha, then I believe they hired Rebecca, and I believe that's when Rebecca came into place.
Q. And that would be Rebecca Reierson?
A. Yes. 0:22:33
Q. You said that Ms. Beacham remained there, what was her role when Ms. Reierson came on board?
A. I don't know exactly what her title was, but I believe she was much more a part of the hiring process over -- more so than overseeing the --
Q. But she was no longer -- Ms. Beacham was no longer your supervisor, correct?
A. Correct.
Q. And did Ms. Beacham report to Ms. Reierson or did Ms. Reierson report to Ms. Beacham?
MS. MARMOR: If you --
A. I don't believe --
MS. MARMOR: -- you know.



A. -- either --
WITNESS: Huh?
MS. MARMOR: If you know.
A. I -- I don't know. Yeah.
Q. In all the jobs that we've gone through from the time you became an RN, have you ever been fired from any of those jobs?
A. No. 0:23:38
Q. And what was your reason for leaving all -- all of these jobs? Was it better opportunities, more money, what was it?
A. Usually, better opportunities or more money.
Q. Have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Object to the form.
A. I'm sorry?
Q. Yes. Have -- have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Same objection.
A. I believe my first job.
Q. Tell us about that.
A. Due to tardiness.
Q. Due -- I'm sorry, due to?
A. Tardiness.
Q. Okay. Any -- any -- anything else?

Page 25

A. No.
Q. Have you ever written any papers or publications regarding, you know, anything pertaining to your work as an RN?
A. No. 0:24:52
Q. Have you ever given any training to others in your field of work?
A. I've worked as a preceptor on the job.
Q. What is that, a preceptor?
A. Where a new hire comes onto the job, and I work to train them on the position.
Q. Have you worked as a preceptor with the Cook County Sheriff's Office?
A. No.
Q. Have you ever been convicted of any felony?
A. No.
Q. Have you ever been convicted of any crime involving dishonesty?
A. No.
Q. How did you prepare for your deposition today?
A. By speaking with my attorney.
Q. Did you look at any documents?
A. Yes. 0:25:48
Q. And what did you look at?

Page 26

A. I looked at the forms that we had employees to sign at the -- that we were requiring them to go for a fitness for duty.
Q. Anything else?
A. I don't recall anything else.
Q. How many times did you meet with your -- your lawyer?
A. Twice.
Q. And when was that?
A. I believe last Wednesday and this morning.
Q. Okay. How long was the meeting last Wednesday?
A. Roughly around an hour, 45 minutes.
Q. And this morning?
A. About 20 minutes.
Q. Let's talk a little bit about HIPAA -- HIPAA.
A. Mm-hmm.
Q. You're familiar --
A. Yes.
Q. You're familiar with HIPAA?
A. Yes, I am.
Q. How did you become familiar with HIPAA? 0:26:54
A. From all of my jobs as nursing, that's one thing that nursing -- or health care is big on HIPAA, so throughout the years, it's constantly -- every job

Page 27

is -- that's the one thing we always go over, HIPAA.
Q. All right. So tell us how -- tell us what HIPAA is first.
A. HIPAA is the laws that are in place that help to protect patients' rights, far as health care goes. It means that we -- it should not be disclosed to anyone that does not have a right to know, far as a patient goes. It also requires the patient give consent before we will disclose of their health care information, unless it's something pertaining to or -- like a legal matter or something where there's a harm to someone, but then in a case like that, usually, someone higher up would make that call on when to make a disclosure far as HIPAA goes. It also requires that health care people that are involved and have access to their records do not -- do not go in and look at patients' records if you don't have a right to be involved in their care or you're not involved in their care. So it also means if you -- in the hospital setting, if you have someone that's there and you're not involved in their care, you shouldn't be looking at their health care records.
Q. Okay. Did you receive training regarding HIPAA at nursing school?
A. I don't recall. 0:28:49

Page 28

Q. If I remember correctly, HIPAA was introduced or signed into law around 1997, which would be around the time you became a nurse. Do you -- does that, you know, refresh your recollection as to having any training regarding HIPAA at nursing school?
A. It does not.
Q. And throughout your career in all these different locations that you worked, has HIPAA always been emphasized as something that is important?
A. Yes.
Q. And as a nurse, have you had occasion to protect a patient's rights under HIPAA?
MS. MARMOR: Object to the form.
A. Have I -- can you repeat that?
Q. Yeah, here's what I'm wondering, have -- has it ever been your experience that -- where you've had to explain to a patient, "These are your rights under HIPAA, you really don't have to give this information because you -- it's protected," that kind of thing?
MS. MARMOR: Same objection. 0:29:50
A. Yes.
Q. And give us an example with -- obviously, without mentioning any patients' names, of that type of interaction with a patient?
A. Well patients would -- would ask or -- or

I've had patients that would be concerned because they would see someone they knew that worked there and they would have questions about their medical records getting out in their neighborhood or people knowing about what was going on with them, and that's where when I would reassure them our rights under HIPAA was to protect their health care information, even though the person worked in the facility, they did not have a right to go into their medical records and view their medical records. And even if they were taking care of them, they didn't have a right to share that information.
Q. Okay. Did you receive any -- were you taught anything about the ADA, the Americans with Disabilities Act, in nursing school?
A. No. 0:31:01
Q. Did you become familiar with the ADA through your work as a nurse?
A. No.
Q. Today, are you familiar with any portion of the ADA?
A. Not enough to say yes.
Q. So you have just some general familiarity, in other words, you understand what ADA stands for, correct?



A. Yeah. Yes.
Q. So now let's -- let's talk a little bit about fitness for duty evaluations, okay?
A. Okay. 0:31:41
Q. Concerning the sheriff's office.
A. Okay.
Q. What is a fitness for duty evaluation?
A. It's one that -- for the sheriff's office, it's one that requires that an employee is sent to an independent contract -- or independent provider, usually -- a mental health provider, who evaluates the person to see if they're fit for duty, to see if they're mentally stable enough to perform their job duties.
Q. Okay. Let me ask first for the general fitness for duty. I know that there are two components -- I believe there are at least two components, one would be physical and one would be mental, okay?
A. Yes.
Q. Do you make such a distinction, or did the sheriff's office make such a distinction, physical versus mental?
A. I think they are -- were kind of intertwined because to send someone for a fitness for duty, the person that was going to perform that evaluation would



need their medical records to rule out that there was nothing physical --
Q. So --
A. -- that was -- that was -- that was causing whatever action or behavior that was going on.
Q. Okay. So maybe it's my confusion because I just imagine things differently, so is it your testimony that every fitness for duty evaluation performed at the request of the sheriff's office is performed by a psychologist or psychiatrist, a mental health professional?
A. If that -- it depends on the reason for the fitness for duty request.
Q. Well that's what I'm getting at.
A. Okay. 0:33:40
Q. So are there some requests that could be just physical components, the guy is, you know, passing out every three minutes, and therefore, we better send him to a doctor to find out if his blood pressure or whatever else, or the guy is acting a little weird, so we better send him to a mental health professional to find out if there's something else?
A. There were cases that we have sent people just for a medical component.
Q. Okay. Is there any difference in terms of



the assessment that is done, by whomever is responsible for assessing, as to whether or not a fitness for duty evaluation should take place when it's a physical component versus a mental component?
MS. MARMOR: Can -- I'm sorry.
MR. BUSTAMANTE: Long question?
MS. MARMOR: Are -- yeah, well I just --
MR. BUSTAMANTE: Okay.
MS. MARMOR: I'm trying to figure out whether you mean the -- the -- the provider or whether the persons making the decision in the first place.
MR. BUSTAMANTE: Okay. Let's -- let me restate. 0:34:32
Q. Before an individual is sent out for a fitness for duty evaluation, an assessment is made by the sheriff's office as to whether that fitness for duty evaluation should take place, is that correct?
A. Yes.
Q. That assessment is made by you as the nurse, correct?
A. No.
Q. Okay. That assessment is made by someone else then?
A. It was -- it was made -- a team decision.
Q. Okay. Well that was the second part of my

Page 33

question, but you as a nurse and someone else?
A. Correct.
Q. How many others? How many people would make the decision?
A. Usually, it would be two people. 0:35:13
Q. And who would those people usually be?
A. Someone in management from HR and myself.
Q. So in making that assessment, okay, that's -- the question comes in, before the person is --
A. Yes.
Q. -- sent for an evaluation, is there a difference between a medical component or a mental component? Is there a difference in making that assessment?
A. Yes.
Q. And what is the difference?
A. For a medical component, it would be strictly based on the information, as well as the doctor's -- their provider's information.
Q. Okay. And for the mental component?
A. It would be based on the -- the person who made the referral, as well as our assessment or our interview with the person once we spoke with the person.
Q. Is this -- what you've just stated, okay, the

Page 34

-- the different parts of the assessment, are those in writing anywhere?
A. I don't know. 0:36:31
Q. Have you ever seen anything in writing from the sheriff's office that says, "In order for you to assess whether or not a person should be sent for a fitness for duty evaluation, you must cover A, B, and C"?
A. No, I have never seen anything.
Q. How did you learn what should be evaluated or -- or looked into in order to make that determination?
A. Nursing judgment.
Q. One more time?
A. Judgment. My nursing judgment.
Q. Okay. How did the other person making the evaluation know what he or she should look to in order to make that determination?
MS. MARMOR: Objection. Lack of foundation. 0:37:18
A. For a medical decision, we were strictly going by the medical notes that was available and whatever the incident was. For the mental component, it was being made on -- I couldn't -- I couldn't explain to you what they made their judgment on.
Q. Okay. All right. In order for you to, I can't think of the word, come up with your nursing

Page 35

judgment, what would you look at?
A. Behavior.
Q. What else?
A. Behavior was a key component. 0:38:35
Q. Okay. Anything else?
A. Our interview with the person.
Q. Okay. Anything else?
A. Their mannerisms.
Q. When you say, "Behavior," are you referring to the report that you receive as the basis for the assessment for the -- for making the assessment, or are you referring to observed behavior of the individual who may or may not be sent for a fitness for duty evaluation?
MS. MARMOR: Did you say, "Observed" or "Absurd"?
MR. BUSTAMANTE: O -- o-b.
MS. MARMOR: Okay.
MR. BUSTAMANTE: Observed.
MS. MARMOR: Okay. Okay. Good.
A. The observed behavior. 0:39:17
Q. Okay. And so that means that -- what you saw, correct?
A. Correct.
Q. All right. So behavior includes -- does that

Page 36

include mannerism?
A. Yes.
Q. Okay. So -- okay. We talked about behavior, including mannerism. What else?
A. The interview with the person.
Q. Okay. What do you gather from the interview?
A. It's just a fact finding interview, so just asking them their version of whatever led to the issue why they were there, because a lot of times, their version would be different.
Q. Okay. Anything else that you looked at?
A. That -- no, those are the main two. 0:40:11
Q. And -- and what are you trying to get by making those observations of behavior and taking the interview? What is -- what are you trying to get?
A. I'm trying to get do I feel that the person is safe to go out and do their job or should they be further evaluated by a provider to make that determination.
Q. When a person is sent to your department for an assessment as to whether a fitness for duty evaluation should take place, what information are you provided with before the person is called into an interview with you?
MS. MARMOR: Object to the form.

Page 37

A. Usually, I would be provided with whatever the reason that the referral is being made.
Q. Anything else? 0:41:26
A. Not that I recall.
Q. Being part of a HR, did you have access to employees' personnel files?
A. No.
Q. Did your supervisor or a person in management who could -- who would also participate in the assessment for fitness for duty, did that person have access to the employees' personnel files?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Have you ever requested additional information about any employee before making your assessment as to fitness for duty?
MS. MARMOR: Object to the form.
A. I'm -- I'm sorry, repeat that.
Q. Sure. Have you ever requested additional information about any employee before making your assessment as to whether you would or would not recommend a fitness for duty evaluation?
MS. MARMOR: Same objection. 0:42:26
A. No.
Q. So what is the basic purpose of a fitness for

Page 38

duty evaluation?
MS. MARMOR: Object to the form.
A. To determine if the -- to determine if the employee was fit to do their job and were not a harm to themselves or their -- or others.
Q. Have you talked to anyone, other than your counsel, about your deposition here today?
A. I have not. 0:43:41
Q. Have you talked to any of your co-Defendants about the fact that you were giving a deposition today?
A. I have not.
Q. Have you talked to any of your co-Defendants about the case after you were served with -- with the lawsuit?
A. I have not.
Q. Where was your office -- that's -- let me restate that. Did you have an office when you were working as a nurse for HR for the sheriff -- Cook County Sheriff?
A. I did.
Q. Where was your office located?
A. 3026 South California, in building number two.
Q. And your office, was it part of a bigger setup of HR, or was it a separate office somewhere

Page 39

else?
A. My office was located directly in the office of HR.
Q. Did you have, you know, a -- a room with a door, or did you have a cubicle?
A. I had a room with a door. 0:44:47
Q. How many people were working at HR in September of 2016?
MS. MARMOR: Object --
A. I do not know.
Q. How many people that you normally see during the day as you worked at HR or in the HR office in September of 2016?
MS. MARMOR: Object to the form.
A. I don't know.
Q. Was there someone in -- when someone walked into the HR area, what do they first see if they -- do they have to go through a door to walk into HR?
A. To come into the building, there -- to come into the HR building, there was a door, and the first person you saw was an officer that was behind a desk.
Q. Okay. That's just coming into the building. Then did you have to take an elevator to -- to the HR office?
A. No. 0:45:48

Page 40

Q. Where was the HR office?
A. On that main floor.
Q. And was there a separate reception for HR?
A. No.
Q. When you called a person in for an assessment for a fitness for duty evaluation, where did you meet that person?
A. In my office.
Q. In 2016 September --
A. And --
Q. Oh, go ahead.
A. Can I elaborate?
Q. Sure.
A. In my office usually. However, we have had meetings in other management staff office.
Q. In September of 2016, were there -- was there video surveillance of the HR area?
MS. MARMOR: Object --
A. I don't know. 0:46:51
Q. Other than this case, the John Nawara case, have you ever been sued?
A. Yes.
Q. How many times?
A. Once.
Q. And what was that about?

Page 41

A. It was a death lawsuit.
Q. Where was that lawsuit?
A. In Illinois.
Q. In what part of Illinois?
A. Chicago.
Q. And when was that lawsuit? What year?
A. I believe in 2005 or 2007. I'm not quite sure.
Q. Did you have to give testimony?
A. Yes, I did.
Q. And you gave a deposition?
A. Yes.
Q. And did you testify at trial?
A. Yes.
Q. What was the result?
A. That the hospital was not liable.
Q. Were you sued personally, or was the hospital sued?
A. The hospital.
Q. And what hospital was that?
A. Little Company of Mary.
Q. And what was your involvement in the -- in that lawsuit? Why did you testify, in other words?
A. I was the nurse taking care of the patient. 0:48:19
Q. Were they blaming you for the patient's

Page 42

death?
A. No.
Q. Any other lawsuits that you may have been involved in?
A. No, not that I know of.
Q. Now, what -- what was your practice while working for the sheriff's office regarding how to go about assessing an employee to determine whether or not you were going to recommend a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered.
A. It was going to be -- it was the management person and myself that would sit down and meet with the employee and talk with the employee.
Q. Okay. Anything else? 0:49:25
A. No.
Q. Okay. And this is a -- a practice that you developed on your own, no one told you, "This is the way we do it"?
A. I didn't --
MS. MARMOR: Object to the form.
A. -- develop the practice. It was just decided on.
Q. Well what I'm asking is this, okay, so for example, someone may say, "I'm going to conduct fitness

Page 43

for duty evaluations, and my practice is going to be I'm going to call in the person for an interview, I'm going to have them fill out a form that says their version of the events," or "I'm going to take a history, and I'm going to prepare a chart, you know, chart down exactly what this person tells me," was there anything such thing in your practice, or is -- it was simply talking to that individual?
MS. MARMOR: Object to the form.
A. Just talking to the individual. 0:50:11
Q. Did you make any notes of the times when you talked to individuals to determine their version of events?
MS. MARMOR: Object --
A. No.
MS. MARMOR: -- to the form.
Q. Why -- why didn't you make any notes?
A. I didn't see that there was a need for me to make any notes when I was just talking with the individual.
Q. The talking to the individual would lead to your nursing judgment of whether or not a -- an -- an evaluation was required, correct? Was part of -- part of what you use for your nursing judgment, correct?
A. Yes.

Page 44

Q. And even though that was part of what you were going to use to make that determination, you did not think it was necessary to keep something in writing?
MS. MARMOR: Objection. Argumentative. 0:51:06
A. In -- no, I did not.
Q. Why not?
A. Because I didn't feel that keeping something with -- in writing was pertinent --
Q. By the way -- okay. I'm sorry.
A. Yeah.
Q. Go ahead.
A. I just felt like it -- it wasn't pertinent to me to keep something in writing on the event that was going on, yes.
Q. When a fitness for duty evaluation request is made, do you create a file for that request?
MS. MARMOR: Object to the form.
A. I don't remember. 0:51:51
Q. Does the sheriff's office keep a separate file, aside from a personnel file, when an employee is sent for a fitness for duty assessment?
MS. MARMOR: Objection. Lack of foundation.
A. They would keep a file of the medical records that was obtained for that employee and was sent over

to CorVel, as well as the -- the -- the fitness for duty report, once it came in.
Q. That -- aside from medical records, what else would that file contain?
MS. MARMOR: Objection. Asked and answered.
A. It would also contain the consent forms that the employee had signed and whatever had went over to CorVel.
Q. Would it contain anything with respect to the request for the assessment?
A. Yes. 0:53:03
Q. Would it contain any other information that the nurse and management use in order to determine whether or not a fitness for duty evaluation was -- was required?
MS. MARMOR: Object to the form.
A. I'm not understanding the question.
Q. Okay. I'll get -- I'll come back to that. I'm --
A. Okay.
Q. I'm sorry, I don't know how to --
A. Okay.
Q. I don't know how to express it, but maybe --
A. Okay.
Q. -- we'll come back to it. Okay. Regarding



that file that was kept for fitness for duty evaluations, who has that -- who had access to that file?
MS. MARMOR: Objection. Calls for speculation and to form.
A. When I was there, my understanding was that I was the only one that had a key.
Q. In nursing school, did you -- were you ever taught that if something is not charted, it didn't happen?
MS. MARMOR: Object to the form.
A. Yes. 0:54:29
Q. Why is that taught in nursing school?
A. Because the medical records that we are utilizing is -- are a legal document.
MR. BUSTAMANTE: I want to take just a short break.
MS. MARMOR: Okay.
MR. BUSTAMANTE: I need to stretch my legs --
RECORDER: Off --
MS. MARMOR: Okay.
RECORDER: Off record, 11:00 a.m.
(Off the record)
RECORDER: On record, 11:07 a.m.
Q. All right. Ms. Shelby, I'm going to be now



directing your attention to September of 2016.
A. Okay.
Q. And in particular, the events concerning John Nawara. When I talk -- when I say, "John," I mean John Nawara, okay? Because I -- I have difficulty pronouncing his name --
A. Okay.
Q. -- his last name, okay?
A. Okay.
Q. So if I -- if I don't say, "Nawara," that often is because it just doesn't roll off the tongue, okay?
A. Okay. Okay.
MS. MARMOR: Let the record show.
Q. So I'm going to show you first what we've marked as Shelby Deposition Exhibit Number 1.
MR. BUSTAMANTE: Of course I messed it up. There we go. Let's see here. I have three there.
MS. MARMOR: Thank you.
Q. Have you ever seen this document before?
A. I don't recall. 0:56:41
Q. Okay. Would you tell us -- for our record, would you tell us what this document is?
MS. MARMOR: Objection. Lack of foundation.
A. It appears to be a documentation -- a



document sent to Karyn Williams, the executive director of human resources, from Matt Burke, chief of staff.
Q. Okay. What is the purpose of this document?
MS. MARMOR: Objection. Lack of foundation.
A. The subject states, "Fitness for Duty."
Q. Okay. For Officer John Nawara, correct?
A. Correct.
Q. Right here in the first page of the document?
A. Yes. Correct.
Q. Okay. Do you know if this was the request that was -- the only request that was sent to HR to assess whether or not Officer Nawara should be evaluated for fitness for duty?
MS. MARMOR: Objection. Lack of foundation. 0:58:00
A. I don't know if anything else was sent to the HR department requesting that.
Q. If a request -- if this was the only request made to assess Officer Nawara for fitness for duty, would you have seen a copy of this document before interviewing Officer Nawara?
MS. MARMOR: Objection. Calls for speculation.
A. I'm sorry, can you repeat that?
Q. Yes. If this was the only document that was created requesting an assessment as to whether or not

Officer Nawara should be evaluated for fitness for duty, would you have seen a copy of this document?
MS. MARMOR: Same objection. Calls for speculation.
A. It would have been determined by someone in HR management because it didn't come to me, if it was sent to me or if they felt that they needed additional information.
Q. Okay. Did you have anything similar to this document before interviewing Officer Nawara?
MS. MARMOR: Objection to the form and foundation.
A. Did I have any document -- any documentation?
Q. Yes, did you have any documents?
A. I don't --
MS. MARMOR: That's a different question --
MR. BUSTAMANTE: Yeah, I --
MS. MARMOR: -- just to be clear. 0:59:36
A. I -- I don't recall.
Q. Do you have any recollection of conducting a -- an interview of Officer Nawara concerning a fitness for duty evaluation in 2016?
A. Do I recall interviewing Officer Nawara?
Q. Correct.
A. Yes, I do.



Q. What led you to interview Officer Nawara?
A. Rebecca and I had a discussion with his superintendent, I believe, and she gave a more detailed -- gave a more detailed report on why she was requesting the fitness for duty.
Q. Okay. Who has the right to request a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation and form.
A. I don't remember. 1:00:47
Q. Okay. Could anybody request a fitness for duty evaluation of an employee of the Cook County Sheriff's Office?
MS. MARMOR: Same objection.
A. I don't remember.
Q. Did you know, at any time, if there were limitations as to who could request a fitness for duty evaluation at the sheriff's office?
A. I don't remember.
Q. Did you know, at some time, who could request a fitness for duty evaluation at the sheriff's office?
MS. MARMOR: Objection to form. 1:01:16
A. I don't remember.
Q. Is there anything in writing as to who in the chain of command may request a fitness for duty



evaluation of a Cook County Sheriff's Office employee?
A. I don't remember.
Q. You said that this request for a fitness for duty was made by Superintendent Jones-Hayes, correct?
A. Correct.
Q. How did Superintendent Jones-Hayes make the request for a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
MS. KAMPER: Join.
A. And when you say, "How do," what do you mean?
Q. Well you tell me, how did you receive information from Superintendent Jones-Hayes or some -- something from Superintendent Jones-Hayes saying, "I want you to evaluate Officer John Nawara for fitness for duty"?
A. I --
MS. MARMOR: Object to the form.
A. I remember me and Rebecca spoke with her. 1:02:10
Q. Other than that?
A. That's all that I remember.
Q. And did you speak to her in person?
A. No, I believe it was via telephone.
Q. All right. And how did you know this was Superintendent Jones-Hayes talking to you?
A. I don't remember.



Q. Did you know the superintendent before the date of your conversation with her?
A. I did not.
Q. Where did that -- where were you physically located when that conversation took place?
A. I believe we were in Rebecca's office. I believe so. I don't remember it being in my office though.
Q. Did you take any notes of that conversation?
A. I don't remember.
Q. Did you see if Ms. Reierson was taking any notes of that conversation?
A. I don't remember.
Q. Have you seen, since that time, anything in writing that purport to be notes of that conversation?
A. I did from -- I believe from the superintendent.
Q. When did you see that? 1:03:35
A. I don't remember when I first saw it.
Q. And what makes you believe that it's from the superintendent?
A. Because it had her name on it.
Q. Now, where in the protocol that you have testified about that you followed regarding how you make an assessment for fitness for duty does it say

that management and the nurse are supposed to interview the person requesting the fitness for duty evaluation?
MS. MARMOR: Okay. I'm going to object both to form and completely mischaracterizes her testimony.
A. Repeat that. 1:04:25
Q. Yes. Initially, I asked you what were the things that you did in order to make an assessment for fitness for duty, and you gave me a detailed explanation of everything that you did. Nowhere in that explanation did you say, "Oh, and we interviewed the person who's requesting the fitness for duty evaluation." Where did that come from? Why did you decide to do it in this case?
MS. MARMOR: Objection. Argumentative.
A. Because I didn't have anything to base it on. You have to have a reason for the request, and I didn't have a reason for the request.
Q. Okay. So was it your decision to interview Superintendent Jones-Hayes?
A. I don't believe so.
Q. Whose decision was it?
A. I believe it -- it was a joint -- Rebecca saying that this is -- "Someone's requesting a fitness for duty, but we don't have enough information, I'm going to request that they give us more information if



-- before we call this person in."
Q. So Rebecca said that to you? 1:05:32
A. Give or take, you know, the word, I'm probably paraphrasing, yeah.
Q. Do you know what information Ms. Reierson had?
A. I don't recall if I knew what she had at that particular point.
Q. I'm -- wait.
A. Okay.
Q. If you take a look at Exhibit 1, please, and look at page 2, page 2 appears to be an email from Karen Jones-Hayes to Dawn Ertler. Do you see that?
A. Yes. 1:06:21
Q. And what is the date of this email?
A. September 29th, 2016.
Q. And then at page 1, the memorandum from Matthew Burke to Karyn Williams is September 29th, 2016, correct?
A. Correct.
Q. When was your interview with John Nawara?
A. I don't recall the date. 1:06:50
Q. If I tell you the interview took place on November 18th, 2016, can you tell me why it took from September 29th through November 16th to call Mr. Nawara



in for an interview?
A. I could not tell you why.
Q. Now, how long had Ms. Reierson been working in HR as of September 2016?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. If she says she started with the sheriff's office, I believe it was around August of 2016, would -- would you be kind of training her as to what to do?
MS. MARMOR: Object to the form.
A. No. 1:07:41
Q. She knew more than you did about the operations of HR at that time?
MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.
A. I was a nurse, and it wasn't my role to train Rebecca. When she came on, she came on and I was under the understanding that her superiors were to train her. It was not me.
Q. Was Ms. Reierson following your lead in concerns to fitness for duty evaluations?
MS. MARMOR: Object to the form.
A. No.
Q. Do all requests for fitness for duty evaluations take as long as a month and a half for --



to -- to call the employee in for an evaluation?
MS. MARMOR: Objection. Lack of foundation. 1:08:50
A. No.
Q. What is the longest that it's taken, in your experience, from the time the request is made until the time of the interview?
A. I don't know.
Q. Okay. Could it have been a year?
A. I don't know.
Q. Okay. Could it have been a month?
A. I don't know.
Q. Okay. What is the least amount of time that has taken?
MS. MARMOR: I'm sorry, what has taken?
MR. BUSTAMANTE: The least amount of time between the request for an assessment for fitness for duty evaluation and the time the interview is called.
MS. MARMOR: In her experience while she was working there?
MR. BUSTAMANTE: Of course. I mean, where else? Yeah.
A. I don't remember the least amount of time it took. It would play into factors, if the employee was there at work, it just -- if the employee was there at work that day, that was -- would -- would be much

Page 57

swifter than someone who wasn't at --
Q. Okay. Do you know who Matthew Burke is?
A. I -- yes, I remember Matthew Burke. 1:10:05
Q. Okay. Do you know if he still works for the sheriff's office?
A. I don't know.
Q. What do you know about Matthew Burke?
MS. MARMOR: Object to the form.
A. That he worked for the sheriff department. I forgot what his title was, but I do remember that he was an attorney.
Q. Okay. Okay. Let me show you what has been marked -- what we're marking as Shelby Deposition Exhibit Number 2.
MS. MARMOR: Thank you.
Q. Have you seen this document before?
A. I have. 1:11:00
Q. What is it?
A. It is a note with the conversation that Superintendent Jones-Hayes had with me and Rebecca --
Q. This --
A. -- concerning the incident.
Q. This is a note regarding the telephone conversation you testified to?
A. Yes.

Page 58

Q. Other than what is contained in this note, did you have any other conversations with Superintendent Jones-Hayes about the incident involving John?
A. Not that I recall.
Q. Who prepared this note?
A. I don't remember. 1:11:44
Q. Did you prepare it?
A. No.
Q. Do you know when this note was signed?
A. I do not.
Q. Do you recognize the signature?
A. I do not.
Q. Okay. Can you read the signature?
A. It says, "Supt. K. Jones-Hayes." And then it has number "271."
Q. Do you know when that signature came onto this document?
MS. MARMOR: Objection. Asked and answered.
A. I do not. 1:12:22
Q. Now, why is it that a written document is prepared concerning an interview with, as you stated, the person requesting the fitness for duty evaluation, but a written document is not prepared from the employee who is supposed to be assessed for fitness for

Page 59

duty?
MS. MARMOR: Objection to the form. Calls for speculation. Lack of foundation.
A. I don't know.
Q. Do you know if any of the statements contained in this note, do you personally know if they're true?
A. I don't.
Q. When you are making an assessment of whether or not to request that an employee undertake a fitness for duty evaluation, do you rely on documents such as this, Exhibit Number 2?
MS. MARMOR: Object to the form. 1:13:37
A. I do not.
Q. What do you rely on?
A. I talk with the employee.
Q. Okay.
A. And --
Q. What do you rely on?
A. I rely on speaking with the -- the employee and the employee's response, as well as the employee's behavior.
Q. Let me show you Shelby Exhibit Number 3.
MR. BUSTAMANTE: Yours is going to have a different number. She has Shelby Number 3.

Page 60

MS. MARMOR: Handwriting --
MR. BUSTAMANTE: So let's mark --
MS. MARMOR: -- takes precedence. Oh, I see. But this is just -- oh, so you're saying that the version we have is a copy of Reierson 5, but the version she has does -- is not?
MR. BUSTAMANTE: Doesn't have this.
MS. MARMOR: Doesn't have the Reierson 5 --
MR. BUSTAMANTE: Right.
MS. MARMOR: -- Exhibit sticker on it? Okay.
Q. Have you ever seen this document before?
A. I have not. 1:14:56
Q. Do you know what this is?
A. I do not.
Q. Okay. Have you ever seen a form from the sheriff's office for discrimination, harassment, sexual harassment complaint form?
A. Not that I recall.
Q. Do you know if this document would have been available to you if you had requested it?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
A. I don't know.
Q. I take it that even if you had this document in November of 2016, you would not have relied on it.

Is that correct?
MS. MARMOR: Object to the form. Lack of foundation. Complete speculation.
A. I would not. 1:15:45
Q. For the same reasons that you would not have relied on Exhibit 2, correct?
A. This would have no bearing on it. It wouldn't have had anything to do with my decision.
Q. Okay. So let's now talk a little bit about the interview with John, okay?
A. Okay.
Q. How was John informed that he was to have an interview with you and Ms. Reierson?
MS. MARMOR: Objection. Lack of foundation.
A. I don't remember.
Q. How would a person, an employee, typically be informed?
MS. MARMOR: Same objection.
A. He could have been informed through a -- through his superior. Usually, I think that was -- the -- the usual route of seeing, when the employee comes back to work, "Send them to us and we will talk to him," something like that, or "Send him here at this time and we can talk to him."
Q. How is the superior or supervisor informed of



that? Is that done by telephone call, by text message, by email, by interoffice memorandum? How is the superior informed that the employee is supposed to report to HR?
MS. MARMOR: Objection. Lack of foundation. 1:17:11
A. It could have been informed numerous ways. It could have been informed via email, via telephone conversation. There was no set way to inform.
Q. Would HR, your office, keep any documentation regarding "we informed this individual to come into the office today"?
MS. MARMOR: Object to the form, and it -- HR is not her entire office -- or she's not the office of HR.
A. No, I wouldn't have kept anything saying I -- are you asking would I have left -- let me ask you to just rephrase it to make sure I'm --
Q. Sure.
A. -- answering it correctly.
Q. So for -- for example, if -- if a phone call is made to whoever is in charge of roll call, when this individual shows up, make -- have him report to HR, is there some kind of documentation that is kept, "On this date, we called, asked that this individual show up," any kind of documentation?



A. No. 1:18:12
Q. How about any documentation regarding scheduling, you know, for example, did you keep a calendar saying, "These individuals are going to come to the office" or "have been requested to come to the office on this date" --
MS. MARMOR: Did she personally? Sorry.
Q. Let's start with you personally first.
A. No.
Q. Did the -- did the HR office keep any -- any such documentation, like a calendar, or diary, or any such form?
MS. MARMOR: Objection. Lack of foundation.
A. That I don't know.
Q. How did you know that you were expecting a certain individual to come up or to come to -- report to HR for an evaluation or an assessment for FFD?
A. I would have just known, whether it was a conversation that the person was coming at a certain time, but it wouldn't -- and maybe I would have put it on my -- I don't know, but I wouldn't have kept a documentation saying that, "I have these appointments here at this time," because my schedule wasn't like that.
Q. At what time did you report to work in



September of 2016?
A. 8:00. Usually around --
Q. 8:00?
A. -- yeah, 8:00. 1:19:34
Q. And at what time did you leave?
A. Usually around 4:00.
Q. At what time did John come for his appointment?
A. I don't know.
Q. Was it morning or was it afternoon?
A. I don't recall.
Q. Did John, in fact, report for his appointment?
A. Yes.
Q. Do you recall that it was November 18th, 2016?
A. I don't recall the date, no.
Q. Who did John report to when he came for his appointment?
A. He would have reported directly to the officer that's -- that sits in the main -- soon as you walk in the door.
Q. And --
A. And would have reported who he was there to see.

Page 65

Q. Okay. When a person is requested to come up to HR for that type of assessment, for fitness for duty, is he told who he is going to see?
A. I believe so. I don't -- I -- I believe so.
Q. Okay. And would it have been, "You're going to see Ms. Reierson and Nurse Shelby," or "You're going to see Ms. Reierson," or "You're going to see Nurse Shelby"?
A. That I don't know. 1:20:52
Q. How does the man at the desk know that, you know, someone is reporting? Does -- does the man at the desk receive some kind of writing saying, "We're expecting these people to come in today"?
MS. MARMOR: Objection. Lack of foundation.
A. Not from me.
Q. All right. Do you know who John was supposed to report to, you, or Ms. Reierson, or both?
A. Both.
Q. Okay. Who greeted him? Aside -- you know, after he got past the guy in the front?
A. I don't remember.
Q. Did you see him first or did Ms. Reierson see him first?
A. I don't recall.
Q. In your office, do you have a desk?

Page 66

A. Yes.
Q. Do you sit behind the desk to interview the employees?
A. I do.
Q. How many chairs are there on the other side of your desk?
MS. MARMOR: Were there. Since she's --
MR. BUSTAMANTE: Were there, right, right --
MS. MARMOR: -- no longer there.
MR. BUSTAMANTE: -- right, right.
MS. MARMOR: Yeah.
MR. BUSTAMANTE: Thank you. 1:21:49
A. Usually, there were two desk -- two chairs by my -- in front of my desk.
Q. When -- did Mr. Nawara come to your office, or did you go to Ms. Reierson's office first?
MS. MARMOR: Object to the form.
A. I believe it was in my office.
Q. Where was Ms. Reierson when Mr. Nawara came?
A. I don't recall.
Q. So it's possible she was not there when Mr. Nawara came in?
A. I don't recall.
Q. Did you have a conversation with Mr. Nawara while you and him were alone in your office?

Page 67

A. No. 1:22:33
Q. Was all the conversations you had with -- with John were when both you and Ms. Reierson were present?
A. I believe so.
Q. Was there any other person present at any time that you had a conversation with John when he first reported to your office?
A. I don't recall.
Q. Who started the conversation when Mr. Nawara reported to your office?
A. I don't recall.
Q. Do you recall any part of that conversation?
A. Vaguely, yes. I -- yeah, vaguely.
Q. What do you recall of the conversation?
A. Trying to explain the purpose of why he was here in the office.
Q. Who -- who was speaking?
A. I believe myself. 1:23:36
Q. Okay. To the best that you can, I know it's not going to be word for word, would you tell us what you said?
A. That he was there --
Q. Pretend I'm John.
A. Okay.

Page 68

Q. Just tell -- say what you said.
A. "Hi, John. You're here -- do you know why you're here?" And I don't remember if he knew why he was there or not at that particular point, but I would go on to just explain that, you know, there was some concerns of his behavior, we're calling him in just to do a fact finding, to get his view on exactly what transpired, because it's very concerning, you know, what was -- was said by his superior.
Q. Okay.
A. But I believe that it couldn't go on very long because he became very raged, very uncooperative, at that particular point. I remember that.
Q. Describe what you saw. 1:24:46
A. He was mad. He was mad. I believe his -- you know, I was trying to talk to him, that he was -- had became loud, and I believe, at one point, that he even stormed out of there. I -- I believe so, but I remember that he was just -- I had never had this happen. I've never seen anyone in that office behave like that before.
Q. When Mr. Nawara first reported to your office, did he sit down at -- at your desk?
A. I don't remember if he was sitting or not.
Q. And was Ms. Reierson on the same side of the

desk that you were on, or was she on the side that Mr. Nawara was on?
A. I believe she was on the side that he was on, because if -- yeah. I believe so.
Q. When you say that John got mad and I asked you what did you observe, okay, what did you observe?
A. Him being loud --
Q. Excuse me for interrupting you. For me, that's what did you hear. What did you observe is what --
MS. MARMOR: Well --
Q. -- did you see?
MS. MARMOR: -- I think she's allowed to answer the question --
MR. BUSTAMANTE: I know.
MS. MARMOR: -- the way she wants to.
MR. BUSTAMANTE: I understand that, but I --
MS. MARMOR: Okay.
MR. BUSTAMANTE: -- because we'd already -- she already testified to that.
A. Okay.
MS. MARMOR: Right. But that's how she defines mad.
A. Okay. I'm -- describe someone -- what I'm observing is someone who looks like they are looking at



me on -- like they're on ten and could attack at any given time.
Q. What gave you the feeling that he could attack at any given time?
A. By the look on his face. He just had a rage in him, and I can't -- it was rage.
Q. Okay.
A. I can't tell you what rage -- but you see it and you know it if it's looking at you. You see it.
Q. Okay. Can you describe John physically? What does he look like?
A. Physically, he has, I think, black hair, maybe olive colored skin. I believe he's kind of a medium or -- medium type of build. That's the most that I could, yeah, tell you.
Q. Did he make any physical gestures when -- when you say that you observed him being mad?
A. When you say, "Physical gestures," what are you speaking of?
Q. Anything that has to do with the body, any gestures.
A. I don't know exactly what do you mean with anything to do with the body. I'm --
Q. Okay. 1:27:48
A. -- not understanding that.



Q. What do you -- do you understand what -- what a gesture is?
A. I don't understand when you're -- no, maybe I don't. Explain to me --
Q. Okay.
A. -- what you mean.
Q. Okay. Did he make any moves that you would consider aggressive?
A. Not towards me.
Q. To -- towards anyone?
A. Not that I saw.
Q. Did you feel that your physical safety was threatened at that time?
A. I did not feel threatened because we were in the sheriff's office.
Q. Did you feel that Ms. Reierson's physical safety was threatened at that time?
A. I didn't think hers was threatened once -- because we were in the sheriff's office.
Q. How long did the interview with John last from the moment he came in until he stormed out?
A. I don't -- I don't -- I don't remember how long it lasted, but I -- I don't remember because I remember at one point, there was a union steward that came in, but I don't -- I -- I remember that there was



a union steward that came in, so I don't remember the time sequence of -- of everything that transpired.
Q. My understanding is that John was there at least twice that morning, okay, of November 18th. You say you -- you testified that he stormed out. He says differently. Doesn't really matter.
A. Okay. 1:29:45
Q. But I'm talking about the first time, before the union steward come -- comes, okay? He later returned with a union steward, okay?
A. Okay.
Q. That first time, how long was he there?
MS. MARMOR: Okay. I'm going to object to lack of foundation. I mean, she -- your -- your -- she's only basing her answers based on what your memory -- what your information is, not on her necessary --
MR. BUSTAMANTE: Correct.
MS. MARMOR: -- necessarily her memory.
A. I could not tell you how long.
Q. During that first part, before the union steward came, did you ask John to sign medical release forms?
A. I believe so. 1:30:22
Q. Tell us what you remember of that conversation.

A. Trying to explain the process for a fitness for duty, that he would be evaluated by an independent -- actually, at that point, let me go back, let me stop, because -- and -- and I -- and I just remembered, I don't know if he was asked to sign it at that point. I believe, at that point, he was not asked to sign it because I believe, at that point, we had not discussed it to decide if that's what -- what route we were going to go with him.
Q. Okay.
A. I believe it was after he stormed out, and then we had chance to talk, that that was the determination, but it was not decided immediately. It was -- it's never decided immediately that we're going to jump for a fitness for duty. There are cases that we didn't do fitness for duty.
Q. Okay. How -- how long -- by the way, put in your mind's eye, okay, what -- what is happening during the first time that John is in your office and you say he stormed out, do you see him, in your mind's eye, standing up from a chair and walking out of your office, or do you see him already standing, and he never sat down, and walking out of your office?
MS. MARMOR: If you remember. 1:31:46
A. I don't remember if he was standing the whole



time or not. I don't picture him sitting down. That I can say, I don't remember him ever sitting down. Okay.
Q. When he walked out of the office -- by the way, was the office door closed when the interview started?
A. Yes.
Q. And so who opened the door when he walked out?
A. He would have opened the door.
Q. Do you have a clear memory of that, or are you just guessing?
A. He stormed out, so he would have opened the door.
Q. Okay. How long was it before he returned?
A. That I don't remember.
Q. Was it a long time or a short time?
MS. MARMOR: Object to the form.
A. I don't remember.
Q. What -- he did return the same day?
A. Yes. 1:32:42
Q. And you say you remember a union rep coming back?
A. Yes.
Q. Okay. Between the time that John left your office and came back with a union rep, did you make a



decision, did you exercise your nursing judgment and determine whether or not he should be subject to a fitness for duty evaluation?
A. I believe Rebecca and I discussed it, and it was agreed upon by both of us that we felt that he should go for a fitness for duty.
Q. Okay. So tell us about that discussion. What did you say and what did Ms. Reierson say?
A. That what we had -- as we watched his behavior and his lack of self-control, and just talking with us from HR, that it's very concerning, him being safe to care for prisoners if he can't show self-control with us and we're not threatening whatsoever, so how would -- does he behave himself in that sort of environment, so he definitely should be evaluated by a provider to make sure that he didn't harm someone while on the job.
Q. All right. What I want to know is what was said by you and what was said by Ms. Reierson?
A. I couldn't tell you. I'm telling you, in gist, what the conversation went -- looked like. I couldn't tell you who said what in the conversation, but I just know that that was a concern.
Q. How did the conversation between you and Ms. Reierson start?



MS. MARMOR: Objection. Asked and answered. 1:34:32
A. I don't know.
Q. Well did you say, "Well can you believe that?" or "What do you think?" or something to that effect?
A. I couldn't tell you.
Q. How long did that conversation take place? How long -- I mean last, not take place. How long did that conversation last?
A. I don't recall.
Q. Did you make any notes of that conversation?
A. No.
Q. Why not?
A. There was no reason to make notes for it.
Q. Why is there no reason?
A. Because we were having a discussion.
Q. Did you make any -- any notes regarding the elements that went into your assessment, your nursing assessment, to recommend a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered. 1:35:27
A. I did not.
Q. So when -- when John came back with the union rep, the determination had already been made that you were going to request that he submit to a fitness for duty evaluation?

A. Correct.
Q. At that point, was it at that point that you got the medical release forms, I'll call them, for John to sign?
MS. MARMOR: I'm sorry, can you -- I -- I didn't --
Q. Was it at that point, after you decided to -- that he was going to be requested to undergo a fitness for duty evaluation, that you obtained the forms for release of medical records?
MS. MARMOR: Object to the form. 1:36:15
A. I believe at that particular time, when he had the rep there, we explained the process and explained that these forms would need to be filled out, yes.
Q. Okay. But someone had to get the forms, correct? Or were the forms already there from the very -- from the very beginning?
A. The forms were probably there from the beginning.
Q. Where are those forms kept?
A. They are kept in a file cabinet in the back part of the office.
Q. They're not kept in your office? Or they were not kept in your office at that time?



A. Yes, they were kept in my office.
Q. So at the -- the file cabinet within your four walls of your office where the forms were --
A. Well my office had -- I had a front part of my office and then there was a back office right in my office, that's where the file cabinet was kept.
Q. Who prepared these forms? In other words, who -- who drafted them?
A. What do you --
MS. MARMOR: Originally? 1:37:24
MR. BUSTAMANTE: Originally, yes.
A. Oh, I don't know.
Q. These forms were already there when you started working for the sheriff's office?
A. I --
Q. The drafting of these forms?
A. Yes.
Q. And did you ever review these forms over the period of time that you had been working for the sheriff's office, did you ever review these forms to make sure that they complied with HIPAA?
A. I did not.
Q. Did you ever review these forms to make sure that they complied with the ADA?
A. I did --



MS. MARMOR: Objection. Lack of foundation.
A. I did not.
Q. So tell us what happened when John came back with the union rep.
A. I believe we spoke with both and explained to them what the next steps was going to be, that we were going to request that he go for a fitness for duty and the process of -- for the fitness of duty to, you know, transpire. CorVel is the third party company that handles it. They require that they receive his medical records, so they can give the provider, whoever is going to be doing the -- the evaluation, all of the medical records, and they need that to rule out anything that could be going on medically with the person.
Q. When John came back with the union rep, where did the meeting take place? Back in your office?
A. Yes. 1:39:12
Q. Besides John, the union rep, you, and Ms. Reierson, was there anybody else present?
A. No.
Q. What was the approximate time?
A. I don't know.
Q. Who spoke first when John came back with the union rep?



A. I don't know.
Q. Did you inform the union rep the reasons why it -- it was requested that John undergo a fitness for duty evaluation?
A. Yes.
Q. Did Ms. Reierson explain to the union rep the reasons why John was to -- requested to undergo a fitness for duty evaluation?
A. I don't recall.
Q. What did you say to the union rep?
A. I don't recall.
Q. What was John's demeanor when he came back with the union rep?
A. He was very upset.
Q. Okay. Explain what you observed or tell us what you observed when you say, "Upset."
A. He was upset, he was -- he was huffing and puffing. He was upset, he was -- I can't explain what an upset person looked like. They are just upset. They're -- they're mad.
Q. When you said he was upset, did you mean to say he was mad?
MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.
A. He was upset, and -- and that's how he was.

He was upset. Even while we were attempting to explain the situation, he was loud. I believe the union rep tried to diffuse it some, I believe -- yeah, I believe the union rep kind of tried to diffuse him some, but he was upset.

Q. All right. What was John saying when you say he was loud?

A. That he wasn't going for no fitness for duty.

Q. Anything else? 1:41:39

A. He made mention to -- that his superintendent, I believe, was lying on him or something to that effect. Yeah.

Q. Anything else that you recall?

A. Not that I recall.

Q. The -- did you --

MS. MARMOR: Oh, wait. She -- she -- looks like she has something more to say.

Q. Oh, go ahead.

A. And he -- I do recall that he was saying that he wasn't signing the papers, and -- and we, you know, informed him at that time if he didn't sign the paperwork or didn't want us to have his information, he could go directly through CorVel.

Q. Okay. Who said -- who said that to him, that he could go directly to CorVel?



A. I don't know if it was I that said it to him or Rebecca, but I do know he was informed that.

Q. And is that true, that an employee can go directly to CorVel if they don't want to sign the forms provided by the sheriff's office?

A. That is true. 1:42:56

Q. And have there been situations with employees other than John where they have gone directly to CorVel and signed the CorVel form?

A. Yes.

Q. Is this something that you tell all employees?

A. Absolutely.

Q. Okay. We'll go to Shelby Number 4. Ms. Shelby, have you seen a copy of this letter before?

A. I have.

Q. When you receive a copy of a letter such as this, what -- what do you do with it?

MS. MARMOR: Objection. Calls for speculation. 1:44:03

A. I -- I didn't have a process on what to do with a letter like this, so.

Q. Would it go into the employee's fitness for duty file that you keep in your office?

A. I might have put it in there and I might have



not. I didn't have a process on what to do with it.

Q. If you did not put it in any file, where would it go? The circular file?

MS. MARMOR: Objection -- objection. Argumentative.

MR. BUSTAMANTE: Sorry.

MS. MARMOR: And no -- and there is no -- there is no -- there's --

Q. I mean, would you just trash it or --

MS. MARMOR: Yeah -- yeah.

A. I probably wouldn't have received it as a hard copy for me to trash it. It would have probably came via an email form or something like that, so then it wouldn't have been a reason for me to trash it or anything. It just would have been part of the email.

Q. Do you know why you were copied on this letter?

A. I don't know why -- why I was copied on it, no. 1:45:06

Q. Okay. Would you please read that letter to yourself? Let me know when you're done.

A. Okay.

Q. Okay?

A. I am complete.

Q. All right. Is there anywhere in this letter



where John is told that if he doesn't want to sign the forms given to him by the sheriff's office, that he could go directly to CorVel and sign CorVel's form?

A. No. 1:46:22

Q. Why not?

MS. MARMOR: Object -- objection. She didn't write this letter. That's not an appropriate question for her.

A. And that's -- I did not write the letter.

Q. I understand that, but why -- why isn't that something that's put in -- in a letter to a -- an employee, copied to you so you saw it, okay? Do you know why that's missing?

MS. MARMOR: Okay. Slow down. I want to get my objection on the record. Number one, that's treating this as if it's a normal situation that was going on. And number two, she doesn't have the foundation to answer that question.

A. I don't know. I did not write the letter. 1:46:56

Q. Okay. Did you call and leave a voicemail for John on November 30, 2016?

A. I don't remember the date I did.

Q. But you did call, do you recall? Do you recall calling and leaving a voicemail?

A. Yes, I did.

Page 85

Q. Were you asked to call, or did you call on your own?
A. I don't remember.
Q. What did you say when you left the voicemail?
A. Just who I -- I -- who I was, who I was calling for, and requested a call back.
Q. And what did you say when you said what you were calling for?
A. Who I was calling for, I was calling for --
Q. Oh, I'm --
A. -- John -- yeah.
Q. Okay. Got it. Did you discuss this letter with Ms. Reierson after you received your copy?
A. I don't recall. 1:47:50
MS. MARMOR: If you need to take a break, you can take a break.
WITNESS: Oh.
MS. MARMOR: Okay?
WITNESS: I'm fine. Thank you.
Q. If you need a break, let me know --
MS. MARMOR: No, she was just --
Q. -- okay?
MS. MARMOR: She was checking her watch. I just wanted to --
MR. BUSTAMANTE: Oh.

Page 86

MS. MARMOR: -- make sure.
WITNESS: Oh, no. Thank you.
MS. MARMOR: Okay.
WITNESS: Sorry. You know, be vibrating these --
MR. BUSTAMANTE: What time is it?
MS. MARMOR: I see.
MR. LINDEN: 12:00, do you --
MR. BUSTAMANTE: Huh? 12 until --
MR. LINDEN: 12:00.
MR. BUSTAMANTE: Okay. I take a lot of breaks because I drink coffee, so.
WITNESS: Okay.
MR. BUSTAMANTE: Let's hope that we'll -- plow through.
Q. Let me show you Shelby Number 5.
MR. LINDEN: Thanks.
Q. Okay. Have you had a chance to read it? 1:49:28
A. Yes, I did.
Q. Okay. You have seen this letter before, correct?
A. Yes.
Q. And it's a letter dated February 28th, 2017?
A. Correct.
Q. To John Nawara from Ms. Reierson, correct?

Page 87

A. Correct.
Q. Anywhere in this letter where Ms. Reierson says, "If you don't want to sign our forms, you can go to CorVel and sign the CorVel form"?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. No.
Q. This letter has attached two forms. Is that correct?
A. Correct. 1:50:06
Q. And are these the forms that were given to Mr. Nawara to sign when he came for the interview on November 18th, 2016?
A. Correct.
Q. If you'd take a look at the third page, which is Cook County Sheriff's Office 128 at the very bottom, you see where "all health care information" is checked?
A. Yes.
Q. Who put that checkmark there?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you -- were the forms that were kept in your office from the Cook County Sheriff's already all marked with "all health care information"?
A. Yes. 1:51:06

Page 88

Q. When a -- when the sheriff's office is putting someone through a fitness for duty evaluation, do they always request all the medical records?
A. Yes.
Q. Why is that?
A. Because -- it should be all of the records because the provider -- we don't know what we're asking -- I -- for. We don't want just one office visit note. We want all of the medical records.
Q. Okay.
A. Because the provider requests that.
Q. So it -- it could happen that records that are not relevant to the issue at hand are therefore turned over?
MS. MARMOR: Objection. Argumentative and mischaracterizes her testimony.
A. I don't know. 1:52:20
Q. So you know, just for the sake of argument, if a -- argument. If a person had a hernia and he's being sent for a medical -- a mental health evaluation, the hernia would not be relevant to mental health, or would it?
MS. MARMOR: Objection. Calls for speculation and lack of foundation.
A. I don't know.

Page 89

Q. Okay. Let me show you Shelby Number 6.
MR. BUSTAMANTE: Oh, shoot -- no, I don't have to worry about it. Got it on -- yeah. Put --
MS. MARMOR: This is why I ask the court reporter to do it for me.
MR. BUSTAMANTE: That's -- it's okay. No problem. We've got it -- got it on time.
Q. Have you ever seen this document before, in the computer, it doesn't have to be in a, you know, printed document, have you seen this type of log before?
MS. MARMOR: Object to the form. 1:53:42
A. I believe so.
Q. Okay. So the title of this document is "Fitness for Duty Log, January 2016 to April 2018," correct?
A. Correct.
Q. And the names of the employees have been redacted, okay, right?
A. Yes.
MS. MARMOR: And actually, can -- sorry, can we go off the record for --
MR. BUSTAMANTE: Sure.
MS. MARMOR: -- one second?
RECORDER: Off record, 12:06 p.m.

Page 90

(Off the record)
RECORDER: On record, 12:06 p.m.
Q. Okay. Does -- did your office keep some kind of log or record of all the employees who came to your office for an assessment for fitness for duty, whether or not to be sent to a fitness for duty evaluation?
MS. MARMOR: Object to the form and lack of foundation. Do you mean she personally or the HR department in general?
MR. BUSTAMANTE: Her department in general.
MS. MARMOR: She --
MR. BUSTAMANTE: Her office.
MS. MARMOR: -- didn't have a department. She -- she had an -- she had an office, but she didn't -- she wasn't the head of a department.
MR. BUSTAMANTE: I -- I get it. I understand that. 1:54:52
A. There was a log that was kept, however, it was -- I couldn't say that it had all the fitness for duty people on here that we evaluated because the log was not into effect all the while while I worked there. The log went into effect, I don't remember when they started the log, but it was not in effect for the whole period that I worked for the sheriff's department.
Q. Okay. When the log was started, was it a

Page 91

computerized record or was it a written record?
A. It was a computerized spreadsheet.
Q. The document that you have in front of you, do you know if this was prepared by the sheriff's office or it was prepared by counsel for purposes of this litigation?
A. I don't know. 1:55:46
Q. Does it look similar to what you would have had in terms of a computerized log while you were working at the sheriff's office?
A. I don't remember what was on -- exactly on that log. I remember that was some form of a log, but I couldn't tell you what was on it. That I don't know.
Q. Well this --
A. I don't remember.
Q. Okay. Let's look at some of the entries.
A. Okay.
Q. But first, we'll look at the -- the -- the descriptions on the top, okay? We have a "referral date," correct?
A. Correct.
Q. Slash "date of meeting." Then we have "last," "first," and "job title," which I assume refers to the employee, correct?
MS. MARMOR: Objection. Lack of foundation. 1:56:35

Page 92

Q. It says, "Last," here, would that be --
A. Yes, I see that.
Q. -- last name?
A. Yes.
Q. First name?
A. Yes.
Q. Job title of the employee?
A. Correct.
Q. Okay. And then we have the "issue" and then "reason for referral," "referral received from," "decision," "comments," and "status," you saw all those?
A. Yes, I see that.
Q. Now from your memory of the log that is kept by the sheriff's office, would there have been any other entries, any other descriptions?
A. I don't recall. 1:57:07
MS. MARMOR: And I'm just going to note for the record that she's already testified she was gone by December, I believe, of 2017, and this log goes through April of 2018, so I'm just going to have a foundation objection to her talking about this.
MR. BUSTAMANTE: I don't think I'm going to go to April '18 -- 2018.
Q. Okay. So you know, I -- I -- I wanted to ask

Page 93

you questions about specific entries, but we don't even know if this is a Cook County Sheriff's document.
A. Okay.
Q. So we may have to ask you to come back when we find out if -- if there's a different document. I'll ask you questions now, but you know, if -- if it's not a Cook County Sheriff's document, might have to ask you to come back, okay?
MS. MARMOR: Well I mean, let me be very clear, we've -- we've made productions in this case. We were clear about our productions in this case. There is, in fact, another log that was produced in this case that was contemporaneous, and I would object to her coming back --
MR. BUSTAMANTE: What was --
MS. MARMOR: -- you know, you should understand what the documents are in the case.
MR. BUSTAMANTE: We'll -- we'll -- during the break that we're going to take in a short while, we'll see if there's another log. Maybe you can help us share -- search it, if you -- you know, I mean, maybe. If not, I'm -- I'm going to just stand by what I'm saying.
Q. Okay. So let's look at some of these entries, okay? First, under "issue," when it says,

Page 94

"Med," m-e-d, what does that refer to?
MS. MARMOR: Lack of foundation. 1:58:41
A. I don't know.
Q. Okay. When it says, "Eval," e-v-a-l, what does it stand for?
MS. MARMOR: Lack of foundation.
A. I don't know.
MR. BUSTAMANTE: Oh, shoot.
MR. LINDEN: That was lucky. Half hour -- sorry about that, I mean.
Q. Under "comments," okay, let's look at -- let's look at the entry for 9/9/2016, under "comments."
A. I'm sorry, what date was that?
Q. 9 --
MS. MARMOR: 9/9/2016.
Q. -- 9 --
A. Okay.
Q. -- 2016.
A. Okay.
Q. When -- under "comments," when it says, "FFD not appropriate, may be disciplinary issue," do you see that?
A. Yes. 1:59:29
Q. Who -- when would that entry be made?
MS. MARMOR: Objection. Lack of foundation.

Page 95

A. I don't know.
Q. By the way, who would make the entries in the log that was kept by sheriff's office?
MS. MARMOR: If you know.
A. I don't remember.
Q. Would it be you?
A. I don't remember.
Q. Okay. Who -- if it was not you, who else could it have been?
A. Someone from the HR management team who was present during the fitness for duty.
Q. Okay. So in Mr. Nawara's case, it would have been either you or Ms. Reierson?
MS. MARMOR: Objection. Mischaracterizes her testimony.
A. Correct.
Q. And who would have access to the computerized log?
A. I don't remember.
Q. Well would it have been more than you or someone in HR management?
MS. MARMOR: Objection. Asked and answered. 2:00:23
A. No. I don't -- I don't remember.
Q. Would this type of information be protected by law from disclosure to people who have no business

Page 96

putting their nose into it?
MS. MARMOR: Objection. Lack of foundation. Calls for a legal conclusion.
A. I don't know.
Q. Based on your experience as a nurse and based on your knowledge of HIPAA, would the information contained in this log be privileged?
MS. MARMOR: Privileged? Objection. Lack --
Q. Privileged from --
MS. MARMOR: -- complete lack of foundation.
Q. -- disclosure -- privileged from disclosure --
A. When you said, "Disclosure to others," what do you mean, "disclosure"?
Q. Well say that the cleaning lady is coming by and doing his or her job -- cleaning lady, her job, of cleaning your office, and this is on the screen, and she starts reading this information, would that be right?
A. Oh, no.
MS. MARMOR: Objection. Lack of --
Q. No?
MS. MARMOR: -- foundation.
A. No.
Q. Why not? 2:01:18

A. Because it has information pertaining to a fitness for duty, so that would not be something that would be shared with anyone that didn't have a reason -- a reason to be involved in that particular case.
Q. So not everybody could see or have access to this information, correct?
MS. MARMOR: Same objection. Lack of foundation.
A. I don't think -- believe so, no.
Q. Okay. The 9/29/16 referral date, is that the John Nawara event?
MS. MARMOR: Objection --
A. I don't know.
Q. By reading the reason for referral, does it appear to be the John Nawara event?
MS. MARMOR: Objection. Calls for speculation.
A. I don't know. 2:02:14
Q. Under "decision," when it says, "FFD," what does that mean?
A. Fitness for duty.
Q. And when it says above that, on 9/27/2016, when it says, "No FFD," what does that mean?
A. They were not sent for a fitness for duty.
Q. When a notation is made, says, "FFD not



appropriate, may be disciplinary issue," is that a nursing decision that is noted, or is it somebody else's decision that is noted?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. It would have been a discussion held with the management from HR and myself.
Q. Okay. So the notation under "comments" is what management and the nurse, being yourself, decided. Is that correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Correct. 2:03:21
Q. Now, assuming -- and -- and I'm going to ask you to assume that the 9/29/2016 entry is John Nawara's entry, why is the "FFD not appropriate, may be disciplinary issue" written in -- in that spot?
MS. MARMOR: No, that's not -- that's the one above him.
MR. BUSTAMANTE: No, I'm asking why that notation is not in Nawara's entry.
MS. MARMOR: Okay. Well that completely calls for speculation, and there is no foundation for her to testify about documents she didn't create.
A. You said why wasn't it --



Q. Yeah.
A. -- written in that?
Q. Why didn't you write down -- or assuming -- why isn't it written down there "FFD not appropriate, may be disciplinary issue"?
A. I don't know.
MS. MARMOR: Same objections. 2:04:20
Q. If you look at the next page, 189, look under "12/9/2016," you see that?
A. 12/9/2016 --
Q. 12/9 --
A. -- right.
Q. -- third -- third from the top.
A. Okay.
Q. Here is an allegation of "work behavior, alleged outburst of anger," and "FFD" means that FFD was requested, correct, under --
MS. MARMOR: Objection.
Q. -- under the column "decision"?
MS. MARMOR: Objection. Lack of foundation.
A. Okay. What is your question?
Q. Well I'm -- I'm asking you, first of all, FFD was requested, correct?
A. Yes.
Q. And then under the comments, it says, "FFD



not appropriate, discussed options with employee's supervisors." And again, my -- my question is why is this here, this comment made, if an FFD was requested?
MS. MARMOR: Objection --
A. I don't --
MS. MARMOR: -- lack of foundation.
A. I don't know. 2:05:28
Q. Is it that the evaluator, the -- you know, the person who CorVel sends the employee to, decided that this was not appropriate for fitness for duty?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. I don't know.
Q. Can you agree that at least it's not the HR manager and the nurse's decision because HR management and the nurse decided that FFD was -- was appropriate, correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Yeah, I don't see anywhere where it says that.
Q. Well it says, "FFD," and if some -- if it says, "FFD," means that you requested FFD, correct?
MS. MARMOR: Objection. Lack of -- lack of foundation. Calls for speculation.

A. I don't know if -- if it's saying that it was decided on an FFD, I don't know.
Q. All right. Well go back and look at all the columns up to --
A. Okay.
Q. -- the time that you left, okay?
A. Okay. 2:06:26
Q. If it says, "FFD," was it decided to FFD?
MS. MARMOR: She has no --
Q. And --
MS. MARMOR: Sorry.
Q. And if it says, "No FFD," was it decided no FFD?
MS. MARMOR: She has no foundation for answering these questions. She did not create this document.
A. I don't know.
Q. Show you Shelby Number 7. Would you tell us what this document is, please?
A. This is the referral form that we sent over to CorVel when we're requesting a fitness for duty for someone.
Q. Is this a document that you prepared?
A. I just put in the -- the -- the form -- the referral form was already prepared, I just plugged in



the individual employee's information into this -- to each referral form.
Q. Okay. When you say the referral form was already prepared, tell us what parts were already done and what parts you plugged in.
A. The date, the employee's name, date of birth, contact information, home address, job description, occupation, the reason referring, any specific questions to address.
Q. So the -- the -- the thing that was already prepared was the line where it says, "Cook County Referral Form"?
A. Yeah, "Cook County Referral Form," the date -- the -- the --
MS. MARMOR: Do you mean the headers right here? I think that's --
MR. BUSTAMANTE: The header.
MS. MARMOR: Yeah. Not just the headers, but the header -- like the header "date."
A. Yeah, the date.
Q. Got it.
A. The employee name, the date of birth, the employee contact, the home address, the job description, the reason for the referral, those were already on the form.



Q. Okay.
A. And I just would make it individualized for each employee by adding what their -- what the date is, what their name is, what their date of birth --
Q. Okay. What -- what is the date of this document?
A. 8/25/2017. 2:09:26
Q. Why was the document prepared at this time?
A. I don't know.
Q. By this time, had the issue regarding John signing the -- the HIPAA form been resolved?
A. I don't recall.
Q. Were you involved in any of the discussions regarding any changes to be made to the HIPAA forms?
A. I was not.
Q. Do you know if John signed the two forms that are referenced in Exhibit 5?
A. I don't recall.
Q. Did you have any other dealings with Mr. Nawara, any personal dealings with Mr. Nawara between the time of that interview in November of 2016 to present?
MS. MARMOR: Does that include the phone call or you mean one on one?
MR. BUSTAMANTE: One on one because I don't



think she -- the phone call, she says he never answered.
MS. MARMOR: Right. But she called -- she did leave a message.
MR. BUSTAMANTE: Personal.
A. I don't recall. 2:10:24
Q. Would Mr. Nawara have any reason to come back to see you at your office after the fitness for duty evaluation?
MS. MARMOR: Objection. Calls for speculation.
A. If he went for a fitness for duty evaluation, then more than likely, the Cook County Sheriff's Office would have received the results, and we would have called him to say we had the results for him to get the return to work paperwork, yes. I don't know if he would have gotten it, per se, from me, but he would have been called in to get the return to work paperwork because he would have had to be returned back to work.
Q. When you wrote this memorandum in August of 2017 -- or the referral form, I'm sorry, how many times had you seen John Nawara?
A. I don't recall. 2:11:28
Q. Had you seen him more than the one day that he came for the initial interview in -- in November of

2016?
A. I don't recall.
Q. Would you have had any other reason to see him between November 18th of 2016 and August 25 of 2017?
MS. MARMOR: Object to the form.
A. I don't -- I don't remember.
Q. When -- would you kindly read into our record the reason for referring?
A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed towards his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resource department."
Q. Did -- how did you come to the conclusion that the employee had been aggressive, physically intimidating, and had inappropriate behavior directed towards -- toward a superior officer?
MS. MARMOR: Object to the form. 2:12:47
A. Based on the discussion with his superior.
Q. Okay. What happened to the -- what you told us before, that those things are not facts that you consider, you don't consider them facts? Why did that change?



MS. MARMOR: Objection -- objection. Argumentative.
A. I was giving them all of the facts. That was not what went into play far as us deciding on the fitness for duty, his behavior was. I wanted to give CorVel all of the facts, so they can make an -- and -- and the provider all of the information, so they can make a decision. We -- it does us no good to send them for a fitness for duty and give them -- and don't give them all the information. I already had the information. I already knew. But that was not my decision in deciding on the fitness for duty. His behavior was our decision maker. But once again, we wanted them to have a clear understanding on why this referral was being made.
Q. Okay. When you say, "In addition," that, "weeks later, employee presented as aggressive and hostile in the human resources department," that's what you already described for us, correct?
A. Correct.
Q. Did you ever file a complaint against John with anyone for the behavior that he exhibited while you were interviewing him on November 18th, 2016?
MS. MARMOR: Objection. Lack of foundation.
A. No. 2:14:10



Q. Why not?
MS. MARMOR: Same objection.
A. I wouldn't have known what sort of complaint to try to file in a situation like this.
Q. Did you ask anyone as to whether or not you should file a complaint?
A. I did not.
Q. Did Ms. Reierson ever tell you that she was going to file a complaint?
A. She did not.
Q. Do you know what Mr. Nawara was doing between -- in terms of his employment, between September 16th, 2016 and the time of the interview at -- at HR in November 18th, 2016?
A. I don't recall.
Q. Did you know at one time?
A. I don't think I did. I --
Q. Would -- would his assignment --
MS. MARMOR: Wait, she --
Q. Oh, I'm sorry. I interrupted you.
A. I knew that he was a correction officer. That's what I knew. That was his position.
Q. Would part of your assessment for determining whether or not a fitness for duty evaluation was appropriate, was part of your assessment required to



determine his -- an individual, an employee's current assignment?
MS. MARMOR: I'm -- I'm -- I'm going to object to the form. There was a lot of words in there.
A. No. 2:15:43
Q. If the individual had, for months, a month and a half now, been assigned to outside services, where he is allowed to carry a weapon and escort inmates to and from different locations, would that have made any difference in your evaluation?
MS. MARMOR: Objection. Calls for speculation. Lack of foundation. And mischaracterizes the record.
A. No, it would not.
MR. BUSTAMANTE: Do you need a break?
MR. LINDEN: Mm-mm.
MR. BUSTAMANTE: Okay.
Q. Before John was called to human resources to meet with you and Ms. Reierson, was John provided with anything in writing regarding the reason why he was being called to HR?
MS. MARMOR: Objection. Lack of foundation.
A. Not -- not to my knowledge. 2:17:10
Q. Before coming to the interview at HR on November 18th, 2016, was John informed in writing of

what was considered the problematic behavior?
A. Not to my knowledge.
Q. When a Cook County Sheriff's Office employee is charged with improper work behavior by allegedly being aggressive, does that always result in a fitness for duty evaluation?
A. I don't know.
Q. Based on your experience in the time that you have been there and acting as the nurse that is part of the team that makes the decision for fitness for duty, when a CCSO employee is charged with improper behavior by allegedly being aggressive, that -- does that always result in a fitness for duty evaluation?
A. I don't know. 2:18:33
Q. When an employee is charged with aggressive behavior and you're making a determination as to whether or not to refer that person to -- for a fitness for duty evaluation, does it matter whether the person charged with making the charge of aggression is a supervisor or not?
MS. MARMOR: Objection. Lack of foundation.
A. No, it does not.
Q. Is it appropriate for a supervisor to have unwanted physical contact with -- with a subordinate?
MS. MARMOR: Object to the form. Lack of



foundation.
MS. KAMPER: Join.
A. I don't know what the policy is far as for the sheriff's department on that.
Q. Other than Shelby Number 7, have you prepared any other writing concerning John Nawara?
MS. MARMOR: Object to the form.
A. I don't recall. 2:20:16
MR. BUSTAMANTE: Okay. All right. I need to take a break. Is that okay?
MS. MARMOR: Yeah, of course.
MR. BUSTAMANTE: And you know what, I -- I think I only have about an hour or -- well less than an hour.
MS. MARMOR: Okay. Great.
MR. BUSTAMANTE: Like 40 minutes left. Can we just finish through without having a lunch break?
MS. MARMOR: Is that okay with you?
MR. LINDEN: That's fine.
WITNESS: Mm-hmm.
MR. BUSTAMANTE: Oh.
MS. MARMOR: Okay.
MR. BUSTAMANTE: That okay?
WITNESS: That's fine.
MS. MARMOR: The only caveat --



MR. LINDEN: Okay.
MS. MARMOR: -- is that I may get a phone call at --
MR. BUSTAMANTE: Okay.
MS. MARMOR: -- 1:00 --
MR. BUSTAMANTE: We can --
MS. MARMOR: -- that I have to take.
MR. BUSTAMANTE: -- break. That's fine.
MS. MARMOR: Yeah.
RECORDER: Off record, 12:33 p.m.
(Off the record)
RECORDER: On the record, 12:43 p.m.
Q. Okay. Let me show you Exhibit Number 8.
MR. BUSTAMANTE: And unfortunately, I only have one copy. It's the --
MS. KAMPER: That's --
MR. BUSTAMANTE: -- answers to interrogatories.
MS. KAMPER: No, that's all right.
MS. HONINGFORD: Okay.
MR. BUSTAMANTE: Apologize for that, but I didn't want to kill that many trees.
Q. Would you take -- take a look at the next to last page, page 21 of this document, please? Do you see that?



MS. MARMOR: No, I'm not there.
MR. BUSTAMANTE: Okay.
MS. MARMOR: Oh my goodness. Oh.
A. You said page 21?
Q. 21.
A. Yes.
Q. Okay. Is that your signature or a facsimile of your signature on that page?
A. Yes, it is.
Q. Would you please read the verification into our record?
A. "I, Winifred Shelby, declare under penalty of perjury, pursuant to USC --
MS. MARMOR: That's a section.
A. -- section" -- oh, "1746, that the foregoing Defendant Winifred Shelby answers to Plaintiff's first set of --
MS. MARMOR: "Interrogatories."
A. -- interrogatories directed to Defendant Winifred Shelby is true and correct. Executed on February 21st, 2018."
Q. So I'm going to ask you some questions about some of these interrogatories, okay?
A. Okay.
Q. Let's look at page 3, please. The last

Page 113

paragraph of that page, would you read that to yourself and onto page 4? Let me know when you're ready.
A. The whole page 4 --
Q. No, just the -- through the --
A. Okay.
Q. -- through the top. 2:24:25
A. Okay. I'm --
Q. You're set?
A. -- finished. Yes.
Q. Okay. Go back to page 3, please. Do you see that last paragraph, under numeral three, would you please read that into our record, just numeral three?
A. "Defendant Shelby had in-person conversations with Defendant Rebecca Reierson regarding the appropriateness of a fitness for duty evaluation for Plaintiff."
Q. Other than the conversation that you described from the time that Mr. Nawara left your office and came back with a union representative, have you had any other conversations with Ms. Reierson regarding the appropriateness of fitness for duty evaluation for Plaintiff?
A. I don't recall. 2:25:17
Q. If you had any other conversation with Ms. Reierson, other than the one I've just described or the

Page 114

time that I just described, would those be documented somewhere?
MS. MARMOR: Objection. Mischaracterizes exactly what the document says, which is that these were in person. I -- it says that they were in person, rather than documented, so it's a little bit --
MR. BUSTAMANTE: No, I understand that.
MS. MARMOR: Yeah.
MR. BUSTAMANTE: But my question is a little different. If she had, there were in-person conversations, but they -- would they be documented so she could later recall, "Oh, yeah, we had this in-person conversation."
MS. MARMOR: Right. I --
MR. BUSTAMANTE: Okay.
MS. MARMOR: -- my objection will stand.
A. Are -- are you asking would they have been documented -- not from me, no.
Q. Okay. You didn't keep any notes, any diary, any phone log, or anything like that --
A. No.
Q. -- saying, "Oh, I had a conversation on this date"?
A. No. 2:26:10
Q. Okay. How many -- look at number four. How

Page 115

many times did you have in-person conversations with Ms. Reierson regarding contacting Plaintiff regarding his fitness for duty examination?
A. I don't know.
Q. Did you keep documentations of any of those conversations regarding contacting Plaintiff for his fitness for duty examination?
A. I did not.
Q. Look at page 14, if you would, please. And look at the first -- the first full paragraph on that page, starts with "notwithstanding," just read that to yourself, please.
MS. MARMOR: You guys, if you want to read this, it starts at the bottom of the page and goes on the next page.
A. Okay.
Q. Done?
A. Yes. 2:28:14
Q. Other than yourself and -- let me restate -- restate -- or start all over again. In September of 2016, other than yourself and Ms. Reierson, did anybody else conduct interviews to make decisions -- with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?
MS. MARMOR: Object to the form. You said,

Page 116

"In September 2016."
MR. BUSTAMANTE: September 2016 is --
MS. MARMOR: Right.
MR. BUSTAMANTE: -- is what I said. Isn't that when -- the time of the -- oh -- let me -- let me restate. Thank you.
Q. Between September of 2016 and November of 2016, other than you and Ms. Reierson, was any other person conducting interviews with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?
A. I am unsure. 2:29:05
Q. Okay. Who else would -- would have been doing -- participating in that -- those interviews, besides you and Ms. Reierson?
MS. MARMOR: Object to the form.
A. If Ms. Reierson was not available, it would have been someone in HR management that would have did the interview with me.
Q. All right. And if you were not available, who replaced you?
A. Usually, I was always available to do them, I think, yes.
Q. Okay. Look at page 14, I want you to read, for yourself, interrogatory number 16 and the answer,

please, and let me know when you're done.
A. Okay.
Q. You're set?
A. Yes. 2:31:23
Q. Okay. At page 15, as part of your answer, would you read into the record the sentence that starts with "as reflected"? Third -- third line from the -- from the top.
A. "As reflected in document CCSO 000177, during the meeting, Plaintiff was uncooperative and appeared to be untruthful regarding an incident between himself and Defendant Jones-Hayes" --
Q. That's it.
A. Okay.
Q. Now in what way did John appear to be untruthful?
A. I don't recall now. 2:32:11
Q. Okay. Would you take a look at Exhibit Number 7, please, which is document CCSO 000177, and would you read into the record, please, where it says in that document that John was untruthful or appeared to be untruthful?
A. It does not say that.
Q. Look at page 15 and read to yourself interrogatory number 17 and your answer, please, then



I'll ask you a question about it.
MS. MARMOR: I'm sorry, what -- what are you asking about?
MR. BUSTAMANTE: I'm -- just to read first interrogatory number 17.
MS. MARMOR: 17, okay.
MR. BUSTAMANTE: And her answer.
Q. And then --
MS. MARMOR: Okay.
Q. -- when you're done, let me know, and I'll ask you a question.
A. Okay.
Q. Okay. Before April 2017, the forms needed -- that needed to be signed for a fitness for duty evaluation were provided by the sheriff's office?
MS. MARMOR: Object to the form and lack of foundation. 2:34:17
A. You said before --
Q. Well I'm asking you because -- okay, in this answer, it says -- when it says, "Notwithstanding," "Beginning April 2017, any forms that need to be signed are provided by CorVel."
A. Okay.
Q. Before that, were they provided by the sheriff's office?



MS. MARMOR: Object to -- objection. Lack of foundation.
A. In some cases. In most cases, they were, but they could go to CorVel also.
Q. Do you know when that change was made?
A. I do not.
Q. Was that your decision?
A. It was not.
Q. Did you participate or contribute to the decision to start using CorVel forms?
A. I did not.
Q. Okay. I'm done with that one. Here's Shelby Number 9.
MR. BUSTAMANTE: And again, I'm sorry, these are just answers to interrogatories --
MS. KAMPER: That's okay.
MR. BUSTAMANTE: -- I'm sorry I didn't make copies of all of them.
Q. If you would just read the interrogatory and answer to yourself, and then I'll ask you a couple of questions.
A. Okay. 2:36:39
Q. Ready?
A. Yes.
Q. Okay. Okay. Do you know Jeff Johnsen?



A. I do not.
Q. Do you know Johnice Brumfield-Greer?
A. I do not.
Q. Have you ever discussed John Nawara with either of those two people, Johnsen or Brumfield-Greer?
A. Not to my knowledge.
Q. Do you have personal -- do you have personal knowledge as to whether or not they know anything about John's case?
A. I don't know. 2:37:17
Q. Okay. This is Number 10, which is the Rule 26 disclosures.
MR. BUSTAMANTE: This one, I do have copies of. I don't know why you need them, but we have them.
MS. MARMOR: Sorry.
MR. BUSTAMANTE: They were short, I guess. 10, okay.
Q. We're going to go through these witnesses, I'm just going to simply ask you if you know these folks, okay?
A. Okay.
Q. Okay. So let's -- John Nawara, you do know?
A. Yes.
Q. Okay. Karen Jones-Hayes?
A. I --

Q. Have you ever met her?
A. No.
Q. Okay. Matthew Burke?
A. Yes.
Q. You do know him?
A. Yes.
Q. Have you ever discussed John Nawara's case with Matthew Burke?
A. No. 2:38:04
Q. Of course you know Rebecca Reierson, number four, right?
A. Yes. Yes.
Q. And you're number five. Who is Thomas Conley, do you know him?
A. I do not.
Q. Who is Barbie Gannon?
A. I don't know.
Q. We talked about Mr. Johnsen. Who is James Turrise?
A. I do not know.
Q. We talked about Johnice Brumfield-Greer. Other than these folks, do you know of any other Cook County Sheriff's employee that has knowledge about the facts concerning John's case?
A. I do not.



Q. Who is Karyn Williams?
A. She was the executive director of HR, human resources.
Q. Do you know when she left the sheriff's employ?
A. I do not. 2:38:53
Q. Did she leave before or after you left?
A. She was still there when I was there.
Q. Okay. Did you ever discuss John's case with Karyn Williams?
A. I don't recall.
Q. Did you ever discuss any requests for fitness for duty evaluations with Karyn Williams?
A. I don't recall.
Q. Did Karyn Williams have -- other than receiving the memo from Matthew Burke -- I think it's Matthew Burke, did Karyn Williams have any involvement in John Nawara's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you know if Ms. Williams made any decisions related to John's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:39:58
Q. Did you -- did I ask you this? Maybe not in



these words. I'm going to ask it again, I'm sorry. Did you have -- did you consult Ms. Williams regarding John's case?
A. I did not.
Q. Did you send any emails or memos to Ms. Williams regarding John's case?
MS. MARMOR: Objection. Lack of foundation, and the record will speak for itself.
A. I don't recall.
Q. Are you familiar with the concept of informed consent?
MS. MARMOR: Object to the form.
A. Yes.
Q. What is -- what is it?
A. That a person is giving consent based on the information that's provided to them.
Q. And when is -- in the practice of your profession, when does this come into play, informed consent?
MS. MARMOR: Same objection.
A. In -- when I think of an informed consent in -- in the practice of nursing, I usually think of it inform of treatment or procedures.
Q. By the way, just digressing just a little bit, have you ever heard of nursing diagnoses?



MS. MARMOR: Object to the form. 2:41:33
A. No.
Q. In the practice of nursing, do you know if informed consent is required for a psychiatric fitness for duty evaluation?
MS. MARMOR: Object to the form. Lack of foundation.
A. I don't know.
Q. Do you know if informed consent is required for a fitness for duty evaluation period?
MS. MARMOR: Same objection.
A. I don't know.
Q. Based on the information that you had at the time that you made the assessment that John should undergo a fitness for duty evaluation, what was it that you determined would make John need that evaluation?
MS. MARMOR: Objection. Asked and answered.
A. His behavior. 2:42:52
Q. What was --
A. His behavior.
Q. Other than that?
A. His behavior was 95 percent.
Q. What was the five percent?
A. Probably the write-up from his supervisor.
MR. BUSTAMANTE: Okay. I just need about two

minutes to consult with my co-counsel and --
MS. MARMOR: Sure.
MR. BUSTAMANTE: -- we're getting done. Okay?
RECORDER: Yep. Off record, 1:06 p.m.
(Off the record)
RECORDER: On record, 1:13 p.m.
Q. Ms. Shelby, have you ever seen Exhibit 11 before?
A. I'm sorry?
Q. Have you ever seen this document before?
A. I believe so.
Q. Okay. Was this sent to you on or about the date it bears?
MS. MARMOR: I don't think it actually bears a date. It just --
MR. BUSTAMANTE: It has --
MS. MARMOR: -- has the date of the exam.
MR. BUSTAMANTE: -- "date of report, 9/16/17."
MS. MARMOR: Oh, okay. Yeah.
A. I don't know. 2:44:01
Q. Okay. What was your reason for seeing this document?
A. Because I would have received it because it



would say if the person was fit to -- to return to work.
Q. You would have received it if it said he was fit to return to work or whether he -- they said he was not fit to return to work, you would have seen it as well, correct?
A. Correct.
Q. All right. So this is some -- a report that is then sent to you as the -- as the nurse for -- I forget what your title was?
A. Occupational health nurse.
Q. Occupational, yes, health --
A. Yes.
Q. -- services?
A. Health nurse.
Q. This was something that was sent to you because you were the nurse?
A. Yes. 2:44:40
Q. Okay. And I want to direct your attention to page CCSO 000113.
A. Okay.
Q. Would you please read into our record the response to number six?
A. "As described above, unfortunately, I cannot accept as fact what was summarized by human resources



seven weeks after the 9/26/2016 incident. Notwithstanding this issue, if indeed the incident transpired as Superintendent Jones-Hayes described, such transgressions of the code of conduct ought to be addressed through discipline, as it is not -- as it is my opinion that Officer Nawara was not suffering from any mental illness or other condition in need of treatment at the time of 9/26" -- I mean, "9/29/2016 incident that would account for such behavior. That is to say if he, in fact, conducted himself disrespectfully and threaten -- threateningly to Superintendent Hayes on 9/29/2016, treatment would not have been relevant in his particular case. Discipline is the best course of action going forward should such -- should any such behavior recur."
Q. And who signs this report? 2:46:32
A. The provider who's doing the assessment.
Q. And -- and the name is?
A. This one here is Diana S. Goldstein.
Q. A PhD, correct?
A. PhD, yes.
Q. And is she an independent evaluator?
A. Yes, she is.
MR. BUSTAMANTE: Okay -- she already said that.



MR. LINDEN: No, she -- okay.
MR. BUSTAMANTE: She already -- that's --
MR. LINDEN: Okay.
MR. BUSTAMANTE: -- the first thing she said.
MR. LINDEN: Okay. My bad. I don't remember.
MR. BUSTAMANTE: Okay. Anything else, Rick?
MR. LINDEN: No.
MR. BUSTAMANTE: Okay. You're done.
MS. MARMOR: Great. Thank you.
MR. BUSTAMANTE: Any questions?
MS. MARMOR: Oh. No, none. No. And we'll --
MR. BUSTAMANTE: Okay.
MS. MARMOR: And we'll reserve signature.
MR. BUSTAMANTE: Okay.
RECORDER: Off record, 1:16 p.m.
MR. BUSTAMANTE: So next one is Mr. Burke, I believe --
MR. LINDEN: Yeah, I told you --
MS. MARMOR: I think it's --

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Katie Jasinski
September 30, 2019

## A

**abnormally** 19:20
**above-entitled** 129:4
**Absolutely** 82:13
**Absurd** 35:16
**Academy** 14:12
**accept** 126:25
**accepted** 18:18
**access** 27:15 37:5, 37:11 46:2, 95:17 97:5
**account** 127:9
**Act** 29:15
**acting** 31:20 109:9
**action** 31:5 127:14
**ADA** 29:14 29:17, 29:21 29:24, 78:24
**adding** 103:3
**addition** 105:13 106:16
**additional** 37:14 37:19, 49:7
**address** 7:4, 9:4 102:7, 102:9 102:23
**addressed** 127:5
**advisors** 16:25
**afternoon** 64:10
**age** 12:5
**aggression** 109:19
**aggressive** 71:8 105:10, 105:14 105:17, 106:17 109:5, 109:12 109:15
**agree** 6:1, 6:2 100:14
**agreed** 9:6, 75:5
**agreement** 5:8 7:6
**ahead** 40:11 44:12, 81:18
**al** 1:11
**allegation** 99:15
**alleged** 99:16
**allegedly** 109:4 109:12
**allowed** 69:13 108:8
**Americans** 29:14
**amount** 56:12 56:15, 56:22
**anger** 99:16
**answer** 5:15 5:16, 6:4, 6:10 6:15, 69:14 84:18, 116:25 117:5, 117:25 118:7, 118:20 119:20
**answered** 42:11 45:5, 58:19 76:1, 76:20 95:22, 104:2 124:17
**answering** 62:19, 101:15
**answers** 72:15 111:17, 112:16 119:15
**anybody** 21:14 50:11, 79:20 115:21
**apartment** 9:7
**Apologize** 111:21
**appear** 97:15 117:15
**appearance** 4:11
**APPEARANC...** 2:1
**appeared** 117:10, 117:21
**appears** 47:25 54:12
**applicable** 5:9
**apply** 18:16 21:19
**appointment** 64:8, 64:13 64:19
**appointments** 63:22
**appropriate** 84:7, 94:21 98:1, 98:16 99:4, 100:1 100:10, 100:16 107:25, 109:23
**appropriateness** 113:15, 113:21
**approve** 17:1
**approximate** 79:22
**April** 89:15 92:21, 92:24 118:13, 118:21
**area** 9:14, 39:17 40:17
**argument** 88:18 88:19
**argumentative** 44:5, 53:14 55:15, 80:24 83:5, 88:15 106:2
**arose** 22:8
**aside** 44:21 45:3, 65:19
**asked** 42:11 45:5, 53:6 58:19, 62:24 69:5, 73:5, 73:6 76:1, 76:20 85:1, 95:22 124:17
**asking** 5:13 36:8, 42:24 62:16, 88:7 98:20, 99:22 114:17, 118:3 118:19
**assess** 34:6 48:12, 48:18
**assessed** 58:25
**assessing** 32:2 42:8
**assessment** 20:3 32:1, 32:15 32:19, 32:22 33:8, 33:14 33:22, 34:1 35:11, 35:11 36:21, 37:10 37:16, 37:21 40:5, 44:22 45:10, 48:25 52:25, 53:7 56:16, 59:9 63:17, 65:2 76:18, 76:19 90:5, 107:23 107:25, 124:14 127:17
**assigned** 14:9 108:7
**assignment** 21:1 21:2, 107:18 108:2
**assist** 17:5
**assume** 91:23 98:15
**Assumes** 87:5
**assuming** 98:14 99:3
**attached** 87:8
**attack** 70:1 70:4
**attempting** 81:1
**attention** 47:1 126:19
**attorney** 25:22 57:11
**Attorney's** 2:21 3:3
**attorneys** 4:10
**August** 55:8 104:20, 105:4
**available** 34:20 60:20, 116:17 116:20, 116:22

## B

**bachelor's** 10:7
**back** 19:9, 19:20 20:15, 20:17 45:18, 45:25 61:22, 73:3 74:22, 74:25 76:22, 77:22 78:5, 79:3 79:16, 79:17 79:24, 80:12 85:6, 93:4, 93:8 93:14, 101:3 104:7, 104:19 113:10, 113:19
**background** 6:23
**bad** 128:5
**Banks** 3:11
**Barbie** 121:16
**base** 53:15
**based** 16:21 16:24, 33:18 33:21, 72:15 96:5, 96:5 105:21, 109:8 123:15, 124:13
**basic** 37:25
**basing** 72:15
**basis** 35:10
**Beach** 22:23 22:23
**Beacham** 22:23 23:2, 23:13 23:18, 23:21 23:22

**bearing** 61:7
**bears** 125:14 125:15
**becoming** 11:12
**bedside** 11:7 13:10
**beginning** 77:18 77:20, 118:21
**behalf** 4:4, 4:12 4:14, 4:16, 4:19 4:21
**behave** 68:20 75:14
**behavior** 31:5 35:2, 35:4, 35:9 35:12, 35:21 35:25, 36:3 36:14, 59:22 68:6, 75:10 99:15, 105:11 105:18, 106:5 106:13, 106:22 109:1, 109:4 109:11, 109:16 124:18, 124:20 124:22, 127:9 127:15
**beings** 6:7
**Beka** 4:18
**believe** 9:12 13:12, 13:13 14:3, 14:5 18:11, 20:8 22:23, 23:9 23:10, 23:16 23:24, 24:20 26:10, 30:17 41:7, 50:3 51:22, 52:6 52:7, 52:16 52:20, 53:20 53:22, 55:8 65:4, 65:4 66:18, 67:5 67:19, 68:11 68:15, 68:17 68:18, 69:3 69:4, 70:13 72:23, 73:6 73:7, 73:11 75:4, 76:3 77:12, 79:5 81:2, 81:3, 81:3 81:11, 89:13 92:20, 97:9 125:12, 128:19
**best** 67:20 127:14
**better** 24:10 24:12, 31:18 31:21
**big** 26:24
**bigger** 38:24
**birth** 6:25 102:6, 102:22 103:4
**bit** 6:22, 10:25 26:16, 30:2 61:9, 114:6 123:25
**black** 70:12
**blaming** 41:25
**blood** 19:18 31:19
**Blue** 15:18 15:18, 15:24 15:25, 16:2 16:2
**board** 14:5, 14:6 14:14, 14:17 14:19, 14:21 23:14
**body** 70:20 70:23
**born** 9:16
**bottom** 87:16 115:14
**break** 46:17 85:15, 85:16 85:20, 93:19 108:15, 110:10 110:17, 111:8
**breaks** 86:12
**bring** 19:4
**Brumfield-Greer** 120:2, 120:5 121:21
**BSN** 10:22 11:22
**build** 70:14
**building** 38:22 39:19, 39:20 39:22
**Bureau** 20:25
**Burke** 3:8, 4:18 48:2, 54:18 57:2, 57:3, 57:7 121:3, 121:8 122:16, 122:17 128:18
**business** 95:25
**Bustamante** 1:22, 2:4, 2:5 3:19, 4:12, 4:12 5:1, 5:5, 5:12 9:6, 32:6, 32:8 32:12, 35:17 35:19, 46:16 46:19, 47:17 49:17, 56:15 56:20, 59:24 60:2, 60:7, 60:9 66:8, 66:10 66:12, 69:15 69:17, 69:19 72:17, 78:11 83:6, 85:25 86:6, 86:9 86:11, 86:14 89:2, 89:6 89:23, 90:10 90:12, 90:16 92:23, 93:15 93:18, 94:8 98:20, 102:17 103:25, 104:5 108:15, 108:17 110:9, 110:12 110:16, 110:21 110:23, 111:4 111:6, 111:8 111:14, 111:17 111:21, 112:2 114:7, 114:9 114:15, 116:2 116:4, 118:4 118:7, 119:14 119:17, 120:13 120:16, 124:25 125:3, 125:17 125:19, 127:24 128:2, 128:4 128:7, 128:9 128:11, 128:14 128:16, 128:18

## C

**cabinet** 77:22 78:2, 78:6
**calendar** 63:4 63:11
**California** 38:22
**call** 27:13, 43:2 54:1, 54:25 56:1, 62:1 62:20, 62:21 77:3, 84:20 84:23, 85:1 85:1, 85:6 103:23, 104:1 111:3
**called** 20:15 20:17, 36:23 40:5, 56:17 62:24, 104:3 104:15, 104:18 108:18, 108:21
**calling** 68:6 84:24, 85:6 85:8, 85:9, 85:9
**calls** 46:4, 48:21 49:3, 59:2 60:22, 82:19 88:23, 96:3 97:16, 98:5 98:12, 98:23 100:12, 100:19 100:25, 104:10 108:11
**Calumet** 9:19
**care** 11:16 13:10, 15:20 17:4, 26:24 27:5, 27:9 27:15, 27:18 27:19, 27:21 27:22, 29:7 29:10, 41:24 75:12, 87:17 87:24
**career** 28:7
**carry** 108:8
**case** 1:9, 3:22 15:22, 16:10 16:12, 17:2 17:25, 18:2 27:12, 38:13 40:20, 40:20 53:13, 93:10 93:11, 93:13 93:17, 95:12 97:4, 120:9 121:7, 121:24 122:9, 122:18 122:22, 123:3 123:6, 127:13
**cases** 31:23 73:15, 119:3 119:3
**causing** 31:4
**caveat** 110:25
**CCSO** 109:11 117:9, 117:19 126:20
**censured** 24:13 24:18
**certain** 63:16 63:19

**CERTIFICAT...** 129:1
**certify** 129:2
**chain** 50:25
**chair** 73:21
**chairs** 66:5 66:13
**chance** 73:12 86:18
**change** 105:25 119:5
**changed** 17:23
**changes** 103:14
**charge** 62:21 109:19
**charged** 109:4 109:11, 109:15 109:19
**chart** 43:5, 43:6
**charted** 46:9
**checked** 87:17
**checking** 85:23
**checkmark** 87:19
**Chicago** 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 9:13, 9:17 14:17, 41:5
**chief** 20:25, 48:2
**child** 12:5
**children** 12:1
**circular** 83:3
**Civil** 5:9
**cleaning** 96:15 96:16, 96:17
**clear** 49:18 74:10, 93:10 93:11, 106:14
**closed** 74:4
**Club** 7:3
**co-counsel** 125:1
**co-Defendants** 38:9, 38:12
**code** 127:4
**coffee** 86:12
**colored** 70:13
**column** 99:19
**columns** 101:4
**come** 19:4 34:25, 39:19 39:19, 45:18 45:25, 49:6 53:12, 62:10 63:4, 63:5 63:16, 63:16 64:7, 65:1 65:13, 66:15 72:9, 93:4, 93:8 104:7, 105:16 123:18
**comes** 25:10 33:9, 61:21 72:9
**coming** 19:9 39:22, 63:19 74:21, 93:14 96:15, 108:24
**command** 50:25
**comment** 100:3
**comments** 92:11 94:11, 94:12 94:20, 98:8 99:25
**community** 17:7
**company** 14:4 15:5, 15:6 41:21, 79:9
**complaint** 60:17 106:21, 107:3 107:6, 107:9
**complete** 6:4 6:9, 6:15, 61:3 83:24, 96:10
**completely** 53:4 98:22
**completes** 4:23
**complied** 78:21 78:24
**component** 31:24, 32:4 32:4, 33:12 33:13, 33:17 33:20, 34:21 35:4
**components** 30:16, 30:17 31:17
**computer** 89:9
**computerized** 91:1, 91:2, 91:9 95:17
**concept** 123:10
**concern** 19:25 75:23
**concerned** 29:1
**concerning** 30:5 47:3, 49:21 57:22, 58:22 68:8, 75:11 110:6, 121:24
**concerns** 55:21 68:6
**conclusion** 96:3 105:16
**condition** 127:7
**conduct** 42:25 115:22, 127:4
**conducted** 127:10
**conducting** 49:20, 116:9
**confidential** 1:16, 7:6, 8:1 8:3, 8:25, 9:5
**confusing** 5:24
**confusion** 31:6
**Conley** 121:14
**consent** 27:9 45:6, 123:11 123:15, 123:19 123:21, 124:4 124:9
**consider** 71:8 105:24, 105:24
**considered** 109:1
**constantly** 26:25
**consult** 123:2 125:1
**contact** 102:7 102:23, 109:24
**contacting** 115:2, 115:6
**contain** 45:4 45:6, 45:9 45:12
**contained** 58:1 59:6, 96:7
**contemporaneo...** 93:13
**Continuation** 9:1
**continue** 10:4
**contract** 30:10
**contribute** 119:9
**conversation** 5:22, 6:6, 52:2 52:5, 52:9 52:12, 52:15 57:19, 57:24 62:8, 63:19 66:24, 67:7 67:10, 67:13 67:15, 72:25 75:21, 75:22 75:24, 76:7 76:9, 76:11 113:17, 113:24 114:13, 114:22
**conversations** 58:2, 67:2 113:13, 113:20 114:11, 115:1 115:6
**convicted** 25:15 25:17
**Cook** 1:11, 2:21 3:1, 3:3, 3:21 3:22, 3:22, 4:22 18:6, 18:9 18:13, 18:21 19:23, 20:10 25:12, 38:18 50:12, 51:1 87:16, 87:23 93:2, 93:7 102:11, 102:13 104:13, 109:3 121:22
**coordinating** 16:12
**coordinator** 15:20, 16:10
**copied** 83:16 83:18, 84:12
**copies** 119:18 120:13
**copy** 48:19, 49:2 60:5, 82:15 82:17, 83:12 85:13, 111:15
**correct** 18:21 23:19, 23:20 29:25, 32:17 32:20, 33:2 35:23, 35:24 43:23, 43:24 48:6, 48:7, 48:9 49:24, 51:4 51:5, 54:19 54:20, 61:1 61:6, 72:17 77:1, 77:17 86:21, 86:24 86:25, 87:1 87:9, 87:10 87:14, 89:16 89:17, 91:20 91:21, 91:24 92:8, 95:16 97:6, 98:10 98:13, 99:17 99:23, 100:17 100:23, 106:19 106:20, 112:20 126:6, 126:7

127:20, 129:2
**correction** 107:21
**correctly** 28:1 62:19
**CorVel** 45:1 45:8, 79:9 81:23, 81:25 82:4, 82:8, 82:9 84:3, 87:4, 87:4 100:9, 101:21 106:6, 118:22 119:4, 119:10
**CorVel's** 84:3
**counsel** 38:7 91:5
**Country** 7:3
**County** 1:11 2:21, 3:1, 3:3 3:21, 3:22, 4:22 18:6, 18:9 18:13, 18:22 19:1, 19:23 20:10, 25:13 38:19, 50:12 51:1, 87:16 87:23, 93:2 93:7, 102:11 102:13, 104:13 109:3, 121:23
**couple** 119:20
**course** 18:19 47:17, 56:20 110:11, 121:10 127:14
**courses** 12:14 12:16
**court** 1:1, 5:10 89:4
**cover** 34:7
**create** 44:17 98:24, 101:15
**created** 48:25
**crime** 25:17
**Cross** 13:3, 13:7 13:11, 13:20

15:18, 15:25 16:2
**cubicle** 39:5
**current** 108:1
**curriculum** 12:18
**CVS** 9:19

**D**

**Dart** 3:8
**date** 5:7, 6:25 52:2, 54:15 54:22, 62:24 63:6, 64:17 84:22, 91:20 91:22, 94:13 97:10, 102:6 102:6, 102:13 102:19, 102:20 102:22, 103:3 103:4, 103:5 114:23, 125:14 125:16, 125:18 125:19
**dated** 86:23
**Dawn** 54:13
**day** 39:12, 56:25 74:19, 104:24
**dealings** 103:19 103:20
**death** 41:1, 42:1
**December** 20:8 92:20
**decide** 53:13 73:8
**decided** 42:22 73:13, 73:14 77:7, 98:9 100:9, 100:16 101:2, 101:8 101:12
**deciding** 106:4 106:12
**decision** 32:11 32:24, 33:4

34:19, 53:18 53:21, 61:8 75:1, 92:11 97:19, 98:2 98:3, 99:19 100:15, 106:8 106:12, 106:13 109:10, 119:7 119:10
**decisions** 115:22 115:23, 116:10 122:22
**declare** 112:12
**Defendant** 2:19 3:1, 112:16 112:19, 113:13 113:14, 117:12
**Defendants** 1:13 3:8
**defines** 69:23
**definitely** 75:15
**degree** 10:7
**demeanor** 80:12
**department** 21:16, 22:24 36:20, 48:16 57:9, 90:9 90:10, 90:13 90:15, 90:24 105:15, 106:18 110:4
**depends** 31:12
**deposition** 1:15 1:16, 3:20, 4:4 5:6, 25:20, 38:7 38:10, 41:11 47:16, 57:13
**describe** 68:14 69:24, 70:10
**described** 106:19, 113:18 113:25, 114:1 126:24, 127:3
**description** 102:7, 102:24
**descriptions**

91:19, 92:16
**designated** 7:5
**designating** 9:4
**desk** 39:21 65:10, 65:12 65:25, 66:2 66:6, 66:13 66:14, 68:23 69:1
**detailed** 50:3 50:4, 53:8
**determination** 34:11, 34:17 36:19, 44:2 73:13, 76:23 109:16
**determine** 38:3 38:3, 42:8 43:12, 45:13 75:2, 108:1
**determined** 49:5, 124:16
**determining** 107:23
**develop** 42:22
**developed** 42:18
**diagnoses** 19:12 123:25
**diagnosis** 19:6
**Diana** 127:19
**diary** 63:11 114:19
**difference** 31:25 33:12, 33:13 33:16, 108:10
**different** 28:8 34:1, 36:10 49:16, 59:25 93:5, 108:9 114:10
**differently** 31:7 72:6
**difficulty** 47:5
**diffuse** 81:3 81:4
**digressing**

123:24
**direct** 126:19
**directed** 105:11 105:18, 112:19
**directing** 47:1
**directive** 105:13
**directives** 21:19
**directly** 39:2 64:20, 81:23 81:25, 82:4 82:8, 84:3
**director** 48:1 122:2
**Disabilities** 29:14
**disciplinary** 94:21, 98:1 98:17, 99:5
**discipline** 127:5 127:13
**disclose** 27:9
**disclosed** 27:6
**disclosure** 27:14 95:25, 96:11 96:11, 96:13 96:14
**disclosures** 120:12
**discrimination** 60:16
**discuss** 85:12 122:9, 122:12
**discussed** 73:7 75:4, 100:1 120:4, 121:7
**discussion** 50:2 75:7, 76:16 98:6, 105:21
**discussions** 103:13
**dishonesty** 25:18
**disrespectfully** 127:11
**distinction** 30:20, 30:21

**District** 1:1, 1:2 3:23, 5:10, 5:11
**division** 1:3 3:24, 21:4
**Dixon** 14:12
**doctor** 19:21 19:22, 31:19
**doctor's** 19:3 19:4, 33:18
**document** 46:15 47:20, 47:23 48:1, 48:3, 48:8 48:19, 48:24 49:2, 49:10 49:13, 57:16 58:18, 58:21 58:24, 60:11 60:19, 60:24 89:8, 89:10 89:14, 91:3 93:2, 93:5, 93:7 101:16, 101:19 101:23, 103:6 103:8, 111:24 114:4, 117:9 117:19, 117:21 125:11, 125:24
**documentation** 47:25, 49:13 62:9, 62:23 62:25, 63:2 63:11, 63:22
**documentations** 115:5
**documented** 114:1, 114:6 114:11, 114:18
**documents** 25:23, 49:14 59:11, 93:17 98:24
**doing** 6:15 16:14, 16:15 17:3, 17:17 17:17, 18:1 19:1, 79:12 96:16, 107:11 116:14, 127:17
**Donahue** 21:11 21:11
**door** 39:5, 39:6 39:18, 39:20 64:22, 74:4 74:7, 74:9 74:13
**drafted** 78:8
**drafting** 78:16
**drink** 86:12
**Drive** 3:12, 8:2
**due** 24:22, 24:23 24:23
**duties** 16:8 17:15, 21:7 21:16, 30:14
**duty** 20:1, 26:3 30:3, 30:7 30:12, 30:16 30:24, 31:8 31:13, 32:2 32:15, 32:17 34:7, 35:13 36:21, 37:10 37:16, 37:22 38:1, 40:6, 42:9 43:1, 44:16 44:22, 45:2 45:14, 46:1 48:5, 48:13 48:18, 49:2 49:22, 50:5 50:7, 50:12 50:17, 50:21 50:25, 51:4 51:7, 51:15 52:25, 53:2 53:8, 53:11 53:24, 55:21 55:24, 56:17 58:23, 59:1 59:11, 65:3 73:2, 73:15 73:16, 75:3 75:6, 76:19 76:25, 77:9 79:7, 79:8, 80:4 80:8, 81:8 82:24, 88:2 89:15, 90:5 90:6, 90:20 95:11, 97:2 97:21, 97:24 100:10, 101:21 104:8, 104:12 106:5, 106:9 106:12, 107:24 109:6, 109:10 109:13, 109:18 113:15, 113:21 115:3, 115:7 115:24, 116:10 118:14, 122:13 124:5, 124:10 124:15

**E**

**e-v-a-l** 94:4
**Eastern** 1:3 3:24
**education** 9:24 10:4, 10:23 14:5, 14:7 14:15, 14:17 14:19, 14:22
**effect** 76:5 81:12, 90:21 90:22, 90:23
**either** 24:1 95:13, 120:5
**el** 3:22
**elaborate** 21:8 40:12
**Elementary** 14:12, 14:13
**elements** 76:18
**elevator** 39:23
**else's** 98:3
**email** 54:12 54:15, 62:2 62:7, 83:13 83:15
**emails** 123:5
**emergency** 18:2
**emphasized** 28:9
**employ** 122:5
**employee** 19:7 19:13, 30:9 37:15, 37:20 38:4, 42:8 42:14, 42:14 44:21, 44:25 45:7, 50:12 51:1, 56:1 56:23, 56:24 58:25, 59:10 59:16, 59:20 61:16, 61:21 62:3, 82:3 84:12, 91:24 92:7, 100:9 102:22, 102:23 103:3, 105:13 105:17, 106:17 109:3, 109:11 109:15, 121:23
**employee's** 59:21, 59:21 82:23, 100:1 102:1, 102:6 105:10, 108:1
**employees** 19:2 26:1, 37:6 37:11, 66:3 82:7, 82:12 89:18, 90:4 115:23, 116:9
**employment** 10:25, 13:1 13:2, 13:18 15:3, 15:12 15:14, 15:17 18:13, 19:13 19:23, 107:12
**entire** 62:13
**entries** 91:16 92:16, 93:1 93:25, 95:2
**entry** 94:12 94:24, 98:15 98:16, 98:21
**environment** 75:15
**ER** 17:25
**Ertler** 54:13
**escort** 108:8
**et** 1:11
**Eval** 94:4
**evaluate** 51:14
**evaluated** 34:10 36:18, 48:13 49:1, 73:2 75:16, 90:20
**evaluates** 30:11
**evaluation** 30:7 30:25, 31:8 32:3, 32:15 32:17, 33:11 34:7, 34:16 35:14, 36:22 37:22, 38:1 40:6, 42:10 43:23, 44:16 45:14, 49:22 50:7, 50:12 50:18, 50:21 51:1, 51:7, 53:2 53:12, 56:1 56:17, 58:23 59:11, 63:17 75:3, 76:19 76:25, 77:9 79:12, 80:4 80:8, 88:2 88:20, 90:6 104:9, 104:12 107:24, 108:10 109:6, 109:13 109:18, 113:15 113:22, 115:24

116:11, 118:15 124:5, 124:10 124:15, 124:16
**evaluations** 30:3 43:1, 46:2 55:21, 55:25 122:13
**evaluator** 100:8 127:22
**event** 44:14 97:11, 97:15
**events** 43:4 43:13, 47:3
**everybody** 97:5
**evidence** 87:6
**exact** 11:19
**exactly** 23:15 43:6, 68:7 70:22, 91:11 114:4
**exam** 10:20 125:18
**examination** 4:25, 10:13 115:3, 115:7
**example** 5:22 28:22, 42:25 62:20, 63:3
**Excuse** 69:8
**Executed** 112:20
**executive** 48:1 122:2
**exercise** 75:1
**Exhibit** 4:4 47:16, 54:11 57:14, 59:12 59:23, 60:10 61:6, 103:17 111:13, 117:18 125:8
**exhibited** 106:22
**expecting** 63:15 65:13
**experience** 28:16, 56:5 56:18, 96:5 109:8
**explain** 28:17 34:23, 67:16 68:5, 71:4, 73:1 80:6, 80:15 80:18, 81:1
**explained** 77:13 77:14, 79:5
**explanation** 53:9, 53:10
**express** 45:23
**eye** 73:18, 73:20

F

**face** 70:5
**facility** 29:8
**facsimile** 112:7
**fact** 36:7, 38:10 64:12, 68:7 93:12, 126:25 127:10
**factors** 56:23
**facts** 87:5 105:23, 105:24 106:3, 106:6 121:24
**familiar** 26:18 26:20, 26:22 29:17, 29:20 123:10
**familiarity** 29:23
**far** 27:5, 27:7 27:14, 106:4 110:3
**February** 86:23 112:21
**Federal** 5:9
**feel** 6:13, 36:16 44:8, 71:12 71:14, 71:16
**feeling** 70:3
**felony** 25:15
**felt** 44:13, 49:7 75:5
**FFD** 63:17 94:20, 97:19 97:23, 97:25 98:16, 99:4 99:16, 99:16 99:22, 99:25 100:3, 100:16 100:22, 100:23 100:23, 101:2 101:8, 101:8 101:12, 101:13
**field** 25:7
**figure** 32:9
**file** 44:17, 44:21 44:21, 44:24 45:4, 46:1, 46:3 77:22, 78:2 78:6, 82:24 83:2, 83:3 106:21, 107:4 107:6, 107:9
**files** 37:6, 37:11
**fill** 21:17, 43:3
**filled** 77:14
**Finally** 6:18
**find** 31:19 31:22, 93:5
**finding** 36:7 68:7
**fine** 85:19 110:19, 110:24 111:8
**finish** 6:3 110:17
**finished** 113:9
**fired** 24:6
**first** 11:4, 15:20 20:21, 24:20 27:3, 30:15 32:11, 39:17 39:20, 47:15 48:8, 52:19 63:8, 65:22 65:23, 66:16 67:8, 68:22 72:8, 72:12 72:20, 73:19 79:24, 91:18 91:23, 92:5 93:25, 99:22 112:16, 115:10 115:10, 118:4 128:4
**fit** 19:23, 30:12 38:4, 126:1 126:4, 126:5
**fitness** 20:1 26:3, 30:3, 30:7 30:16, 30:24 31:8, 31:13 32:2, 32:15 32:16, 34:7 35:13, 36:21 37:10, 37:16 37:22, 37:25 40:6, 42:9 42:25, 44:16 44:22, 45:1 45:14, 46:1 48:5, 48:13 48:18, 49:1 49:21, 50:5 50:6, 50:11 50:17, 50:21 50:25, 51:3 51:7, 51:14 52:25, 53:2 53:8, 53:11 53:23, 55:21 55:24, 56:16 58:23, 58:25 59:10, 65:2 73:1, 73:15 73:16, 75:3 75:6, 76:19 76:24, 77:8 79:7, 79:8, 80:3 80:8, 81:8 82:23, 88:2 89:15, 90:5 90:6, 90:19 95:11, 97:2 97:21, 97:24 100:10, 101:21 104:8, 104:12 106:5, 106:9 106:12, 107:24 109:5, 109:10 109:13, 109:17 113:15, 113:21 115:3, 115:7 115:23, 116:10 118:14, 122:12 124:4, 124:10 124:15
**five** 121:13 124:23
**floor** 40:2
**folks** 16:6 120:20, 121:22
**followed** 52:24
**following** 7:5 55:20
**foregoing** 112:15, 129:2
**forget** 126:10
**forgot** 57:10
**form** 19:16 24:15, 28:13 36:25, 37:17 38:2, 39:14 42:21, 43:3 43:9, 43:16 44:18, 45:16 46:5, 46:11 49:11, 50:9 50:22, 51:17 53:4, 55:10 55:22, 57:8 59:2, 59:13 60:15, 60:17 61:2, 62:12 63:12, 66:17 74:17, 77:11 82:9, 83:13 84:3, 87:4

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 356 of 657 PageID #:4341



89:12, 90:7
91:12, 101:20
101:24, 101:25
102:2, 102:3
102:12, 102:13
102:25, 103:11
104:21, 105:6
105:20, 108:4
109:25, 110:7
115:25, 116:16
118:16, 123:12
124:1, 124:6
**formal** 9:24
10:4, 10:23
**forms** 21:18
26:1, 45:6
72:22, 77:3
77:9, 77:14
77:16, 77:17
77:19, 77:21
78:3, 78:7
78:13, 78:16
78:18, 78:20
78:23, 82:4
84:2, 87:3, 87:8
87:11, 87:22
103:14, 103:16
118:13, 118:21
119:10
**formulating** 6:3
**forward** 127:14
**found** 18:12
**foundation**
34:18, 37:12
44:23, 47:24
48:4, 48:14
49:12, 50:8
51:8, 55:5, 56:2
59:3, 60:21
61:3, 61:14
62:5, 63:13
65:14, 72:14
79:1, 84:18
87:20, 88:24
90:8, 91:25
92:21, 94:2
94:6, 94:25
96:2, 96:10
96:23, 97:8
98:4, 98:11
98:23, 99:20
100:6, 100:11
100:18, 100:25
101:14, 106:24
108:12, 108:22
109:21, 110:1
118:17, 119:2
122:19, 122:23
123:7, 124:7
**four** 11:23, 15:2
78:3, 114:25
121:11
**front** 65:20
66:14, 78:4
91:3
**full** 115:10
**full-time** 15:11
18:5
**further** 36:18

**G**

**Gannon** 121:16
**gather** 36:6
**GED** 9:25, 10:1
10:3
**general** 11:7
29:23, 30:15
90:9, 90:10
**gesture** 71:2
**gestures** 70:16
70:18, 70:21
**getting** 29:4
31:14, 125:3
**gist** 75:21
**give** 6:15, 13:12
13:25, 19:6
19:8, 19:18
19:21, 27:8
28:18, 28:22
41:9, 53:25
54:3, 79:11
106:5, 106:9
106:9
**given** 25:6, 70:2
70:4, 84:2
87:11
**giving** 38:10
106:3, 123:15
**go** 9:18, 13:20
14:1, 14:3
14:20, 16:3
16:24, 17:12
18:9, 18:16
19:13, 20:1
22:5, 22:8, 26:2
27:1, 27:16
29:9, 36:17
39:18, 40:11
42:7, 44:12
47:18, 66:16
68:5, 68:11
73:3, 73:9, 75:6
79:7, 81:18
81:23, 81:25
82:3, 82:14
82:23, 83:3
84:3, 87:3
89:22, 92:24
101:3, 113:10
119:4, 120:18
**goes** 16:18, 27:5
27:8, 27:14
92:20, 115:14
**going** 5:13, 6:5
21:16, 29:5
30:25, 31:5
34:20, 42:9
42:12, 42:25
43:1, 43:2, 43:3
43:4, 43:5, 44:2
44:15, 46:25
47:15, 53:3
53:25, 59:24
63:4, 65:3, 65:5
65:6, 65:7
67:21, 72:13
73:8, 73:14
76:24, 77:8
79:6, 79:7
79:12, 79:14
81:8, 84:17
92:18, 92:21
92:23, 93:19
93:22, 98:14
107:9, 108:3
112:22, 120:18
120:19, 123:1
127:14
**Goldstein**
127:19
**good** 3:16, 6:22
35:20, 106:8
**goodness** 16:5
112:3
**gotten** 104:17
**graduate** 9:21
9:22
**graduating**
10:22
**Grant** 14:22
14:23, 15:3
**Great** 110:15
128:10
**greeted** 65:19
**guess** 6:18
120:16
**guessing** 74:11
**guidelines** 16:21
16:22, 16:24
**guy** 31:17, 31:20
65:20
**guys** 115:13

**H**

**hair** 70:12
**half** 6:10, 55:25
94:9, 108:7
**hand** 4:8, 88:13
**handles** 79:10
**Handwriting**
60:1
**happen** 46:10
68:20, 88:12
**happened** 22:16
79:3, 105:22
**happening**
73:18
**harassment**
60:16, 60:17
**hard** 83:12
**harm** 27:11
38:4, 75:17
**Hayes** 127:12
**head** 23:3, 90:15
**header** 102:17
102:19, 102:19
**headers** 102:15
102:18
**health** 12:17
16:4, 17:4, 17:4
18:24, 19:15
19:16, 21:2
26:24, 27:5
27:9, 27:15
27:22, 29:7
30:11, 31:11
31:21, 87:17
87:24, 88:20
88:21, 126:11
126:12, 126:15
**hear** 69:9
**heard** 123:25
**heart** 19:19
**held** 98:6
**help** 27:4, 93:20
**hernia** 88:19
88:21
**Hi** 68:2
**high** 9:18, 9:20
9:21, 9:22, 11:1
19:20
**higher** 27:13
**Hills** 7:3
**HIPAA** 19:5
19:11, 26:16
26:16, 26:20
26:22, 26:24
27:1, 27:3, 27:4

27:14, 27:24
28:1, 28:5, 28:8
28:12, 28:18
29:6, 78:21
96:6, 103:11
103:14
**hire** 25:10
**hired** 23:3, 23:9
**hires** 19:15
**hiring** 23:16
**history** 13:18
19:17, 43:5
**hold** 12:20
**Holy** 13:3, 13:7
13:11, 13:20
**home** 102:7
102:23
**Honingford** 3:2
4:21, 4:21
111:20
**honor** 19:14
**hope** 86:14
**hospital** 11:6
13:3, 14:22
14:23, 15:4
16:18, 17:6
17:19, 17:24
27:19, 41:16
41:17, 41:19
41:20
**hostile** 105:14
106:18
**hour** 26:13, 94:9
110:13, 110:14
**house** 9:7, 9:8
**HR** 20:2, 20:25
21:2, 21:4
21:15, 22:3
22:24, 23:4
33:7, 37:5
38:18, 38:25
39:3, 39:7
39:12, 39:12
39:17, 39:18
39:20, 39:23
40:1, 40:3
40:17, 48:11
48:16, 49:6
55:4, 55:13
62:4, 62:9
62:12, 62:14
62:22, 63:10
63:17, 65:2
75:11, 90:8
95:10, 95:21
98:7, 100:14
100:15, 107:13
108:21, 108:24
116:18, 122:2
**huffing** 80:17
**Huh** 24:2, 86:9
**human** 6:7
20:25, 48:2
105:14, 106:18
108:18, 122:2
126:25

**I**

**Illinois** 1:2, 1:25
2:8, 2:16, 2:24
3:6, 3:14, 3:20
3:24, 5:11, 7:3
9:17, 10:14
15:18, 41:3
41:4
**illness** 127:7
**imagine** 31:7
**immediately**
73:13, 73:14
**important** 28:9
**improper** 109:4
109:11
**in-person**
113:13, 114:10
115:1
**inappropriate**
105:11, 105:18
**incident** 34:21
57:22, 58:3
117:11, 127:1
127:2, 127:9
**include** 36:1
103:23
**includes** 35:25
**including** 36:4
**Indeed.com**
18:15
**independent**
30:10, 30:10
73:2, 127:22
**individual** 32:14
35:12, 43:8
43:10, 43:20
43:21, 62:10
62:22, 62:24
63:16, 102:1
108:1, 108:6
**individualized**
103:2
**individuals**
43:12, 63:4
**inform** 62:8
80:2, 123:23
**information**
4:24, 19:6
19:12, 27:10
28:18, 29:7
29:12, 33:18
33:19, 36:22
37:15, 37:20
45:12, 49:8
51:12, 53:24
53:25, 54:5
72:16, 81:22
87:17, 87:24
95:24, 96:6
96:18, 97:1
97:6, 102:1
102:7, 106:7
106:10, 106:11
123:16, 124:13
**informed** 61:12
61:17, 61:19
61:25, 62:3
62:6, 62:7
62:10, 81:21
82:2, 108:25
123:10, 123:18
123:21, 124:4
124:9
**initial** 19:19
19:25, 104:25
**Initially** 53:6
**inmates** 108:9
**institution** 10:8
**instruction** 5:17
**interaction**
28:24
**interoffice** 62:2
**interrogatories**
111:18, 112:18
112:19, 112:23
119:15
**interrogatory**
116:25, 117:25
118:5, 119:19
**interrupt** 6:6
**interrupted**
6:14, 107:20
**interrupting**
69:8
**intertwined**
30:23
**interview** 33:23
35:6, 36:5, 36:6
36:7, 36:15
36:24, 43:2
49:21, 50:1
53:1, 53:18
54:21, 54:23
55:1, 56:6
56:17, 58:22
61:10, 61:13
66:2, 71:20
74:4, 87:12
103:21, 104:25
107:13, 108:24
116:19
**interviewed**
53:10
**interviewing**
48:20, 49:10
49:23, 106:23
**interviews**
115:22, 116:9
116:14
**intimidating**
105:11, 105:18
**introduced** 28:1
**involved** 27:15
27:18, 27:18
27:21, 42:4
97:4, 103:13
**involvement**
41:22, 122:17
**involving** 25:18
58:3
**issue** 36:8, 88:13
92:9, 93:25
94:21, 98:1
98:17, 99:5
103:10, 127:2

**J**

**James** 121:18
**January** 89:15
**Jasinski** 4:3
129:7
**Jeff** 119:25
**job** 11:5, 18:18
18:21, 18:23
21:19, 24:20
25:8, 25:10
26:25, 30:13
36:17, 38:4
75:17, 91:23
92:7, 96:16
96:16, 102:7
102:23
**jobs** 11:14, 24:5
24:7, 24:10
24:14, 24:18
26:23
**John** 1:5, 3:21
4:13, 4:14
40:20, 47:3
47:4, 47:4, 48:6
51:14, 54:21

58:4, 61:10 61:12, 64:7 64:12, 64:18 65:16, 67:3 67:7, 67:24 68:2, 69:5 70:10, 71:20 72:3, 72:21 73:19, 74:24 76:22, 77:3 79:3, 79:16 79:19, 79:24 80:3, 80:7, 81:6 82:8, 84:1 84:21, 85:11 86:25, 97:11 97:15, 98:15 103:10, 103:16 104:22, 106:21 108:18, 108:19 108:25, 110:6 117:15, 117:21 120:4, 120:22 121:7, 122:18 124:14, 124:16
**John's** 80:12 120:9, 121:24 122:9, 122:22 123:3, 123:6
**Johnice** 120:2 121:21
**Johnsen** 119:25 120:5, 121:18
**Joi** 2:20, 4:19
**Join** 51:9, 110:2
**joint** 53:22
**Jones-Hayes** 2:19, 4:20, 51:4 51:6, 51:12 51:13, 51:24 53:19, 54:13 57:20, 58:3 58:15, 117:12 120:24, 127:3
**judgment** 34:12 34:14, 34:14 34:23, 35:1 43:22, 43:24 75:1
**jump** 73:15

**K**

**Kamper** 2:20 4:19, 4:19, 51:9 110:2, 111:16 111:19, 119:16
**Karen** 2:19 4:19, 54:13 120:24
**Karyn** 48:1 54:18, 122:1 122:10, 122:13 122:15, 122:17
**Katie** 4:3, 129:7
**keep** 5:19, 17:5 17:6, 44:3 44:14, 44:20 44:24, 62:9 63:3, 63:10 82:24, 90:3 114:19, 115:5
**keeping** 44:8
**kept** 46:1, 62:15 62:23, 63:21 77:21, 77:22 77:24, 77:25 78:1, 78:6 87:22, 90:18 92:14, 95:3
**key** 35:4, 46:7
**kill** 111:22
**kind** 11:14 21:22, 28:19 30:23, 55:9 62:23, 62:25 65:12, 70:13 81:4, 90:3
**kindly** 105:8
**knew** 29:2, 54:7 55:12, 68:3 106:11, 107:21 107:22
**know** 5:14, 6:5 6:7, 6:14, 6:19 6:20, 11:19 22:10, 23:15 23:25, 24:3 24:4, 25:3, 27:7 28:4, 30:16 31:17, 34:3 34:16, 37:13 39:4, 39:10 39:15, 40:19 42:5, 43:5 45:21, 45:23 48:10, 48:15 50:16, 50:20 51:23, 52:1 54:3, 54:5, 55:6 56:7, 56:9 56:11, 57:2 57:4, 57:6, 57:7 58:10, 58:17 59:4, 59:5, 59:6 60:13, 60:19 60:23, 63:3 63:14, 63:15 63:21, 64:9 65:9, 65:10 65:11, 65:16 65:19, 67:20 68:2, 68:5, 68:8 68:16, 69:15 70:9, 70:22 73:5, 75:18 75:23, 76:2 78:12, 79:8 79:23, 80:1 81:20, 82:1 82:2, 83:16 83:18, 83:21 84:13, 84:19 85:20, 86:4 87:21, 88:7 88:17, 88:18 88:25, 89:9 91:4, 91:7 91:13, 92:25 93:2, 93:6 93:16, 93:21 94:3, 94:7, 95:1 95:4, 96:4 97:13, 97:18 99:6, 100:7 100:8, 100:13 101:1, 101:2 101:17, 103:9 103:16, 104:16 107:11, 107:16 109:7, 109:14 110:3, 110:12 113:2, 115:4 117:1, 118:10 119:5, 119:25 120:2, 120:8 120:10, 120:14 120:19, 120:22 121:5, 121:10 121:14, 121:17 121:20, 121:22 122:4, 122:20 122:21, 122:24 124:3, 124:8 124:9, 124:12 125:22
**knowing** 29:4
**knowledge** 96:6 108:23, 109:2 120:6, 120:8 121:23
**known** 63:18 107:3

**L**

**lack** 34:18 37:12, 44:23 47:24, 48:4 48:14, 50:8 51:8, 55:5, 56:2 59:3, 60:21 61:2, 61:14 62:5, 63:13 65:14, 72:14 75:10, 79:1 87:20, 88:24 90:7, 91:25 94:2, 94:6 94:25, 96:2 96:8, 96:10 96:21, 97:7 98:4, 98:11 99:20, 100:6 100:11, 100:18 100:24, 100:24 106:24, 108:12 108:22, 109:21 109:25, 118:16 119:1, 122:19 122:23, 123:7 124:6
**lady** 96:15 96:16
**laid** 20:10 20:14
**lasted** 71:23
**law** 1:22, 2:5 2:13, 3:18, 28:2 95:25
**laws** 27:4
**lawsuit** 38:14 41:1, 41:2, 41:6 41:23
**lawsuits** 42:3
**lawyer** 26:7
**layoffs** 20:10 20:10
**lead** 43:21 55:20
**learn** 34:10
**leave** 19:2, 20:9 22:15, 64:5 84:20, 104:4 122:7
**leaving** 24:9 84:24
**led** 36:8, 50:1
**left** 11:1, 11:10 14:23, 20:7

22:18, 62:16
74:24, 85:4
101:6, 110:16
113:18, 122:4
122:7
**legal** 27:11
46:15, 96:3
**legs** 46:19
**letter** 82:15
82:17, 82:22
83:17, 83:20
83:25, 84:7
84:9, 84:11
84:19, 85:12
86:20, 86:23
87:2, 87:8
**liable** 41:16
**license** 12:20
12:21, 12:23
12:23
**licensed** 10:16
**limitations**
50:17
**Linden** 2:12
2:13, 4:14, 4:14
86:8, 86:10
86:17, 94:9
108:16, 110:19
111:1, 128:1
128:3, 128:5
128:8, 128:20
**line** 102:11
117:7
**litigation** 91:6
**little** 6:22, 10:25
14:3, 15:5, 15:6
26:16, 30:2
31:20, 41:21
61:9, 114:6
114:9, 123:24
**live** 7:2, 7:3, 9:9
**lived** 9:11
**LLC** 3:11, 4:4
**local** 5:10
**located** 3:18
38:21, 39:2
52:5
**locations** 28:8
108:9
**log** 89:10, 89:15
90:4, 90:18
90:20, 90:22
90:23, 90:25
91:9, 91:12
91:12, 92:14
92:20, 93:12
93:20, 95:3
95:18, 96:7
114:20
**long** 9:11, 13:11
13:24, 14:14
15:1, 15:6
15:24, 16:5
17:10, 17:20
20:4, 22:5
22:13, 23:1
26:11, 32:6
55:3, 55:25
68:12, 71:20
71:23, 72:12
72:19, 73:17
74:14, 74:16
76:7, 76:8, 76:8
**longer** 23:18
23:19, 66:9
**longest** 56:4
**look** 16:21
25:23, 25:25
27:16, 34:16
35:1, 54:11
54:12, 70:5
70:11, 87:15
91:8, 91:16
91:18, 93:24
94:11, 94:12
99:8, 99:8
101:3, 111:23
112:25, 114:25
115:9, 115:10
116:24, 117:18
117:24
**looked** 26:1
34:11, 36:11
75:21, 80:19
**looking** 16:16
27:21, 69:25
70:9
**looks** 69:25
81:16
**lot** 36:9, 86:11
108:4
**loud** 68:17, 69:7
81:2, 81:7
**lucky** 94:9
**lunch** 110:17
**lying** 81:11

**M**

**m-e-d** 94:1
**MacNeal** 11:6
11:16, 13:2
**mad** 68:15
68:15, 69:5
69:23, 70:17
80:20, 80:22
**main** 36:12
40:2, 64:21
**maker** 106:13
**making** 32:11
33:8, 33:13
34:15, 35:11
36:14, 37:15
37:20, 59:9
109:16, 109:19
**man** 65:10
65:11
**management**
16:11, 16:13
17:2, 19:8, 20:2
33:7, 37:8
40:15, 42:12
45:13, 49:6
53:1, 95:10
95:21, 98:7
98:9, 100:15
116:18
**manager** 15:22
17:25, 18:2
100:15
**mannerism** 36:1
36:4
**mannerisms**
35:8
**mark** 60:2
**marked** 47:16
57:13, 87:24
**marking** 57:13
**Marmor** 3:10
3:11, 4:1, 4:6
4:16, 4:16, 9:3
23:23, 23:25
24:3, 24:15
24:19, 28:13
28:20, 32:5
32:7, 32:9
34:18, 35:15
35:18, 35:20
36:25, 37:12
37:17, 37:23
38:2, 39:9
39:14, 40:18
42:11, 42:21
43:9, 43:14
43:16, 44:5
44:18, 44:23
45:5, 45:16
46:4, 46:11
46:18, 46:21
47:14, 47:19
47:24, 48:4
48:14, 48:21
49:3, 49:11
49:16, 49:18
50:8, 50:14
50:22, 51:8
51:17, 53:3
53:14, 55:5
55:10, 55:14
55:22, 56:2
56:14, 56:18
57:8, 57:15
58:19, 59:2
59:13, 60:1
60:3, 60:8
60:10, 60:21
61:2, 61:14
61:18, 62:5
62:12, 63:7
63:13, 65:14
66:7, 66:9
66:11, 66:17
69:11, 69:13
69:16, 69:18
69:22, 72:13
72:18, 73:24
74:17, 76:1
76:20, 77:5
77:11, 78:10
79:1, 80:23
81:16, 82:19
83:4, 83:7
83:10, 84:6
84:14, 85:15
85:18, 85:21
85:23, 86:1
86:3, 86:7, 87:5
87:20, 88:15
88:23, 89:4
89:12, 89:21
89:24, 90:7
90:11, 90:13
91:25, 92:18
93:9, 93:16
94:2, 94:6
94:15, 94:25
95:4, 95:14
95:22, 96:2
96:8, 96:10
96:21, 96:23
97:7, 97:12
97:16, 98:4
98:11, 98:18
98:22, 99:7
99:18, 99:20
100:4, 100:6
100:11, 100:18
100:24, 101:9
101:11, 101:14
102:15, 102:18

103:23, 104:3
104:10, 105:6
105:20, 106:1
106:24, 107:2
107:19, 108:3
108:11, 108:22
109:21, 109:25
110:7, 110:11
110:15, 110:18
110:22, 110:25
111:2, 111:5
111:7, 111:9
112:1, 112:3
112:14, 112:18
114:3, 114:8
114:14, 114:16
115:13, 115:25
116:3, 116:16
118:2, 118:6
118:9, 118:16
119:1, 120:15
122:19, 122:23
123:7, 123:12
123:20, 124:1
124:6, 124:11
124:17, 125:2
125:15, 125:18
125:21, 128:10
128:12, 128:15
128:21
**married** 11:24
**Mary** 14:4, 15:5
41:21
**Matt** 4:17, 48:2
**matter** 3:21
27:11, 72:6
109:18, 129:4
**Matthew** 3:8
4:17, 54:18
57:2, 57:3, 57:7
121:3, 121:8
122:16, 122:17
**mean** 5:21, 5:21
5:24, 5:25
16:12, 18:25
22:6, 32:10
47:4, 51:10
56:20, 70:22
71:6, 72:14
76:8, 80:21
83:9, 90:8, 93:9
93:21, 94:10
96:14, 97:20
97:23, 102:15
103:24, 127:8
**means** 27:6
27:19, 35:22
99:16, 100:23
**meant** 19:1
**med** 11:6, 94:1
**medical** 16:16
16:19, 16:23
16:23, 19:17
19:21, 29:3
29:9, 29:10
31:1, 31:24
33:12, 33:17
34:19, 34:20
44:24, 45:3
46:14, 72:21
77:3, 77:10
79:10, 79:13
88:3, 88:9
88:20, 115:24
116:11
**medically** 19:23
79:14
**medications**
17:7
**medium** 70:14
70:14
**meet** 16:23, 20:2
26:6, 40:6
42:13, 108:19
**meeting** 26:11
79:17, 91:22
117:10
**meetings** 40:15
**Megan** 3:2, 4:21
**member** 16:17
20:19
**members** 17:3
**memo** 122:16
**memorandum**
54:17, 62:2
104:20
**memory** 72:15
72:18, 74:10
92:14
**memos** 123:5
**mental** 12:16
30:11, 30:18
30:22, 31:10
31:21, 32:4
33:12, 33:20
34:21, 88:20
88:21, 127:7
**mentally** 30:13
**mention** 81:10
**mentioning**
28:23
**message** 62:1
104:4
**messed** 47:17
**met** 16:23
121:1
**military** 12:7
**Milliman** 16:22
**mind's** 73:18
73:20
**minutes** 26:13
26:15, 31:18
110:16, 125:1
**mischaracterizes**
53:4, 55:14
80:23, 88:16
95:14, 108:12
114:3
**missing** 17:6
84:13
**mistake** 5:20
**Mm-hmm** 26:17
110:20
**Mm-mm** 108:16
**moment** 71:21
**money** 24:11
24:12
**month** 55:25
56:10, 108:6
**months** 13:25
13:25, 108:6
**morning** 3:16
26:10, 26:14
64:10, 72:4
**moves** 71:7

**N**

**name** 4:2, 5:2
5:3, 5:12, 20:23
47:6, 47:8
52:22, 92:3
92:5, 102:6
102:22, 103:4
127:18
**names** 28:23
89:18
**Nancy** 20:23
21:11, 21:11
21:25, 22:1
22:3, 22:9
22:13, 22:15
22:18
**native** 9:13
**nature** 22:12
**Nawara** 1:5
3:21, 4:13, 4:15
40:20, 47:4
47:5, 47:10
48:6, 48:12
48:18, 48:20
49:1, 49:10
49:21, 49:23
50:1, 51:14
54:21, 54:25
66:15, 66:19
66:22, 66:24
67:10, 68:22
69:2, 86:25
87:12, 97:11
97:15, 103:20
103:20, 104:7
104:22, 107:11
110:6, 113:18
120:4, 120:22
127:6
**Nawara's** 95:12
98:15, 98:21
121:7, 122:18
**necessarily**
72:18
**necessary** 44:3
72:16
**necessity** 16:16
16:23, 16:24
**need** 31:1, 43:18
46:19, 77:14
79:13, 85:15
85:20, 108:15
110:9, 118:21
120:14, 124:16
124:25, 127:7
**needed** 19:2
49:7, 118:13
118:14
**neighborhood**
29:4
**never** 34:9
68:19, 68:20
73:14, 73:23
104:1
**new** 19:15, 23:3
25:10
**Non-Confident...**
9:1
**normal** 5:22
6:6, 84:16
**normally** 39:11
**North** 1:23, 2:6
2:14, 3:19
**Northern** 1:2
3:23, 5:11
**Northwestern**
17:18
**nose** 96:1
**notary** 4:3
**notation** 97:25
98:8, 98:21
**note** 19:3, 19:4
19:7, 57:19

57:23, 58:1
58:6, 58:10
59:6, 88:8
92:18
**noted** 98:2, 98:3
**notes** 34:20
43:11, 43:17
43:19, 52:9
52:12, 52:15
76:11, 76:14
76:17, 114:19
**notice** 5:7
**notwithstanding**
115:11, 118:20
127:2
**November**
54:24, 54:25
60:25, 64:15
72:4, 84:21
87:13, 103:21
104:25, 105:4
106:23, 107:14
108:25, 116:7
**number** 1:9
3:22, 38:22
47:16, 57:14
58:16, 59:12
59:23, 59:25
59:25, 82:14
84:15, 84:17
86:16, 89:1
101:18, 110:5
111:13, 114:25
116:25, 117:19
117:25, 118:5
119:13, 120:11
121:10, 121:13
126:23
**numeral** 113:11
113:12
**numerous** 62:6
**nurse** 10:14
14:8, 14:24
15:9, 15:10
15:11, 18:24
21:2, 28:3
28:11, 29:18
32:19, 33:1
38:18, 41:24
45:13, 53:1
55:16, 65:6
65:7, 96:5, 98:9
100:16, 109:9
126:9, 126:11
126:15, 126:17
**nurse's** 100:15
**nursing** 10:7
11:7, 11:15
12:9, 12:11
12:14, 12:17
12:20, 12:23
26:23, 26:24
27:24, 28:5
29:15, 34:12
34:14, 34:25
43:22, 43:24
46:8, 46:13
75:1, 76:18
98:2, 123:22
123:25, 124:3

**O**

**O'Keeffe** 14:13
**o-b** 35:17
**oath** 4:8
**object** 24:15
28:13, 36:25
37:17, 38:2
39:9, 39:14
40:18, 42:21
43:9, 43:14
44:18, 45:16
46:11, 51:17
53:3, 55:10
55:22, 57:8
59:13, 61:2
62:12, 66:17
72:13, 74:17
77:11, 84:6
89:12, 90:7
93:13, 105:6
105:20, 108:4
109:25, 110:7
115:25, 116:16
118:16, 119:1
123:12, 124:1
124:6
**objection** 24:19
28:20, 34:18
37:12, 37:23
42:11, 44:5
44:23, 45:5
46:4, 47:24
48:4, 48:14
48:21, 49:3
49:11, 50:8
50:14, 50:22
51:8, 53:14
55:5, 55:14
56:2, 58:19
59:2, 60:21
61:14, 61:18
62:5, 63:13
65:14, 76:1
76:20, 79:1
80:23, 82:19
83:4, 83:4, 84:6
84:15, 87:5
87:20, 88:15
88:23, 91:25
92:22, 94:25
95:14, 95:22
96:2, 96:8
96:21, 97:7
97:12, 97:16
98:4, 98:11
99:18, 99:20
100:4, 100:11
100:18, 100:24
104:10, 106:1
106:1, 106:24
107:2, 108:11
108:22, 109:21
114:3, 114:16
119:1, 122:19
122:23, 123:7
123:20, 124:11
124:17
**objections** 99:7
**observations**
36:14
**observe** 69:6
69:6, 69:9
**observed** 35:12
35:15, 35:19
35:21, 70:17
80:15, 80:16
**observing** 69:25
**obtain** 12:11
**obtained** 44:25
77:9
**obviously** 28:22
**occasion** 28:11
**occupation**
102:8
**occupational**
18:24, 21:1
126:11, 126:12
**offered** 18:18
**office** 1:22, 2:5
2:21, 3:3, 3:18
18:8, 18:10
18:14, 18:22
19:24, 20:5
20:22, 21:14
25:13, 30:5
30:8, 30:21
31:9, 32:16
34:5, 38:16
38:17, 38:21
38:24, 38:25
39:2, 39:2
39:12, 39:24
40:1, 40:8
40:14, 40:15
42:7, 44:20
50:13, 50:18
50:21, 51:1
52:6, 52:7, 55:8
57:5, 60:16
62:9, 62:11
62:13, 62:13
63:5, 63:6
63:10, 65:25
66:15, 66:16
66:18, 66:25
67:8, 67:11
67:17, 68:20
68:23, 71:15
71:19, 73:19
73:22, 73:23
74:3, 74:4
74:25, 77:23
77:24, 77:25
78:1, 78:3, 78:4
78:5, 78:5, 78:6
78:14, 78:20
79:17, 82:5
82:24, 84:2
87:16, 87:23
88:1, 88:8, 90:3
90:5, 90:12
90:14, 91:5
91:10, 92:15
95:3, 96:17
104:8, 104:13
109:3, 113:19
118:15, 118:25
**officer** 39:21
48:6, 48:12
48:18, 48:20
49:1, 49:10
49:21, 49:23
50:1, 51:14
64:21, 105:12
105:19, 107:21
127:6
**Offices** 2:13
**oh** 23:6, 23:6
40:11, 53:10
60:3, 60:4
78:12, 81:16
81:18, 85:10
85:17, 85:25
86:2, 89:2, 94:8
96:20, 107:20
110:21, 112:3
112:3, 112:15
114:12, 114:22

116:5, 125:21
128:12
**okay** 5:24, 6:11
6:16, 6:17, 6:19
6:20, 6:21, 6:25
9:7, 9:9, 9:11
9:16, 9:18, 9:23
10:3, 11:1, 11:4
13:20, 16:5
16:8, 18:7, 21:9
21:13, 22:5
22:10, 22:13
24:25, 26:11
27:23, 29:13
30:3, 30:4, 30:6
30:15, 30:18
31:6, 31:15
31:25, 32:8
32:12, 32:22
32:25, 33:8
33:20, 33:25
34:15, 34:24
35:5, 35:7
35:18, 35:20
35:20, 35:22
36:3, 36:3, 36:6
36:11, 39:22
42:15, 42:17
42:24, 44:10
45:18, 45:20
45:22, 45:24
45:25, 46:18
46:21, 47:2
47:5, 47:7, 47:8
47:9, 47:12
47:13, 47:13
47:22, 48:3
48:6, 48:10
49:9, 50:6
50:11, 53:3
53:18, 54:10
56:8, 56:10
56:12, 57:2
57:4, 57:12
57:12, 58:14
59:17, 60:10
60:15, 61:9
61:10, 61:11
65:1, 65:5
65:19, 67:20
67:25, 68:10
69:6, 69:18
69:21, 69:24
70:7, 70:10
70:24, 71:5
71:7, 72:4, 72:7
72:9, 72:10
72:11, 72:13
73:10, 73:17
73:18, 74:2
74:14, 74:24
75:7, 77:16
80:15, 81:24
82:14, 83:20
83:22, 83:23
84:12, 84:14
84:20, 85:12
85:18, 85:22
86:3, 86:11
86:13, 86:18
86:20, 88:10
89:1, 89:6
89:14, 89:19
90:3, 90:25
91:16, 91:17
91:19, 92:9
92:25, 93:3
93:8, 93:24
93:25, 94:4
94:11, 94:17
94:19, 95:8
95:12, 97:10
98:8, 98:22
99:14, 99:21
101:5, 101:6
101:7, 102:3
103:1, 103:5
105:22, 106:16
108:17, 110:9
110:10, 110:15
110:18, 110:22
110:23, 111:1
111:4, 111:13
111:20, 112:2
112:7, 112:23
112:24, 113:5
113:7, 113:10
114:15, 114:19
114:25, 115:16
116:13, 116:24
117:2, 117:5
117:14, 117:18
118:6, 118:9
118:12, 118:13
118:19, 118:23
119:12, 119:16
119:22, 119:25
119:25, 120:11
120:17, 120:20
120:21, 120:22
120:24, 121:3
122:9, 124:25
125:4, 125:13
125:21, 125:23
126:19, 126:21
127:24, 128:1
128:3, 128:5
128:7, 128:9
128:14, 128:16
**old** 6:23
**olive** 70:13
**once** 10:20
19:11, 33:23
40:24, 45:2
71:18, 106:13
**ongoing** 22:6
22:8, 22:12
**online** 18:16
18:17
**opened** 74:7
74:9, 74:12
**operations**
55:13
**opinion** 127:6
**opportunities**
24:10, 24:12
**opportunity**
18:13
**options** 100:1
**order** 9:5, 34:5
34:11, 34:16
34:24, 45:13
53:7
**organization**
16:4, 16:18
**Originally**
78:10, 78:11
**ought** 127:4
**outburst** 99:16
**outside** 108:7
**overseeing**
23:17

**P**

**p.m** 89:25, 90:2
111:10, 111:12
125:5, 125:7
128:17
**page** 7:5, 48:8
54:12, 54:12
54:17, 87:15
99:8, 111:24
111:24, 112:4
112:8, 112:25
113:1, 113:2
113:3, 113:10
115:9, 115:11
115:14, 115:15
116:24, 117:5
117:24, 126:20
**Palos** 17:13
17:24, 18:4
**paper** 19:11
22:11
**papers** 21:17
25:2, 81:20
**paperwork**
81:22, 104:16
104:18
**paragraph**
113:1, 113:11
115:10
**paraphrasing**
54:4
**Parkside** 14:12
**part** 12:18
16:15, 23:16
32:25, 37:5
38:24, 41:4
43:23, 43:23
44:1, 67:13
72:20, 77:23
78:4, 83:15
107:23, 107:25
109:9, 117:5
**part-time** 15:12
15:13
**participate** 37:9
119:9
**participating**
116:14
**particular** 16:17
47:3, 54:8, 68:4
68:13, 77:12
97:4, 127:13
**parties** 5:8, 7:6
**parts** 34:1
102:4, 102:5
**party** 79:9
**passing** 31:17
**patient** 11:16
27:8, 27:8
28:17, 28:24
41:24
**patient's** 28:12
41:25
**patients** 13:10
17:18, 27:5
27:17, 28:23
28:25, 29:1
**penalty** 112:12
**people** 6:6
16:20, 27:15
29:4, 31:23
33:3, 33:5, 33:6
39:7, 39:11
65:13, 90:20
95:25, 120:5
**percent** 124:22

124:23
**perfectly** 6:19
**perform** 21:7 30:13, 30:25
**performed** 31:9 31:10
**period** 15:8 21:14, 22:7 22:22, 78:19 90:24, 124:10
**perjury** 112:13
**person** 18:16 19:3, 20:3, 29:8 30:12, 30:25 33:9, 33:21 33:23, 33:24 34:6, 34:15 35:6, 36:5 36:16, 36:20 36:23, 37:8 37:10, 39:21 40:5, 40:7 42:13, 43:2 43:6, 51:21 53:2, 53:11 54:1, 58:23 61:16, 63:19 65:1, 67:6 79:15, 80:19 88:19, 100:9 109:17, 109:18 114:5, 114:5 114:13, 116:9 123:15, 126:1
**personal** 103:20 104:5, 120:7 120:7
**personally** 41:17, 59:6 63:7, 63:8, 90:8
**personnel** 23:8 37:6, 37:11 44:21
**persons** 32:11
**pertain** 21:18
**pertaining** 25:3 27:10, 97:1
**pertinent** 44:9 44:13
**Peter** 1:22, 2:4 2:5, 3:19, 4:12 5:12
**PhD** 127:20 127:21
**phone** 62:20 103:23, 104:1 111:2, 114:20
**phonetic** 21:11
**physical** 19:16 30:18, 30:21 31:2, 31:17 32:3, 70:16 70:18, 71:12 71:16, 109:24
**physically** 52:4 70:10, 70:12 105:10, 105:17
**physician** 16:4 16:17, 16:25
**picture** 74:1
**place** 23:10 27:4, 32:3 32:11, 32:17 36:22, 52:5 54:23, 76:7 76:8, 79:17
**Plaintiff** 1:7, 2:3 2:11, 113:16 113:22, 115:2 115:6, 117:10 115:9, 115:12 117:1, 117:19 117:20, 117:25 126:22
**Plaintiff's** 112:16
**plan** 17:4
**play** 56:23 106:4, 123:18
**please** 4:5, 4:7 4:11, 5:2, 5:14 5:19, 6:3, 6:18 54:11, 83:20 101:19, 111:24 112:10, 112:25 113:10, 113:12
**plow** 86:15
**plugged** 101:25 102:5
**Plus** 16:4
**point** 22:15 54:8, 68:4 68:13, 68:17 71:24, 73:3 73:5, 73:6, 73:7 77:2, 77:2, 77:7
**policy** 110:3
**portion** 8:1, 8:3 17:2, 29:20
**position** 15:20 15:22, 16:10 17:24, 25:11 107:22
**possible** 66:21
**practice** 42:6 42:17, 42:22 43:1, 43:7 123:17, 123:22 124:3
**precedence** 60:3
**preceptor** 25:8 25:9, 25:12
**prepare** 25:20 43:5, 58:8
**prepared** 58:6 58:22, 58:24 78:7, 91:4, 91:5 101:23, 101:25 102:4, 102:11 103:8, 110:5
**present** 67:4 67:6, 79:20 95:11, 103:22
**presented** 105:14, 106:17
**pressure** 19:19 31:19
**Pretend** 67:24
**printed** 89:10
**prisoners** 75:12
**privileged** 96:7 96:8, 96:9 96:11
**probably** 54:4 77:19, 83:11 83:12, 124:24
**problem** 89:7
**problematic** 109:1
**Procedure** 5:10
**procedures** 123:23
**proceed** 4:24
**proceedings** 6:8 129:3
**process** 23:17 73:1, 77:13 79:8, 82:21 83:1
**produced** 93:12
**productions** 93:10, 93:11
**profession** 123:18
**professional** 12:21, 31:11 31:21
**pronouncing** 47:6
**protect** 27:5 28:12, 29:7
**protected** 28:19 95:24
**protective** 9:5
**protocol** 52:23
**provided** 21:6 36:23, 37:1 82:5, 108:19 118:15, 118:22 118:24, 123:16
**provider** 30:10 30:11, 32:10 36:18, 75:16 79:11, 88:7 88:11, 106:7 127:17
**provider's** 33:19
**providing** 17:7
**psychiatric** 12:14, 124:4
**psychiatrist** 31:10
**psychologist** 31:10
**public** 4:3
**publications** 25:3
**puffing** 80:18
**purport** 52:15
**purpose** 37:25 48:3, 67:16
**purposes** 91:5
**pursuant** 5:7 9:5, 112:13
**put** 21:14, 63:20 73:17, 82:25 83:2, 84:11 87:19, 89:3 101:24
**putting** 19:10 88:2, 96:1

**Q**

**question** 5:15 5:16, 6:4, 6:5 6:9, 6:10, 6:11 6:16, 21:3 21:10, 32:6 33:1, 33:9 45:17, 49:16 69:14, 84:7 84:18, 99:21 100:2, 114:9 118:1, 118:11
**questions** 5:13 29:3, 93:1, 93:6 101:15, 102:9 112:22, 119:21

128:11
**quite** 41:7

**R**

**rage** 70:5, 70:6 70:8
**raged** 68:12
**raise** 4:7
**rate** 19:19
**re-ask** 21:10
**reaching** 17:2
**read** 58:14 83:20, 86:18 105:8, 112:10 113:1, 113:12 115:11, 115:13 116:24, 117:6 117:20, 117:24 118:4, 119:19 126:22
**reading** 96:18 97:14
**ready** 113:2 119:23
**really** 28:18 72:6
**reason** 24:9 31:12, 37:2 53:16, 53:17 76:14, 76:15 83:14, 92:10 97:3, 97:4 97:14, 102:8 102:24, 104:7 105:3, 105:9 108:20, 125:23
**reasons** 61:5 80:2, 80:7
**reassure** 29:6
**Rebecca** 3:8 23:9, 23:10 23:11, 50:2 51:18, 53:22 54:2, 55:17 57:20, 75:4 82:2, 113:14 121:10
**Rebecca's** 52:6
**recall** 20:16 22:14, 26:5 27:25, 37:4 47:21, 49:19 49:23, 54:7 54:22, 58:5 60:18, 64:11 64:15, 64:17 65:24, 66:20 66:23, 67:9 67:12, 67:13 67:15, 76:10 80:9, 80:11 81:13, 81:14 81:19, 84:23 84:24, 85:14 92:17, 103:12 103:18, 104:6 104:23, 105:2 107:15, 110:8 113:23, 114:12 117:17, 122:11 122:14, 123:9
**receive** 27:23 29:13, 35:10 51:11, 65:12 79:10, 82:17
**received** 83:11 85:13, 92:10 104:14, 125:25 126:3
**receiving** 122:16
**reception** 40:3
**recognize** 58:12
**recollection** 28:4, 49:20
**recommend** 37:22, 42:9 76:19
**record** 3:17 4:11, 5:3, 5:5 5:24, 9:4, 46:22 46:23, 46:24 47:14, 47:22 84:15, 89:22 89:25, 90:1 90:2, 90:4, 91:1 91:1, 92:19 105:8, 108:13 111:10, 111:11 111:12, 112:11 113:12, 117:6 117:20, 123:8 125:5, 125:6 125:7, 126:22 128:17, 129:3
**RECORDER** 3:16, 4:2, 4:7 4:10, 4:23 46:20, 46:22 46:24, 89:25 90:2, 111:10 111:12, 125:5 125:7, 128:17
**recording** 4:4
**records** 27:16 27:17, 27:22 29:3, 29:9 29:10, 31:1 44:24, 45:3 46:14, 77:10 79:11, 79:13 88:3, 88:6, 88:9 88:12
**recur** 127:15
**redacted** 89:19
**refer** 94:1 109:17
**referenced** 103:17
**referral** 33:22 37:2, 91:19 92:10, 92:10 97:10, 97:14 101:20, 101:25 102:2, 102:3 102:12, 102:13 102:24, 104:21 106:15
**referring** 35:9 35:12, 102:8 105:9
**refers** 91:23
**reflected** 117:7 117:9
**refresh** 28:4
**regarding** 25:3 27:23, 28:5 42:7, 45:25 52:24, 57:23 62:10, 63:2 76:17, 103:10 103:14, 108:20 113:14, 113:21 115:2, 115:2 115:6, 115:23 116:10, 117:11 123:2, 123:6
**registered** 10:14
**Regular** 9:1
**regulations** 21:19
**Reierson** 3:9 4:18, 23:11 23:14, 23:21 23:22, 52:11 54:5, 55:3 55:20, 60:5 60:8, 61:13 65:6, 65:7 65:17, 65:22 66:19, 67:3 68:25, 75:8 75:19, 75:25 79:20, 80:6 85:13, 86:25 87:2, 95:13 107:8, 108:19 113:14, 113:20 113:25, 115:2 115:21, 116:8 116:15, 116:17 121:10
**Reierson's** 66:16, 71:16
**related** 122:22
**release** 19:22 72:21, 77:3 77:10
**relevant** 88:13 88:21, 127:13
**relied** 60:25 61:6
**rely** 59:11 59:15, 59:19 59:20
**remained** 14:23 18:4, 23:3 23:13
**remember** 11:3 11:9, 11:20 13:5, 14:3 20:23, 23:6 23:7, 28:1 44:19, 50:10 50:15, 50:19 50:23, 51:2 51:18, 51:20 51:25, 52:7 52:10, 52:13 52:19, 56:22 57:3, 57:10 58:7, 61:15 65:21, 68:3 68:13, 68:19 68:24, 71:22 71:23, 71:24 71:25, 72:1 72:24, 73:24 73:25, 74:2 74:15, 74:18 74:21, 84:22 85:3, 90:22 91:11, 91:12 91:15, 95:5 95:7, 95:19 95:23, 105:7 128:6
**remembered** 73:4

**rep** 74:21, 74:25 76:23, 77:13 79:4, 79:16 79:19, 79:25 80:2, 80:6 80:10, 80:13 81:2, 81:4
**repeat** 28:14 37:18, 48:23 53:5
**rephrase** 62:17
**replaced** 116:21
**report** 23:21 23:22, 35:10 45:2, 50:4, 62:4 62:22, 63:16 63:25, 64:12 64:18, 65:17 125:19, 126:8 127:16
**reported** 64:20 64:24, 67:8 67:11, 68:22
**reporter** 89:5
**reporting** 65:11
**representative** 113:19
**reprimanded** 24:13, 24:17
**request** 31:9 31:13, 44:16 44:17, 45:10 48:10, 48:11 48:17, 48:17 50:6, 50:11 50:17, 50:20 50:25, 51:3 51:7, 53:16 53:17, 53:25 56:5, 56:16 59:10, 76:24 79:7, 88:3
**requested** 37:14 37:19, 60:20 63:5, 65:1, 77:8 80:3, 80:7, 85:6 99:17, 99:23 100:3, 100:23
**requesting** 48:16, 48:25 50:5, 53:2 53:11, 53:23 58:23, 101:21
**requests** 31:16 55:24, 88:11 122:12
**require** 19:21 79:10
**required** 4:23 21:7, 43:23 45:15, 107:25 124:4, 124:9
**requires** 27:8 27:14, 30:9
**requiring** 16:18 19:25, 26:2
**reserve** 128:15
**resolved** 103:11
**resource** 105:15
**resources** 17:8 20:25, 48:2 106:18, 108:18 122:3, 126:25
**respect** 45:9
**response** 59:21 105:12, 126:23
**responses** 5:19
**responsible** 32:1
**rest** 6:10
**restate** 32:13 38:17, 115:19 115:20, 116:6
**restrictions** 19:10, 19:14
**result** 41:15 109:5, 109:13
**results** 104:14 104:15
**resume** 13:15 13:17
**return** 19:3 19:7, 74:19 104:16, 104:18 126:1, 126:4 126:5
**returned** 72:10 74:14, 104:19
**review** 16:14 16:15, 16:25 17:17, 78:18 78:20, 78:23
**reviewed** 16:19
**Richard** 2:12 2:13, 4:14
**Rick** 128:7
**right** 4:8, 5:2 5:5, 5:19, 6:13 7:2, 9:2, 9:13 13:1, 13:17 15:24, 17:9 18:3, 18:4, 20:4 23:1, 27:2, 27:7 27:17, 29:9 29:11, 34:24 35:25, 46:25 48:8, 50:6 51:23, 60:9 65:16, 66:8 66:8, 66:10 66:10, 69:22 75:18, 78:5 81:6, 83:25 89:19, 96:19 99:12, 101:3 102:15, 104:3 110:9, 111:19 114:14, 116:3 116:20, 121:11 126:8
**rights** 27:5 28:12, 28:17 29:6
**RN** 11:11, 11:12 13:2, 13:8, 13:9 13:18, 13:23 24:6, 25:4
**role** 23:14 55:16
**roll** 47:11, 62:21
**room** 2:23, 3:5 18:2, 39:4, 39:6
**roughly** 20:6 26:13
**route** 61:21 73:8
**routine** 105:12
**rule** 31:1, 79:13 120:11
**rules** 5:9, 5:10 21:18
**Rush** 13:21 13:22, 14:1 14:3, 14:5


## S


**S-h-e-l-b-y** 5:4
**safe** 36:17 75:12
**safety** 71:12 71:17
**sake** 88:18
**Sarah** 3:10, 4:16
**sat** 73:23
**saw** 35:23 39:21, 52:19 68:14, 71:11 84:12, 92:11
**saying** 19:22 51:13, 53:23 60:4, 62:15 63:4, 63:22 65:12, 81:6 81:19, 93:23 101:1, 114:22
**says** 34:5, 43:3 55:7, 58:15 72:5, 87:3, 92:1 93:25, 94:4 94:20, 97:19 97:22, 97:23 97:25, 99:25 100:20, 100:22 100:23, 101:8 101:12, 102:11 104:1, 114:4 114:5, 117:20 118:20, 118:20
**Scharf** 3:11
**schedule** 63:23
**scheduling** 63:3
**school** 9:18 9:20, 9:21, 9:22 11:2, 11:15 12:19, 14:8 14:9, 14:11 27:24, 28:5 29:15, 46:8 46:13
**screen** 96:17
**screening** 19:15
**screenings** 19:19
**se** 104:17
**search** 93:21
**second** 32:25 89:24
**section** 112:14 112:15
**see** 16:22, 16:25 19:13, 22:22 29:2, 30:12 30:12, 39:11 39:17, 43:18 47:18, 52:11 52:18, 54:13 60:3, 64:25 65:3, 65:6, 65:7 65:7, 65:22 65:22, 69:12 70:8, 70:9 73:20, 73:22 86:7, 87:17 92:2, 92:13 93:20, 94:21 97:5, 99:9 100:20, 104:8 105:3, 111:25 113:10
**seeing** 17:3

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 366 of 657 PageID #:4351




17:3, 61:21 125:23
**seen** 34:4, 34:9 47:20, 48:19 49:2, 52:14 57:16, 60:11 60:15, 68:20 82:15, 86:20 89:8, 89:10 104:22, 104:24 125:8, 125:11 126:5
**self-control** 75:10, 75:13
**send** 19:20 30:24, 31:18 31:21, 61:22 61:23, 106:8 123:5
**sends** 100:9
**sent** 30:9, 31:23 32:14, 33:11 34:6, 35:13 36:20, 44:22 44:25, 48:1 48:11, 48:15 49:7, 88:20 90:6, 97:24 101:20, 125:13 126:9, 126:16
**sentence** 117:6
**separate** 38:25 40:3, 44:20
**September** 1:18 3:17, 39:8 39:13, 40:9 40:16, 47:1 54:16, 54:18 54:25, 55:4 64:1, 107:12 115:20, 116:1 116:2, 116:7 129:8
**sequence** 72:2
**series** 5:13
**served** 12:7 38:13
**services** 15:23 16:11, 16:13 16:19, 17:1 19:7, 19:13 108:7, 126:14
**set** 5:7, 62:8 112:17, 113:8 117:3
**setting** 27:20
**setup** 38:25
**seven** 16:1 127:1
**sexual** 60:16
**share** 29:11 93:21
**shared** 97:3
**sheet** 19:16
**Shelby** 1:15 1:16, 3:9, 3:25 4:2, 5:4, 5:6 5:12, 13:14 46:25, 47:16 57:13, 59:23 59:25, 65:6 65:8, 82:14 82:15, 86:16 89:1, 101:18 110:5, 112:12 112:16, 112:20 113:13, 119:12 125:8
**Shelitha** 22:23 23:9
**sheriff** 4:17 38:18, 38:19 57:9
**sheriff's** 18:8 18:9, 18:13 18:22, 19:24 20:5, 20:22 21:14, 25:13 30:5, 30:8 30:21, 31:9 32:16, 34:5 42:7, 44:20 50:13, 50:18 50:21, 51:1 55:7, 57:5 60:16, 71:15 71:19, 78:14 78:20, 82:5 84:2, 87:16 87:23, 88:1 90:24, 91:4 91:10, 92:15 93:2, 93:7, 95:3 104:13, 109:3 110:4, 118:15 118:25, 121:23 122:4
**Shield** 15:18 15:25, 16:2
**shift** 23:7
**shoot** 89:2, 94:8
**short** 22:22 46:16, 74:16 93:19, 120:16
**show** 5:6, 47:14 47:15, 57:12 59:23, 62:24 75:12, 86:16 89:1, 101:18 111:13
**shows** 62:22
**side** 66:5, 68:25 69:1, 69:3
**sign** 26:2, 72:21 73:5, 73:6, 77:4 81:21, 82:4 84:1, 84:3, 87:3 87:4, 87:12
**signature** 58:12 58:14, 58:17 112:7, 112:8 128:15
**signed** 19:17 28:2, 45:7 58:10, 82:9 103:16, 118:14 118:21
**signing** 81:20 103:11
**signs** 127:16
**similar** 49:9 91:8
**simply** 43:8 120:19
**sit** 20:2, 42:13 66:2, 68:23
**site** 17:18
**sits** 64:21
**sitting** 68:24 74:1, 74:2
**situation** 81:2 84:16, 107:4
**situations** 82:7
**six** 13:25, 13:25 126:23
**skin** 70:13
**Slash** 91:22
**Slow** 84:14
**somebody** 98:2
**Someone's** 53:23
**soon** 64:21
**sorry** 9:3, 14:2 14:4, 18:1 21:10, 24:16 24:23, 32:5 37:18, 44:10 45:21, 48:23 56:14, 63:7 77:5, 83:6, 86:4 89:21, 94:10 94:13, 101:11 104:21, 107:20 118:2, 119:14 119:17, 120:15 123:1, 125:10
**sort** 19:11 75:15, 107:3
**South** 38:22
**speak** 51:21 123:8
**speaking** 25:22 59:20, 67:18 70:19
**specialized** 15:23
**specialty** 12:11 13:7
**specific** 14:9 19:14, 93:1 102:8
**speculate** 6:18
**speculation** 46:5 48:22, 49:4 59:3, 60:22 61:3, 82:20 88:24, 97:17 98:5, 98:12 98:23, 100:12 100:19, 100:25 104:11, 108:12
**spell** 5:2
**spoke** 33:23 51:18, 79:5 79:24
**spoken** 5:20
**spot** 98:17
**spreadsheet** 91:2
**St** 10:10, 10:22
**stable** 30:13
**staff** 13:8, 13:8 13:9, 13:23 14:24, 15:9 40:15, 48:2
**stand** 93:22 94:5, 114:16
**standing** 73:21 73:22, 73:25
**stands** 29:24
**start** 8:1, 17:24 19:23, 63:8 75:25, 115:20 119:10
**started** 11:9 11:16, 20:21 22:7, 55:7 67:10, 74:5 78:14, 90:23 90:25

**starts** 96:18 115:11, 115:14 117:6
**state** 1:23, 2:6 2:14, 3:19, 4:11 5:2, 10:14
**State's** 2:21, 3:3
**stated** 33:25 58:22
**statements** 59:5
**states** 1:1, 48:5
**status** 92:11
**steps** 79:6
**steward** 71:24 72:1, 72:9 72:10, 72:21
**sticker** 60:10
**stop** 6:14, 73:4
**stormed** 68:18 71:21, 72:5 73:11, 73:20 74:12
**Street** 1:23, 2:6 2:14, 2:22, 3:4 3:19
**stretch** 46:19
**strictly** 33:17 34:19
**studied** 12:13
**subject** 48:5 75:2
**submit** 76:24
**subordinate** 109:24
**sued** 40:21 41:17, 41:18
**suffering** 127:6
**sugar** 20:12
**Suite** 1:24, 2:7 2:15, 3:13, 3:20
**summarized** 126:25
**superintendent** 50:3, 51:4, 51:6 51:12, 51:13 51:24, 52:1 52:17, 52:21 53:19, 57:20 58:3, 81:11 127:3, 127:12
**superior** 61:20 61:25, 62:3 68:9, 105:12 105:19, 105:21
**superiors** 55:18
**supervised** 23:8
**supervisor** 15:23, 20:22 22:13, 22:19 23:19, 37:8 61:25, 109:20 109:23, 124:24
**supervisors** 100:2
**supposed** 53:1 58:25, 62:3 65:16
**Supt** 58:15
**sure** 5:4, 10:2 37:19, 40:13 41:8, 62:17 62:18, 75:16 78:21, 78:23 86:1, 89:23 125:2
**surg** 11:6
**surveillance** 40:17
**suspended** 12:24
**swifter** 57:1
**sworn** 4:9

**T**

**take** 10:13 10:20, 11:21 13:13, 13:25 23:4, 32:3 32:17, 36:22 39:23, 43:4 46:16, 52:9 54:3, 54:11 55:25, 60:24 76:7, 76:8 79:17, 85:15 85:16, 86:11 87:15, 93:19 110:10, 111:7 111:23, 111:23 117:18
**taken** 5:7, 5:8 12:13, 12:16 56:4, 56:13 56:14
**takes** 60:3
**talk** 26:16, 30:2 42:14, 47:4 59:16, 61:9 61:22, 61:24 68:16, 73:12
**talked** 36:3 38:6, 38:9 38:12, 43:12 121:18, 121:21
**talking** 43:8 43:10, 43:19 43:21, 51:24 72:8, 75:10 92:22
**tardiness** 24:22 24:24
**taught** 12:9 29:13, 46:9 46:13
**tax** 20:12
**team** 16:20 19:9, 20:2 32:24, 95:10 109:10
**technician** 11:17
**telephone** 51:22 57:23, 62:1 62:7
**tell** 6:22, 10:25 11:4, 24:21 27:2, 27:2 47:22, 47:23 51:11, 54:23 54:24, 55:2 67:21, 68:1 70:8, 70:15 72:19, 72:24 75:7, 75:20 75:22, 76:6 79:3, 80:15 82:11, 91:13 101:18, 102:4 107:8
**telling** 75:20
**tells** 43:6
**ten** 70:1
**terms** 9:23 31:25, 91:9 107:12
**testified** 52:24 57:24, 69:20 72:5, 92:19
**testify** 41:13 41:23, 98:24
**testimony** 9:1 31:8, 41:9, 53:4 55:15, 80:24 88:16, 95:15
**testing** 16:19
**text** 62:1
**Thank** 4:10 47:19, 57:15 66:12, 85:19 86:2, 116:6 128:10
**Thanks** 86:17
**thing** 21:22 26:24, 27:1 28:19, 43:7 102:10, 128:4
**things** 17:8 21:15, 22:8 22:12, 31:7 53:7, 105:23
**think** 30:23 34:25, 44:3 61:20, 69:13 70:12, 71:18 76:4, 92:23 97:9, 102:16 104:1, 107:17 110:13, 116:23 122:16, 123:21 123:22, 125:15 128:21
**third** 79:9 87:15, 99:13 99:13, 117:7 117:7
**Thomas** 3:8 121:13
**threaten** 127:11
**threatened** 71:13, 71:14 71:17, 71:18
**threatening** 75:13
**threateningly** 127:11
**three** 14:16 20:6, 31:18 47:18, 113:11 113:12
**time** 3:18, 4:5 5:14, 6:13 13:18, 15:8 17:23, 20:19 22:22, 24:6 28:3, 34:13 50:16, 50:20 52:14, 55:13 56:5, 56:6 56:12, 56:15 56:17, 56:22 61:24, 63:20 63:23, 63:25 64:5, 64:7, 67:7 70:2, 70:4 71:13, 71:17 72:2, 72:8 72:12, 73:19 74:1, 74:16 74:16, 74:24

77:12, 77:25
78:19, 79:22
81:21, 86:6
89:7, 101:6
103:8, 103:10
103:21, 107:13
107:16, 109:8
113:18, 114:1
116:5, 124:14
127:8
**times** 26:6, 36:9
40:23, 43:11
104:21, 115:1
**title** 13:6, 13:22
15:8, 20:24
23:15, 57:10
89:14, 91:23
92:7, 126:10
**today** 3:17, 3:24
25:21, 29:20
38:7, 38:10
62:11, 65:13
**told** 20:14
22:10, 42:18
65:3, 84:1
105:22, 128:20
**tongue** 47:11
**top** 91:19, 99:13
113:6, 117:8
**train** 25:11
55:16, 55:18
**training** 21:6
21:9, 21:15
21:24, 22:5
22:7, 25:6
27:23, 28:5
55:9
**transcribe** 19:5
**transcribed**
5:23
**transcribing** 6:8
19:10
**transcript** 129:3
**transgressions**
127:4
**transpire** 79:9
**transpired** 68:8
72:2, 127:3
**trash** 83:9
83:12, 83:14
**treating** 84:16
**treatment**
123:23, 127:8
127:12
**trees** 111:22
**trial** 41:13
**tried** 81:3, 81:4
**true** 59:7, 82:3
82:6, 112:20
**try** 107:4
**trying** 14:2
14:2, 23:6, 23:7
32:9, 36:13
36:15, 36:16
67:16, 68:16
73:1
**turn** 19:8
**turned** 88:14
**Turrise** 121:19
**twice** 26:8, 72:4
**two** 13:12, 13:12
16:7, 17:11
30:16, 30:17
33:5, 36:12
38:23, 66:13
66:13, 84:17
87:8, 103:16
120:5, 124:25
**type** 10:4, 28:23
65:2, 70:14
89:10, 95:24
**typically** 61:16

**U**

**Uh-huh** 5:22
**Uh-uh** 5:23
**uncooperative**
68:12, 117:10
**undergo** 77:8
80:3, 80:7
124:15
**understand**
5:14, 5:17
29:24, 69:17
71:1, 71:3
84:10, 90:16
93:17, 114:7
**understanding**
21:3, 45:17
46:6, 55:18
70:25, 72:3
106:14
**understood** 5:16
**undertake**
59:10
**unfortunately**
111:14, 126:24
**union** 20:19
71:24, 72:1
72:9, 72:10
72:20, 74:21
74:25, 76:22
79:4, 79:16
79:19, 79:25
80:2, 80:6
80:10, 80:13
81:2, 81:4
113:19
**unit** 11:6, 11:7
**UNITED** 1:1
**UnitedHealthc...**
17:14, 17:16
17:18
**University**
10:10
**unsure** 116:12
**untruthful**
117:11, 117:16
117:21, 117:22
**unwanted**
109:24
**upset** 80:14
80:16, 80:17
80:18, 80:19
80:19, 80:21
80:25, 81:1
81:5
**USC** 112:13
**use** 22:11, 22:11
43:24, 44:2
45:13
**usual** 61:21
**usually** 6:6
24:12, 27:12
30:11, 33:5
33:6, 37:1
40:14, 61:20
64:2, 64:6
66:13, 116:22
123:22
**utilization** 16:14
16:15, 17:17
**utilized** 16:22
**utilizing** 46:15

**V**

**vaguely** 67:14
67:14
**venue** 3:23
**verification**
112:10
**version** 36:8
36:10, 43:4
43:12, 60:5
60:6
**versus** 30:22
32:4
**vibrating** 86:4
**video** 40:17
**view** 29:9, 68:7
**visit** 88:8
**voicemail** 84:20
84:24, 85:4
**vs** 1:9

**W**

**Wacker** 3:12
**wait** 6:3, 17:13
54:9, 81:16
107:19
**walk** 39:18
64:22
**walked** 39:16
74:3, 74:7
**walking** 73:21
73:23
**walls** 78:3
**want** 6:9, 46:16
51:14, 75:18
81:22, 82:4
84:1, 84:14
87:3, 88:8, 88:9
111:22, 115:13
116:24, 126:19
**wanted** 85:24
92:25, 106:5
106:14
**wants** 69:16
**warranted**
115:24, 116:11
**Washington**
2:22, 3:4
**watch** 85:23
**watched** 75:9
**way** 6:7, 21:15
42:19, 44:10
62:8, 69:16
73:17, 74:4
95:2, 117:15
123:24
**ways** 62:6
**we've** 24:5
47:15, 89:7
93:10, 93:10
**weapon** 108:8
**Wednesday**
1:17, 3:17
26:10, 26:12
**week** 22:7
**weekend** 15:10
15:11, 17:24
**weekender** 18:5
**weekends** 17:25
**weeks** 105:13
106:17, 127:1
**weird** 31:20
**went** 9:25, 14:5

17:13, 17:14 18:5, 45:7 75:21, 76:18 90:22, 104:12 106:4
**West** 2:22, 3:4 3:12
**whatsoever** 75:14
**Whoops** 4:6
**Williams** 48:1 54:18, 122:1 122:10, 122:13 122:15, 122:17 122:21, 123:2 123:6
**Winifred** 1:15 1:16, 3:9, 3:25 4:1, 4:2, 5:4, 5:6 112:12, 112:16 112:20
**Winston** 8:2
**witness** 3:24 4:9, 4:17, 24:2 85:17, 85:19 86:2, 86:4 86:13, 110:20 110:24
**witnesses** 120:18
**wondering** 28:15
**word** 34:25 54:3, 67:21 67:21
**words** 5:20 29:24, 41:23 78:7, 108:4 123:1
**work** 11:12 14:14, 15:24 19:3, 19:7 20:11, 21:13 25:4, 25:7 25:11, 29:18 56:24, 56:25 61:22, 63:25 99:15, 104:16 104:18, 104:19 109:4, 126:2 126:4, 126:5
**worked** 14:8 25:8, 25:12 28:8, 29:2, 29:8 39:12, 57:9 90:21, 90:24
**working** 11:16 14:21, 14:22 16:14, 17:24 17:25, 18:2 18:23, 20:21 21:4, 38:18 39:7, 42:7, 55:3 56:19, 78:14 78:19, 91:10
**works** 57:4
**worry** 22:1 89:3
**write** 84:7, 84:9 84:19, 99:3
**write-up** 124:24
**writing** 34:2 34:4, 44:4, 44:9 44:14, 50:24 52:15, 65:12 108:20, 108:25 110:6
**written** 6:9 25:2, 58:21 58:24, 91:1 98:17, 99:2 99:4
**wrote** 104:20

**X**

**Xavier** 10:10 10:22

**Y**

**yeah** 9:12, 13:14 21:13, 22:11 24:4, 28:15 30:1, 32:7 44:11, 49:17 54:4, 56:21 64:4, 66:11 67:14, 69:4 70:15, 81:3 81:12, 83:10 83:10, 85:11 89:3, 99:1 100:20, 102:13 102:18, 102:20 110:11, 111:9 114:8, 114:12 125:21, 128:20
**year** 9:20, 10:2 10:11, 10:18 11:1, 11:8, 11:9 11:18, 11:19 13:12, 17:21 18:7, 18:9, 41:6 56:8
**years** 9:12, 9:12 11:21, 11:23 13:4, 13:12 14:16, 15:2 15:7, 16:1, 16:7 17:11, 20:6 26:25
**Yep** 125:5

**0**

**0:02:17** 5:18
**0:02:58** 6:12
**0:03:55** 9:10
**0:05:23** 10:15
**0:06:36** 11:14
**0:08:25** 12:22
**0:09:27** 13:19
**0:10:29** 14:8
**0:11:09** 14:25
**0:12:15** 16:1
**0:14:12** 17:11
**0:15:00** 18:1
**0:18:17** 20:6
**0:19:31** 21:3
**0:20:22** 21:23
**0:22:33** 23:12
**0:23:38** 24:8
**0:24:52** 25:5
**0:25:48** 25:24
**0:26:54** 26:22
**0:28:49** 27:25
**0:29:50** 28:20
**0:31:01** 29:16
**0:31:41** 30:4
**0:33:40** 31:15
**0:34:32** 32:13
**0:35:13** 33:5
**0:36:31** 34:3
**0:37:18** 34:18
**0:38:35** 35:4
**0:39:17** 35:21
**0:40:11** 36:12
**0:41:26** 37:3
**0:42:26** 37:23
**0:43:41** 38:8
**0:44:47** 39:6
**0:45:48** 39:25
**0:46:51** 40:19
**0:48:19** 41:24
**0:49:25** 42:15
**0:50:11** 43:10
**0:51:06** 44:5
**0:51:51** 44:19
**0:53:03** 45:11
**0:54:29** 46:12
**0:56:41** 47:21
**0:58:00** 48:14
**0:59:36** 49:18
**000113** 126:20
**000177** 117:9 117:19

**1**

**1** 47:16, 54:11 54:17
**1/4/66** 7:1
**1:00** 111:5
**1:00:47** 50:10
**1:01:16** 50:22
**1:02:10** 51:18
**1:03:35** 52:18
**1:04:25** 53:5
**1:05:32** 54:2
**1:06** 125:5
**1:06:21** 54:14
**1:06:50** 54:22
**1:07:41** 55:11
**1:08:50** 56:2
**1:10:05** 57:3
**1:11:00** 57:17
**1:11:44** 58:7
**1:12:22** 58:20
**1:13** 125:7
**1:13:37** 59:13
**1:14:56** 60:12
**1:15:45** 61:4
**1:16** 128:17
**1:17:11** 62:5
**1:18:12** 63:1
**1:19:34** 64:4
**1:20:52** 65:9
**1:2017cv02393** 1:9, 3:23
**1:21:49** 66:12
**1:22:33** 67:1
**1:23:36** 67:19
**1:24:46** 68:14
**1:27:48** 70:24
**1:29:45** 72:7
**1:30:22** 72:23
**1:31:46** 73:24
**1:32:42** 74:20
**1:34:32** 76:1
**1:35:27** 76:20
**1:36:15** 77:11
**1:37:24** 78:10
**1:39:12** 79:18
**1:41:39** 81:9
**1:42:56** 82:6
**1:44:03** 82:20
**1:45:06** 83:19
**1:46:22** 84:4
**1:46:56** 84:19

**1:47:50** 85:14
**1:49:28** 86:18
**1:50:06** 87:10
**1:51:06** 87:25
**1:52:20** 88:17
**1:53:42** 89:12
**1:54:52** 90:17
**1:55:46** 91:7
**1:56:35** 91:25
**1:57:07** 92:17
**1:58:41** 94:2
**1:59:29** 94:23
**10** 120:11 120:17
**10:05** 3:18
**11** 9:12, 125:8
**11:00** 46:22
**11:07** 46:24
**12** 9:12, 9:12 15:7, 86:9
**12/9** 99:11
**12/9/2016** 99:9 99:10
**12:00** 86:8 86:10
**12:06** 89:25 90:2
**12:33** 111:10
**12:43** 111:12
**128** 87:16
**14** 115:9, 116:24
**15** 117:5, 117:24
**1550** 1:24, 2:7 2:15, 3:19, 3:20
**16** 116:25
**16th** 54:25 107:12
**17** 1:23, 2:6 2:14, 3:19 117:25, 118:5 118:6
**1746** 112:15
**17691** 8:2
**18** 92:24
**189** 99:8
**18th** 54:24 64:15, 72:4 87:13, 105:4 106:23, 107:14 108:25
**1996** 10:12
**1997** 10:19, 28:2

**2**

**2** 54:12, 54:12 57:14, 59:12 61:6
**2:00:23** 95:22
**2:01:18** 96:25
**2:02:14** 97:18
**2:03:21** 98:13
**2:04:20** 99:7
**2:05:28** 100:7
**2:06:26** 101:7
**2:09:26** 103:7
**2:10:24** 104:6
**2:11:28** 104:23
**2:12:47** 105:20
**2:14:10** 106:25
**2:15:43** 108:5
**2:17:10** 108:23
**2:18:33** 109:14
**2:20:16** 110:8
**2:24:25** 113:6
**2:25:17** 113:23
**2:26:10** 114:24
**2:28:14** 115:18
**2:29:05** 116:12
**2:31:23** 117:4
**2:32:11** 117:17
**2:34:17** 118:17
**2:36:39** 119:22
**2:37:17** 120:10
**2:38:04** 121:9
**2:38:53** 122:6
**2:39:58** 122:24
**2:41:33** 124:1
**2:42:52** 124:18
**2:44:01** 125:22
**2:44:40** 126:18
**2:46:32** 127:16
**20** 26:15
**2005** 41:7
**2007** 41:7
**2014** 18:11
**2016** 39:8, 39:13 40:9, 40:16 47:1, 49:22 54:16, 54:19 54:24, 55:4 55:8, 60:25 64:1, 64:16 84:21, 87:13 89:15, 94:18 103:21, 105:1 105:4, 106:23 107:13, 107:14 108:25, 115:21 116:1, 116:2 116:7, 116:8
**2017** 20:8, 86:23 92:20, 104:21 105:5, 118:13 118:21
**2018** 89:15 92:21, 92:24 112:21
**2019** 1:18, 3:17 129:8
**21** 111:24, 112:4 112:5
**21st** 112:21
**25** 105:4
**25th** 1:18, 3:17
**26** 120:12
**271** 58:16
**28th** 86:23
**29th** 54:16 54:18, 54:25

**3**

**3** 59:23, 59:25 112:25, 113:10
**30** 84:21, 129:8
**3026** 38:22
**333** 3:12
**34** 12:6

**4**

**4** 82:14, 113:2 113:3
**4:00** 64:6
**40** 110:16
**45** 26:13
**450** 3:13

**5**

**5** 4:4, 60:5, 60:8 86:16, 103:17
**50** 2:22, 3:4
**500** 2:23, 3:5
**53** 6:24

**6**

**6** 89:1
**60602** 2:8, 2:16 2:24, 3:6, 3:20
**60606** 3:14

**7**

**7** 101:18, 110:5 117:19

**8**

**8** 1:16, 7:5 111:13
**8/25/2017** 103:7
**8:00** 64:2, 64:3 64:4

**9**

**9** 94:14, 94:16 119:13
**9/16/17** 125:20
**9/26** 127:8
**9/26/2016** 127:1
**9/27/2016** 97:22
**9/29/16** 97:10
**9/29/2016** 98:15 127:8, 127:12
**9/9/2016** 94:12 94:15
**95** 124:22
**97** 11:9

**/**

**///** 7:7, 8:4

**From:** Dana Kurtz <DKurtz@kurtzlaw.us>
**To:** "Rebecca.Reierson@cookcountyil.gov" <Rebecca.Reierson@cookcountyil.gov>, "Winifred.Shelby@cookcountyil.gov" <Winifred.Shelby@cookcountyil.gov>
**CC:** "Peter.Kramer@cookcounty.gov" <Peter.Kramer@cookcounty.gov>
**Subject:** John Nawara
**Date:** 2016-12-21 15:49:18 -0500
**Importance:** high
**Attachments:** HIPAA_Release_form_given_to_John_to_sign.pdf
**Inline-Images:** image002.png; image001.jpg

---

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner.

As a result of the above actions taken against Officer Nawara and the unlawful order that he cannot return to work, he has been forced to use his vacation time. He has also lost out on advancement and training opportunities. We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from the harassment against him.

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers

*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

EXHIBIT
J
exhibitsticker.com

**HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION**

I, ______________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

______________________________ ______________________________

Printed Name (of person giving authorization) Social Security Number

______________________________ ______________________________

Signature of person giving authorization Date

Signed ______________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel

**From:** Rebecca Reierson (Sheriff)
**To:** Dana Kurtz
**Subject:** John Nawara
**Date:** Monday, March 13, 2017 8:33:32 AM

Ms. Kurtz-

During the Fitness for Duty (FFD) process, I intend to communicate directly with Mr. Nawara.

Mr. Nawara has been ordered to complete a FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well-settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a FFD prior to returning the employee to work.

I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next 7 days, by March 20, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized subjecting him to possible discipline including termination. Your indication that our practice is unlawful is not correct or supported by the law. Therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further.

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT
K
exhibitsticker.com

**From:** "John Nawara (Sheriff)" <John.Nawara@cookcountyil.gov>
**To:** "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>
**CC:** "dkurtz@kurtzlaw.us" <dkurtz@kurtzlaw.us>
**Subject:** Re: John Nawara
**Date:** 2017-03-18 13:22:00 -0400
**Inline-Images:** image002.png; image001.jpg

---

Hello Ms. Reierson,

Please provide the general order or policy that requires me to sign a HIPPA release for my medical records. Thank you.

John A. Nawara

Get Outlook for iOS

---

**From:** J ohonnNJ oaowr( S ei f owa)F
**Sent:** i Ndy w NMt1 Nwnf 72c0: 75 779P09Rb s 1
**To:** ; NSN Dy woKut( f S z NmNwNei f owa)F
**Cc:** . odbwDwNp owei f owa)F
**Subject:** J o9t( f S z NmNwN

Officer Nawara,
Thank you for your email; however, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure.

Thank you,

Rebecca Reierson
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608

P 773-674-8534
F 773-674-8168
rebecca.reierson@cookcountyil.gov

---

**From:** t( f S z NmNwNei f owa)F
**Sent:** l wa NMt1 Nwnf 75c0: 75 779P59 l . 1
**To:** J ohonnNJ oaowr( S ei f owa)Fu; NSN Dy woK
**Cc:** . odbwDwNp owei f owa)F
**Subject:** J o9t( f S z NmNwN

; oNw1 rqJ oaowr( Sc

i oo NddNnf o, wog( wd)w( p ; wqDw( kkcmf ( ar NS aS, ogoS, oSd, ( nd( wNS, S( dp M, ( nd( wqvNp woHyordaSAd( ho gydhNn' d( m( w o))ondaOo ap p o, aNdbkMNS, Nkk( ) df o dap o vf NOo f N, d( hyw ho woaSrdNdb, qv)ookdf o ( w ow)( wp o d( raAS N hkNS' j v. s wokoNro mNr ySkNm)ykNS, Oa( kNdbr df o s p owanNS madf ; aNhakadaor s ndNS, ar aS wodNkaNda( S ) ( wp Mgwa( wryadNANaSrddf o i f owa)4 E))anocaS mf anf df o WwM)( yS, df Nddf o i f owa)) Oa( kNdb, p MNS, ( df ow( ))anow4 l awds p oS, p oSdwaAf drcNS, wodNkaNdb, NANaSrdyr honNyro ( ) ( ywg( kadanNkrygg( wd)( wdf o ( gg( SoSdd( i f owa)) ; NwdcNS, honNyro ( ) p Mh( p gkNaSdr ( ) f NwNrrp oSdhMdf o rygowOar( wq. koNro n( S)awp df NdvnNS n( p o hNn' d( m( w NS, df NdNkk( ) p M dap o makkho woaSrdNdb, cNS, df Ndv makkS( dho ryhWhdd( NSM)ywdf owf NwNrrp oSd( wwodNkaNda( Sq

vk( ( ' )( wmNwy d( f oNwaSA)w( p M( y d( , NMtr( df NdvnNS wodywaS d( m( w ( S 1 ( S, NMq

i aSnowokMt
t( f S s qz NmNwN

---

**From:** J ohonnNJ oaowr( S ei f owa)F
**Sent:** l wa NMt1 Nwnf 75c0: 75 x9x0 . 1
**To:** ; NSN Dy woK

**From:** Dana Kurtz <DKurtz@kurtzlaw.us>
**To:** "'Rebecca.Reierson@cookcountyil.gov'" <Rebecca.Reierson@cookcountyil.gov>, "'Winifred.Shelby@cookcountyil.gov'" <Winifred.Shelby@cookcountyil.gov>
**CC:** "'Peter Kramer (Sheriff)'" <Peter.Kramer@cookcountyil.gov>
**Subject:** RE: John Nawara
**Date:** 2017-03-08 15:23:02 -0500
**Attachments:** CO_NAWARA_2_28_17_LETTER.PDF
**Embedded:** unnamed; unnamed(1)
**Inline-Images:** image002.png; image001.jpg

---

I have received the attached correspondence from my client, Officer Nawara, from Ms. Reierson.

First, it is inaccurate to say that Officer Nawara did not respond to the letter or the voicemail. In fact, I contacted you on Officer Nawara's behalf and at his request on December 21, 2016 (email attached) and January 31, 2017 (email string attached).

Second, I never received a response to my emails.

Third, as indicated in my December 21, 2016 email, the order to Officer Nawara to sign the HIPPA release for his medical records is unlawful and violates the ADA. Case law is clear that the medical inquiries provision of the ADA protects all employees, even if they are not disabled*See Wright v. Ill. Dep't of Children & Family Servs*., 798 F.3d 513 (7th Cir. 2015). If the order is not rescinded and Officer Nawara put back to work this week, we will have to file suit an seek injunctive release as well as all other remedies, including reinstated the time he has been forced to burn as a result of this unlawful order and unlawful suspension.

I look forward to hearing from you this week.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2017*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:26 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** Peter Kramer (Sheriff)
**Subject:** FW: John Nawara
**Importance:** High

Peter, I had the wrong email for you. See below.

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Tuesday, January 31, 2017 4:23 PM
**To:** 'Rebecca.Reierson@cookcountyil.gov'; 'Winifred.Shelby@cookcountyil.gov'
**Cc:** 'Peter.Kramer@cookcounty.gov'
**Subject:** FW: John Nawara
**Importance:** High

We received no response to my email below. If Officer Nawara is not reinstated immediately, before the end of this week, with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees.

Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or to place him on leave without pay. This is clear retaliation for his complaints against Superintendent Jones-Hayes for her harassment of him.

I look forward to hearing from you.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

---

**From:** Dana Kurtz
**Sent:** Wednesday, December 21, 2016 2:49 PM
**To:** Rebecca.Reierson@cookcountyil.gov; Winifred.Shelby@cookcountyil.gov
**Cc:** Peter.Kramer@cookcounty.gov
**Subject:** John Nawara
**Importance:** High

Ms. Reierson and Ms. Shelby,

I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants.

I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the Sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara (and I) believe that such an order is unlawful.

Officer Nawara has not been given any notification of any complaint or allegations against him. You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form.

Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner.

As a result of the above actions taken against Officer Nawara and the unlawful order that he cannot return to work, he has been forced to use his vacation time. He has also lost out on advancement and training opportunities. We are requesting that he be immediately reinstatement and allowed to return to work, as well as his vacation and time that he has had to use be reinstated. We are also requesting that the Sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from the harassment against him.

I look forward to hearing from you before the close of business Friday, December 24, 2016.

Sincerely,

*Dana*

Dana L. Kurtz, Esq.

KURTZ LAW OFFICES, LTD

www.kurtzlaw.us
32 Blaine Street, Hinsdale, Illinois 60521
Office: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

RATED BY Super Lawyers
*Selected by Super Lawyers from 2013 – 2016*

**THIS IS A CONFIDENTIAL COMMUNICATION**: The preceding e-mail message contains information that is confidential. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender at 630.323.9444. Unauthorized use, dissemination, distribution or reproduction of this message is strictly prohibited.

*Making a difference in the lives of others, every way we can. Please visit and support www.lmsdr.org.*

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

**From:** "Peter Kramer (Sheriff)" <Peter.Kramer@cookcountyil.gov>
**To:** "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>
**Subject:** FW: Fitness-for-Duty John Nawara
**Date:** 2016-11-18 12:05:24 -0500

---

[redacted]

**From:** Nicole Chaney [mailto:nicolecteamsters@gmail.com]
**Sent:** Friday, November 18, 2016 10:45 AM
**To:** Peter Kramer (Sheriff); Mark Robinson; Dennis Andrews
**Subject:** Fitness-for-Duty John Nawara

Peter,

Please be advised we have a serious concern about a Weingarten Violation as well as a retaliatory and unfounded fitness for duty order from Director Reirson & Winifred Shelby. Director Reirson has ordered that Ofc. Nawara is prohibited from entering the CCDOC premises until further notice. They have declined to give him anything in writing. They are demanding medical records that have no relationship with the "alleged incident." They are divesting him of pay without due process - and as you already know and as we have already objected to in the past, there are no written orders on this process. We need to discuss this with you immediately. You can reach me on my cell phone - (586) 945-7101.

Thanks,
Nicole

**Nicole L. Chaney**
**Teamsters Local 700**
1300 West Higgins Road | Suite 301 | Park Ridge, IL 60068
Office Phone: (847) 939-9700 | Office Fax: (847) 518-6495

CAUTION: This e-mail transmission and any attachments hereto contain information from Teamsters Local 700 which is strictly confidential and/or privileged. This information is intended solely for the use of the addressee(s) named. This transmission may be subject to the attorney/client privilege, or be attorney work product. If you are not the designated recipient, or an employee or agent authorized to deliver such transmittals to the designated recipient, you are hereby advised that any disclosure, copying, distribution or use of the contents of this electronic transmission is strictly prohibited. If you have received this transmission in error or are not the intended recipient, we respectfully request that you notify us immediately by replying to sender or by calling us so that we may take the necessary precautions in the future and hereby request that you delete the computer entry and we will arrange for the retrieval of the original documents, if any, at no cost to you.

EXHIBIT
L

Cermak, giving justification for the detainees to be unshackled and handcuffed in front of their bodies.

OPR made several attempts to contact C/O Ganon, who is currently on IOD status, via telephone. OPR attempted to make contact with C/O Ganon at her residence on 01 March 2018. All attempts were unsuccessful.

The allegation that detainees were handcuffed in front of their bodies is accurate. However, an incident report generated regarding an inmate fight that occurred immediately prior to Supt. Jones-Hayes' arrival established that at least one inmate *was* handcuffed behind his back and manipulated the handcuffs so that the handcuffs wound up in front. It is also apparent that Cermak was not equipped with a sufficient number of shackles and handcuffs to comply with any rule that all detainees be shackled or handcuffed behind their backs. The transporting C/Os were responsible for handcuffing the detainees and C/O Nawara was not in position to un-handcuff and re-handcuff every detainee that arrived in Cermak at busy intervals. When specifically ordered to do so, C/O Nawara did follow orders to handcuff a specific detainee in the presence of the Superintendent.

OPR found insufficient evidence to support that C/O John Nawara violated the Cook County Sheriff's Orders, Rules, Regulations and/or Policies.

**I certify that no Political Reasons or Factors were considered in any decision I made or action I took relating to this Employment Action. Further, I do not know of, or have any reason to believe that, anyone else considered or took action based on Political Reasons or Factors with respect to this Employment Action.**

| | |
|---|---|
| [signature] | 7 MARCH 2018 |
| Investigator Lissette Rivera | Date |
| Miriam Rentas | 3/7/2018 |
| Director Miriam Rentas | Date |
| [signature] | 3/7/2018 |
| Executive Director Fabio Valentini | Date |



EXHIBIT
M
exhibitsticker.com

CCSO_003039

**From:** "Rebecca Reierson (Sheriff)" <rebecca.reierson@cookcountyil.gov>
**To:** "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
**Subject:** Ofc Nawara
**Date:** 2016-11-18 11:35:18 -0500

---

Hi Matt,
The union informed me that there is a video of the incident between Supt Hayes and Nawara. How can I get access to that? Thanks, Beka

EXHIBIT
N
exhibitsticker.com

**From:** "Matthew Burke (Sheriff)" <MAILER-DAEMON>
**To:** Lisa Garza (Sheriff)
**Subject:** Fwd: Ofc Nawara
**Date:** 2016-11-18 11:43:20 -0500

---

Please help

Matt Burke
Chief of Staff
Cook County Department of Corrections
773-674-7921 (ph)

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

-------- Original message --------
From: "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>
Date: 11/18/16 10:35 AM (GMT-06:00)
To: "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
Subject: Ofc Nawara

Hi Matt,
The union informed me that there is a video of the incident between Supt Hayes and Nawara. How can I get access to that? Thanks, Beka

**From:** "Matthew Burke (Sheriff)" <MAILER-DAEMON>
**To:** Rebecca Reierson (Sheriff)
**Subject:** Re: Ofc Nawara
**Date:** 2016-11-18 12:00:01 -0500

---

I don't have access to the video because the camera system only stores video footage for 30-days.
A complaint register however was sent to OPR soon after the incident, so they possibly pulled and saved it. I would inquire with OPR.
Thank you,

Matt Burke
Chief of Staff
Cook County Department of Corrections
773-674-7921 (ph)

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, November 18, 2016 10:35 AM
**To:** Matthew Burke (Sheriff)
**Subject:** Ofc Nawara

Hi Matt,
The union informed me that there is a video of the incident between Supt Hayes and Nawara. How can I get access to that? Thanks, Beka

**From:** mark robinson <markarobinson71@gmail.com>
**To:** "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov>
**CC:** Peter Kramer <Peter.kramer@cookcountyil.gov>, Dennis Andrews <dennisa@teamsterslocal700.com>, Nicole Chaney <nicolecteamsters@gmail.com>
**Subject:** Re: C/O John Nawara
**Date:** 2016-12-01 15:02:57 -0500

---

Hello ma'am,

Mr. Kramer has notified us that he has a copy of the video. I would also like to point out that the fitness for duty according to nurse Shelby was not based on the original incident but the behavior of the officer when he attended the interview at human resources. Thanks

Sent from my iPhone

On Dec 1, 2016, at 1:15 PM, Rebecca Reierson (Sheriff) <Rebecca.Reierson@cookcountyil.gov> wrote:

Hi Mark,
When we spoke regarding Officer Nawara's fitness for duty, you indicated that the Sheriff's Office provided you with a video related to one of the incidents in question. I have not been successful in locating any such video. Can you please let me know the incident number on the video and the Sheriff's employee who provided you with the video? Thanks very much, Beka

Rebecca Reierson, Esq.
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

**From:** "Rebecca Reierson (Sheriff)" <MAILER-DAEMON>
**To:** Jonathan Myslinski (Sheriff)
**Subject:** RE: Video
**Date:** 2016-11-28 10:51:05 -0500
**Inline-Images:** image001.png

---

Thanks very much. Beka

---

**From:** Jonathan Myslinski (Sheriff)
**Sent:** Monday, November 28, 2016 9:42 AM
**To:** Rebecca Reierson (Sheriff)
**Subject:** RE: Video

Here is the control number: OPR2016-0442

Jonathan Myslinski
Director
Cook County Sheriff's Office
Office of Professional Review
3026 South California Avenue
Chicago, Illinois 60608
Building 2, 4th Floor, Room 407
Main: 773-674-7580
Desk: 773-674-7586
NWU SPSC #385

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply-email and then delete this message and its attachments. Do not deliver, distribute, transmit or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action relative to the information contained in this communication and/or attachments. This e-mail and any attached documents may contain Law Enforcement Sensitive material and should not be disseminated outside of official law enforcement channels. The information contained in this message as well as any attachments shall not be released to the media or the general public.

---

**From:** Jonathan Myslinski (Sheriff)
**Sent:** Monday, November 28, 2016 9:41 AM
**To:** Rebecca Reierson (Sheriff)
**Subject:** RE: Video

Hi Rebecca,

This is an Department Head investigation assigned to DOC. OPR currently does not have any video. I would contact Dawn Ertler from DOC and ask her who is assigned to the case. They will have the video for you to review. If you have no luck, let me know and I will intervene.

Thanks,

Jonathan Myslinski
Director
Cook County Sheriff's Office
Office of Professional Review
3026 South California Avenue
Chicago, Illinois 60608
Building 2, 4th Floor, Room 407
Main: 773-674-7580
Desk: 773-674-7586
NWU SPSC #385

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply-email and then delete this message and its attachments. Do not deliver, distribute, transmit or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action relative to the information contained in this communication and/or attachments. This e-mail and any attached documents may contain Law Enforcement Sensitive material and should not be disseminated outside of official law enforcement channels. The information contained in this message as well as any attachments shall not be released to the media or the general public.

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, November 18, 2016 11:57 AM
**To:** Jonathan Myslinski (Sheriff)
**Subject:** Video

Hi Jonathan,
HR was looking into an incident that occurred in the holding area at Cermak between Superintendent Karen Jones-Hayes and Officer John Nawara on September 28, 2016. The union informed me that they had received a copy of the video of the incident. I was not aware we had video available and I would like to know where I am able to view the footage- I thought maybe OPR had a copy. Thanks, Beka

Rebecca Reierson, Esq.

**From:** "Karen Jones-Hayes (Sheriff)" <MAILER-DAEMON>
**To:** Rebecca Reierson (Sheriff)
**Subject:** Re: Officer Nawara
**Date:** 2017-02-21 12:59:23 -0500

---

The incident occurred over 3o days ago, you will not be able to review it. That was the purpose of me generating the report so the incident can be recorded for future review.

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Tuesday, February 21, 2017 11:50 AM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** FW: Officer Nawara

Superintendent,
I am following up on my email below. Can you please let me know if there was a camera in the area where this incident took place, and if so, which camera? Thank you,
Beka

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, February 10, 2017 8:33 AM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** Officer Nawara

Superintendent Jones-Hayes,
I have been trying to locate video of the incident with the above Officer. I have footage from the staging area, but I believe your interaction with him took place in Basement Control 1, is that right? Are there cameras in that area? Please let me know so I can pull the necessary footage. Thanks, Beka

Rebecca Reierson, Esq.
Cook County Sheriff's Office
Bureau of Human Resources
3026 S. California Avenue, Building 2
Chicago, IL 60608
P (773) 674-8534
F (773) 674-8168
rebecca.reierson@cookcountyil.gov

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney-client and/or work product privileges. If you are not the intended recipient of this message or if this message has been addressed to you in error, please alert the sender immediately by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient. Do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments. Thank you.

**From:** "Karen Jones-Hayes (Sheriff)" <MAILER-DAEMON>
**To:** Rebecca Reierson (Sheriff)
**Subject:** Re: Officer Nawara
**Date:** 2017-02-21 13:11:44 -0500

---

DIV8-Cermak-CAM 0.002 Staging Rear SE and DIV8-Cermak-CAM0.004 Staging Front

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Tuesday, February 21, 2017 12:08 PM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** RE: Officer Nawara

Apparently the proper videos were not pulled. Which camera was it?

---

**From:** Karen Jones-Hayes (Sheriff)
**Sent:** Tuesday, February 21, 2017 11:59 AM
**To:** Rebecca Reierson (Sheriff)
**Subject:** Re: Officer Nawara

The incident occurred over 3o days ago, you will not be able to review it. That was the purpose of me generating the report so the incident can be recorded for future review.

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Tuesday, February 21, 2017 11:50 AM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** FW: Officer Nawara

Superintendent,
I am following up on my email below.   Can you please let me know if there was a camera in the area where this incident took place, and if so, which camera? Thank you,
Beka

---

**From:** Rebecca Reierson (Sheriff)
**Sent:** Friday, February 10, 2017 8:33 AM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** Officer Nawara

Superintendent Jones-Hayes,
I have been trying to locate video of the incident with the above Officer. I have footage from the staging area, but I believe your interaction with him took place in Basement Control 1, is that right? Are there cameras in that area? Please let me know so I can pull the necessary footage. Thanks, Beka

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**CERTAIN DEFENDANTS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S NOTICE OF INSPECTION AND REQUEST TO PRODUCE**

NOW COME Defendants, THOMAS DART, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY (collectively as "Certain Defendants"), by and through their attorneys, SCHARF BANKS MARMOR LLC, and pursuant to Federal Rules of Civil Procedure 34 and 26, provide these responses and objections to Plaintiff's Notice of Inspection and Request to Produce:

**Responses and Objections**

1. Any computer(s), devices, and data repositories that were used in the creation and/or modification of Jones-Hayes' Complaint Register regarding Plaintiff, to be analyzed by Plaintiff's ESI computer forensic expert, but limited to the file(s) created about Plaintiff.

***NOTICE:** This notice requires that the computer be preserved and that the Complaint Register computer file and/or data not be accessed, modified, deleted, or altered in any manner and that the metadata remain intact.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome and disproportionate to the needs of the case insofar as there is no apparent reason why inspection or production of the computer on which the Complaint Register was created and/or modified is related to any of the claims in this case. Certain Defendants also object that this request**



EXHIBIT
O
exhibitsticker.com

**seeks to impose obligations beyond the requirements of the Federal Rules of Civil Procedure 34(b)(2) where Certain Defendants, in their Responses and Objections to Plaintiff's First Request for Production of Documents, state that subject to its objections, they will search for and produce nonprivileged documents (if any) containing the same electronically stored information that would be available concerning the creation of the Complaint Register that Jones-Hayes prepared and sent on September 28, 2016, upon entry of a satisfactory protective order. Certain Defendants also object that the term "data repositories" is undefined and therefore vague and confusing, and that the terms "and/or modified" assume facts not in evidence – *i.e.* that anything was modified.**

**Subject to these objections, Certain Defendants answer that the only computer on which the Complaint Register was prepared was the work computer of Defendant Jones-Hayes. That computer was replaced on or about September 13, 2017 in the normal course of Cook County Sheriff's Office operations. Certain Defendants do not believe the computer or its hard drive may be retrieved but continue to investigate whether they can be found. If they are found, Certain Defendants will maintain their objections to this request unless and until Plaintiff can provide a satisfactory explanation for why he was entitled to inspect the computer.**

**Additionally, Defendants already agreed to meet and confer with Plaintiff and his ESI consultant to create a mutually agreeable set of search terms for production of electronically stored documents in this case. Documents saved to Defendant Jones-Hayes's "My Documents" file on her computer – both current and former – should be available to be searched on the Cook County Sheriff Office's servers, and responsive material will be available for production with metadata. Accordingly, at this time, nothing is being withheld as a result of the above objections. Certain Defendants reserve the right to object to the**

**queries to be identified in the ESI meet and confer, should there be disagreement about the search terms.**

2. Any and all video recordings of the Cermak staging area and basement area on September 28, 2016.

**RESPONSE:** **Certain Defendants object that this request is vague, overbroad, ambiguous, and disproportionate to the needs of the case insofar as it refers to an undefined "basement area" and seeks by its terms video that is unrelated to the issues in this case. Subject to these objections, defendants have searched for video recordings of the area in which the events complained of in the Complaint took place, on September 28, 2016, and will produce such video, subject to entry of a suitable protective order. Defendants also will produce other available videotape from the Cermak building from September 28, 2016 despite the above objections, and does not waive those objections in producing them. Defendants are not withholding any responsive video recordings of which they are aware at this time.**

**The Bates stamp numbers of these recordings are CCSO_000165 to CCSO_000168.**

Respectfully submitted,
THOMAS DART, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY

/s/ Sarah R. Marmor

Stephanie A. Scharf
Sarah R. Marmor
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
mchurma@scharfbanks.com

**CERTIFICATE OF SERVICE**

I, Sarah Marmor, an attorney, hereby certify that a copy of the forgoing CERTAIN DEFENDANTS' SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S NOTICE OF INSPECTION AND REQUEST TO PRODUCE was served upon the below-listed counsel via electronic mail on February 28, 2017.

/s/ Sarah R. Marmor

Dana L. Kurtz
Heidi Karr Sleper
Kurtz Law Offices, Ltd.
32 Blaine St.
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
*Attorneys for John Nawara*

Nile N. Miller
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
nile.miller@cookcountyil.gov
*Attorney for County of Cook*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**CERTAIN DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S**
**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

NOW COME Defendants, THOMAS DART, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY (collectively as "Certain Defendants") by and through their attorneys, SCHARF BANKS MARMOR LLC, and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, provide these Answers to Plaintiff's First Request for Production of Documents:

**Objections to Definitions and Instructions**

1. Certain Defendants object to the instruction requiring the identification of "each person answering or supplying information for use in answering each request" to the extent it is an interrogatory and seeks to circumvent the maximum number allowed under Rule 33 of the Federal Rules of Civil Procedure.

2. Certain Defendants object to the definition of "Defendant" insofar as it is vague, overbroad, and ambiguous. Certain Defendants also object to this definition to the extent it includes parties who are not employed by, or otherwise within the control of, the County of



EXHIBIT
P
exhibitsticker.com

Cook. Certain Defendants further object to the extent that this definition seeks attorney work product and other privileged information.

3. Certain Defendants object to the definition of "Defendants" insofar as it is vague, overbroad, and ambiguous. Certain Defendants also object to this definition to the extent it includes parties who are not employed by, or otherwise within the control of, the named Defendants. Certain Defendants further object to the extent that this definition seeks attorney work product and other privileged information.

4. Certain Defendants object to the definition of "Document" to the extent it is vague, overbroad, ambiguous, unduly burdensome, disproportionate to the needs of the case, and goes beyond the requirements and definitions of the Federal Rules of Civil Procedure and other applicable law.

5. Certain Defendants object to the definition of "Identify" to the extent it constitutes an interrogatory and seeks to circumvent the maximum number allowed under Rule 33 of the Federal Rules of Civil Procedure and is vague, overbroad, ambiguous, unduly burdensome, disproportionate to the needs of the case, and seeks to impose obligations beyond the requirements and allowances within the Federal Rules of Civil Procedure. Certain Defendants further object to this definition to the extent it seeks personally identifiable information without a protective order in this matter.

6. Certain Defendants object to the instruction requiring that "[i]f any document is claimed not to be in the Defendant's possession or control to obtain, give the reasons therefore and the present location and custodian of the document(s)" to the extent it is an interrogatory and seeks to circumvent the maximum number allowed under Rule 33 of the Federal Rules of Civil Procedure.

7. Certain Defendants object to the instruction in paragraph P regarding information to be provided in a privilege log to the extent the instruction seeks to impose obligations beyond the requirements of the Federal Rules of Civil Procedure.

**Responses and Objections to Specific Requests for Production**

1. Any and all documents which reflect, refer, relate to or mention Plaintiff, including his complete personnel, disciplinary, benefits, health or disability file, grievance documents, merit reviews, salary reviews, job evaluations, performance assessments, transfer requests, ratings, commendations, awards, correspondence, E-Mail, notes, memorandums, reports, investigatory notes, loudermill hearing documents, any documents relating in any manner to any investigation, complaints or any documents reflecting complaints made about him, transcripts, position statements, statements and/or affidavits.

**RESPONSE: Certain Defendants object to the extent that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter.**

2. Any and all memorialized communications, whether oral or written (except those subject to the attorney-client privilege, and so detailed pursuant to Instruction P above) made by any person referring or relating to Plaintiff, his employment, training and/or to any issues, claims and/or defenses of this case.

**RESPONSE: Certain Defendants object to the extent that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter.**

3. The electronic records showing when the OPR complaint was filed by KAREN JONES-HAYES against Plaintiff.

**<u>RESPONSE:</u> Certain Defendants object that this request is vague and ambiguous with respect to the document Plaintiff calls "the OPR complaint." Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request.**

4. All emails sent or received by JONES-HAYES relating or referring to Plaintiff.

**<u>RESPONSE:</u> Certain Defendants object to the extent that this request is overbroad, unduly burdensome, disproportionate to the needs of the case. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

5. All emails sent or received by JONES-HAYES relating or referring to Plaintiff from September 28, 2016 through the present.

**<u>RESPONSE:</u> Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

6. Any and all social media posts of JONES-HAYES from September 28, 2016 through the present.

**<u>RESPONSE:</u> Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Jones-**

**Hayes has not made any social media posts relating to her work at the Cook County Sheriff's Office or Plaintiff.**

7. All text messages sent or received by JONES-HAYES from September 28, 2016 through the present relating or referring to Plaintiff, any aspect of his work with Defendants, and/or this case.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome, vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Jones-Hayes has not made or received any text messages related to or referring to Plaintiff.**

8. All emails sent or received by MATTHEW BURKE relating or referring to Plaintiff.

**RESPONSE:** **Certain Defendants object to the extent that this request is overbroad, unduly burdensome, disproportionate to the needs of the case, and calls for documents outside Certain Defendants' possession, custody, or control. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

9. All emails sent or received by MATTHEW BURKE relating or referring to Plaintiff from September 28, 2016 through the present.

**RESPONSE:** **Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

10. Any and all social media posts of MATTHEW BURKE from September 28, 2016 through the present.

**<u>RESPONSE:</u> Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Burke has not made any social media posts relating to his work at the Cook County Sheriff's Office or Plaintiff.**

11. All text messages sent or received by MATTHEW BURKE from September 28, 2016 through the present relating or referring to Plaintiff, any aspect of his work with Defendants, and/or this case.

**<u>RESPONSE:</u> Certain Defendants object that this request is unduly burdensome, vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Burke has not made or received any text messages relating to or regarding Plaintiff.**

12. All emails sent or received by REBECCA REIERSON relating or referring to Plaintiff.

**<u>RESPONSE:</u> Certain Defendants object to the extent that this request is overbroad, unduly burdensome, disproportionate to the needs of the case, and calls for documents outside Certain Defendants' possession, custody, or control. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

13. All emails sent or received by REBECCA REIERSON relating or referring to Plaintiff from September 28, 2016 through the present.

**RESPONSE:** **Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

14. Any and all social media posts of REBECCA REIERSON from September 28, 2016 through the present.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Reierson has not made any social media posts relating to her work at the Cook County Sheriff's Office or Plaintiff.**

15. All text messages sent or received by REBECCA REIERSON from September 28, 2016 through the present relating or referring to Plaintiff, any aspect of his work with Defendants, and/or this case.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome, vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Burke has not made or received any text messages relating to or regarding Plaintiff.**

16. All emails sent or received by WINIFRED SHELBY relating or referring to Plaintiff.

**RESPONSE:** **Certain Defendants object to the extent that this request is overbroad, unduly burdensome, disproportionate to the needs of the case, and calls for documents**

**outside Certain Defendants' possession, custody, or control. Subject to these objections, Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

17. All emails sent or received by WINIFRED SHELBY relating or referring to Plaintiff from September 28, 2016 through the present.

**<u>RESPONSE:</u> Certain Defendants will produce nonprivileged documents (if any) responsive to this request upon entry of a satisfactory protective order in this matter and determination of appropriate search terms for this Electronically Stored Information ("ESI").**

18. Any and all social media posts of WINIFRED SHELBY from September 28, 2016 through the present.

**<u>RESPONSE:</u> Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this request because Defendant Shelby has not made any social media posts relating to her work at the Cook County Sheriff's Office or Plaintiff.**

19. All text messages sent or received by WINIFRED SHELBY from September 28, 2016 through the present relating or referring to Plaintiff, any aspect of his work with Defendants, and/or this case.

**<u>RESPONSE:</u> Certain Defendants object that this request is unduly burdensome, vague, overbroad, ambiguous, and disproportionate to the needs of the case. Subject to these objections, Certain Defendants answer that there are no documents responsive to this**

**request because Defendant has not made or received any text messages relating to or regarding Plaintiff.**

20. The video footage from all cameras on September 28, 2016 and September 29, 2016 in Cermak.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case insofar as it seeks video from areas at Cermak that have no relevance to the claims in this case as well as video from the day after the incidents at issue on this case. Subject to these objections, Certain Defendants will produce video responsive to this request.**

21. The video footage from all cameras on September 28, 2016 and September 29, 2016 in Division 5 or located in the same Division where Burke's office is located and that would show any route to and/or from his office into and out of the building and all individuals that may have visited his office.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case insofar as it seeks video from areas at Cermak that have no relevance to the claims in this case as well as video from the day after the incidents at issue on this case. Subject to these objections, Certain Defendants answer that there is no camera that would show people entering or exiting Defendant Burke's office in Division 5.**

22. All phone records for MATTHEW BURKE, WINIFRED SHELBY, REBECCA REIERSON, JONES-HAYES, and THOMAS DART, Sheriff for September 28, 2016, September 29, 2016, and October 13, 2016 through November 19, 2016.

**RESPONSE:** **Certain Defendants object that this request is unduly burdensome and calls for documents outside Certain Defendants' possession, custody, or control. Certain Defendants further object that the request is vague, overbroad, ambiguous, and disproportionate to the needs of the case. Additionally, to the extent this request seeks phone records of Defendant Dart, who is not named in his individual capacity, this request is outside the scope of the operative complaint. Subject to these objections, Certain Defendants will conduct a search as to whether the Sheriff's Office has such phone records and whether they indicate the source and recipient of any phone calls from the phones assigned to Defendants Burke, Shelby, Reierson, or Jones-Hayes and will produce nonprivileged documents (if any) responsive to this request. Defendants Jones-Hayes, Burke, Reierson, and Shelby do not have personal phone records for the above time period.**

Respectfully submitted,

THOMAS DART, KAREN JONES-HAYES,
MATTHEW BURKE, REBECCA REIERSON, and
WINIFRED SHELBY

/s/ Sarah R. Marmor
Stephanie A. Scharf
Sarah R. Marmor
George D. Sax
Suzanne M. Alexander
Morgan D. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
gsax@scharfbanks.com
mchurma@scharfbanks.com
salexander@scharfbanks.com

**CERTIFICATE OF SERVICE**

I, Sarah Marmor, an attorney/a non-attorney, hereby certify that a copy of the forgoing CERTAIN DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS was served upon the below-listed counsel via electronic mail and U.S. Mail, proper postage prepaid at 333 West Wacker Drive, Chicago, Illinois, before 5:00 p.m. on November 14, 2017.

/s/ Sarah R. Marmor

Dana L. Kurtz
Heidi Karr Sleper
Kurtz Law Offices, Ltd.
32 Blaine
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
*Attorneys for John Nawara*

Kevin William Frey
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
kevin.frey@cookcountyil.gov
*Attorney for County of Cook*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17-cv-2393 |
| | ) | |
| COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities, | ) | Hon. Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

**DEFENDANT COOK COUNTY SHERIFF'S OFFICE'S SUPPLEMENTAL ANSWER TO PLAINTIFF'S FIRST SET OF DOCUMENT PRODUCTION REQUESTS**

NOW COMES the Defendant Cook County Sheriff's Office ("CCSO"), by and through SCHARF BANKS MARMOR LLC, and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, makes the following supplemental response to Plaintiff's First Set of Document Production Requests Directed to Defendant Cook County Sheriff's Office.

4. All documents that may be used to support or otherwise relate to Defendant's affirmative defenses.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 4 by producing the attached documents CCSO_000192-CCSO_000481.**

36. A complete copy of all Defendant's policies, rules, and/or regulations related to all disciplinary actions or investigations, employee complaints of discrimination, retaliation, and/or harassment, Fitness for Duty examinations, medical examinations, the signing of medical releases or HIPAA releases, or any other subject matter relevant to the allegations of the Amended Complaint.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 36 by producing the**

**attached documents CCSO_000192-CCSO_000481.**

> 38. All documents that comprise or relate to Defendant's policies, directives, customs, or practices regarding the retention, maintenance, and destruction of documents, including but not limited to electronic data, computer files, and/or documents in hard copy.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 38 by producing the attached documents CCSO_000192-CCSO_000481.**

> 39. All documents that comprise or describe Defendant's policies, practices, or procedures with respect to harassment or retaliation or that address incidents of alleged of harassment or retaliation in the workplace, including but not limited to all documents relating to any training with respect to employment and anti-retaliation laws.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 39 by producing the attached documents CCSO_000192-CCSO_000481.**

> 41. Any and all documents, data compilations, and tangible things that are in the possession, custody, or control of Defendant and that Defendant may use to support its defenses against Plaintiff's claims.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 41 by producing the attached documents CCSO_000192-CCSO_000481.**

> 43. A complete list of all surveillance cameras, including their name and placement within the Cook County Sheriff's Office, Cermak, or any other relevant area, that may have a visible sightline to any incident, allegation, or fact in the Amended Complaint.

**ANSWER: Subject to, and without waiving answers and objections made previously, the CCSO supplements its response to Document Production Request 43 by stating that the CCSO already has produced all relevant video footage from surveillance cameras in its possession. The CCSO objects to disclosure of the names and placements of all surveillance**

**cameras within the CCSO, Cermak, or any other relevant area on the ground that such information is confidential; its disclosure is not relevant to any issue in this case; and disclosing such information without a relevant purpose poses an unnecessary security risk to the CCSO.**

Dated: June 25, 2018

Respectfully submitted,

COOK COUNTY SHERIFF'S OFFICE,

/s/ Sarah R. Marmor

Stephanie A. Scharf
Sarah R. Marmor
Lynn Moffa
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
lmoffa@scharfbanks.com
mchurma@scharfbanks.com

## CERTIFICATE OF SERVICE

I, Sarah Marmor, an attorney, hereby certify that a copy of the forgoing DEFENDANT COOK COUNTY SHERIFF'S OFFICE'S SUPPLEMENTAL ANSWER TO PLAINTIFF'S FIRST SET OF DOCUMENT PRODUCTION REQUESTS was served upon the below-listed counsel via electronic mail on June 25, 2018.

/s/ Sarah R. Marmor

Dana L. Kurtz
Heidi Karr Sleper
Jacob Exline
Kurtz Law Offices, Ltd.
32 Blaine
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
jexline@kurtzlaw.us
*Attorneys for John Nawara*

Nile N. Miller
Kathleen Cunniff Ori
Jay Rahman
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
nile.miller@cookcountyil.gov
kathleen.ori@cookcountyil.gov
jay.rahman@cookcountyil.gov
*Attorneys for County of Cook*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**COOK COUNTY SHERIFF OFFICE'S OBJECTIONS AND RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Defendant, Cook County Sheriff's Office ("CCSO" of "Defendant"), by and through its attorneys SCHARF BANKS MARMOR LLC and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, makes the following responses to "Plaintiff's Second Set of Interrogatories Directed to Defendant the Cook County Sheriff's Office."

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

The CCSO adopts and incorporates herein its objections to the definitions and instructions in Plaintiff's First Set of Interrogatories, which Plaintiff states are controlling in his Second Set of Interrogatories.

**INTERROGATORY REQUESTS**

1. Identify the Cook County Sheriff's Office policy and/or procedure for maintaining, retrieving, saving, and deleting closed caption television ("CCTV") recordings and where that policy and/or procedure is memorialized.

**ANSWER: Defendant CCSO objects that Plaintiff has exceeded the maximum number of interrogatories allowed by Federal Rule of Civil Procedure 33 and has not sought**

**leave of Court for these interrogatories. Without waiving said objection, Defendant CCSO refers Plaintiff to Sheriff's General Order 11.5.26.0 (CCSO-000453-000464), which provides that video recordings are automatically written over after thirty days has expired.**

2. Identify whether there was a preservation request sent to employees of the Cook County Sheriff's Office to preserve documents, emails, servers, CCTV footage and/or any other form of ESI in response to:

a. The fight between two inmates in the Cermak staging area on September 28, 2016 (see ¶ 31 of the First Amended Complaint);

b. The OPR complaint filed by Defendant Jones-Hayes dated September 28, 2016 (see CCSO_000003-000004);

c. The OPR complaint filed by Plaintiff Nawara dated October 13, 2016 (see NAWARA_000002); and

d. Being informed or on notice of the potential for litigation and/or any of the claims or defenses that have been raised in this case.

**ANSWER: Defendant CCSO objects that Plaintiff has exceeded the maximum number of interrogatories allowed by Federal Rule of Civil Procedure 33, and has not sought leave of Court for these interrogatories. In addition, Defendant CCSO objects that the interrogatory mistakenly identifies NAWARA_000002 as an "OPR complaint." Without waiving said objections, Defendant CCSO answers as follows with regard to requests for preservation of CCTV footage:**

**a. The fight between two inmates in the Cermak staging area on September 28, 2016 was reported through the Jail Monitoring System (JMS) of the CCDOC under CCDOC Incident #DIV11-2016-15666, and video footage was preserved according to CCSO policy referenced in response to Interrogatory # 1 related to incidents that have a CCDOC incident number/Sheriff's Office Case Report (CR) number.**

**b. None. However, a request from OPR for footage pertaining to CCDOC Incident #DIV11-2016-15666 was received prior to the CCSO's 30-day automatic video recording deletion taking effect. Defendants produced this footage to Plaintiff in response to Plaintiff's previous discovery requests.**

**c. None. However, NAWARA_000002 references CCDOC Incident #DIV11-2016-15666, and, as noted above, a request from OPR was received for footage pertaining to CCDOC Incident #DIV11-2016-15666. Defendants produced this footage to Plaintiff in response to Plaintiff's previous discovery requests.**

**d. None. However, the VMU received requests from DOC Chief of Staff Matt Burke's office in November 2016, from the legal department in August 2017, and from OPR in February 2018--all after the CCSO's 30-day automatic video recording deletion took effect—asking for either video footage associated with CCDOC Incident #DIV11-2016-15666 or video preserved from Cermak on the date of CCDOC Incident #DIV11-2016-15666. The VMU provided copies of video footage that had been preserved based on a and b above, in response to those requests.**

**With respect to preservation requests regarding documents, emails, servers, and/or any other form of ESI, a preservation request was sent with regard to d above, by letter dated April 12, 2017 from Kevin Frey, Assistant State's Attorney, to Nicholas Scouffas, General Counsel, Cook County Sheriff's Office.**

3. Identify whether there are any CCTV cameras that did or would have recorded any of the events referenced in:

a. ¶¶ 32-38 of the First Amended Complaint;

b. The OPR complaint filed by Defendant Jones-Hayes dated September 28, 2016 (see CCSO_000003-000004); and

c. The OPR complaint filed by Plaintiff Nawara dated October 13, 2016 (see NAWARA_000002); and

If so, provide sufficient information to identify the location, make and model, and recording logs for each camera; and produce the logs and camera footage.

**ANSWER: Defendant CCSO objects that Plaintiff has exceeded the maximum number of interrogatories allowed by Federal Rule of Civil Procedure 33, and has not sought leave of Court for these interrogatories. Defendant CCSO also objects to this interrogatory to the extent that it requests production of documents and things.**

**Defendant CCSO further objects to identifying the make and model of the cameras in question on relevancy grounds, and to "identifying recording logs for each camera" as vague and ambiguous because it is not clear what Plaintiff means by "recording logs." Surveillance cameras maintained by the CCSO are recording twenty-four hours a day every day. Those recordings are maintained and preserved according to Sheriff's General Order 11.5.26.0. There are no separate "logs" or records of those recordings.**

**Finally, the CCSO objects that this interrogatory is unduly burdensome and harassing. The CCSO already has identified the video footage from relevant surveillance cameras on the date in question that has been preserved beyond the 30-day automatic deletion policy of the CCSO, and has produced those recordings to Plaintiff. Any additional footage taken by surveillance cameras in the twenty-four hour period on the date in question has been written over pursuant to official policy without any record of the footage that was overwritten. Defendant CCSO has fully explained to Plaintiff in Rule 37(a) good faith discussions the facts related to video preservation following the September 28, 2016 incident, and Plaintiff has not provided the CCSO with any basis for calling into question the information the CCSO has provided regarding the video footage that was preserved and the video footage that no longer exists.**

**Without waiving the above objections, Defendant CCSO states that there are four cameras in the staging area of the Cermak basement, one in each corner of the room. There are no cameras inside the control station or ER area of the Cermak basement. Defendant CCSO further states that it will provide Plaintiff with a declaration or declarations of an employee or employees of the CCSO with knowledge pertaining to the existence or lack thereof of video footage and preservation of video footage relevant to the incident described in the complaint, as previously discussed during counsel's Rule 37(a) discussions.**

4. Identify whether any of the recordings named in response to Interrogatory No. 3, above, are still in existence, where they are stored, and who was or were charged as the custodian(s). If the recordings are no longer in existence, identify when they were deleted or overwritten, why they were deleted or overwritten, who deleted them or was charged with them being overwritten, and who ordered that the recordings be deleted or overwritten, or who was in charge of such process.

**ANSWER: Defendant CCSO objects that Plaintiff has exceeded the maximum number of interrogatories allowed by Federal Rule of Civil Procedure 33, and has not sought leave of Court for these interrogatories. The CCSO also objects that this interrogatory is unduly burdensome and harassing for the reasons given in the CCSO's response to Interrogatory # 3, which the CCSO incorporates herein.**

**Without waiving the above objections, Defendant CCSO states that video footage from the staging area that was preserved pursuant to CCDOC Incident #DIV11-2016-15666 is still in existence and is stored and maintained by the Video Management Unit of the CCSO. Further, said video footage has been produced to Plaintiff in discovery in this case. No recording that was preserved beyond the thirty-day automatic deletion process has been destroyed. Any footage that might have been taken by the four cameras in the staging area but was not preserved in the thirty-day period after the date of the recording was overwritten automatically by the video system per policy and normal system operations.**

5. Identify the following in regards to the "Fitness for Duty Log" produced by Defendants as CCSO_000188:

a. Who created the Fitness for Duty Log;

b. How the Fitness for Duty Log was created and, if extracted from a separate program or server, identify that program or server;

c. Who decides whether a Fitness for Duty examination is warranted;

d. What the bases are for requiring a Fitness for Duty examination; and

e. Whether the process for determining whether a Fitness for Duty examination is warranted is memorialized as a CCSO policy or procedure, and, if so, what is the title of that policy or procedure, and produce said policy or procedure.

**ANSWER: Defendant CCSO objects that Plaintiff has exceeded the maximum number of interrogatories allowed by Federal Rule of Civil Procedure 33, and has not sought leave of Court for these interrogatories. Defendant CCSO also objects to this interrogatory to the extent that it requests production of documents and things. Defendant CCSO also objects that part b is vague and ambiguous in that it is not clear what information the interrogatory seeks when it asks "how" the FFD Log was created, or what the term "extracted from a separate program or server" means. Defendant CCSO also objects that part c is overbroad and unduly burdensome in that it calls for a hypothetical which is impossible to answer definitively as there are many circumstances, both known from past experience and not known because those circumstances have not yet been confronted, which potentially might cause a decision-maker to conclude that an FFD examination is called for.**

**Without waiving the foregoing objections, Defendant CCSO answers as follows:**

**a. Staff in Employee Services under the direction of Rebecca Reierson.**

**b. Information was extracted from individual fitness for duty files maintained by the Department of Employee Services.**

**c. At the time of Plaintiff's referral, the decision was made by an Occupational Health Nurse in conjunction with an HR Representative.**

**d. There are numerous bases for requiring an examination. Relevant here was concern about a potential safety risk with having an employee remain in his/her current position based on reported behavior and/or communication with the employee that would better be assessed by an independent medical and/or psychological professional.**

**e. No.**

Dated: July 30, 2018

Respectfully submitted,
COOK COUNTY SHERIFF'S OFFICE

/s/ Lynn D. Moffa

Stephanie A. Scharf
Sarah R. Marmor
Lynn D. Moffa
Morgan D. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
lmoffa@scharfbanks.com
mchurma@scharfbanks.com

**VERIFICATION**

I, Katherine Christy, pursuant to 28 U.S.C. § 1746, state under penalty of perjury, that I have read the foregoing COOK COUNTY SHERIFF OFFICE'S OBJECTIONS AND RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES, and that the Answers contained therein are true and correct to the best of my knowledge and belief. The Answers provided therein were not based on my sole recollection, memory or knowledge but rather were gathered by reviewing the records and documents in the possession of the Cook County Sheriff's Office and by consulting persons employed in the Cook County Sheriff's Office and Cook County State's Attorney's Office.

This 30th day of July, 2018

________________________
Katherine Christy
Assistant General Counsel
Office of the Cook County Sheriff

**CERTIFICATE OF SERVICE**

I, Lynn D. Moffa, one of the attorneys for Defendant CCSO, hereby certifies that a copy of the foregoing **CCSO'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES** was served upon the below-listed counsel via electronic mail on July 30, 2018.

/s/ Lynn D. Moffa

Dana Kurtz
Heidi Sleper
Jacob Exline
Kurtz Law Offices, Ltd.
32 Blaine
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
jexline@kurtzlan.us
*Attorneys for John Nawara*

Nile N. Miller
Kathleen Cunniff Ori
Jay Rahman
COOK COUNTY STATE'S ATTORNEY'S OFFICE
500 Richard J. Daley Center
Chicago, IL 60602
nile.miller@cookcountyil.gov
kathleen.ori@cookcountyil.gov
jay.rahman@cookcountyil.gov
*Attorneys for County of Cookssss*

**VERIFICATION**

I, Rebecca Reierson, pursuant to 28 U.S.C. § 1746, state under penalty of perjury, that I have read the foregoing COOK COUNTY SHERIFF OFFICE'S OBJECTIONS AND RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES, and that the Answers contained in Interrogatory # 5 are true and correct to the best of my knowledge and belief.

This 30th day of July, 2018

Rebecca Reierson

**VERIFICATION**

I, Stephen Bouffard, pursuant to 28 U.S.C. § 1746, state under penalty of perjury, that I have read the foregoing COOK COUNTY SHERIFF OFFICE'S OBJECTIONS AND RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES, and that the Answers contained in Interrogatories ## 1-4 are true and correct to the best of my knowledge and belief.

This 30th day of July, 2018

Stephen Bouffard

## VERIFICATION

I, Katherine Christy, pursuant to 28 U.S.C. § 1746, state under penalty of perjury, that I have read the foregoing COOK COUNTY SHERIFF OFFICE'S OBJECTIONS AND RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES, and that the Answers contained therein are true and correct to the best of my knowledge and belief. The Answers provided therein were not based on my sole recollection, memory or knowledge but rather were gathered by reviewing the records and documents in the possession of the Cook County Sheriff's Office and by consulting persons employed in the Cook County Sheriff's Office and Cook County State's Attorney's Office.

This 1st day of August, 2018

Katherine Christy
Assistant General Counsel
Office of the Cook County Sheriff

SCHARF BANKS MARMOR LLC

**333 West Wacker Drive, Suite 450**
**Chicago IL 60606 • (312) 726-6000**
**www.scharfbanks.com**

**Reply directly to:**
Lynn D. Moffa
312-662-6198
lmoffa@scharfbanks.com

June 27, 2018

**VIA EMAIL**

Dana Kurtz
KURTZ LAW OFFICES, LTD
32 Blaine Street
Hinsdale, Illinois 60521
Phone: 630.323.9444
E-mail: dkurtz@kurtzlaw.us

**RE: *Nawara v. Dart, et al*; Plaintiff's Answers To Defendants' Third Set Of Interrogatories**

Dear Dana:

Although I was not included on the email sent after business hours on Monday, June 25 attaching Plaintiff's Answers To Defendants' Third Set of Interrogatories, my colleagues forwarded it to me yesterday morning. In the future, please be certain to include me on any and all emails about this case.

As you know, in our Rule 37(a)(1) telephone conference held on May 18, 2018, you informed me and my colleagues Morgan Churma and Jesse Kehr that you knew of a witness who supposedly saw a video of the incident at issue in this case between Plaintiff Nawara and Defendant Jones-Hayes that occurred on September 28, 2016. Afterwards, we sent you an interrogatory request (Defendants' Third Set) in which we asked you to identify the person to whom you referred in our phone conversation. Your June 25, 2018 response to that interrogatory—an objection based on relevance, attorney-client privilege, and attorney work product—is extremely troubling.

The relevance of the information sought by the interrogatory is beyond dispute. You have repeatedly accused Defendants of bad faith and threatened us with a sanctions motion for withholding a video of the incident. Yet, as we continually have informed you, Defendants have

EXHIBIT
Q
exhibitsticker.com

searched for such a video and, unable to find one, have determined that no such video exists. In an effort to undermine Defendants' representations to you in discovery that they have not been able to find any evidence that such a video exists, you asserted during our Rule 37(a)(1) conference that you knew for a fact such a video existed because you knew of a person who had seen the video. You thus accused Defendants of intentionally destroying evidence, declaring that you were going to "get to the bottom of this." Defendants too seek to "get to the bottom of this," and therefore served you with the interrogatory in question, asking you to identify the supposed witness who could attest to the fact that the video, at least at some point in time, existed.

The identity of a witness with knowledge of the facts of this case is clearly *not* privileged. *See Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) ("[The] protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may *not* refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.") (emphasis added) (internal quotation marks and citations omitted). It also comes nowhere near falling within the ambit of the attorney work-product privilege. *See, e.g., United States v. Dean Foods Co*., 2010 U.S. Dist. LEXIS 112987, *8-9 (E.D. Wis.) ("In *Hickman [v. Taylor*, 329 U.S. 495], the Supreme Court did state that 'under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to dangers of inaccuracy and untrustworthiness.' However, *Hickman* also held that 'where the party seeking discovery can establish that relevant and non-privileged facts remain hidden in an attorney's file' and where production of those facts is essential to the preparation of the party's case, *discovery of those facts* is proper.") (emphasis added, citations omitted); *see also Richards-Wilcox Mfg. Co. v. Young Spring & Wire Corp.*, 34 F.R.D. 212, 213-214 (N.D. Ill. 1964) ("No longer can we or should we protect archaic principles fostered to protect and promote what was once thought to be the desired sporting element of a trial—surprise. This element of surprise has departed with our modern Federal Rules of Civil Procedure. I fail to see how the producing of this observer's factual observations could constitute a substantial intrusion into the thoughts and trial plans of plaintiff's attorney. On the basis of the facts presented to me I find plaintiff's claim of the work product privilege to be unsubstantiated.").

Indeed, your reliance on attorney-client privilege and attorney work-product to hide the identity of the witness who supposedly saw a video of the incident in question is so patently unsupportable that it suggests either you lied during our Rule 37 conference about the existence of such a witness, or you fear disclosure of the witness's identity will expose that you obtained information about the supposed video through improper channels—for instance, from a former employee who inappropriately shared confidential and/or privileged information with you.

If in fact such a witness exists, Defendants are entitled to know his or her identity, not only to aid in the location of the missing video but to determine whether the source of the information in question has violated any duty owed to Defendants. In response to this letter, we ask that you either admit that no such witness exists, or that you reconsider your irrational objections to disclosing the witness's identity as stated in your Answers to Defendants' Third Set of Interrogatories.

We respectfully request a response on or before Monday, July 2, 2018.

Sincerely,

*/s/ Lynn D. Moffa*
Lynn D. Moffa

cc: Heidi Sleper, Jacob Exline

SCHARF BANKS MARMOR LLC

**333 West Wacker Drive, Suite 450**
**Chicago IL 60606 • (312) 726-6000**
**www.scharfbanks.com**

**Reply directly to:**
Lynn D. Moffa
312-662-6198
lmoffa@scharfbanks.com

July 19, 2018

**VIA EMAIL**

Dana Kurtz
Jacob Exline
Heidi Sleper
KURTZ LAW OFFICES, LTD
32 Blaine Street
Hinsdale, Illinois 60521
Phone: 630.323.9444
E-mail:dkurtz@kurtzlaw.us
jexline@kurtzlaw.us
hsleper@kurtzlaw.us

**RE: *Nawara v. Dart, et al*; Response to Plaintiff's July 3, 2018 Rule 37 Letter**

Counsel:

Much of your 21-page Rule 37 letter of July 3, 2018 is spent discussing what you call Defendants' "boilerplate" objections. Our written discovery responses were served on you in early March 2018, and thereafter we have held numerous Rule 37 telephone conferences. Your July 3, 2018 letter ignores those many conferences.

As is apparent from our written responses, to the extent Defendants' written responses indicate that documents were being produced, then Defendants are not withholding any particular documents or information based on the objections. Objections were made for the purpose of preserving Defendants' position should the request be later interpreted to require Defendants to produce documents other than those which Defendants stated they were producing. If our response did not indicate that any documents would be produced in response to the request, then we are withholding documents based on the objections made to that request.

EXHIBIT
R
exhibitsticker.com

We disagree with your argument that we are not entitled to withhold documents because our objections are "boilerplate." An objection that something is, for example, "overly broad" and/or "unduly burdensome" is not objectionable "boilerplate" simply because it is repeated a number of times in a discovery response. Rather, a repeated objection is proper so long as the party resisting discovery shows specifically how the request meets the objection. *See Methodist Health Servs. Corp. v. OSF Healthcare Sys*., 2014 U.S. Dist. LEXIS 55425 (C.D. Ill. Apr. 22, 2014). Here, even if Defendants used general objections in their written discovery responses, they followed those objections with an explanation for the objections. If the explanation provided in the written response was not sufficient, we provided additional details about our concerns during the Rule 37 correspondence and conferences. In short, we disagree that any further supplementation of our written responses is required.

With respect to specific categories of information, given your failure to acknowledge our extensive past Rule 37 discussions we do not feel it is necessary to respond point by point. Nevertheless, I will briefly address a few specific categories you mention in your letter:

- *Clarification regarding text messages:* That clarification was provided to you in my letter dated May 24, 2018.

- *Video footage/list of surveillance cameras*: We refer you to our many previous discussions which have addressed this issue at length.

- *Telephone call with IT specialists*: Our position on this has not changed from what we have previously told you. You are not entitled to force Defendants to give you and your consultant continuing access to Sheriff's Department personnel simply because you refuse to accept the explanations we have provided about why your unfettered demands are unduly burdensome.

- *Disciplinary Files for Individual Defendants*: We previously indicated that, in addition to Defendants' written objections as stated in their discovery responses, we object to any discovery requiring our clients to duplicate efforts already made by the CCSO in producing documents in response to your FOIA requests. The one case you have provided us where the court allowed discovery of personnel files for individual defendants does not establish a blanket rule that such discovery is always appropriate in any discrimination or retaliation case. Each case must be considered on its facts, and, as we have discussed at length with you, the excessive nature of your discovery requests in light of the allegations and modest financial value of this case render the discovery you seek disproportionate.

- *Documents related to Plaintiff's pay, W-2s, 401K, and retirement benefits*: We already told you we believed we have produced everything we have in this category when we produced Plaintiff's personnel file as well as supplemental documents respecting Plaintiff's pay. We asked you to identify more specifically the categories of documents you think might be missing from our production so that we could determine whether other files needed to be searched for relevant material. Your July 3, 2018 letter references benefit information and the applicable CBA. We do not believe the applicable CBA falls within the category of documents you requested. And, as we have said more than once before, benefits

information, if not contained in Plaintiff's personnel file, would be in the possession of a third party.

- *Comparator evidence*. This covers many different discovery requests that roughly fall into the following categories: (a) list of OPR classification codes, (b) other complaints about harassment, retaliation, ADA/HIPAA violations, or FFD referrals, and (c) complaints and personnel files related to any employee referred for an FFD, any employee accused of the conduct which Jones-Hayes accused Nawara of, or any employee accused of conduct which Nawara accuses Jones Hayes of. We discussed the bases for our objections to this evidence at length in previous Rule 37 calls, and your recent letter does not address any of the matters we raised in those discussions. We provided you with a list of other FFD referrals as a compromise and will entertain any request related specifically to that list provided it is raised properly (including without going over the number of interrogatories to which Plaintiff is entitled under the Rules) and limited to that list.

- *Third Request For Production of Documents*: We stand by our objections to the Third Request For Production of Documents in their entirety as being improper and disproportionate because they seek the same categories of documents sought in previous requests. Specific examples of duplication have been provided to you to support this position. The number of previous documents requests and duplication with Plaintiff's Third Set of Requests is so extensive that it would further compound the oppressive nature of the Third Set of Requests to require Defendants to match up every request in the Third Set of Requests with the numerous duplicative previous requests. Demanding that we do so, therefore, is not an appropriate response to our objection. Rather, if any one of the requests in the Third Set of Requests seeks material not covered by previous requests, then Plaintiff should call Defendants' attention to that new material, and we will respond accordingly.

- *Interrogatories seeking identification of "all facts," "all documents," "all statements" or similar*: Defendants refer Plaintiff to the court's opinion in *Moses v. Halstead*, 236 F.R.D. 667, 672-73 (D. Kan. 2006), where the court considered an interrogatory that asked for the identification of "all individuals who have or claim to have knowledge 'concerning any of the issues raised in the pleadings.'" The court noted that the interrogatory used "ominbus term[s]" applicable to "general categor[ies] or group[s] of documents or a broad range of information." Because the discovery request sought identification of "an enormous amount of information, *i.e.*, all issues raised in the pleadings," the court found the defendant's "overbreadth objection to be valid." *See also Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007) ("Contention interrogatories that systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations, are an abuse of the discovery process because they are overly broad and unduly burdensome. . . . Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."); *In re Urethane Antitrust Litig.*, 261 F.R.D. 570, 576 (D. Kan. 2009) (quoting *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 658 (D. Kan. 2006)) (Discovery requests are overbroad when they contain terms that "make arduous the task of deciding which of numerous documents [or facts] may conceivably fall

within its scope." Discovery requests seeking "a broad range of items requires the respondent either to guess or move through mental gymnastics . . . to determine which of the many pieces of paper conceivably contain some detail, either obvious or hidden, within the scope of the request.").

Finally, as to your demand that Defendants amend their written responses to Plaintiff's document production requests to identify Bates Numbers of responsive documents, Defendants never agreed to undertake an obligation greater than what the Federal Rules require. Rule 34(b)(2)(E)(i) states that documents may be produced *either* as they are kept in the usual course of business *or* organized and labeled to correspond to the categories in the request. Because Defendants did not know whether the documents previously produced pursuant to discovery requests served by you in 2017 were produced as they were kept in the ordinary course of business, we agreed to amend our written response to *those discovery requests* to identify by Bates number the specific documents responsive to each request. We did not agree to produce all documents going forward in this manner. For any document produced to you in 2018 or later, we intend to maintain our production of those documents as they are kept in the ordinary course of business.

Sincerely,

*/s/ Lynn D. Moffa*
Lynn D. Moffa

**Sheriff's Office**
**COOK COUNTY, ILLINOIS**
# SHERIFF'S ORDER

| ISSUANCE DATE | EFFECTIVE DATE | NO. |
|---|---|---|
| **30 SEP 14** | **30 SEP 14** | **11.5.26.0** |

| SUBJECT | DISTRIBUTION | RESCINDS |
|---|---|---|
| **VIDEO SURVEILLANCE SYSTEM** | **G** | **CSD GO 1100** |

| RELATED DIRECTIVES | AMENDS |
|---|---|
| *All department directives regarding Rules and Standards of Conduct* | |

## I. PURPOSE

This Order establishes the policy governing access to the Cook County Sheriff's Office (CCSO) Video Surveillance System (VSS) and the procedures for requesting, reviewing, downloading, storage and retention of video footage.

## II. POLICY

A. It is the policy of the CCSO to use video surveillance to enhance security in and around the CCDOC, County Courthouses, and other County or Sheriff operated facilities and to capture and retain video footage involving CCSO staff, detainees, members of the public, or County or Sheriff operated facilities. Video surveillance will be captured and maintained for, at a maximum, thirty (30) days. Incidents identified and captured on video will be copied and retained according to established state or federal law.

B. The CCSO is committed to the retention of video when such retention is required pursuant to CCSO policies, procedures and state and federal law. The Video Monitoring Unit (VMU) is the sole source for the retention of requested video. Destruction of video retained from the VSS must be completed in accordance with the CCSO's obligations under the Local Records Act (50 ILCS 205) and any applicable state or federal law. Any retained video knowingly destroyed in violation of the CCSO's obligation under the Local Records Act is strictly prohibited and against the policy of the CCSO. Video surveillance footage will be limited to legal uses including, but not limited to subpoena, management review, investigations, etc., as determined by applicable state and federal law.

C. The unauthorized requesting, copying, retention, distribution, dissemination or destruction of video footage captured by the VSS or retained by the VMU is strictly prohibited and shall result in disciplinary action up to and including termination and shall expose the member to criminal prosecution.

EXHIBIT
S
exhibitsticker.com

## III. APPLICABILITY

This Order is applicable to all CCSO members. Any member found in violation of this Order may be subject to discipline, up to and including termination of employment, in accordance with any Collective Bargaining Agreements, Sheriff's Merit Board Rules, and state or federal statutes.

## IV. ENCLOSURES

A. CCSO Video Surveillance System Request/Change Form (FCN -20) (JUN 14)

B. CCSO Request for Hold of Video Surveillance Form (FCN- 21) (JUN 14)

## V. VIDEO SURVEILLANCE SYSTEM ACCESS LEVELS

The Sheriff's Bureau of Information Technology (BOIT) shall maintain a listing of VSS access levels. Access level will be assigned based on the specific locations being viewed by cameras connected to the system. Any changes to the access level list shall only be initiated by a request from a Department Head/designee using the CCSO Video Surveillance System Request/Change Form with the approval of the Undersheriff/designee for any levels above level 3. The access levels are as follows:

A. Level 1 Access – This level is assigned to all sworn members as well as non-sworn members requiring access as provided and indicated above. The user with this level will be able to view live video feeds while on duty and using the VSS in the designated posts in which they are assigned and on duty. In addition, this level will also be able to utilize an emergency review function which allows the staff member to review up to the previous five (5) minutes of video on cameras under their control. This level does not allow any control of the VSS other than temporary movement of camera(s) equipped with the ability to pan, tilt, and/or zoom.

B. Level 2 Access – This level will be assigned to users upon the approval of the Department Head/designee. The user with this level shall have all the features of level 1 access as well as the ability to view live video from any camera within the specific division/district of assignment as well as review video from the previous thirty (30) days specific to the division/district of assignment only. For example, a lieutenant assigned to Skokie Courthouse who has level 2 access would have access to video from all cameras in Skokie Courthouse only.

C. Level 3 Access – This level will be assigned to users upon the request from the Department head/designee and the approval of the Undersheriff/designee. A user with this level will have all of the features of level 1 and 2 access as well as the ability to view live video from any camera within the department of assignment as well as review all video from the previous thirty (30) days from cameras within the department of assignment. For example, an individual with level 3 access assigned to the Cook County Department of

Corrections (CCDOC) will have access to video from cameras in all divisions and CCDOC campus exterior cameras only.

D. Level 4 Access – This level will be assigned to users upon the request from a Department Head/designee and the approval of the Undersheriff/designee. The user with this level will have all of the features of level 1, 2 and 3 access as well as have the ability to view live video from any camera and review all video from the previous thirty (30) days from all CCSO locations.

E. Level 5 Access – This level is assigned to users assigned to the Video Monitoring Unit (VMU) or Investigators that have been trained and allowed this level of access upon approval by the Bureau Chief of the BOIT, or other such approval granted by the Undersheriff/designee. In addition to having all of the features associated with level 1, 2, 3 and 4 access, the individuals assigned to this level will be responsible for saving, copying and burning video data and/or maintaining the database of all video data required to be saved by the CCSO. This level will also require these designated users to be fully trained on all capabilities of the VSS, including but not limited to viewing, recording, downloading, saving, using video analytics, indexing, storage, and the evidence rules associated with the duties and responsibilities associated with this level of assignment. This level of access shall also direct the technical repair and adjustment of cameras and equipment used for the VSS as well as the interface with the repair contractors or internal technicians tasked with the maintenance of the VSS.

F. Level 6 Access – This level is assigned to the Bureau Chief/designee of the BOIT. This level allows for the ability to change access levels upon the signed approval of the Undersheriff/designee.

## VI. INVENTORYING AND/OR REQUESTING SURVEILLANCE VIDEO FOOTAGE

A. Inventorying of VSS Footage

1. The VMU shall save, copy, burn to a disc and inventory all video recorded incidents identified by a CCDOC incident number/Sheriff's Office Case Report (CR) number.

2. For incidents that do not have a CCDOC incident number/Sheriff's Office Case Report (CR) number, the authorized requesters defined in Section VI. B.1 shall complete and submit the CCSO Request for Hold of Video Surveillance Form as outlined in Section VI.C. Exceptions to using the form shall only be authorized by the VMU, and a record must be kept by the VMU of any exceptions made.

B. Authorized Requesters

1. Requests to copy or permanently burn VSS footage to disk (or other storage media as authorized by the BOIT) will only be honored by

the VMU if the request is made by a CCSO Department Head or any of the following individuals:

a. Cook County Department of Corrections (CCDOC) – Superintendents and above; CCDOC CIID Investigators and above; CCSPD CIID Investigators and above; or CCDOC Compliance Office.
b. Court Service Department (CSD) – Assistant Chiefs and above.
c. Legal Office –Assistant General Counsel and above; Legal staff under the direction of Assistant General Counsel.
d. Office of Professional Review (OPR) – Investigators and above.
e. Sheriff's Executive Office.
f. Sheriff's Inspection Unit (SIU) – Investigators and above.
g. Sheriff's Office Intelligence Center (SOIC) – Sergeants and above.
h. Use of Force Review Unit – Investigators and above.

2. No outside agency or individual request will be processed unless the request has been received by the General Counsel and approved by a member of the Sheriff's Legal Department.

C. Procedures For Requesting Video Surveillance Footage

1. Only individuals defined in Section VI.B may request VSS footage from the VMU.

2. Members who cannot request video are nevertheless obligated to bring to the attention of their supervisor(s) any incident that may have been videotaped. The supervisor shall then ensure that an authorized requestor as defined in Section VI.B.1 request that the video(s) be saved.

3. Requests should be made as soon as possible due to the fact that VSS footage is purged after thirty (30) days.

4. Requests for VSS footage, including standard and emergency requests, will only be accepted through the VMU group email at CCSO.VMU@cookcountyil.gov unless an exception is authorized by the VMU and properly documented by the VMU. A CCSO Request for Hold of Video Surveillance Form must be attached to the email and accompany any requests.

5. Emergency requests for VSS footage must be made prior to the 29th day following the event and shall be completed by the VMU within 24 hours of receipt. Standard requests must be submitted within the first 22 days following the event and shall be completed by the VMU within seven (7) days of receipt.

D. Retrieving Video Surveillance Footage

1. Only individuals with level 5 access may copy and burn VSS footage to disk or any other electronic medium.

2. The assigned VMU authorized staff member will retrieve the requested incident video from all available camera angles for the incident timeframe.

3. Copies of VSS footage may only be turned over to the authorized requestor(s) as defined in Section VI.B.

4. Unless a specific timeframe is requested, the VMU will copy video from the incident timeframe plus 15 minutes before and after the incident time. The VMU will copy video from the incident timeframe plus 24 hours before and one hour after the incident time for incidents involving the death or serious suicide attempt (as defined in the current Suicide Detection and Prevention Policy) of an inmate.

5. Any approved request for video from an outside agency or individual made within five (5) days of the automatic erasure of the video requested will require that the video be retained and held until approval by the Legal Department for dissemination. This requirement applies only to video reasonably identifiable as to time and place.

6. Video will be downloaded in the VSS's native format and labeled as original onto digital removable media.

7. Any requested copies will be made from the original and converted as needed for ease of viewing.

8. It shall be the standard recording policy to record these images in as high a quality as the camera is capable of recording, and using no less than 3 frames per second for analog and15 frames per second for digital, unless storage space allows for more.

9. In the event the back log is greater than seven (7) days for requested videos, the VMU shall report the back log to the Bureau Chief of the BOIT.

## VII. ACCESS, AUDITS AND MONITORING

A. Members shall only be allowed to monitor the VSS in accordance with their assigned access levels, as described in Section V.

B. Each member is required to log into the system using his/her unique username and password issued by the CCSO.

C. Members are prohibited from viewing video or using the VSS outside of their assigned job duties.

D. No member, other than an assigned VMU member may copy, record, disseminate, or burn video at any time.

E. Unless responding to a specific internal request for video by an authorized requester as outlined in Section VI.B.1, members are prohibited from distributing copied or burned video to parties outside of the CCSO unless approved by the General Counsel.

F. Members are reminded that the VSS auto-generates an audit trail for every action attempted within the system. This audit trail and especially the record of download video shall be reviewed by OPR on a monthly basis.

G. Members shall report in writing to their direct supervisor all unauthorized use of the VSS or unauthorized copying, recording, burning, dissemination, or viewing of videos.

H. Respective unit heads (e.g. Superintendents, Asst. Chief's, etc.) are responsible for inspecting all cameras (e.g. view, angle, clarity of picture, obstructions, etc.) assigned to the respective unit, at a minimum, of at least once a week.

I. In the event a camera becomes inoperable or there are technical issues (views, viewing quality, image quality, lighting, etc.), the respective unit head shall immediately notify the BOIT Help Desk at CCSO.HelpDesk@cookcountyil.gov upon identifying such issues. In addition, an email shall also be sent to the VMU group email at CCSO.VMU@cookcountyil.gov to provide notice of the issue(s) and verification that an email was sent to the BOIT Help Desk.

J. The CCSO may, at its discretion and without notice, monitor or audit member use of the VSS at any time for training and safety purposes.

K. Department Heads shall ensure that if a member with level 2 access or above is transferred, deceased, separated, resigns, retires or is on a leave of absence for more than 180 days, or any other long term absence from the department an immediate notification shall be made to the Bureau Chief of BOIT.

L. The BOIT shall maintain a current list of member access levels. Semi-annually, the Bureau Chief of the BOIT/designee and Department Heads/designee(s) shall audit member access level lists to ensure accuracy.

M. All approved requests made by a Department Head/designee for level 2 access must be done so on the CCSO Video Surveillance System Access Request/Change Form and emailed to the BOIT at CCSO.Security@cookcountyil.gov. Additionally, any requests for level 3

access and above require approval from both the Department Head/designee and Undersheriff/designee and are to be submitted via email to the BOIT using the CCSO Video Surveillance System Access Request/Change Form.

N. CCSO Department Heads/designee(s) may request an audit of a member's use of the VSS by submitting a written memorandum, which must include the basis for the request, to the BOIT at CCSO.Security@cookcountyil.gov.

O. Violations of this Order may result in the following actions, including but not limited to:

1. Temporary or permanent loss of surveillance privileges;
2. Counseling;
3. Summary Punishment/Discipline,
4. Referral to OPR for investigation,
5. Referral for criminal prosecution; and/or
6. Termination of employment.

P. A monthly report issued by the VMU of the VSS indicating incident requests, video quality, maintenance issues, number of various requests, and other such pertinent data will be summarized in no more than a two (2) page memo and provided to the Undersheriff by the fifth day of the preceding month,

Q. In the event that any additional rules, procedures or changes are made to this Policy, the Bureau Chief of the BOIT/designee may choose to send out a memorandum via email to all CCSO members to address such occurrences.

**BY ORDER OF:**



**NANCY DONAHOE**
**SPECIAL COUNSEL**
**BUREAU OF ADMINISTRATION**
**COOK COUNTY SHERIFF'S OFFICE**

THIS PAGE WAS INTENTIONALLY LEFT BLANK.

# COOK COUNTY SHERIFF'S OFFICE

## VIDEO SURVEILLANCE SYTEM ACCESS REQUEST/CHANGE FORM

| REQUESTING DEPARTMENT/UNIT | | |
|---|---|---|
| DATE: | DEPARTMENT: | DEPARTMENT HEAD/DESIGNEE: |

**VIDEO SURVEILLANCE – ACCESS LEVEL 2**

**LEVEL 2 ACCESS IS APPROVED BY THE DEPARTMENT HEAD/DESIGNEE**

| EMPLOYEE NAME | RANK / TITLE | STAR | UNIT OF ASSIGNMENT | ADD ACCESS | REMOVE ACCESS |
|---|---|---|---|---|---|
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |
| | | | | ☐ | ☐ |

**VIDEO SURVEILLANCE – ACCESS LEVEL 2 APPROVAL**

| | |
|---|---|
| DEPARTMENT HEAD/DESIGNEE SIGNATURE: | DATE: |

**VIDEO SURVEILLANCE – ACCESS LEVELS 3, 4 and 5**

**VIDEO SURVEILLANCE ACCESS LEVELS 3, 4 AND 5 MUST BE APPROVED BY THE RESPECTIVE DEPARTMENT HEAD/DESIGNEE AND UNDERSHERIFF/DESINGEE**

| EMPLOYEE NAME/RANK | DEPARTMENT | JUSTIFICATION | ADD LEVEL 3 ACCESS | ADD LEVEL 4 ACCESS | ADD LEVEL 5 ACCESS | REMOVE ACCESS |
|---|---|---|---|---|---|---|
| | | | ☐ | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ | ☐ |
| | | | ☐ | ☐ | ☐ | ☐ |

**VIDEO SURVEILLANCE – ACCESS LEVELS 3, 4 and 5 APPROVAL**

| | |
|---|---|
| DEPARTMENT HEAD/DESIGNEE SIGNATURE: | DATE: |
| UNDERSHERIFF/DESIGNEE SIGNATURE: | DATE |

THIS PAGE WAS INTENTIONALLY LEFT BLANK

# COOK COUNTY SHERIFF'S OFFICE

## REQUEST FOR HOLD OF VIDEO SURVEILLANCE FORM

| REQUESTING DEPARTMENT/UNIT | | | |
|---|---|---|---|
| AUTHORIZED REQUESTER | TITLE/RANK | | STAR |
| DEPARTMENT/UNIT | INCIDENT REPORT, CR OR TRACKING NUMBER | | TELEPHONE NUMBER |
| DATE OF INCIDENT | TIME OF INCIDENT | DATE REQUEST SUBMITTED | SUPPORTING DOCUMENT(S) ATTACHED ☐ YES ☐ NO |

| CAMERA NUMBER(S) (PRIMARY) | Bookmark Tag(s) |
|---|---|
| | |
| | |
| | |
| | |
| | |

**LOCATION DESCRIPTION**

**INCIDENT DESCRIPTION** *(Brief description and/or attach copy of Offense/Incident Report)*

**INVOLVED INDIVIDUAL(S) SUBJECT(S) DESCRIPTION** *(Include physical attributes, clothing description and identifiable actions for each)*

| DEPARTMENT/UNIT HEAD/AUTHORIZED REQUESTER SIGNATURE | STAR | DATE |
|---|---|---|
| | | |

| VIDEO MONITORING UNIT (VMU) USE ONLY | | |
|---|---|---|
| ASSIGNED VMU PERSONNEL | STAR | DATE REQUEST RECEIVED |
| NOTIFICATION OF SEARCH RESULTS | | |
| RECORDING SEARCH RESULTS<br>☐ REQUEST DENIED ☐ FOUND/LOCATED<br>☐ NOT FOUND ☐ OTHER: ________________ | NOTIFICATION MADE TO | DATE/TIME OF NOTIFICATION |
| ASSIGNED VMU PERSONNEL SIGNATURE | | DATE |

(FCN-21)(JUN 14) **ORIGINAL –** BUREAU OF INFORMAITON TECHNOLOGY **COPY –** DEPARTMENT HEAD **COPY –** AUTHORIZED REQUESTER

THIS PAGE WAS INTENTIONALLY LEFT BLANK.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**CERTAIN DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFF JOHN NAWARA**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants THOMAS DART, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY hereby request that Plaintiff John Nawara answer the following interrogatory within 30 days of service hereof:

**DEFINITIONS AND INSTRUCTIONS**

1. "Plaintiff" "You," "Your," or "Nawara" shall refer to Plaintiff John Nawara, and any affiliates, agents, or other persons or entities acting on his behalf.

2. "Complaint" refers to the Complaint filed by You in this case and all exhibits thereto. To the extent that any amended complaint may be filed in this case, the term "Complaint" shall also refer to such amended complaint.

3. "Person" includes any natural person, firm, association, partnership, trust, corporation or governmental entity.

4. "Document" refers to any document, electronically stored information, or tangible



EXHIBIT
T
exhibitsticker.com

things within the meaning of Rule 34 of the Federal Rules of Civil Procedure, including but not limited to every original, draft and non-identical duplicate of every writing and recording of every type and description, including all writings, audio recordings, electronic or magnetic recordings or transmissions of information, and photographs, and all data maintained in computerized format such as documents, electronically stored information, or tangible things saved on hard drives, emails, or social media.

5. “Identify” or “identity,” when used in reference to a person, means to state the person’s full name, present or last known address, present or last known telephone number, and relationship, if any, to you. “Identify” or “identity,” when used in reference to a document, electronically stored information, or tangible thing, means to state its type (e.g., report, facsimile, memorandum, or e-mail), subject matter, and date, and the identity of each author, addressee, and recipient, or in the alternative to produce the document.

7. If you withhold any documents or information on the grounds of attorney-client or other applicable privilege, please provide a written privilege log that satisfies the requirements of Rule 26(b)(5) of the Federal Rules of Civil Procedure, including but not limited to an itemized description of documents, communications, or tangible things not produced or disclosed.

**INTERROGATORY**

1. Identify the person or persons that Plaintiff’s counsel alleged during a phone conversation with Defendants’ counsel on May 18, 2018 had viewed a video recording showing any interaction between Plaintiff Nawara and Defendant Jones-Hayes on or about September 28, 2016. Specify (1) the date and time each person first viewed the recording, and of any subsequent viewings (2) where each person viewed the recording (physical location of the person at the time and mechanism or device on which the recording was viewed); (3) any others present during each

person's viewing of the recording; and (4) with as much specificity as possible what the person or persons claims to have seen on the alleged video recording.

Dated: May 22, 2018

Respectfully submitted,

THOMAS DART, KAREN JONES-HAYES,
MATTHEW BURKE, REBECCA REIERSON, and
WINIFRED SHELBY

/s/ Sarah R. Marmor
Stephanie A. Scharf
Sarah R. Marmor
Lynn Moffa
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
sscharf@scharfbanks.com
smarmor@scharfbanks.com
lmoffa@scharfbanks.com
mchurma@scharfbanks.com

**CERTIFICATE OF SERVICE**

I, Sarah Marmor, an attorney, hereby certify that a copy of the forgoing CERTAIN DEFENDANTS' THIRD SET OF INTERROGATORIES TO PLAINTIFF JOHN NAWARA was served upon the below-listed counsel via electronic mail on May 22, 2018.

/s/ Sarah R. Marmor

Dana L. Kurtz
Heidi Karr Sleper
Jacob Exline
Kurtz Law Offices, Ltd.
32 Blaine
Hinsdale, IL 60521
dkurtz@kurtzlaw.us
hsleper@kurtzlaw.us
jexline@kurtzlaw.us
*Attorneys for John Nawara*

Nile N. Miller
Kathleen Cunniff Ori
Jay Rahman
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, IL 60602
nile.miller@cookcountyil.gov
kathleen.ori@cookcountyil.gov
jay.rahman@cookcountyil.gov
*Attorneys for County of Cook*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | Case No. 17-cv-02393<br><br>Judge Rebecca R. Pallmeyer |

**PLAINTIFF'S ANSWERS TO**
**DEFENDANTS' THIRD SET OF INTERROGATORIES**

Plaintiff, JOHN NAWARA, through his undersigned counsel, submits his answers to Defendants' Third Set of Interrogatories as follows:

EXHIBIT
U
exhibitsticker.com

**ANSWERS TO INTERROGATORIES**

1. Identify the person or persons that Plaintiff's counsel alleged during a phone conversation with Defendants' counsel on May 18, 2018 had viewed a video recording showing any interaction between Plaintiff Nawara and Defendant Jones-Hayes on or about September 28, 2016. Specify (1) the date and time each person first viewed the recording, and of any subsequent viewings (2) where each person viewed the recording (physical location of the person at the time and mechanism or device on which the recording was viewed); (3) any others present during each person's viewing

of the recording; and (4) with as much specificity as possible what the person or persons claims to have seen on the alleged video recording.

**ANSWER: Plaintiff objects to this request as it calls for attorney client and attorney work product information, and it is not relevant to any claims or defenses at this point in this litigation, and poses a safety risk to an employee that could be subject to retaliation for such disclosure. Defendants have not produced the video footage per Plaintiff's discovery requests, and have not answered Plaintiff's discovery requests or provided information on the videos that should have been preserved and produced. The videos of the incident between Jones-Hayes and Nawara, and of the staging area, and videos of Jones-Hayes following the incident, should be produced as requested by Plaintiff. If it is Defendants' contention that the video no longer exists, then Defendants have to identify when it was destroyed or overwritten, and by whom.**

Respectfully submitted,

JOHN NAWARA

***/s/Dana L. Kurtz***

Attorney for Plaintiff

Dana L. Kurtz (ARDC # 6256245)
KURTZ LAW OFFICES, LTD
32 Blaine Street
Hinsdale, Illinois 60521
Phone: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing **PLAINTIFF'S ANSWERS TO DEFENDANTS' THIRD SET OF INTERROGATORY REQUESTS** was served upon the designated attorneys as indicated below by electronic mail only on June 25, 2018.

| | |
|---|---|
| Kathleen Ori | kathleen.ori@cookcountyil.gov |
| Nile Miller | nile.miller@cookcountyil.gov |
| | |
| Suzanne Alexander | salexander@scharfbanks.com |
| Morgan Churma | mchurma@scharfbanks.com |
| George Sax | gsax@scharfbanks.com |
| Sarah Marmor | smarmor@scharfbanks.com |
| Stephanie Scharf | sscharf@scharfbanks.com |

***/s Dana L. Kurtz***

Dana L. Kurtz

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | No. 17 C 2393<br><br>The Honorable Rebecca R. Pallmeyer<br>Judge, Presiding |

**NOTICE OF 30(b)(6) DEPOSITION**

**TO:** Sarah R. Marmor
Scharf Banks Marmor LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the plaintiff, John Nawara, shall take the deposition upon oral examination of the Cook County Sheriff's Office ("CCSO") through one or more officers, directors, agents or other representatives who shall be designated to testify on the CCSO's behalf regarding all information known or reasonably available to the CCSO with respect to the subject matters identified below. Plaintiff requests that the CCSO provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on the CCSO behalf. The taking of this deposition may be adjourned from day to day until



EXHIBIT
V
exhibitsticker.com

completed, and may occur over several days if more than one person is necessary to provide the information requested.

This deposition shall commence on **August 29, 2019**, at **10:00 am** at the offices of **Linden & Bustamante, 17 North State Street, Suite 1550, Chicago, IL 60602**, or at such other time and location as agreed upon by the parties and shall be taken before a notary public or other person authorized by law to administer oaths. The deposition will be recorded by videotape. Recording Device Operator: Exhibit 5, LLC.

**DATED: June 18, 2019** **JOHN NAWARA**

By: *s/ Peter V. Bustamante*

**SUBJECTS FOR DESIGNATION**

1. Identification of individuals with knowledge of Defendants' answer to Plaintiff's notice of inspection (attached), including the statement that "Certain Defendant answer that to the best of their understanding, prior to the filing of this lawsuit, the computer used in the creation or modification of the complaint register was replaced. Certain Defendants do not believe the computer may be retrieved," and the circumstances surrounding the "replace[ment]" of the computer at issue.

The deponent(s) is (are) directed to produce all documents relating or referring to the said "replace[ment]" of the computer at least three (3) business days prior to the deposition.

2. Identification of individuals with knowledge regarding the closed circuit television ("CCTV") cameras, recordings, footage, and servers; the process by which CCTV footage is saved and the reasons for which it is saved; the process by which CCTV footage is deleted, overridden, or removed from the server, and those with the ability to authorize such an action; whether the incident between Plaintiff and Defendant Jones-Hayes (described in ¶¶ 31-38 of the First Amended Complaint) was saved or deleted or overridden, and when this occurred; and whether there was any request for preservation of the footage sent to the party responsible for saving footage in regards to the incident between Plaintiff and Defendant Jones-Hayes, and, if so, what process occurred in response to the request for preservation.

3. Identification of individuals with knowledge of who reviewed, prepared, and extracted the CCTV footage and other recordings produced and Bates stamped as CCSO_000165-176; the process by which documents CCSO_000165-176 was reviewed, prepared, and extracted and the reasons for their extraction and production as well as how they are relevant to the case at hand.

4. All Cook County Sheriff's Office policies, directives, customs, or practices regarding the retention, maintenance, and destruction of documents, including but not limited to electronic data, computer files, and/or documents in hard copy.

5. All Cook County Sheriff's Office policies, rules, and/or regulations related to all disciplinary actions or investigations, employee complaints of discrimination, retaliation, and/or harassment, Fitness for Duty examinations, medical examinations, the signing of medical releases and/or HIPAA releases.

6. All Cook County Sheriff's Office policies, practices, or procedures with respect to harassment or retaliation or that address incidents of alleged of harassment or retaliation in the workplace, including but not limited to all documents relating to any training with respect to employment and anti-retaliation laws.

Plaintiff further requests that Defendant produce at the deposition the documents described, mentioned or referred to herein, if not already produced.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the above and foregoing **NOTICE OF 30(b)(6) DEPOSITION** was served the persons to whom directed above, by email on June 18, 2019.

*s/ Peter V. Bustamante*

Peter V. Bustamante
Richard F. Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602
(312) 346-2072
(312) 590-0211
pvbust@bustamantelaw.com
lindenlaw@gmail.com

SCHARF
BANKS
MARMOR LLC

333 West Wacker Drive, Suite 450
Chicago IL 60606 • (312) 726-6000
www.scharfbanks.com

**Reply directly to:**
Sarah R. Marmor
312-662-6197
SMarmor@scharfbanks.com

June 20, 2019

**VIA EMAIL**

Richard Linden
Peter Bustamante
Linden & Bustamante
17 N. State Street
Suite 1550
Chicago, IL 60602
lindenlaw@gmail.com
pvbust@bustamante.com

**Re: *Nawara v. County of Cook, et al.*, No. 17 C 2393 (Pallmeyer, J.)**

Dear Rick and Peter:

I write in response to the deposition notices you served earlier this week. As detailed below, there are several problems with the notices that require some discussion before we can begin scheduling anything.

*First*, the thirteen individual depositions and the multi-part 30(b)(6) deposition exceed the 10-deposition limit under Fed. R. Civ. P. 30. You have not obtained leave of court to take more than ten depositions, and given that this is a single-plaintiff case involving less than $60,000 in actual damages, we do not think there is a basis on which to exceed the limit.

*Second*, two of the proposed deponents on the list of individual deposition notices have never been named by Plaintiff or the Defendants as witnesses with knowledge of the facts of this case in either Rule 26 disclosures or in discovery responses. These are Nneka Jones and Miriam Rentas. There is no basis to depose these individuals and we object to presenting them.

EXHIBIT
W
exhibitsticker.com

*Third*, two other proposed deponents have never been identified in Rule 26 disclosures by either Plaintiff or the Defendants as witnesses with knowledge of the facts of this case: Richard Brogan and "Lt. M. Bryant." If you believe these are witnesses with knowledge, please amend your Rule 26 disclosures and identify the subjects of the information you believe they have.

*Fourth*, the "subjects for designation" in your 30(b)(6) notice contain a number of items that are irrelevant to this case in light of the Court's ruling on the motion to dismiss and also are objectionable on proportion grounds.

Item 1 of your subjects seeks a witness to testify about the replacement of the computer on which Supt. Jones-Hayes drafted her OPR complaint register relating to the September 28, 2916 altercation with Mr. Nawara. This topic never really was relevant in the first place, and we incorporate by reference Certain Defendants' Second Supplemental Responses and Objections to Plaintiff's Notice of Inspection and Request to Produce, attached hereto. The topic most assuredly is not relevant now.

Prior counsel for Plaintiff, Ms. Kurtz, claimed that she wanted to see when the OPR complaint was first drafted by Supt. Jones-Hayes, for unknown reasons. The actual complaint register has been produced, showing when it was sent and notarized – namely, on the same day of the incident with Mr. Nawara (CCSO 558-560). We see no probative value in seeking the computer on which the complaint register was drafted nor in determining when the CR was commenced. This is particularly true since there is no retaliation claim left in this case concerning the *Burruss* lawsuit and there likewise is no discrimination claim left. Indeed, it is our position that the Motion to Dismiss ruling establishes that there can be no claim against Supt. Jones-Hayes since she had nothing to do with the decision to send Mr. Nawara for a Fitness for Duty examination. Therefore, we will not produce a witness on this topic.

Items 2 and 3 also are objectionable because they rest on the false premise that there is some relevant videotape from CCTV cameras that was not produced in this case. All videos in the CCSO's possession, custody, or control from the area near where the altercation between Supt. Jones-Hayes and Mr. Nawara took place have been produced. (*See* CCSO's Objections and Responses to Plaintiff's Second Set of Interrogatories at pp. 1-5). The actual altercation never could have been videotaped because it took place in an area that has no CCTV cameras. In the course of meeting and conferring on this subject, Ms. Kurtz claimed that there was some video showing an interaction between Jones-Hayes and Nawara that someone she did not name had viewed. We served an interrogatory asking for the name of that person. Plaintiff flatly refused to name the person, claiming the request called for "attorney client and attorney work product information" and was "not relevant to any claims or defenses at this point in this litigation." (Plaintiff's Answers to Defendants' Third Set of Interrogatories.) Likewise, Plaintiff represented in his now-under-seal surreply to the motion for sanctions that the topic of the videos is not something he is seeking to pursue. (Surreply at 14). Given this record, the effort to depose people about videos that no one has ever seen, that no one has ever been able to establish existed, and which cannot be said to have had relevant information is a complete waste of time, and we will resist such discovery as irrelevant and disproportionate to the needs of this case.

Items 5 and 6 of your 30(b)(6) notice are overly broad and seek discovery on matters that have been rendered wholly irrelevant to this law suit in light of the Court's Motion to Dismiss ruling. There is no discrimination claim of any kind left in this case, nor are there any claims in the case of harassment or retaliation based on membership in a protected class under Title VII. The only claim of retaliation left in the case relates to whether Mr. Nawara was retaliated against in some unlawful way in response to his refusal to sign the HIPAA forms at issue. This renders most of item 5 objectionable; all of item 6 is objectionable on this basis.

Because you seek more than the permitted number of depositions, and because your 30(b)(6) notice is defective, we ask that you first amend your Rule 26 disclosures and then send amended notices of no more than 10 deponents. If you intend to purse 30(b)(6) depositions, we expect an amendment that is limited to topics that are relevant and proportionate to this case.

I am happy to meet and confer to discuss further.

Best,

Sarah R. Marmor

SRM/at

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

Deposition of James Turrise
Wednesday
October 30th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois

Page 2

APPEARANCES

For the Plaintiff:
Claudia E. Sainsot
Linden & Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Joi Kamper
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

Page 3

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Morgan G. Churma
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Wednesday, October 30th, 2019. The time is now 10:58 a.m. We are located at the Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois, for a deposition in the matter of John Nawara v. Cook County -- excuse me, County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Officer James Turrise. Officer Turrise, my name is Abbey Douglas. I'm a notary public, and I'm recording this deposition on behalf of Exhibit 5, LLC. At this time, will you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MR. LINDEN: Richard Linden -- Linden on

Page 4

behalf of the Plaintiff, John Nawara.

MS. SAINSOT: Claudia Sainsot, S like Sam, a-i, N like Nelly, s-o, T like Tom, for Mr. Nawara.

MR. CHURMA: Morgan Churma on behalf of the Defendants Dart, Burke, Shelby, and Reierson.

MS. KAMPER: And Joi Kamper on behalf of Karen Jones-Hayes.

RECORDER: That completes the required information. We can proceed.

MR. LINDEN: Thank you.

EXAMINATION

BY MR. LINDEN:

Q. Good morning --
A. Good morning.
Q. -- Officer Turrise.
A. Turrise. 0:01:12
Q. And could you state and spell your name for the record?
A. James Turrise, T-u, double R, i-s-e.
Q. Have you ever had a deposition taken before?
A. No.
Q. So I'm sure you met with your lawyer --
A. Mm-hmm.
Q. -- this morning, so he explained what's going to happen and kind of the basic procedures, but I just



EXHIBIT
X
exhibitsticker.com

Page 5

want to give you a few kind of ground rules. I'm going to ask you a series of questions, I represent John Nawara in the case against the sheriff's office, and Jones-Hayes, and a couple other people, and I'm going to ask you a series of questions about the case, and if any question is confusing or you don't understand it, just, you know, let me know, and I'll rephrase it. But if you answer a question, it's understood that you understood the question. Fair enough?
A. Got it. 0:02:00
Q. And it's important for the court reporter that we answer -- all answers are verbal, you know, not a nod of the head or anything because it can't be taken down. The only other thing is I'll try not to interrupt you, and if you could do the same, because you know, it's a transcript and it's being videotaped, we -- if we talk over one another, it will be worthless pretty much. All right?
A. Understood.
Q. And what did you do to prepare for your deposition -- deposition today?
A. Pretty much told me what it was going to be about, dos and don'ts.
Q. Yeah, I don't -- I don't want to get into what your lawyer told you, but just you met with your

Page 6

lawyer, I take it, this morning?
A. Right.
Q. And what lawyer did you meet with?
A. The man sitting right next to me.
Q. Okay.
A. Morgan.
Q. And about how long did you meet for?
A. When was it -- maybe an hour and a half, hour.
Q. And did you review any documents or anything in preparation?
A. Yes. 0:03:07
Q. And what -- what did you review that you recall?
A. My report I was writing at the time, I was writing a report at the time of the incident, and --
Q. Did you look at any videotapes?
A. Yeah, there was a video.
Q. And about how long was that video, if you --
A. Maybe ten minutes.
Q. Anything else besides the report and the video?
A. No.
Q. And what is your educational background?
A. High school.

Page 7

Q. And what year?
A. '87.
Q. What high school?
A. Curie.
Q. So did you grow up in Chicago?
A. Yes.
Q. And do you live in Chicago?
A. Currently, no. 0:03:58
Q. Okay. And I'll agree to mark this confidential, but what -- what's your address that you --
MR. CHURMA: Could -- I just want to object on that. Is -- is this really relevant for this? He's not a party in this case. I mean, you can contact him through -- through Counsel.
MR. LINDEN: I'm -- I think it's relevant. I'm -- agreed it'd be confidential in case he becomes --
MR. CHURMA: We -- I mean, we -- we just don't have a -- the -- the protective order in this case isn't attorneys' eyes only at this point in time, so I think it's just, you know, Plaintiff --
MR. LINDEN: I mean, it's basic contact information. I'm allowed to ask a witness for his address or -- or her address. I don't understand the

Page 8

objection. I'm willing to treat it confidential. We're not going to go publish it or anything. That's basic information I think I'm entitled to.
MR. CHURMA: I mean, if the witness is comfortable having it answered on confidential.
MR. LINDEN: Well I think that's a little bit coaching, with all due respect. You can state your objection if you want him not to answer it, that's --
MR. CHURMA: All right --
MR. LINDEN: -- your prerogative.
MR. CHURMA: -- I'm -- I'm going to instruct him not to answer that question.
Q. Okay. Are you going to listen to your attorney's advice?
A. As far as the address -- the address, yes, I'll --
Q. Okay. 0:05:00
A. -- listen to advice.
Q. Are you married, Officer?
A. Yes.
Q. And children?
A. Yes.
Q. How many children?
A. Two.
Q. Okay. So after high school in 1987, can you

describe your work experience?
A. I worked for the airlines, Midway, Southwest, Southwest being the duration for 13 years.
Q. Was it Midway Airlines or --
A. Midway Airlines.
Q. -- Midway Airport? Okay.
A. Midway Airlines at Midway Airport.
Q. Okay. What years did you work for Midway?
A. Maybe '89 to '92, around about.
Q. What type of work do you do?
A. Baggage handler.
Q. And you left in '92? Did they merge or get bought by Southwest?
A. They bought Northwest, but then that fell through, and then I went to Southwest from '93 until 2006.
Q. Were you a baggage handler --
A. Same thing.
Q. -- all those years?
A. Mm-hmm. 0:05:58
Q. Okay. Any other employment during that time?
A. Before?
Q. No, from --
A. No? That's the most --
Q. Okay. And when did you start with Cook



County Sheriff's Office?
A. 2006.
Q. Have you always been a correctional officer?
A. At the jail, yes.
Q. Okay. In 2006, did you attend the academy?
A. Yes.
Q. What assignments have you had with the sheriff's office?
A. Base --
MR. CHURMA: Object to form. You can answer.
Q. Yeah, your lawyer is going to object to some questions, but unless he instructs you not to answer, then pretty much --
A. Basic duties of a --
Q. -- say ignore the dep --
A. I'm sorry.
Q. -- ignore the objections, but you're allowed to answer is pretty much the way it goes.
A. Basic duties of a correctional officer, overseeing the inmates.
Q. So you're responsible for the security and safety of inmates --
A. Exactly.
Q. -- and staff?
A. Exactly. 0:07:00



Q. Have you been at Cook County Jail the entire time?
A. Yes.
Q. And what parts of the jail, have you had different assignments throughout your career from 2006 on?
A. Division -- I've worked division one, I've worked division two, Cermak, and ten. Those --
Q. Is --
A. -- those are lengthy durations.
Q. Is Cermak called division ten?
A. They're a conglomerate of each other, a joint.
Q. Okay. I think you said division one, division two, Cermak, and division ten?
A. Right.
Q. Is Cermak part of division ten, or is it on its own?
A. It's -- it's part of it, but it's also separate, okay? It's not, like, a joint building. It -- it's a totally different area.
Q. Okay. And what is division ten, is that a separate building?
A. Yes.
Q. And what's the address of division --



division ten?
A. I'm -- I don't know the exact address, it's on California, 26th, California.
Q. And Cermak Hospital is where? 0:08:02
A. Just down the street, I would say 2700.
Q. So are the correctional officers assigned division ten, do they also do duty at Cermak?
A. Correct.
Q. Okay. And can you describe Cermak Hospital, what -- what is Cermak Hospital?
A. If the inmate falls ill over in the division and the in-house clinic dispensary can't handle it, they send him over to Cermak where the emergency is, the x-rays are, and all of that.
Q. Is it like a real regular hospital, Cermak?
A. Close --
MR. CHURMA: Object to form. You can answer.
A. Close to it. If -- if it's more serious, they send them out to the outlying hospitals.
Q. So they have an emergency room at Cermak?
A. Mm-hmm, mm-hmm.
Q. Do they have hospital beds and hospital rooms?
A. A few, yes.
Q. How many stories is Cermak Hospital?

Page 13

A. Stories?
Q. Yeah. Or floors or whatever they're called?
A. I'd say maybe three. 0:08:55
Q. Okay. And there is what they call a day room at Cermak Hospital, right?
A. It's -- you could call it that. It's more like a waiting area for the inmates.
Q. And where would that be in relation to when you enter Cermak Hospital?
A. If you're coming from the tunnel, you'll see areas of treatment first, you know, like a hallway -- hallways, but then the main waiting area is behind some doors, behind an alcove almost, we call it a bubble, slang -- slang term, we call it a bubble, all right? It would be behind some doors.
Q. Do you typically bring inmates through the tunnel to get there?
A. Depending on where you're coming from, yes, right.
Q. And where -- where would somebody enter the tunnel, is it -- the whole prison complex connected by tunnels or --
A. Majority. 0:09:58
Q. So you just go underneath the tunnel if you're in building nine and then go through the tunnels

Page 14

and get to Cermak?
A. You're walking there, yes, through the tunnels.
Q. Would the day room be on the first floor of the hospital?
A. It's basement.
Q. Oh, basement. Okay. How -- how big is the waiting area or the day room?
MR. CHURMA: Object to form. You can answer him, yeah.
WITNESS: Okay.
A. You know what, I couldn't -- I could only guesstimate. I'm not good at measurements. I couldn't tell you.
Q. So are they waiting for appointments to see, you know, medical staff there --
A. Yeah, they're --
Q. -- typically?
A. Right. When I was there, there -- I haven't been there since, but there is benches there they just sit down on.
Q. Are there chairs too or just benches?
A. They're benches.
Q. Are the inmates in the day area typically handcuffed?

Page 15

A. Handcuffed behind the back since I've last been there and shackled to the bench.
Q. Has it always been that way? 0:11:01
A. Not always. It used to be they'd cuff to the front, and then the shackling started, then I think behind the back started.
Q. And do you know when that procedure --
A. No, that was gradual. I couldn't tell exactly when.
Q. Do you know if it was before or after 2016?
A. Oh, before.
Q. So ever since -- in 2016, were inmates typically handcuffed from the back?
A. Yes.
Q. And then all inmates would be shackled too?
A. Right, correct.
Q. Were you assigned to Cermak Hospital at any point in time?
A. I was as -- in a different capacity. I wasn't an officer, I was a sergeant.
Q. So you started as a correctional officer in 2006, correct?
A. Mm-hmm.
Q. Then you got promoted at some point to sergeant?

Page 16

A. Yes.
Q. What year did you get appointed to sergeant?
A. 2015. 0:11:59
Q. Are you currently a sergeant?
A. Gave it back.
Q. Was it voluntary, or was it result of any disciplinary thing?
A. No, it was personal, totally voluntary.
Q. In 2016, you were a correctional officer, correct?
A. Yes.
Q. 2016, were you -- were you assigned to the Cermak Hospital?
A. No assignment. The only reason I would be down there is just to bring an inmate from division for medical reasons.
Q. Okay. On the date in question, you know, September 28th, 2016, I take it you weren't specifically assigned to Cermak Hospital?
A. No, I -- I brought my inmate over to be seen by medical over there.
Q. Okay. Do you recall what inmate you brought over?
A. No, I can't.
Q. And where was the inmate in, building nine?

A. Pardon me?
Q. Was the inmate from building nine?
MR. CHURMA: Object to form.
A. Division 11.
Q. Oh, division 11. Would that --
A. From division 11. 0:12:57
Q. Would that be building 11, the --
A. No, it's called division 11.
Q. Okay. Is that a medium --
A. Both, medium and max.
Q. And do you recall what time you brought the inmate over?
A. Can't recall.
Q. Was it morning?
A. I'd say morning.
Q. Mid morning, early morning, if you recall?
A. Mid.
Q. 10:00-ish, would that sound about right?
A. Yeah, just -- could do that.
Q. Was it just one inmate you brought over that day?
A. I believe so.
Q. And I just want to go back a little bit to the handcuffs. In 2016, how many inmates were typically in the waiting area on a typical day?



A. On a -- on a --
MR. CHURMA: Object to foundation.
MS. KAMPER: Join.
WITNESS: I'm sorry, what?
Q. You're allowed to --
MR. CHURMA: You -- you can answer.
Q. -- answer.
A. On any given day?
Q. Yes.
A. It depends. It -- it depends. Usually, it's pretty busy, usually, in the morning.
Q. Okay. When you say, "Busy," would it be more than 20 inmates?
A. Yes.
Q. 30? 0:13:56
A. About. That's a good number.
Q. Were there ever occasions at Cermak Hospital in or around 2016 where there were not enough handcuffs --
MR. CHURMA: Object to form. Object to foundation.
Q. -- for all the inmates --
MS. KAMPER: Join.
Q. -- that were in the day area?
A. During my time and duration at county, I've



never encountered where I've -- how do I put this? I've never had a problem with them being short, okay? Yeah, yeah. If they -- if they were short, it had to be on a day that I wasn't there.
Q. Okay. How often would you be at the jail -- hospital?
A. It wasn't a regular thing. That's just -- on any given assignment that -- that they would give me, maybe I was a Cermak officer for that day, okay? It wasn't a regular.
Q. On September 28th, do you recall if you were a Cermak officer that day, or did you just happen to bring --
A. I more than likely was. That -- that would be the -- the only reason why I'd be going there, because I was assigned to Cermak --
Q. So would you be at the hospital the whole time?
A. While they're there until I brought them back.
Q. Just that one inmate --
A. Yeah. 0:15:10
Q. -- then once you brought him back, then resume your normal --
A. I'd wait for another one.



Q. And would that be throughout your entire shift?
A. Mm-hmm.
Q. Was that enough to keep you busy for eight hours, to go back and forth --
MR. CHURMA: Object -- object to form.
A. Yeah, that -- it -- it would keep me busy.
Q. You said you didn't observe any problems with the number of handcuffs available, were you ever told by anybody that there were situations where there weren't enough handcuffs and or shackles?
A. I don't recall.
Q. May have, may have not, or is it --
A. It's -- I honestly don't recall.
Q. Was the inmate that you brought over handcuffed?
A. Yes.
Q. And was he shackled also?
A. Upon reviewing the video, I believe he wasn't.
Q. He was not?
A. Right. 0:16:02
Q. Do you know why he wasn't?
MR. CHURMA: Object to form. Object to foundation.

A. I can only -- because of the -- of the space, you know, this -- the time, I can only -- I can only say that that day, they were short, and they probably told me, and that would be the only reason why I wouldn't have shackled him to the bench.
Q. So would that be the only reason why you wouldn't have shackled him --
A. That would be --
Q. -- to the bench?
A. -- the only reason.
Q. When you brought him over, was he shackled?
A. No, no, he has to walk.
Q. How about handcuffed, was he handcuffed when you --
A. Yes.
Q. -- walked him over?
A. Yes.
Q. Was he handcuffed in the day room?
A. Either I walked him over with my cuff and then switched them out with their cuff -- we switch cuffs then, you know, then -- then they go to their cuffs, all right? So yeah.
Q. How many guards are at -- in -- in the day room on a typical day at Cermak Hospital?
MR. CHURMA: Object to foundation.



MS. KAMPER: Join. 0:16:59
A. It should be -- in that bubble area, about three.
Q. When you say, "Bubble area," can you describe what you're talking about?
A. Maybe, like, interlock is a better word, maybe -- maybe interlock, watch area. It -- it -- it's almost a control area.
Q. When you say -- when you say, "Control area" --
A. It handles all -- the -- okay. You got one person controlling the doors, there is a main entry door that they come in, and he'll pop that button, and then there is two other officers assisting with the day room.
Q. Okay. Where would they typically be stationed, did they have a desk, or did they float around?
A. Everybody assigned there would hang out in that control area.
Q. What were the duties of the correctional officers inside the day area, what were their --
A. Maintain order, make sure everybody's cuffed -- explain to the officers coming in, you know, "Okay, this," -- you know, "Cuff your guy" and all this stuff.



Q. Was -- was it uncommon for altercations or fights to break out with inmates in the --
A. Not uncommon. 0:18:00
MR. CHURMA: Object to form.
Q. When you say, "Not uncommon," can you be a little more specific?
A. I -- you got a 50/50 chance something happening.
Q. 50/50 chance at any given --
A. Yeah.
Q. -- occasion? So on a daily basis, you'd see fights --
A. Almost.
Q. -- break out?
A. Almost.
Q. So I take it being a correctional officer is not an easy job, is it?
A. No.
Q. Have you ever been assaulted by inmates?
A. Never assaulted. 0:18:26
Q. Have you ever had any physical altercations where an inmate tried to cause you physical harm?
A. No.
Q. No. Have you ever witnessed other guards being assaulted by inmates at Cook County Jail?



A. No.
Q. In -- in the hospital?
A. No.
Q. No. How many fights have you observed in Cermak Hospital over your career?
A. Maybe -- it's -- it's too many to count. Maybe 20. 0:18:58
Q. Yeah. And do you recall that day arriving at Cermak Hospital with your inmate?
A. Don't recall. It -- it's vague. It's -- it's vague.
Q. So I take it you would have gone through the tunnel, then up? Are there --
A. Through the tunnel is down.
MR. CHURMA: Object to foundation.
Q. Down. And then you go through the secure area with the door, correct?
A. Correct, correct.
Q. And the sergeant or whatever correctional officer is stationed there, would -- would the door be automatic?
A. No, they --
MR. CHURMA: Object to form.
A. -- buzz you in. They see through the window --

Page 25

MR. CHURMA: Object to foundation.
A. -- see through the window, and they buzz you in.
Q. Okay. So -- so you got buzzed in that day?
A. I'm pretty sure.
Q. And --
A. That's normally how it goes.
Q. What else do you recall about that day on the 28th?
A. Nothing out of the ordinary.
Q. Do you recall anything specifically without looking at your report or --
A. Uh-uh.
Q. -- going over anything?
RECORDER: Is that --
A. No.
RECORDER: -- no?
WITNESS: Yep. No.
Q. Do you recall any fights breaking out that day?
A. Yeah, the fight. 0:19:58
Q. Okay. Can you describe what happened?
A. Like, I can only go off what I seen in -- the video. I don't have a memory recollection --
Q. Okay. But you did see the video this

Page 26

morning?
A. Yeah, so that's --
Q. So based on the video, you're able to refresh your recollection?
MS. KAMPER: Object to form.
MR. CHURMA: Object -- join.
A. I could say -- I could -- it doesn't bring back anything as far as -- the only thing I remember that day was the argument, okay? The fight, it's so routine, I don't -- you know, it -- it's not even in my head anymore.
Q. Okay. What do you remember about the argument?
A. Being in the control area, writing the report out, and then hearing a superintendent and an officer arguing.
Q. Okay. Was that before or after the inmates fought?
A. After. Because I was writing a report after the incident.
Q. Okay. There was a fight between two inmates, correct?
A. Right.
Q. Were both inmates uncuffed at the time?
A. They were cuffed. 0:21:00

Page 27

MR. CHURMA: Object to foundation.
A. They were cuffed.
Q. Both inmates were cuffed?
A. Yes.
Q. And I take it they were not -- were they shackled too?
MR. CHURMA: Object to foundation.
A. My guy was not shackled. I couldn't speak for the other.
Q. And were the -- did the guards break up the fight between the two inmates?
A. Myself and --
MR. CHURMA: Object to form.
A. -- I believe two other officers.
Q. Okay.
A. Maybe three.
Q. Do you recall what other officers --
A. No, I can't --
Q. -- assisted?
A. -- name them.
Q. Do you know whether or not John Nawara was one of the officers that helped break up the fight?
A. I can't recall.
Q. Do you recall anybody that were there other than you?

Page 28

A. Just two other -- maybe two or three other officers.
Q. Do you recall any of their names?
A. No.
Q. Do you know a person named Correctional Officer Gannon, Barbie Gannon?
A. Only as -- as I was her sergeant, that was it.
Q. You were her sergeant?
A. I believe for -- maybe when they had -- when they had to mandate me -- or you know, I was, like, briefly.
Q. Were you assigned to the same division nine as Barbie Gannon when you were --
A. You mean --
Q. -- sergeant? 0:22:07
A. You mean --
MR. CHURMA: Object to form.
A. -- Cermak?
MR. CHURMA: Mischaracterizes testimony.
MS. KAMPER: Join.
Q. Yeah.
A. If Gannon was in Cermak at the time, then so was I.
Q. What do you remember about Barbie Gannon?

Page 29

A. Basically nothing, just -- just another officer.
Q. Do you know Sergeant Conley?
A. Doesn't ring a bell.
Q. Can you identify any officers working that day in the day room the 28th of September?
A. No, there was nothing -- nobody I was familiar with --
Q. How long --
A. -- except for Officer Nawara.
Q. Okay. How come you can remember Officer Nawara and not --
A. Because he was --
Q. -- anybody else?
A. I -- I don't know him, but I briefly seen him at -- at family functions. My brother-in-law knows him, so he would show up there.
Q. Did you know Officer Nawara before this incident? 0:22:58
A. Just at -- at the functions, I -- I -- it'd be like, "Hey, what's up?" and nothing beyond that, no conversation, so it -- it was just that.
Q. What -- what type of family functions would you see him?
A. Usually maybe -- I think maybe birthdays or

Page 30

barbecues, something like that.
Q. Did you ever have any experience working with Mr. Nawara before --
A. No.
Q. -- this day?
A. No, never worked with him.
Q. Do you recall at all ever having any contact with him at work?
A. Briefly in the halls, "what's up?" you know, in passing.
Q. How would you describe his demeanor from the contact that you had with Officer Nawara?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. Defensive.
Q. Okay. When you say, "Defensive," what do you mean?
A. Yeah, he was loud. They were getting -- they -- they were both escalating in their voices.
Q. Oh, I'm talking generally, when you'd pass in the hallway, not --
A. Oh, okay.
Q. -- not -- not --
A. In the hallway? No, no, he -- he was perfect -- it -- it was a regular "how you doing?"

Page 31

Q. You never saw any anger problems with Officer Nawara --
A. No. 0:24:01
Q. -- at work?
A. No, no.
MR. CHURMA: Object to form. Object to foundation.
Q. If you could just try and I'll try the same, if you kind of wait until I'm done with the question before you answer it, I think we're both talking over one another a little bit.
A. Okay.
Q. How many times before this incident do you think you saw him in a social family setting?
A. Maybe two or three.
Q. Do you recall on the 28th when you first noticed John Nawara was working in the day room?
MR. CHURMA: Object to form.
A. I do not recall.
Q. Do you remember specifically him helping breaking up the fight?
MS. KAMPER: Object to form.
A. I do not. I was too busy worried about my inmate, grabbing a hold of him.
Q. When you looked at the video today, were you

Page 32

able to see Mr. Nawara?
A. I -- I saw him.
Q. Do you know if he assisted, by watching the video, in breaking up the fight?
MR. CHURMA: Object to form. 0:24:59
A. It appears he did.
Q. When you say, "It appears he did," what did you see when you saw the video this morning?
A. I wasn't really paying attention to him, specifically more what I was doing, so still even if -- even if I saw it again, it wouldn't ring a memory of "oh, yeah, I did that," because I -- I really don't remember exactly what I did that day as far as the inmate.
Q. How long did the fight last between the two inmates before --
A. According to the video --
MR. CHURMA: Object to foundation.
A. According -- that -- that's what I'm saying, I'm going off the video. Looks like a few minutes -- the inmate fight?
Q. Yes.
A. How long did the fight last? Maybe -- maybe less than a minute.
Q. Was anybody hurt as a result of the fight?

A. Not that --
MR. CHURMA: Object to form.
A. -- I'm aware of.
MR. CHURMA: Object to foundation.
A. Not that I'm aware of.
MR. LINDEN: Do you just want to make a standing objection to foundation? I mean, it's kind of every question I feel like I'm getting an objection for no apparent good reason as far as I can tell.
MR. CHURMA: With respect to his -- his recollection, I mean, he's already testified that he saw the video, so with respect to any independent memory, then I think I want to object to foundation on what he recalls from that day specifically.
MR. LINDEN: Yeah, just -- I mean, I'll let you make a standing objection --
MR. CHURMA: Okay. 0:26:13
MR. LINDEN: -- to this all. Is that okay?
MR. CHURMA: That's fine.
MS. KAMPER: I would --
MR. LINDEN: Just so --
MS. KAMPER: I would -- I would join that standing objection.
MR. LINDEN: Okay.
MS. KAMPER: He -- he has said, "I -- I don't



recall."
Q. So your testimony regarding this inmate fight is based solely upon the videotape that you saw today of the incident, correct?
A. It -- it -- it's a vague memory.
Q. Was the videotape dated at all?
A. It should be.
Q. When you saw it, was it dated?
A. It appeared to be. I saw the date at the top.
Q. Did that refresh your recollection at all of what occurred that day?
A. No.
Q. Were you able to identify that it was you in the video?
A. Yes.
Q. Were you able to identify for certain it was also John Nawara that was in the video?
A. Yes.
Q. Were you able to identify for certain that was -- inmate that you brought down that day was one of the inmates -- one of the two that were fighting?
A. That I -- I -- I can't confirm.
Q. Do you have any reason to suspect that it was not?



A. No. 0:27:10
Q. And where did the fight occur in proximity in the day room area, middle of the room, side of --
A. More to the side.
Q. From watching the videotape, you said approximately two or three officers broke up the fight?
A. Myself included.
Q. Okay. So I take it you took your inmate aside after -- after you broke up the fight?
A. Mm-hmm.
Q. Were -- were --
RECORDER: Is that a yes? You have to answer out loud.
WITNESS: I thought I did.
RECORDER: Not "mm-hmm" --
WITNESS: Okay.
RECORDER: -- or "mm-mm."
WITNESS: Okay. I gotcha.
MR. LINDEN: Thank you.
A. Yes, I did.
Q. And where did you take him?
A. From the video, I grabbed him and sat him down on the bench with me in front of me.
Q. And that inmate had a medical appointment?
MR. CHURMA: Object to foundation. 0:28:09



A. I believe so.
Q. And do you know if he kept that appointment, or did he --
A. I don't recall.
Q. No. How long were you sitted (sic) on the bench with the inmate, if you recall?
A. According to the video, maybe -- maybe a minute.
Q. I think you indicated that you were working on a report?
A. After the incident.
Q. And where were you working on the report?
A. In the control area.
Q. Okay. When you say, "Control area," where --
A. You could say that. I would say in the bubble, what -- we can call it control area.
Q. Is that a separate room, or would that be part of the larger --
A. It's -- it's in -- it's in the waiting room, almost like a separate office.
Q. How big would the office be?
A. Small.
Q. Would it be about the size of this --
A. Could be, yeah.
Q. -- conference room?

A. About this room. 0:29:03
Q. When you were working on the report, do you recall if anybody else was in the room with you?
A. I know there were other officers there, but I can't recall who.
Q. Do you recall if John Nawara was in the room at the time?
A. I don't recall.
Q. With respect to the other inmate, where did the other inmate go?
A. As far as?
Q. After the fight, you took your inmate and sat on the bench with him, correct?
A. Yeah, correct.
Q. Did another officer take the other inmate to a separate part of the --
A. I believe they were separated. I'm not sure what happened after -- after -- after I got my guy on the bench, I'm not sure what I did after that.
Q. Did somebody else watch him while you went to the control area to make out your report, or what happened to that inmate?
A. I'm sure --
MR. CHURMA: Object to form.
A. -- my guy was --



MR. CHURMA: Object to foundation. 0:29:57
A. I'm sure my -- I'm not exactly sure. Normally, I would just put the guy back on the bench, and we would separate those guys, put one guy way over here, way over here.
Q. Okay.
A. Not much more we could do with them.
Q. How long were you in the control room?
A. For as long as it takes to do a report, I'd say maybe -- maybe 30 minutes, maybe.
Q. Do you know a person Superintendent Jones-Hayes?
A. Yes.
Q. And how do you know Jones-Hayes?
A. How do I know Jones-Hayes?
Q. Yes.
A. Just as a superintendent.
Q. And do you know how long you'd known her before this 2016 incident?
A. I haven't worked with her -- worked with her directly until she made it to division 11 where I was.
Q. Okay. Was she in division 11 at the -- on September 28th, 2016?
A. No, I believe that was Superintendent Joe Brown --



Q. Okay. 0:30:59
A. -- at the time.
Q. Do you know what Jones-Hayes's assignment was back in September of 2016?
A. Not directly.
MS. KAMPER: Form.
A. No.
MS. KAMPER: Foundation.
A. Not directly, no. I didn't know her assignment.
Q. Do you know if she was assigned Cermak Hospital on that day?
MS. KAMPER: Form. Foundation.
A. I can only guess that she was. I -- like I said, I don't know. So if she showed up there and it was a supt, I would just naturally assume that she was the supt of that building.
Q. Okay. And that -- and that's why when you said, "I can only guess," it'd be she is the one that came down?
A. Right, exactly.
Q. When you have an incident like that, do you need to have a supervisor come down?
A. Yes.
MR. CHURMA: Object to form.



A. Yes.
Q. And can you describe what the procedures are for that?
MR. CHURMA: Object to foundation. Form.
A. If there is an incident, you call a supervisor, and they just come and help assist.
Q. Can it be a sergeant, or does it have to be --
A. Sergeant. Start -- usually starts with a sergeant.
Q. A sergeant or higher would be the procedure?
A. Mm-hmm.
Q. What's the purpose of the supervisor coming, what's -- what's their responsibility?
A. Make sure everything --
MR. CHURMA: Object to form. Object to foundation.
WITNESS: Should I answer?
MR. CHURMA: Yeah, you can answer. 0:32:03
A. Make sure everything is being done in the proper order as far as the inmates.
Q. Was Jones-Hayes in the day room when you first entered the day room with your inmate?
A. Don't recall.
Q. Do you know if she was in the room when the

fight broke out between the two inmates?
A. Don't --
MR. CHURMA: Object to form.
A. -- recall.
Q. Do you recall the first time you saw her in the day room area on the 28th of September?
A. The first time I saw her was in the control room.
Q. And that's when you were writing the report?
A. Mm-hmm.
Q. So you didn't see her before that time?
A. No, I did not.
Q. Was Officer Nawara with you in the control room the first time you saw her?
A. First time I saw her, I believe I turned around because I heard a commotion, and I saw Officer Nawara and Superintendent Jones talking.
Q. Okay. You said you saw them talking, were you able to hear --
A. I heard them. 0:33:06
Q. -- them talking?
A. Right, right, right.
Q. And that's when you're writing the report, when you first heard them talking?
A. Right.



Q. Do you know how far Officer Nawara was from you at the time?
A. Just a few feet.
Q. And how about Superintendent Hayes?
A. Same thing, if I -- it wasn't -- yeah, it wasn't that far.
Q. How close to Officer Nawara was Superintendent Hayes?
A. Arms -- I would say arms.
Q. Did you ever see the two of them make any physical contact on that day?
A. The supt touched Officer Nawara on the arm in a gesture of -- of de-escalation.
Q. Okay. Can you describe exactly what happened that caused her to touch his arm?
A. Officer Nawara --
MR. CHURMA: Object to --
MS. KAMPER: Object --
MR. CHURMA: -- foundation.
MS. KAMPER: -- to form. Foundation.
WITNESS: Answer?
MR. CHURMA: You can answer if you know. 0:33:53
A. Officer Nawara was becoming loud in his speech, he was becoming defensive. He didn't like the line of questioning, and she tried to bring him down a



little bit.
Q. When you say, "Loud," can you be a little more specific? Was he yelling?
A. No, it wasn't yelling. He was just raise -- raising his voice more than you would at a talking level.
Q. Do you recall anything specific what Officer Nawara said --
A. Nothing --
Q. -- to Superintendent Hayes?
A. No.
Q. Do you recall anything specific what Superintendent Hayes said to Officer Nawara?
A. Do not.
Q. Did you hear either of them curse at one another?
A. I don't recall cursing.
Q. Did you ever see Officer Nawara threaten Jones-Hayes in any way that day?
MR. CHURMA: Object to form.
A. I don't remember any threats.
Q. That would be something, I take it, you'd remember, if a correctional officer --
A. Yes, I would. I --
Q. -- correct?



A. I would.
Q. So is it fair to say given that you don't remember, it didn't happen?
A. I would say --
MR. CHURMA: Object to form. Object to foundation.
MS. KAMPER: Join. 0:34:58
MR. CHURMA: Mischaracterizes prior testimony.
MS. KAMPER: Join.
A. I would remember a threat.
Q. And you obviously don't remember a threat that day, correct?
A. Right.
MR. CHURMA: Object to form.
MS. KAMPER: Join.
Q. Did you ever see Jones-Hayes poke Officer Nawara in the chest?
MS. KAMPER: Objection. Form.
A. I didn't see any poking.
Q. Can you describe what you meant when you said, "Touch"?
A. She reached down her arm and placed it on his, I believe it was forearm. I -- from what I -- I -- I believe it was his forearm.

Q. Yeah --
A. "Wait" -- she went, "Wait, wait."
Q. Yeah, can you kind of describe that to me if I was --
A. Cross your arms. All right. "Wait, wait."
Q. Okay. Do you know how many times she said, "Wait, wait"?
A. Maybe once or twice.
Q. What was Officer Nawara's reaction when she --
A. He became --
Q. -- did that?
A. He became defensive and told her not to touch him.
Q. Did you see anything wrong with Officer Nawara telling her not to touch him?
MR. CHURMA: Object to form.
MS. KAMPER: Join. 0:35:59
A. I thought he was being extreme because it wasn't try to move --
Q. It wouldn't have bothered you if that --
A. Not in --
Q. -- same touching?
A. -- the slightest.
Q. Do you know what caused him to be upset with



what Superintendent Hayes was telling him?
A. I --
MR. CHURMA: Object to --
MS. KAMPER: Objection.
MR. CHURMA: -- form.
MS. KAMPER: Form.
A. I -- you'd have to talk to Officer Nawara. I can't say what set him off.
Q. But you said -- did something cause, in your mind, him to be upset about something?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. I can't -- I can't answer why he would become upset. I don't know why.
Q. Have you ever worked with Jones-Hayes before this incident?
A. No, not before this.
Q. How about after, have you had much contact with her?
A. Now she's my superintendent in division 11.
Q. Have you ever seen any anger issues with Superintendent Hayes during the time?
A. No anger. 0:36:59
Q. Did you ever hear her raise her voice to anybody at the jail?



A. No.
Q. Do you ever hear her talk in any demeaning or condescending manner?
A. No.
Q. Never?
A. No.
Q. Did you ever observe her, other than this once incident, touch another officer?
A. She had done the same gesture to me.
Q. Before or after this incident?
A. Before -- oh, wait, wait, I'm sorry, after, because she was my supt in 11.
Q. Same exact --
A. Same --
Q. -- thing that you described?
A. Same exact gesture.
Q. Do you know what caused her to touch you that day?
A. She mentioned -- she mentioned that she knew my brother, "Oh, I know your brother."
Q. Was she kind of a touchy-feely type person?
A. That's what I --
MR. CHURMA: Object to form.
MS. KAMPER: Objection. Form.
A. If -- if she was, then that's her



personality.
Q. Did you ever have any problems with her as a superintendent --
A. No.
Q. -- during your time?
MR. CHURMA: Object to form.
A. No. 0:37:57
Q. Was that the first time you observed any reaction -- I'm sorry, strike that. When you described that Superintendent Hayes touched Officer Nawara, was that the first time you observed any interaction between the two of them?
A. Yes.
Q. What happened after that that you recall?
A. I don't recall what happened after that. I -- I -- I have no recollection.
Q. Any --
A. Probably -- I probably went to my inmate and -- and administered to him.
Q. Okay. You said before what happened in the day room area, that was completely based on you watching the video this morning, correct?
A. Right, right.
Q. What happened in the control room area, was that based on the video, or is that based on your

Page 49

independent recollection?
A. What happened in the control room area is off of my memory.
Q. Do you know if there is any cameras in the control room area?
A. Directly in the control room area, no. 0:39:01
Q. Do you know if there is any cameras that would catch what would happen in the control room?
A. It's dark in there, you wouldn't have been able to see.
Q. So you don't know of any videos that would be available to show what did or didn't occur between Officer Nawara and Superintendent Hayes?
A. Nothing that I could see, no.
Q. You ever seen any videos of anything in the control room area?
A. No.
Q. Have you ever seen a video of anything in the control room area?
A. The most you see is outside.
Q. Can you identify anybody else that was in the control room at the time, other than you, Superintendent Hayes, and Officer Nawara?
A. I cannot.
Q. Do you recall if anybody -- anybody else was

Page 50

in there?
A. I do recall other officers, but like I said, it -- I don't have specifics.
Q. Yeah. Do you know how many officers were in the control room area --
A. Maybe --
Q. -- at the time?
A. Besides --
Q. The three of you.
A. It might have been --
MR. CHURMA: Object to form. 0:39:57
A. -- maybe two --
MR. CHURMA: Mischaracterizes testimony.
A. -- maybe two more.
Q. Okay. You've -- you've identified three people, correct, you, Officer Nawara, and Superintendent Hayes?
A. Right, and I'm saying there might be -- may have been two other officers in there.
Q. Okay. Do you recall if they're male, female?
A. I don't. I don't recall.
Q. Do you recall anything about them, what they look like, how tall they were, nothing?
A. No, I was too engrossed in the report and what I was seeing happening in front of me.

Page 51

Q. And you said you spent about a half hour in the day -- or the control area?
A. About, about maybe.
Q. Was John Nawara in there the entire 30 minutes with you?
A. I couldn't -- don't know.
Q. Do you know how long he was in the control room that --
A. Maybe -- it might have been -- the altercation lasted maybe, I'm guessing, a few minutes.
Q. Okay. When you say, "Altercation," you talk about the verbal --
A. Argument.
Q. Okay. Did you ever write a report on what -- what occurred between Officer Nawara and Superintendent Hayes?
A. I've written no reports on that incident.
Q. Excuse me? 0:41:05
A. I've written no reports about them.
Q. Did you write a report about the two of them?
A. No.
Q. No. Was there a reason why you didn't write a report about the two of them?
MR. CHURMA: Object to form.
A. Didn't feel the need to.

Page 52

Q. Okay. You have what you call incident reports, correct?
A. Mm-hmm.
Q. And are there policies and procedures governing when you have -- you're supposed to do an incident report?
MR. CHURMA: Object to form.
A. Unless I see an actual violent act, that's -- you know, then -- then you gotta write one.
Q. Is it pretty much anything significant, you have to write an incident report for?
MR. CHURMA: Object to form.
A. Exactly what you see.
MR. CHURMA: Object to foundation.
MS. KAMPER: Join.
Q. I'm sorry, I didn't hear you.
A. Wait, one more --
Q. What -- what governs or what criteria do you have when you do an incident report or choose not to do an in -- incident report? What level does something have to rise to to cause you --
MR. CHURMA: Same objections.
MS. KAMPER: Same --
A. Violence.
MS. KAMPER: Join. 0:41:58

A. Violence.
Q. Anything else besides violence that you do an incident report for?
A. Assault, violence, maybe -- that -- that's it. That's it.
Q. So you didn't observe anything between Jones-Hayes and Officer Nawara that would cause you to do an incident report regarding what happened that day?
A. Nothing raised any red flags to -- to promote an incident report about them.
Q. Was it relatively minor, based on your experience, what happened --
MR. CHURMA: Object --
Q. -- between --
A. I believe that it -- yeah.
MR. CHURMA: Object to form.
MS. KAMPER: Join.
Q. I'm sorry, you're allowed to answer.
A. I would call it minor.
Q. Do you know what a fitness for duty exam is?
A. I'm familiar with it, that the best -- best I could do. I've never actually had to deal with it.
Q. Okay. How are you familiar with a fitness --
A. Just --
Q. -- for duty?



A. -- in -- in talking, okay, hear -- hear the phrase going around.
Q. Have you ever had to be subjected to one?
A. No. 0:42:59
Q. Do you know anything about what criteria there is for fitness for duty exams?
MR. CHURMA: Object to form.
A. I don't. I don't.
Q. Do you see anything that happened that day that you observed with Officer Nawara that would cause you to believe that Officer Nawara was a danger either to staff or to inmates?
MR. CHURMA: Object to form. Object to foundation.
A. I felt no danger with Officer Nawara, and I felt no danger toward the supt.
Q. So nothing that would cause you to believe that he was a danger to anybody. Is that fair?
A. No, no danger.
Q. Other than raising his voice, did you see anything unprofessional that day on the part of Officer Nawara?
MR. CHURMA: Object to form.
A. No. Other than raising his voice, no.
Q. Do you recall anything else that happened on



September 28th, 2016?
A. No. 0:44:05
Q. Did you witness anything after the time in the control room where an inmate refused or was disobeying Officer Nawara's order to cuff up?
A. I did not.
Q. Did you observe Superintendent Hayes walk over to an inmate to try and assist or get them to be handcuffed?
MR. CHURMA: Object to form.
A. No recollection.
Q. You don't remember Officer -- or Superintendent -- Superintendent Hayes going up to inmate and saying something to the effect, "Hey, baby, come on"?
A. No.
Q. As a correctional officer, is it important that inmates view you as -- with respect?
MR. CHURMA: Object to form. Object to foundation. 0:45:06
A. It helps, yeah. We want control.
Q. You -- you have more inmates typically than guards in any particular area of the jail. Isn't that a fair statement?
MR. CHURMA: Object to foundation.



A. That -- that would be correct.
Q. I mean, in fact, it's more than five to one ratio, isn't it, inmates to guards?
A. That sounds --
MR. CHURMA: Object --
A. -- about right.
MR. CHURMA: -- to foundation.
Q. So they have to respect you with authority. Isn't that a fair statement, the inmates?
A. Fair.
MR. CHURMA: Object to form.
Q. And if you lose that authority with an inmate, that could put your life and the safety of you and others in jeopardy. Is that fair?
A. Correct.
MR. CHURMA: Object to form.
Q. I -- I'm -- I'm sorry, now -- yes?
A. Yes.
Q. Isn't it also important that you don't demean a fellow correctional officer or anybody else do -- in front of the inmates. Isn't that a fair --
MR. CHURMA: Object to form.
MS. KAMPER: Form. 0:45:56
A. It -- it's very important.
Q. And can you explain why -- why that is?

A. Number one, we become entertainment for the inmates, right, that's just my first and foremost thing, now we're entertainment for them, and it also -- it -- it -- it downgrades our -- our -- our natural presence that we have wearing this uniform, you know, and it makes -- makes it look -- it -- it just brings down your level of professionalism. It doesn't look good at all.

Q. Let's say -- let's assume you're trying to handcuff an inmate and the inmate's being a jerk or, you know, playing around with you, then you have a superintendent come in and go over to the inmate, and joke with the inmate, and say, "Hey, baby, come on, let's cuff up," would you see anything inappropriate with that?

MS. KAMPER: Object to form --

MR. LINDEN: Well can you let me finish --

MS. KAMPER: It's a --

MR. LINDEN: -- my question, please?

MS. KAMPER: -- total hypothetical.

MR. LINDEN: Let me finish my question, please.

A. I wouldn't --

MS. KAMPER: Wait a minute. Are you done with your question? Because if you're done with your



question --

MR. LINDEN: Well --

MS. KAMPER: -- I can make an objection.

MR. LINDEN: Well --

MS. KAMPER: He's answering.

MR. LINDEN: -- I wasn't done, and you --

MS. KAMPER: Okay. 0:46:59

MR. LINDEN: -- interrupted me is what --

MS. KAMPER: Okay.

MR. LINDEN: -- happened.

MS. KAMPER: Then I'll let you finish your question --

MR. LINDEN: Let me --

MS. KAMPER: -- and then I'll make --

MR. LINDEN: -- and then you can make your objection.

MS. KAMPER: -- my objection.

MR. LINDEN: Okay.

Q. If you have a superintendent -- you're trying to handcuff an inmate, and the inmate is resisting, and then you have a superintendent come in and kind of sweet talk the inmate and say, "Hey, babe, come on, you know, cuff up and listen to him," would you see anything inappropriate with a superintendent doing that?



MS. KAMPER: Objection. Form and foundation.

MR. CHURMA: Join.

Q. You could answer.

A. I would see a, yeah, problem with that.

Q. And why would you see a problem with that?

MS. KAMPER: Same objection.

MR. CHURMA: Join.

A. Because you don't talk that way to an inmate. That -- I can't explain it no more than that. You -- you don't talk that way to an inmate. It's not "hey, baby." It's "sir, cuff up," all right? What are you, with them or with us? That's how I see it.

Q. And that type of talk to inmates could endanger the superintendent, correct?

A. Right. 0:47:58

MR. CHURMA: Same objections.

A. The officer --

MS. KAMPER: Join.

A. -- loses his -- his respect once he sees, oh, you know, she's going to -- she's going to override the officer, no problem.

Q. And if you were in that spot and let's assume the superintendent did that to you, would that cause you to be upset?

MR. CHURMA: Same --



MS. KAMPER: Form --

MR. CHURMA: -- objections.

MS. KAMPER: -- foundation.

A. I would be upset.

Q. You would view that as inappropriate conduct --

A. Inappropriate.

Q. -- on the part of your superior, correct?

MR. CHURMA: Same objections.

A. Yes.

MS. KAMPER: Join.

A. Inappropriate.

Q. Did you ever observe Officer Nawara lose his temper on September 28th, 2016?

A. Did not observe.

Q. You did not observe him lose his temper?

MR. CHURMA: Object to form.

A. Did not.

MS. KAMPER: Join. 0:48:54

Q. How about his body language, did you see him do anything that would cause any concern with respect to body language on the part of Mr. Nawara?

MR. CHURMA: Object to form. Foundation.

MS. KAMPER: Join.

A. I had no concern.

Page 61

Q. Based on what you observed that day, did you see any basis for the superintendent to file a complaint against John Nawara?
MR. CHURMA: Object to --
MS. KAMPER: Objection. Form and foundation.
MR. CHURMA: Join.
A. Aside from the bantering back and forth, she might have had cause.
Q. You say she might have had a cause, do you -- what would that cause have been?
A. Strictly --
MR. CHURMA: Object to form. Foundation.
WITNESS: Oh, sorry.
MS. KAMPER: Join.
A. Strictly from his tone.
Q. Other than his tone, did you see anything improper what Officer Nawara did or said that day?
MR. CHURMA: Same objections.
MS. KAMPER: Join. 0:49:55
A. Nothing improper.
Q. Okay. You've been talking today in a normal voice, correct? You haven't raised your voice, I haven't raised my voice at you, correct?
A. Correct.
Q. Can you replicate the tone of voice and the

Page 62

volume that you heard, because we are on video, if you could just try and replicate the difference in tone?
MR. CHURMA: Object --
MS. KAMPER: Object --
MR. CHURMA: -- to form.
MS. KAMPER: -- to form.
MR. CHURMA: Foundation.
A. I -- I -- I couldn't. I -- I don't -- it -- it would be exaggerated -- because I -- I wouldn't be able to get -- give an exact.
Q. Okay. How far away from the control area was the day room area?
A. Maybe -- maybe ten to 15 feet.
Q. Was Officer Nawara talking in a tone where his voice could have been heard in the day room area?
MR. CHURMA: Object to foundation. Form.
MS. KAMPER: Join.
A. Yes. 0:50:54
Q. So you think you could have heard him ten or 15 feet away?
A. Yes.
Q. How about 30 feet away?
MR. CHURMA: Object to foundation.
MS. KAMPER: Join.
MR. CHURMA: Form.

Page 63

A. Not sure.
Q. When you heard him raise his voice, did you see anybody react to it, other than possibly Jones-Hayes?
MR. CHURMA: Object to form.
A. I did not.
WITNESS: I'm sorry.
A. I did not notice any reaction.
Q. No reaction of any of the other two correctional officers or sergeants in the room at the time?
A. No.
Q. Do you recall if they were looking in that direction, the other two people that were in the room with you?
MS. KAMPER: Objection. Form.
MR. CHURMA: Join.
A. I don't recall.
Q. Do you recall anything what they were doing, where they were looking, if they were involved in any conversation between Officer Nawara and Jones-Hayes?
MR. CHURMA: Object to form.
A. I remember the supt and Officer Nawara were in front of me, and maybe an officer off to my left. That's as best as I can remember that.

Page 64

Q. Do you recall Officer Nawara leaving the control area?
A. I don't recall that. 0:52:05
Q. Do you recall Superintendent Hayes leaving that room?
A. Don't recall.
Q. Do you recall seeing Superintendent Hayes and Officer Nawara at any time after the verbal, whatever you want to call it, incident between the two of them?
MR. CHURMA: Object to form.
A. Don't recall seeing them.
Q. Have you ever observed anything inappropriate with Superintendent Hayes?
MR. CHURMA: Object --
A. Nothing --
MS. KAMPER: Objection.
MR. CHURMA: -- to form.
MS. KAMPER: Form. 0:52:58
A. Nothing inappropriate.
Q. During your career at Department of Corrections, did you ever observe or any information that the sheriff's office was using fitness for duty exams improperly for, let's say, retaliation?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join.

Page 65

A. Not to my knowledge.
Q. Did you ever hear anything about -- to that effect?
A. Never even heard anything like that.
Q. Okay. Have you ever experienced any retaliation within the sheriff's office?
MR. CHURMA: Object to form.
A. I've never experienced retaliation.
Q. Do you have any information about anybody else being retaliated by anybody within the sheriff's office?
A. No, I do not. 0:54:00
Q. Do you have any fear for your job if you don't give favorable testimony --
MR. CHURMA: Object --
Q. -- in favor of Superintendent Hayes or the sheriff's office?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. I have no fear.
Q. Do you know a person by the name of Winifred Shelby?
A. If you're talking about Nurse Shelby and that's her, yes.
Q. Yes. How do you know who Nurse Shelby is?

Page 66

A. I had to see her for an issue at the jail that I was having.
Q. Do you recall when that was?
A. 2016.
Q. Do you know if it was before or after the incident in the day room we talked about?
A. Before.
Q. Was it a medical issue that you had personally?
A. Medical, yes.
Q. Do you know how many times you -- I -- I don't want to talk about your whatever medical problem may or may not have been, but was it just one interaction you had with her?
A. May have been two for that subject. 0:55:06
Q. Without going into whatever the medical issue was, do you recall anything about Nurse Shelby?
MR. CHURMA: Object to form.
A. She was a nice person.
Q. Did you ever observe Nurse Shelby and Superintendent Jones-Hayes together at any time?
A. I don't believe I've ever seen them together.
Q. Do you know whether or not they had any personal relationship between the two of them?
A. I have --

Page 67

MS. KAMPER: Form.
A. -- no idea.
Q. Do you know whether or not they are friends or not friends?
MS. KAMPER: Objection. Form.
A. I have no idea.
Q. Do you know anything about Officer Nawara and being required to do a fitness for duty exam?
A. No knowledge of that. 0:56:04
Q. Any information regarding that? Any information regarding any fitness for duty issues with Officer Nawara?
A. No information.
Q. Do you know a Rebecca Reierson?
A. Reierson? It doesn't -- I would have to say no.
Q. She was in human resources?
A. Doesn't ring a bell.
Q. Okay. How about a Matthew Burke, do you know who he is?
A. No.
Q. Other than talking to your attorney here, Morgan, have you talked to anybody else about your deposition today?
A. No.

Page 68

Q. You talk to any fellow employees about your deposition?
A. No.
Q. Did you ever talk to Jones-Hayes about your deposition?
A. No.
Q. Did you ever talk to Jones-Hayes regarding the incident between her and John Nawara?
A. No. 0:57:03
Q. Do you know whether or not John Nawara, after this incident, was transferred out of Cermak Hospital?
A. I have no -- no knowledge of that.
Q. Did you see anything that day that would cause you to think that he should be transferred out of Cermak Hospital?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join.
A. I wasn't thinking that.
Q. You -- you didn't see anything that would cause you to believe that he should be out of Cermak Hospital --
A. I did not.
Q. -- is that fair?
A. No.
MR. CHURMA: Same objections.

A. Nothing.
MS. KAMPER: Join.
WITNESS: Sorry.
A. Nothing caused me to believe that.
Q. Have you ever been assigned to external operations?
A. Not in an assignment.
Q. Do you know what external operations is at the sheriff's office?
A. Oh, wait, let me strike that. I was in external operations, placed on light duty assignment for an injury. That's all.
Q. Is that a separate assignment, external operations? 0:58:00
A. It's -- it's -- it's exactly what it says, external. It's the outlying jail, it's every -- everything has to do with the outside of the jail.
Q. So one of the things external operations do, they patrol and police outside area of the jail, correct?
A. Correct.
Q. And in external operations, you typically carry a weapon?
A. Correct.
Q. You typically carry a firearm, correct?



A. Correct.
Q. Would it be fair to assume that if somebody thought you were a danger -- you had an anger problem, that you wouldn't be allowed to carry a weapon?
MR. CHURMA: Object to form. Foundation.
MS. KAMPER: Join.
A. One more time, please.
Q. Isn't it fair to say that if the higher-ups thought you were really a danger to yourself or to others, they wouldn't transfer you to external operations and allow you to carry a firearm?
A. That sounds --
MR. CHURMA: Same objections.
WITNESS: I'm sorry.
A. It sounds reasonable.
Q. Does that seem like a reasonable assumption?
A. Yes.
Q. Have you ever been subjected to any retaliation at the sheriff's office yourself --
MS. KAMPER: Form objection.
Q. -- that you know of? 0:59:08
A. No retaliation.
Q. Is there anything you can think of that happened that day that we haven't talked about, September 28th?



A. Basically what I've --
MR. CHURMA: Object to form.
WITNESS: Oh, sorry.
A. Basically what I've told you is what I can recommend -- or recollect.
Q. Do you recall any time after this incident that you had any contact with John Nawara?
A. I had no contact after that.
Q. Any family functions after?
A. No family functions either.
Q. Is there a reason you had family functions before and no family functions after?
MR. CHURMA: Object to form.
A. I couldn't tell you why. He was more friends with my -- with my brother-in-law, the sergeant.
Q. So your brother-in-law is a sergeant?
A. Yes.
Q. At the jail?
A. Yes. 0:59:59
Q. Do you still see your -- I'm just trying to see why you don't see John Nawara anymore?
A. Like I said, he was more friends with my -- with my brother-in-law than me, and even at the parties, we'd be like, "Hey, what's up?" and that is it.



Q. So nothing negative or positive, just --
A. Just --
Q. -- kind of happened that way?
A. Yeah, that's it.
MR. LINDEN: Can I just have a few minutes, take --
MR. CHURMA: Yeah.
MR. LINDEN: -- a little break?
RECORDER: Off the record, 11:58 a.m.
(Off the record)
RECORDER: Back on the record, 11:59 a.m.
Q. What is your brother-in-law's name?
A. John Staszak.
Q. Can you spell that?
A. I have trouble with the last name, S-t-a-s-z -- wait, S-t-a-z-s-a-k or z-a-k, switch the S and the Z.
Q. How often do you see John?
A. Family functions.
Q. And would that be a few times a year?
A. You could say that.
Q. And is he a sergeant currently?
A. Yes. 1:01:00
Q. And do you know where he is assigned to?
A. I'm not sure.

Q. Do you know if he's within the jail?
A. In the jail.
Q. So you don't see him typically at work on a routine basis?
A. No, he works a different shift than I do.
Q. Do you know if John Nawara and your brother-in-law are still friends or acquaintances?
A. I have --
MR. CHURMA: Object to form --
A. -- no idea.
MR. CHURMA: -- and foundation.
A. I have no idea.
WITNESS: Sorry.
Q. Okay. I think you indicated one time before that John seemed to take issue when Jones-Hayes touched him --
A. Correct.
Q. -- is that a fair statement?
MS. KAMPER: Objection. Form.
A. Correct.
Q. And did he seem at least agitated when Jones-Hayes placed her hands on him, would that be a fair --
MR. CHURMA: Object to form --
Q. And correct me --



MR. CHURMA: -- mischaracterizes prior testimony.
MS. KAMPER: Join.
Q. Correct me if I'm trying to -- if it's not what you --
A. He -- pretty agitated -- agitated.
Q. Did he seem agitated before she touched him?
A. Same level, yes. 1:02:02
Q. And you indicated before that a similar thing happened between you and Ms. Jones-Hayes, and it didn't bother you. Is that a fair characterization of what you testified to?
MR. CHURMA: Object to form.
A. Correct.
Q. Is it fair to say certain people have different levels of tolerance when somebody invades their privacy, based on your experiences in life?
MS. KAMPER: Objection. Form.
A. Sure, everybody's different.
Q. So some people, touching might bother them more than other people. Is that fair?
MR. CHURMA: Object to --
MS. KAMPER: Objection.
MR. CHURMA: -- form.
MS. KAMPER: Form.



A. Absolutely.
Q. And as a correctional officer, I take it you deal on a daily basis with inmates and other staff and --
A. Correct.
Q. -- so you have experience in that regard?
A. Yes.
Q. Are you a person that, you know, if somebody's a little touchy-feely, it doesn't bother you, are you one of those that have -- of a fair -- fairly high tolerance to being touched by another person?
MS. KAMPER: Objection to form.
MR. CHURMA: Join.
A. Touching doesn't bother me.
Q. Touching does not bother you?
A. Long as it's not aggressive.
Q. All right.
A. Yeah. 1:03:11
Q. But in your experiences in life, you've had people that touching does, in fact, bother them, correct?
MR. CHURMA: Object to form.
MS. KAMPER: Join.
A. One more time. Other people or me?



Q. Other people. I understand that you -- as long as somebody doesn't touch you in an aggressive manner, but throughout your life and career in the Department of Corrections, you've seen other staff members in DOC that touching does bother that person, correct?
MR. CHURMA: Object to form.
A. I've never witnessed anybody else become offended.
Q. So do you know if anything might have occurred before that caused John Nawara to be agitated that you didn't hear that occurred between Jones-Hayes and Officer Nawara that day?
A. I --
MR. CHURMA: Object to form.
MS. KAMPER: Join.
WITNESS: Sorry.
A. No, nothing before.
Q. Okay. Were you in a position to observe anything before that? I mean, did you see the two of them together before you saw Jones-Hayes touch Officer Nawara?
MR. CHURMA: Object to form. 1:04:18
A. The first time I saw them was when they met up in the control area.

Q. The first time that you recall seeing the two of them together, was that when she touched Officer Nawara, or did you recall anything before that time?
A. They were -- they were talking, and during the course of that conversation is when she made the gesture.
Q. And do you recall approximately how long you saw them talking before she made that gesture?
A. It might have been a few minutes.
Q. When you say, "A few minutes," more than a minute?
A. More than a minute.
Q. More than two minutes?
A. About two minutes.
Q. Did you ever see Officer Nawara touch Superintendent Hayes?
A. I did not see Officer Nawara touch -- Hayes, I -- I don't believe he did.
MR. LINDEN: I -- I've got nothing else, but thank you very much. Appreciate it.
MS. KAMPER: Sorry about that.
MR. CHURMA: I don't have any questions.
MR. LINDEN: No?
MS. KAMPER: I don't have any questions.
MR. LINDEN: Okay. Thank you very much.



MR. CHURMA: We'll reserve signature.
MR. LINDEN: Okay.
RECORDER: Off the record, 12:04 p.m.



CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Abbey Douglas
November 7, 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | Case No. 17-cv-02393<br><br>Judge Rebecca R. Pallmeyer |

**PLAINTIFF'S ANSWERS TO**
**CERTAIN DEFENDANTS' SECOND SET OF INTERROGATORIES**

Plaintiff, JOHN NAWARA, through his undersigned counsel, submits his answers to Certain Defendants' Second Set of Interrogatories as follows:

**ANSWER TO INTERROGATORY**

1. State with specificity the amount and category of damages you seek under the current complaint in this case, and identify each and every document that supports your alleged entitlement to such damages.

**ANSWER: Plaintiff objects to this request as premature as discovery is still ongoing. Plaintiff will submit a full calculation of damages prior to trial if necessary at the order of the court. Subject to said objection and without waiver, Plaintiff states**

EXHIBIT
Y
exhibitsticker.com

**that his damages will consist of back pay from the date of his unlawful suspension, November 18, 2016 to the date of his return to employ for Cook County Sheriff's Office, September 27, 2017 for an approximate total of $58,333. Plaintiff's damages will also include losses to his pension, benefits, medical time, personal time, vacation time, and any other damages that will make Plaintiff whole. Plaintiff's damages also include the loss of opportunity to advance, apply for, and test for multiple promotions, transfers, or special assignments, including, but not limited to, a promotion to Sergeant and a transfer to Investigations. Plaintiff also demands that all OPR complaints or investigations filed against him stemming from the incident on September 28, 2016 with Defendant Jones-Hayes be removed from his employee file and record. Finally, Plaintiff seeks compensatory damages for harassment and retaliation he has been subjected to by Defendants and which continues to the present day in an amount to be determined by a jury.**

**Further, Plaintiff directs Defendants to Plaintiff's Rule 26 disclosures and any amendments thereto and to Plaintiff's production of documents. Plaintiff also directs Defendants to Plaintiff's First Amended Complaint which states, in each count, that Plaintiff seeks:**

**A. All benefits Plaintiff would have received but for the discrimination, including pre-judgment interest;**

**B. Compensatory damages in an amount to be determined at trial;**

C. A temporary restraining order finding that Defendants' policy of requiring employees to sign blank HIPPA release forms violates the ADA;

D. A temporary restraining order finding that Defendants' policy of requiring employees to sign blank HIPPA release forms and sending them for a fitness for duty evaluation that is not consistent with any business necessity violates the ADA;

E. A permanent injunction enjoining Defendant from engaging in the discriminatory practices complained of herein;

F. A permanent injunction requiring Defendant to adopt employment practices and policies in accord and conformity with the requirements of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (2000);

G. A declaratory judgment that Defendant's actions violate Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111- 12117;

H. That this Court retain jurisdiction of this case until such time as it is assured that Defendant has remedied the policies and practices complained of herein and is determined to be in full compliance with the law;

**I. An award of reasonable attorneys' fees, costs, and litigation expenses; and**

**J. Such other relief as this Court may deem just or equitable.**

**Plaintiff's investigation continues.**

Respectfully submitted,

JOHN NAWARA

***/s/Dana L. Kurtz***

Attorney for Plaintiff

Dana L. Kurtz (ARDC # 6256245)
KURTZ LAW OFFICES, LTD
32 Blaine Street
Hinsdale, Illinois 60521
Phone: 630.323.9444
Facsimile: 630.604.9444
E-mail: dkurtz@kurtzlaw.us

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing **PLAINTIFF'S ANSWERS TO CERTAIN DEFENDANTS' SECOND SET OF INTERROGATORY REQUESTS** was served upon the designated attorneys as indicated below by electronic mail only on April 20, 2018.

| | |
|---|---|
| Kathleen Ori | kathleen.ori@cookcountyil.gov |
| Nile Miller | nile.miller@cookcountyil.gov |
| | |
| Suzanne Alexander | salexander@scharfbanks.com |
| Morgan Churma | mchurma@scharfbanks.com |
| George Sax | gsax@scharfbanks.com |
| Sarah Marmor | smarmor@scharfbanks.com |
| Stephanie Scharf | sscharf@scharfbanks.com |

***/s Dana L. Kurtz***

Dana L. Kurtz

JOHN NAWARA )
) SS:
COUNTY OF COOK )

**VERIFICATION**

The undersigned, JOHN NAWARA, being first duly sworn upon oath, deposes and states that the foregoing **PLAINTIFF'S ANSWERS TO CERTAIN DEFENDANTS' SECOND SET OF INTERROGATORY REQUESTS** are true to the best of his belief and knowledge.

JOHN NAWARA

Subscribed to and sworn
to before me on this 20 day
of April 2018.

Notary Public

Official Seal
Valerie Espinill
Notary Public State of Illinois
My Commission Expires 05/06/2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN NAWARA,

Plaintiff,

v.

COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,

Defendants.

Case No. 1:17-cv-02393

Judge Rebecca R. Pallmeyer

EXHIBIT

Z

exhibitsticker.com

**PLAINTIFF'S SUPPLEMENTAL RULE 26 DISCLOSURES
DATED OCTOBER 25, 2019**

Plaintiff, JOHN NAWARA, by and through his undersigned counsel, serves his supplemental Rule 26 disclosures dated October 25, 2019 pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.

**Preliminary Statement**

Pursuant to F.R.C.P. 26(a)(1), the following disclosures are based on the information reasonably available to Plaintiff at this time. Plaintiff reserves all rights to object to disclosure of information or tangible things protected by any applicable privilege or immunity from discovery, or otherwise subject to any objection to disclosure. Plaintiff reserves the right to rely on testimony from persons and/or information other than or in addition to that identified in this initial disclosure depending on matters actually in dispute

and further discovery. Plaintiff reserves further the right to supplement these disclosures at a later date as more information becomes available to him relating to the issues in this case. The information contained herein is not intended to be, nor should be considered as, a comprehensive list of all known witnesses, evidence, or issues that are, or may be relevant.

## I. Rule 26 Disclosures

**Rule 26(a)(1)(A)(i):** The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

Note: Where possible, the names of persons and their areas of knowledge have been disclosed. In other circumstances disclosure has been made by reference to the type of knowledge the person is likely to have.

1. **Plaintiff John Nawara**

   John Nawara may be contacted through his counsel, Kurtz Law Offices, Ltd.

   John Nawara has information relating to allegations in his Second Amended Complaint and any amendments thereto, the merits of his claims, liability of Defendant, and his damages as a result of Defendants' conduct.

2. **Defendant Thomas Dart**

   Defendant Dart has knowledge of the incident with Defendant Jones-Hayes and Plaintiff's complaints of discrimination and retaliation, and did nothing; formal complaints and/or investigations made to supervising officers and/or the Office of Professional Review (OPR); Fitness for Duty requests, policies, and procedures; HIPPA release forms, requests, policies, and procedures; Sheriff's Office policies and procedures, concerning, but not limited to, Fitness for Duty evaluations, HIPPA releases, and OPR complaints and investigations; harassment and discrimination suffered by Plaintiff; decisions made regarding Plaintiff including, but not limited to, ordering a Fitness for Duty examination, requiring a HIPPA release, placing Plaintiff and others on administrative leave without pay, disciplinary action, and/or denying

Plaintiff special assignments, transfers, training and promotions; and the discrimination and retaliation of Plaintiff.

**3. Defendant Karen Jones-Hayes**

Defendant Karen Jones-Hayes has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Defendant Jones-Hayes has knowledge of and/or participated in the incident on September 28, 2016 in which Jones-Hayes insulted, hit, and verbally abused Plaintiff. She also has knowledge of formal complaints, both to supervising officers and OPR; decisions to transfer and have Plaintiff investigated; harassment and discrimination suffered by Plaintiff; decisions made regarding Plaintiff including, but not limited to, ordering a Fitness for Duty examination, requiring a HIPPA release, placing Plaintiff on administrative leave without pay, disciplinary action, and/or denying Plaintiff special assignments, transfers, training and promotions; and the discrimination and retaliation of Plaintiff.

**4. Defendant Matthew Burke**

Defendant Matthew Burke has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Defendant Burke has knowledge of and/or participated in the incident with Defendant Jones-Hayes; formal complaints and/or investigations made to supervising officers and/or the Office of Professional Review (OPR); Fitness for Duty requests, policies, and procedures; HIPPA release forms, requests, policies, and procedures; Sheriff's Office policies and procedures, concerning, but not limited to, Fitness for Duty evaluations, HIPPA releases, and OPR complaints and investigations; harassment and discrimination suffered by Plaintiff; decisions made regarding Plaintiff including, but not limited to, ordering a Fitness for Duty examination, requiring a HIPPA release, placing Plaintiff on administrative leave without pay, disciplinary action, and/or denying Plaintiff special assignments, transfers, training and promotions; and the discrimination and retaliation of Plaintiff.

**5. Defendant Rebecca Reierson**

Defendant Rebecca Reierson has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Defendant Reierson has knowledge of the incident with Defendant Jones-Hayes; formal complaints and/or investigations made to supervising officers and/or the Office of Professional Review (OPR); Fitness for Duty requests, policies, and procedures; HIPPA release forms, requests, policies, and procedures; Sheriff's Office policies and procedures, concerning, but not limited

to, Fitness for Duty evaluations, HIPPA releases, and OPR complaints and investigations; harassment and discrimination suffered by Plaintiff; decisions made regarding Plaintiff including, but not limited to, ordering a Fitness for Duty examination, requiring a HIPPA release, placing Plaintiff on administrative leave without pay, disciplinary action, and/or denying Plaintiff special assignments, transfers, training and promotions; and examinations, medical, physical, mental, or otherwise, of Plaintiff; and the discrimination and retaliation of Plaintiff.

6. **Defendant Winifred Shelby**

Defendant Winifred Shelby has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Defendant Shelby has knowledge of the incident with Defendant Jones-Hayes; formal complaints and/or investigations made to supervising officers and/or the Office of Professional Review (OPR); Fitness for Duty requests, policies, and procedures; HIPPA release forms, requests, policies, and procedures; Sheriff's Office policies and procedures, concerning, but not limited to, Fitness for Duty evaluations, HIPPA releases, and OPR complaints and investigations; harassment and discrimination suffered by Plaintiff; decisions made regarding Plaintiff including, but not limited to, ordering a Fitness for Duty examination, requiring a HIPPA release, placing Plaintiff on administrative leave without pay, disciplinary action, and/or denying Plaintiff special assignments, transfers, training and promotions; and examinations, medical, physical, mental, or otherwise, of Plaintiff; and the discrimination and retaliation of Plaintiff.

7. **Dr. Robin Kroll, Psy.D, ABPP**
**6323 N. Avondale Ave., #111**
**Chicago, IL 60631**

Dr. Robin Kroll has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. *See* independent fitness for duty evaluation dated March 8, 2017 Bates Numbered NAWARA 61-69.

8. **Diana S. Goldstein, Ph.D., ABPP**
**Isaac Ray Forensic Group**
**65 East Wacker Place, Suite 2240**
**Chicago, IL 60601**

Diana Goldstein has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. *See* independent fitness for duty examination report dated September 16, 2017 NAWARA 389-398.

9. **Michelle Sarocka, RN**
**Corvel Corporation**
**3010 Highland Parkway, Suite 600**
**Downers Grove, IL 60515**

Michelle Sarocka has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. *See*, document NAWARA 223. She is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures. She may have discoverable information related to Plaintiff's fitness for duty examination and issues regarding medical records related to such examinations.

10. **James Penney**

James Penny has discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. He is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures. Mr. Penny is believed to be an employee of the Sheriff's Office and present for a portion of Plaintiff's November 18, 2016 meeting with Defendants Reierson and Shelby as Plaintiff's union representative.

11. **Barbie Gannon**

Barbie Gannon is believed to have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. She is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures. Ms. Gannon is an employee of the Sheriff's Office and is identified as a witness on the Complaint Register related to the incident alleged in Plaintiff's Second Amended Complaint involving Plaintiff and Defendant Jones-Hayes. She is believed to have been present related to the incident alleged in Plaintiff's Second Amended Complaint involving Plaintiff and Defendant Jones-Hayes

12. **Thomas Conley**

Thomas Conley is believed to have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. He is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures. Mr. Conley is an employee of the Sheriff's Office and is identified as a witness on the Complaint Register related to the incident alleged in Plaintiff's Second Amended Complaint involving Plaintiff and Defendant Jones-Hayes. He is believed to have been present related to the incident alleged in Plaintiff's Second Amended Complaint involving Plaintiff and Defendant Jones-Hayes

13. **James Turrise**

James Turrise is believed to have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Mr. Turrise is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures. Mr. Turrise is an employee of the Sheriff's Office and is believed to have been present related to the incident alleged in Plaintiff's Second Amended Complaint involving Plaintiff and Defendant Jones-Hayes.

**14. Helen Cohn**

Helen Cohn is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures and is believed to be an employee of the Sheriff's Office. She may have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint including information related to Plaintiff's wages and payroll records.

**15.` Jeff Johnsen**

Jeff Johnsen is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures and is believed to be an employee of the Sheriff's Office, and Defendant Jones-Hayes' supervisor at the time of the allegations in the Second Amended Complaint. He may have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint.

**16. Johnice Brumfield-Greer**

Johnice Brumfield-Greer is identified by the Defendants in their Third Supplemental Rule 26(a) Disclosures and is believed to be an employee of the Sheriff's Office, and the Defendants have identified her as Plaintiff's supervisor during times relevant to Plaintiff's First Amended Complaint. She may have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint.

**17. Corporate Representative(s) of Cook County Sheriff's Office.** Its corporate representative(s) may have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint including the damages Plaintiff sustained related to loss wages, pension benefits, benefits, including Plaintiff's use of vacation days, sick days, personal days, etc. The corporate representative(s) may have information regarding the Sheriff's Office's fitness for duty process including information related to releases for medical records related to fitness for duty examinations.

**18. Corporate Representative(s) CorVel Corporation.** A CorVel representative(s) may have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Plaintiff was referred to CorVel for a fitness for duty evaluation. A CorVel representative(s) may have discoverable information regarding the fitness for duty

examination process with the Sheriff's Office including information related to releases for medical records related to fitness for duty examinations.

**19. Karolina Hogueisson**. Ms. Hogueisson is identified by Defendants in their disclosures and is believed to have discoverable information regarding the allegations in Plaintiff's Second Amended Complaint. Defendants are directed to their Third Supplemental Rule 26(a) Disclosures.

**Plaintiff's investigation continues.**

**This disclosure is not intended to be a final list of possible witnesses in this matter. Plaintiff reserves the right to supplement this disclosure as the investigation continues. Plaintiff also reserves the right to call any witness disclosed by Defendants through their disclosures or discovery and through responses to any subpoenas issued in this case at the trial of this matter. Additionally, Plaintiff hereby discloses any person with knowledge of the allegations raised in the pleadings at issue, who are identified or referred to in Defendants' answers, affirmative defense(s), the parties' discovery responses, Defendants' Rule 26(a) disclosures, the parties' produced records and deposition testimony in this case.**

**B. Rule 26(a)(1)(ii):** A copy of, or a description by category and location of all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

Note: The documents are described by general category; production is subject to the parties' assertions of privileges and immunities from production, and, if necessary, the Court's ruling on same.

1. Personnel file for Plaintiff John Nawara including documents relating to compensation, benefits, and payroll, as well as all documents relating to Plaintiff (such documents are presently in the possession, custody, and/or control of Defendant and should be produced);

2. Personnel file, Performance Appraisals, Internal Cook County Sheriff's Police Department Reports, Grievance Reports, and all other internal reports and documents relating to the performance of Plaintiff John Nawara (such documents are presently in the possession, custody, and/or control of Defendant and should be produced);

3. Any files prepared and maintained by all individuals who investigated any allegations concerning Plaintiff John Nawara, including any correspondence, summary reports, notes, or other documentation prepared by Plaintiff Nawara's superiors or co-workers, any investigators, Internal Affairs or OPR (such documents are presently in the possession, custody, and/or control of Defendant and should be produced);

4. All Cook County Sheriff's Department policies, procedures, requirements, prerequisites, General Orders, practices, rules, and regulations (such documents are presently in the possession, custody, and/or control of Defendant and should be produced) from 2015 to the present;

5. The computer database of disciplinary action maintained by Cook County Sheriff's Department and/or by the OPR of Sheriff's Department (such database is presently in the possession, custody, and/or control of Defendant and should be produced);

6. All documents prepared and maintained by the Defendants concerning Plaintiff Nawara, Plaintiff Nawara's job performance and/or work-related activities, and disciplinary actions taken against him, including all documents relating to the Fitness for Duty request, HIPPA release form request, and Plaintiff Nawara's suspension without pay (such documents are presently in the possession, custody, and/or control of Defendants and should be produced);

7. All documents obtained in discovery either from Defendants or from other sources; and

8. See Plaintiff's document requests which Defendants have not timely answered, and therefore, any objections are waived.

9. Plaintiff's production of documents.

**Plaintiff's investigation continues.**

**C. Rule 26(a)(1)(iii):** A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which the computation is based, including the materials bearing on the nature and extent of injuries suffered.

Plaintiffs may seek the following categories of damage:

- All wages and benefits Plaintiff would have received but for the discrimination and retaliation and suspension, including but not limited to back pay, front pay, pre-judgment interest, and the value of lost promotions, raises, and other benefits, of which pay information is in the possession and control of Defendant and the Sheriff's Office and as such, Plaintiff requests production of this information necessary to do a computation of Plaintiff's damages;

- Restoration of job assignments;

- Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the humiliation, anguish, and emotional distress caused by Defendants' conduct, and the physical manifestations of Plaintiff's emotional distress, to be determined by the trier of fact;

- A permanent injunction enjoining Defendant from engaging in the discriminatory and retaliatory practices complained of herein;

- A permanent injunction requiring Defendant to adopt employment practices and policies in accord and conformity with the requirements of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (2000), the requirements of 42 U.S.C. § 1983;

- A declaratory judgment that Defendant's actions violate Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111-12117 and violate 42 U.S.C. § 1983;

- The Court retain of jurisdiction of this case until such time as it is assured that Defendant has remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

- Punitive damages against the individual Defendants;

- An award of reasonable attorneys' fees, costs, and litigation expenses; and

- Such other relief as the Court may deem just or equitable.

Plaintiff reserves the right to supplement this disclosure as such information becomes available.

**D. Rule 26(a)(1)(iv):** For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy all or any part of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

1. Not applicable to Plaintiff.

**JOHN NAWARA**

*s/ Richard F. Linden*
One of Plaintiff's attorneys

Richard F. Linden
312/590-0211
lindenlaw@gmail.com

Peter V. Bustamante
312/346-2072
pvbust@bustamantelaw.com

Linden & Bustamante
17 North State Street, Suite 1550
Chicago, Illinois 60602

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing **PLAINTIFF'S RULE 26 DISCLOSURES** was served upon the designated attorneys as indicated below by electronic mail only on October 25, 2019.

Sarah R. Marmor (smarmor@scharfbanks.com)
Morgan Churma (Mchurma@scharfbanks.com)

Lyle K. Henretty (lyle.henretty@cookcountyil.gov)
Megan Honingford (MEGAN.HONINGFORD@cookcountyil.gov)

Joi Kamper (JOI.KAMPER@cookcountyil.gov)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA )
Plaintiff, )
-vs- ) No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The deposition of DIANA GOLDSTEIN, Ph.D., called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before LIZA MARIE REGAN, Illinois Shorthand Reporter within and for the County of Cook and State of Illinois, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, on the 19th day of November, 2019, at the hour of 10:13 a.m.

Reported By: Liza Marie Regan, CSR, RPR
License No.: 084-002477

1

APPEARANCES:

LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER V. BUSTAMANTE,
17 North State Street, Suite 1550
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff,

COOK COUNTY STATE'S ATTORNEY'S OFFICE,
BY: MS. JOI KAMPER,
50 West Washington Street, Fifth Floor,
Chicago, Illinois 60602
(312) 603-1427
joi.kamper@cookcountyil.gov
Representing County of Cook,

SCHARF BANKS MARMOR LLC ,
BY: MS. SARAH MARMOR,
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
Representing Thomas Dart, Karen Jones-Hayes, Matthew Burke, Rebecca Reierson and Winifred Shelby,

2

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DIANA GOLDSTEIN, Ph.D. | |
| By Ms. Marmor | 6 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Goldstein Deposition | |
| Exhibit No. 1 | 4 |
| Exhibit No. 2 | 7 |
| Exhibit No. 3 | 8 |
| Exhibit No. 4 | 11 |
| Exhibit No. 5 | 36 |


3

(Witness sworn.)
MS. MARMOR: Dr. Goldstein, good morning. Can you please state your full name for the record.
THE WITNESS: Diana Susan Goldstein.
MS. MARMOR: And you understand we're here today to talk about a report that you prepared regarding -- a fitness for duty report that you prepared regarding a John Nawara?
THE WITNESS: Yes.
MS. MARMOR: I'm going to hand you what I'm going to ask the court reporter to mark as Exhibit 1.
(Whereupon, Goldstein Deposition Exhibit No. 1 was marked for identification.)
MS. MARMOR: Dr. Goldstein, I'm handing you what the court reporter has marked Goldstein Exhibit 1. If you could just take a quick look at that and just confirm for us that is the report that you prepared regarding Mr. Nawara's fitness for duty?
THE WITNESS: It is.
MS. MARMOR: Okay. I'm going to come back to that. I just wanted to establish that at the

4

outset.
I take it you've been deposed before?
THE WITNESS: I have.
MS. MARMOR: About how many times?
THE WITNESS: Well, I've testified about 70 times. In terms of deps versus court, maybe a quarter of those have been depositions.
MS. MARMOR: So I take it you're fairly comfortable with the deposition process?
THE WITNESS: As comfortable as one can be.
MS. MARMOR: Sure. I'm just going to cover the most basic of the ground rules.
Obviously, you already understand that I need to ask my question and you answer it and we'll try not to talk over each other.
THE WITNESS: Very well.
MS. MARMOR: And I'm not asking for your speculation today, just, you know, the information that you have.
THE WITNESS: Yes.
MS. MARMOR: And if you don't understand my question, please absolutely let me know and I'll try to rephrase.
THE WITNESS: I will.



MS. MARMOR: If you need to take a break at any time, of course, do that. I generally like to have the answer to my question answered before you take a break, but we can take that as it comes.
THE WITNESS: Absolutely.
MS. MARMOR: Okay. Thank you.
DIANA GOLDSTEIN, Ph.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. MARMOR:
Q. So in your prior testimony -- I did a little bit of background research on you. It looks like you've done testimony in things involving -- in cases involving diagnoses; is that right?
A. Every single case we do involves a diagnosis generally speaking except for pre-hire screening.
Q. And you've also performed assessments of emotional distress claims; is that right?
A. I have.
Q. Are there any kind of general types of testimony that you've provided in the past?
A. You mean like competency -- competency to



proceed to trial, sentencing, even to execution, criminal responsibility examinations, mens rea, insanity defense, you know, so-called affirmative defenses. I have provided testimony to pension hearing boards for pension disability. I run a public safety program here, so. I believe -- a lot of worker compensation quasi-legal type, even hybrid criminal/civil commitment types of things with sexually violent predators, things like that. There's not much I haven't testified -- I was in a Daubert hearing. I've done a lot.
Q. Okay. We'll mark this as Exhibit 2.
(Whereupon, Goldstein Deposition Exhibit No. 2 was marked for identification.)
BY MS. MARMOR:
Q. I'm handing you what the court reporter has marked as Goldstein Deposition Exhibit 2. This is a subpoena to testify at a deposition in a civil action.
Really, the only question I have about this is: Are you here pursuant to this subpoena today?
A. Indeed.



Q. We moved by agreement the date and the time of the deposition and the location here to your offices?
A. Yes.
Q. Okay.
A. Thank you.
Q. You're welcome. We're not going need to go back to that.
(Whereupon, Goldstein Deposition Exhibit No. 3 was marked for identification.)
BY MS. MARMOR:
Q. I'm handing you what's been marked as Goldstein Deposition Exhibit No. 3 which is a September 30, 2019, subpoena to produce documents, information or objects to you.
Have you seen this document before?
A. I don't recall it specifically, but I'm sure it was sent to me in this case. I hope I complied with it as fully as I could.
Q. You anticipated my question which is: Did you produce some documents based on this subpoena?
A. I did, indeed.
Q. There's actually a rider if you go to the

second to last page of Exhibit 3. The first question -- these are the documents to be produced and the first was all documents regarding plaintiff John Nawara that were produced pursuant to any other subpoena in this case.
Do you see that?
A. Yes.
Q. And do you recall that prior counsel for Mr. Nawara, Dana Kurtz, had issued a subpoena to you at least a year or so ago?
A. I'm afraid I don't remember. I just do too much of this. Sorry. I intake every single case that comes to both of my practices so I just don't have an independent recollection of it. I have no reason to doubt that this was sent to me.
Q. So the only reason I ask is that it's my understanding that at the time, there were no documents produced to Ms. Kurtz and, therefore, you had nothing to produce in response to No. 1?
A. Other than my report perhaps.
Q. I think the report had already been provided.
A. Okay.
Q. And then the second is all documents

9

obtained from plaintiff John Nawara's medical providers in the course of providing the fitness for duty examination of Mr. Nawara.
I take it to the extent that you had any of that information still that you would have provided that?
A. I would have. We don't tend to keep those things. Also, ethically, we're not supposed to pass along specific medical records.
Q. Okay.
And then the same question applies to No. 3, all documents and/or communications with CorVel Corporation regarding the fitness for duty examination of plaintiff John Nawara.
I take it that you produced what you still had?
A. I don't believe I had any correspondence from them.
Q. Okay. Well, we do have some correspondence here. I'm going to show that to you in a moment.
A. Maybe a cover letter from them.
Q. I'll show that to you in a moment.
And then all communications between Isaac

10

Ray Forensic Group and/or Diana S. Goldstein and counsel for plaintiff John Nawara.
Nothing like that was produced to us so I take it you didn't have anything like that?
A. No.
MS. MARMOR: I need to take a break. Oh, no. Nevermind.
Mark this as the next exhibit.
(Whereupon, Goldstein Deposition Exhibit No. 4 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, I'm handing you what's been marked as Goldstein Exhibit No. 4. I'll represent to you we took what you produced to us and then produced it to counsel in the case and added Bate's stamp numbers at the bottom. I'd just like to go through what these materials were that you produced to us.
A. Sure.
Q. The first -- and by the way, the term "Confidential Pursuant to Protective Order" is something we added at the top.
The first document here says Michigan

11

Avenue Neuropsychologists Biographical Questionnaire filled in by -- it looks like filled in by Mr. Nawara on September 11, 2017.
Do you see that?
A. Yes.
Q. What is this document?
A. So this is a background questionnaire that we give to people who come through our clinic. I have two practices. I believe we were out of the one that we use for the Isaac Ray Forensic Group, but it's the same. So I gave him one from the other practice. It's exactly the same.
Q. Sure.
And this is a document that he -- that Mr. Nawara would have -- by the way, let me also just say for the record in the version that you sent us, there was certain identifying information which we have redacted on the document like his date of birth and that kind of thing. That's another difference between them.
A. I see.
Q. That's why I wanted to use this version.
So would all of this be filled out by Mr. Nawara?

12

A. Exactly.
Q. And would you do anything to check any of his answers?
A. Well, I go through this with him, but I have no way to independently confirm the background that he gives me of his life.
Q. Okay.
For example, if we turn to the second page of Goldstein 4 where it asks to check any conditions that he experienced as a child or adolescent and nothing is filled out, correct?
A. That's correct. So he's denying each and every one of those things.
Q. You didn't, for example, obtain medical records to check whether or not any of this was accurate?
A. Well, I have primary care records, but those are him as an adult. So if there would have been anything in there, I could see that, but no, I don't have records from his developmental years.
Q. In your experience -- I mean, let me step back and just lay some foundation.
Have you done a lot of fitness for duty exams?



A. I have.
Q. Approximately how many?
A. Probably over a hundred.
Q. And in any of those fitness for duty exams, in your experience, did you go back to childhood medical -- did you obtain childhood medical records for the subject?
A. There may be some cases where we do get records from someone's adolescence if they have a mental health issue specifically, yes.
Q. So let me see if I understand that.
For example, if somebody comes in at the age of 30 and has a diagnosis of manic depressive illness, you might then go back and see what their -- and maybe they say, "I had an onset or episode mania when I was 13." Then you might go back and look at their prior records?
A. Yes, as much as possible.
I like to ask for ten years of records. We don't often get that. However, we like to have it, if possible.
With fitness for duty, we know that people have come through -- most have come through a pre-hire screening process, so more recent



functioning as opposed to remote functioning is more critical. Certainly, if someone wanted to provide us information, we would accept that and it does happen sometimes.
The vast majority, to be clear, we do not have developmental records when it comes to fitness for duty cases.
Q. Do you have a sense of how far back the records go for the majority of the FFDs that you do get?
A. Up to five years generally. Some up to ten. You know, typically, up to five years. A lot of these folks have -- they switch primary care docs so sometimes you just get the most recent.
Q. You said that you like to ask for ten years of records.
Why is that?
A. Well, if my role is to determine if someone has a psychiatric or a neurocognitive disorder, you can't always rely on self-report and so records are critical. They often predate, most importantly, a fitness inquiry and that's the most important for me, frankly.
Q. And when you say you like ten years of



records for those reasons, are you saying only records, say, of mental health providers or any doctor records that they may have?
A. Primary care is always critical because many individuals receive their mental health care either directly from their primary care doc or their primary care doctor has made a referral. They're often the frontline treater.
Q. And by that, I take it you mean some people come into their regular -- their internist, for example, and say, "I'm having trouble sleeping" or "I'm having trouble at work" or something like that and that could lead to a referral?
A. Absolutely.
Q. Okay.
A. Often insurance is set up that way too, they have to have the referral. So you never want to miss primary care records if you can have them.
Q. Thank you.
If you could turn to page 3108 and I apologize, it's not the most clear document I've ever seen.
A. Bate's stamps. I'm following you.
Q. I mean the writing on it.

A. Oh, yeah.
Q. I do -- there did seem to me to be a variation in the handwriting at the top.
Are these your notes?
A. Yes.
Q. So you added some of your own notes to this?
A. I go through the biographical questionnaire with the individual during my interview to clarify history or to follow up on anything they may have written yes to, et cetera.
Q. Okay.
I'm just sort of interested further down where it says did you have any difficulty with any schooling subjects and were there any school subjects -- were any of the school subjects a particular strength for you and he said he was good at math -- sorry -- he had difficulty with math and religion was a particular strength.
Why do you ask those questions?
A. Well, as a neuropsychologist, we want to know if there are developmental issues like learning disorders or attention deficit disorders, things like that.

17

Q. Okay.
Then if you go to page 3111 of Exhibit 4, if you could just see where -- again, I think this is your handwriting on here --
A. Yes.
Q. -- where there's a little arrow.
Does that -- I can't read this. Could you just read to us what this says?
A. Yes. So he is reporting here increased creatinine levels which is related to stage two of kidney disease. He was seeing -- he was seen by his primary care doc for that and this was in his labs, lab work, the blood work. He was counseled by his primary care doc about that.
Essentially, it just means there was too much protein found in his blood work.
Q. I'll show you the record, but my recollection of reading the records is that one of the things the doctor said was that he should cease using I think it was performance enhancing medication or supplements?
A. Over-the-counter supplements, yes.
Q. Did you know what those were? Did he tell you what those were?

18

A. Pardon me. Let me look here. I don't know if we discussed that, frankly, and I don't have it on my background questionnaire.
Q. Do you know -- I don't know anything about performance enhancing supplements so this is a genuine just sort of question.
Do you know if performance enhancing supplements can have any affect on mood?
A. I don't feel qualified to answer that.
Q. Okay.
A. But I believe I would have asked him if he was taking steroids and I would have included that if he had been. So we can -- the absence of that in my report, we can make a reasonable inference that that was answered as a no.
Q. And you would have asked him -- you believe you would have asked him about steroids because steroids, as I understand it, can create rage situations; is that right?
A. Absolutely.
Q. Okay.
Were any of the labs that you looked at -- did any of the labs that you looked at test for the presence of steroids?

19

A. Not specifically, no.
Q. And, obviously, you don't know what the doctor was referring to when he said performance enhancing supplements?
A. Right.
Q. If you go to page 3114, am I right this is the section of the questionnaire that asks about substance use?
A. Yes.
Q. Does this ask about anything -- would any of these questions have elicited a statement that he might have been using steroids?
A. Yes, illicit drugs. So No. 8 would be recreational, for example, drugs, yes.
Q. Okay.
Do you know if you discussed with him whether he considered steroids a recreational drug?
A. Well, I would have simply asked him. It might not have come up in this particular aspect of the interview, but I would have asked him whether he was using steroids just from looking at him, frankly.
Q. Because he's very built?
A. He is. So that's important to him, right,

20

and it was in his records that he was using performance enhancing drugs. People lie about that so I needed to ask.

Q. And you don't know one way or the other whether he told you the truth?

A. Absolutely no way to know that other than I tried to verify in records and would hope that his primary care doc would have asked the same question, but it was not tested for specifically.

Q. And if you go to the next page, 3115, which is headed Personality/Emotional Functioning. At the top, he says he has had a prior psychological evaluation and it says have you ever been given a psychiatric diagnosis and he refers to March 2017.

Do you see that?

A. Yes.

Q. And did you understand that to be referring either to his three visits with Dr. Hogueisson or to his -- what did you understand that to be referring to?

A. Yeah, that was a reference to when he got into individual psychotherapy with Karolina Hogueisson.



Q. And did you -- you read her notes, correct?

A. I haven't since the beginning.

Q. But your report reflects that she did not make any diagnosis of him; is that right?

A. That's right.

Q. And did you consider -- did you review Dr. Krull's FFD report?

A. Let me go back to your other question. Not that I saw in the records. So she may have diagnosed a diagnosis with him and it may have been his understanding there was a diagnosis.

Frankly, if she were billing insurance, she would have had to have had a diagnosis for that purpose, but it was not in her notes and I did not ring her to do a collateral interview either. Sorry.

Q. That's okay.

So back to do you recall reviewing Dr. Krull's FFD evaluation?

A. Yes.

Q. And did you consider that to be a psychiatric diagnosis?

A. Can you be more specific -- her report?



Q. Yes.

A. No. Her -- you mean a diagnostic exam? Sure. I mean, she, like I was charged with, would have been doing a background and clinical diagnostic examination as a clinician for the purposes of rendering a fitness for duty opinion. So I would consider that a clinical evaluation if that's what you're asking.

Q. Well, what I'm really asking is: Did you see -- did you after reading her report believe that she had made any kind of psychiatric diagnosis of him?

A. I'm afraid I don't recall that.

Q. That's fine. We're going go through her report shortly. It's not a memory test, I promise.

A. I don't have her report anymore. We don't keep things like that so I did not review that prior to this.

Q. I have a copy for you. We will be reviewing it.

For the rest of CCSO 3315 through 3116, it's asking about significant problems and he said no to everything, correct?

MR. BUSTAMANTE: Objection, misstates the record.



THE WITNESS: So he marked that he has been involved -- on 3116, No. 9, that he has been involved in or witnessed a fire, flood or other disaster and then have you ever witnessed the death or serious injury of another person. These are questions about potential trauma.

MS. MARMOR: Thank you for pointing that out.

BY MS. MARMOR:

Q. In terms of the questions where he's being asked about significant problems on these pages, he said no, correct?

A. Yes.

Q. Then if you could go to 3118, you see where it says Weapons History?

A. Yes.

Q. And he indicated that he owns firearms. He has a handgun and a shotgun and he keeps them at home; is that right?

A. That's right.

Q. Do you know whether that also includes his firearm for work?

A. I would assume so.

Q. Okay.

**And you understood he has a firearm for work?**
A. Right.
**Q. Why do you ask about a weapons history in this questionnaire?**
A. Oftentimes we're doing workplace violence exams. Remember, this is a general questionnaire. Also, we see criminals for the court.
If we're concerned about someone's mental health in the context of fitness for duty, we would want to make a recommendation that firearms be removed from the home, for example.
**Q. So if a correctional -- you understood correctional officers carry guns, police officers carry guns?**
A. When they're doing external operations, the COs do.
**Q. And he was on external operations at the time, correct?**
A. Exactly.
**Q. If there were a serious problem, you would want to make a recommendation to remove him from having the gun; is that right?**
A. If I determined that he were suicidal or



perhaps homicidal, yes.
**Q. And/or just a danger to others; is that right?**
A. An imminent threat to others, right.
**Q. If you could go to page 3121 and it says have you ever been involved in any lawsuits as plaintiff or defendant? If yes, what are the circumstances? His answer was problems at work.**
**Did you ask him about that?**
A. I did. We didn't discuss the details of his suit so much as what he was angry about and his perception of what happened which is in my report.
**Q. So you're talking about this lawsuit?**
A. Right.
**Q. Did he tell you about any other prior lawsuit that he brought against his employer?**
A. If it's not in my report, no.
**Q. If you could turn to 3122 and could you just -- if you see your handwriting on that page, could you just read to us what you wrote there?**
A. Dad was a broker when I was younger. There was so much alcohol. He was describing I think the Mercantile Exchange and what that lifestyle was like. He worked in the Euro dollars



pit at the Merc.
**Q. He did or his father did?**
A. I believe he did. Yeah, he worked for the Mercantile Exchange in 1992 and then at the Board of Trade -- I'm sorry. In 1993, he was at the Board of Trade. Then in 1997, he was at the Mercantile Exchange. These would have been the jobs he had before going to the Sheriff's Office.
**Q. And you say that says so much alcohol?**
A. Yes. He was talking about what was going on in the pits. You know, there was a lot of alcohol and people talk about the cocaine that's running around there.
**Q. And then it says -- does that say four-year high school?**
A. Freshman year of high school he said he met great friends and one of them's father was a CPD. Typically, I'm asking how did you get interested in becoming a cop or a going into corrections. He said his sons and I applied at the same time for the CPD and the other gentleman was hired it looks like.
**Q. And it does it say he -- I can't read -- he something?**



A. He was hired one or two years -- first he said months, one or two months before me and then he said years.
**Q. I see. All right.**
A. You mean you can't read my writing?
**Q. My grandfather was a doctor so I have some experience with this.**
A. I really have no excuse. It's horrific.
**Q. Then if you go to CCSO 3123 and it says are you currently having any work-related difficulties? He responded I don't know where to start.**
**Was that -- did you talk to him about that?**
A. Yes. This was a sarcastic remark, of course. He knew when we went through the consent -- before he filled out anything, he knew that we would be discussing his perceived problems at work in detail. So he just didn't really bother here is what that is.
**Q. Then the next page is CCSO 3124 and this is a job description for a correctional officer, correct?**
A. Yes.

Q. And this is something you reviewed prior to issuing your report?
A. This was provided to me, yes.
Q. And so it has things like key responsibilities and duties?
A. Right.
Q. And that includes things like diffuses disruptive behavior by verbal interventions, controls disruptive behavior by appropriate verbal orders or appropriate use of physical force.
Do you see that?
A. Yes.
Q. And uses verbal and listening skills to determine potential detainee problems.
Do you see that?
A. Yes.
Q. And then, you know, there's a long list. There's -- he, among the things on the top of the next page, CCSO 3125, monitors detainees, watching closely for unusual behavior, improper conduct or signs of conflict.
Do you see that?
A. Yes.
Q. Do you see in the middle of the page



another characteristic is that he communicates with other staff and/or main control to inform about detainee behaviors, incidents and/or request assistance?
A. Yes.
Q. And the last page of the job description which is CCSO 3126, you see where it says keeps current on policies, procedures, directives and memoranda?
A. Right.
Q. And then under Knowledge, Skills and Abilities, the job calls for considerable good judgment and initiative required at all times to assure prompt and thorough action during routine and emergency situations, ability to make sound judgments and decisions?
A. Yes.
Q. And then also thorough knowledge of institutional policies and procedures, general orders and the like.
Do you see that?
A. Yes.
Q. And the ability to supervise and control detainees individually and large groups and crews.



Do you see that?
A. Yes.
Q. So then -- and what is the use that you make of a document like this in an FFD examination?
A. We request it in every fitness for duty examination. It has to be a part of what we do.
Generally speaking, when one offers an opinion about fitness for duty, we are keeping in mind whether any mental health or medical or neurocognitive disorder may significantly impair the capacity to carry out these functions, these essential job functions in a safe and effective manner.
Q. A correctional officer is a very sort of particular kind of job. It's not like an office job, right?
A. Public safety is different we always say. Absolutely.
Q. And how -- what do you mean by "public safety is different"?
A. Not everybody can do that job. So, for example, when we do pre-hire screening, people with a history of mental health disorders, neurocognitive disorders, they're really not cut



out to do this. Because they take care of the public, because they take care of detainees, because they interact with other co-workers, everybody has the right to a safe environment in which they work, they have to be healthy and they have to be -- that includes mental health.
Q. The next document in Exhibit 4 is CCSO 3127. We're going to go into this in more detail later, but this is entitled Information Provided By Superintendent Jones-Hayes telephone conversation with Rebecca Reierson and Winifred Shelby November 16th.
Do you see that?
A. Yes.
Q. This was, in fact, information that had been provided by Superintendent Jones-Hayes about her altercation with Mr. Nawara; is that right?
A. That she provided I believe to HR. This was not created for me specifically, but it was passed along to me.
Q. Right, as background information for you to use in your analysis?
A. Yes.
Q. And it's signed by Jones-Hayes at the

bottom.
Do you see that?
A. It is.
Q. And then the next document is -- sorry. The next page of Exhibit 4 is another document called Cook County Referral Form. That's CCSO 3128.
Do you see that?
A. Yes.
Q. And this is a document sent by Winifred Shelby, occupational health nurse.
Do you see that at the bottom?
A. Yes.
Q. And it says reason referring, employee's aggressive physically and I think that says intimidating and inappropriate behavior directed towards his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resources department.
Do you see that?
A. I do.
Q. So did you understand that there were two reasons why he was being referred, one was the



event with Jones-Hayes and the other was the event with HR?
A. Yes.
Q. And what the CCSO -- you understood that Nurse Shelby worked for the CCSO, Cook County Sheriff's Office.
A. For the human resources department, yes.
Q. And so what the CCSO was asking -- was looking to determine was if employee is able to perform the essential functions of his job which require he maintain composure and respond appropriately in a high stress environment including exhibiting proper behavior toward detainees and his superior officers. Position requires the individual can diffuse disruptive behavior verbally and if escalated, effectively and properly use limited force on problematic and combative inmates.
Do you see that?
A. I do.
Q. And you've talked about public safety and the work that you do in that area.
Is one part of public safety respecting the chain of command?



A. Sure.
Q. And did you understand that Ms. Jones-Hayes was several layers above Officer Nawara in the hierarchy of the Sheriff's Office?
A. I know she was his supervisor.
Q. Did you know that she was a superintendent?
A. Yes.
Q. And do you understand that that's a significantly higher level than a correctional officer?
A. Sure.
Q. The second bullet point in the referral form says employee has -- excuse me -- employer has concerns about anger management including his ability to manage a detainee population without losing his temper.
Do you see that?
A. Yes.
Q. So then -- and this is -- this is everything we received from you. I take it this is what you still have. You've already testified this isn't everything that you reviewed at the time of



you doing the report?
A. Say that again. Sorry.
Q. These documents are what you produced in response to the subpoena, but there were some other documents that you would have reviewed like Dr. Shaw's records and the like that you did not maintain after the report was issued?
A. Right. I also took notes during my interview so not everything that -- all my notes aren't on this background questionnaire, but we don't maintain those because the details of that are in the report.
Q. I see. You're answering a question I was going to ask later anyway.
MS. MARMOR: Let's mark this as Exhibit 5.
(Whereupon, Goldstein Deposition Exhibit No. 5 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, I'm handing you what the court reporter has marked as Goldstein Exhibit 5. I will represent to you that these are documents that were provided by CorVel in response to a subpoena in this case seeking, of course, any of

their correspondence with you.
So if you would not -- if you would not mind just taking a look at this and seeing if you believe that, indeed, you received the cover e-mail from Michelle Sarocka on September 8, 2017, along with the letter and its attachments?
A. I don't remember this e-mail but sure.
Q. You have no reason to believe you didn't get this?
A. Exactly.
MS. MARMOR: Actually, can we take a break?
(A short break was taken.)
BY MS. MARMOR:
Q. So if you go to the first page of Exhibit 5, you see there's an e-mail from Michelle Sarocka from CorVel on Friday, September 28, 2017, and --
A. September 8th?
Q. The very top is a legal hold. It's irrelevant to the lawsuit. I don't know why they produced that.
If you look at this e-mail from Michelle Sarocka, that's September 8, 2017.
Do you see that?



A. Yes.
Q. And the first part refers to somebody that's not relevant to this case apparently, but then it continues and says attached is the FFD letter to you for John Nawara who will be there on Monday, the 11th, for testing and Tuesday, the 12th, for interview with you. I've also attached all of the medical information we have for him. There's a 28-page attachment with the CCSO referral form. Information -- then page 2 is information provided by Superintendent Jones-Hayes dated 11-16-2016 regarding incident that occurred 9-29-2016. There's a letter to Mr. Nawara from Rebecca Reierson, director HR, regarding FFD evaluation. Then the next three documents are progress notes from Karolina Hogueisson. Then progress notes from four visits by a Dr. Charles Shaw. Then lab results from blood collected in 2015 and 2016. Then the job description for a correctional officer.
Do you see that?
A. Right.
Q. And I know we just took a little break and you've determined that, in fact, that's what's



attached to the letter that's attached to this e-mail?
A. Right.
Q. The referral form is the document we just talked about. The information provided by Superintendent Jones-Hayes is also the document we briefly discussed a moment ago.
Then this November 30, 2016, letter which if you go to Nawara 3453 at the bottom. It these very tiny Bate's stamped numbers at the bottom of the page.
A. You're going to...
Q. It's not easy.
Do you see that that's a letter dated November 30, 2016, to Correctional Officer Nawara from Rebecca Reierson?
A. Right.
Q. And in it, she's talking about the fact that on November 18, 2016, he was informed by the occupational health nurse for the Sheriff's Office, Winifred Shelby, that he was required to undergo a fitness for duty evaluation before returning to active duty and that he took the forms in order to review them prior to signing and had failed to



return them to Ms. Shelby; that she called and left a voicemail message for him to which he did not respond.
Do you see that?
A. Yes.
Q. And what they -- it goes on to say that he needs to participate in the FFD process and that signing the forms would be the first step of doing that; is that right?
A. Right.
Q. Okay.
And then we've got the progress notes from Dr. Hogueisson and Dr. Shaw's records. We discussed that a little bit already.
Then the job description which is the same document that we just talked about a moment ago?
A. Right.
MR. BUSTAMANTE: Let me object. This Exhibit No. 5 does not have the job description attached to it.
MS. MARMOR: I apologize. I don't know why we don't have that.
THE WITNESS: Well, you handed it to me separately.

BY MS. MARMOR:
Q. The question is -- but I think -- just to make it clear, you did get a job description because it appears in the documents that you produced to us, correct?
A. Yes.
Q. Okay.
I'd ask you just if you could go back to the first page of Exhibit 5.
Why do you do testing first and then the interview second?
A. Sometimes there are questions that come up from testing. There may be certain critical items that a person endorses that we want to follow up on like suicidality or something like that. So it gives us -- we don't want a missed opportunity to follow up on testing. It's pretty pro forma. I mean, most clinics do that.
Q. Meaning it's pretty pro forma to do the testing first and the interview second?
A. Right.
Q. Then if you could go to Nawara 3449 which is the cover letter from Ms. Sarocka to you. She said she is the nurse case manager at CorVel

41

Corporation working on behalf of the Cook County Sheriff's Office.
Do you see that?
A. Yes.
Q. Did you ever -- I take it you were hired by CorVel to do this FFD, correct?
A. Sure.
Q. And did you ever have any direct communication with anybody at the Sheriff's Office?
A. Never.
Q. Okay.
A. Oh, wait. I think -- I think I may have -- did I ask for something from Michelle and maybe she -- it's been too long. I mean, I try to avoid that at all costs. That's the idea of being independent. I feel like I may have asked for something from Michelle -- from...
Q. Ms. Sarocka?
A. Yes. I just can't remember.
Q. Well, I think there are references in your report to having asked CorVel some questions. Maybe that will refresh your recollection when we get to that point, but we don't have to pause on that.

42

As you sit here right now, you don't recall having any direct communication with the Sheriff's Office about Mr. Nawara or his FFD?
A. No, it wouldn't have been with the Sheriff's Office ever. I think I may have wanted to know more about performance evaluations and asked Michelle if I could get them to be able to verify whether there was a longer -- some more pervasive issues throughout and to verify Mr. Nawara's claim that he had not had significant discipline.
Q. Okay.
So the next paragraph of the letter on September 8th says John Nawara has an evaluation scheduled with Jordan Fuller on Monday 9-11-2017 from 9 a.m. to 5 p.m.
Who is Jordan Fuller?
A. He was my technician that year.
Q. And did he, in fact, conduct the tests?
A. Right.
Q. Do you know how long the tests took?
A. So we do about three and a half hours of psych testing and four hours of cognitive testing which should be here on page 5.

43

Q. And those were the tests Mr. Fuller -- so seven and a half hours were tests that Mr. Fuller conducted?
A. The cognitive testing he conducts, that's interactive, whereas the psychological testing, that's a self-report. Mr. Nawara would just fill those out on his own.
Q. Okay.
And then it says and with you on Tuesday, 9-12-2017 from 9 a.m. to 5 p.m.
Did you actually meet with him from 9 a.m. to 5 p.m.?
A. No. We like to set that time aside so nobody will schedule anything in case -- some people are slow on their psych testing. So that second day is designed to give them some wiggle room. We just met for three hours. My understanding is that he was able to complete everything that first day.
Q. Okay.
And when you say "We just met for three hours," that means you and Mr. Nawara?
A. Exactly.
Q. Okay.

44

And then there are a series of questions that Ms. Sirocha asked you to answer; is that right?
A. Right.
Can we go off the record?
Q. We can.
(A short break was taken.)
THE WITNESS: I'm talking about a court order that says you're not going to pay me.
MS. MARMOR: Okay.
THE WITNESS: And that I have requested it. I was willing -- you know, normally, we do a half day. I was willing to do actual hours at $400 an hour, but she promised me this would not be more than an hour and that the $48 and whatever cents was all she was going to be able to pay.
BY MS. MARMOR:
Q. And you understand you're a fact witness in this case?
A. I do. I also have never in 20 years ever when I've testified as a fact witness not had somebody pay me the courtesy of allowing me to charge for my time.
Q. Just so we have it clear for the record

45

and for whatever it is that I'll present to the Court if we need to get a court order, what you're saying is that you will not testify without a court order saying that you must testify without being paid for that; is that right?
A. Exactly.
Q. And your rate is how much do you want to charge per hour?
A. It's $400 per hour. We normally charge a half day, but I'm willing to charge for just actual time.
Q. Okay.
A. I'm sorry but this is unacceptable, frankly.
Q. Okay. We'll convene. I'll speak to my client if I can get them --
A. And your colleague who --
Q. I promise that I will do that as well, but the reality is that she didn't -- you know, it's an unfortunate misunderstanding.
A. I don't think it was a misunderstanding. I was extremely clear.
Q. I understand but it's not my understanding.

46

So in any event, what we will do is we'll find out if we can get you paid and if we can't, we'll have to go to court.
To that end, are there any dates -- obviously, Thanksgiving is coming up so I don't think in the next week is going to be possible.
Are there dates -- let me see. The week --
MR. BUSTAMANTE: Well, that's something we can take care of afterwards.
MS. MARMOR: Well no. I'd like to...
BY MS. MARMOR:
Q. Are there dates the week of the 2nd of December that are available for you?
A. Let me get a court order in hand first and then I'll give you some dates.
Q. Okay.
A. I'm sorry. I'm really not trying to be difficult. I really find this so disrespectful of my time. I'm sorry.
Q. Okay.
MR. BUSTAMANTE: For the record, from plaintiff's perspective, I agree with Dr. Goldstein that we had expected that she would have been

47

compensated for her time and, frankly, didn't expect the dep to go more than three hours, but so be it.
THE WITNESS: Had I been told there would be no limitations on this, I would have insisted at the time that a judge say "Dr. Goldstein, you can't be paid for your time," and then we wouldn't have wasted this time. There are e-mails. There's discussion. I'm not sure why she didn't communicate with you. I certainly don't mean to be disruptive. I respect your time as well. This is a miscommunication that could have been avoided. I mean, I was extremely clear, you know. So, again, my apologies.
MS. MARMOR: Okay. We'll suspend the deposition.
(Deposition concluded sine die.)

48

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

Liza Marie Regan, being first duly sworn, on oath says that she is a court reporter doing business in the City of Chicago; and that she reported in shorthand the proceedings of said deposition, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said deposition.

Certified Shorthand Reporter

49

## Exhibits


**Goldstein Exhibit 1** 3:13 4:12,14,17,18
**Goldstein Exhibit 2** 3:14 7:12,14,18
**Goldstein Exhibit 3** 3:15 8:10,14 9:1
**Goldstein Exhibit 4** 3:16 11:10,14 18:2 32:7 33:5
**Goldstein Exhibit 5** 3:17 36:15,17,21 37:15 40:18,19 41:9


## 1


**1** 4:12,14,18 9:19
**11** 12:3
**11-16-2016** 38:12
**11th** 38:6
**12th** 38:7
**13** 14:16
**16th** 32:12
**18** 39:19
**1992** 27:4
**1993** 27:5
**1997** 27:6


## 2


**2** 7:12,14,18 38:10
**2015** 38:19
**2016** 38:19 39:8,15,19
**2017** 12:3 21:15 37:5,16,23
**2019** 8:15
**28** 37:16
**28-page** 38:9


## 3


**3** 8:10,14 9:1 10:12
**30** 8:15 14:13 39:8,15
**3108** 16:20
**3111** 18:2
**3114** 20:6
**3115** 21:10
**3116** 23:21 24:3
**3118** 24:14
**3121** 26:5
**3122** 26:18
**3123** 28:9
**3124** 28:21
**3125** 29:19
**3126** 30:7
**3127** 32:8
**3128** 33:7
**3315** 23:21
**3449** 41:22
**3453** 39:9


## 4


**4** 11:10,14 13:9 18:2 32:7 33:5


## 5


**5** 36:15,17,21 37:15 40:19 41:9 43:16,24 44:10,12


## 7


**70** 5:5


## 8


**8** 20:13 37:5,23
**8th** 37:18 43:14


## 9


**9** 24:3 43:16 44:10,11
**9-11-2017** 43:15
**9-12-2017** 44:10
**9-29-2016** 38:13


## A


**a.m.** 43:16 44:10,11
**Abilities** 30:12
**ability** 30:15,23 35:17
**absence** 19:13
**absolutely** 5:22 6:5 16:14 19:20 21:6 31:18
**accept** 15:3
**accurate** 13:16
**action** 7:20 30:14
**active** 39:23
**added** 11:16,23 17:6
**addition** 33:18
**adolescence** 14:9
**adolescent** 13:11
**adult** 13:18
**affect** 19:8
**affirmative** 7:3
**afraid** 9:11 23:13
**age** 14:13
**aggressive** 33:15,19
**agreement** 8:1
**alcohol** 26:22 27:9,12
**altercation** 32:17
**analysis** 32:22
**and/or** 10:12 11:1 26:2 30:2,3
**anger** 35:16
**angry** 26:11
**answering** 36:13
**answers** 13:3
**anticipated** 8:21
**anymore** 23:16
**apologize** 16:21 40:21
**apparently** 38:3
**appears** 41:4
**applied** 27:20
**applies** 10:11
**appropriately** 34:12
**Approximately** 14:2
**area** 34:22
**arrow** 18:6
**asks** 13:9 20:7
**aspect** 20:19
**assessments** 6:19
**assistance** 30:4
**assume** 24:23
**assure** 30:14
**attached** 38:4,7 39:1 40:19
**attachment** 38:9
**attachments** 37:6
**attention** 17:23
**Avenue** 12:1
**avoid** 42:15


## B


**back** 4:23 8:8 13:22 14:5,14,17 15:8 22:9,19 41:8
**background** 6:13 12:7 13:5 19:3 23:4 32:21 36:10
**based** 8:22
**basic** 5:12
**Bate's** 11:16 16:23 39:10
**beginning** 22:3
**behalf** 42:1
**behavior** 29:8,9,20 33:16 34:13,16
**behaviors** 30:3
**billing** 22:13
**biographical** 12:1 17:8
**birth** 12:19
**bit** 6:13 40:14
**blood** 18:13,16 38:18
**Board** 27:4,6
**boards** 7:5
**bother** 28:19
**bottom** 11:17 33:1,12 39:9,10
**break** 6:1,4 11:6 37:11,12 38:23
**briefly** 39:7
**broker** 26:21
**brought** 26:16
**built** 20:23
**bullet** 35:14
**BUSTAMANTE** 23:24 40:18


## C


**called** 6:8 33:6 40:1
**calls** 30:12
**capacity** 31:11
**care** 13:17 15:13 16:4,5,6,7,18 18:12,14 21:8 32:1,2
**carry** 25:14,15 31:11
**case** 6:16 8:19 9:5,13 11:16 36:24 38:3 41:24 44:14
**cases** 6:15 14:8 15:7
**CCSO** 23:21 28:9,21 29:19 30:7 32:7 33:6 34:4,5,8 38:9
**cease** 18:19
**cetera** 17:11
**chain** 34:24
**characteristic** 30:1
**charged** 23:3
**Charles** 38:17
**check** 13:2,9,15
**child** 13:10
**childhood** 14:6
**circumstances** 26:8
**civil** 7:19
**claim** 43:10
**claims** 6:20
**clarify** 17:10
**clear** 15:5 16:21 41:3
**clinic** 12:8
**clinical** 23:4,7
**clinician** 23:5
**clinics** 41:18
**closely** 29:20
**co-workers** 32:3
**cocaine** 27:12
**cognitive** 43:23 44:4
**collateral** 22:16
**collected** 38:18
**combative** 34:18
**comfortable** 5:9,10
**command** 34:24
**commitment** 7:8
**communicates** 30:1
**communication** 42:9 43:2
**communications** 10:12,24
**compensation** 7:7
**competency** 6:24
**complete** 44:18
**complied** 8:20
**composure** 34:11
**concerned** 25:9
**concerns** 35:16
**conditions** 13:10
**conduct** 29:20 43:19
**conducted** 44:3
**conducts** 44:4
**Confidential** 11:22
**confirm** 4:19 13:5
**conflict** 29:21
**consent** 28:17
**considerable** 30:12
**considered** 20:17
**context** 25:10
**continues** 38:4
**control** 30:2,23
**controls** 29:9
**conversation** 32:10
**Cook** 33:6 34:5 42:1
**cop** 27:19
**copy** 23:19
**Corporation** 10:13 42:1
**correct** 13:11,12 22:2 23:23 24:12 25:19 28:23 41:5 42:6
**correctional** 25:13,14 28:22 31:14 35:11 38:20 39:15
**corrections** 27:20
**correspondence** 10:17,20 37:1
**Corvel** 10:13 36:23 37:16 41:24 42:6,21
**COS** 25:17
**costs** 42:15
**counsel** 9:8 11:2,16
**counseled** 18:13
**County** 33:6 34:5 42:1
**court** 4:11,17 5:6 7:17 25:8 36:21

**cover** 5:11 10:22 37:4 41:23
**CPD** 27:18,21
**create** 19:18
**created** 32:19
**creatinine** 18:10
**crews** 30:24
**criminal** 7:2
**criminal/civil** 7:8
**criminals** 25:8
**critical** 15:2,21 16:4 41:13
**current** 30:8
**cut** 31:24

D

**Dad** 26:21
**Dana** 9:9
**danger** 26:2
**date** 8:1 12:19
**dated** 38:11 39:14
**Daubert** 7:11
**day** 44:16,19
**death** 24:5
**decisions** 30:16
**defendant** 26:7
**defense** 7:3
**defenses** 7:4
**deficit** 17:23
**denying** 13:12
**department** 33:20 34:7
**deposed** 5:2
**deposition** 4:13 5:9 7:13,18,19 8:2,9,14 11:9 36:16
**depositions** 5:7
**depressive** 14:13
**deps** 5:6
**describing** 26:22
**description** 28:22 30:6 38:19 40:15,19 41:3
**designed** 44:16
**detail** 28:19 32:8
**details** 26:10 36:11
**detainee** 29:14 30:3 35:17
**detainees** 29:19 30:24 32:2 34:14
**determine** 15:18 29:14 34:9
**determined** 25:24 38:24
**developmental** 13:20 15:6 17:22
**diagnosed** 22:11
**diagnoses** 6:15
**diagnosis** 6:17 14:13 21:14 22:5,11,12,14,23 23:11
**diagnostic** 23:2,5
**Diana** 4:4 6:7 11:1
**difference** 12:20
**difficulties** 28:11
**difficulty** 17:14,18
**diffuse** 34:15
**diffuses** 29:7
**direct** 42:8 43:2
**directed** 33:16
**directive** 33:18
**directives** 30:8
**directly** 16:6
**director** 38:14
**disability** 7:5
**disaster** 24:5
**discipline** 43:11
**discuss** 26:10
**discussed** 19:2 20:16 39:7 40:14
**discussing** 28:18
**disease** 18:11
**disorder** 15:20 31:10
**disorders** 17:23 31:23,24
**disruptive** 29:8,9 34:15
**distress** 6:20
**doc** 16:6 18:12,14 21:8
**docs** 15:14
**doctor** 16:3,7 18:19 20:3 28:6
**document** 8:17 11:24 12:6,14, 18 16:21 31:4 32:7 33:4,5,10 39:4,6 40:16
**documents** 8:15,22 9:2,3,18,24 10:12 36:3,5,22 38:15 41:4
**dollars** 26:24
**doubt** 9:15
**drug** 20:17
**drugs** 20:13,14 21:2
**duly** 6:8
**duties** 29:5
**duty** 4:7,21 10:3,13 13:23 14:4,22 15:7 23:6 25:10 31:5,8 39:22, 23

E

**e-mail** 37:4,7,15,22 39:2
**easy** 39:13
**effective** 31:12
**effectively** 34:16
**elicited** 20:11
**emergency** 30:15
**emotional** 6:20
**employee** 33:19 34:9 35:15
**employee's** 33:14
**employer** 26:16 35:15
**endorses** 41:14
**enhancing** 18:20 19:5,7 20:4 21:2
**entitled** 32:9
**environment** 32:4 34:12
**episode** 14:16
**escalated** 34:16
**essential** 31:12 34:10
**Essentially** 18:15
**establish** 4:24
**ethically** 10:8
**Euro** 26:24
**evaluation** 21:13 22:20 23:7 38:15 39:22 43:14
**evaluations** 43:6
**event** 34:1
**exam** 23:2
**examination** 6:10 10:3,14 23:5 31:4,6
**examinations** 7:2
**examined** 6:9
**exams** 13:24 14:5 25:7
**Exchange** 26:23 27:4,7
**excuse** 28:8 35:15
**execution** 7:1
**exhibit** 4:12,14,18 7:12,14, 18 8:10,14 9:1 11:8, 10,14 18:2 32:7 33:5 36:15,17,21 37:15 40:18 41:9
**exhibiting** 34:13
**experience** 13:21 14:5 28:7
**experienced** 13:10
**extent** 10:4
**external** 25:16,18

F

**fact** 32:15 38:24 39:18 43:19
**failed** 39:24
**fairly** 5:8
**father** 27:2,17
**feel** 19:9 42:16
**FFD** 22:8,20 31:4 38:4,14 40:7 42:6 43:3
**FFDS** 15:9
**fill** 44:6
**filled** 12:2,23 13:11 28:17
**fine** 23:14
**fire** 24:4
**firearm** 24:22 25:1
**firearms** 24:17 25:11
**fitness** 4:7,20 10:2,13 13:23 14:4,22 15:6,22 23:6 25:10 31:5,8 39:22
**flood** 24:4
**folks** 15:13
**follow** 17:10 41:14,17
**force** 29:10 34:17
**Forensic** 11:1 12:10
**form** 33:6 35:15 38:10 39:4
**forma** 41:17,19
**forms** 39:23 40:8
**found** 18:16
**foundation** 13:22
**four-year** 27:15
**frankly** 15:23 19:2 20:22 22:13
**Freshman** 27:16
**Friday** 37:16
**friends** 27:17
**frontline** 16:8
**full** 4:3
**Fuller** 43:15,17 44:1,2
**fully** 8:20
**functioning** 15:1 21:11
**functions** 31:11,12 34:10

G

**gave** 12:11
**general** 6:22 25:7 30:19
**generally** 6:2,17 15:11 31:7
**gentleman** 27:21
**genuine** 19:6
**give** 12:8 44:16
**Goldstein** 4:2,4,13,16,17 6:7 7:13,18 8:9,14 11:1, 9,13,14 13:9 36:16, 20,21
**good** 4:2 17:17 30:12
**grandfather** 28:6
**great** 27:17
**ground** 5:12
**Group** 11:1 12:10
**groups** 30:24
**gun** 25:23
**guns** 25:14,15

H

**half** 43:22 44:2
**hand** 4:10
**handed** 40:23
**handgun** 24:18
**handing** 4:16 7:17 8:13 11:13 36:20
**handwriting** 17:3 18:4 26:19
**happen** 15:4
**happened** 26:12
**headed** 21:11
**health** 14:10 16:2,5 25:10 31:9,23 32:6 33:11 39:20
**healthy** 32:5
**hearing** 7:5,11
**hierarchy** 35:4
**high** 27:15,16 34:12
**higher** 35:11
**hired** 27:22 28:1 42:5
**history** 17:10 24:15 25:4 31:23
**Hogueisson** 21:20,24 38:16 40:13
**hold** 37:19
**home** 24:19 25:12
**homicidal** 26:1
**hope** 8:19 21:7
**horrific** 28:8
**hostile** 33:19
**hours** 43:22,23 44:2,17,22
**HR** 32:18 34:2 38:14
**human** 33:20 34:7
**hundred** 14:3
**hybrid** 7:8

I

**idea** 42:15
**identification** 4:15 7:15 8:11 11:11 36:18
**identifying** 12:17
**illicit** 20:13
**illness** 14:14
**imminent** 26:4
**impair** 31:10
**important** 15:23 20:24
**importantly** 15:22
**improper** 29:20
**inappropriate** 33:16
**incident** 38:12
**incidents** 30:3

included
19:12
includes
24:21 29:7 32:6
including
34:13 35:16
increased
18:9
independent
9:14 42:16
independently
13:5
individual
17:9 21:23 34:15
individually
30:24
individuals
16:5
inference
19:14
inform
30:2
information
5:18 8:16 10:5 12:17 15:3 32:9,15,21 38:8,10 39:5
informed
39:19
initiative
30:13
injury
24:6
inmates
34:18
inquiry
15:22
insanity
7:3
institutional
30:19
insurance
16:16 22:13
intake
9:12
interact
32:3
interactive
44:5
interested
17:13 27:19
internist
16:10
interventions
29:8
interview
17:10 20:20 22:16 36:9 38:7 41:11,20
intimidating
33:16
involved
24:3,4 26:6
involves
6:16
involving
6:14,15
irrelevant
37:20
Isaac
10:24 12:10
issue
14:10
issued
9:9 36:7
issues
17:22 43:9
issuing
29:2
items
41:13

J

job
28:22 30:6,12 31:12, 15,16,21 34:10 38:19 40:15,19 41:3
jobs
27:8
John
4:8 9:4 10:1,14 11:2 38:5 43:14
Jones-hayes
32:10,16,24 34:1 35:3 38:11 39:6
Jordan
43:15,17
judgment
30:13
judgments
30:16

K

Karolina
21:23 38:16
keeping
31:8
key
29:4
kidney
18:11
kind
6:22 12:19 23:11 31:15
knew
28:16,17
knowledge
30:11,18
Krull's
22:8,20
Kurtz
9:9,18

L

lab
18:13 38:18
labs
18:13 19:22,23
large
30:24
lawsuit
26:13,16 37:20
lawsuits
26:6
lay
13:22
layers
35:3
lead
16:13
learning
17:23
left
40:1
legal
37:19
letter
10:22 37:6 38:5,13 39:1,8,14 41:23 43:13
level
35:11
levels
18:10
lie
21:2
life
13:6
lifestyle
26:24
limited
34:17
list
29:17
listening
29:13
location
8:2
long
29:17 42:14 43:21
longer
43:8
looked
19:22,23
losing
35:18
lot
7:6,11 13:23 15:12 27:11

M

made
16:7 23:11
main
30:2
maintain
34:11 36:7,11
majority
15:5,9
make
19:14 22:5 25:11,22 30:15 31:4 41:3
manage
35:17
management
35:16
manager
41:24
mania
14:16
manic
14:13
manner
31:13
March
21:15
mark
4:11 7:12 11:8 36:15
marked
4:14,17 7:14,18 8:10,13 11:10,14 24:2 36:17,21
MARMOR
4:2,5,10,16,23 5:4,8, 11,17,21 6:1,6,11 7:16 8:12 11:6,12 24:8,9 36:15,19 37:11,13 40:21 41:1
materials
11:18
math
17:18
Meaning
41:19
means
18:15 44:22
medical
10:1,9 13:14 14:6,7 31:9 38:8
medication
18:21
meet
44:11
memoranda
30:9
memory
23:15
mens
7:2
mental
14:10 16:2,5 25:9 31:9,23 32:6
Merc
27:1
Mercantile
26:23 27:4,7
message
40:2
met
27:17 44:17,21
Michelle
37:5,15,22 42:13,17 43:7
Michigan
11:24
middle
29:24
mind
31:9 37:3
missed
41:16
misstates
23:24
moment
10:21,23 39:7 40:16
Monday
38:6 43:15
monitors
29:19
months
28:2
mood
19:8
morning
4:2
moved
8:1

N

Nawara
4:8 9:4,9 10:3,14 11:2 12:3,15,24 32:17 35:4 38:5,13 39:9,15 41:22 43:3, 14 44:6,22
Nawara's
4:20 10:1 43:10
needed
21:3
neurocognitive
15:19 31:10,24
neuropsychologis t
17:21
Neuropsychologis ts
12:1
Nevermind
11:7
notes
17:4,6 22:1,15 36:8, 9 38:16,17 40:12
November
32:12 39:8,15,19
numbers
11:17 39:10
nurse
33:11 34:5 39:20 41:24

O

object
40:18
Objection
23:24
objects
8:16
obtain
13:14 14:6
obtained
10:1
occupational
33:11 39:20
occurred
38:12
offers
31:7
office
27:8 31:15 34:6 35:5 39:20 42:2,9 43:3,5
officer
28:22 31:14 33:17 35:4,12 38:20 39:15
officers
25:14 34:14
offices
8:3
Oftentimes
25:6
onset
14:15
operations
25:16,18
opinion
23:6 31:8
opportunity
41:16
opposed
15:1
order
11:22 39:23
orders
29:10 30:20
outset
5:1
Over-the-counter
18:22
owns
24:17

P

p.m.
43:16 44:10,12
pages
24:11
paragraph
43:13
Pardon
19:1
part
31:6 34:23 38:2
participate
40:7
pass
10:9
passed
32:20
past
6:23
pause
42:23
pension
7:4,5
people
12:8 14:22 16:10 21:2 27:12 31:22 44:15
perceived
28:18
perception
26:12
perform
34:10
performance
18:20 19:5,7 20:3 21:2 43:6
performed
6:19
person
24:6 41:14
Personality/ emotional
21:11
pervasive
43:9
Ph.d.
6:7
physical
29:10
physically
33:15
pit
27:1
pits
27:11
plaintiff
9:3 10:1,14 11:2 26:7
point
35:14 42:23
pointing
24:8
police
25:14
policies
30:8,19
population
35:17
Position
34:14
potential
24:7 29:14
practice
12:12
practices
9:13 12:9
pre-hire
6:17 14:24 31:22
predate
15:21
predators
7:9
prepared
4:6,8,20
presence
19:24
presented
33:19
pretty
41:17,19
primary
13:17 15:13 16:4,6, 7,18 18:12,14 21:8
prior
6:12 9:8 14:17 21:12 23:18 26:15 29:1 39:24
pro
41:17,19
problem
25:21
problematic
34:17
problems
23:22 24:11 26:8 28:18 29:14
procedures
30:8,19
proceed
7:1
process
5:9 14:24 40:7

**produce** 8:15,22 9:19
**produced** 9:2,4,18 10:15 11:3, 15,16,18 36:3 37:21 41:5
**program** 7:6
**progress** 38:16,17 40:12
**promise** 23:15
**prompt** 30:14
**proper** 34:13
**properly** 34:17
**Protective** 11:22
**protein** 18:16
**provide** 15:3
**provided** 6:23 7:4 9:22 10:6 29:3 32:9,16,18 36:23 38:11 39:5
**providers** 10:2 16:2
**providing** 10:2
**psych** 43:23 44:15
**psychiatric** 15:19 21:14 22:23 23:11
**psychological** 21:13 44:5
**psychotherapy** 21:23
**public** 7:6 31:17,19 32:2 34:21,23
**purpose** 22:15
**purposes** 23:6
**pursuant** 7:22 9:4 11:22

**Q**

**qualified** 19:9
**quarter** 5:7
**quasi-legal** 7:7
**question** 5:14,22 6:3 7:21 8:21 9:2 10:11 19:6 21:9 22:9 36:13 41:2
**questionnaire** 12:2,7 17:9 19:3 20:7 25:5,7 36:10
**questions** 17:20 20:11 24:7,10 41:12 42:21
**quick** 4:18

**R**

**rage** 19:19
**Ray** 11:1 12:10
**rea** 7:2
**read** 18:7,8 22:1 26:20 27:23 28:5
**reading** 18:18 23:10
**reason** 9:15,16 33:14 37:8
**reasonable** 19:14
**reasons** 16:1 33:24
**Rebecca** 32:11 38:14 39:16
**recall** 8:18 9:8 22:19 23:13 43:2
**receive** 16:5
**received** 35:22 37:4
**recent** 14:24 15:14
**recollection** 9:14 18:18 42:22
**recommendation** 25:11,22
**record** 4:3 12:16 18:17 24:1
**records** 10:9 13:15,17,20 14:7,9,17,19 15:6,9, 16,21 16:1,2,3,18 18:18 21:1,7 22:10 36:6 40:13
**recreational** 20:14,17
**redacted** 12:18
**reference** 21:22
**references** 42:20
**referral** 16:7,13,17 33:6 35:14 38:9 39:4
**referred** 33:24
**referring** 20:3 21:19,21 33:14
**refers** 21:14 38:2
**reflects** 22:4
**refresh** 42:22
**regular** 16:10
**Reierson** 32:11 38:14 39:16
**related** 18:10
**relevant** 38:3
**religion** 17:19
**rely** 15:20
**remark** 28:15
**remember** 9:11 25:7 37:7 42:19
**remote** 15:1
**remove** 25:22
**removed** 25:12
**rendering** 23:6
**rephrase** 5:23
**report** 4:6,7,19 9:20,21 19:14 22:4,8,24 23:10,15,16 26:12, 17 29:2 36:1,7,12 42:21
**reporter** 4:11,17 7:17 36:21
**reporting** 18:9
**represent** 11:14 36:22
**request** 30:3 31:5
**require** 34:11
**required** 30:13 39:21
**requires** 34:15
**research** 6:13
**resources** 33:20 34:7
**respecting** 34:23
**respond** 34:11 40:3
**responded** 28:11
**response** 9:19 33:17 36:4,23
**responsibilities** 29:5
**responsibility** 7:2
**rest** 23:21
**results** 38:18
**return** 40:1
**returning** 39:22
**review** 22:7 23:17 39:24
**reviewed** 29:1 35:24 36:5
**reviewing** 22:19 23:20
**rider** 8:24
**ring** 22:16
**role** 15:18
**room** 44:17
**routine** 30:14 33:18
**rules** 5:12
**run** 7:5
**running** 27:13

**S**

**safe** 31:12 32:4
**safety** 7:6 31:17,20 34:21, 23
**sarcastic** 28:15
**Sarocka** 37:5,16,23 41:23
42:18
**schedule** 44:14
**scheduled** 43:15
**school** 17:15,16 27:15,16
**schooling** 17:15
**screening** 6:18 14:24 31:22
**section** 20:7
**seeking** 36:24
**self-report** 15:20 44:6
**sense** 15:8
**sentencing** 7:1
**separately** 40:24
**September** 8:15 12:3 37:5,16, 18,23 43:14
**set** 16:16 44:13
**sexually** 7:9
**Shaw** 38:18
**Shaw's** 36:6 40:13
**Shelby** 32:11 33:11 34:5 39:21 40:1
**Sheriff's** 27:8 34:6 35:4 39:20 42:2,9 43:3,5
**short** 37:12
**shortly** 23:15
**shotgun** 24:18
**show** 10:20,23 18:17
**signed** 32:24
**significant** 23:22 24:11 43:10
**significantly** 31:10 35:11
**signing** 39:24 40:8
**signs** 29:21
**simply** 20:18
**single** 6:16 9:12
**sit** 43:1
**situations** 19:19 30:15
**skills** 29:13 30:11
**sleeping** 16:11
**slow** 44:15
**so-called** 7:3
**someone's** 14:9 25:9
**sons** 27:20
**sort** 17:13 19:6 31:14
**sound** 30:15
**speaking** 6:17 31:7
**specific** 10:9 22:24
**specifically** 8:18 14:10 20:1 21:9 32:19
**speculation** 5:18
**staff** 30:2
**stage** 18:10
**stamp** 11:17
**stamped** 39:10
**stamps** 16:23
**start** 28:12
**state** 4:3
**statement** 20:11
**step** 13:21 40:8
**steroids** 19:12,17,18,24 20:12,17,21
**strength** 17:17,19
**stress** 34:12
**subject** 14:7
**subjects** 17:15,16
**subpoena** 7:19,22 8:15,22 9:5, 9 36:4,24
**substance** 20:8
**suicidal** 25:24
**suicidality** 41:15
**suit** 26:11
**superintendent** 32:10,16 35:8 38:11 39:6
**superior** 33:17 34:14
**supervise** 30:23
**supervisor** 35:6
**supplements** 18:21,22 19:5,8 20:4
**supposed** 10:8
**Susan** 4:4
**switch** 15:13
**sworn** 4:1 6:9

**T**

**taking** 19:12 37:3
**talk** 4:6 5:15 27:12 28:13
**talked** 34:21 39:5 40:16
**talking** 26:13 27:10 39:18
**technician** 43:18
**telephone** 32:10
**temper** 35:18
**ten** 14:19 15:12,15,24
**tend** 10:7
**term** 11:21
**terms** 5:6 24:10
**test** 19:23 23:15
**tested** 21:9
**testified** 5:5 6:9 7:10 35:23
**testify** 7:19
**testimony** 6:12,14,23 7:4
**testing** 38:6 41:10,13,17,20 43:23 44:4,5,15
**tests** 43:19,21 44:1,2
**them's** 27:17
**thing** 12:19
**things** 6:14 7:8,9 10:8 13:13 17:24 18:19 23:17 29:4,7,18
**threat** 26:4
**time** 6:2 8:2 9:17 25:19 27:21 35:24 44:13
**times** 5:4,6 30:13
**tiny** 39:10
**today** 4:6 5:18 7:23
**told** 21:5
**top** 11:23 17:3 21:12 29:18 37:19
**Trade** 27:5,6
**trauma** 24:7
**treater** 16:8
**trial** 7:1
**trouble** 16:11,12
**truth** 21:5
**Tuesday** 38:6 44:9
**turn** 13:8 16:20 26:18
**type** 7:7
**types** 6:22 7:8
**typically** 15:12 27:18

U

**undergo**
39:21
**understand**
4:5 5:13,21 14:11 19:18 21:18,20 33:23 35:2,10
**understanding**
9:17 22:12 44:18
**understood**
25:1,13 34:4
**unusual**
29:20

V

**variation**
17:3
**vast**
15:5
**verbal**
29:8,9,13
**verbally**
34:16
**verify**
21:7 43:8,9
**version**
12:16,22
**versus**
5:6
**violence**
25:6
**violent**
7:9
**visits**
21:19 38:17
**voicemail**
40:2

W

**wait**
42:12
**wanted**
4:24 12:22 15:2 43:5
**watching**
29:19
**weapons**
24:15 25:4
**weeks**
33:18
**wiggle**
44:16
**Winifred**
32:11 33:10 39:21
**witnessed**
24:4,5
**work**
16:12 18:13,16 24:22 25:2 26:8 28:19 32:5 34:22
**work-related**
28:10
**worked**
26:24 27:3 34:5
**worker**
7:7
**working**
42:1
**workplace**
25:6
**writing**
16:24 28:5
**written**
17:11
**wrote**
26:20

Y

**year**
9:10 27:16 43:18
**years**
13:20 14:19 15:11, 12,16,24 28:1,3
**younger**
26:21

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. )No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The Continued Discovery Deposition of DIANA S. GOLDSTEIN, M.D., called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, on December 16, 2019, at the hour of 2:00 o'clock p.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.



APPEARANCES:

LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER VINCENT BUSTAMANTE,
17 North State Street,
Suite 1550,
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff;

SCHARF, BANKS, MARMOR, LLC,
BY: MS. SARAH R. MARMOR,
333 West Wacker Drive,
Suite 450,
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
Representing Thomas Dart,
in his official capacity
as Sheriff of Cook County,
Illinois, Matthew Burke,
Rebecca Reierson, and
Winifred Shelby;



APPEARANCES (Continued):

STATE'S ATTORNEY OF COOK COUNTY,
ILLINOIS,
BY: MR. LYLE K. HENRETTY,
50 West Washington Street,
Suite 2760,
Chicago, Illinois 60602
(312) 603-1424
lyle.henretty@cookcountyil.gov
Representing Karen Jones-Hayes.



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DIANA S. GOLDSTEIN, M.D. | |
| By Ms. Marmor (continued) | 54 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Goldstein Deposition | |
| Exhibit No. 6 | 56 |
| Exhibit No. 7 | 115 |
| Exhibit No. 8 | 126 |

(WHEREUPON, the witness was duly sworn.)

DIANA S. GOLDSTEIN, M.D.,

called as a witness herein, having been first previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued):

BY MS. MARMOR:

Q. Good afternoon, Dr. Goldstein. We ended the last deposition with a series of questions that had been sent to you by Michelle Sarocka from Isaac Ray -- sorry -- from CorVel. If you go to the third page of Deposition Exhibit 5, do you see her cover letter to you?

A. Yes.

Q. Okay. And I just want to focus very briefly on the numbered items in this letter. Do you see that?

A. Yes.

Q. Okay. And what she said in her letter, what Ms. Sarocka said in her letter, was, "Following your comprehensive evaluation of John Nawara, please provide your comments and recommendations to the following questions."



Do you see that?

A. Right.

Q. And you -- in fact I see what you're doing. You took the questions she gave you in her referral, and you put them in your report, and you answered them where appropriate, correct?

A. Exactly.

Q. Okay. And I'm reading down this list of questions. Would it be fair to say that these are all questions functionally asking was Mr. Nawara safe to return to work?

A. Yeah. Fitness for duty, generally safe and effective in one's position with co-workers, the public, and in this case detainees.

Q. Do you see on No. 6 on Exhibit 5, do you see No. 6 where it says, "Do you have any recommendations to prevent another occurrence?" Do you see that?

A. Yes. And I see you have some notes here. Are these your notes?

Q. Oh, sorry. These are my notes. Sorry. This was the Exhibit 5 that I got. So let me give you a clean copy to look at.



A. That's okay. I'm not going to read those notes into the record. I appreciate.

Q. The only question I have is do you know, what did you understand the word occurrence to mean in that question?

A. Right. The incident that allegedly took place on either 9-28 or 9-29-16, depending on who you speak to. I think it was just a question of which day it was. But yeah, the incident between Officer Nawara and his supervisor, Jones-Hayes.

Q. Okay. That's superintendent Jones-Hayes?

A. Yes, ma'am.

MS. MARMOR: Okay. Can we mark this as the next exhibit?

(WHEREUPON, Goldstein Deposition Exhibit No. 6 was marked for identification.)

BY MS. MARMOR:

Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Deposition Exhibit 6. I'll represent to you I just went to your website and printed off some



of the pages from your website. Does this look familiar to you?

A. Sure.

Q. Okay. And I just thought this would be a kind of quicker way of getting through things like your background and that kind of thing. You have a doctorate in clinical psychology from University of Chicago Medical School, is that correct?

A. No. It's a clinical psychology degree with a specialty in neuropsychology from what used to be called the Chicago Medical School, it's now Rosalyn Franklin School of Medicine, in science what I like to call the nom de guerre. But they changed the name. The University of Chicago is where I did most of my training and my fellowship.

Q. Great. Okay. And Rosalyn Franklin was a great lady.

A. Yes.

Q. When we're off the record, I'll tell you why I think that.

A. Okay.

Q. And you're board certified in clinical

neuropsychology?
A. I am.
Q. And you have specialty areas of research. I'm not going to cover all of them, but some of them include workplace violence, is that right?
A. I wouldn't say that that's really an area of research of mine. Because we have a public safety program and we deal generally speaking with mental health and, you know, occupational medicine in general we do that, but my research is more in neuro and in criminals and malingering and various neurocognitive disorders and things like that.
Q. Okay.
A. I have certainly presented on workplace violence and done teaching, but my area of research where I'm actually, you know, collecting data and whatnot is not in workplace violence.
Q. Okay. Great. Now, it says that you -- it says you treat both civilian populations and law enforcement personnel, is that right?
A. Right.

58

Q. Have you treated others from the Cook County Sheriff's Office?
A. No. I don't believe I have ever treated anybody --
Q. Okay.
A. -- from Cook County.
Q. The Sheriff's Office, that is.
A. From the Sheriff's Office, right. No. I don't think so. Not that I recall.
Q. Do you have any -- I'm just trying to get a sense of your interactions or your experiences with the Cook County Sheriff's Office. Have you had any involvement in how they set up fitness for duty exam processes at the Sheriff's Office?
A. Well, I don't think they are much different from the way that all of our other fitness for duty exams are set up. Typically there's a third party administrator, in this case CorVel, and they set it up with us directly rather than us getting a call directly, say, from a supervisor or HR at Cook County, and, you know, the idea is that it's supposed to be independent.

59

Q. Right. And I was asking a slightly different question. I appreciate that answer and have no problem with that answer, but it's a slightly different question, which is have you had any involvement in, say, consulting with the Sheriff's Office about how they make internally decisions about who to send for fitness for duty exam or not?
A. I don't know of any department that does that. That's all an administrative decision. Is that what you're asking? There are times when I receive calls from someone to say should we have a fitness for duty exam. Is that kind of what you're getting at?
Q. No. I'm really more getting at policies and procedures within the organization or what do you do if you see a problem with someone, and how -- you know, who makes the decision to send somebody for a fitness for duty exam?
A. No.
Q. No, you have had no involvement with that?
A. No. That's not my role.

60

Q. So the second page of Goldstein Deposition Exhibit 6 asks a useful question, which is what is a forensic evaluation. And my question to you is do you consider a fitness for duty exam a forensic evaluation?
A. I consider it quasi-legal, like worker comp. It is not -- there is no legal case pending before a court. Typically there's, you know, some administrative decision or in the case of pension disability, for example, there will be a board of police and fire commissioners. It's not going to get done in a formal court.
Q. But I'm asking does that mean it's not a forensic evaluation?
A. It's a type of forensic. Certainly wouldn't call it clinical evaluation. I mean, it's clinical in the sense that, you know, we conduct examinations on clinical issues, but there's no doctor-patient relationship, and that's really the bottom line of the difference.
Q. Right. And your website actually talks about some of those differences. It says it's not clinical. A clinical would be that a

61

treater or the patient himself would self-refer for an evaluation, and that's not the case in FFD, correct?
A. Well, they're not always self. Patients aren't always self-referred. The difference is is there a doctor-patient relationship or not. That's the bright line between clinical versus nonclinical.
Q. Okay. If you go to the third page of Exhibit 6 where it says, "The goal and scope of a clinical versus forensic evaluation."
A. Um-um.
Q. It says -- it's sort of -- there's a series of jump sites, but then it says, "The purpose of any evaluation should be evident by asking what is the referral question and should always be clearly stated at the beginning of a report." Is that right?
A. Right.
Q. Okay. And I think you did that here, and we'll look at your report in a moment. And let me just ask this. You need to know why the employer is asking for an FFD, right? That's why you want to know the referral question?



A. No. The referral question is fitness for duty.
Q. I see. Okay. And the fitness for duty question, however, comes from the employer, correct?
A. Right. It's prompted by some incident or some concern, right.
Q. Okay. Okay. If we can go to Page 4, where it says, "The nature of the relationship between examiner and examinee in a clinical versus forensic evaluation." Do you see that?
A. Right.
Q. And this is where you're talking about the fact that there's not a doctor-patient relationship, correct?
A. Exactly.
Q. One of the things I noticed in here is you say -- or the website says, "The examinee is not the holder of privilege. The third party that referred the individual for evaluation," and it gives examples including the employer, "owns the record and work product, and while some exceptions exist, in the vast majority of cases examinees are not entitled to the



examiner's report."
A. So this was created -- this website was created before McGreal v. Ostrov --
(WHEREUPON, there was a short interruption.)
THE WITNESS: Before McGreal, M-c-G-r-e-a-l, v Ostrov, O-s-t-r-o-v, which is an Illinois Appellate case, which had to do with a fitness for duty examination.
But one of the things that came out of it was the judge's decision that fitness for duty examination reports are in fact a type of medical record, and therefore, under the Illinois Confidentiality Act, examinees, fitness for duty examinees, can in fact have their report, and of course this would extend to pre-hire reports as well.
BY MS. MARMOR:
Q. So how far back did that decision go?
A. That's a 2004 decision.
Q. Perfect. Thank you. So Mr. Nawara would have had a right to your report?
A. Absolutely, and I would have told him so during the examination.



Q. Okay.
A. We are updating this website, by the way.
Q. Understood.
A. But it clearly does say there are some exceptions.
Q. Sure. If you could go to the -- go two pages in, so this would be the sixth page of Deposition Exhibit 6, the one that says, "Workplace Violence Evaluations."
And here there is a statement that says, "Workplace violence accounts for one in every six violent crimes in the United States and has been referred to as a national epidemic by the Center for Disease Control." Given what you just said, is that a fairly current statement?
A. I don't know.
Q. Do you believe workplace violence is a serious problem?
A. Of course.
Q. And the website goes on to say, "It encompasses physical assault, verbal threats, intimidation, harassment -- sexual harassment,

destruction of workplace property, off-site stalking and telephone harassment. In addition to increasing worker compensation premiums and liability risk for employers, workplace violence diminishes productivity and morale and increases employee turnover." Do you still agree with that statement?
A. Of course.
Q. Okay. I notice if you go down to the -- skip the next paragraph, but go to the next one. It says, "Both personality and environmental factors, actuarial and dynamic, can result in employee instability and risk for violence. Some of these factors include a history of aggression or escalating aggression, poor stress or frustration tolerance, poor coping resources or social support, impulsivity, possession of or access to firearms or other weapons," and then it goes on, "presence of an active substance abuse, psychiatric or personality disorder, a marked change in or decompensation of any of these conditions, and changes in level of interpersonal interaction or personal hygiene and changes in work

66

productivity." I'm going to stop right there. Is that all still accurate in your view?
A. Of course.
Q. Ends with, "Designation of a specific target, e.g., a host (sic) or co-worker."
A. A boss or co-worker.
Q. I'm sorry. I apologize.
A. It's okay. It's very small writing, and I'm amazed that I can actually read that.
Q. I'm sorry. I'll read that again. "Designation of a specific target, for example a boss or co-worker, and a sense of justification for the commission of a violent act." Do you see that?
A. Yes.
Q. Okay. So is there -- can there be cases of workplace violence where people are not necessarily potentially violent to everybody, but they have specific targets that they're angry at?
A. Absolutely.
Q. Okay. Is there a -- okay. If you could go to the last page of Deposition Exhibit 6 where it says, "Public Safety

67

Evaluations." I take it what you did here was not a public safety evaluation, correct?
A. No. We would not necessarily consider it -- I mean, it is and it isn't. We do a lot of pre-hire screening in our public safety program. But fitness for duty when it involves someone who's in a public safety sensitive position, which Officer Nawara is, it is part of public safety because he is dealing with community members, albeit they're detained. Of course he's also doing that if he goes on external operations, right.
So it is in this case fitness for duty is sort of like we also call them impaired professionals examinations, but it is about occupational medicine and occupational health. And so I would consider it in this particular case public safety.
Q. Okay. If you look at the last paragraph underneath the photograph here where it says, and I'll try and read this correctly, "Fitness for duty evaluations may become necessary when an individual encounters problems once in a public safety position." Sounds like

68

that's exactly what you were just talking about with Officer Nawara.
A. Yeah. Just to clarify, and I'm kicking myself that I wrote this so ambiguously, it is not that they're encountering a problem once, it's once they're in a position.
Q. Got it. I see.
A. Yeah.
Q. And then not the next sentence but the one after it says, "Clinicians review performance evaluations, disciplinary action and commendations, citizen complaints and compliments, conduct collateral interviews with supervisors, and review relevant medical records." Do you see that?
A. Yep.
Q. And we talked last time about medical records. I have a question about this, "conduct collateral interviews with supervisors." I don't think you did that here, correct?
A. No. We do that when we are allowed access to a department. So, for example, sometimes a chief will call us directly or a labor attorney will call us directly. They're

69

not using an IME company. And so we can have access.
In this particular case -- there are times when we're just not allowed to do that because we have independent medical evaluation, you know, we're not allowed basically. We don't have access. It limits us a little bit. And so we go with what we have.
And I can anticipate your next question is sure, I would have loved to have had discussion with anybody and anyone that either the County or Officer Nawara would have liked me to speak to.
**Q. And did you ask CorVel to speak to anyone?**
A. I don't remember if I did. But my fitness for duty process is always like that. You know, the more information, the better, can we have access. I think what they did instead is provide me correspondence between HR, for example, and superintendent --
**Q. Officer Nawara?**
A. No, between HR and --
**Q. Jones-Hayes?**



A. -- Jones-Hayes. And then also descriptions of their interactions during that meeting at HR. So that was what they gave me, yeah. Yeah.
**Q. Okay. And if you had asked to speak to, say, Jones-Hayes or the HR people, would you have expected to see that in your report?**
A. Right. Had I done collateral interviews, I would have indicated that in my report.
**Q. Well, I'm asking a little different question, which is if you had asked to meet with them and had been told no or something, would you put that in the report?**
A. Yeah.
MS. MARMOR: Okay. So let's -- it looks like you have a copy of your report. This is Goldstein Exhibit 1. I didn't bring extra copies because I gave them --
MR. BUSTAMANTE: I have it.
MS. MARMOR: Okay. Good.
Just please don't write on that, Lyle, because it's my official copy.
THE WITNESS: Can we go off the record for



one second?
MS. MARMOR: Sure.
(WHEREUPON, a discussion was had off the record.)
BY MS. MARMOR:
**Q. How many fitness for duty reports have you done for CorVel, roughly?**
A. CorVel? I don't know. Dozens and dozens, I imagine. I'm not sure. The IME company changes about every few years, so I don't really look at it as which IME company it's for.
**Q. All right. If you can guesstimate how many FFD reports have you done for Cook County Sheriff's Attorney employees?**
A. Only a handful.
**Q. So less than five?**
A. Yeah. Maybe. Not sure. Maybe more. Some of them are pension disability, so I don't really remember. I don't break them down like that.
**Q. I take it you have never worked for the Sheriff's Office as an employee.**
A. Oh, as an employee, no.



**Q. Have you worked for the Sheriff's Office as a consultant?**
A. Well, I'm not sure what the difference is between the city, county, and -- you know, I have been retained by attorneys to look at, for example -- well, that would be the city, I guess. I don't know if I have. I don't recall if I have.
**Q. Okay. And have you ever worked at a correctional facility?**
A. Not as an employee but spent about five to six days a week in Lake County Jail when I was conducting my research on psychopaths and was intimately involved in the day-to-day workings of that jail. I have been to many prisons. I have been to many jails. Heading to Graham Correctional tomorrow, was at Kane County twice last month. You know, it's a regular part of my work.
**Q. Have you been to the Cook County Jail here in Chicago?**
A. Absolutely.
**Q. And how many times have you been there?**
A. Probably a dozen.

Q. Have you ever been to the Cermak facility there?
A. Yes.
Q. And how many times have you been to Cermak?
A. Couple times, I think. I used to teach there. Maybe three times through the Isaac Ray Center. They had the contract there to provide all the mental health treatment there, the psychiatrists and psychologists. That was through the Isaac Ray Center. So I would go teach there as well and of course my colleagues there, we were in touch all the time.
Q. Was that mental health treatment for employees or for detainees?
A. No, for detainees. Yeah.
Q. Do you have any kind of sort of certificates or training in disciplinary procedures at jails?
A. I'm a psychologist, no.
Q. And do you understand the different roles played by supervisors in HR in the FFD referral process at the Cook County Sheriff's Office?

74

A. Can you be more specific? That's very general.
Q. That's why I'm asking the question. I just want to understand your foundation. Do you know who makes the referrals and how it's done?
A. I imagine every department is different. HR is typically involved when someone is contacting me because you can't put medical protected health information in someone's front personnel jacket.
So I'm either getting a call from HR or from a chief or from a labor attorney, and it's always going to go either to a labor attorney or to HR or both.
Q. Have you ever read -- there are management guidelines at the CCSO for how to do FFD referrals. Have you ever read those?
A. I don't know. Maybe. But it's not something I really -- I mean, it's not my role. You know, what I can say is that there have been times when I have been sent to fitness for duty examination, and I have declined to take it because I felt it was punitive or that the process was being misused.

75

I will accept a fitness for duty examination if I think that the prompting question is relevant and appropriate, it is some kind of mental health or cognitive issue where there has been some disruption at the workplace and somebody's been pulled off work as a result of that, and there may be a question of whether there is personality, mental health, substance use, or cognitive problem prompting the issue that may be treatable, and that there is a question of safety effectiveness, you know, within the workplace. So in this particular case I felt it was a good referral, and I accepted it.
Q. Okay. Thank you. And I assume you have never spoken to Winifred Shelby. That was the occupational nurse.
A. I don't know. There may have been one time where we -- I may have been copied on an e-mail to her, but I don't know that it was even this case. I just don't know.
Q. You have no memory of ever speaking to her about this case.
A. No.

76

Q. Same question about Rebecca Reierson. You've never spoken to her about this case?
A. Been too long. I don't think so. I just don't think so. We really tried to say separate. I don't know.
Q. And then the final person I'll ask about is Superintendent Jones-Hayes. You never spoke with her about her interactions with Mr. Nawara, correct?
A. I don't believe so, no.
Q. Okay. So if you could turn to Exhibit 1. Let me just find my copy of it. So the first page of -- and I'm just going to go --
A. Lovely picture. I was so young then.
Q. So this is, I take it, your form that you use for fitness for duty exams, correct?
A. Yes.
Q. Fitness for duty exam reports.
A. Sure.
Q. Okay. And it says that -- this is sent to Ms. Sarocka, and it notes that at her request on September 11, 2017 and September 12, 2017 you conducted an examination of Officer Nawara for the purpose of assessing his fitness to return

77

to duty as a correctional officer for the Cook County Sheriff's Office. Do you see that?
A. Yes.
Q. Now, it says that, "The request for examination follows an interpersonal interaction between Officer Nawara and Superintendent Jones-Hayes that took place on September 29, 2016 in the basement of Cermak, the location of Officer Nawara's assignment that day." Do you see that?
A. Right.
Q. So one of my questions here, if you may recall at our last -- at the first day of this deposition you said you understood that there were two reasons he was sent. One was that event, but also there was the HR interaction.
A. Right.
Q. I'm just wondering why that wasn't included here, if you know.
A. That wasn't the prompting. That was not the prompting issue. He went to HR to discuss this issue. This is the prompting issue.
Q. But do you recall -- and I'll point you to letter C here on the first page of your



report where it says, "In addition" -- it says on 8-25-17 Cook County referral form from Human Resources describing the reasons for referral as, quote, "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to routine directive. In addition, weeks later employee presented as aggressive and hostile in the Human Resources Department."
A. Okay.
Q. So my question really is -- even if this is the case, I just want to understand it. Were you more focused on the Jones-Hayes altercation than what happened with HR?
A. Not at all. My report addresses both.
Q. And did you understand that in fact both prompted his fitness for duty exam?
A. Sure. Sure.
Q. Really Page 2 -- Page 1 really covers what you say prompted the report and also the materials you were given to review, is that right?
A. Right.
Q. We've already basically gone over that,



so I am not going to retread that ground. Page 2 is -- Pages 2 and -- basically Pages 2 through 4, effectively they describe both what Jones-Hayes says happened and then what Mr. Nawara says happened. Is that a fair statement?
A. Right.
Q. Okay. And one of the things that I noticed, if you go to the middle of Page 2 where you're talking about what Superintendent Jones-Hayes said, she wrote in her statement, "Superintendent Hayes realized that something was going on with this officer and stated maybe it was something about her presence that set Nawara off. Until administration decided what was the required action to take, Superintendent Hayes decided to stay away from him after the incident." Do you see that?
A. Right.
Q. And remember when we were talking about the idea that people could focus their anger on, say, a boss or a single co-worker? One of my questions is did you do any sort of investigation to find out whether there was



something in fact particular to Superintendent Jones-Hayes that might have set Mr. Nawara off?
A. There is nothing that he said related to her in that -- that there was anything, you know, particular about her, simply that that day she seemed very annoyed with him when she came in, and he perceived that perhaps she was annoyed because there had just been a fight, and she counted on him to kind of keep things together. So his reaction was specific to that interaction. He never said there was any larger pattern with her.
So yeah, we would have covered that, and that's not what he said. It related very specifically to the events of that day and the way she perceived him and the way he perceived her, and that just didn't go well after that.
Q. And of course you're relying on him to tell you -- you can't make a judgment about whether he's telling you the truth, but you're relying on him to tell you whatever he's going to tell you.
A. I was very clear in this report that I have no way to confirm one way or another what

he said versus what she said. It's not my role, either.
Q. And it points out here, if you go to the next paragraph after that, the body of the text, that he remained in Cermak I guess for the next day, but then he was moved to external operations, correct?
A. Well, he went to a couple of different places. He originally was assigned to 3 North for about an hour, and then he went to 2 North, and then he was returned to the same place, this staging area in Cermak, and then they put him on external operations after that.
Q. Okay. So it was within a day or two?
A. Right.
Q. Okay. And then you point out, you note that he worked there until November 18, 2016, which was the day he went to Human Resources. And based on what happened there, he was told that they were going to send him for a fitness for duty exam, and they removed him from duty, correct?
A. Hold on. What you just said is not necessarily true. You say based on what

82

happened there they told him he was being removed. I don't know -- it seems to me they were calling him in on that day to tell him that he was being removed for fitness, but I don't know one way or another. You seem to be suggesting that what happened at HR prompted the decision for fitness, but I don't know that that's the case at all.
Q. Well, I will represent to you that the HR representatives -- and I'm sure there will be a dispute about this -- but they say very specifically no decision had been made until he came in, and one of them has testified that it was 99 percent what he did that day that caused them to remove him from duty and send -- remove him from work and send him for fitness for duty.
A. Okay.
Q. And I just really want to make the point that that is the point at which, it was only upon the HR visit that he was in fact removed from duty, correct?
A. All I can say is he was removed from duty after that meeting.
Q. Correct. Right.

83

A. I don't know the reason.
Q. That's fine. That's fine. And then you note that Officer Nawara apparently refused to comply with the fitness process as presented by Human Resources that day, missing deadlines to have his medical records delivered to Human Resources throughout the spring of 2017.
And you point out that while you were not provided a second letter, you did get a -- according to Dr. Kroll's fitness for duty examination, Officer Nawara reported he received a reminder letter from Human Resources on February 28, 2017 to complete the necessary forms to facilitate fitness process provided to him on November 18, 2016, similar to the November 30th letter that you did have, correct?
A. Right.
Q. Okay. And did you understand at the time that you met with him that he in fact rather than comply, he had filed a lawsuit?
A. No.
Q. Okay. Did you know that there was a lawsuit at the time that you took his examination?

84

A. I think he told me he was either involved in a lawsuit or getting ready to, but I specifically stayed away from that because the question put before me was simply a fitness for duty.
Q. Okay. Now, on Page 3 where it says, "During the interview here, Officer Nawara described a very different set of events." Do you see that?
A. Yes.
Q. Was all of this information that you specifically elicited or is this information he wanted to volunteer?
A. No. I mean, it's always in response. It's an interactive process. So I will say, "Tell me what happened," and these are his -- this is his version of events.
Q. Okay. Because I'm reading, and it says, "For context he first described the basement setting details he felt were relevant to understanding the interaction between him and Superintendent Jones-Hayes that followed," and there's a lot of discussion here about whether there was a written policy and whether it was

85

dangerous and all of these things. Were those things that you asked for him to give you or was that detail that --
A. I see. No. I just let people go. So I just say, you know, "Tell me what you feel is relevant. Tell me what you feel is important. I would like to hear your version of events." And I think he kind of said, well, there's a few things, to provide some context.
Those were not his words, but he was setting the scene, if you will, so that I could understand what may have caused some of the tension there. So that's how I like to do my interviews. I just say, "Tell me what you think led to this," and this is what he offered.
Q. Okay. So he disputed that there was a written policy about restraining detainees, is that right?
A. Right.
Q. And you didn't do anything one way or another to determine if that was true.
A. No.
Q. And he discussed his own opinions about why, even if that was the policy, it wasn't



really possible to comply?
A. Yes. He expressed those concerns. Yes.
Q. And he talked about what he considered to be the unsafe environment in that location?
A. He did.
Q. Okay. And did he express any awareness that that was why it was in fact important to have detainees restrained? Since it's unsafe, it's important to have detainees restrained?
A. Oh, I think he appreciated what the point of manacles and shackles are for. His concern was that if some are not -- the way I understood it is that if some are not shackled or manacled and some are, there are situations he was explaining where some detainees strike others who are then helpless because they're manacled. You know, they've got their hands behind their back. Or they're shackled to a bench and can't go anywhere.
So he was talking about, you know, a lack of equipment being available and things like that, and just being -- you know, his perception. I don't want to put words in his



mouth, but his perception of why that is a rather intense situation down there, yeah.
Q. But it was also the case that when Superintendent Jones-Hayes arrived, one of the things she was annoyed about him was not -- that everybody was not manacled and shackled, correct?
A. Yes.
Q. Okay. And he claims he was calm, and she was agitated and poked him in the chest, correct?
A. I don't think he claimed, "Oh, I was perfectly calm." I mean, he saw that she was kind of annoyed, and he admitted to getting sarcastic and, you know, disagreeing with what she had to say.
And in his -- in his mind -- again, his perception is that she aggressed first by putting her finger toward him or nearly touching him or touching him, whatever happened it's not for me to say, but it just went badly. He thought that her verbal exchange was that she was expressing annoyance that things were sort of in disarray, and he responded to that, and it



just really spiraled and went downhill.
Q. Was he saying basically she was being critical of him?
A. Yeah. The way he described it was it was almost like he was drawing the inference. What he said was, you know, I used to be on this -- you know, maybe she expected more from me because it was this fight that just broke out, and that was the reason that they were called down here, you know, her with Sergeant Connolly. That was the reason they were called down.
And I perceived, essentially kind of inferred, not like she said it, but that he felt like she was annoyed, as if to say -- again, it's an inference, but that, you know, why is everything in disarray here, what's going on, you know?
Q. I'm looking at Page 3. You quote -- there is a quote here. It starts out not as a quote, but it says there was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said, "Why is that inmate not cuffed?" Do you see that there?

A. Right.
Q. So was he saying that she was saying that to him?
A. Well, I assume so, because -- and she's putting his finger in my chest. He didn't say that was specifically aimed at him, but, you know, he is saying, quote, "I could just see she was annoyed."
She was saying why is that inmate not cuffed. Whether that's aimed particularly at him or, you know, loud enough for him to hear, clearly he's an officer there, so it was intended for him to hear. Maybe there were other people who it was intended for as well.
But it's his assignment. So for him to infer that that was something that he should take note of is not unreasonable. And then he is saying, "And then she's putting her finger in my chest." I don't know if those things happened at the same moment --
Q. Or at all.
A. -- simultaneously. That's right, or at all.
Q. And I don't want to beat a dead horse.



A. That's okay.
Q. We can leave the question of what happened between them really to the jury, correct?
A. Yeah.
Q. You weren't there, and the jury will end up deciding that.
A. Absolutely.
Q. Okay. Now, he also says that after she left, he had some sort of an issue with somebody who didn't want to be shackled. Do you see that? It starts with dot, dot, dot on Page 4. Do you see where it says dot, dot, dot, "She leaves with Connolly"? The second full paragraph.
A. Okay.
Q. And he says he was being sarcastic. He walked over to Sergeant Connolly and said, And yes, I am sure I was being a little sarcastic here. I said, Hey, Serge. Serge, I got a shackle for the unshackled detainee.
Connolly says he'll come with me to shackle this guy, but Superintendent Jones-Hayes has finished her call and said now I will go



with you. And she does, and he took some umbrage of her allegedly saying, Baby, Baby, I need you to shackle up for this officer. He did, and he did calm down. But what Nawara told you was, As we walked away, I said maybe if you follow me around all day, I could do my job. Do you see that?
A. Right.
Q. And did he say how he said this to her, whether it was, you know, putting his mouth to her ear, whether he was yelling, anything like that?
A. First let me back up. I don't see anywhere where I say he took umbrage with her. He just simply described factually what she did. In other words, she stepped in because she had previously said, "Now you're in charge, and you should be handling this."
So then when he offers to go and shackle this person, she says, "No. I'll do it." So she took over, and he says to her, "Well, you know, maybe if you follow me around all day, I could do my job." Of course he was being sarcastic. He admitted that he was being



sarcastic. He was annoyed.
Q. Right. So he did take umbrage at what she was doing.
A. I don't know that. No. I can't say that. I think that's an inference that's not reasonable here. I think that he was upset with the whole interaction to begin with, and she continued to -- you know, she was there, and he wasn't pleased at how their interaction was going in general. I don't know that it was related to her shackling that person.
Q. Okay. So what do you think, "Maybe if you follow me around all day, I could do my job" was referring to?
A. Generally speaking she was complaining -- she had said, "I know you're in charge, and you should be handling this." She was criticizing his work. She came down and said, Why is this place -- in essence, Why is this place in disarray? Those are not her words.
But he even said, "My perception is she was annoyed with me when she walked in because there had just been a fight, and she was

criticizing me." "Who's the officer in charge? I know you're in charge. You should be handling this." So he is defensive. And if that's what you call taking umbrage, okay. But he admitted he got sarcastic. He was sarcastic with Connolly, too. "Hey, look. I found a shackle."
He just didn't appreciate being -- the way that he describes it he didn't appreciate being criticized when in his view he was handling things the best that he could.
**Q. Right. And we had talked about -- I'd asked did he feel criticized. I wanted to establish it does seem like he felt criticized, correct?**
A. Sure.
**Q. Okay. Then you go on to this November 18, 2016 meeting in Human Resources, and you say, "Officer Nawara explained that it seemed to go badly from the start." Did you tell him that they had in their referral very specifically said that he was hostile and aggressive?**
A. I'm sure we talked openly about it, yeah.
**Q. What did he say about that?**

94

A. Well, would you like me to read my report?
**Q. Well, I don't see any reference to whether or not -- to him denying being hostile or aggressive in here, and that's why I was wondering whether that even came up.**
A. I'm not sure exactly what -- you mean what he might have said or done?
**Q. Yeah.**
A. I don't think that he was denying that that went badly. I mean, he picked up and left and just said, "I'm not going to be a part of this," and he explained why, and that's what's here.
**Q. Okay. Did you -- one of the comments here is that Nurse Shelby told him this wasn't an OPR review. Do you see that?**
A. Yes.
**Q. And what did you understand that to mean?**
A. That he wasn't under professional review. You know, the Office of Professional Review or whatever OPR stands for, that he was asking for representation, and she was trying

95

to say perhaps, well, this isn't that type of investigation. He was uncomfortable. He wanted representation, anyway. There was tension, there was defensiveness, et cetera. He just wasn't comfortable.
He also didn't feel that he was getting a direct explanation as to the reason that he was there. Now, of course I was not there. They may have been trying to tell him, and he was defensive. I think he was very clearly defensive to having to be there to begin with.
And, you know, this idea that he wanted to call union representation, I mean, he even said that may have inflamed an already intense situation. So he was accepting some responsibility for things just spiraling and going badly.
**Q. Did he in fact tell you that he left the meeting to call his union rep?**
A. Yes.
**Q. Okay. And then he went back with the union rep. Did you understand that there were two separate parts to this meeting?**
A. Right.

96

**Q. Okay. And you could see you were not provided details regarding what occurred in the HR meeting other than the general description that was provided with the referral, correct?**
A. Right.
**Q. Okay.**
A. But, I mean, it did say I think threatening and aggressive behavior. Employee's aggressive, physically intimidating, and inappropriate behavior, right? I'm sorry.
**Q. That was the first one.**
A. That was the first one. And then the concerns about anger management just I think were -- persisted based on how he behaved in that meeting in that he was defensive and angry and uncooperative.
**Q. The words are hostile and aggressive.**
A. Yes.
**Q. Okay. One of the things that -- it says, then, Officer Nawara -- after -- you concede to the point we were just talking about, which is that you didn't have all the details about that meeting, from the Sheriff's Office at least.**

97

It says, "Officer Nawara ultimately refused to sign a waiver for release of his medical records to Nurse Shelby and left the meeting." Do you see that?
A. Yes.
Q. Did you guys discuss the fact that he in fact had been given two different forms to sign that day, and he signed neither of them?
A. I don't know. But he said Officer Nawara ultimately refused to sign the waiver for release of his medical records.
Q. To Nurse Shelby. There's a reason I'm asking. One was going to Nurse Shelby, and one was simply for CorVel.
A. Oh, yeah. He did explain. He said, I'm not going to -- generally speaking -- I mean, he may have misunderstood. I don't know. I don't want to -- bottom line, he wouldn't release any medical records to anywhere.
I think you know he went on to make this point about how he would be willing to send them directly to CorVel, and then there was some disagreement about whether that was true or not, and he felt that he was sort of



creating some new policy about things going directly to CorVel when in fact perhaps that was not the case. You know, that's neither here nor there.
The bottom line was, as far as I was concerned, he wasn't going to cooperate with that process as they put it to him. He was not comfortable with it.
Q. With any part of the FFD process.
A. At that point it sounds like it, right.
Q. Thank you. He then explained that -- it goes on, says he explained that at that point he felt he was being paid in some way, and he was talking about that. And it says one of the things he thought was going on was that he had recently filed a complaint against Superintendent Jones-Hayes. Do you see that?
A. I do.
Q. Do you have any basis to know whether Superintendent Jones-Hayes or anybody in HR even knew he had filed the complaint?
A. Not at all.
Q. Okay. He added that because he believes Nurse Shelby and Superintendent



Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources. Do you see that?
A. Yes.
Q. Did you ask him why he thought Superintendent Jones-Hayes and Nurse Shelby were personal friends?
A. I'm sure that I did, but the point here is I don't know one way or another. And I said because he believes. So that's all that really matters. He is describing his perception. I don't know that that's true or not.
I think the point here is that he was trying to say, "I just didn't feel that this was objective. I wasn't comfortable. I didn't want to do it." I have no way to know one way or another whether any of that is true or not, but he was defensive, he was uncomfortable, he just didn't want to play.
Q. The reason I ask is you understand Jones-Hayes is the superintendent at the jail.
A. Yes.
Q. And Nurse Shelby is an occupational health nurse in HR.



A. Yes.
Q. And in fact the only apparent thing they have in common is that they're both African-American women. Did he tell you that, that they were both African-American women?
A. No. I would have absolutely written that if I thought that he was creating some race bias here or something. He very clearly felt -- I mean, he talked about, "I feel like I have been scapegoat." He used that word. "I have to take my lumps."
He definitely described a perception of being mistreated or treated unfairly. Again, I have no way to know whether that is true or not, but this is the reason for his anger.
MS. MARMOR: I need to take a quick break to get some more water.
THE WITNESS: Sure.
(WHEREUPON, there was a short interruption.)
BY MS. MARMOR:
Q. At the bottom of that paragraph it says, "He did ultimately leave with an understanding that the fitness examination was

being requested based on threatening behavior toward his superior officer related to the September incident with Superintendent Jones-Hayes."
So two questions about this because it's a little confusing. Did he leave the -- are you saying he left the HR meeting --
A. Yes.
Q. -- or left your interview?
A. The HR meeting. The point being that at the start he was saying, "They refused to tell me why I" -- or "I was not getting a clear response as to why I was there and what the issue was," so by the end of the meeting he left with an understanding that the fitness for duty examination was being sought because of this incident back in September.
Q. And I take it he didn't tell you that he also understood that his behavior with HR was another reason he was being sent for the fitness for duty exam.
A. Well, I don't know how he could have known that since the decision apparently was made -- at least the way he told me is that at



the moment that he left the HR meeting, it was his understanding that he was being requested to undergo fitness for duty based on the September incident.
Q. But you don't -- and I understand. I'm just simply trying to establish what you don't -- the things you don't know, for example, that there was a conversation in the HR meeting that based on his behavior in the HR meeting he was being sent for a fitness for duty exam.
A. I can't know that one way or another.
Q. And he didn't report that to you.
A. What he reported was that he left with the understanding that the basis for the fitness for duty examination was the September incident.
Q. Okay. The next paragraph goes into what I would say are kind of any kind of reports about stressors and any kind of life dysfunction. Would that be a fair statement about what this is about?
A. Right.
Q. I take it that you found no evidence of significant symptoms or significant life dysfunction?



A. Right.
Q. And what do you mean by that, by life dysfunction?
A. Often times when people have a full-blown psychiatric disorder, by definition they are having impairment in various areas of their life. They can show up in work. They can show up in parenting. They can show up in taking care of themselves, you know, hygiene and all of that, ability to pay bills and manage their home life and things like that.
Q. Did you also find that there was no significant life dysfunction from the stress that he reported from his difference of opinion, let's say, with his employer?
A. Yes.
Q. And that actually -- if we go to the next page, you see the first full paragraph, it says, "During the interview here, Officer Nawara denied ever experiencing significant psychiatric symptoms in his life. And while he described understandable stress and frustration with the work situation at Cook County, he denies a significant life dysfunction in any



critical area."
So my reading that properly, is that meant to say, well, even though there was stress, it wasn't causing any major life dysfunction?
A. Right. And also, as you see, it didn't rise that -- any symptoms that he had did not rise to the level of any psychiatric disorder, so that's consistent with somebody who would not have significant adaptive functioning problems or significant impairments in occupational functioning, personal, social functioning, parenting, whatever might be relevant in that person's life, school, et cetera.
Q. And in fact if you go back to Dr. Hogueisson, she offered no psychiatric diagnosis in any of her notes, is that right?
MR. BUSTAMANTE: Objection. Ms. Hogueisson is not a doctor.
MS. MARMOR: Right.
BY MS. MARMOR:
Q. Ms. Hogueisson.
A. Right. There were three notes available for review between -- a couple in

February and one in April of 2017, and she did not offer any psychiatric diagnosis, and she just describes some mild symptoms, decreased energy, motivation, sleep, diminished sense of self-worth, restlessness, feelings of hopelessness and worry about his job status. Those are all understandable adjustment issues related to an identifiable stressor in his life. And she did not make any diagnosis. She certainly could have as an LCPC, a Licensed Clinical Professional Counselor.
Q. Okay. Back to Page 5. It says -- it notes that he split with his fiance since November of 2016, and they have ended a nine-year relationship. Noted he began dating a new woman about which he feels very positively, hopes it continues to work out.
And then it says he claims the mildly elevated creatinine and glucose levels have normalized. While he refuses to be worked up for possible sleep apnea, he denies daytime somnolence or driving problems. Do you see that?
A. Yes.



Q. Sleep apnea can cause irritation, correct?
A. Well, let's say that the more proximal cause is sleep deprivation, right. Whether it's from obstructive sleep apnea syndrome or anything else, anything that leads to sleep disruption and sleep deprivation and fatigue will certainly leave a person more vulnerable to poor frustration tolerance, irritability, agitation, et cetera.
Q. And I just want to check something here. Well, the thing I was looking for is you recall that he had been told that he had elevated creatinine levels and that there was this question about what supplements might be causing that.
A. Yes.
Q. And he states in here that he claims elevated creatinine and blood glucose levels have normalized. Did you see any medical records that actually confirmed that?
A. Give me a moment. I had some primary care records through --
Q. That was Dr. Shaw.



A. You know what? Through February of 2017. So no, I would not have seen recent labs.
Q. Okay. And you recall that there were at least two notes in his -- well, it doesn't matter. I have got the notes.
A. There was clearly a discussion with his primary care physician about dietary supplements and their potential impact on creatinine and levels, and just generally speaking, you know, they are not FDA approved, so they can cause issues, you know, in some people.
Q. Right.
A. Right.
Q. And at the end of this paragraph here it says he insists -- or but insists that he does not display the type of anger outbursts that Superintendent Jones-Hayes described. Do you see that?
A. Yes.
Q. And again, it sounds like there was no discussion maybe because it just wasn't sort of focus of all of this, whether he denied any angry outbursts with HR.
A. Oh, I don't think he denied that at



all. He was angry. No. I mean, he was defensive, and he didn't want to be there. I mean, he described a -- he said it just went bad from the start. He felt defensive. He didn't know why he was there. Nobody was really talking to him. He got so annoyed he left.
Q. Fair enough.
A. Yeah.
Q. So then the next page goes to your conclusions and opinions, if you turn to the next page.
A. Yes.
Q. And you really answered the first two questions together, which was does he have a health condition that impairs his ability to perform the essential functions which require he maintain composure and respond appropriately in high stress environment, including exhibiting proper behavior towards detainees and superior officers.
Position requires this individual to diffuse disruptive behavior verbally and deescalate it effectively and properly use limited force on problematic and combative

inmates, and that's the list of his position as outlined in his job description.
It also says does Mr. Nawara pose a safety risk to himself or others if he returns to work full duty. Do you see that?
A. Right.
Q. Okay. And to be clear -- and you answered fundamentally he's fit for duty, correct?
A. Right.
Q. Okay. And to be fair this was nearly a full year after September 29, 2016 altercation with Jones-Hayes.
A. Right.
Q. And it was about 11 months after the HR interaction.
A. Sure.
Q. And is it possible that there were things that were going on in his life that you just don't know about at that time that could have in fact predisposed him to being angry or having outbursts at that time?
A. You're saying are there -- is it possible that there were things that he withheld



from me which could have led to -- or helped explain why there was an outburst at the time?
Q. Yes.
A. Sure. I don't have a crystal ball, and I'm not a human lie detector.
Q. And you understood that the Sheriff's Office had been trying to get him to cooperate with the FFD process since November of 2017.
A. Right.
Q. And of course he had not cooperated until shortly before he met with you.
A. Well, my understanding is he sought his own fitness for duty examination. I don't necessarily consider that cooperation, but it certainly seems like he was attempting to address the fitness issue in his own way. But certainly I would say that is not cooperating with the department.
Q. Right. And in fact Dr. Kroll had no information from his employer.
A. Exactly.
Q. And had no medical records.
A. That's exactly right. So there would be limitations in what she could or could not



conclude.
Q. Did you rely on her opinions in reaching yours?
A. Not at all.
Q. You then -- you go through the results of your tests, and you say he had moderate defensiveness. What does that mean?
A. So response bias, a person's approach, which is what we say, a person's approach to the test, has to do with whether they may be exaggerating certain psychiatric symptoms or their status, minimizing certain psychiatric stability or symptoms.
And what I mention here is that it's not uncommon for people in personnel examinations, we see the same thing in custody, to say, look, there is nothing to see here. I'm fine. Everything's fine.
He was not more defensive than other people going through similar types of examinations, fitness for duty, pre-hire screening, et cetera. So in other words, it wasn't so defensive that we learned nothing about him and that it invalidated the clinical



results, the clinical interpretation. But one always has to keep in mind -- and again, these tests are also not, you know, lie detectors, either.
I identified some response bias. He was defensive. I did not feel he was more defensive than other people that I have seen for other 20 years, and he did not invalidate his psych. It was consistent with what he was saying and consistent with other people going through fitness for duty. But of course there was some response bias there.
Q. To put it in complete layperson's terms, do you take what they say with a grain of salt?
A. Always.
Q. Okay. So you then go on to say -- this is the paragraph at the bottom. "While it is my opinion based on available information that Officer Nawara did not have a personality disorder, per se, he does possess obsessive-compulsive and narcissistic personality traits which may shed light on some of his interpersonal reactions." Do you see

that?
A. Yes.
Q. And I assume you were talking about obsessive-compulsive disorder and narcissistic personality disorder are things that are in the Diagnostic & Statistical --
A. Statistical manual, yes, in the -- currently the 5th version. That's right. So sometimes people have -- those are personality disorders. Sometimes people have certain traits which impact them, but it doesn't rise to the level of a disorder, so it is not entirely impairing.
However, personality traits can be -- you know, can really color your interpersonal interactions in particular with people. I guess the way we would think about personality traits and disorders is that it's your filler on everything, it's the way you interpret everything, the way people talk to you, the way -- what you infer from what you're seeing and how people are treating you.
And as I mentioned here, these types of traits can lead one to be somewhat rigid and



sort of miss the gray, everything is black and white, not see the forest for the trees, be somewhat narcissistic which, at its core, means that someone is actually -- sort of has some low self-esteem or, you know, may be particularly sensitive to criticism and therefore react strongly if one perceives that one is being criticized, true or not. That's the filter.
Q. So -- thank you. Appreciate that. Now you understand why I was asking some of my questions. I'd just like to quickly -- I don't want to belabor this, but I would like to quickly take a look at the DSMs.
MR. BUSTAMANTE: I don't want to belabor it, but let me do it, anyway.
THE WITNESS: I appreciate your process. It's good.
(WHEREUPON, Goldstein Deposition Exhibit No. 7 was marked for identification.)
BY MS. MARMOR:
Q. So Dr. Goldstein, the court reporter has handed you Goldstein Exhibit 7, and this is relevant pages from the Diagnostic and



Statistical Manual of Mental Disorders, 5th edition. This one is about obsessive-compulsive personality disorder. Do you see that?
A. Yes.
Q. And it's broken down into various forms. First there is diagnostic criteria, and a person with this full-blown disorder has a pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency. Do you see that?
A. Yes.
Q. So it sounds like what you were just saying was that Officer Nawara has a certain rigidity that -- and did he also in your view need some sort of interpersonal control that led to some of the outcomes here?
MR. BUSTAMANTE: Objection to the form of the question. No diagnosis was made of Officer Nawara as having this particular disorder, and the report refers only to traits.
Counsel's question --
MS. MARMOR: I understand --



MR. BUSTAMANTE: Let me finish my objection. Counsel's question implies that the traits that you have read are the traits that were observed, and I object.
MS. MARMOR: I'm giving the doctor the opportunity to tell me what I have got right and what I've got wrong.
THE WITNESS: It's not right or wrong because nothing is black and white. The idea with people who have obsessive-compulsive traits, it's not that they necessarily have to have control, but the perception of not being in control can lead one to be anxious.
When things -- when gray is involved, and they like black and white, it can lead to anxiety and a sense of kind of losing one's foothold, if you will. So I can't say in Officer Nawara's case, oh, he specifically felt he was losing control. That's not what he said, and that's not necessarily how he described the situation.
I think that even he, by his own admission, has insight into his personality traits, and, you know, describes himself as kind

of a black and white guy. I write things down, and I like things one way or another, and I don't necessarily see the gray. He had some insight.

And I think in general when you see somebody who's a bit of a Boy Scout, who's overly conscientious, they have a high justice principle, this can lead them, because of their inflexibility, to be quick in the moment to interpret, particularly criticism, very keenly, to take it hard, and to react strongly.

BY MS. MARMOR:

**Q. And can that justice principle -- I'll give you an example. Officer Nawara described Nurse Shelby as unethical after having only sat with her for about 20 minutes. Is that consistent with these kinds of traits? Looking at this, for example, which is, you know, overconscientious, scrupulous, and inflexible about matters of morality, ethics, or values?**

A. I would say the combination of both obsessive-compulsive personality traits and narcissism. There is a grandiosity there. You know, "I'm going to label you as unethical."



But again, that's very black and white.

Unethical is an extremely strong word, and most people don't necessarily understand the ethics of one profession or another unless they deal with this quite a lot. So unethical is a very serious accusation.

I think generally speaking what I inferred from what he was saying, and I think he was very clear, is that he felt defensive and angry over having been criticized. He thought the whole process was a bunch of BS. That's bullshit, if you need me to spell that. And he became angry. He took issue with how he perceived he was being treated, and therefore couldn't participate in the manner in which they asked him because he just thought the whole thing was unfair and unjust.

Are there personality traits that could lead him to be vulnerable to interpret all of that in that way? Absolutely. Even if it were not intended in that way or if it were factually untrue, absolutely. I have no way one way or another to know whether it's factually correct or not.



So to say this is all personality or all, you know, his misinterpretation, I can't say that, either, but he certainly would be vulnerable to take criticism very harshly and respond defensively.

**Q. And for a layperson who doesn't have your experience, are they -- is it -- would it be hard for them to be able to say, oh, this is just traits rather than a full-blown personality disorder or a full-blown problem?**

MR. BUSTAMANTE: Objection to form of the question.

MS. MARMOR: You don't need to coach. I get it.

MR. BUSTAMANTE: Sorry. I don't know --

MS. MARMOR: Form is fine.

MR. HENRETTY: Form and foundation are the only ones --

MS. MARMOR: Yeah. Form is fine.

MR. BUSTAMANTE: Give me a chance to --

MS. MARMOR: No. Form is fine.

MR. HENRETTY: Federal deposition. Form and foundation are the only two --

MS. MARMOR: We do not have a lot of time.



Please. I hear your form objection. I think the witness understands the question.

MR. BUSTAMANTE: Reread the question for me, please. One second.

(WHEREUPON, the record was read by the reporter as requested.)

MR. BUSTAMANTE: My objection is that he did not diagnose himself.

Go ahead.

THE WITNESS: If I understand you correctly, and please correct me --

BY MS. MARMOR:

**Q. Yes.**

A. -- if I understand what you're asking is would people on the receiving end of his defensiveness or what might appear to be anger, would they necessarily come to the conclusion that what I'm looking at is actually anxiety, not anger? Or goodness, he's so rigid. Or goodness, he's so overly conscientious. Or goodness, he's so sensitive to criticism. No. They're not psychologists. And so as a psychologist we see subtitles. And what can come across as anger is actually anxiety, and we

know this very well.
And so no, I don't think that they would have understood at all what they were seeing, and they would have immediately said, "This guy has an anger problem" when in fact it may not be that at all.
Q. Thank you. You put my question much better than I did.
If you could go to the next page of Exhibit 7 under Associated Features Supporting Diagnosis.
A. Yeah.
Q. I notice that it says that people -- that they are prone -- if you go sort of halfway down the first paragraph, it says, "They are prone to become upset or angry in situations in which they are not able to maintain control of their physical or interpersonal environment, although the anger is typically not expressed directly."
And then further down it says, "Individuals with this disorder may be especially attentive to their relative status in dominance-submission relationships and may



display excessive deference to an authority they respect and excessive resistance to authority they do not respect." Do you see that?
A. Right.
Q. So if in fact there was an issue here of the fact that there were these women who were in positions of authority over him telling him what to do, could his hostility that they were asking him to do also be related to these kinds of traits?
A. Let me take the gender out of this because I think that's making an assumption. And again, I didn't get that from him. That doesn't mean it doesn't exist. That was not part of our discussion, and perhaps that's because I'm a woman. I don't know.
But to be fair in general this is another example of black and white. Also some grandiosity thrown in there. I either respect you or I don't. There's not a lot of in between. And if I don't respect you, I am much more likely to have a response -- if I don't like what you're doing, and I find it unjust, I'm much more likely to have a strong response



and not be able to control myself. Either I'm anxious or I'm angry. Doesn't really matter. I'm going to feel defensive.
Q. And I don't know if this mattered to you at all, but I do note under Gender-Related Diagnostic Issues, it says, "In systematic studies obsessive-compulsive personality disorder appears to be diagnosed about twice as often among males." Did that matter to you?
A. No. Just to be clear, I didn't diagnose him with any personality disorder. He just has some traits.
Q. And also points out in the Differential Diagnosis section on this page that narcissistic personality disorder can be part of all of this as well, is that right?
A. Sure. I mean, people have a lot of different -- there is this concept of personality disorder not otherwise specified. He does not have that. However, the idea is that some people just have -- there is no prominent personality traits one way or another. There's a bit of a combination of things that helps one understand why a person interprets



things the way that they do, how it colors their world, how they perceive, why they make certain decisions. That's what personality traits are. They're very fixed. You know, we don't really change them much. But I will say he was rather insightful about his. He knows. He knows.
Q. That he has these problems?
A. I wouldn't say problems.
MR. BUSTAMANTE: Objection.
THE WITNESS: Yeah. I wouldn't say problems. I would say traits. I think he was aware of some of his rigidity, as he would call it. He's not going to talk about it as obsessive-compulsive traits. Perhaps less aware of his tendency to be grandiose and narcissistic.
But again, I think that's not a major factor. It just helps one understand the manner in which he describes, you know, or interprets, you know, I am making new policy here, and what I'm doing is so important, and whether that's factually correct or not doesn't matter. In his view it is really important.
So it helps one understand why he dug

his heels in perhaps so hard about this process, because he feels that he is not only doing for himself, but perhaps takes issue with a policy that needs changing in his opinion, and therefore, he was reacting strongly because he felt it wasn't just for him but for other people, too, and that's the Boy Scout in him.
MS. MARMOR: Mark this as the next exhibit.
(WHEREUPON, Goldstein Deposition Exhibit No. 8 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Exhibit 8, and this is the DSM 5th edition about narcissistic personality disorder.
This is a pervasive -- you used the word grandiosity a few times, and this is for a full-blown disorder, "A pervasive pattern of grandiosity, a need for admiration, and lack of empathy beginning by early adulthood." Do you see that?
MR. BUSTAMANTE: Objection to the form of the question for full-blown disorder.



BY MS. MARMOR:
Q. And I really just want to focus on Page 670 and 671, which is the next page. Under Diagnostic Features it says in the second paragraph, "Individuals with this disorder have a grandiose sense of self-importance. They routinely overestimate their abilities and inflate their accomplishments, often appearing boastful and pretentious."
And then if you go to under Associated Features Supporting Diagnosis, it says, "Vulnerability in self-esteem makes individuals with narcissistic personality disorder very sensitive to injury from criticism or defeat." Is that what you've been talking about a little bit?
A. Yes. And just to be clear, not all aspects of narcissism I think are relevant here. I describe what I think were the relevant aspects of narcissistic traits. And again, we have talked about them, but it's this idea of being sensitive to criticism because of the manner in which they may perceive certain people as I either respect you or I don't.



Q. We talked the first day about the fact that in a setting like Cook County Jail deference to authority pretty much matters, right?
A. Yes.
Q. So hostility to criticism could be a problem in that context, correct?
A. Certainly if it were a pervasive problem, yes.
Q. And I just point out that it says that, "A person with narcissistic personality disorder may react with disdain, rage, or defiant counterattacks." Do you see that?
A. If they perceive themselves as being criticized.
Q. Right. And really just to sort of close this out, you have already basically said this, but to a layperson if there is a narcissistic trait that leads you to react with rage or disdain or counterattack, a layperson may not be as well-suited as you are to be able to distinguish what's causing that.
A. Maybe I would answer it another way. I don't know that it matters what's causing it.



From a fitness for duty standpoint if there is a pervasive pattern of anger problems and interpersonal difficulties that impact one's ability to do the job safely and effectively, then there's a problem, and you're going to see all kinds of disciplinary action and verbal counseling and complaints other people don't want to work with this person, et cetera. That's where the issue would be.
So in a way it doesn't matter whether somebody who is on the receiving end of that, if I understand your question correctly, understands it or not. It doesn't really matter. It's -- whether you understand it or not, it's about whether it's causing problems on the job.
Q. One of the things -- let's go back to your report. You talk about he presents himself as accomplishing and taking on big, important matters. Do you see that? The bottom of Page 6.
And in quotes -- you have a couple of quotes here, and one of them is, "I have made new policy by insisting my medical records go

directly to CorVel rather than Human Resources."
Do you see that?
A. Yeah. That was what he presented to me.
Q. So when you put it in quotes, pretty close to exactly what he said?
A. That's exactly what he said.
Q. Okay. And you write, "Notably the latter is not so. According to CorVel at the time the initial examination was requested on November 18, 2016, providing medical records to CorVel was in fact an option."
A. This may be the second release you were referring to.
Q. Right. But I just want to understand. So after you talk to him, you went back and talked to CorVel about this?
A. Right.
Q. And they told you it wasn't accurate.
A. True.
Q. Okay. Now, you talk about you don't find, in the next paragraph, that he experienced chronic anger management difficulties on the job, and you've just been talking a little bit

130

about that as well.
One of the things that I'm trying to understand is let's say this was the beginning of something. Maybe he hadn't historically had serious problems, but something was going on in 2016, and, you know, in fairly short succession he had two rage experiences with people, what they perceived as rage experiences or rage incidents with two people who -- at the Sheriff's Office. Is that not enough to raise a concern?
A. First of all, let me just say I don't put a lot of stock into what happened in HR because he was defensive and being pulled in for something he didn't think -- that was not something I considered to have happened on the job so much as it is that he just didn't agree with why he was being pulled in.
I see that all the time. Officers don't appreciate being pulled in and scolded or told that they have to go for fitness for duty exams. So many people come to my office and they are pissed off. They feel that it's punitive and all of that. So I don't really put

131

much stock in that.
Q. Let me be clear. So whatever Nurse Shelby or Rebecca Reierson, they testified that -- or at least Nurse Shelby has and Rebecca Reierson will testify they were afraid in that meeting.
MR. BUSTAMANTE: Object. You interrupted the witness. She had not finished answering, and I just want to point that out. That was not appropriate.
MS. MARMOR: You pointed it out.
THE WITNESS: Yeah. I appreciate. And I don't -- even if -- let me just assume that all of that is correct. I think that's a very specific situation that was not while he was performing his duties, his daily duties. That was a very special situation.
And I frequently see this, that the moment somebody gets pulled off the job and told there is a problem with you, you need to go to HR, you need to talk to the nurse, we have an issue with you, they blow, perhaps for the first time ever. So I just don't put a lot of stock into that.

132

And again, to come back to your question, hypothetically, which are not the facts in this case, but if somebody had had a couple of anger outbursts on the job itself, that is absolutely an appropriate referral for fitness.
And the question is is there a psychiatric disorder bubbling under the surface here? Do we have a substance abuse problem? Do we have a personality disorder? Are there major stresses in this person's life? Are they going through divorce? Whatever. Do they need to be off work to treat while they handle this?
I saw no evidence of that. There was no pervasive problem. I see -- there was nothing in the personnel record to show a pattern. This guy has been there for 18 years. I see -- from what I understand I see no write-ups. I see no discipline related to this. I don't see issues that are anger related throughout the years, as far as I'm concerned. Now, again, I was not provided with a personnel record. So yes, I had to rely on the self-report of Officer Nawara.

133

Now, if I am given evidence that over the -- over that 18-year period he has repeatedly been pulled from duty, reassigned, sent to EAP, written up, verbally counseled for anger management problems, I would say, yeah, we have a problem.

But at the time that I saw him, I have no -- I was not provided any evidence of that. There was no evidence of a full-blown psychiatric disorder, a substance use disorder, or personality disorder, or impulse control disorder.

And for me the critical thing is if they were so concerned about his anger and ability to be safe and effective, why would they ever have put him back to work? They would have pulled him immediately.

**Q. Who's the they?**

A. Anybody who is in management.

**Q. So do you -- and that's why I was asking my questions earlier. Do you know what that process was? Do you know what happened?**

A. As far as I'm concerned I have been working 20 years with police departments and



correctional facilities. Doesn't matter who it is. If an officer is behaving badly, they get pulled. That's usually someone's sergeant or lieutenant or deputy, depending on what it is. It is command staff's decision to either do it themselves, if they have to involve HR, I don't know, doesn't really matter to me.

The bottom line is if there is a problem, they get pulled, and they are not put back in population working with other employees who have a right to a safe environment in which to work. They are not allowed to interact with the public who have a right not to be threatened or put in peril by somebody who's carrying a firearm or not. And detainees have rights, too, not to work with somebody who is unfit or to be subjected to somebody who's unfit.

So I saw nothing from a clinical standpoint or an operations standpoint to suggest that even the County themselves, the Sheriff's Office themselves, saw that he was unfit or they would have behaved differently.

**Q. Let me just back up here. So I'm just going to give you the scenario because it was**



**fairly consistent with the facts in this case. What if they didn't know what was going on, and what they were doing was asking HR to make that decision?**

MR. BUSTAMANTE: Objection. Form of the question, vague.

THE WITNESS: Are you --

BY MS. MARMOR:

**Q. Let me be much more specific with you. Here is what happened. Nurse Shelby complained about this and said consistent with the note that you got that she didn't know if it was something about her in particular.**

A. You mean Jones-Hayes?

**Q. Jones-Hayes. Thank you. Jones-Hayes reported this to her superiors and said, "I don't know if this is about me in particular. There was an OPR investigation opened, and then a referral was sent to HR because HR is the one who makes the decision, not management, about who gets pulled for a fitness for duty exam."**

MS. MARMOR: Let me finish. Let me finish.

MR. BUSTAMANTE: She said okay.



BY MS. MARMOR:

**Q. And it was -- and there was some difficulty with HR connecting with Jones-Hayes. They connect with her. They call him in a couple days later. And according to their testimony, and you don't have to agree with it, but according to their testimony it was his behavior in that meeting that alarmed them so much that they made the decision on that day to send him for a fitness for duty exam and did exactly what you're talking about, which is they took him off of work. Did you know any of those facts?**

MR. BUSTAMANTE: Objection to the form of the question. Incomplete hypothetical. Brought out a lot of facts that are not agreed to by the other side.

Go ahead.

THE WITNESS: Let me just say none of that is relevant, frankly. The bottom line is he has an interaction that is concerning to a supervisor. Had she been -- to Jones-Hayes. Had she been so concerned about his conduct that day in the basement of Cermak, she would have

made sure that he got pulled.
The fact that she had trouble communicating with HR, I don't know what to say about that other than they better get their shit together. You know? That's crap.
If he had been so unsafe, do you really think that she would have said, "Hmmmm. You know, maybe it's just me." If she had been so concerned about his ability to interact normally with everybody, not just her, and that he was a danger to himself or others or that he was no longer safe or effective in his job, she had a responsibility I would say to pull him.
So I don't care whether she had trouble connecting with or whatever. Bottom line, when somebody behaves so badly that they become a concern -- that they become a safety or effectiveness concern, they better get pulled right away or there is major liability, and you know it.
BY MS. MARMOR:
**Q. So am I taking you to say that there doesn't need to be -- you found that there was no problem here because there was no pervasive**

138

**history. But what you're saying is that in the absence -- at the time in the absence of a pervasive history, the employer really must immediately take the person off of duty.**
A. I'm only going to talk about Nawara's case.
**Q. That's what I'm talking about.**
A. Well, you're speaking generally. In Nawara's case my feeling is I have no evidence whatsoever that he was a major fitness concern for anybody because had he been, they would have pulled him.
So their own actions say that they were not even sufficiently concerned to pull him. They put him right back there the next day in the exact same place. They put him on external operations with a firearm. He's interacting with the public and detainees, and he's still got the backs of his colleagues there, and they're counting on him.
So I think honestly this is a missed opportunity. If they were that upset with him, it's a missed opportunity for them to discipline him. And I do think that his behavior was

139

inappropriate that day, and he ought to have been disciplined. They didn't do that. That's their problem.
**Q. So what if they just made a mistake? What if that was a mistake? I hear you on missed opportunity. What if that was a mistake? Does that invalidate sending him for the fitness for duty exam based on what HR experienced?**
A. Let me be clear. I have no issue of him being sent for fitness for duty. He ought to have been sent and could have been sent for fitness for duty based on the September incident alone in my opinion.
And that to me, like I said, is the thing that matters because that happened on duty, in front of other correctional officers, in front of detainees, and is an inappropriate -- it's disrespect to management. That could have been the tripwire itself for fitness for duty.
The fact that they waited is problematic. And I don't have an opinion about how important this thing at HR was or wasn't. Clearly he was behaving in a way that concerned

140

people, and that's all that matters. It is valid. That is also on its own independently sufficient to prompt a fitness for duty examination.
We always have to take the high road. If anybody is ever concerned about anybody's emotional stability, public safety is different, you got to send them for fitness. No harm, no foul.
And so this was an appropriate referral. Whether it's the combination of them or -- either incident alone would have been sufficient. I have no issue. I think what you're asking, though, hypothetically is, you know, is it possible that he was unfit, and we don't know it? All I can say is --
**Q. No. That's not what I'm asking. That was not what I was asking.**
A. Okay.
**Q. I was simply trying -- I get that you're critical of them for not having done -- not having taken him out of -- off of duty after the first incident.**
A. It's not that I'm critical of them.

141

It's just that I use that as evidence, and it is a reasonable inference to draw that they simply could not have been that concerned about him, because had they been, they would have pulled him.
**Q. I'll just say the "they" is very unclear here.**
A. It doesn't matter. It's irrelevant. He would have been pulled from duty, be that from God, be that from management or HR or some combination. If somebody is -- if there is ever a concern about a public safety servant being unfit, you better get their butt out of work because all of us are counting on them. And it's a liability.
And as a lawyer you know that. You never want somebody who is unfit working in a situation like that. Absolutely. So their own behavior can reasonably be inferred to show that they themselves did not have fitness concerns or he would have been pulled.
**Q. Okay. I mean, you're applying basically your general experience, not anything specific you know about this case, when you say**



**that. You didn't speak to any of the people who made the decisions.**
A. I can tell you it is irrelevant. I can look at what happened and say he wasn't pulled. It is a reasonable inference to draw that had there been significant fitness concerns, he would have and should have been pulled.
**Q. So do you make that inference from what happened at HR?**
A. I'm sorry. I don't understand the question.
**Q. Well, you said you discount what happened at HR. But at HR, after HR, what happened at HR, they did take him off work immediately.**
A. And what I said to you was that that was an appropriate tripwire for fitness. I don't discount the concerns that were raised from that. I don't put a lot of stock in it as to evidence that he was unfit to do the job because that didn't happen in the environment in which he does his job.
It happened -- certainly that's part of the job, is to interact with management and



staff and whatnot. But that is a very understandable situation where I have seen so many people get angry at being pulled in to HR. They're nervous. They're upset. They feel it's unfair. I just don't put a lot of stock in that in terms of evidence that he was unfit.
But like I said, behaving in that way is concerning. I understand that. It's a perfectly fine referral based on what happened at HR, like what I said, or what happened in September.
Frankly, it's more concerning to me what happened in September, but they weren't that concerned. It seemed like it was a very isolated incident. So again, not pervasive. I don't find him unfit just for having this incident with this one person. It is not appropriate. He could have been disciplined for it, but I don't see any fitness issues here.
MS. MARMOR: Okay. I want to take just one moment. I think I'm done, but I want to talk to my fellow counsel here.
(WHEREUPON, a short recess was taken.)



MS. MARMOR: We have a few minutes left, and I will pass the witness.
MR. BUSTAMANTE: I have no questions.
MS. MARMOR: There you go.
MR. HENRETTY: None for me.
MR. BUSTAMANTE: So we're done.
THE WITNESS: But I was having so much fun.
MS. MARMOR: Do you want to reserve signature?
THE WITNESS: Yeah.
(WHEREUPON, a discussion was had off the record.)
THE WITNESS: I'm waiving.
(WHEREUPON, the deposition was concluded at 3:48 o'clock p.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARLENE L. KING, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on December 16, 2019, personally appeared before me, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, DIANA S. GOLDSTEIN, M.D., in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein JOHN NAWARA is the Plaintiff, and COUNTY OF COOK, a unit of local Government, et al., are the Defendants.

I further certify that the said DIANA S. GOLDSTEIN, M.D. was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as



aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 6th day of January, 2020.

Marlene L. King
__________________________________
NOTARY PUBLIC, COOK COUNTY, ILLINOIS
LICENSE NO. 084-003326

**Exhibits**

**Goldstein Exhibit 6**
53:10 56:18,23 61:2 62:10 65:9 67:24
**Goldstein Exhibit 7**
53:11 115:19,23 122:10
**Goldstein Exhibit 8**
53:12 126:10,14,15

**1**

**1**
71:18 77:12 79:19
**11**
77:22 110:15
**12**
77:22
**18**
82:17 84:15 94:17 130:11 133:17
**18-year**
134:2

**2**

**2**
79:19 80:2,9 82:10
**20**
113:8 118:16 134:24
**2004**
64:20
**2016**
78:7 82:17 84:15 94:17 106:14 110:12 130:11 131:6
**2017**
77:22 84:7,13 106:1 108:2 111:8
**28**
84:13
**29**
78:7 110:12

**3**

**3**
82:9 85:6 89:19
**30th**
84:16

**4**

**4**
63:8 80:3 91:12

**5**

**5**
54:14 55:16,23 106:12
**5th**
114:8 116:1 126:15

**6**

**6**
55:16,17 56:18,23 61:2 62:10 65:9 67:24 129:21
**670**
127:3
**671**
127:3

**7**

**7**
115:19,23 122:10

**8**

**8**
126:10,15
**8-25-17**
79:2

**9**

**9-28**
56:7
**9-29-16**
56:7
**99**
83:14

**A**

**abilities**
127:7
**ability**
104:10 109:15 129:4 134:15 138:9
**absence**
139:2
**absolutely**
64:23 67:21 73:22 91:8 101:6 119:20, 22 133:5 142:18
**abuse**
66:20 133:9
**accept**
76:1
**accepted**
76:14
**accepting**
96:15
**access**
66:18 69:22 70:2,7, 19
**accomplishing**
129:19
**accomplishments**
127:8
**accounts**
65:12
**accurate**
67:2 130:19
**accusation**
119:6
**act**
64:14 67:13
**action**
69:11 80:16 129:6
**actions**
139:13
**active**
66:20
**actuarial**
66:12
**adaptive**
105:10
**added**
99:23
**addition**
66:2 79:1,7
**address**
111:16
**addresses**
79:15
**adjustment**
106:7
**administration**
80:15
**administrative**
60:10 61:9
**administrator**
59:19
**admiration**
126:20
**admission**
117:23
**admitted**
88:14 92:24 94:4
**adulthood**
126:21
**afraid**
132:5
**African-american**
101:4,5
**afternoon**
54:9
**aggressed**
88:18
**aggression**
66:15
**aggressive**
79:4,8 94:21 95:5 97:8,9,17
**agitated**
88:10 89:23
**agitation**
107:10
**agree**
66:6 131:17 137:6
**agreed**
137:16
**ahead**
121:9 137:18
**aimed**
90:6,10
**alarmed**
137:8
**albeit**
68:10
**allegedly**
56:6 92:2
**allowed**
69:21 70:4,6 135:12
**altercation**
79:14 110:12
**amazed**
67:9
**ambiguously**
69:4
**anger**
80:21 97:13 101:15 108:16 121:16,19,24 122:5,19 129:2 130:23 133:4,20 134:5,14
**angry**
67:20 97:15 108:23 109:1 110:21 119:10,13 122:16 124:2 144:3
**annoyance**
88:23
**annoyed**
81:6,8 88:5,14 89:15 90:8 93:1,23 109:6
**answering**
132:8
**anticipate**
70:9
**anxiety**
117:16 121:18,24
**anxious**
117:13 124:2
**anybody's**
141:6
**apnea**
106:21 107:1,5
**apologize**
67:7
**apparent**
101:2
**apparently**
84:3 102:23
**appearing**
127:8
**appears**
124:8
**Appellate**
64:8
**applying**
142:22
**appreciated**
87:11
**approach**
112:8,9
**appropriately**
109:17
**approved**
108:10
**April**
106:1
**area**
58:8,17 82:12 105:1
**areas**
58:3 104:6
**arrived**
88:4
**asks**
61:2
**aspects**
127:18,20
**assault**
65:23
**assessing**
77:24
**assigned**
82:9
**assignment**
78:9 90:15
**assume**
76:15 90:4 114:3 132:13
**assumption**
123:12
**attempting**
111:15
**attentive**
122:23
**attorney**
69:24 72:15 75:12, 13
**attorneys**
73:5
**authority**
123:1,2,7 128:3
**aware**
125:11,15
**awareness**
87:7

**B**

**Baby**
92:2
**back**
64:19 87:19 92:13 96:21 102:17 105:15 106:12 129:17 130:16 133:1 134:16 135:10,23 139:15
**background**
57:6
**backs**
139:19
**bad**
109:3
**badly**
88:21 94:19 95:11 96:17 135:2 138:16
**ball**
111:4
**based**
82:19,24 97:14 102:1 103:3,9 113:19 140:8,12 144:9
**basement**
78:8 85:20 137:24
**basically**
70:6 79:24 80:2 89:2 128:17 142:23
**basis**
99:19 103:14
**beat**
90:24
**began**
106:15
**begin**
93:7 96:11
**beginning**
62:17 126:21 131:3
**behaved**
97:14 135:22
**behaves**
138:16
**behaving**
135:2 140:24 144:7
**behavior**
79:5 97:8,10 102:1, 19 103:9 109:19,22 137:8 139:24 142:19
**belabor**
115:12,14
**believes**
99:24 100:10
**bench**
87:20
**bias**
101:8 112:8 113:5, 12
**big**
129:19
**bills**
104:10
**bit**
70:7 118:6 124:23 127:16 130:24
**black**
115:1 117:9,15 118:1 119:1 123:18
**blood**
107:19
**blow**
132:22
**board**
57:24 61:11
**boastful**
127:9
**body**
82:4
**boss**
67:6,12 80:22
**bottom**
61:21 98:18 99:5 101:22 113:18 129:20 135:8 137:20 138:15
**Boy**
118:6 126:7
**break**
72:20 101:16
**briefly**
54:17
**bright**
62:7
**bring**
71:18
**broke**
89:8
**broken**
116:5
**Brought**
137:15
**BS**
119:11
**bubbling**
133:8
**bullshit**
119:12
**bunch**
119:11
**BUSTAMANTE**
71:20 105:18 115:14 116:19 117:1 120:11,15,20 121:3, 7 125:9 126:23 132:7 136:5,23 137:14
**butt**
142:13

**C**

**call**
57:14 59:21 61:17 68:14 69:23,24 75:11 91:24 94:4 96:13,19 125:12 137:4
**called**
54:4 57:12 89:10,11
**calling**
83:3
**calls**
60:12
**calm**
88:9,13 92:4
**care**
104:9 107:23 108:7 138:14
**carrying**
135:14
**case**
55:15 59:20 61:7,10 62:2 64:8 68:13,18 70:3 76:13,21,23 77:2 79:12 83:8 88:3 99:3 117:18 133:3 136:1 139:6,9 142:24
**cases**
63:24 67:17
**cause**
107:1,4 108:10
**caused**
83:14 86:12
**causing**
105:4 107:16 128:22,24 129:15
**CCSO**
75:16
**Center**
65:15 74:8,11
**Cermak**
74:1,5 78:8 82:5,12 137:24
**certificates**
74:18
**certified**
57:24
**cetera**
96:4 105:14 107:10 112:22 129:8
**chance**
120:20

**change** 66:21 125:5
**changed** 57:15
**changing** 126:4
**charge** 92:17 93:17 94:1,2
**check** 107:11
**chest** 88:10 90:5,19
**Chicago** 57:8,12,16 73:21
**chief** 69:23 75:12
**chronic** 130:23
**citizen** 69:12
**city** 73:4,6
**civilian** 58:22
**claimed** 88:12
**claims** 88:9 106:18 107:18
**clarify** 69:3
**clean** 55:24
**clear** 81:23 102:12 110:7 119:9 124:10 127:17 132:2 140:9
**clinical** 57:7,10,24 61:17,18, 19,24 62:8,11 63:10 106:11 112:24 113:1 135:18
**Clinicians** 69:10
**close** 128:17 130:6
**co-worker** 67:5,6,12 80:22
**co-workers** 55:14
**coach** 120:13
**cognitive** 76:4,9
**collateral** 69:13,19 71:8
**colleagues** 74:12 139:19
**collecting** 58:19
**color** 114:15
**colors** 125:1
**combative** 109:24
**combination** 118:21 124:23 141:11 142:11
**comfortable** 96:5 99:8 100:15
**command** 135:5
**commendations** 69:12
**comments** 54:23 95:15
**commission** 67:13
**commissioners** 61:12
**common** 101:3
**communicating** 138:3
**community** 68:10
**comp** 61:7
**company** 70:1 72:10,11
**compensation** 66:3
**complained** 136:10
**complaining** 93:16
**complaint** 99:16,21
**complaints** 69:12 129:7
**complete** 84:13 113:13
**compliments** 69:13
**comply** 84:4,20 87:1
**composure** 109:17
**comprehensive** 54:22
**concede** 97:21
**concept** 124:18
**concern** 63:7 87:13 131:11 138:17,18 139:10 142:12
**concerned** 99:6 133:21 134:14, 23 137:23 138:9 139:14 140:24 141:6 142:3 144:14
**concerns** 87:2 97:13 142:20 143:6,18
**conclude** 112:1
**conclusion** 121:17
**conclusions** 109:10
**condition** 109:15
**conditions** 66:22
**conduct** 61:19 69:13,18 137:23
**conducted** 77:23
**conducting** 73:13
**Confidentiality** 64:14
**confirm** 81:24
**confirmed** 107:21
**confusing** 102:6
**connect** 137:4
**connecting** 137:3 138:15
**Connolly** 89:11 91:14,18,22 94:6
**conscientious** 118:7 121:20
**considered** 87:4 131:16
**consistent** 105:9 113:9,10 118:17 136:1,11
**consultant** 73:2
**consulting** 60:5
**contacting** 75:8
**context** 85:19 86:9 128:7
**continued** 54:7 93:8
**continues** 106:17
**contract** 74:8
**control** 65:15 116:10,17 117:12,13,19 122:17 124:1 134:11
**conversation** 103:8
**Cook** 59:2,6,12,22 72:15 73:20 74:23 78:2 79:2 104:23 128:2
**cooperate** 99:6 111:7
**cooperated** 111:10
**cooperating** 111:17
**cooperation** 111:14
**copied** 76:19
**copies** 71:19
**coping** 66:17
**copy** 55:24 71:17,23 77:12
**core** 115:3
**correct** 55:7 57:9 62:3 63:5, 15 68:2 69:20 77:9, 16 82:7,22 83:21,24 84:16 88:7,11 91:4 94:14 97:4 107:2 110:9 119:23 121:11 125:22 128:7 132:14
**correctional** 73:10,17 78:1 135:1 140:16
**correctly** 68:21 121:10 129:12
**correspondence** 70:20
**Corvel** 54:12 59:20 70:14 72:7,8 98:14,22 99:2 130:1,9,12,17
**counsel** 144:22
**Counsel's** 116:23 117:2
**counseled** 134:4
**counseling** 129:7
**Counselor** 106:11
**counted** 81:9
**counterattack** 128:20
**counterattacks** 128:13
**counting** 139:20 142:14
**county** 59:2,6,12,22 70:12 72:15 73:4,12,17,20 74:23 78:2 79:2 104:23 128:2 135:20
**couple** 74:6 82:8 105:24 129:22 133:4 137:5
**court** 56:21 61:8,13 115:22 126:13
**cover** 54:14 58:4
**covered** 81:13
**covers** 79:19
**crap** 138:5
**created** 64:2,3
**creating** 99:1 101:7
**creatinine** 106:19 107:14,19 108:8
**crimes** 65:13
**criminals** 58:13
**criteria** 116:6
**critical** 89:3 105:1 134:13 141:21,24
**criticism** 115:6 118:10 120:4 121:21 127:14,22 128:6
**criticized** 94:9,12,13 115:8 119:10 128:15
**criticizing** 93:18 94:1
**crystal** 111:4
**cuffed** 89:22,24 90:10
**current** 65:16
**custody** 112:16

**D**

**daily** 132:16
**danger** 138:11
**dangerous** 86:1
**data** 58:19
**dating** 106:15
**day** 56:9 78:9,12 81:5,15 82:6,14,18 83:3,14 84:5 92:6,23 93:13 98:8 128:1 137:9,24 139:15 140:1
**day-to-day** 73:14
**days** 73:12 137:5
**daytime** 106:21
**de** 57:14
**dead** 90:24
**deadlines** 84:5
**deal** 58:9 119:5
**dealing** 68:9
**decided** 80:15,17
**deciding** 91:7
**decision** 60:11,19 61:9 64:11, 19,20 83:7,12 102:23 135:5 136:4, 20 137:9
**decisions** 60:7 125:3 143:2
**declined** 75:22
**decompensation** 66:22
**decreased** 106:3
**deescalate** 109:23
**defeat** 127:14
**defensive** 94:3 96:10,11 97:15 100:18 109:2,4 112:19,23 113:6,7 119:9 124:3 131:14
**defensively** 120:5
**defensiveness** 96:4 112:7 121:16
**deference** 123:1 128:3
**defiant** 128:12
**definition** 104:5
**degree** 57:10
**delivered** 84:6
**denied** 104:20 108:22,24
**denies** 104:24 106:21
**denying** 95:4,10
**department** 60:9 69:22 75:6 79:9 111:18
**departments** 134:24
**depending** 56:7 135:4
**deposition** 54:10,13 56:17,23 61:2 65:9 67:23 78:13 115:18 120:22 126:9
**deprivation** 107:4,7
**deputy** 135:4
**describe** 80:3 127:19
**describes** 94:8 106:3 117:24
125:19
**describing** 79:3 100:11
**description** 97:3 110:2
**descriptions** 71:2
**Designation** 67:4,11
**destruction** 66:1
**detail** 86:3
**details** 85:20 97:2,22
**detained** 68:10
**detainee** 91:21
**detainees** 55:15 74:15,16 86:17 87:9,10,16 109:19 135:15 139:18 140:17
**detector** 111:5
**detectors** 113:3
**determine** 86:21
**diagnose** 121:8 124:11
**diagnosed** 124:8
**diagnosis** 105:17 106:2,9 116:20 122:11 124:14 127:11
**diagnostic** 114:6 115:24 116:6 124:6 127:4
**DIANA** 54:3
**dietary** 108:7
**difference** 61:21 62:6 73:3 104:14
**differences** 61:23
**Differential** 124:13
**differently** 135:22
**difficulties** 129:3 130:23
**difficulty** 137:3
**diffuse** 109:22
**diminished** 106:4
**diminishes** 66:5
**direct** 96:7
**directed** 79:6
**directive** 79:7
**directly** 59:20,21 69:23,24 98:22 99:2 122:20 130:1
**disability** 61:10 72:19
**disagreeing** 88:15
**disagreement** 98:23

**disarray** 88:24 89:17 93:20
**disciplinary** 69:11 74:18 129:6
**discipline** 133:19 139:23
**disciplined** 140:2 144:18
**discount** 143:12,18
**discuss** 78:21 98:6
**discussed** 86:23
**discussion** 70:11 72:3 85:23 108:6,21 123:15
**disdain** 128:12,20
**Disease** 65:15
**disorder** 66:21 104:5 105:8 113:21 114:4,5,12 116:3,7,21 120:10 122:22 124:8,11,15, 19 126:16,19,24 127:5,13 128:11 133:8,10 134:10,11, 12
**disorders** 58:14 114:10,18 116:1
**display** 108:16 123:1
**dispute** 83:11
**disputed** 86:16
**disrespect** 140:18
**disruption** 76:5 107:7
**disruptive** 109:22
**distinguish** 128:22
**divorce** 133:12
**doctor** 105:19 117:5
**doctor-patient** 61:20 62:6 63:14
**doctorate** 57:7
**dominance-submission** 122:24
**dot** 91:12,13
**downhill** 89:1
**dozen** 73:24
**dozens** 72:8,9
**draw** 142:2 143:5
**drawing** 89:5
**driving** 106:22
**DSM** 126:15
**DSMS** 115:13
**dug** 125:24
**duly** 54:2,5
**duties** 132:16
**duty** 55:13 59:14,18 60:7, 13,19 61:5 63:2,4 64:9,12,15 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18 78:1 79:17 82:21 83:15, 16,21,23 84:10 85:5 102:16,21 103:3,10, 15 110:5,8 111:13 112:21 113:11 129:1 131:21 134:3 136:21 137:10 139:4 140:8, 10,12,16,20 141:3, 22 142:9
**dynamic** 66:12
**dysfunction** 103:19,24 104:3,13, 24 105:5

**E**

**e-mail** 76:20
**e.g.** 67:5
**EAP** 134:4
**ear** 92:11
**earlier** 134:21
**early** 126:21
**edition** 116:2 126:15
**effective** 55:14 134:15 138:12
**effectively** 80:3 109:23 129:4
**effectiveness** 76:11 138:18
**efficiency** 116:11
**elevated** 106:19 107:14,19
**elicited** 85:12
**emotional** 141:7
**empathy** 126:21
**employee** 66:6,13 72:23,24 73:11 79:8
**Employee's** 79:4 97:8
**employees** 72:15 74:15 135:10
**employer** 62:23 63:4,21 104:15 111:20 139:3
**employers** 66:4
**encompasses** 65:23
**encountering** 69:5
**encounters** 68:23
**end** 91:7 102:14 108:14 121:15 129:11
**ended** 54:10 106:14
**Ends** 67:4
**energy** 106:4
**enforcement** 58:23
**entitled** 63:24
**environment** 87:5 109:18 122:18 135:11 143:21
**environmental** 66:12
**epidemic** 65:14
**equipment** 87:22
**escalating** 66:15
**essence** 93:19
**essential** 109:16
**essentially** 89:13
**establish** 94:13 103:6
**ethics** 118:20 119:4
**evaluation** 54:22 61:3,5,15,17 62:2,11,15 63:11,20 68:2 70:5
**evaluations** 65:10 68:1,22 69:11
**event** 78:15
**events** 81:15 85:8,17 86:7
**Everything's** 112:18
**evidence** 103:22 133:14 134:1,8,9 139:9 142:1 143:20 144:6
**evident** 62:15
**exact** 139:16
**exaggerating** 112:11
**exam** 59:14 60:8,13,20 61:5 77:18 79:17 82:21 102:21 103:10 136:21 137:10 140:8
**examination** 54:7 64:9,12,24 75:22 76:2 77:23 78:5 84:11,24 101:24 102:16 103:15 111:13 130:10 141:4
**examinations** 61:19 68:15 112:16, 21
**examined** 54:5
**examinee** 63:10,18
**examinees** 63:24 64:14,15
**examiner** 63:10
**examiner's** 64:1
**examples** 63:21
**exams** 59:18 77:16 131:22
**exceptions** 63:23 65:6
**excessive** 123:1,2
**exchange** 88:22
**exhibit** 54:14 55:16,23 56:16,18,23 61:2 62:10 65:9 67:24 71:18 77:11 115:19, 23 122:10 126:8,10, 15
**exhibiting** 109:18
**exist** 63:23 123:14
**expected** 71:7 89:7
**expense** 116:10
**experience** 120:7 142:23
**experienced** 130:22 140:8
**experiences** 59:12 131:7,8
**experiencing** 104:20
**explain** 98:15 111:2
**explained** 94:18 95:13 99:11, 12
**explaining** 87:16
**explanation** 96:7
**express** 87:7
**expressed** 87:2 122:19
**expressing** 88:23
**extend** 64:16
**external** 68:12 82:6,13 139:16
**extra** 71:18
**extremely** 119:2

**F**

**facilitate** 84:14
**facilities** 135:1
**facility** 73:10 74:2
**fact** 55:3 63:14 64:12,15 79:16 81:1 83:20 84:19 87:8 96:18 98:6,7 99:2 101:2 105:15 110:21 111:19 122:5 123:5, 6 128:1 130:12 138:2 140:21
**factor** 125:18
**factors** 66:12,14
**facts** 133:3 136:1 137:13, 16
**factually** 92:15 119:21,23 125:22
**fair** 55:10 80:5 103:19 109:7 110:11 123:17
**fairly** 65:16 131:6 136:1
**familiar** 57:2
**fatigue** 107:7
**FDA** 108:10
**Features** 122:10 127:4,11
**February** 84:13 106:1 108:1
**Federal** 120:22
**feel** 86:5,6 94:12 96:6 100:14 101:9 113:6 124:3 131:23 144:4
**feeling** 139:9
**feelings** 106:5
**feels** 106:16 126:2
**fellow** 144:22
**fellowship** 57:17
**felt** 75:23 76:13 85:20 89:14 94:13 98:24 99:13 101:8 109:4 117:18 119:9 126:6
**FFD** 62:3,23 72:14 74:22 75:17 99:9 111:8
**fiance** 106:13
**fight** 81:8 89:8 93:24
**filed** 84:20 99:16,21
**filler** 114:18
**filter** 115:8
**final** 77:6
**find** 77:12 80:24 104:12 123:23 130:22 144:16
**fine** 84:2 112:18 120:16, 19,21 144:9
**finger** 88:19 90:5,18
**finish** 117:1 136:22
**finished** 91:24 132:8
**fire** 61:11
**firearm** 135:15 139:17
**firearms** 66:18
**fit** 110:8
**fitness** 55:13 59:14,18 60:7, 13,19 61:4 63:1,3 64:8,11,14 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18,24 79:17 82:20 83:4,7, 16 84:4,10,14 85:4 101:24 102:15,21 103:3,10,14 111:13, 16 112:21 113:11 129:1 131:21 133:6 136:21 137:10 139:10 140:7,10,12, 20 141:3,8 142:20 143:6,17 144:19
**fixed** 125:4
**flexibility** 116:11
**focus** 54:16 80:21 108:22 127:2
**focused** 79:13
**follow** 92:6,22 93:13
**foothold** 117:17
**force** 109:24
**forensic** 61:3,5,15,16 62:11 63:11
**forest** 115:2
**form** 77:15 79:2 116:19 120:11,16,17,19,21, 22 121:1 126:23 136:5 137:14
**formal** 61:13
**forms** 84:14 98:7 116:6
**foul** 141:9
**found** 94:6 103:22 138:23
**foundation** 75:4 120:17,23
**Franklin** 57:13,18
**frankly** 137:20 144:12
**frequently** 132:18
**friends** 100:1,7
**front** 75:10 140:16,17
**frustration** 66:16 104:22 107:9
**full** 91:14 104:18 110:5, 12
**full-blown** 104:5 116:7 120:9, 10 126:19,24 134:9
**functionally** 55:11
**functioning** 105:10,12
**functions** 109:16
**fundamentally** 110:8

**G**

**gave** 55:4 71:3,19
**gender** 123:11
**Gender-related** 124:5
**general** 58:11 75:2 93:10 97:3 118:5 123:17

142:23
**generally** 55:13 58:9 93:15 98:16 108:9 119:7 139:8
**give** 55:24 86:2 107:22 118:14 120:20 135:24
**giving** 117:5
**glucose** 106:19 107:19
**goal** 62:10
**God** 142:10
**Goldstein** 54:3,9 56:17,21,22 61:1 71:18 115:18, 22,23 126:9,13,14
**good** 54:9 71:21 76:13 115:17
**goodness** 121:19,20,21
**Graham** 73:17
**grain** 113:14
**grandiose** 125:15 127:6
**grandiosity** 118:23 123:19 126:18,20
**gray** 115:1 117:14 118:3
**great** 57:18,19 58:21
**ground** 80:1
**guerre** 57:15
**guess** 73:7 82:5 114:16
**guesstimate** 72:13
**guidelines** 75:16
**guy** 91:23 118:1 122:5 133:17
**guys** 98:6

H

**halfway** 122:14
**handed** 56:22 115:23 126:14
**handful** 72:16
**handle** 133:13
**handling** 92:18 93:17 94:2,10
**hands** 87:18
**happen** 143:21
**happened** 79:14 80:4,5 82:19 83:1,6 85:16 88:20 90:20 91:3 131:13, 16 134:22 136:10 140:15 143:4,9,13, 14,23 144:9,10,13
**harassment** 65:24 66:2
**hard** 118:11 120:8 126:1
**harm** 141:8
**harshly** 120:4
**Hayes** 56:13 78:7 80:12,17
**he'll** 91:22
**Heading** 73:16
**health** 58:10 68:16 74:9,14 75:9 76:4,8 100:24 109:15
**hear** 86:7 90:11,13 121:1 140:5
**heels** 126:1
**helped** 111:1
**helpless** 87:17
**helps** 124:24 125:18,24
**HENRETTY** 120:17,22
**Hey** 91:20 94:6
**high** 109:18 118:7 141:5
**historically** 131:4
**history** 66:15 139:1,3
**Hmmmm** 138:7
**Hogueisson** 105:16,18,22
**Hold** 82:23
**holder** 63:19
**home** 104:11
**honestly** 139:21
**hopelessness** 106:6
**hopes** 106:17
**horse** 90:24
**host** 67:5
**hostile** 79:8 94:21 95:4 97:17
**hostility** 123:8 128:6
**hour** 82:10
**HR** 59:22 70:20,23 71:3, 6 74:22 75:7,11,14 78:15,20 79:14 83:6, 10,20 97:3 99:20 100:24 102:7,10,19 103:1,8,9 108:23 110:16 131:13 132:21 135:6 136:3, 19 137:3 138:3 140:8,23 142:10 143:9,13,14 144:3, 10
**human** 79:2,9 82:18 84:5,6, 12 94:17 100:3 111:5 130:1
**hygiene** 66:24 104:9
**hypothetical** 137:15
**hypothetically** 133:2 141:14

I

**idea** 59:23 80:21 96:12 117:9 124:20 127:21
**identifiable** 106:8
**identification** 56:19 115:20 126:11
**identified** 113:5
**Illinois** 64:7,14
**imagine** 72:9 75:6
**IME** 70:1 72:9,11
**immediately** 122:4 134:17 139:4 143:15
**impact** 108:8 114:11 129:3
**impaired** 68:14
**impairing** 114:13
**impairment** 104:6
**impairments** 105:11
**impairs** 109:15
**implies** 117:2
**important** 86:6 87:8,10 125:21, 23 129:19 140:23
**impulse** 134:11
**impulsivity** 66:17
**inappropriate** 79:5 97:10 140:1,18
**incident** 56:6,10 63:6 80:18 102:3,17 103:4,15 140:12 141:12,23 144:15,17
**incidents** 131:9
**include** 58:5 66:14
**included** 78:18
**including** 63:21 109:18
**Incomplete** 137:15
**increases** 66:5
**increasing** 66:3
**independent** 59:24 70:5
**independently** 141:2
**individual** 63:20 68:23 109:21
**individuals** 122:22 127:5,12
**infer** 90:16 114:21
**inference** 89:5,16 93:5 142:2 143:5,8
**inferred** 89:14 119:8 142:19
**inflamed** 96:14
**inflate** 127:8
**inflexibility** 118:9
**inflexible** 118:19
**information** 70:18 75:9 85:11,12 111:20 113:19
**initial** 130:10
**injury** 127:14
**inmate** 89:21,23 90:9
**inmates** 110:1
**insight** 117:23 118:4
**insightful** 125:6
**insisting** 129:24
**insists** 108:15
**instability** 66:13
**intended** 90:13,14 119:21
**intense** 88:2 96:14
**interact** 135:12 138:9 143:24
**interacting** 139:17
**interaction** 66:23 78:5,15 81:11 85:21 93:7,9 110:16 137:21
**interactions** 59:11 71:2 77:8 114:16
**interactive** 85:15
**internally** 60:6
**interpersonal** 66:23 78:5 113:24 114:15 116:10,17 122:18 129:3
**interpret** 114:19 118:10
**interpret all** 119:19
**interpretation** 113:1
**interprets** 124:24 125:19
**interrupted** 132:7
**interruption** 64:5 101:20
**interview** 85:7 102:9 104:19
**interviews** 69:13,19 71:9 86:14
**intimately** 73:14
**intimidating** 79:5 97:9
**intimidation** 65:24
**invalidate** 113:8 140:7
**invalidated** 112:24
**investigation** 80:24 96:2 136:18
**involve** 135:6
**involved** 73:14 75:7 85:2 117:14
**involvement** 59:13 60:5,22
**involves** 68:6
**irrelevant** 142:8 143:3
**irritability** 107:9
**irritation** 107:1
**Isaac** 54:12 74:7,11
**isolated** 144:15
**issue** 76:4,9 78:20,21,22 91:10 102:14 111:16 119:13 123:5 126:3 129:9 132:22 140:9 141:13
**issues** 61:19 106:7 108:11 124:6 133:20 144:19
**items** 54:17

J

**jacket** 75:10
**jail** 73:12,15,20 100:21 128:2
**jails** 73:16 74:19
**job** 92:6,23 93:14 106:6 110:2 129:4,16 130:24 131:17 132:19 133:4 138:12 143:20,22,24
**John** 54:23
**Jones-** 56:12 78:6
**Jones-hayes** 56:11 70:24 71:1,6 77:7 79:13 80:4,11 81:2 85:22 88:4 91:23 99:17,20 100:1,6,21 102:4 108:17 110:13 136:14,15 137:3,22
**judge's** 64:11
**judgment** 81:19
**jump** 62:14
**jury** 91:3,6
**justice** 118:7,13
**justification** 67:12

K

**Kane** 73:17
**keenly** 118:10
**kicking** 69:3
**kind** 57:5,6 60:14 74:17 76:4 81:9 86:8 88:14 89:13,22 103:17,18 117:16,24
**kinds** 118:17 123:9 129:6
**knew** 99:21
**Kroll** 111:19
**Kroll's** 84:10

L

**label** 118:24
**labor** 69:24 75:12,13
**labs** 108:2
**lack** 87:22 126:21
**lady** 57:19
**Lake** 73:12
**larger** 81:11
**law** 58:23
**lawsuit** 84:20,23 85:2
**lawyer** 142:16
**layperson** 120:6 128:18,20
**layperson's** 113:13
**LCPC** 106:10
**lead** 114:24 117:13,15 118:8 119:19
**leads** 107:6 128:19
**learned** 112:23
**leave** 91:2 101:23 102:6 107:8
**leaves** 91:14
**led** 86:15 111:1 116:17
**left** 91:10 95:11 96:18 98:3 102:7,9,15 103:1,13 109:6
**legal** 61:7
**letter** 54:14,17,20,21 78:24 84:9,12,16
**level** 66:23 105:8 114:12
**levels** 106:19 107:14,19 108:9

**liability**
66:4 138:19 142:15
**Licensed**
106:10
**lie**
111:5 113:3
**lieutenant**
135:4
**life**
103:18,23 104:2,7, 11,13,21,24 105:4, 14 106:8 110:19 133:11
**light**
113:23
**limitations**
111:24
**limited**
109:24
**limits**
70:7
**list**
55:9 110:1
**location**
78:8 87:5
**long**
77:3
**longer**
138:12
**losing**
117:16,19
**lot**
68:5 85:23 119:5 120:24 123:20 124:17 131:13 132:23 137:16 143:19 144:5
**loud**
90:11
**loved**
70:10
**Lovely**
77:14
**low**
115:4
**lumps**
101:11
**Lyle**
71:22

**M**

**M-C-G-R-E-A-L**
64:6
**M.D.**
54:3
**made**
83:12 102:24 116:20 129:23 137:9 138:1 140:4 143:2
**maintain**
109:17 122:17
**major**
105:4 125:17 133:10 138:19 139:10
**majority**
63:23
**make**
60:6 81:19 83:18 98:20 106:9 125:2 136:3 143:8
**makes**
60:18 75:5 127:12 136:20
**making**
123:12 125:20
**males**
124:9
**malingering**
58:13
**manacled**
87:15,18 88:6
**manacles**
87:12
**manage**
104:10
**management**
75:16 97:13 130:23 134:5,19 136:20 140:18 142:10 143:24
**manner**
119:15 125:18 127:23
**manual**
114:7 116:1
**mark**
56:15 126:8
**marked**
56:18,22 66:21 115:19 126:10,14
**MARMOR**
54:8 56:15,20 64:18 71:16,21 72:2,5 101:16,21 105:20,21 115:21 116:24 117:5 118:12 120:13,16, 19,21,24 121:12 126:8,12 127:1 132:11 136:8,22 137:1 138:21 144:20
**materials**
79:21
**matter**
108:5 124:2,9 125:22 129:10,14 135:1,7 142:8
**mattered**
124:4
**matters**
100:11 118:20 128:3,24 129:20 140:15 141:1
**Mcgreal**
64:3,6
**means**
115:3
**meant**
105:3
**medical**
57:8,12 64:13 69:14, 17 70:5 75:9 84:6 98:3,11,19 100:2 107:20 111:22 129:24 130:11
**medicine**
57:13 58:11 68:16
**meet**
71:12
**meeting**
71:3 83:23 94:17 96:19,23 97:3,15,23 98:4 102:7,10,14 103:1,8,9 132:6 137:8
**members**
68:10
**memory**
76:22
**mental**
58:10 74:9,14 76:4,8 116:1,9
**mention**
112:14
**mentioned**
114:23
**met**
84:19 111:11
**Michelle**
54:11
**middle**
80:9
**mild**
106:3
**mildly**
106:18
**mind**
88:17 113:2
**mine**
58:8
**minimizing**
112:12
**minutes**
118:16
**misinterpretation**
120:2
**missed**
139:21,23 140:6
**missing**
84:5
**mistake**
140:4,5,6
**mistreated**
101:13
**misunderstood**
98:17
**misused**
75:24
**moderate**
112:6
**moment**
62:21 90:20 103:1 107:22 118:9 132:19 144:21
**month**
73:18
**months**
110:15
**morale**
66:5
**morality**
118:20
**motivation**
106:4
**mouth**
88:1 92:10
**moved**
82:6

**N**

**narcissism**
118:23 127:18
**narcissistic**
113:22 114:4 115:3 124:14 125:16 126:16 127:13,20 128:11,19
**national**
65:14
**nature**
63:9
**Nawara**
54:23 55:12 56:10 64:21 68:8 69:2 70:12,22 77:9,23 78:6 80:5,15 81:2 84:3,11 85:7 92:4 94:18 97:20 98:1,10 104:20 110:3 113:20 116:15,21 118:14 133:24
**Nawara's**
78:9 117:18 139:5,9
**necessarily**
67:18 68:3 82:24 111:14 117:11,20 118:3 119:3 121:17
**nervous**
144:4
**neuro**
58:12
**neurocognitive**
58:14
**neuropsychology**
57:11 58:1
**nine-year**
106:15
**nom**
57:14
**nonclinical**
62:8
**normalized**
106:20 107:20
**North**
82:9,10
**Notably**
130:8
**note**
82:16 84:3 90:17 124:5 136:11
**Noted**
106:15
**notes**
55:20,21,22 56:2 77:21 105:17,23 106:13 108:4,5
**notice**
66:9 122:13
**noticed**
63:17 80:9
**November**
82:17 84:15,16 94:16 106:14 111:8 130:11
**numbered**
54:17
**nurse**
76:17 95:16 98:3,12, 13 99:24 100:6,23, 24 118:15 132:2,4, 21 136:10

**O**

**O-S-T-R-O-V**
64:7
**object**
117:4 132:7
**objection**
105:18 116:19 117:1 120:11 121:1,7 125:9 126:23 136:5 137:14
**objective**
100:15
**observed**
117:3
**obsessive-compulsive**
113:22 114:4 116:2 117:10 118:22 124:7 125:14
**obstructive**
107:5
**occupational**
58:11 68:16 76:17 100:23 105:11
**occurred**
97:2
**occurrence**
55:18 56:5
**off-site**
66:1
**offer**
106:2
**offered**
86:15 105:16
**offers**
92:19
**office**
59:2,7,8,13,15 60:6 72:23 73:2 74:24 78:2 95:22 97:23 111:7 131:10,22 135:21
**officer**
56:10 68:8 69:2 70:12,22 77:23 78:1, 6,8 79:6 80:13 84:3, 11 85:7 90:12 92:3 94:1,18 97:20 98:1,9 102:2 104:19 113:20 116:15,20 117:18 118:14 133:24 135:2
**officers**
109:20 131:19 140:16
**official**
71:23
**one's**
55:14 117:16 129:3
**opened**
136:18
**openly**
94:22
**openness**
116:11
**operations**
68:12 82:7,13 135:19 139:17
**opinion**
104:14 113:19 126:4 140:13,22
**opinions**
86:23 109:10 112:2
**opportunity**
117:6 139:22,23 140:6
**OPR**
95:17,23 136:18
**option**
130:12
**orderliness**
116:9
**organization**
60:16
**originally**
82:9
**Ostrov**
64:3,7
**outburst**
111:2
**outbursts**
108:16,23 110:22 133:4
**outcomes**
116:18
**outlined**
110:2
**overconscientious**
118:19
**overestimate**
127:7
**overly**
118:7 121:20
**owns**
63:22

**P**

**pages**
57:1 65:8 80:2 115:24
**paid**
99:13
**paragraph**
66:10 68:20 82:4 91:15 101:22 103:16 104:18 108:14 113:18 122:15 127:5 130:22
**parenting**
104:8 105:13
**part**
68:8 73:18 95:12 99:9 123:15 124:15 143:23
**participate**
119:15
**parts**
96:23
**party**
59:19 63:19
**patient**
62:1
**Patients**
62:5
**pattern**
81:12 116:8 126:19 129:2 133:17
**pay**
104:10
**pending**
61:8
**pension**
61:10 72:19
**people**
67:17 71:6 80:21 86:4 90:14 104:4 108:11 112:15,20 113:7,10 114:9,10, 16,20,22 117:10 119:3 121:15 122:13 124:17,21 126:7 127:23 129:7 131:7, 9,22 141:1 143:1 144:3
**perceive**
125:2 127:23 128:14
**perceived**
81:7,16 89:13 119:14 131:8
**perceives**
115:7
**percent**
83:14
**perception**
87:24 88:1,18 93:22 100:11 101:12 117:12
**Perfect**
64:21
**perfectionism**
116:9
**perfectly**
88:13 144:9
**perform**
109:16
**performance**
69:11
**performing**
132:16
**peril**
135:14
**period**
134:2
**persisted**
97:14
**person**
77:6 92:20 93:11 107:8 116:7 124:24 128:11 129:8 139:4 144:17
**person's**
105:14 112:8,9 133:11
**personal**
66:24 100:1,7 105:12
**personality**
66:11,21 76:8

113:20,23 114:5,9, 14,17 116:3 117:23 118:22 119:18 120:1,9 124:7,11,15, 19,22 125:3 126:16 127:13 128:11 133:10 134:11
**personnel** 58:23 75:10 112:15 133:16,22
**pervasive** 116:8 126:17,19 128:8 129:2 133:15 138:24 139:3 144:15
**photograph** 68:20
**physical** 65:23 122:18
**physically** 79:4 97:9
**physician** 108:7
**picked** 95:11
**picture** 77:14
**pissed** 131:23
**place** 56:7 78:7 82:11 93:19,20 139:16
**places** 82:9
**play** 100:19
**played** 74:22
**pleased** 93:9
**point** 78:23 82:16 83:19 84:8 87:12 97:21 98:21 99:10,12 100:8,13 102:10 128:10 132:9
**pointed** 132:11
**points** 82:3 124:13
**poked** 88:10
**police** 61:11 134:24
**policies** 60:16
**policy** 85:24 86:17,24 99:1 125:20 126:3 129:24
**poor** 66:16 107:9
**population** 135:10
**populations** 58:22
**pose** 110:3
**position** 55:14 68:8,24 69:6 109:21 110:1
**positions** 123:7
**positively** 106:17
**possess** 113:21
**possession** 66:18
**potential** 108:8
**potentially** 67:18
**pre-hire** 64:17 68:5 112:21
**predisposed** 110:21
**premiums** 66:3
**preoccupation** 116:8
**presence** 66:19 80:14
**presented** 58:16 79:8 84:4 130:3
**presents** 129:18
**pretentious** 127:9
**pretty** 128:3 130:5
**prevent** 55:18
**previously** 54:5 92:17
**primary** 107:22 108:7
**principle** 118:8,13
**printed** 56:24
**prisons** 73:16
**privilege** 63:19
**problem** 60:3,17 65:20 69:5 76:9 120:10 122:5 128:7,9 129:5 132:20 133:9,15 134:6 135:9 138:24 140:3
**problematic** 109:24 140:22
**problems** 68:23 105:10 106:22 125:7,8,10 129:2,15 131:5 134:5
**procedures** 60:16 74:19
**process** 70:17 74:23 75:24 84:4,14 85:15 99:7,9 111:8 115:16 119:11 126:1 134:22
**processes** 59:14
**product** 63:22
**productivity** 66:5 67:1
**profession** 119:4
**professional** 95:21,22 106:11
**professionals** 68:15
**program** 58:9 68:6
**prominent** 124:22
**prompt** 141:3
**prompted** 63:6 79:17,20 83:6
**prompting** 76:2,9 78:19,20,21
**prone** 122:14,16
**proper** 109:19
**properly** 105:2 109:23
**property** 66:1
**protected** 75:9
**provide** 54:23 70:20 74:8 86:9
**provided** 84:9,14 97:2,4 133:22 134:8
**providing** 130:11
**proximal** 107:3
**psych** 113:9
**psychiatric** 66:20 104:5,21 105:8,16 106:2 112:11,12 133:8 134:10
**psychiatrists** 74:10
**psychologist** 74:20 121:23
**psychologists** 74:10 121:22
**psychology** 57:8,10
**psychopaths** 73:13
**public** 55:15 58:9 67:24 68:2,5,7,9,18,24 135:13 139:18 141:7 142:12
**pull** 138:13 139:14
**pulled** 76:6 131:14,18,20 132:19 134:3,17 135:3,9 136:21 138:1,18 139:12 142:4,9,21 143:4,7 144:3
**punitive** 75:23 131:24
**purpose** 62:15 77:24
**put** 55:5 71:14 75:9 82:12 85:4 87:24 99:7 113:13 122:7 130:5 131:13,24 132:23 134:16 135:9,14 139:15,16 143:19 144:5
**putting** 88:19 90:5,18 92:10

**Q**

**quasi-legal** 61:6
**question** 56:3,5,9 60:2,4 61:2, 4 62:16,24 63:1,4 69:18 70:9 71:12 75:3 76:3,7,11 77:1 79:11 85:4 91:2 107:15 116:20,23 117:2 120:12 121:2, 3 122:7 126:24 129:12 133:2,7 136:6 137:15 143:11
**questions** 54:11,24 55:4,10,11 78:11 80:23 102:5 109:14 115:11 134:21
**quick** 101:16 118:9
**quicker** 57:5
**quickly** 115:11,13
**quote** 79:4 89:19,20,21 90:7
**quotes** 129:22,23 130:5

**R**

**race** 101:7
**rage** 128:12,20 131:7,8
**raise** 131:10
**raised** 143:18
**Ray** 54:12 74:7,11
**reaching** 112:3
**react** 115:6 118:11 128:12,19
**reacting** 126:5
**reaction** 81:10
**reactions** 113:24
**read** 56:1 67:9,10 68:21 75:15,17 95:1 117:3 121:5 133:16,23
**reading** 55:9 85:18 105:2
**ready** 85:2
**realized** 80:12
**reason** 84:1 89:9,11 96:7 98:12 100:20 101:15 102:20
**reasonable** 93:6 142:2 143:5
**reasons** 78:14 79:3
**reassigned** 134:3
**Rebecca** 77:1 132:3,4
**recall** 59:9 73:7 78:12,23 107:13 108:3
**receive** 60:12
**received** 84:11
**receiving** 121:15 129:11
**recent** 108:2
**recently** 99:16
**recess** 144:23
**recommendations** 54:24 55:18
**record** 56:2 57:21 63:22 64:13 71:24 72:4
**records** 69:15,18 84:6 98:3, 11,19 100:2 107:21, 23 111:22 129:24 130:11
**reference** 95:3
**referral** 55:5 62:16,24 63:1 74:23 76:13 79:2,3 94:20 97:4 133:5 136:19 141:11 144:9
**referrals** 75:5,17
**referred** 63:20 65:14
**referring** 93:14 130:14
**refers** 116:22
**refused** 84:3 98:2,10 102:11
**refuses** 106:20
**regular** 73:18
**Reierson** 77:1 132:3,5
**related** 81:3,14 93:11 102:2 106:8 123:9 133:19, 20
**relationship** 61:20 62:7 63:9,15 106:15
**relationships** 122:24
**relative** 122:23
**release** 98:2,11,19 130:13
**releasing** 100:2
**relevant** 69:14 76:3 85:20 86:6 105:13 115:24 127:18,19 137:20
**rely** 112:2 133:23
**relying** 81:18,21
**remained** 82:5
**remember** 70:16 72:20 80:20
**reminder** 84:12
**remove** 83:15
**removed** 82:21 83:2,4,21,22
**rep** 96:19,22
**repeatedly** 134:3
**report** 55:5 62:18,21 64:1, 16,22 71:7,10,14,17 79:1,15,20 81:23 95:2 103:12 116:22 129:18
**reported** 84:11 103:13 104:14 136:16
**reporter** 56:21 115:22 121:6 126:13
**reports** 64:12,17 72:6,14 77:18 103:17
**represent** 56:23 83:9
**representation** 95:24 96:3,13
**representatives** 83:10
**request** 77:21 78:4
**requested** 102:1 103:2 121:6 130:10
**require** 109:16
**required** 80:16
**requires** 109:21
**Reread** 121:3
**research** 58:4,8,12,18 73:13
**resistance** 123:2
**resources** 66:17 79:3,9 82:18 84:5,7,12 94:17 100:3 130:1
**respect** 123:2,3,19,21 127:24
**respond** 109:17 120:5
**responded** 88:24
**response** 79:6 85:14 102:13 112:8 113:5,12 123:22,24
**responsibility** 96:16 138:13
**restlessness** 106:5
**restrained** 87:9,10
**restraining** 86:17
**result** 66:13 76:6
**results** 112:5 113:1
**retained** 73:5
**retread** 80:1
**return** 55:12 77:24
**returned** 82:11
**returns** 110:4
**review** 69:10,14 79:21 95:17,22,23 105:24
**rights** 135:15
**rigid** 114:24 121:19
**rigidity** 116:16 125:12
**rise** 105:7,8 114:11
**risk** 66:4,13 110:4
**road** 141:5
**role** 60:24 75:19 82:1
**roles** 74:22

**Rosalyn**
57:13,18
**roughly**
72:7
**routine**
79:7
**routinely**
127:7

**S**

**safe**
55:12,13 134:15 135:11 138:12
**safely**
129:4
**safety**
58:9 67:24 68:2,5,7, 9,18,24 76:11 110:4 138:17 141:7 142:12
**salt**
113:15
**sarcastic**
88:15 91:17,20 92:24 93:1 94:5
**Sarocka**
54:12,21 77:21
**sat**
118:16
**scapegoat**
101:10
**scenario**
135:24
**scene**
86:11
**school**
57:9,12,13 105:14
**science**
57:14
**scolded**
131:20
**scope**
62:10
**Scout**
118:6 126:7
**screening**
68:5 112:22
**scrupulous**
118:19
**section**
124:14
**self-esteem**
115:5 127:12
**self-importance**
127:6
**self-refer**
62:1
**self-referred**
62:5
**self-report**
133:24
**self-worth**
106:5
**send**
60:7,19 82:20 83:15, 16 98:22 137:10 141:8
**sending**
140:7
**sense**
59:11 61:18 67:12 106:4 117:16 127:6
**sensitive**
68:7 115:6 121:21 127:14,22
**sentence**
69:9
**separate**
77:5 96:23
**September**
77:22 78:7 102:3,17 103:3,15 110:12 140:12 144:11,13
**Serge**
91:20
**sergeant**
89:10 91:18 135:3
**series**
54:10 62:14
**servant**
142:12
**set**
59:14,18,20 80:14 81:2 85:8
**setting**
85:20 86:11 128:2
**sexual**
65:24
**shackle**
91:21,23 92:3,20 94:6
**shackled**
87:14,19 88:6 91:11
**shackles**
87:12
**shackling**
93:11
**Shaw**
107:24
**shed**
113:23
**Shelby**
76:16 95:16 98:3,12, 13 99:24 100:6,23 118:15 132:3,4 136:10
**Sheriff's**
59:2,7,8,12,15 60:6 72:15,23 73:1 74:23 78:2 97:23 111:6 131:10 135:21
**shit**
138:4
**short**
64:5 101:20 131:6 144:23
**shortly**
111:11
**show**
104:7,8 133:16 142:19
**sic**
67:5
**side**
137:17
**sign**
98:2,8,10
**signed**
98:8
**significant**
103:23 104:13,20,24 105:10,11 143:6
**similar**
84:15 112:20
**simply**
81:5 85:4 92:15 98:14 100:1 103:6 141:20 142:2
**simultaneously**
90:22
**single**
80:22
**sites**
62:14
**situation**
88:2 96:15 104:23 117:21 132:15,17 142:18 144:2
**situations**
87:15 122:16
**sixth**
65:8
**skip**
66:10
**sleep**
106:4,21 107:1,4,5, 6,7
**slightly**
60:1,4
**small**
67:8
**social**
66:17 105:12
**somebody's**
76:6
**someone's**
75:10 135:3
**somnolence**
106:22
**sort**
62:13 68:14 74:17 80:23 88:23 91:10 98:24 108:21 115:1, 4 116:17 122:14 128:16
**sought**
102:16 111:12
**sounds**
68:24 99:10 108:20 116:14
**speak**
56:8 70:13,14 71:5 143:1
**speaking**
58:10 76:22 93:15 98:16 108:9 119:7 139:8
**special**
132:17
**specialty**
57:11 58:3
**specific**
67:4,11,19 75:1 81:10 132:15 136:9 142:24
**specifically**
81:15 83:12 85:3,12 90:6 94:20 117:18
**spell**
119:12
**spent**
73:11
**spiraled**
89:1
**spiraling**
96:16
**split**
106:13
**spoke**
77:8
**spoken**
76:16 77:2
**spring**
84:7
**stability**
112:13 141:7
**staff**
144:1
**staff's**
135:5
**staging**
82:12
**stalking**
66:2
**standpoint**
129:1 135:19
**stands**
95:23
**start**
94:19 102:11 109:4
**starts**
89:20 91:12
**stated**
62:17 80:13
**statement**
65:11,17 66:7 80:6, 11 103:19
**states**
65:13 107:18
**Statistical**
114:6,7 116:1
**status**
106:6 112:12 122:23
**stay**
80:17
**stayed**
85:3
**stepped**
92:16
**stock**
131:13 132:1,23 143:19 144:5
**stop**
67:1
**stress**
66:16 104:13,22 105:4 109:18
**stresses**
133:11
**stressor**
106:8
**stressors**
103:18
**strike**
87:16
**strong**
119:2 123:24
**strongly**
115:7 118:11 126:5
**studies**
124:7
**subjected**
135:17
**substance**
66:20 76:8 133:9 134:10
**subtitles**
121:23
**succession**
131:6
**sufficient**
141:3,13
**sufficiently**
139:14
**suggest**
135:20
**suggesting**
83:6
**superintendent**
56:12 70:21 77:7 78:6 80:10,12,16 81:1 85:22 88:4 91:23 99:17,20,24 100:6,21 102:3 108:17
**superior**
79:6 102:2 109:19
**superiors**
136:16
**supervisor**
56:11 59:22 137:22
**supervisors**
69:14,19 74:22
**supplements**
107:15 108:7
**support**
66:17
**Supporting**
122:10 127:11
**supposed**
59:23
**surface**
133:8
**sworn**
54:2,5
**symptoms**
103:23 104:21 105:7 106:3 112:11,13
**syndrome**
107:5
**systematic**
124:6

**T**

**takes**
126:3
**taking**
94:4 104:9 129:19 138:22
**talk**
114:20 125:13 129:18 130:16,21 132:21 139:5 144:21
**talked**
69:17 87:4 94:11,22 101:9 127:21 128:1 130:17
**talking**
63:13 69:1 80:10,20 87:21 97:21 99:14 109:6 114:3 127:15 130:24 137:11 139:7
**talks**
61:22
**target**
67:5,11
**targets**
67:19
**teach**
74:6,12
**teaching**
58:17
**telephone**
66:2
**telling**
81:20 123:7
**tendency**
125:15
**tension**
86:13 96:3
**terms**
113:14 144:6
**test**
112:10
**testified**
54:6 83:13 132:3
**testify**
132:5
**testimony**
137:6,7
**tests**
112:6 113:3
**text**
82:5
**thing**
57:7 101:2 107:12 112:16 119:17 134:13 140:15,23
**things**
57:6 58:14 63:17 64:10 80:8 81:9 86:1,2,9 87:22 88:5, 23 90:19 94:10 96:16 97:19 99:1,15 103:7 104:11 110:19,24 114:5 117:14 118:1,2 124:23 125:1 129:17 131:2
**thought**
57:4 88:22 99:15 100:5 101:7 119:10, 16
**threatened**
135:13
**threatening**
97:8 102:1
**threats**
65:23
**thrown**
123:19
**time**
69:17 74:13 76:19 84:19,23 110:20,22 111:2 120:24 130:10 131:19 132:23 134:7 139:2
**times**
60:12 70:4 73:23 74:4,6,7 75:21 104:4 126:18
**told**
64:23 71:13 82:19 83:1 85:1 92:4 95:16 102:24 107:13 130:19 131:21 132:19
**tolerance**
66:16 107:9
**tomorrow**
73:17
**touch**
74:13
**touching**
88:19,20
**training**
57:17 74:18
**trait**
128:19
**traits**
113:23 114:10,14, 17,24 116:22 117:2, 3,10,24 118:17,22 119:18 120:9 123:10 124:12,22 125:3,11, 14 127:20
**treat**
58:22 133:13
**treatable**
76:10
**treated**
59:1,4 101:13 119:14
**treater**
62:1
**treating**
114:22
**treatment**
74:9,14
**trees**
115:2
**tripwire**
140:19 143:17
**trouble**
138:2,14
**true**
82:24 86:21 98:24 100:12,17 101:14 115:8 130:20
**truth**
81:20
**turn**
77:11 109:10
**turnover**
66:6
**type**
61:16 64:12 96:1

108:16
**types**
112:20 114:23
**typically**
59:18 61:8 75:7 122:19

U

**ultimately**
98:1,10 101:23
**Um-um**
62:12
**umbrage**
92:2,14 93:2 94:4
**unclear**
142:7
**uncomfortable**
96:2 100:2,18
**uncommon**
112:15
**uncooperative**
97:16
**undergo**
103:3
**underneath**
68:20
**understand**
56:4 74:21 75:4 79:12,16 84:18 86:12 95:19 96:22 100:20 103:5 115:10 116:24 119:3 121:10,14 124:24 125:18,24 129:12,14 130:15 131:3 133:18 143:10 144:8
**understandable**
104:22 106:7 144:2
**understanding**
85:21 101:24 102:15 103:2,14 111:12
**understands**
121:2 129:13
**understood**
65:4 78:13 87:14 102:19 111:6 122:3
**unethical**
118:15,24 119:2,5
**unfair**
119:17 144:5
**unfairly**
101:13
**unfit**
135:16,17,22 141:15 142:13,17 143:20 144:6,16
**union**
96:13,19,22
**United**
65:13
**University**
57:8,16
**unjust**
119:17 123:23
**unreasonable**
90:17
**unsafe**
87:5,9 138:6
**unshackled**
91:21
**untrue**
119:22
**updating**
65:2
**upset**
93:6 122:16 139:22 144:4

V

**vague**
136:6
**valid**
141:2
**values**
118:20
**vast**
63:23
**verbal**
65:23 88:22 129:6
**verbally**
109:22 134:4
**version**
85:17 86:7 114:8
**versus**
62:8,11 63:11 82:1
**view**
67:2 94:9 116:16 125:23
**violence**
58:5,17,20 65:10,12, 19 66:4,14 67:17
**violent**
65:13 67:13,18
**visit**
83:20
**volunteer**
85:13
**Vulnerability**
127:12
**vulnerable**
107:8 119:19 120:4

W

**waited**
140:21
**waiver**
98:2,10
**walked**
91:18 92:5 93:23
**wall**
89:22
**wanted**
85:13 94:12 96:2,12
**water**
101:17
**weapons**
66:19
**website**
56:24 57:1 61:22 63:18 64:2 65:2,22
**week**
73:12
**weeks**
79:7
**well-suited**
128:21
**whatnot**
58:19 144:1
**whatsoever**
139:10
**white**
115:2 117:9,15 118:1 119:1 123:18
**Winifred**
76:16
**withheld**
110:24
**woman**
106:16 123:16
**women**
101:4,5 123:6
**wondering**
78:17 95:6
**word**
56:4 101:10 119:2
126:18
**words**
86:10 87:24 92:16 93:21 97:17 112:22
**work**
55:12 63:22 66:24 73:19 76:6 83:16 93:18 104:7,23 106:17 110:5 129:8 133:13 134:16 135:12,16 137:12 142:13 143:14
**worked**
72:22 73:1,9 82:17 106:20
**worker**
61:6 66:3
**working**
134:24 135:10 142:17
**workings**
73:15
**workplace**
58:5,16,19 65:10,12, 19 66:1,4 67:17 76:5,12
**world**
125:2
**worry**
106:6
**write**
71:22 118:1 130:8
**write-ups**
133:19
**writing**
67:8
**written**
85:24 86:17 101:6 134:4
**wrong**
117:7,8
**wrote**
69:4 80:11

Y

**year**
110:12
**years**
72:10 113:8 133:17, 21 134:24
**yelling**
92:11
**young**
77:14

CORVEL

September 8, 2017

Isaac Ray Forensic Group, LLC
65 E. Wacker Place
Chicago, IL 60601

RE: John Nawara
DOB: [redacted]/1975

Dear Dr. Diana Goldstein:

I am the Nurse Case Manager at CorVel Corporation working on behalf of Cook County Sheriff Office. I have scheduled an evaluation for John Nawara. His address and phone number are: 100 Willow Lane, B207, Willow Springs, IL 60480 and 312-331-0060. He is not currently working.

John Nawara has an evaluation scheduled with Jordan Fuller on Monday 09/11/2017 from 9 am to 5 pm and with you on Tuesday 9/12/2017 from 9 am to 5 pm. Available medical records from his provider/s will be sent to you.

Following your comprehensive evaluation of John Nawara, please provide your comments and recommendations to the following questions: Confidential

1. Does Mr. Nawara have a health condition that impairs his ability to perform the essential functions (which require he maintain composure and respond appropriately in a high stress environment, including exhibiting proper behavior toward detainees and his superior officer. Position requires this individual can diffuse disruptive behavior verbally and if escalated, effectively and properly use limited force on problematic and combative inmates) of his position as outlined in his job description? If yes, please describe the current status and diagnosis of the condition/s impairing his ability to work.
2. Does Mr. Nawara pose a safety risk to himself or others if he returns to work full duty? If yes, please explain.
3. Based on his job description, does Mr. Nawara require any accommodations that would permit him to perform the essential functions? If yes, please describe the suggested accommodations and the estimated length of time that these restrictions will be necessary.
4. Will the above-described accommodations eliminate any identified safety hazard? Please explain.
5. Employer has concerns about anger management, including his ability to manage a detainee population without losing his temper. What type of treatment is required for Mr. Nawara to be able to return to the workforce? I.e., medication, therapy, anger management.
6. Do you have any recommendations to prevent another occurrence?
7. To the best of your knowledge, is Mr. Nawara taking any medication that would affect his ability to safely perform his job duties?

EXHIBIT
CC
exhibitsticker.com

CORVEL

8. To the best of your knowledge, would the failure to take prescribed medication affect his ability to safely perform his job duties?
9. If you find Mr. Nawara unable to perform his job duties, when do you anticipate that he will be able to safely perform all of the essential functions of his position?

Please advise me if the cost goes above $5000 and send all billing and reports associated with this evaluation to:

**CorVel Corporation**
**ATTENTION: Disability Department**
**3010 Highland Parkway, Suite 600**
***Downers Grove, IL 60515***

## Or FAX to 866-450-5138

*Thank you in advance, and should you have questions please contact me at 630-874-7433.*

Sincerely,

*Michelle Sarocka, RN*

Confidential

Michelle Sarocka, RN
Disability Nurse Case Manager
CorVel Corporation
T: 630-874-7433 | Fax: 866-450-5138

cc: Cook County Bureau of Human Resources Employee Services

**From:** "Jeff Johnsen (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
**To:** "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
**CC:** "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
**Subject:** Incident with an Officer
**Date:** 2016-09-28 19:43:38 -0400

---

Good Evening,

I wanted to let you know about an incident Karen had with an officer on her 7-3 shift (Nawara, John) today, where he became extremely disrespectful and began to yell at her.
She was addressing him on the inmates in admissions, who were not properly secured in handcuffs behind their backs as is the policy for admissions. During her conversation with him he became agitated and began to look away from her, while she was explaining herself. At that time she reached out to touch him on his arm to get his attention focused back on her, when he made a large outburst at her about touching him and then calling her "lady" and not addressing her by her rank.
Karen addressed him regarding his outburst and apologized to him for touching his arm to get his attention focused back on her, if that had offended him. She then stood her ground and told him that he will do his job and follow the policy as it has been established.
She has completed a complaint register form against the officer for his unprofessional conduct and threatening outburst, but has not submitted it yet. The question we both have is should she initiate discipline as well. She was also wondering if he can be reassigned from Cermak while the matter is being investigated.
I have cc'd her in the event you had any follow up questions regarding this manner.

Thank you,

Jeff

**Jeff K. Johnsen**
**Assistant Executive Director**
**Cook County Sheriff's Office**
**Department of Corrections**
**Office: 773-674-3474**
**Cell: 312-859-3862**
jeff.johnsen@cookcountyil.gov

EXHIBIT
DD
exhibitsticker.com

**From:** "Jeff Johnson (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
**To:** "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
**CC:** "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
**Subject:** Re: Incident with an Officer
**Date:** 2016-09-28 20:21:58 -0400

---

Yes he is

Jeff K. Johnsen
Assistant Executive Director
Cook County Sheriff's Office
Department of Corrections
Office: 773-674-3474
Cell: 312-859-3862
Jeff.Johsen@cookcountyil.gov

On Sep 28, 2016, at 7:14 PM, Matthew Burke (Sheriff) <Matthew.Burke@cookcountyil.gov> wrote:

Thank you for letting me know.
Is he working tomorrow?
Thanks

Matt Burke
Chief of Staff
Cook County Department of Corrections
773-674-7921 (ph)

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

-------- Original message --------
From: "Jeff Johnson (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
Date: 9/28/16 6:43 PM (GMT-06:00)
To: "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
Cc: "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
Subject: Incident with an Officer

Good Evening,

I wanted to let you know about an incident Karen had with an officer on her 7-3 shift (Nawara, John) today, where he became extremely disrespectful and began to yell at her.

She was addressing him on the inmates in admissions, who were not properly secured in handcuffs behind their backs as is the policy for admissions.

During her conversation with him he became agitated and began to look away from her, while she was explaining herself. At that time she reached out to touch him on his arm to get his attention focused back on her, when he made a large outburst at her about touching him and then calling her "lady" and not addressing her by her rank.

Karen addressed him regarding his outburst and apologized to him for touching his arm to get his attention focused back on her, if that had offended him. She then stood her ground and told him that he will do his job and follow the policy as it has been established.

She has completed a complaint register form against the officer for his unprofessional conduct and threatening outburst, but has not submitted it yet. The question we both have is should she initiate discipline as well. She was also wondering if he can be reassigned from Cermak while the matter is being investigated.

I have cc'd her in the event you had any follow up questions regarding this manner.

Thank you,

Jeff

**Jeff K. Johnsen**
**Assistant Executive Director**
**Cook County Sheriff's Office**
**Department of Corrections**
**Office: 773-674-3474**
**Cell: 312-859-3862**
**jeff.johnsen@cookcountyil.gov**

**From:** Jeff.Johnsen@cookcountyil.gov
**To:** Matthew Burke <Matthew.Burke@cookcountyil.gov>
**Subject:** Fwd: Incident with Officer Nawara, John
**Date:** 2016-09-28 21:10:11 -0400
**Attachments:** ATT00001.htm; SKM_364e16092818560.pdf

---

Here is the complaint register.

Jeff K. Johnsen
Assistant Executive Director
Cook County Sheriff's Office
Department of Corrections
Office: 773-674-3474
Cell: 312-859-3862
Jeff.Johsen@cookcountyil.gov

Begin forwarded message:

**From:** "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
**To:** "Jeff Johnsen (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
**Subject: Incident with Officer Nawara, John**

Director,

Will you just please review it for me?

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

---

**From:** copiers@cookcountyil.gov <copiers@cookcountyil.gov>
**Sent:** Wednesday, September 28, 2016 6:56 PM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** Message from KM_364e

# SHERIFF'S OFFICE OF COOK COUNTY
## OFFICE OF PROFESSIONAL REVIEW
## COMPLAINT REGISTER

**Complainant Information**

| | | | |
|---|---|---|---|
| NAME (Last, First, M.I.): Jones-Hayes, Karen | AGE: N/A | DATE OF BIRTH: N/A | HOME #: 773-350-3140 |
| HOME ADDRESS: 2700 S. California | CITY: Chicago | | WORK/OTHER #: 773-674-3813 |
| STATE: Illinois / ZIP CODE: 60608 | STATE I.D./D.L. #: | | STATE OF ISSUANCE: |

I HAVE BEEN NOTIFIED THAT, PURSUANT TO 50 ILCS 725/3.8(b), ANYONE FILING A COMPLAINT AGAINST A SWORN PEACE OFFICER MUST HAVE THE COMPLAINT SUPPORTED BY A SWORN AFFIDAVIT.

**Complainant Information**

DATE OF INCIDENT: 28 September 2016

TIME OF INCIDENT: 1045 hrs.

LOCATION OF INCIDENT: Basement control and Staging area

PROVIDE NAMES, BADGE NUMBERS, SQUAD NUMBER or LICENSE PLATE, and/or PHYSICAL DESCRIPTION OF THE OFFICER AGAINST WHOM YOU WISH TO FILE A COMPLAINT:

Officer John Nawara JDE# [redacted], Star no. [redacted], detailed to Cermak on the 7-.3 shift.

**Witnesses**

ARE THERE ANY WITNESSES YOU WISH TO BE CONTACTED DURING THE INVESTIGATION? ☐ YES ☐ NO
IF YES, PROVIDE CONTACT INFORMATION.

| NAME | ADDRESS/CITY/STATE/ZIP | HOME PHONE # |
|---|---|---|
| Officer B. Gannon | 2700 S. California Chicago, Il 60608 | 773-674-5800 |
| Sgt. T. Conley | 2700 S. California Chicago, Il 60608 | 773-674-5800 |
| | | |
| | | |
| | | |

**Narrative**

PROVIDE A FULL DETAILED ACCOUNT OF YOUR COMPLAINT AND THE NATURE OF THE INCIDENT.

At 1045 Hrs on September 28, 2016 R/Supt. Hayes [redacted] made rounds in the basement of Cermak Health Services. Upon my arrival to the basement I observed the basement control door ajar; this is a violation of the directive put in place by me for security reasons. R/Supt Hayes entered the area and observed 3 Officers, I was unable to initially identify who they were due to their backs being to the entrance. R/Supt Hayes then tapped officer Nawara on the back top of his shoulder to gain his attention. Officer Nawara turned to faced me at which time I knew he was an assigned Cermak officer. Officer Gannon then turned to face me and I asked her who was the officer on the computer. Officer Turrisse then turned as I tapped him on the shoulder to see who he was and explained that he was doing a report for an incident that had just occurred.

■ CONTINUED ON REVERSE

FOR OFFICE USE ONLY
DATE COMPLAINT RECEIVED: ____________ RECEIVED BY: ____________

IAD/IG #: ____________

I began to ask Officer Nawara why were all the detainees in the staging area not cuffed to the rear as per my directive for this area. He began saying, "I can only do what I can do with the resources I have." I asked Officer Gannon the same question she stated it was busy and they didn't get to it. I then turned to Officer Nawara who is assigned to staging as well as responsible for ensuring the cuffing policy is followed, why are the detainees not cuffed to the rear? As I was addressing both him and Officer Gannon my hand touched his left shoulder, Officer Nawara began screaming, "don't touch me, don't touch me lady, don't put your hands on me period." Officer Nawara was exuding such rage it startled me and I was really taken by surprise. I immediately stepped back and and said, "if I offended you by inadvertently touching your shoulder I apologize, I will not make any kind of contact with you again officer," to get him to calm down. I gave directive to officer Nawara to report to staging and make sure the detainees were properly cuffed. He exited the basement control area and I went into the ER.

Moments later, Officer Nawara entered the ER screaming at R/Supt Hayes, "this is what I am talking about this fucking inmate just jumped in my face because I told him he had to be shackled. I am not dealing with this crap." I exited the ER and Officer Nawara followed me out with his voice still elevated telling me he don't have time for this shit. I asked Sgt. Conley to assist me in the staging area to locate this detainee that officer Nawara was speaking about. I turned and asked officer Nawara, "where is the detainee?" He had no idea at the time, a few moments later he noticed the detainee in the rear of staging. I asked the detainee to come to where I was standing, he complied. I then informed the detainee that he would be shackled and to have a seat where I pointed and he complied. I then gave Officer Nawara an order to shackle the detainee and I walked away. As I walked away Officer Nawara continued to antagonize me stating, "yeah why don't you walk around with me all fucking day so I can do my job." I replied, "No Officer Nawara I will not walk with you all day, but you will do the job you are being paid for." I then exited the area and directed the shift commander to follow up with the officers in the staging area to make sure all detainees were secured properly. (DIV8.CERMAK.CAMERA0.002)

**PLEASE BE AWARE THAT IF YOU ALLEGE INJURIES AS A RESULT OF THIS INCIDENT, DUE TO FEDERAL PRIVACY LAWS ON THE RELEASE OF MEDICAL RECORDS, YOU MUST PROVIDE COPIES OF YOUR RELEVANT MEDICAL RECORDS REGARDING ANY EXAMINATION OR TREATMENT TO THE SHERIFF'S OFFICE INVESTIGATING UNIT TO BE MADE PART OF THE INVESTIGATION.**

**I have read this statement that I have voluntarily made, consisting of ___ pages, and I solemnly swear that the facts and allegations contained within are true and correct to the best of my knowledge.** Supt. Karen Jones Hayes
**(Print Name)**

**Complainant's Signature:** [signature] **Date:** 28 September 2016

**State of Illinois )**
**County of Cook )**

**Signed and sworn to before me on** 9/28/2016 **by** Karen Jones-Hayes
**(date)** **(name of person making statement)**

"OFFICIAL SEAL"
LOUISE RODRIGUEZ
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 07/22/2017
(notary seal)

[signature]
**(signature of notary public)**

**A person commits PERJURY when, under oath or affirmation, in a proceeding or in any matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. PERJURY IS A CLASS 3 FELONY.**

Please mail your completed, **signed and notarized**, complaint form to:

**Cook County Sheriff's Office of Professional Review**
3026 S. California
Chicago, IL. 60608

**From:** "Matthew Burke (Sheriff)" <MAILER-DAEMON>
**To:** Jeff Johnsen (Sheriff)
**CS:** Karen Jones-Hayes (Sheriff);Dawn Ertler (Sheriff)
**ubj ecSt:** RE: Incident with an Officer
**Datc:** 2016-09-29 11:01:28 -0400

---

Sounds good. Please complete the CR and send it to opr, dawn, and I and we will move him.
Thanks

Matt Burke
Chief of Staff
Cook County Department of Corrections
773-674-7921 (ph)

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

-------- Original message --------
From: "Jeff Johnsen (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
Date: 9/29/16 9:28 AM (GMT-06:00)
To: "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
Cc: "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
Subject: Re: Incident with an Officer

I spoke with Karen today and she is still uncomfortable with the officer and his conduct and wants to proceed with the CR.

Jeff K. Johnsen
Assistant Executive Director
Cook County Sheriff's Office
Department of Corrections
Office: 773-674-3474
Cell: 312-859-3862
Jeff.Johsen@cookcountyil.gov

On Sep 28, 2016, at 7:14 PM, Matthew Burke (Sheriff) <Matthew.Burke@cookcountyil.gov> wrote:

Thank you for letting me know.
Is he working tomorrow?
Thanks

Matt Burke
Chief of Staff
Cook County Department of Corrections
773-674-7921 (ph)

The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in this communication or any attachments.

-------- Original message --------
From: "Jeff Johnsen (Sheriff)" <Jeff.Johnsen@cookcountyil.gov>
Date: 9/28/16 6:43 PM (GMT-06:00)
To: "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
Cc: "Karen Jones-Hayes (Sheriff)" <Karen.Jones-Hayes@cookcountyil.gov>
Subject: Incident with an Officer

Good Evening

Good Evening,

I wanted to let you know about an incident Karen had with an officer on her 7-3 shift (Nawara, John) today, where he became extremely disrespectful and began to yell at her.

She was addressing him on the inmates in admissions, who were not properly secured in handcuffs behind their backs as is the policy for admissions.

During her conversation with him he became agitated and began to look away from her, while she was explaining herself. At that time she reached out to touch him on his arm to get his attention focused back on her, when he made a large outburst at her about touching him and then calling her "lady" and not addressing her by her rank.

Karen addressed him regarding his outburst and apologized to him for touching his arm to get his attention focused back on her, if that had offended him. She then stood her ground and told him that he will do his job and follow the policy as it has been established.

She has completed a complaint register form against the officer for his unprofessional conduct and threatening outburst, but has not submitted it yet. The question we both have is should she initiate discipline as well. She was also wondering if he can be reassigned from Cermak while the matter is being investigated.

I have cc'd her in the event you had any follow up questions regarding this manner.

Thank you,

Jeff

**Jeff K. Johnsen**
**Assistant Executive Director**
**Cook County Sheriff's Office**
**Department of Corrections**
**Office: 773-674-3474**
**Cell: 312-859-3862**
**jeff.johnsen@cookcountyil.gov**

**From:** "Karen Jones-Hayes (Sheriff)" <MAILER-DAEMON>
**To:** ccso opr (Sheriff);Dawn Ertler (Sheriff)
**Subject:** Incident with officer in Cermak 7-3
**Date:** 2016-09-29 11:45:31 -0400
**h ttaci mes t :** SKM_364e16092818560.pdf

---

Please review attached document of incident between Officer Nawara and Superintendent Hayes.

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

Ti n ytras mn ms ymaf ycos tans ycos dl es tmporywrgme, el ys dormatms ws tes l el yos pf ydoryu eybf yti eys l rgl uaporyes ttf ytoy i rci yti eytras mn ms yn yal l re el hPdf ouyareys otyti eys tes l el yrecnvres tyf ouyareyi erebf s otmdel yti atyas f yl n cp urewl n emrs atms ycovf rs , yoryl n trrbutms yodyti n ytras mn ms yn y trrctpf ywroi rbtel hCpea eytreatyti n yas l yappoti eryl ocumes t ydromyti eyk oo' yk ous tf ySi ermdL yDevartmes tya yAh W ENFORk EMENTySENSPTPVEyyFORyOFFPk Ph AyUSEyONAYhFurti eryl n trrbutms yodyti n yl ocumes tyn yre trrctel ytoypa. yes dorcemes tya, es cre yws tepp, es ceya, es cre yas l yDevartmes tyodyDedes eyor, as rzatms yos pf w us pe yrmryavvrogapodyti eyk oo' yk ous tf ySi ermdL yDevartmes tyi a ybees yobtans el hKeevys ymrs l yti atyti n yl ocumes tyoryas f y e, mes tyti ereodymaf ys otybeyrepea el ytoyas f ymel my ource hDoys otyl n emrs atew i rci rs cpul e ydbr. arl rs , yti eycos tes t yodyti n yme a, ey rti outyti eyavvrogapodyti ey es l erI

---

**From:** copiers@cookcountyil.gov <copiers@cookcountyil.gov>
**Sent:** Wednesday, September 28, 2016 6:56 PM
**To:** Karen Jones-Hayes (Sheriff)
**Subject:** Message from KM_364e

# SHERIFF'S OFFICE OF COOK COUNTY
# OFFICE OF PROFESSIONAL REVIEW
# COMPLAINT REGISTER

**Complainant Information**

| NAME (Last, First, M.I.): | AGE: | DATE OF BIRTH: | HOME #: |
|---|---|---|---|
| Jones-Hayes, Karen | N/A | N/A | 773-350-3140 |
| HOME ADDRESS: 2700 S. California | CITY: Chicago | | WORK/OTHER #: 773-674-3813 |
| STATE: Illinois / ZIP CODE: 60608 | STATE I.D./D.L. #: | | STATE OF ISSUANCE: |

I HAVE BEEN NOTIFIED THAT, PURSUANT TO 50 ILCS 725/3.8(b), ANYONE FILING A COMPLAINT AGAINST A SWORN PEACE OFFICER MUST HAVE THE COMPLAINT SUPPORTED BY A SWORN AFFIDAVIT.

**Complainant Information**

DATE OF INCIDENT: 28 September 2016

TIME OF INCIDENT: 1045 hrs.

LOCATION OF INCIDENT: Basement control and Staging area

PROVIDE NAMES, BADGE NUMBERS, SQUAD NUMBER or LICENSE PLATE, and/or PHYSICAL DESCRIPTION OF THE OFFICER AGAINST WHOM YOU WISH TO FILE A COMPLAINT:

Officer John Nawara JDE# [redacted], Star no. [redacted], detailed to Cermak on the 7-.3 shift.

**Witnesses**

ARE THERE ANY WITNESSES YOU WISH TO BE CONTACTED DURING THE INVESTIGATION? ☐ YES ☐ NO
IF YES, PROVIDE CONTACT INFORMATION.

| NAME | ADDRESS/CITY/STATE/ZIP | HOME PHONE # |
|---|---|---|
| Officer B. Gannon | 2700 S. California Chicago, Il 60608 | 773-674-5800 |
| Sgt. T. Conley | 2700 S. California Chicago, Il 60608 | 773-674-5800 |
| | | |
| | | |
| | | |

**Narrative**

PROVIDE A FULL DETAILED ACCOUNT OF YOUR COMPLAINT AND THE NATURE OF THE INCIDENT.

At 1045 Hrs on September 28, 2016 R/Supt. Hayes #[redacted] made rounds in the basement of Cermak Health Services. Upon my arrival to the basement I observed the basement control door ajar; this is a violation of the directive put in place by me for security reasons. R/Supt Hayes entered the area and observed 3 Officers, I was unable to initially identify who they were due to their backs being to the entrance. R/Supt Hayes then tapped officer Nawara on the back top of his shoulder to gain his attention. Officer Nawara turned to faced me at which time I knew he was an assigned Cermak officer. Officer Gannon then turned to face me and I asked her who was the officer on the computer. Officer Turrisse then turned as I tapped him on the shoulder to see who he was and explained that he was doing a report for an incident that had just occurred.

■ CONTINUED ON REVERSE

FOR OFFICE USE ONLY
DATE COMPLAINT RECEIVED: ______________ RECEIVED BY: ______________

IAD/IG #: ______________

**Complaint Narrative (Continued)**

I began to ask Officer Nawara why were all the detainees in the staging area not cuffed to the rear as per my directive for this area. He began saying, "I can only do what I can do with the resources I have." I asked Officer Gannon the same question she stated it was busy and they didn't get to it. I then turned to Officer Nawara who is assigned to staging as well as responsible for ensuring the cuffing policy is followed, why are the detainees not cuffed to the rear? As I was addressing both him and Officer Gannon my hand touched his left shoulder, Officer Nawara began screaming, "don't touch me, don't touch me lady, don't put your hands on me period." Officer Nawara was exuding such rage it startled me and I was really taken by surprise. I immediately stepped back and and said, "if I offended you by inadvertently touching your shoulder I apologize, I will not make any kind of contact with you again officer," to get him to calm down. I gave directive to officer Nawara to report to staging and make sure the detainees were properly cuffed. He exited the basement control area and I went into the ER.

Moments later, Officer Nawara entered the ER screaming at R/Supt Hayes, "this is what I am talking about this fucking inmate just jumped in my face because I told him he had to be shackled. I am not dealing with this crap." I exited the ER and Officer Nawara followed me out with his voice still elevated telling me he don't have time for this shit. I asked Sgt. Conley to assist me in the staging area to locate this detainee that officer Nawara was speaking about. I turned and asked officer Nawara, "where is the detainee?" He had no idea at the time, a few moments later he noticed the detainee in the rear of staging. I asked the detainee to come to where I was standing, he complied. I then informed the detainee that he would be shackled and to have a seat where I pointed and he complied. I then gave Officer Nawara an order to shackle the detainee and I walked away. As I walked away Officer Nawara continued to antagonize me stating, "yeah why don't you walk around with me all fucking day so I can do my job." I replied, "No Officer Nawara I will not walk with you all day, but you will do the job you are being paid for." I then exited the area and directed the shift commander to follow up with the officers in the staging area to make sure all detainees were secured properly. (DIV8.CERMAK.CAMERA0.002)

**PLEASE BE AWARE THAT IF YOU ALLEGE INJURIES AS A RESULT OF THIS INCIDENT, DUE TO FEDERAL PRIVACY LAWS ON THE RELEASE OF MEDICAL RECORDS, YOU MUST PROVIDE COPIES OF YOUR RELEVANT MEDICAL RECORDS REGARDING ANY EXAMINATION OR TREATMENT TO THE SHERIFF'S OFFICE INVESTIGATING UNIT TO BE MADE PART OF THE INVESTIGATION.**

**I have read this statement that I have voluntarily made, consisting of ___ pages, and I solemnly swear that the facts and allegations contained within are true and correct to the best of my knowledge.** SUPT. KAREN JONES HAYES
**(Print Name)**

**Complainant's Signature:** [signature] **Date:** 28 SEPTEMBER 2016

**State of Illinois )**
**County of Cook )**

**Signed and sworn to before me on** 9/28/2016 **by** KAREN JONES-HAYES
**(date)** **(name of person making statement)**

"OFFICIAL SEAL"
LOUISE RODRIGUEZ
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 07/22/2017
**(Notary Seal)**

[signature]
**(signature of notary public)**

**A person commits PERJURY when, under oath or affirmation, in a proceeding or in any matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. PERJURY IS A CLASS 3 FELONY.**

Please mail your completed, **signed and notarized**, complaint form to:

**Cook County Sheriff's Office of Professional Review**
3026 S. California
Chicago, IL. 60608

| | |
|---|---|
| **From:** | "Karen Jones-Hayes (Sheriff)" <MAILER-DAEMON> |
| **To:** | Dawn Ertler (Sheriff) |
| **Subject:** | Incident with Officer Nawara, John |
| **Date:** | 2016-09-29 15:59:09 -0400 |

---

Hi Dawn,
I just wanted to touch on the incident that occurred on yesterday with myself and Officer John Nawara. On a daily basis I walk this unit engaging and talking with detainees and staff alike however, yesterday was an eye opening moment. Officer Nawara exuded such rage in his demeanor as I gave him a job related directive, that I felt it was important I inform all my superiors in the event of any future issues.

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
)
Plaintiff, ) Docket No. 17 C 2393
)
vs. )
)
COUNTY OF COOK, a unit of )
local government, et al., ) Chicago, Illinois
) October 9, 2019
Defendants. ) 9:00 a.m.

TRANSCRIPT OF PROCEEDINGS - Motion
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff: LAW OFFICES OF RICHARD LINDEN
BY: MR. RICHARD F. LINDEN
17 North Wabash, Suite 400
Chicago, Illinois 60602

LAW OFFICES OF PETER V. BUSTAMANTE
BY: MR. PETER V. BUSTAMANTE
17 North State Street, Suite 1550
Chicago, Illinois 60602

For the Defendants: SCHARF BANKS MARMOR LLC
BY: MS. SARAH R. MARMOR
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606

HON. KIMBERLY M. FOXX
STATE'S ATTORNEY OF COOK COUNTY
BY: MS. JOI KAMPER
500 Richard J. Daley Center
Chicago, Illinois 60602

Court Reporter: FRANCES WARD, CSR, RPR, RMR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2524A
Chicago, Illinois 60604
(312) 435-5561
frances_ward@ilnd.uscourts.gov

EXHIBIT
FF
exhibitsticker.com

THE CLERK: 17 C 2393, Nawara versus County of Cook.

MR. BUSTAMANTE: Good morning, your Honor.

Peter Bustamante on behalf of John Nawara.

THE COURT: Good morning.

MR. LINDEN: Good morning, your Honor.

Richard Linden on behalf of the plaintiff.

MS. MARMOR: Good morning, your Honor.

Sarah Marmor on behalf of Defendants Dart, Burke, Reierson, and Shelby.

MS. KAMPER: Good morning, your Honor.

Joi Kamper on behalf of Karen Jones-Hayes.

THE COURT: Good morning.

We are here on a motion for leave to file supplemental material in connection with the sanctions issue.

Let me just tell you my conclusion from what was submitted is that it's the plaintiff's position that the defendant challenges, but it's plaintiff's position that Ms. Williams really had no direct involvement in any decisions regarding Mr. Nawara and is not appropriately even called as a witness, which seems to me to suggest you don't have any problem with my barring Ms. Williams from testimony in this on behalf of the plaintiff.

MR. LINDEN: I think we do, Judge. We really don't want our hands tied. Mr. Nawara did nothing improper. The

defense don't seem to concede that she had no involvement.

And there is one issue about a time gap where I think Matthew Burke made a referral for an evaluation in September. And the actual fitness-for-duty evaluation wasn't until November. The referral went to Ms. Williams, and then somehow it got to Ms. Reierson in human resources. We just don't know. I think we should have the right to at least talk to her if we choose and see what she knows. Right now we don't know. It appears she didn't have any involvement in the actual fitness for duty, but we just don't think the plaintiff himself should be subjected to any sanctions.

THE COURT: Then I don't really understand the thrust of your motion.

MR. LINDEN: I guess just let the Court have everything out there. I know you made a decision regarding sanctions. We obviously didn't get into the specifics involving Ms. Kurtz and the conflict. But it seems that if she had no involvement whatsoever, I really don't understand where the defense is coming -- what they are worried about, the communication -- the false confidential communication to us if she had nothing to do with it. We thought it would be wise just to give the Court the whole picture.

THE COURT: I appreciate having the full record, but your position is that she had nothing to do with it.

MR. LINDEN: As far as I know right now.

THE COURT: So there is no reason for -- but right now is years into the case. So long as you are comfortable that she didn't have any direct involvement, I don't see any problem with barring Mr. Nawara from interviewing or calling her as a witness. She has nothing to do with it.

MR. LINDEN: I guess we don't know that. If they are going to represent she had no involvement, we do want to find out why there is a gap. What happened?

Mr. Burke, the chief of staff, sent over a referral that he be evaluated for fitness for duty. And that occurred in September. He was allowed to work and carry a firearm from September until November, and somehow the process got started in November.

So we would like to know what the time gap was. I think there has been some suggestions that maybe the dates of the documents were altered, that maybe Ms. Jones-Hayes didn't really make her complaints in September, that she waited until after Mr. Nawara complained about her and then sent a memo to Mr. Burke. I know Ms. Kurtz tried to get -- I believe I saw in the file computer records. They claim they didn't have the computer or the records to show when the complaint was actually made. So we just don't know, but I don't think we should be hamstrung.

MS. MARMOR: Your Honor, could I respond to that?

THE COURT: Sure.

MS. MARMOR: First, there are documents in this case that we have produced that show why there was a gap. And the plaintiff is fully capable of looking at those documents and understanding that and asking witnesses who were actually involved, like Mr. Burke, about that, or they could have asked Ms. Reierson or Ms. Shelby about that. They both knew what the reason was.

The second issue is, it's not true -- I completely understand your Honor's point, and that's the point we made in our responsive pleading to this, which we filed yesterday. I don't know if your Honor got a copy of it.

THE COURT: I did. I saw it.

MS. MARMOR: Which is that, of course, we disagree that she -- that she had nothing to do with this. We provided all of that information a year ago -- more than a year ago at this point.

And this notion that there is some question about the dates about when the OPR complaint was filed has been -- we also have provided documents that dispel that notion. So this sort of -- this flight of fancy about what Ms. Williams might be able to tell them is just that.

MR. LINDEN: Just one point, Judge, if I may?

I guess if she had no involvement in what they are saying and we have no need to talk to her, why is all this concern by the defendants regarding Ms. Williams? That part

I don't understand.

MS. MARMOR: That, your Honor, is exactly -- sorry.

MR. LINDEN: We would just like to find out and not be hamstrung. I mean, the plaintiff didn't do anything wrong. We are not going to elicit any confidential communications from Ms. Williams. And I think it's pure speculation for them to say, oh, Ms. Williams can't be trusted. They are going to somehow divulge to us some kind of confidential information, I think, is just kind of disingenuous, I believe.

MS. MARMOR: Your Honor, I think I have established that's not the position we have taken. It's not the position we take. Their motion, as your Honor rightly says, doesn't establish any reason for considering this new information.

THE COURT: I don't think anybody should be hamstrung. And at this point I haven't heard that anyone is.

What I'm hearing is that you would like to submit the full transcript from Ms. Williams' deposition. The declarations and the evidentiary record in support of the motion to disqualify is already very complete. And I don't know that we need this information. I am not even hearing that Mr. Nawara has a specific need to talk to Ms. Williams.

What I'm hearing is, well, he might. Maybe she knows something about the time gap, a time gap that the defendants insist has been explained by other evidence in the

case. I'm just not hearing a need for Mr. Nawara to talk to Ms. Williams. And I am very concerned about the fact that the same lawyer was representing them both for a period of time.

So what I think I should do is grant your motion for leave to file the additional materials but direct that Mr. Nawara not have any contact with Mr. Williams -- I'm sorry -- with Ms. Williams or her lawyer in connection with this case absent some showing of need, which I haven't even heard. You are suggesting there might be some need. I haven't even heard that.

MR. LINDEN: One other problem I think we have -- our understanding is that there are affidavits or emails submitted *in camera* to your Honor to review, which are not part of the record, having something to do with Ms. Williams.

I know in a normal *in camera* review privileged material -- you know, it's done all the time to determine if something is privileged. But here it seems like they used documents submitted under seal to argue substantively that there is some sort of conflict of interest. I guess we would like to see those. And without seeing those, it's kind of hard to come to a conclusion that she had absolutely nothing to do with this case.

THE COURT: But that's the position you are taking when you tell me that there should be -- that's exactly the

position the plaintiff is taking. She had nothing to do with this case. That's the position the plaintiff has taken for months and months.

If you need access to documents or records that you haven't seen, I think the first step, obviously, is to talk to the other side about that. If you have a disagreement, you file a motion. But right now I think we should set a trial date.

MR. LINDEN: Okay. But Ms. Kurtz, we have a problem not being able to communicate with her.

THE COURT: I think you are very good lawyers who can handle this without her involvement.

MR. LINDEN: I have got a couple other cases I work with her on. So I assume it wouldn't be --

THE COURT: Oh, it only relates to this case.

MR. LINDEN: Am I allowed to ask her, do you have these documents or these interrogatories? We took over the case, obviously, a little bit late in the game.

THE COURT: Well, my understanding is that Ms. Kurtz was responsible to provide her file to you. If she hasn't done that, that's something that you need to discuss with her. And if there are documents that you don't have that were requested in discovery at some point and you didn't get them, you need to talk to the other side about that.

Let's set a trial date.

MR. LINDEN: We are probably going to file a partial summary judgment -- I don't think it should affect the trial date -- for liability. I think it's quite clear that they violated the ADA from a liability standpoint.

THE COURT: What do you think are Mr. Nawara's damages flowing from that violation?

MR. LINDEN: I think the pay by itself would be 70 to 80,000 range, and the other damages, you know, mental anguish and other items --

THE COURT: He was kept out of the position for how long?

MR. LINDEN: I think it was about 10 months total.

THE COURT: And his --

MR. LINDEN: Part of it was without pay. Part of it he had to use his own time. He wasn't allowed to work for, I believe, eight or nine months. Ms. Marmor could correct me if I'm wrong, but I think that's kind of the time frame we are talking about.

THE COURT: Well, the date for dispositive motions has long come and gone, so you need to file a motion for leave to do that.

But let's set a trial date right now. How is -- I am looking at the middle of February. February 17th.

MR. BUSTAMANTE: One second, your Honor.

(Brief pause.)

MR. BUSTAMANTE: I have a trial starting February 6th, your Honor, which will take probably a week. End of February --

THE COURT: Will the 24th of February be a little bit better?

MR. BUSTAMANTE: That's good.

MS. MARMOR: It's fine with me, your Honor.

MS. KAMPER: Fine for me.

THE COURT: And I'm thinking about a week. What is your sense about how long?

MR. LINDEN: Probably, from our standpoint, if we can get the -- we plan to file the motion for summary judgment --

MR. BUSTAMANTE: She just said it's gone.

THE COURT: You are going to have to seek leave to do that.

MR. LINDEN: No. We will. But probably a week.

THE COURT: All right. A week trial.

All right. Great. Well, then why don't we say that -- set the trial for February 24th. And I want to ask that the final pretrial order be submitted by January 24th, so about a month before trial. And that would require the plaintiff to get a draft to the defendant on, say, the 10th of January.

MR. LINDEN: Okay.

MS. MARMOR: Your Honor, at the next status hearing -- the last order from the Court said at the next status hearing we would be discussing the extent of sanctions. Do you still want us to prepare for that?

THE COURT: I do want to have a hearing on that, but the 13th may not be that good anyway. Why don't we set a status in December, and we can talk about it then.

MS. MARMOR: That's fine, your Honor. Thank you.

THE COURT: Okay. December 12th.

MS. MARMOR: Fine with me, your Honor.

THE COURT: All right. Thank you.

MR. LINDEN: Okay. Thank you.

MR. BUSTAMANTE: Thank you, your Honor.

MS. MARMOR: Thank you.

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward_________________________October 21, 2019.
Official Court Reporter
F

# MANAGEMENT GUIDELINES FOR FITNESS FOR DUTY CONCERNS

**Cook County Sheriff's Office Legal Department**

As management and supervisors within the Cook County Sheriff's Office (CCSO), it remains our duty to ensure that our subordinates are in proper mental and physical fitness to perform the essential functions of their job. We strive to protect the welfare of our employees while ensuring the safety and security of this Office, the people, and places it serves. The following is designed to assist us in this mandate. These Guidelines are provided to ensure that you understand the role each Department Head and supervisor plays in the fitness for duty process and to ensure that you consistently apply these guidelines. Please read the following carefully and contact HR and/or the Legal Department with any questions. Please remember, as has always been the case, it is not your duty to determine whether an employee is "unfit" to conduct his or her job. Rather, you must observe and monitor your subordinates; document when those observations suggest a subordinate may be "unfit," and forward those observations and concerns to HR as soon as possible. HR will then coordinate the fitness for duty evaluation (if applicable) with the employee and a third party service provider.

The following breaks down specific actions that supervisors, managers and Department Heads should take when confronted with a fitness for duty situation.

## I. SUPERVISOR RESPONSIBILITIES AND STEPS TO TAKE

### A. Determining Whether a Fitness for Duty is Needed

A supervisor must ensure his subordinates are physically and mentally fit for work and able to perform their job-related duties.

- Concerns about an employee's fitness for duty may come to your attention in a number of ways. An employee may approach you with a specific concern about his or her ability to perform a job function or you may observe a subordinate exhibiting behavior or conduct that suggests the subordinate may have a mental or physical problem that impairs him or her from doing their job. A supervisor observing an employee or receiving a report about an employee, who is unable to safely and effectively perform his/her essential job functions due to a legal, physical or mental condition, shall take prompt and appropriate action in an effort to resolve the situation while ensuring the workplace remains safe and secure.
- When assessing whether the employee is still capable of performing the essential functions of his or her job, it is important that you can identify a legitimate reason to doubt the employee's capacity to perform his or her duties.
- It is not the supervisor's responsibility to inquire about an employee's health status or medical condition. It is also not the supervisor's responsibility to find or prove that an employee is unfit. Instead, a supervisor should identify the cause(s) of concern, whether reported or observed, clearly document those concerns and report them to HR. HR is designated to be the sole Department for determining the need to send an employee to a fitness for duty evaluation.
- While it is not a supervisor's duty to determine fitness or order a fitness evaluation, it is the duty of the supervisor and Department Head to determine whether the officer or employee should be removed from their assigned post, if the observations and concerns arise while the officer is on-duty.
- Please remember, it is not discipline to seek help for an employee who demonstrates signs of physical or mental impairment that affects him/her from doing his/her job. Seeking HR's assistance in assessing whether an employee has a fitness issue benefits the employee, his/her fellow employees and the CCSO in general. It is not a matter of being right or wrong, but being safe and secure.
- As a supervisor, when assessing whether a referral to HR is needed, you must have a reasonable belief,

EXHIBIT JJ exhibitsticker.com

based on objective evidence, that a condition may impair an employee's ability to perform the essential job functions or that the employee will pose a threat. This belief cannot be based on general assumptions and you should have objective evidence when referring the matter to HR.

- o Behavior that is annoying or inefficient does not justify a referral for evaluation; there must be a genuine reason to doubt whether the employee can perform the job-related functions.

- When referring the matter to HR, all police reports, incident reports, witness reports and any other documentation used in your assessment should be included with the notification/request to HR.

- Whenever feasible, a Supervisor should try to ascertain the reason or source of the problem and in all cases, a preliminary evaluation should be made in an effort to determine the employee's level of inability to perform his or her essential job functions.

  - o As soon as practicable, a Supervisor should thoroughly document his/her observations and any action taken. A supervisor should not wait until a perceived threat becomes real or questionable behavior results in injury or harm.

- The following are examples of circumstances to consider if you have a genuine belief that an employee's fitness for duty is at issue (this list is not exhaustive but should be used as examples). Please note the following may require mandatory notification to HR:

  - o Allegation of domestic violence (*e.g., the employee was arrested for domestic battery or served with a domestic Protective Order, or an allegation of domestic violence was made against the employee*) ***mandatory notification***;
  - o Involved in life-threatening critical incidents (*e.g., a shooting*) - ***mandatory notification***;
  - o Hospitalized as an in-patient at a mental health treatment facility - ***mandatory notification***;
  - o Expressed suicidal or homicidal thoughts or other expressions of mental instability (*e.g., wishing to harm other people or employees*) or exhibits irrational and paranoid-type feelings relating to life and death issues in the workplace - ***mandatory notification***;
  - o Makes or poses direct threats of physical harm to one's self, supervisors or others;
  - o Demonstrates an abrupt and negative change in customary behavior related to an inability to perform essential job functions (*e.g. unable to conduct tier count due to fatigue, depression or physical impairment*) - ***mandatory notification***;
  - o Exhibits irrational verbal conduct or behavior, delusion or hallucination - ***mandatory notification***;
  - o Exhibits hyperactivity, or unexplained and excessive tiredness;
  - o Demonstrates symptoms of inappropriate use of alcohol, medications or other drugs, including illegal drug use;
  - o Exhibits unusual or significant memory loss;
  - o Exhibits impatience or impulsivity, especially with a loss of temper or irrational anger;
  - o Exhibits pattern of conduct indicating:
    - An inability or a decreased ability to defuse tense situations;
    - A tendency to escalate tense situations; or
    - A tendency to create confrontations;
  - o Physical condition affecting one's primary job duties; or
  - o Based on the totality of the circumstances, any other factor (or combination of factors) that causes a supervisor to reasonably suspect that a fitness for duty referral for evaluation may be necessary due to the employee being unable to perform his/her job or that they may pose a threat (*e.g., excessive force incident, sexual misconduct, obvious physical limitations that affect their ability to perform their job*).

- In the event the employee appears to be in need of immediate medical or psychiatric treatment, all reasonable efforts should be made to provide such care, in coordination with HR.

**B. <u>Steps to Take When Referring a Fitness for Duty</u>**

If the supervisor believes a fitness for duty may be required, he or she shall do the following:

- Notify the Department Head and Director of HR or their authorized designees;
- Complete and submit a Request for Fitness for Duty Evaluation Form and submit the Form, with any supporting evidence, as specified;
  - o The form must cite all applicable specific examples of behavior or verbalizations, the date(s) and time(s) associated with such behavior/verbalizations, work productivity or lack thereof, including any observations made by witnesses and other supervisors and include applicable attachments such as incident reports and to/from memoranda, police reports etc.;
  - o Any ongoing course of action or pattern of behavior over time should be combined on one request form. For each unrelated, separate incident or any subsequent request, a new request form shall be completed;
  - o The form and any relevant supporting documents shall be forwarded (as specified on the form) to the respective Department Head <u>and</u> HR or the authorized designee;
- Work with the Department Head to determine whether the employee needs to be de-deputized or deemed "Not Authorized to Carry a Weapon."
  - o Work with the Department Head to determine whether the employee should be removed from the workplace. If so, written notification to the employee will be handled by HR.
- Supervisors should be mindful that a situation calling for a request for fitness for duty may be triggered by mental, emotional or physical issues affecting an employee. Such incidents and the referral to HR should be treated with the appropriate level of sensitivity and confidentiality.
- A supervisor must counsel, or, when applicable, discipline employees for violations of the rules of conduct, failing to perform their job or failing to meet expectations in their performance, even if the failure appears to be related to a fitness for duty issue. It is each employee's responsibility to report for duty physically and mentally fit. Failure to maintain such fitness is a violation of our General Orders.
  - o Discipline is independent of and may be unrelated to fitness for duty evaluations, although the need for both can arise out of the same circumstances.
- A supervisor must be able to articulate what an employee's responsibilities are to remain fit.

**II. EMPLOYEE RESPONSIBILITIES**:

- o It shall be the responsibility of each member of this department to maintain good physical and mental condition sufficient to safely and properly perform essential duties of their position.
- o Each member of this department shall perform his/her respective duties without physical, emotional, and/or mental constraints.
- o During working hours, all employees are required to be alert, attentive, and capable of performing their assigned responsibilities.
- o Any employee who feels unable to perform his/her duties shall promptly notify a supervisor. In the event that an employee believes that another employee is unable to perform his/her duties, such observations and/or belief shall be promptly reported to a supervisor and documented accordingly.

- When communicating with an employee dealing with a fitness for duty issue, supervisors should inform the employee to comply with the process and any requirements given by HR and remind the employee that there are confidential Employee Assistance Programs available to staff.

## III. DEPARTMENT HEAD REPSONSIBILITIES AND STEPS TO TAKE:

Department Heads must coordinate with Supervisors and Managers to ensure the workplace is safe and secure and that employees are fit for duty.

- Department Heads/designees are responsible for making the decision to remove an employee from the workplace, pending an evaluation by HR if the employee is demonstrating signs they pose a safety and security risk to others, themselves or the operations of CCSO in general.
- If a Department Head believes that removing the employee from the workplace is required before any evaluation by HR has taken place, he/she may do the following:
  - De-deputize the employee (if applicable);
  - Temporarily transfer the employee to another location/position that alleviates the workplace concerns (*please refer to applicable CBAs/confer with the Legal and Labor Department*); or
  - Remove the employee from the workplace.
- Any of these actions must be documented and include supporting documentation such as incident reports, arrest reports, to/from memoranda etc., that form the basis for your belief that the employee was not capable of doing their job or that they posed the threat.
  - In such cases, the Legal and Labor department should be consulted, if possible, prior to the action being taken.
- Department Heads must cooperate with HR to assess the need for a fitness for duty evaluation for an employee.

Department Heads and supervisors understand the impact an employee who is unfit has on the operations, safety and security of a workplace. That knowledge must be conveyed to HR so that HR can order the proper fitness for duty evaluation and establish the proper parameters of the fitness evaluation for an employee.

# CHECKLISTS

**Supervisor Fitness for Duty Checklist**:

Stay observant of subordinates;

Document incidents, reports behaviors or verbalizations you observe or are reported to you concerning an employee's fitness for duty that casts legitimate and non-discriminatory doubt they can perform their job duties or behavior/verbalizations that indicate the employee may be a threat to themselves, others or the public at large;

Fill out a Request for Fitness for Duty Evaluation Form and submit the Form to your Department Head and HR with supporting documents attached; and

Assist the Department Head in determining the need to remove the employee from the workplace and whether de-deputization is appropriate.

**Department Head Checklist**:

Evaluate the documentation from the Supervisor to determine whether the employee must be removed from work and/or if additional information, including documentation, is needed.

Evaluate the situation to determine whether the employee should be de-deputized;

Forward all relevant information and documents to HR;

Ensure that Personnel Memoranda are issued and requirements under the SEAM/applicable CBAsare met;

Coordinate with HR to determine the status of the Fitness For Duty evaluation;

Facilitate the Return to Work of employee when applicable;

Remain cognizant that these are confidential matters, when possible; and

Remember that the Legal Department (312.603.3396) is available to assist you with questions or concerns.

**From:** "Mary McQuillan (Sheriff)" <Mary.Mcquillan@cookcountyil.gov>
**To:** "Karyn Williams (Sheriff)" <Karyn.Williams@cookcountyil.gov>
**CC:** "Nneka Jones Tapia (Sheriff)" <Nneka.Jonestapia@cookcountyil.gov>, "Tarry Williams (Sheriff)" <Tarry.Williams@cookcountyil.gov>, "Matthew Burke (Sheriff)" <Matthew.Burke@cookcountyil.gov>
**Subject:** Fitness for Duty - Ofc. J. Nawara
**Date:** 2016-09-29 16:11:42 -0500
**Attachments:** Fitness_for_Duty_-_Ofc._J._Nawara_Sept._2016.pdf

---

Karyn,

Attached, please find a request for a Fitness for Duty Evaluation for Ofc. John Nawara, JDE#[redacted], Cermak 7-3/7. Please be aware that Ofc. Nawara is being transferred to External Operations, 6-2/7, per Article U SEAM, effective Sunday, 10/02/16.

Thank you,

Mary B. McQuillan
Executive Assistant to the Executive Director
Cook County Department of Corrections
Office (773) 674-4465
Mary.McQuillan@cookcountyil.gov

EXHIBIT
LL
exhibitsticker.com

***COOK COUNTY DEPARTMENT OF CORRECTIONS***
***MEMORANDUM***

| | | |
|---|---|---|
| **TO:** | **Karyn Williams, Executive Director**<br>Bureau of Human Resources | **DATE:** 09/29/16 |
| **FROM:** | Matthew Burke, Chief of Staff | |
| **SUBJECT:** | **Fitness for Duty** | |

Pursuant to the attached documentation, I am requesting that Ofc. John Nawara, JDE#[redacted], Cermak, 7-3 Shift Detail 7, be evaluated for fitness for duty.

C: Nneka Jones Tapia, Executive Director
Tarry Williams, DOC Chief of Operations

I certify, that no political reasons or factors were considered in any decision I made or action I took relating to this employment action. Further, I do not know of, or have any reason to believe that, anyone else considered or took action based on political reasons or factors with respect to this employment action.

**SIGNATURE**

**Dawn Ertler (Sheriff)**

---

**From:** Karen Jones-Hayes (Sheriff)
**Sent:** Thursday, September 29, 2016 2:59 PM
**To:** Dawn Ertler (Sheriff)
**Subject:** Incident with Officer Nawara, John

Hi Dawn,
I just wanted to touch on the incident that occurred on yesterday with myself and Officer John Nawara. On a daily basis I walk this unit engaging and talking with detainees and staff alike however, yesterday was an eye opening moment. Officer Nawara exuded such rage in his demeanor as I gave him a job related directive, that I felt it was important I inform all my superiors in the event of any future issues.

***Superintendent Karen Jones-Hayes***
***Cook County Department of Corrections- Cermak***
***2650 South California Ave. Chicago, Illinois 60608***
***Office: 773-674-3813***
***Email: Karen.Jones-Hayes@cookcountyil.gov***

**This transmission may contain confidential or privileged information, intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. Please treat this and all other documents from the Cook County Sheriff's Department as LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY. Further distribution of this document is restricted to law enforcement agencies, intelligence agencies and Department of Defense organizations only, unless prior approval of the Cook County Sheriff's Department has been obtained. Keep in mind that this document, or any segment thereof, may not be released to any media sources. Do not disseminate, which includes forwarding the contents of this message, without the approval of the sender.**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. )No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The Video Discovery Deposition of JOHN NAWARA, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 333 West Wacker Drive, Suite 450, Chicago, Illinois, on October 2, 2019, at the hour of 9:48 o'clock a.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.



APPEARANCES:

LAW OFFICES OF RICHARD LINDEN,
BY: MR. RICHARD F. LINDEN,
17 North Wabash Avenue,
Suite 400,
Chicago, Illinois 60602
(Phone Number Not Provided)
lindenlaw@gmail.com
- and -
LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER VINCENT BUSTAMANTE,
17 North State Street,
Suite 1550,
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff;



APPEARANCES (Continued):

SCHARF, BANKS, MARMOR, LLC,
BY: MS. SARAH R. MARMOR,
MR. MORGAN G. CHURMA,
333 West Wacker Drive,
Suite 450,
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
mchurma@scharfbanks.com
Representing Thomas Dart,
in his official capacity
as Sheriff of Cook County,
Illinois, Matthew Burke,
Rebecca Reierson, and
Winifred Shelby;



APPEARANCES (Continued):

COOK COUNTY STATE'S ATTORNEY'S OFFICE,
BY: MS. MEGAN MARIE HONINGFORD,
50 West Washington Street,
Fifth Floor,
Chicago, Illinois 60602
(Phone Number Not Provided)
megan.honingford@cookcountyil.gov
Representing County of Cook,
a unit of local Government;

STATE'S ATTORNEY OF COOK COUNTY,
ILLINOIS,
BY: MR. LYLE K. HENRETTY,
50 West Washington Street,
Suite 2760,
Chicago, Illinois 60602
(312) 603-1424
lyle.henretty@cookcountyil.gov
Representing Karen Jones-Hayes.



EXHIBIT
NN
exhibitsticker.com

ALSO PRESENT:

MR. DAVID LEHMAN,
Certified Legal Video Specialist,
McCorkle Litigation
Services, Inc.;

MR. JESSE KEHR,
Senior Paralegal,
Scharf, Banks, Marmor, LLC.



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| JOHN NAWARA | |
| By Ms. Marmor | 10 |
| By Mr. Henretty | 274 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 1 | 31 |
| Exhibit No. 2 | 37 |
| Exhibit No. 3 | 58 |
| Exhibit No. 4 | 68 |
| Exhibit No. 5 | 80 |
| Exhibit No. 6 | 92 |
| Exhibit No. 7 | 112 |
| Exhibit No. 8 | 116 |
| Exhibit No. 9 | 118 |
| Exhibit No. 10 | 121 |
| Exhibit No. 11 | 154 |
| Exhibit No. 12 | 155 |
| Exhibit No. 13 | 157 |
| Exhibit No. 14 | 162 |
| Exhibit No. 15 | 170 |




E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 16 | 171 |
| Exhibit No. 17 | 175 |
| Exhibit No. 18 | 178 |
| Exhibit No. 19 | 186 |
| Exhibit No. 20 | 189 |
| Exhibit No. 21 | 189 |
| Exhibit No. 22 | 191 |
| Exhibit No. 23 | 192 |
| Exhibit No. 24 | 194 |
| Exhibit No. 25 | 207 |
| Exhibit No. 26 | 212 |
| Exhibit No. 27 | 215 |
| Exhibit No. 28 | 219 |
| Exhibit No. 29 | 222 |
| Exhibit No. 30 | 224 |
| Exhibit No. 31 | 226 |
| Exhibit No. 32 | 231 |
| Exhibit No. 33 | 233 |
| Exhibit No. 34 | 234 |
| Exhibit No. 35 | 237 |
| Exhibit No. 36 | 245 |




E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 37 | 250 |
| Exhibit No. 38 | 255 |

VIDEOGRAPHER LEHMAN: My name is David Lehman, Certified Legal Video Specialist with McCorkle Litigation Services, 200 North LaSalle, Suite 2900, Chicago, Illinois 60601.
I'm the videographer on October 2nd, 2019 for the recording of the deposition of John Nawara being taken at 333 West Wacker Drive, Chicago, Illinois 60606 at the time of 9:48 a.m. in the matter of Nawara versus Dart, et al., Case No. 17 CV 2393.
Will counsel please identify themselves for the record beginning with the plaintiff's counsel.
MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.
MR. LINDEN: Richard Linden on behalf of John Nawara.
MS. MARMOR: Sarah Marmor on behalf of Sheriff Dart, Matthew Burke, Winifred Shelby, and Rebecca Reierson.
MR. CHURMA: Morgan Churma on behalf of Sheriff Dart, Rebecca Reierson, Matthew Burke, and Winifred Shelby.
MR. HENRETTY: Lyle Henretty on behalf of



defendant Jones-Haynes.
MS. HONINGFORD: Megan Honingford on behalf of Cook County.
VIDEOGRAPHER LEHMAN: Will the reporter please swear in the witness.
(WHEREUPON, the witness was duly sworn.)
JOHN NAWARA,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. MARMOR:
Q. Good morning. My name is Sarah Marmor, as you just heard. I represent most of the defendants in this case.
And I want to start out, your name has been pronounced about eight different ways in this case, so how do you pronounce your last name?
A. Nawara.
Q. Nawara. Okay. That's what I'll try to remember to do. And could you state your full name for the record?



A. John Nawara.
Q. No middle name?
A. Anthony.
Q. Anthony. Okay. And where do you live?
A. Willow Springs.
Q. And what's your address?
A. [redacted]
MR. LINDEN: Just for the record it's agreed it's subject to the protective order?
MS. MARMOR: Yes. Absolutely.
BY MS. MARMOR:
Q. And what's your date of birth?
A. [redacted]-75.
Q. And so how old does that make you today?
A. 44.
Q. 44. Okay. Have you been deposed before?
A. I have.
Q. How many times?
A. Once.
Q. Okay. So I'm just going to cover some of the basic ground rules for a deposition. We need you to answer questions verbally. No



"uh-huh" or "uh-uh" so that we can understand exactly what your answer was. Is that fair?
A. Yes.
Q. And I'm only asking today for your personal knowledge. I'm not asking you to speculate. If you think that a question I've asked you will cause you to speculate, please let me know. Is that okay?
A. Yes.
Q. All right. And please tell me if you don't understand a question that I'm asking you because if you answer the question, I'll assume you understood it. Okay?
A. Yes.
MS. MARMOR: And actually, Morgan, will you do me a favor and get me some water?
BY MS. MARMOR:
Q. We should -- the court reporter already sort of explained this to you, but let's try not to talk over each other. I will try to let you finish your answers. Please let me finish my question. It's natural for people to anticipate what somebody is going to say, and so let's as best we can try not to do that. Okay?

A. Yes, ma'am.
Q. And in terms of breaks, you are allowed to take a break when you want, and I'm happy to accommodate it. The only rule, and your lawyers do it in their depositions, too, is we don't take a break when there's a question pending. Okay?
A. Okay.
Q. Finally, are you on any medication today that would affect your ability to answer completely and truthfully?
A. No, ma'am.
MS. MARMOR: Okay. I guess Morgan didn't realize there was water back there.
MR. HENRETTY: Didn't want to step in the picture.
MS. MARMOR: Good point.
BY MS. MARMOR:
Q. Mr. Nawara, have you ever been married?
A. No.
Q. So you're not currently married. Are you currently engaged to anyone?
A. No.
Q. Do you currently have a girlfriend?

13

A. Yes.
Q. Okay. And the reason I'm asking this is there is sort of different documents throughout that suggested different dates, and we'll get to those documents, but is the girlfriend that you're dating now the one that you began dating in May of 2017?
A. No.
Q. Okay. Do you have any children?
A. No.
Q. Can you tell me your educational background starting from high school on?
A. Completed grades 1 through 12 and some college.
Q. And what college did you do?
A. Various colleges, Triton, Moraine, South Suburban.
Q. And what did you study at those colleges?
A. Law enforcement.
Q. And you never got a degree?
A. No.
Q. Do you remember the years that you went to those colleges?

14

A. No, ma'am.
Q. Okay. Do you have any kind of professional certificates?
A. Many.
Q. Okay. And what are those?
A. I don't know. I have a lot of them.
Q. Can you remember any of them?
A. Certifications in CPR, FEMA, firearms, police certification.
Q. And that's what you can remember today?
A. Yes, ma'am.
Q. Okay. When did you start working at the Cook County Sheriff's Office?
A. September 28, 1998.
Q. What year did you graduate from high school?
A. '93.
Q. So what did you do from 1993 to 1998?
A. Worked for Chicago Board of Trade and then worked at a hardware store close to my house.
Q. What did you do at the Chicago Board of Trade?
A. Broker's assistant, ARB clerk, various

15

pits, various ARB -- clerking in various pits as an ARB clerk, as a broker's assistant wearing a headset, taking orders.
Q. In the days when people would do callouts and that kind of thing?
A. Correct.
Q. Okay. And how long were you working there?
A. Four years at the Chicago Board of Trade, one year at the Mercantile Exchange.
Q. And then did you leave there and start working at the hardware store?
A. No. Worked at the hardware store for probably about 16 years old, maybe 16 to 19 or 20 years old. So they kind of overlapped.
Q. Okay. Got it. Got it. Okay. And were you just working in regular retail at the hardware store?
A. Correct.
Q. Okay. And you say you joined the Cook County Sheriff's Office in 1998, is that right?
A. Yes, ma'am.
Q. And I take it you applied, and is there

16

a sort of test that you take in order to join the police or do you just go through the Academy?
A. You have to fill out an application, general application, that at the time they were handing out at the -- where was it -- the Cook County building down here. And then you wait for a call, and you take a general test, yes.
Q. And then you go to the Academy?
A. No. There's several interviews, a few drug tests, and then eventually if I guess you make the list or however high you make the list, and depending how many people they need for the class, then eventually they call you, yes.
Q. Okay. But when they eventually call you, then you start at the Academy?
A. Yes, ma'am.
Q. Okay. And what years -- how long were you at the Academy?
A. Probably about 12 weeks, I believe.
Q. And when you tell me that you began working on December -- sorry -- September 28, 1998, is that when you started at the Academy or when you graduated from the Academy?

17

A. That was my start date at the Academy.
Q. What was your title or job right out of the Academy?
A. Correctional officer.
Q. And were you still a correctional officer in 2016?
A. Yes, ma'am.
Q. Did you ever -- I understand there are certain kinds of tests you can take to rise up in the ranks at the Sheriff's Office. Did you ever take any of those tests?
A. Yes, ma'am.
Q. And what tests did you take?
A. Tests for electronic monitoring, sergeant's test, the test for the special operations team, the test for the emergency response team, test for court services. I believe that's it.
Q. So did you -- I may be mixing apples and oranges, so I want to understand. The sergeant's test would be testing to get a promotion, correct?
A. Yes, ma'am.
Q. And did you pass that test?

18

A. Yes, ma'am.
Q. And did you try -- did you apply for a sergeant's job?
A. I don't understand.
Q. Well, I'm confused because you were still a correctional officer as of 2016.
A. Correct.
Q. Did you ever become a sergeant?
A. No, ma'am.
Q. And why not?
A. I don't know.
Q. This electronic monitoring test, is that just so that you can do it or is that actually a promotion?
A. I'm considered a promotion. Get a different badge that says investigator on it, and you get a bump in pay. So I consider that a promotion.
Q. And did you get that promotion?
A. No, ma'am.
Q. How about special ops, is that a promotion?
A. The badge also changed, and the uniform changed. The IDs changed. And it was

19

considered a promotion. There was no bump in pay, but everyone considered it a promotion.
Q. And did you get that promotion?
A. Yes, ma'am.
Q. And when did you get that promotion?
A. June I think of 2002.
Q. And in 2016 were you still part of special operations?
A. No, ma'am.
Q. And why not?
A. They disbanded the team.
Q. You said the emergency response team was another one. Was that a promotion? Do you consider that a promotion?
A. Yes, ma'am.
Q. And did you get that promotion?
A. No, ma'am.
Q. Is court services a promotion in your view?
A. I believe so, yes. I believe there is a bump in pay in that, also.
Q. And did you get that promotion?
A. No, ma'am.
Q. In 2016 were you a member of a union?

20

A. Yes, ma'am.
Q. And what union was that?
A. The Teamsters.
Q. Today are you a member of a union?
A. I'm told -- I don't know. I'm in probationary status at the moment, so I don't know.
Q. And that's because you're now -- you're in the process of becoming a sheriff's police, correct?
A. Been a police officer now for about a month.
Q. When did you apply to become a sheriff's police officer?
A. About six years ago maybe? 2014, '13?
Q. And when you -- I know you were off work in 2017 for a period of time, and you came back in 2017. Did you do something in 2017 to kind of reactivate that application? I'm just trying to figure out, understand how you came -- if you applied in 2013 or 2014 but you didn't actually go through the training and that kind of thing until this last year --
A. Then I'm thinking I'm misunderstanding



your question. I believe your question to originally be when I first applied to the Sheriff's Police Department.
Q. No, no. That wasn't my question. Yes, that was my question, and this is because I don't understand this, so anything you can do to help me.
A. I believe I applied in about 2013 or '14, approximately about six years ago. If you were not taken over to the Sheriff's Police Department, if you are not promoted to the Sheriff's Police Department within a two-year period, every two-year period the process starts over again. So there has been three different applications since then.
Q. Okay. Thank you. That's very helpful.
Now, based on your current status, when did you apply for the Sheriff's Police and in fact got the promotion?
A. It was September of '16 or '17. I can't remember exactly.
Q. And you went to the Academy for that, is that right?
A. Yes, ma'am.



Q. And you graduated from the Academy when?
A. August 23rd of this year.
Q. And what does a Sheriff's Police officer do?
A. Short answer to that is everything that you possibly know that a police officer does, except that we patrol all of Cook County, not just certain towns. We have jurisdiction over 500 square miles.
Q. So you can arrest people?
A. Yes, ma'am.
Q. And I take it you carry a gun in this job?
A. Yes, ma'am.
Q. And you said you're probationary, is that right?
A. Yes, ma'am.
Q. So how long does the probation period last?
A. One year from appointment to actual police officer. So the Academy doesn't count.
Q. So probation starting right after --
A. August 23rd.



Q. Let me finish the question.
A. Sorry.
Q. Okay. And is that -- define, if you know, what probationary means. Does that mean if you mess up in some major way, you won't actually become a permanent police officer?
A. So to speak, yes.
Q. Okay. And you said you don't know if you're in a union as a Sheriff's Police officer?
A. We pay union dues, but because of the fact that you're probationary status, the slightest thing can put you, you know, out of the appointment.
Q. I see. So there's fewer protections.
A. Correct.
Q. Okay. And what union is it?
A. FOP.
Q. That's Fraternal Order of Police?
A. Yes, ma'am.
Q. So you were a Teamster up until the time that you switched over to being a police officer?
A. Correct.
Q. A Sheriff's Police officer?

A. Correct.
Q. Have you -- I know that there was a prior lawsuit that you were involved in called the Burris lawsuit. Do you recall that?
A. Yes, ma'am.
Q. Okay. Have you sued the Cook County Sheriff's Office in any other cases?
A. No, ma'am.
Q. Have you ever filed a grievance against the Cook County Sheriff's Office?
A. No, ma'am.
Q. Have you ever filed a grievance against any of the employees of the Cook County Sheriff's Office?
A. No, ma'am.
MR. LINDEN: Other than this case, obviously, right?
MS. MARMOR: Right. Although I don't consider this a grievance. This is a lawsuit.
BY MS. MARMOR:
Q. You understand -- and when I say grievance, I mean a grievance through the union. Did you understand that to be my --
A. Well, I have had -- I have had times



where I needed to file a grievance --
Q. Okay.
A. -- but it was never against a sheriff's employee.
Q. Okay. Who was it against or what were the grievances about?
A. Like tardiness probably one time, I think so. It's been years, so I'm not sure.
Q. Okay. But for example you never filed a grievance about the matters that are at issue in this case.
A. No, ma'am.
Q. Okay. Did you -- I understand that correctional officers can have secondary employment, is that right?
A. Yes, ma'am.
Q. And did you have secondary employment during your years as a correctional officer?
A. I have had various times. I mean --
Q. So in 2016 did you have secondary employment?
A. Yes.
Q. For whom?
A. Trying to -- it was with -- how does



this go -- Aces Security working for UPS.
Q. And when did that job start?
A. I'm not sure.
Q. Was it at least a year before 2016 or was it in 2016?
A. Yes. See, I'm thinking it was more towards 2017, maybe the beginning of it. I'm not sure if it was 2016 or not.
Q. Did you start that job while you were engaged in the conflict with the Sheriff's Office over your fitness for duty?
A. I believe so because it was right around the time I thought I needed another job.
Q. Right. And how many hours a week did you work at Aces?
A. It depended under their availability. It wasn't a set schedule. If they had time to fit me in, I worked. So it wasn't like a particular shift or any kind of consistency.
Q. Do you still work for Aces today?
A. No.
Q. When did you stop working for Aces?
A. When I was appointed to the Police Department.



Q. Okay. We have to -- can you give me a sense roughly what that date was?
A. Probably about April of this year.
Q. April of 2019.
A. Yes, ma'am.
Q. Do you know what your salary or your pay was from Aces in 2017?
A. No, not offhand.
Q. Did you have any other secondary employment during your time working -- since you've been a correctional officer?
A. In the last 20 years?
Q. (Nodding).
A. Various jobs, yes. I mean, I'm not sure exactly what you're asking. All of my employment for the last 20 years other than the Sheriff's Department?
Q. Was there a lot? Was there a little? I mean, if you could describe it.
A. I've had -- I don't know. It was -- they would be -- I never really had a consistent anything. If I did, it was a couple weeks here and there over the years. It wasn't anything -- so I have had other jobs, but it's not like, you

know, anything that I know that I worked for years and years. You know what I mean?
Q. Sure. That's fair. During the time that you were engaged in the dispute with the Cook County Sheriff's Office that's the subject of this case, you've already talked about Aces. Did you work for anyone else during that time?
A. I worked for Amazon.
Q. And what did you do for Amazon?
A. Packaging.
Q. And when did you start working for Amazon?
A. I want to say June of 2017.
Q. And how long did you work for Amazon?
A. Couple months.
Q. So maybe the end of August you stopped working there, 2017?
A. I don't know. I was trying to make ends meet a lot, and I'm not exactly sure.
Q. That raises another question. During the time that you were in this dispute with -- and not working at the Sheriff's Office, at what point -- was there a point at which your salary ran out?



MR. LINDEN: Objection to the form.
BY MS. MARMOR:
Q. You can answer if you understand the question.
A. My salary ran out from the Sheriff's Department?
Q. Correct.
A. I believe it was April of 2017.
Q. So from -- and we'll look at the documents, but I'll represent to you that I believe you were taken off duty on November 19th of 2016, and from that point on you were basically -- you were using accumulated time that you had in your bank, is that right?
A. Yes, ma'am.
Q. Okay. So you were continuing to get paid your regular salary, it was just in the form of using up that time until April, is that right?
A. I was paying myself, yes.
Q. Right. That was money that was -- but that was money that was coming from the Sheriff's Office at the time.
A. That I had earned.



Q. Correct. Were your benefits cut off at any time?
A. I don't know.
Q. Did you ever try to visit a doctor, for example, and they said, oh, your insurance doesn't work?
A. I don't know. I don't get sick that often, so I don't go to the doctor that often.
Q. So but do you -- the question is did that happen. Did anybody say you do not have a benefit?
A. No. Not that I know of, no.
MS. MARMOR: Okay. We'll mark this as Exhibit 1. We'll call it Nawara Exhibit No. 1.
(WHEREUPON, Nawara Deposition Exhibit No. 1 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter's handed you what's been marked as Nawara Exhibit 1, and this appears to be an e-mail from you dated September 5, 2016 to someone named John Zaleski. Do you see that?
A. Yes.



Q. I'll represent to you that one of the things that your original counsel in this case asked for us to do is produce documents with something called metadata. So that's what the second page is, just so you understand that.
Who is John Zaleski?
A. He's an officer that I know.
Q. Just a friend at work?
A. Correct.
Q. Okay. And the subject is Med Pass Sheet 2. Do you see that?
A. Yes.
Q. Okay. And in the e-mail you say, Disregard my last e-mail. During the process of scanning and writing the previous e-mail to you in Cermak's Central Control, I engaged myself in discussion with Commander Tylka and Lieutenant Greer about the form and how I felt about it. Do you see that?
A. Yes.
Q. Is that in reference to this Med Pass Sheet 2 that's the subject?
A. I don't know.
Q. Okay. You also say, I was then told to

disregard filling it out. It was a form that was assigned to them for them to fill out, and the officers no longer need to fill it out. Do you see that?
A. Yes.
Q. And you continue, They are supposed to supervise the dispensing of medication by the medical staff. Do you see that?
A. Yes.
Q. So do you recall having a discussion with Commander Tylka and Lieutenant Greer about a form, about this particular form that this e-mail is referring to?
A. No. Do I have anything more written here?
Q. This is all I've got.
A. It's kind of small, very vague. I've had a lot of conversations.
Q. But does this indicate to you -- assuming that what you said was true at the time, that you did have a conversation with Lieutenant Greer and Commander Tylka about a form that you felt they should be filling out?
MR. LINDEN: Objection. Foundation.



THE WITNESS: Again, it's kind of vague. I've had a lot of -- you know, I object to a lot of things that happen there. I could have had this conversation. If there was more there, I could probably be able to say, oh, I remember this.
BY MS. MARMOR:
Q. Right. I'm asking you -- I hear that you don't remember the specific conversation, but this is your e-mail, correct? You wrote this e-mail.
A. Again, it's just like a small chunk of something that I wrote that you put on here?
Q. No. This is your e-mail. This is the e-mail from -- if you look at the second page --
A. Do you have --
Q. If you look at the second page, this came from your e-mail at the Sheriff's Office. If you look at the third line, custodian, it says John Nawara.
A. Okay.
Q. And this is an e-mail -- it's an e-mail from your e-mail address to Mr. Zaleski, right?
A. That's what it says, yes.



Q. Okay. So are you denying that you sent this e-mail?
A. I'm not denying anything, but I'm not accepting anything, either. I'm saying that the first thing it says is disregard my last e-mail. So, I mean, if I had another e-mail, I could probably verify that I wrote this e-mail because I'd remember the conversation.
Q. Okay. But are you denying that you wrote this e-mail?
A. Again, I'm not denying that I wrote anything. It's just vague to me to be able to recollect the conversation.
Q. Right. But that's not the question I'm asking right now. I'm simply asking you does this reflect that you told Mr. Zaleski that you had a discussion with Commander Tylka and Lieutenant Greer about a form?
MR. LINDEN: Objection. Asked and answered and argumentative.
BY MS. MARMOR:
Q. You can answer the question.
A. If the electronic statement says that this is me who wrote this e-mail, then yes,



sure.
Q. And it continues on and says in the last line, Though it is never my intention, I hope being a thorn will some day pay off somewhere. Do you see that?
A. Yes.
Q. What does that indicate? What were you trying to indicate with that?
A. Lot of things that are done in this department aren't done properly, and no one stands up because of fear of something happening to them like what's happening to me now.
Q. Um-um. So you wanted a payoff from being a thorn, is that right?
A. I didn't -- say that again?
Q. You wanted a payoff -- you said I'm hoping the thorn will pay off somewhere.
A. What do you mean by that?
Q. I'm asking you.
A. Yes. Sort of change, some sort of action to happen so things don't happen to people like this. Whatever that conversation was here.
Q. And do you know who Lieutenant Greer

is?
A. Yes.
Q. Weren't you in fact in the Academy with her?
A. Yes, I was.
MS. MARMOR: Okay. Let's go off the record for one second.
VIDEOGRAPHER LEHMAN: We are off the record. The time is 10:17 a.m.
(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 10:19 a.m.
MS. MARMOR: Let's mark this as the next exhibit.
(WHEREUPON, Nawara Deposition Exhibit No. 2 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 2. This is an e-mail dated September 18, 2016 from you again to John Zaleski, Subject: Division 8-2016-14992. And it starts with the



line, There's a rumor that this place is sending Ex Ops officers to Division 9 when Division 9 is short-staff. I hope that's not true. Do you see that?
A. Yes.
Q. Okay. And then you go on to say, I bidded to Ex Ops 6-2 Detail 5 Wednesday, Thursday. Is that a reference to you were trying to go work at Ex Ops?
A. Yes.
Q. Okay. And was your concern that you were expressing here that Ex Op officers might be sent to Division 9?
A. Yes.
Q. Okay. And then you talk about, you say, I can't work in an environment where my employer sends me to take care of a problem but won't provide me with their support on the matter when all is said and done. Do you know what you were referring to there? Do you remember what you were referring to there?
A. Again, I speak with a lot of people about different subjects about problems here. So it could be a matter of things.



Q. But you don't remember specifically what it was that you're referring to here --
A. No, ma'am.
Q. You have to let me finish the question. So the answer is no, you don't remember?
A. Correct.
Q. Okay. And then you go on to quote a Jack Nicholson speech from A Few Good Men. Do you see that?
A. Yes, ma'am.
Q. And I will represent to you that this blue highlighting was in the original. We didn't add that, just so you know. And is this a quote that you use a lot?
A. You said you received this e-mail this way?
Q. Correct.
A. You didn't do that?
Q. I promise you I didn't do that.
MR. LINDEN: Just want to object to foundation insomuch as it implies the plaintiff had created it.
THE WITNESS: I was just curious because I don't even remember that I even know how to



actually highlight anything like that. I am not that savvy with e-mail, but okay. It's not a quote that I use a lot.
BY MS. MARMOR:
Q. Okay. Do you remember what you were trying to convey by using this quote?
A. Again, it's just one e-mail. Probably refers to the beginning of the e-mail.
Q. The line Son, we live in a world that has walls, and those walls have to be guarded by men with guns?
A. No, ma'am. That's still the Jack Nicholson quote.
Q. Which first line -- sorry. Which first line are you referring to?
A. Sending External Operations officers to Division 9 when Division 9 is short-staffed.
Q. Okay. So you don't really -- are you just saying you don't know why you used this quote in this e-mail?
A. No. I'm saying that even in referring to -- help is asked of you, but you're never rewarded for the help that you give, I guess.
Q. Okay. Then in the second paragraph you

say, I greatly appreciate the times that you search for me throughout this shit hole. The shit hole referring to the jail or Cermak or something else?
A. General term, the area, the environment I was in.
Q. At work.
A. Yes. I've actually been there. I sit there in feces all day sometimes, quite literally.
Q. And you say, Whether it's to send important information about incidents around this jail or information about the tragedies that strike our brothers, and you capitalized o-u-r. Do you know why you did that?
A. No, I don't.
Q. Okay. Who do you think of as our brothers in that line?
A. The officers.
Q. Are there no women officers at the jail?
A. It's a general term for everyone. I don't mean to offend anybody. I include the women there as the same thing. We're all



brothers in blue, as the saying goes.
Q. Can you go back to Exhibit -- Nawara Exhibit 1, please? Do you see where you say that you engaged myself in discussion with Commander Tylka and Lieutenant Greer about the form and how I felt about it. I was then told to disregard filling it out. Do you see that?
A. Yes.
Q. Does that indicate to you that you -- by talking to people about the form you were then relieved of having to fill out the form, is that right?
MR. LINDEN: Objection. Form, asked and answered.
THE WITNESS: Can you rephrase that?
BY MS. MARMOR:
Q. Yeah. It looks to me from reading this like you had a problem with the form, you spoke to some people about it, and they said you don't have to fill out the form. Is that what it looks like to you?
MR. LINDEN: Objection, form.
THE WITNESS: Well, first off I'd like to think that I'm very proud to be an officer and



to do this job, and I never have a problem doing my work. I only have a problem if I think there is a problem with something that might cause some type of safety towards something.
So what I think you're asking me is did I see a problem with the form. So I brought it up to someone, and they saw that problem, so they said you're right, don't fill that out.
BY MS. MARMOR:
Q. Right.
A. Yes.
Q. Okay. So I'd like to -- we were looking at just those e-mails were from September of 2016. I would like to move to the event or the events of September 28, 2016. Do you remember that day?
A. Yes, ma'am.
Q. Okay. So I just from your own memory -- I'll show you some documents as well, but I'd just like to start from your own memory what you remember about that day.
A. It was a fight down in Cermak's basement area. We needed someone to give direction on how that altercation should have



been handled after it was done and over with. So we called for a supervisor. Eventually Superintendent Jones-Hayes showed up along with Sergeant Conley, and I never really got any direction on what we should have done with the fight.
Q. I'm sorry, what did you just say?
A. Never really got any direction on --
Q. Never really. Is that what you said?
A. Correct.
Q. Okay. Sorry.
A. What we should have done with the fight. She became upset that there was a fight and kind of channeled her anger towards me.
Q. How did she show that she was upset that there was a fight?
A. She walked in yelling, then directed herself towards me and made it seem as though I should be the one who would have prevented the fight, like I should have known it was going to happen, and I should have prevented the fight.
Q. Do you remember any actual words that she said?
A. Something to the effect of, You're down

here specifically to make sure that things like this don't happen.
Q. And did you disagree with that statement?
A. Well, there were other officers there, yes. I'm one of the people that should make sure that I can help to disengage people that are fighting. But I'm not psychic. I can't tell who's going to fight before they fight.
Q. Were the people fighting both handcuffed?
A. No.
Q. How many -- were either of them handcuffed?
A. I believe one was handcuffed and one was shackled. One had a shackle to his ankle.
Q. And were there any -- was there any expectation that -- well, let me back up for one second. Can you describe what Cermak is?
A. In short it's type of like a mini hospital for the jail.
Q. And where did the fight happen?
A. In the basement, the inmate waiting area.

45

Q. Did -- when Superintendent Jones-Hayes came in, did she say anything about the fact that one of the people involved in the fight had not been handcuffed?
A. No.
Q. So what else do you remember about -- and where was this conversation or this discussion taking place?
A. In the officers' area down there.
Q. Are there cameras in the officers' area to your knowledge?
A. No, ma'am.
Q. Were you wearing a body camera that day?
A. No, ma'am.
Q. And is that -- is that -- did you normally wear a body camera?
A. No, ma'am.
Q. Okay. And about how long would you say it took for the superintendent to show up at the officers' area?
A. I don't know. I want to say 15 minutes.
Q. And you say she came in, and she was

46

upset about what had happened?
A. Yes, ma'am.
Q. And what else can you tell me about her interaction specifically with you?
A. Well, as she did the -- you should have prevented this. She started poking her finger into my chest.
Q. And what did you do?
A. Tried to back up.
Q. What else?
A. That was it. I ended up eventually hitting the wall behind me, and I had nowhere to go.
Q. Who else was in the room?
A. Officer Ganon and Sergeant Conley came down with her.
Q. No one else was in the room at that time?
A. It's an active area. I'm thinking there were other people around walking around, but no one that was kind of engaged in our conversation, I guess.
Q. Did you --
MR. HENRETTY: Sarah, I don't know if you

47

ever actually said who "she" was.
MS. MARMOR: I'm sorry, yes.
BY MS. MARMOR:
Q. When I said "she," I meant Lieutenant Jones-Hayes. I think you understood that, correct?
A. What do you mean?
Q. Counsel for Lieutenant Jones-Hayes -- I used the word "she," when she came in, did you say anything to her. I meant Lieutenant -- I'm sorry, Superintendent Jones-Hayes. That's who we're talking about right now.
A. You asked me if I said anything to her?
Q. Correct.
A. At what point?
Q. When she was poking you. When you said she was poking you in the chest.
A. I could see she was upset, and I could understand her being in her position having to deal with all the problems that happened in the jail because I know on an officer's level it's a lot. So I can only imagine being one person in there, the highest ranking person, having to deal with all this stuff.

48

So I kind of wasn't -- I understood her anger, put it that way. But when I backed up and I hit the wall, I kind of freaked out because I had nowhere to go. And that's when I asked her to -- could you please stop poking me?

And she looked at me and kind of stopped for a second and composed herself, and she said, If I offended you, I apologize. So that was I think, Would you stop poking me or however I worded that was the only thing I said to her at that time.

**Q. Okay. And then what happened?**

A. She yelled at Officer Ganon. Well, yelled in Officer Ganon's direction. Put it that way. I don't think she was yelling at Officer Ganon because Officer Ganon is a very nice officer and doesn't really ever get involved in anything bad or anything like that.

She yelled at Officer Ganon's direction. She said, When I used to be down here, I used to run this mother fucker. And I guess that means -- I took interpretation as when she was an officer, that she used to do a good job down here.

49

Then someone said she had a phone call, so her and Sergeant Conley walked off to the office that was in the next room.

**Q. There is another office in the next room?**

A. Okay. Well, you have the officers' area where the incident took place. Well, the incident between the superintendent and I. You have the inmate waiting area where the fight took place.

And then I don't know how to put the direction on this, but there is multiple rooms, but there's a third room which is kind of the triage area for an inmate that has an area for an officer to sit, kind of a desk like area, where the officer will take phone calls and admissions and kind of like who's coming down, what inmates are here, so he can relate the information between the divisions to the doctor so they can make the appointments and such. And that's where the phone call came from.

**Q. So she would have walked across the waiting area into that --**

A. Correct.

50

**Q. -- other office.**

A. Yes.

**Q. Okay. Again, I know you're being helpful.**

A. Sorry.

**Q. Are there cameras in the triage area that you're aware of?**

A. No, because they are treating inmates in there, so there are no cameras in there.

**Q. And then after she went to the triage area, did you have any other interaction with her that day? And by "her" I mean Superintendent Jones-Hayes.**

A. I had to restrain another inmate. There were more inmates, detainees, than restraints. And I made an attempt to restrain an inmate with a restraint that was made available because an inmate had left.

And as I went to restrain this inmate, he looked around and saw that probably half the room didn't have restraints on, and he didn't want to be the next guy that was going to be in restraints, so he got up. I don't know if he said it or he just kind of looked at me and gave

51

me a look and said you're not going to -- I'm not going to be the one or you're not going to restrain me. So he walked away.

And I wasn't going to chase him around since I had two supervisors right there. So I walked over to my sergeant, and I asked him if he could help me or at least walk over to this inmate and give him an order to sit still so I could restrain him with the shackle that we had.

**Q. Was that Sergeant Conley?**

A. Yes, ma'am.

**Q. And when you say you walked over, does that mean you went into the triage area?**

A. Yes. They were still in there because she was on her phone.

**Q. And then what happened?**

A. She volunteered to go out there with me. Instead she stopped Sergeant Conley.

**Q. Jones-Hayes did?**

A. Yes, ma'am.

**Q. And then what happened?**

A. Took a second because he went to the back of the room. I couldn't find him, and everyone is in the same uniform. Then I noticed

52

who it was. I pointed him out. She walked up to him closely, too close for how I would like people to walk up to the inmates. So I got up close to her, and she kind of whispers at him, Baby, can you please shackle up for this man? He said yes.

So when that happened, she gave me the look to kind of walk up to him, to approach him. I put the shackle on him, and we walked away. And as we walked away, I leaned over to her out of the inmate's ear, and I said, Maybe if you follow me around all day, I can do my job.

Q. And why did you say that?

A. Because I shouldn't have to rely on someone half my size to go everywhere with me to do my job. I'm supposed to be able to do my job on my own.

Q. What does her size matter?

A. Well, if you're asking how it takes someone smaller than me -- I don't understand the question.

Q. You're the one who said somebody half my size. I'm trying to understand why you think her size matters to whether or not the job can

53

be done.

MR. LINDEN: Objection. Form and misstates the testimony.

THE WITNESS: Because he was trying to challenge authority at that time, I guess. He didn't want to do what was asked of him.

BY MS. MARMOR:

Q. So here is my -- so you had gone to ask for help, is that right?

A. Correct.

Q. And did Superintendent Jones-Hayes give you help?

A. Depends on how you look at that.

Q. So you didn't -- is it that you didn't like the manner in which she gave you help?

A. Correct. She didn't -- there should be a way that you can verbalize your order in an authoritative, respectful way to get the result that you need. I think calling inmate Baby and speaking to him softly gives him this power that he realizes I don't have to listen to the officer. I'm going to wait until the highest ranking person comes over here.

In me doing my job I like to do my job

54

as effectively as possible, that I don't have to bother my upper ranking people unless it's a very bad problem. Then I can do my job. Because they have their own problems on their level already.

By her doing that she has to make herself available all the time because these inmates see this. It's a learned behavior. They see this, and now they're like, okay, we don't have to listen to him. Now we know anytime we want something done, we can disregard him, and she'll come over here, and she'll talk to us, which also puts her out, too, because now she has to make herself available for every little thing that happens down there, and that's not the way it should be.

Q. So if Sergeant Conley had done the same thing, would you have had a problem with it?

A. Yes. Actually, he's bigger than I am.

Q. Are there women correctional officers at the jail that are smaller than you are?

A. Yes.

Q. Does their size matter as to whether or not they can --

55

A. Not at all.

Q. -- be effective? Please let me finish.

A. Sorry.

Q. Does their size matter as to whether or not they can be effective?

A. No, ma'am. Officer Ganon, who's one of the officers who is a witness, is actually a very great officer, and she's also half my size.

Q. Was your assignment to the basement of Cermak that day to monitor detainees?

A. Yes, ma'am.

Q. Okay. And what does that mean?

A. Just that, pretty much. You're pretty much just observing them to make sure they don't do anything out of the ordinary until they're called by the doctor to be seen and then escorted back down to the division.

Q. Were there other correctional officers that day whose job it was to monitor detainees?

A. Yes.

Q. And who were they?

A. Again, I only know of Officer Ganon, who was assigned there with me. There were many officers in and out of there all day long.

56

MS. MARMOR: Oops. That's all right. Don't worry about it.
Mark this as the next exhibit.
And actually, I'm going to hold off on that because I have a couple questions leading up to that.
BY MS. MARMOR:
Q. One of the things that your complaint said was that Jones-Hayes disparaged you in front of detainees. How did she disparage you in front of detainees?
A. Because going up to an inmate and acting in that way takes away the authority from the officer.
Q. Anything else?
A. No.
Q. Okay. And after you made your comment to her, did you consider that to be a respectful comment is my first question.
A. No. No. I was upset.
Q. And what did she do in response to that?
A. She stormed off, kind of slammed the door open and stormed off and said -- I forget

57

exactly what she said. She was in the hallway. She stormed off and yelled something.
Q. And you don't remember what she yelled.
A. Not really.
MS. MARMOR: Now we can -- is that Exhibit -- what exhibit is that?
MR. LINDEN: 3.
MS. MARMOR: The court reporter is going to hand you what's been marked as -- oh, sorry. Go ahead. Do it first, and then I'll make my speech.
(WHEREUPON, Nawara Deposition Exhibit No. 3 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what has been marked as Nawara Exhibit 3. This is an e-mail attaching a complaint form from you to Richard Brogan dated October 13, 2016. Do you see that?
A. Yes, ma'am.
Q. And who is Superintendent Brogan?
A. He was -- at the time he was my boss over the area I was.

58

Q. And after the incident you were transferred to Ex Ops, is that right?
A. Yes, ma'am.
Q. And was Superintendent Brogan the superintendent of Ex Ops?
A. Yes, ma'am.
Q. And had -- and Superintendent Jones-Hayes had been your superintendent at Cermak, is that right?
A. Yes, ma'am.
Q. And why were you sending -- and this is now -- the event took place on September 28, 2016, correct?
A. Yes, ma'am.
Q. And this is dated -- and the form is actually dated October 13, 2016. So why two weeks later did you prepare this complaint form?
A. Because during that period of time, I was wrongfully transferred out of the division. I received an e-mail, I think it was an e-mail, that stated that I was now under investigation. And when I was transferred out of there, depending on where I was placed, I guess this was being talked about now through other people

59

because different officers coming into the jail at work would make comments to me that she's trying to find something to discipline you with or she's looking on cameras to see in past events if there's anything she can write you up for. So I didn't want this to keep happening, so I decided to file a complaint.
Q. Is "she" Superintendent Jones-Hayes?
A. Yes, ma'am.
Q. What officers told you that she was trying to find something to discipline you for?
A. In External Operations you can be placed, well, various areas, but in the jail you're placed on the outskirts of the jail, all the entrances. Kind of like what you see like at an airport, whatever TSA does, and one of the scanners can stop you, scanner coming to the jail. It could have been anybody. Hundreds of officers come through. I know lots of people over 20 years.
Q. So you're saying you don't remember the names of the people who told you this.
A. Correct.
Q. Okay. You said you had been wrongfully

60

transferred out of the division. What division was that?
A. Cermak.
Q. Isn't it the case, though, that you had applied to be in Ex Ops earlier --
A. Yes.
Q. Let me finish. Earlier in September?
A. Yes, ma'am.
Q. Okay. So why do you consider it a wrongful transfer?
A. Because it was done to me directly after that incident.
Q. Was there anything worse about working in Ex Ops than working in Cermak?
A. No.
Q. Was there anything better about working in Ex Ops than working in Cermak?
A. No. It has its give and take, everything else.
Q. You say you received an e-mail that said you were under investigation?
A. Yes.
Q. Who sent you that e-mail?
A. I don't remember.



Q. What did the e-mail say?
A. That I was subject to the Article U, I believe, the S.E.A.M., S-E-A-M, I believe, acronym -- I don't know what it stands for. I forget. Sorry.
Q. And what do you understand Article U to be?
A. It reads something that I'm under investigation pending possible criminal action or whatever. I don't know. It just reads that I'm under investigation.
Q. So at the time that you wrote this complaint, you understood, at least you believed, that there was some investigation stemming from the altercation you had with and the conversation you had with Superintendent Jones-Hayes on September 16, 2016. Sorry, September 28, 2016.
A. Yes, ma'am.
Q. Okay. Did you ask anybody -- did you ask, for example, Superintendent Brogan about the investigation?
A. I don't understand.
Q. Did you ask Superintendent Brogan



whether or not you were being investigated?
A. No.
Q. Did you ask any of your superior officers whether you were being investigated?
A. I don't think so.
Q. Okay. If you'll go to -- unfortunately the way this document was produced, the first page of your complaint is a few pages in. So if you go one -- not this one. That's the second page of your complaint. If you keep going, you'll get to the first page. Do you see that?
A. Yes, ma'am.
Q. And is this the complaint that you prepared?
(WHEREUPON, there was a short pause.)
THE WITNESS: Yes, ma'am.
BY MS. MARMOR:
Q. So do you see where you wrote -- and the date of this complaint is October 13, 2016, correct?
A. Yes, ma'am.
Q. Okay. Do you see where you write in sort of towards the middle of it, In a very



insulting, provoking, and demeaning action Superintendent Jones-Hayes pushes her finger into my chest several times as she says in a very condescending tone of voice, quote, why isn't this inmate cuffed behind the back, end quote. Do you see that?
A. Yes.
Q. Does that refresh your recollection that she was concerned about the fact that one of the inmates was not cuffed?
MR. LINDEN: Objection to form, speculation.
THE WITNESS: I believe that comment was to somebody that had an inmate with them that had just walked in.
BY MS. MARMOR:
Q. Okay. But -- okay. So but she was complaining about an inmate not being cuffed, is that right?
A. I believe so, yes.
Q. Okay. And then she asked who was the staging officer, right?
A. Yes.
Q. And that was -- and you said -- this is what you're reporting, that you amazed at her

behavior. I take a step back and bump into the wall, and behind me feeling trapped I say, You need to keep your hands off me. That is very unprofessional. Is that what you remember she said? Or sorry, what you remember you said?

A. Yes, ma'am.

Q. Okay. And then Sergeant Conley said that you in fact were the staging officer, is that right?

A. Yes, ma'am.

Q. And what is a staging officer?

A. They label that waiting area staging, and I'm the officer who is assigned to that area.

Q. Okay. And was it -- was part of the requirements of the staging officer to make sure that people were cuffed?

A. Yes.

Q. And then you report in your complaint that Ms. Jones-Hayes said, Well, if I offended you by touching you, I apologize? That's at the end of this.

A. Yes.

Q. Okay. So at the bottom of this page in

65

the next kind of box of this page it says, What is your requested remedy to this complaint? Do you see that?

A. Yes, ma'am.

Q. You said, I'm not sure. I'd like to speak with someone if possible about this incident. Do you see that?

A. Yes, ma'am.

Q. So what were you indicating? Why weren't you sure what you wanted to have happen?

A. Because I didn't -- I don't dislike her. Again, I can understand the pressures of what it must be like to be the highest ranking person in a building and being all by yourself and having to handle all these problems because I know what it's like as an officer.

So I didn't want any of these problems. I didn't want this to come to any of this. I wanted maybe somebody to come up to me and say -- or her or however it would go down and say this was a big misunderstanding, and everybody goes their separate ways, and there is no hard feelings. I didn't want all this.

But I kept on thinking she was going to

66

keep harassing me. I didn't want to be under investigation. I was trying to get out of there. I didn't want any of this.

So I wasn't -- sorry. So I guess what I'm trying to say is I wasn't sure what the remedy would be. I wasn't looking to gain anything from this. I just didn't want to be messed with anymore.

So if they would have told me go and do your job, nothing is going to come of this, don't worry about it, I would have been fine with that or whatever. I mean, I don't know. Whatever the powers that be, whoever I have to answer to to this complaint I would have just been okay with that. I didn't want anything further to happen.

Q. So could you go to the first page of Nawara Exhibit 3, please, the front page. So on the front page you say, Hello, Superintendent Brogan. Attached is a complaint for an incident that took place before I was transferred to your division, sir. I would appreciate it very much if you would please help me get this to the proper personnel. Do you see that?

67

A. Yes, ma'am.

Q. You sent this to him -- I see from the form that one of the ways you can send a complaint form like this is to someone in your chain of command, is that right?

A. Yes, ma'am.

Q. Do you have any personal knowledge of what happened to this complaint after you sent it?

A. No, ma'am.

Q. Okay. Do you have any personal knowledge of whether any of the named defendants in this case ever saw this complaint prior to you being called to HR?

A. No, ma'am.

MS. MARMOR: Mark this as the next exhibit.

(WHEREUPON, Nawara Deposition Exhibit No. 4 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 4, which is a Fitness for Duty Examination report from Isaac Ray Forensic Group. Do you

68

see that?
A. Yes, ma'am.
Q. And have you seen this document before?
A. Not presented to me in this way, but I believe I read these things.
Q. Her report?
A. Yes.
Q. Okay. And by "her," I mean Dr. Goldstein?
A. Yes, ma'am.
Q. And did you in fact meet with Dr. Goldstein as it states at the first page here on September 11, 2017 and September 12, 2017?
A. I'm not sure the days, but it was two days, yes, around that time, yes.
Q. Okay. And you understood that that examination was to assess your fitness to return to duty as a correctional officer for the Cook County Sheriff's Office?
A. Yes, ma'am.
Q. Okay. If you could turn to Page 3 of Nawara Exhibit 4, it's also Bates stamped CCSO 108. You see in the first full paragraph



that starts, During the interview here? I'm going to ask you some questions. This is her statement about the things that she says you said during the interview about the day of the incident with Superintendent Jones-Hayes.
A. Okay.
Q. And she says, Officer Nawara described a very different set of events on the day of the incident with Superintendent Jones-Hayes and offered his thoughts as to the reason for the respective descriptions -- as to the reason the respective descriptions depart so significantly. Do you see that?
A. Yes, ma'am.
Q. And you understand she has a different statement about what happened than you do on that day.
A. Superintendent Jones-Hayes?
Q. Yes.
A. Yes, ma'am.
Q. Sorry. Thank you. And you explained to her -- and if there is anything in here, if I read something to you and you say I don't think I said that to her, please let me know. Okay?



A. Sure.
Q. She writes that you explained on the day of the incident that Superintendent Jones-Hayes and Sergeant Conley were called to the basement of Cermak because a fight had broken out between detainees, which you and other officers successfully contained. And that's what we've already talked about, correct?
A. Yes, ma'am.
Q. For context he first described the basement setting, details he thought were relevant to understanding interaction between him and Superintendent Jones-Hayes that followed. Is that accurate? Is that something that you wanted to make sure she understood?
A. Yes, ma'am.
Q. One of the things that you said, she writes, He added that in his opinion even if officers wished to comply -- well, I'll start with it says he began by noting that there had never been a written policy about manacling and shackling detainees in this area. It was just verbal. Do you see that?
A. Yes, ma'am.



Q. What is the difference between manacling and shackling, if you know? I don't know if those are her terms or yours.
A. I never use manacling.
Q. Okay. Is there handcuffs that go around your wrists?
A. Yes.
Q. And then what -- would you call that cuffing?
A. Yes. Handcuffs, short term would be cuffing, yes.
Q. And then --
MR. LINDEN: I guess I just want to make a foundational objection, assume everything she says is true without asking him.
MS. MARMOR: No, I'm not assuming that. I've asked him to let me know if he disagrees with anything, and he absolutely should.
BY MS. MARMOR:
Q. Is shackling --
MR. LINDEN: I guess my point is you have to ask point by point. These are her statements.
MS. MARMOR: Right.
MR. LINDEN: I mean, generally if he agrees,

but specific statements, obviously, they're not -- you know what I'm saying? It's just --
MS. MARMOR: I understand what you're saying. I'm going to keep going.
MR. LINDEN: Okay.
BY MS. MARMOR:
Q. Is shackling meant in your mind to refer to, say, ankle restraints?
A. Yes, ma'am.
Q. Okay. And then it says, He added that in his opinion even if officers wished to comply with such a policy, it would not be possible as there are insufficient numbers of cuffs, shackles to do so. Do you see that?
A. Yes, ma'am.
Q. Is that an accurate statement?
A. Yes, ma'am.
Q. Okay. And then you say it's dangerous -- or she has in quotes, it's dangerous, he added, explaining a number of factors that in his opinion contributed to an unsafe environment in that location.
And then you see where it says first and second? Does that accurately describe the

73

kinds of issues that can arise if people are not properly cuffed or manacled? I'm sorry, cuffed or shackled?
A. Yes, ma'am.
Q. Okay. And one of the things that is reflected here is that if there is an un' -- let's say an uncuffed detainee and gets into a fight with a cuffed detainee, that that can be dangerous to the cuffed detainee, is that right?
A. Yes, ma'am.
Q. All right. And another is you felt there weren't enough officers to properly monitor detainees who are manacled from behind, is that right? That's her word, but probably cuffed from behind.
A. Well, she puts behind in there?
Q. Yes.
A. Because it depends on their situation, their medical situation. They are restrained differently, all of them, which doesn't make it equal to anyone.
Q. Depending on their physical condition?
A. Or what they claim their physical condition is, correct.

74

Q. Okay. Then you see where it says the word, Finally he pointed out that on that particular day they were at maximum detainee capacity for that area?
A. Yes, ma'am.
Q. So what was -- roughly speaking how many people would you characterize as maximum detainee capacity?
A. Oh, I don't know. 40, 60 maybe? The volume changes, though. People are in and out all day long, and it depends. It can go -- in 20 minutes it can go from the entire room looking completely like it's busting at the seams to five people being in there.
An officer can come by, and all of his detainees have been seen by the doctor or he can roll out of there with 20 people. You know what I mean?
Q. Right. Was it your recollection on the day that you were interviewed by the FFD examiner that at the time of the fight, they were at maximum detainee capacity?
A. Yes. There is a lot of people. Sorry.
Q. That's okay. And your estimate at that

75

time is 40 to 60 people?
A. Yes. I guess.
Q. Okay. And then in the next paragraph it says, Officer Nawara went on to explain that when Superintendent Jones-Hayes arrived, he was under the impression she may have been annoyed with him, that there had been a fight, quote, because she knows me, I'm ex S.O.R.T., and she expects me to keep things from getting out of hand. Do you see that?
A. Yes, ma'am.
Q. And is that an accurate statement?
A. Yes, ma'am.
Q. And then it goes on to say, Not that she said anything like that, he added. I could just see she was annoyed. There was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said why is that inmate not cuffed, and she's putting her finger to my chest. I'm backing up, and I say, I don't know. You'll probably have to ask the officer who came in with him. Is that accurate?
A. Yes, ma'am. I could have said that, yes.

76

Q. And then it says -- you see Officer Nawara went on, do you see at the bottom of the page?
A. Yes, ma'am.
Q. And this is a quote. She turned to Sergeant Conley and says, Who's the officer on the roster, which of course is me. Do you see that?
A. Yes, ma'am.
Q. So you were the officer on the roster, and you took that -- did you take that to mean I know you're in charge, et cetera, you should be handling that? Handling this.
MR. LINDEN: Objection, form.
THE WITNESS: Are you asking me to interpret what she means, what she is saying by handling this? I don't understand.
BY MS. MARMOR:
Q. So this is the full sentence. Officer Nawara went on. She turns to Sergeant Conley and said, Who's the officer on the roster, which of course is me, meaning I know you're in charge, et cetera. You should be handling this. And there are quotes around all of that. So my



question is is that what you said to the examiner?
MR. LINDEN: Objection, form.
THE WITNESS: Okay. Well, she probably mistook roster for -- because on the roster there are many officers. They're all distributed as needed per where their assignment could possibly be. She probably --
BY MS. MARMOR:
Q. Sorry. Who's the "she" that you're talking about right now?
A. I'm sorry, the doctor.
Q. Okay.
A. So when she wrote that, she probably meant the person assigned to that area, not necessarily the roster.
Q. So you don't remember one way or the other saying this to her?
A. No. I said this to her.
Q. Okay. So --
A. Not in the words that she's using, but yes.
Q. Okay. And then you -- did you say to the examiner that at that point you told



Officer -- excuse me -- Superintendent Jones-Hayes you need to get your hands off me?
A. No.
Q. Okay. So what did you say?
A. I did say you need to get your hands off me. I didn't say it after she says it here in her assessment. That part had already taken place because she asked Sergeant Conley after she pokes me who's working staging, is how that happened.
Q. Okay. So what you're saying is the FFD examiner may not have gotten all her facts correct in here.
MR. BUSTAMANTE: Objection to form.
MR. LINDEN: Objection to form.
THE WITNESS: They're correct.
MS. MARMOR: Can we not have --
MR. BUSTAMANTE: Since I'm hard of hearing --
MS. MARMOR: I can hear that. Please don't coach the witness.
MR. LINDEN: He is coaching me, not the witness.
MR. HENRETTY: You got to be careful with that because we all heard that.



THE WITNESS: If it's not in the order, it should be.
MR. HENRETTY: Please don't do that again.
BY MS. MARMOR:
Q. So you just said they're correct, if it's not in the order, they should be?
A. Correct. And the words that she used, it's not roster. She didn't say I know you're in charge. Again, everything is a form of what happened, yes, but not in those exact words. It's accurate, but not exactly those words.
MS. MARMOR: Okay. Okay. Let's mark this as the next exhibit. Thank you.
(WHEREUPON, Nawara Deposition Exhibit No. 5 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 5, which I'll represent to you is -- the first page is the cover sheet to the OPR summary report concerning a complaint investigation about the events of September 28, 2016.
If you go to the next page, we

have just taken your testimony from that investigation, which starts at the bottom of the second page of Nawara 5. Do you see that?
A. I'm sorry. I didn't follow you on that.
Q. Do you see where it says Accused audio recorded interview: C/O John Nawara JDE 378032?
A. Yes, ma'am.
Q. Okay. And this -- have you seen any transcription of your testimony before OPR before today?
A. I believe so, yes.
Q. At the time that you saw it, did you consider it to be an accurate transcription or summary of your testimony before OPR?
A. Yes, ma'am.
Q. Okay.
A. Can I ask a question?
Q. Yes.
A. This cover page here has to do with everything in here?
Q. That's the cover page for the entire OPR report, but I'm only --



A. Why does it take place before the incident?
Q. I don't know. Good question, but I don't know. I didn't make the document. Well, no, it looks like March 6, 2018. 2018, that's two years after the incident.
A. So this is the interview, not the actual when the complaint was filed, you're saying.
Q. Correct.
A. Gotcha.
Q. Okay. Have you ever been part of OPR investigations before?
A. No, ma'am.
Q. Okay. So and -- but you got called in a long time after the actual event, correct?
A. Yes, ma'am.
Q. Okay. So if you could go to the next -- the second page of Nawara 5, I'm just going to ask you a few questions about this. I'm not going to make you read the entire thing. So if you look in sort of a third of the way down the page, it says Page 10 of 17 on the bottom. Do you see that?



A. Yes, ma'am.
Q. And you see where it says, C/O Nawara was asked if officers assigned to that post are responsible for handcuffing the detainees. C/O Nawara stated, Yes, I do what I can with what I have. We have very limited cuffs and shackles, so if there are cuffs available for the inmates that are there, they are provided with handcuffs and shackles. Do you see that?
A. Yes, ma'am.
Q. Is that an accurate statement?
A. Yes, ma'am.
Q. Okay. And you're referring there to the waiting area at Cermak?
A. Yes, sir.
Q. Then I'd like to skip down sort of towards the bottom third of the page where it says, C/O Nawara was asked if both he and C/O Ganon were responsible for handcuffing detainees if handcuffs were available.
And you said, C/O Nawara stated no, because I believe her position to be, how would they say, I believe on the roster it says like basement 1, basement 2. They'll classify them



in this type of order.
Her job is more to, well, there is a control panel there that's supposed to operate the functions of the locking and unlocking of the doors to come in and out of the Cermak area from the tunnel, and when it works -- when it worked, that would be the job at the moment.
Again, I haven't been there for a while. She's more to observe, answer the phone, observe the area, and do the best you can with what we have because the buttons weren't working properly.
But is she to go in there and look to see if the detainee needs to be handcuffed or not, no, she is more in the officers' area and kind of observed. Do you see that?
A. Yes, ma'am.
Q. So is that -- A, is that accurate?
A. Yes, ma'am.
Q. Okay. And was that indicating that it was you, not Officer Ganon, that would have been responsible for cuffing?
A. Yes, ma'am.
Q. Okay. And then it says C/O Nawara was

asked if he recalled the incident between him and Superintendent Jones-Hayes, and he responded yes. C/O Nawara was asked to explain what he recalled, and he stated there was a fight in the staging area, which is the reason a lot of the officers complain that we have lack of restraints because in the middle of the week in your busier times the amount of our inmates exceed the amount of restraints, and now you have half the room cuffed and the other half that aren't, and it's only a matter of time before two detainees with a bad relationship see each other, and one takes advantage of that, and this was that case. Do you see that?
A. Yes, ma'am.
Q. So is that an accurate statement?
A. Yes, ma'am.
Q. Based on your memory half the room was cuffed, and half was not?
A. Yes, ma'am.
Q. Okay. And then if you go down a little bit further, do you see where it says, Every seat was taken up by every inmate down there. It's not a comfortable setting?

85

A. No.
Q. All right. If you keep going, it's about a third of the way down. The word "every" is on the right-hand side.
MR. LINDEN: What's the first word in the sentence?
MS. MARMOR: Every. Do you see where it says, Every seat was taken up by every --
MR. LINDEN: I see it.
BY MS. MARMOR:
Q. -- every inmate down there. It's not a comfortable setting. So is your memory that every seat was taken up at the time of the fight between the inmates or the detainees?
A. Quite literally could there have been a couple spaces where somebody sat down, yes, but it was very full.
Q. Okay. And then you see about an inch down where on the right it starts with the word "the," and it says, The amount of inmates that were there again exceeded the amount of restraints.
A. Yes, ma'am.
Q. And then if you could go down to the --

86

sort of the last quarter of this where it says this is -- the second part of this is about your second interaction with Superintendent Jones-Hayes, correct?
A. I don't know which part you're speaking of.
Q. Well, so you see where it says, So the superintendent stepped out to the ER or the staging area and went into the ER area to go into admissions or our intake control? Right here it says -- see where you say, So the superintendent?
A. Yes. Okay.
Q. So this is -- we have already talked about the interaction you had with the superintendent about the other detainee that wasn't cuffed and didn't want to be cuffed, and that's what this is about, correct?
A. Yes.
Q. Okay. And one of the things you say is you look around and you go, Half the room is cuffed, and half the room is not. Do you see that?
A. Yes.

87

Q. Okay. And is that your recollection of the day?
A. That half room was cuffed and half -- yes.
MS. MARMOR: Okay. Are we -- how are we doing on the video? Three minutes. Okay. I'm going to ask one more question, and then we'll take a break.
BY MS. MARMOR:
Q. If you could go to Page 12 of 17, do you see in the second line on the top of the page, I'm thinking -- this is what the summary transcript says. I'm thinking to myself this is my boss who is half my size in a dress and heels, and I need her here to help me do this job. Do you see that?
A. Yes, ma'am.
Q. And then there is a little bit more, but do you see the sentence that begins, So as we're walking back?
MR. LINDEN: I want to object insofar as there is no quote marks. This is a summary. So if you're saying that he said these words, I think it's improper.

88

BY MS. MARMOR:
Q. Do you recall saying these words?
A. Yes.
Q. And then do you see where it says, So as we're walking back, especially after how she just treated me, I couldn't resist. I leaned over to her and again, regardless about how I feel about how someone conducts themselves with me or anybody else, I still won't do anything in front of the inmates at all, whether it's appropriate or not or whatever, how that has to go. Did you say that?
A. Yes, I did.
Q. And then did you say, But I told her in her ear, I go, quote, maybe if you walk around with me all day, I can do my job because this is what I have to go through down here because you don't provide the proper restraints, you don't do any, period, end quote. Do you see that?
A. I'd like there to possibly to be maybe a comment -- I mean a comma somewhere after job maybe, if we can put the punctuation, because maybe she -- or maybe this was -- how do you put this. Because this is what I have to go

89

through, I think probably would be if you were asking me that question, I would tell you because this is what I have to go through.
Q. Right.
A. Yes, I said this.
Q. Okay. And did you say something -- I'm not quite sure what "you don't do any." Was there anything more to that?
A. I don't know.
Q. Okay. But in sum and substance is this what you recall saying to her?
A. Yes, ma'am.
Q. Okay. And then it says, She got mad, she stormed off, she slammed the door, and that was the end of the incident, and then I was transferred out of my division the next day, is that right?
A. Yes, ma'am.
MS. MARMOR: Okay. I think we need to change tapes, so we'll take a break.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 11:20 a.m. This is the end of Videotape No. 1.

90

(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 11:32 a.m. This is the beginning of Videotape No. 2.
MS. MARMOR: So just for the record my paralegal Jesse Kehr is here to help me with doing some videos, since I'm technologically challenged. So I would like to mark as -- and we're going to do a kind of placeholder exhibit because it's just the -- it's the thumb drive, which you guys already have. But this is what we'll mark as the next exhibit. I think it's Exhibit 6, Nawara Exhibit 6.
MR. LINDEN: I think we're on 5, I believe.
MS. MARMOR: No, we were just on 5.
MR. LINDEN: You're right. I'm sorry.
MS. MARMOR: So we're going to mark as Nawara Exhibit 6, and there will just be a placeholder, although the videographer will also have a copy of the thumb drive, of what's been previously produced in this case under Bates stamp No. CCSO 000166.

91

(WHEREUPON, Nawara Deposition Exhibit No. 6 was marked for identification.)
BY MS. MARMOR:
Q. This exhibit is marked Confidential - Subject to Protective Order - and its title is DIV8-Cermak-CAM_0_002_Staging_Rear _SE_2 016-09-28, and it's -- I promise you we're not going to be looking at all nine hours and 43 minutes of it. So with that preamble --
BY MS. MARMOR:
Q. And Mr. Nawara, you're going to -- the video is going to be shown behind you. And we've already talked about this, if you want to stand up to look at it more easily, that's fine, or if you just want to sit where you're sitting. And what I'd like to do is just show you some video, and then stop it periodically, and I'm going to ask you a few questions. Okay?
A. Okay.
Q. And I'll represent to you that this is a video of the staging area at Cermak on the day of the incident, both -- and it really starts with the incident between the two detainees.

92

That's what we're going to look at. Okay?
A. Okay.
MS. MARMOR: All right. Maybe is that blocking it? There we go.
BY MS. MARMOR:
Q. All right. Mr. Nawara, we start at the point of -- at 9:58 a.m. on September 28, 2016. Do you recognize this as the staging area at Cermak where the inmate or detainee fight took place?
A. Yes.
MR. LINDEN: I want to make a general objection to showing only portions without a foundation for the date and time. I don't want to keep objecting.
BY MS. MARMOR:
Q. And if you see on the screen that we're looking at, do you see on the upper left-hand corner of the screen, is that the office that you were talking about earlier in your testimony?
A. Correct.
Q. And that's where the incident between you and Superintendent Jones-Hayes took place,



is that right?
A. Yes.
Q. And we've already established there would be no video of inside that room, correct?
A. Correct.
Q. And then you see there is a middle door. Do you know what that middle door goes to?
A. That's the entrance I spoke of earlier where inmates will be called in by the doctor or an officer or whomever to be seen and triaged by the medical staff.
Q. And what about the door on the far right, what is that?
A. It's called the clinics area, and they'll take care of small things, podiatry, you know, optometry, different things like that. I forgot what else they might have in there.
I think occasionally they'll have like a site doctor in there, somebody can talk to them if they're not feeling well or something like that. But they use that other area for just various other things.
Q. Okay. In the documents we looked at



before the break you had a couple of times from memory, I believe, at the time of the fight between the two detainees that Cermak was at maximum capacity. Do you remember that?
A. It was full, yes.
Q. Okay. And does this look full to you?
A. No.
Q. Okay. And in fact -- so let's -- if we could just start the video because this will show us, I believe, when the fight between the two inmates begins.
And if you could pause it for a moment. I have a question. Do you see in the back of the room, do you know who that officer is at the back of the room?
A. I do not.
Q. And what we've been looking at so far, are these the two inmates, if you recall, that had the fight?
A. No, ma'am, I don't recall.
MS. MARMOR: Okay. You can keep going. And actually can you stop the tape there?
BY MS. MARMOR:
Q. Do you see that the inmate on the right



has no handcuffs, correct?
A. Yes, ma'am.
Q. And the inmate on the left had his handcuffs behind his back, but he brings them to the front, is that right?
A. Yes, ma'am.
MS. MARMOR: Okay. Keep going. Stop here, please.
BY MS. MARMOR:
Q. Can you recognize who that officer is, the first officer there?
A. Yes.
Q. And who is that?
A. Officer Turrise.
Q. Okay. And now that you're seeing this, does that refresh your recollection that these are the two individuals who had the fight on the day?
A. Yes, ma'am.
Q. And just hold on. I notice you have got a wound on your nose. Would you like a Kleenex or something?
A. Am I bleeding?
Q. You're worried about it. I can tell.

A. I don't know if I ripped my scab.
Q. No, you're okay. We can keep going.
MS. MARMOR: Stop there.
BY MS. MARMOR:
Q. Is that you, the first -- the second person on the scene?
A. Yes.
Q. Okay. And who's the person behind you there?
A. I don't remember.
Q. And he's carrying a pair of handcuffs on his person, correct?
A. Yes.
Q. And could those handcuffs have been used to cuff the fellow who was not cuffed originally?
MR. LINDEN: Objection. Form, speculation.
THE WITNESS: Immediate answer is yes, but the extended answer would be no, because I don't remember who he is. Probably means he's from a different division. So I don't know where he came from or what his business was here or anything.
I am guessing he is coming to help us

97

out, but I don't know where he came from or what he was doing or where those cuffs came from or if they belonged to us or any of those things.
BY MS. MARMOR:
Q. I'm sorry I'm not remembering. The first officer there, what was his name again?
A. Officer Turrise.
Q. And he was a correctional officer like you were?
A. Yes.
Q. Okay. And so let's keep going. Do you recognize the next man who shows up, next officer who shows up?
A. Yes. Yes.
Q. Who's that?
A. Officer Codd.
Q. C-o-d?
A. I believe it's two "d"s, C-o-d-d.
MS. MARMOR: Stop there, please.
BY MS. MARMOR:
Q. Do you know what role Officer Codd played that day, whether he was assigned to Cermak?
A. I'm not sure.

98

MS. MARMOR: Okay. Stop there, please.
BY MS. MARMOR:
Q. Did you see that Officer Codd pulled out a pair of handcuffs there?
A. Yes.
Q. And do you know if he was assigned to someplace else that day and he just happened to be there?
A. Well, I know he works in our building. So he was down there. Not exactly sure where he was assigned to, I guess, but he was down there every now and then.
Lot of officers they're assigned to other places that clearly are down there often because, again, they're moving the inmates per the doctor's order back and forth throughout the building.
Q. But he did have a pair of cuffs that he pulled out at this time, correct?
A. It looks like that, yes.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. And you see this gentleman walking now towards the scene with a pair of handcuffs in

99

his hand?
A. Yes.
Q. And who is he?
A. Officer Lopez.
Q. Was he assigned to Cermak that day?
A. I don't think so.
MS. MARMOR: Can you stop for a second?
BY MS. MARMOR:
Q. Can you tell from this how many people are actually cuffed or not cuffed?
A. Not really. The gentleman sitting on the bench next to Officer Turrise possibly could not be cuffed. This gentleman right here isn't cuffed. The gentleman in the wheelchair isn't cuffed. I'm not exactly sure.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. Do you know who that is walking through the back of the scene?
A. I do not. Gentleman back there, wheeled his chair back, isn't cuffed.
MS. MARMOR: Stop for a second.
BY MS. MARMOR:
Q. So is that you going into the

100

right-hand area with one of the detainees?
A. Yes.
Q. Okay. And what happened when you went into that area, if you recall?
A. I just hung against the wall waiting for a supervisor.
MS. MARMOR: Okay. Keep going. And actually stop there.
BY MS. MARMOR:
Q. So I want to make sure I understand -- I want to be crystal clear about what each of these doors are. We know the door on the upper left side is into the office, correct?
A. Yes.
Q. And then there is two in the front and then one on the far right that you just walked into in the video. Do you see that?
A. Yes.
Q. So I just am clear, what's the area that you're going into when you go into the far right?
A. That's labeled the clinics.
Q. Okay. And then the two blue doors there, what's the first blue door on the upper



right-hand corner of this shot?
A. Restroom door. There's another one exactly like it right next to it on the right, but the pillar's blocking it.
Q. And then the blue door to the left of that is --
A. Right next to -- sorry. I'm sorry. Go ahead.
Q. No, that's okay. Go ahead.
A. The door to the right of the pillar is the door that the doctors see the inmates, triage room area. Immediately where the pillar is, behind that there's a door that's a restroom door, and this is another restroom door to its left.
Q. I see. Okay. And then the clinic door is the door you walked through.
A. Correct.
MS. MARMOR: All right. Keep going. All right. So I think we can stop there for the moment. Isn't there the next one? So we're going to skip ahead now to what time?
MR. KEHR: 10:41.
MS. MARMOR: So we're going to skip to 10:41



that morning. Let me stop. Looks like based on this that everybody kind of calmed back down at 10:00 o'clock, and then we're going to go ahead to 10:41. So this is a shot later on the same day. Why don't you pause for one second, Jesse.
BY MS. MARMOR:
Q. This is still the Cermak staging area, correct?
A. Yes.
Q. There are even fewer inmates there at this time, correct?
A. Yes.
Q. Okay. And is it possible to tell -- do you see any inmates at this point who are not handcuffed or shackled?
A. Not offhand on this camera. There's a gentleman standing there doesn't look to be restrained.
Q. Okay. Keep going.
A. The gentleman on the left doesn't look to be restrained.
Q. Man in the fetal position?
A. No. Man next to him, above him.
Q. Okay.



A. He's not. He just reached into his pocket for something.
MS. MARMOR: Okay. Stop right there.
BY MS. MARMOR:
Q. So given what had just happened with, you know, 40 minutes earlier with an inmate who had gotten into a fight who wasn't shackled, do you know why that fellow wasn't shackled at this point?
A. Probably because we didn't have any shackles.
MS. MARMOR: Okay. Keep going. Stop right there.
BY MS. MARMOR:
Q. You see that gentleman up there is shackling the inmate who just walked towards him, correct?
A. Yes.
MS. MARMOR: Okay. Now, stop for a moment.
BY MS. MARMOR:
Q. Do you know who that is in the doorway of the office?
MR. LINDEN: For the record it's not shackled, it's handcuff.

MS. MARMOR: Handcuff. Fair enough. I thought the same thing after I said it.
MR. LINDEN: Did you? Okay.
BY MS. MARMOR:
Q. Do you know who that is standing at the doorway of the office on the upper left-hand side of the video?
A. Appears to be Officer Turrise and Sergeant Conley.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. Do you know who just walked in that door?
A. No.
Q. And that's Sergeant Conley leaving?
A. Yes, ma'am.
MS. MARMOR: So stop there, please. Actually, back up just a little because you're not going to be able to see a face.
BY MS. MARMOR:
Q. My question is going to be is that Superintendent Jones-Hayes walking out of the office?
A. Yes.



MS. MARMOR: And let's keep going, Jesse. Just keep going.
BY MS. MARMOR:
Q. And that's her just standing there talking to another officer. Who's that walking out behind her?
A. I don't know.
Q. Okay. Who's that that just walked out, if you know?
A. I don't know. It looks like Officer Turrise again.
Q. Okay. And do you notice that Superintendent Jones-Hayes is not wearing a dress that day?
A. Yes.
Q. Do you know who that is that just walked out?
A. Speaking with the sergeant right now?
Q. No. There is a person that's short -- yes. Speaking with Sergeant Conley.
A. Officer Naringowski.
MS. MARMOR: Okay. Is that the end?
MR. KEHR: Yes.



BY MS. MARMOR:
Q. Okay. So I didn't see Superintendent Jones-Hayes go anywhere to take a phone call. Do you know how much time elapsed after you had your incident with her that she went to take the phone call?
MR. LINDEN: Objection. Form.
THE WITNESS: Couple minutes.
BY MS. MARMOR:
Q. Okay. And what did you do after she left the room after your dispute?
A. I had to -- I attempted to shackle an inmate.
Q. You had to shackle an inmate?
A. I had to shackle an inmate.
Q. In here?
A. Yes.
Q. Okay. But we don't have -- but that doesn't show that here, correct?
A. I know.
Q. Have you ever seen this video before?
A. Yes.
Q. When?
A. In Ms. Kurtz' office, I believe.



Q. But when I asked.
A. I don't know. Maybe this time last year.
Q. It was after you filed the lawsuit?
A. Yes.
Q. Did you ever make any request for any video from the Sheriff's Office in the weeks following the altercation with Superintendent Jones-Hayes?
A. No.
Q. Did you ever talk to anybody who claimed to have seen video of the altercation or any part of your intersection with Superintendent Jones-Hayes prior to you filing the lawsuit?
A. Say it one more time, please?
MS. MARMOR: Can you read it back?
(WHEREUPON, the record was read by the reporter as requested.)
THE WITNESS: Yes.
BY MS. MARMOR:
Q. Who?
A. John Zaleski.
Q. And what did he tell you?

A. That it looks like he can see her poking at me in the video that he could see at the time.
Q. The video -- so he claimed that he saw video from inside that office that doesn't have a camera?
MR. LINDEN: Objection. Form.
THE WITNESS: No.
MR. LINDEN: Misstates testimony.
BY MS. MARMOR:
Q. But the poking happened inside that office, correct?
A. Correct.
Q. So if he said that he saw video of her poking at you, where would that video have come from?
MR. LINDEN: Objection. Foundation, form.
THE WITNESS: This angle, the other angle? I'm not sure. I'm not sure the video that he saw that he said -- not sure video that he saw when he said that he saw it.
BY MS. MARMOR:
Q. When did he tell you this?
A. Early last -- wait. Probably early

109

2017.
Q. And what was the context in which -- did he tell you the context in which he showed you the video? Sorry. Excuse me. Did he tell you the context in which he allegedly saw this video?
A. I'm not understanding.
Q. Well, how did he come to see the video? Did he tell you that?
A. He searched for it.
Q. And how did he search? Did he tell you how he searched for it?
A. I mean, I don't know. I'm guessing the same way here. You click on the cameras for the division.
MR. LINDEN: I want to object to this video playing with him testifying. It's not clear.
MS. MARMOR: Jesse, turn this off.
MR. LINDEN: He's talking about this video --
MS. MARMOR: We're done with the video now.
(WHEREUPON, the video was turned off.)
BY MS. MARMOR:
Q. You have no idea how he came to see it,

110

is that right? Remember, I'm just asking what you know. It's okay if you don't know.
A. He told me this over the phone, so I wasn't there watching him when he said this.
Q. Did you ask him to get a copy of the video?
A. No.
Q. Why not?
A. Because you can't get a copy of the video.
Q. Why not?
A. Because it's played on whatever program that it's on. There is no way to like make a copy of it, at least for us there isn't.
Q. Were you represented by counsel at that time?
A. Yes.
Q. Did your counsel ever make any formal request that that particular video that Mr. Zaleski claims to have seen be preserved?
MR. LINDEN: Objection. Foundation. Also getting into any attorney/client communications.
MS. MARMOR: Only talking about communications to others. Does he know if she

111

ever made --
MR. LINDEN: But if it's something --
MS. MARMOR: Let me rephrase.
BY MS. MARMOR:
Q. Do you know if your counsel made any request to the Cook County Sheriff's Office at the time that you learned about this video from Mr. Zaleski to preserve such a video?
A. No. I don't know.
MR. LINDEN: I also want to object that since there's no video shown there, there's no foundation. I have no idea.
MS. MARMOR: I agree.
I don't have extra copies. Maybe I do. Mark this as the next exhibit.
And Jesse, you can go.
(WHEREUPON, Nawara Deposition Exhibit No. 7 was marked for identification.)
MR. LINDEN: Can we go off the record just one second?
VIDEOGRAPHER LEHMAN: We are off the record. The time is 11:58 a.m.

112

(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 12:00 o'clock p.m.
MR. LINDEN: Just for the record I just want to state we discussed Officer Nawara is scheduled to be on duty at 3:00 o'clock today. He has notified his superiors this deposition is going to go, you know, past 3:00 o'clock is what defense counsel has represented.
And I just want to make sure that the plaintiff is not subject to any discipline for not being at work at 3:00 o'clock. He has done everything. He is willing to sit here, even without a lunch, and get it done. But I just don't think there should be any discipline or retaliation that could possibly occur.
MS. MARMOR: And for the record all I'll say about that is, number one, I don't have any control over that. Number two, when we set a deposition, we expect it to take seven hours. So it would have been fair notice that 3:00 o'clock was not a reasonable time to be going back to work, but we also agreed to discuss it

113

off the record.
MR. LINDEN: If he is going to be disciplined, my suggestion would be end it and continue the dep so he's not subject to discipline. But I think this will all be taken care of at lunch. He's going to call his supervisor.
MS. MARMOR: Okay.
BY MS. MARMOR:
**Q. Officer -- excuse me. Mr. Nawara, the court reporter is about to hand you Nawara Exhibit 7. Nawara Exhibit 7 is Plaintiff's Initial Rule 26 Disclosures. Do you see that?**
A. Yes, ma'am.
**Q. Okay. And I just want to ask you do you know why Officer Zaleski is not named as a witness in this case by the plaintiff? If you want to look, there is a list here.**
A. Because I never named him.
**Q. And why not?**
A. Because I didn't want any harassment to happen to him the same way it's happening to me.
**Q. So you didn't disclose information that you knew because you made that choice.**

114

A. Officer Zaleski to protect him because I didn't want anything bad to happen to him the way it's happening to me.
**Q. Do you understand that disclosures in lawsuits are not subject to the personal opinions -- let me finish my question -- are not subject to the personal opinions of parties, but in fact that disclosures are required to let the parties know who has knowledge of the facts of a case?**
MR. LINDEN: Objection to the question. Calls for a legal conclusion. Also, if you look at Rules, simply not accurate. Rule 26(a)(1) states the witnesses that the disclosing party may use to support his claim or defenses.
If Officer Zaleski is not going to be used to support plaintiff's claims or defenses, which he is not, there is no obligation to disclosure. Number one, calls for a legal conclusion. Number two, it's an inaccurate statement of the law.
MS. MARMOR: Actually, I think that's not accurate about the initial disclosures, but we're not going to debate it right now.

115

MR. LINDEN: Says it right there.
MS. MARMOR: Not going to debate it right now.
BY MS. MARMOR:
**Q. So you made the choice not to disclose Officer --**
A. I did.
**Q. -- let me finish -- Officer Zaleski's name, correct?**
A. Zaleski, yes, I did.
**Q. Zaleski. Have you talked to Officer Zaleski about this case?**
A. No.
MS. MARMOR: Mark this as the next exhibit.
(WHEREUPON, Nawara Deposition Exhibit No. 8 was marked for identification.)
MR. LINDEN: Do you have one more? We didn't get it.
MS. MARMOR: Sorry. Here you go. This is 8 or 9? 8?
BY MS. MARMOR:
**Q. Mr. Nawara, the court reporter has handed you what has been marked as Nawara**

116

Exhibit 8, which is Plaintiff's Answers to Defendants' Third Set of Interrogatories. First page of this it asks the plaintiff to identify the person or persons that plaintiff's counsel alleged during a phone conversation with defense counsel on May 18, 2018, had viewed a video recording showing any interaction between Plaintiff Nawara and Defendant Jones-Hayes on or about September 28, 2016. Do you see that? It's in the question.
A. Okay.
Q. Do you know of anybody other than Officer Zaleski -- is that how you pronounce it?
A. Yes, ma'am.
Q. Do you know of anybody other than Officer Zaleski that you believe might have viewed such a video?
A. No.
Q. And do you see in the answer that Officer Zaleski was not identified?
MR. LINDEN: I just want to object that there's no -- the answer objects to the question.
MS. MARMOR: I will get there.

117

THE WITNESS: Not understanding what you're asking me.
BY MS. MARMOR:
Q. Officer Zaleski's name is not identified in this answer, correct?
A. Correct.
Q. Instead it says, Plaintiff objects to this request as it calls for attorney/client and attorney work product information and is not relevant to any claims or defenses at this point in this litigation and poses a safety risk to an employee that could be subject to retaliation for such disclosure. Do you see that?
A. Yes, ma'am.
MS. MARMOR: Okay. No wonder I can't see. I don't have my reading glasses.
(WHEREUPON, Nawara Deposition Exhibit No. 9 was marked for identification.)
BY MS. MARMOR:
Q. So Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 9, and the first e-mail here is from Mary McQuillan to you dated September 29, 2016.

118

Do you see that?
A. Yes, ma'am.
Q. And that's the day after the altercation at Cermak, correct?
A. Yes, ma'am.
Q. And it says, Officer J. Nawara, Attached please find a copy of Personnel Memorandum #16-793, which is effective Sunday, October 2nd, 2016. Do you see that?
A. Yes, ma'am.
Q. And in fact this was the document that -- the attachment is the document that sent you to Ex Ops, correct?
A. Yes, ma'am.
Q. And you earlier testified that -- you talked about S.E.A.M. Article U being an indication to you that you were under investigation. Do you remember that testimony?
A. Yes, ma'am.
Q. So the attachment to Nawara 9 says effective Sunday, October 2nd, 2016 the following staff member will be assigned as indicated below: Per Article XIV, Section 14.4(1)(B), I think that is, of the parties

119

collective bargaining agreement/S.E.A.M. Article U. Is that what you were referring to earlier today?
A. Yes, ma'am.
Q. And what about Article U to your knowledge means that -- is about being under investigation?
A. That it says I'm under investigation.
Q. And you were being transferred from Cermak 7:00 to 3:00 shift detail to External Operations 6:00 to 2:00 shift detail, is that correct?
A. Yes, ma'am.
Q. And then you forwarded on the next day, if you go back to the first page, you forwarded this e-mail to Darin Waller -- if you could go to the first page of Nawara 9. You forwarded this e-mail to Darin Waller and Leroy Martiniak. Who are they?
A. My old supervisors from my ex S.O.R.T. team.
Q. From S.O.R.T.?
A. Yes. And at the time I think they were both in charge of the emergency response team.

120

Q. And why did you send this to them?
A. To let them know what was happening to me.
Q. And what does that mean?
A. That this place does things to people on an individual basis, and no one knows what goes on here. So two people that I trust didn't know -- that are good supervisors, I was letting them know what was going on with me.
Q. Did you believe that you were transferred to Ex Ops because of your interactions with Superintendent Jones-Hayes the day before?
A. Well, this was the -- yes. Yes.
MS. MARMOR: Let's do this one.
(WHEREUPON, Nawara Deposition Exhibit No. 10 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara 10, which is a series of e-mails between you and someone named Kelly Cappy at the Sheriff's Office.

121

If you start at the bottom, this is the way we have to read e-mails these days, you'll see that the first one is at the bottom of the page, dated October 17, 2016. Do you see that, where it says, I heard you're in Ex Ops now, lucky?
A. Yes.
Q. Okay. Who is Kelly Cappy?
A. An officer that works at the jail.
Q. Is Officer Cappy a man or woman?
A. Woman.
Q. And she says, I heard you're in Ex Ops now, lucky. Do you see that?
A. Yes.
Q. And do you have any understanding, do people regard Ex Ops as a good assignment?
A. It depends on how you look at it.
Q. Okay. And you responded, Yeah, and, question mark, explanation, with a little sort of emoji face. Do you see that?
A. Yes.
Q. Okay. And then you say, Where did you go? Do lunch or drinks with me sometime, and you give your cell number, which we have blacked

122

out to protect your confidentiality. Do you see that?
A. Yes. Thanks.
Q. Okay. And then she says, LOL, maybe, with her own emoji. Such a shy young man you are, Where do they have you in Ex Ops so I can swing by, and this now is on October 19. Do you see that?
A. Yes.
Q. And on the same day you said, In Ex Ops they can and do put you everywhere. Is that right?
A. Yes.
Q. Can you explain to me what you did in Ex Ops?
A. Can be stationed anywhere in and around the jail. I can transport inmates from different counties to our courthouses to their courthouses. Can be assigned to any of the hospitals we have in the county if any inmates go there. I also was called to do -- to move inmates that ERT needed help with --
Q. What's ERT?
A. -- Emergency Response Team -- while I

123

was in Ex Ops. Lots of various things.
Q. And if you recall one of the first documents we looked at this morning was the document where you talked about how you had bid to be transferred to External Ops, correct?
A. Correct.
Q. Why did you want to be transferred to External Ops?
A. I needed to get away from Cermak.
Q. She then responds, What time is your bedtime? This is all on October 19th. And you say, My mom doesn't really check on me, so I go to bed when I want. I mean, fair to say you were kind of flirting with each other here, right?
A. Sure.
MR. LINDEN: Objection, form.
BY MS. MARMOR:
Q. And she says, Call me up here. I'm at Cermak in Central Control. Regretting my decision to bid here. Ha. What's 5801?
A. Phone number.
Q. I see. Okay. And then you respond, Incoming. What does that mean?

124

A. I'm going to call.
Q. Okay. Did you actually date Ms. Cappy?
A. Excuse me?
MR. LINDEN: Object to relevance.
MS. MARMOR: Relevance is not an appropriate objection.
BY MS. MARMOR:
Q. You can answer the question. Did you ever date Ms. Cappy?
A. No.
Q. Okay. So I'd like to turn to the day that you went to see the people in the HR Department. Okay? And just ask you what do you recall about how you came to be asked to go to HR that day? And the day was I believe November -- let me get the correct -- November 18, 2016.
A. I was assigned to one of the main entrances of the jail, and Lieutenant Bryant called me and told me that I had an appointment in HR.
Q. On the day of or the day before?
A. Like an hour before.
Q. And can you tell me what you did in



response?
A. Told him I didn't know that I had that appointment. He told me that I did and that I should go down there.
Q. Okay.
A. Said okay, and I walked down there.
Q. Was it in the same building that you were assigned to?
A. No.
Q. What building was HR in?
A. Just off 31st and California.
Q. And what building had you been working in that day?
A. Right off of 2700 -- it's the main entrance to the jail.
Q. Okay. So it's within walking distance.
A. It's a few blocks away, yes.
Q. And did you walk over?
A. I did.
Q. Okay. And what happened when you got there?
A. I waited around for a little while, and then Nurse Shelby saw me and told me she'll be with me in a minute.



Q. Were you sitting in a waiting area?
A. No, standing, just as you enter the building.
Q. And what happened next?
A. She waited for Rebecca Reierson, and they asked me to step in their little office.
Q. Had you ever met Nurse Shelby or Rebecca Reierson before that day?
A. No.
Q. Approximately what time did you go there?
A. 9:00 o'clock.
Q. And what happened when you -- and you went into -- it was Nurse Shelby's office?
A. I believe so.
Q. And were there seats?
A. Yes.
Q. And did you sit?
A. Yes.
Q. And did they close the door?
A. Yes.
Q. And what happened next?
A. She said -- she said she was a nurse.
Q. Who's she?



A. Nurse Shelby said she was a nurse and Rebecca Reierson was a director, and then wanted to know if I threatened my co-workers or something or if I'm known to threaten my co-workers. I don't remember exactly how they worded it.
Q. What did you say?
A. That I was wondering why I was here, what this is pertaining to.
Q. What else? Or what happened next? So your response to -- let me just be clear. Your response to their question about whether or not you had threatened co-workers is you said, Why am I here?
A. No. I asked what it was -- what this was a result of because I never met these people. I mean, how random is it for two people you have never met to ask you an off the wall question like that.
Q. Um-um.
A. Have to have some sort of knowledge where did this come from, some sort of documentation.
Q. And then what happened?

A. She told me --
Q. Who is -- you have to be clear about who's talking.
A. Rebecca Reierson didn't say probably not that much this entire time.
Q. Let me -- so I understand that, in your meeting with just the two of them Rebecca Reierson said virtually nothing or very little, is that right?
A. Yes, until the end.
Q. Until the end of the meeting when it was just the three of you?
A. Correct.
Q. Okay. And then -- and so most of the conversation or most of the talking from their side was from Nurse Shelby, is that right?
A. Correct.
Q. Okay.
A. She told me that this wasn't that type of inquiry, I guess. She said it was -- this isn't OPR.
Q. Is not OPR.
A. Correct, this isn't OPR. I just want to know if you feel threatening or whatever



towards co-workers. I believe this time she worded it or inmates, detainees.
Then I stopped her, and I said, Well, co-workers no. Detainees to a certain extent yes. This job requires some sort of authoritative intonation, I guess, if you will. You can't walk up to 60 guys by yourself and speak softly to anyone to demand control of a room. It doesn't work like that. I don't really have problems with my co-workers, so no.
And again I asked does this have to do with anything that happened because I don't know you guys, and you haven't presented me with any paperwork, so I don't know why I'm here.
And again she goes you don't have to worry about that because this isn't OPR. We're just here to ask you some questions. And we did this dance for a little while.
Q. This dance, you mean you wanting information from her rather than -- and her trying to tell you that information wasn't relevant to the inquiry?
A. I don't believe --
MR. LINDEN: Object to form.



THE WITNESS: I would be entitled to information. They're asking me questions that could possibly damage me without providing me a reason as to why I'm there.
BY MS. MARMOR:
Q. How did you think they could damage you?
A. Somebody had to have told them something about something to go ahead and make them ask me a question like that.
Q. Right. Did you understand that you were not there for discipline?
A. No, because it wasn't stated anywhere.
Q. Is OPR a channel for discipline?
A. Yes, it is.
Q. How long were you there talking -- have you talked about everything that you remember that you and Nurse Shelby and Ms. Reierson spoke about in that first period of time?
A. I don't know. What else would you like?
Q. Everything you remember.
A. Well, we kind of went around that circle because she was trying to get me to I



don't know what, say I was intimidating to people or something like that. I don't know exactly what she was getting at, but she became frustrated because I kept asking her is there something you can show me that would show me why I was here, and then I could possibly provide you with more information if you're talking about something specifically.
And she kind of gave me dismissive wave, and she said, Step out. I'll let you know what we talked about.
Q. You said that Rebecca Reierson didn't speak until the end. What did she say at the end?
A. Oh, no. That was after James Penney showed up.
Q. Okay. So in the first period of time -- how long was the first period of time before you were asked to step out?
A. 15 minutes?
Q. And did you have an understanding of why they asked you to step out?
A. To my belief it's because they wanted to talk about whatever they wanted to talk about

that they didn't want me to hear.
Q. Did you ask to have Mr. Penney or some other person from your union present during that first part?
A. No.
Q. So after you stepped out, did you call Mr. Penney or some other member of your union?
A. No. The lady at the front desk called.
Q. Did you ask her to call him?
A. No. I walked past her. She could see I was upset. And when I came back in, she told me that she called. She said that -- I guess what tipped her off was that Nurse Shelby had called down there.
She says -- if I remember correctly, she said something to the effect of, That lady called down here twice looking for you. I know what they do to people up there. I already called the union. And this is my assignment. I'm not letting you back up there until he shows up.
Q. Who is this lady?
A. Officer Johnson-Green.
Q. I'm sorry, Officer what?



A. Johnson-Green.
Q. What's her first name?
A. I don't know.
Q. Had you known her before that day?
A. Yes, ma'am.
Q. How?
A. She's worked in S.O.R.T. Operations for a long time. She's since retired. She's an older black woman that I befriended when we were working Ex Ops.
Q. So it's your testimony that she called Mr. Penney?
A. Yes, ma'am.
Q. And when did Mr. Penney arrive?
A. Maybe 10 minutes later, 15 minutes later.
Q. And what did you tell him?
A. Everything that had happened up until that point.
Q. Which was what?
A. That they were asking me way off the wall questions, and it felt very wrong for me to be in there, and that I'm glad he was here.
Q. Were you angry that they were asking



you those questions?
A. I don't know if I was angry. I was upset being asked that by two people I didn't know, yes.
Q. Would you describe the mood in that room as having been tense?
A. Oh, yes.
Q. And what did Mr. Penney tell you?
A. Let's go up there and see what happens.
Q. And what is Mr. Penney's role vis-à-vis you and the union?
A. I don't know. I just know he's like a union representative.
Q. Okay. And when you say you were downstairs, so you had been upstairs with Nurse Shelby and Ms. Reierson, and then you left knowing that they were going to want to talk to you again, correct?
A. Yes.
Q. Okay. And then you went downstairs? Is that your testimony?
A. Letting her know I wanted a break, yes. So I let her know that I'll be right back. So she said, Okay.



Q. So did she tell you to leave or did you say, I want a break?
A. No. Well, once they -- she kind of dismissed me out of the room, Rebecca Reierson got up, and she was going to close the door. I go, If you don't see me outside when you open the door, I'll be right back.
Q. Okay.
A. She said, Okay. So I guess they waited for me, but I guess Nurse Shelby called because that's what Johnson-Green said.
Q. Okay. So how long was it before you returned to Nurse Shelby's office?
A. 15, 20 minutes.
Q. And what happened when you went in the office?
A. Nurse Shelby asked who James Penney was, and he said, I'm his union rep. She says, Well, this isn't OPR. He doesn't need a union rep. He said, From what he told me, he does. So since that happened she got upset.
Q. How did you know she was upset?
A. Because she immediately said, Okay. Fine. So just so you know, he's being found

unfit for duty.
Q. She said, Okay, fine, and that's your sign that she was upset?
A. I don't know. Gestures, the way that she acted? I don't know.
Q. So she said, Just so you know -- she said that to Mr. Penney?
A. Yes.
Q. Just so you know, he's being referred for unfitness for duty, is that right?
A. Yes.
Q. What happened next?
A. He said, Why, and she said, Due to the aggressive behavior he displayed before you showed up.
Q. And what happened next?
A. I believe that was at the moment he asked to step out for a second, and he called the chief union steward, Mark Robinson, who however that worked, I think he asked Nurse Shelby what the phone number was there. Either that or he -- or Mark Robinson knew the phone number there.
One way or the other a couple seconds



later the phone rang, and we were on speaker phone with Mark Robinson, Nicole Chaney, and then the four of us in the room. So six ears.
Q. So what you're saying is that Mr. Robinson called in to Nurse Shelby's office?
A. Yes. That's the way it -- yes.
Q. Okay. And Nicole Chaney, who was counsel for the Teamsters, was on the call?
A. Yes.
Q. And then you, Mr. Penney, Ms. Reierson, and Nurse Shelby were on the call as well.
A. Yes. Yeah. We were in the room.
Q. Okay. And what do you recall happening on that call or being said on that call?
A. I believe Nurse Shelby repeated again that I'm being found unfit for duty, and I don't remember what James Penney said, but then I remember Robinson saying specifically, Does this have to do with that thing with the superintendent from earlier?
Q. And how -- did you know how Mr. Robinson knew about the altercation with Superintendent Jones-Hayes?
A. Because I had mentioned it I think to



Penney when it happened or sometime after it happened. I think that's -- yeah. I had mentioned it to Penney.
Q. And what did they say in response -- what did anybody say in response to that question from Mr. Robinson?
A. I don't think they did. That's when the paperwork came out and said he has to sign this so that we can continue the process. Or no, that's when Shelby actually -- I mean, that's when Rebecca Reierson actually spoke.
He said, Does this have to do with what happened a couple of months ago, something to that effect.
Q. Robinson said that.
A. Yes, ma'am. And then that's when Rebecca Reierson said, We only found out about this two days ago. She didn't like address it. She almost mumbled it under her breath. I believe that was the only time that she said anything that entire session.
Q. Okay. And then the -- you said the paperwork came out?
A. Yes, ma'am.



Q. And they said, You have to sign this so we can continue the process, is that right?
A. Yes.
Q. And who said that?
A. Nurse Shelby.
Q. And did you study the forms at that time?
A. I looked at them, yes.
Q. And what happened next?
A. She said I had to sign them or I'm not going to -- or I can't go back to work. I have to sign them so we can do this process, and I can't come back to work until I complete this process.
Q. Okay. So you understood that the forms were the first step of the process, correct?
A. Correct.
Q. And that once that process was over, if you were found fit for duty, you could come back.
A. Correct.
Q. Okay. So what happened next?

(WHEREUPON, Mr. Lyle Henretty left the deposition proceedings.)
THE WITNESS: I told them I wasn't going to sign them.
BY MS. MARMOR:
Q. Why not?
A. Because they were blank.
Q. Is that what you said, I'm not going to sign this because it's blank?
A. Yes.
Q. And then what happened?
A. She says, Well, you can't come back to work until you do.
Q. Okay. And then what happened?
A. I said, Could I take these to review these? She said, Sure.
Q. And then what happened?
A. Left the office.
Q. Okay. Let's go back to Nawara 4, please. It's going to be backwards there for you. If you want to give them to me, I can find it for you. This is a good test to see whether you actually have everything. Here you go.

141

A. Thanks.
Q. I'm re-handing to you what's been previously marked as Nawara Exhibit 4, which is the Fitness for Duty Exam report from the Isaac Ray Forensic Group. Do you recall this document, sir?
A. Yes, ma'am.
Q. If you could go to Page 4 of Nawara 4. Just let me know when you get there. Up on the upper right-hand corner are the page numbers.
Do you see in the second full paragraph that starts, Of the 11-18-16 meeting in Human Resources, Officer Nawara explained that it seemed to go badly from the start?
A. Yes.
Q. Is that an accurate statement?
A. Yes.
Q. And in what way did you think it went badly from the start?
A. My job consists of having to feel out situations, dangerous situations I put myself into every day. So I'd like to think that I can kind of get a notion on something that's not right. Two people that I don't know in a room

142

I've never been. There's no paperwork there. I was just given a verbal order to show up, asking an opening question of if I threatened people. I would like to think that everybody would agree that that's not necessarily a good situation.
Q. Did you think this was a dangerous situation?
A. From my experiences here, yes.
Q. In HR? You felt in danger in HR?
A. Being employed in this place.
Q. You see that it says, He explained that while he was told that he was being mandated for a fitness for duty examination, he felt he wasn't given direct explanation as to the reason, which he asked for several times, and that his attempt to have union representation for the discussion was met with resistance. Do you see that? It's the second sentence of that paragraph.
A. Yes. I see it.
Q. Okay. Did you -- is this an accurate -- I'm confused by this because your testimony has been that somebody else called the union --

143

A. Yes.
Q. -- but what you seem to have told --
(WHEREUPON, Mr. Lyle Henretty entered the deposition proceedings.)
BY MS. MARMOR:
Q. -- the fitness for duty examiner in September of 2017, and I'll read the rest of this to you just so you understand my question, He agreed his leaving the meeting in order to call union representation may have inflamed an already tense situation. Do you see that?
A. Yes. Probably misinterpreted that.
Q. So in fact this is not correct, that the statement from the fitness for duty examiner about the fact -- she got the facts wrong here, is that right?
MR. LINDEN: Objection to form.
THE WITNESS: No. Those were the facts.
BY MS. MARMOR:
Q. But you said you didn't call the union, is that right?
MR. LINDEN: Object to form, foundation.
THE WITNESS: Correct. I didn't call the

144

union.
BY MS. MARMOR:
Q. Okay. But this does say that you did call the union.
MR. LINDEN: Objection. I just want to object. Argumentative, asked and answered. And the document, it speaks for itself. Somebody else's recap.
BY MS. MARMOR:
Q. The document says, He agreed his leaving the meeting in order to call union representation may have inflamed an already tense situation. Do you see that statement?
A. I do.
Q. And your testimony today is that you didn't leave the meeting in order to call union representation, is that right?
A. Correct.
Q. Do you agree that it was an already tense situation?
A. Yes.
Q. How is it -- it also says here that your attempt to have union representation for the discussion was met with resistance. Was



there any attempt in that first part for you to have union representation for the discussion, that first -- before Mr. Penney showed up, did you ask to have union representation there?
A. No.
Q. And --
A. I was told this wasn't an OPR investigation.
Q. Okay. And so is it accurate that given that you didn't attempt to have union representative there, is it accurate to say that that was met with resistance?
MR. LINDEN: Object to the form. What time frame, the first part, second part?
MS. MARMOR: You can just object to the form. I don't need to be coached. Thank you.
THE WITNESS: Can you rephrase that, please?
MS. MARMOR: Can you read the question back?
(WHEREUPON, the record was read by the reporter as requested.)
THE WITNESS: Before James Penney showed up?
BY MS. MARMOR:
Q. Correct.
A. Yes. I didn't attempt to have any



union representation at the moment because she said -- every time I asked her what this was about, she said it wasn't an OPR investigation.
Q. And that in fact was true, this was not OPR.
A. I don't know. I didn't see any paperwork. I couldn't tell you.
Q. Do you know whether HR investigates OPR matters?
A. I have no idea.
Q. The next line after it says, It may have inflamed an already intense situation, she reports that, But he insists -- this is her writing. But he insisted he felt too vulnerable not to have someone there as a witness, given the manner in which he perceived the conversation to be going. Do you see that?
A. Yes.
Q. So given that you didn't ask for any union representation there, is that an inaccurate statement?
MR. BUSTAMANTE: Objection to form.
MR. LINDEN: Objection to form.



(WHEREUPON, Mr. Peter Bustamante left the deposition proceedings.)
THE WITNESS: I mean, this is -- it's how I felt.
BY MS. MARMOR:
Q. But you didn't -- you felt vulnerable, right?
A. Yes.
Q. But did you -- but you didn't -- but that vulnerability did not lead you to call the union, somebody else called the union, right?
MR. LINDEN: Objection. Asked and answered.
THE WITNESS: The vulnerability led me to take the opportunity to take a break when I was dismissed out of the room. I guess I felt trapped, and I didn't know what to do.
When they finally decided to come to the point where they wanted to speak alone, I realized for a second that I could just take a breather and think about what was going on. So I left.
At that moment again all the thoughts jumbling in my head and the fact that I didn't

do anything wrong, and I'm trying to figure out what's going on, and I was in HR, not OPR, so I'm wondering, very confused here, how this is happening to me.

And going downstairs once Officer Johnson-Green said to me that she had called the union, kind of gave me a big relief because then I forgot that I actually could do that until that time because of the situation I was in.

Normally certain standards go with -- just like in training, at intense moments you actually forget your normal habits, and you rely on your training because intense situations. In this situation I don't think it dawned on me that I should have got union representation until Johnson-Green told me, I called somebody for you.

BY MS. MARMOR:

Q. Did you tell the fitness for duty examiner that Ms. Johnson-Green had called the union rep, not you?

A. I believe I did because I -- the story goes one way.

Q. Because why?



A. The story only goes one way. There's only one truth.

Q. I don't understand what you're saying.

A. That this is what happened.

Q. Do you see at the bottom where it says -- bottom of this paragraph on Nawara 4, He did ultimately leave with an understanding that the fitness examination was being requested based on threatening behavior toward his superior officer related to the September incident with Superintendent Jones-Hayes. Do you see that?

A. Yes.

Q. Is that accurate?

A. Yes. She told me.

Q. Also right above that, so they did tell you that the altercation between you and Jones-Hayes had something to do with why you were being sent.

A. Are we talking about the doctor here or Rebecca Reierson and Winifred Shelby?

Q. I mean on the day. This is a paragraph about the meeting in Human Resources.

A. This reads, He did ultimately leave



with the understanding.

(WHEREUPON, Mr. Peter Bustamante entered the deposition proceedings.)

THE WITNESS: So what I'm getting from this is that the doctor is understanding that I'm leaving with the understanding that it was because of threatening behavior.

BY MS. MARMOR:

Q. So you think she's referring to what you understood in September of 2017, not what you understood in November of 2016?

MR. LINDEN: Objection to the form. Calls for speculation.

THE WITNESS: I left with the understanding that this request was based on threatening behavior due to the fact that the doctor told me so.

BY MS. MARMOR:

Q. Right. That's in 2017.

A. Correct.

Q. Okay. That was my question. So is your testimony that you didn't understand in November of 2016 when you left Nurse Shelby's



office that you were being sent for a fitness for duty exam in any way related to the altercation with Jones-Hayes?

A. She didn't say so in so many words.

Q. I'm asking about your understanding.

A. I was understanding this, yes.

Q. Yes, what?

A. That that's what the reason was for that altercation because what else would there be?

Q. Well, didn't you also just testify that it was also what Nurse Shelby said when you and Mr. Penney showed up for the second part was it was also based on your conduct between -- with them?

A. Right, right.

MR. LINDEN: Objection to form, foundation, misstates testimony.

THE WITNESS: That's what she said at that moment, yes.

BY MS. MARMOR:

Q. Okay. So I want to go back to what happened. So you left with the forms?

A. Yes.

Q. And what did you do with the forms?
A. I made copies, and I gave two to James Penney.
Q. Gave two copies or gave a copy of each form?
A. Copy of each form.
Q. To Mr. Penney.
A. Correct.
Q. In the Second Amended Complaint in this case there's an allegation in Paragraph 50 that Defendant Dart, through Defendants Burke, Shelby, and Reierson, told plaintiff that he could not return to work until he signed the HIPAA release forms, which plaintiff believed was an unlawful request.
My question to you is was defendant -- was Matt Burke there that day?
A. No.
Q. Okay.
A. Never met Matt Burke ever.
Q. Okay. So you said you made copies of the forms for James Penney. What did you do for the rest of that day?
A. Went home.



MS. MARMOR: Let's see.
(WHEREUPON, Nawara Deposition Exhibit No. 11 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara Exhibit 11, which at the bottom is an e-mail from Mary McQuillan on Friday, November 18th attaching a copy of a memorandum regarding you, and says, Officer Nawara is not permitted to work until -- and there is a typo there -- but his has been released for duty by Human Resources. Do you see that?
A. Yes.
Q. And that was sent to you by Superintendent Brogan, it appears. Somehow you got a copy of this on or about the same day?
A. The next day, I believe, Lieutenant Worthon called me and --
Q. Oh, I see.
A. -- asked -- or kind of asked and told, because he was confused when he said it, I believe. He said, You're not supposed to come to work today or whatever? Not allowed to come back to work? And I told him I wasn't exactly sure what he meant. He said he would forward me the e-mail.



Q. Okay. And that was consistent with what you had been told at HR, which is that until you completed the FFD process, you could not come back to work.
(WHEREUPON, Mr. Lyle Henretty left the deposition proceedings.)
THE WITNESS: Correct.
BY MS. MARMOR:
Q. And who is Paul Worthon?
A. Lieutenant in External Operations area.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 12 was marked for identification.)
BY MS. MARMOR:
Q. The court reporter has just handed you what's been marked as Nawara Exhibit 12, which is an e-mail from you to Mark Robinson. And as I recall your testimony, that is the -- is that



the union steward or is he just the union representative?
A. I believe he's the Chief Union Steward is his title.
Q. And that's at the Teamsters?
A. Yes, ma'am.
Q. And why were you sending this to him?
A. What did I send to him?
Q. The HR clearance required to return to work. I have got another version of this with the actual attachment. Would you like to look at that?
A. Is that the e-mail you just showed me?
Q. Yes.
A. Let me look at that.
Q. Oh, actually, that went to James Penney. Right. This is the HR clearance required return to work. You were letting -- you were letting -- it looks like you were letting the Chief Union Steward know that you had gotten this order.
A. Yes.
Q. Okay. And why did you send that to him?

A. To let him know that I got this order.
Q. Any other reason?
A. No.
Q. Were you in any ongoing conversations with the union about the situation at this time?
(WHEREUPON, Mr. Lyle Henretty entered the deposition proceedings.)
THE WITNESS: We had spoken a couple of times to where he said that he was doing what he could about it.
BY MS. MARMOR:
Q. Mr. Robinson?
A. Yes.
Q. Did you understand what that meant?
A. No.
(WHEREUPON, Nawara Deposition Exhibit No. 13 was marked for identification.)
BY MS. MARMOR:
Q. Okay. The court reporter has shown you what's been marked as Nawara 13, and this is the same memorandum that we've just been talking about, but this time you forwarded it to James



Penney. Do you see that on November 19th at the top of the page?
A. Yes.
Q. Okay. And why were you sending this to Mr. Penney?
A. To let him see the order that I have.
Q. Is there some requirement that you let your union know when you get these kinds of orders?
A. No.
Q. Between November 19th and the end of the month did you engage in conversations with the union about what to do about this situation?
A. Yes.
Q. And what were those conversations?
A. I asked them what we could possibly do about this.
Q. And what did they tell you?
A. That they were working on it. And eventually until the point where they told me they couldn't do anything about it, Mark Robinson told me if you haven't figured out by now the union is reactive and not proactive.
And since no one is taking any



disciplinary action against you, he goes, I suggest you seek legal counsel elsewhere to help get myself back to work because they didn't know what they could do about it. Nothing they could grieve because there was no paperwork written against me.
Q. When did Mr. Robinson tell you that?
A. Sometime after this, the incident of November 18th.
Q. Within a week, within days?
A. Within a month that you stated sometime.
Q. Before the end of the month?
A. Probably. Something like that. I believe I reached out to Dana Kurtz later on in December. So probably, yeah, sometime before that.
Q. And Dana Kurtz was your original counsel in this case?
A. Correct.
Q. And she had been counsel for you in another lawsuit against the Sheriff's Office, is that right?
A. Correct.



Q. And were you aware that she has filed a number of lawsuits against the Sheriff's Office?
A. I am.
MS. MARMOR: It's about 1:00 o'clock. I think we should take a half hour break.
MR. LINDEN: Okay.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 12:55 p.m. This is the end of Videotape No. 2.
(WHEREUPON, a luncheon recess was had.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 1:37 p.m. This is the beginning of Videotape No. 3.
BY MS. MARMOR:
Q. Mr. Nawara, before we go to the next document, when you left HR on the 18th of November 2016, what did you tell them -- you told -- you've testified that you said you wouldn't sign the forms, is that right?
MR. BUSTAMANTE: What date?
MS. MARMOR: I said November 18, 2016.
MR. BUSTAMANTE: Okay.

BY MS. MARMOR:
Q. You have testified that you said, I'm not going to sign these forms on that day, correct?
A. Yes.
Q. Did you give them a reason at the time?
A. Because they were blank.
Q. Okay. Just because they were blank. Okay. All right. So --
A. They wanted my medical records.
Q. Did you say you want my medical records or did you say they were blank?
A. No. The form said that. Form was blank. It said it was requesting my medical records. I believe Winifred Shelby's name and address was stamped in the area where the information is where her information would go.
And the other form was releasing the sheriff from liability for taking my medical records, and I just believed in my heart that was wrong.
Q. Right. But I'm not asking you what you believed in your heart. I was asking you what you said to them about the reason that you

161

wouldn't sign them. On that day the reason that you gave them was that it was blank, is that correct?
A. Correct.
MS. MARMOR: Okay.
MR. LINDEN: Did you give him any other reasons to be --
MS. MARMOR: Did you give them any -- well, that actually was my question already, but thank you.
BY MS. MARMOR:
Q. Did you say anything else about why you would not sign the forms on that day?
A. I don't recall.
(WHEREUPON, Nawara Deposition Exhibit No. 14 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked Nawara 14, which is an e-mail from yourself to yourself, if you look at the first page. Very first page, do you see that you sent this e-mail -- you sent this e-mail from your cookcountyil.gov e-mail address

162

to an e-mail address that says John Nawara, indestructibull, with two "l"s at the end, at yahoo.com. Do you see that?
A. Yes, ma'am.
Q. And you sent that on November 30, 2016?
A. Okay.
Q. Is that correct?
A. Yes, ma'am.
Q. And is this indestructibull@yahoo.com your personal e-mail address?
A. Yes.
Q. And when you were asked to search for documents in this case, did you search that e-mail for any responsive documents in this case?
A. No, because everything I had was sending from here to there. Yeah, no. Yeah. Everything I was sending was from my county e-mail to my personal e-mail.
Q. Did you ever have any communications with anybody about this case, other than your counsel, using the indestructibull@yahoo.com e-mail address?
A. I don't know.

163

Q. Okay. And you didn't -- at the time the discovery was issued in this case you didn't search for any of those -- to see if there were any such communications at that time, is that correct?
A. Yes. I don't think so.
Q. Okay. If you turn to the third page of Nawara 14, you see that that -- yeah. That's the actual letter that was sent by Ms. Reierson. Do you see that?
A. Um-um.
Q. It looks like you actually did receive this letter on November 30, 2016, given that you've sent it to yourself on the same day?
A. Okay.
Q. Would you agree with that?
A. Yes.
Q. And Ms. Reierson was writing to you on November 30th now about two weeks after the HR meeting, correct?
A. Yes.
Q. And she writes that, On 11-18-16 you were informed by the occupational health nurse for the Sheriff's Office, Winifred Shelby, that

164

you were required to undergo a Fitness for Duty evaluation before returning to active duty. You took the forms -- and that's in fact what happened, she did make that statement to you at that time, correct?
A. Yes.
Q. You took the forms in order to review them prior to signing and failed to return them to Ms. Shelby. Do you see that?
A. Yes.
Q. And I think that you testified that you did take them in order to review them further, is that right?
A. Yes.
Q. She called, "she" meaning Ms. Shelby, called and left a voicemail message for you on 11-30-16 to which you did not respond. Do you see that? The third sentence.
MR. LINDEN: I just want to object insofar as it assumes statements is true.
MS. MARMOR: I haven't assumed anything. Just asked him to read the statement.
BY MS. MARMOR:
Q. Now, there has been testimony from

165

Nurse Shelby in this case that she's not sure exactly when she called you. Might have been before that date. Do you recall getting a voicemail from Nurse Shelby?
A. Yes.
Q. And did you -- do you remember what she said in the voicemail?
A. No.
Q. Do you remember when the voicemail was left?
A. No, ma'am.
Q. Was it sometime around November 30, 2016?
A. Sure.
Q. Prior to this date.
A. Yes.
Q. And did she ask you to call her back?
A. Maybe. I don't know.
Q. Okay. After you got this letter, did you try to call Nurse Shelby?
A. No.
Q. Did you ever try to call Nurse Shelby at any time after the HR meeting?
A. Not at all.

166

Q. Have you ever had any conversations with Nurse Shelby since the HR meeting on November 18, 2016?
A. No.
Q. Have you ever had any conversations with Rebecca Reierson since November 18, 2016?
A. No, ma'am.
Q. Have you ever had any conversations with Superintendent Jones-Hayes since the November 18, 2016 HR meeting?
A. No, ma'am.
Q. Have you ever had any conversations -- I think you've already testified you never met Matt Burke, correct?
A. Correct.
Q. So you have never had any conversations with him at all, correct?
A. Correct.
Q. Why didn't you call Nurse Shelby back?
A. Because what she was doing to me was wrong, so how am I supposed to call somebody who's deliberately doing something to me who doesn't even know me and try to rectify anything with her in any kind of way? I don't understand

167

the logic in that. I wouldn't call somebody who's trying to screw me over and say, Hey, how can we -- I don't know. Didn't bother to call her back.
Q. Do you know whether -- you said before the lunch break, you testified about the fact that the union told you there was really nothing they could do for you. Do you remember that?
A. Yes, ma'am.
Q. And was that in part because the fitness for duty process is not disciplined?
MR. LINDEN: Objection. Form and foundation.
THE WITNESS: All depends on how you look at it.
BY MS. MARMOR:
Q. Well, what were they saying to you?
A. They were saying that the amount of my medical records to be delivered directly to Winifred Shelby.
Q. No. I meant what was the union saying to you?
A. The union was saying they couldn't do anything because they didn't have any paperwork to grieve.

168

Q. And what does that mean? Do you have to have a piece of paper -- wasn't there, for example, a notice to you that we saw this morning or earlier in the day telling you you couldn't come back to work until you completed the fitness for duty process?
A. Yes.
Q. And they couldn't grieve that?
A. I don't know.
Q. But they told you there was nothing that they could grieve, correct?
A. Correct.
Q. You got to let me finish the question. And who was it that told you that?
A. Mark Robinson.
Q. And was it sometime after you received this November 30, 2016 letter from Ms. Reierson that you retained counsel?
A. Yes.
Q. Why didn't you think that you could handle this issue on your own?
A. Because I'd never gone through this experience before. Never had this happen to me. I needed my job, and I didn't know how to go

169

about getting it back.
Q. Was your objection to the whole fitness for duty process that you didn't think you should be subjected to the fitness for duty process at all?
A. Of course. I didn't do anything wrong.
Q. Did you ever ask Nurse Shelby or Rebecca Reierson at the HR meeting why people are sent for fitness for duty exams?
A. No.
Q. Did they ever discuss that with you?
A. No.
(WHEREUPON, Nawara Deposition Exhibit No. 15 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 15, which is that same letter from Nurse Reierson that had been sent to you by Jessica White at the Sheriff's Office, and it's also the same day, November 30, 2016. That's on the top front page.
You forwarded that to James Penney and Mark Robinson. Do you see that? On the very

170

first page. Do you see at the top?
A. Okay.
Q. So you did in fact forward Rebecca Reierson's letter from November 30th to Mr. Penney and Mr. Robinson at the union, correct?
A. Yes.
Q. Okay. Did you have any discussion with them about what to do about this letter?
A. I don't think so because I wasn't really getting anywhere with any answers as to the action they were taking. They just told me they were working on it. So my intention was just to keep them updated or informed from my end of the small things I was getting.
Q. And the "them" here is your Teamsters union representatives.
A. Correct.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 16 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, court reporter has

171

handed you Nawara Exhibit 16, which is a December 1, 2016 e-mail, and it's from Teamsters@cookcountyil.gov to you at cookcountyil.gov. Do you know who at the Teamsters sent you this document?
A. I believe it was James Penney.
Q. And do you know why Mr. Penney -- and attached to this document are two forms. Do you see that?
A. Yes.
Q. And that's the HIPAA Authorization For Disclosure Of Protected Health Information, and the next one says Cook County Sheriff Authorization To Release Healthcare Information. Do you see those?
A. Yes.
Q. Are those the forms that Ms. Shelby gave you on November 18, 2016 that you took -- that you said you took to review?
MR. LINDEN: Objection. Foundation.
THE WITNESS: Yes and no because the ones that I remember had her name and address and phone number stamped into the -- who the forms -- who my documents would go to.

172

BY MS. MARMOR:
Q. So that's the second of the two forms?
A. Correct.
Q. And the first form looks exactly like the form you got, one of the two forms, that's exactly like the HIPAA form?
MR. LINDEN: Just want to object to the form looks like. If you want to show him to compare the two, it's proper, but I think it's improper the way it's phrased.
THE WITNESS: It looks like the form, yes.
BY MS. MARMOR:
Q. Okay. And do you know why Mr. Penney was sending you these two forms on that day?
A. Maybe he forgot that I had a copy or I don't know. As far as I remember, we both had copies or he had copies or HR made me copies or I thought I had copies. I don't know.
Q. Do you know whether these were forms that the union already had for fitness for duty exams at the Cook County Sheriff's Office?
MR. LINDEN: Objection. Form, speculation.
MS. MARMOR: I asked the question do you know.

173

BY MS. MARMOR:
Q. And you don't know why he was sending this to you on that day.
A. No.
Q. Do you recall whether you asked him to send you any forms?
A. No.
Q. Did you keep the forms that you had been given by Nurse Shelby when you left HR on November 18, 2016?
A. I'm not sure exactly how that went down. Not sure if I gave him the forms and he made copies or I picked them up later on. All I know is that I got copies because I was able to give them to Ms. Kurtz later on.
Q. Okay. So you do believe you handed those over to Ms. Kurtz at or about the time you retained her?
A. Yes.
Q. Okay. And that was sometime in December of 2016?
A. Yes, ma'am.
MS. MARMOR: Okay. Here we go. Here we go.

174

(WHEREUPON, Nawara Deposition Exhibit No. 17 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 17, which is a December 16, 2016 e-mail from somebody that says ciid.investigations@cookcountyil.gov to you at cookcountyil.gov. Do you see that on the first page?
A. Yes.
Q. And it appears to be the incident report from the altercation between the detainees that we saw the video of, is that correct?
A. Yes.
Q. And it was -- and you're listed as a participant there. Do you see that under personnel involved?
A. Oh, yes.
Q. Okay. And trying to see, can you see who drafted this? Doesn't have a signature, does it?
A. I don't think they -- I believe the way

175

the system was then we weren't able to actually do any of that. It was kind of still in practice here. They were trying to -- we're even on a different system now, also.
Q. Right.
A. This is kind of what we could get out of it.
Q. Fair to say you did not draft this?
A. Oh, no. I believe this would be Officer -- well, the way it would be written I would assume that would be Officer -- wouldn't know for a fact, but it would be Officer Turrise.
Q. Right. I just want to establish you didn't write it.
A. Oh, yes. It wasn't me.
Q. Okay. Why were you asking for -- did you make a request for this incident report?
A. No. I don't know. I would assume that if I sent this to myself -- I printed it. I have access to the --
Q. Actually, you didn't send it to yourself. It was to you from ciid.investigations.

176

A. No, I know. All you have to do is put it on copy machine. Print it out, put it on the copy machine.

Q. That wasn't my question, though. Why was it e-mailed to you? Did you ask to have it e-mailed to you?

A. No. I can send e-mails to myself from the copy machine.

Q. Oh, I see. So you simply got --

A. The same way I was getting--

Q. Let me finish. So you got a copy of it, you made a copy of it, and you sent it from the copier to yourself?

A. Yeah. Done it several times, yes.

Q. Okay. And do you know why you did that?

A. To keep record of it the way I've been keeping record of everything.

Q. Okay. And so at that point did you understand that -- this is December 16, 2016. Did you understand that the fitness for duty process that you were being asked to participate in had something to do with what had happened between you and Jones -- Superintendent



Jones-Hayes in September of 2016?

A. It was always my assumption because the only thing that could have happened, I filed a complaint against -- I've been working there 21 years now. I've never had problems with anybody, employees at least. I've always gotten along for the most part with everybody. This is the only thing it could have been.

Q. Okay. So the answer to my question is yes, you believed that FFD was related to your interaction with Jones-Hayes in September of 2016.

A. Yes.

MR. LINDEN: Running out of exhibits?

MS. MARMOR: Not a chance.

(WHEREUPON, Nawara Deposition Exhibit No. 18 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter handed you Nawara 18, which is an e-mail from Dana Kurtz, your former counsel in this case, dated December 21, 2016, and it's sent to Ms. Reierson and Ms. Shelby and then another person named



Peter -- cc'd to a person named Peter Kramer, and the subject is John Nawara. And it says -- it's got an attachment, which is a HIPAA release form, given to John to sign. Do you see that in the top of the first page?

A. Yes, ma'am.

Q. And she writes, Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants. Do you see that?

A. Yes, ma'am.

Q. And you understood she had sued the Sheriff's Office numerous times before, correct?

A. Yes, ma'am.

Q. And she said, I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. Do you see that?

A. I do, ma'am.

Q. Now, if you'll go to the second to last page of Exhibit 18, which is the form, do you see that? That's the HIPAA Authorization form



For Disclosure Of Protected Health Information.

A. Yes.

Q. And it's the case that she doesn't attach both forms, she only attaches this form, correct?

MR. LINDEN: Objection. Foundation, speculation.

THE WITNESS: It appears that way, yes.

BY MS. MARMOR:

Q. And then she says, On what legal basis or policy provision do you and the Sheriff's Office have to order him to complete this form for his personal medical records? Officer Nawara and I believe that such an order is unlawful. Do you see that? It's right there.

A. Which paragraph?

Q. It's in the second paragraph.

A. Yes.

Q. Okay. And then she goes on to say, Officer Nawara has not been given any notification of any complaint or allegations against him. And then she says, You also refuse to provide him with any information other than that he was being ordered to sign a HIPAA

release form. Do you see that?
A. I do.
Q. Now, you did know that this was for a fitness for duty exam, correct?
A. I did.
Q. Okay. Then it says, Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner. Do you see that?
A. I do.
Q. You already established that you don't have any personal knowledge as to whether any of the defendants in this case were aware of that complaint at the time that you were brought to HR and ordered to complete a fitness for duty process, correct?
MR. LINDEN: Objection to form of the question. Misstates the testimony.
THE WITNESS: Could you please say that again?
BY MS. MARMOR:
Q. You have no personal knowledge that

181

Mr. Burke knew about that complaint at the time that you were ordered for a fitness for duty exam.
A. No.
Q. And you have no personal knowledge that Rebecca Reierson -- Rebecca Reierson was aware of that complaint at the time you appeared at HR before her.
A. Correct, because they would never state at all why I was there.
Q. But you also don't have any personal knowledge of whether or not that complaint had anything to do with it.
A. I was never told anything about any paperwork. I was never told verbally why I was there. Nothing.
Q. And you have no personal knowledge that Nurse Shelby had any awareness that you had made a complaint against Superintendent Jones-Hayes at the time that you presented at HR.
A. That is correct. They told me nothing.
Q. She says -- then she talks about, As a result of the above actions taken against Officer Nawara and the unlawful order that he

182

cannot return to work, do you know, do you have a view about whether or not the order that said you could not return to work was unlawful?
MR. LINDEN: Objection. Legal conclusion.
THE WITNESS: I don't know of the order being unlawful or not. I know that I was being wronged.
BY MS. MARMOR:
Q. Okay. And it says, He has been forced to use his vacation time. He has also lost out on advancement and training opportunities. Do you see that?
A. Yes.
Q. What advancement and training opportunities had you lost out on at this point that you were aware of?
A. I missed an appointment for an interview with investigations, per the exact unit. I also believe on or about that time people were supposed to be -- excuse me. I had previously tested for the Transportation unit in which it only required a physical test. There was no interview. There was no written test.
And once you pass the physical test,

183

all the -- they ended up taking people to Transportation by seniority. And on that list I was told by Mark Robinson that I fell second on that list, so they took anybody more than two -- if they took at least two people, I should have been one of them.
Q. Do you know if they took two people?
A. I was told they took about 15.
Q. And did you try to get into either Investigations or this Transportation unit after you returned to work later in 2017?
A. No, ma'am.
Q. Then if you look -- it's the second to last paragraph of Ms. Kurtz's e-mail. She says, We are requesting that he, meaning you, be immediately -- and I think she meant to say reinstated, but it says reinstatement, and allowed to return to work as well as his vacation and time that he has had to use be reinstated.
So did you understand that the position that your attorney was taking for you at the time was that you shouldn't have to go through the FFD process at all?

184

A. Correct.
Q. Okay. And then she says, We are also requesting that the sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from harassment against him. Do you see that?
A. I do.
Q. What was -- was there any ongoing harassment from Superintendent Jones-Hayes at that time against you?
A. I wasn't working.
Q. But she wasn't the one who told you not to work, was she?
MR. LINDEN: Objection. Asked and answered. Calls for speculation.
THE WITNESS: She is the cause of everything I've been going through.
BY MS. MARMOR:
Q. But she -- did you have any personal contact with her?
A. I did not.
MS. MARMOR: Okay.
MR. LINDEN: And that was asked and answered.

185

MS. MARMOR: Not a soup incident.
MR. HENRETTY: I would say I'd help you, but I'll spill it all over the place.
(WHEREUPON, Nawara Deposition Exhibit No. 19 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 19, which is a second e-mail from Ms. Kurtz. Do you see at the bottom of this front page is her December 21st e-mail that we just talked about, and now it's January 31, 2017, and she is sending another e-mail to Ms. Reierson, Ms. Shelby, and Mr. Kramer. And again it attaches a HIPAA release form given to John to sign pdf. Do you see that?
A. Yes.
Q. And she says, We received no response to my e-mail below. If Officer Nawara is not reinstated immediately before the end of this week with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees. Do you see that?

186

A. I do.
Q. And again, if you look at the second to last page of this document, the only form attached to Nawara 19 is again that HIPAA Authorization For Disclosure Of Protected Health Information, correct?
A. Yes, ma'am.
Q. And if you go back to the first page, there is still -- basically what this is doing is still saying you shouldn't have to go through the FFD process at all, correct?
A. Yes.
MR. LINDEN: Objection. Beat me to objection, form of the question. Document speaks for itself.
BY MS. MARMOR:
Q. Then she says, Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or to place him on leave without pay. Do you see that? That's the second paragraph.
A. Yes.
Q. Now, she doesn't -- there's no mention

187

of the words ADA in here, correct?
A. Not that I can see.
Q. And there's no allegation in here that the form itself was illegal.
A. Not that I could see.
Q. And instead she says, This is clear retaliation for his complaints, presumably yours? Do you understand that to be referring to your complaints?
A. Yes.
Q. Against Superintendent Jones-Hayes for her harassment of him. Do you see that?
A. I do.
Q. So we see in the written complaint that we talked about this morning that you did, that you sent to Superintendent Brogan, correct?
A. Yes.
Q. Were there any other complaints that you made against Superintendent Jones-Hayes for what you perceived as her harassment of you?
A. No.
Q. Okay. Who is Matthias Vlahos?
A. A friend of mine.
Q. Works at the Sheriff's Office?

188

A. He does.

(WHEREUPON, Nawara Deposition Exhibit No. 20 was marked for identification.)

BY MS. MARMOR:

Q. The court reporter has handed you Nawara 20, which is a copy of the November 30, 2016 letter from Ms. Reierson to you which you forwarded to Matthias Vlahos on February 7, 2017. Why were you sending this to Mr. Vlahos at that time?

A. To inform him of what was happening to me.

Q. Any other reason?

A. No.

(WHEREUPON, Nawara Deposition Exhibit No. 21 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has handed you Nawara 21, which is a February 8, 2017 e-mail from you to yourself at the indestructibull@yahoo.com e-mail address. Subject is medical release forms. Do you see



that?

A. I do.

Q. And what's attached here is the same HIPAA authorization form that we've been looking at, is that right?

A. Yes.

Q. And then also attached is the Cook County Sheriff Authorization To Release Healthcare Information. Do you see that?

A. Yes.

Q. But this is again not -- this is the same one that Mr. Penney sent to you, not the one that you say you got on the day of the HR meeting, is that right?

A. I guess so. By this time I think this is floating around a little bit everywhere, you know, so I'm not sure.

Q. But this doesn't have a reference to Nurse Shelby on it, is that right? I'm looking at CCSO 1093.

A. Doesn't seem to look like it. Don't see her name on here.

Q. Why were you sending yourself these forms February 8, 2017?



A. So I could keep a record of it.

Q. Did you still have the forms that you've been given at HR in November of 2016 at this time?

A. Possibly.

Q. You don't know?

A. I don't know. Maybe -- maybe I needed access to it very quickly or something like that, so I forwarded from one to the other so that I would have it. I'm not sure.

(WHEREUPON, there was a short interruption.)

MR. LINDEN: That phone, does that work?

MS. MARMOR: This should be 22.

(WHEREUPON, a discussion was had off the record.)

(WHEREUPON, Nawara Deposition Exhibit No. 22 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, Nawara 22 is another copy of the November 30th letter from Ms. Reierson that you sent to yourself on February 8, 2017, again at your indestructibull@yahoo.com e-mail



address. Do you know why you were sending that to yourself in February?

A. To keep record of it.

Q. And why were you keeping a record of it since you had already gotten the letter?

A. Might have needed to search it very quickly. I couldn't find the letter that I possibly had. Maybe I misplaced the copy that I had somewhere. So I sent myself the record of it.

Q. Was any part of this done in preparation for suing the Sheriff's Office?

A. No. My previous e-mail we just talked about, I didn't want this to happen. I didn't want to be here. I didn't want to do this.

MS. MARMOR: Move to strike as nonresponsive.

MR. LINDEN: Overruled.

MS. MARMOR: And I object to that.

(WHEREUPON, Nawara Deposition Exhibit No. 23 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has just handed you Nawara 23, which is a February 8,

2017 e-mail, same day as the last one, from you to somebody named Kelly Stott, and the subject is Recreational Reading. Do you see that?
A. Yes.
Q. Who is Kelly Stott?
A. Kelly Stott is union representative for Sheriff's Police, also Sheriff's police officer.
Q. For Sheriff's Police.
A. Correct.
Q. So not actually your union at the time.
A. That is correct.
Q. And I see that you're flipping through. Is it fair to say that these are a number of documents related to the fitness for duty correspondence that you have been having with the CCSO?
A. Yes.
Q. And why were you sending -- why did you call this recreational reading?
A. Because I didn't want him to think it was something that he felt had to be obligated to look at. He's a -- he's an acquaintance. He is a nice guy that tries to help people that I don't know very well. So I didn't want it to



seem like some sort of request he was obligated to.
But I was hoping that if and when he got to it in his time, that he could possibly give me some advice on how to go about protecting myself from everything that was happening to me.
Q. And did he?
A. No. He just told me to try to get in touch with my union because he's not sure how the contract works between Corrections to police side. He only knows police contract. So he wasn't much help.
(WHEREUPON, Nawara Deposition Exhibit No. 24 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 24, which is a series of progress notes that were produced by you in this litigation that came from a provider named Karolina Hogueisson. Do you see that?
A. I do.
Q. And who is Karolina Hogueisson?



A. She's a doctor that I know that worked in Cermak at one point.
Q. Was she also married to a colleague of yours?
A. She has a husband who works in Cermak. I forget where he works now, but he used to work in Cermak.
Q. And why did you go to Ms. Hogueisson?
A. Several occasions while working in Cermak in Cermak's basement area in dealing with a lot of the detainees down there and having to transport those detainees to her so she could interview them, she seemed to carry herself in a very nice manner where I felt comfortable possibly asking her how to go about protecting myself from something like this happening to me.
Q. You mean the FFD process?
A. Yes.
Q. Okay. So I'm looking at the first page, and this was -- this was -- it says client goal addressed, assessment. Let's look under this. At the upper part of the page of Nawara 24 it says Stressors/extraordinary events. Patient presents for intake, slash, assessment.



Patient reports stressors related to his current work situation as the precipitating factors in seeking help at this time. Do you see that?
A. Yes.
Q. So did you go to see her to deal with stress that you were experiencing?
A. Yes. I don't understand what you're saying.
Q. I'm asking you if you went -- it says, if you go down under Additional Information/plan, it says, Patient referred himself for therapy due to stress he has experienced in regards to his current work situation. And my question to you is is that why you were seeing her, because of stress concerning your current work situation?
A. She was no longer working for the Sheriff's Department when I looked her up to reach out to her because I asked where she had gone. So in order to not inconvenience her, I didn't ask -- I didn't call her office and ask to meet her at a coffee shop or something like that to take up her time. I figured I could seek help in the setting where she wouldn't be

wasting her time, where she could professionally give me advice.
Q. But are you saying that you weren't there for stress regarding your current work situation but instead were there for advice about an FFD process?
A. All of it. I was stressed. I had no job. I wasn't able to come back to work. I was worried about paying my bills. I needed to find out -- I was uneducated about any of this. I needed to find out how to go about combatting all this happening to me, and her name was the first one that popped up into my head because she was a nice doctor that worked in the basement.
Q. Okay. This progress note, which is the first two pages of Nawara 24, says that you referred yourself for therapy due to stress you experienced in regards to your current work situation. And you can read it, but it doesn't refer to an FFD. My question is did you discuss the FFD at that first meeting?
A. Yes.
Q. Okay. She writes under Additional



Information/plan that, Patient reports that his work issues began in September 2016, and he considers his work status as unregulated. Patient reports that he has not been terminated or disciplined and does not know his current status. Do you see that?
A. Yes.
Q. Is that an accurate statement of what you told her?
A. Yes.
Q. Okay. If you could go to the next page -- and I'll actually correct myself. There is a reference to a fitness for duty in here, but I'd like to focus on the line that says, Patient reports that the current situation has caused him a great deal of distress. He is looking for assistance in managing the stressors. Do you see that?
MR. LINDEN: Distress or stress?
MS. MARMOR: Distress.
MR. LINDEN: I thought you read it stress.
MS. MARMOR: Nope.
THE WITNESS: Yes, I see that.



BY MS. MARMOR:
Q. Have you ever been hospitalized for anything -- let me finish the question. Have you ever been hospitalized for any stress related to the dispute that we're here about today?
A. No.
Q. Have you ever been prescribed any drugs to take for stress related to the conflict that you had with your employer?
A. No.
Q. Have you ever suffered any physical ailments that you're aware of that are related to the conflict that you've had with your employer about -- in this matter?
A. Blood pressure's pretty high.
Q. Was your blood pressure high before?
A. I don't know.
Q. Has any doctor diagnosed you as having high blood pressure as a result of the dispute with your employer?
A. Not as a result of the dispute with my employer, no.
Q. If you could go to Page Nawara 000221



of Nawara Exhibit 24. This is a progress note. For the record the previous progress note we looked at was dated February 11, 2017. This is now February 17, 2017. Do you see that?
A. I do.
Q. And here it says that the Additional information/plan is discussed work status, healthy coping mechanisms to help patient alleviate the levels of stress. Discussed engaging in activities that bring the patient a level of relief, i.e., biking, working out, and listening to music. Is that an accurate statement of what happened, what you discussed at the time?
A. Yes.
Q. And it also says, Discussed referrals for fitness for duty evaluation. Do you see that?
A. Yes.
Q. And did she in fact refer you to a doctor named Dr. Kroll for a fitness for duty evaluation?
A. Yes.
Q. And we'll go to that in a minute, but I

want to do the last page of Nawara No. 24. This is a progress note from April 11, 2017. Do you see that at the top? Right here, the date.
A. Trying to see.
Q. The very last page. It's right here, April 11, 2017.
A. Yes.
Q. Okay. So you went back -- these are all the records we have from her. This is the last time you saw Ms. Hogueisson?
A. I am not sure.
Q. If we have no other records, would that indicate that you didn't see her after this?
A. I would hope so.
Q. Okay. And under Additional information/plan it says, Patient reports he has proposed to his girlfriend in February. Do you see that?
A. Yes.
Q. And was that accurate?
A. Yes.
Q. Okay. And when did that engagement end?
A. I don't remember. Not long after.



Q. Now, when had you started dating this person?
A. 2009.
Q. It says, Patient reports that there have been no changes in his work status, and he has filed a lawsuit against his employer. Do you see that?
A. Yes.
Q. Okay. And he says -- it says, Patient states that he continues to be worried about his status at work as his income will be terminated. He is looking at alternative employment options so that he can pay his bills. Do you see that?
A. Yes.
Q. So at this time in April of 2017 it appears that you were still getting income from the Sheriff's Office, is that correct?
A. I was still paying myself with my own time, yes.
Q. But that money was coming from the Sheriff's Office, correct?
A. That I earned.
MR. LINDEN: Objection. Asked and answered.
MS. MARMOR: Neither asked nor answered.



BY MS. MARMOR:
Q. The money came from the Sheriff's Office, correct?
MR. LINDEN: He answered it about the first hour of the deposition, I believe.
BY MS. MARMOR:
Q. Please answer the question.
A. The money that I received in my paycheck was from my own time, yes.
Q. But it was paid from the Sheriff's Office bank account, correct?
A. Yes.
MR. LINDEN: Objection. Asked and answered and argumentative.
BY MS. MARMOR:
Q. It says, He is looking at alternative employment options so that he can pay his bills. So at this time you could pay your bills, is that right?
A. Yes.
Q. And is this when you started working for Aces?
A. No.
Q. When did you start working for Aces?



A. I'm not sure. Sometime towards the end of the spring, maybe beginning of the summer. I'm not sure.
Q. And did you also start working at Amazon, I think you testified, later on in June, right?
A. I did.
Q. Did you stop getting -- do you have a clear sense of when you stopped getting income if at all from the Sheriff's Office?
A. No, ma'am. I think it was somewhere around end of April. I received a call from Lieutenant Bryant telling me that this is your last paycheck, good luck.
Q. Lieutenant who?
A. Bryant.
Q. B-r-y --
A. B-r-y-a-n-t.
Q. And who is Lieutenant Bryant?
A. He's now retired Cook County Sheriff's Lieutenant from S.O.R.T. Operations. He was one of my somewhat immediate supervisors.
Q. Was he in the chain of your command?
A. Correct.

Q. And what did you take the good luck to mean?
A. Originally the only reason I got paid, and I thank that man, okay, the only reason I got paid was because when the e-mail came that Lieutenant Worthon gave me that said that I was no longer allowed to come back to work, I guess rumors spread or things were talked about because somehow he found out, and he called me, and he told me that he had something similar like this happen to him, and he understands what I'm going through.
And since no one has ordered him to cut my benefits off, that he would pay me for my own time since I've been coming to work -- only called in sick once in the last seven years, that I'd be coming to work -- since I have been coming to work and I've accumulated all this time, he would pay me with my own benefits until they ran out because no one ordered him not to yet.
So since there was nothing against that or violating policy to pay me my own time, he was able to afford me --



(WHEREUPON, there was a short interruption.)
THE WITNESS: I'm sorry.
MS. MARMOR: She's saying please slow down.
THE WITNESS: He was able to give me paychecks for the time that I was gone.
BY MS. MARMOR:
Q. So was Lieutenant Bryant part of Payroll?
A. I don't think so.
Q. Do you know whether or not what you say he did for you was contrary to the rules?
A. No, not at all. It's what I did today right now to get authorized to be here for this long right now. Instead of me putting in the time, he put the time in for me. It was my own time and my own money.
Q. Right. So it was consistent with the rules.
A. Yes.
Q. It wasn't some special treatment, it was what the rules allowed.
A. Sure.
Q. It says, Patient also reports sadness



and regret as he has missed out on opportunities to advance his employment status such as an opportunity for transfer to Sheriff's Police. Do you see that?
A. Yes.
Q. When would the opportunity to have transferred to Sheriff's Police have arisen in 2017 that it suggests you missed out on?
A. That's what she said. Every two years you're able to apply to Sheriff's Police. I'm not exactly sure what she meant here. I expressed that I had missed opportunities. I don't think I would have said that I missed opportunity for Sheriff's Police at this time because I don't think there was an opportunity for Sheriff's Police at this time.
MS. MARMOR: Okay. Thank you.
(WHEREUPON, Nawara Deposition Exhibit No. 25 was marked for identification.)
BY MS. MARMOR:
Q. The court reporter has shown you Nawara 25, which is a letter sent by Rebecca Reierson to you. It's via e-mail on Tuesday, February



28, 2017. And it says, Officer Nawara, please see the attached letter and HIPAA forms that must be completed. This attachment has also been sent to you via regular and certified mail, and it looks like she forgot to attach it, so then she did attach it with the second e-mail. Do you see that?
A. Yes.
Q. And this is in fact attached to this is a February 28, 2017 letter from Ms. Reierson to you, and it goes over some of the same information we have already seen, that you were informed on November 18, 2016 that you were required to undergo a fitness for duty evaluation before returning to active duty. Do you see that?
A. Yes, ma'am.
Q. And it says -- this says, You were referred for a fitness for duty based on an interaction you had with Superintendent Jones-Hayes in which you were alleged to have acted in overly aggressive and threatening manner. Do you see that?
A. Yes, ma'am.

Q. And then it says, During the meeting on November 18th you were given an Authorization to Release Healthcare Information and a HIPAA Authorization For Disclosure of Protected Health Information form which you took in order to review prior to signing. We have already covered that.

To date you have not returned these forms to Ms. Shelby, which of course is true, right, sir?

A. It is correct.

Q. And refers again to the voicemail message that Ms. Shelby said that we have established you never responded to. And then it says, In addition, I sent you a letter on November 30, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the FFD process. Do you see that?

A. I do.

Q. And to date -- she says, To date I have not heard back from you. And that's true, you personally never responded to her, is that right?

209

A. That's correct.

Q. She says, The signed waiver documents given to you must be returned to Ms. Shelby by Wednesday, March 8, 2017 so the FFD evaluation process can proceed. Do you see that?

A. Yes.

Q. And you were at this point still unwilling to participate in that process, isn't that right?

A. Correct.

Q. And then it says, If the forms are not received by March 8, your time off work will be deemed unauthorized. Did you understand what that would mean?

A. No.

Q. And of course she reiterates something you already knew, which is you're not able to return to work until you have completed the FFD process, is that right?

A. Yes.

Q. Now, she says, I've enclosed another copy of the forms for your convenience. And I'd like you to turn to the next page of Nawara 25, and this is the first page of the form that your

210

lawyer has been sending, correct, the same form we have seen a few times now?

A. Yes, ma'am.

Q. And that's the HIPAA Authorization For Disclosure Of Protected Health Information.

A. Yes, ma'am.

Q. Second form attached hereto is different from the ones we were just looking at in that it refers to Nurse Shelby right there in the middle of the page. Do you see that?

A. Yes, ma'am.

Q. Now, as you sit here today, do you remember whether the form that you got on November 18, 2016 looked like this or looked like the one that Mr. Penney sent you?

A. As I sit here today, I'm trying to answer everything as best I can. It's been three years, and I'm not exactly sure right now, with all the information being thrown at me, how accurate any of it might possibly be with these because there are so many different forms of the same thing here.

Q. Right. But I'm just asking you a simple question. As you sit here today, do you

211

have any specific memory whether the form you were given on November 18, 2016 looked like this one or looked like the one that Mr. Penney sent you.

A. I'm not sure. Still seem both blank to me.

Q. I understand. I understand that. Did you in your meeting with Ms. Hogueisson talk about the forms?

A. I think so.

Q. Was she familiar with how FFD processes work?

A. I don't know. I was hoping so. That's why I went to her for advice.

(WHEREUPON, Nawara Deposition Exhibit No. 26 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has handed you what's marked Nawara 26, which is an e-mail from -- at the top from Ms. Kurtz to you, and it says -- and it's -- you had sent her an e-mail saying, RE: HR letter and HIPAA forms. Do you see that?

212

A. Yes.
Q. And this is February 1, 2017?
A. Yes.
Q. And she says, Got it, and I will draft a response, and then says --
MR. LINDEN: March 1st.
MS. MARMOR: I'm sorry. Thank you. March 1, 2017.
MR. LINDEN: I just want to preserve -- I don't know if this document was produced accidentally. Looking at it looks like it should be subject to attorney/client privilege.
MS. MARMOR: It should not be because he used his Cook County e-mail address to contact her. They waived the privilege.
MR. LINDEN: Not so sure about that.
MS. MARMOR: It's in my client's point of custody and control, but we can argue that another time.
MR. LINDEN: But I am going to object on attorney/client privilege.
MS. MARMOR: That's fine.
BY MS. MARMOR:
Q. I assume you never got the voicemail or



letter referenced in her letter. That's what she said, correct?
A. Yes.
Q. And of course you did get the voicemail and the letter referenced in Rebecca Reierson's letter, correct?
A. I never received an e-mail or voicemail from Rebecca Reierson.
Q. No, but the voicemail referenced in her letter was the Nurse Shelby voicemail.
A. Yes. This is from Ms. Reierson, whatever Ms. Reierson --
Q. Would you like to go back and look at Ms. Reierson's letter where she refers to Nurse Shelby's voicemail? I'd be happy to.
MR. LINDEN: Objection. Argumentative and also calls for speculation. But you're talking about what Ms. Reierson --
MS. MARMOR: Counsel, I understand. I understand you say that.
BY MS. MARMOR:
Q. Is it true that you -- we know that you got the voicemail from Nurse Shelby, right?
A. Yes.



Q. And we know that you got the letter from Ms. Reierson on November 30th, right?
A. Yes. It was sent to my e-mail.
MS. MARMOR: Right.
(WHEREUPON, Nawara Deposition Exhibit No. 27 was marked for identification.)
MR. LINDEN: I just want to make the same objection on No. 27 on the top where it appears again to be attorney/client privilege.
MR. BUSTAMANTE: CCSO. Cook County Sheriff's Office, Sheriff's Office HR.
MR. LINDEN: I'm sorry. Never mind. Withdraw.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 27, which is an e-mail from Ms. Kurtz to the Cook County Sheriff's Office, dot, HR. Do you see that? And cc'ing you?
A. Yes.
Q. And it says, See below and attached. And below that there is another March 8 e-mail to Rebecca Reierson and Winifred Shelby cc'ing Peter Kramer. Do you see that?



A. I do.
Q. Do you know who at CCSO HR this would have been sent to?
A. I do not.
Q. Have you ever met Karen Williams?
A. I don't know who Karen Williams is.
Q. So you're not aware that she was the Executive Director of HR at this time?
A. No.
Q. So the e-mail -- I want to focus on the second e-mail, the one halfway down the page, to Ms. Reierson and Ms. Shelby. Do you see that?
A. Yes.
Q. Okay. And she argues, she says she's received the attached correspondence, which is that February 28 letter and its attachments, along with some other correspondence, correct?
A. Yes.
Q. Okay. And she says, It's inaccurate to say Officer Nawara did not respond to your letter, and she says in fact I contacted you on Officer Nawara's behalf and at his request on December 21, 2016 and January 31, 2017, correct?

A. Yes.
Q. And she was acting on your behalf when she sent those e-mails.
A. Yes.
Q. And she says, Second, I never received a response to my e-mails. And then, Third, as I indicated -- as indicated in my December 21, 2016 e-mail, the order to Officer Nawara to sign the HIPAA release for his medical records is unlawful and violates the ADA. Do you see that?
A. I do.
Q. And this is the first mention of the ADA in any correspondence that I've seen. Did you send anything to the Sheriff's Office prior to this date in which you explicitly said that you thought the forms violate -- any of the forms violated the ADA?
MR. LINDEN: Objection. Form.
THE WITNESS: Not that I know of.
BY MS. MARMOR:
Q. And then she says, If the order is not rescinded and Officer Nawara put back to work this week, we will have to file suit and seek injunctive release as well as other remedies and

217

including reinstating the time he's been forced to burn. Do you see that?
A. Yes, ma'am.
Q. So again the position was you shouldn't have to do the FFD at all.
A. Is that a question?
MR. LINDEN: Objection. Form.
BY MS. MARMOR:
Q. Again, the position -- we have established that you didn't want to participate, you didn't want to do any FFD examination.
MR. LINDEN: Objection. Form and misstates testimony.
MS. MARMOR: He's answered the question.
MR. LINDEN: He indicated, also, about the forms. If you want to confuse him --
MS. MARMOR: Counsel, please do not coach your witness.
MR. LINDEN: I'm not coaching.
MS. MARMOR: You are coaching your witness.
MR. LINDEN: You're misstating his testimony is what you're doing.
MS. MARMOR: No, I'm not.
MR. LINDEN: He's testified over and over

218

again he wouldn't sign a blank form.
MS. MARMOR: Counsel, you are coaching your witness. You are coaching your witness. Please stop.
MR. LINDEN: You're misstating his testimony.
MS. MARMOR: He can answer the question and did.
(WHEREUPON, Nawara Deposition Exhibit No. 28 was marked for identification.)
MR. HENRETTY: Is this one 27? I just wrote 25.
MS. MARMOR: 28.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter is showing you Nawara 28, which is a response from Rebecca Reierson to Dana Kurtz dated March 13, 2017 in which she says, Ms. Kurtz, during the fitness for duty process, I intend to communicate directly with Mr. Nawara. Do you see that?
A. I do.
Q. And you understood that Ms. Reierson was not a lawyer acting as a lawyer for the

219

Cook County Sheriff's Office in this matter, correct?
A. I have no idea her position there. I never saw any credentials. I didn't see any paperwork. I have no idea who she was or who she is.
Q. So you didn't understand that she was working at HR?
MR. LINDEN: Objection. Misstates testimony, argumentative.
THE WITNESS: I don't know where she was working.
BY MS. MARMOR:
Q. Okay. So you're saying you didn't understand she worked at HR.
MR. LINDEN: Objection.
THE WITNESS: I don't know where she's working.
BY MS. MARMOR:
Q. I'm asking the question. Are you saying you did not understand that she worked at HR?
A. Does she work at HR?
Q. That's my question. That was my

220

question to you.
A. I don't know if she worked at HR.
Q. Will you please go back to Nawara 25? It's in the pile right here. Could you turn to -- this is the November 28th letter. Do you see that? And you see under Ms. Reierson's signature it says Bureau of Human Resources, Employee Services?
A. Yes.
Q. So do you think you might have read that at the time?
A. Yes.
Q. So is it fair to say that you had at least a basis to understand she worked for Human Resources?
A. Yes.
Q. Back to Nawara 28. Ms. Reierson told Ms. Kurtz, your lawyer, that you had been ordered to complete an FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. Did you understand that to be the case from their point of view?
A. Yes.

221

(WHEREUPON, Nawara Deposition Exhibit No. 29 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, Nawara 29 is a March 13, 2017 response from Ms. Kurtz to Ms. Reierson on which you were cc'd, correct?
A. Yes.
Q. Okay. And it says -- among the things she says in the second paragraph is that Officer Nawara has been placed on unpaid leave because he would not sign a HIPAA medical release form for his own medical records without limitation of time, scope, or any other limitations, setting aside that such a request is unlawful in the first place. Do you see that?
A. Yes.
Q. Did you ever tell anyone at the Sheriff's Office yourself that the issue was that there was no limitation of time, scope, or other limitation in the forms that you were asked to sign?
A. No. I don't think so.
Q. Then in the paragraph that says Third

222

it says, The Sheriff's position to require Officer Nawara or any other employee to complete a medical release form so that the Sheriff's Office can obtain that individual's private medical records is unlawful and in violation of the ADA, that's something we had seen before, right, that she mentioned ADA in her last e-mail?
A. Saying we saw this in an e-mail before?
Q. Yes.
A. Yes.
Q. Then she adds, An employer cannot order an employee to complete a HIPAA or medical release form so that the employer can obtain the employee's own medical records, which is what you have ordered Officer Nawara to do.
Did you ever tell anybody at the Sheriff's Office yourself that your concern was that the Sheriff's Office was going to be able to get your own medical records?
A. I did not tell anyone, no.
Q. Then at the bottom she says, Please let -- you see where it says finally?
A. Yes.

223

Q. Please let me know if a note from his doctor would suffice. Do you see that?
A. I do.
Q. And in fact this is dated March 13, 2017, correct?
A. Yes.
Q. And you had already met with Dr. Kroll at this time, isn't that right?
A. I don't know.
(WHEREUPON, Nawara Deposition Exhibit No. 30 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you or you're picking up Nawara 30, which at the top is Ms. Reierson's response to the last e-mail we saw from Ms. Kurtz, again cc'ing you, and it's dated March 17, 2017. Do you see that?
A. I do.
Q. And she said, Ms. Kurtz, We have contacted our employee Mr. Nawara on several occasions about this issue, as you are aware. And then she goes on to say, A note from

224

Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace we believe there's a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time as you suggest. Do you see that?
A. I do.
Q. Okay. And then it says, I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20th in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. Do you see that?
A. I do.
Q. Giving you some more time to try and get you to sign some forms, correct?
A. Yes.
Q. And participate in the process.
A. Yes, ma'am.

225

MS. MARMOR: You want to switch? Why don't we take a break, and you can switch the tape.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 2:55 p.m. This is the end of Videotape No. 3.
(WHEREUPON, a discussion was had off the record.)
(WHEREUPON, a short recess was taken.)
(WHEREUPON, Nawara Deposition Exhibit No. 31 was marked for identification.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 3:06 p.m. this is the beginning of Videotape No. 4.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 31. The cover page of this document is a March 18, 2017 e-mail to Rebecca Reierson that appears to have been from you since it says, Sincerely, John A. Nawara at the bottom. Do you see that?
A. I do.
Q. And you're attaching a report from

226

Dr. Kroll, who you say is an independent doctor and not my doctor. Do you see that?
A. Yes.
Q. And Dr. Kroll -- you refer to Dr. Kroll by Ms. Hogueisson?
A. Yes.
Q. And when you went to Dr. Kroll for an evaluation, did you sign any release forms for any medical document, any of your medical documents?
A. I don't remember.
Q. Okay. Do you know if Dr. Kroll considered any of your medical records in conducting a fitness for duty exam?
A. I don't know.
Q. If you could turn to Page CCSO 1202, which is the Fitness for Duty Evaluation by Dr. Robin Kroll. Do you see that?
A. Yes.
Q. It says the date of evaluation was March 8, 2017, correct?
A. Yes.
Q. And is Dr. Kroll a man or woman?
A. Woman.

227

Q. If you turn to the second page of her report, do you see where it says evaluation procedures at the top?
A. Yes.
Q. And it says Clinical Interview, Mini Mental Status Exam, MMPI-RF, Beck Depression Check List, Beck Anxiety Inventory, State/Trait Anxiety, Shipley-2, and SIMS. Do you see that?
A. I do.
Q. And then it discusses there is a heading called Current Medications, and none were reported. Is that that you reported not taking any medications?
A. Yes.
Q. And there was Appearance and Behavioral Observations, an Intake Report and Interview, and then if you go to Page 3 of this report Assessment Results. Do you see that?
A. Yes.
Q. Do you see anything in here suggesting that Dr. Kroll reviewed any of your own medical records in coming up with a fitness for duty assessment?
A. You'd like me to read all this?

228

MS. MARMOR: Sure.
(WHEREUPON, there was a short pause.)
THE WITNESS: I don't see anything in there.
BY MS. MARMOR:
Q. You don't see anything in there indicating that Dr. Kroll considered any of your medical records in coming up with a determination.
A. Correct. Correct.
Q. And if you could go back to the first page of the report, meaning if you go three pages in, there you go, under Reason For Evaluation it says, Deputy John Nawara was referred for a fitness for duty evaluation. That was by Ms. Hogueisson or by someone else?
A. She told me I could see her, that this would be a person who would do this type of evaluation, yes.
Q. Okay. And did she tell you anything else about Dr. Kroll?
A. I -- no.
Q. Nothing that you can recall?
A. No.



Q. I'd like to go back to Nawara 31. Did you write all of this e-mail yourself?
A. Under the direction of Dana Kurtz, yes.
Q. So did Ms. Kurtz effectively tell you the things to say in here?
A. Yes.
MR. LINDEN: Hold on. Answered a little too fast. I do want to object. It's attorney/client privilege. Understand what is communicated from this, the document is not, but what she told him would be subject to attorney/client. I don't think she waived it.
MS. MARMOR: Well --
MR. LINDEN: Doesn't matter.
MS. MARMOR: I think the fact that this came from her via him is probably enough to waive it.
BY MS. MARMOR:
Q. You reference to -- a statement in here, I feel the order for me to sign a blank HIPAA release was unlawful and violates the Americans with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office in which the jury found that the sheriff violated my and other officers'



First Amendment rights and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Do you see that?
A. I do.
Q. So the first one is the Burris lawsuit? The first retaliation item is the Burris lawsuit?
A. Yes.
Q. And the second retaliation item is the complaint that you made about Superintendent Jones-Hayes?
A. Yes.
Q. And there was only one complaint, I think we have established, correct?
A. Yes.
(WHEREUPON, Nawara Deposition Exhibit No. 32 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has shown you Nawara Exhibit 32, which is dated March 18, 2017 from you to Ms. Reierson, cc'ing



Ms. Kurtz, and it says, Hello, Ms. Reierson. Please provide the general order or policy that requires me to sign a HIPAA release for my medical records. Thank you. Do you see that?
A. I do.
Q. Why did you think that there had to be a general order or policy that had such a requirement?
A. Because you just can't ask things at random of someone because you don't like them.
Q. Does that mean there has to be a general order or policy?
A. Yes. She's not even in my chain of command, so I would like something that says I have to do this.
Q. Had anybody at the union told you that there had to be a general order or policy for HIPAA release?
A. Mark Robinson said they didn't have a policy on this.
Q. Who didn't have a policy?
A. The County.
Q. But that's the same person, Mr. Robinson, who said that the union couldn't

do anything for you, correct?
A. This is correct.
Q. And then on or about -- on -- let's see. You then filed an EEOC charge in March of 2017 against the Cook County Sheriff's Office?
A. Yes.
Q. And then on March 29, 2017 you filed a lawsuit against the Cook County Sheriff's Office?
A. I'm not sure the exact date.
MS. MARMOR: Oh, dear. I need to go off the record. Oh, never mind. I thought I'd lost something.
(WHEREUPON, Nawara Deposition Exhibit No. 33 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 33, which is a -- the original complaint filed in this lawsuit. And do you see at the top that it says filed March 29, 2017?
MR. LINDEN: Stipulate that it's filed on that date.
MS. MARMOR: Sure.



BY MS. MARMOR:
Q. And this lawsuit was filed at the time only against Cook County and Thomas Dart, is that correct?
A. Yes.
MR. LINDEN: See how reasonable we are in the stipulations?
MS. MARMOR: Pardon me?
MR. LINDEN: See how reasonable we are in the stipulations?
MS. MARMOR: The good news is we are not going to look at very much of this document.
MR. LINDEN: Good.
(WHEREUPON, Nawara Deposition Exhibit No. 34 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 34, which is an e-mail from you to John Zaleski, and the subject is contract proposal, dated July 4, 2017, and the attachment is Teamster 700 Final Tentative Agreement. Do you see that, Agreement 2017 that's in the attachments line?



A. Yes.
Q. And that's in fact what's attached here, is a Final Tentative Agreement between the Teamsters Local 700 and the Cook County Sheriff's Office, correct?
A. Yes.
Q. And if you turn to CCSO 1291, do you see that the date this was signed was June 16, 2017?
A. Okay.
Q. And then if you turn to -- my first question is why were you sending the Final Tentative Agreement to Mr. Zaleski on July 4th, 2017, if you recall?
A. Providing information to a friend.
Q. Okay. Had you reviewed this Final Tentative Agreement at that time?
A. No.
Q. If you would turn to CCSO 1295, which is Page 5 of 10, do you see there is a paragraph at the bottom of the page that says 10, Fitness for Duty?
A. I do.
Q. And it says, Add New Section, and it



reads, The employer shall pay any employee that is ordered to take a fitness for duty evaluation, during the course of the first evaluation period, as long as the employee cooperates and complies with all scheduled appointments of the employer. There "scheduled by" is crossed out. That must have been in there or some language like that before.
In the event that an employee does not pass the fitness for duty evaluation, pay shall be stopped after the employer has provided notification to the officer/investigator of a failed fitness for duty evaluation. Do you see that?
A. Yes.
Q. Okay. And did you read this at the time?
A. I did not.
Q. Have you ever read this?
A. No.
Q. Do you understand that what this is saying is that you can get paid if you cooperate with the fitness for duty process?
A. Effective December 1, 2017?

Q. Answer yes, effective that day?
MR. LINDEN: I want to object. I think calls for legal conclusion. Also assumes that this is somehow the policy.
MS. MARMOR: It doesn't assume that it's the policy.
BY MS. MARMOR:
Q. But if you can answer my question.
A. This date right now as I read this, yes, I understand this.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 35 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 35, which -- the first page of which is dated July 5, 2017, and it's a statement from -- it says, To whom it may concern. Medical records have been provided for the following patient, John Nawara. This is the invoice for the cost of producing these records. Do you see that on the first page?
A. Yes.



Q. Then if you turn to the second page, there is a letter from your lawyer, Dana Kurtz. Do you see that?
A. Yes.
Q. It's dated June 3 (sic), 2017, and it's to Charles T. Shaw, M.D. Do you see that?
A. Yes.
Q. And it says, Re: Patient John Nawara, and it gives your date of birth and your Social Security number, which again we have redacted to protect your privacy.
And it says, Dear Dr. Shaw, this office represents the above-named patient. We are requesting a complete copy of your records regarding this patient. Also, please find a certification that needs to be completed for the admission of these records at trial. Do you see that?
A. Yes.
Q. And then it says, The request is made in accordance with the provisions of 735 ILCS 5/8-2001 and 735 ILCS 5/8-2003 of the Illinois Code of Civil Procedure, the HIPAA Rule Section 164.508. Please be sure to provide copies of



all medical records without restriction as to time, including all inpatient records, tests, results -- test results, operative results, paramedic reports, consultations, physical therapy records, counseling and treatment records, progress notes and admission, discharge reports, notes, billings -- billing records, itemized statements, EOBs, prescriptions, and all other records regarding this patient.
And then it says, It's necessary that any document with writing on the back side be copied both front and back. Do you see that?
A. Yes.
Q. Do you know why your lawyer was asking -- well, first, who is Charles T. Shaw?
A. My primary doctor.
Q. And do you know why Ms. Kurtz was asking Mr. Shaw to send medical records about you?
MR. LINDEN: Objection to form, calls for speculation.
THE WITNESS: This is what this whole thing was about.



BY MS. MARMOR:
Q. Can you be more specific? I don't understand that answer.
A. The whole thing was about obtaining my medical records, so she was obtaining my medical records.
Q. But you had not wanted your medical records to be obtained prior to this day.
A. Did not want my medical records to be obtained prior to this date to someone who was going to make up lies about me and have my personal medical records sent to her office.
I was never bothered by -- I have a perfectly clean background. It was the principle of the fact. I wasn't worried about my medical records. I wasn't going to give my medical records to somebody who has no integrity who's trying to do something to me.
Q. How about times have you met Nurse Shelby?
A. Once.
Q. So you feel that you can make a judgment about her integrity -- let me finish my question -- based on one meeting with her? Is

that your answer?
A. Yes, ma'am, based on --
Q. I'm not asking you any -- asked and answered.
A. I want to answer.
MR. LINDEN: He's entitled to give an answer. You're interrupting his answer.
THE WITNESS: If someone can look me in the face and never seen me once before in their life and make a judgment of me to where they can look me in the face and ask me if I walk around here for the last 18 years threatening people, that's very concerning to me, and I wonder where somebody gets the guts to do something like that.
BY MS. MARMOR:
Q. Have you ever made any effort to understand what occupational nurses do?
A. No.
Q. Have you ever made any effort to understand what the purpose of fitness for duty exams are?
A. I have only learned in this past three years.



Q. Okay. Prior to that day did you have an understanding of what fitness for duty exams were supposed to be for?
A. No. I tried to ask for documentation and paperwork and them to explain what was going on to me, but that never happened.
Q. And did you think that -- and did you ever consider just going back to them once Nurse Shelby called you and saying, I have a problem with sending my records to you?
A. I don't even know why you would ask that. If someone who is doing this to you, I don't understand -- I think it's a failed attempt to try to do something right who's deliberately doing something wrong to you from the beginning and doesn't even know you.
I see it's a very failed attempt to go back and ask something right or ask someone to do something right who is doing it wrong, and they never met you before.
Q. So you made that decision on November 18 that you were not going to deal with Nurse Shelby again, is that right?
MR. LINDEN: Objection. Asked and answered



and argumentative.
THE WITNESS: Yes. I make determinations all the time every day with people who are safe and unsafe or people who cause problems or potential to cause problems. That's the job I have. I have to make those judgments to keep people safe every day.
BY MS. MARMOR:
Q. So why was -- did you understand that these records that were requested by your lawyer on June 30, 2017, what was the purpose of these documents as you understood it?
A. Finally retrieving my medical records so we could somehow go about furthering this process to get me back to work was the whole process.
Q. Have you offered to participate in the FFD process if you could obtain your own records at this time?
A. I don't understand.
Q. Had you made an offer to the Sheriff's Office that as long as you could obtain your own medical records, you would participate in the FFD process at this time?



A. I didn't think that was a choice I had. I don't understand how me obtaining my own records -- I don't see how they would allow me to obtain my own records. I didn't know that was a choice I would have. No one ever offered me that choice.
Q. So did you understand that the only reason these documents were being obtained was so they could be used in this litigation?
A. I don't know.
Q. So you don't know --
A. This is the first time I've seen this. I remember that my records were obtained. I don't remember exactly when they were. And as I'm looking at this, I don't remember actually seeing this, my records as a whole like this.
Q. But did you sign a HIPAA release for these records to be sent to your lawyer?
A. Eventually when she had it changed, yes. I don't remember when that was.
Q. Actually, if you look at Nawara 000165.
A. Yes.
Q. Did you sign -- the patient's signature is blocked out, so we don't know whose signature

this is. Do you recall signing this document?
A. Yes.
(WHEREUPON, Nawara Deposition Exhibit No. 36 was marked for identification.)
MR. LINDEN: Are we on 36?
MS. MARMOR: Yes.
MR. LINDEN: Okay. Thank you.
MR. BUSTAMANTE: 36.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has shown you or handed you what's marked as Nawara Exhibit 36. Do you see that document?
A. Yes, ma'am.
Q. And this is a different HIPAA authorization form that you signed on August 17, 2017. Do you see that?
A. Yes.
Q. And this one -- the prior one authorized your lawyer to get medical records, correct?
A. Yes.
Q. What this authorizes is -- in No. 1, With this authorization I allow all medical

245

records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation. Do you see that?
A. Yes, ma'am.
Q. And then it says in No. 2, Any health care provider or facility who treats/treated me for my medical condition or medical illness may disclose the above-described information to disability management case manager for Cook County employed by CorVel Corporation. Do you see that?
A. Yes, ma'am.
Q. Do you know how it came to be that this -- because this is somewhat revised from the form that you got in November of 2018 -- or excuse me -- November 2016.
Do you know how it came to be that this revised form was offered up to you?
MR. LINDEN: Objection, form.
THE WITNESS: I believe it was in negotiations between Ms. Kurtz and HR that came up with this form so that my medical records would not end up on Winifred Shelby's desk and will end up in the proper hands, would be the

246

person who will be evaluating me, which is CorVel.
BY MS. MARMOR:
Q. So the Cook County Sheriff's Office agreed to allow you not to have your records go to them in order to complete the fitness for duty process, correct?
A. Yes.
Q. Has anybody ever told you that in fact that was always an option?
MR. LINDEN: Objection. Foundation, form.
THE WITNESS: Not that I know of. All e-mails and everything said that I had to turn those papers back in to them.
BY MS. MARMOR:
Q. Did you ever tell -- did you ever tell the Cook County Sheriff's Office that you would be prepared to pursue or go through the fitness for duty process prior to filing this lawsuit as long as you didn't have to give your medical records to the Sheriff's Office?
A. I was under the impression, due to the e-mails, that this was the only choice I had. So in order to prepare for my fitness for duty,

247

which I figured I would eventually have to go through, I decided to seek an outside evaluation just in case the person I was sent to was as dishonest as Ms. Shelby, and that way I would have something to combat with that doctor.
So I didn't know I had any other choice. I looked at what was presented to me, and I tried to protect myself by going to a separate doctor because of the choices I thought that I had.
Q. How do you -- about what was Ms. Shelby dishonest with you?
MR. LINDEN: Objection. I think it's been asked and answered.
MS. MARMOR: No. He just said as dishonest as Ms. Shelby. He said all sorts of other unpleasant things about her, but not that yet.
MR. HENRETTY: Whoa, whoa, whoa. Don't coach him, please.
MR. LINDEN: I'm not coaching. It's been asked and answered.
MR. HENRETTY: It hasn't. Do not do that again, please.
THE WITNESS: If someone can look you in the

248

face, they've never seen you before, and ask you if you're threatening people, and they're going to go ahead and say that -- I'm referring to when James Penney walked in the room after the second half of the meeting resumed, and say to this person here that he's being found unfit for duty due to the aggressive behavior he displayed before you were here, you're going to make up those lies, and you know nothing happened, I sat there the way I sit here, am I frustrated, yes. I'm frustrated now going through this here.

I was exactly the same tone. I don't know how you interpret me here, but I was exactly the same way in that room with those two ladies. I didn't know them. I have nothing against them. I had never seen them before. All these accusations were made to me and about me in that time.

I would think you would feel the same way about somebody you never met when they're going to say all these things about you.

BY MS. MARMOR:

Q. So are you saying -- because both Nurse



Shelby and Nurse -- excuse me. Both Nurse Shelby and Ms. Reierson say that you were very aggressive that day. Are you saying they're both liars?

MR. LINDEN: Objection. Argumentative.

THE WITNESS: If you're saying that -- like I said, Ms. Reierson never really said much of anything that day. It was Nurse Shelby who made the accusations. If they're both saying this now, yes, they're both liars.

(WHEREUPON, Nawara Deposition Exhibit No. 37 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara 37, which is an e-mail from Michelle Sarocka at CorVel to you on August 28, about ten days after you signed the FFD form, correct?

A. Yes, ma'am.

Q. And she says, The FFD provider will need to review medical records from all health care providers you have seen over the past two years. If your primary care physician receives



updates from specialists, then you would only need to request the records from the PCP. Do you see that?

A. Yes, ma'am.

Q. Did you talk to Ms. Sarocka?

A. She called me once on the phone, yes.

Q. And did you explain to her who your providers were?

A. I believe so.

Q. Do you have an understanding -- is there any -- going back to this whole question of how Nurse Shelby -- you didn't want Nurse Shelby to see your medical records and that the form was blank, did you have an understanding of how that form was going to get filled out with names of providers?

A. No.

Q. And in fact the way you filled it out, the way you provided information to CorVel was you had to identify who your providers were, correct?

A. Yes.

Q. Because they wouldn't know that otherwise.



A. Correct.

Q. Okay. And this limitation for the past two years, was that something that you asked for or did they suggest it, CorVel suggest it?

A. I believe in the policy CorVel had that I read that says they only go back two years.

Q. And what policy are you talking about from CorVel?

A. They're like HIPAA release that they had.

Q. You mean the actual release that you signed?

A. Yes. I believe I read that in there somewhere.

Q. Why don't you go back to Nawara 36. I don't see any limit there. Do you see -- if you see it, please let me know.

A. I read somewhere that it goes back two years. I do remember also seeing something in this pile here that says it was January 1st of 2016 from the actual time that they requested the records, which kind of made it two years there, too. I forgot where it was.

Q. So do you have any independent

recollection of reading a CorVel policy that limited -- let me finish -- that limited it to two years?
A. I don't know.
Q. Did you ever have any other conversations with Michelle Sarocka?
A. No, ma'am. I believe it was that one time on the phone.
Q. Do you know what treaters CorVel -- the records of what treaters -- let me rephrase that. Do you know what treaters CorVel -- let me start over.
Do you know how many treaters you identified for CorVel?
A. I don't understand.
Q. How many treaters that you would have had in the previous two years did you identify for CorVel so that they could go get records?
A. I only ever seen my primary doctor. I don't really get sick. Don't go to any kind of therapy. I don't do any of that.
Q. Did you identify Ms. Hogueisson as a treater?
A. I don't know if they asked that at that



moment. I believe it might have been asked by the doctor there, by Ms. Goldstein, I believe it is.
Q. Dr. Goldstein asked you about that?
A. I believe so.
Q. So after you had the conversation with Ms. Sarocka and you -- well, after this conversation with Ms. Sarocka, what happened next?
A. I believe she said that she obtained my records, and then when they were ready, they would tell me when my interview was to be scheduled, my appointment.
Q. Did you have any conversations with anybody else at CorVel prior to hearing about when your appointment would be?
A. No, ma'am.
Q. Did you have any involvement with the effort to obtain your medical records?
A. No.
Q. Do you know what medical records were provided to Dr. Goldstein for her to review?
A. I have no idea.
Q. Do you know if they were the same



records that Ms. Kurtz provided earlier in the year?
A. I don't know.
(WHEREUPON, Nawara Deposition Exhibit No. 38 was marked for identification.)
BY MS. MARMOR:
Q. So Mr. Nawara, the court reporter has handed you Nawara 38, which is an e-mail from Michelle Sarocka dated September 8, 2017 to you with appointment information. Do you see that?
A. Yes, ma'am.
Q. This was about three weeks after you had signed the FFD -- excuse me -- the HIPAA release form, correct?
A. Yes, ma'am.
Q. And in fact attached to this is a letter explaining where you should go. Do you see that? It's CCSO 1411?
A. Yes, ma'am.
MR. LINDEN: I'm sorry.
MS. MARMOR: 38.
MR. LINDEN: This one.
MS. MARMOR: Did I give you guys the wrong



thing?
MR. HENRETTY: This is the one you gave us.
MS. MARMOR: I'm sorry.
MR. LINDEN: Want to go off the record for a second and figure out the exhibits?
MS. MARMOR: Make sure that I've done this. Can I see that one?
MR. LINDEN: Everybody agree to go off?
MS. MARMOR: Off the record, yes.
VIDEOGRAPHER LEHMAN: We are off the record. The time is 3:45 p.m.
(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 3:46 p.m.
BY MS. MARMOR:
Q. Okay. My apologies. I was showing you the wrong document before. If you take a look at Nawara 38, that is a September 8, 2017 e-mail from Michelle Sarocka to you about appointment information, and attached to it is a letter, if you go two pages in, and that's telling you to go to Isaac Ray Forensic Group on September 11 and September 12, 2017, correct?

A. Yes.
Q. Okay. And again, just so we're clear, this is about three weeks after you signed the HIPAA release form, correct?
A. Yes.
Q. Thank you. If you could go back to Nawara 4, please. If you want me to find it for you, I'd be happy to.
(WHEREUPON, there was a short pause.)
(WHEREUPON, a discussion was had off the record.)
BY MS. MARMOR:
Q. If you could go to Page 4 of Nawara 4, please. If you could go to the last paragraph on the page that says, At the time of the examination here. Do you see that?
A. I do.
Q. Officer Nawara explained he had been out of work for many months and that this was certainly a stressor, but that he has been working several part-time jobs to make ends meet. Is that an accurate statement?
A. Yes.

257

Q. And then it says, Since leaving work in mid-November, he sought treatment in the form of individual counseling with Karolina Hogueisson, a therapist who was apparently the wife of a co-worker and someone who used to offer services at the jail, in order to discuss the stress associated with the work issue. Do you see that?
A. Yes.
Q. Is that an accurate statement?
A. Yes.
Q. And she refers to three notes were available for review, a 2-11-17 intake and 2-17-17 and 4-11-17 progress notes. Do you see that?
A. I do.
Q. We looked at those earlier today.
And it says, No psychiatric diagnosis is offered in any note beyond the first session when mild symptoms without significant life dysfunction are noted. Do you see that?
A. Yes.
Q. Have you suffered any significant life dysfunction as a result of your dispute with

258

your employer?
MR. LINDEN: Objection. Foundation, calls for medical conclusion.
THE WITNESS: No.
BY MS. MARMOR:
Q. And then it says -- you see where it says at the bottom, it says and -- let's see. See where it says, Subsequent notes reflect adaptive functioning. Do you see that? Bottom of the page. It's the second to last -- the end of the second to last line. Same page. See where it says, Subsequent notes reflect adaptive functioning?
A. Yes.
Q. Okay. And then it says, And, goes to next page, decreased stress and symptomatology. If you could go to the next page. And indicate that Officer Nawara proposed to his girlfriend in late February. Do you see that?
A. Yes.
Q. And then it says, It appears that Ms. Hogueisson referred Officer Nawara to Dr. Kroll -- I think she misspells the name -- after discussion about the ongoing fitness for

259

duty process on 2-17-17, correct?
A. Yes.
Q. And you denied in your interview with Dr. Goldstein ever experiencing significant psychiatric symptoms in your life, and while you described understandable stress and frustration with the work situation in Cook County, you denied significant life dysfunction in any critical area, is that accurate?
MR. LINDEN: Objection. Form of the question, compound.
THE WITNESS: When you're talking to the doctor that your employer sent you to, and you're there because you've been wronged, you don't want to sound like they got you down. So you go ahead and keep your chin up and go in there and tell them everything is good. That's what I said.
BY MS. MARMOR:
Q. So are you saying that you didn't tell her the truth?
MR. LINDEN: Objection. Argumentative, misstates the testimony.
THE WITNESS: I didn't want to let anybody

260

know all the bad things that this place does to me or that I feel how when things happen or that all this has to happen. I mean. . .
BY MS. MARMOR:
Q. So you're saying that you were not completely forthcoming with her?
MR. LINDEN: Objection. Argumentative, asked and answered.
THE WITNESS: Yes. I wasn't completely forthcoming with her.
BY MS. MARMOR:
Q. Then it says, and I'm really confused by this, and I feel like there might be a date inc' -- something wrong here. Of other potential interim stressors since November 2016, Officer -- oh, maybe I misunderstood. Of other potential interim stressors since November 2016, Officer Nawara reported that he and his fiance split up and ended their nine-year relationship.
So you didn't split up in November 2016, it was sometime after April of 2017?
A. Yes.
Q. Okay. If you go to Page 6 of Nawara 4. Do you see where on the bottom paragraph there's



a sentence that begins, In this regard?
A. Yes.
Q. It says, In this regard he may become sarcastic at times or defensive, his frustration tolerance may diminish periodically, and he may present himself as accomplishing and taking on big/important matters, parenthesis, quote, I need to follow through on this complaint and lawsuit to help others, end quote. And another quote, I have made new policy by insisting my medical records go directly to CorVel rather than Human Resources, end quote, et cetera.
Do you recall making those two statements in quotes to Dr. Goldstein?
A. I do.
Q. And reading on she says, Notably, the latter is not so, according to CorVel. At the time the initial examination was requested on 11-18-16, providing medical records to CorVel was in fact an option. Do you see that?
A. Yes.
Q. Did you have any discussion with Dr. Goldstein about that?
A. Not that I can recall, no.



Q. Has anybody ever told you that this was in fact the case?
A. Not that I knew. If I had that option, I would have done that. If I believed that option was there, I would have done that.
Q. And you're aware that Dr. Goldstein, based on her interview with you and whatever else she considered, declared you fit to return to work, correct?
A. Told me so at the end of it.
MS. MARMOR: Can I take a break?
MR. LINDEN: Sure.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 3:55 p.m. This is the end of Videotape No. 4.
(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 4:03 p.m. This is the beginning of Videotape No. 5.
BY MS. MARMOR:
Q. Officer -- excuse me, Mr. Nawara. Could you please go back to Nawara 4, and go to Page 4 again. You see where you say in



the second full paragraph, the one that starts, Of the 11-18-16 meeting in Human Resources, do you see that paragraph?
A. Yes, ma'am.
Q. You see towards the end that it says, He added that because he believes Nurse Shelby and Superintendent Jones-Hayes are personal friends. Do you see that?
A. How far down are you?
Q. Almost towards the end.
A. Yes. I see it.
Q. It says, He added that because he believes Nurse Shelby and Superintendent Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources.
So did you actually tell Dr. Goldstein that you believed Nurse Shelby and Superintendent Jones-Hayes are personal friends?
A. No.
Q. You didn't tell her that?
A. No. I thought I. . .
Q. So she has that wrong?
A. It's my belief. I didn't tell her

Case: 1:17-cv-02393 Document #: 241-1 Filed: 01/24/20 Page 637 of 657 PageID #:4622


they're personal friends. It's my belief they are. What other reason would somebody go ahead and do this to somebody they have no idea -- they never met before? What motivation would they have?
Q. I was asking you a different question. Did you say to Dr. Goldstein that you believed that Nurse Shelby and Superintendent Jones-Hayes are personal friends? That's the question I'm asking.
A. I believe they know each other, yes.
Q. No, I'm not asking that question. I'm asking did you say that in your fitness for duty examination to Dr. Goldstein? Did you tell Dr. Goldstein that you believed Nurse Shelby and Superintendent Jones-Hayes are personal friends?
A. I don't know.
Q. You don't know, but you believe -- whether or not you said it to her, you actually believe it, correct?
A. Again, it's my belief that if somebody is willing to do this to you, and they've never met you before, they have to have some sort of relationship with somebody else to be able to



do that. Why would you just up and do that to somebody?
Q. Well, Rebecca Reierson was in the room. Why didn't you make an assumption that she was friends with Jones-Hayes?
MR. LINDEN: Objection. Asked and answered, argumentative.
THE WITNESS: Because it's my belief that she was innocent to begin with in the whole process, and Jones -- Winifred Shelby didn't inform her what was about to happen because she seemed very uncomfortable during the whole questioning about Winifred Shelby towards me while she was sitting there.
I actually felt bad for her at one point because of the fact that she didn't look like she was in on what was about to happen to me. She seemed very uncomfortable, and that's at the point on the second half of that when Mark Robinson says this is the incident -- I forgot how he words it. But when he refers back to the September incident, this is where she goes ahead and she puts her head down, and she says we only heard about this two days ago. I



can tell that she was very uncomfortable that she was dragged into something she didn't want to be in. What could they do, right?
BY MS. MARMOR:
Q. So that was your assumption about how she felt.
A. Correct.
Q. Okay. So you don't actually know that Nurse Shelby and Superintendent Jones-Hayes are friends, correct?
A. Correct.
Q. And you had never met Nurse Shelby before that day, correct?
A. Correct.
MR. LINDEN: Objection. Asked and answered.
BY MS. MARMOR:
Q. And you made -- and you made the assumption that Rebecca Reierson wasn't friends with Jones-Hayes because you perceived her as to be uncomfortable in the room?
A. No, that's not what I said. My assumption was that because of how uncomfortable she looked like she felt in the room, that she wasn't advised about what was about to happen



right at that moment.
Q. But I had asked you why you made the assumption that Nurse Shelby and Jones-Hayes were personal friends, but you didn't make that assumption about Reierson.
A. Because she was giving signals as a person who wasn't informed about anything. She could have known her, but she wasn't the one making false accusations at me and actually saying that I have to be found unfit for duty.
Q. So if you didn't feel that Ms. Reierson felt the same way that Nurse Shelby felt, and if you didn't feel that Ms. Reierson was making false assumptions about you, why didn't you contact Ms. Reierson when you got that letter in November of 2016 and say I don't feel comfortable sending my records to Nurse Shelby, is there some other way we can do this?
A. Because she had all this time in that interview alone to stand up and say this isn't right what you're doing to him, and I don't want to be a part of it, and she could have walked out at any time. Instead, she chose to sit there and be quiet and take on responsibility

that Nurse Shelby was doing to me.
Q. So is it your understanding, do you have any basis to believe that Rebecca Reierson disagreed with the decision to send you for an FFD apart from your personal interaction with her on that day where you assumed that she had a reaction to what Nurse Shelby was saying?
A. I believe if someone informed her of some information about an officer, and that information was that that officer was very threatening or he got, I don't know, overly excited or angry or something of an intimidated form to someone else, a fellow colleague, and this is what she was told, she'd get the impression that somebody -- that the person they were about to interview was that type of person.
But I could tell by what was happening that no one informed her of anything, that Nurse Shelby made the accusations that she made, Rebecca Reierson saw how I was, and realized didn't know what was going on, and that's when she felt uncomfortable.
Q. Do is it your belief that Rebecca Reierson didn't know about any of Superintendent

269

Jones-Hayes' accusations about what happened in September before that meeting?
A. Well, she said, We only heard about this two days ago. So I'm not exactly sure what they told her.
Q. Okay. But who's the "they"?
A. I don't know.
Q. So are you saying that somehow -- so is it your testimony that you don't believe that Rebecca Reierson knew anything about what had happened with Jones-Hayes prior to her meeting with you?
MR. LINDEN: Objection. Asked and answered. Objection. Asked and answered.
MS. MARMOR: I'm trying to understand his testimony because he's claiming that she didn't know.
MR. LINDEN: Well, still asked and answered regardless of whether you understand what his answer was. He answered it. But go ahead.
BY MS. MARMOR:
Q. Please answer my question. Is it your testimony that you believed, based on simply the way she was acting in that meeting, that she

270

didn't know anything about what Superintendent Jones-Hayes had said that you did?
MR. LINDEN: Objection to form.
THE WITNESS: Prior to -- before that day, yes. Two days before that day she said, We only heard about this two days ago is what she said.
BY MS. MARMOR:
Q. Okay. And did you think that Nurse Shelby knew something before two days prior to that?
A. I don't know.
Q. So I'm trying to understand why you make the distinction and you say that you don't think that Nurse -- excuse me -- that you don't think that Ms. Reierson knew anything, she walked in the door, and that it was all being driven by Nurse Shelby?
MR. LINDEN: Objection. Asked and answered for the third time and form.
THE WITNESS: I can't lay a piece of paper down for you so that you can read about any of it like you're doing with me here. I can only tell you I do this job every day, and I try to do it the best I can.

271

I have a lot of experience having to interpret whether someone is going to be safe or unsafe so I can protect everybody around me. I do this every day, assessing people and looking to see who might be good and who might be bad, and even if this guy is acting like he's okay, will he be okay, and will this gentleman jump on that? It's what I do. So it's all feeling. I don't know.
BY MS. MARMOR:
Q. So it's your feeling about what she thought.
A. Correct.
Q. Slightly related, but I noticed that you're injured today. How did you get your injury?
A. I was responding to an alarm call and lost my footing on the sidewalk and smacked my face into a fence. I don't understand.
Q. I think you did. You answered the question.
A. Right. I don't understand the relevance.
Q. Relevance is not an objection at a

272

deposition, sir.
MR. LINDEN: He didn't object.
BY MS. MARMOR:
Q. Have you seen a psychiatrist or therapist since your fitness for duty exam?
A. Which one? I have had two.
Q. You have seen psychiatrists?
A. I have had two fitness for duty exams.
Q. Oh, what was the other one?
A. One with Dr. Kroll and one with --
Q. Have you seen a psychiatrist or therapist since taking the fitness for duty exam through CorVel?
A. No, ma'am.
MS. MARMOR: I think I'm ready to pass the witness.
MS. HONINGFORD: I don't have anything.
MS. MARMOR: Do you want to switch places with me?
MR. HENRETTY: Yes. I'm going to cough right in the microphone.
MS. MARMOR: Do you want a Ricola?
MR. HENRETTY: Just in case. I don't think I'm going to go that long. Am I good? Can you



hear me?

EXAMINATION

BY MR. HENRETTY:
Q. All right. Mr. Nawara, my name is Lyle Henretty. At the beginning I mentioned my name. I represent Jones-Hayes.
A. Yes, sir.
Q. I'm going to just ask you a few questions. I'm going to try very hard not to repeat. I know you've been here a while. So I'll try to move through it, but I'm going to jump around a little because of that.
We talked a little bit about the -- we talked a lot about the day of September 28, 2016 today, right?
A. Yes, sir.
Q. And to the best of your knowledge as you sit here today we have already discussed all of the conversations that you had with Superintendent Jones-Hayes that day?
A. Yes.
MR. LINDEN: Objection, form.
BY MR. HENRETTY:
Q. Are there any that you can think of



that we haven't already talked about today?
A. No, sir.
Q. Okay. So in the complaint you mentioned that during -- we talked a little bit about it before, that when Jones-Hayes and you were in the office together, that she had been -- I think the way in the complaint was hitting you with her finger. Does that mean she's poking you?
A. Yes. She was kind of stressed about everything that happened, so she kind of said, You, you should have been the one who kind of made sure this didn't happen.
Q. Was she making contact with you?
A. Yes.
Q. About how many times would you say she did that?
A. Four, five?
Q. Was it all in a row or was it over the course of --
A. Well, yeah, all in a row.
Q. Okay. And in the complaint it states that during that time while she was speaking to you, that she spoke to you in a condescending



voice.
A. Yes.
Q. Would you describe to me how her voice was condescending?
A. She was very aggravated, kind of, Officer, you, this, addressing my rank. She was just upset and yelling, and it was unnecessary. It was just us. There weren't any detainees in the immediate area or anything like that. Didn't need to be that way.
Q. You say she was yelling. Sort of subjective. More than just a raised voice? Was she actually yelling or how loud did her voice get?
A. I don't know. I mean, she wasn't screaming at the top of her lungs or anything like that. She was just upset.
Q. And you testified earlier that while she was poking at you, you stepped back, is that right?
A. Yes, sir.
Q. How many steps back? I think -- correct me if I'm wrong. I'm just trying to move things along. You stepped back to the

wall, is that right?
A. Well, the first time didn't actually touch the wall. Step back, kind of stepped back, but when she motioned at me again because she was still in that motion, probably two steps total before I hit the wall.
Q. That was my next question. Okay. Were you afraid something was going to happen?
A. In what way?
Q. Were you afraid of Jones-Hayes?
A. I don't understand.
Q. Were you physically afraid of Jones-Hayes?
A. No. I mean, no. None of us have never seen another officer or supervisor or anybody ever strike anybody or anything to where there was some kind of damage. I didn't think she was going to hit me.
Q. Have you seen in your career -- well, strike that.
While you were at the Cook County Jail, did you see supervisors yell at subordinates?
A. Um-um.
Q. About how often?



MS. MARMOR: You have to answer yes or no.
THE WITNESS: Yes.
BY MR. HENRETTY:
Q. Very good. About how often did you see that?
A. Oh, I don't know. I mean, it's a very heated situation lot of times with detainees, and things can get hectic, and it happens. It's just something for the most part that I watch, and it just rolls off people's shoulders and keep going. It's part of the job.
If it was something where somebody might have taken offensively, well, you know, again, not in front of detainees, they'll walk off in a corner. Hey, earlier about that, sorry about that, and whatever, and we just go on.
Q. And you might have answered this before, and I apologize if you did. Did you -- have you seen Jones-Hayes since that day?
A. I think I was in Cermak one time in the basement almost in that area. I don't know if you guys remember, but the area where the doctors triage the inmates, I was taking somebody over there. I think I was bringing



them from the hospital. She happened to walk through, but I don't think she saw me. If she was walking through with some people, that was it. We had no interaction. I don't think she even saw me.
Q. So since that day you've had no interactions with Jones-Hayes?
A. No.
Q. Haven't spoken to her?
A. Right.
Q. All right. What if any role -- or strike that.
Do you know what if any role Jones-Hayes had in your fitness for duty exam?
MR. LINDEN: Objection to form of the question.
THE WITNESS: I mean, I don't know of any. It has to stem from that because that was the incident. Educated guess that she had to be the one to get the ball rolling. That's about it.
BY MR. HENRETTY:
Q. What do you mean by ball rolling?
A. To make the phone calls to go ahead and



say he did this or to combat my complaint that she said that I wrote.
Q. Do you know whether or not as of November of 2016 she had seen that complaint against her?
A. I have no idea.
Q. And when you said you made the complaint, you made that with -- who did you make the complaint with?
A. Where I sent it to?
Q. Where did you send it, right.
A. In the complaint it says you can send it to anyone in your chain of command that you feel comfortable with, so I just sent it to the highest guy, Superintendent Brogan.
Q. We saw that earlier.
A. Yes, sir.
Q. And do you know -- and again, I'm sort of setting up the next question, so I apologize if you answered this before. Do you know what Brogan did with it, what if anything Brogan did with it?
A. The short answer is no, but it's his obligation to forward that to the proper people.

Q. Do you know who the proper people were?
A. Office of Professional Review.
Q. And that's what we have been calling OPR today?
A. Yes, sir.
Q. Do you know what point, if any point, OPR lets people know they're being investigated?
A. Only when they need interviews. Otherwise, I believe a case can be ongoing, and if they're able to dismiss it or get rid of it somehow without your closing, and they don't need you, you'll never know.
MR. HENRETTY: I don't have any other questions.
MS. HONINGFORD: I don't have anything.
MR. HENRETTY: You guys don't have any questions?
MR. LINDEN: No.
MR. HENRETTY: Sarah?
MS. MARMOR: No. I'm done.
MR. HENRETTY: I think we're all done.
MR. LINDEN: We'll reserve signature.
VIDEOGRAPHER LEHMAN: This marks the end of today's deposition. The time is 4:22 p.m.

281

We are now off the record.
(WHEREUPON, the deposition was concluded at 4:22 o'clock p.m.)

282

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. ) No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, et al., )
Defendants. )

I, JOHN NAWARA, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on October 2, 2019; that I have read the foregoing transcript of my deposition, and affix my signature to same.

______________________________
JOHN NAWARA

Subscribed and sworn to
before me this day
of , 2019

Notary Public

283

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARLENE L. KING, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on October 2, 2019, personally appeared before me, at 333 West Wacker Drive, Suite 450, Chicago, Illinois, JOHN NAWARA, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, Eastern Division, wherein JOHN NAWARA is the Plaintiff, and COUNTY OF COOK, a unit of local Government, et al., are the Defendants.

I further certify that the said JOHN NAWARA was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

284

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 16th day of October, 2019.

Marlene L King

NOTARY PUBLIC, COOK COUNTY, ILLINOIS

285

McCORKLE LITIGATION SERVICES, Inc.
200 N. LaSalle Street Suite 2900
Chicago, Illinois 60601-1014

CERTIFIED MAIL
October 16, 2019
MR. JOHN NAWARA,
8469 Archer Avenue,
Willow Springs, Illinois 60480

IN RE: Nawara vs. County of Cook
DATE OF DEPOSITION: October 2, 2019

Dear Mr. Nawara:

Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition. You have 28 days from the date of this correspondence in which to appear for reading and signing.

If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

______ Procedure outlined in Rule 207 (a) of the Illinois Supreme Court Rules

______ Procedure outlined in Rule 30 (e) of the Rules of Civil Procedure for the U.S. District Courts

Sincerely,

Cindy Alicea — Signature Department

Court Reporter: MARLENE L. KING

cc: All attorneys of record

286

#

#16-793
119:8

(

(a)
286:18
(e)
286:19

0

000165
244:21
000166
91:23
000221
199:24
016-09-28
92:8

1

1
14:13 31:14,16,20 42:3 83:24 90:23 172:2 213:2,7 236:24 245:23
10
82:23 121:17,21 134:15 235:20,21
108
69:24
1093
190:20
10:00
103:3
10:17
37:9
10:19
37:13
10:41
102:23,24 103:4
11
69:13 154:3,7 200:3 201:2,6 256:23
11-18-16
142:12 164:22 262:19 264:2
11-30-16
165:17
11:20
90:22
11:32
91:4
11:58
112:23
12
14:13 17:20 69:13 88:10 155:18,22 256:24
1202
227:16
1291
235:7
1295
235:19
12:00
113:4
12:55
160:9
13
21:15 58:20 59:16 63:20 157:18,22 219:17 222:5 224:4
14
22:9 162:16,20 164:8
14.4(1)(B)
119:24
1411
255:19
15
46:22 132:20 134:15 136:14 170:14,18 184:8
16
16:14 22:20 62:17 171:21 172:1 175:7 177:20 235:8 286:4
164.508
238:24
16th
285:14
17
9:10 22:20 82:23 88:10 122:4 175:2,6 200:4 224:18 245:16
17-CV-2393
283:7
18
37:22 117:6 125:17 160:23 167:3,6,10 172:18 174:10 178:17,21 179:23 208:13 209:17 211:14 212:2 226:19 231:24 241:12 242:22
18th
154:9 159:9 160:18 209:2
19
16:14 123:7 186:5,9 187:4
1993
15:18
1998
15:14,18 16:21 17:23
19th
30:11 124:11 158:1, 11
1:00
160:5
1:37
160:14
1st
213:6 252:20

2

2
32:11,22 37:17,22 83:24 91:5 160:10 246:5 283:14 284:7 286:7
2-11-17
258:13
2-17-17
258:14 260:1
20
16:15 28:12,16 60:20 75:12,17 136:14 189:3,7
200
9:3
2002
20:6
2009
202:3
2013
21:21 22:8
2014
21:15,21
2016
18:6 19:6 20:7,24 26:20 27:4,5,8 30:12 31:22 37:23 43:14, 15 58:20 59:13,16 62:17,18 63:20 80:23 93:7 117:9 118:24 119:9,21 122:4 125:17 151:12,24 160:19,23 163:5 164:13 166:13 167:3,6,10 169:17 170:21 172:2,18 174:10,21 175:7 177:20 178:1,12,23 189:8 191:3 198:2 208:13 209:16,17 211:14 212:2 216:23 217:8 246:16 252:21 261:15,17,21 268:16 274:14 280:4
2017
14:7 21:17,18 27:7 28:7 29:13,17 30:8 69:13,14 110:1 144:8 151:11,20 184:11 186:13 189:10,22 190:24 191:23 193:1 200:3, 4 201:2,6 202:15 207:8 208:1,10 210:4 213:2,8 216:24 219:18 222:6 224:5,18 225:18 226:19 227:21 231:24 233:5,7,21 234:21,23 235:9,14 236:24 237:18 238:5 243:11 245:17 255:10 256:19,24 261:21
2018
82:5 117:6 246:15
2019
9:6 28:4 283:14,20 284:7 285:14 286:4, 7
207
286:18
20th
225:15
21
178:4,23 189:17,21 216:23 217:7
21st
186:11
22
191:14,18,21 225:17
23
192:20,24
2393
9:10
23rd
23:3,24
24
194:15,19 195:23 197:17 200:1 201:1
25
207:19,23 210:23 219:12 221:3
26
114:13 212:16,20
26(a)(1)
115:13
27
215:6,9,17 219:11
2700
126:14
28
15:14 17:22 43:15 59:12 62:18 80:23 93:7 117:9 208:1,10 216:16 219:9,13,16 221:17 250:18 274:14 286:13
28th
221:5
29
118:24 222:2,5 233:7,21
2900
9:4 286:1
2:00
120:11
2:55
226:4
2nd
9:5 119:9,21

3

3
58:7,13,18 67:18 69:22 160:15 226:5 228:17 238:5
30
163:5 164:13 166:12 169:17 170:21 189:7 209:16 224:11,15 243:11 286:19
30th
164:19 171:4 191:22 215:2
31
186:12 216:23 226:11,18 230:1
31st
126:11
32
231:19,23
33
233:15,19
333
9:7 284:8
34
234:15,19
35
237:13,17
36
245:4,6,9,13 252:15
37
250:12,16
378032
81:8
38
255:5,9,22 256:19
3:00
113:7,9,13,22 120:10
3:06
226:14
3:45
256:11
3:46
256:15
3:55
263:14

4

4
68:18,23 69:23 141:20 142:3,8 150:6 226:15 234:21 257:7,14 261:23 263:15,23,24
4-11-17
258:14
4-27-75
11:13
40
75:9 76:1 104:6
43
92:9
44
11:16,17
450
284:9
4:03
263:19
4:22
281:24 282:3
4th
235:13

5

5
31:22 38:7 80:15,20 81:3 82:19 91:15,16 235:20 237:18 263:20
5/8-2001
238:22
5/8-2003
238:22
50
153:10
500
23:10
5801
124:21

6

6
82:5 91:14,19 92:2 261:23
6-2
38:7
60
75:9 76:1 130:7
60480
286:6
60601
9:4
60601-1014
286:2
60606
9:8
6:00
120:11

7

7
112:18 114:12 189:9
700
234:22 235:4
735
238:21,22
7:00
120:10

8

8
116:16,20,21 117:1 189:21 190:24 191:23 192:24 210:4,12 215:22 227:21 255:10 256:19
8-2016-14992
37:24
8469
11:7

9

9
38:2,13 40:17 116:21 118:18,23 119:20 120:17
93
15:17
9:00
127:12
9:48
9:9
9:58
93:7

A

a.m.
9:9 37:9,13 90:22 91:4 93:7 112:23
ability
13:10
above-described
246:8
above-entitled
286:9
above-named
238:13
absolutely
11:10 72:18
Academy
17:3,9,16,19,23,24 18:1,3 22:22 23:1,22 37:3
accepting
35:4
access
176:21 191:8
accidentally
213:11
accommodate
13:4
accomplishing
262:6
accordance
238:21
account
203:11
accumulated
30:13 205:18
accurate
71:14 73:16 76:12, 22 80:11 81:15 83:11 84:18 85:16 115:13,23 142:16 143:22 146:9,11 150:14 198:8 200:12 201:20 211:20 257:23 258:10 260:9
accurately
73:24
accusations
249:18 250:9 268:9 269:19 270:1
Accused
81:6
Aces
27:1,15,20,22 28:7 29:6 203:22,24
acquaintance
193:22
acronym
62:4
Act
230:21
acted
137:5 181:10 208:22
acting
57:13 217:2 219:24 270:24 272:6
action
36:21 62:9 64:1 159:1 171:12
actions
182:23

**active**
47:19 165:2 208:15
**activities**
200:10
**actual**
23:21 44:22 82:8,16 156:11 164:9 252:11,21
**ADA**
188:1 217:10,13,17 223:6,7
**adaptive**
259:9,12
**add**
39:13 235:24
**added**
71:18 73:10,20 76:15 264:6,12
**addition**
209:15
**Additional**
196:10 197:24 200:6 201:15
**address**
11:6 34:23 139:18 161:16 162:24 163:1,10,23 172:22 189:23 192:1 213:14 286:12
**addressed**
195:21
**addressing**
276:6
**adds**
223:12
**adequate**
225:1
**admission**
238:17 239:6
**admissions**
50:17 87:10
**advance**
207:2
**advancement**
183:11,14
**advantage**
85:13
**advice**
194:5 197:2,5 212:14
**advised**
267:24
**affect**
13:10
**affix**
283:16
**affixed**
285:13
**afford**
205:24
**aforesaid**
283:14 284:19 285:2
**afraid**
277:8,10,12
**aggravated**
276:5
**aggressive**
137:14 208:22 249:7 250:3
**agitated**
76:18
**agree**
112:13 143:4 145:19 164:16 256:8
**agreed**
11:8 113:24 144:10 145:10 247:5
**Agreement**
234:22,23 235:3,13, 17
**agreement/s.e.a.m.**
120:1
**agrees**
72:24
**ahead**
58:10 102:8,9,22 103:3 131:9 249:3 260:16 265:2 266:23 270:20 279:24
**ailments**
199:13
**airport**
60:16
**alarm**
272:17
**Alicea**
286:22
**allegation**
153:10 188:3
**allegations**
180:21
**alleged**
117:5 208:21
**allegedly**
110:5
**alleviate**
200:9
**allowed**
13:2 155:1 184:18 205:7 206:22
**altercation**
43:24 62:15 108:8, 12 119:4 138:22 150:17 152:3,9 175:13
**alternative**
202:12 203:16
**amazed**
64:24
**Amazon**
29:8,9,12,14 204:5
**Amended**
153:9
**Amendment**
231:1
**Americans**
230:21
**amount**
85:8,9 86:20,21 168:17
**anger**
44:14 49:2
**angle**
109:18
**angry**
134:24 135:2 269:12
**ankle**
45:16 73:8
**annoyed**
76:6,16
**answers**
12:21 117:1 171:11
**Anthony**
11:3,4
**anticipate**
12:22
**Anxiety**
228:7,8
**anymore**
67:8
**anytime**
55:11
**apologies**
256:17
**apologize**
49:8 65:21 278:18 280:19
**apparently**
258:4
**Appearance**
228:15
**appeared**
182:7 284:8
**appears**
31:21 105:8 154:17 175:12 180:8 202:16 215:9 226:20 259:21
**apples**
18:19
**application**
17:4,5 21:19
**applications**
22:15
**applied**
16:24 21:21 22:2,8 61:5
**apply**
19:2 21:13 22:18 207:10
**appointed**
27:23
**appointment**
23:21 24:13 125:20 126:3 183:17 254:13,16 255:11 256:20 286:12,15
**appointments**
50:20 236:6
**approach**
53:8
**approximately**
22:9 127:10
**April**
28:3,4 30:8,18 201:2,6 202:15 204:12 261:21
**ARB**
15:24 16:1,2
**Archer**
11:7 286:5
**area**
41:5 43:23 45:24 46:9,10,21 47:19 50:7,9,14,15,23 51:6,11 52:13 58:24 65:12,14 71:22 75:4 78:15 83:14 84:5,10, 15 85:5 87:9 92:22 93:8 94:15,22 101:1, 4,19 102:12 103:7 127:1 155:15 161:16 195:10 260:9 276:9 278:21,22
**areas**
60:13
**argue**
213:18
**argues**
216:14
**argumentative**
35:20 145:6 203:14 214:16 220:10 243:1 250:5 260:22 261:7 266:7
**arise**
74:1
**arisen**
207:7
**arrangements**
286:15
**arrest**
23:11
**arrive**
134:14
**arrived**
76:5
**Article**
62:2,6 119:16,23 120:2,5
**asks**
117:3
**assess**
69:18
**assessing**
272:4
**assessment**
79:7 195:21,24 228:18,23
**assigned**
33:2 56:23 65:13 78:15 83:3 98:22 99:6,11,13 100:5 119:22 123:19 125:18 126:8
**assignment**
56:9 78:7 122:16 133:19
**assistance**
198:17
**assistant**
15:24 16:2
**assume**
12:12 72:14 176:11, 19 213:24 237:5
**assumed**
165:21 269:6
**assumes**
165:20 237:3
**assuming**
33:20 72:16
**assumption**
178:2 266:4 267:5, 18,22 268:3,5
**assumptions**
268:14
**attach**
180:4 208:5,6
**attached**
67:20 119:7 172:8 179:19 187:4 190:3, 7 208:2,9 211:7 215:21 216:15 235:2 255:17 256:21
**attaches**
180:4 186:15
**attaching**
58:18 154:9 226:24
**attachment**
119:12,20 156:11 179:3 208:3 234:21
**attachments**
216:16 234:24
**attempt**
51:16 143:16 145:23 146:1,10,24 242:14, 17
**attempted**
107:12
**attorney**
118:9 184:22
**attorney/client**
111:22 118:8 213:12,21 215:10 230:9,12
**attorneys**
285:6 286:16,24
**attorneys'**
186:24
**audio**
81:7
**August**
23:3,24 29:16 245:16 250:18
**authoritative**
54:18 130:6
**authority**
54:5 57:13
**authorization**
172:11,14 179:20,24 187:5 190:4,8 209:2, 4 211:4 245:16,24
**authorized**
206:14 209:18 245:20
**authorizes**
245:23
**availability**
27:16
**Avenue**
11:7 286:5
**aware**
51:7 160:1 181:15 182:6 183:16 199:13 216:7 224:23 263:6
**awareness**
182:18

**B**

**B-R-Y**
204:17
**B-R-Y-A-N-T**
204:18
**Baby**
53:5 54:19
**back**
13:14 21:18 37:12 42:2 45:18 47:9 52:23 56:17 64:5 65:1 88:20 89:5 91:3 95:13,15 96:4 99:16 100:19,20,21 103:2 105:18 108:17 113:3,24 120:15 133:11,20 135:23 136:7 140:11,13,20 141:13,20 146:18 152:22 155:2,8 159:3 160:13 166:17 167:19 168:4 169:5 170:1 187:8 197:8 201:8 205:7 209:22 214:13 217:22 221:3,17 226:13 229:11 230:1 239:11,12 242:8,18 243:15 247:14 251:11 252:6,15,18 256:14 257:6 263:18,23 266:21 276:19,22,24 277:3, 4
**backed**
49:2
**background**
14:12 240:14
**backing**
76:20
**backwards**
141:21
**bad**
49:18 55:3 85:12 115:2 261:1 266:15 272:5
**badge**
19:16,23
**badly**
142:14,19
**ball**
279:20,23
**bank**
30:14 203:11
**bargaining**
120:1
**based**
22:17 85:18 103:1 150:9 151:16 152:14 208:19 225:5 240:24 241:2 263:7 270:23
**basement**
43:23 45:23 56:9
71:5,11 83:24 195:10 197:15 278:21
**basic**
11:23
**basically**
30:13 187:9
**basis**
121:6 180:10 187:19 221:14 269:3
**Bates**
69:23 91:22
**Beat**
187:13
**Beck**
228:6,7
**bed**
124:13
**bedtime**
124:11
**befriended**
134:9
**began**
14:7 17:21 71:20 198:2
**begin**
266:9
**beginning**
9:12 27:7 40:8 91:5 160:15 204:2 226:15 242:16 263:20 274:5
**begins**
88:19 95:11 262:1
**behalf**
9:14,16,18,21,24 10:2 216:22 217:2
**behavior**
55:8 65:1 137:14 150:9 151:8,17 225:6 249:7
**Behavioral**
228:15
**belief**
132:23 264:24 265:1,21 266:8 269:23
**believed**
62:14 153:14 161:20,23 178:10 263:4 264:18 265:7, 15 270:23
**believes**
264:6,13
**belonged**
98:3
**bench**
100:12
**benefit**
31:11
**benefits**
31:1 186:21 205:14, 19
**bid**
124:5,21
**bidded**
38:7
**big**
66:21 149:7
**big/important**
262:7
**bigger**
55:19
**biking**
200:11
**billing**
239:7
**billings**
239:7
**bills**
197:9 202:13

203:17,18
**birth**
11:12 238:9
**bit**
85:22 88:18 190:16 274:13 275:5
**black**
134:9
**blacked**
122:24
**blank**
141:8,10 161:7,8,12, 14 162:2 212:5 219:1 230:19 251:14
**bleeding**
96:23
**blocked**
244:24
**blocking**
93:4 102:4
**blocks**
126:17
**blood**
199:16,17,20
**blue**
39:12 42:1 101:23, 24 102:5
**Board**
15:19,22 16:9
**body**
46:13,17
**boss**
58:23 88:14
**bother**
55:2 168:3
**bothered**
240:13
**bottom**
65:24 77:2 81:2 82:24 83:17 122:1,3 150:5,6 154:8 186:10 223:22 226:22 235:21 259:7,9 261:24
**box**
66:1
**break**
13:3,6 88:8 90:20 95:1 135:22 136:2 148:15 160:6 168:6 226:2 263:11
**breaks**
13:2
**breath**
139:19
**breather**
148:21
**bring**
200:10
**bringing**
278:24
**brings**
96:4
**Brogan**
58:19,22 59:4 62:21, 24 67:20 154:17 188:16 280:15,21
**broken**
71:6
**broker's**
15:24 16:2
**brothers**
41:14,18 42:1
**brought**
43:6 181:16
**Bryant**
125:19 204:13,16,19 206:8
**building**
17:7 66:14 99:9,17 126:7,10,12 127:3
**bump**
19:17 20:1,21 65:1
**Bureau**
221:7
**Burke**
9:19,22 153:11,17, 20 167:14 182:1
**burn**
218:2
**Burris**
25:4 231:7,8
**busier**
85:8
**business**
97:22 225:7
**Bustamante**
9:14 79:14,18 147:22 148:2 151:2 160:22,24 215:11 245:9
**busting**
75:13
**buttons**
84:11

**C**

**C-O-D**
98:17
**C-O-D-D**
98:18
**C/o**
81:7 83:2,4,18,19,21 84:24 85:3
**California**
126:11
**call**
17:8,14,15 31:14 50:1,21 72:8 107:3,6 114:6 124:19 125:1 133:6,9 138:8,11,14 144:11,21,24 145:4, 11,16 148:11 166:17,20,22 167:19,21 168:1,3 193:19 196:21 204:12 272:17 286:11
**called**
10:9 25:3 32:4 44:2 56:16 68:14 71:4 82:15 94:10,15 123:21 125:20 133:8,12,14,17,19 134:11 136:10 137:18 138:5 143:23 148:12 149:6,16,20 154:20 165:15,16 166:2 205:9,16 228:11 242:9 251:6
**calling**
54:19 281:3
**callouts**
16:5
**calls**
50:16 115:12,19 118:8 151:13 185:16 214:17 237:2 239:20 259:2 279:24
**calmed**
103:2
**camera**
46:13,17 103:16 109:6
**cameras**
46:10 51:6,9 60:4 110:14
**capacity**
75:4,8,22 95:4
**capitalized**
41:14
**Cappy**
121:23 122:8,10 125:2,9
**care**
38:17 94:16 114:6 246:6 250:23,24
**career**
277:19
**careful**
79:23
**carry**
23:13 195:13
**carrying**
97:11
**case**
9:10 10:16,19 25:16 26:11 29:6 32:2 61:4 68:13 85:14 91:22 114:17 115:10 116:12 153:10 159:19 163:13,15,21 164:2 166:1 178:22 180:3 181:15 221:22 225:4 246:9 248:3 263:2 273:23 281:9
**cases**
25:7
**cause**
12:7 43:3 185:17 243:4,5 284:10,19 286:9
**caused**
198:16
**cc'd**
179:1 222:7
**cc'ing**
215:19,23 224:17 231:24
**CCSO**
69:24 91:23 190:20 193:16 215:11 216:2 227:16 235:7,19 255:19
**cease**
185:6
**cell**
122:24
**Central**
32:16 124:20
**Cermak**
41:3 45:19 56:10 59:9 61:3,14,17 71:5 83:14 84:5 92:22 93:9 95:3 98:23 100:5 103:7 119:4 120:10 124:9,20 195:2,5,7,10 278:20
**Cermak's**
32:16 43:22 195:10
**certificates**
15:3
**certification**
15:9 238:16
**Certifications**
15:8
**certified**
9:2 208:4 286:3
**certify**
284:6,16 285:3,8
**cetera**
77:12,23 262:12
**chain**
68:5 204:23 232:13 280:13
**chair**
100:21
**challenge**
54:5
**challenged**
91:9
**chance**
178:15
**Chaney**
138:2,7
**change**
36:20 90:19
**changed**
19:23,24 244:19
**channel**
131:14
**channeled**
44:14
**characterize**
75:7
**charge**
77:12,23 80:9 120:24 233:4
**Charles**
238:6 239:15
**chase**
52:4
**check**
124:12 228:7
**chest**
47:7 48:17 64:3 76:20
**Chicago**
9:4,8 15:19,22 16:9 284:9 286:2
**chief**
137:19 156:3,20
**children**
14:9
**chin**
260:16
**choice**
114:24 116:5 244:1, 5,6 247:23 248:7
**choices**
248:9
**chose**
268:23
**chunk**
34:12
**Churma**
9:21
**ciid. investigations.**
176:24
**ciid. investigations@ cookcountyil.gov**
175:8
**Cindy**
286:22
**circle**
131:24
**Civil**
238:23 286:20
**claim**
74:23 115:15
**claimed**
108:12 109:4
**claiming**
270:16
**claims**
111:20 115:17 118:10 179:10
**class**
17:14
**classify**
83:24
**clean**
240:14
**clear**
101:11,19 110:17 128:11 129:2 188:6 204:9 225:7 257:2
**clearance**
156:9,17
**clerk**
15:24 16:2
**clerking**
16:1
**click**
110:14
**client**
195:20
**client's**
213:17
**clinic**
102:16
**Clinical**
228:5
**clinics**
94:15 101:22
**close**
15:20 53:2,4 127:20 136:5
**closely**
53:2
**closing**
281:11
**co-worker**
258:5
**co-workers**
128:3,5,13 130:1,4, 10
**coach**
79:20 218:17 248:18
**coached**
146:16
**coaching**
79:21 218:19,20 219:2,3 248:20
**Codd**
98:16,21 99:3
**Code**
238:23
**coffee**
196:22
**colleague**
195:3 269:13
**collective**
120:1
**college**
14:14,15
**colleges**
14:16,19,24
**combat**
248:5 280:1
**combatting**
197:11
**comfortable**
85:24 86:12 195:14 268:17 280:14
**comma**
89:21
**command**
68:5 204:23 232:14 280:13
**Commander**
32:17 33:11,22 35:17 42:5
**comment**
57:17,19 64:12 89:21
**comments**
60:2
**communicate**
219:20
**communicated**
230:10
**communications**
111:22,24 163:20 164:4
**compare**
173:8
**complain**
85:6
**complaining**
64:17
**complaint**
57:8 58:19 59:17 60:7 62:13 63:8,10, 13,20 65:19 66:2 67:14,20 68:4,8,13 80:22 82:8 153:9 178:4 180:21 181:7, 16 182:1,7,12,19 188:14 231:12,15 233:20 262:8 275:3, 7,22 280:1,4,8,9,12
**complaints**
188:7,9,18 231:4
**complete**
140:13 180:12 181:17 221:19,21 223:2,13 238:14 247:6
**completed**
14:13 155:7 169:5 208:3 210:18 225:3 238:16 286:16
**completely**
13:11 75:13 261:6,9
**completes**
179:19
**complies**
236:5
**comply**
71:19 73:11
**composed**
49:7
**compound**
260:11
**Computer-aided**
284:23
**concern**
38:11 223:18 237:20
**concerned**
64:9
**concluded**
282:3
**conclusion**
115:12,20 183:4 237:3 259:3
**condescending**
64:4 275:24 276:4
**condition**
74:22,24 246:7
**conduct**
152:14
**conducting**
227:14
**conducts**
89:8
**Confidential**
92:5
**confidentiality**
123:1
**conflict**
27:10 199:9,14
**confuse**
218:16
**confused**
19:5 143:22 149:3 154:23 261:12
**Conley**
44:4 47:15 50:2 52:10,18 55:17 65:7 71:4 77:6,20 79:8 105:9,15 106:20
**considered**
19:15 20:1,2 227:13 229:7 263:8
**considers**
198:3

**consistency**
27:19
**consistent**
28:21 155:5 206:18
**consists**
142:20
**consultations**
239:4
**contact**
185:5,21 213:14 268:15 275:14
**contacted**
216:21 224:22
**contained**
71:7
**context**
71:10 110:2,3,5
**continue**
33:6 114:4 139:9 140:2
**continues**
36:2 202:10
**continuing**
30:16
**contract**
194:11,12 234:20
**contrary**
206:12
**contributed**
73:21
**control**
32:16 84:3 87:10 113:20 124:20 130:8 213:18
**convenience**
210:22
**conversation**
33:21 34:4,9 35:8,13 36:22 46:7 47:22 62:16 117:5 129:15 147:17 254:6,8
**conversations**
33:18 157:4 158:12, 15 167:1,5,8,12,16 253:6 254:14 274:19
**convey**
40:6
**Cook**
10:3 15:13 16:21 17:6 23:8 25:6,10,13 29:5 69:20 112:6 172:13 173:21 190:8 204:20 213:14 215:11,18 220:1 233:5,8 234:3 235:4 246:10 247:4,17 260:7 277:21 283:8 284:5,14 285:20 286:7
**cookcountyil.gov**
162:24
**cookcountyil.gov.**
172:4 175:9
**cooperate**
236:22
**cooperates**
236:5
**copied**
239:12
**copier**
177:13
**copies**
112:14 153:2,4,21 173:17,18 174:13,14 238:24
**coping**
200:8
**copy**
91:20 111:5,9,14 119:7 153:4,6 154:9, 18 173:15 177:2,3,8, 11,12 189:7 191:21 192:8 210:22 238:14
**corner**
93:19 102:1 142:10 278:15
**Corporation**
246:3,10
**correct**
16:6,19 18:22 19:7 21:10 24:15,23 25:1 30:7 31:1 32:9 34:10 39:6,17 44:10 48:6, 14 50:24 54:10,16 59:13 60:23 63:21 71:8 74:24 79:13,16 80:5,7 82:10,16 87:4,18 93:22 94:4,5 96:1 97:12 99:19 101:13 102:18 103:8,11 104:17 107:19 109:12,13 116:9 118:5,6 119:4, 13 120:12 124:5,6 125:16 129:13,17,23 135:18 140:16,17,21 144:14,24 145:18 146:23 151:21 153:8 155:12 159:20,24 161:4 162:3,4 163:7 164:5,20 165:5 167:14,15,17,18 169:11,12 171:6,18 173:3 175:15 179:15 180:5 181:4,18 182:9,21 185:1 187:6,11 188:1,16 193:9,11 198:12 202:17,21 203:3,11 204:24 209:11 210:1,10 211:1 214:2,6 216:17,24 220:2 222:7 224:5 225:21 227:21 229:10 231:16 233:1,2 234:4 235:5 245:21 247:7 250:19 251:21 252:1 255:15 256:24 257:4 260:1 263:9 265:20 267:7, 10,11,13,14 272:13 276:23 284:24
**correctional**
18:4,5 19:6 26:14,18 28:11 55:20 56:18 69:19 98:8
**Corrections**
194:11
**correctly**
133:15
**correspondence**
193:15 216:15,17 217:13 286:13
**Corvel**
246:3,10 247:2 250:18 251:19 252:4,5,8 253:1,9, 11,14,18 254:15 262:11,17,19 273:13
**cost**
237:22
**cough**
273:20
**counsel**
9:11,13 32:2 48:8 111:15,18 112:5 113:10 117:4,6 138:8 159:2,19,21 163:22 169:18 178:22 214:19 218:17 219:2 285:4, 8
**counseling**
239:5 258:3
**count**
23:22
**counties**
123:18
**county**
10:3 15:13 16:21 17:7 23:8 25:6,10,13 29:5 69:20 112:6 123:20 163:18 172:13 173:21 190:8 204:20 213:14 215:11,18 220:1 232:22 233:5,8 234:3 235:4 246:10 247:4,17 260:7 277:21 283:8 284:3, 5,14 285:20 286:7
**couple**
28:22 29:15 57:5 86:16 95:1 107:8 137:24 139:13 157:9
**court**
12:18 18:17 20:18 31:19 37:20 58:8,16 68:21 80:18 114:11 116:23 118:21 121:20 154:6 155:21 157:21 162:19 170:17 171:24 175:5 178:20 186:8 189:6, 20 192:23 194:18 207:22 212:19 215:16 219:15 224:14 226:17 231:22 233:18 234:18 237:16 245:11 250:15 255:8 283:1 284:11 286:18,22
**courthouses**
123:18,19
**Courts**
286:20
**cover**
11:22 80:21 81:21, 23 226:18
**covered**
209:7
**CPR**
15:8
**created**
39:22
**credentials**
220:4
**criminal**
62:9
**critical**
260:9
**crossed**
236:7
**crystal**
101:11
**cuff**
97:15
**cuffed**
64:5,10,17 65:17 74:2,8,9,15 76:17,19 85:10,19 87:17,22 88:3 97:15 100:10, 13,14,15,21
**cuffing**
72:9,11 84:22
**cuffs**
73:13 83:6,7 98:2 99:18
**curious**
39:23
**current**
22:17 196:1,13,16 197:4,19 198:5,15 228:11
**custodian**
34:19
**custody**
213:18
**cut**
31:1 205:13
**CV**
9:10

**D**

**d"s**
98:18
**damage**
131:3,6 277:17
**Dana**
159:15,18 178:21 219:17 230:3 238:2
**dance**
130:18,19
**danger**
143:9
**dangerous**
73:19,20 74:9 142:21 143:6
**Darin**
120:16,18
**Dart**
9:9,19,22 153:11 231:3 234:3
**date**
11:12 18:1 28:2 63:20 93:14 125:2,9 160:22 166:3,15 201:3 209:8,21 217:15 227:20 233:10,23 235:8 237:9 238:9 240:10 261:13 286:7,13
**dated**
31:21 37:22 58:19 59:15,16 118:24 122:4 178:22 200:3 219:17 224:4,18 231:23 234:21 237:18 238:5 255:10
**dates**
14:4
**dating**
14:6,7 202:1
**David**
9:1
**dawned**
149:14
**day**
36:4 41:9 43:16,21 46:14 51:12 53:12 56:10,19,24 70:4,8, 17 71:3 75:3,11,20 88:2 89:16 90:16 92:22 96:18 98:22 99:7 100:5 103:5 106:14 119:3 120:14 121:13 123:10 125:11,15,22 126:13 127:8 134:4 142:22 150:22 153:17,23 154:18,19 161:3 162:1,13 164:14 169:4 170:21 173:14 174:3 190:13 193:1 237:1 240:8 242:1 243:3,7 250:3,8 267:13 269:6 271:4, 5,23 272:4 274:14, 20 278:19 279:6 283:19 285:14
**days**
16:4 69:15,16 122:2 139:18 159:10 250:18 266:24 270:4 271:5,6,9 286:13
**deal**
48:20,24 196:5 198:16 242:22
**dealing**
195:10
**dear**
233:11 238:12 286:8
**debate**
115:24 116:2
**December**
17:22 159:16 172:2 174:21 175:6 177:20 178:23 186:11 216:23 217:7 236:24
**decided**
60:7 148:18 248:2
**decision**
124:21 242:21 269:4
**declared**
263:8
**decreased**
259:16
**deemed**
210:13
**defendant**
10:1 117:8 153:11, 16
**defendants**
10:16 68:12 153:11 179:11 181:15 283:10 284:15
**Defendants'**
117:2
**defense**
113:10 117:5
**defenses**
115:15,17 118:10
**defensive**
262:4
**define**
24:3
**degree**
14:21
**deliberately**
167:22 242:15
**delivered**
168:18
**demand**
130:8
**demeaning**
64:1
**denied**
260:3,8
**denying**
35:1,3,9,11
**dep**
114:4
**depart**
70:12
**department**
22:3,11,12 27:24 28:17 30:6 36:10 125:13 196:18 286:11,23
**depended**
27:16
**depending**
17:13 59:23 74:22
**depends**
54:13 74:18 75:11 122:17 168:13
**deponent**
283:13
**deposed**
11:17
**deposition**
9:6 11:23 31:15 37:16 58:12 68:17 80:14 92:1 112:17 113:8,21 116:15 118:17 121:16 141:2 144:4 148:2 151:3 154:2 155:10,17 157:7,17 162:15 170:13 171:20 175:1 178:16 186:4 189:2, 16 191:17 192:19 194:14 203:5 207:18 212:15 215:5 219:8 222:1 224:10 226:10 231:18 233:14 234:14 237:12 245:3 250:11 255:4 273:1 281:24 282:2 283:14,16 285:4,6 286:7,9,13,16
**depositions**
13:5
**Depression**
228:6
**Deputy**
229:14
**describe**
28:19 45:19 73:24 135:5 276:3
**descriptions**
70:11,12
**desist**
185:6
**desk**
50:15 133:8 246:23
**detail**
38:7 120:10,11
**details**
71:11
**detainee**
74:7,8,9 75:3,8,22 84:14 87:16 93:9
**detainees**
51:15 56:10,19 57:10,11 71:6,22 74:13 75:16 83:4,20 85:12 86:14 92:24 95:3 101:1 130:2,4 175:14 195:11,12 276:8 278:7,14
**determination**
229:9
**determinations**
243:2
**diagnosed**
199:19
**diagnosis**
258:18
**difference**
72:1
**differently**
74:20
**diminish**
262:5
**direct**
143:14
**directed**
44:17
**direction**
43:24 44:5,8 49:14, 20 50:12 230:3
**directly**
61:11 168:18 219:20 262:11
**director**
128:2 216:8
**Disabilities**
230:21
**disability**
246:9
**disagree**
45:3

**disagreed** 269:4
**disagrees** 72:17
**disbanded** 20:11
**discharge** 239:6
**disciplinary** 159:1
**discipline** 60:3,11 113:12,16 114:5 131:12,14
**disciplined** 114:3 168:11 198:5
**disclose** 114:23 116:5 246:8
**disclosing** 115:14
**disclosure** 115:19 118:13 172:12 180:1 187:5 209:4 211:5
**disclosures** 114:13 115:4,8,23
**discovery** 164:2
**discuss** 113:24 170:11 197:21 258:6
**discussed** 113:6 200:7,9,13,16 274:18
**discusses** 228:10
**discussion** 32:17 33:10 35:17 37:10 42:4 46:8 113:1 143:17 145:24 146:2 171:8 191:15 226:6 256:12 257:11 259:24 262:22
**disengage** 45:7
**dishonest** 248:4,12,15
**dislike** 66:11
**dismiss** 281:10
**dismissed** 136:4 148:16
**dismissive** 132:9
**disparage** 57:10
**disparaged** 57:9
**dispensing** 33:7
**displayed** 137:14 249:8
**dispute** 29:4,21 107:11 199:5,20,22 258:24
**disregard** 32:14 33:1 35:5 42:7 55:11
**distance** 126:16
**distinction** 271:13
**distress** 198:16,19,20
**distributed** 78:7
**District** 283:1,2 284:11,12 286:20
**DIV8-CERMAK-CAM_0_002_STAGING_REAR** 92:7
**division** 37:24 38:2,13 40:17 56:17 59:19 61:1 67:22 90:16 97:21 110:15 283:3 284:13
**divisions** 50:19
**doctor** 31:4,8 50:19 56:16 75:16 78:12 94:10,20 150:20 151:6,17 195:1 197:14 199:19 200:21 224:2 227:1,2 239:16 248:5,9 253:19 254:2 260:13
**doctor's** 99:16
**doctors** 102:11 278:23
**document** 63:7 69:3 82:4 119:11,12 124:4 142:6 145:7,10 160:18 172:5,8 187:3,14 213:10 226:19 227:9 230:10 234:12 239:11 245:1,13 256:18
**documentation** 128:23 242:4
**documents** 14:3,5 30:10 32:3 43:19 94:24 124:3 163:13,14 172:24 193:14 210:2 227:10 243:12 244:8
**door** 57:24 90:14 94:7,13 101:12,24 102:2,5,10,11,13,14,16,17 105:13 127:20 136:5,7 271:16
**doors** 84:5 101:12,23
**doorway** 104:21 105:6
**dot** 215:19
**downstairs** 135:15,20 149:5
**draft** 176:8 213:4
**drafted** 175:22
**dragged** 267:2
**dress** 88:14 106:14
**drinks** 122:23
**drive** 9:8 91:11,21 284:9
**driven** 271:17
**drug** 17:11
**drugs** 199:8
**due** 137:13 151:17 196:12 197:18 247:22 249:7
**dues** 24:10
**duly** 10:7,10 283:12 284:17
**duty** 27:11 30:11 68:23 69:19 113:7 137:1,10 138:16 140:19 142:4 143:13 144:7,15 149:19 152:2 154:13 165:1,2 168:11 169:6 170:3,4,9 173:20 177:21 181:4,17 182:2 193:14 198:13 200:17,21 208:14,15,19 219:19 225:3,5,16 227:14,17 228:22 229:15 235:22 236:2,10,13,23 241:21 242:2 246:2 247:7,19,24 249:7 260:1 265:13 268:10 273:5,8,12 279:14
**dysfunction** 258:21,24 260:8

**E**

**e-mail** 31:21 32:13,14,15 33:13 34:10,11,14,15,18,22,23 35:2,5,6,7,10,24 37:22 39:15 40:2,7,8,20 58:18 59:20 61:20,23 62:1 118:23 120:16,18 154:8 155:4,23 156:13 162:21,23,24 163:1,10,14,19,23 172:2 175:7 178:21 184:14 186:9,11,13,19 189:22,23 191:24 192:13 193:1 205:5 207:24 208:6 212:21,23 213:14 214:7 215:3,17,22 216:10,11 217:8 223:8,9 224:17 226:19 230:2 234:19 250:17 255:9 256:19
**e-mailed** 177:5,6
**e-mails** 43:13 121:22 122:2 177:7 217:3,6 247:13,23
**ear** 53:11 89:15
**earlier** 61:5,7 93:20 94:9 104:6 119:15 120:3 138:20 169:4 255:1 258:17 276:18 278:15 280:16
**early** 109:24
**earned** 30:24 202:22
**ears** 138:3
**easily** 92:15
**Eastern** 283:3 284:12
**Educated** 279:19
**educational** 14:11
**EEOC** 233:4
**effect** 44:24 133:16 139:14
**effective** 56:2,5 119:8,21 236:24 237:1
**effectively** 55:1 230:4
**effort** 241:17,20 254:19
**elapsed** 107:4
**electronic** 18:14 19:12 35:23
**else's** 145:8
**emergency** 18:16 20:12 120:24 123:24
**emoji** 122:20 123:5
**employed** 143:10 246:10
**employee** 26:4 118:12 221:8 223:2,13 224:22 236:1,4,9
**employee's** 223:15
**employees** 25:13 178:6
**employer** 38:17 199:10,15,21,23 202:6 223:12,14 236:1,6,11 259:1 260:13
**employment** 26:15,17,21 28:10,16 202:12 203:17 207:2
**enclosed** 210:21
**end** 29:16 64:5 65:22 89:19 90:15,22 106:22 114:3 129:10,11 132:13,14 158:11 159:13 160:9 163:2 171:15 186:20 201:23 204:1,12 226:4 246:23,24 259:10 262:9,12 263:10,14 264:5,10 281:23
**ended** 47:11 184:1 261:19
**ends** 29:19 257:22
**enforcement** 14:20
**engage** 158:12
**engaged** 13:22 27:10 29:4 32:16 42:4 47:21
**engagement** 201:22
**engaging** 200:10
**enter** 127:2
**entered** 144:4 151:3 157:7
**entire** 75:12 81:23 82:21 129:5 139:21
**entitled** 131:1 241:6
**entrance** 94:9 126:15
**entrances** 60:15 125:19
**environment** 38:16 41:5 73:22
**EOBS** 239:8
**equal** 74:21
**ER** 87:8,9
**ERT** 123:22,23
**escorted** 56:17
**establish** 176:14
**established** 94:3 181:13 209:14 218:10 231:16
**estimate** 75:24
**et al** 9:10 283:9 284:15
**evaluating** 247:1
**evaluation** 165:2 200:17,22 208:15 210:4 221:19 225:3 227:8,17,20 228:2 229:14,15,19 236:3,4,10,13 248:2
**event** 43:15 59:12 82:16 236:9
**events** 43:15 60:5 70:8 80:23 195:23
**eventually** 17:11,14,15 44:2 47:11 158:20 244:19 248:1
**exact** 80:10 183:18 233:10
**exam** 142:4 152:2 181:4 182:3 227:14 228:6 246:3 273:5,12 279:14
**examination** 10:12 68:23 69:18 143:13 150:8 218:11 257:17 262:18 265:14 274:2
**examinations** 225:5
**examined** 10:10
**examiner** 75:21 78:2,24 79:12 144:7,15 149:20
**exams** 170:9 173:21 241:22 242:2 273:8
**exceed** 85:9
**exceeded** 86:21
**Exchange** 16:10
**excited** 269:12
**excuse** 79:1 110:4 114:10 125:3 183:20 246:16 250:1 255:14 263:22 271:14
**execute** 221:20
**Executive** 216:8
**exhibit** 31:14,16,20 37:15,17,21 42:2,3 57:3 58:5,6,13,18 67:18 68:16,18,22 69:23 80:13,15,19 91:10,13,14,19 92:2,5 112:15,18 114:12 116:14,16 117:1 118:18,22 121:17 142:3 154:3,7 155:18,22 157:18 162:16 170:14 171:21 172:1 175:2 178:17 179:23 186:5 189:3,17 191:18 192:20 194:15 200:1 207:19 212:16 215:6 219:9 222:2 224:11 226:11 231:19,23 233:15 234:15 237:13 245:4,13 250:12 255:5
**exhibits** 178:14 256:5
**expect** 113:21
**expectation** 45:18
**expects** 76:9
**experience** 169:23 272:1
**experienced** 196:13 197:19
**experiences** 143:8
**experiencing** 196:6 260:4
**explain** 76:4 85:3 123:14 242:5 251:7
**explained** 12:19 70:21 71:2 142:13 143:11 257:19
**explaining** 73:20 255:18
**explanation** 122:19 143:14
**explicitly** 217:15
**expressed** 207:12
**expressing** 38:12
**extended** 97:19 225:17
**extent** 130:4
**External** 40:16 60:12 120:10 124:5,8 155:15
**extra** 112:14

**F**

**face** 105:19 122:20 241:9,11 249:1 272:19
**facility** 246:6
**fact** 22:19 24:11 37:3 46:2 64:9 65:8 69:11 95:8 115:8 119:11 144:14,16 147:4 148:24 151:17 165:3 168:6 171:3 176:12 200:20 208:9 216:21 224:4 230:15 235:2 240:15 247:9 251:18 255:17 262:20 263:2 266:16

**factors**
73:21 196:2
**facts**
79:12 115:9 144:16, 19
**fail**
286:15
**failed**
165:8 236:13 242:13,17
**fair**
12:2 29:3 105:1 113:22 124:13 176:8 193:13 221:13
**false**
268:9,14
**familiar**
212:11
**fast**
230:8
**favor**
12:16
**fear**
36:11
**February**
189:9,21 190:24 191:23 192:2,24 200:3,4 201:17 207:24 208:10 213:2 216:16 259:19
**feces**
41:9
**feel**
89:8 129:24 142:20 230:19 240:22 249:20 261:2,13 268:11,13,16 280:14
**feeling**
65:2 94:21 272:8,11
**feelings**
66:23
**fees**
186:24
**fell**
184:3
**fellow**
97:15 104:8 269:13
**felt**
32:18 33:23 42:6 74:11 134:22 143:9, 13 147:14 148:5,7, 16 193:21 195:14 266:15 267:6,23 268:12 269:22
**FEMA**
15:8
**fence**
272:19
**fetal**
103:22
**fewer**
24:14 103:10
**FFD**
75:20 79:12 155:7 178:10 184:24 187:11 195:17 197:6,21,22 209:19 210:4,18 212:11 218:5,11 221:19,21 243:18,24 250:19,21 255:14 269:5
**fiance**
261:18
**fight**
43:22 44:6,13,16,20, 21 45:9,22 46:3 50:9 71:5 74:8 75:21 76:7 85:4 86:13 93:9 95:2,10,19 96:17 104:7
**fighting**
45:8,10
**figure**
21:20 149:1 256:5
**figured**
158:22 196:23 248:1
**file**
26:1 60:7 181:7 186:22 217:23
**filed**
25:9,12 26:9 82:8 108:4 160:1 178:3 202:6 233:4,7,20,21, 22 234:2
**filing**
108:14 247:19
**fill**
17:4 33:2,3 42:11,20 43:8
**filled**
251:15,18
**filling**
33:1,23 42:7
**Final**
234:22 235:3,12,16
**finally**
13:9 75:2 148:18 223:23 243:13
**find**
52:23 60:3,11 119:7 141:22 192:7 197:9, 11 238:15 257:7
**fine**
67:11 92:15 136:24 137:2 213:22
**finger**
47:6 64:2 76:19 275:8
**finish**
12:21 24:1 39:4 56:2 61:7 115:6 116:8 169:13 177:11 199:3 240:23 253:2
**firearms**
15:8
**fit**
27:18 140:19 263:8
**fitness**
27:11 68:23 69:18 142:4 143:13 144:7, 15 149:19 150:8 152:1 165:1 168:11 169:6 170:2,4,9 173:20 177:21 181:4,17 182:2 193:14 198:13 200:17,21 208:14,19 219:19 225:2,5,16 227:14,17 228:22 229:15 235:21 236:2,10,13,23 241:21 242:2 246:2 247:6,18,24 259:24 265:13 273:5,8,12 279:14
**flipping**
193:12
**flirting**
124:14
**floating**
190:16
**focus**
198:14 216:10
**follow**
53:12 81:4 262:8
**footing**
272:18
**FOP**
24:17
**force**
187:19
**forced**
183:9 218:1
**foregoing**
283:15 284:24 285:4
**Forensic**
68:24 142:5 256:23
**forget**
57:24 62:5 149:12 195:6
**forgot**
94:18 149:8 173:15 208:5 252:23 266:21
**form**
30:1,18 32:18 33:1, 12,23 35:18 42:6,10, 11,13,18,20,22 43:6 54:2 58:19 59:15,17 64:11 68:3,4 77:14 78:3 79:14,15 80:9 97:17 107:7 109:7, 17 124:17 130:24 144:18,23 146:13,15 147:22,23 151:13 152:17 153:5,6 161:13,18 168:12 173:4,5,6,7,11,22 179:4,20,23,24 180:4,12 181:1,19 186:15 187:3,14 188:4 190:4 209:5 210:24 211:1,7,13 212:1 217:18 218:7, 12 219:1 222:12 223:3,14 239:20 245:16 246:15,18, 19,22 247:11 250:19 251:14,15 255:15 257:4 258:2 260:10 269:13 271:3,19 274:22 279:15
**formal**
111:18
**forms**
140:6,15 152:23 153:1,14,22 160:21 161:3 162:13 165:3, 7 172:8,17,24 173:2, 5,14,19 174:6,8,12 180:4 189:24 190:24 191:2 208:2 209:9 210:11,22 211:21 212:9,23 217:16,17 218:16 221:20 222:21 225:21 227:8
**forthcoming**
261:6,10
**forward**
155:3 171:3 280:24
**forwarded**
120:14,15,17 157:24 170:23 189:9 191:9 286:16
**found**
136:24 138:16 139:17 140:19 205:9 230:23 249:6 268:10
**foundation**
33:24 39:21 93:14 109:17 111:21 112:12 144:23 152:17 168:12 172:20 180:6 247:11 259:2
**foundational**
72:14
**frame**
146:14
**Fraternal**
24:18
**freaked**
49:3
**Friday**
154:9
**friend**
32:8 188:23 235:15
**friends**
264:8,14,19 265:1,9, 16 266:5 267:10,18 268:4
**front**
57:10,11 67:18,19 89:10 96:5 101:15 133:8 170:22 186:11 239:12 278:14
**frustrated**
132:4 249:11
**frustration**
260:6 262:4
**fucker**
49:21
**full**
10:23 69:24 77:19 86:17 95:5,6 142:11 264:1
**fully**
286:16
**functioning**
259:9,13
**functions**
84:4
**furthering**
243:14

G

**gain**
67:6
**Ganon**
47:15 49:13,16 56:6, 22 83:19 84:21
**Ganon's**
49:14,19
**gave**
51:24 53:7 54:15 132:9 149:7 153:2,4 162:2 172:18 174:12 205:6 256:2
**general**
17:5,8 41:5,22 93:12 232:2,7,12,17
**generally**
72:24
**gentleman**
99:23 100:11,13,14, 20 103:17,20 104:15 272:7
**Gestures**
137:4
**getting--**
177:10
**girlfriend**
13:24 14:6 201:17 259:18
**give**
28:1 40:23 43:23 52:8 54:11 61:18 122:24 141:22 161:6 162:6,8 174:15 194:5 197:2 206:5 240:16 241:6 247:20 255:24
**giving**
225:20 268:6
**glad**
134:23
**glasses**
118:16
**goal**
195:21
**Goldstein**
69:9,12 254:2,4,22 260:4 262:14,23
263:6 264:17 265:7, 14,15
**good**
10:14 13:17 39:8 49:24 82:3 121:8 122:16 141:23 143:5 204:14 205:1 234:11,13 260:17 272:5 273:24 278:4
**Gotcha**
82:11
**Government**
283:9 284:14
**grades**
14:13
**graduate**
15:15
**graduated**
17:24 23:1
**great**
56:8 198:16
**greatly**
41:1
**Greer**
32:18 33:11,22 35:18 36:24 42:5
**grievance**
25:9,12,19,22 26:1, 10
**grievances**
26:6
**grieve**
159:5 168:24 169:8, 11
**ground**
11:23
**Group**
68:24 142:5 256:23
**guarded**
40:10
**guess**
13:13 17:11 40:23 47:22 49:22 54:5 59:23 67:4 72:13,21 76:2 99:11 129:20 130:6 133:12 136:9, 10 148:16 190:15 205:7 279:19
**guessing**
97:24 110:13
**gun**
23:13
**guns**
40:11
**guts**
241:14
**guy**
51:22 193:23 272:6 280:15
**guys**
91:12 130:7,13 255:24 278:22 281:16

H

**Ha**
124:21
**habits**
149:12
**half**
51:20 53:15,22 56:8 85:10,18,19 87:21, 22 88:3,14 160:6 249:5 266:19
**halfway**
216:11
**hallway**
58:1
**hand**
58:9 76:10 100:1 114:11 285:13
**handcuff**
104:24 105:1
**handcuffed**
45:11,14,15 46:4 84:14 103:15
**handcuffing**
83:4,19
**handcuffs**
72:5,10 83:8,20 96:1,4 97:11,14 99:4,24
**handed**
31:19 37:21 58:17 68:22 80:19 116:24 118:22 121:21 154:7 155:21 162:20 170:18 172:1 174:16 175:6 178:20 186:9 189:6,21 192:24 194:19 212:20 215:17 224:15 226:18 233:19 234:19 237:17 245:12 250:16 255:9
**handing**
17:6
**handle**
66:15 169:21
**handled**
44:1
**handling**
77:13,16,23
**hands**
65:3 79:2,5 181:9 246:24
**happen**
31:10 34:3 36:21 44:21 45:2,22 66:10 67:16 114:22 115:2 169:23 192:14 205:11 261:2,3 266:11,17 267:24 275:13 277:8
**happened**
47:1 48:20 49:12 52:16,21 53:7 68:8 70:16 79:10 80:10 99:7 101:3 104:5 109:11 126:20 127:4,13,22 128:10, 24 130:12 134:18 136:15,21 137:12,16 139:1,2,13 140:9,22 141:12,15,18 150:4 152:23 165:4 177:23 178:3 200:13 242:6 249:10 254:8 270:1, 11 275:11 279:1
**happening**
36:11,12 60:6 114:22 115:3 121:2 138:13 149:4 189:12 194:7 195:16 197:12 269:17
**happy**
13:3 214:15 257:8
**harassing**
67:1
**harassment**
114:21 181:7 185:6, 10 188:12,20 231:4
**hard**
66:23 79:18 274:9
**hardware**
15:20 16:12,13,18
**head**
148:24 197:13 266:23

**heading**
228:11
**headset**
16:3
**health**
164:23 172:12 180:1 187:5 209:4 211:5 246:5 250:22
**Healthcare**
172:14 190:9 209:3
**healthy**
200:8
**hear**
34:8 79:19 133:1 274:1
**heard**
10:15 79:24 122:5, 12 209:22 266:24 270:3 271:6
**hearing**
79:18 254:15
**heart**
161:20,23
**heated**
278:7
**hectic**
278:8
**heels**
88:15
**helpful**
22:16 51:4
**Henretty**
9:24 13:15 47:24 79:23 80:3 141:1 144:3 155:9 157:6 186:2 219:11 248:18,22 256:2 273:20,23 274:3,5, 23 278:3 279:22 281:13,16,19,21
**hereinbefore**
285:7
**hereto**
211:7
**heretofore**
284:7
**hereunto**
285:12
**Hey**
168:2 278:15
**high**
14:12 15:15 17:12 199:16,17,20
**highest**
48:23 54:22 66:13 280:15
**highlight**
40:1
**highlighting**
39:12
**HIPAA**
153:14 172:11 173:6 179:3,20,24 180:24 186:15 187:4 190:4 208:2 209:3 211:4 212:23 217:9 221:20 222:12 223:13 225:8 230:20 232:3,18 238:23 244:17 245:15 252:9 255:14 257:4
**hit**
49:3 277:6,18
**hitting**
47:12 275:8
**Hogueisson**
194:22,24 195:8 201:10 212:8 227:5 229:16 253:22 258:3 259:22
**hold**
57:4 96:20 230:7
**hole**
41:2,3
**home**
153:24
**Honingford**
10:2 273:17 281:15
**hope**
36:4 38:3 201:14
**hoping**
36:17 194:3 212:13
**hospital**
45:21 279:1
**hospitalized**
199:2,4
**hospitals**
123:20
**hour**
125:23 160:6 203:5
**hours**
27:14 92:9 113:21
**house**
15:21
**HR**
68:14 125:12,15,21 126:10 143:9 147:8 149:2 155:6 156:9, 17 160:18 164:19 166:23 167:2,10 170:8 173:17 174:9 181:17 182:8,20 190:13 191:3 212:23 215:12,19 216:2,8 220:8,15,22,23 221:2 246:21
**Human**
142:12 150:23 154:13 221:7,14 262:12 264:2,16
**Hundreds**
60:18
**hung**
101:5
**husband**
195:5

**I**

**i.e.**
200:11
**idea**
110:24 112:12 147:10 220:3,5 254:23 265:3 280:6
**identification**
31:17 37:18 58:14 68:19 80:16 92:3 112:19 116:17 118:19 121:18 154:4 155:19 157:19 162:17 170:15 171:22 175:3 178:18 186:6 189:4,18 191:19 192:21 194:16 207:20 212:17 215:7 219:10 222:3 224:12 226:12 231:20 233:16 234:16 237:14 245:5 250:13 255:6
**identified**
117:20 118:5 253:14
**identify**
9:11 117:3 251:20 253:17,22
**IDS**
19:24
**ILCS**
238:21,22
**illegal**
188:4
**Illinois**
9:4,8 238:22 283:2 284:1,6,9,12 285:20 286:2,6,18
**illness**
246:7
**imagine**
48:22
**immediately**
102:12 136:23 184:16 185:3 186:20
**implies**
39:21
**important**
41:12
**impression**
76:6 247:22 269:15
**improper**
88:24 173:9
**inaccurate**
115:20 147:21 216:20
**inc'**
261:14
**inch**
86:18
**incident**
50:7,8 59:1 61:12 66:7 67:20 70:5,9 71:3 82:2,6 85:1 90:15 92:23,24 93:23 107:5 150:11 159:8 175:12 176:18 181:9 186:1 266:20, 22 279:19
**incidents**
41:12
**include**
41:23
**including**
218:1 239:2
**income**
202:11,16 204:9
**Incoming**
124:24
**inconvenience**
196:20
**independent**
225:4 227:1 252:24
**indestructibull**
163:2
**indestructibull@ yahoo.com**
163:9,22 189:23 191:24
**indicating**
66:9 84:20 229:7
**indication**
119:17
**individual**
121:6 179:11 258:3
**individual's**
223:4
**individuals**
96:17
**inflamed**
144:11 145:12 147:12
**inform**
189:12 266:11
**information**
41:12,13 50:19 114:23 118:9 130:20,21 131:2 132:7 161:17 172:12,14 180:1,23 187:6 190:9 208:12 209:3,5 211:5,19 235:15 246:1,8 251:19 255:11 256:21 269:9,10
**information/plan**
196:11 198:1 200:7 201:16
**informed**
164:23 171:14 208:13 225:2 268:7 269:8,18
**informing**
209:16
**initial**
114:13 115:23 262:18
**injunctive**
217:24
**injured**
272:15
**injury**
272:16
**inmate**
45:23 50:9,14 51:14, 17,18,19 52:8 54:19 57:12 64:5,13,17 76:17,19 85:23 86:11 93:9 95:24 96:3 104:6,16 107:13,14,15
**inmate's**
53:11
**inmates**
50:18 51:8,15 53:3 55:8 64:10 83:7 85:8 86:14,20 89:10 94:10 95:11,18 99:15 102:11 103:10,14 123:17, 20,22 130:2 278:23
**innocent**
266:9
**inpatient**
239:2
**inquiry**
129:20 130:22
**inside**
94:4 109:5,11
**insisted**
147:14
**insisting**
262:10
**insists**
147:13
**insomuch**
39:21
**insufficient**
73:13
**insulting**
64:1
**insurance**
31:5
**intake**
87:10 195:24 228:16 258:13
**integrity**
240:17,23
**intend**
219:19
**intense**
147:12 149:11,13
**intention**
36:3 171:13
**interaction**
47:4 51:11 71:12 87:3,15 117:7 178:11 208:20 269:5 279:4
**interactions**
121:12 279:7
**interested**
285:10
**interim**
261:15,17
**interpret**
77:15 249:14 272:2
**interpretation**
49:22
**Interrogatories**
117:2
**interrupting**
241:7
**interruption**
191:12 206:2
**intersection**
108:13
**interview**
70:1,4 81:7 82:7 183:18,23 195:13 228:5,16 254:12 260:3 263:7 268:20 269:16
**interviewed**
75:20
**interviews**
17:10 281:8
**intimidated**
269:12
**intimidating**
132:1
**intonation**
130:6
**Inventory**
228:7
**investigated**
63:1,4 281:7
**investigates**
147:8
**investigation**
59:21 61:21 62:9,11, 14,22 67:2 80:22 81:2 119:18 120:7,8 146:8 147:3
**investigations**
82:13 183:18 184:10
**investigator**
19:16
**invoice**
237:22
**involved**
25:3 46:3 49:18 175:19
**involvement**
254:18
**Isaac**
68:24 142:4 256:23
**issue**
26:10 169:21 222:19 224:23 258:7
**issued**
164:2
**issues**
74:1 198:2
**item**
231:8,11
**itemized**
239:8

**J**

**Jack**
39:8 40:12
**jail**
41:3,13,21 45:21 48:21 55:21 60:1,13, 14,18 122:9 123:17 125:19 126:15 258:6 277:21
**James**
132:15 136:17 138:17 146:21 153:2,22 156:16 157:24 170:23 172:6 249:4
**January**
186:12 216:23 252:20
**JDE**
81:8
**Jesse**
91:7 103:5 106:1 110:18 112:16
**Jessica**
170:20
**job**
18:2 19:3 23:14 27:2,9,13 43:1 49:24 53:12,16,24 54:24 55:3 56:19 67:10 84:2,7 88:16 89:16, 21 130:5 142:20 169:24 197:8 243:5 271:23 278:11
**jobs**
28:14,24 257:22
**John**
9:7,15,17 10:8 11:1 31:22 32:6 34:20 37:23 81:7 108:23 163:1 179:2,4,8 186:16 226:21 229:14 234:20 237:21 238:8 283:5, 12,17 284:10,13,16 286:5
**Johnson-green**
133:23 134:1 136:11 149:6,16,20
**join**
17:1
**joined**
16:20
**Jones**
177:24 266:10
**Jones-hayes**
44:3 46:1 48:5,8,11 51:13 52:19 54:11 57:9 59:8 60:8 62:17 64:2 65:20 70:5,9,18 71:4,13 76:5 79:2 85:2 87:4 93:24 105:22 106:13 107:3 108:9,14 117:8 121:12 138:23 150:11,18 152:3 167:9 178:1,11 181:8 182:19 185:4, 10 188:11,19 208:21 231:13 264:7,14,19 265:8,16 266:5 267:9,19 268:3 270:11 271:2 274:6, 20 275:5 277:10,13 278:19 279:7,14
**Jones-hayes'**
270:1
**Jones-haynes**
10:1
**judgment**
240:23 241:10
**judgments**
243:6
**July**
234:21 235:13 237:18
**jumbling**
148:24
**jump**
272:7 274:12
**June**
20:6 29:13 204:5 235:8 238:5 243:11

**jurisdiction**
23:9
**jury**
230:23

**K**

**Karen**
216:5,6
**Karolina**
194:22,24 258:3
**keeping**
177:18 192:4
**Kehr**
91:7 102:23 106:23
**Kelly**
121:23 122:8 193:2, 5,6
**kind**
15:2 16:5,15 21:19, 22 27:19 33:17 34:1 44:14 47:21 49:1,3,6 50:13,15,17 51:24 53:4,8 57:23 60:15 66:1 76:18 84:16 91:10 103:2 124:14 131:23 132:9 136:3 142:23 149:7 154:22 167:24 176:2,6 252:22 253:20 275:10,11,12 276:5 277:3,17
**kinds**
18:9 74:1 158:8
**KING**
284:4 286:23
**Kleenex**
96:22
**knew**
114:24 137:22 138:22 182:1 210:17 263:3 270:10 271:9, 15
**knowing**
135:17
**knowledge**
12:5 46:11 68:7,12 115:9 120:6 128:21 181:14,24 182:5,12, 17 274:17
**Kramer**
179:1 186:14 215:24
**Kroll**
200:21 224:7 227:1, 4,7,12,18,23 228:21 229:7,21 259:23 273:10
**Kurtz**
159:15,18 174:15,17 178:22 186:10 212:21 215:18 219:17,18 221:18 222:6 224:17,21 230:3,4 232:1 238:2 239:17 246:21 255:1
**Kurtz'**
107:24
**Kurtz's**
184:14

**L**

**l"s**
163:2
**label**
65:12
**labeled**
101:22
**lack**
85:6
**ladies**
249:16
**lady**
133:8,16,22
**language**
236:8
**Lasalle**
9:3 286:1
**late**
259:19
**law**
14:20 115:21 286:10
**lawsuit**
25:3,4,19 108:4,15 159:22 202:6 231:7, 9 233:8,20 234:2 247:19 262:9
**lawsuits**
115:5 160:2
**lawyer**
211:1 219:24 221:18 238:2 239:14 243:10 244:18 245:20
**lawyers**
13:4
**lay**
271:20
**lead**
148:11
**leading**
57:5
**leaned**
53:10 89:6
**learned**
55:8 112:7 241:23
**leave**
16:11 136:1 145:16 150:7,24 179:18 187:20 222:11
**leaving**
105:15 144:10 145:11 151:7 258:1
**led**
148:14
**left**
51:18 96:3 101:13 102:5,15 103:20 107:11 135:16 141:2,19 148:2,22 151:15,24 152:23 155:10 160:18 165:16 166:10 174:9
**left-hand**
93:18 105:6
**legal**
9:2 115:12,19 159:2 180:10 183:4 187:18 225:8 237:3
**Lehman**
9:1,2 10:4 37:8,12 90:21 91:3 112:22 113:3 160:8,13 226:3,13 256:10,14 263:13,18 281:23
**Leroy**
120:18
**lets**
281:7
**letter**
164:9,13 166:19 169:17 170:18 171:4,9 189:8 191:22 192:5,7 207:23 208:2,10 209:15 212:23 214:1,5,6,10,14 215:1 216:16,21 221:5 225:13 238:2 255:18 256:21 268:15 286:12
**letting**
121:8 133:20 135:22 156:18,19,20
**level**
48:21 55:5 200:11
**levels**
200:9
**liability**
161:19
**liars**
250:4,10
**lies**
240:11 249:9
**Lieutenant**
32:17 33:11,22 35:18 36:24 42:5 48:4,8,10 125:19 154:19 155:15 204:13,15,19,21 205:6 206:8
**life**
241:9 258:20,23 260:5,8
**limit**
252:16
**limitation**
222:13,20,21 252:2
**limitations**
222:14
**limited**
83:6 253:2
**Linden**
9:16 11:8 25:16 30:1 33:24 35:19 39:20 42:13,22 54:2 58:7 64:11 72:13,21,24 73:5 77:14 78:3 79:15,21 86:5,9 88:21 91:15,17 93:12 97:17 104:23 105:3 107:7 109:7,9, 17 110:16,19 111:21 112:2,10,20 113:5 114:2 115:11 116:1, 18 117:21 124:17 125:4 130:24 144:18,23 145:5 146:13 147:23 148:13 151:13 152:17 160:7 162:6 165:19 168:12 172:20 173:7,22 178:14 180:6 181:19 183:4 185:15,24 187:13 191:13 192:17 198:19,21 202:23 203:4,13 213:6,9,16,20 214:16 215:8,13 217:18 218:7,12,15, 19,21,24 219:5 220:9,16 230:7,14 233:22 234:6,9,13 237:2 239:20 241:6 242:24 245:6,8 246:19 247:11 248:13,20 250:5 255:21,23 256:4,8 259:2 260:10,22 261:7 263:12 266:6 267:15 270:13,18 271:3,18 273:2 274:22 279:15 281:18,22
**list**
17:12 114:18 184:2, 4 228:7
**listed**
175:17
**listen**
54:21 55:10
**listening**
200:12
**literally**
41:10 86:15
**litigation**
9:3 118:11 194:21 244:9 286:1
**live**
11:4 40:9
**local**
235:4 283:9 284:14
**location**
73:22
**locking**
84:4
**logic**
168:1
**LOL**
123:4
**long**
16:7 17:18 23:19 29:14 46:19 56:24 75:11 82:16 131:16 132:18 134:8 136:12 201:24 206:15 236:4 243:22 247:20 273:24
**longer**
33:3 196:17 205:7
**looked**
49:6 51:20,24 94:24 124:3 140:8 196:18 200:3 211:14 212:2, 3 248:7 258:17 267:23
**Lopez**
100:4
**lost**
183:10,15 233:12 272:18
**lot**
15:6 28:18 29:19 33:18 34:2 36:9 38:22 39:14 40:3 48:22 75:23 85:5 99:13 195:11 272:1 274:14 278:7
**lots**
60:19 124:1
**loud**
276:13
**luck**
204:14 205:1
**lucky**
122:6,13
**lunch**
113:15 114:6 122:23 168:6
**luncheon**
160:11
**lungs**
276:16
**Lyle**
9:24 141:1 144:3 155:9 157:6 274:4

**M**

**M.D.**
238:6
**machine**
177:2,3,8
**mad**
90:13
**made**
44:18 51:16,17 57:17 112:1,5 114:24 116:5 153:2, 21 173:17 174:13 177:12 182:18 188:19 231:12 238:20 241:17,20 242:21 243:21 249:18 250:8 252:22 262:10 267:17 268:2 269:19 275:13 280:7,8
**mail**
208:4 286:3
**main**
125:18 126:14
**major**
24:5
**make**
11:14 17:12 29:18 45:1,6 50:20 55:6,14 56:14 58:10 60:2 65:16 71:15 72:13 74:20 82:4,21 93:12 101:10 108:6 111:13,18 113:11 131:9 165:4 176:18 215:8 240:11,22 241:10 243:2,6 249:9 256:6 257:22 266:4 268:4 271:13 279:24 280:9 286:15
**making**
262:13 268:9,13 275:14
**man**
53:5 98:12 103:22, 23 122:10 123:5 205:4 227:23
**manacled**
74:2,13
**manacling**
71:21 72:2,4
**management**
246:9
**manager**
246:9
**managing**
198:17
**mandated**
143:12
**manner**
54:15 147:16 181:10 195:14 208:23
**March**
82:5 210:4,12 213:6, 7 215:22 219:17 222:5 224:4,18 225:15,17 226:19 227:21 231:24 233:4,7,21
**mark**
31:13 37:14 57:3 68:16 80:12 91:9,13, 18 112:15 116:14 122:19 137:19,22 138:2 155:23 158:21 169:15 170:24 184:3 232:19 266:20
**marked**
31:16,20 37:17,21 58:9,13,17 68:18,22 80:15,19 92:2,5 112:18 116:16,24 118:18,22 121:17,21 142:3 154:3 155:18, 22 157:18,22 162:16,20 170:14 171:21 175:2 178:17 186:5 189:3,17 191:18 192:20 194:15 207:19 212:16,20 215:6 219:9 222:2 224:11 226:11 231:19 233:15 234:15 237:13 245:4,12 250:12,16 255:5
**marks**
88:22 281:23
**MARLENE**
284:4 286:23
**Marmor**
9:18 10:13,14 11:10, 11 12:15,17 13:13, 17,18 25:18,20 30:2 31:13,18 34:7 35:21 37:6,14,19 40:4 42:16 43:9 48:2,3 54:7 57:1,7 58:5,8, 15 63:18 64:15 68:16,20 72:16,19, 23 73:3,6 77:18 78:9 79:17,19 80:4,12,17 86:7,10 88:5,9 89:1 90:19 91:6,16,18 92:4,11 93:3,5,16 95:21,23 96:7,9 97:3,4 98:4,19,20 99:1,2,21,22 100:7, 8,16,17,22,23 101:7, 9 102:19,24 103:6 104:3,4,12,14,19,20 105:1,4,10,11,17,20 106:1,3,22 107:1,9 108:17,21 109:10,22 110:18,20,23 111:23 112:3,4,13 113:18 114:8,9 115:22 116:2,4,14,20,22 117:24 118:3,15,20 121:15,19 124:18 125:5,7 131:5 141:6 144:6,20 145:2,9 146:15,18,22 148:6 149:18 151:9,19 152:21 154:1,5 155:13,16,20 157:12,20 160:5,16, 23 161:1 162:5,8,11, 18 165:21,23 168:15 170:16 171:19,23 173:1,12,23 174:1, 23 175:4 178:15,19 180:9 181:23 183:8 185:19,23 186:1,7 187:16 189:5,19 191:14,20 192:16, 18,22 194:17 198:20,22 199:1 202:24 203:1,6,15 206:4,7 207:17,21 212:18 213:7,13,17, 22,23 214:19,21 215:4,15 217:20 218:8,14,17,20,23 219:2,6,13,14 220:13,19 222:4 224:13 226:1,16 229:1,5 230:13,15, 17 231:21 233:11, 17,24 234:1,8,11,17 237:5,7,11,15 240:1 241:16 243:8 245:7, 10 247:3,15 248:15 249:23 250:14 255:7,22,24 256:3,6, 9,16 257:13 259:5 260:19 261:4,11 263:11,21 267:4,16 270:15,21 271:7 272:10 273:3,15,18, 22 278:1 281:20
**married**
13:19,21 195:3
**Martiniak**
120:18
**Mary**
118:23 154:8
**Matt**
153:17,20 167:14

**matter**
9:9 38:19,24 53:18 55:23 56:4 85:11 199:15 220:1 230:14
**matters**
26:10 53:24 147:9 262:7
**Matthew**
9:19,22
**Matthias**
188:22 189:9
**maximum**
75:3,7,22 95:4
**Mccorkle**
9:3 286:1
**Mcquillan**
118:24 154:8
**meaning**
77:22 165:15 184:15 229:12
**means**
24:4 49:22 77:16 97:20 120:6
**meant**
48:4,10 73:7 78:15 155:3 157:15 168:20 184:16 207:11
**mechanisms**
200:8
**Med**
32:10,21
**medical**
33:8 74:19 94:12 161:10,11,14,19 168:18 180:13 187:20 189:24 217:9 222:12,13 223:3,5, 13,15,20 225:14 227:9,13 228:21 229:8 232:4 237:20 239:1,18 240:5,7,9, 12,16,17 243:13,23 245:20,24 246:7,22 247:20 250:22 251:13 254:19,21 259:3 262:11,19 264:15
**medication**
13:9 33:7
**medications**
228:11,13
**meet**
29:19 69:11 196:22 257:23
**meeting**
129:7,11 142:12 144:10 145:11,16 150:23 164:20 166:23 167:2,10 170:8 190:14 197:22 209:1 212:8 240:24 249:5 264:2 270:2, 11,24
**meets**
225:8
**Megan**
10:2
**member**
20:24 21:4 119:22 133:7
**memorandum**
119:8 154:10 157:23
**memory**
43:19,20 85:18 86:12 95:2 212:1
**men**
39:8 40:11
**Mental**
228:6
**mention**
187:24 217:12
**mentioned**
138:24 139:3 223:7 274:5 275:4 285:7
**Mercantile**
16:10
**mess**
24:5
**message**
165:16 209:13
**messed**
67:8
**met**
127:7 128:16,18 143:17 145:24 146:12 153:20 167:13 216:5 224:7 240:19 242:20 249:21 265:4,23 267:12
**metadata**
32:4
**Michelle**
250:17 253:6 255:10 256:20
**microphone**
273:21
**mid-november**
258:2
**middle**
11:2 63:24 85:7 94:6,7 211:10
**mild**
258:20
**miles**
23:10
**mind**
73:7 215:13 233:12
**mine**
188:23
**mini**
45:20 228:5
**minute**
126:24 200:24
**minutes**
46:23 75:12 88:6 92:10 104:6 107:8 132:20 134:15 136:14
**misinterpreted**
144:13
**misplaced**
192:8
**missed**
183:17 207:1,8,12, 13
**misspells**
259:23
**misstates**
54:2 109:9 152:18 181:20 218:12 220:9 260:23
**misstating**
218:21 219:5
**mistook**
78:5
**misunderstanding**
21:24 66:21
**misunderstood**
261:16
**mixing**
18:19
**MMPI-RF**
228:6
**mom**
124:12
**moment**
21:6 84:7 95:12 102:21 104:19 137:17 147:1 148:23 152:20 254:1 268:1
**moments**
149:11
**money**
30:21,22 202:20 203:2,8 206:17
**monitor**
56:10,19 74:13
**monitoring**
18:14 19:12
**month**
21:12 158:12 159:11,13
**months**
29:15 139:13 257:20
**mood**
135:5
**Moraine**
14:16
**Morgan**
9:21 12:15 13:13
**morning**
10:14 103:1 124:3 169:4 188:15
**mother**
49:21
**motion**
277:5
**motioned**
277:4
**motivation**
265:4
**move**
43:14 123:21 192:16 274:11 276:24
**moving**
99:15
**multiple**
50:12
**mumbled**
139:19
**music**
200:12

**N**

**named**
31:22 68:12 114:16, 19 121:23 178:24 179:1 193:2 194:22 200:21
**names**
60:22 251:16
**Naringowski**
106:21
**natural**
12:22
**Nawara**
9:7,9,15,17 10:8,21, 22 11:1 13:19 31:14, 15,19,20 34:20 37:16,20,21 42:2 58:12,16,17 67:18 68:17,21,22 69:23 70:7 76:4 77:2,20 80:14,18,19 81:3,7 82:19 83:2,5,18,21 84:24 85:3 91:14,18 92:1,12 93:6 112:17 113:6 114:10,11,12 116:15,23,24 117:8 118:17,21,22 119:6, 20 120:17 121:16, 20,21 141:20 142:3, 8,13 150:6 154:2,6, 7,11 155:17,22 157:17,22 160:17 162:15,19,20 163:1 164:8 170:13,17,18 171:20,24 172:1 175:1,5,6 178:16,20, 21 179:2,8 180:14, 20 181:7 182:24 185:5 186:4,8,9,19 187:4 189:2,7,16,20, 21 191:17,21 192:19,23,24 194:14,18,19 195:22 197:17 199:24 200:1 201:1 207:18,22 208:1 210:23 212:15,19,20 215:5, 16,17 216:20 217:8, 22 219:8,15,16,20 221:3,17 222:1,5,11 223:2,16 224:10,14, 15,22 226:10,17,18, 21 229:14 230:1 231:18,22,23 233:14,18,19 234:14,18,19 237:12,16,17,21 238:8 244:21 245:3, 11,12 250:11,15,16 252:15 255:4,8,9 256:19 257:7,14,19 259:18,22 261:18,23 263:22,23 274:4 283:5,12,17 284:10, 13,17 286:5,7,8
**Nawara's**
216:22 225:1,6,14
**necessarily**
78:16 143:5
**necessity**
225:7
**needed**
26:1 27:13 43:23 78:7 123:22 124:9 169:24 191:7 192:6 197:9,11
**negotiations**
246:21
**news**
234:11
**nice**
49:17 193:23 195:14 197:14
**Nicholson**
39:8 40:13
**Nicole**
138:2,7
**nine-year**
261:19
**Nodding**
28:13
**nonresponsive**
192:16
**normal**
149:12
**North**
9:3
**Northern**
283:2 284:12
**nose**
96:21
**Notably**
262:16
**notarial**
285:13
**notary**
283:22 284:4 285:20
**note**
197:16 200:1,2 201:2 224:1,24 258:19
**noted**
258:21
**notes**
194:20 239:6,7 258:12,14 259:8,12
**notice**
96:20 106:12 113:22 169:3
**noticed**
52:24 272:14
**notification**
180:21 185:4 236:12
**notified**
113:8
**notify**
286:15
**noting**
71:20
**notion**
142:23
**November**
30:11 125:16 151:12,24 154:9 158:1,11 159:9 160:19,23 163:5 164:13,19 166:12 167:3,6,10 169:17 170:21 171:4 172:18 174:10 189:7 191:3, 22 208:13 209:2,16, 17 211:14 212:2 215:2 221:5 242:21 246:15,16 261:15, 17,20 268:16 280:4
**number**
73:20 113:19,20 115:19,20 122:24 124:22 137:21,23 160:2 172:23 193:13 238:10
**numbers**
73:13 142:10
**numerous**
179:15
**nurse**
126:23 127:7,14,23 128:1 129:16 131:18 133:13 135:15 136:10,13,17 137:20 138:5,11,15 140:5 151:24 152:12 164:23 166:1,4,20, 22 167:2,19 170:7, 19 174:9 182:18 190:19 211:9 214:10,14,23 240:19 242:8,22 249:24 250:1,8 251:12 264:6,13,18 265:8, 15 267:9,12 268:3, 12,17 269:1,7,18 271:8,14,17
**nurses**
241:18

**O**

**o-u-r**
41:15
**oath**
283:13
**object**
34:2 39:20 88:21 110:16 112:10 117:21 125:4 130:24 144:23 145:6 146:13,15 165:19 173:7 192:18 213:20 230:8 237:2 273:2
**objecting**
93:15
**objection**
30:1 33:24 35:19 42:13,22 54:2 64:11 72:14 77:14 78:3 79:14,15 93:13 97:17 107:7 109:7, 17 111:21 115:11 124:17 125:6 144:18 145:5 147:22,23 148:13 151:13 152:17 168:12 170:2 172:20 173:22 180:6 181:19 183:4 185:15 187:13,14 202:23 203:13 214:16 215:9 217:18 218:7,12 220:9,16 239:20 242:24 246:19 247:11 248:13 250:5 259:2 260:10,22 261:7 266:6 267:15 270:13,14 271:3,18 272:24 274:22 279:15
**objects**
117:22 118:7
**obligated**
193:21 194:1
**obligation**
115:18 280:24
**Observations**
228:16
**observe**
84:9,10
**observed**
84:16
**observing**
56:14
**obtain**
223:4,14 243:18,22 244:4 254:19
**obtained**
240:8,10 244:8,13 254:10
**obtaining**
240:4,5 244:2
**occasionally**
94:19
**occasions**
195:9 224:23
**occupational**
164:23 241:18
**occur**
113:17
**October**
9:5 58:20 59:16 63:20 119:9,21 122:4 123:7 124:11 283:14 284:7 285:14 286:4,7
**offend**
41:23
**offended**
49:8 65:20
**offensive**
181:10
**offensively**
278:13
**offer**
243:21 258:5
**offered**
70:10 243:17 244:5 246:18 258:19
**offhand**
28:8 103:16
**office**
15:13 16:21 18:10 25:7,10,14 27:11 29:5,22 30:23 34:18 50:3,4 51:1 69:20 93:19 101:13 104:22 105:6,23 107:24 108:7 109:5,12 112:6 121:24 127:6, 14 136:13,16 138:5 141:19 152:1 159:22 160:3 164:24 170:20 173:21 179:10,15 180:12 188:24

192:12 196:21 202:17,21 203:3,11 204:10 215:12,18 217:14 220:1 222:19 223:4,18,19 230:23 233:5,9 235:5 238:12 240:12 243:22 247:4,17,21 275:6 281:2
**officer**
18:4,6 19:6 21:11,14 23:5,7,22 24:6,9,22, 24 26:18 28:11 32:7 42:24 47:15 49:13, 14,16,17,19,23 50:15,16 54:22 56:6, 8,22 57:14 64:21 65:8,11,13,16 66:16 69:19 70:7 75:15 76:4,21 77:1,6,10, 19,21 79:1 84:21 94:11 95:14 96:10, 11,14 98:6,7,8,13, 16,21 99:3 100:4,12 105:8 106:5,10,21 113:6 114:10,16 115:1,16 116:6,8,11 117:13,16,20 118:4 119:6 122:9,10 133:23,24 142:13 149:5 150:10 154:10 176:10,11,12 180:13,20 181:6 182:24 185:5 186:19 193:7 208:1 216:20, 22 217:8,22 222:10 223:2,16 257:19 259:18,22 261:16,18 263:22 269:9,10 276:6 277:15
**officer's**
48:21
**officer/ investigator**
236:12
**officers**
26:14 33:3 38:2,12 40:16 41:19,20 45:5 55:20 56:7,18,24 60:1,10,19 63:4 71:7,19 73:11 74:12 78:6 83:3 85:6 99:13
**officers'**
46:9,10,21 50:6 84:15 230:24
**older**
134:9
**ongoing**
157:4 185:9 259:24 281:9
**Oops**
57:1
**Op**
38:12
**open**
57:24 136:6
**opening**
143:3
**operate**
84:3
**operations**
18:16 20:8 40:16 60:12 120:11 134:7 155:15 204:21
**operative**
239:3
**opinion**
71:18 73:11,21
**opinions**
115:6,7
**opponent**
231:3
**opportunities**
183:11,15 207:1,12
**opportunity**
148:15 207:3,6,14, 15
**OPR**
80:21 81:11,16,24 82:12 129:21,22,23 130:16 131:14 136:19 146:7 147:3, 5,8 149:2 281:4,7
**ops**
19:21 38:2,7,9 59:2, 5 61:5,14,17 119:13 121:11 122:5,12,16 123:6,10,15 124:1,5, 8 134:10
**option**
247:10 262:20 263:3,5
**options**
202:12 203:17
**optometry**
94:17
**oranges**
18:20
**order**
11:9 17:1 24:18 52:8 54:17 80:1,6 84:1 92:6 99:16 143:2 144:10 145:11,16 156:21 157:1 158:6 165:7,12 180:12,14 182:24 183:2,5 196:20 209:5 217:8, 21 221:20 223:12 225:15 230:19 232:2,7,12,17 247:6, 24 258:6
**ordered**
179:18 180:24 181:17 182:2 205:13,20 221:19 223:16 236:2
**orders**
16:3 158:9
**ordinary**
56:15
**original**
32:2 39:12 159:18 233:19
**originally**
22:2 97:16 205:3
**outcome**
285:11
**outlined**
286:18,19
**outskirts**
60:14
**overlapped**
16:15
**overly**
208:22 269:11
**Overruled**
192:17

**P**

**p.m.**
113:4 160:9,14 226:4,14 256:11,15 263:14,19 281:24 282:3
**Packaging**
29:10
**pages**
63:8 197:17 229:13 256:22
**paid**
30:17 203:10 205:3, 5 236:22
**pair**
97:11 99:4,18,24
**panel**
84:3
**paper**
169:2 271:20
**papers**
247:14
**paperwork**
130:14 139:8,23 143:1 147:7 159:5 168:23 182:15 220:5 225:15 242:5
**paragraph**
40:24 69:24 76:3 142:11 143:19 150:6,22 153:10 180:16,17 184:14 187:22 222:10,24 235:20 257:15 261:24 264:1,3
**paralegal**
91:7
**paramedic**
239:4
**Pardon**
234:8
**parenthesis**
262:7
**part**
20:7 65:15 79:7 82:12 87:2,5 108:13 133:4 146:1,14 152:13 168:10 178:7 192:11 195:22 206:8 268:22 278:9,11
**part-time**
257:22
**participant**
175:18
**participate**
177:22 210:8 218:10 225:23 243:17,23
**participating**
209:18
**parties**
115:7,9 119:24 285:5,9
**party**
115:14
**pass**
18:24 32:10,21 183:24 236:10 273:15
**past**
60:4 113:9 133:10 241:23 250:23 252:2
**patient**
195:24 196:1,11 198:1,4,15 200:8,10 201:16 202:4,9 206:24 237:21 238:8,13,15 239:9
**patient's**
244:23
**patrol**
23:8
**Paul**
155:14
**pause**
63:16 95:12 103:5 229:3 257:10
**pay**
19:17 20:2,21 24:10 28:7 36:4,17 187:21 202:13 203:17,18 205:14,19,23 236:1, 10
**paycheck**
203:9 204:14
**paychecks**
206:6
**paying**
30:20 197:9 202:18
**payoff**
36:13,16
**Payroll**
206:9
**PCP**
251:2
**pdf**
186:16
**pending**
13:6 62:9 284:10
**Penney**
132:15 133:2,7 134:12,14 135:8 136:17 137:7 138:10,17 139:1,3 146:3,21 152:13 153:3,7,22 156:17 158:1,5 170:23 171:5 172:6,7 173:13 190:12 211:15 212:3 249:4
**Penney's**
135:10
**people**
12:22 16:4 17:13 23:11 36:22 38:22 42:10,19 45:6,7,10 46:3 47:20 53:3 55:2 59:24 60:19,22 65:17 74:1 75:7,10, 14,17,23 76:1 100:9 121:5,7 122:16 125:12 128:17 132:2 133:18 135:3 142:24 143:3 170:8 183:20 184:1,5,7 193:23 241:12 243:3,4,6 249:2 272:4 279:3 280:24 281:1,7
**people's**
278:10
**perceived**
147:16 188:20 267:19
**perfectly**
240:14
**period**
21:17 22:13 23:19 59:18 89:19 131:19 132:17,18 236:4
**periodically**
92:18 262:5
**permanent**
24:6
**permitted**
154:11
**person**
48:22,23 54:23 66:14 78:15 97:6,8, 12 106:19 117:4 133:3 178:24 179:1 202:2 229:18 232:23 247:1 248:3 249:6 268:7 269:15,16
**personal**
12:5 68:7,11 115:5,7 163:10,19 180:13 181:14,24 182:5,11, 17 185:20 187:19 240:12 264:7,14,19 265:1,9,16 268:4 269:5
**personally**
209:23 284:8
**personnel**
67:24 119:7 175:19
**persons**
117:4
**pertaining**
128:9
**Peter**
9:14 148:1 151:2 179:1 215:24
**phone**
50:1,16,21 52:15 84:9 107:3,6 111:3 117:5 124:22 137:21,22 138:1,2 172:23 191:13 251:6 253:8 279:24
**phrased**
173:10
**physical**
74:22,23 183:22,24 199:12 239:4
**physically**
277:12
**physician**
225:1,4 250:24
**picked**
174:13
**picking**
224:15
**picture**
13:16
**piece**
169:2 271:20
**pile**
221:4 252:20
**pillar**
102:10,12
**pillar's**
102:4
**pits**
16:1
**place**
38:1 46:8 50:7,10 59:12 67:21 79:8 82:1 93:10,24 121:5 143:10 186:3 187:20 222:16 261:1
**placeholder**
91:10,19
**places**
99:14 273:18
**plaintiff**
39:21 113:12 114:17 117:3,8 118:7 153:12,14 283:6 284:13
**plaintiff's**
9:12 114:12 115:17 117:1,4
**played**
98:22 111:12
**playing**
110:17
**pocket**
104:2
**podiatry**
94:16
**point**
13:17 29:23 30:12 48:15 72:21,22 78:24 93:7 103:14 104:9 118:10 134:19 148:19 158:20 177:19 183:15 195:2 210:7 213:17 221:22 266:16,19 281:6
**pointed**
53:1 75:2
**pokes**
79:9
**poking**
47:6 48:16,17 49:5,9 109:2,11,15 275:9
276:19
**police**
15:9 17:2 21:9,11,14 22:3,10,12,18 23:4, 7,22 24:6,9,18,21,24 27:23 193:7,8 194:11,12 207:3,7, 10,14,16
**policy**
71:21 73:12 180:11 205:23 232:2,7,12, 17,20,21 237:4,6 252:5,7 253:1 262:10
**political**
231:2
**popped**
197:13
**portions**
93:13
**poses**
118:11
**position**
48:19 83:22 103:22 184:21 218:4,9 220:3 223:1
**possibly**
23:7 78:8 89:20 100:12 113:17 131:3 132:6 158:16 191:5 192:8 194:4 195:15 211:20
**post**
83:3
**potential**
179:9 243:4 261:15, 17
**power**
54:20
**powers**
67:13
**practice**
176:3
**preamble**
92:10
**precipitating**
196:2
**preparation**
192:12
**prepare**
59:17 247:24
**prepared**
63:14 247:18
**prescribed**
199:8
**prescriptions**
239:8
**presence**
284:21
**present**
133:3 262:6 285:6
**presented**
69:4 130:13 182:20 248:7
**presents**
195:24
**preserve**
112:8 213:9
**preserved**
111:20
**pressure**
199:17,20
**pressure's**
199:16
**pressures**
66:12
**pretty**
56:13 199:16
**prevented**
44:19,21 47:6

**previous**
32:15 192:13 200:2 225:13 253:17
**previously**
91:21 142:3 183:21 225:2
**primary**
239:16 250:24 253:19
**principle**
240:15
**Print**
177:2
**printed**
176:20
**prior**
25:3 68:13 108:14 165:8 166:15 209:6 217:14 230:22 240:8,10 242:1 245:19 247:19 254:15 270:11 271:4,9
**privacy**
238:11
**private**
223:4
**privilege**
213:12,15,21 215:10 230:9
**proactive**
158:23
**probation**
23:19,23
**probationary**
21:6 23:16 24:4,11
**problem**
38:17 42:18 43:1,2, 3,6,7 55:3,18 242:9
**problems**
38:23 48:20 55:4 66:15,17 130:10 178:5 243:4,5
**Procedure**
238:23 286:18,19,20
**procedures**
228:3
**proceed**
187:18 210:5 225:16
**proceedings**
141:3 144:5 148:3 151:4 155:11 157:8
**process**
21:9 22:13 32:14 139:9 140:2,12,14, 16,18 155:7 168:11 169:6 170:3,5 177:22 181:18 184:24 187:11 195:17 197:6 209:19 210:5,8,19 219:19 221:21 225:16,23 236:23 243:15,16, 18,24 247:7,19 260:1 266:10
**processes**
212:11
**produce**
32:3
**produced**
63:7 91:22 194:20 213:10
**producing**
237:22
**product**
118:9
**professional**
15:3 281:2
**professionally**
197:1
**program**
111:12
**progress**
194:20 197:16 200:1,2 201:2 239:6 258:14
**promise**
39:19 92:8
**promoted**
22:11
**promotion**
18:22 19:14,15,18, 19,22 20:1,2,3,5,13, 14,16,18,22 22:19
**pronounce**
10:19 117:13
**pronounced**
10:18
**proper**
67:24 89:18 173:9 246:24 280:24 281:1
**properly**
36:10 74:2,12 84:12
**proposal**
234:21
**proposed**
201:17 259:18
**protect**
115:1 123:1 238:11 248:8 272:3
**Protected**
172:12 180:1 187:5 209:4 211:5
**protecting**
194:6 195:15
**protections**
24:14
**protective**
11:9 92:6
**proud**
42:24
**provide**
38:18 89:18 132:6 180:23 232:2 238:24
**provided**
83:8 236:11 237:20 251:19 254:22 255:1
**provider**
194:21 246:6 250:21
**providers**
250:23 251:8,16,20
**providing**
131:3 235:15 262:19
**provision**
180:11
**provisions**
238:21
**provoking**
64:1
**psychiatric**
258:18 260:5
**psychiatrist**
273:4,11
**psychiatrists**
273:7
**psychic**
45:8
**public**
283:22 284:4 285:20
**pulled**
99:3,19
**punctuation**
89:22
**purpose**
241:21 243:11
**pursue**
247:18
**pushes**
64:2
**put**
24:12 34:13 49:2,14 50:11 53:9 89:22,23 123:11 142:21 177:1,2 181:9 206:16 217:22
**puts**
55:13 74:16 266:23
**putting**
76:19 206:15

**Q**

**quarter**
87:1
**question**
12:6,11,12,22 13:6 22:1,4,5 24:1 29:20 30:4 31:9 35:14,22 39:4 53:21 57:19 78:1 81:19 82:3 88:7 90:2 95:13 105:21 115:6,11 117:10,23 122:19 125:8 128:12,19 131:10 139:6 143:3 144:9 146:18 151:22 153:16 162:9 169:13 173:23 177:4 178:9 181:20 187:14 196:14 197:21 199:3 203:7 211:24 218:6, 14 219:6 220:20,24 221:1 235:12 237:8 240:24 251:11 260:11 265:6,9,12 270:22 272:21 277:7 279:16 280:19
**questioning**
266:13
**questions**
11:24 57:5 70:2 82:20 92:19 130:17 131:2 134:22 135:1 274:9 281:14,17
**quickly**
191:8 192:7
**quiet**
268:24
**quote**
39:7,14 40:3,6,13,20 64:4,6 76:7 77:5 88:22 89:15,19 262:7,9,10,12
**quotes**
73:19 77:24 262:14

**R**

**raised**
276:12
**raises**
29:20
**ran**
29:24 30:5 205:20
**random**
128:17 232:10
**rang**
138:1
**rank**
276:6
**ranking**
48:23 54:23 55:2 66:13
**ranks**
18:10
**Ray**
68:24 142:5 256:23
**re-handing**
142:2
**reach**
196:19
**reached**
104:1 159:15
**reaction**
269:7
**reactivate**
21:19
**reactive**
158:23
**read**
69:5 70:23 82:21 108:17,18 122:2 144:8 146:18,19 165:22 197:20 198:21 221:10 228:24 236:16,19 237:9 252:6,13,18 271:21 283:15 286:13
**reading**
42:17 118:16 193:3, 19 253:1 262:16 286:10,14
**reads**
62:8,10 150:24 236:1
**ready**
254:11 273:15 286:10
**realize**
13:14
**realized**
148:20 269:20
**realizes**
54:21
**reason**
14:2 70:10,11 85:5 131:4 143:15 152:8 157:2 161:6,24 162:1 189:14 205:3, 4 229:13 244:8 265:2
**reasonable**
113:23 234:6,9
**reasons**
162:7
**Rebecca**
9:20,22 127:5,8 128:2 129:4,7 132:12 136:4 139:11,17 150:21 167:6 170:8 171:3 182:6 207:23 214:5, 8 215:23 219:17 226:19 266:3 267:18 269:3,20,23 270:10
**recall**
25:4 33:10 89:2 90:11 95:18,20 101:4 124:2 125:14 138:13 142:5 155:24 162:14 166:3 174:5 229:23 235:14 245:1 262:13,24
**recalled**
85:1,4
**recap**
145:8
**receipt**
286:12
**receive**
164:12 225:14
**received**
39:15 59:20 61:20 169:16 186:18 203:8 204:12 210:12 214:7 216:15 217:5
**receives**
250:24
**recess**
91:1 160:12 226:8 263:16
**recognize**
93:8 96:10 98:12
**recollect**
35:13
**recollection**
64:8 75:19 88:1 96:16 253:1
**record**
9:12 10:24 11:8 37:6,8,11,13 90:22 91:4,6 104:23 108:18 112:20,22 113:2,4,5,18 114:1 146:19 160:9,14 177:17,18 191:1,16 192:3,4,9 200:2 226:4,7,14 233:12 256:4,9,10,13,15 257:12 263:14,19 282:1 286:24
**recorded**
81:7
**recording**
9:6 117:7
**records**
161:10,11,15,20 168:18 180:13 187:20 201:9,12 217:9 222:13 223:5, 15,20 227:13 228:22 229:8 232:4 237:20, 22 238:14,17 239:1, 2,5,6,7,9,18 240:5,6, 8,9,12,16,17 242:10 243:10,13,18,23 244:3,4,13,16,18 245:20 246:1,22 247:5,21 250:22 251:2,13 252:22 253:10,18 254:11, 19,21 255:1 262:11, 19 264:15 268:17
**recreational**
193:3,19
**rectify**
167:23
**redacted**
238:10
**reduced**
284:22
**refer**
73:8 197:21 200:20 227:4
**reference**
32:21 38:8 190:18 198:13 230:18
**referenced**
214:1,5,9
**referrals**
200:16
**referred**
137:9 196:11 197:18 208:19 229:15 259:22
**referring**
33:13 38:20,21 39:2 40:15,21 41:3 83:13 120:2 151:10 188:8 249:3
**refers**
40:8 209:12 211:9 214:14 258:12 266:21
**reflect**
35:16 259:8,12
**reflected**
74:6
**refresh**
64:8 96:16
**refuse**
180:22
**regard**
122:16 262:1,3
**regret**
207:1
**Regretting**
124:20
**regular**
16:17 30:17 208:4
**Reierson**
9:20,22 127:5,8 128:2 129:4,8 131:18 132:12 135:16 136:4 138:10 139:11,17 150:21 153:12 164:10,18 167:6 169:17 170:8, 19 178:23 179:7 182:6 186:14 189:8 191:22 207:23 208:10 214:8,11,12, 18 215:2,23 216:12 219:17,23 221:17 222:6 226:20 231:24 232:1 250:2,7 266:3 267:18 268:5,11,13, 15 269:3,20,24 270:10 271:15
**Reierson's**
171:4 214:5,14 221:6 224:16
**reimbursement**
186:23
**reinstated**
184:17,20 186:20,22
**reinstatement**
184:17
**reinstating**
218:1
**reiterates**
210:16
**relate**
50:18
**related**
150:10 152:2 178:10 193:14 196:1 199:5, 9,13 272:14 285:9
**relates**
246:2
**relationship**
85:12 261:19 265:24
**release**
153:14 172:14 179:3 181:1 186:15 187:19 189:24 190:8 209:3 217:9,24 222:12 223:3,14 225:8,15 227:8 230:20 232:3, 18 244:17 252:9,11 255:15 257:4
**released**
154:13 246:1
**releasing**
161:18 264:15
**relevance**
125:4,5 272:23,24
**relevant**
71:12 118:10 130:22
**relief**
149:7 200:11
**relieved**
42:11
**rely**
53:14 149:12
**remedies**
217:24
**remedy**
66:2 67:6

remember
10:23 14:23 15:7,10 22:21 34:5,9 35:8 38:21 39:1,5,24 40:5 43:16,21 44:22 46:6 58:3 60:21 61:24 65:4,5 78:17 95:4 97:10,20 111:1 119:18 128:5 131:17,22 133:15 138:17,18 166:6,9 168:8 172:22 173:16 201:24 211:13 227:11 244:13,14, 15,20 252:19 278:22
remembering
98:5
rep
136:18,20 149:21
repeat
274:10
repeated
138:15
rephrase
42:15 112:3 146:17 253:10
report
65:19 68:24 69:6 80:22 81:24 142:4 175:13 176:18 226:24 228:2,16,17 229:12
reported
228:12 261:18 284:20
reporter
10:4 12:18 37:20 58:8,16 68:21 80:18 108:19 114:11 116:23 118:21 121:20 146:20 154:6 155:21 157:21 162:19 170:17 171:24 175:5 178:20 186:8 189:6,20 192:23 194:18 207:22 212:19 215:16 219:15 224:14 226:17 231:22 233:18 234:18 237:16 245:11 250:15 255:8 286:22
reporter's
31:19
reporting
64:24
reports
147:13 196:1 198:1, 4,15 201:16 202:4 206:24 239:4,7
represent
10:15 30:10 32:1 39:11 80:20 92:21 179:9 274:6
representation
143:16 144:11 145:12,17,23 146:2, 4 147:1,20 149:15
representative
135:13 146:11 156:2 193:6
representatives
171:17
represented
111:15 113:10
represents
238:13
request
108:6 111:19 112:6 118:8 151:16 153:15 176:18 186:23 194:1 216:23 222:15 238:20 251:2
requested
66:2 108:19 146:20 150:8 243:10 252:21 262:18
requesting
161:14 184:15 185:3 238:14
require
223:1
required
115:8 156:9,18 165:1 183:22 208:14 286:10
requirement
158:7 232:8
requirements
65:16 225:9
requires
130:5 232:3
rescinded
217:22
reserve
281:22
reserved
285:4
resist
89:6
resistance
143:17 145:24 146:12
Resources
142:13 150:23 154:13 221:7,15 262:12 264:2,16
respect
179:9
respectful
54:18 57:18
respective
70:11,12 285:5
respond
124:23 165:17 216:20
responded
85:2 122:18 209:14, 23
responding
272:17
responds
124:10
response
18:17 20:12 57:21 120:24 123:24 126:1 128:11,12 139:4,5 186:18 213:5 217:6 219:16 222:6 224:16
responsibility
268:24
responsible
83:4,19 84:22
responsive
163:14
rest
144:8 153:23
restrain
51:14,16,19 52:3,9
restrained
74:19 103:18,21
restraint
51:17
restraints
51:16,21,23 73:8 85:7,9 86:22 89:18
restriction
239:1
restroom
102:2,13,14
result
54:18 128:16 181:8 182:23 199:20,22 258:24
results
228:18 239:3
resumed
249:5
retail
16:17
retained
169:18 174:18 179:8
retaliated
231:1
retaliation
113:17 118:12 188:7 230:22 231:8,11
retired
134:8 204:20
retrieving
243:13
return
69:19 153:13 156:9, 18 165:8 179:19 183:1,3 184:18 210:18 263:8
returned
136:13 184:11 209:8 210:3
returning
165:2 208:15
review
141:16 165:7,12 172:19 209:6 250:22 254:22 258:13 281:2
reviewed
228:21 235:16 246:2
revised
246:14,18
rewarded
40:23
Richard
9:16 58:19
Ricola
273:22
rid
281:10
right-hand
86:4 101:1 102:1 142:10
rights
231:1
ripped
97:1
rise
18:9
risk
118:11
Robin
227:18
Robinson
137:19,22 138:2,5, 18,22 139:6,15 155:23 157:13 158:22 159:7 169:15 170:24 171:5 184:3 232:19,24 266:20
role
98:21 135:10 279:11,13
roll
75:17
rolling
279:20,23
rolls
278:10
room
47:14,17 50:3,5,13 51:21 52:23 75:12 85:10,18 87:21,22 88:3 94:4 95:14,15 102:12 107:11 130:9 135:6 136:4 138:3, 12 142:24 148:16 249:4,15 266:3 267:20,23
rooms
50:12
roster
77:7,10,21 78:5,16 80:8 83:23
roughly
28:2 75:6
row
275:19,21
rule
13:4 114:13 115:13 238:23 286:18,19
rules
11:23 115:13 206:12,19,22 286:18,20
rumor
38:1
rumors
205:8
run
49:21
Running
178:14

S

S-E-A-M
62:3
S.E.A.M.
62:3 119:16
S.O.R.T.
76:8 120:20,22 134:7 204:21
sadness
206:24
safe
243:3,6 272:2
safety
43:4 118:11
salary
28:6 29:23 30:5,17 186:21,24
Sarah
9:18 10:14 47:24 281:19
sarcastic
262:4
Sarocka
250:17 251:5 253:6 254:7,8 255:10 256:20
sat
86:16 249:10
savvy
40:2
scab
97:1
scanner
60:17
scanners
60:17
scanning
32:15
scene
97:6 99:24 100:19
schedule
27:17 286:12
scheduled
113:7 236:5,6 254:13
school
14:12 15:16
scope
222:14,20
screaming
276:16
screen
93:17,19
screw
168:2
SE_2
92:7
seal
285:13
seams
75:14
search
41:2 110:11 163:12, 13 164:3 192:6
searched
110:10,12
seat
85:23 86:8,13
seats
127:16
secondary
26:14,17,20 28:9
seconds
137:24
Section
119:23 235:24 238:23
Security
27:1 238:10
seek
159:2 196:24 217:23 248:2
seeking
196:3
send
41:11 68:3 121:1 156:8,23 174:6 176:22 177:7 185:3 217:14 239:18 269:4 280:11,12
sending
38:1 40:16 59:11 156:7 158:4 163:17, 18 173:14 174:2 186:13 189:10 190:23 192:1 193:18 211:1 235:12 242:10 268:17
sends
38:17
seniority
184:2
sense
28:2 204:9
sentence
77:19 86:6 88:19 143:18 165:18 262:1
separate
66:22 248:9
September
15:14 17:22 22:20 31:22 37:22 43:14, 15 59:12 61:7 62:17, 18 69:13 80:23 93:7 117:9 118:24 144:8 150:10 151:11 178:1,11 198:2 255:10 256:19,23,24 266:22 270:2 274:14
sergeant
19:8 44:4 47:15 50:2 52:6,10,18 55:17 65:7 71:4 77:6,20 79:8 105:9,15 106:18,20
sergeant's
18:15,21 19:3
series
121:22 194:19
services
9:3 18:17 20:18 221:8 258:5 286:1
session
139:21 258:19
set
27:17 70:8 113:20 117:2 285:13
setting
71:11 85:24 86:12 196:24 222:15 280:19
shackle
45:16 52:9 53:5,9 107:12,14,15
shackled
45:16 74:3 103:15 104:7,8,24
shackles
73:14 83:6,9 104:11
shackling
71:22 72:2,20 73:7 104:16
Shaw
238:6,12 239:15,18
she'd
269:14
she'll
55:12 126:23
sheet
32:11,22 80:21
Shelby
9:19,23 126:23 127:7 128:1 129:16 131:18 133:13 135:16 136:10,17 137:21 138:11,15 139:10 140:5 150:21 152:12 153:12 164:24 165:9,15 166:1,4,20,22 167:2, 19 168:19 170:7 172:17 174:9 178:24 179:8 182:18 186:14 190:19 209:9,13 210:3 211:9 214:10, 23 215:23 216:12 240:20 242:9,23 248:4,11,16 250:1,2, 8 251:12,13 264:6, 13,18 265:8,15 266:10,13 267:9,12 268:3,12,17 269:1,7, 19 271:9,17
Shelby's
127:14 136:13 138:5 151:24 161:15 214:15 246:23
sheriff
9:19,22 161:19 172:13 185:3 190:8 230:24 231:3
sheriff's
15:13 16:21 18:10 21:9,14 22:3,10,12, 18 23:4 24:9,24 25:7,10,14 26:3 27:10 28:17 29:5,22 30:5,23 34:18 69:20 108:7 112:6 121:23 159:22 160:2 164:24 170:20 173:21 179:10,15 180:11 188:24 192:12 193:7,8 196:18 202:17,21 203:2,10 204:10,20 207:3,7, 10,14,16 215:11,12, 18 217:14 220:1 222:19 223:1,3,18, 19 230:23 233:5,8 235:5 243:21 247:4,

17,21
**shift**
27:19 120:10,11
**Shipley-2**
228:8
**shit**
41:2,3
**shop**
196:22
**short**
23:6 45:20 63:15 72:10 91:1 106:19 191:12 206:2 226:8 229:2 257:9 263:16 280:23
**short-staff**
38:3
**short-staffed**
40:17
**shot**
102:1 103:4
**shoulders**
278:10
**show**
43:19 44:15 46:20 92:17 95:10 107:19 132:5 143:2 173:8
**showed**
44:3 110:3 132:16 137:15 146:3,21 152:13 156:13
**showing**
93:13 117:7 219:16 256:17
**shown**
92:13 112:11 157:21 207:22 231:23 245:12
**shows**
98:12,13 133:20
**shy**
123:5
**sic**
238:5
**sick**
31:7 205:16 253:20
**side**
86:4 101:13 105:7 129:16 194:12 239:11
**sidewalk**
272:18
**sign**
137:3 139:8 140:1, 10,12 141:5,10 160:21 161:3 162:1, 13 179:4 180:24 186:16 217:8 219:1 222:12,22 225:21 227:8 230:19 232:3 244:17,23 286:13
**signals**
268:6
**signature**
175:22 221:7 244:23,24 281:22 283:16 285:3 286:11,23
**signed**
153:13 210:2 225:14 235:8 245:16 250:19 252:12 255:14 257:3 286:17
**significant**
258:20,23 260:4,8
**significantly**
70:12
**signing**
165:8 209:6 245:1 286:10,14
**similar**
205:10
**simple**
211:24
**simply**
35:15 115:13 177:9 264:14 270:23
**SIMS**
228:8
**Sincerely**
226:21 286:21
**sir**
67:22 83:15 142:6 209:10 273:1 274:7, 16 275:2 276:21 280:17 281:5
**sit**
41:8 50:15 52:8 92:16 113:14 127:18 211:12,16,24 249:10 268:23 274:18
**site**
94:20
**sitting**
92:16 100:11 127:1 266:14
**situation**
74:18,19 143:5,7 144:12 145:13,20 147:12 149:9,14 157:5 158:13 196:2, 14,16 197:5,20 198:15 260:7 278:7
**situations**
142:21 149:13
**size**
53:15,18,23,24 55:23 56:4,8 88:14
**skip**
83:16 102:22,24
**slammed**
57:23 90:14
**slash**
195:24
**slightest**
24:12
**Slightly**
272:14
**slow**
206:4
**smacked**
272:18
**small**
33:17 34:12 94:16 171:15
**smaller**
53:20 55:21
**Social**
238:9
**softly**
54:20 130:8
**someplace**
99:7
**Son**
40:9
**sort**
12:19 14:3 17:1 36:20 63:24 82:22 83:16 87:1 122:19 128:21,22 130:5 194:1 265:23 276:11 280:18
**sorts**
248:16
**sought**
258:2
**sound**
260:15
**soup**
186:1
**South**
14:17
**spaces**
86:16
**speak**
24:7 38:22 66:6 130:8 132:13 148:19
**speaker**
138:1
**speaking**
54:20 75:6 87:5 106:18,20 275:23
**speaks**
145:7 187:15
**special**
18:15 19:21 20:8 206:21
**Specialist**
9:2
**specialists**
251:1
**specific**
34:9 73:1 212:1 240:2
**specifically**
39:1 45:1 47:4 132:8 138:18
**speculate**
12:6,7
**speculation**
64:11 97:17 151:14 173:22 180:7 185:16 214:17 239:21
**speech**
39:8 58:11
**spill**
186:3
**split**
261:19,20
**spoke**
42:18 94:9 131:18 139:11 275:24
**spoken**
157:9 279:9
**spread**
205:8
**spring**
204:2
**Springs**
11:5 286:6
**square**
23:10
**SS**
284:2
**staff**
33:8 94:12 119:22
**staging**
64:21 65:8,11,12,16 79:9 85:5 87:9 92:22 93:8 103:7
**stamp**
91:22
**stamped**
69:23 161:16 172:23
**stand**
92:15 268:20
**standards**
149:10
**standing**
103:17 105:5 106:4 127:2
**stands**
36:11 62:4
**start**
10:17 15:12 16:11 17:16 18:1 27:2,9 29:11 43:20 71:19 93:6 95:9 122:1 142:14,19 203:24 204:4 253:12
**started**
17:23 47:6 202:1 203:21
**starting**
14:12 23:23
**starts**
22:13 37:24 70:1 81:2 86:19 92:23 142:12 264:1
**state**
10:23 113:6 182:9 284:1,6
**State/trait**
228:7
**stated**
59:21 83:5,21 85:4 131:13 159:11
**statement**
35:23 45:4 70:3,16 73:16 76:12 83:11 85:16 115:21 142:16 144:15 145:13 147:21 165:4,22 198:8 200:13 230:18 237:19 257:23 258:10
**statements**
72:22 73:1 165:20 239:8 262:14
**states**
69:12 115:14 202:10 275:22 283:1 284:11
**stationed**
123:16
**status**
21:6 22:17 24:11 198:3,6 200:7 202:5, 11 207:2 228:6
**stem**
279:18
**stemming**
62:15
**stenographically**
284:21
**step**
13:15 65:1 127:6 132:10,19,22 137:18 140:16 277:3
**stepped**
87:8 133:6 276:19, 24 277:3
**steps**
276:22 277:5
**steward**
137:19 156:1,3,20
**Stipulate**
233:22
**stipulations**
234:7,10
**stop**
27:22 49:5,9 60:17 92:18 95:22 96:7 97:3 98:19 99:1 100:7,22 101:8 102:20 103:1 104:3, 12,19 105:17 204:8 219:4
**stopped**
29:16 49:7 52:18 130:3 204:9 236:11
**store**
15:20 16:12,13,18
**stormed**
57:23,24 58:2 90:14
**story**
149:22 150:1
**Stott**
193:2,5,6
**Street**
286:1
**stress**
196:6,12,15 197:4, 18 198:19,21 199:4, 9 200:9 258:6 259:16 260:6
**stressed**
197:7 275:10
**stressor**
257:21
**stressors**
196:1 198:18 261:15,17
**Stressors/ extraordinary**
195:23
**strike**
41:14 192:16 277:16,20 279:12
**study**
14:18 140:6
**stuff**
48:24
**subject**
11:9 29:5 32:10,22 37:23 62:2 92:6 113:12 114:4 115:5, 7 118:12 179:2 189:24 193:2 213:12 230:11 234:20
**subjected**
170:4
**subjective**
276:12
**subjects**
38:23
**subordinates**
277:22
**Subscribed**
283:19
**Subsequent**
259:8,12
**substance**
90:10
**Suburban**
14:17
**successfully**
71:7
**sued**
25:6 179:14
**suffered**
199:12 258:23
**suffice**
224:2
**suggest**
159:2 225:10 252:4
**suggested**
14:4
**suggesting**
228:20
**suggestion**
114:3
**suggests**
207:8
**suing**
192:12
**suit**
186:22 217:23 230:22 285:10
**Suite**
9:4 284:9 286:1
**sum**
90:10
**summary**
80:21 81:16 88:12, 22
**summer**
204:2
**Sunday**
119:8,21
**superintendent**
44:3 46:1,20 48:11 50:8 51:13 54:11 58:22 59:4,5,7,8 60:8 62:16,21,24 64:2 67:19 70:5,9,18 71:3,13 76:5 79:1 85:2 87:3,8,12,16 93:24 105:22 106:13 107:2 108:8,14 121:12 138:20,23 150:11 154:17 167:9 177:24 181:8 182:19 185:4,10 188:11,16, 19 208:20 231:12 264:7,13,19 265:8, 16 267:9 269:24 271:1 274:20 280:15
**superior**
63:3 150:10
**superiors**
113:8
**supervise**
33:7
**supervisor**
44:2 101:6 114:7 231:4 277:15
**supervisors**
52:5 120:20 121:8 204:22 277:22
**support**
38:18 115:15,17 231:2
**supposed**
33:6 53:16 84:3 154:24 167:21 183:20 242:3
**Supreme**
286:18
**swear**
10:5
**swing**
123:7
**switch**
226:1,2 273:18
**switched**
24:21
**sworn**
10:7,10 283:12,19 284:17
**symptomatology**
259:16
**symptoms**
258:20 260:5
**system**
176:1,4

**T**

**takes**
53:19 57:13 85:13
**taking**
16:3 46:8 158:24 161:19 171:12 184:1,22 228:13 262:6 273:12 278:23
**talk**
12:20 38:15 55:12 94:20 108:11 132:24 135:17 212:8 251:5
**talked**
29:6 59:24 71:8 87:14 92:14 116:11 119:16 124:4 131:17 132:11 186:12 188:15 192:13 205:8 274:13,14 275:1,4
**talking**
42:10 48:12 78:11 93:20 106:5 110:19 111:23 129:3,15

131:16 132:7 150:20 157:23 214:17 252:7 260:12
**talks**
182:22
**tape**
95:22 226:2
**tapes**
90:20
**tardiness**
26:7
**team**
18:16,17 20:11,12 120:21,24 123:24
**Teamster**
24:20 234:22
**Teamsters**
21:3 138:8 156:5 171:16 172:5 235:4
**Teamsters@ cookcountyil.gov**
172:3
**technologically**
91:8
**telling**
169:4 204:13 256:22
**ten**
250:18
**tense**
135:6 144:12 145:13,20
**Tentative**
234:22 235:3,13,17
**term**
41:5,22 72:10
**terminated**
198:4 202:11
**terms**
13:2 72:3
**test**
17:1,8 18:15,16,17, 21,24 19:12 141:23 183:22,23,24 239:3
**tested**
183:21
**testified**
10:10 119:15 160:20 161:2 165:11 167:13 168:6 204:5 218:24 276:18
**testify**
152:11 284:17
**testifying**
110:17
**testimony**
54:3 81:1,11,16 93:21 109:9 119:18 134:11 135:21 143:23 145:15 151:23 152:18 155:24 165:24 181:20 218:13,21 219:5 220:9 260:23 270:9,16,23 284:19 285:1,12
**testing**
18:21
**tests**
17:11 18:9,11,13,14 239:2
**therapist**
258:4 273:5,12
**therapy**
196:12 197:18 239:5 253:21
**thereof**
285:11
**thing**
16:5 21:23 24:12 35:5 41:24 49:10 55:15,18 82:21 105:2 138:19 178:3, 8 211:22 239:22 240:4 256:1
**things**
32:2 34:3 36:9,21 38:24 45:1 57:8 69:5 70:3 71:17 74:5 76:9 87:20 94:16,17,23 98:3 121:5 124:1 171:15 205:8 222:9 230:5 232:9 248:17 249:22 261:1,2 276:24 278:8
**thinking**
21:24 27:6 47:19 66:24 88:12,13
**Thomas**
234:3
**thorn**
36:4,14,17
**thought**
27:13 71:11 105:2 173:18 198:21 217:16 233:12 248:9 264:22 272:12
**thoughts**
70:10 148:23
**threaten**
128:4
**threatened**
128:3,13 143:3
**threatening**
129:24 150:9 151:8, 16 181:10 208:22 241:12 249:2 269:11
**thrown**
211:19
**thumb**
91:11,21
**Thursday**
38:8
**time**
9:8 17:5 21:17 24:21 26:7 27:13,17 28:10 29:3,7,21 30:13,18, 23 31:2 33:21 37:9, 13 47:18 49:11 54:5 55:7 58:23 59:18 62:12 69:16 75:21 76:1 81:14 82:16 85:11 86:13 90:22 91:4 93:14 95:2 99:19 102:22 103:11 107:4 108:2,16 109:3 111:16 112:7, 23 113:4,23 120:23 124:10 127:10 129:5 130:1 131:19 132:18 134:8 139:20 140:7 146:13 147:2 149:9 157:5,24 160:9,14 161:6 164:1,4 165:5 166:23 174:17 181:16 182:1,7,20 183:10,19 184:19,23 185:11 186:21,23 189:11 190:15 191:4 193:10 194:4 196:3, 23 197:1 200:14 201:10 202:15,19 203:9,18 205:15,19, 23 206:6,16,17 207:14,16 209:16 210:12 213:19 216:8 218:1 221:11 222:14,20 224:8 225:9,20 226:4,14 234:2 235:17 236:17 239:2 243:3,19,24 244:12 249:19 252:21 253:8 256:11,15 257:16 262:18 263:14,19 268:19,23 271:19 275:23 277:2 278:20 281:24
**times**
11:20 25:24 26:19 41:1 64:3 85:8 95:1 143:15 157:9 177:14 179:15 211:2 240:19 262:4 275:16 278:7
**tipped**
133:13
**title**
18:2 92:6 156:4
**to-wit**
284:7
**today**
11:15 12:4 13:10 15:10 21:4 27:20 81:12 113:7 120:3 145:15 155:1 199:6 206:13 211:12,16,24 258:17 272:15 274:15,18 275:1 281:4
**today's**
281:24
**told**
21:5 32:24 35:16 42:6 60:10,22 67:9 78:24 89:14 111:3 125:20 126:2,3,23 129:1,19 131:8 133:11 136:20 141:4 143:12 144:2 146:7 149:16 150:15 151:17 153:12 154:22 155:2,6 158:20,22 160:20 168:7 169:10,14 171:12 182:14,15,21 184:3,8 185:13 194:9 198:9 205:10 221:17 229:17 230:11 232:16 247:9 263:1,10 269:14 270:5
**tolerance**
262:5
**tone**
64:4 249:13
**top**
88:11 158:2 170:22 171:1 179:5 201:3 212:21 215:9 224:16 228:3 233:21 276:16
**total**
277:6
**touch**
194:10 277:3
**touching**
65:21
**towns**
23:9
**Trade**
15:19,23 16:10
**tragedies**
41:13
**training**
21:22 149:11,13 183:11,14
**transcript**
88:13 283:15 284:24
**transcription**
81:11,15 284:23
**transfer**
61:10 207:3
**transferred**
59:2,19,22 61:1 67:21 90:16 120:9 121:11 124:5,7 207:7
**transport**
123:17 195:12
**Transportation**
183:21 184:2,10
**trapped**
65:2 148:17
**treated**
89:6
**treater**
253:23
**treaters**
253:9,10,11,13,16
**treating**
51:8
**treatment**
206:21 239:5 258:2
**treats/treated**
246:6
**triage**
50:14 51:6,10 52:13 102:12 278:23
**triaged**
94:11
**trial**
238:17
**Triton**
14:16
**true**
33:20 38:3 72:15 147:4 165:20 209:9, 22 214:22 284:24
**trust**
121:7
**truth**
150:2 260:21 284:18,19
**truthfully**
13:11
**TSA**
60:16
**Tuesday**
207:24
**tunnel**
84:6
**turn**
69:22 110:18 125:11 164:7 210:23 221:4 227:16 228:1 235:7, 11,19 238:1 247:13
**turned**
77:5 110:22
**turns**
77:20
**Turrise**
96:14 98:7 100:12 105:8 106:11 176:13
**two-year**
22:12,13
**Tylka**
32:17 33:11,22 35:17 42:5
**type**
43:4 45:20 84:1 129:19 229:18 269:16
**typewriting**
284:23
**typo**
154:12

**U**

**U.S.**
286:20
**uh-huh**
12:1
**uh-uh**
12:1
**ultimately**
150:7,24
**Um-um**
36:13 128:20 164:11 277:23
**un'**
74:6
**unauthorized**
210:13
**uncomfortable**
264:15 266:12,18 267:1,20,22 269:22
**uncuffed**
74:7
**undergo**
165:1 208:14
**understand**
12:1,11 18:8,20 19:4 21:20 22:6 25:21,23 26:13 30:3 32:5 48:19 53:20,23 62:6, 23 66:12 70:15 73:3 77:17 101:10 115:4 129:6 131:11 144:9 150:3 151:23 157:15 167:24 177:20,21 179:17 184:21 188:8 196:7 210:13 212:7 214:19,20 220:7,15, 21 221:14,21 230:9 236:21 237:10 240:3 241:18,21 242:13 243:9,20 244:2,7 253:15 270:15,19 271:12 272:19,22 277:11
**understandable**
260:6
**understanding**
71:12 110:7 118:1 122:15 132:21 150:7 151:1,6,7,15 152:5,6 242:2 251:10,14 269:2
**understands**
205:11
**understood**
12:13 48:5 49:1 62:13 69:17 71:15 140:15 151:11,12 179:14 219:23 243:12
**undetermined**
284:11
**uneducated**
197:10
**unfit**
137:1 138:16 249:6 268:10
**unfitness**
137:10
**uniform**
19:23 52:24
**union**
20:24 21:2,4 24:9, 10,16 25:22 133:3,7, 19 135:11,13 136:18,19 137:19 143:16,24 144:11,21 145:1,4,11,16,23 146:2,4,10 147:1,20 148:12 149:7,15,21 156:1,3,20 157:5 158:8,13,23 168:7, 20,22 171:5,17 173:20 193:6,10 194:10 232:16,24
**unit**
183:19,21 184:10 283:8 284:14
**United**
283:1 284:11
**unlawful**
153:15 180:15 182:24 183:3,6 217:10 222:15 223:5 230:20
**unlimited**
225:9
**unlocking**
84:4
**unnecessary**
276:7
**unpaid**
222:11
**unpleasant**
248:17
**unprofessional**
65:4
**unregulated**
198:3
**unsafe**
73:22 243:4 272:3
**unwilling**
210:8
**updated**
171:14
**updates**
251:1
**upper**
55:2 93:18 101:12, 24 105:6 142:10 195:22
**UPS**
27:1
**upset**
44:13,15 47:1 48:18 57:20 133:11 135:3 136:21,22 137:3 276:7,17
**upstairs**
135:15

**V**

**vacation**
183:10 184:19
**vague**
33:17 34:1 35:12
**verbal**
71:23 143:2
**verbalize**
54:17
**verbally**
11:24 182:15
**verify**
35:7
**version**
156:10
**versus**
9:9
**video**
9:2 88:6 92:13,18,22 94:4 95:9 101:17 105:7 107:21 108:7, 12 109:2,4,5,14,15, 19,20 110:4,6,8,16, 19,20,21 111:6,10, 19 112:7,8,11 117:6, 17 175:14
**videos**
91:8
**Videotape**
90:23 91:5 160:10, 15 226:5,15 263:15, 20
**view**
20:19 183:2 221:22
**viewed**
117:6,17

**violate**
217:16
**violated**
217:17 230:24
**violates**
217:10 230:20
**violating**
205:23
**violation**
223:5
**virtually**
129:8
**vis-à-vis**
135:10
**visit**
31:4
**Vlahos**
188:22 189:9,10
**voice**
64:4 276:1,3,12,13
**voicemail**
165:16 166:4,7,9 209:12 213:24 214:4,8,9,10,15,23
**volume**
75:10
**volunteered**
52:17
**vulnerability**
148:11,14
**vulnerable**
147:14 148:7

W

**Wacker**
9:7 284:9
**wait**
17:7 54:22 109:24
**waited**
126:22 127:5 136:9
**waiting**
45:23 50:9,23 65:12 83:14 101:5 127:1
**waive**
230:16
**waived**
213:15 230:12
**waiver**
210:2 221:20
**walk**
52:7 53:3,8 89:15 126:18 130:7 241:11 278:14 279:1
**walked**
44:17 50:2,22 52:3, 6,12 53:1,9,10 64:14 101:16 102:17 104:16 105:12 106:8,17 126:6 133:10 249:4 268:22 271:16
**walking**
47:20 88:20 89:5 99:23 100:18 105:22 106:5 126:16 279:3
**wall**
47:12 49:3 65:2 76:17 101:5 128:18 134:22 277:1,3,6
**Waller**
120:16,18
**walls**
40:10
**wanted**
36:13,16 66:10,19 71:15 128:2 132:23, 24 135:22 148:19 161:10 240:7
**wanting**
130:19
**wasting**
197:1
**watch**
278:9
**watching**
111:4
**water**
12:16 13:14
**wave**
132:10
**ways**
10:18 66:22 68:3
**wear**
46:17
**wearing**
16:2 46:13 106:13
**Wednesday**
38:7 210:4 225:17
**week**
27:14 85:7 159:10 186:21,23 217:23
**weeks**
17:20 28:22 59:17 108:7 164:19 255:13 257:3
**West**
9:7 284:8
**wheelchair**
100:14
**wheeled**
100:21
**WHEREOF**
285:12
**whispers**
53:4
**White**
170:20
**whoa**
248:18
**whomever**
94:11
**wife**
258:4
**Williams**
216:5,6
**Willow**
11:5 286:6
**Winifred**
9:19,23 150:21 161:15 164:24 168:19 215:23 246:23 266:10,13
**wished**
71:19 73:11
**Withdraw**
215:14
**witnesses**
115:14
**woman**
122:10,11 134:9 227:23,24
**women**
41:20,24 55:20
**wondering**
128:8 149:3
**word**
48:9 74:14 75:2 86:3,5,19
**worded**
49:10 128:6 130:2
**words**
44:22 78:21 80:7,10, 11 88:23 89:2 152:4 188:1 266:21
**work**
21:17 27:15,20 29:7, 14 31:6 32:8 38:9,16 41:7 43:2 60:2 113:13,24 118:9 130:9 140:11,13 141:14 153:13 154:11 155:1,2,8 156:10,18 159:3 169:5 179:19 183:1, 3 184:11,18 185:14 191:13 195:6 196:2, 13,16 197:4,8,19 198:2,3 200:7 202:5, 11 205:7,15,17,18 209:17 210:12,18 212:12 217:22 220:23 243:15 257:20 258:1,7 260:7 263:9
**worked**
15:19,20 16:13 27:18 29:1,8 84:7 134:7 137:20 195:1 197:14 220:15,21 221:2,14
**working**
15:12 16:7,12,17 17:22 27:1,22 28:10 29:11,17,22 61:13, 14,16,17 79:9 84:11 126:12 134:10 158:19 171:13 178:4 185:12 195:9 196:17 200:11 203:21,24 204:4 220:8,12,18 257:22
**workplace**
225:6
**works**
84:6 99:9 122:9 188:24 194:11 195:5,6
**world**
40:9
**worried**
96:24 197:9 202:10 240:15
**worry**
57:2 67:11 130:16
**worse**
61:13
**Worthon**
154:20 155:14 205:6
**wound**
96:21
**wrists**
72:6
**write**
60:5 63:23 176:15 230:2
**writes**
71:2,18 164:22 179:7 197:24
**writing**
32:15 147:14 164:18 239:11
**written**
33:14 71:21 159:5 176:10 183:23 188:14
**wrong**
134:22 144:16 149:1 161:21 167:21 170:6 242:15,19 255:24 256:18 261:14 264:23 276:23
**wronged**
183:7 260:14
**wrongful**
61:10
**wrongfully**
59:19 60:24
**wrote**
34:10,13 35:7,10,11, 24 62:12 63:19 78:14 219:11 280:2

X

**XIV**
119:23

Y

**yahoo.com.**
163:3
**year**
15:15 16:10 21:23 23:3,21 27:4 28:3 108:3 255:2
**years**
14:23 16:9,14,15 17:18 21:15 22:9 26:8,18 28:12,16,23 29:2 60:20 82:6 178:5 205:16 207:9 211:18 241:12,24 250:24 252:3,6,19, 22 253:3,17
**yell**
277:22
**yelled**
49:13,14,19 58:2,3
**yelling**
44:17 49:15 276:7, 11,13
**young**
123:5

Z

**Zaleski**
31:22 32:6 34:23 35:16 37:23 108:23 111:20 112:8 114:16 115:1,16 116:10,11, 12 117:13,16,20 234:20 235:13
**Zaleski's**
116:8 118:4