IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, Plaintiff, -vs- COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities, Defendants.

No. 17-CV-2393

The deposition of DIANA GOLDSTEIN, Ph.D., called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before LIZA MARIE REGAN, Illinois Shorthand Reporter within and for the County of Cook and State of Illinois, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, on the 19th day of November, 2019, at the hour of 10:13 a.m.

Reported By: Liza Marie Regan, CSR, RPR
License No.: 084-002477



APPEARANCES:

LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER V. BUSTAMANTE,
17 North State Street, Suite 1550
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff,

COOK COUNTY STATE'S ATTORNEY'S OFFICE,
BY: MS. JOI KAMPER,
50 West Washington Street, Fifth Floor,
Chicago, Illinois 60602
(312) 603-1427
joi.kamper@cookcountyil.gov
Representing County of Cook,

SCHARF BANKS MARMOR LLC ,
BY: MS. SARAH MARMOR,
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
Representing Thomas Dart, Karen Jones-Hayes, Matthew Burke, Rebecca Reierson and Winifred Shelby,



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DIANA GOLDSTEIN, Ph.D. | |
| By Ms. Marmor | 6 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Goldstein Deposition | |
| Exhibit No. 1 | 4 |
| Exhibit No. 2 | 7 |
| Exhibit No. 3 | 8 |
| Exhibit No. 4 | 11 |
| Exhibit No. 5 | 36 |




(Witness sworn.)

MS. MARMOR: Dr. Goldstein, good morning. Can you please state your full name for the record.

THE WITNESS: Diana Susan Goldstein.

MS. MARMOR: And you understand we're here today to talk about a report that you prepared regarding -- a fitness for duty report that you prepared regarding a John Nawara?

THE WITNESS: Yes.

MS. MARMOR: I'm going to hand you what I'm going to ask the court reporter to mark as Exhibit 1.

(Whereupon, Goldstein Deposition Exhibit No. 1 was marked for identification.)

MS. MARMOR: Dr. Goldstein, I'm handing you what the court reporter has marked Goldstein Exhibit 1. If you could just take a quick look at that and just confirm for us that is the report that you prepared regarding Mr. Nawara's fitness for duty?

THE WITNESS: It is.

MS. MARMOR: Okay. I'm going to come back to that. I just wanted to establish that at the





EXHIBIT AA

outset.
I take it you've been deposed before?
THE WITNESS: I have.
MS. MARMOR: About how many times?
THE WITNESS: Well, I've testified about 70 times. In terms of deps versus court, maybe a quarter of those have been depositions.
MS. MARMOR: So I take it you're fairly comfortable with the deposition process?
THE WITNESS: As comfortable as one can be.
MS. MARMOR: Sure. I'm just going to cover the most basic of the ground rules.
Obviously, you already understand that I need to ask my question and you answer it and we'll try not to talk over each other.
THE WITNESS: Very well.
MS. MARMOR: And I'm not asking for your speculation today, just, you know, the information that you have.
THE WITNESS: Yes.
MS. MARMOR: And if you don't understand my question, please absolutely let me know and I'll try to rephrase.
THE WITNESS: I will.

5

MS. MARMOR: If you need to take a break at any time, of course, do that. I generally like to have the answer to my question answered before you take a break, but we can take that as it comes.
THE WITNESS: Absolutely.
MS. MARMOR: Okay. Thank you.
DIANA GOLDSTEIN, Ph.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. MARMOR:
Q. So in your prior testimony -- I did a little bit of background research on you. It looks like you've done testimony in things involving -- in cases involving diagnoses; is that right?
A. Every single case we do involves a diagnosis generally speaking except for pre-hire screening.
Q. And you've also performed assessments of emotional distress claims; is that right?
A. I have.
Q. Are there any kind of general types of testimony that you've provided in the past?
A. You mean like competency -- competency to

6

proceed to trial, sentencing, even to execution, criminal responsibility examinations, mens rea, insanity defense, you know, so-called affirmative defenses. I have provided testimony to pension hearing boards for pension disability. I run a public safety program here, so. I believe -- a lot of worker compensation quasi-legal type, even hybrid criminal/civil commitment types of things with sexually violent predators, things like that. There's not much I haven't testified -- I was in a Daubert hearing. I've done a lot.
Q. Okay. We'll mark this as Exhibit 2.
(Whereupon, Goldstein Deposition Exhibit No. 2 was marked for identification.)
BY MS. MARMOR:
Q. I'm handing you what the court reporter has marked as Goldstein Deposition Exhibit 2. This is a subpoena to testify at a deposition in a civil action.
Really, the only question I have about this is: Are you here pursuant to this subpoena today?
A. Indeed.

7

Q. We moved by agreement the date and the time of the deposition and the location here to your offices?
A. Yes.
Q. Okay.
A. Thank you.
Q. You're welcome. We're not going need to go back to that.
(Whereupon, Goldstein Deposition Exhibit No. 3 was marked for identification.)
BY MS. MARMOR:
Q. I'm handing you what's been marked as Goldstein Deposition Exhibit No. 3 which is a September 30, 2019, subpoena to produce documents, information or objects to you.
Have you seen this document before?
A. I don't recall it specifically, but I'm sure it was sent to me in this case. I hope I complied with it as fully as I could.
Q. You anticipated my question which is: Did you produce some documents based on this subpoena?
A. I did, indeed.
Q. There's actually a rider if you go to the

8

second to last page of Exhibit 3. The first question -- these are the documents to be produced and the first was all documents regarding plaintiff John Nawara that were produced pursuant to any other subpoena in this case.
Do you see that?
A. Yes.
Q. And do you recall that prior counsel for Mr. Nawara, Dana Kurtz, had issued a subpoena to you at least a year or so ago?
A. I'm afraid I don't remember. I just do too much of this. Sorry. I intake every single case that comes to both of my practices so I just don't have an independent recollection of it. I have no reason to doubt that this was sent to me.
Q. So the only reason I ask is that it's my understanding that at the time, there were no documents produced to Ms. Kurtz and, therefore, you had nothing to produce in response to No. 1?
A. Other than my report perhaps.
Q. I think the report had already been provided.
A. Okay.
Q. And then the second is all documents

9

obtained from plaintiff John Nawara's medical providers in the course of providing the fitness for duty examination of Mr. Nawara.
I take it to the extent that you had any of that information still that you would have provided that?
A. I would have. We don't tend to keep those things. Also, ethically, we're not supposed to pass along specific medical records.
Q. Okay.
And then the same question applies to No. 3, all documents and/or communications with CorVel Corporation regarding the fitness for duty examination of plaintiff John Nawara.
I take it that you produced what you still had?
A. I don't believe I had any correspondence from them.
Q. Okay. Well, we do have some correspondence here. I'm going to show that to you in a moment.
A. Maybe a cover letter from them.
Q. I'll show that to you in a moment.
And then all communications between Isaac

10

Ray Forensic Group and/or Diana S. Goldstein and counsel for plaintiff John Nawara.
Nothing like that was produced to us so I take it you didn't have anything like that?
A. No.
MS. MARMOR: I need to take a break. Oh, no. Nevermind.
Mark this as the next exhibit.
(Whereupon, Goldstein Deposition Exhibit No. 4 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, I'm handing you what's been marked as Goldstein Exhibit No. 4. I'll represent to you we took what you produced to us and then produced it to counsel in the case and added Bate's stamp numbers at the bottom. I'd just like to go through what these materials were that you produced to us.
A. Sure.
Q. The first -- and by the way, the term "Confidential Pursuant to Protective Order" is something we added at the top.
The first document here says Michigan

11

Avenue Neuropsychologists Biographical Questionnaire filled in by -- it looks like filled in by Mr. Nawara on September 11, 2017.
Do you see that?
A. Yes.
Q. What is this document?
A. So this is a background questionnaire that we give to people who come through our clinic. I have two practices. I believe we were out of the one that we use for the Isaac Ray Forensic Group, but it's the same. So I gave him one from the other practice. It's exactly the same.
Q. Sure.
And this is a document that he -- that Mr. Nawara would have -- by the way, let me also just say for the record in the version that you sent us, there was certain identifying information which we have redacted on the document like his date of birth and that kind of thing. That's another difference between them.
A. I see.
Q. That's why I wanted to use this version.
So would all of this be filled out by Mr. Nawara?

12

A. Exactly.
Q. And would you do anything to check any of his answers?
A. Well, I go through this with him, but I have no way to independently confirm the background that he gives me of his life.
Q. Okay.
For example, if we turn to the second page of Goldstein 4 where it asks to check any conditions that he experienced as a child or adolescent and nothing is filled out, correct?
A. That's correct. So he's denying each and every one of those things.
Q. You didn't, for example, obtain medical records to check whether or not any of this was accurate?
A. Well, I have primary care records, but those are him as an adult. So if there would have been anything in there, I could see that, but no, I don't have records from his developmental years.
Q. In your experience -- I mean, let me step back and just lay some foundation.
Have you done a lot of fitness for duty exams?



A. I have.
Q. Approximately how many?
A. Probably over a hundred.
Q. And in any of those fitness for duty exams, in your experience, did you go back to childhood medical -- did you obtain childhood medical records for the subject?
A. There may be some cases where we do get records from someone's adolescence if they have a mental health issue specifically, yes.
Q. So let me see if I understand that.
For example, if somebody comes in at the age of 30 and has a diagnosis of manic depressive illness, you might then go back and see what their -- and maybe they say, "I had an onset or episode mania when I was 13." Then you might go back and look at their prior records?
A. Yes, as much as possible.
I like to ask for ten years of records. We don't often get that. However, we like to have it, if possible.
With fitness for duty, we know that people have come through -- most have come through a pre-hire screening process, so more recent



functioning as opposed to remote functioning is more critical. Certainly, if someone wanted to provide us information, we would accept that and it does happen sometimes.
The vast majority, to be clear, we do not have developmental records when it comes to fitness for duty cases.
Q. Do you have a sense of how far back the records go for the majority of the FFDs that you do get?
A. Up to five years generally. Some up to ten. You know, typically, up to five years. A lot of these folks have -- they switch primary care docs so sometimes you just get the most recent.
Q. You said that you like to ask for ten years of records.
Why is that?
A. Well, if my role is to determine if someone has a psychiatric or a neurocognitive disorder, you can't always rely on self-report and so records are critical. They often predate, most importantly, a fitness inquiry and that's the most important for me, frankly.
Q. And when you say you like ten years of



records for those reasons, are you saying only records, say, of mental health providers or any doctor records that they may have?
A. Primary care is always critical because many individuals receive their mental health care either directly from their primary care doc or their primary care doctor has made a referral. They're often the frontline treater.
Q. And by that, I take it you mean some people come into their regular -- their internist, for example, and say, "I'm having trouble sleeping" or "I'm having trouble at work" or something like that and that could lead to a referral?
A. Absolutely.
Q. Okay.
A. Often insurance is set up that way too, they have to have the referral. So you never want to miss primary care records if you can have them.
Q. Thank you.
If you could turn to page 3108 and I apologize, it's not the most clear document I've ever seen.
A. Bate's stamps. I'm following you.
Q. I mean the writing on it.

A. Oh, yeah.
Q. I do -- there did seem to me to be a variation in the handwriting at the top.
Are these your notes?
A. Yes.
Q. So you added some of your own notes to this?
A. I go through the biographical questionnaire with the individual during my interview to clarify history or to follow up on anything they may have written yes to, et cetera.
Q. Okay.
I'm just sort of interested further down where it says did you have any difficulty with any schooling subjects and were there any school subjects -- were any of the school subjects a particular strength for you and he said he was good at math -- sorry -- he had difficulty with math and religion was a particular strength.
Why do you ask those questions?
A. Well, as a neuropsychologist, we want to know if there are developmental issues like learning disorders or attention deficit disorders, things like that.

17

Q. Okay.
Then if you go to page 3111 of Exhibit 4, if you could just see where -- again, I think this is your handwriting on here --
A. Yes.
Q. -- where there's a little arrow.
Does that -- I can't read this. Could you just read to us what this says?
A. Yes. So he is reporting here increased creatinine levels which is related to stage two of kidney disease. He was seeing -- he was seen by his primary care doc for that and this was in his labs, lab work, the blood work. He was counseled by his primary care doc about that.
Essentially, it just means there was too much protein found in his blood work.
Q. I'll show you the record, but my recollection of reading the records is that one of the things the doctor said was that he should cease using I think it was performance enhancing medication or supplements?
A. Over-the-counter supplements, yes.
Q. Did you know what those were? Did he tell you what those were?

18

A. Pardon me. Let me look here. I don't know if we discussed that, frankly, and I don't have it on my background questionnaire.
Q. Do you know -- I don't know anything about performance enhancing supplements so this is a genuine just sort of question.
Do you know if performance enhancing supplements can have any affect on mood?
A. I don't feel qualified to answer that.
Q. Okay.
A. But I believe I would have asked him if he was taking steroids and I would have included that if he had been. So we can -- the absence of that in my report, we can make a reasonable inference that that was answered as a no.
Q. And you would have asked him -- you believe you would have asked him about steroids because steroids, as I understand it, can create rage situations; is that right?
A. Absolutely.
Q. Okay.
Were any of the labs that you looked at -- did any of the labs that you looked at test for the presence of steroids?

19

A. Not specifically, no.
Q. And, obviously, you don't know what the doctor was referring to when he said performance enhancing supplements?
A. Right.
Q. If you go to page 3114, am I right this is the section of the questionnaire that asks about substance use?
A. Yes.
Q. Does this ask about anything -- would any of these questions have elicited a statement that he might have been using steroids?
A. Yes, illicit drugs. So No. 8 would be recreational, for example, drugs, yes.
Q. Okay.
Do you know if you discussed with him whether he considered steroids a recreational drug?
A. Well, I would have simply asked him. It might not have come up in this particular aspect of the interview, but I would have asked him whether he was using steroids just from looking at him, frankly.
Q. Because he's very built?
A. He is. So that's important to him, right,

20

and it was in his records that he was using performance enhancing drugs. People lie about that so I needed to ask.
Q. And you don't know one way or the other whether he told you the truth?
A. Absolutely no way to know that other than I tried to verify in records and would hope that his primary care doc would have asked the same question, but it was not tested for specifically.
Q. And if you go to the next page, 3115, which is headed Personality/Emotional Functioning. At the top, he says he has had a prior psychological evaluation and it says have you ever been given a psychiatric diagnosis and he refers to March 2017.
Do you see that?
A. Yes.
Q. And did you understand that to be referring either to his three visits with Dr. Hogueisson or to his -- what did you understand that to be referring to?
A. Yeah, that was a reference to when he got into individual psychotherapy with Karolina Hogueisson.



Q. And did you -- you read her notes, correct?
A. I haven't since the beginning.
Q. But your report reflects that she did not make any diagnosis of him; is that right?
A. That's right.
Q. And did you consider -- did you review Dr. Krull's FFD report?
A. Let me go back to your other question. Not that I saw in the records. So she may have diagnosed a diagnosis with him and it may have been his understanding there was a diagnosis.
Frankly, if she were billing insurance, she would have had to have had a diagnosis for that purpose, but it was not in her notes and I did not ring her to do a collateral interview either. Sorry.
Q. That's okay.
So back to do you recall reviewing Dr. Krull's FFD evaluation?
A. Yes.
Q. And did you consider that to be a psychiatric diagnosis?
A. Can you be more specific -- her report?



Q. Yes.
A. No. Her -- you mean a diagnostic exam? Sure. I mean, she, like I was charged with, would have been doing a background and clinical diagnostic examination as a clinician for the purposes of rendering a fitness for duty opinion. So I would consider that a clinical evaluation if that's what you're asking.
Q. Well, what I'm really asking is: Did you see -- did you after reading her report believe that she had made any kind of psychiatric diagnosis of him?
A. I'm afraid I don't recall that.
Q. That's fine. We're going go through her report shortly. It's not a memory test, I promise.
A. I don't have her report anymore. We don't keep things like that so I did not review that prior to this.
Q. I have a copy for you. We will be reviewing it.
For the rest of CCSO 3315 through 3116, it's asking about significant problems and he said no to everything, correct?
MR. BUSTAMANTE: Objection, misstates the



record.
THE WITNESS: So he marked that he has been involved -- on 3116, No. 9, that he has been involved in or witnessed a fire, flood or other disaster and then have you ever witnessed the death or serious injury of another person. These are questions about potential trauma.
MS. MARMOR: Thank you for pointing that out.
BY MS. MARMOR:
Q. In terms of the questions where he's being asked about significant problems on these pages, he said no, correct?
A. Yes.
Q. Then if you could go to 3118, you see where it says Weapons History?
A. Yes.
Q. And he indicated that he owns firearms. He has a handgun and a shotgun and he keeps them at home; is that right?
A. That's right.
Q. Do you know whether that also includes his firearm for work?
A. I would assume so.
Q. Okay.

**Q. And you understood he has a firearm for work?**
A. Right.
**Q. Why do you ask about a weapons history in this questionnaire?**
A. Oftentimes we're doing workplace violence exams. Remember, this is a general questionnaire. Also, we see criminals for the court.
If we're concerned about someone's mental health in the context of fitness for duty, we would want to make a recommendation that firearms be removed from the home, for example.
**Q. So if a correctional -- you understood correctional officers carry guns, police officers carry guns?**
A. When they're doing external operations, the COs do.
**Q. And he was on external operations at the time, correct?**
A. Exactly.
**Q. If there were a serious problem, you would want to make a recommendation to remove him from having the gun; is that right?**
A. If I determined that he were suicidal or



perhaps homicidal, yes.
**Q. And/or just a danger to others; is that right?**
A. An imminent threat to others, right.
**Q. If you could go to page 3121 and it says have you ever been involved in any lawsuits as plaintiff or defendant? If yes, what are the circumstances? His answer was problems at work.**
**Did you ask him about that?**
A. I did. We didn't discuss the details of his suit so much as what he was angry about and his perception of what happened which is in my report.
**Q. So you're talking about this lawsuit?**
A. Right.
**Q. Did he tell you about any other prior lawsuit that he brought against his employer?**
A. If it's not in my report, no.
**Q. If you could turn to 3122 and could you just -- if you see your handwriting on that page, could you just read to us what you wrote there?**
A. Dad was a broker when I was younger. There was so much alcohol. He was describing I think the Mercantile Exchange and what that lifestyle was like. He worked in the Euro dollars



pit at the Merc.
**Q. He did or his father did?**
A. I believe he did. Yeah, he worked for the Mercantile Exchange in 1992 and then at the Board of Trade -- I'm sorry. In 1993, he was at the Board of Trade. Then in 1997, he was at the Mercantile Exchange. These would have been the jobs he had before going to the Sheriff's Office.
**Q. And you say that says so much alcohol?**
A. Yes. He was talking about what was going on in the pits. You know, there was a lot of alcohol and people talk about the cocaine that's running around there.
**Q. And then it says -- does that say four-year high school?**
A. Freshman year of high school he said he met great friends and one of them's father was a CPD. Typically, I'm asking how did you get interested in becoming a cop or a going into corrections. He said his sons and I applied at the same time for the CPD and the other gentleman was hired it looks like.
**Q. And it does it say he -- I can't read -- he something?**



A. He was hired one or two years -- first he said months, one or two months before me and then he said years.
**Q. I see. All right.**
A. You mean you can't read my writing?
**Q. My grandfather was a doctor so I have some experience with this.**
A. I really have no excuse. It's horrific.
**Q. Then if you go to CCSO 3123 and it says are you currently having any work-related difficulties? He responded I don't know where to start.**
**Was that -- did you talk to him about that?**
A. Yes. This was a sarcastic remark, of course. He knew when we went through the consent -- before he filled out anything, he knew that we would be discussing his perceived problems at work in detail. So he just didn't really bother here is what that is.
**Q. Then the next page is CCSO 3124 and this is a job description for a correctional officer, correct?**
A. Yes.

Q. And this is something you reviewed prior to issuing your report?
A. This was provided to me, yes.
Q. And so it has things like key responsibilities and duties?
A. Right.
Q. And that includes things like diffuses disruptive behavior by verbal interventions, controls disruptive behavior by appropriate verbal orders or appropriate use of physical force.
Do you see that?
A. Yes.
Q. And uses verbal and listening skills to determine potential detainee problems.
Do you see that?
A. Yes.
Q. And then, you know, there's a long list. There's -- he, among the things on the top of the next page, CCSO 3125, monitors detainees, watching closely for unusual behavior, improper conduct or signs of conflict.
Do you see that?
A. Yes.
Q. Do you see in the middle of the page

29

another characteristic is that he communicates with other staff and/or main control to inform about detainee behaviors, incidents and/or request assistance?
A. Yes.
Q. And the last page of the job description which is CCSO 3126, you see where it says keeps current on policies, procedures, directives and memoranda?
A. Right.
Q. And then under Knowledge, Skills and Abilities, the job calls for considerable good judgment and initiative required at all times to assure prompt and thorough action during routine and emergency situations, ability to make sound judgments and decisions?
A. Yes.
Q. And then also thorough knowledge of institutional policies and procedures, general orders and the like.
Do you see that?
A. Yes.
Q. And the ability to supervise and control detainees individually and large groups and crews.

30

Do you see that?
A. Yes.
Q. So then -- and what is the use that you make of a document like this in an FFD examination?
A. We request it in every fitness for duty examination. It has to be a part of what we do.
Generally speaking, when one offers an opinion about fitness for duty, we are keeping in mind whether any mental health or medical or neurocognitive disorder may significantly impair the capacity to carry out these functions, these essential job functions in a safe and effective manner.
Q. A correctional officer is a very sort of particular kind of job. It's not like an office job, right?
A. Public safety is different we always say. Absolutely.
Q. And how -- what do you mean by "public safety is different"?
A. Not everybody can do that job. So, for example, when we do pre-hire screening, people with a history of mental health disorders, neurocognitive disorders, they're really not cut

31

out to do this. Because they take care of the public, because they take care of detainees, because they interact with other co-workers, everybody has the right to a safe environment in which they work, they have to be healthy and they have to be -- that includes mental health.
Q. The next document in Exhibit 4 is CCSO 3127. We're going to go into this in more detail later, but this is entitled Information Provided By Superintendent Jones-Hayes telephone conversation with Rebecca Reierson and Winifred Shelby November 16th.
Do you see that?
A. Yes.
Q. This was, in fact, information that had been provided by Superintendent Jones-Hayes about her altercation with Mr. Nawara; is that right?
A. That she provided I believe to HR. This was not created for me specifically, but it was passed along to me.
Q. Right, as background information for you to use in your analysis?
A. Yes.
Q. And it's signed by Jones-Hayes at the

32

bottom.
Do you see that?
A. It is.
Q. And then the next document is -- sorry. The next page of Exhibit 4 is another document called Cook County Referral Form. That's CCSO 3128.
Do you see that?
A. Yes.
Q. And this is a document sent by Winifred Shelby, occupational health nurse.
Do you see that at the bottom?
A. Yes.
Q. And it says reason referring, employee's aggressive physically and I think that says intimidating and inappropriate behavior directed towards his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resources department.
Do you see that?
A. I do.
Q. So did you understand that there were two reasons why he was being referred, one was the

33

event with Jones-Hayes and the other was the event with HR?
A. Yes.
Q. And what the CCSO -- you understood that Nurse Shelby worked for the CCSO, Cook County Sheriff's Office.
A. For the human resources department, yes.
Q. And so what the CCSO was asking -- was looking to determine was if employee is able to perform the essential functions of his job which require he maintain composure and respond appropriately in a high stress environment including exhibiting proper behavior toward detainees and his superior officers. Position requires the individual can diffuse disruptive behavior verbally and if escalated, effectively and properly use limited force on problematic and combative inmates.
Do you see that?
A. I do.
Q. And you've talked about public safety and the work that you do in that area.
Is one part of public safety respecting the chain of command?

34

A. Sure.
Q. And did you understand that Ms. Jones-Hayes was several layers above Officer Nawara in the hierarchy of the Sheriff's Office?
A. I know she was his supervisor.
Q. Did you know that she was a superintendent?
A. Yes.
Q. And do you understand that that's a significantly higher level than a correctional officer?
A. Sure.
Q. The second bullet point in the referral form says employee has -- excuse me -- employer has concerns about anger management including his ability to manage a detainee population without losing his temper.
Do you see that?
A. Yes.
Q. So then -- and this is -- this is everything we received from you. I take it this is what you still have. You've already testified this isn't everything that you reviewed at the time of

35

you doing the report?
A. Say that again. Sorry.
Q. These documents are what you produced in response to the subpoena, but there were some other documents that you would have reviewed like Dr. Shaw's records and the like that you did not maintain after the report was issued?
A. Right. I also took notes during my interview so not everything that -- all my notes aren't on this background questionnaire, but we don't maintain those because the details of that are in the report.
Q. I see. You're answering a question I was going to ask later anyway.
MS. MARMOR: Let's mark this as Exhibit 5.
(Whereupon, Goldstein Deposition Exhibit No. 5 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, I'm handing you what the court reporter has marked as Goldstein Exhibit 5. I will represent to you that these are documents that were provided by CorVel in response to a subpoena in this case seeking, of course, any of

36

their correspondence with you.
So if you would not -- if you would not mind just taking a look at this and seeing if you believe that, indeed, you received the cover e-mail from Michelle Sarocka on September 8, 2017, along with the letter and its attachments?
A. I don't remember this e-mail but sure.
Q. You have no reason to believe you didn't get this?
A. Exactly.
MS. MARMOR: Actually, can we take a break?
(A short break was taken.)
BY MS. MARMOR:
Q. So if you go to the first page of Exhibit 5, you see there's an e-mail from Michelle Sarocka from CorVel on Friday, September 28, 2017, and --
A. September 8th?
Q. The very top is a legal hold. It's irrelevant to the lawsuit. I don't know why they produced that.
If you look at this e-mail from Michelle Sarocka, that's September 8, 2017.
Do you see that?



A. Yes.
Q. And the first part refers to somebody that's not relevant to this case apparently, but then it continues and says attached is the FFD letter to you for John Nawara who will be there on Monday, the 11th, for testing and Tuesday, the 12th, for interview with you. I've also attached all of the medical information we have for him. There's a 28-page attachment with the CCSO referral form. Information -- then page 2 is information provided by Superintendent Jones-Hayes dated 11-16-2016 regarding incident that occurred 9-29-2016. There's a letter to Mr. Nawara from Rebecca Reierson, director HR, regarding FFD evaluation. Then the next three documents are progress notes from Karolina Hogueisson. Then progress notes from four visits by a Dr. Charles Shaw. Then lab results from blood collected in 2015 and 2016. Then the job description for a correctional officer.
Do you see that?
A. Right.
Q. And I know we just took a little break and you've determined that, in fact, that's what's



attached to the letter that's attached to this e-mail?
A. Right.
Q. The referral form is the document we just talked about. The information provided by Superintendent Jones-Hayes is also the document we briefly discussed a moment ago.
Then this November 30, 2016, letter which if you go to Nawara 3453 at the bottom. It these very tiny Bate's stamped numbers at the bottom of the page.
A. You're going to...
Q. It's not easy.
Do you see that that's a letter dated November 30, 2016, to Correctional Officer Nawara from Rebecca Reierson?
A. Right.
Q. And in it, she's talking about the fact that on November 18, 2016, he was informed by the occupational health nurse for the Sheriff's Office, Winifred Shelby, that he was required to undergo a fitness for duty evaluation before returning to active duty and that he took the forms in order to review them prior to signing and had failed to



return them to Ms. Shelby; that she called and left a voicemail message for him to which he did not respond.
Do you see that?
A. Yes.
Q. And what they -- it goes on to say that he needs to participate in the FFD process and that signing the forms would be the first step of doing that; is that right?
A. Right.
Q. Okay.
And then we've got the progress notes from Dr. Hogueisson and Dr. Shaw's records. We discussed that a little bit already.
Then the job description which is the same document that we just talked about a moment ago?
A. Right.
MR. BUSTAMANTE: Let me object. This Exhibit No. 5 does not have the job description attached to it.
MS. MARMOR: I apologize. I don't know why we don't have that.
THE WITNESS: Well, you handed it to me separately.

BY MS. MARMOR:
Q. The question is -- but I think -- just to make it clear, you did get a job description because it appears in the documents that you produced to us, correct?
A. Yes.
Q. Okay.
I'd ask you just if you could go back to the first page of Exhibit 5.
Why do you do testing first and then the interview second?
A. Sometimes there are questions that come up from testing. There may be certain critical items that a person endorses that we want to follow up on like suicidality or something like that. So it gives us -- we don't want a missed opportunity to follow up on testing. It's pretty pro forma. I mean, most clinics do that.
Q. Meaning it's pretty pro forma to do the testing first and the interview second?
A. Right.
Q. Then if you could go to Nawara 3449 which is the cover letter from Ms. Sarocka to you. She said she is the nurse case manager at CorVel



Corporation working on behalf of the Cook County Sheriff's Office.
Do you see that?
A. Yes.
Q. Did you ever -- I take it you were hired by CorVel to do this FFD, correct?
A. Sure.
Q. And did you ever have any direct communication with anybody at the Sheriff's Office?
A. Never.
Q. Okay.
A. Oh, wait. I think -- I think I may have -- did I ask for something from Michelle and maybe she -- it's been too long. I mean, I try to avoid that at all costs. That's the idea of being independent. I feel like I may have asked for something from Michelle -- from...
Q. Ms. Sarocka?
A. Yes. I just can't remember.
Q. Well, I think there are references in your report to having asked CorVel some questions. Maybe that will refresh your recollection when we get to that point, but we don't have to pause on that.



As you sit here right now, you don't recall having any direct communication with the Sheriff's Office about Mr. Nawara or his FFD?
A. No, it wouldn't have been with the Sheriff's Office ever. I think I may have wanted to know more about performance evaluations and asked Michelle if I could get them to be able to verify whether there was a longer -- some more pervasive issues throughout and to verify Mr. Nawara's claim that he had not had significant discipline.
Q. Okay.
So the next paragraph of the letter on September 8th says John Nawara has an evaluation scheduled with Jordan Fuller on Monday 9-11-2017 from 9 a.m. to 5 p.m.
Who is Jordan Fuller?
A. He was my technician that year.
Q. And did he, in fact, conduct the tests?
A. Right.
Q. Do you know how long the tests took?
A. So we do about three and a half hours of psych testing and four hours of cognitive testing which should be here on page 5.



Q. And those were the tests Mr. Fuller -- so seven and a half hours were tests that Mr. Fuller conducted?
A. The cognitive testing he conducts, that's interactive, whereas the psychological testing, that's a self-report. Mr. Nawara would just fill those out on his own.
Q. Okay.
And then it says and with you on Tuesday, 9-12-2017 from 9 a.m. to 5 p.m.
Did you actually meet with him from 9 a.m. to 5 p.m.?
A. No. We like to set that time aside so nobody will schedule anything in case -- some people are slow on their psych testing. So that second day is designed to give them some wiggle room. We just met for three hours. My understanding is that he was able to complete everything that first day.
Q. Okay.
And when you say "We just met for three hours," that means you and Mr. Nawara?
A. Exactly.
Q. Okay.

And then there are a series of questions that Ms. Sirocha asked you to answer; is that right?
A. Right.
Can we go off the record?
Q. We can.
(A short break was taken.)
THE WITNESS: I'm talking about a court order that says you're not going to pay me.
MS. MARMOR: Okay.
THE WITNESS: And that I have requested it. I was willing -- you know, normally, we do a half day. I was willing to do actual hours at $400 an hour, but she promised me this would not be more than an hour and that the $48 and whatever cents was all she was going to be able to pay.
BY MS. MARMOR:
Q. And you understand you're a fact witness in this case?
A. I do. I also have never in 20 years ever when I've testified as a fact witness not had somebody pay me the courtesy of allowing me to charge for my time.
Q. Just so we have it clear for the record



and for whatever it is that I'll present to the Court if we need to get a court order, what you're saying is that you will not testify without a court order saying that you must testify without being paid for that; is that right?
A. Exactly.
Q. And your rate is how much do you want to charge per hour?
A. It's $400 per hour. We normally charge a half day, but I'm willing to charge for just actual time.
Q. Okay.
A. I'm sorry but this is unacceptable, frankly.
Q. Okay. We'll convene. I'll speak to my client if I can get them --
A. And your colleague who --
Q. I promise that I will do that as well, but the reality is that she didn't -- you know, it's an unfortunate misunderstanding.
A. I don't think it was a misunderstanding. I was extremely clear.
Q. I understand but it's not my understanding.



So in any event, what we will do is we'll find out if we can get you paid and if we can't, we'll have to go to court.
To that end, are there any dates -- obviously, Thanksgiving is coming up so I don't think in the next week is going to be possible.
Are there dates -- let me see. The week --
MR. BUSTAMANTE: Well, that's something we can take care of afterwards.
MS. MARMOR: Well no. I'd like to...
BY MS. MARMOR:
Q. Are there dates the week of the 2nd of December that are available for you?
A. Let me get a court order in hand first and then I'll give you some dates.
Q. Okay.
A. I'm sorry. I'm really not trying to be difficult. I really find this so disrespectful of my time. I'm sorry.
Q. Okay.
MR. BUSTAMANTE: For the record, from plaintiff's perspective, I agree with Dr. Goldstein that we had expected that she would have been



compensated for her time and, frankly, didn't expect the dep to go more than three hours, but so be it.
THE WITNESS: Had I been told there would be no limitations on this, I would have insisted at the time that a judge say "Dr. Goldstein, you can't be paid for your time," and then we wouldn't have wasted this time. There are e-mails. There's discussion. I'm not sure why she didn't communicate with you. I certainly don't mean to be disruptive. I respect your time as well. This is a miscommunication that could have been avoided. I mean, I was extremely clear, you know. So, again, my apologies.
MS. MARMOR: Okay. We'll suspend the deposition.
(Deposition concluded sine die.)

Case: 1:17-cv-02393 Document #: 254-27 Filed: 01/28/20 Page 13 of 51 PageID #:5553


STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

Liza Marie Regan, being first duly sworn, on oath says that she is a court reporter doing business in the City of Chicago; and that she reported in shorthand the proceedings of said deposition, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said deposition.

Liza Marie Regan
______________________________
Certified Shorthand Reporter

**Exhibits**

**Goldstein Exhibit 1**
3:13 4:12,14,17,18
**Goldstein Exhibit 2**
3:14 7:12,14,18
**Goldstein Exhibit 3**
3:15 8:10,14 9:1
**Goldstein Exhibit 4**
3:16 11:10,14 18:2 32:7 33:5
**Goldstein Exhibit 5**
3:17 36:15,17,21 37:15 40:18,19 41:9

**1**

**1**
4:12,14,18 9:19
**11**
12:3
**11-16-2016**
38:12
**11th**
38:6
**12th**
38:7
**13**
14:16
**16th**
32:12
**18**
39:19
**1992**
27:4
**1993**
27:5
**1997**
27:6

**2**

**2**
7:12,14,18 38:10
**2015**
38:19
**2016**
38:19 39:8,15,19
**2017**
12:3 21:15 37:5,16,23
**2019**
8:15
**28**
37:16
**28-page**
38:9

**3**

**3**
8:10,14 9:1 10:12
**30**
8:15 14:13 39:8,15
**3108**
16:20
**3111**
18:2
**3114**
20:6
**3115**
21:10
**3116**
23:21 24:3
**3118**
24:14
**3121**
26:5
**3122**
26:18
**3123**
28:9
**3124**
28:21
**3125**
29:19
**3126**
30:7
**3127**
32:8
**3128**
33:7
**3315**
23:21
**3449**
41:22
**3453**
39:9

**4**

**4**
11:10,14 13:9 18:2 32:7 33:5

**5**

**5**
36:15,17,21 37:15 40:19 41:9 43:16,24 44:10,12

**7**

**70**
5:5

**8**

**8**
20:13 37:5,23
**8th**
37:18 43:14

**9**

**9**
24:3 43:16 44:10,11
**9-11-2017**
43:15
**9-12-2017**
44:10
**9-29-2016**
38:13

**A**

**a.m.**
43:16 44:10,11
**Abilities**
30:12
**ability**
30:15,23 35:17
**absence**
19:13
**absolutely**
5:22 6:5 16:14 19:20 21:6 31:18
**accept**
15:3
**accurate**
13:16
**action**
7:20 30:14
**active**
39:23
**added**
11:16,23 17:6
**addition**
33:18
**adolescence**
14:9
**adolescent**
13:11
**adult**
13:18
**affect**
19:8
**affirmative**
7:3
**afraid**
9:11 23:13
**age**
14:13
**aggressive**
33:15,19
**agreement**
8:1
**alcohol**
26:22 27:9,12
**altercation**
32:17
**analysis**
32:22
**and/or**
10:12 11:1 26:2 30:2,3
**anger**
35:16
**angry**
26:11
**answering**
36:13
**answers**
13:3
**anticipated**
8:21
**anymore**
23:16
**apologize**
16:21 40:21
**apparently**
38:3
**appears**
41:4
**applied**
27:20
**applies**
10:11
**appropriately**
34:12
**Approximately**
14:2
**area**
34:22
**arrow**
18:6
**asks**
13:9 20:7
**aspect**
20:19
**assessments**
6:19
**assistance**
30:4
**assume**
24:23
**assure**
30:14
**attached**
38:4,7 39:1 40:19
**attachment**
38:9
**attachments**
37:6
**attention**
17:23
**Avenue**
12:1
**avoid**
42:15

**B**

**back**
4:23 8:8 13:22 14:5,14,17 15:8 22:9,19 41:8
**background**
6:13 12:7 13:5 19:3 23:4 32:21 36:10
**based**
8:22
**basic**
5:12
**Bate's**
11:16 16:23 39:10
**beginning**
22:3
**behalf**
42:1
**behavior**
29:8,9,20 33:16 34:13,16
**behaviors**
30:3
**billing**
22:13
**biographical**
12:1 17:8
**birth**
12:19
**bit**
6:13 40:14
**blood**
18:13,16 38:18
**Board**
27:4,6
**boards**
7:5
**bother**
28:19
**bottom**
11:17 33:1,12 39:9,10
**break**
6:1,4 11:6 37:11,12 38:23
**briefly**
39:7
**broker**
26:21
**brought**
26:16
**built**
20:23
**bullet**
35:14
**BUSTAMANTE**
23:24 40:18

**C**

**called**
6:8 33:6 40:1
**calls**
30:12
**capacity**
31:11
**care**
13:17 15:13 16:4,5,6,7,18 18:12,14 21:8 32:1,2
**carry**
25:14,15 31:11
**case**
6:16 8:19 9:5,13 11:16 36:24 38:3 41:24 44:14
**cases**
6:15 14:8 15:7
**CCSO**
23:21 28:9,21 29:19 30:7 32:7 33:6 34:4,5,8 38:9
**cease**
18:19
**cetera**
17:11
**chain**
34:24
**characteristic**
30:1
**charged**
23:3
**Charles**
38:17
**check**
13:2,9,15
**child**
13:10
**childhood**
14:6
**circumstances**
26:8
**civil**
7:19
**claim**
43:10
**claims**
6:20
**clarify**
17:10
**clear**
15:5 16:21 41:3
**clinic**
12:8
**clinical**
23:4,7
**clinician**
23:5
**clinics**
41:18
**closely**
29:20
**co-workers**
32:3
**cocaine**
27:12
**cognitive**
43:23 44:4
**collateral**
22:16
**collected**
38:18
**combative**
34:18
**comfortable**
5:9,10
**command**
34:24
**commitment**
7:8
**communicates**
30:1
**communication**
42:9 43:2
**communications**
10:12,24
**compensation**
7:7
**competency**
6:24
**complete**
44:18
**complied**
8:20
**composure**
34:11
**concerned**
25:9
**concerns**
35:16
**conditions**
13:10
**conduct**
29:20 43:19
**conducted**
44:3
**conducts**
44:4
**Confidential**
11:22
**confirm**
4:19 13:5
**conflict**
29:21
**consent**
28:17
**considerable**
30:12
**considered**
20:17
**context**
25:10
**continues**
38:4
**control**
30:2,23
**controls**
29:9
**conversation**
32:10
**Cook**
33:6 34:5 42:1
**cop**
27:19
**copy**
23:19
**Corporation**
10:13 42:1
**correct**
13:11,12 22:2 23:23 24:12 25:19 28:23 41:5 42:6
**correctional**
25:13,14 28:22 31:14 35:11 38:20 39:15
**corrections**
27:20
**correspondence**
10:17,20 37:1
**Corvel**
10:13 36:23 37:16 41:24 42:6,21
**COS**
25:17
**costs**
42:15
**counsel**
9:8 11:2,16
**counseled**
18:13
**County**
33:6 34:5 42:1
**court**
4:11,17 5:6 7:17 25:8 36:21

cover
5:11 10:22 37:4 41:23
CPD
27:18,21
create
19:18
created
32:19
creatinine
18:10
crews
30:24
criminal
7:2
criminal/civil
7:8
criminals
25:8
critical
15:2,21 16:4 41:13
current
30:8
cut
31:24

D

Dad
26:21
Dana
9:9
danger
26:2
date
8:1 12:19
dated
38:11 39:14
Daubert
7:11
day
44:16,19
death
24:5
decisions
30:16
defendant
26:7
defense
7:3
defenses
7:4
deficit
17:23
denying
13:12
department
33:20 34:7
deposed
5:2
deposition
4:13 5:9 7:13,18,19 8:2,9,14 11:9 36:16
depositions
5:7
depressive
14:13
deps
5:6
describing
26:22
description
28:22 30:6 38:19 40:15,19 41:3
designed
44:16
detail
28:19 32:8
details
26:10 36:11

detainee
29:14 30:3 35:17
detainees
29:19 30:24 32:2 34:14
determine
15:18 29:14 34:9
determined
25:24 38:24
developmental
13:20 15:6 17:22
diagnosed
22:11
diagnoses
6:15
diagnosis
6:17 14:13 21:14 22:5,11,12,14,23 23:11
diagnostic
23:2,5
Diana
4:4 6:7 11:1
difference
12:20
difficulties
28:11
difficulty
17:14,18
diffuse
34:15
diffuses
29:7
direct
42:8 43:2
directed
33:16
directive
33:18
directives
30:8
directly
16:6
director
38:14
disability
7:5
disaster
24:5
discipline
43:11
discuss
26:10
discussed
19:2 20:16 39:7 40:14
discussing
28:18
disease
18:11
disorder
15:20 31:10
disorders
17:23 31:23,24
disruptive
29:8,9 34:15
distress
6:20
doc
16:6 18:12,14 21:8
docs
15:14
doctor
16:3,7 18:19 20:3 28:6
document
8:17 11:24 12:6,14, 18 16:21 31:4 32:7 33:4,5,10 39:4,6 40:16

documents
8:15,22 9:2,3,18,24 10:12 36:3,5,22 38:15 41:4
dollars
26:24
doubt
9:15
drug
20:17
drugs
20:13,14 21:2
duly
6:8
duties
29:5
duty
4:7,21 10:3,13 13:23 14:4,22 15:7 23:6 25:10 31:5,8 39:22, 23

E

e-mail
37:4,7,15,22 39:2
easy
39:13
effective
31:12
effectively
34:16
elicited
20:11
emergency
30:15
emotional
6:20
employee
33:19 34:9 35:15
employee's
33:14
employer
26:16 35:15
endorses
41:14
enhancing
18:20 19:5,7 20:4 21:2
entitled
32:9
environment
32:4 34:12
episode
14:16
escalated
34:16
essential
31:12 34:10
Essentially
18:15
establish
4:24
ethically
10:8
Euro
26:24
evaluation
21:13 22:20 23:7 38:15 39:22 43:14
evaluations
43:6
event
34:1
exam
23:2
examination
6:10 10:3,14 23:5 31:4,6

examinations
7:2
examined
6:9
exams
13:24 14:5 25:7
Exchange
26:23 27:4,7
excuse
28:8 35:15
execution
7:1
exhibit
4:12,14,18 7:12,14, 18 8:10,14 9:1 11:8, 10,14 18:2 32:7 33:5 36:15,17,21 37:15 40:18 41:9
exhibiting
34:13
experience
13:21 14:5 28:7
experienced
13:10
extent
10:4
external
25:16,18

F

fact
32:15 38:24 39:18 43:19
failed
39:24
fairly
5:8
father
27:2,17
feel
19:9 42:16
FFD
22:8,20 31:4 38:4,14 40:7 42:6 43:3
FFDS
15:9
fill
44:6
filled
12:2,23 13:11 28:17
fine
23:14
fire
24:4
firearm
24:22 25:1
firearms
24:17 25:11
fitness
4:7,20 10:2,13 13:23 14:4,22 15:6,22 23:6 25:10 31:5,8 39:22
flood
24:4
folks
15:13
follow
17:10 41:14,17
force
29:10 34:17
Forensic
11:1 12:10
form
33:6 35:15 38:10 39:4
forma
41:17,19
forms
39:23 40:8

found
18:16
foundation
13:22
four-year
27:15
frankly
15:23 19:2 20:22 22:13
Freshman
27:16
Friday
37:16
friends
27:17
frontline
16:8
full
4:3
Fuller
43:15,17 44:1,2
fully
8:20
functioning
15:1 21:11
functions
31:11,12 34:10

G

gave
12:11
general
6:22 25:7 30:19
generally
6:2,17 15:11 31:7
gentleman
27:21
genuine
19:6
give
12:8 44:16
Goldstein
4:2,4,13,16,17 6:7 7:13,18 8:9,14 11:1, 9,13,14 13:9 36:16, 20,21
good
4:2 17:17 30:12
grandfather
28:6
great
27:17
ground
5:12
Group
11:1 12:10
groups
30:24
gun
25:23
guns
25:14,15

H

half
43:22 44:2
hand
4:10
handed
40:23
handgun
24:18
handing
4:16 7:17 8:13 11:13 36:20
handwriting
17:3 18:4 26:19

happen
15:4
happened
26:12
headed
21:11
health
14:10 16:2,5 25:10 31:9,23 32:6 33:11 39:20
healthy
32:5
hearing
7:5,11
hierarchy
35:4
high
27:15,16 34:12
higher
35:11
hired
27:22 28:1 42:5
history
17:10 24:15 25:4 31:23
Hogueisson
21:20,24 38:16 40:13
hold
37:19
home
24:19 25:12
homicidal
26:1
hope
8:19 21:7
horrific
28:8
hostile
33:19
hours
43:22,23 44:2,17,22
HR
32:18 34:2 38:14
human
33:20 34:7
hundred
14:3
hybrid
7:8

I

idea
42:15
identification
4:15 7:15 8:11 11:11 36:18
identifying
12:17
illicit
20:13
illness
14:14
imminent
26:4
impair
31:10
important
15:23 20:24
importantly
15:22
improper
29:20
inappropriate
33:16
incident
38:12
incidents
30:3

**included**
19:12
**includes**
24:21 29:7 32:6
**including**
34:13 35:16
**increased**
18:9
**independent**
9:14 42:16
**independently**
13:5
**individual**
17:9 21:23 34:15
**individually**
30:24
**individuals**
16:5
**inference**
19:14
**inform**
30:2
**information**
5:18 8:16 10:5 12:17 15:3 32:9,15,21 38:8,10 39:5
**informed**
39:19
**initiative**
30:13
**injury**
24:6
**inmates**
34:18
**inquiry**
15:22
**insanity**
7:3
**institutional**
30:19
**insurance**
16:16 22:13
**intake**
9:12
**interact**
32:3
**interactive**
44:5
**interested**
17:13 27:19
**internist**
16:10
**interventions**
29:8
**interview**
17:10 20:20 22:16 36:9 38:7 41:11,20
**intimidating**
33:16
**involved**
24:3,4 26:6
**involves**
6:16
**involving**
6:14,15
**irrelevant**
37:20
**Isaac**
10:24 12:10
**issue**
14:10
**issued**
9:9 36:7
**issues**
17:22 43:9
**issuing**
29:2
**items**
41:13

**J**

**job**
28:22 30:6,12 31:12, 15,16,21 34:10 38:19 40:15,19 41:3
**jobs**
27:8
**John**
4:8 9:4 10:1,14 11:2 38:5 43:14
**Jones-hayes**
32:10,16,24 34:1 35:3 38:11 39:6
**Jordan**
43:15,17
**judgment**
30:13
**judgments**
30:16

**K**

**Karolina**
21:23 38:16
**keeping**
31:8
**key**
29:4
**kidney**
18:11
**kind**
6:22 12:19 23:11 31:15
**knew**
28:16,17
**knowledge**
30:11,18
**Krull's**
22:8,20
**Kurtz**
9:9,18

**L**

**lab**
18:13 38:18
**labs**
18:13 19:22,23
**large**
30:24
**lawsuit**
26:13,16 37:20
**lawsuits**
26:6
**lay**
13:22
**layers**
35:3
**lead**
16:13
**learning**
17:23
**left**
40:1
**legal**
37:19
**letter**
10:22 37:6 38:5,13 39:1,8,14 41:23 43:13
**level**
35:11
**levels**
18:10
**lie**
21:2
**life**
13:6
**lifestyle**
26:24
**limited**
34:17
**list**
29:17
**listening**
29:13
**location**
8:2
**long**
29:17 42:14 43:21
**longer**
43:8
**looked**
19:22,23
**losing**
35:18
**lot**
7:6,11 13:23 15:12 27:11

**M**

**made**
16:7 23:11
**main**
30:2
**maintain**
34:11 36:7,11
**majority**
15:5,9
**make**
19:14 22:5 25:11,22 30:15 31:4 41:3
**manage**
35:17
**management**
35:16
**manager**
41:24
**mania**
14:16
**manic**
14:13
**manner**
31:13
**March**
21:15
**mark**
4:11 7:12 11:8 36:15
**marked**
4:14,17 7:14,18 8:10,13 11:10,14 24:2 36:17,21
**MARMOR**
4:2,5,10,16,23 5:4,8, 11,17,21 6:1,6,11 7:16 8:12 11:6,12 24:8,9 36:15,19 37:11,13 40:21 41:1
**materials**
11:18
**math**
17:18
**Meaning**
41:19
**means**
18:15 44:22
**medical**
10:1,9 13:14 14:6,7 31:9 38:8
**medication**
18:21
**meet**
44:11
**memoranda**
30:9
**memory**
23:15
**mens**
7:2
**mental**
14:10 16:2,5 25:9 31:9,23 32:6
**Merc**
27:1
**Mercantile**
26:23 27:4,7
**message**
40:2
**met**
27:17 44:17,21
**Michelle**
37:5,15,22 42:13,17 43:7
**Michigan**
11:24
**middle**
29:24
**mind**
31:9 37:3
**missed**
41:16
**misstates**
23:24
**moment**
10:21,23 39:7 40:16
**Monday**
38:6 43:15
**monitors**
29:19
**months**
28:2
**mood**
19:8
**morning**
4:2
**moved**
8:1

**N**

**Nawara**
4:8 9:4,9 10:3,14 11:2 12:3,15,24 32:17 35:4 38:5,13 39:9,15 41:22 43:3, 14 44:6,22
**Nawara's**
4:20 10:1 43:10
**needed**
21:3
**neurocognitive**
15:19 31:10,24
**neuropsychologist**
17:21
**Neuropsychologists**
12:1
**Nevermind**
11:7
**notes**
17:4,6 22:1,15 36:8, 9 38:16,17 40:12
**November**
32:12 39:8,15,19
**numbers**
11:17 39:10
**nurse**
33:11 34:5 39:20 41:24

**O**

**object**
40:18
**Objection**
23:24
**objects**
8:16
**obtain**
13:14 14:6
**obtained**
10:1
**occupational**
33:11 39:20
**occurred**
38:12
**offers**
31:7
**office**
27:8 31:15 34:6 35:5 39:20 42:2,9 43:3,5
**officer**
28:22 31:14 33:17 35:4,12 38:20 39:15
**officers**
25:14 34:14
**offices**
8:3
**Oftentimes**
25:6
**onset**
14:15
**operations**
25:16,18
**opinion**
23:6 31:8
**opportunity**
41:16
**opposed**
15:1
**order**
11:22 39:23
**orders**
29:10 30:20
**outset**
5:1
**Over-the-counter**
18:22
**owns**
24:17

**P**

**p.m.**
43:16 44:10,12
**pages**
24:11
**paragraph**
43:13
**Pardon**
19:1
**part**
31:6 34:23 38:2
**participate**
40:7
**pass**
10:9
**passed**
32:20
**past**
6:23
**pause**
42:23
**pension**
7:4,5
**people**
12:8 14:22 16:10 21:2 27:12 31:22 44:15
**perceived**
28:18
**perception**
26:12
**perform**
34:10
**performance**
18:20 19:5,7 20:3 21:2 43:6
**performed**
6:19
**person**
24:6 41:14
**Personality/ emotional**
21:11
**pervasive**
43:9
**Ph.d.**
6:7
**physical**
29:10
**physically**
33:15
**pit**
27:1
**pits**
27:11
**plaintiff**
9:3 10:1,14 11:2 26:7
**point**
35:14 42:23
**pointing**
24:8
**police**
25:14
**policies**
30:8,19
**population**
35:17
**Position**
34:14
**potential**
24:7 29:14
**practice**
12:12
**practices**
9:13 12:9
**pre-hire**
6:17 14:24 31:22
**predate**
15:21
**predators**
7:9
**prepared**
4:6,8,20
**presence**
19:24
**presented**
33:19
**pretty**
41:17,19
**primary**
13:17 15:13 16:4,6, 7,18 18:12,14 21:8
**prior**
6:12 9:8 14:17 21:12 23:18 26:15 29:1 39:24
**pro**
41:17,19
**problem**
25:21
**problematic**
34:17
**problems**
23:22 24:11 26:8 28:18 29:14
**procedures**
30:8,19
**proceed**
7:1
**process**
5:9 14:24 40:7

**produce** 8:15,22 9:19
**produced** 9:2,4,18 10:15 11:3, 15,16,18 36:3 37:21 41:5
**program** 7:6
**progress** 38:16,17 40:12
**promise** 23:15
**prompt** 30:14
**proper** 34:13
**properly** 34:17
**Protective** 11:22
**protein** 18:16
**provide** 15:3
**provided** 6:23 7:4 9:22 10:6 29:3 32:9,16,18 36:23 38:11 39:5
**providers** 10:2 16:2
**providing** 10:2
**psych** 43:23 44:15
**psychiatric** 15:19 21:14 22:23 23:11
**psychological** 21:13 44:5
**psychotherapy** 21:23
**public** 7:6 31:17,19 32:2 34:21,23
**purpose** 22:15
**purposes** 23:6
**pursuant** 7:22 9:4 11:22

**Q**

**qualified** 19:9
**quarter** 5:7
**quasi-legal** 7:7
**question** 5:14,22 6:3 7:21 8:21 9:2 10:11 19:6 21:9 22:9 36:13 41:2
**questionnaire** 12:2,7 17:9 19:3 20:7 25:5,7 36:10
**questions** 17:20 20:11 24:7,10 41:12 42:21
**quick** 4:18

**R**

**rage** 19:19
**Ray** 11:1 12:10
**rea** 7:2
**read** 18:7,8 22:1 26:20 27:23 28:5
**reading** 18:18 23:10
**reason** 9:15,16 33:14 37:8
**reasonable** 19:14
**reasons** 16:1 33:24
**Rebecca** 32:11 38:14 39:16
**recall** 8:18 9:8 22:19 23:13 43:2
**receive** 16:5
**received** 35:22 37:4
**recent** 14:24 15:14
**recollection** 9:14 18:18 42:22
**recommendation** 25:11,22
**record** 4:3 12:16 18:17 24:1
**records** 10:9 13:15,17,20 14:7,9,17,19 15:6,9, 16,21 16:1,2,3,18 18:18 21:1,7 22:10 36:6 40:13
**recreational** 20:14,17
**redacted** 12:18
**reference** 21:22
**references** 42:20
**referral** 16:7,13,17 33:6 35:14 38:9 39:4
**referred** 33:24
**referring** 20:3 21:19,21 33:14
**refers** 21:14 38:2
**reflects** 22:4
**refresh** 42:22
**regular** 16:10
**Reierson** 32:11 38:14 39:16
**related** 18:10
**relevant** 38:3
**religion** 17:19
**rely** 15:20
**remark** 28:15
**remember** 9:11 25:7 37:7 42:19
**remote** 15:1
**remove** 25:22
**removed** 25:12
**rendering** 23:6
**rephrase** 5:23
**report** 4:6,7,19 9:20,21 19:14 22:4,8,24 23:10,15,16 26:12, 17 29:2 36:1,7,12 42:21
**reporter** 4:11,17 7:17 36:21
**reporting** 18:9
**represent** 11:14 36:22
**request** 30:3 31:5
**require** 34:11
**required** 30:13 39:21
**requires** 34:15
**research** 6:13
**resources** 33:20 34:7
**respecting** 34:23
**respond** 34:11 40:3
**responded** 28:11
**response** 9:19 33:17 36:4,23
**responsibilities** 29:5
**responsibility** 7:2
**rest** 23:21
**results** 38:18
**return** 40:1
**returning** 39:22
**review** 22:7 23:17 39:24
**reviewed** 29:1 35:24 36:5
**reviewing** 22:19 23:20
**rider** 8:24
**ring** 22:16
**role** 15:18
**room** 44:17
**routine** 30:14 33:18
**rules** 5:12
**run** 7:5
**running** 27:13

**S**

**safe** 31:12 32:4
**safety** 7:6 31:17,20 34:21, 23
**sarcastic** 28:15
**Sarocka** 37:5,16,23 41:23
42:18
**schedule** 44:14
**scheduled** 43:15
**school** 17:15,16 27:15,16
**schooling** 17:15
**screening** 6:18 14:24 31:22
**section** 20:7
**seeking** 36:24
**self-report** 15:20 44:6
**sense** 15:8
**sentencing** 7:1
**separately** 40:24
**September** 8:15 12:3 37:5,16, 18,23 43:14
**set** 16:16 44:13
**sexually** 7:9
**Shaw** 38:18
**Shaw's** 36:6 40:13
**Shelby** 32:11 33:11 34:5 39:21 40:1
**Sheriff's** 27:8 34:6 35:4 39:20 42:2,9 43:3,5
**short** 37:12
**shortly** 23:15
**shotgun** 24:18
**show** 10:20,23 18:17
**signed** 32:24
**significant** 23:22 24:11 43:10
**significantly** 31:10 35:11
**signing** 39:24 40:8
**signs** 29:21
**simply** 20:18
**single** 6:16 9:12
**sit** 43:1
**situations** 19:19 30:15
**skills** 29:13 30:11
**sleeping** 16:11
**slow** 44:15
**so-called** 7:3
**someone's** 14:9 25:9
**sons** 27:20
**sort** 17:13 19:6 31:14
**sound** 30:15
**speaking** 6:17 31:7
**specific** 10:9 22:24
**specifically** 8:18 14:10 20:1 21:9 32:19
**speculation** 5:18
**staff** 30:2
**stage** 18:10
**stamp** 11:17
**stamped** 39:10
**stamps** 16:23
**start** 28:12
**state** 4:3
**statement** 20:11
**step** 13:21 40:8
**steroids** 19:12,17,18,24 20:12,17,21
**strength** 17:17,19
**stress** 34:12
**subject** 14:7
**subjects** 17:15,16
**subpoena** 7:19,22 8:15,22 9:5, 9 36:4,24
**substance** 20:8
**suicidal** 25:24
**suicidality** 41:15
**suit** 26:11
**superintendent** 32:10,16 35:8 38:11 39:6
**superior** 33:17 34:14
**supervise** 30:23
**supervisor** 35:6
**supplements** 18:21,22 19:5,8 20:4
**supposed** 10:8
**Susan** 4:4
**switch** 15:13
**sworn** 4:1 6:9

**T**

**taking** 19:12 37:3
**talk** 4:6 5:15 27:12 28:13
**talked** 34:21 39:5 40:16
**talking** 26:13 27:10 39:18
**technician** 43:18
**telephone** 32:10
**temper** 35:18
**ten** 14:19 15:12,15,24
**tend** 10:7
**term** 11:21
**terms** 5:6 24:10
**test** 19:23 23:15
**tested** 21:9
**testified** 5:5 6:9 7:10 35:23
**testify** 7:19
**testimony** 6:12,14,23 7:4
**testing** 38:6 41:10,13,17,20 43:23 44:4,5,15
**tests** 43:19,21 44:1,2
**them's** 27:17
**thing** 12:19
**things** 6:14 7:8,9 10:8 13:13 17:24 18:19 23:17 29:4,7,18
**threat** 26:4
**time** 6:2 8:2 9:17 25:19 27:21 35:24 44:13
**times** 5:4,6 30:13
**tiny** 39:10
**today** 4:6 5:18 7:23
**told** 21:5
**top** 11:23 17:3 21:12 29:18 37:19
**Trade** 27:5,6
**trauma** 24:7
**treater** 16:8
**trial** 7:1
**trouble** 16:11,12
**truth** 21:5
**Tuesday** 38:6 44:9
**turn** 13:8 16:20 26:18
**type** 7:7
**types** 6:22 7:8
**typically** 15:12 27:18

Case: 1:17-cv-02393 Document #: 254-27 Filed: 01/28/20 Page 18 of 51 PageID #:5558



**U**

**undergo**
39:21
**understand**
4:5 5:13,21 14:11 19:18 21:18,20 33:23 35:2,10
**understanding**
9:17 22:12 44:18
**understood**
25:1,13 34:4
**unusual**
29:20

**V**

**variation**
17:3
**vast**
15:5
**verbal**
29:8,9,13
**verbally**
34:16
**verify**
21:7 43:8,9
**version**
12:16,22
**versus**
5:6
**violence**
25:6
**violent**
7:9
**visits**
21:19 38:17
**voicemail**
40:2

**W**

**wait**
42:12
**wanted**
4:24 12:22 15:2 43:5
**watching**
29:19
**weapons**
24:15 25:4
**weeks**
33:18
**wiggle**
44:16
**Winifred**
32:11 33:10 39:21
**witnessed**
24:4,5
**work**
16:12 18:13,16 24:22 25:2 26:8 28:19 32:5 34:22
**work-related**
28:10
**worked**
26:24 27:3 34:5
**worker**
7:7
**working**
42:1
**workplace**
25:6
**writing**
16:24 28:5
**written**
17:11
**wrote**
26:20

**Y**

**year**
9:10 27:16 43:18
**years**
13:20 14:19 15:11, 12,16,24 28:1,3
**younger**
26:21

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. )No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The Continued Discovery Deposition of DIANA S. GOLDSTEIN, M.D., called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, on December 16, 2019, at the hour of 2:00 o'clock p.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.

50

APPEARANCES:

LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER VINCENT BUSTAMANTE,
17 North State Street,
Suite 1550,
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff;

SCHARF, BANKS, MARMOR, LLC,
BY: MS. SARAH R. MARMOR,
333 West Wacker Drive,
Suite 450,
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
Representing Thomas Dart,
in his official capacity
as Sheriff of Cook County,
Illinois, Matthew Burke,
Rebecca Reierson, and
Winifred Shelby;

51

APPEARANCES (Continued):

STATE'S ATTORNEY OF COOK COUNTY,
ILLINOIS,
BY: MR. LYLE K. HENRETTY,
50 West Washington Street,
Suite 2760,
Chicago, Illinois 60602
(312) 603-1424
lyle.henretty@cookcountyil.gov
Representing Karen Jones-Hayes.

52

I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DIANA S. GOLDSTEIN, M.D. | |
| By Ms. Marmor (continued) | 54 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Goldstein Deposition | |
| Exhibit No. 6 | 56 |
| Exhibit No. 7 | 115 |
| Exhibit No. 8 | 126 |


53

(WHEREUPON, the witness was duly sworn.)
DIANA S. GOLDSTEIN, M.D.,
called as a witness herein, having been first previously duly sworn, was examined and testified further as follows:
EXAMINATION (Continued):
BY MS. MARMOR:
Q. Good afternoon, Dr. Goldstein. We ended the last deposition with a series of questions that had been sent to you by Michelle Sarocka from Isaac Ray -- sorry -- from CorVel. If you go to the third page of Deposition Exhibit 5, do you see her cover letter to you?
A. Yes.
Q. Okay. And I just want to focus very briefly on the numbered items in this letter. Do you see that?
A. Yes.
Q. Okay. And what she said in her letter, what Ms. Sarocka said in her letter, was, "Following your comprehensive evaluation of John Nawara, please provide your comments and recommendations to the following questions."



Do you see that?
A. Right.
Q. And you -- in fact I see what you're doing. You took the questions she gave you in her referral, and you put them in your report, and you answered them where appropriate, correct?
A. Exactly.
Q. Okay. And I'm reading down this list of questions. Would it be fair to say that these are all questions functionally asking was Mr. Nawara safe to return to work?
A. Yeah. Fitness for duty, generally safe and effective in one's position with co-workers, the public, and in this case detainees.
Q. Do you see on No. 6 on Exhibit 5, do you see No. 6 where it says, "Do you have any recommendations to prevent another occurrence?" Do you see that?
A. Yes. And I see you have some notes here. Are these your notes?
Q. Oh, sorry. These are my notes. Sorry. This was the Exhibit 5 that I got. So let me give you a clean copy to look at.



A. That's okay. I'm not going to read those notes into the record. I appreciate.
Q. The only question I have is do you know, what did you understand the word occurrence to mean in that question?
A. Right. The incident that allegedly took place on either 9-28 or 9-29-16, depending on who you speak to. I think it was just a question of which day it was. But yeah, the incident between Officer Nawara and his supervisor, Jones-Hayes.
Q. Okay. That's superintendent Jones-Hayes?
A. Yes, ma'am.
MS. MARMOR: Okay. Can we mark this as the next exhibit?
(WHEREUPON, Goldstein Deposition Exhibit No. 6 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Deposition Exhibit 6. I'll represent to you I just went to your website and printed off some



of the pages from your website. Does this look familiar to you?
A. Sure.
Q. Okay. And I just thought this would be a kind of quicker way of getting through things like your background and that kind of thing. You have a doctorate in clinical psychology from University of Chicago Medical School, is that correct?
A. No. It's a clinical psychology degree with a specialty in neuropsychology from what used to be called the Chicago Medical School, it's now Rosalyn Franklin School of Medicine, in science what I like to call the nom de guerre. But they changed the name. The University of Chicago is where I did most of my training and my fellowship.
Q. Great. Okay. And Rosalyn Franklin was a great lady.
A. Yes.
Q. When we're off the record, I'll tell you why I think that.
A. Okay.
Q. And you're board certified in clinical

neuropsychology?
A. I am.
Q. And you have specialty areas of research. I'm not going to cover all of them, but some of them include workplace violence, is that right?
A. I wouldn't say that that's really an area of research of mine. Because we have a public safety program and we deal generally speaking with mental health and, you know, occupational medicine in general we do that, but my research is more in neuro and in criminals and malingering and various neurocognitive disorders and things like that.
Q. Okay.
A. I have certainly presented on workplace violence and done teaching, but my area of research where I'm actually, you know, collecting data and whatnot is not in workplace violence.
Q. Okay. Great. Now, it says that you -- it says you treat both civilian populations and law enforcement personnel, is that right?
A. Right.



Q. Have you treated others from the Cook County Sheriff's Office?
A. No. I don't believe I have ever treated anybody --
Q. Okay.
A. -- from Cook County.
Q. The Sheriff's Office, that is.
A. From the Sheriff's Office, right. No. I don't think so. Not that I recall.
Q. Do you have any -- I'm just trying to get a sense of your interactions or your experiences with the Cook County Sheriff's Office. Have you had any involvement in how they set up fitness for duty exam processes at the Sheriff's Office?
A. Well, I don't think they are much different from the way that all of our other fitness for duty exams are set up. Typically there's a third party administrator, in this case CorVel, and they set it up with us directly rather than us getting a call directly, say, from a supervisor or HR at Cook County, and, you know, the idea is that it's supposed to be independent.



Q. Right. And I was asking a slightly different question. I appreciate that answer and have no problem with that answer, but it's a slightly different question, which is have you had any involvement in, say, consulting with the Sheriff's Office about how they make internally decisions about who to send for fitness for duty exam or not?
A. I don't know of any department that does that. That's all an administrative decision. Is that what you're asking? There are times when I receive calls from someone to say should we have a fitness for duty exam. Is that kind of what you're getting at?
Q. No. I'm really more getting at policies and procedures within the organization or what do you do if you see a problem with someone, and how -- you know, who makes the decision to send somebody for a fitness for duty exam?
A. No.
Q. No, you have had no involvement with that?
A. No. That's not my role.



Q. So the second page of Goldstein Deposition Exhibit 6 asks a useful question, which is what is a forensic evaluation. And my question to you is do you consider a fitness for duty exam a forensic evaluation?
A. I consider it quasi-legal, like worker comp. It is not -- there is no legal case pending before a court. Typically there's, you know, some administrative decision or in the case of pension disability, for example, there will be a board of police and fire commissioners. It's not going to get done in a formal court.
Q. But I'm asking does that mean it's not a forensic evaluation?
A. It's a type of forensic. Certainly wouldn't call it clinical evaluation. I mean, it's clinical in the sense that, you know, we conduct examinations on clinical issues, but there's no doctor-patient relationship, and that's really the bottom line of the difference.
Q. Right. And your website actually talks about some of those differences. It says it's not clinical. A clinical would be that a

treater or the patient himself would self-refer for an evaluation, and that's not the case in FFD, correct?
A. Well, they're not always self. Patients aren't always self-referred. The difference is is there a doctor-patient relationship or not. That's the bright line between clinical versus nonclinical.
Q. Okay. If you go to the third page of Exhibit 6 where it says, "The goal and scope of a clinical versus forensic evaluation."
A. Um-um.
Q. It says -- it's sort of -- there's a series of jump sites, but then it says, "The purpose of any evaluation should be evident by asking what is the referral question and should always be clearly stated at the beginning of a report." Is that right?
A. Right.
Q. Okay. And I think you did that here, and we'll look at your report in a moment. And let me just ask this. You need to know why the employer is asking for an FFD, right? That's why you want to know the referral question?

62

A. No. The referral question is fitness for duty.
Q. I see. Okay. And the fitness for duty question, however, comes from the employer, correct?
A. Right. It's prompted by some incident or some concern, right.
Q. Okay. Okay. If we can go to Page 4, where it says, "The nature of the relationship between examiner and examinee in a clinical versus forensic evaluation." Do you see that?
A. Right.
Q. And this is where you're talking about the fact that there's not a doctor-patient relationship, correct?
A. Exactly.
Q. One of the things I noticed in here is you say -- or the website says, "The examinee is not the holder of privilege. The third party that referred the individual for evaluation," and it gives examples including the employer, "owns the record and work product, and while some exceptions exist, in the vast majority of cases examinees are not entitled to the

63

examiner's report."
A. So this was created -- this website was created before McGreal v. Ostrov --
(WHEREUPON, there was a short interruption.)
THE WITNESS: Before McGreal, M-c-G-r-e-a-l, v Ostrov, O-s-t-r-o-v, which is an Illinois Appellate case, which had to do with a fitness for duty examination.
But one of the things that came out of it was the judge's decision that fitness for duty examination reports are in fact a type of medical record, and therefore, under the Illinois Confidentiality Act, examinees, fitness for duty examinees, can in fact have their report, and of course this would extend to pre-hire reports as well.
BY MS. MARMOR:
Q. So how far back did that decision go?
A. That's a 2004 decision.
Q. Perfect. Thank you. So Mr. Nawara would have had a right to your report?
A. Absolutely, and I would have told him so during the examination.

64

Q. Okay.
A. We are updating this website, by the way.
Q. Understood.
A. But it clearly does say there are some exceptions.
Q. Sure. If you could go to the -- go two pages in, so this would be the sixth page of Deposition Exhibit 6, the one that says, "Workplace Violence Evaluations."
And here there is a statement that says, "Workplace violence accounts for one in every six violent crimes in the United States and has been referred to as a national epidemic by the Center for Disease Control." Given what you just said, is that a fairly current statement?
A. I don't know.
Q. Do you believe workplace violence is a serious problem?
A. Of course.
Q. And the website goes on to say, "It encompasses physical assault, verbal threats, intimidation, harassment -- sexual harassment,

65

destruction of workplace property, off-site stalking and telephone harassment. In addition to increasing worker compensation premiums and liability risk for employers, workplace violence diminishes productivity and morale and increases employee turnover." Do you still agree with that statement?
A. Of course.
Q. Okay. I notice if you go down to the -- skip the next paragraph, but go to the next one. It says, "Both personality and environmental factors, actuarial and dynamic, can result in employee instability and risk for violence. Some of these factors include a history of aggression or escalating aggression, poor stress or frustration tolerance, poor coping resources or social support, impulsivity, possession of or access to firearms or other weapons," and then it goes on, "presence of an active substance abuse, psychiatric or personality disorder, a marked change in or decompensation of any of these conditions, and changes in level of interpersonal interaction or personal hygiene and changes in work



productivity." I'm going to stop right there. Is that all still accurate in your view?
A. Of course.
Q. Ends with, "Designation of a specific target, e.g., a host (sic) or co-worker."
A. A boss or co-worker.
Q. I'm sorry. I apologize.
A. It's okay. It's very small writing, and I'm amazed that I can actually read that.
Q. I'm sorry. I'll read that again. "Designation of a specific target, for example a boss or co-worker, and a sense of justification for the commission of a violent act." Do you see that?
A. Yes.
Q. Okay. So is there -- can there be cases of workplace violence where people are not necessarily potentially violent to everybody, but they have specific targets that they're angry at?
A. Absolutely.
Q. Okay. Is there a -- okay. If you could go to the last page of Deposition Exhibit 6 where it says, "Public Safety



Evaluations." I take it what you did here was not a public safety evaluation, correct?
A. No. We would not necessarily consider it -- I mean, it is and it isn't. We do a lot of pre-hire screening in our public safety program. But fitness for duty when it involves someone who's in a public safety sensitive position, which Officer Nawara is, it is part of public safety because he is dealing with community members, albeit they're detained. Of course he's also doing that if he goes on external operations, right.
So it is in this case fitness for duty is sort of like we also call them impaired professionals examinations, but it is about occupational medicine and occupational health. And so I would consider it in this particular case public safety.
Q. Okay. If you look at the last paragraph underneath the photograph here where it says, and I'll try and read this correctly, "Fitness for duty evaluations may become necessary when an individual encounters problems once in a public safety position." Sounds like



that's exactly what you were just talking about with Officer Nawara.
A. Yeah. Just to clarify, and I'm kicking myself that I wrote this so ambiguously, it is not that they're encountering a problem once, it's once they're in a position.
Q. Got it. I see.
A. Yeah.
Q. And then not the next sentence but the one after it says, "Clinicians review performance evaluations, disciplinary action and commendations, citizen complaints and compliments, conduct collateral interviews with supervisors, and review relevant medical records." Do you see that?
A. Yep.
Q. And we talked last time about medical records. I have a question about this, "conduct collateral interviews with supervisors." I don't think you did that here, correct?
A. No. We do that when we are allowed access to a department. So, for example, sometimes a chief will call us directly or a labor attorney will call us directly. They're

not using an IME company. And so we can have access.

In this particular case -- there are times when we're just not allowed to do that because we have independent medical evaluation, you know, we're not allowed basically. We don't have access. It limits us a little bit. And so we go with what we have.

And I can anticipate your next question is sure, I would have loved to have had discussion with anybody and anyone that either the County or Officer Nawara would have liked me to speak to.

**Q. And did you ask CorVel to speak to anyone?**

A. I don't remember if I did. But my fitness for duty process is always like that. You know, the more information, the better, can we have access. I think what they did instead is provide me correspondence between HR, for example, and superintendent --

**Q. Officer Nawara?**

A. No, between HR and --

**Q. Jones-Hayes?**



A. -- Jones-Hayes. And then also descriptions of their interactions during that meeting at HR. So that was what they gave me, yeah. Yeah.

**Q. Okay. And if you had asked to speak to, say, Jones-Hayes or the HR people, would you have expected to see that in your report?**

A. Right. Had I done collateral interviews, I would have indicated that in my report.

**Q. Well, I'm asking a little different question, which is if you had asked to meet with them and had been told no or something, would you put that in the report?**

A. Yeah.

MS. MARMOR: Okay. So let's -- it looks like you have a copy of your report. This is Goldstein Exhibit 1. I didn't bring extra copies because I gave them --

MR. BUSTAMANTE: I have it.

MS. MARMOR: Okay. Good.

Just please don't write on that, Lyle, because it's my official copy.

THE WITNESS: Can we go off the record for



one second?

MS. MARMOR: Sure.

(WHEREUPON, a discussion was had off the record.)

BY MS. MARMOR:

**Q. How many fitness for duty reports have you done for CorVel, roughly?**

A. CorVel? I don't know. Dozens and dozens, I imagine. I'm not sure. The IME company changes about every few years, so I don't really look at it as which IME company it's for.

**Q. All right. If you can guesstimate how many FFD reports have you done for Cook County Sheriff's Attorney employees?**

A. Only a handful.

**Q. So less than five?**

A. Yeah. Maybe. Not sure. Maybe more. Some of them are pension disability, so I don't really remember. I don't break them down like that.

**Q. I take it you have never worked for the Sheriff's Office as an employee.**

A. Oh, as an employee, no.



**Q. Have you worked for the Sheriff's Office as a consultant?**

A. Well, I'm not sure what the difference is between the city, county, and -- you know, I have been retained by attorneys to look at, for example -- well, that would be the city, I guess. I don't know if I have. I don't recall if I have.

**Q. Okay. And have you ever worked at a correctional facility?**

A. Not as an employee but spent about five to six days a week in Lake County Jail when I was conducting my research on psychopaths and was intimately involved in the day-to-day workings of that jail. I have been to many prisons. I have been to many jails. Heading to Graham Correctional tomorrow, was at Kane County twice last month. You know, it's a regular part of my work.

**Q. Have you been to the Cook County Jail here in Chicago?**

A. Absolutely.

**Q. And how many times have you been there?**

A. Probably a dozen.

Q. Have you ever been to the Cermak facility there?
A. Yes.
Q. And how many times have you been to Cermak?
A. Couple times, I think. I used to teach there. Maybe three times through the Isaac Ray Center. They had the contract there to provide all the mental health treatment there, the psychiatrists and psychologists. That was through the Isaac Ray Center. So I would go teach there as well and of course my colleagues there, we were in touch all the time.
Q. Was that mental health treatment for employees or for detainees?
A. No, for detainees. Yeah.
Q. Do you have any kind of sort of certificates or training in disciplinary procedures at jails?
A. I'm a psychologist, no.
Q. And do you understand the different roles played by supervisors in HR in the FFD referral process at the Cook County Sheriff's Office?

74

A. Can you be more specific? That's very general.
Q. That's why I'm asking the question. I just want to understand your foundation. Do you know who makes the referrals and how it's done?
A. I imagine every department is different. HR is typically involved when someone is contacting me because you can't put medical protected health information in someone's front personnel jacket.
So I'm either getting a call from HR or from a chief or from a labor attorney, and it's always going to go either to a labor attorney or to HR or both.
Q. Have you ever read -- there are management guidelines at the CCSO for how to do FFD referrals. Have you ever read those?
A. I don't know. Maybe. But it's not something I really -- I mean, it's not my role. You know, what I can say is that there have been times when I have been sent to fitness for duty examination, and I have declined to take it because I felt it was punitive or that the process was being misused.

75

I will accept a fitness for duty examination if I think that the prompting question is relevant and appropriate, it is some kind of mental health or cognitive issue where there has been some disruption at the workplace and somebody's been pulled off work as a result of that, and there may be a question of whether there is personality, mental health, substance use, or cognitive problem prompting the issue that may be treatable, and that there is a question of safety effectiveness, you know, within the workplace. So in this particular case I felt it was a good referral, and I accepted it.
Q. Okay. Thank you. And I assume you have never spoken to Winifred Shelby. That was the occupational nurse.
A. I don't know. There may have been one time where we -- I may have been copied on an e-mail to her, but I don't know that it was even this case. I just don't know.
Q. You have no memory of ever speaking to her about this case.
A. No.

76

Q. Same question about Rebecca Reierson. You've never spoken to her about this case?
A. Been too long. I don't think so. I just don't think so. We really tried to say separate. I don't know.
Q. And then the final person I'll ask about is Superintendent Jones-Hayes. You never spoke with her about her interactions with Mr. Nawara, correct?
A. I don't believe so, no.
Q. Okay. So if you could turn to Exhibit 1. Let me just find my copy of it. So the first page of -- and I'm just going to go --
A. Lovely picture. I was so young then.
Q. So this is, I take it, your form that you use for fitness for duty exams, correct?
A. Yes.
Q. Fitness for duty exam reports.
A. Sure.
Q. Okay. And it says that -- this is sent to Ms. Sarocka, and it notes that at her request on September 11, 2017 and September 12, 2017 you conducted an examination of Officer Nawara for the purpose of assessing his fitness to return

77

to duty as a correctional officer for the Cook County Sheriff's Office. Do you see that?
A. Yes.
Q. Now, it says that, "The request for examination follows an interpersonal interaction between Officer Nawara and Superintendent Jones-Hayes that took place on September 29, 2016 in the basement of Cermak, the location of Officer Nawara's assignment that day." Do you see that?
A. Right.
Q. So one of my questions here, if you may recall at our last -- at the first day of this deposition you said you understood that there were two reasons he was sent. One was that event, but also there was the HR interaction.
A. Right.
Q. I'm just wondering why that wasn't included here, if you know.
A. That wasn't the prompting. That was not the prompting issue. He went to HR to discuss this issue. This is the prompting issue.
Q. But do you recall -- and I'll point you to letter C here on the first page of your



report where it says, "In addition" -- it says on 8-25-17 Cook County referral form from Human Resources describing the reasons for referral as, quote, "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to routine directive. In addition, weeks later employee presented as aggressive and hostile in the Human Resources Department."
A. Okay.
Q. So my question really is -- even if this is the case, I just want to understand it. Were you more focused on the Jones-Hayes altercation than what happened with HR?
A. Not at all. My report addresses both.
Q. And did you understand that in fact both prompted his fitness for duty exam?
A. Sure. Sure.
Q. Really Page 2 -- Page 1 really covers what you say prompted the report and also the materials you were given to review, is that right?
A. Right.
Q. We've already basically gone over that,



so I am not going to retread that ground. Page 2 is -- Pages 2 and -- basically Pages 2 through 4, effectively they describe both what Jones-Hayes says happened and then what Mr. Nawara says happened. Is that a fair statement?
A. Right.
Q. Okay. And one of the things that I noticed, if you go to the middle of Page 2 where you're talking about what Superintendent Jones-Hayes said, she wrote in her statement, "Superintendent Hayes realized that something was going on with this officer and stated maybe it was something about her presence that set Nawara off. Until administration decided what was the required action to take, Superintendent Hayes decided to stay away from him after the incident." Do you see that?
A. Right.
Q. And remember when we were talking about the idea that people could focus their anger on, say, a boss or a single co-worker? One of my questions is did you do any sort of investigation to find out whether there was



something in fact particular to Superintendent Jones-Hayes that might have set Mr. Nawara off?
A. There is nothing that he said related to her in that -- that there was anything, you know, particular about her, simply that that day she seemed very annoyed with him when she came in, and he perceived that perhaps she was annoyed because there had just been a fight, and she counted on him to kind of keep things together. So his reaction was specific to that interaction. He never said there was any larger pattern with her.
So yeah, we would have covered that, and that's not what he said. It related very specifically to the events of that day and the way she perceived him and the way he perceived her, and that just didn't go well after that.
Q. And of course you're relying on him to tell you -- you can't make a judgment about whether he's telling you the truth, but you're relying on him to tell you whatever he's going to tell you.
A. I was very clear in this report that I have no way to confirm one way or another what

he said versus what she said. It's not my role, either.
Q. And it points out here, if you go to the next paragraph after that, the body of the text, that he remained in Cermak I guess for the next day, but then he was moved to external operations, correct?
A. Well, he went to a couple of different places. He originally was assigned to 3 North for about an hour, and then he went to 2 North, and then he was returned to the same place, this staging area in Cermak, and then they put him on external operations after that.
Q. Okay. So it was within a day or two?
A. Right.
Q. Okay. And then you point out, you note that he worked there until November 18, 2016, which was the day he went to Human Resources. And based on what happened there, he was told that they were going to send him for a fitness for duty exam, and they removed him from duty, correct?
A. Hold on. What you just said is not necessarily true. You say based on what



happened there they told him he was being removed. I don't know -- it seems to me they were calling him in on that day to tell him that he was being removed for fitness, but I don't know one way or another. You seem to be suggesting that what happened at HR prompted the decision for fitness, but I don't know that that's the case at all.
Q. Well, I will represent to you that the HR representatives -- and I'm sure there will be a dispute about this -- but they say very specifically no decision had been made until he came in, and one of them has testified that it was 99 percent what he did that day that caused them to remove him from duty and send -- remove him from work and send him for fitness for duty.
A. Okay.
Q. And I just really want to make the point that that is the point at which, it was only upon the HR visit that he was in fact removed from duty, correct?
A. All I can say is he was removed from duty after that meeting.
Q. Correct. Right.



A. I don't know the reason.
Q. That's fine. That's fine. And then you note that Officer Nawara apparently refused to comply with the fitness process as presented by Human Resources that day, missing deadlines to have his medical records delivered to Human Resources throughout the spring of 2017.
And you point out that while you were not provided a second letter, you did get a -- according to Dr. Kroll's fitness for duty examination, Officer Nawara reported he received a reminder letter from Human Resources on February 28, 2017 to complete the necessary forms to facilitate fitness process provided to him on November 18, 2016, similar to the November 30th letter that you did have, correct?
A. Right.
Q. Okay. And did you understand at the time that you met with him that he in fact rather than comply, he had filed a lawsuit?
A. No.
Q. Okay. Did you know that there was a lawsuit at the time that you took his examination?



A. I think he told me he was either involved in a lawsuit or getting ready to, but I specifically stayed away from that because the question put before me was simply a fitness for duty.
Q. Okay. Now, on Page 3 where it says, "During the interview here, Officer Nawara described a very different set of events." Do you see that?
A. Yes.
Q. Was all of this information that you specifically elicited or is this information he wanted to volunteer?
A. No. I mean, it's always in response. It's an interactive process. So I will say, "Tell me what happened," and these are his -- this is his version of events.
Q. Okay. Because I'm reading, and it says, "For context he first described the basement setting details he felt were relevant to understanding the interaction between him and Superintendent Jones-Hayes that followed," and there's a lot of discussion here about whether there was a written policy and whether it was

dangerous and all of these things. Were those things that you asked for him to give you or was that detail that --
A. I see. No. I just let people go. So I just say, you know, "Tell me what you feel is relevant. Tell me what you feel is important. I would like to hear your version of events." And I think he kind of said, well, there's a few things, to provide some context.
Those were not his words, but he was setting the scene, if you will, so that I could understand what may have caused some of the tension there. So that's how I like to do my interviews. I just say, "Tell me what you think led to this," and this is what he offered.
Q. Okay. So he disputed that there was a written policy about restraining detainees, is that right?
A. Right.
Q. And you didn't do anything one way or another to determine if that was true.
A. No.
Q. And he discussed his own opinions about why, even if that was the policy, it wasn't



really possible to comply?
A. Yes. He expressed those concerns. Yes.
Q. And he talked about what he considered to be the unsafe environment in that location?
A. He did.
Q. Okay. And did he express any awareness that that was why it was in fact important to have detainees restrained? Since it's unsafe, it's important to have detainees restrained?
A. Oh, I think he appreciated what the point of manacles and shackles are for. His concern was that if some are not -- the way I understood it is that if some are not shackled or manacled and some are, there are situations he was explaining where some detainees strike others who are then helpless because they're manacled. You know, they've got their hands behind their back. Or they're shackled to a bench and can't go anywhere.
So he was talking about, you know, a lack of equipment being available and things like that, and just being -- you know, his perception. I don't want to put words in his



mouth, but his perception of why that is a rather intense situation down there, yeah.
Q. But it was also the case that when Superintendent Jones-Hayes arrived, one of the things she was annoyed about him was not -- that everybody was not manacled and shackled, correct?
A. Yes.
Q. Okay. And he claims he was calm, and she was agitated and poked him in the chest, correct?
A. I don't think he claimed, "Oh, I was perfectly calm." I mean, he saw that she was kind of annoyed, and he admitted to getting sarcastic and, you know, disagreeing with what she had to say.
And in his -- in his mind -- again, his perception is that she aggressed first by putting her finger toward him or nearly touching him or touching him, whatever happened it's not for me to say, but it just went badly. He thought that her verbal exchange was that she was expressing annoyance that things were sort of in disarray, and he responded to that, and it



just really spiraled and went downhill.
Q. Was he saying basically she was being critical of him?
A. Yeah. The way he described it was it was almost like he was drawing the inference. What he said was, you know, I used to be on this -- you know, maybe she expected more from me because it was this fight that just broke out, and that was the reason that they were called down here, you know, her with Sergeant Connolly. That was the reason they were called down.
And I perceived, essentially kind of inferred, not like she said it, but that he felt like she was annoyed, as if to say -- again, it's an inference, but that, you know, why is everything in disarray here, what's going on, you know?
Q. I'm looking at Page 3. You quote -- there is a quote here. It starts out not as a quote, but it says there was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said, "Why is that inmate not cuffed?" Do you see that there?

A. Right.
Q. So was he saying that she was saying that to him?
A. Well, I assume so, because -- and she's putting his finger in my chest. He didn't say that was specifically aimed at him, but, you know, he is saying, quote, "I could just see she was annoyed."
She was saying why is that inmate not cuffed. Whether that's aimed particularly at him or, you know, loud enough for him to hear, clearly he's an officer there, so it was intended for him to hear. Maybe there were other people who it was intended for as well.
But it's his assignment. So for him to infer that that was something that he should take note of is not unreasonable. And then he is saying, "And then she's putting her finger in my chest." I don't know if those things happened at the same moment --
Q. Or at all.
A. -- simultaneously. That's right, or at all.
Q. And I don't want to beat a dead horse.



A. That's okay.
Q. We can leave the question of what happened between them really to the jury, correct?
A. Yeah.
Q. You weren't there, and the jury will end up deciding that.
A. Absolutely.
Q. Okay. Now, he also says that after she left, he had some sort of an issue with somebody who didn't want to be shackled. Do you see that? It starts with dot, dot, dot on Page 4. Do you see where it says dot, dot, dot, "She leaves with Connolly"? The second full paragraph.
A. Okay.
Q. And he says he was being sarcastic. He walked over to Sergeant Connolly and said, And yes, I am sure I was being a little sarcastic here. I said, Hey, Serge. Serge, I got a shackle for the unshackled detainee.
Connolly says he'll come with me to shackle this guy, but Superintendent Jones-Hayes has finished her call and said now I will go



with you. And she does, and he took some umbrage of her allegedly saying, Baby, Baby, I need you to shackle up for this officer. He did, and he did calm down. But what Nawara told you was, As we walked away, I said maybe if you follow me around all day, I could do my job. Do you see that?
A. Right.
Q. And did he say how he said this to her, whether it was, you know, putting his mouth to her ear, whether he was yelling, anything like that?
A. First let me back up. I don't see anywhere where I say he took umbrage with her. He just simply described factually what she did. In other words, she stepped in because she had previously said, "Now you're in charge, and you should be handling this."
So then when he offers to go and shackle this person, she says, "No. I'll do it." So she took over, and he says to her, "Well, you know, maybe if you follow me around all day, I could do my job." Of course he was being sarcastic. He admitted that he was being



sarcastic. He was annoyed.
Q. Right. So he did take umbrage at what she was doing.
A. I don't know that. No. I can't say that. I think that's an inference that's not reasonable here. I think that he was upset with the whole interaction to begin with, and she continued to -- you know, she was there, and he wasn't pleased at how their interaction was going in general. I don't know that it was related to her shackling that person.
Q. Okay. So what do you think, "Maybe if you follow me around all day, I could do my job" was referring to?
A. Generally speaking she was complaining -- she had said, "I know you're in charge, and you should be handling this." She was criticizing his work. She came down and said, why is this place -- in essence, why is this place in disarray? Those are not her words.
But he even said, "My perception is she was annoyed with me when she walked in because there had just been a fight, and she was

criticizing me." "Who's the officer in charge? I know you're in charge. You should be handling this." So he is defensive. And if that's what you call taking umbrage, okay. But he admitted he got sarcastic. He was sarcastic with Connolly, too. "Hey, look. I found a shackle."

He just didn't appreciate being -- the way that he describes it he didn't appreciate being criticized when in his view he was handling things the best that he could.

**Q. Right. And we had talked about -- I'd asked did he feel criticized. I wanted to establish it does seem like he felt criticized, correct?**

A. Sure.

**Q. Okay. Then you go on to this November 18, 2016 meeting in Human Resources, and you say, "Officer Nawara explained that it seemed to go badly from the start." Did you tell him that they had in their referral very specifically said that he was hostile and aggressive?**

A. I'm sure we talked openly about it, yeah.

**Q. What did he say about that?**

94

A. Well, would you like me to read my report?

**Q. Well, I don't see any reference to whether or not -- to him denying being hostile or aggressive in here, and that's why I was wondering whether that even came up.**

A. I'm not sure exactly what -- you mean what he might have said or done?

**Q. Yeah.**

A. I don't think that he was denying that that went badly. I mean, he picked up and left and just said, "I'm not going to be a part of this," and he explained why, and that's what's here.

**Q. Okay. Did you -- one of the comments here is that Nurse Shelby told him this wasn't an OPR review. Do you see that?**

A. Yes.

**Q. And what did you understand that to mean?**

A. That he wasn't under professional review. You know, the Office of Professional Review or whatever OPR stands for, that he was asking for representation, and she was trying

95

to say perhaps, well, this isn't that type of investigation. He was uncomfortable. He wanted representation, anyway. There was tension, there was defensiveness, et cetera. He just wasn't comfortable.

He also didn't feel that he was getting a direct explanation as to the reason that he was there. Now, of course I was not there. They may have been trying to tell him, and he was defensive. I think he was very clearly defensive to having to be there to begin with.

And, you know, this idea that he wanted to call union representation, I mean, he even said that may have inflamed an already intense situation. So he was accepting some responsibility for things just spiraling and going badly.

**Q. Did he in fact tell you that he left the meeting to call his union rep?**

A. Yes.

**Q. Okay. And then he went back with the union rep. Did you understand that there were two separate parts to this meeting?**

A. Right.

96

**Q. Okay. And you could see you were not provided details regarding what occurred in the HR meeting other than the general description that was provided with the referral, correct?**

A. Right.

**Q. Okay.**

A. But, I mean, it did say I think threatening and aggressive behavior. Employee's aggressive, physically intimidating, and inappropriate behavior, right? I'm sorry.

**Q. That was the first one.**

A. That was the first one. And then the concerns about anger management just I think were -- persisted based on how he behaved in that meeting in that he was defensive and angry and uncooperative.

**Q. The words are hostile and aggressive.**

A. Yes.

**Q. Okay. One of the things that -- it says, then, Officer Nawara -- after -- you concede to the point we were just talking about, which is that you didn't have all the details about that meeting, from the Sheriff's Office at least.**

97

It says, "Officer Nawara ultimately refused to sign a waiver for release of his medical records to Nurse Shelby and left the meeting." Do you see that?
A. Yes.
Q. Did you guys discuss the fact that he in fact had been given two different forms to sign that day, and he signed neither of them?
A. I don't know. But he said Officer Nawara ultimately refused to sign the waiver for release of his medical records.
Q. To Nurse Shelby. There's a reason I'm asking. One was going to Nurse Shelby, and one was simply for CorVel.
A. Oh, yeah. He did explain. He said, I'm not going to -- generally speaking -- I mean, he may have misunderstood. I don't know. I don't want to -- bottom line, he wouldn't release any medical records to anywhere.
I think you know he went on to make this point about how he would be willing to send them directly to CorVel, and then there was some disagreement about whether that was true or not, and he felt that he was sort of

98

creating some new policy about things going directly to CorVel when in fact perhaps that was not the case. You know, that's neither here nor there.
The bottom line was, as far as I was concerned, he wasn't going to cooperate with that process as they put it to him. He was not comfortable with it.
Q. With any part of the FFD process.
A. At that point it sounds like it, right.
Q. Thank you. He then explained that -- it goes on, says he explained that at that point he felt he was being paid in some way, and he was talking about that. And it says one of the things he thought was going on was that he had recently filed a complaint against Superintendent Jones-Hayes. Do you see that?
A. I do.
Q. Do you have any basis to know whether Superintendent Jones-Hayes or anybody in HR even knew he had filed the complaint?
A. Not at all.
Q. Okay. He added that because he believes Nurse Shelby and Superintendent

99

Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources. Do you see that?
A. Yes.
Q. Did you ask him why he thought Superintendent Jones-Hayes and Nurse Shelby were personal friends?
A. I'm sure that I did, but the point here is I don't know one way or another. And I said because he believes. So that's all that really matters. He is describing his perception. I don't know that that's true or not.
I think the point here is that he was trying to say, "I just didn't feel that this was objective. I wasn't comfortable. I didn't want to do it." I have no way to know one way or another whether any of that is true or not, but he was defensive, he was uncomfortable, he just didn't want to play.
Q. The reason I ask is you understand Jones-Hayes is the superintendent at the jail.
A. Yes.
Q. And Nurse Shelby is an occupational health nurse in HR.

100

A. Yes.
Q. And in fact the only apparent thing they have in common is that they're both African-American women. Did he tell you that, that they were both African-American women?
A. No. I would have absolutely written that if I thought that he was creating some race bias here or something. He very clearly felt -- I mean, he talked about, "I feel like I have been scapegoat." He used that word. "I have to take my lumps."
He definitely described a perception of being mistreated or treated unfairly. Again, I have no way to know whether that is true or not, but this is the reason for his anger.
MS. MARMOR: I need to take a quick break to get some more water.
THE WITNESS: Sure.
(WHEREUPON, there was a short interruption.)
BY MS. MARMOR:
Q. At the bottom of that paragraph it says, "He did ultimately leave with an understanding that the fitness examination was

101

being requested based on threatening behavior toward his superior officer related to the September incident with Superintendent Jones-Hayes."
So two questions about this because it's a little confusing. Did he leave the -- are you saying he left the HR meeting --
A. Yes.
Q. -- or left your interview?
A. The HR meeting. The point being that at the start he was saying, "They refused to tell me why I" -- or "I was not getting a clear response as to why I was there and what the issue was," so by the end of the meeting he left with an understanding that the fitness for duty examination was being sought because of this incident back in September.
Q. And I take it he didn't tell you that he also understood that his behavior with HR was another reason he was being sent for the fitness for duty exam.
A. Well, I don't know how he could have known that since the decision apparently was made -- at least the way he told me is that at

102

the moment that he left the HR meeting, it was his understanding that he was being requested to undergo fitness for duty based on the September incident.
Q. But you don't -- and I understand. I'm just simply trying to establish what you don't -- the things you don't know, for example, that there was a conversation in the HR meeting that based on his behavior in the HR meeting he was being sent for a fitness for duty exam.
A. I can't know that one way or another.
Q. And he didn't report that to you.
A. What he reported was that he left with the understanding that the basis for the fitness for duty examination was the September incident.
Q. Okay. The next paragraph goes into what I would say are kind of any kind of reports about stressors and any kind of life dysfunction. Would that be a fair statement about what this is about?
A. Right.
Q. I take it that you found no evidence of significant symptoms or significant life dysfunction?

103

A. Right.
Q. And what do you mean by that, by life dysfunction?
A. Often times when people have a full-blown psychiatric disorder, by definition they are having impairment in various areas of their life. They can show up in work. They can show up in parenting. They can show up in taking care of themselves, you know, hygiene and all of that, ability to pay bills and manage their home life and things like that.
Q. Did you also find that there was no significant life dysfunction from the stress that he reported from his difference of opinion, let's say, with his employer?
A. Yes.
Q. And that actually -- if we go to the next page, you see the first full paragraph, it says, "During the interview here, Officer Nawara denied ever experiencing significant psychiatric symptoms in his life. And while he described understandable stress and frustration with the work situation at Cook County, he denies a significant life dysfunction in any

104

critical area."
So my reading that properly, is that meant to say, well, even though there was stress, it wasn't causing any major life dysfunction?
A. Right. And also, as you see, it didn't rise that -- any symptoms that he had did not rise to the level of any psychiatric disorder, so that's consistent with somebody who would not have significant adaptive functioning problems or significant impairments in occupational functioning, personal, social functioning, parenting, whatever might be relevant in that person's life, school, et cetera.
Q. And in fact if you go back to Dr. Hogueisson, she offered no psychiatric diagnosis in any of her notes, is that right?
MR. BUSTAMANTE: Objection. Ms. Hogueisson is not a doctor.
MS. MARMOR: Right.
BY MS. MARMOR:
Q. Ms. Hogueisson.
A. Right. There were three notes available for review between -- a couple in

105

February and one in April of 2017, and she did not offer any psychiatric diagnosis, and she just describes some mild symptoms, decreased energy, motivation, sleep, diminished sense of self-worth, restlessness, feelings of hopelessness and worry about his job status. Those are all understandable adjustment issues related to an identifiable stressor in his life. And she did not make any diagnosis. She certainly could have as an LCPC, a Licensed Clinical Professional Counselor.
Q. Okay. Back to Page 5. It says -- it notes that he split with his fiance since November of 2016, and they have ended a nine-year relationship. Noted he began dating a new woman about which he feels very positively, hopes it continues to work out.
And then it says he claims the mildly elevated creatinine and glucose levels have normalized. While he refuses to be worked up for possible sleep apnea, he denies daytime somnolence or driving problems. Do you see that?
A. Yes.



Q. Sleep apnea can cause irritation, correct?
A. Well, let's say that the more proximal cause is sleep deprivation, right. Whether it's from obstructive sleep apnea syndrome or anything else, anything that leads to sleep disruption and sleep deprivation and fatigue will certainly leave a person more vulnerable to poor frustration tolerance, irritability, agitation, et cetera.
Q. And I just want to check something here. Well, the thing I was looking for is you recall that he had been told that he had elevated creatinine levels and that there was this question about what supplements might be causing that.
A. Yes.
Q. And he states in here that he claims elevated creatinine and blood glucose levels have normalized. Did you see any medical records that actually confirmed that?
A. Give me a moment. I had some primary care records through --
Q. That was Dr. Shaw.



A. You know what? Through February of 2017. So no, I would not have seen recent labs.
Q. Okay. And you recall that there were at least two notes in his -- well, it doesn't matter. I have got the notes.
A. There was clearly a discussion with his primary care physician about dietary supplements and their potential impact on creatinine and levels, and just generally speaking, you know, they are not FDA approved, so they can cause issues, you know, in some people.
Q. Right.
A. Right.
Q. And at the end of this paragraph here it says he insists -- or but insists that he does not display the type of anger outbursts that Superintendent Jones-Hayes described. Do you see that?
A. Yes.
Q. And again, it sounds like there was no discussion maybe because it just wasn't sort of focus of all of this, whether he denied any angry outbursts with HR.
A. Oh, I don't think he denied that at



all. He was angry. No. I mean, he was defensive, and he didn't want to be there. I mean, he described a -- he said it just went bad from the start. He felt defensive. He didn't know why he was there. Nobody was really talking to him. He got so annoyed he left.
Q. Fair enough.
A. Yeah.
Q. So then the next page goes to your conclusions and opinions, if you turn to the next page.
A. Yes.
Q. And you really answered the first two questions together, which was does he have a health condition that impairs his ability to perform the essential functions which require he maintain composure and respond appropriately in high stress environment, including exhibiting proper behavior towards detainees and superior officers.
Position requires this individual to diffuse disruptive behavior verbally and deescalate it effectively and properly use limited force on problematic and combative

inmates, and that's the list of his position as outlined in his job description.
It also says does Mr. Nawara pose a safety risk to himself or others if he returns to work full duty. Do you see that?
A. Right.
Q. Okay. And to be clear -- and you answered fundamentally he's fit for duty, correct?
A. Right.
Q. Okay. And to be fair this was nearly a full year after September 29, 2016 altercation with Jones-Hayes.
A. Right.
Q. And it was about 11 months after the HR interaction.
A. Sure.
Q. And is it possible that there were things that were going on in his life that you just don't know about at that time that could have in fact predisposed him to being angry or having outbursts at that time?
A. You're saying are there -- is it possible that there were things that he withheld

110

from me which could have led to -- or helped explain why there was an outburst at the time?
Q. Yes.
A. Sure. I don't have a crystal ball, and I'm not a human lie detector.
Q. And you understood that the Sheriff's Office had been trying to get him to cooperate with the FFD process since November of 2017.
A. Right.
Q. And of course he had not cooperated until shortly before he met with you.
A. Well, my understanding is he sought his own fitness for duty examination. I don't necessarily consider that cooperation, but it certainly seems like he was attempting to address the fitness issue in his own way. But certainly I would say that is not cooperating with the department.
Q. Right. And in fact Dr. Kroll had no information from his employer.
A. Exactly.
Q. And had no medical records.
A. That's exactly right. So there would be limitations in what she could or could not

111

conclude.
Q. Did you rely on her opinions in reaching yours?
A. Not at all.
Q. You then -- you go through the results of your tests, and you say he had moderate defensiveness. What does that mean?
A. So response bias, a person's approach, which is what we say, a person's approach to the test, has to do with whether they may be exaggerating certain psychiatric symptoms or their status, minimizing certain psychiatric stability or symptoms.
And what I mention here is that it's not uncommon for people in personnel examinations, we see the same thing in custody, to say, look, there is nothing to see here. I'm fine. Everything's fine.
He was not more defensive than other people going through similar types of examinations, fitness for duty, pre-hire screening, et cetera. So in other words, it wasn't so defensive that we learned nothing about him and that it invalidated the clinical

112

results, the clinical interpretation. But one always has to keep in mind -- and again, these tests are also not, you know, lie detectors, either.
I identified some response bias. He was defensive. I did not feel he was more defensive than other people that I have seen for other 20 years, and he did not invalidate his psych. It was consistent with what he was saying and consistent with other people going through fitness for duty. But of course there was some response bias there.
Q. To put it in complete layperson's terms, do you take what they say with a grain of salt?
A. Always.
Q. Okay. So you then go on to say -- this is the paragraph at the bottom. "While it is my opinion based on available information that Officer Nawara did not have a personality disorder, per se, he does possess obsessive-compulsive and narcissistic personality traits which may shed light on some of his interpersonal reactions." Do you see

113

that?
A. Yes.
Q. And I assume you were talking about obsessive-compulsive disorder and narcissistic personality disorder are things that are in the Diagnostic & Statistical --
A. Statistical manual, yes, in the -- currently the 5th version. That's right. So sometimes people have -- those are personality disorders. Sometimes people have certain traits which impact them, but it doesn't rise to the level of a disorder, so it is not entirely impairing.
However, personality traits can be -- you know, can really color your interpersonal interactions in particular with people. I guess the way we would think about personality traits and disorders is that it's your filler on everything, it's the way you interpret everything, the way people talk to you, the way -- what you infer from what you're seeing and how people are treating you.
And as I mentioned here, these types of traits can lead one to be somewhat rigid and



sort of miss the gray, everything is black and white, not see the forest for the trees, be somewhat narcissistic which, at its core, means that someone is actually -- sort of has some low self-esteem or, you know, may be particularly sensitive to criticism and therefore react strongly if one perceives that one is being criticized, true or not. That's the filter.
Q. So -- thank you. Appreciate that. Now you understand why I was asking some of my questions. I'd just like to quickly -- I don't want to belabor this, but I would like to quickly take a look at the DSMs.
MR. BUSTAMANTE: I don't want to belabor it, but let me do it, anyway.
THE WITNESS: I appreciate your process. It's good.
(WHEREUPON, Goldstein Deposition Exhibit No. 7 was marked for identification.)
BY MS. MARMOR:
Q. So Dr. Goldstein, the court reporter has handed you Goldstein Exhibit 7, and this is relevant pages from the Diagnostic and



Statistical Manual of Mental Disorders, 5th edition. This one is about obsessive-compulsive personality disorder. Do you see that?
A. Yes.
Q. And it's broken down into various forms. First there is diagnostic criteria, and a person with this full-blown disorder has a pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency. Do you see that?
A. Yes.
Q. So it sounds like what you were just saying was that Officer Nawara has a certain rigidity that -- and did he also in your view need some sort of interpersonal control that led to some of the outcomes here?
MR. BUSTAMANTE: Objection to the form of the question. No diagnosis was made of Officer Nawara as having this particular disorder, and the report refers only to traits.
Counsel's question --
MS. MARMOR: I understand --



MR. BUSTAMANTE: Let me finish my objection. Counsel's question implies that the traits that you have read are the traits that were observed, and I object.
MS. MARMOR: I'm giving the doctor the opportunity to tell me what I have got right and what I've got wrong.
THE WITNESS: It's not right or wrong because nothing is black and white. The idea with people who have obsessive-compulsive traits, it's not that they necessarily have to have control, but the perception of not being in control can lead one to be anxious.
When things -- when gray is involved, and they like black and white, it can lead to anxiety and a sense of kind of losing one's foothold, if you will. So I can't say in Officer Nawara's case, oh, he specifically felt he was losing control. That's not what he said, and that's not necessarily how he described the situation.
I think that even he, by his own admission, has insight into his personality traits, and, you know, describes himself as kind

of a black and white guy. I write things down, and I like things one way or another, and I don't necessarily see the gray. He had some insight.

And I think in general when you see somebody who's a bit of a Boy Scout, who's overly conscientious, they have a high justice principle, this can lead them, because of their inflexibility, to be quick in the moment to interpret, particularly criticism, very keenly, to take it hard, and to react strongly.

BY MS. MARMOR:

**Q. And can that justice principle -- I'll give you an example. Officer Nawara described Nurse Shelby as unethical after having only sat with her for about 20 minutes. Is that consistent with these kinds of traits? Looking at this, for example, which is, you know, overconscientious, scrupulous, and inflexible about matters of morality, ethics, or values?**

A. I would say the combination of both obsessive-compulsive personality traits and narcissism. There is a grandiosity there. You know, "I'm going to label you as unethical."



But again, that's very black and white.

Unethical is an extremely strong word, and most people don't necessarily understand the ethics of one profession or another unless they deal with this quite a lot. So unethical is a very serious accusation.

I think generally speaking what I inferred from what he was saying, and I think he was very clear, is that he felt defensive and angry over having been criticized. He thought the whole process was a bunch of BS. That's bullshit, if you need me to spell that. And he became angry. He took issue with how he perceived he was being treated, and therefore couldn't participate in the manner in which they asked him because he just thought the whole thing was unfair and unjust.

Are there personality traits that could lead him to be vulnerable to interpret all of that in that way? Absolutely. Even if it were not intended in that way or if it were factually untrue, absolutely. I have no way one way or another to know whether it's factually correct or not.



So to say this is all personality or all, you know, his misinterpretation, I can't say that, either, but he certainly would be vulnerable to take criticism very harshly and respond defensively.

**Q. And for a layperson who doesn't have your experience, are they -- is it -- would it be hard for them to be able to say, oh, this is just traits rather than a full-blown personality disorder or a full-blown problem?**

MR. BUSTAMANTE: Objection to form of the question.

MS. MARMOR: You don't need to coach. I get it.

MR. BUSTAMANTE: Sorry. I don't know --

MS. MARMOR: Form is fine.

MR. HENRETTY: Form and foundation are the only ones --

MS. MARMOR: Yeah. Form is fine.

MR. BUSTAMANTE: Give me a chance to --

MS. MARMOR: No. Form is fine.

MR. HENRETTY: Federal deposition. Form and foundation are the only two --

MS. MARMOR: We do not have a lot of time.



Please. I hear your form objection. I think the witness understands the question.

MR. BUSTAMANTE: Reread the question for me, please. One second.

(WHEREUPON, the record was read by the reporter as requested.)

MR. BUSTAMANTE: My objection is that he did not diagnose himself.

Go ahead.

THE WITNESS: If I understand you correctly, and please correct me --

BY MS. MARMOR:

**Q. Yes.**

A. -- if I understand what you're asking is would people on the receiving end of his defensiveness or what might appear to be anger, would they necessarily come to the conclusion that what I'm looking at is actually anxiety, not anger? Or goodness, he's so rigid. Or goodness, he's so overly conscientious. Or goodness, he's so sensitive to criticism. No. They're not psychologists. And so as a psychologist we see subtitles. And what can come across as anger is actually anxiety, and we

know this very well.
And so no, I don't think that they would have understood at all what they were seeing, and they would have immediately said, "This guy has an anger problem" when in fact it may not be that at all.
Q. Thank you. You put my question much better than I did.
If you could go to the next page of Exhibit 7 under Associated Features Supporting Diagnosis.
A. Yeah.
Q. I notice that it says that people -- that they are prone -- if you go sort of halfway down the first paragraph, it says, "They are prone to become upset or angry in situations in which they are not able to maintain control of their physical or interpersonal environment, although the anger is typically not expressed directly."
And then further down it says, "Individuals with this disorder may be especially attentive to their relative status in dominance-submission relationships and may

122

display excessive deference to an authority they respect and excessive resistance to authority they do not respect." Do you see that?
A. Right.
Q. So if in fact there was an issue here of the fact that there were these women who were in positions of authority over him telling him what to do, could his hostility that they were asking him to do also be related to these kinds of traits?
A. Let me take the gender out of this because I think that's making an assumption. And again, I didn't get that from him. That doesn't mean it doesn't exist. That was not part of our discussion, and perhaps that's because I'm a woman. I don't know.
But to be fair in general this is another example of black and white. Also some grandiosity thrown in there. I either respect you or I don't. There's not a lot of in between. And if I don't respect you, I am much more likely to have a response -- if I don't like what you're doing, and I find it unjust, I'm much more likely to have a strong response

123

and not be able to control myself. Either I'm anxious or I'm angry. Doesn't really matter. I'm going to feel defensive.
Q. And I don't know if this mattered to you at all, but I do note under Gender-Related Diagnostic Issues, it says, "In systematic studies obsessive-compulsive personality disorder appears to be diagnosed about twice as often among males." Did that matter to you?
A. No. Just to be clear, I didn't diagnose him with any personality disorder. He just has some traits.
Q. And also points out in the Differential Diagnosis section on this page that narcissistic personality disorder can be part of all of this as well, is that right?
A. Sure. I mean, people have a lot of different -- there is this concept of personality disorder not otherwise specified. He does not have that. However, the idea is that some people just have -- there is no prominent personality traits one way or another. There's a bit of a combination of things that helps one understand why a person interprets

124

things the way that they do, how it colors their world, how they perceive, why they make certain decisions. That's what personality traits are. They're very fixed. You know, we don't really change them much. But I will say he was rather insightful about his. He knows. He knows.
Q. That he has these problems?
A. I wouldn't say problems.
MR. BUSTAMANTE: Objection.
THE WITNESS: Yeah. I wouldn't say problems. I would say traits. I think he was aware of some of his rigidity, as he would call it. He's not going to talk about it as obsessive-compulsive traits. Perhaps less aware of his tendency to be grandiose and narcissistic.
But again, I think that's not a major factor. It just helps one understand the manner in which he describes, you know, or interprets, you know, I am making new policy here, and what I'm doing is so important, and whether that's factually correct or not doesn't matter. In his view it is really important.
So it helps one understand why he dug

125

his heels in perhaps so hard about this process, because he feels that he is not only doing for himself, but perhaps takes issue with a policy that needs changing in his opinion, and therefore, he was reacting strongly because he felt it wasn't just for him but for other people, too, and that's the Boy Scout in him.
MS. MARMOR: Mark this as the next exhibit.
(WHEREUPON, Goldstein Deposition Exhibit No. 8 was marked for identification.)
BY MS. MARMOR:
Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Exhibit 8, and this is the DSM 5th edition about narcissistic personality disorder.
This is a pervasive -- you used the word grandiosity a few times, and this is for a full-blown disorder, "A pervasive pattern of grandiosity, a need for admiration, and lack of empathy beginning by early adulthood." Do you see that?
MR. BUSTAMANTE: Objection to the form of the question for full-blown disorder.



BY MS. MARMOR:
Q. And I really just want to focus on Page 670 and 671, which is the next page. Under Diagnostic Features it says in the second paragraph, "Individuals with this disorder have a grandiose sense of self-importance. They routinely overestimate their abilities and inflate their accomplishments, often appearing boastful and pretentious."
And then if you go to under Associated Features Supporting Diagnosis, it says, "Vulnerability in self-esteem makes individuals with narcissistic personality disorder very sensitive to injury from criticism or defeat." Is that what you've been talking about a little bit?
A. Yes. And just to be clear, not all aspects of narcissism I think are relevant here. I describe what I think were the relevant aspects of narcissistic traits. And again, we have talked about them, but it's this idea of being sensitive to criticism because of the manner in which they may perceive certain people as I either respect you or I don't.



Q. We talked the first day about the fact that in a setting like Cook County Jail deference to authority pretty much matters, right?
A. Yes.
Q. So hostility to criticism could be a problem in that context, correct?
A. Certainly if it were a pervasive problem, yes.
Q. And I just point out that it says that, "A person with narcissistic personality disorder may react with disdain, rage, or defiant counterattacks." Do you see that?
A. If they perceive themselves as being criticized.
Q. Right. And really just to sort of close this out, you have already basically said this, but to a layperson if there is a narcissistic trait that leads you to react with rage or disdain or counterattack, a layperson may not be as well-suited as you are to be able to distinguish what's causing that.
A. Maybe I would answer it another way. I don't know that it matters what's causing it.



From a fitness for duty standpoint if there is a pervasive pattern of anger problems and interpersonal difficulties that impact one's ability to do the job safely and effectively, then there's a problem, and you're going to see all kinds of disciplinary action and verbal counseling and complaints other people don't want to work with this person, et cetera. That's where the issue would be.
So in a way it doesn't matter whether somebody who is on the receiving end of that, if I understand your question correctly, understands it or not. It doesn't really matter. It's -- whether you understand it or not, it's about whether it's causing problems on the job.
Q. One of the things -- let's go back to your report. You talk about he presents himself as accomplishing and taking on big, important matters. Do you see that? The bottom of Page 6.
And in quotes -- you have a couple of quotes here, and one of them is, "I have made new policy by insisting my medical records go

directly to CorVel rather than Human Resources."
Do you see that?
A. Yeah. That was what he presented to me.
Q. So when you put it in quotes, pretty close to exactly what he said?
A. That's exactly what he said.
Q. Okay. And you write, "Notably the latter is not so. According to CorVel at the time the initial examination was requested on November 18, 2016, providing medical records to CorVel was in fact an option."
A. This may be the second release you were referring to.
Q. Right. But I just want to understand. So after you talk to him, you went back and talked to CorVel about this?
A. Right.
Q. And they told you it wasn't accurate.
A. True.
Q. Okay. Now, you talk about you don't find, in the next paragraph, that he experienced chronic anger management difficulties on the job, and you've just been talking a little bit

130

about that as well.
One of the things that I'm trying to understand is let's say this was the beginning of something. Maybe he hadn't historically had serious problems, but something was going on in 2016, and, you know, in fairly short succession he had two rage experiences with people, what they perceived as rage experiences or rage incidents with two people who -- at the Sheriff's Office. Is that not enough to raise a concern?
A. First of all, let me just say I don't put a lot of stock into what happened in HR because he was defensive and being pulled in for something he didn't think -- that was not something I considered to have happened on the job so much as it is that he just didn't agree with why he was being pulled in.
I see that all the time. Officers don't appreciate being pulled in and scolded or told that they have to go for fitness for duty exams. So many people come to my office and they are pissed off. They feel that it's punitive and all of that. So I don't really put

131

much stock in that.
Q. Let me be clear. So whatever Nurse Shelby or Rebecca Reierson, they testified that -- or at least Nurse Shelby has and Rebecca Reierson will testify they were afraid in that meeting.
MR. BUSTAMANTE: Object. You interrupted the witness. She had not finished answering, and I just want to point that out. That was not appropriate.
MS. MARMOR: You pointed it out.
THE WITNESS: Yeah. I appreciate. And I don't -- even if -- let me just assume that all of that is correct. I think that's a very specific situation that was not while he was performing his duties, his daily duties. That was a very special situation.
And I frequently see this, that the moment somebody gets pulled off the job and told there is a problem with you, you need to go to HR, you need to talk to the nurse, we have an issue with you, they blow, perhaps for the first time ever. So I just don't put a lot of stock into that.

132

And again, to come back to your question, hypothetically, which are not the facts in this case, but if somebody had had a couple of anger outbursts on the job itself, that is absolutely an appropriate referral for fitness.
And the question is is there a psychiatric disorder bubbling under the surface here? Do we have a substance abuse problem? Do we have a personality disorder? Are there major stresses in this person's life? Are they going through divorce? Whatever. Do they need to be off work to treat while they handle this?
I saw no evidence of that. There was no pervasive problem. I see -- there was nothing in the personnel record to show a pattern. This guy has been there for 18 years. I see -- from what I understand I see no write-ups. I see no discipline related to this. I don't see issues that are anger related throughout the years, as far as I'm concerned. Now, again, I was not provided with a personnel record. So yes, I had to rely on the self-report of Officer Nawara.

133

Now, if I am given evidence that over the -- over that 18-year period he has repeatedly been pulled from duty, reassigned, sent to EAP, written up, verbally counseled for anger management problems, I would say, yeah, we have a problem.

But at the time that I saw him, I have no -- I was not provided any evidence of that. There was no evidence of a full-blown psychiatric disorder, a substance use disorder, or personality disorder, or impulse control disorder.

And for me the critical thing is if they were so concerned about his anger and ability to be safe and effective, why would they ever have put him back to work? They would have pulled him immediately.

Q. Who's the they?

A. Anybody who is in management.

Q. So do you -- and that's why I was asking my questions earlier. Do you know what that process was? Do you know what happened?

A. As far as I'm concerned I have been working 20 years with police departments and



correctional facilities. Doesn't matter who it is. If an officer is behaving badly, they get pulled. That's usually someone's sergeant or lieutenant or deputy, depending on what it is. It is command staff's decision to either do it themselves, if they have to involve HR, I don't know, doesn't really matter to me.

The bottom line is if there is a problem, they get pulled, and they are not put back in population working with other employees who have a right to a safe environment in which to work. They are not allowed to interact with the public who have a right not to be threatened or put in peril by somebody who's carrying a firearm or not. And detainees have rights, too, not to work with somebody who is unfit or to be subjected to somebody who's unfit.

So I saw nothing from a clinical standpoint or an operations standpoint to suggest that even the County themselves, the Sheriff's Office themselves, saw that he was unfit or they would have behaved differently.

Q. Let me just back up here. So I'm just going to give you the scenario because it was



fairly consistent with the facts in this case. What if they didn't know what was going on, and what they were doing was asking HR to make that decision?

MR. BUSTAMANTE: Objection. Form of the question, vague.

THE WITNESS: Are you --

BY MS. MARMOR:

Q. Let me be much more specific with you. Here is what happened. Nurse Shelby complained about this and said consistent with the note that you got that she didn't know if it was something about her in particular.

A. You mean Jones-Hayes?

Q. Jones-Hayes. Thank you. Jones-Hayes reported this to her superiors and said, "I don't know if this is about me in particular. There was an OPR investigation opened, and then a referral was sent to HR because HR is the one who makes the decision, not management, about who gets pulled for a fitness for duty exam."

MS. MARMOR: Let me finish. Let me finish.

MR. BUSTAMANTE: She said okay.



BY MS. MARMOR:

Q. And it was -- and there was some difficulty with HR connecting with Jones-Hayes. They connect with her. They call him in a couple days later. And according to their testimony, and you don't have to agree with it, but according to their testimony it was his behavior in that meeting that alarmed them so much that they made the decision on that day to send him for a fitness for duty exam and did exactly what you're talking about, which is they took him off of work. Did you know any of those facts?

MR. BUSTAMANTE: Objection to the form of the question. Incomplete hypothetical. Brought out a lot of facts that are not agreed to by the other side.

Go ahead.

THE WITNESS: Let me just say none of that is relevant, frankly. The bottom line is he has an interaction that is concerning to a supervisor. Had she been -- to Jones-Hayes. Had she been so concerned about his conduct that day in the basement of Cermak, she would have

made sure that he got pulled.
The fact that she had trouble communicating with HR, I don't know what to say about that other than they better get their shit together. You know? That's crap.
If he had been so unsafe, do you really think that she would have said, "Hmmmm. You know, maybe it's just me." If she had been so concerned about his ability to interact normally with everybody, not just her, and that he was a danger to himself or others or that he was no longer safe or effective in his job, she had a responsibility I would say to pull him.
So I don't care whether she had trouble connecting with or whatever. Bottom line, when somebody behaves so badly that they become a concern -- that they become a safety or effectiveness concern, they better get pulled right away or there is major liability, and you know it.
BY MS. MARMOR:
**Q. So am I taking you to say that there doesn't need to be -- you found that there was no problem here because there was no pervasive**

138

**history. But what you're saying is that in the absence -- at the time in the absence of a pervasive history, the employer really must immediately take the person off of duty.**
A. I'm only going to talk about Nawara's case.
**Q. That's what I'm talking about.**
A. Well, you're speaking generally. In Nawara's case my feeling is I have no evidence whatsoever that he was a major fitness concern for anybody because had he been, they would have pulled him.
So their own actions say that they were not even sufficiently concerned to pull him. They put him right back there the next day in the exact same place. They put him on external operations with a firearm. He's interacting with the public and detainees, and he's still got the backs of his colleagues there, and they're counting on him.
So I think honestly this is a missed opportunity. If they were that upset with him, it's a missed opportunity for them to discipline him. And I do think that his behavior was

139

inappropriate that day, and he ought to have been disciplined. They didn't do that. That's their problem.
**Q. So what if they just made a mistake? What if that was a mistake? I hear you on missed opportunity. What if that was a mistake? Does that invalidate sending him for the fitness for duty exam based on what HR experienced?**
A. Let me be clear. I have no issue of him being sent for fitness for duty. He ought to have been sent and could have been sent for fitness for duty based on the September incident alone in my opinion.
And that to me, like I said, is the thing that matters because that happened on duty, in front of other correctional officers, in front of detainees, and is an inappropriate -- it's disrespect to management. That could have been the tripwire itself for fitness for duty.
The fact that they waited is problematic. And I don't have an opinion about how important this thing at HR was or wasn't. Clearly he was behaving in a way that concerned

140

people, and that's all that matters. It is valid. That is also on its own independently sufficient to prompt a fitness for duty examination.
We always have to take the high road. If anybody is ever concerned about anybody's emotional stability, public safety is different, you got to send them for fitness. No harm, no foul.
And so this was an appropriate referral. Whether it's the combination of them or -- either incident alone would have been sufficient. I have no issue. I think what you're asking, though, hypothetically is, you know, is it possible that he was unfit, and we don't know it? All I can say is --
**Q. No. That's not what I'm asking. That was not what I was asking.**
A. Okay.
**Q. I was simply trying -- I get that you're critical of them for not having done -- not having taken him out of -- off of duty after the first incident.**
A. It's not that I'm critical of them.

141

It's just that I use that as evidence, and it is a reasonable inference to draw that they simply could not have been that concerned about him, because had they been, they would have pulled him.

**Q. I'll just say the "they" is very unclear here.**

A. It doesn't matter. It's irrelevant. He would have been pulled from duty, be that from God, be that from management or HR or some combination. If somebody is -- if there is ever a concern about a public safety servant being unfit, you better get their butt out of work because all of us are counting on them. And it's a liability.

And as a lawyer you know that. You never want somebody who is unfit working in a situation like that. Absolutely. So their own behavior can reasonably be inferred to show that they themselves did not have fitness concerns or he would have been pulled.

**Q. Okay. I mean, you're applying basically your general experience, not anything specific you know about this case, when you say**

142

**that. You didn't speak to any of the people who made the decisions.**

A. I can tell you it is irrelevant. I can look at what happened and say he wasn't pulled. It is a reasonable inference to draw that had there been significant fitness concerns, he would have and should have been pulled.

**Q. So do you make that inference from what happened at HR?**

A. I'm sorry. I don't understand the question.

**Q. Well, you said you discount what happened at HR. But at HR, after HR, what happened at HR, they did take him off work immediately.**

A. And what I said to you was that that was an appropriate tripwire for fitness. I don't discount the concerns that were raised from that. I don't put a lot of stock in it as to evidence that he was unfit to do the job because that didn't happen in the environment in which he does his job.

It happened -- certainly that's part of the job, is to interact with management and

143

staff and whatnot. But that is a very understandable situation where I have seen so many people get angry at being pulled in to HR. They're nervous. They're upset. They feel it's unfair. I just don't put a lot of stock in that in terms of evidence that he was unfit.

But like I said, behaving in that way is concerning. I understand that. It's a perfectly fine referral based on what happened at HR, like what I said, or what happened in September.

Frankly, it's more concerning to me what happened in September, but they weren't that concerned. It seemed like it was a very isolated incident. So again, not pervasive. I don't find him unfit just for having this incident with this one person. It is not appropriate. He could have been disciplined for it, but I don't see any fitness issues here.

MS. MARMOR: Okay. I want to take just one moment. I think I'm done, but I want to talk to my fellow counsel here.

(WHEREUPON, a short recess was taken.)

144

MS. MARMOR: We have a few minutes left, and I will pass the witness.

MR. BUSTAMANTE: I have no questions.

MS. MARMOR: There you go.

MR. HENRETTY: None for me.

MR. BUSTAMANTE: So we're done.

THE WITNESS: But I was having so much fun.

MS. MARMOR: Do you want to reserve signature?

THE WITNESS: Yeah.

(WHEREUPON, a discussion was had off the record.)

THE WITNESS: I'm waiving.

(WHEREUPON, the deposition was concluded at 3:48 o'clock p.m.)

145

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARLENE L. KING, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on December 16, 2019, personally appeared before me, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, DIANA S. GOLDSTEIN, M.D., in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein JOHN NAWARA is the Plaintiff, and COUNTY OF COOK, a unit of local Government, et al., are the Defendants.

I further certify that the said DIANA S. GOLDSTEIN, M.D. was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as

146

aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 6th day of January, 2020.

Marlene L King
______________________________
NOTARY PUBLIC, COOK COUNTY, ILLINOIS
LICENSE NO. 084-003326

147

**Exhibits**

**Goldstein Exhibit 6**
53:10 56:18,23 61:2 62:10 65:9 67:24
**Goldstein Exhibit 7**
53:11 115:19,23 122:10
**Goldstein Exhibit 8**
53:12 126:10,14,15

**1**

**1**
71:18 77:12 79:19
**11**
77:22 110:15
**12**
77:22
**18**
82:17 84:15 94:17 130:11 133:17
**18-year**
134:2

**2**

**2**
79:19 80:2,9 82:10
**20**
113:8 118:16 134:24
**2004**
64:20
**2016**
78:7 82:17 84:15 94:17 106:14 110:12 130:11 131:6
**2017**
77:22 84:7,13 106:1 108:2 111:8
**28**
84:13
**29**
78:7 110:12

**3**

**3**
82:9 85:6 89:19
**30th**
84:16

**4**

**4**
63:8 80:3 91:12

**5**

**5**
54:14 55:16,23 106:12
**5th**
114:8 116:1 126:15

**6**

**6**
55:16,17 56:18,23 61:2 62:10 65:9 67:24 129:21
**670**
127:3
**671**
127:3

**7**

**7**
115:19,23 122:10

**8**

**8**
126:10,15
**8-25-17**
79:2

**9**

**9-28**
56:7
**9-29-16**
56:7
**99**
83:14

**A**

**abilities**
127:7
**ability**
104:10 109:15 129:4 134:15 138:9
**absence**
139:2
**absolutely**
64:23 67:21 73:22 91:8 101:6 119:20, 22 133:5 142:18
**abuse**
66:20 133:9
**accept**
76:1
**accepted**
76:14
**accepting**
96:15
**access**
66:18 69:22 70:2,7, 19
**accomplishing**
129:19
**accomplishments**
127:8
**accounts**
65:12
**accurate**
67:2 130:19
**accusation**
119:6
**act**
64:14 67:13
**action**
69:11 80:16 129:6
**actions**
139:13
**active**
66:20
**actuarial**
66:12
**adaptive**
105:10
**added**
99:23
**addition**
66:2 79:1,7
**address**
111:16
**addresses**
79:15
**adjustment**
106:7
**administration**
80:15
**administrative**
60:10 61:9
**administrator**
59:19
**admiration**
126:20
**admission**
117:23
**admitted**
88:14 92:24 94:4
**adulthood**
126:21
**afraid**
132:5
**African-american**
101:4,5
**afternoon**
54:9
**aggressed**
88:18
**aggression**
66:15
**aggressive**
79:4,8 94:21 95:5 97:8,9,17
**agitated**
88:10 89:23
**agitation**
107:10
**agree**
66:6 131:17 137:6
**agreed**
137:16
**ahead**
121:9 137:18
**aimed**
90:6,10
**alarmed**
137:8
**albeit**
68:10
**allegedly**
56:6 92:2
**allowed**
69:21 70:4,6 135:12
**altercation**
79:14 110:12
**amazed**
67:9
**ambiguously**
69:4
**anger**
80:21 97:13 101:15 108:16 121:16,19,24 122:5,19 129:2 130:23 133:4,20 134:5,14
**angry**
67:20 97:15 108:23 109:1 110:21 119:10,13 122:16 124:2 144:3
**annoyance**
88:23
**annoyed**
81:6,8 88:5,14 89:15 90:8 93:1,23 109:6
**answering**
132:8
**anticipate**
70:9
**anxiety**
117:16 121:18,24
**anxious**
117:13 124:2
**anybody's**
141:6
**apnea**
106:21 107:1,5
**apologize**
67:7
**apparent**
101:2
**apparently**
84:3 102:23
**appearing**
127:8
**appears**
124:8
**Appellate**
64:8
**applying**
142:22
**appreciated**
87:11
**approach**
112:8,9
**appropriately**
109:17
**approved**
108:10
**April**
106:1
**area**
58:8,17 82:12 105:1
**areas**
58:3 104:6
**arrived**
88:4
**asks**
61:2
**aspects**
127:18,20
**assault**
65:23
**assessing**
77:24
**assigned**
82:9
**assignment**
78:9 90:15
**assume**
76:15 90:4 114:3 132:13
**assumption**
123:12
**attempting**
111:15
**attentive**
122:23
**attorney**
69:24 72:15 75:12, 13
**attorneys**
73:5
**authority**
123:1,2,7 128:3
**aware**
125:11,15
**awareness**
87:7

**B**

**Baby**
92:2
**back**
64:19 87:19 92:13 96:21 102:17 105:15 106:12 129:17 130:16 133:1 134:16 135:10,23 139:15
**background**
57:6
**backs**
139:19
**bad**
109:3
**badly**
88:21 94:19 95:11 96:17 135:2 138:16
**ball**
111:4
**based**
82:19,24 97:14 102:1 103:3,9 113:19 140:8,12 144:9
**basement**
78:8 85:20 137:24
**basically**
70:6 79:24 80:2 89:2 128:17 142:23
**basis**
99:19 103:14
**beat**
90:24
**began**
106:15
**begin**
93:7 96:11
**beginning**
62:17 126:21 131:3
**behaved**
97:14 135:22
**behaves**
138:16
**behaving**
135:2 140:24 144:7
**behavior**
79:5 97:8,10 102:1, 19 103:9 109:19,22 137:8 139:24 142:19
**belabor**
115:12,14
**believes**
99:24 100:10
**bench**
87:20
**bias**
101:8 112:8 113:5, 12
**big**
129:19
**bills**
104:10
**bit**
70:7 118:6 124:23 127:16 130:24
**black**
115:1 117:9,15 118:1 119:1 123:18
**blood**
107:19
**blow**
132:22
**board**
57:24 61:11
**boastful**
127:9
**body**
82:4
**boss**
67:6,12 80:22
**bottom**
61:21 98:18 99:5 101:22 113:18 129:20 135:8 137:20 138:15
**Boy**
118:6 126:7
**break**
72:20 101:16
**briefly**
54:17
**bright**
62:7
**bring**
71:18
**broke**
89:8
**broken**
116:5
**Brought**
137:15
**BS**
119:11
**bubbling**
133:8
**bullshit**
119:12
**bunch**
119:11
**BUSTAMANTE**
71:20 105:18 115:14 116:19 117:1 120:11,15,20 121:3, 7 125:9 126:23 132:7 136:5,23 137:14
**butt**
142:13

**C**

**call**
57:14 59:21 61:17 68:14 69:23,24 75:11 91:24 94:4 96:13,19 125:12 137:4
**called**
54:4 57:12 89:10,11
**calling**
83:3
**calls**
60:12
**calm**
88:9,13 92:4
**care**
104:9 107:23 108:7 138:14
**carrying**
135:14
**case**
55:15 59:20 61:7,10 62:2 64:8 68:13,18 70:3 76:13,21,23 77:2 79:12 83:8 88:3 99:3 117:18 133:3 136:1 139:6,9 142:24
**cases**
63:24 67:17
**cause**
107:1,4 108:10
**caused**
83:14 86:12
**causing**
105:4 107:16 128:22,24 129:15
**CCSO**
75:16
**Center**
65:15 74:8,11
**Cermak**
74:1,5 78:8 82:5,12 137:24
**certificates**
74:18
**certified**
57:24
**cetera**
96:4 105:14 107:10 112:22 129:8
**chance**
120:20

change
66:21 125:5
changed
57:15
changing
126:4
charge
92:17 93:17 94:1,2
check
107:11
chest
88:10 90:5,19
Chicago
57:8,12,16 73:21
chief
69:23 75:12
chronic
130:23
citizen
69:12
city
73:4,6
civilian
58:22
claimed
88:12
claims
88:9 106:18 107:18
clarify
69:3
clean
55:24
clear
81:23 102:12 110:7 119:9 124:10 127:17 132:2 140:9
clinical
57:7,10,24 61:17,18, 19,24 62:8,11 63:10 106:11 112:24 113:1 135:18
Clinicians
69:10
close
128:17 130:6
co-worker
67:5,6,12 80:22
co-workers
55:14
coach
120:13
cognitive
76:4,9
collateral
69:13,19 71:8
colleagues
74:12 139:19
collecting
58:19
color
114:15
colors
125:1
combative
109:24
combination
118:21 124:23 141:11 142:11
comfortable
96:5 99:8 100:15
command
135:5
commendations
69:12
comments
54:23 95:15
commission
67:13
commissioners
61:12
common
101:3
communicating
138:3
community
68:10
comp
61:7
company
70:1 72:10,11
compensation
66:3
complained
136:10
complaining
93:16
complaint
99:16,21
complaints
69:12 129:7
complete
84:13 113:13
compliments
69:13
comply
84:4,20 87:1
composure
109:17
comprehensive
54:22
concede
97:21
concept
124:18
concern
63:7 87:13 131:11 138:17,18 139:10 142:12
concerned
99:6 133:21 134:14, 23 137:23 138:9 139:14 140:24 141:6 142:3 144:14
concerns
87:2 97:13 142:20 143:6,18
conclude
112:1
conclusion
121:17
conclusions
109:10
condition
109:15
conditions
66:22
conduct
61:19 69:13,18 137:23
conducted
77:23
conducting
73:13
Confidentiality
64:14
confirm
81:24
confirmed
107:21
confusing
102:6
connect
137:4
connecting
137:3 138:15
Connolly
89:11 91:14,18,22 94:6
conscientious
118:7 121:20
considered
87:4 131:16
consistent
105:9 113:9,10 118:17 136:1,11
consultant
73:2
consulting
60:5
contacting
75:8
context
85:19 86:9 128:7
continued
54:7 93:8
continues
106:17
contract
74:8
control
65:15 116:10,17 117:12,13,19 122:17 124:1 134:11
conversation
103:8
Cook
59:2,6,12,22 72:15 73:20 74:23 78:2 79:2 104:23 128:2
cooperate
99:6 111:7
cooperated
111:10
cooperating
111:17
cooperation
111:14
copied
76:19
copies
71:19
coping
66:17
copy
55:24 71:17,23 77:12
core
115:3
correct
55:7 57:9 62:3 63:5, 15 68:2 69:20 77:9, 16 82:7,22 83:21,24 84:16 88:7,11 91:4 94:14 97:4 107:2 110:9 119:23 121:11 125:22 128:7 132:14
correctional
73:10,17 78:1 135:1 140:16
correctly
68:21 121:10 129:12
correspondence
70:20
Corvel
54:12 59:20 70:14 72:7,8 98:14,22 99:2 130:1,9,12,17
counsel
144:22
Counsel's
116:23 117:2
counseled
134:4
counseling
129:7
Counselor
106:11
counted
81:9
counterattack
128:20
counterattacks
128:13
counting
139:20 142:14
county
59:2,6,12,22 70:12 72:15 73:4,12,17,20 74:23 78:2 79:2 104:23 128:2 135:20
couple
74:6 82:8 105:24 129:22 133:4 137:5
court
56:21 61:8,13 115:22 126:13
cover
54:14 58:4
covered
81:13
covers
79:19
crap
138:5
created
64:2,3
creating
99:1 101:7
creatinine
106:19 107:14,19 108:8
crimes
65:13
criminals
58:13
criteria
116:6
critical
89:3 105:1 134:13 141:21,24
criticism
115:6 118:10 120:4 121:21 127:14,22 128:6
criticized
94:9,12,13 115:8 119:10 128:15
criticizing
93:18 94:1
crystal
111:4
cuffed
89:22,24 90:10
current
65:16
custody
112:16

D

daily
132:16
danger
138:11
dangerous
86:1
data
58:19
dating
106:15
day
56:9 78:9,12 81:5,15 82:6,14,18 83:3,14 84:5 92:6,23 93:13 98:8 128:1 137:9,24 139:15 140:1
day-to-day
73:14
days
73:12 137:5
daytime
106:21
de
57:14
dead
90:24
deadlines
84:5
deal
58:9 119:5
dealing
68:9
decided
80:15,17
deciding
91:7
decision
60:11,19 61:9 64:11, 19,20 83:7,12 102:23 135:5 136:4, 20 137:9
decisions
60:7 125:3 143:2
declined
75:22
decompensation
66:22
decreased
106:3
deescalate
109:23
defeat
127:14
defensive
94:3 96:10,11 97:15 100:18 109:2,4 112:19,23 113:6,7 119:9 124:3 131:14
defensively
120:5
defensiveness
96:4 112:7 121:16
deference
123:1 128:3
defiant
128:12
definition
104:5
degree
57:10
delivered
84:6
denied
104:20 108:22,24
denies
104:24 106:21
denying
95:4,10
department
60:9 69:22 75:6 79:9 111:18
departments
134:24
depending
56:7 135:4
deposition
54:10,13 56:17,23 61:2 65:9 67:23 78:13 115:18 120:22 126:9
deprivation
107:4,7
deputy
135:4
describe
80:3 127:19
describes
94:8 106:3 117:24
125:19
describing
79:3 100:11
description
97:3 110:2
descriptions
71:2
Designation
67:4,11
destruction
66:1
detail
86:3
details
85:20 97:2,22
detained
68:10
detainee
91:21
detainees
55:15 74:15,16 86:17 87:9,10,16 109:19 135:15 139:18 140:17
detector
111:5
detectors
113:3
determine
86:21
diagnose
121:8 124:11
diagnosed
124:8
diagnosis
105:17 106:2,9 116:20 122:11 124:14 127:11
diagnostic
114:6 115:24 116:6 124:6 127:4
DIANA
54:3
dietary
108:7
difference
61:21 62:6 73:3 104:14
differences
61:23
Differential
124:13
differently
135:22
difficulties
129:3 130:23
difficulty
137:3
diffuse
109:22
diminished
106:4
diminishes
66:5
direct
96:7
directed
79:6
directive
79:7
directly
59:20,21 69:23,24 98:22 99:2 122:20 130:1
disability
61:10 72:19
disagreeing
88:15
disagreement
98:23

**disarray** 88:24 89:17 93:20
**disciplinary** 69:11 74:18 129:6
**discipline** 133:19 139:23
**disciplined** 140:2 144:18
**discount** 143:12,18
**discuss** 78:21 98:6
**discussed** 86:23
**discussion** 70:11 72:3 85:23 108:6,21 123:15
**disdain** 128:12,20
**Disease** 65:15
**disorder** 66:21 104:5 105:8 113:21 114:4,5,12 116:3,7,21 120:10 122:22 124:8,11,15, 19 126:16,19,24 127:5,13 128:11 133:8,10 134:10,11, 12
**disorders** 58:14 114:10,18 116:1
**display** 108:16 123:1
**dispute** 83:11
**disputed** 86:16
**disrespect** 140:18
**disruption** 76:5 107:7
**disruptive** 109:22
**distinguish** 128:22
**divorce** 133:12
**doctor** 105:19 117:5
**doctor-patient** 61:20 62:6 63:14
**doctorate** 57:7
**dominance-submission** 122:24
**dot** 91:12,13
**downhill** 89:1
**dozen** 73:24
**dozens** 72:8,9
**draw** 142:2 143:5
**drawing** 89:5
**driving** 106:22
**DSM** 126:15
**DSMS** 115:13
**dug** 125:24
**duly** 54:2,5
**duties** 132:16
**duty** 55:13 59:14,18 60:7, 13,19 61:5 63:2,4 64:9,12,15 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18 78:1 79:17 82:21 83:15, 16,21,23 84:10 85:5 102:16,21 103:3,10, 15 110:5,8 111:13 112:21 113:11 129:1 131:21 134:3 136:21 137:10 139:4 140:8, 10,12,16,20 141:3, 22 142:9
**dynamic** 66:12
**dysfunction** 103:19,24 104:3,13, 24 105:5

**E**

**e-mail** 76:20
**e.g.** 67:5
**EAP** 134:4
**ear** 92:11
**earlier** 134:21
**early** 126:21
**edition** 116:2 126:15
**effective** 55:14 134:15 138:12
**effectively** 80:3 109:23 129:4
**effectiveness** 76:11 138:18
**efficiency** 116:11
**elevated** 106:19 107:14,19
**elicited** 85:12
**emotional** 141:7
**empathy** 126:21
**employee** 66:6,13 72:23,24 73:11 79:8
**Employee's** 79:4 97:8
**employees** 72:15 74:15 135:10
**employer** 62:23 63:4,21 104:15 111:20 139:3
**employers** 66:4
**encompasses** 65:23
**encountering** 69:5
**encounters** 68:23
**end** 91:7 102:14 108:14 121:15 129:11
**ended** 54:10 106:14
**Ends** 67:4
**energy** 106:4
**enforcement** 58:23
**entitled** 63:24
**environment** 87:5 109:18 122:18 135:11 143:21
**environmental** 66:12
**epidemic** 65:14
**equipment** 87:22
**escalating** 66:15
**essence** 93:19
**essential** 109:16
**essentially** 89:13
**establish** 94:13 103:6
**ethics** 118:20 119:4
**evaluation** 54:22 61:3,5,15,17 62:2,11,15 63:11,20 68:2 70:5
**evaluations** 65:10 68:1,22 69:11
**event** 78:15
**events** 81:15 85:8,17 86:7
**Everything's** 112:18
**evidence** 103:22 133:14 134:1,8,9 139:9 142:1 143:20 144:6
**evident** 62:15
**exact** 139:16
**exaggerating** 112:11
**exam** 59:14 60:8,13,20 61:5 77:18 79:17 82:21 102:21 103:10 136:21 137:10 140:8
**examination** 54:7 64:9,12,24 75:22 76:2 77:23 78:5 84:11,24 101:24 102:16 103:15 111:13 130:10 141:4
**examinations** 61:19 68:15 112:16, 21
**examined** 54:5
**examinee** 63:10,18
**examinees** 63:24 64:14,15
**examiner** 63:10
**examiner's** 64:1
**examples** 63:21
**exams** 59:18 77:16 131:22
**exceptions** 63:23 65:6
**excessive** 123:1,2
**exchange** 88:22
**exhibit** 54:14 55:16,23 56:16,18,23 61:2 62:10 65:9 67:24 71:18 77:11 115:19, 23 122:10 126:8,10, 15
**exhibiting** 109:18
**exist** 63:23 123:14
**expected** 71:7 89:7
**expense** 116:10
**experience** 120:7 142:23
**experienced** 130:22 140:8
**experiences** 59:12 131:7,8
**experiencing** 104:20
**explain** 98:15 111:2
**explained** 94:18 95:13 99:11, 12
**explaining** 87:16
**explanation** 96:7
**express** 87:7
**expressed** 87:2 122:19
**expressing** 88:23
**extend** 64:16
**external** 68:12 82:6,13 139:16
**extra** 71:18
**extremely** 119:2

**F**

**facilitate** 84:14
**facilities** 135:1
**facility** 73:10 74:2
**fact** 55:3 63:14 64:12,15 79:16 81:1 83:20 84:19 87:8 96:18 98:6,7 99:2 101:2 105:15 110:21 111:19 122:5 123:5, 6 128:1 130:12 138:2 140:21
**factor** 125:18
**factors** 66:12,14
**facts** 133:3 136:1 137:13, 16
**factually** 92:15 119:21,23 125:22
**fair** 55:10 80:5 103:19 109:7 110:11 123:17
**fairly** 65:16 131:6 136:1
**familiar** 57:2
**fatigue** 107:7
**FDA** 108:10
**Features** 122:10 127:4,11
**February** 84:13 106:1 108:1
**Federal** 120:22
**feel** 86:5,6 94:12 96:6 100:14 101:9 113:6 124:3 131:23 144:4
**feeling** 139:9
**feelings** 106:5
**feels** 106:16 126:2
**fellow** 144:22
**fellowship** 57:17
**felt** 75:23 76:13 85:20 89:14 94:13 98:24 99:13 101:8 109:4 117:18 119:9 126:6
**FFD** 62:3,23 72:14 74:22 75:17 99:9 111:8
**fiance** 106:13
**fight** 81:8 89:8 93:24
**filed** 84:20 99:16,21
**filler** 114:18
**filter** 115:8
**final** 77:6
**find** 77:12 80:24 104:12 123:23 130:22 144:16
**fine** 84:2 112:18 120:16, 19,21 144:9
**finger** 88:19 90:5,18
**finish** 117:1 136:22
**finished** 91:24 132:8
**fire** 61:11
**firearm** 135:15 139:17
**firearms** 66:18
**fit** 110:8
**fitness** 55:13 59:14,18 60:7, 13,19 61:4 63:1,3 64:8,11,14 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18,24 79:17 82:20 83:4,7, 16 84:4,10,14 85:4 101:24 102:15,21 103:3,10,14 111:13, 16 112:21 113:11 129:1 131:21 133:6 136:21 137:10 139:10 140:7,10,12, 20 141:3,8 142:20 143:6,17 144:19
**fixed** 125:4
**flexibility** 116:11
**focus** 54:16 80:21 108:22 127:2
**focused** 79:13
**follow** 92:6,22 93:13
**foothold** 117:17
**force** 109:24
**forensic** 61:3,5,15,16 62:11 63:11
**forest** 115:2
**form** 77:15 79:2 116:19 120:11,16,17,19,21, 22 121:1 126:23 136:5 137:14
**formal** 61:13
**forms** 84:14 98:7 116:6
**foul** 141:9
**found** 94:6 103:22 138:23
**foundation** 75:4 120:17,23
**Franklin** 57:13,18
**frankly** 137:20 144:12
**frequently** 132:18
**friends** 100:1,7
**front** 75:10 140:16,17
**frustration** 66:16 104:22 107:9
**full** 91:14 104:18 110:5, 12
**full-blown** 104:5 116:7 120:9, 10 126:19,24 134:9
**functionally** 55:11
**functioning** 105:10,12
**functions** 109:16
**fundamentally** 110:8

**G**

**gave** 55:4 71:3,19
**gender** 123:11
**Gender-related** 124:5
**general** 58:11 75:2 93:10 97:3 118:5 123:17

142:23
**generally** 55:13 58:9 93:15 98:16 108:9 119:7 139:8
**give** 55:24 86:2 107:22 118:14 120:20 135:24
**giving** 117:5
**glucose** 106:19 107:19
**goal** 62:10
**God** 142:10
**Goldstein** 54:3,9 56:17,21,22 61:1 71:18 115:18, 22,23 126:9,13,14
**good** 54:9 71:21 76:13 115:17
**goodness** 121:19,20,21
**Graham** 73:17
**grain** 113:14
**grandiose** 125:15 127:6
**grandiosity** 118:23 123:19 126:18,20
**gray** 115:1 117:14 118:3
**great** 57:18,19 58:21
**ground** 80:1
**guerre** 57:15
**guess** 73:7 82:5 114:16
**guesstimate** 72:13
**guidelines** 75:16
**guy** 91:23 118:1 122:5 133:17
**guys** 98:6

**H**

**halfway** 122:14
**handed** 56:22 115:23 126:14
**handful** 72:16
**handle** 133:13
**handling** 92:18 93:17 94:2,10
**hands** 87:18
**happen** 143:21
**happened** 79:14 80:4,5 82:19 83:1,6 85:16 88:20 90:20 91:3 131:13, 16 134:22 136:10 140:15 143:4,9,13, 14,23 144:9,10,13
**harassment** 65:24 66:2
**hard** 118:11 120:8 126:1
**harm** 141:8
**harshly** 120:4
**Hayes** 56:13 78:7 80:12,17
**he'll** 91:22
**Heading** 73:16
**health** 58:10 68:16 74:9,14 75:9 76:4,8 100:24 109:15
**hear** 86:7 90:11,13 121:1 140:5
**heels** 126:1
**helped** 111:1
**helpless** 87:17
**helps** 124:24 125:18,24
**HENRETTY** 120:17,22
**Hey** 91:20 94:6
**high** 109:18 118:7 141:5
**historically** 131:4
**history** 66:15 139:1,3
**Hmmmm** 138:7
**Hogueisson** 105:16,18,22
**Hold** 82:23
**holder** 63:19
**home** 104:11
**honestly** 139:21
**hopelessness** 106:6
**hopes** 106:17
**horse** 90:24
**host** 67:5
**hostile** 79:8 94:21 95:4 97:17
**hostility** 123:8 128:6
**hour** 82:10
**HR** 59:22 70:20,23 71:3, 6 74:22 75:7,11,14 78:15,20 79:14 83:6, 10,20 97:3 99:20 100:24 102:7,10,19 103:1,8,9 108:23 110:16 131:13 132:21 135:6 136:3, 19 137:3 138:3 140:8,23 142:10 143:9,13,14 144:3, 10
**human** 79:2,9 82:18 84:5,6, 12 94:17 100:3 111:5 130:1
**hygiene** 66:24 104:9
**hypothetical** 137:15
**hypothetically** 133:2 141:14

**I**

**idea** 59:23 80:21 96:12 117:9 124:20 127:21
**identifiable** 106:8
**identification** 56:19 115:20 126:11
**identified** 113:5
**Illinois** 64:7,14
**imagine** 72:9 75:6
**IME** 70:1 72:9,11
**immediately** 122:4 134:17 139:4 143:15
**impact** 108:8 114:11 129:3
**impaired** 68:14
**impairing** 114:13
**impairment** 104:6
**impairments** 105:11
**impairs** 109:15
**implies** 117:2
**important** 86:6 87:8,10 125:21, 23 129:19 140:23
**impulse** 134:11
**impulsivity** 66:17
**inappropriate** 79:5 97:10 140:1,18
**incident** 56:6,10 63:6 80:18 102:3,17 103:4,15 140:12 141:12,23 144:15,17
**incidents** 131:9
**include** 58:5 66:14
**included** 78:18
**including** 63:21 109:18
**Incomplete** 137:15
**increases** 66:5
**increasing** 66:3
**independent** 59:24 70:5
**independently** 141:2
**individual** 63:20 68:23 109:21
**individuals** 122:22 127:5,12
**infer** 90:16 114:21
**inference** 89:5,16 93:5 142:2 143:5,8
**inferred** 89:14 119:8 142:19
**inflamed** 96:14
**inflate** 127:8
**inflexibility** 118:9
**inflexible** 118:19
**information** 70:18 75:9 85:11,12 111:20 113:19
**initial** 130:10
**injury** 127:14
**inmate** 89:21,23 90:9
**inmates** 110:1
**insight** 117:23 118:4
**insightful** 125:6
**insisting** 129:24
**insists** 108:15
**instability** 66:13
**intended** 90:13,14 119:21
**intense** 88:2 96:14
**interact** 135:12 138:9 143:24
**interacting** 139:17
**interaction** 66:23 78:5,15 81:11 85:21 93:7,9 110:16 137:21
**interactions** 59:11 71:2 77:8 114:16
**interactive** 85:15
**internally** 60:6
**interpersonal** 66:23 78:5 113:24 114:15 116:10,17 122:18 129:3
**interpret** 114:19 118:10
**interpret all** 119:19
**interpretation** 113:1
**interprets** 124:24 125:19
**interrupted** 132:7
**interruption** 64:5 101:20
**interview** 85:7 102:9 104:19
**interviews** 69:13,19 71:9 86:14
**intimately** 73:14
**intimidating** 79:5 97:9
**intimidation** 65:24
**invalidate** 113:8 140:7
**invalidated** 112:24
**investigation** 80:24 96:2 136:18
**involve** 135:6
**involved** 73:14 75:7 85:2 117:14
**involvement** 59:13 60:5,22
**involves** 68:6
**irrelevant** 142:8 143:3
**irritability** 107:9
**irritation** 107:1
**Isaac** 54:12 74:7,11
**isolated** 144:15
**issue** 76:4,9 78:20,21,22 91:10 102:14 111:16 119:13 123:5 126:3 129:9 132:22 140:9 141:13
**issues** 61:19 106:7 108:11 124:6 133:20 144:19
**items** 54:17

**J**

**jacket** 75:10
**jail** 73:12,15,20 100:21 128:2
**jails** 73:16 74:19
**job** 92:6,23 93:14 106:6 110:2 129:4,16 130:24 131:17 132:19 133:4 138:12 143:20,22,24
**John** 54:23
**Jones-** 56:12 78:6
**Jones-hayes** 56:11 70:24 71:1,6 77:7 79:13 80:4,11 81:2 85:22 88:4 91:23 99:17,20 100:1,6,21 102:4 108:17 110:13 136:14,15 137:3,22
**judge's** 64:11
**judgment** 81:19
**jump** 62:14
**jury** 91:3,6
**justice** 118:7,13
**justification** 67:12

**K**

**Kane** 73:17
**keenly** 118:10
**kicking** 69:3
**kind** 57:5,6 60:14 74:17 76:4 81:9 86:8 88:14 89:13,22 103:17,18 117:16,24
**kinds** 118:17 123:9 129:6
**knew** 99:21
**Kroll** 111:19
**Kroll's** 84:10

**L**

**label** 118:24
**labor** 69:24 75:12,13
**labs** 108:2
**lack** 87:22 126:21
**lady** 57:19
**Lake** 73:12
**larger** 81:11
**law** 58:23
**lawsuit** 84:20,23 85:2
**lawyer** 142:16
**layperson** 120:6 128:18,20
**layperson's** 113:13
**LCPC** 106:10
**lead** 114:24 117:13,15 118:8 119:19
**leads** 107:6 128:19
**learned** 112:23
**leave** 91:2 101:23 102:6 107:8
**leaves** 91:14
**led** 86:15 111:1 116:17
**left** 91:10 95:11 96:18 98:3 102:7,9,15 103:1,13 109:6
**legal** 61:7
**letter** 54:14,17,20,21 78:24 84:9,12,16
**level** 66:23 105:8 114:12
**levels** 106:19 107:14,19 108:9

**liability**
66:4 138:19 142:15
**Licensed**
106:10
**lie**
111:5 113:3
**lieutenant**
135:4
**life**
103:18,23 104:2,7, 11,13,21,24 105:4, 14 106:8 110:19 133:11
**light**
113:23
**limitations**
111:24
**limited**
109:24
**limits**
70:7
**list**
55:9 110:1
**location**
78:8 87:5
**long**
77:3
**longer**
138:12
**losing**
117:16,19
**lot**
68:5 85:23 119:5 120:24 123:20 124:17 131:13 132:23 137:16 143:19 144:5
**loud**
90:11
**loved**
70:10
**Lovely**
77:14
**low**
115:4
**lumps**
101:11
**Lyle**
71:22

**M**

**M-C-G-R-E-A-L**
64:6
**M.D.**
54:3
**made**
83:12 102:24 116:20 129:23 137:9 138:1 140:4 143:2
**maintain**
109:17 122:17
**major**
105:4 125:17 133:10 138:19 139:10
**majority**
63:23
**make**
60:6 81:19 83:18 98:20 106:9 125:2 136:3 143:8
**makes**
60:18 75:5 127:12 136:20
**making**
123:12 125:20
**males**
124:9
**malingering**
58:13
**manacled**
87:15,18 88:6
**manacles**
87:12
**manage**
104:10
**management**
75:16 97:13 130:23 134:5,19 136:20 140:18 142:10 143:24
**manner**
119:15 125:18 127:23
**manual**
114:7 116:1
**mark**
56:15 126:8
**marked**
56:18,22 66:21 115:19 126:10,14
**MARMOR**
54:8 56:15,20 64:18 71:16,21 72:2,5 101:16,21 105:20,21 115:21 116:24 117:5 118:12 120:13,16, 19,21,24 121:12 126:8,12 127:1 132:11 136:8,22 137:1 138:21 144:20
**materials**
79:21
**matter**
108:5 124:2,9 125:22 129:10,14 135:1,7 142:8
**mattered**
124:4
**matters**
100:11 118:20 128:3,24 129:20 140:15 141:1
**Mcgreal**
64:3,6
**means**
115:3
**meant**
105:3
**medical**
57:8,12 64:13 69:14, 17 70:5 75:9 84:6 98:3,11,19 100:2 107:20 111:22 129:24 130:11
**medicine**
57:13 58:11 68:16
**meet**
71:12
**meeting**
71:3 83:23 94:17 96:19,23 97:3,15,23 98:4 102:7,10,14 103:1,8,9 132:6 137:8
**members**
68:10
**memory**
76:22
**mental**
58:10 74:9,14 76:4,8 116:1,9
**mention**
112:14
**mentioned**
114:23
**met**
84:19 111:11
**Michelle**
54:11
**middle**
80:9
**mild**
106:3
**mildly**
106:18
**mind**
88:17 113:2
**mine**
58:8
**minimizing**
112:12
**minutes**
118:16
**misinterpretation**
120:2
**missed**
139:21,23 140:6
**missing**
84:5
**mistake**
140:4,5,6
**mistreated**
101:13
**misunderstood**
98:17
**misused**
75:24
**moderate**
112:6
**moment**
62:21 90:20 103:1 107:22 118:9 132:19 144:21
**month**
73:18
**months**
110:15
**morale**
66:5
**morality**
118:20
**motivation**
106:4
**mouth**
88:1 92:10
**moved**
82:6

**N**

**narcissism**
118:23 127:18
**narcissistic**
113:22 114:4 115:3 124:14 125:16 126:16 127:13,20 128:11,19
**national**
65:14
**nature**
63:9
**Nawara**
54:23 55:12 56:10 64:21 68:8 69:2 70:12,22 77:9,23 78:6 80:5,15 81:2 84:3,11 85:7 92:4 94:18 97:20 98:1,10 104:20 110:3 113:20 116:15,21 118:14 133:24
**Nawara's**
78:9 117:18 139:5,9
**necessarily**
67:18 68:3 82:24 111:14 117:11,20 118:3 119:3 121:17
**nervous**
144:4
**neuro**
58:12
**neurocognitive**
58:14
**neuropsychology**
57:11 58:1
**nine-year**
106:15
**nom**
57:14
**nonclinical**
62:8
**normalized**
106:20 107:20
**North**
82:9,10
**Notably**
130:8
**note**
82:16 84:3 90:17 124:5 136:11
**Noted**
106:15
**notes**
55:20,21,22 56:2 77:21 105:17,23 106:13 108:4,5
**notice**
66:9 122:13
**noticed**
63:17 80:9
**November**
82:17 84:15,16 94:16 106:14 111:8 130:11
**numbered**
54:17
**nurse**
76:17 95:16 98:3,12, 13 99:24 100:6,23, 24 118:15 132:2,4, 21 136:10

**O**

**O-S-T-R-O-V**
64:7
**object**
117:4 132:7
**objection**
105:18 116:19 117:1 120:11 121:1,7 125:9 126:23 136:5 137:14
**objective**
100:15
**observed**
117:3
**obsessive-compulsive**
113:22 114:4 116:2 117:10 118:22 124:7 125:14
**obstructive**
107:5
**occupational**
58:11 68:16 76:17 100:23 105:11
**occurred**
97:2
**occurrence**
55:18 56:5
**off-site**
66:1
**offer**
106:2
**offered**
86:15 105:16
**offers**
92:19
**office**
59:2,7,8,13,15 60:6 72:23 73:2 74:24 78:2 95:22 97:23 111:7 131:10,22 135:21
**officer**
56:10 68:8 69:2 70:12,22 77:23 78:1, 6,8 79:6 80:13 84:3, 11 85:7 90:12 92:3 94:1,18 97:20 98:1,9 102:2 104:19 113:20 116:15,20 117:18 118:14 133:24 135:2
**officers**
109:20 131:19 140:16
**official**
71:23
**one's**
55:14 117:16 129:3
**opened**
136:18
**openly**
94:22
**openness**
116:11
**operations**
68:12 82:7,13 135:19 139:17
**opinion**
104:14 113:19 126:4 140:13,22
**opinions**
86:23 109:10 112:2
**opportunity**
117:6 139:22,23 140:6
**OPR**
95:17,23 136:18
**option**
130:12
**orderliness**
116:9
**organization**
60:16
**originally**
82:9
**Ostrov**
64:3,7
**outburst**
111:2
**outbursts**
108:16,23 110:22 133:4
**outcomes**
116:18
**outlined**
110:2
**overconscientious**
118:19
**overestimate**
127:7
**overly**
118:7 121:20
**owns**
63:22

**P**

**pages**
57:1 65:8 80:2 115:24
**paid**
99:13
**paragraph**
66:10 68:20 82:4 91:15 101:22 103:16 104:18 108:14 113:18 122:15 127:5
130:22
**parenting**
104:8 105:13
**part**
68:8 73:18 95:12 99:9 123:15 124:15 143:23
**participate**
119:15
**parts**
96:23
**party**
59:19 63:19
**patient**
62:1
**Patients**
62:5
**pattern**
81:12 116:8 126:19 129:2 133:17
**pay**
104:10
**pending**
61:8
**pension**
61:10 72:19
**people**
67:17 71:6 80:21 86:4 90:14 104:4 108:11 112:15,20 113:7,10 114:9,10, 16,20,22 117:10 119:3 121:15 122:13 124:17,21 126:7 127:23 129:7 131:7, 9,22 141:1 143:1 144:3
**perceive**
125:2 127:23 128:14
**perceived**
81:7,16 89:13 119:14 131:8
**perceives**
115:7
**percent**
83:14
**perception**
87:24 88:1,18 93:22 100:11 101:12 117:12
**Perfect**
64:21
**perfectionism**
116:9
**perfectly**
88:13 144:9
**perform**
109:16
**performance**
69:11
**performing**
132:16
**peril**
135:14
**period**
134:2
**persisted**
97:14
**person**
77:6 92:20 93:11 107:8 116:7 124:24 128:11 129:8 139:4 144:17
**person's**
105:14 112:8,9 133:11
**personal**
66:24 100:1,7 105:12
**personality**
66:11,21 76:8

113:20,23 114:5,9, 14,17 116:3 117:23 118:22 119:18 120:1,9 124:7,11,15, 19,22 125:3 126:16 127:13 128:11 133:10 134:11
**personnel** 58:23 75:10 112:15 133:16,22
**pervasive** 116:8 126:17,19 128:8 129:2 133:15 138:24 139:3 144:15
**photograph** 68:20
**physical** 65:23 122:18
**physically** 79:4 97:9
**physician** 108:7
**picked** 95:11
**picture** 77:14
**pissed** 131:23
**place** 56:7 78:7 82:11 93:19,20 139:16
**places** 82:9
**play** 100:19
**played** 74:22
**pleased** 93:9
**point** 78:23 82:16 83:19 84:8 87:12 97:21 98:21 99:10,12 100:8,13 102:10 128:10 132:9
**pointed** 132:11
**points** 82:3 124:13
**poked** 88:10
**police** 61:11 134:24
**policies** 60:16
**policy** 85:24 86:17,24 99:1 125:20 126:3 129:24
**poor** 66:16 107:9
**population** 135:10
**populations** 58:22
**pose** 110:3
**position** 55:14 68:8,24 69:6 109:21 110:1
**positions** 123:7
**positively** 106:17
**possess** 113:21
**possession** 66:18
**potential** 108:8
**potentially** 67:18
**pre-hire** 64:17 68:5 112:21
**predisposed** 110:21
**premiums** 66:3
**preoccupation** 116:8
**presence** 66:19 80:14
**presented** 58:16 79:8 84:4 130:3
**presents** 129:18
**pretentious** 127:9
**pretty** 128:3 130:5
**prevent** 55:18
**previously** 54:5 92:17
**primary** 107:22 108:7
**principle** 118:8,13
**printed** 56:24
**prisons** 73:16
**privilege** 63:19
**problem** 60:3,17 65:20 69:5 76:9 120:10 122:5 128:7,9 129:5 132:20 133:9,15 134:6 135:9 138:24 140:3
**problematic** 109:24 140:22
**problems** 68:23 105:10 106:22 125:7,8,10 129:2,15 131:5 134:5
**procedures** 60:16 74:19
**process** 70:17 74:23 75:24 84:4,14 85:15 99:7,9 111:8 115:16 119:11 126:1 134:22
**processes** 59:14
**product** 63:22
**productivity** 66:5 67:1
**profession** 119:4
**professional** 95:21,22 106:11
**professionals** 68:15
**program** 58:9 68:6
**prominent** 124:22
**prompt** 141:3
**prompted** 63:6 79:17,20 83:6
**prompting** 76:2,9 78:19,20,21
**prone** 122:14,16
**proper** 109:19
**properly** 105:2 109:23
**property** 66:1
**protected** 75:9
**provide** 54:23 70:20 74:8 86:9
**provided** 84:9,14 97:2,4 133:22 134:8
**providing** 130:11
**proximal** 107:3
**psych** 113:9
**psychiatric** 66:20 104:5,21 105:8,16 106:2 112:11,12 133:8 134:10
**psychiatrists** 74:10
**psychologist** 74:20 121:23
**psychologists** 74:10 121:22
**psychology** 57:8,10
**psychopaths** 73:13
**public** 55:15 58:9 67:24 68:2,5,7,9,18,24 135:13 139:18 141:7 142:12
**pull** 138:13 139:14
**pulled** 76:6 131:14,18,20 132:19 134:3,17 135:3,9 136:21 138:1,18 139:12 142:4,9,21 143:4,7 144:3
**punitive** 75:23 131:24
**purpose** 62:15 77:24
**put** 55:5 71:14 75:9 82:12 85:4 87:24 99:7 113:13 122:7 130:5 131:13,24 132:23 134:16 135:9,14 139:15,16 143:19 144:5
**putting** 88:19 90:5,18 92:10

**Q**

**quasi-legal** 61:6
**question** 56:3,5,9 60:2,4 61:2, 4 62:16,24 63:1,4 69:18 70:9 71:12 75:3 76:3,7,11 77:1 79:11 85:4 91:2 107:15 116:20,23 117:2 120:12 121:2, 3 122:7 126:24 129:12 133:2,7 136:6 137:15 143:11
**questions** 54:11,24 55:4,10,11 78:11 80:23 102:5 109:14 115:11 134:21
**quick** 101:16 118:9
**quicker** 57:5
**quickly** 115:11,13
**quote** 79:4 89:19,20,21 90:7
**quotes** 129:22,23 130:5

**R**

**race** 101:7
**rage** 128:12,20 131:7,8
**raise** 131:10
**raised** 143:18
**Ray** 54:12 74:7,11
**reaching** 112:3
**react** 115:6 118:11 128:12,19
**reacting** 126:5
**reaction** 81:10
**reactions** 113:24
**read** 56:1 67:9,10 68:21 75:15,17 95:1 117:3 121:5 133:16,23
**reading** 55:9 85:18 105:2
**ready** 85:2
**realized** 80:12
**reason** 84:1 89:9,11 96:7 98:12 100:20 101:15 102:20
**reasonable** 93:6 142:2 143:5
**reasons** 78:14 79:3
**reassigned** 134:3
**Rebecca** 77:1 132:3,4
**recall** 59:9 73:7 78:12,23 107:13 108:3
**receive** 60:12
**received** 84:11
**receiving** 121:15 129:11
**recent** 108:2
**recently** 99:16
**recess** 144:23
**recommendations** 54:24 55:18
**record** 56:2 57:21 63:22 64:13 71:24 72:4
**records** 69:15,18 84:6 98:3, 11,19 100:2 107:21, 23 111:22 129:24 130:11
**reference** 95:3
**referral** 55:5 62:16,24 63:1 74:23 76:13 79:2,3 94:20 97:4 133:5 136:19 141:11 144:9
**referrals** 75:5,17
**referred** 63:20 65:14
**referring** 93:14 130:14
**refers** 116:22
**refused** 84:3 98:2,10 102:11
**refuses** 106:20
**regular** 73:18
**Reierson** 77:1 132:3,5
**related** 81:3,14 93:11 102:2 106:8 123:9 133:19, 20
**relationship** 61:20 62:7 63:9,15 106:15
**relationships** 122:24
**relative** 122:23
**release** 98:2,11,19 130:13
**releasing** 100:2
**relevant** 69:14 76:3 85:20 86:6 105:13 115:24 127:18,19 137:20
**rely** 112:2 133:23
**relying** 81:18,21
**remained** 82:5
**remember** 70:16 72:20 80:20
**reminder** 84:12
**remove** 83:15
**removed** 82:21 83:2,4,21,22
**rep** 96:19,22
**repeatedly** 134:3
**report** 55:5 62:18,21 64:1, 16,22 71:7,10,14,17 79:1,15,20 81:23 95:2 103:12 116:22 129:18
**reported** 84:11 103:13 104:14 136:16
**reporter** 56:21 115:22 121:6 126:13
**reports** 64:12,17 72:6,14 77:18 103:17
**represent** 56:23 83:9
**representation** 95:24 96:3,13
**representatives** 83:10
**request** 77:21 78:4
**requested** 102:1 103:2 121:6 130:10
**require** 109:16
**required** 80:16
**requires** 109:21
**Reread** 121:3
**research** 58:4,8,12,18 73:13
**resistance** 123:2
**resources** 66:17 79:3,9 82:18 84:5,7,12 94:17 100:3 130:1
**respect** 123:2,3,19,21 127:24
**respond** 109:17 120:5
**responded** 88:24
**response** 79:6 85:14 102:13 112:8 113:5,12 123:22,24
**responsibility** 96:16 138:13
**restlessness** 106:5
**restrained** 87:9,10
**restraining** 86:17
**result** 66:13 76:6
**results** 112:5 113:1
**retained** 73:5
**retread** 80:1
**return** 55:12 77:24
**returned** 82:11
**returns** 110:4
**review** 69:10,14 79:21 95:17,22,23 105:24
**rights** 135:15
**rigid** 114:24 121:19
**rigidity** 116:16 125:12
**rise** 105:7,8 114:11
**risk** 66:4,13 110:4
**road** 141:5
**role** 60:24 75:19 82:1
**roles** 74:22

**Rosalyn** 57:13,18
**roughly** 72:7
**routine** 79:7
**routinely** 127:7

## S

**safe** 55:12,13 134:15 135:11 138:12
**safely** 129:4
**safety** 58:9 67:24 68:2,5,7, 9,18,24 76:11 110:4 138:17 141:7 142:12
**salt** 113:15
**sarcastic** 88:15 91:17,20 92:24 93:1 94:5
**Sarocka** 54:12,21 77:21
**sat** 118:16
**scapegoat** 101:10
**scenario** 135:24
**scene** 86:11
**school** 57:9,12,13 105:14
**science** 57:14
**scolded** 131:20
**scope** 62:10
**Scout** 118:6 126:7
**screening** 68:5 112:22
**scrupulous** 118:19
**section** 124:14
**self-esteem** 115:5 127:12
**self-importance** 127:6
**self-refer** 62:1
**self-referred** 62:5
**self-report** 133:24
**self-worth** 106:5
**send** 60:7,19 82:20 83:15, 16 98:22 137:10 141:8
**sending** 140:7
**sense** 59:11 61:18 67:12 106:4 117:16 127:6
**sensitive** 68:7 115:6 121:21 127:14,22
**sentence** 69:9
**separate** 77:5 96:23
**September** 77:22 78:7 102:3,17 103:3,15 110:12 140:12 144:11,13
**Serge** 91:20
**sergeant** 89:10 91:18 135:3
**series** 54:10 62:14
**servant** 142:12
**set** 59:14,18,20 80:14 81:2 85:8
**setting** 85:20 86:11 128:2
**sexual** 65:24
**shackle** 91:21,23 92:3,20 94:6
**shackled** 87:14,19 88:6 91:11
**shackles** 87:12
**shackling** 93:11
**Shaw** 107:24
**shed** 113:23
**Shelby** 76:16 95:16 98:3,12, 13 99:24 100:6,23 118:15 132:3,4 136:10
**Sheriff's** 59:2,7,8,12,15 60:6 72:15,23 73:1 74:23 78:2 97:23 111:6 131:10 135:21
**shit** 138:4
**short** 64:5 101:20 131:6 144:23
**shortly** 111:11
**show** 104:7,8 133:16 142:19
**sic** 67:5
**side** 137:17
**sign** 98:2,8,10
**signed** 98:8
**significant** 103:23 104:13,20,24 105:10,11 143:6
**similar** 84:15 112:20
**simply** 81:5 85:4 92:15 98:14 100:1 103:6 141:20 142:2
**simultaneously** 90:22
**single** 80:22
**sites** 62:14
**situation** 88:2 96:15 104:23 117:21 132:15,17 142:18 144:2
**situations** 87:15 122:16
**sixth** 65:8
**skip** 66:10
**sleep** 106:4,21 107:1,4,5, 6,7
**slightly** 60:1,4
**small** 67:8
**social** 66:17 105:12
**somebody's** 76:6
**someone's** 75:10 135:3
**somnolence** 106:22
**sort** 62:13 68:14 74:17 80:23 88:23 91:10 98:24 108:21 115:1, 4 116:17 122:14 128:16
**sought** 102:16 111:12
**sounds** 68:24 99:10 108:20 116:14
**speak** 56:8 70:13,14 71:5 143:1
**speaking** 58:10 76:22 93:15 98:16 108:9 119:7 139:8
**special** 132:17
**specialty** 57:11 58:3
**specific** 67:4,11,19 75:1 81:10 132:15 136:9 142:24
**specifically** 81:15 83:12 85:3,12 90:6 94:20 117:18
**spell** 119:12
**spent** 73:11
**spiraled** 89:1
**spiraling** 96:16
**split** 106:13
**spoke** 77:8
**spoken** 76:16 77:2
**spring** 84:7
**stability** 112:13 141:7
**staff** 144:1
**staff's** 135:5
**staging** 82:12
**stalking** 66:2
**standpoint** 129:1 135:19
**stands** 95:23
**start** 94:19 102:11 109:4
**starts** 89:20 91:12
**stated** 62:17 80:13
**statement** 65:11,17 66:7 80:6, 11 103:19
**states** 65:13 107:18
**Statistical** 114:6,7 116:1
**status** 106:6 112:12 122:23
**stay** 80:17
**stayed** 85:3
**stepped** 92:16
**stock** 131:13 132:1,23 143:19 144:5
**stop** 67:1
**stress** 66:16 104:13,22 105:4 109:18
**stresses** 133:11
**stressor** 106:8
**stressors** 103:18
**strike** 87:16
**strong** 119:2 123:24
**strongly** 115:7 118:11 126:5
**studies** 124:7
**subjected** 135:17
**substance** 66:20 76:8 133:9 134:10
**subtitles** 121:23
**succession** 131:6
**sufficient** 141:3,13
**sufficiently** 139:14
**suggest** 135:20
**suggesting** 83:6
**superintendent** 56:12 70:21 77:7 78:6 80:10,12,16 81:1 85:22 88:4 91:23 99:17,20,24 100:6,21 102:3 108:17
**superior** 79:6 102:2 109:19
**superiors** 136:16
**supervisor** 56:11 59:22 137:22
**supervisors** 69:14,19 74:22
**supplements** 107:15 108:7
**support** 66:17
**Supporting** 122:10 127:11
**supposed** 59:23
**surface** 133:8
**sworn** 54:2,5
**symptoms** 103:23 104:21 105:7 106:3 112:11,13
**syndrome** 107:5
**systematic** 124:6

## T

**takes** 126:3
**taking** 94:4 104:9 129:19 138:22
**talk** 114:20 125:13 129:18 130:16,21 132:21 139:5 144:21
**talked** 69:17 87:4 94:11,22 101:9 127:21 128:1 130:17
**talking** 63:13 69:1 80:10,20 87:21 97:21 99:14 109:6 114:3 127:15 130:24 137:11 139:7
**talks** 61:22
**target** 67:5,11
**targets** 67:19
**teach** 74:6,12
**teaching** 58:17
**telephone** 66:2
**telling** 81:20 123:7
**tendency** 125:15
**tension** 86:13 96:3
**terms** 113:14 144:6
**test** 112:10
**testified** 54:6 83:13 132:3
**testify** 132:5
**testimony** 137:6,7
**tests** 112:6 113:3
**text** 82:5
**thing** 57:7 101:2 107:12 112:16 119:17 134:13 140:15,23
**things** 57:6 58:14 63:17 64:10 80:8 81:9 86:1,2,9 87:22 88:5, 23 90:19 94:10 96:16 97:19 99:1,15 103:7 104:11 110:19,24 114:5 117:14 118:1,2 124:23 125:1 129:17 131:2
**thought** 57:4 88:22 99:15 100:5 101:7 119:10, 16
**threatened** 135:13
**threatening** 97:8 102:1
**threats** 65:23
**thrown** 123:19
**time** 69:17 74:13 76:19 84:19,23 110:20,22 111:2 120:24 130:10 131:19 132:23 134:7 139:2
**times** 60:12 70:4 73:23 74:4,6,7 75:21 104:4 126:18
**told** 64:23 71:13 82:19 83:1 85:1 92:4 95:16 102:24 107:13 130:19 131:21 132:19
**tolerance** 66:16 107:9
**tomorrow** 73:17
**touch** 74:13
**touching** 88:19,20
**training** 57:17 74:18
**trait** 128:19
**traits** 113:23 114:10,14, 17,24 116:22 117:2, 3,10,24 118:17,22 119:18 120:9 123:10 124:12,22 125:3,11, 14 127:20
**treat** 58:22 133:13
**treatable** 76:10
**treated** 59:1,4 101:13 119:14
**treater** 62:1
**treating** 114:22
**treatment** 74:9,14
**trees** 115:2
**tripwire** 140:19 143:17
**trouble** 138:2,14
**true** 82:24 86:21 98:24 100:12,17 101:14 115:8 130:20
**truth** 81:20
**turn** 77:11 109:10
**turnover** 66:6
**type** 61:16 64:12 96:1

108:16
**types**
112:20 114:23
**typically**
59:18 61:8 75:7 122:19

**U**

**ultimately**
98:1,10 101:23
**Um-um**
62:12
**umbrage**
92:2,14 93:2 94:4
**unclear**
142:7
**uncomfortable**
96:2 100:2,18
**uncommon**
112:15
**uncooperative**
97:16
**undergo**
103:3
**underneath**
68:20
**understand**
56:4 74:21 75:4 79:12,16 84:18 86:12 95:19 96:22 100:20 103:5 115:10 116:24 119:3 121:10,14 124:24 125:18,24 129:12,14 130:15 131:3 133:18 143:10 144:8
**understandable**
104:22 106:7 144:2
**understanding**
85:21 101:24 102:15 103:2,14 111:12
**understands**
121:2 129:13
**understood**
65:4 78:13 87:14 102:19 111:6 122:3
**unethical**
118:15,24 119:2,5
**unfair**
119:17 144:5
**unfairly**
101:13
**unfit**
135:16,17,22 141:15 142:13,17 143:20 144:6,16
**union**
96:13,19,22
**United**
65:13
**University**
57:8,16
**unjust**
119:17 123:23
**unreasonable**
90:17
**unsafe**
87:5,9 138:6
**unshackled**
91:21
**untrue**
119:22
**updating**
65:2
**upset**
93:6 122:16 139:22 144:4

**V**

**vague**
136:6
**valid**
141:2
**values**
118:20
**vast**
63:23
**verbal**
65:23 88:22 129:6
**verbally**
109:22 134:4
**version**
85:17 86:7 114:8
**versus**
62:8,11 63:11 82:1
**view**
67:2 94:9 116:16 125:23
**violence**
58:5,17,20 65:10,12, 19 66:4,14 67:17
**violent**
65:13 67:13,18
**visit**
83:20
**volunteer**
85:13
**Vulnerability**
127:12
**vulnerable**
107:8 119:19 120:4

**W**

**waited**
140:21
**waiver**
98:2,10
**walked**
91:18 92:5 93:23
**wall**
89:22
**wanted**
85:13 94:12 96:2,12
**water**
101:17
**weapons**
66:19
**website**
56:24 57:1 61:22 63:18 64:2 65:2,22
**week**
73:12
**weeks**
79:7
**well-suited**
128:21
**whatnot**
58:19 144:1
**whatsoever**
139:10
**white**
115:2 117:9,15 118:1 119:1 123:18
**Winifred**
76:16
**withheld**
110:24
**woman**
106:16 123:16
**women**
101:4,5 123:6
**wondering**
78:17 95:6
**word**
56:4 101:10 119:2
126:18
**words**
86:10 87:24 92:16 93:21 97:17 112:22
**work**
55:12 63:22 66:24 73:19 76:6 83:16 93:18 104:7,23 106:17 110:5 129:8 133:13 134:16 135:12,16 137:12 142:13 143:14
**worked**
72:22 73:1,9 82:17 106:20
**worker**
61:6 66:3
**working**
134:24 135:10 142:17
**workings**
73:15
**workplace**
58:5,16,19 65:10,12, 19 66:1,4 67:17 76:5,12
**world**
125:2
**worry**
106:6
**write**
71:22 118:1 130:8
**write-ups**
133:19
**writing**
67:8
**written**
85:24 86:17 101:6 134:4
**wrong**
117:7,8
**wrote**
69:4 80:11

**Y**

**year**
110:12
**years**
72:10 113:8 133:17, 21 134:24
**yelling**
92:11
**young**
77:14