UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTIONS *IN LIMINE***

Defendants THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, ("Defendants") respond to Plaintiff's Motions *in Limine* as follows.

1. **The Motion in Limine To bar Evidence/Argument that the Medical Release Forms are ADA and/or HIPAA Compliant Is An Improper Effort to Obtain Summary Judgment and Must be Denied in Light of the Very Substantial Record in this Case.**

Plaintiff's first motion *in limine* is an improper effort to present the same summary judgment motion this Court precluded on October 28, 2019 as too late to be heard or decided (Hrg. Tr. at 5-6, Ex. A) – and without a single citation to the record developed in discovery in this case. The premise of this motion *in limine* – that the forms at issue, if they had been executed, "would have authorized the Sheriff's Office to obtain Nawara's entire medical records and history from the date he was born to the present" (Mot. at 1) is just untrue, and the record proves it. Setting aside the impropriety of refiling a summary judgment motion masquerading as a motion *in limine* at this even later date, there are material fact issues that would have defeated the precluded summary judgment motion and they certainly mean this motion *in limine* must be denied. As

EXHIBIT
A
exhibitsticker.com

detailed below, these include whether Plaintiff in fact was required to sign both forms at any time, what the forms mean on their face and in practice, and whether the forms in fact suffered from the legal defects Plaintiff now claims. To grant this motion would, in effect, hand the Plaintiff a full verdict in this case and invade the province of the jury. But sufficient facts have been established in discovery to create questions that must be presented to the jury to decide about whether the medical release forms in this case violate the bounds of the ADA.[1]

**a. Facts Established by the Record That Plaintiff Ignores.**

*First*, there are significant fact issues with respect to what forms really are, or should be, at issue in this case. There are two forms that Plaintiff has complained about, variously, in his dispute with his employer. (Reierson Dep. 67:17-20, Ex. B). The first is a form created by CorVel, the third-party administrator who handles FFD exams for the County, which is a "HIPAA Authorization for Disclosure of Protected Health Information" ("CorVel form"). (*See* PX2; *see also* Shelby Dep. 79:5-15). That form authorized CorVel to obtain medical records from providers. (Reierson Dep. 67:17-20). A version of this form was signed by Plaintiff in August 2017 that finally permitted the FFD process to proceed. (PX17). The second form, had Nawara completed and signed it, would have authorized the release of medical records from treaters he would have had to identify to the Occupational Nurse at the Sheriff's Office ("CCSO form"). (*Id.; see* also PX 1; Reierson Dep. 69:24-70:24 ("the employee's authorizing the physician to release the records to the sheriff's office, to the nurse. She will compile all of the medical documentation that was received and give it to CorVel to provide to the independent physician that was selected by CorVel.")).

[1] Plaintiff's presentation of the question as being whether the forms were "ADA or HIPAA compliant" is something of a misdirection. There is no cause of action in this case alleging that the forms violate HIPAA. Rather, the issue in this case is whether one or both of the forms violate the ADA.

Only the CorVel form was referenced in complaints from Plaintiff and his lawyer for months after he was sent for an FFD exam; and for months, Nawara's lawyer made clear that he was refusing to participate in an FFD exam at all. (*See* DX 28 (12/21/16 Kurtz email attaching only the CorVel form), DX 29 (1/31/17 Kurtz email attaching only the CorVel form), DX 33 (3/8/17 Kurtz email demanding reinstatement with no reference to either form), DX 34 (3/13/17 Reierson response stating the CorVel "HIPAA" form needed to be completed after resending both); *see also* Nawara Dep. 170:2-12, Ex. C (he didn't think he "should be subjected to the fitness for duty process at all"); *id.* at 174:8-22 (he gave both forms to his lawyer); 184:21-185:1 ("Q. So did you understand that the position that your attorney was taking for you at the time [December 21, 2016] was that you shouldn't have to go through the FFD process at all? A. Correct."); 186:8-188:5 (establishing that on January 31, 2017 Kurtz again only attached the CorVel form; still was saying he should not have to go through an FFD at all; made no mention of "ADA" and no allegation that the form was illegal).

It was not until March 2017 – after having been sent both forms again – that Plaintiff and his lawyer made any mention of the ADA or any complaint about the CCSO form at all – albeit obliquely. (*See* DX 35 (3/13/17 Kurtz email claiming "an employer cannot order an employee to complete a HIPAA or medical release form" to get an employee's medical records); DX 36 (3/17/17 Nawara email claiming "I feel the order requiring me to sign a blank HIPAA release was unlawful and violates the [ADA.]")).

*Second,* the record shows that there was a clear job-related business necessity to send Nawara for an FFD; the forms simply were part of that process; and Nawara in fact *never* was required to sign both forms to complete the process. Plaintiff focuses only on the events of September 28, 2016 in his Motion, completely ignoring the real cause of the FFD referral:

Nawara's behavior on November 18, 2016 in the CCSO's HR department. Nawara's hostile and aggressive behavior at that meeting is what led Defendants Rebecca Reierson of Human Resources ("HR") and Occupational Nurse Winifred Shelby to conclude that Nawara should be sent for a Fitness for Duty examination. (*See* Shelby 9/25/19 Dep. 68:1-21, Ex. D ("he became [en]raged, very uncooperative . . . I've never seen anyone in that office behave like that before."); 69:24-70:2 ("what I'm observing is someone who looks like . . . they're on a ten and could attack at any given time."); 74:24-75:17 ("as we watched his behavior and his lack of self-control, and just talking with us from HR, that it's very concerning, him being safe to care for prisoners if he can't show self-control with us and we're not threatening whatsoever, so how would . . . he behave himself in that sort of environment, so he definitely should be evaluated by a provider to make sure that he didn't harm someone while on the job."); *Id.* 124:13-24 (Nawara's behavior in his HR meeting was "95 percent" of the reason he was sent for an FFD exam); *see also* Nawara 10/2/19 Dep. 136:9-137:15 (Nawara recalls Shelby saying he was being referred "Due to the aggressive behavior he displayed" in HR)). Notably, Nawara himself admitted that when he was asked by Nurse Shelby whether he felt he was threating to coworkers, inmates, or detainees, he said "Well, co-workers no. Detainees, to a certain extent." (Nawara Dep. 129:23-130:5).[2] These facts alone are sufficient to show a job-related business necessity for sending Nawara for an FFD exam.[3]

[2] Nawara's hostility to his employer – and a potential explanation for some of his behavior – is reflected in emails he sent in the *same month* as his altercation with Defendant Jones-Hayes, in which he wrote that "I hope being a thorn [at work] will someday payoff somewhere" (DX 3); and referred to his place of employment as a "shithole" (DX 4). He also testified that he felt "in danger . . . "[b]eing employed in this place." (Nawara Dep. 143:10)

[3] The FFD examiner retained by CorVel confirmed that the FFD referral in this case was appropriate and "a good referral," noting that "I will accept a fitness for duty examination if I think that the prompting question is relevant and appropriate, it is some kind of mental health or cognitive issue where there has been some disruption at the workplace and somebody's been pulled off work as a result of that, and there may be a question of whether there is a personality, mental health, substance use, or cognitive problem

Nawara testified that he was presented with paperwork and told he needed to fill out the forms to continue the FFD process. (Nawara Dep. 139:22-140:5; Shelby Dep. 77:12-15 ("we explained the process and explained that these forms would need to be filled out.")). Nawara looked at the forms, understood he could not come back to work "until I complete this [FFD] process" and that the "forms were the first step of the process" and once that process was over, he could come back. (*Id.* 140:6-20). Nawara says he "told them I wasn't going to sign them . . . [b]ecause they were blank." (*Id.* 140:22-141:10). He further testified that Nurse Shelby told him he could not come back until he did, and that he asked "Could I take these to review these? She said, Sure." (*Id.* 141:15-19).

Nurse Shelby testified that Nawara said during the HR meeting that "he wasn't going for no fitness for duty" and "that he wasn't signing the papers". (Shelby 81:6-23). Critically, Shelby also recalled that "we . . **. informed him at that time that if he didn't sign the paperwork or didn't want us to have this information, he could go directly through CorVel**." (Shelby Dep. 81:19-23, emphasis added). Shelby confirmed that it is true "that an employee can go directly to CorVel if they don't want to sign the forms provided by the sheriff's office"; that other employees "have gone directly to CorVel and signed the CorVel form"; and this "absolutely" was something she told all employees. (*Id.* 82:3-13; *see also* Goldstein Dep. 129:17-130:20, Ex. E ("at the time the initial examination was requested on November 18, 2016, providing medical records to CorVel was in fact an option."); *see also id.* 98:6-19 ("bottom line, he wouldn't release any medical records to anywhere.")). For this reason alone, it is incumbent upon Nawara to explain what about the CorVel form – a very slightly edited version of which he executed in August 2017 (PX 17) – in

prompting the issue that may be treatable, and that there is a question of safety effectiveness, you know, within the workplace." (Goldstein Dep. 76:1-14)

fact violates the ADA. As it stands, this wealth of evidence is sufficient to present the question of the legality of the forms to the jury and the motion should be denied.

*Third*, and relatedly, Nawara makes too much of the Court's commentary in its March 28, 2018 opinion on Defendants' Motion to Dismiss that the forms were "untailored" and "would effectively permit Defendants access to a wealth of information about Nawara unrelated to his fitness for duty." (Pltf. Mot. at 1-2). A motion to dismiss, by its nature, relies solely on the complaint and related documents. The Court did not have the benefit of the record that now has been developed, and which belies the initial impression that the forms were in some way untailored or permitted unwarranted access to irrelevant medical information. The *only way* these forms could be completed – and medical records obtained – was through an interactive process with the employee. *Only* the employee could tell either CorVel or the CCSO who the relevant providers were; likewise, if in the interactive process the employee wanted to limit the time frame for the requests, he could do so – and only if a dispute actually arose as to the time frame would there be a legitimate basis for alleging an ADA violation.

**The CorVel Form**

The CorVel form was, on its face, properly tailored, stating in the very first paragraph: "With this authorization, I allow all medical records and information to be released and reviewed ***that relates to my fitness for duty exam.***" (PX 2 ¶ 1). There is nothing in the form itself that identifies providers or the relevant time frame – both would have to be determined between the employee and the case manager once the form is executed. (Parrinello Dep. 18:14-24, Ex. F (this is a "standard CorVel form" whose purpose is "to allow CorVel the ability to engage with this customer, the case management program, in order to fulfill the processes required under that case management program for the customer, relating to a fitness-for-duty.") The CorVel form also

expressly permits the employee to "***revoke this authorization in writing at any time***" by sending a letter to a provider's privacy officer. (PX 2 ¶ 1). This, too, establishes that if during the process Nawara felt that CorVel was asking for too much, he could put a stop to it.

After Nawara signed a slightly modified version of the CorVel form – which, according to CorVel's 30(b)(6) representative, made no material changes to the original form (Parrinello Dep. 24:10-29:19) – a CorVel case manager named Michelle Sarocka received the referral from the CCSO and she thereafter worked directly with Nawara to determine what medical records to obtain and for what period of time. (*See* DXs 42, 43, 44, 46, and 47). Sarocka told Nawara that the "FFD provider will need to review medical records from all Health Care Providers you have seen over the past two years" (DX 45) and the only providers identified by Nawara were Dr. Charles Shaw, Nawara's primary care physician, and Karolina Hogueisson, a therapist that Nawara chose to see after his dispute with his employer arose. (DX 46, 50, 51). Ms. Sarocka was identified as a witness in Defendants' Rule 26 disclosures and has been named by both Plaintiff and Defendants as a trial witness – but she never was deposed by Plaintiff. She is expected to testify as to the uses of the CorVel form and to confirm the position that this form is not used to demand more medical information than is reasonably related to the FFD examination.

Furthermore, both the purported FFD examiner Nawara chose to retain in March 2017[4] and the actual FFD examiner chosen by CorVel testified that they *always* ask for medical records for FFD exams, and they go back multiple years. (Kroll 11/22/19 Dep. 33:8-13, Ex. G ("Q. [W]hen

[4] Nawara tried to avoid the CCSO's FFD process by going to see Robin Kroll, Psy.D in March of 2016 and tendered a "report" from Kroll that he claimed was an FFD report. (DX 36). However, Dr. Kroll testified that her examination of Nawara was *not* a legitimate or reliable fitness for duty exam. (Kroll Dep. 31:12-19 ("He wasn't coming in specifically stating that this was a fit for duty. . . . He – he was stating that he was coming in basically for himself to see what his psychological status is.")).

you do a fitness for duty exam for a department, you typically ask for medical records? A. I always ask for medical records."); Goldstein Dep. 14:12-21 ("I like to ask for ten years of records.")). Dr. Goldstein also explained why it is important in a mental health FFD evaluation to get primary care records in addition to any mental health care provider's records:

> Q. You say you like to ask for ten years of records. Why is that?
> A. Well, if my role is to determine if someone has a psychiatric or neurocognitive disorder, you can't always rely on self-report and so records are critical. They often predate, most importantly, a fitness inquiry and that's the most important for me, frankly.
> Q. And when you say you like ten years of records for those reasons, are you saying only records, say, of mental health providers or any doctor records that they may have?
> A. **Primary care is always critical because many individuals receive their mental health care either directly or indirectly from their primary care doc or their primary care doctor has made a referral. They're often the frontline treater**.
> Q. And by that, I take it you mean some people come into their regular – their internist, for example, and say, "I'm having trouble sleeping" or "I'm having trouble at work: or something like that and that could lead to a referral?
> A. Absolutely.

(Goldstein Dep. 15:24-16:14). And, indeed, the primary care records gathered by CorVel and supplied to the FFD examiner explicitly included notations from Nawara's doctor concerning "Neuropsychiatric" symptoms that the doctor checked for as part of his exam. (DX 51 at NAWARA 3459, 3464, 3467). Primary care records also could disclose substance use or other symptoms or conditions that may have caused an employee to act out at work as well, and Nawara's did: revealing he was taking "muscle building supplements" and had sleep apnea – which can lead to "poor frustration tolerance, irritability, agitation" – that he refused to treat. (Goldstein Dep. 76:1-14; 106:18-108:11).[5]

[5] Nawara's records in this case showed persistent use of "performance enhancing supplements," which were a matter of interest to the FFD examiner: "There was clearly a discussion with his primary care physician about dietary supplements and their potential impact on creatinine and levels, and just generally speaking, you know, they are not FDA approved, so they can cause issues . . . in some people." (*Id.* 107:11-108:11).

In short, Defendants should be able to show that the CorVel form was not an improperly broad or un-tailored inquiry under the ADA – both on its face and in light of the record facts concerning this form and how it was to be used.

**The CCSO Form**

As already established, Nawara was not in fact required to complete the CCSO form to satisfy the FFD process. But even if he had agreed to fill out that form, it likewise did not run afoul of the ADA. Just like the CorVel form, it was not self-executing; the only way it could be filled out was with the cooperation and input of the employee. This is why none of the information sought by the form, including the names of any doctors from whom information might be requested, was filled in before giving the form to Nawara:

> So typically, it's kind of an interactive process when we meet with employees to determine if it would be necessary for them to undergo a fitness for duty, but Mr. Nawara was not cooperative, so, you know, normally, the nurse would talk to the employee and gather their providers' names and things like that and assist with completing the forms and explaining them, we just didn't have the opportunity with Mr. Nawara.

(Reierson Dep. 64:25-65:11). Likewise, the reason no time frame was filled-in prior to giving him the forms was because that is "a conversation [Nurse Shelby] would have had with Mr. Nawara had he interacted with us in our meeting." (*Id.* 74:16-21) Nurse Shelby tried to discuss the forms with Nawara that day, but was shut down, and followed up with a phone call to him to which he never responded despite receiving her message. (*Id.* 75:1-7; Nawara Dep. 164:24-166:24).

Given these salient facts, the request on the CCSO form for "all healthcare information" does not mean that completing the form would have permitted the CCSO to "obtain Nawara's entire medical records and history from the date he was born to the present." Indeed, the very fact that the form was blank – which was Nawara's only complaint at HR on November 18, 2016 (*id.* 162:1-4) – confirms this point. If he had opted to cooperate in the FFD process and fill out this

form, Nawara would have identified his providers and could have limited the timeframe for their records in any way he saw fit. And, as the record above makes clear, he was free to refuse to complete the CCSO form at all.

**b. The *Jackson* case is inapposite and does not provide a rule of decision.**

The primary legal basis for Plaintiff's motion is *Jackson v. Regal Beloit America, Inc*., 2018 U.S. Dist. LEXIS 103682 (E. Dist. Ky.). That case, however, is fundamentally inapposite and highlights the problematic nature of Plaintiff's arguments in this case. *Jackson* involved an assembly-line worker who had taken FMLA leave for colon cancer treatment and had returned to work without restrictions based on a doctor having cleared her to do so. *Id.* at *2-3. In the following year, the employer sent the employee for a routine medical screening (which she passed), during which the screener asked questions about her colon cancer. *Id.* at *3. The employee refused to discuss her colon cancer or surgery with the doctor. *Id.* Thereafter, the doctor and the company demanded medical records from the employee about her colon cancer and surgery, claiming they were necessary to certify her as safe to operate machinery. *Id.* at *4. Despite providing another doctor's note stating she was able to perform her duties without the need for accommodation, her employer insisted that she be moved to another position within the company, which she also refused to do. *Id.* at *9. Ultimately, the employee was fired. *Id.*.

Observing that the ADA "clearly permits medical examinations and inquiries," the court recognized that "demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'" *Id.* at *15 (quoting 42 U.S.C. § 12112(d)(4)(A)). "An employer who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.* at *21. The only relevant inquiry in *Jackson* – as here – was whether the employer reasonably

believed "the employee posed a direct threat to himself or others." *Id.* The court found that the medical exam itself, in Jackson's case, simply was not job-related or consistent with business necessity. Unlike this case, the employer had no "evidence in the record to suggest" that it had a reasonable belief that the employee's ability to perform the essential functions of her job were impaired, nor was there evidence that would cause a reasonable person to inquire as to whether the employee was still capable of performing her job. *Id.* at *22. That plainly is not the case here – the testimony from Reierson and Shelby demonstrates that they had a reasonable belief – based on his conduct in HR and, to a lesser extent, the reported altercation with Jones-Hayes – that Nawara, who unlike Jackson was in a public safety position, might not be able to perform the essential functions of his job and might pose a safety risk to detainees.

The nature of Nawara's job is another key distinction from *Jackson.* "Absent evidence of current performance problems or observable evidence suggesting that a particular employee will pose a direct threat, employers can require periodic medical examinations of employees *in only two instances*: (1) **where the employees are in positions affecting public safety (e.g., police officers and firefighters)** or (2) where the medical examinations are required or necessitated by other law or regulation." *Id.* (emphasis added). The *Jackson* court found that neither of these two instances applied – but of course, here, there can be no debate that Nawara was in a position affecting public safety. (*See* Goldstein Dep. 31:14-18 ("Q. A correctional officer is a very sort of particular kind of a job. It's not like an office job, right? A. Public safety is different we always say. Absolutely."); *see also id.* 68:6-12 ("But fitness for duty when it involves someone who's in a public safety sensitive position, which Officer Nawara is, it is part of public safety because he is dealing with community members, albeit they're detained. Of course he's also doing that if he's going on external operations, right.")

Further, after finding that the employer had no justification for its medical examination in the first instance, the *Jackson* court, also held that the disability inquiry was not "appropriately narrow" in scope because the employer requested medical records "related to her colon-cancer surgery, even though her physical examination did not reveal any physical abnormalities or uncover any causes for concern." *Id.* at *25. Here, of course, lies the root of the dispute in this case: whether the forms at issue would lead to overly broad requests for records. There is absolutely no evidence in this case that anyone inquired about medical conditions Nawara might have had that, like Jackson's cancer, were unrelated to his fitness for duty as a correctional officer. Perhaps if someone had, Plaintiff might have had a point, but the record does not support any such claim, and to the contrary, shows that both the CCSO and CorVel understood that medical records to be obtained pursuant to the forms at issue in this case needed to be relevant to the FFD exam and not some free-floating inquiry into an employee's entire medical history "from birth to the present," as Plaintiff argues.

Plaintiff's Motion in Limine to exclude any evidence/argument that the medical release forms are ADA or HIPAA compliant must therefore be denied. Defendants have a right to present their defenses and have the record on which to do so.

**2. To Bar Opinions or Testimony that the Medical Release Forms are ADA and/or HIPAA Compliant, and Any Other Opinion Testimony.**

This Motion *in Limine* is largely duplicative of Motion 1 and can be denied for much the same reasons presented above. But it is worth noting Plaintiff's admission that whether the forms at issue are ADA compliant calls for the "jury [to] decide if the Sheriff's Office can prove 'business necessity.'" (Mot. at 6). That is exactly the point of Defendants' argument opposing Motion 1 and underscores why that motion should be denied.

In Motion No. 2, Plaintiff seeks to bar alleged opinion testimony from Mary Parrinello –

who will only appear by deposition designation – based in the claim that Defendants failed to comply with Rule 26 by not disclosing Parrinello, CorVel's 30(b)(6) witness, as an expert. As a threshold matter, the portions of Parrinello's testimony can or cannot come into evidence should have been addressed in the Pretrial Order in response to the designations made by Defendants – but Plaintiff chose instead to file a blanket motion based on a perceived violation of Rule 26. Defendants disagree with that position.

Rule 26 provides that a "party must comply with the disclosure requirements in Rule 26(a)(2) *if the expert witness is one retained or specially employed* to provide expert testimony in the case *or one who's duties as the party's employee regularly involve giving expert testimony*." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added); *Meyers v. Nat'l R.R. Passenger Corp.,* 619 F.3d 729, 734 (7th Cir. 2010). Parrinello never was "retained or specially employed" by Defendants. She is not offered as expert witness, but rather is a corporate representative of CorVel, the company that created the CorVel form – and she was designated to testify as to CorVel's position that the form it created was proper. Plaintiff received notice of the subpoena issued to CorVel for a corporate representative, which included the topics for the deposition. (10/25/19 30(b)(6) subpoena and notice, Ex. H). Among the noticed topics was "The propriety of the attached forms," and the subpoena attached all of the medical release forms at issue in this case. *Id.*

Parrinello testified as to the CorVel form's creation, its long use by CorVel in independent medical exams, and CorVel's view that the form is proper. (Parrinello 11/18/19 Dep. 16:7-15 ("this form was authored prior to my time by the privacy officer, who is no longer with our company, whose name was Gregory Stevens."); 18:14-24 ("My understanding of the form's use is for business purposes to allow CorVel the ability to engage with this customer, the case management program, in order to fulfill the processes required under that case management

program for the customer, relating to a fitness-for-duty."). As a corporate representative for CorVel, Parrinello testified based both on her experience as CorVel's Privacy Officer and on her review of the CorVel form, including its history. *Id. Stanley v. Ameren Ill. Co.,* 982 F. Supp. 2d 844, 850, 860 (N.D. Ill. 2013) (corporate representative testimony could be used to establish proper controls). Parinello also provided admissible testimony explaining why the original CorVel form and the one that Nawara ultimately signed were not materially different – again, based on her knowledge of the form and her role as CorVel's Privacy Officer. (Parrinello Dep. 24:10-29:19). It may be that Parrinello's testimony as to the form being HIPAA compliant need not come into the case, since HIPAA compliance is not actually at issue here. But there is other testimony proposed from this witness, and it cannot all be rejected on the basis of Plaintiff's blanket argument.

Defendants have offered no opinion testimony, and therefore Plaintiff's Motion *in Limine* No. 2 should be denied.

**3. To Bar Any Questioning, Argument, Inference or Speculation That the Plaintiff Would Not Have Undergone the FFD Evaluation Even If He Had Been Provided With a Legal, ADA Compliant, Form.**

Motion *in Limine* No. 3 once again completely ignores the record developed in this case – arguing that Defendants should be precluded from showing that Nawara was unwilling to participate in any FFD evaluation at all, and that his complaints about the CorVel and CCSO forms are red herrings. Far from being speculative, the record is replete with evidence that this in fact was the case – and of course Defendants should be permitted to present that evidence and make all appropriate arguments on the basis of that evidence. Here is the wealth of evidence established in this case:

- On November 18, 2016 – the day Nawara was sent for the FFD evaluation – he said to Shelby and Reierson that he "wasn't going for no fitness for duty." (Shelby Dep. 81:6-

8).

- When Shelby left Nawara a follow-up voicemail about the FFD process on or before November 30, 2016, he "[d]idn't bother to call her back." (Nawara Dep. 168:3-4).
- Nawara thereafter retained counsel because he "didn't think [he] should be subjected to the fitness for duty process at all". (*Id.* 170:2-12).
- On December 21, 2016, Nawara's lawyer wrote to Reierson demanding his immediate reinstatement. (DX 28). Nawara testified that the position communicated was that he "shouldn't have to go through the FFD process at all". (Nawara Dep. 184:21-185:1)
- On January 31, 2017, Nawara's lawyer wrote again demanding his immediate reinstatement, made no mention of the ADA or that the CorVel form, which was the only form attached, was illegal. (DX 29). Again, Nawara testified that the import of the letter was that he should not have to go through an FFD process at all. (Nawara Dep. 186:8-188:5 ("Q. [B]asically what this [email] is doing is still saying you shouldn't have to go through the FFD process at all, correct? A. Yes.")
- On March 8, 2017, Nawara's lawyer again wrote demanding that the FFD order be "rescinded" and Nawara put back to work "this week." (DX 33).
- Nawara admitted to Dr. Goldstein that he was simply unwilling to participate in any process that involved releasing his medical records to anyone. (Goldstein Dep. 98:6-19 ("bottom line, he wouldn't release any medical records to anywhere.")

The fact that Nawara tried to gin up his own invalid and unreliable fitness for duty report does not help his argument, at all. Dr. Robin Kroll testified explicitly that what Nawara came for her for was not a "fit for duty." (Kroll Dep. 16:19-17:11 ("No . . . he wasn't coming in specifically saying he wanted a fit for duty. He did come in saying I would like some psychological work done.") Dr. Kroll testified that in a real fitness for duty exam performed for an employer to return an employee to work, she would conduct interviews, including of the "department," and "forensic work". (*Id.* 15:18-16:6). Here, she reviewed no documents from the employer and did not review any medical records at all. (*Id.* 30:17-31:3). Nor could she remember even asking Nawara for any medical records, which was because "[h]e wasn't coming in specifically stating that this was a fit for duty. He wasn't coming in saying this was going to be a legal issue. He . . . was coming in basically for himself to see what his psychological status is." (*Id.* 31:4-19). This was not "typical" in her experience – and if she were really doing a fitness for duty exam for an employer's purposes, she would ask for medical records to review. "I always ask for medical records." (*Id.* 32:17-

33:13). Such records would include those from psychiatrists and general practitioners and could go back for as long as the employee has been on the job. (*Id.* 34:13-36:24).

In addition to having no medical records, Kroll also confirmed that she did not review any referral from the CCSO regarding Nawara, Jones-Hayes's account of her altercation with Nawara, or any reports from Shelby or Reierson: "Like I said, this was not typical. This was him coming in for something more personal." (*Id.* 37:1-24; *see also id.* 38:4-40:4). And when asked if she knew why Nawara "refused to sign the papers and go through the fitness for duty process," Kroll testified "he didn't think it was warranted, so he refused." (*Id.* 40:22-41:5; 41:7-10 ("Q. [I]s your understanding that Mr. Nawara did not believe a fitness for duty exam was warranted? A. Yes.") Driving home the point, Kroll was clear that Nawara absolutely refused to go through the FFD process with his employer:

> Q. I believe you said your indication was that Mr. Nawara didn't want to go through the whole fitness for duty process with the County, he didn't –
> A. I didn't say that he didn't want to. **I'm saying he refused. He stated that to me.**

(*Id.* 51:16-21, emphasis added).

Kroll further testified that her "report" was not intended for "any type of legal proceeding," that she did not have the "expectation" that the report would even go to Nawara's employer, and that she "**would've assumed that the County would do their own fitness for duty as well and then accumulate all of the information**, but at the time my assumption was this is something he was interested in doing personally for him." (*Id.* 49:20-50:12, emphasis added). In sum, the bald statement that "there is no evidence that Nawara would not have undergone an FFD examination if he had been provided with a legal, ADA compliant form" (Mot. at 8) is demonstrably false, and smacks of a futile effort to mislead the Court.

Finally, Nawara's reliance on *George v. Kraft Foods Global, Inc.*, 800 F. Supp. 2d 928,

933 (N.D. Ill. 2011) is curious. In *George*, the court barred proposed expert testimony about the defendants' state of mind that was based only on inferences "aris[ing] from defendants' conduct" and where nothing in the expert's report established a basis for his suggesting he could divine the defendants' state of mind. *Id.* That, of course, is exactly why Defendants have moved to bar portions of Dr. Goldstein's testimony (*see* MIL 15 at 26), but that case really has no bearing here, where no expert opinion testimony as to Nawara's state of mind is offered. The evidence of Nawara's state of mind – if one could even call it that – is from Nawara himself (as well as his lawyer). Unlike the expert in *George,* therefore, there is a basis for permitting such evidence here because the conclusion that Nawara would not have submitted to an FFD even if the forms were somehow different comes from his own (and his lawyer's) testimony and statements. Moreover, because the Whistleblower cause of action includes elements that implicate both the Plaintiff's and the Defendants' states of mind, evidence about what Nawara and his lawyer communicated to the Defendants, and how they understood those communications, is directly relevant to this case. In *George*, by contrast, state of mind was not relevant to the causes of action.

This Court should deny Plaintiff's Motion *in Limine* 3 because the record demonstrates through Plaintiff's own admissions that he would not have participated in the FFD process regardless of the medical release forms.

**4. To Bar Any Question, Argument or Inference About Any Prior Discipline.**

Defendants agree that evidence of prior discipline of any of the witnesses or parties that is unrelated to this case should be barred. However, there is no basis on which to bar discipline that *is* related to this case. To wit, on October 11, 2016, Plaintiff was disciplined for failing to properly restrain detainees who were involved in a fight at the Cermak waiting room on September 28, 2016. (*See* DX 16). It was that fight that brought Defendant Jones-Hayes to the waiting room

shortly thereafter, where she raised concerns about the failure to restrain employees and where the disputed altercation with Nawara ensued. (10/2/19 Nawara Dep. Tr. at 43:22-44:3). Nawara repeatedly has denied that his failure to restrain detainees was a violation of any rules (*Id.* at 71:17-24; DX 57 at 12); a claim that is refuted by the fact that he was written up for this infraction. Moreover, and notably, the internal complaint that Nawara made against Jones-Hayes was submitted on October 13, 2016 – just *two days after* he was written up for his infraction at Cermak. (*See* PX 3). Although Defendants contend that the internal complaint should not be admitted or referenced in this case (*see* Defs. MIL 6), if it does come into evidence in any way, this disciplinary document should be admissible for the additional reason that it shows Nawara's real motivation for his self-serving internal complaint.

**5. To Bar Any Questioning, Argument or Inference As To Whether Or Not Plaintiff Was Taking Steroids Or Protein Supplements.**

Plaintiff's Motion *in Limine* No. 5 seeks to bar evidence gleaned from his medical records showing that in 2015 and 2016 – the years leading up to and including his two episodes of explosive anger at work – he was taking "muscle building supplements" in sufficient quantities that his doctor felt they were raising creatine levels in his blood and harming his kidneys and twice counseled Nawara to stop taking these "supplements." (DX 51 at NAWARA 3461-63, 3465). The FFD examiner who reviewed these records noticed these entries and testified that she believes she must have asked Nawara whether he was taking steroid because steroids "[a]bsolutely" can create "rage situations." (Goldstein Dep. 18:16-20). She also testified that she would have asked him "whether he was using steroids just from looking at him" because he was very built:

A. So that's important to him, right, and it was in his records that he was using performance enhancing drugs. People lie about that so I needed to ask.
Q. And you don't know one way or the other whether he told you the truth?
A. Absolutely no way to know that other than I tried to verify in records and would hope that his primary care doc would have asked the same question, but it was not

tested for specifically.

(*Id.* 20:23-21:9). Dr. Goldstein also testified that the records clearly showed a "discussion with his primary care physician about dietary supplements and their potential impact on creatinine . . . levels, and just generally speaking, you know, they are not FDA approved, so they can cause issues, you know, in some people." (*Id.* 108:6-11).

Defendants have no intention of arguing that Nawara was in fact taking steroids or some other substance that in fact causes uncontrolled rage. Nor is this evidence a matter of expert opinion. Rather, this evidence is admissible for at least three entirely appropriate reasons. *First*, the fact that Nawara knew his medical records would reveal his use – excessive in his doctor's view – of muscle building supplements could well have been the real motivation for his 10-month-long refusal to permit release of those records for an FFD examination. As Dr. Goldstein testified, substance use is one of the things an FFD examiner looks for, and the reaction that the supplements, whatever they were, could have had an effect on Nawara's mood in 2016 – a full year before his actual FFD exam, is simply common sense. Defendants should be allowed to present this a possible motive for Nawara having resisted the FFD process – knowing it required releasing his medical records and disclosing his use of these supplements.

*Second*, Nawara's good faith intent in resisting the fitness for duty process and releasing his medical records is a required element of his claim under the Illinois Whistleblower's Act, 740 ILCS 174/15. To state a claim under the Illinois Whistleblower Act, an employee must have a reasonable and good faith belief that the conduct at issue violates the law. *See, e.g.*, *Woodley v. RGB Grp., Inc.*, 2006 U.S. Dist. LEXIS 43862, *19 (N.D. Ill. June 13, 2006) (denying plaintiff's motion for summary judgment because plaintiff did not clearly establish reasonable belief); *Arias v. Citgo Petroleum Corp.,* 2019 U.S. Dist. LEXIS 166062, *23 (2019) (plaintiff's "reasonable

belief is the relevant factor for an IWA claim"). Because Nawara's intent and belief are at issue in this case, Defendants should be permitted to present evidence showing an alternative explanation for his motivations.

*Third*, in the fall of 2016, Nawara engaged in two incidents of aggressive and hostile behavior at work that were of such an unusual nature that a seasoned Superintendent, an HR professional, and an experienced occupational nurse all concluded that there seemed to be something seriously wrong with him. Nawara's medical records raise the possibility that his use of muscle building supplements could have played a part in his uncontrolled behavior. The same could be said of his sleep apnea or other aspects of his personality – for example, resentment of women in positions of authority over him. There is no reason to deny Defendants the ability to present this argument for the jury to consider – especially where, as here, Defendants have the burden of proof as to the propriety of sending Nawara for an FFD exam.

**6. To Bar Any Questioning, Argument Or Inference That Plaintiff Has Been Diagnosed With Any Psychiatric Condition.**

Defendants have no intention of arguing that Nawara was diagnosed with a psychiatric condition. However, the FFD examiner did find that Nawara "does possess obsessive-compulsive and narcissistic personality *traits*, **which may shed light on some of his interpersonal interactions**." (Goldstein Report, DX53, at 6, italics in original, bold added). Nawara argues that evidence about these traits should be barred as inadmissible character evidence pursuant to Fed. R. Evid. 404(a)(1). As a threshold matter, it is ironic that Nawara seeks to bar part of Goldstein's report when he has objected to Defendants' proposed redactions of that same report. Her conclusions about Nawara's fitness for duty unquestionably took into account her views about these traits, and can come in for that reason alone. More to the point, however, Dr. Goldstein's report and testimony establish that this evidence can and should come in, not as character evidence,

but to "shed light" on Nawara's "interpersonal interactions" on the job and his rigid refusal to cooperate with the FFD process thereafter. This evidence is probative of the reasonableness of Jones-Hayes's, Reierson's, and Shelby's reactions to Nawara's behavior, and likewise of the "business necessity" element that Defendants will have to establish to defend his FFD referral.

At pages 113 through 130 of Goldstein's deposition, she lays out in detail what the traits of obsessive-compulsive and narcissistic personality disorders are, and which ones apply to Nawara. (Goldstein Dep. 113:17-130:20). Goldstein explained:

- "Sometimes people have certain traits, but it doesn't rise to the level of a disorder, so it's not entirely impairing. However, personality traits can really color your interpersonal interactions in particular with people. . . . it's the way you interpret everything . . . what you infer from what you're seeing and how people are treating you." (*Id.* 114:7-22)
- "These types of traits can lead one to be somewhat rigid . . . be somewhat narcissistic . . . may be particularly sensitive to criticism and therefore react strongly if one perceives that one is being criticized, true or not." (*Id.* 114:23-115:8)
- "I think that even he, by his own admission, has insight into his personality traits, and, you know, describes himself as kind of a black and white guy . . . . this can lead them, because of their inflexibility, to be quick in the moment to interpret, particularly criticism, very keenly, to take it hard, and to react strongly." (*Id.* 117:22-118:11)
- These traits could explain Nawara's conclusion that Nurse Shelby was "unethical": "I would say the combination of both obsessive-compulsive personality traits and narcissism. There is a grandiosity there. You know, 'I'm going to label you as unethical.' . . . Unethical is an extremely strong word, and most people don't necessarily understand the ethics of one profession or another unless they deal with this quite a lot. So unethical is a very serious accusation." (*Id.* 118:13-119:6)

These insights from Goldstein – gleaned directly from her examination of Nawara and for the purposes of her report – also are directly relevant to the reasonableness of Jones-Hayes's, Reierson's, and Shelby's experiences of Nawara as seeming to have an anger management problem:

> [I]f I understand what you're asking is what would people on the receiving end of his defensiveness or what may appear to be anger, would they necessarily come to the conclusion that what I'm looking at is actually anxiety, not anger? Or, goodness, he's so rigid. Or goodness, he's so overly conscientious. Or goodness, he's so sensitive to criticism. No. They're not psychologists. And so as a psychologist, we see subtitles. And

> what can come across as anger is actually anxiety, and we know this very well.
>
> And so no, I don't think that they would have understood at all what they were seeing, and they would have immediately said, "This guy has an anger problem" when in fact it may not be that at all.

(*Id.* 121:14-122:6).

That, of course, is exactly the case. Dr. Goldstein is a psychologist; the CCSO sent Nawara to her for precisely this type of insight into his behavior so they could be assured he was able to safely and effectively do his job as a Correctional Officer in a public safety role, and those insights have the added value of underscoring why the referral was appropriate in the first place. This evidence has all the foundation it needs, and should be admissible at trial.

**7. That the Court Exclude All Witnesses, Other Than Parties, During the Trial Of This Case.**

Defendants agree to Motion *in Limine* No. 7.

**8. To Bar Any Reference Or Any Statement That Plaintiff Failed To Mitigate His Damages.**

This motion makes no sense. Defendants have in fact pleaded the affirmative defense of failure to mitigate, both in the Answer to the Second Amended Complaint (Dkt. 188 at 40) and in the Pretrial Order (Dkt. 248 at 66). *See Vaughn v. King*, 167 F.3d 347, 352 (7th Cir. 1999) (affirmative defense can be raised even if first asserted in the pretrial order). Moreover, Defendants adduced failure-to-mitigate evidence in discovery (*see, e.g.,* Nawara Dep. 28:9-30:15) and there is no reason they cannot refer to this evidence at any time – in opening statements or thereafter. Motion *in Limine* 8 should be denied.

**9. To Bar Any Mention, Inference Or Suggestion That Any Verdict Will Harm the Defendants' Reputation Or Will Otherwise Jeopardize the Defendants' Occupation.**

Plaintiff seeks to bar Defendants' from any "mention or suggestion [that] is in effect an

argument for sympathy for the Defendants." (Dkt. 249 at 11.) This utterly vague and unsupported motion should be denied as an improper effort to cabin Defendants' presentation of their cases. The generic and commonplace jury instruction – the only purported support for this motion – is not a limit on what parties may argue, it is a limit on how juries are expected to consider the evidence that is presented to them. The motion should be denied.

**10. To Bar the Deposition Testimony of Mary Parrinello and Opinions or Testimony that the Medical Release Forms are ADA and/or HIPAA compliant.**

This Motion is duplicative of Motions 1 and 2, and Defendants incorporate their responses thereto. As stated in Defendant's response to Motion *in Limine* No. 2, Parrinello is not offered as an expert, rather, she is a corporate representative of CorVel, which created the CorVel form – and she was designated to testify as to CorVel's position that the form it created was proper, not to give an expert opinion that the form is compliant with the ADA. "Witnesses not disclosed as experts will not be permitted to testify as experts, but they may testify to historical facts from their personal knowledge." *Erickson v. Baxter Healthcare, Inc*., 2001 U.S. Dist. LEXIS 26377, *50 (N.D. Ill.) (citing Fed. R. Evid. 703 and 602). Here, Parrinello testified as to historical facts, her personal knowledge, and her knowledge as a corporate representative. (Parrinello Dep. 16:7-15).

Plaintiff cites *Good Shepard Manor Found, Inc. v. City of Momence*, 323 F.3d 557 (7th Cir. 2003) to argue that an expert may not "testify as to the legal conclusions that will determine the outcome of the case." *Id.* at 564; Pl. Mot. at 13. Parrinello is not an expert in the ADA, nor has she or Defendants ever argued that she is, and the "legal conclusion that will determine the outcome of this case" is whether or not the forms violate the ADA, as Plaintiff concedes. (Pl. Mot. at 13). It is therefore confusing why Plaintiff has filed this motion to exclude Parrinello's testimony, when she never testified about the ADA. Again, Parrinello testified that the CorVel form, which was created by CorVel and used by the CCSO, was appropriate and proper, pursuant

to HIPAA, not pursuant to the ADA. (Parrinello 11/18/19 Dep. 16:7-15; 18:14-24). Plaintiff is free to argue that distinction, and therefore is not prejudiced by any testimony from Parrinello.

Respectfully submitted,

THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY,

/s/ Sarah R. Marmor
Sarah R. Marmor
Suzanne M. Alexander
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
smarmor@scharfbanks.com
salexander@scharfbanks.com
mchurma@scharfbanks.com

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2020, I caused to be filed the foregoing Defendants' Response to Plaintiff's Motions *in Limine* using the Court's CM/ECF system, which will send e-mail notification of the filing to all counsel of record. These documents are available for viewing and downloading via the CM/ECF system.

/s/ Sarah R. Marmor

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 17 C 2393 |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF COOK, a unit of | ) | |
| local government, et al., | ) | Chicago, Illinois |
| | ) | October 28, 2019 |
| Defendants. | ) | 9:07 a.m. |

TRANSCRIPT OF PROCEEDINGS - Motion
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff: LAW OFFICES OF RICHARD LINDEN
BY: MR. RICHARD F. LINDEN
17 North Wabash, Suite 400
Chicago, Illinois 60602

For the Defendants: SCHARF BANKS MARMOR LLC
BY: MS. SARAH R. MARMOR
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606

HON. KIMBERLY M. FOXX
STATE'S ATTORNEY OF COOK COUNTY
BY: MS. NATALIE ELLIS
MS. JOI KAMPER
500 Richard J. Daley Center
Chicago, Illinois 60602

Court Reporter: FRANCES WARD, CSR, RPR, RMR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2524A
Chicago, Illinois 60604
(312) 435-5561
frances_ward@ilnd.uscourts.gov

EXHIBIT
A
exhibitsticker.com

THE CLERK: 17 C 2393, Nawara versus County of Cook.

MR. LINDEN: Good morning, your Honor.

Richard Linden on behalf of the plaintiff.

THE COURT: Good morning, Mr. Linden.

MS. ELLIS: Natalie Ellis on behalf of Cook County.

THE COURT: Good morning.

MS. MARMOR: Good morning, your Honor.

Sarah Marmor on behalf of the sheriff's office, Matthew Burke, Rebecca Reierson, and Winifred Shelby.

MS. KAMPER: Good morning.

Joi Kamper on behalf of Karen Jones-Hayes.

THE COURT: Good morning.

Okay. We are here on motion.

MS. MARMOR: There is two motions up today, your Honor. I didn't know which one you wanted to start with.

THE COURT: Either one.

MS. MARMOR: Okay. Well, the sheriff's office plus the three individual defendants that I represent have filed a motion for a protective order in this case. It's a fairly straightforward issue in the sense that the facts are pretty clear.

There was a deposition of Defendant Burke about two weeks ago -- maybe a little bit less -- who is a defendant in this case. My colleague, who was at the deposition, came

back and reported that there were some strange questions --

THE COURT: Right.

MS. MARMOR: -- that were asked.

THE COURT: I guess I need to hear from plaintiff on that. I did read the motion.

Why would -- it appears that this deposition was being used as a vehicle for discovery in another case.

MR. LINDEN: That really wasn't my intention. I started asking questions generally about the Employee Action Manual, and they were pretty innocuous questions. The answers were that it's for transparency. I think my knowledge maybe got the best of me and maybe asked a question. But I just don't see where the rule, even if what they say is true, forbids what they are asking for.

And also they are trying to get a protective order. And if the protective order should be anywhere, it should be in the other case that presumably (unintelligible). But they are pretty innocuous questions and answers.

THE COURT: But if they're -- here is the problem that I see in it: If you are asking questions about another case, that might implicate different lawyers who are representing various parties in other positions. And it isn't fair to those other lawyers to be asking questions that you are going to be able to use, then, in their case if they are not there to follow-up.

We have all seen this in summary judgment, where somebody puts in something and nobody asks the opposite question, so it's just sort of unrebutted.

It's not appropriate to do that. I am confident that the defendants are on solid ground here. So I am going to ask that you not pursue questions that are unrelated to this case.

What's the other motion?

MR. LINDEN: The other motion is our motion for leave to file a motion for summary judgment. The reason why we ask for leave -- on October 9th we were before your Honor, and we mentioned that we were going to be filing summary judgment, and your Honor said that the time had long passed. I went back and looked at the order in June. And if you look at your Honor's order, the parties had originally contemplated until February.

So we quickly got a motion for summary judgment on file just as to liability on Count I of our second amended complaint, and that's the ADA claims.

THE COURT: Yes.

MR. LINDEN: It's a pretty straightforward motion for summary judgment. We have a copy of our proposed summary judgment we can file today if we get leave. I think it will help in the long run disposing of this case. It will streamline the case.

There is really no questions of fact, I don't believe, with respect to the medical release forms and whether or not they violate the ADA.

MS. MARMOR: Your Honor, I will have a few things to say about that.

THE COURT: All right.

MS. MARMOR: First and foremost, we think this is premature. There are nine depositions still to be taken in this case. Five of them are on the exact issue that this motion is addressed to.

It's been our position we could file a Rule 56 motion on that. It seems like kind of a waste of time and energy, because what we would propose instead is simply that we be given until 30 days after discovery closes to respond to the motion.

Just for the record, we completely disagree that it's -- about the presentation of facts. We think there are serious not only disputes of fact but that the declaration Mr. Nawara has provided contradicts his own deposition testimony in this case.

THE COURT: Okay. I have got a different problem.

We have got a trial set for February 24th. If I were to allow -- well, Ms. Marmor is requesting a date after the close of discovery, which would be November 15th. She would like 30 days beyond that -- it seems kind of

reasonable -- to respond. And that would put us in the middle of December. And I have got a February 24th trial date. It's not going to get ruled on.

The motion for leave to file is denied.

MS. MARMOR: Your Honor, just some housekeeping things on my motion?

THE COURT: Sure.

MS. MARMOR: We had filed a motion for leave to file the concerning testimony under seal. And I just want to make sure that that --

THE COURT: That motion is allowed.

MS. MARMOR: And then the other part of our motion, just to be clear, was that, we asked that this testimony be stricken from the deposition or at least not used in this case.

THE COURT: I think the real concern is using it in a different case. So that motion is denied.

MS. MARMOR: Okay. Thank you, your Honor.

THE COURT: We have a status on December 12th, correct?

MS. MARMOR: Yes.

THE COURT: I will see you then.

MR. LINDEN: Thank you, Judge.

MS. MARMOR: Thank you.

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward________________________December 19, 2019.
Official Court Reporter
F

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
-----------------------------------------------------
John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.
-----------------------------------------------------
Deposition of Rebecca Reierson
Confidential - Deposition of Rebecca Reierson (7, 9)
Friday
September 20th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois

Page 2

APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Lyle Henretty
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

Page 3

For Defendant County of Cook:
Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Sarah R. Marmor
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Friday, September 20th, 2019. The time is now 10:07 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook et al., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Mrs. Rebecca Reierson. Mrs. Reierson, my name is Gregory Diaz. I am a notary public, and I am

Page 4

recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearances for the record?

MR. LINDEN: Richard Linden on behalf of the Plaintiff, John Nawara.

MR. BUSTAMANTE: Peter Bustamante for John Nawara.

MR. HENRETTY: Lyle Henretty on behalf of Defendant Karen Jones-Hayes.

MS. MARMOR: Sarah Marmor on behalf of the Sheriff, Ms. Reierson, Mr. Burke, and Ms. Shelby.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

MR. LINDEN: Let the record reflect this is the deposition of Rebecca Reierson taken pursuant to notice, and agreement of the parties, and the Federal Rules of Civil Procedure, and local rules.

EXAMINATION

BY MR. LINDEN:

Q. Good morning, Ms. Reierson.



EXHIBIT
B
exhibitsticker.com

Page 5

A. Good morning. 0:01:29
Q. Am I pronouncing it right?
A. You are, yes.
Q. Can you please state and spell your name?
A. Sure, Rebecca Reierson, R-e-b-e-c-c-a, R-e-i-e-r-s-o-n.
Q. And have you ever had your deposition taken before?
A. Yes.
Q. And how many times have you been deposed?
A. Approximately four times, five perhaps.
Q. So I take it you're aware of the procedures and what's going to take place here?
A. Yes.
Q. I'm going to ask you a series of questions regarding the John Nawara case, and if at any -- any time you don't understand the question or if it's confusing, just let me know, but if you answer a question, it's going to be presumed that you understood the question. Fair enough?
A. Yes.
Q. And if at any time you want a break ,as long as there's not a question pending, just let us know, and you can take the break.
A. Okay.

Page 6

Q. All right?
A. Yes. 0:02:22
Q. And it's real important that I don't interrupt you, and I'll try my best too, and you don't interrupt me because we have a court reporter and the transcript will get all messed up if we both talk over one another, all right?
A. Yes.
Q. And what is your date of birth?
A. [redacted]/70.
Q. And where were you born?
A. Chicago.
Q. And what's your address?
(The following page 7 has been designated as confidential by agreement of the parties)
///

Page 7

(Start of Confidential Portion)
[redacted]
(End of Confidential Portion)
///

*CONFIDENTIAL*

Page 8

(Continuation of Regular, Non-Confidential Testimony)
Q. Are you married?
A. No.
Q. Any children?
A. Yes.
Q. And how many children?
A. I have two children.
Q. And how -- what are their ages?
A. 17 and 15.
Q. And did you ever serve in the military?
A. I did not.
Q. And do you have any prior addresses?
A. I do. 0:03:16
Q. And what was the -- the one before this?
(The following page 9 has been designated as confidential by agreement of the parties)
///

(Start of Confidential Portion)
[redacted]
(End of Confidential Portion)
///

*CONFIDENTIAL*



(Continuation of Regular, Non-Confidential Testimony)
Q. And how long did you live on Burling Street?
A. For approximately nine years.
Q. And you moved to the Halsted address when?
MS. MARMOR: Sorry, I just want -- just because I -- we have a protective order in the case, I'd just like to designate any addresses as confidential --
MR. LINDEN: Oh, that's --
MS. MARMOR: -- under the protective order.
MR. LINDEN: That's fine, yeah.
A. I'm sorry, what did you --
Q. I'm sorry.
A. -- ask?
Q. How long have you lived at the Halsted address?
A. Since January of 2017.
Q. And nine years at the Burling address?
A. Yes, approximately.
Q. And can you -- did you live with anybody at -- at Halsted?
A. My children.
Q. Okay. Anybody else?
A. No.
Q. What -- what is your educational background?



A. I have a bachelor in science in criminology from --
Q. And from what college? 0:04:17
A. Eastern Michigan University.
Q. What year did you obtain that?
A. 1993.
Q. And where did you go to high school?
A. I went to Rich East High School.
Q. And is that in Chicago?
A. It's not, it's in Park Forest, Illinois.
Q. And what year did you graduate from there?
A. 1988.
Q. And if you could, up until the sheriff's department, start with your employment history, your first job, and you can be kind of brief in that, but what was your first job after college, let's start?
A. So I went to graduate school after undergrad, and I worked for a company called Research Pros, which is a marketing research firm.
Q. Okay. What graduate school?
A. University of Illinois at Chicago.
Q. And what did you study there?
A. Criminal justice. 0:05:13
Q. And did you get a graduate degree from there?
A. I did not.



Q. How many years did you spend there?
A. Two years, I just did not complete my thesis.
Q. Did you have any other school you had to do to get the degree, or you just had to do the thesis?
A. I just had to do the thesis.
Q. And what year did you leave University of Illinois, or stop going?
A. '96.
Q. '96. Okay. And your first job after -- during grad school was a marketing research firm?
A. Yes.
Q. What was the name of that?
A. Research Pros.
Q. And what years did you work there?
A. 1995 to 1999. 0:06:01
Q. And what was your title there?
A. I think I was a marketing research specialist, I have to check my resume.
Q. Okay. And -- and why did you leave there in '99?
A. So after graduate school, I attended law school, and so after I got my law degree, I left Research Pros once I found a regular full-time job.
Q. Okay. And what law school did you go to?
A. DePaul University in Chicago.

Q. And what years?
A. '96 to '99.
Q. And did you get a JD from DePaul?
A. Yes.
Q. And the JD is 1999?
A. Yes.
Q. Did you study for the bar exam?
A. I did.
Q. And did you take the bar exam?
A. Yes.
Q. And you passed it?
A. Yes.
Q. And are you a licensed lawyer in the State of Illinois?
A. Yes.
Q. How long have you been a licensed attorney?
A. Since 1999.
Q. Have you been current the whole time?
A. Yes. 0:07:02
Q. Has your license ever been suspended or revoked?
A. No.
Q. Have you ever been disciplined?
A. No.
Q. You ever been convicted of a felony?



A. No.
Q. And I take it you haven't been convicted of a misdemeanor or a crime involving dishonesty?
A. No.
Q. Okay. And after the marketing job, what was your first job --
A. I --
Q. -- after that?
A. I worked for the City of Chicago as a sexual harassment investigator.
Q. And were you a lawyer at the time?
A. I was.
Q. And what years did you work for the city?
A. 1999 until 2004.
Q. Were you part of their corporation counsel's office?
A. No, the sexual harassment office was a part of the department of personnel at the time.
Q. Was that part of their human resources --
A. Yes.
Q. -- at the city?
A. Yes. 0:07:56
Q. And what type of things did you do for the city?
A. So I investigated sexual harassment



complaints filed by city employees against other city employees, conducted training for all city employees on the sexual harassment policy, did other research projects related to sexual harassment in general.
Q. Were you essentially a fact finder, or was your job really, you know, to advocate for the city back then?
A. I was just a fact finder.
Q. And after 2004, what was your next position?
A. I was senior counsel with the Chicago Park District.
Q. And what year were you senior counsel?
A. 2004 until 2006. 0:08:44
Q. And what does a senior counsel for the park district do?
A. That senior counsel position was a laborer position, so union negotiations, grievances, discipline, some training, advising departments regarding labor issues, employee relation things.
Q. How many lawyers did the park district have in your department?
A. At that time, there were maybe nine attorneys.
Q. And entry level lawyer, would they be senior counsels? I take it they'd have a different title?



A. There is a counsel position and a senior counsel position.
Q. And who would be the next person up from a senior counsel?
A. Deputy general counsel.
Q. Would anybody be higher than the deputy general counsel?
A. There was also a general counsel. 0:09:46
Q. And you left the park district in 2004?
MR. BUSTAMANTE: '06.
A. Two thousand --
MR. BUSTAMANTE: Sorry.
A. I was --
MR. LINDEN: Swear -- swear the witness in.
A. I left in two thousand --
Q. It would be '06 I believe --
A. -- sorry, '16.
Q. '16? 2006 or 2016?
A. 2016.
Q. So you worked for 12 years for the park district?
A. I did.
Q. Oh, okay. And in 2016, did you go to the sheriff's office?
A. Yes.

Q. Okay. And that was the Cook County Sheriff's Office that you're employed with?
A. Yes.
Q. What was your first position in 2016 with them?
A. Leave and absence manager.
Q. What is a leave and absence manager?
A. You direct the employee services department, which is a department within the bureau of HR, and that department handles employee leaves, return to work issues, light duty, things like that.
Q. Do you recall when in 2016 you got hired? 0:11:04
A. I think I started August of 2016.
Q. So you had only been there a couple of months when the Nawara incident happened in September of '16 --
A. Yes.
Q. -- correct? Who was your immediate supervisor in 2016?
A. Karyn Williams.
Q. Was she an HR person, Karyn Williams?
A. Yes, she was the executive director of human resources.
Q. And how do you spell Karyn?
A. K-a-r-y-n.



Q. And how long was she your supervisor?
A. She was my supervisor until -- oh, gosh, maybe the spring of 2018. That's -- that's an approximation. I can't remember exactly when she left.
Q. So she was your supervisor up until the time Ms. Williams left the sheriff's office?
A. Yes. 0:12:15
Q. Was she your immediate supervisor?
A. Yes.
Q. Did you report to Ms. Williams?
A. I did.
Q. Did she work in the same office you did?
A. Yes.
Q. Where was your office?
A. My office is at the jail compound at 31st and California.
Q. Are there different buildings for the jail compound?
A. There are, I'm in building two.
Q. Is all of HR for the corrections in building two?
A. Yes.
Q. Is it HR just for corrections, or do you oversee other divisions or departments of the Cook County Sheriff's Office?



A. It's for all of the Cook County Sheriff's Office.
Q. So you also do HR for police officers?
A. Yes.
Q. Court personnel people?
A. Yes.
Q. They would all be in the jail complex, the HR?
A. Yes.
Q. And who would have been above Ms. Williams in 2016?
MS. MARMOR: Object to the form. 0:13:14
A. I believe Karyn reported to Dana.
Q. And Dana is -- what -- what was Dana's last name?
A. Dana Wright, sorry. I blanked for a second there.
Q. W-r-i-g-h-t?
A. Yes.
Q. What was her title in 2016?
A. I think she was a deputy chief or something similar.
Q. And did she work in the same building with you?
A. No.



Q. Was she part of HR?
A. No, she was not.
Q. So is it fair to say Karyn Williams would have been head of HR at the time?
A. Yes.
Q. And what were your job responsibilities in 2016?
A. Like I stated before, just kind of overseeing all of the human resource functions for current employees, so after hire. We didn't do any recruiting or anything like that in my department, but once an employee is hired, then any kind of leaves, benefit information, return to work, light duty, any kind of employee issues would be handled by employee services.
Q. And did you supervise anybody in 2016?
A. Yes. 0:14:29
Q. And who was underneath you? And I mean in the hierarchy, not literally, obviously, but.
A. I had five people in HR underneath me.
Q. Five people that reported directly to you?
A. Yes.
Q. And who were those five people, if you recall?
A. Wylola Shinnawi, I can spell that for you --
Q. Oh, please.

A. -- if you'd like. W-y-l-o-l-a, last name, Shinnawi, S-h-i-n-n-a-w-i.
Q. What was her position?
A. She was the FMLA manager.
Q. Did she have anything to do with John Nawara?
A. No, not that I believe -- no, not that I recall.
Q. Okay. But who were the other four people that -- if you recall?
A. Griselda Lobato.
Q. Can you spell that name too?
A. Sure, G-r-i-s-e-l-d-a, L-o-b-a-t-o. She was a -- maybe, like, a personnel analyst or something -- a title similar to that.
Q. Do you know if she had any -- anything to do or any involvement with John Nawara?
A. No. 0:15:41
Q. And who would be the third person that reported to you?
A. Jessica White.
Q. I -- I can even spell that name, but what -- what was her title?
A. Again, she was another personnel analyst or something of that nature.
Q. Do you know if she had anything to do with



the John Nawara incident or any involvement?
A. No.
Q. Okay. I think we've covered three of them, who is the fourth one?
A. Teresa Brown, T-e-r-e-s-a, Brown.
Q. What was her position?
A. Again, similar, personnel assistant or analyst.
Q. Did she have anything to do with John Nawara?
A. No.
Q. Was there a fifth person that reported to you?
A. Yes, Willette Lindsey, W-i-l-l-e-t-t-e.
Q. And what was Ms. Lindsey's position?
A. Again, she was a personnel analyst or HR analyst.
Q. Did she have anything to do with John Nawara?
A. No. I mean, the most they would -- involvement they would have had is issuing paperwork upon his return to work, I guess, but --
Q. How -- how about Karyn Williams, did she have anything to do with John Nawara?
MS. MARMOR: Object to the form. 0:16:58
A. Well as my supervisor, she -- we would meet about whatever current tasks I had ongoing.



Q. Was she directly involved at all in any of the issues regarding John Nawara, if you recall?
A. I did discuss the issues with him with Ms. Williams, yes.
Q. Okay. When did you have discussions with Ms. Williams regarding John Nawara?
A. I mean, just from the initial complaint from the Department of Corrections, I think, was sent to Karyn, and then she forwarded it to me, and so from that point on, she would ask for updates on the situation or I would, you know, talk to her about any issues I was having or anything that was happening.
Q. Do you recall any specific discussions you had with Ms. -- Ms. Williams regarding John Nawara?
A. You mean dates and exactly what we discussed or? 0:17:56
Q. Or not exact dates, but any specific conversations. I know it's hard to go back, that you're not a photographic memory to say, "On this date," but any specific conversations you had where the subject John Nawara was discussed.
A. I know that I would have raised with her, you know, the fact that he hadn't been -- that he wasn't participating in our process and he wasn't returning to work, so I mean she was -- she was -- is the one who



would give me advice or, you know, let me know what my next step should be, if any.
Q. Okay. As you sit here today, do you recall any specific conversations you had with Ms. Williams where you said anything to her or she said anything to you specifically regarding John Nawara?
A. No, I know we discussed it, but I can't recall specific conversations.
Q. As you sit here, you can't recall a single conversation with Ms. Williams in -- in which John Nawara's name came up. Is that fair?
MS. MARMOR: Object to the form.
A. Yeah, I mean, I -- I know we discussed it, but again, I can't -- I can't give you word for word what we discussed.
Q. Did she make any decisions regarding John Nawara?
MS. MARMOR: Object to the form. 0:19:08
Q. And "she" meaning Karyn Williams.
A. No, I think she would have advised me to go to the law department most likely, she wouldn't have made a decision.
Q. Okay. You said she would have advised you, do you recall her specifically advising you?
A. I don't recall the words coming out of her

mouth at this moment, but that was typically her advice.
Q. Okay. So you're talking in a general nature for matters that came up in H -- HR and not specifically related to John Nawara, is -- would that be a fair statement?
A. I'm sorry, can you repeat that?
Q. Are you talking generally what would have happened with an employee rather than specific -- specifically recalling Ms. Williams advising you to go to the law department?
A. Yes.
Q. How often would you go to the law department to seek advice regarding HR issues?
A. It would just depend on what was happening at the time. I don't have an estimate.
Q. Would it be on a daily basis?
A. No. 0:20:10
Q. Weekly basis?
A. Again, it would depend kind of, you know, what the issues were.
Q. Did HR have a law department?
A. No.
Q. Would you go -- who -- who would you go to in the law department if you had a question regarding an



HR issue?
A. Typically, Kate Christy or Nick Scouffas.
Q. What was Kate Christy's position back then?
A. I don't know what her title was.
Q. Was she in-house counsel for the sheriff's in 2016?
A. Yeah, she worked for the sheriff's office law department.
Q. And where was she located, at the jail?
A. No, at the Daley Center.
Q. Do you know if you talked to her at all regarding John Nawara?
A. Yes.
Q. And do you recall when any of these conversations took place?
A. Just during the ongoing issues. 0:21:05
Q. Did you talk to her about employment decisions?
MS. MARMOR: I -- I'm going to caution, I -- I don't really think you can ask that kind of question, the topic of the conversation. I -- I -- I -- I'm going to instruct the --
MR. LINDEN: Okay. But you --
MS. MARMOR: -- witness not to answer that.
MR. LINDEN: You can instruct her not to



answer, but I'm just going to tell you why, if it's an employment decision, I don't think it'd be covered. It's not litigation. There's -- I'm -- I'm just saying if you want to instruct her not to answer --
MS. MARMOR: I -- yeah, I -- I think that's -- I think you're getting into -- because you can -- it's not just litigation. It's not just -- it's not just litigation. It's also if you're seeking advice from counsel, that's also protected.
MR. LINDEN: I don't -- all due respect, for employment, I don't think it is, but if you're going --
MS. MARMOR: I -- I'm going --
MR. LINDEN: -- to object --
MS. MARMOR: Yeah, I am going to object.
Q. Did you seek advice from counsel when you talked to Ms. Christy?
A. Yes.
Q. Okay. Based on your counsel's instructions, are you refusing to answer questions regarding any discussions of any nature and any topics regarding Ms. Christy?
A. Yes. 0:22:06
Q. Anybody else in the legal department that you discussed John Nawara with, would it have been Nick Scouffas?



A. Yes.
Q. Right now, he's general counsel for the sheriff?
A. Yes.
Q. Back in '16, was he the general counsel?
A. I believe he was, yes.
Q. Did you seek any advice from Mr. Scouffas regarding labor decisions?
A. I would typically reach out to them together.
MR. LINDEN: Okay. And I take it you're going to instruct her not to answer regarding Mr. Scouffas, correct?
MS. MARMOR: Correct, any content of conversations with Mr. Scouffas, I'm instructing you not to answer.
MR. LINDEN: And also regarding topics?
MS. MARMOR: Yes.
Q. So based on advice of counsel, are you going to refuse to answer any questions regarding conversations you had with Mr. Scouffas?
A. Yes.
Q. And John Nawara?
MS. MARMOR: Regarding John Nawara.
Q. Regarding John Nawara?
A. Yes. 0:23:03

Page 29

Q. Okay. Are you still employed at the sheriff's office?
A. Yes.
Q. And what's your current position with the sheriff's office?
A. Director of employee services.
Q. Was that the next position after your initial hire date in 2016?
A. Yes.
Q. And what does director of employer (sic) services do?
A. It's actually the exact same job duties, they just corrected the title because the job was essentially directing that department.
Q. And when did you get your title changed?
A. Maybe approximately four months ago.
Q. Is there any difference between your prior position in 2016 and the director of employee services?
A. There is not. 0:24:06
Q. Okay. Ms. Williams left, I believe you thought, somewhere around 2018?
A. Yes.
Q. And who replaced her?
A. Matt Burke.
Q. And what is Mr. Burke's title?

Page 30

A. He is the interim executive director of human resources.
Q. How long has he been interim director, since 2018?
A. Yes, there was a little bit of a gap between when Karyn left and when he moved to HR, but it was still in 2018.
Q. And do you report -- report directly to Matt Burke?
A. I do not.
Q. How -- how come the reporting --
A. We --
Q. -- changed?
A. We also now have an assistant executive director of human resources, and I report to her.
Q. And who is that person?
A. Theresa Olson. 0:25:07
Q. And do you know when she became assistant director?
A. I believe it was early summer of 2019.
MS. MARMOR: How do you spell Olson?
WITNESS: O-l-s-o-n.
Q. So you -- you report directly to Theresa Olson?
A. Yes.

Page 31

Q. And I take it Ms. Olson reports directly to Matt Burke?
A. Yes.
Q. And how many people are currently underneath you? Or report to you is probably a better question --
A. Eight people.
Q. Were any of those eight people involved in any manner in the John Nawara matter?
A. No. 0:25:59
Q. How about Matt Burke, did he have any involvement with John Nawara?
A. I believe the initial documents regarding the incident came from Matt.
Q. Was he formally the chief of staff, Matt Burke?
A. He worked for DOC, but I'm not certain of what his title was.
Q. When you say, "Initial documents," do you recall what the initial documents were?
A. It would have been a referral to HR that went to Karyn Williams, asking us to meet with an employee following an incident.
Q. Do you know of any other involvement that Matt Burke had with John Nawara?
A. I believe he followed up regarding the case

Page 32

also at some point.
Q. And when you say, "Followed up," do you recall anything more you know?
A. No, I think he was just looking for the status of the case.
Q. Do you know if he talked to anybody or interviewed anybody about the case?
A. Oh, I don't -- not that I know of. 0:27:06
Q. How -- how about Theresa Olson, was she involved in any way with John Nawara?
A. Not from HR that I'm aware of.
Q. Do you know of any other involvement aside from HR that she may have had?
A. No, he came from DOC, but if she was involved in any way, I was not aware of it.
Q. You just have no knowledge either way --
A. Yes.
Q. -- is that fair? Okay. What did you do today to -- or to prepare for today's deposition?
A. Sorry. I met with counsel a couple days ago.
Q. And that was with Ms. Marmor?
A. Yes.
Q. And you met at her office?
A. Yes.
Q. And how long did that meeting occur?

A. We met for maybe two hours, three hours.
Q. And did you review any documents in preparation for today's deposition?
A. Yes. 0:28:03
Q. What documents did you review?
A. My -- the notice calling me as a witness for the deposition, correspondence that I've sent in this case. I -- I also answered questions, like, along the -- the way through the lawsuit, so I reviewed those also.
Q. You mean answers to interrogatories?
A. Yes, thank you.
Q. Okay. Anything else that you recall?
A. Not that I recall.
Q. Did you review any photographs?
A. No.
Q. Any videotapes?
A. No.
Q. No videos?
A. No. 0:28:59
Q. Any pleadings at all, aside from the answers to interrogatories?
A. Only my own.
Q. Okay. What is a fitness for duty exam?
A. The fitness for duty exam itself is when an



employee meets with an independent doctor to be evaluated for their fitness essentially to perform their job functions for the sheriff's office.
Q. Is it any employee within the sheriff's office that could be subject to a fitness for duty exam?
A. Yes. 0:29:50
Q. Do you know if there are any policies and procedures regarding fitness for duty exams in 2016 within the sheriff's office?
MS. MARMOR: Object to the form.
A. There were procedures that we followed.
Q. Do you know if there are written procedures regarding fitness for duty exams?
A. I don't know if -- if there were.
Q. Do you know either way if there were?
A. I -- I do not know if there were.
Q. Do you know what the procedures were in 2016?
A. Yes.
Q. And what were the procedures? 0:30:34
A. The department of HR would receive a referral, typically from an employee's department where they worked or from OPR regarding an incident involving an employee, could be an arrest, something like that, that, you know, would raise concern about whether or



not the employee would be able to continue working based on the incident that had occurred.
Q. Who had the authority to make a referral to HR for a fitness for duty?
A. It typically came from the department head, from DOC, or from one of the supervisors in OPR.
Q. Did each of those people have authority to -- to make a referral?
A. You know, I -- I don't know that there was -- it was specifically outlined who was allowed to make a referral. I mean, in general, you know, anyone who became aware of a potential issue should refer it to HR.
Q. Okay. And once HR got a referral, would it be automatic that it would be ordered or would somebody have to make a decision whether or not that employee is going to be ordered for a fitness for duty exam?
A. It -- it wouldn't be automatic. The employee would come to HR and meet with the occupational health nurse and -- and with me also, we'd meet with the employee together.
Q. Would it always be with the nurse and yourself for a fitness for duty exam? And I'm talking about 2016.
A. Yeah, I -- I believe there was one that might



have taken place in my absence, and I think it was the director of risk management who sat in with the nurse at that time.
Q. And do you know who that would have been?
A. Michele Morris, one L. 0:32:19
Q. Do you know if she had anything to do with John Nawara?
A. No, she did not.
Q. And did HR have the nurse working in HR?
A. Yes.
Q. And how many occupational nurses were there in HR?
A. One.
Q. And who is that person?
A. Winifred Shelby.
Q. Can you spell the first name?
A. W-i-n-i-f-r-e-d.
Q. Did Ms. Shelby report directly to you?
A. She did. She reported to me. I signed her timesheet, but she -- she reported to me and to the executive director of HR.
Q. Do you know what Ms. Shelby's title was within the sheriff's office?
A. Occupational health nurse.
Q. Is she there -- still there as an

occupational health nurse?
A. No, she's not.
Q. Do you know when she left the sheriff's office?
A. I believe she left in 2017.
Q. And she was involved with John Nawara, correct?
A. Yes. 0:33:24
Q. So the procedure was you'd call the -- I'm not talking about John Nawara specifically, but the procedure in 2016 is you'd call the person into HR, correct, the employee?
A. Yes.
Q. And then you and the nurse, Ms. Shelby, would meet with that person?
A. Yes.
Q. And what would be the purpose of that meeting?
A. We'd just try to get a sense from the employee about what occurred that led to the referral, and you know, it -- it would depend on what the exact situation was, but if, you know, someone was -- was struggling, we'd make sure they had, you know, resources if they needed them, a support system if that was necessary based on the situation, or you know,



relevant doctors' notes if someone were having a medical issue that appeared to make them unable to do their job, and at -- we would just meet with the employee, kind of gather information on the situation, and assess whether we thought the employee could actually return to work.
Q. Would you also meet with the person making the referral?
A. No. 0:34:37
Q. Would you talk to the person making the referral?
A. If we needed additional information, yes.
Q. So would you get the employee's side of the story if it's an incident that allegedly happened?
MS. MARMOR: Which --
A. Which --
MS. MARMOR: I'm sorry. Object to the form. I didn't -- we both had the same question.
MR. LINDEN: No, it wasn't the best question, but --
Q. Would -- would you -- like, in John Nawara's case, Jones-Hayes accused him of an incident in September of '16, correct?
A. Yes.
Q. In a case like that, not just with John



Nawara, but in a similar type of case, would you get the employee's side of the story of what happened before a fitness for duty exam would be ordered?
MS. MARMOR: And -- and I have the same objection because both people are employees, and so which employee are you talking about? You see the problem?
MR. LINDEN: A case like John Nawara, not John --
MS. MARMOR: Right.
MR. LINDEN: -- Nawara.
MS. MARMOR: But are you talking about would you get Mr. Nawara's or Ms. Jones-Hayes' side of the story? That's the --
MR. LINDEN: Okay. Let me --
MS. MARMOR: -- that's the --
MR. LINDEN: Let me -- let me -- I -- I can do this better.
Q. Okay. Who has the authority to order a fitness for duty exam?
A. You mean once the referral has come to HR?
Q. Yeah. 0:35:46
A. Who can then --
Q. Once you interview the employee and bring them in.



MR. BUSTAMANTE: Interrupt --
WITNESS: Oh.
A. The occupational health nurse would then send the referral to CorVel, which was our independent third party company.
Q. Okay. But who would make the decision that the employee has to undergo a fitness for duty exam?
A. The nurse and I would make it together.
Q. Would it be a joint decision?
A. Yes.
Q. Would you have to both agree on it, or can one of you say yes, another one say no, or how did that work?
A. I don't recall a time that we disagreed. If we initially had a disagreement, we would talk it through. In the end, I don't recall anyone ever being sent when one of us thought it was necessary and the other one didn't.
Q. Did you have the authority yourself to order a fitness for duty exam of an employee?
A. If -- if the nurse wasn't in agreement?
Q. Yeah, let's -- let's assume the nurse did not agree, did you have authority by yourself to order a fitness for duty exam?
A. It's not a situation that ever came up. 0:36:52

Q. Did you feel like you had the authority to order a fitness for duty exam?
MS. MARMOR: Objection. Calls for speculation.
A. I -- I would not do it on my own.
Q. Okay. In Mr. Nawara's case, he came in for an interview in November of 2016, correct?
A. Yes.
Q. And you met with Mr. Nawara, along with Ms. Shelby, correct?
A. Yes.
Q. And between the two of you, did you agree that Mr. Nawara would be ordered for a fitness for duty exam?
A. Yes.
Q. And you, along with Nurse Shelby, ordered a fitness for duty exam, correct?
A. We agreed that he should have one, yes.
Q. So between the two of you, you both had the authority to order Mr. Nawara to undergo a fitness for duty exam. Is that fair?
A. Yes. 0:37:45
Q. Okay. Would the referring person have the authority to order a fitness for duty exam?
A. Someone from outside of HR?



Q. Yes.
A. No.
Q. Like in this case, you said, I think, Matthew Burke made the referral for John Nawara, correct?
A. I believe so, yes.
Q. In 2016, could Matthew Burke order that fitness for duty exam be ordered for Mr. Nawara?
A. No, we would always have to meet with the employee in HR.
Q. Did Mr. Burke ever tell you that aside from a referral, that he should be ordered for a fitness for duty exam?
A. Aside -- no, no. 0:38:39
Q. Did you ever talk to Mr. Burke regarding John Nawara after you got the initial referral?
A. I don't believe so, other than he might have assisted me reaching the superintendent to get further information on the incident.
Q. And do you recall specifically going to Mr. Burke to get information from Jones-Hayes?
A. I -- I don't recall.
Q. Do you recall any involvement other than that you may have gone to him for assistance to get information with respect to John Nawara?
A. No, nothing other than putting us in touch.



Q. Do you recall any pertinent conversations you had regarding John Nawara other than just getting in touch with Superintendent Jones-Hayes?
A. With Matt Burke?
Q. Yes. 0:39:37
A. I don't.
Q. Do you know what criteria go into making decision whether or not the employee should be ordered for a fitness for duty exam?
A. It's essentially whether or not the employee presents in a way and the incident is such that Nurse Shelby and I believe that it would be best to have the employee evaluated before being returned to work.
Q. Do you recall any other criteria in 2016?
A. No. 0:40:27
Q. Do you recall any written criteria in place for fitness for duty exams?
A. If -- for us sending someone for a fitness for duty exam?
Q. Yes.
A. No.
Q. How specifically -- specifically did you go about making a decision whether or not to order the employee for a fitness for duty exam?
A. What do you mean?



Q. Mean you meet with the nurse, Ms. Shelby, and would you two meet and come -- try to come to a consensus whether or not that employee should be ordered to it?
A. So after we met with the employee, then we would talk amongst ourselves and try to come to a determination.
Q. Would it be typically that day that -- when you met with the employee that you would discuss it with Nurse Shelby?
A. Yes. 0:41:23
Q. And if you came to a determination where a fitness for duty exam should take place, what would be the next step?
A. We would inform the employee about what the procedures are, you know, the reason why we were recommending the employee go, and just kind of the procedural steps. Nurse Shelby would explain what the appointments are like, depending on whether it was a medical fitness for duty or a psychological fitness for duty, and she would assist, you know, and answer any questions the employees might have about the process.
Q. And would the employee receive written notice that he or she was required to do this?
A. They would -- the employee would receive

documentation regarding their medical records, but I don't believe the nurse gave a document to the employee.
Q. Would they be given the name of the person they should contact to have this exam?
MS. MARMOR: Object to the form. 0:42:36
A. I'm sorry, I'm -- I'm just -- I apologize, I'm just trying to remember if there was, like, a letter that the nurse would -- would give the employee, and I -- I can't recall at this time. But they would be informed either via letter or you know, also verbally from Nurse Shelby that, you know, CorVel was our third party administrator, that someone would be reaching out from CorVel to facilitate the process of, you know, gathering the medical records and setting an appointment.
Q. Okay. Who is CorVel, do they have a formal name company?
A. I believe that is their formal name.
Q. And what type -- is it a medical provider, CorVel?
A. We -- I don't know all of what they do, but we use them as a third party administrator to select an independent provider to conduct the fitness for duty exams.



Q. So in 2016, did you always use CorVel?
A. Yes. 0:43:29
Q. And would CorVel actually conduct the evaluation?
A. No, they would locate a provider and kind of coordinate getting the medical records to the provider, set up the appointment, notify the employee of when the appointment was scheduled. They would receive any documents that came from the independent medical provider also.
Q. Was there a list of medical providers that were approved to do these type of evaluations?
A. Not from the sheriff's office, no.
Q. That would be strictly done by CorVel?
A. Yes.
Q. Have you ever heard the name of a Dr. Kroll or Kroll, K-r-o, double L?
A. Not that I recall.
Q. Okay. I think you indicated that the procedures would depend on whether it's a medical or a psychological type referral?
A. Yes. 0:44:34
Q. Okay. What would be the difference between a medical referral versus a psychological referral?
A. Typically, a medical referral results in a



one day examination by a doctor, the psychological referrals are two day appointments, so the nurse would just kind of explain what their appointments would be regard -- you know, depending on what kind of referral they were being sent for.
Q. Okay. And what would be the criteria that you'd say, "This person is going to be subject to a medical referral versus psychological referral"?
A. It would be based on whatever the incident was that led them to be sent to human resources.
Q. Now as you sit here today, do you recall what the incident was regarding the referral for John Nawara?
A. Yes.
Q. And what was that?
A. It was an altercation that he had with a superintendent at work.
Q. And who is that superintendent?
A. Karen Hones-Hayes. 0:45:32
Q. When you say, "Altercation," what do you mean by "an altercation"?
A. There was -- according to the superintendent, when she asked Officer Nawara about something that was occurring at work, he, you know, reacted kind of in an agitated way toward her, and that's what led to the



referral that led him coming to human resources.
Q. Do you recall when that incident occurred?
A. It -- 2016, November, I believe.
Q. And John Nawara had a different version of what Ms. Hayes claimed happened, right?
MS. MARMOR: Object to the -- object. Assumes facts not in evidence. I don't think you've established that she knows what his version was.
Q. Did you ever talk to Ms. Hayes regarding what happened?
A. Yes. 0:46:29
Q. And do you recall what Ms. Hayes said to you what occurred?
A. Generally, yes.
Q. And when did you talk to Ms. Hayes?
A. It was just a day prior, I believe, to when we went with Officer Nawara, I don't recall the date.
Q. So it would have been November of 2016 --
A. Yes.
Q. -- fair?
A. Yes.
Q. And do you recall what Ms. Hayes told you what -- what happened?
A. Again, generally, yes. We have a -- she signed a statement kind of indicating all the details

of what occurred.
Q. Okay. Do you have any independent knowledge of what she said in this statement?
A. I do.
Q. And can you kind of tell us --
MS. MARMOR: I --
Q. -- what it is?
MS. MARMOR: I just want to make it clear. Independent recollection, she wasn't -- you're not suggesting she was there?
Q. Independent recollection of what --
MS. MARMOR: Yes.
Q. -- Ms. Hayes told you --
A. Yes. 0:47:12
Q. -- is what I'm asking.
A. So the superintendent spoke with the nurse and myself, and she indicated that in Cermak, she noticed inmates that were not handcuffed as they should have been, I guess, according to procedure, and when she went into the office to ask the officers who were there about why the inmates weren't handcuffed, Officer Nawara didn't respond to her question, and so she, I think, tapped his shoulder to get his attention, and kind of reacted in a violent way toward her, she felt, and was aggressive and disrespectful to the



superintendent.
Q. Okay. Do you recall specifically what -- when you say, "Violent way" that she claimed, do you recall how that was or what specifically the violent way was?
A. If I recall correct, I think he jumped out of his chair kind of angrily.
Q. Did she ever claim that Mr. Nawara struck her?
A. Not that I recall. 0:48:20
Q. Do you recall anything else specifically regarding what she claimed Mr. Nawara did that day?
A. So there was that incident in the office, and then I think she left the area because she was upset about what had happened, and then I believe that officer -- Officer Nawara approached her again in a way that she found to be disturbing.
Q. Okay. Everything you're testifying to is based upon what Ms. Jones-Hayes told you, correct?
A. Yes.
Q. Do you have any independent knowledge of the facts of what occurred that day?
A. I do not, only her statement.
Q. Do you know whether or not the incident occurred the way Jones-Hayes told you what happened?



A. I do not.
Q. Did you talk to Mr. Nawara regarding what happened that day?
A. I tried, yes. 0:49:14
Q. Okay. You said you tried, can you be more specific?
A. He wouldn't discuss -- I mean, he, at first, didn't acknowledge that there had even been any kind of an incident and wouldn't discuss the particulars of anything involving the superintendent.
Q. And do you recall was it an in person meeting you had with Mr. Nawara?
A. Yes, he met with the nurse and I in human resources --
Q. And --
A. -- the nurse and me.
Q. Do you recall the date you met?
A. I don't, November of 2016.
Q. Do you recall anything that Mr. Nawara said about anything that occurred that day back in September?
A. No, I recall that he said he didn't have -- you know, that he hadn't been experiencing any issues at work, that he didn't have an issue with the superintendent, and then he also stated later that he



tried to stay away from the superintendent.
Q. Did he ever indicate that Ms. Hayes -- and when I say, "Ms. Hayes," it's Jones-Hayes --
MS. MARMOR: Yes. 0:50:14
MR. LINDEN: Okay.
MS. MARMOR: And I think what --
MR. LINDEN: Making sure.
MS. MARMOR: Just so everybody understands the record, when she says, "The superintendent," we mean Jones-Hayes as well.
MR. LINDEN: Okay. Gotcha.
Q. Either "Superintendent" or "Ms. Hayes" might be easier.
A. Okay.
Q. Hyphens just becomes difficult for me. What was my -- I forgot -- let's see --
MS. MARMOR: You've lost -- he's lost -- actually, do you -- I -- I don't want to interrupt in the middle --
MR. LINDEN: No, that's fine.
MS. MARMOR: -- of a question, but --
MR. LINDEN: Yeah, now let's take a little break.
MS. MARMOR: Okay.
RECORDER: Okay. Okay.

MR. LINDEN: Off --
RECORDER: Off the --
MR. LINDEN: -- the record.
RECORDER: Off the record, 10:58 a.m.
MR. LINDEN: And let's --
(Off the record)
RECORDER: Back on the record, 11:06 a.m.
Q. Just want to just back up for a second. I think we talked a little bit about that you went to Karyn Williams for advice?
A. Yes.
Q. And do you recall specifically any advice that Ms. Williams gave you regarding John Nawara?
A. I do not. 0:51:03
Q. Do you know whether or not she gave you any advice regarding John Nawara?
A. I don't recall our specific conversations, but again, we did discuss it, so it wouldn't have just been me kind of talking. You know, she would have responded with direction.
Q. Do you recall any directions that she responded with as you sit here today?
A. Not specifically, no.
Q. Generally?
A. Generally, like I said before, she would have



directed me to go to the law department most likely --
Q. Okay.
A. -- with questions.
Q. Other than she would have directed you to the law department most likely, do you recall any other general advice that she may have gave you regarding John Nawara?
A. No.
Q. Do you know if she had any other involvement in John Nawara than generally that she may have said, "Go to the law department"?
A. No.
MS. MARMOR: Objection. Lack of foundation.
Q. I guess when you say, "No," you -- you agree with my statement. Would that be fair?
A. That she didn't have any other involvement that I'm aware of?
Q. Yes. 0:52:05
A. That's right.
Q. Okay. Okay. You talked about the referral depends on whether it be a medical referral or a psychological referral, correct?
A. Yes.
Q. And the medical would be one day, and you send him to a medical doctor -- or her, right?



A. Yes.
Q. And psychological, they'd be sent to either a psychologist or a psych -- a psychiatrist?
A. Yes.
Q. And you talked about medical authorization forms, would that be done for every employee that would be sent for a fitness for duty?
A. Yes.
Q. And did you have forms within HR for the employee to give his consent for a medical release?
A. Yes.
Q. What type of forms were they, were they general forms?
MS. MARMOR: Object to the form. 0:53:00
MR. LINDEN: No -- no -- no -- no -- no pun intended.
MS. MARMOR: No pun indeed.
Q. Do you understand the question?
A. I do. One form was for the employee to complete to go to their doctor, so that -- it was a release, essentially, for the doctor to -- to release their medical documentation or their medical file, and then another one was for the final fitness for duty report to be released to the sheriff's office.
Q. Would it be two separate releases the



employee would sign?
A. There were two forms, yes.
Q. And do you know who prepared those forms?
A. I do not.
Q. Did you have anything to do with the preparation of the forms?
A. No.
Q. Do you know if legal prepared those forms?
A. I don't know who prepared them.
Q. When you started in HR in 2016, were the forms already at HR?
A. Yes. 0:53:57
Q. Prior to ordering a fitness for duty exam for Mr. Nawara, did you or Ms. Shelby do any type of investigation to determine whether or not what Ms. Jones said actually happened?
A. We did not.
Q. Did you just accept what Ms. Jones said as true for purposes in determining whether or not he should be required to undergo an evaluation?
A. No, that was why we met with Officer Nawara, to try to figure out, you know, what had happened, if anything.
Q. Okay. Did you come to any conclusions at that time what -- what had happened?

A. You mean whether what she told us was accurate?
Q. Yes. 0:54:53
A. We did not.
Q. Did you ever assess whether or not Ms. Hayes should be ordered to undergo a fitness for duty evaluation?
A. We did not.
Q. How come?
A. We didn't have any information that alleged any kind of behavior from her that would make us suspect she wasn't able to perform her job duties.
Q. Did Mr. Nawara ever indicate to you that she treated him in an aggressive manner back in September of 2016?
A. No.
Q. Not at all?
A. No. 0:55:35
Q. When he went and saw you in November for the interview for the fitness for duty to determine whether or not he should be ordered, do you know what his status was as an employee?
A. He was a -- he was an active employee.
Q. Do you know what he was doing for the sheriff's office when he came in November of 2016?



A. He was a correctional officer.
Q. Did he have any limitations placed upon him prior to your meeting in November of 2016?
MS. MARMOR: Object to the form.
A. I -- what do you mean, "limitations"?
Q. Any work limitations, was he allowed, for instance, to carry a gun?
A. As far as I know, yes.
Q. Is it fair to say that he had been authorized to carry a gun from the time of the September incident up until the time that he came for the interview with you and Ms. Shelby?
A. Yes. 0:56:38
Q. Are there -- if somebody within the Department of Corrections considered a correctional officer to be of imminent danger, imminent threat, is there action that they could take to prevent that person from carrying a weapon?
A. It would depend on the circumstances, you know, where that information came from.
Q. Let's assume they had reason to believe that that employee was a danger, could they take immediate -- have immediate action taken to prevent that person from carrying a firearm?
A. I -- yeah. I -- I mean, I'm sure if a



supervisor had some kind of fear of an imminent situation happening, that they could go to OPR or something like that, or they would refer them to human resources.
Q. And I take it Ms. Jones could have communicated that to you back in November of '16 if that was a concern with Mr. Nawara, correct?
A. That she thought there was imminent danger with him?
Q. Yes. 0:57:45
A. Well she did write a memorandum following the incident, so I guess I don't know what you mean.
Q. Did she ever indicate to you that there was any imminent danger to either employees or the inmates with Mr. Nawara working as a correctional officer?
MS. MARMOR: Object to the form.
A. No, she passed on what her experience was with him.
Q. And that would have been in the statement that she gave you --
A. Yes.
Q. -- fair?
A. Yes.
MR. LINDEN: Okay. Do you have any Exhibit stickers?



RECORDER: Yeah.
MR. LINDEN: Okay.
RECORDER: Do you want me to write them out or you --
MR. LINDEN: Oh, gosh, you can write them out if you want. I don't care. I can't --
MS. MARMOR: I always make him do it. 0:58:45
MR. LINDEN: I can't -- why don't we get them all --
MS. MARMOR: I -- in fact, I have never filled out an Exhibit sticker in my life.
MR. LINDEN: No? Your -- either one --
MR. BUSTAMANTE: What are the numbers?
MR. LINDEN: Yeah, the numbers --
MR. HENRETTY: Probably did for trial. I don't know that I ever did it for deps.
MS. MARMOR: I've never done it for trial before.
MR. LINDEN: Oh, let's see.
MR. HENRETTY: Oh, you had better --
MS. MARMOR: I was --
WITNESS: Must be nice.
MS. MARMOR: -- Kirkland and Ellis.
MS. HONINGFORD: Yeah. Yeah.
MR. HENRETTY: Even -- even -- you had

Page 61

support staff.
MS. MARMOR: Exactly. I was not working for the government.
MR. HENRETTY: At the firm, I don't think I ever did, but I did -- the government, you don't -- any --
MS. MARMOR: I was a paralegal before I went to law school, but I don't think I ever did a trial then.
MR. LINDEN: Just -- just for the record, I know we're getting a protective order entered. I think it's --
MS. MARMOR: Yes.
MR. LINDEN: -- pending.
MS. MARMOR: Oh, that's a different protective order. We have a protective order in the case already.
MR. LINDEN: Oh, do we already?
MS. MARMOR: We have a qualified HIPAA protective order.
MR. LINDEN: Oh, okay, that's it.
MS. MARMOR: That's a -- it's a different --
MR. LINDEN: Okay.
MS. MARMOR: -- issue, but we definitely have a protective order in the case.

Page 62

MR. LINDEN: So the documents have already been marked confidential --
MS. MARMOR: Correct.
MR. LINDEN: -- we just can agree it's subject to the protective order?
MS. MARMOR: Exactly.
MR. LINDEN: All right.
MS. MARMOR: Yes.
MR. LINDEN: Great. Okay. I'd like to --
MS. MARMOR: We should probably -- he's -- he's -- he can't do both things, I don't think.
MR. LINDEN: Well the camera's on, right?
MS. MARMOR: Okay, but is that --
MR. LINDEN: Because --
MS. MARMOR: So is that -- is that -- I -- I've never done it where he wasn't typing while --
RECORDER: No --
MS. MARMOR: Is this off the record right now?
RECORDER: No, this is --
MS. MARMOR: This is on the record? Okay. All right. 0:59:57
MR. LINDEN: Do you want to -- can we just go off the record a second, if you'd like?
RECORDER: Off the record, 11:13 (sic) --

Page 63

11:15 a.m.
MR. LINDEN: Yeah, what they do, they --
(Off the record)
Q. I have shown you what --
RECORDER: Back on --
MR. BUSTAMANTE: Wait.
RECORDER: Back on the record, 11:17 a.m.
MR. BUSTAMANTE: Okay.
Q. I -- I've shown you what's been marked as Reierson Number 1, do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is a document -- it's very blurry. This is a document that would be filled out and given to the employee's health care provider in order to release their medical information for a fitness for duty examination.
Q. Okay. You said this form would be filled out, who would fill this -- this form out?
A. It could be filled out by the employee or by Nurse Shelby.
Q. It's got a spot on top that says, "Patient's name"?
A. Yes. 1:00:57
Q. And it's got the date of birth for the

Page 64

patient, correct --
A. Yes.
Q. -- spot? And Social Security?
A. Yes.
Q. And this is a form in use in 2016?
A. Yes.
Q. And this is actually the form given to Mr. Nawara to sign, correct?
A. Yes.
MS. MARMOR: Object to the form.
Q. Okay. The answer is yes?
A. Yes.
Q. So when this form was given to Mr. Nawara, the only part that was filled out was second box checked that reads "all health care information," correct?
A. I don't know what this specific -- what was checked on the specific form he got. It is checked on this form.
Q. Okay. If I represent to you that this is a form, I can show you other communications that came, but this box was checked, do you know who checked this box?
A. I do not. 1:01:59
Q. Do you know why none of this -- any of the

other information on this form was not filled out before it was given to Mr. Nawara?
A. So typically, it's kind of an interactive process when we meet with employees to determine if it would be necessary for them to undergo a fitness for duty, but Mr. Nawara was not cooperative, and so you know, normally, the nurse would talk to the employee and gather their providers' names and things like that and assist with completing the forms and explaining them, we just didn't have the opportunity with Mr. Nawara.
Q. Did you ask Mr. Nawara in November of '16 to complete this form in your presence?
A. I don't believe so. I don't believe we got to that point with him.
Q. Was there anything that prevented you or Ms. Shelby from putting the patient's name on this document?
A. No, not necessarily. 1:03:04
Q. And I take it being in HR, you either knew his date of birth or you had access to his date of birth?
A. Yes.
Q. So you or Ms. Shelby could have filled in the date of birth, correct?



A. Yes.
Q. And same thing when applied to the Social Security number?
A. Yes.
Q. And if there is a previous name, the sheriff's office would have known his previous name, correct?
A. Perhaps.
Q. Okay. It's got a spot here, it says, "I request and authorize," blank, "to release health care information of the patient named above," and who would -- this was blank what it was given to Mr. Nawara, correct?
A. Yes. 1:03:51
Q. Do you know why nothing was filled in when it says, "I request -- I request and authorize," blank, "to"?
A. Well again, this is a form that is kind of completed along with the employee while you are meeting and talking with the employee, so because we didn't get to that point with Mr. Nawara, the form wasn't completed with him like it would be in most circumstances.
Q. Would it typically be filled in -- who was the provider, Corell (sic)?



MR. BUSTAMANTE: CorVel.
MS. MARMOR: Object to the form. CorVel.
MR. LINDEN: CorVel.
Q. Would CorVel typically be the one authorized to receive the information when you were at HR in 2016?
MS. MARMOR: Object to the form and assumes facts not in evidence.
A. So this line that you're talking about would be where the provider's name would go, so you're authorizing the provider to release the information.
Q. Okay. And the provider in this case would have been CorVel, correct?
MS. MARMOR: Objection. Mischaracterizes her testimony. 1:04:52
Q. And -- and if I'm not stating it accurately, you know, please tell us.
A. So there's -- there's one form that authorizes a release to the sheriff's office, and there's one that allows the medical provider to release the records to CorVel. I would have to see the other one next to this, I guess, to differentiate.
Q. Who -- who would you typically put in this blank of this form, if you know --
A. I -- I didn't --
Q. -- in 2016?



A. Oh, I'm sorry. I didn't complete these forms, the nurse did.
Q. Okay. Do you know what the standard procedure would have been in 2016 on this specific form, if it would have been the sheriff's office to be filled in this blank or the provider?
A. Again, I'd have to see the other form to kind of have a frame --
Q. Okay.
A. -- of reference for this one.
Q. Okay. Let me show you what's been -- or is marked as Exhibit Number 2.
MS. MARMOR: Reierson Exhibit 2? 1:06:01
Q. And I just ask you, tell us what it is?
A. It says, "HIPAA authorization for disclosure of protected health information."
Q. And this is the other form that you're referring to?
A. Yes.
Q. Okay. By looking at this form and going back to my prior questions regarding Exhibit Number 1, can you tell on Exhibit 1 who the entity or -- should have been in the blank, that "I request and authorize," blank, "to release health care information"?
A. Yes, so this would be the employee

Page 69

authorizing their physician to release information to the sheriff's office.
Q. So it'd be their personal physician? 1:06:54
A. Whatever physicians were -- right, that they were -- that they had seen.
Q. Okay. Then the next line says, "Release health care information of the patient named above to," and then it's got blanks, name, address, city, etcetera, correct? Do you see that?
A. Yes.
Q. And I'm referring to Exhibit Number 1.
MS. MARMOR: Oh, sorry. Yeah, I was completely confused.
WITNESS: Oh.
MR. LINDEN: Okay.
A. Excuse me. Yes, that's correct.
Q. Okay. And there's a stamp here, and can you read what the stamp is next to the name, and it's got an address?
A. Yes, it says, "Cook County Sheriff's Office, Winifred Shelby, RN, CO -- CCM, South Campus, Building 2, 3026 South California Avenue, Chicago, Illinois 60608."
Q. Do you know why, according to this firm (sic), the medical information be released to the

Page 70

sheriff's office as opposed to the provider?
MS. MARMOR: Can -- can you read that back? 1:07:59
(Record replayed)
MS. MARMOR: I'm going to object to the form.
Q. Do you understand the question?
A. I do. So the employee's physician -- the employee's authorizing the physician to release the records to the sheriff's office, to the nurse. She will compile all of the medical documentation that was received and give it to CorVel to provide to the independent physician that was selected by CorVel.
Q. If that information would have been released to the sheriff's office, who within the sheriff's office would have had access to the medical records?
A. Just to the nurse, as indicated on here. 1:08:59
Q. Okay. What -- what protections were in place in 2016 that it would stay within the nurse's purview?
A. The nurse had her own locked office with locked filing cabinets.
Q. Is there anything on this document that says that that information would be limited to the nurse receiving it?
A. Well the authorization is for it to be released to her.
Q. Okay. On top, it says it'd be released to

Page 71

the Cook County Sheriff's Office, correct?
MS. MARMOR: Object -- objection.
A. It says, "Cook County Sheriff's Office, Winifred Shelby," so they are authorizing the records to be released to her.
Q. Okay. Do you know why the authorization would be released to the Cook County Sheriff's Office, Winifred Shelby, as opposed to CorVel?
A. It was just because many times, employees had more than one provider, and so she would just kind of corral all of the documents together and present them in one packet to CorVel.
Q. Okay. Then if you go down after that, there is a paragraph that the document says, "This request and authorization applies to," colon, and there is three boxes that can be checked. See that?
A. Yes. 1:10:30
Q. And the first box would be if it would have been checked, "health care information relating to the following treatment condition or dates," colon?
A. Yes.
Q. And what was the purpose of that box on the form as an HR person?
A. If we had a specific referral for an employee -- regarding a particular medical situation, then we

Page 72

might put details in that area.
Q. What about a specific psychological issue, would you limit and check that box?
A. That would -- that was -- wasn't done, as far as I was aware.
Q. So in Mr. Nawara's case, if you would have signed it, isn't it a fair statement that any records whatsoever relating to Mr. Nawara would have been released to the sheriff's office and Nurse Shelby?
MS. MARMOR: Objection. Mischaracterizes the testimony and puts facts not in evidence.
Q. Am I wrong? 1:11:33
A. No, so the information would be released to the nurse, and that would be provided to the independent medical doctor because that -- that would be the person who could decide what's relevant and what's not to whatever the current situation is.
Q. I -- I guess my question is this release, the way it's written, would call for the release of any and all medical information regarding that employee and it wouldn't be limited in scope. Is that a fair statement?
MS. MARMOR: Same objection.
A. Yeah, it's asking for all health care information.

Q. And you or Ms. Shelby could have checked the first box regarding Mr. Nawara and said it should be limited to X, Y, or Z, correct?
A. Yes, but I guess I don't -- if -- I don't know why you'd do that in a case like this because it wouldn't be -- I mean, there are a number of records that could be relevant, not just specifically a psychological record.
Q. Okay. What type of records were you seeking when you referred him to a fitness for duty exam?
MS. MARMOR: Objection. Calls for facts not in evidence. 1:12:42
A. I mean, I don't know specifically what the doctor considers relevant when they are reviewing the medical information and when they meet with the employee, but certainly, there could be physical issues that could lead to psychological issues, and there could be crossover, so limiting a request just to psychological records might not give a doctor the complete picture they need to evaluate an employee.
Q. How about limiting the release to a specific period of time, was that ever done when you were at HR?
A. Yeah, it was common for employees to ask about, you know, how long would these records need to go back, and then the nurse would have a conversation



with the employee about what seemed reasonable.
Q. And would that be a decision typically made by the nurse and not you, or would it be made by the two of you together?
A. It would be -- the nurse would discuss with the employee, and they would kind of come up with something that seemed reasonable under the circumstances.
Q. What type of scope limitations were typically --
A. I mean, it --
Q. -- put on these forms? 1:13:46
A. It could be a number of years. I mean, I -- the nurse would be more fit to discuss that. It wasn't a decision I made.
Q. With respect to Mr. Nawara, did you ever discuss with Ms. Shelby about any time limitations that should be placed upon the release?
A. No, again, that's a conversation she would have had with Mr. Nawara had he interacted with us in our meeting.
Q. Did anything prevent her from putting a time limitation on there?
A. Only that she hadn't been able to talk with Mr. Nawara.



Q. Do you know what efforts Ms. Shelby made trying to talk to Mr. Nawara about any limitations that should be placed on this form?
A. Well I know that she tried to have two conversations with him the day when he came to HR, and I know she reached out him at least once via telephone, maybe more than that.
Q. Isn't it true that when he came in, he expressed a problem with signing these forms, Exhibits 1 and 2?
MS. MARMOR: Objection. 1:14:51
A. No. Well I mean, he expressed a problem with just being there and discussing anything.
Q. Did he ever indicate to you that he didn't -- he wanted to talk to his lawyer before he signed the medical release forms?
A. No, not that I recall.
Q. Was there a reason why he didn't sign them on the day that he came in?
MS. MARMOR: Objection. Calls for speculation.
A. I don't even know if he knew what the forms were honestly, we weren't really able to discuss the process with him at all.
Q. Did you hand him the forms that day?



A. The nurse might have.
Q. Okay. When you say, "The nurse might have," do you -- do you recall whether or not she did or didn't on that day?
A. I -- I believe he -- he left with the forms.
Q. Did you have any information when Mr. Nawara came to you in 2016 that he had any psychological issues predating the alleged September 2016 incident?
A. No. 1:16:02
Q. Do you know of any reason why a psychological medical record should have been requested for a fitness for duty exam, medical records existing prior to 2016?
MS. MARMOR: Objection. Calls for -- it assumes facts not in evidence.
A. When the fitness for duty evaluations are conducted, like I said before, the doctor kind of looks at a full picture of the employee, which is why they request to have their medical history.
Q. Do you know what records a doctor in this case wanted?
A. I do not.
Q. Did you or Ms. Shelby ever call the doctor and say, "Should there be any limitations placed upon the release and what documents you, the doctor, needed to perform an evaluation on Mr. Nawara?"

Page 77

A. No, we don't communicate with the doctor. 1:16:53
Q. Was there any reason for Mr. Nawara's fitness for duty examination that you needed the medical records as opposed to psychological records regarding Mr. Nawara?
MS. MARMOR: Objection to form and calls -- and assumes facts not in evidence.
A. I mean, just as I said before, that having the employee's full medical history, whether it's simply medical or psychological, assists -- assists with having a full evaluation done of the employee.
Q. Do you know of any medical issues with respect to Mr. Nawara when he came in for the interview in November 2016?
A. No.
Q. Do you know of any reason why a doctor, given that you didn't know of any medical issues, would have needed the medical records of Mr. Nawara as opposed to just psychological records, if he had any?
MS. MARMOR: Object to form and assumes facts not in evidence.
A. Oh, I -- just the same reason, they would need to know the medical history of the employee in order to make a complete assessment of the employee.
Q. But you're seeking a psychological assessment

Page 78

regarding Mr. Nawara, I take it, correct?
A. Yes. 1:18:07
Q. Do you know why the doctor would have needed the medical records, as opposed to psychological records --
MS. MARMOR: Object --
Q. -- that psychological evaluation?
MS. MARMOR: Sorry. Objection. Asked and answered. I mean, I think she's answered several times now to that same question.
Q. I know you're not a doctor, I'm just asking do you know, as you sit here today, of any medical reason why that evaluator would have needed Mr. Nawara's medical records as opposed to psychologic records?
A. Yeah, again, only because, you know, someone's physical health can be intertwined with their psychological health.
Q. Okay. What physical health did that doctor need to perform the evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. I don't know. That's why they get the records and go through, you know, what they feel is relevant and use that in their assessment.

Page 79

Q. Can you give us examples of any physical issues that would go to psychological issues for a fitness for duty examination?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. Yeah, I cannot. 1:19:11
Q. You cannot, okay.
MS. MARMOR: I need to take a quick break.
MR. LINDEN: Sure.
MS. MARMOR: Okay.
RECORDER: Off the record, 11:36 a.m.
(Off the record)
RECORDER: Back on the record, 11:44 a.m.
Q. Just to clarify, did you meet one time with Mr. Nawara?
A. Yes. 1:19:31
Q. And that was the only time you met with Mr. Nawara, was one time in November?
A. It was one meeting date. He did come in and out of the office twice, but it was all within a short span of time.
Q. Okay. Do you know what kind of span we're talking about?
A. Oh, within probably 20 minutes, I would say.
Q. So was there a break where he left and then

Page 80

came back?
A. He left and met with his union representative, yes.
Q. Do you know how long he was there before he met with the union rep?
A. A couple minutes maybe, tops. 1:20:02
Q. So one of the first things he said to you and Ms. Shelby was "I want to meet with the union rep," is that what happened?
A. No, he -- well we just explained why we wanted to meet with him.
Q. Did he ask to have a union rep present during that meeting?
A. I don't know if he had called the union in advance, the -- but -- and the union is not typically right there, so he -- he might have called them in advance. I don't remember him saying he wanted a union rep there, no.
Q. But initially, there was not a union rep, is that what happened?
A. Yes.
Q. Was anything -- did he say anything in that first session before the union rep got there?
A. Not much.
Q. When you say, "Not much," do you recall

anything what he said?
A. Well basically, what I told you before, that he wasn't experiencing any issues at work, he wasn't -- he hadn't been in any altercations, he didn't have an issue with the superintendent, and then that he stayed away from the superintendent, just very short, clipped answers. That was it.
Q. Okay. And where did this interview occur?
A. The meeting was in the nurse's office. 1:21:14
Q. And it was just you and Ms. Shelby?
A. Yes.
Q. Did Ms. Shelby have any other interviews that you know of with Mr. Nawara?
A. No, just I know she did try to reach him by phone, but I don't know that she ever connected with him again after we met with him that day.
Q. Do you know whether or not she met privately outside your presence at any time personally with Mr. Nawara?
A. Not that I'm aware of.
Q. Okay. And how long after the break was it when he came back in with the union rep?
A. Oh, I'm not certain, a few minutes maybe.
Q. And how long -- did he say anything more with the union rep, or what happened when he came back, if



you can separate the two time frames?
A. I don't recall. I -- I just -- I -- I recall that it ended abruptly with him just kind of -- with him just leaving, but I -- I don't recall the conversation once the union rep was there.
Q. Was this an office with a private door or more of a cubicle nature?
A. It's a private office. 1:22:22
Q. Can anybody else, other than you, and the nurse, and the union rep, when he was there, and Mr. Nawara hear what was going on?
A. No.
Q. Okay. I'd like to show you Exhibit Number 3.
MR. LINDEN: And there's two -- one --
MR. HENRETTY: I'll share.
MR. LINDEN: Yeah. You don't care?
MS. MARMOR: Thanks.
Q. And ask first of all, do you know what this document is?
A. Yes.
Q. What -- what is it?
A. This is the information that was given to Nurse Shelby and I by the superintendent regarding the incident with Mr. Nawara.
Q. And that would have been super --



Superintendent Hayes, correct? I think we already --
A. Yes.
Q. -- fixed that one.
MS. MARMOR: We -- we've now got Superintendent Jones, Superintendent Hayes, the record shows it's Superintendent Jones-Hayes. It's fine.
MR. LINDEN: Okay. 1:23:22
Q. And this is dated November 16th, 2016?
A. Yes.
Q. Do you know if that was the day that it was provided to you?
A. It was -- I -- it's the day the telephone conversation took place.
Q. And do you know who actually typed this Exhibit 3 up?
A. I believe I did.
Q. It was not given to you beforehand by Superintendent Hayes?
A. No, this was based on our conversation with Superintendent Hayes.
Q. Do you take handwritten notes of your conversation?
A. I don't know if I had -- was typing as we were talking or if there were other notes. I -- I think I probably typed as we spoke.



Q. Is that your normal practice, to type as you speak?
A. Yes, because I often can't read my handwriting when I go back, so.
Q. And is that a verbatim statement of what she gave or is it more of a nature of a summary?
A. It was a summary of what she said. 1:24:24
Q. By looking at this document, do you have a better idea of when you talked to Mr. Nawara?
A. It would have been after this statement, so maybe a day or two after, as soon as we could get him in the office.
Q. So it probably would have been either November 17th or 18th, 2016. Is that fair?
A. Yes.
Q. I notice one line here, and I don't want to go through the whole thing with you, it's -- this is Ms. Hayes' version of what occurred that day, correct?
A. Yes.
Q. As you sit here, you don't know if that's accurate or not accurate, correct?
A. Yes.
Q. You -- you don't know, correct? The question is bad. When you say, "Yes," you don't know if it's accurate or not, right?

A. No, I --
Q. It's solely --
A. This -- this is the statement that she gave to me and to Nurse Shelby -- or this is the information she gave to us --
Q. Okay.
A. -- I should say.
Q. So I notice one line says, "Officer Nawara displayed extreme rage towards her, his body trembled as he screamed at her with his fists clenched." You didn't come to a conclusion that that's what happened, I take it, correct?
A. No, this is what the superintendent reported --
Q. Okay. 1:25:37
A. -- occurred.
Q. So you don't know whether or not he did or did not display any type of rage towards her, correct?
A. I do not.
Q. Do you know what type of history Ms. Hayes had, did she have any other prior complaints of any employees?
MR. HENRETTY: Object to form.
MS. MARMOR: Same objection.
A. Did she complain about other employees?



Q. No, do you know whether or not, prior to meeting her or talking to her in November of 2016, whether or not she had any complaints against her by any fellow employees?
A. I do not know.
Q. Do you know --
A. I -- I do not know.
Q. Do you know if she had any disciplinary history within the sheriff's office?
A. I don't know.
Q. Did you or Ms. Shelby check to see whether or not she had ever been disciplined?
A. No.
Q. Did you check to see if she had any prior complaints against her by fellow employees?
A. No. 1:26:37
Q. Did you type any -- when you talked to Mr. Nawara, did you type any type of notes regarding your conversation with him?
A. No.
Q. Was there a reason that somehow you -- when you talked to Ms. Hayes, that you typed your notes up, but you did not when you talked to Mr. Nawara?
A. Well this was in order to get more detail on the incident she was reporting. There really was not



much of a conversation to -- to document with Mr. Nawara.
Q. Did you take any notes whatsoever when you talked to Mr. Nawara?
A. I don't believe so.
Q. Do you know whether or not Ms. Shelby took any notes regarding the interview with Mr. Nawara?
A. I don't know.
Q. Do you know of any written record of what Mr. Nawara might have said at that meeting with you and Ms. Shelby?
A. I don't. 1:27:37
Q. Do you know how many referrals for fitness of duty exams that you've been involved with during your time at the sheriff's office?
A. Oh, I would say approximately maybe 15 or so. It's -- it's a guess though.
Q. So it's somewhat rare to have a referral for a fitness for duty exam?
A. Yes.
Q. Of those 15 or so, did you always agree with the referral?
A. No. 1:28:30
Q. Of the 15, do you know how many you disagreed and said the employee should not have to be subjected



to it?
A. I would say maybe a third of the time, this is just an estimation, employees are actually sent through the fitness for duty process following their meeting in human resources.
Q. So is it fair to say that more often than not, you find that the employee should not have to undergo it?
A. Yes.
Q. Okay. When you said you have been involved in about 15, that would have been from 2016 until today, correct? About three year period?
A. Yes.
Q. Do you know if the --
A. That number might be a little low, I'm sorry.
Q. Okay. And I think when Mr. Nawara came in in November, you hadn't been there too long, right, same year --
A. Yes. 1:29:43
Q. -- under the sheriff's office? Prior to Mr. Nawara, do you know how many, approximately, fitness for duty evaluations you -- you had been involved in?
A. Maybe one or two before that.
Q. Yeah. Do you recall specifically what the one or two were?

A. I recall -- I recall one, but I feel like there was another one also, and I am not recollecting the details.
Q. How about Ms. Shelby, how long had she been working for HR as a nurse?
A. I believe she started in 2015 with the sheriff's office.
Q. Do you know how experienced she was in 2016 with referrals for fitness for duty exams?
A. I don't know.
MS. MARMOR: Objection. Lack of foundation.
Q. You don't know?
A. I -- I don't know. 1:30:40
MR. LINDEN: Okay. The Exhibits, we can just kind of keep over there so I don't lose them.
MS. MARMOR: Oh, okay.
MR. LINDEN: Okay.
MS. MARMOR: You're, like, the -- a partner --
MR. LINDEN: We're --
MS. MARMOR: -- at a big firm that cannot be trusted with them.
MR. LINDEN: No, no, no, no. Okay.
MS. MARMOR: We're on 4?
MR. LINDEN: Yes.



Q. I'd like to show you Exhibit Number 4 and ask you if you recognize Exhibit Number 4.
A. Yes. 1:31:38
Q. And what is Exhibit Number 4?
A. This was the referral that came from DOC requesting that we meet with Officer Nawara.
Q. Okay. And that was from Matthew Burke, comma, chief of staff?
A. Yes.
Q. And does that refresh your recollection what position Mr. Burke held on 9/29/16?
A. Yes, I guess he was chief of staff.
Q. Would that be chief of staff for the sheriff or just chief of staff within DOC?
A. DOC.
Q. So each department would have its own chief of staff?
A. I'm not certain.
Q. Do you know whether or not Mr. Burke had any communications with Ms. Hayes?
A. I don't.
Q. Do you where Ms. -- Mr. Burke got his information that a referral should be made to HR?
A. I do not. 1:32:39
Q. And this form says, "Pursuant to the attached



documentation, I am requesting that Officer John Nawara, employee number" -- goes on to say, "be evaluated for fitness for duty," do you know what the attached documentation was?
A. I believe the statement from the superintendent about the incident with Officer Nawara.
Q. Okay. And I see there is two people copied here, Nneka Jones Tapia --
MS. MARMOR: Nneka.
MR. LINDEN: Nneka? I'm sorry.
Q. Says, "Executive director," do you know was she executive director of DOC?
A. Yes, she was.
Q. And Tarry Williams, DOC chief of operations. Other than being cc'd on this referral, do you know of any involvement these two people had with John Nawara?
A. No. 1:33:43
Q. Is it common for the executive director and DOC chief of operation be copied on these type of letters, if you recall?
A. I don't know if they're typically copied or not. Probably.
Q. Does it mean anything to you that they are copied on this one?
A. No. I mean, only that Matt was just, you



know, keeping his supervisors in the loop.
Q. Okay. So would it typically go from -- in 2016, would Karyn Williams typically assign these to you?
A. Yes.
Q. Would Karyn Williams typically make the decisions for fitness for duty evaluations, or would she delegate that to you?
A. What do you mean, make the decisions for them?
Q. You indicated that you and Ms. Shelby made the decisions whether or not the employee should be required to undergo a fitness for duty exam, correct?
A. Yes. 1:34:46
Q. Would Ms. Williams have had the authority to make those determinations in 2016?
A. Oh, I don't know. She really wasn't involved in the process in that way. It would be more referring the cases to me and to the nurse.
Q. And that's what happened with Mr. Nawara, she basically referred it, stepped aside, and let you do the work with Ms. Shelby?
A. Yes.
Q. Okay. Do you know of any information if we talk to Ms. Williams that she'd have regarding

knowledge to this case?
MS. MARMOR: Objection. Calls for speculation.
A. I do not know.
Q. You don't know of any knowledge that she'd have, correct?
A. Yes. 1:35:33
Q. Do you know whether or not Ms. Hayes filed a complaint against Mr. Nawara?
A. I don't.
Q. Do you know whether or not Mr. Nawara was ever disciplined?
A. No, I don't know.
Q. You don't know either way? Do you have any information to indicate that Mr. Nawara was ever disciplined for the alleged incident that occurred in September?
A. I don't know if he was or not.
Q. Do you know whether or not OPR ever investigated what Ms. Hayes says occurred back in September of '16?
A. I don't know if they investigated. 1:36:38
Q. Do you know -- do you know of any conclusions by OPR regarding what happened that day?
A. I don't.



Q. Do you know whether or not John Nawara, prior to meeting with you in November, filed any type of complaint against Ms. Hayes?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't know.
Q. Okay. I want to show you --
MR. LINDEN: Exhibit 5?
MS. MARMOR: Yeah.
Q. Going to hand you Exhibit 5.
MS. HONINGFORD: Thank you.
MR. LINDEN: I think a couple of these, we might have one less Exhibit.
MR. HENRETTY: Exhibit 5 --
MS. MARMOR: Oh, goodness.
MR. LINDEN: So far or not --
MR. HENRETTY: -- have --
MR. LINDEN: -- too bad.
Q. Do you recognize Exhibit Number 5?
A. No, I don't. 1:37:51
Q. Have you ever seen Exhibit 5 before today?
A. No, not that I recall.
Q. Have you ever seen this type of form before when you worked for the sheriff's office?
A. Yes.
Q. And what type of form is it?



A. It's --
MS. MARMOR: Objection. Lack of foundation.
A. So it -- it says, "Cook County Sheriff's Office discrimination, harassment, sexual harassment complaint form."
Q. Is this the type of form that's typically kept in the ordinary course of business based on your experience at the sheriff's office?
MS. MARMOR: Objection. Lack of foundation.
MR. HENRETTY: Join.
A. No, this isn't a form that I use, so I couldn't answer.
Q. How often -- how many times have you seen this form?
A. I -- I couldn't estimate. I don't know.
Q. More than ten?
A. This type of form?
Q. Yes.
A. Oh, maybe. I'm not certain.
Q. But according to this report, he filed a complaint on October 13th, 2016. See the date here?
A. Yes. 1:38:58
MS. MARMOR: Objection. Lack of foundation.
Q. At the time -- assuming he filed this complaint, would you have had access, if you wanted to,



to this document when you interviewed Mr. Nawara in November?
MS. MARMOR: Objection. Calls for speculation. Lack of foundation.
MR. HENRETTY: Join.
Q. If you know.
A. No, I don't know where he filed this complaint.
Q. Okay. You see on the top portion, it says, "This form must be submitted to either a member in your own chain of command," comma, "director of personnel, or the office of professional review." You see that up there?
A. Yes.
Q. Director of personnel at the time would have been within human resources, or would that be the DOC director of personnel?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Yeah, it --
Q. If you know. 1:39:56
A. Yeah, it's -- it's not clear on here.
Q. If you can just kind of read this, and I just wanted to ask you one question.
A. Okay. 1:41:26

Q. Would it have been useful in order for you and Ms. Shelby to make the decision whether or not to order a fitness for duty exam for you to have this information in November?
MS. MARMOR: Objection. Calls for speculation.
Q. And I know you didn't -- I know you didn't have it, so I'm not criticizing you, but would it have been helpful to you?
MS. MARMOR: Same objection.
WITNESS: Well --
MR. HENRETTY: Join.
WITNESS: -- can I answer?
MS. MARMOR: Yes, you can answer.
WITNESS: Okay.
A. I mean, that's why we meet with the employee, to kind of get a full picture of what's happening, but we didn't know about this. He didn't tell us about any of this.
Q. Okay. If you would have known, would that -- would you have considered that in determining whether or not he should be ordered for a fitness for duty exam?
MS. MARMOR: Same objection.
MR. HENRETTY: Join.



A. Yeah, it would have been considered, sure.
Q. So I take it in HR, you wouldn't automatically -- if you have a he said versus she said, you wouldn't automatically take the word of a supervisor, would you?
A. No. 1:42:28
Q. That they both should be given equal consideration, correct?
A. Yes.
Q. So based upon this, Mr. Nawara's version of events are quite different than what Ms. Hayes told you, correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
MR. HENRETTY: Join.
A. Yes.
Q. You would agree that if what Mr. Nawara says in this Exhibit Number 5 is true, that would be inappropriate conduct on the part of Ms. Hayes, wouldn't you?
MS. MARMOR: Objection. Lack of -- complete lack of foundation for --both for the document and for the question.
MR. HENRETTY: Join.
A. Can you repeat your question? I'm sorry.



Q. Yes. You would agree that based upon assuming what Mr. Nawara said is true in Number 5, I know you don't have independent knowledge, that that would be inappropriate conduct on the part of Ms. Hayes, correct?
MS. MARMOR: Same objection. She does not have a foundation to make that kind of a judgment.
MR. HENRETTY: Also form. 1:43:36
Q. You can --
WITNESS: Can --
Q. You can answer.
A. Okay.
Q. Unless they tell you not to answer, you can --
MS. MARMOR: Right.
Q. -- go ahead.
A. Yeah, I -- I mean, just reading this, if this were true, it -- it would be inappropriate behavior, yes.
Q. Okay. I'd like to show you Exhibit Number 6 and just ask you if you have ever seen this document before.
MR. HENRETTY: Sorry. 1:44:56
MR. LINDEN: All right.
A. I don't -- I don't recall seeing it, but he



-- it's -- I'm cc'd, so I must have received it.
Q. And what type of document is it, is it a normal document when you're in HR?
A. No, this is a document from DOC.
Q. And is this document -- what's the date of this document?
A. November 18th, 2016.
Q. Do you have any reason to dispute the date on this document?
A. No.
Q. It says here that Mr. -- be -- "Please be advised that director's office received notification on November 18th, 2016 that Officer Nawara is not permitted to work until he has been released by the bureau of human resources." You see that part?
A. Yes. 1:45:43
Q. Do you know who made that decision?
A. Well once someone is being referred out to undergo a fitness for duty, they are not allowed to work until the report is received --
Q. Is that automatic --
A. -- indicating --
Q. -- in all -- all cases?
A. If they're sent out for a fitness for duty, yes.

Page 101

Q. Yes. And if they would not have been referred to fitness for duty, then they're allowed to work, I take it, the reverse would be true?
A. It -- it would depend on the situation with the employee, but typically, yes.
Q. Okay. It says he's not allowed to work until he has been released by the bureau of human resources, that would be your bureau, correct?
A. Yes.
Q. And what would it take for Mr. Nawara to be released?
A. So we would have to have the report back from CorVel, from the physician, indicating that he was fit for duty and was able to return to work with or without restrictions.
Q. Okay. So until you got the report back saying that he's fit for duty, he would not be allowed to work --
A. Yes. 1:46:55
Q. -- correct? And during this time on November 18th, 2016, was he still getting paid, or would he be not paid?
A. Employees who are out on fitness for duty at this time would be able to use whatever benefit time they had available, and so they would be paid in that

Page 102

way.
Q. That's only if they have benefit time, correct?
A. Yes.
Q. So they'd have to use their own time to get paid?
A. Yes.
Q. So is it fair to say that effective on November 18th, 2016, that Mr. Nawara would have -- in order to get paid, would have had to use his own time?
MS. MARMOR: Objection. Lack of foundation.
A. Yes.
Q. And what type of time could Mr. Nawara use to get a paycheck?
A. Any benefit time he had accumulated, so vacation, sick, personal, compensatory, holiday.
Q. And are those days worth money, vacation days an employee --
A. Yes. 1:48:00
Q. And how so or how -- how would that work?
MS. MARMOR: Objection. Lack of foundation.
A. So if you don't work for a day and you use eight hours of vacation, you're still paid for that day as if you had worked.
Q. Okay. And that would be the same for a sick

Page 103

day too?
A. Yes.
Q. Would sick days be day for day, or would you only get credit for, like, half a day for -- if you have ten sick days, can you use ten of those days to get paid for those ten days?
A. It's all based on hours, so you would use benefit time in lieu of working, and you'd be paid as if you had worked.
Q. As of November 18th, 2016, do you know what type -- what time Mr. Nawara had accumulated for vacation days, sick days, or other days?
A. No. 1:48:51
MS. MARMOR: I -- I need to ask my client a question because I just want to make sure --
MR. LINDEN: Sure.
MS. MARMOR: -- that she has a --
MR. LINDEN: Sure.
MS. MARMOR: -- nothing's misleading here.
RECORDER: Off the record, 12:14 p.m.
(Off the record)
RECORDER: Back on the record, 12:17 p.m.
MR. LINDEN: Let's see -- that.
MS. MARMOR: This is 7?
MR. LINDEN: Yeah, pretty sure that is.

Page 104

Q. I can show you Exhibit Number 7, and have you ever seen Exhibit 7?
A. Yes.
Q. And what is Exhibit 7?
A. This is a letter that I sent to Officer Nawara.
Q. And this would have been a couple weeks approximately after you met with him?
A. Yes. 1:49:41
Q. Can you just read the first paragraph of this letter?
A. "Dear CO John Nawara, on 11/8/16, you were informed by the occupational health nurse for the sheriff's office, Winifred Shelby, that you were required to undergo a fitness for duty evaluation before returning to active duty. You took the forms in order to review them prior to signing and have failed to return them to Ms. Shelby. She called and left a voicemail message for you on 11/30/16 to which you did not respond. The time you have been off work since 11/18/16 is only authorized if you are participating in the -- in the FFD process. These signed documents must be returned to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you

are not participating in the process and your time off from work from 11/18/16 will be unauthorized. Further, you will -- you are not able to return to work until you have completed the FFD process."
Q. Okay. The forms that are being referred to in that paragraphs are Exhibit 1 and 2, correct? And you can go back and check if you want, but.
A. Yes. 1:51:05
Q. And -- and then Nurse Shelby is copied on your letter, correct?
A. Yes.
Q. And was this letter mailed to Mr. Nawara?
A. Yes.
Q. And it says here -- and it says, "Re," it says, "Via email, first class, and certified mail," do you know if it went out to Mr. Nawara in all three ways?
A. It should have gone out at each way that's listed.
Q. And when you send something certified, do you typically get a -- do a return receipt requested?
A. Yes.
Q. Do you know whether or not you got any -- you did it that way for this letter?
MS. MARMOR: Object to the form.



A. If it were sent certified mail, that's how it would have been.
Q. Yeah. Have you ever seen any signed certified receipt by Mr. Nawara acknowledging whether or not he got this letter?
A. Oh, I don't recall. 1:52:01
Q. Do you know what Mr. Nawara's -- Nawara's email address was in 2016?
A. I would have used -- used his sheriff's email address.
Q. Okay. Do you typically put it on the letter if you would have emailed it, or is it -- was it your practice just to do it this way?
A. Put what on the letter? I'm sorry.
Q. When you typically emailed something to an employee, would you put the email letter, you know, next to the address or somewhere on it?
A. Oh, the email address --
Q. Yes.
A. -- that I used? No.
Q. So your normal practice would be if you would have emailed it, that that address would not appear in the letter?
A. Right, because it would go through the sheriff's --



Q. Okay.
A. -- email system.
Q. Okay. When you say, "Ms. Shelby called and left a voice message for you on 11/30 to which you did not respond," how did you know that Ms. Shelby called and left a voicemail?
A. She told me. 1:53:11
Q. And she would have left the voicemail on the same day you wrote this letter, correct?
A. Yes.
Q. Do you know what time Ms. Shelby left the email -- or the voicemail? I'm sorry.
A. No.
Q. Do you know how long after she left the voicemail that you wrote this letter?
A. No.
Q. So could it have been half hour or ten minutes?
MS. MARMOR: Objection. Calls for speculation.
A. I mean, it -- it would have been a reasonable amount of time after leaving a message --
Q. Okay. When you say --
A. -- to expect a response, but I don't know for certain what -- what time she called or what time I



wrote the letter.
Q. Other than a guess, do you -- can you provide any approximation of how much time between the time she left the voicemail and your letter saying that you didn't respond to her voicemail?
A. No.
Q. Okay.
A. But he never did respond at any time.
Q. He never responded?
A. Not to her message, no. 1:54:12
Q. Okay. I'd like to show you Exhibit Number 8 and ask if you've ever seen this document before.
A. Yes.
Q. What is Number 8?
A. This is a letter I sent to Officer Nawara.
Q. What's the date of this letter?
A. February 28th, 2017.
Q. Okay. And that would have been sent, according to this letter, the same three ways, email, first class mail, and certified mail, yes?
A. Yes. 1:55:36
Q. Okay. Can you read the first paragraph of this letter?
A. "On November 18th, 2016, you were informed by the occupational health nurse for the sheriff's office,

Page 109

Winifred Shelby, that you were required to undergo a fitness for duty, FFD, evaluation before returning to active duty. You were referred for fitness for duty based on an interaction you had with Superintendent Jones-Hayes, in which you were alleged to have acted in an overly aggressive and threatening manner. During the meeting on November 18th, 2016, you were given an authorization to release health care information and a HIPAA authorization for disclosure of protected health information form, which you took in order to review prior to signing. To date, you have not returned these forms to Ms. Shelby. Nurse Shelby also called you and left a message for you on November 30th, 2016. You never responded to her message. In addition, I sent you a letter on November 30th, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the fitness for duty process. To date, I have not heard back from you."
Q. Okay. The two authorization forms that were referred to in this paragraph, again, relate to Exhibits 1 and 2, correct?
A. Yes. 1:57:03
Q. And your letter indicates he never responded to her message, see that part?

Page 110

A. Yes.
Q. Okay. But isn't it true that at the time you wrote this letter, Ms. Dana Kurtz was representing Mr. Nawara?
A. I don't know if that was when I -- I don't know what the timing was with that and me sending this letter.
Q. Okay. But if a lawyer for an employee responds to you, would that be the equivalent of the employee responding to you?
MS. MARMOR: Objection.
A. It would depend on what the situation was.
Q. But if you send a letter or a request to an employee and their lawyer responds, you wouldn't hold it against the employee for not responding personally, they're responding through a lawyer, would you?
MS. MARMOR: Object to the form.
MR. HENRETTY: Join. 1:57:56
A. I mean -- "hold it against them," I guess I'm not --
Q. Yeah, when you say the employee doesn't respond, if their lawyer would have responded on behalf of the employee, wouldn't that be essentially the same as the employee responding to you?
MS. MARMOR: Object to -- objection.

Page 111

Argumentative.
A. It would depend on the circumstances.
Q. Okay. Prior to this letter of February 28th, 2017, do you know if you received any communications from Dana Kurtz?
A. I don't -- I don't know when -- she did send me an email. I don't recall when it was though.
Q. Okay. I'd like to hand you Exhibit Number 9 and ask you if you've ever seen this document?
A. Yes. 1:59:14
Q. And what -- what is it?
A. This is an email from Dana Kurtz to me, Nurse Shelby, and Peter Kramer.
Q. And what's the date of this?
A. December 21st, 2016.
Q. Okay. And it has -- on top, it says, "To," and then it's to you at cookcountyil.gov, correct?
A. Yes.
Q. Was that your correct email back on December 21st --
A. Yeah.
Q. -- 2016?
A. Yes.
Q. And Winifred Shelby is listed at cookcountyil.gov, would that have been her correct

Page 112

email?
A. Yes.
Q. Do you recall receiving it on November (sic) 21st, 2016?
A. No, I know I -- I've seen it. I don't recall the date that I read it.
Q. Do you have any reason to doubt that that would have not been sent to you on November (sic) 21st?
A. That would have been sent to me on that day?
Q. Yes. 2:00:13
A. No, it says that's the date sent, I just don't know what day I saw it.
Q. Okay.
MS. MARMOR: And just -- I just want to make, for the record, clear because this is not a Bates stamped version of this document, that it looks like this is a document that was filed at the outset of this case. I do believe there are identical date -- Bates stamped versions of it --
MR. LINDEN: No, that's true.
MS. MARMOR: -- in the case.
MR. LINDEN: And if you want, it came from the motion for a temporary restraining order.
MS. MARMOR: I figured it was, but I just -- I wanted to make sure we weren't confused later on.

Page 113

MR. LINDEN: Okay.
Q. Can you just read the first two paragraphs of this email?
A. "Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the sheriff's office and other possible individual defendants. I understand that you placed him on leave in order that he cannot return to work until he completes the attached HIPAA authorization form. On what legal basis or policy provision do you and the sheriff's office have to order him to complete this form for his personal medical records? Officer Nawara and I," in parentheses, "believe that such an order is unlawful."
Q. Did you ever respond to this email, if you recall?
A. I -- I don't recall. 2:01:30
Q. Is it something you would recall if you would have responded to?
MS. MARMOR: Objection. Calls for speculation.
A. There would be a document if I did. I just -- I don't recall if I did or not.
Q. Would you consider that to be a response from Mr. Nawara to your request -- request regarding for him

Page 114

-- or demand that he signs medical release forms?
A. Not necessarily.
Q. Okay. When you say, "Not necessarily," would that be a yes, or a no, or a maybe?
A. Well when I receive documentation from attorneys, I deal with our law department in how to respond or if to respond.
Q. Okay. Do you know whether or not you specifically dealt with your law department when you got this email on December 21st, 2016?
A. Yes, I did.
Q. Do you recall who you dealt with?
A. Kate Christy and probably Nick Scouffas as well.
Q. Did you seek advice to them regarding an employment matter within the sheriff's office when you contacted them?
MS. MARMOR: You mean "advice from them"? You said, "Advice to them."
MR. LINDEN: Advice from them.
A. I called them --
MR. LINDEN: Yeah. 2:02:36
A. -- with advice. Yeah, I -- I would have forwarded what I received and asked them what next steps should be.

Page 115

Q. Do you recall -- and don't answer right away, because give your counsel a chance to object, do you recall what advice they gave you, if any, when you forwarded this to them?
MS. MARMOR: And I'm going to instruct you not to answer that question based on attorney-client communication and privilege.
WITNESS: Okay.
Q. And you're going to heed your attorney's advice --
A. Yes.
Q. -- and you understood the question, you're going to refuse to answer?
A. Yes, I am.
Q. Did that advice, if any, that was given to you relate to an employment decision, or did it relate to anticipation for litigation?
MS. MARMOR: Object to the form. 2:03:21
A. It related to this whole situation with Officer Nawara.
Q. Okay. Prior to your letter of November 30th, the prior Exhibit, was Mr. Nawara ever given any written notice that he had to complete the authorization forms, if you know?
A. I -- I'm not certain.

Page 116

Q. Okay. The next paragraph, Ms. Kurtz says, "Officer Nawara has not been given any notification of any complaint or allegations against him," as of that date, do you know whether or not that's a true statement?
A. It's not a true statement.
Q. How so?
A. Well we met with Officer Nawara and told him why we wanted to meet with him. In the meeting, we discussed what led to the meeting, so he was aware that there were allegations against him.
Q. Okay. It also says, directed at you and Ms. Shelby, "You also refused to provide him with any information other than he was being ordered to sign the HIPAA release form." Is that true or false?
A. That's false. 2:04:48
Q. Okay. What other information was given to him?
MS. MARMOR: Object to the form.
A. Well I -- I -- my -- essentially described the meeting before, you know, the nurse would explain why we had asked him to come to HR, you know, what the concerns were, and again, I don't know how far along we got in discussing the process -- or the nurse got in discussing the process with him because, you know, it

Page 117

wasn't really an interactive type of meeting as they typically are, and it ended abruptly with him leaving. So I'm not certain exactly how much information he received, but he definitely was aware of why he was there. He wasn't just handed forms and pushed out the door.
Q. Based on Exhibit Number 9, is it true that he had not responded to you as of February of 2017?
MS. MARMOR: Mr. Nawara had not responded? 2:06:05
Q. Or -- or on behalf of his lawyer?
MS. MARMOR: Object to --
Q. At that time, his lawyer had responded on his behalf, correct?
MS. MARMOR: Object to the form.
A. I'm sorry, can you repeat the question?
Q. The prior Exhibit, Number 8, was dated 2/28/17, correct?
A. Yes.
Q. And when you wrote this letter, his lawyer, Dana Kurtz, had responded regarding the release forms on 12/21/16, correct?
MS. MARMOR: Object to the form.
A. Yes, her email is from December 2016.
Q. Okay. Do you know if you ever contacted Dana Kurtz from 12/21/16 up until February 28th, 2017?

Page 118

MS. MARMOR: About Mr. Nawara?
MR. LINDEN: Yes. 2:07:03
A. I am not certain if I did. There would be a document if I had responded to her email.
Q. Have you seen any documents shown that you responded to the email?
A. I don't recall.
Q. Is there any reason why you apparently did not respond to this email?
A. I will --
MS. MARMOR: Objection.
Q. Would it have been based on conversations you had with the legal department?
A. Yes.
Q. So I take it they told you not to respond to her?
MS. MARMOR: Objection.
MR. LINDEN: I --
MS. MARMOR: I'm instructing you not to answer -- answer that --
MR. LINDEN: I think she kind --
MS. MARMOR: -- question.
MR. LINDEN: I think she kind of did. I'm sorry.
WITNESS: Not at all.

Page 119

MR. LINDEN: I'm joke -- I'm being sarcastic.
Q. Had they told you to respond to it, I take it you would have responded?
MS. MARMOR: Objection. 2:07:47
Q. No, you don't have to answer that. Let's see, I'd like to show you Exhibit Number 10 and ask if you've ever seen this document before?
A. Yes.
Q. And this is an email from Dana Kurtz to you, correct?
A. Yes, to me, Nurse Shelby, and Peter Kramer.
Q. And it's dated January 31st, 2017 at 4:23 p.m.?
A. Yes. 2:08:53
Q. And I take it you have no doubt that you received it on that date and that time on January 31st, correct?
MS. MARMOR: Object to the form.
A. Yeah, it was sent that day. I don't know what day I actually read it, but it was sent that day, according to the email.
Q. Was it your practice to read your emails at or near the time that they would have been received?
A. As soon as I am able, yes.
Q. And Peter Kramer, who is Peter Kramer?

Page 120

A. He is an attorney with the sheriff's office.
Q. Did he work with Ms. Christy?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. At this time, I'm not certain if he was working in the law department or not.
Q. Yeah. Were you dealing with Mr. -- Attorney Kramer at that time involving John Nawara?
A. Not specifically, no. 2:09:45
Q. And can you just read this email that was sent to you?
A. "We received no response to my email below. If Officer Nawara is not reinstated immediately before the end of this week, with his time and all benefits and salary -- salary reinstated as well, then we will file suit next week and request -- request -- request reimbursement of his time, salary, and attorney's fees. Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or place him on leave without pay. This is clear retaliation for his complaint against Superintendent Jones-Hayes for her harassment of him. I look forward to hearing from you."
Q. Was Ms. Kurtz correct in the first sentence saying that, "We received no response to my email

Page 121

below," which refers to the December 21st, 2016 email?
A. Again, I don't recall if there was a response, but --
Q. Okay.
A. -- there would be a document if -- if there was a response --
Q. Okay. And again --
A. -- from me.
Q. -- you don't know of any document, correct?
A. I do not. 2:10:52
Q. Do you know if you ever responded to this January 31st email from Ms. Kurtz?
A. I don't recall.
Q. Would there be a document if you -- had you responded?
A. Yes.
Q. And do you know of any documents showing that you responded?
A. I do not.
Q. Do you know why there is no such document?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
Q. If you know.
A. I -- I'm sorry, what was the question?
Q. Do you know why there isn't a document

Page 122

showing that you responded to the January 31st, 2017 email from Ms. Kurtz?
MS. MARMOR: Same objection and -- and assumes facts not in evidence.
A. No, I don't.
Q. Is there a document that you know of showing that you responded to this email?
A. I do not know.
Q. Do you know what you did when you got this email?
A. I would have referred to the law department.
Q. Okay. Do you recall specifically referring it to the law department?
A. Yes. 2:11:57
Q. Do you recall specifically who you referred it to?
A. To Kate Christy.
Q. And I take it you got advice from Ms. Christy?
A. Yes, any -- any correspondence from attorneys, I would refer to the law department.
Q. Do you know if Ms. Christy ever responded to Ms. Kurtz from this email?
A. I don't know.
Q. Do you know if Ms. Christy or anybody else in

Page 123

the law department responded to her as a result of the December 2016 email that's marked Exhibit Number 9?
A. I'm not certain.
Q. Did you ever contact Ms. Kurtz and try and work something out regarding limiting the medical release?
A. No.
Q. Did anything prevent you from contacting Ms. Kurtz to try and get an agreement to limit the scope or the breadth of the medical releases?
A. I --
MS. MARMOR: Objection. Calls for speculation. 2:13:02
A. I wouldn't have worked personally with an employee's attorney.
Q. But I guess what I'm asking is did anything prevent you from doing it if you wanted to?
MS. MARMOR: Object to the form and argumentative.
A. I -- I -- like I said before, any correspondence from attorneys, I would handle -- hand to our law department for them to handle any kind of communications.
Q. Was there a written procedure or rule that required you to have the law department respond to

Page 124

attorney communication rather than you responding?
A. That's the job of the law department, is to handle the other lawyers that --
Q. Okay. I'm not --
A. -- reach out to us.
Q. I'm not really questioning what your testimony is, I'm just saying is there a written rule or procedure -- procedure that would have prevented you from responding directly to Ms. Kurtz?
A. That's the procedure I follow.
Q. Okay. But do you know of any written procedure is my question?
A. I don't know.
Q. Do you know why it is nobody from legal responded to it?
MS. MARMOR: Objection. Lack of foundation.
A. I --
WITNESS: Oh, I'm sorry. 2:14:04
MS. MARMOR: It's -- go --
A. I don't know if they did, and if they did not, I don't know why.
Q. When you referred it, was it your understanding that somebody would respond to Ms. Kurtz from legal?
MS. MARMOR: Objection. I'm -- I'm going to

Page 125

instruct you not to answer that question.
Q. Based on advice of counsel, are you refusing to answer the question?
A. Yes.
Q. I'd like to hand you Exhibit Number 11.
MR. LINDEN: I'm sorry --
Q. And if you can, identify this document.
A. It's an email from me to Dana Kurtz. 2:15:31
Q. So in this email, did you communicate directly to Ms. Kurtz, the lawyer for Mr. Nawara?
A. I did.
Q. What's the date of this email?
A. March 13th, 2017.
Q. And can you read the first paragraph?
A. "Ms. Kurtz, during the fitness for duty process, I intend to communicate directly with Mr. Nawara."
Q. And do you know why it is that you're telling her that you're going to communicate directly with her client and not with -- with her?
A. I do.
Q. And what is it?
MS. MARMOR: Is this something that would -- would -- would be based on advice of counsel?
WITNESS: Yes.

Page 126

MS. MARMOR: So I'm going to instruct her not to answer.
Q. So I take it you understood the question, but based on advice of counsel, you're refusing to answer the question?
A. That's right. 2:16:31
Q. Okay. In this email, you write, "It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo a fitness for duty prior to returning the employee to work," that's -- are those your words?
MS. MARMOR: Are you asking if she wrote that?
MR. LINDEN: Yes.
WITNESS: I'm unsure how to --
MS. MARMOR: You can -- you can --
WITNESS: -- answer.
MS. MARMOR: He's only asking if you actually wrote those words in the email, that's -- that's -- you can answer that.
WITNESS: I still have a --
MS. MARMOR: You need to --
WITNESS: -- question.
MS. MARMOR: Do you -- we -- can we take a --
MR. LINDEN: Yeah, sure.

Page 127

MS. MARMOR: Yeah.
MR. LINDEN: Yeah.
RECORDER: Off the record, 12:46 p.m.
(Off the record)
RECORDER: Back on the record, 1:26 p.m. 2:17:33
Q. Ms. Reierson, on Exhibit Number 11, can you read the second paragraph? I don't think we did yet.
A. "Mr. Nawara has been ordered to complete an FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. It is well settled that a law enforcement agency may order an employee about whom they have fitness concerns to undergo an FFD prior to returning the employee to work."
Q. I'm sorry, I meant the third paragraph.
A. Okay.
MS. MARMOR: Oh.
A. "I have provided Mr. Nawara more than ample time to complete this FFD. In fact, I first requested he sign the HIPAA" -- oh, my grammar. "I first requested he sign the HIPAA in November 2016. If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered to not be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible

Page 128

discipline, including termination. Your indication that our practice is unlawful is not correct or supported by the law, therefore, his reliance on this position is not our concern and is not a reason to hold up the FFD process any further."
Q. Are these all your words in the third paragraph, or did some of those words come from legal?
A. All this language came from legal. 2:18:58
Q. Okay. This statement says, you know, in your email, "Your indication that our practice is unlawful and not correct or supported by the law," do you know of any law that would support requiring Mr. Nawara to sign Exhibit Number 2 with -- without basically any limitations on scope or time?
MS. MARMOR: Object to the form and the characterization of the document.
MR. HENRETTY: Join.
A. I'm sorry, can you repeat that question?
Q. Yeah, if you want -- if you want to look back in Exhibit Number 2, but do you know of any law offhand, and if you do or don't, that's fine, that indicates that you could require an employee to sign a waiver form in the form of Exhibit Number 2?
A. This is the form -- Exhibit 2 is the form that allows the sheriff's office to review his

Page 129

evaluation.
Q. I'm sorry, I meant Exhibit Number 1, the one with the three blanks on -- three boxes. I think that's Exhibit 1, right?
MS. MARMOR: Oh. 2:20:13
MR. BUSTAMANTE: Yeah.
Q. Exhibit 1, I'm sorry, do you know of any law that would -- would require an employee to sign a document in the form of Exhibit Number 1 that's not limited to scope or time?
MS. MARMOR: Same objection as the last time.
A. I guess I don't know exactly what you're saying. I mean, the form hasn't been completed, because we didn't -- it wasn't -- it would be discussed with the employee.
Q. Okay. I'm not asking reasons why, but do you know of any case law or law that would require an employee to sign a form that's in the form of Exhibit Number 1?
MS. MARMOR: Same objection.
MR. HENRETTY: "In the form"?
A. I'm -- I think I'm -- I'm missing --
Q. Okay. And --
A. -- what you're trying to ask me here.
Q. -- I think we both agree that it's -- it's

Page 130

not limited in time, right, the way it's written, Exhibit Number 1?
MS. MARMOR: Same objection. 2:21:10
Q. Correct?
A. Well because it is not completed, yes.
Q. Okay. And it's not limited regarding the type of medical records that would be released, correct?
MS. MARMOR: Same -- same objection.
A. Right -- well I mean, because it's only a blank form.
Q. Okay. But the way it's written, it's not limited to the type of medical records, correct?
A. You mean -- I'm sorry, the way the form is created?
Q. Yes.
A. Well I mean, it has lines to include what the limiting information would be, it's -- this is just a blank form.
Q. Okay. And -- and that's a form you're requiring him to sign in this email dated March 13th, 2017, correct?
MS. MARMOR: Objection. Assumes facts not in evidence. 2:21:53
A. So I -- like I said before, when we meet with

Page 131

the employee is when the nurse completes this form to -- you know, so it's determined what's being requested or what might be needed for the situation, but it wasn't filled out with him.
Q. Okay. I understand it's not your words, but this email from you says, "If he does not sign and return the form within the next seven days, by March 20th, 2017, he will be considered not to be engaged in the FFD process and his absence will be deemed unauthorized, subjecting him to possible discipline, including termination." This sentence is explicitly referring to Exhibit 1, correct?
MS. MARMOR: Objection. Lack of foundation.
A. It's referring to this form, you're -- you're asking?
Q. This specific document, is it not?
MS. MARMOR: Same objection. 2:22:50
A. I think it's referring to the document in Exhibit 2 --
Q. So Mr. --
A. -- the HIPAA form.
Q. Was Mr. Nawara required to sign Exhibit Number 1 in order for him not to be subject to discipline, according to this March 13th, 2017 email?
MS. MARMOR: Objection to the form and lack

Page 132

of foundation.
A. No, I mean the email is referring to this document, the HIPAA form.
Q. So is it your testimony that had he signed Exhibit Number 2 and not Exhibit 1, that that would have been okay with the sheriff's office --
A. Well --
Q. -- or was he required to file -- sign both?
A. Well I think if he had signed this or done something for us to kind of engage in a conversation, we could have had gotten the process started.
Q. Okay. Ms. Kurtz did try and engage in a conversation, did she not, by her prior two emails that we went through?
MS. MARMOR: Objection. Argumentative. Lack of foundation. 2:24:02
A. I'm -- you --
Q. Isn't it true that Ms. Kurtz, by her prior two emails, the December one and the January one that you referred to legal, that she did attempt to engage in a process with the sheriff's office?
MS. MARMOR: Object to the form. Lack of foundation.
A. Sorry, I'm just looking for the document. Well she demanded he be reinstated. It doesn't look

Page 133

like she was trying to engage in a conversation, I guess.
Q. But she also object to him signing a blank form, correct?
MS. MARMOR: Objection. Lack of foundation. It mischaracterizes the document.
A. She objected to him signing the -- the HIPAA authorization form, this Exhibit 2.
Q. Okay. 2:25:19
A. This.
Q. She also signed -- objected to signing Exhibit Number 1, correct?
MS. MARMOR: In what letter or what email?
Q. Which one are you looking at, the December 21st one?
A. Exhibit 9, December 21st.
Q. Okay. If you'd go back -- go back to Exhibit Number 8 for a second, I think that's still in front of you. You see Exhibit 8, which is your letter dated --
A. Oh. 2:26:07
Q. -- 2/28/17?
A. Yes.
Q. Okay. And you talk about the forms that Mr. Nawara needed to sign in order not to be subject to discipline, correct, in this letter?

Page 134

MS. MARMOR: Objection. That's not what that letter says.
A. So I'm sorry, what did you want me to --
MS. MARMOR: So --
A. -- read?
WITNESS: Oh.
Q. Okay. Your -- let me strike that question. But your letter dated February 28th, 2017 complains that Mr. Nawara had not returned the forms in plural, correct? And if you -- if you want to read it, you can, that's fine.
MS. MARMOR: It's in the second full paragraph.
WITNESS: Oh. 2:26:57
A. Yes, it says, "Documents and forms," plural.
Q. So according to this letter, is it a fair statement that Mr. Nawara, in order not to be subject to discipline, at least as of February 28th, 2017, was required to sign Exhibits 1 and Exhibit 2?
MS. MARMOR: Objection. That is not what the letter says, it does not say, "Discipline" number one, and number two, that assumes facts not in evidence.
Q. You can answer if you understand the question.
A. So it -- it says that, "If the forms aren't

Page 135

received, your time will be -- since -- your time off will be deemed unauthorized," which is not the same as discipline.
Q. Okay. Well what does it mean when your time is deemed unauthorized compared to what his status was before this?
A. So he was off, he -- there really was no official status for him. He wasn't on an approved leave, but he hadn't been deemed unauthorized, so it's just a way of characterizing the time, but it's not necessarily something that would be disciplinary.
Q. What happens when -- what are the consequences when somebody is deemed to be an unauthorized absence?
MS. MARMOR: Objection. Lack of foundation. 2:28:15
A. It's a process, it goes through employee discipline.
Q. Can the employee --
A. But --
Q. -- be disciplined if his absence is, quote, "unauthorized," unquote?
A. It's -- it's a possibility depending on the circumstances.
Q. Well one of your job functions in HR is to deal with authorized versus unauthorized absences,

Page 136

correct?
MS. MARMOR: Objection. Lack of foundation.
A. Not as it relates to discipline, no.
Q. So is it fair to say that as of 2/28/2017, the sheriff's office was requiring Mr. Nawara to sign Exhibits 1 and Exhibit 2 in order to complete the fitness for duty process?
MS. MARMOR: Objection. Lack of -- lack of -- excuse me. Assumes facts not in evidence.
A. Right, or contact us if he wanted additional information --
Q. Am I -- if I --
A. -- or guidance. 2:29:10
Q. If I'm wrong, just correct me, but is it true that he was required to sign both forms and not just Exhibit 2 as of 2/28/17?
MS. MARMOR: Except -- objection. Asked and answered. She just clarified the answer.
A. So the -- the letter is asking him to complete the forms and return them or contact us.
Q. So --
A. So if -- if he had an issue with the forms, I mean, then he should have contacted us to discuss the forms. That's what the letter is saying.
Q. Okay. But it's true that Ms. Kurtz did

contact you --
MS. MARMOR: Object --
Q. -- and any -- anybody could have reached out to Ms. Kurtz. Isn't that correct?
MS. MARMOR: Objection. Argumentative.
A. The -- the question is I -- if -- could anyone have reached out to Ms. Kurtz?
Q. You had the ability to reach out to Ms. Kurtz, correct, if you wanted to?
MS. MARMOR: Same objection. 2:30:05
A. Yeah, I -- I would only reach out to the attorney if I was directed to do so.
Q. Okay. But there is no rule prohibiting you from contacting Ms. -- Ms. Kurtz directly and asked her, "Can we come to some type of an agreement with the forms?" was there?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. Yeah, I guess I don't know what kind of rule it would be.
Q. Okay.
A. But like I said before, any communication from an attorney will go to our law department.
Q. Do you know of any communication either to Mr. Nawara or to Ms. Kurtz, written communication,



saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?
MS. MARMOR: Objection. Assumes facts not in evidence. 2:30:54
A. Of the documents I have here, are you asking that, or?
Q. I -- I'm asking in your whole breadth of your knowledge, are you aware of any document that either went to Mr. Nawara or Ms. Kurtz saying that Mr. Nawara was only required to sign Exhibit Number 2 and not Exhibit Number 1?
MS. MARMOR: Same objection.
A. Yeah, I -- I can't recall a document that specifically says that, no.
Q. And if you would have written such a communication to either Mr. Nawara or Ms. Kurtz, there would be a written record of it, correct?
MS. MARMOR: Object to the form.
A. There should be, yes.
Q. And if somebody else within the legal department would have written such a letter, that should have been produced in this litigation --
MS. MARMOR: Objection --
Q. -- would you agree?
MS. MARMOR: Objection. That's --



A. I can't --
MS. MARMOR: She can't answer --
A. -- comment on that.
MS. MARMOR: -- that question.
Q. But you would expect that such a document would -- would exist if that was done, right?
MS. MARMOR: Object to the form and calls --
A. I can't --
MS. MARMOR: -- for speculation. 2:31:58
A. I'm -- I -- I -- so what is the question now? I apologize.
Q. If a letter was written by anybody else at the sheriff's office to either Ms. Kurtz or Mr. Nawara indicating, "You're not required to sign Exhibit Number 1, but all we need is Exhibit Number 2," you would expect that there would be a record of it within the sheriff's office, wouldn't you?
A. Most likely, yes.
Q. Okay. And when your, on Exhibit Number 11, March 13th, 2017 email refers to the FFD process, that's a process for the fitness for duty evaluation?
A. FFD returns -- I'm sorry, refers to fitness for duty.
Q. What do you mean by "process"? 2:33:02
A. To deal with the occupational health nurse to



determine what medical records or psychological records would be necessary for the exam, getting those documents to CorVel, scheduling an appointment through CorVel with the selected doctor, and meeting with the doctor and cooperating.
Q. I take it part of that process, in order for that to occur, would -- according to the sheriff's office, would require Mr. Nawara to sign both Exhibits 1 and 2, correct?
MS. MARMOR: Objection. Argumentative. Assumes facts not in evidence.
A. Yeah, I mean, without -- I mean, without having the particulars from Mr. Nawara, it's hard to say exactly what he would have been required to do in terms of what would have been required to be turned over.
Q. You would have needed the release -- at least a release signed by him in order for him to --
A. Because he -- he --
Q. -- get the fitness for duty evaluation. Is that fair?
MS. MARMOR: Object to the --
WITNESS: Sorry.
MS. MARMOR: -- form. Go ahead. 2:34:14
A. So when he signs -- when the employee signs a

release that's in -- this Exhibit 1 is the form that the employee would give to his or her physicians in order to --
Q. Okay.
A. -- receive the records.
Q. Okay. We talked a little bit a few minutes ago about Exhibit Number 8, which is your 2/28/17 letter, you see it there?
A. Yes. 2:35:05
Q. And -- and your letter, again, refers to the forms in plural, correct?
MS. MARMOR: Yeah, I -- objection. Asked and answered.
MR. LINDEN: It's -- it's just lead up and foundation coming for the next --
A. It does --
MR. LINDEN: -- question.
A. -- say, "Forms," in plural, yes.
Q. Okay. And you -- you actually attach the forms or include it with your 2/28/17 letter, correct?
A. It says, "I have enclosed another copy of the forms."
Q. Okay. And there is two forms attached --
A. Yes.
Q. -- to this letter, correct?



A. Yes.
Q. And they are Bates stamped Nawara 000059 and Nawara 000060, see it in the bottom right corner?
A. Yes.
Q. And those are the exact documents that are Exhibits 1 and 2, correct? And you can -- you can compare them if you want.
A. Yes. 2:36:17
Q. Okay. And I'm going to hand you two Exhibits, one time this time. Okay. Hand you Exhibit Number 12.
MR. LINDEN: Here's --
MS. MARMOR: Thank you.
Q. And -- and Exhibit Number 13, I'll just ask you some questions --
MS. MARMOR: Rick, do you know when -- I -- I've never been able to figure out when Mr. Nawara actually sent this email.
MR. LINDEN: I'm not positive. I think they correspond in the next -- I think it's right around the date of the emails that are attached, because it looks like page 1 of 5, see, wasn't it?
MS. MARMOR: So it's after March 17th? 2:38:29
MR. LINDEN: Must be or somewhere right in there. There's a date -- yeah, that's a good question.



I couldn't -- you tried too, Sarah, figuring out when it was?
MS. MARMOR: I just -- I don't want to assume anything. I -- I --
MR. HENRETTY: No --
MR. LINDEN: Yeah.
MR. HENRETTY: -- no, no, I'm just saying it could be either of those things, could be --
MR. LINDEN: Had to have been after March 8th.
MS. MARMOR: I mean, normally, the last one is the most recent one.
MR. LINDEN: Yeah.
MS. MARMOR: So it seems like it's after March 17th --
MR. LINDEN: Yeah, I think so --
MS. MARMOR: -- but.
MR. LINDEN: -- had to have been --
MS. MARMOR: It's just hard to tell.
MR. LINDEN: -- after March 8th, right?
MR. BUSTAMANTE: Yeah.
MS. MARMOR: Right, the -- since the evaluation was March 8th.
MR. LINDEN: Oh, Perry Mason.
Q. I -- have you ever seen Exhibit Number 12 to



start with?
A. Yes, the email looks familiar.
Q. And that's an email from John --
A. Excuse me. Sorry. 2:39:24
Q. You got a cold? I'm --
A. It's at the tail end, thank goodness.
Q. Okay. Like some water or anything, or?
A. No, I'm fine.
Q. Okay.
A. Thanks.
Q. Okay. But this is an email from John Nawara to you, and Dana Kurtz is on here, and it looks like Peter Kramer also?
A. Yeah --
Q. Or Peter?
A. Yes.
Q. And do you know whether or not you -- do you recall receiving this email?
A. I do recall this email.
Q. Okay. And it refers, "See attached report from Dr. Kroll," and if you look at Exhibit 13, it's a report from a Dr. Robin Kroll, K-r-o-l -- K-r-o-l-l, see that?
A. Yes.
Q. And do you recall receiving this report that

was -- should have been attached to Exhibit Number 12?
A. I do.
Q. And do you know when you would have received it?
A. No. 2:40:21
Q. By looking at the dates, does it appear to be sometime around March of 2017?
MS. MARMOR: Object to the form. Why don't you say, "After March 17th"?
A. Yeah, I mean, it looks like he emailed me following an email that was sent to him on March 17th, so sometime after that.
Q. And what -- what did you do when you received Exhibit Number 12 along with the Exhibit Number 13?
A. I consulted our law department.
Q. And who would that have been with?
A. Kate Christy.
Q. And were you seeking advice how to respond, if -- if at all, to the email and the report from Dr. Kroll?
A. Yes.
Q. Did you receive advice regarding it from Ms. Christy?
A. I did. 2:41:13
Q. And can you tell us what advice that was?



MS. MARMOR: And I'm going to object and instruct you not to answer, although I think there is a document that -- that responded to this.
Q. Okay. Based on advice from counsel, are you refusing to answer the question?
A. Yes.
Q. You -- I take it you understood the question and you know the answer to the question?
MS. MARMOR: I --
MR. LINDEN: Or I can -- I can start -- I was trying to go quick.
Q. First of all, you understood the question, correct?
A. The -- can you repeat what the question is?
Q. First of all, you under -- the question that your lawyer instructed you not to answer, you understood what the question was, correct?
MS. MARMOR: The question where he was --
A. That's -- that --
MS. MARMOR: -- asking what advice was given to you.
MR. LINDEN: Yeah.
A. Oh, that was the -- okay.
Q. Sorry, it's more --
A. Yes, I -- I did.



Q. -- formality we have to do.
A. I did understand that question, yes.
Q. And if you were permitted to answer, you could have answered the question, I take it, correct?
A. Yes. 2:41:59
Q. Okay. Did you review this report when you received it from Dr. Robin Kroll?
MS. MARMOR: You mean -- mean Exhibit 13?
MR. LINDEN: Yes.
A. I did.
Q. And are you aware that Dr. Kroll performed what he (sic) called a fitness for duty evaluation of Dr. (sic) Nawara?
A. Yes.
Q. And you're aware the date of the evaluation is March 8th, 2017?
A. Yes.
MS. MARMOR: And just for the --
A. As --
MS. MARMOR: -- record, do we know if Robin Kroll is a man or a woman? You said, "He," but I don't know.
MR. LINDEN: I think it might be a she with Robin. I don't know why --
MS. MARMOR: Okay.



MR. LINDEN: -- sex was thinking. Kroll sounds like a guy, but -- all due respect to the doctor. I don't mean to --
WITNESS: I know a male --
MR. LINDEN: -- offend him or her.
WITNESS: -- Robin too, so you know.
MR. LINDEN: Could be both, right? I have no -- no idea. Do you, Peter, know?
MR. BUSTAMANTE: No. 2:42:54
Q. Have you ever heard of a Dr. Robin Kroll before?
A. Not outside of this document.
Q. Have you ever since heard of Dr. Kroll in any other document?
A. Not that I recall.
Q. Do you know what it means to be a board certified police and public safety psychologist?
A. I assume just what it says there.
Q. Does that indicate to you that he's (sic) qualified to perform --
MR. HENRETTY: It's -- it's a she.
MS. MARMOR: A she.
Q. -- a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.

A. Yeah, no, just that she -- the doctor would be certified as this type of psychologist.
Q. Do you know what Dr. Kroll's findings were?
MS. MARMOR: I'm going to object to the lack of foundation. 2:43:46
A. The doctor wrote that she suggested that he was fit for duty.
Q. And can you just, on page 4, right underneath "recommendations," just read the paragraph of Exhibit 13?
MS. MARMOR: And I'm going to object to lack of foundation for any use of this document for this witness, but go ahead.
A. "Deputy John Nawara received a fitness for duty evaluation to determine any implications of cognitive, emotional, and or behavioral impairment related to his conduct at work. Clinical interview and evaluation all suggest that Deputy Nawara is fit for duty. It is recommended that he return to work with no restrictions."
Q. As you sit here today, do you disagree at all with that conclusion?
MS. MARMOR: Objection. Lack of foundation. 2:44:41
A. Yeah, I wouldn't have any basis to agree or disagree with what the doctor wrote.



Q. It's, in fact, consistent with the ultimate fitness for duty examination that Mr. Nawara had with the sheriff's office's doctor, correct?
MS. MARMOR: Objection. Lack of foundation, and that's actually not correct, that's a mischaracterization of the second examination.
MR. LINDEN: Okay.
A. The independent fitness for duty evaluation through the sheriff's office found Mr. Nawara to be fit for duty.
Q. Okay. Was Dr. Kroll's report sufficient for the sheriff's office in order to find him fit for duty?
A. No. 2:45:29
Q. Do you know why that is?
A. Because it wasn't conducted by an independent doctor as far as we were aware.
Q. Okay. What information do you have to show that Dr. Kroll was, in fact, not independent?
MS. MARMOR: Objection. That mischaracterizes her testimony.
A. Well the reason we use a third party administrator is because we know it's someone selected by the company and not related to either party.
Q. Okay.
A. So that -- that's how we know someone is



independent for certain.
Q. Okay. Do you know whether or not Dr. Kroll was related at all to -- to John Nawara, or is --
A. I don't.
Q. Do you know whether or not Dr. Kroll is related to his counsel?
A. No.
Q. When you send an employee to -- to your, quote, "independent doctor" or "psychologist," like to Correl (sic), is that doctor paid by the sheriff's office?
MS. MARMOR: Excuse me, I think did you mean CorVel?
MR. LINDEN: CorVel, I'm sorry. 2:46:38
MS. MARMOR: Okay. And I'm going to object to -- more generally to the form.
A. So we send the referral to CorVel, who then -- sorry.
Q. Okay.
A. He was distracting me.
Q. Let me -- let me -- that's --
WITNESS: Are you okay?
MR. BUSTAMANTE: I'm --
Q. That's a -- that's a terrible --
MR. BUSTAMANTE: I'm laughing because --



MR. LINDEN: Yeah.
MR. BUSTAMANTE: -- he always mispronounces words.
MR. LINDEN: Yeah.
WITNESS: Oh.
MR. LINDEN: That's fair. I'm -- I'm --
WITNESS: Okay.
MR. LINDEN: I'm bad.
MR. BUSTAMANTE: Sorry.
Q. Who -- who is CorVel --
A. Sorry.
Q. -- paid by when you send the employee to CorVel? 2:47:05
A. So we send the referral to CorVel, CorVel reaches out and obtains a doctor for the fitness for duty evaluation, and then later, we're billed for the evaluation and for CorVel's services from CorVel.
Q. So you're paying the doctor in -- indirectly through CorVel, correct, meaning the sheriff's office?
A. The sheriff's office is paying for the evaluation?
Q. Yes.
A. Yes, we don't make the employee pay for their own --
Q. Okay.

A. -- evaluation.
Q. Do you have any information as you sit here today that Dr. Kroll was in any way bias in favor of John Nawara when he (sic) did her (sic) fitness for duty evaluation?
MS. MARMOR: She did his? 2:47:48
MR. LINDEN: Yeah.
MS. MARMOR: And I'm going to object to lack of foundation.
A. No, I would have no way of knowing one way or the other.
Q. Who made the determination that Dr. Kroll's fitness for duty evaluation was not sufficient for John Nawara to go back to work, was it you?
A. No.
Q. Who was it?
A. When I received this, I reached out to the law department for guidance.
Q. Okay. But somebody made a determination that "we're not going to accept Dr. Kroll's fitness for duty evaluation," correct?
A. Yes.
Q. And who made that decision?
A. The law department.
Q. Who within the law department?



A. I don't know. I know who communicated to me, but I don't know who made the decision.
Q. Okay. Who communicated that to you?
A. Kate Christy.
Q. Do you know anybody else that were involved in the decision not to accept Dr. Kroll's report?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:48:48
Q. Okay. But Ms. Christy did communicate to you that this would not be sufficient for John Nawara, correct?
MS. MARMOR: I -- I'm going to tell her not to answer that question. I think there is a written document which you can get that same information from, and so I'm going to tell her not to answer that question, but I think you can get the same fundamental information from a written document that's -- that's produced in this case.
Q. Based on advice of counsel, are you refusing to answer that question?
A. Yes.
Q. And you understand the question?
A. Yes.
Q. And if you were permitted to answer the question, you could have answered it, correct?



A. Yes.
Q. Okay. What was John Nawara's status with the sheriff's office as of March of 2017?
MS. MARMOR: Object to the form. 2:49:48
A. He was just not reporting to work.
Q. Was he on what they call unpaid leave?
A. I mean, he wasn't --
MS. MARMOR: Object to the form.
WITNESS: Oh, I'm sorry.
MS. MARMOR: And I don't know who "they" is.
MR. LINDEN: Okay.
MR. BUSTAMANTE: Good point.
A. So when I think of leave, I think of you being off in an approved status, I guess, so I -- I don't know how you classify. He just -- he -- he wasn't following the -- the process in order to be able to return to work, so.
Q. So at that time, is it fair to say that he either wasn't being paid or he had to use his own days to get paid?
A. Yes. 2:50:26
MR. LINDEN: So -- emailed the documents pretty well.
MS. MARMOR: Uh-huh. 2:51:47
Q. I'd like to show you Exhibit Number 14, I



think that's what you're talking about here.
MS. MARMOR: Here to help.
MR. LINDEN: Okay. No, I don't think you are. All right.
MS. MARMOR: I object.
Q. Do you recognize page 1 of Exhibit Number 14, the first email?
A. Yes.
Q. And is that from you to Dana Kurtz?
A. To Dana Kurtz and John Nawara, and Peter Kramer is cc'd.
Q. So you're working weekends, right, Saturday, March 18th at 11:52, you sent it, right?
A. 24/7.
Q. Okay. And -- and can you read your email?
A. "Officer Nawara, thank you for your email. However, the document attached is insufficient to allow your return to work. Please return the signed release documents as previously instructed so we can begin the proper fitness for duty procedure."
Q. Okay. And when you say, "The document attached," you're referring to Dr. Kroll's report in Exhibit Number 13, correct?
A. Yes. 2:53:01
MS. MARMOR: I stole your version, I'm sorry.

MS. HONINGFORD: Oh, it's okay.
Q. And when you indicate in this email, "Please return the signed release documents, as previously instructed, so we can begin the proper fitness for duty procedure," you're referring to Exhibits 1 and 2. Is that fair?
A. Yes.
Q. Okay. The day before, on Friday, March 17th, there is an email from John Nawara to you copied, with Peter Kramer copied. Do you see that?
A. Yes.
Q. And do you know whether or not you received this email from Mr. Nawara?
MS. MARMOR: That's -- that's the same email we just looked at.
MR. LINDEN: Was it? Yeah, no, you're right.
MS. MARMOR: Which answers the question --
MR. LINDEN: Okay.
MS. MARMOR: -- what date it was sent.
MR. LINDEN: Gotcha. Okay.
Q. Correct, that one --
A. Yes, it was in --
Q. Okay. 2:54:02
A. -- the previous Exhibit.
Q. Okay. Now Mr. Nawara informed you that Dr.



Kroll was an independent doctor and not his doctor. Isn't that a fair statement?
MS. MARMOR: Where does it say that? Oh, yeah.
Q. That right?
A. Yes, he wrote that.
Q. Okay. Did anybody within the sheriff's office disagree with that statement --
MS. MARMOR: Object to --
Q. -- that you know of?
MS. MARMOR: Objection. Lack of foundation.
A. I'm -- I don't know.
Q. That you know of? Did you disagree with the statement that Dr. Kroll was an independent doctor and not John Nawara's doctor?
MS. MARMOR: Objection. Lack of foundation.
A. I might -- I think it's a statement you don't take at face value. We -- we had -- no one had any idea if that was true or not.
Q. Okay. But you don't have any information to dispute that. Is that a fair statement?
A. I do not, no.
Q. Do you know of any information that exists within the sheriff's office that would dispute the statement that Dr. Kroll is an independent doctor?



A. I don't have any information, no. 2:55:04
Q. Okay. Okay. On this date, March 17th, the previous email sent to you by Mr. Nawara, isn't it correct that he informed you that, quote, "I feel the order for me to sign a blank HIPAA release was unlawful and violates the American with Disabilities Act and is in retaliation for my prior suit against the sheriff's office in which the jury found the sheriff violated my and other officers' first amendment rights and retaliated against us because of our political support for the opponent to Sheriff Dart and because of my complaints of harassment by the supervisor." He informed you of what he believed, correct, in this?
A. He did write that, yes. 2:55:53
Q. Okay. We might have talked a little about the third page of Exhibit 14, which was an email from Ms. Kurtz to you dated March 13th.
MS. MARMOR: I think this is the first time we're talking about it.
MR. LINDEN: Oh, is it? Okay.
MR. HENRETTY: You had to tell him?
MS. MARMOR: Sorry.
Q. Can you read the second full paragraph -- or first of all, did you receive this email?
A. Yes, I did.



Q. And that's an email dated Monday, March 13th, 2017 from Dana Kurtz to you?
A. Yes.
Q. That was a copy to Peter Kramer and John Nawara?
A. Yes. 2:57:05
Q. Okay. And can you read the paragraph where it starts "Second," comma?
A. "Second, Officer Nawara has been placed on an unpaid leave and is burning his sick and vacation time to his detriment, which he will run out of soon because he would not sign a HIPAA medical release form for his own medical records without limitation of time, scope, or any other limitations, setting aside that such a request is unlawful in the first place. He is also being denied promotions and other special assignments as a result as well. I have requested that his time be reinstated, also with no response from you or the sheriff's office. All of this has caused Officer Nawara -- Nawara irreparable harm and will continue to if he is not allowed to return to work and his medical and vacation time is not restored. As I have mentioned in my prior emails, we will be forced to file suit and a temporary restraining order seeking injunctive relief if this is not immediately remedied."

Page 161

Q. What did you do, if anything, when you received this email on March 13th?
A. I forwarded it to the law department. 2:58:15
Q. And that would have been Ms. Christy again?
A. Yes.
Q. Did you -- did you forward it to her for advice in how, you know, this email should be responded to?
A. Yes.
Q. Did you receive advice from her?
A. Yes.
Q. Do you recall what that advice was?
MS. MARMOR: You can say if you recall what it was, you can't say what it was.
A. Yeah, I -- I don't recall what the advice was.
Q. Okay. Do you recall the gist of what she said in how to respond to her?
MS. MARMOR: Again, he's only asking if you recall the gist --
Q. And I don't want you to --
MS. MARMOR: -- not the actual --
Q. -- disclose it, but --
MS. MARMOR: Right.
Q. -- do you recall generally what the advice

Page 162

was?
A. I do not.
Q. No, okay. Did you reach out to Ms. Kurtz at all after receiving this March 13th email to discuss with her limitations of time and scope on the forms?
A. I'm not certain. If I did, there would be a document.
Q. Okay. If you --
A. But I don't recall if I did or not. 2:59:20
Q. Would it be something you ordinarily would do if you received a letter like this from a lawyer, or would that be something you'd refer to legal to do?
MS. MARMOR: Objection. Calls for speculation.
A. I would refer it to legal, and then whatever the advice was, I would follow, whether that was --
Q. Okay.
A. -- me responding or the law department responding.
Q. Okay. If you turn to the next page, which is stamped Nawara page 84.
MS. MARMOR: Thank you for skipping the zeros. 3:00:07
MR. LINDEN: I hate when people say six zeros and --

Page 163

Q. And if you could start with the paragraph that starts, "Fifth," comma?
A. "Fifth, in addition to the above, Officer Nawara has been provided no information as to who would be doing the fitness for duty exam -- the FFD examination, nor has he been ordered to see any doctor. He was only ordered to complete a HIPAA form so that the sheriff's office could obtain Officer Nawara's person -- own personal medical records, which is in violation of the ADA and violates his privacy rights."
Q. Okay. With respect to the first sentence of that paragraph, is there anything in that first sentence that is inaccurate?
MS. MARMOR: Object to the form.
A. No. 3:00:58
Q. Okay. Skipping the next sentence, and I'd like you to skip where the -- after the comma. I know you're not going to agree with that, "Which is in violation of the ADA and violates his privacy rights," the statement, "He was only ordered to complete a HIPAA form so the sheriff's office could obtain Officer Nawara's own personal medical records," do you disagree with that statement?
MS. MARMOR: Object to the form.
A. Yeah, it's -- it's an incomplete statement.

Page 164

Q. Just in -- incompleteness, but not the accuracy, I take it, right?
A. Well I think they go together.
Q. Okay. What's inaccurate about it?
A. Well I -- to me, it reads as though we just wanted his medical records, not that they were going to be provided to, you know, a doctor to actually complete the fitness for duty examination.
Q. Okay. Can you read the next paragraph, starting with "sixth"?
A. "Sixth, my additional email to which you finally responded was necessitated by the fact that your letter suggests that Officer Nawara did not respond to prior inquiries. In fact, he did. He retained counsel," parentheses, "me, to respond for him which we did and received no response from the sheriff's office until your email below."
Q. Is there anything in that paragraph that you disagree with?
MS. MARMOR: Object to the -- number one, object to the -- the lack of foundation, she didn't write this, and to the form.
A. I -- I mean, she's writing about what required her to do something, I can't really speak to whether that's true or not.

Page 165

Q. Do you disagree with her statement that, "Your letter suggests Officer Nawara did not respond to prior inquiries"?
A. My letter did suggest that, I would say, yes. 3:03:10
Q. And do you disagree with her statement that he retained counsel, Dana Kurtz, who responded for him, anything that you disagree with that statement?
MS. MARMOR: Objection. Lack of foundation.
A. I'm -- I knew she -- I know she sent an email. I'm not certain if she indicated that he had retained her as counsel.
Q. You can go back, if you want, to the -- I think your December 21st -- I think you have in front of you as Exhibit 5 or so. It's in front of me, let's see --
MS. MARMOR: And let me just be really clear because I -- I don't want to keep going around this.
MR. LINDEN: Yeah.
MS. MARMOR: My only objection is that you're asking her to accept her representation that she is responding for him as if that's sufficient. That -- that's really where the -- the -- the --
MR. LINDEN: Okay. Maybe we can --
MS. MARMOR: -- disagreement shows.
MR. LINDEN: -- shorten it.

Page 166

Q. Back in December of 2016, you were informed by Ms. Kurtz that she was representing John Nawara with respect to these issues, correct?
MS. MARMOR: Object to the form. 3:04:07
A. I'm --
MS. MARMOR: "These issues." But you can answer.
A. I'm not certain --
Q. You -- you can go back --
A. -- what she stated.
Q. -- and look at the document, but --
A. What was the Exhibit?
Q. In -- what Exhibit was that, 5? The December --
A. Oh, okay.
Q. -- 21st email, was it from Dana Kurtz to you, didn't she inform you --
A. Oh, she --
Q. -- she has been retained to represent John Nawara?
A. She did write that, yes.
Q. And from this email, it's clear that she was representing him regarding the issues relating to the fitness for duty evaluation process, correct?
MS. MARMOR: Hang on, I -- I need to read.

Page 167

Which -- which --
WITNESS: Exhibit 9.
MS. MARMOR: 9. Okay. I'm going to character -- characterization.
A. So I'm -- I'm sorry, what was the question?
Q. That in her December 21st email in front of you, correct, do you see that?
A. Yes. 3:05:00
Q. She informed you that she was representing Mr. Nawara related to matters in connection with his fitness for duty issues?
MS. MARMOR: Object -- object to the form.
A. She wrote, "With respect to potential claims he has against the sheriff's office."
Q. And those related to the release forms, yes?
MS. MARMOR: Objection. That's not what this says. You can answer it "yes" or "no" if you understand the question.
Q. And you could explain it, if you'd like, or --
A. I apologize, what was --
Q. What --
A. -- your question? 3:05:59
Q. What was -- what was your understanding from the December 21st email from Ms. Kurtz of what this --

Page 168

what she was representing Mr. Nawara in?
A. My understanding was that he didn't want to go for a fitness for duty and she was representing him to argue that point for him.
Q. Okay. All right. Get that from you, just one second. I'm sorry. In Exhibit 9, isn't it true that she asked, "On what legal basis or policy provision do you and the sheriff's office have in order to -- to order him to complete this form for his personal medical records?" question mark. "Officer Nawara and I believe that such an order is unlawful." She communicated that to you, did she not, in the December 21st, 2016 email?
A. She did write that, yes. 3:06:57
MR. LINDEN: This will go faster.
MR. BUSTAMANTE: Promises, promises.
MR. LINDEN: Yeah.
MR. BUSTAMANTE: Come on, Rick, let's get moving.
MR. LINDEN: Oh, you could help me over there -- what are you -- what are you doing on your computer? No, I'm joking.
MS. MARMOR: Words with Friends is so much fun.
MR. LINDEN: Isn't it?. Bless you.

WITNESS: Sorry. 3:07:53
MR. LINDEN: 25 -- oh, it's okay. I'm doing it in some kind of order, date order. This one. This should be an easy one.
Q. Show you Exhibit Number 15 and ask you if you've ever seen this document before?
A. Well I -- I must have. It was -- it's an email addressed to me. I don't specifically recall it.
Q. Do you know who Sean Lynch is?
A. Yes.
Q. Who is Sean Lynch?
A. He works in our payroll department.
Q. Do you know what his title was?
A. No.
Q. Helen Cohn, do you know who she is?
A. Yes. 3:08:58
Q. Who is -- who is Helen?
A. Sorry. She's the manager of payroll for the sheriff's office.
Q. Melody Morley, does she also work with payroll?
A. Yes.
Q. Deborah Munizzi, is --
MS. MARMOR: Munizzi.
MR. LINDEN: Munizzi. Sorry. Thanks,



appreciate it.
MS. MARMOR: I speak Italian.
Q. Is she in payroll?
A. Yes, she is.
Q. John Harrington?
A. John Harrington is in attendance review.
Q. Is that within HR?
A. Now it is. At this time, I don't think it was.
Q. Who is Ann --
WITNESS: Excuse me.
Q. -- Dunlap?
A. I don't know who that is. 3:09:36
Q. Okay. And you're being asked to determine the status for John Nawara as he -- he is unauthorized effective 4/25/17 move -- moving forward, were you able to determine -- determine the status?
A. I -- I don't recall what -- what the situation was at this time.
Q. Do you know whether or not Mr. Nawara was unauthorized effective 4/25/17?
A. I am not certain. I don't know when he returned to work.
Q. Do you have any reason to dispute what Sean Lynch wrote in this memo?



MS. MARMOR: Objection. Lack of foundation.
A. Well -- I mean, it could -- he could have been marked unauthorized.
Q. Okay. "Unauthorized" means -- if he is unauthorized on May 11th, how is that different than his prior status before 4/25/17?
A. It's just the entry on a timesheet. 3:10:48
Q. That would possibly make him subject to discipline. Is that a fair statement --
MS. MARMOR: Objection.
Q. -- being unauthorized?
MS. MARMOR: Objection. Lack of foundation.
A. It -- it would -- it would go before attendance review to see what the situation was.
Q. Do you know who the people were in attendance review, was that a department?
A. It -- it was just John Harrington, I think, at the time.
Q. Is that within HR, attendance review?
MS. MARMOR: Objection. Asked and answered.
A. It -- it is -- now, it's in HR. At this time, I think it was just kind of on its own.
Q. Okay --
MS. MARMOR: Do you need something? 3:11:55
WITNESS: I thought I had a cough drop, I'm



just looking.
MR. LINDEN: Well we had some --
MS. MARMOR: I have --
MR. HENRETTY: Yeah, that's a --
MR. LINDEN: Could we go --
MS. MARMOR: Oh, you have cough drops?
MR. LINDEN: Could we go off --
WITNESS: Oh.
MR. LINDEN: Yeah, could we go off the record a second?
RECORDER: Off -- off the record, 2:21 p.m.
(Off the record)
RECORDER: Back on the record, 2:25 p.m.
Q. Do you recognize Exhibit Number 16?
A. I'm -- I -- I don't know that I've seen it before, but I mean, I see that he's -- that Officer Nawara signed the HIPAA authorization disclosure form.
Q. And can you -- is it dated?
A. Yes.
Q. And that's dated August 17th, 2017?
A. Yes.
Q. You indicated that your typical practice at the sheriff's office was to use CorVel, correct?
A. Yes. 3:12:52
Q. Have you ever seen this form of a HIPAA

Page 173

authorization before from CorVel?
A. I don't know that I've seen this form before, but we've had medical workers go straight to CorVel rather than through the sheriff's office before.
Q. Do you know whose form was it, was it a form from the sheriff's office or was that a form from CorVel, if you know?
A. This -- in Exhibit 16?
Q. Yes.
A. I don't know.
Q. On paragraph one, can you read paragraph one of this authorization?
A. "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation."
Q. Okay. And that's different than Exhibit Number 1 which would have had the medical records go to Nurse Shelby, correct?
A. Yes. 3:14:02
Q. And this one instead goes to CorVel limited --
A. Yes.
Q. -- correct? And it's also limited to his fitness for duty exam for medical records, correct?

Page 174

MS. MARMOR: That's what this says?
MR. LINDEN: Yes.
Q. Is that fair?
A. Yes, it does say that.
Q. And can you read paragraph three, please?
A. "This disclosure is made for the purpose of your fitness for duty examination as requested by your employer, Cook County. Your employer may (sic) receive a copy of the independent" --
MS. MARMOR: You said -- it says, "Will," not "May." "Your employer will."
WITNESS: Did I say, "May"?
MS. MARMOR: Yeah.
WITNESS: Oh, wow. Sorry about that.
A. "Your employer will receive a copy of the independent medical exam, IME," in parentheses. "You will also receive a copy of the IME."
Q. Okay. Based on paragraph three, is it your understanding that the sheriff's office would only receive a copy of the independent medical exam as opposed to all the medical records that CorVel was set to receive from the medical doctors of Mr. Nawara?
A. Yes. 3:15:16
Q. And that differs from Exhibit 1, correct? You -- you could go back and refer if you'd like.

Page 175

MS. MARMOR: Yeah, that's Exhibit 1 right there.
WITNESS: Oh. This is --
MS. MARMOR: He's comparing it to --
WITNESS: -- a different form.
MS. MARMOR: -- this, not to that.
WITNESS: Oh.
A. You mean Exhibit 2?
Q. Yes, that provision differs from what's on Exhibit 1 is all --
MS. MARMOR: No, no, no.
Q. -- the question was --
MS. MARMOR: Now -- now there's confusion.
MR. LINDEN: Wait.
MS. MARMOR: She thinks you're comparing Exhibit 16 to Exhibit 2, are you actually --
MR. LINDEN: 16 --
MS. MARMOR: -- comparing --
MR. LINDEN: -- to 1 is what --
MS. MARMOR: 16 to 1?
MR. LINDEN: -- I'm comparing.
MS. MARMOR: So --
MR. LINDEN: Sorry about that.
WITNESS: Oh.
MR. LINDEN: Let -- let me -- could you read

Page 176

back the question? I'm sorry. Let -- let me just ask it, I think it will read better --
RECORDER: Oh. 3:16:15
MR. LINDEN: -- if you -- I remember.
Q. On paragraph three of Exhibit Number 16, it states, "Your employer will receive a copy of independent medical exam." On Exhibit Number 16, that differs from Exhibit 1, where the employer, meaning the sheriff's office, would have received all the medical records in addition to, correct?
A. Well these are --
WITNESS: Oh, I'm sorry.
MS. MARMOR: Sorry to interrupt. Just "in addition to," is that what you just said?
MR. LINDEN: Or -- that's -- that's a terrible question. I'm tired.
Q. But on Exhibit Number 3, the sheriff's office is only going to get a copy of the evaluation and not the underlying medical records, correct?
MS. MARMOR: Sorry, you just said, "Exhibit 3," you're -- you're confusing everyone.
MR. LINDEN: Paragraph three of Exhibit 16, I'm sorry.
MS. MARMOR: Okay.
Q. On paragraph three, the sheriff would only

get a copy of the evaluation report, correct?
MS. MARMOR: The IME. 3:17:13
A. Yes, which is the same as Exhibit 2.
Q. But I'm --
MS. MARMOR: But he's asking --
MR. LINDEN: Right.
MS. MARMOR: -- about Exhibit 1.
Q. About Exhibit 1, on Exhibit 1, the sheriff's office, through Nurse Shelby, would get a copy of all the medical records, correct?
A. To pass on to CorVel, yes.
Q. Right, yeah, but they receive the medical records to pass on, correct?
A. She could, yes, yes.
Q. Do you recognize -- do you recognize Exhibit Number 17?
A. Yes. 3:18:16
Q. And what is Exhibit 17?
A. This is the referral form that's sent from the sheriff's office to CorVel when we're referring an employee for a fitness for duty.
Q. Okay. And it's got Nurse Shelby's name at the bottom, correct?
A. Yes.
Q. And what -- were you still working in tandem



with Ms. -- Ms. Shelby at that time?
MS. MARMOR: Object --
A. What do you --
MS. MARMOR: -- to the form.
Q. That's a bad question. Were -- were you still in the loop when this was going on in August of 2017?
A. Regarding fitness for duty?
Q. Yes.
A. Yes.
Q. So this -- purpose of this document was to refer John Nawara and inform him that he's being referred for a fitness for duty exam, correct?
A. No, this actually goes to CorVel --
Q. Okay. 3:19:18
A. -- to explain to them why -- you know, who is being referred and why, because then CorVel reaches out to the employee to get the appointment scheduled and --
Q. Okay. It says, "Reason for referring," and it goes on to say, "The employee is aggressive, physically intimidating," etcetera, that information came solely from Superintendent Jones-Hayes, correct?
MS. MARMOR: Objection. That's not what the document says.
A. The first sentence is -- is relating to what



the superintendent related to us, yes.
Q. Okay. Can you read the first sentence?
A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to a routine directive," period.
Q. Okay. Do you have any information other than what was relayed to you by Ms. Jones to support that statement?
MS. MARMOR: Superintendent Jones-Hayes?
MR. LINDEN: Yes. 3:20:26
A. No.
Q. Okay. The last sentence here, can you read the last sentence --
MS. MARMOR: Of the first paragraph?
Q. -- of the first paragraph?
A. "In addition, weeks later, employee presented as aggressive and hostile in the human resources department."
Q. Was that talking about the interview with you?
A. That's the meeting with -- with me and the nurse, yes.
Q. Was he aggressive towards you at that meeting?



A. Yes.
Q. How was he aggressive?
A. His -- his demeanor and his -- the way of speaking.
Q. Can you be more specific about his demeanor, what did you find in his demeanor that was, you know, quote, "aggressive"?
A. Just kind of the way he responded to questions. Excuse me.
Q. Did he physically threaten either you or Ms. Shelby during that interview?
A. He did not. 3:21:23
Q. When you say, "Hostile," how was he hostile?
A. He just looked as though he was seething with anger the whole time he was sitting in the nurse's office with us.
Q. Did he say anything to you in an angry tone?
A. Oh, all of his responses were very clipped and angry.
Q. Did he raise his voice at you?
A. I think his -- his voice was raised a little bit. Not screaming, but loud, it was -- he was unnecessarily -- it -- it just kind of hostile, and it was a very uncomfortable feeling in the room with him.
Q. Have you ever been accused of something you

Page 181

didn't do in your life?
A. Yes.
Q. Did that make you angry?
A. Oh, sure. 3:22:16
Q. Now if Mr. Nawara was accused by Hayes of doing something he didn't do, you'd expect him to be a little angry. Isn't that fair?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. He might be, sure.
Q. Would you find that unusual?
MS. MARMOR: Object to -- object to the form.
A. Being angry about something and being outwardly hostile are two different things, I think.
Q. Did Mr. Nawara, in fact, go to an independent fitness for duty evaluation as directed by the sheriff?
A. Through CorVel?
Q. Yes. 3:23:21
A. Yes.
Q. Okay. Okay. Do you -- do you recognize Exhibit Number 18?
A. I mean, I recognize this type of letter. I don't know if I've seen this one before.
Q. Okay. And this is a letter from CorVel to Mr. Nawara, correct?

Page 182

A. Yes.
Q. What's the date of this letter?
A. September 8th, 2017.
Q. And can you read the first paragraph of this letter?
A. "Dear Mr. Nawara, this letter is to inform you that we have scheduled you for a two day fitness for duty exam with the Isaac Ray Forensic Group, LLC on Monday, September 11th, 2017 from 9:00 a.m. to 5:00 p.m. and Tuesday, September 12th, 2017 from 9:00 a.m. to 5:00 p.m."
Q. And is that consistent with your testimony before, that if it was a psychological evaluation, that would be for two days?
A. Yes. 3:24:33
Q. And have you ever heard of the Isaac Ray Forensic Group before?
A. Not that I recall, no.
Q. Do you recall any other employees being sent there by CorVel?
A. I don't recall this name, no.
Q. But it would have been approved by the sheriff's office if it came from CorVel, wouldn't that be a fair statement?
MS. MARMOR: Objection. No, that's not a

Page 183

fair statement.
Q. You can correct me if you're -- I'm wrong.
A. CorVel chooses the providers. The sheriff's office doesn't -- doesn't choose the providers.
Q. Does the sheriff's office accept the conclusions of the provide -- the provider chosen by CorVel?
A. Yeah.
Q. Okay. And the Cook County Bureau of Human Resource Employee Services is copied on this letter of September 8th, 2017, correct?
A. Yes.
Q. And that would have been your department, correct?
A. Yes.
Q. Would that have been given to you, a copy of this?
A. Probably the nurse, not -- not to me.
Q. Was there any reason for the bureau of human -- human resources to object to Mr. Nawara going to the Isaac Ray Forensic Group?
A. No, not that I'm aware of. 3:25:49
MR. LINDEN: Okay.
WITNESS: Could I have just another minute break?

Page 184

MR. LINDEN: Oh, sure.
WITNESS: Do you mind?
MR. LINDEN: No, any -- any time.
WITNESS: I just have to take some --
RECORDER: Off the record, 2:38 p.m.
(Off the record)
Q. Have you ever --
RECORDER: Back on the record, 2:44 p.m.
Q. Have you ever seen Exhibit 19 before?
A. Yes.
Q. What is Exhibit 19?
A. It's the fitness for duty report on Officer Nawara that was sent by CorVel.
Q. And was that received by your bureau?
A. Yes.
Q. And did you receive it, you know, shortly after 9/16/17 or that day?
A. I'm not certain what day I received it. 3:26:45
MS. MARMOR: Yeah, the bottom of the document says, "10/19/17 --
MR. LINDEN: Okay.
MS. MARMOR: -- 17."
MR. BUSTAMANTE: That computer --
MR. LINDEN: Thanks.
MR. BUSTAMANTE: If you look --

Page 185

MR. LINDEN: Okay.
MR. BUSTAMANTE: Okay.
MR. LINDEN: Just off the --
MR. BUSTAMANTE: I'm ready.
MR. LINDEN: Return to work is, like, 9/27 --
MS. MARMOR: Okay. I'll -- I'll believe you. I actually think -- as you know, I know all the documents in the case. There is a document showing it being transmitted, but I just don't -- I don't know how --
MR. LINDEN: Oh, okay.
MS. MARMOR: -- to get that --
MR. LINDEN: Okay.
Q. It -- it indicates the date of the report September 16th, 2017, yes?
A. September 16th, 2017, is that what you said?
MS. MARMOR: Yeah, he's --
Q. Yes.
MS. MARMOR: -- pointing to right here.
Q. That's the date of the report --
A. Yes.
Q. -- correct?
A. Yes. 3:27:29
Q. If you could turn to page 2 of -- of 10, and the second to bottom paragraph, and just read the first

Page 186

sentence, "According to"?
A. "According to Officer Nawara -- Nawara, during the interview here," in parentheses, "he was neither verbally counseled nor more formally disciplined for this incident, which he stated occurred on 9/28/16, not 9/29/16."
Q. Do you have any information that shows that that statement is inaccurate?
MS. MARMOR: I'm going to object for -- for a couple of reasons. First, she didn't write this, second, this is hearsay, and we can deal with that at a later date.
MR. LINDEN: Sure. 3:28:31
A. Is the incident -- I don't know what incident she was referring to.
Q. Right. I -- I -- my question is do you have anything -- do you know of anything that shows that that sentence is inaccurate in any way?
MS. MARMOR: Same objections.
A. So I don't know what she's referring to when she says, "This incident," so I guess I don't understand what you're asking.
Q. Okay. Assuming the incident refers back to the September 2016 incident with Jones-Hayes, would you agree that John Nawara was neither verbally counseled

Page 187

or formally disciplined for the September 2016 incident?
MS. MARMOR: Okay. So in addition to my other objections, she's got absolutely no foundation to answer that question.
A. I don't know.
Q. You don't know of any discipline, correct?
A. I don't know if he was or not.
Q. Okay. And that goes to the counseling too, correct, that you don't know?
A. Yes, I -- I do not know. 3:29:33
Q. And on page 3 of 10 of this report, it summarizes John Nawara's version of what happened in September of '16, correct?
A. In the second paragraph here you're referring to?
Q. Second paragraph, and also the following third paragraph.
A. It looks like that's what it is, yes. 3:30:27
Q. And I take it you have no information to either support it or dispute what is contained here, correct?
MS. MARMOR: Okay. I mean, again, I don't really think you have a foundation to be asking her about hearsay from him. There's a lot of information

Page 188

here. I don't think it's a fair question to ask her about two paragraphs that somebody else wrote, whether she has information to dispute it.
Q. You can read them, but I just want -- if there -- if you have any information to dispute anything what's in the second paragraph? Let's start with that.
MS. MARMOR: Same objection, and -- and I think even if she reads, it's kind of an unfair question.
Q. Let -- let me cut this one short, I don't want to spend ten minutes on the next two paragraphs.
A. Okay. 3:31:43
Q. Just to be clear, you don't have any independent information of what happened in September of 2016, correct?
MS. MARMOR: Meaning between Mr. --
MR. LINDEN: Nawara and --
MS. MARMOR: -- Nawara and Jones-Hayes?
MR. LINDEN: Correct.
A. Yeah, I was not a part of any investigation or anything.
Q. Anything you know -- anything you know would be based on what Ms. Jones-Hayes told you or what Mr. Nawara told you, correct?

A. Yes. Yes, sorry.
Q. Okay. Do you know whether or not Nurse Shelby and Superintendent Jones-Hayes are personal friends?
A. I don't know.
Q. You don't know either way?
A. No.
MS. MARMOR: He's on the next page, if you want to turn it.
WITNESS: Oh.
MR. BUSTAMANTE: Can I --
MR. LINDEN: All right.
MR. BUSTAMANTE: I'm sorry.
MR. LINDEN: No problem. 3:32:47
MS. MARMOR: So is that going to get transcribed?
Q. Okay. If you could turn to page 7 of 10 and read the first paragraph, starting with "notwithstanding."
MS. MARMOR: Just read it to herself?
MR. LINDEN: No.
Q. Read it out loud, please. 3:33:51
MS. MARMOR: Okay. I -- I'm -- again, I'm just going to have an objection. This is all hearsay, this is not her document, and I -- you know, I'll



object if this is tried to be read in on the record at -- at trial.
A. "Notwithstanding potentially problematic personality traits, I have been presented with no evidence from Officer Nawara's 18 plus year history with the county that he has experienced chronic, i.e. longstanding and pervasive, anger management difficulties on the job or any other particular difficulties for that matter. According to him, his last suspension was in 2006 pertaining to a situation involving a disagreement over a unit lockdown, and he ultimately prevailed in arbitration. Related, he deemed -- he denied that -- that other verbal and written discipline has -- he has received over the years related to anger management difficulties per se. I have similarly been presented with no evidence that the 9/29/16 incident was perceived as an anger management problem by administration at the time. Officer Nawara was not subjected to discipline, nor was he pulled from working or sent for a fitness for duty examination. It is reasonable to infer that he had concern -- that -- that" --
MS. MARMOR: "That had concerns."
A. Sorry.
Q. No problem.



MS. MARMOR: You were on, "It is reasonable --
Q. "It is reasonable."
MS. MARMOR: -- to infer."
A. I found it.
Q. Yeah, okay. 3:35:28
A. I knew where I was, I just couldn't find the line. "It's reasonable to infer that had concerns about Officer Nawara's emotional state been significant at that time, one or both would have occurred, yet Officer Nawara was returned to the very same assignment the next day and worked two other units before ultimately being sent to a fourth assignment where he would be interacting with both detainees and the general public and required to carry a firearm. It is my understanding, and I have been presented no evidence to the contrary, that Officer Nawara worked all assignments following the 9/29/16 incident without difficulty for another approximate six weeks before being pulled from the job and mandated to a fitness for duty examination on 11/18/16."
Q. Do you know of any facts which would refute anything in that paragraph you just read?
MS. MARMOR: I'm going to have all the same objections. This is a whole series of claims, it's



hearsay, it's based on things he told her and -- and this examiner's lack of information, and I don't even know how she can answer fairly a question like that.
Q. You -- you could read it, just tell me if you know of anything that would make that paragraph -- anything in there inaccurate.
A. I'm --
MS. MARMOR: Same objections.
A. I don't have information on his disciplinary history or his assignments.
Q. Okay. Is it fair to say that you don't have any information to either support it or dispute anything in this?
MS. MARMOR: Same objection. This is unbelievably compound.
A. Yeah, I don't have any information at all --
Q. And we can go through each sentence, but is there anything in here that you know of that would make anything in this paragraph untrue?
MS. MARMOR: As she sits here today?
MR. LINDEN: Yeah. 3:37:15
A. No, I don't -- I don't have any information --
Q. Okay.
A. -- one way or the other on this.

Q. Can you read the next paragraph, starting with "as a fitness examiner"?
A. "As a fitness examiner, this set of facts places me in a difficult position. The county's own actions suggest Officer Nawara was not deemed a threat to the safety of co-workers, detainees, or the general public. The only reasonable alternative explanation in -- if, in fact, the incident occurred as Superintendent Jones-Hayes described," in parentheses, "it is not my role to fact find and settle this apparent he said, she said, is that management failed to discipline or otherwise act appropriately at the time of the incident, and this was simply a missed opportunity for intervention. Finally, I would be remiss if I did not express my concerns about the timing of this examination being requested on 11/18/16, not only so remotely in time from the incident itself on 9/29/16, but following a formal complaint being filed by Officer Nawara in the interim."
Q. And this paragraph is written by Diana S. Goldstein, PhD, correct? If you want to turn to the following page, page 8 of 10.
A. She was the psychologist who wrote the report, yes. 3:39:10
Q. Is there anything in that paragraph that you



disagree with?
MS. MARMOR: Same set of objections and incredibly compound.
A. And this is just her opinion based on what he told her.
Q. It's her --
A. That doesn't seem to relate to the reason for a fitness for duty, I guess.
Q. Do you have any facts to dispute anything in that paragraph?
MS. MARMOR: Object to the form. Again, very compound, and I don't even know what "anything" is.
A. I mean, do I disagree with her opinion? I mean, it's just -- I don't understand exactly what facts I could have to --
Q. Yeah, do you have any facts to dispute what she says in the paragraph beginning with "as a fitness examiner" and ending --
A. Well I -- I do, because she's saying, "This set of facts," when she's just relaying what he told her.
Q. Okay. But do you have any facts to dispute what John -- what is contained here, other than what Superintendent Hayes told you?
MS. MARMOR: Objection. Object to the form. 3:40:36



A. I -- I guess I'm -- I'm not sure what you're asking me.
Q. Let -- let me -- let me move onto the next question, but can you just read the final full paragraph on page 7 of 10?
A. Mm-hmm. "It is my -- it is my opinion that there is presently no evidence that Officer Nawara's work conduct on 9/29/16, whatever that conduct may have been, arose directly from mental illness, cognitive impairment, or any medical condition or its treatment. It is similarly my opinion that he suffers from no mental illness, cognitive impairment, or medical condition that may impair his -- his capacity to do his job at the present time. As such, it is my opinion that Officer Nawara does not pose a safety risk to himself or others, co-workers, detainees, or the public," in parentheses, "and that he is fully capable of safely and effectively carrying out the essential functions of his job. I currently find Officer Nawara fit to return to duty without restriction."
Q. Based on Diana Goldstein's report, in hindsight, was the order for a fitness for duty examination of doctor -- for John Nawara proper?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.



A. So based on her report --
Q. In hindsight, based --
A. -- should he have been sent for --
Q. Yeah. 3:42:34
A. -- fitness for duty?
Q. Based on her report, should he have ever had to have undergone a fitness -- fitness for duty evaluation?
A. Are -- are you asking my opinion or her opinion?
MS. MARMOR: Your opinion.
Q. Your opinion.
A. Oh. Well yeah, I mean, we wouldn't have known -- based on the situation and how he presented to us, we wouldn't have known that he was actually fit for duty until we received a report saying so.
Q. But again, the sheriff's office didn't do an investigation into the allegations made by Jones-Hayes -- Jones-Hayes before ordering Nawara to undergo a fitness for duty examination, correct?
MS. MARMOR: Objection. Argumentative and ignores other facts in the evidence.
A. He -- the investigation for discipline is separate from speaking to an employee about an alleged incident regarding a possible fitness for duty.

Page 197

Q. Okay. What investigation is performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes actually were true before ordering John Nawara to submit to a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered, and this is really not -- she doesn't do the -- the discipline side, she's established that. She has no foundation for answering those kinds of questions.
Q. If -- if you know of any, do you know of any investigation?
A. I -- I don't know what investigation was done. It's separate from meeting with an employee to discuss an allegation that may result in a fitness for duty exam.
Q. Was your order for John Nawara to submit to a physical -- fitness for duty evaluation based, in any part, on an investigation performed by the sheriff's office to determine whether or not the allegations made by Jones-Hayes were true or not true?
MS. MARMOR: Object to the form. 3:44:29
A. No, that's how we met with him --
Q. Okay.
A. -- to assess what the situation was.
Q. Okay. But there's no investigation that you

Page 198

used from the sheriff's office before you and Nurse Shelby made the decision that he -- he was required to submit to a fitness for duty evaluation, correct?
A. No, we don't investigate in HR.
Q. Could you have referred the matter for an investigation in the sheriff's office of professional review?
MS. MARMOR: Objection. Lack of foundation.
A. So the -- if an allegation like this is raised, there is an investigative track that is handled by OPR. The fitness for duty referral would come to HR, we talk to the employee, try to figure out what had happened, what the situation was, if anything happened, and so that's what we were attempting to do when Mr. Nawara came to HR. And just based on his behavior and his failure to cooperate, we weren't able to -- to understand what had happened.
Q. Is there a mechanism in place at the sheriff's office where you could request an investigation be performed to determine whether or not allegations against an employee are true or not true?
MS. MARMOR: She personally?
MR. LINDEN: Or HR.
MS. MARMOR: Well no -- well no, no, no, there is no -- there is no foundation for HR. If

Page 199

you're asking her personally, she can answer that question.
Q. Okay. You personally?
MR. LINDEN: That's fine. That's fair enough. 3:45:49
A. Me personally what? I'm sorry.
Q. Is there a mechanism in place that you could request an investigation into the complaints of Jones-Hayes before you ordered a fitness for duty evaluation?
A. So there is a mechanism to file a complaint for investigation, yes, and again, it's -- it's -- it's not really in line with meeting with someone for a fitness for duty. I just feel like you're confusing two separate issues.
Q. Okay. But the sheriff's office also has investigators, correct, within the sheriff's office?
A. Yes.
Q. Are you allowed to request an investigation be done separate and apart from a disciplinary investigation?
MS. MARMOR: Wait, what?
Q. You -- you have investigators that are not part of OPR that work for the sheriff's office, correct?

Page 200

A. No. 3:46:43
Q. You have detectives within the sheriff's office?
A. Not for -- they -- all internal complaints are investigated by OPR.
Q. They can't be investigated outside of OPR?
A. I can't think of an instance where they're not handled by OPR.
Q. Okay. And -- and you -- you don't know whether or not OPR performed any investigation regarding this, correct?
A. I don't know.
Q. Okay. Let's see. I'm almost done. There you go. Do you recognize Exhibit Number 20?
A. Yes. 3:47:44
Q. And what is Exhibit 20?
A. This is the form indicating that Officer Nawara didn't have any restrictions and he could return to work full duty.
Q. And that came from Nurse Shelby?
A. Yes.
Q. And the date on this document is September 26th, 2017?
A. Yes.
Q. When was Mr. Nawara authorized to return to

work?
A. As of the issuance of this document.
Q. Well I think right above it, doesn't it say, "Return to work on 9/27/17"?
A. Right, so the day -- so she wrote this, he was able to return the next day.
Q. Okay. So what was his status on -- as of 9/27/17?
MS. MARMOR: Objection. Lack of foundation.
Q. If you know.
A. If -- if he returned on that day, his status would have been working.
Q. Working, being paid, and benefits?
A. Mm-hmm.
Q. Okay.
A. Yes. 3:48:36
Q. Do you know whether or not he returned to work that day?
A. I don't know what day he returned
Q. Let's see. I'd like to show you Exhibit Number 21, if you could -- and might want to take a minute to review it.
MR. LINDEN: This is the latest one, right? 3:49:45
MS. MARMOR: Yeah, although I think we're going to supplement it with a new one.



MR. LINDEN: Okay.
A. Okay.
Q. Have you ever seen Exhibit Number 21 before?
A. No.
Q. And it states here to "identify the name, if known, the address, telephone number of each individual likely to have discoverable information that the disclosing party may use to support the claims or defenses as follows." Do you know what information Matthew Burke has, other than referring the referral for the fitness for duty?
A. No.
MS. MARMOR: Objection. Lack of foundation.
WITNESS: Sorry.
MS. MARMOR: It's okay.
Q. Do you know who Thomas Conley is?
A. Yes. 3:50:52
Q. Who is Mr. Conley?
A. He is a sergeant with the sheriff's office.
Q. Do you know what information he has related to this case?
A. I do not.
Q. Do you know whether or not he witnessed anything regarding the incident between Mr. Nawara and Ms. Jones-Hayes?



MS. MARMOR: Objection. Lack of foundation.
A. I'm not certain.
Q. Do you have any idea of what information he has?
MS. MARMOR: Objection. Asked and answered.
A. No, I don't.
Q. Okay. How about Barbie Gannon, do you know who she is?
A. No.
Q. Do you know what information, if any, she might have?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. Do you know who Jeff Johnsen is on here, number eight?
A. Yes. 3:51:46
Q. Who is he?
A. He is -- he might be chief of staff now for DOC.
Q. So -- yeah, from this disclosure, Jeff Johnsen was Jones-Hayes' supervisor?
MS. MARMOR: That's what it says.
MR. LINDEN: It's her answers too, but.
Q. Do you -- do you know whether or not he was, in fact, Jones-Hayes' supervisor at the time of the



allegations --
MS. MARMOR: Objection. Lack of foundation.
A. Yeah, I mean, if he had a supervisory role over DOC, then the superintendents would have all reported up to him.
Q. Do you know what discoverable -- discoverable information Mr. Johnsen may have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No.
Q. How about James Turrise?
MS. MARMOR: Turrise.
MR. LINDEN: Turrise. Thank you.
Q. Do you know who Mr. Turrise is?
A. I do not.
Q. Do you know what information he may or may not have regarding this case?
MS. MARMOR: Objection. Lack of foundation.
A. No. 3:52:53
Q. How about Johnice Brumfield-Greer, do you know what information she has?
A. No.
Q. Do you know who she is?
A. No.
Q. Do you know any other persons or individuals that may have information related to this case other

Page 205

than the people listed on Exhibit Number 21?
A. No.
MR. BUSTAMANTE: Do you need, Rick, one more Exhibit sticker? No, you've got one.
MR. LINDEN: Okay. Maybe. Let's see.
WITNESS: Only one more.
MS. MARMOR: It's an indication.
MR. LINDEN: Maybe, let's see. Could be like Rizzo, "Any question I asked that I should have" -- no. That's Hinshaw's favorite question.
MS. MARMOR: Really? Oh, my God.
MR. HENRETTY: What is that? 3:53:58
MR. LINDEN: "Is there anything I should have asked you?"
MR. HENRETTY: Oh.
MS. HONINGFORD: That's --
MS. MARMOR: Off the record.
MR. LINDEN: Yes.
MR. HENRETTY: Do you want to --
MS. MARMOR: Off the record.
RECORDER: Oh, off the record, 3:12 p.m.
(Off the record)
RECORDER: Back on the -- back on the record, 3:13 p.m.
Q. Okay. I just want to show you Exhibit 22,

Page 206

and it's kind of a Group Exhibit. If we can, I -- I can start with the first page and might short circuit it.
MS. MARMOR: And I'm actually going to interpose an object -- several objections. Number one, this is not produced in this case, number two, this is about a subject that the court has already said is not part of this case, so I am going to object to any line of inquiry on this.
MR. LINDEN: Are you going to allow her to answer or you're not?
MS. MARMOR: I'm going to listen to your question first.
MR. LINDEN: Okay. 3:54:55
Q. First off, have you ever seen the letter dated December 18th, 2018 from Brian White to John Nawara?
A. No.
Q. Do you have any knowledge or information regarding him being disqualified for the present cycle of merit rank promotional process for the position of police officer?
A. No.
Q. Did you ever discuss this with Brian White?
MS. MARMOR: I'm going to -- there is no

Page 207

foundation for that.
MR. LINDEN: Right -- okay. But if she didn't, it's just no.
Q. And it sounds like that's what --
WITNESS: Can --
Q. -- your answer is going to be --
A. No.
Q. -- right? So this is the first you ever heard of this --
A. Yes.
Q. -- happening?
A. With Mr. Nawara, yes.
Q. Yes. Did you have any involvement or anything to do with Mr. Nawara being disqualified for the promotional process for a police officer?
MS. MARMOR: Object to the form, and again, no foundation.
A. Not that I'm aware of, no. 3:56:01
Q. Okay. Are -- are you related to any current or former politician, either through your -- any marriages or by blood?
A. No.
Q. Do you have any political clout?
MS. MARMOR: Object --
MR. HENRETTY: To the --

Page 208

Q. "Clout" is a bad word. Let's see.
MR. BUSTAMANTE: The correct legal term is "Chinaman."
MS. MARMOR: What?
MR. BUSTAMANTE: Oh, you never heard of that?
MS. MARMOR: No.
MR. BUSTAMANTE: Oh, when you're --
MS. MARMOR: We should probably take this off the record.
MR. HENRETTY: Yeah, we might --
MS. MARMOR: Wait off the record.
MR. BUSTAMANTE: Yeah.
MR. LINDEN: That was -- that was Peter's -- his question, better than I phrased it. Anything else?
MR. BUSTAMANTE: No.
MR. LINDEN: Thank you very much. Appreciate your time, and I have no --
MR. BUSTAMANTE: And do you have --
MR. LINDEN: -- further questions.
MR. BUSTAMANTE: Do you have questions?
WITNESS: Thank you.
MS. MARMOR: I don't have any questions.
MR. BUSTAMANTE: Anybody? No?
MS. HONINGFORD: No, no.
MR. BUSTAMANTE: So we're done.

MS. MARMOR: And we'll reserve signature.
RECORDER: Off the record, 3:16 p.m.



CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Gregory Diaz
September 30, 2019

**A**

**ability** 137:8
**able** 35:1, 57:12 74:24, 75:23 101:14, 101:24 105:3, 119:24 142:17, 155:16 170:16, 198:16 201:6
**above-entitled** 210:4
**abruptly** 82:3 117:2
**absence** 17:6 17:7, 36:1 127:24, 131:9 135:14, 135:20
**absences** 135:25
**absolutely** 187:4
**accept** 56:18 153:20, 154:6 165:20, 183:5
**access** 65:21 70:14, 95:25
**accumulated** 102:15, 103:11
**accuracy** 164:2
**accurate** 57:2 84:21, 84:21 84:25
**accurately** 67:15
**accused** 38:22 180:25, 181:5
**acknowledge** 51:8
**acknowledging** 106:4
**act** 159:6 193:12
**acted** 109:5
**action** 58:17 58:23
**actions** 193:5
**active** 57:23 104:16, 109:3
**actual** 161:22
**ADA** 163:10 163:19
**addition** 109:14 163:3, 176:10 176:14, 179:17 187:3
**additional** 38:12 136:10, 164:11
**address** 6:13 10:4, 10:16 10:18, 69:8 69:19, 106:8 106:10, 106:17 106:18, 106:22 202:6
**addressed** 169:8
**addresses** 8:12 10:7
**administration** 190:18
**administrator** 45:13, 45:23 150:22
**advance** 80:15 80:17
**advice** 24:1 25:2, 25:14 27:8, 27:15 28:7, 28:18 53:10, 53:12 53:16, 54:6 114:15, 114:18 114:19, 114:20 114:23, 115:3 115:10, 115:15 122:18, 125:2 125:24, 126:4 145:18, 145:22 145:25, 146:4 146:20, 154:19 161:7, 161:10 161:12, 161:15 161:25, 162:16
**advised** 24:20 24:23, 100:12
**advising** 15:18 24:24, 25:10
**advocate** 15:6
**agency** 126:8 127:11
**ages** 8:8
**aggressive** 49:25, 57:14 109:6, 178:20 179:3, 179:18 179:24, 180:2 180:7
**agitated** 47:25
**ago** 29:16, 32:20 141:7
**agree** 40:11 40:23, 41:12 54:14, 62:4 87:21, 98:17 99:1, 129:25 138:24, 149:24 163:18, 186:25
**agreed** 41:18
**agreement** 4:21 6:15, 8:16 40:21, 123:9 137:15
**ahead** 99:16 140:24, 149:13
**al** 1:11, 3:21
**allegation** 197:14, 198:9
**allegations** 116:3, 116:11 196:18, 197:3 197:19, 198:21 204:1
**alleged** 57:10 76:8, 93:16 109:5, 196:24
**allegedly** 38:14
**allow** 156:17 173:13, 206:10
**allowed** 35:10 58:6, 100:19 101:2, 101:6 101:17, 160:21 199:19
**allows** 67:19 128:25
**altercation** 47:16, 47:20 47:21
**altercations** 81:4
**alternative** 193:7
**amendment** 159:9
**American** 159:6
**amount** 107:22
**ample** 127:18
**analyst** 21:13 21:23, 22:8 22:15, 22:16
**anger** 180:15 190:7, 190:15 190:17
**angrily** 50:7
**angry** 180:17 180:19, 181:3 181:7, 181:13
**Ann** 170:10
**answer** 5:18 26:24, 27:1 27:4, 27:19 28:11, 28:15 28:19, 44:21 64:11, 95:12 97:13, 97:14 99:11, 99:13 115:1, 115:6 115:13, 118:20 118:20, 119:5 125:1, 125:3 126:2, 126:4 126:17, 126:20 134:23, 136:18 139:2, 146:2 146:5, 146:8 146:16, 147:3 154:13, 154:15 154:20, 154:24 166:7, 167:17 187:5, 192:3 199:1, 206:11 207:6
**answered** 33:8 78:9, 78:9, 94:4 136:18, 141:13 147:4, 154:25 171:20, 197:6 203:5
**answering** 197:9
**answers** 33:11 33:21, 81:7 157:17, 203:23
**anticipation** 115:17
**anybody** 10:20 10:23, 16:6 20:15, 27:23 32:6, 32:7, 82:9 122:25, 137:3 139:12, 154:5 158:7, 208:23
**apart** 199:20
**apologize** 45:7 139:11, 167:21
**apparent** 193:10
**apparently** 118:8
**appear** 106:22 145:6
**appearances** 2:1 4:6
**appeared** 38:2
**applied** 66:2
**applies** 71:15
**appointment** 45:16, 46:7 46:8, 140:3 178:18
**appointments** 44:19, 47:2

47:3
**appreciate** 170:1, 208:16
**approached** 50:16
**appropriately** 193:12
**approved** 46:12 135:8, 155:14 182:22
**approximate** 191:19
**approximately** 5:11, 10:3 10:19, 29:16 87:16, 88:21 104:8
**approximation** 18:4, 108:3
**arbitration** 190:12
**area** 50:14, 72:1
**argue** 168:4
**argumentative** 111:1, 123:19 132:15, 137:5 140:10, 196:21
**arose** 195:9
**arrest** 34:24
**aside** 32:12 33:21, 42:10 42:13, 92:21 160:14
**asked** 47:23 78:8, 94:4 114:24, 116:22 136:17, 137:14 141:12, 168:7 170:14, 171:20 197:6, 203:5 205:9, 205:14
**asking** 31:21 49:15, 72:24 78:11, 123:16 126:12, 126:18 129:16, 131:15 136:19, 138:5 138:7, 146:20 161:19, 165:20 177:5, 186:22 187:24, 195:2 196:9, 199:1
**assess** 38:5, 57:5 197:24
**assessment** 77:24, 77:25 78:25
**assign** 92:3
**assignment** 191:11, 191:13
**assignments** 160:16, 191:18 192:10
**assist** 44:21 65:9
**assistance** 42:23
**assistant** 22:7 30:14, 30:18
**assisted** 42:17
**assists** 77:10 77:10
**assume** 40:22 58:21, 143:3 148:18
**assumes** 48:7 67:6, 76:14 77:7, 77:20 79:4, 122:4 130:23, 134:22 136:9, 137:17 138:3, 140:11
**assuming** 95:24 99:2, 186:23
**attach** 141:19
**attached** 90:25 91:4, 113:9 141:23, 142:21 144:20, 145:1 156:17, 156:22
**attempt** 132:20
**attempting** 198:14
**attendance** 170:6, 171:14 171:15, 171:19
**attended** 12:21
**attention** 49:23
**attorney** 13:16 120:1, 120:7 123:15, 124:1 137:12, 137:23
**attorney's** 2:21 3:3, 115:9 120:17
**attorney-client** 115:6
**attorneys** 4:5 15:23, 114:6 122:21, 123:21
**August** 17:13 172:20, 178:6
**authority** 35:3 35:7, 39:19 40:19, 40:23 41:1, 41:20 41:24, 92:15
**authorization** 55:5, 68:15 70:23, 71:6 71:15, 109:8 109:9, 109:20 113:10, 115:24 133:8, 172:17 173:1, 173:12 173:13
**authorize** 66:10 66:16, 68:23
**authorized** 58:9 67:4, 104:21 109:17, 135:25 200:25
**authorizes** 67:18
**authorizing** 67:10, 69:1 70:7, 71:4
**automatic** 35:15 35:18, 100:21
**automatically** 98:3, 98:4
**available** 101:25
**Avenue** 69:22
**aware** 5:12 32:11, 32:15 35:12, 54:17 72:5, 81:20 116:10, 117:4 138:8, 147:11 147:15, 150:16 183:22, 207:18

**B**

**bachelor** 11:1
**back** 15:7, 23:18 26:3, 28:5 51:20, 53:7 53:8, 57:14 59:6, 63:5, 63:7 68:20, 70:2 73:25, 79:13 80:1, 81:22 81:25, 84:4 93:20, 101:12 101:16, 103:22 105:7, 109:19 111:19, 127:5 128:19, 133:17 133:17, 153:14 165:12, 166:1 166:9, 172:13 174:25, 176:1 184:8, 186:23 205:23, 205:23
**background** 10:25
**bad** 84:24 94:17, 152:8 178:5, 208:1
**Banks** 3:11
**bar** 13:7, 13:9
**Barbie** 203:7
**based** 27:18 28:18, 35:2 37:25, 47:9 50:19, 83:19 95:7, 98:10 99:1, 103:7 109:4, 115:6 117:7, 118:12 125:2, 125:24 126:4, 146:4 154:19, 174:18 188:24, 192:1 194:4, 195:21 196:1, 196:2 196:6, 196:14 197:17, 198:15
**basically** 81:2 92:21, 128:13
**basis** 25:17 25:19, 113:10 120:19, 149:24 168:7
**Bates** 112:15 112:18, 142:2
**beginning** 194:17
**behalf** 4:1, 4:7 4:11, 4:13, 4:15 110:22, 117:10 117:13
**behavior** 57:11 99:18, 179:4 198:15
**behavioral** 149:16
**believe** 16:16 19:13, 21:6 28:6, 29:20 30:20, 31:12 31:25, 35:25 37:5, 42:5 42:16, 43:12 45:2, 45:19 48:3, 48:16 50:15, 58:21 65:14, 65:14 76:5, 83:16 87:5, 89:6, 91:5

112:18, 113:14 168:11, 185:6
**believed** 159:13
**benefit** 20:12 101:24, 102:2 102:15, 103:8
**benefits** 120:14 201:13
**best** 6:4, 38:19 43:12
**better** 31:5 39:18, 60:20 84:9, 176:2 208:14
**bias** 153:3
**big** 89:21
**billed** 152:16
**birth** 6:9, 63:25 65:21, 65:22 65:25
**bit** 30:5, 53:9 141:6, 180:22
**blank** 66:10 66:12, 66:16 67:23, 68:6 68:23, 68:24 130:11, 130:19 133:3, 159:5
**blanked** 19:16
**blanks** 69:8 129:3
**Bless** 168:25
**blood** 207:21
**blurry** 63:13
**board** 148:16
**body** 85:9
**born** 6:11
**bottom** 142:3 177:23, 184:19 185:25
**box** 64:14, 64:22 64:23, 71:18 71:22, 72:3 73:2
**boxes** 71:16 129:3
**breadth** 123:10 138:7
**break** 5:22, 5:24 52:23, 79:8 79:25, 81:21 183:25
**Brian** 206:16 206:24
**brief** 11:15
**bring** 39:24
**Brown** 22:5 22:5
**Brumfield-Greer** 204:19
**building** 18:19 18:20, 19:23 69:21
**buildings** 18:17
**bureau** 17:9 100:15, 101:7 101:8, 183:9 183:19, 184:14
**Burke** 3:8, 4:14 29:24, 30:9 31:2, 31:10 31:15, 31:24 42:4, 42:6 42:10, 42:14 42:20, 43:4 90:7, 90:11 90:19, 90:22 202:10
**Burke's** 29:25
**Burling** 9:2 10:2, 10:18
**burning** 160:10
**business** 95:7
**Bustamante** 1:22, 2:4, 2:5 3:19, 4:9, 4:9 16:10, 16:12 40:1, 60:13 63:6, 63:8, 67:1 129:6, 143:21 148:9, 151:23 151:25, 152:2 152:9, 155:12 168:16, 168:18 184:23, 184:25 185:2, 185:4 189:11, 189:13 205:3, 208:2 208:5, 208:7 208:12, 208:15 208:18, 208:20 208:23, 208:25

**C**

**cabinets** 70:19
**California** 18:16, 69:22
**call** 37:9, 37:11 72:19, 76:22 155:6
**called** 11:18 80:14, 80:16 104:18, 107:3 107:5, 107:25 109:12, 114:21 147:12
**calling** 33:6
**calls** 41:3, 73:11 75:20, 76:13 77:6, 93:2, 96:3 96:19, 97:5 98:14, 107:19 113:20, 121:22 123:12, 139:7 162:13, 181:9 195:25
**camera's** 62:12
**Campus** 69:21
**capable** 195:17
**capacity** 195:13
**care** 60:6, 63:15 64:15, 66:10 68:24, 69:7 71:19, 72:24 82:16, 109:8
**carry** 58:7 58:10, 191:15
**carrying** 58:18 58:24, 195:18
**case** 1:9, 3:22 5:16, 10:6 31:25, 32:5 32:7, 33:8 38:22, 38:25 39:1, 39:8, 41:6 42:3, 61:17 61:25, 67:11 72:6, 73:5 76:20, 93:1 112:18, 112:21 129:17, 154:18 185:8, 202:21 204:7, 204:16 204:25, 206:6 206:8
**cases** 92:19 100:23
**caused** 160:19
**caution** 26:19
**cc'd** 91:15 100:1, 156:11
**CCM** 69:21
**Center** 26:10
**Cermak** 49:17
**certain** 31:16 81:23, 90:18 95:19, 107:25 115:25, 117:3 118:3, 120:5 123:3, 151:1 162:6, 165:10 166:8, 170:22 184:18, 203:2
**certainly** 73:16
**CERTIFICAT...** 210:1
**certified** 105:15 105:20, 106:1 106:4, 108:20 148:17, 149:2
**certify** 210:2
**chain** 96:11
**chair** 50:7
**chance** 115:2
**changed** 29:15 30:13
**character** 167:4
**characterization** 128:16, 167:4
**characterizing** 135:10
**check** 12:18 72:3, 86:11 86:14, 105:7
**checked** 64:15 64:18, 64:18 64:22, 64:22 71:16, 71:19 73:1
**Chicago** 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 6:12, 11:9 11:21, 12:25 14:9, 15:10 69:22
**chief** 19:21 31:14, 90:8 90:12, 90:13 90:14, 90:16 91:14, 91:19 203:18
**children** 8:4, 8:6 8:7, 10:22
**Chinaman** 208:3
**choose** 183:4
**chooses** 183:3
**chosen** 183:6
**Christy** 26:2 27:16, 27:21 114:13, 120:2 122:17, 122:19 122:22, 122:25 145:17, 145:23 154:4, 154:9 161:4
**Christy's** 26:3
**chronic** 190:6

**circuit** 206:2
**circumstances** 58:19, 66:23 74:8, 111:2 135:23
**city** 14:9, 14:13 14:21, 14:24 15:1, 15:1, 15:2 15:6, 69:8
**Civil** 4:22
**claim** 50:8
**claimed** 48:5 50:3, 50:12
**claims** 113:6 167:13, 191:25 202:8
**clarified** 136:18
**clarify** 79:14
**class** 105:15 108:20
**classify** 155:15
**clear** 49:8 96:22, 112:15 120:21, 165:16 166:22, 188:14
**clenched** 85:10
**client** 103:14 125:20
**Clinical** 149:17
**clipped** 81:6 180:18
**clout** 207:23 208:1
**co-workers** 193:6, 195:16
**cognitive** 149:16 195:9, 195:12
**Cohn** 169:15
**cold** 144:5
**college** 11:3 11:16
**colon** 71:15 71:20
**come** 30:11 35:19, 39:21 44:2, 44:2, 44:6 56:24, 57:9 74:6, 79:19 85:11, 116:22 128:7, 137:15 168:18, 198:11
**coming** 24:25 48:1, 141:15
**comma** 90:8 96:11, 160:8 163:2, 163:17
**command** 96:11
**comment** 139:3
**common** 73:23 91:18
**communicate** 77:1, 125:9 125:16, 125:19 154:9
**communicated** 59:6, 154:1 154:3, 168:12
**communication** 115:7, 124:1 137:22, 137:24 137:25, 138:16
**communications** 64:21, 90:20 111:4, 123:23
**company** 11:18 40:5, 45:18 150:23
**compare** 142:7
**compared** 135:5
**comparing** 175:4, 175:15 175:18, 175:21
**compensatory** 102:16
**compile** 70:9
**complain** 85:25
**complains** 134:8
**complaint** 23:7 93:9, 94:3, 95:5 95:21, 95:25 96:8, 116:3 120:21, 193:18 199:11
**complaints** 15:1 85:21, 86:3 86:15, 159:12 199:8, 200:4
**complete** 12:2 55:20, 65:13 68:1, 73:20 77:24, 98:21 113:12, 115:23 127:8, 127:10 127:19, 136:6 136:20, 163:7 163:20, 164:7 168:9
**completed** 66:19, 66:22 105:4, 129:13 130:5
**completely** 69:13
**completes** 4:17 113:9, 131:1
**completing** 65:9
**complex** 19:7
**compound** 18:15, 18:18 192:15, 194:3 194:12
**computer** 168:21, 184:23
**concern** 34:25 59:7, 128:4 190:22
**concerns** 116:23 126:9, 127:12 190:23, 191:8 193:15
**conclusion** 85:11, 149:22
**conclusions** 56:24, 93:23 183:6
**condition** 71:20 195:10, 195:13
**conduct** 45:24 46:3, 98:19 99:4, 149:17 195:8, 195:8
**conducted** 15:2 76:16, 150:15
**confidential** 1:16, 6:15, 7:1 7:5, 7:25, 8:16 9:1, 9:3, 9:25 10:8, 62:2
**confused** 69:13 112:25
**confusing** 5:18 176:21, 199:14
**confusion** 175:13
**Conley** 202:16 202:18
**connected** 81:15
**connection** 167:10
**consensus** 44:3
**consent** 55:10
**consequences** 135:13
**consider** 113:24
**consideration** 98:8
**considered** 58:15, 97:21 98:1, 127:23 131:8
**considers** 73:14
**consistent** 150:1 182:12
**consulted** 145:15
**contact** 45:5 123:4, 136:10 136:20, 137:1
**contacted** 114:17, 117:24 136:23
**contacting** 123:8, 137:14
**contained** 187:21, 194:23
**content** 28:13
**Continuation** 8:1, 10:1
**continue** 35:1 160:20
**contrary** 191:17
**conversation** 24:10, 26:21 73:25, 74:19 82:5, 83:13 83:19, 83:22 86:19, 87:1 132:10, 132:13 133:1
**conversations** 23:18, 23:20 24:4, 24:8 26:15, 28:14 28:20, 43:1 53:17, 75:5 118:12
**convicted** 13:25 14:2
**Cook** 1:11, 2:21 3:1, 3:3, 3:21 3:21, 4:16, 17:1 18:24, 19:1 69:20, 71:1 71:3, 71:7, 95:3 174:8, 183:9
**cookcountyil.gov** 111:17, 111:25
**cooperate** 198:16
**cooperating** 140:5
**cooperative** 65:6
**coordinate** 46:6
**copied** 91:7 91:19, 91:21 91:24, 105:9 157:9, 157:10 183:10
**copy** 141:21

160:4, 174:9
174:15, 174:17
174:20, 176:6
176:18, 177:1
177:9, 183:16
**Corell** 66:25
**corner** 142:3
**corporation**
14:15, 173:16
**corral** 71:11
**correct** 17:18
28:12, 28:13
37:7, 37:12
38:23, 41:7
41:10, 41:17
42:4, 50:6
50:19, 54:22
59:7, 62:3, 64:1
64:8, 64:16
65:25, 66:7
66:13, 67:12
69:9, 69:16
71:1, 73:3, 78:1
83:1, 84:18
84:21, 84:23
85:12, 85:18
88:12, 92:13
93:6, 98:8
98:12, 99:5
101:8, 101:20
102:3, 105:6
105:10, 107:9
109:22, 111:17
111:19, 111:25
117:13, 117:17
117:21, 119:10
119:17, 120:24
121:9, 128:2
128:11, 130:4
130:8, 130:13
130:22, 131:12
133:4, 133:12
133:25, 134:10
136:1, 136:14
137:4, 137:9
138:17, 140:9
141:11, 141:20
141:25, 142:6
146:13, 146:17
147:4, 150:3
150:5, 152:19
153:21, 154:11
154:25, 156:23
157:21, 159:4
159:13, 166:3
166:24, 167:7
172:23, 173:19
173:24, 173:25
174:24, 176:10
176:19, 177:1
177:10, 177:13
177:23, 178:13
178:22, 181:25
183:2, 183:11
183:14, 185:22
187:7, 187:10
187:14, 187:22
188:16, 188:20
188:25, 193:21
196:20, 198:3
199:17, 199:25
200:11, 208:2
210:2
**corrected** 29:13
**correctional**
58:1, 58:15
59:15
**corrections**
18:20, 18:23
23:8, 58:15
**Correl** 151:10
**correspond**
142:20
**correspondence**
33:7, 122:20
123:21
**CorVel** 40:4
45:12, 45:14
45:17, 45:21
46:1, 46:3
46:14, 67:1
67:2, 67:3, 67:4
67:12, 67:20
70:10, 70:11
71:8, 71:12
101:13, 140:3
140:4, 151:13
151:14, 151:17
152:10, 152:13
152:14, 152:14
152:17, 152:19
172:23, 173:1
173:3, 173:7
173:15, 173:21
174:21, 177:11
177:20, 178:14
178:17, 181:17
181:24, 182:20
182:23, 183:3
183:7, 184:13
**CorVel's** 152:17
**cough** 171:25
172:6
**counsel** 15:10
15:12, 15:14
15:16, 16:1
16:2, 16:4, 16:5
16:7, 16:8, 26:5
27:9, 27:15
28:2, 28:5
28:18, 32:20
115:2, 125:2
125:24, 126:4
146:4, 151:6
154:19, 164:15
165:6, 165:11
**counsel's** 14:15
27:18
**counseled** 186:4
186:25
**counseling**
187:9
**counsels** 15:25
**county** 1:11
2:21, 3:1, 3:3
3:21, 4:16, 17:1
18:25, 19:1
69:20, 71:1
71:3, 71:7, 95:3
174:8, 183:9
190:6
**county's** 193:4
**couple** 17:14
32:20, 80:6
94:11, 104:7
186:10
**course** 95:7
**court** 1:1, 6:5
19:5, 206:7
**covered** 22:3
27:2
**created** 130:15
**credit** 103:4
**crime** 14:3
**Criminal** 11:23
**criminology**
11:1
**criteria** 43:7
43:14, 43:16
47:6
**criticizing** 97:8
**crossover** 73:18
**cubicle** 82:7
**current** 13:18
20:9, 22:25
29:4, 72:17
207:19
**currently** 31:4
195:19
**cut** 188:11
**cycle** 206:20

## D

**daily** 25:17
**Daley** 26:10
**Dana** 19:13
19:14, 19:16
110:3, 111:5
111:12, 117:20
117:24, 119:9
125:8, 144:12
156:9, 156:10
160:2, 165:6
166:16
**Dana's** 19:14
**danger** 58:16
58:22, 59:8
59:14
**Dart** 3:8, 159:11
**date** 6:9, 23:20
29:8, 48:17
51:17, 63:25
65:21, 65:21
65:25, 79:19
95:21, 100:5
100:8, 104:25
108:16, 109:11
109:18, 111:14
112:6, 112:11
112:18, 116:4
119:16, 125:12
142:21, 142:25
147:15, 157:19
159:2, 169:3
182:2, 185:14
185:20, 186:12
200:22
**dated** 83:8
117:16, 119:12
130:21, 133:19
134:8, 159:17
160:1, 172:18
172:20, 206:16
**dates** 23:15
23:17, 71:20
145:6
**day** 44:8, 47:1
47:2, 48:16
50:12, 50:22
51:3, 51:20
54:24, 75:5
75:19, 75:25
76:4, 81:16
83:10, 83:12
84:11, 84:18
93:24, 102:22
102:23, 103:1
103:3, 103:3
103:4, 107:9

112:9, 112:12 119:19, 119:20 119:20, 157:8 182:7, 184:17 184:18, 191:12 201:5, 201:6 201:11, 201:18 201:19
**days** 32:20 102:17, 102:17 103:3, 103:5 103:5, 103:6 103:12, 103:12 103:12, 127:23 131:7, 155:19 182:14
**deal** 114:6 135:25, 139:25 186:11
**dealing** 120:7
**dealt** 114:9 114:12
**Dear** 104:12 182:6
**Deborah** 169:23
**December** 111:15, 111:19 114:10, 117:23 121:1, 123:2 132:19, 133:14 133:16, 165:13 166:1, 166:13 167:6, 167:25 168:13, 206:16
**decide** 72:16
**decision** 24:22 27:2, 35:16 40:6, 40:9, 43:8 43:23, 74:2 74:15, 97:2 100:17, 115:16 153:23, 154:2 154:6, 198:2
**decisions** 24:16 26:18, 28:8 92:7, 92:9 92:12
**deemed** 127:25 131:9, 135:2 135:5, 135:9 135:13, 190:13 193:5
**Defendant** 2:19 3:1, 4:12
**defendants** 1:13 3:8, 113:7
**defenses** 202:9
**definitely** 61:24 117:4
**degree** 11:24 12:4, 12:22
**delegate** 92:8
**demand** 114:1
**demanded** 132:25
**demeanor** 180:3 180:5, 180:6
**denied** 160:16 190:13
**department** 11:14, 14:18 15:21, 17:8 17:9, 17:10 20:11, 23:8 24:21, 25:11 25:13, 25:22 25:25, 26:8 27:23, 29:14 34:21, 34:22 35:5, 54:1, 54:5 54:11, 58:15 90:16, 114:6 114:9, 118:13 120:6, 122:11 122:13, 122:21 123:1, 123:22 123:25, 124:2 137:23, 138:21 145:15, 153:18 153:24, 153:25 161:3, 162:18 169:12, 171:16 179:19, 183:13
**departments** 15:18, 18:24
**DePaul** 12:25 13:3
**depend** 25:15 25:20, 37:21 46:20, 58:19 101:4, 110:12 111:2
**depending** 44:19, 47:4 135:22
**depends** 54:21
**deposed** 5:10
**deposition** 1:15 1:16, 3:20, 4:1 4:20, 5:7, 32:19 33:3, 33:7
**deps** 60:16
**deputy** 16:5 16:6, 19:21 149:14, 149:18
**described** 116:20, 193:9
**designate** 10:7
**designated** 6:14 8:15
**detail** 86:24
**details** 48:25 72:1, 89:3
**detainees** 191:14, 193:6 195:16
**detectives** 200:2
**determination** 44:7, 44:12 153:12, 153:19
**determinations** 92:16
**determine** 56:15 57:20, 65:4 140:1, 149:15 170:14, 170:17 170:17, 197:2 197:19, 198:20
**determined** 104:25, 131:2
**determining** 56:19, 97:21
**detriment** 160:11
**Diana** 193:20 195:21
**Diaz** 3:25, 210:7
**difference** 29:17 46:23
**different** 15:25 18:17, 48:4 61:15, 61:22 98:11, 171:5 173:17, 175:5 181:14
**differentiate** 67:21
**differs** 174:24 175:9, 176:8
**difficult** 52:15 193:4
**difficulties** 190:8, 190:9 190:15
**difficulty** 191:19
**direct** 17:8
**directed** 54:1 54:4, 116:12 137:12, 179:4 181:16
**directing** 29:14
**direction** 53:20
**directions** 53:21
**directive** 179:6
**directly** 20:20 23:1, 30:8 30:23, 31:1 36:18, 124:9 125:10, 125:16 125:19, 137:14 195:9
**director** 17:22 29:6, 29:10 29:18, 30:1 30:3, 30:15 30:19, 36:2 36:21, 91:11 91:12, 91:18 96:11, 96:15 96:17
**director's** 100:12
**Disabilities** 159:6
**disagree** 149:21 149:25, 158:8 158:13, 163:22 164:19, 165:1 165:5, 165:7 194:1, 194:13
**disagreed** 40:14 87:24
**disagreement** 40:15, 165:24 190:11
**disciplinary** 86:8, 135:11 192:9, 199:20
**discipline** 15:18 128:1, 131:10 131:24, 133:25 134:18, 134:21 135:3, 135:17 136:3, 171:9 187:7, 190:14 190:19, 193:11 196:23, 197:8
**disciplined** 13:23, 86:12 93:12, 93:16 135:20, 186:5 187:1
**disclose** 161:23
**disclosing** 202:8
**disclosure** 68:15 109:9, 172:17 174:6, 203:20
**discoverable** 202:7, 204:6

204:6
**discrimination** 95:4
**discuss** 23:3 44:9, 51:7, 51:9 53:18, 74:5 74:14, 74:17 75:23, 136:23 162:4, 197:14 206:24
**discussed** 23:15 23:21, 24:7 24:13, 24:15 27:24, 116:10 129:14
**discussing** 75:13 116:24, 116:25
**discussions** 23:5 23:13, 27:20
**dishonesty** 14:3
**display** 85:18
**displayed** 85:9
**dispute** 100:8 158:21, 158:24 170:24, 187:21 188:3, 188:5 192:12, 194:9 194:16, 194:22
**disqualified** 206:20, 207:14
**disrespectful** 49:25
**distracting** 151:20
**district** 1:1, 1:2 3:23, 15:11 15:15, 15:20 16:9, 16:21
**disturbing** 50:17
**Division** 1:3 3:23
**divisions** 18:24
**DOC** 31:16 32:14, 35:6 90:5, 90:14 90:15, 91:12 91:14, 91:19 96:16, 100:4 203:19, 204:4
**doctor** 34:1 47:1, 54:25 55:20, 55:21 72:15, 73:14 73:19, 76:16 76:19, 76:22 76:24, 77:1 77:16, 78:3 78:11, 78:19 140:4, 140:5 148:3, 149:1 149:6, 149:25 150:3, 150:16 151:9, 151:10 152:15, 152:18 158:1, 158:1 158:14, 158:15 158:25, 163:6 164:7, 195:23
**doctors** 38:1 174:22
**document** 45:2 63:10, 63:12 63:13, 63:14 65:18, 70:20 71:14, 82:19 84:8, 87:1, 96:1 98:22, 99:21 100:2, 100:3 100:4, 100:5 100:6, 100:9 108:12, 111:9 112:16, 112:17 113:22, 118:4 119:7, 121:5 121:9, 121:14 121:20, 121:25 122:6, 125:7 128:16, 129:9 131:16, 131:18 132:3, 132:24 133:6, 138:8 138:13, 139:5 146:3, 148:12 148:14, 149:12 154:14, 154:17 156:17, 156:21 162:7, 166:11 169:6, 178:11 178:24, 184:19 185:8, 189:25 200:22, 201:2
**documentation** 45:1, 55:22 70:9, 91:1, 91:4 114:5
**documents** 31:12, 31:18 31:19, 33:2 33:5, 46:9, 62:1 71:11, 76:24 104:22, 118:5 121:17, 134:15 138:5, 140:3 142:5, 155:22 156:19, 157:3 185:8
**doing** 57:24 123:17, 163:5 168:21, 169:2 181:6
**door** 82:6, 117:6
**double** 46:17
**doubt** 112:7 119:15
**Dr** 46:16 144:21, 144:22 145:19, 147:7 147:11, 147:13 148:10, 148:13 149:3, 150:11 150:18, 151:2 151:5, 153:3 153:12, 153:20 154:6, 156:22 157:25, 158:14 158:25
**Drive** 3:12
**drop** 171:25
**drops** 172:6
**due** 27:10, 148:2
**Dunlap** 170:12
**duties** 29:12 57:12
**duty** 17:11 20:13, 33:24 33:25, 34:5 34:9, 34:14 35:4, 35:17 35:23, 39:3 39:20, 40:7 40:20, 40:24 41:2, 41:13 41:17, 41:21 41:24, 42:7 42:12, 43:9 43:17, 43:19 43:24, 44:13 44:20, 44:21 45:24, 55:7 55:23, 56:13 57:6, 57:20 63:16, 65:6 73:10, 76:12 76:15, 77:3 79:3, 87:14 87:19, 88:4 88:22, 89:9 91:3, 92:7 92:13, 97:3 97:22, 100:19 100:24, 101:2 101:14, 101:17 101:23, 104:15 104:16, 109:2 109:3, 109:3 109:18, 125:15 126:10, 136:7 139:21, 139:23 140:20, 147:12 148:23, 149:7 149:15, 149:19 150:2, 150:8 150:10, 150:12 152:16, 153:5 153:13, 153:20 156:20, 157:4 163:5, 164:8 166:24, 167:11 168:3, 173:15 173:25, 174:7 177:21, 178:8 178:13, 181:16 182:8, 184:12 190:20, 191:21 194:8, 195:20 195:22, 196:5 196:7, 196:16 196:20, 196:25 197:5, 197:15 197:17, 198:3 198:11, 199:9 199:14, 200:19 202:11

**E**

**early** 30:20
**easier** 52:13
**East** 11:8
**Eastern** 1:3 3:23, 11:4
**easy** 169:4
**educational** 10:25
**effective** 102:8 170:16, 170:21
**effectively** 195:18
**efforts** 75:1
**eight** 31:6, 31:7 102:23, 203:15
**either** 32:16 34:16, 45:11 52:12, 55:2 59:14, 60:12 65:20, 84:13 93:14, 96:10 137:24, 138:8 138:16, 139:13

143:8, 150:23
155:19, 180:10
187:21, 189:6
192:12, 207:20
**Ellis** 60:23
**email** 105:15
106:8, 106:9
106:16, 106:18
107:2, 107:12
108:19, 111:7
111:12, 111:19
112:1, 113:3
113:15, 114:10
117:23, 118:4
118:6, 118:9
119:9, 119:21
120:10, 120:12
120:25, 121:1
121:12, 122:2
122:7, 122:10
122:23, 123:2
125:8, 125:9
125:12, 126:7
126:19, 128:10
130:21, 131:6
131:24, 132:2
133:13, 139:20
142:18, 144:2
144:3, 144:11
144:18, 144:19
145:11, 145:19
156:7, 156:15
156:16, 157:2
157:9, 157:13
157:14, 159:3
159:16, 159:24
160:1, 161:2
161:7, 162:4
164:11, 164:17
165:10, 166:16
166:22, 167:6
167:25, 168:13
169:8
**emailed** 106:12
106:15, 106:22
145:10, 155:22
**emails** 119:22
132:13, 132:19
142:21, 160:23
**emotional**
149:16, 191:9
**employed** 17:2
29:1
**employee** 15:19
17:8, 17:10
20:12, 20:14
20:14, 25:9
29:6, 29:18
31:21, 34:1
34:4, 34:24
35:1, 35:16
35:18, 35:21
37:12, 37:20
38:4, 38:5, 39:6
39:24, 40:7
40:20, 42:9
43:8, 43:10
43:13, 43:24
44:3, 44:5, 44:9
44:15, 44:17
44:23, 44:25
45:3, 45:9, 46:7
55:6, 55:10
55:19, 56:1
57:22, 57:23
58:22, 63:20
65:7, 66:19
66:20, 68:25
71:24, 72:20
73:16, 73:20
74:1, 74:6
76:17, 77:11
77:23, 77:24
87:25, 88:7
91:2, 92:12
97:16, 101:5
102:18, 106:16
110:8, 110:10
110:14, 110:15
110:21, 110:23
110:24, 126:9
126:11, 127:12
127:13, 128:22
129:8, 129:15
129:18, 131:1
135:16, 135:18
140:25, 141:2
151:8, 152:12
152:23, 177:21
178:18, 178:20
179:17, 183:10
196:24, 197:13
198:12, 198:21
**employee's**
34:22, 38:13
39:2, 63:15
70:6, 70:7, 77:9
123:15, 179:3
**employees** 15:1
15:2, 15:2
20:10, 39:5
44:22, 59:14
65:4, 71:9
73:23, 85:22
85:25, 86:4
86:15, 88:3
101:23, 182:19
**employer** 29:10
174:8, 174:8
174:11, 174:15
176:6, 176:8
**employment**
11:14, 26:17
27:2, 27:11
114:16, 115:16
**enclosed** 141:21
**ended** 82:3
117:2
**enforcement**
126:8, 127:11
**engage** 132:10
132:12, 132:20
133:1
**engaged** 127:24
131:8
**entered** 61:11
**entity** 68:22
**entry** 15:24
171:7
**equal** 98:7
**equivalent**
110:9
**essential** 195:18
**essentially** 15:5
29:14, 34:2
43:10, 55:21
110:23, 116:20
**established** 48:8
197:8
**estimate** 25:16
95:15
**estimation** 88:3
**et** 1:11, 3:21
**etcetera** 69:9
178:21
**evaluate** 73:20
**evaluated** 34:2
43:13, 91:3
**evaluation** 46:4
56:20, 57:7
76:25, 77:11
78:7, 78:20
104:15, 104:24
109:2, 127:9
129:1, 139:21
140:20, 143:23
147:12, 147:15
148:23, 149:15
149:18, 150:8
152:16, 152:17
152:21, 153:1
153:5, 153:13
153:21, 166:24
176:18, 177:1
181:16, 182:13
196:8, 197:5
197:17, 198:3
199:10
**evaluations**
46:12, 76:15
88:22, 92:7
**evaluator** 78:13
**events** 98:11
**everybody** 52:8
**evidence** 48:7
67:7, 72:11
73:12, 76:14
77:7, 77:21
79:5, 122:4
130:24, 134:22
136:9, 137:18
138:4, 140:11
190:5, 190:16
191:16, 195:7
196:22
**exact** 23:17
29:12, 37:21
142:5
**exactly** 18:4
23:15, 61:2
62:6, 117:3
129:12, 140:14
194:14
**exam** 13:7, 13:9
33:24, 33:25
34:6, 35:17
35:23, 39:3
39:20, 40:7
40:20, 40:24
41:2, 41:14
41:17, 41:21
41:24, 42:7
42:12, 43:9
43:19, 43:24
44:13, 45:5
56:13, 73:10
76:12, 87:19
92:13, 97:3
97:23, 140:2
163:5, 173:15
173:25, 174:16
174:20, 176:7
178:13, 182:8
197:15
**examination**
4:23, 47:1
63:17, 77:3
79:3, 150:2
150:6, 163:6
164:8, 174:7

190:21, 191:21 193:16, 195:23 196:20
**examiner** 193:2 193:3, 194:18
**examiner's** 192:2
**examples** 79:1
**exams** 34:9 34:14, 43:17 45:25, 87:14 89:9
**excuse** 69:16 136:9, 144:4 151:12, 170:11 180:9
**execute** 127:9
**executive** 17:22 30:1, 30:14 36:21, 91:11 91:12, 91:18
**Exhibit** 4:1 59:24, 60:11 68:12, 68:13 68:21, 68:22 69:11, 82:13 83:15, 90:1 90:2, 90:4, 94:7 94:9, 94:12 94:13, 94:18 94:20, 98:18 99:20, 104:1 104:2, 104:4 105:6, 108:11 111:8, 115:22 117:7, 117:16 119:6, 123:2 125:5, 127:6 128:13, 128:20 128:23, 128:24 129:2, 129:4 129:7, 129:9 129:18, 130:2 131:12, 131:19 131:22, 132:5 132:5, 133:8 133:12, 133:16 133:17, 133:19 134:19, 136:6 136:16, 138:2 138:2, 138:10 138:11, 139:14 139:15, 139:19 141:1, 141:7 142:10, 142:14 143:25, 144:21 145:1, 145:14 145:14, 147:8 149:9, 155:25 156:6, 156:23 157:24, 159:16 165:14, 166:12 166:13, 167:2 168:6, 169:5 172:14, 173:8 173:17, 174:24 175:1, 175:8 175:10, 175:16 175:16, 176:5 176:7, 176:8 176:17, 176:20 176:22, 177:3 177:7, 177:8 177:8, 177:15 177:18, 181:21 184:9, 184:11 200:14, 200:16 201:20, 202:3 205:1, 205:4 205:25, 206:1
**Exhibits** 75:9 89:14, 109:22 134:19, 136:6 140:8, 142:6 142:10, 157:5
**exist** 139:6
**existing** 76:12
**exists** 158:23
**expect** 107:24 139:5, 139:16 181:6
**experience** 59:17, 95:8
**experienced** 89:8, 190:6
**experiencing** 51:23, 81:3
**explain** 44:18 47:3, 116:21 167:19, 178:16
**explained** 80:10
**explaining** 65:9
**explanation** 193:7
**explicitly** 131:11
**express** 193:15
**expressed** 75:9 75:12
**extreme** 85:9

**F**

**face** 158:18
**facilitate** 45:14
**fact** 15:5, 15:8 23:23, 60:10 127:19, 150:1 150:18, 164:12 164:14, 181:15 193:8, 193:10 203:25
**facts** 48:7, 50:22 67:7, 72:11 73:11, 76:14 77:7, 77:20 79:4, 122:4 130:23, 134:22 136:9, 137:17 138:3, 140:11 191:22, 193:3 194:9, 194:15 194:16, 194:20 194:22, 196:22
**failed** 104:17 193:11
**failure** 198:16
**fair** 5:20, 20:3 24:11, 25:6 32:18, 41:21 48:20, 54:15 58:9, 59:22 72:7, 72:21 84:14, 88:6 102:8, 134:16 136:4, 140:21 152:6, 155:18 157:6, 158:2 158:21, 171:9 174:3, 181:7 182:24, 183:1 188:1, 192:11 199:4
**fairly** 192:3
**false** 116:15 116:16
**familiar** 144:2
**far** 58:8, 72:4 94:15, 116:23 150:16
**faster** 168:15
**favor** 153:3
**favorite** 205:10
**fear** 59:1
**February** 108:17, 111:3 117:8, 117:25 134:8, 134:18
**Federal** 4:21
**feel** 41:1, 78:24 89:1, 159:4 199:14
**feeling** 180:24
**fees** 120:17
**fellow** 86:4 86:15
**felony** 13:25
**felt** 49:24
**FFD** 104:22 104:24, 105:4 109:2, 127:9 127:10, 127:13 127:19, 127:24 128:5, 131:9 139:20, 139:22 163:5
**fifth** 22:11 163:2, 163:3
**figure** 56:22 142:17, 198:12
**figured** 112:24
**figuring** 143:1
**file** 55:22 120:16, 132:8 160:23, 199:11
**filed** 15:1, 93:8 94:2, 95:20 95:24, 96:7 112:17, 193:18
**filing** 70:19
**fill** 63:19
**filled** 60:11 63:14, 63:18 63:20, 64:14 65:1, 65:24 66:15, 66:24 68:6, 131:4
**final** 55:23 195:4
**finally** 164:12 193:14
**find** 88:7 150:12, 180:6 181:11, 191:7 193:10, 195:19
**finder** 15:5 15:8
**findings** 149:3
**fine** 10:11 52:20, 83:6 128:21, 134:11 144:8, 199:4
**firearm** 58:24 191:15
**firm** 11:19 12:10, 61:4 69:24, 89:21
**first** 11:15 11:16, 12:9 14:6, 17:4

36:16, 51:7
71:18, 73:2
80:7, 80:23
82:18, 104:10
105:15, 108:20
108:22, 113:2
120:24, 125:14
127:19, 127:20
146:12, 146:15
156:7, 159:9
159:18, 159:24
160:15, 163:11
163:12, 178:25
179:2, 179:15
179:16, 182:4
185:25, 186:10
189:18, 206:2
206:13, 206:15
207:8
**fists** 85:10
**fit** 74:14, 101:13
101:17, 149:7
149:18, 150:9
150:12, 195:20
196:15
**fitness** 33:24
33:25, 34:2
34:5, 34:9
34:14, 35:4
35:17, 35:23
39:3, 39:20
40:7, 40:20
40:24, 41:2
41:13, 41:17
41:20, 41:24
42:7, 42:11
43:9, 43:17
43:18, 43:24
44:13, 44:20
44:20, 45:24
55:7, 55:23
56:13, 57:6
57:20, 63:16
65:5, 73:10
76:11, 76:15
77:2, 79:3
87:13, 87:19
88:4, 88:21
89:9, 91:3, 92:7
92:13, 97:3
97:22, 100:19
100:24, 101:2
101:23, 104:15
109:2, 109:3
109:18, 125:15
126:9, 126:10
127:12, 136:7
139:21, 139:22
140:20, 147:12
148:23, 149:14
150:2, 150:8
152:15, 153:4
153:13, 153:20
156:20, 157:4
163:5, 164:8
166:24, 167:11
168:3, 173:15
173:25, 174:7
177:21, 178:8
178:13, 181:16
182:7, 184:12
190:20, 191:20
193:2, 193:3
194:8, 194:17
195:22, 196:5
196:7, 196:7
196:20, 196:25
197:4, 197:14
197:17, 198:3
198:11, 199:9
199:14, 202:11
**five** 5:11, 20:19
20:20, 20:22
**fixed** 83:3
**FMLA** 21:4
**follow** 124:10
162:16
**followed** 31:25
32:2, 34:12
**following** 6:14
8:15, 31:22
59:11, 71:20
88:4, 145:11
155:16, 187:17
191:18, 193:18
193:22
**follows** 202:9
**force** 120:19
**forced** 160:23
**foregoing** 210:2
**Forensic** 182:8
182:17, 183:21
**Forest** 11:10
**forgot** 52:16
**form** 19:12
22:23, 24:12
24:18, 34:11
38:17, 45:6
55:14, 55:19
58:4, 59:16
63:18, 63:19
64:5, 64:7
64:10, 64:13
64:18, 64:19
64:21, 65:1
65:13, 66:18
66:21, 67:2
67:6, 67:17
67:23, 68:5
68:7, 68:17
68:20, 70:4
71:23, 75:3
77:6, 77:20
85:23, 90:25
94:22, 94:25
95:5, 95:6
95:11, 95:14
95:17, 96:10
99:8, 105:25
109:10, 110:17
113:10, 113:12
115:18, 116:15
116:19, 117:14
117:22, 119:18
123:18, 127:22
128:15, 128:23
128:23, 128:24
128:24, 129:9
129:13, 129:18
129:18, 129:21
130:11, 130:14
130:19, 130:20
131:1, 131:7
131:14, 131:21
131:25, 132:3
132:22, 133:4
133:8, 138:18
139:7, 140:24
141:1, 145:8
151:16, 155:4
155:8, 160:12
163:7, 163:14
163:21, 163:24
164:22, 166:4
167:12, 168:9
172:17, 172:25
173:2, 173:5
173:5, 173:6
175:5, 177:19
178:4, 181:12
194:11, 194:25
197:21, 200:17
207:16
**formal** 45:17
45:19, 193:18
**formality** 147:1
**formally** 31:14
186:4, 187:1
**former** 207:20
**forms** 55:6, 55:9
55:12, 55:13
56:2, 56:3, 56:6
56:8, 56:11
65:9, 68:2
74:12, 75:9
75:16, 75:22
75:25, 76:5
104:16, 105:5
109:12, 109:20
114:1, 115:24
117:5, 117:20
127:9, 133:23
134:9, 134:15
134:25, 136:15
136:20, 136:22
136:24, 137:16
141:11, 141:18
141:20, 141:22
141:23, 162:5
167:15
**forward** 120:23
161:6, 170:16
**forwarded** 23:9
114:24, 115:4
161:3
**found** 12:23
50:17, 150:9
159:8, 191:5
**foundation**
54:13, 78:21
89:11, 95:2
95:9, 95:23
96:4, 96:18
98:13, 98:22
99:7, 102:11
102:21, 120:3
121:21, 124:16
131:13, 132:1
132:16, 132:23
133:5, 135:15
136:2, 141:15
148:24, 149:5
149:12, 149:23
150:4, 153:9
154:7, 158:11
158:16, 164:21
165:8, 171:1
171:12, 181:8
187:4, 187:24
195:24, 197:9
198:8, 198:25
201:9, 202:13
203:1, 203:12
204:2, 204:8
204:17, 207:1
207:17
**four** 5:11, 21:8
29:16
**fourth** 22:4
191:13

**frame** 68:8
**frames** 82:1
**Friday** 1:17 3:17, 157:8
**friends** 168:23 189:4
**front** 133:18 165:13, 165:14 167:6
**full** 76:17, 77:9 77:11, 97:17 134:12, 159:23 195:4, 200:19
**full-time** 12:23
**fully** 195:17
**fun** 168:24
**functions** 20:9 34:3, 135:24 195:19
**fundamental** 154:16
**further** 42:17 105:2, 128:5 208:19

**G**

**G-r-i-s-e-l-d-a** 21:12
**Gannon** 203:7
**gap** 30:5
**gather** 38:4 65:8
**gathering** 45:15
**general** 15:4 16:5, 16:7, 16:8 25:3, 28:2, 28:5 35:11, 54:6 55:13, 191:15 193:6
**generally** 25:8 48:14, 48:24 53:24, 53:25 54:10, 151:16 161:25
**getting** 27:6 43:2, 46:6 61:11, 101:21 140:2
**gist** 161:17 161:20
**give** 24:1, 24:14 45:9, 55:10 70:10, 73:19 79:1, 115:2 141:2
**given** 45:4 63:14, 64:7 64:13, 65:2 66:12, 77:16 82:22, 83:17 98:7, 109:7 115:15, 115:22 116:2, 116:17 146:20, 183:16
**go** 11:7, 12:24 16:23, 23:18 24:20, 25:10 25:13, 25:24 25:24, 43:7 43:22, 44:17 54:1, 54:11 55:20, 59:2 62:23, 67:9 71:13, 73:25 78:24, 79:2 84:4, 84:17 92:2, 99:16 105:7, 106:24 124:19, 133:17 133:17, 137:23 140:24, 146:11 149:13, 153:14 164:3, 165:12 166:9, 168:3 168:15, 171:13 172:5, 172:7 172:9, 173:3 173:18, 174:25 181:15, 192:17 200:14
**God** 205:11
**goes** 91:2 135:16, 173:21 178:14, 178:20 187:9
**going** 5:13, 5:15 5:19, 12:7 26:19, 26:22 27:1, 27:11 27:12, 27:14 28:11, 28:18 35:17, 42:19 47:7, 68:20 70:4, 82:11 94:9, 115:5 115:9, 115:13 124:25, 125:19 126:1, 142:9 146:1, 149:4 149:11, 151:15 153:8, 153:20 154:12, 154:15 163:18, 164:6 165:17, 167:3 176:18, 178:6 183:20, 186:9 189:15, 189:24 191:24, 201:25 206:4, 206:8 206:10, 206:12 206:25, 207:6
**Goldstein** 193:21
**Goldstein's** 195:21
**good** 3:16, 4:25 5:1, 142:25 155:12
**goodness** 94:14 144:6
**gosh** 18:2, 60:5
**Gotcha** 52:11 157:20
**gotten** 132:11
**government** 61:3, 61:5
**grad** 12:10
**graduate** 11:11 11:17, 11:20 11:24, 12:21
**grammar** 127:20
**Great** 62:9
**Gregory** 3:25 210:7
**grievances** 15:17
**Griselda** 21:10
**Group** 182:8 182:17, 183:21 206:1
**guess** 22:20 49:19, 54:14 59:12, 67:21 72:18, 73:4 87:17, 90:12 108:2, 110:19 123:16, 129:12 133:2, 137:19 155:14, 186:21 194:8, 195:1
**guidance** 136:13 153:18
**gun** 58:7, 58:10
**guy** 148:2

**H**

**half** 103:4 107:17
**Halsted** 7:2 10:4, 10:15 10:21
**hand** 4:2, 75:25 94:9, 111:8 123:21, 125:5 142:9, 142:10
**handcuffed** 49:18, 49:21
**handed** 117:5
**handle** 123:21 123:22, 124:3
**handled** 20:14 198:10, 200:8
**handles** 17:10
**handwriting** 84:4
**handwritten** 83:21
**Hang** 166:25
**happened** 17:15 25:9, 38:14 39:2, 48:5 48:10, 48:23 50:15, 50:25 51:3, 56:16 56:22, 56:25 80:9, 80:20 81:25, 85:11 92:20, 93:24 187:13, 188:15 198:13, 198:13 198:17
**happening** 23:12, 25:15 59:2, 97:17 207:11
**happens** 135:12
**harassment** 14:10, 14:17 14:25, 15:3 15:4, 95:4, 95:4 120:22, 159:12
**hard** 23:18 140:13, 143:19
**harm** 160:20
**Harrington** 170:5, 170:6 171:17
**hate** 162:24
**Hayes** 48:5 48:9, 48:12 48:15, 48:22 49:13, 52:2 52:3, 52:12 57:5, 83:1, 83:5 83:18, 83:20 84:18, 85:20 86:22, 90:20

93:8, 93:20
94:3, 98:11
98:19, 99:5
181:5, 194:24
**head** 20:4, 35:5
**health** 35:19
36:24, 37:1
40:3, 63:15
64:15, 66:10
68:16, 68:24
69:7, 71:19
72:24, 78:17
78:18, 78:19
104:13, 108:25
109:8, 109:9
139:25
**hear** 82:11
**heard** 46:16
109:18, 148:10
148:13, 182:16
207:9, 208:5
**hearing** 120:23
**hearsay** 186:11
187:25, 189:24
192:1
**heed** 115:9
**held** 90:11
**Helen** 169:15
169:17
**help** 156:2
168:20
**helpful** 97:9
**Henretty** 2:20
4:11, 4:11
60:15, 60:20
60:25, 61:4
82:15, 85:23
94:13, 94:16
95:10, 96:5
97:12, 97:25
98:15, 98:24
99:8, 99:23
110:18, 128:17
129:21, 143:5
143:7, 148:21
159:21, 172:4
205:12, 205:15
205:19, 207:25
208:10
**hierarchy** 20:18
**high** 11:7, 11:8
**higher** 16:6
**hindsight**
195:22, 196:2
**Hinshaw's**
205:10
**HIPAA** 61:19
68:15, 109:9
113:9, 116:15
127:9, 127:20
127:21, 131:21
132:3, 133:7
159:5, 160:12
163:7, 163:20
172:17, 172:25
**hire** 20:10, 29:8
**hired** 17:12
20:12
**history** 11:14
76:18, 77:9
77:23, 85:20
86:9, 190:5
192:10
**hold** 110:14
110:19, 128:4
**holiday** 102:16
**Hones-Hayes**
47:19
**honestly** 75:23
**Honingford** 3:2
4:15, 4:15
60:24, 94:10
157:1, 205:16
208:24
**hostile** 179:18
180:13, 180:13
180:23, 181:14
**hour** 107:17
**hours** 33:1, 33:1
102:23, 103:7
**HR** 17:9, 17:21
18:20, 18:23
19:3, 19:8, 20:1
20:4, 20:19
22:15, 25:4
25:14, 25:22
26:1, 30:6
31:20, 32:11
32:13, 34:21
35:4, 35:13
35:14, 35:19
36:9, 36:9
36:12, 36:21
37:11, 39:21
41:25, 42:9
55:9, 56:10
56:11, 65:20
67:5, 71:23
73:22, 75:5
89:5, 90:23
98:2, 100:3
116:22, 135:24
170:7, 171:19
171:21, 198:4
198:12, 198:15
198:23, 198:25
**human** 14:19
17:22, 20:9
30:1, 30:15
47:10, 48:1
51:13, 59:3
88:5, 96:16
100:15, 101:7
179:18, 183:9
183:19, 183:20
**Hyphens** 52:15

**I**

**idea** 84:9, 148:8
158:19, 203:3
**identical** 112:18
**identify** 125:7
202:5
**ignores** 196:22
**Illinois** 1:2, 1:25
2:8, 2:16, 2:24
3:6, 3:14, 3:20
3:23, 11:10
11:21, 12:7
13:14, 69:22
**illness** 195:9
195:12
**IME** 174:16
174:17, 177:2
**immediate**
17:18, 18:8
58:22, 58:23
**immediately**
120:13, 160:25
**imminent** 58:16
58:16, 59:1
59:8, 59:14
**impair** 195:13
**impairment**
149:16, 195:10
195:12
**implications**
149:15
**important** 6:3
**in-house** 26:5
**inaccurate**
163:13, 164:4
186:8, 186:18
192:6
**inappropriate**
98:19, 99:4
99:18, 179:4
**incident** 17:15
22:1, 31:13
31:22, 34:23
35:2, 38:14
38:22, 42:18
43:11, 47:9
47:12, 48:2
50:13, 50:24
51:9, 58:10
59:12, 76:8
82:24, 86:25
91:6, 93:16
186:5, 186:14
186:14, 186:21
186:23, 186:24
187:2, 190:17
191:18, 193:8
193:13, 193:17
196:25, 202:24
**include** 130:17
141:20
**including** 128:1
131:11
**incomplete**
163:25
**incompleteness**
164:1
**incredibly** 194:3
**independent**
34:1, 40:4
45:24, 46:9
49:2, 49:9
49:11, 50:21
70:11, 72:15
99:3, 150:8
150:15, 150:18
151:1, 151:9
158:1, 158:14
158:25, 174:9
174:16, 174:20
176:7, 181:15
188:15
**indicate** 52:2
57:13, 59:13
75:14, 93:15
148:19, 157:2
**indicated** 46:19
49:17, 70:15
92:11, 165:10
172:22
**indicates** 109:24
128:22, 185:14
**indicating** 48:25
100:22, 101:13
139:14, 200:17
**indication** 128:1
128:10, 205:7
**indirectly**
152:18
**individual** 113:7
202:6
**individuals**

204:24
**infer** 190:21 191:4, 191:8
**inform** 44:15 166:17, 178:12 182:6
**information** 4:18, 20:13 38:4, 38:12 42:18, 42:20 42:24, 57:10 58:20, 63:16 64:15, 65:1 66:11, 67:5 67:10, 68:16 68:24, 69:1 69:7, 69:25 70:12, 70:21 71:19, 72:13 72:20, 72:25 73:15, 76:6 82:22, 85:4 90:23, 92:24 93:15, 97:4 109:8, 109:10 116:14, 116:17 117:3, 130:18 136:11, 150:17 153:2, 154:14 154:17, 158:20 158:23, 159:1 163:4, 173:14 178:21, 179:7 186:7, 187:20 187:25, 188:3 188:5, 188:15 192:2, 192:9 192:12, 192:16 192:22, 202:7 202:9, 202:20 203:3, 203:10 204:7, 204:15 204:20, 204:25 206:19
**informed** 45:11 104:13, 108:24 157:25, 159:4 159:13, 166:1 167:9
**informing** 109:15
**initial** 23:7, 29:7 31:12, 31:18 31:19, 42:15
**initially** 40:15 80:19
**injunctive** 160:24
**inmates** 49:18 49:21, 59:14
**inquiries** 164:14 165:3
**inquiry** 206:9
**instance** 58:7 200:7
**instruct** 26:22 26:25, 27:4 28:11, 115:5 125:1, 126:1 146:2
**instructed** 146:16, 156:19 157:4
**instructing** 28:14, 118:19
**instructions** 27:18
**insufficient** 156:17
**intend** 125:16
**intended** 55:16
**interacted** 74:20
**interacting** 191:14
**interaction** 109:4
**interactive** 65:3 117:1
**interim** 30:1 30:3, 193:19
**internal** 200:4
**interpose** 206:5
**interrogatories** 33:11, 33:22
**interrupt** 6:4 6:5, 40:1, 52:18 176:13
**intertwined** 78:17
**intervention** 193:14
**interview** 39:24 41:7, 57:20 58:11, 77:13 81:8, 87:7 149:17, 179:20 180:11, 186:3
**interviewed** 32:7, 96:1
**interviews** 81:12
**intimidating** 178:21, 179:4
**investigate** 198:4
**investigated** 14:25, 93:20 93:22, 200:5 200:6
**investigation** 56:15, 188:21 196:18, 196:23 197:1, 197:11 197:12, 197:18 197:25, 198:6 198:20, 199:8 199:12, 199:19 199:21, 200:10
**investigative** 198:10
**investigator** 14:10
**investigators** 199:17, 199:23
**involved** 23:1 31:7, 32:10 32:14, 37:6 87:14, 88:10 88:22, 92:17 154:5
**involvement** 21:16, 22:1 22:19, 31:11 31:23, 32:12 42:22, 54:9 54:16, 91:16 207:13
**involving** 14:3 34:23, 51:10 120:8, 190:11
**irreparable** 160:20
**Isaac** 182:8 182:16, 183:21
**issuance** 201:2
**issue** 26:1, 35:12 38:2, 51:24 61:24, 72:2 81:5, 136:22
**issues** 15:19 17:11, 20:14 23:2, 23:3 23:12, 25:14 25:21, 26:16 51:23, 73:16 73:17, 76:8 77:12, 77:17 79:2, 79:2, 81:3 166:3, 166:6 166:23, 167:11 199:15
**issuing** 22:19
**it'd** 27:2, 69:3 70:25
**Italian** 170:2

**J**

**jail** 18:15, 18:17 19:7, 26:9
**James** 204:10
**January** 10:17 119:12, 119:16 121:12, 122:1 132:19
**JD** 13:3, 13:5
**Jeff** 203:14 203:20
**Jessica** 21:20
**job** 11:15, 11:16 12:9, 12:23 14:5, 14:6, 15:6 20:6, 29:12 29:13, 34:3 38:3, 57:12 124:2, 135:24 190:8, 191:20 195:14, 195:19
**John** 1:5, 3:21 4:8, 4:9, 5:16 21:5, 21:16 22:1, 22:9 22:17, 22:22 23:2, 23:6 23:14, 23:21 24:6, 24:10 24:16, 25:5 26:12, 27:24 28:22, 28:23 28:24, 31:8 31:11, 31:24 32:10, 36:7 37:6, 37:10 38:21, 38:25 39:8, 39:9, 42:4 42:14, 42:24 43:2, 47:12 48:4, 53:13 53:16, 54:7 54:10, 91:1 91:16, 94:1 104:12, 113:5 120:8, 144:3 144:11, 149:14 151:3, 153:4 153:13, 154:10 155:2, 156:10 157:9, 158:15 160:4, 166:2 166:19, 170:5

170:6, 170:15 171:17, 178:12 186:25, 187:13 194:23, 195:23 197:4, 197:16 206:16
**Johnice** 204:19
**Johnsen** 203:14 203:21, 204:7
**Join** 95:10, 96:5 97:12, 97:25 98:15, 98:24 110:18, 128:17
**joint** 40:9
**joke** 119:1
**joking** 168:22
**Jones** 56:16 56:18, 59:5 83:5, 91:8 179:8
**Jones-Hayes** 2:19, 4:12 38:22, 39:13 42:20, 43:3 50:19, 50:25 52:3, 52:10 83:6, 109:5 120:22, 178:22 179:10, 186:24 188:19, 188:24 189:3, 193:9 196:18, 196:19 197:3, 197:20 199:9, 202:25 203:21, 203:25
**judgment** 99:7
**jumped** 50:6
**jury** 159:8
**justice** 11:23

**K**

**K-a-r-y-n** 17:25
**K-r-o** 46:17
**K-r-o-l** 144:22
**K-r-o-l-l** 144:22
**Karen** 2:19 4:12, 47:19
**Karyn** 17:20 17:21, 17:24 19:13, 20:3 22:21, 23:9 24:19, 30:6 31:21, 53:10 92:3, 92:6
**Kate** 26:2, 26:3 114:13, 122:17 145:17, 154:4
**keep** 89:15 165:17
**keeping** 92:1
**kept** 95:7
**kind** 11:15, 20:8 20:12, 20:13 25:20, 26:20 38:4, 44:17 46:5, 47:3, 47:4 47:24, 48:25 49:5, 49:24 50:7, 51:8 53:19, 57:11 59:1, 65:3 66:18, 68:7 71:10, 74:6 76:16, 79:22 82:3, 89:15 96:23, 97:17 99:7, 118:21 118:23, 123:22 132:10, 137:19 169:3, 171:22 180:8, 180:23 188:9, 206:1
**kinds** 197:9
**Kirkland** 60:23
**knew** 65:20 75:22, 165:9 191:7
**know** 5:18, 5:23 15:6, 21:15 21:25, 23:11 23:18, 23:22 23:23, 24:1 24:1, 24:7 24:13, 25:20 26:4, 26:11 30:18, 31:23 32:3, 32:6, 32:8 32:12, 34:8 34:13, 34:15 34:16, 34:17 34:18, 34:25 35:9, 35:9 35:11, 36:4 36:6, 36:22 37:3, 37:21 37:22, 37:23 37:25, 43:7 44:16, 44:21 45:11, 45:12 45:15, 45:22 47:4, 47:24 50:24, 51:23 53:15, 53:19 54:9, 56:3, 56:8 56:9, 56:22 57:21, 57:24 58:8, 58:20 59:12, 60:16 61:11, 64:17 64:22, 64:25 65:7, 66:15 67:16, 67:23 68:3, 69:24 71:6, 73:5 73:13, 73:24 75:1, 75:4, 75:6 75:22, 76:10 76:19, 77:12 77:16, 77:17 77:23, 78:3 78:11, 78:12 78:16, 78:22 78:23, 78:24 79:22, 80:4 80:14, 81:13 81:14, 81:15 81:17, 82:18 83:10, 83:14 83:23, 84:20 84:23, 84:24 85:17, 85:20 86:1, 86:5, 86:6 86:7, 86:8 86:10, 87:6 87:8, 87:9 87:13, 87:24 88:14, 88:21 89:8, 89:10 89:12, 89:13 90:19, 91:3 91:11, 91:15 91:21, 92:1 92:17, 92:24 93:4, 93:5, 93:8 93:11, 93:13 93:14, 93:18 93:19, 93:22 93:23, 93:23 94:1, 94:5 95:15, 96:6 96:7, 96:21 97:7, 97:7 97:18, 99:3 100:17, 103:10 105:16, 105:23 106:7, 106:16 107:5, 107:11 107:14, 107:24 110:5, 110:6 111:4, 111:6 112:5, 112:12 114:8, 115:24 116:4, 116:21 116:22, 116:23 116:25, 117:24 119:19, 120:4 120:18, 121:9 121:11, 121:17 121:20, 121:23 121:25, 122:6 122:8, 122:9 122:22, 122:24 122:25, 124:11 124:13, 124:14 124:20, 124:21 125:18, 128:9 128:11, 128:20 129:7, 129:12 129:17, 131:2 137:19, 137:24 142:16, 144:17 145:3, 146:8 147:20, 147:22 147:24, 148:4 148:6, 148:8 148:16, 148:25 149:3, 150:14 150:22, 150:25 151:2, 151:5 154:1, 154:1 154:2, 154:5 154:8, 155:10 155:15, 157:12 158:10, 158:12 158:13, 158:23 161:7, 163:17 164:7, 165:9 169:9, 169:13 169:15, 170:13 170:20, 170:22 171:15, 172:15 173:2, 173:5 173:7, 173:10 178:16, 180:6 181:23, 184:16 185:7, 185:7 185:9, 186:14 186:17, 186:20 187:6, 187:7 187:8, 187:10 187:11, 188:23 188:23, 189:2 189:5, 189:6 189:25, 191:22 192:3, 192:5 192:18, 194:12 197:10, 197:10 197:12, 200:9 200:12, 201:10

Case: 1:17-cv-02393 Document #: 257 Filed: 02/05/20 Page 100 of 351 PageID #:6172




201:17, 201:19
202:9, 202:16
202:20, 202:23
203:7, 203:10
203:14, 203:24
204:6, 204:13
204:15, 204:20
204:22, 204:24
**knowing** 153:10
**knowledge**
32:16, 49:2
50:21, 93:1
93:5, 99:3
138:8, 206:19
**known** 66:6
97:20, 196:14
196:15, 202:6
**knows** 48:8
**Kramer** 111:13
119:11, 119:25
119:25, 120:8
144:13, 156:11
157:10, 160:4
**Kroll** 46:16
46:17, 144:21
144:22, 145:20
147:7, 147:11
147:21, 148:1
148:10, 148:13
150:18, 151:2
151:5, 153:3
158:1, 158:14
158:25
**Kroll's** 149:3
150:11, 153:12
153:20, 154:6
156:22
**Kurtz** 110:3
111:5, 111:12
116:1, 117:20
117:25, 119:9
120:24, 121:12
122:2, 122:23
123:4, 123:9
124:9, 124:23
125:8, 125:10
125:15, 132:12
132:18, 136:25
137:4, 137:7
137:9, 137:14
137:25, 138:9
138:16, 139:13
144:12, 156:9
156:10, 159:17
160:2, 162:3
165:6, 166:2
166:16, 167:25

## L

**L-o-b-a-t-o**
21:12
**labor** 15:19
28:8
**laborer** 15:16
**lack** 54:13
78:21, 89:11
95:2, 95:9
95:23, 96:4
96:18, 98:13
98:21, 98:22
102:11, 102:21
120:3, 121:21
124:16, 131:13
131:25, 132:15
132:22, 133:5
135:15, 136:2
136:8, 136:8
148:24, 149:4
149:11, 149:23
150:4, 153:8
154:7, 158:11
158:16, 164:21
165:8, 171:1
171:12, 181:8
192:2, 195:24
198:8, 201:9
202:13, 203:1
203:12, 204:2
204:8, 204:17
**language** 128:8
**latest** 201:23
**laughing** 151:25
**law** 1:22, 2:5
2:13, 3:18
12:21, 12:22
12:24, 24:21
25:11, 25:13
25:22, 25:25
26:7, 54:1, 54:5
54:11, 61:8
114:6, 114:9
120:6, 122:11
122:13, 122:21
123:1, 123:22
123:25, 124:2
126:8, 127:11
128:3, 128:11
128:12, 128:20
129:7, 129:17
129:17, 137:23
145:15, 153:18
153:24, 153:25
161:3, 162:18
**lawsuit** 33:9
**lawyer** 13:13
14:11, 15:24
75:15, 110:8
110:14, 110:16
110:22, 117:10
117:12, 117:19
125:10, 146:16
162:11
**lawyers** 15:20
124:3
**lead** 73:17
141:14
**leave** 12:6
12:19, 17:6
17:7, 113:8
120:20, 135:9
155:6, 155:13
160:10
**leaves** 17:10
20:12
**leaving** 82:4
107:22, 117:2
**led** 37:20, 47:10
47:25, 48:1
116:10
**left** 12:22, 16:9
16:15, 18:4
18:6, 29:20
30:6, 37:3, 37:5
50:14, 76:5
79:25, 80:2
104:18, 107:4
107:6, 107:8
107:11, 107:14
108:4, 109:13
**legal** 27:23, 56:8
113:10, 118:13
120:19, 124:14
124:24, 128:7
128:8, 132:20
138:20, 162:12
162:15, 168:7
208:2
**letter** 45:9
45:11, 104:5
104:11, 105:10
105:12, 105:24
106:5, 106:11
106:14, 106:16
106:23, 107:9
107:15, 108:1
108:4, 108:15
108:16, 108:19
108:23, 109:15
109:24, 110:3
110:7, 110:13
111:3, 115:21
117:19, 133:13
133:19, 133:25
134:2, 134:8
134:16, 134:21
136:19, 136:24
138:21, 139:12
141:8, 141:10
141:20, 141:25
162:11, 164:13
165:2, 165:4
181:22, 181:24
182:2, 182:5
182:6, 183:10
206:15
**letters** 91:20
**level** 15:24
**license** 13:20
**licensed** 13:13
13:16
**lieu** 103:8
**life** 60:11, 181:1
**light** 17:11
20:13
**limit** 72:3, 123:9
**limitation** 74:23
160:13
**limitations** 58:2
58:5, 58:6, 74:9
74:17, 75:2
76:23, 128:14
160:14, 162:5
**limited** 70:21
72:21, 73:3
129:10, 130:1
130:6, 130:13
173:21, 173:24
**limiting** 73:18
73:21, 123:5
130:18
**Linden** 2:12
2:13, 4:7, 4:7
4:19, 4:24, 10:9
10:11, 16:14
26:23, 26:25
27:10, 27:13
28:10, 28:16
38:19, 39:8
39:11, 39:15
39:17, 52:5
52:7, 52:11
52:20, 52:22
53:1, 53:3, 53:5
55:15, 59:24
60:2, 60:5, 60:8
60:12, 60:14
60:19, 61:10
61:14, 61:18
61:21, 61:23

62:1, 62:4, 62:7 62:9, 62:12 62:14, 62:23 63:2, 67:3 69:15, 79:9 82:14, 82:16 83:7, 89:14 89:17, 89:20 89:23, 89:25 91:10, 94:7 94:11, 94:15 94:17, 99:24 103:16, 103:18 103:23, 103:25 112:20, 112:22 113:1, 114:20 114:22, 118:2 118:18, 118:21 118:23, 119:1 125:6, 126:14 126:25, 127:2 141:14, 141:17 142:12, 142:19 142:24, 143:6 143:9, 143:13 143:16, 143:18 143:20, 143:24 146:10, 146:22 147:9, 147:23 148:1, 148:5 148:7, 150:7 151:14, 152:1 152:4, 152:6 152:8, 153:7 155:11, 155:22 156:3, 157:16 157:18, 157:20 159:20, 162:24 165:18, 165:23 165:25, 168:15 168:17, 168:20 168:25, 169:2 169:25, 172:2 172:5, 172:7 172:9, 174:2 175:14, 175:17 175:19, 175:21 175:23, 175:25 176:4, 176:15 176:22, 177:6 179:11, 183:23 184:1, 184:3 184:21, 184:24 185:1, 185:3 185:5, 185:11 185:13, 186:13 188:18, 188:20 189:12, 189:14 189:21, 192:21 198:23, 199:4 201:23, 202:1 203:23, 204:12 205:5, 205:8 205:13, 205:18 206:10, 206:14 207:2, 208:13 208:16, 208:19

**Lindsey** 22:13
**Lindsey's** 22:14
**line** 67:8, 69:6 84:16, 85:8 191:8, 199:13 206:8
**lines** 130:17
**list** 46:11
**listed** 105:19 111:24, 205:1
**listen** 206:12
**literally** 20:18
**litigation** 27:3 27:7, 27:8 115:17, 138:22
**little** 30:5, 52:22 53:9, 88:15 141:6, 159:15 180:21, 181:7
**live** 10:2, 10:20
**lived** 10:15
**LLC** 3:11, 4:1 182:8
**Lobato** 21:10
**local** 4:22
**locate** 46:5
**located** 3:18 26:9
**lockdown** 190:11
**locked** 70:18 70:19
**long** 5:22, 10:2 10:15, 13:16 18:1, 30:3 32:25, 73:24 80:4, 81:21 81:24, 88:17 89:4, 107:14
**longstanding** 190:7
**look** 120:23 128:19, 132:25 144:21, 166:11 184:25
**looked** 157:15 180:14
**looking** 32:4 68:20, 84:8 132:24, 133:14 145:6, 172:1
**looks** 76:16 112:16, 142:21 144:2, 144:12 145:10, 187:19
**loop** 92:1, 178:6
**lose** 89:15
**lost** 52:17, 52:17
**lot** 187:25
**loud** 180:22 189:22
**low** 88:15
**Lyle** 2:20, 4:11
**Lynch** 169:9 169:11, 170:25

**M**

**mail** 105:15 106:1, 108:20 108:20
**mailed** 105:12
**making** 38:7 38:10, 43:7 43:23, 52:7
**male** 148:4
**man** 147:21
**management** 36:2, 190:7 190:15, 190:18 193:11
**manager** 17:6 17:7, 21:4 169:18
**mandated** 191:20
**manner** 31:8 57:14, 109:6
**March** 125:13 127:23, 130:21 131:7, 131:24 139:20, 142:23 143:9, 143:15 143:20, 143:23 145:7, 145:9 145:11, 147:16 155:3, 156:13 157:8, 159:2 159:17, 160:1 161:2, 162:4
**mark** 168:10
**marked** 62:2 63:9, 68:12 123:2, 171:3
**marketing** 11:19, 12:10 12:17, 14:5
**Marmor** 3:10 3:11, 4:13, 4:13 10:5, 10:10 19:12, 22:23 24:12, 24:18 26:19, 26:24 27:5, 27:12 27:14, 28:13 28:17, 28:23 30:21, 32:21 34:11, 38:15 38:17, 39:4 39:10, 39:12 39:16, 41:3 45:6, 48:6, 49:6 49:8, 49:12 52:4, 52:6, 52:8 52:17, 52:21 52:24, 54:13 55:14, 55:17 58:4, 59:16 60:7, 60:10 60:17, 60:21 60:23, 61:2 61:7, 61:13 61:15, 61:19 61:22, 61:24 62:3, 62:6, 62:8 62:10, 62:13 62:15, 62:18 62:21, 64:10 67:2, 67:6 67:13, 68:13 69:12, 70:2 70:4, 71:2 72:10, 72:23 73:11, 75:11 75:20, 76:13 77:6, 77:20 78:6, 78:8 78:21, 79:4 79:8, 79:10 82:17, 83:4 85:24, 89:11 89:16, 89:18 89:21, 89:24 91:9, 93:2, 94:4 94:8, 94:14 95:2, 95:9 95:23, 96:3 96:18, 97:5 97:10, 97:14 97:24, 98:13 98:21, 99:6 99:15, 102:11 102:21, 103:14

103:17, 103:19
103:24, 105:25
107:19, 110:11
110:17, 110:25
112:14, 112:21
112:24, 113:20
114:18, 115:5
115:18, 116:19
117:9, 117:11
117:14, 117:22
118:1, 118:11
118:17, 118:19
118:22, 119:4
119:18, 120:3
121:21, 122:3
123:12, 123:18
124:16, 124:19
124:25, 125:23
126:1, 126:12
126:16, 126:18
126:22, 126:24
127:1, 127:17
128:15, 129:5
129:11, 129:20
130:3, 130:9
130:23, 131:13
131:17, 131:25
132:15, 132:22
133:5, 133:13
134:1, 134:4
134:12, 134:20
135:15, 136:2
136:8, 136:17
137:2, 137:5
137:10, 137:17
138:3, 138:12
138:18, 138:23
138:25, 139:2
139:4, 139:7
139:9, 140:10
140:22, 140:24
141:12, 142:13
142:16, 142:23
143:3, 143:11
143:14, 143:17
143:19, 143:22
145:8, 146:1
146:9, 146:18
146:20, 147:8
147:18, 147:20
147:25, 148:22
148:24, 149:4
149:11, 149:23
150:4, 150:19
151:12, 151:15
153:6, 153:8
154:7, 154:12
155:4, 155:8
155:10, 155:24
156:2, 156:5
156:25, 157:14
157:17, 157:19
158:3, 158:9
158:11, 158:16
159:18, 159:22
161:13, 161:19
161:22, 161:24
162:13, 162:22
163:14, 163:24
164:20, 165:8
165:16, 165:19
165:24, 166:4
166:6, 166:25
167:3, 167:12
167:16, 168:23
169:24, 170:2
171:1, 171:10
171:12, 171:20
171:24, 172:3
172:6, 174:1
174:10, 174:13
175:1, 175:4
175:6, 175:11
175:13, 175:15
175:18, 175:20
175:22, 176:13
176:20, 176:24
177:2, 177:5
177:7, 178:2
178:4, 178:23
179:10, 179:15
181:8, 181:12
182:25, 184:19
184:22, 185:6
185:12, 185:17
185:19, 186:9
186:19, 187:3
187:23, 188:8
188:17, 188:19
189:8, 189:15
189:20, 189:23
190:23, 191:1
191:4, 191:24
192:8, 192:14
192:20, 194:2
194:11, 194:25
195:24, 196:11
196:21, 197:6
197:21, 198:8
198:22, 198:24
199:22, 201:9
201:24, 202:13
202:15, 203:1
203:5, 203:12
203:22, 204:2
204:8, 204:11
204:17, 205:7
205:11, 205:17
205:20, 206:4
206:12, 206:25
207:16, 207:24
208:4, 208:6
208:8, 208:11
208:22, 209:1
**marriages**
207:21
**married** 8:2
**Mason** 143:24
**Matt** 29:24
30:8, 31:2
31:10, 31:13
31:14, 31:24
43:4, 91:25
**matter** 3:20
31:8, 114:16
190:9, 198:5
210:4
**matters** 25:4
167:10
**Matthew** 3:8
42:3, 42:6, 90:7
202:10
**mean** 20:17
22:18, 23:7
23:15, 23:25
24:13, 33:11
35:11, 39:21
43:25, 44:1
47:20, 51:7
52:10, 57:1
58:5, 58:25
59:12, 73:6
73:13, 74:11
74:13, 75:12
77:8, 78:9
91:23, 91:25
92:9, 97:16
99:17, 107:21
110:19, 114:18
129:13, 130:10
130:14, 130:17
132:2, 135:4
136:23, 139:24
140:12, 140:12
143:11, 145:10
147:8, 147:8
148:3, 151:12
155:7, 164:23
171:2, 172:16
175:8, 181:22
187:23, 194:13
194:14, 196:13
204:3
**meaning** 24:19
152:19, 176:8
188:17
**means** 148:16
171:4
**meant** 127:15
129:2
**mechanism**
198:18, 199:7
199:11
**medical** 38:2
44:20, 45:1
45:15, 45:20
46:6, 46:9
46:11, 46:20
46:24, 46:25
47:8, 54:21
54:24, 54:25
55:5, 55:10
55:22, 55:22
63:16, 67:19
69:25, 70:9
70:14, 71:25
72:15, 72:20
73:15, 75:16
76:11, 76:12
76:18, 77:3
77:9, 77:10
77:12, 77:17
77:18, 77:23
78:4, 78:12
78:14, 113:12
114:1, 120:20
123:5, 123:10
130:7, 130:13
140:1, 160:12
160:13, 160:21
163:9, 163:22
164:6, 168:10
173:3, 173:13
173:18, 173:25
174:16, 174:20
174:21, 174:22
176:7, 176:9
176:19, 177:10
177:12, 195:10
195:12
**meet** 22:24
31:21, 35:19
35:20, 37:15
38:3, 38:7, 42:8
44:1, 44:2, 65:4
73:15, 79:14
80:8, 80:11
90:6, 97:16
116:9, 130:25
**meeting** 32:25

37:18, 51:11
58:3, 66:19
74:21, 79:19
80:13, 81:9
86:2, 87:10
88:5, 94:2
109:7, 116:9
116:10, 116:21
117:1, 140:4
179:22, 179:25
197:13, 199:13
**meets** 34:1
**Megan** 3:2, 4:15
**Melody** 169:20
**member** 96:10
**memo** 170:25
**memorandum** 59:11
**memory** 23:19
**mental** 195:9 195:12
**mentioned** 160:22
**merit** 206:21
**message** 104:19 107:4, 107:22 108:10, 109:13 109:14, 109:25
**messed** 6:6
**met** 32:20 32:23, 33:1 41:9, 44:5, 44:9 51:13, 51:17 56:21, 79:17 80:2, 80:5 81:16, 81:17 104:8, 116:8 197:22
**Michele** 36:5
**Michigan** 11:4
**middle** 52:19
**military** 8:10
**mind** 184:2
**minute** 183:24 201:22
**minutes** 79:24 80:6, 81:23 107:18, 141:6 188:12
**mischaracteriz...** 150:6
**mischaracterizes** 67:13, 72:10 133:6, 150:20
**misdemeanor** 14:3
**misleading** 103:19
**mispronounces** 152:2
**missed** 193:13
**missing** 129:22
**Mm-hmm** 195:6 201:14
**moment** 25:1
**Monday** 104:23 160:1, 182:9
**money** 102:17
**months** 17:14 29:16
**Morley** 169:20
**morning** 3:16 4:25, 5:1
**Morris** 36:5
**motion** 112:23
**mouth** 25:1
**move** 170:16 195:3
**moved** 10:4 30:6
**moving** 168:19 170:16
**Munizzi** 169:23 169:24, 169:25

N

**name** 3:24, 5:4 12:12, 19:15 21:1, 21:11 21:21, 24:11 36:16, 45:4 45:18, 45:19 46:16, 63:23 65:17, 66:5 66:6, 67:9, 69:8 69:18, 177:22 182:21, 202:5
**named** 66:11 69:7
**names** 65:8
**nature** 21:24 25:3, 27:20 82:7, 84:6
**Nawara** 1:5 3:21, 4:8, 4:10 5:16, 17:15 21:5, 21:16 22:1, 22:9 22:17, 22:22 23:2, 23:6 23:14, 23:21 24:6, 24:17 25:5, 26:12 27:24, 28:22 28:23, 28:24 31:8, 31:11 31:24, 32:10 36:7, 37:6 37:10, 39:1 39:8, 39:11 41:9, 41:13 41:20, 42:4 42:7, 42:15 42:24, 43:2 47:13, 47:23 48:4, 48:17 49:22, 50:8 50:12, 50:16 51:2, 51:12 51:19, 53:13 53:16, 54:7 54:10, 56:14 56:21, 57:13 59:7, 59:15 64:8, 64:13 65:2, 65:6 65:11, 65:12 66:12, 66:21 72:8, 73:2 74:16, 74:20 74:25, 75:2 76:6, 76:25 77:5, 77:13 77:18, 78:1 79:15, 79:18 81:13, 81:19 82:11, 82:24 84:9, 85:8 86:18, 86:23 87:2, 87:4, 87:7 87:10, 88:16 88:21, 90:6 91:2, 91:6 91:16, 92:20 93:9, 93:11 93:15, 94:1 96:1, 98:17 99:2, 100:13 101:10, 102:9 102:13, 103:11 104:6, 104:12 105:12, 105:16 106:4, 108:15 110:4, 113:5 113:13, 113:25 115:20, 115:22 116:2, 116:8 117:9, 118:1 120:8, 120:13 125:10, 125:17 127:8, 127:18 128:12, 131:22 133:24, 134:9 134:17, 136:5 137:25, 138:1 138:9, 138:9 138:16, 139:13 140:8, 140:13 142:2, 142:3 142:17, 144:11 147:13, 149:14 149:18, 150:2 150:9, 151:3 153:4, 153:14 154:10, 156:10 156:16, 157:9 157:13, 157:25 159:3, 160:5 160:9, 160:20 160:20, 162:21 163:4, 164:13 165:2, 166:2 166:20, 167:10 168:1, 168:11 170:15, 170:20 172:17, 174:22 178:12, 181:5 181:15, 181:25 182:6, 183:20 184:13, 186:2 186:2, 186:25 188:18, 188:19 188:25, 190:19 191:11, 191:17 193:5, 193:19 195:15, 195:19 195:23, 196:19 197:4, 197:16 198:15, 200:18 200:25, 202:24 206:17, 207:12 207:14
**Nawara's** 24:11 38:21, 39:13 41:6, 72:6, 77:2 78:14, 98:10 106:7, 106:7 155:2, 158:15 163:8, 163:22 187:13, 190:5 191:9, 195:7
**near** 119:23
**necessarily** 65:19, 114:2 114:3, 135:11
**necessary** 37:25 40:17, 65:5 140:2
**necessitated**

164:12
**need** 73:20 73:24, 77:23 78:20, 79:8 103:14, 126:22 139:15, 166:25 171:24, 205:3
**needed** 37:24 38:12, 76:24 77:3, 77:18 78:3, 78:13 131:3, 133:24 140:17
**negotiations** 15:17
**neither** 186:4 186:25
**never** 60:10 60:17, 62:16 108:8, 108:9 109:14, 109:24 142:17, 208:5
**new** 201:25
**nice** 60:22
**Nick** 26:2, 27:24 114:13
**nine** 10:3, 10:18 15:22
**Nneka** 91:8 91:9, 91:10
**Non-Confident...** 8:1, 10:1
**normal** 84:1 100:3, 106:21
**normally** 65:7 143:11
**North** 1:23, 2:6 2:14, 3:19, 7:2 9:2
**Northern** 1:2 3:22
**notary** 3:25
**notes** 38:1 83:21, 83:24 86:18, 86:22 87:3, 87:7
**nothing's** 103:19
**notice** 4:21, 33:6 44:23, 84:16 85:8, 115:23
**noticed** 49:18
**notification** 100:12, 116:2
**notify** 46:7
**notwithstanding** 189:19, 190:3
**November** 41:7 48:3, 48:18 51:18, 57:19 57:25, 58:3 59:6, 65:12 77:14, 79:18 83:8, 84:14 86:2, 88:17 94:2, 96:2, 97:4 100:7, 100:13 101:20, 102:9 103:10, 108:24 109:7, 109:13 109:15, 109:16 112:3, 112:8 115:21, 127:21
**number** 1:9 3:22, 63:10 66:3, 68:12 68:21, 69:11 73:6, 74:13 82:13, 88:15 90:1, 90:2, 90:4 91:2, 94:18 98:18, 99:2 99:20, 104:1 108:11, 108:14 111:8, 117:7 117:16, 119:6 123:2, 125:5 127:6, 128:13 128:20, 128:23 129:2, 129:9 129:19, 130:2 131:23, 132:5 133:12, 133:18 134:21, 134:22 138:2, 138:2 138:10, 138:11 139:14, 139:15 139:19, 141:7 142:11, 142:14 143:25, 145:1 145:14, 145:14 155:25, 156:6 156:23, 164:20 169:5, 172:14 173:18, 176:5 176:7, 176:17 177:16, 181:21 200:14, 201:21 202:3, 202:6 203:15, 205:1 206:5, 206:6
**numbers** 60:13 60:14
**nurse** 35:20 35:22, 36:2 36:9, 36:24 37:1, 37:14 40:3, 40:8 40:21, 40:22 41:16, 43:11 44:1, 44:10 44:18, 45:2 45:9, 45:12 47:2, 49:16 51:13, 51:16 63:21, 65:7 68:2, 70:8 70:15, 70:18 70:21, 72:9 72:14, 73:25 74:3, 74:5 74:14, 76:1 76:2, 82:10 82:23, 85:4 89:5, 92:19 104:13, 105:9 108:25, 109:12 111:12, 116:21 116:24, 119:11 131:1, 139:25 173:19, 177:9 177:22, 179:23 183:18, 189:2 198:1, 200:20
**nurse's** 70:17 81:9, 180:15
**nurses** 36:11

**O**

**O-l-s-o-n** 30:22
**oath** 4:3
**object** 19:12 22:23, 24:12 24:18, 27:13 27:14, 34:11 38:17, 45:6 48:6, 48:6 55:14, 58:4 59:16, 64:10 67:2, 67:6, 70:4 71:2, 77:20 78:6, 85:23 105:25, 110:17 110:25, 115:2 115:18, 116:19 117:11, 117:14 117:22, 119:18 123:18, 128:15 132:22, 133:3 137:2, 138:18 139:7, 140:22 145:8, 146:1 149:4, 149:11 151:15, 153:8 155:4, 155:8 156:5, 158:9 163:14, 163:24 164:20, 164:21 166:4, 167:12 167:12, 178:2 181:12, 181:12 183:20, 186:9 190:1, 194:11 194:25, 197:21 206:5, 206:8 207:16, 207:24
**objected** 133:7 133:11
**objection** 39:5 41:3, 54:13 67:13, 71:2 72:10, 72:23 73:11, 75:11 75:20, 76:13 77:6, 78:8 78:21, 79:4 85:24, 89:11 93:2, 94:4, 95:2 95:9, 95:23 96:3, 96:18 97:5, 97:10 97:24, 98:13 98:21, 99:6 102:11, 102:21 107:19, 110:11 110:25, 113:20 118:11, 118:17 119:4, 120:3 121:21, 122:3 123:12, 124:16 124:25, 129:11 129:20, 130:3 130:9, 130:23 131:13, 131:17 131:25, 132:15 133:5, 134:1 134:20, 135:15 136:2, 136:8 136:17, 137:5 137:10, 137:17 138:3, 138:12 138:23, 138:25 140:10, 141:12 148:24, 149:23 150:4, 150:19 154:7, 158:11 158:16, 162:13 165:8, 165:19 167:16, 171:1

171:10, 171:12
171:20, 178:23
181:8, 182:25
188:8, 189:24
192:14, 194:25
195:24, 196:21
197:6, 198:8
201:9, 202:13
203:1, 203:5
203:12, 204:2
204:8, 204:17
**objections**
186:19, 187:4
191:25, 192:8
194:2, 206:5
**obtain** 11:5
163:8, 163:21
**obtains** 152:15
**obviously** 20:18
**occupational**
35:19, 36:11
36:24, 37:1
40:3, 104:13
108:25, 139:25
**occur** 32:25
81:8, 140:7
**occurred** 35:2
37:20, 48:2
48:13, 49:1
50:22, 50:25
51:20, 84:18
85:16, 93:16
93:20, 186:5
191:10, 193:8
**occurring** 47:24
**October** 95:21
**offend** 148:5
**offhand** 128:21
**office** 1:22, 2:5
2:21, 3:3, 3:18
14:16, 14:17
16:24, 17:2
18:6, 18:12
18:14, 18:15
18:25, 19:2
26:7, 29:2, 29:5
32:23, 34:3
34:5, 34:10
36:23, 37:4
46:13, 49:20
50:13, 55:24
57:25, 66:6
67:18, 68:5
69:2, 69:20
70:1, 70:8
70:13, 70:14
70:18, 71:1
71:3, 71:7, 72:9
79:20, 81:9
82:6, 82:8
84:12, 86:9
87:15, 88:20
89:7, 94:23
95:4, 95:8
96:12, 100:12
104:14, 108:25
113:6, 113:11
114:16, 120:1
128:25, 132:6
132:21, 136:5
139:13, 139:17
140:8, 150:9
150:12, 151:11
152:19, 152:20
155:3, 158:8
158:24, 159:8
160:19, 163:8
163:21, 164:17
167:14, 168:8
169:19, 172:23
173:4, 173:6
174:19, 176:9
176:17, 177:9
177:20, 180:16
182:23, 183:4
183:5, 196:17
197:2, 197:19
198:1, 198:6
198:19, 199:16
199:17, 199:24
200:3, 202:19
**office's** 150:3
**officer** 47:23
48:17, 49:21
50:16, 50:16
56:21, 58:1
58:16, 59:15
85:8, 90:6, 91:1
91:6, 100:13
104:5, 108:15
113:13, 115:20
116:2, 116:8
120:13, 156:16
160:9, 160:19
163:3, 163:8
163:21, 164:13
165:2, 168:10
172:16, 179:5
184:12, 186:2
190:5, 190:19
191:9, 191:11
191:17, 193:5
193:18, 195:7
195:15, 195:19
200:17, 206:22
207:15
**officers** 19:3
49:20, 159:9
**Offices** 2:13
**official** 135:8
**oh** 10:9, 16:23
18:2, 20:25
32:8, 40:2, 60:5
60:19, 60:20
61:15, 61:18
61:21, 68:1
69:12, 69:14
77:22, 79:24
81:23, 87:16
89:16, 92:17
94:14, 95:19
106:6, 106:18
124:18, 127:17
127:20, 129:5
133:20, 134:6
134:14, 143:24
146:23, 152:5
155:9, 157:1
158:3, 159:20
166:15, 166:18
168:20, 169:2
172:6, 172:8
174:14, 175:3
175:7, 175:24
176:3, 176:12
180:18, 181:4
184:1, 185:11
189:10, 196:13
205:11, 205:15
205:21, 208:5
208:7
**okay** 5:25, 10:23
11:20, 12:9
12:19, 12:24
14:5, 16:23
17:1, 21:8, 22:3
23:5, 24:3
24:23, 25:3
26:23, 27:18
28:10, 29:1
29:20, 32:18
33:13, 33:24
35:14, 39:15
39:19, 40:6
41:6, 41:23
45:17, 46:19
46:23, 47:6
49:2, 50:2
50:18, 51:5
52:5, 52:11
52:14, 52:24
52:25, 52:25
54:2, 54:20
54:20, 56:24
59:24, 60:2
61:21, 61:23
62:9, 62:13
62:21, 63:8
63:18, 64:11
64:20, 66:9
67:11, 68:3
68:9, 68:11
68:20, 69:6
69:15, 69:17
70:16, 70:25
71:6, 71:13
73:9, 76:2
78:19, 79:7
79:10, 79:22
81:8, 81:21
82:13, 83:7
85:6, 85:15
88:10, 88:16
89:14, 89:16
89:17, 89:23
90:7, 91:7, 92:2
92:24, 94:6
96:9, 96:25
97:15, 97:20
99:12, 99:20
101:6, 101:16
102:25, 105:5
106:11, 107:1
107:3, 107:23
108:7, 108:11
108:18, 108:22
109:20, 110:2
110:8, 111:3
111:8, 111:16
112:13, 113:1
114:3, 114:8
115:8, 115:21
116:1, 116:12
116:17, 117:24
121:4, 121:7
122:12, 124:4
124:11, 126:7
127:16, 128:9
129:16, 129:23
130:6, 130:12
130:20, 131:5
132:6, 132:12
133:9, 133:17
133:23, 134:7
135:4, 136:25
137:13, 137:21
139:19, 141:4
141:6, 141:19
141:23, 142:9
142:10, 144:7

144:9, 144:11
144:20, 146:4
146:23, 147:6
147:25, 150:7
150:11, 150:17
150:24, 151:2
151:15, 151:19
151:22, 152:7
152:25, 153:19
154:3, 154:9
155:2, 155:11
156:3, 156:15
156:21, 157:1
157:8, 157:18
157:20, 157:23
157:25, 158:7
158:20, 159:2
159:2, 159:15
159:20, 160:7
161:17, 162:3
162:8, 162:17
162:20, 163:11
163:16, 164:4
164:9, 165:23
166:15, 167:3
168:5, 169:2
170:14, 171:4
171:23, 173:17
174:18, 176:24
177:22, 178:15
178:19, 179:2
179:7, 179:13
181:20, 181:20
181:24, 183:9
183:23, 184:21
185:1, 185:2
185:6, 185:11
185:13, 186:23
187:3, 187:9
187:23, 188:13
189:2, 189:17
189:23, 191:6
192:11, 192:24
194:22, 197:1
197:23, 197:25
199:3, 199:16
200:9, 200:13
201:7, 201:15
202:1, 202:2
202:15, 203:7
205:5, 205:25
206:14, 207:2
207:19

**Olson** 30:17
30:21, 30:24
31:1, 32:9

**once** 12:23
20:11, 35:14
39:21, 39:24
75:6, 82:5
100:18

**ongoing** 22:25
26:16

**operation** 91:19

**operations**
91:14

**opinion** 194:4
194:13, 195:6
195:11, 195:14
196:9, 196:10
196:11, 196:12

**opponent**
159:11

**opportunity**
65:10, 193:13

**opposed** 70:1
71:8, 77:4
77:18, 78:4
78:14, 174:21

**OPR** 34:23
35:6, 59:2
93:19, 93:24
198:11, 199:24
200:5, 200:6
200:8, 200:10

**order** 10:6
10:10, 39:19
40:19, 40:23
41:2, 41:20
41:24, 42:6
43:23, 61:11
61:16, 61:16
61:20, 61:25
62:5, 63:15
77:24, 86:24
97:1, 97:3
102:10, 104:17
109:10, 112:23
113:8, 113:11
113:14, 126:8
127:10, 127:11
131:23, 133:24
134:17, 136:6
140:6, 140:18
141:3, 150:12
155:16, 159:5
160:24, 168:8
168:9, 168:11
169:3, 169:3
195:22, 197:16

**ordered** 35:15
35:17, 39:3
41:13, 41:16
42:7, 42:11
43:8, 44:4, 57:6
57:21, 97:22
116:14, 127:8
163:6, 163:7
163:20, 199:9

**ordering** 56:13
196:19, 197:4

**ordinarily**
162:10

**ordinary** 95:7

**outlined** 35:10

**outset** 112:17

**outside** 41:25
81:18, 148:12
200:6

**outwardly**
181:14

**overly** 109:6

**oversee** 18:24

**overseeing** 20:8

**P**

**p.m** 103:20
103:22, 119:13
127:3, 127:5
172:11, 172:13
182:10, 182:11
184:5, 184:8
205:21, 205:24
209:2

**packet** 71:12

**page** 6:14, 8:15
142:22, 149:8
156:6, 159:16
162:20, 162:21
185:24, 187:12
189:8, 189:17
193:22, 193:22
195:5, 206:2

**paid** 101:21
101:22, 101:25
102:6, 102:10
102:23, 103:6
103:8, 151:10
152:12, 155:19
155:20, 201:13

**paperwork**
22:19

**paragraph**
71:14, 104:10
108:22, 109:21
116:1, 125:14
127:7, 127:15
128:7, 134:13
149:9, 159:23
160:7, 163:1
163:12, 164:9
164:18, 173:11
173:11, 174:5
174:18, 176:5
176:22, 176:25
179:15, 179:16
182:4, 185:25
187:15, 187:17
187:18, 188:6
189:18, 191:23
192:5, 192:19
193:1, 193:20
193:25, 194:10
194:17, 195:5

**paragraphs**
105:6, 113:2
188:2, 188:12

**paralegal** 61:7

**parentheses**
113:13, 164:15
174:16, 186:3
193:9, 195:17

**park** 11:10
15:10, 15:14
15:20, 16:9
16:20

**part** 14:15
14:17, 14:19
20:1, 64:14
98:19, 99:4
100:15, 109:25
140:6, 188:21
197:18, 199:24
206:8

**participating**
23:24, 104:21
105:1, 109:17

**particular** 71:25
190:8

**particulars** 51:9
140:13

**parties** 4:21
6:15, 8:16

**partner** 89:18

**party** 40:5
45:13, 45:23
150:21, 150:23
202:8

**pass** 177:11
177:13

**passed** 13:11
59:17

**patient** 64:1
66:11, 69:7

**patient's** 63:22
65:17

**pay** 120:21
152:23

**paycheck**

102:14
**paying** 152:18 152:20
**payroll** 169:12 169:18, 169:21 170:3
**pending** 5:23 61:14
**people** 19:5 20:19, 20:20 20:22, 21:8 31:4, 31:6, 31:7 35:7, 39:5, 91:7 91:16, 162:24 171:15, 205:1
**perceived** 190:17
**perform** 34:2 57:12, 76:25 78:20, 148:20
**performed** 147:11, 197:1 197:18, 198:20 200:10
**period** 73:22 88:12, 179:6
**permitted** 100:14, 147:3 154:24
**Perry** 143:24
**person** 16:3 17:21, 21:18 22:11, 30:16 36:14, 37:11 37:15, 38:7 38:10, 41:23 45:4, 47:7 51:11, 58:18 58:23, 71:23 72:16, 163:9
**personal** 69:3 102:16, 113:12 120:20, 163:9 163:22, 168:10 189:3
**personality** 190:4
**personally** 81:18, 110:15 123:14, 198:22 199:1, 199:3 199:6
**personnel** 14:18 19:5, 21:13 21:23, 22:7 22:15, 96:11 96:15, 96:17
**persons** 204:24
**pertaining** 190:10
**pertinent** 43:1
**pervasive** 190:7
**Peter** 1:22, 2:4 2:5, 3:19, 4:9 111:13, 119:11 119:25, 119:25 144:13, 144:15 148:8, 156:10 157:10, 160:4
**Peter's** 208:13
**PhD** 193:21
**phone** 81:15
**photographic** 23:19
**photographs** 33:15
**phrased** 208:14
**physical** 73:16 78:17, 78:19 79:1, 197:17
**physically** 178:21, 179:3 180:10
**physician** 69:1 69:3, 70:6, 70:7 70:11, 101:13
**physicians** 69:4 141:2
**picture** 73:20 76:17, 97:17
**place** 5:13 26:15, 36:1 43:16, 44:13 70:16, 83:13 120:20, 160:15 198:18, 199:7
**placed** 58:2 74:18, 75:3 76:23, 113:8 160:9
**places** 193:4
**Plaintiff** 1:7, 2:3 2:11, 4:8
**pleadings** 33:21
**please** 4:2, 4:6 5:4, 20:25 67:16, 100:11 120:18, 156:18 157:2, 174:5 189:22
**plural** 134:9 134:15, 141:11 141:18
**plus** 190:5
**point** 23:10 32:1, 65:15 66:21, 155:12 168:4
**pointing** 185:19
**police** 19:3 148:17, 206:22 207:15
**policies** 34:8
**policy** 15:3 113:10, 168:7
**political** 159:10 207:23
**politician** 207:20
**portion** 7:1, 7:5 9:1, 9:3, 96:9
**pose** 195:15
**position** 15:9 15:16, 15:17 16:1, 16:2, 17:4 21:3, 22:6 22:14, 26:3 29:4, 29:7 29:18, 90:11 128:4, 193:4 206:21
**positive** 142:19
**possibility** 135:22
**possible** 113:7 127:25, 131:10 196:25
**possibly** 171:8
**potential** 35:12 113:6, 167:13
**potentially** 190:3
**practice** 84:1 106:13, 106:21 119:22, 128:2 128:10, 172:22
**predating** 76:8
**preparation** 33:3, 56:6
**prepare** 32:19
**prepared** 56:3 56:8, 56:9
**presence** 65:13 81:18
**present** 71:11 80:12, 195:14 206:20
**presented** 179:17, 190:4 190:16, 191:16 196:14
**presently** 195:7
**presents** 43:11
**presumed** 5:19
**pretty** 103:25 155:23
**prevailed** 190:12
**prevent** 58:17 58:23, 74:22 123:8, 123:17
**prevented** 65:16 124:8
**previous** 66:5 66:6, 157:24 159:3
**previously** 156:19, 157:3
**prior** 8:12 29:17, 48:16 56:13, 58:3 68:21, 76:12 85:21, 86:1 86:14, 88:20 94:1, 104:17 109:11, 111:3 115:21, 115:22 117:16, 126:10 127:13, 132:13 132:18, 159:7 160:23, 164:14 165:3, 171:6
**privacy** 163:10 163:19
**private** 82:6 82:8
**privately** 81:17
**privilege** 115:7
**probably** 31:5 60:15, 62:10 79:24, 83:25 84:13, 91:22 114:13, 183:18 208:8
**problem** 39:7 75:9, 75:12 189:14, 190:18 190:25
**problematic** 190:3
**procedural** 44:18
**procedure** 4:22 37:9, 37:11 49:19, 68:4 123:24, 124:8 124:8, 124:10 124:12, 156:20 157:5
**procedures** 5:12

34:9, 34:12
34:13, 34:18
34:20, 44:16
46:20
**proceed** 4:18
120:18
**proceedings**
210:3
**process** 23:24
44:22, 45:14
65:4, 75:24
88:4, 92:18
104:22, 104:24
105:1, 105:4
109:18, 116:24
116:25, 125:16
127:10, 127:24
128:5, 131:9
132:11, 132:21
135:16, 136:7
139:20, 139:21
139:24, 140:6
155:16, 166:24
206:21, 207:15
**produced**
138:22, 154:18
206:6
**professional**
96:12, 198:6
**prohibiting**
137:13
**projects** 15:4
**promises** 168:16
168:16
**promotional**
206:21, 207:15
**promotions**
160:16
**pronouncing**
5:2
**proper** 156:20
157:4, 195:23
**Pros** 11:18
12:13, 12:23
**protected** 27:9
68:16, 109:9
**protections**
70:16
**protective** 10:6
10:10, 61:11
61:16, 61:16
61:20, 61:25
62:5
**provide** 70:10
108:2, 116:13
183:6
**provided** 72:14
83:11, 127:18
163:4, 164:7
**provider** 45:20
45:24, 46:5
46:6, 46:10
63:15, 66:25
67:10, 67:11
67:19, 68:6
70:1, 71:10
183:6
**provider's** 67:9
**providers** 46:11
65:8, 183:3
183:4
**provision**
113:11, 168:8
175:9
**psych** 55:3
**psychiatrist**
55:3
**psychologic**
78:14
**psychological**
44:20, 46:21
46:24, 47:1
47:8, 54:22
55:2, 72:2, 73:8
73:17, 73:19
76:7, 76:10
77:4, 77:10
77:19, 77:25
78:4, 78:7
78:18, 79:2
140:1, 182:13
**psychologist**
55:3, 148:17
149:2, 151:9
193:23
**public** 3:25
148:17, 191:15
193:7, 195:17
**pulled** 190:20
191:20
**pun** 55:15
55:17
**purpose** 37:17
71:22, 174:6
178:11
**purposes** 56:19
**pursuant** 4:20
90:25
**purview** 70:17
**pushed** 117:5
**put** 67:22, 72:1
74:12, 106:11
106:14, 106:16
**puts** 72:11
**putting** 42:25
65:17, 74:22

**Q**

**qualified** 61:19
148:20
**question** 5:17
5:19, 5:20, 5:23
25:25, 26:20
31:5, 38:18
38:19, 49:22
52:21, 55:18
70:5, 72:18
78:10, 84:23
96:24, 98:23
98:25, 103:15
115:6, 115:12
117:15, 118:22
121:24, 124:12
125:1, 125:3
126:3, 126:5
126:23, 128:18
134:7, 134:24
137:6, 139:4
139:10, 141:17
142:25, 146:5
146:7, 146:8
146:12, 146:14
146:15, 146:17
146:18, 147:2
147:4, 154:13
154:16, 154:20
154:22, 154:25
157:17, 167:5
167:18, 167:23
168:10, 175:12
176:1, 176:16
178:5, 186:16
187:5, 188:1
188:10, 192:3
195:4, 199:2
205:9, 205:10
206:13, 208:14
**questioning**
124:6
**questions** 5:15
27:19, 28:19
33:8, 44:22
54:3, 68:21
142:15, 180:9
197:9, 208:19
208:20, 208:22
**quick** 79:8
146:11
**quite** 98:11
**quote** 135:20
151:9, 159:4
180:7

**R**

**R-e-b-e-c-c-a**
5:5
**R-e-i-e-r-s-o-n**
5:6
**rage** 85:9, 85:18
**raise** 4:2, 34:25
180:20
**raised** 23:22
180:21, 198:10
**rank** 206:21
**rare** 87:18
**Ray** 182:8
182:16, 183:21
**reach** 28:9
81:14, 124:5
137:8, 137:11
162:3
**reached** 75:6
137:3, 137:7
153:17
**reaches** 152:15
178:17
**reaching** 42:17
45:14
**reacted** 47:24
49:24
**read** 69:18, 70:2
84:3, 96:23
104:10, 108:22
112:6, 113:2
119:20, 119:22
120:10, 125:14
127:7, 134:5
134:10, 149:9
156:15, 159:23
160:7, 164:9
166:25, 173:11
174:5, 175:25
176:2, 179:2
179:13, 182:4
185:25, 188:4
189:18, 189:20
189:22, 190:1
191:23, 192:4
193:1, 195:4
**reading** 99:17
**reads** 64:15
164:5, 188:9
**ready** 185:4
**real** 6:3
**really** 15:6
26:20, 75:23
86:25, 92:17
117:1, 124:6

135:7, 164:24
165:16, 165:22
187:24, 197:7
199:13, 205:11
**reason** 44:16
58:21, 75:18
76:10, 77:2
77:16, 77:22
78:13, 86:21
100:8, 112:7
118:8, 128:4
150:21, 170:24
178:19, 183:19
194:7
**reasonable** 74:1
74:7, 107:21
190:21, 191:1
191:3, 191:8
193:7
**reasons** 129:16
186:10
**Rebecca** 1:15
1:16, 3:8, 3:24
4:20, 5:5
**recall** 17:12
20:23, 21:7
21:9, 23:2
23:13, 24:3
24:8, 24:9
24:24, 24:25
26:14, 31:19
32:3, 33:13
33:14, 40:14
40:16, 42:19
42:21, 42:22
43:1, 43:14
43:16, 45:10
46:18, 47:11
48:2, 48:12
48:17, 48:22
50:2, 50:4, 50:6
50:10, 50:11
51:11, 51:17
51:19, 51:22
53:12, 53:17
53:21, 54:5
75:17, 76:3
80:25, 82:2
82:2, 82:4
88:24, 89:1
89:1, 91:20
94:21, 99:25
106:6, 111:7
112:3, 112:5
113:16, 113:17
113:18, 113:23
114:12, 115:1
115:3, 118:7
121:2, 121:13
122:12, 122:15
138:13, 144:18
144:19, 144:25
148:15, 161:12
161:13, 161:15
161:17, 161:20
161:25, 162:9
169:8, 170:18
182:18, 182:19
182:21
**recalling** 25:10
**receipt** 105:21
106:4
**receive** 34:21
44:23, 44:25
46:8, 67:5
114:5, 141:5
145:22, 159:24
161:10, 174:8
174:15, 174:17
174:20, 174:22
176:6, 177:12
184:16
**received** 70:10
100:1, 100:12
100:20, 104:25
111:4, 114:24
117:4, 119:16
119:23, 120:12
120:25, 135:1
145:3, 145:13
147:7, 149:14
153:17, 157:12
161:2, 162:11
164:16, 176:9
184:14, 184:18
190:14, 196:16
**receiving** 70:22
112:3, 144:18
144:25, 162:4
**recognize** 63:10
90:2, 94:18
156:6, 172:14
177:15, 177:15
181:20, 181:22
200:14
**recollecting**
89:2
**recollection**
49:9, 49:11
90:10
**recommendati...**
149:9
**recommended**
149:19
**recommending**
44:17
**record** 3:17, 4:6
4:19, 52:9, 53:3
53:4, 53:6, 53:7
61:10, 62:18
62:21, 62:24
62:25, 63:3
63:7, 70:3, 73:8
76:11, 79:11
79:12, 79:13
83:5, 87:9
103:20, 103:21
103:22, 112:15
127:3, 127:4
127:5, 138:17
139:16, 147:20
172:9, 172:11
172:12, 172:13
184:5, 184:6
184:8, 190:1
205:17, 205:20
205:21, 205:22
205:23, 208:9
208:11, 209:2
210:3
**RECORDER**
3:16, 4:5, 4:17
52:25, 53:2
53:4, 53:7, 60:1
60:3, 62:17
62:20, 62:25
63:5, 63:7
79:11, 79:13
103:20, 103:22
127:3, 127:5
172:11, 172:13
176:3, 184:5
184:8, 205:21
205:23, 209:2
**recording** 4:1
**records** 45:1
45:15, 46:6
67:20, 70:8
70:14, 71:4
72:7, 73:6, 73:9
73:19, 73:24
76:12, 76:19
77:4, 77:4
77:18, 77:19
78:4, 78:5
78:14, 78:15
78:24, 113:13
120:20, 130:7
130:13, 140:1
140:1, 141:5
160:13, 163:9
163:22, 164:6
168:10, 173:14
173:18, 173:25
174:21, 176:10
176:19, 177:10
177:13
**recruiting** 20:10
**refer** 35:12
59:3, 122:21
162:12, 162:15
174:25, 178:12
**reference** 68:10
**referral** 31:20
34:22, 35:3
35:8, 35:11
35:14, 37:20
38:8, 38:11
39:21, 40:4
42:4, 42:11
42:15, 46:21
46:24, 46:24
46:25, 47:4
47:8, 47:8
47:12, 48:1
54:20, 54:21
54:22, 71:24
87:18, 87:22
90:5, 90:23
91:15, 151:17
152:14, 177:19
198:11, 202:10
**referrals** 47:2
87:13, 89:9
**referred** 73:10
92:21, 100:18
101:2, 105:5
109:3, 109:21
122:11, 122:15
124:22, 132:20
178:13, 178:17
198:5
**referring** 41:23
68:18, 69:11
92:18, 122:12
131:12, 131:14
131:18, 132:2
156:22, 157:5
177:20, 178:19
186:15, 186:20
187:15, 202:10
**refers** 121:1
139:20, 139:22
141:10, 144:20
186:23
**reflect** 4:19
**refresh** 90:10
**refuse** 28:19
115:13
**refused** 116:13

**refusing** 27:19 125:2, 126:4 146:5, 154:19
**refute** 191:22
**regard** 47:4
**regarding** 5:16 15:19, 23:2 23:6, 23:14 24:6, 24:16 25:14, 25:25 26:12, 27:19 27:20, 28:8 28:11, 28:16 28:19, 28:23 28:24, 31:12 31:25, 34:9 34:14, 34:23 42:14, 43:2 45:1, 47:12 48:9, 50:12 51:2, 53:13 53:16, 54:6 68:21, 71:25 72:20, 73:2 77:4, 78:1 82:23, 86:18 87:7, 92:25 93:24, 113:25 114:15, 117:20 123:5, 130:6 145:22, 166:23 178:8, 196:25 200:11, 202:24 204:7, 204:16 206:20
**regular** 8:1 10:1, 12:23
**Reierson** 1:15 1:16, 3:9, 3:24 3:24, 4:14, 4:20 4:25, 5:5, 63:10 68:13, 113:4 127:6
**reimbursement** 120:17
**reinstated** 120:13, 120:15 132:25, 160:18
**relate** 109:21 115:16, 115:16 194:7
**related** 15:4 25:5, 115:19 149:17, 150:23 151:3, 151:6 167:10, 167:15 179:1, 190:12 190:15, 202:20 204:25, 207:19
**relates** 136:3 173:15
**relating** 71:19 72:8, 166:23 178:25
**relation** 15:19
**relayed** 179:8
**relaying** 194:20
**release** 55:10 55:21, 55:21 63:15, 66:10 67:10, 67:18 67:19, 68:24 69:1, 69:6, 70:7 72:18, 72:19 73:21, 74:18 75:16, 76:24 109:8, 114:1 116:15, 117:20 120:19, 123:6 140:17, 140:18 141:1, 156:18 157:3, 159:5 160:12, 167:15
**released** 55:24 69:25, 70:12 70:24, 70:25 71:5, 71:7, 72:9 72:13, 100:14 101:7, 101:11 130:7, 173:14
**releases** 55:25 123:10
**relevant** 38:1 72:16, 73:7 73:14, 78:25
**reliance** 128:3
**relief** 160:24
**remedied** 160:25
**remember** 18:4 45:8, 80:17 176:4
**remiss** 193:14
**remotely** 193:17
**rep** 80:5, 80:8 80:12, 80:18 80:19, 80:23 81:22, 81:25 82:5, 82:10
**repeat** 25:7 98:25, 117:15 128:18, 146:14
**replaced** 29:23
**replayed** 70:3
**report** 18:10 30:8, 30:8 30:15, 30:23 31:5, 36:18 55:24, 95:20 100:20, 101:12 101:16, 144:20 144:22, 144:25 145:19, 147:6 150:11, 154:6 156:22, 177:1 184:12, 185:14 185:20, 187:12 193:24, 195:21 196:1, 196:6 196:16
**reported** 19:13 20:20, 21:19 22:11, 36:19 36:20, 85:13 204:5
**reporter** 6:5
**reporting** 30:11 86:25, 155:5
**reports** 31:1
**represent** 64:20 113:5, 166:19
**representation** 165:20
**representative** 80:3
**representing** 110:3, 166:2 166:23, 167:9 168:1, 168:3
**request** 66:10 66:16, 66:16 68:23, 71:14 73:18, 76:18 110:13, 113:25 113:25, 120:16 120:16, 120:16 160:15, 198:19 199:8, 199:19
**requested** 76:11 105:21, 127:19 127:21, 131:2 160:17, 174:7 193:16
**requesting** 90:6 91:1
**require** 128:22 129:8, 129:17 140:8
**required** 4:17 44:24, 56:20 92:13, 104:15 109:1, 123:25 131:22, 132:8 134:19, 136:15 138:1, 138:10 139:14, 140:14 140:15, 164:24 191:15, 198:2
**requiring** 128:12, 130:21 136:5
**research** 11:18 11:19, 12:10 12:13, 12:17 12:23, 15:3
**reserve** 209:1
**resource** 20:9 183:10
**resources** 14:19 17:23, 30:2 30:15, 37:24 47:10, 48:1 51:14, 59:4 88:5, 96:16 100:15, 101:7 179:18, 183:20
**respect** 27:10 42:24, 74:16 77:13, 113:5 148:2, 163:11 166:3, 167:13
**respond** 49:22 104:20, 107:5 108:5, 108:8 110:22, 113:15 114:7, 114:7 118:9, 118:15 119:2, 123:25 124:23, 145:18 161:18, 164:14 164:15, 165:2
**responded** 53:20, 53:22 108:9, 109:14 109:24, 110:22 113:19, 117:8 117:9, 117:12 117:20, 118:4 118:6, 119:3 121:11, 121:15 121:18, 122:1 122:7, 122:22 123:1, 124:15 146:3, 161:7 164:12, 165:6 180:8
**responding** 110:10, 110:15 110:16, 110:24 124:1, 124:9

162:18, 162:19
165:21
**responds** 110:9
110:14
**response** 107:24
113:24, 120:12
120:25, 121:3
121:6, 160:18
164:16, 179:5
**responses**
180:18
**responsibilities**
20:6
**restored** 160:22
**restraining**
112:23, 160:24
**restriction**
195:20
**restrictions**
101:15, 149:20
200:18
**result** 123:1
160:17, 197:14
**results** 46:25
**resume** 12:18
**retained** 113:5
164:15, 165:6
165:11, 166:19
**retaliated**
159:10
**retaliation**
120:21, 159:7
**return** 17:10
20:13, 22:20
38:6, 101:14
104:18, 105:3
105:21, 113:9
127:22, 131:7
136:20, 149:19
155:17, 156:18
156:18, 157:3
160:21, 185:5
195:20, 200:18
200:25, 201:4
201:6
**returned** 43:13
104:23, 109:11
134:9, 170:23
191:11, 201:11
201:17, 201:19
**returning** 23:24
104:16, 109:2
126:10, 127:13
**returns** 139:22
**reverse** 101:3
**review** 33:2
33:5, 33:15
96:12, 104:17
109:10, 128:25
147:6, 170:6
171:14, 171:16
171:19, 198:7
201:22
**reviewed** 33:9
173:14
**reviewing** 73:14
**revoked** 13:21
**Rich** 11:8
**Richard** 2:12
2:13, 4:7
**Rick** 142:16
168:18, 205:3
**right** 4:2, 5:2
6:1, 6:7, 28:2
39:10, 48:5
54:19, 54:25
62:7, 62:12
62:18, 62:22
69:4, 80:16
84:25, 88:17
99:15, 99:24
106:24, 115:1
126:6, 129:4
130:1, 130:10
136:10, 139:6
142:3, 142:20
142:24, 143:20
143:22, 148:7
149:8, 156:4
156:12, 156:13
157:16, 158:5
161:24, 164:2
168:5, 175:1
177:6, 177:12
185:19, 186:16
189:12, 201:3
201:5, 201:23
207:2, 207:8
**rights** 159:9
163:10, 163:19
**risk** 36:2
195:15
**Rizzo** 205:9
**RN** 69:21
**Robin** 144:22
147:7, 147:20
147:24, 148:6
148:10
**role** 193:10
204:3
**room** 2:23, 3:5
180:24
**routine** 179:5
**rule** 123:24
124:7, 137:13
137:19
**rules** 4:22, 4:22
**run** 160:11

**S**

**S-h-i-n-n-a-w-i**
21:2
**safely** 195:18
**safety** 148:17
193:6, 195:15
**salary** 120:15
120:15, 120:17
**Sarah** 3:10, 4:13
143:1
**sarcastic** 119:1
**sat** 36:2
**Saturday**
156:12
**saw** 57:19
112:12
**saying** 27:3
80:17, 101:17
108:4, 120:25
124:7, 129:13
136:24, 138:1
138:9, 143:7
194:19, 196:16
**says** 52:9, 63:22
66:9, 66:16
68:15, 69:6
69:20, 70:20
70:25, 71:3
71:14, 85:8
90:25, 91:11
93:20, 95:3
96:9, 98:17
100:11, 101:6
105:14, 105:14
105:15, 111:16
112:11, 116:1
116:12, 128:9
131:6, 134:2
134:15, 134:21
134:25, 138:14
141:21, 148:18
167:17, 174:1
174:10, 178:19
178:24, 184:20
186:21, 194:17
203:22
**Scharf** 3:11
**scheduled** 46:8
178:18, 182:7
**scheduling**
140:3
**school** 11:7
11:8, 11:17
11:20, 12:3
12:10, 12:21
12:22, 12:24
61:8
**science** 11:1
**scope** 72:21
74:9, 123:9
128:14, 129:10
160:13, 162:5
**Scouffas** 26:2
27:25, 28:7
28:12, 28:14
28:20, 114:13
**screamed** 85:10
**screaming**
180:22
**se** 190:15
**Sean** 169:9
169:11, 170:24
**second** 19:16
53:8, 62:24
64:14, 127:7
133:18, 134:12
150:6, 159:23
160:8, 160:9
168:6, 172:10
185:25, 186:11
187:15, 187:17
188:6
**Security** 64:3
66:3
**see** 39:6, 52:16
60:19, 67:20
68:7, 69:9
71:16, 86:11
86:14, 91:7
95:21, 96:9
96:12, 100:15
103:23, 109:25
119:6, 133:19
141:8, 142:3
142:22, 144:20
144:23, 157:10
163:6, 165:15
167:7, 171:14
172:16, 200:13
201:20, 205:5
205:8, 208:1
**seeing** 99:25
**seek** 25:14
27:15, 28:7
114:15
**seeking** 27:8
73:9, 77:25
145:18, 160:24
**seen** 69:5, 94:20
94:22, 95:13

99:21, 104:2
106:3, 108:12
111:9, 112:5
118:5, 119:7
143:25, 169:6
172:15, 172:25
173:2, 181:23
184:9, 202:3
206:15
**seething** 180:14
**select** 45:23
**selected** 70:11
140:4, 150:22
**send** 40:3, 54:25
105:20, 110:13
111:6, 151:8
151:17, 152:12
152:14
**sending** 43:18
110:6
**senior** 15:10
15:12, 15:14
15:16, 15:24
16:1, 16:4
**sense** 37:19
**sent** 23:8, 33:7
40:17, 47:5
47:10, 55:2
55:7, 88:3
100:24, 104:5
106:1, 108:15
108:18, 109:14
112:8, 112:9
112:11, 119:19
119:20, 120:11
142:18, 145:11
156:13, 157:19
159:3, 165:9
177:19, 182:19
184:13, 190:20
191:13, 196:3
**sentence** 120:24
131:11, 163:11
163:13, 163:16
178:25, 179:2
179:13, 179:14
186:1, 186:18
192:17
**separate** 55:25
82:1, 196:24
197:13, 199:15
199:20
**September** 1:18
3:17, 17:15
38:23, 51:21
57:14, 58:10
76:8, 93:17
93:21, 182:3
182:9, 182:10
183:11, 185:15
185:16, 186:24
187:1, 187:14
188:15, 200:22
210:8
**sergeant** 202:19
**series** 5:15
191:25
**serve** 8:10
**services** 17:8
20:14, 29:6
29:11, 29:18
152:17, 183:10
**session** 80:23
**set** 46:7, 174:21
193:3, 194:2
194:20
**setting** 45:15
160:14
**settle** 193:10
**settled** 126:8
127:11
**seven** 127:22
131:7
**sex** 148:1
**sexual** 14:9
14:17, 14:25
15:3, 15:4, 95:4
**share** 82:15
**she'd** 92:25
93:5
**Shelby** 3:9, 4:14
36:15, 36:18
37:14, 41:10
41:16, 43:12
44:1, 44:10
44:18, 45:12
56:14, 58:12
63:21, 65:17
65:24, 69:21
71:4, 71:8, 72:9
73:1, 74:17
75:1, 76:22
80:8, 81:10
81:12, 82:23
85:4, 86:11
87:6, 87:11
89:4, 92:11
92:22, 97:2
104:14, 104:18
104:23, 105:9
107:3, 107:5
107:11, 109:1
109:12, 109:12
111:13, 111:24
113:4, 116:13
119:11, 173:19
177:9, 178:1
180:11, 189:3
198:2, 200:20
**Shelby's** 36:22
177:22
**sheriff** 4:14
28:3, 90:13
159:8, 159:11
176:25, 181:16
**sheriff's** 11:13
16:24, 17:1
18:6, 18:25
19:1, 26:5, 26:7
29:2, 29:5, 34:3
34:4, 34:10
36:23, 37:3
46:13, 55:24
57:25, 66:6
67:18, 68:5
69:2, 69:20
70:1, 70:8
70:13, 70:13
71:1, 71:3, 71:7
72:9, 86:9
87:15, 88:20
89:7, 94:23
95:3, 95:8
104:14, 106:9
106:25, 108:25
113:6, 113:11
114:16, 120:1
128:25, 132:6
132:21, 136:5
139:13, 139:17
140:7, 150:3
150:9, 150:12
151:10, 152:19
152:20, 155:3
158:7, 158:24
159:7, 160:19
163:8, 163:21
164:17, 167:14
168:8, 169:19
172:23, 173:4
173:6, 174:19
176:9, 176:17
177:8, 177:20
182:23, 183:3
183:5, 196:17
197:2, 197:18
198:1, 198:6
198:19, 199:16
199:17, 199:24
200:2, 202:19
**Shinnawi** 20:24
21:2
**short** 79:20
81:6, 188:11
206:2
**shorten** 165:25
**shortly** 184:16
**shoulder** 49:23
**show** 64:21
68:11, 82:13
90:1, 94:6
99:20, 104:1
108:11, 119:6
150:17, 155:25
169:5, 201:20
205:25
**showing** 121:17
122:1, 122:6
185:8
**shown** 63:4
63:9, 118:5
**shows** 83:6
165:24, 186:7
186:17
**sic** 29:10, 62:25
66:25, 69:25
112:3, 112:8
147:12, 147:13
148:19, 151:10
153:4, 153:4
174:8
**sick** 102:16
102:25, 103:3
103:5, 103:12
160:10
**side** 38:13, 39:2
39:13, 197:8
**sign** 56:1, 64:8
75:18, 116:14
127:20, 127:21
127:22, 128:13
128:22, 129:8
129:18, 130:21
131:6, 131:22
132:8, 133:24
134:19, 136:5
136:15, 138:1
138:10, 139:14
140:8, 159:5
160:12
**signature** 209:1
**signed** 36:19
48:25, 72:7
75:15, 104:22
106:3, 132:4
132:9, 133:11
140:18, 156:18
157:3, 172:17
**significant**
191:9

**signing** 75:9 104:17, 109:11 133:3, 133:7 133:11
**signs** 114:1 140:25, 140:25
**similar** 19:22 21:14, 22:7 39:1
**similarly** 190:16 195:11
**simply** 77:10 193:13
**single** 24:9
**sit** 24:3, 24:9 47:11, 53:22 78:12, 84:20 149:21, 153:2
**sits** 192:20
**sitting** 180:15
**situation** 23:11 37:22, 37:25 38:4, 40:25 59:2, 71:25 72:17, 101:4 110:12, 115:19 131:3, 170:19 171:14, 190:10 196:14, 197:24 198:13
**six** 162:24 191:19
**sixth** 164:10 164:11
**skip** 163:17
**skipping** 162:22 163:16
**Social** 64:3, 66:2
**solely** 85:2 178:22
**somebody** 35:15 58:14, 124:23 135:13, 138:20 153:19, 188:2
**someone's** 78:17
**somewhat** 87:18
**soon** 84:11 119:24, 160:11
**sorry** 10:5 10:12, 10:13 16:12, 16:17 19:16, 25:7 32:20, 38:17 45:7, 68:1 69:12, 78:8 88:15, 91:10 98:25, 99:23 106:14, 107:12 117:15, 118:24 121:24, 124:18 125:6, 127:15 128:18, 129:2 129:7, 130:14 132:24, 134:3 139:22, 140:23 144:4, 146:24 151:14, 151:18 152:9, 152:11 155:9, 156:25 159:22, 167:5 168:6, 169:1 169:18, 169:25 174:14, 175:23 176:1, 176:12 176:13, 176:20 176:23, 189:1 189:13, 190:24 199:6, 202:14
**sounds** 148:2 207:4
**South** 69:21 69:22
**span** 79:21 79:22
**speak** 84:2 164:24, 170:2
**speaking** 180:4 196:24
**special** 160:16
**specialist** 12:18
**specific** 23:13 23:17, 23:20 24:4, 24:8, 25:9 51:6, 53:17 64:17, 64:18 68:4, 71:24 72:2, 73:21 131:16, 180:5
**specifically** 24:6 24:24, 25:5 25:10, 35:10 37:10, 42:19 43:22, 43:22 50:2, 50:4 50:11, 53:12 53:23, 73:7 73:13, 88:24 114:9, 120:9 122:12, 122:15 138:14, 169:8
**speculation** 41:4 75:21, 93:3 96:4, 96:19 97:6, 98:14 107:20, 113:21 121:22, 123:13 139:9, 162:14 181:9, 195:25
**spell** 5:4, 17:24 20:24, 21:11 21:21, 30:21 36:16
**spend** 12:1 188:12
**spoke** 49:16 83:25
**spot** 63:22, 64:3 66:9
**spring** 18:3
**staff** 31:14, 61:1 90:8, 90:12 90:13, 90:14 90:17, 203:18
**stamp** 69:17 69:18
**stamped** 112:16 112:19, 142:2 162:21
**standard** 68:3
**start** 7:1, 9:1 11:14, 11:16 144:1, 146:10 163:1, 188:6 206:2
**started** 17:13 56:10, 89:6 132:11
**starting** 164:10 189:18, 193:1
**starts** 160:8 163:2
**state** 1:23, 2:6 2:14, 3:19, 4:6 5:4, 13:13 191:9
**State's** 2:21, 3:3
**stated** 20:8 51:25, 166:10 186:5
**statement** 25:6 48:25, 49:3 50:23, 54:15 59:19, 72:7 72:22, 84:5 84:10, 85:3 91:5, 116:5 116:6, 128:9 134:17, 158:2 158:8, 158:14 158:17, 158:21 158:25, 163:20 163:23, 163:25 165:1, 165:5 165:7, 171:9 179:9, 182:24 183:1, 186:8
**states** 1:1, 176:6 202:5
**stating** 67:15
**status** 32:5 57:22, 135:5 135:8, 155:2 155:14, 170:15 170:17, 171:6 201:7, 201:11
**stay** 52:1, 70:17
**stayed** 81:5
**step** 24:2, 44:14
**stepped** 92:21
**steps** 44:18 114:25
**sticker** 60:11 205:4
**stickers** 59:25
**stole** 156:25
**stop** 12:7
**story** 38:14 39:2, 39:14
**straight** 173:3
**Street** 1:23, 2:6 2:14, 2:22, 3:4 3:19, 7:2, 10:2
**strictly** 46:14
**strike** 134:7
**struck** 50:8
**struggling** 37:23
**study** 11:22 13:7
**subject** 23:21 34:5, 47:7, 62:5 131:23, 133:24 134:17, 171:8 206:7
**subjected** 87:25 190:19
**subjecting** 127:25, 131:10
**submit** 197:4 197:16, 198:3
**submitted** 96:10
**suffers** 195:11
**sufficient** 150:11, 153:13 154:10, 165:21
**suggest** 149:18 165:4, 193:5
**suggested** 149:6
**suggesting** 49:10
**suggests** 164:13

165:2
**suit** 120:16 159:7, 160:23
**Suite** 1:24, 2:7 2:15, 3:13, 3:19
**summarizes** 187:13
**summary** 84:6 84:7
**summer** 30:20
**super** 82:25
**superintendent** 42:17, 43:3 47:17, 47:18 47:22, 49:16 50:1, 51:10 51:25, 52:1 52:9, 52:12 81:5, 81:6 82:23, 83:1 83:5, 83:5, 83:6 83:18, 83:20 85:13, 91:6 109:4, 120:22 178:22, 179:1 179:10, 189:3 193:8, 194:24
**superintendents** 204:4
**superior** 179:5
**supervise** 20:15
**supervisor** 17:19, 18:1 18:2, 18:5, 18:8 22:24, 59:1 98:5, 159:12 203:21, 203:25
**supervisors** 35:6, 92:1
**supervisory** 204:3
**supplement** 201:25
**support** 37:24 61:1, 128:12 159:10, 179:8 187:21, 192:12 202:8
**supported** 128:3 128:11
**sure** 5:5, 21:12 37:23, 52:7 58:25, 79:9 98:1, 103:15 103:16, 103:18 103:25, 112:25 126:25, 181:4 181:10, 184:1 186:13, 195:1
**suspect** 57:12
**suspended** 13:20
**suspension** 190:10
**swear** 16:14 16:14
**sworn** 4:4
**system** 37:24 107:2

**T**

**T-e-r-e-s-a** 22:5
**tail** 144:6
**take** 5:12, 5:13 5:24, 13:9, 14:2 15:25, 28:10 31:1, 44:13 52:22, 58:17 58:22, 59:5 65:20, 78:1 79:8, 83:21 85:12, 87:3 98:2, 98:4 101:3, 101:10 118:15, 119:2 119:15, 122:18 126:3, 126:24 140:6, 146:7 147:4, 158:18 164:2, 184:4 187:20, 201:21 208:8
**taken** 4:20, 5:7 36:1, 58:23
**talk** 6:6, 23:11 26:17, 38:10 40:15, 42:14 44:6, 48:9 48:15, 51:2 65:7, 74:24 75:2, 75:15 92:25, 133:23 198:12
**talked** 26:11 27:16, 32:6 53:9, 54:20 55:5, 84:9 86:17, 86:22 86:23, 87:4 141:6, 159:15
**talking** 25:3 25:8, 35:23 37:10, 39:6 39:12, 53:19 66:20, 67:8 79:23, 83:24 86:2, 156:1 159:19, 179:20
**tandem** 177:25
**Tapia** 91:8
**tapped** 49:23
**Tarry** 91:14
**tasks** 22:25
**telephone** 75:6 83:12, 202:6
**tell** 27:1, 42:10 49:5, 67:16 68:14, 68:22 97:18, 99:13 143:19, 145:25 154:12, 154:15 159:21, 192:4
**telling** 125:18
**temporary** 112:23, 160:24
**ten** 95:16, 103:5 103:5, 103:6 107:17, 188:12
**Teresa** 22:5
**term** 208:2
**termination** 128:1, 131:11
**terms** 140:15
**terrible** 151:24 176:16
**testifying** 50:18
**testimony** 8:1 10:1, 67:14 72:11, 124:7 132:4, 150:20 182:12
**thank** 4:5, 33:12 94:10, 142:13 144:6, 156:16 162:22, 204:12 208:16, 208:21
**Thanks** 82:17 144:10, 169:25 184:24
**Theresa** 30:17 30:23, 32:9
**thesis** 12:2, 12:4 12:5
**thing** 66:2 84:17
**things** 14:23 15:19, 17:11 62:11, 65:8 80:7, 143:8 181:14, 192:1
**think** 12:17 17:13, 19:21 22:3, 23:8 24:20, 26:20 27:2, 27:5, 27:6 27:11, 32:4 36:1, 42:3 46:19, 48:7 49:23, 50:6 50:14, 52:6 53:9, 61:4, 61:8 61:11, 62:11 78:9, 83:1 83:25, 88:16 94:11, 118:21 118:23, 127:7 129:3, 129:22 129:25, 131:18 132:9, 133:18 142:19, 142:20 143:16, 146:2 147:23, 151:12 154:13, 154:16 155:13, 155:13 156:1, 156:3 158:17, 159:18 164:3, 165:13 165:13, 170:8 171:17, 171:22 176:2, 180:21 181:14, 185:7 187:24, 188:1 188:9, 200:7 201:3, 201:24
**thinking** 148:1
**thinks** 175:15
**third** 21:18 40:4, 45:13 45:23, 88:2 127:15, 128:6 150:21, 159:16 187:18
**Thomas** 3:8 202:16
**thought** 29:21 38:5, 40:17 59:8, 171:25
**thousand** 16:11 16:15
**threat** 58:16 193:5
**threaten** 180:10
**threatening** 109:6
**three** 22:3, 33:1 71:16, 88:12 105:16, 108:19 129:3, 129:3 174:5, 174:18

176:5, 176:22
176:25
**time** 3:18, 4:2
5:17, 5:22
13:18, 14:11
14:18, 15:22
18:5, 20:4
25:16, 36:3
40:14, 45:10
56:25, 58:10
58:11, 73:22
74:17, 74:22
79:14, 79:17
79:18, 79:21
81:18, 82:1
87:15, 88:2
95:24, 96:15
101:20, 101:24
101:24, 102:2
102:5, 102:10
102:13, 102:15
103:8, 103:11
104:20, 105:1
107:11, 107:22
107:25, 107:25
108:3, 108:3
108:8, 109:16
110:2, 117:12
119:16, 119:23
120:5, 120:8
120:14, 120:17
127:19, 128:14
129:10, 129:11
130:1, 135:1
135:1, 135:4
135:10, 142:10
142:10, 155:18
159:18, 160:10
160:13, 160:17
160:22, 162:5
170:8, 170:19
171:18, 171:22
178:1, 180:15
184:3, 190:18
191:10, 193:12
193:17, 195:14
203:25, 208:17
**times** 5:10, 5:11
71:9, 78:9
95:13
**timesheet** 36:20
171:7
**timing** 110:6
193:15
**tired** 176:16
**title** 12:16
15:25, 19:20
21:14, 21:22
26:4, 29:13
29:15, 29:25
31:17, 36:22
169:13
**today** 3:17, 3:24
24:3, 32:19
47:11, 53:22
78:12, 88:12
94:20, 149:21
153:3, 192:20
**today's** 32:19
33:3
**told** 48:22
49:13, 50:19
50:25, 57:1
81:2, 98:11
107:7, 116:8
118:15, 119:2
188:24, 188:25
192:1, 194:5
194:20, 194:24
**tone** 180:17
**top** 63:22, 70:25
96:9, 111:16
**topic** 26:21
**topics** 27:20
28:16
**tops** 80:6
**touch** 42:25
43:3
**track** 198:10
**training** 15:2
15:18
**traits** 190:4
**transcribed**
189:16
**transcript** 6:6
210:3
**transmitted**
185:9
**treated** 57:14
**treatment** 71:20
195:10
**trembled** 85:9
**trial** 60:15
60:17, 61:8
190:2
**tried** 51:4, 51:5
52:1, 75:4
143:1, 190:1
**true** 56:19, 75:8
98:18, 99:2
99:18, 101:3
110:2, 112:20
116:4, 116:6
116:15, 117:7
132:18, 136:14
136:25, 158:19
164:25, 168:6
197:3, 197:20
197:20, 198:21
198:21
**trusted** 89:22
**try** 6:4, 37:19
44:2, 44:6
56:22, 81:14
123:4, 123:9
132:12, 198:12
**trying** 45:8
75:2, 129:24
133:1, 146:11
**Tuesday** 182:10
**turn** 162:20
185:24, 189:9
189:17, 193:21
**turned** 140:15
**Turrise** 204:10
204:11, 204:12
204:13
**twice** 79:20
**two** 8:7, 12:2
16:11, 16:15
18:19, 18:21
33:1, 41:12
41:19, 44:2
47:2, 55:25
56:2, 74:4, 75:4
82:1, 82:14
84:11, 88:23
88:25, 91:7
91:16, 109:20
113:2, 132:13
132:19, 134:22
141:23, 142:9
181:14, 182:7
182:14, 188:2
188:12, 191:12
199:15, 206:6
**type** 14:23, 39:1
45:20, 46:12
46:21, 55:12
56:14, 73:9
74:9, 84:1
85:18, 85:20
86:17, 86:18
86:18, 91:19
94:2, 94:22
94:25, 95:6
95:17, 100:2
102:13, 103:11
117:1, 130:7
130:13, 137:15
149:2, 181:22
**typed** 83:14
83:25, 86:22
**typical** 172:22
**typically** 25:1
26:2, 28:9
34:22, 35:5
44:8, 46:25
65:3, 66:24
67:4, 67:22
74:2, 74:9
80:15, 91:21
92:2, 92:3, 92:6
95:6, 101:5
105:21, 106:11
106:15, 117:2
**typing** 62:16
83:23

## U

**Uh-huh** 155:24
**ultimate** 150:1
**ultimately**
190:12, 191:13
**unable** 38:2
**unauthorized**
105:2, 127:25
131:10, 135:2
135:5, 135:9
135:14, 135:21
135:25, 170:15
170:21, 171:3
171:4, 171:5
171:11
**unbelievably**
192:15
**uncomfortable**
180:24
**undergo** 40:7
41:20, 56:20
57:6, 65:5, 88:8
92:13, 100:19
104:15, 109:1
126:10, 127:13
196:19
**undergone**
196:7
**undergrad**
11:17
**underlying**
176:19
**underneath**
20:17, 20:19
31:4, 149:8
**understand**
5:17, 55:18
70:5, 113:7
131:5, 134:23
147:2, 154:22

167:18, 186:22
194:14, 198:17
**understanding** 124:23, 167:24 168:2, 174:19 191:16
**understands** 52:8
**understood** 5:19 115:12, 126:3 146:7, 146:12 146:17
**unfair** 188:9
**union** 15:17 80:2, 80:5, 80:8 80:12, 80:14 80:15, 80:17 80:19, 80:23 81:22, 81:25 82:5, 82:10
**unit** 190:11
**UNITED** 1:1
**units** 191:12
**University** 11:4 11:21, 12:6 12:25
**unlawful** 113:14 128:2, 128:10 159:5, 160:15 168:11
**unnecessarily** 180:23
**unpaid** 155:6 160:10
**unquote** 135:21
**unsure** 126:15
**untrue** 192:19
**unusual** 181:11
**updates** 23:10
**upset** 50:14
**use** 45:23, 46:1 64:5, 78:25 95:11, 101:24 102:5, 102:10 102:13, 102:22 103:5, 103:7
149:12, 150:21 155:19, 172:23 202:8
**useful** 97:1

**V**

**vacation** 102:16 102:17, 102:23 103:12, 160:10 160:22
**value** 158:18
**venue** 3:22
**verbal** 190:13
**verbally** 45:12 186:4, 186:25
**verbatim** 84:5
**version** 48:4 48:8, 84:18 98:10, 112:16 156:25, 187:13
**versions** 112:19
**versus** 46:24 47:8, 98:3 135:25
**videos** 33:19
**videotapes** 33:17
**violated** 159:8
**violates** 159:6 163:10, 163:19
**violation** 163:10 163:19
**violent** 49:24 50:3, 50:4
**voice** 107:4 180:20, 180:21
**voicemail** 104:19, 107:6 107:8, 107:12 107:15, 108:4 108:5
**vs** 1:9

**W**

**W-i-l-l-e-t-t-e** 22:13
**W-i-n-i-f-r-e-d** 36:17
**W-r-i-g-h-t** 19:18
**W-y-l-o-l-a** 21:1
**Wacker** 3:12
**Wait** 63:6 175:14, 199:22 208:11
**waiver** 127:9 128:23
**want** 5:22, 10:5 27:4, 49:8 52:18, 53:8 60:3, 60:6 62:23, 80:8 84:16, 94:6 103:15, 105:7 112:14, 112:22 128:19, 128:19 134:3, 134:10 142:7, 143:3 161:21, 165:12 165:17, 168:2 188:4, 188:12 189:9, 193:21 201:21, 205:19 205:25
**wanted** 75:15 76:20, 80:11 80:17, 95:25 96:24, 112:25 116:9, 123:17 136:10, 137:9 164:6
**Washington** 2:22, 3:4
**water** 144:7
**way** 32:10 32:15, 32:16 33:9, 34:16 43:11, 47:25
49:24, 50:3 50:5, 50:16 50:25, 72:19 92:18, 93:14 102:1, 105:18 105:24, 106:13 130:1, 130:12 130:14, 135:10 153:3, 153:10 153:10, 180:3 180:8, 186:18 189:6, 192:25
**ways** 105:17 108:19
**we've** 22:3, 83:4 173:3
**weapon** 58:18
**week** 120:14 120:16
**weekends** 156:12
**Weekly** 25:19
**weeks** 104:7 179:17, 191:19
**went** 11:8, 11:17 31:20, 48:17 49:20, 53:9 57:19, 61:7 105:16, 132:14 138:9
**West** 2:22, 3:4 3:12
**whatsoever** 72:8 87:3
**White** 21:20 206:16, 206:24
**Willette** 22:13
**Williams** 17:20 17:21, 18:6 18:10, 19:10 20:3, 22:21 23:4, 23:6 23:14, 24:4 24:10, 24:19 25:10, 29:20 31:21, 53:10
53:13, 91:14 92:3, 92:6 92:15, 92:25
**Winifred** 3:9 36:15, 69:21 71:4, 71:8 104:14, 109:1 111:24
**witness** 3:23 4:4, 16:14 26:24, 30:22 33:6, 40:2 60:22, 69:14 97:11, 97:13 97:15, 99:10 115:8, 118:25 124:18, 125:25 126:15, 126:17 126:21, 126:23 134:6, 134:14 140:23, 148:4 148:6, 149:13 151:22, 152:5 152:7, 155:9 167:2, 169:1 170:11, 171:25 172:8, 174:12 174:14, 175:3 175:5, 175:7 175:24, 176:12 183:24, 184:2 184:4, 189:10 202:14, 205:6 207:5, 208:21
**witnessed** 202:23
**woman** 147:21
**word** 24:14 24:14, 98:4 208:1
**words** 24:25 126:11, 126:19 128:6, 128:7 131:5, 152:3 168:23
**work** 12:14

14:13, 17:10
18:12, 19:23
20:13, 22:20
23:25, 38:6
40:13, 43:13
47:17, 47:24
51:24, 58:6
81:3, 92:22
100:14, 100:20
101:3, 101:6
101:14, 101:18
102:20, 102:22
104:20, 105:2
105:3, 109:16
113:9, 120:2
123:5, 126:11
127:14, 149:17
149:19, 153:14
155:5, 155:17
156:18, 160:21
169:20, 170:23
185:5, 195:8
199:24, 200:19
201:1, 201:4
201:18
**worked** 11:18
14:9, 16:20
26:7, 31:16
34:23, 94:23
102:24, 103:9
123:14, 191:12
191:17
**workers** 173:3
**working** 35:1
36:9, 59:15
61:2, 89:5
103:8, 120:6
156:12, 177:25
190:20, 201:12
201:13
**works** 169:12
**worth** 102:17
**wow** 174:14
**Wright** 19:16
**write** 59:11
60:3, 60:5
126:7, 159:14
164:22, 166:21
168:14, 186:10
**writing** 164:23
**written** 34:13
43:16, 44:23
72:19, 87:9
115:23, 123:24
124:7, 124:11
130:1, 130:12
137:25, 138:15
138:17, 138:21
139:12, 154:13
154:17, 190:14
193:20
**wrong** 72:12
136:14, 183:2
**wrote** 107:9
107:15, 108:1
110:3, 117:19
126:12, 126:19
149:6, 149:25
158:6, 167:13
170:25, 188:2
193:23, 201:5
**Wylola** 20:24

**Y**

**yeah** 10:11
24:13, 26:7
27:5, 27:14
35:25, 39:22
40:22, 52:22
58:25, 60:1
60:14, 60:24
60:24, 63:2
69:12, 72:24
73:23, 78:16
79:6, 82:16
88:24, 94:8
96:20, 96:22
98:1, 99:17
103:25, 106:3
110:21, 111:21
114:22, 114:23
119:19, 120:7
126:25, 127:1
127:2, 128:19
129:6, 137:11
137:19, 138:13
140:12, 141:12
142:25, 143:6
143:13, 143:16
143:21, 144:14
145:10, 146:22
149:1, 149:24
152:1, 152:4
153:7, 157:16
158:4, 161:15
163:25, 165:18
168:17, 172:4
172:9, 174:13
175:1, 177:12
183:8, 184:19
185:17, 188:21
191:6, 192:16
192:21, 194:16
196:4, 196:13
201:24, 203:20
204:3, 208:10
208:12
**year** 11:5, 11:11
12:6, 15:12
88:12, 88:18
190:5
**years** 10:3
10:18, 12:1
12:2, 12:14
13:1, 14:13
16:20, 74:13
190:15

**Z**

**zeros** 162:23
162:24

**0**

**0:01:29** 5:1
**0:02:22** 6:2
**0:03:16** 8:13
**0:04:17** 11:3
**0:05:13** 11:23
**0:06:01** 12:15
**0:07:02** 13:19
**0:07:56** 14:22
**0:08:44** 15:13
**0:09:46** 16:8
**0:11:04** 17:12
**0:12:15** 18:7
**0:13:14** 19:12
**0:14:29** 20:16
**0:15:41** 21:17
**0:16:58** 22:23
**0:17:56** 23:16
**0:19:08** 24:18
**0:20:10** 25:18
**0:21:05** 26:16
**0:22:06** 27:22
**0:23:03** 28:25
**0:24:06** 29:19
**0:25:07** 30:17
**0:25:59** 31:9
**0:27:06** 32:8
**0:28:03** 33:4
**0:28:59** 33:20
**0:29:50** 34:7
**0:30:34** 34:20
**0:32:19** 36:5
**0:33:24** 37:8
**0:34:37** 38:9
**0:35:46** 39:22
**0:36:52** 40:25
**0:37:45** 41:22
**0:38:39** 42:13
**0:39:37** 43:5
**0:40:27** 43:15
**0:41:23** 44:11
**0:42:36** 45:6
**0:43:29** 46:2
**0:44:34** 46:22
**0:45:32** 47:19
**0:46:29** 48:11
**0:47:12** 49:14
**0:48:20** 50:10
**0:49:14** 51:4
**0:50:14** 52:4
**0:51:03** 53:14
**0:52:05** 54:18
**0:53:00** 55:14
**0:53:57** 56:12
**0:54:53** 57:3
**0:55:35** 57:18
**0:56:38** 58:13
**0:57:45** 59:10
**0:58:45** 60:7
**0:59:57** 62:22
**000059** 142:2
**000060** 142:3
**06** 16:10, 16:16

**1**

**1** 63:10, 68:21
68:22, 69:11
75:10, 105:6
109:22, 129:2
129:4, 129:7
129:9, 129:19
130:2, 131:12
131:23, 132:5
133:12, 134:19
136:6, 138:2
138:11, 139:15
140:9, 141:1
142:6, 142:22
156:6, 157:5
173:18, 174:24
175:1, 175:10
175:19, 175:20
176:8, 177:7
177:8, 177:8
**1:00:57** 63:24
**1:01:59** 64:24
**1:03:04** 65:19
**1:03:51** 66:14
**1:04:52** 67:14
**1:06:01** 68:13
**1:06:54** 69:3
**1:07:59** 70:2
**1:08:59** 70:15
**1:10:30** 71:17

**1:11:33** 72:12
**1:12:42** 73:12
**1:13:46** 74:12
**1:14:51** 75:11
**1:16:02** 76:9
**1:16:53** 77:1
**1:18:07** 78:2
**1:19:11** 79:6
**1:19:31** 79:16
**1:20:02** 80:6
**1:2017cv02393** 1:9, 3:22
**1:21:14** 81:9
**1:22:22** 82:8
**1:23:22** 83:7
**1:24:24** 84:7
**1:25:37** 85:15
**1:26** 127:5
**1:26:37** 86:16
**1:27:37** 87:12
**1:28:30** 87:23
**1:29:43** 88:19
**1:30:40** 89:13
**1:31:38** 90:3
**1:32:39** 90:24
**1:33:43** 91:17
**1:34:46** 92:14
**1:35:33** 93:7
**1:36:38** 93:22
**1:37:51** 94:19
**1:38:58** 95:22
**1:39:56** 96:21
**1:41:26** 96:25
**1:42:28** 98:6
**1:43:36** 99:8
**1:44:56** 99:23
**1:45:43** 100:16
**1:46:55** 101:19
**1:48:00** 102:19
**1:48:51** 103:13
**1:49:41** 104:9
**1:51:05** 105:8
**1:52:01** 106:6
**1:53:11** 107:7
**1:54:12** 108:10
**1:55:36** 108:21
**1:57:03** 109:23
**1:57:56** 110:18
**1:59:14** 111:10
**10** 119:6, 185:24 187:12, 189:17 193:22, 195:5
**10/19/17** 184:20
**10/20/70** 6:10
**10:07** 3:18
**10:58** 53:4
**11** 125:5, 127:6 139:19
**11/18/16** 104:21 105:2, 191:21 193:16
**11/30** 107:4
**11/30/16** 104:19
**11/8/16** 104:12
**11:06** 53:7
**11:13** 62:25
**11:15** 63:1
**11:17** 63:7
**11:36** 79:11
**11:44** 79:13
**11:52** 156:13
**11th** 171:5 182:9
**12** 16:20, 142:11 143:25, 145:1 145:14
**12/21/16** 117:21 117:25
**12/5/16** 104:23
**12:14** 103:20
**12:17** 103:22
**12:46** 127:3
**12th** 182:10
**13** 142:14 144:21, 145:14 147:8, 149:10 156:23
**13th** 95:21 125:13, 130:21 131:24, 139:20 159:17, 160:1 161:2, 162:4
**14** 7:4, 155:25 156:6, 159:16
**15** 8:9, 87:16 87:21, 87:24 88:11, 169:5
**1550** 1:24, 2:7 2:15, 3:19
**16** 16:17, 16:18 17:15, 28:5 38:23, 59:6 65:12, 93:21 172:14, 173:8 175:16, 175:17 175:20, 176:5 176:7, 176:22 187:14
**16th** 83:8 185:15, 185:16
**17** 1:23, 2:6 2:14, 3:19, 8:9 177:16, 177:18 184:22
**17th** 84:14 142:23, 143:15 145:9, 145:11 157:8, 159:2 172:20
**18** 109:16 181:21, 190:5
**18th** 84:14 100:7, 100:13 101:21, 102:9 103:10, 108:24 109:7, 156:13 206:16
**19** 184:9, 184:11
**1918** 7:2
**1988** 11:12
**1993** 11:6
**1995** 12:15
**1999** 12:15, 13:5 13:17, 14:14

**2**

**2** 68:12, 68:13 69:22, 75:10 105:6, 109:22 128:13, 128:20 128:23, 128:24 131:19, 132:5 133:8, 134:19 136:6, 136:16 138:2, 138:10 139:15, 140:9 142:6, 157:5 175:8, 175:16 177:3, 185:24
**2/28/17** 117:17 133:21, 136:16 141:7, 141:20
**2/28/2017** 136:4
**2:00:13** 112:10
**2:01:30** 113:17
**2:02:36** 114:22
**2:03:21** 115:18
**2:04:48** 116:16
**2:06:05** 117:9
**2:07:03** 118:2
**2:07:47** 119:4
**2:08:53** 119:14
**2:09:45** 120:9
**2:10:52** 121:10
**2:11:57** 122:14
**2:13:02** 123:13
**2:14:04** 124:18
**2:15:31** 125:8
**2:16:31** 126:6
**2:17:33** 127:5
**2:18:58** 128:8
**2:20:13** 129:5
**2:21** 172:11
**2:21:10** 130:3
**2:21:53** 130:24
**2:22:50** 131:17
**2:24:02** 132:16
**2:25** 172:13
**2:25:19** 133:9
**2:26:07** 133:20
**2:26:57** 134:14
**2:28:15** 135:15
**2:29:10** 136:13
**2:30:05** 137:10
**2:30:54** 138:4
**2:31:58** 139:9
**2:33:02** 139:24
**2:34:14** 140:24
**2:35:05** 141:9
**2:36:17** 142:8
**2:38** 184:5
**2:38:29** 142:23
**2:39:24** 144:4
**2:40:21** 145:5
**2:41:13** 145:24
**2:41:59** 147:5
**2:42:54** 148:9
**2:43:46** 149:5
**2:44** 184:8
**2:44:41** 149:23
**2:45:29** 150:13
**2:46:38** 151:14
**2:47:05** 152:13
**2:47:48** 153:6
**2:48:48** 154:8
**2:49:48** 155:4
**2:50:26** 155:21
**2:51:47** 155:24
**2:53:01** 156:24
**2:54:02** 157:23
**2:55:04** 159:1
**2:55:53** 159:14
**2:57:05** 160:6
**2:58:15** 161:3
**2:59:20** 162:9
**20** 79:24, 200:14 200:16
**2004** 14:14, 15:9 15:13, 16:9
**2006** 15:13 16:18, 190:10
**2015** 89:6
**2016** 16:18 16:19, 16:23 17:4, 17:12 17:13, 17:19 19:11, 19:20 20:7, 20:15 26:6, 29:8

29:18, 34:9
34:18, 35:24
37:11, 41:7
42:6, 43:14
46:1, 48:3
48:18, 51:18
56:10, 57:15
57:25, 58:3
64:5, 67:5
67:25, 68:4
70:17, 76:7
76:8, 76:12
77:14, 83:8
84:14, 86:2
88:11, 89:8
92:3, 92:16
95:21, 100:7
100:13, 101:21
102:9, 103:10
106:8, 108:24
109:7, 109:13
109:15, 109:16
111:15, 111:22
112:4, 114:10
117:23, 121:1
123:2, 127:21
166:1, 168:13
186:24, 187:1
188:16
**2017** 10:17, 37:5
108:17, 111:4
117:8, 117:25
119:12, 122:1
125:13, 127:23
130:22, 131:8
131:24, 134:8
134:18, 139:20
145:7, 147:16
155:3, 160:2
172:20, 178:7
182:3, 182:9
182:10, 183:11
185:15, 185:16
200:23
**2018** 18:3, 29:21
30:4, 30:7
206:16
**2019** 1:18, 3:17
30:20, 210:8
**20th** 1:18, 3:17
127:23, 131:8
**21** 201:21, 202:3
205:1
**21st** 111:15
111:20, 112:4
112:8, 114:10
121:1, 133:15
133:16, 165:13
166:16, 167:6
167:25, 168:13
**22** 205:25
**24/7** 156:14
**2453** 9:2
**25** 169:2
**26th** 200:23
**28th** 108:17
111:3, 117:25
134:8, 134:18

**3**

**3** 82:13, 83:15
176:17, 176:21
187:12
**3:00:07** 162:23
**3:00:58** 163:15
**3:03:10** 165:4
**3:04:07** 166:4
**3:05:00** 167:8
**3:05:59** 167:23
**3:06:57** 168:14
**3:07:53** 169:1
**3:08:58** 169:16
**3:09:36** 170:13
**3:10:48** 171:7
**3:11:55** 171:24
**3:12** 205:21
**3:12:52** 172:24
**3:13** 205:24
**3:14:02** 173:20
**3:15:16** 174:23
**3:16** 209:2
**3:16:15** 176:3
**3:17:13** 177:2
**3:18:16** 177:17
**3:19:18** 178:15
**3:20:26** 179:11
**3:21:23** 180:12
**3:22:16** 181:4
**3:23:21** 181:18
**3:24:33** 182:15
**3:25:49** 183:22
**3:26:45** 184:18
**3:27:29** 185:23
**3:28:31** 186:13
**3:29:33** 187:11
**3:30:27** 187:19
**3:31:43** 188:13
**3:32:47** 189:14
**3:33:51** 189:22
**3:35:28** 191:6
**3:37:15** 192:21
**3:39:10** 193:24
**3:40:36** 194:25
**3:42:34** 196:4
**3:44:29** 197:21
**3:45:49** 199:5
**3:46:43** 200:1
**3:47:44** 200:15
**3:48:36** 201:16
**3:49:45** 201:23
**3:50:52** 202:17
**3:51:46** 203:16
**3:52:53** 204:18
**3:53:58** 205:12
**3:54:55** 206:14
**3:56:01** 207:18
**30** 210:8
**3026** 69:22
**30th** 109:13
109:15, 115:21
**31st** 18:15
119:12, 119:16
121:12, 122:1
**333** 3:12

**4**

**4** 89:24, 90:1
90:2, 90:4
149:8
**4/25/17** 170:16
170:21, 171:6
**4:23** 119:12
**450** 3:13

**5**

**5** 4:1, 94:7, 94:9
94:13, 94:18
94:20, 98:18
99:2, 142:22
165:14, 166:13
**5:00** 182:9
182:11
**50** 2:22, 3:4
**500** 2:23, 3:5

**6**

**6** 99:20
**606** 7:3
**60602** 2:8, 2:16
2:24, 3:6, 3:20
**60606** 3:14
**60608** 69:23

**7**

**7** 1:16, 6:14
103:24, 104:1
104:2, 104:4
189:17, 195:5

**8**

**8** 108:11, 108:14
117:16, 133:18
133:19, 141:7
193:22
**84** 162:21
**8th** 143:10
143:20, 143:23
147:16, 182:3
183:11

**9**

**9** 1:16, 8:15
111:8, 117:7
123:2, 133:16
167:2, 167:3
168:6
**9/16/17** 184:17
**9/27** 185:5
**9/27/17** 201:4
201:8
**9/28/16** 186:6
**9/29/16** 90:11
186:6, 190:17
191:18, 193:17
195:8
**9:00** 182:9
182:10
**96** 12:8, 12:9
13:2
**99** 12:20, 13:2

**/**

/// 6:16, 7:6
8:17, 9:4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. )No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The Video Discovery Deposition of JOHN NAWARA, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 333 West Wacker Drive, Suite 450, Chicago, Illinois, on October 2, 2019, at the hour of 9:48 o'clock a.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.



APPEARANCES:

LAW OFFICES OF RICHARD LINDEN,
BY: MR. RICHARD F. LINDEN,
17 North Wabash Avenue,
Suite 400,
Chicago, Illinois 60602
(Phone Number Not Provided)
lindenlaw@gmail.com
- and -
LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER VINCENT BUSTAMANTE,
17 North State Street,
Suite 1550,
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff;



APPEARANCES (Continued):

SCHARF, BANKS, MARMOR, LLC,
BY: MS. SARAH R. MARMOR,
MR. MORGAN G. CHURMA,
333 West Wacker Drive,
Suite 450,
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
mchurma@scharfbanks.com
Representing Thomas Dart,
in his official capacity
as Sheriff of Cook County,
Illinois, Matthew Burke,
Rebecca Reierson, and
Winifred Shelby;



APPEARANCES (Continued):

COOK COUNTY STATE'S ATTORNEY'S OFFICE,
BY: MS. MEGAN MARIE HONINGFORD,
50 West Washington Street,
Fifth Floor,
Chicago, Illinois 60602
(Phone Number Not Provided)
megan.honingford@cookcountyil.gov
Representing County of Cook,
a unit of local Government;

STATE'S ATTORNEY OF COOK COUNTY,
ILLINOIS,
BY: MR. LYLE K. HENRETTY,
50 West Washington Street,
Suite 2760,
Chicago, Illinois 60602
(312) 603-1424
lyle.henretty@cookcountyil.gov
Representing Karen Jones-Hayes.



EXHIBIT
C
exhibitsticker.com

ALSO PRESENT:

MR. DAVID LEHMAN,
Certified Legal Video Specialist,
McCorkle Litigation
Services, Inc.;

MR. JESSE KEHR,
Senior Paralegal,
Scharf, Banks, Marmor, LLC.



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| JOHN NAWARA | |
| By Ms. Marmor | 10 |
| By Mr. Henretty | 274 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 1 | 31 |
| Exhibit No. 2 | 37 |
| Exhibit No. 3 | 58 |
| Exhibit No. 4 | 68 |
| Exhibit No. 5 | 80 |
| Exhibit No. 6 | 92 |
| Exhibit No. 7 | 112 |
| Exhibit No. 8 | 116 |
| Exhibit No. 9 | 118 |
| Exhibit No. 10 | 121 |
| Exhibit No. 11 | 154 |
| Exhibit No. 12 | 155 |
| Exhibit No. 13 | 157 |
| Exhibit No. 14 | 162 |
| Exhibit No. 15 | 170 |




E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 16 | 171 |
| Exhibit No. 17 | 175 |
| Exhibit No. 18 | 178 |
| Exhibit No. 19 | 186 |
| Exhibit No. 20 | 189 |
| Exhibit No. 21 | 189 |
| Exhibit No. 22 | 191 |
| Exhibit No. 23 | 192 |
| Exhibit No. 24 | 194 |
| Exhibit No. 25 | 207 |
| Exhibit No. 26 | 212 |
| Exhibit No. 27 | 215 |
| Exhibit No. 28 | 219 |
| Exhibit No. 29 | 222 |
| Exhibit No. 30 | 224 |
| Exhibit No. 31 | 226 |
| Exhibit No. 32 | 231 |
| Exhibit No. 33 | 233 |
| Exhibit No. 34 | 234 |
| Exhibit No. 35 | 237 |
| Exhibit No. 36 | 245 |




E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Nawara Deposition | |
| Exhibit No. 37 | 250 |
| Exhibit No. 38 | 255 |

VIDEOGRAPHER LEHMAN: My name is David Lehman, Certified Legal Video Specialist with McCorkle Litigation Services, 200 North LaSalle, Suite 2900, Chicago, Illinois 60601.

I'm the videographer on October 2nd, 2019 for the recording of the deposition of John Nawara being taken at 333 West Wacker Drive, Chicago, Illinois 60606 at the time of 9:48 a.m. in the matter of Nawara versus Dart, et al., Case No. 17 CV 2393.

Will counsel please identify themselves for the record beginning with the plaintiff's counsel.

MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.

MR. LINDEN: Richard Linden on behalf of John Nawara.

MS. MARMOR: Sarah Marmor on behalf of Sheriff Dart, Matthew Burke, Winifred Shelby, and Rebecca Reierson.

MR. CHURMA: Morgan Churma on behalf of Sheriff Dart, Rebecca Reierson, Matthew Burke, and Winifred Shelby.

MR. HENRETTY: Lyle Henretty on behalf of



defendant Jones-Haynes.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

VIDEOGRAPHER LEHMAN: Will the reporter please swear in the witness.

(WHEREUPON, the witness was duly sworn.)

JOHN NAWARA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MARMOR:

Q. Good morning. My name is Sarah Marmor, as you just heard. I represent most of the defendants in this case.

And I want to start out, your name has been pronounced about eight different ways in this case, so how do you pronounce your last name?

A. Nawara.

Q. Nawara. Okay. That's what I'll try to remember to do. And could you state your full name for the record?



A. John Nawara.

Q. No middle name?

A. Anthony.

Q. Anthony. Okay. And where do you live?

A. Willow Springs.

Q. And what's your address?

A. [redacted]

MR. LINDEN: Just for the record it's agreed it's subject to the protective order?

MS. MARMOR: Yes. Absolutely.

BY MS. MARMOR:

Q. And what's your date of birth?

A. [redacted]-75.

Q. And so how old does that make you today?

A. 44.

Q. 44. Okay. Have you been deposed before?

A. I have.

Q. How many times?

A. Once.

Q. Okay. So I'm just going to cover some of the basic ground rules for a deposition. We need you to answer questions verbally. No



"uh-huh" or "uh-uh" so that we can understand exactly what your answer was. Is that fair?

A. Yes.

Q. And I'm only asking today for your personal knowledge. I'm not asking you to speculate. If you think that a question I've asked you will cause you to speculate, please let me know. Is that okay?

A. Yes.

Q. All right. And please tell me if you don't understand a question that I'm asking you because if you answer the question, I'll assume you understood it. Okay?

A. Yes.

MS. MARMOR: And actually, Morgan, will you do me a favor and get me some water?

BY MS. MARMOR:

Q. We should -- the court reporter already sort of explained this to you, but let's try not to talk over each other. I will try to let you finish your answers. Please let me finish my question. It's natural for people to anticipate what somebody is going to say, and so let's as best we can try not to do that. Okay?

A. Yes, ma'am.
Q. And in terms of breaks, you are allowed to take a break when you want, and I'm happy to accommodate it. The only rule, and your lawyers do it in their depositions, too, is we don't take a break when there's a question pending. Okay?
A. Okay.
Q. Finally, are you on any medication today that would affect your ability to answer completely and truthfully?
A. No, ma'am.
MS. MARMOR: Okay. I guess Morgan didn't realize there was water back there.
MR. HENRETTY: Didn't want to step in the picture.
MS. MARMOR: Good point.
BY MS. MARMOR:
Q. Mr. Nawara, have you ever been married?
A. No.
Q. So you're not currently married. Are you currently engaged to anyone?
A. No.
Q. Do you currently have a girlfriend?



A. Yes.
Q. Okay. And the reason I'm asking this is there is sort of different documents throughout that suggested different dates, and we'll get to those documents, but is the girlfriend that you're dating now the one that you began dating in May of 2017?
A. No.
Q. Okay. Do you have any children?
A. No.
Q. Can you tell me your educational background starting from high school on?
A. Completed grades 1 through 12 and some college.
Q. And what college did you do?
A. Various colleges, Triton, Moraine, South Suburban.
Q. And what did you study at those colleges?
A. Law enforcement.
Q. And you never got a degree?
A. No.
Q. Do you remember the years that you went to those colleges?



A. No, ma'am.
Q. Okay. Do you have any kind of professional certificates?
A. Many.
Q. Okay. And what are those?
A. I don't know. I have a lot of them.
Q. Can you remember any of them?
A. Certifications in CPR, FEMA, firearms, police certification.
Q. And that's what you can remember today?
A. Yes, ma'am.
Q. Okay. When did you start working at the Cook County Sheriff's Office?
A. September 28, 1998.
Q. What year did you graduate from high school?
A. '93.
Q. So what did you do from 1993 to 1998?
A. Worked for Chicago Board of Trade and then worked at a hardware store close to my house.
Q. What did you do at the Chicago Board of Trade?
A. Broker's assistant, ARB clerk, various



pits, various ARB -- clerking in various pits as an ARB clerk, as a broker's assistant wearing a headset, taking orders.
Q. In the days when people would do callouts and that kind of thing?
A. Correct.
Q. Okay. And how long were you working there?
A. Four years at the Chicago Board of Trade, one year at the Mercantile Exchange.
Q. And then did you leave there and start working at the hardware store?
A. No. Worked at the hardware store for probably about 16 years old, maybe 16 to 19 or 20 years old. So they kind of overlapped.
Q. Okay. Got it. Got it. Okay. And were you just working in regular retail at the hardware store?
A. Correct.
Q. Okay. And you say you joined the Cook County Sheriff's Office in 1998, is that right?
A. Yes, ma'am.
Q. And I take it you applied, and is there

a sort of test that you take in order to join the police or do you just go through the Academy?
A. You have to fill out an application, general application, that at the time they were handing out at the -- where was it -- the Cook County building down here. And then you wait for a call, and you take a general test, yes.
Q. And then you go to the Academy?
A. No. There's several interviews, a few drug tests, and then eventually if I guess you make the list or however high you make the list, and depending how many people they need for the class, then eventually they call you, yes.
Q. Okay. But when they eventually call you, then you start at the Academy?
A. Yes, ma'am.
Q. Okay. And what years -- how long were you at the Academy?
A. Probably about 12 weeks, I believe.
Q. And when you tell me that you began working on December -- sorry -- September 28, 1998, is that when you started at the Academy or when you graduated from the Academy?

17

A. That was my start date at the Academy.
Q. What was your title or job right out of the Academy?
A. Correctional officer.
Q. And were you still a correctional officer in 2016?
A. Yes, ma'am.
Q. Did you ever -- I understand there are certain kinds of tests you can take to rise up in the ranks at the Sheriff's Office. Did you ever take any of those tests?
A. Yes, ma'am.
Q. And what tests did you take?
A. Tests for electronic monitoring, sergeant's test, the test for the special operations team, the test for the emergency response team, test for court services. I believe that's it.
Q. So did you -- I may be mixing apples and oranges, so I want to understand. The sergeant's test would be testing to get a promotion, correct?
A. Yes, ma'am.
Q. And did you pass that test?

18

A. Yes, ma'am.
Q. And did you try -- did you apply for a sergeant's job?
A. I don't understand.
Q. Well, I'm confused because you were still a correctional officer as of 2016.
A. Correct.
Q. Did you ever become a sergeant?
A. No, ma'am.
Q. And why not?
A. I don't know.
Q. This electronic monitoring test, is that just so that you can do it or is that actually a promotion?
A. I'm considered a promotion. Get a different badge that says investigator on it, and you get a bump in pay. So I consider that a promotion.
Q. And did you get that promotion?
A. No, ma'am.
Q. How about special ops, is that a promotion?
A. The badge also changed, and the uniform changed. The IDs changed. And it was

19

considered a promotion. There was no bump in pay, but everyone considered it a promotion.
Q. And did you get that promotion?
A. Yes, ma'am.
Q. And when did you get that promotion?
A. June I think of 2002.
Q. And in 2016 were you still part of special operations?
A. No, ma'am.
Q. And why not?
A. They disbanded the team.
Q. You said the emergency response team was another one. Was that a promotion? Do you consider that a promotion?
A. Yes, ma'am.
Q. And did you get that promotion?
A. No, ma'am.
Q. Is court services a promotion in your view?
A. I believe so, yes. I believe there is a bump in pay in that, also.
Q. And did you get that promotion?
A. No, ma'am.
Q. In 2016 were you a member of a union?

20

A. Yes, ma'am.
Q. And what union was that?
A. The Teamsters.
Q. Today are you a member of a union?
A. I'm told -- I don't know. I'm in probationary status at the moment, so I don't know.
Q. And that's because you're now -- you're in the process of becoming a sheriff's police, correct?
A. Been a police officer now for about a month.
Q. When did you apply to become a sheriff's police officer?
A. About six years ago maybe? 2014, '13?
Q. And when you -- I know you were off work in 2017 for a period of time, and you came back in 2017. Did you do something in 2017 to kind of reactivate that application? I'm just trying to figure out, understand how you came -- if you applied in 2013 or 2014 but you didn't actually go through the training and that kind of thing until this last year --
A. Then I'm thinking I'm misunderstanding

21

your question. I believe your question to originally be when I first applied to the Sheriff's Police Department.
Q. No, no. That wasn't my question. Yes, that was my question, and this is because I don't understand this, so anything you can do to help me.
A. I believe I applied in about 2013 or '14, approximately about six years ago. If you were not taken over to the Sheriff's Police Department, if you are not promoted to the Sheriff's Police Department within a two-year period, every two-year period the process starts over again. So there has been three different applications since then.
Q. Okay. Thank you. That's very helpful.
Now, based on your current status, when did you apply for the Sheriff's Police and in fact got the promotion?
A. It was September of '16 or '17. I can't remember exactly.
Q. And you went to the Academy for that, is that right?
A. Yes, ma'am.

22

Q. And you graduated from the Academy when?
A. August 23rd of this year.
Q. And what does a Sheriff's Police officer do?
A. Short answer to that is everything that you possibly know that a police officer does, except that we patrol all of Cook County, not just certain towns. We have jurisdiction over 500 square miles.
Q. So you can arrest people?
A. Yes, ma'am.
Q. And I take it you carry a gun in this job?
A. Yes, ma'am.
Q. And you said you're probationary, is that right?
A. Yes, ma'am.
Q. So how long does the probation period last?
A. One year from appointment to actual police officer. So the Academy doesn't count.
Q. So probation starting right after --
A. August 23rd.

23

Q. Let me finish the question.
A. Sorry.
Q. Okay. And is that -- define, if you know, what probationary means. Does that mean if you mess up in some major way, you won't actually become a permanent police officer?
A. So to speak, yes.
Q. Okay. And you said you don't know if you're in a union as a Sheriff's Police officer?
A. We pay union dues, but because of the fact that you're probationary status, the slightest thing can put you, you know, out of the appointment.
Q. I see. So there's fewer protections.
A. Correct.
Q. Okay. And what union is it?
A. FOP.
Q. That's Fraternal Order of Police?
A. Yes, ma'am.
Q. So you were a Teamster up until the time that you switched over to being a police officer?
A. Correct.
Q. A Sheriff's Police officer?

24

A. Correct.
Q. Have you -- I know that there was a prior lawsuit that you were involved in called the Burris lawsuit. Do you recall that?
A. Yes, ma'am.
Q. Okay. Have you sued the Cook County Sheriff's Office in any other cases?
A. No, ma'am.
Q. Have you ever filed a grievance against the Cook County Sheriff's Office?
A. No, ma'am.
Q. Have you ever filed a grievance against any of the employees of the Cook County Sheriff's Office?
A. No, ma'am.
MR. LINDEN: Other than this case, obviously, right?
MS. MARMOR: Right. Although I don't consider this a grievance. This is a lawsuit.
BY MS. MARMOR:
Q. You understand -- and when I say grievance, I mean a grievance through the union. Did you understand that to be my --
A. Well, I have had -- I have had times



where I needed to file a grievance --
Q. Okay.
A. -- but it was never against a sheriff's employee.
Q. Okay. Who was it against or what were the grievances about?
A. Like tardiness probably one time, I think so. It's been years, so I'm not sure.
Q. Okay. But for example you never filed a grievance about the matters that are at issue in this case.
A. No, ma'am.
Q. Okay. Did you -- I understand that correctional officers can have secondary employment, is that right?
A. Yes, ma'am.
Q. And did you have secondary employment during your years as a correctional officer?
A. I have had various times. I mean --
Q. So in 2016 did you have secondary employment?
A. Yes.
Q. For whom?
A. Trying to -- it was with -- how does



this go -- Aces Security working for UPS.
Q. And when did that job start?
A. I'm not sure.
Q. Was it at least a year before 2016 or was it in 2016?
A. Yes. See, I'm thinking it was more towards 2017, maybe the beginning of it. I'm not sure if it was 2016 or not.
Q. Did you start that job while you were engaged in the conflict with the Sheriff's Office over your fitness for duty?
A. I believe so because it was right around the time I thought I needed another job.
Q. Right. And how many hours a week did you work at Aces?
A. It depended under their availability. It wasn't a set schedule. If they had time to fit me in, I worked. So it wasn't like a particular shift or any kind of consistency.
Q. Do you still work for Aces today?
A. No.
Q. When did you stop working for Aces?
A. When I was appointed to the Police Department.



Q. Okay. We have to -- can you give me a sense roughly what that date was?
A. Probably about April of this year.
Q. April of 2019.
A. Yes, ma'am.
Q. Do you know what your salary or your pay was from Aces in 2017?
A. No, not offhand.
Q. Did you have any other secondary employment during your time working -- since you've been a correctional officer?
A. In the last 20 years?
Q. (Nodding).
A. Various jobs, yes. I mean, I'm not sure exactly what you're asking. All of my employment for the last 20 years other than the Sheriff's Department?
Q. Was there a lot? Was there a little? I mean, if you could describe it.
A. I've had -- I don't know. It was -- they would be -- I never really had a consistent anything. If I did, it was a couple weeks here and there over the years. It wasn't anything -- so I have had other jobs, but it's not like, you

know, anything that I know that I worked for years and years. You know what I mean?
Q. Sure. That's fair. During the time that you were engaged in the dispute with the Cook County Sheriff's Office that's the subject of this case, you've already talked about Aces. Did you work for anyone else during that time?
A. I worked for Amazon.
Q. And what did you do for Amazon?
A. Packaging.
Q. And when did you start working for Amazon?
A. I want to say June of 2017.
Q. And how long did you work for Amazon?
A. Couple months.
Q. So maybe the end of August you stopped working there, 2017?
A. I don't know. I was trying to make ends meet a lot, and I'm not exactly sure.
Q. That raises another question. During the time that you were in this dispute with -- and not working at the Sheriff's Office, at what point -- was there a point at which your salary ran out?

29

MR. LINDEN: Objection to the form.
BY MS. MARMOR:
Q. You can answer if you understand the question.
A. My salary ran out from the Sheriff's Department?
Q. Correct.
A. I believe it was April of 2017.
Q. So from -- and we'll look at the documents, but I'll represent to you that I believe you were taken off duty on November 19th of 2016, and from that point on you were basically -- you were using accumulated time that you had in your bank, is that right?
A. Yes, ma'am.
Q. Okay. So you were continuing to get paid your regular salary, it was just in the form of using up that time until April, is that right?
A. I was paying myself, yes.
Q. Right. That was money that was -- but that was money that was coming from the Sheriff's Office at the time.
A. That I had earned.

30

Q. Correct. Were your benefits cut off at any time?
A. I don't know.
Q. Did you ever try to visit a doctor, for example, and they said, oh, your insurance doesn't work?
A. I don't know. I don't get sick that often, so I don't go to the doctor that often.
Q. So but do you -- the question is did that happen. Did anybody say you do not have a benefit?
A. No. Not that I know of, no.
MS. MARMOR: Okay. We'll mark this as Exhibit 1. We'll call it Nawara Exhibit No. 1.
(WHEREUPON, Nawara Deposition Exhibit No. 1 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter's handed you what's been marked as Nawara Exhibit 1, and this appears to be an e-mail from you dated September 5, 2016 to someone named John Zaleski. Do you see that?
A. Yes.

31

Q. I'll represent to you that one of the things that your original counsel in this case asked for us to do is produce documents with something called metadata. So that's what the second page is, just so you understand that.
Who is John Zaleski?
A. He's an officer that I know.
Q. Just a friend at work?
A. Correct.
Q. Okay. And the subject is Med Pass Sheet 2. Do you see that?
A. Yes.
Q. Okay. And in the e-mail you say, Disregard my last e-mail. During the process of scanning and writing the previous e-mail to you in Cermak's Central Control, I engaged myself in discussion with Commander Tylka and Lieutenant Greer about the form and how I felt about it. Do you see that?
A. Yes.
Q. Is that in reference to this Med Pass Sheet 2 that's the subject?
A. I don't know.
Q. Okay. You also say, I was then told to

32

disregard filling it out. It was a form that was assigned to them for them to fill out, and the officers no longer need to fill it out. Do you see that?
A. Yes.
Q. And you continue, They are supposed to supervise the dispensing of medication by the medical staff. Do you see that?
A. Yes.
Q. So do you recall having a discussion with Commander Tylka and Lieutenant Greer about a form, about this particular form that this e-mail is referring to?
A. No. Do I have anything more written here?
Q. This is all I've got.
A. It's kind of small, very vague. I've had a lot of conversations.
Q. But does this indicate to you -- assuming that what you said was true at the time, that you did have a conversation with Lieutenant Greer and Commander Tylka about a form that you felt they should be filling out?
MR. LINDEN: Objection. Foundation.

33

THE WITNESS: Again, it's kind of vague. I've had a lot of -- you know, I object to a lot of things that happen there. I could have had this conversation. If there was more there, I could probably be able to say, oh, I remember this.
BY MS. MARMOR:
Q. Right. I'm asking you -- I hear that you don't remember the specific conversation, but this is your e-mail, correct? You wrote this e-mail.
A. Again, it's just like a small chunk of something that I wrote that you put on here?
Q. No. This is your e-mail. This is the e-mail from -- if you look at the second page --
A. Do you have --
Q. If you look at the second page, this came from your e-mail at the Sheriff's Office. If you look at the third line, custodian, it says John Nawara.
A. Okay.
Q. And this is an e-mail -- it's an e-mail from your e-mail address to Mr. Zaleski, right?
A. That's what it says, yes.

34

Q. Okay. So are you denying that you sent this e-mail?
A. I'm not denying anything, but I'm not accepting anything, either. I'm saying that the first thing it says is disregard my last e-mail. So, I mean, if I had another e-mail, I could probably verify that I wrote this e-mail because I'd remember the conversation.
Q. Okay. But are you denying that you wrote this e-mail?
A. Again, I'm not denying that I wrote anything. It's just vague to me to be able to recollect the conversation.
Q. Right. But that's not the question I'm asking right now. I'm simply asking you does this reflect that you told Mr. Zaleski that you had a discussion with Commander Tylka and Lieutenant Greer about a form?
MR. LINDEN: Objection. Asked and answered and argumentative.
BY MS. MARMOR:
Q. You can answer the question.
A. If the electronic statement says that this is me who wrote this e-mail, then yes,

35

sure.
Q. And it continues on and says in the last line, Though it is never my intention, I hope being a thorn will some day pay off somewhere. Do you see that?
A. Yes.
Q. What does that indicate? What were you trying to indicate with that?
A. Lot of things that are done in this department aren't done properly, and no one stands up because of fear of something happening to them like what's happening to me now.
Q. Um-um. So you wanted a payoff from being a thorn, is that right?
A. I didn't -- say that again?
Q. You wanted a payoff -- you said I'm hoping the thorn will pay off somewhere.
A. What do you mean by that?
Q. I'm asking you.
A. Yes. Sort of change, some sort of action to happen so things don't happen to people like this. Whatever that conversation was here.
Q. And do you know who Lieutenant Greer

36

is?
A. Yes.
Q. Weren't you in fact in the Academy with her?
A. Yes, I was.
MS. MARMOR: Okay. Let's go off the record for one second.
VIDEOGRAPHER LEHMAN: We are off the record. The time is 10:17 a.m.
(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 10:19 a.m.
MS. MARMOR: Let's mark this as the next exhibit.
(WHEREUPON, Nawara Deposition Exhibit No. 2 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 2. This is an e-mail dated September 18, 2016 from you again to John Zaleski, Subject: Division 8-2016-14992. And it starts with the



line, There's a rumor that this place is sending Ex Ops officers to Division 9 when Division 9 is short-staff. I hope that's not true. Do you see that?
A. Yes.
Q. Okay. And then you go on to say, I bidded to Ex Ops 6-2 Detail 5 Wednesday, Thursday. Is that a reference to you were trying to go work at Ex Ops?
A. Yes.
Q. Okay. And was your concern that you were expressing here that Ex Op officers might be sent to Division 9?
A. Yes.
Q. Okay. And then you talk about, you say, I can't work in an environment where my employer sends me to take care of a problem but won't provide me with their support on the matter when all is said and done. Do you know what you were referring to there? Do you remember what you were referring to there?
A. Again, I speak with a lot of people about different subjects about problems here. So it could be a matter of things.



Q. But you don't remember specifically what it was that you're referring to here --
A. No, ma'am.
Q. You have to let me finish the question. So the answer is no, you don't remember?
A. Correct.
Q. Okay. And then you go on to quote a Jack Nicholson speech from A Few Good Men. Do you see that?
A. Yes, ma'am.
Q. And I will represent to you that this blue highlighting was in the original. We didn't add that, just so you know. And is this a quote that you use a lot?
A. You said you received this e-mail this way?
Q. Correct.
A. You didn't do that?
Q. I promise you I didn't do that.
MR. LINDEN: Just want to object to foundation insomuch as it implies the plaintiff had created it.
THE WITNESS: I was just curious because I don't even remember that I even know how to



actually highlight anything like that. I am not that savvy with e-mail, but okay. It's not a quote that I use a lot.
BY MS. MARMOR:
Q. Okay. Do you remember what you were trying to convey by using this quote?
A. Again, it's just one e-mail. Probably refers to the beginning of the e-mail.
Q. The line Son, we live in a world that has walls, and those walls have to be guarded by men with guns?
A. No, ma'am. That's still the Jack Nicholson quote.
Q. Which first line -- sorry. Which first line are you referring to?
A. Sending External Operations officers to Division 9 when Division 9 is short-staffed.
Q. Okay. So you don't really -- are you just saying you don't know why you used this quote in this e-mail?
A. No. I'm saying that even in referring to -- help is asked of you, but you're never rewarded for the help that you give, I guess.
Q. Okay. Then in the second paragraph you

say, I greatly appreciate the times that you search for me throughout this shit hole. The shit hole referring to the jail or Cermak or something else?
A. General term, the area, the environment I was in.
Q. At work.
A. Yes. I've actually been there. I sit there in feces all day sometimes, quite literally.
Q. And you say, whether it's to send important information about incidents around this jail or information about the tragedies that strike our brothers, and you capitalized o-u-r. Do you know why you did that?
A. No, I don't.
Q. Okay. Who do you think of as our brothers in that line?
A. The officers.
Q. Are there no women officers at the jail?
A. It's a general term for everyone. I don't mean to offend anybody. I include the women there as the same thing. We're all



brothers in blue, as the saying goes.
Q. Can you go back to Exhibit -- Nawara Exhibit 1, please? Do you see where you say that you engaged myself in discussion with Commander Tylka and Lieutenant Greer about the form and how I felt about it. I was then told to disregard filling it out. Do you see that?
A. Yes.
Q. Does that indicate to you that you -- by talking to people about the form you were then relieved of having to fill out the form, is that right?
MR. LINDEN: Objection. Form, asked and answered.
THE WITNESS: Can you rephrase that?
BY MS. MARMOR:
Q. Yeah. It looks to me from reading this like you had a problem with the form, you spoke to some people about it, and they said you don't have to fill out the form. Is that what it looks like to you?
MR. LINDEN: Objection, form.
THE WITNESS: Well, first off I'd like to think that I'm very proud to be an officer and



to do this job, and I never have a problem doing my work. I only have a problem if I think there is a problem with something that might cause some type of safety towards something.
So what I think you're asking me is did I see a problem with the form. So I brought it up to someone, and they saw that problem, so they said you're right, don't fill that out.
BY MS. MARMOR:
Q. Right.
A. Yes.
Q. Okay. So I'd like to -- we were looking at just those e-mails were from September of 2016. I would like to move to the event or the events of September 28, 2016. Do you remember that day?
A. Yes, ma'am.
Q. Okay. So I just from your own memory -- I'll show you some documents as well, but I'd just like to start from your own memory what you remember about that day.
A. It was a fight down in Cermak's basement area. We needed someone to give direction on how that altercation should have



been handled after it was done and over with. So we called for a supervisor. Eventually Superintendent Jones-Hayes showed up along with Sergeant Conley, and I never really got any direction on what we should have done with the fight.
Q. I'm sorry, what did you just say?
A. Never really got any direction on --
Q. Never really. Is that what you said?
A. Correct.
Q. Okay. Sorry.
A. What we should have done with the fight. She became upset that there was a fight and kind of channeled her anger towards me.
Q. How did she show that she was upset that there was a fight?
A. She walked in yelling, then directed herself towards me and made it seem as though I should be the one who would have prevented the fight, like I should have known it was going to happen, and I should have prevented the fight.
Q. Do you remember any actual words that she said?
A. Something to the effect of, You're down

here specifically to make sure that things like this don't happen.
Q. And did you disagree with that statement?
A. Well, there were other officers there, yes. I'm one of the people that should make sure that I can help to disengage people that are fighting. But I'm not psychic. I can't tell who's going to fight before they fight.
Q. Were the people fighting both handcuffed?
A. No.
Q. How many -- were either of them handcuffed?
A. I believe one was handcuffed and one was shackled. One had a shackle to his ankle.
Q. And were there any -- was there any expectation that -- well, let me back up for one second. Can you describe what Cermak is?
A. In short it's type of like a mini hospital for the jail.
Q. And where did the fight happen?
A. In the basement, the inmate waiting area.

45

Q. Did -- when Superintendent Jones-Hayes came in, did she say anything about the fact that one of the people involved in the fight had not been handcuffed?
A. No.
Q. So what else do you remember about -- and where was this conversation or this discussion taking place?
A. In the officers' area down there.
Q. Are there cameras in the officers' area to your knowledge?
A. No, ma'am.
Q. Were you wearing a body camera that day?
A. No, ma'am.
Q. And is that -- is that -- did you normally wear a body camera?
A. No, ma'am.
Q. Okay. And about how long would you say it took for the superintendent to show up at the officers' area?
A. I don't know. I want to say 15 minutes.
Q. And you say she came in, and she was

46

upset about what had happened?
A. Yes, ma'am.
Q. And what else can you tell me about her interaction specifically with you?
A. Well, as she did the -- you should have prevented this. She started poking her finger into my chest.
Q. And what did you do?
A. Tried to back up.
Q. What else?
A. That was it. I ended up eventually hitting the wall behind me, and I had nowhere to go.
Q. Who else was in the room?
A. Officer Ganon and Sergeant Conley came down with her.
Q. No one else was in the room at that time?
A. It's an active area. I'm thinking there were other people around walking around, but no one that was kind of engaged in our conversation, I guess.
Q. Did you --
MR. HENRETTY: Sarah, I don't know if you

47

ever actually said who "she" was.
MS. MARMOR: I'm sorry, yes.
BY MS. MARMOR:
Q. When I said "she," I meant Lieutenant Jones-Hayes. I think you understood that, correct?
A. What do you mean?
Q. Counsel for Lieutenant Jones-Hayes -- I used the word "she," when she came in, did you say anything to her. I meant Lieutenant -- I'm sorry, Superintendent Jones-Hayes. That's who we're talking about right now.
A. You asked me if I said anything to her?
Q. Correct.
A. At what point?
Q. When she was poking you. When you said she was poking you in the chest.
A. I could see she was upset, and I could understand her being in her position having to deal with all the problems that happened in the jail because I know on an officer's level it's a lot. So I can only imagine being one person in there, the highest ranking person, having to deal with all this stuff.

48

So I kind of wasn't -- I understood her anger, put it that way. But when I backed up and I hit the wall, I kind of freaked out because I had nowhere to go. And that's when I asked her to -- could you please stop poking me?

And she looked at me and kind of stopped for a second and composed herself, and she said, If I offended you, I apologize. So that was I think, Would you stop poking me or however I worded that was the only thing I said to her at that time.

**Q. Okay. And then what happened?**

A. She yelled at Officer Ganon. Well, yelled in Officer Ganon's direction. Put it that way. I don't think she was yelling at Officer Ganon because Officer Ganon is a very nice officer and doesn't really ever get involved in anything bad or anything like that.

She yelled at Officer Ganon's direction. She said, When I used to be down here, I used to run this mother fucker. And I guess that means -- I took interpretation as when she was an officer, that she used to do a good job down here.



Then someone said she had a phone call, so her and Sergeant Conley walked off to the office that was in the next room.

**Q. There is another office in the next room?**

A. Okay. Well, you have the officers' area where the incident took place. Well, the incident between the superintendent and I. You have the inmate waiting area where the fight took place.

And then I don't know how to put the direction on this, but there is multiple rooms, but there's a third room which is kind of the triage area for an inmate that has an area for an officer to sit, kind of a desk like area, where the officer will take phone calls and admissions and kind of like who's coming down, what inmates are here, so he can relate the information between the divisions to the doctor so they can make the appointments and such. And that's where the phone call came from.

**Q. So she would have walked across the waiting area into that --**

A. Correct.



**Q. -- other office.**

A. Yes.

**Q. Okay. Again, I know you're being helpful.**

A. Sorry.

**Q. Are there cameras in the triage area that you're aware of?**

A. No, because they are treating inmates in there, so there are no cameras in there.

**Q. And then after she went to the triage area, did you have any other interaction with her that day? And by "her" I mean Superintendent Jones-Hayes.**

A. I had to restrain another inmate. There were more inmates, detainees, than restraints. And I made an attempt to restrain an inmate with a restraint that was made available because an inmate had left.

And as I went to restrain this inmate, he looked around and saw that probably half the room didn't have restraints on, and he didn't want to be the next guy that was going to be in restraints, so he got up. I don't know if he said it or he just kind of looked at me and gave



me a look and said you're not going to -- I'm not going to be the one or you're not going to restrain me. So he walked away.

And I wasn't going to chase him around since I had two supervisors right there. So I walked over to my sergeant, and I asked him if he could help me or at least walk over to this inmate and give him an order to sit still so I could restrain him with the shackle that we had.

**Q. Was that Sergeant Conley?**

A. Yes, ma'am.

**Q. And when you say you walked over, does that mean you went into the triage area?**

A. Yes. They were still in there because she was on her phone.

**Q. And then what happened?**

A. She volunteered to go out there with me. Instead she stopped Sergeant Conley.

**Q. Jones-Hayes did?**

A. Yes, ma'am.

**Q. And then what happened?**

A. Took a second because he went to the back of the room. I couldn't find him, and everyone is in the same uniform. Then I noticed

who it was. I pointed him out. She walked up to him closely, too close for how I would like people to walk up to the inmates. So I got up close to her, and she kind of whispers at him, Baby, can you please shackle up for this man? He said yes.

So when that happened, she gave me the look to kind of walk up to him, to approach him. I put the shackle on him, and we walked away. And as we walked away, I leaned over to her out of the inmate's ear, and I said, Maybe if you follow me around all day, I can do my job.

Q. And why did you say that?

A. Because I shouldn't have to rely on someone half my size to go everywhere with me to do my job. I'm supposed to be able to do my job on my own.

Q. What does her size matter?

A. Well, if you're asking how it takes someone smaller than me -- I don't understand the question.

Q. You're the one who said somebody half my size. I'm trying to understand why you think her size matters to whether or not the job can



be done.

MR. LINDEN: Objection. Form and misstates the testimony.

THE WITNESS: Because he was trying to challenge authority at that time, I guess. He didn't want to do what was asked of him.

BY MS. MARMOR:

Q. So here is my -- so you had gone to ask for help, is that right?

A. Correct.

Q. And did Superintendent Jones-Hayes give you help?

A. Depends on how you look at that.

Q. So you didn't -- is it that you didn't like the manner in which she gave you help?

A. Correct. She didn't -- there should be a way that you can verbalize your order in an authoritative, respectful way to get the result that you need. I think calling inmate Baby and speaking to him softly gives him this power that he realizes I don't have to listen to the officer. I'm going to wait until the highest ranking person comes over here.

In me doing my job I like to do my job



as effectively as possible, that I don't have to bother my upper ranking people unless it's a very bad problem. Then I can do my job. Because they have their own problems on their level already.

By her doing that she has to make herself available all the time because these inmates see this. It's a learned behavior. They see this, and now they're like, okay, we don't have to listen to him. Now we know anytime we want something done, we can disregard him, and she'll come over here, and she'll talk to us, which also puts her out, too, because now she has to make herself available for every little thing that happens down there, and that's not the way it should be.

Q. So if Sergeant Conley had done the same thing, would you have had a problem with it?

A. Yes. Actually, he's bigger than I am.

Q. Are there women correctional officers at the jail that are smaller than you are?

A. Yes.

Q. Does their size matter as to whether or not they can --



A. Not at all.

Q. -- be effective? Please let me finish.

A. Sorry.

Q. Does their size matter as to whether or not they can be effective?

A. No, ma'am. Officer Ganon, who's one of the officers who is a witness, is actually a very great officer, and she's also half my size.

Q. Was your assignment to the basement of Cermak that day to monitor detainees?

A. Yes, ma'am.

Q. Okay. And what does that mean?

A. Just that, pretty much. You're pretty much just observing them to make sure they don't do anything out of the ordinary until they're called by the doctor to be seen and then escorted back down to the division.

Q. Were there other correctional officers that day whose job it was to monitor detainees?

A. Yes.

Q. And who were they?

A. Again, I only know of Officer Ganon, who was assigned there with me. There were many officers in and out of there all day long.

MS. MARMOR: Oops. That's all right. Don't worry about it.
Mark this as the next exhibit.
And actually, I'm going to hold off on that because I have a couple questions leading up to that.
BY MS. MARMOR:
Q. One of the things that your complaint said was that Jones-Hayes disparaged you in front of detainees. How did she disparage you in front of detainees?
A. Because going up to an inmate and acting in that way takes away the authority from the officer.
Q. Anything else?
A. No.
Q. Okay. And after you made your comment to her, did you consider that to be a respectful comment is my first question.
A. No. No. I was upset.
Q. And what did she do in response to that?
A. She stormed off, kind of slammed the door open and stormed off and said -- I forget

57

exactly what she said. She was in the hallway. She stormed off and yelled something.
Q. And you don't remember what she yelled.
A. Not really.
MS. MARMOR: Now we can -- is that Exhibit -- what exhibit is that?
MR. LINDEN: 3.
MS. MARMOR: The court reporter is going to hand you what's been marked as -- oh, sorry. Go ahead. Do it first, and then I'll make my speech.
(WHEREUPON, Nawara Deposition Exhibit No. 3 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what has been marked as Nawara Exhibit 3. This is an e-mail attaching a complaint form from you to Richard Brogan dated October 13, 2016. Do you see that?
A. Yes, ma'am.
Q. And who is Superintendent Brogan?
A. He was -- at the time he was my boss over the area I was.

58

Q. And after the incident you were transferred to Ex Ops, is that right?
A. Yes, ma'am.
Q. And was Superintendent Brogan the superintendent of Ex Ops?
A. Yes, ma'am.
Q. And had -- and Superintendent Jones-Hayes had been your superintendent at Cermak, is that right?
A. Yes, ma'am.
Q. And why were you sending -- and this is now -- the event took place on September 28, 2016, correct?
A. Yes, ma'am.
Q. And this is dated -- and the form is actually dated October 13, 2016. So why two weeks later did you prepare this complaint form?
A. Because during that period of time, I was wrongfully transferred out of the division. I received an e-mail, I think it was an e-mail, that stated that I was now under investigation. And when I was transferred out of there, depending on where I was placed, I guess this was being talked about now through other people

59

because different officers coming into the jail at work would make comments to me that she's trying to find something to discipline you with or she's looking on cameras to see in past events if there's anything she can write you up for. So I didn't want this to keep happening, so I decided to file a complaint.
Q. Is "she" Superintendent Jones-Hayes?
A. Yes, ma'am.
Q. What officers told you that she was trying to find something to discipline you for?
A. In External Operations you can be placed, well, various areas, but in the jail you're placed on the outskirts of the jail, all the entrances. Kind of like what you see like at an airport, whatever TSA does, and one of the scanners can stop you, scanner coming to the jail. It could have been anybody. Hundreds of officers come through. I know lots of people over 20 years.
Q. So you're saying you don't remember the names of the people who told you this.
A. Correct.
Q. Okay. You said you had been wrongfully

60

transferred out of the division. What division was that?
A. Cermak.
Q. Isn't it the case, though, that you had applied to be in Ex Ops earlier --
A. Yes.
Q. Let me finish. Earlier in September?
A. Yes, ma'am.
Q. Okay. So why do you consider it a wrongful transfer?
A. Because it was done to me directly after that incident.
Q. Was there anything worse about working in Ex Ops than working in Cermak?
A. No.
Q. Was there anything better about working in Ex Ops than working in Cermak?
A. No. It has its give and take, everything else.
Q. You say you received an e-mail that said you were under investigation?
A. Yes.
Q. Who sent you that e-mail?
A. I don't remember.

61

Q. What did the e-mail say?
A. That I was subject to the Article U, I believe, the S.E.A.M., S-E-A-M, I believe, acronym -- I don't know what it stands for. I forget. Sorry.
Q. And what do you understand Article U to be?
A. It reads something that I'm under investigation pending possible criminal action or whatever. I don't know. It just reads that I'm under investigation.
Q. So at the time that you wrote this complaint, you understood, at least you believed, that there was some investigation stemming from the altercation you had with and the conversation you had with Superintendent Jones-Hayes on September 16, 2016. Sorry, September 28, 2016.
A. Yes, ma'am.
Q. Okay. Did you ask anybody -- did you ask, for example, Superintendent Brogan about the investigation?
A. I don't understand.
Q. Did you ask Superintendent Brogan

62

whether or not you were being investigated?
A. No.
Q. Did you ask any of your superior officers whether you were being investigated?
A. I don't think so.
Q. Okay. If you'll go to -- unfortunately the way this document was produced, the first page of your complaint is a few pages in. So if you go one -- not this one. That's the second page of your complaint. If you keep going, you'll get to the first page. Do you see that?
A. Yes, ma'am.
Q. And is this the complaint that you prepared?
(WHEREUPON, there was a short pause.)
THE WITNESS: Yes, ma'am.
BY MS. MARMOR:
Q. So do you see where you wrote -- and the date of this complaint is October 13, 2016, correct?
A. Yes, ma'am.
Q. Okay. Do you see where you write in sort of towards the middle of it, In a very

63

insulting, provoking, and demeaning action Superintendent Jones-Hayes pushes her finger into my chest several times as she says in a very condescending tone of voice, quote, why isn't this inmate cuffed behind the back, end quote. Do you see that?
A. Yes.
Q. Does that refresh your recollection that she was concerned about the fact that one of the inmates was not cuffed?
MR. LINDEN: Objection to form, speculation.
THE WITNESS: I believe that comment was to somebody that had an inmate with them that had just walked in.
BY MS. MARMOR:
Q. Okay. But -- okay. So but she was complaining about an inmate not being cuffed, is that right?
A. I believe so, yes.
Q. Okay. And then she asked who was the staging officer, right?
A. Yes.
Q. And that was -- and you said -- this is what you're reporting, that you amazed at her

64

behavior. I take a step back and bump into the wall, and behind me feeling trapped I say, You need to keep your hands off me. That is very unprofessional. Is that what you remember she said? Or sorry, what you remember you said?
A. Yes, ma'am.
Q. Okay. And then Sergeant Conley said that you in fact were the staging officer, is that right?
A. Yes, ma'am.
Q. And what is a staging officer?
A. They label that waiting area staging, and I'm the officer who is assigned to that area.
Q. Okay. And was it -- was part of the requirements of the staging officer to make sure that people were cuffed?
A. Yes.
Q. And then you report in your complaint that Ms. Jones-Hayes said, Well, if I offended you by touching you, I apologize? That's at the end of this.
A. Yes.
Q. Okay. So at the bottom of this page in



the next kind of box of this page it says, What is your requested remedy to this complaint? Do you see that?
A. Yes, ma'am.
Q. You said, I'm not sure. I'd like to speak with someone if possible about this incident. Do you see that?
A. Yes, ma'am.
Q. So what were you indicating? Why weren't you sure what you wanted to have happen?
A. Because I didn't -- I don't dislike her. Again, I can understand the pressures of what it must be like to be the highest ranking person in a building and being all by yourself and having to handle all these problems because I know what it's like as an officer.
So I didn't want any of these problems. I didn't want this to come to any of this. I wanted maybe somebody to come up to me and say -- or her or however it would go down and say this was a big misunderstanding, and everybody goes their separate ways, and there is no hard feelings. I didn't want all this.
But I kept on thinking she was going to



keep harassing me. I didn't want to be under investigation. I was trying to get out of there. I didn't want any of this.
So I wasn't -- sorry. So I guess what I'm trying to say is I wasn't sure what the remedy would be. I wasn't looking to gain anything from this. I just didn't want to be messed with anymore.
So if they would have told me go and do your job, nothing is going to come of this, don't worry about it, I would have been fine with that or whatever. I mean, I don't know. Whatever the powers that be, whoever I have to answer to to this complaint I would have just been okay with that. I didn't want anything further to happen.
Q. So could you go to the first page of Nawara Exhibit 3, please, the front page. So on the front page you say, Hello, Superintendent Brogan. Attached is a complaint for an incident that took place before I was transferred to your division, sir. I would appreciate it very much if you would please help me get this to the proper personnel. Do you see that?



A. Yes, ma'am.
Q. You sent this to him -- I see from the form that one of the ways you can send a complaint form like this is to someone in your chain of command, is that right?
A. Yes, ma'am.
Q. Do you have any personal knowledge of what happened to this complaint after you sent it?
A. No, ma'am.
Q. Okay. Do you have any personal knowledge of whether any of the named defendants in this case ever saw this complaint prior to you being called to HR?
A. No, ma'am.
MS. MARMOR: Mark this as the next exhibit.
(WHEREUPON, Nawara Deposition Exhibit No. 4 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 4, which is a Fitness for Duty Examination report from Isaac Ray Forensic Group. Do you

see that?
A. Yes, ma'am.
Q. And have you seen this document before?
A. Not presented to me in this way, but I believe I read these things.
Q. Her report?
A. Yes.
Q. Okay. And by "her," I mean Dr. Goldstein?
A. Yes, ma'am.
Q. And did you in fact meet with Dr. Goldstein as it states at the first page here on September 11, 2017 and September 12, 2017?
A. I'm not sure the days, but it was two days, yes, around that time, yes.
Q. Okay. And you understood that that examination was to assess your fitness to return to duty as a correctional officer for the Cook County Sheriff's Office?
A. Yes, ma'am.
Q. Okay. If you could turn to Page 3 of Nawara Exhibit 4, it's also Bates stamped CCSO 108. You see in the first full paragraph



that starts, During the interview here? I'm going to ask you some questions. This is her statement about the things that she says you said during the interview about the day of the incident with Superintendent Jones-Hayes.
A. Okay.
Q. And she says, Officer Nawara described a very different set of events on the day of the incident with Superintendent Jones-Hayes and offered his thoughts as to the reason for the respective descriptions -- as to the reason the respective descriptions depart so significantly. Do you see that?
A. Yes, ma'am.
Q. And you understand she has a different statement about what happened than you do on that day.
A. Superintendent Jones-Hayes?
Q. Yes.
A. Yes, ma'am.
Q. Sorry. Thank you. And you explained to her -- and if there is anything in here, if I read something to you and you say I don't think I said that to her, please let me know. Okay?



A. Sure.
Q. She writes that you explained on the day of the incident that Superintendent Jones-Hayes and Sergeant Conley were called to the basement of Cermak because a fight had broken out between detainees, which you and other officers successfully contained. And that's what we've already talked about, correct?
A. Yes, ma'am.
Q. For context he first described the basement setting, details he thought were relevant to understanding interaction between him and Superintendent Jones-Hayes that followed. Is that accurate? Is that something that you wanted to make sure she understood?
A. Yes, ma'am.
Q. One of the things that you said, she writes, He added that in his opinion even if officers wished to comply -- well, I'll start with it says he began by noting that there had never been a written policy about manacling and shackling detainees in this area. It was just verbal. Do you see that?
A. Yes, ma'am.



Q. What is the difference between manacling and shackling, if you know? I don't know if those are her terms or yours.
A. I never use manacling.
Q. Okay. Is there handcuffs that go around your wrists?
A. Yes.
Q. And then what -- would you call that cuffing?
A. Yes. Handcuffs, short term would be cuffing, yes.
Q. And then --
MR. LINDEN: I guess I just want to make a foundational objection, assume everything she says is true without asking him.
MS. MARMOR: No, I'm not assuming that. I've asked him to let me know if he disagrees with anything, and he absolutely should.
BY MS. MARMOR:
Q. Is shackling --
MR. LINDEN: I guess my point is you have to ask point by point. These are her statements.
MS. MARMOR: Right.
MR. LINDEN: I mean, generally if he agrees,

but specific statements, obviously, they're not -- you know what I'm saying? It's just --
MS. MARMOR: I understand what you're saying. I'm going to keep going.
MR. LINDEN: Okay.
BY MS. MARMOR:
Q. Is shackling meant in your mind to refer to, say, ankle restraints?
A. Yes, ma'am.
Q. Okay. And then it says, He added that in his opinion even if officers wished to comply with such a policy, it would not be possible as there are insufficient numbers of cuffs, shackles to do so. Do you see that?
A. Yes, ma'am.
Q. Is that an accurate statement?
A. Yes, ma'am.
Q. Okay. And then you say it's dangerous -- or she has in quotes, it's dangerous, he added, explaining a number of factors that in his opinion contributed to an unsafe environment in that location.
And then you see where it says first and second? Does that accurately describe the

73

kinds of issues that can arise if people are not properly cuffed or manacled? I'm sorry, cuffed or shackled?
A. Yes, ma'am.
Q. Okay. And one of the things that is reflected here is that if there is an un' -- let's say an uncuffed detainee and gets into a fight with a cuffed detainee, that that can be dangerous to the cuffed detainee, is that right?
A. Yes, ma'am.
Q. All right. And another is you felt there weren't enough officers to properly monitor detainees who are manacled from behind, is that right? That's her word, but probably cuffed from behind.
A. Well, she puts behind in there?
Q. Yes.
A. Because it depends on their situation, their medical situation. They are restrained differently, all of them, which doesn't make it equal to anyone.
Q. Depending on their physical condition?
A. Or what they claim their physical condition is, correct.

74

Q. Okay. Then you see where it says the word, Finally he pointed out that on that particular day they were at maximum detainee capacity for that area?
A. Yes, ma'am.
Q. So what was -- roughly speaking how many people would you characterize as maximum detainee capacity?
A. Oh, I don't know. 40, 60 maybe? The volume changes, though. People are in and out all day long, and it depends. It can go -- in 20 minutes it can go from the entire room looking completely like it's busting at the seams to five people being in there.
An officer can come by, and all of his detainees have been seen by the doctor or he can roll out of there with 20 people. You know what I mean?
Q. Right. Was it your recollection on the day that you were interviewed by the FFD examiner that at the time of the fight, they were at maximum detainee capacity?
A. Yes. There is a lot of people. Sorry.
Q. That's okay. And your estimate at that

75

time is 40 to 60 people?
A. Yes. I guess.
Q. Okay. And then in the next paragraph it says, Officer Nawara went on to explain that when Superintendent Jones-Hayes arrived, he was under the impression she may have been annoyed with him, that there had been a fight, quote, because she knows me, I'm ex S.O.R.T., and she expects me to keep things from getting out of hand. Do you see that?
A. Yes, ma'am.
Q. And is that an accurate statement?
A. Yes, ma'am.
Q. And then it goes on to say, Not that she said anything like that, he added. I could just see she was annoyed. There was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said why is that inmate not cuffed, and she's putting her finger to my chest. I'm backing up, and I say, I don't know. You'll probably have to ask the officer who came in with him. Is that accurate?
A. Yes, ma'am. I could have said that, yes.

76

Q. And then it says -- you see Officer Nawara went on, do you see at the bottom of the page?
A. Yes, ma'am.
Q. And this is a quote. She turned to Sergeant Conley and says, Who's the officer on the roster, which of course is me. Do you see that?
A. Yes, ma'am.
Q. So you were the officer on the roster, and you took that -- did you take that to mean I know you're in charge, et cetera, you should be handling that? Handling this.
MR. LINDEN: Objection, form.
THE WITNESS: Are you asking me to interpret what she means, what she is saying by handling this? I don't understand.
BY MS. MARMOR:
Q. So this is the full sentence. Officer Nawara went on. She turns to Sergeant Conley and said, Who's the officer on the roster, which of course is me, meaning I know you're in charge, et cetera. You should be handling this. And there are quotes around all of that. So my

77

question is is that what you said to the examiner?
MR. LINDEN: Objection, form.
THE WITNESS: Okay. Well, she probably mistook roster for -- because on the roster there are many officers. They're all distributed as needed per where their assignment could possibly be. She probably --
BY MS. MARMOR:
Q. Sorry. Who's the "she" that you're talking about right now?
A. I'm sorry, the doctor.
Q. Okay.
A. So when she wrote that, she probably meant the person assigned to that area, not necessarily the roster.
Q. So you don't remember one way or the other saying this to her?
A. No. I said this to her.
Q. Okay. So --
A. Not in the words that she's using, but yes.
Q. Okay. And then you -- did you say to the examiner that at that point you told

78

Officer -- excuse me -- Superintendent Jones-Hayes you need to get your hands off me?
A. No.
Q. Okay. So what did you say?
A. I did say you need to get your hands off me. I didn't say it after she says it here in her assessment. That part had already taken place because she asked Sergeant Conley after she pokes me who's working staging, is how that happened.
Q. Okay. So what you're saying is the FFD examiner may not have gotten all her facts correct in here.
MR. BUSTAMANTE: Objection to form.
MR. LINDEN: Objection to form.
THE WITNESS: They're correct.
MS. MARMOR: Can we not have --
MR. BUSTAMANTE: Since I'm hard of hearing --
MS. MARMOR: I can hear that. Please don't coach the witness.
MR. LINDEN: He is coaching me, not the witness.
MR. HENRETTY: You got to be careful with that because we all heard that.

79

THE WITNESS: If it's not in the order, it should be.
MR. HENRETTY: Please don't do that again.
BY MS. MARMOR:
Q. So you just said they're correct, if it's not in the order, they should be?
A. Correct. And the words that she used, it's not roster. She didn't say I know you're in charge. Again, everything is a form of what happened, yes, but not in those exact words. It's accurate, but not exactly those words.
MS. MARMOR: Okay. Okay. Let's mark this as the next exhibit. Thank you.
(WHEREUPON, Nawara Deposition Exhibit No. 5 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 5, which I'll represent to you is -- the first page is the cover sheet to the OPR summary report concerning a complaint investigation about the events of September 28, 2016.
If you go to the next page, we

80

have just taken your testimony from that investigation, which starts at the bottom of the second page of Nawara 5. Do you see that?
A. I'm sorry. I didn't follow you on that.
Q. Do you see where it says Accused audio recorded interview: C/O John Nawara JDE 378032?
A. Yes, ma'am.
Q. Okay. And this -- have you seen any transcription of your testimony before OPR before today?
A. I believe so, yes.
Q. At the time that you saw it, did you consider it to be an accurate transcription or summary of your testimony before OPR?
A. Yes, ma'am.
Q. Okay.
A. Can I ask a question?
Q. Yes.
A. This cover page here has to do with everything in here?
Q. That's the cover page for the entire OPR report, but I'm only --

81

A. Why does it take place before the incident?
Q. I don't know. Good question, but I don't know. I didn't make the document. Well, no, it looks like March 6, 2018. 2018, that's two years after the incident.
A. So this is the interview, not the actual when the complaint was filed, you're saying.
Q. Correct.
A. Gotcha.
Q. Okay. Have you ever been part of OPR investigations before?
A. No, ma'am.
Q. Okay. So and -- but you got called in a long time after the actual event, correct?
A. Yes, ma'am.
Q. Okay. So if you could go to the next -- the second page of Nawara 5, I'm just going to ask you a few questions about this. I'm not going to make you read the entire thing. So if you look in sort of a third of the way down the page, it says Page 10 of 17 on the bottom. Do you see that?

82

A. Yes, ma'am.
Q. And you see where it says, C/O Nawara was asked if officers assigned to that post are responsible for handcuffing the detainees. C/O Nawara stated, Yes, I do what I can with what I have. We have very limited cuffs and shackles, so if there are cuffs available for the inmates that are there, they are provided with handcuffs and shackles. Do you see that?
A. Yes, ma'am.
Q. Is that an accurate statement?
A. Yes, ma'am.
Q. Okay. And you're referring there to the waiting area at Cermak?
A. Yes, sir.
Q. Then I'd like to skip down sort of towards the bottom third of the page where it says, C/O Nawara was asked if both he and C/O Ganon were responsible for handcuffing detainees if handcuffs were available.
And you said, C/O Nawara stated no, because I believe her position to be, how would they say, I believe on the roster it says like basement 1, basement 2. They'll classify them

83

in this type of order.
Her job is more to, well, there is a control panel there that's supposed to operate the functions of the locking and unlocking of the doors to come in and out of the Cermak area from the tunnel, and when it works -- when it worked, that would be the job at the moment.
Again, I haven't been there for a while. She's more to observe, answer the phone, observe the area, and do the best you can with what we have because the buttons weren't working properly.
But is she to go in there and look to see if the detainee needs to be handcuffed or not, no, she is more in the officers' area and kind of observed. Do you see that?
A. Yes, ma'am.
Q. So is that -- A, is that accurate?
A. Yes, ma'am.
Q. Okay. And was that indicating that it was you, not Officer Ganon, that would have been responsible for cuffing?
A. Yes, ma'am.
Q. Okay. And then it says C/O Nawara was

84

asked if he recalled the incident between him and Superintendent Jones-Hayes, and he responded yes. C/O Nawara was asked to explain what he recalled, and he stated there was a fight in the staging area, which is the reason a lot of the officers complain that we have lack of restraints because in the middle of the week in your busier times the amount of our inmates exceed the amount of restraints, and now you have half the room cuffed and the other half that aren't, and it's only a matter of time before two detainees with a bad relationship see each other, and one takes advantage of that, and this was that case. Do you see that?
A. Yes, ma'am.
Q. So is that an accurate statement?
A. Yes, ma'am.
Q. Based on your memory half the room was cuffed, and half was not?
A. Yes, ma'am.
Q. Okay. And then if you go down a little bit further, do you see where it says, Every seat was taken up by every inmate down there. It's not a comfortable setting?



A. No.
Q. All right. If you keep going, it's about a third of the way down. The word "every" is on the right-hand side.
MR. LINDEN: What's the first word in the sentence?
MS. MARMOR: Every. Do you see where it says, Every seat was taken up by every --
MR. LINDEN: I see it.
BY MS. MARMOR:
Q. -- every inmate down there. It's not a comfortable setting. So is your memory that every seat was taken up at the time of the fight between the inmates or the detainees?
A. Quite literally could there have been a couple spaces where somebody sat down, yes, but it was very full.
Q. Okay. And then you see about an inch down where on the right it starts with the word "the," and it says, The amount of inmates that were there again exceeded the amount of restraints.
A. Yes, ma'am.
Q. And then if you could go down to the --



sort of the last quarter of this where it says this is -- the second part of this is about your second interaction with Superintendent Jones-Hayes, correct?
A. I don't know which part you're speaking of.
Q. Well, so you see where it says, So the superintendent stepped out to the ER or the staging area and went into the ER area to go into admissions or our intake control? Right here it says -- see where you say, So the superintendent?
A. Yes. Okay.
Q. So this is -- we have already talked about the interaction you had with the superintendent about the other detainee that wasn't cuffed and didn't want to be cuffed, and that's what this is about, correct?
A. Yes.
Q. Okay. And one of the things you say is you look around and you go, Half the room is cuffed, and half the room is not. Do you see that?
A. Yes.



Q. Okay. And is that your recollection of the day?
A. That half room was cuffed and half -- yes.
MS. MARMOR: Okay. Are we -- how are we doing on the video? Three minutes. Okay. I'm going to ask one more question, and then we'll take a break.
BY MS. MARMOR:
Q. If you could go to Page 12 of 17, do you see in the second line on the top of the page, I'm thinking -- this is what the summary transcript says. I'm thinking to myself this is my boss who is half my size in a dress and heels, and I need her here to help me do this job. Do you see that?
A. Yes, ma'am.
Q. And then there is a little bit more, but do you see the sentence that begins, So as we're walking back?
MR. LINDEN: I want to object insofar as there is no quote marks. This is a summary. So if you're saying that he said these words, I think it's improper.

BY MS. MARMOR:
Q. Do you recall saying these words?
A. Yes.
Q. And then do you see where it says, So as we're walking back, especially after how she just treated me, I couldn't resist. I leaned over to her and again, regardless about how I feel about how someone conducts themselves with me or anybody else, I still won't do anything in front of the inmates at all, whether it's appropriate or not or whatever, how that has to go. Did you say that?
A. Yes, I did.
Q. And then did you say, But I told her in her ear, I go, quote, maybe if you walk around with me all day, I can do my job because this is what I have to go through down here because you don't provide the proper restraints, you don't do any, period, end quote. Do you see that?
A. I'd like there to possibly to be maybe a comment -- I mean a comma somewhere after job maybe, if we can put the punctuation, because maybe she -- or maybe this was -- how do you put this. Because this is what I have to go



through, I think probably would be if you were asking me that question, I would tell you because this is what I have to go through.
Q. Right.
A. Yes, I said this.
Q. Okay. And did you say something -- I'm not quite sure what "you don't do any." Was there anything more to that?
A. I don't know.
Q. Okay. But in sum and substance is this what you recall saying to her?
A. Yes, ma'am.
Q. Okay. And then it says, She got mad, she stormed off, she slammed the door, and that was the end of the incident, and then I was transferred out of my division the next day, is that right?
A. Yes, ma'am.
MS. MARMOR: Okay. I think we need to change tapes, so we'll take a break.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 11:20 a.m. This is the end of Videotape No. 1.



(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 11:32 a.m. This is the beginning of Videotape No. 2.
MS. MARMOR: So just for the record my paralegal Jesse Kehr is here to help me with doing some videos, since I'm technologically challenged. So I would like to mark as -- and we're going to do a kind of placeholder exhibit because it's just the -- it's the thumb drive, which you guys already have. But this is what we'll mark as the next exhibit. I think it's Exhibit 6, Nawara Exhibit 6.
MR. LINDEN: I think we're on 5, I believe.
MS. MARMOR: No, we were just on 5.
MR. LINDEN: You're right. I'm sorry.
MS. MARMOR: So we're going to mark as Nawara Exhibit 6, and there will just be a placeholder, although the videographer will also have a copy of the thumb drive, of what's been previously produced in this case under Bates stamp No. CCSO 000166.



(WHEREUPON, Nawara Deposition Exhibit No. 6 was marked for identification.)
BY MS. MARMOR:
Q. This exhibit is marked Confidential - Subject to Protective Order - and its title is DIV8-Cermak-CAM_0_002_Staging_Rear _SE_2 016-09-28, and it's -- I promise you we're not going to be looking at all nine hours and 43 minutes of it. So with that preamble --
BY MS. MARMOR:
Q. And Mr. Nawara, you're going to -- the video is going to be shown behind you. And we've already talked about this, if you want to stand up to look at it more easily, that's fine, or if you just want to sit where you're sitting. And what I'd like to do is just show you some video, and then stop it periodically, and I'm going to ask you a few questions. Okay?
A. Okay.
Q. And I'll represent to you that this is a video of the staging area at Cermak on the day of the incident, both -- and it really starts with the incident between the two detainees.

That's what we're going to look at. Okay?
A. Okay.
MS. MARMOR: All right. Maybe is that blocking it? There we go.
BY MS. MARMOR:
Q. All right. Mr. Nawara, we start at the point of -- at 9:58 a.m. on September 28, 2016. Do you recognize this as the staging area at Cermak where the inmate or detainee fight took place?
A. Yes.
MR. LINDEN: I want to make a general objection to showing only portions without a foundation for the date and time. I don't want to keep objecting.
BY MS. MARMOR:
Q. And if you see on the screen that we're looking at, do you see on the upper left-hand corner of the screen, is that the office that you were talking about earlier in your testimony?
A. Correct.
Q. And that's where the incident between you and Superintendent Jones-Hayes took place,

93

is that right?
A. Yes.
Q. And we've already established there would be no video of inside that room, correct?
A. Correct.
Q. And then you see there is a middle door. Do you know what that middle door goes to?
A. That's the entrance I spoke of earlier where inmates will be called in by the doctor or an officer or whomever to be seen and triaged by the medical staff.
Q. And what about the door on the far right, what is that?
A. It's called the clinics area, and they'll take care of small things, podiatry, you know, optometry, different things like that. I forgot what else they might have in there.
I think occasionally they'll have like a site doctor in there, somebody can talk to them if they're not feeling well or something like that. But they use that other area for just various other things.
Q. Okay. In the documents we looked at

94

before the break you had a couple of times from memory, I believe, at the time of the fight between the two detainees that Cermak was at maximum capacity. Do you remember that?
A. It was full, yes.
Q. Okay. And does this look full to you?
A. No.
Q. Okay. And in fact -- so let's -- if we could just start the video because this will show us, I believe, when the fight between the two inmates begins.
And if you could pause it for a moment. I have a question. Do you see in the back of the room, do you know who that officer is at the back of the room?
A. I do not.
Q. And what we've been looking at so far, are these the two inmates, if you recall, that had the fight?
A. No, ma'am, I don't recall.
MS. MARMOR: Okay. You can keep going. And actually can you stop the tape there?
BY MS. MARMOR:
Q. Do you see that the inmate on the right

95

has no handcuffs, correct?
A. Yes, ma'am.
Q. And the inmate on the left had his handcuffs behind his back, but he brings them to the front, is that right?
A. Yes, ma'am.
MS. MARMOR: Okay. Keep going. Stop here, please.
BY MS. MARMOR:
Q. Can you recognize who that officer is, the first officer there?
A. Yes.
Q. And who is that?
A. Officer Turrise.
Q. Okay. And now that you're seeing this, does that refresh your recollection that these are the two individuals who had the fight on the day?
A. Yes, ma'am.
Q. And just hold on. I notice you have got a wound on your nose. Would you like a Kleenex or something?
A. Am I bleeding?
Q. You're worried about it. I can tell.

96

A. I don't know if I ripped my scab.
Q. No, you're okay. We can keep going.
MS. MARMOR: Stop there.
BY MS. MARMOR:
Q. Is that you, the first -- the second person on the scene?
A. Yes.
Q. Okay. And who's the person behind you there?
A. I don't remember.
Q. And he's carrying a pair of handcuffs on his person, correct?
A. Yes.
Q. And could those handcuffs have been used to cuff the fellow who was not cuffed originally?
MR. LINDEN: Objection. Form, speculation.
THE WITNESS: Immediate answer is yes, but the extended answer would be no, because I don't remember who he is. Probably means he's from a different division. So I don't know where he came from or what his business was here or anything.
I am guessing he is coming to help us



out, but I don't know where he came from or what he was doing or where those cuffs came from or if they belonged to us or any of those things.
BY MS. MARMOR:
Q. I'm sorry I'm not remembering. The first officer there, what was his name again?
A. Officer Turrise.
Q. And he was a correctional officer like you were?
A. Yes.
Q. Okay. And so let's keep going. Do you recognize the next man who shows up, next officer who shows up?
A. Yes. Yes.
Q. Who's that?
A. Officer Codd.
Q. C-o-d?
A. I believe it's two "d"s, C-o-d-d.
MS. MARMOR: Stop there, please.
BY MS. MARMOR:
Q. Do you know what role Officer Codd played that day, whether he was assigned to Cermak?
A. I'm not sure.



MS. MARMOR: Okay. Stop there, please.
BY MS. MARMOR:
Q. Did you see that Officer Codd pulled out a pair of handcuffs there?
A. Yes.
Q. And do you know if he was assigned to someplace else that day and he just happened to be there?
A. Well, I know he works in our building. So he was down there. Not exactly sure where he was assigned to, I guess, but he was down there every now and then.
Lot of officers they're assigned to other places that clearly are down there often because, again, they're moving the inmates per the doctor's order back and forth throughout the building.
Q. But he did have a pair of cuffs that he pulled out at this time, correct?
A. It looks like that, yes.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. And you see this gentleman walking now towards the scene with a pair of handcuffs in



his hand?
A. Yes.
Q. And who is he?
A. Officer Lopez.
Q. Was he assigned to Cermak that day?
A. I don't think so.
MS. MARMOR: Can you stop for a second?
BY MS. MARMOR:
Q. Can you tell from this how many people are actually cuffed or not cuffed?
A. Not really. The gentleman sitting on the bench next to Officer Turrise possibly could not be cuffed. This gentleman right here isn't cuffed. The gentleman in the wheelchair isn't cuffed. I'm not exactly sure.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. Do you know who that is walking through the back of the scene?
A. I do not. Gentleman back there, wheeled his chair back, isn't cuffed.
MS. MARMOR: Stop for a second.
BY MS. MARMOR:
Q. So is that you going into the

right-hand area with one of the detainees?
A. Yes.
Q. Okay. And what happened when you went into that area, if you recall?
A. I just hung against the wall waiting for a supervisor.
MS. MARMOR: Okay. Keep going. And actually stop there.
BY MS. MARMOR:
Q. So I want to make sure I understand -- I want to be crystal clear about what each of these doors are. We know the door on the upper left side is into the office, correct?
A. Yes.
Q. And then there is two in the front and then one on the far right that you just walked into in the video. Do you see that?
A. Yes.
Q. So I just am clear, what's the area that you're going into when you go into the far right?
A. That's labeled the clinics.
Q. Okay. And then the two blue doors there, what's the first blue door on the upper



right-hand corner of this shot?
A. Restroom door. There's another one exactly like it right next to it on the right, but the pillar's blocking it.
Q. And then the blue door to the left of that is --
A. Right next to -- sorry. I'm sorry. Go ahead.
Q. No, that's okay. Go ahead.
A. The door to the right of the pillar is the door that the doctors see the inmates, triage room area. Immediately where the pillar is, behind that there's a door that's a restroom door, and this is another restroom door to its left.
Q. I see. Okay. And then the clinic door is the door you walked through.
A. Correct.
MS. MARMOR: All right. Keep going. All right. So I think we can stop there for the moment. Isn't there the next one? So we're going to skip ahead now to what time?
MR. KEHR: 10:41.
MS. MARMOR: So we're going to skip to 10:41



that morning. Let me stop. Looks like based on this that everybody kind of calmed back down at 10:00 o'clock, and then we're going to go ahead to 10:41. So this is a shot later on the same day. Why don't you pause for one second, Jesse.
BY MS. MARMOR:
Q. This is still the Cermak staging area, correct?
A. Yes.
Q. There are even fewer inmates there at this time, correct?
A. Yes.
Q. Okay. And is it possible to tell -- do you see any inmates at this point who are not handcuffed or shackled?
A. Not offhand on this camera. There's a gentleman standing there doesn't look to be restrained.
Q. Okay. Keep going.
A. The gentleman on the left doesn't look to be restrained.
Q. Man in the fetal position?
A. No. Man next to him, above him.
Q. Okay.



A. He's not. He just reached into his pocket for something.
MS. MARMOR: Okay. Stop right there.
BY MS. MARMOR:
Q. So given what had just happened with, you know, 40 minutes earlier with an inmate who had gotten into a fight who wasn't shackled, do you know why that fellow wasn't shackled at this point?
A. Probably because we didn't have any shackles.
MS. MARMOR: Okay. Keep going. Stop right there.
BY MS. MARMOR:
Q. You see that gentleman up there is shackling the inmate who just walked towards him, correct?
A. Yes.
MS. MARMOR: Okay. Now, stop for a moment.
BY MS. MARMOR:
Q. Do you know who that is in the doorway of the office?
MR. LINDEN: For the record it's not shackled, it's handcuff.

MS. MARMOR: Handcuff. Fair enough. I thought the same thing after I said it.
MR. LINDEN: Did you? Okay.
BY MS. MARMOR:
Q. Do you know who that is standing at the doorway of the office on the upper left-hand side of the video?
A. Appears to be Officer Turrise and Sergeant Conley.
MS. MARMOR: Okay. Keep going.
BY MS. MARMOR:
Q. Do you know who just walked in that door?
A. No.
Q. And that's Sergeant Conley leaving?
A. Yes, ma'am.
MS. MARMOR: So stop there, please. Actually, back up just a little because you're not going to be able to see a face.
BY MS. MARMOR:
Q. My question is going to be is that Superintendent Jones-Hayes walking out of the office?
A. Yes.



MS. MARMOR: And let's keep going, Jesse. Just keep going.
BY MS. MARMOR:
Q. And that's her just standing there talking to another officer. Who's that walking out behind her?
A. I don't know.
Q. Okay. Who's that that just walked out, if you know?
A. I don't know. It looks like Officer Turrise again.
Q. Okay. And do you notice that Superintendent Jones-Hayes is not wearing a dress that day?
A. Yes.
Q. Do you know who that is that just walked out?
A. Speaking with the sergeant right now?
Q. No. There is a person that's short -- yes. Speaking with Sergeant Conley.
A. Officer Naringowski.
MS. MARMOR: Okay. Is that the end?
MR. KEHR: Yes.



BY MS. MARMOR:
Q. Okay. So I didn't see Superintendent Jones-Hayes go anywhere to take a phone call. Do you know how much time elapsed after you had your incident with her that she went to take the phone call?
MR. LINDEN: Objection. Form.
THE WITNESS: Couple minutes.
BY MS. MARMOR:
Q. Okay. And what did you do after she left the room after your dispute?
A. I had to -- I attempted to shackle an inmate.
Q. You had to shackle an inmate?
A. I had to shackle an inmate.
Q. In here?
A. Yes.
Q. Okay. But we don't have -- but that doesn't show that here, correct?
A. I know.
Q. Have you ever seen this video before?
A. Yes.
Q. When?
A. In Ms. Kurtz' office, I believe.



Q. But when I asked.
A. I don't know. Maybe this time last year.
Q. It was after you filed the lawsuit?
A. Yes.
Q. Did you ever make any request for any video from the Sheriff's Office in the weeks following the altercation with Superintendent Jones-Hayes?
A. No.
Q. Did you ever talk to anybody who claimed to have seen video of the altercation or any part of your intersection with Superintendent Jones-Hayes prior to you filing the lawsuit?
A. Say it one more time, please?
MS. MARMOR: Can you read it back?
(WHEREUPON, the record was read by the reporter as requested.)
THE WITNESS: Yes.
BY MS. MARMOR:
Q. Who?
A. John Zaleski.
Q. And what did he tell you?

A. That it looks like he can see her poking at me in the video that he could see at the time.
Q. The video -- so he claimed that he saw video from inside that office that doesn't have a camera?
MR. LINDEN: Objection. Form.
THE WITNESS: No.
MR. LINDEN: Misstates testimony.
BY MS. MARMOR:
Q. But the poking happened inside that office, correct?
A. Correct.
Q. So if he said that he saw video of her poking at you, where would that video have come from?
MR. LINDEN: Objection. Foundation, form.
THE WITNESS: This angle, the other angle? I'm not sure. I'm not sure the video that he saw that he said -- not sure video that he saw when he said that he saw it.
BY MS. MARMOR:
Q. When did he tell you this?
A. Early last -- wait. Probably early

109

2017.
Q. And what was the context in which -- did he tell you the context in which he showed you the video? Sorry. Excuse me. Did he tell you the context in which he allegedly saw this video?
A. I'm not understanding.
Q. Well, how did he come to see the video? Did he tell you that?
A. He searched for it.
Q. And how did he search? Did he tell you how he searched for it?
A. I mean, I don't know. I'm guessing the same way here. You click on the cameras for the division.
MR. LINDEN: I want to object to this video playing with him testifying. It's not clear.
MS. MARMOR: Jesse, turn this off.
MR. LINDEN: He's talking about this video --
MS. MARMOR: We're done with the video now.
(WHEREUPON, the video was turned off.)
BY MS. MARMOR:
Q. You have no idea how he came to see it,

110

is that right? Remember, I'm just asking what you know. It's okay if you don't know.
A. He told me this over the phone, so I wasn't there watching him when he said this.
Q. Did you ask him to get a copy of the video?
A. No.
Q. Why not?
A. Because you can't get a copy of the video.
Q. Why not?
A. Because it's played on whatever program that it's on. There is no way to like make a copy of it, at least for us there isn't.
Q. Were you represented by counsel at that time?
A. Yes.
Q. Did your counsel ever make any formal request that that particular video that Mr. Zaleski claims to have seen be preserved?
MR. LINDEN: Objection. Foundation. Also getting into any attorney/client communications.
MS. MARMOR: Only talking about communications to others. Does he know if she

111

ever made --
MR. LINDEN: But if it's something --
MS. MARMOR: Let me rephrase.
BY MS. MARMOR:
Q. Do you know if your counsel made any request to the Cook County Sheriff's Office at the time that you learned about this video from Mr. Zaleski to preserve such a video?
A. No. I don't know.
MR. LINDEN: I also want to object that since there's no video shown there, there's no foundation. I have no idea.
MS. MARMOR: I agree.
I don't have extra copies. Maybe I do. Mark this as the next exhibit.
And Jesse, you can go.
(WHEREUPON, Nawara Deposition Exhibit No. 7 was marked for identification.)
MR. LINDEN: Can we go off the record just one second?
VIDEOGRAPHER LEHMAN: We are off the record. The time is 11:58 a.m.

112

(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 12:00 o'clock p.m.
MR. LINDEN: Just for the record I just want to state we discussed Officer Nawara is scheduled to be on duty at 3:00 o'clock today. He has notified his superiors this deposition is going to go, you know, past 3:00 o'clock is what defense counsel has represented.
And I just want to make sure that the plaintiff is not subject to any discipline for not being at work at 3:00 o'clock. He has done everything. He is willing to sit here, even without a lunch, and get it done. But I just don't think there should be any discipline or retaliation that could possibly occur.
MS. MARMOR: And for the record all I'll say about that is, number one, I don't have any control over that. Number two, when we set a deposition, we expect it to take seven hours. So it would have been fair notice that 3:00 o'clock was not a reasonable time to be going back to work, but we also agreed to discuss it

113

off the record.
MR. LINDEN: If he is going to be disciplined, my suggestion would be end it and continue the dep so he's not subject to discipline. But I think this will all be taken care of at lunch. He's going to call his supervisor.
MS. MARMOR: Okay.
BY MS. MARMOR:
**Q. Officer -- excuse me. Mr. Nawara, the court reporter is about to hand you Nawara Exhibit 7. Nawara Exhibit 7 is Plaintiff's Initial Rule 26 Disclosures. Do you see that?**
A. Yes, ma'am.
**Q. Okay. And I just want to ask you do you know why Officer Zaleski is not named as a witness in this case by the plaintiff? If you want to look, there is a list here.**
A. Because I never named him.
**Q. And why not?**
A. Because I didn't want any harassment to happen to him the same way it's happening to me.
**Q. So you didn't disclose information that you knew because you made that choice.**

114

A. Officer Zaleski to protect him because I didn't want anything bad to happen to him the way it's happening to me.
**Q. Do you understand that disclosures in lawsuits are not subject to the personal opinions -- let me finish my question -- are not subject to the personal opinions of parties, but in fact that disclosures are required to let the parties know who has knowledge of the facts of a case?**
MR. LINDEN: Objection to the question. Calls for a legal conclusion. Also, if you look at Rules, simply not accurate. Rule 26(a)(1) states the witnesses that the disclosing party may use to support his claim or defenses.
If Officer Zaleski is not going to be used to support plaintiff's claims or defenses, which he is not, there is no obligation to disclosure. Number one, calls for a legal conclusion. Number two, it's an inaccurate statement of the law.
MS. MARMOR: Actually, I think that's not accurate about the initial disclosures, but we're not going to debate it right now.

115

MR. LINDEN: Says it right there.
MS. MARMOR: Not going to debate it right now.
BY MS. MARMOR:
**Q. So you made the choice not to disclose Officer --**
A. I did.
**Q. -- let me finish -- Officer Zaleski's name, correct?**
A. Zaleski, yes, I did.
**Q. Zaleski. Have you talked to Officer Zaleski about this case?**
A. No.
MS. MARMOR: Mark this as the next exhibit.
(WHEREUPON, Nawara Deposition Exhibit No. 8 was marked for identification.)
MR. LINDEN: Do you have one more? We didn't get it.
MS. MARMOR: Sorry. Here you go. This is 8 or 9? 8?
BY MS. MARMOR:
**Q. Mr. Nawara, the court reporter has handed you what has been marked as Nawara**

116

Exhibit 8, which is Plaintiff's Answers to Defendants' Third Set of Interrogatories. First page of this it asks the plaintiff to identify the person or persons that plaintiff's counsel alleged during a phone conversation with defense counsel on May 18, 2018, had viewed a video recording showing any interaction between Plaintiff Nawara and Defendant Jones-Hayes on or about September 28, 2016. Do you see that? It's in the question.
A. Okay.
Q. Do you know of anybody other than Officer Zaleski -- is that how you pronounce it?
A. Yes, ma'am.
Q. Do you know of anybody other than Officer Zaleski that you believe might have viewed such a video?
A. No.
Q. And do you see in the answer that Officer Zaleski was not identified?
MR. LINDEN: I just want to object that there's no -- the answer objects to the question.
MS. MARMOR: I will get there.

117

THE WITNESS: Not understanding what you're asking me.
BY MS. MARMOR:
Q. Officer Zaleski's name is not identified in this answer, correct?
A. Correct.
Q. Instead it says, Plaintiff objects to this request as it calls for attorney/client and attorney work product information and is not relevant to any claims or defenses at this point in this litigation and poses a safety risk to an employee that could be subject to retaliation for such disclosure. Do you see that?
A. Yes, ma'am.
MS. MARMOR: Okay. No wonder I can't see. I don't have my reading glasses.
(WHEREUPON, Nawara Deposition Exhibit No. 9 was marked for identification.)
BY MS. MARMOR:
Q. So Mr. Nawara, the court reporter has handed you what's been marked as Nawara Exhibit 9, and the first e-mail here is from Mary McQuillan to you dated September 29, 2016.

118

Do you see that?
A. Yes, ma'am.
Q. And that's the day after the altercation at Cermak, correct?
A. Yes, ma'am.
Q. And it says, Officer J. Nawara, Attached please find a copy of Personnel Memorandum #16-793, which is effective Sunday, October 2nd, 2016. Do you see that?
A. Yes, ma'am.
Q. And in fact this was the document that -- the attachment is the document that sent you to Ex Ops, correct?
A. Yes, ma'am.
Q. And you earlier testified that -- you talked about S.E.A.M. Article U being an indication to you that you were under investigation. Do you remember that testimony?
A. Yes, ma'am.
Q. So the attachment to Nawara 9 says effective Sunday, October 2nd, 2016 the following staff member will be assigned as indicated below: Per Article XIV, Section 14.4(1)(B), I think that is, of the parties

119

collective bargaining agreement/S.E.A.M. Article U. Is that what you were referring to earlier today?
A. Yes, ma'am.
Q. And what about Article U to your knowledge means that -- is about being under investigation?
A. That it says I'm under investigation.
Q. And you were being transferred from Cermak 7:00 to 3:00 shift detail to External Operations 6:00 to 2:00 shift detail, is that correct?
A. Yes, ma'am.
Q. And then you forwarded on the next day, if you go back to the first page, you forwarded this e-mail to Darin Waller -- if you could go to the first page of Nawara 9. You forwarded this e-mail to Darin Waller and Leroy Martiniak. Who are they?
A. My old supervisors from my ex S.O.R.T. team.
Q. From S.O.R.T.?
A. Yes. And at the time I think they were both in charge of the emergency response team.

120

Q. And why did you send this to them?
A. To let them know what was happening to me.
Q. And what does that mean?
A. That this place does things to people on an individual basis, and no one knows what goes on here. So two people that I trust didn't know -- that are good supervisors, I was letting them know what was going on with me.
Q. Did you believe that you were transferred to Ex Ops because of your interactions with Superintendent Jones-Hayes the day before?
A. Well, this was the -- yes. Yes.
MS. MARMOR: Let's do this one.
(WHEREUPON, Nawara Deposition Exhibit No. 10 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara 10, which is a series of e-mails between you and someone named Kelly Cappy at the Sheriff's Office.

121

If you start at the bottom, this is the way we have to read e-mails these days, you'll see that the first one is at the bottom of the page, dated October 17, 2016. Do you see that, where it says, I heard you're in Ex Ops now, lucky?
A. Yes.
Q. Okay. Who is Kelly Cappy?
A. An officer that works at the jail.
Q. Is Officer Cappy a man or woman?
A. Woman.
Q. And she says, I heard you're in Ex Ops now, lucky. Do you see that?
A. Yes.
Q. And do you have any understanding, do people regard Ex Ops as a good assignment?
A. It depends on how you look at it.
Q. Okay. And you responded, Yeah, and, question mark, explanation, with a little sort of emoji face. Do you see that?
A. Yes.
Q. Okay. And then you say, Where did you go? Do lunch or drinks with me sometime, and you give your cell number, which we have blacked

122

out to protect your confidentiality. Do you see that?
A. Yes. Thanks.
Q. Okay. And then she says, LOL, maybe, with her own emoji. Such a shy young man you are, where do they have you in Ex Ops so I can swing by, and this now is on October 19. Do you see that?
A. Yes.
Q. And on the same day you said, In Ex Ops they can and do put you everywhere. Is that right?
A. Yes.
Q. Can you explain to me what you did in Ex Ops?
A. Can be stationed anywhere in and around the jail. I can transport inmates from different counties to our courthouses to their courthouses. Can be assigned to any of the hospitals we have in the county if any inmates go there. I also was called to do -- to move inmates that ERT needed help with --
Q. What's ERT?
A. -- Emergency Response Team -- while I

123

was in Ex Ops. Lots of various things.
Q. And if you recall one of the first documents we looked at this morning was the document where you talked about how you had bid to be transferred to External Ops, correct?
A. Correct.
Q. Why did you want to be transferred to External Ops?
A. I needed to get away from Cermak.
Q. She then responds, What time is your bedtime? This is all on October 19th. And you say, My mom doesn't really check on me, so I go to bed when I want. I mean, fair to say you were kind of flirting with each other here, right?
A. Sure.
MR. LINDEN: Objection, form.
BY MS. MARMOR:
Q. And she says, Call me up here. I'm at Cermak in Central Control. Regretting my decision to bid here. Ha. What's 5801?
A. Phone number.
Q. I see. Okay. And then you respond, Incoming. What does that mean?

124

A. I'm going to call.
Q. Okay. Did you actually date Ms. Cappy?
A. Excuse me?
MR. LINDEN: Object to relevance.
MS. MARMOR: Relevance is not an appropriate objection.
BY MS. MARMOR:
Q. You can answer the question. Did you ever date Ms. Cappy?
A. No.
Q. Okay. So I'd like to turn to the day that you went to see the people in the HR Department. Okay? And just ask you what do you recall about how you came to be asked to go to HR that day? And the day was I believe November -- let me get the correct -- November 18, 2016.
A. I was assigned to one of the main entrances of the jail, and Lieutenant Bryant called me and told me that I had an appointment in HR.
Q. On the day of or the day before?
A. Like an hour before.
Q. And can you tell me what you did in

125

response?
A. Told him I didn't know that I had that appointment. He told me that I did and that I should go down there.
Q. Okay.
A. Said okay, and I walked down there.
Q. Was it in the same building that you were assigned to?
A. No.
Q. What building was HR in?
A. Just off 31st and California.
Q. And what building had you been working in that day?
A. Right off of 2700 -- it's the main entrance to the jail.
Q. Okay. So it's within walking distance.
A. It's a few blocks away, yes.
Q. And did you walk over?
A. I did.
Q. Okay. And what happened when you got there?
A. I waited around for a little while, and then Nurse Shelby saw me and told me she'll be with me in a minute.

126

Q. Were you sitting in a waiting area?
A. No, standing, just as you enter the building.
Q. And what happened next?
A. She waited for Rebecca Reierson, and they asked me to step in their little office.
Q. Had you ever met Nurse Shelby or Rebecca Reierson before that day?
A. No.
Q. Approximately what time did you go there?
A. 9:00 o'clock.
Q. And what happened when you -- and you went into -- it was Nurse Shelby's office?
A. I believe so.
Q. And were there seats?
A. Yes.
Q. And did you sit?
A. Yes.
Q. And did they close the door?
A. Yes.
Q. And what happened next?
A. She said -- she said she was a nurse.
Q. Who's she?

127

A. Nurse Shelby said she was a nurse and Rebecca Reierson was a director, and then wanted to know if I threatened my co-workers or something or if I'm known to threaten my co-workers. I don't remember exactly how they worded it.
Q. What did you say?
A. That I was wondering why I was here, what this is pertaining to.
Q. What else? Or what happened next? So your response to -- let me just be clear. Your response to their question about whether or not you had threatened co-workers is you said, why am I here?
A. No. I asked what it was -- what this was a result of because I never met these people. I mean, how random is it for two people you have never met to ask you an off the wall question like that.
Q. Um-um.
A. Have to have some sort of knowledge where did this come from, some sort of documentation.
Q. And then what happened?

128

A. She told me --
Q. Who is -- you have to be clear about who's talking.
A. Rebecca Reierson didn't say probably not that much this entire time.
Q. Let me -- so I understand that, in your meeting with just the two of them Rebecca Reierson said virtually nothing or very little, is that right?
A. Yes, until the end.
Q. Until the end of the meeting when it was just the three of you?
A. Correct.
Q. Okay. And then -- and so most of the conversation or most of the talking from their side was from Nurse Shelby, is that right?
A. Correct.
Q. Okay.
A. She told me that this wasn't that type of inquiry, I guess. She said it was -- this isn't OPR.
Q. Is not OPR.
A. Correct, this isn't OPR. I just want to know if you feel threatening or whatever



towards co-workers. I believe this time she worded it or inmates, detainees.
Then I stopped her, and I said, Well, co-workers no. Detainees to a certain extent yes. This job requires some sort of authoritative intonation, I guess, if you will. You can't walk up to 60 guys by yourself and speak softly to anyone to demand control of a room. It doesn't work like that. I don't really have problems with my co-workers, so no.
And again I asked does this have to do with anything that happened because I don't know you guys, and you haven't presented me with any paperwork, so I don't know why I'm here.
And again she goes you don't have to worry about that because this isn't OPR. We're just here to ask you some questions. And we did this dance for a little while.
Q. This dance, you mean you wanting information from her rather than -- and her trying to tell you that that information wasn't relevant to the inquiry?
A. I don't believe --
MR. LINDEN: Object to form.



THE WITNESS: I would be entitled to information. They're asking me questions that could possibly damage me without providing me a reason as to why I'm there.
BY MS. MARMOR:
Q. How did you think they could damage you?
A. Somebody had to have told them something about something to go ahead and make them ask me a question like that.
Q. Right. Did you understand that you were not there for discipline?
A. No, because it wasn't stated anywhere.
Q. Is OPR a channel for discipline?
A. Yes, it is.
Q. How long were you there talking -- have you talked about everything that you remember that you and Nurse Shelby and Ms. Reierson spoke about in that first period of time?
A. I don't know. What else would you like?
Q. Everything you remember.
A. Well, we kind of went around that circle because she was trying to get me to I



don't know what, say I was intimidating to people or something like that. I don't know exactly what she was getting at, but she became frustrated because I kept asking her is there something you can show me that would show me why I was here, and then I could possibly provide you with more information if you're talking about something specifically.
And she kind of gave me dismissive wave, and she said, Step out. I'll let you know what we talked about.
Q. You said that Rebecca Reierson didn't speak until the end. What did she say at the end?
A. Oh, no. That was after James Penney showed up.
Q. Okay. So in the first period of time -- how long was the first period of time before you were asked to step out?
A. 15 minutes?
Q. And did you have an understanding of why they asked you to step out?
A. To my belief it's because they wanted to talk about whatever they wanted to talk about

that they didn't want me to hear.
Q. Did you ask to have Mr. Penney or some other person from your union present during that first part?
A. No.
Q. So after you stepped out, did you call Mr. Penney or some other member of your union?
A. No. The lady at the front desk called.
Q. Did you ask her to call him?
A. No. I walked past her. She could see I was upset. And when I came back in, she told me that she called. She said that -- I guess what tipped her off was that Nurse Shelby had called down there.
She says -- if I remember correctly, she said something to the effect of, That lady called down here twice looking for you. I know what they do to people up there. I already called the union. And this is my assignment. I'm not letting you back up there until he shows up.
Q. Who is this lady?
A. Officer Johnson-Green.
Q. I'm sorry, Officer what?



A. Johnson-Green.
Q. What's her first name?
A. I don't know.
Q. Had you known her before that day?
A. Yes, ma'am.
Q. How?
A. She's worked in S.O.R.T. Operations for a long time. She's since retired. She's an older black woman that I befriended when we were working Ex Ops.
Q. So it's your testimony that she called Mr. Penney?
A. Yes, ma'am.
Q. And when did Mr. Penney arrive?
A. Maybe 10 minutes later, 15 minutes later.
Q. And what did you tell him?
A. Everything that had happened up until that point.
Q. Which was what?
A. That they were asking me way off the wall questions, and it felt very wrong for me to be in there, and that I'm glad he was here.
Q. Were you angry that they were asking



you those questions?
A. I don't know if I was angry. I was upset being asked that by two people I didn't know, yes.
Q. Would you describe the mood in that room as having been tense?
A. Oh, yes.
Q. And what did Mr. Penney tell you?
A. Let's go up there and see what happens.
Q. And what is Mr. Penney's role vis-à-vis you and the union?
A. I don't know. I just know he's like a union representative.
Q. Okay. And when you say you were downstairs, so you had been upstairs with Nurse Shelby and Ms. Reierson, and then you left knowing that they were going to want to talk to you again, correct?
A. Yes.
Q. Okay. And then you went downstairs? Is that your testimony?
A. Letting her know I wanted a break, yes. So I let her know that I'll be right back. So she said, Okay.



Q. So did she tell you to leave or did you say, I want a break?
A. No. Well, once they -- she kind of dismissed me out of the room, Rebecca Reierson got up, and she was going to close the door. I go, If you don't see me outside when you open the door, I'll be right back.
Q. Okay.
A. She said, Okay. So I guess they waited for me, but I guess Nurse Shelby called because that's what Johnson-Green said.
Q. Okay. So how long was it before you returned to Nurse Shelby's office?
A. 15, 20 minutes.
Q. And what happened when you went in the office?
A. Nurse Shelby asked who James Penney was, and he said, I'm his union rep. She says, Well, this isn't OPR. He doesn't need a union rep. He said, From what he told me, he does. So since that happened she got upset.
Q. How did you know she was upset?
A. Because she immediately said, Okay. Fine. So just so you know, he's being found

unfit for duty.
Q. She said, Okay, fine, and that's your sign that she was upset?
A. I don't know. Gestures, the way that she acted? I don't know.
Q. So she said, Just so you know -- she said that to Mr. Penney?
A. Yes.
Q. Just so you know, he's being referred for unfitness for duty, is that right?
A. Yes.
Q. What happened next?
A. He said, Why, and she said, Due to the aggressive behavior he displayed before you showed up.
Q. And what happened next?
A. I believe that was at the moment he asked to step out for a second, and he called the chief union steward, Mark Robinson, who however that worked, I think he asked Nurse Shelby what the phone number was there. Either that or he -- or Mark Robinson knew the phone number there.
One way or the other a couple seconds

137

later the phone rang, and we were on speaker phone with Mark Robinson, Nicole Chaney, and then the four of us in the room. So six ears.
Q. So what you're saying is that Mr. Robinson called in to Nurse Shelby's office?
A. Yes. That's the way it -- yes.
Q. Okay. And Nicole Chaney, who was counsel for the Teamsters, was on the call?
A. Yes.
Q. And then you, Mr. Penney, Ms. Reierson, and Nurse Shelby were on the call as well.
A. Yes. Yeah. We were in the room.
Q. Okay. And what do you recall happening on that call or being said on that call?
A. I believe Nurse Shelby repeated again that I'm being found unfit for duty, and I don't remember what James Penney said, but then I remember Robinson saying specifically, Does this have to do with that thing with the superintendent from earlier?
Q. And how -- did you know how Mr. Robinson knew about the altercation with Superintendent Jones-Hayes?
A. Because I had mentioned it I think to

138

Penney when it happened or sometime after it happened. I think that's -- yeah. I had mentioned it to Penney.
Q. And what did they say in response -- what did anybody say in response to that question from Mr. Robinson?
A. I don't think they did. That's when the paperwork came out and said he has to sign this so that we can continue the process. Or no, that's when Shelby actually -- I mean, that's when Rebecca Reierson actually spoke.
He said, Does this have to do with what happened a couple of months ago, something to that effect.
Q. Robinson said that.
A. Yes, ma'am. And then that's when Rebecca Reierson said, We only found out about this two days ago. She didn't like address it. She almost mumbled it under her breath. I believe that was the only time that she said anything that entire session.
Q. Okay. And then the -- you said the paperwork came out?
A. Yes, ma'am.

139

Q. And they said, You have to sign this so we can continue the process, is that right?
A. Yes.
Q. And who said that?
A. Nurse Shelby.
Q. And did you study the forms at that time?
A. I looked at them, yes.
Q. And what happened next?
A. She said I had to sign them or I'm not going to -- or I can't go back to work. I have to sign them so we can do this process, and I can't come back to work until I complete this process.
Q. Okay. So you understood that the forms were the first step of the process, correct?
A. Correct.
Q. And that once that process was over, if you were found fit for duty, you could come back.
A. Correct.
Q. Okay. So what happened next?

140

(WHEREUPON, Mr. Lyle Henretty left the deposition proceedings.)
THE WITNESS: I told them I wasn't going to sign them.
BY MS. MARMOR:
Q. Why not?
A. Because they were blank.
Q. Is that what you said, I'm not going to sign this because it's blank?
A. Yes.
Q. And then what happened?
A. She says, Well, you can't come back to work until you do.
Q. Okay. And then what happened?
A. I said, Could I take these to review these? She said, Sure.
Q. And then what happened?
A. Left the office.
Q. Okay. Let's go back to Nawara 4, please. It's going to be backwards there for you. If you want to give them to me, I can find it for you. This is a good test to see whether you actually have everything. Here you go.

141

A. Thanks.
Q. I'm re-handing to you what's been previously marked as Nawara Exhibit 4, which is the Fitness for Duty Exam report from the Isaac Ray Forensic Group. Do you recall this document, sir?
A. Yes, ma'am.
Q. If you could go to Page 4 of Nawara 4. Just let me know when you get there. Up on the upper right-hand corner are the page numbers.
Do you see in the second full paragraph that starts, Of the 11-18-16 meeting in Human Resources, Officer Nawara explained that it seemed to go badly from the start?
A. Yes.
Q. Is that an accurate statement?
A. Yes.
Q. And in what way did you think it went badly from the start?
A. My job consists of having to feel out situations, dangerous situations I put myself into every day. So I'd like to think that I can kind of get a notion on something that's not right. Two people that I don't know in a room

142

I've never been. There's no paperwork there. I was just given a verbal order to show up, asking an opening question of if I threatened people. I would like to think that everybody would agree that that's not necessarily a good situation.
Q. Did you think this was a dangerous situation?
A. From my experiences here, yes.
Q. In HR? You felt in danger in HR?
A. Being employed in this place.
Q. You see that it says, He explained that while he was told that he was being mandated for a fitness for duty examination, he felt he wasn't given direct explanation as to the reason, which he asked for several times, and that his attempt to have union representation for the discussion was met with resistance. Do you see that? It's the second sentence of that paragraph.
A. Yes. I see it.
Q. Okay. Did you -- is this an accurate -- I'm confused by this because your testimony has been that somebody else called the union --

143

A. Yes.
Q. -- but what you seem to have told --
(WHEREUPON, Mr. Lyle Henretty entered the deposition proceedings.)
BY MS. MARMOR:
Q. -- the fitness for duty examiner in September of 2017, and I'll read the rest of this to you just so you understand my question, He agreed his leaving the meeting in order to call union representation may have inflamed an already tense situation. Do you see that?
A. Yes. Probably misinterpreted that.
Q. So in fact this is not correct, that the statement from the fitness for duty examiner about the fact -- she got the facts wrong here, is that right?
MR. LINDEN: Objection to form.
THE WITNESS: No. Those were the facts.
BY MS. MARMOR:
Q. But you said you didn't call the union, is that right?
MR. LINDEN: Object to form, foundation.
THE WITNESS: Correct. I didn't call the

144

union.
BY MS. MARMOR:
Q. Okay. But this does say that you did call the union.
MR. LINDEN: Objection. I just want to object. Argumentative, asked and answered. And the document, it speaks for itself. Somebody else's recap.
BY MS. MARMOR:
Q. The document says, He agreed his leaving the meeting in order to call union representation may have inflamed an already tense situation. Do you see that statement?
A. I do.
Q. And your testimony today is that you didn't leave the meeting in order to call union representation, is that right?
A. Correct.
Q. Do you agree that it was an already tense situation?
A. Yes.
Q. How is it -- it also says here that your attempt to have union representation for the discussion was met with resistance. Was

145

there any attempt in that first part for you to have union representation for the discussion, that first -- before Mr. Penney showed up, did you ask to have union representation there?
A. No.
Q. And --
A. I was told this wasn't an OPR investigation.
Q. Okay. And so is it accurate that given that you didn't attempt to have union representative there, is it accurate to say that that was met with resistance?
MR. LINDEN: Object to the form. What time frame, the first part, second part?
MS. MARMOR: You can just object to the form. I don't need to be coached. Thank you.
THE WITNESS: Can you rephrase that, please?
MS. MARMOR: Can you read the question back?
(WHEREUPON, the record was read by the reporter as requested.)
THE WITNESS: Before James Penney showed up?
BY MS. MARMOR:
Q. Correct.
A. Yes. I didn't attempt to have any

146

union representation at the moment because she said -- every time I asked her what this was about, she said it wasn't an OPR investigation.
Q. And that in fact was true, this was not OPR.
A. I don't know. I didn't see any paperwork. I couldn't tell you.
Q. Do you know whether HR investigates OPR matters?
A. I have no idea.
Q. The next line after it says, It may have inflamed an already intense situation, she reports that, But he insists -- this is her writing. But he insisted he felt too vulnerable not to have someone there as a witness, given the manner in which he perceived the conversation to be going. Do you see that?
A. Yes.
Q. So given that you didn't ask for any union representation there, is that an inaccurate statement?
MR. BUSTAMANTE: Objection to form.
MR. LINDEN: Objection to form.

147

(WHEREUPON, Mr. Peter Bustamante left the deposition proceedings.)
THE WITNESS: I mean, this is -- it's how I felt.
BY MS. MARMOR:
Q. But you didn't -- you felt vulnerable, right?
A. Yes.
Q. But did you -- but you didn't -- but that vulnerability did not lead you to call the union, somebody else called the union, right?
MR. LINDEN: Objection. Asked and answered.
THE WITNESS: The vulnerability led me to take the opportunity to take a break when I was dismissed out of the room. I guess I felt trapped, and I didn't know what to do.
When they finally decided to come to the point where they wanted to speak alone, I realized for a second that I could just take a breather and think about what was going on. So I left.
At that moment again all the thoughts jumbling in my head and the fact that I didn't

148

do anything wrong, and I'm trying to figure out what's going on, and I was in HR, not OPR, so I'm wondering, very confused here, how this is happening to me.

And going downstairs once Officer Johnson-Green said to me that she had called the union, kind of gave me a big relief because then I forgot that I actually could do that until that time because of the situation I was in.

Normally certain standards go with -- just like in training, at intense moments you actually forget your normal habits, and you rely on your training because intense situations. In this situation I don't think it dawned on me that I should have got union representation until Johnson-Green told me, I called somebody for you.

BY MS. MARMOR:

Q. Did you tell the fitness for duty examiner that Ms. Johnson-Green had called the union rep, not you?

A. I believe I did because I -- the story goes one way.

Q. Because why?



A. The story only goes one way. There's only one truth.

Q. I don't understand what you're saying.

A. That this is what happened.

Q. Do you see at the bottom where it says -- bottom of this paragraph on Nawara 4, He did ultimately leave with an understanding that the fitness examination was being requested based on threatening behavior toward his superior officer related to the September incident with Superintendent Jones-Hayes. Do you see that?

A. Yes.

Q. Is that accurate?

A. Yes. She told me.

Q. Also right above that, so they did tell you that the altercation between you and Jones-Hayes had something to do with why you were being sent.

A. Are we talking about the doctor here or Rebecca Reierson and Winifred Shelby?

Q. I mean on the day. This is a paragraph about the meeting in Human Resources.

A. This reads, He did ultimately leave



with the understanding.

(WHEREUPON, Mr. Peter Bustamante entered the deposition proceedings.)

THE WITNESS: So what I'm getting from this is that the doctor is understanding that I'm leaving with the understanding that it was because of threatening behavior.

BY MS. MARMOR:

Q. So you think she's referring to what you understood in September of 2017, not what you understood in November of 2016?

MR. LINDEN: Objection to the form. Calls for speculation.

THE WITNESS: I left with the understanding that this request was based on threatening behavior due to the fact that the doctor told me so.

BY MS. MARMOR:

Q. Right. That's in 2017.

A. Correct.

Q. Okay. That was my question. So is your testimony that you didn't understand in November of 2016 when you left Nurse Shelby's



office that you were being sent for a fitness for duty exam in any way related to the altercation with Jones-Hayes?

A. She didn't say so in so many words.

Q. I'm asking about your understanding.

A. I was understanding this, yes.

Q. Yes, what?

A. That that's what the reason was for that altercation because what else would there be?

Q. Well, didn't you also just testify that it was also what Nurse Shelby said when you and Mr. Penney showed up for the second part was it was also based on your conduct between -- with them?

A. Right, right.

MR. LINDEN: Objection to form, foundation, misstates testimony.

THE WITNESS: That's what she said at that moment, yes.

BY MS. MARMOR:

Q. Okay. So I want to go back to what happened. So you left with the forms?

A. Yes.

Q. And what did you do with the forms?
A. I made copies, and I gave two to James Penney.
Q. Gave two copies or gave a copy of each form?
A. Copy of each form.
Q. To Mr. Penney.
A. Correct.
Q. In the Second Amended Complaint in this case there's an allegation in Paragraph 50 that Defendant Dart, through Defendants Burke, Shelby, and Reierson, told plaintiff that he could not return to work until he signed the HIPAA release forms, which plaintiff believed was an unlawful request.
My question to you is was defendant -- was Matt Burke there that day?
A. No.
Q. Okay.
A. Never met Matt Burke ever.
Q. Okay. So you said you made copies of the forms for James Penney. What did you do for the rest of that day?
A. Went home.



MS. MARMOR: Let's see.
(WHEREUPON, Nawara Deposition Exhibit No. 11 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara Exhibit 11, which at the bottom is an e-mail from Mary McQuillan on Friday, November 18th attaching a copy of a memorandum regarding you, and says, Officer Nawara is not permitted to work until -- and there is a typo there -- but his has been released for duty by Human Resources. Do you see that?
A. Yes.
Q. And that was sent to you by Superintendent Brogan, it appears. Somehow you got a copy of this on or about the same day?
A. The next day, I believe, Lieutenant Worthon called me and --
Q. Oh, I see.
A. -- asked -- or kind of asked and told, because he was confused when he said it, I believe. He said, You're not supposed to come to work today or whatever? Not allowed to come back to work? And I told him I wasn't exactly sure what he meant. He said he would forward me the e-mail.



Q. Okay. And that was consistent with what you had been told at HR, which is that until you completed the FFD process, you could not come back to work.
(WHEREUPON, Mr. Lyle Henretty left the deposition proceedings.)
THE WITNESS: Correct.
BY MS. MARMOR:
Q. And who is Paul Worthon?
A. Lieutenant in External Operations area.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 12 was marked for identification.)
BY MS. MARMOR:
Q. The court reporter has just handed you what's been marked as Nawara Exhibit 12, which is an e-mail from you to Mark Robinson. And as I recall your testimony, that is the -- is that



the union steward or is he just the union representative?
A. I believe he's the Chief Union Steward is his title.
Q. And that's at the Teamsters?
A. Yes, ma'am.
Q. And why were you sending this to him?
A. What did I send to him?
Q. The HR clearance required to return to work. I have got another version of this with the actual attachment. Would you like to look at that?
A. Is that the e-mail you just showed me?
Q. Yes.
A. Let me look at that.
Q. Oh, actually, that went to James Penney. Right. This is the HR clearance required return to work. You were letting -- you were letting -- it looks like you were letting the Chief Union Steward know that you had gotten this order.
A. Yes.
Q. Okay. And why did you send that to him?

A. To let him know that I got this order.
Q. Any other reason?
A. No.
Q. Were you in any ongoing conversations with the union about the situation at this time?
(WHEREUPON, Mr. Lyle Henretty entered the deposition proceedings.)
THE WITNESS: We had spoken a couple of times to where he said that he was doing what he could about it.
BY MS. MARMOR:
Q. Mr. Robinson?
A. Yes.
Q. Did you understand what that meant?
A. No.
(WHEREUPON, Nawara Deposition Exhibit No. 13 was marked for identification.)
BY MS. MARMOR:
Q. Okay. The court reporter has shown you what's been marked as Nawara 13, and this is the same memorandum that we've just been talking about, but this time you forwarded it to James

157

Penney. Do you see that on November 19th at the top of the page?
A. Yes.
Q. Okay. And why were you sending this to Mr. Penney?
A. To let him see the order that I have.
Q. Is there some requirement that you let your union know when you get these kinds of orders?
A. No.
Q. Between November 19th and the end of the month did you engage in conversations with the union about what to do about this situation?
A. Yes.
Q. And what were those conversations?
A. I asked them what we could possibly do about this.
Q. And what did they tell you?
A. That they were working on it. And eventually until the point where they told me they couldn't do anything about it, Mark Robinson told me if you haven't figured out by now the union is reactive and not proactive.
And since no one is taking any

158

disciplinary action against you, he goes, I suggest you seek legal counsel elsewhere to help get myself back to work because they didn't know what they could do about it. Nothing they could grieve because there was no paperwork written against me.
Q. When did Mr. Robinson tell you that?
A. Sometime after this, the incident of November 18th.
Q. Within a week, within days?
A. Within a month that you stated sometime.
Q. Before the end of the month?
A. Probably. Something like that. I believe I reached out to Dana Kurtz later on in December. So probably, yeah, sometime before that.
Q. And Dana Kurtz was your original counsel in this case?
A. Correct.
Q. And she had been counsel for you in another lawsuit against the Sheriff's Office, is that right?
A. Correct.

159

Q. And were you aware that she has filed a number of lawsuits against the Sheriff's Office?
A. I am.
MS. MARMOR: It's about 1:00 o'clock. I think we should take a half hour break.
MR. LINDEN: Okay.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 12:55 p.m. This is the end of Videotape No. 2.
(WHEREUPON, a luncheon recess was had.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 1:37 p.m. This is the beginning of Videotape No. 3.
BY MS. MARMOR:
Q. Mr. Nawara, before we go to the next document, when you left HR on the 18th of November 2016, what did you tell them -- you told -- you've testified that you said you wouldn't sign the forms, is that right?
MR. BUSTAMANTE: What date?
MS. MARMOR: I said November 18, 2016.
MR. BUSTAMANTE: Okay.

160

BY MS. MARMOR:
Q. You have testified that you said, I'm not going to sign these forms on that day, correct?
A. Yes.
Q. Did you give them a reason at the time?
A. Because they were blank.
Q. Okay. Just because they were blank. Okay. All right. So --
A. They wanted my medical records.
Q. Did you say you want my medical records or did you say they were blank?
A. No. The form said that. Form was blank. It said it was requesting my medical records. I believe Winifred Shelby's name and address was stamped in the area where the information is where her information would go.
And the other form was releasing the sheriff from liability for taking my medical records, and I just believed in my heart that was wrong.
Q. Right. But I'm not asking you what you believed in your heart. I was asking you what you said to them about the reason that you

161

wouldn't sign them. On that day the reason that you gave them was that it was blank, is that correct?
A. Correct.
MS. MARMOR: Okay.
MR. LINDEN: Did you give him any other reasons to be --
MS. MARMOR: Did you give them any -- well, that actually was my question already, but thank you.
BY MS. MARMOR:
Q. Did you say anything else about why you would not sign the forms on that day?
A. I don't recall.
(WHEREUPON, Nawara Deposition Exhibit No. 14 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's been marked Nawara 14, which is an e-mail from yourself to yourself, if you look at the first page. Very first page, do you see that you sent this e-mail -- you sent this e-mail from your cookcountyil.gov e-mail address

162

to an e-mail address that says John Nawara, indestructibull, with two "l"s at the end, at yahoo.com. Do you see that?
A. Yes, ma'am.
Q. And you sent that on November 30, 2016?
A. Okay.
Q. Is that correct?
A. Yes, ma'am.
Q. And is this indestructibull@yahoo.com your personal e-mail address?
A. Yes.
Q. And when you were asked to search for documents in this case, did you search that e-mail for any responsive documents in this case?
A. No, because everything I had was sending from here to there. Yeah, no. Yeah. Everything I was sending was from my county e-mail to my personal e-mail.
Q. Did you ever have any communications with anybody about this case, other than your counsel, using the indestructibull@yahoo.com e-mail address?
A. I don't know.

163

Q. Okay. And you didn't -- at the time the discovery was issued in this case you didn't search for any of those -- to see if there were any such communications at that time, is that correct?
A. Yes. I don't think so.
Q. Okay. If you turn to the third page of Nawara 14, you see that that -- yeah. That's the actual letter that was sent by Ms. Reierson. Do you see that?
A. Um-um.
Q. It looks like you actually did receive this letter on November 30, 2016, given that you've sent it to yourself on the same day?
A. Okay.
Q. Would you agree with that?
A. Yes.
Q. And Ms. Reierson was writing to you on November 30th now about two weeks after the HR meeting, correct?
A. Yes.
Q. And she writes that, On 11-18-16 you were informed by the occupational health nurse for the Sheriff's Office, Winifred Shelby, that

164

you were required to undergo a Fitness for Duty evaluation before returning to active duty. You took the forms -- and that's in fact what happened, she did make that statement to you at that time, correct?
A. Yes.
Q. You took the forms in order to review them prior to signing and failed to return them to Ms. Shelby. Do you see that?
A. Yes.
Q. And I think that you testified that you did take them in order to review them further, is that right?
A. Yes.
Q. She called, "she" meaning Ms. Shelby, called and left a voicemail message for you on 11-30-16 to which you did not respond. Do you see that? The third sentence.
MR. LINDEN: I just want to object insofar as it assumes statements is true.
MS. MARMOR: I haven't assumed anything. Just asked him to read the statement.
BY MS. MARMOR:
Q. Now, there has been testimony from

165

Nurse Shelby in this case that she's not sure exactly when she called you. Might have been before that date. Do you recall getting a voicemail from Nurse Shelby?
A. Yes.
Q. And did you -- do you remember what she said in the voicemail?
A. No.
Q. Do you remember when the voicemail was left?
A. No, ma'am.
Q. Was it sometime around November 30, 2016?
A. Sure.
Q. Prior to this date.
A. Yes.
Q. And did she ask you to call her back?
A. Maybe. I don't know.
Q. Okay. After you got this letter, did you try to call Nurse Shelby?
A. No.
Q. Did you ever try to call Nurse Shelby at any time after the HR meeting?
A. Not at all.

166

Q. Have you ever had any conversations with Nurse Shelby since the HR meeting on November 18, 2016?
A. No.
Q. Have you ever had any conversations with Rebecca Reierson since November 18, 2016?
A. No, ma'am.
Q. Have you ever had any conversations with Superintendent Jones-Hayes since the November 18, 2016 HR meeting?
A. No, ma'am.
Q. Have you ever had any conversations -- I think you've already testified you never met Matt Burke, correct?
A. Correct.
Q. So you have never had any conversations with him at all, correct?
A. Correct.
Q. Why didn't you call Nurse Shelby back?
A. Because what she was doing to me was wrong, so how am I supposed to call somebody who's deliberately doing something to me who doesn't even know me and try to rectify anything with her in any kind of way? I don't understand

167

the logic in that. I wouldn't call somebody who's trying to screw me over and say, Hey, how can we -- I don't know. Didn't bother to call her back.
Q. Do you know whether -- you said before the lunch break, you testified about the fact that the union told you there was really nothing they could do for you. Do you remember that?
A. Yes, ma'am.
Q. And was that in part because the fitness for duty process is not disciplined?
MR. LINDEN: Objection. Form and foundation.
THE WITNESS: All depends on how you look at it.
BY MS. MARMOR:
Q. Well, what were they saying to you?
A. They were saying that the amount of my medical records to be delivered directly to Winifred Shelby.
Q. No. I meant what was the union saying to you?
A. The union was saying they couldn't do anything because they didn't have any paperwork to grieve.

168

Q. And what does that mean? Do you have to have a piece of paper -- wasn't there, for example, a notice to you that we saw this morning or earlier in the day telling you you couldn't come back to work until you completed the fitness for duty process?
A. Yes.
Q. And they couldn't grieve that?
A. I don't know.
Q. But they told you there was nothing that they could grieve, correct?
A. Correct.
Q. You got to let me finish the question. And who was it that told you that?
A. Mark Robinson.
Q. And was it sometime after you received this November 30, 2016 letter from Ms. Reierson that you retained counsel?
A. Yes.
Q. Why didn't you think that you could handle this issue on your own?
A. Because I'd never gone through this experience before. Never had this happen to me. I needed my job, and I didn't know how to go

169

about getting it back.
Q. Was your objection to the whole fitness for duty process that you didn't think you should be subjected to the fitness for duty process at all?
A. Of course. I didn't do anything wrong.
Q. Did you ever ask Nurse Shelby or Rebecca Reierson at the HR meeting why people are sent for fitness for duty exams?
A. No.
Q. Did they ever discuss that with you?
A. No.
(WHEREUPON, Nawara Deposition Exhibit No. 15 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 15, which is that same letter from Nurse Reierson that had been sent to you by Jessica White at the Sheriff's Office, and it's also the same day, November 30, 2016. That's on the top front page.
You forwarded that to James Penney and Mark Robinson. Do you see that? On the very

170

first page. Do you see at the top?
A. Okay.
Q. So you did in fact forward Rebecca Reierson's letter from November 30th to Mr. Penney and Mr. Robinson at the union, correct?
A. Yes.
Q. Okay. Did you have any discussion with them about what to do about this letter?
A. I don't think so because I wasn't really getting anywhere with any answers as to the action they were taking. They just told me they were working on it. So my intention was just to keep them updated or informed from my end of the small things I was getting.
Q. And the "them" here is your Teamsters union representatives.
A. Correct.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 16 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, court reporter has

171

handed you Nawara Exhibit 16, which is a December 1, 2016 e-mail, and it's from Teamsters@cookcountyil.gov to you at cookcountyil.gov. Do you know who at the Teamsters sent you this document?
A. I believe it was James Penney.
Q. And do you know why Mr. Penney -- and attached to this document are two forms. Do you see that?
A. Yes.
Q. And that's the HIPAA Authorization For Disclosure Of Protected Health Information, and the next one says Cook County Sheriff Authorization To Release Healthcare Information. Do you see those?
A. Yes.
Q. Are those the forms that Ms. Shelby gave you on November 18, 2016 that you took -- that you said you took to review?
MR. LINDEN: Objection. Foundation.
THE WITNESS: Yes and no because the ones that I remember had her name and address and phone number stamped into the -- who the forms -- who my documents would go to.

172

BY MS. MARMOR:
Q. So that's the second of the two forms?
A. Correct.
Q. And the first form looks exactly like the form you got, one of the two forms, that's exactly like the HIPAA form?
MR. LINDEN: Just want to object to the form looks like. If you want to show him to compare the two, it's proper, but I think it's improper the way it's phrased.
THE WITNESS: It looks like the form, yes.
BY MS. MARMOR:
Q. Okay. And do you know why Mr. Penney was sending you these two forms on that day?
A. Maybe he forgot that I had a copy or I don't know. As far as I remember, we both had copies or he had copies or HR made me copies or I thought I had copies. I don't know.
Q. Do you know whether these were forms that the union already had for fitness for duty exams at the Cook County Sheriff's Office?
MR. LINDEN: Objection. Form, speculation.
MS. MARMOR: I asked the question do you know.



BY MS. MARMOR:
Q. And you don't know why he was sending this to you on that day.
A. No.
Q. Do you recall whether you asked him to send you any forms?
A. No.
Q. Did you keep the forms that you had been given by Nurse Shelby when you left HR on November 18, 2016?
A. I'm not sure exactly how that went down. Not sure if I gave him the forms and he made copies or I picked them up later on. All I know is that I got copies because I was able to give them to Ms. Kurtz later on.
Q. Okay. So you do believe you handed those over to Ms. Kurtz at or about the time you retained her?
A. Yes.
Q. Okay. And that was sometime in December of 2016?
A. Yes, ma'am.
MS. MARMOR: Okay. Here we go. Here we go.



(WHEREUPON, Nawara Deposition Exhibit No. 17 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 17, which is a December 16, 2016 e-mail from somebody that says ciid.investigations@cookcountyil.gov to you at cookcountyil.gov. Do you see that on the first page?
A. Yes.
Q. And it appears to be the incident report from the altercation between the detainees that we saw the video of, is that correct?
A. Yes.
Q. And it was -- and you're listed as a participant there. Do you see that under personnel involved?
A. Oh, yes.
Q. Okay. And trying to see, can you see who drafted this? Doesn't have a signature, does it?
A. I don't think they -- I believe the way



the system was then we weren't able to actually do any of that. It was kind of still in practice here. They were trying to -- we're even on a different system now, also.
Q. Right.
A. This is kind of what we could get out of it.
Q. Fair to say you did not draft this?
A. Oh, no. I believe this would be Officer -- well, the way it would be written I would assume that would be Officer -- wouldn't know for a fact, but it would be Officer Turrise.
Q. Right. I just want to establish you didn't write it.
A. Oh, yes. It wasn't me.
Q. Okay. Why were you asking for -- did you make a request for this incident report?
A. No. I don't know. I would assume that if I sent this to myself -- I printed it. I have access to the --
Q. Actually, you didn't send it to yourself. It was to you from ciid.investigations.

A. No, I know. All you have to do is put it on copy machine. Print it out, put it on the copy machine.
Q. That wasn't my question, though. Why was it e-mailed to you? Did you ask to have it e-mailed to you?
A. No. I can send e-mails to myself from the copy machine.
Q. Oh, I see. So you simply got --
A. The same way I was getting--
Q. Let me finish. So you got a copy of it, you made a copy of it, and you sent it from the copier to yourself?
A. Yeah. Done it several times, yes.
Q. Okay. And do you know why you did that?
A. To keep record of it the way I've been keeping record of everything.
Q. Okay. And so at that point did you understand that -- this is December 16, 2016. Did you understand that the fitness for duty process that you were being asked to participate in had something to do with what had happened between you and Jones -- Superintendent



Jones-Hayes in September of 2016?
A. It was always my assumption because the only thing that could have happened, I filed a complaint against -- I've been working there 21 years now. I've never had problems with anybody, employees at least. I've always gotten along for the most part with everybody. This is the only thing it could have been.
Q. Okay. So the answer to my question is yes, you believed that FFD was related to your interaction with Jones-Hayes in September of 2016.
A. Yes.
MR. LINDEN: Running out of exhibits?
MS. MARMOR: Not a chance.
(WHEREUPON, Nawara Deposition Exhibit No. 18 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter handed you Nawara 18, which is an e-mail from Dana Kurtz, your former counsel in this case, dated December 21, 2016, and it's sent to Ms. Reierson and Ms. Shelby and then another person named



Peter -- cc'd to a person named Peter Kramer, and the subject is John Nawara. And it says -- it's got an attachment, which is a HIPAA release form, given to John to sign. Do you see that in the top of the first page?
A. Yes, ma'am.
Q. And she writes, Ms. Reierson and Ms. Shelby, I have been retained by John Nawara to represent him with respect to potential claims he has against the Sheriff's Office and other possible individual defendants. Do you see that?
A. Yes, ma'am.
Q. And you understood she had sued the Sheriff's Office numerous times before, correct?
A. Yes, ma'am.
Q. And she said, I understand that you placed him on leave and ordered that he cannot return to work until he completes the attached HIPAA authorization form. Do you see that?
A. I do, ma'am.
Q. Now, if you'll go to the second to last page of Exhibit 18, which is the form, do you see that? That's the HIPAA Authorization form



For Disclosure Of Protected Health Information.
A. Yes.
Q. And it's the case that she doesn't attach both forms, she only attaches this form, correct?
MR. LINDEN: Objection. Foundation, speculation.
THE WITNESS: It appears that way, yes.
BY MS. MARMOR:
Q. And then she says, On what legal basis or policy provision do you and the Sheriff's Office have to order him to complete this form for his personal medical records? Officer Nawara and I believe that such an order is unlawful. Do you see that? It's right there.
A. Which paragraph?
Q. It's in the second paragraph.
A. Yes.
Q. Okay. And then she goes on to say, Officer Nawara has not been given any notification of any complaint or allegations against him. And then she says, You also refuse to provide him with any information other than that he was being ordered to sign a HIPAA

release form. Do you see that?
A. I do.
Q. Now, you did know that this was for a fitness for duty exam, correct?
A. I did.
Q. Okay. Then it says, Further, Officer Nawara did file a harassment complaint against Superintendent Jones-Hayes as a result of an incident in which she put her hands on him and acted in a threatening and offensive manner. Do you see that?
A. I do.
Q. You already established that you don't have any personal knowledge as to whether any of the defendants in this case were aware of that complaint at the time that you were brought to HR and ordered to complete a fitness for duty process, correct?
MR. LINDEN: Objection to form of the question. Misstates the testimony.
THE WITNESS: Could you please say that again?
BY MS. MARMOR:
Q. You have no personal knowledge that



Mr. Burke knew about that complaint at the time that you were ordered for a fitness for duty exam.
A. No.
Q. And you have no personal knowledge that Rebecca Reierson -- Rebecca Reierson was aware of that complaint at the time you appeared at HR before her.
A. Correct, because they would never state at all why I was there.
Q. But you also don't have any personal knowledge of whether or not that complaint had anything to do with it.
A. I was never told anything about any paperwork. I was never told verbally why I was there. Nothing.
Q. And you have no personal knowledge that Nurse Shelby had any awareness that you had made a complaint against Superintendent Jones-Hayes at the time that you presented at HR.
A. That is correct. They told me nothing.
Q. She says -- then she talks about, As a result of the above actions taken against Officer Nawara and the unlawful order that he



cannot return to work, do you know, do you have a view about whether or not the order that said you could not return to work was unlawful?
MR. LINDEN: Objection. Legal conclusion.
THE WITNESS: I don't know of the order being unlawful or not. I know that I was being wronged.
BY MS. MARMOR:
Q. Okay. And it says, He has been forced to use his vacation time. He has also lost out on advancement and training opportunities. Do you see that?
A. Yes.
Q. What advancement and training opportunities had you lost out on at this point that you were aware of?
A. I missed an appointment for an interview with investigations, per the exact unit. I also believe on or about that time people were supposed to be -- excuse me. I had previously tested for the Transportation unit in which it only required a physical test. There was no interview. There was no written test.
And once you pass the physical test,



all the -- they ended up taking people to Transportation by seniority. And on that list I was told by Mark Robinson that I fell second on that list, so they took anybody more than two -- if they took at least two people, I should have been one of them.
Q. Do you know if they took two people?
A. I was told they took about 15.
Q. And did you try to get into either Investigations or this Transportation unit after you returned to work later in 2017?
A. No, ma'am.
Q. Then if you look -- it's the second to last paragraph of Ms. Kurtz's e-mail. She says, We are requesting that he, meaning you, be immediately -- and I think she meant to say reinstated, but it says reinstatement, and allowed to return to work as well as his vacation and time that he has had to use be reinstated.
So did you understand that the position that your attorney was taking for you at the time was that you shouldn't have to go through the FFD process at all?

A. Correct.
Q. Okay. And then she says, We are also requesting that the sheriff immediately send a notification to Superintendent Jones-Hayes to have no further contact with Officer Nawara and to cease and desist from harassment against him. Do you see that?
A. I do.
Q. What was -- was there any ongoing harassment from Superintendent Jones-Hayes at that time against you?
A. I wasn't working.
Q. But she wasn't the one who told you not to work, was she?
MR. LINDEN: Objection. Asked and answered. Calls for speculation.
THE WITNESS: She is the cause of everything I've been going through.
BY MS. MARMOR:
Q. But she -- did you have any personal contact with her?
A. I did not.
MS. MARMOR: Okay.
MR. LINDEN: And that was asked and answered.



MS. MARMOR: Not a soup incident.
MR. HENRETTY: I would say I'd help you, but I'll spill it all over the place.
(WHEREUPON, Nawara Deposition Exhibit No. 19 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 19, which is a second e-mail from Ms. Kurtz. Do you see at the bottom of this front page is her December 21st e-mail that we just talked about, and now it's January 31, 2017, and she is sending another e-mail to Ms. Reierson, Ms. Shelby, and Mr. Kramer. And again it attaches a HIPAA release form given to John to sign pdf. Do you see that?
A. Yes.
Q. And she says, We received no response to my e-mail below. If Officer Nawara is not reinstated immediately before the end of this week with his time and all benefits and salary reinstated as well, then we will file suit next week and request reimbursement of his time, salary, and attorneys' fees. Do you see that?



A. I do.
Q. And again, if you look at the second to last page of this document, the only form attached to Nawara 19 is again that HIPAA Authorization For Disclosure Of Protected Health Information, correct?
A. Yes, ma'am.
Q. And if you go back to the first page, there is still -- basically what this is doing is still saying you shouldn't have to go through the FFD process at all, correct?
A. Yes.
MR. LINDEN: Objection. Beat me to objection, form of the question. Document speaks for itself.
BY MS. MARMOR:
Q. Then she says, Please let me know how you would like to proceed. There is no legal basis to force him to release his personal medical records or to place him on leave without pay. Do you see that? That's the second paragraph.
A. Yes.
Q. Now, she doesn't -- there's no mention



of the words ADA in here, correct?
A. Not that I can see.
Q. And there's no allegation in here that the form itself was illegal.
A. Not that I could see.
Q. And instead she says, This is clear retaliation for his complaints, presumably yours? Do you understand that to be referring to your complaints?
A. Yes.
Q. Against Superintendent Jones-Hayes for her harassment of him. Do you see that?
A. I do.
Q. So we see in the written complaint that we talked about this morning that you did, that you sent to Superintendent Brogan, correct?
A. Yes.
Q. Were there any other complaints that you made against Superintendent Jones-Hayes for what you perceived as her harassment of you?
A. No.
Q. Okay. Who is Matthias Vlahos?
A. A friend of mine.
Q. Works at the Sheriff's Office?

A. He does.
(WHEREUPON, Nawara Deposition Exhibit No. 20 was marked for identification.)
BY MS. MARMOR:
Q. The court reporter has handed you Nawara 20, which is a copy of the November 30, 2016 letter from Ms. Reierson to you which you forwarded to Matthias Vlahos on February 7, 2017. Why were you sending this to Mr. Vlahos at that time?
A. To inform him of what was happening to me.
Q. Any other reason?
A. No.
(WHEREUPON, Nawara Deposition Exhibit No. 21 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 21, which is a February 8, 2017 e-mail from you to yourself at the indestructibull@yahoo.com e-mail address. Subject is medical release forms. Do you see

189

that?
A. I do.
Q. And what's attached here is the same HIPAA authorization form that we've been looking at, is that right?
A. Yes.
Q. And then also attached is the Cook County Sheriff Authorization To Release Healthcare Information. Do you see that?
A. Yes.
Q. But this is again not -- this is the same one that Mr. Penney sent to you, not the one that you say you got on the day of the HR meeting, is that right?
A. I guess so. By this time I think this is floating around a little bit everywhere, you know, so I'm not sure.
Q. But this doesn't have a reference to Nurse Shelby on it, is that right? I'm looking at CCSO 1093.
A. Doesn't seem to look like it. Don't see her name on here.
Q. Why were you sending yourself these forms February 8, 2017?

190

A. So I could keep a record of it.
Q. Did you still have the forms that you've been given at HR in November of 2016 at this time?
A. Possibly.
Q. You don't know?
A. I don't know. Maybe -- maybe I needed access to it very quickly or something like that, so I forwarded from one to the other so that I would have it. I'm not sure.
(WHEREUPON, there was a short interruption.)
MR. LINDEN: That phone, does that work?
MS. MARMOR: This should be 22.
(WHEREUPON, a discussion was had off the record.)
(WHEREUPON, Nawara Deposition Exhibit No. 22 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, Nawara 22 is another copy of the November 30th letter from Ms. Reierson that you sent to yourself on February 8, 2017, again at your indestructibull@yahoo.com e-mail

191

address. Do you know why you were sending that to yourself in February?
A. To keep record of it.
Q. And why were you keeping a record of it since you had already gotten the letter?
A. Might have needed to search it very quickly. I couldn't find the letter that I possibly had. Maybe I misplaced the copy that I had somewhere. So I sent myself the record of it.
Q. Was any part of this done in preparation for suing the Sheriff's Office?
A. No. My previous e-mail we just talked about, I didn't want this to happen. I didn't want to be here. I didn't want to do this.
MS. MARMOR: Move to strike as nonresponsive.
MR. LINDEN: Overruled.
MS. MARMOR: And I object to that.
(WHEREUPON, Nawara Deposition Exhibit No. 23 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has just handed you Nawara 23, which is a February 8,

192

2017 e-mail, same day as the last one, from you to somebody named Kelly Stott, and the subject is Recreational Reading. Do you see that?
A. Yes.
Q. Who is Kelly Stott?
A. Kelly Stott is union representative for Sheriff's Police, also Sheriff's police officer.
Q. For Sheriff's Police.
A. Correct.
Q. So not actually your union at the time.
A. That is correct.
Q. And I see that you're flipping through. Is it fair to say that these are a number of documents related to the fitness for duty correspondence that you have been having with the CCSO?
A. Yes.
Q. And why were you sending -- why did you call this recreational reading?
A. Because I didn't want him to think it was something that he felt had to be obligated to look at. He's a -- he's an acquaintance. He is a nice guy that tries to help people that I don't know very well. So I didn't want it to



seem like some sort of request he was obligated to.
But I was hoping that if and when he got to it in his time, that he could possibly give me some advice on how to go about protecting myself from everything that was happening to me.
Q. And did he?
A. No. He just told me to try to get in touch with my union because he's not sure how the contract works between Corrections to police side. He only knows police contract. So he wasn't much help.
(WHEREUPON, Nawara Deposition Exhibit No. 24 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 24, which is a series of progress notes that were produced by you in this litigation that came from a provider named Karolina Hogueisson. Do you see that?
A. I do.
Q. And who is Karolina Hogueisson?



A. She's a doctor that I know that worked in Cermak at one point.
Q. Was she also married to a colleague of yours?
A. She has a husband who works in Cermak. I forget where he works now, but he used to work in Cermak.
Q. And why did you go to Ms. Hogueisson?
A. Several occasions while working in Cermak in Cermak's basement area in dealing with a lot of the detainees down there and having to transport those detainees to her so she could interview them, she seemed to carry herself in a very nice manner where I felt comfortable possibly asking her how to go about protecting myself from something like this happening to me.
Q. You mean the FFD process?
A. Yes.
Q. Okay. So I'm looking at the first page, and this was -- this was -- it says client goal addressed, assessment. Let's look under this. At the upper part of the page of Nawara 24 it says Stressors/extraordinary events. Patient presents for intake, slash, assessment.



Patient reports stressors related to his current work situation as the precipitating factors in seeking help at this time. Do you see that?
A. Yes.
Q. So did you go to see her to deal with stress that you were experiencing?
A. Yes. I don't understand what you're saying.
Q. I'm asking you if you went -- it says, if you go down under Additional Information/plan, it says, Patient referred himself for therapy due to stress he has experienced in regards to his current work situation. And my question to you is is that why you were seeing her, because of stress concerning your current work situation?
A. She was no longer working for the Sheriff's Department when I looked her up to reach out to her because I asked where she had gone. So in order to not inconvenience her, I didn't ask -- I didn't call her office and ask to meet her at a coffee shop or something like that to take up her time. I figured I could seek help in the setting where she wouldn't be

wasting her time, where she could professionally give me advice.
Q. But are you saying that you weren't there for stress regarding your current work situation but instead were there for advice about an FFD process?
A. All of it. I was stressed. I had no job. I wasn't able to come back to work. I was worried about paying my bills. I needed to find out -- I was uneducated about any of this. I needed to find out how to go about combatting all this happening to me, and her name was the first one that popped up into my head because she was a nice doctor that worked in the basement.
Q. Okay. This progress note, which is the first two pages of Nawara 24, says that you referred yourself for therapy due to stress you experienced in regards to your current work situation. And you can read it, but it doesn't refer to an FFD. My question is did you discuss the FFD at that first meeting?
A. Yes.
Q. Okay. She writes under Additional



Information/plan that, Patient reports that his work issues began in September 2016, and he considers his work status as unregulated. Patient reports that he has not been terminated or disciplined and does not know his current status. Do you see that?
A. Yes.
Q. Is that an accurate statement of what you told her?
A. Yes.
Q. Okay. If you could go to the next page -- and I'll actually correct myself. There is a reference to a fitness for duty in here, but I'd like to focus on the line that says, Patient reports that the current situation has caused him a great deal of distress. He is looking for assistance in managing the stressors. Do you see that?
MR. LINDEN: Distress or stress?
MS. MARMOR: Distress.
MR. LINDEN: I thought you read it stress.
MS. MARMOR: Nope.
THE WITNESS: Yes, I see that.



BY MS. MARMOR:
Q. Have you ever been hospitalized for anything -- let me finish the question. Have you ever been hospitalized for any stress related to the dispute that we're here about today?
A. No.
Q. Have you ever been prescribed any drugs to take for stress related to the conflict that you had with your employer?
A. No.
Q. Have you ever suffered any physical ailments that you're aware of that are related to the conflict that you've had with your employer about -- in this matter?
A. Blood pressure's pretty high.
Q. Was your blood pressure high before?
A. I don't know.
Q. Has any doctor diagnosed you as having high blood pressure as a result of the dispute with your employer?
A. Not as a result of the dispute with my employer, no.
Q. If you could go to Page Nawara 000221



of Nawara Exhibit 24. This is a progress note. For the record the previous progress note we looked at was dated February 11, 2017. This is now February 17, 2017. Do you see that?
A. I do.
Q. And here it says that the Additional information/plan is discussed work status, healthy coping mechanisms to help patient alleviate the levels of stress. Discussed engaging in activities that bring the patient a level of relief, i.e., biking, working out, and listening to music. Is that an accurate statement of what happened, what you discussed at the time?
A. Yes.
Q. And it also says, Discussed referrals for fitness for duty evaluation. Do you see that?
A. Yes.
Q. And did she in fact refer you to a doctor named Dr. Kroll for a fitness for duty evaluation?
A. Yes.
Q. And we'll go to that in a minute, but I

want to do the last page of Nawara No. 24. This is a progress note from April 11, 2017. Do you see that at the top? Right here, the date.
A. Trying to see.
Q. The very last page. It's right here, April 11, 2017.
A. Yes.
Q. Okay. So you went back -- these are all the records we have from her. This is the last time you saw Ms. Hogueisson?
A. I am not sure.
Q. If we have no other records, would that indicate that you didn't see her after this?
A. I would hope so.
Q. Okay. And under Additional information/plan it says, Patient reports he has proposed to his girlfriend in February. Do you see that?
A. Yes.
Q. And was that accurate?
A. Yes.
Q. Okay. And when did that engagement end?
A. I don't remember. Not long after.



Q. Now, when had you started dating this person?
A. 2009.
Q. It says, Patient reports that there have been no changes in his work status, and he has filed a lawsuit against his employer. Do you see that?
A. Yes.
Q. Okay. And he says -- it says, Patient states that he continues to be worried about his status at work as his income will be terminated. He is looking at alternative employment options so that he can pay his bills. Do you see that?
A. Yes.
Q. So at this time in April of 2017 it appears that you were still getting income from the Sheriff's Office, is that correct?
A. I was still paying myself with my own time, yes.
Q. But that money was coming from the Sheriff's Office, correct?
A. That I earned.
MR. LINDEN: Objection. Asked and answered.
MS. MARMOR: Neither asked nor answered.



BY MS. MARMOR:
Q. The money came from the Sheriff's Office, correct?
MR. LINDEN: He answered it about the first hour of the deposition, I believe.
BY MS. MARMOR:
Q. Please answer the question.
A. The money that I received in my paycheck was from my own time, yes.
Q. But it was paid from the Sheriff's Office bank account, correct?
A. Yes.
MR. LINDEN: Objection. Asked and answered and argumentative.
BY MS. MARMOR:
Q. It says, He is looking at alternative employment options so that he can pay his bills. So at this time you could pay your bills, is that right?
A. Yes.
Q. And is this when you started working for Aces?
A. No.
Q. When did you start working for Aces?



A. I'm not sure. Sometime towards the end of the spring, maybe beginning of the summer. I'm not sure.
Q. And did you also start working at Amazon, I think you testified, later on in June, right?
A. I did.
Q. Did you stop getting -- do you have a clear sense of when you stopped getting income if at all from the Sheriff's Office?
A. No, ma'am. I think it was somewhere around end of April. I received a call from Lieutenant Bryant telling me that this is your last paycheck, good luck.
Q. Lieutenant who?
A. Bryant.
Q. B-r-y --
A. B-r-y-a-n-t.
Q. And who is Lieutenant Bryant?
A. He's now retired Cook County Sheriff's Lieutenant from S.O.R.T. Operations. He was one of my somewhat immediate supervisors.
Q. Was he in the chain of your command?
A. Correct.

Q. And what did you take the good luck to mean?
A. Originally the only reason I got paid, and I thank that man, okay, the only reason I got paid was because when the e-mail came that Lieutenant Worthon gave me that said that I was no longer allowed to come back to work, I guess rumors spread or things were talked about because somehow he found out, and he called me, and he told me that he had something similar like this happen to him, and he understands what I'm going through.
And since no one has ordered him to cut my benefits off, that he would pay me for my own time since I've been coming to work -- only called in sick once in the last seven years, that I'd be coming to work -- since I have been coming to work and I've accumulated all this time, he would pay me with my own benefits until they ran out because no one ordered him not to yet.
So since there was nothing against that or violating policy to pay me my own time, he was able to afford me --



(WHEREUPON, there was a short interruption.)
THE WITNESS: I'm sorry.
MS. MARMOR: She's saying please slow down.
THE WITNESS: He was able to give me paychecks for the time that I was gone.
BY MS. MARMOR:
Q. So was Lieutenant Bryant part of Payroll?
A. I don't think so.
Q. Do you know whether or not what you say he did for you was contrary to the rules?
A. No, not at all. It's what I did today right now to get authorized to be here for this long right now. Instead of me putting in the time, he put the time in for me. It was my own time and my own money.
Q. Right. So it was consistent with the rules.
A. Yes.
Q. It wasn't some special treatment, it was what the rules allowed.
A. Sure.
Q. It says, Patient also reports sadness



and regret as he has missed out on opportunities to advance his employment status such as an opportunity for transfer to Sheriff's Police. Do you see that?
A. Yes.
Q. When would the opportunity to have transferred to Sheriff's Police have arisen in 2017 that it suggests you missed out on?
A. That's what she said. Every two years you're able to apply to Sheriff's Police. I'm not exactly sure what she meant here. I expressed that I had missed opportunities. I don't think I would have said that I missed opportunity for Sheriff's Police at this time because I don't think there was an opportunity for Sheriff's Police at this time.
MS. MARMOR: Okay. Thank you.
(WHEREUPON, Nawara Deposition Exhibit No. 25 was marked for identification.)
BY MS. MARMOR:
Q. The court reporter has shown you Nawara 25, which is a letter sent by Rebecca Reierson to you. It's via e-mail on Tuesday, February



28, 2017. And it says, Officer Nawara, please see the attached letter and HIPAA forms that must be completed. This attachment has also been sent to you via regular and certified mail, and it looks like she forgot to attach it, so then she did attach it with the second e-mail. Do you see that?
A. Yes.
Q. And this is in fact attached to this is a February 28, 2017 letter from Ms. Reierson to you, and it goes over some of the same information we have already seen, that you were informed on November 18, 2016 that you were required to undergo a fitness for duty evaluation before returning to active duty. Do you see that?
A. Yes, ma'am.
Q. And it says -- this says, You were referred for a fitness for duty based on an interaction you had with Superintendent Jones-Hayes in which you were alleged to have acted in overly aggressive and threatening manner. Do you see that?
A. Yes, ma'am.

Q. And then it says, During the meeting on November 18th you were given an Authorization to Release Healthcare Information and a HIPAA Authorization For Disclosure of Protected Health Information form which you took in order to review prior to signing. We have already covered that.
To date you have not returned these forms to Ms. Shelby, which of course is true, right, sir?
A. It is correct.
Q. And refers again to the voicemail message that Ms. Shelby said that we have established you never responded to. And then it says, In addition, I sent you a letter on November 30, 2016 informing you that the time you have been off work since November 18, 2016 is only authorized if you are participating in the FFD process. Do you see that?
A. I do.
Q. And to date -- she says, To date I have not heard back from you. And that's true, you personally never responded to her, is that right?

209

A. That's correct.
Q. She says, The signed waiver documents given to you must be returned to Ms. Shelby by Wednesday, March 8, 2017 so the FFD evaluation process can proceed. Do you see that?
A. Yes.
Q. And you were at this point still unwilling to participate in that process, isn't that right?
A. Correct.
Q. And then it says, If the forms are not received by March 8, your time off work will be deemed unauthorized. Did you understand what that would mean?
A. No.
Q. And of course she reiterates something you already knew, which is you're not able to return to work until you have completed the FFD process, is that right?
A. Yes.
Q. Now, she says, I've enclosed another copy of the forms for your convenience. And I'd like you to turn to the next page of Nawara 25, and this is the first page of the form that your

210

lawyer has been sending, correct, the same form we have seen a few times now?
A. Yes, ma'am.
Q. And that's the HIPAA Authorization For Disclosure Of Protected Health Information.
A. Yes, ma'am.
Q. Second form attached hereto is different from the ones we were just looking at in that it refers to Nurse Shelby right there in the middle of the page. Do you see that?
A. Yes, ma'am.
Q. Now, as you sit here today, do you remember whether the form that you got on November 18, 2016 looked like this or looked like the one that Mr. Penney sent you?
A. As I sit here today, I'm trying to answer everything as best I can. It's been three years, and I'm not exactly sure right now, with all the information being thrown at me, how accurate any of it might possibly be with these because there are so many different forms of the same thing here.
Q. Right. But I'm just asking you a simple question. As you sit here today, do you

211

have any specific memory whether the form you were given on November 18, 2016 looked like this one or looked like the one that Mr. Penney sent you.
A. I'm not sure. Still seem both blank to me.
Q. I understand. I understand that. Did you in your meeting with Ms. Hogueisson talk about the forms?
A. I think so.
Q. Was she familiar with how FFD processes work?
A. I don't know. I was hoping so. That's why I went to her for advice.
(WHEREUPON, Nawara Deposition Exhibit No. 26 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you what's marked Nawara 26, which is an e-mail from -- at the top from Ms. Kurtz to you, and it says -- and it's -- you had sent her an e-mail saying, RE: HR letter and HIPAA forms. Do you see that?

212

A. Yes.
Q. And this is February 1, 2017?
A. Yes.
Q. And she says, Got it, and I will draft a response, and then says --
MR. LINDEN: March 1st.
MS. MARMOR: I'm sorry. Thank you. March 1, 2017.
MR. LINDEN: I just want to preserve -- I don't know if this document was produced accidentally. Looking at it looks like it should be subject to attorney/client privilege.
MS. MARMOR: It should not be because he used his Cook County e-mail address to contact her. They waived the privilege.
MR. LINDEN: Not so sure about that.
MS. MARMOR: It's in my client's point of custody and control, but we can argue that another time.
MR. LINDEN: But I am going to object on attorney/client privilege.
MS. MARMOR: That's fine.
BY MS. MARMOR:
Q. I assume you never got the voicemail or



letter referenced in her letter. That's what she said, correct?
A. Yes.
Q. And of course you did get the voicemail and the letter referenced in Rebecca Reierson's letter, correct?
A. I never received an e-mail or voicemail from Rebecca Reierson.
Q. No, but the voicemail referenced in her letter was the Nurse Shelby voicemail.
A. Yes. This is from Ms. Reierson, whatever Ms. Reierson --
Q. Would you like to go back and look at Ms. Reierson's letter where she refers to Nurse Shelby's voicemail? I'd be happy to.
MR. LINDEN: Objection. Argumentative and also calls for speculation. But you're talking about what Ms. Reierson --
MS. MARMOR: Counsel, I understand. I understand you say that.
BY MS. MARMOR:
Q. Is it true that you -- we know that you got the voicemail from Nurse Shelby, right?
A. Yes.



Q. And we know that you got the letter from Ms. Reierson on November 30th, right?
A. Yes. It was sent to my e-mail.
MS. MARMOR: Right.
(WHEREUPON, Nawara Deposition Exhibit No. 27 was marked for identification.)
MR. LINDEN: I just want to make the same objection on No. 27 on the top where it appears again to be attorney/client privilege.
MR. BUSTAMANTE: CCSO. Cook County Sheriff's Office, Sheriff's Office HR.
MR. LINDEN: I'm sorry. Never mind. Withdraw.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 27, which is an e-mail from Ms. Kurtz to the Cook County Sheriff's Office, dot, HR. Do you see that? And cc'ing you?
A. Yes.
Q. And it says, See below and attached. And below that there is another March 8 e-mail to Rebecca Reierson and Winifred Shelby cc'ing Peter Kramer. Do you see that?



A. I do.
Q. Do you know who at CCSO HR this would have been sent to?
A. I do not.
Q. Have you ever met Karen Williams?
A. I don't know who Karen Williams is.
Q. So you're not aware that she was the Executive Director of HR at this time?
A. No.
Q. So the e-mail -- I want to focus on the second e-mail, the one halfway down the page, to Ms. Reierson and Ms. Shelby. Do you see that?
A. Yes.
Q. Okay. And she argues, she says she's received the attached correspondence, which is that February 28 letter and its attachments, along with some other correspondence, correct?
A. Yes.
Q. Okay. And she says, It's inaccurate to say Officer Nawara did not respond to your letter, and she says in fact I contacted you on Officer Nawara's behalf and at his request on December 21, 2016 and January 31, 2017, correct?

A. Yes.
Q. And she was acting on your behalf when she sent those e-mails.
A. Yes.
Q. And she says, Second, I never received a response to my e-mails. And then, Third, as I indicated -- as indicated in my December 21, 2016 e-mail, the order to Officer Nawara to sign the HIPAA release for his medical records is unlawful and violates the ADA. Do you see that?
A. I do.
Q. And this is the first mention of the ADA in any correspondence that I've seen. Did you send anything to the Sheriff's Office prior to this date in which you explicitly said that you thought the forms violate -- any of the forms violated the ADA?
MR. LINDEN: Objection. Form.
THE WITNESS: Not that I know of.
BY MS. MARMOR:
Q. And then she says, If the order is not rescinded and Officer Nawara put back to work this week, we will have to file suit and seek injunctive release as well as other remedies and

217

including reinstating the time he's been forced to burn. Do you see that?
A. Yes, ma'am.
Q. So again the position was you shouldn't have to do the FFD at all.
A. Is that a question?
MR. LINDEN: Objection. Form.
BY MS. MARMOR:
Q. Again, the position -- we have established that you didn't want to participate, you didn't want to do any FFD examination.
MR. LINDEN: Objection. Form and misstates testimony.
MS. MARMOR: He's answered the question.
MR. LINDEN: He indicated, also, about the forms. If you want to confuse him --
MS. MARMOR: Counsel, please do not coach your witness.
MR. LINDEN: I'm not coaching.
MS. MARMOR: You are coaching your witness.
MR. LINDEN: You're misstating his testimony is what you're doing.
MS. MARMOR: No, I'm not.
MR. LINDEN: He's testified over and over

218

again he wouldn't sign a blank form.
MS. MARMOR: Counsel, you are coaching your witness. You are coaching your witness. Please stop.
MR. LINDEN: You're misstating his testimony.
MS. MARMOR: He can answer the question and did.
(WHEREUPON, Nawara Deposition Exhibit No. 28 was marked for identification.)
MR. HENRETTY: Is this one 27? I just wrote 25.
MS. MARMOR: 28.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter is showing you Nawara 28, which is a response from Rebecca Reierson to Dana Kurtz dated March 13, 2017 in which she says, Ms. Kurtz, during the fitness for duty process, I intend to communicate directly with Mr. Nawara. Do you see that?
A. I do.
Q. And you understood that Ms. Reierson was not a lawyer acting as a lawyer for the

219

Cook County Sheriff's Office in this matter, correct?
A. I have no idea her position there. I never saw any credentials. I didn't see any paperwork. I have no idea who she was or who she is.
Q. So you didn't understand that she was working at HR?
MR. LINDEN: Objection. Misstates testimony, argumentative.
THE WITNESS: I don't know where she was working.
BY MS. MARMOR:
Q. Okay. So you're saying you didn't understand she worked at HR.
MR. LINDEN: Objection.
THE WITNESS: I don't know where she's working.
BY MS. MARMOR:
Q. I'm asking the question. Are you saying you did not understand that she worked at HR?
A. Does she work at HR?
Q. That's my question. That was my

220

question to you.
A. I don't know if she worked at HR.
Q. Will you please go back to Nawara 25? It's in the pile right here. Could you turn to -- this is the November 28th letter. Do you see that? And you see under Ms. Reierson's signature it says Bureau of Human Resources, Employee Services?
A. Yes.
Q. So do you think you might have read that at the time?
A. Yes.
Q. So is it fair to say that you had at least a basis to understand she worked for Human Resources?
A. Yes.
Q. Back to Nawara 28. Ms. Reierson told Ms. Kurtz, your lawyer, that you had been ordered to complete an FFD evaluation and must execute the HIPAA waiver forms in order to complete the FFD process. Did you understand that to be the case from their point of view?
A. Yes.



(WHEREUPON, Nawara Deposition Exhibit No. 29 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, Nawara 29 is a March 13, 2017 response from Ms. Kurtz to Ms. Reierson on which you were cc'd, correct?
A. Yes.
Q. Okay. And it says -- among the things she says in the second paragraph is that Officer Nawara has been placed on unpaid leave because he would not sign a HIPAA medical release form for his own medical records without limitation of time, scope, or any other limitations, setting aside that such a request is unlawful in the first place. Do you see that?
A. Yes.
Q. Did you ever tell anyone at the Sheriff's Office yourself that the issue was that there was no limitation of time, scope, or other limitation in the forms that you were asked to sign?
A. No. I don't think so.
Q. Then in the paragraph that says Third



it says, The Sheriff's position to require Officer Nawara or any other employee to complete a medical release form so that the Sheriff's Office can obtain that individual's private medical records is unlawful and in violation of the ADA, that's something we had seen before, right, that she mentioned ADA in her last e-mail?
A. Saying we saw this in an e-mail before?
Q. Yes.
A. Yes.
Q. Then she adds, An employer cannot order an employee to complete a HIPAA or medical release form so that the employer can obtain the employee's own medical records, which is what you have ordered Officer Nawara to do.
Did you ever tell anybody at the Sheriff's Office yourself that your concern was that the Sheriff's Office was going to be able to get your own medical records?
A. I did not tell anyone, no.
Q. Then at the bottom she says, Please let -- you see where it says finally?
A. Yes.



Q. Please let me know if a note from his doctor would suffice. Do you see that?
A. I do.
Q. And in fact this is dated March 13, 2017, correct?
A. Yes.
Q. And you had already met with Dr. Kroll at this time, isn't that right?
A. I don't know.
(WHEREUPON, Nawara Deposition Exhibit No. 30 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you or you're picking up Nawara 30, which at the top is Ms. Reierson's response to the last e-mail we saw from Ms. Kurtz, again cc'ing you, and it's dated March 17, 2017. Do you see that?
A. I do.
Q. And she said, Ms. Kurtz, We have contacted our employee Mr. Nawara on several occasions about this issue, as you are aware. And then she goes on to say, A note from

Mr. Nawara's own physician will not be adequate. He was previously informed that the fitness for duty evaluation will be completed by an independent physician as is the case with all of our fitness for duty examinations. Based on Mr. Nawara's behavior in the workplace we believe there's a clear business necessity, and we believe our HIPAA release meets legal requirements. It is not unlimited in time as you suggest. Do you see that?
A. I do.
Q. Okay. And then it says, I indicated in my previous letter that it was necessary for us to receive Mr. Nawara's signed medical release paperwork by March 20th in order to proceed with the fitness for duty process. This will be extended until Wednesday, March 22, 2017. Do you see that?
A. I do.
Q. Giving you some more time to try and get you to sign some forms, correct?
A. Yes.
Q. And participate in the process.
A. Yes, ma'am.



MS. MARMOR: You want to switch? Why don't we take a break, and you can switch the tape.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 2:55 p.m. This is the end of Videotape No. 3.
(WHEREUPON, a discussion was had off the record.)
(WHEREUPON, a short recess was taken.)
(WHEREUPON, Nawara Deposition Exhibit No. 31 was marked for identification.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 3:06 p.m. this is the beginning of Videotape No. 4.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 31. The cover page of this document is a March 18, 2017 e-mail to Rebecca Reierson that appears to have been from you since it says, Sincerely, John A. Nawara at the bottom. Do you see that?
A. I do.
Q. And you're attaching a report from



Dr. Kroll, who you say is an independent doctor and not my doctor. Do you see that?
A. Yes.
Q. And Dr. Kroll -- you refer to Dr. Kroll by Ms. Hogueisson?
A. Yes.
Q. And when you went to Dr. Kroll for an evaluation, did you sign any release forms for any medical document, any of your medical documents?
A. I don't remember.
Q. Okay. Do you know if Dr. Kroll considered any of your medical records in conducting a fitness for duty exam?
A. I don't know.
Q. If you could turn to Page CCSO 1202, which is the Fitness for Duty Evaluation by Dr. Robin Kroll. Do you see that?
A. Yes.
Q. It says the date of evaluation was March 8, 2017, correct?
A. Yes.
Q. And is Dr. Kroll a man or woman?
A. Woman.



Q. If you turn to the second page of her report, do you see where it says evaluation procedures at the top?
A. Yes.
Q. And it says Clinical Interview, Mini Mental Status Exam, MMPI-RF, Beck Depression Check List, Beck Anxiety Inventory, State/Trait Anxiety, Shipley-2, and SIMS. Do you see that?
A. I do.
Q. And then it discusses there is a heading called Current Medications, and none were reported. Is that that you reported not taking any medications?
A. Yes.
Q. And there was Appearance and Behavioral Observations, an Intake Report and Interview, and then if you go to Page 3 of this report Assessment Results. Do you see that?
A. Yes.
Q. Do you see anything in here suggesting that Dr. Kroll reviewed any of your own medical records in coming up with a fitness for duty assessment?
A. You'd like me to read all this?

MS. MARMOR: Sure.
(WHEREUPON, there was a short pause.)
THE WITNESS: I don't see anything in there.
BY MS. MARMOR:
Q. You don't see anything in there indicating that Dr. Kroll considered any of your medical records in coming up with a determination.
A. Correct. Correct.
Q. And if you could go back to the first page of the report, meaning if you go three pages in, there you go, under Reason For Evaluation it says, Deputy John Nawara was referred for a fitness for duty evaluation. That was by Ms. Hogueisson or by someone else?
A. She told me I could see her, that this would be a person who would do this type of evaluation, yes.
Q. Okay. And did she tell you anything else about Dr. Kroll?
A. I -- no.
Q. Nothing that you can recall?
A. No.



Q. I'd like to go back to Nawara 31. Did you write all of this e-mail yourself?
A. Under the direction of Dana Kurtz, yes.
Q. So did Ms. Kurtz effectively tell you the things to say in here?
A. Yes.
MR. LINDEN: Hold on. Answered a little too fast. I do want to object. It's attorney/client privilege. Understand what is communicated from this, the document is not, but what she told him would be subject to attorney/client. I don't think she waived it.
MS. MARMOR: Well --
MR. LINDEN: Doesn't matter.
MS. MARMOR: I think the fact that this came from her via him is probably enough to waive it.
BY MS. MARMOR:
Q. You reference to -- a statement in here, I feel the order for me to sign a blank HIPAA release was unlawful and violates the Americans with Disabilities Act and is in retaliation for my prior suit against the Sheriff's Office in which the jury found that the sheriff violated my and other officers'



First Amendment rights and retaliated against us because of our political support for the opponent to Sheriff Dart, and because of my complaints of harassment by the supervisor. Do you see that?
A. I do.
Q. So the first one is the Burris lawsuit? The first retaliation item is the Burris lawsuit?
A. Yes.
Q. And the second retaliation item is the complaint that you made about Superintendent Jones-Hayes?
A. Yes.
Q. And there was only one complaint, I think we have established, correct?
A. Yes.
(WHEREUPON, Nawara Deposition Exhibit No. 32 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has shown you Nawara Exhibit 32, which is dated March 18, 2017 from you to Ms. Reierson, cc'ing



Ms. Kurtz, and it says, Hello, Ms. Reierson. Please provide the general order or policy that requires me to sign a HIPAA release for my medical records. Thank you. Do you see that?
A. I do.
Q. Why did you think that there had to be a general order or policy that had such a requirement?
A. Because you just can't ask things at random of someone because you don't like them.
Q. Does that mean there has to be a general order or policy?
A. Yes. She's not even in my chain of command, so I would like something that says I have to do this.
Q. Had anybody at the union told you that there had to be a general order or policy for HIPAA release?
A. Mark Robinson said they didn't have a policy on this.
Q. Who didn't have a policy?
A. The County.
Q. But that's the same person, Mr. Robinson, who said that the union couldn't

do anything for you, correct?
A. This is correct.
Q. And then on or about -- on -- let's see. You then filed an EEOC charge in March of 2017 against the Cook County Sheriff's Office?
A. Yes.
Q. And then on March 29, 2017 you filed a lawsuit against the Cook County Sheriff's Office?
A. I'm not sure the exact date.
MS. MARMOR: Oh, dear. I need to go off the record. Oh, never mind. I thought I'd lost something.
(WHEREUPON, Nawara Deposition Exhibit No. 33 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 33, which is a -- the original complaint filed in this lawsuit. And do you see at the top that it says filed March 29, 2017?
MR. LINDEN: Stipulate that it's filed on that date.
MS. MARMOR: Sure.

233

BY MS. MARMOR:
Q. And this lawsuit was filed at the time only against Cook County and Thomas Dart, is that correct?
A. Yes.
MR. LINDEN: See how reasonable we are in the stipulations?
MS. MARMOR: Pardon me?
MR. LINDEN: See how reasonable we are in the stipulations?
MS. MARMOR: The good news is we are not going to look at very much of this document.
MR. LINDEN: Good.
(WHEREUPON, Nawara Deposition Exhibit No. 34 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 34, which is an e-mail from you to John Zaleski, and the subject is contract proposal, dated July 4, 2017, and the attachment is Teamster 700 Final Tentative Agreement. Do you see that, Agreement 2017 that's in the attachments line?

234

A. Yes.
Q. And that's in fact what's attached here, is a Final Tentative Agreement between the Teamsters Local 700 and the Cook County Sheriff's Office, correct?
A. Yes.
Q. And if you turn to CCSO 1291, do you see that the date this was signed was June 16, 2017?
A. Okay.
Q. And then if you turn to -- my first question is why were you sending the Final Tentative Agreement to Mr. Zaleski on July 4th, 2017, if you recall?
A. Providing information to a friend.
Q. Okay. Had you reviewed this Final Tentative Agreement at that time?
A. No.
Q. If you would turn to CCSO 1295, which is Page 5 of 10, do you see there is a paragraph at the bottom of the page that says 10, Fitness for Duty?
A. I do.
Q. And it says, Add New Section, and it

235

reads, The employer shall pay any employee that is ordered to take a fitness for duty evaluation, during the course of the first evaluation period, as long as the employee cooperates and complies with all scheduled appointments of the employer. There "scheduled by" is crossed out. That must have been in there or some language like that before.
In the event that an employee does not pass the fitness for duty evaluation, pay shall be stopped after the employer has provided notification to the officer/investigator of a failed fitness for duty evaluation. Do you see that?
A. Yes.
Q. Okay. And did you read this at the time?
A. I did not.
Q. Have you ever read this?
A. No.
Q. Do you understand that what this is saying is that you can get paid if you cooperate with the fitness for duty process?
A. Effective December 1, 2017?

236

Q. Answer yes, effective that day?
MR. LINDEN: I want to object. I think calls for legal conclusion. Also assumes that this is somehow the policy.
MS. MARMOR: It doesn't assume that it's the policy.
BY MS. MARMOR:
Q. But if you can answer my question.
A. This date right now as I read this, yes, I understand this.
MS. MARMOR: Okay.
(WHEREUPON, Nawara Deposition Exhibit No. 35 was marked for identification.)
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has handed you Nawara 35, which -- the first page of which is dated July 5, 2017, and it's a statement from -- it says, To whom it may concern. Medical records have been provided for the following patient, John Nawara. This is the invoice for the cost of producing these records. Do you see that on the first page?
A. Yes.



Q. Then if you turn to the second page, there is a letter from your lawyer, Dana Kurtz. Do you see that?
A. Yes.
Q. It's dated June 3 (sic), 2017, and it's to Charles T. Shaw, M.D. Do you see that?
A. Yes.
Q. And it says, Re: Patient John Nawara, and it gives your date of birth and your Social Security number, which again we have redacted to protect your privacy.
And it says, Dear Dr. Shaw, this office represents the above-named patient. We are requesting a complete copy of your records regarding this patient. Also, please find a certification that needs to be completed for the admission of these records at trial. Do you see that?
A. Yes.
Q. And then it says, The request is made in accordance with the provisions of 735 ILCS 5/8-2001 and 735 ILCS 5/8-2003 of the Illinois Code of Civil Procedure, the HIPAA Rule Section 164.508. Please be sure to provide copies of



all medical records without restriction as to time, including all inpatient records, tests, results -- test results, operative results, paramedic reports, consultations, physical therapy records, counseling and treatment records, progress notes and admission, discharge reports, notes, billings -- billing records, itemized statements, EOBs, prescriptions, and all other records regarding this patient.
And then it says, It's necessary that any document with writing on the back side be copied both front and back. Do you see that?
A. Yes.
Q. Do you know why your lawyer was asking -- well, first, who is Charles T. Shaw?
A. My primary doctor.
Q. And do you know why Ms. Kurtz was asking Mr. Shaw to send medical records about you?
MR. LINDEN: Objection to form, calls for speculation.
THE WITNESS: This is what this whole thing was about.



BY MS. MARMOR:
Q. Can you be more specific? I don't understand that answer.
A. The whole thing was about obtaining my medical records, so she was obtaining my medical records.
Q. But you had not wanted your medical records to be obtained prior to this day.
A. Did not want my medical records to be obtained prior to this date to someone who was going to make up lies about me and have my personal medical records sent to her office.
I was never bothered by -- I have a perfectly clean background. It was the principle of the fact. I wasn't worried about my medical records. I wasn't going to give my medical records to somebody who has no integrity who's trying to do something to me.
Q. How about times have you met Nurse Shelby?
A. Once.
Q. So you feel that you can make a judgment about her integrity -- let me finish my question -- based on one meeting with her? Is

that your answer?
A. Yes, ma'am, based on --
**Q. I'm not asking you any -- asked and answered.**
A. I want to answer.
MR. LINDEN: He's entitled to give an answer. You're interrupting his answer.
THE WITNESS: If someone can look me in the face and never seen me once before in their life and make a judgment of me to where they can look me in the face and ask me if I walk around here for the last 18 years threatening people, that's very concerning to me, and I wonder where somebody gets the guts to do something like that.
BY MS. MARMOR:
**Q. Have you ever made any effort to understand what occupational nurses do?**
A. No.
**Q. Have you ever made any effort to understand what the purpose of fitness for duty exams are?**
A. I have only learned in this past three years.

241

**Q. Okay. Prior to that day did you have an understanding of what fitness for duty exams were supposed to be for?**
A. No. I tried to ask for documentation and paperwork and them to explain what was going on to me, but that never happened.
**Q. And did you think that -- and did you ever consider just going back to them once Nurse Shelby called you and saying, I have a problem with sending my records to you?**
A. I don't even know why you would ask that. If someone who is doing this to you, I don't understand -- I think it's a failed attempt to try to do something right who's deliberately doing something wrong to you from the beginning and doesn't even know you.
I see it's a very failed attempt to go back and ask something right or ask someone to do something right who is doing it wrong, and they never met you before.
**Q. So you made that decision on November 18 that you were not going to deal with Nurse Shelby again, is that right?**
MR. LINDEN: Objection. Asked and answered

242

and argumentative.
THE WITNESS: Yes. I make determinations all the time every day with people who are safe and unsafe or people who cause problems or potential to cause problems. That's the job I have. I have to make those judgments to keep people safe every day.
BY MS. MARMOR:
**Q. So why was -- did you understand that these records that were requested by your lawyer on June 30, 2017, what was the purpose of these documents as you understood it?**
A. Finally retrieving my medical records so we could somehow go about furthering this process to get me back to work was the whole process.
**Q. Have you offered to participate in the FFD process if you could obtain your own records at this time?**
A. I don't understand.
**Q. Had you made an offer to the Sheriff's Office that as long as you could obtain your own medical records, you would participate in the FFD process at this time?**

243

A. I didn't think that was a choice I had. I don't understand how me obtaining my own records -- I don't see how they would allow me to obtain my own records. I didn't know that was a choice I would have. No one ever offered me that choice.
**Q. So did you understand that the only reason these documents were being obtained was so they could be used in this litigation?**
A. I don't know.
**Q. So you don't know --**
A. This is the first time I've seen this. I remember that my records were obtained. I don't remember exactly when they were. And as I'm looking at this, I don't remember actually seeing this, my records as a whole like this.
**Q. But did you sign a HIPAA release for these records to be sent to your lawyer?**
A. Eventually when she had it changed, yes. I don't remember when that was.
**Q. Actually, if you look at Nawara 000165.**
A. Yes.
**Q. Did you sign -- the patient's signature is blocked out, so we don't know whose signature**

244

this is. Do you recall signing this document?
A. Yes.
(WHEREUPON, Nawara Deposition Exhibit No. 36 was marked for identification.)
MR. LINDEN: Are we on 36?
MS. MARMOR: Yes.
MR. LINDEN: Okay. Thank you.
MR. BUSTAMANTE: 36.
BY MS. MARMOR:
Q. Mr. Nawara, the court reporter has shown you or handed you what's marked as Nawara Exhibit 36. Do you see that document?
A. Yes, ma'am.
Q. And this is a different HIPAA authorization form that you signed on August 17, 2017. Do you see that?
A. Yes.
Q. And this one -- the prior one authorized your lawyer to get medical records, correct?
A. Yes.
Q. What this authorizes is -- in No. 1, With this authorization I allow all medical

245

records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation. Do you see that?
A. Yes, ma'am.
Q. And then it says in No. 2, Any health care provider or facility who treats/treated me for my medical condition or medical illness may disclose the above-described information to disability management case manager for Cook County employed by CorVel Corporation. Do you see that?
A. Yes, ma'am.
Q. Do you know how it came to be that this -- because this is somewhat revised from the form that you got in November of 2018 -- or excuse me -- November 2016.
Do you know how it came to be that this revised form was offered up to you?
MR. LINDEN: Objection, form.
THE WITNESS: I believe it was in negotiations between Ms. Kurtz and HR that came up with this form so that my medical records would not end up on Winifred Shelby's desk and will end up in the proper hands, would be the

246

person who will be evaluating me, which is CorVel.
BY MS. MARMOR:
Q. So the Cook County Sheriff's Office agreed to allow you not to have your records go to them in order to complete the fitness for duty process, correct?
A. Yes.
Q. Has anybody ever told you that in fact that was always an option?
MR. LINDEN: Objection. Foundation, form.
THE WITNESS: Not that I know of. All e-mails and everything said that I had to turn those papers back in to them.
BY MS. MARMOR:
Q. Did you ever tell -- did you ever tell the Cook County Sheriff's Office that you would be prepared to pursue or go through the fitness for duty process prior to filing this lawsuit as long as you didn't have to give your medical records to the Sheriff's Office?
A. I was under the impression, due to the e-mails, that this was the only choice I had. So in order to prepare for my fitness for duty,

247

which I figured I would eventually have to go through, I decided to seek an outside evaluation just in case the person I was sent to was as dishonest as Ms. Shelby, and that way I would have something to combat with that doctor.
So I didn't know I had any other choice. I looked at what was presented to me, and I tried to protect myself by going to a separate doctor because of the choices I thought that I had.
Q. How do you -- about what was Ms. Shelby dishonest with you?
MR. LINDEN: Objection. I think it's been asked and answered.
MS. MARMOR: No. He just said as dishonest as Ms. Shelby. He said all sorts of other unpleasant things about her, but not that yet.
MR. HENRETTY: Whoa, whoa, whoa. Don't coach him, please.
MR. LINDEN: I'm not coaching. It's been asked and answered.
MR. HENRETTY: It hasn't. Do not do that again, please.
THE WITNESS: If someone can look you in the

248

face, they've never seen you before, and ask you if you're threatening people, and they're going to go ahead and say that -- I'm referring to when James Penney walked in the room after the second half of the meeting resumed, and say to this person here that he's being found unfit for duty due to the aggressive behavior he displayed before you were here, you're going to make up those lies, and you know nothing happened, I sat there the way I sit here, am I frustrated, yes. I'm frustrated now going through this here.

I was exactly the same tone. I don't know how you interpret me here, but I was exactly the same way in that room with those two ladies. I didn't know them. I have nothing against them. I had never seen them before. All these accusations were made to me and about me in that time.

I would think you would feel the same way about somebody you never met when they're going to say all these things about you.

BY MS. MARMOR:

Q. So are you saying -- because both Nurse



Shelby and Nurse -- excuse me. Both Nurse Shelby and Ms. Reierson say that you were very aggressive that day. Are you saying they're both liars?

MR. LINDEN: Objection. Argumentative.

THE WITNESS: If you're saying that -- like I said, Ms. Reierson never really said much of anything that day. It was Nurse Shelby who made the accusations. If they're both saying this now, yes, they're both liars.

(WHEREUPON, Nawara Deposition Exhibit No. 37 was marked for identification.)

BY MS. MARMOR:

Q. Mr. Nawara, the court reporter has handed you what's been marked as Nawara 37, which is an e-mail from Michelle Sarocka at CorVel to you on August 28, about ten days after you signed the FFD form, correct?

A. Yes, ma'am.

Q. And she says, The FFD provider will need to review medical records from all health care providers you have seen over the past two years. If your primary care physician receives



updates from specialists, then you would only need to request the records from the PCP. Do you see that?

A. Yes, ma'am.

Q. Did you talk to Ms. Sarocka?

A. She called me once on the phone, yes.

Q. And did you explain to her who your providers were?

A. I believe so.

Q. Do you have an understanding -- is there any -- going back to this whole question of how Nurse Shelby -- you didn't want Nurse Shelby to see your medical records and that the form was blank, did you have an understanding of how that form was going to get filled out with names of providers?

A. No.

Q. And in fact the way you filled it out, the way you provided information to CorVel was you had to identify who your providers were, correct?

A. Yes.

Q. Because they wouldn't know that otherwise.



A. Correct.

Q. Okay. And this limitation for the past two years, was that something that you asked for or did they suggest it, CorVel suggest it?

A. I believe in the policy CorVel had that I read that says they only go back two years.

Q. And what policy are you talking about from CorVel?

A. They're like HIPAA release that they had.

Q. You mean the actual release that you signed?

A. Yes. I believe I read that in there somewhere.

Q. Why don't you go back to Nawara 36. I don't see any limit there. Do you see -- if you see it, please let me know.

A. I read somewhere that it goes back two years. I do remember also seeing something in this pile here that says it was January 1st of 2016 from the actual time that they requested the records, which kind of made it two years there, too. I forgot where it was.

Q. So do you have any independent

recollection of reading a CorVel policy that limited -- let me finish -- that limited it to two years?
A. I don't know.
Q. Did you ever have any other conversations with Michelle Sarocka?
A. No, ma'am. I believe it was that one time on the phone.
Q. Do you know what treaters CorVel -- the records of what treaters -- let me rephrase that. Do you know what treaters CorVel -- let me start over.
Do you know how many treaters you identified for CorVel?
A. I don't understand.
Q. How many treaters that you would have had in the previous two years did you identify for CorVel so that they could go get records?
A. I only ever seen my primary doctor. I don't really get sick. Don't go to any kind of therapy. I don't do any of that.
Q. Did you identify Ms. Hogueisson as a treater?
A. I don't know if they asked that at that



moment. I believe it might have been asked by the doctor there, by Ms. Goldstein, I believe it is.
Q. Dr. Goldstein asked you about that?
A. I believe so.
Q. So after you had the conversation with Ms. Sarocka and you -- well, after this conversation with Ms. Sarocka, what happened next?
A. I believe she said that she obtained my records, and then when they were ready, they would tell me when my interview was to be scheduled, my appointment.
Q. Did you have any conversations with anybody else at CorVel prior to hearing about when your appointment would be?
A. No, ma'am.
Q. Did you have any involvement with the effort to obtain your medical records?
A. No.
Q. Do you know what medical records were provided to Dr. Goldstein for her to review?
A. I have no idea.
Q. Do you know if they were the same



records that Ms. Kurtz provided earlier in the year?
A. I don't know.
(WHEREUPON, Nawara Deposition Exhibit No. 38 was marked for identification.)
BY MS. MARMOR:
Q. So Mr. Nawara, the court reporter has handed you Nawara 38, which is an e-mail from Michelle Sarocka dated September 8, 2017 to you with appointment information. Do you see that?
A. Yes, ma'am.
Q. This was about three weeks after you had signed the FFD -- excuse me -- the HIPAA release form, correct?
A. Yes, ma'am.
Q. And in fact attached to this is a letter explaining where you should go. Do you see that? It's CCSO 1411?
A. Yes, ma'am.
MR. LINDEN: I'm sorry.
MS. MARMOR: 38.
MR. LINDEN: This one.
MS. MARMOR: Did I give you guys the wrong



thing?
MR. HENRETTY: This is the one you gave us.
MS. MARMOR: I'm sorry.
MR. LINDEN: Want to go off the record for a second and figure out the exhibits?
MS. MARMOR: Make sure that I've done this. Can I see that one?
MR. LINDEN: Everybody agree to go off?
MS. MARMOR: Off the record, yes.
VIDEOGRAPHER LEHMAN: We are off the record. The time is 3:45 p.m.
(WHEREUPON, a discussion was had off the record.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 3:46 p.m.
BY MS. MARMOR:
Q. Okay. My apologies. I was showing you the wrong document before. If you take a look at Nawara 38, that is a September 8, 2017 e-mail from Michelle Sarocka to you about appointment information, and attached to it is a letter, if you go two pages in, and that's telling you to go to Isaac Ray Forensic Group on September 11 and September 12, 2017, correct?

A. Yes.
Q. Okay. And again, just so we're clear, this is about three weeks after you signed the HIPAA release form, correct?
A. Yes.
Q. Thank you. If you could go back to Nawara 4, please. If you want me to find it for you, I'd be happy to.
(WHEREUPON, there was a short pause.)
(WHEREUPON, a discussion was had off the record.)
BY MS. MARMOR:
Q. If you could go to Page 4 of Nawara 4, please. If you could go to the last paragraph on the page that says, At the time of the examination here. Do you see that?
A. I do.
Q. Officer Nawara explained he had been out of work for many months and that this was certainly a stressor, but that he has been working several part-time jobs to make ends meet. Is that an accurate statement?
A. Yes.

257

Q. And then it says, Since leaving work in mid-November, he sought treatment in the form of individual counseling with Karolina Hogueisson, a therapist who was apparently the wife of a co-worker and someone who used to offer services at the jail, in order to discuss the stress associated with the work issue. Do you see that?
A. Yes.
Q. Is that an accurate statement?
A. Yes.
Q. And she refers to three notes were available for review, a 2-11-17 intake and 2-17-17 and 4-11-17 progress notes. Do you see that?
A. I do.
Q. We looked at those earlier today.
And it says, No psychiatric diagnosis is offered in any note beyond the first session when mild symptoms without significant life dysfunction are noted. Do you see that?
A. Yes.
Q. Have you suffered any significant life dysfunction as a result of your dispute with

258

your employer?
MR. LINDEN: Objection. Foundation, calls for medical conclusion.
THE WITNESS: No.
BY MS. MARMOR:
Q. And then it says -- you see where it says at the bottom, it says and -- let's see. See where it says, Subsequent notes reflect adaptive functioning. Do you see that? Bottom of the page. It's the second to last -- the end of the second to last line. Same page. See where it says, Subsequent notes reflect adaptive functioning?
A. Yes.
Q. Okay. And then it says, And, goes to next page, decreased stress and symptomatology. If you could go to the next page. And indicate that Officer Nawara proposed to his girlfriend in late February. Do you see that?
A. Yes.
Q. And then it says, It appears that Ms. Hogueisson referred Officer Nawara to Dr. Kroll -- I think she misspells the name -- after discussion about the ongoing fitness for

259

duty process on 2-17-17, correct?
A. Yes.
Q. And you denied in your interview with Dr. Goldstein ever experiencing significant psychiatric symptoms in your life, and while you described understandable stress and frustration with the work situation in Cook County, you denied significant life dysfunction in any critical area, is that accurate?
MR. LINDEN: Objection. Form of the question, compound.
THE WITNESS: When you're talking to the doctor that your employer sent you to, and you're there because you've been wronged, you don't want to sound like they got you down. So you go ahead and keep your chin up and go in there and tell them everything is good. That's what I said.
BY MS. MARMOR:
Q. So are you saying that you didn't tell her the truth?
MR. LINDEN: Objection. Argumentative, misstates the testimony.
THE WITNESS: I didn't want to let anybody

260

know all the bad things that this place does to me or that I feel how when things happen or that all this has to happen. I mean. . .
BY MS. MARMOR:
Q. So you're saying that you were not completely forthcoming with her?
MR. LINDEN: Objection. Argumentative, asked and answered.
THE WITNESS: Yes. I wasn't completely forthcoming with her.
BY MS. MARMOR:
Q. Then it says, and I'm really confused by this, and I feel like there might be a date inc' -- something wrong here. Of other potential interim stressors since November 2016, Officer -- oh, maybe I misunderstood. Of other potential interim stressors since November 2016, Officer Nawara reported that he and his fiance split up and ended their nine-year relationship.
So you didn't split up in November 2016, it was sometime after April of 2017?
A. Yes.
Q. Okay. If you go to Page 6 of Nawara 4. Do you see where on the bottom paragraph there's



a sentence that begins, In this regard?
A. Yes.
Q. It says, In this regard he may become sarcastic at times or defensive, his frustration tolerance may diminish periodically, and he may present himself as accomplishing and taking on big/important matters, parenthesis, quote, I need to follow through on this complaint and lawsuit to help others, end quote. And another quote, I have made new policy by insisting my medical records go directly to CorVel rather than Human Resources, end quote, et cetera.
Do you recall making those two statements in quotes to Dr. Goldstein?
A. I do.
Q. And reading on she says, Notably, the latter is not so, according to CorVel. At the time the initial examination was requested on 11-18-16, providing medical records to CorVel was in fact an option. Do you see that?
A. Yes.
Q. Did you have any discussion with Dr. Goldstein about that?
A. Not that I can recall, no.



Q. Has anybody ever told you that this was in fact the case?
A. Not that I knew. If I had that option, I would have done that. If I believed that option was there, I would have done that.
Q. And you're aware that Dr. Goldstein, based on her interview with you and whatever else she considered, declared you fit to return to work, correct?
A. Told me so at the end of it.
MS. MARMOR: Can I take a break?
MR. LINDEN: Sure.
VIDEOGRAPHER LEHMAN: We are going off the record. The time is 3:55 p.m. This is the end of Videotape No. 4.
(WHEREUPON, a short recess was taken.)
VIDEOGRAPHER LEHMAN: We are back on the record. The time is 4:03 p.m. This is the beginning of Videotape No. 5.
BY MS. MARMOR:
Q. Officer -- excuse me, Mr. Nawara. Could you please go back to Nawara 4, and go to Page 4 again. You see where you say in



the second full paragraph, the one that starts, Of the 11-18-16 meeting in Human Resources, do you see that paragraph?
A. Yes, ma'am.
Q. You see towards the end that it says, He added that because he believes Nurse Shelby and Superintendent Jones-Hayes are personal friends. Do you see that?
A. How far down are you?
Q. Almost towards the end.
A. Yes. I see it.
Q. It says, He added that because he believes Nurse Shelby and Superintendent Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources.
So did you actually tell Dr. Goldstein that you believed Nurse Shelby and Superintendent Jones-Hayes are personal friends?
A. No.
Q. You didn't tell her that?
A. No. I thought I. . .
Q. So she has that wrong?
A. It's my belief. I didn't tell her

they're personal friends. It's my belief they are. What other reason would somebody go ahead and do this to somebody they have no idea -- they never met before? What motivation would they have?

**Q. I was asking you a different question. Did you say to Dr. Goldstein that you believed that Nurse Shelby and Superintendent Jones-Hayes are personal friends? That's the question I'm asking.**

A. I believe they know each other, yes.

**Q. No, I'm not asking that question. I'm asking did you say that in your fitness for duty examination to Dr. Goldstein? Did you tell Dr. Goldstein that you believed Nurse Shelby and Superintendent Jones-Hayes are personal friends?**

A. I don't know.

**Q. You don't know, but you believe -- whether or not you said it to her, you actually believe it, correct?**

A. Again, it's my belief that if somebody is willing to do this to you, and they've never met you before, they have to have some sort of relationship with somebody else to be able to

265

do that. Why would you just up and do that to somebody?

**Q. Well, Rebecca Reierson was in the room. Why didn't you make an assumption that she was friends with Jones-Hayes?**

MR. LINDEN: Objection. Asked and answered, argumentative.

THE WITNESS: Because it's my belief that she was innocent to begin with in the whole process, and Jones -- Winifred Shelby didn't inform her what was about to happen because she seemed very uncomfortable during the whole questioning about Winifred Shelby towards me while she was sitting there.

I actually felt bad for her at one point because of the fact that she didn't look like she was in on what was about to happen to me. She seemed very uncomfortable, and that's at the point on the second half of that when Mark Robinson says this is the incident -- I forgot how he words it. But when he refers back to the September incident, this is where she goes ahead and she puts her head down, and she says we only heard about this two days ago. I

266

can tell that she was very uncomfortable that she was dragged into something she didn't want to be in. What could they do, right?

BY MS. MARMOR:

**Q. So that was your assumption about how she felt.**

A. Correct.

**Q. Okay. So you don't actually know that Nurse Shelby and Superintendent Jones-Hayes are friends, correct?**

A. Correct.

**Q. And you had never met Nurse Shelby before that day, correct?**

A. Correct.

MR. LINDEN: Objection. Asked and answered.

BY MS. MARMOR:

**Q. And you made -- and you made the assumption that Rebecca Reierson wasn't friends with Jones-Hayes because you perceived her as to be uncomfortable in the room?**

A. No, that's not what I said. My assumption was that because of how uncomfortable she looked like she felt in the room, that she wasn't advised about what was about to happen

267

right at that moment.

**Q. But I had asked you why you made the assumption that Nurse Shelby and Jones-Hayes were personal friends, but you didn't make that assumption about Reierson.**

A. Because she was giving signals as a person who wasn't informed about anything. She could have known her, but she wasn't the one making false accusations at me and actually saying that I have to be found unfit for duty.

**Q. So if you didn't feel that Ms. Reierson felt the same way that Nurse Shelby felt, and if you didn't feel that Ms. Reierson was making false assumptions about you, why didn't you contact Ms. Reierson when you got that letter in November of 2016 and say I don't feel comfortable sending my records to Nurse Shelby, is there some other way we can do this?**

A. Because she had all this time in that interview alone to stand up and say this isn't right what you're doing to him, and I don't want to be a part of it, and she could have walked out at any time. Instead, she chose to sit there and be quiet and take on responsibility

268

that Nurse Shelby was doing to me.
Q. So is it your understanding, do you have any basis to believe that Rebecca Reierson disagreed with the decision to send you for an FFD apart from your personal interaction with her on that day where you assumed that she had a reaction to what Nurse Shelby was saying?
A. I believe if someone informed her of some information about an officer, and that information was that that officer was very threatening or he got, I don't know, overly excited or angry or something of an intimidated form to someone else, a fellow colleague, and this is what she was told, she'd get the impression that somebody -- that the person they were about to interview was that type of person.
But I could tell by what was happening that no one informed her of anything, that Nurse Shelby made the accusations that she made, Rebecca Reierson saw how I was, and realized didn't know what was going on, and that's when she felt uncomfortable.
Q. Do is it your belief that Rebecca Reierson didn't know about any of Superintendent

269

Jones-Hayes' accusations about what happened in September before that meeting?
A. Well, she said, We only heard about this two days ago. So I'm not exactly sure what they told her.
Q. Okay. But who's the "they"?
A. I don't know.
Q. So are you saying that somehow -- so is it your testimony that you don't believe that Rebecca Reierson knew anything about what had happened with Jones-Hayes prior to her meeting with you?
MR. LINDEN: Objection. Asked and answered. Objection. Asked and answered.
MS. MARMOR: I'm trying to understand his testimony because he's claiming that she didn't know.
MR. LINDEN: Well, still asked and answered regardless of whether you understand what his answer was. He answered it. But go ahead.
BY MS. MARMOR:
Q. Please answer my question. Is it your testimony that you believed, based on simply the way she was acting in that meeting, that she

270

didn't know anything about what Superintendent Jones-Hayes had said that you did?
MR. LINDEN: Objection to form.
THE WITNESS: Prior to -- before that day, yes. Two days before that day she said, We only heard about this two days ago is what she said.
BY MS. MARMOR:
Q. Okay. And did you think that Nurse Shelby knew something before two days prior to that?
A. I don't know.
Q. So I'm trying to understand why you make the distinction and you say that you don't think that Nurse -- excuse me -- that you don't think that Ms. Reierson knew anything, she walked in the door, and that it was all being driven by Nurse Shelby?
MR. LINDEN: Objection. Asked and answered for the third time and form.
THE WITNESS: I can't lay a piece of paper down for you so that you can read about any of it like you're doing with me here. I can only tell you I do this job every day, and I try to do it the best I can.

271

I have a lot of experience having to interpret whether someone is going to be safe or unsafe so I can protect everybody around me. I do this every day, assessing people and looking to see who might be good and who might be bad, and even if this guy is acting like he's okay, will he be okay, and will this gentleman jump on that? It's what I do. So it's all feeling. I don't know.
BY MS. MARMOR:
Q. So it's your feeling about what she thought.
A. Correct.
Q. Slightly related, but I noticed that you're injured today. How did you get your injury?
A. I was responding to an alarm call and lost my footing on the sidewalk and smacked my face into a fence. I don't understand.
Q. I think you did. You answered the question.
A. Right. I don't understand the relevance.
Q. Relevance is not an objection at a

272

deposition, sir.
MR. LINDEN: He didn't object.
BY MS. MARMOR:
Q. Have you seen a psychiatrist or therapist since your fitness for duty exam?
A. Which one? I have had two.
Q. You have seen psychiatrists?
A. I have had two fitness for duty exams.
Q. Oh, what was the other one?
A. One with Dr. Kroll and one with --
Q. Have you seen a psychiatrist or therapist since taking the fitness for duty exam through CorVel?
A. No, ma'am.
MS. MARMOR: I think I'm ready to pass the witness.
MS. HONINGFORD: I don't have anything.
MS. MARMOR: Do you want to switch places with me?
MR. HENRETTY: Yes. I'm going to cough right in the microphone.
MS. MARMOR: Do you want a Ricola?
MR. HENRETTY: Just in case. I don't think I'm going to go that long. Am I good? Can you



hear me?
EXAMINATION
BY MR. HENRETTY:
Q. All right. Mr. Nawara, my name is Lyle Henretty. At the beginning I mentioned my name. I represent Jones-Hayes.
A. Yes, sir.
Q. I'm going to just ask you a few questions. I'm going to try very hard not to repeat. I know you've been here a while. So I'll try to move through it, but I'm going to jump around a little because of that.
We talked a little bit about the -- we talked a lot about the day of September 28, 2016 today, right?
A. Yes, sir.
Q. And to the best of your knowledge as you sit here today we have already discussed all of the conversations that you had with Superintendent Jones-Hayes that day?
A. Yes.
MR. LINDEN: Objection, form.
BY MR. HENRETTY:
Q. Are there any that you can think of



that we haven't already talked about today?
A. No, sir.
Q. Okay. So in the complaint you mentioned that during -- we talked a little bit about it before, that when Jones-Hayes and you were in the office together, that she had been -- I think the way in the complaint was hitting you with her finger. Does that mean she's poking you?
A. Yes. She was kind of stressed about everything that happened, so she kind of said, You, you should have been the one who kind of made sure this didn't happen.
Q. Was she making contact with you?
A. Yes.
Q. About how many times would you say she did that?
A. Four, five?
Q. Was it all in a row or was it over the course of --
A. Well, yeah, all in a row.
Q. Okay. And in the complaint it states that during that time while she was speaking to you, that she spoke to you in a condescending



voice.
A. Yes.
Q. Would you describe to me how her voice was condescending?
A. She was very aggravated, kind of, Officer, you, this, addressing my rank. She was just upset and yelling, and it was unnecessary. It was just us. There weren't any detainees in the immediate area or anything like that. Didn't need to be that way.
Q. You say she was yelling. Sort of subjective. More than just a raised voice? Was she actually yelling or how loud did her voice get?
A. I don't know. I mean, she wasn't screaming at the top of her lungs or anything like that. She was just upset.
Q. And you testified earlier that while she was poking at you, you stepped back, is that right?
A. Yes, sir.
Q. How many steps back? I think -- correct me if I'm wrong. I'm just trying to move things along. You stepped back to the

wall, is that right?
A. Well, the first time didn't actually touch the wall. Step back, kind of stepped back, but when she motioned at me again because she was still in that motion, probably two steps total before I hit the wall.
Q. That was my next question. Okay. Were you afraid something was going to happen?
A. In what way?
Q. Were you afraid of Jones-Hayes?
A. I don't understand.
Q. Were you physically afraid of Jones-Hayes?
A. No. I mean, no. None of us have never seen another officer or supervisor or anybody ever strike anybody or anything to where there was some kind of damage. I didn't think she was going to hit me.
Q. Have you seen in your career -- well, strike that.
While you were at the Cook County Jail, did you see supervisors yell at subordinates?
A. Um-um.
Q. About how often?



MS. MARMOR: You have to answer yes or no.
THE WITNESS: Yes.
BY MR. HENRETTY:
Q. Very good. About how often did you see that?
A. Oh, I don't know. I mean, it's a very heated situation lot of times with detainees, and things can get hectic, and it happens. It's just something for the most part that I watch, and it just rolls off people's shoulders and keep going. It's part of the job.
If it was something where somebody might have taken offensively, well, you know, again, not in front of detainees, they'll walk off in a corner. Hey, earlier about that, sorry about that, and whatever, and we just go on.
Q. And you might have answered this before, and I apologize if you did. Did you -- have you seen Jones-Hayes since that day?
A. I think I was in Cermak one time in the basement almost in that area. I don't know if you guys remember, but the area where the doctors triage the inmates, I was taking somebody over there. I think I was bringing



them from the hospital. She happened to walk through, but I don't think she saw me. If she was walking through with some people, that was it. We had no interaction. I don't think she even saw me.
Q. So since that day you've had no interactions with Jones-Hayes?
A. No.
Q. Haven't spoken to her?
A. Right.
Q. All right. What if any role -- or strike that.
Do you know what if any role Jones-Hayes had in your fitness for duty exam?
MR. LINDEN: Objection to form of the question.
THE WITNESS: I mean, I don't know of any. It has to stem from that because that was the incident. Educated guess that she had to be the one to get the ball rolling. That's about it.
BY MR. HENRETTY:
Q. What do you mean by ball rolling?
A. To make the phone calls to go ahead and



say he did this or to combat my complaint that she said that I wrote.
Q. Do you know whether or not as of November of 2016 she had seen that complaint against her?
A. I have no idea.
Q. And when you said you made the complaint, you made that with -- who did you make the complaint with?
A. Where I sent it to?
Q. Where did you send it, right.
A. In the complaint it says you can send it to anyone in your chain of command that you feel comfortable with, so I just sent it to the highest guy, Superintendent Brogan.
Q. We saw that earlier.
A. Yes, sir.
Q. And do you know -- and again, I'm sort of setting up the next question, so I apologize if you answered this before. Do you know what Brogan did with it, what if anything Brogan did with it?
A. The short answer is no, but it's his obligation to forward that to the proper people.

Q. Do you know who the proper people were?
A. Office of Professional Review.
Q. And that's what we have been calling OPR today?
A. Yes, sir.
Q. Do you know what point, if any point, OPR lets people know they're being investigated?
A. Only when they need interviews. Otherwise, I believe a case can be ongoing, and if they're able to dismiss it or get rid of it somehow without your closing, and they don't need you, you'll never know.
MR. HENRETTY: I don't have any other questions.
MS. HONINGFORD: I don't have anything.
MR. HENRETTY: You guys don't have any questions?
MR. LINDEN: No.
MR. HENRETTY: Sarah?
MS. MARMOR: No. I'm done.
MR. HENRETTY: I think we're all done.
MR. LINDEN: We'll reserve signature.
VIDEOGRAPHER LEHMAN: This marks the end of today's deposition. The time is 4:22 p.m.

281

We are now off the record.
(WHEREUPON, the deposition was concluded at 4:22 o'clock p.m.)

282

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. ) No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, et al., )
Defendants. )

I, JOHN NAWARA, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on October 2, 2019; that I have read the foregoing transcript of my deposition, and affix my signature to same.

__________________________
JOHN NAWARA

Subscribed and sworn to
before me this day
of , 2019

Notary Public

283

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARLENE L. KING, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on October 2, 2019, personally appeared before me, at 333 West Wacker Drive, Suite 450, Chicago, Illinois, JOHN NAWARA, in a cause now pending and undetermined in the United States District Court for the Northern District of Illinois, Eastern Division, wherein JOHN NAWARA is the Plaintiff, and COUNTY OF COOK, a unit of local Government, et al., are the Defendants.

I further certify that the said JOHN NAWARA was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

284

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for the respective parties and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 16th day of October, 2019.

Marlene L. King

NOTARY PUBLIC, COOK COUNTY, ILLINOIS



MCCORKLE LITIGATION SERVICES, Inc.
200 N. LaSalle Street Suite 2900
Chicago, Illinois 60601-1014

CERTIFIED MAIL
October 16, 2019
MR. JOHN NAWARA,
[redacted]
[redacted], Illinois 60480
IN RE: Nawara vs. County of Cook
DATE OF DEPOSITION: October 2, 2019

Dear Mr. Nawara:

Your deposition in the above-entitled cause is now ready for reading and signing as required by law.

Please call the Signature Department upon receipt of this letter to schedule an appointment to come to the above address to read and sign your deposition. You have 28 days from the date of this correspondence in which to appear for reading and signing.

If you fail to appear or notify us so that we may make arrangements for another appointment, your deposition will be completed and forwarded to the attorneys and will be "... used as fully as though signed."

______ Procedure outlined in Rule 207 (a) of the Illinois Supreme Court Rules

______ Procedure outlined in Rule 30 (e) of the Rules of Civil Procedure for the U.S. District Courts

Sincerely,

Cindy Alicea
Signature Department

Court Reporter:
MARLENE L. KING

cc: All attorneys of record

#

#16-793
119:8

(

(a)
286:18
(e)
286:19

0

000165
244:21
000166
91:23
000221
199:24
016-09-28
92:8

1

1
14:13 31:14,16,20 42:3 83:24 90:23 172:2 213:2,7 236:24 245:23
10
82:23 121:17,21 134:15 235:20,21
108
69:24
1093
190:20
10:00
103:3
10:17
37:9
10:19
37:13
10:41
102:23,24 103:4
11
69:13 154:3,7 200:3 201:2,6 256:23
11-18-16
142:12 164:22 262:19 264:2
11-30-16
165:17
11:20
90:22
11:32
91:4
11:58
112:23
12
14:13 17:20 69:13 88:10 155:18,22 256:24
1202
227:16
1291
235:7
1295
235:19
12:00
113:4
12:55
160:9
13
21:15 58:20 59:16 63:20 157:18,22 219:17 222:5 224:4
14
22:9 162:16,20 164:8
14.4(1)(B)
119:24
1411
255:19
15
46:22 132:20 134:15 136:14 170:14,18 184:8
16
16:14 22:20 62:17 171:21 172:1 175:7 177:20 235:8 286:4
164.508
238:24
16th
285:14
17
9:10 22:20 82:23 88:10 122:4 175:2,6 200:4 224:18 245:16
17-CV-2393
283:7
18
37:22 117:6 125:17 160:23 167:3,6,10 172:18 174:10 178:17,21 179:23 208:13 209:17 211:14 212:2 226:19 231:24 241:12 242:22
18th
154:9 159:9 160:18 209:2
19
16:14 123:7 186:5,9 187:4
1993
15:18
1998
15:14,18 16:21 17:23
19th
30:11 124:11 158:1, 11
1:00
160:5
1:37
160:14
1st
213:6 252:20

2

2
32:11,22 37:17,22 83:24 91:5 160:10 246:5 283:14 284:7 286:7
2-11-17
258:13
2-17-17
258:14 260:1
20
16:15 28:12,16 60:20 75:12,17 136:14 189:3,7
200
9:3
2002
20:6
2009
202:3
2013
21:21 22:8
2014
21:15,21
2016
18:6 19:6 20:7,24 26:20 27:4,5,8 30:12 31:22 37:23 43:14, 15 58:20 59:13,16 62:17,18 63:20 80:23 93:7 117:9 118:24 119:9,21 122:4 125:17 151:12,24 160:19,23 163:5 164:13 166:13 167:3,6,10 169:17 170:21 172:2,18 174:10,21 175:7 177:20 178:1,12,23 189:8 191:3 198:2 208:13 209:16,17 211:14 212:2 216:23 217:8 246:16 252:21 261:15,17,21 268:16 274:14 280:4
2017
14:7 21:17,18 27:7 28:7 29:13,17 30:8 69:13,14 110:1 144:8 151:11,20 184:11 186:13 189:10,22 190:24 191:23 193:1 200:3, 4 201:2,6 202:15 207:8 208:1,10 210:4 213:2,8 216:24 219:18 222:6 224:5,18 225:18 226:19 227:21 231:24 233:5,7,21 234:21,23 235:9,14 236:24 237:18 238:5 243:11 245:17 255:10 256:19,24 261:21
2018
82:5 117:6 246:15
2019
9:6 28:4 283:14,20 284:7 285:14 286:4, 7
207
286:18
20th
225:15
21
178:4,23 189:17,21 216:23 217:7
21st
186:11
22
191:14,18,21 225:17
23
192:20,24
2393
9:10
23rd
23:3,24
24
194:15,19 195:23 197:17 200:1 201:1
25
207:19,23 210:23 219:12 221:3
26
114:13 212:16,20
26(a)(1)
115:13
27
215:6,9,17 219:11
2700
126:14
28
15:14 17:22 43:15 59:12 62:18 80:23 93:7 117:9 208:1,10 216:16 219:9,13,16 221:17 250:18 274:14 286:13
28th
221:5
29
118:24 222:2,5 233:7,21
2900
9:4 286:1
2:00
120:11
2:55
226:4
2nd
9:5 119:9,21

3

3
58:7,13,18 67:18 69:22 160:15 226:5 228:17 238:5
30
163:5 164:13 166:12 169:17 170:21 189:7 209:16 224:11,15 243:11 286:19
30th
164:19 171:4 191:22 215:2
31
186:12 216:23 226:11,18 230:1
31st
126:11
32
231:19,23
33
233:15,19
333
9:7 284:8
34
234:15,19
35
237:13,17
36
245:4,6,9,13 252:15
37
250:12,16
378032
81:8
38
255:5,9,22 256:19
3:00
113:7,9,13,22 120:10
3:06
226:14
3:45
256:11
3:46
256:15
3:55
263:14

4

4
68:18,23 69:23 141:20 142:3,8 150:6 226:15 234:21 257:7,14 261:23 263:15,23,24
4-11-17
258:14
4-27-75
11:13
40
75:9 76:1 104:6
43
92:9
44
11:16,17
450
284:9
4:03
263:19
4:22
281:24 282:3
4th
235:13

5

5
31:22 38:7 80:15,20 81:3 82:19 91:15,16 235:20 237:18 263:20
5/8-2001
238:22
5/8-2003
238:22
50
153:10
500
23:10
5801
124:21

6

6
82:5 91:14,19 92:2 261:23
6-2
38:7
60
75:9 76:1 130:7
60480
286:6
60601
9:4
60601-1014
286:2
60606
9:8
6:00
120:11

7

7
112:18 114:12 189:9
700
234:22 235:4
735
238:21,22
7:00
120:10

8

8
116:16,20,21 117:1 189:21 190:24 191:23 192:24 210:4,12 215:22 227:21 255:10 256:19
8-2016-14992
37:24
8469
11:7

9

9
38:2,13 40:17 116:21 118:18,23 119:20 120:17
93
15:17
9:00
127:12
9:48
9:9
9:58
93:7

A

a.m.
9:9 37:9,13 90:22 91:4 93:7 112:23
ability
13:10
above-described
246:8
above-entitled
286:9
above-named
238:13
absolutely
11:10 72:18
Academy
17:3,9,16,19,23,24 18:1,3 22:22 23:1,22 37:3
accepting
35:4
access
176:21 191:8
accidentally
213:11
accommodate
13:4
accomplishing
262:6
accordance
238:21
account
203:11
accumulated
30:13 205:18
accurate
71:14 73:16 76:12, 22 80:11 81:15 83:11 84:18 85:16 115:13,23 142:16 143:22 146:9,11 150:14 198:8 200:12 201:20 211:20 257:23 258:10 260:9
accurately
73:24
accusations
249:18 250:9 268:9 269:19 270:1
Accused
81:6
Aces
27:1,15,20,22 28:7 29:6 203:22,24
acquaintance
193:22
acronym
62:4
Act
230:21
acted
137:5 181:10 208:22
acting
57:13 217:2 219:24 270:24 272:6
action
36:21 62:9 64:1 159:1 171:12
actions
182:23

**active** 47:19 165:2 208:15
**activities** 200:10
**actual** 23:21 44:22 82:8,16 156:11 164:9 252:11,21
**ADA** 188:1 217:10,13,17 223:6,7
**adaptive** 259:9,12
**add** 39:13 235:24
**added** 71:18 73:10,20 76:15 264:6,12
**addition** 209:15
**Additional** 196:10 197:24 200:6 201:15
**address** 11:6 34:23 139:18 161:16 162:24 163:1,10,23 172:22 189:23 192:1 213:14 286:12
**addressed** 195:21
**addressing** 276:6
**adds** 223:12
**adequate** 225:1
**admission** 238:17 239:6
**admissions** 50:17 87:10
**advance** 207:2
**advancement** 183:11,14
**advantage** 85:13
**advice** 194:5 197:2,5 212:14
**advised** 267:24
**affect** 13:10
**affix** 283:16
**affixed** 285:13
**afford** 205:24
**aforesaid** 283:14 284:19 285:2
**afraid** 277:8,10,12
**aggravated** 276:5
**aggressive** 137:14 208:22 249:7 250:3
**agitated** 76:18
**agree** 112:13 143:4 145:19 164:16 256:8
**agreed** 11:8 113:24 144:10 145:10 247:5
**Agreement** 234:22,23 235:3,13, 17
**agreement/s.e.a.m.** 120:1
**agrees** 72:24
**ahead** 58:10 102:8,9,22 103:3 131:9 249:3 260:16 265:2 266:23 270:20 279:24
**ailments** 199:13
**airport** 60:16
**alarm** 272:17
**Alicea** 286:22
**allegation** 153:10 188:3
**allegations** 180:21
**alleged** 117:5 208:21
**allegedly** 110:5
**alleviate** 200:9
**allowed** 13:2 155:1 184:18 205:7 206:22
**altercation** 43:24 62:15 108:8, 12 119:4 138:22 150:17 152:3,9 175:13
**alternative** 202:12 203:16
**amazed** 64:24
**Amazon** 29:8,9,12,14 204:5
**Amended** 153:9
**Amendment** 231:1
**Americans** 230:21
**amount** 85:8,9 86:20,21 168:17
**anger** 44:14 49:2
**angle** 109:18
**angry** 134:24 135:2 269:12
**ankle** 45:16 73:8
**annoyed** 76:6,16
**answers** 12:21 117:1 171:11
**Anthony** 11:3,4
**anticipate** 12:22
**Anxiety** 228:7,8
**anymore** 67:8
**anytime** 55:11
**apologies** 256:17
**apologize** 49:8 65:21 278:18 280:19
**apparently** 258:4
**Appearance** 228:15
**appeared** 182:7 284:8
**appears** 31:21 105:8 154:17 175:12 180:8 202:16 215:9 226:20 259:21
**apples** 18:19
**application** 17:4,5 21:19
**applications** 22:15
**applied** 16:24 21:21 22:2,8 61:5
**apply** 19:2 21:13 22:18 207:10
**appointed** 27:23
**appointment** 23:21 24:13 125:20 126:3 183:17 254:13,16 255:11 256:20 286:12,15
**appointments** 50:20 236:6
**approach** 53:8
**approximately** 22:9 127:10
**April** 28:3,4 30:8,18 201:2,6 202:15 204:12 261:21
**ARB** 15:24 16:1,2
**Archer** 11:7 286:5
**area** 41:5 43:23 45:24 46:9,10,21 47:19 50:7,9,14,15,23 51:6,11 52:13 58:24 65:12,14 71:22 75:4 78:15 83:14 84:5,10, 15 85:5 87:9 92:22 93:8 94:15,22 101:1, 4,19 102:12 103:7 127:1 155:15 161:16 195:10 260:9 276:9 278:21,22
**areas** 60:13
**argue** 213:18
**argues** 216:14
**argumentative** 35:20 145:6 203:14 214:16 220:10 243:1 250:5 260:22 261:7 266:7
**arise** 74:1
**arisen** 207:7
**arrangements** 286:15
**arrest** 23:11
**arrive** 134:14
**arrived** 76:5
**Article** 62:2,6 119:16,23 120:2,5
**asks** 117:3
**assess** 69:18
**assessing** 272:4
**assessment** 79:7 195:21,24 228:18,23
**assigned** 33:2 56:23 65:13 78:15 83:3 98:22 99:6,11,13 100:5 119:22 123:19 125:18 126:8
**assignment** 56:9 78:7 122:16 133:19
**assistance** 198:17
**assistant** 15:24 16:2
**assume** 12:12 72:14 176:11, 19 213:24 237:5
**assumed** 165:21 269:6
**assumes** 165:20 237:3
**assuming** 33:20 72:16
**assumption** 178:2 266:4 267:5, 18,22 268:3,5
**assumptions** 268:14
**attach** 180:4 208:5,6
**attached** 67:20 119:7 172:8 179:19 187:4 190:3, 7 208:2,9 211:7 215:21 216:15 235:2 255:17 256:21
**attaches** 180:4 186:15
**attaching** 58:18 154:9 226:24
**attachment** 119:12,20 156:11 179:3 208:3 234:21
**attachments** 216:16 234:24
**attempt** 51:16 143:16 145:23 146:1,10,24 242:14, 17
**attempted** 107:12
**attorney** 118:9 184:22
**attorney/client** 111:22 118:8 213:12,21 215:10 230:9,12
**attorneys** 285:6 286:16,24
**attorneys'** 186:24
**audio** 81:7
**August** 23:3,24 29:16 245:16 250:18
**authoritative** 54:18 130:6
**authority** 54:5 57:13
**authorization** 172:11,14 179:20,24 187:5 190:4,8 209:2, 4 211:4 245:16,24
**authorized** 206:14 209:18 245:20
**authorizes** 245:23
**availability** 27:16
**Avenue** 11:7 286:5
**aware** 51:7 160:1 181:15 182:6 183:16 199:13 216:7 224:23 263:6
**awareness** 182:18

**B**

**B-R-Y** 204:17
**B-R-Y-A-N-T** 204:18
**Baby** 53:5 54:19
**back** 13:14 21:18 37:12 42:2 45:18 47:9 52:23 56:17 64:5 65:1 88:20 89:5 91:3 95:13,15 96:4 99:16 100:19,20,21 103:2 105:18 108:17 113:3,24 120:15 133:11,20 135:23 136:7 140:11,13,20 141:13,20 146:18 152:22 155:2,8 159:3 160:13 166:17 167:19 168:4 169:5 170:1 187:8 197:8 201:8 205:7 209:22 214:13 217:22 221:3,17 226:13 229:11 230:1 239:11,12 242:8,18 243:15 247:14 251:11 252:6,15,18 256:14 257:6 263:18,23 266:21 276:19,22,24 277:3, 4
**backed** 49:2
**background** 14:12 240:14
**backing** 76:20
**backwards** 141:21
**bad** 49:18 55:3 85:12 115:2 261:1 266:15 272:5
**badge** 19:16,23
**badly** 142:14,19
**ball** 279:20,23
**bank** 30:14 203:11
**bargaining** 120:1
**based** 22:17 85:18 103:1 150:9 151:16 152:14 208:19 225:5 240:24 241:2 263:7 270:23
**basement** 43:23 45:23 56:9 71:5,11 83:24 195:10 197:15 278:21
**basic** 11:23
**basically** 30:13 187:9
**basis** 121:6 180:10 187:19 221:14 269:3
**Bates** 69:23 91:22
**Beat** 187:13
**Beck** 228:6,7
**bed** 124:13
**bedtime** 124:11
**befriended** 134:9
**began** 14:7 17:21 71:20 198:2
**begin** 266:9
**beginning** 9:12 27:7 40:8 91:5 160:15 204:2 226:15 242:16 263:20 274:5
**begins** 88:19 95:11 262:1
**behalf** 9:14,16,18,21,24 10:2 216:22 217:2
**behavior** 55:8 65:1 137:14 150:9 151:8,17 225:6 249:7
**Behavioral** 228:15
**belief** 132:23 264:24 265:1,21 266:8 269:23
**believed** 62:14 153:14 161:20,23 178:10 263:4 264:18 265:7, 15 270:23
**believes** 264:6,13
**belonged** 98:3
**bench** 100:12
**benefit** 31:11
**benefits** 31:1 186:21 205:14, 19
**bid** 124:5,21
**bidded** 38:7
**big** 66:21 149:7
**big/important** 262:7
**bigger** 55:19
**biking** 200:11
**billing** 239:7
**billings** 239:7
**bills** 197:9 202:13

203:17,18
**birth**
11:12 238:9
**bit**
85:22 88:18 190:16 274:13 275:5
**black**
134:9
**blacked**
122:24
**blank**
141:8,10 161:7,8,12, 14 162:2 212:5 219:1 230:19 251:14
**bleeding**
96:23
**blocked**
244:24
**blocking**
93:4 102:4
**blocks**
126:17
**blood**
199:16,17,20
**blue**
39:12 42:1 101:23, 24 102:5
**Board**
15:19,22 16:9
**body**
46:13,17
**boss**
58:23 88:14
**bother**
55:2 168:3
**bothered**
240:13
**bottom**
65:24 77:2 81:2 82:24 83:17 122:1,3 150:5,6 154:8 186:10 223:22 226:22 235:21 259:7,9 261:24
**box**
66:1
**break**
13:3,6 88:8 90:20 95:1 135:22 136:2 148:15 160:6 168:6 226:2 263:11
**breaks**
13:2
**breath**
139:19
**breather**
148:21
**bring**
200:10
**bringing**
278:24
**brings**
96:4
**Brogan**
58:19,22 59:4 62:21, 24 67:20 154:17 188:16 280:15,21
**broken**
71:6
**broker's**
15:24 16:2
**brothers**
41:14,18 42:1
**brought**
43:6 181:16
**Bryant**
125:19 204:13,16,19 206:8
**building**
17:7 66:14 99:9,17

126:7,10,12 127:3
**bump**
19:17 20:1,21 65:1
**Bureau**
221:7
**Burke**
9:19,22 153:11,17, 20 167:14 182:1
**burn**
218:2
**Burris**
25:4 231:7,8
**busier**
85:8
**business**
97:22 225:7
**Bustamante**
9:14 79:14,18 147:22 148:2 151:2 160:22,24 215:11 245:9
**busting**
75:13
**buttons**
84:11

**C**

**C-O-D**
98:17
**C-O-D-D**
98:18
**C/o**
81:7 83:2,4,18,19,21 84:24 85:3
**California**
126:11
**call**
17:8,14,15 31:14 50:1,21 72:8 107:3,6 114:6 124:19 125:1 133:6,9 138:8,11,14 144:11,21,24 145:4, 11,16 148:11 166:17,20,22 167:19,21 168:1,3 193:19 196:21 204:12 272:17 286:11
**called**
10:9 25:3 32:4 44:2 56:16 68:14 71:4 82:15 94:10,15 123:21 125:20 133:8,12,14,17,19 134:11 136:10 137:18 138:5 143:23 148:12 149:6,16,20 154:20 165:15,16 166:2 205:9,16 228:11 242:9 251:6
**calling**
54:19 281:3
**callouts**
16:5
**calls**
50:16 115:12,19 118:8 151:13 185:16 214:17 237:2 239:20 259:2 279:24
**calmed**
103:2
**camera**
46:13,17 103:16 109:6
**cameras**
46:10 51:6,9 60:4 110:14
**capacity**
75:4,8,22 95:4

**capitalized**
41:14
**Cappy**
121:23 122:8,10 125:2,9
**care**
38:17 94:16 114:6 246:6 250:23,24
**career**
277:19
**careful**
79:23
**carry**
23:13 195:13
**carrying**
97:11
**case**
9:10 10:16,19 25:16 26:11 29:6 32:2 61:4 68:13 85:14 91:22 114:17 115:10 116:12 153:10 159:19 163:13,15,21 164:2 166:1 178:22 180:3 181:15 221:22 225:4 246:9 248:3 263:2 273:23 281:9
**cases**
25:7
**cause**
12:7 43:3 185:17 243:4,5 284:10,19 286:9
**caused**
198:16
**cc'd**
179:1 222:7
**cc'ing**
215:19,23 224:17 231:24
**CCSO**
69:24 91:23 190:20 193:16 215:11 216:2 227:16 235:7,19 255:19
**cease**
185:6
**cell**
122:24
**Central**
32:16 124:20
**Cermak**
41:3 45:19 56:10 59:9 61:3,14,17 71:5 83:14 84:5 92:22 93:9 95:3 98:23 100:5 103:7 119:4 120:10 124:9,20 195:2,5,7,10 278:20
**Cermak's**
32:16 43:22 195:10
**certificates**
15:3
**certification**
15:9 238:16
**Certifications**
15:8
**certified**
9:2 208:4 286:3
**certify**
284:6,16 285:3,8
**cetera**
77:12,23 262:12
**chain**
68:5 204:23 232:13 280:13
**chair**
100:21
**challenge**
54:5

**challenged**
91:9
**chance**
178:15
**Chaney**
138:2,7
**change**
36:20 90:19
**changed**
19:23,24 244:19
**channel**
131:14
**channeled**
44:14
**characterize**
75:7
**charge**
77:12,23 80:9 120:24 233:4
**Charles**
238:6 239:15
**chase**
52:4
**check**
124:12 228:7
**chest**
47:7 48:17 64:3 76:20
**Chicago**
9:4,8 15:19,22 16:9 284:9 286:2
**chief**
137:19 156:3,20
**children**
14:9
**chin**
260:16
**choice**
114:24 116:5 244:1, 5,6 247:23 248:7
**choices**
248:9
**chose**
268:23
**chunk**
34:12
**Churma**
9:21
**ciid. investigations.**
176:24
**ciid. investigations@ cookcountyil.gov**
175:8
**Cindy**
286:22
**circle**
131:24
**Civil**
238:23 286:20
**claim**
74:23 115:15
**claimed**
108:12 109:4
**claiming**
270:16
**claims**
111:20 115:17 118:10 179:10
**class**
17:14
**classify**
83:24
**clean**
240:14
**clear**
101:11,19 110:17 128:11 129:2 188:6 204:9 225:7 257:2

**clearance**
156:9,17
**clerk**
15:24 16:2
**clerking**
16:1
**click**
110:14
**client**
195:20
**client's**
213:17
**clinic**
102:16
**Clinical**
228:5
**clinics**
94:15 101:22
**close**
15:20 53:2,4 127:20 136:5
**closely**
53:2
**closing**
281:11
**co-worker**
258:5
**co-workers**
128:3,5,13 130:1,4, 10
**coach**
79:20 218:17 248:18
**coached**
146:16
**coaching**
79:21 218:19,20 219:2,3 248:20
**Codd**
98:16,21 99:3
**Code**
238:23
**coffee**
196:22
**colleague**
195:3 269:13
**collective**
120:1
**college**
14:14,15
**colleges**
14:16,19,24
**combat**
248:5 280:1
**combatting**
197:11
**comfortable**
85:24 86:12 195:14 268:17 280:14
**comma**
89:21
**command**
68:5 204:23 232:14 280:13
**Commander**
32:17 33:11,22 35:17 42:5
**comment**
57:17,19 64:12 89:21
**comments**
60:2
**communicate**
219:20
**communicated**
230:10
**communications**
111:22,24 163:20 164:4
**compare**
173:8

**complain**
85:6
**complaining**
64:17
**complaint**
57:8 58:19 59:17 60:7 62:13 63:8,10, 13,20 65:19 66:2 67:14,20 68:4,8,13 80:22 82:8 153:9 178:4 180:21 181:7, 16 182:1,7,12,19 188:14 231:12,15 233:20 262:8 275:3, 7,22 280:1,4,8,9,12
**complaints**
188:7,9,18 231:4
**complete**
140:13 180:12 181:17 221:19,21 223:2,13 238:14 247:6
**completed**
14:13 155:7 169:5 208:3 210:18 225:3 238:16 286:16
**completely**
13:11 75:13 261:6,9
**completes**
179:19
**complies**
236:5
**comply**
71:19 73:11
**composed**
49:7
**compound**
260:11
**Computer-aided**
284:23
**concern**
38:11 223:18 237:20
**concerned**
64:9
**concluded**
282:3
**conclusion**
115:12,20 183:4 237:3 259:3
**condescending**
64:4 275:24 276:4
**condition**
74:22,24 246:7
**conduct**
152:14
**conducting**
227:14
**conducts**
89:8
**Confidential**
92:5
**confidentiality**
123:1
**conflict**
27:10 199:9,14
**confuse**
218:16
**confused**
19:5 143:22 149:3 154:23 261:12
**Conley**
44:4 47:15 50:2 52:10,18 55:17 65:7 71:4 77:6,20 79:8 105:9,15 106:20
**considered**
19:15 20:1,2 227:13 229:7 263:8
**considers**
198:3

**consistency**
27:19
**consistent**
28:21 155:5 206:18
**consists**
142:20
**consultations**
239:4
**contact**
185:5,21 213:14 268:15 275:14
**contacted**
216:21 224:22
**contained**
71:7
**context**
71:10 110:2,3,5
**continue**
33:6 114:4 139:9 140:2
**continues**
36:2 202:10
**continuing**
30:16
**contract**
194:11,12 234:20
**contrary**
206:12
**contributed**
73:21
**control**
32:16 84:3 87:10 113:20 124:20 130:8 213:18
**convenience**
210:22
**conversation**
33:21 34:4,9 35:8,13 36:22 46:7 47:22 62:16 117:5 129:15 147:17 254:6,8
**conversations**
33:18 157:4 158:12, 15 167:1,5,8,12,16 253:6 254:14 274:19
**convey**
40:6
**Cook**
10:3 15:13 16:21 17:6 23:8 25:6,10,13 29:5 69:20 112:6 172:13 173:21 190:8 204:20 213:14 215:11,18 220:1 233:5,8 234:3 235:4 246:10 247:4,17 260:7 277:21 283:8 284:5,14 285:20 286:7
**cookcountyil.gov**
162:24
**cookcountyil.gov.**
172:4 175:9
**cooperate**
236:22
**cooperates**
236:5
**copied**
239:12
**copier**
177:13
**copies**
112:14 153:2,4,21 173:17,18 174:13,14 238:24
**coping**
200:8
**copy**
91:20 111:5,9,14 119:7 153:4,6 154:9, 18 173:15 177:2,3,8, 11,12 189:7 191:21 192:8 210:22 238:14
**corner**
93:19 102:1 142:10 278:15
**Corporation**
246:3,10
**correct**
16:6,19 18:22 19:7 21:10 24:15,23 25:1 30:7 31:1 32:9 34:10 39:6,17 44:10 48:6, 14 50:24 54:10,16 59:13 60:23 63:21 71:8 74:24 79:13,16 80:5,7 82:10,16 87:4,18 93:22 94:4,5 96:1 97:12 99:19 101:13 102:18 103:8,11 104:17 107:19 109:12,13 116:9 118:5,6 119:4, 13 120:12 124:5,6 125:16 129:13,17,23 135:18 140:16,17,21 144:14,24 145:18 146:23 151:21 153:8 155:12 159:20,24 161:4 162:3,4 163:7 164:5,20 165:5 167:14,15,17,18 169:11,12 171:6,18 173:3 175:15 179:15 180:5 181:4,18 182:9,21 185:1 187:6,11 188:1,16 193:9,11 198:12 202:17,21 203:3,11 204:24 209:11 210:1,10 211:1 214:2,6 216:17,24 220:2 222:7 224:5 225:21 227:21 229:10 231:16 233:1,2 234:4 235:5 245:21 247:7 250:19 251:21 252:1 255:15 256:24 257:4 260:1 263:9 265:20 267:7, 10,11,13,14 272:13 276:23 284:24
**correctional**
18:4,5 19:6 26:14,18 28:11 55:20 56:18 69:19 98:8
**Corrections**
194:11
**correctly**
133:15
**correspondence**
193:15 216:15,17 217:13 286:13
**Corvel**
246:3,10 247:2 250:18 251:19 252:4,5,8 253:1,9, 11,14,18 254:15 262:11,17,19 273:13
**cost**
237:22
**cough**
273:20
**counsel**
9:11,13 32:2 48:8 111:15,18 112:5 113:10 117:4,6 138:8 159:2,19,21 163:22 169:18 178:22 214:19 218:17 219:2 285:4, 8
**counseling**
239:5 258:3
**count**
23:22
**counties**
123:18
**county**
10:3 15:13 16:21 17:7 23:8 25:6,10,13 29:5 69:20 112:6 123:20 163:18 172:13 173:21 190:8 204:20 213:14 215:11,18 220:1 232:22 233:5,8 234:3 235:4 246:10 247:4,17 260:7 277:21 283:8 284:3, 5,14 285:20 286:7
**couple**
28:22 29:15 57:5 86:16 95:1 107:8 137:24 139:13 157:9
**court**
12:18 18:17 20:18 31:19 37:20 58:8,16 68:21 80:18 114:11 116:23 118:21 121:20 154:6 155:21 157:21 162:19 170:17 171:24 175:5 178:20 186:8 189:6, 20 192:23 194:18 207:22 212:19 215:16 219:15 224:14 226:17 231:22 233:18 234:18 237:16 245:11 250:15 255:8 283:1 284:11 286:18,22
**courthouses**
123:18,19
**Courts**
286:20
**cover**
11:22 80:21 81:21, 23 226:18
**covered**
209:7
**CPR**
15:8
**created**
39:22
**credentials**
220:4
**criminal**
62:9
**critical**
260:9
**crossed**
236:7
**crystal**
101:11
**cuff**
97:15
**cuffed**
64:5,10,17 65:17 74:2,8,9,15 76:17,19 85:10,19 87:17,22 88:3 97:15 100:10, 13,14,15,21
**cuffing**
72:9,11 84:22
**cuffs**
73:13 83:6,7 98:2 99:18
**curious**
39:23
**current**
22:17 196:1,13,16 197:4,19 198:5,15 228:11
**custodian**
34:19
**custody**
213:18
**cut**
31:1 205:13
**CV**
9:10

**D**

**d"s**
98:18
**damage**
131:3,6 277:17
**Dana**
159:15,18 178:21 219:17 230:3 238:2
**dance**
130:18,19
**danger**
143:9
**dangerous**
73:19,20 74:9 142:21 143:6
**Darin**
120:16,18
**Dart**
9:9,19,22 153:11 231:3 234:3
**date**
11:12 18:1 28:2 63:20 93:14 125:2,9 160:22 166:3,15 201:3 209:8,21 217:15 227:20 233:10,23 235:8 237:9 238:9 240:10 261:13 286:7,13
**dated**
31:21 37:22 58:19 59:15,16 118:24 122:4 178:22 200:3 219:17 224:4,18 231:23 234:21 237:18 238:5 255:10
**dates**
14:4
**dating**
14:6,7 202:1
**David**
9:1
**dawned**
149:14
**day**
36:4 41:9 43:16,21 46:14 51:12 53:12 56:10,19,24 70:4,8, 17 71:3 75:3,11,20 88:2 89:16 90:16 92:22 96:18 98:22 99:7 100:5 103:5 106:14 119:3 120:14 121:13 123:10 125:11,15,22 126:13 127:8 134:4 142:22 150:22 153:17,23 154:18,19 161:3 162:1,13 164:14 169:4 170:21 173:14 174:3 190:13 193:1 237:1 240:8 242:1 243:3,7 250:3,8 267:13 269:6 271:4, 5,23 272:4 274:14, 20 278:19 279:6 283:19 285:14
**days**
16:4 69:15,16 122:2 139:18 159:10 250:18 266:24 270:4 271:5,6,9 286:13
**deal**
48:20,24 196:5 198:16 242:22
**dealing**
195:10
**dear**
233:11 238:12 286:8
**debate**
115:24 116:2
**December**
17:22 159:16 172:2 174:21 175:6 177:20 178:23 186:11 216:23 217:7 236:24
**decided**
60:7 148:18 248:2
**decision**
124:21 242:21 269:4
**declared**
263:8
**decreased**
259:16
**deemed**
210:13
**defendant**
10:1 117:8 153:11, 16
**defendants**
10:16 68:12 153:11 179:11 181:15 283:10 284:15
**Defendants'**
117:2
**defense**
113:10 117:5
**defenses**
115:15,17 118:10
**defensive**
262:4
**define**
24:3
**degree**
14:21
**deliberately**
167:22 242:15
**delivered**
168:18
**demand**
130:8
**demeaning**
64:1
**denied**
260:3,8
**denying**
35:1,3,9,11
**dep**
114:4
**depart**
70:12
**department**
22:3,11,12 27:24 28:17 30:6 36:10 125:13 196:18 286:11,23
**depended**
27:16
**depending**
17:13 59:23 74:22
**depends**
54:13 74:18 75:11 122:17 168:13
**deponent**
283:13
**deposed**
11:17
**deposition**
9:6 11:23 31:15 37:16 58:12 68:17 80:14 92:1 112:17 113:8,21 116:15 118:17 121:16 141:2 144:4 148:2 151:3 154:2 155:10,17 157:7,17 162:15 170:13 171:20 175:1 178:16 186:4 189:2, 16 191:17 192:19 194:14 203:5 207:18 212:15 215:5 219:8 222:1 224:10 226:10 231:18 233:14 234:14 237:12 245:3 250:11 255:4 273:1 281:24 282:2 283:14,16 285:4,6 286:7,9,13,16
**depositions**
13:5
**Depression**
228:6
**Deputy**
229:14
**describe**
28:19 45:19 73:24 135:5 276:3
**descriptions**
70:11,12
**desist**
185:6
**desk**
50:15 133:8 246:23
**detail**
38:7 120:10,11
**details**
71:11
**detainee**
74:7,8,9 75:3,8,22 84:14 87:16 93:9
**detainees**
51:15 56:10,19 57:10,11 71:6,22 74:13 75:16 83:4,20 85:12 86:14 92:24 95:3 101:1 130:2,4 175:14 195:11,12 276:8 278:7,14
**determination**
229:9
**determinations**
243:2
**diagnosed**
199:19
**diagnosis**
258:18
**difference**
72:1
**differently**
74:20
**diminish**
262:5
**direct**
143:14
**directed**
44:17
**direction**
43:24 44:5,8 49:14, 20 50:12 230:3
**directly**
61:11 168:18 219:20 262:11
**director**
128:2 216:8
**Disabilities**
230:21
**disability**
246:9
**disagree**
45:3

**disagreed** 269:4
**disagrees** 72:17
**disbanded** 20:11
**discharge** 239:6
**disciplinary** 159:1
**discipline** 60:3,11 113:12,16 114:5 131:12,14
**disciplined** 114:3 168:11 198:5
**disclose** 114:23 116:5 246:8
**disclosing** 115:14
**disclosure** 115:19 118:13 172:12 180:1 187:5 209:4 211:5
**disclosures** 114:13 115:4,8,23
**discovery** 164:2
**discuss** 113:24 170:11 197:21 258:6
**discussed** 113:6 200:7,9,13,16 274:18
**discusses** 228:10
**discussion** 32:17 33:10 35:17 37:10 42:4 46:8 113:1 143:17 145:24 146:2 171:8 191:15 226:6 256:12 257:11 259:24 262:22
**disengage** 45:7
**dishonest** 248:4,12,15
**dislike** 66:11
**dismiss** 281:10
**dismissed** 136:4 148:16
**dismissive** 132:9
**disparage** 57:10
**disparaged** 57:9
**dispensing** 33:7
**displayed** 137:14 249:8
**dispute** 29:4,21 107:11 199:5,20,22 258:24
**disregard** 32:14 33:1 35:5 42:7 55:11
**distance** 126:16
**distinction** 271:13
**distress** 198:16,19,20
**distributed** 78:7
**District** 283:1,2 284:11,12 286:20
**DIV8-CERMAK-CAM_0_002_STAGING_REAR** 92:7
**division** 37:24 38:2,13 40:17 56:17 59:19 61:1 67:22 90:16 97:21 110:15 283:3 284:13
**divisions** 50:19
**doctor** 31:4,8 50:19 56:16 75:16 78:12 94:10,20 150:20 151:6,17 195:1 197:14 199:19 200:21 224:2 227:1,2 239:16 248:5,9 253:19 254:2 260:13
**doctor's** 99:16
**doctors** 102:11 278:23
**document** 63:7 69:3 82:4 119:11,12 124:4 142:6 145:7,10 160:18 172:5,8 187:3,14 213:10 226:19 227:9 230:10 234:12 239:11 245:1,13 256:18
**documentation** 128:23 242:4
**documents** 14:3,5 30:10 32:3 43:19 94:24 124:3 163:13,14 172:24 193:14 210:2 227:10 243:12 244:8
**door** 57:24 90:14 94:7,13 101:12,24 102:2,5,10,11,13,14,16,17 105:13 127:20 136:5,7 271:16
**doors** 84:5 101:12,23
**doorway** 104:21 105:6
**dot** 215:19
**downstairs** 135:15,20 149:5
**draft** 176:8 213:4
**drafted** 175:22
**dragged** 267:2
**dress** 88:14 106:14
**drinks** 122:23
**drive** 9:8 91:11,21 284:9
**driven** 271:17
**drug** 17:11
**drugs** 199:8
**due** 137:13 151:17 196:12 197:18 247:22 249:7
**dues** 24:10
**duly** 10:7,10 283:12 284:17
**duty** 27:11 30:11 68:23 69:19 113:7 137:1,10 138:16 140:19 142:4 143:13 144:7,15 149:19 152:2 154:13 165:1,2 168:11 169:6 170:3,4,9 173:20 177:21 181:4,17 182:2 193:14 198:13 200:17,21 208:14,15,19 219:19 225:3,5,16 227:14,17 228:22 229:15 235:22 236:2,10,13,23 241:21 242:2 246:2 247:7,19,24 249:7 260:1 265:13 268:10 273:5,8,12 279:14
**dysfunction** 258:21,24 260:8

**E**

**e-mail** 31:21 32:13,14,15 33:13 34:10,11,14,15,18,22,23 35:2,5,6,7,10,24 37:22 39:15 40:2,7,8,20 58:18 59:20 61:20,23 62:1 118:23 120:16,18 154:8 155:4,23 156:13 162:21,23,24 163:1,10,14,19,23 172:2 175:7 178:21 184:14 186:9,11,13,19 189:22,23 191:24 192:13 193:1 205:5 207:24 208:6 212:21,23 213:14 214:7 215:3,17,22 216:10,11 217:8 223:8,9 224:17 226:19 230:2 234:19 250:17 255:9 256:19
**e-mailed** 177:5,6
**e-mails** 43:13 121:22 122:2 177:7 217:3,6 247:13,23
**ear** 53:11 89:15
**earlier** 61:5,7 93:20 94:9 104:6 119:15 120:3 138:20 169:4 255:1 258:17 276:18 278:15 280:16
**early** 109:24
**earned** 30:24 202:22
**ears** 138:3
**easily** 92:15
**Eastern** 283:3 284:12
**Educated** 279:19
**educational** 14:11
**EEOC** 233:4
**effect** 44:24 133:16 139:14
**effective** 56:2,5 119:8,21 236:24 237:1
**effectively** 55:1 230:4
**effort** 241:17,20 254:19
**elapsed** 107:4
**electronic** 18:14 19:12 35:23
**else's** 145:8
**emergency** 18:16 20:12 120:24 123:24
**emoji** 122:20 123:5
**employed** 143:10 246:10
**employee** 26:4 118:12 221:8 223:2,13 224:22 236:1,4,9
**employee's** 223:15
**employees** 25:13 178:6
**employer** 38:17 199:10,15,21,23 202:6 223:12,14 236:1,6,11 259:1 260:13
**employment** 26:15,17,21 28:10,16 202:12 203:17 207:2
**enclosed** 210:21
**end** 29:16 64:5 65:22 89:19 90:15,22 106:22 114:3 129:10,11 132:13,14 158:11 159:13 160:9 163:2 171:15 186:20 201:23 204:1,12 226:4 246:23,24 259:10 262:9,12 263:10,14 264:5,10 281:23
**ended** 47:11 184:1 261:19
**ends** 29:19 257:22
**enforcement** 14:20
**engage** 158:12
**engaged** 13:22 27:10 29:4 32:16 42:4 47:21
**engagement** 201:22
**engaging** 200:10
**enter** 127:2
**entered** 144:4 151:3 157:7
**entire** 75:12 81:23 82:21 129:5 139:21
**entitled** 131:1 241:6
**entrance** 94:9 126:15
**entrances** 60:15 125:19
**environment** 38:16 41:5 73:22
**EOBS** 239:8
**equal** 74:21
**ER** 87:8,9
**ERT** 123:22,23
**escorted** 56:17
**establish** 176:14
**established** 94:3 181:13 209:14 218:10 231:16
**estimate** 75:24
**et al** 9:10 283:9 284:15
**evaluating** 247:1
**evaluation** 165:2 200:17,22 208:15 210:4 221:19 225:3 227:8,17,20 228:2 229:14,15,19 236:3,4,10,13 248:2
**event** 43:15 59:12 82:16 236:9
**events** 43:15 60:5 70:8 80:23 195:23
**eventually** 17:11,14,15 44:2 47:11 158:20 244:19 248:1
**exact** 80:10 183:18 233:10
**exam** 142:4 152:2 181:4 182:3 227:14 228:6 246:3 273:5,12 279:14
**examination** 10:12 68:23 69:18 143:13 150:8 218:11 257:17 262:18 265:14 274:2
**examinations** 225:5
**examined** 10:10
**examiner** 75:21 78:2,24 79:12 144:7,15 149:20
**exams** 170:9 173:21 241:22 242:2 273:8
**exceed** 85:9
**exceeded** 86:21
**Exchange** 16:10
**excited** 269:12
**excuse** 79:1 110:4 114:10 125:3 183:20 246:16 250:1 255:14 263:22 271:14
**execute** 221:20
**Executive** 216:8
**exhibit** 31:14,16,20 37:15,17,21 42:2,3 57:3 58:5,6,13,18 67:18 68:16,18,22 69:23 80:13,15,19 91:10,13,14,19 92:2,5 112:15,18 114:12 116:14,16 117:1 118:18,22 121:17 142:3 154:3,7 155:18,22 157:18 162:16 170:14 171:21 172:1 175:2 178:17 179:23 186:5 189:3,17 191:18 192:20 194:15 200:1 207:19 212:16 215:6 219:9 222:2 224:11 226:11 231:19,23 233:15 234:15 237:13 245:4,13 250:12 255:5
**exhibits** 178:14 256:5
**expect** 113:21
**expectation** 45:18
**expects** 76:9
**experience** 169:23 272:1
**experienced** 196:13 197:19
**experiences** 143:8
**experiencing** 196:6 260:4
**explain** 76:4 85:3 123:14 242:5 251:7
**explained** 12:19 70:21 71:2 142:13 143:11 257:19
**explaining** 73:20 255:18
**explanation** 122:19 143:14
**explicitly** 217:15
**expressed** 207:12
**expressing** 38:12
**extended** 97:19 225:17
**extent** 130:4
**External** 40:16 60:12 120:10 124:5,8 155:15
**extra** 112:14

**F**

**face** 105:19 122:20 241:9,11 249:1 272:19
**facility** 246:6
**fact** 22:19 24:11 37:3 46:2 64:9 65:8 69:11 95:8 115:8 119:11 144:14,16 147:4 148:24 151:17 165:3 168:6 171:3 176:12 200:20 208:9 216:21 224:4 230:15 235:2 240:15 247:9 251:18 255:17 262:20 263:2 266:16

**factors**
73:21 196:2
**facts**
79:12 115:9 144:16, 19
**fail**
286:15
**failed**
165:8 236:13 242:13,17
**fair**
12:2 29:3 105:1 113:22 124:13 176:8 193:13 221:13
**false**
268:9,14
**familiar**
212:11
**fast**
230:8
**favor**
12:16
**fear**
36:11
**February**
189:9,21 190:24 191:23 192:2,24 200:3,4 201:17 207:24 208:10 213:2 216:16 259:19
**feces**
41:9
**feel**
89:8 129:24 142:20 230:19 240:22 249:20 261:2,13 268:11,13,16 280:14
**feeling**
65:2 94:21 272:8,11
**feelings**
66:23
**fees**
186:24
**fell**
184:3
**fellow**
97:15 104:8 269:13
**felt**
32:18 33:23 42:6 74:11 134:22 143:9, 13 147:14 148:5,7, 16 193:21 195:14 266:15 267:6,23 268:12 269:22
**FEMA**
15:8
**fence**
272:19
**fetal**
103:22
**fewer**
24:14 103:10
**FFD**
75:20 79:12 155:7 178:10 184:24 187:11 195:17 197:6,21,22 209:19 210:4,18 212:11 218:5,11 221:19,21 243:18,24 250:19,21 255:14 269:5
**fiance**
261:18
**fight**
43:22 44:6,13,16,20, 21 45:9,22 46:3 50:9 71:5 74:8 75:21 76:7 85:4 86:13 93:9 95:2,10,19 96:17 104:7
**fighting**
45:8,10
**figure**
21:20 149:1 256:5
**figured**
158:22 196:23 248:1
**file**
26:1 60:7 181:7 186:22 217:23
**filed**
25:9,12 26:9 82:8 108:4 160:1 178:3 202:6 233:4,7,20,21, 22 234:2
**filing**
108:14 247:19
**fill**
17:4 33:2,3 42:11,20 43:8
**filled**
251:15,18
**filling**
33:1,23 42:7
**Final**
234:22 235:3,12,16
**finally**
13:9 75:2 148:18 223:23 243:13
**find**
52:23 60:3,11 119:7 141:22 192:7 197:9, 11 238:15 257:7
**fine**
67:11 92:15 136:24 137:2 213:22
**finger**
47:6 64:2 76:19 275:8
**finish**
12:21 24:1 39:4 56:2 61:7 115:6 116:8 169:13 177:11 199:3 240:23 253:2
**firearms**
15:8
**fit**
27:18 140:19 263:8
**fitness**
27:11 68:23 69:18 142:4 143:13 144:7, 15 149:19 150:8 152:1 165:1 168:11 169:6 170:2,4,9 173:20 177:21 181:4,17 182:2 193:14 198:13 200:17,21 208:14,19 219:19 225:2,5,16 227:14,17 228:22 229:15 235:21 236:2,10,13,23 241:21 242:2 246:2 247:6,18,24 259:24 265:13 273:5,8,12 279:14
**flipping**
193:12
**flirting**
124:14
**floating**
190:16
**focus**
198:14 216:10
**follow**
53:12 81:4 262:8
**footing**
272:18
**FOP**
24:17
**force**
187:19
**forced**
183:9 218:1
**foregoing**
283:15 284:24 285:4
**Forensic**
68:24 142:5 256:23
**forget**
57:24 62:5 149:12 195:6
**forgot**
94:18 149:8 173:15 208:5 252:23 266:21
**form**
30:1,18 32:18 33:1, 12,23 35:18 42:6,10, 11,13,18,20,22 43:6 54:2 58:19 59:15,17 64:11 68:3,4 77:14 78:3 79:14,15 80:9 97:17 107:7 109:7, 17 124:17 130:24 144:18,23 146:13,15 147:22,23 151:13 152:17 153:5,6 161:13,18 168:12 173:4,5,6,7,11,22 179:4,20,23,24 180:4,12 181:1,19 186:15 187:3,14 188:4 190:4 209:5 210:24 211:1,7,13 212:1 217:18 218:7, 12 219:1 222:12 223:3,14 239:20 245:16 246:15,18, 19,22 247:11 250:19 251:14,15 255:15 257:4 258:2 260:10 269:13 271:3,19 274:22 279:15
**formal**
111:18
**forms**
140:6,15 152:23 153:1,14,22 160:21 161:3 162:13 165:3, 7 172:8,17,24 173:2, 5,14,19 174:6,8,12 180:4 189:24 190:24 191:2 208:2 209:9 210:11,22 211:21 212:9,23 217:16,17 218:16 221:20 222:21 225:21 227:8
**forthcoming**
261:6,10
**forward**
155:3 171:3 280:24
**forwarded**
120:14,15,17 157:24 170:23 189:9 191:9 286:16
**found**
136:24 138:16 139:17 140:19 205:9 230:23 249:6 268:10
**foundation**
33:24 39:21 93:14 109:17 111:21 112:12 144:23 152:17 168:12 172:20 180:6 247:11 259:2
**foundational**
72:14
**frame**
146:14
**Fraternal**
24:18
**freaked**
49:3
**Friday**
154:9
**friend**
32:8 188:23 235:15
**friends**
264:8,14,19 265:1,9, 16 266:5 267:10,18 268:4
**front**
57:10,11 67:18,19 89:10 96:5 101:15 133:8 170:22 186:11 239:12 278:14
**frustrated**
132:4 249:11
**frustration**
260:6 262:4
**fucker**
49:21
**full**
10:23 69:24 77:19 86:17 95:5,6 142:11 264:1
**fully**
286:16
**functioning**
259:9,13
**functions**
84:4
**furthering**
243:14

**G**

**gain**
67:6
**Ganon**
47:15 49:13,16 56:6, 22 83:19 84:21
**Ganon's**
49:14,19
**gave**
51:24 53:7 54:15 132:9 149:7 153:2,4 162:2 172:18 174:12 205:6 256:2
**general**
17:5,8 41:5,22 93:12 232:2,7,12,17
**generally**
72:24
**gentleman**
99:23 100:11,13,14, 20 103:17,20 104:15 272:7
**Gestures**
137:4
**getting--**
177:10
**girlfriend**
13:24 14:6 201:17 259:18
**give**
28:1 40:23 43:23 52:8 54:11 61:18 122:24 141:22 161:6 162:6,8 174:15 194:5 197:2 206:5 240:16 241:6 247:20 255:24
**giving**
225:20 268:6
**glad**
134:23
**glasses**
118:16
**goal**
195:21
**Goldstein**
69:9,12 254:2,4,22 260:4 262:14,23 263:6 264:17 265:7, 14,15
**good**
10:14 13:17 39:8 49:24 82:3 121:8 122:16 141:23 143:5 204:14 205:1 234:11,13 260:17 272:5 273:24 278:4
**Gotcha**
82:11
**Government**
283:9 284:14
**grades**
14:13
**graduate**
15:15
**graduated**
17:24 23:1
**great**
56:8 198:16
**greatly**
41:1
**Greer**
32:18 33:11,22 35:18 36:24 42:5
**grievance**
25:9,12,19,22 26:1, 10
**grievances**
26:6
**grieve**
159:5 168:24 169:8, 11
**ground**
11:23
**Group**
68:24 142:5 256:23
**guarded**
40:10
**guess**
13:13 17:11 40:23 47:22 49:22 54:5 59:23 67:4 72:13,21 76:2 99:11 129:20 130:6 133:12 136:9, 10 148:16 190:15 205:7 279:19
**guessing**
97:24 110:13
**gun**
23:13
**guns**
40:11
**guts**
241:14
**guy**
51:22 193:23 272:6 280:15
**guys**
91:12 130:7,13 255:24 278:22 281:16

**H**

**Ha**
124:21
**habits**
149:12
**half**
51:20 53:15,22 56:8 85:10,18,19 87:21, 22 88:3,14 160:6 249:5 266:19
**halfway**
216:11
**hallway**
58:1
**hand**
58:9 76:10 100:1 114:11 285:13
**handcuff**
104:24 105:1
**handcuffed**
45:11,14,15 46:4 84:14 103:15
**handcuffing**
83:4,19
**handcuffs**
72:5,10 83:8,20 96:1,4 97:11,14 99:4,24
**handed**
31:19 37:21 58:17 68:22 80:19 116:24 118:22 121:21 154:7 155:21 162:20 170:18 172:1 174:16 175:6 178:20 186:9 189:6,21 192:24 194:19 212:20 215:17 224:15 226:18 233:19 234:19 237:17 245:12 250:16 255:9
**handing**
17:6
**handle**
66:15 169:21
**handled**
44:1
**handling**
77:13,16,23
**hands**
65:3 79:2,5 181:9 246:24
**happen**
31:10 34:3 36:21 44:21 45:2,22 66:10 67:16 114:22 115:2 169:23 192:14 205:11 261:2,3 266:11,17 267:24 275:13 277:8
**happened**
47:1 48:20 49:12 52:16,21 53:7 68:8 70:16 79:10 80:10 99:7 101:3 104:5 109:11 126:20 127:4,13,22 128:10, 24 130:12 134:18 136:15,21 137:12,16 139:1,2,13 140:9,22 141:12,15,18 150:4 152:23 165:4 177:23 178:3 200:13 242:6 249:10 254:8 270:1, 11 275:11 279:1
**happening**
36:11,12 60:6 114:22 115:3 121:2 138:13 149:4 189:12 194:7 195:16 197:12 269:17
**happy**
13:3 214:15 257:8
**harassing**
67:1
**harassment**
114:21 181:7 185:6, 10 188:12,20 231:4
**hard**
66:23 79:18 274:9
**hardware**
15:20 16:12,13,18
**head**
148:24 197:13 266:23

**heading**
228:11
**headset**
16:3
**health**
164:23 172:12 180:1 187:5 209:4 211:5 246:5 250:22
**Healthcare**
172:14 190:9 209:3
**healthy**
200:8
**hear**
34:8 79:19 133:1 274:1
**heard**
10:15 79:24 122:5, 12 209:22 266:24 270:3 271:6
**hearing**
79:18 254:15
**heart**
161:20,23
**heated**
278:7
**hectic**
278:8
**heels**
88:15
**helpful**
22:16 51:4
**Henretty**
9:24 13:15 47:24 79:23 80:3 141:1 144:3 155:9 157:6 186:2 219:11 248:18,22 256:2 273:20,23 274:3,5, 23 278:3 279:22 281:13,16,19,21
**hereinbefore**
285:7
**hereto**
211:7
**heretofore**
284:7
**hereunto**
285:12
**Hey**
168:2 278:15
**high**
14:12 15:15 17:12 199:16,17,20
**highest**
48:23 54:22 66:13 280:15
**highlight**
40:1
**highlighting**
39:12
**HIPAA**
153:14 172:11 173:6 179:3,20,24 180:24 186:15 187:4 190:4 208:2 209:3 211:4 212:23 217:9 221:20 222:12 223:13 225:8 230:20 232:3,18 238:23 244:17 245:15 252:9 255:14 257:4
**hit**
49:3 277:6,18
**hitting**
47:12 275:8
**Hogueisson**
194:22,24 195:8 201:10 212:8 227:5 229:16 253:22 258:3 259:22
**hold**
57:4 96:20 230:7
**hole**
41:2,3
**home**
153:24
**Honingford**
10:2 273:17 281:15
**hope**
36:4 38:3 201:14
**hoping**
36:17 194:3 212:13
**hospital**
45:21 279:1
**hospitalized**
199:2,4
**hospitals**
123:20
**hour**
125:23 160:6 203:5
**hours**
27:14 92:9 113:21
**house**
15:21
**HR**
68:14 125:12,15,21 126:10 143:9 147:8 149:2 155:6 156:9, 17 160:18 164:19 166:23 167:2,10 170:8 173:17 174:9 181:17 182:8,20 190:13 191:3 212:23 215:12,19 216:2,8 220:8,15,22,23 221:2 246:21
**Human**
142:12 150:23 154:13 221:7,14 262:12 264:2,16
**Hundreds**
60:18
**hung**
101:5
**husband**
195:5

**I**

**i.e.**
200:11
**idea**
110:24 112:12 147:10 220:3,5 254:23 265:3 280:6
**identification**
31:17 37:18 58:14 68:19 80:16 92:3 112:19 116:17 118:19 121:18 154:4 155:19 157:19 162:17 170:15 171:22 175:3 178:18 186:6 189:4,18 191:19 192:21 194:16 207:20 212:17 215:7 219:10 222:3 224:12 226:12 231:20 233:16 234:16 237:14 245:5 250:13 255:6
**identified**
117:20 118:5 253:14
**identify**
9:11 117:3 251:20 253:17,22
**IDS**
19:24
**ILCS**
238:21,22
**illegal**
188:4
**Illinois**
9:4,8 238:22 283:2 284:1,6,9,12 285:20 286:2,6,18
**illness**
246:7
**imagine**
48:22
**immediately**
102:12 136:23 184:16 185:3 186:20
**implies**
39:21
**important**
41:12
**impression**
76:6 247:22 269:15
**improper**
88:24 173:9
**inaccurate**
115:20 147:21 216:20
**inc'**
261:14
**inch**
86:18
**incident**
50:7,8 59:1 61:12 66:7 67:20 70:5,9 71:3 82:2,6 85:1 90:15 92:23,24 93:23 107:5 150:11 159:8 175:12 176:18 181:9 186:1 266:20, 22 279:19
**incidents**
41:12
**include**
41:23
**including**
218:1 239:2
**income**
202:11,16 204:9
**Incoming**
124:24
**inconvenience**
196:20
**independent**
225:4 227:1 252:24
**indestructibull**
163:2
**indestructibull@ yahoo.com**
163:9,22 189:23 191:24
**indicating**
66:9 84:20 229:7
**indication**
119:17
**individual**
121:6 179:11 258:3
**individual's**
223:4
**individuals**
96:17
**inflamed**
144:11 145:12 147:12
**inform**
189:12 266:11
**information**
41:12,13 50:19 114:23 118:9 130:20,21 131:2 132:7 161:17 172:12,14 180:1,23 187:6 190:9 208:12 209:3,5 211:5,19 235:15 246:1,8
251:19 255:11 256:21 269:9,10
**information/plan**
196:11 198:1 200:7 201:16
**informed**
164:23 171:14 208:13 225:2 268:7 269:8,18
**informing**
209:16
**initial**
114:13 115:23 262:18
**injunctive**
217:24
**injured**
272:15
**injury**
272:16
**inmate**
45:23 50:9,14 51:14, 17,18,19 52:8 54:19 57:12 64:5,13,17 76:17,19 85:23 86:11 93:9 95:24 96:3 104:6,16 107:13,14,15
**inmate's**
53:11
**inmates**
50:18 51:8,15 53:3 55:8 64:10 83:7 85:8 86:14,20 89:10 94:10 95:11,18 99:15 102:11 103:10,14 123:17, 20,22 130:2 278:23
**innocent**
266:9
**inpatient**
239:2
**inquiry**
129:20 130:22
**inside**
94:4 109:5,11
**insisted**
147:14
**insisting**
262:10
**insists**
147:13
**insomuch**
39:21
**insufficient**
73:13
**insulting**
64:1
**insurance**
31:5
**intake**
87:10 195:24 228:16 258:13
**integrity**
240:17,23
**intend**
219:19
**intense**
147:12 149:11,13
**intention**
36:3 171:13
**interaction**
47:4 51:11 71:12 87:3,15 117:7 178:11 208:20 269:5 279:4
**interactions**
121:12 279:7
**interested**
285:10
**interim**
261:15,17
**interpret**
77:15 249:14 272:2
**interpretation**
49:22
**Interrogatories**
117:2
**interrupting**
241:7
**interruption**
191:12 206:2
**intersection**
108:13
**interview**
70:1,4 81:7 82:7 183:18,23 195:13 228:5,16 254:12 260:3 263:7 268:20 269:16
**interviewed**
75:20
**interviews**
17:10 281:8
**intimidated**
269:12
**intimidating**
132:1
**intonation**
130:6
**Inventory**
228:7
**investigated**
63:1,4 281:7
**investigates**
147:8
**investigation**
59:21 61:21 62:9,11, 14,22 67:2 80:22 81:2 119:18 120:7,8 146:8 147:3
**investigations**
82:13 183:18 184:10
**investigator**
19:16
**invoice**
237:22
**involved**
25:3 46:3 49:18 175:19
**involvement**
254:18
**Isaac**
68:24 142:4 256:23
**issue**
26:10 169:21 222:19 224:23 258:7
**issued**
164:2
**issues**
74:1 198:2
**item**
231:8,11
**itemized**
239:8

**J**

**Jack**
39:8 40:12
**jail**
41:3,13,21 45:21 48:21 55:21 60:1,13, 14,18 122:9 123:17 125:19 126:15 258:6 277:21
**James**
132:15 136:17 138:17 146:21 153:2,22 156:16
157:24 170:23 172:6 249:4
**January**
186:12 216:23 252:20
**JDE**
81:8
**Jesse**
91:7 103:5 106:1 110:18 112:16
**Jessica**
170:20
**job**
18:2 19:3 23:14 27:2,9,13 43:1 49:24 53:12,16,24 54:24 55:3 56:19 67:10 84:2,7 88:16 89:16, 21 130:5 142:20 169:24 197:8 243:5 271:23 278:11
**jobs**
28:14,24 257:22
**John**
9:7,15,17 10:8 11:1 31:22 32:6 34:20 37:23 81:7 108:23 163:1 179:2,4,8 186:16 226:21 229:14 234:20 237:21 238:8 283:5, 12,17 284:10,13,16 286:5
**Johnson-green**
133:23 134:1 136:11 149:6,16,20
**join**
17:1
**joined**
16:20
**Jones**
177:24 266:10
**Jones-hayes**
44:3 46:1 48:5,8,11 51:13 52:19 54:11 57:9 59:8 60:8 62:17 64:2 65:20 70:5,9,18 71:4,13 76:5 79:2 85:2 87:4 93:24 105:22 106:13 107:3 108:9,14 117:8 121:12 138:23 150:11,18 152:3 167:9 178:1,11 181:8 182:19 185:4, 10 188:11,19 208:21 231:13 264:7,14,19 265:8,16 266:5 267:9,19 268:3 270:11 271:2 274:6, 20 275:5 277:10,13 278:19 279:7,14
**Jones-hayes'**
270:1
**Jones-haynes**
10:1
**judgment**
240:23 241:10
**judgments**
243:6
**July**
234:21 235:13 237:18
**jumbling**
148:24
**jump**
272:7 274:12
**June**
20:6 29:13 204:5 235:8 238:5 243:11

**jurisdiction**
23:9
**jury**
230:23

**K**

**Karen**
216:5,6
**Karolina**
194:22,24 258:3
**keeping**
177:18 192:4
**Kehr**
91:7 102:23 106:23
**Kelly**
121:23 122:8 193:2, 5,6
**kind**
15:2 16:5,15 21:19, 22 27:19 33:17 34:1 44:14 47:21 49:1,3,6 50:13,15,17 51:24 53:4,8 57:23 60:15 66:1 76:18 84:16 91:10 103:2 124:14 131:23 132:9 136:3 142:23 149:7 154:22 167:24 176:2,6 252:22 253:20 275:10,11,12 276:5 277:3,17
**kinds**
18:9 74:1 158:8
**KING**
284:4 286:23
**Kleenex**
96:22
**knew**
114:24 137:22 138:22 182:1 210:17 263:3 270:10 271:9, 15
**knowing**
135:17
**knowledge**
12:5 46:11 68:7,12 115:9 120:6 128:21 181:14,24 182:5,12, 17 274:17
**Kramer**
179:1 186:14 215:24
**Kroll**
200:21 224:7 227:1, 4,7,12,18,23 228:21 229:7,21 259:23 273:10
**Kurtz**
159:15,18 174:15,17 178:22 186:10 212:21 215:18 219:17,18 221:18 222:6 224:17,21 230:3,4 232:1 238:2 239:17 246:21 255:1
**Kurtz'**
107:24
**Kurtz's**
184:14

**L**

**l''s**
163:2
**label**
65:12
**labeled**
101:22
**lack**
85:6
**ladies**
249:16
**lady**
133:8,16,22
**language**
236:8
**Lasalle**
9:3 286:1
**late**
259:19
**law**
14:20 115:21 286:10
**lawsuit**
25:3,4,19 108:4,15 159:22 202:6 231:7, 9 233:8,20 234:2 247:19 262:9
**lawsuits**
115:5 160:2
**lawyer**
211:1 219:24 221:18 238:2 239:14 243:10 244:18 245:20
**lawyers**
13:4
**lay**
271:20
**lead**
148:11
**leading**
57:5
**leaned**
53:10 89:6
**learned**
55:8 112:7 241:23
**leave**
16:11 136:1 145:16 150:7,24 179:18 187:20 222:11
**leaving**
105:15 144:10 145:11 151:7 258:1
**led**
148:14
**left**
51:18 96:3 101:13 102:5,15 103:20 107:11 135:16 141:2,19 148:2,22 151:15,24 152:23 155:10 160:18 165:16 166:10 174:9
**left-hand**
93:18 105:6
**legal**
9:2 115:12,19 159:2 180:10 183:4 187:18 225:8 237:3
**Lehman**
9:1,2 10:4 37:8,12 90:21 91:3 112:22 113:3 160:8,13 226:3,13 256:10,14 263:13,18 281:23
**Leroy**
120:18
**lets**
281:7
**letter**
164:9,13 166:19 169:17 170:18 171:4,9 189:8 191:22 192:5,7 207:23 208:2,10 209:15 212:23 214:1,5,6,10,14 215:1 216:16,21 221:5 225:13 238:2 255:18 256:21 268:15 286:12
**letting**
121:8 133:20 135:22 156:18,19,20
**level**
48:21 55:5 200:11
**levels**
200:9
**liability**
161:19
**liars**
250:4,10
**lies**
240:11 249:9
**Lieutenant**
32:17 33:11,22 35:18 36:24 42:5 48:4,8,10 125:19 154:19 155:15 204:13,15,19,21 205:6 206:8
**life**
241:9 258:20,23 260:5,8
**limit**
252:16
**limitation**
222:13,20,21 252:2
**limitations**
222:14
**limited**
83:6 253:2
**Linden**
9:16 11:8 25:16 30:1 33:24 35:19 39:20 42:13,22 54:2 58:7 64:11 72:13,21,24 73:5 77:14 78:3 79:15,21 86:5,9 88:21 91:15,17 93:12 97:17 104:23 105:3 107:7 109:7,9, 17 110:16,19 111:21 112:2,10,20 113:5 114:2 115:11 116:1, 18 117:21 124:17 125:4 130:24 144:18,23 145:5 146:13 147:23 148:13 151:13 152:17 160:7 162:6 165:19 168:12 172:20 173:7,22 178:14 180:6 181:19 183:4 185:15,24 187:13 191:13 192:17 198:19,21 202:23 203:4,13 213:6,9,16,20 214:16 215:8,13 217:18 218:7,12,15, 19,21,24 219:5 220:9,16 230:7,14 233:22 234:6,9,13 237:2 239:20 241:6 242:24 245:6,8 246:19 247:11 248:13,20 250:5 255:21,23 256:4,8 259:2 260:10,22 261:7 263:12 266:6 267:15 270:13,18 271:3,18 273:2 274:22 279:15 281:18,22
**list**
17:12 114:18 184:2, 4 228:7
**listed**
175:17
**listen**
54:21 55:10
**listening**
200:12
**literally**
41:10 86:15
**litigation**
9:3 118:11 194:21 244:9 286:1
**live**
11:4 40:9
**local**
235:4 283:9 284:14
**location**
73:22
**locking**
84:4
**logic**
168:1
**LOL**
123:4
**long**
16:7 17:18 23:19 29:14 46:19 56:24 75:11 82:16 131:16 132:18 134:8 136:12 201:24 206:15 236:4 243:22 247:20 273:24
**longer**
33:3 196:17 205:7
**looked**
49:6 51:20,24 94:24 124:3 140:8 196:18 200:3 211:14 212:2, 3 248:7 258:17 267:23
**Lopez**
100:4
**lost**
183:10,15 233:12 272:18
**lot**
15:6 28:18 29:19 33:18 34:2 36:9 38:22 39:14 40:3 48:22 75:23 85:5 99:13 195:11 272:1 274:14 278:7
**lots**
60:19 124:1
**loud**
276:13
**luck**
204:14 205:1
**lucky**
122:6,13
**lunch**
113:15 114:6 122:23 168:6
**luncheon**
160:11
**lungs**
276:16
**Lyle**
9:24 141:1 144:3 155:9 157:6 274:4

**M**

**M.D.**
238:6
**machine**
177:2,3,8
**mad**
90:13
**made**
44:18 51:16,17 57:17 112:1,5 114:24 116:5 153:2, 21 173:17 174:13 177:12 182:18 188:19 231:12 238:20 241:17,20 242:21 243:21 249:18 250:8 252:22 262:10 267:17 268:2 269:19 275:13 280:7,8
**mail**
208:4 286:3
**main**
125:18 126:14
**major**
24:5
**make**
11:14 17:12 29:18 45:1,6 50:20 55:6,14 56:14 58:10 60:2 65:16 71:15 72:13 74:20 82:4,21 93:12 101:10 108:6 111:13,18 113:11 131:9 165:4 176:18 215:8 240:11,22 241:10 243:2,6 249:9 256:6 257:22 266:4 268:4 271:13 279:24 280:9 286:15
**making**
262:13 268:9,13 275:14
**man**
53:5 98:12 103:22, 23 122:10 123:5 205:4 227:23
**manacled**
74:2,13
**manacling**
71:21 72:2,4
**management**
246:9
**manager**
246:9
**managing**
198:17
**mandated**
143:12
**manner**
54:15 147:16 181:10 195:14 208:23
**March**
82:5 210:4,12 213:6, 7 215:22 219:17 222:5 224:4,18 225:15,17 226:19 227:21 231:24 233:4,7,21
**mark**
31:13 37:14 57:3 68:16 80:12 91:9,13, 18 112:15 116:14 122:19 137:19,22 138:2 155:23 158:21 169:15 170:24 184:3 232:19 266:20
**marked**
31:16,20 37:17,21 58:9,13,17 68:18,22 80:15,19 92:2,5 112:18 116:16,24 118:18,22 121:17,21 142:3 154:3 155:18, 22 157:18,22 162:16,20 170:14 171:21 175:2 178:17 186:5 189:3,17 191:18 192:20 194:15 207:19 212:16,20 215:6 219:9 222:2 224:11 226:11 231:19 233:15 234:15 237:13 245:4,12 250:12,16 255:5
**marks**
88:22 281:23
**MARLENE**
284:4 286:23
**Marmor**
9:18 10:13,14 11:10, 11 12:15,17 13:13, 17,18 25:18,20 30:2 31:13,18 34:7 35:21 37:6,14,19 40:4 42:16 43:9 48:2,3 54:7 57:1,7 58:5,8, 15 63:18 64:15 68:16,20 72:16,19, 23 73:3,6 77:18 78:9 79:17,19 80:4,12,17 86:7,10 88:5,9 89:1 90:19 91:6,16,18 92:4,11 93:3,5,16 95:21,23 96:7,9 97:3,4 98:4,19,20 99:1,2,21,22 100:7, 8,16,17,22,23 101:7, 9 102:19,24 103:6 104:3,4,12,14,19,20 105:1,4,10,11,17,20 106:1,3,22 107:1,9 108:17,21 109:10,22 110:18,20,23 111:23 112:3,4,13 113:18 114:8,9 115:22 116:2,4,14,20,22 117:24 118:3,15,20 121:15,19 124:18 125:5,7 131:5 141:6 144:6,20 145:2,9 146:15,18,22 148:6 149:18 151:9,19 152:21 154:1,5 155:13,16,20 157:12,20 160:5,16, 23 161:1 162:5,8,11, 18 165:21,23 168:15 170:16 171:19,23 173:1,12,23 174:1, 23 175:4 178:15,19 180:9 181:23 183:8 185:19,23 186:1,7 187:16 189:5,19 191:14,20 192:16, 18,22 194:17 198:20,22 199:1 202:24 203:1,6,15 206:4,7 207:17,21 212:18 213:7,13,17, 22,23 214:19,21 215:4,15 217:20 218:8,14,17,20,23 219:2,6,13,14 220:13,19 222:4 224:13 226:1,16 229:1,5 230:13,15, 17 231:21 233:11, 17,24 234:1,8,11,17 237:5,7,11,15 240:1 241:16 243:8 245:7, 10 247:3,15 248:15 249:23 250:14 255:7,22,24 256:3,6, 9,16 257:13 259:5 260:19 261:4,11 263:11,21 267:4,16 270:15,21 271:7 272:10 273:3,15,18, 22 278:1 281:20
**married**
13:19,21 195:3
**Martiniak**
120:18
**Mary**
118:23 154:8
**Matt**
153:17,20 167:14

**matter**
9:9 38:19,24 53:18 55:23 56:4 85:11 199:15 220:1 230:14
**matters**
26:10 53:24 147:9 262:7
**Matthew**
9:19,22
**Matthias**
188:22 189:9
**maximum**
75:3,7,22 95:4
**Mccorkle**
9:3 286:1
**Mcquillan**
118:24 154:8
**meaning**
77:22 165:15 184:15 229:12
**means**
24:4 49:22 77:16 97:20 120:6
**meant**
48:4,10 73:7 78:15 155:3 157:15 168:20 184:16 207:11
**mechanisms**
200:8
**Med**
32:10,21
**medical**
33:8 74:19 94:12 161:10,11,14,19 168:18 180:13 187:20 189:24 217:9 222:12,13 223:3,5, 13,15,20 225:14 227:9,13 228:21 229:8 232:4 237:20 239:1,18 240:5,7,9, 12,16,17 243:13,23 245:20,24 246:7,22 247:20 250:22 251:13 254:19,21 259:3 262:11,19 264:15
**medication**
13:9 33:7
**medications**
228:11,13
**meet**
29:19 69:11 196:22 257:23
**meeting**
129:7,11 142:12 144:10 145:11,16 150:23 164:20 166:23 167:2,10 170:8 190:14 197:22 209:1 212:8 240:24 249:5 264:2 270:2, 11,24
**meets**
225:8
**Megan**
10:2
**member**
20:24 21:4 119:22 133:7
**memorandum**
119:8 154:10 157:23
**memory**
43:19,20 85:18 86:12 95:2 212:1
**men**
39:8 40:11
**Mental**
228:6
**mention**
187:24 217:12
**mentioned**
138:24 139:3 223:7 274:5 275:4 285:7
**Mercantile**
16:10
**mess**
24:5
**message**
165:16 209:13
**messed**
67:8
**met**
127:7 128:16,18 143:17 145:24 146:12 153:20 167:13 216:5 224:7 240:19 242:20 249:21 265:4,23 267:12
**metadata**
32:4
**Michelle**
250:17 253:6 255:10 256:20
**microphone**
273:21
**mid-november**
258:2
**middle**
11:2 63:24 85:7 94:6,7 211:10
**mild**
258:20
**miles**
23:10
**mind**
73:7 215:13 233:12
**mine**
188:23
**mini**
45:20 228:5
**minute**
126:24 200:24
**minutes**
46:23 75:12 88:6 92:10 104:6 107:8 132:20 134:15 136:14
**misinterpreted**
144:13
**misplaced**
192:8
**missed**
183:17 207:1,8,12, 13
**misspells**
259:23
**misstates**
54:2 109:9 152:18 181:20 218:12 220:9 260:23
**misstating**
218:21 219:5
**mistook**
78:5
**misunderstanding**
21:24 66:21
**misunderstood**
261:16
**mixing**
18:19
**MMPI-RF**
228:6
**mom**
124:12
**moment**
21:6 84:7 95:12 102:21 104:19 137:17 147:1 148:23 152:20 254:1 268:1
**moments**
149:11
**money**
30:21,22 202:20 203:2,8 206:17
**monitor**
56:10,19 74:13
**monitoring**
18:14 19:12
**month**
21:12 158:12 159:11,13
**months**
29:15 139:13 257:20
**mood**
135:5
**Moraine**
14:16
**Morgan**
9:21 12:15 13:13
**morning**
10:14 103:1 124:3 169:4 188:15
**mother**
49:21
**motion**
277:5
**motioned**
277:4
**motivation**
265:4
**move**
43:14 123:21 192:16 274:11 276:24
**moving**
99:15
**multiple**
50:12
**mumbled**
139:19
**music**
200:12

**N**

**named**
31:22 68:12 114:16, 19 121:23 178:24 179:1 193:2 194:22 200:21
**names**
60:22 251:16
**Naringowski**
106:21
**natural**
12:22
**Nawara**
9:7,9,15,17 10:8,21, 22 11:1 13:19 31:14, 15,19,20 34:20 37:16,20,21 42:2 58:12,16,17 67:18 68:17,21,22 69:23 70:7 76:4 77:2,20 80:14,18,19 81:3,7 82:19 83:2,5,18,21 84:24 85:3 91:14,18 92:1,12 93:6 112:17 113:6 114:10,11,12 116:15,23,24 117:8 118:17,21,22 119:6, 20 120:17 121:16, 20,21 141:20 142:3, 8,13 150:6 154:2,6, 7,11 155:17,22 157:17,22 160:17 162:15,19,20 163:1 164:8 170:13,17,18 171:20,24 172:1 175:1,5,6 178:16,20, 21 179:2,8 180:14, 20 181:7 182:24 185:5 186:4,8,9,19 187:4 189:2,7,16,20, 21 191:17,21 192:19,23,24 194:14,18,19 195:22 197:17 199:24 200:1 201:1 207:18,22 208:1 210:23 212:15,19,20 215:5, 16,17 216:20 217:8, 22 219:8,15,16,20 221:3,17 222:1,5,11 223:2,16 224:10,14, 15,22 226:10,17,18, 21 229:14 230:1 231:18,22,23 233:14,18,19 234:14,18,19 237:12,16,17,21 238:8 244:21 245:3, 11,12 250:11,15,16 252:15 255:4,8,9 256:19 257:7,14,19 259:18,22 261:18,23 263:22,23 274:4 283:5,12,17 284:10, 13,17 286:5,7,8
**Nawara's**
216:22 225:1,6,14
**necessarily**
78:16 143:5
**necessity**
225:7
**needed**
26:1 27:13 43:23 78:7 123:22 124:9 169:24 191:7 192:6 197:9,11
**negotiations**
246:21
**news**
234:11
**nice**
49:17 193:23 195:14 197:14
**Nicholson**
39:8 40:13
**Nicole**
138:2,7
**nine-year**
261:19
**Nodding**
28:13
**nonresponsive**
192:16
**normal**
149:12
**North**
9:3
**Northern**
283:2 284:12
**nose**
96:21
**Notably**
262:16
**notarial**
285:13
**notary**
283:22 284:4 285:20
**note**
197:16 200:1,2 201:2 224:1,24 258:19
**noted**
258:21
**notes**
194:20 239:6,7 258:12,14 259:8,12
**notice**
96:20 106:12 113:22 169:3
**noticed**
52:24 272:14
**notification**
180:21 185:4 236:12
**notified**
113:8
**notify**
286:15
**noting**
71:20
**notion**
142:23
**November**
30:11 125:16 151:12,24 154:9 158:1,11 159:9 160:19,23 163:5 164:13,19 166:12 167:3,6,10 169:17 170:21 171:4 172:18 174:10 189:7 191:3, 22 208:13 209:2,16, 17 211:14 212:2 215:2 221:5 242:21 246:15,16 261:15, 17,20 268:16 280:4
**number**
73:20 113:19,20 115:19,20 122:24 124:22 137:21,23 160:2 172:23 193:13 238:10
**numbers**
73:13 142:10
**numerous**
179:15
**nurse**
126:23 127:7,14,23 128:1 129:16 131:18 133:13 135:15 136:10,13,17 137:20 138:5,11,15 140:5 151:24 152:12 164:23 166:1,4,20, 22 167:2,19 170:7, 19 174:9 182:18 190:19 211:9 214:10,14,23 240:19 242:8,22 249:24 250:1,8 251:12 264:6,13,18 265:8, 15 267:9,12 268:3, 12,17 269:1,7,18 271:8,14,17
**nurses**
241:18

**O**

**o-u-r**
41:15
**oath**
283:13
**object**
34:2 39:20 88:21 110:16 112:10 117:21 125:4 130:24 144:23 145:6 146:13,15 165:19 173:7 192:18 213:20 230:8 237:2 273:2
**objecting**
93:15
**objection**
30:1 33:24 35:19 42:13,22 54:2 64:11 72:14 77:14 78:3 79:14,15 93:13 97:17 107:7 109:7, 17 111:21 115:11 124:17 125:6 144:18 145:5 147:22,23 148:13 151:13 152:17 168:12 170:2 172:20 173:22 180:6 181:19 183:4 185:15 187:13,14 202:23 203:13 214:16 215:9 217:18 218:7,12 220:9,16 239:20 242:24 246:19 247:11 248:13 250:5 259:2 260:10,22 261:7 266:6 267:15 270:13,14 271:3,18 272:24 274:22 279:15
**objects**
117:22 118:7
**obligated**
193:21 194:1
**obligation**
115:18 280:24
**Observations**
228:16
**observe**
84:9,10
**observed**
84:16
**observing**
56:14
**obtain**
223:4,14 243:18,22 244:4 254:19
**obtained**
240:8,10 244:8,13 254:10
**obtaining**
240:4,5 244:2
**occasionally**
94:19
**occasions**
195:9 224:23
**occupational**
164:23 241:18
**occur**
113:17
**October**
9:5 58:20 59:16 63:20 119:9,21 122:4 123:7 124:11 283:14 284:7 285:14 286:4,7
**offend**
41:23
**offended**
49:8 65:20
**offensive**
181:10
**offensively**
278:13
**offer**
243:21 258:5
**offered**
70:10 243:17 244:5 246:18 258:19
**offhand**
28:8 103:16
**office**
15:13 16:21 18:10 25:7,10,14 27:11 29:5,22 30:23 34:18 50:3,4 51:1 69:20 93:19 101:13 104:22 105:6,23 107:24 108:7 109:5,12 112:6 121:24 127:6, 14 136:13,16 138:5 141:19 152:1 159:22 160:3 164:24 170:20 173:21 179:10,15 180:12 188:24

192:12 196:21 202:17,21 203:3,11 204:10 215:12,18 217:14 220:1 222:19 223:4,18,19 230:23 233:5,9 235:5 238:12 240:12 243:22 247:4,17,21 275:6 281:2

**officer**
18:4,6 19:6 21:11,14 23:5,7,22 24:6,9,22, 24 26:18 28:11 32:7 42:24 47:15 49:13, 14,16,17,19,23 50:15,16 54:22 56:6, 8,22 57:14 64:21 65:8,11,13,16 66:16 69:19 70:7 75:15 76:4,21 77:1,6,10, 19,21 79:1 84:21 94:11 95:14 96:10, 11,14 98:6,7,8,13, 16,21 99:3 100:4,12 105:8 106:5,10,21 113:6 114:10,16 115:1,16 116:6,8,11 117:13,16,20 118:4 119:6 122:9,10 133:23,24 142:13 149:5 150:10 154:10 176:10,11,12 180:13,20 181:6 182:24 185:5 186:19 193:7 208:1 216:20, 22 217:8,22 222:10 223:2,16 257:19 259:18,22 261:16,18 263:22 269:9,10 276:6 277:15

**officer's**
48:21

**officer/ investigator**
236:12

**officers**
26:14 33:3 38:2,12 40:16 41:19,20 45:5 55:20 56:7,18,24 60:1,10,19 63:4 71:7,19 73:11 74:12 78:6 83:3 85:6 99:13

**officers'**
46:9,10,21 50:6 84:15 230:24

**older**
134:9

**ongoing**
157:4 185:9 259:24 281:9

**Oops**
57:1

**Op**
38:12

**open**
57:24 136:6

**opening**
143:3

**operate**
84:3

**operations**
18:16 20:8 40:16 60:12 120:11 134:7 155:15 204:21

**operative**
239:3

**opinion**
71:18 73:11,21

**opinions**
115:6,7

**opponent**
231:3

**opportunities**
183:11,15 207:1,12

**opportunity**
148:15 207:3,6,14, 15

**OPR**
80:21 81:11,16,24 82:12 129:21,22,23 130:16 131:14 136:19 146:7 147:3, 5,8 149:2 281:4,7

**ops**
19:21 38:2,7,9 59:2, 5 61:5,14,17 119:13 121:11 122:5,12,16 123:6,10,15 124:1,5, 8 134:10

**option**
247:10 262:20 263:3,5

**options**
202:12 203:17

**optometry**
94:17

**oranges**
18:20

**order**
11:9 17:1 24:18 52:8 54:17 80:1,6 84:1 92:6 99:16 143:2 144:10 145:11,16 156:21 157:1 158:6 165:7,12 180:12,14 182:24 183:2,5 196:20 209:5 217:8, 21 221:20 223:12 225:15 230:19 232:2,7,12,17 247:6, 24 258:6

**ordered**
179:18 180:24 181:17 182:2 205:13,20 221:19 223:16 236:2

**orders**
16:3 158:9

**ordinary**
56:15

**original**
32:2 39:12 159:18 233:19

**originally**
22:2 97:16 205:3

**outcome**
285:11

**outlined**
286:18,19

**outskirts**
60:14

**overlapped**
16:15

**overly**
208:22 269:11

**Overruled**
192:17

**P**

**p.m.**
113:4 160:9,14 226:4,14 256:11,15 263:14,19 281:24 282:3

**Packaging**
29:10

**pages**
63:8 197:17 229:13 256:22

**paid**
30:17 203:10 205:3, 5 236:22

**pair**
97:11 99:4,18,24

**panel**
84:3

**paper**
169:2 271:20

**papers**
247:14

**paperwork**
130:14 139:8,23 143:1 147:7 159:5 168:23 182:15 220:5 225:15 242:5

**paragraph**
40:24 69:24 76:3 142:11 143:19 150:6,22 153:10 180:16,17 184:14 187:22 222:10,24 235:20 257:15 261:24 264:1,3

**paralegal**
91:7

**paramedic**
239:4

**Pardon**
234:8

**parenthesis**
262:7

**part**
20:7 65:15 79:7 82:12 87:2,5 108:13 133:4 146:1,14 152:13 168:10 178:7 192:11 195:22 206:8 268:22 278:9,11

**part-time**
257:22

**participant**
175:18

**participate**
177:22 210:8 218:10 225:23 243:17,23

**participating**
209:18

**parties**
115:7,9 119:24 285:5,9

**party**
115:14

**pass**
18:24 32:10,21 183:24 236:10 273:15

**past**
60:4 113:9 133:10 241:23 250:23 252:2

**patient**
195:24 196:1,11 198:1,4,15 200:8,10 201:16 202:4,9 206:24 237:21 238:8,13,15 239:9

**patient's**
244:23

**patrol**
23:8

**Paul**
155:14

**pause**
63:16 95:12 103:5 229:3 257:10

**pay**
19:17 20:2,21 24:10 28:7 36:4,17 187:21 202:13 203:17,18 205:14,19,23 236:1, 10

**paycheck**
203:9 204:14

**paychecks**
206:6

**paying**
30:20 197:9 202:18

**payoff**
36:13,16

**Payroll**
206:9

**PCP**
251:2

**pdf**
186:16

**pending**
13:6 62:9 284:10

**Penney**
132:15 133:2,7 134:12,14 135:8 136:17 137:7 138:10,17 139:1,3 146:3,21 152:13 153:3,7,22 156:17 158:1,5 170:23 171:5 172:6,7 173:13 190:12 211:15 212:3 249:4

**Penney's**
135:10

**people**
12:22 16:4 17:13 23:11 36:22 38:22 42:10,19 45:6,7,10 46:3 47:20 53:3 55:2 59:24 60:19,22 65:17 74:1 75:7,10, 14,17,23 76:1 100:9 121:5,7 122:16 125:12 128:17 132:2 133:18 135:3 142:24 143:3 170:8 183:20 184:1,5,7 193:23 241:12 243:3,4,6 249:2 272:4 279:3 280:24 281:1,7

**people's**
278:10

**perceived**
147:16 188:20 267:19

**perfectly**
240:14

**period**
21:17 22:13 23:19 59:18 89:19 131:19 132:17,18 236:4

**periodically**
92:18 262:5

**permanent**
24:6

**permitted**
154:11

**person**
48:22,23 54:23 66:14 78:15 97:6,8, 12 106:19 117:4 133:3 178:24 179:1 202:2 229:18 232:23 247:1 248:3 249:6 268:7 269:15,16

**personal**
12:5 68:7,11 115:5,7 163:10,19 180:13 181:14,24 182:5,11, 17 185:20 187:19 240:12 264:7,14,19 265:1,9,16 268:4 269:5

**personally**
209:23 284:8

**personnel**
67:24 119:7 175:19

**persons**
117:4

**pertaining**
128:9

**Peter**
9:14 148:1 151:2 179:1 215:24

**phone**
50:1,16,21 52:15 84:9 107:3,6 111:3 117:5 124:22 137:21,22 138:1,2 172:23 191:13 251:6 253:8 279:24

**phrased**
173:10

**physical**
74:22,23 183:22,24 199:12 239:4

**physically**
277:12

**physician**
225:1,4 250:24

**picked**
174:13

**picking**
224:15

**picture**
13:16

**piece**
169:2 271:20

**pile**
221:4 252:20

**pillar**
102:10,12

**pillar's**
102:4

**pits**
16:1

**place**
38:1 46:8 50:7,10 59:12 67:21 79:8 82:1 93:10,24 121:5 143:10 186:3 187:20 222:16 261:1

**placeholder**
91:10,19

**places**
99:14 273:18

**plaintiff**
39:21 113:12 114:17 117:3,8 118:7 153:12,14 283:6 284:13

**plaintiff's**
9:12 114:12 115:17 117:1,4

**played**
98:22 111:12

**playing**
110:17

**pocket**
104:2

**podiatry**
94:16

**point**
13:17 29:23 30:12 48:15 72:21,22 78:24 93:7 103:14 104:9 118:10 134:19 148:19 158:20 177:19 183:15 195:2 210:7 213:17 221:22 266:16,19 281:6

**pointed**
53:1 75:2

**pokes**
79:9

**poking**
47:6 48:16,17 49:5,9 109:2,11,15 275:9

276:19

**police**
15:9 17:2 21:9,11,14 22:3,10,12,18 23:4, 7,22 24:6,9,18,21,24 27:23 193:7,8 194:11,12 207:3,7, 10,14,16

**policy**
71:21 73:12 180:11 205:23 232:2,7,12, 17,20,21 237:4,6 252:5,7 253:1 262:10

**political**
231:2

**popped**
197:13

**portions**
93:13

**poses**
118:11

**position**
48:19 83:22 103:22 184:21 218:4,9 220:3 223:1

**possibly**
23:7 78:8 89:20 100:12 113:17 131:3 132:6 158:16 191:5 192:8 194:4 195:15 211:20

**post**
83:3

**potential**
179:9 243:4 261:15, 17

**power**
54:20

**powers**
67:13

**practice**
176:3

**preamble**
92:10

**precipitating**
196:2

**preparation**
192:12

**prepare**
59:17 247:24

**prepared**
63:14 247:18

**prescribed**
199:8

**prescriptions**
239:8

**presence**
284:21

**present**
133:3 262:6 285:6

**presented**
69:4 130:13 182:20 248:7

**presents**
195:24

**preserve**
112:8 213:9

**preserved**
111:20

**pressure**
199:17,20

**pressure's**
199:16

**pressures**
66:12

**pretty**
56:13 199:16

**prevented**
44:19,21 47:6

**previous**
32:15 192:13 200:2 225:13 253:17
**previously**
91:21 142:3 183:21 225:2
**primary**
239:16 250:24 253:19
**principle**
240:15
**Print**
177:2
**printed**
176:20
**prior**
25:3 68:13 108:14 165:8 166:15 209:6 217:14 230:22 240:8,10 242:1 245:19 247:19 254:15 270:11 271:4,9
**privacy**
238:11
**private**
223:4
**privilege**
213:12,15,21 215:10 230:9
**proactive**
158:23
**probation**
23:19,23
**probationary**
21:6 23:16 24:4,11
**problem**
38:17 42:18 43:1,2, 3,6,7 55:3,18 242:9
**problems**
38:23 48:20 55:4 66:15,17 130:10 178:5 243:4,5
**Procedure**
238:23 286:18,19,20
**procedures**
228:3
**proceed**
187:18 210:5 225:16
**proceedings**
141:3 144:5 148:3 151:4 155:11 157:8
**process**
21:9 22:13 32:14 139:9 140:2,12,14, 16,18 155:7 168:11 169:6 170:3,5 177:22 181:18 184:24 187:11 195:17 197:6 209:19 210:5,8,19 219:19 221:21 225:16,23 236:23 243:15,16, 18,24 247:7,19 260:1 266:10
**processes**
212:11
**produce**
32:3
**produced**
63:7 91:22 194:20 213:10
**producing**
237:22
**product**
118:9
**professional**
15:3 281:2
**professionally**
197:1
**program**
111:12
**progress**
194:20 197:16 200:1,2 201:2 239:6 258:14
**promise**
39:19 92:8
**promoted**
22:11
**promotion**
18:22 19:14,15,18, 19,22 20:1,2,3,5,13, 14,16,18,22 22:19
**pronounce**
10:19 117:13
**pronounced**
10:18
**proper**
67:24 89:18 173:9 246:24 280:24 281:1
**properly**
36:10 74:2,12 84:12
**proposal**
234:21
**proposed**
201:17 259:18
**protect**
115:1 123:1 238:11 248:8 272:3
**Protected**
172:12 180:1 187:5 209:4 211:5
**protecting**
194:6 195:15
**protections**
24:14
**protective**
11:9 92:6
**proud**
42:24
**provide**
38:18 89:18 132:6 180:23 232:2 238:24
**provided**
83:8 236:11 237:20 251:19 254:22 255:1
**provider**
194:21 246:6 250:21
**providers**
250:23 251:8,16,20
**providing**
131:3 235:15 262:19
**provision**
180:11
**provisions**
238:21
**provoking**
64:1
**psychiatric**
258:18 260:5
**psychiatrist**
273:4,11
**psychiatrists**
273:7
**psychic**
45:8
**public**
283:22 284:4 285:20
**pulled**
99:3,19
**punctuation**
89:22
**purpose**
241:21 243:11
**pursue**
247:18
**pushes**
64:2
**put**
24:12 34:13 49:2,14 50:11 53:9 89:22,23 123:11 142:21 177:1,2 181:9 206:16 217:22
**puts**
55:13 74:16 266:23
**putting**
76:19 206:15

**Q**

**quarter**
87:1
**question**
12:6,11,12,22 13:6 22:1,4,5 24:1 29:20 30:4 31:9 35:14,22 39:4 53:21 57:19 78:1 81:19 82:3 88:7 90:2 95:13 105:21 115:6,11 117:10,23 122:19 125:8 128:12,19 131:10 139:6 143:3 144:9 146:18 151:22 153:16 162:9 169:13 173:23 177:4 178:9 181:20 187:14 196:14 197:21 199:3 203:7 211:24 218:6, 14 219:6 220:20,24 221:1 235:12 237:8 240:24 251:11 260:11 265:6,9,12 270:22 272:21 277:7 279:16 280:19
**questioning**
266:13
**questions**
11:24 57:5 70:2 82:20 92:19 130:17 131:2 134:22 135:1 274:9 281:14,17
**quickly**
191:8 192:7
**quiet**
268:24
**quote**
39:7,14 40:3,6,13,20 64:4,6 76:7 77:5 88:22 89:15,19 262:7,9,10,12
**quotes**
73:19 77:24 262:14

**R**

**raised**
276:12
**raises**
29:20
**ran**
29:24 30:5 205:20
**random**
128:17 232:10
**rang**
138:1
**rank**
276:6
**ranking**
48:23 54:23 55:2 66:13
**ranks**
18:10
**Ray**
68:24 142:5 256:23
**re-handing**
142:2
**reach**
196:19
**reached**
104:1 159:15
**reaction**
269:7
**reactivate**
21:19
**reactive**
158:23
**read**
69:5 70:23 82:21 108:17,18 122:2 144:8 146:18,19 165:22 197:20 198:21 221:10 228:24 236:16,19 237:9 252:6,13,18 271:21 283:15 286:13
**reading**
42:17 118:16 193:3, 19 253:1 262:16 286:10,14
**reads**
62:8,10 150:24 236:1
**ready**
254:11 273:15 286:10
**realize**
13:14
**realized**
148:20 269:20
**realizes**
54:21
**reason**
14:2 70:10,11 85:5 131:4 143:15 152:8 157:2 161:6,24 162:1 189:14 205:3, 4 229:13 244:8 265:2
**reasonable**
113:23 234:6,9
**reasons**
162:7
**Rebecca**
9:20,22 127:5,8 128:2 129:4,7 132:12 136:4 139:11,17 150:21 167:6 170:8 171:3 182:6 207:23 214:5, 8 215:23 219:17 226:19 266:3 267:18 269:3,20,23 270:10
**recall**
25:4 33:10 89:2 90:11 95:18,20 101:4 124:2 125:14 138:13 142:5 155:24 162:14 166:3 174:5 229:23 235:14 245:1 262:13,24
**recalled**
85:1,4
**recap**
145:8
**receipt**
286:12
**receive**
164:12 225:14
**received**
39:15 59:20 61:20 169:16 186:18 203:8 204:12 210:12 214:7 216:15 217:5
**receives**
250:24
**recess**
91:1 160:12 226:8 263:16
**recognize**
93:8 96:10 98:12
**recollect**
35:13
**recollection**
64:8 75:19 88:1 96:16 253:1
**record**
9:12 10:24 11:8 37:6,8,11,13 90:22 91:4,6 104:23 108:18 112:20,22 113:2,4,5,18 114:1 146:19 160:9,14 177:17,18 191:1,16 192:3,4,9 200:2 226:4,7,14 233:12 256:4,9,10,13,15 257:12 263:14,19 282:1 286:24
**recorded**
81:7
**recording**
9:6 117:7
**records**
161:10,11,15,20 168:18 180:13 187:20 201:9,12 217:9 222:13 223:5, 15,20 227:13 228:22 229:8 232:4 237:20, 22 238:14,17 239:1, 2,5,6,7,9,18 240:5,6, 8,9,12,16,17 242:10 243:10,13,18,23 244:3,4,13,16,18 245:20 246:1,22 247:5,21 250:22 251:2,13 252:22 253:10,18 254:11, 19,21 255:1 262:11, 19 264:15 268:17
**recreational**
193:3,19
**rectify**
167:23
**redacted**
238:10
**reduced**
284:22
**refer**
73:8 197:21 200:20 227:4
**reference**
32:21 38:8 190:18 198:13 230:18
**referenced**
214:1,5,9
**referrals**
200:16
**referred**
137:9 196:11 197:18 208:19 229:15 259:22
**referring**
33:13 38:20,21 39:2 40:15,21 41:3 83:13 120:2 151:10 188:8 249:3
**refers**
40:8 209:12 211:9 214:14 258:12 266:21
**reflect**
35:16 259:8,12
**reflected**
74:6
**refresh**
64:8 96:16
**refuse**
180:22
**regard**
122:16 262:1,3
**regret**
207:1
**Regretting**
124:20
**regular**
16:17 30:17 208:4
**Reierson**
9:20,22 127:5,8 128:2 129:4,8 131:18 132:12 135:16 136:4 138:10 139:11,17 150:21 153:12 164:10,18 167:6 169:17 170:8, 19 178:23 179:7 182:6 186:14 189:8 191:22 207:23 208:10 214:8,11,12, 18 215:2,23 216:12 219:17,23 221:17 222:6 226:20 231:24 232:1 250:2,7 266:3 267:18 268:5,11,13, 15 269:3,20,24 270:10 271:15
**Reierson's**
171:4 214:5,14 221:6 224:16
**reimbursement**
186:23
**reinstated**
184:17,20 186:20,22
**reinstatement**
184:17
**reinstating**
218:1
**reiterates**
210:16
**relate**
50:18
**related**
150:10 152:2 178:10 193:14 196:1 199:5, 9,13 272:14 285:9
**relates**
246:2
**relationship**
85:12 261:19 265:24
**release**
153:14 172:14 179:3 181:1 186:15 187:19 189:24 190:8 209:3 217:9,24 222:12 223:3,14 225:8,15 227:8 230:20 232:3, 18 244:17 252:9,11 255:15 257:4
**released**
154:13 246:1
**releasing**
161:18 264:15
**relevance**
125:4,5 272:23,24
**relevant**
71:12 118:10 130:22
**relief**
149:7 200:11
**relieved**
42:11
**rely**
53:14 149:12
**remedies**
217:24
**remedy**
66:2 67:6

**remember**
10:23 14:23 15:7,10 22:21 34:5,9 35:8 38:21 39:1,5,24 40:5 43:16,21 44:22 46:6 58:3 60:21 61:24 65:4,5 78:17 95:4 97:10,20 111:1 119:18 128:5 131:17,22 133:15 138:17,18 166:6,9 168:8 172:22 173:16 201:24 211:13 227:11 244:13,14, 15,20 252:19 278:22
**remembering**
98:5
**rep**
136:18,20 149:21
**repeat**
274:10
**repeated**
138:15
**rephrase**
42:15 112:3 146:17 253:10
**report**
65:19 68:24 69:6 80:22 81:24 142:4 175:13 176:18 226:24 228:2,16,17 229:12
**reported**
228:12 261:18 284:20
**reporter**
10:4 12:18 37:20 58:8,16 68:21 80:18 108:19 114:11 116:23 118:21 121:20 146:20 154:6 155:21 157:21 162:19 170:17 171:24 175:5 178:20 186:8 189:6,20 192:23 194:18 207:22 212:19 215:16 219:15 224:14 226:17 231:22 233:18 234:18 237:16 245:11 250:15 255:8 286:22
**reporter's**
31:19
**reporting**
64:24
**reports**
147:13 196:1 198:1, 4,15 201:16 202:4 206:24 239:4,7
**represent**
10:15 30:10 32:1 39:11 80:20 92:21 179:9 274:6
**representation**
143:16 144:11 145:12,17,23 146:2, 4 147:1,20 149:15
**representative**
135:13 146:11 156:2 193:6
**representatives**
171:17
**represented**
111:15 113:10
**represents**
238:13
**request**
108:6 111:19 112:6 118:8 151:16 153:15 176:18 186:23 194:1 216:23 222:15 238:20 251:2
**requested**
66:2 108:19 146:20 150:8 243:10 252:21 262:18
**requesting**
161:14 184:15 185:3 238:14
**require**
223:1
**required**
115:8 156:9,18 165:1 183:22 208:14 286:10
**requirement**
158:7 232:8
**requirements**
65:16 225:9
**requires**
130:5 232:3
**rescinded**
217:22
**reserve**
281:22
**reserved**
285:4
**resist**
89:6
**resistance**
143:17 145:24 146:12
**Resources**
142:13 150:23 154:13 221:7,15 262:12 264:2,16
**respect**
179:9
**respectful**
54:18 57:18
**respective**
70:11,12 285:5
**respond**
124:23 165:17 216:20
**responded**
85:2 122:18 209:14, 23
**responding**
272:17
**responds**
124:10
**response**
18:17 20:12 57:21 120:24 123:24 126:1 128:11,12 139:4,5 186:18 213:5 217:6 219:16 222:6 224:16
**responsibility**
268:24
**responsible**
83:4,19 84:22
**responsive**
163:14
**rest**
144:8 153:23
**restrain**
51:14,16,19 52:3,9
**restrained**
74:19 103:18,21
**restraint**
51:17
**restraints**
51:16,21,23 73:8 85:7,9 86:22 89:18
**restriction**
239:1
**restroom**
102:2,13,14
**result**
54:18 128:16 181:8 182:23 199:20,22 258:24
**results**
228:18 239:3
**resumed**
249:5
**retail**
16:17
**retained**
169:18 174:18 179:8
**retaliated**
231:1
**retaliation**
113:17 118:12 188:7 230:22 231:8,11
**retired**
134:8 204:20
**retrieving**
243:13
**return**
69:19 153:13 156:9, 18 165:8 179:19 183:1,3 184:18 210:18 263:8
**returned**
136:13 184:11 209:8 210:3
**returning**
165:2 208:15
**review**
141:16 165:7,12 172:19 209:6 250:22 254:22 258:13 281:2
**reviewed**
228:21 235:16 246:2
**revised**
246:14,18
**rewarded**
40:23
**Richard**
9:16 58:19
**Ricola**
273:22
**rid**
281:10
**right-hand**
86:4 101:1 102:1 142:10
**rights**
231:1
**ripped**
97:1
**rise**
18:9
**risk**
118:11
**Robin**
227:18
**Robinson**
137:19,22 138:2,5, 18,22 139:6,15 155:23 157:13 158:22 159:7 169:15 170:24 171:5 184:3 232:19,24 266:20
**role**
98:21 135:10 279:11,13
**roll**
75:17
**rolling**
279:20,23
**rolls**
278:10
**room**
47:14,17 50:3,5,13 51:21 52:23 75:12 85:10,18 87:21,22 88:3 94:4 95:14,15 102:12 107:11 130:9 135:6 136:4 138:3, 12 142:24 148:16 249:4,15 266:3 267:20,23
**rooms**
50:12
**roster**
77:7,10,21 78:5,16 80:8 83:23
**roughly**
28:2 75:6
**row**
275:19,21
**rule**
13:4 114:13 115:13 238:23 286:18,19
**rules**
11:23 115:13 206:12,19,22 286:18,20
**rumor**
38:1
**rumors**
205:8
**run**
49:21
**Running**
178:14

**S**

**S-E-A-M**
62:3
**S.E.A.M.**
62:3 119:16
**S.O.R.T.**
76:8 120:20,22 134:7 204:21
**sadness**
206:24
**safe**
243:3,6 272:2
**safety**
43:4 118:11
**salary**
28:6 29:23 30:5,17 186:21,24
**Sarah**
9:18 10:14 47:24 281:19
**sarcastic**
262:4
**Sarocka**
250:17 251:5 253:6 254:7,8 255:10 256:20
**sat**
86:16 249:10
**savvy**
40:2
**scab**
97:1
**scanner**
60:17
**scanners**
60:17
**scanning**
32:15
**scene**
97:6 99:24 100:19
**schedule**
27:17 286:12
**scheduled**
113:7 236:5,6 254:13
**school**
14:12 15:16
**scope**
222:14,20
**screaming**
276:16
**screen**
93:17,19
**screw**
168:2
**SE_2**
92:7
**seal**
285:13
**seams**
75:14
**search**
41:2 110:11 163:12, 13 164:3 192:6
**searched**
110:10,12
**seat**
85:23 86:8,13
**seats**
127:16
**secondary**
26:14,17,20 28:9
**seconds**
137:24
**Section**
119:23 235:24 238:23
**Security**
27:1 238:10
**seek**
159:2 196:24 217:23 248:2
**seeking**
196:3
**send**
41:11 68:3 121:1 156:8,23 174:6 176:22 177:7 185:3 217:14 239:18 269:4 280:11,12
**sending**
38:1 40:16 59:11 156:7 158:4 163:17, 18 173:14 174:2 186:13 189:10 190:23 192:1 193:18 211:1 235:12 242:10 268:17
**sends**
38:17
**seniority**
184:2
**sense**
28:2 204:9
**sentence**
77:19 86:6 88:19 143:18 165:18 262:1
**separate**
66:22 248:9
**September**
15:14 17:22 22:20 31:22 37:22 43:14, 15 59:12 61:7 62:17, 18 69:13 80:23 93:7 117:9 118:24 144:8 150:10 151:11 178:1,11 198:2 255:10 256:19,23,24 266:22 270:2 274:14
**sergeant**
19:8 44:4 47:15 50:2 52:6,10,18 55:17 65:7 71:4 77:6,20 79:8 105:9,15 106:18,20
**sergeant's**
18:15,21 19:3
**series**
121:22 194:19
**services**
9:3 18:17 20:18 221:8 258:5 286:1
**session**
139:21 258:19
**set**
27:17 70:8 113:20 117:2 285:13
**setting**
71:11 85:24 86:12 196:24 222:15 280:19
**shackle**
45:16 52:9 53:5,9 107:12,14,15
**shackled**
45:16 74:3 103:15 104:7,8,24
**shackles**
73:14 83:6,9 104:11
**shackling**
71:22 72:2,20 73:7 104:16
**Shaw**
238:6,12 239:15,18
**she'd**
269:14
**she'll**
55:12 126:23
**sheet**
32:11,22 80:21
**Shelby**
9:19,23 126:23 127:7 128:1 129:16 131:18 133:13 135:16 136:10,17 137:21 138:11,15 139:10 140:5 150:21 152:12 153:12 164:24 165:9,15 166:1,4,20,22 167:2, 19 168:19 170:7 172:17 174:9 178:24 179:8 182:18 186:14 190:19 209:9,13 210:3 211:9 214:10, 23 215:23 216:12 240:20 242:9,23 248:4,11,16 250:1,2, 8 251:12,13 264:6, 13,18 265:8,15 266:10,13 267:9,12 268:3,12,17 269:1,7, 19 271:9,17
**Shelby's**
127:14 136:13 138:5 151:24 161:15 214:15 246:23
**sheriff**
9:19,22 161:19 172:13 185:3 190:8 230:24 231:3
**sheriff's**
15:13 16:21 18:10 21:9,14 22:3,10,12, 18 23:4 24:9,24 25:7,10,14 26:3 27:10 28:17 29:5,22 30:5,23 34:18 69:20 108:7 112:6 121:23 159:22 160:2 164:24 170:20 173:21 179:10,15 180:11 188:24 192:12 193:7,8 196:18 202:17,21 203:2,10 204:10,20 207:3,7, 10,14,16 215:11,12, 18 217:14 220:1 222:19 223:1,3,18, 19 230:23 233:5,8 235:5 243:21 247:4,

17,21
**shift**
27:19 120:10,11
**Shipley-2**
228:8
**shit**
41:2,3
**shop**
196:22
**short**
23:6 45:20 63:15 72:10 91:1 106:19 191:12 206:2 226:8 229:2 257:9 263:16 280:23
**short-staff**
38:3
**short-staffed**
40:17
**shot**
102:1 103:4
**shoulders**
278:10
**show**
43:19 44:15 46:20 92:17 95:10 107:19 132:5 143:2 173:8
**showed**
44:3 110:3 132:16 137:15 146:3,21 152:13 156:13
**showing**
93:13 117:7 219:16 256:17
**shown**
92:13 112:11 157:21 207:22 231:23 245:12
**shows**
98:12,13 133:20
**shy**
123:5
**sic**
238:5
**sick**
31:7 205:16 253:20
**side**
86:4 101:13 105:7 129:16 194:12 239:11
**sidewalk**
272:18
**sign**
137:3 139:8 140:1, 10,12 141:5,10 160:21 161:3 162:1, 13 179:4 180:24 186:16 217:8 219:1 222:12,22 225:21 227:8 230:19 232:3 244:17,23 286:13
**signals**
268:6
**signature**
175:22 221:7 244:23,24 281:22 283:16 285:3 286:11,23
**signed**
153:13 210:2 225:14 235:8 245:16 250:19 252:12 255:14 257:3 286:17
**significant**
258:20,23 260:4,8
**significantly**
70:12
**signing**
165:8 209:6 245:1 286:10,14
**similar**
205:10
**simple**
211:24
**simply**
35:15 115:13 177:9 264:14 270:23
**SIMS**
228:8
**Sincerely**
226:21 286:21
**sir**
67:22 83:15 142:6 209:10 273:1 274:7, 16 275:2 276:21 280:17 281:5
**sit**
41:8 50:15 52:8 92:16 113:14 127:18 211:12,16,24 249:10 268:23 274:18
**site**
94:20
**sitting**
92:16 100:11 127:1 266:14
**situation**
74:18,19 143:5,7 144:12 145:13,20 147:12 149:9,14 157:5 158:13 196:2, 14,16 197:5,20 198:15 260:7 278:7
**situations**
142:21 149:13
**size**
53:15,18,23,24 55:23 56:4,8 88:14
**skip**
83:16 102:22,24
**slammed**
57:23 90:14
**slash**
195:24
**slightest**
24:12
**Slightly**
272:14
**slow**
206:4
**smacked**
272:18
**small**
33:17 34:12 94:16 171:15
**smaller**
53:20 55:21
**Social**
238:9
**softly**
54:20 130:8
**someplace**
99:7
**Son**
40:9
**sort**
12:19 14:3 17:1 36:20 63:24 82:22 83:16 87:1 122:19 128:21,22 130:5 194:1 265:23 276:11 280:18
**sorts**
248:16
**sought**
258:2
**sound**
260:15
**soup**
186:1
**South**
14:17
**spaces**
86:16
**speak**
24:7 38:22 66:6 130:8 132:13 148:19
**speaker**
138:1
**speaking**
54:20 75:6 87:5 106:18,20 275:23
**speaks**
145:7 187:15
**special**
18:15 19:21 20:8 206:21
**Specialist**
9:2
**specialists**
251:1
**specific**
34:9 73:1 212:1 240:2
**specifically**
39:1 45:1 47:4 132:8 138:18
**speculate**
12:6,7
**speculation**
64:11 97:17 151:14 173:22 180:7 185:16 214:17 239:21
**speech**
39:8 58:11
**spill**
186:3
**split**
261:19,20
**spoke**
42:18 94:9 131:18 139:11 275:24
**spoken**
157:9 279:9
**spread**
205:8
**spring**
204:2
**Springs**
11:5 286:6
**square**
23:10
**SS**
284:2
**staff**
33:8 94:12 119:22
**staging**
64:21 65:8,11,12,16 79:9 85:5 87:9 92:22 93:8 103:7
**stamp**
91:22
**stamped**
69:23 161:16 172:23
**stand**
92:15 268:20
**standards**
149:10
**standing**
103:17 105:5 106:4 127:2
**stands**
36:11 62:4
**start**
10:17 15:12 16:11 17:16 18:1 27:2,9 29:11 43:20 71:19 93:6 95:9 122:1 142:14,19 203:24 204:4 253:12
**started**
17:23 47:6 202:1 203:21
**starting**
14:12 23:23
**starts**
22:13 37:24 70:1 81:2 86:19 92:23 142:12 264:1
**state**
10:23 113:6 182:9 284:1,6
**State/trait**
228:7
**stated**
59:21 83:5,21 85:4 131:13 159:11
**statement**
35:23 45:4 70:3,16 73:16 76:12 83:11 85:16 115:21 142:16 144:15 145:13 147:21 165:4,22 198:8 200:13 230:18 237:19 257:23 258:10
**statements**
72:22 73:1 165:20 239:8 262:14
**states**
69:12 115:14 202:10 275:22 283:1 284:11
**stationed**
123:16
**status**
21:6 22:17 24:11 198:3,6 200:7 202:5, 11 207:2 228:6
**stem**
279:18
**stemming**
62:15
**stenographically**
284:21
**step**
13:15 65:1 127:6 132:10,19,22 137:18 140:16 277:3
**stepped**
87:8 133:6 276:19, 24 277:3
**steps**
276:22 277:5
**steward**
137:19 156:1,3,20
**Stipulate**
233:22
**stipulations**
234:7,10
**stop**
27:22 49:5,9 60:17 92:18 95:22 96:7 97:3 98:19 99:1 100:7,22 101:8 102:20 103:1 104:3, 12,19 105:17 204:8 219:4
**stopped**
29:16 49:7 52:18 130:3 204:9 236:11
**store**
15:20 16:12,13,18
**stormed**
57:23,24 58:2 90:14
**story**
149:22 150:1
**Stott**
193:2,5,6
**Street**
286:1
**stress**
196:6,12,15 197:4, 18 198:19,21 199:4, 9 200:9 258:6 259:16 260:6
**stressed**
197:7 275:10
**stressor**
257:21
**stressors**
196:1 198:18 261:15,17
**Stressors/ extraordinary**
195:23
**strike**
41:14 192:16 277:16,20 279:12
**study**
14:18 140:6
**stuff**
48:24
**subject**
11:9 29:5 32:10,22 37:23 62:2 92:6 113:12 114:4 115:5, 7 118:12 179:2 189:24 193:2 213:12 230:11 234:20
**subjected**
170:4
**subjective**
276:12
**subjects**
38:23
**subordinates**
277:22
**Subscribed**
283:19
**Subsequent**
259:8,12
**substance**
90:10
**Suburban**
14:17
**successfully**
71:7
**sued**
25:6 179:14
**suffered**
199:12 258:23
**suffice**
224:2
**suggest**
159:2 225:10 252:4
**suggested**
14:4
**suggesting**
228:20
**suggestion**
114:3
**suggests**
207:8
**suing**
192:12
**suit**
186:22 217:23 230:22 285:10
**Suite**
9:4 284:9 286:1
**sum**
90:10
**summary**
80:21 81:16 88:12, 22
**summer**
204:2
**Sunday**
119:8,21
**superintendent**
44:3 46:1,20 48:11 50:8 51:13 54:11 58:22 59:4,5,7,8 60:8 62:16,21,24 64:2 67:19 70:5,9,18 71:3,13 76:5 79:1 85:2 87:3,8,12,16 93:24 105:22 106:13 107:2 108:8,14 121:12 138:20,23 150:11 154:17 167:9 177:24 181:8 182:19 185:4,10 188:11,16, 19 208:20 231:12 264:7,13,19 265:8, 16 267:9 269:24 271:1 274:20 280:15
**superior**
63:3 150:10
**superiors**
113:8
**supervise**
33:7
**supervisor**
44:2 101:6 114:7 231:4 277:15
**supervisors**
52:5 120:20 121:8 204:22 277:22
**support**
38:18 115:15,17 231:2
**supposed**
33:6 53:16 84:3 154:24 167:21 183:20 242:3
**Supreme**
286:18
**swear**
10:5
**swing**
123:7
**switch**
226:1,2 273:18
**switched**
24:21
**sworn**
10:7,10 283:12,19 284:17
**symptomatology**
259:16
**symptoms**
258:20 260:5
**system**
176:1,4

**T**

**takes**
53:19 57:13 85:13
**taking**
16:3 46:8 158:24 161:19 171:12 184:1,22 228:13 262:6 273:12 278:23
**talk**
12:20 38:15 55:12 94:20 108:11 132:24 135:17 212:8 251:5
**talked**
29:6 59:24 71:8 87:14 92:14 116:11 119:16 124:4 131:17 132:11 186:12 188:15 192:13 205:8 274:13,14 275:1,4
**talking**
42:10 48:12 78:11 93:20 106:5 110:19 111:23 129:3,15

131:16 132:7 150:20 157:23 214:17 252:7 260:12
**talks**
182:22
**tape**
95:22 226:2
**tapes**
90:20
**tardiness**
26:7
**team**
18:16,17 20:11,12 120:21,24 123:24
**Teamster**
24:20 234:22
**Teamsters**
21:3 138:8 156:5 171:16 172:5 235:4
**Teamsters@ cookcountyil.gov**
172:3
**technologically**
91:8
**telling**
169:4 204:13 256:22
**ten**
250:18
**tense**
135:6 144:12 145:13,20
**Tentative**
234:22 235:3,13,17
**term**
41:5,22 72:10
**terminated**
198:4 202:11
**terms**
13:2 72:3
**test**
17:1,8 18:15,16,17, 21,24 19:12 141:23 183:22,23,24 239:3
**tested**
183:21
**testified**
10:10 119:15 160:20 161:2 165:11 167:13 168:6 204:5 218:24 276:18
**testify**
152:11 284:17
**testifying**
110:17
**testimony**
54:3 81:1,11,16 93:21 109:9 119:18 134:11 135:21 143:23 145:15 151:23 152:18 155:24 165:24 181:20 218:13,21 219:5 220:9 260:23 270:9,16,23 284:19 285:1,12
**testing**
18:21
**tests**
17:11 18:9,11,13,14 239:2
**therapist**
258:4 273:5,12
**therapy**
196:12 197:18 239:5 253:21
**thereof**
285:11
**thing**
16:5 21:23 24:12 35:5 41:24 49:10 55:15,18 82:21 105:2 138:19 178:3, 8 211:22 239:22 240:4 256:1
**things**
32:2 34:3 36:9,21 38:24 45:1 57:8 69:5 70:3 71:17 74:5 76:9 87:20 94:16,17,23 98:3 121:5 124:1 171:15 205:8 222:9 230:5 232:9 248:17 249:22 261:1,2 276:24 278:8
**thinking**
21:24 27:6 47:19 66:24 88:12,13
**Thomas**
234:3
**thorn**
36:4,14,17
**thought**
27:13 71:11 105:2 173:18 198:21 217:16 233:12 248:9 264:22 272:12
**thoughts**
70:10 148:23
**threaten**
128:4
**threatened**
128:3,13 143:3
**threatening**
129:24 150:9 151:8, 16 181:10 208:22 241:12 249:2 269:11
**thrown**
211:19
**thumb**
91:11,21
**Thursday**
38:8
**time**
9:8 17:5 21:17 24:21 26:7 27:13,17 28:10 29:3,7,21 30:13,18, 23 31:2 33:21 37:9, 13 47:18 49:11 54:5 55:7 58:23 59:18 62:12 69:16 75:21 76:1 81:14 82:16 85:11 86:13 90:22 91:4 93:14 95:2 99:19 102:22 103:11 107:4 108:2,16 109:3 111:16 112:7, 23 113:4,23 120:23 124:10 127:10 129:5 130:1 131:19 132:18 134:8 139:20 140:7 146:13 147:2 149:9 157:5,24 160:9,14 161:6 164:1,4 165:5 166:23 174:17 181:16 182:1,7,20 183:10,19 184:19,23 185:11 186:21,23 189:11 190:15 191:4 193:10 194:4 196:3, 23 197:1 200:14 201:10 202:15,19 203:9,18 205:15,19, 23 206:6,16,17 207:14,16 209:16 210:12 213:19 216:8 218:1 221:11 222:14,20 224:8 225:9,20 226:4,14 234:2 235:17 236:17 239:2 243:3,19,24 244:12 249:19 252:21 253:8 256:11,15 257:16 262:18 263:14,19 268:19,23 271:19 275:23 277:2 278:20 281:24
**times**
11:20 25:24 26:19 41:1 64:3 85:8 95:1 143:15 157:9 177:14 179:15 211:2 240:19 262:4 275:16 278:7
**tipped**
133:13
**title**
18:2 92:6 156:4
**to-wit**
284:7
**today**
11:15 12:4 13:10 15:10 21:4 27:20 81:12 113:7 120:3 145:15 155:1 199:6 206:13 211:12,16,24 258:17 272:15 274:15,18 275:1 281:4
**today's**
281:24
**told**
21:5 32:24 35:16 42:6 60:10,22 67:9 78:24 89:14 111:3 125:20 126:2,3,23 129:1,19 131:8 133:11 136:20 141:4 143:12 144:2 146:7 149:16 150:15 151:17 153:12 154:22 155:2,6 158:20,22 160:20 168:7 169:10,14 171:12 182:14,15,21 184:3,8 185:13 194:9 198:9 205:10 221:17 229:17 230:11 232:16 247:9 263:1,10 269:14 270:5
**tolerance**
262:5
**tone**
64:4 249:13
**top**
88:11 158:2 170:22 171:1 179:5 201:3 212:21 215:9 224:16 228:3 233:21 276:16
**total**
277:6
**touch**
194:10 277:3
**touching**
65:21
**towns**
23:9
**Trade**
15:19,23 16:10
**tragedies**
41:13
**training**
21:22 149:11,13 183:11,14
**transcript**
88:13 283:15 284:24
**transcription**
81:11,15 284:23
**transfer**
61:10 207:3
**transferred**
59:2,19,22 61:1 67:21 90:16 120:9 121:11 124:5,7 207:7
**transport**
123:17 195:12
**Transportation**
183:21 184:2,10
**trapped**
65:2 148:17
**treated**
89:6
**treater**
253:23
**treaters**
253:9,10,11,13,16
**treating**
51:8
**treatment**
206:21 239:5 258:2
**treats/treated**
246:6
**triage**
50:14 51:6,10 52:13 102:12 278:23
**triaged**
94:11
**trial**
238:17
**Triton**
14:16
**true**
33:20 38:3 72:15 147:4 165:20 209:9, 22 214:22 284:24
**trust**
121:7
**truth**
150:2 260:21 284:18,19
**truthfully**
13:11
**TSA**
60:16
**Tuesday**
207:24
**tunnel**
84:6
**turn**
69:22 110:18 125:11 164:7 210:23 221:4 227:16 228:1 235:7, 11,19 238:1 247:13
**turned**
77:5 110:22
**turns**
77:20
**Turrise**
96:14 98:7 100:12 105:8 106:11 176:13
**two-year**
22:12,13
**Tylka**
32:17 33:11,22 35:17 42:5
**type**
43:4 45:20 84:1 129:19 229:18 269:16
**typewriting**
284:23
**typo**
154:12

**U**

**U.S.**
286:20
**uh-huh**
12:1
**uh-uh**
12:1
**ultimately**
150:7,24
**Um-um**
36:13 128:20 164:11 277:23
**un'**
74:6
**unauthorized**
210:13
**uncomfortable**
264:15 266:12,18 267:1,20,22 269:22
**uncuffed**
74:7
**undergo**
165:1 208:14
**understand**
12:1,11 18:8,20 19:4 21:20 22:6 25:21,23 26:13 30:3 32:5 48:19 53:20,23 62:6, 23 66:12 70:15 73:3 77:17 101:10 115:4 129:6 131:11 144:9 150:3 151:23 157:15 167:24 177:20,21 179:17 184:21 188:8 196:7 210:13 212:7 214:19,20 220:7,15, 21 221:14,21 230:9 236:21 237:10 240:3 241:18,21 242:13 243:9,20 244:2,7 253:15 270:15,19 271:12 272:19,22 277:11
**understandable**
260:6
**understanding**
71:12 110:7 118:1 122:15 132:21 150:7 151:1,6,7,15 152:5,6 242:2 251:10,14 269:2
**understands**
205:11
**understood**
12:13 48:5 49:1 62:13 69:17 71:15 140:15 151:11,12 179:14 219:23 243:12
**undetermined**
284:11
**uneducated**
197:10
**unfit**
137:1 138:16 249:6 268:10
**unfitness**
137:10
**uniform**
19:23 52:24
**union**
20:24 21:2,4 24:9, 10,16 25:22 133:3,7, 19 135:11,13 136:18,19 137:19 143:16,24 144:11,21 145:1,4,11,16,23 146:2,4,10 147:1,20 148:12 149:7,15,21 156:1,3,20 157:5 158:8,13,23 168:7, 20,22 171:5,17 173:20 193:6,10 194:10 232:16,24
**unit**
183:19,21 184:10 283:8 284:14
**United**
283:1 284:11
**unlawful**
153:15 180:15 182:24 183:3,6 217:10 222:15 223:5 230:20
**unlimited**
225:9
**unlocking**
84:4
**unnecessary**
276:7
**unpaid**
222:11
**unpleasant**
248:17
**unprofessional**
65:4
**unregulated**
198:3
**unsafe**
73:22 243:4 272:3
**unwilling**
210:8
**updated**
171:14
**updates**
251:1
**upper**
55:2 93:18 101:12, 24 105:6 142:10 195:22
**UPS**
27:1
**upset**
44:13,15 47:1 48:18 57:20 133:11 135:3 136:21,22 137:3 276:7,17
**upstairs**
135:15

**V**

**vacation**
183:10 184:19
**vague**
33:17 34:1 35:12
**verbal**
71:23 143:2
**verbalize**
54:17
**verbally**
11:24 182:15
**verify**
35:7
**version**
156:10
**versus**
9:9
**video**
9:2 88:6 92:13,18,22 94:4 95:9 101:17 105:7 107:21 108:7, 12 109:2,4,5,14,15, 19,20 110:4,6,8,16, 19,20,21 111:6,10, 19 112:7,8,11 117:6, 17 175:14
**videos**
91:8
**Videotape**
90:23 91:5 160:10, 15 226:5,15 263:15, 20
**view**
20:19 183:2 221:22
**viewed**
117:6,17

**violate**
217:16
**violated**
217:17 230:24
**violates**
217:10 230:20
**violating**
205:23
**violation**
223:5
**virtually**
129:8
**vis-à-vis**
135:10
**visit**
31:4
**Vlahos**
188:22 189:9,10
**voice**
64:4 276:1,3,12,13
**voicemail**
165:16 166:4,7,9 209:12 213:24 214:4,8,9,10,15,23
**volume**
75:10
**volunteered**
52:17
**vulnerability**
148:11,14
**vulnerable**
147:14 148:7

W

**Wacker**
9:7 284:9
**wait**
17:7 54:22 109:24
**waited**
126:22 127:5 136:9
**waiting**
45:23 50:9,23 65:12 83:14 101:5 127:1
**waive**
230:16
**waived**
213:15 230:12
**waiver**
210:2 221:20
**walk**
52:7 53:3,8 89:15 126:18 130:7 241:11 278:14 279:1
**walked**
44:17 50:2,22 52:3,6,12 53:1,9,10 64:14 101:16 102:17 104:16 105:12 106:8,17 126:6 133:10 249:4 268:22 271:16
**walking**
47:20 88:20 89:5 99:23 100:18 105:22 106:5 126:16 279:3
**wall**
47:12 49:3 65:2 76:17 101:5 128:18 134:22 277:1,3,6
**Waller**
120:16,18
**walls**
40:10
**wanted**
36:13,16 66:10,19 71:15 128:2 132:23,24 135:22 148:19 161:10 240:7
**wanting**
130:19
**wasting**
197:1
**watch**
278:9
**watching**
111:4
**water**
12:16 13:14
**wave**
132:10
**ways**
10:18 66:22 68:3
**wear**
46:17
**wearing**
16:2 46:13 106:13
**Wednesday**
38:7 210:4 225:17
**week**
27:14 85:7 159:10 186:21,23 217:23
**weeks**
17:20 28:22 59:17 108:7 164:19 255:13 257:3
**West**
9:7 284:8
**wheelchair**
100:14
**wheeled**
100:21
**WHEREOF**
285:12
**whispers**
53:4
**White**
170:20
**whoa**
248:18
**whomever**
94:11
**wife**
258:4
**Williams**
216:5,6
**Willow**
11:5 286:6
**Winifred**
9:19,23 150:21 161:15 164:24 168:19 215:23 246:23 266:10,13
**wished**
71:19 73:11
**Withdraw**
215:14
**witnesses**
115:14
**woman**
122:10,11 134:9 227:23,24
**women**
41:20,24 55:20
**wondering**
128:8 149:3
**word**
48:9 74:14 75:2 86:3,5,19
**worded**
49:10 128:6 130:2
**words**
44:22 78:21 80:7,10,11 88:23 89:2 152:4 188:1 266:21
**work**
21:17 27:15,20 29:7,14 31:6 32:8 38:9,16 41:7 43:2 60:2 113:13,24 118:9 130:9 140:11,13 141:14 153:13 154:11 155:1,2,8 156:10,18 159:3 169:5 179:19 183:1,3 184:11,18 185:14 191:13 195:6 196:2,13,16 197:4,8,19 198:2,3 200:7 202:5,11 205:7,15,17,18 209:17 210:12,18 212:12 217:22 220:23 243:15 257:20 258:1,7 260:7 263:9
**worked**
15:19,20 16:13 27:18 29:1,8 84:7 134:7 137:20 195:1 197:14 220:15,21 221:2,14
**working**
15:12 16:7,12,17 17:22 27:1,22 28:10 29:11,17,22 61:13,14,16,17 79:9 84:11 126:12 134:10 158:19 171:13 178:4 185:12 195:9 196:17 200:11 203:21,24 204:4 220:8,12,18 257:22
**workplace**
225:6
**works**
84:6 99:9 122:9 188:24 194:11 195:5,6
**world**
40:9
**worried**
96:24 197:9 202:10 240:15
**worry**
57:2 67:11 130:16
**worse**
61:13
**Worthon**
154:20 155:14 205:6
**wound**
96:21
**wrists**
72:6
**write**
60:5 63:23 176:15 230:2
**writes**
71:2,18 164:22 179:7 197:24
**writing**
32:15 147:14 164:18 239:11
**written**
33:14 71:21 159:5 176:10 183:23 188:14
**wrong**
134:22 144:16 149:1 161:21 167:21 170:6 242:15,19 255:24 256:18 261:14 264:23 276:23
**wronged**
183:7 260:14
**wrongful**
61:10
**wrongfully**
59:19 60:24
**wrote**
34:10,13 35:7,10,11,24 62:12 63:19 78:14 219:11 280:2

X

**XIV**
119:23

Y

**yahoo.com.**
163:3
**year**
15:15 16:10 21:23 23:3,21 27:4 28:3 108:3 255:2
**years**
14:23 16:9,14,15 17:18 21:15 22:9 26:8,18 28:12,16,23 29:2 60:20 82:6 178:5 205:16 207:9 211:18 241:12,24 250:24 252:3,6,19,22 253:3,17
**yell**
277:22
**yelled**
49:13,14,19 58:2,3
**yelling**
44:17 49:15 276:7,11,13
**young**
123:5

Z

**Zaleski**
31:22 32:6 34:23 35:16 37:23 108:23 111:20 112:8 114:16 115:1,16 116:10,11,12 117:13,16,20 234:20 235:13
**Zaleski's**
116:8 118:4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

John Nawara,

Plaintiff,

vs. Case Number 1:2017cv02393

County of Cook et al.,

Defendants.

Deposition of Winifred Shelby
Confidential - Deposition of Winifred Shelby (8)
Wednesday
September 25th, 2019

-at-

Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois



APPEARANCES

For the Plaintiff:
Peter V. Bustamante
Law Office of Peter V. Bustamante
17 North State Street
Suite 1550
Chicago, Illinois 60602

For the Plaintiff:
Richard F. Linden
Law Offices of Richard Linden
17 North State Street
Suite 1550
Chicago, Illinois 60602

For Defendant Karen Jones-Hayes:
Joi Kamper
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602



For Defendant County of Cook:
Megan Honingford
Cook County State's Attorney's Office
50 West Washington Street
Room 500
Chicago, Illinois 60602

For Defendants Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby:
Sarah R. Marmor
Scharf Banks Marmor, LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606

RECORDER: Good morning. We are now on the record. Today is Wednesday, September 25th, 2019. The time is now 10:05 a.m. We are located at Law Office of Peter V. Bustamante, 17 North State Street, 1550 -- Suite 1550, Chicago, Illinois 60602, for a deposition in the matter of John Nawara v. Cook -- v. County of Cook -- v. County of Cook at el., case number 1:2017cv02393. The venue is Northern District of Illinois, Eastern Division. The witness today is Ms. Winifred Shelby. Ms. --



MS. MARMOR: Winifred.

RECORDER: -- Winifred Shelby. My name is Katie Jasinski, and I'm a notary public, and I'm recording this deposition on behalf of Exhibit 5, LLC. At this time, would you please --

MS. MARMOR: Whoops.

RECORDER: -- would you please raise your right hand for the oath?

(Witness sworn)

RECORDER: Thank you. Would the attorneys please state their appearance for the record?

MR. BUSTAMANTE: Peter Bustamante on behalf of John Nawara.

MR. LINDEN: Richard Linden on behalf of John Nawara.

MS. MARMOR: Sarah Marmor on behalf of the witness, as we well as the sheriff, Matt -- Matthew Burke, and Beka Reierson.

MS. KAMPER: Joi Kamper on behalf of Karen Jones-Hayes.

MS. HONINGFORD: Megan Honingford on behalf of Cook County.

RECORDER: That completes the required information. We can proceed.

EXAMINATION



EXHIBIT
D
exhibitsticker.com

Page 5

BY MR. BUSTAMANTE:
Q. All right. Please state your name and spell your last name for our record.
A. Sure. Winifred Shelby, S-h-e-l-b-y.
MR. BUSTAMANTE: All right. Let the record show that this is the deposition of Winifred Shelby, taken pursuant to notice and set to this date by agreement of the parties, and it will be taken in accordance with the applicable Rules of Federal Civil Procedure and local rules of the U.S. District Court for the Northern District of Illinois.
Q. Ms. Shelby, my name is Peter Bustamante. I'm going to be asking you a series of questions. If at any time you do not understand me, please let me know, so that every question that you answer should be an answer to a question that you understood. Do you understand that instruction?
A. Yes, I do. 0:02:17
Q. All right. Please keep all of your responses in spoken words so there's no mistake as to when you mean to say, "Yes" or you mean to say, "No." For example, in normal conversation, we may say, "Uh-huh" or "Uh-uh," but when that is transcribed in a -- in a record, that may be confusing, okay? So if you mean to say, "Yes," say, "Yes." If you mean to say, "No," say,

Page 6

"No." Agree?
A. Agree.
Q. Also, please wait until I finish formulating a complete question before you answer, even though you know what that question is going to be. Again, in normal conversation, people usually interrupt each other because that's the way we, you know, human beings are, but when we're transcribing the proceedings, we want to have a complete question written out, instead of having half a question, an answer, and then the rest of the question after that. Okay?
A. Yes. 0:02:58
Q. All right. If at any time you feel I've interrupted you, let me know, and I'll stop whatever I'm doing and let you give a complete answer to your -- to any question, okay?
A. Okay.
Q. Finally, please do not guess, speculate on anything. If you don't know, it's perfectly okay to say, "I don't know." Okay?
A. Okay.
Q. Very good. Tell us a little bit about your background. How old are you?
A. I'm 53.
Q. Okay. And your date of birth is?

Page 7

A. 1/4/66.
Q. All right. Where do you live?
A. I live in Country Club Hills, Illinois.
Q. And what is your address?
(The following page 8 has been designated as confidential by agreement of the parties)
///

Page 8

(Start of Confidential Portion)
A. 17691 Winston Drive.
(End of Confidential Portion)
///

*CONFIDENTIAL*

(Continuation of Regular, Non-Confidential Testimony)
Q. All right. And is that a --
MS. MARMOR: And -- sorry. Let me just -- for the record, I'm designating her address as -- as confidential pursuant to the protective order.
MR. BUSTAMANTE: Agreed.
Q. Okay. Is that a house or an apartment?
A. A house.
Q. Okay. Who do you live there with?
A. By myself. 0:03:55
Q. Okay. How long have you lived there?
A. I believe 12 years, 11, 12 years -- yeah.
Q. All right. Are you native to the Chicago area?
A. Yes, I am.
Q. Okay. Where were you born?
A. Chicago, Illinois.
Q. Okay. Where did you go to high school?
A. CVS in Calumet.
Q. And after high school, what -- what year did you graduate high school?
A. I did not graduate high school.
Q. Okay. What did you do in terms of your formal education?
A. I went and got a GED.



Q. When did you get your GED?
A. I'm not sure of the year.
Q. Okay. Thereafter, after the GED, did you continue any type of formal education?
A. Yes, I did.
Q. And what was that?
A. I got my bachelor's degree in nursing.
Q. And what -- what institution did you get that from?
A. St. Xavier University.
Q. What year?
A. 1996.
Q. Did you thereafter take an examination to become a registered nurse with the State of Illinois?
A. Yes, I did. 0:05:23
Q. And were you licensed?
A. Yes.
Q. What year?
A. 1997.
Q. Did you have to take the exam more than once?
A. No.
Q. Since graduating from St. Xavier with a BSN, have you had any other formal education?
A. No.
Q. Tell us a little bit about your employment,



okay? What -- what year were you in when you left high school?
A. I don't remember.
Q. Okay. Well, tell us about the -- your first job.
A. At MacNeal Hospital, on a med surg unit, which is a general bedside nursing unit.
Q. What year was that?
A. '97, I started. I don't remember what year I left.
Q. So this is after you became an RN, you -- did you work before becoming an RN?
A. Yes, I did.
Q. What kind of jobs did you do? 0:06:36
A. Before -- when I was in nursing school, I started working at MacNeal as a patient care technician.
Q. What year was that?
A. I don't know the exact year. I -- I don't -- I don't remember.
Q. How many years did it take you to get your BSN?
A. Four years.
Q. Have you ever been married?
A. No.



Q. Do you have any children?
A. Yes, I do.
Q. How many?
A. One.
Q. And the -- the age of the child?
A. 34.
Q. Have you ever served in the military?
A. No.
Q. Have you ever taught nursing?
A. No.
Q. Did you obtain a specialty in nursing?
A. No.
Q. Have you ever studied any -- taken any courses on psychiatric nursing?
A. No.
Q. Have you ever taken any courses on mental health nursing?
A. None besides what was part of my curriculum in school.
Q. Other than your nursing license, do you hold any other professional license?
A. No. 0:08:25
Q. Has your license -- your nursing license ever been suspended?
A. No.

Q. All right. After your employment with MacNeal, what was your next employment, as an RN now?
A. Holy Cross Hospital.
Q. And what years were you there?
A. I don't remember.
Q. What -- what were your -- what was your title with them? Did you have a specialty with Holy Cross?
A. Staff -- staff RN.
Q. What does a staff RN do?
A. We're bedside, taking care of patients.
Q. And how long were you at Holy Cross?
A. I believe two year -- around two years, give or take, I believe.
Q. Yeah. Ms. -- Ms. Shelby, do you have a resume?
A. I do.
Q. All right. Does your resume have all of your employment history from the time you became an RN?
A. No, it does not. 0:09:27
Q. Okay. After Holy Cross, where did you go?
A. Rush.
Q. And what was your title at Rush?
A. Staff RN.
Q. How long were you there?
A. Give or take, six months. Around six months.



Q. And after Rush, where did you go?
A. I'm trying to -- I'm sorry, I'm trying to remember. After Rush, where did I go -- believe Little Company of Mary -- no, no, I'm sorry. I -- no. After Rush, I went to, I believe, the Board of Education.
Q. And what did you do for the Board of Education?
A. I worked as a school nurse. 0:10:29
Q. Were you assigned to a specific school?
A. Yes, I was.
Q. What school was that?
A. Dixon Elementary, Parkside Academy, and O'Keeffe Elementary.
Q. And how long did you work for the Board of Education?
A. Around three years.
Q. And this was the Chicago Board of Education?
A. Yes, it was.
Q. After the Board of Education, where did you go?
A. During -- while working for the Board of Education, I also was working at Grant Hospital, so when I left there, I just remained at Grant Hospital.
Q. As a staff nurse?
A. Yes. 0:11:09



Q. And for how long?
A. For about four years.
Q. What was your next employment after Grant Hospital?
A. Little Company of Mary.
Q. How long were you at Little Company?
A. For around 12 years.
Q. And during this period of time, your title still was staff nurse?
A. I was a weekend nurse there, yes.
Q. As a weekend nurse, is this full-time employment, or is it part-time?
A. It was part-time.
Q. Did you have any other employment besides that?
A. Yes.
Q. And what was the other employment?
A. Blue Cross Blue Shield of Illinois.
Q. What did you do for them?
A. My first position, I was a care coordinator.
Q. And thereafter?
A. A case manager, and then my last position was a supervisor of specialized services.
Q. All right. How long did you work for Blue Cross Blue Shield?



A. Seven years. 0:12:15
Q. And after Blue Cross Blue Shield, where did you go?
A. Health Plus Physician Organization.
Q. Goodness. Okay. How long were you with those folks?
A. I was with them for two years.
Q. Okay. And what was -- what were your duties there?
A. My position there was a coordinator of case management services.
Q. What does that mean, coordinating case management services?
A. It's working doing utilization review, which is -- well part of it is doing utilization review, which is looking at medical necessity, so if someone who is a member of this particular physician organization goes into the hospital or requiring services or testing, it has to be reviewed by a medical team. So I would be one of the people that would -- would look at it based on the guidelines that we were -- utilized, which was Milliman Guidelines, to see if it met medical necessity. If it didn't meet medical necessity based on the guidelines, then it would go over to one of our physician advisors for review to see

if they would approve the services. Also, with the case management portion, it was reaching out to the members, seeing how they were doing and seeing if there was anything besides their health care -- health plan that we can do to assist them to keep them out of the hospital, keep them where they were not missing their medications, if -- providing them with community resources, things like that.
Q. All right. And you did -- you did that for how long?
A. Two years. 0:14:12
Q. And from there, where did you go?
A. From there, I went to Palos -- wait, I -- from there, I went to UnitedHealthcare.
Q. And what were your duties with UnitedHealthcare?
A. Doing utilization review, but doing it on site for UnitedHealthcare patients at Northwestern Hospital.
Q. And how long did you do that?
A. I did that for a year.
Q. And thereafter?
A. And during that same time, I changed the weekend position to start working at Palos Hospital on the weekends, working as an ER case manager.



Q. I'm sorry, doing what? 0:15:00
A. Working as an emergency room case manager.
Q. All right. Thereafter, what did you do?
A. After that -- well I remained at Palos right now as a weekender, but full-time, that's when I went to the -- Cook County --
Q. Okay. What year --
A. -- Sheriff's Office.
Q. What year did you go to Cook County Sheriff's Office?
A. I believe it was 2014.
Q. And how was it that you found out about that employment opportunity with the Cook County Sheriff's Office?
A. Indeed.com.
Q. Did you apply online or did you go in person?
A. Online.
Q. And you were offered a job and you accepted it, of course --
A. Yes.
Q. -- correct? What was your job with the Cook County Sheriff's Office?
A. I was -- my job was working as an occupational health nurse.
Q. What does that mean?



A. For County, it meant I was doing -- when employees was off on leave or were off and needed a doctor's note to return to work, I was the person that they would come to me to bring in their doctor's note. If -- and I would transcribe it, taking out any HIPAA information, such as diagnosis, and give that to employee services, and that was the return to work note that I would give them to turn in to their management team. Also, if they were coming back with restrictions, I was transcribing that, putting that on paper, but once again, taking out any sort of HIPAA information, such as their diagnoses, so that it could go out to the employment -- employee services to see if they can honor these specific restrictions. I also would do screening on new hires. There was a health and physical sheet -- well it was a health form that they signed about their past medical history that they would give to me. Also, I would do their blood pressure screenings, initial heart rate. If it was abnormally high, I would send them back to their own medical doctor to give them -- to require them to get a release from their doctor, saying that they were medically fit to start employment with the Cook County Sheriff's Office. I was -- I would also do the initial, if there was concern with someone requiring



that they go for a fitness for duty, me and someone of the management team from HR would sit and just meet with the person to do an assessment.
Q. All right. How long were -- were you with the sheriff's office?
A. For roughly around three years. 0:18:17
Q. And so when is it that you left?
A. I believe December of 2017.
Q. Why did you leave?
A. Layoffs. Cook County layoffs. I was laid off from work.
Q. Was this because of the sugar tax?
A. Yes, it was.
Q. When you were laid off, were you told that you may be called back?
A. I don't recall.
Q. Has anyone called you back?
A. No.
Q. Were you a union member at the time?
A. No.
Q. When you first started working for the sheriff's office, who was your supervisor?
A. Nancy, and I can't remember her last name.
Q. And what was her title?
A. Bureau chief of HR, of human resources.

Q. So was your assignment as an occupational health nurse -- was your assignment to HR?
A. I'm not understanding your question. 0:19:31
Q. Well were you working under the HR division?
A. Yes.
Q. Were you provided with any training as to what was required to perform your duties?
A. I -- can you elaborate more so when you say, "Training"? Okay.
Q. Sorry. I'll -- I'll re-ask the question, but was this Nancy Nancy Donahue -- Donahue (phonetic)?
A. No.
Q. Okay. Yeah. When you came to work for the sheriff's office, did anybody put you through a period of training, "This is the way we do things in the HR department, these are going to be your duties, the -- these are the papers that you have to fill out, these are the forms that pertain to you, these are the rules and regulations and directives that apply to your job," that --
A. Yes.
Q. -- kind of thing?
A. Yes. 0:20:22
Q. Who gave you that training?
A. Nancy, which --



Q. Don't worry. Nancy.
A. Yes.
Q. Nancy in HR.
A. Yes.
Q. Okay. And how long did that training go for?
A. It was ongoing. I mean, it wasn't like a period of we have one week training. When I started, it was just ongoing as things arose, I would go to Nancy, and say, "How do we do this?" And that's where, you know, I would be told, "Okay, for -- these are what we use -- a paper that we use for this," and yeah, things of that nature. So it was ongoing.
Q. Okay. How long was Nancy your supervisor?
A. I don't recall.
Q. Did Nancy leave at one point, or what happened there?
A. Yes, she did.
Q. And after Nancy left, did someone else become your supervisor?
A. Yes.
Q. Who was that?
A. Let's see. For a short period of time, Shelitha Beach -- Beach -- Beacham, I believe it is, took over the HR department, so then I became under her.



Q. All right. And how -- how long was Ms. Beacham there?
A. She remained there, but they hired a new head of HR to take over.
Q. And who was that?
A. Oh. I'm trying to remember. Oh, that was -- I'm -- I'm trying to remember. It was so much a shift there of -- of personnel and who supervised me. After Shelitha, then I believe they hired Rebecca, and I believe that's when Rebecca came into place.
Q. And that would be Rebecca Reierson?
A. Yes. 0:22:33
Q. You said that Ms. Beacham remained there, what was her role when Ms. Reierson came on board?
A. I don't know exactly what her title was, but I believe she was much more a part of the hiring process over -- more so than overseeing the --
Q. But she was no longer -- Ms. Beacham was no longer your supervisor, correct?
A. Correct.
Q. And did Ms. Beacham report to Ms. Reierson or did Ms. Reierson report to Ms. Beacham?
MS. MARMOR: If you --
A. I don't believe --
MS. MARMOR: -- you know.



A. -- either --
WITNESS: Huh?
MS. MARMOR: If you know.
A. I -- I don't know. Yeah.
Q. In all the jobs that we've gone through from the time you became an RN, have you ever been fired from any of those jobs?
A. No. 0:23:38
Q. And what was your reason for leaving all -- all of these jobs? Was it better opportunities, more money, what was it?
A. Usually, better opportunities or more money.
Q. Have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Object to the form.
A. I'm sorry?
Q. Yes. Have -- have you ever been reprimanded or censured in any of your jobs?
MS. MARMOR: Same objection.
A. I believe my first job.
Q. Tell us about that.
A. Due to tardiness.
Q. Due -- I'm sorry, due to?
A. Tardiness.
Q. Okay. Any -- any -- anything else?

A. No.
Q. Have you ever written any papers or publications regarding, you know, anything pertaining to your work as an RN?
A. No. 0:24:52
Q. Have you ever given any training to others in your field of work?
A. I've worked as a preceptor on the job.
Q. What is that, a preceptor?
A. Where a new hire comes onto the job, and I work to train them on the position.
Q. Have you worked as a preceptor with the Cook County Sheriff's Office?
A. No.
Q. Have you ever been convicted of any felony?
A. No.
Q. Have you ever been convicted of any crime involving dishonesty?
A. No.
Q. How did you prepare for your deposition today?
A. By speaking with my attorney.
Q. Did you look at any documents?
A. Yes. 0:25:48
Q. And what did you look at?



A. I looked at the forms that we had employees to sign at the -- that we were requiring them to go for a fitness for duty.
Q. Anything else?
A. I don't recall anything else.
Q. How many times did you meet with your -- your lawyer?
A. Twice.
Q. And when was that?
A. I believe last Wednesday and this morning.
Q. Okay. How long was the meeting last Wednesday?
A. Roughly around an hour, 45 minutes.
Q. And this morning?
A. About 20 minutes.
Q. Let's talk a little bit about HIPAA -- HIPAA.
A. Mm-hmm.
Q. You're familiar --
A. Yes.
Q. You're familiar with HIPAA?
A. Yes, I am.
Q. How did you become familiar with HIPAA? 0:26:54
A. From all of my jobs as nursing, that's one thing that nursing -- or health care is big on HIPAA, so throughout the years, it's constantly -- every job



is -- that's the one thing we always go over, HIPAA.
Q. All right. So tell us how -- tell us what HIPAA is first.
A. HIPAA is the laws that are in place that help to protect patients' rights, far as health care goes. It means that we -- it should not be disclosed to anyone that does not have a right to know, far as a patient goes. It also requires the patient give consent before we will disclose of their health care information, unless it's something pertaining to or -- like a legal matter or something where there's a harm to someone, but then in a case like that, usually, someone higher up would make that call on when to make a disclosure far as HIPAA goes. It also requires that health care people that are involved and have access to their records do not -- do not go in and look at patients' records if you don't have a right to be involved in their care or you're not involved in their care. So it also means if you -- in the hospital setting, if you have someone that's there and you're not involved in their care, you shouldn't be looking at their health care records.
Q. Okay. Did you receive training regarding HIPAA at nursing school?
A. I don't recall. 0:28:49



Q. If I remember correctly, HIPAA was introduced or signed into law around 1997, which would be around the time you became a nurse. Do you -- does that, you know, refresh your recollection as to having any training regarding HIPAA at nursing school?
A. It does not.
Q. And throughout your career in all these different locations that you worked, has HIPAA always been emphasized as something that is important?
A. Yes.
Q. And as a nurse, have you had occasion to protect a patient's rights under HIPAA?
MS. MARMOR: Object to the form.
A. Have I -- can you repeat that?
Q. Yeah, here's what I'm wondering, have -- has it ever been your experience that -- where you've had to explain to a patient, "These are your rights under HIPAA, you really don't have to give this information because you -- it's protected," that kind of thing?
MS. MARMOR: Same objection. 0:29:50
A. Yes.
Q. And give us an example with -- obviously, without mentioning any patients' names, of that type of interaction with a patient?
A. Well patients would -- would ask or -- or

I've had patients that would be concerned because they would see someone they knew that worked there and they would have questions about their medical records getting out in their neighborhood or people knowing about what was going on with them, and that's where when I would reassure them our rights under HIPAA was to protect their health care information, even though the person worked in the facility, they did not have a right to go into their medical records and view their medical records. And even if they were taking care of them, they didn't have a right to share that information.

Q. Okay. Did you receive any -- were you taught anything about the ADA, the Americans with Disabilities Act, in nursing school?

A. No. 0:31:01

Q. Did you become familiar with the ADA through your work as a nurse?

A. No.

Q. Today, are you familiar with any portion of the ADA?

A. Not enough to say yes.

Q. So you have just some general familiarity, in other words, you understand what ADA stands for, correct?



A. Yeah. Yes.

Q. So now let's -- let's talk a little bit about fitness for duty evaluations, okay?

A. Okay. 0:31:41

Q. Concerning the sheriff's office.

A. Okay.

Q. What is a fitness for duty evaluation?

A. It's one that -- for the sheriff's office, it's one that requires that an employee is sent to an independent contract -- or independent provider, usually -- a mental health provider, who evaluates the person to see if they're fit for duty, to see if they're mentally stable enough to perform their job duties.

Q. Okay. Let me ask first for the general fitness for duty. I know that there are two components -- I believe there are at least two components, one would be physical and one would be mental, okay?

A. Yes.

Q. Do you make such a distinction, or did the sheriff's office make such a distinction, physical versus mental?

A. I think they are -- were kind of intertwined because to send someone for a fitness for duty, the person that was going to perform that evaluation would



need their medical records to rule out that there was nothing physical --

Q. So --

A. -- that was -- that was -- that was causing whatever action or behavior that was going on.

Q. Okay. So maybe it's my confusion because I just imagine things differently, so is it your testimony that every fitness for duty evaluation performed at the request of the sheriff's office is performed by a psychologist or psychiatrist, a mental health professional?

A. If that -- it depends on the reason for the fitness for duty request.

Q. Well that's what I'm getting at.

A. Okay. 0:33:40

Q. So are there some requests that could be just physical components, the guy is, you know, passing out every three minutes, and therefore, we better send him to a doctor to find out if his blood pressure or whatever else, or the guy is acting a little weird, so we better send him to a mental health professional to find out if there's something else?

A. There were cases that we have sent people just for a medical component.

Q. Okay. Is there any difference in terms of



the assessment that is done, by whomever is responsible for assessing, as to whether or not a fitness for duty evaluation should take place when it's a physical component versus a mental component?

MS. MARMOR: Can -- I'm sorry.

MR. BUSTAMANTE: Long question?

MS. MARMOR: Are -- yeah, well I just --

MR. BUSTAMANTE: Okay.

MS. MARMOR: I'm trying to figure out whether you mean the -- the -- the provider or whether the persons making the decision in the first place.

MR. BUSTAMANTE: Okay. Let's -- let me restate. 0:34:32

Q. Before an individual is sent out for a fitness for duty evaluation, an assessment is made by the sheriff's office as to whether that fitness for duty evaluation should take place, is that correct?

A. Yes.

Q. That assessment is made by you as the nurse, correct?

A. No.

Q. Okay. That assessment is made by someone else then?

A. It was -- it was made -- a team decision.

Q. Okay. Well that was the second part of my

question, but you as a nurse and someone else?
A. Correct.
Q. How many others? How many people would make the decision?
A. Usually, it would be two people. 0:35:13
Q. And who would those people usually be?
A. Someone in management from HR and myself.
Q. So in making that assessment, okay, that's -- the question comes in, before the person is --
A. Yes.
Q. -- sent for an evaluation, is there a difference between a medical component or a mental component? Is there a difference in making that assessment?
A. Yes.
Q. And what is the difference?
A. For a medical component, it would be strictly based on the information, as well as the doctor's -- their provider's information.
Q. Okay. And for the mental component?
A. It would be based on the -- the person who made the referral, as well as our assessment or our interview with the person once we spoke with the person.
Q. Is this -- what you've just stated, okay, the



-- the different parts of the assessment, are those in writing anywhere?
A. I don't know. 0:36:31
Q. Have you ever seen anything in writing from the sheriff's office that says, "In order for you to assess whether or not a person should be sent for a fitness for duty evaluation, you must cover A, B, and C"?
A. No, I have never seen anything.
Q. How did you learn what should be evaluated or -- or looked into in order to make that determination?
A. Nursing judgment.
Q. One more time?
A. Judgment. My nursing judgment.
Q. Okay. How did the other person making the evaluation know what he or she should look to in order to make that determination?
MS. MARMOR: Objection. Lack of foundation. 0:37:18
A. For a medical decision, we were strictly going by the medical notes that was available and whatever the incident was. For the mental component, it was being made on -- I couldn't -- I couldn't explain to you what they made their judgment on.
Q. Okay. All right. In order for you to, I can't think of the word, come up with your nursing



judgment, what would you look at?
A. Behavior.
Q. What else?
A. Behavior was a key component. 0:38:35
Q. Okay. Anything else?
A. Our interview with the person.
Q. Okay. Anything else?
A. Their mannerisms.
Q. When you say, "Behavior," are you referring to the report that you receive as the basis for the assessment for the -- for making the assessment, or are you referring to observed behavior of the individual who may or may not be sent for a fitness for duty evaluation?
MS. MARMOR: Did you say, "Observed" or "Absurd"?
MR. BUSTAMANTE: O -- o-b.
MS. MARMOR: Okay.
MR. BUSTAMANTE: Observed.
MS. MARMOR: Okay. Okay. Good.
A. The observed behavior. 0:39:17
Q. Okay. And so that means that -- what you saw, correct?
A. Correct.
Q. All right. So behavior includes -- does that



include mannerism?
A. Yes.
Q. Okay. So -- okay. We talked about behavior, including mannerism. What else?
A. The interview with the person.
Q. Okay. What do you gather from the interview?
A. It's just a fact finding interview, so just asking them their version of whatever led to the issue why they were there, because a lot of times, their version would be different.
Q. Okay. Anything else that you looked at?
A. That -- no, those are the main two. 0:40:11
Q. And -- and what are you trying to get by making those observations of behavior and taking the interview? What is -- what are you trying to get?
A. I'm trying to get do I feel that the person is safe to go out and do their job or should they be further evaluated by a provider to make that determination.
Q. When a person is sent to your department for an assessment as to whether a fitness for duty evaluation should take place, what information are you provided with before the person is called into an interview with you?
MS. MARMOR: Object to the form.

A. Usually, I would be provided with whatever the reason that the referral is being made.
Q. Anything else? 0:41:26
A. Not that I recall.
Q. Being part of a HR, did you have access to employees' personnel files?
A. No.
Q. Did your supervisor or a person in management who could -- who would also participate in the assessment for fitness for duty, did that person have access to the employees' personnel files?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Have you ever requested additional information about any employee before making your assessment as to fitness for duty?
MS. MARMOR: Object to the form.
A. I'm -- I'm sorry, repeat that.
Q. Sure. Have you ever requested additional information about any employee before making your assessment as to whether you would or would not recommend a fitness for duty evaluation?
MS. MARMOR: Same objection. 0:42:26
A. No.
Q. So what is the basic purpose of a fitness for



duty evaluation?
MS. MARMOR: Object to the form.
A. To determine if the -- to determine if the employee was fit to do their job and were not a harm to themselves or their -- or others.
Q. Have you talked to anyone, other than your counsel, about your deposition here today?
A. I have not. 0:43:41
Q. Have you talked to any of your co-Defendants about the fact that you were giving a deposition today?
A. I have not.
Q. Have you talked to any of your co-Defendants about the case after you were served with -- with the lawsuit?
A. I have not.
Q. Where was your office -- that's -- let me restate that. Did you have an office when you were working as a nurse for HR for the sheriff -- Cook County Sheriff?
A. I did.
Q. Where was your office located?
A. 3026 South California, in building number two.
Q. And your office, was it part of a bigger setup of HR, or was it a separate office somewhere



else?
A. My office was located directly in the office of HR.
Q. Did you have, you know, a -- a room with a door, or did you have a cubicle?
A. I had a room with a door. 0:44:47
Q. How many people were working at HR in September of 2016?
MS. MARMOR: Object --
A. I do not know.
Q. How many people that you normally see during the day as you worked at HR or in the HR office in September of 2016?
MS. MARMOR: Object to the form.
A. I don't know.
Q. Was there someone in -- when someone walked into the HR area, what do they first see if they -- do they have to go through a door to walk into HR?
A. To come into the building, there -- to come into the HR building, there was a door, and the first person you saw was an officer that was behind a desk.
Q. Okay. That's just coming into the building. Then did you have to take an elevator to -- to the HR office?
A. No. 0:45:48



Q. Where was the HR office?
A. On that main floor.
Q. And was there a separate reception for HR?
A. No.
Q. When you called a person in for an assessment for a fitness for duty evaluation, where did you meet that person?
A. In my office.
Q. In 2016 September --
A. And --
Q. Oh, go ahead.
A. Can I elaborate?
Q. Sure.
A. In my office usually. However, we have had meetings in other management staff office.
Q. In September of 2016, were there -- was there video surveillance of the HR area?
MS. MARMOR: Object --
A. I don't know. 0:46:51
Q. Other than this case, the John Nawara case, have you ever been sued?
A. Yes.
Q. How many times?
A. Once.
Q. And what was that about?

A. It was a death lawsuit.
Q. Where was that lawsuit?
A. In Illinois.
Q. In what part of Illinois?
A. Chicago.
Q. And when was that lawsuit? What year?
A. I believe in 2005 or 2007. I'm not quite sure.
Q. Did you have to give testimony?
A. Yes, I did.
Q. And you gave a deposition?
A. Yes.
Q. And did you testify at trial?
A. Yes.
Q. What was the result?
A. That the hospital was not liable.
Q. Were you sued personally, or was the hospital sued?
A. The hospital.
Q. And what hospital was that?
A. Little Company of Mary.
Q. And what was your involvement in the -- in that lawsuit? Why did you testify, in other words?
A. I was the nurse taking care of the patient. 0:48:19
Q. Were they blaming you for the patient's



death?
A. No.
Q. Any other lawsuits that you may have been involved in?
A. No, not that I know of.
Q. Now, what -- what was your practice while working for the sheriff's office regarding how to go about assessing an employee to determine whether or not you were going to recommend a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered.
A. It was going to be -- it was the management person and myself that would sit down and meet with the employee and talk with the employee.
Q. Okay. Anything else? 0:49:25
A. No.
Q. Okay. And this is a -- a practice that you developed on your own, no one told you, "This is the way we do it"?
A. I didn't --
MS. MARMOR: Object to the form.
A. -- develop the practice. It was just decided on.
Q. Well what I'm asking is this, okay, so for example, someone may say, "I'm going to conduct fitness



for duty evaluations, and my practice is going to be I'm going to call in the person for an interview, I'm going to have them fill out a form that says their version of the events," or "I'm going to take a history, and I'm going to prepare a chart, you know, chart down exactly what this person tells me," was there anything such thing in your practice, or is -- it was simply talking to that individual?
MS. MARMOR: Object to the form.
A. Just talking to the individual. 0:50:11
Q. Did you make any notes of the times when you talked to individuals to determine their version of events?
MS. MARMOR: Object --
A. No.
MS. MARMOR: -- to the form.
Q. Why -- why didn't you make any notes?
A. I didn't see that there was a need for me to make any notes when I was just talking with the individual.
Q. The talking to the individual would lead to your nursing judgment of whether or not a -- an -- an evaluation was required, correct? Was part of -- part of what you use for your nursing judgment, correct?
A. Yes.



Q. And even though that was part of what you were going to use to make that determination, you did not think it was necessary to keep something in writing?
MS. MARMOR: Objection. Argumentative. 0:51:06
A. In -- no, I did not.
Q. Why not?
A. Because I didn't feel that keeping something with -- in writing was pertinent --
Q. By the way -- okay. I'm sorry.
A. Yeah.
Q. Go ahead.
A. I just felt like it -- it wasn't pertinent to me to keep something in writing on the event that was going on, yes.
Q. When a fitness for duty evaluation request is made, do you create a file for that request?
MS. MARMOR: Object to the form.
A. I don't remember. 0:51:51
Q. Does the sheriff's office keep a separate file, aside from a personnel file, when an employee is sent for a fitness for duty assessment?
MS. MARMOR: Objection. Lack of foundation.
A. They would keep a file of the medical records that was obtained for that employee and was sent over

to CorVel, as well as the -- the -- the fitness for duty report, once it came in.
Q. That -- aside from medical records, what else would that file contain?
MS. MARMOR: Objection. Asked and answered.
A. It would also contain the consent forms that the employee had signed and whatever had went over to CorVel.
Q. Would it contain anything with respect to the request for the assessment?
A. Yes. 0:53:03
Q. Would it contain any other information that the nurse and management use in order to determine whether or not a fitness for duty evaluation was -- was required?
MS. MARMOR: Object to the form.
A. I'm not understanding the question.
Q. Okay. I'll get -- I'll come back to that. I'm --
A. Okay.
Q. I'm sorry, I don't know how to --
A. Okay.
Q. I don't know how to express it, but maybe --
A. Okay.
Q. -- we'll come back to it. Okay. Regarding



that file that was kept for fitness for duty evaluations, who has that -- who had access to that file?
MS. MARMOR: Objection. Calls for speculation and to form.
A. When I was there, my understanding was that I was the only one that had a key.
Q. In nursing school, did you -- were you ever taught that if something is not charted, it didn't happen?
MS. MARMOR: Object to the form.
A. Yes. 0:54:29
Q. Why is that taught in nursing school?
A. Because the medical records that we are utilizing is -- are a legal document.
MR. BUSTAMANTE: I want to take just a short break.
MS. MARMOR: Okay.
MR. BUSTAMANTE: I need to stretch my legs --
RECORDER: Off --
MS. MARMOR: Okay.
RECORDER: Off record, 11:00 a.m.
(Off the record)
RECORDER: On record, 11:07 a.m.
Q. All right. Ms. Shelby, I'm going to be now



directing your attention to September of 2016.
A. Okay.
Q. And in particular, the events concerning John Nawara. When I talk -- when I say, "John," I mean John Nawara, okay? Because I -- I have difficulty pronouncing his name --
A. Okay.
Q. -- his last name, okay?
A. Okay.
Q. So if I -- if I don't say, "Nawara," that often is because it just doesn't roll off the tongue, okay?
A. Okay. Okay.
MS. MARMOR: Let the record show.
Q. So I'm going to show you first what we've marked as Shelby Deposition Exhibit Number 1.
MR. BUSTAMANTE: Of course I messed it up. There we go. Let's see here. I have three there.
MS. MARMOR: Thank you.
Q. Have you ever seen this document before?
A. I don't recall. 0:56:41
Q. Okay. Would you tell us -- for our record, would you tell us what this document is?
MS. MARMOR: Objection. Lack of foundation.
A. It appears to be a documentation -- a



document sent to Karyn Williams, the executive director of human resources, from Matt Burke, chief of staff.
Q. Okay. What is the purpose of this document?
MS. MARMOR: Objection. Lack of foundation.
A. The subject states, "Fitness for Duty."
Q. Okay. For Officer John Nawara, correct?
A. Correct.
Q. Right here in the first page of the document?
A. Yes. Correct.
Q. Okay. Do you know if this was the request that was -- the only request that was sent to HR to assess whether or not Officer Nawara should be evaluated for fitness for duty?
MS. MARMOR: Objection. Lack of foundation. 0:58:00
A. I don't know if anything else was sent to the HR department requesting that.
Q. If a request -- if this was the only request made to assess Officer Nawara for fitness for duty, would you have seen a copy of this document before interviewing Officer Nawara?
MS. MARMOR: Objection. Calls for speculation.
A. I'm sorry, can you repeat that?
Q. Yes. If this was the only document that was created requesting an assessment as to whether or not

Page 49

Officer Nawara should be evaluated for fitness for duty, would you have seen a copy of this document?
MS. MARMOR: Same objection. Calls for speculation.
A. It would have been determined by someone in HR management because it didn't come to me, if it was sent to me or if they felt that they needed additional information.
Q. Okay. Did you have anything similar to this document before interviewing Officer Nawara?
MS. MARMOR: Objection to the form and foundation.
A. Did I have any document -- any documentation?
Q. Yes, did you have any documents?
A. I don't --
MS. MARMOR: That's a different question --
MR. BUSTAMANTE: Yeah, I --
MS. MARMOR: -- just to be clear. 0:59:36
A. I -- I don't recall.
Q. Do you have any recollection of conducting a -- an interview of Officer Nawara concerning a fitness for duty evaluation in 2016?
A. Do I recall interviewing Officer Nawara?
Q. Correct.
A. Yes, I do.

Page 50

Q. What led you to interview Officer Nawara?
A. Rebecca and I had a discussion with his superintendent, I believe, and she gave a more detailed -- gave a more detailed report on why she was requesting the fitness for duty.
Q. Okay. Who has the right to request a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation and form.
A. I don't remember. 1:00:47
Q. Okay. Could anybody request a fitness for duty evaluation of an employee of the Cook County Sheriff's Office?
MS. MARMOR: Same objection.
A. I don't remember.
Q. Did you know, at any time, if there were limitations as to who could request a fitness for duty evaluation at the sheriff's office?
A. I don't remember.
Q. Did you know, at some time, who could request a fitness for duty evaluation at the sheriff's office?
MS. MARMOR: Objection to form. 1:01:16
A. I don't remember.
Q. Is there anything in writing as to who in the chain of command may request a fitness for duty

Page 51

evaluation of a Cook County Sheriff's Office employee?
A. I don't remember.
Q. You said that this request for a fitness for duty was made by Superintendent Jones-Hayes, correct?
A. Correct.
Q. How did Superintendent Jones-Hayes make the request for a fitness for duty evaluation?
MS. MARMOR: Objection. Lack of foundation.
MS. KAMPER: Join.
A. And when you say, "How do," what do you mean?
Q. Well you tell me, how did you receive information from Superintendent Jones-Hayes or some -- something from Superintendent Jones-Hayes saying, "I want you to evaluate Officer John Nawara for fitness for duty"?
A. I --
MS. MARMOR: Object to the form.
A. I remember me and Rebecca spoke with her. 1:02:10
Q. Other than that?
A. That's all that I remember.
Q. And did you speak to her in person?
A. No, I believe it was via telephone.
Q. All right. And how did you know this was Superintendent Jones-Hayes talking to you?
A. I don't remember.

Page 52

Q. Did you know the superintendent before the date of your conversation with her?
A. I did not.
Q. Where did that -- where were you physically located when that conversation took place?
A. I believe we were in Rebecca's office. I believe so. I don't remember it being in my office though.
Q. Did you take any notes of that conversation?
A. I don't remember.
Q. Did you see if Ms. Reierson was taking any notes of that conversation?
A. I don't remember.
Q. Have you seen, since that time, anything in writing that purport to be notes of that conversation?
A. I did from -- I believe from the superintendent.
Q. When did you see that? 1:03:35
A. I don't remember when I first saw it.
Q. And what makes you believe that it's from the superintendent?
A. Because it had her name on it.
Q. Now, where in the protocol that you have testified about that you followed regarding how you make an assessment for fitness for duty does it say

that management and the nurse are supposed to interview the person requesting the fitness for duty evaluation?

MS. MARMOR: Okay. I'm going to object both to form and completely mischaracterizes her testimony.

A. Repeat that. 1:04:25

Q. Yes. Initially, I asked you what were the things that you did in order to make an assessment for fitness for duty, and you gave me a detailed explanation of everything that you did. Nowhere in that explanation did you say, "Oh, and we interviewed the person who's requesting the fitness for duty evaluation." Where did that come from? Why did you decide to do it in this case?

MS. MARMOR: Objection. Argumentative.

A. Because I didn't have anything to base it on. You have to have a reason for the request, and I didn't have a reason for the request.

Q. Okay. So was it your decision to interview Superintendent Jones-Hayes?

A. I don't believe so.

Q. Whose decision was it?

A. I believe it -- it was a joint -- Rebecca saying that this is -- "Someone's requesting a fitness for duty, but we don't have enough information, I'm going to request that they give us more information if



-- before we call this person in."

Q. So Rebecca said that to you? 1:05:32

A. Give or take, you know, the word, I'm probably paraphrasing, yeah.

Q. Do you know what information Ms. Reierson had?

A. I don't recall if I knew what she had at that particular point.

Q. I'm -- wait.

A. Okay.

Q. If you take a look at Exhibit 1, please, and look at page 2, page 2 appears to be an email from Karen Jones-Hayes to Dawn Ertler. Do you see that?

A. Yes. 1:06:21

Q. And what is the date of this email?

A. September 29th, 2016.

Q. And then at page 1, the memorandum from Matthew Burke to Karyn Williams is September 29th, 2016, correct?

A. Correct.

Q. When was your interview with John Nawara?

A. I don't recall the date. 1:06:50

Q. If I tell you the interview took place on November 18th, 2016, can you tell me why it took from September 29th through November 16th to call Mr. Nawara



in for an interview?

A. I could not tell you why.

Q. Now, how long had Ms. Reierson been working in HR as of September 2016?

MS. MARMOR: Objection. Lack of foundation.

A. I don't know.

Q. If she says she started with the sheriff's office, I believe it was around August of 2016, would -- would you be kind of training her as to what to do?

MS. MARMOR: Object to the form.

A. No. 1:07:41

Q. She knew more than you did about the operations of HR at that time?

MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.

A. I was a nurse, and it wasn't my role to train Rebecca. When she came on, she came on and I was under the understanding that her superiors were to train her. It was not me.

Q. Was Ms. Reierson following your lead in concerns to fitness for duty evaluations?

MS. MARMOR: Object to the form.

A. No.

Q. Do all requests for fitness for duty evaluations take as long as a month and a half for --



to -- to call the employee in for an evaluation?

MS. MARMOR: Objection. Lack of foundation. 1:08:50

A. No.

Q. What is the longest that it's taken, in your experience, from the time the request is made until the time of the interview?

A. I don't know.

Q. Okay. Could it have been a year?

A. I don't know.

Q. Okay. Could it have been a month?

A. I don't know.

Q. Okay. What is the least amount of time that has taken?

MS. MARMOR: I'm sorry, what has taken?

MR. BUSTAMANTE: The least amount of time between the request for an assessment for fitness for duty evaluation and the time the interview is called.

MS. MARMOR: In her experience while she was working there?

MR. BUSTAMANTE: Of course. I mean, where else? Yeah.

A. I don't remember the least amount of time it took. It would play into factors, if the employee was there at work, it just -- if the employee was there at work that day, that was -- would -- would be much

swifter than someone who wasn't at --
Q. Okay. Do you know who Matthew Burke is?
A. I -- yes, I remember Matthew Burke. 1:10:05
Q. Okay. Do you know if he still works for the sheriff's office?
A. I don't know.
Q. What do you know about Matthew Burke?
MS. MARMOR: Object to the form.
A. That he worked for the sheriff department. I forgot what his title was, but I do remember that he was an attorney.
Q. Okay. Okay. Let me show you what has been marked -- what we're marking as Shelby Deposition Exhibit Number 2.
MS. MARMOR: Thank you.
Q. Have you seen this document before?
A. I have. 1:11:00
Q. What is it?
A. It is a note with the conversation that Superintendent Jones-Hayes had with me and Rebecca --
Q. This --
A. -- concerning the incident.
Q. This is a note regarding the telephone conversation you testified to?
A. Yes.



Q. Other than what is contained in this note, did you have any other conversations with Superintendent Jones-Hayes about the incident involving John?
A. Not that I recall.
Q. Who prepared this note?
A. I don't remember. 1:11:44
Q. Did you prepare it?
A. No.
Q. Do you know when this note was signed?
A. I do not.
Q. Do you recognize the signature?
A. I do not.
Q. Okay. Can you read the signature?
A. It says, "Supt. K. Jones-Hayes." And then it has number "271."
Q. Do you know when that signature came onto this document?
MS. MARMOR: Objection. Asked and answered.
A. I do not. 1:12:22
Q. Now, why is it that a written document is prepared concerning an interview with, as you stated, the person requesting the fitness for duty evaluation, but a written document is not prepared from the employee who is supposed to be assessed for fitness for



duty?
MS. MARMOR: Objection to the form. Calls for speculation. Lack of foundation.
A. I don't know.
Q. Do you know if any of the statements contained in this note, do you personally know if they're true?
A. I don't.
Q. When you are making an assessment of whether or not to request that an employee undertake a fitness for duty evaluation, do you rely on documents such as this, Exhibit Number 2?
MS. MARMOR: Object to the form. 1:13:37
A. I do not.
Q. What do you rely on?
A. I talk with the employee.
Q. Okay.
A. And --
Q. What do you rely on?
A. I rely on speaking with the -- the employee and the employee's response, as well as the employee's behavior.
Q. Let me show you Shelby Exhibit Number 3.
MR. BUSTAMANTE: Yours is going to have a different number. She has Shelby Number 3.



MS. MARMOR: Handwriting --
MR. BUSTAMANTE: So let's mark --
MS. MARMOR: -- takes precedence. Oh, I see. But this is just -- oh, so you're saying that the version we have is a copy of Reierson 5, but the version she has does -- is not?
MR. BUSTAMANTE: Doesn't have this.
MS. MARMOR: Doesn't have the Reierson 5 --
MR. BUSTAMANTE: Right.
MS. MARMOR: -- Exhibit sticker on it? Okay.
Q. Have you ever seen this document before?
A. I have not. 1:14:56
Q. Do you know what this is?
A. I do not.
Q. Okay. Have you ever seen a form from the sheriff's office for discrimination, harassment, sexual harassment complaint form?
A. Not that I recall.
Q. Do you know if this document would have been available to you if you had requested it?
MS. MARMOR: Objection. Lack of foundation and calls for speculation.
A. I don't know.
Q. I take it that even if you had this document in November of 2016, you would not have relied on it.

Page 61

Is that correct?
MS. MARMOR: Object to the form. Lack of foundation. Complete speculation.
A. I would not. 1:15:45
Q. For the same reasons that you would not have relied on Exhibit 2, correct?
A. This would have no bearing on it. It wouldn't have had anything to do with my decision.
Q. Okay. So let's now talk a little bit about the interview with John, okay?
A. Okay.
Q. How was John informed that he was to have an interview with you and Ms. Reierson?
MS. MARMOR: Objection. Lack of foundation.
A. I don't remember.
Q. How would a person, an employee, typically be informed?
MS. MARMOR: Same objection.
A. He could have been informed through a -- through his superior. Usually, I think that was -- the -- the usual route of seeing, when the employee comes back to work, "Send them to us and we will talk to him," something like that, or "Send him here at this time and we can talk to him."
Q. How is the superior or supervisor informed of

Page 62

that? Is that done by telephone call, by text message, by email, by interoffice memorandum? How is the superior informed that the employee is supposed to report to HR?
MS. MARMOR: Objection. Lack of foundation. 1:17:11
A. It could have been informed numerous ways. It could have been informed via email, via telephone conversation. There was no set way to inform.
Q. Would HR, your office, keep any documentation regarding "we informed this individual to come into the office today"?
MS. MARMOR: Object to the form, and it -- HR is not her entire office -- or she's not the office of HR.
A. No, I wouldn't have kept anything saying I -- are you asking would I have left -- let me ask you to just rephrase it to make sure I'm --
Q. Sure.
A. -- answering it correctly.
Q. So for -- for example, if -- if a phone call is made to whoever is in charge of roll call, when this individual shows up, make -- have him report to HR, is there some kind of documentation that is kept, "On this date, we called, asked that this individual show up," any kind of documentation?

Page 63

A. No. 1:18:12
Q. How about any documentation regarding scheduling, you know, for example, did you keep a calendar saying, "These individuals are going to come to the office" or "have been requested to come to the office on this date" --
MS. MARMOR: Did she personally? Sorry.
Q. Let's start with you personally first.
A. No.
Q. Did the -- did the HR office keep any -- any such documentation, like a calendar, or diary, or any such form?
MS. MARMOR: Objection. Lack of foundation.
A. That I don't know.
Q. How did you know that you were expecting a certain individual to come up or to come to -- report to HR for an evaluation or an assessment for FFD?
A. I would have just known, whether it was a conversation that the person was coming at a certain time, but it wouldn't -- and maybe I would have put it on my -- I don't know, but I wouldn't have kept a documentation saying that, "I have these appointments here at this time," because my schedule wasn't like that.
Q. At what time did you report to work in

Page 64

September of 2016?
A. 8:00. Usually around --
Q. 8:00?
A. -- yeah, 8:00. 1:19:34
Q. And at what time did you leave?
A. Usually around 4:00.
Q. At what time did John come for his appointment?
A. I don't know.
Q. Was it morning or was it afternoon?
A. I don't recall.
Q. Did John, in fact, report for his appointment?
A. Yes.
Q. Do you recall that it was November 18th, 2016?
A. I don't recall the date, no.
Q. Who did John report to when he came for his appointment?
A. He would have reported directly to the officer that's -- that sits in the main -- soon as you walk in the door.
Q. And --
A. And would have reported who he was there to see.

Q. Okay. When a person is requested to come up to HR for that type of assessment, for fitness for duty, is he told who he is going to see?
A. I believe so. I don't -- I -- I believe so.
Q. Okay. And would it have been, "You're going to see Ms. Reierson and Nurse Shelby," or "You're going to see Ms. Reierson," or "You're going to see Nurse Shelby"?
A. That I don't know. 1:20:52
Q. How does the man at the desk know that, you know, someone is reporting? Does -- does the man at the desk receive some kind of writing saying, "We're expecting these people to come in today"?
MS. MARMOR: Objection. Lack of foundation.
A. Not from me.
Q. All right. Do you know who John was supposed to report to, you, or Ms. Reierson, or both?
A. Both.
Q. Okay. Who greeted him? Aside -- you know, after he got past the guy in the front?
A. I don't remember.
Q. Did you see him first or did Ms. Reierson see him first?
A. I don't recall.
Q. In your office, do you have a desk?



A. Yes.
Q. Do you sit behind the desk to interview the employees?
A. I do.
Q. How many chairs are there on the other side of your desk?
MS. MARMOR: Were there. Since she's --
MR. BUSTAMANTE: Were there, right, right --
MS. MARMOR: -- no longer there.
MR. BUSTAMANTE: -- right, right.
MS. MARMOR: Yeah.
MR. BUSTAMANTE: Thank you. 1:21:49
A. Usually, there were two desk -- two chairs by my -- in front of my desk.
Q. When -- did Mr. Nawara come to your office, or did you go to Ms. Reierson's office first?
MS. MARMOR: Object to the form.
A. I believe it was in my office.
Q. Where was Ms. Reierson when Mr. Nawara came?
A. I don't recall.
Q. So it's possible she was not there when Mr. Nawara came in?
A. I don't recall.
Q. Did you have a conversation with Mr. Nawara while you and him were alone in your office?



A. No. 1:22:33
Q. Was all the conversations you had with -- with John were when both you and Ms. Reierson were present?
A. I believe so.
Q. Was there any other person present at any time that you had a conversation with John when he first reported to your office?
A. I don't recall.
Q. Who started the conversation when Mr. Nawara reported to your office?
A. I don't recall.
Q. Do you recall any part of that conversation?
A. Vaguely, yes. I -- yeah, vaguely.
Q. What do you recall of the conversation?
A. Trying to explain the purpose of why he was here in the office.
Q. Who -- who was speaking?
A. I believe myself. 1:23:36
Q. Okay. To the best that you can, I know it's not going to be word for word, would you tell us what you said?
A. That he was there --
Q. Pretend I'm John.
A. Okay.



Q. Just tell -- say what you said.
A. "Hi, John. You're here -- do you know why you're here?" And I don't remember if he knew why he was there or not at that particular point, but I would go on to just explain that, you know, there was some concerns of his behavior, we're calling him in just to do a fact finding, to get his view on exactly what transpired, because it's very concerning, you know, what was -- was said by his superior.
Q. Okay.
A. But I believe that it couldn't go on very long because he became very raged, very uncooperative, at that particular point. I remember that.
Q. Describe what you saw. 1:24:46
A. He was mad. He was mad. I believe his -- you know, I was trying to talk to him, that he was -- had became loud, and I believe, at one point, that he even stormed out of there. I -- I believe so, but I remember that he was just -- I had never had this happen. I've never seen anyone in that office behave like that before.
Q. When Mr. Nawara first reported to your office, did he sit down at -- at your desk?
A. I don't remember if he was sitting or not.
Q. And was Ms. Reierson on the same side of the

Page 69

desk that you were on, or was she on the side that Mr. Nawara was on?
A. I believe she was on the side that he was on, because if -- yeah. I believe so.
Q. When you say that John got mad and I asked you what did you observe, okay, what did you observe?
A. Him being loud --
Q. Excuse me for interrupting you. For me, that's what did you hear. What did you observe is what --
MS. MARMOR: Well --
Q. -- did you see?
MS. MARMOR: -- I think she's allowed to answer the question --
MR. BUSTAMANTE: I know.
MS. MARMOR: -- the way she wants to.
MR. BUSTAMANTE: I understand that, but I --
MS. MARMOR: Okay.
MR. BUSTAMANTE: -- because we'd already -- she already testified to that.
A. Okay.
MS. MARMOR: Right. But that's how she defines mad.
A. Okay. I'm -- describe someone -- what I'm observing is someone who looks like they are looking at

Page 70

me on -- like they're on ten and could attack at any given time.
Q. What gave you the feeling that he could attack at any given time?
A. By the look on his face. He just had a rage in him, and I can't -- it was rage.
Q. Okay.
A. I can't tell you what rage -- but you see it and you know it if it's looking at you. You see it.
Q. Okay. Can you describe John physically? What does he look like?
A. Physically, he has, I think, black hair, maybe olive colored skin. I believe he's kind of a medium or -- medium type of build. That's the most that I could, yeah, tell you.
Q. Did he make any physical gestures when -- when you say that you observed him being mad?
A. When you say, "Physical gestures," what are you speaking of?
Q. Anything that has to do with the body, any gestures.
A. I don't know exactly what do you mean with anything to do with the body. I'm --
Q. Okay. 1:27:48
A. -- not understanding that.

Page 71

Q. What do you -- do you understand what -- what a gesture is?
A. I don't understand when you're -- no, maybe I don't. Explain to me --
Q. Okay.
A. -- what you mean.
Q. Okay. Did he make any moves that you would consider aggressive?
A. Not towards me.
Q. To -- towards anyone?
A. Not that I saw.
Q. Did you feel that your physical safety was threatened at that time?
A. I did not feel threatened because we were in the sheriff's office.
Q. Did you feel that Ms. Reierson's physical safety was threatened at that time?
A. I didn't think hers was threatened once -- because we were in the sheriff's office.
Q. How long did the interview with John last from the moment he came in until he stormed out?
A. I don't -- I don't -- I don't remember how long it lasted, but I -- I don't remember because I remember at one point, there was a union steward that came in, but I don't -- I -- I remember that there was

Page 72

a union steward that came in, so I don't remember the time sequence of -- of everything that transpired.
Q. My understanding is that John was there at least twice that morning, okay, of November 18th. You say you -- you testified that he stormed out. He says differently. Doesn't really matter.
A. Okay. 1:29:45
Q. But I'm talking about the first time, before the union steward come -- comes, okay? He later returned with a union steward, okay?
A. Okay.
Q. That first time, how long was he there?
MS. MARMOR: Okay. I'm going to object to lack of foundation. I mean, she -- your -- your -- she's only basing her answers based on what your memory -- what your information is, not on her necessary --
MR. BUSTAMANTE: Correct.
MS. MARMOR: -- necessarily her memory.
A. I could not tell you how long.
Q. During that first part, before the union steward came, did you ask John to sign medical release forms?
A. I believe so. 1:30:22
Q. Tell us what you remember of that conversation.

Page 73

A. Trying to explain the process for a fitness for duty, that he would be evaluated by an independent -- actually, at that point, let me go back, let me stop, because -- and -- and I -- and I just remembered, I don't know if he was asked to sign it at that point. I believe, at that point, he was not asked to sign it because I believe, at that point, we had not discussed it to decide if that's what -- what route we were going to go with him.
Q. Okay.
A. I believe it was after he stormed out, and then we had chance to talk, that that was the determination, but it was not decided immediately. It was -- it's never decided immediately that we're going to jump for a fitness for duty. There are cases that we didn't do fitness for duty.
Q. Okay. How -- how long -- by the way, put in your mind's eye, okay, what -- what is happening during the first time that John is in your office and you say he stormed out, do you see him, in your mind's eye, standing up from a chair and walking out of your office, or do you see him already standing, and he never sat down, and walking out of your office?
MS. MARMOR: If you remember. 1:31:46
A. I don't remember if he was standing the whole

Page 74

time or not. I don't picture him sitting down. That I can say, I don't remember him ever sitting down. Okay.
Q. When he walked out of the office -- by the way, was the office door closed when the interview started?
A. Yes.
Q. And so who opened the door when he walked out?
A. He would have opened the door.
Q. Do you have a clear memory of that, or are you just guessing?
A. He stormed out, so he would have opened the door.
Q. Okay. How long was it before he returned?
A. That I don't remember.
Q. Was it a long time or a short time?
MS. MARMOR: Object to the form.
A. I don't remember.
Q. What -- he did return the same day?
A. Yes. 1:32:42
Q. And you say you remember a union rep coming back?
A. Yes.
Q. Okay. Between the time that John left your office and came back with a union rep, did you make a

Page 75

decision, did you exercise your nursing judgment and determine whether or not he should be subject to a fitness for duty evaluation?
A. I believe Rebecca and I discussed it, and it was agreed upon by both of us that we felt that he should go for a fitness for duty.
Q. Okay. So tell us about that discussion. What did you say and what did Ms. Reierson say?
A. That what we had -- as we watched his behavior and his lack of self-control, and just talking with us from HR, that it's very concerning, him being safe to care for prisoners if he can't show self-control with us and we're not threatening whatsoever, so how would -- does he behave himself in that sort of environment, so he definitely should be evaluated by a provider to make sure that he didn't harm someone while on the job.
Q. All right. What I want to know is what was said by you and what was said by Ms. Reierson?
A. I couldn't tell you. I'm telling you, in gist, what the conversation went -- looked like. I couldn't tell you who said what in the conversation, but I just know that that was a concern.
Q. How did the conversation between you and Ms. Reierson start?

Page 76

MS. MARMOR: Objection. Asked and answered. 1:34:32
A. I don't know.
Q. Well did you say, "Well can you believe that?" or "What do you think?" or something to that effect?
A. I couldn't tell you.
Q. How long did that conversation take place? How long -- I mean last, not take place. How long did that conversation last?
A. I don't recall.
Q. Did you make any notes of that conversation?
A. No.
Q. Why not?
A. There was no reason to make notes for it.
Q. Why is there no reason?
A. Because we were having a discussion.
Q. Did you make any -- any notes regarding the elements that went into your assessment, your nursing assessment, to recommend a fitness for duty evaluation?
MS. MARMOR: Objection. Asked and answered. 1:35:27
A. I did not.
Q. So when -- when John came back with the union rep, the determination had already been made that you were going to request that he submit to a fitness for duty evaluation?

A. Correct.
Q. At that point, was it at that point that you got the medical release forms, I'll call them, for John to sign?
MS. MARMOR: I'm sorry, can you -- I -- I didn't --
Q. Was it at that point, after you decided to -- that he was going to be requested to undergo a fitness for duty evaluation, that you obtained the forms for release of medical records?
MS. MARMOR: Object to the form. 1:36:15
A. I believe at that particular time, when he had the rep there, we explained the process and explained that these forms would need to be filled out, yes.
Q. Okay. But someone had to get the forms, correct? Or were the forms already there from the very -- from the very beginning?
A. The forms were probably there from the beginning.
Q. Where are those forms kept?
A. They are kept in a file cabinet in the back part of the office.
Q. They're not kept in your office? Or they were not kept in your office at that time?



A. Yes, they were kept in my office.
Q. So at the -- the file cabinet within your four walls of your office where the forms were --
A. Well my office had -- I had a front part of my office and then there was a back office right in my office, that's where the file cabinet was kept.
Q. Who prepared these forms? In other words, who -- who drafted them?
A. What do you --
MS. MARMOR: Originally? 1:37:24
MR. BUSTAMANTE: Originally, yes.
A. Oh, I don't know.
Q. These forms were already there when you started working for the sheriff's office?
A. I --
Q. The drafting of these forms?
A. Yes.
Q. And did you ever review these forms over the period of time that you had been working for the sheriff's office, did you ever review these forms to make sure that they complied with HIPAA?
A. I did not.
Q. Did you ever review these forms to make sure that they complied with the ADA?
A. I did --



MS. MARMOR: Objection. Lack of foundation.
A. I did not.
Q. So tell us what happened when John came back with the union rep.
A. I believe we spoke with both and explained to them what the next steps was going to be, that we were going to request that he go for a fitness for duty and the process of -- for the fitness of duty to, you know, transpire. CorVel is the third party company that handles it. They require that they receive his medical records, so they can give the provider, whoever is going to be doing the -- the evaluation, all of the medical records, and they need that to rule out anything that could be going on medically with the person.
Q. When John came back with the union rep, where did the meeting take place? Back in your office?
A. Yes. 1:39:12
Q. Besides John, the union rep, you, and Ms. Reierson, was there anybody else present?
A. No.
Q. What was the approximate time?
A. I don't know.
Q. Who spoke first when John came back with the union rep?



A. I don't know.
Q. Did you inform the union rep the reasons why it -- it was requested that John undergo a fitness for duty evaluation?
A. Yes.
Q. Did Ms. Reierson explain to the union rep the reasons why John was to -- requested to undergo a fitness for duty evaluation?
A. I don't recall.
Q. What did you say to the union rep?
A. I don't recall.
Q. What was John's demeanor when he came back with the union rep?
A. He was very upset.
Q. Okay. Explain what you observed or tell us what you observed when you say, "Upset."
A. He was upset, he was -- he was huffing and puffing. He was upset, he was -- I can't explain what an upset person looked like. They are just upset. They're -- they're mad.
Q. When you said he was upset, did you mean to say he was mad?
MS. MARMOR: Objection. Mischaracterizes her testimony and argumentative.
A. He was upset, and -- and that's how he was.

Page 81

He was upset. Even while we were attempting to explain the situation, he was loud. I believe the union rep tried to diffuse it some, I believe -- yeah, I believe the union rep kind of tried to diffuse him some, but he was upset.
Q. All right. What was John saying when you say he was loud?
A. That he wasn't going for no fitness for duty.
Q. Anything else? 1:41:39
A. He made mention to -- that his superintendent, I believe, was lying on him or something to that effect. Yeah.
Q. Anything else that you recall?
A. Not that I recall.
Q. The -- did you --
MS. MARMOR: Oh, wait. She -- she -- looks like she has something more to say.
Q. Oh, go ahead.
A. And he -- I do recall that he was saying that he wasn't signing the papers, and -- and we, you know, informed him at that time if he didn't sign the paperwork or didn't want us to have his information, he could go directly through CorVel.
Q. Okay. Who said -- who said that to him, that he could go directly to CorVel?

Page 82

A. I don't know if it was I that said it to him or Rebecca, but I do know he was informed that.
Q. And is that true, that an employee can go directly to CorVel if they don't want to sign the forms provided by the sheriff's office?
A. That is true. 1:42:56
Q. And have there been situations with employees other than John where they have gone directly to CorVel and signed the CorVel form?
A. Yes.
Q. Is this something that you tell all employees?
A. Absolutely.
Q. Okay. We'll go to Shelby Number 4. Ms. Shelby, have you seen a copy of this letter before?
A. I have.
Q. When you receive a copy of a letter such as this, what -- what do you do with it?
MS. MARMOR: Objection. Calls for speculation. 1:44:03
A. I -- I didn't have a process on what to do with a letter like this, so.
Q. Would it go into the employee's fitness for duty file that you keep in your office?
A. I might have put it in there and I might have

Page 83

not. I didn't have a process on what to do with it.
Q. If you did not put it in any file, where would it go? The circular file?
MS. MARMOR: Objection -- objection. Argumentative.
MR. BUSTAMANTE: Sorry.
MS. MARMOR: And no -- and there is no -- there is no -- there's --
Q. I mean, would you just trash it or --
MS. MARMOR: Yeah -- yeah.
A. I probably wouldn't have received it as a hard copy for me to trash it. It would have probably came via an email form or something like that, so then it wouldn't have been a reason for me to trash it or anything. It just would have been part of the email.
Q. Do you know why you were copied on this letter?
A. I don't know why -- why I was copied on it, no. 1:45:06
Q. Okay. Would you please read that letter to yourself? Let me know when you're done.
A. Okay.
Q. Okay?
A. I am complete.
Q. All right. Is there anywhere in this letter

Page 84

where John is told that if he doesn't want to sign the forms given to him by the sheriff's office, that he could go directly to CorVel and sign CorVel's form?
A. No. 1:46:22
Q. Why not?
MS. MARMOR: Object -- objection. She didn't write this letter. That's not an appropriate question for her.
A. And that's -- I did not write the letter.
Q. I understand that, but why -- why isn't that something that's put in -- in a letter to a -- an employee, copied to you so you saw it, okay? Do you know why that's missing?
MS. MARMOR: Okay. Slow down. I want to get my objection on the record. Number one, that's treating this as if it's a normal situation that was going on. And number two, she doesn't have the foundation to answer that question.
A. I don't know. I did not write the letter. 1:46:56
Q. Okay. Did you call and leave a voicemail for John on November 30, 2016?
A. I don't remember the date I did.
Q. But you did call, do you recall? Do you recall calling and leaving a voicemail?
A. Yes, I did.

Q. Were you asked to call, or did you call on your own?
A. I don't remember.
Q. What did you say when you left the voicemail?
A. Just who I -- I -- who I was, who I was calling for, and requested a call back.
Q. And what did you say when you said what you were calling for?
A. Who I was calling for, I was calling for --
Q. Oh, I'm --
A. -- John -- yeah.
Q. Okay. Got it. Did you discuss this letter with Ms. Reierson after you received your copy?
A. I don't recall. 1:47:50
MS. MARMOR: If you need to take a break, you can take a break.
WITNESS: Oh.
MS. MARMOR: Okay?
WITNESS: I'm fine. Thank you.
Q. If you need a break, let me know --
MS. MARMOR: No, she was just --
Q. -- okay?
MS. MARMOR: She was checking her watch. I just wanted to --
MR. BUSTAMANTE: Oh.



MS. MARMOR: -- make sure.
WITNESS: Oh, no. Thank you.
MS. MARMOR: Okay.
WITNESS: Sorry. You know, be vibrating these --
MR. BUSTAMANTE: What time is it?
MS. MARMOR: I see.
MR. LINDEN: 12:00, do you --
MR. BUSTAMANTE: Huh? 12 until --
MR. LINDEN: 12:00.
MR. BUSTAMANTE: Okay. I take a lot of breaks because I drink coffee, so.
WITNESS: Okay.
MR. BUSTAMANTE: Let's hope that we'll -- plow through.
Q. Let me show you Shelby Number 5.
MR. LINDEN: Thanks.
Q. Okay. Have you had a chance to read it? 1:49:28
A. Yes, I did.
Q. Okay. You have seen this letter before, correct?
A. Yes.
Q. And it's a letter dated February 28th, 2017?
A. Correct.
Q. To John Nawara from Ms. Reierson, correct?



A. Correct.
Q. Anywhere in this letter where Ms. Reierson says, "If you don't want to sign our forms, you can go to CorVel and sign the CorVel form"?
MS. MARMOR: Objection. Assumes facts not in evidence.
A. No.
Q. This letter has attached two forms. Is that correct?
A. Correct. 1:50:06
Q. And are these the forms that were given to Mr. Nawara to sign when he came for the interview on November 18th, 2016?
A. Correct.
Q. If you'd take a look at the third page, which is Cook County Sheriff's Office 128 at the very bottom, you see where "all health care information" is checked?
A. Yes.
Q. Who put that checkmark there?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you -- were the forms that were kept in your office from the Cook County Sheriff's already all marked with "all health care information"?
A. Yes. 1:51:06



Q. When a -- when the sheriff's office is putting someone through a fitness for duty evaluation, do they always request all the medical records?
A. Yes.
Q. Why is that?
A. Because -- it should be all of the records because the provider -- we don't know what we're asking -- I -- for. We don't want just one office visit note. We want all of the medical records.
Q. Okay.
A. Because the provider requests that.
Q. So it -- it could happen that records that are not relevant to the issue at hand are therefore turned over?
MS. MARMOR: Objection. Argumentative and mischaracterizes her testimony.
A. I don't know. 1:52:20
Q. So you know, just for the sake of argument, if a -- argument. If a person had a hernia and he's being sent for a medical -- a mental health evaluation, the hernia would not be relevant to mental health, or would it?
MS. MARMOR: Objection. Calls for speculation and lack of foundation.
A. I don't know.

Q. Okay. Let me show you Shelby Number 6.
MR. BUSTAMANTE: Oh, shoot -- no, I don't have to worry about it. Got it on -- yeah. Put --
MS. MARMOR: This is why I ask the court reporter to do it for me.
MR. BUSTAMANTE: That's -- it's okay. No problem. We've got it -- got it on time.
Q. Have you ever seen this document before, in the computer, it doesn't have to be in a, you know, printed document, have you seen this type of log before?
MS. MARMOR: Object to the form. 1:53:42
A. I believe so.
Q. Okay. So the title of this document is "Fitness for Duty Log, January 2016 to April 2018," correct?
A. Correct.
Q. And the names of the employees have been redacted, okay, right?
A. Yes.
MS. MARMOR: And actually, can -- sorry, can we go off the record for --
MR. BUSTAMANTE: Sure.
MS. MARMOR: -- one second?
RECORDER: Off record, 12:06 p.m.



(Off the record)
RECORDER: On record, 12:06 p.m.
Q. Okay. Does -- did your office keep some kind of log or record of all the employees who came to your office for an assessment for fitness for duty, whether or not to be sent to a fitness for duty evaluation?
MS. MARMOR: Object to the form and lack of foundation. Do you mean she personally or the HR department in general?
MR. BUSTAMANTE: Her department in general.
MS. MARMOR: She --
MR. BUSTAMANTE: Her office.
MS. MARMOR: -- didn't have a department. She -- she had an -- she had an office, but she didn't -- she wasn't the head of a department.
MR. BUSTAMANTE: I -- I get it. I understand that. 1:54:52
A. There was a log that was kept, however, it was -- I couldn't say that it had all the fitness for duty people on here that we evaluated because the log was not into effect all the while while I worked there. The log went into effect, I don't remember when they started the log, but it was not in effect for the whole period that I worked for the sheriff's department.
Q. Okay. When the log was started, was it a



computerized record or was it a written record?
A. It was a computerized spreadsheet.
Q. The document that you have in front of you, do you know if this was prepared by the sheriff's office or it was prepared by counsel for purposes of this litigation?
A. I don't know. 1:55:46
Q. Does it look similar to what you would have had in terms of a computerized log while you were working at the sheriff's office?
A. I don't remember what was on -- exactly on that log. I remember that was some form of a log, but I couldn't tell you what was on it. That I don't know.
Q. Well this --
A. I don't remember.
Q. Okay. Let's look at some of the entries.
A. Okay.
Q. But first, we'll look at the -- the -- the descriptions on the top, okay? We have a "referral date," correct?
A. Correct.
Q. Slash "date of meeting." Then we have "last," "first," and "job title," which I assume refers to the employee, correct?
MS. MARMOR: Objection. Lack of foundation. 1:56:35



Q. It says, "Last," here, would that be --
A. Yes, I see that.
Q. -- last name?
A. Yes.
Q. First name?
A. Yes.
Q. Job title of the employee?
A. Correct.
Q. Okay. And then we have the "issue" and then "reason for referral," "referral received from," "decision," "comments," and "status," you saw all those?
A. Yes, I see that.
Q. Now from your memory of the log that is kept by the sheriff's office, would there have been any other entries, any other descriptions?
A. I don't recall. 1:57:07
MS. MARMOR: And I'm just going to note for the record that she's already testified she was gone by December, I believe, of 2017, and this log goes through April of 2018, so I'm just going to have a foundation objection to her talking about this.
MR. BUSTAMANTE: I don't think I'm going to go to April '18 -- 2018.
Q. Okay. So you know, I -- I -- I wanted to ask

you questions about specific entries, but we don't even know if this is a Cook County Sheriff's document.
A. Okay.
Q. So we may have to ask you to come back when we find out if -- if there's a different document. I'll ask you questions now, but you know, if -- if it's not a Cook County Sheriff's document, might have to ask you to come back, okay?
MS. MARMOR: Well I mean, let me be very clear, we've -- we've made productions in this case. We were clear about our productions in this case. There is, in fact, another log that was produced in this case that was contemporaneous, and I would object to her coming back --
MR. BUSTAMANTE: What was --
MS. MARMOR: -- you know, you should understand what the documents are in the case.
MR. BUSTAMANTE: We'll -- we'll -- during the break that we're going to take in a short while, we'll see if there's another log. Maybe you can help us share -- search it, if you -- you know, I mean, maybe. If not, I'm -- I'm going to just stand by what I'm saying.
Q. Okay. So let's look at some of these entries, okay? First, under "issue," when it says,



"Med," m-e-d, what does that refer to?
MS. MARMOR: Lack of foundation. 1:58:41
A. I don't know.
Q. Okay. When it says, "Eval," e-v-a-l, what does it stand for?
MS. MARMOR: Lack of foundation.
A. I don't know.
MR. BUSTAMANTE: Oh, shoot.
MR. LINDEN: That was lucky. Half hour -- sorry about that, I mean.
Q. Under "comments," okay, let's look at -- let's look at the entry for 9/9/2016, under "comments."
A. I'm sorry, what date was that?
Q. 9 --
MS. MARMOR: 9/9/2016.
Q. -- 9 --
A. Okay.
Q. -- 2016.
A. Okay.
Q. When -- under "comments," when it says, "FFD not appropriate, may be disciplinary issue," do you see that?
A. Yes. 1:59:29
Q. Who -- when would that entry be made?
MS. MARMOR: Objection. Lack of foundation.



A. I don't know.
Q. By the way, who would make the entries in the log that was kept by sheriff's office?
MS. MARMOR: If you know.
A. I don't remember.
Q. Would it be you?
A. I don't remember.
Q. Okay. Who -- if it was not you, who else could it have been?
A. Someone from the HR management team who was present during the fitness for duty.
Q. Okay. So in Mr. Nawara's case, it would have been either you or Ms. Reierson?
MS. MARMOR: Objection. Mischaracterizes her testimony.
A. Correct.
Q. And who would have access to the computerized log?
A. I don't remember.
Q. Well would it have been more than you or someone in HR management?
MS. MARMOR: Objection. Asked and answered. 2:00:23
A. No. I don't -- I don't remember.
Q. Would this type of information be protected by law from disclosure to people who have no business



putting their nose into it?
MS. MARMOR: Objection. Lack of foundation. Calls for a legal conclusion.
A. I don't know.
Q. Based on your experience as a nurse and based on your knowledge of HIPAA, would the information contained in this log be privileged?
MS. MARMOR: Privileged? Objection. Lack --
Q. Privileged from --
MS. MARMOR: -- complete lack of foundation.
Q. -- disclosure -- privileged from disclosure --
A. When you said, "Disclosure to others," what do you mean, "disclosure"?
Q. Well say that the cleaning lady is coming by and doing his or her job -- cleaning lady, her job, of cleaning your office, and this is on the screen, and she starts reading this information, would that be right?
A. Oh, no.
MS. MARMOR: Objection. Lack of --
Q. No?
MS. MARMOR: -- foundation.
A. No.
Q. Why not? 2:01:18

A. Because it has information pertaining to a fitness for duty, so that would not be something that would be shared with anyone that didn't have a reason -- a reason to be involved in that particular case.
Q. So not everybody could see or have access to this information, correct?
MS. MARMOR: Same objection. Lack of foundation.
A. I don't think -- believe so, no.
Q. Okay. The 9/29/16 referral date, is that the John Nawara event?
MS. MARMOR: Objection --
A. I don't know.
Q. By reading the reason for referral, does it appear to be the John Nawara event?
MS. MARMOR: Objection. Calls for speculation.
A. I don't know. 2:02:14
Q. Under "decision," when it says, "FFD," what does that mean?
A. Fitness for duty.
Q. And when it says above that, on 9/27/2016, when it says, "No FFD," what does that mean?
A. They were not sent for a fitness for duty.
Q. When a notation is made, says, "FFD not



appropriate, may be disciplinary issue," is that a nursing decision that is noted, or is it somebody else's decision that is noted?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. It would have been a discussion held with the management from HR and myself.
Q. Okay. So the notation under "comments" is what management and the nurse, being yourself, decided. Is that correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Correct. 2:03:21
Q. Now, assuming -- and -- and I'm going to ask you to assume that the 9/29/2016 entry is John Nawara's entry, why is the "FFD not appropriate, may be disciplinary issue" written in -- in that spot?
MS. MARMOR: No, that's not -- that's the one above him.
MR. BUSTAMANTE: No, I'm asking why that notation is not in Nawara's entry.
MS. MARMOR: Okay. Well that completely calls for speculation, and there is no foundation for her to testify about documents she didn't create.
A. You said why wasn't it --



Q. Yeah.
A. -- written in that?
Q. Why didn't you write down -- or assuming -- why isn't it written down there "FFD not appropriate, may be disciplinary issue"?
A. I don't know.
MS. MARMOR: Same objections. 2:04:20
Q. If you look at the next page, 189, look under "12/9/2016," you see that?
A. 12/9/2016 --
Q. 12/9 --
A. -- right.
Q. -- third -- third from the top.
A. Okay.
Q. Here is an allegation of "work behavior, alleged outburst of anger," and "FFD" means that FFD was requested, correct, under --
MS. MARMOR: Objection.
Q. -- under the column "decision"?
MS. MARMOR: Objection. Lack of foundation.
A. Okay. What is your question?
Q. Well I'm -- I'm asking you, first of all, FFD was requested, correct?
A. Yes.
Q. And then under the comments, it says, "FFD



not appropriate, discussed options with employee's supervisors." And again, my -- my question is why is this here, this comment made, if an FFD was requested?
MS. MARMOR: Objection --
A. I don't --
MS. MARMOR: -- lack of foundation.
A. I don't know. 2:05:28
Q. Is it that the evaluator, the -- you know, the person who CorVel sends the employee to, decided that this was not appropriate for fitness for duty?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. I don't know.
Q. Can you agree that at least it's not the HR manager and the nurse's decision because HR management and the nurse decided that FFD was -- was appropriate, correct?
MS. MARMOR: Objection. Lack of foundation. Calls for speculation.
A. Yeah, I don't see anywhere where it says that.
Q. Well it says, "FFD," and if some -- if it says, "FFD," means that you requested FFD, correct?
MS. MARMOR: Objection. Lack of -- lack of foundation. Calls for speculation.

Page 101

A. I don't know if -- if it's saying that it was decided on an FFD, I don't know.
Q. All right. Well go back and look at all the columns up to --
A. Okay.
Q. -- the time that you left, okay?
A. Okay. 2:06:26
Q. If it says, "FFD," was it decided to FFD?
MS. MARMOR: She has no --
Q. And --
MS. MARMOR: Sorry.
Q. And if it says, "No FFD," was it decided no FFD?
MS. MARMOR: She has no foundation for answering these questions. She did not create this document.
A. I don't know.
Q. Show you Shelby Number 7. Would you tell us what this document is, please?
A. This is the referral form that we sent over to CorVel when we're requesting a fitness for duty for someone.
Q. Is this a document that you prepared?
A. I just put in the -- the -- the form -- the referral form was already prepared, I just plugged in

Page 102

the individual employee's information into this -- to each referral form.
Q. Okay. When you say the referral form was already prepared, tell us what parts were already done and what parts you plugged in.
A. The date, the employee's name, date of birth, contact information, home address, job description, occupation, the reason referring, any specific questions to address.
Q. So the -- the -- the thing that was already prepared was the line where it says, "Cook County Referral Form"?
A. Yeah, "Cook County Referral Form," the date -- the -- the --
MS. MARMOR: Do you mean the headers right here? I think that's --
MR. BUSTAMANTE: The header.
MS. MARMOR: Yeah. Not just the headers, but the header -- like the header "date."
A. Yeah, the date.
Q. Got it.
A. The employee name, the date of birth, the employee contact, the home address, the job description, the reason for the referral, those were already on the form.

Page 103

Q. Okay.
A. And I just would make it individualized for each employee by adding what their -- what the date is, what their name is, what their date of birth --
Q. Okay. What -- what is the date of this document?
A. 8/25/2017. 2:09:26
Q. Why was the document prepared at this time?
A. I don't know.
Q. By this time, had the issue regarding John signing the -- the HIPAA form been resolved?
A. I don't recall.
Q. Were you involved in any of the discussions regarding any changes to be made to the HIPAA forms?
A. I was not.
Q. Do you know if John signed the two forms that are referenced in Exhibit 5?
A. I don't recall.
Q. Did you have any other dealings with Mr. Nawara, any personal dealings with Mr. Nawara between the time of that interview in November of 2016 to present?
MS. MARMOR: Does that include the phone call or you mean one on one?
MR. BUSTAMANTE: One on one because I don't

Page 104

think she -- the phone call, she says he never answered.
MS. MARMOR: Right. But she called -- she did leave a message.
MR. BUSTAMANTE: Personal.
A. I don't recall. 2:10:24
Q. Would Mr. Nawara have any reason to come back to see you at your office after the fitness for duty evaluation?
MS. MARMOR: Objection. Calls for speculation.
A. If he went for a fitness for duty evaluation, then more than likely, the Cook County Sheriff's Office would have received the results, and we would have called him to say we had the results for him to get the return to work paperwork, yes. I don't know if he would have gotten it, per se, from me, but he would have been called in to get the return to work paperwork because he would have had to be returned back to work.
Q. When you wrote this memorandum in August of 2017 -- or the referral form, I'm sorry, how many times had you seen John Nawara?
A. I don't recall. 2:11:28
Q. Had you seen him more than the one day that he came for the initial interview in -- in November of

Page 105

2016?
A. I don't recall.
Q. Would you have had any other reason to see him between November 18th of 2016 and August 25 of 2017?
MS. MARMOR: Object to the form.
A. I don't -- I don't remember.
Q. When -- would you kindly read into our record the reason for referring?
A. "Employee's aggressive, physically intimidating, and inappropriate behavior directed towards his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resource department."
Q. Did -- how did you come to the conclusion that the employee had been aggressive, physically intimidating, and had inappropriate behavior directed towards -- toward a superior officer?
MS. MARMOR: Object to the form. 2:12:47
A. Based on the discussion with his superior.
Q. Okay. What happened to the -- what you told us before, that those things are not facts that you consider, you don't consider them facts? Why did that change?

Page 106

MS. MARMOR: Objection -- objection. Argumentative.
A. I was giving them all of the facts. That was not what went into play far as us deciding on the fitness for duty, his behavior was. I wanted to give CorVel all of the facts, so they can make an -- and -- and the provider all of the information, so they can make a decision. We -- it does us no good to send them for a fitness for duty and give them -- and don't give them all the information. I already had the information. I already knew. But that was not my decision in deciding on the fitness for duty. His behavior was our decision maker. But once again, we wanted them to have a clear understanding on why this referral was being made.
Q. Okay. When you say, "In addition," that, "weeks later, employee presented as aggressive and hostile in the human resources department," that's what you already described for us, correct?
A. Correct.
Q. Did you ever file a complaint against John with anyone for the behavior that he exhibited while you were interviewing him on November 18th, 2016?
MS. MARMOR: Objection. Lack of foundation.
A. No. 2:14:10

Page 107

Q. Why not?
MS. MARMOR: Same objection.
A. I wouldn't have known what sort of complaint to try to file in a situation like this.
Q. Did you ask anyone as to whether or not you should file a complaint?
A. I did not.
Q. Did Ms. Reierson ever tell you that she was going to file a complaint?
A. She did not.
Q. Do you know what Mr. Nawara was doing between -- in terms of his employment, between September 16th, 2016 and the time of the interview at -- at HR in November 18th, 2016?
A. I don't recall.
Q. Did you know at one time?
A. I don't think I did. I --
Q. Would -- would his assignment --
MS. MARMOR: Wait, she --
Q. Oh, I'm sorry. I interrupted you.
A. I knew that he was a correction officer. That's what I knew. That was his position.
Q. Would part of your assessment for determining whether or not a fitness for duty evaluation was appropriate, was part of your assessment required to

Page 108

determine his -- an individual, an employee's current assignment?
MS. MARMOR: I'm -- I'm -- I'm going to object to the form. There was a lot of words in there.
A. No. 2:15:43
Q. If the individual had, for months, a month and a half now, been assigned to outside services, where he is allowed to carry a weapon and escort inmates to and from different locations, would that have made any difference in your evaluation?
MS. MARMOR: Objection. Calls for speculation. Lack of foundation. And mischaracterizes the record.
A. No, it would not.
MR. BUSTAMANTE: Do you need a break?
MR. LINDEN: Mm-mm.
MR. BUSTAMANTE: Okay.
Q. Before John was called to human resources to meet with you and Ms. Reierson, was John provided with anything in writing regarding the reason why he was being called to HR?
MS. MARMOR: Objection. Lack of foundation.
A. Not -- not to my knowledge. 2:17:10
Q. Before coming to the interview at HR on November 18th, 2016, was John informed in writing of

what was considered the problematic behavior?
A. Not to my knowledge.
Q. When a Cook County Sheriff's Office employee is charged with improper work behavior by allegedly being aggressive, does that always result in a fitness for duty evaluation?
A. I don't know.
Q. Based on your experience in the time that you have been there and acting as the nurse that is part of the team that makes the decision for fitness for duty, when a CCSO employee is charged with improper behavior by allegedly being aggressive, that -- does that always result in a fitness for duty evaluation?
A. I don't know. 2:18:33
Q. When an employee is charged with aggressive behavior and you're making a determination as to whether or not to refer that person to -- for a fitness for duty evaluation, does it matter whether the person charged with making the charge of aggression is a supervisor or not?
MS. MARMOR: Objection. Lack of foundation.
A. No, it does not.
Q. Is it appropriate for a supervisor to have unwanted physical contact with -- with a subordinate?
MS. MARMOR: Object to the form. Lack of



foundation.
MS. KAMPER: Join.
A. I don't know what the policy is far as for the sheriff's department on that.
Q. Other than Shelby Number 7, have you prepared any other writing concerning John Nawara?
MS. MARMOR: Object to the form.
A. I don't recall. 2:20:16
MR. BUSTAMANTE: Okay. All right. I need to take a break. Is that okay?
MS. MARMOR: Yeah, of course.
MR. BUSTAMANTE: And you know what, I -- I think I only have about an hour or -- well less than an hour.
MS. MARMOR: Okay. Great.
MR. BUSTAMANTE: Like 40 minutes left. Can we just finish through without having a lunch break?
MS. MARMOR: Is that okay with you?
MR. LINDEN: That's fine.
WITNESS: Mm-hmm.
MR. BUSTAMANTE: Oh.
MS. MARMOR: Okay.
MR. BUSTAMANTE: That okay?
WITNESS: That's fine.
MS. MARMOR: The only caveat --



MR. LINDEN: Okay.
MS. MARMOR: -- is that I may get a phone call at --
MR. BUSTAMANTE: Okay.
MS. MARMOR: -- 1:00 --
MR. BUSTAMANTE: We can --
MS. MARMOR: -- that I have to take.
MR. BUSTAMANTE: -- break. That's fine.
MS. MARMOR: Yeah.
RECORDER: Off record, 12:33 p.m.
(Off the record)
RECORDER: On the record, 12:43 p.m.
Q. Okay. Let me show you Exhibit Number 8.
MR. BUSTAMANTE: And unfortunately, I only have one copy. It's the --
MS. KAMPER: That's --
MR. BUSTAMANTE: -- answers to interrogatories.
MS. KAMPER: No, that's all right.
MS. HONINGFORD: Okay.
MR. BUSTAMANTE: Apologize for that, but I didn't want to kill that many trees.
Q. Would you take -- take a look at the next to last page, page 21 of this document, please? Do you see that?



MS. MARMOR: No, I'm not there.
MR. BUSTAMANTE: Okay.
MS. MARMOR: Oh my goodness. Oh.
A. You said page 21?
Q. 21.
A. Yes.
Q. Okay. Is that your signature or a facsimile of your signature on that page?
A. Yes, it is.
Q. Would you please read the verification into our record?
A. "I, Winifred Shelby, declare under penalty of perjury, pursuant to USC --
MS. MARMOR: That's a section.
A. -- section" -- oh, "1746, that the foregoing Defendant Winifred Shelby answers to Plaintiff's first set of --
MS. MARMOR: "Interrogatories."
A. -- interrogatories directed to Defendant Winifred Shelby is true and correct. Executed on February 21st, 2018."
Q. So I'm going to ask you some questions about some of these interrogatories, okay?
A. Okay.
Q. Let's look at page 3, please. The last

paragraph of that page, would you read that to yourself and onto page 4? Let me know when you're ready.
A. The whole page 4 --
Q. No, just the -- through the --
A. Okay.
Q. -- through the top. 2:24:25
A. Okay. I'm --
Q. You're set?
A. -- finished. Yes.
Q. Okay. Go back to page 3, please. Do you see that last paragraph, under numeral three, would you please read that into our record, just numeral three?
A. "Defendant Shelby had in-person conversations with Defendant Rebecca Reierson regarding the appropriateness of a fitness for duty evaluation for Plaintiff."
Q. Other than the conversation that you described from the time that Mr. Nawara left your office and came back with a union representative, have you had any other conversations with Ms. Reierson regarding the appropriateness of fitness for duty evaluation for Plaintiff?
A. I don't recall. 2:25:17
Q. If you had any other conversation with Ms. Reierson, other than the one I've just described or the



time that I just described, would those be documented somewhere?
MS. MARMOR: Objection. Mischaracterizes exactly what the document says, which is that these were in person. I -- it says that they were in person, rather than documented, so it's a little bit --
MR. BUSTAMANTE: No, I understand that.
MS. MARMOR: Yeah.
MR. BUSTAMANTE: But my question is a little different. If she had, there were in-person conversations, but they -- would they be documented so she could later recall, "Oh, yeah, we had this in-person conversation."
MS. MARMOR: Right. I --
MR. BUSTAMANTE: Okay.
MS. MARMOR: -- my objection will stand.
A. Are -- are you asking would they have been documented -- not from me, no.
Q. Okay. You didn't keep any notes, any diary, any phone log, or anything like that --
A. No.
Q. -- saying, "Oh, I had a conversation on this date"?
A. No. 2:26:10
Q. Okay. How many -- look at number four. How



many times did you have in-person conversations with Ms. Reierson regarding contacting Plaintiff regarding his fitness for duty examination?
A. I don't know.
Q. Did you keep documentations of any of those conversations regarding contacting Plaintiff for his fitness for duty examination?
A. I did not.
Q. Look at page 14, if you would, please. And look at the first -- the first full paragraph on that page, starts with "notwithstanding," just read that to yourself, please.
MS. MARMOR: You guys, if you want to read this, it starts at the bottom of the page and goes on the next page.
A. Okay.
Q. Done?
A. Yes. 2:28:14
Q. Other than yourself and -- let me restate -- restate -- or start all over again. In September of 2016, other than yourself and Ms. Reierson, did anybody else conduct interviews to make decisions -- with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?
MS. MARMOR: Object to the form. You said,



"In September 2016."
MR. BUSTAMANTE: September 2016 is --
MS. MARMOR: Right.
MR. BUSTAMANTE: -- is what I said. Isn't that when -- the time of the -- oh -- let me -- let me restate. Thank you.
Q. Between September of 2016 and November of 2016, other than you and Ms. Reierson, was any other person conducting interviews with employees to make decisions regarding whether a fitness for duty and or medical evaluation is warranted?
A. I am unsure. 2:29:05
Q. Okay. Who else would -- would have been doing -- participating in that -- those interviews, besides you and Ms. Reierson?
MS. MARMOR: Object to the form.
A. If Ms. Reierson was not available, it would have been someone in HR management that would have did the interview with me.
Q. All right. And if you were not available, who replaced you?
A. Usually, I was always available to do them, I think, yes.
Q. Okay. Look at page 14, I want you to read, for yourself, interrogatory number 16 and the answer,

Page 117

please, and let me know when you're done.
A. Okay.
Q. You're set?
A. Yes. 2:31:23
Q. Okay. At page 15, as part of your answer, would you read into the record the sentence that starts with "as reflected"? Third -- third line from the -- from the top.
A. "As reflected in document CCSO 000177, during the meeting, Plaintiff was uncooperative and appeared to be untruthful regarding an incident between himself and Defendant Jones-Hayes" --
Q. That's it.
A. Okay.
Q. Now in what way did John appear to be untruthful?
A. I don't recall now. 2:32:11
Q. Okay. Would you take a look at Exhibit Number 7, please, which is document CCSO 000177, and would you read into the record, please, where it says in that document that John was untruthful or appeared to be untruthful?
A. It does not say that.
Q. Look at page 15 and read to yourself interrogatory number 17 and your answer, please, then

Page 118

I'll ask you a question about it.
MS. MARMOR: I'm sorry, what -- what are you asking about?
MR. BUSTAMANTE: I'm -- just to read first interrogatory number 17.
MS. MARMOR: 17, okay.
MR. BUSTAMANTE: And her answer.
Q. And then --
MS. MARMOR: Okay.
Q. -- when you're done, let me know, and I'll ask you a question.
A. Okay.
Q. Okay. Before April 2017, the forms needed -- that needed to be signed for a fitness for duty evaluation were provided by the sheriff's office?
MS. MARMOR: Object to the form and lack of foundation. 2:34:17
A. You said before --
Q. Well I'm asking you because -- okay, in this answer, it says -- when it says, "Notwithstanding," "Beginning April 2017, any forms that need to be signed are provided by CorVel."
A. Okay.
Q. Before that, were they provided by the sheriff's office?

Page 119

MS. MARMOR: Object to -- objection. Lack of foundation.
A. In some cases. In most cases, they were, but they could go to CorVel also.
Q. Do you know when that change was made?
A. I do not.
Q. Was that your decision?
A. It was not.
Q. Did you participate or contribute to the decision to start using CorVel forms?
A. I did not.
Q. Okay. I'm done with that one. Here's Shelby Number 9.
MR. BUSTAMANTE: And again, I'm sorry, these are just answers to interrogatories --
MS. KAMPER: That's okay.
MR. BUSTAMANTE: -- I'm sorry I didn't make copies of all of them.
Q. If you would just read the interrogatory and answer to yourself, and then I'll ask you a couple of questions.
A. Okay. 2:36:39
Q. Ready?
A. Yes.
Q. Okay. Okay. Do you know Jeff Johnsen?

Page 120

A. I do not.
Q. Do you know Johnice Brumfield-Greer?
A. I do not.
Q. Have you ever discussed John Nawara with either of those two people, Johnsen or Brumfield-Greer?
A. Not to my knowledge.
Q. Do you have personal -- do you have personal knowledge as to whether or not they know anything about John's case?
A. I don't know. 2:37:17
Q. Okay. This is Number 10, which is the Rule 26 disclosures.
MR. BUSTAMANTE: This one, I do have copies of. I don't know why you need them, but we have them.
MS. MARMOR: Sorry.
MR. BUSTAMANTE: They were short, I guess. 10, okay.
Q. We're going to go through these witnesses, I'm just going to simply ask you if you know these folks, okay?
A. Okay.
Q. Okay. So let's -- John Nawara, you do know?
A. Yes.
Q. Okay. Karen Jones-Hayes?
A. I --

Q. Have you ever met her?
A. No.
Q. Okay. Matthew Burke?
A. Yes.
Q. You do know him?
A. Yes.
Q. Have you ever discussed John Nawara's case with Matthew Burke?
A. No. 2:38:04
Q. Of course you know Rebecca Reierson, number four, right?
A. Yes. Yes.
Q. And you're number five. Who is Thomas Conley, do you know him?
A. I do not.
Q. Who is Barbie Gannon?
A. I don't know.
Q. We talked about Mr. Johnsen. Who is James Turrise?
A. I do not know.
Q. We talked about Johnice Brumfield-Greer. Other than these folks, do you know of any other Cook County Sheriff's employee that has knowledge about the facts concerning John's case?
A. I do not.



Q. Who is Karyn Williams?
A. She was the executive director of HR, human resources.
Q. Do you know when she left the sheriff's employ?
A. I do not. 2:38:53
Q. Did she leave before or after you left?
A. She was still there when I was there.
Q. Okay. Did you ever discuss John's case with Karyn Williams?
A. I don't recall.
Q. Did you ever discuss any requests for fitness for duty evaluations with Karyn Williams?
A. I don't recall.
Q. Did Karyn Williams have -- other than receiving the memo from Matthew Burke -- I think it's Matthew Burke, did Karyn Williams have any involvement in John Nawara's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know.
Q. Do you know if Ms. Williams made any decisions related to John's case?
MS. MARMOR: Objection. Lack of foundation.
A. I don't know. 2:39:58
Q. Did you -- did I ask you this? Maybe not in



these words. I'm going to ask it again, I'm sorry. Did you have -- did you consult Ms. Williams regarding John's case?
A. I did not.
Q. Did you send any emails or memos to Ms. Williams regarding John's case?
MS. MARMOR: Objection. Lack of foundation, and the record will speak for itself.
A. I don't recall.
Q. Are you familiar with the concept of informed consent?
MS. MARMOR: Object to the form.
A. Yes.
Q. What is -- what is it?
A. That a person is giving consent based on the information that's provided to them.
Q. And when is -- in the practice of your profession, when does this come into play, informed consent?
MS. MARMOR: Same objection.
A. In -- when I think of an informed consent in -- in the practice of nursing, I usually think of it inform of treatment or procedures.
Q. By the way, just digressing just a little bit, have you ever heard of nursing diagnoses?



MS. MARMOR: Object to the form. 2:41:33
A. No.
Q. In the practice of nursing, do you know if informed consent is required for a psychiatric fitness for duty evaluation?
MS. MARMOR: Object to the form. Lack of foundation.
A. I don't know.
Q. Do you know if informed consent is required for a fitness for duty evaluation period?
MS. MARMOR: Same objection.
A. I don't know.
Q. Based on the information that you had at the time that you made the assessment that John should undergo a fitness for duty evaluation, what was it that you determined would make John need that evaluation?
MS. MARMOR: Objection. Asked and answered.
A. His behavior. 2:42:52
Q. What was --
A. His behavior.
Q. Other than that?
A. His behavior was 95 percent.
Q. What was the five percent?
A. Probably the write-up from his supervisor.
MR. BUSTAMANTE: Okay. I just need about two

minutes to consult with my co-counsel and --
MS. MARMOR: Sure.
MR. BUSTAMANTE: -- we're getting done. Okay?
RECORDER: Yep. Off record, 1:06 p.m.
(Off the record)
RECORDER: On record, 1:13 p.m.
Q. Ms. Shelby, have you ever seen Exhibit 11 before?
A. I'm sorry?
Q. Have you ever seen this document before?
A. I believe so.
Q. Okay. Was this sent to you on or about the date it bears?
MS. MARMOR: I don't think it actually bears a date. It just --
MR. BUSTAMANTE: It has --
MS. MARMOR: -- has the date of the exam.
MR. BUSTAMANTE: -- "date of report, 9/16/17."
MS. MARMOR: Oh, okay. Yeah.
A. I don't know. 2:44:01
Q. Okay. What was your reason for seeing this document?
A. Because I would have received it because it



would say if the person was fit to -- to return to work.
Q. You would have received it if it said he was fit to return to work or whether he -- they said he was not fit to return to work, you would have seen it as well, correct?
A. Correct.
Q. All right. So this is some -- a report that is then sent to you as the -- as the nurse for -- I forget what your title was?
A. Occupational health nurse.
Q. Occupational, yes, health --
A. Yes.
Q. -- services?
A. Health nurse.
Q. This was something that was sent to you because you were the nurse?
A. Yes. 2:44:40
Q. Okay. And I want to direct your attention to page CCSO 000113.
A. Okay.
Q. Would you please read into our record the response to number six?
A. "As described above, unfortunately, I cannot accept as fact what was summarized by human resources



seven weeks after the 9/26/2016 incident. Notwithstanding this issue, if indeed the incident transpired as Superintendent Jones-Hayes described, such transgressions of the code of conduct ought to be addressed through discipline, as it is not -- as it is my opinion that Officer Nawara was not suffering from any mental illness or other condition in need of treatment at the time of 9/26" -- I mean, "9/29/2016 incident that would account for such behavior. That is to say if he, in fact, conducted himself disrespectfully and threaten -- threateningly to Superintendent Hayes on 9/29/2016, treatment would not have been relevant in his particular case. Discipline is the best course of action going forward should such -- should any such behavior recur."
Q. And who signs this report? 2:46:32
A. The provider who's doing the assessment.
Q. And -- and the name is?
A. This one here is Diana S. Goldstein.
Q. A PhD, correct?
A. PhD, yes.
Q. And is she an independent evaluator?
A. Yes, she is.
MR. BUSTAMANTE: Okay -- she already said that.



MR. LINDEN: No, she -- okay.
MR. BUSTAMANTE: She already -- that's --
MR. LINDEN: Okay.
MR. BUSTAMANTE: -- the first thing she said.
MR. LINDEN: Okay. My bad. I don't remember.
MR. BUSTAMANTE: Okay. Anything else, Rick?
MR. LINDEN: No.
MR. BUSTAMANTE: Okay. You're done.
MS. MARMOR: Great. Thank you.
MR. BUSTAMANTE: Any questions?
MS. MARMOR: Oh. No, none. No. And we'll --
MR. BUSTAMANTE: Okay.
MS. MARMOR: And we'll reserve signature.
MR. BUSTAMANTE: Okay.
RECORDER: Off record, 1:16 p.m.
MR. BUSTAMANTE: So next one is Mr. Burke, I believe --
MR. LINDEN: Yeah, I told you --
MS. MARMOR: I think it's --

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Katie Jasinski
September 30, 2019

**A**

**abnormally** 19:20
**above-entitled** 129:4
**Absolutely** 82:13
**Absurd** 35:16
**Academy** 14:12
**accept** 126:25
**accepted** 18:18
**access** 27:15 37:5, 37:11 46:2, 95:17 97:5
**account** 127:9
**Act** 29:15
**acting** 31:20 109:9
**action** 31:5 127:14
**ADA** 29:14 29:17, 29:21 29:24, 78:24
**adding** 103:3
**addition** 105:13 106:16
**additional** 37:14 37:19, 49:7
**address** 7:4, 9:4 102:7, 102:9 102:23
**addressed** 127:5
**advisors** 16:25
**afternoon** 64:10
**age** 12:5
**aggression** 109:19
**aggressive** 71:8 105:10, 105:14 105:17, 106:17 109:5, 109:12 109:15
**agree** 6:1, 6:2 100:14
**agreed** 9:6, 75:5
**agreement** 5:8 7:6
**ahead** 40:11 44:12, 81:18
**al** 1:11
**allegation** 99:15
**alleged** 99:16
**allegedly** 109:4 109:12
**allowed** 69:13 108:8
**Americans** 29:14
**amount** 56:12 56:15, 56:22
**anger** 99:16
**answer** 5:15 5:16, 6:4, 6:10 6:15, 69:14 84:18, 116:25 117:5, 117:25 118:7, 118:20 119:20
**answered** 42:11 45:5, 58:19 76:1, 76:20 95:22, 104:2 124:17
**answering** 62:19, 101:15
**answers** 72:15 111:17, 112:16 119:15
**anybody** 21:14 50:11, 79:20 115:21
**apartment** 9:7
**Apologize** 111:21
**appear** 97:15 117:15
**appearance** 4:11
**APPEARANC...** 2:1
**appeared** 117:10, 117:21
**appears** 47:25 54:12
**applicable** 5:9
**apply** 18:16 21:19
**appointment** 64:8, 64:13 64:19
**appointments** 63:22
**appropriate** 84:7, 94:21 98:1, 98:16 99:4, 100:1 100:10, 100:16 107:25, 109:23
**appropriateness** 113:15, 113:21
**approve** 17:1
**approximate** 79:22
**April** 89:15 92:21, 92:24 118:13, 118:21
**area** 9:14, 39:17 40:17
**argument** 88:18 88:19
**argumentative** 44:5, 53:14 55:15, 80:24 83:5, 88:15 106:2
**arose** 22:8
**aside** 44:21 45:3, 65:19
**asked** 42:11 45:5, 53:6 58:19, 62:24 69:5, 73:5, 73:6 76:1, 76:20 85:1, 95:22 124:17
**asking** 5:13 36:8, 42:24 62:16, 88:7 98:20, 99:22 114:17, 118:3 118:19
**assess** 34:6 48:12, 48:18
**assessed** 58:25
**assessing** 32:2 42:8
**assessment** 20:3 32:1, 32:15 32:19, 32:22 33:8, 33:14 33:22, 34:1 35:11, 35:11 36:21, 37:10 37:16, 37:21 40:5, 44:22 45:10, 48:25 52:25, 53:7 56:16, 59:9 63:17, 65:2 76:18, 76:19 90:5, 107:23 107:25, 124:14 127:17
**assigned** 14:9 108:7
**assignment** 21:1 21:2, 107:18 108:2
**assist** 17:5
**assume** 91:23 98:15
**Assumes** 87:5
**assuming** 98:14 99:3
**attached** 87:8
**attack** 70:1 70:4
**attempting** 81:1
**attention** 47:1 126:19
**attorney** 25:22 57:11
**Attorney's** 2:21 3:3
**attorneys** 4:10
**August** 55:8 104:20, 105:4
**available** 34:20 60:20, 116:17 116:20, 116:22

**B**

**bachelor's** 10:7
**back** 19:9, 19:20 20:15, 20:17 45:18, 45:25 61:22, 73:3 74:22, 74:25 76:22, 77:22 78:5, 79:3 79:16, 79:17 79:24, 80:12 85:6, 93:4, 93:8 93:14, 101:3 104:7, 104:19 113:10, 113:19
**background** 6:23
**bad** 128:5
**Banks** 3:11
**Barbie** 121:16
**base** 53:15
**based** 16:21 16:24, 33:18 33:21, 72:15 96:5, 96:5 105:21, 109:8 123:15, 124:13
**basic** 37:25
**basing** 72:15
**basis** 35:10
**Beach** 22:23 22:23
**Beacham** 22:23 23:2, 23:13 23:18, 23:21 23:22

**bearing** 61:7
**bears** 125:14 125:15
**becoming** 11:12
**bedside** 11:7 13:10
**beginning** 77:18 77:20, 118:21
**behalf** 4:4, 4:12 4:14, 4:16, 4:19 4:21
**behave** 68:20 75:14
**behavior** 31:5 35:2, 35:4, 35:9 35:12, 35:21 35:25, 36:3 36:14, 59:22 68:6, 75:10 99:15, 105:11 105:18, 106:5 106:13, 106:22 109:1, 109:4 109:11, 109:16 124:18, 124:20 124:22, 127:9 127:15
**beings** 6:7
**Beka** 4:18
**believe** 9:12 13:12, 13:13 14:3, 14:5 18:11, 20:8 22:23, 23:9 23:10, 23:16 23:24, 24:20 26:10, 30:17 41:7, 50:3 51:22, 52:6 52:7, 52:16 52:20, 53:20 53:22, 55:8 65:4, 65:4 66:18, 67:5 67:19, 68:11 68:15, 68:17 68:18, 69:3 69:4, 70:13 72:23, 73:6 73:7, 73:11 75:4, 76:3 77:12, 79:5 81:2, 81:3, 81:3 81:11, 89:13 92:20, 97:9 125:12, 128:19
**best** 67:20 127:14
**better** 24:10 24:12, 31:18 31:21
**big** 26:24
**bigger** 38:24
**birth** 6:25 102:6, 102:22 103:4
**bit** 6:22, 10:25 26:16, 30:2 61:9, 114:6 123:25
**black** 70:12
**blaming** 41:25
**blood** 19:18 31:19
**Blue** 15:18 15:18, 15:24 15:25, 16:2 16:2
**board** 14:5, 14:6 14:14, 14:17 14:19, 14:21 23:14
**body** 70:20 70:23
**born** 9:16
**bottom** 87:16 115:14
**break** 46:17 85:15, 85:16 85:20, 93:19 108:15, 110:10 110:17, 111:8
**breaks** 86:12
**bring** 19:4
**Brumfield-Greer** 120:2, 120:5 121:21
**BSN** 10:22 11:22
**build** 70:14
**building** 38:22 39:19, 39:20 39:22
**Bureau** 20:25
**Burke** 3:8, 4:18 48:2, 54:18 57:2, 57:3, 57:7 121:3, 121:8 122:16, 122:17 128:18
**business** 95:25
**Bustamante** 1:22, 2:4, 2:5 3:19, 4:12, 4:12 5:1, 5:5, 5:12 9:6, 32:6, 32:8 32:12, 35:17 35:19, 46:16 46:19, 47:17 49:17, 56:15 56:20, 59:24 60:2, 60:7, 60:9 66:8, 66:10 66:12, 69:15 69:17, 69:19 72:17, 78:11 83:6, 85:25 86:6, 86:9 86:11, 86:14 89:2, 89:6 89:23, 90:10 90:12, 90:16 92:23, 93:15 93:18, 94:8 98:20, 102:17 103:25, 104:5 108:15, 108:17 110:9, 110:12 110:16, 110:21 110:23, 111:4 111:6, 111:8 111:14, 111:17 111:21, 112:2 114:7, 114:9 114:15, 116:2 116:4, 118:4 118:7, 119:14 119:17, 120:13 120:16, 124:25 125:3, 125:17 125:19, 127:24 128:2, 128:4 128:7, 128:9 128:11, 128:14 128:16, 128:18

**C**

**cabinet** 77:22 78:2, 78:6
**calendar** 63:4 63:11
**California** 38:22
**call** 27:13, 43:2 54:1, 54:25 56:1, 62:1 62:20, 62:21 77:3, 84:20 84:23, 85:1 85:1, 85:6 103:23, 104:1 111:3
**called** 20:15 20:17, 36:23 40:5, 56:17 62:24, 104:3 104:15, 104:18 108:18, 108:21
**calling** 68:6 84:24, 85:6 85:8, 85:9, 85:9
**calls** 46:4, 48:21 49:3, 59:2 60:22, 82:19 88:23, 96:3 97:16, 98:5 98:12, 98:23 100:12, 100:19 100:25, 104:10 108:11
**Calumet** 9:19
**care** 11:16 13:10, 15:20 17:4, 26:24 27:5, 27:9 27:15, 27:18 27:19, 27:21 27:22, 29:7 29:10, 41:24 75:12, 87:17 87:24
**career** 28:7
**carry** 108:8
**case** 1:9, 3:22 15:22, 16:10 16:12, 17:2 17:25, 18:2 27:12, 38:13 40:20, 40:20 53:13, 93:10 93:11, 93:13 93:17, 95:12 97:4, 120:9 121:7, 121:24 122:9, 122:18 122:22, 123:3 123:6, 127:13
**cases** 31:23 73:15, 119:3 119:3
**causing** 31:4
**caveat** 110:25
**CCSO** 109:11 117:9, 117:19 126:20
**censured** 24:13 24:18
**certain** 63:16 63:19

**CERTIFICAT...** 129:1
**certify** 129:2
**chain** 50:25
**chair** 73:21
**chairs** 66:5 66:13
**chance** 73:12 86:18
**change** 105:25 119:5
**changed** 17:23
**changes** 103:14
**charge** 62:21 109:19
**charged** 109:4 109:11, 109:15 109:19
**chart** 43:5, 43:6
**charted** 46:9
**checked** 87:17
**checking** 85:23
**checkmark** 87:19
**Chicago** 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 9:13, 9:17 14:17, 41:5
**chief** 20:25, 48:2
**child** 12:5
**children** 12:1
**circular** 83:3
**Civil** 5:9
**cleaning** 96:15 96:16, 96:17
**clear** 49:18 74:10, 93:10 93:11, 106:14
**closed** 74:4
**Club** 7:3
**co-counsel** 125:1
**co-Defendants** 38:9, 38:12
**code** 127:4
**coffee** 86:12
**colored** 70:13
**column** 99:19
**columns** 101:4
**come** 19:4 34:25, 39:19 39:19, 45:18 45:25, 49:6 53:12, 62:10 63:4, 63:5 63:16, 63:16 64:7, 65:1 65:13, 66:15 72:9, 93:4, 93:8 104:7, 105:16 123:18
**comes** 25:10 33:9, 61:21 72:9
**coming** 19:9 39:22, 63:19 74:21, 93:14 96:15, 108:24
**command** 50:25
**comment** 100:3
**comments** 92:11 94:11, 94:12 94:20, 98:8 99:25
**community** 17:7
**company** 14:4 15:5, 15:6 41:21, 79:9
**complaint** 60:17 106:21, 107:3 107:6, 107:9
**complete** 6:4 6:9, 6:15, 61:3 83:24, 96:10
**completely** 53:4 98:22
**completes** 4:23
**complied** 78:21 78:24
**component** 31:24, 32:4 32:4, 33:12 33:13, 33:17 33:20, 34:21 35:4
**components** 30:16, 30:17 31:17
**computer** 89:9
**computerized** 91:1, 91:2, 91:9 95:17
**concept** 123:10
**concern** 19:25 75:23
**concerned** 29:1
**concerning** 30:5 47:3, 49:21 57:22, 58:22 68:8, 75:11 110:6, 121:24
**concerns** 55:21 68:6
**conclusion** 96:3 105:16
**condition** 127:7
**conduct** 42:25 115:22, 127:4
**conducted** 127:10
**conducting** 49:20, 116:9
**confidential** 1:16, 7:6, 8:1 8:3, 8:25, 9:5
**confusing** 5:24
**confusion** 31:6
**Conley** 121:14
**consent** 27:9 45:6, 123:11 123:15, 123:19 123:21, 124:4 124:9
**consider** 71:8 105:24, 105:24
**considered** 109:1
**constantly** 26:25
**consult** 123:2 125:1
**contact** 102:7 102:23, 109:24
**contacting** 115:2, 115:6
**contain** 45:4 45:6, 45:9 45:12
**contained** 58:1 59:6, 96:7
**contemporaneo...** 93:13
**Continuation** 9:1
**continue** 10:4
**contract** 30:10
**contribute** 119:9
**conversation** 5:22, 6:6, 52:2 52:5, 52:9 52:12, 52:15 57:19, 57:24 62:8, 63:19 66:24, 67:7 67:10, 67:13 67:15, 72:25 75:21, 75:22 75:24, 76:7 76:9, 76:11 113:17, 113:24 114:13, 114:22
**conversations** 58:2, 67:2 113:13, 113:20 114:11, 115:1 115:6
**convicted** 25:15 25:17
**Cook** 1:11, 2:21 3:1, 3:3, 3:21 3:22, 3:22, 4:22 18:6, 18:9 18:13, 18:21 19:23, 20:10 25:12, 38:18 50:12, 51:1 87:16, 87:23 93:2, 93:7 102:11, 102:13 104:13, 109:3 121:22
**coordinating** 16:12
**coordinator** 15:20, 16:10
**copied** 83:16 83:18, 84:12
**copies** 119:18 120:13
**copy** 48:19, 49:2 60:5, 82:15 82:17, 83:12 85:13, 111:15
**correct** 18:21 23:19, 23:20 29:25, 32:17 32:20, 33:2 35:23, 35:24 43:23, 43:24 48:6, 48:7, 48:9 49:24, 51:4 51:5, 54:19 54:20, 61:1 61:6, 72:17 77:1, 77:17 86:21, 86:24 86:25, 87:1 87:9, 87:10 87:14, 89:16 89:17, 91:20 91:21, 91:24 92:8, 95:16 97:6, 98:10 98:13, 99:17 99:23, 100:17 100:23, 106:19 106:20, 112:20 126:6, 126:7

127:20, 129:2
**correction** 107:21
**correctly** 28:1 62:19
**CorVel** 45:1 45:8, 79:9 81:23, 81:25 82:4, 82:8, 82:9 84:3, 87:4, 87:4 100:9, 101:21 106:6, 118:22 119:4, 119:10
**CorVel's** 84:3
**counsel** 38:7 91:5
**Country** 7:3
**County** 1:11 2:21, 3:1, 3:3 3:21, 3:22, 4:22 18:6, 18:9 18:13, 18:22 19:1, 19:23 20:10, 25:13 38:19, 50:12 51:1, 87:16 87:23, 93:2 93:7, 102:11 102:13, 104:13 109:3, 121:23
**couple** 119:20
**course** 18:19 47:17, 56:20 110:11, 121:10 127:14
**courses** 12:14 12:16
**court** 1:1, 5:10 89:4
**cover** 34:7
**create** 44:17 98:24, 101:15
**created** 48:25
**crime** 25:17
**Cross** 13:3, 13:7 13:11, 13:20 15:18, 15:25 16:2
**cubicle** 39:5
**current** 108:1
**curriculum** 12:18
**CVS** 9:19

**D**

**Dart** 3:8
**date** 5:7, 6:25 52:2, 54:15 54:22, 62:24 63:6, 64:17 84:22, 91:20 91:22, 94:13 97:10, 102:6 102:6, 102:13 102:19, 102:20 102:22, 103:3 103:4, 103:5 114:23, 125:14 125:16, 125:18 125:19
**dated** 86:23
**Dawn** 54:13
**day** 39:12, 56:25 74:19, 104:24
**dealings** 103:19 103:20
**death** 41:1, 42:1
**December** 20:8 92:20
**decide** 53:13 73:8
**decided** 42:22 73:13, 73:14 77:7, 98:9 100:9, 100:16 101:2, 101:8 101:12
**deciding** 106:4 106:12
**decision** 32:11 32:24, 33:4 34:19, 53:18 53:21, 61:8 75:1, 92:11 97:19, 98:2 98:3, 99:19 100:15, 106:8 106:12, 106:13 109:10, 119:7 119:10
**decisions** 115:22 115:23, 116:10 122:22
**declare** 112:12
**Defendant** 2:19 3:1, 112:16 112:19, 113:13 113:14, 117:12
**Defendants** 1:13 3:8
**defines** 69:23
**definitely** 75:15
**degree** 10:7
**demeanor** 80:12
**department** 21:16, 22:24 36:20, 48:16 57:9, 90:9 90:10, 90:13 90:15, 90:24 105:15, 106:18 110:4
**depends** 31:12
**deposition** 1:15 1:16, 3:20, 4:4 5:6, 25:20, 38:7 38:10, 41:11 47:16, 57:13
**describe** 68:14 69:24, 70:10
**described** 106:19, 113:18 113:25, 114:1 126:24, 127:3
**description** 102:7, 102:24
**descriptions** 91:19, 92:16
**designated** 7:5
**designating** 9:4
**desk** 39:21 65:10, 65:12 65:25, 66:2 66:6, 66:13 66:14, 68:23 69:1
**detailed** 50:3 50:4, 53:8
**determination** 34:11, 34:17 36:19, 44:2 73:13, 76:23 109:16
**determine** 38:3 38:3, 42:8 43:12, 45:13 75:2, 108:1
**determined** 49:5, 124:16
**determining** 107:23
**develop** 42:22
**developed** 42:18
**diagnoses** 19:12 123:25
**diagnosis** 19:6
**Diana** 127:19
**diary** 63:11 114:19
**difference** 31:25 33:12, 33:13 33:16, 108:10
**different** 28:8 34:1, 36:10 49:16, 59:25 93:5, 108:9 114:10
**differently** 31:7 72:6
**difficulty** 47:5
**diffuse** 81:3 81:4
**digressing** 123:24
**direct** 126:19
**directed** 105:11 105:18, 112:19
**directing** 47:1
**directive** 105:13
**directives** 21:19
**directly** 39:2 64:20, 81:23 81:25, 82:4 82:8, 84:3
**director** 48:1 122:2
**Disabilities** 29:14
**disciplinary** 94:21, 98:1 98:17, 99:5
**discipline** 127:5 127:13
**disclose** 27:9
**disclosed** 27:6
**disclosure** 27:14 95:25, 96:11 96:11, 96:13 96:14
**disclosures** 120:12
**discrimination** 60:16
**discuss** 85:12 122:9, 122:12
**discussed** 73:7 75:4, 100:1 120:4, 121:7
**discussion** 50:2 75:7, 76:16 98:6, 105:21
**discussions** 103:13
**dishonesty** 25:18
**disrespectfully** 127:11
**distinction** 30:20, 30:21

**District** 1:1, 1:2 3:23, 5:10, 5:11
**division** 1:3 3:24, 21:4
**Dixon** 14:12
**doctor** 19:21 19:22, 31:19
**doctor's** 19:3 19:4, 33:18
**document** 46:15 47:20, 47:23 48:1, 48:3, 48:8 48:19, 48:24 49:2, 49:10 49:13, 57:16 58:18, 58:21 58:24, 60:11 60:19, 60:24 89:8, 89:10 89:14, 91:3 93:2, 93:5, 93:7 101:16, 101:19 101:23, 103:6 103:8, 111:24 114:4, 117:9 117:19, 117:21 125:11, 125:24
**documentation** 47:25, 49:13 62:9, 62:23 62:25, 63:2 63:11, 63:22
**documentations** 115:5
**documented** 114:1, 114:6 114:11, 114:18
**documents** 25:23, 49:14 59:11, 93:17 98:24
**doing** 6:15 16:14, 16:15 17:3, 17:17 17:17, 18:1 19:1, 79:12 96:16, 107:11 116:14, 127:17
**Donahue** 21:11 21:11
**door** 39:5, 39:6 39:18, 39:20 64:22, 74:4 74:7, 74:9 74:13
**drafted** 78:8
**drafting** 78:16
**drink** 86:12
**Drive** 3:12, 8:2
**due** 24:22, 24:23 24:23
**duties** 16:8 17:15, 21:7 21:16, 30:14
**duty** 20:1, 26:3 30:3, 30:7 30:12, 30:16 30:24, 31:8 31:13, 32:2 32:15, 32:17 34:7, 35:13 36:21, 37:10 37:16, 37:22 38:1, 40:6, 42:9 43:1, 44:16 44:22, 45:2 45:14, 46:1 48:5, 48:13 48:18, 49:2 49:22, 50:5 50:7, 50:12 50:17, 50:21 50:25, 51:4 51:7, 51:15 52:25, 53:2 53:8, 53:11 53:24, 55:21 55:24, 56:17 58:23, 59:1 59:11, 65:3 73:2, 73:15 73:16, 75:3 75:6, 76:19 76:25, 77:9 79:7, 79:8, 80:4 80:8, 81:8 82:24, 88:2 89:15, 90:5 90:6, 90:20 95:11, 97:2 97:21, 97:24 100:10, 101:21 104:8, 104:12 106:5, 106:9 106:12, 107:24 109:6, 109:10 109:13, 109:18 113:15, 113:21 115:3, 115:7 115:24, 116:10 118:14, 122:13 124:5, 124:10 124:15

**E**

**e-v-a-l** 94:4
**Eastern** 1:3 3:24
**education** 9:24 10:4, 10:23 14:5, 14:7 14:15, 14:17 14:19, 14:22
**effect** 76:5 81:12, 90:21 90:22, 90:23
**either** 24:1 95:13, 120:5
**el** 3:22
**elaborate** 21:8 40:12
**Elementary** 14:12, 14:13
**elements** 76:18
**elevator** 39:23
**else's** 98:3
**email** 54:12 54:15, 62:2 62:7, 83:13 83:15
**emails** 123:5
**emergency** 18:2
**emphasized** 28:9
**employ** 122:5
**employee** 19:7 19:13, 30:9 37:15, 37:20 38:4, 42:8 42:14, 42:14 44:21, 44:25 45:7, 50:12 51:1, 56:1 56:23, 56:24 58:25, 59:10 59:16, 59:20 61:16, 61:21 62:3, 82:3 84:12, 91:24 92:7, 100:9 102:22, 102:23 103:3, 105:13 105:17, 106:17 109:3, 109:11 109:15, 121:23
**employee's** 59:21, 59:21 82:23, 100:1 102:1, 102:6 105:10, 108:1
**employees** 19:2 26:1, 37:6 37:11, 66:3 82:7, 82:12 89:18, 90:4 115:23, 116:9
**employment** 10:25, 13:1 13:2, 13:18 15:3, 15:12 15:14, 15:17 18:13, 19:13 19:23, 107:12
**entire** 62:13
**entries** 91:16 92:16, 93:1 93:25, 95:2
**entry** 94:12 94:24, 98:15 98:16, 98:21
**environment** 75:15
**ER** 17:25
**Ertler** 54:13
**escort** 108:8
**et** 1:11
**Eval** 94:4
**evaluate** 51:14
**evaluated** 34:10 36:18, 48:13 49:1, 73:2 75:16, 90:20
**evaluates** 30:11
**evaluation** 30:7 30:25, 31:8 32:3, 32:15 32:17, 33:11 34:7, 34:16 35:14, 36:22 37:22, 38:1 40:6, 42:10 43:23, 44:16 45:14, 49:22 50:7, 50:12 50:18, 50:21 51:1, 51:7, 53:2 53:12, 56:1 56:17, 58:23 59:11, 63:17 75:3, 76:19 76:25, 77:9 79:12, 80:4 80:8, 88:2 88:20, 90:6 104:9, 104:12 107:24, 108:10 109:6, 109:13 109:18, 113:15 113:22, 115:24

116:11, 118:15 124:5, 124:10 124:15, 124:16
**evaluations** 30:3 43:1, 46:2 55:21, 55:25 122:13
**evaluator** 100:8 127:22
**event** 44:14 97:11, 97:15
**events** 43:4 43:13, 47:3
**everybody** 97:5
**evidence** 87:6
**exact** 11:19
**exactly** 23:15 43:6, 68:7 70:22, 91:11 114:4
**exam** 10:20 125:18
**examination** 4:25, 10:13 115:3, 115:7
**example** 5:22 28:22, 42:25 62:20, 63:3
**Excuse** 69:8
**Executed** 112:20
**executive** 48:1 122:2
**exercise** 75:1
**Exhibit** 4:4 47:16, 54:11 57:14, 59:12 59:23, 60:10 61:6, 103:17 111:13, 117:18 125:8
**exhibited** 106:22
**expecting** 63:15 65:13
**experience** 28:16, 56:5 56:18, 96:5 109:8
**explain** 28:17 34:23, 67:16 68:5, 71:4, 73:1 80:6, 80:15 80:18, 81:1
**explained** 77:13 77:14, 79:5
**explanation** 53:9, 53:10
**express** 45:23
**eye** 73:18, 73:20

**F**

**face** 70:5
**facility** 29:8
**facsimile** 112:7
**fact** 36:7, 38:10 64:12, 68:7 93:12, 126:25 127:10
**factors** 56:23
**facts** 87:5 105:23, 105:24 106:3, 106:6 121:24
**familiar** 26:18 26:20, 26:22 29:17, 29:20 123:10
**familiarity** 29:23
**far** 27:5, 27:7 27:14, 106:4 110:3
**February** 86:23 112:21
**Federal** 5:9
**feel** 6:13, 36:16 44:8, 71:12 71:14, 71:16
**feeling** 70:3
**felony** 25:15
**felt** 44:13, 49:7 75:5
**FFD** 63:17 94:20, 97:19 97:23, 97:25 98:16, 99:4 99:16, 99:16 99:22, 99:25 100:3, 100:16 100:22, 100:23 100:23, 101:2 101:8, 101:8 101:12, 101:13
**field** 25:7
**figure** 32:9
**file** 44:17, 44:21 44:21, 44:24 45:4, 46:1, 46:3 77:22, 78:2 78:6, 82:24 83:2, 83:3 106:21, 107:4 107:6, 107:9
**files** 37:6, 37:11
**fill** 21:17, 43:3
**filled** 77:14
**Finally** 6:18
**find** 31:19 31:22, 93:5
**finding** 36:7 68:7
**fine** 85:19 110:19, 110:24 111:8
**finish** 6:3 110:17
**finished** 113:9
**fired** 24:6
**first** 11:4, 15:20 20:21, 24:20 27:3, 30:15 32:11, 39:17 39:20, 47:15 48:8, 52:19 63:8, 65:22 65:23, 66:16 67:8, 68:22 72:8, 72:12 72:20, 73:19 79:24, 91:18 91:23, 92:5 93:25, 99:22 112:16, 115:10 115:10, 118:4 128:4
**fit** 19:23, 30:12 38:4, 126:1 126:4, 126:5
**fitness** 20:1 26:3, 30:3, 30:7 30:16, 30:24 31:8, 31:13 32:2, 32:15 32:16, 34:7 35:13, 36:21 37:10, 37:16 37:22, 37:25 40:6, 42:9 42:25, 44:16 44:22, 45:1 45:14, 46:1 48:5, 48:13 48:18, 49:1 49:21, 50:5 50:6, 50:11 50:17, 50:21 50:25, 51:3 51:7, 51:14 52:25, 53:2 53:8, 53:11 53:23, 55:21 55:24, 56:16 58:23, 58:25 59:10, 65:2 73:1, 73:15 73:16, 75:3 75:6, 76:19 76:24, 77:8 79:7, 79:8, 80:3 80:8, 81:8 82:23, 88:2 89:15, 90:5 90:6, 90:19 95:11, 97:2 97:21, 97:24 100:10, 101:21 104:8, 104:12 106:5, 106:9 106:12, 107:24 109:5, 109:10 109:13, 109:17 113:15, 113:21 115:3, 115:7 115:23, 116:10 118:14, 122:12 124:4, 124:10 124:15
**five** 121:13 124:23
**floor** 40:2
**folks** 16:6 120:20, 121:22
**followed** 52:24
**following** 7:5 55:20
**foregoing** 112:15, 129:2
**forget** 126:10
**forgot** 57:10
**form** 19:16 24:15, 28:13 36:25, 37:17 38:2, 39:14 42:21, 43:3 43:9, 43:16 44:18, 45:16 46:5, 46:11 49:11, 50:9 50:22, 51:17 53:4, 55:10 55:22, 57:8 59:2, 59:13 60:15, 60:17 61:2, 62:12 63:12, 66:17 74:17, 77:11 82:9, 83:13 84:3, 87:4

89:12, 90:7
91:12, 101:20
101:24, 101:25
102:2, 102:3
102:12, 102:13
102:25, 103:11
104:21, 105:6
105:20, 108:4
109:25, 110:7
115:25, 116:16
118:16, 123:12
124:1, 124:6
**formal** 9:24
10:4, 10:23
**forms** 21:18
26:1, 45:6
72:22, 77:3
77:9, 77:14
77:16, 77:17
77:19, 77:21
78:3, 78:7
78:13, 78:16
78:18, 78:20
78:23, 82:4
84:2, 87:3, 87:8
87:11, 87:22
103:14, 103:16
118:13, 118:21
119:10
**formulating** 6:3
**forward** 127:14
**found** 18:12
**foundation**
34:18, 37:12
44:23, 47:24
48:4, 48:14
49:12, 50:8
51:8, 55:5, 56:2
59:3, 60:21
61:3, 61:14
62:5, 63:13
65:14, 72:14
79:1, 84:18
87:20, 88:24
90:8, 91:25
92:21, 94:2
94:6, 94:25
96:2, 96:10
96:23, 97:8
98:4, 98:11
98:23, 99:20
100:6, 100:11
100:18, 100:25
101:14, 106:24
108:12, 108:22
109:21, 110:1
118:17, 119:2
122:19, 122:23
123:7, 124:7
**four** 11:23, 15:2
78:3, 114:25
121:11
**front** 65:20
66:14, 78:4
91:3
**full** 115:10
**full-time** 15:11
18:5
**further** 36:18

**G**

**Gannon** 121:16
**gather** 36:6
**GED** 9:25, 10:1
10:3
**general** 11:7
29:23, 30:15
90:9, 90:10
**gesture** 71:2
**gestures** 70:16
70:18, 70:21
**getting** 29:4
31:14, 125:3
**gist** 75:21
**give** 6:15, 13:12
13:25, 19:6
19:8, 19:18
19:21, 27:8
28:18, 28:22
41:9, 53:25
54:3, 79:11
106:5, 106:9
106:9
**given** 25:6, 70:2
70:4, 84:2
87:11
**giving** 38:10
106:3, 123:15
**go** 9:18, 13:20
14:1, 14:3
14:20, 16:3
16:24, 17:12
18:9, 18:16
19:13, 20:1
22:5, 22:8, 26:2
27:1, 27:16
29:9, 36:17
39:18, 40:11
42:7, 44:12
47:18, 66:16
68:5, 68:11
73:3, 73:9, 75:6
79:7, 81:18
81:23, 81:25
82:3, 82:14
82:23, 83:3
84:3, 87:3
89:22, 92:24
101:3, 113:10
119:4, 120:18
**goes** 16:18, 27:5
27:8, 27:14
92:20, 115:14
**going** 5:13, 6:5
21:16, 29:5
30:25, 31:5
34:20, 42:9
42:12, 42:25
43:1, 43:2, 43:3
43:4, 43:5, 44:2
44:15, 46:25
47:15, 53:3
53:25, 59:24
63:4, 65:3, 65:5
65:6, 65:7
67:21, 72:13
73:8, 73:14
76:24, 77:8
79:6, 79:7
79:12, 79:14
81:8, 84:17
92:18, 92:21
92:23, 93:19
93:22, 98:14
107:9, 108:3
112:22, 120:18
120:19, 123:1
127:14
**Goldstein**
127:19
**good** 3:16, 6:22
35:20, 106:8
**goodness** 16:5
112:3
**gotten** 104:17
**graduate** 9:21
9:22
**graduating**
10:22
**Grant** 14:22
14:23, 15:3
**Great** 110:15
128:10
**greeted** 65:19
**guess** 6:18
120:16
**guessing** 74:11
**guidelines** 16:21
16:22, 16:24
**guy** 31:17, 31:20
65:20
**guys** 115:13

**H**

**hair** 70:12
**half** 6:10, 55:25
94:9, 108:7
**hand** 4:8, 88:13
**handles** 79:10
**Handwriting**
60:1
**happen** 46:10
68:20, 88:12
**happened** 22:16
79:3, 105:22
**happening**
73:18
**harassment**
60:16, 60:17
**hard** 83:12
**harm** 27:11
38:4, 75:17
**Hayes** 127:12
**head** 23:3, 90:15
**header** 102:17
102:19, 102:19
**headers** 102:15
102:18
**health** 12:17
16:4, 17:4, 17:4
18:24, 19:15
19:16, 21:2
26:24, 27:5
27:9, 27:15
27:22, 29:7
30:11, 31:11
31:21, 87:17
87:24, 88:20
88:21, 126:11
126:12, 126:15
**hear** 69:9
**heard** 123:25
**heart** 19:19
**held** 98:6
**help** 27:4, 93:20
**hernia** 88:19
88:21
**Hi** 68:2
**high** 9:18, 9:20
9:21, 9:22, 11:1
19:20
**higher** 27:13
**Hills** 7:3
**HIPAA** 19:5
19:11, 26:16
26:16, 26:20
26:22, 26:24
27:1, 27:3, 27:4

27:14, 27:24 28:1, 28:5, 28:8 28:12, 28:18 29:6, 78:21 96:6, 103:11 103:14
**hire** 25:10
**hired** 23:3, 23:9
**hires** 19:15
**hiring** 23:16
**history** 13:18 19:17, 43:5
**hold** 12:20
**Holy** 13:3, 13:7 13:11, 13:20
**home** 102:7 102:23
**Honingford** 3:2 4:21, 4:21 111:20
**honor** 19:14
**hope** 86:14
**hospital** 11:6 13:3, 14:22 14:23, 15:4 16:18, 17:6 17:19, 17:24 27:19, 41:16 41:17, 41:19 41:20
**hostile** 105:14 106:18
**hour** 26:13, 94:9 110:13, 110:14
**house** 9:7, 9:8
**HR** 20:2, 20:25 21:2, 21:4 21:15, 22:3 22:24, 23:4 33:7, 37:5 38:18, 38:25 39:3, 39:7 39:12, 39:12 39:17, 39:18 39:20, 39:23 40:1, 40:3 40:17, 48:11 48:16, 49:6 55:4, 55:13 62:4, 62:9 62:12, 62:14 62:22, 63:10 63:17, 65:2 75:11, 90:8 95:10, 95:21 98:7, 100:14 100:15, 107:13 108:21, 108:24 116:18, 122:2
**huffing** 80:17
**Huh** 24:2, 86:9
**human** 6:7 20:25, 48:2 105:14, 106:18 108:18, 122:2 126:25

**I**

**Illinois** 1:2, 1:25 2:8, 2:16, 2:24 3:6, 3:14, 3:20 3:24, 5:11, 7:3 9:17, 10:14 15:18, 41:3 41:4
**illness** 127:7
**imagine** 31:7
**immediately** 73:13, 73:14
**important** 28:9
**improper** 109:4 109:11
**in-person** 113:13, 114:10 115:1
**inappropriate** 105:11, 105:18
**incident** 34:21 57:22, 58:3 117:11, 127:1 127:2, 127:9
**include** 36:1 103:23
**includes** 35:25
**including** 36:4
**Indeed.com** 18:15
**independent** 30:10, 30:10 73:2, 127:22
**individual** 32:14 35:12, 43:8 43:10, 43:20 43:21, 62:10 62:22, 62:24 63:16, 102:1 108:1, 108:6
**individualized** 103:2
**individuals** 43:12, 63:4
**inform** 62:8 80:2, 123:23
**information** 4:24, 19:6 19:12, 27:10 28:18, 29:7 29:12, 33:18 33:19, 36:22 37:15, 37:20 45:12, 49:8 51:12, 53:24 53:25, 54:5 72:16, 81:22 87:17, 87:24 95:24, 96:6 96:18, 97:1 97:6, 102:1 102:7, 106:7 106:10, 106:11 123:16, 124:13
**informed** 61:12 61:17, 61:19 61:25, 62:3 62:6, 62:7 62:10, 81:21 82:2, 108:25 123:10, 123:18 123:21, 124:4 124:9
**initial** 19:19 19:25, 104:25
**Initially** 53:6
**inmates** 108:9
**institution** 10:8
**instruction** 5:17
**interaction** 28:24
**interoffice** 62:2
**interrogatories** 111:18, 112:18 112:19, 112:23 119:15
**interrogatory** 116:25, 117:25 118:5, 119:19
**interrupt** 6:6
**interrupted** 6:14, 107:20
**interrupting** 69:8
**intertwined** 30:23
**interview** 33:23 35:6, 36:5, 36:6 36:7, 36:15 36:24, 43:2 49:21, 50:1 53:1, 53:18 54:21, 54:23 55:1, 56:6 56:17, 58:22 61:10, 61:13 66:2, 71:20 74:4, 87:12 103:21, 104:25 107:13, 108:24 116:19
**interviewed** 53:10
**interviewing** 48:20, 49:10 49:23, 106:23
**interviews** 115:22, 116:9 116:14
**intimidating** 105:11, 105:18
**introduced** 28:1
**involved** 27:15 27:18, 27:18 27:21, 42:4 97:4, 103:13
**involvement** 41:22, 122:17
**involving** 25:18 58:3
**issue** 36:8, 88:13 92:9, 93:25 94:21, 98:1 98:17, 99:5 103:10, 127:2

**J**

**James** 121:18
**January** 89:15
**Jasinski** 4:3 129:7
**Jeff** 119:25
**job** 11:5, 18:18 18:21, 18:23 21:19, 24:20 25:8, 25:10 26:25, 30:13 36:17, 38:4 75:17, 91:23 92:7, 96:16 96:16, 102:7 102:23
**jobs** 11:14, 24:5 24:7, 24:10 24:14, 24:18 26:23
**John** 1:5, 3:21 4:13, 4:14 40:20, 47:3 47:4, 47:4, 48:6 51:14, 54:21

58:4, 61:10
61:12, 64:7
64:12, 64:18
65:16, 67:3
67:7, 67:24
68:2, 69:5
70:10, 71:20
72:3, 72:21
73:19, 74:24
76:22, 77:3
79:3, 79:16
79:19, 79:24
80:3, 80:7, 81:6
82:8, 84:1
84:21, 85:11
86:25, 97:11
97:15, 98:15
103:10, 103:16
104:22, 106:21
108:18, 108:19
108:25, 110:6
117:15, 117:21
120:4, 120:22
121:7, 122:18
124:14, 124:16
**John's** 80:12
120:9, 121:24
122:9, 122:22
123:3, 123:6
**Johnice** 120:2
121:21
**Johnsen** 119:25
120:5, 121:18
**Joi** 2:20, 4:19
**Join** 51:9, 110:2
**joint** 53:22
**Jones-Hayes**
2:19, 4:20, 51:4
51:6, 51:12
51:13, 51:24
53:19, 54:13
57:20, 58:3
58:15, 117:12
120:24, 127:3
**judgment** 34:12
34:14, 34:14
34:23, 35:1
43:22, 43:24
75:1
**jump** 73:15

**K**

**Kamper** 2:20
4:19, 4:19, 51:9
110:2, 111:16
111:19, 119:16
**Karen** 2:19
4:19, 54:13
120:24
**Karyn** 48:1
54:18, 122:1
122:10, 122:13
122:15, 122:17
**Katie** 4:3, 129:7
**keep** 5:19, 17:5
17:6, 44:3
44:14, 44:20
44:24, 62:9
63:3, 63:10
82:24, 90:3
114:19, 115:5
**keeping** 44:8
**kept** 46:1, 62:15
62:23, 63:21
77:21, 77:22
77:24, 77:25
78:1, 78:6
87:22, 90:18
92:14, 95:3
**key** 35:4, 46:7
**kill** 111:22
**kind** 11:14
21:22, 28:19
30:23, 55:9
62:23, 62:25
65:12, 70:13
81:4, 90:3
**kindly** 105:8
**knew** 29:2, 54:7
55:12, 68:3
106:11, 107:21
107:22
**know** 5:14, 6:5
6:7, 6:14, 6:19
6:20, 11:19
22:10, 23:15
23:25, 24:3
24:4, 25:3, 27:7
28:4, 30:16
31:17, 34:3
34:16, 37:13
39:4, 39:10
39:15, 40:19
42:5, 43:5
45:21, 45:23
48:10, 48:15
50:16, 50:20
51:23, 52:1
54:3, 54:5, 55:6
56:7, 56:9
56:11, 57:2
57:4, 57:6, 57:7
58:10, 58:17
59:4, 59:5, 59:6
60:13, 60:19
60:23, 63:3
63:14, 63:15
63:21, 64:9
65:9, 65:10
65:11, 65:16
65:19, 67:20
68:2, 68:5, 68:8
68:16, 69:15
70:9, 70:22
73:5, 75:18
75:23, 76:2
78:12, 79:8
79:23, 80:1
81:20, 82:1
82:2, 83:16
83:18, 83:21
84:13, 84:19
85:20, 86:4
87:21, 88:7
88:17, 88:18
88:25, 89:9
91:4, 91:7
91:13, 92:25
93:2, 93:6
93:16, 93:21
94:3, 94:7, 95:1
95:4, 96:4
97:13, 97:18
99:6, 100:7
100:8, 100:13
101:1, 101:2
101:17, 103:9
103:16, 104:16
107:11, 107:16
109:7, 109:14
110:3, 110:12
113:2, 115:4
117:1, 118:10
119:5, 119:25
120:2, 120:8
120:10, 120:14
120:19, 120:22
121:5, 121:10
121:14, 121:17
121:20, 121:22
122:4, 122:20
122:21, 122:24
124:3, 124:8
124:9, 124:12
125:22
**knowing** 29:4
**knowledge** 96:6
108:23, 109:2
120:6, 120:8
121:23
**known** 63:18
107:3

**L**

**lack** 34:18
37:12, 44:23
47:24, 48:4
48:14, 50:8
51:8, 55:5, 56:2
59:3, 60:21
61:2, 61:14
62:5, 63:13
65:14, 72:14
75:10, 79:1
87:20, 88:24
90:7, 91:25
94:2, 94:6
94:25, 96:2
96:8, 96:10
96:21, 97:7
98:4, 98:11
99:20, 100:6
100:11, 100:18
100:24, 100:24
106:24, 108:12
108:22, 109:21
109:25, 118:16
119:1, 122:19
122:23, 123:7
124:6
**lady** 96:15
96:16
**laid** 20:10
20:14
**lasted** 71:23
**law** 1:22, 2:5
2:13, 3:18, 28:2
95:25
**laws** 27:4
**lawsuit** 38:14
41:1, 41:2, 41:6
41:23
**lawsuits** 42:3
**lawyer** 26:7
**layoffs** 20:10
20:10
**lead** 43:21
55:20
**learn** 34:10
**leave** 19:2, 20:9
22:15, 64:5
84:20, 104:4
122:7
**leaving** 24:9
84:24
**led** 36:8, 50:1
**left** 11:1, 11:10
14:23, 20:7

22:18, 62:16 74:24, 85:4 101:6, 110:16 113:18, 122:4 122:7
**legal** 27:11 46:15, 96:3
**legs** 46:19
**letter** 82:15 82:17, 82:22 83:17, 83:20 83:25, 84:7 84:9, 84:11 84:19, 85:12 86:20, 86:23 87:2, 87:8
**liable** 41:16
**license** 12:20 12:21, 12:23 12:23
**licensed** 10:16
**limitations** 50:17
**Linden** 2:12 2:13, 4:14, 4:14 86:8, 86:10 86:17, 94:9 108:16, 110:19 111:1, 128:1 128:3, 128:5 128:8, 128:20
**line** 102:11 117:7
**litigation** 91:6
**little** 6:22, 10:25 14:3, 15:5, 15:6 26:16, 30:2 31:20, 41:21 61:9, 114:6 114:9, 123:24
**live** 7:2, 7:3, 9:9
**lived** 9:11
**LLC** 3:11, 4:4
**local** 5:10
**located** 3:18 38:21, 39:2 52:5
**locations** 28:8 108:9
**log** 89:10, 89:15 90:4, 90:18 90:20, 90:22 90:23, 90:25 91:9, 91:12 91:12, 92:14 92:20, 93:12 93:20, 95:3 95:18, 96:7 114:20
**long** 9:11, 13:11 13:24, 14:14 15:1, 15:6 15:24, 16:5 17:10, 17:20 20:4, 22:5 22:13, 23:1 26:11, 32:6 55:3, 55:25 68:12, 71:20 71:23, 72:12 72:19, 73:17 74:14, 74:16 76:7, 76:8, 76:8
**longer** 23:18 23:19, 66:9
**longest** 56:4
**look** 16:21 25:23, 25:25 27:16, 34:16 35:1, 54:11 54:12, 70:5 70:11, 87:15 91:8, 91:16 91:18, 93:24 94:11, 94:12 99:8, 99:8 101:3, 111:23 112:25, 114:25 115:9, 115:10 116:24, 117:18 117:24
**looked** 26:1 34:11, 36:11 75:21, 80:19
**looking** 16:16 27:21, 69:25 70:9
**looks** 69:25 81:16
**lot** 36:9, 86:11 108:4
**loud** 68:17, 69:7 81:2, 81:7
**lucky** 94:9
**lunch** 110:17
**lying** 81:11

**M**

**m-e-d** 94:1
**MacNeal** 11:6 11:16, 13:2
**mad** 68:15 68:15, 69:5 69:23, 70:17 80:20, 80:22
**main** 36:12 40:2, 64:21
**maker** 106:13
**making** 32:11 33:8, 33:13 34:15, 35:11 36:14, 37:15 37:20, 59:9 109:16, 109:19
**man** 65:10 65:11
**management** 16:11, 16:13 17:2, 19:8, 20:2 33:7, 37:8 40:15, 42:12 45:13, 49:6 53:1, 95:10 95:21, 98:7 98:9, 100:15 116:18
**manager** 15:22 17:25, 18:2 100:15
**mannerism** 36:1 36:4
**mannerisms** 35:8
**mark** 60:2
**marked** 47:16 57:13, 87:24
**marking** 57:13
**Marmor** 3:10 3:11, 4:1, 4:6 4:16, 4:16, 9:3 23:23, 23:25 24:3, 24:15 24:19, 28:13 28:20, 32:5 32:7, 32:9 34:18, 35:15 35:18, 35:20 36:25, 37:12 37:17, 37:23 38:2, 39:9 39:14, 40:18 42:11, 42:21 43:9, 43:14 43:16, 44:5 44:18, 44:23 45:5, 45:16 46:4, 46:11 46:18, 46:21 47:14, 47:19 47:24, 48:4 48:14, 48:21 49:3, 49:11 49:16, 49:18 50:8, 50:14 50:22, 51:8 51:17, 53:3 53:14, 55:5 55:10, 55:14 55:22, 56:2 56:14, 56:18 57:8, 57:15 58:19, 59:2 59:13, 60:1 60:3, 60:8 60:10, 60:21 61:2, 61:14 61:18, 62:5 62:12, 63:7 63:13, 65:14 66:7, 66:9 66:11, 66:17 69:11, 69:13 69:16, 69:18 69:22, 72:13 72:18, 73:24 74:17, 76:1 76:20, 77:5 77:11, 78:10 79:1, 80:23 81:16, 82:19 83:4, 83:7 83:10, 84:6 84:14, 85:15 85:18, 85:21 85:23, 86:1 86:3, 86:7, 87:5 87:20, 88:15 88:23, 89:4 89:12, 89:21 89:24, 90:7 90:11, 90:13 91:25, 92:18 93:9, 93:16 94:2, 94:6 94:15, 94:25 95:4, 95:14 95:22, 96:2 96:8, 96:10 96:21, 96:23 97:7, 97:12 97:16, 98:4 98:11, 98:18 98:22, 99:7 99:18, 99:20 100:4, 100:6 100:11, 100:18 100:24, 101:9 101:11, 101:14 102:15, 102:18

103:23, 104:3 104:10, 105:6 105:20, 106:1 106:24, 107:2 107:19, 108:3 108:11, 108:22 109:21, 109:25 110:7, 110:11 110:15, 110:18 110:22, 110:25 111:2, 111:5 111:7, 111:9 112:1, 112:3 112:14, 112:18 114:3, 114:8 114:14, 114:16 115:13, 115:25 116:3, 116:16 118:2, 118:6 118:9, 118:16 119:1, 120:15 122:19, 122:23 123:7, 123:12 123:20, 124:1 124:6, 124:11 124:17, 125:2 125:15, 125:18 125:21, 128:10 128:12, 128:15 128:21
**married** 11:24
**Mary** 14:4, 15:5 41:21
**Matt** 4:17, 48:2
**matter** 3:21 27:11, 72:6 109:18, 129:4
**Matthew** 3:8 4:17, 54:18 57:2, 57:3, 57:7 121:3, 121:8 122:16, 122:17
**mean** 5:21, 5:21 5:24, 5:25 16:12, 18:25 22:6, 32:10 47:4, 51:10 56:20, 70:22 71:6, 72:14 76:8, 80:21 83:9, 90:8, 93:9 93:21, 94:10 96:14, 97:20 97:23, 102:15 103:24, 127:8
**means** 27:6 27:19, 35:22 99:16, 100:23
**meant** 19:1
**med** 11:6, 94:1
**medical** 16:16 16:19, 16:23 16:23, 19:17 19:21, 29:3 29:9, 29:10 31:1, 31:24 33:12, 33:17 34:19, 34:20 44:24, 45:3 46:14, 72:21 77:3, 77:10 79:10, 79:13 88:3, 88:9 88:20, 115:24 116:11
**medically** 19:23 79:14
**medications** 17:7
**medium** 70:14 70:14
**meet** 16:23, 20:2 26:6, 40:6 42:13, 108:19
**meeting** 26:11 79:17, 91:22 117:10
**meetings** 40:15
**Megan** 3:2, 4:21
**member** 16:17 20:19
**members** 17:3
**memo** 122:16
**memorandum** 54:17, 62:2 104:20
**memory** 72:15 72:18, 74:10 92:14
**memos** 123:5
**mental** 12:16 30:11, 30:18 30:22, 31:10 31:21, 32:4 33:12, 33:20 34:21, 88:20 88:21, 127:7
**mentally** 30:13
**mention** 81:10
**mentioning** 28:23
**message** 62:1 104:4
**messed** 47:17
**met** 16:23 121:1
**military** 12:7
**Milliman** 16:22
**mind's** 73:18 73:20
**minutes** 26:13 26:15, 31:18 110:16, 125:1
**mischaracterizes** 53:4, 55:14 80:23, 88:16 95:14, 108:12 114:3
**missing** 17:6 84:13
**mistake** 5:20
**Mm-hmm** 26:17 110:20
**Mm-mm** 108:16
**moment** 71:21
**money** 24:11 24:12
**month** 55:25 56:10, 108:6
**months** 13:25 13:25, 108:6
**morning** 3:16 26:10, 26:14 64:10, 72:4
**moves** 71:7

**N**

**name** 4:2, 5:2 5:3, 5:12, 20:23 47:6, 47:8 52:22, 92:3 92:5, 102:6 102:22, 103:4 127:18
**names** 28:23 89:18
**Nancy** 20:23 21:11, 21:11 21:25, 22:1 22:3, 22:9 22:13, 22:15 22:18
**native** 9:13
**nature** 22:12
**Nawara** 1:5 3:21, 4:13, 4:15 40:20, 47:4 47:5, 47:10 48:6, 48:12 48:18, 48:20 49:1, 49:10 49:21, 49:23 50:1, 51:14 54:21, 54:25 66:15, 66:19 66:22, 66:24 67:10, 68:22 69:2, 86:25 87:12, 97:11 97:15, 103:20 103:20, 104:7 104:22, 107:11 110:6, 113:18 120:4, 120:22 127:6
**Nawara's** 95:12 98:15, 98:21 121:7, 122:18
**necessarily** 72:18
**necessary** 44:3 72:16
**necessity** 16:16 16:23, 16:24
**need** 31:1, 43:18 46:19, 77:14 79:13, 85:15 85:20, 108:15 110:9, 118:21 120:14, 124:16 124:25, 127:7
**needed** 19:2 49:7, 118:13 118:14
**neighborhood** 29:4
**never** 34:9 68:19, 68:20 73:14, 73:23 104:1
**new** 19:15, 23:3 25:10
**Non-Confident...** 9:1
**normal** 5:22 6:6, 84:16
**normally** 39:11
**North** 1:23, 2:6 2:14, 3:19
**Northern** 1:2 3:23, 5:11
**Northwestern** 17:18
**nose** 96:1
**notary** 4:3
**notation** 97:25 98:8, 98:21
**note** 19:3, 19:4 19:7, 57:19

57:23, 58:1
58:6, 58:10
59:6, 88:8
92:18
**noted** 98:2, 98:3
**notes** 34:20
43:11, 43:17
43:19, 52:9
52:12, 52:15
76:11, 76:14
76:17, 114:19
**notice** 5:7
**notwithstanding**
115:11, 118:20
127:2
**November**
54:24, 54:25
60:25, 64:15
72:4, 84:21
87:13, 103:21
104:25, 105:4
106:23, 107:14
108:25, 116:7
**number** 1:9
3:22, 38:22
47:16, 57:14
58:16, 59:12
59:23, 59:25
59:25, 82:14
84:15, 84:17
86:16, 89:1
101:18, 110:5
111:13, 114:25
116:25, 117:19
117:25, 118:5
119:13, 120:11
121:10, 121:13
126:23
**numeral** 113:11
113:12
**numerous** 62:6
**nurse** 10:14
14:8, 14:24
15:9, 15:10
15:11, 18:24
21:2, 28:3
28:11, 29:18
32:19, 33:1
38:18, 41:24
45:13, 53:1
55:16, 65:6
65:7, 96:5, 98:9
100:16, 109:9
126:9, 126:11
126:15, 126:17
**nurse's** 100:15
**nursing** 10:7
11:7, 11:15
12:9, 12:11
12:14, 12:17
12:20, 12:23
26:23, 26:24
27:24, 28:5
29:15, 34:12
34:14, 34:25
43:22, 43:24
46:8, 46:13
75:1, 76:18
98:2, 123:22
123:25, 124:3

## O

**O'Keeffe** 14:13
**o-b** 35:17
**oath** 4:8
**object** 24:15
28:13, 36:25
37:17, 38:2
39:9, 39:14
40:18, 42:21
43:9, 43:14
44:18, 45:16
46:11, 51:17
53:3, 55:10
55:22, 57:8
59:13, 61:2
62:12, 66:17
72:13, 74:17
77:11, 84:6
89:12, 90:7
93:13, 105:6
105:20, 108:4
109:25, 110:7
115:25, 116:16
118:16, 119:1
123:12, 124:1
124:6
**objection** 24:19
28:20, 34:18
37:12, 37:23
42:11, 44:5
44:23, 45:5
46:4, 47:24
48:4, 48:14
48:21, 49:3
49:11, 50:8
50:14, 50:22
51:8, 53:14
55:5, 55:14
56:2, 58:19
59:2, 60:21
61:14, 61:18
62:5, 63:13
65:14, 76:1
76:20, 79:1
80:23, 82:19
83:4, 83:4, 84:6
84:15, 87:5
87:20, 88:15
88:23, 91:25
92:22, 94:25
95:14, 95:22
96:2, 96:8
96:21, 97:7
97:12, 97:16
98:4, 98:11
99:18, 99:20
100:4, 100:11
100:18, 100:24
104:10, 106:1
106:1, 106:24
107:2, 108:11
108:22, 109:21
114:3, 114:16
119:1, 122:19
122:23, 123:7
123:20, 124:11
124:17
**objections** 99:7
**observations**
36:14
**observe** 69:6
69:6, 69:9
**observed** 35:12
35:15, 35:19
35:21, 70:17
80:15, 80:16
**observing** 69:25
**obtain** 12:11
**obtained** 44:25
77:9
**obviously** 28:22
**occasion** 28:11
**occupation**
102:8
**occupational**
18:24, 21:1
126:11, 126:12
**offered** 18:18
**office** 1:22, 2:5
2:21, 3:3, 3:18
18:8, 18:10
18:14, 18:22
19:24, 20:5
20:22, 21:14
25:13, 30:5
30:8, 30:21
31:9, 32:16
34:5, 38:16
38:17, 38:21
38:24, 38:25
39:2, 39:2
39:12, 39:24
40:1, 40:8
40:14, 40:15
42:7, 44:20
50:13, 50:18
50:21, 51:1
52:6, 52:7, 55:8
57:5, 60:16
62:9, 62:11
62:13, 62:13
63:5, 63:6
63:10, 65:25
66:15, 66:16
66:18, 66:25
67:8, 67:11
67:17, 68:20
68:23, 71:15
71:19, 73:19
73:22, 73:23
74:3, 74:4
74:25, 77:23
77:24, 77:25
78:1, 78:3, 78:4
78:5, 78:5, 78:6
78:14, 78:20
79:17, 82:5
82:24, 84:2
87:16, 87:23
88:1, 88:8, 90:3
90:5, 90:12
90:14, 91:5
91:10, 92:15
95:3, 96:17
104:8, 104:13
109:3, 113:19
118:15, 118:25
**officer** 39:21
48:6, 48:12
48:18, 48:20
49:1, 49:10
49:21, 49:23
50:1, 51:14
64:21, 105:12
105:19, 107:21
127:6
**Offices** 2:13
**oh** 23:6, 23:6
40:11, 53:10
60:3, 60:4
78:12, 81:16
81:18, 85:10
85:17, 85:25
86:2, 89:2, 94:8
96:20, 107:20
110:21, 112:3
112:3, 112:15
114:12, 114:22

116:5, 125:21
128:12
**okay** 5:24, 6:11
6:16, 6:17, 6:19
6:20, 6:21, 6:25
9:7, 9:9, 9:11
9:16, 9:18, 9:23
10:3, 11:1, 11:4
13:20, 16:5
16:8, 18:7, 21:9
21:13, 22:5
22:10, 22:13
24:25, 26:11
27:23, 29:13
30:3, 30:4, 30:6
30:15, 30:18
31:6, 31:15
31:25, 32:8
32:12, 32:22
32:25, 33:8
33:20, 33:25
34:15, 34:24
35:5, 35:7
35:18, 35:20
35:20, 35:22
36:3, 36:3, 36:6
36:11, 39:22
42:15, 42:17
42:24, 44:10
45:18, 45:20
45:22, 45:24
45:25, 46:18
46:21, 47:2
47:5, 47:7, 47:8
47:9, 47:12
47:13, 47:13
47:22, 48:3
48:6, 48:10
49:9, 50:6
50:11, 53:3
53:18, 54:10
56:8, 56:10
56:12, 57:2
57:4, 57:12
57:12, 58:14
59:17, 60:10
60:15, 61:9
61:10, 61:11
65:1, 65:5
65:19, 67:20
67:25, 68:10
69:6, 69:18
69:21, 69:24
70:7, 70:10
70:24, 71:5
71:7, 72:4, 72:7
72:9, 72:10
72:11, 72:13
73:10, 73:17
73:18, 74:2
74:14, 74:24
75:7, 77:16
80:15, 81:24
82:14, 83:20
83:22, 83:23
84:12, 84:14
84:20, 85:12
85:18, 85:22
86:3, 86:11
86:13, 86:18
86:20, 88:10
89:1, 89:6
89:14, 89:19
90:3, 90:25
91:16, 91:17
91:19, 92:9
92:25, 93:3
93:8, 93:24
93:25, 94:4
94:11, 94:17
94:19, 95:8
95:12, 97:10
98:8, 98:22
99:14, 99:21
101:5, 101:6
101:7, 102:3
103:1, 103:5
105:22, 106:16
108:17, 110:9
110:10, 110:15
110:18, 110:22
110:23, 111:1
111:4, 111:13
111:20, 112:2
112:7, 112:23
112:24, 113:5
113:7, 113:10
114:15, 114:19
114:25, 115:16
116:13, 116:24
117:2, 117:5
117:14, 117:18
118:6, 118:9
118:12, 118:13
118:19, 118:23
119:12, 119:16
119:22, 119:25
119:25, 120:11
120:17, 120:20
120:21, 120:22
120:24, 121:3
122:9, 124:25
125:4, 125:13
125:21, 125:23
126:19, 126:21
127:24, 128:1
128:3, 128:5
128:7, 128:9
128:14, 128:16
**old** 6:23
**olive** 70:13
**once** 10:20
19:11, 33:23
40:24, 45:2
71:18, 106:13
**ongoing** 22:6
22:8, 22:12
**online** 18:16
18:17
**opened** 74:7
74:9, 74:12
**operations**
55:13
**opinion** 127:6
**opportunities**
24:10, 24:12
**opportunity**
18:13
**options** 100:1
**order** 9:5, 34:5
34:11, 34:16
34:24, 45:13
53:7
**organization**
16:4, 16:18
**Originally**
78:10, 78:11
**ought** 127:4
**outburst** 99:16
**outside** 108:7
**overseeing**
23:17

**P**

**p.m** 89:25, 90:2
111:10, 111:12
125:5, 125:7
128:17
**page** 7:5, 48:8
54:12, 54:12
54:17, 87:15
99:8, 111:24
111:24, 112:4
112:8, 112:25
113:1, 113:2
113:3, 113:10
115:9, 115:11
115:14, 115:15
116:24, 117:5
117:24, 126:20
**Palos** 17:13
17:24, 18:4
**paper** 19:11
22:11
**papers** 21:17
25:2, 81:20
**paperwork**
81:22, 104:16
104:18
**paragraph**
113:1, 113:11
115:10
**paraphrasing**
54:4
**Parkside** 14:12
**part** 12:18
16:15, 23:16
32:25, 37:5
38:24, 41:4
43:23, 43:23
44:1, 67:13
72:20, 77:23
78:4, 83:15
107:23, 107:25
109:9, 117:5
**part-time** 15:12
15:13
**participate** 37:9
119:9
**participating**
116:14
**particular** 16:17
47:3, 54:8, 68:4
68:13, 77:12
97:4, 127:13
**parties** 5:8, 7:6
**parts** 34:1
102:4, 102:5
**party** 79:9
**passing** 31:17
**patient** 11:16
27:8, 27:8
28:17, 28:24
41:24
**patient's** 28:12
41:25
**patients** 13:10
17:18, 27:5
27:17, 28:23
28:25, 29:1
**penalty** 112:12
**people** 6:6
16:20, 27:15
29:4, 31:23
33:3, 33:5, 33:6
39:7, 39:11
65:13, 90:20
95:25, 120:5
**percent** 124:22

124:23
**perfectly** 6:19
**perform** 21:7 30:13, 30:25
**performed** 31:9 31:10
**period** 15:8 21:14, 22:7 22:22, 78:19 90:24, 124:10
**perjury** 112:13
**person** 18:16 19:3, 20:3, 29:8 30:12, 30:25 33:9, 33:21 33:23, 33:24 34:6, 34:15 35:6, 36:5 36:16, 36:20 36:23, 37:8 37:10, 39:21 40:5, 40:7 42:13, 43:2 43:6, 51:21 53:2, 53:11 54:1, 58:23 61:16, 63:19 65:1, 67:6 79:15, 80:19 88:19, 100:9 109:17, 109:18 114:5, 114:5 114:13, 116:9 123:15, 126:1
**personal** 103:20 104:5, 120:7 120:7
**personally** 41:17, 59:6 63:7, 63:8, 90:8
**personnel** 23:8 37:6, 37:11 44:21
**persons** 32:11
**pertain** 21:18
**pertaining** 25:3 27:10, 97:1
**pertinent** 44:9 44:13
**Peter** 1:22, 2:4 2:5, 3:19, 4:12 5:12
**PhD** 127:20 127:21
**phone** 62:20 103:23, 104:1 111:2, 114:20
**phonetic** 21:11
**physical** 19:16 30:18, 30:21 31:2, 31:17 32:3, 70:16 70:18, 71:12 71:16, 109:24
**physically** 52:4 70:10, 70:12 105:10, 105:17
**physician** 16:4 16:17, 16:25
**picture** 74:1
**place** 23:10 27:4, 32:3 32:11, 32:17 36:22, 52:5 54:23, 76:7 76:8, 79:17
**Plaintiff** 1:7, 2:3 2:11, 113:16 113:22, 115:2 115:6, 117:10
**Plaintiff's** 112:16
**plan** 17:4
**play** 56:23 106:4, 123:18
**please** 4:5, 4:7 4:11, 5:2, 5:14 5:19, 6:3, 6:18 54:11, 83:20 101:19, 111:24 112:10, 112:25 113:10, 113:12 115:9, 115:12 117:1, 117:19 117:20, 117:25 126:22
**plow** 86:15
**plugged** 101:25 102:5
**Plus** 16:4
**point** 22:15 54:8, 68:4 68:13, 68:17 71:24, 73:3 73:5, 73:6, 73:7 77:2, 77:2, 77:7
**policy** 110:3
**portion** 8:1, 8:3 17:2, 29:20
**position** 15:20 15:22, 16:10 17:24, 25:11 107:22
**possible** 66:21
**practice** 42:6 42:17, 42:22 43:1, 43:7 123:17, 123:22 124:3
**precedence** 60:3
**preceptor** 25:8 25:9, 25:12
**prepare** 25:20 43:5, 58:8
**prepared** 58:6 58:22, 58:24 78:7, 91:4, 91:5 101:23, 101:25 102:4, 102:11 103:8, 110:5
**present** 67:4 67:6, 79:20 95:11, 103:22
**presented** 105:14, 106:17
**pressure** 19:19 31:19
**Pretend** 67:24
**printed** 89:10
**prisoners** 75:12
**privileged** 96:7 96:8, 96:9 96:11
**probably** 54:4 77:19, 83:11 83:12, 124:24
**problem** 89:7
**problematic** 109:1
**Procedure** 5:10
**procedures** 123:23
**proceed** 4:24
**proceedings** 6:8 129:3
**process** 23:17 73:1, 77:13 79:8, 82:21 83:1
**produced** 93:12
**productions** 93:10, 93:11
**profession** 123:18
**professional** 12:21, 31:11 31:21
**pronouncing** 47:6
**protect** 27:5 28:12, 29:7
**protected** 28:19 95:24
**protective** 9:5
**protocol** 52:23
**provided** 21:6 36:23, 37:1 82:5, 108:19 118:15, 118:22 118:24, 123:16
**provider** 30:10 30:11, 32:10 36:18, 75:16 79:11, 88:7 88:11, 106:7 127:17
**provider's** 33:19
**providing** 17:7
**psychiatric** 12:14, 124:4
**psychiatrist** 31:10
**psychologist** 31:10
**public** 4:3
**publications** 25:3
**puffing** 80:18
**purport** 52:15
**purpose** 37:25 48:3, 67:16
**purposes** 91:5
**pursuant** 5:7 9:5, 112:13
**put** 21:14, 63:20 73:17, 82:25 83:2, 84:11 87:19, 89:3 101:24
**putting** 19:10 88:2, 96:1

**Q**

**question** 5:15 5:16, 6:4, 6:5 6:9, 6:10, 6:11 6:16, 21:3 21:10, 32:6 33:1, 33:9 45:17, 49:16 69:14, 84:7 84:18, 99:21 100:2, 114:9 118:1, 118:11
**questions** 5:13 29:3, 93:1, 93:6 101:15, 102:9 112:22, 119:21

128:11
**quite** 41:7

**R**

**rage** 70:5, 70:6 70:8
**raged** 68:12
**raise** 4:7
**rate** 19:19
**re-ask** 21:10
**reaching** 17:2
**read** 58:14 83:20, 86:18 105:8, 112:10 113:1, 113:12 115:11, 115:13 116:24, 117:6 117:20, 117:24 118:4, 119:19 126:22
**reading** 96:18 97:14
**ready** 113:2 119:23
**really** 28:18 72:6
**reason** 24:9 31:12, 37:2 53:16, 53:17 76:14, 76:15 83:14, 92:10 97:3, 97:4 97:14, 102:8 102:24, 104:7 105:3, 105:9 108:20, 125:23
**reasons** 61:5 80:2, 80:7
**reassure** 29:6
**Rebecca** 3:8 23:9, 23:10 23:11, 50:2 51:18, 53:22 54:2, 55:17 57:20, 75:4 82:2, 113:14 121:10
**Rebecca's** 52:6
**recall** 20:16 22:14, 26:5 27:25, 37:4 47:21, 49:19 49:23, 54:7 54:22, 58:5 60:18, 64:11 64:15, 64:17 65:24, 66:20 66:23, 67:9 67:12, 67:13 67:15, 76:10 80:9, 80:11 81:13, 81:14 81:19, 84:23 84:24, 85:14 92:17, 103:12 103:18, 104:6 104:23, 105:2 107:15, 110:8 113:23, 114:12 117:17, 122:11 122:14, 123:9
**receive** 27:23 29:13, 35:10 51:11, 65:12 79:10, 82:17
**received** 83:11 85:13, 92:10 104:14, 125:25 126:3
**receiving** 122:16
**reception** 40:3
**recognize** 58:12
**recollection** 28:4, 49:20
**recommend** 37:22, 42:9 76:19
**record** 3:17 4:11, 5:3, 5:5 5:24, 9:4, 46:22 46:23, 46:24 47:14, 47:22 84:15, 89:22 89:25, 90:1 90:2, 90:4, 91:1 91:1, 92:19 105:8, 108:13 111:10, 111:11 111:12, 112:11 113:12, 117:6 117:20, 123:8 125:5, 125:6 125:7, 126:22 128:17, 129:3
**RECORDER** 3:16, 4:2, 4:7 4:10, 4:23 46:20, 46:22 46:24, 89:25 90:2, 111:10 111:12, 125:5 125:7, 128:17
**recording** 4:4
**records** 27:16 27:17, 27:22 29:3, 29:9 29:10, 31:1 44:24, 45:3 46:14, 77:10 79:11, 79:13 88:3, 88:6, 88:9 88:12
**recur** 127:15
**redacted** 89:19
**refer** 94:1 109:17
**referenced** 103:17
**referral** 33:22 37:2, 91:19 92:10, 92:10 97:10, 97:14 101:20, 101:25 102:2, 102:3 102:12, 102:13 102:24, 104:21 106:15
**referring** 35:9 35:12, 102:8 105:9
**refers** 91:23
**reflected** 117:7 117:9
**refresh** 28:4
**regarding** 25:3 27:23, 28:5 42:7, 45:25 52:24, 57:23 62:10, 63:2 76:17, 103:10 103:14, 108:20 113:14, 113:21 115:2, 115:2 115:6, 115:23 116:10, 117:11 123:2, 123:6
**registered** 10:14
**Regular** 9:1
**regulations** 21:19
**Reierson** 3:9 4:18, 23:11 23:14, 23:21 23:22, 52:11 54:5, 55:3 55:20, 60:5 60:8, 61:13 65:6, 65:7 65:17, 65:22 66:19, 67:3 68:25, 75:8 75:19, 75:25 79:20, 80:6 85:13, 86:25 87:2, 95:13 107:8, 108:19 113:14, 113:20 113:25, 115:2 115:21, 116:8 116:15, 116:17 121:10
**Reierson's** 66:16, 71:16
**related** 122:22
**release** 19:22 72:21, 77:3 77:10
**relevant** 88:13 88:21, 127:13
**relied** 60:25 61:6
**rely** 59:11 59:15, 59:19 59:20
**remained** 14:23 18:4, 23:3 23:13
**remember** 11:3 11:9, 11:20 13:5, 14:3 20:23, 23:6 23:7, 28:1 44:19, 50:10 50:15, 50:19 50:23, 51:2 51:18, 51:20 51:25, 52:7 52:10, 52:13 52:19, 56:22 57:3, 57:10 58:7, 61:15 65:21, 68:3 68:13, 68:19 68:24, 71:22 71:23, 71:24 71:25, 72:1 72:24, 73:24 73:25, 74:2 74:15, 74:18 74:21, 84:22 85:3, 90:22 91:11, 91:12 91:15, 95:5 95:7, 95:19 95:23, 105:7 128:6
**remembered** 73:4

**rep** 74:21, 74:25 76:23, 77:13 79:4, 79:16 79:19, 79:25 80:2, 80:6 80:10, 80:13 81:2, 81:4
**repeat** 28:14 37:18, 48:23 53:5
**rephrase** 62:17
**replaced** 116:21
**report** 23:21 23:22, 35:10 45:2, 50:4, 62:4 62:22, 63:16 63:25, 64:12 64:18, 65:17 125:19, 126:8 127:16
**reported** 64:20 64:24, 67:8 67:11, 68:22
**reporter** 89:5
**reporting** 65:11
**representative** 113:19
**reprimanded** 24:13, 24:17
**request** 31:9 31:13, 44:16 44:17, 45:10 48:10, 48:11 48:17, 48:17 50:6, 50:11 50:17, 50:20 50:25, 51:3 51:7, 53:16 53:17, 53:25 56:5, 56:16 59:10, 76:24 79:7, 88:3
**requested** 37:14 37:19, 60:20 63:5, 65:1, 77:8 80:3, 80:7, 85:6 99:17, 99:23 100:3, 100:23
**requesting** 48:16, 48:25 50:5, 53:2 53:11, 53:23 58:23, 101:21
**requests** 31:16 55:24, 88:11 122:12
**require** 19:21 79:10
**required** 4:23 21:7, 43:23 45:15, 107:25 124:4, 124:9
**requires** 27:8 27:14, 30:9
**requiring** 16:18 19:25, 26:2
**reserve** 128:15
**resolved** 103:11
**resource** 105:15
**resources** 17:8 20:25, 48:2 106:18, 108:18 122:3, 126:25
**respect** 45:9
**response** 59:21 105:12, 126:23
**responses** 5:19
**responsible** 32:1
**rest** 6:10
**restate** 32:13 38:17, 115:19 115:20, 116:6
**restrictions** 19:10, 19:14
**result** 41:15 109:5, 109:13
**results** 104:14 104:15
**resume** 13:15 13:17
**return** 19:3 19:7, 74:19 104:16, 104:18 126:1, 126:4 126:5
**returned** 72:10 74:14, 104:19
**review** 16:14 16:15, 16:25 17:17, 78:18 78:20, 78:23
**reviewed** 16:19
**Richard** 2:12 2:13, 4:14
**Rick** 128:7
**right** 4:8, 5:2 5:5, 5:19, 6:13 7:2, 9:2, 9:13 13:1, 13:17 15:24, 17:9 18:3, 18:4, 20:4 23:1, 27:2, 27:7 27:17, 29:9 29:11, 34:24 35:25, 46:25 48:8, 50:6 51:23, 60:9 65:16, 66:8 66:8, 66:10 66:10, 69:22 75:18, 78:5 81:6, 83:25 89:19, 96:19 99:12, 101:3 102:15, 104:3 110:9, 111:19 114:14, 116:3 116:20, 121:11 126:8
**rights** 27:5 28:12, 28:17 29:6
**RN** 11:11, 11:12 13:2, 13:8, 13:9 13:18, 13:23 24:6, 25:4
**role** 23:14 55:16
**roll** 47:11, 62:21
**room** 2:23, 3:5 18:2, 39:4, 39:6
**roughly** 20:6 26:13
**route** 61:21 73:8
**routine** 105:12
**rule** 31:1, 79:13 120:11
**rules** 5:9, 5:10 21:18
**Rush** 13:21 13:22, 14:1 14:3, 14:5

**S**

**S-h-e-l-b-y** 5:4
**safe** 36:17 75:12
**safety** 71:12 71:17
**sake** 88:18
**Sarah** 3:10, 4:16
**sat** 73:23
**saw** 35:23 39:21, 52:19 68:14, 71:11 84:12, 92:11
**saying** 19:22 51:13, 53:23 60:4, 62:15 63:4, 63:22 65:12, 81:6 81:19, 93:23 101:1, 114:22
**says** 34:5, 43:3 55:7, 58:15 72:5, 87:3, 92:1 93:25, 94:4 94:20, 97:19 97:22, 97:23 97:25, 99:25 100:20, 100:22 100:23, 101:8 101:12, 102:11 104:1, 114:4 114:5, 117:20 118:20, 118:20
**Scharf** 3:11
**schedule** 63:23
**scheduling** 63:3
**school** 9:18 9:20, 9:21, 9:22 11:2, 11:15 12:19, 14:8 14:9, 14:11 27:24, 28:5 29:15, 46:8 46:13
**screen** 96:17
**screening** 19:15
**screenings** 19:19
**se** 104:17
**search** 93:21
**second** 32:25 89:24
**section** 112:14 112:15
**see** 16:22, 16:25 19:13, 22:22 29:2, 30:12 30:12, 39:11 39:17, 43:18 47:18, 52:11 52:18, 54:13 60:3, 64:25 65:3, 65:6, 65:7 65:7, 65:22 65:22, 69:12 70:8, 70:9 73:20, 73:22 86:7, 87:17 92:2, 92:13 93:20, 94:21 97:5, 99:9 100:20, 104:8 105:3, 111:25 113:10
**seeing** 17:3

17:3, 61:21
125:23
**seen** 34:4, 34:9
47:20, 48:19
49:2, 52:14
57:16, 60:11
60:15, 68:20
82:15, 86:20
89:8, 89:10
104:22, 104:24
125:8, 125:11
126:5
**self-control**
75:10, 75:13
**send** 19:20
30:24, 31:18
31:21, 61:22
61:23, 106:8
123:5
**sends** 100:9
**sent** 30:9, 31:23
32:14, 33:11
34:6, 35:13
36:20, 44:22
44:25, 48:1
48:11, 48:15
49:7, 88:20
90:6, 97:24
101:20, 125:13
126:9, 126:16
**sentence** 117:6
**separate** 38:25
40:3, 44:20
**September** 1:18
3:17, 39:8
39:13, 40:9
40:16, 47:1
54:16, 54:18
54:25, 55:4
64:1, 107:12
115:20, 116:1
116:2, 116:7
129:8
**sequence** 72:2
**series** 5:13
**served** 12:7
38:13
**services** 15:23
16:11, 16:13
16:19, 17:1
19:7, 19:13
108:7, 126:14
**set** 5:7, 62:8
112:17, 113:8
117:3
**setting** 27:20
**setup** 38:25
**seven** 16:1
127:1
**sexual** 60:16
**share** 29:11
93:21
**shared** 97:3
**sheet** 19:16
**Shelby** 1:15
1:16, 3:9, 3:25
4:2, 5:4, 5:6
5:12, 13:14
46:25, 47:16
57:13, 59:23
59:25, 65:6
65:8, 82:14
82:15, 86:16
89:1, 101:18
110:5, 112:12
112:16, 112:20
113:13, 119:12
125:8
**Shelitha** 22:23
23:9
**sheriff** 4:17
38:18, 38:19
57:9
**sheriff's** 18:8
18:9, 18:13
18:22, 19:24
20:5, 20:22
21:14, 25:13
30:5, 30:8
30:21, 31:9
32:16, 34:5
42:7, 44:20
50:13, 50:18
50:21, 51:1
55:7, 57:5
60:16, 71:15
71:19, 78:14
78:20, 82:5
84:2, 87:16
87:23, 88:1
90:24, 91:4
91:10, 92:15
93:2, 93:7, 95:3
104:13, 109:3
110:4, 118:15
118:25, 121:23
122:4
**Shield** 15:18
15:25, 16:2
**shift** 23:7
**shoot** 89:2, 94:8
**short** 22:22
46:16, 74:16
93:19, 120:16
**show** 5:6, 47:14
47:15, 57:12
59:23, 62:24
75:12, 86:16
89:1, 101:18
111:13
**shows** 62:22
**side** 66:5, 68:25
69:1, 69:3
**sign** 26:2, 72:21
73:5, 73:6, 77:4
81:21, 82:4
84:1, 84:3, 87:3
87:4, 87:12
**signature** 58:12
58:14, 58:17
112:7, 112:8
128:15
**signed** 19:17
28:2, 45:7
58:10, 82:9
103:16, 118:14
118:21
**signing** 81:20
103:11
**signs** 127:16
**similar** 49:9
91:8
**simply** 43:8
120:19
**sit** 20:2, 42:13
66:2, 68:23
**site** 17:18
**sits** 64:21
**sitting** 68:24
74:1, 74:2
**situation** 81:2
84:16, 107:4
**situations** 82:7
**six** 13:25, 13:25
126:23
**skin** 70:13
**Slash** 91:22
**Slow** 84:14
**somebody** 98:2
**Someone's**
53:23
**soon** 64:21
**sorry** 9:3, 14:2
14:4, 18:1
21:10, 24:16
24:23, 32:5
37:18, 44:10
45:21, 48:23
56:14, 63:7
77:5, 83:6, 86:4
89:21, 94:10
94:13, 101:11
104:21, 107:20
118:2, 119:14
119:17, 120:15
123:1, 125:10
**sort** 19:11
75:15, 107:3
**South** 38:22
**speak** 51:21
123:8
**speaking** 25:22
59:20, 67:18
70:19
**specialized**
15:23
**specialty** 12:11
13:7
**specific** 14:9
19:14, 93:1
102:8
**speculate** 6:18
**speculation** 46:5
48:22, 49:4
59:3, 60:22
61:3, 82:20
88:24, 97:17
98:5, 98:12
98:23, 100:12
100:19, 100:25
104:11, 108:12
**spell** 5:2
**spoke** 33:23
51:18, 79:5
79:24
**spoken** 5:20
**spot** 98:17
**spreadsheet**
91:2
**St** 10:10, 10:22
**stable** 30:13
**staff** 13:8, 13:8
13:9, 13:23
14:24, 15:9
40:15, 48:2
**stand** 93:22
94:5, 114:16
**standing** 73:21
73:22, 73:25
**stands** 29:24
**start** 8:1, 17:24
19:23, 63:8
75:25, 115:20
119:10
**started** 11:9
11:16, 20:21
22:7, 55:7
67:10, 74:5
78:14, 90:23
90:25

**starts** 96:18 115:11, 115:14 117:6
**state** 1:23, 2:6 2:14, 3:19, 4:11 5:2, 10:14
**State's** 2:21, 3:3
**stated** 33:25 58:22
**statements** 59:5
**states** 1:1, 48:5
**status** 92:11
**steps** 79:6
**steward** 71:24 72:1, 72:9 72:10, 72:21
**sticker** 60:10
**stop** 6:14, 73:4
**stormed** 68:18 71:21, 72:5 73:11, 73:20 74:12
**Street** 1:23, 2:6 2:14, 2:22, 3:4 3:19
**stretch** 46:19
**strictly** 33:17 34:19
**studied** 12:13
**subject** 48:5 75:2
**submit** 76:24
**subordinate** 109:24
**sued** 40:21 41:17, 41:18
**suffering** 127:6
**sugar** 20:12
**Suite** 1:24, 2:7 2:15, 3:13, 3:20
**summarized** 126:25
**superintendent** 50:3, 51:4, 51:6 51:12, 51:13 51:24, 52:1 52:17, 52:21 53:19, 57:20 58:3, 81:11 127:3, 127:12
**superior** 61:20 61:25, 62:3 68:9, 105:12 105:19, 105:21
**superiors** 55:18
**supervised** 23:8
**supervisor** 15:23, 20:22 22:13, 22:19 23:19, 37:8 61:25, 109:20 109:23, 124:24
**supervisors** 100:2
**supposed** 53:1 58:25, 62:3 65:16
**Supt** 58:15
**sure** 5:4, 10:2 37:19, 40:13 41:8, 62:17 62:18, 75:16 78:21, 78:23 86:1, 89:23 125:2
**surg** 11:6
**surveillance** 40:17
**suspended** 12:24
**swifter** 57:1
**sworn** 4:9

**T**

**take** 10:13 10:20, 11:21 13:13, 13:25 23:4, 32:3 32:17, 36:22 39:23, 43:4 46:16, 52:9 54:3, 54:11 55:25, 60:24 76:7, 76:8 79:17, 85:15 85:16, 86:11 87:15, 93:19 110:10, 111:7 111:23, 111:23 117:18
**taken** 5:7, 5:8 12:13, 12:16 56:4, 56:13 56:14
**takes** 60:3
**talk** 26:16, 30:2 42:14, 47:4 59:16, 61:9 61:22, 61:24 68:16, 73:12
**talked** 36:3 38:6, 38:9 38:12, 43:12 121:18, 121:21
**talking** 43:8 43:10, 43:19 43:21, 51:24 72:8, 75:10 92:22
**tardiness** 24:22 24:24
**taught** 12:9 29:13, 46:9 46:13
**tax** 20:12
**team** 16:20 19:9, 20:2 32:24, 95:10 109:10
**technician** 11:17
**telephone** 51:22 57:23, 62:1 62:7
**tell** 6:22, 10:25 11:4, 24:21 27:2, 27:2 47:22, 47:23 51:11, 54:23 54:24, 55:2 67:21, 68:1 70:8, 70:15 72:19, 72:24 75:7, 75:20 75:22, 76:6 79:3, 80:15 82:11, 91:13 101:18, 102:4 107:8
**telling** 75:20
**tells** 43:6
**ten** 70:1
**terms** 9:23 31:25, 91:9 107:12
**testified** 52:24 57:24, 69:20 72:5, 92:19
**testify** 41:13 41:23, 98:24
**testimony** 9:1 31:8, 41:9, 53:4 55:15, 80:24 88:16, 95:15
**testing** 16:19
**text** 62:1
**Thank** 4:10 47:19, 57:15 66:12, 85:19 86:2, 116:6 128:10
**Thanks** 86:17
**thing** 21:22 26:24, 27:1 28:19, 43:7 102:10, 128:4
**things** 17:8 21:15, 22:8 22:12, 31:7 53:7, 105:23
**think** 30:23 34:25, 44:3 61:20, 69:13 70:12, 71:18 76:4, 92:23 97:9, 102:16 104:1, 107:17 110:13, 116:23 122:16, 123:21 123:22, 125:15 128:21
**third** 79:9 87:15, 99:13 99:13, 117:7 117:7
**Thomas** 3:8 121:13
**threaten** 127:11
**threatened** 71:13, 71:14 71:17, 71:18
**threatening** 75:13
**threateningly** 127:11
**three** 14:16 20:6, 31:18 47:18, 113:11 113:12
**time** 3:18, 4:5 5:14, 6:13 13:18, 15:8 17:23, 20:19 22:22, 24:6 28:3, 34:13 50:16, 50:20 52:14, 55:13 56:5, 56:6 56:12, 56:15 56:17, 56:22 61:24, 63:20 63:23, 63:25 64:5, 64:7, 67:7 70:2, 70:4 71:13, 71:17 72:2, 72:8 72:12, 73:19 74:1, 74:16 74:16, 74:24

77:12, 77:25
78:19, 79:22
81:21, 86:6
89:7, 101:6
103:8, 103:10
103:21, 107:13
107:16, 109:8
113:18, 114:1
116:5, 124:14
127:8
**times** 26:6, 36:9
40:23, 43:11
104:21, 115:1
**title** 13:6, 13:22
15:8, 20:24
23:15, 57:10
89:14, 91:23
92:7, 126:10
**today** 3:17, 3:24
25:21, 29:20
38:7, 38:10
62:11, 65:13
**told** 20:14
22:10, 42:18
65:3, 84:1
105:22, 128:20
**tongue** 47:11
**top** 91:19, 99:13
113:6, 117:8
**train** 25:11
55:16, 55:18
**training** 21:6
21:9, 21:15
21:24, 22:5
22:7, 25:6
27:23, 28:5
55:9
**transcribe** 19:5
**transcribed**
5:23
**transcribing** 6:8
19:10
**transcript** 129:3
**transgressions**
127:4
**transpire** 79:9
**transpired** 68:8
72:2, 127:3
**trash** 83:9
83:12, 83:14
**treating** 84:16
**treatment**
123:23, 127:8
127:12
**trees** 111:22
**trial** 41:13
**tried** 81:3, 81:4
**true** 59:7, 82:3
82:6, 112:20
**try** 107:4
**trying** 14:2
14:2, 23:6, 23:7
32:9, 36:13
36:15, 36:16
67:16, 68:16
73:1
**turn** 19:8
**turned** 88:14
**Turrise** 121:19
**twice** 26:8, 72:4
**two** 13:12, 13:12
16:7, 17:11
30:16, 30:17
33:5, 36:12
38:23, 66:13
66:13, 84:17
87:8, 103:16
120:5, 124:25
**type** 10:4, 28:23
65:2, 70:14
89:10, 95:24
**typically** 61:16

**U**

**Uh-huh** 5:22
**Uh-uh** 5:23
**uncooperative**
68:12, 117:10
**undergo** 77:8
80:3, 80:7
124:15
**understand**
5:14, 5:17
29:24, 69:17
71:1, 71:3
84:10, 90:16
93:17, 114:7
**understanding**
21:3, 45:17
46:6, 55:18
70:25, 72:3
106:14
**understood** 5:16
**undertake**
59:10
**unfortunately**
111:14, 126:24
**union** 20:19
71:24, 72:1
72:9, 72:10
72:20, 74:21
74:25, 76:22
79:4, 79:16
79:19, 79:25
80:2, 80:6
80:10, 80:13
81:2, 81:4
113:19
**unit** 11:6, 11:7
**UNITED** 1:1
**UnitedHealthc...**
17:14, 17:16
17:18
**University**
10:10
**unsure** 116:12
**untruthful**
117:11, 117:16
117:21, 117:22
**unwanted**
109:24
**upset** 80:14
80:16, 80:17
80:18, 80:19
80:19, 80:21
80:25, 81:1
81:5
**USC** 112:13
**use** 22:11, 22:11
43:24, 44:2
45:13
**usual** 61:21
**usually** 6:6
24:12, 27:12
30:11, 33:5
33:6, 37:1
40:14, 61:20
64:2, 64:6
66:13, 116:22
123:22
**utilization** 16:14
16:15, 17:17
**utilized** 16:22
**utilizing** 46:15

**V**

**vaguely** 67:14
67:14
**venue** 3:23
**verification**
112:10
**version** 36:8
36:10, 43:4
43:12, 60:5
60:6
**versus** 30:22
32:4
**vibrating** 86:4
**video** 40:17
**view** 29:9, 68:7
**visit** 88:8
**voicemail** 84:20
84:24, 85:4
**vs** 1:9

**W**

**Wacker** 3:12
**wait** 6:3, 17:13
54:9, 81:16
107:19
**walk** 39:18
64:22
**walked** 39:16
74:3, 74:7
**walking** 73:21
73:23
**walls** 78:3
**want** 6:9, 46:16
51:14, 75:18
81:22, 82:4
84:1, 84:14
87:3, 88:8, 88:9
111:22, 115:13
116:24, 126:19
**wanted** 85:24
92:25, 106:5
106:14
**wants** 69:16
**warranted**
115:24, 116:11
**Washington**
2:22, 3:4
**watch** 85:23
**watched** 75:9
**way** 6:7, 21:15
42:19, 44:10
62:8, 69:16
73:17, 74:4
95:2, 117:15
123:24
**ways** 62:6
**we've** 24:5
47:15, 89:7
93:10, 93:10
**weapon** 108:8
**Wednesday**
1:17, 3:17
26:10, 26:12
**week** 22:7
**weekend** 15:10
15:11, 17:24
**weekender** 18:5
**weekends** 17:25
**weeks** 105:13
106:17, 127:1
**weird** 31:20
**went** 9:25, 14:5

17:13, 17:14 18:5, 45:7 75:21, 76:18 90:22, 104:12 106:4
**West** 2:22, 3:4 3:12
**whatsoever** 75:14
**Whoops** 4:6
**Williams** 48:1 54:18, 122:1 122:10, 122:13 122:15, 122:17 122:21, 123:2 123:6
**Winifred** 1:15 1:16, 3:9, 3:25 4:1, 4:2, 5:4, 5:6 112:12, 112:16 112:20
**Winston** 8:2
**witness** 3:24 4:9, 4:17, 24:2 85:17, 85:19 86:2, 86:4 86:13, 110:20 110:24
**witnesses** 120:18
**wondering** 28:15
**word** 34:25 54:3, 67:21 67:21
**words** 5:20 29:24, 41:23 78:7, 108:4 123:1
**work** 11:12 14:14, 15:24 19:3, 19:7 20:11, 21:13 25:4, 25:7 25:11, 29:18 56:24, 56:25 61:22, 63:25 99:15, 104:16 104:18, 104:19 109:4, 126:2 126:4, 126:5
**worked** 14:8 25:8, 25:12 28:8, 29:2, 29:8 39:12, 57:9 90:21, 90:24
**working** 11:16 14:21, 14:22 16:14, 17:24 17:25, 18:2 18:23, 20:21 21:4, 38:18 39:7, 42:7, 55:3 56:19, 78:14 78:19, 91:10
**works** 57:4
**worry** 22:1 89:3
**write** 84:7, 84:9 84:19, 99:3
**write-up** 124:24
**writing** 34:2 34:4, 44:4, 44:9 44:14, 50:24 52:15, 65:12 108:20, 108:25 110:6
**written** 6:9 25:2, 58:21 58:24, 91:1 98:17, 99:2 99:4
**wrote** 104:20

**X**

**Xavier** 10:10 10:22

**Y**

**yeah** 9:12, 13:14 21:13, 22:11 24:4, 28:15 30:1, 32:7 44:11, 49:17 54:4, 56:21 64:4, 66:11 67:14, 69:4 70:15, 81:3 81:12, 83:10 83:10, 85:11 89:3, 99:1 100:20, 102:13 102:18, 102:20 110:11, 111:9 114:8, 114:12 125:21, 128:20
**year** 9:20, 10:2 10:11, 10:18 11:1, 11:8, 11:9 11:18, 11:19 13:12, 17:21 18:7, 18:9, 41:6 56:8
**years** 9:12, 9:12 11:21, 11:23 13:4, 13:12 14:16, 15:2 15:7, 16:1, 16:7 17:11, 20:6 26:25
**Yep** 125:5

**0**

**0:02:17** 5:18
**0:02:58** 6:12
**0:03:55** 9:10
**0:05:23** 10:15
**0:06:36** 11:14
**0:08:25** 12:22
**0:09:27** 13:19
**0:10:29** 14:8
**0:11:09** 14:25
**0:12:15** 16:1
**0:14:12** 17:11
**0:15:00** 18:1
**0:18:17** 20:6
**0:19:31** 21:3
**0:20:22** 21:23
**0:22:33** 23:12
**0:23:38** 24:8
**0:24:52** 25:5
**0:25:48** 25:24
**0:26:54** 26:22
**0:28:49** 27:25
**0:29:50** 28:20
**0:31:01** 29:16
**0:31:41** 30:4
**0:33:40** 31:15
**0:34:32** 32:13
**0:35:13** 33:5
**0:36:31** 34:3
**0:37:18** 34:18
**0:38:35** 35:4
**0:39:17** 35:21
**0:40:11** 36:12
**0:41:26** 37:3
**0:42:26** 37:23
**0:43:41** 38:8
**0:44:47** 39:6
**0:45:48** 39:25
**0:46:51** 40:19
**0:48:19** 41:24
**0:49:25** 42:15
**0:50:11** 43:10
**0:51:06** 44:5
**0:51:51** 44:19
**0:53:03** 45:11
**0:54:29** 46:12
**0:56:41** 47:21
**0:58:00** 48:14
**0:59:36** 49:18
**000113** 126:20
**000177** 117:9 117:19

**1**

**1** 47:16, 54:11 54:17
**1/4/66** 7:1
**1:00** 111:5
**1:00:47** 50:10
**1:01:16** 50:22
**1:02:10** 51:18
**1:03:35** 52:18
**1:04:25** 53:5
**1:05:32** 54:2
**1:06** 125:5
**1:06:21** 54:14
**1:06:50** 54:22
**1:07:41** 55:11
**1:08:50** 56:2
**1:10:05** 57:3
**1:11:00** 57:17
**1:11:44** 58:7
**1:12:22** 58:20
**1:13** 125:7
**1:13:37** 59:13
**1:14:56** 60:12
**1:15:45** 61:4
**1:16** 128:17
**1:17:11** 62:5
**1:18:12** 63:1
**1:19:34** 64:4
**1:20:52** 65:9
**1:2017cv02393** 1:9, 3:23
**1:21:49** 66:12
**1:22:33** 67:1
**1:23:36** 67:19
**1:24:46** 68:14
**1:27:48** 70:24
**1:29:45** 72:7
**1:30:22** 72:23
**1:31:46** 73:24
**1:32:42** 74:20
**1:34:32** 76:1
**1:35:27** 76:20
**1:36:15** 77:11
**1:37:24** 78:10
**1:39:12** 79:18
**1:41:39** 81:9
**1:42:56** 82:6
**1:44:03** 82:20
**1:45:06** 83:19
**1:46:22** 84:4
**1:46:56** 84:19

**1:47:50** 85:14
**1:49:28** 86:18
**1:50:06** 87:10
**1:51:06** 87:25
**1:52:20** 88:17
**1:53:42** 89:12
**1:54:52** 90:17
**1:55:46** 91:7
**1:56:35** 91:25
**1:57:07** 92:17
**1:58:41** 94:2
**1:59:29** 94:23
**10** 120:11 120:17
**10:05** 3:18
**11** 9:12, 125:8
**11:00** 46:22
**11:07** 46:24
**12** 9:12, 9:12 15:7, 86:9
**12/9** 99:11
**12/9/2016** 99:9 99:10
**12:00** 86:8 86:10
**12:06** 89:25 90:2
**12:33** 111:10
**12:43** 111:12
**128** 87:16
**14** 115:9, 116:24
**15** 117:5, 117:24
**1550** 1:24, 2:7 2:15, 3:19, 3:20
**16** 116:25
**16th** 54:25 107:12
**17** 1:23, 2:6 2:14, 3:19 117:25, 118:5 118:6
**1746** 112:15
**17691** 8:2
**18** 92:24
**189** 99:8
**18th** 54:24
64:15, 72:4 87:13, 105:4 106:23, 107:14 108:25
**1996** 10:12
**1997** 10:19, 28:2

**2**

**2** 54:12, 54:12 57:14, 59:12 61:6
**2:00:23** 95:22
**2:01:18** 96:25
**2:02:14** 97:18
**2:03:21** 98:13
**2:04:20** 99:7
**2:05:28** 100:7
**2:06:26** 101:7
**2:09:26** 103:7
**2:10:24** 104:6
**2:11:28** 104:23
**2:12:47** 105:20
**2:14:10** 106:25
**2:15:43** 108:5
**2:17:10** 108:23
**2:18:33** 109:14
**2:20:16** 110:8
**2:24:25** 113:6
**2:25:17** 113:23
**2:26:10** 114:24
**2:28:14** 115:18
**2:29:05** 116:12
**2:31:23** 117:4
**2:32:11** 117:17
**2:34:17** 118:17
**2:36:39** 119:22
**2:37:17** 120:10
**2:38:04** 121:9
**2:38:53** 122:6
**2:39:58** 122:24
**2:41:33** 124:1
**2:42:52** 124:18
**2:44:01** 125:22
**2:44:40** 126:18
**2:46:32** 127:16
**20** 26:15
**2005** 41:7
**2007** 41:7
**2014** 18:11
**2016** 39:8, 39:13 40:9, 40:16 47:1, 49:22 54:16, 54:19 54:24, 55:4 55:8, 60:25 64:1, 64:16 84:21, 87:13 89:15, 94:18 103:21, 105:1 105:4, 106:23 107:13, 107:14 108:25, 115:21 116:1, 116:2 116:7, 116:8
**2017** 20:8, 86:23 92:20, 104:21 105:5, 118:13 118:21
**2018** 89:15 92:21, 92:24 112:21
**2019** 1:18, 3:17 129:8
**21** 111:24, 112:4 112:5
**21st** 112:21
**25** 105:4
**25th** 1:18, 3:17
**26** 120:12
**271** 58:16
**28th** 86:23
**29th** 54:16 54:18, 54:25

**3**

**3** 59:23, 59:25 112:25, 113:10
**30** 84:21, 129:8
**3026** 38:22
**333** 3:12
**34** 12:6

**4**

**4** 82:14, 113:2 113:3
**4:00** 64:6
**40** 110:16
**45** 26:13
**450** 3:13

**5**

**5** 4:4, 60:5, 60:8 86:16, 103:17
**50** 2:22, 3:4
**500** 2:23, 3:5
**53** 6:24

**6**

**6** 89:1
**60602** 2:8, 2:16 2:24, 3:6, 3:20
**60606** 3:14

**7**

**7** 101:18, 110:5 117:19

**8**

**8** 1:16, 7:5 111:13
**8/25/2017** 103:7
**8:00** 64:2, 64:3 64:4

**9**

**9** 94:14, 94:16 119:13
**9/16/17** 125:20
**9/26** 127:8
**9/26/2016** 127:1
**9/27/2016** 97:22
**9/29/16** 97:10
**9/29/2016** 98:15 127:8, 127:12
**9/9/2016** 94:12 94:15
**95** 124:22
**97** 11:9

**/**

/// 7:7, 8:4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA, )
Plaintiff, )
vs. )No. 17-CV-2393
COUNTY OF COOK, a unit of )
local Government, THOMAS DART, )
in his official capacity as )
Sheriff of Cook County, )
Illinois, KAREN JONES-HAYES, )
MATTHEW BURKE, REBECCA REIERSON,)
and WINIFRED SHELBY, in their )
individual capacities, )
Defendants. )

The Continued Discovery Deposition of DIANA S. GOLDSTEIN, M.D., called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before MARLENE L. KING, a notary public within and for the County of Cook and State of Illinois, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, on December 16, 2019, at the hour of 2:00 o'clock p.m.

REPORTED BY: MARLENE L. KING, C.S.R.
LICENSE NO.: 084-003326.

50

APPEARANCES:

LAW OFFICES OF PETER V. BUSTAMANTE,
BY: MR. PETER VINCENT BUSTAMANTE,
17 North State Street,
Suite 1550,
Chicago, Illinois 60602
(312) 346-2072
pvbust@bustamantelaw.com
Representing the Plaintiff;

SCHARF, BANKS, MARMOR, LLC,
BY: MS. SARAH R. MARMOR,
333 West Wacker Drive,
Suite 450,
Chicago, Illinois 60606
(312) 726-6000
smarmor@scharfbanks.com
Representing Thomas Dart,
in his official capacity
as Sheriff of Cook County,
Illinois, Matthew Burke,
Rebecca Reierson, and
Winifred Shelby;

51

APPEARANCES (Continued):

STATE'S ATTORNEY OF COOK COUNTY,
ILLINOIS,
BY: MR. LYLE K. HENRETTY,
50 West Washington Street,
Suite 2760,
Chicago, Illinois 60602
(312) 603-1424
lyle.henretty@cookcountyil.gov
Representing Karen Jones-Hayes.

52

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| DIANA S. GOLDSTEIN, M.D. | |
| By Ms. Marmor (continued) | 54 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| Goldstein Deposition | |
| Exhibit No. 6 | 56 |
| Exhibit No. 7 | 115 |
| Exhibit No. 8 | 126 |

EXHIBIT
E
exhibitsticker.com

53

(WHEREUPON, the witness was duly sworn.)

DIANA S. GOLDSTEIN, M.D.,

called as a witness herein, having been first previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued):

BY MS. MARMOR:

Q. Good afternoon, Dr. Goldstein. We ended the last deposition with a series of questions that had been sent to you by Michelle Sarocka from Isaac Ray -- sorry -- from CorVel. If you go to the third page of Deposition Exhibit 5, do you see her cover letter to you?

A. Yes.

Q. Okay. And I just want to focus very briefly on the numbered items in this letter. Do you see that?

A. Yes.

Q. Okay. And what she said in her letter, what Ms. Sarocka said in her letter, was, "Following your comprehensive evaluation of John Nawara, please provide your comments and recommendations to the following questions."



Do you see that?

A. Right.

Q. And you -- in fact I see what you're doing. You took the questions she gave you in her referral, and you put them in your report, and you answered them where appropriate, correct?

A. Exactly.

Q. Okay. And I'm reading down this list of questions. Would it be fair to say that these are all questions functionally asking was Mr. Nawara safe to return to work?

A. Yeah. Fitness for duty, generally safe and effective in one's position with co-workers, the public, and in this case detainees.

Q. Do you see on No. 6 on Exhibit 5, do you see No. 6 where it says, "Do you have any recommendations to prevent another occurrence?" Do you see that?

A. Yes. And I see you have some notes here. Are these your notes?

Q. Oh, sorry. These are my notes. Sorry. This was the Exhibit 5 that I got. So let me give you a clean copy to look at.



A. That's okay. I'm not going to read those notes into the record. I appreciate.

Q. The only question I have is do you know, what did you understand the word occurrence to mean in that question?

A. Right. The incident that allegedly took place on either 9-28 or 9-29-16, depending on who you speak to. I think it was just a question of which day it was. But yeah, the incident between Officer Nawara and his supervisor, Jones-Hayes.

Q. Okay. That's superintendent Jones-Hayes?

A. Yes, ma'am.

MS. MARMOR: Okay. Can we mark this as the next exhibit?

(WHEREUPON, Goldstein Deposition Exhibit No. 6 was marked for identification.)

BY MS. MARMOR:

Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Deposition Exhibit 6. I'll represent to you I just went to your website and printed off some



of the pages from your website. Does this look familiar to you?

A. Sure.

Q. Okay. And I just thought this would be a kind of quicker way of getting through things like your background and that kind of thing. You have a doctorate in clinical psychology from University of Chicago Medical School, is that correct?

A. No. It's a clinical psychology degree with a specialty in neuropsychology from what used to be called the Chicago Medical School, it's now Rosalyn Franklin School of Medicine, in science what I like to call the nom de guerre. But they changed the name. The University of Chicago is where I did most of my training and my fellowship.

Q. Great. Okay. And Rosalyn Franklin was a great lady.

A. Yes.

Q. When we're off the record, I'll tell you why I think that.

A. Okay.

Q. And you're board certified in clinical

neuropsychology?
A. I am.
Q. And you have specialty areas of research. I'm not going to cover all of them, but some of them include workplace violence, is that right?
A. I wouldn't say that that's really an area of research of mine. Because we have a public safety program and we deal generally speaking with mental health and, you know, occupational medicine in general we do that, but my research is more in neuro and in criminals and malingering and various neurocognitive disorders and things like that.
Q. Okay.
A. I have certainly presented on workplace violence and done teaching, but my area of research where I'm actually, you know, collecting data and whatnot is not in workplace violence.
Q. Okay. Great. Now, it says that you -- it says you treat both civilian populations and law enforcement personnel, is that right?
A. Right.



Q. Have you treated others from the Cook County Sheriff's Office?
A. No. I don't believe I have ever treated anybody --
Q. Okay.
A. -- from Cook County.
Q. The Sheriff's Office, that is.
A. From the Sheriff's Office, right. No. I don't think so. Not that I recall.
Q. Do you have any -- I'm just trying to get a sense of your interactions or your experiences with the Cook County Sheriff's Office. Have you had any involvement in how they set up fitness for duty exam processes at the Sheriff's Office?
A. Well, I don't think they are much different from the way that all of our other fitness for duty exams are set up. Typically there's a third party administrator, in this case CorVel, and they set it up with us directly rather than us getting a call directly, say, from a supervisor or HR at Cook County, and, you know, the idea is that it's supposed to be independent.



Q. Right. And I was asking a slightly different question. I appreciate that answer and have no problem with that answer, but it's a slightly different question, which is have you had any involvement in, say, consulting with the Sheriff's Office about how they make internally decisions about who to send for fitness for duty exam or not?
A. I don't know of any department that does that. That's all an administrative decision. Is that what you're asking? There are times when I receive calls from someone to say should we have a fitness for duty exam. Is that kind of what you're getting at?
Q. No. I'm really more getting at policies and procedures within the organization or what do you do if you see a problem with someone, and how -- you know, who makes the decision to send somebody for a fitness for duty exam?
A. No.
Q. No, you have had no involvement with that?
A. No. That's not my role.



Q. So the second page of Goldstein Deposition Exhibit 6 asks a useful question, which is what is a forensic evaluation. And my question to you is do you consider a fitness for duty exam a forensic evaluation?
A. I consider it quasi-legal, like worker comp. It is not -- there is no legal case pending before a court. Typically there's, you know, some administrative decision or in the case of pension disability, for example, there will be a board of police and fire commissioners. It's not going to get done in a formal court.
Q. But I'm asking does that mean it's not a forensic evaluation?
A. It's a type of forensic. Certainly wouldn't call it clinical evaluation. I mean, it's clinical in the sense that, you know, we conduct examinations on clinical issues, but there's no doctor-patient relationship, and that's really the bottom line of the difference.
Q. Right. And your website actually talks about some of those differences. It says it's not clinical. A clinical would be that a

treater or the patient himself would self-refer for an evaluation, and that's not the case in FFD, correct?
A. Well, they're not always self. Patients aren't always self-referred. The difference is is there a doctor-patient relationship or not. That's the bright line between clinical versus nonclinical.
Q. Okay. If you go to the third page of Exhibit 6 where it says, "The goal and scope of a clinical versus forensic evaluation."
A. Um-um.
Q. It says -- it's sort of -- there's a series of jump sites, but then it says, "The purpose of any evaluation should be evident by asking what is the referral question and should always be clearly stated at the beginning of a report." Is that right?
A. Right.
Q. Okay. And I think you did that here, and we'll look at your report in a moment. And let me just ask this. You need to know why the employer is asking for an FFD, right? That's why you want to know the referral question?



A. No. The referral question is fitness for duty.
Q. I see. Okay. And the fitness for duty question, however, comes from the employer, correct?
A. Right. It's prompted by some incident or some concern, right.
Q. Okay. Okay. If we can go to Page 4, where it says, "The nature of the relationship between examiner and examinee in a clinical versus forensic evaluation." Do you see that?
A. Right.
Q. And this is where you're talking about the fact that there's not a doctor-patient relationship, correct?
A. Exactly.
Q. One of the things I noticed in here is you say -- or the website says, "The examinee is not the holder of privilege. The third party that referred the individual for evaluation," and it gives examples including the employer, "owns the record and work product, and while some exceptions exist, in the vast majority of cases examinees are not entitled to the



examiner's report."
A. So this was created -- this website was created before McGreal v. Ostrov --
(WHEREUPON, there was a short interruption.)
THE WITNESS: Before McGreal, M-c-G-r-e-a-l, v Ostrov, O-s-t-r-o-v, which is an Illinois Appellate case, which had to do with a fitness for duty examination.
But one of the things that came out of it was the judge's decision that fitness for duty examination reports are in fact a type of medical record, and therefore, under the Illinois Confidentiality Act, examinees, fitness for duty examinees, can in fact have their report, and of course this would extend to pre-hire reports as well.
BY MS. MARMOR:
Q. So how far back did that decision go?
A. That's a 2004 decision.
Q. Perfect. Thank you. So Mr. Nawara would have had a right to your report?
A. Absolutely, and I would have told him so during the examination.



Q. Okay.
A. We are updating this website, by the way.
Q. Understood.
A. But it clearly does say there are some exceptions.
Q. Sure. If you could go to the -- go two pages in, so this would be the sixth page of Deposition Exhibit 6, the one that says, "Workplace Violence Evaluations."
And here there is a statement that says, "Workplace violence accounts for one in every six violent crimes in the United States and has been referred to as a national epidemic by the Center for Disease Control." Given what you just said, is that a fairly current statement?
A. I don't know.
Q. Do you believe workplace violence is a serious problem?
A. Of course.
Q. And the website goes on to say, "It encompasses physical assault, verbal threats, intimidation, harassment -- sexual harassment,

destruction of workplace property, off-site stalking and telephone harassment. In addition to increasing worker compensation premiums and liability risk for employers, workplace violence diminishes productivity and morale and increases employee turnover." Do you still agree with that statement?
A. Of course.
Q. Okay. I notice if you go down to the -- skip the next paragraph, but go to the next one. It says, "Both personality and environmental factors, actuarial and dynamic, can result in employee instability and risk for violence. Some of these factors include a history of aggression or escalating aggression, poor stress or frustration tolerance, poor coping resources or social support, impulsivity, possession of or access to firearms or other weapons," and then it goes on, "presence of an active substance abuse, psychiatric or personality disorder, a marked change in or decompensation of any of these conditions, and changes in level of interpersonal interaction or personal hygiene and changes in work



productivity." I'm going to stop right there. Is that all still accurate in your view?
A. Of course.
Q. Ends with, "Designation of a specific target, e.g., a host (sic) or co-worker."
A. A boss or co-worker.
Q. I'm sorry. I apologize.
A. It's okay. It's very small writing, and I'm amazed that I can actually read that.
Q. I'm sorry. I'll read that again. "Designation of a specific target, for example a boss or co-worker, and a sense of justification for the commission of a violent act." Do you see that?
A. Yes.
Q. Okay. So is there -- can there be cases of workplace violence where people are not necessarily potentially violent to everybody, but they have specific targets that they're angry at?
A. Absolutely.
Q. Okay. Is there a -- okay. If you could go to the last page of Deposition Exhibit 6 where it says, "Public Safety



Evaluations." I take it what you did here was not a public safety evaluation, correct?
A. No. We would not necessarily consider it -- I mean, it is and it isn't. We do a lot of pre-hire screening in our public safety program. But fitness for duty when it involves someone who's in a public safety sensitive position, which Officer Nawara is, it is part of public safety because he is dealing with community members, albeit they're detained. Of course he's also doing that if he goes on external operations, right.
So it is in this case fitness for duty is sort of like we also call them impaired professionals examinations, but it is about occupational medicine and occupational health. And so I would consider it in this particular case public safety.
Q. Okay. If you look at the last paragraph underneath the photograph here where it says, and I'll try and read this correctly, "Fitness for duty evaluations may become necessary when an individual encounters problems once in a public safety position." Sounds like



that's exactly what you were just talking about with Officer Nawara.
A. Yeah. Just to clarify, and I'm kicking myself that I wrote this so ambiguously, it is not that they're encountering a problem once, it's once they're in a position.
Q. Got it. I see.
A. Yeah.
Q. And then not the next sentence but the one after it says, "Clinicians review performance evaluations, disciplinary action and commendations, citizen complaints and compliments, conduct collateral interviews with supervisors, and review relevant medical records." Do you see that?
A. Yep.
Q. And we talked last time about medical records. I have a question about this, "conduct collateral interviews with supervisors." I don't think you did that here, correct?
A. No. We do that when we are allowed access to a department. So, for example, sometimes a chief will call us directly or a labor attorney will call us directly. They're

not using an IME company. And so we can have access.
In this particular case -- there are times when we're just not allowed to do that because we have independent medical evaluation, you know, we're not allowed basically. We don't have access. It limits us a little bit. And so we go with what we have.
And I can anticipate your next question is sure, I would have loved to have had discussion with anybody and anyone that either the County or Officer Nawara would have liked me to speak to.
**Q. And did you ask CorVel to speak to anyone?**
A. I don't remember if I did. But my fitness for duty process is always like that. You know, the more information, the better, can we have access. I think what they did instead is provide me correspondence between HR, for example, and superintendent --
**Q. Officer Nawara?**
A. No, between HR and --
**Q. Jones-Hayes?**



A. -- Jones-Hayes. And then also descriptions of their interactions during that meeting at HR. So that was what they gave me, yeah. Yeah.
**Q. Okay. And if you had asked to speak to, say, Jones-Hayes or the HR people, would you have expected to see that in your report?**
A. Right. Had I done collateral interviews, I would have indicated that in my report.
**Q. Well, I'm asking a little different question, which is if you had asked to meet with them and had been told no or something, would you put that in the report?**
A. Yeah.
MS. MARMOR: Okay. So let's -- it looks like you have a copy of your report. This is Goldstein Exhibit 1. I didn't bring extra copies because I gave them --
MR. BUSTAMANTE: I have it.
MS. MARMOR: Okay. Good.
Just please don't write on that, Lyle, because it's my official copy.
THE WITNESS: Can we go off the record for



one second?
MS. MARMOR: Sure.
(WHEREUPON, a discussion was had off the record.)
BY MS. MARMOR:
**Q. How many fitness for duty reports have you done for CorVel, roughly?**
A. CorVel? I don't know. Dozens and dozens, I imagine. I'm not sure. The IME company changes about every few years, so I don't really look at it as which IME company it's for.
**Q. All right. If you can guesstimate how many FFD reports have you done for Cook County Sheriff's Attorney employees?**
A. Only a handful.
**Q. So less than five?**
A. Yeah. Maybe. Not sure. Maybe more. Some of them are pension disability, so I don't really remember. I don't break them down like that.
**Q. I take it you have never worked for the Sheriff's Office as an employee.**
A. Oh, as an employee, no.



**Q. Have you worked for the Sheriff's Office as a consultant?**
A. Well, I'm not sure what the difference is between the city, county, and -- you know, I have been retained by attorneys to look at, for example -- well, that would be the city, I guess. I don't know if I have. I don't recall if I have.
**Q. Okay. And have you ever worked at a correctional facility?**
A. Not as an employee but spent about five to six days a week in Lake County Jail when I was conducting my research on psychopaths and was intimately involved in the day-to-day workings of that jail. I have been to many prisons. I have been to many jails. Heading to Graham Correctional tomorrow, was at Kane County twice last month. You know, it's a regular part of my work.
**Q. Have you been to the Cook County Jail here in Chicago?**
A. Absolutely.
**Q. And how many times have you been there?**
A. Probably a dozen.

Q. Have you ever been to the Cermak facility there?
A. Yes.
Q. And how many times have you been to Cermak?
A. Couple times, I think. I used to teach there. Maybe three times through the Isaac Ray Center. They had the contract there to provide all the mental health treatment there, the psychiatrists and psychologists. That was through the Isaac Ray Center. So I would go teach there as well and of course my colleagues there, we were in touch all the time.
Q. Was that mental health treatment for employees or for detainees?
A. No, for detainees. Yeah.
Q. Do you have any kind of sort of certificates or training in disciplinary procedures at jails?
A. I'm a psychologist, no.
Q. And do you understand the different roles played by supervisors in HR in the FFD referral process at the Cook County Sheriff's Office?

74

A. Can you be more specific? That's very general.
Q. That's why I'm asking the question. I just want to understand your foundation. Do you know who makes the referrals and how it's done?
A. I imagine every department is different. HR is typically involved when someone is contacting me because you can't put medical protected health information in someone's front personnel jacket.
So I'm either getting a call from HR or from a chief or from a labor attorney, and it's always going to go either to a labor attorney or to HR or both.
Q. Have you ever read -- there are management guidelines at the CCSO for how to do FFD referrals. Have you ever read those?
A. I don't know. Maybe. But it's not something I really -- I mean, it's not my role. You know, what I can say is that there have been times when I have been sent to fitness for duty examination, and I have declined to take it because I felt it was punitive or that the process was being misused.

75

I will accept a fitness for duty examination if I think that the prompting question is relevant and appropriate, it is some kind of mental health or cognitive issue where there has been some disruption at the workplace and somebody's been pulled off work as a result of that, and there may be a question of whether there is personality, mental health, substance use, or cognitive problem prompting the issue that may be treatable, and that there is a question of safety effectiveness, you know, within the workplace. So in this particular case I felt it was a good referral, and I accepted it.
Q. Okay. Thank you. And I assume you have never spoken to Winifred Shelby. That was the occupational nurse.
A. I don't know. There may have been one time where we -- I may have been copied on an e-mail to her, but I don't know that it was even this case. I just don't know.
Q. You have no memory of ever speaking to her about this case.
A. No.

76

Q. Same question about Rebecca Reierson. You've never spoken to her about this case?
A. Been too long. I don't think so. I just don't think so. We really tried to say separate. I don't know.
Q. And then the final person I'll ask about is Superintendent Jones-Hayes. You never spoke with her about her interactions with Mr. Nawara, correct?
A. I don't believe so, no.
Q. Okay. So if you could turn to Exhibit 1. Let me just find my copy of it. So the first page of -- and I'm just going to go --
A. Lovely picture. I was so young then.
Q. So this is, I take it, your form that you use for fitness for duty exams, correct?
A. Yes.
Q. Fitness for duty exam reports.
A. Sure.
Q. Okay. And it says that -- this is sent to Ms. Sarocka, and it notes that at her request on September 11, 2017 and September 12, 2017 you conducted an examination of Officer Nawara for the purpose of assessing his fitness to return

77

to duty as a correctional officer for the
Cook County Sheriff's Office. Do you see that?
A. Yes.
Q. Now, it says that, "The request for examination follows an interpersonal interaction between Officer Nawara and Superintendent Jones-Hayes that took place on September 29, 2016 in the basement of Cermak, the location of Officer Nawara's assignment that day." Do you see that?
A. Right.
Q. So one of my questions here, if you may recall at our last -- at the first day of this deposition you said you understood that there were two reasons he was sent. One was that event, but also there was the HR interaction.
A. Right.
Q. I'm just wondering why that wasn't included here, if you know.
A. That wasn't the prompting. That was not the prompting issue. He went to HR to discuss this issue. This is the prompting issue.
Q. But do you recall -- and I'll point you to letter C here on the first page of your



report where it says, "In addition" -- it says on 8-25-17 Cook County referral form from Human Resources describing the reasons for referral as, quote, "Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to routine directive. In addition, weeks later employee presented as aggressive and hostile in the Human Resources Department."
A. Okay.
Q. So my question really is -- even if this is the case, I just want to understand it. Were you more focused on the Jones-Hayes altercation than what happened with HR?
A. Not at all. My report addresses both.
Q. And did you understand that in fact both prompted his fitness for duty exam?
A. Sure. Sure.
Q. Really Page 2 -- Page 1 really covers what you say prompted the report and also the materials you were given to review, is that right?
A. Right.
Q. We've already basically gone over that,



so I am not going to retread that ground. Page 2 is -- Pages 2 and -- basically Pages 2 through 4, effectively they describe both what Jones-Hayes says happened and then what Mr. Nawara says happened. Is that a fair statement?
A. Right.
Q. Okay. And one of the things that I noticed, if you go to the middle of Page 2 where you're talking about what Superintendent Jones-Hayes said, she wrote in her statement, "Superintendent Hayes realized that something was going on with this officer and stated maybe it was something about her presence that set Nawara off. Until administration decided what was the required action to take, Superintendent Hayes decided to stay away from him after the incident." Do you see that?
A. Right.
Q. And remember when we were talking about the idea that people could focus their anger on, say, a boss or a single co-worker? One of my questions is did you do any sort of investigation to find out whether there was



something in fact particular to Superintendent Jones-Hayes that might have set Mr. Nawara off?
A. There is nothing that he said related to her in that -- that there was anything, you know, particular about her, simply that that day she seemed very annoyed with him when she came in, and he perceived that perhaps she was annoyed because there had just been a fight, and she counted on him to kind of keep things together. So his reaction was specific to that interaction. He never said there was any larger pattern with her.
So yeah, we would have covered that, and that's not what he said. It related very specifically to the events of that day and the way she perceived him and the way he perceived her, and that just didn't go well after that.
Q. And of course you're relying on him to tell you -- you can't make a judgment about whether he's telling you the truth, but you're relying on him to tell you whatever he's going to tell you.
A. I was very clear in this report that I have no way to confirm one way or another what

he said versus what she said. It's not my role, either.
Q. And it points out here, if you go to the next paragraph after that, the body of the text, that he remained in Cermak I guess for the next day, but then he was moved to external operations, correct?
A. Well, he went to a couple of different places. He originally was assigned to 3 North for about an hour, and then he went to 2 North, and then he was returned to the same place, this staging area in Cermak, and then they put him on external operations after that.
Q. Okay. So it was within a day or two?
A. Right.
Q. Okay. And then you point out, you note that he worked there until November 18, 2016, which was the day he went to Human Resources. And based on what happened there, he was told that they were going to send him for a fitness for duty exam, and they removed him from duty, correct?
A. Hold on. What you just said is not necessarily true. You say based on what



happened there they told him he was being removed. I don't know -- it seems to me they were calling him in on that day to tell him that he was being removed for fitness, but I don't know one way or another. You seem to be suggesting that what happened at HR prompted the decision for fitness, but I don't know that that's the case at all.
Q. Well, I will represent to you that the HR representatives -- and I'm sure there will be a dispute about this -- but they say very specifically no decision had been made until he came in, and one of them has testified that it was 99 percent what he did that day that caused them to remove him from duty and send -- remove him from work and send him for fitness for duty.
A. Okay.
Q. And I just really want to make the point that that is the point at which, it was only upon the HR visit that he was in fact removed from duty, correct?
A. All I can say is he was removed from duty after that meeting.
Q. Correct. Right.



A. I don't know the reason.
Q. That's fine. That's fine. And then you note that Officer Nawara apparently refused to comply with the fitness process as presented by Human Resources that day, missing deadlines to have his medical records delivered to Human Resources throughout the spring of 2017.
And you point out that while you were not provided a second letter, you did get a -- according to Dr. Kroll's fitness for duty examination, Officer Nawara reported he received a reminder letter from Human Resources on February 28, 2017 to complete the necessary forms to facilitate fitness process provided to him on November 18, 2016, similar to the November 30th letter that you did have, correct?
A. Right.
Q. Okay. And did you understand at the time that you met with him that he in fact rather than comply, he had filed a lawsuit?
A. No.
Q. Okay. Did you know that there was a lawsuit at the time that you took his examination?



A. I think he told me he was either involved in a lawsuit or getting ready to, but I specifically stayed away from that because the question put before me was simply a fitness for duty.
Q. Okay. Now, on Page 3 where it says, "During the interview here, Officer Nawara described a very different set of events."
Do you see that?
A. Yes.
Q. Was all of this information that you specifically elicited or is this information he wanted to volunteer?
A. No. I mean, it's always in response. It's an interactive process. So I will say, "Tell me what happened," and these are his -- this is his version of events.
Q. Okay. Because I'm reading, and it says, "For context he first described the basement setting details he felt were relevant to understanding the interaction between him and Superintendent Jones-Hayes that followed," and there's a lot of discussion here about whether there was a written policy and whether it was

**dangerous and all of these things. Were those things that you asked for him to give you or was that detail that --**
A. I see. No. I just let people go. So I just say, you know, "Tell me what you feel is relevant. Tell me what you feel is important. I would like to hear your version of events." And I think he kind of said, well, there's a few things, to provide some context.
Those were not his words, but he was setting the scene, if you will, so that I could understand what may have caused some of the tension there. So that's how I like to do my interviews. I just say, "Tell me what you think led to this," and this is what he offered.
**Q. Okay. So he disputed that there was a written policy about restraining detainees, is that right?**
A. Right.
**Q. And you didn't do anything one way or another to determine if that was true.**
A. No.
**Q. And he discussed his own opinions about why, even if that was the policy, it wasn't**



**really possible to comply?**
A. Yes. He expressed those concerns. Yes.
**Q. And he talked about what he considered to be the unsafe environment in that location?**
A. He did.
**Q. Okay. And did he express any awareness that that was why it was in fact important to have detainees restrained? Since it's unsafe, it's important to have detainees restrained?**
A. Oh, I think he appreciated what the point of manacles and shackles are for. His concern was that if some are not -- the way I understood it is that if some are not shackled or manacled and some are, there are situations he was explaining where some detainees strike others who are then helpless because they're manacled. You know, they've got their hands behind their back. Or they're shackled to a bench and can't go anywhere.
So he was talking about, you know, a lack of equipment being available and things like that, and just being -- you know, his perception. I don't want to put words in his



mouth, but his perception of why that is a rather intense situation down there, yeah.
**Q. But it was also the case that when Superintendent Jones-Hayes arrived, one of the things she was annoyed about him was not -- that everybody was not manacled and shackled, correct?**
A. Yes.
**Q. Okay. And he claims he was calm, and she was agitated and poked him in the chest, correct?**
A. I don't think he claimed, "Oh, I was perfectly calm." I mean, he saw that she was kind of annoyed, and he admitted to getting sarcastic and, you know, disagreeing with what she had to say.
And in his -- in his mind -- again, his perception is that she aggressed first by putting her finger toward him or nearly touching him or touching him, whatever happened it's not for me to say, but it just went badly. He thought that her verbal exchange was that she was expressing annoyance that things were sort of in disarray, and he responded to that, and it



just really spiraled and went downhill.
**Q. Was he saying basically she was being critical of him?**
A. Yeah. The way he described it was it was almost like he was drawing the inference. What he said was, you know, I used to be on this -- you know, maybe she expected more from me because it was this fight that just broke out, and that was the reason that they were called down here, you know, her with Sergeant Connolly. That was the reason they were called down.
And I perceived, essentially kind of inferred, not like she said it, but that he felt like she was annoyed, as if to say -- again, it's an inference, but that, you know, why is everything in disarray here, what's going on, you know?
**Q. I'm looking at Page 3. You quote -- there is a quote here. It starts out not as a quote, but it says there was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said, "Why is that inmate not cuffed?" Do you see that there?**

A. Right.
Q. So was he saying that she was saying that to him?
A. Well, I assume so, because -- and she's putting his finger in my chest. He didn't say that was specifically aimed at him, but, you know, he is saying, quote, "I could just see she was annoyed."
She was saying why is that inmate not cuffed. Whether that's aimed particularly at him or, you know, loud enough for him to hear, clearly he's an officer there, so it was intended for him to hear. Maybe there were other people who it was intended for as well.
But it's his assignment. So for him to infer that that was something that he should take note of is not unreasonable. And then he is saying, "And then she's putting her finger in my chest." I don't know if those things happened at the same moment --
Q. Or at all.
A. -- simultaneously. That's right, or at all.
Q. And I don't want to beat a dead horse.



A. That's okay.
Q. We can leave the question of what happened between them really to the jury, correct?
A. Yeah.
Q. You weren't there, and the jury will end up deciding that.
A. Absolutely.
Q. Okay. Now, he also says that after she left, he had some sort of an issue with somebody who didn't want to be shackled. Do you see that? It starts with dot, dot, dot on Page 4. Do you see where it says dot, dot, dot, "She leaves with Connolly"? The second full paragraph.
A. Okay.
Q. And he says he was being sarcastic. He walked over to Sergeant Connolly and said, And yes, I am sure I was being a little sarcastic here. I said, Hey, Serge. Serge, I got a shackle for the unshackled detainee.
Connolly says he'll come with me to shackle this guy, but Superintendent Jones-Hayes has finished her call and said now I will go



with you. And she does, and he took some umbrage of her allegedly saying, Baby, Baby, I need you to shackle up for this officer. He did, and he did calm down. But what Nawara told you was, As we walked away, I said maybe if you follow me around all day, I could do my job. Do you see that?
A. Right.
Q. And did he say how he said this to her, whether it was, you know, putting his mouth to her ear, whether he was yelling, anything like that?
A. First let me back up. I don't see anywhere where I say he took umbrage with her. He just simply described factually what she did. In other words, she stepped in because she had previously said, "Now you're in charge, and you should be handling this."
So then when he offers to go and shackle this person, she says, "No. I'll do it." So she took over, and he says to her, "Well, you know, maybe if you follow me around all day, I could do my job." Of course he was being sarcastic. He admitted that he was being



sarcastic. He was annoyed.
Q. Right. So he did take umbrage at what she was doing.
A. I don't know that. No. I can't say that. I think that's an inference that's not reasonable here. I think that he was upset with the whole interaction to begin with, and she continued to -- you know, she was there, and he wasn't pleased at how their interaction was going in general. I don't know that it was related to her shackling that person.
Q. Okay. So what do you think, "Maybe if you follow me around all day, I could do my job" was referring to?
A. Generally speaking she was complaining -- she had said, "I know you're in charge, and you should be handling this." She was criticizing his work. She came down and said, why is this place -- in essence, why is this place in disarray? Those are not her words.
But he even said, "My perception is she was annoyed with me when she walked in because there had just been a fight, and she was

criticizing me." "Who's the officer in charge? I know you're in charge. You should be handling this." So he is defensive. And if that's what you call taking umbrage, okay. But he admitted he got sarcastic. He was sarcastic with Connolly, too. "Hey, look. I found a shackle."

He just didn't appreciate being -- the way that he describes it he didn't appreciate being criticized when in his view he was handling things the best that he could.

**Q. Right. And we had talked about -- I'd asked did he feel criticized. I wanted to establish it does seem like he felt criticized, correct?**

A. Sure.

**Q. Okay. Then you go on to this November 18, 2016 meeting in Human Resources, and you say, "Officer Nawara explained that it seemed to go badly from the start." Did you tell him that they had in their referral very specifically said that he was hostile and aggressive?**

A. I'm sure we talked openly about it, yeah.

**Q. What did he say about that?**

94

A. Well, would you like me to read my report?

**Q. Well, I don't see any reference to whether or not -- to him denying being hostile or aggressive in here, and that's why I was wondering whether that even came up.**

A. I'm not sure exactly what -- you mean what he might have said or done?

**Q. Yeah.**

A. I don't think that he was denying that that went badly. I mean, he picked up and left and just said, "I'm not going to be a part of this," and he explained why, and that's what's here.

**Q. Okay. Did you -- one of the comments here is that Nurse Shelby told him this wasn't an OPR review. Do you see that?**

A. Yes.

**Q. And what did you understand that to mean?**

A. That he wasn't under professional review. You know, the Office of Professional Review or whatever OPR stands for, that he was asking for representation, and she was trying to say perhaps, well, this isn't that type of investigation. He was uncomfortable. He wanted representation, anyway. There was tension, there was defensiveness, et cetera. He just wasn't comfortable.

95

He also didn't feel that he was getting a direct explanation as to the reason that he was there. Now, of course I was not there. They may have been trying to tell him, and he was defensive. I think he was very clearly defensive to having to be there to begin with.

And, you know, this idea that he wanted to call union representation, I mean, he even said that may have inflamed an already intense situation. So he was accepting some responsibility for things just spiraling and going badly.

**Q. Did he in fact tell you that he left the meeting to call his union rep?**

A. Yes.

**Q. Okay. And then he went back with the union rep. Did you understand that there were two separate parts to this meeting?**

A. Right.

96

**Q. Okay. And you could see you were not provided details regarding what occurred in the HR meeting other than the general description that was provided with the referral, correct?**

A. Right.

**Q. Okay.**

A. But, I mean, it did say I think threatening and aggressive behavior. Employee's aggressive, physically intimidating, and inappropriate behavior, right? I'm sorry.

**Q. That was the first one.**

A. That was the first one. And then the concerns about anger management just I think were -- persisted based on how he behaved in that meeting in that he was defensive and angry and uncooperative.

**Q. The words are hostile and aggressive.**

A. Yes.

**Q. Okay. One of the things that -- it says, then, Officer Nawara -- after -- you concede to the point we were just talking about, which is that you didn't have all the details about that meeting, from the Sheriff's Office at least.**

97

It says, "Officer Nawara ultimately refused to sign a waiver for release of his medical records to Nurse Shelby and left the meeting." Do you see that?
A. Yes.
Q. Did you guys discuss the fact that he in fact had been given two different forms to sign that day, and he signed neither of them?
A. I don't know. But he said Officer Nawara ultimately refused to sign the waiver for release of his medical records.
Q. To Nurse Shelby. There's a reason I'm asking. One was going to Nurse Shelby, and one was simply for CorVel.
A. Oh, yeah. He did explain. He said, I'm not going to -- generally speaking -- I mean, he may have misunderstood. I don't know. I don't want to -- bottom line, he wouldn't release any medical records to anywhere.
I think you know he went on to make this point about how he would be willing to send them directly to CorVel, and then there was some disagreement about whether that was true or not, and he felt that he was sort of

98

creating some new policy about things going directly to CorVel when in fact perhaps that was not the case. You know, that's neither here nor there.
The bottom line was, as far as I was concerned, he wasn't going to cooperate with that process as they put it to him. He was not comfortable with it.
Q. With any part of the FFD process.
A. At that point it sounds like it, right.
Q. Thank you. He then explained that -- it goes on, says he explained that at that point he felt he was being paid in some way, and he was talking about that. And it says one of the things he thought was going on was that he had recently filed a complaint against Superintendent Jones-Hayes. Do you see that?
A. I do.
Q. Do you have any basis to know whether Superintendent Jones-Hayes or anybody in HR even knew he had filed the complaint?
A. Not at all.
Q. Okay. He added that because he believes Nurse Shelby and Superintendent

99

Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources. Do you see that?
A. Yes.
Q. Did you ask him why he thought Superintendent Jones-Hayes and Nurse Shelby were personal friends?
A. I'm sure that I did, but the point here is I don't know one way or another. And I said because he believes. So that's all that really matters. He is describing his perception. I don't know that that's true or not.
I think the point here is that he was trying to say, "I just didn't feel that this was objective. I wasn't comfortable. I didn't want to do it." I have no way to know one way or another whether any of that is true or not, but he was defensive, he was uncomfortable, he just didn't want to play.
Q. The reason I ask is you understand Jones-Hayes is the superintendent at the jail.
A. Yes.
Q. And Nurse Shelby is an occupational health nurse in HR.

100

A. Yes.
Q. And in fact the only apparent thing they have in common is that they're both African-American women. Did he tell you that, that they were both African-American women?
A. No. I would have absolutely written that if I thought that he was creating some race bias here or something. He very clearly felt -- I mean, he talked about, "I feel like I have been scapegoat." He used that word. "I have to take my lumps."
He definitely described a perception of being mistreated or treated unfairly. Again, I have no way to know whether that is true or not, but this is the reason for his anger.
MS. MARMOR: I need to take a quick break to get some more water.
THE WITNESS: Sure.
(WHEREUPON, there was a short interruption.)
BY MS. MARMOR:
Q. At the bottom of that paragraph it says, "He did ultimately leave with an understanding that the fitness examination was

101

being requested based on threatening behavior toward his superior officer related to the September incident with Superintendent Jones-Hayes."
So two questions about this because it's a little confusing. Did he leave the -- are you saying he left the HR meeting --
A. Yes.
Q. -- or left your interview?
A. The HR meeting. The point being that at the start he was saying, "They refused to tell me why I" -- or "I was not getting a clear response as to why I was there and what the issue was," so by the end of the meeting he left with an understanding that the fitness for duty examination was being sought because of this incident back in September.
Q. And I take it he didn't tell you that he also understood that his behavior with HR was another reason he was being sent for the fitness for duty exam.
A. Well, I don't know how he could have known that since the decision apparently was made -- at least the way he told me is that at



the moment that he left the HR meeting, it was his understanding that he was being requested to undergo fitness for duty based on the September incident.
Q. But you don't -- and I understand. I'm just simply trying to establish what you don't -- the things you don't know, for example, that there was a conversation in the HR meeting that based on his behavior in the HR meeting he was being sent for a fitness for duty exam.
A. I can't know that one way or another.
Q. And he didn't report that to you.
A. What he reported was that he left with the understanding that the basis for the fitness for duty examination was the September incident.
Q. Okay. The next paragraph goes into what I would say are kind of any kind of reports about stressors and any kind of life dysfunction. Would that be a fair statement about what this is about?
A. Right.
Q. I take it that you found no evidence of significant symptoms or significant life dysfunction?



A. Right.
Q. And what do you mean by that, by life dysfunction?
A. Often times when people have a full-blown psychiatric disorder, by definition they are having impairment in various areas of their life. They can show up in work. They can show up in parenting. They can show up in taking care of themselves, you know, hygiene and all of that, ability to pay bills and manage their home life and things like that.
Q. Did you also find that there was no significant life dysfunction from the stress that he reported from his difference of opinion, let's say, with his employer?
A. Yes.
Q. And that actually -- if we go to the next page, you see the first full paragraph, it says, "During the interview here, Officer Nawara denied ever experiencing significant psychiatric symptoms in his life. And while he described understandable stress and frustration with the work situation at Cook County, he denies a significant life dysfunction in any



critical area."
So my reading that properly, is that meant to say, well, even though there was stress, it wasn't causing any major life dysfunction?
A. Right. And also, as you see, it didn't rise that -- any symptoms that he had did not rise to the level of any psychiatric disorder, so that's consistent with somebody who would not have significant adaptive functioning problems or significant impairments in occupational functioning, personal, social functioning, parenting, whatever might be relevant in that person's life, school, et cetera.
Q. And in fact if you go back to Dr. Hogueisson, she offered no psychiatric diagnosis in any of her notes, is that right?
MR. BUSTAMANTE: Objection. Ms. Hogueisson is not a doctor.
MS. MARMOR: Right.
BY MS. MARMOR:
Q. Ms. Hogueisson.
A. Right. There were three notes available for review between -- a couple in

February and one in April of 2017, and she did not offer any psychiatric diagnosis, and she just describes some mild symptoms, decreased energy, motivation, sleep, diminished sense of self-worth, restlessness, feelings of hopelessness and worry about his job status. Those are all understandable adjustment issues related to an identifiable stressor in his life. And she did not make any diagnosis. She certainly could have as an LCPC, a Licensed Clinical Professional Counselor.
Q. Okay. Back to Page 5. It says -- it notes that he split with his fiance since November of 2016, and they have ended a nine-year relationship. Noted he began dating a new woman about which he feels very positively, hopes it continues to work out.
And then it says he claims the mildly elevated creatinine and glucose levels have normalized. While he refuses to be worked up for possible sleep apnea, he denies daytime somnolence or driving problems. Do you see that?
A. Yes.



Q. Sleep apnea can cause irritation, correct?
A. Well, let's say that the more proximal cause is sleep deprivation, right. Whether it's from obstructive sleep apnea syndrome or anything else, anything that leads to sleep disruption and sleep deprivation and fatigue will certainly leave a person more vulnerable to poor frustration tolerance, irritability, agitation, et cetera.
Q. And I just want to check something here. Well, the thing I was looking for is you recall that he had been told that he had elevated creatinine levels and that there was this question about what supplements might be causing that.
A. Yes.
Q. And he states in here that he claims elevated creatinine and blood glucose levels have normalized. Did you see any medical records that actually confirmed that?
A. Give me a moment. I had some primary care records through --
Q. That was Dr. Shaw.



A. You know what? Through February of 2017. So no, I would not have seen recent labs.
Q. Okay. And you recall that there were at least two notes in his -- well, it doesn't matter. I have got the notes.
A. There was clearly a discussion with his primary care physician about dietary supplements and their potential impact on creatinine and levels, and just generally speaking, you know, they are not FDA approved, so they can cause issues, you know, in some people.
Q. Right.
A. Right.
Q. And at the end of this paragraph here it says he insists -- or but insists that he does not display the type of anger outbursts that Superintendent Jones-Hayes described. Do you see that?
A. Yes.
Q. And again, it sounds like there was no discussion maybe because it just wasn't sort of focus of all of this, whether he denied any angry outbursts with HR.
A. Oh, I don't think he denied that at



all. He was angry. No. I mean, he was defensive, and he didn't want to be there. I mean, he described a -- he said it just went bad from the start. He felt defensive. He didn't know why he was there. Nobody was really talking to him. He got so annoyed he left.
Q. Fair enough.
A. Yeah.
Q. So then the next page goes to your conclusions and opinions, if you turn to the next page.
A. Yes.
Q. And you really answered the first two questions together, which was does he have a health condition that impairs his ability to perform the essential functions which require he maintain composure and respond appropriately in high stress environment, including exhibiting proper behavior towards detainees and superior officers.
Position requires this individual to diffuse disruptive behavior verbally and deescalate it effectively and properly use limited force on problematic and combative

inmates, and that's the list of his position as outlined in his job description.
It also says does Mr. Nawara pose a safety risk to himself or others if he returns to work full duty. Do you see that?
A. Right.
Q. Okay. And to be clear -- and you answered fundamentally he's fit for duty, correct?
A. Right.
Q. Okay. And to be fair this was nearly a full year after September 29, 2016 altercation with Jones-Hayes.
A. Right.
Q. And it was about 11 months after the HR interaction.
A. Sure.
Q. And is it possible that there were things that were going on in his life that you just don't know about at that time that could have in fact predisposed him to being angry or having outbursts at that time?
A. You're saying are there -- is it possible that there were things that he withheld

110

from me which could have led to -- or helped explain why there was an outburst at the time?
Q. Yes.
A. Sure. I don't have a crystal ball, and I'm not a human lie detector.
Q. And you understood that the Sheriff's Office had been trying to get him to cooperate with the FFD process since November of 2017.
A. Right.
Q. And of course he had not cooperated until shortly before he met with you.
A. Well, my understanding is he sought his own fitness for duty examination. I don't necessarily consider that cooperation, but it certainly seems like he was attempting to address the fitness issue in his own way. But certainly I would say that is not cooperating with the department.
Q. Right. And in fact Dr. Kroll had no information from his employer.
A. Exactly.
Q. And had no medical records.
A. That's exactly right. So there would be limitations in what she could or could not

111

conclude.
Q. Did you rely on her opinions in reaching yours?
A. Not at all.
Q. You then -- you go through the results of your tests, and you say he had moderate defensiveness. What does that mean?
A. So response bias, a person's approach, which is what we say, a person's approach to the test, has to do with whether they may be exaggerating certain psychiatric symptoms or their status, minimizing certain psychiatric stability or symptoms.
And what I mention here is that it's not uncommon for people in personnel examinations, we see the same thing in custody, to say, look, there is nothing to see here. I'm fine. Everything's fine.
He was not more defensive than other people going through similar types of examinations, fitness for duty, pre-hire screening, et cetera. So in other words, it wasn't so defensive that we learned nothing about him and that it invalidated the clinical

112

results, the clinical interpretation. But one always has to keep in mind -- and again, these tests are also not, you know, lie detectors, either.
I identified some response bias. He was defensive. I did not feel he was more defensive than other people that I have seen for other 20 years, and he did not invalidate his psych. It was consistent with what he was saying and consistent with other people going through fitness for duty. But of course there was some response bias there.
Q. To put it in complete layperson's terms, do you take what they say with a grain of salt?
A. Always.
Q. Okay. So you then go on to say -- this is the paragraph at the bottom. "While it is my opinion based on available information that Officer Nawara did not have a personality disorder, per se, he does possess obsessive-compulsive and narcissistic personality traits which may shed light on some of his interpersonal reactions." Do you see

113

that?
A. Yes.
Q. And I assume you were talking about obsessive-compulsive disorder and narcissistic personality disorder are things that are in the Diagnostic & Statistical --
A. Statistical manual, yes, in the -- currently the 5th version. That's right. So sometimes people have -- those are personality disorders. Sometimes people have certain traits which impact them, but it doesn't rise to the level of a disorder, so it is not entirely impairing.
However, personality traits can be -- you know, can really color your interpersonal interactions in particular with people. I guess the way we would think about personality traits and disorders is that it's your filler on everything, it's the way you interpret everything, the way people talk to you, the way -- what you infer from what you're seeing and how people are treating you.
And as I mentioned here, these types of traits can lead one to be somewhat rigid and



sort of miss the gray, everything is black and white, not see the forest for the trees, be somewhat narcissistic which, at its core, means that someone is actually -- sort of has some low self-esteem or, you know, may be particularly sensitive to criticism and therefore react strongly if one perceives that one is being criticized, true or not. That's the filter.
Q. So -- thank you. Appreciate that. Now you understand why I was asking some of my questions. I'd just like to quickly -- I don't want to belabor this, but I would like to quickly take a look at the DSMs.
MR. BUSTAMANTE: I don't want to belabor it, but let me do it, anyway.
THE WITNESS: I appreciate your process. It's good.
(WHEREUPON, Goldstein Deposition Exhibit No. 7 was marked for identification.)
BY MS. MARMOR:
Q. So Dr. Goldstein, the court reporter has handed you Goldstein Exhibit 7, and this is relevant pages from the Diagnostic and



Statistical Manual of Mental Disorders, 5th edition. This one is about obsessive-compulsive personality disorder. Do you see that?
A. Yes.
Q. And it's broken down into various forms. First there is diagnostic criteria, and a person with this full-blown disorder has a pervasive pattern of preoccupation with orderliness, perfectionism, and mental and interpersonal control, at the expense of flexibility, openness, and efficiency. Do you see that?
A. Yes.
Q. So it sounds like what you were just saying was that Officer Nawara has a certain rigidity that -- and did he also in your view need some sort of interpersonal control that led to some of the outcomes here?
MR. BUSTAMANTE: Objection to the form of the question. No diagnosis was made of Officer Nawara as having this particular disorder, and the report refers only to traits.
Counsel's question --
MS. MARMOR: I understand --



MR. BUSTAMANTE: Let me finish my objection. Counsel's question implies that the traits that you have read are the traits that were observed, and I object.
MS. MARMOR: I'm giving the doctor the opportunity to tell me what I have got right and what I've got wrong.
THE WITNESS: It's not right or wrong because nothing is black and white. The idea with people who have obsessive-compulsive traits, it's not that they necessarily have to have control, but the perception of not being in control can lead one to be anxious.
When things -- when gray is involved, and they like black and white, it can lead to anxiety and a sense of kind of losing one's foothold, if you will. So I can't say in Officer Nawara's case, oh, he specifically felt he was losing control. That's not what he said, and that's not necessarily how he described the situation.
I think that even he, by his own admission, has insight into his personality traits, and, you know, describes himself as kind

of a black and white guy. I write things down, and I like things one way or another, and I don't necessarily see the gray. He had some insight.

And I think in general when you see somebody who's a bit of a Boy Scout, who's overly conscientious, they have a high justice principle, this can lead them, because of their inflexibility, to be quick in the moment to interpret, particularly criticism, very keenly, to take it hard, and to react strongly.

BY MS. MARMOR:

**Q. And can that justice principle -- I'll give you an example. Officer Nawara described Nurse Shelby as unethical after having only sat with her for about 20 minutes. Is that consistent with these kinds of traits? Looking at this, for example, which is, you know, overconscientious, scrupulous, and inflexible about matters of morality, ethics, or values?**

A. I would say the combination of both obsessive-compulsive personality traits and narcissism. There is a grandiosity there. You know, "I'm going to label you as unethical."

118

But again, that's very black and white.

Unethical is an extremely strong word, and most people don't necessarily understand the ethics of one profession or another unless they deal with this quite a lot. So unethical is a very serious accusation.

I think generally speaking what I inferred from what he was saying, and I think he was very clear, is that he felt defensive and angry over having been criticized. He thought the whole process was a bunch of BS. That's bullshit, if you need me to spell that. And he became angry. He took issue with how he perceived he was being treated, and therefore couldn't participate in the manner in which they asked him because he just thought the whole thing was unfair and unjust.

Are there personality traits that could lead him to be vulnerable to interpret all of that in that way? Absolutely. Even if it were not intended in that way or if it were factually untrue, absolutely. I have no way one way or another to know whether it's factually correct or not.

119

So to say this is all personality or all, you know, his misinterpretation, I can't say that, either, but he certainly would be vulnerable to take criticism very harshly and respond defensively.

**Q. And for a layperson who doesn't have your experience, are they -- is it -- would it be hard for them to be able to say, oh, this is just traits rather than a full-blown personality disorder or a full-blown problem?**

MR. BUSTAMANTE: Objection to form of the question.

MS. MARMOR: You don't need to coach. I get it.

MR. BUSTAMANTE: Sorry. I don't know --

MS. MARMOR: Form is fine.

MR. HENRETTY: Form and foundation are the only ones --

MS. MARMOR: Yeah. Form is fine.

MR. BUSTAMANTE: Give me a chance to --

MS. MARMOR: No. Form is fine.

MR. HENRETTY: Federal deposition. Form and foundation are the only two --

MS. MARMOR: We do not have a lot of time.

120

Please. I hear your form objection. I think the witness understands the question.

MR. BUSTAMANTE: Reread the question for me, please. One second.

(WHEREUPON, the record was read by the reporter as requested.)

MR. BUSTAMANTE: My objection is that he did not diagnose himself.

Go ahead.

THE WITNESS: If I understand you correctly, and please correct me --

BY MS. MARMOR:

**Q. Yes.**

A. -- if I understand what you're asking is would people on the receiving end of his defensiveness or what might appear to be anger, would they necessarily come to the conclusion that what I'm looking at is actually anxiety, not anger? Or goodness, he's so rigid. Or goodness, he's so overly conscientious. Or goodness, he's so sensitive to criticism. No. They're not psychologists. And so as a psychologist we see subtitles. And what can come across as anger is actually anxiety, and we

121

know this very well.
And so no, I don't think that they would have understood at all what they were seeing, and they would have immediately said, "This guy has an anger problem" when in fact it may not be that at all.
Q. Thank you. You put my question much better than I did.
If you could go to the next page of Exhibit 7 under Associated Features Supporting Diagnosis.
A. Yeah.
Q. I notice that it says that people -- that they are prone -- if you go sort of halfway down the first paragraph, it says, "They are prone to become upset or angry in situations in which they are not able to maintain control of their physical or interpersonal environment, although the anger is typically not expressed directly."
And then further down it says, "Individuals with this disorder may be especially attentive to their relative status in dominance-submission relationships and may



display excessive deference to an authority they respect and excessive resistance to authority they do not respect." Do you see that?
A. Right.
Q. So if in fact there was an issue here of the fact that there were these women who were in positions of authority over him telling him what to do, could his hostility that they were asking him to do also be related to these kinds of traits?
A. Let me take the gender out of this because I think that's making an assumption. And again, I didn't get that from him. That doesn't mean it doesn't exist. That was not part of our discussion, and perhaps that's because I'm a woman. I don't know.
But to be fair in general this is another example of black and white. Also some grandiosity thrown in there. I either respect you or I don't. There's not a lot of in between. And if I don't respect you, I am much more likely to have a response -- if I don't like what you're doing, and I find it unjust, I'm much more likely to have a strong response



and not be able to control myself. Either I'm anxious or I'm angry. Doesn't really matter. I'm going to feel defensive.
Q. And I don't know if this mattered to you at all, but I do note under Gender-Related Diagnostic Issues, it says, "In systematic studies obsessive-compulsive personality disorder appears to be diagnosed about twice as often among males." Did that matter to you?
A. No. Just to be clear, I didn't diagnose him with any personality disorder. He just has some traits.
Q. And also points out in the Differential Diagnosis section on this page that narcissistic personality disorder can be part of all of this as well, is that right?
A. Sure. I mean, people have a lot of different -- there is this concept of personality disorder not otherwise specified. He does not have that. However, the idea is that some people just have -- there is no prominent personality traits one way or another. There's a bit of a combination of things that helps one understand why a person interprets



things the way that they do, how it colors their world, how they perceive, why they make certain decisions. That's what personality traits are. They're very fixed. You know, we don't really change them much. But I will say he was rather insightful about his. He knows. He knows.
Q. That he has these problems?
A. I wouldn't say problems.
MR. BUSTAMANTE: Objection.
THE WITNESS: Yeah. I wouldn't say problems. I would say traits. I think he was aware of some of his rigidity, as he would call it. He's not going to talk about it as obsessive-compulsive traits. Perhaps less aware of his tendency to be grandiose and narcissistic.
But again, I think that's not a major factor. It just helps one understand the manner in which he describes, you know, or interprets, you know, I am making new policy here, and what I'm doing is so important, and whether that's factually correct or not doesn't matter. In his view it is really important.
So it helps one understand why he dug

his heels in perhaps so hard about this process, because he feels that he is not only doing for himself, but perhaps takes issue with a policy that needs changing in his opinion, and therefore, he was reacting strongly because he felt it wasn't just for him but for other people, too, and that's the Boy Scout in him.

MS. MARMOR: Mark this as the next exhibit.

(WHEREUPON, Goldstein Deposition Exhibit No. 8 was marked for identification.)

BY MS. MARMOR:

Q. Dr. Goldstein, the court reporter has handed you what's been marked as Goldstein Exhibit 8, and this is the DSM 5th edition about narcissistic personality disorder.

This is a pervasive -- you used the word grandiosity a few times, and this is for a full-blown disorder, "A pervasive pattern of grandiosity, a need for admiration, and lack of empathy beginning by early adulthood." Do you see that?

MR. BUSTAMANTE: Objection to the form of the question for full-blown disorder.



BY MS. MARMOR:

Q. And I really just want to focus on Page 670 and 671, which is the next page. Under Diagnostic Features it says in the second paragraph, "Individuals with this disorder have a grandiose sense of self-importance. They routinely overestimate their abilities and inflate their accomplishments, often appearing boastful and pretentious."

And then if you go to under Associated Features Supporting Diagnosis, it says, "Vulnerability in self-esteem makes individuals with narcissistic personality disorder very sensitive to injury from criticism or defeat." Is that what you've been talking about a little bit?

A. Yes. And just to be clear, not all aspects of narcissism I think are relevant here. I describe what I think were the relevant aspects of narcissistic traits. And again, we have talked about them, but it's this idea of being sensitive to criticism because of the manner in which they may perceive certain people as I either respect you or I don't.



Q. We talked the first day about the fact that in a setting like Cook County Jail deference to authority pretty much matters, right?

A. Yes.

Q. So hostility to criticism could be a problem in that context, correct?

A. Certainly if it were a pervasive problem, yes.

Q. And I just point out that it says that, "A person with narcissistic personality disorder may react with disdain, rage, or defiant counterattacks." Do you see that?

A. If they perceive themselves as being criticized.

Q. Right. And really just to sort of close this out, you have already basically said this, but to a layperson if there is a narcissistic trait that leads you to react with rage or disdain or counterattack, a layperson may not be as well-suited as you are to be able to distinguish what's causing that.

A. Maybe I would answer it another way. I don't know that it matters what's causing it.



From a fitness for duty standpoint if there is a pervasive pattern of anger problems and interpersonal difficulties that impact one's ability to do the job safely and effectively, then there's a problem, and you're going to see all kinds of disciplinary action and verbal counseling and complaints other people don't want to work with this person, et cetera. That's where the issue would be.

So in a way it doesn't matter whether somebody who is on the receiving end of that, if I understand your question correctly, understands it or not. It doesn't really matter. It's -- whether you understand it or not, it's about whether it's causing problems on the job.

Q. One of the things -- let's go back to your report. You talk about he presents himself as accomplishing and taking on big, important matters. Do you see that? The bottom of Page 6.

And in quotes -- you have a couple of quotes here, and one of them is, "I have made new policy by insisting my medical records go

directly to CorVel rather than Human Resources."
Do you see that?
A. Yeah. That was what he presented to me.
Q. So when you put it in quotes, pretty close to exactly what he said?
A. That's exactly what he said.
Q. Okay. And you write, "Notably the latter is not so. According to CorVel at the time the initial examination was requested on November 18, 2016, providing medical records to CorVel was in fact an option."
A. This may be the second release you were referring to.
Q. Right. But I just want to understand. So after you talk to him, you went back and talked to CorVel about this?
A. Right.
Q. And they told you it wasn't accurate.
A. True.
Q. Okay. Now, you talk about you don't find, in the next paragraph, that he experienced chronic anger management difficulties on the job, and you've just been talking a little bit

130

about that as well.
One of the things that I'm trying to understand is let's say this was the beginning of something. Maybe he hadn't historically had serious problems, but something was going on in 2016, and, you know, in fairly short succession he had two rage experiences with people, what they perceived as rage experiences or rage incidents with two people who -- at the Sheriff's Office. Is that not enough to raise a concern?
A. First of all, let me just say I don't put a lot of stock into what happened in HR because he was defensive and being pulled in for something he didn't think -- that was not something I considered to have happened on the job so much as it is that he just didn't agree with why he was being pulled in.
I see that all the time. Officers don't appreciate being pulled in and scolded or told that they have to go for fitness for duty exams. So many people come to my office and they are pissed off. They feel that it's punitive and all of that. So I don't really put

131

much stock in that.
Q. Let me be clear. So whatever Nurse Shelby or Rebecca Reierson, they testified that -- or at least Nurse Shelby has and Rebecca Reierson will testify they were afraid in that meeting.
MR. BUSTAMANTE: Object. You interrupted the witness. She had not finished answering, and I just want to point that out. That was not appropriate.
MS. MARMOR: You pointed it out.
THE WITNESS: Yeah. I appreciate. And I don't -- even if -- let me just assume that all of that is correct. I think that's a very specific situation that was not while he was performing his duties, his daily duties. That was a very special situation.
And I frequently see this, that the moment somebody gets pulled off the job and told there is a problem with you, you need to go to HR, you need to talk to the nurse, we have an issue with you, they blow, perhaps for the first time ever. So I just don't put a lot of stock into that.

132

And again, to come back to your question, hypothetically, which are not the facts in this case, but if somebody had had a couple of anger outbursts on the job itself, that is absolutely an appropriate referral for fitness.
And the question is is there a psychiatric disorder bubbling under the surface here? Do we have a substance abuse problem? Do we have a personality disorder? Are there major stresses in this person's life? Are they going through divorce? Whatever. Do they need to be off work to treat while they handle this?
I saw no evidence of that. There was no pervasive problem. I see -- there was nothing in the personnel record to show a pattern. This guy has been there for 18 years. I see -- from what I understand I see no write-ups. I see no discipline related to this. I don't see issues that are anger related throughout the years, as far as I'm concerned. Now, again, I was not provided with a personnel record. So yes, I had to rely on the self-report of Officer Nawara.

133

Now, if I am given evidence that over the -- over that 18-year period he has repeatedly been pulled from duty, reassigned, sent to EAP, written up, verbally counseled for anger management problems, I would say, yeah, we have a problem.

But at the time that I saw him, I have no -- I was not provided any evidence of that. There was no evidence of a full-blown psychiatric disorder, a substance use disorder, or personality disorder, or impulse control disorder.

And for me the critical thing is if they were so concerned about his anger and ability to be safe and effective, why would they ever have put him back to work? They would have pulled him immediately.

**Q. Who's the they?**

A. Anybody who is in management.

**Q. So do you -- and that's why I was asking my questions earlier. Do you know what that process was? Do you know what happened?**

A. As far as I'm concerned I have been working 20 years with police departments and



correctional facilities. Doesn't matter who it is. If an officer is behaving badly, they get pulled. That's usually someone's sergeant or lieutenant or deputy, depending on what it is. It is command staff's decision to either do it themselves, if they have to involve HR, I don't know, doesn't really matter to me.

The bottom line is if there is a problem, they get pulled, and they are not put back in population working with other employees who have a right to a safe environment in which to work. They are not allowed to interact with the public who have a right not to be threatened or put in peril by somebody who's carrying a firearm or not. And detainees have rights, too, not to work with somebody who is unfit or to be subjected to somebody who's unfit.

So I saw nothing from a clinical standpoint or an operations standpoint to suggest that even the County themselves, the Sheriff's Office themselves, saw that he was unfit or they would have behaved differently.

**Q. Let me just back up here. So I'm just going to give you the scenario because it was**



**fairly consistent with the facts in this case. What if they didn't know what was going on, and what they were doing was asking HR to make that decision?**

MR. BUSTAMANTE: Objection. Form of the question, vague.

THE WITNESS: Are you --

BY MS. MARMOR:

**Q. Let me be much more specific with you. Here is what happened. Nurse Shelby complained about this and said consistent with the note that you got that she didn't know if it was something about her in particular.**

A. You mean Jones-Hayes?

**Q. Jones-Hayes. Thank you. Jones-Hayes reported this to her superiors and said, "I don't know if this is about me in particular. There was an OPR investigation opened, and then a referral was sent to HR because HR is the one who makes the decision, not management, about who gets pulled for a fitness for duty exam."**

MS. MARMOR: Let me finish. Let me finish.

MR. BUSTAMANTE: She said okay.



BY MS. MARMOR:

**Q. And it was -- and there was some difficulty with HR connecting with Jones-Hayes. They connect with her. They call him in a couple days later. And according to their testimony, and you don't have to agree with it, but according to their testimony it was his behavior in that meeting that alarmed them so much that they made the decision on that day to send him for a fitness for duty exam and did exactly what you're talking about, which is they took him off of work. Did you know any of those facts?**

MR. BUSTAMANTE: Objection to the form of the question. Incomplete hypothetical. Brought out a lot of facts that are not agreed to by the other side.

Go ahead.

THE WITNESS: Let me just say none of that is relevant, frankly. The bottom line is he has an interaction that is concerning to a supervisor. Had she been -- to Jones-Hayes. Had she been so concerned about his conduct that day in the basement of Cermak, she would have

made sure that he got pulled.

The fact that she had trouble communicating with HR, I don't know what to say about that other than they better get their shit together. You know? That's crap.

If he had been so unsafe, do you really think that she would have said, "Hmmmm. You know, maybe it's just me." If she had been so concerned about his ability to interact normally with everybody, not just her, and that he was a danger to himself or others or that he was no longer safe or effective in his job, she had a responsibility I would say to pull him.

So I don't care whether she had trouble connecting with or whatever. Bottom line, when somebody behaves so badly that they become a concern -- that they become a safety or effectiveness concern, they better get pulled right away or there is major liability, and you know it.

BY MS. MARMOR:

**Q. So am I taking you to say that there doesn't need to be -- you found that there was no problem here because there was no pervasive**

138

**history. But what you're saying is that in the absence -- at the time in the absence of a pervasive history, the employer really must immediately take the person off of duty.**

A. I'm only going to talk about Nawara's case.

**Q. That's what I'm talking about.**

A. Well, you're speaking generally. In Nawara's case my feeling is I have no evidence whatsoever that he was a major fitness concern for anybody because had he been, they would have pulled him.

So their own actions say that they were not even sufficiently concerned to pull him. They put him right back there the next day in the exact same place. They put him on external operations with a firearm. He's interacting with the public and detainees, and he's still got the backs of his colleagues there, and they're counting on him.

So I think honestly this is a missed opportunity. If they were that upset with him, it's a missed opportunity for them to discipline him. And I do think that his behavior was

139

inappropriate that day, and he ought to have been disciplined. They didn't do that. That's their problem.

**Q. So what if they just made a mistake? What if that was a mistake? I hear you on missed opportunity. What if that was a mistake? Does that invalidate sending him for the fitness for duty exam based on what HR experienced?**

A. Let me be clear. I have no issue of him being sent for fitness for duty. He ought to have been sent and could have been sent for fitness for duty based on the September incident alone in my opinion.

And that to me, like I said, is the thing that matters because that happened on duty, in front of other correctional officers, in front of detainees, and is an inappropriate -- it's disrespect to management. That could have been the tripwire itself for fitness for duty.

The fact that they waited is problematic. And I don't have an opinion about how important this thing at HR was or wasn't. Clearly he was behaving in a way that concerned

140

people, and that's all that matters. It is valid. That is also on its own independently sufficient to prompt a fitness for duty examination.

We always have to take the high road. If anybody is ever concerned about anybody's emotional stability, public safety is different, you got to send them for fitness. No harm, no foul.

And so this was an appropriate referral. Whether it's the combination of them or -- either incident alone would have been sufficient. I have no issue. I think what you're asking, though, hypothetically is, you know, is it possible that he was unfit, and we don't know it? All I can say is --

**Q. No. That's not what I'm asking. That was not what I was asking.**

A. Okay.

**Q. I was simply trying -- I get that you're critical of them for not having done -- not having taken him out of -- off of duty after the first incident.**

A. It's not that I'm critical of them.

141

It's just that I use that as evidence, and it is a reasonable inference to draw that they simply could not have been that concerned about him, because had they been, they would have pulled him.

**Q. I'll just say the "they" is very unclear here.**

A. It doesn't matter. It's irrelevant. He would have been pulled from duty, be that from God, be that from management or HR or some combination. If somebody is -- if there is ever a concern about a public safety servant being unfit, you better get their butt out of work because all of us are counting on them. And it's a liability.

And as a lawyer you know that. You never want somebody who is unfit working in a situation like that. Absolutely. So their own behavior can reasonably be inferred to show that they themselves did not have fitness concerns or he would have been pulled.

**Q. Okay. I mean, you're applying basically your general experience, not anything specific you know about this case, when you say**



**that. You didn't speak to any of the people who made the decisions.**

A. I can tell you it is irrelevant. I can look at what happened and say he wasn't pulled. It is a reasonable inference to draw that had there been significant fitness concerns, he would have and should have been pulled.

**Q. So do you make that inference from what happened at HR?**

A. I'm sorry. I don't understand the question.

**Q. Well, you said you discount what happened at HR. But at HR, after HR, what happened at HR, they did take him off work immediately.**

A. And what I said to you was that that was an appropriate tripwire for fitness. I don't discount the concerns that were raised from that. I don't put a lot of stock in it as to evidence that he was unfit to do the job because that didn't happen in the environment in which he does his job.

It happened -- certainly that's part of the job, is to interact with management and



staff and whatnot. But that is a very understandable situation where I have seen so many people get angry at being pulled in to HR. They're nervous. They're upset. They feel it's unfair. I just don't put a lot of stock in that in terms of evidence that he was unfit.

But like I said, behaving in that way is concerning. I understand that. It's a perfectly fine referral based on what happened at HR, like what I said, or what happened in September.

Frankly, it's more concerning to me what happened in September, but they weren't that concerned. It seemed like it was a very isolated incident. So again, not pervasive. I don't find him unfit just for having this incident with this one person. It is not appropriate. He could have been disciplined for it, but I don't see any fitness issues here.

MS. MARMOR: Okay. I want to take just one moment. I think I'm done, but I want to talk to my fellow counsel here.

(WHEREUPON, a short recess was taken.)



MS. MARMOR: We have a few minutes left, and I will pass the witness.

MR. BUSTAMANTE: I have no questions.

MS. MARMOR: There you go.

MR. HENRETTY: None for me.

MR. BUSTAMANTE: So we're done.

THE WITNESS: But I was having so much fun.

MS. MARMOR: Do you want to reserve signature?

THE WITNESS: Yeah.

(WHEREUPON, a discussion was had off the record.)

THE WITNESS: I'm waiving.

(WHEREUPON, the deposition was concluded at 3:48 o'clock p.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, MARLENE L. KING, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on December 16, 2019, personally appeared before me, at 65 East Wacker Place, Suite 2240, Chicago, Illinois, DIANA S. GOLDSTEIN, M.D., in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein JOHN NAWARA is the Plaintiff, and COUNTY OF COOK, a unit of local Government, et al., are the Defendants.

I further certify that the said DIANA S. GOLDSTEIN, M.D. was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as



aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 6th day of January, 2020.

Marlene L King
______________________________
NOTARY PUBLIC, COOK COUNTY, ILLINOIS
LICENSE NO. 084-003326

**Exhibits**

**Goldstein Exhibit 6**
53:10 56:18,23 61:2 62:10 65:9 67:24
**Goldstein Exhibit 7**
53:11 115:19,23 122:10
**Goldstein Exhibit 8**
53:12 126:10,14,15

**1**

**1**
71:18 77:12 79:19
**11**
77:22 110:15
**12**
77:22
**18**
82:17 84:15 94:17 130:11 133:17
**18-year**
134:2

**2**

**2**
79:19 80:2,9 82:10
**20**
113:8 118:16 134:24
**2004**
64:20
**2016**
78:7 82:17 84:15 94:17 106:14 110:12 130:11 131:6
**2017**
77:22 84:7,13 106:1 108:2 111:8
**28**
84:13
**29**
78:7 110:12

**3**

**3**
82:9 85:6 89:19
**30th**
84:16

**4**

**4**
63:8 80:3 91:12

**5**

**5**
54:14 55:16,23 106:12
**5th**
114:8 116:1 126:15

**6**

**6**
55:16,17 56:18,23 61:2 62:10 65:9 67:24 129:21
**670**
127:3
**671**
127:3

**7**

**7**
115:19,23 122:10

**8**

**8**
126:10,15
**8-25-17**
79:2

**9**

**9-28**
56:7
**9-29-16**
56:7
**99**
83:14

**A**

**abilities**
127:7
**ability**
104:10 109:15 129:4 134:15 138:9
**absence**
139:2
**absolutely**
64:23 67:21 73:22 91:8 101:6 119:20, 22 133:5 142:18
**abuse**
66:20 133:9
**accept**
76:1
**accepted**
76:14
**accepting**
96:15
**access**
66:18 69:22 70:2,7, 19
**accomplishing**
129:19
**accomplishments**
127:8
**accounts**
65:12
**accurate**
67:2 130:19
**accusation**
119:6
**act**
64:14 67:13
**action**
69:11 80:16 129:6
**actions**
139:13
**active**
66:20
**actuarial**
66:12
**adaptive**
105:10
**added**
99:23
**addition**
66:2 79:1,7
**address**
111:16
**addresses**
79:15
**adjustment**
106:7
**administration**
80:15
**administrative**
60:10 61:9
**administrator**
59:19
**admiration**
126:20
**admission**
117:23
**admitted**
88:14 92:24 94:4
**adulthood**
126:21
**afraid**
132:5
**African-american**
101:4,5
**afternoon**
54:9
**aggressed**
88:18
**aggression**
66:15
**aggressive**
79:4,8 94:21 95:5 97:8,9,17
**agitated**
88:10 89:23
**agitation**
107:10
**agree**
66:6 131:17 137:6
**agreed**
137:16
**ahead**
121:9 137:18
**aimed**
90:6,10
**alarmed**
137:8
**albeit**
68:10
**allegedly**
56:6 92:2
**allowed**
69:21 70:4,6 135:12
**altercation**
79:14 110:12
**amazed**
67:9
**ambiguously**
69:4
**anger**
80:21 97:13 101:15 108:16 121:16,19,24 122:5,19 129:2 130:23 133:4,20 134:5,14
**angry**
67:20 97:15 108:23 109:1 110:21 119:10,13 122:16 124:2 144:3
**annoyance**
88:23
**annoyed**
81:6,8 88:5,14 89:15 90:8 93:1,23 109:6
**answering**
132:8
**anticipate**
70:9
**anxiety**
117:16 121:18,24
**anxious**
117:13 124:2
**anybody's**
141:6
**apnea**
106:21 107:1,5
**apologize**
67:7
**apparent**
101:2
**apparently**
84:3 102:23
**appearing**
127:8
**appears**
124:8
**Appellate**
64:8
**applying**
142:22
**appreciated**
87:11
**approach**
112:8,9
**appropriately**
109:17
**approved**
108:10
**April**
106:1
**area**
58:8,17 82:12 105:1
**areas**
58:3 104:6
**arrived**
88:4
**asks**
61:2
**aspects**
127:18,20
**assault**
65:23
**assessing**
77:24
**assigned**
82:9
**assignment**
78:9 90:15
**assume**
76:15 90:4 114:3 132:13
**assumption**
123:12
**attempting**
111:15
**attentive**
122:23
**attorney**
69:24 72:15 75:12, 13
**attorneys**
73:5
**authority**
123:1,2,7 128:3
**aware**
125:11,15
**awareness**
87:7

**B**

**Baby**
92:2
**back**
64:19 87:19 92:13 96:21 102:17 105:15 106:12 129:17 130:16 133:1 134:16 135:10,23 139:15
**background**
57:6
**backs**
139:19
**bad**
109:3
**badly**
88:21 94:19 95:11 96:17 135:2 138:16
**ball**
111:4
**based**
82:19,24 97:14 102:1 103:3,9 113:19 140:8,12 144:9
**basement**
78:8 85:20 137:24
**basically**
70:6 79:24 80:2 89:2 128:17 142:23
**basis**
99:19 103:14
**beat**
90:24
**began**
106:15
**begin**
93:7 96:11
**beginning**
62:17 126:21 131:3
**behaved**
97:14 135:22
**behaves**
138:16
**behaving**
135:2 140:24 144:7
**behavior**
79:5 97:8,10 102:1, 19 103:9 109:19,22 137:8 139:24 142:19
**belabor**
115:12,14
**believes**
99:24 100:10
**bench**
87:20
**bias**
101:8 112:8 113:5, 12
**big**
129:19
**bills**
104:10
**bit**
70:7 118:6 124:23 127:16 130:24
**black**
115:1 117:9,15 118:1 119:1 123:18
**blood**
107:19
**blow**
132:22
**board**
57:24 61:11
**boastful**
127:9
**body**
82:4
**boss**
67:6,12 80:22
**bottom**
61:21 98:18 99:5 101:22 113:18 129:20 135:8 137:20 138:15
**Boy**
118:6 126:7
**break**
72:20 101:16
**briefly**
54:17
**bright**
62:7
**bring**
71:18
**broke**
89:8
**broken**
116:5
**Brought**
137:15
**BS**
119:11
**bubbling**
133:8
**bullshit**
119:12
**bunch**
119:11
**BUSTAMANTE**
71:20 105:18 115:14 116:19 117:1 120:11,15,20 121:3, 7 125:9 126:23 132:7 136:5,23 137:14
**butt**
142:13

**C**

**call**
57:14 59:21 61:17 68:14 69:23,24 75:11 91:24 94:4 96:13,19 125:12 137:4
**called**
54:4 57:12 89:10,11
**calling**
83:3
**calls**
60:12
**calm**
88:9,13 92:4
**care**
104:9 107:23 108:7 138:14
**carrying**
135:14
**case**
55:15 59:20 61:7,10 62:2 64:8 68:13,18 70:3 76:13,21,23 77:2 79:12 83:8 88:3 99:3 117:18 133:3 136:1 139:6,9 142:24
**cases**
63:24 67:17
**cause**
107:1,4 108:10
**caused**
83:14 86:12
**causing**
105:4 107:16 128:22,24 129:15
**CCSO**
75:16
**Center**
65:15 74:8,11
**Cermak**
74:1,5 78:8 82:5,12 137:24
**certificates**
74:18
**certified**
57:24
**cetera**
96:4 105:14 107:10 112:22 129:8
**chance**
120:20

change 66:21 125:5
changed 57:15
changing 126:4
charge 92:17 93:17 94:1,2
check 107:11
chest 88:10 90:5,19
Chicago 57:8,12,16 73:21
chief 69:23 75:12
chronic 130:23
citizen 69:12
city 73:4,6
civilian 58:22
claimed 88:12
claims 88:9 106:18 107:18
clarify 69:3
clean 55:24
clear 81:23 102:12 110:7 119:9 124:10 127:17 132:2 140:9
clinical 57:7,10,24 61:17,18, 19,24 62:8,11 63:10 106:11 112:24 113:1 135:18
Clinicians 69:10
close 128:17 130:6
co-worker 67:5,6,12 80:22
co-workers 55:14
coach 120:13
cognitive 76:4,9
collateral 69:13,19 71:8
colleagues 74:12 139:19
collecting 58:19
color 114:15
colors 125:1
combative 109:24
combination 118:21 124:23 141:11 142:11
comfortable 96:5 99:8 100:15
command 135:5
commendations 69:12
comments 54:23 95:15
commission 67:13
commissioners 61:12
common 101:3
communicating 138:3
community 68:10
comp 61:7
company 70:1 72:10,11
compensation 66:3
complained 136:10
complaining 93:16
complaint 99:16,21
complaints 69:12 129:7
complete 84:13 113:13
compliments 69:13
comply 84:4,20 87:1
composure 109:17
comprehensive 54:22
concede 97:21
concept 124:18
concern 63:7 87:13 131:11 138:17,18 139:10 142:12
concerned 99:6 133:21 134:14, 23 137:23 138:9 139:14 140:24 141:6 142:3 144:14
concerns 87:2 97:13 142:20 143:6,18
conclude 112:1
conclusion 121:17
conclusions 109:10
condition 109:15
conditions 66:22
conduct 61:19 69:13,18 137:23
conducted 77:23
conducting 73:13
Confidentiality 64:14
confirm 81:24
confirmed 107:21
confusing 102:6
connect 137:4
connecting 137:3 138:15
Connolly 89:11 91:14,18,22 94:6
conscientious 118:7 121:20
considered 87:4 131:16
consistent 105:9 113:9,10 118:17 136:1,11
consultant 73:2
consulting 60:5
contacting 75:8
context 85:19 86:9 128:7
continued 54:7 93:8
continues 106:17
contract 74:8
control 65:15 116:10,17 117:12,13,19 122:17 124:1 134:11
conversation 103:8
Cook 59:2,6,12,22 72:15 73:20 74:23 78:2 79:2 104:23 128:2
cooperate 99:6 111:7
cooperated 111:10
cooperating 111:17
cooperation 111:14
copied 76:19
copies 71:19
coping 66:17
copy 55:24 71:17,23 77:12
core 115:3
correct 55:7 57:9 62:3 63:5, 15 68:2 69:20 77:9, 16 82:7,22 83:21,24 84:16 88:7,11 91:4 94:14 97:4 107:2 110:9 119:23 121:11 125:22 128:7 132:14
correctional 73:10,17 78:1 135:1 140:16
correctly 68:21 121:10 129:12
correspondence 70:20
Corvel 54:12 59:20 70:14 72:7,8 98:14,22 99:2 130:1,9,12,17
counsel 144:22
Counsel's 116:23 117:2
counseled 134:4
counseling 129:7
Counselor 106:11
counted 81:9
counterattack 128:20
counterattacks 128:13
counting 139:20 142:14
county 59:2,6,12,22 70:12 72:15 73:4,12,17,20 74:23 78:2 79:2 104:23 128:2 135:20
couple 74:6 82:8 105:24 129:22 133:4 137:5
court 56:21 61:8,13 115:22 126:13
cover 54:14 58:4
covered 81:13
covers 79:19
crap 138:5
created 64:2,3
creating 99:1 101:7
creatinine 106:19 107:14,19 108:8
crimes 65:13
criminals 58:13
criteria 116:6
critical 89:3 105:1 134:13 141:21,24
criticism 115:6 118:10 120:4 121:21 127:14,22 128:6
criticized 94:9,12,13 115:8 119:10 128:15
criticizing 93:18 94:1
crystal 111:4
cuffed 89:22,24 90:10
current 65:16
custody 112:16

D

daily 132:16
danger 138:11
dangerous 86:1
data 58:19
dating 106:15
day 56:9 78:9,12 81:5,15 82:6,14,18 83:3,14 84:5 92:6,23 93:13 98:8 128:1 137:9,24 139:15 140:1
day-to-day 73:14
days 73:12 137:5
daytime 106:21
de 57:14
dead 90:24
deadlines 84:5
deal 58:9 119:5
dealing 68:9
decided 80:15,17
deciding 91:7
decision 60:11,19 61:9 64:11, 19,20 83:7,12 102:23 135:5 136:4, 20 137:9
decisions 60:7 125:3 143:2
declined 75:22
decompensation 66:22
decreased 106:3
deescalate 109:23
defeat 127:14
defensive 94:3 96:10,11 97:15 100:18 109:2,4 112:19,23 113:6,7 119:9 124:3 131:14
defensively 120:5
defensiveness 96:4 112:7 121:16
deference 123:1 128:3
defiant 128:12
definition 104:5
degree 57:10
delivered 84:6
denied 104:20 108:22,24
denies 104:24 106:21
denying 95:4,10
department 60:9 69:22 75:6 79:9 111:18
departments 134:24
depending 56:7 135:4
deposition 54:10,13 56:17,23 61:2 65:9 67:23 78:13 115:18 120:22 126:9
deprivation 107:4,7
deputy 135:4
describe 80:3 127:19
describes 94:8 106:3 117:24
125:19
describing 79:3 100:11
description 97:3 110:2
descriptions 71:2
Designation 67:4,11
destruction 66:1
detail 86:3
details 85:20 97:2,22
detained 68:10
detainee 91:21
detainees 55:15 74:15,16 86:17 87:9,10,16 109:19 135:15 139:18 140:17
detector 111:5
detectors 113:3
determine 86:21
diagnose 121:8 124:11
diagnosed 124:8
diagnosis 105:17 106:2,9 116:20 122:11 124:14 127:11
diagnostic 114:6 115:24 116:6 124:6 127:4
DIANA 54:3
dietary 108:7
difference 61:21 62:6 73:3 104:14
differences 61:23
Differential 124:13
differently 135:22
difficulties 129:3 130:23
difficulty 137:3
diffuse 109:22
diminished 106:4
diminishes 66:5
direct 96:7
directed 79:6
directive 79:7
directly 59:20,21 69:23,24 98:22 99:2 122:20 130:1
disability 61:10 72:19
disagreeing 88:15
disagreement 98:23

**disarray** 88:24 89:17 93:20
**disciplinary** 69:11 74:18 129:6
**discipline** 133:19 139:23
**disciplined** 140:2 144:18
**discount** 143:12,18
**discuss** 78:21 98:6
**discussed** 86:23
**discussion** 70:11 72:3 85:23 108:6,21 123:15
**disdain** 128:12,20
**Disease** 65:15
**disorder** 66:21 104:5 105:8 113:21 114:4,5,12 116:3,7,21 120:10 122:22 124:8,11,15, 19 126:16,19,24 127:5,13 128:11 133:8,10 134:10,11, 12
**disorders** 58:14 114:10,18 116:1
**display** 108:16 123:1
**dispute** 83:11
**disputed** 86:16
**disrespect** 140:18
**disruption** 76:5 107:7
**disruptive** 109:22
**distinguish** 128:22
**divorce** 133:12
**doctor** 105:19 117:5
**doctor-patient** 61:20 62:6 63:14
**doctorate** 57:7
**dominance-submission** 122:24
**dot** 91:12,13
**downhill** 89:1
**dozen** 73:24
**dozens** 72:8,9
**draw** 142:2 143:5
**drawing** 89:5
**driving** 106:22
**DSM** 126:15
**DSMS** 115:13
**dug** 125:24
**duly** 54:2,5
**duties** 132:16
**duty** 55:13 59:14,18 60:7, 13,19 61:5 63:2,4 64:9,12,15 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18 78:1 79:17 82:21 83:15, 16,21,23 84:10 85:5 102:16,21 103:3,10, 15 110:5,8 111:13 112:21 113:11 129:1 131:21 134:3 136:21 137:10 139:4 140:8, 10,12,16,20 141:3, 22 142:9
**dynamic** 66:12
**dysfunction** 103:19,24 104:3,13, 24 105:5

**E**

**e-mail** 76:20
**e.g.** 67:5
**EAP** 134:4
**ear** 92:11
**earlier** 134:21
**early** 126:21
**edition** 116:2 126:15
**effective** 55:14 134:15 138:12
**effectively** 80:3 109:23 129:4
**effectiveness** 76:11 138:18
**efficiency** 116:11
**elevated** 106:19 107:14,19
**elicited** 85:12
**emotional** 141:7
**empathy** 126:21
**employee** 66:6,13 72:23,24 73:11 79:8
**Employee's** 79:4 97:8
**employees** 72:15 74:15 135:10
**employer** 62:23 63:4,21 104:15 111:20 139:3
**employers** 66:4
**encompasses** 65:23
**encountering** 69:5
**encounters** 68:23
**end** 91:7 102:14 108:14 121:15 129:11
**ended** 54:10 106:14
**Ends** 67:4
**energy** 106:4
**enforcement** 58:23
**entitled** 63:24
**environment** 87:5 109:18 122:18 135:11 143:21
**environmental** 66:12
**epidemic** 65:14
**equipment** 87:22
**escalating** 66:15
**essence** 93:19
**essential** 109:16
**essentially** 89:13
**establish** 94:13 103:6
**ethics** 118:20 119:4
**evaluation** 54:22 61:3,5,15,17 62:2,11,15 63:11,20 68:2 70:5
**evaluations** 65:10 68:1,22 69:11
**event** 78:15
**events** 81:15 85:8,17 86:7
**Everything's** 112:18
**evidence** 103:22 133:14 134:1,8,9 139:9 142:1 143:20 144:6
**evident** 62:15
**exact** 139:16
**exaggerating** 112:11
**exam** 59:14 60:8,13,20 61:5 77:18 79:17 82:21 102:21 103:10 136:21 137:10 140:8
**examination** 54:7 64:9,12,24 75:22 76:2 77:23 78:5 84:11,24 101:24 102:16 103:15 111:13 130:10 141:4
**examinations** 61:19 68:15 112:16, 21
**examined** 54:5
**examinee** 63:10,18
**examinees** 63:24 64:14,15
**examiner** 63:10
**examiner's** 64:1
**examples** 63:21
**exams** 59:18 77:16 131:22
**exceptions** 63:23 65:6
**excessive** 123:1,2
**exchange** 88:22
**exhibit** 54:14 55:16,23 56:16,18,23 61:2 62:10 65:9 67:24 71:18 77:11 115:19, 23 122:10 126:8,10, 15
**exhibiting** 109:18
**exist** 63:23 123:14
**expected** 71:7 89:7
**expense** 116:10
**experience** 120:7 142:23
**experienced** 130:22 140:8
**experiences** 59:12 131:7,8
**experiencing** 104:20
**explain** 98:15 111:2
**explained** 94:18 95:13 99:11, 12
**explaining** 87:16
**explanation** 96:7
**express** 87:7
**expressed** 87:2 122:19
**expressing** 88:23
**extend** 64:16
**external** 68:12 82:6,13 139:16
**extra** 71:18
**extremely** 119:2

**F**

**facilitate** 84:14
**facilities** 135:1
**facility** 73:10 74:2
**fact** 55:3 63:14 64:12,15 79:16 81:1 83:20 84:19 87:8 96:18 98:6,7 99:2 101:2 105:15 110:21 111:19 122:5 123:5, 6 128:1 130:12 138:2 140:21
**factor** 125:18
**factors** 66:12,14
**facts** 133:3 136:1 137:13, 16
**factually** 92:15 119:21,23 125:22
**fair** 55:10 80:5 103:19 109:7 110:11 123:17
**fairly** 65:16 131:6 136:1
**familiar** 57:2
**fatigue** 107:7
**FDA** 108:10
**Features** 122:10 127:4,11
**February** 84:13 106:1 108:1
**Federal** 120:22
**feel** 86:5,6 94:12 96:6 100:14 101:9 113:6 124:3 131:23 144:4
**feeling** 139:9
**feelings** 106:5
**feels** 106:16 126:2
**fellow** 144:22
**fellowship** 57:17
**felt** 75:23 76:13 85:20 89:14 94:13 98:24 99:13 101:8 109:4 117:18 119:9 126:6
**FFD** 62:3,23 72:14 74:22 75:17 99:9 111:8
**fiance** 106:13
**fight** 81:8 89:8 93:24
**filed** 84:20 99:16,21
**filler** 114:18
**filter** 115:8
**final** 77:6
**find** 77:12 80:24 104:12 123:23 130:22 144:16
**fine** 84:2 112:18 120:16, 19,21 144:9
**finger** 88:19 90:5,18
**finish** 117:1 136:22
**finished** 91:24 132:8
**fire** 61:11
**firearm** 135:15 139:17
**firearms** 66:18
**fit** 110:8
**fitness** 55:13 59:14,18 60:7, 13,19 61:4 63:1,3 64:8,11,14 68:6,13, 22 70:17 72:6 75:21 76:1 77:16,18,24 79:17 82:20 83:4,7, 16 84:4,10,14 85:4 101:24 102:15,21 103:3,10,14 111:13, 16 112:21 113:11 129:1 131:21 133:6 136:21 137:10 139:10 140:7,10,12, 20 141:3,8 142:20 143:6,17 144:19
**fixed** 125:4
**flexibility** 116:11
**focus** 54:16 80:21 108:22 127:2
**focused** 79:13
**follow** 92:6,22 93:13
**foothold** 117:17
**force** 109:24
**forensic** 61:3,5,15,16 62:11 63:11
**forest** 115:2
**form** 77:15 79:2 116:19 120:11,16,17,19,21, 22 121:1 126:23 136:5 137:14
**formal** 61:13
**forms** 84:14 98:7 116:6
**foul** 141:9
**found** 94:6 103:22 138:23
**foundation** 75:4 120:17,23
**Franklin** 57:13,18
**frankly** 137:20 144:12
**frequently** 132:18
**friends** 100:1,7
**front** 75:10 140:16,17
**frustration** 66:16 104:22 107:9
**full** 91:14 104:18 110:5, 12
**full-blown** 104:5 116:7 120:9, 10 126:19,24 134:9
**functionally** 55:11
**functioning** 105:10,12
**functions** 109:16
**fundamentally** 110:8

**G**

**gave** 55:4 71:3,19
**gender** 123:11
**Gender-related** 124:5
**general** 58:11 75:2 93:10 97:3 118:5 123:17

142:23
**generally** 55:13 58:9 93:15 98:16 108:9 119:7 139:8
**give** 55:24 86:2 107:22 118:14 120:20 135:24
**giving** 117:5
**glucose** 106:19 107:19
**goal** 62:10
**God** 142:10
**Goldstein** 54:3,9 56:17,21,22 61:1 71:18 115:18, 22,23 126:9,13,14
**good** 54:9 71:21 76:13 115:17
**goodness** 121:19,20,21
**Graham** 73:17
**grain** 113:14
**grandiose** 125:15 127:6
**grandiosity** 118:23 123:19 126:18,20
**gray** 115:1 117:14 118:3
**great** 57:18,19 58:21
**ground** 80:1
**guerre** 57:15
**guess** 73:7 82:5 114:16
**guesstimate** 72:13
**guidelines** 75:16
**guy** 91:23 118:1 122:5 133:17
**guys** 98:6

**H**

**halfway** 122:14
**handed** 56:22 115:23 126:14
**handful** 72:16
**handle** 133:13
**handling** 92:18 93:17 94:2,10
**hands** 87:18
**happen** 143:21
**happened** 79:14 80:4,5 82:19 83:1,6 85:16 88:20 90:20 91:3 131:13, 16 134:22 136:10 140:15 143:4,9,13, 14,23 144:9,10,13
**harassment** 65:24 66:2
**hard** 118:11 120:8 126:1
**harm** 141:8
**harshly** 120:4
**Hayes** 56:13 78:7 80:12,17
**he'll** 91:22
**Heading** 73:16
**health** 58:10 68:16 74:9,14 75:9 76:4,8 100:24 109:15
**hear** 86:7 90:11,13 121:1 140:5
**heels** 126:1
**helped** 111:1
**helpless** 87:17
**helps** 124:24 125:18,24
**HENRETTY** 120:17,22
**Hey** 91:20 94:6
**high** 109:18 118:7 141:5
**historically** 131:4
**history** 66:15 139:1,3
**Hmmmm** 138:7
**Hogueisson** 105:16,18,22
**Hold** 82:23
**holder** 63:19
**home** 104:11
**honestly** 139:21
**hopelessness** 106:6
**hopes** 106:17
**horse** 90:24
**host** 67:5
**hostile** 79:8 94:21 95:4 97:17
**hostility** 123:8 128:6
**hour** 82:10
**HR** 59:22 70:20,23 71:3, 6 74:22 75:7,11,14 78:15,20 79:14 83:6, 10,20 97:3 99:20 100:24 102:7,10,19 103:1,8,9 108:23 110:16 131:13 132:21 135:6 136:3, 19 137:3 138:3 140:8,23 142:10 143:9,13,14 144:3, 10
**human** 79:2,9 82:18 84:5,6, 12 94:17 100:3 111:5 130:1
**hygiene** 66:24 104:9
**hypothetical** 137:15
**hypothetically** 133:2 141:14

**I**

**idea** 59:23 80:21 96:12 117:9 124:20 127:21
**identifiable** 106:8
**identification** 56:19 115:20 126:11
**identified** 113:5
**Illinois** 64:7,14
**imagine** 72:9 75:6
**IME** 70:1 72:9,11
**immediately** 122:4 134:17 139:4 143:15
**impact** 108:8 114:11 129:3
**impaired** 68:14
**impairing** 114:13
**impairment** 104:6
**impairments** 105:11
**impairs** 109:15
**implies** 117:2
**important** 86:6 87:8,10 125:21, 23 129:19 140:23
**impulse** 134:11
**impulsivity** 66:17
**inappropriate** 79:5 97:10 140:1,18
**incident** 56:6,10 63:6 80:18 102:3,17 103:4,15 140:12 141:12,23 144:15,17
**incidents** 131:9
**include** 58:5 66:14
**included** 78:18
**including** 63:21 109:18
**Incomplete** 137:15
**increases** 66:5
**increasing** 66:3
**independent** 59:24 70:5
**independently** 141:2
**individual** 63:20 68:23 109:21
**individuals** 122:22 127:5,12
**infer** 90:16 114:21
**inference** 89:5,16 93:5 142:2 143:5,8
**inferred** 89:14 119:8 142:19
**inflamed** 96:14
**inflate** 127:8
**inflexibility** 118:9
**inflexible** 118:19
**information** 70:18 75:9 85:11,12 111:20 113:19
**initial** 130:10
**injury** 127:14
**inmate** 89:21,23 90:9
**inmates** 110:1
**insight** 117:23 118:4
**insightful** 125:6
**insisting** 129:24
**insists** 108:15
**instability** 66:13
**intended** 90:13,14 119:21
**intense** 88:2 96:14
**interact** 135:12 138:9 143:24
**interacting** 139:17
**interaction** 66:23 78:5,15 81:11 85:21 93:7,9 110:16 137:21
**interactions** 59:11 71:2 77:8 114:16
**interactive** 85:15
**internally** 60:6
**interpersonal** 66:23 78:5 113:24 114:15 116:10,17 122:18 129:3
**interpret** 114:19 118:10
**interpret all** 119:19
**interpretation** 113:1
**interprets** 124:24 125:19
**interrupted** 132:7
**interruption** 64:5 101:20
**interview** 85:7 102:9 104:19
**interviews** 69:13,19 71:9 86:14
**intimately** 73:14
**intimidating** 79:5 97:9
**intimidation** 65:24
**invalidate** 113:8 140:7
**invalidated** 112:24
**investigation** 80:24 96:2 136:18
**involve** 135:6
**involved** 73:14 75:7 85:2 117:14
**involvement** 59:13 60:5,22
**involves** 68:6
**irrelevant** 142:8 143:3
**irritability** 107:9
**irritation** 107:1
**Isaac** 54:12 74:7,11
**isolated** 144:15
**issue** 76:4,9 78:20,21,22 91:10 102:14 111:16 119:13 123:5 126:3 129:9 132:22 140:9 141:13
**issues** 61:19 106:7 108:11 124:6 133:20 144:19
**items** 54:17

**J**

**jacket** 75:10
**jail** 73:12,15,20 100:21 128:2
**jails** 73:16 74:19
**job** 92:6,23 93:14 106:6 110:2 129:4,16 130:24 131:17 132:19 133:4 138:12 143:20,22,24
**John** 54:23
**Jones-** 56:12 78:6
**Jones-hayes** 56:11 70:24 71:1,6 77:7 79:13 80:4,11 81:2 85:22 88:4 91:23 99:17,20 100:1,6,21 102:4 108:17 110:13 136:14,15 137:3,22
**judge's** 64:11
**judgment** 81:19
**jump** 62:14
**jury** 91:3,6
**justice** 118:7,13
**justification** 67:12

**K**

**Kane** 73:17
**keenly** 118:10
**kicking** 69:3
**kind** 57:5,6 60:14 74:17 76:4 81:9 86:8 88:14 89:13,22 103:17,18 117:16,24
**kinds** 118:17 123:9 129:6
**knew** 99:21
**Kroll** 111:19
**Kroll's** 84:10

**L**

**label** 118:24
**labor** 69:24 75:12,13
**labs** 108:2
**lack** 87:22 126:21
**lady** 57:19
**Lake** 73:12
**larger** 81:11
**law** 58:23
**lawsuit** 84:20,23 85:2
**lawyer** 142:16
**layperson** 120:6 128:18,20
**layperson's** 113:13
**LCPC** 106:10
**lead** 114:24 117:13,15 118:8 119:19
**leads** 107:6 128:19
**learned** 112:23
**leave** 91:2 101:23 102:6 107:8
**leaves** 91:14
**led** 86:15 111:1 116:17
**left** 91:10 95:11 96:18 98:3 102:7,9,15 103:1,13 109:6
**legal** 61:7
**letter** 54:14,17,20,21 78:24 84:9,12,16
**level** 66:23 105:8 114:12
**levels** 106:19 107:14,19 108:9

**liability**
66:4 138:19 142:15
**Licensed**
106:10
**lie**
111:5 113:3
**lieutenant**
135:4
**life**
103:18,23 104:2,7,11,13,21,24 105:4,14 106:8 110:19 133:11
**light**
113:23
**limitations**
111:24
**limited**
109:24
**limits**
70:7
**list**
55:9 110:1
**location**
78:8 87:5
**long**
77:3
**longer**
138:12
**losing**
117:16,19
**lot**
68:5 85:23 119:5 120:24 123:20 124:17 131:13 132:23 137:16 143:19 144:5
**loud**
90:11
**loved**
70:10
**Lovely**
77:14
**low**
115:4
**lumps**
101:11
**Lyle**
71:22

**M**

**M-C-G-R-E-A-L**
64:6
**M.D.**
54:3
**made**
83:12 102:24 116:20 129:23 137:9 138:1 140:4 143:2
**maintain**
109:17 122:17
**major**
105:4 125:17 133:10 138:19 139:10
**majority**
63:23
**make**
60:6 81:19 83:18 98:20 106:9 125:2 136:3 143:8
**makes**
60:18 75:5 127:12 136:20
**making**
123:12 125:20
**males**
124:9
**malingering**
58:13
**manacled**
87:15,18 88:6
**manacles**
87:12
**manage**
104:10
**management**
75:16 97:13 130:23 134:5,19 136:20 140:18 142:10 143:24
**manner**
119:15 125:18 127:23
**manual**
114:7 116:1
**mark**
56:15 126:8
**marked**
56:18,22 66:21 115:19 126:10,14
**MARMOR**
54:8 56:15,20 64:18 71:16,21 72:2,5 101:16,21 105:20,21 115:21 116:24 117:5 118:12 120:13,16,19,21,24 121:12 126:8,12 127:1 132:11 136:8,22 137:1 138:21 144:20
**materials**
79:21
**matter**
108:5 124:2,9 125:22 129:10,14 135:1,7 142:8
**mattered**
124:4
**matters**
100:11 118:20 128:3,24 129:20 140:15 141:1
**Mcgreal**
64:3,6
**means**
115:3
**meant**
105:3
**medical**
57:8,12 64:13 69:14,17 70:5 75:9 84:6 98:3,11,19 100:2 107:20 111:22 129:24 130:11
**medicine**
57:13 58:11 68:16
**meet**
71:12
**meeting**
71:3 83:23 94:17 96:19,23 97:3,15,23 98:4 102:7,10,14 103:1,8,9 132:6 137:8
**members**
68:10
**memory**
76:22
**mental**
58:10 74:9,14 76:4,8 116:1,9
**mention**
112:14
**mentioned**
114:23
**met**
84:19 111:11
**Michelle**
54:11
**middle**
80:9
**mild**
106:3
**mildly**
106:18
**mind**
88:17 113:2
**mine**
58:8
**minimizing**
112:12
**minutes**
118:16
**misinterpretation**
120:2
**missed**
139:21,23 140:6
**missing**
84:5
**mistake**
140:4,5,6
**mistreated**
101:13
**misunderstood**
98:17
**misused**
75:24
**moderate**
112:6
**moment**
62:21 90:20 103:1 107:22 118:9 132:19 144:21
**month**
73:18
**months**
110:15
**morale**
66:5
**morality**
118:20
**motivation**
106:4
**mouth**
88:1 92:10
**moved**
82:6

**N**

**narcissism**
118:23 127:18
**narcissistic**
113:22 114:4 115:3 124:14 125:16 126:16 127:13,20 128:11,19
**national**
65:14
**nature**
63:9
**Nawara**
54:23 55:12 56:10 64:21 68:8 69:2 70:12,22 77:9,23 78:6 80:5,15 81:2 84:3,11 85:7 92:4 94:18 97:20 98:1,10 104:20 110:3 113:20 116:15,21 118:14 133:24
**Nawara's**
78:9 117:18 139:5,9
**necessarily**
67:18 68:3 82:24 111:14 117:11,20 118:3 119:3 121:17
**nervous**
144:4
**neuro**
58:12
**neurocognitive**
58:14
**neuropsychology**
57:11 58:1
**nine-year**
106:15
**nom**
57:14
**nonclinical**
62:8
**normalized**
106:20 107:20
**North**
82:9,10
**Notably**
130:8
**note**
82:16 84:3 90:17 124:5 136:11
**Noted**
106:15
**notes**
55:20,21,22 56:2 77:21 105:17,23 106:13 108:4,5
**notice**
66:9 122:13
**noticed**
63:17 80:9
**November**
82:17 84:15,16 94:16 106:14 111:8 130:11
**numbered**
54:17
**nurse**
76:17 95:16 98:3,12,13 99:24 100:6,23,24 118:15 132:2,4,21 136:10

**O**

**O-S-T-R-O-V**
64:7
**object**
117:4 132:7
**objection**
105:18 116:19 117:1 120:11 121:1,7 125:9 126:23 136:5 137:14
**objective**
100:15
**observed**
117:3
**obsessive-compulsive**
113:22 114:4 116:2 117:10 118:22 124:7 125:14
**obstructive**
107:5
**occupational**
58:11 68:16 76:17 100:23 105:11
**occurred**
97:2
**occurrence**
55:18 56:5
**off-site**
66:1
**offer**
106:2
**offered**
86:15 105:16
**offers**
92:19
**office**
59:2,7,8,13,15 60:6 72:23 73:2 74:24 78:2 95:22 97:23 111:7 131:10,22 135:21
**officer**
56:10 68:8 69:2 70:12,22 77:23 78:1,6,8 79:6 80:13 84:3,11 85:7 90:12 92:3 94:1,18 97:20 98:1,9 102:2 104:19 113:20 116:15,20 117:18 118:14 133:24 135:2
**officers**
109:20 131:19 140:16
**official**
71:23
**one's**
55:14 117:16 129:3
**opened**
136:18
**openly**
94:22
**openness**
116:11
**operations**
68:12 82:7,13 135:19 139:17
**opinion**
104:14 113:19 126:4 140:13,22
**opinions**
86:23 109:10 112:2
**opportunity**
117:6 139:22,23 140:6
**OPR**
95:17,23 136:18
**option**
130:12
**orderliness**
116:9
**organization**
60:16
**originally**
82:9
**Ostrov**
64:3,7
**outburst**
111:2
**outbursts**
108:16,23 110:22 133:4
**outcomes**
116:18
**outlined**
110:2
**overconscientious**
118:19
**overestimate**
127:7
**overly**
118:7 121:20
**owns**
63:22

**P**

**pages**
57:1 65:8 80:2 115:24
**paid**
99:13
**paragraph**
66:10 68:20 82:4 91:15 101:22 103:16 104:18 108:14 113:18 122:15 127:5 130:22
**parenting**
104:8 105:13
**part**
68:8 73:18 95:12 99:9 123:15 124:15 143:23
**participate**
119:15
**parts**
96:23
**party**
59:19 63:19
**patient**
62:1
**Patients**
62:5
**pattern**
81:12 116:8 126:19 129:2 133:17
**pay**
104:10
**pending**
61:8
**pension**
61:10 72:19
**people**
67:17 71:6 80:21 86:4 90:14 104:4 108:11 112:15,20 113:7,10 114:9,10,16,20,22 117:10 119:3 121:15 122:13 124:17,21 126:7 127:23 129:7 131:7,9,22 141:1 143:1 144:3
**perceive**
125:2 127:23 128:14
**perceived**
81:7,16 89:13 119:14 131:8
**perceives**
115:7
**percent**
83:14
**perception**
87:24 88:1,18 93:22 100:11 101:12 117:12
**Perfect**
64:21
**perfectionism**
116:9
**perfectly**
88:13 144:9
**perform**
109:16
**performance**
69:11
**performing**
132:16
**peril**
135:14
**period**
134:2
**persisted**
97:14
**person**
77:6 92:20 93:11 107:8 116:7 124:24 128:11 129:8 139:4 144:17
**person's**
105:14 112:8,9 133:11
**personal**
66:24 100:1,7 105:12
**personality**
66:11,21 76:8

113:20,23 114:5,9, 14,17 116:3 117:23 118:22 119:18 120:1,9 124:7,11,15, 19,22 125:3 126:16 127:13 128:11 133:10 134:11
**personnel** 58:23 75:10 112:15 133:16,22
**pervasive** 116:8 126:17,19 128:8 129:2 133:15 138:24 139:3 144:15
**photograph** 68:20
**physical** 65:23 122:18
**physically** 79:4 97:9
**physician** 108:7
**picked** 95:11
**picture** 77:14
**pissed** 131:23
**place** 56:7 78:7 82:11 93:19,20 139:16
**places** 82:9
**play** 100:19
**played** 74:22
**pleased** 93:9
**point** 78:23 82:16 83:19 84:8 87:12 97:21 98:21 99:10,12 100:8,13 102:10 128:10 132:9
**pointed** 132:11
**points** 82:3 124:13
**poked** 88:10
**police** 61:11 134:24
**policies** 60:16
**policy** 85:24 86:17,24 99:1 125:20 126:3 129:24
**poor** 66:16 107:9
**population** 135:10
**populations** 58:22
**pose** 110:3
**position** 55:14 68:8,24 69:6 109:21 110:1
**positions** 123:7
**positively** 106:17
**possess** 113:21
**possession** 66:18
**potential** 108:8
**potentially** 67:18
**pre-hire** 64:17 68:5 112:21
**predisposed** 110:21
**premiums** 66:3
**preoccupation** 116:8
**presence** 66:19 80:14
**presented** 58:16 79:8 84:4 130:3
**presents** 129:18
**pretentious** 127:9
**pretty** 128:3 130:5
**prevent** 55:18
**previously** 54:5 92:17
**primary** 107:22 108:7
**principle** 118:8,13
**printed** 56:24
**prisons** 73:16
**privilege** 63:19
**problem** 60:3,17 65:20 69:5 76:9 120:10 122:5 128:7,9 129:5 132:20 133:9,15 134:6 135:9 138:24 140:3
**problematic** 109:24 140:22
**problems** 68:23 105:10 106:22 125:7,8,10 129:2,15 131:5 134:5
**procedures** 60:16 74:19
**process** 70:17 74:23 75:24 84:4,14 85:15 99:7,9 111:8 115:16 119:11 126:1 134:22
**processes** 59:14
**product** 63:22
**productivity** 66:5 67:1
**profession** 119:4
**professional** 95:21,22 106:11
**professionals** 68:15
**program** 58:9 68:6
**prominent** 124:22
**prompt** 141:3
**prompted** 63:6 79:17,20 83:6
**prompting** 76:2,9 78:19,20,21
**prone** 122:14,16
**proper** 109:19
**properly** 105:2 109:23
**property** 66:1
**protected** 75:9
**provide** 54:23 70:20 74:8 86:9
**provided** 84:9,14 97:2,4 133:22 134:8
**providing** 130:11
**proximal** 107:3
**psych** 113:9
**psychiatric** 66:20 104:5,21 105:8,16 106:2 112:11,12 133:8 134:10
**psychiatrists** 74:10
**psychologist** 74:20 121:23
**psychologists** 74:10 121:22
**psychology** 57:8,10
**psychopaths** 73:13
**public** 55:15 58:9 67:24 68:2,5,7,9,18,24 135:13 139:18 141:7 142:12
**pull** 138:13 139:14
**pulled** 76:6 131:14,18,20 132:19 134:3,17 135:3,9 136:21 138:1,18 139:12 142:4,9,21 143:4,7 144:3
**punitive** 75:23 131:24
**purpose** 62:15 77:24
**put** 55:5 71:14 75:9 82:12 85:4 87:24 99:7 113:13 122:7 130:5 131:13,24 132:23 134:16 135:9,14 139:15,16 143:19 144:5
**putting** 88:19 90:5,18 92:10

**Q**

**quasi-legal** 61:6
**question** 56:3,5,9 60:2,4 61:2, 4 62:16,24 63:1,4 69:18 70:9 71:12 75:3 76:3,7,11 77:1 79:11 85:4 91:2 107:15 116:20,23 117:2 120:12 121:2, 3 122:7 126:24 129:12 133:2,7 136:6 137:15 143:11
**questions** 54:11,24 55:4,10,11 78:11 80:23 102:5 109:14 115:11 134:21
**quick** 101:16 118:9
**quicker** 57:5
**quickly** 115:11,13
**quote** 79:4 89:19,20,21 90:7
**quotes** 129:22,23 130:5

**R**

**race** 101:7
**rage** 128:12,20 131:7,8
**raise** 131:10
**raised** 143:18
**Ray** 54:12 74:7,11
**reaching** 112:3
**react** 115:6 118:11 128:12,19
**reacting** 126:5
**reaction** 81:10
**reactions** 113:24
**read** 56:1 67:9,10 68:21 75:15,17 95:1 117:3 121:5
**reading** 55:9 85:18 105:2
**ready** 85:2
**realized** 80:12
**reason** 84:1 89:9,11 96:7 98:12 100:20 101:15 102:20
**reasonable** 93:6 142:2 143:5
**reasons** 78:14 79:3
**reassigned** 134:3
**Rebecca** 77:1 132:3,4
**recall** 59:9 73:7 78:12,23 107:13 108:3
**receive** 60:12
**received** 84:11
**receiving** 121:15 129:11
**recent** 108:2
**recently** 99:16
**recess** 144:23
**recommendations** 54:24 55:18
**record** 56:2 57:21 63:22 64:13 71:24 72:4 121:5 133:16,23
**records** 69:15,18 84:6 98:3, 11,19 100:2 107:21, 23 111:22 129:24 130:11
**reference** 95:3
**referral** 55:5 62:16,24 63:1 74:23 76:13 79:2,3 94:20 97:4 133:5 136:19 141:11 144:9
**referrals** 75:5,17
**referred** 63:20 65:14
**referring** 93:14 130:14
**refers** 116:22
**refused** 84:3 98:2,10 102:11
**refuses** 106:20
**regular** 73:18
**Reierson** 77:1 132:3,5
**related** 81:3,14 93:11 102:2 106:8 123:9 133:19, 20
**relationship** 61:20 62:7 63:9,15 106:15
**relationships** 122:24
**relative** 122:23
**release** 98:2,11,19 130:13
**releasing** 100:2
**relevant** 69:14 76:3 85:20 86:6 105:13 115:24 127:18,19 137:20
**rely** 112:2 133:23
**relying** 81:18,21
**remained** 82:5
**remember** 70:16 72:20 80:20
**reminder** 84:12
**remove** 83:15
**removed** 82:21 83:2,4,21,22
**rep** 96:19,22
**repeatedly** 134:3
**report** 55:5 62:18,21 64:1, 16,22 71:7,10,14,17 79:1,15,20 81:23 95:2 103:12 116:22 129:18
**reported** 84:11 103:13 104:14 136:16
**reporter** 56:21 115:22 121:6 126:13
**reports** 64:12,17 72:6,14 77:18 103:17
**represent** 56:23 83:9
**representation** 95:24 96:3,13
**representatives** 83:10
**request** 77:21 78:4
**requested** 102:1 103:2 121:6 130:10
**require** 109:16
**required** 80:16
**requires** 109:21
**Reread** 121:3
**research** 58:4,8,12,18 73:13
**resistance** 123:2
**resources** 66:17 79:3,9 82:18 84:5,7,12 94:17 100:3 130:1
**respect** 123:2,3,19,21 127:24
**respond** 109:17 120:5
**responded** 88:24
**response** 79:6 85:14 102:13 112:8 113:5,12 123:22,24
**responsibility** 96:16 138:13
**restlessness** 106:5
**restrained** 87:9,10
**restraining** 86:17
**result** 66:13 76:6
**results** 112:5 113:1
**retained** 73:5
**retread** 80:1
**return** 55:12 77:24
**returned** 82:11
**returns** 110:4
**review** 69:10,14 79:21 95:17,22,23 105:24
**rights** 135:15
**rigid** 114:24 121:19
**rigidity** 116:16 125:12
**rise** 105:7,8 114:11
**risk** 66:4,13 110:4
**road** 141:5
**role** 60:24 75:19 82:1
**roles** 74:22

**Rosalyn** 57:13,18
**roughly** 72:7
**routine** 79:7
**routinely** 127:7

S

**safe** 55:12,13 134:15 135:11 138:12
**safely** 129:4
**safety** 58:9 67:24 68:2,5,7, 9,18,24 76:11 110:4 138:17 141:7 142:12
**salt** 113:15
**sarcastic** 88:15 91:17,20 92:24 93:1 94:5
**Sarocka** 54:12,21 77:21
**sat** 118:16
**scapegoat** 101:10
**scenario** 135:24
**scene** 86:11
**school** 57:9,12,13 105:14
**science** 57:14
**scolded** 131:20
**scope** 62:10
**Scout** 118:6 126:7
**screening** 68:5 112:22
**scrupulous** 118:19
**section** 124:14
**self-esteem** 115:5 127:12
**self-importance** 127:6
**self-refer** 62:1
**self-referred** 62:5
**self-report** 133:24
**self-worth** 106:5
**send** 60:7,19 82:20 83:15, 16 98:22 137:10 141:8
**sending** 140:7
**sense** 59:11 61:18 67:12 106:4 117:16 127:6
**sensitive** 68:7 115:6 121:21 127:14,22
**sentence** 69:9
**separate** 77:5 96:23
**September** 77:22 78:7 102:3,17 103:3,15 110:12 140:12 144:11,13
**Serge** 91:20
**sergeant** 89:10 91:18 135:3
**series** 54:10 62:14
**servant** 142:12
**set** 59:14,18,20 80:14 81:2 85:8
**setting** 85:20 86:11 128:2
**sexual** 65:24
**shackle** 91:21,23 92:3,20 94:6
**shackled** 87:14,19 88:6 91:11
**shackles** 87:12
**shackling** 93:11
**Shaw** 107:24
**shed** 113:23
**Shelby** 76:16 95:16 98:3,12, 13 99:24 100:6,23 118:15 132:3,4 136:10
**Sheriff's** 59:2,7,8,12,15 60:6 72:15,23 73:1 74:23 78:2 97:23 111:6 131:10 135:21
**shit** 138:4
**short** 64:5 101:20 131:6 144:23
**shortly** 111:11
**show** 104:7,8 133:16 142:19
**sic** 67:5
**side** 137:17
**sign** 98:2,8,10
**signed** 98:8
**significant** 103:23 104:13,20,24 105:10,11 143:6
**similar** 84:15 112:20
**simply** 81:5 85:4 92:15 98:14 100:1 103:6 141:20 142:2
**simultaneously** 90:22
**single** 80:22
**sites** 62:14
**situation** 88:2 96:15 104:23 117:21 132:15,17 142:18 144:2
**situations** 87:15 122:16
**sixth** 65:8
**skip** 66:10
**sleep** 106:4,21 107:1,4,5, 6,7
**slightly** 60:1,4
**small** 67:8
**social** 66:17 105:12
**somebody's** 76:6
**someone's** 75:10 135:3
**somnolence** 106:22
**sort** 62:13 68:14 74:17 80:23 88:23 91:10 98:24 108:21 115:1, 4 116:17 122:14 128:16
**sought** 102:16 111:12
**sounds** 68:24 99:10 108:20 116:14
**speak** 56:8 70:13,14 71:5 143:1
**speaking** 58:10 76:22 93:15 98:16 108:9 119:7 139:8
**special** 132:17
**specialty** 57:11 58:3
**specific** 67:4,11,19 75:1 81:10 132:15 136:9 142:24
**specifically** 81:15 83:12 85:3,12 90:6 94:20 117:18
**spell** 119:12
**spent** 73:11
**spiraled** 89:1
**spiraling** 96:16
**split** 106:13
**spoke** 77:8
**spoken** 76:16 77:2
**spring** 84:7
**stability** 112:13 141:7
**staff** 144:1
**staff's** 135:5
**staging** 82:12
**stalking** 66:2
**standpoint** 129:1 135:19
**stands** 95:23
**start** 94:19 102:11 109:4
**starts** 89:20 91:12
**stated** 62:17 80:13
**statement** 65:11,17 66:7 80:6, 11 103:19
**states** 65:13 107:18
**Statistical** 114:6,7 116:1
**status** 106:6 112:12 122:23
**stay** 80:17
**stayed** 85:3
**stepped** 92:16
**stock** 131:13 132:1,23 143:19 144:5
**stop** 67:1
**stress** 66:16 104:13,22 105:4 109:18
**stresses** 133:11
**stressor** 106:8
**stressors** 103:18
**strike** 87:16
**strong** 119:2 123:24
**strongly** 115:7 118:11 126:5
**studies** 124:7
**subjected** 135:17
**substance** 66:20 76:8 133:9 134:10
**subtitles** 121:23
**succession** 131:6
**sufficient** 141:3,13
**sufficiently** 139:14
**suggest** 135:20
**suggesting** 83:6
**superintendent** 56:12 70:21 77:7 78:6 80:10,12,16 81:1 85:22 88:4 91:23 99:17,20,24 100:6,21 102:3 108:17
**superior** 79:6 102:2 109:19
**superiors** 136:16
**supervisor** 56:11 59:22 137:22
**supervisors** 69:14,19 74:22
**supplements** 107:15 108:7
**support** 66:17
**Supporting** 122:10 127:11
**supposed** 59:23
**surface** 133:8
**sworn** 54:2,5
**symptoms** 103:23 104:21 105:7 106:3 112:11,13
**syndrome** 107:5
**systematic** 124:6

T

**takes** 126:3
**taking** 94:4 104:9 129:19 138:22
**talk** 114:20 125:13 129:18 130:16,21 132:21 139:5 144:21
**talked** 69:17 87:4 94:11,22 101:9 127:21 128:1 130:17
**talking** 63:13 69:1 80:10,20 87:21 97:21 99:14 109:6 114:3 127:15 130:24 137:11 139:7
**talks** 61:22
**target** 67:5,11
**targets** 67:19
**teach** 74:6,12
**teaching** 58:17
**telephone** 66:2
**telling** 81:20 123:7
**tendency** 125:15
**tension** 86:13 96:3
**terms** 113:14 144:6
**test** 112:10
**testified** 54:6 83:13 132:3
**testify** 132:5
**testimony** 137:6,7
**tests** 112:6 113:3
**text** 82:5
**thing** 57:7 101:2 107:12 112:16 119:17 134:13 140:15,23
**things** 57:6 58:14 63:17 64:10 80:8 81:9 86:1,2,9 87:22 88:5, 23 90:19 94:10 96:16 97:19 99:1,15 103:7 104:11 110:19,24 114:5
117:14 118:1,2 124:23 125:1 129:17 131:2
**thought** 57:4 88:22 99:15 100:5 101:7 119:10, 16
**threatened** 135:13
**threatening** 97:8 102:1
**threats** 65:23
**thrown** 123:19
**time** 69:17 74:13 76:19 84:19,23 110:20,22 111:2 120:24 130:10 131:19 132:23 134:7 139:2
**times** 60:12 70:4 73:23 74:4,6,7 75:21 104:4 126:18
**told** 64:23 71:13 82:19 83:1 85:1 92:4 95:16 102:24 107:13 130:19 131:21 132:19
**tolerance** 66:16 107:9
**tomorrow** 73:17
**touch** 74:13
**touching** 88:19,20
**training** 57:17 74:18
**trait** 128:19
**traits** 113:23 114:10,14, 17,24 116:22 117:2, 3,10,24 118:17,22 119:18 120:9 123:10 124:12,22 125:3,11, 14 127:20
**treat** 58:22 133:13
**treatable** 76:10
**treated** 59:1,4 101:13 119:14
**treater** 62:1
**treating** 114:22
**treatment** 74:9,14
**trees** 115:2
**tripwire** 140:19 143:17
**trouble** 138:2,14
**true** 82:24 86:21 98:24 100:12,17 101:14 115:8 130:20
**truth** 81:20
**turn** 77:11 109:10
**turnover** 66:6
**type** 61:16 64:12 96:1

108:16
**types**
112:20 114:23
**typically**
59:18 61:8 75:7
122:19

U

**ultimately**
98:1,10 101:23
**Um-um**
62:12
**umbrage**
92:2,14 93:2 94:4
**unclear**
142:7
**uncomfortable**
96:2 100:2,18
**uncommon**
112:15
**uncooperative**
97:16
**undergo**
103:3
**underneath**
68:20
**understand**
56:4 74:21 75:4
79:12,16 84:18
86:12 95:19 96:22
100:20 103:5 115:10
116:24 119:3
121:10,14 124:24
125:18,24 129:12,14
130:15 131:3 133:18
143:10 144:8
**understandable**
104:22 106:7 144:2
**understanding**
85:21 101:24 102:15
103:2,14 111:12
**understands**
121:2 129:13
**understood**
65:4 78:13 87:14
102:19 111:6 122:3
**unethical**
118:15,24 119:2,5
**unfair**
119:17 144:5
**unfairly**
101:13
**unfit**
135:16,17,22 141:15
142:13,17 143:20
144:6,16
**union**
96:13,19,22
**United**
65:13
**University**
57:8,16
**unjust**
119:17 123:23
**unreasonable**
90:17
**unsafe**
87:5,9 138:6
**unshackled**
91:21
**untrue**
119:22
**updating**
65:2
**upset**
93:6 122:16 139:22
144:4

V

**vague**
136:6
**valid**
141:2
**values**
118:20
**vast**
63:23
**verbal**
65:23 88:22 129:6
**verbally**
109:22 134:4
**version**
85:17 86:7 114:8
**versus**
62:8,11 63:11 82:1
**view**
67:2 94:9 116:16
125:23
**violence**
58:5,17,20 65:10,12,
19 66:4,14 67:17
**violent**
65:13 67:13,18
**visit**
83:20
**volunteer**
85:13
**Vulnerability**
127:12
**vulnerable**
107:8 119:19 120:4

W

**waited**
140:21
**waiver**
98:2,10
**walked**
91:18 92:5 93:23
**wall**
89:22
**wanted**
85:13 94:12 96:2,12
**water**
101:17
**weapons**
66:19
**website**
56:24 57:1 61:22
63:18 64:2 65:2,22
**week**
73:12
**weeks**
79:7
**well-suited**
128:21
**whatnot**
58:19 144:1
**whatsoever**
139:10
**white**
115:2 117:9,15
118:1 119:1 123:18
**Winifred**
76:16
**withheld**
110:24
**woman**
106:16 123:16
**women**
101:4,5 123:6
**wondering**
78:17 95:6
**word**
56:4 101:10 119:2
126:18
**words**
86:10 87:24 92:16
93:21 97:17 112:22
**work**
55:12 63:22 66:24
73:19 76:6 83:16
93:18 104:7,23
106:17 110:5 129:8
133:13 134:16
135:12,16 137:12
142:13 143:14
**worked**
72:22 73:1,9 82:17
106:20
**worker**
61:6 66:3
**working**
134:24 135:10
142:17
**workings**
73:15
**workplace**
58:5,16,19 65:10,12,
19 66:1,4 67:17
76:5,12
**world**
125:2
**worry**
106:6
**write**
71:22 118:1 130:8
**write-ups**
133:19
**writing**
67:8
**written**
85:24 86:17 101:6
134:4
**wrong**
117:7,8
**wrote**
69:4 80:11

Y

**year**
110:12
**years**
72:10 113:8 133:17,
21 134:24
**yelling**
92:11
**young**
77:14

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

JOHN NAWARA,

Plaintiff,

vs. Case No. 17-cv-02393

COOK COUNTY, et al,
Defendants.

VIDEOCONFERENCE DEPOSITION OF MARY PARRINELLO
MONDAY, NOVEMBER 18, 2019
9:00 a.m.

BE IT REMEMBERED THAT, the videoconference deposition of MARY PARRINELLO was reported by Mary C. Soldati, Registered Professional Reporter, Certified Shorthand Reporter, on Monday, November 18, 2019, commencing at the hour of 9:00 a.m., the proceedings being reported at the offices of LNS Court Reporting, 520 SW Yamhill Street, Suite 444, Portland, Oregon.



APPEARANCES

Appearing on behalf of the Plaintiff:
LINDEN LAW
MR. RICHARD LINDEN
161 N. Clark Street, Suite 2230
Chicago, IL 60601
Lindenlaw@gmail.com
(via videoconference)

Appearing on behalf of the Defendant Sheriff Dart:
SCHARF BANKS MARMOR, LLC
MS. SUZANNE ALEXANDER
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
salexander@scharfbanks.com
(via videoconference)



APPEARANCES

Appearing on behalf of CorVel Corporation and Mary Parrinello:
MR. EDWARD JORDAN
BRYCE DOWNEY & LENKOV, LLC
200 North LaSalle Street
Suite 2700
Chicago, Illinois 60601
ejordan@bdlfirm.com
(via videoconference)

ALSO PRESENT: Lani Milton, Videographer



P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. The time is approximately 9:04, on today, Monday, November 18th, 2019.

My name is Lani Milton. I'm the videographer representing LNS Court Reporting, here with court reporter, Mary Soldati, also in association with LNS Court Reporting.

This is the start of the videotaped deposition of Mary Parrinello, being taken in the matter of the John Nawara versus the County of Cook, et al. It is being held in the U.S. District Court for the Northern District of Illinois. The case number is 117-cv-02393. We are located today at LNS Court Reporting.

Counsel, could you please introduce yourself and association for the record.

MS. ALEXANDER: Suzanne Alexander, on behalf of Defendant Sheriff Dart.

MR. LINDEN: Good morning. Richard Linden, L-I-N-D-E-N, on behalf of Plaintiff John Nawara.

MR. MORRIS: Patrick Morris on behalf of Defendant Karen Jones Hayes.

MR. JORDAN: Edward Jordan, on behalf of the





EXHIBIT
F

witness, Mary Parrinello, as well as CorVel Corporation.

MARY PARRINELLO,

was thereupon produced as a witness and, after having been sworn on oath, was examined and testified as follows:

EXAMINATION

BY MS. ALEXANDER:

Q. Good morning, Mary.
A. Good morning.
Q. Can you please state your name for the record and spell your last name.
A. My name is Mary Parrinello, spelled P-A-R-R-I-N-E-L-L-O.
Q. And, Mary, have you ever been deposed before?
A. No, I have not.
Q. Okay. So, my name is Suzanne Alexander, on behalf of the Cook County State Attorney's Office -- excuse me -- Cook County Sheriff's Office, and I will be asking you a few questions.
So before we start, I just want to go over a couple of quick little, sort of, rules of the road in this deposition.
The first is that we need you to answer audibly because the court reporter is taking everything down,

5

and obviously, she can't take down a nod, okay?
A. Okay.
Q. Is that okay? Does that make sense?
A. Yes, it does.
Q. The sound is cutting out. So did that make sense, Mary?
(Discussion off the record.)
THE VIDEOGRAPHER: We are off the record at 9:07 a.m.
(Discussion off the record.)
THE VIDEOGRAPHER: We are back on the record at 9:08.

BY MS. ALEXANDER:

Q. Okay. So Mary, the next -- the next rule of the road here is that if you don't understand a question that I ask, please just ask me to rephrase it or tell me you don't understand.
And I'll assume that if you answer a question I asked, that you understood the question. Is that okay?
A. That's fine.
Q. Okay. And also if you need a break, please feel free to take a break any time you need. I would just ask that you not leave a question pending, you answer the question that's pending before you take a break.
Does that sound good?

6

A. Understood, yes.
Q. Okay. Mary, can we start -- where are you employed right now, Mary?
A. I'm employed at CorVel Corporation here in Portland, Oregon.
Q. Okay. And what do you do there?
A. My position is privacy officer and also director of privacy and audit.
Q. Okay. And let's back up, then. What's your -- what is your education? Did you go to college?
A. Yes, I did. My education is a Bachelor's of Arts in Education, for both regular and special education.
I have a minor in sociology and then ongoing higher education toward a master's degree, which is not yet completed.
I've also been certified as a resource specialist, and I continue to do approximately 25 hours or more per year on professional education and growth.
Q. Okay. So let's break that up.
You said you're working on your master's degree right now?
A. I am not working on it actively right now, but I had worked toward it in the past.
Q. Okay. And what was that for? What -- master's in what?

7

A. That would have been education.
Q. Okay. So you're working on that right now -- anymore?
A. No, I'm not.
Q. And how long have you been employed at CorVel?
A. I was hired there in early 2002. I began as a temporary staff prior to that, so it's been over 18 years, as part of what is now Symbeo, which is a subsidiary of CorVel Corporation, and then actively at our parent corporation, CorVel for almost four years.
Q. Okay. So in 2002 you started at Symbeo, you said?
A. Yes. At that time it was called Net One Scan One, and then became Scan One and now Symbeo.
Q. Okay. Net One Scan One it was called?
A. Mm-hmm.
Q. How do you spell Symbeo?
A. S, as in Sam, Y-M-B-E-O.
Q. And what did Net One Scan One do?
A. In those days, we were doing primarily document preparation, high speed scanning and data entry and data validation.
Q. And what did you do? What was your job?
A. I actually began in document preparation, moved into scanning, becoming a scan operator, and then moved

8

from there into the data program, so that I could learn all aspects of what the business entailed.

I became a manager and over the course of the years, became the director of the production environment. So I did manage approximately 80 staff and oversaw all aspects of five departments of production. I also did the HR, the business continuity and disaster recovery plans and also the audits for SOC 1 and SOC 2.

**Q. What is SOC 1 and SOC 2?**

A. Those are the audits that have to do with the operation of our business and financial aspect of the SOC 1.

And then the SOC 2 two, of course, is the more highly -- security-oriented and control based from government guidelines. And I chair those still today at CorVel.

**Q. I'm sorry. Can you say that again?**

A. I chair those same audits --

**Q. You still do that today?**

A. Yes, at CorVel. Mm-hmm.

**Q. And so when -- when did your work change from Symbeo to CorVel?**

A. In February, three years ago, that would have been 2016, I moved over part-time at first as privacy officer, and then full-time by August of 2016.



**Q. Okay. So by August of 2016 is when you became full-time privacy officer at CorVel?**

A. Yes.

MR. LINDEN: Objection. Asked and answered.

MS. ALEXANDER:

**Q. Okay. And are there any other privacy officers at CorVel or are you the only one?**

A. I am the only privacy officer at CorVel.

**Q. Okay. And can you tell me what your job responsibilities are as privacy officer at CorVel?**

A. Yes. I oversee and handle the tracking and investigation of all privacy and security incidents.

I also work toward the development of the necessary policies and protocols required for data privacy and security at CorVel, the training and development of our staff's educational program and authorship of some of those annual training compliance programs are also part of what I manage and oversee.

And then again, I also handle the SOC 1 and SOC 2 audit program and work closely with our IT staff and other accounting staff on the Sarbanes-Oxley, the SOX audits.

**Q. Okay. What types of -- what are -- you said you did trainings --**

A. Yes.



**Q. -- for your staff at CorVel.**

**And what types of -- what are the topics? What types of trainings do you do?**

A. Primarily, my focus is on data privacy and all aspects of reporting anything to do with privacy incidents that would occur at CorVel.

I also oversee the security awareness program, which is the training and authorship again of course work that our staff are required to take annually.

And so that is in development, in collaboration with other members of my team and my manager.

**Q. And how many people do you supervise?**

A. I have no direct staff that I supervise. However, of course, I work across the entire enterprise, and I work very closely with our legal team, on both data privacy and security on all aspects of that work flow.

**Q. Okay. And when you say all aspects of the data privacy and security, does that involve laws or regulations?**

A. Our legal team internally, as well as external legal firm support us in that workflow. My primary role, again, is the tracking, the investigation, the work toward resolution of any of the privacy or security incidents that occur.



But, of course, I do have to take the time and the course work to ensure that I am absolutely current in anything to do with federal and state law as well as with HIPAA.

**Q. Okay. So you said you take course work to keep up to date on federal and state laws?**

A. Yes.

**Q. Is that correct?**

A. That is correct.

**Q. And what type of course work do you take?**

A. The course work is primarily course work that is provided through the Internet, although we do have an educational program at CorVel, and I have taken some courses through that.

Most of this, again, is primarily through the Internet, although I have done some educational courses in the local area that have been offered publicly.

**Q. And what are the titles of those, of the course work that you're taking or the topics cover?**

A. Some of them would include state laws, such as the CCPA for California. The GDPR, we have a GDPR program, of course, at our company and I've helped with the training on that matter, as well.

Anything to do with HIPAA, with cyber security, with compliance, and with all aspects of reporting

privacy incidents, awareness of breach, staying attuned to the current status of breaches in our country and internationally as well.
Q. Okay. You stated two acronyms that I didn't understand. Can you explain what those acronyms are? I think you said GDPR?
A. Yes. That is the government regulations for privacy and security that have come through the European Union.
Q. Okay.
A. So we follow that. And then I know I mentioned HIPAA, which of course we're familiar with. And the California law is a new one coming into effect the first of the year, so I've been involved in studies for that. That would be the CCPA. I know there are a lot of acronyms across states.
Q. Yeah. So you said the CCPA is in California?
A. Yes. Mm-hmm.
Q. Do you know what that stands for, CCPA?
A. It has to do with the California Protection Act and the privacy rights of all individuals.
Q. Okay. And you said that's coming into effect in the first -- January 1st. Is that January 1st, 2020?
A. Correct.
Q. Okay . And tell me what education you have



regarding HIPAA.
A. Primarily, it has been a lot of on-the-job learning. Of course, I received a lot of training and guidance from the prior privacy officer at CorVel Corporation when I took over the position, as well as, of course, from my immediate managers across time.
And then, again, professional education, primarily through the Internet, working on course work that had to do with all of the standards of HIPAA and of course self-study as well.
Q. Okay. Thank you. Are you -- in your role as privacy officer at CorVel, are you familiar with HIPAA medical release forms used by CorVel?
A. Yes, to some extent. Although the authorship of those was not something that I am directly involved in large measure.
Q. So you don't write the -- you don't create the HIPAA forms?
A. That is correct.
Q. Is that what you're saying?
A. Yes.
Q. But you are familiar with them?
A. Yes, I am.
Q. And are you familiar with HIPAA medical release forms that accompany a fitness-for-duty referral to



CorVel Corporation?
A. I am familiar with the general form for fitness of duty for that HIPAA release.
Q. Okay. All right. Let's look at a form, then. I believe you have -- the court reporter there has the subpoena and three forms attached to the subpoena.
(Discussion off the record.)
BY MS. ALEXANDER:
Q. Mary, did you bring the subpoena with you today?
A. Yes, I did.
Q. And you have the three forms that were attached to the subpoena?
A. Yes, I do.
Q. Okay. And the one that's titled HIPAA Authorization For Disclosure of Protected Health Information?
A. Yes, I have that.
Q. Do you see that one?
A. Yes.
MS. ALEXANDER: Can we mark that, please, as Exhibit 1.
(Exhibit No. 1 marked for identification.)
THE WITNESS: Yes.
BY MS. ALEXANDER:
Q. So we've marked that then Exhibit 1.



And, Mary, have you seen this form before?
A. Yes, I have. In relation to this subpoena, in particular.
Q. But even before the subpoena, had you ever seen this form before?
A. I cannot say that I had seen it prior to this.
Q. Okay. So since you've seen it since the subpoena do you feel familiar with this form?
A. Yes, I do.
Q. Okay. And who created this form?
A. Through some internal review at CorVel and speaking with employees at CorVel, I have come to the understanding that this form was authored prior to my time by the privacy officer, who is no longer with our company, whose name was Gregory Stevens.
Q. So Gregory Stevens was the privacy officer before you?
A. He was two before me. Gregory Stevens --
Q. Two before you?
A. Yes.
Gregory Stevens left the company and then Rhonda Moran took over after him, and then I came into my position.
Q. Do you know when Gregory Stevens created this form?

A. I do not know.
Q. Okay. And is this form compliant with HIPAA?
MR. LINDEN: I just want to object, number one, it calls for a legal conclusion. Number two, I think it's improper soliciting opinions from the witness, under Federal Rule 26. There's been no expert report or disclosure of any opinions and it's totally improper.
BY MS. ALEXANDER:
Q. So based on your -- Mary, based on your experience as a privacy officer at CorVel, and based on your education with HIPAA, is this form CCSO 1130 compliant with HIPAA?
A. To the best of my knowledge and understanding, I would say yes, that that is.
Q. And why is that?
A. It contains the key requirements that HIPAA defines.
MR. LINDEN: Again, I just want to make a standing -- if you allow me to make a standing objection. I think this whole deposition is improper. It's really the role of the court to determine whether or not this form complies with or doesn't comply with HIPAA.
There's been no foundation that this witness



is qualified to give legal conclusions. She's not a lawyer. And as far as I can tell, she really never saw it until she got the subpoena.
BY MS. ALEXANDER:
Q. Mary, you can answer. He's just putting his objection on the record.
So let's go back to -- my question was, based on your experience as a privacy officer at CorVel and your education surrounding HIPAA, why is this form compliant?
A. My review of the form and my review of all the requirements under HIPPA have led me to the understanding and belief that this is in accord with HIPAA standards and HIPAA requirements.
Q. And is this a standard CorVel form?
A. Yes, it is a standard CorVel form.
Q. So how is this form used by CorVel?
A. Again, this is the first in relation to this subpoena that I've become familiar with the form.
My understanding of the form's use is for business purposes to allow CorVel the ability to engage with this customer, the case management program, in order to fulfill the processes required under that case management program for the customer, relating to a fitness-for-duty.
Q. Okay. And once a person, an individual signs



this form -- at the bottom it says, "Signature of person giving authorization.
When that person signs the form, then what happens with this form then?
MR. LINDEN: Objection to form.
BY MS. ALEXANDER:
Q. You can answer.
MS. ALEXANDER: What is the objection?
MR. LINDEN: Form. I mean, I don't think I have to say anymore.
MS. ALEXANDER: You don't have to.
MR. LINDEN: Calls for, number one, speculation. And host of other --
MS. ALEXANDER: Okay.
BY MS. ALEXANDER:
Q. So, Mary, again, like I said, what -- after a person signs this form, what does CorVel do with this form?
A. I am not involved in that aspect of the process. That would engage the case management team and that case management program.
So I do not have understanding or knowledge of exactly what happens with this form.
Q. And the person to ask would be the case manager?
A. That would be the route I would suggest.



Q. Okay. And what does this form allow the case manager to do?
MR. LINDEN: Objection. Form. Speculation.
BY MS. ALEXANDER:
Q. Let me rephrase that.
Mary what is the purpose of this form?
A. The purpose of the form is to authorize our case management involvement with this particular customer, and to authorize the release that relates to this particular purpose, which is the fitness-for-duty exam, as well as to allow for the noted items here, the eight items on this form.
So it would include release of information in order for our business purposes to proceed with our case manager.
Q. Okay. Let's look at those items. Number one states, "Witness authorization: I allow all medical records and information to be released and reviewed that relate to my fitness-for-duty exam."
Did I read that correctly?
A. Yes.
Q. Did I read that correctly, Mary?
A. Yes, I did.
Q. Okay. And number two states, "Any healthcare provider or facility who treats/treated me for my

medical condition or medical illness, identified healthcare provider, may disclose the above-described information to a disability management case manager for Cook County, employed by CorVel Corporation."
Did I read that correctly?
A. Yes.
Q. Okay. So what medical records would the disability case manager for Cook County, employed by CorVel Corporation, be permitted to obtain after this form has been signed?
MR. LINDEN: Objection as to form. Calls for legal conclusion. And also speculation.
BY MS. ALEXANDER:
Q. You can answer.
A. Based on what this form states, it would allow all medical records and information to be released related to this fitness of duty.
Q. So what -- how is it determined which medical records to be -- are sought?
MR. LINDEN: Objection to form. Foundation. Speculation.
THE WITNESS: This question would be best answered by, in my opinion, the case manager. That would not be an area that I would be actively engaged in.



MR. LINDEN: I'd like to add foundation.
BY MS. ALEXANDER:
Q. So the case manager is the person to talk to about that, which medical records would be sought?
A. That would be my recommendation.
Q. Does this form provide a space for the signature of the person -- excuse me -- for the person giving authorization to provide names of medical providers from whom to seek records?
A. I don't see that on the form.
Q. So how do we decide which medical providers to ask for records?
MR. LINDEN: Objection. Form. Foundation.
THE WITNESS: Again, that would be best answered, in my opinion, by the case manager, who was actively involved in the actual work of this matter.
BY MS. ALEXANDER:
Q. I guess my question is, if the person giving authorization doesn't write down the names of the doctors, does the case manager then decide the names of the doctors?
MR. LINDEN: Again, objection to form. Foundation. Speculation. And asked and answered.
MS. ALEXANDER:
Q. You can answer Mary. Go ahead.



A. My opinion would be to discuss that with the case manager. Again, I can only go by the statement on the form, which is allowing all medical records and information to be released, relating to the fitness-for-duty of the signee.
Q. Okay. And there are no limitations placed in this form on which medical providers to be asked or the dates on which medical -- the records are obtained?
MR. LINDEN: Objection as to form.
MS. ALEXANDER:
Q. Are there any limitations in this form?
A. Not that I am aware of.
Q. And are there any limitations as to which -- which type of medical records can be obtained or are all medical records able to be obtained?
MR. LINDEN: Objection. Form. Calls for a legal conclusion.
BY MS. ALEXANDER:
Q. You can answer, Mary.
A. Referring to item one on the form, again, it does state, "All medical records and information," in this particular regard.
Q. And based on your experience as the privacy officer of CorVel and your education in HIPAA, is it compliant with HIPAA to request all medical records?



MR. LINDEN: Objection. Calls for legal conclusion. Foundation. And also speculation.
BY MS. ALEXANDER:
Q. Go ahead. You can answer.
A. To the best of my knowledge, it would be compliant with HIPAA.
Q. Okay. And can we look at the form that has -- at the bottom it says Nawara 000438?
A. Yes.
MS. ALEXANDER: Can we mark that Exhibit 2, please.
(Exhibit No. 2 marked for identification.)
BY MS. ALEXANDER:
Q. You ready?
A. Yes.
Q. Do you see on Nawara 000438, that this is -- this also states, "HIPAA authorization for disclosure of protected health information." Is that correct?
A. Yes.
Q. And it's been filled in. Do you see that?
A. I do.
MR. LINDEN: Objection. Form.
BY MS. ALEXANDER:
Q. Mary, I'm sorry. I didn't hear your answer. Did you say --

A. Yes, I do see that it has been filled in.
Q. All right. It says -- John Nawara is listed as the person's name at the top?
A. Correct.
Q. And also at the bottom, with the date and signature that's been blocked out?
A. Correct.
Q. Okay. And have you seen this form before?
A. Subsequent to receiving the subpoena, I have now seen the form.
Q. And did you review it before today?
A. Yes, I did.
Q. Okay. And did you see any differences between this form and the one we just spoke about, CCSO 1130?
MR. LINDEN: Objection. Form. Calls for a legal conclusion. And making a standing objection under Rule 26 that this person has not been properly disclosed as an expert witness.
MS. ALEXANDER: Okay. We got your standing objection.
BY MS. ALEXANDER:
Q. So all I asked was, are there any -- did you see any differences between Nawara 000438 and CCSO 1130?
A. Yes, there are changes.
BY MS. ALEXANDER:



Q. Let's look at No. 1, please.
"With this authorization, I allow all medical records and information to be released and reviewed that relate to my fitness-for-duty exams to CorVel Corporation."
Do you see any change there between that and the No. 1 on the previous form?
A. Yes.
Q. What change? What is that change?
A. On the signed form, the addition to that first sentence of "To CorVel Corporation," has been added to the end of the first sentence.
Q. Does the blank form that we just discussed CCSO 1130, does that provide for the release of medical information, medical records and information to CorVel Corporation?
A. Yes. The blank would provide for release of information to CorVel, specific to this particular fitness-for-duty.
Q. Does it provide for release of information, medical information to anyone besides CorVel?
A. Which form are we now discussing?
Q. I'm sorry. Sorry. The first form, the blank one CCSO 1130?
A. Would you repeat the question, please?



Q. Does that form provide for medical records and information to be released to anyone, other than CorVel Corporation?
MR. LINDEN: Objection. Calls for a legal conclusion, and the forms speak for themselves and what has been provided.
THE WITNESS: My understanding is it does absolutely allow for release of information to CorVel Corporation, in this particular scope.
I would have to look back over it again to see if there are others approved for release as well.
Q. You can do that. Go ahead.
A. My review of the form is quite specific to CorVel. Again, this is a CorVel approved form. And the release of information relates to the fitness-for-duty for records to be provided specifically to a disability case manager, assigned for Cook County and employed by CorVel Corporation.
Q. Okay. So the addition of the words "To CorVel Corporation," number one, on the signed form, right?
A. Yes.
Q. Does that change -- does that really add anything to the blank form that we discussed CCSO 1130?
MR. LINDEN: Objection as to form to the extent it calls for a legal conclusion also.



BY MS. ALEXANDER:
Q. Okay. Go on Mary.
A. My understanding is that it would not materially change the release of information that would be provided to CorVel.
Q. Okay. And let's look, then, at No. 3 on the form titled Nawara 000438. "This disclosure is made for the purposes of your fitness-for-duty examination as requested by your employer, Cook County. Your employer will receive a copy of the independent medical exam, IME. You will also receive a copy of the IME."
Is that different from No. 3 in the blank form CCSO 1130?
A. Yes.
Q. How is it different?
A. There has been an addition to the end of the statement, No. 3 on the blank form. On the signed form, it has added, "Your employer will receive a copy of the independent medical exam. You also will receive a copy of the IME."
Q. Does the blank form, CCSO 1130, allow for CorVel to provide a copy of the independent medical exam to the employer?
MR. LINDEN: Objection. Form. Legal conclusion.

THE WITNESS: Not that I am aware of in review of the form.
BY MS. ALEXANDER:
Q. Let's look at No. 5. "I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal" -- excuse me -- by the Federal Health Privacy Rules, otherwise known as HIPAA, and may be subject to redisclosure by the recipient."
Is that different from the blank form, CCSO 1130?
A. I do not see that that is different from the blank.
Q. Okay. And then does No. 5 allow CorVel, then, to provide a copy of the independent medical exam to the employer?
MR. LINDEN: Objection. Calls for a legal conclusion. Form.
THE WITNESS: It does state that it may be subject to redisclosure by the recipient.
BY MS. ALEXANDER:
Q. So is that a correct statement that I just made, that that would allow the -- CorVel to release a copy of the independent medical exam to the employer?
MR. LINDEN: Objection. Form. Legal conclusion. Foundation. Asked and answered.

29

THE WITNESS: Yes.
BY MS. ALEXANDER:
Q. Go ahead, Mary.
A. Yes.
Q. And we should -- let's clarify. Independent medical exam or IME, is that the same or is that another word for a fitness-for-duty exam or can that be?
MR. LINDEN: Objection. Form.
THE WITNESS: I would not relate an IME specifically to being the same as a fitness-for-duty. There are different types of independent medical exams. This particular form is specifically for a fitness-for-duty.
BY MS. ALEXANDER:
Q. Thank you for that clarification.
Is a fitness-for-duty exam a type of independent medical exam?
A. It could be.
Q. Okay. Does this -- does the blank form for CCSO 1130 allow the case manager for CorVel to seek records from any provider that it deems relevant?
MR. LINDEN: Objection as to form. Calls for a legal conclusion. Speculation on the issue.
THE WITNESS: The form does state that in the course of this particular business purpose for the

30

disability management case manager, that they are allowed to seek the necessary information.
BY MS. ALEXANDER:
Q. And the case manager will decide what information is necessary?
MR. LINDEN: Objection. Form.
THE WITNESS: Yes, that would be my suggestion, yes, to discuss with the case manager.
BY MS. ALEXANDER:
Q. I'm sorry. I missed that last part.
A. To discuss that question with the case manager would be my suggestion.
Q. Back to No. 5 on those two forms that we just discussed, where we discussed that the IME or excuse me the information disclosed pursuant to this authorization may no longer be protected by Federal Health Privacy Rules, also known as HIPAA, and may be subject to redisclosure by the recipient."
Back to that. Are you there? Are you with me?
A. Yes.
Q. Is that compliant with HIPAA?
MR. LINDEN: Objection. Calls for a legal conclusion. Foundation.
BY MS. ALEXANDER:
Q. Actually, let me rephrase the question.

31

Is the redisclosure of information allowed by HIPAA?
MR. LINDEN: Again, same objection. Form. Legal conclusion. Foundation.
BY MS. ALEXANDER:
Q. Go ahead.
A. Yes. My understanding is that yes, that would be compliant with HIPAA.
Q. Okay. And let's look at the third form CCSO 1131.
MS. ALEXANDER: Can we mark that as Exhibit No. 3.
(Exhibit No. 3 marked for identification.)
THE WITNESS: We have that.
BY MS. ALEXANDER:
Q. Okay. And are you familiar with this form?
A. The first I saw this form was subsequent to receiving the subpoena.
Q. And this states, "Cook County Sheriff," at the top and it says, "Authorization to release healthcare information," is that correct?
A. Correct. Yes.
Q. Is that correct?
A. Yes.
Q. Okay. And is this a CorVel form?

32

A. No, it is not.
Q. Do you know if this form is compliant with HIPAA?
MR. LINDEN: Objection. Calls for a legal conclusion. Foundation. Outside the scope of the 30(b)(6) notice. It's not a CorVel form. And Rule 26 of the Federal Rules and foundation.
BY MS. ALEXANDER:
Q. Go ahead, Mary. You can answer.
A. I would not give an opinion on this form. It is not a CorVel form.
Q. So you're not familiar with this form?
A. I am not.
MR. LINDEN: Objection. Asked and answered.
BY MS. ALEXANDER:
Q. Back to Exhibit No. 1 CCSO 1130?
A. Yes.
Q. Is this form too broad under HIPAA?
MR. LINDEN: Objection as to the form of the question. Calls for a legal conclusion and foundation.
BY MS. ALEXANDER:
Q. Go ahead, Mary.
A. In my opinion.
MR. LINDEN: And Rule 26. I'm sorry.
BY MS. ALEXANDER:
Q. Go ahead.



A. In my opinion, this is a general form from CorVel, our standard form specific to a fitness-for-duty.
Q. Do you have any problems with this form?
MR. LINDEN: Objection as to form. Calls -- to the extent it calls for a legal conclusion. Object. Foundation.
THE WITNESS: I do not have a problem with this form.
BY MS. ALEXANDER:
Q. And I just want to go back quickly to your education around HIPAA.
Could you estimate about how many hours you would say you have gone in classes regarding HIPAA?
A. At a rough estimate over the course of the last almost four years, I would say a minimum of 40 to 50 hours.
Q. And have you done that -- do you take courses related to HIPAA every year?
A. I do try to take courses related to HIPAA every year.
Q. Is that an important part of your job at CorVel?
MR. LINDEN: Objection. Form.
THE WITNESS: Absolutely. Yes. Ongoing higher education, professional education is critical.



BY MS. ALEXANDER:
Q. I think that's all the questions I have. Thank you.
MR. LINDEN: Mary, I've got some questions for you now.

EXAMINATION

BY MR. LINDEN:
Q. I represent the plaintiff, John Nawara.
And I'd just like to -- a few things on the background.
Did you ever go to law school?
A. I did not.
Q. So you're not a lawyer; is that a fair statement?
A. That is a fair statement.
Q. You're obviously not licensed to practice law, correct?
A. That is correct.
Q. Have you reviewed Federal Court discussions addressing HIPAA and what's allowed and what is not allowed under HIPAA?
A. I have done personal study. I have not looked over active cases, if I'm understanding the question correctly.
Q. Can you name any cases that address HIPAA by



name?
A. No, sir, I cannot.
Q. When is the last time that you read a court of opinion specifically addressing the limitations or allowances under HIPAA?
A. I have not read court opinions regarding HIPAA.
Q. So you've never read a court opinion regarding HIPAA?
A. Not in entirety, no, sir.
Q. Now you're trained that HIPAA protects individuals' privacy, correct?
A. Yes, sir.
Q. And you understand, being the privacy officer, that it's a very important thing for anybody, including employees, correct?
A. Yes.
MS. ALEXANDER: Object. Form.
BY MR. LINDEN:
Q. And medical records often contain very personal information, correct?
A. Yes.
Q. And oftentimes they contain personal information, that is completely unrelated to a particular fitness-for-duty exam; would that be a fair statement?
MS. ALEXANDER: Objection. Foundation.

THE WITNESS: I would say yes, to my understanding.
BY MR. LINDEN:
Q. And do you know anything about John Nawara?
A. No, sir, only what I've been -- talked with about regarding this particular subpoena.
Q. Do you know why he was referred for a fitness-for-duty evaluation?
A. I have an understanding from discussions with the attorneys that there was a question regarding -- with his employer. I don't really have details on that.
Q. Do you know anything about any underlying incidents that might have prompted the Cook County Sheriff's Office to seek a fitness-for-duty evaluation?
A. My understanding is that there were -- there was some behavior involved, but I don't have any detail whatsoever on what really occurred, no.
Q. You're aware CorVel did send over the fitness-for-duty evaluation, I believe in September of 2017, correct?
A. I'm sorry. Would you repeat the question?
Q. You're aware that CorVel did, indeed, send Mr. Nawara for a fitness-for-duty evaluation with Isaac Ray Forensic Group in Chicago?
A. I was not involved with the case on that level,



so I do not know what occurred, as you're asking.
Q. Are you aware that they found him fit for duty?
A. I am not aware of that.
Q. Now, if you look at your forms -- and I believe you indicated that at least deposition Exhibit No. 2 and No. 1, your opinion complied with HIPAA. And if you could first look at Exhibit No. 1.
Do you have that in front of you, the one that is not filled out?
A. Yes, I have it.
Q. And there are limitations and scope contained in this form, correct?
A. Yes.
Q. And it's got to relate to my fitness-for-duty exam, right --
A. That is what the form states.
Q. -- under this form.
It's been your experience -- what does that mean it's got to relate to that particular fitness-for-duty exam?
A. It means that the involvement of CorVel would relate specifically with our case management assigned employee to work strictly in that area for that fitness of duty exam.
Q. So you would expect that employee not to ask



about -- ask for records that are unrelated, that it would have nothing to do with the reason why that employee was sent, correct?
A. That would be my understanding. Again, I'm not actively engaged in the case management program.
Q. For instance, let's say that employee had medical issues. Let's even say a sexually transmitted disease when they were 16 years old.
You wouldn't expect that information to be disclosed as part of an ordinary fitness-for-duty exam, would you?
A. I am not involved in that level. I would not really want to give an opinion in that way. I'm not involved in the case. I'm not sure what all would be involved.
Q. But you would agree that HIPAA, it's got to be limited for a specific purpose. It can't be unlimited in scope and time. Would you agree with that standard?
A. Yes, I would agree to that; it is limited in scope and time.
MS. ALEXANDER: Objection to that, to the vagueness of that question and answer.
BY MR. LINDEN:
Q. Do you know who Michelle Serocka is, S-E-R-O-C-K-A?



A. I have heard her name. My understanding is she was involved in the case management of this particular matter.
Q. And I can mark this as an exhibit, but I'm reading an email that was produced. It's Bates stamped Nawara 3401, but it's an email to John. It's says -- it's from Michelle, states that the FFD provider will need to review medical records of all healthcare providers you have seen in the past two years.
I could send that to you, but would you expect her to limit the request over a reasonable period of time?
A. Again, I was not involved in the actual case management. I would not want to give an opinion on how that progressed or what was required.
Q. Do you know if there were any medical issues raised in connection with John Nawara's fitness-for-duty evaluation?
A. I am not involved in the case on that level at all. I have no understanding or knowledge.
Q. If there weren't any medical records, then the medical reports related to any medical condition would not be relevant for any fitness-for-duty evaluation, correct?
MS. ALEXANDER: Objection to form.

THE WITNESS: And again, I would refer that to the case management team involved or the case manager involved in this matter. I am not involved in that level of this work.
BY MR. LINDEN:
Q. Okay. I noticed on the CorVel forms, the employer does not get a copy of any medical records that you receive from the employee's medical provider, correct?
A. I do not see on the general form that the employer would receive those records.
Q. All employers are permitted to receive under the CorVel forms are or is that IMC or the examination report. Is that a fair statement?
A. Would you repeat the question? I'm sorry. I don't understand.
Q. Yeah. I'm sorry that was a terrible question. Hold on one second.
Under the CorVel forms, isn't it correct that the employer has not received any of the employee's medical records, yes?
A. On the general form, which would be Exhibit 1, I do not see that specifically. If you -- when you say CorVel forms, are you referring only to the general form?



Q. Yeah. Let's start with Exhibit No. 1, under the authorization for Exhibit No. 1, the employer, in this case would be the Cook County Sheriff's Office, is not authorized to receive any of the medical records of the employee, correct?
A. I do not see that specified on that Exhibit 1 form, the general form.
Q. So would it be a fair statement under this authorization, they are not authorized to receive employee's, quote, medical records and medical information, correct?
A. I would not state that specifically as clear. Again, we do have item No. 5 regarding redisclosure by the recipient.
However, I am not sure what that could entail. I do not see Cook County specifically spelled out on this form as receiving the records.
Q. But the redisclosure would be what is permitted under the underlying authorization, correct?
A. Yes.
Q. Do you see anywhere here in Exhibit No. 1 that the employer has a right to receive any of the employee's medical records?
A. I do not see that defined on this form.
Q. And, in fact, in paragraph 2, may disclose the



records to disability management case manager for Cook County employed by CorVel Corporation, correct?
A. Correct.
Q. So that disclosure for authorization is limited to an employee of CorVel Corporation, yes?
A. It is specified to that case manager of CorVel employed by CorVel Corporation.
Q. Okay. Look at number -- Exhibit No. 3 that you weren't able to give any opinions on.
You see a stamp, Cook County Sheriff's Office Winifred Shelby, South Campus. And it's got an address here in Chicago.
Do you know who Winifred Shelby is?
A. I do not.
Q. She's not an employee of CorVel, correct?
A. I do not know who she is or who employs her.
Q. But if you look at the stamp, doesn't it appear to be an employee of the Cook County's Sheriff's office?
A. Again, I would not give my opinion, even though there is a stamp there. I am not sure who that is or specifically what this form is about or who authored it.
Q. Okay. Assume Winifred Shelby is not an employee of CorVel, she would not be authorized, under the CorVel forms to receive any of John Nawara's medical records; is that a fair statement?



A. Her name is not on the CorVel form.
Q. But what I'm getting at is, if she is not an employee of CorVel -- I want you to assume she is not an employee -- that under any authorization signed under the CorVel forms, then Winifred Shelby would not be authorized to receive medical records of John Nawara well, correct?
A. Again, I can only state that she is not an employee listed or anyone listed on this CorVel form.
Q. And if she's not an employee of CorVel, she can't receive the records under the CorVel forms, correct?
A. I am not going to give an opinion related to anything to do with that particular form for Cook County Sheriff.
Again, I was not involved. It is not a CorVel form. I'm not sure who authored it, so I will not give an opinion on that matter.
Q. I'm not asking that. But in order to get any medical records under Exhibit No. 1, you have to be an employee of CorVel, correct?
A. Specifically, on our form, the blank form, again it specifies the disability management case manager employed by CorVel Corporation.
Q. It's limited to those individuals, correct?
A. That is the limitations specified on the form.

Q. Have you ever heard of the ADA, what that means?
A. I have heard of the ADA.
Q. What does that stand for, based on your experience and training?
A. Americans With Disability Act.
Q. Have you had any training with ADA?
A. Many years ago when I worked in education, I had some familiarity in that area.
Q. How many years ago was that?
A. That would have been approximately 20 years ago.
Q. Have you had any training in the last 20 years with respect to the ADA?
A. Minimally, the work that I had been in primarily did not call for that type of training, ongoing training.
Q. When you say "minimally" can you estimate how many hours of formal training you had in the last 20 years with respect to ADA?
A. I would say none. You know, in the course of work, I have, of course, heard of it, but I have not had any formal training in ADA since my education days.
Q. So I take it you certainly wouldn't consider yourself an expert with respect to the Americans With Disability Act. Is that a fair statement?
A. That is a fair statement.

45

Q. You don't consider yourself having any particular expertise with respect to the ADA; is that a fair statement?
A. That is a fair statement.
Q. What is CorVel's relationship, if you know, with the Cook County Sheriff's Office?
A. My understanding is that Cook County is the customer of CorVel.
Q. Do you know how big of a customer Cook County Sheriff's Office is with CorVel?
A. I do not.
Q. Do you know how many fitness-for-duty evaluations they have in any given year?
A. I do not.
Q. Do you know if they have any formal contracts with CorVel Corporation?
A. No, I do not know about the formal contract.
Q. Do you know how much in revenue Cook County receives in a given year?
MR. JORDAN: Objection as to relevance. You can answer, if you know.
THE WITNESS: I do not know.
BY MR. LINDEN
Q. Do you know if it's more than $10,000 a year?
MS. ALEXANDER: Objection.

46

MR. JORDAN: Again, Mary, you can answer.
THE WITNESS: I do not know.
BY MR. LINDEN:
Q. Do you know what the cost of a typical fitness-for-duty evaluation would be for an employer?
A. I do not know that.
Q. What did you do, if anything, to prepare for your deposition today?
A. I did meet with the attorneys, with Ed and with Suzanne by phone. I also reviewed the requirements and standards under HIPAA, and went over all of the forms and the complete subpoena involved in this deposition process.
Q. When did you talk with Suzanne?
A. That would have been last Friday, the 15th.
Q. Was it a telephone conference?
A. Yes.
Q. And who were the parties on the phone?
A. Suzanne and Ed. And there was one other person. I don't recall the name.
Q. And that's Ed Jordan?
A. Yes.
Q. Do you recall how long that conversation lasted?
A. Approximately 40 minutes.
Q. Do you recall what Suzanne said to you during this telephone conversation?
A. We went over the basic plan for today. In that I would be coming here for this video recording, very basic information about this being a suit by Mr. Nawara relating to Cook County, and then we went through the four rider points and reviewed the forms involved.
Q. Did she ever indicate to you what opinions they were seeking from you?
A. Not specifically. Again, it was a matter of going over the forms.
Q. How about generally? Did she indicate what generally -- what general opinions are after?
A. I'm not sure I understand the question.
Q. You said "not specifically." Did she indicate what opinions or what opinions, generally, did she say that they're after?
A. In general, she simply asked questions, as we have in this process, regarding the form -- the forms involved and the content.
Q. Did she ever tell you what opinions Cook County wanted?
A. No, sir.
Q. Did she ever suggest any answers to you?
A. No, sir.
Q. Do you know if CorVel is being compensated for

48

this deposition now?
MR. JORDAN: Objection. Relevance.
Again, you get to answer if you know.
THE WITNESS: I do not know.
BY MR. LINDEN:
Q. Are you being compensated at all, other than your normal being paid as an employee of CorVel?
A. Not to my knowledge, no.
Q. Do you know if CorVel is billing the Sheriff's Office for your time here today?
MR. JORDAN: Again, objection. Relevance on behalf of CorVel.
Mary you can answer. If you understand, you can answer.
THE WITNESS: I do not know that answer.
BY MR. LINDEN:
Q. Would it surprise you if they're charging Cook County Sheriff's Office a fee for your testimony here today?
MR. JORDAN: Objection. Relevance. You can answer if you know or understand the question.
THE WITNESS: I have no opinion on that.
BY MR. LINDEN:
Q. Okay. If you could look at Exhibit No. 2.
Do you have that in front of you, the one that



John Nawara has filled out there?
A. Yes, I do.
Q. That's a CorVel approved form, I think you testified to?
A. No. I do not know who authored this form, nor who made the changes.
Q. Have you ever seen this form before you got the subpoena?
A. I have not.
Q. In the first paragraph, it says, "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness-for-duty exam to CorVel Corporation."
Is that what it says?
A. Yes.
Q. Okay. So like Exhibit No. 1, this form is limited in scope, correct?
A. I'm sorry. I didn't hear the question.
Q. Like Exhibit No. 1, it's limited in scope, Exhibit 2, correct?
A. Correct.
Q. It's only medical records that relate to John Nawara's fitness-for-duty exam in the CorVel Corporation, correct?
A. Correct.



Q. So if records didn't relate to an exam, then those records would not be authorized to be released under this form; is that a fair statement?
A. That would be my understanding.
Q. In paragraph 2, it limits the release of any records related to the fitness-for-duty exam to the disability management case manager for Cook County employed by CorVel Corporation, correct?
A. Correct.
Q. So in order to receive any documents or information under this release, that person would have to be an employee of CorVel, correct?
MS. ALEXANDER: Objection asked and answered.
MR. JORDAN: You can answer, if you know.
THE WITNESS: My understanding is that it would be the disability management case manager employed by CorVel.
BY MR. LINDEN:
Q. So they'd have to be an employee of CorVel to receive any records under the authorization reflected in Exhibit 2, yes?
MS. ALEXANDER: Same objection.
THE WITNESS: That is my understanding.
BY MR. LINDEN:



Q. Paragraph 3 limits the information that the employer is going to receive, yes?
A. Yes.
Q. For instance, under paragraph 3, the employer, in this case Cook County Sheriff's Office would not receive John Nawara's medical records, yes?
MS. ALEXANDER: Objection asked answered.
THE WITNESS: This statement No. 3 states that "the employer will receive a copy of the independent medical exam."
BY MR. LINDEN:
Q. Okay. The independent medical exam are not medical records that would be received from a provider, correct?
A. They are different.
Q. In the medical exam, would the report be prepared by the actual provider that conducts the fitness-for-duty exam, correct?
A. Again, I am not in the case management field, so I would not want to definitely define that response.
It would be my understanding from the statement here on the document.
Q. You don't see anywhere in the document that would allow the employer to receive any medical records of that employee, correct?

A. On the signed form, I do not see release to the employer of this medical record.
**Q. As a privacy officer, you would understand any concerns that an employee would have with an employer receiving actual medical records, wouldn't you?**
A. On a general basis for any patient in my role, I would certainly understand concerns.
**Q. That's why CorVel goes to takes measures to make sure that the employer is not authorized to receive the records, that it's somebody employed by CorVel, correct?**
A. To that question, I would refer to our legal team. Again, I do not author these forms. I work closely with our internal legal team, and they would be the final approvers of these forms.
So I would refer, on that type of question, to our legal expertise at CorVel.
**Q. So you don't seem -- you don't deem yourself qualified to answer that question; is that a fair statement?**
A. I would refer, rather, to legal to be absolutely certain.
**Q. I'm trying to seek your opinion on it, rather that referring to legal.**
**You would agree with my statement in general, correct?**



A. In a general way I would agree.
MS. ALEXANDER: What was the statement again? Sorry.
MR. LINDEN: I ask the court reporter.
MS. ALEXANDER: Sure. Court reporter, could you read back the last couple questions.
(Record read.)
BY MR. LINDEN:
**Q. I see in Exhibit No. 2, I don't see any specific time limitations contained in there, do you?**
A. The time limitations that I see is on item No. 8; "This authorization shall expire one year from the date of my signature to this authorization below."
**Q. Wouldn't you agree that paragraph 1, at least implicitly contains a time limitation insofar as those records have to, quote, relate to my fitness-for-duty exam to CorVel Corporation?**
A. That would be --
MS. ALEXANDER: Objection.
THE WITNESS: That would be a conclusion from this statement that there is a limitation relating to the purpose of the form.
BY MR. LINDEN:
**Q. How far back would HIPAA allow CorVel or any fitness-for-duty provider to go back for a**



**fitness-for-duty examination?**
A. I do not know that answer.
**Q. But at some point in time that would be a violation of HIPAA, would it not, if it had nothing to do with the particular fitness exam of that employee?**
A. I do not know the specifics of that type of answer required regarding HIPAA.
**Q. So you can agree that -- you'd agree, generally, if you have a complete limitless authorization, both in scope and time, that would not be HIPAA compliant. Isn't that a fair statement?**
A. HIPAA requirements do involve specific purpose and time limitations.
**Q. So HIPAA requires limitations on scope, number one, correct?**
A. Correct.
**Q. And HIPAA also requires limitation on time, correct?**
A. Correct.
**Q. Thank you very much. Thanks for your time.**
MS. ALEXANDER: Let's take a quick break.
THE VIDEOGRAPHER: We are off the record at 10:20.
(Break taken.)
THE VIDEOGRAPHER: We're back on the record



at 10:31.
FURTHER EXAMINATION
BY MS. ALEXANDER:
**Q. Mary, can you please look at -- let's look at Exhibit 1, please.**
A. Yes.
**Q. Are there any -- in this form, are there any time limits contained in this form?**
A. Number 8, at the bottom states: "This authorization shall expire one year from the date of my signature to this authorization below."
**Q. Are there any time limits as to what medical records may be collected?**
MR. LINDEN: Objection. Asked and answered.
BY MS. ALEXANDER:
**Q. Go ahead.**
A. The first statement does list all medical records and information to be released and reviewed that relates to the fitness for duty of the signee.
**Q. So there's no time limitation?**
MR. LINDEN: Objection. Misstates the testimony and form. She just said there was.
BY MS. ALEXANDER:
**Q. Go ahead, Mary.**
A. The time limitation --

Q. Is there a time limitation?
A. The time limitation would relate to the records allowed, once this form would have been signed.
Q. What's the time limitation? Does it say it can only go back two years or three years?
A. It does not have --
MR. LINDEN: Objection. Asked and answered.
BY MS. ALEXANDER:
Q. Go ahead, Mary.
A. It does not have any detail as to going back in time for records.
It says, "Any and all medical records and information." All medical records and information.
Q. So there is no time limitation as to what -- as to the medical records and information, correct?
MR. LINDEN: Objection to form. Misstates the testimony.
By MS. ALEXANDER:
Q. Go ahead, Mary.
A. It is not specified.
Q. And the only limitation in scope on this form is that it relates -- that the medical information relates to my fitness-for-duty exam, correct?
A. That is correct.
Q. And are there any limitations on which medical



providers can be asked for medical records in this form?
A. No.
Q. Okay. And can we look at Exhibit 2, which is the filled out form, correct?
A. Yes.
Q. And in Exhibit 2, are there any limitations on time as to the medical records that can be obtained?
MR. LINDEN: Objection. Asked and answered.
THE WITNESS: On this form that is signed, it also has the same verbiage on No. 8 with the authorization expiring one year from the date of signature.
BY MS. ALEXANDER:
Q. Okay. And there's no -- and so that's a limitation on how long this form is good -- is in effect, correct?
A. Yes. The authorization of the form is limited to that time.
Q. And there's no limitation as to how far back medical records can be obtained; is that correct?
MR. LINDEN: Objection. Form. Asked and answered.
THE WITNESS: That is correct.
BY MS. ALEXANDER:
Q. And the only limitation on scope, stated in this



form, is that "The medical records must relate to my fitness-for-duty exam." Is that correct?
MR. LINDEN: Objection. Form. Asked and answered.
THE WITNESS: That is correct.
BY MS. ALEXANDER:
Q. And are there any limitations on which medical providers can be asked for federal records in this form on Exhibit 2?
MR. LINDEN: Objection. Form. Asked and answered.
THE WITNESS: No, there are not.
BY MS. ALEXANDER:
Q. Thank you. That's all the questions I have.
MR. LINDEN: Does the state's attorney have any questions? I've got a couple follow-ups.
MR. MORRIS: I do not.
MR. LINDEN: Mary, just briefly. I think you'll be out of here pretty soon.

FURTHER EXAMINATION

BY MR. LINDEN:
Q. Again, Counsel is trying to tell you that there is no express limitations on either Exhibit 1 or 2 to time, correct?



MS. ALEXANDER: Objection to form.
(Reporter clarification.)
BY MR. LINDEN:
Q. You indicated that there's no express time limitations on exhibits 1 or 2 of the forms, correct?
A. The express time limits on Exhibits 1 and 2 have to do with item No. 8, where the authorization will expire one year from the date of signature.
Q. Okay. I believe you testified before, when I questioned you before, that the records have to, quote, relate to a fitness-for-duty exam, correct?
A. That is what it states, yes. The records relate to the specific purpose, which is fitness-for-duty.
Q. So for instance, records, you know, 30 years ago, if that was not related to that fitness-for-duty exam, then that would not be authorized under this form, correct?
A. Again, as I'm not involved in case management, I would not be able to absolutely respond to that question with certainty.
Q. You would agree that's a violation of HIPAA to ask for -- to require an employee to release documents that are completely unrelated for a particular fitness-for-duty exam, correct?
A. This fitness-for-duty requirement, under these

forms, would relate specifically to that only, for that purpose only.
Q. Based on your training and experience under HIPAA, in order to comply with HIPAA, the records must relate to the particular fitness-for-duty examination or an authorization for the form to be compliant, correct?
A. For compliance under these forms for authorization of release, that would be correct.
Q. Okay. And that would also apply to scope, in addition to time, correct?
A. Yes, scope and time.
MS. ALEXANDER: Objection.
BY MR. LINDEN:
Q. So scope would be -- one example of scope would be a particular type of medical problem, correct?
A. That would be my --
Q. Or condition?
A. -- that would be my understanding for these forms for this authorization.
Q. So if an employee's medical condition had nothing to do with fitness-for-duty exam, it would be a violation of HIPAA to require that employee to release such records, correct?
MS. ALEXANDER: Objection. Form.
THE WITNESS: In that particular question,



again --
BY MR. LINDEN:
Q. Yes.
A. -- legal expertise would be valued for certainty. My understanding is that you would be focused because of the release of information required on these forms only to the fitness-for-duty, in order to not violate the release of authorization specified on these forms.
Q. So if the scope was outside of the scope of that fitness-for-duty exam, that would be a violation to require that employee to disclose such records, correct?
MS. ALEXANDER: Objection.
THE WITNESS: It would not be covered on these forms.
BY MR. LINDEN:
Q. It would not be compliant with HIPAA based on your understanding, experience and education, correct?
A. It would not be compliant with the requirement of these forms. If there's any broader HIPAA requirement, then I would not be familiar with that at this time.
Q. So you couldn't say that would be a violation of HIPAA or you just don't know?
A. I would say that I am not absolutely certain. I would have to do further research for understanding.
Q. I understand that you're not, quote, absolutely



certain, but your understanding is that would be a violation of HIPAA, correct?
MS. ALEXANDER: Objection.
THE WITNESS: My understanding would relate only to the forms in this particular matter at this time and the requirements, as I understand them, under HIPAA.
BY MR. LINDEN:
Q. Does HIPAA allow an employer to obtain records that are not related to that particular employee's fitness-for-duty exam?
A. Not to my knowledge. I would have to do further research to be absolutely certain.
Q. How certain are you that HIPAA doesn't permit such a thing?
MS. ALEXANDER: Objection.
MR. JORDAN: You can answer if you know.
THE WITNESS: I do not know.
BY MR. LINDEN:
Q. How certain are you that HIPAA would prohibit such records?
MS. ALEXANDER: Same objection.
THE WITNESS: Again, I would follow the understanding that is specified on these particular forms.
And as far as HIPAA, for that specific



question, I would have to do further research to be absolutely certain.
BY MR. LINDEN:
Q. So I guess you don't know the answer? Is that a fair statement?
A. I do not know with certainty.
Q. And now you're talking about a certainty. Absent 100 percent certainty, what would be your belief on that question?
MR. JORDAN: Mary, you can answer if you understand the question.
THE WITNESS: I do. Thank you.
MS. ALEXANDER: Objection.
THE WITNESS: I understand the question. Thank you.
Again, at this time, I would have to do further research to be absolutely certain. To the best of my knowledge, I will only be able to relate to these particular forms in this instance.
BY MR. LINDEN:
Q. Okay. I'm not asking you to be absolutely certain. I'm not absolutely certain about what time I woke up today, for instance.
But with a reasonable degree of certainty, it would be a violation of HIPAA requiring an employee to

disclose records that have no relation to a fitness-for-duty exam.
Wouldn't you agree with that statement?
MS. ALEXANDER: Objection.
THE WITNESS: Certainly this relates entirely to the purpose of fitness-for-duty.
To that extent, I would say that my understanding is that we would only be able to comply with this fitness for duty under HIPAA.
BY MR. LINDEN:
Q. Okay. And the same would go for providers, would it not, that a particular provider would have to have records that be, quote, related to the fitness-for-duty exam, correct?
A. I am not engaged on the case management level with providers, so I don't have the experience or expertise to be able to answer that.
Q. Okay. Let's say you have a correctional officer that the employer, you know, said he had anger management problems, for instance.
Now medical records from a dermatologist, wouldn't you agree, would have nothing to do with a fitness-for-duty exam, correct?
MS. ALEXANDER: Objection. Foundation.
MR. JORDAN: If you know or understand,



Mary, you can answer the question.
THE WITNESS: I do understand the question. Thank you.
However, not being engaged in the case, I could not say with certainty what may or may not be involved in a relationship with a particular type of medical exam or medical situation for a specific purpose.
BY MR. LINDEN:
Q. But under either of these forms, number 1 or Exhibit 2, that information must relate to that particular fitness-for-duty exam, correct?
A. That is correct.
MS. ALEXANDER: Objection.
BY MR. LINDEN:
Q. And I think you indicated you have case workers that actually actively work on a particular case?
A. Yes. Our case managers work on their assigned cases.
Q. Do you know what type of training the case workers typically have?
MR. JORDAN: I'm going to object to relevance. You can answer, if you know.
THE WITNESS: I have some knowledge as to them being registered nurses, but I do not have the



details on that.
I don't know what level of education or across their field of expertise what education they're required to have or what certification or licenses they're required to have.
Q. I assume CorVel would make sure that they're well versed in HIPAA, would you not?
MS. ALEXANDER: Objection.
THE WITNESS: Absolutely.
BY MR. LINDEN:
Q. Absolutely, I think you said?
A. I would say absolutely they are versed in what is necessary for their position.
Q. And you would trust that they would use appropriate judgment to limit any medical records in scope and time that would relate to that particular fitness-for-duty exam; isn't that a fair statement?
A. That would be under the direction of their management. And certainly, they would be schooled as to what is allowable, and what they are to fulfill.
Q. So they would be schooled to limit that request to only records in scope and time that relate to that particular fitness-for-duty exam or that employee, correct?
A. To the best of my knowledge.



MS. ALEXANDER: Objection.
MR. LINDEN: That's all I have. Thank you.
(Discussion off the record.)
THE VIDEOGRAPHER: This concludes the deposition. We are off the record at 10:46 a.m.)
(Whereupon, the deposition concluded at 10:46 a.m.)

EXAMINATION INDEX

| MARY PARRINELLO | PAGE NO. |
| --- | --- |
| By Ms. Alexander | 5/56 |
| By Mr. Linden | 35/59 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| Exhibit No. 1 | HIPAA Authorization for Disclosure Form | 15 |
| Exhibit No. 2 | HIPAA Authorization for Disclosure Form | 24 |
| Exhibit No. 3 | Authorization to Release Healthcare Information | 32 |

69

CERTIFICATE

I, Mary C. Soldati, Registered Professional Reporter, Oregon and Washington Certified Shorthand Reporter, hereby certify that said witness personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed through computer-aided transcription by me; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify review of the transcript was requested.

In witness whereof, I have hereunto set my hand this 1st day of December, 2019.

Mary C. Soldati, RPR
CSR-WA No. 3406
Expires April 20, 2020
CSR-OR No. 19-0457
Expires September 30, 2022

70

**$**

**$10,000** 46:24

**0**

**000438** 24:8,16 25:23 28:7

**1**

**1** 9:8,9,12 10:19 15:21,22,25 26:1,7 33:15 38:6,7 41:22 42:1,2,6,21 44:19 50:16,19 54:14 56:5 59:24 60:5,6 66:10
**100** 64:8
**10:20** 55:23
**10:31** 56:1
**10:46** 68:5,7
**1130** 17:12 25:14,23 26:14,24 27:23 28:13,21 29:10 30:20 33:15
**1131** 32:10
**117-cv-02393** 4:15
**15th** 47:15
**16** 39:8
**18** 8:7
**18th** 4:5
**1st** 13:23

**2**

**2** 9:8,9,13 10:19 24:10,12 38:5 42:25 49:24 50:20 51:5,22 54:9 58:3,6 59:9,24 60:5,6 66:11
**20** 45:10,11,18
**2002** 8:6,11
**2016** 9:24,25 10:1
**2017** 37:20
**2019** 4:5
**2020** 13:23
**25** 7:17
**26** 17:6 25:17 33:5,23

**3**

**3** 28:6,12,17 32:12,13 43:8 52:1,4,8
**30** 60:14
**30(b)(6)** 33:5
**3401** 40:6

**4**

**40** 34:16 47:24

**5**

**5** 29:4,13 31:13 42:13
**50** 34:17

**8**

**8** 54:11 56:9 58:10 60:7
**80** 9:5

**9**

**9:04** 4:4
**9:07** 6:9
**9:08** 6:12

**A**

**a.m.** 6:9 68:5,7
**ability** 18:20
**above-described** 21:2
**Absent** 64:7
**absolutely** 12:2 27:8 34:24 53:20 60:19 62:23, 25 63:12 64:2,17,21, 22 67:9,11,12
**accompany** 14:25
**accord** 18:12
**accounting** 10:21
**acronyms** 13:4,5,16
**Act** 13:20 45:5,24
**active** 35:23
**actively** 7:22 8:9 21:24 22:16 39:5 66:17
**actual** 22:16 40:13 52:17 53:5
**ADA** 45:1,2,6,12,18,21 46:2
**add** 22:1 27:22
**added** 26:11 28:18
**addition** 26:10 27:19 28:16 61:10
**address** 35:25 43:11
**addressing** 35:20 36:4
**agree** 39:16,18,19 53:24 54:1,14 55:8 60:21 65:3,22
**ahead** 22:25 24:4 27:12 30:3 32:6 33:8,21,25 56:16,24 57:9,19
**Alexander** 4:19 5:8,17 6:13 10:5 15:8,20,24 17:9 18:4 19:6,8,11,14,15 20:4 21:13 22:2,17, 24 23:10,18 24:3,10, 13,23 25:19,21,25 28:1 29:3,20 30:2,14 31:3,9,24 32:5,11,15 33:7,14,20,24 34:10 35:1 36:17,25 39:21 40:25 46:25 51:13, 23 52:7 54:2,5,19 55:21 56:3,15,23 57:8,18 58:13,24 59:6,13 60:1 61:12, 24 62:12 63:3,15,21 64:13 65:4,24 66:14 67:8 68:1
**allowable** 67:20
**allowances** 36:5
**allowed** 31:2 32:1 35:20,21 57:3
**allowing** 23:3
**Americans** 45:5,23
**anger** 65:19
**annual** 10:17
**annually** 11:9
**answers** 48:23
**anymore** 8:3 19:10
**apply** 61:9
**approved** 27:11,14 50:3
**approvers** 53:14
**approximately** 4:4 7:17 9:5 45:10 47:24
**area** 12:17 21:24 38:23 45:8
**Arts** 7:11
**aspect** 9:11 19:19
**aspects** 9:2,6 11:5,16,18 12:25
**assigned** 27:17 38:22 66:18
**association** 4:8,18
**assume** 6:18 43:22 44:3 67:6
**attached** 15:6,11
**attorney** 59:15
**Attorney's** 5:18
**attorneys** 37:10 47:9
**attuned** 13:1
**audibly** 5:24
**audit** 7:8 10:20
**audits** 9:8,10,18 10:22
**August** 9:25 10:1
**author** 53:12
**authored** 16:13 43:21 44:16 50:5
**authorization** 15:15 19:2 20:17 22:8,19 24:17 26:2 29:5 31:15 32:20 42:2,9,19 43:4 44:4 50:11 51:21 54:12, 13 55:9 56:10,11 58:11,17 60:7 61:6, 8,19 62:8
**authorize** 20:7,9
**authorized** 42:4,9 43:23 44:6 51:2 53:9 60:16
**authorship** 10:17 11:8 14:14
**aware** 23:12 29:1 37:18,22 38:2,3
**awareness** 11:7 13:1

**B**

**Bachelor's** 7:11
**back** 6:11 7:9 18:7 27:10 31:13,19 33:15 34:11 54:6,24,25 55:25 57:5,10 58:19
**background** 35:11
**based** 9:14 17:10,11 18:7 21:15 23:23 45:3 61:3 62:16
**basic** 48:2,4
**basis** 53:6
**Bates** 40:5
**began** 8:6,24
**behalf** 4:19,22,23,25 5:18 49:12
**behavior** 37:16
**belief** 18:12 64:8
**big** 46:9
**billing** 49:9
**blank** 26:13,17,23 27:23 28:12,17,21 29:10, 12 30:19 44:21
**blocked** 25:6
**bottom** 19:1 24:8 25:5 56:9
**breach** 13:1
**breaches** 13:2
**break** 6:21,22,24 7:19 55:21,24
**briefly** 59:18
**bring** 15:9
**broad** 33:17
**broader** 62:19
**business** 9:2,7,11 18:20 20:14 30:25

**C**

**California** 12:21 13:13,17,20
**call** 45:14
**called** 8:13,15
**calls** 17:4 19:12 21:11 23:16 24:1 25:15 27:4,25 29:16 30:22 31:22 33:3,19 34:5,6
**Campus** 43:11
**case** 4:14 18:21,22 19:20, 24 20:1,7,14 21:3,8, 23 22:3,15,20 23:1 27:17 30:20 31:1,4, 8,11 37:25 38:22 39:5,14 40:2,13,19 41:2 42:3 43:1,6 44:22 51:7,17 52:5, 19 60:18 65:15 66:4, 16,17,18,20
**cases** 35:23,25 66:19
**CCPA** 12:21 13:15,17,19
**CCSO** 17:12 25:14,23 26:13,24 27:23 28:13,21 29:10 30:19 32:9 33:15
**certainty** 60:20 62:4 64:6,7,8, 24 66:5
**certification** 67:4
**certified** 7:16
**chair** 9:15,18
**change** 9:21 26:6,9 27:22 28:4
**charging** 49:17
**Chicago** 37:24 43:12
**clarification** 30:15 60:2
**clarify** 30:5
**classes** 34:14
**clear** 42:12
**closely** 10:20 11:15 53:13
**collaboration** 11:10
**collected** 56:13
**college** 7:10
**company** 12:22 16:15,21
**compensated** 48:25 49:6
**complete** 47:12 55:9
**completed** 7:15
**completely** 36:23 60:23
**compliance** 10:17 12:25 61:7
**compliant** 17:2,13 18:9 23:25 24:6 31:21 32:8 33:2 55:10 61:6 62:16,18
**complied** 38:6
**complies** 17:23
**comply** 17:23 61:4 65:8
**concerns** 53:4,7
**concluded** 68:6
**concludes** 68:4
**conclusion** 17:4 21:12 23:17 24:2 25:16 27:5,25 28:25 29:17,25 30:23 31:23 32:4 33:4,19 34:6 54:20
**conclusions** 18:1
**condition** 21:1 40:22 61:17,20
**conducts** 52:17
**conference** 47:16
**connection** 40:17
**contained** 38:11 54:10 56:8
**content** 48:19
**continue** 7:17
**continuity** 9:7
**contract** 46:17
**contracts** 46:15
**control** 9:14
**conversation** 47:23 48:1
**Cook** 4:12 5:18,19 21:4,8 27:17 28:9 32:19 37:13 42:3,16 43:1, 10,18 44:13 46:6,7, 9,18 48:5,20 49:17 51:7 52:5
**copy** 28:10,11,18,19,22 29:14,22 41:7 52:9
**corporation** 5:1 7:4 8:9,10 14:5

15:1 21:4,9 26:5,11, 16 27:3,9,18,20 43:2,5,7 44:23 46:16 50:13,24 51:8 54:17
**correct**
12:8,9 13:24 14:19 24:18 25:4,7 29:21 32:21,22,23 35:17, 18 36:11,15,20 37:20 38:12 39:3 40:24 41:9,19 42:5, 11,19 43:2,3,15 44:7,11,20,24 50:17, 20,21,24,25 51:8,9, 12 52:14,18,25 53:10,25 55:15,16, 18,19 57:15,23,24 58:4,16,20,23 59:2, 5,25 60:5,11,17,24 61:6,8,10,15,23 62:11,17 63:2 65:14, 23 66:12,13 67:24
**correctional**
65:18
**correctly**
20:20,22 21:5 35:24
**Corvel**
5:1 7:4 8:5,9,10 9:16,20,22 10:2,7,8, 10,15 11:1,6 12:13 14:4,12,13 15:1 16:11,12 17:11 18:8, 14,15,16,20 19:17 21:4,9 23:24 26:4, 11,15,18,21 27:2,8, 14,18,19 28:5,21 29:13,22 30:20 32:25 33:5,10 34:2, 22 37:18,22 38:21 41:6,13,19,24 43:2, 5,6,7,15,23 44:1,3,5, 9,10,11,15,20,23 46:8,10,16 48:25 49:7,9,12 50:3,13,23 51:8,12,18,20 53:8, 10,16 54:17,24 67:6
**Corvel's**
46:5
**cost**
47:4
**Counsel**
4:17 59:23
**country**
13:2
**County**
4:12 5:18,19 21:4,8 27:17 28:9 32:19 37:13 42:3,16 43:2, 10 44:13 46:6,7,9,18 48:5,20 49:18 51:7 52:5
**County's**
43:18
**couple**
5:22 54:6 59:16
**courses**
12:14,16 34:18,20
**court**
4:7,8,9,13,15 5:25 15:5 17:22 35:19 36:3,6,7 54:4,5
**cover**
12:19
**covered**
62:13
**create**
14:17
**created**
16:10,24
**critical**
34:25
**current**
12:2 13:2
**customer**
18:21,23 20:8 46:8,9
**cutting**
6:5
**cyber**
12:24

**D**

**Dart**
4:20
**data**
8:21 9:1 10:14 11:4, 16,18
**date**
12:6 25:5 54:12 56:10 58:11 60:8
**dates**
23:8
**days**
8:20 45:21
**decide**
22:11,20 31:4
**deem**
53:17
**deems**
30:21
**Defendant**
4:20,24
**define**
52:20
**defined**
42:24
**defines**
17:18
**degree**
7:14,20 64:24
**departments**
9:6
**deposed**
5:15
**deposition**
4:11 5:23 17:21 38:5 47:8,12 49:1 68:5,6
**dermatologist**
65:21
**detail**
37:16 57:10
**details**
37:11 67:1
**determine**
17:22
**determined**
21:18
**development**
10:13,16 11:10
**differences**
25:13,23
**direct**
11:13
**direction**
67:18
**directly**
14:15
**director**
7:7 9:4
**disability**
21:3,8 27:16 31:1 43:1 44:22 45:5,24 51:7,17
**disaster**
9:7
**disclose**
21:2 42:25 62:11 65:1
**disclosed**
25:17 29:5 31:15 39:10
**disclosure**
15:15 17:7 24:17 28:7 43:4
**discuss**
23:1 31:8,11
**discussed**
26:13 27:23 31:14
**discussing**
26:22
**discussion**
6:7,10 15:7 68:3
**discussions**
35:19 37:9
**disease**
39:7
**District**
4:13,14
**doctors**
22:20,21
**document**
8:20,24 52:22,23
**documents**
51:10 60:22
**duty**
15:3 21:17 38:2,24 56:19 65:9

**E**

**early**
8:6
**Ed**
47:9,19,21
**education**
7:10,11,12,14,18 8:1 13:25 14:7 17:12 18:9 23:24 34:12,25 45:7,21 62:17 67:2,3
**educational**
10:16 12:13,16
**Edward**
4:25
**effect**
13:13,22 58:16
**email**
40:5,6
**employed**
7:3,4 8:5 21:4,8 27:17 43:2,7 44:23 51:8,17 53:10
**employee**
38:23,25 39:3,6 42:5 43:5,15,18,22 44:3, 4,9,10,20 49:7 51:12,20 52:25 53:4 55:5 60:22 61:22 62:11 64:25 67:23
**employee's**
41:8,20 42:10,23 61:20 63:9
**employees**
16:12 36:15
**employer**
28:9,18,23 29:15,23 37:11 41:7,11,20 42:2,22 47:5 52:2,4, 9,24 53:2,4,9 63:8 65:19
**employers**
41:12
**employs**
43:16
**end**
26:12 28:16
**engage**
18:20 19:20
**engaged**
21:24 39:5 65:15 66:4
**ensure**
12:2
**entail**
42:15
**entailed**
9:2
**enterprise**
11:14
**entire**
11:14
**entirety**
36:9
**entry**
8:21
**environment**
9:5
**estimate**
34:13,15 45:16
**et al**
4:12
**European**
13:8
**evaluation**
37:8,14,19,23 40:18, 23 47:5
**evaluations**
46:12
**exam**
20:10,19 28:10,19, 22 29:14,23 30:6,7, 16,17 36:24 38:15, 20,24 39:10 50:13, 23 51:1,6 52:10,12, 16,18 54:17 55:5 57:23 59:2 60:11,15, 24 61:21 62:10 63:10 65:2,14,23 66:7,12 67:17,23
**examination**
5:7 28:8 35:7 41:13 55:1 56:2 59:21 61:5
**examined**
5:5
**exams**
26:4 30:11
**excuse**
5:19 22:7 29:6 31:14
**exhibit**
15:21,22,25 24:10, 12 32:11,13 33:15 38:5,7 40:4 41:22 42:1,2,6,21 43:8 44:19 49:24 50:16, 19,20 51:22 54:9 56:5 58:3,6 59:9,24 66:11
**exhibits**
60:5,6
**expect**
38:25 39:9 40:10
**experience**
17:11 18:8 23:23 38:18 45:4 61:3 62:17 65:16
**expert**
17:6 25:18 45:23
**expertise**
46:2 53:16 62:4 65:17 67:3
**expire**
54:12 56:10 60:8
**expiring**
58:11
**explain**
13:5
**express**
59:24 60:4,6
**extent**
14:14 27:25 34:6 65:7
**external**
11:21

**F**

**facility**
20:25
**fact**
42:25
**fair**
35:14,15 36:24 41:14 42:8 43:25 45:24,25 46:2,4 51:3 53:18 55:11 64:5 67:17
**familiar**
13:12 14:12,22,24 15:2 16:8 18:18 32:16 33:11 62:20
**familiarity**
45:8
**February**
9:23
**federal**
12:3,6 17:6 29:6,7 31:16 33:6 35:19 59:8
**fee**
49:18
**feel**
6:21 16:8
**FFD**
40:7
**field**
52:19 67:3
**filled**
24:20 25:1 38:9 50:1 58:4
**final**
53:14
**financial**
9:11
**fine**
6:20
**firm**
11:22
**fit**
38:2
**fitness**
15:2 21:17 38:23 55:5 56:19 65:9
**fitness-for-duty**
14:25 18:24 20:10, 19 23:5 26:4,19 27:15 28:8 30:7,10, 13,16 34:3 36:24 37:8,14,19,23 38:14, 19 39:10 40:17,23 46:12 47:5 50:13,23 51:6 52:18 54:16,25 55:1 57:23 59:2 60:11,13,15,24,25 61:5,21 62:7,10 63:10 65:2,6,13,23 66:12 67:17,23
**flow**
11:17
**focus**
11:4
**focused**
62:5
**follow**
13:11 63:22
**follow-ups**
59:16
**Forensic**
37:24
**form**
15:2,4 16:1,5,8,10, 13,25 17:2,12,23 18:9,10,14,15,16,18 19:1,3,4,5,9,17,18, 23 20:1,3,6,7,12 21:10,11,15,20 22:6, 10,13,22 23:3,7,9, 11,16,20 24:7,22 25:8,10,14,15 26:7, 10,13,22,23 27:1,13, 14,20,23,24 28:6,12, 17,21,24 29:2,10,17, 24 30:8,12,19,22,24 31:6 32:3,9,16,17,25 33:2,5,9,10,11,17,18 34:1,2,4,5,9,23 36:17 38:12,16,17 40:25 41:10,22,25 42:7,17,24 43:21 44:1,9,13,16,21,25 48:18 50:3,5,7,16 51:3 53:1 54:22 56:7,8,22 57:3,16,21 58:1,4,9,15,17,21 59:1,3,8,10 60:1,16 61:6,24
**form's**
18:19
**formal**
45:17,21 46:15,17
**forms**
14:13,18,25 15:6,11 27:5 31:13 38:4 41:6,13,19,24 43:24 44:5,11 47:11 48:6, 10,18 53:12,14 60:5 61:1,7,18 62:6,8,14, 19 63:5,24 64:19 66:10
**found**
38:2
**foundation**
17:25 21:20 22:1,13, 23 24:2 29:25 31:23 32:4 33:4,6,19 34:7 36:25 65:24
**free**
6:22
**Friday**
47:15
**front**
38:8 49:25
**fulfill**
18:22 67:20
**full-time**
9:25 10:2

**G**

**GDPR**
12:21 13:6
**general**
15:2 34:1 41:10,22, 24 42:7 48:12,17 53:6,24 54:1
**generally**
48:11,12,15 55:8
**give**
18:1 33:9 39:13 40:14 43:9,19 44:12, 16
**giving**
19:2 22:7,18
**good**
4:21 5:9,10 6:25 58:15
**government**
9:15 13:7
**Gregory**
16:15,16,18,21,24
**Group**
37:24
**growth**
7:18

**guess**
22:18 64:4
**guidance**
14:4
**guidelines**
9:15

H

**handle**
10:11,19
**Hayes**
4:24
**health**
15:15 24:18 29:7 31:16
**healthcare**
20:24 21:2 32:20 40:8
**hear**
24:24 50:18
**heard**
40:1 45:1,2,20
**held**
4:13
**helped**
12:22
**high**
8:21
**higher**
7:14 34:25
**highly**
9:14
**HIPAA**
12:4,24 13:12 14:1, 9,12,18,24 15:3,14 17:2,12,13,17,24 18:9,13 23:24,25 24:6,17 29:8 31:17, 21 32:2,8 33:2,17 34:12,14,19,20 35:20,21,25 36:5,6, 8,10 38:6 39:16 47:11 54:24 55:4,7, 10,12,14,17 60:21 61:4,22 62:16,19,22 63:2,6,8,13,19,25 64:25 65:9 67:7
**HIPPA**
18:11
**hired**
8:6
**Hold**
41:18
**host**
19:13
**hours**
7:17 34:13,17 45:17
**HR**
9:7

I

**identification**
15:22 24:12 32:13
**identified**
21:1
**Illinois**
4:14
**illness**
21:1
**IMC**
41:13
**IME**
28:11,20 30:6,9 31:14
**implicitly**
54:15
**important**
34:22 36:14
**improper**
17:5,8,21
**incidents**
10:12 11:6,25 13:1 37:13
**include**
12:20 20:13
**including**
36:14
**independent**
28:10,19,22 29:14, 23 30:5,11,16 52:10, 12
**individual**
18:25
**individuals**
13:21 44:24
**individuals'**
36:11
**information**
15:16 20:13,18 21:3, 16 23:4,21 24:18 26:3,15,18,20,21 27:2,8,15 28:4 29:5 31:2,4,15 32:1,21 36:20,22 39:9 42:11 48:4 50:12 51:11 52:1 56:18 57:13,15, 22 62:6 66:11
**instance**
39:6 52:4 60:14 64:19,23 65:20
**internal**
16:11 53:13
**internally**
11:21
**internationally**
13:3
**Internet**
12:12,16 14:8
**introduce**
4:17
**investigation**
10:12 11:23
**involve**
11:19 55:12
**involved**
13:14 14:15 19:19 22:16 37:16,25 39:12,14,15 40:2,13, 19 41:2,3 44:15 47:12 48:6,19 60:18 66:6
**involvement**
20:8 38:21
**Isaac**
37:23
**issue**
30:23
**issues**
39:7 40:16
**item**
23:20 42:13 54:11 60:7
**items**
20:11,12,16

J

**January**
13:23
**job**
8:23 10:9 34:22
**John**
4:12,22 25:2 35:9 37:4 40:6,17 43:24 44:6 50:1,22 52:6
**Jones**
4:24
**Jordan**
4:25 46:20 47:1,21 49:2,11,20 51:15 63:16 64:10 65:25 66:22
**judgment**
67:15

K

**Karen**
4:24
**key**
17:17
**knowledge**
17:14 19:22 24:5 40:20 49:8 63:11 64:18 66:24 67:25

L

**L-I-N-D-E-N**
4:22
**Lani**
4:6
**large**
14:16
**lasted**
47:23
**law**
12:3 13:13 35:12,16
**laws**
11:19 12:6,20
**lawyer**
18:2 35:14
**learn**
9:1
**learning**
14:3
**leave**
6:23
**led**
18:11
**left**
16:21
**legal**
11:15,21,22 17:4 18:1 21:12 23:17 24:1 25:16 27:4,25 28:24 29:16,24 30:23 31:22 32:4 33:3,19 34:6 53:11, 13,16,20,23 62:4
**level**
37:25 39:12 40:19 41:4 65:15 67:2
**licensed**
35:16
**licenses**
67:4
**limit**
40:11 67:15,21
**limitation**
54:15,21 55:17 56:20,25 57:1,2,4, 14,21 58:15,19,25
**limitations**
23:6,11,13 36:4 38:11 44:25 54:10, 11 55:13,14 57:25 58:6 59:7,24 60:5
**limited**
39:17,19 43:4 44:24 50:17,19 58:17
**limitless**
55:9
**limits**
51:5 52:1 56:8,12 60:6
**Linden**
4:21 10:4 17:3,19 19:5,9,12 20:3 21:11,20 22:1,13,22 23:9,16 24:1,22 25:15 27:4,24 28:24 29:16,24 30:8,22 31:6,22 32:3 33:3, 13,18,23 34:5,23 35:4,8 36:18 37:3 39:23 41:5 46:23 47:3 49:5,16,23 51:19,25 52:11 54:4, 8,23 56:14,21 57:7, 16 58:8,21 59:3,10, 15,18,22 60:3 61:13 62:2,15 63:7,18 64:3,20 65:10 66:9, 15 67:10 68:2
**list**
56:17
**listed**
25:2 44:9
**LNS**
4:7,9,15
**local**
12:17
**located**
4:15
**long**
8:5 47:23 58:15
**longer**
16:14 29:6 31:16
**looked**
35:22
**lot**
13:15 14:2,3

M

**made**
28:7 29:21 50:6
**make**
6:3,5 17:19,20 53:8 67:6
**making**
25:16
**manage**
9:5 10:18
**management**
18:21,23 19:20,21 20:8 21:3 31:1 38:22 39:5 40:2,14 41:2 43:1 44:22 51:7,17 52:19 60:18 65:15, 20 67:19
**manager**
9:3 11:11 19:24 20:2,15 21:3,8,23 22:3,15,20 23:2 27:17 30:20 31:1,4, 8,11 41:2 43:1,6 44:22 51:7,17
**managers**
14:6 66:18
**mark**
15:20 24:10 32:11 40:4
**marked**
15:22,25 24:12 32:13
**Mary**
4:8,11 5:1,3,9,13,15 6:6,14 7:2,3 15:9 16:1 17:10 18:5 19:16 20:6,22 22:25 23:19 24:24 28:2 30:3 33:8,21 35:4 47:1 49:13 56:4,24 57:9,19 59:18 64:10 66:1
**master's**
7:14,20,24
**materially**
28:3
**matter**
4:11 12:23 22:16 40:3 41:3 44:17 48:9 63:5
**means**
38:21 45:1
**measure**
14:16
**measures**
53:8
**medical**
14:13,24 20:17 21:1, 7,16,18 22:4,8,11 23:3,7,8,14,15,21,25 26:2,14,15,21 27:1 28:10,19,22 29:14, 23 30:6,11,17 36:19 39:6 40:8,16,21,22 41:7,8,20 42:4,10,23 43:24 44:6,19 50:11, 22 52:6,10,12,13,16, 24 53:2,5 56:12,17 57:12,13,15,22,25 58:1,7,20 59:1,7 61:15,20 65:21 66:7 67:15
**meet**
47:9
**members**
11:11
**mentioned**
13:11
**Michelle**
39:24 40:7
**Milton**
4:6
**minimally**
45:13,16
**minimum**
34:16
**minor**
7:13
**minutes**
47:24
**missed**
31:10
**Misstates**
56:21 57:16
**Mm-hmm**
8:16 9:20 13:18
**Monday**
4:4
**Moran**
16:22
**morning**
4:21 5:9,10
**Morris**
4:23 59:17
**moved**
8:24,25 9:24

N

**names**
22:8,19,20
**Nawara**
4:12,22 24:8,16 25:2,23 28:7 35:9 37:4,23 40:6 44:6 48:4 50:1
**Nawara's**
40:17 43:24 50:23 52:6
**Net**
8:13,15,19
**nod**
6:1
**normal**
49:7
**Northern**
4:14
**noted**
20:11
**notice**
33:5
**noticed**
41:6
**November**
4:5
**number**
4:14 17:3,4 19:12 20:16,24 27:20 43:8 55:14 56:9 66:10
**nurses**
66:25

O

**oath**
5:5
**object**
17:3 34:6 36:17 66:22
**objection**
10:4 17:21 18:6 19:5,8 20:3 21:11,20 22:13,22 23:9,16 24:1,22 25:15,16,20 27:4,24 28:24 29:16, 24 30:8,22 31:6,22 32:3 33:3,13,18 34:5,23 36:25 39:21 40:25 46:20,25 49:2, 11,20 51:13,23 52:7 54:19 56:14,21 57:7, 16 58:8,21 59:3,10 60:1 61:12,24 62:12 63:3,15,21 64:13 65:4,24 66:14 67:8 68:1
**obtain**
21:9 63:8
**obtained**
23:8,14,15 58:7,20
**occur**
11:6,25
**occurred**
37:17 38:1
**offered**
12:17
**office**
5:18,19 37:14 42:3 43:10,18 46:6,10 49:10,18 52:5
**officer**
7:7 9:25 10:2,8,10 14:4,12 16:14,16 17:11 18:8 23:24 36:13 53:3 65:18
**officers**
10:6
**oftentimes**
36:22
**on-the-job**
14:2
**ongoing**
7:13 34:24 45:14
**operation**
9:11
**operator**
8:25
**opinion**
21:23 22:15 23:1 33:9,22 34:1 36:4,7 38:6 39:13 40:14 43:19 44:12,17

49:22 53:22
**opinions**
17:5,7 36:6 43:9 48:7,12,15,20
**order**
18:22 20:14 44:18 51:10 61:4 62:7
**ordinary**
39:10
**Oregon**
7:5
**oversaw**
9:6
**oversee**
10:11,18 11:7

**P**

**P-A-R-R-I-N-E-L-L-O**
5:14
**paid**
49:7
**paragraph**
42:25 50:10 51:5 52:1,4 54:14
**parent**
8:10
**Parrinello**
4:11 5:1,3,13
**part**
8:8 10:18 31:10 34:22 39:10
**part-time**
9:24
**parties**
47:18
**past**
7:23 40:9
**patient**
53:6
**Patrick**
4:23
**pending**
6:23,24
**people**
11:12
**percent**
64:8
**period**
40:11
**permit**
63:13
**permitted**
21:9 41:12 42:18
**person**
18:25 19:1,3,17,24 22:3,7,18 25:17 47:19 51:11
**person's**
25:3
**personal**
35:22 36:19,22
**phone**
47:10,18
**plaintiff**
4:22 35:9
**plan**
48:2
**plans**
9:8
**point**
55:3
**points**
48:6
**policies**
10:14
**Portland**
7:5
**position**
7:7 14:5 16:23 67:13
**practice**
35:16
**preparation**
8:21,24
**prepare**
47:7
**prepared**
52:16
**pretty**
59:19
**previous**
26:7
**primarily**
8:20 11:4 12:11,15 14:2,8 45:13
**primary**
11:22
**prior**
8:7 14:4 16:6,13
**privacy**
7:7,8 9:24 10:2,6,8, 10,12,15 11:4,5,16, 19,24 13:1,8,21 14:4,12 16:14,16 17:11 18:8 23:23 29:7 31:16 36:11,13 53:3
**problem**
34:8 61:15
**problems**
34:4 65:20
**proceed**
20:14
**process**
19:19 47:13 48:18
**processes**
18:22
**produced**
5:4 40:5
**production**
9:4,6
**professional**
7:18 14:7 34:25
**program**
9:1 10:16,20 11:7 12:13,22 18:21,23 19:21 39:5
**programs**
10:18
**progressed**
40:15
**prohibit**
63:19
**prompted**
37:13
**properly**
25:17
**protected**
15:15 24:18 29:6 31:16
**Protection**
13:20
**protects**
36:10
**protocols**
10:14
**provide**
22:6,8 26:14,17,20 27:1 28:22 29:14
**provided**
12:12 27:6,16 28:4
**provider**
20:25 21:2 30:21 40:7 41:8 52:13,17 54:25 65:12
**providers**
22:8,11 23:7 40:9 58:1 59:8 65:11,16
**publicly**
12:17
**purpose**
20:6,7,10 30:25 39:17 54:22 55:12 60:13 61:2 65:6 66:8
**purposes**
18:20 20:14 28:8
**pursuant**
29:5 31:15
**putting**
18:5

**Q**

**qualified**
18:1 53:18
**question**
6:15,18,19,23,24 18:7 21:22 22:18 26:25 31:11,25 33:19 35:23 37:10, 21 39:22 41:15,17 48:13 49:21 50:18 53:11,15,18 60:19 61:25 64:1,9,11,14 66:1,2
**questioned**
60:10
**questions**
5:20 35:2,4 48:17 54:6 59:14,16
**quick**
5:22 55:21
**quickly**
34:11
**quote**
42:10 54:16 60:10 62:25 65:13

**R**

**raised**
40:17
**Ray**
37:23
**read**
20:20,22 21:5 36:3, 6,7 54:6,7
**reading**
40:5
**ready**
24:14
**reason**
39:2
**reasonable**
40:11 64:24
**recall**
47:20,23,25
**receive**
28:10,11,18,19 41:8, 11,12 42:4,9,22 43:24 44:6,11 51:10, 21 52:2,5,9,24 53:9
**received**
14:3 41:20 52:13
**receives**
46:19
**receiving**
25:9 32:18 42:17 53:5
**recipient**
29:9,19 31:18 42:14
**recommendation**
22:5
**record**
4:3,18 5:11 6:7,8,10, 11 15:7 18:6 53:2 54:7 55:22,25 68:3,5
**recording**
48:3
**records**
20:18 21:7,16,19 22:4,9,12 23:3,8,14, 15,21,25 26:3,15 27:1,16 30:20 36:19 39:1 40:8,21 41:7, 11,21 42:4,10,17,23 43:1,24 44:6,11,19 50:11,22 51:1,2,6,21 52:6,13,24 53:5,10 54:16 56:13,17 57:2, 11,12,13,15 58:1,7, 20 59:1,8 60:10,12, 14 61:4,23 62:11 63:8,20 65:1,13,21 67:15,22
**recovery**
9:8
**redisclosure**
29:8,19 31:18 32:1 42:13,18
**refer**
41:1 53:11,15,20
**referral**
14:25
**referred**
37:7
**referring**
23:20 41:24 53:23
**reflected**
51:21
**regard**
23:22
**registered**
66:25
**regular**
7:12
**regulations**
11:20 13:7
**relate**
20:19 26:4 30:9 38:14,19,22 50:22 51:1 54:16 57:2 59:1 60:11,12 61:1,5 63:4 64:18 66:11 67:16, 22
**related**
21:17 34:19,20 40:22 44:12 51:6 60:15 63:9 65:13
**relates**
20:9 27:15 50:12 56:18 57:22 65:5
**relating**
18:23 23:4 48:5 54:21
**relation**
16:2 18:17 65:1
**relationship**
46:5 66:6
**release**
14:13,24 15:3 20:9, 13 26:14,17,20 27:8, 11,15 28:4 29:22 32:20 51:5,11 53:1 60:22 61:8,22 62:6,8
**released**
20:18 21:16 23:4 26:3 27:2 50:12 51:2 56:18
**relevance**
46:20 49:2,11,20 66:23
**relevant**
30:21 40:23
**repeat**
26:25 37:21 41:15
**rephrase**
6:16 20:5 31:25
**report**
17:7 41:14 52:16
**reporter**
4:8 5:25 15:5 54:4,5 60:2
**reporting**
4:7,9,16 11:5 12:25
**reports**
40:22
**represent**
35:9
**representing**
4:7
**request**
23:25 40:11 67:21
**requested**
28:9
**require**
60:22 61:22 62:11
**required**
10:14 11:9 18:22 40:15 55:7 62:6 67:4,5
**requirement**
60:25 62:18,19
**requirements**
17:17 18:11,13 47:10 55:12 63:6
**requires**
55:14,17
**requiring**
64:25
**research**
62:24 63:12 64:1,17
**resolution**
11:24
**resource**
7:16
**respect**
45:12,18,23 46:2
**respond**
60:19
**response**
52:20
**responsibilities**
10:10
**revenue**
46:18
**review**
16:11 18:10 25:11 27:13 29:2 40:8
**reviewed**
20:18 26:3 35:19 47:10 48:6 50:12 56:18
**Rhonda**
16:21
**Richard**
4:21
**rider**
48:6
**rights**
13:21
**road**
5:22 6:15
**role**
11:23 14:11 17:22 53:6
**rough**
34:15
**route**
19:25
**rule**
6:14 17:6 25:17 33:5,23
**rules**
5:22 29:7 31:17 33:6

**S**

**S-E-R-O-C-K-A**
39:25
**Sam**
8:18
**Sarbanes-oxley**
10:21
**scan**
8:13,14,15,19,25
**scanning**
8:21,25
**school**
35:12
**schooled**
67:19,21
**scope**
27:9 33:4 38:11 39:18,20 50:17,19 55:10,14 57:21 58:25 61:9,11,14 62:9 67:16,22
**security**
10:12,15 11:7,16,19, 24 12:24 13:8
**security-oriented**
9:14
**seek**
22:9 30:20 31:2 37:14 53:22
**seeking**
48:8
**self-study**
14:10
**send**
37:18,22 40:10
**sense**
6:3,6
**sentence**
26:11,12
**September**
37:19
**Serocka**
39:24
**sexually**
39:7
**Shelby**
43:11,13,22 44:5
**Sheriff**
4:20 32:19 44:14
**Sheriff's**
5:19 37:14 42:3 43:10,18 46:6,10 49:9,18 52:5
**signature**
19:1 22:6 25:6 54:13 56:11 58:12 60:8
**signed**
21:10 26:10 27:20 28:17 44:4 53:1 57:3 58:9
**signee**
23:5 56:19
**signs**
18:25 19:3,17
**simply**
48:17
**sir**
36:2,9,12 37:5 48:22,24
**situation**
66:7
**SOC**
9:8,9,12,13 10:19
**sociology**
7:13
**Soldati**
4:8

**soliciting** 17:5
**sort** 5:22
**sought** 21:19 22:4
**sound** 6:5,25
**South** 43:11
**SOX** 10:21
**space** 22:6
**speak** 27:5
**speaking** 16:12
**special** 7:12
**specialist** 7:17
**specific** 26:18 27:13 34:2 39:17 54:9 55:12 60:13 63:25 66:7
**specifically** 27:16 30:10,12 36:4 38:22 41:23 42:12, 16 43:21 44:21 48:9, 14 61:1
**specifics** 55:6
**specifies** 44:22
**speculation** 19:13 20:3 21:12,21 22:23 24:2 30:23
**speed** 8:21
**spell** 5:12 8:17
**spelled** 5:13 42:16
**spoke** 25:14
**staff** 8:7 9:5 10:20,21 11:1,9,13
**staff's** 10:16
**stamp** 43:10,17,20
**stamped** 40:5
**stand** 45:3
**standard** 18:14,15 34:2 39:18
**standards** 14:9 18:13 47:11
**standing** 17:20 25:16,19
**stands** 13:19
**start** 4:10 5:21 7:2 42:1
**started** 8:11
**state** 5:11,18 12:3,6,20 23:21 29:18 30:24 42:12 44:8
**state's** 59:15
**stated** 13:4 58:25
**statement** 23:2 28:17 29:21 35:14,15 36:24
41:14 42:8 43:25 45:24,25 46:3,4 51:3 52:8,21 53:19,24 54:2,21 55:11 56:17 64:5 65:3 67:17
**states** 13:16 20:17,24 21:15 24:17 32:19 38:16 40:7 52:8 56:9 60:12
**status** 13:2
**staying** 13:1
**Stevens** 16:15,16,18,21,24
**strictly** 38:23
**studies** 13:14
**study** 35:22
**subject** 29:8,19 31:17
**subpoena** 15:6,9,12 16:2,4,7 18:3,18 25:9 32:18 37:6 47:12 50:8
**subsequent** 25:9 32:17
**subsidiary** 8:9
**suggest** 19:25 48:23
**suggestion** 31:8,12
**suit** 48:4
**supervise** 11:12,13
**support** 11:22
**surprise** 49:17
**surrounding** 18:9
**Suzanne** 4:19 5:17 47:10,14, 19,25
**sworn** 5:5
**Symbeo** 8:8,11,14,17 9:22

**T**

**takes** 53:8
**taking** 5:25 12:19
**talk** 22:3 47:14
**talked** 37:5
**talking** 64:7
**team** 11:11,15,21 19:20 41:2 53:12,13
**telephone** 47:16 48:1
**temporary** 8:7
**terrible** 41:17
**testified** 5:5 50:4 60:9
**testimony** 49:18 56:22 57:17
**thing** 36:14 63:14
**things** 35:10
**time** 4:4 6:22 8:13 12:1 14:6 16:14 36:3 39:18,20 40:12 49:10 54:10,11,15 55:3,10,13,17,20 56:7,12,20,25 57:1, 2,4,11,14 58:7,18 59:25 60:4,6 61:10, 11 62:20 63:5 64:16, 22 67:16,22
**titled** 15:14 28:7
**titles** 12:18
**today** 4:4,15 9:15,19 15:9 25:11 47:8 48:2 49:10,19 64:23
**top** 25:3 32:20
**topics** 11:2 12:19
**totally** 17:7
**tracking** 10:11 11:23
**trained** 36:10
**training** 10:15,17 11:8 12:23 14:3 45:4,6,11,14, 15,17,21 61:3 66:20
**trainings** 10:24 11:3
**transmitted** 39:7
**treats/treated** 20:25
**trust** 67:14
**type** 12:10 23:14 30:16 45:14 53:15 55:6 61:15 66:6,20
**types** 10:23 11:2,3 30:11
**typical** 47:4
**typically** 66:21

**U**

**U.S.** 4:13
**underlying** 37:12 42:19
**understand** 6:15,17 13:5 29:4 36:13 41:16 48:13 49:13,21 53:3,7 62:25 63:6 64:11,14 65:25 66:2
**understanding** 16:13 17:14 18:12, 19 19:22 27:7 28:3 32:7 35:23 37:2,9,15 39:4 40:1,20 46:7 51:4,16,24 52:21 61:18 62:5,17,24 63:1,4,23 65:8
**understood** 6:19 7:1
**Union** 13:9
**unlimited** 39:17
**unrelated** 36:23 39:1 60:23

**V**

**vagueness** 39:22
**validation** 8:22
**valued** 62:4
**verbiage** 58:10
**versed** 67:7,12
**versus** 4:12
**video** 48:3
**violate** 62:7
**violation** 55:4 60:21 61:22 62:10,21 63:2 64:25

**W**

**wanted** 48:21
**whatsoever** 37:17
**Winifred** 43:11,13,22 44:5
**woke** 64:23
**word** 30:7
**words** 27:19
**work** 9:21 10:13,20 11:9, 14,15,16,24 12:2,5, 10,11,19 14:8 22:16 38:23 41:4 45:13,20 53:12 66:17,18
**worked** 7:23 45:7
**workers** 66:16,21
**workflow** 11:22
**working** 7:20,22 8:2 14:8
**write** 14:17 22:19

**Y**

**Y-M-B-E-O** 8:18
**year** 7:18 13:14 34:19,21 46:13,19,24 54:12 56:10 58:11 60:8
**years** 8:8,10 9:4,23 34:16 39:8 40:9 45:7,9,10, 11,18 57:5 60:14

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN NAWARA )
Plaintiff, )
-vs- ) No. 17 CV 2393
COUNTY OF COOK, a unit of )
local government, THOMAS )
DART in his official )
Capacity as Sheriff of Cook )
County, Illinois, KAREN )
JONES-HAYES, MATTHEW BURKE, )
REBECCA REIERSON, and )
WINIFRED SHELBY, in their )
invidividual capacities, )
Defendants. )

The deposition of ROBIN KROLL, Psy.D called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Josephine Lehman, a Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 6323 North Avondale, Chicago, Illinois, on the 22nd day of November, 2019, at the hour of 8:56 a.m.

REPORTED BY: Josephine Lehman, CSR
LICENSE NO.: 084-002951



APPEARANCES:

LIPMAN & LINDEN
BY: MR. RICHARD F. LINDEN
17 North State Street, Suite 1550
Chicago, Illinois 60602
(312) 590-0211
lindenlaw@gmail.com
Representing the Plaintiff;

SCHARF, BANKS, MARMOR LLC
BY: MS. SUZANNE ALEXANDER
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606
(312) 726-6000
salexander@scharfbanks.com

Representing the Defendants, Thomas Dart, Matthew Burke, Rebecca Reierson, and Winifred Shelby;



APPEARANCES: CONT'D
MS. JOI KAMPER
Conflicts Counsel Unit
Cook County State's Attorney's Office
50 West Washington, Suite 2760
(312) 603-1427
joi.kamper@cookcountyil.gov
Representing the Defendant, Karen Jones-Hayes.

*************



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| ROBIN KROLL, Psy.D | |
| By Ms. Alexander | 5 |
| By Mr. Linden | 51 |
| By Ms. Alexander | 78 |
| By Mr. Linden | 83 |


E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Kroll Deposition | |
| Exhibit No. 1 | 19 |
| Exhibit No. 2 | 20 |


EXHIBIT
G
exhibitsticker.com

(Witness sworn.)
ROBIN KROLL, Psy.D,
having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. ALEXANDER:
Q. Good morning.
A. Good morning. How are you?
Q. Good, how are you?
A. Good, thank you.
Q. Thank you very much for being here today.
Can you please state your name and spell your last name for the record.
A. Robin Kroll, K-R-O-L-L.
(Whereupon, a discussion was had off the record.)
BY MS. ALEXANDER:
Q. And, Dr. Kroll, have you ever been deposed before?
A. On other cases?
Q. Yes?
A. Yes.
Q. Okay. So you're familiar with the

5

process here today?
A. Yes, uh-huh.
Q. So I'll just -- one thing I just want to remind you of is if you -- if I ask a question and you answer, I will assume that you understood the question.
A. Yes.
Q. And just, you know, if you don't understand, please just let me know.
A. Yes.
Q. Okay. Let's start with your background and education. What is your education, Dr. Kroll?
A. I have a Doctorate in Clinical Psychology and I'm board certified in police and public safety.
Q. And the Doctorate in Clinical Psychology --
A. Uh-huh, with a forensic concentration.
Q. Forensic concentration.
And is the clinical psychology -- is that a Psy.D?
A. Yes.
Q. That's what's commonly known as a

6

Psy.D?
A. Yes.
Q. And you said you had a -- what was the other thing you said you had?
A. I'm board certified in police and public safety, psychology.
Q. What does that mean? Board certified in police and public safety?
A. Board certification is just extra training in a specialty area.
Q. Okay. And so what kind of training did you go through for this board certification?
A. It requires workshops, presentations, it requires case studies, it requires a lengthy paper that would be similar to a dissertation, it requires an interview, an oral interview, it requires particular amount of hours.
Q. Okay.
A. Yeah.
Q. And you said it's in police and public safety. Can you just expand on what does that -- what does that entail, police and public safety?
A. Just understanding, working

7

particularly as an interventionist, meaning that I do the clinical work or I can do the assessment work with police and public safety personnel, so it's a concentration of knowledge in -- and having a specific competency in working with first responders.
Q. Okay. And let's talk about your experience then. Since you, you know, graduated with your degree --
A. Uh-huh.
Q. -- how long has that been?
A. I been here in private practice for almost 15 years doing exactly this.
Q. What's this, when you say "exactly this?"
A. Working specifically with police and public safety.
Q. Would you say you're a hundred percent working with police and public safety?
A. I would say I'm 90 percent. I do see civilians which means I will see family members.
Q. Okay.
A. Or sometimes I will just see civilians, but mainly police and fire.

8

Q. And what -- what -- in your practice, you said you see police officers. What -- what do you mean when you say you see them, what do you do?
A. Clinical work, therapy, intervention work. I'll do the diagnostics, I will see officers for specific issues related to the job, meaning trauma, a lot of PTSD.
I'll work with them with addiction, I'll work with them with cumulative stress, I'll work with them with all of the specific areas that you typically see in police work.
Q. And do -- in your practice, do you do fitness for duty evaluations?
A. I do.
Q. And how often would you say you do those?
A. I typically do them maybe once a month.
Q. Okay.
A. Sometimes twice a month.
Q. And who do you do those for?
A. All different agencies that call and request it, or if somebody is coming in for a personal fit for duty, looking just to do their



own psychological assessment, I'll do it that way.
Q. Okay. And do you have any specific contracts with any, you know, specific police, local police departments that always send them, send their people to you or is it just one officer?
A. It's not so much contractual work. It's a department calling me and saying hey, we have a fit for duty for you, so, you know, they'll send me the officer, and we will do the fit for duty and then typically just send in your bill in the department.
Q. You said that's typically how it happens?
A. Typically for me.
Q. And what training or how are you qualified to do a fitness for duty exam?
A. Oh, aside from doing many of them, I've taken many workshops and presentations, you know, in order to obtain my -- my board certification, so a lot of experience, a lot of working and going to special workshops, presentations, and then just experience doing



it.
Q. And is there a specific licensure or certification or is there something specific that a psychologist has to have in order to do a fitness for duty exam?
A. It would be, I believe, a C classification, which means you have to have -- more than likely you need a clinical degree in psychology as a Psy.D or Ph.D.
Q. Okay. That's --
A. But a doctorate.
Q. There's no specific fitness for duty certification?
A. No, no.
Q. And how long have you been doing these fitness for duty exams once a month?
A. I can't say. Years, maybe ten years.
Q. Okay. And do you -- have you ever done fitness for duty exams for the Cook County Sheriff's office?
A. I have.
Q. And the Sheriff's office has called you specifically to do that?
A. No, I do them as patients.



Q. So the patients call you specifically?
A. Yes, or if I am seeing them as patients, we will do psychological assessments.
Q. Okay. So they're already coming to you for --
A. Yes.
Q. -- therapy of -- a sheriff's officer is already coming to you for therapy, and they need a fitness for duty, they might ask you to do that?
A. Well, we will do the psychological assessments, yes, and it is -- it is a fitness assessment.
Q. So are you saying you do psychological assessments as part of your therapy?
A. If needed, yes.
Q. Okay. And what experience do you have with the Cook County Sheriff's office?
A. Oh, well, I have a very nice relationship with the Cook County Sheriff's Department.
Q. Okay.
A. And my relationships include seeing the officers from all of the three sections, you

know, the jails, the streets, the courthouse. They participate in my peer support programs, they participate in my seminars, they, you know, they have had me come out and speak.
Q. Okay. And what -- when you say seminars, what seminars do you do?
A. I usually hold seminars on police and public safety related issues, trauma, addiction, family, police families, those sorts of things. There's a variety of different seminars that we hold.
Q. Okay.
A. And we always invite the county.
Q. Okay. So you invite the county. Do you invite the police departments? Who do you invite?
A. Oh, we invite anyone and any -- any department that's interested in coming, so I mean it could be anybody across the Illinois region. We get departments that come from Wisconsin, you know, that want to come to the seminars.
Q. Okay.
A. So it's multiple departments.

13

Q. Okay. And so you said that you have done fitness for duty exams for Cook County Sheriff's Officers when they have come to you personally?
A. Uh-huh.
Q. You have never had the Cook County Sheriff's office call you --
A. No.
Q. -- specifically for a fitness for duty?
A. No.
Q. So are you familiar with the criteria or the processes that the Cook County Sheriff's office uses for their fitness for duty --
A. I have seen their reports from other -- from the psychologists that I am assuming they're contracting with. I don't really even know if they are contracted with anybody specifically.
Q. Okay. But you -- so you are not contracted with --
A. No.
Q. -- Cook County Sheriff's office?
And have you ever had a conversation with anyone at the Cook County Sheriff's office about how they want their fitness for duty evaluations done or anything to that nature?
A. No.
Q. Okay. And what is a fitness for duty exam?
A. It's a psychological assessment to look at an officer's readiness to either return to work or perform the duties of their job.
Q. And so why would a person -- why would an officer be sent for a fitness for duty exam in your experience?
A. Typically, someone is sent for a fit for duty if there is a concern regarding their performance, it could be disciplinary, it could be a mental health issue.
Q. Okay.
A. Typically, those two things.
Q. And when you do a fitness for duty exam, what -- what is entailed in that? What do you do to perform a fitness for duty evaluation?
A. You'll typically begin with an interview to find out what specifically is the issue. You'll do some forensic work. You'll call whoever you need to call if it's -- if it's

14

15

handed to you through a department, so you might do an interview with specific people in the department, you might -- you might then assess what the issue is. You would then make a selection of the particular test that you think would be applicable.
Q. Okay.
A. And then, you know, you do your assessment work, and then you do your interpretations.
Q. And when you say interpretations --
A. Through --
Q. -- what does that mean?
A. -- whatever the assessment results are, you write your report according to the assessments and the interview.
Q. Okay. Let's talk about John Nawara.
A. Sure.
Q. Do you remember him coming to you for a fitness for duty evaluation?
A. I do remember. It was two years ago.
Q. Uh-huh.
A. No, I -- he wasn't coming in specifically saying he wanted a fit for duty.

16

He did come in saying I would like some psychological work done. He had an issue with the department, and I don't know if he was looking for multiple people to assess him or if he was coming to me specifically.

I recall he was going to look for a -- more than just me. I don't know if he did or not. I only saw him on a few occasions. This wasn't a therapy. It was specifically to look at him and assess him personally at the time. He was looking for this report specific for him.

Q. Okay. So Mr. Nawara came to you -- let me make sure I have this correctly.
A. Yeah.
Q. He came to you for a fitness for duty report, he did not come to you for therapy, is that correct?
A. No, he did not.
Q. And you said he might have been looking for more than one report but he --
A. I don't know.
Q. -- came to you?
A. I don't know if he went to other psychologists.



Q. Okay. Did you know him before he came to you?
A. No.
Q. Do you know how he got your information, your number, your name?
A. I don't recall.
Q. Okay. And what was your understanding of why he was coming for psychological testing?
A. He was having an issue with the supervisor, and then there was some disciplinary actions taken, and I believe he was placed on -- on off-duty status.
Q. Okay. I see you looking at a paper here.
A. The report, uh-huh.
Q. Without even looking at that, do you have an independent recollection of why he was coming to you?
A. I really need to refer to this.
Q. Okay. That's fine.
A. I remember he was --
Q. Wait, wait. Can I just stop you?
A. Yeah.
Q. Let's mark this as an exhibit.



A. Sure.
MS. ALEXANDER: I'm going to -- can you mark this for me? I'm handing you what we're marking here Exhibit 1, which is what you --
(Whereupon, Kroll Deposition Exhibit No. 1 was marked for identification.)
BY MS. ALEXANDER:
Q. So this is what I received from you in response to our subpoena, is that correct?
A. Uh-huh.
Q. Can you take a look?
A. I believe so, yes.
Q. Does it appear to be --
A. Yeah.
Q. -- your fitness for duty evaluation --
A. Yes.
Q. -- for Mr. John Nawara?
A. Yes.
MR. LINDEN: I just want to object insofar as it appears incomplete. Page 2 is not attached.
MS. ALEXANDER: Well, I was going to get to that. Thank you.
MR. LINDEN: Yeah.



BY MS. ALEXANDER:
Q. Does it appear to be missing a page?
A. Oh, let's see. I might have missed -- did I fax it to you?
Q. I believe we got this through email but that's okay. We have another copy if it's -- is it missing a page?
A. Yeah, it sure is.
MS. ALEXANDER: Let's look then at something else. Let's mark this next one as Exhibit 2.
(Whereupon, Kroll Deposition Exhibit No. 2 was marked for identification.)
THE WITNESS: Here we go. Now how did you obtain this? Did I resend this?
BY MS. ALEXANDER:
Q. If you take a look, this Exhibit 2 is marked Bate stamped CC -- at the bottom CCS000116 --
A. Oh.
Q. -- through 124. So this was produced in the litigation.
A. Okay.
Q. Okay? Does that appear --

A. Yes.
Q. -- to be a complete copy of your fitness for duty evaluation of Mr. Nawara?
A. Yes.
Q. And did you author this evaluation?
A. Yes.
Q. All right. Let's get back to -- we were discussing your understanding of why Mr. Nawara came to see you.
A. He came in for an incident that took place on September 28th, 2016. He said he was assigned to the basement of Cermak Hospital to monitor prisoners who were being seen for medical evaluations.
He was assigned with two other officers. He said that over 50 percent of the 60 to 70 inmates were not in restraints and that there were only 26 handcuffs and 13 leg shackles provided to the correctional officers.
He said that a fight broke out between two inmates and they broke up the fight, followed protocol he stated by contacting the supervisor, who was Joan (sic) Hayes.
He said that when the superintendent

21

arrived, she noticed that specific inmate was not cuffed. She asked why. He asked -- he responded by saying that the deputy -- that she should ask the deputy who escorted the inmate.
He described that the superintendent's tone was insulting, provoking, demeaning, and that while speaking to him, she repeatedly poked her finger, her index finger into his chest.
Deputy Nawara asked her to stop, she said if I offended you by touching you, I apologize. He stated that she then left the room. He stated that shackle became free, attempted to place it on the detainee, the inmate resisted, walked away.
Officer Nawara contacted his sergeant, stated that the superintendent returned announcing that she was going to handle it. After pointing out the inmate, he said she approached the inmate and said baby, baby let him shackle you, and the inmate complied, and then she left the room.
He stated that at 4:30 p.m. on September 29th, 2016, which was the next day, he received an email that informed him that he was

22

transferred to external operations without explanation. He said he followed the directive.
On October 13th, 2016, he filed a complaint against his superintendents, stated that he did not receive a response until November 18th, 2016 with a claim that he threatened her, Superintendent Joan Hayes. Deputy Nawara denies this allegation. He claimed that there were no formal complaints presented to him.
He stated on November 18th, 2016, that he reported to work at 7:00 a.m. and was asked to report to HR at 9:00 a.m., said he arrived at 8:45, was met by Nurse Shelby and Rebecca Reierson who was a witness to the interview.
Nurse Shelby and Deputy Nawara asked -- she asked him, Deputy Nawara, if he was threatening to others, and he responded no and asked why he was called to HR. He was told that this was not an OPR review, and he described the experience as very confusing.
He states that he was asked to step out of the room, a union rep was contacted, he returned to the room with James Penny, his union

23

rep, and Deputy Nawara was told he needed to sign documents regarding consent forms to perform a fit for duty and he refused, and he was then instructed he could not return to work.
He stated that on November 30th, 2016, he received a letter from Rebecca Reierson reminding him to fill out the consent and that his time off was unauthorized, he refused.
On February 28th, 2017, he received a letter with the same request. He refused again. He states that he has retained an attorney, Dana Kurtz, for representation.
He stated that he had never been involved in any disciplinary action that would require a fit for duty. He perceives himself as a strong officer with good work ethics, is looked up to by his supervisors and peers and that he has an excellent attendance record and that he has not called in sick for five years.
Q. Okay. So, basically, you just read a good chunk of your report about why Mr. Nawara -- about what happened leading up to Mr. Nawara's coming to see you?
A. Narrative, yes. It's a narrative,

24

uh-huh.
Q. And when did you meet with Mr. Nawara?
A. On -- I have the dates March 16th, I have of '17, 3-8 and 3-10.
Q. So March 8th?
A. Uh-huh.
Q. 2017?
A. Uh-huh.
Q. March 10th, 2017?
A. Uh-huh.
Q. And March 16th, 2017?
A. Uh-huh.
Q. You met with Mr. Nawara on three occasions?
A. Correct.
Q. And for how long did you meet with him each time?
A. From what I recall probably the first time was an hour interview.
Q. Okay.
A. The second time and the third time were probably interviews and then finalizing questions, so I would say maybe three hours the second time, maybe an hour to two hours the



third time.
Q. Okay. So in total you probably met with Mr. Nawara you would say six hours? Five to six hours?
A. Yes.
Q. And what did you do to evaluate Mr. Nawara? You said you did an interview. What else did you do?
A. He took the MMPI.
Q. What's the MMPI?
A. It's -- it's the Multiphasic Personality Inventory. It looks at very specific aspects of how a person self reports, it looks at -- I'm just going to use this as my reference.
It looks at very specific areas that shows cognitive functioning, somatic functioning, consistency in their answers, substance use, family issues, interpersonal problems, social situations, defiance, aggression.
Q. Okay. You said somatic issues?
A. Yeah, those are physical complaints.
Q. Okay. And what is the MMPI? Is it a



questionnaire, does Mr. Nawara fill something out, is that how it works?
A. It's a self-report questionnaire.
Q. So you asked Mr. Nawara to fill that out for you?
A. He does it on a computer.
Q. Does he do it here at your office?
A. Yes.
Q. Okay. And about how long does that take?
A. That could take an hour.
Q. Okay. So would he have done that maybe on the second or third visit?
A. He did it more than likely on the second visit.
Q. Okay. What else did you do for Mr. Nawara?
A. He's given the Shipley, which --
Q. What's -- I'm sorry, what's Shipley?
A. That's okay, the -- the -- the Shipley is a test that looks at cognitive functioning, so it will look at abstract reasoning, it will look at vocabulary, it will look at things that have to do with understanding patterns like



puzzles to look at how his cognitive functioning is.
Q. Is it similar to an IQ test?
A. It's similar. It's not as detailed. It just gives us an idea of where his functioning is within average, below, or above average range in terms of abstract reasoning and concrete reasoning.
Q. Okay.
A. And then he took the Beck series, which they're all self-report, depression, anxiety. State-trait anxiety scale looks at anxiety as well, and then he took a test of malingering.
Q. I'm sorry, I just want to stop you right there.
A. That's okay.
Q. The Beck series looks at depression and anxiety you said?
A. Uh-huh.
Q. And is that also a self-report --
A. Yes.
Q. -- questionnaire on a computer?
A. No, he filled that out on paper.
Q. On paper. So it's a questionnaire --

A. Uh-huh.
Q. -- that Mr. Nawara fills out on his own?
A. Uh-huh.
Q. And then the Shipley -- I'm sorry, we didn't get that. The Shipley, is that also a questionnaire that Mr. Nawara fills out?
A. It is a questionnaire, and it's a series of block designs. I think he took that on paper.
Q. Okay. And then was there another test?
A. Uh-huh.
Q. What's that?
A. We do a mini mental status exam at the beginning just to make sure that their orientation to place and time is intact, and then --
Q. And how -- is that through an interview with you?
A. Through interview.
Q. Okay.
A. And then he takes a test, structured test of malingering to look at if he is being deceptive.



Q. Okay. And how -- how is that test administered?
A. It's also given to him, paper, and then he self reports.
Q. And that's to determine whether the subject is lying to you?
A. Yeah, feigning and malingering.
Q. Okay. And you said that was a self-report --
A. Uh-huh.
Q. -- questionnaire on paper?
A. Uh-huh.
Q. Okay. Did you do anything else to evaluate Mr. Nawara or have we covered everything?
A. We've covered everything.
Q. Okay. And did you review any documents before you examined Mr. Nawara?
A. From the County?
Q. Did you review any --
A. No.
Q. -- documents from the County?
A. Uh-ugh.
Q. Did you review any medical records --



A. No.
Q. -- of Mr. Nawara?
A. No, no.
Q. Did you ask Mr. Nawara for any medical records, to get you any medical records?
A. You know, I've got to go get his file. He might have given me -- I -- I can't recall. It's really my best answer right now.
Q. Okay. You can't recall if he -- if you asked him for any records?
A. I can't recall.
Q. Okay. And why did you not review any medical records for Mr. Nawara?
A. He wasn't coming in specifically stating that this was a fit for duty. He wasn't coming in stating that this was going to be a legal issue. He -- he was stating that he was coming in basically for himself to see what his psychological status is.
Q. So he told -- Mr. Nawara told you that he wanted to determine his psychological status?
A. For his own -- his own psychological fitness.
Q. For his own personal knowledge?



MR. LINDEN: I want to object insofar as misstates testimony and form.
THE WITNESS: Okay.
MS. ALEXANDER: We are allowed to object and you're allowed to answer.
THE WITNESS: I understand.
BY MS. ALEXANDER:
Q. Is what I said correct or --
A. I'm going to say --
Q. -- a good understanding?
A. -- it's my understanding, as I can recall, that when he came in, he was not stating that this was going to turn into an issue, particularly with the department, that he was coming in for himself to look at his own psychological readiness to be fit for work.
Q. In your experience, do many police officers, sheriff officers come to you for a fitness for duty or come to you for that reason that you just stated?
A. Not typically.
Q. It's not typical in your experience?
A. Not in my experiences here.
Q. Okay. Typically, if you are doing a

fitness for duty exam, for a legal purpose or for -- if the department is asking, would you request medical records to review?
A. Yes.
MR. LINDEN: Objection as -- just object as to form.
BY MS. ALEXANDER:
Q. In your experience, based on your experience doing fitness for duty exams, you -- when you do a fitness for duty exam for a department, you typically ask for medical records?
A. I always ask for medical records.
Q. You always ask for medical records. And what medical records do you request?
A. Everything that they have.
Q. What does that mean when you say everything?
A. It could include their -- their actual medical records, it would include their disciplinary records, it would include certificates, awards, it would include any video, if necessary.
Q. Video of what?



A. Of encounters if it was specific to the incident. They typically send me all that they have.
Q. Sounds like you want -- you'd like to review his entire personnel file if you could?
A. I do.
Q. Okay. Do you request his -- a personnel file?
A. Usually, yes.
Q. Okay.
A. When it comes from a department's request.
Q. Okay. And let's talk about medical records. What medical records do you like to review when you're doing a fitness for duty exam?
A. Oh, I try to review any -- all of it. I'll go over everything and then I'll go over the specifics, depending on what it is that I'm looking for.
If there was a specific critical incident, I will -- and there's video, I will watch the video. If there were injuries during that incident, I will look at the doctor



reports, medical doctor's reports. If there were other fit for duties, I will look at those.
Q. Okay. And do you like to see medical records for the officer from the past -- from his past? From his primary care physician, from his --
A. Any --
Q. -- a surgeon? Anyone?
A. Anything that would be related to documentation that is in the files at his department, his or her department.
Q. So you only want to see what's in the County's -- or -- or strike that.
You want to see what -- what the department has, what records the department has?
A. Uh-huh, if there's a need to go outside of the department to look at other documentation, I would do that.
Q. Okay. When you do a fitness for duty exam, in your experience do you typically see medical records for the officer from a psychologist, a psychiatrist?
A. Uh-huh.
Q. Yes?



A. Yes.
Q. Do you typically see medical records from a general -- the general practitioner, the officer's family doctor?
A. I can, yes.
Q. And how many years back of medical records would you like to review --
A. Typically --
MR. LINDEN: I'm --
BY MS. ALEXANDER:
Q. -- in your experience doing a fitness for duty exam?
MR. LINDEN: I'm going to object as to form.
MS. ALEXANDER: Go ahead.
THE WITNESS: Do you want me to answer that?
BY MS. ALEXANDER:
Q. Uh-huh, I do.
A. I usually look at the -- the time that they have had on the job.
Q. So you'd like to see if the -- if the officer has been working for the department for ten years, you'd like to see those ten years of medical records?
A. Yes.

Q. Okay. So -- so you did not review --
we've established you did not review any medical records from any of Mr. Nawara's doctors?
A. (Shaking head.)
Q. And you did not review a referral from the Cook County Sheriff's office for Mr. Nawara?
A. No.
Q. And you did not review Superintendent Jones-Hayes' report of this incident, correct?
A. No.
Q. And you did not review any reports by Rebecca Reierson or Nurse Shelby --
A. No.
Q. -- correct?
And did you ever speak with Miss Reierson or Miss Shelby?
A. No.
Q. Did you speak --
A. Not that I could recall, no.
Q. Do you recall speaking with anyone at the Sheriff's department about Mr. Nawara?
A. I do not recall speaking to anybody. Like I said, this was not typical. This was him coming in for something more personal.



Q. Okay.
A. In my understanding.
Q. Sure.
And did you review any notes from doctor -- or excuse me, Mr. Nawara's therapist or counselor?
A. Wasn't even aware there was one.
Q. Okay. So you wouldn't be aware if -- that he had -- if he has any sort of diagnosis or anything?
A. Not aware of any of that.
Q. Okay. And did you ask Mr. Nawara to bring you any documents that he refused to bring or --
A. No, not that I can recall.
Q. You don't recall asking him for any documents?
A. I can't recall.
Q. And did you review Mr. Nawara's job description at the County?
A. I can't recall if I did specifically for him. I -- I -- I -- no. No.
Q. No, you did not review a job description?



A. I don't recall. I don't believe so.
Q. Okay. So you didn't review any information from the Cook County Sheriff's office related to Mr. Nawara?
A. No, not that I can recall.
Q. So is it fair to say that you don't know anything about the incident with Superintendent Jones-Hayes except what Mr. Nawara told you?
A. That is correct.
Q. And is it fair to say that -- well, strike that. Let me back up.
Do you know superintendent Jones-Hayes?
A. I don't believe so.
Q. And so is it fair to say that you don't know what she was thinking as it relates to this incident, except what Mr. Nawara told you?
A. That's correct.
Q. And it's fair to say you don't know anything -- anything that happened in a meeting between Miss Reierson and Nurse Shelby and Mr. Nawara except what Mr. Nawara told you?
A. That's correct.
Q. And you never talked to anyone in Human



Resources at Cook County Sheriff's office?
A. For that particular --
Q. About Mr. Nawara?
A. No, I don't believe so.
Q. Okay. Do you know Dana Kurtz?
A. I know the name -- oh, the lawyer? Just by name.
Q. Did you talk with Dana Kurtz about Mr. Nawara?
A. No, I don't believe so.
Q. And you stated that the incident between Mr. Nawara and Superintendent Jones-Hayes was on September 28th, 2016, is that correct?
A. That's what I have documented.
Q. And he came to you in March of 2017, is that correct?
A. Uh-huh.
Q. Do you know why -- why there was a time lapse there?
A. I do not.
Q. Okay. Do you know why Mr. Nawara refused to sign the papers and go through the fitness for duty process?

MR. LINDEN: I just want to object to the form.
THE WITNESS: My understanding is that he didn't believe that it was warranted, so he refused.
BY MS. ALEXANDER:
Q. Okay. He didn't believe -- is your understanding that Mr. Nawara did not believe a fitness for duty exam was warranted?
A. Yes.
Q. Okay. And did you -- did you bill Mr. Nawara for your services?
A. He went through the insurance.
Q. Okay. His insurance paid you --
A. Uh-huh.
Q. -- for your services?
A. Uh-huh.
Q. You billed his insurance?
A. Correct.
Q. And do you know that they -- that the insurance did pay?
A. Yeah.
Q. Do you know how much you charged?
A. I -- I don't recall. A normal fit for



duty is -- it can be anywhere from 1300 to $2,000.
Q. As far as you know, Mr. Nawara's insurance paid?
A. Yeah.
Q. Okay. And have you seen any other fitness for duty reports in this case about Mr. Nawara?
A. No.
Q. So you haven't seen another report that states that Mr. Nawara has certain traits of personality disorders?
A. I -- I haven't seen anything after he left.
Q. Okay. Have you talked to Mr. Nawara after --
A. No.
Q. -- March of 2017?
A. I don't believe so.
Q. Okay. And did you do any testing for personality disorders in your fitness for duty?
A. Normally, you would see certain spikes in the MMPI, but I didn't do a specific personality. Can you tell me what -- what he



took?
Q. No, I don't know.
A. Okay.
Q. Is there a specific test for personality disorders?
A. Yes, there is the MMCI, which looks at that --
Q. And you did not do the MMCI --
A. I did not.
Q. -- with Mr. Nawara?
A. No.
Q. You did the MMPI?
A. Personality inventory. I mean it does look for specific traits but nothing in his testing showed up anything of a clinical nature that would be a concern for readiness to return to work.
Q. Okay.
A. I have no idea what anybody else did. Like I said, I never saw him again after that --
Q. Okay.
A. -- that I can recall.
Q. So I just want to clarify. The MMPI that you did --



A. Uh-huh.
Q. -- doesn't test for specific personality disorders?
A. Well, it will test -- may I look at this?
It will look -- no, it won't look specifically. It will give you an interpretation, but it will look more at specific personality traits --
Q. Okay.
A. -- which is a little bit different from a personality disorder.
Q. Okay.
A. You know, a disorder has to do with a rigid personality style that is really never going to change. You know, somebody has a specific personality disorder, there's a rigidity to their personality style that can create social, occupational, personal issues. I don't -- I mean according to him, he hasn't had much disciplinary issue in the past --
Q. Right.
A. -- that would really warrant a personality issue --

Q. Okay.
A. -- that where I would go and seek, you know.
Q. Okay. You didn't see any reason to do it?
A. Not at that time.
Q. To do a specific personality disorder test?
A. No.
Q. But there are specific personality disorder tests that you could have done, it's possible to do, correct?
A. That someone can do if they believe they should.
Q. And can you tell me just in your experience --
A. Uh-huh.
Q. -- what are those tests or how many are there?
A. It's similar to, it could be done on paper, it could be done on a computer, it's self reporting again, and just looking for very specific personality styles, like borderline personality, you know, histrionic, dependent



personality style, narcicisstic personality style, that sort of thing.
Q. Do you know how many different tests there are to test for -- to test for these different disorders?
A. I mean, they're out there. I mean, I'm sure there's a handful. If I throw a number out to you, I could be incorrect so I can't really say.
Q. Okay. So --
A. There are -- there are multiple tests out there.
Q. Okay. And would it have made a difference in your evaluation of Mr. Nawara to know that he frightened Miss Reierson and Nurse Shelby in his meeting and they described him as aggressive?
MR. LINDEN: Objection as to form. It assumes facts not in evidence, foundation.
BY MS. ALEXANDER:
Q. Would that have made a difference in your evaluation?
A. You know, if it would have come from the County, you know, I don't know at that time



had -- had he even expressed to me that this was going to turn into something like this, I'm not sure that the County would have even released anything to me at that point because he hadn't signed no documents for a fit for duty, so I'm not sure that I would have even been able to obtain anything, to be honest.
Q. Uh-huh, uh-huh.
A. You were asking me if it would have changed my perception of him?
Q. Could it have made a difference in your evaluation had you had that information?
MR. LINDEN: Objection, form, assumes facts not in evidence, speculation.
THE WITNESS: I would -- I would have to have exactly the evidence that that took place.
MS. ALEXANDER: Okay.
THE WITNESS: So, unless that were to happen, no. I mean, certainly sitting with him, I did not sense, you know, somebody who was defensive or aggressive.
I mean, he's a police officer. I believe he was on sort, you know -- you know, they have a stance about them, but I would



assume she would be quite comfortable with that, working with -- with officers.
No, it didn't -- I wouldn't have -- at that point, if it would have come to that, I would have then suggested or discussed is this going to turn into something that's going to be, I'm not sure -- I don't even know what his case is to be honest.
I don't know if they're looking at termination for him. I haven't a clue. So, you know, if this came through the County or if this was more formal, yeah, I would have done all of that.
BY MS. ALEXANDER:
Q. When you say "if this had been -- come through the County or been more formal," what -- you would have done all of that, what does that mean? All of what? What would you have done?
A. I would have had the lawyer, if there was a lawyer contacting me, saying that, you know, this is a case that we -- we need at that point, back then, you know, documentation, we need to send you information, we need to send you documentation, you know, then I would be

looking at all of that, but there was none of that.
Q. Okay. So had you had any information from the County, it would have made a difference in your report --
MR. LINDEN: Objection.
BY MS. ALEXANDER:
Q. -- correct?
MR. LINDEN: Form of the question. Speculation.
MS. ALEXANDER: Go ahead.
THE WITNESS: I would have --
BY MS. ALEXANDER:
Q. It would have made a difference?
A. I would have asked for the documentation.
Q. Okay. Had you known it was available, you would have asked for it?
A. Yes.
Q. Okay. And so then is it fair to say that this report, that's Exhibit 2, was not meant for any type of legal proceeding?
A. Not at that time, no.
Q. And is it fair to say that this report



was not meant -- well, strike that.
Did you mean for this report to go to the County?
A. I didn't have an expectation. I mean, it could have. I would assume that maybe he would have used it if there would have been some incidence down the road, but I also would've assumed that the County would do their own fitness for duty as well and then accumulate all the information, but at the time my assumption was this is something he was interested in doing personally for him.
Q. Okay. And --
A. Would I not assume that? No, I would not assume that it wouldn't go to the County, but -- at the time.
Q. At the time you wrote this report for Mr. Nawara personally?
A. Personally.
Q. And in your experience doing fitness for duty exams, is it your experience that the Department or the County, the employer, asks -- asks a provider for a fitness for duty evaluation?



A. Yes.
Q. And is it your experience that the employer sends the fitness for duty evaluator documentation?
A. Yes.
Q. And in your experience does the employer send the fitness for duty evaluator medical records?
A. Yes.
MS. ALEXANDER: That's all I have right now.
MR. LINDEN: Thank you, Doctor, for coming. Just a few areas.
THE WITNESS: Uh-huh.

CROSS EXAMINATION

BY MR. LINDEN:
Q. I believe you said your indication was that Mr. Nawara didn't want to go through the whole fitness for duty process with the County, he didn't --
A. I didn't say that he didn't want to. I'm saying he refused. He stated that to me.
Q. Okay.
A. She asked me why. I'm making an assumption from my conversations with him.



Q. Got you.
If you look at your report --
A. Uh-huh.
Q. -- on Page No. 3, so third to last paragraph before your assessment results.
A. Uh-huh.
Q. And can you read the last sentence? I think you went through it a lot where it states "Deputy Nawara was told he needed to sign documents regarding consent forms?"
A. Uh-huh.
Q. Can you just read that whole sentence?
A. Are you talking about "Deputy Nawara states that on November 30th," or above that?
Q. No, right here, this last sentence of this paragraph here, the --
A. He returned -- "Deputy Nawara was told he needed to sign documents regarding consent forms to perform a fit for duty evaluation."
Q. Correct.
A. "When he refused he was instructed he could not return to work."
Q. And did Deputy Nawara tell you he refused to sign documents regarding consent

forms?
A. That's what I wrote down.
Q. Is that where you got that information?
A. Yes.
Q. Do you know what the consent forms were or why he apparently had a problem signing consent forms?
A. I don't. He didn't -- no, I mean this is what he told me. I mean, I -- he told me he probably didn't believe that this situation warranted a fit for duty.
Q. When you do fitness for duty exams, I assume that you want the medical records related to the fitness for duty examination. Is that a fair assessment?
A. When it's a formalized fit for duty, yes.
Q. And do you have training in HIPAA?
A. Yes.
Q. And what is HIPAA?
A. Well, it's confidentiality of the personal records of your patient.
Q. Is it very important as a doctor to keep -- to maintain the privacy and



confidentiality of medical records?
A. Unless you're subpoenaed, yeah.
Q. And could you explain why that is?
A. Explain why?
Q. Why you have to maintain confidentiality in the privacy of medical records of patients?
A. Well, because you're protecting the patient's rights.
Q. You said you normally go back for the number of years -- I think counsel asked you if somebody has been an employee for ten years --
A. Uh-huh.
Q. -- you want the records for ten years?
A. Yeah, it depends on how far back issues go, disciplinary issues, so, yes, it would depend.
Q. Like with respect to John Nawara, if there's no previous incidents of discipline before this --
A. Uh-huh.
Q. -- you wouldn't want to go back ten years, would you?
A. No, I probably would to -- to -- to



recognize that this is an individual without disciplinary issues.
Q. Would it be any and all medical records regardless of what --
A. Whatever the County would be able to give, yes.
Q. So the records that the County would have, correct? Is that what you're saying?
A. Correct, which is probably also why, you know, he -- I -- I shouldn't say that. I don't know really why he refused to sign consent, but say the question again.
Q. I mean, I think you indicated that you would go back -- you'd want the records the County already has. Is that what your testimony was in performing your fitness for duty exam?
A. If this were a formalized fit for duty.
Q. Yes?
A. Uh-huh.
Q. So if a patient, let's say went to a dermatologist 20 years before having no relation to what you're examining the patient for, would you want those records?
A. With the consent -- no, if it wasn't



pertinent to the case, I wouldn't.
Q. And let's say medical records. If the issue was, you know, psychological, let's say the County complained that they had fear that he had some kind of rage --
A. Uh-huh.
Q. -- or anger issues?
A. Uh-huh.
Q. In that case, you wouldn't have to go back ten years for medical records, would you, as opposed to psychological records if you could?
A. Oh, if it -- if it's not pertinent to any physical issues?
Q. Yes?
A. No, you would look at just the psychological. I mean, they might come in with the records if they send everything, but, you know, if it's psychological related to, let's just say a critical incident and there were physical injuries, you know.
Q. Now, if you asked -- needed records, you wouldn't ask a patient to sign an authorization that is completely unlimited in

scope in time, would you?
A. I would be more specific.
Q. You realize it's important to protect the patient's privacy, No. 1?
A. Correct.
Q. Medical records should be limited in scope, correct?
A. Correct.
Q. And the scope should be limited only that the scope is related to the issue that you're examining the patient for, correct?
A. Correct.
Q. And time too that you have to make an assessment, that it should be limited in time, correct? The medical records?
A. It would depend on the case.
Q. And what factors would go into --
A. Past disciplinary issues, past issues. If you are just looking at a trend of behavior, it would be important, whether it's good behavior or not, you know, you want to look at their commendations, you want to look at their honorable mentions.
Q. So, typically, when you receive a

57

patient's medical records, let's say from a patient's, you know, providers, directly for you for an exam, and then you -- at some point you write a report similar to what's been marked as Exhibit 2, correct?
A. Uh-huh, uh-huh.
Q. Does -- I think you said uh-huh, but if you can --
A. Right, yes.
Q. Does the employer typically receive a copy of your exam report?
A. Yes, if it's a formal fit for duty coming from a department or if the individual hands to it to them.
Q. If you receive records correctly from a patient's, let's say primary physician --
A. Yes.
Q. -- without a specific authorization from a patient, you wouldn't share those medical records with the employer they received, would you?
A. Who would be giving them to me?
Q. Let's say the provider gave it to you correctly and you write a report, typically the

58

employer only gets a copy of your report, is that fair?
A. Well, why would I be asking for -- I wouldn't be asking for an outside physician's notes unless it were pertinent to the case.
Q. Do you know whether or not the reason that Mr. Nawara had a problem with the fitness for duty exam would be he had a problem with the scope and the breadth of the forms the County was requiring him to sign for his fitness for duty exam?
A. He didn't articulate that to me.
Q. Did he articulate the specific reason why he had any opposition, if any, to the fitness for duty process or is it just --
A. He articulated that he was confused about why.
Q. Did you ever ask him if he had a -- problems with the forms, specifically that the County was requiring him to sign?
A. I'm sorry, could you repeat that?
Q. Did you ever ask him specifically if he had a problem with the forms that the County was requiring him to sign for medical

59

authorizations?
A. He acknowledged to me, he offered that information that he did not want to sign.
Q. Did you follow up and ask him why he didn't want to sign, do you recall?
A. Well, he was confused and he didn't believe that the situation that took place warranted.
Q. Did not warrant him signing an authorization --
A. Fit for duty, correct.
Q. -- for his medical records, correct?
A. I don't know anything about medical records. I -- there was no discussion of medical records.
Q. Okay. So that's an area you just have no knowledge of, is that a fair statement?
A. Well, he didn't bring that up as something that they wanted from him at that time. He didn't specifically say to me, that I can recall, they want my medical records. This was just I'm -- the assumption was that they wanted him to sign consent for a fit for duty.
I would imagine at that time there

60

weren't any psychological records, and he stated that he had no disciplinary issues prior to that.
Q. And were you able to perform a fitness for duty exam on him and come up with a report?
A. Yes.
Q. And that's Exhibit No. 2, correct?
A. Right.
Q. Is there anything you needed that you didn't receive in order for you to perform a fitness for duty evaluation of Mr. Nawara?
A. For that particular situation, no.
Q. Yes. And did you come to conclusions with respect to your fitness for duty exam?
A. Yes.
Q. And those are under the assessment results of your report?
A. Correct.
Q. And what conclusions did you come to?
A. Assessment testing showed mini mental status results, no cognitive impairment, Beck Depression Inventory suggested no clinical depressive features.
Q. Okay. And that's No. 1?



A. No. 1 was the mini mental status.
Q. And that indicated no cognitive impairment?
A. Correct.
Q. What does that mean?
A. That his orientation to place, time was intact.
Q. And you indicated before that a lot of your information here was what the patient told you, correct?
A. Correct, and his self reporting, correct.
Q. But when a patient is self reporting, you have more of a subjective nature of what happened. As a board certified psychologist are you trying to determine objectively whether or not a patient is being honest with you?
A. Yes.
Q. And you indicated that was part of the malingering analysis that you do?
A. No, no, he did not show any malingering symptoms.
Q. Okay. And if you would have seen any, that would have been noted in your report?



A. I would have noted it, absolutely.
Q. And I assume that's an important thing as a psychologist to make sure the patient is not making up a false narrative, is that true?
A. Yes.
Q. And you're trained to spot instances where a patient might not be completely forthcoming to you, correct?
A. Correct.
Q. And you've seen that before in the course of your work --
A. Yes, I have.
Q. -- correct?
Did you see any signs whatsoever that Mr. Nawara was being either untruthful or not accurate in what he told you?
A. No, not at that point.
Q. And I assume if you saw any signs whatsoever, that would be noted in this report, correct?
A. It would be noted. Whatever I see on the assessments is what I note.
Q. And there's nothing noted to that affect in your report, correct?



A. No.
MS. ALEXANDER: Objection, asked and answered.
BY MR. LINDEN:
Q. I'm sorry, you're allowed to answer.
A. I said correct.
Q. Okay. And for finding No. 2, Beck Depression Inventory No. 2, what is Beck Depression Inventory No. 2?
A. It's the self reporting sheet that looks at clinical signs of depression, so it will ask specific questions as to how they feel in the moment. Typically, with the Beck, it's over the past two weeks.
Q. Okay. And that's based in part in self reporting --
A. Correct.
Q. From a patient?
A. Uh-huh.
Q. Again, are you also using an objective analysis based on --
A. Interview.
Q. -- training?
A. Sure, yes.

Q. And it says here "Results", quote, "No clinical depressive features." What does that mean from a layperson?
A. A clinical would mean that the depression is disruptive to their daily functioning.
Q. In No. 3 it says Beck Anxiety Inventory measures severity of anxieties, results, quotes, "Suggests no clinical anxiety." What does that finding mean?
A. It means that his anxiety isn't causing impairment in his daily functioning.
Q. And is that based on an objective analysis that you performed?
A. Yes.
Q. Along with what he told you, correct?
A. Correct.
Q. So you're trained to put two and two together to reach whatever conclusion you did?
A. Yes, I mean his anxiety for situation would be normalized. I mean, if someone's anxiety over work performance or a disciplinary action that might, you know, that might result in -- in their job, I mean, you wouldn't call



that in clinical anxiety, it's situational.
Q. What is a state-trait anxiety skill?
A. It looks at the anxiety related to how they typically are in terms of where their anxiety usually sits as opposed to an anxiety due to a situation, so your trait is how are you normally functioning in terms of anxiety.
Your state is what's the state of your anxiety in this moment and his scores fell within the average when compared to other males his age.
Q. So you didn't see anything significant with respect to anxiety with respect to Mr. Nawara, is that fair to say?
A. Not -- not from a clinical perspective. It didn't show in his reporting.
Q. Okay. Aside from clinical, what would be another type?
A. Well, normal anxiety, you know, that we all typically have that helps motivate us, drive us.
Q. So aside from any normal average anxiety, you didn't note anything?
A. No.



Q. Did you find anything in Officer Nawara that gave you any concerns about his fitness for duty to perform his duties as a correctional officer?
A. No.
Q. Now counsel asked you whether or not you have seen a job description that he gave you for a correctional officer.
A. Right.
Q. Do you remember that testimony?
A. Yeah, I do.
Q. I think you indicated before that you had experience with Cook County Sheriff's Department employees?
A. Uh-huh.
Q. Have you ever had experience with other correctional officers?
A. Yes.
Q. Do you know what a correctional officer does?
A. Sure, they work on the tiers, they deal with the inmates.
Q. Have you ever seen a job description before for correctional officers?



A. I believe I have. I can't state specifically.
Q. In order for you to perform the fitness for duty exam of Mr. Nawara, did you need a job description for correctional officer?
A. No, not for his situation.
Q. Are you aware whether or not correctional officers typically in Cook County jail are permitted to carry a gun or weapon?
A. No, they don't.
Q. Have you ever had any experience dealing with employees that worked in external operations of the Cook County Sheriff's office?
A. Regarding which particular units?
Q. Just generally in the jail where external operations are allowed to carry weapons?
A. Do you mean the officers that are on the street?
Q. Or outside the jail complex?
A. Yeah. Oh, yes.
Q. But based on your experience in law enforcement with respect to prison guards and prison, if Cook County Sheriff's office really

had concerns about Mr. Nawara being a threat to either his safety or the safety of others, would you expect them to transfer him the day after this alleged incident to external operations and allow him to carry a weapon? Does it make any sense to you as --
MS. ALEXANDER: Objection.
BY MR. LINDEN:
Q. -- a clinical psychologist?
MS. ALEXANDER: Objection foundation.
THE WITNESS: No, I agree with you.
BY MR. LINDEN:
Q. Do you know whether or not there's almost a two-month delay from the time of this alleged September 2016 instant until the time that they required Mr. Nawara to undergo fitness for duty exam?
A. Well, I don't know that they did that.
Q. Okay. But let's assume -- let's assume they did that.
A. Okay.
Q. Would that make any sense to you as a psychologist that they had legitimate concerns that he posed a threat to either his own safety

69

or other people's safety?
MS. ALEXANDER: Objection, foundation.
THE WITNESS: No, typically, a department would pull them off, put them on medical leave and then -- immediately.
BY MR. LINDEN:
Q. So based on your experience, if they had real concerns, they wouldn't allow him to work after that, correct?
MS. ALEXANDER: Objection.
THE WITNESS: That's correct.
MS. ALEXANDER: Foundation.
BY MR. LINDEN:
Q. Okay. In No. 5 it says "Shipley-2, measures crystalized intelligence?"
A. Uh-huh.
Q. Is that the box in the abstract nature?
A. Yes, yes.
Q. Is that an objective test?
A. Yes.
Q. What were the results of that test with Officer Nawara?
A. He -- his vocab was average, his abstraction --

70

Q. Vocabulary was average or above average?
A. I'm sorry, I apologize. It was above average. His abstraction was average and his block patterns were above average.
Q. Anything with respect to Shipley-2 that gave you any concerns --
A. No.
Q. -- about his fitness for duty?
A. No, not from an intellectual perspective.
Q. What is Minnesota Multi?
A. Okay. That's the MMPI.
Q. Okay. Are these all published, standardized?
A. Yes.
Q. And who are they recognized by, if anybody?
A. Oh, APA, American Psychological Association.
Q. So they're down in pretty much every fitness for duty exam?
A. Yeah. Yes.
Q. Can you read your findings in No. 6 for

71

the Minnesota Multiphasic?
A. Results are determined -- okay -- by comparing individual test responses to those from a variety of psychiatric and nonpsychiatric populations.
Behavior characteristics, levels of adjustment, personality traits, no indication of clinical -- indication of somatic emotional behavioral or thought disorder, dysfunction.
Q. Is there anything with respect to the Minnesota Multiphasic Personality Inventory that gave you any concerns about his fitness for duty?
A. No.
Q. Now the last one is SIMS?
A. Uh-huh.
Q. Can you tell us what that is?
A. The Structured Inventory for Malingering. It's used to assess malingering, psychopathology, neuropsychological symptoms.
Q. And why is that important?
A. Well, it looks at -- it looks at feigning, lying, you know, manipulating. It looks at memory issues and determines if the

72

inconsistency of statements or responses show an inconsistency and truthfulness.
Q. And are those based on objective findings?
A. Yes.
Q. What was the results of SIMS?
A. No indication of malingering.
Q. Do you have any doubts about your findings with respect to that?
A. No.
Q. And then, finally, when it comes down to the recommendations, would that be fair to classify those as your overall conclusions based on your exam?
A. Yes.
Q. And can you read what your recommendations are?
A. There --
Q. If you could just start from the beginning and just --
A. "The Deputy, John Nawara, received a fitness for duty evaluation to determine any implications of cognitive, emotional, and/or behavioral impairment related to his conduct at

73

work.
Clinical interview evaluation all suggests that Deputy Nawara is fit for duty. Recommended that he return to work with no restrictions."
Q. Are there any records or documents that you needed to come to that conclusion that he didn't -- that you did not have?
A. I was -- no, that came from his interview and his assessment results.
Q. Now you're board certified, correct?
A. Correct.
Q. And you have a license in the State of Illinois, correct?
A. Correct.
Q. You're not allowed to come to any conclusions or recommendations unless you had sufficient information to do so. Is that a fair statement?
A. That's a fair statement.
Q. If you needed anything additional, I take it you would not have come to any conclusions or these conclusions?
A. No.

74

Q. Are there any records that you didn't have that you needed in order to come to your conclusion that's fit for duty?
A. No, not at that time.
Q. Is there anything that gave you any doubts based upon your overall five to six hours worth of Officer Nawara --
A. No.
Q. Any doubts at all that he was fit for duty?
A. No.
Q. Did you see any anger management issues with Mr. Nawara?
A. No.
Q. Is that one of the issues you would be looking for?
A. It would be.
Q. If you saw any signs of that, is it fair to say that it would have been noted in your report?
A. I would have written the report accordingly.
Q. And I assume you're doing an objective analysis looking for anger management issues,

75

correct?
A. Correct.
Q. Just simply because a patient tells you hey, I've got no anger management issues, Doctor, you wouldn't take a patient's word for that, correct?
A. Well, I will look at the assessments when they do the MMPI. They're asking questions related to aggression and anger, so, you know, they'll ask it a few different ways, and, you know, the person is going to self-report. I mean that's what we have. So however he answers, if there's inconsistencies in his -- in how he reports, it would show up.
Q. Okay. And they typically would show up if there were any issues?
A. Typically, they do.
Q. Did you see anything whatsoever in your objective tests, in the subjective reporting that he gave you, or anything in your exam that gave you any concerns about any anger management?
A. No.
Q. No.

76

I think counsel asked you a little bit about additional personality disorder tests you could have possibly conducted in the realm of available tests?
A. Yes.
Q. But as a doctor, you don't conduct tests that are unneeded, do you, for a patient?
A. If I'm suspecting that there might be a personality disorder, I would.
Q. Right, but only if you suspect a personality disorder would you order additional tests, correct?
A. Correct.
Q. And I assume in Mr. Nawara's case, you saw nothing that warranted any additional personality disorder tests, is that fair?
A. That's fair.
Q. And if you would have seen something, that would have been noted in your report, correct?
A. I would have done additional testing.
Q. And if he would have refused that additional testing, you would not have completed your report in the way that you did in

77

Exhibit 2, is that fair?
A. If he would have refused?
Q. Yes?
A. No, he was extremely compliant.
Q. Did you see any personality disorders with respect to Mr. Nawara?
A. I did not.
Q. And if you did, those would have been noted in your report, I take it?
A. Yes, uh-huh.
MR. LINDEN: I've got nothing else. Thanks, Doctor.
MS. KAMPER: Hi, this is Joi. I don't have any questions.
MS. ALEXANDER: Okay. I just have a couple more questions. Do you need a break?
THE WITNESS: No.

REDIRECT EXAMINATION

BY MS. ALEXANDER:
Q. Dr. Kroll, in your experience with police officers and first responders, is it important for a deputy sheriff to be able to control his anger and aggressiveness?
A. Yes.

78

Q. And if a department, any department, police department, sheriff's office had asked you -- strike that.
If the Cook County Sheriff's office had asked you to perform a fitness for duty exam for Mr. Nawara, you would have asked for all of the documentation they had, correct?
A. Correct.
Q. And would you have asked for medical records, correct?
A. Correct.
Q. Okay. And do you have any in your experience -- with fitness for duty exams, do you have experience in actually obtaining the medical records yourself or do you generally get those medical records from the department?
A. Well, I'll request it from the department.
Q. Okay.
A. The department will send it to me, yeah.
Q. So you don't request medical records from the doctors?
A. Not without consent.

79

Q. You generally request it from the department?
A. Yes.
Q. If you want psychological records for a certain patient but the patient hasn't been to a psychiatrist or a psychologist, doesn't have psychological records, would you want then records from a family physician or an internist or a general doctor?
MR. LINDEN: Objection, form.
THE WITNESS: If it would be appropriate to the situation, I might.
BY MS. ALEXANDER:
Q. And can -- can -- oh, go ahead.
A. No, typically, those documentations are already in the files.
Q. Okay. But can you find psychological medical information in records from doctors other than psychiatrists or psychologists?
MR. LINDEN: Objection, form, foundation, speculation.
THE WITNESS: I guess you can. I can't say that I've ever -- I don't think I have ever come across that situation.

80

MS. ALEXANDER: Okay.
THE WITNESS: And to be honest, I would be looking at documentation that would come from an individual who was competent in that specific area. I mean, a general practitioner isn't somebody that's really going to assess somebody's psychological state, a psychologist would.
BY MS. ALEXANDER:
Q. But could -- a person could certainly talk to their internist or their family physician about --
A. Sure.
Q. -- you know, their depression, their anxiety --
A. Absolutely.
Q. -- that type of thing, and if that happened, would you want to see the records then from that family physician?
A. Yes, if the family --
MR. LINDEN: I just want to object to form, speculation.
THE WITNESS: I mean if the practitioner is prescribing --

81

MS. ALEXANDER: Uh-huh.
THE WITNESS: -- you know, then you would need to know that.
BY MS. ALEXANDER:
Q. Okay. Or -- or any -- or treating in any way or discussing with the --
A. Yes.
Q. -- with the patient?
A. Yes.
Q. Okay. And you stated that Mr. Nawara's anxiety was normal, he had normal anxiety about his situation, is that correct?
A. He fell in the average range when compared to other males his age.
Q. Okay. And so it's not -- you would say he does not have clinical anxiety, is that correct?
A. Didn't show.
Q. And would you give him then a diagnosis of anxiety?
A. No.
Q. Would you give him a diagnosis of adjustment disorder?
A. I -- you know what, I -- I wasn't

82

treating him.
Q. Okay.
A. Yeah.
Q. So you wouldn't give him a diagnosis at all, is that correct?
A. I would -- I would use the assessments to determine --
Q. Okay.
A. -- his personality states-traits which could possibly show a diagnosis.
Q. Okay. But you didn't find a diagnosis then?
A. No.
Q. And you didn't find that Mr. Nawara had adjustment disorder?
A. No, not at that time.
MS. ALEXANDER: Okay. That's all I have.
MR. LINDEN: Just a couple and you'll be done.
THE WITNESS: Okay.

RECROSS EXAMINATION

BY MR. LINDEN:
Q. Do you know if a company by the name of CorVel?

83

A. I'm not familiar.
Q. In working for doing fitness for duty exams from police departments or law enforcement areas?
A. Is that Dave Cory?
Q. It's a company that --
A. Okay.
Q. -- administers fitness for duties, and they will go and select a provider such as you to perform and they work as like intermediary for the departments. Have you ever dealt with any companies like that?
A. Pertaining to the County, I've seen various specific names of psychologists. I don't know how they obtain them.
Q. Okay. And counsel asked you about whether or not you made any clinical diagnosis for anxiety, correct?
A. Correct.
Q. Were you seeing him for that issue, Officer Nawara?
A. I didn't treat him as for -- for intervention.
Q. So when you made findings regarding

84

anxiety, were you trying to make those findings with respect to whether or not he was fit for duty?
A. Yes.
Q. If somebody came in and wanted a diagnosis or determine whether or not the person had any anxiety disorders, would that be a different procedure than you employed for Officer Nawara?
A. No, we would give some similar tests.
Q. But I take it you didn't find anything that negatively impacted his ability to be a correctional officer?
A. His results didn't indicate that.
MR. LINDEN: Okay. Thank you.
MS. ALEXANDER: I'm done.
THE WITNESS: Good.
MS. ALEXANDER: Do you want to see a copy so that you can sign it or do you want to waive?
THE WITNESS: I'm waiving it.
(Proceedings concluded at 10:15 a.m.)

85

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Josephine Lehman, a Certified Shorthand Reporter, in the State of Illinois, do hereby certify that heretofore, to-wit, on the November 22, 2019, personally appeared before me, at 6323 North Avondale, Chicago, Illinois, ROBIN KROLL, Psy.D, in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein JOHN NAWARA is the Plaintiff, and COOK COUNTY, et al. are the Defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the

86

foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 10th day of December, 2019.

Josephine Lehman

CERTIFIED SHORTHAND REPORTER
CSR CERTIFICATE NO. 084-002951

87

**Exhibits**

**Kroll Exhibit 1**
4:16 19:4,6
**Kroll Exhibit 2**
4:17 20:10,12,17 49:21 58:5 61:7 78:1

**$**

**$2,000**
42:2

**1**

**1**
19:4,6 57:4 61:24 62:1
**10:15**
85:21
**10th**
25:9
**124**
20:21
**13**
21:18
**1300**
42:1
**13th**
23:3
**15**
8:13
**16th**
25:3,11
**17**
25:4
**18th**
23:6,11

**2**

**2**
19:21 20:10,12,17 49:21 58:5 61:7 64:7,8,9 78:1
**20**
55:21
**2016**
21:11 22:23 23:3,6, 11 24:5 40:13 69:15
**2017**
24:9 25:7,9,11 40:16 42:18
**26**
21:18
**28th**
21:11 24:9 40:13
**29th**
22:23

**3**

**3**
52:4 65:7
**3-10**
25:4
**3-8**
25:4
**30th**
24:5 52:14

**4**

**4:30**
22:22

**5**

**5**
70:14
**50**
21:16

**6**

**6**
71:24
**60**
21:17

**7**

**70**
21:17
**7:00**
23:12

**8**

**8:45**
23:14
**8th**
25:5

**9**

**90**
8:20
**9:00**
23:13

**A**

**a.m.**
23:12,13 85:21
**ability**
85:12
**absolutely**
63:1 81:16
**abstract**
27:22 28:7 70:17
**abstraction**
70:24 71:4
**accumulate**
50:9
**accurate**
63:16
**acknowledged**
60:2
**action**
24:14 65:23
**actions**
18:11
**actual**
33:19
**addiction**
9:9 13:8
**additional**
74:21 77:2,11,15,21, 23
**adjustment**
72:7 82:23 83:15
**administered**
30:2
**administers**
84:8
**affect**
63:24
**age**
66:11 82:14
**agencies**
9:22
**aggression**
26:21 76:9
**aggressive**
46:17 47:21
**aggressiveness**
78:23
**agree**
69:11
**ahead**
36:14 49:11 80:14
**ALEXANDER**
5:6,18 19:2,8,22 20:1,9,16 32:4,7 33:7 36:10,14,16 41:6 46:20 47:17 48:14 49:7,11,13 51:10 64:2 69:7,10 70:2,10,12 78:15,19 80:13 81:1,9 82:1,4 83:17 85:16,18
**allegation**
23:8
**alleged**
69:4,15
**allowed**
32:4,5 64:5 68:16 74:16
**American**
71:19
**amount**
7:17
**analysis**
62:20 64:21 65:14 75:24
**and/or**
73:23
**anger**
56:7 75:12,24 76:4, 9,21 78:23
**announcing**
22:17
**answers**
26:18 76:13
**anxieties**
65:8
**anxiety**
28:11,12,18 65:7,9, 11,20,22 66:1,2,3,5, 7,9,13,19,23 81:15 82:11,16,20 84:18 85:1,7
**APA**
71:19
**apologize**
22:11 71:3
**apparently**
53:6
**appears**
19:21
**applicable**
16:6
**approached**
22:19
**area**
7:10 60:16 81:5
**areas**
9:11 26:16 51:12 84:4
**arrived**
22:1 23:13
**articulate**
59:12,13
**articulated**
59:16
**asks**
50:22,23
**aspects**
26:13
**assess**
16:3 17:4,10 72:19 81:6
**assessment**
8:3 10:1 12:13 15:6 16:9,14 52:5 53:15 57:14 61:16,20 74:10
**assessments**
12:3,12,15 16:16 63:22 76:7 83:6
**assigned**
21:12,15
**Association**
71:20
**assume**
6:5 48:1 50:5,14,15 53:13 63:2,18 69:19 75:23 77:14
**assumed**
50:8
**assumes**
46:19 47:13
**assuming**
14:15
**assumption**
50:10 51:24 60:22
**attached**
19:21
**attempted**
22:13
**attendance**
24:18
**attorney**
24:11
**author**
21:5
**authorization**
56:24 58:18 60:10
**authorizations**
60:1
**average**
28:6,7 66:10,22 70:23 71:1,2,4,5 82:13
**awards**
33:22
**aware**
38:7,8,11 68:7

**B**

**baby**
22:19
**back**
21:7 36:6 39:12 48:22 54:10,15,22 55:14 56:10
**background**
6:11
**based**
33:8 64:15,21 65:13 68:22 70:7 73:3,13 75:6
**basement**
21:12
**basically**
24:20 31:18
**Bate**
20:18
**Beck**
28:10,17 61:21 64:7, 8,13 65:7
**begin**
15:21
**beginning**
29:15 73:20
**behavior**
57:19,21 72:6
**behavioral**
72:9 73:24
**bill**
10:13 41:11
**billed**
41:18
**bit**
44:11 77:1
**block**
29:9 71:5
**board**
6:15 7:5,7,9,12 10:21 62:15 74:11
**borderline**
45:23
**bottom**
20:18
**box**
70:17
**breadth**
59:9
**break**
78:16
**bring**
38:13 60:18
**broke**
21:20,21

**C**

**call**
9:22 12:1 14:7 15:24 65:24
**called**
11:22 23:19 24:19
**calling**
10:9
**care**
35:5
**carry**
68:9,16 69:5
**case**
7:14 42:7 48:7,21 56:1,9 57:16 59:5 77:14
**cases**
5:21
**causing**
65:11
**CCSO00116**
20:19
**Cermak**
21:12
**certificates**
33:22
**certification**
7:9,12 10:22 11:3,13
**certified**
6:15 7:5,7 62:15 74:11
**change**
44:16
**changed**
47:10
**characteristics**
72:6
**charged**
41:23
**chest**
22:8
**chunk**
24:21
**civilians**
8:21,23
**claim**
23:6
**claimed**
23:9
**clarify**
43:23
**classification**
11:7
**classify**
73:13
**clinical**
6:14,17,21 8:2 9:5 11:8 43:15 61:22 64:11 65:2,4,9 66:1, 15,17 69:9 72:8 74:2 82:16 84:17
**clue**
48:10
**cognitive**
26:17 27:21 28:1 61:21 62:2 73:23
**comfortable**
48:1
**commendations**
57:22
**commonly**
6:24
**companies**
84:12
**company**
83:23 84:6
**compared**
66:10 82:14
**comparing**
72:3
**competency**
8:5
**competent**
81:4
**complained**
56:4
**complaint**
23:4
**complaints**
23:9 26:23
**complete**
21:2
**completed**
77:23
**completely**
56:24 63:7
**complex**
68:20
**compliant**
78:4
**complied**
22:20
**computer**
27:6 28:22 45:21
**concentration**
6:19,20 8:4
**concern**
15:13 43:16
**concerns**
67:2 69:1,23 70:8 71:7 72:12 76:21
**concluded**
85:21
**conclusion**
65:19 74:7 75:3
**conclusions**
61:13,19 73:13 74:17,23
**concrete**
28:8
**conduct**
73:24 77:6
**conducted**
77:3
**confidentiality**
53:21 54:1,6
**confused**
59:16 60:6
**confusing**
23:21
**consent**
24:2,7 52:10,18,24 53:5,7 55:12,24 60:23 79:24

**consistency** 26:18
**contacted** 22:15 23:23
**contacting** 21:22 48:20
**contracted** 14:17,20
**contracting** 14:16
**contracts** 10:4
**contractual** 10:8
**control** 78:23
**conversation** 14:23
**conversations** 51:24
**Cook** 11:19 12:18,20 14:2, 6,12,22,24 37:6 39:3 40:1 67:13 68:8,13, 24 79:4
**copy** 20:6 21:2 58:11 59:1 85:18
**correct** 17:17 19:10 25:15 32:8 37:9,14 39:10, 18,23 40:14,17 41:19 45:12 49:8 52:20 55:8,9 57:5,7, 8,11,12,15 58:5 60:11,12 61:7,18 62:4,10,11,12 63:8, 9,13,20,24 64:6,17 65:16,17 70:9,11 74:11,12,14,15 76:1, 2,6 77:12,13,20 79:7,8,10,11 82:12, 17 83:5 84:18,19
**correctional** 21:19 67:3,8,17,19, 24 68:5,8 85:13
**correctly** 17:13 58:15,24
**Corvel** 83:24
**Cory** 84:5
**counsel** 54:11 67:6 77:1 84:16
**counselor** 38:6
**county** 11:19 12:18,20 13:13,14 14:2,6,12, 22,24 30:19,22 37:6 38:20 39:3 40:1 46:24 47:3 48:11,16 49:4 50:3,8,15,22 51:18 55:5,7,15 56:4 59:9,20,23 67:13 68:8,13,24 79:4 84:13
**County's** 35:13
**couple** 78:15 83:18
**courthouse** 13:1
**covered** 30:14,16
**create** 44:19
**criteria** 14:11
**critical** 34:21 56:20
**CROSS** 51:14
**crystalized** 70:15
**cuffed** 22:2
**cumulative** 9:10

**D**

**daily** 65:5,12
**Dana** 24:11 40:5,8
**dates** 25:3
**Dave** 84:5
**day** 22:23 69:3
**deal** 67:21
**dealing** 68:12
**dealt** 84:11
**deceptive** 29:24
**defensive** 47:20
**defiance** 26:20
**degree** 8:9 11:8
**delay** 69:14
**demeaning** 22:6
**denies** 23:8
**department** 10:9,13 12:21 13:18 16:1,3 17:3 32:14 33:2,11 35:11,15,17 36:21 37:21 50:22 58:13 67:14 70:3 79:1,2,16,18,20 80:2
**department's** 34:11
**departments** 10:5 13:15,20,24 84:3,11
**depend** 54:17 57:16
**dependent** 45:24
**depending** 34:19
**depends** 54:15
**deposed** 5:20
**Deposition** 19:5 20:11
**depression** 28:11,17 61:22 64:8, 9,11 65:5 81:14
**depressive** 61:23 65:2
**deputy** 22:3,4,9 23:8,16,17 24:1 52:9,13,17,23 73:21 74:3 78:22
**dermatologist** 55:21
**description** 38:20,24 67:7,23 68:5
**designs** 29:9
**detailed** 28:4
**detainee** 22:13
**determine** 30:5 31:21 62:16 73:22 83:7 85:6
**determined** 72:2
**determines** 72:24
**diagnosis** 38:9 82:19,22 83:4, 10,11 84:17 85:6
**diagnostics** 9:6
**difference** 46:14,21 47:11 49:4, 14
**DIRECT** 5:5
**directive** 23:2
**directly** 58:2
**disciplinary** 15:14 18:10 24:14 33:21 44:21 54:16 55:2 57:18 61:2 65:22
**discipline** 54:19
**discussed** 48:5
**discussing** 21:8 82:6
**discussion** 5:16 60:14
**disorder** 44:12,14,17 45:7,11 72:9 77:2,9,11,16 82:23 83:15
**disorders** 42:12,21 43:5 44:3 46:5 78:5 85:7
**disruptive** 65:5
**dissertation** 7:15
**doctor** 34:24 36:4 38:5 51:11 53:23 76:5 77:6 78:12 80:9
**doctor's** 35:1
**doctorate** 6:14,17 11:11
**doctors** 37:3 79:23 80:18
**documentation** 35:10,18 48:22,24 49:16 51:4 79:7 81:3
**documentations** 80:15
**documented** 40:15
**documents** 24:2 30:17,22 38:13, 17 47:5 52:10,18,24 74:6
**doubts** 73:8 75:6,9
**drive** 66:20
**due** 66:6
**duly** 5:3
**duties** 15:8 35:2 67:3 84:8
**duty** 9:14,24 10:10,12,18 11:5,12,16,19 12:9 14:2,9,13 15:1,4,10, 13,18,20 16:20,24 17:15 19:16 21:3 24:3,15 31:15 32:19 33:1,9,10 34:15 35:19 36:12 40:24 41:9 42:1,7,21 47:5 50:9,21,23 51:3,7,18 52:19 53:11,12,14, 16 55:16,17 58:12 59:8,11,15 60:11,23 61:5,11,14 67:3 68:4 69:17 71:9,22 72:13 73:22 74:3 75:3,10 79:5,13 84:2 85:3
**dysfunction** 72:9

**E**

**education** 6:12
**email** 20:5 22:24
**emotional** 72:8 73:23
**employed** 85:8
**employee** 54:12
**employees** 67:14 68:12
**employer** 50:22 51:3,7 58:10, 20 59:1
**encounters** 34:1
**enforcement** 68:23 84:3
**entail** 7:22
**entailed** 15:19
**entire** 34:5
**escorted** 22:4
**established** 37:2
**ethics** 24:16
**evaluate** 26:6 30:14
**evaluation** 15:20 16:20 19:16 21:3,5 46:14,22 47:12 50:24 52:19 61:11 73:22 74:2
**evaluations** 9:14 15:2 21:14
**evaluator** 51:3,7
**evidence** 46:19 47:14,16
**exam** 10:18 11:5 15:5,10, 19 29:14 33:1,10 34:16 35:20 36:12 41:9 55:16 58:3,11 59:8,11 61:5,14 68:4 69:17 71:22 73:14 76:20 79:5
**examination** 5:5 51:14 53:14 78:18 83:21
**examined** 5:3 30:18
**examining** 55:22 57:11
**exams** 11:16,19 14:2 33:9 50:21 53:12 79:13 84:3
**excellent** 24:18
**excuse** 38:5
**exhibit** 18:24 19:4,6 20:10, 12,17 49:21 58:5 61:7 78:1
**expand** 7:21
**expect** 69:3
**expectation** 50:4
**experience** 8:8 10:22,24 12:17 15:11 23:21 32:17, 22 33:8,9 35:20 36:11 45:16 50:20, 21 51:2,6 67:13,16 68:11,22 70:7 78:20 79:13,14
**experiences** 32:23
**explain** 54:3,4
**explanation** 23:2
**expressed** 47:1
**external** 23:1 68:12,16 69:4
**extra** 7:9
**extremely** 78:4

**F**

**factors** 57:17
**facts** 46:19 47:13
**fair** 39:6,11,15,19 49:20, 24 53:15 59:2 60:17 66:14 73:12 74:18, 20 75:19 77:16,17 78:1
**false** 63:4
**familiar** 5:24 14:11 84:1
**families** 13:9
**family** 8:21 13:9 26:19 36:4 80:8 81:11,19,20
**fax** 20:4
**fear** 56:4
**features** 61:23 65:2
**February** 24:9
**feel** 64:12
**feigning** 30:7 72:23
**fell** 66:9 82:13
**fight** 21:20,21
**file** 31:6 34:5,8
**filed** 23:3
**files** 35:10 80:16
**fill** 24:7 27:1,4
**filled** 28:23
**fills** 29:2,7
**finalizing** 25:22
**finally** 73:11
**find** 15:22 67:1 80:17 83:11,14 85:11
**finding** 64:7 65:10
**findings** 71:24 73:4,9 84:24 85:1
**fine** 18:20
**finger** 22:8
**fire** 8:24
**fit** 9:24 10:10,12 15:12 16:24 24:3,15 31:15 32:16 35:2 41:24 47:5 52:19 53:11,16 55:17 58:12 60:11, 23 74:3 75:3,9 85:2
**fitness** 9:14 10:18 11:5,12, 16,19 12:9,12 14:2, 9,13 15:1,4,10,18,20 16:20 17:15 19:16 21:3 31:23 32:19 33:1,9,10 34:15 35:19 36:11 40:24 41:9 42:7,21 50:9, 20,23 51:3,7,18 53:12,14 55:16 59:7, 10,15 61:4,11,14 67:2 68:3 69:16 71:9,22 72:12 73:22 79:5,13 84:2,8
**follow** 60:4
**forensic** 6:19,20 15:23
**form** 32:2 33:6 36:13 41:2 46:18 47:13 49:9 80:10,20 81:21
**formal** 23:9 48:12,16 58:12
**formalized** 53:16 55:17
**forms** 24:2 52:10,19 53:1, 5,7 59:9,19,23
**forthcoming** 63:8
**foundation** 46:19 69:10 70:2,12 80:20
**free** 22:12
**frightened** 46:15

**functioning**
26:17,18 27:21 28:1, 6 65:6,12 66:7

**G**

**gave**
58:23 67:2,7 71:7 72:12 75:5 76:20,21
**general**
36:3 80:9 81:5
**generally**
68:15 79:15 80:1
**give**
44:7 55:6 82:19,22 83:4 85:10
**giving**
58:22
**good**
5:7,8,9,10 24:16,21 32:10 57:20 85:17
**graduated**
8:8
**guards**
68:23
**guess**
80:22
**gun**
68:9

**H**

**handcuffs**
21:18
**handed**
16:1
**handful**
46:7
**handing**
19:3
**handle**
22:17
**hands**
58:14
**happen**
47:18
**happened**
24:22 39:20 62:15 81:18
**Hayes**
21:23 23:7
**head**
37:4
**health**
15:15
**helps**
66:20
**hey**
10:9 76:4
**HIPAA**
53:18,20
**histrionic**
45:24
**hold**
13:7,11
**honest**
47:7 48:8 62:17 81:2
**honorable**
57:23
**Hospital**
21:12
**hour**
25:19,24 27:11
**hours**
7:17 25:23,24 26:3,4 75:6
**HR**
23:13,19
**Human**
39:24

**hundred**
8:18

**I**

**idea**
28:5 43:19
**identification**
19:7 20:13
**Illinois**
13:19 74:14
**imagine**
60:24
**immediately**
70:5
**impacted**
85:12
**impairment**
61:21 62:3 65:12 73:24
**implications**
73:23
**important**
53:23 57:3,20 63:2 72:21 78:22
**incidence**
50:7
**incident**
21:10 34:2,22,24 37:9 39:7,17 40:11 56:20 69:4
**incidents**
54:19
**include**
12:23 33:19,20,21, 22
**incomplete**
19:21
**inconsistencies**
76:13
**inconsistency**
73:1,2
**incorrect**
46:8
**independent**
18:17
**index**
22:8
**indication**
51:16 72:7,8 73:7
**individual**
55:1 58:13 72:3 81:4
**information**
18:5 39:3 47:12 48:23 49:3 50:10 53:3 60:3 62:9 74:18 80:18
**informed**
22:24
**injuries**
34:23 56:21
**inmate**
22:1,4,14,18,19,20
**inmates**
21:17,21 67:22
**instances**
63:6
**instant**
69:15
**instructed**
24:4 52:21
**insulting**
22:6
**insurance**
41:13,14,18,21 42:4
**intact**
29:16 62:7
**intellectual**
71:10

**intelligence**
70:15
**interested**
13:18 50:11
**intermediary**
84:10
**internist**
80:8 81:11
**interpersonal**
26:19
**interpretation**
44:8
**interpretations**
16:10,11
**intervention**
9:5 84:23
**interventionist**
8:1
**interview**
7:16 15:22 16:2,16 23:15 25:19 26:7 29:18,20 64:22 74:2, 10
**interviews**
25:22
**inventory**
26:12 43:13 61:22 64:8,9 65:7 72:11,18
**invite**
13:13,14,15,16,17
**involved**
24:14
**IQ**
28:3
**issue**
15:15,23 16:4 17:2 18:9 31:17 32:13 44:21,24 56:3 57:10 84:20
**issues**
9:7 13:8 26:19,22 44:19 54:15,16 55:2 56:7,14 57:18 61:2 72:24 75:12,15,24 76:4,16

**J**

**jail**
68:9,15,20
**jails**
13:1
**James**
23:24
**Joan**
21:23 23:7
**job**
9:7 15:8 36:19 38:19,23 65:24 67:7, 23 68:4
**John**
16:17 19:18 54:18 73:21
**Joi**
78:13
**Jones-hayes**
39:8,13 40:13
**Jones-hayes'**
37:9

**K**

**K-R-O-L-L**
5:15
**KAMPER**
78:13
**kind**
7:11 56:5
**knowledge**
8:4 31:24 60:17

**Kroll**
5:2,15,19 6:13 19:5 20:11 78:20
**Kurtz**
24:12 40:5,8

**L**

**lapse**
40:20
**law**
68:22 84:3
**lawyer**
40:6 48:19,20
**layperson**
65:3
**leading**
24:22
**leave**
70:4
**left**
22:11,21 42:14
**leg**
21:18
**legal**
31:17 33:1 49:22
**legitimate**
69:23
**lengthy**
7:14
**letter**
24:6,10
**levels**
72:6
**license**
74:13
**licensure**
11:2
**limited**
57:6,9,14
**LINDEN**
19:20,24 32:1 33:5 36:9,13 41:1 46:18 47:13 49:6,9 51:11, 15 64:4 69:8,12 70:6,13 78:11 80:10, 20 81:21 83:18,22 85:15
**litigation**
20:22
**local**
10:5
**long**
8:11 11:15 25:16 27:9
**looked**
24:17
**lot**
9:8 10:22 52:8 62:8
**lying**
30:6 72:23

**M**

**made**
46:13,21 47:11 49:4, 14 84:17,24
**maintain**
53:24 54:5
**make**
16:4 17:13 29:15 57:13 63:3 69:5,22 85:1
**making**
51:23 63:4
**males**
66:10 82:14
**malingering**
28:13 29:23 30:7 62:20,21 72:19 73:7

**management**
75:12,24 76:4,22
**manipulating**
72:23
**March**
25:3,5,9,11 40:16 42:18
**mark**
18:24 19:2 20:10
**marked**
19:6 20:12,18 58:4
**marking**
19:3
**meaning**
8:1 9:8
**means**
8:21 11:7 65:11
**meant**
49:22 50:1
**measures**
65:8 70:15
**medical**
21:14 30:24 31:4,5, 13 33:3,11,13,14,15, 20 34:13,14 35:1,3, 21 36:2,6,23 37:2 51:8 53:13 54:1,6 55:3 56:2,10 57:6,15 58:1,19 59:24 60:12, 13,15,21 70:4 79:9, 15,16,22 80:18
**meet**
25:2,16
**meeting**
39:20 46:16
**members**
8:21
**memory**
72:24
**mental**
15:15 29:14 61:20 62:1
**mentions**
57:23
**met**
23:14 25:13 26:2
**mini**
29:14 61:20 62:1
**Minnesota**
71:12 72:1,11
**missed**
20:3
**missing**
20:2,7
**misstates**
32:2
**MMCI**
43:6,8
**MMPI**
26:9,10,24 42:23 43:12,23 71:13 76:8
**moment**
64:13 66:9
**monitor**
21:13
**month**
9:18,20 11:16
**morning**
5:7,8
**motivate**
66:20
**Multi**
71:12
**Multiphasic**
26:11 72:1,11
**multiple**
13:24 17:4 46:11

**N**

**names**
84:14
**narcicisstic**
46:1
**narrative**
24:24 63:4
**nature**
15:2 43:15 62:14 70:17
**Nawara**
16:17 17:12 19:18 21:3,9 22:9,15 23:8, 16,17 24:1,22 25:2, 13 26:3,7 27:1,4,17 29:2,7 30:14,18 31:2,4,13,20 37:6,21 38:12 39:4,9,17,22 40:3,9,12,22 41:8,12 42:8,11,15 43:10 46:14 50:18 51:17 52:9,13,17,23 54:18 59:7 61:11 63:15 66:14 67:1 68:4 69:1,16 70:22 73:21 74:3 75:7,13 78:6 79:6 83:14 84:21 85:9
**Nawara's**
24:23 37:3 38:5,19 42:3 77:14 82:10
**needed**
12:16 24:1 52:9,18 56:22 61:9 74:7,21 75:2
**negatively**
85:12
**neuropsychologic al**
72:20
**nice**
12:19
**nonpsychiatric**
72:4
**normal**
41:24 66:19,22 82:11
**normalized**
65:21
**note**
63:22 66:23
**noted**
62:24 63:1,19,21,23 75:19 77:19 78:9
**notes**
38:4 59:5
**noticed**
22:1
**November**
23:6,11 24:5 52:14
**number**
18:5 46:7 54:11
**Nurse**
23:14,16 37:12 39:21 46:15

**O**

**object**
19:20 32:1,4 33:5 36:13 41:1 81:21
**Objection**
33:5 46:18 47:13 49:6 64:2 69:7,10 70:2,10 80:10,20
**objective**
64:20 65:13 70:19 73:3 75:23 76:19

**objectively**
62:16
**obtain**
10:21 20:15 47:7 84:15
**obtaining**
79:14
**occasions**
17:8 25:14
**occupational**
44:19
**October**
23:3
**off-duty**
18:12
**offended**
22:10
**offered**
60:2
**office**
11:20,22 12:18 14:7, 13,22,24 27:7 37:6 39:4 40:1 68:13,24 79:2,4
**officer**
10:7,11 12:7 15:10 22:15 24:16 35:4,21 36:21 47:22 67:1,4, 8,19 68:5 70:22 75:7 84:21 85:9,13
**officer's**
15:7 36:4
**officers**
9:2,7 12:24 14:3 21:16,19 32:18 48:2 67:17,24 68:8,18 78:21
**operations**
23:1 68:13,16 69:4
**opposed**
56:11 66:5
**opposition**
59:14
**OPR**
23:20
**oral**
7:16
**order**
10:21 11:4 61:10 68:3 75:2 77:11
**orientation**
29:16 62:6

**P**

**p.m.**
22:22
**paid**
41:14 42:4
**paper**
7:15 18:13 28:23,24 29:10 30:3,11 45:21
**papers**
40:23
**paragraph**
52:5,16
**part**
12:15 62:19 64:15
**participate**
13:2,3
**past**
35:4,5 44:21 57:18 64:14
**patient**
53:22 55:20,22 56:23 57:11 58:19 62:9,13,17 63:3,7 64:18 76:3 77:7 80:5 82:8
**patient's**
54:9 57:4 58:1,2,16 76:5
**patients**
11:24 12:1,3 54:7
**patterns**
27:24 71:5
**pay**
41:21
**peer**
13:2
**peers**
24:17
**Penny**
23:24
**people**
10:6 16:2 17:4
**people's**
70:1
**perceives**
24:15
**percent**
8:18,20 21:16
**perception**
47:10
**perform**
15:8,20 24:3 52:19 61:4,10 67:3 68:3 79:5 84:10
**performance**
15:14 65:22
**performed**
65:14
**performing**
55:16
**permitted**
68:9
**person**
15:9 26:13 76:11 81:10 85:6
**personal**
9:24 31:24 37:24 44:19 53:22
**personality**
26:12 42:12,21,24 43:5,13 44:3,9,12, 15,17,18,24 45:7,10, 23,24 46:1 72:7,11 77:2,9,11,16 78:5 83:9
**personally**
14:4 17:10 50:12,18, 19
**personnel**
8:4 34:5,8
**perspective**
66:15 71:11
**Pertaining**
84:13
**pertinent**
56:1,13 59:5
**Ph.d.**
11:9
**physical**
26:23 56:14,21
**physician**
35:5 58:16 80:8 81:12,19
**physician's**
59:4
**place**
21:11 22:13 29:16 47:16 60:7 62:6
**point**
47:4 48:4,22 58:3 63:17
**pointing**
22:18
**poked**
22:7
**police**
6:15 7:5,8,20,22 8:3, 16,19,24 9:2,12 10:4,5 13:7,9,15 32:17 47:22 78:21 79:2 84:3
**populations**
72:5
**posed**
69:24
**possibly**
77:3 83:10
**practice**
8:12 9:1,13
**practitioner**
36:3 81:5,23
**prescribing**
81:24
**presentations**
7:13 10:20,24
**presented**
23:10
**pretty**
71:21
**previous**
54:19
**primary**
35:5 58:16
**prior**
61:2
**prison**
68:23,24
**prisoners**
21:13
**privacy**
53:24 54:6 57:4
**private**
8:12
**problem**
53:6 59:7,8,23
**problems**
26:20 59:19
**procedure**
85:8
**proceeding**
49:22
**proceedings**
85:21
**process**
6:1 40:24 51:18 59:15
**processes**
14:12
**produced**
20:21
**programs**
13:2
**protect**
57:3
**protecting**
54:8
**protocol**
21:22
**provided**
21:19
**provider**
50:23 58:23 84:9
**providers**
58:2
**provoking**
22:6
**Psy.d**
5:2 6:22 7:1 11:9
**psychiatric**
72:4
**psychiatrist**
35:22 80:6
**psychiatrists**
80:19
**psychological**
10:1 12:3,11,14 15:6 17:2 18:8 31:19,21, 22 32:16 56:3,11,17, 19 61:1 71:19 80:4, 7,17 81:7
**psychologist**
11:4 35:22 62:15 63:3 69:9,23 80:6 81:7
**psychologists**
14:15 17:24 80:19 84:14
**psychology**
6:15,18,21 7:6 11:9
**psychopathology**
72:20
**PTSD**
9:8
**public**
6:16 7:6,8,20,22 8:3, 17,19 13:8
**published**
71:14
**pull**
70:4
**purpose**
33:1
**put**
65:18 70:4
**puzzles**
28:1

**Q**

**qualified**
10:18
**question**
6:5,6 49:9 55:12
**questionnaire**
27:1,3 28:22,24 29:7,8 30:11
**questions**
25:23 64:12 76:8 78:14,16
**quote**
65:1
**quotes**
65:8

**R**

**rage**
56:5
**range**
28:7 82:13
**reach**
65:19
**read**
24:20 52:7,12 71:24 73:16
**readiness**
15:7 32:16 43:16
**real**
70:8
**realize**
57:3
**realm**
77:3
**reason**
32:19 45:4 59:6,13
**reasoning**
27:22 28:7,8
**Rebecca**
23:14 24:6 37:12
**recall**
17:6 18:6 25:18 31:7,9,11 32:12 37:19,20,22 38:15, 16,18,21 39:1,5 41:24 43:22 60:5,21
**receive**
23:5 57:24 58:10,15 61:10
**received**
19:9 22:24 24:6,9 58:20 73:21
**recognize**
55:1
**recognized**
71:17
**recollection**
18:17
**recommendations**
73:12,17 74:17
**Recommended**
74:4
**record**
5:14,17 24:18
**records**
30:24 31:5,10,13 33:3,12,13,14,15,20, 21 34:14 35:4,15,21 36:2,7,23 37:3 51:8 53:13,22 54:1,7,14 55:3,7,14,23 56:2, 10,11,18,22 57:6,15 58:1,15,20 60:12,14, 15,21 61:1 74:6 75:1 79:10,15,16,22 80:4, 7,8,18 81:18
**RECROSS**
83:21
**REDIRECT**
78:18
**refer**
18:19
**reference**
26:15
**referral**
37:5
**refused**
24:3,8,10 38:13 40:23 41:5 51:21 52:21,24 55:11 77:22 78:2
**region**
13:20
**Reierson**
23:15 24:6 37:12,16 39:21 46:15
**related**
9:7 13:8 35:9 39:4 53:13 56:19 57:10 66:3 73:24 76:9
**relates**
39:16
**relation**
55:21
**relationship**
12:20
**relationships**
12:23
**released**
47:3
**remember**
16:19,21 18:21 67:10
**remind**
6:4
**reminding**
24:7
**rep**
23:23 24:1
**repeat**
59:21
**repeatedly**
22:7
**report**
16:15 17:11,16,20 18:15 23:13 24:21 37:9 42:10 49:5,21, 24 50:2,17 52:2 58:4,11,24 59:1 61:5,17 62:24 63:19, 24 75:20,21 77:19, 24 78:9
**reported**
23:12
**reporting**
45:22 62:11,13 64:10,16 66:16 76:19
**reports**
14:14 26:13 30:4 35:1 37:11 42:7 76:14
**representation**
24:12
**request**
9:23 24:10 33:3,15 34:7,12 79:17,22 80:1
**require**
24:15
**required**
69:16
**requires**
7:13,14,16,17
**requiring**
59:10,20,24
**resend**
20:15
**resisted**
22:14
**Resources**
40:1
**respect**
54:18 61:14 66:13 68:23 71:6 72:10 73:9 78:6 85:2
**responded**
22:3 23:18
**responders**
8:6 78:21
**response**
19:10 23:5
**responses**
72:3 73:1
**restraints**
21:17
**restrictions**
74:5
**result**
65:23
**results**
16:14 52:5 61:17,21 65:1,8 70:21 72:2 73:6 74:10 85:14
**retained**
24:11
**return**
15:7 24:4 43:16 52:22 74:4
**returned**
22:16 23:24 52:17
**review**
23:20 30:17,20,24 31:12 33:3 34:5,15, 17 36:7 37:1,2,5,8, 11 38:4,19,23 39:2
**rights**
54:9
**rigid**
44:15
**rigidity**
44:18
**road**
50:7
**Robin**
5:2,15

**room** 22:12,21 23:23,24

**S**

**safety** 6:16 7:6,8,21,23 8:3, 17,19 13:8 69:2,24 70:1
**scale** 28:12
**scope** 57:1,7,9,10 59:9
**scores** 66:9
**sections** 12:24
**seek** 45:2
**select** 84:9
**selection** 16:5
**self-report** 27:3 28:11,20 30:9 76:11
**seminars** 13:3,6,7,10,22
**send** 10:5,6,11,12 34:2 48:23 51:7 56:18 79:20
**sends** 51:3
**sense** 47:20 69:6,22
**sentence** 52:7,12,15
**September** 21:11 22:23 40:13 69:15
**sergeant** 22:15
**series** 28:10,17 29:9
**services** 41:12,16
**severity** 65:8
**shackle** 22:12,20
**shackles** 21:18
**shaking** 37:4
**share** 58:19
**sheet** 64:10
**Shelby** 23:14,16 37:12,16 39:21 46:16
**sheriff** 32:18 78:22
**sheriff's** 11:20,22 12:7,18,20 14:3,7,12,22,24 37:6,21 39:3 40:1 67:13 68:13,24 79:2, 4
**Shipley** 27:18,19,20 29:5,6
**Shipley-2** 70:14 71:6
**show** 62:21 66:16 73:1 76:14,15 82:18 83:10
**showed** 43:15 61:20
**shows** 26:17
**sic** 21:23
**sick** 24:19
**sign** 24:2 40:23 52:9,18, 24 55:11 56:23 59:10,20,24 60:3,5, 23 85:19
**signed** 47:5
**significant** 66:12
**signing** 53:6 60:9
**signs** 63:14,18 64:11 75:18
**similar** 7:15 28:3,4 45:20 58:4 85:10
**simply** 76:3
**SIMS** 72:15 73:6
**sits** 66:5
**sitting** 47:19
**situation** 53:10 60:7 61:12 65:20 66:6 68:6 80:12,24 82:12
**situational** 66:1
**situations** 26:20
**skill** 66:2
**social** 26:20 44:19
**somatic** 26:17,22 72:8
**somebody's** 81:7
**someone's** 65:21
**sort** 38:9 46:2 47:23
**sorts** 13:9
**Sounds** 34:4
**speak** 13:4 37:15,18
**speaking** 22:7 37:20,22
**special** 10:23
**specialty** 7:10
**specific** 8:5 9:7,11 10:3,4 11:2,3,12 16:2 17:11 22:1 26:13,16 34:1, 21 42:23 43:4,14 44:2,9,17 45:7,10,23 57:2 58:18 59:13 64:12 81:4 84:14
**specifically** 8:16 11:23 12:1 14:9,18 15:22 16:24 17:5,9 31:14 38:21 44:7 59:19,22 60:20 68:2
**specifics** 34:19
**speculation** 47:14 49:10 80:21 81:22
**spell** 5:14
**spikes** 42:22
**spot** 63:6
**stamped** 20:18
**stance** 47:24
**standardized** 71:15
**start** 6:11 73:19
**state** 5:13 66:8 68:1 74:13 81:7
**state-trait** 28:12 66:2
**stated** 21:22 22:11,12,16, 22 23:4,11 24:5,13 32:20 40:11 51:21 61:1 82:10
**statement** 60:17 74:19,20
**statements** 73:1
**states** 23:22 24:11 42:11 52:8,14
**states-traits** 83:9
**stating** 31:15,16,17 32:12
**status** 18:12 29:14 31:19, 21 61:21 62:1
**step** 23:22
**stop** 18:22 22:9 28:14
**street** 68:19
**streets** 13:1
**stress** 9:10
**strike** 35:13 39:12 50:1 79:3
**strong** 24:16
**structured** 29:22 72:18
**studies** 7:14
**style** 44:15,18 46:1,2
**styles** 45:23
**subject** 30:6
**subjective** 62:14 76:19
**subpoena** 19:10
**subpoenaed** 54:2
**substance** 26:19
**sufficient** 74:18
**suggested** 48:5 61:22
**suggests** 65:9 74:3
**superintendent** 21:24 22:16 23:7 37:8 39:8,13 40:12
**superintendent's** 22:5
**superintendents** 23:4
**supervisor** 18:10 21:23
**supervisors** 24:17
**support** 13:2
**surgeon** 35:8
**suspect** 77:10
**suspecting** 77:8
**sworn** 5:1,3
**symptoms** 62:22 72:20

**T**

**takes** 29:22
**talk** 8:7 16:17 34:13 40:8 81:11
**talked** 39:24 42:15
**talking** 52:13
**tells** 76:3
**ten** 11:17 36:22 54:12, 14,22 56:10
**termination** 48:10
**terms** 28:7 66:4,7
**test** 16:5 27:21 28:3,13 29:11,22,23 30:1 43:4 44:2,4 45:8 46:4 70:19,21 72:3
**testified** 5:4
**testimony** 32:2 55:15 67:10
**testing** 18:8 42:20 43:15 61:20 77:21,23
**tests** 45:11,18 46:3,11 76:19 77:2,4,7,12,16 85:10
**therapist** 38:5
**therapy** 9:5 12:7,8,15 17:9, 16
**thing** 6:3 7:4 46:2 63:2 81:17
**things** 13:9 15:17 27:23
**thinking** 39:16
**thought** 72:9
**threat** 69:1,24
**threatened** 23:7
**threatening** 23:18
**throw** 46:7
**tiers** 67:21
**time** 17:10 24:8 25:17,19, 21,24 26:1 29:16 36:18 40:19 45:6 46:24 49:23 50:10, 16,17 57:1,13,14 60:20,24 62:6 69:14, 15 75:4 83:16
**today** 5:12 6:1
**told** 23:19 24:1 31:20 39:9,17,22 52:9,17 53:9 62:9 63:16 65:16
**tone** 22:6
**total** 26:2
**touching** 22:10
**trained** 63:6 65:18
**training** 7:10,11 10:17 53:18 64:23
**trait** 66:6
**traits** 42:11 43:14 44:9 72:7
**transfer** 69:3
**transferred** 23:1
**trauma** 9:8 13:8
**treat** 84:22
**treating** 82:5 83:1
**trend** 57:19
**true** 63:4
**truthfulness** 73:2
**turn** 32:13 47:2 48:6
**two-month** 69:14
**type** 49:22 66:18 81:17
**typical** 32:22 37:23
**typically** 9:12,18 10:12,14,16 15:12,17,21 32:21, 24 33:11 34:2 35:20 36:2,8 57:24 58:10, 24 64:13 66:4,20 68:8 70:3 76:15,17 80:15

**U**

**uh-huh** 6:2,19 8:10 14:5 16:22 18:15 19:11 25:1,6,8,10,12 28:19 29:1,4,12 30:10,12 35:16,23 36:17 40:18 41:15,17 44:1 45:17 47:8 51:13 52:3,6,11 54:13,21 55:19 56:6,8 58:6,7 64:19 67:15 70:16 72:16 78:10 82:1
**Uh-ugh** 30:23
**unauthorized** 24:8
**undergo** 69:16
**understand** 6:9 32:6
**understanding** 7:24 18:7 21:8 27:24 32:10,11 38:2 41:3,8
**understood** 6:6
**union** 23:23,24
**units** 68:14
**unlimited** 56:24
**unneeded** 77:7
**untruthful** 63:15

**V**

**variety** 13:10 72:4
**video** 33:23,24 34:22,23
**visit** 27:13,15
**vocab** 70:23
**vocabulary** 27:23 71:1

**W**

**wait** 18:22
**waive** 85:19
**waiving** 85:20
**walked** 22:14
**wanted** 16:24 31:21 60:19, 23 85:5
**warrant** 44:23 60:9
**warranted** 41:4,9 53:11 60:8 77:15
**watch** 34:23
**ways** 76:10
**weapon** 68:9 69:5
**weapons** 68:17
**weeks** 64:14
**whatsoever** 63:14,19 76:18
**Wisconsin** 13:21
**word** 76:5
**work** 8:2,3 9:5,6,9,10,11, 12 10:8 15:8,23 16:9 17:2 23:12 24:4,16 32:16 43:17 52:22 63:11 65:22 67:21 70:9 74:1,4 84:10

**worked**
68:12
**working**
7:24 8:6,16,19 10:23 36:21 48:2 84:2
**works**
27:2
**workshops**
7:13 10:20,23
**worth**
75:7
**would've**
50:7
**write**
16:15 58:4,24
**written**
75:21
**wrote**
50:17 53:2

**Y**

**years**
8:13 11:17 16:21 24:19 36:6,22 54:11,12,14,23 55:21 56:10

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

John Nawara
*Plaintiff*
v.
County of Cook, et al.
*Defendant*

Civil Action No. 17-cv-02393

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: CorVel Corporation, 3010 Highland Pkwy Suite 600, Downers Grove, IL 60515

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

SEE ATTACHED RIDER

| Place: Via videoconference from court reporting facility in Portland, Oregon - location to be determined. | Date and Time: 11/05/2019 11:00 am |
|---|---|

The deposition will be recorded by this method: Videotape and stenography

❐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/25/2019

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

/s/ Sarah R. Marmor

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Defendants Dart, in his official capacity, Burke, Reierson, and Shelby, who issues or requests this subpoena, are:

Sarah R. Marmor, Scharf Banks Marmor LLC, 333 W Wacker Dr, Ste. 450, Chicago, IL 60606 312-726-6000
smarmor@scharfbanks.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

EXHIBIT
H

Civil Action No. 17-cv-02393

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* CorVel Corporation,
on *(date)* 10/25/2019 .

☑ I served the subpoena by delivering a copy to the named individual as follows: CorVel Corporation,
3010 Highland Pkwy Suite 600, Downers Grove, IL 60515 via FedEx Tracking #776821506201 and via email to Edward Jordan at ejordan@mcandrewsnorgle.legal on *(date)* 10/25/2019 ; or

❒ I returned the subpoena unexecuted because: ______ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ Witness fees to be tendered at time of deposition

My fees are $ ______ for travel and $ ______ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: 10/25/2019

/s/ Jesse Kehr
*Server's signature*

Jesse Kehr, Paralegal
*Printed name and title*

Scharf Banks Marmor LLC
333 W. Wacker Dr, Ste 450
Chicago, IL 60606
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**RIDER TO SUBPOENA TO CORVEL CORPORATION**

1. HIPAA medical release forms that accompany a fitness for duty evaluation referral.
2. The procedures by which a HIPAA release of medical records accompanying a fitness for duty evaluation referral are completed in order to obtain medical records, including how the medical providers are determined and what limitations, if any, are placed in the release forms.
3. Medical records and/or documentation necessary to perform a fitness for duty evaluation and why such information is necessary.
4. The propriety of the attached forms.

Received by CorVel on 2017-08-25 10:36:57 Central Time

P.003/004

## HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION

I, JOHN A. NAWARA authorize the independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam to CorVel Corporation.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your Fitness for Duty Examination as requested by your employer, Cook County. Your employer will receive a copy of the Independent Medical Exam (IME). You will also receive a copy of the IME.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the d[redacted] below.

JOHN A. NAWARA
Printed Name (of person giving authorization)

[redacted]
Social Security Number

[redacted]
Signature of person giving authorization

08-17-2017
Date

Signed ______________________
*(If applicable. Power of Attorney, Guardian, or Conservator. Attach a copy of document granting authority.)*

This document contains confidential information of a claimant and may not be disclosed or duplicated without prior written consent of CorVel.





CONFIDENTIAL

## HIPAA AUTHORIZATION FOR DISCLOSURE OF PROTECTED HEALTH INFORMATION

I, ___________________________, authorize the Independent medical exam or fitness for duty exam physician to disclose protected health information ("PHI") about me as described below in this Authorization:

1. With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness for duty exam.

2. Any health care provider or facility who treats/treated me for my medical condition or medical illness ("Identified Health Care Providers") may disclose the above-described information to a Disability Management Case Manager, for Cook County, employed by CorVel Corporation.

3. This disclosure is made for the purposes of your fitness for duty examination as requested by your employer, Cook County.

4. I understand that the Identified Health Care Providers are not conditioning my treatment, payment, enrollment, or eligibility for benefits on whether I agree to sign this authorization.

5. I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to re-disclosure by the recipient.

6. I understand that I have the right to revoke this authorization in writing at any time by sending a letter to the Privacy Officer of the Identified Health Care Providers for my medical condition or medical illness as described above, and that the effective date of my revocation will be the date the Privacy Officer receives it. I further understand that any revocation will be effective only to the extent that Identified Health Care Providers has not already taken action in reliance on this authorization.

7. This authorization allows for the release of medical records produced as the result of treatment provided prior to the date of expiration of this authorization.

8. This Authorization shall expire one year from the date of my signature to this authorization, below.

| | |
|---|---|
| Printed Name (of person giving authorization) | Social Security Number |
| Signature of person giving authorization | Date |

Signed ___________________________________

***(If applicable, Power of Attorney, Guardian or Conservator. Attach copy of document granting authority.)***

This document contains confidential information of a claimant and may not be disclosed or duplicated without the prior written consent of CorVel.

Cook County SHERIFF

# AUTHORIZATION TO RELEASE HEALTHCARE INFORMATION

Patient's Name: ______________________ Date of Birth: ______________________

Previous Name: ______________________ Social Security #: ______________________

I request and authorize ______________________________________________ to release healthcare information of the patient named above to:

Name: ______________ Cook County Sheriff's Office ______________

Address: ______________ Winifred Shelby, RN, CCM, South Campus Bldg. 2
3026 South California Avenue ______________

City: ______________ Chicago, IL 60608 ______________

This request and authorization applies to:

☐ Healthcare information relating to the following treatment, condition, or dates: ______________

______________________________________________________________

X All healthcare information

☐ Other: ______________________________________________________________

**Definition:** Sexually Transmitted Disease (STD) as defined by law, RCW 70.24 et seq., includes herpes, herpes simplex, human papilloma virus, wart, genital wart, condyloma, Chlamydia, non-specific urethritis, syphilis, VDRL, chancroid, lymphogranuloma venereuem, HIV (Human Immunodeficiency Virus), AIDS (Acquired Immunodeficiency Syndrome), and gonorrhea.

☐ Yes ☐ No I authorize the release of my STD results, HIV/AIDS testing, whether negative or positive, to the person(s) listed above. I understand that the person(s) listed above will be notified that I must give specific written permission before disclosure of these test results to anyone.

☐ Yes ☐ No I authorize the release of any records regarding drug, alcohol, or mental health treatment to the person(s) listed above.

Patient Signature: ______________________________ Date Signed: ______________

THIS AUTHORIZATION EXPIRES NINETY DAYS AFTER IT IS SIGNED.