IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 17 C 2393 |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF COOK, a unit of | ) | |
| local government, et al., | ) | Chicago, Illinois |
| | ) | March 3, 2020 |
| Defendants. | ) | 9:37 a.m. |

VOLUME 7A
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER,
and a jury

APPEARANCES:

For the Plaintiff: LINDEN & BUSTAMANTE
BY: MR. RICHARD F. LINDEN
MR. PETER V. BUSTAMANTE
17 North State Street, Suite 1550
Chicago, Illinois 60602

For the Defendants: SCHARF BANKS MARMOR LLC
BY: MS. SARAH R. MARMOR
MS. SUZANNE M. ALEXANDER
MR. MORGAN G. CHURMA
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606

HON. KIMBERLY M. FOXX
STATE'S ATTORNEY OF COOK COUNTY
BY: MS. JOI KAMPER
500 Richard J. Daley Center
Chicago, Illinois 60602

Court Reporter: FRANCES WARD, CSR, RPR, RMR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2524A
Chicago, Illinois 60604
(312) 435-5561
frances_ward@ilnd.uscourts.gov

# I N D E X

Examinations:

**MICHELLE SAROCKA**

- DIRECT EXAMINATION

By Ms. Marmor....................................1475

- CROSS-EXAMINATION

By Ms. Kamper....................................1522

- CROSS-EXAMINATION

By Mr. Bustamante................................1523

- REDIRECT EXAMINATION

By Ms. Marmor ...................................1536

- FURTHER REDIRECT EXAMINATION

By Ms. Marmor....................................1540

**WINIFRED SHELBY**

- CROSS-EXAMINATION - Resumed

By Mr. Bustamante................................1541

- REDIRECT EXAMINATION

By Ms. Marmor....................................1573

- FURTHER REDIRECT EXAMINATION

By Ms. Marmor....................................1582

THE COURT: Everyone is ready to proceed with our next witness, correct?

We will bring in the jurors.

(Jury in at 9:37 a.m.)

THE COURT: You may be seated.

Ladies and gentlemen, you remember that yesterday, when we broke, we had Nurse Shelby on the stand. We had not completed her testimony.

We are taking the next witness out of order because this witness is being heard by way of a videoconference, and this was when we could get the equipment set up on both ends. So that's the reason.

So we are going to hear this witness, get her direct and cross-examination done. Then, when this witness is complete, we will recall Ms. Shelby and get her testimony complete as well.

All right. Everyone ready to proceed?

MS. MARMOR: Yes, your Honor.

THE COURT: All right.

I am going to step around and make sure -- so that she can see me.

MS. MARMOR: Right. Can we do the camera on us? Right now it's just showing the shield.

THE COURT: The shield is what she sees.

MS. MARMOR: Right, but they told me that the --

THE COURT: They need a camera that can see us, right?

I thought we had this set up.

(Brief pause.)

THE COURT: If you want to go back to the jury room, you are welcome to. This might take a little while.

(Jury out at 9:39 a.m.)

THE COURT: Maybe while we are waiting, we should look at jury instructions.

(Brief pause.)

THE COURT: Okay. We will take a quick look at the jury instructions.

I did get a set from the defendant last night that I have printed out. There are lots of what I think will be relatively routine issues there. So maybe we should start with the defendants' proposed instructions.

Do you have those, Mr. Linden?

MR. LINDEN: Yes, Judge.

Most of the preliminary ones, we don't really have an issue with.

THE COURT: Right. That's what I was assuming.

MS. ALEXANDER: I think we are pretty much in agreement on all of those.

THE COURT: All the way up to, like, maybe Page 25 or something like that. Does that sound right?

MR. LINDEN: I think that's right, the issue instructions.

MS. ALEXANDER: Yes, Page 25. Exactly.

THE COURT: Great. Okay.

So let's start at Page 25. This is an instruction labeled "Nature of Plaintiff's ADA Claim and Cook County Sheriff's Office's Defense." It's based, as I understand it, on the Seventh Circuit Pattern 4.01.

MS. ALEXANDER: Yes. Really it's just that first sentence, though, because there is no pattern instructions on this actual issue.

THE COURT: Right.

MS. ALEXANDER: Then we start in with the case law and the ADA.

THE COURT: Right. Okay.

Mr. Linden, have you had a chance to look at that?

MR. LINDEN: Yes. We have a major problem with this instruction.

THE COURT: Okay. Tell me about it.

MR. LINDEN: The biggest one is under B, the third paragraph down, where it's A and B, where they are saying it's an inquiry into the ability of an employee to perform job-related functions, especially with the "or" there.

The case law is very clear. I think we all rely a lot on the same cases, but I think one main Seventh Circuit

case is the *Wright* case, 708 F.3d 513.

THE COURT: 798 F.3d.

MR. LINDEN: I'm sorry. My eyes aren't -- even with these glasses -- aren't the best, but that's the case.

All the case law talks about, there is really two requirements for them to prove a business necessity.

Number one, job-related; and number two, a business necessity.

If you look at the statute this they quote -- I went through it; I don't have it right here -- the 43 USC 12112(d)(4)(B) *{sic}*, I believe if you look at that, that really -- it's a paragraph regarding voluntary medical records. That leaves, obviously, the impression where it's really not very strict for a business necessity.

And they also, I think, phrase it in such a way where it's almost argumentative. They say, under the ADA, "an employer may require a mental health examination or make a disability inquiry."

The case law really talks about, you know, they cannot require, absent a business necessity. So they have kind of cleverly, I think, at least implicitly, made an argument --

THE COURT: Can you tell me specifically, then, which of these -- what language you think is improper and should be deleted or changed?

MR. LINDEN: The entire Subparagraph (B).

THE COURT: So you think it should just be (A).

MR. LINDEN: Just (A), job-related and consistent. If you look at the case law, that's all the case law that I have seen that talks about it in mainstream.

THE COURT: Hold on just a second. I want to make sure they understand the urgency here.

(Brief pause.)

THE COURT: Okay.

MR. LINDEN: I would refer the Court, if I can, to Plaintiff's Exhibit No. 20. I think that better expresses the law in a much more evenhanded -- Instruction No. 20, not exhibit. I'm sorry. I misspoke.

THE COURT: Let me take a look at that. So back to 20.

MR. LINDEN: Defendants' No. 24 makes it sound like the only claim the plaintiff has is ADA. So we were careful to say, one of John's claims Officer Nawara has brought under the ADA.

MS. ALEXANDER: That goes along with the pattern jury instructions, your Honor.

Your Honor, if you look at plaintiff's first sentence in Paragraph 2 -- again, I mean, theirs says, under the ADA, it's illegal -- using the word "illegal" -- for the Cook County Sheriff's Office to require a fitness-for-duty

examination.

The law is clear. And I have cited actually *Jackson*, which is their favorite case, *Jackson v. Regal*. It's an Eastern District of Kentucky case, which states that the law is clear. The ADA "clearly permits medical examinations and inquiries." If you have -- and then notice we wrote, "but only if." So I think that fairly balances the first part of the sentence.

THE COURT: Whether we say that requiring a fitness-for-duty examination is illegal or whether we say that requiring a fitness-for-duty -- requiring a mental health examination or disability inquiry is permissible only if, I think that's really equivalent to the same thing.

So the question, in my mind, is not whether or not the language -- the inquiry must be job-related and consistent with business necessity. Everybody agrees with that. The question is whether (B) -- Paragraph (B) of the defendants' instruction is also appropriate; in other words, as an alternative.

MS. ALEXANDER: Yes.

THE COURT: Is it an alternative to simply inquire into the ability of the employee to perform job-related functions?

MS. ALEXANDER: Yes, your Honor.

In your motion to dismiss order on Page 13, at the

top, you basically said that. "To satisfy the ADA statutory restrictions on an inquiry, it would have to be either job-related and consistent with business necessity or inquiries into the ability of an employee to perform job-related functions." Those two different ...

And if you look at the ADA, under 42 USC, Section 12112 --

THE COURT: Right. That's what I am looking at.

MS. ALEXANDER: -- subsection (4)(A) states that "unless such examination or inquiry is shown to be job-related and consistent with business necessity." And (C) -- excuse me. (B) states, "A covered entity may make inquiries into the ability of an employee to perform job-related functions."

Those are two separate -- did you want me to hand this up to you?

THE COURT: I'm looking at it.

MS. ALEXANDER: Oh, okay.

MR. LINDEN: The first sentence of that clearly -- I'm going off memory, because I don't have it in front of me, but I believe it says, regarding voluntary examinations, and then it continues in the second sentence.

But if you look at almost every case, it addresses the ADA business necessity, including the *Wright* case and many other cases. It's very clear that it's got to be

job-related and a business necessity. For them to put (B) here, they are basically removing the business necessity requirement.

MS. ALEXANDER: No, it's not removed. It's there.

THE COURT: Here is what the statute says:

"4(A). A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity.

"(B). A covered entity may conduct voluntary medical examinations" -- voluntary -- "including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions."

It seems to me that we could potentially solve this problem by simply quoting the statute and not using the word "or."

MR. LINDEN: I'll just say that, I mean, I think the statute is fine for the first one. But I do think by putting what's contained in (B), that's really pertaining -- I think you have to read the second sentence with the first sentence.

THE COURT: Well, it seems to me that you can argue -- first of all, the statute has to be fine for everything. I mean, the statute is the statute. I'm not changing the law.

But it seems to me that your problem with (B) could be solved if we simply use the language of the statute, which says, "A covered entity may conduct voluntary medical examinations." And you can argue that, for Mr. Nawara, it wasn't voluntary.

I think what we ought to do is eliminate the word "or" and simply use the language of the statute. "The statute provides" and then quote the statute, (A) and (B).

MR. LINDEN: I guess my problem with that, clearly there is no evidence to suggest that the exam was voluntary.

MS. ALEXANDER: I disagree, your Honor.

THE COURT: Then, you make that argument.

MS. ALEXANDER: This is clearly --

THE COURT: That's fine. Make that argument.

Okay. So I think, with respect to that first paragraph, we can solve this by simply quoting the statute.

MS. ALEXANDER: So we will just say, "The ADA provides," (A) and (B).

THE COURT: Yes.

MR. LINDEN: And we are going to get rid of the "or," right?

THE COURT: That's right.

MR. LINDEN: And I think it needs to be corrected. The second-to-last paragraph, the second part of the last sentence, "and because there were an inquiry into the ability of its employees to perform job-related functions."

Our draft, what we proposed -- or what I gave -- I propose that we cross off "and because there were an inquiry into the ability of its employee to perform job-related functions."

I mean, if you are going to allow anything like that, then I think you have to go back and quote the statute, that if it's voluntary, then that may or may not come into play.

MS. ALEXANDER: No, that's not what the statute says.

THE COURT: Why not just say, "In this case, plaintiff claims that the Defendant Cook County Sheriff's Office violated these provisions"?

MR. LINDEN: That would be a solution, I believe.

MS. ALEXANDER: And then I think we need to say what the Cook County Sheriff's Office's position is, too.

THE COURT: You can add, Cook County Sheriff's Office argues that it did not violate -- that its procedures were consistent with the statute.

MR. LINDEN: I think that would solve it if ours is

vanilla and theirs is kind of vanilla, also.

THE COURT: Okay. Here's what -- off the record.

(A discussion was had off the record.)

(Jury in at 9:53 a.m.)

THE COURT: I am going to step around so I can swear the witness.

Ms. Sarocka, can you see me?

THE WITNESS (via videoconference): Yes, I can.

(Witness sworn.)

MS. MARMOR: Hi, Ms. Sarocka. I am going to wait for everybody to sit down, and then we will start. Okay?

THE COURT: You may be seated.

MS. MARMOR: May I proceed, your Honor?

THE COURT: You may.

MICHELLE SAROCKA, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. MARMOR:

Q. Good morning, Ms. Sarocka.

Sorry about the technical difficulties. And thank you for doing this.

I understand you have a medical condition that wouldn't allow you to come to court today; is that right?

A. Yes.

Q. Okay. Could you just -- we are going to go into some of your background, but let's just start.

Could you introduce yourself to the jury, who is sitting, watching you on video right now.
A. My name is Michelle Sarocka. I'm a nurse. I work at CorVel Corporation.
Q. I am having a little bit of trouble. Can you move the mouthpiece a little bit closer to your mouth, if possible. There you go.
You said you work at the CorVel Corporation?
A. Correct.
Q. And what's your job title there?
A. Case manager lead.
Q. Case manager lead?
A. Yes.
Q. Okay. Can you tell the jury -- we will talk about what you do, but could you tell the jury just what your educational background is?
A. I have an associate degree in nursing. I also received my Bachelor of Science and a certification in case manager.
Q. You said you are a nurse.
Did you get a nursing degree?
A. Yes, registered nurse.
Q. Are you a registered nurse?
A. Yes.
Q. Okay. Just briefly, prior to coming to CorVel, what was your employment background?

A. I had about five years in the hospital on the different units.

And then, from there, I have been doing this. I have been doing case management for approximately 20, 21 years.

Q. What is case management?

A. From what I do, I handle short-term disability, long-term disability. I review medical records; speak with the employees, the doctor, members of the healthcare team, sometimes physical therapists, psychologists, psychiatrists, and give recommendations of disability to their employer.

Q. Do you also work on fitness-for-duty exams for some clients?

A. Yes, I do.

Q. Okay. When did you start working at CorVel?

A. 2006.

Q. What was your job at the time?

A. I started out as a telephonic case manager.

Q. I'm sorry. What did you say?

A. A telephonic case manager.

Q. Oh, a telephonic case manager. Okay.

And then did you get promoted from that position?

A. Yes, I did --

Q. And what was your next --

A. -- approximately four or five months later.

Q. And what did you get promoted to?
A. Case management supervisor.
Q. And then -- I think you called yourself a lead; is that right? Is that what you are today?
A. Yes. Approximately four or five years ago, our department reorganized and no longer had a supervisor. I am now the lead.
Q. Okay. And as the lead, do people report to you?
A. Yes. I have got four who report to me.
Q. Four people report to you?
A. Yes.
Q. And are those also nurses?
A. Yes, they are.
Q. And are those people that may also do fitness-for-duty work?
A. Yes, two of them do.
Q. Okay. Was Cook County your only client for fitness-for-duty exams?
A. Yes, they were.
Q. Did you have other clients that you did this other work for?
A. Right. We set other exams up. They were not called fitness-for-duty, but they were very similar.
Q. Okay. You mentioned short-term and long-term disability inquiries for some of your clients.

Did you also -- I am just trying to sort of set the stage.

Were those people sent for something like an FFD?

A. Yes. I'm sorry. We would send them for independent medical exams if there was any question whether or not we felt they were disabled or not.

Q. Okay. The reason I'm asking is, we have seen a document that refers to independent medical exams and the acronym IME.

Is that what -- does IME stand for independent medical exam?

A. Yes, it does.

Q. Okay. Am about how much of your work has been working on FFD case management, just percentage-wise.

A. Maybe 10 percent.

Q. Okay.

MR. BUSTAMANTE: I'm sorry. I didn't hear.

MS. MARMOR: 10 percent. "Maybe 10 percent" is what she said.

BY MS. MARMOR:

Q. So I would like to show you -- and we are going to switch to the document view now. Okay?

A. Yes.

Q. All right. So I am going to show you what has been marked as Defendants' Exhibit 2.

So this is the first time we are trying this. Let

me make sure you can see what I am doing. Okay?
A. Okay.
Q. Do you see this document?
A. Yes, I do.
Q. Okay. Great.
Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It's our standard medical release form that the employee signs to allow us to obtain medical information.
Q. You say, "It's our standard."
Who created this document?
A. I don't know who.
Q. I don't mean the human being. What company?
A. Most likely CorVel.
Q. Okay. And this is the form you use at CorVel?
MR. BUSTAMANTE: Objection. Foundation and form.
BY THE WITNESS:
A. Similar. Sometimes a different employer's name would be on there.
BY MS. MARMOR:
Q. Right. Okay.
So do you use this form for employers other than the Cook County Sheriff's Office?
A. Yes.

Q. Okay. But with some modification to show who the other employer is; is that right?
A. Correct.
Q. Can you -- if you get an FFD referral, can you talk to an employee without a release like this having been signed?
A. I can talk to them.
Q. Can you talk to them about their treaters and their medical conditions without a form like this having been signed?
MR. BUSTAMANTE: Objection. Compound question.
THE COURT: Sustained.
BY MS. MARMOR:
Q. Can you talk to an employee, when you get an FFD referral, about their treaters without a form like this being signed?
A. Not about their medical condition.
Q. Okay. And why is that?
A. Because it's protected medical information. I need to obtain permission to speak about it.
Q. And do you, therefore, always start with a release like this before you talk to an employee in an FFD context?
A. Yes. We usually obtain them with the referral. And if we don't, we will send one to the employee to sign it.
Q. Okay. What kind of training -- have you gotten training with respect to HIPAA and privacy?

A. Yes. Every year we go for training.
Q. Okay. Can you describe that training to the jury, please.
A. Well, it's computer-based. We go through what it stands for, what is considered protected medical information.
Q. And are there any CorVel policies about HIPAA and privacy?
A. Yes, there is.
Q. What, generally speaking, are those policies?
A. It describes the different information that is protected.
Q. If a person -- let's say an employee is going through an FFD with you, if they ask you a question about the privacy of the information that you are gathering, are you able to answer that question?
A. Yes.
Q. Is that -- how -- what's your foundation for being able to answer questions about the privacy of the information that you are gathering?
A. I'm not sure what you are --
Q. Well, do you have experience with treating medical information as being private?
A. Yes.
Q. Do you have training on that?
A. Yes, we do, every year.

Q. You said "every year"?
A. Yes. We have to acknowledge that we have read through it, we understand it.
MS. MARMOR: We can go back to the video view now.
BY MS. MARMOR:
Q. Here we are again.
Have you ever been accused of violating the privacy rights of an employee engaged in the FFD process?
MR. BUSTAMANTE: Objection.
BY THE WITNESS:
A. No, I have not.
MR. BUSTAMANTE: Objection. Relevance, your Honor.
Could the witness be instructed not to answer if there is an objection pending.
MS. MARMOR: I don't think she can hear you because you are not loud enough.
THE COURT: She has already answered, but I think the more important focus is what happened in this case. Thank you.
BY MS. MARMOR:
Q. Who gets the medical records that you gather?
A. The healthcare provider that's doing the examination.
Q. How do you get the medical records to the healthcare provider?
A. We either email, fax, or next-day delivery.

Q. I have noticed a lot that medical records seem to get faxed.
Is there some privacy relation to faxing medical records rather than emailing them, or is that just something doctors do?
A. That's what they do.
Q. Okay. When you -- sorry. Go ahead.
A. No. I was just going to say, there is a note on there that it's confidential and if you receive it in error, to shred it.
Q. Okay. And if you email records, do those just go to anybody, or is there something that you do to try and protect the privacy of those records?
A. Every email that we send back to CorVel is encrypted.
Q. Okay. How many FFDs have you done for the Cook County Sheriff's Office -- or have you case-managed for the Cook County Sheriff's Office?
A. I have been involved in approximately 50 of them.
Q. Fifty?
A. Yes.
Q. You said that you were the lead and you had two nurses who report to you that manage FFDs.
Did they manage FFDs for the County as well -- or for the sheriff's office?
A. Yes, they did.

Q. Where other people below you manage FFDs, do you review their work?
A. Yes, I do.
Q. Are the majority of FFDs, are they mental health or physical health, in your experience?
A. Majority are mental health.
Q. How would you get a referral to work on a sheriff's office FFD?
A. They would fax the referral to our group mailbox, or they would send them directly to me.
Q. Okay. But if it went to the group mailbox, it would eventually get to you; is that right?
A. Yes.
Q. Okay. What would you do -- what would you need to be able to proceed, once you got the referral?
A. I would review the referral. There would be the authorization for release of medical. Depended on why they were requesting it, it starts to determine which type of physician to obtain to do the exam.
Q. Okay. And did there come a time when you would make a phone call or reach out to the employee?
A. Yes. We would receive a referral. Once it's been referred -- I'm sorry -- reviewed, I would call the employee, and we would discuss what was needed for the examination, such as medical records from their physician, treating

provider.

And then we would have a conversation, discussion about who would obtain them. Either the employee could collect them from their physician, providers, or I could.

Q. Either the employee could go -- why would the employee request them from their provider?

A. A lot of times it's quicker for them to do it. That's the main reason.

Q. Okay. And once you -- how would you determine what kinds of records would be relevant?

A. Well, initially, it's always the primary care physician, because they are the ones that handle referrals to other specialists to manage that employee's healthcare.

Q. Okay. How would you find out the identity of the primary care physician?

A. The employee would tell us.

Q. If the employee didn't tell you, did you have any way to take the release form, that HIPAA form, and go out and find somebody's treaters?

A. No.

Q. And then once you get the medical records, what would you normally do?

A. Review them, make sure it has -- what type of information it has. We would list it out for the provider, just a document of what they have received.

Q. And then once you have reviewed the medical records, what's your next step?

A. We would determine which provider should do the examination, the fit-for-duty exam, and contact them, make an appointment, and then contact the employee and make sure that appointment fits within their schedule and they are able to attend.

Q. Let me stop you for a second.

How would you pick a provider?

A. It would depend on --

Q. And when we say "provider" -- I just want to make sure we are in agreement -- that's the person who's going to do the FFD exam, correct?

A. Correct.

Q. Okay. So how would you pick that person?

A. It would depend on the reason for the referral, and we had a list. We would need -- for Cook County Sheriff's Office, we would want someone familiar with law enforcement, that they have done these type of exams for them.

Let's see. Their schedule, how quick -- because for these exams, we usually try to get them done as quick as possible, because most of the employees are not being paid while they are out. So that played a part of it.

We contact somebody. And if they can't see them for a month, then we will try another physician -- or

provider to see if they could see them sooner.
Q. Okay. In mental health FFDs, what kind of providers -- or what kind of FFD examiners would you look for?
A. The psychologists that usually do the testing, they do medical testing to see -- just neuropsychological testing.
Q. Okay. Now, are there cases in which you would actually get medical records with the referral package?
A. Yes.
Q. And would you basically follow the same procedure, whether you got the medical records or they were given to you with the referral package?
A. Yes.
Q. Okay. And then when you sent the medical records to the examiner, would you -- what would you tell the examiner?
A. We provide a letter that -- a lot of it's pretty standard questions, but we would change the questions to reflect what we needed.
Q. And did you -- does CorVel keep -- did CorVel keep job descriptions for Cook County Sheriff's Office employees that you had available for these exams?
A. We do have a list of them. Occasionally we would get someone that we did not have. So we would request that from them.
Q. Do you recall -- we can look at the documents, but do you recall whether you had a job description for a

correctional officer at the Cook County Sheriff's Office that you maintained at the CorVel -- in CorVel's files?
A. Yes, we did.
Q. Okay. Why would that be maintained in your files?
Why would you use that document?
A. It let's the provider know what that employee does for their job, if they are fit for that job.
Q. Okay. So that's the characteristics of their job.
And the understanding is that the fitness-for-duty examiner was trying to figure out whether they can do that job; is that right?
A. Correct.
Q. Okay. Now, do you remember Winifred Shelby?
A. Yes.
Q. Did you call her Winnie?
A. Sometimes.
Q. Do you know Rebecca Reierson? Do you know who that is?
A. Yes.
Q. Okay. Did you work with each of these ladies in the course of your FFD work for the Cook County Sheriff's Office?
A. Yes, I have.
Q. About how many times did you work with Ms. Shelby?
A. I believe I had approximately 17 cases with Winifred.
Q. And what about with Ms. Reierson?
A. It was less for her. I want to say approximately seven,

maybe.
Q. Okay. Now, are you aware that in some cases the sheriff's office would obtain medical records and provide them to CorVel?
A. Yes.
Q. And did you understand why that would happen?
A. Yes. It would make our portion of the exam go much faster.
Q. Why would it make it go faster?
A. We did not have to wait to obtain the records. It can take one, two months before -- for them to send us the records.
Q. You mean the doctors or the sheriff's office?
A. I'm sorry. The doctors.
Q. Okay. Have you ever had a situation involving an FFD where the employee only wanted to have CorVel obtain that employee's medical records and not the sheriff's office?
A. Yes.
Q. Was that a problem in any way?
A. No.
Q. Did Ms. Shelby or Ms. Reierson treat the process any differently in those cases?
A. No.
MR. BUSTAMANTE: Can we have an objection for foundation, please, as to who, when, and where we are talking

about?

THE COURT: I assume you are talking about her experience with those individuals?

MS. MARMOR: Exactly.

THE COURT: Overruled.

You may answer.

BY MS. MARMOR:

Q. Let me just repeat the question because there was an objection on this end.

Did Ms. Shelby or Ms. Reierson treat the process any differently in those cases where the employee didn't want them to -- the sheriff's office to obtain their medical records?

A. No, they did not.

Q. Have you, in your experience with Ms. Shelby or Ms. Reierson, ever had them ask to see an employee's medical records?

A. No, I have not.

Q. What, just very briefly, do you understand an FFD examination to be?

A. The provider examines the patient, reviews the medical records, and makes a determination of their fitness for duty, if they are able to do it.

Q. Do you have experience with police and correctional officers going through FFDs?

A. Yes.
Q. Are there special safety concerns for such officers?
A. Yes. Their jobs are safety-sensitive, meaning that their duties are responsible for not only safety, their coworkers' safety, and the public safety.
Q. Have you ever seen an FFD done without an actual referral from the employer explaining what their concerns were?
A. No.
Q. Have you ever seen an FFD done without any medical records?
A. I don't believe so.
Q. So I would like to go back to the form we were talking about a little bit ago.
MS. MARMOR: If we could switch back to the document view?
BY MS. MARMOR:
Q. So can you see this document?
A. Yes, I can.
Q. I am going to ask you just a few questions.
Did you feel you understood this document when you were using it for County FFD examinations?
A. Yes, I did.
Q. You see here it says, "I" blank.
What would go in that blank?

A. The employee's name.

Q. Okay. And it says "authorize the independent medical exam or fitness-for-duty exam physician to disclose protected health information."

Do you see that?

A. Yes, I do.

Q. And that's why I was asking about the independent medical exam.

In this case, would that be relevant?

A. No.

That it says that instead of fit for duty?

Q. It says both. It says "independent medical exam or fitness-for-duty exam physician."

Was this a form that could be used for either process?

A. Yes.

Q. Okay. And then it says, in Paragraph 1, "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness-for-duty exam."

Do you see that?

A. Yes.

Q. So who did this form allow medical records and information to be released to?

A. Further down it tells you CorVel.

Q. Okay. And did you ever understand this form to mean that this would allow medical records and information to be released to the sheriff's office?
A. No.
Q. Paragraph 2 then says, "Any healthcare provider or facility who treats/treated me for my medical condition or medical illness" -- and then it puts that in -- and it defines that term as "identified healthcare providers."
Do you see that?
A. Yes.
Q. Who would identify the healthcare providers?
Do you want me to make it bigger?
A. I don't --
Q. How did you find out who the healthcare providers were?
A. Through -- the employee would tell.
Q. Okay. And then -- sorry. I wish I could make it bigger, but that's as big as I can do.
It says -- so, "Any healthcare provider who treats/treated me for my medical condition or medical illness ... may disclose the above-described information to a disability management case manager for Cook County employed by CorVel Corporation."
What did this paragraph permit?
A. It allows their healthcare providers to release the medical information to the nurse at CorVel.

Q. And you are one of those nurses?
A. Yes, I am.
Q. And the other nurses that were allowed to have this information reported to you; is that right?
A. Correct.
Q. Then it says, "This disclosure is made for the purpose of your fitness-for-duty examination as requested by your employer, Cook County."
What did that mean?
A. That just gives the reason why we need the information.
Q. Okay. Because it was for a fitness-for-duty?
A. For a fitness-for-duty exam, yes.
Q. Okay. And then it says, "I understand that the information disclosed pursuant to this authorization may no longer be protected by the federal health privacy rule (otherwise known as HIPAA) and may be subject to redisclosure by the recipient."
Who's the recipient in that line?
A. That would be us.
Q. "Us" meaning CorVel?
A. I'm sorry. Yes.
Q. Okay. I want to go back up to the opening line.
It says, "I" -- blank -- "authorize the fitness-for-duty exam physician to disclose protected health information about me." All right?

What did that mean?
A. They are authorizing the provider to give CorVel their information.
Q. Their report?
A. Correct.
Q. Okay. Did Paragraph 5 allow CorVel to then give the employer the report?
A. Yes.
Q. Okay. And then it says, "I understand I have the right to revoke this authorization in writing at any time by sending a letter to the privacy officer."
And there is a sort of process that goes along there, correct?
A. Yes.
Q. Okay. What did you understand that to mean?
A. That if they were -- if the employee signs that form, they are able to revoke it, to take it back so that they no longer want their physician to release their medical information.
Q. Did that ever happen, in your experience, that an employee actually revoked this authorization in writing to a provider?
A. Not in writing, no.
Q. How did they do it?
A. They told the provider not to release the information.

Q. When you say "told," are you saying they picked up the phone --
A. They verbally told them.
Q. Okay. And did the provider honor the revocation in that case?
A. Yes, they did. They did not release it.
Q. They did not release the records?
A. Correct.
Q. And was that okay by CorVel?
Could CorVel continue to try to do its work, even if that had been revoked?
A. Yes, they would.
Q. Okay. Now, at the bottom of this page there are about four more blanks. We have got the printed name of the person giving authority, social security number, the signature of the person giving authorization, and the date.
Do you see that?
A. Yes.
Q. So if these blanks had been filled in, as you understand it, could the sheriff's office have taken this document and gone and get medical records for an employee?
A. No, they could not.
Q. Do the blanks tell you anything about how medical providers are identified?
If you filled in the blanks, would the blanks

identify medical providers?
A. Not the providers, no.
Q. One question I have is, how far would you generally go back in looking at medical records?
A. Generally two to three years, depending on the reason.
Q. If an employee had a question about that form --
MS. MARMOR: Why don't we go back to the video view.
BY MS. MARMOR:
Q. Can you see us?
A. Yes.
Q. Okay. If an employee had any questions about the FFD process or this form, could you answer those questions?
A. Yes.
Q. Did sometimes employees have questions?
A. Not that I can recall.
Q. Okay. I apologize if I have already asked this question, but how would you figure out what's a relevant medical record to a mental health fitness-for-duty exam?
A. Well, it would be the psychiatrist, psychologist, if they were seeing anyone, and their primary care provider.
Q. Was your nursing background helpful to that process?
A. Yes.
Q. What do you do if an employee thinks you are asking for too much or they don't want to go back that far?

Let's say you suggested three years and they said, "No, I only want one year." What do you do?
A. We get the one year.
Q. So you honor the employee's position; is that right?
A. Yes, we do.
Q. Now I want to show another document to you. This is Defendants' Exhibit 37.
MS. MARMOR: For the record, the other documents we were looking at were from Defendants' Exhibit 2.
BY MS. MARMOR:
Q. So, Ms. Sarocka, this is -- and I know it's really hard to read, but I am going to just focus in on a couple of things.
This is the actual fitness-for-duty -- strike that.
This is the actual CorVel HIPAA form that Mr. Nawara signed.
Did you see that as part of your work on this --
A. Yes.
Q. -- case?
A. Yes, I did.
Q. And by "case," I mean as case manager, not --
A. Yes.
Q. Okay. And you see that he filled in the blank with his name, and he filled in the blank for his name again and his social security number and the date and his signature.

Do you see that?

A. Yes, I do.

Q. Now, before I go into the detail of this, when you got this form, did you notice that it had been changed in any way from the usual form?

A. No.

Q. Did you do anything differently with this form than you would normally do in an FFD process where the usual CorVel form was signed?

A. No, nothing different.

Q. So I want to point out to you just a couple of changes that were made to this form.

In Paragraph 1 -- and I will try and zoom in on this for you -- it says, "With this authorization, I allow all medical records and information to be released and reviewed that relates to my fitness-for-duty exam," and then the words "to CorVel Corporation" were added.

Do you see that?

A. Yes, I do.

Q. As you understand the forms, did that change anything about how you functioned?

A. Not at all.

Q. Then in Paragraph 3, the other change was that it says -- it used to just say, "This disclosure is made for the purposes of your fitness-for-duty examination as requested by

your employer, Cook County."

The words "Your employer will receive a copy of the independent medical exam (IME)."

Do you see that?

A. Yes, I do.

Q. In this case, it was actually an FFD, right?

A. Yes.

Q. And did that change anything about the way you would normally function in terms of -- did you normally give the employer a copy of the FFD exam? Sorry. Of the report? Excuse me. Of the report?

A. Yes.

Q. Okay. And it also says, "You" -- meaning Mr. Nawara -- "will also receive a copy of the IME."

Do you see that?

A. Yes, I do.

Q. And if an employee wanted a copy, did they get a copy?

A. Not through CorVel. They could ask their employer.

Q. Okay.

Now I would like to just finish by talking about what you actually did with respect to Mr. Nawara and his FFD case before you. Okay?

A. Okay.

Q. All right.

So we are going to go to Defendants' Exhibit 42. I

will put it up in one second when I find it here.

(Brief pause.)

BY MS. MARMOR:

Q. I hope you can see this.

At the top -- this is Defendants' Exhibit 42. It says at the top "Sheriff's Office of Cook County, Illinois, Bureau of Human Resources Memorandum." And there is a fax cover sheet. And it says, "To: CorVel," with your their fax number; "From: Winifred Shelby."

Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's the fax cover that we would receive from Cook County Sheriff for the fit-for-duty exam.

Q. I think you mentioned there was some general repository or some number that things would go to and eventually get to you.

Is that what this is?

A. Yes. That's the group mailbox number.

Q. The group mailbox number?

A. Correct.

Q. So Page 2 of Defendant's 42 says, "Cook County Referral Form."

Do you see that?

A. Yes.

Q. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It was the referral form sent for this case.
Q. Okay. And did you read it at the time?
A. Yes, I did.
Q. It says, "Reason Referring: Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to a routine directive. In addition, weeks later employee presented as aggressive and hostile in the human resources department."
Do you see that?
A. Yes.
Q. Why would you -- was it important to get the reason why an employee was being referred to CorVel?
A. Yes. It determines the type of provider that would do the fit-for-duty exam.
Q. Okay. And then there is two bullet points.
The first says, "Looking to determine if employee is able to perform the essential functions of his job, which require he maintain composure and respond appropriately in a high-stress environment, including exhibiting proper behavior toward detainees and his superior officer. Position requires this individual can defuse disruptive behavior verbally and, if escalated, effectively and properly use limited force on

problematic and combative inmates."

Do you see that?

A. Yes.

Q. Was that relevant to your work?

A. It's one of the questions that we would pose to the provider doing the exam.

Q. Okay. So is the second bullet point, is that the second question that you would pose to the provider?

I will read it to you in a second. Well, I will read it to you now.

It says, "Employer has concerns about anger management, including his ability to manage a detainee population without losing his temper."

Do you see that?

A. Yes.

Q. And would that be relevant to the fitness-for-duty process?

A. Yes, it would.

Q. And why is that?

A. It's another question that we would pose to the provider.

Q. Okay. We already saw -- did you get -- it looks like you got the HIPAA authorization with the original referral; is that right?

A. Yes.

Q. Okay. And that's the one that Mr. Nawara signed?
A. Correct.
Q. And then you also got -- attached -- some notes or summary of information provided by Supt. Jones-Hayes from a telephone conversation with Rebecca Reierson and Winifred Shelby November 16, 2016.
Do you see that?
A. Yes.
Q. Okay. And that was signed by Supt. Jones-Hayes?
A. Yes.
Q. Would that be helpful in the fitness-for-duty exam process, that kind of --
A. For the provider, yes, to get their -- the Cook County's version of what happened.
Q. Okay. So why would it be important for the provider to have Cook County's version of what happened?
A. Because when they do the exam of the employee, they will receive his version or her version.
Q. Of what happened?
A. Correct. I'm sorry. Yes.
Q. Okay.
A. So they will get both.
Q. I am going to show you now what has been marked as Defendants' Exhibit 43.
MS. MARMOR: Any objection?

MR. BUSTAMANTE: No.

BY MS. MARMOR:

Q. Oh, boy. This is going to be impossible to read. I am sorry.

So it says -- this is an email -- Exhibit 43 has an email from you dated August 25th, which I think is the same day that you got the referral -- or the referral was sent.

And you said, "I have a couple of questions re: Mr. Nawara. Incident happened 9-29-16. What is triggering an FFD eval now? I believe you said he got enraged in HR. Was that yesterday?

"Is he currently working? If he's not working, how long has he been out of work? If he is working, what shift does he work? What is best time to call him?"

Do you see that?

A. Yes.

Q. So I want to start with the first part of this.

I take it -- were you confused as to why nearly a year later Mr. Nawara was being sent for an FFD?

A. Yes. That's why I asked the question.

Q. Okay. We will talk about that.

You said, "What's triggering an FFD eval now? I believe you said he got enraged in HR. Was that yesterday?"

Did you actually have a conversation with Nurse Shelby about Mr. Nawara's conduct in HR?

A. Yes. She had called me to let me know that she was referring a file over.
Q. Okay. And then -- and that's something she told you when she called you, that he had gotten enraged in HR?
A. Yes.
Q. All right. And then why were you asking whether he was currently working. And if he's working, what shift does he work? Why were you asking those questions?
A. If he was working, so I knew what time to call him. If he worked nights, I would call a little bit in the afternoon. If he was working, for that reason; and if he was not, for how long he had been out.
Q. Why did you want to know for how long he had been out?
A. Why did I want to know? Just to let the provider know.
Q. Okay. And then did -- Ms. Shelby responded to you and she said, "Hi, Michelle. See the attached letter that was sent to the employee. He has not cooperated with us since our meeting outlined in this letter. He is not currently working. He has been off work since our meeting with him 11-2016."
Do you see that?
A. Yes.
Q. Okay. And did that help you to understand the context in which the FFD referral had been made now about ten months after his time in HR?

A. Yes.
Q. Okay.
I am going to be doing a bunch of documents, so let's just stay on the document review, if you don't mind, Ms. Sarocka.
What did you do after you got the referral and the questions that the sheriff's office was asking and the concerns they raised and the information that they provided about what Ms. Jones-Hayes said she experienced?
A. I contacted the employee.
Q. Mr. Nawara?
A. Yes.
Q. How long were you on the phone with him?
A. I don't know.
Q. Was it a long call or was it -- was there anything unusual about the call?
A. No, it was not.
Q. And what did you talk about on the call?
A. What we needed in order to set it up and him to attend the exam.
Q. Did he ask you whether he needed to get records from specialists?
A. I believe that came up, or I just told him out of habit that we would need -- we didn't necessarily need him to -- if he saw, say, a cardiologist, I did not need all the notes

from the cardiologist. His primary care physician should have reports on that.
Q. So you said "out of habit."
Did you sort of have a script that you followed when you talked to people about what you needed for their FFDs?
A. Not a script, but I know what is needed.
Q. And would you say pretty much the same stuff every time?
A. Correct, based on that reason why they were being referred.
Q. Right, tailored to whatever their reason for referral was; is that right?
A. Yes.
Q. Okay. So after you spoke to Mr. Nawara, did you gather records?
A. Yes. He requested me to email him specifically what we wanted, and he dropped one off -- or dropped the email off at his primary care physician.
Q. Okay. And did you discuss how far you would go back -- how far the records would go back?
A. I believe in the email I told him two years.
Q. Okay. Did he object to that?
A. No.
Q. Did he object to you getting his treater's records?
A. No.

Q. So Dr. Diana Goldstein is the treater that was -- or the FFD examiner who was chosen.

How did you pick her? Did you pick her? That's my first question. Did you pick her?

A. Yes, I did.

She has got experience doing fit-for-duties for the law enforcement, she gets the reports back quickly, and she makes room for the employee to be seen fairly quickly.

Q. Okay. Does the sheriff's office ever have a say in who the FFD examiner will be?

A. No, they do not.

Q. Does the employee have a say in who the FFD examiner is going to be?

A. No.

Q. I would like to show you what has been marked as Defendants' Exhibit 45.

This is an email from you dated August 28th, 2017. I will see if I can help with a highlighter here.

This is an email from you to Mr. Nawara at his CookCountyIL.gov email address dated August 28th.

Do you see that?

A. Yes.

Q. And you said, "Hello, John."

Just because it's so hard, I'm going to just read it to you, if that's okay.

"The FFD provider will need to review medical records from all healthcare providers you have seen over the past two years. If your primary care physician receives updates from specialists, then you would only need to request the records from the PCP."

I assume that means primary care physician?
A. Yes.
Q. Okay. Why is it useful in a mental health examination to get primary care physician records?
A. The primary care, most insurances have them refer you to specialists. They would document the reason why they are referring you. It's the overall picture of the inquiry.
Q. Okay. And you said, "Please have your providers either fax or mail the medical records to me."

And you provided a fax and a mailing address for CorVel; is that right?
A. Yes.
Q. And then you said, "As soon as I receive the records, I will call to make sure I have all of them. I will then make an appointment with an FFD provider and let you know the date and time. Please call me with any questions."

Do you see that?
A. Yes.
Q. Did he call you with any questions that you recall?
A. Not that I recall.

Q. So now we are going to look at Defendants' Exhibit 46.

THE COURT: While we are doing that, hello to our guests.

Mr. Bustamante, thank you for putting the sign down.

You may proceed.

BY MS. MARMOR:

Q. I am showing you what has been marked as Defendants' Exhibit 46.

This is a fax dated September 1st, 2017, to Monica, Dr. Charles Shaw, from Michelle Sarocka. And it says it's regarding John Nawara. "Please call with any questions."

Do you see that?

A. Yes.

Q. And you were requesting -- was this requesting medical records from Dr. Shaw?

A. Yes, it was.

Q. Okay. And was Dr. Shaw the primary care physician?

A. Yes.

Q. And it says:

"Dear Dr. Shaw:

"The Cook County Sheriff's Office has contracted with CorVel Corporation to obtain medical records and arrange for a fit-for-duty exam for John Nawara. You are listed as the primary treating physician for Mr. Nawara."

And then it was asking for progress notes, consultation reports, and diagnostic tests during the above time frame. I'm sorry. There's a little something that's sort of getting in the way of that.

And it also says, "A signed confidentiality release is enclosed."

Do you see that?

A. Yes.

Q. Did you, in fact, attach the HIPAA -- the CorVel HIPAA authorization form for disclosure of protected health information?

A. Yes, I did.

Q. The one that was signed by Mr. Nawara?

A. Uh-huh.

Q. And did you do -- why would you give the doctor the signed HIPAA form?

A. That's the form the employee signed allowing his doctor to release the medical information to me.

Q. To you at CorVel?

A. Correct.

Q. Okay. I am now going to show you Defendants' Exhibit 47.

This is an email dated September 8th, 2017, from you at CorVel Corporation to Mr. Nawara at his CookCountyIL.gov email address.

And it says:

"Hi, John.

"I've attached your FFD appointment letter. Please let me know if you are unable to attend these appointments."

Do you see that?

A. Yes.

Q. And then you gave him -- this is the letter that was attached, correct?

A. Yes.

Q. And it says:

"Dear Mr. Nawara:

"This letter is to inform you that we have scheduled you for a two-day fitness-for-duty exam with the Isaac Ray Forensic Group."

The dates were going to be Monday, September 11th, and Tuesday, September 12th; is that right?

A. Yes.

Q. And you explained where it was.

And then you said, "If you are unable to attend this appointment, please contact me immediately."

And you gave your phone number, correct?

A. Yes.

Q. And you also -- did he call you and say he couldn't make the appointment?

A. No.

Q. Okay. And then it says, "Copies of your medical records received will be sent to Isaac Ray Forensic Group for the evaluation along with the HIPAA signed release of information."
Do you see that?
A. Yes.
Q. Why would you tell the employee about that?
A. Just to let him know what I was doing.
Q. Okay.
A. That the provider would have that information.
Q. I am showing you what has been marked as Defendants' Exhibit 51.
This is the same day, September 8th, to dgoldstein@irfg.org.
Is that Dr. Goldstein?
A. Yes.
Q. It actually says:
"Hi, Dr. Goldstein."
You are talking about somebody else at the top, so we are not going to talk about that.
But then you say, "Attached is the FFD letter to you for John Nawara, who will be there Monday the 11th for testing and Tuesday the 12th for the interview for you. I have also attached all of the medical information we have for him."

Do you see that?
A. Yes.
Q. And you had the Nawara -- the CCSO referral form that you sent her?
And you had information provided by Supt. Jones-Hayes -- sorry. I didn't let you answer that question.
Did you send her the CCSO referral form?
A. Yes.
Q. And did you also send her information provided by Supt. Jones-Hayes dated 11-16-2016 regarding the incident that occurred 9-29-2016?
Do you see that?
A. Yes.
Q. And I think everybody in this case knows it was actually the 28th, but I don't think that's a material mistake.
Then it says, "Letter" from "Mr. Nawara from Rebecca Reierson/director ... regarding FFD eval."
Do you see that?
A. Yes.
Q. Okay. And then it says, progress note from Dr. Hogueisson -- Karolina Hogueisson. She is not a doctor.
So you sent three progress notes from Ms. Hogueisson; is that right?
A. Yes.

Q. And who provided you those progress notes?
Did you contact her or did Mr. Nawara?
A. Mr. Nawara did, and she faxed them -- emailed them to me.
Q. Okay. And then there are progress notes from 2015, 2016, and 2017 from Dr. Charles Shaw, Family Care Associates of Chicago?
A. Yes.
Q. That's what you got from Dr. Shaw?
A. Yes.
Q. And does that suggest that you got approximately two years' worth of records from Dr. Shaw?
A. I believe that was 17 years -- I'm sorry -- three years.
Q. 2015 to 2017?
A. '15, '16, '17, three years.
Q. You went back two years from 2017?
A. Correct.
Q. Okay. And got some lab results from blood collected; is that right?
A. Yes.
Q. And you had a job description for a correctional officer; is that correct?
A. Yes.
Q. And I think we have already talked about why you would send the job description.

Did you review these medical records at the time that you got them?
A. I glanced through them. I didn't review them thoroughly.
Q. Okay. I would like to just -- give me one second here.
(Brief pause.)
BY MS. MARMOR:
Q. One of the medical records in this exhibit has a Bates stamp number at the bottom of "Nawara 3459." And this is from -- I will represent to you that this is from Dr. Shaw.
And it says, "Neuropsychiatric. The patient's mood and affect are described as normal."
Do you see that?
A. Yes.
Q. Was it surprising to you to see, in a primary care physician's records, that he might have had a notation about a neuropsychiatric condition?
A. No.
Q. Is that one of the reasons that you get a primary care physician's records?
A. Yes. They would mention if there was any type of problem.
MS. MARMOR: Sorry. I have got a lot of paper here, so I'm trying to make sure I don't lose anything.
(Brief pause.)

BY MS. MARMOR:

Q. After you sent the referral to Dr. Goldstein, did you update the sheriff's office on where things stood?

A. Yes.

Q. This is Defendants' Exhibit 48.

It's an email the next day. The others we were looking at were September 8th. This is now September 9th. You are updating Winifred Shelby and Ms. Reierson.

And you say, "I have received medical records from two providers and confirmed appointments with Dr. Goldstein. I have attached both letters.

"I spoke to Mr. Nawara, and he is good with the appointment schedule, and emailed him the FFD letter. I also emailed Dr. Goldstein's letter along with his paperwork, including his medical records."

Then you say, "We are beyond the four-hour mark for hours worked on this case. Please provide your permission to continue working on this case at the hourly rate."

And you said, "If everything goes as planned, I do not see the need for more than one hour of work."

And my simple question is, again, was any of this unusual that you were reporting?

A. Not at all.

Q. Did you get the permission to do a little bit more work?

A. Yes, I did.

Q. I would like to show you what has been marked as Plaintiff's Exhibit 70.

This is an email from you, dated Wednesday, September 13th, to Winifred Shelby and Rebecca Reierson.

Do you see that?

A. Yes.

Q. Okay. Oh, boy. It's really going to be -- I'm sorry. I am just going to have to read it to you, because it's so hard to do this.

It says you emailed -- you were emailing about two people. You say, "Dr. Goldstein finished the evals on John Nawara" and another person whose name is not relevant and is blocked out. "She is finding them fit for duty without restrictions. She stated she will not be able to get the reports done until next week."

Do you see that?

A. Yes.

Q. Or do you understand that -- do you agree that you said that?

A. Yes.

Q. Okay. From start to this point, you received the referral -- is it correct that you received the referral on August 25th?

A. Yes.

Q. And that contained an FFD -- strike that.

That contained the CorVel HIPAA release that had been dated August 17th; is that right?
A. Yes.
Q. And now you have got -- from start to finish, in terms of getting the word from Dr. Goldstein, you went from August 17th to September 13th. So less than a month; is that right?
A. August 25th.
Q. Well, the form, to be fair, was signed on August 17th. The CorVel HIPAA form was signed August 17th. So we are at September 13th.
Are we less than a month from the date that the form was signed?
A. Yes.
Q. And my question really is that, where you could, were these kinds of FFDs done in a month or less?
A. The majority of them, yes.
Q. What would delay -- what would cause delays in getting them done in less than a month?
A. Obtaining the medical records is the most common; if the employee could not attend the appointment for some reason and it had to be rescheduled.
Q. Can you think of any reason why, had Mr. Nawara agreed to do the FFD process in November of 2016, it couldn't have been done in less than a month?

A. No.
Q. Apart from the long delay between Mr. Nawara being told he had to undergo -- let me just say this: Once the report was submitted, was that the end of your work on Mr. Nawara's matter as a case manager?
A. Once I submitted it to Cook County?
Q. Yes.
A. Pretty much, yes.
Q. Okay. I mean, apart from having to come and testify in this case.
Apart from the long delay between Mr. Nawara being told he had to undergo an FFD exam and the outcome here, was there anything unusual about this process?
A. No.
MS. MARMOR: Thank you. That's all I have.
THE COURT: All right. We will begin cross-examination. Oh, I'm sorry. No. Ms. Kamper is next. Ms. Kamper is next.

CROSS-EXAMINATION

BY MS. KAMPER:
Q. Good morning, Ms. Sarocka.
I just have one question for you.
You didn't have any contact -- phone, mail, otherwise -- with Supt. Karen Jones-Hayes, correct?
A. Correct.

MS. KAMPER: Thank you.

THE COURT: Okay.

Cross-examination, Mr. Bustamante?

CROSS-EXAMINATION

BY MR. BUSTAMANTE:

Q. Ms. Sarocka, my name is Peter Bustamante.

Before I begin, if you need a break for any reason, let us know. We have been sitting here for a little over an hour.

THE COURT: We will take a recess shortly, but I want to at least get started with the cross.

BY MR. BUSTAMANTE:

Q. First things first.

Your deposition was not taken in this case; is that correct?

A. Correct.

Q. And before you testified today, did you speak with any of the lawyers representing the Cook County Sheriff's Office?

A. Yes.

Q. When did you speak to them?

A. I don't know the specific date.

Q. Well, how long ago approximately?

A. Like approximately two, three weeks ago, I believe.

Q. And who did you talk to?

A. It was Suzanne and --

Q. Suzanne Alexander.
Who else?
A. I want to say Sarah.
Q. Sarah. Suzanne and Sarah. Okay.
And what did they tell you?
A. I think --
Q. That's okay. That was the person who was just asking you questions, Ms. Marmor.
A. They went through the type of questions that they would be asking me.
Q. Did you have a lawyer representing you?
A. Me?
Q. Yes.
A. CorVel has an attorney.
Q. I'm asking you.
When you were speaking with Ms. Alexander and Ms. Marmor, did you have a lawyer representing you?
A. Not present, no.
Q. We were told, when you were issued a subpoena, that you had a lawyer who contacted the parties and said that you could not come to testify because of medical reasons?
A. That was CorVel's attorney.
Q. All right. Did they share any documents with you?
Did they send you any documents by fax, email, or mail before they spoke to you two or three weeks ago?

A. Not before, no.
Q. I want to ask you -- you said HIPAA training, that you have HIPAA training every year.
My understanding, again, is that part of HIPAA has to do with protecting the privacy of people's medical histories, records, whatever, right?
A. Correct.
Q. There are -- my understanding is that there are three components, three types of records that HIPAA protects.
What are they?
A. Their personal medical information, anything that -- anyone they have seen, anywhere they have -- there is medical, there is behavioral health, there is genetic.
Q. Okay. So would you agree that medical records are protected by HIPAA?
A. Yes.
Q. Dental records are protected by HIPAA?
MS. MARMOR: Your Honor, what's the relevance of this?
MR. BUSTAMANTE: It's very relevant. I'll come to it.
THE COURT: I will allow it.
You may answer.
BY MR. BUSTAMANTE:
Q. So medical records, correct? Yes?

A. Yes.
Q. Dental records, correct?
A. Yes.
Q. And -- hold on one second. It's at the tip of my tongue.
Health insurance records, correct?
A. Yes.
Q. Because when an employer or a health insurance provider sends out, let's say, an explanation of benefits, an EOB, those contain all of the providers that that person has seen, correct?
A. Correct.
Q. And any person having an authorization in blank, once they have that authorization, they can actually then have the permission to go and look at the health insurance records and determine who was giving or providing care for that patient, right?
MS. MARMOR: Objection, your Honor. This calls for speculation.
THE COURT: Sustained as to form.
BY MR. BUSTAMANTE:
Q. So it's important, would you agree, to protect the health insurance records?
A. Yes.
Q. I want to find out a little bit about your involvement

with the Cook County Sheriff's Office. All right?

I understand you have been working for CorVel for over 20 years. True? No?

A. No.

Q. How long?

A. Coming on 14 years.

Q. Oh, 14 years.

So is it your -- maybe I misunderstood. You have been a nurse for over 20 years?

A. Yes.

Q. Okay. And CorVel for 14 years.

Now, CorVel Corporation is a nationwide corporation, correct?

A. Correct.

Q. It is licensed to do business in all 50 states?

A. Correct.

Q. It is a publicly traded company. Is that true?

A. Yes.

Q. So it has revenues in the half-billion-dollar area?

MS. MARMOR: Your Honor, there is no foundation for this. This is really far afield of relevance.

THE COURT: If she can answer the question, I will allow it.

Do you know what the CorVel revenues are?

THE WITNESS: No, I do not. Not exactly.

BY MR. BUSTAMANTE:
Q. Generally, do you know?
A. Actually, no, I don't.
Q. The reason I asked you those things is because I want now you to bring us to the relationship between the Cook County Sheriff's Office and CorVel Corporation.
Did they have a relationship with any other individual besides you?
MS. MARMOR: I object to the form.
BY MR. BUSTAMANTE:
Q. To your knowledge?
MS. MARMOR: I literally don't understand what that question is.
THE COURT: I will allow it.
Do you know whether the Cook County Sheriff's Office had any relationship with anybody at CorVel other than you?
BY THE WITNESS:
A. I would assume so, an account manager regarding the fit-for-duty. Is that what you are --
BY MR. BUSTAMANTE:
Q. Well, is that the only thing that CorVel did for the Cook County Sheriff's Office, fit-for-duty?
A. I believe they did their workers' compensation, but I have nothing to do with that.

Q. All right. So there would be an account manager in charge of that account?

MS. MARMOR: Your Honor, again, there is no foundation. She just said she doesn't know about that.

MR. BUSTAMANTE: She mentioned account manager, your Honor.

MS. MARMOR: She said she assumed, and she doesn't know anything about that.

THE COURT: Why don't you ask her what she does know about.

Go ahead, Mr. Bustamante.

BY MR. BUSTAMANTE:

Q. Would there be an account manager, if you know?

A. Yes.

Q. Okay. And that account manager -- who was in charge -- let me withdraw that question and ask you this: When you did work, whatever work you did at either workers' compensation or IMEs or fitness-for-duty for the Cook County Sheriff's Office, how did you keep track of the time that you were spending on each event?

A. That's -- part of our job is to document how long we spent on each activity that we did.

Q. When you did keep track of the time, was that part of your billing system so that your company could charge the Cook County Sheriff's Office?

A. Yes.
Q. Was there an agreement -- let me withdraw that question and start with this: When did you first start working with the Cook County Sheriff's Office?
When did you become the nurse that was working with Cook County Sheriff's Office?
A. It was 2015.
Q. When you started working with the Cook County Sheriff's Office in 2015, was there some certain parameters, some certain guides that said, for this type of work, workers' compensation, we will only bill X hours?
MS. MARMOR: Again, your Honor, she said she has no -- she doesn't do workers' compensation, and she doesn't know anything about workers' compensation, and it's irrelevant.
MR. BUSTAMANTE: Your Honor, I'm asking generally. If you want to limit it to fitness-for-duty -- but I was asking generally, how does she bill the time?
THE COURT: I am really struggling with the relevance.
MR. BUSTAMANTE: Well, your Honor, the relevance is going to -- may I tell the Court at a sidebar?
THE COURT: Sure. Let's talk about it at sidebar.
(The following proceedings were had at sidebar:)
MR. BUSTAMANTE: Your Honor, my belief is --

there's no deposition.

My belief is that the procedure did not encompass CorVel getting the records, as she testified, because it would always go over the time period that is assigned for each file. So I'm going to bring her to that.

She said, in this particular case, it's going over four hours. I want to bring her to that situation and let the jury determine, even if she says "No."

THE COURT: I'm fine with some of that, but what does this question have to do with that?

MR. BUSTAMANTE: Well, I was just asking generally. So I'll keep it to FFDs.

THE COURT: No. I mean, even on FFDs.

I thought you were trying to establish that there was some kind of a financial incentive or something.

MR. BUSTAMANTE: That's just the point.

THE COURT: No, it isn't, because unless this witness was being paid commission. I assume she is a salaried employee of CorVel. What difference does it make to --

MR. BUSTAMANTE: It's CorVel Corporation's incentive.

THE COURT: Yes. She doesn't represent CorVel Corporation. She is an individual that's employed by it. She is not a corporate representative.

MS. MARMOR: No.

THE COURT: She is an employee.

MR. BUSTAMANTE: Your Honor, what I'm trying to establish, if it please the Court, is that CorVel Corporation would not allow its employees either to go beyond the four hours, or if they went beyond the four hours --

THE COURT: Ask her that question.

MR. BUSTAMANTE: All right. Fine.

THE COURT: Thanks.

(End of sidebar proceedings.)

MR. BUSTAMANTE: May I proceed, your Honor?

THE COURT: Sure.

BY MR. BUSTAMANTE:

Q. Ms. Sarocka, we saw that email where you request permission to go over four hours in Mr. Nawara's case.

Do you remember that?

A. Yes.

Q. Was your time per FFD limited to four hours?

A. It wasn't limited. We have a flat-rate charge up to four hours, and then it was in the contract that we were to ask permission to charge at hourly rate after that.

Q. When you first started working as the case manager for the Cook County Sheriff's Office, was the procedure at that time that the Cook County Sheriff's Office would gather all of the medical records and then send them to CorVel?

A. Initially, I believe that's what they did, yes.
Q. Do you know when that changed?
MS. MARMOR: Your Honor, can we have sidebar about this?
BY THE WITNESS:
A. No.
MR. BUSTAMANTE: She said "No."
THE COURT: All right. She doesn't know. Let's move on.
BY MR. BUSTAMANTE:
Q. We saw an email from you to Ms. Reierson and Ms. Shelby where you tell them that Dr. Goldstein has found Mr. Nawara fit for duty, and I believe it was September 13th or so, that email.
Do you remember that?
A. I believe it was.
Q. Okay. Now, do you know if that email -- just the email alone -- was sufficient for Ms. Reierson and Ms. Shelby to put Mr. Nawara back to work immediately?
MS. MARMOR: Objection. Lack of foundation.
MR. BUSTAMANTE: I asked if she knows.
MS. MARMOR: I don't think she has a foundation for that. She doesn't work for the sheriff's office.
THE COURT: Sustained.
MR. BUSTAMANTE: Okay.

BY MR. BUSTAMANTE:

Q. Would you expect Nurse Shelby to fully read the examiner's report -- 10-page report -- before putting an individual back to work even if the conclusion is fit for duty, no restrictions?

MS. MARMOR: Your Honor, objection. Lack of foundation; pure speculation.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. You have worked with Ms. Shelby before, you told us, correct?

THE COURT: You know what?

BY THE WITNESS:

A. Before this case, yes.

BY MR. BUSTAMANTE:

Q. Yes, before this case.

THE COURT: My screen has gone blank.

Ladies and gentlemen, can you see the witness?

We will give the jurors a recess.

(A brief recess was taken at 11:17 a.m.)

THE COURT: You may be seated.

We are going to continue with Ms. Sarocka's cross-examination.

Mr. Bustamante.

BY MR. BUSTAMANTE:
Q. Ms. Sarocka, can you hear me?
A. Yes, I can.
Q. I was asking you about your experience with Nurse Shelby.
I believe in direct testimony you said that you had worked on approximately 17 fitness-for-duty evaluations with Nurse Shelby, correct?
A. Correct.
Q. In dealing with Nurse Shelby, did you ever discuss fitness-for-duty evaluations with her?
A. Did I ever discuss what?
Q. Fitness-for-duty evaluation reports with her.
A. Just if they had questions.
Q. Okay. Do you know what Nurse Shelby's role was with the Cook County Sheriff's Office?
A. I just -- just from what I talked to her about --
Q. What was your understanding of her role?
A. -- which was --
She was in HR, and that she put together the (inaudible) --
Q. I'm sorry. She was in HR, and she put together what?
A. The referrals.
Q. Is she also the one that would send you the medical records that were gathered by the Cook County Sheriff's

Office?
A. If they had them, yeah.
Q. Is the Cook County Sheriff's Office still a client of CorVel's?
MS. MARMOR: Objection.
BY THE WITNESS:
A. No.
MS. MARMOR: Relevance.
THE COURT: The witness has answered. We can move on.
MR. BUSTAMANTE: All right. I think that is all I have.
Thank you, ma'am. I appreciate it.
THE COURT: Redirect examination?
MS. MARMOR: Just one question, your Honor.
THE COURT: Ms. Marmor.

REDIRECT EXAMINATION

BY MS. MARMOR:
Q. Hi, Ms. Sarocka.
I just have one question for you. It may turn into three short ones, but there it is.
While you were working on FFDs for the Cook County Sheriff's Office, were there occasions where the sheriff's office provided you with medical records?
A. Yes.

Q. And were there also occasions where the sheriff's office did not provide you with medical records?
A. Yes.
Q. And in those second occasions, was that because the employee did not want the sheriff's office to have their medical records?
A. Yes --
MS. MARMOR: That's it.
BY THE WITNESS:
A. -- from my understanding.
MS. KAMPER: Nothing further, your Honor.
THE COURT: Mr. Bustamante, anything further?
MS. KAMPER: No, nothing further from me.
THE COURT: She already indicated she has no questions.
MR. BUSTAMANTE: One second, Judge.
THE COURT: Sure.
(Brief pause.)
MR. LINDEN: Can we have another sidebar, Judge?
THE COURT: Sure.
(The following proceedings were had at sidebar:)
MR. LINDEN: Judge, if you recall, the motion *in limine* with respect to subsequent remedial measures, in 2016, because of Officer Nawara, they --
MR. BUSTAMANTE: '17.

MR. LINDEN: '17 -- I am sorry -- they changed their policy where, at first, the sheriff's office would get the records. And then, I think, in August they changed the policy where they would go directly to CorVel. We believe they have opened up the door to asking this witness whether or not -- implying that employees can go directly to CorVel --

THE COURT: I don't think that opens the door.

MR. LINDEN: -- and bypass the sheriff --

THE COURT: I don't think that opens the door.

MR. BUSTAMANTE: I think we are done.

THE COURT: We have to ask the jurors.

MS. MARMOR: Oh, right.

(End of sidebar proceedings.)

THE COURT: Ladies and gentlemen of the jury, do you have any questions for this witness?

(Questions tendered.)

(The following proceedings were had at sidebar:)

THE COURT: First question: Once CorVel receives an FFD form in regard to an employee, does CorVel request the other side of the story from the employee in the case that the employee was unjustly sent to FFD?

Why the sheriff's office no longer use your company? Do you have any reasons why?

MS. MARMOR: Your Honor, this goes to the fact that

just the contract wasn't renewed. I think that that's --

THE COURT: She probably doesn't know. We might as well close that loop.

MR. BUSTAMANTE: Okay.

THE COURT: Thanks.

(End of sidebar proceedings.)

THE COURT: Ms. Sarocka, the jurors have a couple of questions. I am going to review those with you right now.

Do you happen to know, why does the sheriff no longer use your company? Do you happen to know why that is?

THE WITNESS: I believe it's they no longer do the workers' compensation. So we were grouped in with that, as far as I know.

THE COURT: So it was just one contract, perhaps? Okay.

THE WITNESS: I'm sorry?

THE COURT: It was just one contract, perhaps?

So once they stopped doing the workers' comp., they stopped doing FFD?

THE WITNESS: Yes.

THE COURT: All right.

When CorVel -- when you or people in CorVel receive the FFD form in regard to an employee, do you then ask for what we would call the other side of the story from the employee about why that FFD was necessary?

THE WITNESS: No, I do not.

THE COURT: Thank you.

Ladies and gentlemen, Counsel, any further questions of this witness based upon that colloquy?

MS. MARMOR: Just a brief one, your Honor.

THE COURT: Okay.

FURTHER REDIRECT EXAMINATION

BY MS. MARMOR:

Q. Ms. Sarocka, with regard to that last question, is it the case that the FFD examiner asks the employee for their side of the story?

A. Yes. They are the ones that are evaluating the patient.

Q. Okay. Thank you.

MR. BUSTAMANTE: Nothing further, your Honor.

MS. KAMPER: Nothing further, your Honor.

THE COURT: All right. The witness is excused. Thank you very much.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: We will turn to your next witness.

MS. MARMOR: I think Ms. Shelby is going back.

THE COURT: Oh, that's right. We need to complete Ms. Shelby's examination.

We will ask you to return, and I'll remind you that you are under oath.

We will probably need to pull the television out of the way of the jurors.

Mr. Bustamante, whenever you are ready.

MR. BUSTAMANTE: Thank you, your Honor.

WINIFRED SHELBY, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION - Resumed

BY MR. BUSTAMANTE:

Q. Good morning, Ms. Shelby.

A. Good morning.

Q. So when I was asking you questions yesterday, I think we were talking about the conversation that you and Ms. Reierson had with Supt. Jones-Hayes in which you distinctly, definitely recalled her stating -- Jones-Hayes stating that Mr. Nawara whispered in her ear, "Are you going to follow me around all day so I can do my job?"

Do you remember that?

A. I do.

Q. Okay. Now, I understand that when the referral was made to CorVel, that you sent your referral form, and you included the authorization -- the medical release authorization -- and Supt. Jones-Hayes' -- I'll call it letter; I don't know what to call it -- letter, statement, whatever you want to call it. Okay?

A. Okay.

Q. Is that true, that you sent those three things?

A. I don't recall off the top of my head what was it.

Q. We just had Ms. Sarocka testify that she received a request for an FFD and medical records release authorization and a letter signed by Ms. Jones-Hayes -- by Supt. Jones-Hayes.

Do you recall that testimony?

A. I do. Thank you.

Q. Okay. So this letter or report or statement signed by Supt. Jones-Hayes has the statement that, "Mr. Nawara yelled, 'Are you going to follow me around all day?'"

Do you see that?

A. Absolutely not. I can't read that.

Q. Okay. Let's see if I can bring it closer to you. Bear with me. Bear with me for one second.

(Brief pause.)

BY MR. BUSTAMANTE:

Q. Okay. I tried to highlight it in yellow.

I'm sorry. I said, "yelled," but I was referring to the first half-page report.

In this report, what does it say? Can you read it?

A. "Superintendent quickly began to exit the area, and Officer Nawara began stating, 'What are you going to do? Follow me around all day and help me do my fucking job?'"

Q. Okay. Now, number one is, you sent this authorization -- I mean, this report along with the request

for FFD knowing that this was an error, correct?

MS. MARMOR: I object to the form, your Honor.

THE COURT: Overruled.

You may answer.

Did you know that was an error?

BY THE WITNESS:

A. I did not.

BY MR. BUSTAMANTE:

Q. You did not send it, or you did not know it was an error?

A. I did not look to see if it was an error. I just sent it as is.

Q. Now, why would you not look at it before you sent it?

A. Because it's her statement.

Q. You had no interest in finding out if her statement was accurate?

MS. MARMOR: I object. Argumentative.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. Let me move to another area.

Do you remember when you were being asked questions by your legal representative yesterday?

A. I do.

Q. Okay. And you were being asked questions about other FFDs, in the over 50 FFDs that you had been involved in while

working for the Cook County Sheriff's Office, correct?
A. Correct.
Q. Of those FFDs, how many of them took 51 days between the date of the incident and the date of the preliminary interview in HR aside from Mr. Nawara's?
MS. MARMOR: Objection. Lack of foundation.
THE COURT: If she knows, she can answer.
Do you know?
BY THE WITNESS:
A. I do not.
BY MR. BUSTAMANTE:
Q. Any?
MS. MARMOR: She just said she didn't know, your Honor.
THE COURT: Sustained.
BY MR. BUSTAMANTE:
Q. In one of the examples that you were asked about, you stated, that individual seemed to be experiencing high levels of stress but showed no signs that he was not able to perform his duties.
Do you recall that?
A. I don't remember the part about him not being able to perform his duties.
Q. Not showing any sign of not being able to perform his duties.

This was not about Mr. Nawara. Your legal representative was asking you about samples of other FFDs.
A. Okay.
Q. Okay?
Do you recall that?
A. I recall that someone was referred due to high levels of stress.
Q. And you found there was no FFD required, correct?
A. Correct.
Q. That's because persons can perform their duties even though they have high levels of stress, correct?
A. That wasn't the reason for not proceeding with the FFD on that particular employee.
Q. You also were referred to a PTSD event, correct?
A. Correct.
Q. And again, your statement was, "I did not consider this person to need a fitness-for-duty because he was seeing a mental health professional," correct?
A. Correct.
Q. Now, what is PTSD?
A. Posttraumatic stress syndrome.
Q. And what happens when a personal has PTSD?
A. They have numerous events. I couldn't just tell you off the top of my head what it would be.
Q. Among those events is depression and suicidal ideation;

is it not?

MS. MARMOR: Your Honor, this is the stuff of expert testimony. That's not appropriate.

MR. BUSTAMANTE: Your Honor, she makes these decisions as a nurse every day in her work when she was working for the sheriff's office.

THE COURT: Why don't you ask a question that relates to this case.

MR. BUSTAMANTE: Well, your Honor -- okay. All right.

BY MR. BUSTAMANTE:

Q. Depression would be something important for you to consider as to whether or not to refer someone for a fitness-for-duty evaluation, correct?

A. Correct.

Q. Is it important that these preliminary assessments at HR be done promptly?

A. Yes.

Q. As soon as possible, correct?

A. As soon as I would receive the information that we needed to proceed, correct.

Q. I believe you stated, if it's not done promptly and someone gets hurt, you could not live with yourself. Was that your statement?

MS. MARMOR: Objection. That mischaracterizes her

testimony entirely.

THE COURT: I'm not sure she made that statement.

Why don't you ask another question.

You are welcome to ask about the importance of a prompt evaluation, if you want.

MR. BUSTAMANTE: No, your Honor. I think I'm going to leave that for a moment and come back to another area.

THE COURT: All right.

BY MR. BUSTAMANTE:

Q. I want to ask you about the procedure -- your procedure for the fitness-for-duty assessment.

When I use the word "assessment," I mean that initial interview that you and Ms. Reierson would have with an employee. Okay?

A. Okay.

Q. All right. So my understanding is that your procedure for this initial assessment was not in writing; is that correct?

A. Correct.

Q. And my understanding is that what you were doing was, you were just checking in with the employee, correct?

A. Correct.

Q. The technique that you followed was to talk to the employee, correct?

MS. MARMOR: I object to the form.

THE COURT: Overruled.

You may answer.

BY THE WITNESS:

A. Correct.

BY MR. BUSTAMANTE:

Q. It was to watch the employee, correct?

A. Partially.

Q. And it was to observe the employee; is that correct?

A. Partially.

Q. And you would also look at whatever the person requesting your assessment sent to you, correct?

A. Correct.

Q. What would you call that? Reports? Requests? What would you call that?

You would look at the -- let's call it a request. Okay?

I am going to say requests/incidents. Okay? Is that okay?

You would look at the requests or the incidents involved?

A. I don't know if it would be considered a request as much as just documentation on what had happened.

Q. Okay.

A. It wouldn't be a request per se. It would just be a person's documentation on them explaining the event.

Q. Okay. Documentation/incident. Good enough?
A. Okay.
MS. MARMOR: She said "event," your Honor.
BY MR. BUSTAMANTE:
Q. Incident/event. Okay?
THE COURT: That's fine.
BY MR. BUSTAMANTE:
Q. People get antsy coming to HR sometimes. True?
A. That is true.
Q. Now, in this particular case involving Mr. Nawara, my understanding is that you testified that he became enraged; is that correct?
A. Correct.
Q. I want you to walk us through, if you would be kind enough, through the events of that morning. Okay?
A. Okay.
Q. The meeting with Mr. Nawara took place at around 9 a.m., correct?
A. I do not have a clue what time it took place.
Q. Well, was it morning or night?
A. I know it wasn't night because I didn't work nights, but I don't know what time throughout the day that it happened.
Q. Okay. If other folks have testified it happened at around 9:00, do you have any problem with that?
MS. MARMOR: Objection, your Honor. Why is this

relevant?

THE COURT: Why is the time of day relevant on this?

MR. BUSTAMANTE: The timing? Frankly, I just want to find out what she remembers. It's a question of her memory.

THE COURT: She's already indicated she doesn't remember what time.

Let's move on.

MR. BUSTAMANTE: Okay.

BY MR. BUSTAMANTE:

Q. So where did you meet Mr. Nawara, the first time you saw him, when you first laid eyes on him?

A. I don't remember if it was in the hallway or if I walked over to the meeting area to meet him. I don't remember that.

Q. And eventually you walked into your office, correct?

A. Correct.

Q. Describe your office for us, please.

How big is it? Only your front room. I know you told us there is a back room. Let's talk about the front room where you all were.

MS. MARMOR: And just for the record, it's her former office. It's not "is" but "was."

BY THE WITNESS:

A. I don't know how big to describe it. I can tell you

what was in this part of the office to give you an idea, but I'm not -- I couldn't tell you X amount of feet by X amount of feet. I'm just not good with those kind of things.

BY MR. BUSTAMANTE:

Q. Is it a big office or a small office?

A. I would think it's a medium to small, because I have seen smaller and I have seen larger. So it's kind of a medium to small type of office.

Q. We have a door going into your office.

What do we see when we step in?

A. There is a door going into the office. When you walk in the door, there is a path right there. You will see a desk on the -- say you come in the office this way (indicating), and then there is a desk over here, on this side here (indicating). That's where I sit at. I sit behind that desk.

In front of there, there is usually -- either there is one chair in front or one chair on the side. And if it's on the side, it's on the side -- kind of on the side of the desk instead of both chairs being in front of the desk.

Q. Okay. Assume that where I'm standing, there is a door. Okay?

A. Uh-huh.

Q. That's the door to your office?

A. Correct.

Q. Once I step in, to my right and in front of me there would be a desk?

MS. MARMOR: Your Honor, this has been asked and answered. I don't understand the relevance of any of this.

THE COURT: Can we talk about it at sidebar for a moment.

(The following proceedings were had at sidebar:)

THE COURT: Is there any evidence that -- I'm not talking about evidence in this case; I'm talking about evidence in life -- that whether somebody remembers the dimensions of their office or the locations of the desk and the door is relevant to whether their memories of another encounter are accurate? I suspect the answer is no.

MR. BUSTAMANTE: Your Honor, let me just tell you why I am doing this. Okay?

THE COURT: Please do.

MR. BUSTAMANTE: I'm trying to paint a picture of what happened that day so that I can bring it to life within the jury's mind and within my mind for the purpose of this.

Eventually we are going to get to the point of, she is going to say he was enraged. What did she do? Where was he? Did he stand up and shout out --

THE COURT: You can ask those questions.

First of all, you are running the very serious risk that by the time you get to those questions, the jury will no

longer be listening.

MR. BUSTAMANTE: All right. I agree with that.

THE COURT: We need to zero in.

MR. BUSTAMANTE: Okay. I will do that.

Thank you, Judge.

(End of sidebar proceedings.)

BY MR. BUSTAMANTE:

Q. Nurse Shelby, Mr. Nawara came into your office and sat down, correct?

A. The first time he came into the office, I believe he did.

Q. He was carrying a jug of water under his arm -- his left arm, correct?

A. I don't remember that.

Q. And Ms. Reierson was sitting to the side -- not behind the desk but to the side of the desk, correct?

A. I don't recall if she was sitting on to the side of the desk. I don't see her sitting on to the side of the desk because -- yeah.

Q. The initial meeting, how long did it take?

A. I don't know.

Q. Approximately?

A. I do not know.

Q. Okay. Was it more than half an hour?

MS. MARMOR: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. Was it about ten minutes, ma'am?

MS. MARMOR: Your Honor --

BY THE WITNESS:

A. I don't know.

BY MR. BUSTAMANTE:

Q. All right.

You then testified that Mr. Nawara became enraged.

Did he become enraged immediately upon sitting down after entering your office?

A. I believe it was shortly after. It was quickly afterwards, I believe, when I started just trying to talk with him about -- explaining to him and asking him, did he know why he was here?

Q. Nurse Shelby, the question was real simple.

Did he become enraged immediately after coming into your office?

You said shortly afterwards, correct?

A. Yes.

Q. You have answered my question. Now let's move on. Okay?

A. Okay.

Q. So tell us what you observed that led you to the conclusion that he was enraged.

What did you see?
A. His eyes, the way he was looking.
Q. What else?
MS. MARMOR: Your Honor, she is trying to answer the question. She is just thinking.
THE COURT: She is doing fine.
Let's proceed.
BY THE WITNESS:
A. He was almost breathing heavier. He was just --
BY MR. BUSTAMANTE:
Q. Anything else?
A. Just looking like he was ready to just explode.
Q. Now, these are the things that you observed, correct?
A. Correct.
Q. What did he do physically -- how did he move? How did he act? -- to show you that he was enraged?
A. He was not answering, or when he was, he was yelling.
Q. He was yelling. Okay.
Tell us, for example, one of the things he said when he yelled.
A. "Show me the" -- I couldn't give you verbatim, but in a roundabout way, "Show me the report," or, "Show me the claim," or whatever, the -- you know.
Q. Would you be kind enough to yell that? Yell, "Show me the claim." Yell it.

MS. MARMOR: Your Honor, that seems inappropriate to me. She can't -- she can't -- this is a woman, four years later, and he is asking her to yell in court.

THE COURT: The jurors understand what it means to yell.

MR. BUSTAMANTE: But I want to hear what she understood by yelling.

THE COURT: Sustained. Sustained.

MR. BUSTAMANTE: All right.

BY MR. BUSTAMANTE:

Q. He never made any physical gesture of attacking you. Is that true?

A. That is true.

Q. And my understanding, from your testimony, is, of course, that this behavior concerned you quite a bit, right?

A. It did.

Q. So, of course, you probably wrote an incident report, correct?

MS. MARMOR: Objection, your Honor. No foundation. She is an HR employee.

THE COURT: I think she said that it did, but let's --

BY MR. BUSTAMANTE:

Q. You did write an incident report?

A. No.

Q. Did you call in security to come in? "Please, we have a madman in our office. Come and protect us."
MS. MARMOR: Objection. Argumentative.
THE COURT: Sustained.
BY MR. BUSTAMANTE:
Q. Did you call security into your office, ma'am?
A. I had security outside the door.
Q. That's not what the question was.
Did you call security to come into your office?
A. I did not, because I had security outside the door.
Q. Did you open the door to make sure that security could hear the yelling?
A. I did not.
Q. Did security show up and knock on the door and say, "Ms. Shelby, I hear some yelling in here. What's going on?"
A. I don't recall.
Q. So now I believe your testimony is that Mr. Nawara stormed out of your office, correct?
A. I believe so.
Q. And you did tell him, did you not, "We have to make a decision; please step out of the office," before he stepped out, correct?
A. I don't recall telling him that.
Q. And you did tell him, of course, that he had to come back to hear your decision?

MS. MARMOR: Objection. Argumentative.

MR. BUSTAMANTE: It's a different question, your Honor.

MS. MARMOR: There is no "of course" about it.

THE COURT: I think what you should do is ask her what she did do as opposed to saying, you didn't do this, or, did you do that? Ask her what she did do.

MR. BUSTAMANTE: Well, your Honor, this is cross. And, if it please the Court, I would like to ask the questions in a different manner.

MS. MARMOR: Could we have a sidebar, your Honor.

THE COURT: Sure.

(The following proceedings were had at sidebar:)

MS. MARMOR: My problem with this is the same problem we have been having all along, which is, it's fair to ask a question when you know the answer, when you actually have an admission.

It's not fair for a lawyer to be making things up when they know they don't have an admission on it and making statements that are not -- that have no foundation. That's my objection to this.

THE COURT: Well, I think Mr. Bustamante may be correct that it's not appropriate for me to tell him what to ask or not to ask, but what I can do is impose a time limit, and I think that will focus our attention on getting the

really relevant information, which we are not right now.

So how about 15 minutes with this witness?

MR. BUSTAMANTE: How much?

THE COURT: Fifteen minutes.

MR. BUSTAMANTE: How about 20 minutes?

THE COURT: Twenty minutes and we are done.

Thank you.

(End of sidebar proceedings.)

BY MR. BUSTAMANTE:

Q. So, Ms. Shelby, you told him to come back, correct?

A. I don't know if I told him or if Rebecca told him to come back.

Q. Someone told him, correct?

A. I believe so.

Q. So your testimony is that this enraged human being, who stormed out of your office, comes back with a union representative, correct?

A. Correct.

Q. Do you believe that Mr. Nawara was acting rationally during the first part of your session with him?

MS. MARMOR: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. You were trying to assess his mental status, correct?

MS. MARMOR: Objection. That's not what the

testimony is.

THE COURT: You may answer.

Were you trying to assess his mental status?

BY THE WITNESS:

A. I was doing a check-in to see if the officer was okay.

BY MR. BUSTAMANTE:

Q. And by "okay," means, did he have any evidence or indication of anger management issues, correct?

MS. MARMOR: Objection. That's argumentative.

THE COURT: You may answer.

BY THE WITNESS:

A. Well, the determination would be of the provider, the healthcare provider. They would need to make that determination. Mine was just an assessment to do, like, a preliminary assessment of the person.

BY MR. BUSTAMANTE:

Q. Let me switch to another area. Okay?

Do you remember yesterday your legal representative was asking you questions about what type of information or what type of records or what type of providers we would look to when gathering records for a fitness-for-duty evaluation?

Do you remember that?

MS. MARMOR: I object to the form.

BY THE WITNESS:

A. Correct.

BY MR. BUSTAMANTE:
Q. She said that you wouldn't necessarily -- you wouldn't be looking for records from a dermatologist, correct?
A. Correct.
Q. And you agree with that?
A. Correct.
Q. And then she said, well, you wouldn't be looking for any records from an oncologist, correct?
A. I believe so.
Q. And you agreed with that?
A. Okay.
Q. You do?
A. I said, "Okay," if I said that.
Q. No. I'm asking, do you agree with that?
A. I don't remember -- are you asking me, do I remember the testimony, or are you asking me, do I agree with what was said?
Q. Do you agree with what was said, that you wouldn't be looking for an oncologist's records?
A. Correct.
Q. Your legal representative asked you that?
A. Correct.
Q. You agree with that?
A. Depending on the referral type, correct.
Q. For mental referral?

A. Correct.
Q. You do. Okay.
So let me ask you about the dermatologist. Okay?
Have you ever heard of a specialty called psychodermatology?
A. I have not.
Q. You know that the skin is an organ, correct?
MS. MARMOR: Your Honor, this is far afield. This is totally irrelevant.
THE COURT: I really don't see the relevance, but I think we have set a time limit on this. So if Mr. Bustamante wants to spend it talking about dermatology, you are welcome to do that.
MR. BUSTAMANTE: Thank you, your Honor.
BY MR. BUSTAMANTE:
Q. Skin is an organ, correct?
A. Correct.
Q. And it reacts directly upon emotional stimuli; is that correct?
A. Correct.
Q. So emotional problems are more prominent as a result of having a skin disease; is that correct?
A. I couldn't say yea or nay on that one.
Q. Okay. Regarding oncology, the physical impact cancer can have can make worse preexisting mental issues, such as

depression or suicidal ideation; is that true?

MS. MARMOR: Object. Lack of foundation.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. Is that true?

MS. MARMOR: Your Honor --

THE COURT: The objection was sustained.

MR. BUSTAMANTE: I'm sorry. I didn't hear.

THE COURT: The objection was sustained.

MR. BUSTAMANTE: Because?

THE COURT: No foundation. I don't think this witness is an expert on these issues.

BY MR. BUSTAMANTE:

Q. Now, you heard Nurse Sarocka testify that under HIPAA, your medical records are protected, your dental records are protected, and your insurance information is protected.

Do you agree with her?

A. Correct.

Q. So you, as a nurse in HR, once somebody signs a blank form, that gives you permission to go into their health insurance information and gather any doctor that the employee has seen, correct?

A. Not from my understanding.

Q. Okay. You heard Nurse Sarocka testify that in 2015 -- and you started in 2014, December -- at HR at the Cook County

Sheriff's Office the practice was for the Cook County Sheriff's Office to obtain all the medical records, correct?

MS. MARMOR: Your Honor, I am going to object to this. That's not what her testimony was.

THE COURT: Overruled.

You may answer.

Was that the practice?

THE WITNESS: I believe so.

BY MR. BUSTAMANTE:

Q. Regarding the medical records themselves that you keep under lock and key in your office -- or you used to keep -- you testified there was only one key, and you gave it to Ms. Reierson when you left, correct?

A. Correct.

Q. There was no written policy regarding what to do with those records, correct?

MS. MARMOR: Objection. Lack of foundation.

THE COURT: Overruled.

You may answer.

Was there any written policy concerning that issue?

THE WITNESS: Not that I know of.

BY MR. BUSTAMANTE:

Q. There was no written policy for how long the records could be maintained, correct?

A. Not that I know of.

Q. There was no written policy for the destruction, correct -- destruction of those records, correct?
A. Not that I know of.
Q. And the fax that you were using was not a secure fax; is that true?
A. The fax that I was using to fax over the information?
Q. Correct.
A. Well, it was -- when you say "secure," what do you mean?
Q. You are the one who mentioned secured faxes. I am saying that this was a fax that was not just for your office, for the nurse's office. It was a fax that was used for other folks in HR, correct?
MS. MARMOR: Objection. I think we are completely unclear about what fax we are talking about.
THE COURT: I think what you mean is a fax machine for the transmission of medical records.
MR. BUSTAMANTE: Correct, your Honor.
THE COURT: Was that a secure fax?
MS. MARMOR: But to whom? That's my problem. I don't know if that's to CorVel or to the sheriff's office.
THE COURT: The witness can tell us if she doesn't know.
You may answer.
BY THE WITNESS:
A. I actually had a fax in my office.

BY MR. BUSTAMANTE:

Q. Okay. This fax in your office, of course, is the type of fax that grabs all the paper in and then keeps it in memory and then sends out the fax when the phone is answered, correct?

MS. MARMOR: Objection. Lack of foundation.

THE COURT: If the witness knows, she can answer.

Do you know whether it is that type of fax?

THE WITNESS: I do not know.

BY MR. BUSTAMANTE:

Q. You know those faxes have a memory?

MS. MARMOR: Your Honor, she just said she doesn't know.

MR. BUSTAMANTE: Okay.

THE COURT: Sustained.

BY MR. BUSTAMANTE:

Q. I only have a few more questions.

In 2016, when you evaluated Officer Nawara, there was nothing in writing for your office that told you, in order for you to assess whether or not a person should be sent for a fitness-for-duty, you must cover A, B, or C; is that correct?

MS. MARMOR: Objection, your Honor. Asked and answered.

THE COURT: You may answer.

MS. MARMOR: And also form. I don't know what "A, B, or C" means.

MR. BUSTAMANTE: It's just a list.

BY MR. BUSTAMANTE:

Q. Go ahead.

THE COURT: You may answer.

BY THE WITNESS:

A. No, it was not.

BY MR. BUSTAMANTE:

Q. What you used, in order to make your determination, was what you called nursing judgment. Is that true?

A. Nursing assessment judgment.

Q. And you don't know what kind of assessment nurse -- Ms. Reierson made, correct?

She is not a nurse, so you don't know if she -- what kind of assessment she made, right?

MS. MARMOR: Objection. Lack of foundation.

THE COURT: It's important for us to know whether she knew what Ms. Reierson did?

MR. BUSTAMANTE: I guess not.

THE COURT: Sustained.

MR. BUSTAMANTE: Okay.

BY MR. BUSTAMANTE:

Q. So in order to make your nursing assessment judgment, what you looked at was behavior; is that correct?

A. Partially.
Q. Your interview with a person, correct?
A. Partially.
Q. Their mannerisms, correct?
A. Partially.
Q. And your interview with a person -- we said interview. Okay.
And what you were trying to do is, you were trying to get a feel that the person is safe to go out and do their job, correct?
A. That as well as just speaking with the persons and asking them, talking with them, getting a feel. But a lot of times just speaking with them, asking them, how are they feeling.
Q. From your end, you were trying to get a feel for them, correct, if they can go back and do their job?
A. I was doing an assessment, correct.
Q. You never requested additional information regarding Mr. Nawara, correct?
MS. MARMOR: Your Honor, I just object. He is writing down words selectively when she is not agreeing to them.
MR. BUSTAMANTE: I'm sorry?
THE COURT: I don't think that's an objection to this question.

Overruled.

You may answer.

BY THE WITNESS:

A. I'm sorry. What was the question?

THE COURT: Did you request additional information regarding Mr. Nawara?

BY THE WITNESS:

A. I did not.

BY MR. BUSTAMANTE:

Q. By the way, I think your legal representative may object or have objected to the word "a feel."

Do you agree or disagree with that?

A. I think when you finished it, I just agreed when you said -- you said I was -- when I do a feel, I'm doing a feel to get an idea on if the person needs to be seen by a medical provider to do a fitness-for-duty so they can determine if they can do their job.

You said, do I do a feel on if they are able to do their job. So I don't do that feel, because I send it to a healthcare professional to make that determination.

Q. Okay. At your deposition on Wednesday, September 25, 2019, were you asked these questions and were you giving these answers?

MS. MARMOR: Your Honor, objection. She was explaining what just happened in court today, not something

that -- he was asking her whether or not what he wrote down was accurate based on what she just said. This is not -- that's not a matter for impeachment about something she said in a deposition.

MR. BUSTAMANTE: Your Honor, we have had complaints by counsel that I bring up things that we don't have any basis for, and here it is.

THE COURT: Proceed, sir.

MR. BUSTAMANTE: I'm sorry?

THE COURT: Overruled.

You may proceed.

MR. BUSTAMANTE: Thank you, Judge.

THE COURT: Thank you.

MR. BUSTAMANTE: I appreciate it.

BY MR. BUSTAMANTE:

Q. Okay. Were these questions asked of you and were these your answers under oath? Page 36 starting at Line 13.

"And what are you trying to get by making those observations of behavior and taking the interview? What are you trying to get?

"A. I'm trying to get, do I feel that the person is safe to go out and do their job, or should they be further evaluated by a provider to make that determination."

Was that question asked of you, and was that your answer under oath?

A. I'm sorry?
Q. Was that question asked of you at your deposition, and was that your answer under oath?
A. If it's on that piece of paper, yes, absolutely.
(Document tendered.)
BY MR. BUSTAMANTE:
Q. Starting at this line (indicating).
A. Yes.
MR. BUSTAMANTE: Thank you, Nurse Shelby.
THE COURT: All right. Redirect examination, Ms. Marmor?
MR. BUSTAMANTE: Your Honor, I forgot one quick thing. I'm sorry. Do I have a minute or two?
THE COURT: That's fine.
BY MR. BUSTAMANTE:
Q. Nurse Shelby, 95 percent of your reason for sending John to an FFD was his behavior at your office, correct? You testified to that.
A. Correct.
Q. When you first initially prepared the referral form, you did not put in there that you were referring him because of his behavior at HR, correct?
A. I don't know what I put in there.
Q. Okay. Well, let's show you.
You received an email from Rebecca Reierson. It

says, "Please use this language instead. Reason: Employee's aggressive, physically intimidating, inappropriate behavior directed toward his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resources department."

Do you see that?

A. Yes, I do.

Q. And this was sent to you because your initial referral form, which -- I just read from Plaintiff's Exhibit 64 -- and your initial referral form, Plaintiff's Exhibit 63, said, "Reason for referring: Employee's inappropriate, aggressive behavior with his superior."

Do you see that?

A. I do.

Q. So your initial Cook County referral form did not mention the behavior at HR, correct?

A. I sent it to Rebecca to tweak it for the wording, and that's what she did.

Q. My question is: It does not mention the behavior at HR, correct?

A. Because it wasn't a finished product.

Q. Is your answer, yes, it does or does not mention it?

A. I'm sorry. It wasn't a finished product, so it wasn't a referral form to be sent out.

Q. Why is it so hard for you to say "Yes" or "No"?

MS. MARMOR: Your Honor --

THE COURT: The jury can see whether it's on there or not.

MR. BUSTAMANTE: Okay. I'm done, your Honor. Thank you.

THE COURT: Thank you.

Redirect examination, Ms. Marmor?

REDIRECT EXAMINATION

BY MS. MARMOR:

Q. I just have a couple of questions, Nurse Shelby.

You were asked on cross whether the practice was in -- I think it was 2014, when you started, to gather medical records and send them to CorVel; is that right?

A. Yes.

Q. And was the practice, also, when an employee was unwilling to -- did not want to sign the CCSO form, that they would just go to CorVel?

A. Correct.

Q. And was signing the form voluntary?

A. Yes, it was.

Q. One other question.

You were asked about depression can interfere with an -- strike it. I'm not going to ask the question. It doesn't matter.

Thank you.

THE COURT: Ms. Kamper?

MS. KAMPER: Nothing further, your Honor.

THE COURT: Any redirect?

MR. BUSTAMANTE: No, your Honor.

THE COURT: Ladies and gentlemen of the jury, do you have questions for this witness?

(Questions tendered.)

(The following proceedings were had at sidebar:)

THE COURT: Okay. The first question I just don't understand. It says, "Listen to the employee conversation" -- I think it's "conversion," but conversation -- "and mannerism and his or her listening."

MS. MARMOR: Do you? I mean, I suppose the question would be.

THE COURT: Okay. "Questions for Dr. Shelby." It's Nurse Shelby.

"If an employee is called in for an interview, and it is determined they are receiving treatment for a mental condition, would they still be recommended for an FFD?"

"If an employee is already seeking and obtaining treatment for an issue, is that treating physician considered independent or not?"

"If considered independent, why is that physician considered independent and Mr. Nawara's physician not?"

"If an employee is being treated by a physician,

would you still get info from that physician to determine the employee's ability?"

"Before working at the CCSO, did you work with any patients who had mental deficiencies?"

"Did you consult with a mental health or behavioral health professional before making the decision with Ms. Reierson to send Mr. Nawara for the FFD? Why or why not?"

MS. MARMOR: That's fine.

THE COURT: "You stated a sheriff was posted outside your office. Did the sheriff come to check on things due to the noise level of John Nawara, or could he not be heard outside the door?"

"If no, did you inform the sheriff to watch or keep the door open upon John Nawara's return?"

"If found to meet an FFD and the employee has their own physician that they are currently receiving treatment from for what the FFD referral is, are they allowed to skip the CorVel process and return to work immediately?"

"You stated during the check-in meeting some employees would say they are seeing their own physician, and this was acceptable if someone is sent for an FFD evaluation?"

"How long are medical records kept at the DOC?"

"If not kept there forever, where did medical

records -- are they destroyed after a certain time frame?"

"Were only medical records removed from the locked file during your time" -- I'm sorry. "Were any medical records removed from the locked file during your time of employment with the DOC? If not, what happens when a locked file cabinet is full?"

"Do you normally sit in on phone calls to get more information about incidents with the HR team member? If no, what was the reason you sat in on this particular call?"

And finally, "Ms. Shelby, it was in 2016. Any program in the Cook County sheriff correctional that would help an officer in the case that he or she would have some day problem" --

MS. MARMOR: One day, I think?

THE COURT: -- "one-day problem with another coworker? Any person or office that would call both sides of the conflict and find a way to work their differences?"

"Why Officer Nawara was not given the opportunity to hear his side of the problem?"

MS. MARMOR: Okay.

(End of sidebar proceedings.)

THE COURT: Ms. Shelby, if an employee is called in for an interview and it is determined that he or she is receiving treatment for a mental condition, would that person still be recommended for an FFD?

THE WITNESS: It depends on if -- if they were actively seeing a provider, a lot of times I would talk with them, ask them, could we reach out to the provider to let them know that they were going through a fitness-for-duty evaluation. If they had a far-off appointment, could they move the appointment up to this week or in the next few days, because we felt like the person needed to be evaluated.

But the key with the fitness-for-duty evaluation was, you didn't want to send someone if their provider was not saying that they were medically stable, because if they were not medically or mentally stable, they shouldn't go to a fitness-for-duty. They should first have been -- if they were seeing a provider, so their provider said that they are fit to do their job functions.

THE COURT: Okay. If an employee is already seeking and obtaining treatment for an issue, is the treating physician considered independent or not?

THE WITNESS: It's not considered an independent evaluator because it's their doctor. From my understanding, an independent doctor should be one that does not have a relationship with the employee or with the County. It should be an independent doctor coming in, evaluating it with no biases whatsoever. They are just coming in, looking at a new person, a new, blank individual.

THE COURT: And that's why Dr. Shaw was not

considered independent? He was --

THE WITNESS: Correct.

THE COURT: All right. If an employee is being treated by a physician, would you still get information from that physician to determine the employee's ability to work?

THE WITNESS: I'm sorry? Can you repeat that.

THE COURT: If an employee is being treated by a physician, would you still get information from that physician to determine the employee's ability to work?

THE WITNESS: I guess -- I wonder, are you asking if they are being treated by a medical physician?

THE COURT: I think a medical physician.

THE WITNESS: Yeah. If they were being treated by a medical, especially their primary care, because their primary care physician is the gatekeeper for all the doctors. So even if you have consults, they all have to go through that primary care physician usually. That's the gatekeeper.

THE COURT: Before working at the CCSO, did you work with any patients who had mental deficiencies?

THE WITNESS: I have.

THE COURT: And did you consult with a mental health or behavioral health professional before making a decision with Ms. Reierson to send Mr. Nawara out for an FFD?

THE WITNESS: No, we did not.

THE COURT: Why not?

THE WITNESS: That was not our practice. If we were going to send them, we were sending them directly to the mental health provider to be evaluated. We wouldn't have a conversation with a mental health provider and then send them to a mental health provider.

THE COURT: If an employee is found to need an FFD and that employee has a physician he or she is currently receiving treatment from for the condition for which the FFD referral would be, would they be allowed to skip that CorVel process and return to work immediately?

THE WITNESS: If their doctor that was treating them was willing to sign off and say that, once again, that they are treating them and this person is being treated with them and they are good to return to work.

THE COURT: That would be okay?

THE WITNESS: Yes.

THE COURT: All right. You told us in the meeting with Mr. Nawara that a sheriff was posted outside your office.

Did that person come in to check on things due to the noise level, or could -- of the meeting with Mr. Nawara, or could he not be heard outside the door?

THE WITNESS: I don't recall that. I don't recall if they came and knocked on the door. They wouldn't have probably just barged in. They would probably knock on the

door and said, "Is everything okay in there?" But I don't remember if that occurred during that conversation or not.

THE COURT: Did you inform the sheriff to keep watch, or did you keep the door open?

THE WITNESS: I did not. And the reason I did not was, once again, I was still asking him personal questions. I had not concluded the interview. So even though he was getting loud, I -- opening up the door would be the same as a doctor doing an evaluation of you with the door open. I couldn't open up the door if I'm going to still ask him personal questions concerning his mental health or any questions that I was having.

THE COURT: How long are medical records retained at the DOC?

THE WITNESS: That, I don't know.

THE COURT: So you don't know whether they are kept forever?

THE WITNESS: That's true. I don't know.

THE COURT: And were any medical records removed from the locked file during your time of employment with DOC?

THE WITNESS: Not that I recall.

THE COURT: And you don't know what happens when a file cabinet gets completely full?

THE WITNESS: I do not.

THE COURT: Do you normally sit in on phone calls

to get more information about incidents with an HR team member?

THE WITNESS: I'm sorry, your Honor. Can we go back to that last question?

THE COURT: Sure.

THE WITNESS: I do remember, we did have -- our locked cabinet did get full, and I received another cabinet.

THE COURT: You got an empty locked cabinet?

THE WITNESS: I got an empty cabinet, but I kept that cabinet, so I just added on another cabinet.

THE COURT: Okay. Do you normally sit in on phone calls to get more information about incidents with the HR team member?

THE WITNESS: If it was in relation to a fitness-for-duty, yes.

THE COURT: Okay. And was there, in 2016, any program in Cook County that would help an officer in case he or she had a one-day problem with another coworker?

THE WITNESS: We had peer support in place to help employees.

THE COURT: Okay. That was a person or office that you could call -- that both sides of the call could -- the conflict could call and find a way to work things out?

THE WITNESS: Correct. And it was kind of -- or if they were having any sort of issues, they could reach out to

this department. It, I believe, had a social worker, part of the team, plus it had other officers. So they were more equipped to understand what the officers were going through on a day-to-day basis.

THE COURT: And why was Officer Nawara not given an opportunity to be heard -- to have his side of the situation be heard?

THE WITNESS: He was. That was the whole purpose of him coming to the meeting in my office. Officer Nawara chose not to participate, chose not to communicate, and chose just to not communicate or participate, and not to answer any questions in relationship to his side of the story. I welcomed that. That's what I wanted. I wanted to know his side of the story.

THE COURT: Any other questions, ladies and gentlemen?

Ms. Marmor?

MS. MARMOR: Just a brief one.

FURTHER REDIRECT EXAMINATION

BY MS. MARMOR:

Q. I just want to make sure we understand the answer to one of your questions where you were talking about, if an employee is already seeing a treater for some problem -- that could be an emotional problem, let's say -- and you could take a note from that doctor, would that note from the doctor

basically say, "Yes, I'm treating this person, but they are not -- this person -- I can vouch that this person is able to perform the essential functions of the job"?

A. Correct.

MS. MARMOR: That's my only question.

THE COURT: Ms. Kamper?

MS. KAMPER: Nothing, your Honor.

THE COURT: And Mr. Bustamante?

MR. BUSTAMANTE: No, your Honor.

THE COURT: All right. Ms. Shelby, your testimony is completed. You may step down.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: We will take a lunch break now. It's 12:30. We will resume at 1:30.

Ladies and gentlemen, I am going to be pushing on until about probably quarter to 4:00 today. We will have to break a little early for an event that we are having down the hall.

All right. All rise.

(Jury out at 12:33 p.m.)

THE COURT: Before we recess, just to get some closure on one of the things that we were looking at, and that was this -- I think we had kind of made some determinations about defendants' instruction on Page 25 of

their set and Plaintiff's No. 20.

And I think -- just to finish the loop, I think we had decided we would use the language of the statute. And the last paragraph of both proposed instructions is identical. So obviously we can use that.

All right. After my event this afternoon, we could resume and talk more about instructions.

MR. LINDEN: Okay.

MS. MARMOR: Your Honor, just so everybody knows, I promised Dr. Goldstein she would start at 1:30. Luckily that will work out.

THE COURT: That's perfect.

MS. MARMOR: I just got an email that she is on a train that's slightly delayed. So she said she would get here by 1:35.

THE COURT: Well, I'll tell you what. We will assume that she will be here at 1:35. That should be fine. If it's going to be a lot later than that, we can go back to instructions.

MS. MARMOR: Or we could also do a designation.

THE COURT: That's true. That's right. Okay. Good. Thanks.

(A luncheon recess was taken at 12:35 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward______________________________March 29, 2020.
Official Court Reporter
F/j