IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 17 C 2393 |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF COOK, a unit of local government, et al., | ) | Chicago, Illinois |
| | ) | March 3, 2020 |
| Defendants. | ) | 1:35 p.m. |

VOLUME 7B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER,
and a jury

APPEARANCES:

For the Plaintiff: LINDEN & BUSTAMANTE
BY: MR. RICHARD F. LINDEN
MR. PETER V. BUSTAMANTE
17 North State Street, Suite 1550
Chicago, Illinois 60602

For the Defendants: SCHARF BANKS MARMOR LLC
BY: MS. SARAH R. MARMOR
MS. SUZANNE M. ALEXANDER
MR. MORGAN G. CHURMA
333 West Wacker Drive, Suite 450
Chicago, Illinois 60606

HON. KIMBERLY M. FOXX
STATE'S ATTORNEY OF COOK COUNTY
BY: MS. JOI KAMPER
500 Richard J. Daley Center
Chicago, Illinois 60602

Court Reporter: FRANCES WARD, CSR, RPR, RMR, FCRR
Official Court Reporter
219 S. Dearborn Street, Suite 2524A
Chicago, Illinois 60604
(312) 435-5561
frances_ward@ilnd.uscourts.gov

# I N D E X

Examinations:

**DIANA GOLDSTEIN**

- DIRECT EXAMINATION
By Ms. Marmor......................................1595
- CROSS-EXAMINATION
By Mr. Linden......................................1624
- VOIR DIRE EXAMINATION
By Mr. Linden......................................1630
- VOIR DIRE EXAMINATION
By Ms. Marmor .....................................1636
- VOIR DIRE EXAMINATION
By Ms. Kamper......................................1643
- CROSS-EXAMINATION - Resumed
By Mr. Linden......................................1646
- FURTHER CROSS-EXAMINATION
By Mr. Linden......................................1664

**ROBIN KROLL**

- DEPOSITION.......................................1667

THE COURT: We will take another look at instructions.

(Brief pause.)

THE COURT: Okay. Back on the record.

We were just examining Defendants' Instruction No. 4 as compared with Plaintiff's No. 20. So let's move on to Defendants' No. 25, the elements of the ADA claim.

I think the first two paragraphs are consistent with the plaintiff's; is that right?

MR. LINDEN: Yes, except for -- let's see. I guess our 20 has "One of the claims brought by the plaintiff" rather than "Plaintiff has brought this lawsuit." That seems to imply or could cause confusion that that's Mr. Nawara's only claim.

MS. ALEXANDER: I think we are on to the next one. I think we're on to 21.

THE COURT: I'm on Plaintiff's 21 and Defendants' 25.

MR. LINDEN: Oh, okay. Plaintiff's 21.

MS. ALEXANDER: So, your Honor, it looks like plaintiff split this one up into two instructions --

THE COURT: Right.

MS. ALEXANDER: -- elements for a fitness-for-duty and elements for release of medical records. We put it as --

THE COURT: You put it as one.

MS. ALEXANDER: -- as one.

They both go to the ADA claim. So I really don't know why we need two different instructions for it when they are really the same on plaintiff's instructions, but --

MR. LINDEN: Because we have two.

MS. ALEXANDER: Also, the fitness-for-duty assessment, your Honor, they are calling that a disability-related inquiry. I think it's a medical examination.

MR. LINDEN: I think under the case law, it's real clear. I almost think the jury should be instructed that it is. The case law is very clear. If you look at the --

MS. ALEXANDER: Well, you --

MR. LINDEN: Please let me talk.

If you look at the *Wright* case, it says fitness-for-duty exams are medical-related inquiries. So are basically requiring a release form. So I don't know they can argue not.

THE COURT: What's the specific dispute?

MR. LINDEN: I guess we broke it up in two --

THE COURT: Right.

MR. LINDEN: -- on that. I think it is well defined in the first one. I mean, we're not --

THE COURT: Okay. So 21 relates to a fitness-for-duty examination, right?

MR. LINDEN: Correct. And because elements are a "disability-related inquiry," I put according to the case law, but it seems like there really can't be a genuine dispute whether or not their requirement is a disability-related inquiry.

Under the law, then you shift -- the burden shifts to the sheriff's office to show that it's job-related and a business necessity.

We did -- just for safety reasons, did put that we have to prove that it's a disability-related inquiry, but I think it's -- at least after then to the case, I think we can have the jury instructed that this has been proven already, that it is, as a matter of law, a duty -- "disability-related inquiry or inquiries."

I don't know if they have any dispute on it. I don't know how you could possibly argue otherwise.

MS. ALEXANDER: Your Honor, we would dispute it.

THE COURT: Here is my problem with both sides' proposals.

Maybe I just misunderstand this, but it appears that both sides begin by saying that, "Mr. Nawara has to prove by a preponderance of the evidence that the Cook County Sheriff's Office made a disability inquiry or inquiries by requiring a fitness-for-duty examination."

MR. LINDEN: Correct.

THE COURT: And that's it.

In other words, any employer that ever makes a disability-related inquiry is liable. That's not what you mean.

MR. LINDEN: No, but that's the first step. If you look at the case law, then you go to the next step.

THE COURT: Remember that the jurors aren't going to be looking at the case law. They are going to be looking at the instruction, and what they are going to read is that all he needs to do is prove that the Cook County Sheriff's Office made a disability-related inquiry by requiring a fitness-for-duty examination and he succeeds.

MS. ALEXANDER: No.

MR. LINDEN: I believe if you look at the second part of Plaintiff's Instruction No. 21, I think it clarifies it and makes it clear.

THE COURT: I don't think it clarifies it. I think that you have to say, to succeed on his claim, he would have to first prove and then can prevail only if, or something like that.

As worded right now, that sentence suggests that any disability-related inquiry is *ipso facto* a violation of the law.

To be honest with you, the defendants' instruction falls into the same trap.

MS. ALEXANDER: Well -- right. We can definitely edit that, your Honor. But I think -- right. It's -- first, the plaintiff has to prove their burden, and then we have to prove -- defendants have to prove -- we can only prevail if defendants prove that it was justified -- demonstrate that it was justified by a business necessity or a job-related inquiry.

MR. LINDEN: That's a problem we have with the "job-related inquiry." What does that mean?

MS. MARMOR: That's straight out of the law.

MR. LINDEN: That comes back to our objection that the instruction before that, that that only applies to voluntary. I do think it would be a mistake to instruct the jury on that aspect when there is no evidence that --

MS. ALEXANDER: We can --

MR. LINDEN: If you could please not interrupt.

MS. ALEXANDER: Sorry.

THE COURT: Go ahead, Mr. Linden.

MR. LINDEN: Thank you, Judge.

I think it just would confuse the jury. There is no evidence here that it was a voluntary request for either medical records or a fitness-for-duty exam.

They said, if you don't submit to both of those, you can't work and you can't go through with the process. You are going to be unauthorized and ultimately fired.

So I don't know how in the world there is any evidence where they could possibly argue that it was voluntary to arguably make that second -- you know, the words in the Part B applicable here.

MS. ALEXANDER: Your Honor, first of all, that was just testified to this morning, number one.

Number two, that's for the jury to decide.

I'm sorry that I interrupted you, but what I was going to say is, we could maybe just put the language of the statute in.

THE COURT: That's exactly what I think we should do.

By the way, Mr. Linden, if you feel the expression "job-related" is improper, your argument is with Congress. That's the statute. That's what the statute says.

MR. LINDEN: But it only --

THE COURT: They use the word "job-related."

MR. LINDEN: But it only applies to voluntary. And by putting both, they are going to try -- I'm sure they are going to try and argue that they really don't have to prove a business necessity. If you look at all the case law, that's what the case law says, interpreting it.

THE COURT: Why not simply say what Congress has said? The employer "shall not require a medical examination and shall not make inquiries of an employee as to whether

such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

"If you find that plaintiff has proven the employer violated this provision, your verdict should be for the plaintiff. If you find that" --

MR. LINDEN: That was fine the way you read it, but I don't think you read the one part where they put in that Subsection -- what is it? -- (B).

THE COURT: That's right. I am happy to include that as well.

An employer "may conduct voluntary" --

MR. LINDEN: We don't -- just to make clear, we do not want that included. That's the basis of our objection, that that provision only applies arguably to voluntary requests. There is no evidence in this case that it is voluntary. It's either do it or else, or you are going to be fired.

MS. MARMOR: Your Honor, that's --

MR. LINDEN: Now they are going to try and argue that they really don't have to prove business necessity. And if you look at the *Wright* Seventh Circuit case, they are very clear. They said it's job-related and a business necessity.

I understand how your Honor ruled, but I obviously

want to preserve it for the record.

THE COURT: You are welcome to preserve the record.

Paragraph (B) should also be used. "A covered entity" -- that's an employer -- "may make inquiries into the ability of an employee to perform job-related functions."

MS. MARMOR: Yes.

MS. ALEXANDER: It doesn't state that it only relates to voluntary; but, again, that's for the jury to decide if it was voluntary.

THE COURT: I really think that we cover our bases here if we simply use the language of the statute and then ask the jurors to decide whether a violation has been shown.

MS. MARMOR: Your Honor, the witness is here.

THE COURT: Good. Let's bring in the jurors.

(Counsel conferring.)

MR. LINDEN: I think the best way is for both sides to submit their own instructions just to preserve it for both sides.

THE COURT: Well, that's already been done. I mean, it's in the record.

MR. LINDEN: Okay.

THE COURT: But I think what we should do is redraft it and just use the language of the statute.

(Jury in at 1:45 p.m.)

THE COURT: I will ask the witness to step forward

as well.

I will ask you to raise your right hand.

(Witness sworn.)

THE COURT: All right. You may proceed, Ms. Marmor.

MS. MARMOR: Thank you, your Honor.

Dr. Goldstein, before we start, I know you said you wanted some water.

I don't know if there is any in there, but I do have a bottle of water, if that's okay?

THE COURT: Sure. That's fine. I think there actually is some, but I'm sure there are any cups.

DIANA GOLDSTEIN, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. MARMOR:

Q. Good afternoon, Dr. Goldstein.

A. Good afternoon.

Q. Thank you for coming today.

Could you introduce yourself to the jury.

A. Sure. My name is Diana Goldstein. D-i-a-n-a, G-o-l-d-s-t-e-i-n.

I'm a clinical neuropsychologist, and I conducted a fitness-for-duty exam on Mr. Nawara.

Q. Could you just pull the mic toward you a little bit.

Great. Thank you very much. People have been

having trouble with it. Does that work?
A. Better?
Q. I think so, yes.
So you actually anticipated my question.
Did you perform a fitness-for-duty examination on John Nawara in September of 2017?
A. I did.
Q. And did you find him fit for duty without restrictions?
A. I did.
Q. So before we get further into your work, could you explain to the jury what your credentials are for performing fitness-for-duty examinations.
A. Sure. I own two practices in Chicago. One is a clinical practice, Michigan Avenue Neuropsychologist, where we see people with all kinds of mental health and neurocognitive disorders.
The Isaac Ray Forensic Group is a second practice, where there is no doctor-patient relationship there.
There are really two types of exams that we do there. We have a public safety program, which I'm the director of. That is everything from prehire screening to fitness for duty, worker comp, and pension disability, the whole gamut.
We will see people who want to get into law enforcement -- that can be corrections as well -- and

firefighters, EMTs, 911, things like that. And we are there to assess -- not treat -- assess whether they are a good fit. Public safety is not for everybody, as we always say.

And the other part of what we do is, we see criminals who are involved in various levels of adjudication. They might be pretrial. They might be presentence or what have you. And if there is some mental health issue, we may be asked to be involved in that case and provide some information to factfinders, be that a jury or a judge, at that point in the exam.

Q. Okay. You said, "public safety is not for everybody."

What do you mean by that?

A. Well, when we are doing prehire screening, there are certain characteristics that we like to see -- low anxiety. I always say I could not be in public safety. It's not for me. I run a little too high that way. People need to be calm under pressure. They need to be able to work well together. They need to be able to handle people who are agitated and may be intoxicated out on the street.

In the jail setting or the prison setting, that would be handling and separating people who are fighting, perhaps anticipating somebody is getting agitated, recognizing that.

And then outside of the direct detainee type of contact, you also have being able to work with coworkers,

back each other up, being able to work with supervisors, report things to them that are problematic, et cetera, and do one's job in a safe and effective manner.

Q. Who hired you to perform the fitness-for-duty exam on Mr. Nawara?

A. So it was a third-party administrator, as we call them. I was not directly contacted by the County. It was CorVel, I believe.

They call them an IME, an independent medical or psychological evaluation. And they provide us whatever information the County would like for them to have, and then we do our examination.

Q. Are you -- what are your academic credentials?

A. Yes. I have a dual degree from the University of Wisconsin-Madison in psychology and French literature and civilization. So I doubled. I have a degree from the Sorbonne in French literature.

And I went on to be accepted into a doctoral program in clinical psychology with a distinct track in neuropsychology. And that was at what was then called the Chicago Medical School. It's now the Rosalind Franklin University of Medicine and Science.

I did an internship at the Yale West Haven Veterans Administration Center in Connecticut, and then a post-doc, a two-year post-doc. That was in neuropsychology, and so was

my two-year post-doc at the University of Chicago.
Q. So are you a medical doctor or something else?
A. Right. So I'm not a physician. I'm a Ph.D.
Q. And did you have -- going back to the question of who hired you, did you have any contact with anyone from the sheriff's office in the course of doing your FFD work in this case?
A. I did not.
Q. Are FFDs for the sheriff's office a major source of income for you?
A. No.
Q. Approximately how many FFDs have you done in your career for the sheriff's office, if you can recall?
A. We don't break them down like that. I'm afraid I don't really know. I have done over 100 fitness-for-duty exams in general. A handful would be for the County. That's it.
Q. Okay. I would like to talk just a little bit about what you were provided in this case for purposes of your FFD.
I am going to show you a document that's already in evidence. We will put it up here. You will be able to see it on the screen. Okay?
A. Great.
Q. So this is Defendants' Exhibit 51. It was produced in this case, but we will start with the email, an email dated Friday, September 8th, 2017, from Michelle Sarocka to you.

Do you remember who Michelle Sarocka is?
A. I believe she is a nurse case manager or some type of manager over there. She is the one who makes the referral to me.
Q. From CorVel?
A. Yes.
Q. Okay. We are going to skip the first line, because it doesn't have anything to do with this case.
The second line says, "Attached is the FFD letter to you for John Nawara, who will be there Monday, the 11th, for testing and Tuesday, the 12th, for the interview" for "you. I've also attached all of the medical information we have for him."
And do you see the list of things that she sent you?
A. Yes.
Q. Okay. So that included a referral form.
Do you see the Nawara referral form right here (indicating)?
A. Right.
Q. Are referral forms something that you consider in doing an FFD exam?
A. Sure.
Q. And why?
A. Well, one wants to ensure that it is an appropriate

referral. Also, it provides just a very basic idea of why this person is being sent. What prompted the exam? What's the major issue?
Q. Why do you want to ensure that it's an appropriate referral?
A. Well, over the years -- by the way, 99 percent of the time I receive a call from a police chief or someone from HR or both. And that's how I do my intakes for these.
So there have been times, particularly during the first ten years of my doing this -- I have been at this for over 20 -- where there were inappropriate referrals. In other words, oftentimes it was a punitive process. People were sent -- rather than having been disciplined -- perhaps the department didn't want to deal with it -- "Send this person for a fitness-for-duty," and I would refuse to take those cases.
Q. Did you refuse to take this case?
A. No, but this was sent to me in a slightly different manner. And perhaps I will anticipate your question. I felt it was appropriate based on the information I had at the time.
Q. Okay. So you accepted it?
A. I did.
Q. Did you understand in this case that the referral was based on two different sets of incidents?

A. Yes.
Q. One of them was the events in Cermak on September 28, 2016?
A. Right.
Q. And then there was also events in HR on November 18, 2016?
A. Right.
Q. Now, additionally, you had information provided by Supt. Jones-Hayes regarding the incident that occurred.
Do you see that?
A. Yes.
Q. Is that the kind of thing that you would want to review in doing an FFD examination?
A. Sure.
Q. And why?
A. Well, normally I have access to a full record, a full personnel form, which I -- I'm sorry -- a full personnel record going back to when an individual first started. Those contain write-ups from sergeants, lieutenants, people who have supervised them, you know, their performance evaluations, any concerns they might have, et cetera. So if there is a critical incident, the write-up from that is important.
Q. And if you had wanted more information, could you ask for it in this context?
A. Not really. I asked if I could have the full personnel record, and they were not willing to provide that for me. So

I indicated in my report, as you know, there were some limitations there. But I also indicated what Mr. Nawara himself told me about his disciplinary record. I just could not confirm it.

Q. So based on the information that you had, you felt comfortable making the assessment that you did in this case, that he was fit for duty?

A. With that qualification, yes.

Q. Sure.

And then you were given some progress notes from a Karolina Hogueisson.

Do you see that, three progress notes?

A. Yes.

Q. And is that something that you would consider in doing an FFD exam?

A. Well, that's treatment. A progress note about treatment for mental health issues are obviously relevant.

Q. Okay. And you got medical records from a Dr. Charles Shaw.

Do you see that?

A. Yes.

Q. Why would that -- would that be relevant to an FFD exam?

A. Critical.

Q. And why is it critical?

A. Well, also critical is that these medical records are

prior to any alleged incident that occurred. So if one is concerned about a mental health disorder or a behavioral disorder or a neurocognitive disorder, anything, even a medical condition that might impact someone's behavior at work, you would expect that a primary care physician, who was often the first-line treater or assessor of someone -- particularly in public safety, they are required to go annually or even semiannually, depending on what's going on with them -- you would expect to see information there that could shed light on this person's history. That would be totally relevant.

Q. Do you have a preferred number of years of records that you like to get for an FFD?

A. I always beg for ten, and I'm happy to have five.

Q. Okay. And the final thing that was sent was a job description for a correctional officer.

Do you see that?

A. Yes.

Q. Is that something that you would find useful in doing an FFD exam?

A. Always. One has to have it. I have read a million of them. But, yeah, one always has to have that.

Q. Why do you always have to have that?

A. Well, first of all, if you are unaware of what the job is, you have to assess what it means when someone says

"safely and effectively do their job." What are we referring to here?

So it's important to look at everything that that individual is tasked with doing on their -- in their day-to-day work life.

Q. So I would like to look at the actual referral that was attached and just ask you a couple of questions about that.

Is this -- this is from the same set of documents. It says, "Reason referring: Employee's aggressive, physically intimidating, and inappropriate behavior directed toward his superior officer in response to a routine directive. In addition, weeks later employee presented as aggressive and hostile in the human resources department."

I take it you read that at the time?

A. I did.

Q. And then it has two bullet points.

And the first is -- and they seem to be questions -- "Looking to determine if employee is able to perform the essential functions of his job, which require he maintain composure and respond appropriately in a high-stress environment, including exhibiting proper behavior toward detainees and his superior officer. Position requires this individual can defuse disruptive behavior verbally and, if escalated, effectively and properly use limited force on problematic and combative inmates."

The second bullet point or question says, "Employer has concerns about anger management, including his ability to manage a detainee population without losing his temper."

Do you see that?

A. Yes.

Q. Were the referral questions, as far as you could see, having looked at his job description, related to Mr. Nawara's job?

A. Sure.

Q. Was your examination related to whether or not Mr. Nawara could perform the essential functions of his job?

A. Can you be more specific?

Q. Were you trying to figure out whether, in fact, he could safely and effectively perform the functions that were laid out in his job descriptions -- or description?

A. Well, the purpose is to assess whether there is any kind of mental health disorder, neurocognitive disorder, or other condition that might impact their ability to do their job safely. So it's really both.

Q. Okay. That's fine.

So then did you meet with Mr. Nawara?

A. Yes.

Q. I saw in the referral there was a discussion of two -- a meeting on the 11th for testing and on the 12th of September for the interview.

Why are those over two separate days?
A. Sure. That's our typical evaluation, no matter who we are seeing. Even clinically sometimes we will do that, and it's simply because there is just so much to do.
We do a clinical diagnostic interview, which, in this case, was three hours with Mr. Nawara. But we never know. Sometimes they can go four to six, you know. It just depends how complicated the history is or, frankly, how circumstantial the individual is.
And then we do two types of testing.
The cognitive testing always takes at least four hours. It could be longer if we are looking at academic achievement. That was not relevant in this case. So I spent four hours doing that.
And then three and a half hours of psych testing. It just takes a long time. Some people can take a whole day to complete psych testing. He completed things at a normal pace.
But that's the reason we set aside two days, so no one feels rushed.
Q. So just so I'm clear, four days the first day, three and a half -- I'm sorry -- four hours the first day and three and a half hours the second day?
A. Seven and a half hours of testing the first day.
Q. Oh, okay.

A. Four of cognitive, three and a half of psych.

And then the interview was three hours. I don't believe he had any psych to complete that day, but that's one of the reasons we give ourselves wiggle room like that. But I think he completed all of that in the first day.

Q. Okay. When you met with Mr. Nawara, did you give him an opportunity to tell you his version of the events that led to his referral for an FFD?

A. Absolutely.

Q. And did you get the sense that he was free to tell you whatever he wanted to tell you?

A. I always say, "I'm just going to let you have the floor. Tell me, in your own words, what happened here. Why are you here?"

Q. And was he able to describe why he was there?

A. Yes.

Q. And did you take a position at any time about -- I mean, I understand that you had Supt. Jones-Hayes' statement and you had all of this time with Mr. Nawara.

Did you take a position, one way or the other, about who was telling the truth about what happened?

A. Not at all, and I would never.

Q. And the same question with HR.

You didn't have a lot about HR, but did you take a position, one way or another, whether or not he, in fact, was

hostile and aggressive in HR?

A. No.

Q. Now, during his description of the events that led to his referral, did he report to you that on the day in Cermak, in September, that Supt. Jones-Hayes had been critical of him?

MR. LINDEN: Objection. Leading.

THE COURT: Overruled.

BY THE WITNESS:

A. The way he described it to me was that she seemed annoyed when she came in. And there may be a difference of opinion as to why she was actually annoyed. She, in her write-up, says one thing. His perception was another. But either way, it sounds like his perception was, she wasn't happy.

BY MS. MARMOR:

Q. Can I just -- I am going to show you something to see if this refreshes your recollection. First, I will show it to you.

The question is: Do you remember that he was basically saying she was critical of him?

I am just going to show this to you to see if that refreshes your recollection.

(Document tendered.)

BY THE WITNESS:
A. Sure. This just doesn't tell the whole story. That's from my deposition.
BY MS. MARMOR:
Q. But, in fact, was she -- something that he was telling you was that she basically was being critical of him?
Including all these other things, but did he feel that she had criticized him?
MR. LINDEN: Objection. Leading.
BY THE WITNESS:
A. She thought -- he thought that --
THE COURT: It's not leading.
Go ahead.
BY THE WITNESS:
A. -- she was annoyed because of something that she would have been critical of that he either had done or had failed to do at that time, yes.
BY MS. MARMOR:
Q. Okay. Did he tell you, in your interview, that he thought that Supt. Jones-Hayes and Nurse Winifred Shelby were personal friends?
A. He did believe they were.
Q. Did you understand that to be his perception, whether or not it was true?
A. Right. And it's not my job to determine if that is so.

Q. And did he tell you that, in fact, some parts of what Ms. Jones-Hayes had said were true, like that he had, in fact, gone into ER after the initial confrontation about some shackling issue?
A. Yes.
MR. LINDEN: Objection to form and leading. She should ask, what did he tell her, instead of the way she is going about this.
MS. MARMOR: Your Honor, we will be here for five hours if we do that.
THE COURT: I think you can ask her what he told her.
BY MS. MARMOR:
Q. What did he tell you about --
MR. LINDEN: I just want to leading -- "about." If she wants to establish foundation --
MS. MARMOR: Could I get my question in?
THE COURT: The question, "What did he say?" is way too broad.
Overruled.
BY MS. MARMOR:
Q. Did you have a conversation first about what happened in the control room?
A. Yes.
Q. And then did you have a conversation about what happened

after he and Supt. Jones-Hayes left the control room?
A. Yes.
Q. And did you have a conversation about what might have happened in ER sometime thereafter?
A. Yes.
Q. And did Mr. Nawara tell you anything about having -- did he tell you that he went into ER?
A. Yes.
Q. And did he tell you why he went into the ER?
A. I would need my report to refresh my memory, I'm afraid. I don't want to say anything incorrect.
(Document tendered.)
BY THE WITNESS:
A. Thank you. Just give me a moment.
BY MS. MARMOR:
Q. Sure.
(Brief pause.)
BY THE WITNESS:
A. I'm sorry. Can you repeat your exact question?
BY MS. MARMOR:
Q. Sure. Did he tell you why he went into the ER that day, or the triage area? He may say "triage area." I'm not sure.
(Brief pause.)
BY THE WITNESS:
A. So I'm not exactly sure in what area it happened, but I

think what you are asking me is, Sergeant Jones-Hayes was concerned about a number of things that she saw when she came in.
Q. Superintendent.
A. Sorry. I apologize.
Q. It's okay.
A. And one of them was that there were some unshackled detainees. And Officer Nawara agreed that that was an issue, a safety issue.

And she did ask why one of the detainees was unshackled. He had apparently just been brought in.

Officer Nawara said, "Look, you are going to have to talk to this one officer who just brought him in."

She then asked him to please shackle him.

And I believe that's when he ultimately did shackle the individual while she watched him. And then I believe he followed her -- I'm not sure if I have this in the correct order. But then I believe he followed her to say, you know, "Are you going to follow me around all day while I do my job?"
Q. So he told you about that?
A. Right.
Q. Did he acknowledge that there had been any difficulties in the human resources meeting that he had?
A. Yes.

Q. What did he say about that?
A. Well, he said it went south from the start. That's really his -- those are his words. It went badly from the start.
Q. Okay. Now, you were doing the fitness-for-duty exam nearly a year after Mr. Nawara had his altercation with Ms. Jones-Hayes in Cermak and about ten months after his HR meeting, correct?
A. That's right.
Q. And is it possible that there were things going on in his life at that time, a year earlier, that could have caused him to be having issues that you wouldn't know about unless he told you about them?
MR. LINDEN: Objection. Form; speculation.
THE COURT: Overruled.
You may answer.
BY THE WITNESS:
A. Well, we always ask people about personal stressors. That's a very legitimate question. We want to know about everything that might impact someone's behavior, their mood, their anxiety level, et cetera. And he denied that there were any major stressors.
Are we talking about since he had been off work --
BY MS. MARMOR:
Q. No. I mean --

A. -- or at the time of the incident?
Q. At the time of both incidents.
A. Again, I don't recall anything like that.
Q. So he didn't tell you -- do you think you asked him about whether or not something was going on at that time?
A. I absolutely would have. I'm afraid, without my report -- but I don't think so, as I sit here right now.
Q. You don't think that he told you that anything was going on?
A. Right.
MR. LINDEN: Objection. Asked and answered.
THE COURT: The answer is in the record.
Let's move on.
BY MS. MARMOR:
Q. And you were aware that he was not cooperating with the sheriff's office request that he take an FFD for about ten months, correct?
MR. LINDEN: Objection to the form of the question. Argumentative.
MS. MARMOR: I think it's -- I mean, it's clearly in evidence, your Honor.
THE COURT: Overruled.
You may answer.
Were you aware of that?

BY THE WITNESS:
A. I was aware that he took issue with what he was being asked to do at the time. So he, therefore, was not following through in the manner in which HR had hoped he would.
BY MS. MARMOR:
Q. Right.
And were you aware that Mr. Nawara sought his own FFD exam with a Dr. Robin Kroll?
A. Yes.
Q. Were you aware that Dr. Kroll had no information about the sheriff's office, about what their referral concerns were?
A. Absolutely.
Q. Were you aware that she also had no medical records?
A. Right.
Q. And did you rely on her opinions in reaching yours?
A. On her opinions? No.
Q. Now, there is no debate that you found Mr. Nawara fit for duty.
But did you also determine that he had traits of personality disorders that may shed light on his interpersonal reactions?
A. Let me be really clear. Traits of personality disorders is -- I would say certainly personality traits.
Q. That's fine. That's fine.

A. Yes.
Q. And what were those?
A. He has some what we would call obsessive-compulsive personality traits and also some narcissistic traits as well.
Q. Can you explain what those traits were that you found.
A. Sure.

Obsessive-compulsive traits, a person can be somewhat rigid in the way that they think. They are -- they can have a very high justice principle. Because of that way of thinking, they can have a real sense of right and wrong, a little black and white in the thinking. There is not a whole lot of gray, not a whole lot of in-between.

The narcissism, again, just traits. A person can be a bit grandiose, feel that they must take a stand on certain things, because they feel that it will not only affect them but could impact a system of policy or others who may walk their same path later.

And in general, Mr. Nawara described himself as a boy scout. You know, "I always want to do the right thing." And that's that way of thinking.

You know, it's those traits that can make a person somewhat sensitive to react, to feel slighted or disrespected, whether or not that's intended.
Q. And can those traits become a filter on the way they interpret things?

A. Well, I would say that's exactly what the definition of personality traits are. They filter the way we interpret and perceive the world.
Q. And could those traits, the traits that you perceived after doing your tests and having your interview with Mr. Nawara, could they render him particularly sensitive to criticism?
A. Sure.
Q. Can you explain what -- how that works.
A. Again, it's situation-specific. I mean, if someone is being disrespectful, they are being disrespectful. It's not that they can't recognize disrespect.
It's just that a person may be upset about something. We have all encountered someone who's upset. Whether you take it personally or not really depends on you and your personality and how you think about things.
You may tend to personalize them because you are a bit narcissistic. It's hard for you to take someone else's position and recognize that not everything is about you, and it may just have nothing to do with you.
Q. And can people with those traits react strongly to criticism?
MR. LINDEN: Objection to form.
THE COURT: Overruled.
You may answer.

BY THE WITNESS:
A. Sure, they can.
BY MS. MARMOR:
Q. And could that also lead to anger?
A. Sure.
MR. LINDEN: Objection. Form in general. There is no testimony, foundation that Mr. Nawara's purported anger had anything to do with these traits.
MS. MARMOR: Well, I think that's exactly what the --
THE COURT: You can explore that on cross.
Overruled.
BY MS. MARMOR:
Q. Dr. Goldstein, isn't it the case that you determined that Mr. Nawara's traits of personality disorders may shed light on his interpersonal interactions?
A. They may.
Q. Right.
Now, did you perceive that he had a propensity to defensiveness?
A. Not during our interview, not really. He did tend to minimize a little bit about some of the safety issues that were associated with what was going on in the basement of Cermak that day, particularly about the door being opened. He minimized, I think, the safety issues there. But that was

also his true perception of how safe or unsafe it was.

But on psychological testing, we can get a read objectively of how defensive a person is being, and there are a couple of ways of looking at that. One is whether somebody is minimizing normal human experiences and what we would call common human faults and shortcomings: I never lie. My table manners are just as good when I'm alone as when I'm with other people. We call it sort of Mother Teresa. But a lot of people do see themselves in that way. Priests, for example, would score highly on that, sort of a virtue type of index. And he scored highly on that.

The other thing was that he was defensive in coming across with emotional problems or behavioral problems, not unlike many people, I should say, going through personnel screening or fitness-for-duty examinations. He was not more defensive than typical, but it's nonetheless a somewhat defensive profile.

Q. And would people on the receiving end of his defensiveness understand that what's going on is simply personality traits?

MR. LINDEN: Objection. Speculation about what somebody else may or may not understand.

MS. MARMOR: I think she has got the basis to say that she has got the training to understand this in ways that other people do not.

THE COURT: Overruled.

BY THE WITNESS:

A. If I'm understanding your question correctly, you are asking whether someone on the receiving end of his defensiveness would or would not know that it was aimed at them or --

BY MS. MARMOR:

Q. Right. Would they be able to understand -- you have a deep understanding of the way that personality traits of obsessive-compulsive personality disorder and narcissistic personality disorder can play out.

But a layperson, would they be able to understand, oh, that's something -- this is a complex psychological situation. It's not just anger management?

A. I see. With that hypothetical set of facts, no, they wouldn't necessarily.

Q. And it took -- you brought to bear your training and experience to reach these conclusions that he has traits of these personality disorders, correct?

A. Yes. And that may have impacted that situation. It may have.

Q. I'm sorry. May have impacted?

A. It may have impacted the interpersonal interaction with Supt. Jones-Hayes.

Q. And with HR?

A. Sure.
Q. Did you find any symptoms of significant -- sorry.
Did you find any evidence of significant symptoms or significant life dysfunction for Mr. Nawara?
A. I did not.
Q. Did you find any evidence of any significant life dysfunction from any stress he may have been experiencing relating to his conflict with his employer?
A. Other than the stress associated with no longer being on the job and the financial stress that was secondary to that, no, if that's what -- no direct effects, if that's what you are asking.
Q. I'm just going to ask you to -- I asked you in your deposition: "Did you also find there was no significant life dysfunction from the stress that he reported from his difference of opinion, let's say, with his employer?"
And is your answer anything other than -- did you find that or not?
A. I think I understand. Sorry.
I didn't see any life dysfunction in any critical area of his life at any point.
Q. Including related to his conflict with his employer?
A. Right.
Q. And, in fact, did he deny that he was experiencing any major life dysfunction from stress?

A. He described some symptoms, although they didn't rise to the level of a psychiatric disorder.

But, yes, he denied any dysfunction in his daily life. We are talking about interpersonal relationships, work, taking care of one's household, hygiene, things like that.

Q. And did you review -- we looked at the fact that you were sent Ms. Hogueisson's notes as part of your FFD examination?

A. Right.

Q. Did anything in those notes give you any indication that, in fact, he was suffering from any major life dysfunction?

A. No. She didn't -- I see no diagnosis in her notes either.

Q. And do you see anything in the notes that say he is experiencing major life dysfunction?

A. I don't recall her exact notes. I don't think I summarized them in my report, but the bottom line from that -- the takeaway from that was that I didn't see anything like that.

Q. Okay. Did finding Mr. Nawara fit for duty mean the referral never should have been made?

A. Those two things aren't related.

MS. MARMOR: That's all I have.

THE COURT: Cross-examination?

MR. LINDEN: Yes, Judge. Thank you.

MS. KAMPER: No questions, your Honor.

THE COURT: Thank you, Ms. Kamper. I apologize.

CROSS-EXAMINATION

BY MR. LINDEN:

Q. Good afternoon, Doctor.

A. Hello.

Q. I believe your testimony was you have done over 100 fit-for-duty exams?

A. Sure.

Q. Have you ever done any on behalf of the Cook County Sheriff's Office before?

A. I think a handful over 20-some years maybe.

Q. And is it true that fitness-for-duty examinations should never be a substitute for discipline? Is that a fair statement?

MS. MARMOR: Objection, your Honor. I really think that's beyond the scope.

THE COURT: I will allow it.

You may answer.

BY THE WITNESS:

A. I would absolutely agree with that.

BY MR. LINDEN:

Q. Can you explain to the ladies and gentlemen of the jury

why that is?
A. I can explain my personal experience with it.
It's an abuse of the system. Fitness-for-duty should, in fact, be a good process. It's there to help people. It's there to help them keep their jobs. There may even be some protections under ADA, that one can't fire someone for the same thing that makes them unfit, in other words. That's not going to be true of every single type of mental disorder. If someone has major, major disorders, et cetera, then they no longer can be in public safety.
But generally speaking, I have had departments ring me, and it is so clear that they have a discipline problem on their hands and they just are not willing to handle it.
So I have told them, handle this with progressive discipline, up to and including termination. You have to -- you know, there may have been some missed opportunity to write this person up. I see it over and over and over again.
MS. MARMOR: Your Honor --
BY THE WITNESS:
A. Sending them to me is inappropriate in those situations.
MS. MARMOR: Could we have a sidebar for just one moment?
(The following proceedings were had at sidebar:)
MS. MARMOR: I am just concerned about -- she is bringing in all sorts of things that an expert would bring

in. I am worried that she -- because this is a witness who often is an expert witness, she may not understand the difference between being a fact witness and an expert here.

THE COURT: Well, some of the questions you asked her, I think, call for expertise.

MS. MARMOR: And I think that was fair, but I'm just worried about it. For example, when she is talking about ADA, I just get concerned about that.

MR. LINDEN: I should be able to ask my questions without being interrupted by counsel.

MS. MARMOR: I didn't interrupt.

MR. LINDEN: She's trying to anticipate what might be done. You heard her exam. It asked for a number of so-called -- I have yet to ask for an opinion. I can ask, I think, based on that.

(End of sidebar proceedings.)

THE COURT: You may proceed, Mr. Linden.

MR. LINDEN: Thank you, Judge.

BY MR. LINDEN:

Q. Now, you talked about that there are situations where there is inappropriate referrals for fitness for duties?

A. Yes.

Q. Do you recall that testimony?

A. Yes.

Q. And I think you indicated in this case with

Officer Nawara that, when you first received the referral, you thought it was an appropriate referral?
A. Yes, based on the information I had at the time.
Q. Okay. Did anything that you learned after that initial referral that came to you give you any concerns that this was not an appropriate referral?
MS. MARMOR: Your Honor, objection. This is -- that's asking -- I'm concerned that's getting into an area that we have a motion on.
THE COURT: Objection to this question is sustained.
BY MR. LINDEN:
Q. Are you trained to recognize what's an appropriate referral and what's not an appropriate referral?
A. Be more specific, please.
Q. What would be an inappropriate referral, based on your experience?
MS. MARMOR: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. LINDEN:
Q. Was the referral in this case, after you spent all this time with him on two occasions, was this an appropriate referral, based on your experience?
MS. MARMOR: Your Honor, same objection. This goes straight into the motion.

THE COURT: Why don't you ask specifics about the evaluation itself as opposed to impropriety of asking for it.

MR. LINDEN: I don't know why I can't ask my question, Judge. I don't see anything --

THE COURT: All right. Let's talk about it at sidebar, and I will explain my reasoning.

MR. LINDEN: Okay. Thank you.

(The following proceedings were had at sidebar:)

THE COURT: Here is my reasoning, Mr. Linden: We had a motion *in limine* on the very issue of whether or not this witness could testify about improprieties on the part of Cook County, and specifically the delays. They left him on the job. They left him carrying a badge. They left him holding a gun, et cetera, et cetera. We already talked about that in motions *in limine*. I don't want to revisit my rulings. I want to complete the case.

MR. LINDEN: But Ms. Marmor asked --

MS. MARMOR: I only asked if she accepted it.

MR. LINDEN: -- "Was it an appropriate referral?" She said, "At the time."

And now I can't ask the witness, you know, what she meant by it, "At the time"?

MS. MARMOR: No, your Honor.

MR. LINDEN: It just seems unfair.

MS. MARMOR: Because she has absolutely got no

foundation to do it, and that's why we filed the motion *in limine*.

MR. LINDEN: I'll make a foundation for it.

THE COURT: Okay. You know what? Here is what we need to do. We will have to excuse the jury, because if she says what I believe she is going to say, based on the motion *in limine*, it won't be admissible. Do you want to spend that time --

MR. LINDEN: Can I make an offer of proof, Judge, on this?

THE COURT: You may.

MR. LINDEN: Can I? And then maybe I could ask you to reconsider, based on her testimony, depending on what it is?

THE COURT: Of course.

MR. LINDEN: Is that okay?

THE COURT: Let's excuse the jurors.

MR. LINDEN: Okay. Thank you, Judge.

(End of sidebar proceedings.)

THE COURT: Ladies and gentlemen, I am going to ask that you step out for a moment.

(Jury out at 2:29 p.m.)

THE COURT: All right. You may proceed, Mr. Linden.

MR. LINDEN: Thank you, Judge.

VOIR DIRE EXAMINATION

BY MR. LINDEN:

Q. I think, Doctor -- just to establish foundation -- you indicated when you first got this referral, you thought it was an appropriate or a proper referral, correct?

A. Sure.

Q. And did anything cause you concerns to change your mind about that?

A. Yes.

Q. Can you tell us what it was?

A. Well, I subsequently learned that I really hadn't been provided full information and -- full context, perhaps, is a better way to say it -- for this exam.

I mean, there was a complaint apparently that was made against Supt. Jones-Hayes by Mr. Nawara. And here we have -- we don't get the write-up of that phone call -- the phone call between Supt. Jones-Hayes, Director Reierson, and Nurse Shelby -- of the 9-28 event until 48 days later. And two days after that he is sent for a fitness-for-duty, after he is called into HR.

I think the timing of it stinks, frankly.

Q. What do you mean by "the timing stinks"?

And how, based on your experience, would that lead you to conclude that it is somehow an inappropriate referral?

A. Let me say it like this: If I had had that

information -- if I had been talking to HR and realized that there was all of this interpersonal strife happening between the superintendent and Mr. Nawara -- even Supt. Jones-Hayes herself said in her write-up that she thought maybe this was an interpersonal issue between them and maybe he just had an issue with her.

And unlike the discipline that she was immediately able to tell Sgt. Conley she wanted meted out for the door being open, she never said anything about disciplining him for insubordination at that time. We get it 48 days later, just prior to him being sent for a fitness-for-duty and after this apparent complaint was made. I would have said, listen, you two need to work things out. If you have insubordination concerns, discipline him.

There is nothing to suggest at all that that arose out of a mental health disorder.

Q. Did the sheriff's office or anybody at the sheriff's office tell you that shortly after this alleged incident with Jones-Hayes on September 28th, 2016, that he was transferred to external operations, where he is allowed to work in Ex Ops for exactly 51 days until he came to HR?

Did they tell you that information?

A. Not only did I know that -- well, they didn't tell me. He did.

Not only did I have that information, but he --

literally the next day, after going to 2 North and South or 3 North and South, whatever it was, they put him right back in the basement of Cermak where he was.

So again, as I wrote in my report, my concern always was, how is there possibly a fitness concern here? One can infer there was not based on the fact that they put him right back to work.

Q. The fact that he was able to carry a gun and a weapon for 51 days before he is called into HR, based on your experience, would that be an indication that it was an inappropriate referral?

A. Any one of the positions, internal or external, at the jail would -- oh, I'm sorry. You are saying just -- sorry. Back up.

THE COURT: The fact that he was able to continue carrying a gun for 51 days, is that an indication that the referral was inappropriate?

BY THE WITNESS:

A. No, not that in and of itself, because that was prior to what happened on 11-18 in HR. I understand that that perhaps was a tipping point.

BY MR. LINDEN:

Q. What other factors in this case leads you to conclude that it was an inappropriate referral, aside from the time span until HR, carrying a weapon for 51 days?

Anything else that caused you to conclude that it was an inappropriate referral?

A. Well, I guess I would say that these incidents -- what happened in HR, somehow being suggested that that was so significant, I really -- I really can't agree with that. It is -- yes, he was defensive, and perhaps he was inappropriate. And if one takes at face value that everything happened as they said it did, again, this is -- it's all the same incident. He is going to come in defensively because he is being asked about something that happened 50 days earlier.

He has just made a complaint, and now they won't tell him why he is there.

And he starts to say, "Well, maybe I should get representation."

And they are sort of saying, "Gee, you really don't need that."

And he is getting nervous and agitated about it. I consider that all the same incident. It's not like it was some separate thing. It was all about the same issue.

Q. You understand part of the referral asked you to look at the alleged behavior in HR 51 days after the incident, Doctor?

A. Yeah. It was clearly in addition. In fact, the referral says, "additionally." So it's not until he goes

there.

Clearly, the way it was written, to me, was that the primary issue was what happened in front of detainees. And secondarily, that may have been the trip wire once they saw him in HR.

Q. What, if anything, does the alleged behavior at HR have anything to do with his fitness for duty?

A. Well, again, if someone is losing their temper, I don't think it's an inappropriate question to say, "Is this person okay?" And that's why I said, no, it is an appropriate referral. It's all right.

It was later when I came to realize that this was -- this could be explained -- some of his defensiveness could be explained by the fact that he has got a complaint out there and they are trying to talk with him about something that they hadn't disciplined him for, hadn't sent him out for a fitness-for-duty exam for 50 days earlier, and he is becoming defensive. I can't say that that's out of the norm, is my point.

Q. Based on what you observed and based on your experiences, is it your conclusion that, in this case, they used -- when I say "they," the Cook County Sheriff's Office -- used a fitness-for-duty process as a substitute for discipline for John Nawara?

A. Yes.

Q. Anything else you would like to add to the basis for that statement?
A. If they had thought that he was unfit following this original incident, they would have pulled him immediately and would have sent him. And frankly, there is such a liability issue there for failing to pull him. God forbid something had hit the fan and he would have hurt somebody or hurt a detainee or somebody in the public. I just cannot imagine that they would have dropped the ball and failed to act.

And they didn't discipline him, not even a verbal. He has been -- based on what he told me, he has been given verbal warnings and written things years earlier, at least ten years earlier, but for things that weren't even that big of a deal.

If they really had concerns about him, they would have acted. That's my experience over all this period. And, you know, having -- I spent three and a half years doing research at the Lake County Jail. It's not the same as Cook County. But the bottom line is, I know what correctional officers are disciplined for very well.
Q. Is that a factual statement as opposed to a medical opinion, when you state, based on your experience, observations, in this case the referral was inappropriate?

MS. MARMOR: Objection, your Honor. That's a completely leading question and inappropriate. She is not a

medical doctor.

MR. LINDEN: And it's cross, too.

THE COURT: A question, is something inappropriate? is, by definition, not a fact. That is an opinion.

So sustained.

MR. LINDEN: Your Honor, that's all for my offer of proof. I would ask that your Honor reconsider your ruling.

MS. MARMOR: Your Honor, I would like to ask a few questions.

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MS. MARMOR:

Q. Dr. Goldstein, isn't it true that the only basis for your opinions about what -- the only information you had about what happened in that 51 days and what happened in HR was from Mr. Nawara?

A. Sure.

Q. And you didn't speak to anybody who made the decisions to refer Mr. Nawara for an FFD to HR, correct?

A. I wouldn't have been allowed to.

MR. LINDEN: Objection. Leading.

MS. MARMOR: I'm allowed to lead, your Honor. This is --

MR. LINDEN: It's her witness, Judge.

THE COURT: You may answer.

BY THE WITNESS:
A. I wouldn't have been allowed to.
BY MS. MARMOR:
Q. Okay. But did you ask?
A. No. What do you mean, did I ask?
Q. Did you go to CorVel and ask: "Could I speak to somebody about this referral? I have got problems with it."
A. Let me answer it this way: I did not report to CorVel that I had issues with it.
Q. Okay. And so you didn't ask to speak to anybody at the sheriff's office to hear what the answers were to the concerns that you had?
A. I would never have had an opportunity to do that. That's the whole point of an IME company.
Q. Didn't you ask CorVel, after your meeting with Mr. Nawara, about his claims about the forms?
A. Yes.
Q. And they gave you an answer, correct?
A. Yes.
Q. And you could have asked CorVel to ask these questions, couldn't you?
A. Sorry?
Q. You could have asked CorVel. You could have gone to CorVel and said: "I have issues with this referral. These are my issues. Can you find answers for me?"

A. No. That would have been inappropriate. It's not my job to figure out a "he said, she said."

Q. Well, you never had any direct communications, but you accepted what Mr. Nawara said about all of these subjects, and that's what led to your concerns about what the sheriff's office did?

A. I very clearly in my report said I do not accept, one way or another, anybody's facts. I gave hypotheticals about, even if one accepted as fact this, that, or the other thing.

Q. But you don't know -- he doesn't know why the sheriff's office didn't pull him off immediately, and you don't know why the sheriff's office didn't pull him off immediately, do you?

MR. LINDEN: Objection. Form; argumentative.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, in my training and experience, I think it is absolutely a reasonable inference to draw that if they had concerns about his fitness, they would have pulled him.

BY MS. MARMOR:

Q. You don't -- your role is not -- how to do FFD referrals is not your role, is it?

A. Say that again.

Q. The manner in which FFD referrals are done is not your role, is it?

A. In the way they are done?
Q. Yes.
A. I don't understand the question.
Q. The manner -- you are complaining -- your big issue here is that they waited too long and that you read into the fact that you think they waited too long. And your role is not, in fact, to decide how a department conducts an FFD referral process?
A. That's true. I have no opinion about their administrative functions or rules.
Q. And you have no certificates or training in disciplinary procedures at jails, correct?
A. Right.
Q. And you understand that the factual questions in this case are to be left to the jury, right?
A. Right.
Q. Now, you've talked about the fact that you heard from Mr. Nawara that he had made a complaint, right?
A. Yes.
Q. And you, in fact, don't have any knowledge that any of the defendants in this case even knew that that complaint had been filed, right?
A. Say that again. I don't have any --
Q. Knowledge that any defendant in this case even knew that that complaint had been filed?

MR. LINDEN: Objection. Form of the question; leading; outside the scope; argumentative.

THE COURT: Overruled.

Did you know whether the defendants were aware that Mr. Nawara had made a complaint?

THE WITNESS: No.

BY MS. MARMOR:

Q. And you discounted what happened in HR, right, in reaching these conclusions?

A. Be more specific.

Q. In concluding that you felt that this was an inappropriate -- you said, "I don't put a lot of stock in what happened in HR. That's not something I consider to have happened on the job." Right?

A. Sure. That's part of the -- right. I also just offered that answer a few minutes ago.

Q. And you are applying your general experience, not specifically -- anything you specifically know about this case, when you say that the sheriff's office's own behavior can be inferred to show they didn't have fitness concerns or he would have been pulled. You said that's irrelevant to you?

A. What?

Q. You said -- when you make this conclusion that the -- sorry.

What you said is, you don't speak to the people who make the decisions. You didn't speak to the people who made the decisions about this referral, did you?
A. Right.
Q. And you have said that whatever was in their mind, in your view, is irrelevant. Meaning not having spoken to them, you don't have to care about what they had in their minds?
A. Well, that's your interpretation.

What I would say is, when they are making a referral, they provided me everything that they felt was relevant.

So asking for further information would not have been relevant. They wrote up the incident. They provided the referral form through HR. They obviously felt that that's the information I ought to have and that was relevant.

So speaking to them further -- you have suggested I should have spoken with Supt. Jones-Hayes. That would have been entirely inappropriate.
Q. I am going to go to your deposition at Page 140.

(Brief pause.)

MS. MARMOR: Sorry, your Honor. I'm just trying to -- I thought I had it in my motion *in limine*, and I didn't. So give me one second.

(Brief pause.)

BY MS. MARMOR:
Q. Did I ask you this question at your deposition, and did you give me this answer:
"Question" --
MR. LINDEN: Can I have the page?
MS. MARMOR: Page 142, Line 22 to --
MR. LINDEN: I'm sorry?
MS. MARMOR: 142, Line 22 to 143, Line 7.
MR. LINDEN: Okay. Can you have counsel wait a little bit so I could follow?
142 -- what?
MS. MARMOR: 142, Line 22 to 143, Line 7.
(Brief pause.)
BY MS. MARMOR:
Q. Did I ask you that question, and did you give me this answer in your deposition:
"Q. Okay. I mean, you are applying basically your general experience, not specifically -- not anything specific you know about this case when you say that. You didn't speak to any of the people who made the decisions?
"A. I can tell you it's irrelevant. I can look at what happened and say, he wasn't pulled. It's a reasonable inference to draw that, had there been significant fitness concerns, he would have and should have been pulled."
MR. LINDEN: Objection.

BY MS. MARMOR:

Q. Did I ask you that question, and did you give me that answer?

A. Yes, and I maintain that's my opinion.

Q. I understand that's your opinion.

But are you a fact witness in this case or an opinion witness in this case?

A. I'm a fact witness.

Q. Okay.

MS. MARMOR: Your Honor, I could go on.

THE COURT: I want to hear from Ms. Kamper, if she has any questions.

MS. KAMPER: Just one.

VOIR DIRE EXAMINATION

BY MS. KAMPER:

Q. You mentioned that Jones-Hayes had said there was an interpersonal problem between her and Mr. Nawara.

Where did you see that written?

A. It's in her write-up.

Q. You saw those exact words?

A. I can tell you the exact words. Because I haven't been allowed to bring things up -- I don't like to paraphrase. I would be happy to read it to you directly.

Q. I will refresh your memory. Just a moment.

(Brief pause.)

MS. KAMPER: I want to hand up the statement. It is Jones-Hayes Exhibit 2. This is a signed statement from HR.

(Document tendered.)

BY THE WITNESS:

A. Thanks.

Where is the second page of this?

BY MS. KAMPER:

Q. There is just one.

A. No. I had -- oh, wait.

(Brief pause.)

BY THE WITNESS:

A. "Supt. Hayes realized that something was going on with this officer and stated maybe it was something about her presence that set Nawara off."

BY MS. KAMPER:

Q. And that doesn't say that she thought they had an interpersonal problem, correct?

Those words weren't used?

A. Right. It was paraphrased.

Q. Okay. So you paraphrased someone else's words without talking to them, correct?

A. No.

Q. So you did talk to Karen Jones-Hayes?

A. No.

Q. So you have paraphrased her words without talking to her, correct?

MR. LINDEN: Objection. Asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. In my report, I think I indicated that she thought there may have been an interpersonal problem here based on what she wrote. I believe that's what that means, that perhaps he was upset based on her presence, that there was something between them personally.

BY MS. KAMPER:

Q. Okay. So that's your opinion based on what you read without talking to her?

A. Well, that's how I read that, yes.

Q. Okay.

MS. KAMPER: No further questions.

THE COURT: I'm ready to rule on this. I'm ready to rule on this.

This witness is free to tell us what she considered in connection with her evaluation of Mr. Nawara. And what he told her in connection with seeking that evaluation, she is free to consider.

The jury heard what actually happened with Ms. Jones-Hayes. And defendants can say, well, this witness had the idea that this happened. She got it from Mr. Nawara.

In fact, the following happened.

It's also completely fair for the plaintiff to argue, as I'm sure plaintiff will, that this 51-day delay just shows us that this had nothing to do with Mr. Nawara's actual mental state. It was really a matter of disciplining him. That's a perfectly fair argument to make.

It's not a fair argument for this witness to make, because that's something the jury would conclude.

So this witness is free to tell us what Mr. Nawara told her and what conclusions she drew from that and why those supported her conclusion that the evaluation was improper or that the fitness-for-duty referral should never have been made. She can tell us that.

What she can't tell us is things that, for example, Ms. Jones-Hayes said, because that would be hearsay. She can't tell us what's in some report that Ms. Jones-Hayes said. Whether it's a paraphrased or an accurate summary or not makes no difference. She can't testify about hearsay.

Let's bring back the jury.

(Jury in at 2:52 p.m.)

THE COURT: You may proceed, Mr. Linden.

MR. LINDEN: Thank you, Judge.

CROSS-EXAMINATION - Resumed

BY MR. LINDEN:

Q. Doctor, you received the CorVel referral form for part

of your evaluation, correct?
A. Correct.
Q. The referral form -- I can probably summarize -- described two -- what the sheriff's office described as two separate instances, number one being the situation with Supt. Jones-Hayes?
A. Right, on 9-28-16.
Q. Okay. What did Officer Nawara tell you about the incident with Jones-Hayes?
A. Would you like for me to have my report while I do this, or would you like me to do this to the best of my memory?
MS. MARMOR: Your Honor, we would object to reading the report into the record.
MR. LINDEN: I think it's in evidence.
MS. MARMOR: No, it is not. No, it is not.
THE COURT: I don't think it's been admitted.
You are welcome to use it to refresh her recollection.
BY MR. LINDEN:
Q. I would like to hand you a document and ask if that refreshes your recollection?
(Document tendered.)
BY THE WITNESS:
A. Thank you.
MS. MARMOR: It's only being used to refresh

recollection.
BY MR. LINDEN:
Q. I know there are some redactions on that. I have got an unredacted, if you need it to refresh your recollection as well.
A. Thank you.
(Brief pause.)
BY THE WITNESS:
A. So --
MS. MARMOR: Your Honor, I think the proper procedure is to take the document back and then ask if it refreshes her recollection.
MR. LINDEN: I think she is still reading it. I was going to wait until she is done.
(Brief pause.)
BY THE WITNESS:
A. All right. I will do the best I can here --
BY MR. LINDEN:
Q. I will put it down.
A. -- from my memory.
Q. I know it's been quite a while.
Does that refresh your recollection, Doctor?
A. As best as can be. I have to rely on my memory.
Q. Based on your recollection refreshed, can you tell us what Officer Nawara told you about the Jones-Hayes incident?

MS. MARMOR: Your Honor, could we have a limiting instruction that it's not offered for the truth of the matter asserted?

THE COURT: The evidence of what Mr. Nawara told Dr. Goldstein is admissible because it goes to what she considered in her mind when she made an evaluation of him.

BY MR. LINDEN:

Q. You could go on. You can answer, if you can, Doctor.

A. So when I asked him to just tell me what happened, he began with some context. He said, you know, "It's really critical that you know certain things before we talk about this, because I think it will help you understand why I reacted the way that I did."

He said that there had been -- there was never any written policy, but there was a verbal policy about inmates being shackled while they were in the basement of Cermak and getting medical attention and that there weren't enough shackles for everybody. There weren't enough manacles for everybody. There could be some fights that would happen with people having their arms behind their back and, you know, even intentionally harming people in front of cameras, et cetera.

So it was a pretty tense situation. They didn't have a lot of staff. They were understaffed, et cetera. So he provided some of that context.

He said that when Supt. Jones-Hayes and Sgt. Conley came in, there were really three things, I think, that she took issue with.

One was that there was this door that was open that should not have been. And he explained that that was about trying to get female officers in and out without having to go through and sort of being ogled by some of the male detainees there. And he admitted that he shouldn't have had that open, though he minimized it.

He said that there was someone working on the computer down there who shouldn't have been there, writing a report.

And the third thing was that people weren't shackled.

At that point, Supt. Jones-Hayes tapped him on the shoulder and said, "Why isn't this inmate shackled?" and was referring to one specifically.

And he told her that she should ask the officer who had brought that detainee there. He had just showed up.

According to him, she also was asking -- she said, "Who's in charge here? Who's on the roster?" Meaning, whose role is this? Which I think related to who was supposed to be where and who was supposed to be shackled and whatnot.

And he said, "She knew it was me. This was her way of kind of giving me a hard time."

And he says that she put her finger in his face, you know, and was angry with him about, you know, "You're not doing this right," et cetera, and started to sort of provide information and schooled him, if you will, on what the procedures were down there that were not being followed.

He denies he ever swore at her. He says, "Look, I told her to get her finger out of my face."

And she apologized. She said, "I'm sorry. I didn't mean to make you uncomfortable."

And he told me that there were two people there that witnessed that. I can't remember who they were, but an officer, I think, and possibly Sgt. Conley. I can't remember. But that there were two people who witnessed that.

And then she went out. She took a phone call. He was about to shackle that detainee. And she said, "No, I'll come with you while you do that."

So she was watching him while he shackled this detainee. I guess she had to calm him down a little bit first because he was really agitated and said, "I don't want him. He is kind of crazy. I don't want him to shackle me up."

And then she had said, like, "Baby, baby, calm down. I need for you to let this officer shackle you." And she did calm him down, and he did shackle this detainee.

At that point she walked away, and I think he

followed her. And he admits -- he said, you know, "I was sarcastic. I picked up that shackle or that manacle and said, 'Look, I have a shackle.'" You know, he was upset. He was defensive, and then he said something to the effect of, you know, "You want to follow me around all day and watch me do my job?"

And that's how that interaction went.

Q. You talked about him telling you about inmates weren't shackled?

A. Yes.

Q. Would that cause you any concern as a fitness-for-duty examiner about his fitness for duty?

A. No. To me, it provided context for -- well, look, let me say it like this: If he were supposed to have everybody shackled and there were, in fact, sufficient shackles and manacles for everybody to be exactly where they were, in the condition that they ought to be, fine. Yes, that would make me concerned that he wasn't following protocol. I have no way to verify one way or another whether that's so.

But according to him, it was a dangerous situation because there were insufficient shackles and manacles in order to meet that protocol, and they were understaffed as well.

Q. I just want to go back just a moment to what he told you.

Did he ever complain about Jones-Hayes putting her finger in his chest?

A. Yes. So that's right. So while they were having this conversation -- that's what I just testified to -- that she was putting his finger in his -- oh, you're asking whether she touched his chest?

Q. Whether or not he told you --

A. Yeah, he did. He did. That she actually touched him. It wasn't just in his face, yeah.

Q. And you indicated that he had a defensive personality trait. And maybe I'm messing this up, but something to that effect?

A. Being defensive isn't a personality trait.

What are you referring to? What I just said about him feeling defensive in that moment?

Q. Yes, Doctor.

A. Yes, he was not pleased. He said, you know, "Look, I became sarcastic. I didn't appreciate being told how to do my job and having someone put their finger in my face and touch me. I told her to get her hands off me." But, yeah, right.

Q. Is that an understandable reaction?

MS. MARMOR: Objection, your Honor. That calls for speculation.

THE COURT: Sustained.

BY MR. LINDEN:
Q. How would you describe the level of Officer Nawara's cooperation with you in the two days that you saw him back in September of '17?
A. He was fully cooperative.
Q. Did he answer all of your questions?
A. Absolutely.
Q. Did you find him honest and forthright?
MS. MARMOR: Objection, your Honor. That completely gets into the jury's purview.
THE COURT: She accepted what he said to her. I think we can move on from there.
BY MR. LINDEN:
Q. Did you see any signs of him being untruthful to you?
MS. MARMOR: Objection, your Honor.
THE COURT: Overruled.
You may answer.
BY THE WITNESS:
A. Well, let me say it like this: I was very clear in my report that I could not accept as fact what anybody told me. I did not necessarily accept as fact his version of events nor Supt. Jones-Hayes' version of events. It's not my job to figure what out what the "he said," "she said" is. Okay?
But I saw no indication that he was inconsistent between what he told me and what he had told Dr. Kroll, what

he told me and what was in his medical records, what he told me and what was in his psychology -- in the mental health records.

BY MR. LINDEN:

Q. I would like to show you, if I can -- I don't think there would be an objection -- Defendants' Exhibit 42. I believe it is in evidence. I want to refer you to the referral form.

MR. LINDEN: May I publish that, Judge?

THE COURT: It's in evidence?

MS. MARMOR: It's in evidence, your Honor.

THE COURT: You may publish.

BY MR. LINDEN:

Q. Doctor, you see Exhibit 42, what's in front of you?

MS. MARMOR: Your Honor, for some reason, it's not coming up on our screen.

THE COURT: Okay.

(Brief pause.)

BY MR. LINDEN:

Q. It looks like you are almost ready to sneeze up there.

MS. MARMOR: And we all got paranoid.

BY MR. LINDEN:

Q. Okay. With respect to HR, the referral states, "In addition, weeks later, employee presented as aggressive and hostile in the human resources department."

Do you see that there?

A. I do.

Q. Did the sheriff's office or Ms. Shelby tell you anything more than what's on this line about what allegedly occurred in HR?

A. No.

Q. Was any other information provided by the sheriff's office regarding his behavior at HR on November 18th, 2016?

A. None.

Q. Did they ever tell you anything or provide any information to say that he exhibited any rage --

MS. MARMOR: Objection, your Honor. Asked and answered.

THE COURT: Overruled.

You may answer.

BY MR. LINDEN:

Q. -- on that day?

A. This is the information that I received. So if the word "rage" is not in here, then no.

Q. Okay. You don't see anything about the word "rage" in here, do you?

A. No.

MS. MARMOR: Same objection, your Honor. Asked and answered.

THE COURT: The jury can read the document as well.

BY MR. LINDEN:
Q. Did they tell you anything else in this one sentence about what occurred at HR that day?
MS. MARMOR: Objection. Asked and answered.
THE COURT: Overruled.
You may answer.
BY THE WITNESS:
A. No.
BY MR. LINDEN:
Q. Did anything prevent the Cook County Sheriff's Office, that you know of, providing you with whatever information they wished to regarding the alleged incident at HR?
MS. MARMOR: Objection. Lack of foundation; calls for speculation.
THE COURT: Sustained.
BY MR. LINDEN:
Q. I think counsel asked, the fact that you testified that you didn't put much stock into what happened with HR --
MS. MARMOR: Your Honor, could we have a sidebar, please?
MR. LINDEN: She brought that up, Judge.
(The following proceedings were had at sidebar:)
MS. MARMOR: I brought that up in the offer of proof.
THE COURT: That was part of the offer of proof.

Sustained.

MR. LINDEN: Okay. Can I ask that question of her?

MS. MARMOR: Absolutely not.

(End of sidebar proceedings.)

BY MR. LINDEN:

Q. Based on your examination of Officer Nawara, did you have any concerns about his fitness to return to duty as a Cook County correctional officer without restrictions?

A. None.

MS. MARMOR: Objection. Calls for a -- I think it's been stipulated that she found him fit for duty.

THE COURT: Overruled.

You may answer.

BY THE WITNESS:

A. None.

BY MR. LINDEN:

Q. Do you have any concerns about any anger management issues on the part of Officer Nawara that would in any way inhibit his fitness for duty to act as a correctional officer?

A. I found no evidence of anger management problems, significant psychiatric problems, neurocognitive problems, or any other conditions that would impact his ability to safely and effectively conduct the duties of a correctional officer.

Q. I think you indicated that one of the duties or traits

he needed as a correctional officer is to be calm under pressure?

A. Sure.

Q. Based on your examination, did you see any evidence to indicate that Officer Nawara had any difficulty in being calm under pressure that would lead you to conclude that he was not fit for duty?

MS. MARMOR: Your Honor, lack of foundation.

THE COURT: Overruled.

You may answer.

BY THE WITNESS:

A. This is one of the reasons I asked for the personnel file, because I want to look at what discipline was about, and I want to look at performance evaluations and any concerns that might come up.

You know, I only have Mr. Nawara's description that he has never been disciplined for anything relating to anger management problems.

MS. MARMOR: Your Honor, I have an objection to this. There is a motion on this.

THE COURT: Ladies and gentlemen, this witness does not have information about Mr. Nawara's disciplinary history. She has none. So she can't tell us either way.

Let's proceed.

BY MR. LINDEN:
Q. You indicated that you asked for his personnel file?
A. I did.
Q. Who did you ask -- make the request to?
A. CorVel.
Q. And do you know whether or not CorVel went back to the sheriff's office to try and get that for you?
MS. MARMOR: Objection. Lack of foundation.
THE COURT: That would be hearsay, if she knows -- if she answers the question.
Sustained.
BY MR. LINDEN:
Q. Were you able to obtain his personnel file?
MS. MARMOR: Objection, your Honor. Asked and answered, and this already has been ruled on.
THE COURT: Sustained.
BY MR. LINDEN:
Q. I think you also indicated that one of the attributes or what a correctional officer needs to do is being able to interact with supervisors?
A. Yes.
Q. Do you have any concerns that would affect his ability to be fit for duty as a correctional officer based on his inability to interact with a supervisor?
A. He had a very specific problem with Supt. Jones-Hayes.

That's clear. But I don't believe that that's related to any mental health disorder or neurocognitive disorder or any other condition.

Q. So I take it, as a fitness-for-duty examiner, that would not cause you to find a correctional officer unfit for duty?

A. No, in this particular case.

Q. Okay. You indicate that you didn't have any contact directly with the Cook County Sheriff's Office?

A. Right.

Q. Do you know why that is?

MS. MARMOR: Objection. Lack of foundation; calls for speculation.

THE COURT: Sustained.

BY MR. LINDEN:

Q. Now, counsel talked to you about a number of personality traits.

Do you recall that testimony?

A. Right.

Q. Were any of those traits of such a concern that it caused any questions regarding Officer Nawara's fitness for duty?

A. No.

(Counsel conferring.)

MR. LINDEN: Thank you, Doctor.

THE COURT: Any redirect?

MS. MARMOR: No, your Honor.

THE COURT: Ms. Kamper?

MS. KAMPER: Nothing further, your Honor.

THE COURT: Ladies and gentlemen of the jury, do you have questions for this witness?

(Questions tendered.)

(The following proceedings were had at sidebar:)

THE COURT: Okay. There are two questions.

The first one is: Why do you believe this was an appropriate referral despite not receiving personnel files?

And the second one: CorVel refused to provide them. Is this common?

MR. LINDEN: We are okay with that.

MS. MARMOR: I mean, I think my concern is that I think I don't want her volunteering what we just had the offer of proof about.

THE COURT: I don't think she will.

All right. Thanks.

(End of sidebar proceedings.)

THE COURT: Doctor, why do you believe this was an appropriate referral despite the fact that you didn't have access to Mr. Nawara's personnel files?

THE WITNESS: So, generally speaking, when there have been concerns about someone's anger management in general, that's an appropriate referral, because the question

really is, is there anything about this person's presentation that we should be concerned about comes from a mental health disorder?

In other words, does this person need treatment in order to continue to do work and to do it in a safe and effective manner?

So in that regard, assessing someone who has an -- when someone has an outburst, if that's, in fact, what happened, that's not an inappropriate question to ask: Does this person need help? Is this going to be a recurring problem that's chronic and pervasive? Is it going to affect his ability to work safely with the public, with detainees, and his coworkers?

THE COURT: All right. And CorVel did not provide the personnel files. Is this common?

THE WITNESS: No. So it's common among IME companies. They don't -- they try to get the most direct information, the most recent and current information. However, I tend to be very comprehensive.

So everyone in our public safety program, if we are doing fitness for duty, workers' comp, pension disability, I just say, I want everything. I want everything because I want to see if there is any pattern of problematic functioning. I wanted to see if there was a pattern of anger problems, not just in this situation with this one

supervisor, but was it pervasive? Did it come up -- were there excessive force issues, for example? Was he being written up and disciplined, for example, for being insubordinate or, you know, hurting someone, for example?

THE COURT: All right. Counsel, any questions to follow up from either of those?

MS. MARMOR: No, your Honor.

MS. KAMPER: No, your Honor.

MR. LINDEN: One very short question.

THE COURT: Okay.

FURTHER CROSS-EXAMINATION

BY MR. LINDEN:

Q. When you answered the question regarding an appropriate referral at the time, you are talking you felt it was appropriate at the time of the referral but not later on; is that right?

A. Right.

MS. MARMOR: Objection, your Honor.

THE COURT: I will allow it.

That's your answer, "Right," you determined later that it was not, in your view?

THE WITNESS: Right. I apologize.

MR. LINDEN: Okay. Thank you, Doctor.

THE COURT: All right. I think that concludes with this witness. You are excused.

(Witness excused.)

THE COURT: All rise. I am going to give you a short recess.

Oh, you have deposition designations.

MS. MARMOR: Yes.

THE COURT: Oh, let's do those. All right. Back on. Good. Thanks.

Okay. Deposition designations, ladies and gentlemen, are testimony that you are going to be hearing. You are not going to be actually hearing the witness who gave the testimony, and here is why:

This testimony -- this witness is not -- I think she is not currently in the state of Illinois. So she is not able to come in and give her testimony.

What we are going to do instead is have a person read -- one person read the questions and the other person read the answers. So it will be as close as we can make it to the testimony if it had come in here from the witness stand.

Recognizing that you are not seeing the demeanor of the witness or her facial expressions and the like, I'm still going to ask that you consider this testimony in the same way that you did any of the other testimony that you heard.

MS. MARMOR: Your Honor, if you could just explain the sort of odd thing, which is the back and forth.

THE COURT: Some of the -- when a deposition is taken, both sides are permitted to ask questions, but very often what one lawyer wants you to hear is not the same thing that the other lawyer wants you to hear. So we are going to have this odd situation where sometimes the questions are going to be asked by one side and sometimes the other, but not first all one and then all the other. It will be kind of back and forth.

All right. All set?

MS. MARMOR: Our fake witness.

THE COURT: All right. I am going to ask you to take a seat and say your name. First your actual name.

MS. SPACAPAN: My actual name is Lise, spelled L-i-s-e, Spacapan, S-p-a-c-a-p-a-n.

THE COURT: All right.

Ms. Spacapan, you are playing the role of Dr. Kroll in this proceeding, correct?

MS. SPACAPAN: That's right, your Honor.

THE COURT: We can confirm that Dr. Kroll was sworn when she gave her testimony.

All right. You may proceed, Counsel.

MS. ALEXANDER: Thank you, your Honor.

ROBIN KROLL, DEPOSITION

EXAMINATION

BY MS. ALEXANDER:

Q. What is your education, Dr. Kroll?

A. I have a doctorate in clinical psychology, and I am board certified in police and public safety.

Q. And the doctoral in clinical psychology --

A. Uh-huh, with a forensic concentration.

Q. A forensic concentration.

And the clinical psychology, is that a Psy.D?

A. Yes.

Q. And what was the other thing you said you had?

A. I'm board certified in police and public safety, psychology.

Q. And what does that mean?

A. Board certification is just an extra training in a specialty area.

Q. And so what kind of training did you go through for this board certification?

A. It requires workshops, presentations. It requires case studies. It requires a lengthy paper that would be similar to a dissertation. It requires an interview, an oral interview. It requires a particular amount of hours.

Q. And what does that entail, police and public safety?

A. Just understanding, you know, working, particularly as

an interventionist, meaning that I do the clinical work or I can do the assessment work with police and public safety personnel. So it's a concentration of knowledge and having a specific competency in working with first responders.

Q. And let's talk about your experience, then.
Since you graduated with your degree, how long has that been?

A. I have been here in private practice for almost 15 years doing exactly this.

Q. And what's "exactly this"?

A. Working specifically with police and public safety.

Q. Would you say you're 100 percent working with police and public safety?

A. I would say I'm 90 percent. I do see civilians, which means I will see family members.

Q. In your practice, you said you see police officers.
What do you mean when you say you see them?

A. Clinical work, therapy, intervention work. I will do the diagnostics. I will see officers for specific issues related to the job, meaning trauma, a lot of PTSD.
I will work with them with addiction. I will work with them with cumulative stress. I will work with them with all of the specific areas that you typically see in police work.

Q. In your practice, do you do fitness-for-duty

evaluations?
A. I do.
Q. And how often would you say you do those?
A. I typically do, maybe, once a month, sometimes twice a month.
Q. And what training or how are you qualified to do a fitness-for-duty exam?
A. Well, aside from doing many of them, I have taken many workshops and presentations, you know, in order to obtain my -- my board certification. So a lot of experience, a lot of working and going to special workshops, presentations, and then just experience doing it.
Q. And is there a specific licensure or certification, or is there something specific that a psychologist has to have in order to do a fitness-for-duty exam?
A. It would be, I believe, a C classification, which means you have to have -- more than likely, you need a clinical degree in psychology as a Psy.D or a Ph.D., but a doctorate.
Q. There is no specific fitness-for-duty certification?
A. No.
Q. And how long have you been doing these fitness-for-duty exams once a month?
A. I can't say, but years. Maybe ten years.
BY MR. BUSTAMANTE:
Q. Have you ever done fitness-for-duty exams for the Cook

County Sheriff's Office?
A. I have.
Q. And the sheriff's office has called you specifically to do that?
A. No. I do them as patients.
BY MS. ALEXANDER:
Q. And what is a fitness-for-duty exam?
A. It's a psychological assessment to look at an officer's readiness to either return to work or perform the duties of their job.
Q. What do you do to perform a fitness-for-duty evaluation?
A. You will typically begin with an interview to find out what specifically is the issue. You will do some forensic work. You will call whoever you need to call, if it's handed to you through a department. So you might do an interview with specific people in the department.
You might then assess what the issue is. You would then make a selection of the particular test that you think would be applicable. And then you do your assessment work. And then you do your interpretations.
Q. And when you say "interpretations," what does that mean?
A. Whatever the assessment results are, you write your report according to the assessments and the interview.
Q. Let's talk about John Nawara.
A. Sure.

Q. Do you remember him coming to you for a fitness-for-duty evaluation?
A. I do remember. It was about two years ago. No. He wasn't coming in specifically saying he wanted a fit-for-duty.

He did come in saying, "I would like some psychological work done." He had an issue with the department. I don't know if he was looking for multiple people to assess him or if he was coming to me specifically. I recall he was going to look for more than just me. I don't know if he did or not.

I only saw him on a few occasions. This wasn't a therapy. It was specifically to look at him and assess him personally at the time. He was looking for this report specific for him.

BY MR. BUSTAMANTE:
Q. He did not come to you for therapy; is that correct?
A. No, he did not.
Q. Did you know him before he came to you?
A. No.
Q. What was your understanding of why he was coming for psychological testing?
A. He was having an issue with the supervisor, and then there was some disciplinary actions taken, and I believe he was placed on off-duty status.

Q. Exhibit 2, marked Bates-stamped CSO 00116 through 124, does that appear to be a copy of your fitness-for-duty evaluation of Mr. Nawara?
A. Yes.
BY MS. ALEXANDER:
Q. And when did you meet with Mr. Nawara?
A. On March 16th, the 17, 3-8, and 3-10.
MR. BUSTAMANTE: Objection, your Honor, just to the reading. It's March 16h of '17, meaning of 2017. I don't think it was read correctly.
MS. ALEXANDER: I apologize. That's my fault.
THE COURT: You are right.
BY MS. ALEXANDER:
Q. So March 16th of 2017?
A. I have the dates March 16, I have of '17, 3-8, and 3-10.
(Counsel conferring.)
BY MR. BUSTAMANTE:
Q. And then there was another test. What's that?
A. We do a mini mental-status exam at the beginning just to make sure that their orientation to place and time is intact. And then --
Q. Is that through an interview with you?
A. Through interview. And when he takes a test, structured test of malingering to look to see if he is being deceptive.
Q. And that's to determine whether the subject is lying to

you?
A. Yeah, feigning and malingering.
BY MS. ALEXANDER:
Q. And did you review any documents before you examined Mr. Nawara?
A. From the County? No.
Q. Did you review any medical records of Mr. Nawara?
A. No.
Q. You can't recall if he -- if you asked him for any records?
A. I can't recall.
Q. And why did you not review any medical records for Mr. Nawara?
A. He wasn't coming specifically stating that this was a fit-for-duty. He wasn't coming stating that this was going to be a legal issue.
He was stating that he was coming in basically for himself to see what his psychological status is.
Q. So he told you -- Mr. Nawara told you that he wanted to determine his psychological status?
A. For his own -- his own psychological fitness.
Q. For his own personal knowledge?
A. I'm going to say, that's my understanding, as I can recall --
MR. BUSTAMANTE: Objection. Objection. Objection.

I'm sorry. It doesn't say the word "that's."
MS. SPACAPAN: I'm going to say, it's my understanding? Is that where we are?
MR. BUSTAMANTE: That's where we are.
MS. SPACAPAN: Okay.
BY THE WITNESS:
A. I'm going to say, it's my understanding, as I can recall, that when he came in, he was not stating that this was going to turn into an issue, particularly with the department; that he was coming in for himself, to look at his own psychological readiness to be fit for work.
BY MS. ALEXANDER:
Q. In your experience, do many police officers, sheriff's officers come to you for a fitness-for-duty or come to you for that reason that you just stated?
A. Not typically.
Q. It's not typical, in your experience?
A. Not in my experiences here.
Q. Typically, if you are doing a fitness-for-duty exam for a legal purpose or if the department is asking, would you request medical records to review?
A. Yes.
Q. In your experience, based on your experience doing fitness-for-duty exams, when you do a fitness-for-duty exam for a department, you typically ask for medical records?

A. I always ask for medical records.
Q. And what medical records do you request?
A. Everything that they have.
Q. What does that mean when you say "everything"?
A. It could include their actual medical records. It would include their disciplinary records. It would include certificates, awards. It would include any video, if necessary.
Q. Video of what?
A. Of encounters, if it was specific to the incident. They typically send me all that they have.
BY MR. BUSTAMANTE:
Q. It sounds like you would like to review his entire personnel file, if you could?
A. I do.
Q. Do you request his personnel file?
A. Usually, yes.
Q. When it comes from a department's --
MR. BUSTAMANTE: I'm sorry.
BY THE WITNESS:
A. When it comes from a department's request.
BY MR. BUSTAMANTE:
Q. And let's talk about medical records.
What medical records do you like to review when you are doing a fitness-for-duty exam?

A. Oh, I try to review any, all of that. I'll go over everything. And then I'll go over the specifics, depending on what it is that I'm looking for. If there was a specific critical incident, I will -- and there is a video, I will watch the video. If there were injuries during that incident, I will look at the doctor reports, medical doctors' reports. If there were other fit-for-duties, I will look at those.
Q. And do you like to see medical records for the officer from his past, from his primary care physician, from his surgeon, anyone?
A. Anything that would be related to documentation that is in the files at his department -- his or her department.
Q. You want to see what records the department has?
A. Uh-huh. If there is a need to go outside of the department to look at other documentation, I would do that.
BY MS. ALEXANDER:
Q. When you do a fitness-for-duty exam, in your experience, do you typically see medical records for the officer from a psychologist or a psychiatrist?
A. Yes.
Q. Do you typically see medical records from the general practitioner, the officer's family doctor?
A. I can, yes.
Q. And how many years back of medical records would you

like to review, in your experience, doing a fitness-for-duty exam?
A. I usually look at the -- the time that they have had on the job.
Q. And you did not review a referral from the Cook County Sheriff's Office for Mr. Nawara?
A. No.
Q. And you did not review Supt. Jones-Hayes' report of this incident, correct?
A. No.
Q. And you did not review any reports by Rebecca Reierson or Nurse Shelby?
A. No.
Q. Do you recall speaking with anyone at the sheriff's department about Mr. Nawara?
A. I do not recall speaking to anybody. Like I said, this was not typical. This was him coming in for something more personal.
Q. And did you review any notes from Dr. -- or excuse me -- Mr. Nawara's therapist or counselor?
A. Wasn't even aware there was one.
BY MR. BUSTAMANTE:
Q. And did you ask Mr. Nawara to bring you any documents that he refused to bring?
A. No, not that I can recall.

Q. You don't recall asking him for any documents?
A. I can't recall.
Q. And did you review Mr. Nawara's job description at the County?
A. I don't recall. I don't believe so.
Q. So you didn't review any information from the Cook County Sheriff's Office related to Mr. Nawara?
A. No, not that I can recall.
Q. So is it fair to say that you don't know anything about the incident with Supt. Jones-Hayes except what Mr. Nawara told you?
A. That is correct.
Q. And so is it fair to say that you don't know what she was thinking as it relates to this incident except what Mr. Nawara told you?
A. That's correct.
Q. And it's fair to say you don't know anything -- anything that happened in a meeting between Ms. Reierson and Nurse Shelby and Mr. Nawara except what Mr. Nawara told you?
A. That's correct.
Q. And do you know why Mr. Nawara refused to sign the papers and go through the fitness-for-duty process?
A. My understanding is that he didn't believe that it was warranted, so he refused.
Q. Is your understanding that Mr. Nawara did not believe a

fitness-for-duty exam was warranted?
A. Yes.
BY MR. BUSTAMANTE:
Q. You did the MMPI?
A. Personality inventory. I mean, it does look for specific traits, but nothing in his testing showed up anything of a clinical nature that would be a concern for readiness to return to work.
BY MS. ALEXANDER:
Q. Exhibit 2 was not meant for any type of legal proceeding?
A. No. Not at that time, no.
Q. Did you mean for this report to go to the County?
A. I didn't have an expectation. I mean, it could have. I would assume that maybe he would have used it if there would have been some incidents down the road, but I also would have assumed that the County would do their own fitness-for-duty as well and then accumulate all the information.
But at the time, my assumption was, this is something he was interested in doing personally for him.
Q. At the time, you wrote this report for Mr. Nawara personally?
A. Personally.
Q. I believe you said your indication was that Mr. Nawara didn't want to go through the whole fitness-for-duty process

with the County. He didn't --
A. I didn't say that he didn't want to. I'm saying he refused. He stated that to me.
MR. BUSTAMANTE: The next two lines, please.
BY THE WITNESS:
A. She asked me why. I'm making an assumption from my conversations with him.
BY MR. BUSTAMANTE:
Q. When you do fitness-for-duty exams, I assume that you want the medical records related to the fitness-for-duty examination.
Is that a fair assessment?
A. When it's a formalized fit-for-duty, yes.
Q. You said normally you go back for the number of years.
If somebody has been an employee for ten years, you want the records for ten years?
A. Yeah. It depends on how far back issues go -- disciplinary issues. So yes, it would depend.
Q. I mean, you think --
MR. BUSTAMANTE: Sorry.
BY MR. BUSTAMANTE:
Q. I mean, I think you indicated that you would go back -- you would want the records the County already has.
Is that what your testimony was in performing your fitness-for-duty exam?

A. If this were a formalized fit-for-duty.
Q. So if a patient, let's say, went to a dermatologist 20 years before, having no relation to what you are examining the patient for, would you want those records?
A. With the consent, no. If it wasn't pertinent to the case, I wouldn't.
Q. And let's say medical records. If the issue was, you know, a psychological -- let's say the County complained that they had fear that he had some kind of rage or anger issues. In that case, you wouldn't have to go back 10 years for medical records, would you, as opposed to psychological records, if you could?
A. Oh, if it -- if it's not pertinent to any physical issues?
Q. Yes.
A. No. You would look at just the psychological. I mean, they might come in with the records if they send everything. But, you know, if it's psychological, related to, let's just say, a critical incident and there were physical injuries, you know.
Q. Now, if you asked -- needed records, you wouldn't ask a patient to sign an authorization that's completely unlimited in scope, would you?
A. I would be more specific.
Q. You realize it's important to protect the patient's

privacy, number one?
A. Correct.
Q. Medical records should be limited in scope, correct?
A. Correct.
Q. And the scope should be limited only that the scope is related to the issue that you are examining the patient for, correct?
A. Correct.
Q. And time, too, that you would have to make an assessment that it should be limited in time, correct, the medical records?
A. It would depend on the case.
Q. And what factors would go into --
A. Past disciplinary issues, past issues. If you're just looking at a trend of behavior, it would be important, whether it's good behavior or not, you know. You want to look at their commendations. You want to look at their honorable mentions.
BY MS. ALEXANDER:
Q. Do you know whether or not the reason that Mr. Nawara had a problem with the fitness-for-duty exam would be, he had a problem with the scope and the breadth of the forms the County was requiring him to sign for his fitness-for-duty exam?
A. He didn't articulate that to me.

Q. Did he articulate the specific reason why he had any opposition, if any, to the fitness-for-duty process, or is it just --
A. He articulated that he was confused about why.
THE COURT: I know this is a weird time to stop, but I am due down the hall in about five minutes. So I think we will recess right now and resume.
Let me tell you, ladies and gentlemen, there is only probably 10, 15 minutes left of this witness' testimony. And for obvious reasons, you won't be able to ask her any questions. But we will then -- we will complete this tomorrow morning and proceed with any additional evidence that there is.
So we will recess for the afternoon.
Before I excuse you, let me just tell you, I am actually speaking at an event down the hall, but that's not the important thing.
The important thing is, the American Bar Association has loaned us for one day some banners that are outside our ceremonial courtroom right down the hall. They are about the history of the women's suffrage movement in the United States. We like to say it was very noble. And, of course, I'm a big believer in women's suffrage. But it turns out that the history of getting there was not always pretty. I mean, there are some very interesting things about the way

women fought to get the vote that I think you might enjoy reading about.

No obligation, of course. If you want to just get your train and go home, that's fine. You are doing your duty to the United States.

I am just mentioning this in case any of you would like to look at those banners, because they are here for one day only. If you go out this way (indicating), go down to the hall to the ceremonial courtroom, you will see those.

The ceremonial courtroom, by the way, is a very large courtroom. It's about twice as big as this one. And instead of photographs of the Chief Judges that you see like this (indicating), there are photographs of every judge -- just about every judge that served our court. It's kind of an impressive room to see.

Anyway, I want to thank you for your time. I know we had you in and out a few times today. It's a little frustrating to me, but you have been just as wonderful as you always were. I want to thank you for your time.

Looking forward to seeing you tomorrow. I hope we will be getting the case to you for deliberations soon.

All rise.

9:30 tomorrow.

(Jury out at 3:38 p.m.)

THE COURT: I will be back at, like, 5:00 if you

want to resume with instructions at that point. Does that work for you? Maybe you can also compare and see where the disagreements are.

MR. BUSTAMANTE: Your Honor?

THE COURT: I was going to say at 5 o'clock I can come back and we can resume --

MR. BUSTAMANTE: Your Honor, I have a statute of limitations issue. I have got to run to my office, file a complaint. I wonder if we could just pick it up tomorrow morning. We can be here at 8:30 or 8 o'clock.

THE COURT: Well, how much do we have tomorrow for testimony?

MS. MARMOR: Not very much, your Honor. I think we could actually get through the testimony and then maybe let the jury go, do the instructions conference. I mean, I really don't expect to go past the morning.

THE COURT: Well, then, why don't we -- I have kind of almost a rock-hard rule that I don't -- I don't require people to close on the same day we are ironing out the instructions. I have done it a couple times. It's always a mistake. I think you are entitled to sleep on the instructions is what I mean -- or maybe you are not going to sleep, but you are entitled to know what the instructions are before you fine-tune your closing is what I mean.

So why don't we just tell the jurors when they get

in that we are going to finish the testimony and let them go for the day, and that they will come back first thing Thursday for closings.

MR. BUSTAMANTE: Thank you.

THE COURT: All right. And then we will have the whole afternoon to hammer out any disputes that we might have.

MS. MARMOR: I guess the question is, the only witnesses I expect at this point are just small, short snippets from -- well, we will finish Kroll. We might do the world's smallest piece of Parrinello. I mean, genuinely probably just the part that says that CorVel created that form.

And then maybe short examinations of Matt Burke and Rebecca Reierson. And I think that's it. Possibly Sean Lynch; but, again, extremely short.

I guess the question is, do we -- the only thing I don't know is if there is plans to be a rebuttal case?

THE COURT: There might be.

MR. BUSTAMANTE: I don't know. We will let you know first thing in the morning.

THE COURT: You have to talk about it. All right.

MR. LINDEN: Thank you, Judge.

(An adjournment was taken at 3:41 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Frances Ward__________________________March 30, 2020.
Official Court Reporter
F/j