# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| JOHN NAWARA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17-cv-2393 |
| | ) | |
| COUNTY OF COOK, a unit of local Government, | ) | Hon. Rebecca R. Pallmeyer |
| THOMAS DART, in his official capacity as | ) | |
| Sheriff of Cook County, Illinois, KAREN JONES- | ) | |
| HAYES, MATTHEW BURKE, REBECCA | ) | |
| REIERSON, and WINIFRED SHELBY, in their | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CCSO'S REVISED MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) ON PLAINTIFF'S CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PERTINENT EVIDENCE CONCERNING THE FFD REQUEST ....................................... 3

Summary of the Bases for the Referral ............................................................................ 3

The Job-Related Functions Implicated by Nawara's Behavior ...................................... 5

The Public Safety Business Necessities Implicated by Nawara's Behavior ................... 5

Nawara's Refusal to Cooperate or Sign Any Forms ....................................................... 6

The September 28, 2016 Altercation with Supt. Jones-Hayes ....................................... 8

Referral to HR for Possible FFD ..................................................................................... 9

The November 18, 2016 HR Meeting ............................................................................ 10

The Forms and Nawara's Refusal to Cooperate ........................................................... 12

The Actual FFD Process Followed in This Case ........................................................... 14

LEGAL STANDARD ...................................................................................................... 15

ARGUMENT .................................................................................................................... 15

I.   Requiring Nawara to Complete the FFD Process was Job Related, Consistent
     with Business Necessity, and Was a Legitimate Inquiry into His Ability to
     Perform Job-Related Functions. ................................................................................ 16

     A.   As a Matter of Law, the ADA Permits a Public Safety Employer to Require
          an FFD Evaluation and Medical Records to Ascertain the Cause of Troubling
          Behavior in the Workplace. ............................................................................... 16

     B.   A Public Safety Employer May Legally Send an Employee for an FFD Upon
          Reports of Disruptive or Unusual Behavior Implicating Safety Concerns in
          the Workplace. ................................................................................................... 19

          1.   The cases rejecting ADA claims under circumstances like those here are
               legion ....................................................................................................... 20

          2.   Wright cannot be used to distinguish this case from Coffman's well-
               established standard for FFD referrals of public safety employees. ............ 27

     C.   Disagreement Over the Referral Process or Whether an Employee Engaged in
          Disruptive Conduct Warranting an FFD Exam Does Not Create an Issue of
          Material Fact. ..................................................................................................... 28

D.    The Public Policy Interest in Ensuring that Law Enforcement Employees Can Safely do Their Jobs Underscores the Need for Judgment as a Matter of Law.....31

**II. The Forms Nawara Was Given Do Not Render the FFD Referral Illegal.** ...............32

A.    The CorVel Form Permitted Only Records Related to the FFD to Be Gathered and Was Entirely Legal Under the ADA. ...............................33

B.    The CCSO Form Permitted the CCSO to Gather Medical Records Only if the Employee Agreed and Identified His Treaters.......................................35

C.    Because Nawara Never Signed the Original CorVel Form and the CCSO Form, and No Form Ever Was Used to Obtain Irrelevant Medical Information About Nawara, The CCSO Cannot Have Violated the ADA. ..............................36

**CONCLUSION** .....................................................................................................................39

# TABLE OF AUTHORITIES

Page(s)

CASES

*Cody v. CIGNA Healthcare of St. Louis, Inc.*,
139 F.3d 595 (8th Cir. 1998) ..........................................................32

*Coffman v. Indianapolis Fire Dep't*,
578 F.3d 559 (7th Cir. 2009) ........................................... 17, *passim*

*Conroy v. N.Y. State Dep't of Corr. Servs.*,
333 F.3d 88 (2d Cir. 2003).............................................................22

*Coursey v. Univ. of Md. E. Shore*,
577 Fed. Appx. 167 (4th Cir. 2014)................................................18

*Dengel v. Waukesha County*,
16 F. Supp. 3d 983 (E.D. Wis. 2014)..............................................19

*English v. Smith*,
2008 WL 4287628 (N.D. Ill. Sept. 15, 2008) ..................................33

*Farmiloe v. Ford Motor Co.*,
277 F. Supp. 2d 778 (N.D. Ohio 2002).............................................38

*Grassel v. Dep't of Educ. of N.Y.*,
2017 U.S. Dist. LEXIS 39683 (E.D.N.Y. 2017)...............................38

*Green v. Joy Cone Co.*,
278 F. Supp. 2d 526 (W.D. Pa. 2003).........................................34, 35

*Hall v. Forest River, Inc.*,
536 F.3d 615 (7th Cir. 2008) .........................................................15

*Jackson v. Regal Beloit Am., Inc.*,
2018 U.S. Dist. LEXIS 103682 (E.D. Ky. 2018).............................38

*Koszuta v. Office Depot, Inc.*,
2018 U.S. Dist. LEXIS 62580 (N.D. Ill. 2018) ................................. 17, *passim*

*Krocka v. City of Chicago*,
203 F.3d 507 (7th Cir. 2000) ...............................................17, 19, 32

*Kurtzhals v. Cty. of Dunn*,
2019 U.S. Dist. LEXIS 185330 (W.D. Wis. Oct. 25, 2019)..................19, 29, 30

*Massey v. Blue Cross-Blue Shield of Illinois,*
226 F.3d 922 (7th Cir. 2000) ....................................................15

*McClure v. Cywinski,*
686 F.2d 541 (7th Cir. 1982) ...................................................15

*Mickens v. Polk County School Board,*
430 F.Supp.2d 1265 (M.D.Fla.2006) ......................................18

*Miller v. Champaign Community Unit School District No. 4,*
983 F. Supp. 1201 (C.D.Ill.1997) ...........................................17

*O'Neal v. City of New Albany,*
293 F.3d 998 (7th Cir. 2002) ...................................................38

*Owusu-Ansah v. Coca-Cola Co.,*
715 F.3d 1306 (11th Cir. 2013) ......................................18, *passim*

*Painter v. Ill. DOT,*
715 Fed. Appx. 538 (7th Cir. 2017)....................................23, 32

*Pena v. City of Flushing,*
651 Fed. Appx. 415 (6th Cir. 2016)........................................36

*Pence v. Tenneco Auto. Operating Co.,*
169 Fed. Appx. 808 (4th Cir. 2006)..........................18, 29, 30

*Sullivan v. River Valley Sch. Dist.,*
197 F.3d 804 (6th Cir. 1999) ...........................18, 29, 30, 36

*Tice v. Ctr. Area Transp. Auth.,*
247 F.3d 506 (3d Cir. 2001)............................................28, 31

*Watson v. City of Miami Beach,*
177 F.3d 932 (11th Cir. 1999) ....................................18, *passim*

*Williams v. Motorola, Inc.,*
303 F.3d 1284 (11th Cir. 2002) ..............................................18

*Wright v. Ill. Dept. of Children & Family Servs.,*
798 F.3d 513 (7th Cir. 2015) ............................................27, 28

## STATUTES

42 U.S.C. § 12112(d) ................................................................35, 38

42 U.S.C. § 12112(d)(2) ..................................................................34

42 U.S.C. § 12112(d)(4) ..................................................................34

42 U.S.C. § 12112(d)(2)(A) ................................................................................34

42 U.S.C. § 12112(d)(2)(B) ................................................................................34

42 U.S.C. § 12112(d)(4)(A) ................................................................ 1, *passim*

42 U.S.C. § 12112(d)(4)(B) ...........................................................................17, 34

Illinois Whistle Blower Act ..................................................................................1

RULES

Fed. R. Civ. P. 50 ............................................................................... 1, *passim*

*Introduction*

Before this case went to the jury for decision, Defendants Thomas Dart in his official capacity (the "CCSO"), Karen Jones-Hayes, Matthew Burke, Rebecca Reierson and Winifred Shelby (the "Individual Defendants") moved pursuant to Fed. R. Civ. P. 50 to dismiss all three claims remaining in the Second Amended Complaint against them. The Court granted the motion in favor of all defendants on Counts IV and V and dismissed the Individual Defendants, concluding that no reasonable juror could find the Individual Defendants acted illegally towards Plaintiff and that no claim under the Illinois Whistleblower Act or for Due Process could lie against them or the CCSO. The Court entered and continued the CCSO's Rule 50 Motion as to the lone remaining claim against it, for violation of the Americans with Disabilities Act, 42 U.S.C. 12112(d)(4)(A), (the "ADA"), which then went to the jury.

The jury found the CCSO liable under the ADA but awarded Plaintiff no damages. As detailed below, the ADA count should not have been presented to the jury at all, as the decision by the CCSO's HR professionals to send Plaintiff for a Fitness for Duty ("FFD") exam fell well within parameters established by the Seventh Circuit. Indeed, apart from cases involving actual discrimination – which is not an issue here – the CCSO has found no precedent in the Seventh Circuit or elsewhere permitting an ADA claim to proceed or stand against a public safety employer for sending an employee for an FFD examination based on concerning behavior in the workplace. Nor can an ADA claim rest on forms an employee never signed and which never were used to seek protected health information unrelated to the FFD exam or to take an adverse employment action. Pursuant to Federal Rule 50(b) the CCSO now renews its motion for judgment as a matter of law on the lone count that went to the jury.

The unrebutted evidence presented during trial confirms that the CCSO's request that Nawara undergo an FFD assessment (including granting the examiner access to his medical information) was (a) job related and consistent with a business necessity and (b) a permissible inquiry into whether Plaintiff could perform job-related functions. Case law in the Seventh Circuit and across the country confirms that an employer – especially a public safety employer like the CCSO – may require an FFD evaluation where, against the backdrop of legitimate concerns about the safety of the public and others, it receives information of disruptive or concerning conduct by an employee. That is precisely what occurred in this case and no reasonable jury could have found otherwise. Upholding the jury's verdict would chill the ability of law enforcement agencies to ensure the safety of the public and their employees in stressful work environments that also are subject to important Constitutional requirements.

As for the forms that Nawara was presented but never signed, the testimony in this case established that the forms could not be used to obtain personal health information unrelated to the FFD and indeed they never were. The forms given to Nawara complied with the ADA because they simply allowed for an interactive process by which Nawara could identify his relevant providers for purposes of his FFD examination. Even if Nawara had been required to sign these forms – which he in fact never signed – they were not and could not be used to obtain personal health information unrelated to Nawara's FFD exam. Nawara's subjective belief to the contrary cannot overcome the unrebutted evidence in this case about the meaning and uses of the forms – information that could have been provided to Nawara had he cooperated and communicated with his employer at any time before he finally completed a release form and proceeded with his FFD.

Under the facts and the clear law, this Court should grant the CCSO's Motion for Judgment as a Matter of Law.

## PERTINENT EVIDENCE CONCERNING THE FFD REQUEST

### *Summary of the Bases for the Referral*

Correctional Officer John Nawara was ordered to undergo an FFD exam on November 18, 2016 based both on information provided to the CCSO's Human Resources department about an altercation with Superintendent Karen Jones-Hayes and the first-hand experience of two HR employees – Rebecca Reierson, the CCSO's HR Leave and Absence Manager and Winifred Shelby, an Occupational Health Nurse in HR at the time – in their attempted interview of Nawara about the altercation. (2/25/20 Trial Tr. at 384:17-409:16 (Reierson); 3/2/20 Tr. (Shelby) at 1381:1-1399:10:10; 3/4/20 Tr. (Reierson) 1766:12-1782:22.)

Both Reierson and Shelby testified that the information about Nawara and his conduct with them in HR – detailed here and further below – raised concerns about his ability to manage a prison population and to control his anger. (See, e.g., 2/25/20 Trial Tr. (Reierson) at 388:21-22 ("It raised concerns that an employee wouldn't be responding to their supervisor."), 390:16-20 ("if a detainee thinks that one of our officers is crazy, there's definitely an issue because they are the ones that are supposed to be enforcing order"), 404:21-25 ("his demeanor through [the HR meeting]," "he was not responsive," and "he was not truthful," "all made us concerned about his ability to go back and work in the jail"); 3/2/20 Trial Tr. at 1389:4-1391:1 (Shelby) ("how will he show self-control with that inmate or detainee who's right up in his face screaming and yelling at him?"), 1392 (explained to Nawara that the evaluation is to "make sure you are safe for yourself to return to work."), 1392 (based on his lack of self-control, "[t]here is [Nawara's] safety and as well as the safety of his colleagues and the detainees."), 1397-1398 ("that's concerning for any officer that can't control themselves."); 3/4/20 Trial Tr. (Reierson) at 1770:16-1771:18 (Nawara made no effort to tell his side of the story at HR; all he said was he didn't have an issue with Jones-Hayes

but stayed away from her); 1771:19-1773:24 ("he was very upset" and didn't respond to follow up re Jones-Hayes);(1780:11-1782:22; *id.* at 1780:21-25) (Q. Did you have concerns that Mr. Nawara could not perform job related functions after the report from Jones-Hayes and your meeting in HR? A. Yes that's why he was sent for the fitness-for-duty evaluation."); *id.* at 1781:1-1782:14 ("Based on the statement from Supt. Jones-Hayes, I had concerns about him not following orders regarding the cuffing and the shackling because those are safety requirements. His insubordination when questioned about not following a safety rule or regulation. The sudden anger that was presented I mean that's an issue. You have to be able to communicate with others that you are working with. Our correctional officers, their job is to maintain the security and safety of the detainees and the staff.")[1]

While Nawara disagreed with the characterizations of his behavior, he never denied that the underlying conflict with his Superintendent occurred (and indeed he confirmed that key elements of his angry conduct in fact occurred) or that the meeting with HR took place and was "tense" and "seemed to go badly from the start." (See, e.g., 2/28/20 Trial Tr. (Nawara) at 1061:19-25 (Nawara "kind of freaked out" with the Superintendent and got "a little loud"), 1067:12-22 ("'[t]his is my boss, who is half my size in a dress and heels, and I need her here to help me do my job'"), 1070:4-6 (Q. "So what you did next was because you were upset, right? A. Okay."), 1076:14-18 (Q. But you don't deny the room was tense? A. Not at all. Q. And you don't deny that it seemed to go badly from the start? A. Correct."), 1070:7-13 ("'So as we're walking back, especially after how she had just treated me, I couldn't resist. I leaned over to her, and I told her in her ear – I go, 'Maybe if you walk around with me all day, I can do my job, because this is what I have to go through down here because you don't provide the proper restraints. You don't do

---

[1] Additional testimony about Nawara's demeanor is provided below.

any.'"").)  Nor, apart from Nawara's bizarre and unfounded speculation that Jones-Hayes and Shelby must have been personal friends (2/28/20 Trial Tr. at 1136:20-1137:7 (Nawara); *cf.* 3/2/20 Tr. at 1230:4-14 (Jones-Hayes); 3/2/20 Trial Tr. at 1377:3-15 (Shelby)) did Plaintiff offer any evidence whatsoever that the decision by Reierson and Shelby to send Nawara for an FFD exam was motivated by anything other than the information they had and the conduct they witnessed.

### The Job-Related Functions Implicated by Nawara's Behavior

The CCSO entered into evidence the written job description for Correctional Officers at the CCSO, and both Reierson and Shelby, as well as Matthew Burke (who referred the matter to HR), identified the job-related functions that Nawara's behavior implicated.  (2/25/20 Trial Tr. at 404:21-405:21 (Reierson); 2/27/20 Trial Tr. at 861:6-867:9 (Burke); 3/2/20 Trial Tr. at 1404:10-1406:20 (Shelby); 3/4/20 Trial Tr. at 1780:11-1782:22 (Reierson); see also DX 1 (job description), Ex. A.)  Among these were the ability to "follow[] orders," "enforce[e] orders" pertaining to "safety requirements," "communicate with others," "respond[] to [his] supervisor," be "responsive" and "truthful" in HR, "maintain composure," "keep his anger under control,"  ensure "his safety and … the safety of his colleagues and the detainees," "respond appropriately in a high stress environment," "exhibit[] proper behavior toward detainees and his superior officer," "manage a detainee population without losing his temper," and "show self-control with [an] inmate."  (2/25/20 Trial Tr. at 388:21-390:20; 404:21-405:21 (Reierson); 3/2/20 Trial Tr. at 1390:1-1398:15, 1404:10-1406:20 (Shelby); 3/4/20 Trial Tr. at 1769:20-1781:25 (Reierson); DX 42, Ex. B.)

### The Public Safety Business Necessities Implicated by Nawara's Behavior

In addition, Burke explained in detail the serious constitutional obligation to avoid incidents of excessive force at the Cook County Jail and the Department of Justice consent decree

and Agreed Order that made this a particular concern in that environment. (2/27/20 Trial Tr. 830, 848-867 (First concern identified by the DOJ in the consent decree was "Protection of inmates from harm. And this included protection from each other, from other detainees, meaning that we ensured that we had good practices to keep inmates safe from each other, and that they were safe from excessive force from correctional officers and other correctional staff."; "Corrections is unique in that officers are often forced to put their hands on other human beings."); 3/4/20 Trial Tr. at 1705:24-1707:13, 1713:2-1714:20 ("We had issues with several employees that would come up on a day-to-day basis, employees that were going through a tough time.").) Burke also described the consequences that could befall others as well as the CCSO if potential warning signs from Correctional Officers were not taken seriously, underscoring the need for the CCSO to be able to refer cases to HR for evaluation, and for HR in turn to be able to send concerning employees for FFDs. (*See, e.g.*, 3/4/20 Trial Tr. at 1709:14-1714:9 (the previous year, correctional officer "had killed herself after shooting two other people and seriously injuring them" about ten months after she was reported as "irate and yelling at supervisors in front of detainees and staff" and eight months after a report of "unprofessional conduct after having a verbal altercation with a fellow correctional officer." This correctional officer was not referred to HR for an FFD check-in meeting).)

### *Nawara's Refusal to Cooperate or Sign Any Forms*

Nawara resisted the request to undergo an FFD for ten months, demanding repeatedly that he be reinstated without any FFD exam at all. (2/28/20 Trial Tr. at 1095:15-19, 1096:16-1097:25, 1102:12-25, 1109:21-1110:17; 1116:19-1116:24.) At trial, however, Nawara testified that he was not concerned or worried about the FFD evaluation; he just did not want to sign blank forms. (2/28/20 Trial Tr. at 1032:25-1033:4 ("Q. What was your concern at that time? A. That I was being

ordered to sign two blank forms. Q. Did you have any concerns or worries about the fitness-for-duty evaluation itself? A. No, sir.").) This brought the focus onto the two forms Nawara was provided on November 18, 2016 – one, that allowed the third party administrator the CorVel Corporation ("CorVel") to obtain medical records relevant to the FFD exam (the "CorVel form"), and the second, which would have allowed the CCSO to gather the records for transmission to CorVel (the "CCSO form"). (DX 2, Ex. C; 2/25/20 Trial Tr. at 279:19-25; 3/2/20 Trial Tr. at 1364:13-1373:9,1391:15-1395:20; 3/3/20 Trial Tr. at 1492:18-1496:25.)

The unrebutted testimony is that Nawara never signed either of these forms, that the CCSO never got any of his medical records, and that the CCSO form always was optional. (2/25/20 Trial Tr. at 364:7-367:14, 417:13-418:16 (Reierson); 3/2/20 Trial Tr. at 1367:12-1369:1, 221 (Shelby); 3/3/20 Trial Tr. at 1573:15-20 (Shelby) ("Q. "and was signing the [CCSO] form voluntary? A. Yes, it was.").) There was not a single document entered into evidence showing that Nawara objected to the CCSO form; rather, the correspondence between Nawara's counsel and the CCSO prior to filing suit complained generally about his being sent for an FFD at all, and only the CorVel form was identified as the subject of dispute. (DX 28, Ex. D; DX 29, Ex. E; DX 33, Ex. F; 2/28/20 Trial Tr. at 1093:16-1117:17 ("Q. But she only ever attached the CorVel form to any of her emails that she sent about this matter, right? A. Yes."; Q. "'So did you understand that the position that your attorney was taking for you at the time was that you shouldn't have to go through the FFD process at all?" A. Correct.'") In any event, the only form Nawara ever signed was a slightly modified version of the CorVel form that changed nothing about how the FFD exam proceeded. (DX 37, Ex. G; 2/28/20 Trial Tr. at 1129:10-1130:6 (Nawara); 3/2/20 Trial Tr. at 1402:1-5, 1500:3-1501:12 (Shelby); 3/3/20 Trial Tr. at 1500:3-1501:12 (Sarocka) ("Q. Did you do anything differently with this form than you would normally do in an FFD process where the usual CorVel

form was signed? A. No, nothing different.").)  This form, along with a referral form from the CCSO and Jones-Hayes's signed account of the events of September 28, 2016 were provided to CorVel, who in turn gathered two years of relevant medical records based on Nawara's identification of relevant treaters, sent the records to an examiner CorVel chose, set up Nawara's appointments, and produced a report five weeks after the modified Corvel form was signed by Nawara.  (DX 21, Ex. H; DX 37, 42; 3/3/20 Trial Tr. at 1513:9-1519:23 (Sarocka).)  Nawara was put back to work on September 27, 2017, one day after the report was received.  (DX 55, Ex. I; DX 56, Ex. J; 2/28/20 Tr. 1132:12-14 (Nawara).)

### *The September 28, 2016 Altercation with Supt. Jones-Hayes*

The events relevant to Nawara's ADA claim arose from a September 28, 2016 altercation between Nawara and Superintendent Karen Jones-Hayes – Nawara's superior officer.  (2/25/20 Trial Tr. at 384-87; 389:3-4.)  On the same day as the conflict, Jones-Hayes submitted a complaint register and informed her superiors including then-Chief of Staff Matthew Burke that in response to a routine directive from her, Nawara exuded rage, screamed at her, called her "lady," and escalated the conflict, eventually telling her "Yeah, why don't you walk around with me all fucking day so I can do my job." (2/27/20 Trial Tr. at 874:7-887:3.)  These were three separate interactions, each of which raised significant concerns for the CCSO.

On September 29, 2016, Burke referred the matter to Human Resources ("HR") – the department with the authority to refer employees for FFDs – to see if anything was going on with him that may have caused "this aggression and these outbursts directed towards the superintendent."  (2/27/20 Trial Tr. at 817:20-823:24 ("the focus for HR was to have a meeting with Officer Nawara and evaluate his well-being and see if he could safely and effectively perform the essential functions of the job."), 889:9-13 (Burke); 3/2/20 Trial Tr. at 1344:12-20 (Shelby);

DX 11, Ex. K (Referral to HR).)  The referral to HR included an email from Jones-Hayes, which stated:

> I just wanted to touch on the incident that occurred on yesterday with myself and Officer John Nawara. On a daily basis I walk this unit engaging and talking with detainees and staff alike however, yesterday was an eye opening moment. Officer Nawara exuded such rage in his demeanor as I gave him a job related directive, that I felt it was important I inform all my superiors in the event of any future issues.

(DX 11; 2/27/20 Trial Tr. at 826:5-829:7 (Burke).)

### *Referral to HR for Possible FFD*

Rebecca Reierson, the Leave and Absence Manager in Human Resources (2/25/20 Trial Tr. at 222:12-16), was assigned the HR referral.  (2/25/20 Trial Tr. at 373:20-22.)  Reierson testified that the referral indicated problematic behavior because "exuding rage at work…would be a problem."  (2/25/20 Trial Tr. at 374:3-375:8.)  She emailed Jones-Hayes to get additional information but Jones-Hayes missed the email.  (2/25/20 Trial Tr. at 377:12-23 (Reierson); 3/2/20 Trial Tr. at 1229:10-22 (Jones-Hayes).)  On November 8, 2016, Reierson told Burke that there was not enough information at the time to support sending Nawara for an FFD evaluation, but she would be happy to meet with Jones-Hayes to learn more.  (PX 26, Ex. L; 2/25/20 Trial Tr. at 378:17-380:14 (Reierson).)  Burke emailed Jones-Hayes directing her to contact Reierson to "relay [her] concerns about Officer Nawara's behavior," which she did.  (DX 20, Ex. M; 2/27/20 Trial Tr. at 911:20-913:23 (Burke).)  Thereafter, Burke had no involvement in deciding whether Nawara would or would not be referred for and FFD exam.  (2/27/20 Trial Tr. at 914:9-14.)

During a telephone call on November 16, 2016 with Reierson and Shelby, Jones-Hayes described Officer Nawara's behavior toward her, which raised concerns for Reierson and Shelby about Nawara's ability to safely perform his duties and "workplace violence."  (2/25/20 Trial Tr. at 384:17-393:11 (Reierson) ("It seemed like a frightening incident for [Jones-Hayes], definitely;" the call "raised concerns that an employee wouldn't be responding to their supervisor"); 3/2/20

Trial Tr. at 1376:22-1382:14 (Shelby) ("lack of self-control;" "lacked the ability to communicate;" "came to her and whispered in her ear…to me that was very threatening;" "[y]ou just think about workplace violence;" "[correctional officers] should be able to calm these situations down, not add fire to the situation").)  According to notes taken by Reierson, Jones-Hayes reported that she had addressed Nawara about his failure to follow a directive to cuff and shackle detainees, but he ignored her.  (2/25/20 Tr. at 384:17-393:11 (Reierson) (discussing her concerns based on the following language from PX 118))  After Jones-Hayes got his attention by tapping his shoulder and asking "if he heard her, and he jumped her face and yelled at the top of his lungs 'Don't touch me! Don't fucking touch me!' over and over again."  (PX 118, Ex. N)  Jones-Hayes removed herself from the area, directing that Nawara "cuff and shackle the detainees that were not already."  (*Id.*)  Shortly thereafter, a detainee told Jones-Hayes that "he didn't want to be cuffed by Nawara because [he] was crazy."  (*Id.*)  After securing the detainee, as Jones-Hayes reported it, "[a]s Jones-Hayes was leaving, Nawara "stormed behind her and yelled 'So what? Are you going to follow me around all day?'"  (*Id.*)

### *The November 18, 2016 HR Meeting*

The report from Jones-Hayes raised concerns for Reierson and Shelby about Nawara's ability to perform his job-related functions of responding to a supervisor, managing a detainee population, communicating with staff and detainees, and calming situations without "add[ing] fire" to them.  (2/25/20 Trial Tr. at 384:17-393:11; 404:21-405:21 (Reierson); 3/2/20 Trial Tr. at 1376:22-1382:14, 1389:24-1398:15, 1404:10-1406:20 (Shelby); 3/4/20 Trial Tr. at 1769:20-1781:25 (Reierson).)  They agreed that they should meet with Nawara to "get a sense of what was going on." (2/25/20 Trial Tr. at 395:16-21 (Reierson).)  Nawara was off-duty November 16th and 17th, so he was ordered to appear at HR on November 18, 2016 at 9:00 a.m. as soon as he returned

to work.  (DX 22, Ex. O; 2/25/20 Trial Tr. at 398:6-12 (Reierson).)  At the meeting, Shelby assured Nawara that the meeting was not disciplinary and tried to get his account of what had happened with Jones-Hayes.  (2/28/20 Trial Tr. at 1074:21-1075:1 (Nawara); 3/2/20 Trial Tr. at 1382:20-1386:20 (Shelby).)

Nawara would not cooperate in the meeting and did not provide any account of his altercation with Jones-Hayes.  (2/28/20 Tr. at 1076:1-3, 1077:25-1078:9 (Nawara); 3/2/20 Tr. at 1382:20-1386:20 (Shelby); 3/4/20 Trial Tr. at 1769:20-1781:25 (Reierson).)  Nawara himself testified that his interaction with them was a "dance" in which he would not answer questions because he wanted to see a written complaint first.  (2/28/20 Trial Tr. at 1076:1-9 (Nawara).)

Nurse Shelby testified that Nawara was "mad" and "enraged" almost from the start and looked "like a bulldog just ready to attack."  (3/2/20 Trial Tr. at 1386:21-1387:5.)  In all of Shelby's experiences conducting these types of meetings, "no one had ever acted the way [Nawara] acted. No one had showed this type of rage."  (3/2/20 Trial Tr. at 1387:12-21.)  Reierson testified that he became enraged, "was hostile the entire time," "his jaw was clenched," "his fists were clenched," "he seemed very agitated…almost like he was just trying to keep himself in the chair," and she was in "fear. (2/25/20 Trial Tr. at 272:7- 273:3; 3/4/20 Trial Tr. at 1733:7-24.)  Reierson testified that Nawara's behavior "was scary to [her] because [she] felt like [she] didn't know what was going to happen next."  (2/25/20 Trial Tr. at 401:1-6.)  Nawara admitted that the mood in the room was tense and the meeting seemed to go badly from the start.  (2/28/20 Trial Tr. at 1076:14-18.)  Based on their experience, Reierson and Shelby found Nawara's failure to engage with them abnormal.  (2/25/20 Trial Tr. at 401:7-16; 3/2/20 1387:12-1388:12.)

At some point, Nawara left the room and contacted a union representative to join him for the remainder of the meeting.  (2/25/20 Trial Tr. at 273:25-274:4 (Reierson).)  While Nawara was

out of the room, Reierson and Shelby both agreed that based on the Jones-Hayes report and Nawara's behavior during their meeting, he should undergo an FFD evaluation before returning to work because they were concerned about his ability to perform his duties and control his anger. (2/25/20 Trial Tr. at 402:21-405:23 (Reierson); 3/2/20 Trial Tr. at 1388:22-1389:6 (Shelby) ("We talked about his behavior, his lack of self-control, the rage. This officer needed to be assessed by a mental health provider to make sure he was okay."); 3/4/20 Trial Tr. at 1772:24-1774:23 (Reierson) (the conduct "seemed like a continuing behavior").)

Upon returning with his union representative, Reierson and Shelby informed Nawara that he was being sent for an FFD evaluation based on the incident with Jones-Hayes and his conduct during the first part of the meeting. (2/25/20 Trial Tr. at 407:6-15 (Reierson); 2/28/20 Trial Tr. at 1078:4-9, 1095:10-14 (Nawara).) Nawara admitted that Shelby told him that one of the reasons for the FFD referral was "the aggressive behavior he displayed [in HR]" and he made no effort to dispute that at the time. (2/28/20 Trial Tr. at 1076:21-1077:7, 1095:10-14 (Nawara); 3/2/20 Trial Tr. at 1398:9-15 (Shelby).) Shelby told Nawara he could not return to work until he had been cleared by the FFD examiner. (2/25/20 Trial Tr. at 408:22-409:7 (Reierson).) Thereafter, at the request of Nawara's union representative, Shelby and Reierson participated in a call with another union representative and a union lawyer, during which the subject of the Jones-Hayes conflict was discussed, but Nawara once again failed to offer his version of the events of that day. (2/25/20 Trial Tr. at 274:5-18 (Reierson); 2/28/20 Trial Tr. at 1077:8-22 (Nawara).)

### *The Forms and Nawara's Refusal to Cooperate*

Shelby presented two medical release forms to Nawara on November 18, 2016: (1) a form from the third-party administrator, CorVel, who would facilitate the FFD exam (the "CorVel form") and (2) a form from the CCSO (the "CCSO form"). (DX 2; 2/28/20 Trial Tr. 1078:10-12

(Nawara); 3/3/20 Trial Tr. at 1492:18-1496:19 (Sarocka).) While Nawara referred to (and says he complained about) these forms as "blank," the forms were designed to permit dialogue about an employee's medical information relevant to the FFD exam; no medical information that might be requested under either form could be identified without the employee's participation. (2/25/20 Trial Tr. at 279:19-25 (Reierson); 3/2/20 Trial Tr. at 1364:13-1370:6, 1391:19-1395:20 (Shelby); 3/3/20 Trial Tr. at 1492:2-1499:5 (Sarocka).) The CorVel form also authorized CorVel to send the FFD report to the CCSO. (3/2/20 Trial Tr. at 1363:9-1364:3 (Shelby); 3/3/20 Trial Tr. at 1501:2-16 (Sarocka).) To obtain information using either form, the employee would have to disclose his providers, and if he did not, the forms could not be used to obtain medical information. (3/2/20 Trial Tr. at 1364:17-1370:12 (Shelby).) If, after completing the forms, an employee did not want to disclose certain medical information, he could refuse to do so, and also could revoke his consent to disclosure of his personal health information. (3/2/20 Trial Tr. at 1367:1-11 (Shelby).) When Shelby tried explaining the process, Nawara was nonresponsive. (3/2/20 Tr. at 1391:18-1395:17 (Shelby).) Nawara also was told that he would be placed on authorized leave pending completion of his FFD. (2/25/20 Trial Tr. at 409:4-10 (Reierson).)

Nawara refused to cooperate in the FFD process or complete either form. (See 2/25/20 Trial Tr. at 279:19-25 (Reierson); 3/2/20 Trial Tr. at 1364:13-1370:6 (Shelby).) Within two weeks, Nawara was told by his union that the FFD referral and related leave were not disciplinary and Nawara admitted that he was never disciplined for refusing to cooperate with the FFD process. (2/28/20 Trial Tr. at 1087:5-15, 1132:19-22 (Nawara).) Rather than cooperate or provide any information explaining his behavior, Nawara hired a lawyer who engaged in a months-long email campaign threatening litigation and demanding immediate reinstatement without any FFD exam. (See DX 28, 29, 33; 2/28/20 Trial Tr. at 1095:15-19, 1096:16-1097:25, 1102:12-25, 1109:21-

1110:17, 1116:19-1116:24 (Nawara).)  Nawara himself never complained about the scope of the requested examination or the medical release forms, and none of the emails ever referenced or attached the CCSO form at all – the only form attached to the emails questioning the FFD exam was the CorVel form.  (2/28/20 Trial Tr. at 1115:19-1116:24 (Nawara).)

### *The Actual FFD Process Followed in This Case*

Eventually, on August 17, 2017, Nawara agreed to and signed a modified version of the CorVel form and to undergo an FFD evaluation.[2]  (DX 37; 2/28/20 Trial Tr. at 1129:10-1130:6 (Nawara).)  He was never required to sign the CCSO form.  Once the CorVel form was signed the process promptly began.  (2/28/20 Trial Tr. at 1130:2-6 (Nawara).)  Nurse Shelby sent CorVel an FFD referral for Nawara based on his "aggressive, physically intimidating and inappropriate behavior" toward Jones-Hayes and his "aggressive and hostile [behavior] in the human resources department" weeks later.  (DX 42.)  The referral requested that Nawara be evaluated for his ability to "perform essential functions of his job, which require he maintain composure and respond appropriately in a high stress environment, including exhibiting proper behavior toward detainees and his superior officer."  (*Id.*)  The referral also identified the CCSO's concern about Nawara's "ability to manage a detainee population without losing his temper."  (*Id.*)

Upon receipt of the referral and the signed modified CorVel form, case manager Michelle Sarocka called Nawara, who identified his relevant providers.  (3/3/20 Trial Tr. at 1510:19-25 (Sarocka); see also *id.* at 1492:10-12 (Sarocka does not believe she ever facilitated an FFD without medical records).)  Sarocka obtained two years of medical records from Dr. Charles Shaw, Nawara's primary care physician, and Nawara obtained and sent progress notes from a counselor

---

[2] Nawara attached a Rule 56 statement of uncontested facts to his October 22, 2019 motion for leave to file a summary judgment motion.  **In that statement, Nawara averred that it was <u>uncontested</u> that the signed release was <u>"limited in scope and provided that the Sheriff's Office would only receive a copy of the "Independent Medical Exam."</u>**  (Dkt. 220-2 at ¶ 40.)  No evidence at trial established otherwise.

he had seen.  (DX 46, Ex. P; 2/28/20 Trial Tr. at 1130:7-1132:7 (Nawara); 3/3/20 Trial Tr. at 1512:8-1513:20 (Sarocka).)  At no point did Nawara complain that CorVel or the examiner sought more information than necessary to complete his FFD exam, nor was any argument made that the records obtained were unrelated to the FFD inquiry.  The examiner found Nawara fit for duty without restrictions.  Once the CCSO received the examiner's report, Nawara immediately was returned to work.  (2/25/20 Trial Tr. at 461:7-462:2 (Reierson).)

## LEGAL STANDARD

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on that issue, "then the party's opponent is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 50(a).  "Judgment as a matter of law is appropriate if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on an issue."  *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008); *Massey v. Blue Cross-Blue Shield of Illinois,* 226 F.3d 922, 924-25 (7th Cir. 2000) Drawing reasonable inferences from the evidence, the question for the Court is whether the evidence as a whole is "sufficient to allow a reasonable jury to find in favor of [the nonmoving party]."  *Hall*, 536 F.3d at 619.  Inferences based on speculation and conjecture do not warrant consideration of the issue by the jury.  *See McClure v. Cywinski*, 686 F.2d 541, 544 (7th Cir. 1982).  This motion is brought under Rule 50(b) because the jury entered its verdict in favor of Nawara.

## ARGUMENT

Under the law of this Circuit and other federal courts who have addressed the legality of FFDs, the CCSO's referral in this case was job-related, consistent with the CCSO's public safety necessities, and a legitimate inquiry into his ability to perform job related functions as described both in his job description and in testimony.  First, as a public safety employer, the CCSO had a

particularly strong interest in ensuring Nawara could perform his job safely without risk to detainees or his fellow employees – and the law confirms that this interest coupled with evidence implicating safety concerns – is sufficient to justify sending an employee for an FFD. *Second*, the forms Nawara was asked to sign did not seek – and could not be used to seek – protected health information unrelated to the FFD inquiry. Because the forms themselves did not overstep the bounds of permissible inquiries under the ADA, and because Nawara offered only subjective and unfounded speculation about how the forms *might* have been used had he signed them – speculation that is flatly belied by the forms and the testimony at trial – Nawara can point to no legitimate factual dispute that would render the forms a violation of the ADA. The CCSO therefore is entitled to judgment as a matter of law in this case.

I.  **Requiring Nawara to Complete the FFD Process was Job Related, Consistent with Business Necessity, and Was a Legitimate Inquiry into His Ability to Perform Job-Related Functions.**

No reasonable jury could have concluded based on the evidence at trial that the CCSO violated the ADA by requiring Nawara to complete the FFD process before returning to work. The statute and case law confirm this conclusion. Indeed, apart from cases involving actual discrimination claims – which is not an issue here – the CCSO has found no precedent in the Seventh Circuit or elsewhere permitting an ADA claim to proceed or stand against a public safety employer for sending an employee for an FFD examination based on concerning behavior in the workplace. In case after case, *even where the employee disputes engaging in the behavior*, courts have found that safety concerns of employers – especially for public safety employers like the CCSO – preclude a liability finding under the ADA because FFDs to ascertain whether such an employee poses a danger to the workplace undoubtedly is job related and consistent with business necessity.

A.  **As a Matter of Law, the ADA Permits a Public Safety Employer to Require an**

**FFD Evaluation and Medical Records to Ascertain the Cause of Troubling Behavior in the Workplace.**

Section 12112(d)(4)(A) of the ADA permits an employer to require a medical examination and/or inquire into whether an "employee is an individual with a disability or as to the nature or severity of the disability" where "such examination or inquiry is job related and consistent with business necessity." 42 U.S.C § 12112(d)(4)(A). The ADA also permits an employer to make an inquiry "into the ability of an employee to perform job-related functions." *Id.* § 12112(d)(4)(B); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (noting § 12112(d)(4)(B) is an independent basis to allow inquiries into the ability of an employee to perform job-related functions). The evidence at trial established that Nawara's FFD referral and process were permitted under both of these provisions as a matter of law.

The Seventh Circuit and other circuit courts repeatedly have found as a matter of law that an employer may require an employee to undergo an FFD based on information suggesting that the employee may be unable to perform essential job duties or may pose a safety risk to others, even when the information underlying the referral is subject to debate. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565-66 (7th Cir. 2009) (upheld summary judgment finding psychological exam appropriate for firefighter upon receipt of reports of "withdrawn" or "defensive" behavior); *Krocka v. City of Chicago*, 203 F.3d 507, 513-15 (7th Cir. 2000) (summary judgment approving FFD upheld for depressed police officer); *Koszuta v. Office Depot, Inc.*, 2018 U.S. Dist. LEXIS 62580, *36-39 (N.D. Ill. 2018) (summary judgment granted in non-public safety role where psychological evaluation was appropriate following reports of unusual or aggressive behavior); *Miller v. Champaign Community Unit School District No. 4,* 983 F. Supp. 1201, 1206-07 (C.D.Ill.1997) (summary judgment granted where elementary school employee exhibited paranoid or agitated behavior that caused "school administration to be concerned about the

personal safety of those in contact with the employee."); *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311-12 (11th Cir. 2013) (summary judgment upheld; "an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others."); *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290-91 (11th Cir. 2002) (upheld judgment as a matter of law because "employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position" and hostility, threats, and insubordination warrant FFD exams); *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (summary judgment upheld; psychological FFD was appropriate based on information that police officer was mildly paranoid, hostile, or oppositional) (followed by *Coffman*, 578 F.3d at 565-66); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810-13 (6th Cir. 1999) (summary judgment upheld; mental health evaluation to determine the cause of "troubling behavior" does not support a claim under the ADA); *Coursey v. Univ. of Md. E. Shore*, 577 Fed. Appx. 167, 173 (4th Cir. 2014) (summary judgment upheld; a business necessity "will be found to exist where the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties"); *Pence v. Tenneco Auto. Operating Co.*, 169 Fed. Appx. 808, 812 (4th Cir. 2006) (summary judgment upheld; a psychological evaluation "is undoubtedly 'job-related and consistent with business necessity' to ascertain whether such an employee poses a danger to the workplace"); *Mickens v. Polk County School Board,* 430 F.Supp.2d 1265, 1280 (M.D.Fla.2006) (Rule 50 motion after jury verdict granted because "[a]s a matter of law, a school board's psychological examination of an employee is both job-related and consistent with a business necessity if that employee exhibits even mild signs of paranoid or agitated behavior that causes the school administration to question the employee's ability to perform essential job duties.").

In deference to heightened concerns for public safety employers, the evidence needed to establish that a psychological evaluation is job-related and consistent with a business necessity for their employees is substantially less in than in other contexts and courts will not "second guess the propriety of such evaluation[s] . . . when they reflect concern for the safety of employees and the 'public at large.'" *Coffman*, 578 F.3d at 566 (firefighter). *See also Krocka*, 203 F.3d at 515 (Chicago police officer); *Dengel v. Waukesha County*, 16 F. Supp. 3d 983, 993 (E.D. Wis. 2014) (emergency preparedness employee); *Owusu*, 715 F.3d at 1311 (noting lower bar for public safety employer); *Watson*, 177 F.3d at 935 (police officer).

*Coffman*'s admonition against second-guessing the propriety of a safety-related FFD referral extends to questions about the process by which such a referral is made. *Kurtzhals v. Cty. of Dunn*, 2019 U.S. Dist. LEXIS 185330, *19, 22 (W.D. Wis. Oct. 25, 2019) (employer "does not need to show that the need for the exam was beyond reasonable dispute" and where there was a delay in referring employee for FFD, "the decision to forebear from more aggressive action does not mean the steps taken were not necessary.")

The cases cited above and discussed in more detail below compel the conclusion that Nawara's FFD referral and process were permitted under the ADA. The CCSO required Nawara to complete the FFD process based on information reported by Jones-Hayes and conduct experienced by Shelby and Reierson – all of which raised concern about Nawara's ability to safely perform the essential functions of a correctional officer. The purpose of requiring Nawara to complete the FFD process was to ensure that he could perform the required responsibilities of a correctional officer and not be a danger to others.

> **B. A Public Safety Employer May Legally Send an Employee for an FFD Upon Reports of Disruptive or Unusual Behavior Implicating Safety Concerns in the Workplace.**

### 1. The cases rejecting ADA claims under circumstances like those here are legion.

The CCSO's evidence as to why Nawara was sent for an FFD should have ended the inquiry, in line with the Seventh Circuit's decision in *Coffman* and cases cited above. In particular, *Coffman, Watson, Koszuta, and Owusu-Ansah* all hold that an employer may require psychological FFD examinations and medical information to ascertain the cause of disruptive conduct in the workplace. Each of these cases is highly analogous to the facts here, and all compel the conclusion that the CCSO is not liable under the ADA as a matter of law.

In *Coffman*, the Indianapolis Fire Department received information that the plaintiff firefighter "acted mad or upset" during a performance review, was "withdrawn," seemed to be "'defensive' for 'no legitimate reason,'" became "'defensive' and . . . wanted to know whether there were any complaints in writing" when discussing her work performance. 578 F.3d at 561-62. Relying on this information and apparently without further investigation, the Chief referred Coffman for a "fitness for duty psychological evaluation" and transferred her to "limited duty status." *Id.* at 562.

A doctor affiliated with the Department conducted the FFD evaluation, noted that Coffman was "unhappy with 'some aspect of her worklife,'" and recommended that Coffman participate in six weeks of private therapy with an unaffiliated therapist. *Id.* After three sessions, the private therapist stated that he did not notice any difficulties "which would interfere with her ability to perform her job" and recommended another FFD evaluation. *Id.* The Department's doctor again met with Coffman and this time deemed her unfit for duty based on her "***defensive attitude*** about why she was there [and] that she was '***overreacting*** … and ***acting out in an immature and hostile manner***." *Id.* (emphasis added). Despite finding no mental or physical problems that would prevent Coffman from performing her duties, the Department's doctor based the FFD decision on

Coffman's apparent "***choice to be* '*extremely resistant*.**'" *Id.* (emphasis added). Following subsequent evaluations in the next two months, Coffman was found fit and returned to active duty. *Id.* Coffman sued the Department under § 12112(d)(4)(A) alleging that the evaluations were neither job related nor consistent with business necessity. On this record, the district court found for the employer as a matter of law.

On appeal, Coffman maintained that the Department did not have objective evidence to support the decision to refer her for the FFD evaluations. The Seventh Circuit disagreed. *Id.* at 565. Noting that "inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the 'public at large,'" the court considered the "*particularly compelling interest*" of the Department in "assuring [Coffman] was both physically and mentally fit to perform her duties" in response to the reports, especially in light of the backdrop in which the referrals were made – recent firefighter suicides – which it deemed evidence of the Department's legitimate concern for the well-being of its employees. *Id.* (emphasis added) Moreover, as a firefighter, "Coffman's well-being was essential not only to her safety, but to the public at large." *Id.* The information the Department relied on to support the FFD referral was appropriate because it demonstrated concern "that Coffman's behavior was ***uncharacteristic*** and was adversely impacting her ability to perform her job." *Id.* at 566 (emphasis added). The Seventh Circuit further explained that the public safety context in which Coffman worked moved the bar very low indeed for finding an FFD referral to be legal:

> Although a psychological evaluation in response to "***withdrawn***" and "***defensive***" behavior might not be job related in many vocations, ***we do not second-guess*** the propriety of such an evaluation for a firefighter. The Department has an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work. ***This special work environment convinces us that the Department's decision to refer Coffman for the fitness for duty evaluations was job-related and consistent with business necessity***.

*Id.* (citing *Krocka*, 203 F.3d at 515 (police officer); *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 99 (2d Cir. 2003) (involving correctional officer and acknowledging the "special circumstances of [correctional] facilities" that the Supreme Court has recognized in other contexts) (citing *Sandin v. Conner*, 515 U.S. 472, 482 (1995) ("***federal courts ought to afford appropriate deference and flexibility to [correctional facilities] trying to manage a volatile environment***") (emphasis added); *Bell v. Wolfish*, 441 U.S. 520, 547 n.29 (1979) ("***The realities of running a corrections institution are complex and difficult***") (emphasis added); *Watson*, 177 F.3d at 935 (police officer)).

Similarly, the Eleventh Circuit held in *Watson* that "*where a police department reasonably perceives an officer to be even **mildly** paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity*." 177 F.3d at 935 (emphasis added) (cited favorably in *Coffman*). There, concerns about the plaintiff police officer's "unusually defensive and antagonistic behavior towards his co-workers and supervisors" resulted in an investigation that revealed complaints by and against the officer. *Id.* at 934. Shortly thereafter, the officer refused to participate in a mandatory tuberculosis testing program because it required him to disclose his HIV/AIDS status and complained that "the city was out to get him." *Id.* The manager of employee health services "found his behavior to be rude and unreasonable," and suggested an FFD examination. *Id.* *Over two months later* – an even longer delay than in this case – the officer was required to undergo an FFD evaluation and relieved of pay. *Id.* The FFD examiner found the officer to be "somewhat oppositional in style and experiencing symptoms typically associated with stress" but recommended he return to work. *Id.* The officer sued, alleging the FFD was a prohibited medical inquiry under the ADA. *Id.* at 935. As in *Coffman*, the district court granted summary judgment on the ADA claim.

On appeal, in addressing the scope of the ADA, the Eleventh Circuit took notice of the safety concerns unique to law enforcement:

> Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. Contrary to Watson's contention, the ***ADA does not, indeed cannot, require a police department to forego a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries***.

*Id.* (emphasis added). Like the Seventh Circuit in *Coffman*, the court held that reports of the officer overreacting and concerns that he might be paranoid were permissible bases to refer the officer for an FFD exam and no rational juror could find otherwise. *Id.*

Even beyond the public safety context, information raising concerns about an employee's ability to act appropriately in the workplace permits an employer to refer the employee for a psychological examination. This is because "a safe workplace is a paradigmatic necessity of operating a business." *Painter*, 715 Fed. Appx. at 541 (medical examinations appropriate based on reports of intimidating looks, ranting, blank stares, snapping, screaming, and rude, angry, abrasive, aggressive behavior); *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *40.

In *Koszuta*, Judge Castillo granted the employer's motion for summary judgment on an ADA discrimination claim arising from a referral for an FFD in such a non-public safety setting. *Id.* at *38-42. The *Koszuta* plaintiff worked at a Home Depot. His "co-workers reported witnessing him engage in unusual or aggressive behavior" and he was referred for an FFD. *Id.* at *38. Like Nawara here, the employee disagreed with his co-workers' accounts of his behavior but provided nothing other than speculation and conjecture that his employer lacked legitimate concerns prompting the FFD referral. *Id.* at *39. Since "the ADA 'does not require an employer to retain a potentially violent employee,'" Judge Castillo concluded that:

> when ***a "disruptive incident"*** occurs in the workplace suggesting that an employee may be suffering from a mental illness that interferes with her ability to perform her job duties, "an employer may seek a professional assessment of the likelihood of an employee's

unacceptable behavior recurring before it decides . . . whether the employee is qualified for continued employment."

*Id.* at *37 (quoting *Felix*, 828 F.3d at 568) (emphasis added).   Because the employer had information about a disruptive incident – just as the CCSO did here – the FFD exam was deemed legal under the ADA as a matter of law.  *Id.* at *49.

Likewise, in *Owusu-Ansah*, the Eleventh Circuit held an FFD evaluation was appropriate where the employer, Coca-Cola, had information that raised concerns about an employee's emotional and psychological stability.  715 F.3d at 1312.  There, a long-term call center employee who repeatedly had been promoted created concern in a one-on-one meeting in which he reported alleged mistreatment and banged his hand on a table and said someone was "going to pay for this." *Id.* at 1308-09.  His manager reported the incident to human resources, who called the employee in.  *Id.* at 1309.  Like Nawara here, the employee refused to discuss his workplace issues with human resources.  *Id.*  He did agree to speak with a crisis management consultant who concluded that he was a "very stressed and agitated individual" but could not complete the evaluation because the employee refused to cooperate or discuss his workplace issues.  *Id.*  The consultant recommended that the employee undergo a psychiatric FFD evaluation "to rule out the possibility of a mental condition that could interfere with his ability to successfully and safely carry out his job duties."  *Id.* at 1310.  Again, like Nawara, despite initially failing to cooperate with the FFD requirements, the employee eventually complied and was cleared to return to work.  *Id.*

The employee argued that the FFD referral and evaluation violated the ADA because he denied engaging in the reported behaviors and argued that there were no prior incidents showing a propensity for workplace violence – just as Nawara argued here.  The court nonetheless concluded that Coca-Cola had a "reasonable, objective concern about Mr. Owusu-Ansah's mental state, which affected job performance and potentially threatened the safety of its other employees."

24

*Id.* at 1311-12. This is because an "employee's ***ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position***." *Id.* at 1311 (emphasis added). The court further held that mental health FFDs are consistent with business necessity if the employer "has information ***suggesting*** that an employee is unstable and may pose a danger to others." *Id.* at 1312 (emphasis added).

As in *Coffman, Watson, Koszuta, and Owusu-Ansah*, the evidence in this case "paints a consistent picture of genuine concern that [Nawara]'s behavior was uncharacteristic and was adversely impacting [his] ability to perform [his] job." *See Coffman*, 578 F.3d at 566. Following Superintendent Jones-Hayes's September 28, 2016 report of Nawara's loud, defensive, oppositional, aggressive, and abnormally insubordinate conduct toward her in response to routine directives to ensure inmates were properly secured, Burke referred Nawara to Human Resources to check-in with him and assess whether an FFD exam was warranted. (2/27/20 Trial Tr. at 817:20-823:24; 889:9-13 (Burke); 3/2/20 Trial Tr. at 1344:2-1351:16 (Shelby); DX 11 (testified to by Burke at 2/27/20 Trial Tr. at 817:20-823:24).) Following that referral, Reierson and Shelby interviewed Jones-Hayes to obtain additional information before deciding whether to interview Nawara. (2/25/20 Trial Tr. at 384:17-393:11; 3/2/20 Trial Tr. at 1377:2-1382:14; see also PX 118; DX 21.) Jones-Hayes described in detail Nawara's aggressive and hostile conduct and later memorialized her experience in a written and signed statement. (DX 21 (Jones-Hayes memo re call with HR); 2/25/20 Trial Tr. at 410:18-411:12.) On November 18, 2016, Nawara again displayed irrational agitation, rage, and non-responsiveness in the course of what should have been an unthreatening HR meeting. (2/25/20 Trial Tr. at 388:21-404:25 (Reierson); 3/2/20 Trial Tr. at 1389:24-1398:15 (Shelby); 3/4/20 Trial Tr. at 1780:21-1782:22 (Reierson).)

Reierson and Shelby decided that Nawara should not be allowed to work until he completed the FFD process based on the report from Jones-Hayes and Nawara's behavior in the meeting -- because they were concerned about workplace violence and his ability to safely perform his job. (2/25/20 Trial Tr. at 407:6-15, 408:22-409:7 (Reierson); 2/28/20 Trial Tr. at 1076:21-1077:7, 1078:4-9, 1095:10-14 (Nawara); 3/2/20 Trial Tr. at 1398:15 (Shelby); 2/25/20 Trial Tr. at 388:21-404:25 (Reierson); 3/2/20 Trial Tr. at 1388:22-1393:5 (Shelby); 3/4/20 Trial Tr. at 1780:21-1782:22 (Reierson).) The bases for the FFD referral unquestionably were sufficient under the standards set forth in cases above for requiring psychological assessments – indeed, Reierson and Shelby's testimony repeats the same or synonymous terms found in the case law in which FFDs were deemed legal and appropriate under the ADA. To wit, Nawara was:

- "**defensive"** (3/2/20 Trial Tr. at 1415:21-23 (Shelby)); and

- "**hostile"** (3/2/20 Trial Tr. at 1391:18-23, 1415:21-23 (Shelby); 3/4/20 Trial Tr. at 1773:7-12 (Reierson)); and

- "**oppositional"** (3/2/20 Trial Tr. at 1415:17-20 (Shelby)); and

- **withdrawn** and **non-responsive** (2/25/20 Trial Tr. 403:9-12, 404:21-25 (Reierson); 3/2/20 Trial Tr. at 1379:14, 1384:5-1387:5 (Shelby); 3/4/20 Trial Tr. at 1770:9-11 (Reierson); and

- Demonstrated an **inability to handle reasonably necessary stress** (3/2/20 Trial Tr. at 1387:24-1388:12, 1390:4-16, 1404:10-20 (Shelby); 3/4/20 Trial Tr. at 1767:2-18, 1769:20-1770:8, 1781:18-25 (Reierson)); and his behavior was

- **abnormal** or **unusual** (3/2/20 Trial Tr. at 1387:14-1388:12 ("I had never had this happen as far as an employee behave this way… No one had showed this type of rage.") (Shelby).

All of this conduct rendered the FFD referral legal as a matter of law and this Court should void the jury's verdict.

## 2. *Wright* cannot be used to distinguish this case from *Coffman*'s standard for FFD referrals of public safety employees.

Nawara repeatedly has referenced the decision in *Wright v. Ill. Dept. of Children & Family Servs.*, 798 F.3d 513 (7th Cir. 2015) to substantiate his ADA claim, and he can be expected do so again. *Wright* represents a limited exception to *Coffman*; there, the evidence showed that the employer acted contrary to its usual practice by allowing an employee to remain on the job for months *after* an FFD referral. *Wright* is distinguishable from this case and does not alter the conclusion that the CCSO is entitled to judgment as a matter of law.

The *first* critical distinction between this case and *Wright* is that there, the employee's work was not curtailed after the decision to send her for an FFD evaluation was made; she continued in her role for two months, sufficiently undermining the notion that those referring her had a legitimate concern about her fitness to create an issue of fact. 798 F.3d at 524. The court also took note of the fact that the employee was assigned a new "sensitive case," again, after the referral was made and before the FFD evaluation was completed. *Id.* at 525. The court reasoned that allowing Wright to remain in the same role undermined the business necessity defense because the employer's *ordinary* practice was to put the employee on desk duty or leave once the employer made the FFD referral. *Id.* ("The Department's inconsistent application of its evaluation procedures provided objective evidence that the evaluation order was not consistent with business necessity, creating a genuine issue of material fact for the jury.")

Here, the 51-day delay that Nawara harped on at trial came *before* the decision to send him for an FFD. The evidence is clear and unrebutted that once Reierson and Shelby heard Jones-Hayes's account, they called Nawara into HR as soon as possible; and after his troubling behavior at HR and the consequent decision to send him for an FFD, he was removed from duty immediately. (Reierson 3/4/20 Trial Tr. 1776:2-12). Moreover, Nawara offered no evidence that

the CCSO treated him differently than any similarly situated employee.  *Compare Tice*, 247 F.3d at 518 (finding no issue of fact because plaintiff failed to identify similarly situated employees who were treated differently) with *Wright*, 798 F.3d at 524 (evidence that Wright was treated differently).  The fact that Burke transferred Nawara to external operations after referring the matter to human resources does not change the analysis.  It was Reierson and Shelby, not Burke, who made the FFD referral decision, and that decision was made based on both the Jones-Hayes account and their own observations of Nawara on November 18, 2016.

*Second*, *Wright* did not involve a public safety employer with Constitutional obligations to protect against the excessive use of force towards inmates.  As Burke testified, the FFD process is a measure available to the CCSO to prevent instances of excessive force against detainees, which is both a Constitutional obligation and required under the CCSO's consent decree with the United States Department of Justice.  (2/27/20 Trial Tr. at 849:9-853:15 (Burke describing the DOJ consent decree and efforts available to avoid instances of excessive force, including the FFD process).)  Against this important backdrop, requiring an FFD exam in response to reports of Nawara's aggressive and oppositional behavior comports with the ADA's requirements under *Coffman*.

### C.  Disagreement Over the Referral Process or Whether an Employee Engaged in Disruptive Conduct Warranting an FFD Exam Does Not Create an Issue of Material Fact.

Throughout the trial, Nawara sought to misdirect the jury with arguments about the "51-day" delay in HR speaking with Jones-Hayes, the absence of written policies for FFD referrals, and disputes about the extent of Nawara's misconduct and troubling behavior on September 28th and November 18, 2016.  (*E.g.,* 2/25/20 Trial Tr. at 394:2-10; 2/26/20 Trial Tr. at 494:12-495:13; 2/28/20 Trial Tr. at 995:11-14, 1020:8-11; 3/3/20 Trial Tr. at 1566:18-1567:8; 3/4/20 Trial Tr. at

1734:20-1735:24; 3/4/20 Trial Tr. at 1788:14-21.)  Under the law, all of that purported evidence

was an impermissible diversion that need not be considered in finding for the CCSO as a matter

of law.  Such arguments regularly have been rejected by courts considering the legality of FFDs

under the ADA.  *See Owusu*, 715 F.3d at 1311-12 (FFD exam was appropriate based upon

"information suggesting that an employee is unstable and may pose a danger to others" – proof of

the underlying conduct was not required); *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39

("Although Plaintiff believes that [his supervisor] was faking [her crying and trembling], and that

his coworkers' accounts were inaccurate or took his actions out of context, the question is not

whether Defendant's concerns were accurate, but whether they were honestly held.") (citing *Felix

v. Wis. Dep't of Transp.*, 828 F.3d 560, 573-74 (7th Cir. 2016) (affirming summary judgment for

employer despite dispute as to whether employee was fit for duty because the question was not

whether employer was "right or wrong" in its assessment but whether it honestly concluded

employee's behavior warranted discharge); *Sullivan*, 197 F.3d at 809-810 ("purported" and

"supposed" behavior sufficient even where, before the FFD referral, an outside psychologist

reported that he did not think the plaintiff was dangerous); *Pence v. Tenneco Auto. Operating Co.*,

169 Fed. Appx. 808, 812 (4th Cir. 2006) (employer was not required to verify that a threat was

actually made or interview the employee before making the FFD referral); *Kurtzhals*, 2019 U.S.

Dist. LEXIS 185330 at *19-21 (the decision to refer employee for FFD exam need not be

unanimous and "[t]he county [did] not have to show that the need for the exam was beyond

reasonable dispute.").

While Nawara certainly disagrees that he posed such a risk and that the events transpired

as they were reported, he did not contend that the events that led to the FFD referral did not happen;

instead, he sought to second-guess, with testimony from people who did not witness all of the

events of September 28, 2016, whether the altercation with Jones-Hayes alone really was serious enough to warrant a *referral to HR*. (2/26/20 Trial Tr. at 552:2-7 (Gannon), 610:2-12 (Turrise); 2/27/20 Trial Tr. at 742:23-25, 749:9-10 (Conley).) This evidence and Nawara's version of events – especially since he refused to provide information to the CCSO about the incident with Jones-Hayes – have no bearing on whether the FFD referral was appropriate based on the information the CCSO actually received and considered. *Owusu*, 715 F.3d at 1311-12; *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39; *Sullivan*, 197 F.3d at 809-810; *Pence*, 169 Fed. Appx. at 812; *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *19.

The adequacy or reasonableness of the investigation into Nawara's conduct likewise is irrelevant to whether the FFD referral was based on information that reflected concern about Nawara's ability to safely perform essential functions of his job. The CCSO is unaware of any case holding otherwise – and, indeed the cases discussed above demonstrate that an employer need not wait to complete a factual investigation before referring an employee for an FFD exam. *See, e.g.*, *Coffman*, 578 F.3d at 565-66 (FFD referral appropriate following reports re demeanor); *Owusu*, 715 F.3d at 1311-12 (prior employment history irrelevant and employer not required to prove underlying conduct); *Sullivan*, 197 F.3d at 809-810 (alleged conduct sufficient); *Pence*, 169 Fed. Appx. at 812 (fact investigation not required); *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39 (accuracy of employer's concerns irrelevant); *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *19-21 (concerns need not be indisputable). Moreover, there is no evidence that any investigation would have produced a different result.

Nothing in the language of the ADA requires an employer to have policies for when an employee is required to undergo an FFD evaluation and Nawara's focus on such policies at trial was unwarranted. *See Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *20-21 (rejecting the

plaintiff's argument that a "lack of a policy regarding fitness-for-duty examinations and its past use (or lack of use) of such examinations undermines the reasonableness of [defendant's] belief that an examination was necessary."); *see also Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) (no issue of fact where no other employee before or after plaintiff was referred for an examination). The Court need not consider Nawara's arguments on these subjects because the ADA in no way requires written policies and the case law makes clear that even where the employee denies engaging in concerning behavior, an FFD based on real reports and actual experience satisfies the law.

The record in this case does not provide any meaningful basis to distinguish it from *Coffman* or the cases discussed and cited above. This Court should apply the Seventh Circuit's standard for public safety employers and enter judgment as a matter of law for the CCSO.

### D. The Public Policy Interest In Ensuring that Law Enforcement Employees Can Safely do Their Jobs Underscores the Need for Judgment as a Matter of Law.

To rule otherwise also would undermine the public policy interest emphasized time and again in ensuring that public safety employees do not pose a safety risk – a policy so strong that public safety employers, broadly applied to correctional and law enforcement officer, firefighters, and public-school employees – are permitted to respond proactively to troubling behavior by requiring prophylactic psychological FFD evaluations. *Coffman¸* 578 F.3d at 566 ("we do not second-guess the propriety of such an evaluation for a" public safety employee).

To permit the welter of second-guessing proposed by Plaintiff in this case – that there should have been written policies and that there were differences of opinion about Nawara's conduct – not only runs afoul of *Coffman*, it also would have a chilling effect on law enforcement agencies, including the CCSO, against sending public safety employees for FFD exams where there may be a dispute about the underlying conduct. Law enforcement agencies are under intense

scrutiny to ensure that their employees can safely carry out their responsibilities without posing a risk to the public. The jury's verdict in this case could force such agencies to make a Hobson's choice: ignore the mental health implications and safety concerns raised by reports of abnormal or aggressive behavior and pursue disciplinary actions alone, or face liability under the ADA. The law does not require such an untenable choice. *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *37 (prohibiting prophylactic FFD examinations "would place the employer on a razor's edge" between violating the ADA and liability if the employee remains on the job and hurts someone) (quoting *Felix*, 828 F.3d at 568); *Painter v. Ill. DOT*, 715 Fed. Appx. 538, 541 (7th Cir. 2017) ("such a rule would force an employer to risk a negligence suit to avoid violating the ADA."); *Cody v. CIGNA Healthcare of St. Louis, Inc.,* 139 F.3d 595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims. . . .").

Permitting FFD referrals where, as here, information suggests that a law enforcement officer engaged in disruptive behavior and the employer seeks to ascertain the cause of such behavior balances these interests with the protections under the ADA. *See, e.g.*, *Krocka*, 203 F.3d at 515 (FFD appropriate because referral and evaluation were not based on broad assumptions about employee's mental illness but related to his particular situation). In short, the FFD referral was proper and cannot be a basis for liability in this case.

## II. The Forms Nawara Was Given Do Not Render the FFD Referral Illegal.

This leaves only the forms Nawara was provided and never signed. Nawara's only complaint about the forms was that they were "blank," and his attorneys tried, with no foundation whatsoever, to argue that had Nawara signed these forms, the CCSO could have gained access to medical records that were unrelated to the issues that led Nawara to be referred for an FFD. Neither

Nawara's subjective beliefs nor the unfounded speculation by his lawyers can render the forms an overbroad inquiry in the face of the language of the forms themselves and in light of the unrebutted testimony by Reierson, Shelby, and Sarocka as to the meaning of these forms. *See English v. Smith,* 2008 WL 4287628, * 3 (N.D. Ill. Sept. 15, 2008) ("the nonmoving party . . . [may] not rely merely on its own assertions and speculation 'to manufacture a genuine issue of fact.'") (quoting *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008).

### A. The CorVel Form Permitted Only Records Related to the FFD to Be Gathered and Was Entirely Legal Under the ADA.

The consistent testimony from Reierson, Shelby, and Sarocka was that the CorVel form simply permitted CorVel to speak to an employee about his treaters and engage in an interactive process to determine what records to gather for an FFD. (2/25/20 Trial Tr. at 279:19-25 (Reierson); 3/2/20 Trial Tr. at 1362:12-1375:25, 1391:7-1398:5 (Shelby); 3/3/20 Trial Tr. at 1492:2-1499:5 (Sarocka).) The CorVel form also authorized CorVel to send the FFD report to the CCSO. (3/2/20 Trial Tr. at 1363:17-1364:3 (Shelby); 3/3/20 Trial Tr. at 1501-12 (Sarocka).) Each witness walked through the CorVel form and explained the meaning of virtually every word – that the form permitted CorVel to gather medical records related to the FFD examination from the employee's providers; the examiner to receive records; CorVel to disclose the examiner's report to the employer; and the employee to revoke permission under the form at any time. (2/25/20 Trial Tr. at 354:3-369:23, 438:17-440:8 (Reierson); 3/2/20 Trial Tr. 1361:17-1373:18 (Shelby); 3/3/20 Trial Tr. at 1492:6-1499:5 (Sarocka).) Each also confirmed that it was CorVel alone who could get records; that the CorVel form did *not* permit the CCSO to get any medical records at all. (*Id.*; *see* 3/3/20 Trial Tr. at 1497:19-1498:2 (Sarocka).) Sarocka, Reierson, and Shelby also made crystal clear that CorVel could not have used its signed form to obtain any medical information without the active cooperation of the employee – that there was and is no way for CorVel to identify an

employee's treaters unless he tells CorVel who they are, and that the employee also can place limits on the time period of any records CorVel requests. (2/25/20 Trial Tr. at 354:3-357:18; 360:2-8 (Reierson); 3/2/20 Trial Tr. 1402:1-1409:2 (Shelby); 3/3/20 Trial Tr. at 1492:6-1499:5 (Sarocka).) All three witnesses also agreed that the form Nawara actually signed changed nothing about how the process worked. (2/26/20 Trial Tr. at 452:454:5, 455:2-457:8 (Reierson); 3/2/20 Trial Tr. 1402:1-1409:2 (Shelby); 3/3/20 Trial Tr. at 1500:20-22 (Sarocka).)

This testimony establishes not only that the CorVel form could not be used to gain unfettered access to Nawara's medical records, but also that the form itself cannot be deemed a "medical inquiry" at all under the ADA, as was the finding in *Green v. Joy Cone Co.*, 278 F. Supp. 2d 526 (W.D. Pa. 2003), *aff'd on other grounds,* 107 Fed. Appx. 278 (3d Cir. 2004). *Green* involved a challenge to an employer's practice of requiring the execution of a medical release form as part of a preemployment job application. The standards for when an employer may make a preemployment medical inquiry are found in subsection (d)(2) of § 12112, and are similar to the standards at issue here for when an employer may make a medical inquiry of a current employee, which are found in subsection (d)(4) of § 12112. In both situations, an employer is prohibited from making inquiries as to whether a job applicant or current employee "is an individual with a disability or as to the nature or severity of such disability." *Cf.* 42 U.S.C. § 12112(d)(2)(A) and § 12112(d)(4)(A). However, an employer may inquire into the ability of a job applicant or current employee "to perform job-related functions." § 12112(d)(2)(B) and § 12112(d)(4)(B).

After examining the meaning of the word "inquiry," the *Green* court held that the medical release form at issue there did not fall within the definition of a medical "inquiry." The court reached this conclusion because the release form did not ask any questions about an individual's medical history or her limitations," and, did "not force a person to identify her disability." 278

F. Supp. 2d at 540. Thus, a demand to execute the release form could not amount to a violation of § 12112(d). Similarly here, the form in question did not ask any questions about Nawara's medical history or limitations, nor did it force him to identify any disability he might have. Thus, the form did not constitute a medical "inquiry," and could not itself be a violation of the ADA. Like the release form in *Green*, the HIPAA form here merely "require[d] the [plaintiff's] authorization to allow . . . access to the [plaintiff's] medical records." *Green,* 278 F. Supp. 2d at 529.

The remaining issue in *Green*, and the only issue Nawara raised here, is whether signing the CorVel form would create an *opportunity* to find out about Nawara's health status by allowing access to his medical records. In *Green*, the court held that the opportunity to access medical records created by the medical release form was "not a violation of the ADA," and that no violation occurred "unless and until an applicant's medical records are requested prematurely," *i.e.,* in that case, before the ADA permitted such a medical inquiry for job applicants. *Id.* at 542. Here, because the CCSO had a legitimate basis for requesting an FFD, and because the form never was used to obtain information unrelated to the FFD, there likewise is no basis on which to find that the CorVel form in and of itself violated the ADA.

### B. The CCSO Form Permitted the CCSO to Gather Medical Records *Only* if the Employee Agreed and Identified His Treaters.

The same conclusion applies to the CCSO form – a form that Nawara never signed, even in a modified version, unlike the CorVel form. Here, again, Sarocka, Reierson, and Shelby all testified consistently that the purpose of the CCSO form was to speed up the FFD process and that this form was entirely optional. (2/25/20 Trial Tr. at 361:25-367:14, 417:13-418:16 (Reierson); 3/2/20 Trial Tr. at 1367:24-1370:6, 1395:1 (Shelby); 3/3/20 Trial Tr. at 1573:15-20 (Shelby); 3/3/20 Trial Tr. at 1490:2-1491:18 (Sarocka).) All testified that employees had, prior to Nawara's situation, declined to complete the CCSO form and the FFD process in those cases proceeded

solely under the CorVel form. (2/25/20 Trial Tr. at 364:10-21; 365:6-366:17 (Reierson); 3/2/20 Trial Tr. 1368:17-1369:1 (Shelby); 3/3/20 Trial Tr. at 1490:15-23 (Sarocka).) Just like the CorVel form, moreover, Reierson and Shelby testified that the only way the CCSO could have learned who an employee's treaters were would have been from the employee himself – there was no other means available to the CCSO for identifying treaters. (2/25/20 Trial Tr. at 360:23-368:5, 438:17-440:8 (Reierson); 3/2/20 Trial Tr. 1372:22-1373:9 (Shelby).) Had Nawara communicated his concerns about either form, the CCSO could have explained the meaning and uses of the forms to Nawara – it was only because he chose not to communicate or cooperate with his employer that he assumed the forms could be put to improper uses. (*Id.*)

Thus, *even if*, as Nawara contends, he believed he was required to sign both the CCSO and the CorVel form, neither would have permitted either the CCSO or CorVel to gain access to his medical information at all – let alone unfettered access to irrelevant information – absent the cooperation and permission of Nawara in the first place. On their face, the forms in this case simply did not violate the ADA.

### C. Because Nawara Never Signed the Original CorVel Form and the CCSO Form, and No Form Ever Was Used to Obtain Irrelevant Medical Information About Nawara, The CCSO Cannot Have Violated the ADA.

It is undisputed that Nawara never completed either the original CorVel form or the CCSO form. The argument, therefore, that the forms – and therefore the FFD referral as a whole – were illegal is based solely on Nawara's mistaken and speculative claim that had they been completed they could have been used to obtain medical information unrelated to whether Nawara could safely perform his job. *See Sullivan*, 197 F.3d at 812 ("Since Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope."); *see also Pena v. City*

*of Flushing*, 651 Fed. Appx. 415, 421-22 (6th Cir. 2016) (same, and rejecting arguments contesting FFD exam process because examiner was not provided with a job description, should have been a physician instead of a psychologist, and employer should have conferred with an outside health official before the referral). But Rule 50 does not permit an inference based solely on speculation and conjecture that the medical release forms that Nawara refused to sign could have been put to improper purposes.

Specifically, Nawara's counsel asked Sarocka questions about whether HIPAA waivers applied to insurance records (3/3/20 Trial Tr. at 1526:6-24 (Sarocka)), then tried to use that testimony with Reierson to suggest that the CCSO could have used insurance records to identify Nawara's treaters (an argument Reierson completely refuted by pointing out that the CCSO does not have access to employee health insurance records. (3/4/20 Trial Tr. at 1779:3-23). No other witness offered any testimony to support this bizarre theory. Nonetheless, in closing, Nawara's counsel argued that the forms would have allowed the CCSO to get health insurance information or give it a "blank check" to go to Northwestern Hospital to look for his medical records – an argument that was both specious and utterly unfounded. (3/5/20 Trial Tr. at 1990:17-1991:21 (Plaintiff's closing); *see also* 3/3/20 Trial Tr. at 1497:19-1498:2.)

Nawara's counsel also repeatedly sought to introduce, by means of wholly improper questions and innuendo in violation of this Court's Motion *in limine* ruling on subsequent remedial measures, the CCSO's decision to discontinue use of the CCSO form. (See, e.g., 2/25/20 Trial Tr. at 284:19-24 (In a clear reference to an email from Karyn Williams and barred by this Court's rulings, counsel asked "Q. Isn't it true that in 2016, CorVel was not asked to obtain all the medical records because it would increase the cost to the sheriff? Is that correct? A. No."); 3/3/20 Trial Tr. at 1532:22-1533:6 (Sarocka) (Q. When you first started working as the case manager for the Cook

County Sheriff's Office, was the procedure at that time that the Cook County Sheriff's Office would gather all of the medical records and then send them to CorVel? A. Initially, I believe that's what they did, yes. Q. *Do you know when that changed*?") (emphasis added.); 3/5/20 Trial Tr. at 2055:1-2 ("Ms. Reierson testified the procedure changed where they did go at some point directly to CorVel.") (closing).  This unfairly permitted the jury to speculate that there must have been something legally defective about the CCSO form – another reason to grant this Motion.

The CCSO is aware of no case where an employer was found liable solely for the content of a waiver form.  Rather, liability has attached only where employers have insisted on actually obtaining medical information unrelated to the FFD inquiry.  *See Jackson v. Regal Beloit Am., Inc.*, 2018 U.S. Dist. LEXIS 103682, *19 (E.D. Ky. 2018); *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 783-84 (N.D. Ohio 2002).  The only question that may have been appropriate is whether the CorVel form Nawara *actually* signed and the FFD examination he *actually* took sought information unrelated to the reasons for his FFD referral.  There is no evidence that CorVel or the FFD examiner sought medical information unrelated to the FFD referral or went beyond ascertaining Nawara's ability to safely perform essential functions of a correctional officer – and Nawara did not elicit any testimony to the contrary.  Nawara also failed to establish that either the evaluation or the modified CorVel form caused him an injury-in-fact; this failure also precludes a judgment in his favor.  *See O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) (plaintiff must show "some tangible injury-in-fact caused by the § 12112(d) violation"; ADA claim dismissed on summary judgment); *Grassel v. Dep't of Educ. of N.Y.*, 2017 U.S. Dist. LEXIS 39683, *30-31 (E.D.N.Y. 2017) (summary judgment for employer where employee failed to show injury-in-fact resulting from request for medical information and FFD evaluation).  Accordingly, the CCSO is entitled to judgment as a matter of law on this question, too.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Defendant judgment as a matter of law pursuant to Federal Rule of Civil procedure 50(b).

Respectfully submitted,

/s/ Sarah R. Marmor
Sarah R. Marmor
Suzanne M. Alexander
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
smarmor@scharfbanks.com
salexander@scharfbanks.com
mchurma@scharfbanks.com

*Counsel for THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois.*

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2020, I filed the foregoing DEFENDANT CCSO'S REVISED MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) ON PLAINTIFF'S CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT using the Court's CM/ECF system, which will send e-mail notification of the filing to all counsel of record. These documents are available for viewing and downloading via the CM/ECF system.

/s/ Sarah R. Marmor