**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN NAWARA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF COOK, a unit of local Government; THOMAS DART, in his individual and official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON and WINIFRED SHELBY in their individual capacities,<br><br>Defendants. | Case No. 1:17-cv-02393<br><br>Chief Judge Rebecca R. Pallmeyer |

***PLAINTIFF'S RESPONSE TO DEFENDANT COOK COUNTY SHERIFF'S OFFICE MOTIONS FOR JUDGMENT AS A MATTER OF LAW***

Plaintiff, John Nawara ("Nawara"), submits this combined response to Defendant, Cook County Sheriff's Office's ("Sheriff's Office", "CCSO") renewed motion for judgment as a matter of law pursuant to Rule 50(a) [Doc. 312] and CCSO's renewed motion for judgment as a matter of law pursuant to Rule 50(b) [Doc. 314]. [1]

Richard F. Linden
312/590-0211
lindenlaw@gmail.com

Peter V. Bustamante
312/346-2072
pvbust@bustamantelaw.com

Linden & Bustamante
17 North State Street, Suite 1550
Chicago, Illinois 60602

[11] On April 6, 2020, the court took the Sheriff's Office's motions for judgment (Docs. 312 & 314) under advisement and entered a briefing schedule [Docs. 319 and 320]. On April 10, 2020, Defendant filed a revised memorandum in support of its renewed motion for judgment as a matter of law under Rule 50(b) (Doc. 333). Documents 312, 314.1 and 333 are essentially the same memorandum. Accordingly, Nawara is responding to Defendant's revised memorandum (Doc. 333).

## TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1

***II. LAW*** .......... 1

***a. Standard for Rule 50 Motions*** .......... 1

***b. Standard for General Verdicts*** .......... 2

***c. The Americans with Disabilities Act*** .......... 3

***III. THERE IS A MOUNTAIN OF EVIDENCE TO SUPPORT THE JURY VERDICT THAT THE SHERIFF'S OFFICE VIOLATED THE ADA WITH REGARD TO THE FFD*** .......... 4

***a. Burke's Admissions that Nawara was Not a Threat to Himself or Others Undermines the Defendant's Core Reason for the FFD Referral*** .......... 4

***b. Nawara's Reassignment to External Operations where he was Required to Carry a Gun is Inconsistent with the Sheriff's Office's Defenses*** .......... 5

***c. Allowing Nawara to Work for 51 Days before the Interview at HR is Inconsistent with the Defendant's Business Necessity Defense*** .......... 6

***d. Testimony of Gannon, Turrise and Conley Contradicts Jones-Hayes*** .......... 8

***e. Video of Nawara Breaking up the Inmate Fight 40 Minutes before the Jones-Hayes Incident is Inconsistent with Jones-Hayes Testimony*** .......... 10

***f. Burke and HR's Inaction from September 29, 2016 to November 2016 is Inconsistent with the Sheriff's Office's Business Necessity Defense*** .......... 11

***g. Reierson Admission That There Was Not Enough Information for an FFD Examination Supports the Jury's Verdict that the Defendant Violated the ADA*** .......... 12

***h. Jones-Hayes' Failure to Respond to HR or Follow-up is more Evidence that there Were No Legitimate Concerns about Nawara's Fitness for Duty*** .......... 13

***i. Nawara was an 18-Year Veteran with No Anger Management Issues*** .......... 13

***j. Allowing Nawara to Work at Cermak after the Jones-Hayes Incident is Inconsistent with the Sheriff's Office's Business Necessity Defense*** .......... 15

***k. The Evidence Supports a Finding that the FFD was Improperly Used as Discipline*** .......... 15

*l. The Fact that Nawara was Found Fit for Duty with No Anger Management Problems Confirms that the Sheriff's Office Violated the ADA* .............................................17

*m. Providing Disinformation about what Occurred at HR Indicates a Cover up to Justify the FFD Referral* .........................................................................18

*n. No Written Rules, Policies, Guidelines or Procedures for FFDs* ..........................................20

*o. John Nawara's Testimony* ........................................................................................21

*IV. WRIGHT v. DCFS REQUIRES THE DENIAL OF DEFENDANT'S MOTIONS FOR JUDGMENT AS MATTER OF LAW* .......................................................21

*V. THERE IS MORE THAN SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT THAT THE SHERIFF'S OFFICE VIOLATED THE ADA BY REQUIRING NAWARA TO SIGN MEDICAL RELEASES* .................................25

*A. The Sheriff's Office Violated the ADA by Requiring Nawara to Sign Unlimited Releases for His Complete Medical Records* .........................................................26

*B. Evidence was Presented that the Defendant Required Both Forms to be Signed* .................28

*C. The CCSO Form Violates the ADA* .........................................................................29

*D. The CorVel Form Violates the ADA* .........................................................................32

*E. The Defendant's Cases are Distinguishable* ............................................................33

*F. The Defendant Kept Nawara Off Work for Nine Months due to Its Insistence on Having Nawara Sign Both Forms* .....................................................34

**VI. THE SHERIFF'S OFFICE WAS REQUIRE TO PROVE THAT THE FFD AND THE MEDICAL RELEASES WERE "JOB REATED AND CONSISTENT WITH BUSINESS NECESSITY"** ..................................................37

*VII. THE SHERIFF'S OFFICE FAILS TO CITE ANY AUTHORITY TO TAKE THE JURY VERDICT AWAY* ...............................................................39

*CONCLUSION* ..........................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ....................7

*Bloate v. U.S.*, 559 U.S. 196, 207-08 (2010) ....................38

*Butler v. State, Louisiana Dep't of Pub. Safety & Corr.*,
2014 WL 6959940, at *12 ....................7

*Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559 (7th Cir. 2009) ....................37, 39, 40

*Conroy v. New York State Dept. of Correctional Services*,
333 F.3d 88 (2nd Cir. 2002) ....................34, 36

*Farmiloe v. Ford Motor Co.*, 277 F.Supp.2d 778 (N.D. Ohio 2002) ....................30, 35

*Freeman v. Chicago Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) ....................1

*Grassel v. Dep't of Educ. of N.Y.*, 2017 WL 1051115 (E.D.N.Y. 3/20/2017) ....................36

*Green v. Joy Cone Co.*, 278 F.Supp.2d 526 (W.D. Pa. 2003) ....................33

*Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) ....................2

*Harris v. Union Pac. R.R. Co.*,
2019 WL 4749982, at *9 (N.D. Ill. Sept. 30, 2019) ....................3, 37

*Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004) ....................2

*Jackson v. Regal Beloit America Inc.*,
2018 WL 3078760 (E.Dist.Ky. June 21, 2018) ....................30, 31, 32, 35

*Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*,
211 F.3d 1031, 1037 (7th Cir. 2000) ....................2

*Koszuta v. Office Depot, Inc.*,
2018 WL 1769368 (N.D. Ill. Apr. 12, 2018) ....................37, 39, 41

*Kroll v. White Lake Ambulance Auth.*,
763 F.3d 619, 623 (6th Cir. 2014) ....................14, 15

*O'Neal v. City of New Albany*, 293 F.3d 998 (7th Cir. 2002) ....................30, 36

*Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306 (11th Cir. 2013) ....................39, 41, 42

*Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) ........................................... 1, 2

*Pena v. City of Flushing*, 651 Fed. Appx. 415 (6th Cir. 2016) ............................................... 34

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133, 151 (2000) .................................................................................................. 2

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810-13 (6th Cir. 1999) ......................... 33, 34

*Thomas v. Anderson*, 912 F.3d 971, 975 (7th Cir. 2018) ............................................................ 2

*U.S. v. Balint*, 201 F.3d 928, 932-33 (7th Cir. 2000) ............................................................... 38

*U.S. v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016) .................................................................... 21

*Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999) ................................... 39, 40, 41

*Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007) ............................................................... 1

*Wright v. Illinois Dep't of Children & Family Servs.*,
798 F.3d 513, 522 (7th Cir. 2015) ............................................................ 3, *passim*

**Statutes and Rules**

29 C.F.R. Part 1630, App. § 1630.14(c) ................................................................................ 34

42 U.S.C. § 12112(d)(4)(A) ..................................................................................................... 37

42 U.S.C.A. § 12112(d)(4)(B) .................................................................................................. 39

42 U.S.C.A. § 12112(d)(4)(A) and (B) ...................................................................................... 38

**Other Sources**

3/28/19 MTD Opinion, Doc. 187 ............................................................................... 26, 27, 28

EEOC Enforcement Guidance: Disability–Related Inquiries and
Medical Examinations of Employees under the Americans with
Disabilities Act, Question 13 (July 27, 2000) ......................................................................... 30

www.cookcountysheriff.org/departments/c-c-s-p-d/investigations/hospitals-cook-county/ ......... 27

## *I. INTRODUCTION*

On March 5, 2020, after a nine-day trial, the jury returned a general verdict in favor of John Nawara. The jury found that the Defendant violated the Americans with Disabilities Act by referring Nawara to, and requiring, a fitness for duty evaluation and by requiring him to sign Medical Records Release Authorizations that were not limited in time or scope.

The Defendant chose not to submit special interrogatories to the jury. Because the jury returned a general verdict, the law presumes it found that the Defendant violated the ADA in both respects. *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) ("General verdicts necessarily encompass all of the essential elements of the claim" and give rise to the presumption that material fact issues have been resolved in favor of the prevailing party).

In its motion, the Defendant culls all of the testimony in its favor, erroneously claims the testimony is "uncontradicted," disregards the testimony favorable to Nawara, and claims that it is, therefore, entitled to judgment as a matter of law. This approach ignores the standards under Rule 50 which provides that the verdict can be overturned only if no reasonable jury could have found in Nawara's favor. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007).

## *II. LAW*

### *a. Standard for Rule 50 Motions*

Rule 50 of the Federal Rules of Civil Procedure allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury verdict could reasonably be based on that

evidence. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000); *Passananti*, 689 F.3d at 659. The court does not make credibility determinations or weigh the evidence. *Thomas v. Anderson*, 912 F.3d 971, 975 (7th Cir. 2018); *Passananti*, 689 F.3d at 659. After the jury has rendered its verdict, the court's job is "not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict." *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004).

Under Rule 50, the court "must disregard all evidence favorable to the moving party that the jury [was] not required to believe." *Reeves*, 530 U.S. at 151 (2000); *Passananti*, 689 F.3d at 659. Only by improperly disregarding all the evidence favorable to Nawara can the Sheriff's Office arguably maintain that it is entitled to judgment as a matter of law. In weighing a Rule 50 motion, however, "the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008). The Seventh Circuit rigorously reviews a district court's grant of a Rule 50 motion. *Passananti*, 689 F.3d at 659.

***b. Standard for General Verdicts***

When a jury returns a general verdict, the Court need only find support in the record for any one of the theories presented to the jury to affirm the jury award. *Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000). The *Kossman* Court held that when a defendant does not request any special form of verdict, the jury only returns a general verdict. *Kossman*, 211 F.3d at 1037. The Defendant in this case never requested any special form of verdict or special interrogatories. Thus, the jury verdict must be affirmed if a reasonable jury could have found in favor of Nawara under either of the theories of liability presented by Nawara.

### *c. The Americans with Disabilities Act*

The ADA prohibits employers from inquiring about employees' medical histories, except under certain limited circumstances:

> A covered entity shall not require a medical examination and shall not make inquires of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A); *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 522 (7th Cir. 2015).

It was the Sheriff Office's burden to establish that the inquiry or examination is "consistent with business necessity… [and] must show that the asserted business necessity is vital to the business, as opposed to a mere expediency." *Wright*, 798 F.3d at 523. The burden of proving business necessity is high. *Id*. The above statute pertaining to requests for information protects "[a]ll employees, regardless of whether they have a qualifying disability under the ADA." *Wright*, 798 F.3d at 522. Courts require that an employer provide "significant evidence" that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. *Wright*, 798 F.3d at 523.

In addition, the examination or inquiry must genuinely serve the asserted business necessity and must be a reasonably effective method of achieving the employer's goal. *Wright*, 798 F.3d at 523; *Harris v. Union Pac. R.R. Co.*, No. 16-CV-11607, 2019 WL 4749982, at *9 (N.D. Ill. Sept. 30, 2019). The employer cannot merely rely on the reasons that have been found valid in other cases but must actually show that the requirement contributes to the achievement of those business necessities. *Wright*, 798 F.3d at 523. The fact that an employee's behavior could be described as annoying or inefficient does not justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions. *Id*.

"The employer's reasonable belief 'must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions.'" *Wright*, 798 F.3d at 523 (quoting EEOC Guidance § A.5; citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001)).

It was the Sheriff Office's burden, not Nawara's, to prove that the fitness for duty ("FFD") was a "business necessity" and "job related." *Wright*, 798 F.3d at 523.

## *III. THERE IS A MOUNTAIN OF EVIDENCE TO SUPPORT THE JURY VERDICT THAT THE SHERIFF OFFICE'S VIOLATED THE ADA WITH REGARD TO THE FFD*

Each of the following, discussed in sections (a) through (o) below, requires the denial of Defendant's motions:

### *a. Burke's Admissions that Nawara was Not a Threat to Himself or Others Undermines the Defendant's Core Reason for the FFD Referral*

Perhaps the most damning piece of evidence to the Sheriff's Office was Matthew Burke's testimony in answer to a juror's question, that he did not feel Nawara was a threat to himself or others:

| | |
|---|---|
| Juror's Question: | If Officer Nawara's behavior with Supt. Jones-Hayes made you fear his potential to harm others, why did you allow him a position with a firearm?<br>1748:24 to 1749:1<br>… |
| Burke's Answer: | I did not feel as though he was a threat to himself or others.<br>…<br>1749:12-13<br>… |
| Burke's Answer: | But I did not feel as though he was a threat to himself or others.<br>1749:22-23 |

Burke admitted that he would not have assigned Nawara to a position where he carried a gun if he had felt there was any imminent danger of Nawara inflicting harm upon someone. These admissions should be the death knell to Defendant's Rule 50 motions. Burke was the Department

of Correction's Chief of Staff who on September 29, 2016 referred Nawara to HR for a FFD evaluation (DX 11). Burke's reason for the referral was the alleged "rage" exhibited by Nawara towards Superintendent Jones-Hayes during the September 28, 2016 incident (*Id*).

Burke's repeated admissions that he didn't feel Nawara was a threat to himself or others undermines the core reason for the FFD referral. Based on this testimony alone, a reasonable juror could conclude that there was no business necessity for a FFD and that the referral was not based on genuine concerns about Nawara being able to perform his duties as a correctional officer. The basis for the referral makes no sense given that Burke did not believe Nawara was a threat to himself or to others.

***b.*** ***Nawara's Reassignment to External Operations where he was Required to Carry a Gun is Inconsistent with the Sheriff Office's Defenses***

Equally damaging to the Sheriff's Office is the fact that Nawara was allowed to work for 51 days and carry a gun before being sent to HR. This evidence shows that Nawara was fully capable of performing his duties as a correctional officer. By assigning him to external operations, it is evident that Burke also thought that Nawara was capable of performing his job.

The evidence at trial was that effective October 2, 2016, Nawara was transferred from Cermak Hospital to External Operations (DX 13). Burke transferred Nawara from a position where he was not allowed to carry a gun to a position where he was required to carry a firearm. Burke conceded that he knew Nawara would be carrying a gun and that he would have daily contact with staff at the time of the transfer to External Operations.

External Operations required Nawara to interact and have daily contact with staff and inmates. External Operations was also responsible for guarding the perimeter of Cermak Hospital and the post where Superintendent Jones-Hayes entered and exited the hospital. In his testimony, Burke confirmed that External Operations guarded the post where Jones-Hayes would enter and

exit Cermak Hospital. In External Operations, Nawara transported inmates to and from court and outside medical appointments. Nawara testified that he transported high-risk inmates and manned different posts outside the jail where staff entered and exited. In External Operations, Nawara had occasion to go into Cermak Hospital.

Nawara's reassignment from a position where he was not permitted to carry a gun to a position where he was required to carry a firearm makes no sense if the Sheriff's Office was genuinely concerned about anger management problems. Sergeant Thomas Conley, who had been a sergeant in External Operations, testified that he would be uncomfortable allowing a correctional officer with anger management problems to carry a gun. Conley testified that as a matter of common sense, he would not hand a gun to a correctional officer with anger management problems.

The jury's verdict could reasonably be based on this evidence alone.

***c. Allowing Nawara to Work for 51 Days before the Interview at HR is Inconsistent with the Defendant's Business Necessity Defense***

The evidence was that Nawara worked for 51 days before he was sent to HR for an evaluation. The Jones-Hayes incident occurred on September 28, 2016 and it was not until November 18, 2016 that Nawara was sent to HR. Reasonable prison officials would not allow a correctional officer to work and carry a gun for 51 days if they had legitimate concerns that a correctional officer had anger management problems that posed a threat to the safety of inmates or staff.

Burke testified that he made no efforts to remove Nawara from the workforce. Burke acknowledged that a correctional officer could be de-deputized, and Sgt. Conley testified there were steps that could be taken to remove a correctional officer from service, if there were serious concerns about the officer.

The Seventh Circuit in *Wright* dealt with similar facts. Wright was a caseworker for DCFS who refused to undergo an FFD evaluation. *Wright*, 798 F.3d at 516 (for additional discussion of *Wright*, see *infra* p. 21). She contended that DCFS violated the ADA by ordering her to undergo the evaluation. *Id*. Based on an incident with a 10-year-old ward of the department (along with a host of other reasons), a doctor concluded that Wright posed a risk to the ward. *Id*. at 517. The Seventh Circuit held:

> In contrast to the Department's customary practice, Ms. Wright was not placed on desk duty when she was ordered to undergo a fitness-for-duty evaluation on June 4. Instead, for almost two months, she continued to oversee her normal case load, which included approximately twenty-two cases. The Department's inconsistent application of its evaluation procedures provided objective evidence that the evaluation order was not consistent with business necessity, creating a genuine issue of material fact for the jury.

*Wright*, 798 F.3d at 524.[1]

*Wright* fully supports the jury's verdict that the Sheriff's Office violated the ADA and shows that the jury would be justified in finding that allowing Nawara to work 51 days and carry a gun negates Defendant's business necessity defense. *See also*, *Butler v. State, Louisiana Dep't of Pub. Safety & Corr.*, 2014 WL 6959940, at *12 (M.D. La. Dec. 4, 2014) ("throughout the period relevant to this litigation, …, Plaintiff continued to carry a weapon and to perform all of the duties of a state trooper, including regularly interacting with the public while effecting traffic stops and investigating accidents. Accordingly, the Court finds that Plaintiff has pointed to sufficient evidence from which a rational jury could find that Defendants' actions were not justified on the ground that Plaintiff posed a direct threat to himself and others.").

In this case, the jury was fully justified in finding for Nawara based on the uncontested

[1] The standard for summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

evidence that Nawara was allowed to work and carry a gun for 51 days. This objective evidence is wholly inconsistent with the Sheriff's Office's business necessity defense.

### *d.* ***Testimony of Gannon, Turrise and Conley Contradicts Jones-Hayes***

The trial testimony of Correctional Officers Barbie Gannon, James Turrise and Sergeant Thomas Conley contradicts Jones-Hayes' narrative and provides yet another basis for sustaining the verdict. Jones-Hayes' notarized Complaint Register ("CR") lists Gannon and Conley as witnesses to be contacted during the investigation (DX 7). In the narrative section, Jones-Hayes identifies Turrise as being present. *Id*. Nawara testified that Gannon, Turrise and Conley were all in the control room at the time of the purported incident with Jones-Hayes.

According to Jones-Hayes, as she was addressing Nawara and Gannon in the control room, Nawara began screaming "don't touch me, don't touch me lady, don't put your hands on me period." *Id*. Jones-Hayes claims that "Nawara was exuding such rage it startled me…" *Id*. Jones-Hayes asserts that Nawara "yelled at the top of his lungs 'Don't touch me! Don't fucking touch me lady!' over and over again." (DX 21). Jones-Hayes' signed statement claims that "Nawara displayed extreme rage… (his body trembled as he screamed at her)." (DX 21). At trial, Jones-Hayes repeated her claim that Nawara was screaming, yelling and very aggressive; that he got in her face; that he was so enraged; and that his fist was balled up.

Gannon testified that the control room is roughly 8' by 10'. She was assigned to basement control with Nawara. Gannon testified that Jones-Hayes was talking loudly when she entered the control room and struck Nawara in the chest two times.[2] Gannon was only 1-2 feet away. She did not recall Nawara saying anything to Jones-Hayes that caused her to poke him. She had no idea

[2] Gannon admitted that she said Jones-Hayes was talking very loudly at her deposition and that Jones-Hayes poked Nawara in the chest two times.

what caused Jones-Hayes to poke him. Gannon testified that Nawara did not yell at Jones-Hayes. Gannon recalls Nawara saying to Jones-Hayes: Ma'am you don't have to touch me to talk to me.

Gannon did not hear Nawara yell, scream or curse at Jones-Hayes. She never saw Nawara threaten Jones-Hayes and did not recall anything threatening. Gannon never witnessed any improper behavior by Nawara and never saw anything to cause her concerns about being partners with him. Gannon did not observe Nawara lose his temper with Jones-Hayes. She could not recall seeing or hearing Nawara say anything or do anything disrespectful towards Jones-Hayes. Gannon never observed anything that day that would warrant preparing an incident report.

Officer James Turrise also contradicted Jones-Hayes. He did not observe any rage or anger by Nawara. Turrise was preparing an incident report inside the control room when he observed Jones-Hayes and Nawara in the control room. Turrise was about 3-4 feet away when he observed Jones-Hayes touch Nawara. According to Turrise, Nawara did not yell at Jones-Hayes. He testified that no one was screaming. Turrise testified that he knows for a fact that Nawara never cursed at Jones-Hayes and did not use any profanity. He did not believe Nawara said anything disrespectful towards Jones-Hayes. Turrise did not observe anything to cause concerns that Nawara would be a danger. Nor did Turrise have any concerns about Nawara performing his duties as a correctional officer. He testified that he did not observe Nawara lose his temper and there was no reason for Turrise to prepare an incident report concerning Nawara and Jones-Hayes.

Sgt. Conley described witnessing a conversation/discussion between Nawara and Jones-Hayes. Conley overheard a loud discussion taking place. He did not recall any profanity. Conley did not prepare either an incident report or witness report regarding the interaction he observed between Jones-Hayes and Nawara.

Nawara also denied Jones-Hayes' narrative of what occurred, and the jury was free to

believe Nawara's testimony. Nawara described an inappropriate touching by Jones-Hayes (poking him twice in the chest); he denied screaming or cursing at the superintendent; he testified that Jones-Hayes used profanity directed at him; and that she undermined his authority in front of the inmate who resisted cuffing up including addressing the inmate as "baby."

It is noteworthy that Burke accepted Jones-Hayes' account of what happened at face value even after Burke heard the testimony of Gannon, Turrise and Conley. These witnesses had every incentive to back the superintendent. These Sheriff's Office employees risked reprisal. It would be permissible and reasonable for the jury to consider this in assessing Burke's credibility.

The testimony of Gannon, Turrise and Conley is in itself sufficient to support the jury verdict. Accepting their testimony at face value, a jury could reasonably conclude that there was no business necessity to require Nawara to undergo a FFD.

***e. <u>Video of Nawara Breaking up the Inmate Fight 40 Minutes before the Jones-Hayes Incident is Inconsistent with Jones-Hayes Testimony</u>***

The video of the inmate fight that occurred at approximately 10 a.m. on November 28, 2016 provides additional support for the verdict. The video shows a calm, cool and collected Correctional Officer Nawara breaking up a fight between two inmates in the staging area. The video does not portray an individual with anger management problems. The video does not display an individual who is a danger to inmates or staff. Nawara acted calmly and professionally in breaking up the fight and even patted the back of one of the inmates to help deescalate the situation.

The video is not consistent with Jones-Hayes' narrative that approximately 40 minutes later, Nawara became an enraged lunatic. *See*, DX 9, DX21 (Jones-Hayes' complaint register and information provided by Jones-Hayes on November 16, 2016). The video also shows a calm Jones-Hayes after the alleged incident. Jones-Hayes is shown walking around the staging area and performing her duties as if nothing happened.

### *f.* ***Burke and HR's Inaction from September 29, 2016 to November 2016 is Inconsistent with the Sheriff Office's Business Necessity Defense***

Burke and HR did absolutely nothing from September 29, 2016, when Burke referred Nawara to HR for a FFD, until November 2016, when Reierson allegedly tried to contact Jones-Hayes. Burke did not bother to view the videos, despite Jones-Hayes' complaint register identifying specific cameras. (DX9). Burke testified that he could have viewed the videos from his desk and that it would have taken him only 5-10 minutes to access the videos.

The Sheriff Office's failure to pull the videos resulted in at least one important piece of evidence being destroyed. After the control room incident, Jones-Hayes and Nawara testified about an inmate who resisted Nawara's efforts to shackle him in the staging area. This would have been captured on video since there were cameras in the staging area as shown by the other videos played to the jury. There was no video of this subsequent incident. The evidence at trial was that videos are only kept for 30 days.

Burke and HR also made no effort to investigate or even inquire about the incident. They never contacted Gannon, Turrise and Conley, whom Jones-Hayes had identified as witnesses. Despite admitting that he had the authority to summon them to his office, Burke testified that he did not feel it was necessary to contact any of the witnesses listed on Jones-Hayes' complaint register. Had Burke or anyone else at the Sheriff's Office bothered to contact these individuals, they would have discovered that Jones-Hayes' story was false. No one even tried to learn Nawara's side of the story during this 51-day period.

In response to a juror's question, Burke responded that it wasn't his job to look at the video or to investigate. Burke admitted that he took no steps to follow-up on the FFD referral from September 29, 2016 until he received an email from Reierson on November 8th telling him that there was not enough information for an FFD. Burke testified that Reierson never reached out to

him prior to November 8th about having difficulty getting in touch with Jones-Hayes. A jury could reasonably conclude from Burke's attitude, and from his failure to act, that he did not have any genuine concerns that Nawara posed a safety threat.

Moreover, a reasonable jury could find that the FFD was improperly used to protect Jones-Hayes. Burke testified that he was personally involved in the interview process and recommended Jones-Hayes to be promoted to superintendent. Burke testified to a mentoring relationship with Jones-Hayes. She was a rising star in the Department of Corrections. She signed the complaint register under penalties of perjury. A false CR, signed under oath, could have ended Jones-Hayes' career.

Reierson testified that during the 51 days, she never looked at Plaintiff's personnel file despite the fact that the file was in her office (Transcript, p. 1798, lines 8-14). During the 51 days, Reierson never requested any video, never requested incident reports, never requested disciplinary reports and did not even know that Jones-Hayes had submitted a complaint register (*Id*., p. 1798-99, lines 24-25, 1-21). Reierson previously testified that it is reasonable to have all reports and any other documentation used in the supervisor's assessment sent to HR.

The Sheriff Office's inactions during this 51-day period are inconsistent with its business necessity defense. If it had real concerns about Nawara, a reasonable person would expect that the Sheriff's Office, acting through Burke and HR, would have done something from September 29, 2016 until November 2016.

### *g.* ***Reierson's Admission That There Was Not Enough Information for an FFD Examination Supports the Jury's Verdict that the Defendant Violated the ADA***

On November 8, 2016, Reierson wrote Burke:

> There is not enough information in this referral to support sending Officer Nawara for a fitness for duty evaluation. I did reach out to Superintendent Jones-Hayes and request more detailed information but I never received a response.

(November 8, 2016, at 4:20 p.m. Reierson email to Burke, PX103).

More than a month after the September 28th incident, Reierson admitted that there was not enough information to support an FFD evaluation. Nothing happened from Burke's referral on September 29th until Reierson's November 8th email, to support an FFD evaluation. Nawara was working and carrying a gun this entire time. There was no evidence introduced that Nawara was unable to perform job-related functions during this time. Reierson's admission, alone, requires that the verdict be affirmed.

***h. <u>Jones-Hayes' Failure to Respond to HR or Follow-up is more Evidence that there Were No Legitimate Concerns about Nawara's Fitness for Duty</u>***

The fact that Jones-Hayes did not respond to Reierson is additional evidence that there were no legitimate concerns about Nawara's fitness for duty. In her November 8, 2016 email to Burke, Reierson informed Burke that she had reached out to Jones-Hayes "but never received a response." (PX 103, PX 50).

If there were legitimate concerns about Nawara, it is reasonable to expect Jones-Hayes to cooperate with HR and to promptly respond to Reierson. One would also expect Jones-Hayes, a prison superintendent, to follow-up if she was truly concerned about anger management issues that could threaten the safety of inmates or staff.

Jones-Hayes tried to explain her lack of cooperation/follow-up as miscommunication claiming she may have missed Reierson's email(s). The superintendent acknowledged that she was required to check emails daily. Further, the jury was free not to believe Jones-Hayes' explanation.

***i. <u>Nawara was an 18-Year Veteran with No Anger Management Issues</u>***

Nawara was an 18-year veteran correctional officer hired in 1998. There was no evidence that Nawara had any prior anger management issues. Reierson admitted that she had no

information that Nawara had any anger management issues prior to the Jones-Hayes incident (Transcript, p. 1800, lines 12-15). Reierson testified that she was not aware of any other incidents where Nawara exhibited anger. Burke also testified that he was not aware of any mental health issues and did not recall if he ever inquired whether Nawara had any history of anger management. Thomas Conley, Nawara's sergeant at the time, never observed him lose his temper or yell at a supervisor before September 28, 2016. Jones-Hayes' version of the incident, even if true, shows that what occurred on September 28th, was an isolated event and fully supports a finding that a FFD evaluation was not appropriate and that the FFD process was being used as discipline.

For 18 years Nawara was able to perform his duties as a correctional officer. It would be appropriate for the jury to consider whether the September 28, 2016 incident was an isolated incident or a pattern. In *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619 (6th Cir. 2014), in upholding the denial of summary judgment, the court held:

> However, even in public safety workplaces, a small number of isolated incidents or troubling behavior may not be sufficient to establish that a psychological examination is a business necessity.
>
> ***
>
> However, as discussed above, Binns knew of only two isolated incidents when Kroll ever behaved in a way that could endanger another person. A reasonable jury could find that Binns could not reasonably have concluded from these missteps that Kroll presented 'a significant risk to the health or safety of others.' 42 U.S.C. § 12111(3).
>
> Moreover, even if Kroll did pose a safety risk, a reasonable jury could find that Binns was not justified in ordering her to submit to a medical examination because he did not make his decision 'based on a reasonable medical judgment.' 29 C.F.R. § 1630.2(r)… For the regulation to have any meaning, however, an employer must do more than follow its own lay intuition regarding the threat posed by an employee's potential medical condition.

*Kroll*, 763 F.3d at 626.

The facts of *Kroll* pale in comparison to this case. Kroll was an emergency medical technician for an ambulance company who was involved in an affair with a coworker. *Id.*, p. 620.

Her personal conflicts with the coworker affected her behavior at work. Kroll frequently sent the coworker text messages and emails and screamed at him over the phone while at work. Several coworkers witnessed other incidents that made them question Kroll's emotional stability. *Id*. On one occasion Kroll was found crying in a parking lot, and on another occasion Kroll called the office manager in tears after finishing a shift. *Id*. at 620-21. Coworkers testified that they reported to supervisors Kroll's frequent use her cell phone while operating the ambulance which violated policy. *Id*. at 621. On another occasion, a coworker asked Kroll to assist her in administering oxygen to a patient, but Kroll ignored the request. *Id*.

Kroll claimed her employer violated the ADA by requiring her to submit to a medical examination that was not shown to be job-related and consistent with business necessity. In reversing the district court's grant of summary judgment, the court of appeals found that the record, at most, revealed only two incidents that could support a determination that Kroll's behavior may have undermined her ability to perform the essential functions of her job. *Id*. at 625. "Based on this information, a reasonable jury could find that [the supervisor] could not reasonably have concluded that Kroll was unable to perform the essential functions of her job." *Id*.

*Kroll* fully supports the verdict in this case. A reasonable jury could find, even if Jones-Hayes' account was true (which it is not), that the Sheriff's Office failed to sustain its burden to prove that the FFD was job related and consistent with business necessity. By all accounts, the occurrence with Jones-Hayes was an isolated incident, and for the 18 years before that, Nawara was able to perform the essential functions of his job. The Sheriff's Office failed to present any objective evidence to the contrary.

***j. <u>Allowing Nawara to Work at Cermak after the Jones-Hayes Incident is Inconsistent with the Sheriff Office's Business Necessity Defense</u>***

Also inconsistent with the CCSO's business necessity defense is the testimony that Nawara

was allowed to complete his shift at Cermak Hospital on September 28, 2016. The testimony was that he was reassigned to the psych unit at Cermak to complete his shift on September 28th. Nawara testified that he also worked the next day at Cermak.

It makes no sense that Superintendent Jones-Hayes would allow Nawara to finish his shift and work the next day in the same building that she supervised if she really perceived Nawara to be a threat.

### *k.* ***The Evidence Supports a Finding that the FFD was Improperly Used as Discipline***

Burke, Reierson, Shelby and others acknowledge that it would be improper to use FFD as a substitute for discipline. Reierson testified that it is improper to use FFD as discipline. Burke testified that the FFD process is not to be used as a substitute for discipline and it would be against department rules to use it as discipline. Dr. Diana Goldstein testified that FFD should never be used as a substitute for discipline. Dr. Goldstein testified that she has observed FFDs being improperly used by departments as discipline over and over again.

There is sufficient evidence for the jury to find that the FFD was used as a substitute for discipline. Burke's admission that he did not feel Nawara was a threat to himself or others supports a finding that the FFD was being improperly used as discipline. There was no legitimate reason to have referred him for a FFD if he was not a threat.

Moreover, on November 9, 2016, Reierson sent an email to Burke stating: "It's not really clear from the short statement what exactly occurred. Is this something more than insubordination that should be handled through the disciplinary process?" (PX 26). On November 10, 2016, Reierson sent Karyn Williams an email:

> Hi Karyn,
>
> The fitness for duty log is attached. It seems as though DOC is trying to use the

> FFD process in lieu of supervising/disciplining employees. Can we talk about this when you are free?

(PX 32).

Attached to the above email is the fitness for duty log for Nawara referenced by Reierson saying the case was closed noting: "Complainant would not provide more detailed information. Not enough in write up to justify FFD." (PX 32). There is ample evidence for a jury to find that the Sheriff's Office improperly used FFD in lieu of discipline.

### *l.* ***The Fact that Nawara was Found Fit for Duty with No Anger Management Problems Confirms that the Sheriff's Office Violated the ADA***

Nawara was twice found fit for duty. On September 11th and September 12th, 2017, Dr. Diana Goldstein conducted a psychological and neurocognitive examination of Nawara. In her report dated September 16, 2017, she found Nawara "fit to return to duty, without restrictions." (PX 19). The report found Nawara to be "fully capable of safely and effectively carrying out the essential functions of his job." (*Id)*. Dr. Goldstein testified that she found no evidence of anger management problems or any other conditions that would impact Nawara's ability to safely and effectively conduct the duties of a correctional officer. She testified that she did not have any concerns about Nawara's fitness to return to duty as a correctional officer without restrictions. Robin Kroll on March 3, 2017 found Nawara fit for duty. (Trial Transcript 1702:8-14)

The jury could have reasonably relied on the fact that twice Nawara was found fit for duty. It was reasonable for the jury to reject the Sheriff's Office business necessity defense and find in favor of Nawara based on the fact that he was found fit for duty by Dr. Goldstein. There was no evidence to suggest that Nawara's ability or mental state to function as a correctional officer changed from September 2016 to September 2017 when Dr. Goldstein found him fit for duty.

### ***m. <u>Providing Disinformation about what Occurred at HR Indicates a Cover up to Justify the FFD Referral</u>***

The jury did not have to believe Reierson and Shelby's version of the events at HR. The jury could have reasonably concluded that Reierson and Shelby concocted a story about what occurred at HR, especially when Reierson acknowledged in writing that there was no basis to refer Nawara for FFD based on the Jones-Hayes' incident and Shelby testified that ninety-five percent (95%) of the reason for the FFD referral was Nawara's behavior at HR.

When Shelby prepared the referral form for CorVel and sent it to Reierson for review, she did not mention the events at HR as a reason for the referral. Shelby listed "[e]mployee's inappropriate, aggressive behavior with his superior" as the **only** reason for the FFD referral (PX 63). On August 25, 2017, Reierson responded to Shelby telling her to add: "In addition, weeks later, employee presented as aggressive and hostile in the human resources department." (PX 65). This is the referral that Shelby ultimately sent to CorVel on August 25, 2017 (DX 42).

Any reasonable person would question how Shelby could forget to mention Nawara's conduct at HR as a reason for the referral if indeed she ascribed his conduct at HR as 95% of the reason for the referral. Based on this fact alone, it would be reasonable for the jury to conclude that Shelby and Reierson's version of the events was not credible, that there was no legitimate basis for the FFD referral, and there was no business necessity for the FFD.

Furthermore, a reasonable jury could have also found that Nawara's alleged behavior at HR was not job-related. A jury could have reasonably concluded that the manner in which Nawara answered questions at HR had nothing to do with his ability to perform the duties of a correctional officer and it did not provide justification for Defendant's business necessity defense.

Further, the allegation that Nawara "presented as aggressive" at HR, which was forwarded to Dr. Diana Goldstein for her FFD evaluation, is undescriptive and devoid of facts. CorVel's case

manager, Michelle Sarocka, testified that it is important for CorVel to receive the employer's version of what happened. As Dr. Goldstein testified, no other information was provided by the Sheriff's Office about the meeting at HR. Nothing was conveyed about the purported rage, clenched fists, etc.

Reierson's purported justification for the lack of detail provided to CorVel by blaming it on Nawara's lawsuit having been on file at the time is nonsensical. A reasonable jury could find that what allegedly occurred at HR was nothing but an after-thought to justify a bogus referral for a FFD.

Reierson claimed that she was "scared" during the HR meeting with Nawara (Transcript, 1767:13-18). Reierson testified that Nawara was aggressive and hostile the entire time (*Id*., 1773:7-24). She claimed that Nawara's fists were clenched, his jaw tight, and it was "like the fear of the unknown of what his next move was going to be." (*Id*., p. 1773:15-24). Reierson went so far as saying that Nawara was trying to keep himself in the chair.

Shelby provided similar testimony. She testified that Nawara was yelling, mad, enraged and looked like a bulldog ready to attack. Shelby testified that no one had ever acted this way; that no one had ever shown the rage that Nawara exhibited; and that Nawara "stormed" out after the first session. When Nawara returned with his union representative, Shelby claims he was still full of rage.

Shelby testified that there was a deputy sheriff right outside her door. The testimony was that Reierson and Shelby kept the office door closed the entire time they were with Nawara. Reierson and Shelby never alerted the deputy sheriff stationed outside the door about Nawara's behavior. They did not call for security (*Id*., p. 1804-05, lines 23-25, 2-3). They never asked security to keep a look-out when Nawara came back (*Id*., p. 1805, 14-18). Reierson kept the door

closed even after Nawara came back for the second part of the interview (*Id*., p. 1805-06, lines 14-25). From this testimony, the jury could reasonably conclude the Shelby and Reierson's testimony was not credible and that there was no business necessity for the FFD.

Finally, a jury could reasonably conclude that Nawara was ambushed and set up when he was summoned to HR. Nawara was given no advance notice. He was told by his lieutenant an hour before that he was required to report to HR. He did not know why. It had been 51 days since the incident with Jones-Hayes. Nawara testified that he was asked questions in an accusatory manner by Shelby without any reference to Jones-Hayes.

Reierson and Shelby also testified that they did not prepare a report or any writing regarding Nawara's alleged behavior in HR. Based on all the facts that make Shelby and Reierson's testimony questionable, the jury could have reasonably concluded that: Reierson and Shelby were not forthcoming about what occurred at HR; that there was no legitimate basis to send Nawara for an FFD; and that they created a cover up to justify the FFD referral.

***n. No Written Rules, Policies, Guidelines or Procedures for FFDs***

The evidence was uncontroverted that the Sheriff's Office had no written policies, procedures or guidelines in 2016 for FFDs. Burke testified that he was not aware of any written procedures, criteria guidelines or anything in writing for FFDs in 2016. Reierson and Shelby also acknowledged the same. Reierson had minimal experience with FFDs when she conducted Nawara's FFD. Reierson, Shelby and Burke had no formal training or instruction on FFDs.

The jury could have reasonably found that the lack of written policies, guidelines or criteria (along with a lack of training) led to an unjustified FFD in violation of the ADA. There were no safeguards to ensure that the FFD process was not abused. It would have been reasonable for the jury to find that the entire process was flawed. Meaningful written guidelines and procedures

should have resulted in someone looking at Nawara's personnel file to learn that in his 18 years as a correctional officer he never had any incidents of anger management or anything that would call into question his ability to perform his duties as a correctional officer. Such written procedures should have caused someone to investigate the allegations made by Jones-Hayes and to contact Gannon, Turrise and Conley.

***o. John Nawara's Testimony***

Plaintiff's testimony, by itself, supports the verdict. Nawara denied Jones-Hayes' account of what occurred at Cermak Hospital. At trial, Nawara disputed Reierson and Shelby's claim of the events at HR. Nawara testified that he never stormed out of the room, did not become enraged and did not clench his fists. Nawara also denied any aggressive behavior at HR.

Accepting Nawara's testimony as true, there was no basis to refer Nawara for an FFD. It is for the jury to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a sufficiency of the evidence challenge. *U.S. v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016).

There is simply no basis for the Sheriff's Office to contend that when the evidence is considered as a whole, combined with all reasonable inferences in favor of Nawara, a reasonable jury could not find in favor of the Plaintiff.

## ***IV. WRIGHT v. DCFS REQUIRES THE DENIAL OF DEFENDANT'S MOTIONS FOR JUDGMENT AS MATTER OF LAW***

The Sheriff Office's Rule 50 motions are not well-taken based on *Wright v. Illinois Dept. of Children & Family Services*, 798 F.3d 513 (7th Cir. 2015). Wright's claim that her employer violated the ADA by ordering her to undergo an FFD evaluation was tried before a jury after the district court denied DCFS's motion for summary judgment. The jury found for Wright on her ADA claim but awarded no compensatory damages. *Id*. at 516. In upholding the district court's

finding that DCFS failed to prove its defense of business necessity, the Seventh Circuit stated: "the district court correctly determined that the evidence submitted at trial was insufficient to establish, as a matter of law, that requiring Ms. Wright to undergo a fitness-for-duty evaluation was consistent with business necessity." *Id*. at 524. DCFS argued that no reasonable jury could disagree with its perception that Wright's ability to perform the duties of a caseworker was impaired, and that ordering an evaluation to determine the extent of that impairment was consistent with business necessity. *Id*. at 522. The Seventh Circuit rejected DCFS's argument. *Id*.

DCFS presented evidence that Wright exhibited inappropriate behavior between 2004 and 2007, displayed boundary issues with a 10-year old ward of the department, undermined the child's treatment team, and acted aggressively towards staff. *Id*. at 522. According to a doctor, Wright threw the child into a "manicking" frenzy by telling the ten-year-old that there were foster families available for her even though the child, who had emotional issues, was not on the foster care list. *Id*. at 517. This child's "frenzy incited a riot" at the facility, during which children threw furniture and attempted to attack staff. *Id*. The doctor described Wright's conduct as "unheard of," and concluded that Ms. Wright posed a risk to the child. *Id*.

Wright was barred from having further contact with child and she was removed from the case. *Id*. at 517-18. Supervisors said that Wright was "unsupervisable;" that she did not get along with supervisors; and that her failure to follow orders resulted in a lasting injury to a child. *Id*. at 518. The doctor wrote a letter stating that he believed there was enough clinical data to question Wright's ability to work with children and that "her mental health needs to be assessed." *Id*. Wright was ordered to undergo an evaluation and notice was provided to Wright informing her that she had exhibited behavior that put into question her personal safety and that of others in the workplace. *Id*. In her recommendation for an FFD, a department administrator listed a litany of

troubling behavior by Wright including having a history of defiance to all levels of management, failing to see risk to children in foster care and to report incidents of unexplained injury, cases having had to be removed from her caseload, verbally abusive and abrasive manner with foster parents, appearing to be physically very stressed, her face flushed and a blatant disregard for any rules or procedures. *Id*. at 518. Wright refused to undergo an FFD. *Id*.

Contrary to department policy, Wright was not placed on desk duty when she was ordered to undergo an FFD evaluation. *Id*. at 524. Instead, for almost two months, Wright continued to oversee her normal caseload. *Id*. The department administrator admitted at trial (much like Burke in this case) that she thought it was somewhat contradictory to send a caseworker for an FFD because she may be a risk to children and at the same time continue to assign her cases. *Id*. at 525. This administrator further testified that if she sincerely believed Wright to be a risk to children, she would have removed her from those cases. *Id*.

The Seventh Circuit held:

> The evidence presented at trial supports a finding that the Department did not believe that Ms. Wright posed a safety risk to the children with whom she worked and, instead, that it considered her competent to continue working with approximately two-dozen children. Given this evidence, a reasonable jury could determine that Ms. Wright's fitness-for-duty examination was not, in fact, consistent with business necessity. The district court therefore did not err in denying the Department's motion for judgment as a matter of law.

*Wright*, 798 F.3d at 525.

The facts here against the Sheriff's Office are more compelling than those in *Wright*. Unlike this case, DCFS investigated the allegations against Wright before ordering an FFD by interviewing coworkers and supervisors, and even obtained the opinion of a doctor.

Like *Wright*, Nawara was not relieved of duty but permitted to work for almost two months. *Wright* teaches that allowing Nawara to work for 51 days and carry a gun undercuts the Sheriff

Office's business necessity defense. Burke's admission that he did not feel Nawara was a threat to himself or others is even stronger than the supervisor's admission in *Wright* that she thought it was "somewhat contradictory to send a caseworker in to a fitness-for-duty evaluation because she may be a risk to children and at the same time continue to assign cases to her." *Wright*, 798 F.3d at 525.

Realizing the negative impact of *Wright*, the Sheriff's Office devotes two pages in its motion trying to distinguish *Wright* (Amended Memorandum, pp. 27-28, Doc. 333). Defendant points to distinctions without differences and makes form over substance arguments.

First, without citing any authority, the Sheriff asserts that "*Wright* represents a limited exception to *Coffman*."[3] *Wright* is not an anomaly; it has been cited 133 times by courts nationwide. *Wright* is the most definitive authority in this Circuit on FFD evaluations under the ADA and nowhere does the Seventh Circuit suggest that the decision is an exception to *Coffman*.

Second, the Sheriff's Office attempts to minimize the fact that Nawara was allowed to work for 51 days and carry a gun after Burke's FFD referral. The Defendant's argument misses the point. No rational prison administrator with genuine anger management concerns would transfer a correctional officer from a position where he did not have gun to a position where he was required to carry a gun and have daily interaction with staff and inmates. It makes no sense no matter how the Sheriff's Office tries to spin it. The Sheriff Office's actions speak volumes.

Third, the Sheriff's Office argues that *Wright* is distinguishable because DCFS had a policy to place the employee on leave or desk duty after the FFD referral was made, and the Sheriff's Office did not. The truth is that the Sheriff's Office had **no policies** whatsoever with respect to FFDs. This does not lessen *Wright's* devastating impact on the Sheriff Office's contrived business necessity defense.

[3] As discussed *infra*, *Coffman* provides no support for Defendant's motion.

Fourth, Defendant argues that Nawara offered no evidence that he was treated differently than any similarly situated employee (Def's Memo, pp. 27-28). This is not an equal protection case. Surely, the Sheriff's Office is not advocating that its custom and practice is to hand a gun and allow that employee to work for 51 days in cases where it had legitimate concerns that the employee is a threat to public safety.

Finally, the Sheriff's Office argues that *Wright* did not involve a public safety employer with constitutional obligations to protect against the excessive use of force towards inmates. DCFS's obligation to protect children is every bit as important, some would say even more important as it involves children. The ADA does not grant special immunities or exceptions to local sheriffs. This is an absurd argument especially given that there was no evidence that Nawara ever used excessive force against an inmate.

*Wright* requires the denial of the Sheriff Office's Rule 50 motions.

## ***V. THERE IS MORE THAN SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT THAT THE SHERIFF'S OFFICE VIOLATED THE ADA BY REQUIRING NAWARA TO SIGN MEDICAL RELEASES***

Even **assuming arguendo** that the Sheriff's Office was justified in requiring Nawara to undergo an FFD, the jury verdict must nonetheless be upheld.[4] There is compelling evidence to support the verdict that the Sheriff's Office violated the ADA by requiring Nawara to sign the medical release forms. The evidence was uncontroverted that at HR on November 18, 2016, Shelby and/or Reierson provided Nawara with two forms (PX 1 and PX 2) authorizing the release of Nawara's medical records. Nawara testified that he was told at HR that he was required to sign both forms in order for him to complete the FFD process. There was no dispute that Nawara was

[4] If the Sheriff's Office violated the ADA based on the FFD, then it necessarily follows that Defendant's demand that Nawara sign the medical records also violates the ADA.

not allowed to return to work unless and until he was found fit for duty.

### A. ***The Sheriff's Office Violated the ADA by Requiring Nawara to Sign Unlimited Releases for His Complete Medical Records***

In its argument about the forms, the Defendant states that the forms do not make the FFD referral illegal. That is not the issue. The issue is that the forms violate the ADA. As this Court noted in its March 28, 2018 Memorandum Opinion and Order, "the question is whether anyone, at CCSO or otherwise, was entitled under the ADA to request [Nawara's] entire medical history for purposes of [a fitness for duty] examination." (Doc. 187, 3/28/19 Order, p. 13). The jury's verdict gives the answer to that question as a resounding "No."

This Court found that "the forms in question in this case are broad medical release forms that are untailored for any specific type of fitness for duty exam." (*Id*., p. 14). The Court recognized that the ADA "only permits limited medical inquiries." (*Id*., p. 13). The Sheriff's Office violated the ADA when it required Nawara to authorize the release to the Sheriff's Office of all of his medical records and information. Based on the evidence presented, the jury correctly found that there was no justification for such a broad release and that the forms violate the ADA.

The Defendant tries in vain to explain away the forms. It does not matter how many witnesses attempted to spin the forms on behalf of the Sheriff's Office. The jury was not required to believe them. The forms were there for anyone with an understanding of the English language, to read and interpret. When asked about the CCSO form and the box checked "All medical information," Nawara testified that all means all, there was no limitation. He found a problem with the form because it allowed the Sheriff Office to get all of his medical information going back to "whatever."

The Sheriff's Office's argument that it could not have done anything with the forms because the medical provider on the forms was left blank and that it would have required Nawara

to provide this information is spurious. The jury could have reasonably concluded that Nawara would have been required to provide the identity of his medical providers to the Sheriff's Office in order to participate in the FFD process if he had any chance of returning to work. Without Nawara's medical records, Nawara would not have been able to complete the FFD and return to work. It is plausible to conclude that an employer could take blank authorizations and send them to the hospitals in Cook County[5], or to the hospitals near the Plaintiff's home. It is reasonable to conclude that the Sheriff's Office with all its police powers could investigate and find out an employee's medical providers, or learn the identity of providers through insurance records or from an employee's personnel records. Whether an employer would or would not do this is beside the point. The point is that the law does not allow any employer to be in that position or require the employee to sign unlimited and blank medical releases.

Any request for the unlimited release of complete medical records violates the ADA. The Sheriff's Office violated the ADA through its repeated demands that Nawara sign both forms. In its March 28, 2019 Memorandum Order and Opinion, this Court noted that "the forms in question in this case are broad medical release forms that are untailored for any specific type of fitness for duty exam." (Doc. 187 p. 14). The Court further commented that the "Defendants in this case have not articulated how or why such broad HIPAA form is a business necessity." *Id*. Reierson testified that the Sheriff's Office did not need all of Plaintiff's records for an FFD which destroys any "business necessity" defense.

With respect to the argument that Nawara's only complaint was that the forms were blank (Def. Memo. P 32), this Court stated:

---

[5] The Sheriff's Office lists the hospitals in Cook County in its website: www.cookcountysheriff.org/departments/c-c-s-p-d/investigations/hospitals-cook-county/

> This argument hardly creates a defense; from the court's review of the Release Form, it appears to seek '[a]ll healthcare information' from any medical provider, without specifying any particular time-frame or medical condition about which Cook County sought information, and would effectively permit Defendants access to a wealth of information about Nawara unrelated to his fitness for duty. The fact that Nawara referred to these forms as 'blank' does not defeat his ADA claim. Defendants' motion to dismiss Plaintiff's ADA claim is denied.

(*Id*., p. 15).

### ***B.*** ***<u>Evidence was Presented that the Defendant Required Both Forms to be Signed</u>***

There was plenty of evidence that the Sheriff's Office required both the CorVel Form and the CCSO form to be signed. Nawara testified that Shelby pulled out the two forms, slid them across her desk and said, "you need to sign these so we can go on with your FFD process," and "you cannot return to work until you sign these two forms." He also testified that he looked at the forms that were blank and immediately said I'm not signing these forms. Shelby responded that he could not come back to work until he signed those forms. Nawara stated that he was concerned with, and had a problem with, both forms. Nawara testified that he never told attorney Kurtz that he was only concerned about one of the forms.

Further there were the two letters from Reierson and a number of emails, all of them to the effect that the CCSO demanded that both forms be signed. On November 30, 2016, Reierson sent a letter to Nawara stating*:*

> On 11/18/16 you were informed by the Occupational Health Nurse for the Sheriff's Office, Winifred Shelby, that you were required to undergo a Fitness for Duty (FFD) evaluation before returning to active duty. You took the ***forms*** in order to review them prior to signing and have failed to return them to Ms. Shelby… ***These signed documents must be returned*** to Ms. Shelby by Monday, 12/5/16, so the FFD evaluation process can begin. If they are not received by that date, it will be determined that you are not participating in the process and your time off of work from 11/18/16 will be unauthorized. Further, you are not able to return to work until you have completed the FFD process.

(PX 5 (emphasis added)).

On February 28, 2017, Reierson sent a letter to Nawara stating *inter alia*:

> The signed waiver documents given to you on November 18, 2016 must be returned to Ms. Shelby by Wednesday, March 8, 2017 so the FFD evaluation process can proceed. This is the last notification you will receive. If the forms are not received by March 8, 2017, your time off work (November 18, 2016-present) will be deemed unauthorized. Further, you are not able to return to work until you have completed the FFD process.
>
> I have enclosed another copy of the forms for your convenience…

(PX 7).

Reierson enclosed a copy of the two forms with her February 28, 2017 letter. *Id*. On March 13, 2017, Reierson emailed Kurtz stating Nawara "must execute the HIPAA waiver ***forms*** in order to complete the FFD process." (PX 10) (emphasis added). The evidence clearly supports a finding that Nawara was required to sign **both** forms. Defendant's assertion that Nawara was only required to sign the CorVel form is belied by Defendant's letters and emails. Nawara also denied that he was ever told that he only needed to sign the CorVel form.

Despite the Defendant's protestations that only the CorVel form was required, there was also evidence that at one time the Sheriff obtained all the records. Neither Sarocka nor Shelby knew when that practice ended. The jury could reasonably conclude that at the time Nawara was commanded to sign the forms, both forms were required.[6]

### *C. The CCSO Form Violates the ADA*

The CCSO form violates the ADA because it is unlimited in scope and time and it authorizes the Sheriff's Office to receive Nawara's complete medical records without regard to the relevancy of the records for his fitness for duty examination.

The EEOC Enforcement Guidance on Disability-Related Inquiries and Medical

[6] Evidence kept out by Defendant's motion *in limine* is that the practice ended in April 2017, well after Nawara's meeting at HR.

Examinations of Employees under the ADA shows that the form is unlawful:

> **An employer is entitled only to the information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. *This means that, in most situations, an employer cannot request an employee's complete medical records because they are likely to contain information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat.***

(EEOC Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 13 (July 27, 2000) (emphasis added).

"The EEOC's stated position on the scope of medical inquiry is that an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe v. Ford Motor Co.*, 277 F. Supp.2d 778, 782–83 (N.D. Ohio 2002); *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760, at *9 (E.Dist.Ky. June 21, 2018). The Seventh Circuit has relied on EEOC Enforcement Guidance in deciding cases under the ADA. *Wright*, 798 F.3d 522-24 and footnote 25; *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) ("We previously have recognized that, "[a]lthough not binding on this court, such administrative interpretations do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

In *Jackson v. Regal Beloit America, Inc.*, 2018 WL 3078760 (E.Dist.Ky. June 21, 2018), the district court granted the employee partial summary judgment as to liability under the ADA. Jackson worked for Regal as a forklift operator. *Jackson*, 2018 WL 3078760, at *1. In 2014, Jackson was diagnosed with colon cancer and her doctor cleared her to work a couple of months later. *Id*. She returned to work and resumed her position with no restrictions and no performance issues. *Id*.

Several months later, Regal notified Jackson that she would have to undergo a medical screening and she underwent a medical screening with Regal's contracted medical provider. *Id*.

Jackson passed the screening but at the conclusion of the appointment the doctor requested Jackson to provide her medical records related to the colon cancer. *Id*. at *2. Jackson refused. *Id*. Jackson instead provided a note from her doctor stating that she could drive any type of vehicle given that she was released to go back to work without restrictions. *Id*. Regal then threatened Jackson with termination if she did not agree to provide her medical records. *Id*. at *3.

Jackson was ultimately terminated and filed an ADA claim. *Id*. Jackson claimed that Regal violated the ADA by conditioning her continued employment on Jackson submitting to a medical examination and producing medical records; displacing and being demoted for refusing to turn over all of her medical records related to her cancer treatment; and terminating her for refusing to turn over the medical records. *Id*. at *5.

The *Jackson* Court noted that an employee's unlawful medical examination/inquiry claim reduces to two essential inquiries: (1) whether the employer performed or authorized a medical examination or disability inquiry ("the regulated conduct"); and if so, (2) whether the exam/inquiry was job-related and consistent with business necessity ("the justification"). *Jackson*, 2018 WL 3078760, at *6. The Court found that "Jackson has easily carried her burden with respect to the first element" noting:

> It is undisputed that Regal required Jackson to submit to a medical examination. During that medical examination and afterwards, Regal also made a 'disability-related inquiry' by requesting Jackson's medical records related to her colon-cancer surgery. Therefore, the burden shifts to Regal to 'prov[e] that [the] medical examination' and disability inquiry were 'job-related and consistent with business necessity.

*Jackson*, 2018 WL 3078760, at *7, *citing Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014).

The Court rejected Regal's business necessity defense:

> Moreover, even if Regal had provided a sufficient justification for its request for a medical examination or disability inquiry, which it has not, the scope of the examination and the inquiry 'must remain appropriately narrow.' *James v*

> *Goodyear Tire & Rubber Co.*, 354 Fed.Appx. 246, 249 (6th Cir. 2009) …Therefore, 'an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity.' *Farmiloe v. Ford Motor Co.*, 277 F.Supp.2d 778, 782-83 (N.D. Ohio 2002); *see also*, *EEOC Guidance*, Part B. 10.
>
> Here, any appropriate scope was far surpassed…Regal has put forth no rationale supporting its broad request.
>
> Put simply, Regal has failed to carry its 'burden of proving that' the medical examination or inquiry was 'job-related and consistent with business necessity.' [citation omitted] …By failing to limit the scope of the medical examination and inquiry and failing to put forth a legally valid justification for demanding it, Regal violated the ADA and the KCRA.
>
> Accordingly, Jackson is entitled to partial summary judgment in her favor on her unlawful-medical examination claim under the ADA and the KCRA. 'In order to prevail on this claim, however, [Jackson] must still establish that [she] suffered cognizable injury in fact of which the violation is a legal and proximate cause.' [Citations omitted]. Therefore, the matter of damages is best left for a jury.

*(Jackson*, 2018 WL 3078760, at *9-10).

The ADA prohibited the Sheriff's Office from making a disability related inquiry by requiring Nawara to provide ***all*** of his medical records to the Sheriff's Office. Over and over again, the Sheriff's Office conditioned Nawara's employment on signing such a broad intrusive release. Nawara could not return to work without completing the fitness for duty examination and he was not permitted to undergo the examination without signing the release.

### *D. The CorVel Form Violates the ADA*

The CorVel form also violates the ADA. The form is unlimited in time or scope. Like the CCSO form, the release covers records from the beginning of time to present. Also, once signed, the form can be sent to any medical provider for medical records. Although the form mentions "identified Health Care Providers" there is no place in the form to list those providers, and therefore it applies to any provider. The Sheriff's Office's argument that CorVel prepared the form is not a defense. Either the form is ADA compliant or it's not.

Through its general verdict, the jury found that the Sheriff's Office did not prove that it was justified in requiring Nawara to sign a release for his complete medical records on the grounds of job-relatedness and business necessity.

### ***E.*** ***The Defendant's Cases are Distinguishable***

The Sheriff's Office's reliance on *Green v. Joy Cone Co*., 278 F.Supp.2d 526 (W.D. Pa. 2003) is misguided especially given that this Court has already examined *Green* and found the case "unpersuasive." (3/28/19 MTD Opinion, p. 11, Doc. 187). The Court discussed the differences between the two cases including the fact that the cases are governed by different sections of the ADA. *Id*., at 11-12. *Green* involved "pre-offer medical inquiries," which are covered by 42 U.S.C.A. § 12112(d)(2)(A) as opposed to 42 U.S.C.A. § 12112(d)(4)(A) for employees.

In distinguishing *Green*, this Court stated:

> In the case before this court, however, the employer's medical inquiry was directed at an employee, not a job applicant. While all job applicants may inevitably have to undergo a medical examination if offered the job, *see* 42 U.S.C. § 12112(d)(3). Nawara was individually suspected of having a disability that impacted his ability to perform his job (thus, the referral for the FFD examination), and he was required to fill out broad medical releases on the basis of his employer's perception. *The court thus finds Green distinguishable and determines that medical releases given to an employee, upon an employer's specific suspicion of disability, and without which an employee may not return to work, are covered by the ADA* § 12112(d)(4).

(3/28/19 Opinion, p. 12).

Our case does not concern a pre-employment application where a form is requested for convenience. It is without question that Nawara was being required to sign the forms. It is without question that the CCSO intended to use its forms to obtain Nawara's medical records. Thus, the forms constituted inquiries into Nawara's medical history in violation of the ADA.

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810-13 (6th Cir. 1999), has no application to this case. In *Sullivan*, the district court held that Sullivan failed to provide evidence sufficient

for a jury to infer that he received adverse treatment due to being regarded as disabled. *Id*. at 810-13. An employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled. *Id*. at 811.

> However, an employer's discretion to order employees to undergo examinations is hardly unbounded. Post-hiring demands for examinations can only be made where shown to be "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Thus, for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can "perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

(*Id.*at 811).

"Hence, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job. *See* 29 C.F.R. Part 1630, App. § 1630.14(c) (offering interpretive guidance to § 1630.14(c)). *Sullivan*, 197 F.3d at 811-12." *Sullivan*, 197 F.3d at 811-12.

*Pena v. City of Flushing*, 651 Fed. Appx. 415 (6th Cir. 2016), involved an employee with a long history of mental health issues, depression, distractedness, two leaves of absence and the requirement of FFD before returning to work from leave. Pena is not at all like the case at bar.

### ***F.*** ***<u>The Defendant Kept Nawara Off Work for Nine Months due to Its Insistence on Having Nawara Sign Both Forms</u>***

The form violates the ADA, and the Defendant's requirement that the form be executed, before the FFD process could begin and before Mr. Nawara could return to work, make it responsible for the harms caused by that violation. Requiring an employee to sign an unlimited release form is sufficient to trigger the protections of the ADA. (*See, e.g., Conroy v. New York State Dept. of Correctional Services*, 333 F.3d 88 (2nd Cir. 2002) (even a "general diagnosis" may tend to reveal a disability and is sufficient to trigger the protections of the ADA under 42 U.S.C.

§ 12112(d)(4)(A)).

In denying the employer's motion for summary judgment, the Court in *Farmiloe v. Ford Motor Co.*, 277 F.Supp.2d 778 (N.D. Ohio 2002), did not directly state that the waiver forms violated the ADA. It did state, however, that the employer did not have the right to obtain Farmiloe's complete medical and psychiatric records. The inquiry must be limited to the suspected impairments. (277 F.Supp.2d at 783-84).

In *Farmiloe* the employer's inquiry was not limited to a medical certification from a physician, or medical records related to the alleged impairments. Instead, the inquiry was unlimited in scope. Because the employer did not show that its request for Mr. Farmiloe's complete medical and psychiatric records was job-related, summary judgment in favor of the employer was unwarranted.

In *Jackson v. Regal Beloit America Inc.*, 2018 WL 3078760 (E.Dist.Ky. June 21, 2018), the form was not at issue. The employer specifically demanded that Jackson provide it with her medical records related to her colon cancer. The Jackson court did note, however, that even if Regal had provided a sufficient justification for its request for a medical examination or disability inquiry, the scope of the examination and the inquiry "must remain appropriately narrow."

> A medical examination or inquiry under § 12112(d)(4) "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance"; rather, the examination and the inquiry must be "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan*, 197 F.3d at 812-13. Therefore, "an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782-83 (N.D. Ohio 2002); *see also EEOC Guidance*, Part B.10.

*O'Neal v. City of New Albany*, 293 F.3d 998 (7th Cir. 2002), concerned a post-job-offer medical examination. Once an employer has made an offer of employment to an applicant, the

employer "may require a medical examination ... and may condition an offer of employment on the results." A post-offer examination does not have to be job-related. *Id*. at 1008.

*Grassel v. Dep't of Educ. of N.Y.*, 2017 WL 1051115 (E.D.N.Y. 3/20/2017), does not aid the Defendant. In *Grassel* there was an exceptionally long history of the employer's concerns about Grassel's psychological health and his interactions with students. This history extended over a period of several years and many incidents. The employer had repeatedly attempted, over a period of 13-years, to evaluate Grassel's job fitness. Thus, the Court found that the required exam was reasonable. The Court also noted that Grassel could not articulate any injury. Here, however, Nawara was injured in that he was without a job for nine months, lost benefits and seniority.

The Defendant now says because Nawara did not sign either of the forms, but a modified form agreed upon by both sides, Nawara was not injured or sustained damages. Such a result is nonsensical, and finds no support in law. It is undisputed that the Defendant required Nawara to submit to an FFD and that it made a disability-related inquiry by requiring Nawara to sign medical release forms as a pre-condition of the FFD. Nawara testified that he did not want to sign the negotiated form prepared by CorVel but that he essentially had no choice because he had gone months without receiving a paycheck. Because Nawara refused to sign the medical release forms, the Sheriff's Office kept him off work for nine months.

As a result of Defendant's insistence that Nawara sign forms that violate the ADA, Nawara was deprived of salary, benefits and seniority and he should be made whole. Nawara was further injured and suffered the injury prohibited by the ADA's prohibition against inquiries into disability. (*See, Conroy*, 333 F.3d at 95).

## *VI. THE SHERIFF'S OFFICE WAS REQUIRED TO PROVE THAT THE FFD AND THE MEDICAL RELEASES WERE "JOB RELATED AND CONSISTENT WITH BUSINESS NECESSITY"*

The Sheriff's Office was required to prove that the FFD and requiring Nawara to sign the medical releases were "job-related and consistent with business necessity." *C.f.*, 42 U.S.C.A. § 12112(d)(4)(A); *Wright*, 798 F.3d at 52-23; *Coffman*, 578 F.3d at 565; *Harris v. Union Pac. R.R. Co.*, 2019 WL 4749982, at *9 (N.D. Ill. Sept. 30, 2019); *Koszuta v. Office Depot, Inc.*, 2018 WL 1769368, at *12 (N.D. Ill. April 12, 2018). The Sheriff's Office tries to shirk its burden of proving "business necessity" by arguing that it only needs to show that they were related to Nawara's ability to perform his job related functions (Def's Memo, p. 17; Defendant's Jury Instruction #s 24, 27).

Even though this is not a correct statement of the law, a reasonable jury could have found that the FFD and the forms were not related to Nawara's ability to perform job related functions of a correctional officer. Burke's admission that he did not believe that Nawara was a danger to himself or to others, allowing him to work and carry a firearm for 51 days, the video, Nawara's 18 years as a correctional officer, Reierson's admission that there was not enough information to support an FFD, the concocted story about what happened at HR and the other evidence fully supports the verdict. The jury could have reasonably found that the FFD process was improperly being used as a substitute for discipline. *See*, discussion *supra*.

The statute provides:

> **(4) Examination and inquiry**
>
> **(A) Prohibited examinations and inquiries**
> A covered entity *shall not require* a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, *unless such examination or inquiry is shown to be job-related and consistent with business necessity*.

> **(B) Acceptable examinations and inquiries**
> A covered entity *may conduct voluntary* medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. *A covered entity may make inquiries into the ability of an employee to perform job-related functions.*

(42 U.S.C.A. § 12112(d)(4)(A) and (B) (emphasis added)).

Subsection (4)(A) applies to involuntary examinations and inquiries, such as the ones in this case. Subsection (4)(B) on its face applies to voluntary examinations which are part of an employee health program. With voluntary examinations, the employer is permitted to make inquiries into the ability of an employee to perform job related functions. This inquiry is not permitted under Subsection (4)(A) unless such examination is shown to be job related and consistent with business necessity.

The two subsections may not be used together because Subsection (B) would render meaningless the protections created by Subsection (A). The Sheriff Office's interpretation of the statute would allow employers to circumvent and avoid the high burden of proving "business necessity."[7]

The application of Subsection (B) to this case is contrary to controlling precedent. The Sheriff's Office incorrectly states that the Seventh Circuit in *Coffman* noted that § 12112(d)(4)(B) provides an independent basis to allow inquiries into the ability of an employee to perform job-related functions. (Def's Memo, p. 17). Nowhere in *Coffman* does the court note that this section provides an independent basis to permit the Sheriff's Office to sidestep the "business necessity"

[7] Principles of statutory construction support this construction. In the event of a conflict of a statute, the more specific provision controls over the more general. *Bloate v. U.S.*, 559 U.S. 196, 207-08 (2010). Also, the plain meaning of a statute is not conclusive if the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters or lead to absurd results. *U.S. v. Balint*, 201 F.3d 928, 932-33 (7th Cir. 2000). Under rules of statutory construction, the language contained in subsection (d)(4)(B) does not apply to FFDs or to the medical release forms.

requirement set forth in subsection (d)(4)(A). In fact, the Seventh Circuit stated: "Section 12112(d)(4)(A) of the ADA prohibits covered entities from requiring a medical examination or inquiring whether an 'employee is an individual with a disability, unless such examination or inquiry *is shown to be job-related and consistent with business necessity.*'" *Coffman*, 578 F.3d at 565 (emphasis added).

Regardless, the evidence set forth in Sections III and V of this Response, fully supports the jury verdict even under the language contained in 42 U.S.C.A. § 12112(d)(4)(B).

## *VII. THE SHERIFF'S OFFICE FAILS TO CITE ANY AUTHORITY TO TAKE THE JURY VERDICT AWAY*

There is no authority cited by the Defendant to support the entry of judgment as a matter of law. The authority cited by the Sheriff's Office is inapposite and easily distinguishable. The law does not provide the Sheriff's Office with unfettered discretion for FFDs and to demand its employees sign releases for all their medical records in the name of contrived public safety. Burke's admission that he did not feel Nawara was a threat to himself or to others along with allowing Nawara to work and carry a gun for 51 days distinguishes this case from the cases cited by the Sheriff's Office.

The Sheriff's Office is wrong that *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559 (7th Cir. 2009), *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999), *Koszuta v. Office Depot, Inc.*, 2018 WL 1769368 (N.D. Ill. Apr. 12, 2018) and *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306 (11th Cir. 2013) are analogous to this case (Defendant's Memo, p. 20, Doc. 333).

*Coffman* involved FFD referrals for a substitute female firefighter based on objective evidence and after thorough investigation. Emails from fellow firefighters and supervisors "paint[ed] a consistent picture of genuine concern that Coffman's behavior was uncharacteristic and was adversely impacting her ability to perform her job." *Coffman*, 578 F.3d at 566. Multiple

firefighters expressed concern that Coffman was not herself; a fire department chief believed she could be suffering from paranoia; another firefighter told a chief that she was withdrawn and uncommunicative with other firefighters; another firefighter sent the chief an email stating he was concerned about Coffman's mental well-being and that she showed signs of depression, and seemed unable to make decisions or even perform routine tasks on the scene of an incident, a firefighter emailed several chiefs with his observations that she was withdrawn and not communicative. *Id*. at 565-66. The fire department immediately transferred Coffman to "limited duty status" after a fire department chief recommended that Coffman undergo an FFD evaluation. *Id*. at 562. All this took place against the backdrop of two firefighter suicides in the preceding months. *Id*. at 565.

*Coffman* is not analogous to this case. Burke's admission that he did not feel Nawara was a threat to himself or to others separates this case from *Coffman*. This case involved a single isolated purported incident where *Coffman* involved a pattern of behavior documented through multiple sources after an investigation. Unlike *Coffman*, Nawara was not transferred to limited duty status after the FFD referral but was assigned to a position where he carried a gun and was allowed to work 51 days before he was called into HR. *Coffman* also did not involve claims that she was forced to sign non-ADA-compliant medical releases.

*Watson* is also easily distinguishable. The police officer in *Watson* had a history of overreacting and was found to be unusually defensive and antagonistic towards his co-workers. *Watson*, 177 F.3d at 934. There also was a litany of internal affairs investigations, disciplinary actions taken, and grievances filed against the officer. *Id.* Unlike the Sheriff's Office in this case, the Miami Beach Police Department relieved Watson of duty and did not allow Watson to work. *Id*. The police department also launched an investigation before requiring an FFD. *Id*.

*Watson* did not involve an isolated incident since the police officer was involved in other instances of troublesome behavior/misconduct. Furthermore, police officials, unlike Burke, did not admit that Watson was not a danger to himself or to others.

Defendant's assertion that *Koszuta* is analogous strains any notion of credibility. *Koszuta* involved an FFD for a software engineer at Office Depot. The FFD was ordered after an investigation and a series of bizarre well-documented behavior and threats made to fellow employees. Office Depot was aware that Koszuta had taken an extended leave of absence for mental health reasons, and that he had stopped taking his medications. *Koszuta*, 2018 WL 1769368, at *12. His coworkers reported witnessing plaintiff engage in unusual or aggressive behavior *Id*. Plaintiff's immediate supervisor was visibly crying and trembling when she reported a recent incident involving the plaintiff. *Id*. The court noted that the record, including documents authored by and submitted by the plaintiff, painted a consistent picture of genuine concerns that his behavior was uncharacteristic and adversely impacting his ability to perform his job. *Id*. Plaintiff was escorted out of the building and placed on leave *Id*. at *4.

The court found plaintiff's use of the word "eliminate" in a statement he gave to HR "particularly troubling" and Office Depot "had the right to be concerned about whether Plaintiff posed a potential threat to his coworkers." *Id*., at *13. Koszuta repeatedly made personal attacks on employees and demanded a face-to-face meeting with the company's new CEO (*Id*). Hence, *Koszuta* provides no support for the Sheriff's Office's motion.

The Sheriff's Office's reliance on the Eleventh Circuit's decision in *Owusu-Ansah* is equally unavailing. The plaintiff was a quality assurance specialist at Coca-Cola. During a performance review meeting with his manager, the plaintiff became agitated, banged his hand on the table and said someone was "going to pay for this." *Owusu-Ansah*, 715 F.3d at 1309. After the

meeting, the manager went to her supervisor who became concerned about the threat. Plaintiff agreed to meet with a psychologist and after the meeting the psychologist expressed concern to Coca-Cola over the emotional and psychological stability of the plaintiff noting there was a "strong possibility that he was delusional." (*Id*.). The psychologist concluded that the plaintiff was very stressed, agitated and recommended that he be placed on paid leave, which Coca-Cola did (*Id*.). The plaintiff then agreed to be seen by a psychiatrist but was uncooperative with the psychiatrist including refusing to allow the psychiatrist to share his impressions with Dr. McElhaney (*Id*.). As a result, Dr. McElhaney was unable to complete his evaluation.

Dr. McElhaney informed Coca-Cola in writing that he remained concerned over plaintiff's apparent level of emotional distress and about his ability to perceive events accurately (*Id*.). Dr. McElhaney recommended a FFD evaluation (*Id*. at 1309-10). In granting summary judgment, the court found that "Coca-Cola had a reasonable, objective concern about [plaintiff's] mental state, which affected job performance and potentially threatened the safety of its other employees." (*Id*. at 1312). *Owusu-Ansah* is inapposite to this case and fails to support voiding the jury verdict.

## ***CONCLUSION***

It is apparent, based on the evidence that a reasonable jury could have found, and did find, that the Sheriff's Office violated the ADA. Accordingly, this Court must deny the Defendant's motion.

***JOHN NAWARA***

*/s/ Richard F. Linden*
One of Plaintiff's attorneys