**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN NAWARA,<br><br>Nawara,<br>v.<br><br>COUNTY OF COOK, a unit of local Government, THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois, KAREN JONES-HAYES, MATTHEW BURKE, REBECCA REIERSON, and WINIFRED SHELBY, in their individual capacities,<br><br>Defendants. | ) | Case No. 17-cv-2393<br><br>Hon. Rebecca R. Pallmeyer |

**DEFENDANT'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) ON PLAINTIFF'S CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT**

# TABLE OF CONTENTS


Introduction ............ 1

ARGUMENT ............ 2

I. The "Facts" Alleged in the Response Are Unsupported by the Record, Marked by Speculation and Conjecture, and Irrelevant to the Legal Issues Before This Court. ............ 2

A. Nawara Provides Virtually no Record Citations and Merely Parrots his Closing Arguments Rather Than Actual Testimony. ............ 2

B. Nawara Gets the Standard Wrong, Dooming His Arguments. ............ 5

C. Nawara's Inferences Are Based on Speculation and Conjecture and Cannot be Used to Justify the Jury's Verdict. ............ 7

D. Nawara Provides a "Mountain" Only of Irrelevant Argument. ............ 9

1. The only relevant question is what the decision-makers knew and did. ............ 11

2. What Burke and Jones-Hayes knew or believed is irrelevant because they were not decision-makers. ............ 12

3. The "51 day" delay and assignment to Ex-Ops are irrelevant because these predated Reierson's and Shelby's FFD decision and were not their choices. ............ 12

4. Whether Jones-Hayes's account of what happened was true or not is immaterial. ............ 14

5. Arguments about the lack of written procedures, the extent of the investigation, or prior disciplinary history are meaningless because the ADA imposes no such obligations and because the Court barred evidence or inferences as to Nawara's disciplinary history. ............ 15

6. Attacks on Reierson's and Shelby's credibility are unavailing. ............ 16

7. The fact that Nawara was ultimately found fit for duty cannot be a basis to find that he should not have been sent for an FFD exam in the first place. ............ 17

II. The Law Does Not Support Nawara's Second-Guessing Arguments and Requires Granting the Motion Under the Relevant Facts of This Case. ............ 18

A. Under Both *Coffman* and *Wright*, the Jury Verdict on the ADA Claim Cannot Stand. ............ 18

B. *Kroll* Likewise Supports the Motion. ............ 20

C. Nawara Fails to Grapple with the Public Policy Interests Presented By This Case. ............ 22

III. Nawara's Attempt to Limit The Meaning of §12112(d)(4)(B) Contradicts the Regulations and is Unsupported. ............ 23

IV. There is No Evidence Supporting the Claim that the Medical Release Forms Were (or Were Used for) An Impermissible Medical Inquiry Under the ADA. 24

A. Nawara's Rank Speculation about the CCSO's Ability to Use the Medical Release Forms Does Not Render the Forms Illegal. ....25

B. The Forms Did Not Permit Unlimited Access to Nawara's Complete Medical Records. ....27

1. The CCSO Form. ....27

2. The CorVel Form. ....29

C. Neither Form Constituted an Improper Inquiry Within the Meaning of the ADA. ....29

CONCLUSION ....32

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Anderson V. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................9, 17, 29

*Brady v. Southern R. Co.*,
320 U.S. 476 (1943)....................................................................................9

*Butler v. State, Louisiana Dep't of Pub. Safety & Corr.*,
2014 U.S. Dist. LEXIS 168261 ......................................................20, 31

*Breen v. Concrete by Wagner, Inc.*,
1999 U.S. Dist. LEXIS 17401 (N.D. Ill. 1999) ......................................27

*Coffman v. Indianapolis Fire Dep't*,
578 F.3d 559 (7th Cir. 2003) ............................................................ *passim*

*Conroy v. N.Y. State Dep't of Corr. Servs.*,
333 F.3d 88 (2nd Cir. 2003)........................................................12, 32

*Dengel v. Waukesha County*,
16 F.Supp.3d 983 (E.D. Wis. 2014)........................................................7

*English v. Smith*,
*2008 WL 4287628 (N.D. Ill. Sept. 2008)* ............................................8, 26

*Farmiloe v. Ford Motor Co.*,
277 F.Supp.2d 778 (N.D. Ohio 2002)....................................................31

*Green v. Joy Cone Co.*,
278 F.Supp.2d 526 (W.D. Pa. 2003)......................................................30

*Jackson v. Regal Beloit American, Inc.*,
2018 U.S. Dist. LEXIS 103682 (E.D. Ky. 2018)..............................28, 29

*Koszuta v. Office Depot, Inc.*,
2018 U.S. Dist. LEXIS 62580 ......................................................... *passim*

*Krocka v. City of Chicago*,
578 F.3d 507 (7th Cir. 2000) ...............................................................7

*Kroll v. White Lake Ambulance Authority*,
763 F.3d 619 (6th Cir. 2014) ......................................4, 11, 18, 20, 21

*Kurtzhals v. Cty. Of Dunn,*
2019 U.S. Dist. LEXIS 185330 ........................................................ *passim*

*Massey v. Blue Cross-Blue Shield,*
226 F.3d 922 (7th Cir. 2000) ..........................................................................17

*Mickens v. Polk County School Board,*
430 F.Supp.2d 1265 (M.D. Fla. 2006)..............................................................7

*Millbrook v. IBP, Inc.,*
280 F.3d 1169 (7th Cir. 2002) ...................................................................12, 15

*Miller v. Champaign Community Unit School District No. 4,*
2018 U.S. Dist. LEXIS 62580 (N.D. Ill. 2018) .................................................7

*Owusu-Ansah v. Coca-Cola Co.*
715 F.3d 1306 (11th Cir. 2013) .......................................................5, 9, 14, 15, 21

*Painter v. Ill. DOT,*
715 Fed. Appx. 538 (7th Cir. 2017)..........................................................11, 23

*Passananti v. Cook County,*
689 F.3d 655 (7th Cir. 2012) .............................................................................8

*Pena v City of Flushing,*
651 Fed. Appx. 415 (6th Cir. 2016)..................................................................32

*Pence v. Tenneco Auto. Operating Co.,*
169 Fed. Appx. 808 (4th Cir. 2006)...........................................5, 10, 14, 31

*Redfield v. Continental Casualty Corp.,*
818 F.2d 596 (7th Cir. 1986) ..........................................................................28

*Sachs v. Reef Aquaria Design, Inc.,*
2007 U.S. Dist. LEXIS 79809 (N.D. Ill. 2007) ...............................................29

*Selle v. Gibb,*
741 F.2d 896 (7th Cir. 1984) .............................................................................8

*Sorenson v. Sec'y of Treasury of U.S.,*
475 U.S. 851 (1986).........................................................................................30

*Springer v. Durflinger,*
518 F.3d 479 (7th Cir. 2008) .......................................................................9, 26

*Sullivan v. River Valley Sch. Dist.,*
197 F.3d 804 (6th Cir. 1999) ........................................................................ *passim*

*Sweeney v. Pence*
767 F.3d 654 (7th Cir. 2014) ....................................................................30

*Visser v. packer Engineering Assoc., Inc.*,
924 F.2d 655 (7th Cir. 1991) ....................................................................8

*Watson v. City of Miami Beach*,
177 F.3d 932 (11th Cir. 1999) ..........................................................4, 7, 10, 13, 18

*Wright v. Ill. Dep't of Children & Family Servs.*,
798 F.3d 513 (7th Cir. 2015) .......................................................................... *passim*

**STATUTES**

42 U.S.C. § 12112(a)(4)(A)-(B) ..................................................................2, 11

42 U.S.C. § 12112(d)(4)(B) ..........................................................23, 24, 31, 32

**REGULATIONS**

29 C.F.R. § 1630.14(c)...........................................................................................24

## *Introduction*

Plaintiff John Nawara's ("Nawara") Response is an extended effort at distraction and misdirection – one that ultimately fails to rebut the case law presented by Defendant Cook County Sheriff's Office's ("CCSO") Motion and Opening Brief. Throughout the Response, Plaintiff confuses argument with facts, urging this Court to conclude that the jury made inferences that are unsupported by the record or relevant evidence. The welter of argument and unfounded claims cannot obscure what the law and the record makes clear: the two CCSO employees who decided to send Nawara for an FFD did so based on a report from Supt. Jones-Hayes as well as their own first-hand experiences with Nawara, and this is sufficient to support the decision under the many authorities provided by the Motion.

The FFD referral in this case was made against the backdrop of justified departmental concerns about excessive force against detainees – a concern that has become all the more vivid in recent days. Public safety employers like the CCSO increasingly are expected to be proactive in avoiding excessive force claims *before* they happen, not after, and FFDs need to be a means for achieving that end. Seventh Circuit law recognizes the importance of such concerns in assessing FFD referrals of public safety employees like Nawara, and there is simply no evidence in this case that Nawara's referral was for any reason other than legitimate concerns about whether Nawara had anger management problems that could affect the essential functions of his job.

As for the forms Nawara was asked to sign, but never did, the Response proffers only rank speculation and no record testimony at all to try to justify the jury's verdict. The forms on their face do not overstep the bounds of the ADA; they never were used to obtain information unrelated to the FFD; and the testimony showed they could not be used in that fashion. Nawara's unqualified opinion evidence and his counsel's outrageous and unfounded speculations cannot create an issue

of fact as to the legality of the forms, and no reasonable jury could have found otherwise on this record.

## ARGUMENT

### I. The "Facts" Alleged in the Response Are Unsupported by the Record, Marked by Speculation and Conjecture, and Irrelevant to the Legal Issues Before This Court.

#### A. Nawara Provides Virtually no Record Citations and Merely Parrots his Closing Arguments Rather Than Actual Testimony.

Nawara claims that there is a "mountain of evidence" to support the verdict in this case. Remarkably, however, in the nearly 20 pages of purported evidence, he cites to the transcript only thirteen times. (Rsp. Br. 4-21) What Nawara presents in his Response is not evidence but rather a series of mud-slinging arguments – Section I of the Response hews almost exactly to the arguments made at closing in the trial – made in the hope that something will stick to justify the verdict. (Tr. at 1983:24-2006:6.) But Nawara repeatedly relies on irrelevancies and utterly unsupported speculation and conjecture to defend the verdict, underscoring why the Rule 50 Motion should be granted.

The questions before this Court are whether under the law the evidence sufficiently showed that (1) Rebecca Reierson and Winifred Shelby's decision to refer Nawara for a fitness for duty ("FFD") evaluation was job-related and consistent with business necessity and/or an inquiry into his ability to perform job-related functions; and (2) the forms Nawara was asked to sign (but did not) constituted a medical inquiry unrelated to the reasons for Nawara's FFD referral. *See* 42 U.S.C. 12112(a)(4)(A)-(B); *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559 (7th Cir. 2003). The Response twists these questions beyond recognition and, like the case Nawara presented, throws up a bevy of improper inferences in an effort to hide from the legal and evidentiary standards that should decide the pending motion. Just as the jury was instructed not to consider statements in closing argument as evidence (Tr. at 1968:7-11), so too can this Court disregard arguments in the

Response that are wholly unsupported by record testimony and have no relevance to the ADA count in this case.

A signal example is the outrageous assertion that the jury could have concluded, by inference alone, that "an employer could take blank authorizations and send them to the hospitals in Cook County, or to the hospitals near Nawara's home" or that "the Sheriff's Office with all its police powers could investigate and find out an employee's medical providers, or learn the identity of providers through insurance records or from an employee's personnel records." (Rsp. at 27.) This argument relies on Plaintiff's counsel's theory alone – there is not a shred of evidence to support it. Indeed, the evidence affirmatively refutes it, and the fact that Nawara feels the need to make up such a theory adds to the conclusion that the actual evidence in this case does not support the verdict. (*See* Tr. at 1486:14-20 (Sarocka) ("Q. How would you find out the identity of the primary care physician? A. The employee would tell us. Q. If the employee didn't tell you, did you have any way to take the release form, the HIPAA form, and go out and find somebody's treaters? A. No."); *see also id.* at 1563:19-23 (Shelby) (Q. So you, as a nurse in HR, once somebody signs a blank form, that gives you permission to go into their health insurance information and gather any doctor that the employee has seen, correct? A. Not from my understanding."; *id.* at 1779:12-23 (Reierson) (HR does not have access to insurance records).

Similarly, the overweening focus on anything and everything *other* than what Reierson and Shelby knew and/or based the FFD referral on is a massive misdirection. The evidence was clear and unrebutted that Matthew Burke referred the matter to HR for *HR* to make the decision whether Nawara should be sent for an FFD. (Op. Br. at 25). The evidence likewise showed that once Reierson and Shelby finally connected with Supt. Jones-Hayes, they concluded a check-in meeting was necessary and held one with him at the first possible time. (*Id.* at 10). And once they met

with Nawara, who acted out with what they perceived as barely contained rage and who, by his own admission, failed to cooperate with their inquiry, they concluded he should be sent for an FFD for job-related reasons that were consistent with business necessity. (*Id.* at 12). It also is unrebutted that the forms Nawara was presented but never signed were not used to obtain any medical information unrelated to the FFD evaluation. (*Id.* at 2).

Reierson and Shelby ordered Nawara to complete an FFD evaluation and provided him medical release forms because they were concerned that Nawara was unable to perform his job duties, and do so without posing a safety risk to others. (*Id.* at 3-6, 11-12, 14-15.) As they explained to Nawara, they based their decision both on the report they received about the extended altercation with Jones-Hayes and the "aggressive behavior he displayed [in HR]" during their assessment. (Tr. at 1076:21-1077:7, 1095:10-14 (Nawara); Tr. at 1398:9-15 (Shelby)). Sending a public safety employee for such an FFD is permitted where, as here, the public safety employer has information about an employee's conduct that reasonably can be perceived as defensive, mildly paranoid, hostile, or oppositional. *See Coffman v. Indianapolis Fire Dep't,*, 578 F.3d 559, 566 (7th Cir. 2003); *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999). And neither courts nor juries may "second-guess the propriety of such an evaluation." *Coffman*, 578 F.3d at 566.

To the contrary, as detailed further below, only where there is affirmative evidence showing that the decision-makers *did not* perceive the employee as a risk or that the decision-makers deviated from their normal procedures in a way that contradicted the claim of risk will courts allow a jury to determine whether an FFD referral violated the ADA. *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 524(7th Cir. 2015) (emails and witness admissions indicated the examination was unrelated to concerns about employee's ability to do her job); *Kroll*

*v. White Lake Ambulance Authority*, 763 F.3d 619 at 627 (6th Cir. 2014) (decision-maker admitted he required psychological evaluation because "he had 'concerns' about [employee's] 'sexual relationships with men' and that he thought that 'her life was a mess and [h]e could help her.'").

**B. Nawara Gets the Standard Wrong, Dooming His Arguments.**

Nawara never has proffered any other, non-job-related reason why Reierson and Shelby sent him for the FFD – nor did either ever make any such admission – meaning there can be no fact issue that the FFD referral was motivated by non-job-related concerns. Instead, Nawara wrongly contends that information these women *did not have* at the time they made their decision means the jury could conclude that Nawara didn't really engage in concerning activity with Jones-Hayes, and because he denies the behavior they themselves witnessed at HR, there was no business necessity to send him for an FFD. That, however, is not the standard for business necessity.

The focus is not whether, in a particular case, the events did or did not happen in the way the decision-makers understood or perceived them. The focus is on whether the information provided to and perceived by the decision-makers raised concerns about whether the employee could perform his job and that the FFD examination served the CCSO's business necessity. *See Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306 at 1311-12 (11th Cir. 2013) (FFD exam was appropriate based upon "information suggesting that an employee is unstable and may pose a danger to others" – proof of the underlying conduct was not required); *Koszuta v. Office Depot, Inc.,* 2018 U.S. Dist. LEXIS 62580 at *38-39 ("Although Plaintiff believes that [his supervisor] was faking [her crying and trembling], and that his coworkers' accounts were inaccurate or took his actions out of context, the question is not whether Defendant's concerns were accurate, but whether they were honestly held."); *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 809-810 (6th Cir. 1999) ("purported" and "supposed" behavior sufficient even where, before the FFD referral, an outside psychologist reported that he did not think the plaintiff was dangerous); *Pence v.*

*Tenneco Auto. Operating Co.*, 169 Fed. Appx. 808, 812 (4th Cir. 2006) (employer was not required to verify that a threat was actually made or interview the employee before making the FFD referral); *Kurtzhals v. Cty. Of Dunn,* 2019 U.S. Dist. LEXIS 185330 at *19-21 ("[t]he county [did] not have to show that the need for the exam was beyond reasonable dispute.").

Everything Nawara argues – that *Burke* somehow "admitted" he didn't think Nawara was a danger to himself or others when he assigned him to Ex-Ops pending HR's review and decision; that the 51-day delay *before* HR met with Jones-Hayes and Nawara meant that "the CCSO" (rather than the actual decision-makers) didn't really think Nawara's behavior warranted an FFD; that officers that Reierson and Shelby *never spoke to* had differing recollections of the altercation between Jones-Hays and Nawara; that there *should have been* written rules or policies for FFD referrals although the ADA does not require them; that there was some sort of "cover-up" to justify the referral even though Nawara admits he was told the reasons for his referral at the outset *and those reasons never changed*; and that Nawara ultimately was found fit for duty – are just the kinds of "second-guessing" that the Seventh Circuit rejected in *Coffman* and likewise should have no place here.

The standard for this Court is not whether, in hindsight, the process could have been handled faster or more people could have been interviewed; nor can the standard possibly be that an FFD referral that results in a finding that the employee can return to work means the FFD never should have been ordered in the first place. Likewise, the vast majority of Nawara's arguments do not really go to the sole count that remained at the end of testimony. Questions about process and fairness and whether the FFD here was used as "discipline" really apply only to the Due Process and Merit Board counts, which the Court dismissed at the end of evidence. Thus, to the extent that the Response argues about such evidence – and inferences therefrom – again, it underscores that

the jury lacked a sufficient basis for its verdict and at best was led astray by the many improper arguments made by Plaintiff's counsel.

In short, there is no way to square Nawara's arguments – or the verdict – with *Coffman* or the many other authorities presented in the Opening Brief establishing the proper parameters for assessing (and precluding second-guessing) a public safety employer's decision to send an employee like Nawara for an FFD exam. *See Coffman,* 578 F.3d at 565; *Krocka v. City of Chicago*, 578 F.3d 507 (7th Cir. 2000); *Miller v. Champaign Community Unit School District No. 4*, 2018 U.S. Dist. LEXIS 62580 (N.D. Ill. 2018); *Dengel v. Waukesha County*, 16 F.Supp.3d 983 (E.D. Wis. 2014); *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999); *Mickens v. Polk County School Board*, 430 F.Supp.2d 1265 (M.D. Fla. 2006). Moreover, the only way *Wright* can be harmonized with *Coffman* – both Seventh Circuit decisions that must be considered – is to understand what types of evidence were identified in *Wright* to justify the jury's verdict: namely, admissions by and actions taken *by the decision makers* that contradicted their decision that the employee needed to be sent for an FFD. Neither Reierson nor Shelby made any such admissions and the actions Nawara complains about were not actions taken by these decision-makers. Instead, Nawara asked the jury and now asks this Court to make inferential leaps that cannot be justified by the record or under the law.

### C. Nawara's Inferences Are Based on Speculation and Conjecture and Cannot be Used to Justify the Jury's Verdict.

Nawara repeatedly argues the jury could have made inferences that are in fact no more that speculation and stretch the facts to their breaking point. For example, the wholly unfounded theory noted above that that the CCSO *could have* taken the forms if they have been signed to hospitals to find out the names of Nawara's treaters. (Rsp. at 27). Likewise, the assertion that Jones-Hayes called Nawara a "raving lunatic" – as part of an effort to suggest she overplayed the facts as part

of some plot against Nawara – when there is not a shred of testimony using those words. (Rsp. at 10). The only time the word "lunatic" appears in the transcript is in closing argument by Plaintiff's counsel – another example of using rank speculation in the place of evidence. (Tr. at 1999:9-11) Yet a third example is the theory that the entire FFD process was some sort of effort by Burke to protect Jones-Hayes from potential perjury allegations for signing a complaint register against Nawara. (Rsp. at 12). This theory also was spun out of nothing by Plaintiff's counsel in his closing argument. (Tr. at 2051:17-21).

Inferences based on speculation and conjecture do not merit consideration by the jury or provide a basis to deny the CCSO's Motion. *Wright*, 798 F.3d at 530 (judgment as a matter of law for employer on constructive discharge claim that was based on speculation; it is not the "court's position to speculate on 'what-ifs.'"); *Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir. 1984) ("evidence must provide a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts."); *see also Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (court can reject testimony that is not "grounded in observation or other first-hand personal experience. [The testimony] must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience."); *Passananti v. Cook County*, 689 F.3d 655, 675-76 (7th Cir. 2012) (plaintiff could not avoid judgment as a matter of law by arguing the jury was entitled to disbelieve defense witness's testimony as to reasons for allegedly discriminatory budget decision and substituting "speculation for evidence"); *English v. Smith,* 2008 WL 4287628, * 3 (N.D. Ill. Sept. 15, 2008) ("the nonmoving party . . . [may] not rely merely on its own assertions and speculation 'to manufacture a genuine issue of fact.'") (quoting *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008)).

While it is true that the Court must view the evidence as a whole and make *reasonable* inferences based on that evidence, the Court "must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Brady v. Southern R. Co.*, 320 U.S. 476, 480 (1943) ("By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims."). Here, court after court has found as a matter of law that an employer may require an employee to undergo an FFD based on information suggesting that the employee may be unable to perform essential job duties or may pose a safety risk to others, even when the information underlying the referral is subject to debate, and especially for public safety employees. (Op. Br. at 17-19). Based on the relevant evidence in this case, the only reasonable conclusion is that the FFD referral and provision of medical forms were job-related and consistent with business necessity.

### D. Nawara Provides a "Mountain" Only of Irrelevant Argument.

The Response consistently focuses on evidence and arguments that are wholly irrelevant to the issues before the Court – challenging the accuracy of Nawara's reported behavior and pointing to the actions of non-decision-makers. The CCSO's Opening Brief identified a host of cases establishing that arguments about whether reports about an employee's conduct in fact were true, disputes about the process or absence of written policies, and whether the employee remained at work before the FFD referral have no bearing on the propriety of an FFD referral. *See Coffman*, 578 F.3d at 565-66 (reliance on reports and observations sufficient); *Owusu*, 715 F.3d at 1311-12 (prior employment history irrelevant and not required to prove underlying conduct); *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39 (accuracy of concerns irrelevant); *Sullivan*, 197 F.3d at 809-810 (even where outside psychiatrist disagreed, decision to refer employee did not violate ADA because based on actual events raising concerns about ability to do job); *Pence*, 169 Fed. Appx. at 812 (no verification or interviews required before making FFD referral); *Kurtzhals*, 2019 U.S.

Dist. LEXIS 185330 at *19-21 (for sheriff's deputy of 22 years, employer did not have to show need for the exam was beyond dispute); *Watson,* 177 F.3d at 934 (FFD appropriate even though officer allowed to work for over two months between incident and referral). (Op. Br. at 28-30.)

The Response does not meaningfully address these decisions and their implications. Instead, Nawara:

- focuses on admissions and actions of Matthew Burke (including assigning Nawara to Ex-Ops.) and Supt. Jones-Hayes (including the missed email that led to a 51-day delay in talking to HR) – neither of whom made the FFD referral decision in this case (Rsp. at 4-8; 13);

- argues that testimony from Gannon, Turisse, and Conley, along with video from 40 minutes before the altercation show that Jones-Hayes's account to HR was false – despite the fact that HR never spoke to those officers or saw the video (*id.* at 8-10);

- claims "inaction" by HR until they spoke to Jones-Hayes meant they didn't take the initial report seriously – despite the obvious point that once they did speak to Jones-Hayes they acted immediately (*id.* at 11-13, 16-17);

- contends with utter circularity that the fact that Nawara was found fit for duty means he should not have been referred in the first place – a standard that finds no support anywhere in the law (*id.* at 17);

- tries to use Nawara's lack of prior discipline as a basis to claim the FFD was unjustified – ignoring the fact that Nawara himself moved *in limine* to exclude evidence or inferences related to prior discipline (*id.* at 12, 13-15);

- manufactures a "cover up" theory about the reasons for the referral – when Nawara himself admitted he knew the reasons for the referral from the start (*id.* at 18-20);

- raises a host of other second-guessing claims about the lack of policies or procedures for FFDs that have no basis in law (*id.* at 20-21); and

- contends that because Nawara denied engaging in the behavior that led to the FFD referral (*id.* at 21), ignoring the clear case law establishing that the truth of facts about the the underlying incidents leading to a referral is immaterial to the legality of the referral.

This welter of arguments – made with virtually no citations to the actual record – cannot overcome the many cases presented in the opening; nor do many of them stand the test of basic logic.

**1. The only relevant question is what the decision-makers knew and did.**

Here, the only relevant inquiry is whether the decision makers – Reierson and Shelby – had a legally sufficient basis to send Nawara for an FFD exam. In the language of the statute and the cases: did they have a reasonable belief based on their assessment of Nawara and his position as a Correctional Officer that his ability to perform the essential functions of his job or that he posed a threat to others? *Wright*, 798 F.3d at 523. Accordingly, the only relevant evidence to consider is what *Reierson and Shelby* knew or witnessed, and the endless detours urged by the Response can be ignored. *See Painter v. Ill. DOT*, 715 Fed. Appx. 538, 543 (7th Cir. 2017) ("*the individual who decides to require a medical examination* must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business.") (emphasis added); *Kroll*, 763 F.3d at 625 (limiting the inquiry to information the decision-maker received).

Nawara tries to avoid this problem by treating his referral as if it were made by the CCSO writ large rather than by Reierson and Shelby alone, arguing that the actions and testimony of non-decision makers meant that there was no business necessity to send Nawara for an FFD – or, alternatively, that inferences could be made that are "inconsistent with the Sheriff's Office's business necessity defense" and similar iterations. (Rsp. at 4-6, 10-12, 15, 18, 37). These arguments ignore logic and the case law. The ADA does not require that an FFD referral (or forms related thereto) be "a" business necessity. Rather, the statute requires only that the FFD referral and release forms be "*consistent* with business necessity" (42 U.S.C. 12112(a)(4)(A)) and "a *reasonably effective* method of achieving" the goal of ensuring employees can safely perform their duties. *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Dist. 2003) (emphasis added). Dragging in claims about what non-decision-makers may or may not have believed cannot create a factual basis for the jury's verdict. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th

Cir. 2002) (neither plaintiff's own opinions nor "submission of materials from a co-worker or supervisor indicating that an employee's performance is satisfactory…[can] create a material issue of fact" about what decision-maker believed).[1]

**2. What Burke and Jones-Hayes knew or believed is irrelevant because they were not decision-makers.**

The Response's reliance on Burke's testimony that he did not perceive Nawara as a threat (Rsp. at 4) and speculation that Jones-Hayes wasn't really concerned about Nawara's ability to control his anger (*id.* at 13) are irrelevant because neither Burke nor Jones-Hayes made the decision to send Nawara for his FFD exam. (Op. Br. at 9; Tr. at 914:9-14.) Burke's referral to HR was to assess whether an FFD would be appropriate and was not itself a prohibited inquiry under the ADA. And even if Burke's statement at trial – which was not conveyed to Reierson or Shelby at the time – could be considered, the CCSO is not required "to show that the need for the exam was beyond reasonable dispute." *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *19-21 (before the referral, outside counsel believed FFD referral was an "over-reaction"); *see also Sullivan*, 197 F.3d at 809-810 (FFD referral proper after outside psychologist did not think plaintiff was dangerous).

**3. The "51 day" delay and assignment to Ex-Ops are irrelevant because these predated Reierson's and Shelby's FFD decision and were not their choices.**

Likewise, because it was not HR's choices that caused the "51-day" gap between Nawara's altercation with Jones-Hayes and the FFD referral order, or allowed Nawara to work in Ex-Ops and carry a gun, these facts are irrelevant and cannot properly support the jury's verdict. Neither

---

[1] Nawara suggests that the CCSO must show "imminent danger of Nawara inflicting harm upon someone" to justify the FFD referral. (Rsp. at 4.) The CCSO has not found any case that imposed such a burden on an employer before requiring an FFD examination – let alone a public safety employer. This standard cannot be the law in light of the many cases cited in the opening brief finding an FFD evaluation is appropriate as a matter of law for conduct falling far short of "imminent danger." (See Op. Br. 17-19.)

Reierson nor Shelby knew the full extent of Nawara's behavior towards Jones-Hayes until they spoke with her on November 16, 2016 and neither transferred Nawara to external operations in the interim. Nor was any evidence presented that Reierson was told the referral to HR was not serious – the record is clear that she simply did not have enough to call Nawara in and there was an unfortunate but not volitional missed message to Jones-Hayes. (Tr. at 378:17-380:14). After Reierson and Shelby spoke with Jones-Hayes, they acted swiftly and met with Nawara at the beginning of his next shift. (Op. Br. at 9-11.) Following their assessment and his aggressive behavior during the meeting, consistent with their normal procedure, they immediately removed Nawara from the workplace and ordered him to complete an FFD. (*Id.* at 10-14.)

Allowing an employee to work *before* an FFD referral is made is entirely consistent with the case law – even in situations, unlike here, where no subsequent concerning conduct occurs and there are significant gaps between the behavior and a decision to send the employee for an FFD. *See Watson*, 177 F.3d at 934 (officer allowed to work for over two months following incident); *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *6, 21-23 (employee allowed to complete several days of training after the decision to require FFD exam and allowed to keep gun and access privileges after removal from workplace); *Sullivan*, 197 F.3d at 808 (summary judgment granted to employer despite gap of nearly two months between concerning behavior and decision to require employee to undergo FFDs). Indeed, the fact that Reierson and Shelby put Nawara on administrative leave immediately once they decided to send him for an FFD is consistent with cases cited by *Wright* as examples of legitimate FFD referrals – where "the employees were placed on administrative leave *at the time the evaluation was ordered*." 798 F.3d at 524, fn. 30 (emphasis added). That also is what distinguishes this case from *Wright*, of course.

**4. Whether Jones-Hayes's account of what happened was true or not is immaterial.**

Nawara's efforts to cast doubt on whether Jones-Hayes told the truth about what happened are immaterial and again, would only be relevant to claims previously dismissed by the Court. It is undisputed that she made her report to Reierson and Shelby and that both the report and Nawara's behavior in HR raised sufficient concerns that they decided he should be sent for an FFD. (Op. Br. at 26). Nor does the conflicting testimony of officers Gannon, Turisse, or Conley matter to the ADA count – because they never spoke to Reierson or Shelby about their impressions of the altercation. *See Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39 (declining to consider disputes over the accuracy of reports about the employee's conduct); *Owusu-Ansah*, 715 F.3d at 1311-12 (no proof of the underlying conduct required; only "information suggesting that an employee is unstable and may pose a danger to others"); *Sullivan*, 197 F.3d at 809-810 ("purported" and "supposed" behavior sufficient); *Pence*, 169 Fed. Appx. at 812 (employer not required to verify that a threat was actually made or even interview employee before FFD referral).

Anything witnesses may or may not have said in a hypothetical investigation into Nawara's conduct is wholly irrelevant to whether Reierson or Shelby received a report and witnessed behavior that could cause a reasonable person to doubt whether Nawara was capable of performing his job and sent him for an examination to determine whether he could perform the essential functions of his job. This includes accounts by Gannon, Turisse, and Conley that were unknown to Reierson and Shelby at the time of the FFD referral. And it is important to note that Nawara, by his own admission, failed to contest either Jones-Hayes's account or that he displayed "aggressive behavior" during HR's assessment. (Op. Br. at 10-12); *see also*, *Millbrook*, 280 F.3d at 1181 ("an employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities.").

**5. Arguments about the lack of written procedures, the extent of the investigation, or prior disciplinary history are meaningless because the ADA imposes no such obligations and because the Court barred evidence or inferences as to Nawara's disciplinary history.**

There is nothing in the ADA that requires written procedures for FFD referrals, nor is there any basis in the law to argue about investigatory steps that should have been taken before an FFD referral was made. To the contrary, courts have rejected the such contentions repeatedly. *See Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *4-6, 19-21 (rejecting argument that a "lack of a policy regarding fitness-for-duty examinations and its past use (or lack of use) of such examinations undermines the reasonableness of [defendant's] belief that an examination was necessary."); *Owusu-Ansah*, 715 F.3d at 1311-12 (FFD exam held appropriate even though the employer conducted no investigation into underlying conduct). Thus, contending that Burke or HR *should have* pulled or watched videos, interviewed Gannon, Turisse, or Conley, or taken any number of other steps has no basis in law. (Rsp. at 11-12) And Nawara once again makes an argument wholly unsupported by the record – that the CCSO somehow "destroyed" evidence. (Resp. at 11). The Court ruled *in limine* that no spoliation claims could be made about any videos in this case. (Tr. at 78:17-20) And the Court explained to the jury that no video was improperly destroyed. (Tr. at 276:1-10). The jury thus could not properly have inferred that any video was destroyed to support the verdict and Nawara's argument on this point only supports granting the pending motion.

Nor does the case law support the notion that Reierson and Shelby should have determined whether Nawara had prior disciplinary history that was consistent with his behavior with Jones-Hayes, and with them. (Resp. at 12, 13). Courts are clear that even one incident is enough to warrant an FFD exam and that evidence of a prior pattern is not required at all. *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *19-21 (only one alleged altercation, no prior incidents showing a

propensity for workplace violence in over eight years of employment); *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *37 ("when a disruptive incident occurs in the workplace" raising mental health concerns, an FFD exam to decide whether conduct will recur is appropriate). Moreover, this Court ruled *in limine* on Nawara's *own motion* that neither party could present evidence about Nawara's prior disciplinary history. (2/7/20 Tr. at 38:1-39:16 (granting Nawara's motion *in limine* "to bar questions, arguments, or inference about prior discipline" by agreement)). Nawara cannot have it both ways. Having excluded such evidence on the ground that it would violate the rules of evidence, he cannot now argue that the jury could draw inferences from the absence of such evidence at trial.

**6. Attacks on Reierson's and Shelby's credibility are unavailing.**

In the few instances where Nawara actually tries to address Reierson or Shelby's concerns, he merely attacks their credibility without offering affirmative evidence demonstrating their concerns were illegitimate. (Rsp. at 18-20). The CCSO has provided ample evidence, including Nawara's own admissions, that the FFD referral was based on Reierson and Shelby's belief that Jones-Hayes's report and their corresponding observations of Nawara raised serious concerns about his ability to safely perform his job and not pose a risk to fellow employees and detainees. The issue before this Court is not whether their concerns were accurate, but whether they were honestly held. *Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *38-39.

Nawara has not provided any evidence that either Reierson or Shelby were not honestly concerned by Nawara's behavior. Nawara's bare assertion that the jury might have found them not credible is insufficient to sustain the verdict because he must actually provide evidence affirmatively contradicting their state of mind at the time of the referral. *See Anderson*, 477 U.S. at 256-57 (requiring affirmative evidence of defendant's state of mind to create factual issue and stating that "discredited testimony is not normally considered a sufficient basis for drawing a

contrary conclusion" from the testimony); *Massey v. Blue Cross-Blue Shield*, 226 F.3d 922, 925-26 (7th Cir. 2000) ("It is always possible, of course, that the jury might have disbelieved everything [the defendant's employee] said, but we regularly deny summary judgments based on that kind of hope, and consistency requires us also to reject that possibility as a way of saving the jury's verdict."); *Cf. Wright*, 798 F.3d at 524-25 (after the FFD referral, decision makers sent emails demonstrating their lack of concern about the employee's ability to safely perform her duties).

Without any evidence that Reierson and Shelby did not actually have concerns about Nawara, the Response again evades the issue by disputing the accuracy of his reported aggression during HR's assessment. (Rsp. at 19-20.) As discussed above and in the Opening Brief, whether Nawara agrees that he actually behaved as reported is irrelevant. Notwithstanding Nawara's dispute over verbiage and the accuracy of Jones-Hayes's report, the undisputed evidence showed that Reierson and Shelby in fact received a report from her that raised concerns for them, and their first-hand experience of his behavior confirmed their concerns about Nawara's ability to safely perform his job. (Br. at 3-6, 8-10.)

**7. The fact that Nawara was ultimately found fit for duty cannot be a basis to find that he should not have been sent for an FFD exam in the first place.**

The argument that because Nawara was found fit for duty the jury could reasonably "reject the Sheriff's Office business necessity defense" (Rsp. at 17) is an absurdity and once again undermines the notion that the verdict was reasonable. There is not a single case that supports such a proposition. To the contrary, courts repeatedly have found FFD referrals legal under the ADA even where the examiner determined the employee was fit. *E.g.*, *Coffman*, 578 F.3d at 562 (ultimate finding that employee was fit for duty did not affect the propriety of the referral); *Watson*, 177 F.3d at 934 (the fact that employee was found fit for duty by the examiner did not undermine the FFD referral). Nawara's argument – which also improperly was made to the jury – that findings

by Drs. Goldstein and Kroll could have some retroactive effect on the validity of the referral is completely unsupported. (Rsp. at 17; Tr. at 2050:5-16 (arguing for inference that there was no business necessity based on Dr. Goldstein finding him fit) (Nawara closing).) Aside from the absurdity of Nawara's position, this also fundamentally contradicts cases ruling that an FFD decision need not be unanimous – even where a psychologist finds an examination unnecessary *before* the referral. *See Sullivan*, 197 F.3d at 809-810; *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *19-21; *see also* Op. Br. at 28-30.

## II. The Law Does Not Support Nawara's Second-Guessing Arguments and Requires Granting the Motion Under the Relevant Facts of This Case.

### A. Under Both *Coffman* and *Wright*, the Jury Verdict on the ADA Claim Cannot Stand.

The long detour the Response takes into its skein of irrelevancies and speculations is precisely what *Coffman* rejected when it established, in the clearest of terms, that courts must not second guess FFD decisions where, as here, the decision was based on information implicating actual job-related functions of a public safety employee. *Coffman*, 578 F.3d at 566. In *Coffman,* as in this case, the referral took place against the backdrop of larger departmental safety concerns, and was made based on three emails saying the employee seemed "defensive" and "withdrawn." *Id.* at 562, 565-66. As in this case, the employee ultimately was found fit for duty (after an initial period of her being "extremely resistant" to the FFD) and returned to work without restrictions. *Id.* at 562. While in other settings, the Court observed, these relatively mild issues might not justify an FFD, "we do not second-guess the propriety of such an evaluation for a firefighter" and affirmed summary judgment. *Id.* at 566.

In *Wright*, which involved a long history of very serious issues with a highly oppositional and difficult employee – including the emotional health of a troubled child in the employee's care

– the court nonetheless found there were sufficient fact issues to support a jury's verdict that an FFD order violated the ADA. *Wright*, 798 F.3d at 517-18. There, the court focused on two pieces of evidence: the fact that the employee was not placed on administrative leave as soon as the fitness for duty evaluation was ordered – which was the usual practice by her employer – and indeed was permitted to work on a new and highly sensitive case by one of the people who requested the FFD examination; and the fact that there were related emails and admissions by the people involved in the decision to send the employee for an FFD suggesting the examination was unrelated to concerns about the employee's ability to do her job. *Id.* at 524-25. Such evidence, the court concluded, "supports a finding that the Department did not believe that Ms. Wright posed a safety risk to the children with whom she worked and, instead, that it considered her competent to continue working with approximately two-dozen children." *Id.* at 525.

The *Wright* court did not second-guess the FFD decision in the manner Nawara asks this Court (and asked the jury) to. Instead, it identified specific evidence from *after* the decision to send the employee for an FFD that was known to the decision-makers and "provided objective evidence that the evaluation order was not consistent with business necessity, creating a material issue of fact for the jury." *Id.* at 524. There is no such objective evidence in this case. Nawara offered no evidence that Nawara was treated differently than other employees in similar circumstances – to the contrary, Reierson's refusal to call Nawara into HR based solely on the brief statement in Burke's referral was entirely consistent with HR's stance that it would not do check-ins that seemed to be related to disciplinary rather than fitness concerns. (Tr. at 380:19-384:4; Rsp. at 16). Likewise, Nawara was placed on leave *at the time* the FFD was ordered – consistent with the CCSO's normal practice and consistent with the many cases cited by *Wright* in which FFD's were deemed legal. *Id.* at 524, fn. 30. There likewise were no emails or other

admissions by Reierson or Shelby suggesting their concerns about Nawara were unrelated to their concerns about his ability to do his job or that they were told by Burke or Jones-Hayes that they didn't think what happened implicated his job-related functions. The *Wright* court cites to *Coffman* for this point, noting that there the evidence showed "*genuine* concern" that the employee's "behavior was uncharacteristic and was adversely impacting her ability to perform her job." *Id.* at 524 (emphasis in original); *Coffman*, 578 F.3d at 566. What neither *Wright* nor *Coffman* permits is arguments based on no evidence at all, or on what non-decision-makers said or did or thought – and did not convey to the decision-makers – before the decision was made.

### B. *Kroll* Likewise Supports the Motion.

The only case other than *Wright*[2] that Nawara highlights is *Kroll,* a Sixth Circuit case that also actually supports the Motion in this case. Just as in *Wright*, the *Kroll* court focused on what the decision maker knew and admissions he made that clearly established that his concerns about the employee (an EMT who was involved in an affair with a coworker) were not job-related and did not actually implicate a mental health issue. Specifically, the decision maker "admitted that he 'never had a problem with [the employee] as far as patient care'. . . . Rather, he decided to compel counseling because [her] 'life was a mess and [h]e thought [h]e could help her.' He also explained that his primary concerns regarding Kroll related to her personal life and her sexual relationships." *Id.* at 620. *Kroll* considered whether one reported use of a cell phone while driving and one refusal to administer oxygen to a patient justified a mental health FFD. *Id.* at 625. Neither of these reports had any connection to mental health concerns and the court held that the employee's "[aberrant emotional] behavior is relevant to the assessment of whether she was

[2] Nawara also cites a Louisiana district court case, *Butler v. State, Louisiana Dep't of Pub. Safety & Corr.*, 2014 U.S. Dist. LEXIS 168261 (Rsp. at 7) for its application of the wholly irrelevant "direct threat" defense to discrimination under the ADA – specifically, an employee who, because of a disability, poses a "direct threat" is not a "qualified individual." *Id.* at *24-27. That is not an issue here.

capable of performing her job *only to the extent* that it interfered with her [ability to perform her job]." *Id.* (emphasis added). The *Kroll* court found there was a question whether the FFD was justified – denying summary judgment – both because the decision-maker admitted it was prompted in part by "moralistic condemnation of an employee's private behavior" (*id.* at 627) and because the work-related conduct did not suggest mental health issues were interfering with job functions. *Id.* at 626. Critically, there was other ample evidence from co-workers that the employee displayed aberrant behavior suggesting she had emotional problems, but the court did not consider that evidence *because the decision maker was unaware of it*. *Id.* at 25. Thus, *Kroll* adds to the conclusion that an FFD decision can proceed to a jury only where there is actual evidence that the decision maker(s) did not have genuine concerns based on reports or their own observations about an employee's ability to perform his or her job.

Finally, neither *Kroll* nor any other case establishes a requirement that an employee engage in some specific quantum of or even multiple concerning events before an FFD can be justified. Courts consistently focus on the implications reported misbehavior has for an employee's ability to perform job-related functions without posing safety risks, and not the number of incidents reported. *See Owusu-Ansah*, 715 F.3d at 1311-12 (only one alleged altercation in 8 years of employment with no prior incidents suggesting propensity for workplace violence; behavior at meeting confirmed issues and led to FFD); *Kurtzhals*, 2019 U.S. Dist. LEXIS 185330 at *4-5 (single incident during an escalated argument with subordinate officer, saying "they would have to settle the matter outside" if called a liar again justified FFD).

It is not the number of events that matters; what matters is that the events raised doubts about the ability to perform the job. Here, the two events that justified the FFD were serious, job-related, and objectively could have caused a reasonable person to decide to send Nawara for an

evaluation to determine if he had anger management issues. Nawara has not provided any affirmative evidence tending to show a lack of concern by Reierson or Shelby about his ability to safely perform his job. As discussed above, the only "evidence" he relies on to dispute Reierson or Shelby's beliefs are credibility attacks contradicted by his own admissions and Reierson's initial perception based on the brief description in the check-in referral to HR. These efforts to create a factual dispute do not bring this case within the purview of *Wright* or permit second-guessing the referral in contravention of *Coffman*. *See also Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *37 (when *a* "disruptive incident" occurs in the workplace suggesting that an employee may be suffering from a mental illness that interferes with her ability to perform her job duties, "an employer may seek a professional assessment of the likelihood of an employee's unacceptable behavior recurring before it decides . . . whether the employee is qualified for continued employment.")

### C. Nawara Fails to Grapple with the Public Policy Interests Presented By This Case.

The Response fails to address the public policy interests that would be undermined if the jury's verdict stands. (Op. Br. at 31-32.) Burke testified at length about the CCSO's constitutional concerns about and efforts to limit incidents of excessive force against inmates – efforts in part served by the FFD process. (*Id.* at 5-6.) If allowed to stand, the jury's verdict in this case would make it harder for the CCSO and other law enforcement agencies to proactively address concerning behavior that could result in excessive force against detainees in custody. The problem of excessive force by officers with police powers is one of overweening focus in our society and cannot be overstated, especially in light of recent events. This is exactly why the *Coffman* court concluded that such decisions by public safety employers must not be second-guessed.

The Response's assertion that there is no difference between the policy and safety issues in this case and those allegedly in *Wright* misses a critical point. Unlike this case – and unlike

*Coffman*, where evidence was presented of acute concern to prevent firefighter suicides (578 F.3d at 561-62) – *Wright* identifies no evidence from the employer of such a backdrop, and it cannot be assumed. The assertion that this distinction is "absurd" because there was no evidence that Nawara engaged in excessive force itself is an absurd claim. (Rsp. at 25.) Prophylactic FFD examinations in the public safety context plainly are permitted – indeed encouraged – precisely to avoid danger to the public, including excessive force. *See Koszuta*, 2018 U.S. Dist. LEXIS 62580 at *37 (prohibiting prophylactic FFD examinations "would place the employer on a razor's edge" between violating the ADA and liability if the employee remains on the job and hurts someone); *Painter v. Ill. DOT*, 715 Fed. Appx. 538, 541 (7th Cir. 2017) ("such a rule would force an employer to risk a negligence suit to avoid violating the ADA."). The public policy interests here are more pressing and salient than they have ever been.

### III. Nawara's Attempt to Limit The Meaning of §12112(d)(4)(B) Contradicts the Regulations and is Unsupported.

Separate and apart from the business necessity issue, the CCSO also is entitled to judgment under section 12112(d)(4)(B) of the ADA, which expressly permits inquiries into the ability of "an employee to perform job-related functions." 42 U.S.C. 12112(d)(4)(B); *Coffman*, 578 F.3d at 561-62 ("[t]he ADA ***also*** allows inquiries 'into the ability of an employee to perform job-related functions.'") Under this section, the only question is whether the inquiry in fact related to Nawara's ability to perform job related functions. The job description for Nawara's role and the testimony from Reierson and Shelby conclusively should answer the question and the Motion could be granted on this basis alone – without having to resolve the business necessity arguments at all. (*See* DX 1 and Op. Br. at 5).

Nawara proffers no evidentiary response to this point. Instead, he trots out the same argument made – and rejected – at the jury instructions conference before the Court. Specifically, that the statute only allows inquiries into the ability of an employee to perform job-related functions if they are "voluntary." (Rsp. at 37-39; 3/4/20 Tr. at 1868-77; 1883-87). This argument has no legal basis at all and is directly at odds with the regulations interpreting permissible inquiries, 29 C.F.R. 1630.14(c) (Medical examinations and inquiries specifically permitted).

Section 1630.14(c) expressly permits such inquiries with no regard to whether they are voluntary or not:

> Examination of employees. A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. **A covered entity may make inquiries into the ability of an employee to perform job-related functions.**

(Emphasis added). The only place where the regulations refer to voluntary medical examinations is in a separate subsection under § 1630.14(d) ("*Other* acceptable examinations and inquiries") (emphasis added). There is no legitimate way to import the term "voluntary" from one subsection to another, and Nawara's argument cannot be credited. Accordingly, Section 12112(d)(4)(B) provides a separate basis to determine that the FFD referral was legal under the ADA.

## IV. There is No Evidence Supporting the Claim that the Medical Release Forms Were (or Were Used for) An Impermissible Medical Inquiry Under the ADA.

Nawara's arguments about the medical release forms do not provide any cognizable evidence that the forms violated – or could be used to violate – the ADA. Nawara argues that even if the CCSO was justified in requiring Nawara to undergo an FFD, the medical release forms nonetheless support the jury's verdict because both forms somehow could have permitted access to all of Nawara's medical records – rather than those related to his FFD exam – and the CCSO required both forms to be signed. (Rsp. at 26-29.) Nawara relies on his counsel's outrageous and improper speculation that both forms could somehow be sent to nearby hospitals to obtain Nawara's medical records. (*Id.* at 27.) Nawara bootstraps from that argument, contending that the CCSO form violated the ADA because it was unlimited in time and scope and allowed the CCSO to obtain irrelevant medical records because "all means all." (*Id.* at 26, 29). As to the CorVel form, he argues it violated the ADA because it covered records "from the beginning of time" and could be sent to any medical provider. (*Id.* at 32.) But nowhere does Nawara come to terms with

the fact that the unrebutted testimony at trial established that neither form allowed the CCSO to obtain *all* of his medical records, nor did anyone at the CCSO ever attempt to do so.

Put simply, none of Nawara's arguments overcome the fact that there was no evidence that the forms – even assuming the CCSO told Nawara he was required to sign both – could be used in any way that violated the ADA.

### A. Nawara's Rank Speculation about the CCSO's Ability to Use the Medical Release Forms Does Not Render the Forms Illegal.

Nawara argues that it is "plausible to conclude that an employer could take blank authorizations and send them to the hospitals in Cook County, or to the hospitals near Nawara's home" and that it is "reasonable to conclude that the Sheriff's Office with all its police powers could investigate and find out an employee's medical providers, or learn the identity of providers through insurance records or from an employee's personnel records. (Rsp. at 27.) Such rank speculation is anything but "plausible" or "reasonable." *See English v. Smith,* 2008 WL 4287628, * 3 (N.D. Ill. Sept. 15, 2008) ("the nonmoving party . . . [may] not rely merely on its own assertions and speculation 'to manufacture a genuine issue of fact.'") (quoting *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008)). There is no record evidence that anyone from the CCSO requested any medical records without Nawara's input or that anyone at the CCSO took the signed medical release to any hospital or insurance company.

This speculation is attorney argument, and no more. (Tr. at 38:3-39:3 (Plaintiff's closing); *see also* Tr. at 1497:19-1498:2.) During trial, Plaintiff's counsel concocted a theory – for which they had no evidence – that the medical releases could have been used by the CCSO to obtain Nawara's insurance records, and that in turn such insurance records could have been used to identify and gain access to his medical records. (Tr. at 1497-1498.) This absurd theory flatly was refuted by Reierson, who testified that the HR office *has no access to employee insurance records*

*and does not*, as Plaintiff's counsel speculated, *manage employee insurance*. (Tr. at 1779:12-23). It was also was refuted by Shelby: "Q. So you, as a nurse in HR, once somebody signs a blank form, that gives you permission to go into their health insurance information and gather any doctor that the employee has seen, correct? A. Not from my understanding." (Tr. 1563:19-23.)

No witness provided any testimony to support the theory concocted by counsel. Nevertheless, with no foundation to do so, Plaintiff's counsel argued in closing a totally different and utterly unsupported theory – that someone at the CCSO could have taken the forms to Northwestern Hospital to find out who Nawara's treaters were. (Tr. at 1991.) The CCSO rightly objected to this outrageous claim, and the objection was sustained. (*Id.*) Now, in his Response, Nawara takes his wholly imaginary argument a step *further* – claiming that a series of events could have happened even though there is precisely zero evidence that such events could happen, did happen, or ever were considered by anyone at the CCSO. (Rsp. at 27.) The Response offers no citations to anything in the record to support this claim because there is no such record evidence. Plaintiff counsel's resort to this absurd argument only proves the point that no reasonable jury could have concluded that the CCSO could have or would have used the medical release forms to obtain information unrelated to the FFD.

Nawara also argues that evidence was presented that the CCSO required him to sign both medical release forms. (Rsp. at 28-29). But even if Nawara reasonably believed this to be true, because neither form violated the ADA, this argument has no merit. As established in the opening brief, both forms required Nawara himself to identify the relevant treaters and could not be used without this information. (Op. Br. at 35-36.) Improper speculation by Nawara's attorneys cannot establish otherwise.

### B. The Forms Did Not Permit Unlimited Access to Nawara's Complete Medical Records.

Nawara argues that both medical release forms were unlimited in scope and sought his complete medical history and therefore violated the ADA. (Rsp. at 26-27, 29-33.) There is no record citation for this claim, nor could there be since it runs counter to the consistent testimony of Sarocka, Shelby, and Reierson, not to mention the content of the forms themselves. Nawara cites only to this Court's Order on the CCSO's Motion to Dismiss for the proposition that the medical release forms were "broad" and "untailored for any specific type of fitness for duty exam" and therefore must have been illegal under the ADA. (Rsp. at 26). But Nawara's reliance on a motion to dismiss opinion at this stage of the litigation is misplaced. The "law of the case" doctrine provides only that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Breen v. Concrete by Wagner, Inc*., 1999 U.S. Dist. LEXIS 17401, *14 (N.D. Ill. 1999) (citing *Redfield v. Continental Casualty Corp*., 818 F.2d 596, 606 (7th Cir. 1986)). The statements cited by Nawara are not decisions on a "rule of law" that should continue to govern in this case. *Id.* A ruling on a motion to dismiss, where all allegations of fact are taken as true, and without the benefit of witness testimony to provide explanation and context, has no bearing on whether the jury had a legally sufficient evidentiary basis to find that the forms violated the ADA. The Court's comments were based solely on the allegations in the complaint, and cannot supplant the actual evidence presented at trial.

#### 1. The CCSO Form.

Nawara's only support for the argument that the CCSO form allows the CCSO to receive all medical records without limitation are the EEOC guidelines and *Jackson v. Regal Beloit America, Inc.,* 2018 U.S. Dist. LEXIS 103682 (E.D. Ky. 2018) – both quoted extensively, but

without any analysis or comparison to this case. (Rsp. at 29-32.) In fact, Nawara admits that in *Jackson*, "the form was not at issue." (*Id.* at 35.) Nawara presented no evidence that the CCSO requested Nawara's complete medical records. As stated in the CCSO's opening brief, the *only* evidence introduced about the CCSO form was that the purpose of the CCSO was to speed up the FFD process, that it was entirely optional, that CCSO employees in the past had declined to complete the CCSO form, and that the only way to learn who an employee's treaters were was from the employee himself. (Op. Br. at 35-36).

As explained in the Opening Brief, the context and meaning of both forms was consistently explained by three witnesses with the foundation to provide such testimony, Reierson, Shelby and Sarocka. The *only* "evidence" identified by Nawara rebutting the testimony of these three witnesses is Nawara's assertion that the word "all means all" in the CCSO form. (Rsp. at 26). But Nawara has no foundation to provide opinion testimony about the meaning of release forms. He had no experience with the forms; neither he nor his lawyer ever inquired about the meaning of the forms or how they would be used; nor did he have any basis other than his subjective beliefs for his views of what the forms meant. (2-28-20 Tr. at 1087:16-20, 1108:15-18). "Rule 701 requires that a lay opinion have a reasonable basis grounded either in *experience or specialized knowledge* for arriving at the opinion that he or she expresses." *Sachs v. Reef Aquaria Design, Inc*., 2007 U.S. Dist. LEXIS 79809, *37 (N.D. Ill. 2007). Finally, the argument that the jury was not required to believe Reierson, Shelby or Sarocka is without merit, as Nawara presented no affirmative evidence to rebut these witnesses. *Anderson*, 477 U.S. at 257 (nonmoving party cannot create issue of fact by arguing jury did not have to credit witness testimony).

*Jackson* easily is distinguishable from this case. There, the employer *did* in fact request medical records related to the employee's colon cancer. The Kentucky district court concluded

that this medical inquiry was unrelated to whether the employee could perform the essential functions of her job since a routine physical exam for the employer did not show that the employee had any physical limitations in performing her job duties – there thus was no basis to believe that a prior cancer treatment had any bearing on her ability to do her job. *Jackson,* 2018 U.S. Dist. LEXIS 103682 at *25 ("Jackson was also required to submit medical records related to her colon-cancer surgery, even though her physical examination did not reveal any physical abnormalities or uncover any causes for concern."). Here, it is undisputed that the CCSO never requested any medical records, and that CorVel never requested records that were not related to Nawara's FFD exam – it requested only those records that were "related" to his FFD (consistent with the express terms of the CorVel form). Nawara is the one who identified his treaters and never had a single complaint about the process being excessive once it finally occurred.

#### 2. The CorVel Form.

Nawara also argues that CorVel form violated the ADA because it was unlimited in time or scope, and could be sent to any medical provider. Once again, he cites nothing in the record to support this speculation. The consistent testimony of Reierson, Shelby, and Sarocka was that the CorVel form permitted CorVel to speak to an employee about the identity of his treaters and authorized CorVel to send the FFD report to the CCSO. (Op. Br. at 36-37.) Nawara has no evidence to rebut that testimony. And the CorVel form on its face states that it seeks medical records "related to the fitness for duty examination." (PX 2.) There thus is no evidence supporting the claim that it was unlimited.

### C. Neither Form Constituted an Improper Inquiry Within the Meaning of the ADA.

As demonstrated in *Green v. Joy Cone Co.,* 278 F.Supp.2d 526 (W.D. Pa. 2003), neither form was an "inquiry" at all within the meaning of the ADA. Nawara argues that the CCSO's

reliance on *Green* is "misguided" because this Court observed at the motion to dismiss stage that *Green* involved a pre-employment inquiry and not an employment inquiry under the ADA. But the term "inquiry" has only one meaning under the ADA. *Sweeney v. Pence*, 767 F.3d 654, 660 (7th Cir. 2014) (citing *Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning.")). The *Green* court found that a medical release form that does not force a person to identify a disability or any medical history or limitations was not an "inquiry" pursuant to the ADA. *Id.* at 540. More importantly, the *Green* court found that no violation of the ADA occurs "unless and until … medical records *are requested* prematurely." *Id.* at 542 (emphasis added). In *Green*, "prematurely" meant before the employer was permitted to request them under the ADA. *Id.* Here, Nawara's medical records were never requested before they were permitted under the ADA; they were requested only after Nawara executed a release, and the only records that CorVel sought were those "related to the FFD." Such a request is expressly permitted as part of an inquiry into an employee's ability to "perform job-related functions" under the ADA. 42 U.S.C. 12112(d)(4)(B). Therefore, medical records never were requested "prematurely" nor were they unrelated to the FFD. None of the forms violated the ADA.

Moreover, *Sullivan,* 197 F.3d at 810-13 compels the conclusion that the forms were not an improper inquiry within the meaning of the ADA because they were never used to obtain medical records unrelated to an FFD. Nawara argues that *Sullivan* has no application to this case (Rsp. at 33), but it most certainly does. *Sullivan* held that an examination and the inquiry must be "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id.* at 812-13. Because "Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were

related to his job, or were too broad in scope." *Id.* at 812. Here, because the forms were never used to obtain medical records unrelated to the FFD, they cannot have been too broad and Nawara cannot establish that the forms were inquiries "unrelated to his job" or "too broad in scope." *Id.*[3] *See also Butler.,* 2014 U.S. Dist. LEXIS 168261 at *22 ("[a] plaintiff cannot succeed on a claim under Section 12112(d) *unless the employer obtained* the medical information that was disclosed through an entrance exam or disability-related inquiry. Additionally, a plaintiff must allege that he suffered a tangible injury *due to the disclosure* of the protected medical information.") (emphasis added). Nawara has offered nothing but speculation about the forms and his self-serving interpretations of them despite there being no evidence that the forms were ever used to obtain information unrelated to an FFD evaluation. Because Nawara never completed the release forms at issue in this case, he cannot now create an issue of material fact about what might have happened had he completed them. (Br. at 36-37.) *See Sullivan*, 197 F.3d at 812; *see also Pena v. City of Flushing*, 651 Fed. Appx. 415, 421-22 (6th Cir. 2016).

Nawara's citation to *Conroy v. New York State Dept. of Corr. Servs*., 333 F. 3d 88 (2d Cir. 2002) provides no support that the release forms violated the ADA. *Conroy* is not at all related to medical release forms, but rather to whether an employer may require a general diagnosis from a medical provider in order to determine whether an employee was entitled sick leave. *Id.* at 92. The court found that a general diagnosis may indeed tend to reveal a disability, as prohibited by the ADA, and therefore could be an improper inquiry within the meaning of the ADA. *Id.* at 95. Here, the CCSO did not ask Nawara for any diagnosis, but rather for medical records related to

[3] Nawara admits that the court in *Farmiloe v. Ford Motor Co.,* 277 F. Supp. 2d 778, 783-84 (N.D. Ohio 2002) did not state that the waiver forms violated the ADA, but only that an employer could not obtain an employee's complete medical records. Here, the request for medical records was limited in scope to those "related to the fitness for duty examination," which is permitted under the ADA. *Id*. at 784 ("The inquiry must be limited to the suspected impairments.").

whether he could perform job related functions – an inquiry *specifically permitted* under the ADA. 42 U.S.C. 12112(d)(4)(B).

**CONCLUSION**

For the reasons discussed herein and in the opening motion and brief, the CCSO requests that this Court strike the jury verdict and enter judgment as a matter of law in its favor on Nawara's ADA claim.

Respectfully submitted,
/s/ Sarah R. Marmor

Sarah R. Marmor
Suzanne M. Alexander
Morgan G. Churma
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
smarmor@scharfbanks.com
salexander@scharfbanks.com
mchurma@scharfbanks.com

*Counsel for THOMAS DART, in his official capacity as Sheriff of Cook County, Illinois.*

**CERTIFICATE OF SERVICE**

I certify that on June 22, 2020, I caused the foregoing DEFENDANT'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) ON PLAINTIFF'S CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT to be filed using the Court's CM/ECF system, which will send e-mail notification of the filing to all counsel of record. These documents are available for viewing and downloading via the CM/ECF system.

/s/ Sarah R. Marmor