**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN NAWARA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **No. 17 C 2393** |
| | ) |
| COUNTY OF COOK, a unit of local | )    **Judge Rebecca R. Pallmeyer** |
| Government and THOMAS DART, in his | ) |
| official capacity as Sheriff of Cook County, | ) |
| Illinois, | ) |
| | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff John Nawara has worked as a correctional officer at the Cook County Sheriff's Office ("CCSO") since 1998. In September 2016, while working a shift at the Cook County Jail, Nawara got into an altercation with his superintendent, Karen Jones-Hayes. Jones-Hayes reported the incident, and Matthew Burke—the chief of staff of CCSO's Department of Corrections—sent Nawara to Human Resources ("HR") to determine whether he should be required to undergo a professional fitness-for-duty examination. Leave and Absence Manager Rebecca Reierson and occupational nurse Winnifred Shelby were tasked with meeting with Nawara and making the determination. After a tense and uncomfortable meeting with Nawara, Reierson and Shelby placed Nawara on authorized leave and told him he could not return to work until he completed a fitness-for-duty examination. They also directed him to sign some paperwork to get the process started. Nawara refused to sign the paperwork, however, and spent some ten months on leave before agreeing to undergo the fitness-for-duty exam and ultimately returning to work. While he was on leave, Nawara filed this action against Cook County and Thomas Dart in his official capacity as Cook County Sheriff [1], arguing, among other things, that Defendants— referred to hereafter collectively as "CCSO"—had violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(d)(4), by forcing him to undergo a fitness-for-duty exam and requiring him to sign what he believes are unlawful medical disclosure forms as a part of that process.

At trial, the jury found for Nawara on this issue but awarded him zero dollars in emotional damages. The appropriate award of backpay is for the court to decide. Defendants have moved for judgment as a matter of law [312]. They contend that no reasonable jury could have found liability, and that Nawara is not legally entitled to backpay [347]. For reasons explained here, the court declines to disturb the jury's liability determination but also defers any award of backpay pending further briefing on the issue of whether such an award is appropriate here. In addition to that briefing, the court directs the parties to submit additional information within 21 days to enable the court to make an appropriate backpay calculation should the court decide that such an award is warranted.

## **BACKGROUND**

The court summarizes the evidence here, recognizing that it must view that evidence in the light most favorable to the jury's verdict. Plaintiff Nawara began working for CCSO on September 28, 1998 and remained employed by CCSO as of the time of trial. (Trial Tr. [321–332] at 973:9–11, 1049:2–7.) On September 28, 2016, Nawara was assigned to work in the basement of Cermak Hospital, an on-site hospital for the County Jail detainees. (*Id.* at 509:10–14, 1049:11–19.) At the time, Nawara was monitoring maximum security detainees in the hospital's basement waiting room—also known as the "staging area." (*Id.* at 1049:17–1050:11.) As a correctional officer in the staging area, Nawara was responsible for ensuring that detainees were properly cuffed and shackled. (*Id.* at 1050:12–14, 1183:16–20.) A "shackle" is "basically a large handcuff . . . for around your ankles." (*Id.* at 530:14–17.) During Nawara's shift, a fight broke out between two detainees—one uncuffed and one cuffed but not shackled. (*Id.* at 1050:21–1051:3.) Nawara and a fellow officer, James Turrise, broke up the fight. (*Id.* at 562:15–20.) When asked about his emotional state as he broke up the fight, Nawara testified that he "wasn't happy, calm, upset . . . just doing [his] job." (*Id.* at 981:10–20.) About 40 minutes later (*id.* at 736:6–18), Nawara was in the adjacent room—the "control" room—with Officer Barbie Gannon when Sergeant Thomas Conley and Superintendent Karen Jones-Hayes entered the room. (*Id.* at 992:16–993:1.) Conley and Jones-Hayes were both senior in rank to Nawara; sergeants rank

2

directly above correctional officers, while superintendents are three ranks above sergeants. (*Id.* at 511:6–12.)

Jones-Hayes testified that she had been making her rounds that day when, on her way into the control room, she observed that a number of detainees in the staging area were not properly handcuffed or shackled. (*Id.* at 1181:15–17, 1183:25–1184:7.) When Jones-Hayes directed Nawara to ensure the detainees were properly secured, he turned away without responding. (*Id.* at 1186:8–16.) According to Jones-Hayes, she then "touched his arm" and asked him to "go and shackle and handcuff the detainees," and in response, Nawara "just exploded— erupted on [her]." (*Id.* at 1186:17–20.) Jones-Hayes testified that he "got in [her] face," balled up his fist, and screamed, "'Don't touch me. Don't touch me, lady.'" (*Id.* at 1186:21–24.) Jones-Hayes then left to continue making her rounds by heading to the Cermak Emergency Room ("ER"). (*Id.* at 1187:8–1191:1.)

According to Jones-Hayes, a couple of minutes after she arrived in the ER, Nawara "burst in the door screaming" at her for making his job more difficult. (*Id.* at 1191:18–1192:11.) After their interaction in the control room, Nawara had struggled to shackle one of the detainees and blamed Jones-Hayes for his troubles. (*Id.* at 1192:3–23.) Jones-Hayes then followed Nawara to the staging area (*id.* at 1193:7–1194:7), and asked the unshackled detainee to "[h]ave a seat so the officer can shackle you," but the detainee refused, saying, "No, I'm not coming up there. That dude [Nawara] is not touching me." (*Id.* at 1195:2–9.) Eventually, Jones-Hayes was able to prevail upon the detainee to allow Nawara to shackle him. (*Id.* at 1195:13–22.) This made Nawara angry; Jones-Hayes testified that as she was leaving the staging area, Nawara said in her ear, "So what are you going to do? Walk around all F-ing day to help me do my job?" (*Id.* at 1198:4–8.) Jones-Hayes responded, "No, sir . . . I'm going to ask you to do [your] job," and left. (*Id.* at 1198:19–23.)

Nawara confirmed portions of Jones-Hayes account but denied others. He testified that Jones-Hayes "seemed upset" and "was raising her voice" when she entered the room. (*Id.* at 998:11–13, 999:8–10.) He says she "poked" him twice, and, after the first poke, he "kind of

3

freaked out a little bit." (*Id.* at 994:12–995:3, 997:2–4.) But according to Nawara, although his voice "[p]robably could have been" "a little raised," he did not scream at Jones-Hayes. (*Id.* at 995:11–15.) Nor did he use the F-word towards Jones-Hayes at any point that day. (*Id.* at 1006:8–16.) He admitted that he sarcastically remarked, "Maybe if you follow me around, I can do my job." (*Id.* at 1004:20–23.) Nawara also acknowledged that it was improper for him to make that remark. (*Id.* at 1005:4–11.) But he discounted that the comment was disruptive, as he had said it "[l]oud enough only for her to hear" because "that's just between me and my supervisor . . . I still wasn't going to let the inmates hear me." (*Id.* at 1004:24–1005:7.) Gannon, Turrise, and Conley were all in the control room at the time (*id.* at 514:11–13, 569:24–570:3, 992:16–18), and none recalled Nawara using any profanity. (*Id.* at 519:4–10, 571:9–11, 697:18–20.)

After the incident, Jones-Hayes wrote up a report (*id.* at 1199:2–8), and sent it to her immediate supervisor, Jeff Johnsen, who in turn reported it to Matthew Burke, chief of staff for CCSO's Department of Corrections. (*Id.* at 777:6–15, 795:3–796:10, 1200:10–12.) Although Nawara returned to work at Cermak the day after the incident (*id.* at 1007:11–15), Burke reassigned him to the External Operations unit at the start of the following work week. (*Id.* at 809:15–18, 1007:16–1008:1.) The External Operations unit provides security for everything outside of the jail under the leadership of Superintendent Richard Brogan, not Superintendent Jones-Hayes. (*Id.* at 809:19–22, 1008:2–3.) Burke was aware this was a reassignment to a position in which Nawara would be authorized to carry a firearm. (*Id.* at 810:5–11.) Burke felt "it was prudent just to get [Nawara] out of [Cermak and] away from [Jones-Hayes]" but "did not feel as though he was a threat to himself or others." (*Id.* at 1749:19–23.) On September 29, Burke also referred Nawara's case to the Human Resources department ("HR"), requesting that [Officer] John Nawara . . . be evaluated for fitness for duty." (Burke Referral to HR, Ex. 10 to Def.'s Mot. for J. [312-10] (hereinafter "Burke Referral") at 2.) Before referring Nawara's case, Burke did not contact any witnesses; nor did he review videotapes of the episode in the Cermak basement from

September 28—a task that would have taken him no more than ten minutes.[1] (Trial Tr. at 798:4–799:15, 800:20–806:4.)

HR received the referral on September 29, 2016. (Burke Referral at 1.) Before the end of the month, Nawara's case was assigned to Leave and Absence Manager Rebecca Reierson. (Trial Tr. at 222:12–25.) After reviewing Burke's referral, Reierson testified that the "first thing" she did was reach out to Jones-Hayes via email to gather more information. (*Id.* at 375:9–12, 377:12–18.) Jones-Hayes never responded. (*Id.* at 378:9–380:3; Reierson Burke Emails, Ex. 11 to Def.'s Mot. for J. [312-11] (hereinafter "Reierson Burke Emails").) On November 8, Reierson contacted Burke with the following message: "There is not enough information in this referral to support sending Officer Nawara for a fitness for duty evaluation." (Reierson Burke Emails.) Burke responded minutes later, suggesting that HR should "still investigate." (*Id.*) Reierson replied, "Is this something more than insubordination that should be handled through the disciplinary process?" (*Id.*) On November 9, Burke sent an email to Jones-Hayes asking her to reach out to Reierson to discuss Nawara's case. (Trial Tr. at 911:21–912:8.) Jones-Hayes called and left a message with Reierson that same day. (*Id.* at 912:12–913:4.)

On November 11, Reierson sent an email to her supervisor, Karyn Williams, expressing concern that the Department of Corrections "is trying to use the FFD process in lieu of supervising/disciplining employees." (*Id.* at 227:12–228:7, 224:10–11.) Reierson felt it was part of her role "to be vigilant in ensuring that FFDs are not used for discipline." (*Id.* at 381:20–22.) At that point, Reierson believed Nawara's case was an example of the department improperly using the FFD process for disciplinary purposes. (*Id.* at 229:19–23.) Reierson explained in her testimony that the FFD process was meant for individuals "having some kind of personal or medical issue that's preventing them from [properly] performing the[ir] job," while a separate

---

[1] Nawara argues that Burke's failure to check the videotapes also led to their destruction because CCSO only keeps videos for 30 days unless they are intentionally preserved. (Pl.'s Opp'n [338] at 11.) As CCSO notes, however, the court barred spoliation arguments in an *in limine* ruling (Pretrial Tr. [282] at 78:17–20), and instructed the jury that there was no basis for a determination that video evidence was improperly destroyed. (Trial Tr. at 276:1–10.)

process existed for investigating and disciplining an employee for a rule violation. (*Id.* at 381:12–19.) In an attachment to Reierson's email to Williams, Reierson acknowledged that she had recently received a call from Jones-Hayes and "[h]ope[d] to get additional info[rmation] to reevaluate" Nawara's case. (*Id.* at 229:11–16.)

On November 16, Reierson spoke on the phone with Jones-Hayes and with Nurse Winifred Shelby, an occupational health nurse. (*Id.* at 231:11–13, 384:2–7, 1375:13–18.) Reierson took contemporaneous notes of the call. (*Id.* at 385:9–386:9; Reierson Notes, Ex. 13 to Def.'s Mot. for J. [312-13] (hereinafter "Reierson Notes"), at 2.) According to those notes, Jones-Hayes made the following statements about the events of September 28: (1) when Jones-Hayes first addressed Nawara in the Cermak basement, he "did not turn around or respond," (2) when Jones-Hayes "tapped Nawara on the shoulder" to ask if he had heard her, he "jumped up in her face and yelled at the top of his lungs 'Don't touch me! Don't fucking touch me!' over and over again," (3) an uncuffed detainee told Jones-Hayes that he did not want to be cuffed by Nawara because Nawara "was crazy," (4) after Nawara cuffed and shackled that detainee, Nawara "screamed in [Jones-Hayes's] face again [saying] 'Because of you an inmate jumped in my fucking face!'" and (5) finally, Nawara "stormed behind [Jones-Hayes] and again yelled 'So what? Are you going to follow me around all day?'" (Reierson Notes at 2.) Based on this call, Reierson and Shelby decided to ask Nawara to come to HR to check in. (Trial Tr. at 395:16–21, 1379:10–24.) Reierson testified that "getting in the face of the superintendent . . . really, is an issue. Yelling, swearing, and repeating something again and again like this seems to be inappropriate in the workplace." (*Id.* at 389:22–390:6.) Shelby agreed. (*Id.* at 1379:10–24.) On November 16, Reierson spoke with Burke's executive assistant Mary McQuillan about sending Nawara to HR. (*Id.* at 397:3–14; Reierson McQuillan Emails, Ex. 14 to Def.'s Mot. for J. [312-14] (hereinafter "Reierson McQuillan Emails"), at 1.) Nawara had regularly scheduled days off on November 16th and the 17th. (Trial Tr. at 397:19–398:9.) Reierson asked McQuillan to have someone send Nawara to HR when he returned to work on the morning of the 18th. (*Id.*) Reierson did not

request or view any videotapes, incident reports, or disciplinary records at any time before Nawara's check-in on November 18th. (*Id.* at 1798:8–1799:12.)

At around 8:00 a.m. on November 18th, Nawara's shift commander directed him to go to HR. (*Id.* at 1012:10–24.) Although 51 days had passed since the events in the Cermak basement, Nawara was not told that this meeting concerned either those events or a fitness for duty ("FFD") evaluation. (*Id.* at 1014:5–10.) When Nawara arrived at HR, he met with Reierson and Shelby in Shelby's office. (*Id.* at 1015:6–24.) Nawara testified that Shelby may have begun by briefly saying, "We are here to see how you are doing," but quickly went "right into" saying "I want to know if you feel that you are threatening to your coworkers." (*Id.* at 1016:15–1017:4.) Nawara asked, "Is this about something?" and "What's going on here?" (*Id.* at 1017:14–20.) Shelby assured him that "This isn't an investigation . . . We are just here to see if you feel that you are intimidating to yourself or your coworkers or detainees." (*Id.* at 1017:21–25.) Nawara again asked why he was there and again, Shelby responded the same way. (*Id.* at 1018:1–11.) Nawara and Shelby continued "kind of dancing" back and forth like this for "a very good uncomfortable five to ten minutes." (*Id.* at 1018:12–14.) At some point, Nawara responded that he was not intimidating toward his coworkers "because I don't need to be . . . But to the inmates, there are times when I have to do that." (*Id.* at 1018:22–1019:13.) Nawara denied that Shelby asked him if he had any issues with Jones-Hayes. (*Id.* at 1018:15–17.) Eventually, Shelby got "a little frustrated" and said, "You need to go so that we can talk." (*Id.* at 1019:14–19.)

Shelby and Reierson described this meeting differently. Shelby testified that she assured Nawara, from the start, this was "strictly a factfinding meeting so we can talk, and you can kind of explain to me your understanding on what happened and occurred on this event or this day." (*Id.* at 1383:12–21.) In contrast to Nawara's testimony, Shelby testified that she asked Nawara if he had any issue with Jones-Hayes, to which he responded, "No, I don't have no issue . . . Because I stay away from her." (*Id.* at 1384:25–1385:7.) At that point, Nawara stopped talking other than to ask why he was there. (*Id.* at 1385:8–12.) According to Shelby, Nawara's demeanor in the meeting "went south really quickly." (*Id.* at 1386:23.) Nawara "was so mad and so enraged, it

7

was like . . . looking at a bulldog just ready to attack." (*Id.* at 1386:23–1387:5.) Ultimately, Nawara "storm[ed] out" of Shelby's office. (*Id.* at 1388:19–21.) Shelby had never seen an employee respond this way to an FFD meeting before. (*Id.* at 1387:15–21.) "Everybody wasn't in agreement to going for a fitness-for-duty, but no one had ever . . . showed this type of rage . . . I have had people maybe scream or get loud, but it was a totally different level for me." (*Id.*)

Reierson similarly testified that Nawara seemed "hostile the entire time." (*Id.* at 1773:7–12.) He "seemed very tightly wound," "his fists were clenched," "his jaw was tight"; it was "like he was just trying to keep himself in the chair." (*Id.* at 272:10–273:3, 1773:7–24.) She testified that she "had never been in a meeting like that . . . ." (*Id.* at 403:5–8.) Nawara did not deny either that the "mood in the room was tense" or that "it seemed to go badly from the start." (*Id.* at 1076:12–18.) He testified, however, that he did not clench his jaw or his fists; he was not restraining himself from doing anything; he did not become "enraged" in the room; and he did not "storm out." (*Id.* at 1020:8–1021:2.) Nawara testified that he was "very uncomfortable . . . [and] just wanted to be out of the room." (*Id.* at 1021:5–10.)

As soon as Nawara left the room, Shelby and Reierson "looked at each other and said, without hesitation, 'He needs to go for a fitness-for-duty [exam].'" (*Id.* at 1388:22–1389:2.) Shelby testified that this decision was based on "his behavior, his lack of self-control, the rage," and that Reierson "shared [her] views" on this. (*Id.* at 1389:3–9.) Reierson testified that her decision to send Nawara for an FFD was based on the "combination" of the September 28 events in the Cermak basement and the November 18 events in HR. (*Id.* at 1774:2–17.) Nawara's episode in Shelby's office "seemed like . . . a continuing behavior" (*id.*), in that his "struggling to . . . keep his anger under control . . . kind of rang a bell with what [Jones-Hayes] had expressed about him." (*Id.* at 405:7–12.) In particular, Reierson had concerns about "insubordination," failure to communicate, and inability to control his "sudden anger." (*Id.* at 1781:1–14.) Nurse Shelby testified similarly (*id.* at 1389:3–1390:16, 1392:12–22, 1397:19–1398:13), though for her, the decision to send Nawara for an FFD "was 95 percent [based on] the way he acted in the office." (*Id.* at 1398:9–15.) Both Reierson and Shelby denied having any reason for sending Nawara for

8

an FFD exam other than the events of September 28 and November 18. (*Id.* at 1780:17–20, 1415:9–12.)

About fifteen to twenty minutes after leaving Shelby's office, Nawara returned, accompanied by a union representative. (*Id.* at 273:25–274:4.) Shelby and Reierson told Nawara they intended to refer him for a fitness-for-duty exam based on the combination of his behaviors on September 28 and what Shelby called "the aggressive display of behavior" he had exhibited in Shelby's office that day. (*Id.* at 1026:14–19, 1028:2–9.) Nawara denies displaying any such aggressive behavior. (*Id.* at 1028:7–15.) Although a deputy sheriff had been posted outside of Shelby's door throughout the encounter (*id.* at 1387:8–11), Reierson and Shelby never called for assistance. (*Id.* at 1804:23–1805:11.) Nor did they ask security to keep a look-out, or leave the office door open, when Nawara returned. (*Id.* at 1805:14–20.)

Shelby explained that Nawara would not be permitted to return to work until he had completed the FFD exam and gained clearance from an examiner. (*Id.* at 408:22–409:3.) In the meantime, Nawara would not face suspension but would be on authorized leave. (*Id.* at 409:4–22.) While suspension was the result of a disciplinary process, all employees sent for FFD exams were placed on authorized leave—a status which allowed the employee the option of using benefit time pending the outcome of the FFD exam. (*Id.* at 409:8–410:17.) Next, Shelby pulled out two forms, and, according to Nawara, told him, "You need to sign these so we can go on with your fitness-for-duty process. You can't return back to work until you sign these two forms." (*Id.* at 1029:5–16.)

The first form—the "CorVel form"—was a HIPAA authorization form that asked Nawara to authorize disclosure of his health information to CorVel, the third-party administrator who ran CCSO's FFD exams. (*Id.* at 1362:7–22, 1367:15–23.) In particular, the form sought approval for the disclosure of "all medical records and information . . . relate[d] to [his] fitness for duty exam," from "[a]ny health care provider or facility who treats [or has] treated me for my medical condition or medical illness." (FFD Forms, Ex. 3 to Def.'s Mot. for J. [312-3] (hereinafter "FFD Forms"), at 2.) The form stated that "Identified Health Care Providers" would be authorized to disclose

Nawara's medical information to CorVel, but it did not set aside any space for Nawara to identify any such health care providers. (*Id.*) Michelle Sarocka, the CorVel case manager assigned to Nawara's case (Trial Tr. at 1130:7–10), testified that, even after an employee fills out the CorVel authorization form, CorVel remains reliant on that employee to identify the employee's providers. (*Id.* at 1486:14–20.) CorVel has no other way to "go out and find somebody's treaters." (*Id.*) She explained that an employee's completing the CorVel authorization form did not give the employer (CCSO) access to the employee's medical records. (*Id.* at 1364:25–1365:7, 1497:19–22.) CCSO could obtain only the final FFD report from CorVel. (*Id.* at 1363:16–1364:3, 1496:6–8.)

On the other hand, the second form—the "CCSO form"—allowed CCSO to expedite the FFD process by authorizing release of an employee's medical documentation directly to CCSO. (*Id.* at 1367:24–1368:16, 1369:2–14.) The form states "I request and authorize _____ to release [my] healthcare information . . . to:" and leaves a space to list the name and address of the employer. (FFD Forms at 3.) Next, the form states that "This request and authorization applies to: All healthcare information." (*Id.*) Without the CCSO form, CorVel would have to wait for the FFD referral, assign it to one of the CorVel case managers, and only then attempt to reach out to the employee and gain the necessary documentation from the employee's providers. (Trial Tr. at 1369:2–19, 1490:2–14.) If the employee were to sign the CCSO form, Nurse Shelby could call the employee's providers directly and immediately get the ball rolling. (*Id.*) CCSO could not identify an employee's providers unless the employee either listed those providers on the form or otherwise cooperated with CCSO. (*Id.* at 363:17–364:9, 1372:22–1373:9.)

According to Nawara, when Shelby showed him these two forms in her office, he realized the forms were "completely blank besides where you have to fill everything in" and refused to sign them for that reason. (*Id.* at 1029:17–22.) Indeed, the CCSO form provided blank spaces on which Navara could identify providers he authorized to release his records, while the CorVel form provided no space at all in which Nawara could limit the providers whose records would be released. (FFD forms at 2–3.) Nawara testified that he did not have any problem with undergoing the FFD process at the time; he only refused to sign the forms because they were blank. (*Id.* at

1032:25–1033:4.)  Elsewhere, however, Nawara suggested other reasons for refusing to sign the forms, such as needing more time to read over them in a more comfortable environment (*id.* at 1030:6–10), and wanting to "be advised as to why these forms are what they are and what they are instructing."  (*Id.* at 1033:5–12.)  Shelby testified that she attempted to explain both forms to Nawara at the time, but he did not ask any questions and did not appear to be paying attention; he simply kept repeating, "I'm not filling out no forms, and I'm not going for no fitness-for-duty." (*Id.* at 1393:17–1395:15.)  Eventually, though, Nawara asked to "take these forms with me and review them," and Shelby allowed him to go home with the forms.  (*Id.* at 1030:11–16.)

In the following weeks, Nawara reached out to attorney Dana Kurtz.  (*Id.* at 1036:17–1037:11.)  On December 21, 2016, Kurtz emailed Shelby, stating her belief that requiring Nawara to complete the CorVel form was unlawful and "requesting that [Nawara] be immediately reinstate[d] and allowed to return to work."  (Dec. 21 Kurtz Email, Ex. 4 to Def.'s Mot. for J. [312-4] (hereinafter "Dec. 21 Kurtz Email") at 1.)  Nawara, Kurtz, and Reierson continued corresponding through email, letter, and voicemail over the next few months but made no progress in resolving the dispute.  (Jan. 31 Kurtz Email, Ex. 5 to Def.'s Mot. for J. [312-5] (hereinafter "Jan. 31 Kurtz Email"); Mar. 8 Kurtz Email, Ex. 6 to Def.'s Mot. for J. [312-6] (hereinafter "Mar. 8 Kurtz Email"); Nov. 30 Reierson Letter, PX 5 (hereinafter "Nov. 30 Reierson Letter"); Feb. 28 Reierson Letter, PX 7 (hereinafter "Feb. 28 Reierson Letter"); Mar. 13 Reierson Email, PX 10 (hereinafter "Mar. 13 Reierson Email").)  The parties focus on multiple factual discrepancies between these communications and the witnesses' testimony.  First, while Nawara testified that he refused to sign the forms because they were blank, Kurtz's emails appear to challenge the FFD referral in its entirety.  (Dec. 21 Kurtz Email; Jan. 31 Kurtz Email; Mar. 8 Kurtz Email.)  Second, Reierson sent three letters to Nawara stating that he could not return to work until he returned what she referred to as, "signed *documents*" or "HIPAA waiver *forms*" to Shelby's office.  (Nov. 30 Reierson Letter; Feb. 28 Reierson Letter; Mar. 13 Reierson Letter (emphases added)).)  Yet Shelby and Reierson testified that just one form (the CorVel form) was required (*id.* at 365:22–366:4, 1367:24–1368:18), and that employees in the past had completed the FFD

11

process without signing the CCSO form. (*Id.* at 1368:19–1369:1.) Third, although Nawara testified that he had objected to signing both forms (*id.* at 1033:25–1034:1, 1037:12–14), Kurtz's email to CCSO objected only to the CorVel form. (Dec. 21 Kurtz Email; Jan. 31 Kurtz Email; Mar. 8 Kurtz Email.)

On August 17, 2017, Nawara agreed to sign a modified version of the CorVel form and undergo an FFD examination. (Signed CorVel Form [315].) Nawara testified that he did so because he "was desperate" and "hurting pretty bad for money" after being out of work for a while. (Trial Tr. at 1038:15–1039:2.) Reierson, Shelby, and Sarocka all testified that the modified form changed nothing about the FFD process. (*Id.* at 455:2–6, 1407:1–1408:9, 1500:3–1501:19.) Once Nawara signed the modified CorVel form, the FFD process began; there is no evidence that Nawara signed any version of the CCSO form. (*Id.* at 1129:10–1130:6, 1402:1–15.) On August 25, 2017, Shelby prepared a first draft of a "Referral Form" for CorVel based only on the events of September 28 and making no mention of the November 18 interaction in her office. (*Id.* at 1409:7–18; CorVel Referral Draft, PX 63 (hereinafter "CorVel Referral Draft"), at 1.) After edits from Reierson, however, the final referral included mention of Nawara's behavior on both dates. (Trial Tr. at 1409:19–1410:20; CorVel Referral Final, PX 65 (hereinafter "CorVel Referral Final"), at 2.) The final version listed the "Reason referring" as "Employee's aggressive, physically intimidating and inappropriate behavior directed toward his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resources department." The referral asked examiners to determine whether Nawara could "maintain composure . . . in a high stress environment," properly behave toward detainees and superiors, "diffuse disruptive behavior verbally," and "properly use limited force on problematic and combative inmates." (CorVel Referral Final at 2.) It also noted CCSO's concerns about "anger management," or "ability to manage a detainee population without losing his temper." (*Id.*)

After receiving the referral form and other relevant documents (CorVel Fax, Ex. 2 to Def.'s Mot. for J. [312-2] (hereinafter "CorVel Fax")), Sarocka, CorVel's case manager assigned to Nawara's case, called Nawara to discuss "what [CorVel] needed in order to set . . . up and [have]

him . . . attend the exam." (Trial Tr. at 1508:6–20.) Sarocka then gathered the necessary medical records and set up a two-day FFD exam with Dr. Diana Goldstein on September 11th and 12th. (*Id.* at 1509:14–1515:25.) Based on a review of his documents and a "psychological and neurocognitive examination," Dr. Goldstein issued a report on September 16, 2017 finding Nawara "fit to return to duty, without restrictions." (*Id.* at 333:3–334:16.) By September 27, 2017, Nawara returned to work at CCSO. (*Id.* at 1132:12–14.)

Ultimately, Nawara's leave from CCSO lasted from November 18, 2016 to September 26, 2017. (*Id.* at 1042:20–22.) Between November 18, 2016 and April 25, 2017, Nawara received pay from CCSO by electing to use his accrued sick days, vacation days, and personal days off. (*Id.* at 1042:20–1043:7, 1089:2–13.) Between April 25, 2017 and September 26, 2017, after those benefits had run out, Nawara was not paid by CCSO. (*Id.*) After refreshing his recollection by viewing an old paystub, Nawara testified that his yearly salary in 2016 was $75,394.49. (*Id.* at 1047:3–1048:5.) The only other evidence Nawara's counsel presented concerning lost wages are two "Schedule G" documents that purport to calculate Nawara's total lost wages based on this number. (Original Schedule G, Ex. 7 to Pretrial Order [248-7] (hereinafter "Original Schedule G"); Revised Schedule G [272].) The revised Schedule G calculated Nawara's lost pay at $64,653.36 by dividing his pretax income by 365 and multiplying it by the number of days that he missed. (Revised Schedule G.) Neither document explains how to calculate the value of other lost benefits such as pension contributions, health insurance, vacation days, or seniority.

From June 2017 to September 2017, Nawara elected to work jobs at Amazon and Aces Security. (*Id.* at 1119:8–22, 1122:7–10.) Asked whether he could have gotten these jobs earlier, Nawara replied "Yes, ma'am"; it is not clear from the record, however, whether he meant that the positions were available earlier, or simply that he was permitted to obtain secondary employment even while drawing on his benefits with CCSO. (*Id.* at 1122:11–23.) CCSO presented no other evidence about these positions. Nor did CCSO present evidence about other available positions that Nawara could have applied for at the time.

On March 24, 2017—while he was still on leave—Nawara filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation and violations of the Americans with Disabilities Act ("ADA"). (Answer [57] ¶ 7.) On March 29, 2017, he filed this suit in federal court, alleging discrimination under the ADA, a violation of his First Amendment rights, and retaliation under Title VII. (Compl. ¶¶ 68–98.) According to the Second Amended Complaint, on October 11, 2017, the EEOC issued a notice of right to sue. (Second Am. Compl. [89] ¶ 8.) In multiple amended complaints, Nawara added a claim that the Defendants had violated the Illinois Whistleblower Act and a claim seeking a declaratory judgment under the Cook County Sheriff's Merit Board Act. (Am. Compl. [22] ¶¶ 127–134; Second Am. Compl. ¶¶ 147–152.)

The case proceeded to trial on February 24, 2020. (Trial Tr. at 1.) On Defendant's motion (*id.* at 1167:1–1170:8, 1938:2–13), the court dismissed all claims except for Nawara's claim that CCSO had violated the ADA by unlawfully requiring him to undergo a fitness-for-duty exam and disclose his medical information. (*Id.* at 1864:24–1866:2, 1932:1–7, 1942:2–9.) On that claim, the jury found for Nawara but awarded no compensatory damages for emotional distress. (*Id.* at 2067:14–2068:2.) Although Nawara had originally included Burke, Jones-Hayes, Reierson, and Shelby as defendants, the court dismissed the claims against these defendants before the end of trial, as well. (*Id.* at 1971:25–1972:5.) CCSO has renewed a motion for judgment as a matter of law, asking this court to overturn the jury's ruling on Nawara's ADA claim. If the court does not overturn the jury's ruling, the court must also rule on how much backpay—if any—Nawara is entitled to recover.

## DISCUSSION

Under Rule 50 of the Federal Rules of Civil procedure, a district court can "enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (quoting FED. R. CIV. P. 50(a)). The court "construe[s] the evidence strictly in favor of the party who prevailed before the jury and . . . do[es] not make credibility determinations or reweigh the evidence." *Epic Sys. Corp. v. Tata Consultancy*

14

*Servs. Ltd.*, 980 F.3d 1117, 1133 (7th Cir. 2020) (internal quotations omitted).  For that reason, the court "must disregard all evidence favorable to the moving party that the jury [was] not required to believe."  *Passananti*, 689 F.3d at 659 (internal quotations omitted).  Here, CCSO contends that, based on the evidence adduced at trial, no reasonable jury could find that CCSO violated the ADA either by requiring Nawara to undergo a fitness-for-duty exam or by requiring Nawara to sign the release forms in question.  As the jury returned a general verdict against CCSO (Trial Tr. at 2068:14–2070:9), the court "need only find support in the record for one of the theories presented to the jury."  *Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1037 (7th Cir. 2000).

The ADA prohibits employers from "requir[ing] a medical examination . . . [or] mak[ing] inquiries of an employee as to whether such employee is an individual with a disability . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).  An employer can also "make inquiries into the ability of an employee to perform job-related functions."  *Id.* § 12112(d)(4)(B).[2]  The employer, not the employee, "bears the burden of establishing that an examination is consistent with business necessity . . . and that burden is quite high."  *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 798 F.3d 513, 523 (7th Cir. 2015) (internal quotations omitted).  The employer can carry its burden by showing it "has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition."  *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 565 (7th Cir. 2009).  All employees

---

[2]     CCSO argues that, even if its FFD examination fails § 12112(d)(4)(A)'s requirement that the exam is "job-related and consistent with business necessity," CCSO could separately prevail under § 12112(d)(4)(B)'s provision, which expressly allows "inquiries into the ability of an employee to perform job-related functions."  CCSO, however, identifies no case suggesting that subsection (B)'s standard is separate from or easier to meet than subsection (A)'s.  Indeed, even in *Coffman*, the case CCSO cites for this proposition, the Seventh Circuit defined the "job-related" and "business necessity" inquiries as overlapping, if not identical.  578 F.3d at 565 ("[A] medical examination is job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition.").

are protected by these subsections, "regardless of whether they have a qualifying disability under the ADA." *Wright*, 798 F.3d at 522.

## A.    Deference to correctional facilities

In determining whether the fitness-for-duty inquiry in this case is permissible, the court considers first, whether CCSO is entitled to an added degree of deference because it operates a correctional facility.  In some cases, courts have been hesitant to second-guess the propriety of FFD evaluations in "special work environment[s]" associated with public safety.  *Coffman*, 578 F.3d at 566.  The Seventh Circuit has held that firefighters, *id.*, and police officers, *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 731 (7th Cir. 2020), work in such environments.  In these professions, courts have granted "greater leeway for supervisors," because the well-being of these plaintiffs is "essential not only to [their] safety but to the public at large."  *Id.* (quoting *Coffman*, 578 F.3d at 565).  Still, in *Wright*, the Seventh Circuit extended no such deference to supervisors of caseworkers at the Illinois Department of Children and Family Services ("DCFS") even though the plaintiff caseworker worked with approximately two-dozen vulnerable children, including at least one that had experienced physical and sexual abuse.  798 F.3d at 517, 526.

CCSO argues here that supervisors of correctional officers should receive the same deference as supervisors of firefighters and police officers.  Certainly, as other courts have recognized, "[t]he needs of correctional facilities for secure and adequate staffing are particularly strong."  *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 99 (2d Cir. 2003).  The same can be said, however, about the needs for secure and adequate staffing among caseworkers at DCFS.  Both work with vulnerable individuals, but unlike police officers and firefighters, both work with only a small subset of the population rather than the "public at large."  *Kurtzhals*, 969 F.3d at 731 (quoting *Coffman*, 578 F.3d at 565.).  And while an unstable correctional officer may pose risks to himself and his coworkers, that was likely true of the plaintiff in *Wright* who was deemed to "exhibit[ ] behavior that put[ ] into question [her] personal safety and that of others in the workplace."  *Wright*, 798 F.3d at 518.  Wright's behavior provoked a ten-year-old resident of a Child and Family Center to "incite[ ] a riot," during which "the children threw and broke furniture

and attempted to attack the staff." *Id.* at 517. The Seventh Circuit ultimately affirmed a judgment for defendant on other grounds but held that the evidence was insufficient to establish, as a matter of law, that requiring plaintiff to undergo an FFD evaluation was consistent with business necessity. *Id.* at 526. The court did not discuss the possibility of special deference to defendant on this issue. Instead, it was enough that the evidence supported a finding that defendant had not been truthful in asserting that it had ordered an FFD because plaintiff posed a safety risk to the children with whom she worked. *Id.* at 524–26. It is not clear to the court that allowing for additional deference to supervisors at correctional facilities would change the outcome in this case, but the court declines to disturb the jury's finding on this basis.

## B. The fitness-for-duty examination

The court turns to analysis of the evidence on Nawara's two theories of liability under § 12112(d)(4)(A): first, whether CCSO unlawfully required him to undergo a fitness-for-duty evaluation; and second, whether CCSO unlawfully required him to sign the CorVel form and the CCSO form. To begin, Nawara notes that CCSO Department of Corrections Chief of Staff Matthew Burke admitted that he did not think Nawara was a threat to himself or others (Trial Tr. at 1749:19–23), and that Burke knew that Nawara would carry a gun when he reassigned Nawara to the External Operations unit. (*Id.* at 810:5–11.) Burke did not make the decision to require Nawara to undergo a fitness-for-duty exam; Reierson and Shelby did. (*See id.* at 1388:22–1389:2.) Burke merely referred Nawara to HR "to determine whether or not [Nawara] should undergo a fitness-for-duty evaluation." (*Id.* at 222:17–25.) In fact, Reierson testified that the majority of cases that get referred to HR do *not* result in the employee's being sent for a fitness-for-duty exam. (*Id.* at 350:25–351:8.) Although Burke's state of mind may not be dispositive, *see Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (centering the § 12112(d)(4)(A) analysis around "the individual who decides to require a medical examination"); *see also Kurtzhals*, 969 F.3d at 731 (focusing the decision on what the decision-maker "genuinely believe[d]"), it is notable that Burke evidently did not believe that Nawara was so dangerous that he needed to be removed from the workplace.

The relevant question is whether any reasonable jury could find that Reierson or Shelby could not have reasonably believed, based on objective evidence, that there was a sufficient basis for requiring Nawara to undergo a fitness-for-duty exam. *Coffman*, 578 F.3d at 565. The jury heard hours of testimony and the parties devoted many pages of briefs concerning what actually happened in the Cermak basement on September 28. What Reierson and Shelby had before them when they made their fitness-for-duty decision, however, was Jones-Hayes's November 16 account of the events of September 28 and Reierson and Shelby's first-hand experience from Nawara's visit to HR on November 18, 2016.

In assessing whether these instances provided sufficient evidence to support Reierson and Shelby's FFD decision, *Wright* is again instructive. 798 F.3d at 517–518. There, the Seventh Circuit held that a reasonable jury could find that the fitness-for-duty examination in that case was not consistent with business necessity despite the plaintiff's displaying an inability to get along with or follow orders from supervisors and exhibiting "unheard of" conduct that "put[ ] into question [her] personal safety and that of others in the workplace." *Id.* The Seventh Circuit did so because, in contravention of its usual policy, DCFS continued to allow the plaintiff to work with children, suggesting "that the Department did not believe that [plaintiff] posed a safety risk to the children with whom she worked." *Id.* at 526. In short, even without identifying an ulterior motive for sending the plaintiff for a fitness-for-duty examination, the Seventh Circuit affirmed the ruling that a reasonable jury could find the exam in question was not consistent with business necessity because the evidence contradicted DCFS's stated reasons for ordering the exam.

Here too, the evidence—construed in the light most favorable to the plaintiff—suggests that business necessity did not cause Nawara to undergo a fitness-for-duty exam. Burke did not believe Nawara's behavior on September 28 suggested he was dangerous to himself or others, or that Nawara could not safely carry a weapon. When they did complete the referral form, Reierson and Shelby listed the reasons for the referral as both his "aggressive, physically intimidating and inappropriate behavior" directed toward Jones-Hayes on September 28, and the

"aggressive and hostile" behavior he displayed in HR on November 18.[3] (CorVel Referral Final at 2.) But at the time she received information about the September 28 episode, Reierson herself was suspicious that the events suggested insubordination calling for discipline, rather than a fitness-for-duty referral. And for unexplained reasons, Jones-Hayes did not respond to Reierson's request for additional information for several weeks.

Moreover, there was evidence from which the jury could conclude that Reierson and Shelby's assessments of Nawara's conduct were overstatements. Though they testified that Nawara looked like "a bulldog just ready to attack," (*id.* at 1386:23–1387:5), and appeared to be "just trying to keep himself in the chair," (*id.* at 272:10–15), neither Shelby nor Reierson alerted the deputy guarding Shelby's door. (*Id.* at 1804:23–1805:11.) Nor did they elect to leave the door open when Nawara returned with the union representative. (*Id.* at 1805:14–20.) Notably, too, in the first draft of the FFD referral form that Shelby submitted to Reierson for review, Shelby failed entirely to mention Nawara's behavior at HR as contributing to the decision to send him for a fitness-for-duty exam. (CorVel Referral Draft at 1.)

Nawara's own account of the November 18 meeting differed. Nawara denied clenching his fist, tightening his jaw, becoming "enraged," storming out of the room, or acting as if he were restraining himself from doing something. (Trial Tr. at 1020:8–1021:2.) True, Nawara acknowledged that the "mood in the room was tense," that he was "very uncomfortable," and that the meeting "seemed to go badly from the start." (*Id.* at 1021:5–10, 1076:14–18.) According to Nawara, however, this tension arose from the fact that Shelby and Reierson would not tell him why, 51 days after the Jones-Hayes incident, he had been abruptly and without notice called to HR, at 8:00 in the morning, to be asked, without context, whether he felt he was "intimidating" or if he felt he didn't "get along with [his] coworkers." (*Id.* at 1012:10–1014:10, 1016:15–1019:19.) In fact, Nawara testified that he left only after *Shelby* got "a little frustrated" and asked him to

---

[3]     Although the form is signed only by Shelby (CorVel Referral Final at 2), the record makes clear that Reierson and Shelby prepared this form in concert, and Reierson actually provided the final edits on this document. (*Id.* at 1; Trial Tr. at 1571:16–1573:6.)

leave.  (*Id.* at 1019:14–24.)  From Nawara's version of the events at HR, the jury could have reasonably concluded that neither Shelby nor Reierson were truthful when they reported that Nawara's "aggressive and hostile" behavior in HR played a large role in their decision to refer Nawara for an FFD exam.  (CorVel Referral Final at 2.)  Yet it was this meeting that Defendants cite as most relevant to their decision; Nurse Shelby characterized Nawara's purportedly rageful behavior and lack of self-control in HR as "95 percent" of the reason she decided Nawara needed an FFD.  (*Id.* at 1388:22–1389:6, 1398:9–15.)  And while Reierson testified that her decision to refer Nawara for an FFD was a "combination of all of the events" (*id.* at 1774:2–17), she repeatedly emphasized the importance of Nawara's behavior in HR as contributing to this decision.  (*Id.* at 405:13–21, 1774:2–17.)

To the extent that information Reierson obtained in the phone call with Jones-Hayes played a role in the fitness-for-duty referral, the jury might reasonably have concluded that this information also was insufficient to establish a business necessity for an FFD.  Certainly, the contents of the call—as Reierson described them—could have raised concerns about Nawara's behavior in the workplace.  According to Reierson's contemporaneous notes of that call, Jones-Hayes told Reierson and Shelby that, in the Cermak basement on September 28, Nawara repeatedly yelled and swore at her, and an inmate refused to allow Nawara to cuff him because Nawara "was crazy."  (Reierson Notes at 2.)  And ordinarily, even a single such incident can serve as the basis for an FFD without violating the ADA.  *See Kurtzhals*, 969 F.3d at 727, 731 (approving of a fitness-for-duty exam based only on a single event in which the plaintiff told another employee "if you call me a liar again, we are going to take it outside").  Here, however, Reierson and Shelby collected no evidence verifying Jones-Hayes's version of these events; they did not interview witnesses, look for security footage of the events, or even review Nawara's personnel file for past performance issues.  (*Id.* at 256:24–258:6, 1347:2–9, 1798:8–1799:12.)  Again, Reierson herself was initially skeptical that the events of September 28 warranted any response other than discipline.  The jury here could reasonably have concluded that a single report of misconduct from

the individual targeted by the alleged behavior is insufficient to support an FFD referral.[4]  *See*

*Wright*, 798 F.3d at 523 (explaining that the employer's burden is "quite high" and requires them

to provide "significant evidence that could cause a reasonable person to inquire as to whether an

employee is still capable of performing his job" (internal quotations omitted)).

CCSO cites two Seventh Circuit cases decided on summary judgment, *Coffman*, 578 F.3d

at 565–66, and *Kurtzhals*, 969 F.3d at 728–31, to support Reierson and Shelby's decision.  But

neither of these cases satisfies the court that the jury's verdict in this case must be set aside.  In

*Coffman*, the Seventh Circuit held that the Indianapolis Fire Department did not violate

§ 12112(d)(4)(A) when the fire chief recommended that the plaintiff firefighter undergo a fitness-

for-duty evaluation based on "defensive" and "withdrawn" behavior that raised concerns that she

might be experiencing depression.  578 F.3d at 561–62, 565–66.  That recommendation came

after multiple reports from several officers and supervisors all separately confirming that the

plaintiff appeared "defensive," "alone," and "withdrawn."  *Id.* at 562.  Based on these reports, along

with the deference afforded to the Fire Department as a public safety employer, the Seventh

Circuit held that the FFD exam was justified.  *Id.* at 565–66.  The court's holding in *Kurtzhals* relied

on similar factors.  969 F.3d at 730–31.  There, the Seventh Circuit upheld the propriety of an

FFD exam from the Sheriff's Department—another public safety employer, deserving

deference—ordered after plaintiff police officer threatened another officer by telling the officer, "[I]f

you call me a liar again, we are going to take it outside."  *Id.* at 727.  Several witnesses had

corroborated plaintiff's words, and the Sheriff did not order an FFD exam until after hiring an

outside employment-law attorney, who concluded that plaintiff had, indeed, violated the

---

[4]      Nawara overstates his case by asserting that an FFD referral is appropriate only if it is based on evidence "supplied by disinterested third parties."  (Suppl. Resp. [356] at 4.)  Nawara did not make this argument in his initial response; he raised it for the first time in his response to CCSO's supplemental briefing addressing the Seventh Circuit's decision in *Kurtzhals*.  In any event, the only authority he cites for his definition of objective evidence is the concurring opinion of a case about construing ambiguous terms in contracts.  (Suppl. Resp. at 4 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Cartage Co.*, 69 F.3d 1312, 1317 (7th Cir. 1995) (Flaum, J., concurring)).)  Nawara also makes no effort to explain how this argument applies to the facts here.

department's Workplace Violence Policy.[5]  *Id.* at 727.  The court is unwilling to disturb the jury's verdict on the basis of these summary judgment rulings.[6]

Finally, Reierson testified that, in the immediate aftermath of the November 18th HR meeting, she and Shelby decided that Nawara needed to be sent for an FFD—not based on his rage and hostility—but based on "his demeanor, how he wasn't responsive.  And then when he responded, he didn't tell the truth."  (Trial Tr. at 402:23–403:12.)  But the jury was entitled to believe Nawara's testimony about what happened at that meeting.  The jury could also reasonably have concluded that concern about non-responsiveness could not alone justify the FFD referral. Notably, Reierson's testimony is arguably inconsistent with Shelby's assertion that she and Reierson both believed the FFD was warranted, not by Nawara's non-responsiveness, but instead by his "behavior, his lack of self-control, the rage."  (*Id.* at 1388:25–1389:9.)  The FFD referral form also makes no comment on Nawara's non-responsiveness in HR, but rather says only that he "presented as aggressive and hostile in the human resources department."  (CorVel Referral Final at 2.)  In any event, mere dishonesty or non-responsiveness may justify discipline; it is not clear that these behaviors would justify a psychiatric exam.  *See Wright*, 798 F.3d at 524 ("[W]e have acknowledged that inquiries into an employee's psychiatric health may be permissible when

---

[5]      Even so, the attorney recommended against ordering a fitness-for-duty exam based only on a single event.  *Kurtzhals*, 969 F.3d at 727.  The sheriff chose to ignore this recommendation and ordered an FFD anyway.  *Id.*  The Seventh Circuit upheld the decision, recognizing that there was "no one right answer in this situation," and that the attorney's recommendations were "just that—advice that the Sheriff was not obliged to accept."  *Id.* at 731.

[6]      Other caselaw cited by CCSO also does not compel a different conclusion.  *See Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311–12 (11th Cir. 2013) (approving an FFD evaluation based on both a report from a supervisor that plaintiff had made a threat against other employees and reports from an independent psychologist who met with plaintiff and continued assessing him over phone and email before recommending he undergo an FFD); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808–09, 811–13 (6th Cir. 1999) (approving an FFD evaluation based on a series of improper behaviors toward students, schoolboard members, and other faculty, as well as an informal review from a psychologist who determined plaintiff "might be dangerous and mentally unstable"); *Koszuta v. Off. Depot, Inc.*, No. 16 C 2679, 2018 WL 1769368, at *12 (N.D. Ill. Apr. 12, 2018) (approving FFD after "[s]everal of Plaintiff's co-workers reported witnessing him engage in unusual or aggressive behavior in recent months"); *Watson v. City of Mia. Beach*, 177 F.3d 932, 934–35 (11th Cir. 1999) (approving FFD for a police officer based on both a report of unreasonable behavior from a coworker and an investigation that had revealed numerous incidents in prior years).

they reflect concern for the safety of employees and the public at large." (internal quotations omitted)); *see also Owusu-Ansah*, 715 F.3d at 1312 ("[A]n employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others.").

## C.    The medical release forms

CCSO also argues that no reasonable jury could have found that the CorVel and CCSO medical release forms constituted medical inquiries in violation of § 12112(d)(4).  Even where a medical inquiry is justified under § 12112(d)(4), "the scope of the . . . inquiry 'must remain appropriately narrow.'"  *Jackson v. Regal Beloit Am., Inc.*, No. 16-134-DLB-CJS, 2018 WL 3078760, at *24–25 (E.D. Ky. June 21, 2018) (quoting *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009)).  For that reason, "an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782–83 (N.D. Ohio 2002); *cf. also* EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 13 (July 27, 2000) ("[I]n most situations, an employer cannot request an employee's complete medical records because they are likely to contain information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat.")  In this case, CCSO presented Nawara with a form that required release of "All healthcare information."  (FFD Forms at 3.)  Since CCSO has identified no job-related function or business necessity that would require Nawara's *entire* medical history, CCSO violated the ADA by requiring Nawara to sign this form as a part of his FFD exam.

Nawara (and, later, his attorney) objected to signing the forms.  To establish a violation of § 12112(d)(4), however, a non-disabled plaintiff must show "some tangible injury-in-fact caused by the § 12112(d) violation."[7]  *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002).

---

[7]    To the extent that Nawara argues that the modified CorVel form, that he ultimately signed, violated the ADA, this argument is unsuccessful for this same reason. Nawara has identified no such injury-in-fact arising from the modified form that he eventually signed.  Nor does any version of the CorVel form appear to require a release of all of Nawara's medical records.

The court is uncertain that Nawara established any injury-in-fact resulting from CCSO's demand that he sign the forms. Nawara testified that Shelby told him that both forms were required (Trial Tr. at 1029:5–16), and Reierson's letters to Nawara appeared to confirm this. (Nov. 30 Reierson Letter; Feb. 28 Reierson Letter; Mar. 13 Reierson Email.) There was also testimony, however, that the FFD evaluation could proceed once the employee signed only the CorVel form. Indeed, Nawara ultimately participated in his FFD exam and returned to work without ever signing the CCSO form. (Trial Tr. at 1129:10–1130:6, 1402:1–15.) This would be consistent with testimony from Shelby that employees in the past had refused to sign the CCSO form and still completed their FFD. (*Id.* at 1367:24–1369:1.) As described above, once Nawara gave in and participated in an FFD, he was almost immediately cleared to return to work. Perhaps these circumstances explain the jury's determination that he suffered no emotional distress damages.

The court need not address this issue in further detail. The jury here returned a general verdict against CCSO (*id.* at 2068:14–2070:9), so the court "need only find support in the record for one of the theories presented to the jury." *Kossman*, 211 F.3d at 1037. Given the court's ruling above that a reasonable jury could have found for Nawara on the issue of whether the FFD referral violated the ADA, the court need not rule on the issue of whether the CCSO form—or the CorVel form for that matter—did as well. CCSO's Rule 50 motion for judgment as a matter of law is denied.[8]

---

[8] CCSO also argued that the court should grant its motion because Nawara's counsel violated this court's *in limine* ruling that prohibited reference to the fact that CorVel eventually changed its policy and eliminated the CCSO form. Nawara's counsel did ask a question about the change in policy, but the witness testified she did not have knowledge of such a change. (Trial Tr. at 1532:22–1533:9.) When Plaintiff's counsel attempted to mention it in closing, he drew an objection (*id.* at 2055:1–10), and the court directed him to return to a discussion of the evidence. The court also instructed the jury that neither questions from attorneys nor statements made in closing argument can be considered evidence (*id.* at 1968:1–11), and the jury is presumed to have abided by these instructions barring "an overwhelming probability that the jury was unable to disregard inadmissible evidence and also a strong likelihood of a devastating effect from the evidence." *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 635 (7th Cir. 2018) (internal quotations omitted).

D.      **Backpay**

Despite the jury's finding of liability, CCSO argues that Nawara is not entitled to any backpay award based upon Seventh Circuit caselaw and language in the ADA.

To begin, CCSO points to *Hertzberg v. SRAM Corp.*, where the Seventh Circuit examined the history of available remedies under Title VII and determined that "A victim of discrimination . . . must show either an actual or constructive discharge in order to receive [backpay]." 261 F.3d 651, 659 (7th Cir. 2001). CCSO's argument, however, ignores the Seventh Circuit's subsequent ruling in *E.E.O.C. v. Costco Wholesale Corp.*, where the court clarified that *Hertzberg* does not apply to plaintiffs like Nawara, seeking backpay as a remedy for unpaid leave. 903 F.3d 618, 628–29 (7th Cir. 2018). The *Costco* court explained that "*Hertzberg* only addresses what a plaintiff who '*leaves his or her employment*' must show," while a plaintiff who is forced to take unpaid leave "[can] seek backpay for the wages she lost while on an unpaid leave." *Id.* (emphasis in original). Though CCSO also cites to a number of district court cases in support of its argument, each of those cases relies on *Hertzberg* and was decided before the Seventh Circuit clarified *Hertzberg*'s reach in *Costco*. *See Masud v. Rohr-Grove Motors, Inc.*, No. 13 C 6419, 2016 WL 2593356, at *1–2 (N.D. Ill. May 5, 2016) (finding based on *Hertzberg*, in a "virtually identical" case, that a plaintiff who left her job due to sexual harassment could not receive backpay because she could not show either constructive or actual discharge); *Bell v. City of Chicago*, No. 03 C 2117, 2006 WL 1343177, at *1, 8 (N.D. Ill. May 11, 2006) (same); *Grant v. Coken Co.*, No. 01 C 6400, 2005 WL 300388, at *4 (N.D. Ill. Feb. 1, 2005) (finding based on *Hertzberg* that a plaintiff claiming sexual harassment could not receive backpay because she had failed to establish that her discharge was discriminatory.)

Next, CCSO argues that an award of backpay is precluded by language in the ADA. In ADA cases, while the jury determines liability, it is up to the judge to determine how much backpay a successful plaintiff is entitled to receive. *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 500 (7th Cir. 2000) ("Back pay and front pay are equitable remedies . . . and therefore matters for the judge . . . ."). As a general matter, the ADA allows courts to award backpay to a

plaintiff when the defendant has "intentionally engaged in . . . an unlawful employment practice." 42 U.S.C. § 2000e-5(g)(1); *see also id.* § 12117(a). Subsection 2000e-5(g)(2)(A), however, outlines an exception to that rule as follows:

> No order of the court shall require . . . the payment . . . of any back pay, if [a plaintiff] was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin . . . .

CCSO argues that the court cannot award backpay here because even if a medical inquiry violates the ADA, it may not amount to disability *discrimination* and, thus, is a "reason other than discrimination" under § 2000e-5(g)(2)(A). In support of this argument, CCSO cites a number of cases, most of which have little application here. First, CCSO cites *Diaz v. Kraft Foods Glob., Inc.*, No. 08 C 6814, 2013 U.S. Dist. LEXIS 22296 (N.D. Ill. Feb. 19, 2013), and *Henderson v. Borough of Baldwin*, Case No. 15-1011, 2017 WL 6371361 (W.D. Pa. Dec. 13, 2017), as examples of cases where courts refused to award backpay for lack of discrimination. But both of these causes turned on the plaintiffs' inability to show that their damages were causally related to the complained-of conduct. *Diaz*, 2013 U.S. Dist. LEXIS 22296, at *4 (finding that plaintiffs could not recover backpay because they could not prove that race discrimination was the but-for cause of the employer's refusal to hire the plaintiff); *Henderson*, 2017 WL 6371361, at *3 ("[T]here is no factual basis from which the Court can reasonably infer that Defendant's decision to promote [other employees] was causally related to the medical examinations that Plaintiff took and passed."). Here, the evidence supports a finding that requiring Nawara to submit to an FFD before returning to work was the but-for cause of Nawara's unpaid leave. Second, CCSO cites *Hrobowski v. Henderson*, where this court found "no basis in the Rehabilitation Act for a conclusion that an employer must continue to pay an employee during the time that she is on administrative leave pending a physical or mental status examination." No. 97 C 5608, 2000 WL 682673, at *5 (N.D. Ill. May 24, 2000). There, however, the plaintiff did not challenge the propriety of the fitness-for-duty exam in question; in fact, the court explicitly noted, "There is no suggestion of any bad faith in the [defendant]'s request that Plaintiff undergo a fitness-for-duty examination."

*Id.*  Thus, the cited language in *Hrobowski* does not speak to whether backpay is among the remedies available when a defendant violates the ADA by forcing a plaintiff to go on unpaid leave due to his refusal to undergo a fitness-for-duty evaluation that is not justified by business necessity.

Next, CCSO again cites *Green*.  278 F. Supp. 2d at 544.  The relevant portion of 42 U.S.C. § 2000e-5(g)(2)(A) prohibits awarding backpay to plaintiffs who were "refused employment or advancement or [were] suspended or discharged for any reason other than discrimination . . . . " The plaintiff in *Green* was "refused employment" based on the defendant's § 12112(d) violation, so the Western District explained, "In accordance with 42 U.S.C. § 2000e-5(g)(2)(A) . . . [s]ince Ms. Green is not claiming to have been discriminated against on account of a disability, the issuance of back pay is inappropriate under the law."[9]  *Id.*

In reaching that conclusion, the *Green* court assumed that a violation of § 12112(d) does not constitute discrimination under the ADA.  The court is not sure this question is so easily answered.  The ADA states, in § 12112(a) that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability."   At the start of § 12112(d)—the subsection discussing medical examinations and inquiries—the ADA states that "[t]he prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries." For that reason, other courts have held that violations of § 12112(d)(4) constitute discrimination under the ADA.  *See Taylor v. City of Shreveport*, 798 F.3d 276, 282 (5th Cir. 2015) (citing 42

---

[9]        The *Green* court applied 42 U.S.C. § 2000e-5(g)(2)(A) to an ADA case despite the language of the statute referring only to "race, color, religion, sex, or national origin."  The court agrees with this decision.  Although caselaw is sparse on this question, the enforcement provision of the ADA, *id.* § 12117(a), incorporates § 2000e-5 in its entirety.  Moreover, § 2000e-5(g)(2)(B), immediately following § 2000e-5(g)(2)(A), applies to violations of § 2000e-2(m) which similarly refers to "impermissible consideration of race, color, religion, sex or national origin" without mentioning disability.  But courts regularly apply § 2000e-5(g)(2)(B) to disability discrimination cases.  *Skomsky v. Speedway SuperAmerica, L.L.C.*, 267 F. Supp. 2d 995, 1000 (D. Minn. 2003) ("Federal anti-discrimination laws such as the ADA are patterned after Title VII, and as such should be evaluated similarly.   The interests of uniformity require the Court to extend the . . . paradigm articulated in 42 U.S.C. § 2000–2(m) and § 2000–5(g)(2)(B) to [the] ADA . . . . "); *LeClair v. Wells Fargo Bank Iowa*, 291 F. Supp. 2d 873, 880 (S.D. Iowa 2003) (same).  Thus, the court finds that § 2000e-5(g)(2)(A) applies to discrimination under the ADA.

U.S.C. § 12112(d)(1)) ("Thus, a prohibited medical examination or inquiry [under Section 12112(d)(4)(A)] may constitute a form of employment discrimination under the ADA."); *see also Transp. Workers Union of Am., Loc. 100, AFL-CIO v. NYC Transit Auth.*, 342 F. Supp. 2d 160, 162–63 (S.D.N.Y. 2004) ("Although the sick leave policy does not 'discriminate' in the ordinary sense of treating some people less favorably than others, Title I of the ADA defines discrimination as including 'medical examinations and inquiries.'").

The parties in this case have not discussed this caselaw, however. Without the benefit of further briefing on the issue, the court is unwilling to reach a conclusion on whether improper medical inquiries or examinations in violation of § 12112(d)(4) constitute discrimination under the ADA for purposes of a backpay award. As neither party has addressed this issue directly, the court requests further briefing, to be submitted within 21 days.

Finally, if—based on the parties' supplemental briefing—the court does decide Nawara is entitled to backpay, the court will also require additional information from which to determine the amount of backpay owed. At trial, Plaintiff refreshed his recollection by looking at an old pay stub, testified that his salary in 2016 was $75,394.49, and agreed with counsel that the money he lost could be calculated by dividing by 365 days and multiplying by the 311 days that he had been off from work. (Trial Tr. at 1047:3–1048:9.) The only other evidence that Plaintiff provided consisted of two "Schedule G" documents: one original and one revised. (Original Schedule G; Revised Schedule G.) The original Schedule G listed Plaintiff's calculated "Lost earnings" as $50,580.25, providing no explanation of how that number was reached. (Original Schedule G.) The revised Schedule G listed Plaintiff's calculated "Lost earnings" as $64,653.36 and explained:

> The lost wages calculation represents Plaintiff's pretax lost income from November 18, 2016 to September 27, 2017 ($206.56 per day). This figure is based on Plaintiff's 2016 gross wages of $75,394.49 divided by 365 multiplied by 313 days.[10] Plaintiff's gross wages for 2016 is from "Historical Payroll Register" (CCSO 184).

---

[10]     Plaintiff's counsel admitted in the briefing on this matter that the quotient should have been multiplied by 311 days, rather than 313 days, and the calculated lost wages should thus have been $64,240.23. (Backpay Reply [351] at 14.)

(Revised Schedule G.)  Neither document provided any calculation of any other lost benefits such as pension contributions, health insurance, or seniority.  (Original Schedule G; Revised Schedule G.)  Nawara's counsel did attach a document entitled "Historical Payroll Register" which appears to break down Nawara's 2016 salary into categories such as "Holiday," "Training," "Vacation," "Overtime," "Regular," and dental, vision, health, and life insurance premiums. (Historical Payroll Register, Ex. 1 to Pl.'s Mot. for Relief [305-1] (hereinafter "Payroll Register").) Still, Nawara's counsel provides no explanation of any portion of this document nor any indication of why the court should base its backpay analysis on simple "Gross Pay" rather than accounting for the effects of the various categories of pay listed on the register.

As it stands, the court cannot meaningfully calculate lost pay based on the sparse information provided by the current record and will direct submission of additional evidence on this issue.  *See, e.g.*, *Ortega v. Chi. Bd. of Educ.*, 280 F. Supp. 3d 1072, 1077 (N.D. Ill. 2017) (noting that after the jury found intentional discrimination, the parties appeared before the court to "allow the introduction of additional evidence on the equitable relief question").  The court thus asks the parties to stipulate to the amount of lost wages for the time period in question, accounting for values such as payroll deductions, vacation days used during that time period, and any other relevant lost benefits such as health insurance, pension contributions, and loss of seniority.  The court asks the parties to submit these stipulations within 21 days of the publishing of this ruling.

## CONCLUSION

Defendant CCSO's renewed motion for judgment as a matter of law [312, 314] is denied. Plaintiff Nawara's motion for an award of backpay [305] is stricken without prejudice pending supplemental briefing and submission of a stipulation or additional information within 21 days on the appropriate backpay award.

ENTER:

Dated:  March 29, 2021

_____
REBECCA R. PALLMEYER
United States District Judge

29