| | |
|---|---|
| **From:** | "Sarocka, Michelle" <Michelle_Sarocka@Corvel.com> |
| **To:** | "Winifred Shelby (Sheriff)" <Winifred.Shelby@cookcountyil.gov>, "Rebecca Reierson (Sheriff)" <Rebecca.Reierson@cookcountyil.gov> |
| **CC:** | "Galvez, Kristy" <Kristy_Galvez@Corvel.com>, "Scudieri, Sheryl" <Sheryl_Scudieri@Corvel.com> |
| **Subject:** | FFD Report |
| **Date:** | 2017-09-25 12:45:25 -0400 |
| **Attachments:** | NawaraFFDreport.doc |

The FFD Report for John Nawara is attached. Please let me know if you have any questions.

Thank you,
Michelle

Michelle Sarocka, RN, CCM | Case Manager Lead
CorVel Corporation | Downers Grove
T 800 524 7560 | VoIP 47433 | T 630 874 7433 | F 866 450 5138
michelle_sarocka@corvel.com | www.corvel.com

**Confidentiality Notice: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and delete the original message and destroy all copies.

EXHIBIT
DX 53
exhibitsticker.com

Isaac Ray Forensic Group
*65 E. Wacker Place, Suite 2240*
*Chicago, Illinois 60601*
*tel: 312.621.9002 fax: 312.621.9003*

---

Michelle Sarocka, RN
Disability Nurse Case Manager
CorVel Corporation
3010 Highland Parkway, Suite 600
Downers Grove, IL 60515

**FITNESS FOR DUTY EXAMINATION**
***CONFIDENTIAL***

| | | | |
|---|---|---|---|
| **NAME:** | John Anthony Nawara | **EDUCATION:** | 12 years |
| **DATE OF BIRTH (AGE):** | [redacted]/75 (42) | **OCCUPATION:** | Correctional Officer |
| **DATE(S) OF EXAM:** | 9/11/17, 9/12/17 | **HANDEDNESS:** | Ambidextrous |
| **DATE OF REPORT:** | 9/16/17 | **REFERRAL:** | CorVel Corporation |

Dear Ms. Sarocka:

At your request, on 9/11/17 and 9/12/17 I conducted a psychological and neurocognitive examination of Officer John Nawara, a 42-year-old single male of Caucasian and Puerto Rican descent, for the purpose of assessing his fitness to return to duty as a Correctional Officer for the Cook County Sheriff's Office (year of hire 1998). The request for examination follows an interpersonal interaction between Officer Nawara and Superintendent Jones-Hayes that took place on 9/29/16 in the basement of Cermak, the location of Officer Nawara's assignment that day. According to Officer Nawara (during the interview here), and a fitness for duty examination that Officer Nawara sought on his own on 3/08/17, the specific content of this verbal interaction, and the specific nature of a physical exchange between Office Nawara and Supt. Jones-Hayes, are apparently the subject of dispute.

In addition to the 3/08/17 independent fitness for duty exam conducted by Robin Krull, Psy.D., I was provided the following for review:

a) a summary of an 11/16/16 telephone conversation between Human Resources personnel (Director Rebecca Reierson and Nurse Winifred Shelby) and Superintendent Jones-Hayes, detailing Supt. Jones-Hayes' version of events of the 9/29/16 incident, to which she offered a signature of approval;

b) an 11/30/16 letter from Human Resources to Officer Nawara reminding him to complete and return forms required to proceed with the fitness for duty examination (provided to him on 11/18/16), and informing him that if forms were not received by 12/05/16, all time off since 11/18/16 would be deemed unauthorized;

c) an 8/25/17 Cook County Referral Form from Human Resources describing the reason(s) for referral as:

> "Employee's aggressive, physically intimidating and inappropriate behavior directed toward his superior officer in response to a routine directive. In addition, weeks later, employee presented as aggressive and hostile in the human resources department…Employer has concerns about anger management, including his ability to manage a detainee population without losing his temper";

d) Primary care records (Charles Shaw, M.D., Family Care Associates of Chicago, 11/02/15-2/20/17);

e) Individual psychotherapy notes (Karolina Hogueisson, MA, LCPC, RDDP, 2/11/17-4/11/17); and

f) Officer Nawara's job description as a Correctional Officer for the Cook County Department of Corrections.

According to the 11/16/16 summary of the telephone conversation between Human Resources and Superintendent Jones-Hayes, upon entering the basement of Cermak on 9/29/16, several protocol/policy infractions were observed by Supt. Jones-Hayes and her accompanying Sergeant Conley, including unmanacled and unshackled detainees, front-manacled rather than back-manacled detainees, an unlocked security door, and an officer from Division 11 writing a report on a computer who was unauthorized to be in the basement control location for such a purpose. The summary goes on to document that in response to Supt. Jones-Hayes inquiring about the reason detainees were not cuffed and shackled, the following ensued:

> "Officer Nawara did not turn around or respond. Hayes then touched Nawara on the shoulder and asked if he heard her and he got in her face and yelled at the top of his lungs, 'Don't touch me! Don't fucking touch me, lady!' over and over again".

The summary goes on to describe the following observations/perceptions of Supt. Jones-Hayes as the remainder of the interaction with Officer Nawara unfolded:

> "Officer Nawara displayed extreme rage towards her (his body trembled as he screamed at her with his fist clenched). Supt. Hayes left the area and stood in staging to regain her composure, because he startled her. After answering the detainees' questions in the staging area, [she] went to the ER, after telling Officer Nawara to cuff and shackle the detainees that were not already.
>
> Moments later, Officer Nawara entered the ER screaming in the Supt.'s face, 'You see, you see, this fucking inmate jumped in my face because you want him shackled'…She saw a detainee in the back of staging away from everyone and asked him to come forward. After some prodding he reluctantly came forward and said that he didn't want to be cuffed by Nawara because he was crazy. She and the Sergeant watched the Officer as he shackled the detainee. Supt. quickly began to exit the area and Officer Nawara began stating, 'What are you going to do, follow me around all day and help me do my fucking job?' He continued to antagonize the superintendent by walking out of the area as she did.
>
> Supt. Hayes realized that something was going on with this officer and stated maybe it was something about her presence [that] set Nawara off. Until administration decided what was the required action to take, Supt. Hayes decided to stay away from him after the incident.
>
> Officer Nawara is now assigned to Ex-Ops so Jones [Jones-Hayes] does not currently have any contact with him".

According to Officer Nawara (during the interview here), he was neither verbally counseled nor more formally disciplined for this incident, which he stated occurred on 9/28/16, not 9/29/16. The day after the incident, which he stated was 9/29/16, he learned via email that he was being transferred to External Operations, without apparent explanation. However, he explained that this did not in fact occur on that day; Officer Nawara explained that he was assigned to 3 North for an hour that day (which he characterized as "a light assignment"), then to 2 North (which he characterized as "a tough assignment"), and was then returned to the staging area in Cermak, the same assignment to which he was designated the day before when the incident took place. All shifts thereafter were assignments to External Operations, which he stated he worked without incident until 11/18/16 when he was asked to report to Human Resources and told he was being removed from duty pending a fitness for duty examination.

Officer Nawara apparently refused to comply with the fitness process as presented by Human Resources that day, missing deadlines to have his medical records delivered to Human Resources throughout the Spring of 2017 (while I was not provided a second letter, according to Dr. Krull's fitness for duty examination, Officer Nawara reported that he received a reminder letter from Human Resources on

2/28/17 to complete the necessary forms to facilitate the fitness process provided to him on 11/18/16, similar to the 11/30/16 reminder letter described above). Officer Nawara has not been cleared to return to work since 11/18/16, and is no longer being paid; benefits were suspended according to him in the early Spring, etc. (I do not have details on when salary and benefits were suspended). Officer Nawara offered an independent fitness for duty determination to Human Resources that was conducted by Robin Krull, Psy.D. on 3/08/17, which found him fit without restrictions to return to work based on a clinical interview, psychological testing and a brief cognitive screening exam, but this was apparently not accepted, and Officer Nawara was told he would need to comply with Cook County's process in order to be released to return to work. Officer Nawara filed a lawsuit against the County in the interim, the details of which were not discussed during the examination here. Ultimately, Officer Nawara did reportedly provide his medical records directly to Corvel (he says this was in July, Corvel says it was in August), agreeing ultimately to attend the fitness examination here.

During the interview here, Officer Nawara described a very different set of events on the day of the incident with Supt. Jones-Hayes, and offered his thoughts as to the reason the respective descriptions depart so significantly. He explained that on the day of the incident, Supt. Jones-Hayes and Sgt. Conley were called to the basement of Cermak because a fight had broken out between detainees, which he and other officers successfully contained. For context, he first described the basement setting, details he felt were relevant to understanding the interaction between him and Supt. Jones-Hayes that followed. He began by noting that there had never been a written policy about manacling and shackling detainees in this area, "it was just verbal". He added that in his opinion, even if officers wished to comply with such a policy, it would not be possible as there are insufficient numbers of cuff/shackles to do so. "It's dangerous" he added, explaining a number of factors that (in his opinion) contributed to an unsafe environment in that location. First, when a detainee is unshackled or unmanacled, every detainee who is manacled and shackled is vulnerable to being attacked and unable to defend themselves. Officer Nawara indicated that in fact he believes there are times when detainees intentionally plan such an attack in front of the cameras in order to bring lawsuits against the County. Second, he felt there weren't enough officers to properly monitor detainees who are manacled from behind. Third, he pointed out that the detainees in this area often wait for significant periods to be seen by medical, on backless wooden benches that are uncomfortable for them, and are likely to become agitated in the environment for this reason, in addition to not feeling well and having to be manacled/shackled at the same time. Finally, he pointed out that on that particular day, they were at maximum detainee capacity for that area. The examiner clarified with Officer Nawara that this description of the environment, or that certain policies may not be in writing, was not intended to convey he was refusing to follow protocols on that day, but rather to describe the safety challenges with which he perceived he and other officers are faced in that particular location (he agreed with this recapitulation). In contrast, while describing the reason the security door remained unlocked (essentially to offer an alternative route to females so that they aren't subjected to 'oogling' by male detainees), Officer Nawara offered no safety-related explanation, and downplayed potential safety issues associated with this infraction.

Officer Nawara went on to explain that when Supt. Jones-Hayes arrived, he was under the impression she may have been annoyed with him that there had been a fight, "because she knows me—I'm ex S.O.R.T.[1]—and she expects me to keep things from getting out of hand". "Not that she said anything like that," he added, I could just see she was annoyed—there was this one inmate against the wall who wasn't cuffed and was kind of agitated, and she said, 'Why is that inmate not cuffed?' and she's putting her finger in my chest…I'm backing up, and I say, 'I don't know, you'll probably have to ask the officer who came in with him'." He added that this particular detainee had just recently been brought to the

[1] Special Operations Response Team; this tactical team was charged with first response to defuse detainee aggression, cell fires and other potential safety threats. Officer Nawara served on this team from 2002-2007 when the team was disbanded.

area. Officer Nawara went on, "She turns to [Sgt.] Conley and says, 'Who's the officer on the roster?' which of course is me, meaning, 'I know you're in charge,' etc., 'you should be handling this'…At that point I told her, 'You need to get your hands off me'. She immediately apologized, and that was in front of Officer Barb Gannon and Sgt. Conley—they both heard it. She said, 'I didn't mean to make you uncomfortable'. I never threatened her, I would never threaten a woman…But I knew she was annoyed. She makes some comment like, 'When I was here, we used to run this MF' or whatever…

…She leaves with Conley into the admission area, and then she got a phone call so she walked out. At that point, another officer—Daniel Cod—came in and he had a pair of shackles. I walked over to Sgt. Conley, and yes, I'm sure I *was* being a little sarcastic here. I said, 'Hey, Serg! I got a shackle! [for the unshackled detainee]'. Conley says he'll come with me to shackle the guy, but Supt. Jones-Hayes had finished her call and says, 'No, I'll go with you'…Cod assessed the room and then left…She walked up to the inmate—a little too close, I think—and I hear her say, 'Baby, baby, I need you to shackle up for this officer'. He did, and he did calm down. As we walked away, I said, 'Maybe if you follow me around all day I could do my job'. She got pissed. Not that she said anything, but I know she was upset because she slammed the door on her way out, *loud*, and other people who saw her leave said to me, 'What did you say to her?' I *did* say that, but I didn't swear at her."

Of the 11/18/16 meeting in Human Resources, Officer Nawara explained that it seemed to go badly from the start. He explained that while he was told that he was being mandated for a fitness for duty examination, he felt he wasn't given a direct explanation as to the reason, which he asked for several times, and that his attempt to have union representation for the discussion was met with resistance (after some discussion, during which he was assured by Nurse Shelby that "This wasn't an OPR review," he agreed his leaving the meeting in order to call union representation may have inflamed an already tense situation, but he insisted he felt too vulnerable not to have someone there as a witness given the manner in which he perceived the conversation to be going). He said his discomfort with the situation grew as he was asked by Nurse Shelby whether he considered himself to be a threat to others (I was not provided details regarding what occurred in this HR meeting, other than the general description contained in the 8/25/17 Referral Form, authored by Nurse Shelby, which notes: "employee presented as aggressive and hostile in the human resources department"). Officer Nawara ultimately refused to sign a waiver for a release of his medical records to Nurse Shelby and left the meeting. He explained that at that point he felt he was being made to pay in some way for the problematic policies in the Cermak basement area. He used the term "scapegoat," and described his perception of a history of having "taken his lumps" throughout the years in similar situations where he feels he was disciplined for systemic issues, and also because he had recently filed a complaint against Supt. Jones-Hayes. He added that because he believes Nurse Shelby and Supt. Jones-Hayes are personal friends, he was simply uncomfortable with releasing medical records to Human Resources. He did ultimately leave with an understanding that the fitness examination was being requested based on threatening behavior toward his superior officer related to the September incident with Supt. Jones-Hayes.

At the time of the examination here, Officer Nawara explained that he had been out of work for many months, and that this was certainly a stressor, but that he has been working several part-time jobs to make ends meet. Since leaving work in mid-November, he sought treatment in the form of individual counseling with Karolina Hogueisson, NA, LCPC, RDDP, a therapist who is apparently the wife of a coworker and someone who used to offer services at the jail, in order to discuss the stress associated with the work issue. Three notes were available for review (a 2/11/17 intake, and 2/17/17 and 4/11/17 progress notes). No psychiatric diagnosis is offered in any note; beyond the first session when mild symptoms without significant life dysfunction are noted (decreased energy, motivation, sleep and sense of self-worth; restlessness, feelings of hopelessness, and excessive worry about job status), subsequent

notes reflect adaptive functioning (plans to look for work as benefits were soon to be suspended) and decreased stress and symptomatology, and indicate that Officer Nawara proposed to his girlfriend in late February. It appears that Ms. Hogueisson referred Officer Nawara to Dr. Krull after a discussion about the ongoing fitness for duty process on 2/17/17.

During the interview here, Officer Nawara denied ever experiencing significant psychiatric symptoms in his life, and while he described understandable stress and frustration with the work situation at Cook County, he denied significant life dysfunction in any critical area. Of other potential interim stressors since November 2016, Officer Nawara reported that he and his fiancé split up, and have ended their nine-year relationship. He described normal reactions to this, but noted that he has begun dating a new woman since May, about which he feels very positively. He has continued to work out, and available medical records reflect stability (he claims the mildly elevated creatinine and glucose levels have normalized, and while he refuses to be worked up for possible sleep apnea, he denies daytime somnolence or driving problems). He describes his mood as stable, denies significant anxiety (other than financial stress related to working lesser-paying jobs), and denies any anger outbursts. Officer Nawara denied problematic/pervasive discipline at the County throughout the years (he explained what several write-ups were for), and does not feel that he has a temper problem, *per se*, though agrees he can be sarcastic at times when he is annoyed. He describes himself as "a boy scout" with a strong sense of right and wrong, which he admitted could make him somewhat inflexible at times ("I only know one way to do things, and I have to fight for what I feel is right" in regards to filing a complaint and lawsuit), but insists that he does not display the type of anger outbursts that Supt. Jones-Hayes described.

The examination here consisted of a comprehensive clinical diagnostic and background interview (3.0 hours),[2] psychological testing (3.5 hours),[3] and neurocognitive testing (4.0 hours).[4] Below please find conclusions and opinions in response to specific questions I have been asked to address. Relevant psychological and cognitive test findings are included in the opinion section. I hope you will find the report helpful as you proceed with this matter.

---

[2] Content areas addressed during the background interview appear in **Appendix I**.

[3] Tests administered: Minnesota Multiphasic Personality Inventory, 2nd edition (MMPI-2); Personality Assessment Inventory (PAI); Beck Depression Inventory, 2nd edition (BDI-II); Beck Anxiety Inventory (BAI).

[4] Tests administered: Rey 15-item Test (FIT); Test of Memory Malingering (TOMM); Word Memory Test (WMT); Victoria Symptom Validity Test (VSVT); Word Choice Test (WCT); Test of Premorbid Functioning (TOPF); Wechsler Adult Intelligence Scale, 4th edition (WAIS-IV); Trailmaking Test; Stroop Color-Word Test; Conners' Continuous Performance Test, second edition (CPT-II); California Verbal Learning Test, 2nd edition (CVLT-II): standard form; Controlled Oral Word Association Test (COWAT): Letters and Categories; Wisconsin Card Sorting Test (WCST); Finger Oscillation Test (FOT); Grooved Pegboard.

## Conclusions and Opinions

I have been asked to address the following questions. Responses follow.

1) **Does Mr. Nawara have a health condition that impairs his ability to perform the essential functions (which require he maintain composure and respond appropriately in a high stress environment, including exhibiting proper behavior toward detainees and his superior officers. Position requires this individual can defuse disruptive behavior verbally, and if escalated, effectively and properly use limited force on problematic and combative inmates) of his position as outlined in his job description? If yes, please describe the current status and diagnosis of the condition(s) impairing his ability to work.**

2) **Does Mr. Nawara pose a safety risk to himself or others if he returns to work full duty? If yes, please explain.**

The following is a response to questions #1 and #2, above.

Based on a review of available records, a comprehensive clinical diagnostic and background interview, psychological and cognitive testing, it is my opinion that Officer Nawara is not currently experiencing a psychiatric (including impulse control), neurocognitive, alcohol or substance use disorder. While psychological test results reflect moderate defensiveness on Officer Nawara's part, his approach to testing is not particularly different from others involved in personnel examinations of this type (typically reflecting defensiveness, but not to the point of invalidating clinical findings, e.g., in Officer Nawara's case, MMPI-2 K and L T-Scores of 64 and 55, respectively; PAI PIM T-Score of 61), and clinical scales reveal no significant elevations. Cognitive testing is entirely normal. These findings are consistent with subjective complaints and observations made by prior mental health clinicians (Ms. Hogueisson between February and April of 2017, and Dr. Krull in February, 2017), and Officer Nawara's primary care physician (Dr. Shaw, whose notes between November, 2015 and February, 2017 reflect no significant concerns/diagnoses or treatment related to mental health or cognition). And while I am not a physician, Officer Nawara is presently taking no medication that may be impacting behavior (he takes no prescription medications, and over-the-counter medications are being monitored closely by his physician, who has recommended decreasing protein supplements in order to address increased creatinine levels), and he suffers from no major medical conditions at this time that are cause for concern (medical records reflect mildly elevated blood pressure and glucose levels, but these conditions have stabilized and no medications are presently being required to maintain their stability).

While it is my opinion based on available information that Officer Nawara does not have a personality disorder, *per se*, he does possess obsessive-compulsive and narcissistic personality *traits*, which may shed light on some of his interpersonal interactions. Such traits make him more likely to perceive the world in black and white terms, as right versus wrong, to approach situations with a high justice principle viewpoint (he refers to this as "being a boy scout"), and to be somewhat grandiose, making him vulnerable to be let down by others who he feels are behaving badly in some way, or with less than full integrity, etc., and to interpret negative interpersonal interactions as personal slights and/or disrespect by others aimed at him personally. In this regard, he may become sarcastic at times, or defensive, his frustration tolerance may diminish periodically, and he may present himself as accomplishing and taking on big/important matters ("I need to follow through on this complaint and lawsuit to help others"; "I have made new policy by insisting my medical records go directly to Corvel rather than Human Resources," etc. Notably, the latter is not so, according to

Corvel; at the time the initial examination was requested on 11/18/16, providing medical records to Corvel was in fact an option).

Notwithstanding potentially problematic personality traits, I have been presented with no evidence from Officer Nawara's 18+ year history with the County that he has experienced chronic (i.e., longstanding and pervasive) anger management difficulties on the job, or any other particular difficulties, for that matter. According to him, his last suspension was in 2006, pertaining to a situation involving a disagreement over a unit lockdown, and he ultimately prevailed in arbitration. Related, he denied that other verbal and written discipline he has received over the years related to anger management difficulties, *per se*. [redacted]

[redacted]

It is my opinion that there is presently no evidence that Officer Nawara's work conduct on 9/29/16—whatever that conduct may have been—arose directly from mental illness, cognitive impairment, or any medical condition or its treatment. It is similarly my opinion that he suffers from no mental illness, cognitive impairment, or medical condition that may impair his capacity to do his job at the present time. As such, it is my opinion that Officer Nawara does not pose a safety risk to himself or others (coworkers, detainees, or the public), and that he is fully capable of safely and effectively carrying out the essential functions of his job. I currently find Officer Nawara <u>fit to return to duty, without restrictions</u>.

3) **Based on his job description, does Mr. Nawara require any accommodations that would permit him to perform the essential functions? If yes, please describe the suggested accommodations and the estimated length of time that these restrictions will be necessary.**

N/A.

4) **Will the above-described accommodations eliminate any identified safety hazard? Please explain.**

N/A.

[redacted]

[redacted]

[redacted]

[redacted]

7) **To the best of your knowledge, is Officer Nawara taking any medication that would affect his ability to safely perform his job duties?**

No.

8) **To the best of your knowledge, would the failure to take prescribed medication affect his ability to safely perform his job duties?**

N/A.

9) **If you find Officer Nawara unable to perform his job duties, when do you anticipate that he will be able to safely perform all of the essential functions of his position?**

N/A.

Thank you very much for this consultation. I hope the examination has been helpful, and please do not hesitate to contact me directly should you have any further questions, at 312.621.9004.

Sincerely,



Diana S. Goldstein, Ph.D., ABPP
Director of Public Safety
Licensed Clinical Psychologist, #071-006006
Isaac Ray Forensic Group, LLC

## APPENDIX I. SUMMARY OF CONTENT AREAS EVALUATED

***1) Medical History***

(Use of current prescription or over-the-counter medications; serious medical illnesses; serious injuries or broken bones; surgeries or hospitalizations; head injuries with or without loss of consciousness; exposure to toxic chemicals; electrical injury; neurologic conditions or symptoms including seizures, multiple sclerosis, brain tumors, aneurysms or stroke, tremors, paralysis or weakness, sensation loss or skin tingling, changes in sense of smell, taste, vision, or hearing; episodes of dizziness or fainting; persistent fatigue; chronic or migraine headaches; chronic pain; developmental conditions such as mental retardation, learning disability, attention deficits or hyperactivity; and cognitive difficulties, e.g., concentration or memory problems, disorientation or becoming lost).

***2) Family Medical/Psychiatric/Substance Use History***

(Hypertension; heart disease; stroke/aneurysm; diabetes; kidney problems/dialysis; asthma/ emphysema; chronic headaches/migraines; cancer/leukemia; and neurological problems, e.g. brain tumor, multiple sclerosis, epilepsy/seizure disorder, Alzheimer's/Parkinson's/Huntington's Disease or other dementia; significant anxiety or depression; suicide attempts; bipolar disorder; schizophrenia; psychiatric treatment or hospitalizations; developmental conditions, e.g., mental retardation, learning disability, attention deficit or hyperactivity disorder; alcohol or drug abuse; and criminal arrests).

***3) Developmental History***

(Place of birth and upbringing; birth complications; status of parents as married, separated, divorced or widowed; current relationships with parents and siblings; history of a learning disorder, attention deficit disorder, hyperactivity, or other behavior disorder; childhood physical or sexual abuse; method of discipline; childhood problems, e.g., developmental delays in walking, talking, reading or learning, significant shyness, stubbornness, poor frustration tolerance, tantrums, crying easily, depression or anxiety, aggression, poor coordination, inattentiveness, disorganization, difficulty finishing projects, prolonged bed wetting, nightmares, difficulty making friends, etc.; adolescent history of physical fights, stealing, vandalizing or writing graffiti, fire setting, curfew violation, arrests, probation, and community service).

***4) Educational/Training History***

(Grade averages in elementary, high school, college, and graduate school; difficulty with school subjects; need for special education classes, tutoring or summer school; significant absenteeism; grade retentions or dropouts; detentions, suspensions, and expulsions; degrees earned; other specialized training, e.g., weapons, CPR, EMT or Paramedic, drug or alcohol counselor, etc.).

***5) Legal/Driving/Financial History***

(Adult history of physical fights, stealing, vandalizing or writing graffiti, fire setting, curfew violation, arrests, probation, and community service; personal or family victimization from a violent crime; lawsuit involvement as plaintiff or defendant; total speeding/parking tickets and number in past five years; other traffic violations; responsible payment of tickets or booting of vehicle; attendance at driving school; driver's license suspension or revocation; DUIs; car accidents; financial aid, e.g., unemployment or worker's compensation benefits, public aid, social security disability, of financial support from family or friends; financial difficulties, e.g., serious debt, creditor involvement, loan default, utilities shut off for nonpayment, foreclosure/property seizure, filing chapter 7, 1 l, or 13, or having wages garnered).

***6) Psychological/Substance Use History***

(Previous psychological evaluations for pre-employment screening or clinical purposes; individual, couple's, or family counseling; prescription of psychotropic medication for a psychological condition; experience of serious depression, anxiety, phobias, mania, persecutory ideation or paranoia, disordered thinking, desire to harm self or others, eating- or sleeping-related difficulties, fatigue, self-esteem problems, periods of stress or feeling overwhelmed; chronic or transient life stressors; methods of alleviating stress; regretted decisions; anger problems; arguments or personality conflicts; impulsivity or poor judgment; risk-taking/thrill-seeking behavior, e.g., driving motorcycles or off-road vehicles and related use of a helmet, bungee jumping, scuba diving, car racing, downhill skiing or snowboarding; gambling; use of tobacco products, illicit drugs, and prescription or over-the-counter medications in ways other than directed; current and past alcohol habits, problems, and tolerance; field sobriety tests).

***7) Social History***

(Current living situation; marital or current relationship status; allegations of physical abuse in intimate relationships; children; death of family members and children; family/friend support of career interests; hobbies).

***8) Vocational/Military/Weapons History***

(Current and past positions civilian and military positions, including agency, position title and duties, full- or part-time status, and reason for leaving; terminations; formal or informal reprimands or disciplinary actions or military reductions in rank; performance evaluations and noted areas for improvement; awards/certifications/ letters of commendation/honors; leadership/supervisory positions; frequency of tardiness and absenteeism; racial or gender difficulties, including being the target of racial discrimination; conflict resolution style; interest in current position; qualities possessed consistent with the position; knowledge of the position requirements and confidence in meeting them; long-term career goals; weapons ownership; comfort with and attitude toward weapons for weapons-carrying positions; training experience/FOlD card possession/discharge vs. drawing weapons for weapons-carrying positions).